Volume 1

Pages 1 - 188

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

WAYMO, LLC                             )
            Plaintiff,                 )
   vs.                                 ) No. C 17-00939 WHA
                                       )
UBER TECHNOLOGIES, LLC., OTTO          )
TRUCKING, LLC, and OTTOMOTTO, LLC,     )
                                       ) San Francisco, California
            Defendants.                ) Wednesday
                                       ) January 31, 2018
_____    ) 7:30 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
**For Plaintiff:**          QUINN, EMANUEL, URQUHART, OLIVER
                             & SULLIVAN, LLP
                            50 California Street
                            22nd Floor
                            San Francisco, California 94111
                    BY:  **CHARLES KRAMER VERHOEVEN, ESQ.**
                         **JORDAN R. JAFFE, ESQ.**
                         **DAVID ANDREW PERLSON, ESQ.**
                         **MELISSA J. BAILY, ESQ.**
                         **DAVID EISEMAN, ESQ.**
                         **ANDREA PALLIOS ROBERTS, ESQ.**
                         **JAMES DUBOIS JUDAH, ESQ.**


                            QUINN, EMANUEL, URQUHART, OLIVER
                             & SULLIVAN, LLP
                            1299 Pennsylvania Avenue, NW
                            Suite 825
                            Washington, DC 20004
                    BY:  **JARED WESTON NEWTON, ESQ.**

         (APPEARANCES CONTINUED ON FOLLOWING PAGE)

*Reported By:*  *Debra L. Pas, CSR 11916, CRR, RMR*
                *Katherine Sullivan CSR 5812, CRR, RMR*
                Official Reporters - US District Court

1   <u>APPEARANCES (Continued)</u>

2

3   For Plaintiffs:          QUINN, EMANUEL, URQUHART & OLIVER
                              & SULLIVAN, LLP
4                            865 South Figueroa Street
                             10th Floor
5                            Los Angeles, California 90017
                       BY:  **DUANE R. LYONS, ESQ.**
6

7

8

    For Defendants:          MORRISON & FOERSTER, LLP
9                            425 Market Street
                             San Francisco, California 94105
10                     BY:  **ARTURO J. GONZÁLEZ, ESQ.**
                            **MICHAEL A. JACOBS, ESQ.**
11                          **ESTHER KIM CHANG, ESQ.**
                            **THOMAS J. PARDINI, ESQ.**
12

13
    For Defendants:          BOIES, SCHILLER AND FLEXNER, LLP
14                           5301 Wisconsin Avenue, NW
                             Washington, DC 20015
15                     BY:  **KAREN LEAH DUNN, ESQ.**

16
                             BOIES, SCHILLER AND FLEXNER, LLP
17                           435 Tasso Street
                             Suite 205
18                           Palo Alto, California 94301
                       BY:  **MICHAEL BRILLE, ESQ.**
19                          **MEREDITH R. DEARBORN, ESQ.**

20

21  For Defendants:          SUSMAN, GODFREY, LLP
                             1000 Louisiana Street
22                           Suite 5100
                             Houston, Texas, 77002
23                     BY:  **JOSEPH S. GRINSTEIN, ESQ.**

24

25          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

```
 1   APPEARANCES:  (CONTINUED)

 2
     For Defendants:          SUSMAN, GODFREY, LLP
 3                            1301 Avenue of the Americas
                              32nd Floor
 4                            New York, New York 10019
                       BY:   WILLIAM CARMODY, ESQ.
 5                           SHAWN RABIN, ESQ.

 6

 7                            SUSMAN, GODFREY, LLP
                              1201 Third Avenue
 8                            Suite 3800
                              Seattle, Washington 98101
 9                     BY:   MATTHEW ROBERT BERRY, ESQ.

10

11

12   Special Master:          FARELLA BRAUN & MARTEL, LLP
                              Russ Building, 30th Floor
13                            235 Montgomery Street
                              San Francisco, California 94104
14                     BY:   JOHN L. COOPER, ESQ.

15

16   Also Present:            DEMARRON BERKLEY

17

18                            ERIC MEYHOFER

19                            TONY WEST

20                                 _   _   _

21

22

23

24

25
```

1                      **P R O C E E D I N G S**

2    **JANUARY 31, 2018**                              **7:30 A.M.**

3                          ---oOo--

4         **THE COURT:**  Okay.  Have a seat.  Let's have our

5    appearances, please.

6         **THE CLERK:**  Calling Civil Action 17-939, Waymo LLC v.

7    Uber Technologies, Inc., et al.

8       Counsel, please state your appearances for the record.

9         **MR. VERHOEVEN:**  Good morning, Your Honor.  Charles

10   Verhoeven.  With me is David Eiseman, Duane Lyons, Melissa

11   Baily, Jordan Jaffe, David Perlson, and our corporate

12   representative sitting at counsel table, Demarron Berkley from

13   Waymo.

14        **THE COURT:**  Welcome to all of you.

15      And?

16        **MR. GONZÁLEZ:**  Good morning, Your Honor.  Arturo

17   González, Mike Jacobs, Esther Kim Chang, from

18   Morrison & Foerster.  I would like to introduce the Court to

19   Tony West, the general counsel for Uber is present.

20        **MR. WEST:**  Good morning.

21        **THE COURT:**  Good morning.

22        **MR. GONZÁLEZ:**  And our client representative, Your

23   Honor, Eric Meyhofer, is the head of the advanced technology

24   group, who is also present.

25        **THE COURT:**  All right.  So welcome to all of you.

PROCEEDINGS

1      And?

2            MR. COOPER:  Good morning, Your Honor.  John Cooper,

3   special master.

4            THE COURT:  Welcome, Mr. Cooper, again.  I wish we had

5   a better seat for you, but I think, for now, you're in as good

6   a place as I can find.

7            MR. COOPER:  The gallery is perfect.  Thank you.

8            THE COURT:  All right.  We're here for the trial.  And

9   we need to pick the jury, of course.  That's what we're going

10  to do today.  And then we'll start with the opening statements

11  on Monday.

12      Before we bring in the venire, is there any business?

13            MR. VERHOEVEN:  Not from us, Your Honor.

14            MR. GONZÁLEZ:  I don't believe so, Your Honor.

15            THE COURT:  All right.  So let's advise the jury

16  office that -- while we're doing that, raise your hand if

17  you're a member of the press.

18      (Show of hands.)

19            THE COURT:  Welcome to all of you.  Thank you.

20      And the members of the public, I know you know this, but,

21  out of caution, I want to tell you this:  Please don't talk to

22  any -- you know, don't rush up to some member of the venire,

23  "Oh, how do you feel about being on this?"  No, that would be

24  improper.  Then I would have to have an evidentiary hearing.  I

25  would have to bring in your employer.  No, don't do that.  You

PROCEEDINGS

1  know better than that.

2      So everyone who's out there in the gallery, you have to

3  respect the role of the jurors.  After the trial is over, you

4  can interview them all you want except as to the alleged trade

5  secrets, but not now.

6      So enough on that.  Of course, the lawyers know better

7  than to do any of that.  I will tell the lawyers -- and the

8  jury at some point -- that if they run into one of you in the

9  elevator that don't be insulted because you say nothing more

10 than "good morning."  I always remember to say that at some

11 point.

12     Okay.  We'll just count dots on the ceiling until they

13 show up.

14     (Laughter.)

15         THE COURT:  Who will be doing the voir dire for the

16 lawyers?

17         MR. GONZÁLEZ:  I will, Your Honor.

18         THE COURT:  All right.

19         MR. VERHOEVEN:  I will for Waymo.

20         THE COURT:  All right.  Good.

21     While we have a moment, since we don't -- I have the

22 following thought on the problem of the corporate

23 representatives we had discussed yesterday.  And that is to

24 give Uber two corporate representatives:  one who is cleared

25 under the protective order, who can stay here for all purposes,

PROCEEDINGS

```
 1   and the other who will go in and out depending on when we're
 2   closing the courtroom.
 3        What's wrong with that?
 4           MR. VERHOEVEN:  That's acceptable to Waymo, Your
 5   Honor.
 6           THE COURT:  All right.
 7           MR. GONZÁLEZ:  That would be fine, Your Honor.
 8           THE COURT:  Okay.  See how smart your judge is?
 9           MR. GONZÁLEZ:  So we don't have to file the briefs
10   anymore?
11           THE COURT:  You don't have to file it if that works.
12   No, it seems to me that that ought to work.
13           MR. GONZÁLEZ:  Thank you.
14           THE COURT:  I was hoping as I drove in, looking at the
15   moon, that I would reach the office and there would be an
16   announcement:  Case settled.
17        (Laughter.)
18           THE COURT:  No.  It was not there.
19        You know that this is the first time in 135 years that
20   there's been a super moon that has had a full total eclipse in
21   North America.  So you've got to go back a long way before you
22   can find that again.
23        We're just a few minutes away from bringing in the venire.
24   I think we're going to bring in 65.  And there will be about 15
25   overflow who will have to stay in the jury assembly room.  I
```

1    don't think we'll need more than 65, but that's the number

2    that -- more than 65 showed up.

3        Oh, one other thing.  You'll notice that we turned the

4    screens away from the jury box.  And you need to keep them that

5    way because it would be a problem if they managed -- the jury

6    managed to see something possibly.

7        And I would alert you to one other thing.  Whoever winds

8    up sitting in the front row -- I'm sorry -- the back row,

9    closest seat, if they have telescopic vision, will be able to

10   see at a very slight angle the witness's screen.

11       We've tried to turn it so that that won't happen, but I

12   don't -- I don't think it's going to be a problem because I

13   don't believe anyone has eyesight that fantastic.  But that's

14   something that we're thinking about.  So if you see it as a

15   problem, let me know.

16       Kevin, what is your last name?

17           **JURY COMMISSIONER:**  Austin.

18           **THE COURT:**  Everyone ought to know, this is our jury

19   administrator.  He's been working hard on this case.  He is

20   bringing us, now, the lists.

21       The list that you will get is in alphabetical order, which

22   is not the order they will be called.  They will be called in a

23   random number.

24           **THE COURT:**  Angie, it's unnecessary that the venire

25   sit in any particular order.  So they can -- and just make

1   sure -- it looks like we've got way more than 65 anyway.

2        (Venire enters courtroom.)

3                          **JURY VOIR DIRE**

4        **THE CLERK:**  Your Honor, we have a panel.  Would you

5   like for me to swear them in?

6        **THE COURT:**  I want to call the case first, and then we

7   will swear them in.

8        Everyone be seated, please.

9        I want to welcome you all to the United States District

10  Court for the Northern District of California.  I thank you for

11  your service today.  It's a large group of you.  You came out

12  early.  This is great.

13       Now, someone just came in.  Is that a member of the

14  venire?

15       **COURT SECURITY OFFICER:**  It's a member of the jury,

16  Your Honor.

17       **THE COURT:**  Member of the jury?

18       **COURT SECURITY OFFICER:**  Yes, sir.

19       **THE COURT:**  Okay.  Again, welcome.  At this time, the

20  clerk will call the case and start the case off right.

21       Please call the case.

22       **THE CLERK:**  Calling Civil Action 17-939, Waymo LLC v.

23  Uber Technologies, Inc., et al.

24       **THE COURT:**  All right.  Appearances, please.

25       **MR. VERHOEVEN:**  Good morning, Your Honor.  Charles

1   Verhoeven on behalf of the plaintiff Waymo.  With me are my

2   partners David Perlson, Jordan Jaffe, Melissa Baily, Duane

3   Lyons, David Eiseman.

4        We also have here Demarron Berkley.  He's from Waymo and

5   will be our corporate representative sitting through the trial.

6        **THE COURT:**  Thank you.

7        And?

8        **MR. GONZÁLEZ:**  Good morning, Your Honor.  Arturo

9   González.  And with me here as representatives of Uber, our

10  client, will be Tony West, the general counsel for Uber.  Eric

11  Meyhofer is the head of the advanced technology group at Uber.

12       My colleagues here at counsel table are Karen Dunn,

13  Michael Jacobs, Mike Brille, Joe Grinstein, Bill Carmody, and

14  Karen Mason.

15       **THE COURT:**  Very well.

16       Now, in addition to Uber, you also represent Ottomotto

17  LLC; correct?

18       **MR. GONZÁLEZ:**  Correct, Your Honor.

19       **THE COURT:**  All right.  Thank you.

20       Okay.  Thank you all for coming out again, on being here

21  early.  I very much appreciate it.

22       I will explain as we go along where we are.  It's just

23  more efficient to do it that way.

24       So the first order of business for you prospective members

25  of the jury to decide this case is to stand up, raise your

1    right hand, and take an oath that all the information that

2    you're about to give us will be the truth and the whole truth.

3           Please stand and the clerk will swear you in.

4           (Oath administered to venire.)

5           **THE COURT:**  Great.  Thank you.  Have a seat.

6    So what we're here today to do is to select a jury of ten

7    people.  So you can see we've got a lot more than ten, but

8    you'll figure out why we need so many as we go along.

9           We need ten of you to serve as the jury in this case that

10   will likely consume February.  And we will start with the

11   evidence on Monday, but today our job is to spend most of the

12   day picking the jury.  So there we are.

13          Now, here's something that I need to say right off the

14   bat.  And I -- I have to say this.  And I love jurors, but I've

15   got to say this.  It concerns using your cell phones or

16   computers to do any kind of research about this case.  That

17   would be a huge no-no.  And I have to give you a direct order

18   not to do that.

19          Let me explain first about this case.

20          On this side of the room, my left, is Waymo.  Now, some of

21   you have never even heard of Waymo.  It's spelled W-a-y-m-o.

22   That's a company.  And they're in the business of trying to

23   develop self-driving cars.  Okay?

24          On this side of the room is Uber and Ottomotto -- that's

25   spelled O-t-t-o-m-o-t-t-o, I guess -- and their lawyers.

 1          And you've all heard of Uber.  They are also in the

 2   business of trying to develop a self-driving car.  But, in

 3   addition, they have that service where somebody will come and

 4   pick you up.

 5          So those are the two sides.  Waymo here, Uber/Ottomotto

 6   there.

 7          Now, you can see we have a number of lawyers.  And, in due

 8   course, those of you who get selected for service will know

 9   every lawyer in here because we'll be in here a long time

10   together.  So you'll just eventually pick up the names of the

11   lawyers.

12          And my name is Alsup, A-l-s-u-p.  I'm the judge in the

13   case, so I'll be here every day with you.  And some of my staff

14   here, which -- like, Angie, whom you've already met, will --

15   you'll get to know them pretty well.

16          Now, right off the bat, I need to give you a direct order.

17   And that is that this is a high-profile case.  There has been a

18   huge amount of publicity about this case already.  And both

19   sides have been waiting a long time to have their day to go at

20   each other here in the U.S. District Court.

21          And that's what they're going to do.  So you're going to

22   get to see some outstanding, famous lawyers in action if you're

23   selected to serve.

24          You will be tempted to get on your cell phone and google

25   their names or google this case.  I would have to hold you in

1    contempt and maybe fine you if you did that.

2         When the case is over, you can google it all you want.

3    Your names may even show up in some of the news articles.  And

4    you are free, after the case is over, to look it up all you

5    want.  Write a book, if you want.

6         But, no, while you're a juror in this case or a

7    prospective juror in this case, you must do what I'm telling

8    you, which is, don't do any research and don't -- about this

9    case or the lawyers.  And don't talk to anyone about the case.

10   Don't receive any information about the case except right here

11   in the courtroom.

12        Now, why is that?  Well, there's a very good reason.  And

13   that is that this is like a laboratory experiment.  During the

14   trial, both sides are going to present their evidence.  And, at

15   the end of the case, your job is to decide who wins based on

16   the evidence here in court, not based on something outside of

17   this courtroom.

18        If we were to find out you did that, we would have to hold

19   you in contempt and then start all over maybe with a new trial,

20   do it all over again because you didn't follow the rules.

21        You can't do that to me or the system or to your fellow

22   jurors.  You must not google, you must not do any of those

23   things.

24        Now, next question, related.  Don't put on Facebook or

25   Instagram or any of those things, "Oh, I'm on the jury."  "Oh,

JURY VOIR DIRE

 1    I'm being considered for the jury."  You know why?  You'll get

 2    42 messages within ten minutes that say, "Oh, good.  I've heard

 3    about that case.  Here's what you should do."

 4         No.  Don't even tell people on Facebook that you are being

 5    considered for this case.  You can see that.  I mean, it's

 6    obvious that you shouldn't do that.  But some of you, that's

 7    your first reaction, especially if you're under age 30, to get

 8    on Facebook and tell the world what you're up to.  It will have

 9    to wait.

10         And now let's say that you have a loved one.  I bet all of

11    you have more than one loved one.  You can't tell them about

12    the case.  You can just say -- you can tell them that you're on

13    a case called Waymo v. Uber.  You can do that much.  But you

14    can't talk with them about the case because they might try to

15    influence you.  And they're not under oath.  They're not on the

16    jury.  They haven't been selected.

17         When the case is over, you can google it all you want, but

18    not now.

19         Now, in addition, I want you to know how good these

20    lawyers are.  They have agreed that they won't do what lawyers

21    usually do in trials, which is they would try to go on your

22    Facebook page and find everything about you so they can figure

23    out if they want you on the jury or not.  That happens in many

24    trials.

25         These very good lawyers have promised me they will not do

1   that.  They're going to respect your privacy.  They are not

2   going to try to do Google searches on you or figure out what

3   you say on Facebook or Instagram or any of those things.

4        Now, after the trial is over, just like you will be free

5   to do that, they will be free then.  So if you were to violate

6   my orders, they could figure it out after the fact and then

7   make a motion for a new trial.  And then you'd see I would have

8   to call you in here and get you to testify under oath.  You'd

9   have to have a lawyer.  You don't want to put me in that

10  position.  No.  Just do it the right way.

11       But be aware, these lawyers, just like you're going to

12  respect the system, they're going to respect your privacy.

13  And, that way, it's kind of an even playing field.

14       I do have to say one thing.  There are going to be

15  newspaper people, media people here.  There are some right here

16  in the courtroom now.  And I can't control them.  So they will

17  be free to go onto your Facebook page and figure out your

18  background and so forth.  But I can't control them.

19       So if -- at one of our breaks, if you want to go on

20  Facebook and change your privacy settings -- you know what

21  those are? -- your privacy settings so that the press can't

22  snoop on you, there's something called friends of friends,

23  which -- which goes to about 10 billion people in the world.

24  So maybe one of those press people is a friend of a friend and

25  they can find out all about you.  So, please, it's up to you.

JURY VOIR DIRE

1   I don't care whether you change your privacy settings or not;

2   I'm just giving you a heads-up.

3       All right.  I didn't mention texting or anything.  Please,

4   I don't just mean Google.  I mean don't send texts, don't email

5   with anyone, no emails, no verbal.  If you're selected on this

6   case, you've got to stay pure so that you decide the case just

7   based on what's here in the courtroom.  Okay.

8       So you know what I managed to not bring up here -- maybe

9   one of the lawyers can hand it up to me -- is that one-page

10  statement of the case.  Does anybody have that?

11          **MR. EISEMAN:**  I think I should have it.

12          **THE COURT:**  Otherwise, I'll have to do it from memory,

13  which I'm happy to do.

14      Thank you, Mr. Eiseman.

15      All right.  So I want to tell you what this case is about.

16  I'm going to kind of do it my own way here.

17      So if you're a prospective member of the jury, just raise

18  your hand if you've ever heard about something called trade

19  secrets.

20      (Show of hands.)

21          **THE COURT:**  Okay.  There you go.

22      Okay.  Good.  Well, that's what this case is about,

23  alleged trade secrets.  And the Waymo side is contending that

24  the Uber side stole the Waymo trade secrets, specifically,

25  eight of them.

 1          Now, are they actually trade secrets?  Well, that's what

 2     the jury is going to have to decide.  It may turn out that

 3     there are trade secrets; it may turn out that they're not trade

 4     secrets.  That's one of the issues for the jury.

 5          But, in addition, assuming they are trade secrets, then

 6     the allegation is that this side of the room stole them to use

 7     in its own self-driving car program.

 8          That's the case right there.  However, it's going to take

 9     us a long time to go through all the evidence.

10          Of course, this side of the room vehemently denies that

11     they stole anything.  So let's make that very clear.  This side

12     is vehement they did steal, and this side is vehement they did

13     not steal.  And they also say, by the way, these aren't trade

14     secrets anyhow.  But those are kind of the issues.

15          Now, if you the jury were to find that there is liability

16     for stealing trade secrets, then we would get into the issue of

17     damages and how much money should be awarded.  That would be

18     another question for the jury to decide.

19          Okay.  Anybody want to add or subtract from what I just

20     said?

21               **MR. GONZÁLEZ:**  No, Your Honor.

22               **MR. VERHOEVEN:**  No.

23               **THE COURT:**  Great.  Good.

24          Now, what we're going to do today is pick the jury.  And

25     to help move this along as expeditiously as we can, we're going

 1   to hand out to you right now a questionnaire.  It's short,

 2   mercifully short.  It will take you about 10 to 15 minutes max

 3   to fill this in.  But it will be under oath.  You've got to be

 4   accurate.  You have to be honest and accurate.  I know you all

 5   will be.  Even though this is going to take up to 15 minutes, I

 6   have a feeling that this will save us an hour of time, maybe

 7   two hours of time, as the day goes on.

 8        So just bear with us.  And now Angie and my law clerk are

 9   going to hand out the -- a clipboard with the questionnaire on

10   it.

11        Now, it's a front-and-back thing.  The questionnaire

12   continues on the back.  So be sure you fill in both sides.

13        And there is a list of potential witnesses.  If you know

14   any of those, you need to circle those names of the ones you

15   think you might know.

16        Now, when you're done, just keep it in your lap so, when

17   you are called upon later, then we'll get your questionnaire at

18   that time.  So take your time, answer the front and the back,

19   and then circle the witnesses you know.

20        And just so you won't panic, there's no way we're going to

21   have all of those people as witnesses.  So I've asked the

22   lawyers, please be extra careful and put everyone that you can

23   possibly think of that might be a witness down.  So we won't

24   have that many witnesses, but, out of caution, you have a long

25   list.

```
 1        So there you go.  We're all going to sit here in silence

 2   while you work on that questionnaire.

 3        (Pause in proceedings.)

 4        THE COURT:  Just to find out, raise your hands if

 5   you're still working on the questionnaire.

 6        (Show of hands.)

 7        THE COURT:  Okay.  We have a few.  Okay.  Please

 8   continue working on the questionnaire.

 9        (Pause in proceedings.)

10        THE COURT:  How about now?  Anyone still working on

11   the questionnaire?

12        (Show of hands.)

13        THE COURT:  All right.  We've got a couple more still

14   working.  Please continue.

15        (Pause in proceedings.)

16        THE COURT:  Okay.  How about now?  All done?  Raise

17   your hand if you still need time.  I'm sorry.  Keep your hand

18   up if you're still working on it.  Okay.  One left.  Okay.  I

19   think I just saw one hand go up.  So raise your hand when

20   you're done, please.

21        (Pause in proceedings.)

22        THE COURT:  Okay.  Everyone done with the

23   questionnaire?  Anyone still working on it?  Anyone still

24   working on the questionnaire?

25        Looks like everyone is done now.  Wait.  Okay.  I think
```

 1  everyone is now completed.

 2      Okay.  Good.  So just to clarify, I said you couldn't look

 3  up anything about the lawyers or this case.  That includes me.

 4  Don't look up anything about me, because if you look at

 5  anything about me, you're going to wind up seeing a lot of hits

 6  on this case.  So that's not good either.

 7      All right.  Does anyone here have the flu, a bad cold,

 8  bronchitis, prone to hacking and coughing?  If so, raise your

 9  hand.

10      (Show of hands.)

11          THE COURT:  Okay.  The first person, come down here.

12  I need to put -- you're under oath.  I need to examine you.

13      Yes, you.

14      Come up to the lectern here.  And don't give me your

15  questionnaire yet, just tell me your name.

16          PROSPECTIVE JUROR FOX:  My name is Henry Fox.

17          THE COURT:  Henry Fox.  So what's your situation

18  healthwise?

19          PROSPECTIVE JUROR FOX:  So I work at a restaurant.  I

20  think -- I'm not a hundred percent sure if I got it from there

21  or not, but --

22          THE COURT:  You have a disease?

23          PROSPECTIVE JUROR FOX:  I had --

24          THE COURT:  What do you have?

25          PROSPECTIVE JUROR FOX:  -- a cold or a flu.  I'm not

 1   sure exactly what it was.

 2           THE COURT:  Do you have a fever?

 3           PROSPECTIVE JUROR FOX:  I did.

 4           THE COURT:  How long ago?

 5           PROSPECTIVE JUROR FOX:  Just, like, two or three days

 6   ago.  I'm kind of coming out of it now, but --

 7           THE COURT:  I'm going to excuse him unless I hear an

 8   objection.

 9           MR. GONZÁLEZ:  No objection, Your Honor.

10           MR. VERHOEVEN:  No objection.

11           THE COURT:  You can go back to the jury assembly room.

12   Tell them you were excused on account of you may have the flu.

13   I don't want anybody on the jury who will get the other jurors

14   sick.

15       Who else raised their hand, please?

16       Please come forward, and give us your name first.

17           PROSPECTIVE JUROR KRUEGER:  Richard Krueger.

18           THE COURT:  Who?

19           PROSPECTIVE JUROR KRUEGER:  Richard Krueger.

20           THE COURT:  What's your situation?

21           PROSPECTIVE JUROR KRUEGER:  Just have a hacking cough.

22   You can probably hear it, a hacking cough.  I haven't got it

23   officially checked out yet, though.

24           THE COURT:  Give this to Mr. Krueger.

25           PROSPECTIVE JUROR KRUEGER:  Thank you.

 1              **THE COURT:**  However, I'm going to excuse you unless I

 2    hear an objection.

 3        Who was that that just hacked and coughed over there?

 4        (Laughter.)

 5              **THE COURT:**  We don't do that.

 6        Okay.  Any objection?

 7              **MR. GONZÁLEZ:**  No objection.

 8              **MR. VERHOEVEN:**  No objection.

 9              **THE COURT:**  All right.  You get to go too.

10        Now, you other members of the jury, you're wondering, why

11    am I being so lenient?  This is a long trial as trials go.  I

12    cannot afford to have you get sick.  Then we have a delay.  So

13    I don't want anybody even in here -- I should have asked

14    sooner -- who's sick or who could -- I don't even want you

15    worrying about it, that you might get sick.

16        Okay.  Who else is a hacker and a cougher, somebody who

17    has flu, maybe has the flu?  Please raise your hand.

18        Okay.  Nobody.  That's great.  What a healthy group.

19        How about this:  At home, is there somebody at home who

20    definitely is sick and you might get it?  Anybody in that

21    category?

22        (Show of hands.)

23              **THE COURT:**  All right.  For the time being, I'm going

24    to let you stay where you are, but remind me that that might be

25    a problem if you get called forward.  Okay?

```
 1          All right.  Great.  Let me give you the schedule of the
 2   case.  And the -- we'll start -- we'll be here most of the day.
 3   I'm going to say at least until 2 o'clock, and we might be here
 4   until later today.  It could be it will go faster than that.
 5   Sometimes we have the jury selected by 11:00 a.m.; sometimes it
 6   takes longer.  So we just have to see.
 7          But we will start on Monday morning with the -- with the
 8   opening statements by these excellent lawyers.  And then we'll
 9   get right into the first witness or two, three.  And we'll be
10   off and running.
11          And then we will go every Monday through Friday, all the
12   way through until possibly March 2nd.  And we'll have one day
13   off, which is President's Day, which I believe is 19 --
14   February 19.  That's a Monday.
15          So you, if you're on the jury, have to be here by
16   7:45 a.m.  The lawyers will be here much earlier.  We'll be in
17   here working, trying to smooth out the problems for the day so
18   that the evidence goes smoothly for you.  So they'll be here
19   even earlier.
20          But you need to be here by 7:45.  And then we start by
21   8 o'clock at the latest with the evidence, and then we run
22   until 1:00 o'clock each day.  And then you get to go home at
23   1:00 o'clock.
24          I heard somebody hacking and coughing back there.
25          (Laughter)
```

JURY VOIR DIRE

```
 1              THE COURT:  So let's focus on that now because you

 2    have to be here that whole time, 7:45 to 1:00, all of those

 3    days.  And then when we deliberate -- when you deliberate, you

 4    can go later than that if you wish, and most jurors do --

 5    juries do.

 6          So, for example, sometimes the jury can wind up a case if

 7    they just go a couple more hours, so they decide to go to

 8    4 o'clock.  So that's up to the jury.

 9          Now, if you're on the jury, you have to be here that whole

10    time.  Think about it.  You have to be here.  This is not like,

11    when you miss class, you can read somebody else's notes.  No.

12          The law requires you to be here to see the witnesses for

13    yourself, hear them for yourself, evaluate the evidence for

14    yourself.  And we can't start.

15          So I've had a number of times -- I shouldn't say a number

16    of times.  Thankfully it's only been -- in 19 years, it's only

17    been maybe four or five times where a juror is late, and we and

18    the lawyers sit out here.  We count the dots on the ceiling

19    until everyone's here.

20          Let's say we got ten people and one is late and nine

21    jurors are sitting in the jury room counting the dots while we

22    wait for that one juror who may be stuck in traffic.  So you've

23    got to get up early enough to be here by 7:45, taking into

24    account the risks of traffic and weather.  So that's a burden.

25          And I -- one of the most rewarding things about my job is
```

```
 1   for me to see over and over again the tremendous public service
 2   of our jurors who make that sacrifice.  And they're doing it
 3   for their country.  They're not doing it just to hear the
 4   lawyers, as good as they may be.  They are doing it for the
 5   United States.
 6        And I thank you in advance for that because I -- it means
 7   a great deal to me.  It's -- one of the rewards of this job is
 8   to see it time and time again, but it is a burden.  It is a
 9   huge burden, a sacrifice.
10        Now, all of you have said in a questionnaire that we sent
11   out earlier that you're available for that time period.  But I
12   will give you another chance.  If something has come up that
13   you don't want to serve on this case because it would be a
14   hardship, I will hear you out on that.  So please don't panic
15   if you're in that category.  You'll get a chance to make your
16   points.
17        All right.  So do you have in mind the schedule?
18        I want to say, these lawyers told me the case could be
19   done in -- will be done in two weeks.  That's what they told
20   me.  Two weeks?  Two weeks.  That's what they said.  And they
21   both have time limits.  I won't tell you what the limits are,
22   but one of the things I get to do is keep track of how much
23   time they used.  And when the time runs out, the time runs out.
24   And then you get to decide the case.
25        So, nevertheless, out of caution and because I kind of
```

1    think that they may not be accurate in their estimates, I'm

2    going to say we're going to go all the way through March 2nd.

3    Probably the odds are pretty good that it will be done well

4    before March 2nd, but I can't promise you that so early in the

5    case.

6         All right.  I hope I made all that clear, and I will

7    now -- we're going to start with the process.

8         Again, we're going to select 10 of you.  And the way we do

9    this is we call forward 16 of you, and we will put 16 of you

10   over there in the jury box.  It's actually 14 plus those 2

11   seats right there.  And then we're going to ask you some

12   questions.

13        And as time goes on, I know a number of you will be

14   excused and we'll have to keep filling in until we finally get

15   16 that are passed for cause, meaning that there's no good

16   cause to strike them from the jury.

17        And then the lawyers get to exercise three challenges each

18   to knock out anyone they -- you know, don't like the way they

19   tie their shoelaces, and so they get to knock them off the

20   jury.

21        And then we'll have -- 16 minus 3 minus 3 is the magic

22   number, 10.  Then we swear that jury in, and that will be it.

23        Now, once you're sworn in, you cannot get off.  It's like

24   being drafted into the Army.  You can't say, "Oh, wait a

25   minute.  I don't want to serve in the Army."  No.  Once you're

JURY VOIR DIRE

 1   on the jury and sworn in, it's too late.  You are stuck.  So

 2   you cannot -- you're in for the duration at that point.

 3       So anything you want to tell us beforehand, you've got to

 4   say beforehand.  You can't hold it back and say, after you get

 5   selected, thinking, "Oh, they'll never select me," yes, they

 6   will.  And then you'll say, "Oh, wait a minute.  Wait."  It's

 7   too late.

 8       So there we are.

 9       All right.  So what we're going to do now is see how this

10   works.  If your name is called, come forward.  And then we will

11   just take it from there.

12       So, Angie, call the first -- these are randomly selected,

13   by the way.  That's the way we do it, with a computer and a

14   random number generated.  Okay.

15           **THE CLERK:**  Tracey Nash.  N-a-s-h.

16           **THE COURT:**  Okay.  Please come forward.

17           **PROSPECTIVE JUROR NASH:**  Up here?

18           **THE COURT:**  Yes.  Come right here and hand us your

19   questionnaire.  Hand it to Angie, and just stand right there

20   for a second.

21       All right.  Counsel, by our prior agreement, Ms. Nash is

22   excused.  All right.

23       Thank you.

24           **PROSPECTIVE JUROR NASH:**  Thank you.

25           **THE COURT:**  All right.  Just so you all out there will

 1   know, the lawyers have agreed with me and, as a concession to

 2   the shortness of life, that there are some answers on here that

 3   will be automatic exclusions.

 4        So don't go back and try to change anything.

 5        (Laughter)

 6        THE COURT:  You won't get that past me.

 7        Nevertheless, call the last name.

 8        THE CLERK:  Darci Bowen, B-o-w-e-n.

 9        THE COURT:  The jurors should not have been seated in

10   the order in which they're going to be called, Angie.

11        All right.  So we'll fix that later.  But for the future,

12   remember that.

13        Now, counsel, remind me, we had three questions that were

14   the automatic exclusion thing; right?  Is that correct?

15        MR. VERHOEVEN:  Yes, Your Honor.

16        MR. GONZÁLEZ:  Yes.

17        THE COURT:  Okay.  So you get to go have that first

18   seat there, Ms. -- Bowen; right?

19        PROSPECTIVE JUROR BOWEN:  Yes.

20        THE COURT:  Okay.  That's seat number 1 right there.

21   Thank you.

22        THE CLERK:  Roger Brown, B-r-o-w-n.

23        THE COURT:  How are you today?

24        PROSPECTIVE JUROR BROWN:  I'm good.  How about you?

25        THE COURT:  I'm good.

```
 1        All right.  For the time being, Mr. -- Brown?

 2            PROSPECTIVE JUROR BROWN:  Brown, yes.

 3            THE COURT:  Welcome.  Please have a seat over there by

 4   Ms. Bowen.

 5            THE CLERK:  Andrew William Harris.  H-a-r-r-i-s.

 6            THE COURT:  Mr. Harris, how are you today?

 7            PROSPECTIVE JUROR HARRIS:  I am well.  Thank you.

 8            THE COURT:  I have to excuse you under our ground

 9   rule.  Thank you.  Go back to our jury assembly room and tell

10   them what happened.  Thank you.

11        Next?

12            THE CLERK:  Jacquelyn Marshall, M-a-r-s-h-a-l-l.

13            THE COURT:  Thank you.  How are you today?

14            PROSPECTIVE JUROR MARSHALL:  I'm doing swell.

15            THE COURT:  Great.  Ms. Marshall, welcome.  Please

16   have a seat over there in the third seat.  Thank you.

17        Next?

18            THE CLERK:  May Pho, P-h-o.

19            THE COURT:  How are you today?

20            PROSPECTIVE JUROR PHO:  I am good.  How are you?

21            THE COURT:  Very good.  Thank you.

22        Are we saying your name right, Pho?

23            PROSPECTIVE JUROR PHO:  Yes.

24            THE COURT:  Ms. Pho, have a seat in that fourth seat,

25   please.  Thank you.
```

```
1              THE CLERK:  Helen Bisbee, B-i-s-b-e-e.

2              THE COURT:  Good morning.

3         PROSPECTIVE JUROR BISBEE:  Good morning.  How are you?

4              THE COURT:  Excellent.  And you?

5         PROSPECTIVE JUROR BISBEE:  Blessed.

6              THE COURT:  All right.  Is it -- I just can't read

7    very well.

8              PROSPECTIVE JUROR BISBEE:  Bisbee.

9              THE COURT:  Bisbee.  Ms. Bisbee, you get seat

10   number 5.  Thank you.

11      Okay.  Next?

12             THE CLERK:  Jonathan Levin, L-e-v-i-n.

13             THE COURT:  Good morning.

14        PROSPECTIVE JUROR LEVIN:  Good morning.

15             THE COURT:  Mr. Levin, you get to have that next seat

16   there, please.

17             THE CLERK:  Kelly Collard, C-o-l-l-a-r-d.

18             THE COURT:  Good morning.

19        PROSPECTIVE JUROR COLLARD:  Good morning.

20             THE COURT:  Collard?

21        PROSPECTIVE JUROR COLLARD:  Collard.

22             THE COURT:  Collard.  Please have a seat over there.

23   Thank you.

24             THE CLERK:  Mary Bazigos, B-a-z-i-g-o-s.

25             THE COURT:  How are you today?
```

```
 1              PROSPECTIVE JUROR BAZIGOS:  I'm fine.  Thank you.

 2              THE COURT:  Good.  There should be a second page.

 3              PROSPECTIVE JUROR BAZIGOS:  Oh, yes.  The second page,

 4   yes.

 5              THE COURT:  The one with all the -- let's see.

 6   Thanks.

 7         I'm sorry.  Not yet.  Not yet.

 8         So under our ground rules, Ms. --

 9              PROSPECTIVE JUROR BAZIGOS:  Bazigos.

10              THE COURT:  -- Bazigos, I have to excuse you.

11              PROSPECTIVE JUROR BAZIGOS:  Thank you.

12              THE COURT:  All right.  Go back to the jury assembly

13   room and tell them what happened.

14         Okay.  Next?

15              THE CLERK:  Gregory Regelman, R-e-g-e-l-m-a-n.

16              THE COURT:  Good morning, Mr. Regelman.

17              PROSPECTIVE JUROR REGELMAN:  Good morning.

18              THE COURT:  How are you today?

19              PROSPECTIVE JUROR REGELMAN:  Good.  Thank you.

20              THE COURT:  Okay.  Please go have -- you see that seat

21   that's sitting -- kind of sticking out?  It's just a make-do

22   thing, but it's temporary.  That's your seat for the time

23   being.  All right.  Have that.

24         And I need to have my law clerk come up here, now that we

25   have the front row filled in.  And these will be copied -- you
```

 1    know the rules.  Each side is going to get a copy.

 2         Right there, please.

 3         All right.  Next -- next name?

 4              THE CLERK:  Mikelle Mancini, M-a-n-c-i-n-i.

 5              THE COURT:  Good morning, Ms. Mancini.

 6              PROSPECTIVE JUROR MANCINI:  Good morning.

 7              THE COURT:  Please go to the jury assembly room.  I'm

 8    excusing you.

 9              PROSPECTIVE JUROR MANCINI:  Thank you.

10              THE COURT:  All right.

11              THE CLERK:  Steve Perazzo, P-e-r-a-z-z-o.

12              THE COURT:  How are you today, Mr. Perazzo?

13              PROSPECTIVE JUROR PERAZZO:  Good.  Thank you.

14              THE COURT:  Okay.  You may take that first seat in the

15    back row of the jury box.  Thank you.

16              PROSPECTIVE JUROR PERAZZO:  Thank you.

17              THE CLERK:  Jenna Magat, M-a-g-a-t.

18              THE COURT:  Good morning.

19              PROSPECTIVE JUROR MAGAT:  Good morning.

20              THE COURT:  Are we saying your name right?

21              PROSPECTIVE JUROR MAGAT:  Yes.

22              THE COURT:  Ms. Magat, please have the next seat over

23    there in the jury box.  Thank you.

24              THE CLERK:  Thomas Lombard, L-o-m-b-a-r-d.

25              THE COURT:  Lombard.

1          Mr. Lombard, how are you today?

2              **PROSPECTIVE JUROR LOMBARD:**  Fine, sir.

3              **THE COURT:**  Great.  Please have that next seat.

4              **THE CLERK:**  Kathryn Buccellato, B-u-c-c-e-l-l-a-t-o.

5              **THE COURT:**  Good morning.

6              **PROSPECTIVE JUROR BUCCELLATO:**  Good morning.

7              **THE COURT:**  How do you say your last name?

8              **PROSPECTIVE JUROR BUCCELLATO:**  Buccellato.

9              **THE COURT:**  Buccellato.  Okay.  Ms. Buccellato,

10  welcome.  Please have that next seat.

11             **THE CLERK:**  Alexander Alvarado, A-l-v-a-r-a-d-o.

12             **THE COURT:**  Good morning.

13             **PROSPECTIVE JUROR ALVARADO:**  Good morning.

14             **THE COURT:**  Alvarado; right?

15             **PROSPECTIVE JUROR ALVARADO:**  That's right.

16             **THE COURT:**  Under our ground rules, Mr. Alvarado, I

17  have to excuse you.  Please go back to the jury assembly room.

18             **THE CLERK:**  Reinacarol Oldan, O-l-d-a-n.

19             **THE COURT:**  Good morning.

20             **PROSPECTIVE JUROR OLDAN:**  Good morning.

21             **THE COURT:**  How do you say your last name?

22             **PROSPECTIVE JUROR OLDAN:**  Oldan.

23             **THE COURT:**  Oldan?

24             **PROSPECTIVE JUROR OLDAN:**  Uh-huh.

25             **THE COURT:**  Please, Ms. Oldan, have that next seat.

```
 1    Thank you.

 2              THE CLERK:  Robert Helling, H-e-l-l-i-n-g.

 3              THE COURT:  How are you today?

 4              PROSPECTIVE JUROR HELLING:  Good.  Thanks.

 5              THE COURT:  How do you say that?  Helling?

 6              PROSPECTIVE JUROR HELLING:  Helling, just like it

 7    looks, yeah.

 8              THE COURT:  Helling.  Have that next seat.  Thank you.

 9              THE CLERK:  Christopher Meyers, M-e-y-e-r-s.

10              THE COURT:  Mr. Meyers, how are you today?

11              PROSPECTIVE JUROR MEYERS:  Good.

12              THE COURT:  Great.  Please have that next seat.

13              THE CLERK:  Stephanie Di Domenico,

14    D-i D-o-m-e-n-i-c-o.

15              THE COURT:  Good morning.

16              PROSPECTIVE JUROR DI DOMENICO:  Good morning.

17              THE COURT:  Di Domenico?  Is that it?

18              PROSPECTIVE JUROR DI DOMENICO:  That's it.

19              THE COURT:  Great.  Please, there's one more seat over

20    there that's kind of out in the aisleway.  And I apologize.

21    That's only temporary.

22         Do you see where I'm talking about?

23              PROSPECTIVE JUROR DI DOMENICO:  It's got a cushion.

24    I'm good.

25         (Laughter)
```

1          **THE COURT:**  Okay.  I need my troops to come get this,

2   please.  Now, make sure we're copying both sides.

3          **LAW CLERK:**  Yes, sir.

4          **THE COURT:**  Now, while I -- oh, Di Domenico.

5       Now, I did say I would ask you if you had any hardship.

6   You all have in mind how long you would have to serve and how

7   many days.  It's every day.  You can't just pick and choose.

8   You have to be here each day.  And if you're late, we have to

9   wait.  We can't have any proceedings until you're here.  The

10  reason for that is, you can see why, the jury has to decide --

11  has to decide the case.

12      So all of you have to hear the evidence and the arguments

13  and the opening statements.  So it's important that you be able

14  to promise me you're going to be here.

15      Now, knowing the commitment of time, starting next Monday

16  and running through possibly as late as March 2nd, and with

17  that one day off, President's Day, do any of you wish to raise

18  a hardship issue with me?  And we'll talk about it now.

19      (Show of hands.)

20         **THE COURT:**  Okay.  We've got a couple of hands go up.

21  Okay.  On the front row, it's Mr. Levin.

22      Mr. Levin, we're going to hand you a microphone.  Why

23  don't you say your name into it so we can make sure it works.

24         **PROSPECTIVE JUROR LEVIN:**  Jonathan Levin.  I go by

25  John.

```
 1            THE COURT:  Keep it right there so we can hear your

 2    voice.

 3        So, Mr. Levin, what's your situation?

 4            PROSPECTIVE JUROR LEVIN:  I work at PG&E.  And I'm

 5    managing two programs, one for vendor safety or contractor

 6    safety, the other one vendor risk.  And there aren't backups

 7    for the roles that I fill in managing these.  The contractor

 8    safety is the result of a CPUC order investigating -- or an

 9    investigation by the safety enforcement division.

10        On top of that, I am completing a year of training to get

11    certified as a coach.  And I just scheduled two clients during

12    the day on Friday.  So getting off at 1:00, there might be a

13    possibility of rescheduling, yet it's going to be a lot of

14    shifting and shuffling to make everything work.

15        And with my work, I'd have to be working after hours to

16    cover bases.

17            THE COURT:  Okay.  Hang on a second.  What was that

18    second thing about a coach?

19            PROSPECTIVE JUROR LEVIN:  I've been taking classes.

20    And as a result of completing the curriculum, I have to work

21    live with clients, and I have clients scheduled on Fridays

22    during the day.  So I would have to reschedule them.

23            THE COURT:  What kind of coach?

24            PROSPECTIVE JUROR LEVIN:  Right now, this curriculum

25    is narrative health coaching, yet I actually had an intention
```

 1   towards career and life and all of the requirements within a

 2   coaching curriculum to meet the requirements for the

 3   International Coaching Federation.  So I just happen to know

 4   the person that was offering this -- this program.  So he

 5   offered it.  And I said, "Sure.  I'd like to take your

 6   curriculum."

 7           THE COURT:  All the time, we get -- on your first

 8   problem -- well, it sounds like if you get off at 1:00 o'clock,

 9   your second problem, you can manage.

10           PROSPECTIVE JUROR LEVIN:  I'm thinking I can try.

11           THE COURT:  All right.  So let's concentrate on your

12   first one.

13       We get people with important jobs.  School teachers are a

14   good example.  School teachers have to serve even though it's

15   going to hurt the kids.  So you -- you being here, it's going

16   to hurt PG&E.  But it's a big company.  They can survive;

17   right?

18           PROSPECTIVE JUROR LEVIN:  It's hard to believe out of

19   22,000 employees, I'm the only important one.  I get that.

20       (Laughter.)

21           THE COURT:  I'm going to think about it, but I -- I'm

22   inclined to say -- I'm sympathetic, especially these days with

23   that investigation that's going on.  They may need you.  But

24   I -- I want to think about that.  And, right now, I'm inclined

25   to say that's not a good enough reason.

```
 1           PROSPECTIVE JUROR LEVIN:  Okay.  I consider it an

 2    honor to be here and, you know, will work to do what I can in

 3    the off hours, et cetera.  It's just presenting.

 4           THE COURT:  Thank you.

 5           PROSPECTIVE JUROR LEVIN:  Thank you.

 6           THE COURT:  All right.  Who else raised their hand

 7    back there?

 8        And that's Ms. Olden; right?

 9           PROSPECTIVE JUROR OLDAN:  Yes.

10           THE COURT:  Ms. Oldan, what's your situation?

11           PROSPECTIVE JUROR OLDAN:  I'm a student, and I have

12    classes Mondays and Wednesdays.  And missing three classes, I

13    would have to get dropped.  And I am already missing today.

14           THE COURT:  You're a student?

15           PROSPECTIVE JUROR OLDAN:  Yes.

16           THE COURT:  Where are you a student?

17           PROSPECTIVE JUROR OLDAN:  At Contra Costa College in

18    San Pablo.  And I have classes Mondays, Wednesdays from 8:00 to

19    12:00 in the morning.

20           THE COURT:  Why didn't you say that in your

21    questionnaire?

22           PROSPECTIVE JUROR OLDAN:  Well, I answered it last

23    year when -- when I got the mail.  But I wasn't really planning

24    on going to school, and I just applied really late.

25           THE COURT:  So you're literally in -- not literally,
```

1   but you're actually enrolled right now in college?

2          PROSPECTIVE JUROR OLDAN:  Yes.  We just started last

3   week.

4          THE COURT:  And you have classes scheduled when?

5          PROSPECTIVE JUROR OLDAN:  Monday and Wednesdays from

6   8:00 to 12:00.

7          THE COURT:  This week and next week?

8          PROSPECTIVE JUROR OLDAN:  Yes.  Correct.

9          THE COURT:  And you're missing out today?

10         PROSPECTIVE JUROR OLDAN:  Yes.

11         THE COURT:  Listen, that's an automatic for me.  Under

12   the law, you get excused.  We don't want you to flunk out.

13         PROSPECTIVE JUROR OLDAN:  Thank you.

14         THE COURT:  Any objection to excusing Ms. Oldan?

15         MR. VERHOEVEN:  No, Your Honor.

16         MR. GONZÁLEZ:  No.

17         THE COURT:  All right.  Hand the microphone back down,

18   and you go back to the jury assembly room with my thanks.  All

19   right?

20      Okay.  Before we -- okay.  Did someone else want to raise

21   their hand?  You didn't raise your hand a while ago.

22         PROSPECTIVE JUROR BISBEE:  Well, I did, but --

23         THE COURT:  All right.  Go ahead.  Tell me your

24   situation.

25         PROSPECTIVE JUROR BISBEE:  Well, I --

1          THE COURT:  Wait a minute.  Wait a minute.  Got to

2     have your name.

3          PROSPECTIVE JUROR BISBEE:  My name is Helen Bisbee.

4          THE COURT:  Ms. Bisbee.

5          PROSPECTIVE JUROR BISBEE:  I got hired yesterday and

6     starting a new job next Monday.  And next Wednesday is my

7     birthday, so we already got plans for that.

8          THE COURT:  We'll get you a cake.

9          PROSPECTIVE JUROR BISBEE:  No.

10      (Laughter.)

11          THE COURT:  What about your job now?

12          PROSPECTIVE JUROR BISBEE:  It's starting next Monday.

13          THE COURT:  Has this company got jury service?  Do

14     they pay you for jury service?

15          PROSPECTIVE JUROR BISBEE:  I did mention that to her.

16     She said, "I hope you don't get selected, Ms. Bisbee."

17          THE COURT:  What's the name of your employer?

18          PROSPECTIVE JUROR BISBEE:  It is the home care for

19     senior care in Brentwood.

20          THE COURT:  Home care for senior care.  And what are

21     you going to be doing for them?

22          PROSPECTIVE JUROR BISBEE:  I'm companionship to

23     seniors.

24          THE COURT:  All right.  Is there a union at that

25     company?

JURY VOIR DIRE

```
 1           PROSPECTIVE JUROR BISBEE:  No, it's not a union.

 2           THE COURT:  Do they give you jury service pay?

 3           PROSPECTIVE JUROR BISBEE:  No.

 4           THE COURT:  Would it be a hardship for you to serve on

 5   this jury and have to postpone your employment?

 6           PROSPECTIVE JUROR BISBEE:  Yes, it would be.

 7           THE COURT:  Why would that be?

 8           PROSPECTIVE JUROR BISBEE:  Because a lot of things I

 9   have to pay out, I have to do.

10           THE COURT:  And you're starting this job on Monday?

11           PROSPECTIVE JUROR BISBEE:  On Monday.

12           THE COURT:  Full-time?

13           PROSPECTIVE JUROR BISBEE:  No, just part-time.

14           THE COURT:  What time?

15           PROSPECTIVE JUROR BISBEE:  Starts from 7:00 a.m., 12

16   hours, 7:00 a.m. to 7:00 p.m.

17           THE COURT:  7:00 a.m. to 7:00 p.m.

18           PROSPECTIVE JUROR BISBEE:  Uh-huh.

19           THE COURT:  That's 12 hours.

20           PROSPECTIVE JUROR BISBEE:  Right.  Three days a week:

21   Monday, Tuesday, Wednesday.

22           THE COURT:  All right.  Ms. Bisbee, I'm going to think

23   about it.

24       Who else was raising their hand after the fact over there?

25       Okay.  Let's give it to Ms. Pho.  Ms. Pho -- oh, wait.
```

1   You got the microphone, Ms. Collard.

2           **PROSPECTIVE JUROR COLLARD:**  Yeah.

3           **THE COURT:**  What's your situation?

4           **PROSPECTIVE JUROR COLLARD:**  I am -- my 84-year-old

5   mother lives with me.  I'm her sole caretaker.  So if all goes

6   well, it's not a hardship.  But if she gets sick, I am

7   responsible for caring for her.

8           **THE COURT:**  Is there anyone else who could step in, in

9   a pinch?

10          **PROSPECTIVE JUROR COLLARD:**  Possibly.

11          **THE COURT:**  What are the odds that your mom, in the

12  next four weeks, will need attention?

13          **PROSPECTIVE JUROR COLLARD:**  It's really hard to say.

14          **THE COURT:**  Is she --

15          **PROSPECTIVE JUROR COLLARD:**  I would say the odds are,

16  you know, 50/50.

17          **THE COURT:**  50/50?

18          **PROSPECTIVE JUROR COLLARD:**  50/50.

19          **THE COURT:**  Does she still drive?

20          **PROSPECTIVE JUROR COLLARD:**  No.

21          **THE COURT:**  Is she in a wheelchair?

22          **PROSPECTIVE JUROR COLLARD:**  No.

23          **THE COURT:**  Can she use a telephone?

24          **PROSPECTIVE JUROR COLLARD:**  Yes.

25          **THE COURT:**  Is she in good health?

```
 1              PROSPECTIVE JUROR COLLARD:  Mentally, yes.

 2          THE COURT:  All right.  I don't know.  When's the last

 3  time she had some event that required attention?

 4              PROSPECTIVE JUROR COLLARD:  In October, you know,

 5  2017.

 6          THE COURT:  Did that require going to see a doctor or

 7  a hospital or what?

 8              PROSPECTIVE JUROR COLLARD:  Fortunately, no.  It

 9  required getting medication for her over the phone.

10          THE COURT:  Now, if you did -- if the 50/50 came up

11  that your mom needed attention, what are the odds that somebody

12  could step in for you?

13              PROSPECTIVE JUROR COLLARD:  It's possible my husband

14  could step in.

15          THE COURT:  Do you have brothers or sisters in the

16  area?

17              PROSPECTIVE JUROR COLLARD:  Not in the area, no.

18          THE COURT:  All right.  I've got to think about that

19  one too.  Thank you.  Anything else you want to add on that?

20              PROSPECTIVE JUROR COLLARD:  No.  Thank you.

21          THE COURT:  Please pass the microphone down to

22  Ms. Pho.  And what did you want to say?

23              PROSPECTIVE JUROR PHO:  I can -- I can speak simple,

24  simple English.  But you know, like, read or write, I might not

25  be able to understand a lot.
```

```
 1              THE COURT:  All right.  Is English your second

 2    language?

 3              PROSPECTIVE JUROR PHO:  Yes.

 4              THE COURT:  What is your first language?

 5              PROSPECTIVE JUROR PHO:  Chinese and Vietnamese.

 6              THE COURT:  And are you a naturalized citizen?

 7              PROSPECTIVE JUROR PHO:  Yes.

 8              THE COURT:  Okay.  How long have you been in the USA?

 9              PROSPECTIVE JUROR PHO:   38 years.

10              THE COURT:  38?

11              PROSPECTIVE JUROR PHO:  Yes.

12              THE COURT:  And in that length of time, haven't you

13    learned to read English?

14              PROSPECTIVE JUROR PHO:  Yes, I can -- I can just,

15    like, simple.  But, you know, like, some of the words and some

16    of the vocabulary, I might not understand.

17              THE COURT:  All right.

18              PROSPECTIVE JUROR PHO:  Like, simple English, you

19    know, I can, you know, like...

20              THE COURT:  Okay.  Any other issue you want to raise

21    by way of hardship?

22              PROSPECTIVE JUROR PHO:  No, no.  I can come here every

23    day --

24              THE COURT:  All right.

25              PROSPECTIVE JUROR PHO:  -- early, no problem.  But
```

 1   just, like, I am worried that I don't understand.

 2        THE COURT:  So you'd want the lawyers to know that, if

 3   you served on the jury, you're going to have a hard time

 4   reading the documents?

 5        PROSPECTIVE JUROR PHO:  Yes.  Yeah, that's the --

 6        THE COURT:  Okay.  All right.  But you're willing to

 7   serve?

 8        PROSPECTIVE JUROR PHO:  I am.

 9        THE COURT:  Very good.  Thank you.

10     Okay.  Did someone else over here raise your hand?

11     Ms. Marshall, what was your situation?

12        PROSPECTIVE JUROR MARSHALL:  It's not a hardship; it's

13   more of a situation.  I have a jury summons for criminal court

14   on Monday.

15     (Laughter.)

16        PROSPECTIVE JUROR MARSHALL:  I have the paperwork.

17        THE COURT:  That's pretty good.  Which county?

18        PROSPECTIVE JUROR MARSHALL:  It's 850 Bryant,

19   San Francisco.

20        THE COURT:  Well --

21        PROSPECTIVE JUROR MARSHALL:  I think you guys take

22   precedence over the criminal.

23        THE COURT:  This would be an interesting

24   constitutional issue.

25     (Laughter.)

 1          THE COURT:  It could go all the way to the Supreme

 2     Court.

 3          (Laughter.)

 4          THE COURT:  If you're selected here, we will tell them

 5     down there you're not available.

 6          PROSPECTIVE JUROR MARSHALL:  Okay.  I'm fine with

 7     that.  I didn't know if I had to have a written document on a

 8     letterhead that I can take down there --

 9          THE COURT:  I will give you whatever you need.  We'll

10     give you a letter, but we'll also call down there and say that

11     you're serving on a jury.

12          PROSPECTIVE JUROR MARSHALL:  Okay.  That's fair.

13     Thank you.

14          THE COURT:  Hall of Justice, uhm?

15          PROSPECTIVE JUROR MARSHALL:  Yes.

16          THE COURT:  Our facilities are nicer here.

17          (Laughter.)

18          PROSPECTIVE JUROR MARSHALL:  They are.

19          THE COURT:  Okay.  Another hand went back up there.

20     Let's see, that's Ms. --

21          PROSPECTIVE JUROR BUCCELLATO:  Buccellato.

22          I come from Oakley, so I have to take BART, and I have to

23     get on early.  And I take Pittsburg BART.  And I just don't

24     feel safe coming over, walking through the parking lot, coming

25     from here -- to the BART stations here.  I know it's not a

 1    hardship, but I just don't feel safe.

 2              THE COURT:  How long does it take you to go from --

 3    what -- counting the walking and everything, how long would it

 4    take you each day to get back and forth?

 5              PROSPECTIVE JUROR BUCCELLATO:  Coming from here?

 6              THE COURT:  To your home.

 7              PROSPECTIVE JUROR BUCCELLATO:  Probably two and a

 8    half, three hours.

 9              THE COURT:  Round-trip?

10              PROSPECTIVE JUROR BUCCELLATO:  Yes, round-trip.

11              THE COURT:  So this morning, how did you come in?

12              PROSPECTIVE JUROR BUCCELLATO:  I came in through BART.

13              THE COURT:  How long did that take?

14              PROSPECTIVE JUROR BUCCELLATO:  That took one and a

15    half hours.  BART took one hour, then it maybe took maybe about

16    20 minutes here.

17              THE COURT:  Okay.

18              PROSPECTIVE JUROR BUCCELLATO:  It's just the

19    surroundings and BART.  And being very early, it's not really

20    cleaned out.

21              THE COURT:  Okay.  Anyone else want to raise

22    something?

23         Okay.  Just hold on, Ms. --

24              PROSPECTIVE JUROR BUCCELLATO:  Buccellato.

25              THE COURT:  -- Buccellato.  Hold the mic for a second.

```
 1        I want to fill in where Ms. Oldan was.  Call the next
 2   name, please.
 3             THE CLERK:  Ying Cui, C-u-i.
 4             THE COURT:  Good morning.
 5             PROSPECTIVE JUROR CUI:  Good morning.
 6             THE COURT:  How do you say that last name?
 7             PROSPECTIVE JUROR CUI:  Cui.
 8             THE COURT:  Say it again.
 9             PROSPECTIVE JUROR CUI:  Cui.
10             THE COURT:  Cui?  Okay.
11        Good news, I guess.  You get to go back to the jury
12   assembly room under our guidelines.  So you're excused.  All
13   right?
14             PROSPECTIVE JUROR CUI:  Thank you.
15             THE COURT:  Thank you.
16        Next?
17             THE CLERK:  Salvador Sandoval, S-a-n-d-o-v-a-l.
18             THE COURT:  Good morning.  Sandoval; right?
19             PROSPECTIVE JUROR SANDOVAL:  Yes.
20             THE COURT:  Mr. Sandoval, would you take that empty
21   seat in the jury box, please.
22        Let's get you seated, and then I have a question for you.
23        Do you have any hardship issue?
24             PROSPECTIVE JUROR SANDOVAL:  Well, I'm --
25             THE COURT:  You need the microphone, please.
```

1    **PROSPECTIVE JUROR SANDOVAL:**  I'm Salvador Sandoval.

2    I'm honored to be here.

3        My language is not perfect.  I'm second -- English is my

4    second language.  I understand, but sometimes I have to go over

5    stuff to read.  So my problem is to writing, but that's it.

6        **THE COURT:**  How well can you read English?

7        **PROSPECTIVE JUROR SANDOVAL:**  Well, I can read, but, to

8    write, it takes me time to -- to make sure that I'm using the

9    right --

10       **THE COURT:**  Well, you won't have to write much on the

11   jury.

12       **PROSPECTIVE JUROR SANDOVAL:**  But I have to read.

13       **THE COURT:**  But you have to be able to read the

14   evidence.  And there will be many hundreds of documents in the

15   evidence.  So there will be emails, there will be letters,

16   there will be big, thick documents with pictures sometimes and

17   diagrams, graphs.  But it is in English.  And the jury needs --

18   is by law required to be able to understand and read English.

19       So are you able to do that?

20       **PROSPECTIVE JUROR SANDOVAL:**  I can read it, but it's

21   going to take me time.  In order to understand something, I

22   have to translate it.

23       **THE COURT:**  That, I'm not sure.  We don't get to do

24   translations.

25       **PROSPECTIVE JUROR SANDOVAL:**  No, I can use the

 1    computer.

 2            **THE COURT:**  You have to do your own translations.  I

 3    can't give you a translator.

 4            **PROSPECTIVE JUROR SANDOVAL:**  Yeah.

 5            **THE COURT:**  I can't rely on someone else on the jury

 6    to translate for you.  That's not right.  You have to be able

 7    to do it yourself, read it yourself in English and understand

 8    it.  Good?

 9            **PROSPECTIVE JUROR SANDOVAL:**  Yeah, I can.

10            **THE COURT:**  Okay.

11            **PROSPECTIVE JUROR SANDOVAL:**  I can do it.

12            **THE COURT:**  All right.  Do you have any other hardship

13    issue you want to raise?

14            **PROSPECTIVE JUROR SANDOVAL:**  No.

15            **THE COURT:**  No?

16            **PROSPECTIVE JUROR SANDOVAL:**  No.

17            **THE COURT:**  No?

18        Okay.  This is what we're going to do.  This is a good

19    breaking point.  So we're going to take a 15-minute recess so

20    that everybody can go use the bathroom.

21        But wait a minute.  Please don't jump up yet.  I want

22    everybody to hear this, so don't rush for the door.

23        We're going to have a 15-minute break.  During the break,

24    the potential members of the jury, including those of you still

25    in the back of the room, because a number of are you going to

 1   get called forward, you should not talk about the case with

 2   anybody, not do any of that Google research or any other thing

 3   that -- or any kind of Facebook.

 4        I've already told you about this.  I just have to

 5   emphasize it so much.  No talking about the case.  And then

 6   we're going to reconvene, and you can come back and sit

 7   wherever you -- those of you who are still on the -- when we

 8   come back, here's what I want to happen:  I don't want you

 9   sitting in the order that you're necessarily sitting in now.

10   Those of you who are on the prospective jury can sit anywhere

11   on that side of the room, including those of you over here,

12   okay.  So when you come back, I want you on that side of the

13   room, all of you, and kind of scrambled up would be okay as far

14   as I'm concerned.  Because we will call you in random order

15   anyway.

16        Fifteen minutes.

17        And, counsel, I'll need to see you for a few minutes but,

18   I'll wait until all the prospective members of the jury excuse

19   themselves.  Okay.  All right.

20        (Prospective jurors exit courtroom.)

21        **THE COURT:**  All right.  Everyone be seated.

22        Are there any prospective members of the jury still in the

23   courtroom?  I guess not.  All right.  So is that Russ back

24   there?

25        **COURT SECURITY OFFICER:**  Yes, Your Honor.

 1          **THE COURT:**  Who is that right there?  Is that a juror?

 2   Who is that?  I can't see.

 3       One of the attorneys.  Okay.  That's fine.

 4       Russ, don't let any of the jurors back in until I'm done

 5   with the lawyers here.

 6       All right.  I think what we'll do is to give you a chance

 7   to talk with your clients.

 8       I just want to raise some issues.  I'm going to ask you,

 9   my inclination, I'm just giving you a suggestion, is

10   Mr. Bisbee, the guy from PG&E, should stay.  Or at least he

11   hasn't given us a good enough reason to leave yet.

12          **MR. GONZÁLEZ:**  That would be Levin, Your Honor.

13          **THE COURT:**  You don't have to say anything yet.

14          **MR. GONZÁLEZ:**  I was just correcting the name.

15          **THE COURT:**  No, no.  I'm sorry.  Mr. Levin.

16          **MR. GONZÁLEZ:**  Yes.

17          **THE COURT:**  You're right.  You're correct.

18       Ms. Bisbee, I think we should excuse because she has got a

19   job.

20       Ms. Pho we should excuse on account of her English.

21       Ms. Buccellato, on account of a three-hour commute, aside

22   from the fact she doesn't like walking through the Tenderloin,

23   but the three hours alone is too much of a hardship in my view.

24       And then for the lady who is going to be on the criminal

25   jury, that's easy to fix.  That's not a problem.

1          Now, Ms. Collard, who has a 50/50 chance of her mom being

2     ill, I'm going to ask you to consider what you want to do

3     there.  And I'm not inclined one way or the other in her case.

4          All right.  So you all want to think about it and let me

5     know in 10 or 15 minutes, whenever I come back, what your

6     druthers are.  Okay.

7               MR. GONZÁLEZ:  Okay.

8               THE COURT:  All right.

9                     (Recess taken at 9:13 a.m.)

10               (Proceedings resumed at 9:28 a...m.)

11          THE COURT:  All right.  Let's go back to work.  Please

12    be seated, and let's go to work.

13          What input do the lawyers want to give me on Ms. Collard?

14               MR. VERHOEVEN:  From Waymo's perspective, we're fine

15    with Your Honor's inclination.

16               THE COURT:  Which is what?

17               MR. GONZÁLEZ:  You didn't have one.

18               THE COURT:  I didn't have one.

19               MR. VERHOEVEN:  Oh, I thought you were inclined to

20    keep her.

21               THE COURT:  I was saying, if you both agree to excuse

22    her, I will.  Otherwise, I'm inclined to say I'll take a chance

23    with her.

24               MR. VERHOEVEN:  We agree.

25               THE COURT:  Without any -- on this record anyway.

 1          **MR. GONZÁLEZ:**  We agree with everything you've said

 2    thus far about all of these jurors, Your Honor.

 3          **THE COURT:**  All right.  So -- well.  All right.  So we

 4    keep Ms. Collard for now.  Mr. Levin, we keep.

 5       Bisbee and her job, I'm inclined to say she should be

 6    allowed to go to her job.

 7       Any objection?

 8          **MR. VERHOEVEN:**  No, Your Honor.

 9          **MR. GONZÁLEZ:**  No.

10          **THE COURT:**  All right.  So we'll do that.

11       Ms. Pho, on account of her English, I would excuse her.

12       Yes?  No?

13          **MR. VERHOEVEN:**  My only question is I thought she said

14    she could read English but not great.

15          **THE COURT:**  She said it would be difficult for her to

16    read it.

17          **MR. VERHOEVEN:**  Well, I'll go with what Your Honor

18    wants to do.

19          **THE COURT:**  All right.  We're going to excuse her.

20       And the lady from Oakley and the three-hour commute, I

21    would excuse her.

22          **MR. GONZÁLEZ:**  Number 12, Buccellato.

23          **THE COURT:**  Yes.  Agreed?

24          **MR. VERHOEVEN:**  Yes, Your Honor.

25          **MR. GONZÁLEZ:**  Yes, Your Honor.

 1              **THE COURT:**  All right.

 2              **MR. VERHOEVEN:**  So these Bisbee, Buccellato, and Pho.

 3              **THE COURT:**  Yeah.  And what I'm going to do is we will

 4    replace them -- I'm going to excuse Pho first, then Bisbee,

 5    then Buccellato.  And then we will replace them in that order.

 6              **MR. GONZÁLEZ:**  Thank you.

 7              **MR. VERHOEVEN:**  One question of procedure.

 8         Will we have -- what's Your Honor's thought on when we're

 9    going to have a chance to read the forms that are being handed

10    out?

11              **THE COURT:**  As soon as we get 16 where we can start

12    actually asking them questions, I'm going to give you the --

13    give you -- see, when I excuse somebody, that person's

14    questionnaire, for privacy, I don't want to give to you.

15         By the way, I do have some up here now of the people that

16    I excused automatically.  I'm going to hand that stack down to

17    you so you can confirm that I did it right.  And then you'll

18    enjoy reading some of their comments.

19         (Laughter)

20              **THE COURT:**  Most of them are in the negative category

21    but not -- a few of -- one, at least, was in the positive

22    category but, nevertheless, was a strong, strong opinion.  So

23    you should read those and then hand those back to Angie

24    whenever you're done.

25         All right.  But the other ones, I'm going to hold onto

1  until we get 16 that are -- and we're close to that, I think.

2  All right?

3          MR. VERHOEVEN:  And then you'll pass them out?

4          THE COURT:  Yeah, then you'll get to see the

5  questionnaires.

6          MR. VERHOEVEN:  All right.  Thank you, Your Honor.

7          THE COURT:  Okay.  We're going to call back in the

8  venire.

9          THE CLERK:  All rise for the jury.

10     (Venire reenters courtroom)

11         THE COURT:  Welcome back, prospective members of the

12 jury.  Those of you in the jury box, please sit in your

13 assigned seat.  Those of you still in the back of the

14 courtroom, you may sit anywhere on my left.

15     Members of the jury -- prospective members of the jury, I

16 prefer you sit on my left.  Is that okay?  Please.  You can

17 just find any seat you want over there on the left.

18     Angie, would you help the jury.

19     Okay.  We're good.

20     Okay.  I think we're good.  Now, everyone be seated.

21     All right.  Okay.  Welcome back, everyone.

22     Ms. Pho, we're going to excuse you for the reasons you

23 stated.  Please go back to the jury assembly room and tell them

24 what happened.

25         PROSPECTIVE JUROR PHO:  Thank you.

1          **THE COURT:**  All right.  Ms. Bisbee.

2          **PROSPECTIVE JUROR BISBEE:**  Yes.

3          **THE COURT:**  Good luck with your new job.  We're going

4     to excuse you for that reason.

5          **PROSPECTIVE JUROR BISBEE:**  Uh-huh.

6          **THE COURT:**  And Ms. -- from Oakley.

7          **PROSPECTIVE JUROR BUCCELLATO:**  Buccellato.

8          **THE COURT:**  Yes.  We're going to excuse you for the

9     reasons you stated about the long commute.  So please go back

10    to the jury assembly room and tell them what happened.  Thank

11    you.

12         And now, Ms. Collard, we're not going to excuse you, at

13    least yet.  I am worried about your situation.  On the other

14    hand, it's not a certainty.  It's only 50/50.

15         At the next break, maybe you could talk to your mom on the

16    phone and see how she is doing.  I would hate if -- you know,

17    maybe you can even ask her how she feels about if she's in good

18    health and so forth.

19         Right now, I can't excuse you.  All right.

20         Ms. -- we will now replace Ms. Pho's seat.  Please call a

21    name.  Next.

22         **THE CLERK:**  Jennifer Chu, C-h-u.

23         **THE COURT:**  And call the name after the -- two more

24    names, please.

25         Good morning, Ms. Chu.

 1              **THE CLERK:**  Miguel Posadas, P-o-s-a-d-a-s.

 2              **THE COURT:**  Ms. Chu, how are you today?

 3          **PROSPECTIVE JUROR CHU:**  I'm fine.   Thank you.

 4              **THE COURT:**  Ms. Chu, I want you to go sit over there

 5      in the fourth seat in the front row.   Thank you.

 6          Next?

 7              **THE CLERK:**  Posadas.

 8              **THE COURT:**  Posadas?

 9          **PROSPECTIVE JUROR POSADAS:**  Yes.

10              **THE COURT:**  Great.   Have that next seat by Ms. Chu.

11      We need another name, please.

12              **THE CLERK:**  Susan Stoney, S-t-o-n-e-y.

13              **THE COURT:**  Good morning.

14          **PROSPECTIVE JUROR STONEY:**  Good morning.

15              **THE COURT:**   Ms. Stoney, please have that empty seat on

16      the second row.

17          So to the three of you who've just joined us, do you have

18      any hardship issue you wish to raise?

19          First, let me make sure, do you understand how long and

20      what the time commitment is, 7:45 to 1:00; and then once you

21      deliberate, even longer each day?   And that would be every

22      single workday between now and March 2nd, with the exception of

23      President's Day.

24          So if you have a hardship issue, now's the time to raise

25      your hand and let me know about it.

```
1        No?  Great.

2        Okay.  Then I'll ask you -- the rest of you, again, any

3    hardship issue any of the rest of you want to bring up?

4        I keep forgetting about you two down there, and I don't

5    mean to.  I apologize.  You're down at a lower level, but I can

6    see you.

7        Okay.  All right.  So would my staff come get these three.

8        And, now, Kanu, I need for you to organize the 16 so that

9    the lawyers can have them.  And there's some up here already.

10       So are these ready to go?  They need to be organized.

11   So -- I mean, those people who've been excused, their

12   questionnaire should not be in the stacks.  You can go ahead

13   and copy these, though, please.

14       All right.  We're going to move to Phase 2.

15       Now, those in the back of the room, you still may get

16   called back up here.  At least seven or eight of you certainly

17   will be called up here.  Don't think you're -- you need to pay

18   close attention because, when you come up here, I'm going to

19   say, "Did you hear all those questions?" and then "Would you

20   have raised your hand to a question?"  Something like that.  So

21   pay close attention.

22       Who has the microphone?

23       Right there in front of you.  Right there.  See it?  Right

24   there.  Isn't that it?

25       Okay.  Over there to Ms. Bowen.
```

1        Ms. Bowen, let's test your eyesight.  Can you see that

2    chart over there?

3        **PROSPECTIVE JUROR BOWEN:**  Yes.

4        **THE COURT:**  You can?  Okay.  I can barely see it from

5    here, so I -- good for you.  You've got great eyesight.

6        Mr. Arturo González is going to push it closer.  Why don't

7    you stand up and just move it more toward -- where it's easy

8    and comfortable for you to see.

9        Good.  All right.

10       All right.  Now, what we need to do -- and this will speed

11   things along.  Just go down that list and give us the

12   information that is complete as to each category.

13       All right.  Are you ready?

14       **PROSPECTIVE JUROR BOWEN:**  I'm ready.  My name is Darci

15   Bowen.  I live in Concord, California.  I have completed my

16   bachelor's degree.  I currently work at John Muir, Concord

17   campus.  I have work organizations that I belong to, the AARC.

18   It's respiratory.

19       My hobbies are biking and hiking and swimming and reading.

20       Marital status is divorced, single.  So no spouse or

21   partner occupation.

22       I have four children.  Their ages are 28 -- no, 27, 25,

23   23, and 21.

24       Their occupations are student.  One works at Vdara, which

25   is hospitality in Las Vegas.  Another one works in medical

```
 1   records at a local hospital.  And then my last works also in

 2   Las Vegas at the MGM.

 3       Prior jury service:  I've been on -- I've been a juror in

 4   two cases.  I don't know if they were criminal or civil.  And

 5   we reached a verdict in both of them.

 6       Never been in the military or law enforcement and never

 7   been a party or witness in court.

 8            THE COURT:  Okay.  Thank you.

 9       Mr. Brown, your turn.  Please start with your full name.

10            PROSPECTIVE JUROR BROWN:  My name is Roger Brown.  I

11   live in San Francisco.  Bachelor's degree at San Francisco

12   State.

13       I work with the San Francisco VA, Department of Veterans

14   Affairs.  We're part of a union.

15       Hobbies, I like running, gaming, hiking.

16       Marital status, single.  No spouse.  No children.

17       No prior jury service.  I was in the military, U.S. Air

18   Force.

19       No other court witness.

20            THE COURT:  Good.  Thank you.

21       Ms. Marshall?

22            PROSPECTIVE JUROR MARSHALL:  Jacquelyn Marshall.

23            THE COURT:  Little closer to your voice, please.

24            PROSPECTIVE JUROR MARSHALL:  Jacquelyn Marshall.

25   San Francisco.  Completion of junior college, UCSF Health.
```

JURY VOIR DIRE

1   Organization, American Health Information Management

2   Association as well as California Health Information

3   Association.

4       Hobbies, fishing.

5       Status, married.  Spouse, lending distributor.  Children,

6   zilch.

7       Jury, criminal, settled out of court.

8       And the last two are no.

9           **THE COURT:**  Great.

10   Ms. Chu?

11          **PROSPECTIVE JUROR CHU:**  My name is Jennifer Chu.  My

12   city of residence is San Francisco.

13       My education is a bachelor's.

14       My current employer is Homebridge.  I'm not part of any

15   other organizations.

16       And my hobbies include hiking and drawing.

17       My marital status is single.  No spouse, no children.

18       No prior jury service.  And I've never been in the

19   military or a witness in court.

20          **THE COURT:**  Thank you.

21   Mr. Posadas?

22          **PROSPECTIVE JUROR POSADAS:**  Miguel Magana Posadas.

23   Pittsburg, California.

24       Education, vocational school.

25       Certified optician.  Employer, Kaiser Permanente.

JURY VOIR DIRE

```
 1        Organizations, I'm a member of SGI-USA, a Buddhist
 2   organization.  No clubs.
 3        Union, I belong to NUHW.
 4        Hobbies, wine tasting.
 5        Marital status, single.
 6        No jury duty prior.  Was summoned before but never served
 7   on a jury.
 8        No military or law enforcement or never been a party or a
 9   witness in court.
10        THE COURT:  Thank you.
11        Mr. Levin?
12        PROSPECTIVE JUROR LEVIN:  Jonathan Levin.  I go by
13   John.  I live in Richmond.
14        Education, bachelor's from California Institute of
15   Integral Studies.
16        Most recent employer, Pacific Gas & Electric.
17        Organizations and clubs, the only current organization I
18   belong to is ACM, the American Computer Machinery -- it's
19   ACM.org.
20        Hobbies would be mainly hiking, skiing, snowboarding,
21   physical activities.
22        Marital status, married.  Spouse works for Oracle.
23   Children, I have one son, 22.  He's in school and working in a
24   bar.
25        No prior jury.  No military.  No party or witness in
```

 1   court.

 2          **THE COURT:**  Thank you.

 3      Ms. Collard.

 4          **PROSPECTIVE JUROR COLLARD:**  Hi.  My name is Kelly

 5   Collard.  I live in Berkeley.

 6      I have a master's degree in nursing from UCSF.  I work for

 7   Alta Bates Summit Medical Center.

 8      I do belong to a gym.  I like to garden, read, and run.

 9      I am married.  He is a contractor, self-employed.

10      I have a 22-year-old at Cal Berkeley, an 11-year-old in

11   middle school.

12      And no to 10, 11, and 12.

13          **THE COURT:**  Thank you.

14      Mr. Regelman.

15          **PROSPECTIVE JUROR REGELMAN:**  My name is Gregory

16   Regelman.  Living in Daly City, San Mateo County.

17      Bachelor degree.  Back home, I'm from Azerbaijan, former

18   Republic of Soviet Union.  Immigrated in 1991.  So I got a

19   bachelor degree in mechanical engineering.

20      My recent job is a software tester working through the

21   Technical Connection as a contractor and serving at Universal

22   Electronics at present time for three-plus years.

23          **THE COURT:**  We need to rotate this.  It's hard.

24      Would one of the lawyers help out the jury and rotate that

25   around so he can see it.

1        How's that?  Is that better?

2              **PROSPECTIVE JUROR REGELMAN:**  Thank you.

3              **THE COURT:**  Okay.

4              **PROSPECTIVE JUROR REGELMAN:**  I'm not a member of any

5        organization.

6        Hobbies, digital photography and flying drones.

7        Married.  My wife work as a mechanical engineer at Applied

8        Materials.

9        Children, I've got two kids, 43 and 36.  One is a software

10       engineer and youngest is a medical doctor.

11       And I never served in a jury before.

12       I got military training for three months back home.  It

13       was necessary to graduate from university.  You have to finish

14       three months after your last year.

15       Yeah, I was witness in a court one time.  I got my credit

16       card stolen at gas station, so they called me as a witness in

17       San Mateo County.

18             **THE COURT:**  Wait one second.

19       Kanu, are we ready to hand out the groups?

20             **LAW CLERK:**  For the ones who have gone so far?

21             **THE COURT:**  No.  For all 16.  Can we do that now?

22             **LAW CLERK:**  Is that for the ones that --

23             **THE COURT:**  Where's the original?  Please get whatever

24       you need and make appropriate copies.  All right.

25       Okay.  I'm sorry for the delay.

1        Let's go to the second row, and just hand the -- hand the

2    microphone, please, to Ms. -- I can't read my own writing.

3        I'm sorry.  The microphone is already over here.  We'll

4    start over here.

5            **PROSPECTIVE JUROR PERAZZO:**  Steve Perazzo, Novato,

6    California.

7        After high school, AA degree at JC, on to fire college.

8    Firefighter I, EMT-paramedic; commercial B truck driver

9    license.

10        Work for Marin Sanitary and Recycling Service in

11   San Rafael.

12        Italian Catholic Federation, Teamsters union.

13        Hobbies, long-time baseball player and coach, long walks,

14   vacations as much as possible with my wife, Linda, who owns a

15   medical billing company.

16        Two sons.  Nick is a junior at Oregon State.  Christopher

17   is in eighth grade, middle school.

18        No jury service.  No military or law.  No party or

19   witness.

20            **THE COURT:**  Thank you.

21        Next?

22            **PROSPECTIVE JUROR MAGAT:**  I'm Jenna Magat.  I live in

23   Pacifica.

24        I have my bachelor's and master's in biology from UC San

25   Diego.

JURY VOIR DIRE

1    I work as a research associate at BioMarin Pharmaceutical.

2    No orgs or clubs.

3    I like baking, rock climbing, and playing piano.

4    I'm single.  No spouse, no children.

5    No prior jury service, no military, and no party or

6  witness in court.

7        **THE COURT:**  All right.  Thank you.

8        **PROSPECTIVE JUROR LOMBARD:**  Thomas Lombard, Livermore,

9  California.

10    I have a bachelor of arts in business administration from

11  Western New England University.

12    I'm a branch manager for Rexel Holdings USA, doing

13  business as Gexpro Services.

14        **THE COURT:**  Please slow down just a little.

15        **PROSPECTIVE JUROR LOMBARD:**  Okay.

16        **THE COURT:**  Slow down.  I want to be able to -- it's

17  going too fast, and it's too fast for me.  So go back about a

18  sentence.

19        **PROSPECTIVE JUROR LOMBARD:**  I have a bachelor of arts

20  in business administration from Western New England

21  University --

22        **THE COURT:**  Thank you.

23        **PROSPECTIVE JUROR LOMBARD:**  -- with a major in

24  computer information systems.

25    My recent job is -- I'm a branch manager for Rexel

 1    Holdings USA doing business as Gexpro Services.

 2        Organizations, I'm a benefactor member of the Marines

 3    Memorial Club here in San Francisco.

 4        My hobbies are anything outdoors:  Fishing, shooting.

 5        Marital status, I'm married.  My wife, Jennifer, works in

 6    at-home advertising.

 7        I have two children, two daughters, four and seven years

 8    old.

 9        No prior jury service.  Six years in the Marine Corps.

10    And I've been a witness twice.

11            THE COURT:  What kinds of cases were you a witness in?

12            PROSPECTIVE JUROR LOMBARD:  Both criminal.

13            THE COURT:  And, like, you were an eyewitness to some

14    crime?

15            PROSPECTIVE JUROR LOMBARD:  I was a victim of identity

16    theft in one, and I was a witness in another case involving a

17    driving under the influence.

18            THE COURT:  Were you ever on a jury?

19            PROSPECTIVE JUROR LOMBARD:  Negative.

20            THE COURT:  Okay.  Good.  Thank you.

21        Next?

22            PROSPECTIVE JUROR STONEY:  My name is Susan Stoney.  I

23    live in Pleasant Hill.

24        My education level is master's degree in English from the

25    State University of New York at Buffalo.

 1          I am currently self-employed.

 2          I belong to the San Francisco chapter of the International

 3     Association of Business Communicators, and I'm also a member of

 4     my church choir.

 5          My hobbies are wine tasting, reading, and bowling.

 6          I'm married.  My husband is retired.  I have no children.

 7          My prior jury service was for two trials many years ago.

 8     One was criminal; one was civil.  And we did reach a verdict in

 9     both cases.

10          I have never been in the military or in law enforcement,

11     and I have never been a party or witness in court.

12          **THE COURT:**  Okay.  Thank you.

13     Next?

14          **PROSPECTIVE JUROR SANDOVAL:**  My name is Salvador

15     Sandoval.  I live in Redwood City.

16          My education is high school in Mexico.

17          I work for at Apple.

18          I don't belong to any organizations, club, unions.

19          My hobby is work.

20          I'm married.  My wife works at the Palo Alto School

21     District.  Two kids.  The youngest is in Portland State.  The

22     oldest still with us.  He has some mental illness.

23          No jury service, no military, and never -- no party

24     witness in court.

25          **THE COURT:**  What is your job again?

1          **PROSPECTIVE JUROR SANDOVAL:**  It's graphic design.

2          **THE COURT:**  Okay.  Good.  Thank you.

3      Next?

4          **PROSPECTIVE JUROR HELLING:**  I'm Robert Helling.  I

5   live in Clayton.

6      I have an MBA.

7      I'm retired from Chevron after 30 years.  I was an

8   accountant and financial analyst.

9      Organizations, Chevron Retirees Association, Contra Costa

10  Historical Society.

11     Hobbies, I play golf and the ukulele, enjoy traveling.

12     I am married.  My wife also is retired from Chevron, and

13  she was also an accountant.

14     No kids, no jury service, no military, and never been a --

15         **THE COURT:**  Are you a CPA?

16         **PROSPECTIVE JUROR HELLING:**  No.

17         **THE COURT:**  And what kind of accounting did -- do you

18  or did you do for Chevron?

19         **PROSPECTIVE JUROR HELLING:**  Budgetary kind of things.

20  Tracked budgets and created budgets for departments.  That's

21  what I did the last ten kind of years and made some financial

22  decisions whether things were expense or assets or that kind of

23  thing.

24         **THE COURT:**  Okay.  Thank you.

25     Next?

```
 1          PROSPECTIVE JUROR MEYERS:  My name is Chris Meyers.  I

 2   live in Sausalito.

 3          I have some college education, no degrees.

 4          Currently working for Equis as a software engineer in

 5   San Rafael.

 6          No organizations or clubs.

 7          Hobbies, skiing, running, motorcycles.

 8          I am single.  No spouse.  No children.

 9          I've been summoned for jury service, never been on a jury.

10          No military or law enforcement, and I was never a party or

11   a witness in court.

12          THE COURT:  Okay.  Thank you.

13          Now, we go to Ms. Di Domenico.

14          PROSPECTIVE JUROR DI DOMENICO:  I'm Stephanie Di

15   Domenico.  I live in Brentwood.

16          I have some college, no degree.

17          My employer is J.D. Fine.  They make a line of women's

18   clothing.

19          I belong to Saint Vincent de Paul and a couple of clubs at

20   my church.

21          THE COURT:  What do you do for your employer?

22          PROSPECTIVE JUROR DI DOMENICO:  I'm in the accounting

23   department.

24          THE COURT:  All right.

25          PROSPECTIVE JUROR DI DOMENICO:  My hobbies are I like
```

1    to exercise and help at the food bank when I have time.

2        I'm married.  My husband is a business software

3    consultant.

4        I have two daughters.  One of them is in retail, and the

5    other one is going to college.

6        I've never been on a jury.  Called a lot of times.

7        I'm not in the military or law enforcement.

8        And my husband and I were sued in small claims court -- I

9    don't know if that counts -- for an automobile accident.

10           **THE COURT:**  That's okay.

11           **PROSPECTIVE JUROR DI DOMENICO:**  So, yes.

12           **THE COURT:**  All right.  That's it.  Hold the

13    microphone.

14        Let me ask my law clerk.

15        Are we ready?

16        Just so you will know, we are handing out now to each set

17    of lawyers one copy of the questionnaires for you 16

18    individuals who are in the jury box.  So that way the lawyers

19    will get the benefit of what you've already told us, and maybe

20    it will speeds things up.

21        So that's -- that's all that's going on there.

22        Okay.  Ms. Bowen, I think I neglected to ask you -- if we

23    could pass the microphone back.

24        I don't think you told us what your specific job was.

25           **PROSPECTIVE JUROR BOWEN:**  I am the manager of the

1    respiratory therapy department.

2           THE COURT:  That's hard to hear.  The manager of the

3    what?

4           PROSPECTIVE JUROR BOWEN:  Respiratory therapy

5    department.

6           THE COURT:  All right.  And that's at John --

7           PROSPECTIVE JUROR BOWEN:  At John Muir.  I'm at the

8    Concord campus.

9           THE COURT:  All right.  Are you a nurse?  A doctor?

10   What are you?

11          PROSPECTIVE JUROR BOWEN:  I'm a respiratory therapist.

12          THE COURT:  All right.  And who was the nurse?  You're

13   the nurse, right.

14       And you're at John Muir too or -- no, you're at Summit

15   Alta Bates; right?

16          PROSPECTIVE JUROR COLLARD:  Uh-huh.

17          THE COURT:  Got it.  Any other nurses or doctors here?

18   Okay.  All right.

19       I'll explain to you what the jury does.  The ten of you

20   who get selected -- and maybe someone in the back of the

21   courtroom yet.  Because a number of you never served on a jury

22   and probably never even gotten this far in the process, so it's

23   so important for you to understand the responsibility that

24   you'll have.

25       Under our system, we -- juries decide cases like this,

 1    just like in criminal cases juries decide cases.

 2         And what that means is that you, the jury, after you hear

 3    all of the evidence, will make a decision on whether or not the

 4    party with the burden of proof has proven the elements that are

 5    needed to establish, for example, a claim for relief.

 6         And you do that together.  It has to be a unanimous

 7    decision.

 8         You do that in the jury room.  We have a nice comfortable

 9    room back there called the jury room, where you will be able to

10    sift through evidence that's presented at trial and discuss it

11    among yourselves after all the evidence and during your

12    deliberations.

13         And so the process is that you decide who wins the case;

14    it's not the judge.

15         Sometimes I think the members of the jury think that the

16    judge is going to give you a hand signal of some sort -- you

17    know, like this -- some kind of hand signal to tell you who

18    should win.  No.  No, no.  It's -- you decide that.

19         Now, do I have a role here.  One of my important roles is

20    to explain to you what the law is and what the elements of

21    proof have to be proven to establish a claim.  And I will do

22    that in due course, because that's a legal thing and my job is

23    to help you understand what the law is.

24         But on the facts -- let's just take a different type of

25    case.  Let's take a traffic case.  Let's say, on the facts, if

 1   one of the issues is, was the light red or was the light green?

 2   you the jury is going to decide that.

 3       And it could be we have three witnesses who say the light

 4   was red and we have three witnesses who say the light was green

 5   and yet it could be that some of those witnesses are much more

 6   credible to you than other witnesses.  And so you are the ones

 7   that put all that together and decide whether or not the party

 8   with the burden of proof has carried its burden of proof as to

 9   each element that has to be proven in order to prevail.

10       So remember earlier I said it's like a laboratory

11   experiment?  The courtroom is the laboratory.  And the

12   witnesses come up here, and it's one question at a time, so

13   slow.  And sometimes it's fascinating and extremely

14   interesting.  And one question at a time, one document at a

15   time.  We go through a lot.  And it either comes into evidence

16   or it doesn't come in.  Some things are not going to come into

17   evidence.  But most of what you hear is going to be in

18   evidence.  And then you have to decide, okay, that's the body

19   of evidence.

20       All right.  Then, at the end of the case, I'm going to

21   give you what the elements of proof are that have to be proven

22   up.  And then you decide, has that been proven or not?

23       If you decide, yes, it has been proven and each element

24   that is required to be proven has been proven, then that party

25   gets your verdict.

```
 1          On the other hand, if you decide that that party has

 2     fallen just a little bit short of proving something on a

 3     critical element, that party loses.  And it's you who decide

 4     whether or not the proof is good enough, not me.

 5          So you can see how important it is for you to pay close

 6     attention.  Here's another thing:  This case involves science

 7     and technology.

 8          Raise your hand if you think -- just raise your hand.  I

 9     want the lawyers to see, raise your hand if you think

10     somebody -- somebody is coughing over there.  Who is that?

11          Do you need a cough drop?

12              PROSPECTIVE JUROR DI DOMENICO:  I need some water.  I

13     have some in my bag.

14              THE COURT:  Where is your bag?

15              PROSPECTIVE JUROR DI DOMENICO:  Right here.

16              THE COURT:  You do whatever you need, but I want you

17     to be comfortable here.

18          All right.  So how many of you think of yourselves as

19     better than average on science?

20          (Show of hands.)

21              THE COURT:  Wait.  Keep your hands up.  We've got one,

22     two, three, four, five, six, seven.  Okay.

23          Wait.  Did you raise your hand?  You're an engineer?

24              PROSPECTIVE JUROR REGELMAN:  Yes.

25              THE COURT:  Eight.  Okay.
```

```
 1        All right.  And you have a master's degree in bio
 2   something; right?
 3           PROSPECTIVE JUROR REGELMAN:  Yes, biology.
 4           THE COURT:  So you probably are great at science.  I
 5   don't know; I'm just guessing.
 6        Anyway, that laboratory thing that I told you about is
 7   like a science experiment in a way, but this is a courtroom.
 8   And you've got to figure out how good the evidence is, how
 9   solid it is.  And you don't look to me for signals; you are the
10   ones that make that decision.  So you've got to pay close
11   attention.
12        Now, on the science thing, these are great lawyers.  I'm
13   telling you, you could go into courtrooms all over the
14   United States and it would be a hard thing to beat the quality
15   of the lawyers we've got here.
16        These lawyers are presenting a case that has a lot of
17   engineering.  And you -- it's their responsibility, not yours.
18   They get to pick -- help pick the jury.  They've got -- they've
19   got to help educate you on the science, at least sufficiently
20   that you think you know it well enough to say who wins or
21   loses.
22        And if, at the end of the day, the party with the burden
23   of proof has not persuaded you on that, that's their problem,
24   not your problem.  You have to be the one to decide whether or
25   not they have persuaded you on the -- on the case.
```

 1          There are some issues on which the defense has the burden;

 2     there are some issues on which the plaintiff has the burden.   I

 3     don't need to get into which is which right now.

 4          But what I'm telling you is, these lawyers are great.   And

 5     I think they'll do a good job of educating you on the science.

 6     So you've got to pay close attention, but it's their problem to

 7     educate you.

 8          If you come in here and you don't have any science

 9     background and nevertheless they have selected you for the

10     jury, then they've got to help you understand it.   But you've

11     got to try your best.   And, at the end of the case, you've got

12     to decide the case, not me.

13          All right.   So that's what the jury does.   And I told you

14     earlier, this is a case that's gotten national publicity.   So

15     your verdict is going to go in the newspapers, it's going to go

16     into magazines, it will be all over the TV.

17          You're going to want to do it -- you're going to want to

18     do it right.   You're going to want to do your very best to get

19     this case right, whatever that is.   And I don't have a view on

20     which one is right.   That's always up to you.

21          All right.   So that's what the jury does.   And I've given

22     this little speech because why?   Because I want you to know

23     what you're getting yourself into.   This is not going to the

24     movies and entertainment to see these great lawyers perform.

25     This is a huge responsibility that you will have.   It's a

1  bigger responsibility even than I have in the case.  You're the

2  one that decides who wins or loses.

3      All right.  So enough on that.  I've got a couple of

4  other -- any questions about -- raise your hand if you've got

5  some concern or question about what I just told you, and then

6  we can discuss it a little more.

7      Okay.  Don't tell me your name.  I've got it down here.

8  Mr. Levin.

9          PROSPECTIVE JUROR LEVIN:  I can probably project well.

10         THE COURT:  Wait, wait.  You've got to have a mic.

11         PROSPECTIVE JUROR LEVIN:  I guess my question is

12 around the next stage of how.  And I'm assuming that

13 transcripts will be provided for us when it comes to

14 deliberations?

15         THE COURT:  No.

16         PROSPECTIVE JUROR LEVIN:  No?

17         THE COURT:  No.

18         PROSPECTIVE JUROR LEVIN:  So do we take notes?

19         THE COURT:  You take notes.  That's a very good

20 question.  I was going to come to it.  We've got these

21 outstanding court reporters here who can take it down faster

22 than I can possibly talk.  But that's for the appeal and that's

23 for the lawyers to have.  But you don't get that in the jury

24 room.  So you go with the old steno pad method or you just

25 remember.

1      You don't have to take a single note.  It's great.  Or you

2  can take as many notes as you want.  I had one trial where a

3  juror took three steno pads full of notes.  It's up to you

4  individually what you want to do.

5           **PROSPECTIVE JUROR LEVIN:**  I guess second round would

6  be, by the time we get to deliberations, is there any room for

7  clarification and questions, or is everything done and we work

8  with what's done and presented?

9           **THE COURT:**  You work with what's done and presented.

10  Now, occasionally, they will send out a note from the jury that

11  will say, "We need to hear the testimony of witness X again."

12  This doesn't happen too often, but it does happen occasionally.

13  So we bring you all out here.  The court reporter reads from

14  her notes.

15      **"Q.**        What color was the light?

16      **"A.**        I don't remember.

17      **"Q.**        Are you sure you don't remember?

18      **"A.**        Well, yeah.  It was red."

19  (Laughter.)

20  Okay.  Something like that.  So then you --

21       everyone -- just like -- so you can ask for a

22       read-back.  But you don't get to hear additional

23       evidence.  You don't get to say, "Would you tell us

24       who was at that meeting?"  And then it turns out the

25       lawyers forgot to tell you who was at the meeting.

1          Well, then, that may count -- you have to take into

2          account that you don't have proof on that point.

3      It may turn out you don't need proof on that point.  It

4  may be a way to work around it.  But the record is the record

5  once it goes to you for deliberation.

6      Now, along the way, I let the jurors send me notes that I

7  then give to the lawyers.  And a note might say, "Are we going

8  to hear about what color the light was?"  Then I give it to the

9  lawyers.  And the lawyers know that at least one juror has that

10 question on their mind.  So that's okay.  But once the case and

11 the evidence is over, it's over.

12     Either the party has done a good enough job that has the

13 burden of proof or not.  If they have, they win; otherwise,

14 they lose.

15     Okay.  Next.  Anybody else want to bring up a point on

16 that?

17     Okay.  I've got a different question.  Do any of you have

18 family members who drive for Uber or Lyft or -- Uber or Lyft?

19 Anybody have a family member that does that?

20     Give you the microphone.

21     Her name is Ms. Magat.

22          **PROSPECTIVE JUROR MAGAT:**  I have family members that

23 drive taxis.

24          **THE COURT:**  Taxi.  Is that for Uber?

25          **PROSPECTIVE JUROR MAGAT:**  No.

JURY VOIR DIRE

```
 1              THE COURT:  It's for Uber?

 2              PROSPECTIVE JUROR MAGAT:  No, for a, like, taxi

 3    company, like, Luxor Cabs, I think.

 4              THE COURT:  Okay.

 5         Over there.  What's your situation?

 6              PROSPECTIVE JUROR SANDOVAL:  I have a brother that he

 7    drives an Uber car.

 8              THE COURT:  I'm sorry.  What relative?

 9              PROSPECTIVE JUROR SANDOVAL:  Brother.

10              THE COURT:  A brother?

11              PROSPECTIVE JUROR SANDOVAL:  Uh-huh.

12              THE COURT:  And he drives for Uber?

13              PROSPECTIVE JUROR SANDOVAL:  Uh-huh.

14              THE COURT:  All right.  Okay.  And how often do you

15    talk to him about that job?

16              PROSPECTIVE JUROR SANDOVAL:  Like, every weekend.

17              THE COURT:  All right.  Is there anything about that

18    situation that's going to cause you to be biased one way or the

19    other against one side or the other here?

20              PROSPECTIVE JUROR SANDOVAL:  I don't know.

21              THE COURT:  Do what?

22              PROSPECTIVE JUROR SANDOVAL:  I don't know.

23              THE COURT:  Well, let me put it differently.

24              PROSPECTIVE JUROR SANDOVAL:  I don't think I'm going

25    to be talking to him about this.
```

```
 1              THE COURT:  Well, you wouldn't be talking to anybody

 2     about this.

 3              PROSPECTIVE JUROR SANDOVAL:  Yes.

 4         (Laughter.)

 5              THE COURT:  I mean, based on what you've already heard

 6     from him, do you have any thought that you might be prejudiced

 7     one way or the other against one of these parties?

 8              PROSPECTIVE JUROR SANDOVAL:  No.

 9              THE COURT:  All right.  Thank you.

10         Let's go to Mr. Helling.

11              PROSPECTIVE JUROR HELLING:  I have a nephew that

12     drives for Lyft.

13              THE COURT:  For Lyft?

14              PROSPECTIVE JUROR HELLING:  Yeah.

15              THE COURT:  How about for Uber?

16              PROSPECTIVE JUROR HELLING:  Not for Uber, no.

17              THE COURT:  All right.  Thank you.

18         Okay.  I've got a different overall question for you.

19         You know, I've been very stern in telling you, you cannot

20     go online and do research about this case and you cannot talk

21     to your loved ones about the case or anyone else until you go

22     in and deliberate with each other.

23         After the case is over, you can talk all you want, except

24     for one thing I'm going to come to.

25         But let me just start with that.  Some people just can't
```

1  help themselves.  Some people are so addicted to their cell

2  phone and the Internet that, even though I tell you not to do

3  it, you're going to do it anyway probably.

4      So raise your hand if you just don't trust yourself to

5  follow my admonition.

6          **PROSPECTIVE JUROR MAGAT:**  I do not trust myself,

7  but --

8          **THE COURT:**  Wait.  You've got to have the microphone.

9          **PROSPECTIVE JUROR MAGAT:**  I do like researching, and I

10  did find out that this was a case that I would be summoned for

11  by googling your calendar.

12          **THE COURT:**  So you have already --

13          **PROSPECTIVE JUROR MAGAT:**  But I didn't learn anything

14  past what you've said so far about the case.

15          **THE COURT:**  Okay.  Well, first, I want to give you an

16  A-plus for being forthcoming about this.  That's good.

17          **PROSPECTIVE JUROR MAGAT:**  I googled the --

18          **THE COURT:**  Okay.

19      So did anybody else do that, by the way, any of you

20  others?  Over there.  Okay.  But in the 16 of you, did any of

21  you google the case and figure out that you were going to be

22  called for Waymo v. Uber?

23      Okay.  Nobody else.

24      All right.  So did you learn anything about this case

25  beyond what has already been said in the courtroom?

 1          **PROSPECTIVE JUROR MAGAT:**  No.  I then googled to see

 2    if that would be a bad thing to do, and it looked like it would

 3    be.

 4          (Laughter.)

 5          **THE COURT:**  All right.  And is that the first time --

 6    have you been otherwise following this case for some reason?

 7          **PROSPECTIVE JUROR MAGAT:**  No.

 8          **THE COURT:**  All right.  So have you learned

 9    anything -- don't tell me which way, but have you learned

10    anything on the Internet about this case that would cause you

11    to lean one way or the other in this case?

12          **PROSPECTIVE JUROR MAGAT:**  I have not.

13          **THE COURT:**  All right.  Thank you.

14      Anyone else who is going to have trouble -- Ms. Magat,

15    before I leave you, going forward, will you stay off the

16    Internet?

17          **PROSPECTIVE JUROR MAGAT:**  Yes.  I stayed off after

18    that part already.

19          **THE COURT:**  All right.  And you understand -- you

20    being a scientist, you understand why we've got to do it the

21    right way here?

22          **PROSPECTIVE JUROR MAGAT:**  (Nods head.)

23          **THE COURT:**  Okay.  Anyone else have a problem with the

24    admonition that -- admonition means nice word for order -- the

25    order for you not to go on the Internet about this case?

 1   Anyone?

 2       If you think you're just going to violate it, I'm going to

 3   let you off the jury, because I can't have that.  I have to

 4   have people who are going to do it the right way.

 5       All right.  Good.

 6       All right.  Now, here's another wrinkle that you don't

 7   have in many cases.  I told you this case involves alleged

 8   trade secrets.  And there are eight that are alleged in this

 9   case, that Waymo will try to prove that it owned eight trade

10   secrets and that the other side of the room, Uber, stole them

11   and used or disclosed them.

12       So that's kind of the case in a nutshell.

13       Now, here's the problem:  It's up to you to decide whether

14   or not these qualify as trade secrets.  The other side is going

15   to say, no, these don't qualify as trade secrets because they

16   are generally known scientific things anyway.  And no one has

17   the right to claim as a trade secret something that is

18   generally known.

19       On the other hand, Waymo is going to contend, no, that's

20   not right.  These are things that only were -- or were not

21   generally known and that Waymo developed on its own.  I'm

22   simplifying it slightly, but that's kind of the way the

23   argument is.

24       So you the jury are going to learn what these eight things

25   are.  And because the case could go on appeal, until the

 1   further order of the Court, even for several years, you could

 2   not tell people and discuss and disclose to somebody what these

 3   eight things are because then it wouldn't be a secret anymore.

 4   You see that?

 5       So we have to -- we have to preserve the secrecy of it in

 6   order to even preserve the contest over whether or not they

 7   qualify as a trade secret or not.

 8       So I'm not going to be -- I don't go out and tell people

 9   what these alleged trade secrets are, and you're not going to

10   be able to do that either.  And when we get to -- you're going

11   to say, "Well, we've got a courtroom full of people."

12       No, when we get to those parts, we have to clear the

13   courtroom.  It's under seal.  So you get to be on a jury in an

14   under-seal proceeding.  And then we get to talk about those

15   items that are secret.

16       So, first, do you understand what I'm just saying?  Does

17   anybody have a question about that much?

18       I guess not.  All right.

19       Here's the broader question:  Three years from now, you'll

20   still be under the admonition not to disclose these eight items

21   until -- maybe someday I might send you an order saying you can

22   disclose them at this point or not.  But until there's a court

23   order to that effect, you would be obligated to keep it to

24   yourself.

25       Some people just couldn't do that.  Some people just would

1   not be able to follow an order like that and don't want to be

2   under that restraint.  So if you don't trust yourself on that,

3   to be able to honor that requirement, I need to know about it

4   now.

5        And this is for real.  It's not like I'm doing this for --

6   what's the word? -- window dressing.  No, this is the real

7   thing.  You have to keep it to yourself.

8        All right.  Anyone would have trouble with that?

9        (No response.)

10        **THE COURT:**  Okay.  I guess not.

11        Here is another thing that comes up in trials, then I'm

12   going to let the lawyers ask you some questions.

13        I've learned this not -- these lawyers are very good, and

14   you will be telling stories to your grandchildren about the

15   great lawyering you saw in this case.

16        However, I've learned in all trials that, one, the easiest

17   way for a jury to go wrong is confusing something that a lawyer

18   says with evidence.  The evidence is what the witnesses say

19   from the stand under oath and subject to cross examination and

20   the documents and the photos and things like that that come

21   into evidence.  That's the evidence.

22        The lawyers, though, are going to be talking to you -- you

23   haven't heard much from them yet, but they are going to say a

24   lot in this case.  You will hear so much -- you'll hear five

25   times more from them than me.  And the risk is that they will

1    say something, say, in an opening statement or a closing

2    argument or just the way they phrase a question.

3        Like, they might say to a witness, "Isn't it true that the

4    light was red?"  And the witness says, "I don't remember."

5        The lawyer says, "Isn't it true the light was red?"  The

6    witness says, "I don't remember."

7        What does that prove?  It proves the witness doesn't

8    remember.  But the risk is somebody will get in deliberations

9    in the jury room and say, "You know, I heard somebody -- well,

10   I remember hearing that.  During the trial, somebody said the

11   light was red."

12       And you, I hope, will remember and say, "Oh, no, that was

13   just a lawyer talking, just a lawyer.  The judge told us that's

14   not evidence."

15       It's what -- all the witness said was, "I don't remember."

16       So as you go through the trial, it is extremely important

17   that you keep track of what the lawyers say.  Respect what

18   lawyers say, that's fine, but you don't treat that as evidence

19   ever unless I give you a specific statement that you can.  And

20   you keep straight what is evidence versus lawyer talking.

21   Okay?

22       Now, my question to you is, do you think -- any of you

23   think that you'll get confused between those two such that you

24   will treat what the lawyers say as evidence?  If so, you need

25   to tell me now because maybe you shouldn't serve on the jury.

 1         Anybody think you're going to have a problem there?

 2         (No response.)

 3         **THE COURT:**  All right.  Okay.  Here is what we're

 4    going to do for a while.  I'm going to be quiet and you are

 5    going to get a chance now to see some of these outstanding

 6    lawyers in action.  And they are going to get to ask you some

 7    questions about your background.

 8         And why am I allowing this?  It's because we want to get

 9    the fairest jury we can, and they are within their rights to

10    ask you questions that pry a little bit into your background

11    because they want to know if you're going to be biased against

12    them or maybe you had some prior experience that would make you

13    unsuitable for this case.  So don't hold it against them

14    because they ask you some prying questions.  Both sides are

15    going to do that.

16         Mr. Verhoeven, you get to go first.  Thank you.  The floor

17    is yours.

18         **MR. VERHOEVEN:**  Thank you, Your Honor.

19         Good morning to you all.  Let me start by saying thank you

20    very much.  I know this is a big burden.  And it's taking out

21    of your time.  And all of us lawyers in this courtroom, all of

22    us, very much appreciate your service as potential jurors in

23    this case.

24         **THE COURT:**  You're not using the mic, which is okay,

25    but you've got to keep your voice up.  If any member of you 16

1    or anybody in the back of the courtroom -- because I want

2    everyone to hear you.  If you can't hear, raise your hand so

3    that I can -- I can try to fix it.  All right.

4         **MR. VERHOEVEN:**  So I'm going to be asking you

5    questions about yourself, and so I think it's only fair that I

6    tell you just a little bit about myself as well.

7         My name is Charles Verhoeven.  I go by Charlie.  I grew up

8    in Iowa in the Midwest.  I've lived in California for 26 years.

9    I currently live down in San Mateo.  I'm married, been married

10   for 21 years.  Have a 14-year-old boy -- he's in high school --

11   and a 12-year-old daughter, and she's in middle school.  So

12   that's a little bit about me.

13        Now, before I go into the specific questions, I just want

14   to say a few general things.  I'm going to start this by asking

15   you all questions and asking for a show of hands.  And when I

16   do that, please keep your hands raised until I tell you to put

17   them down.  I'm probably going to ask some follow-up questions

18   of some of you and not others.

19        If I ask you follow-up questions, that doesn't mean I'm

20   picking on you.  So please don't take it the wrong way.  And if

21   I don't ask you follow-up questions, I'm not ignoring you.

22   It's just this process that we have to go through that's sort

23   of unnatural.

24        Certainly, if I ask a question, please understand I'm not

25   trying to insult anybody, I'm not trying to embarrass anybody.

1   This is just a process that we need to go through to make sure

2   that all of you are going to be fair and impartial and don't

3   have some -- even if you want to be fair and impartial, don't

4   have some connection or some aspect that you may not even

5   realize but we would have realized would cause an issue.

6         So this is our only chance for the lawyers to actually

7   talk to you and ask you questions.  For the rest of the trial,

8   we'll talk to you, but we can't ask you any questions.  So now

9   is your time to speak up in response.

10        A lot of people think, "Well" -- a lot of people who don't

11  want to be on juries think, "Well, if I never say anything, I

12  won't get picked."  But that's actually not the case.  So you

13  need to speak up and answer the questions fully so that we can

14  avoid having a problem later.

15        The judge has already told you the summary of this case.

16  It's a trade secret case.  My client is a company called Waymo.

17  Waymo is a subsidiary of a company called Alphabet, which is

18  the owner of Google.  Until recently, Waymo's business was part

19  of Google, and then they got spun out as a separate company

20  from Google.  And Waymo's business, as the Court said, was

21  driverless cars, developing driverless car technology.

22        In this case, Waymo is alleging that Uber misappropriated

23  trade secrets that Waymo had developed.  And we'll go into the

24  specifics of that when we go into the trial.

25        Now, I'm going to start by asking some background

 1    questions.  And I think I'll start with the joint submission,

 2    Your Honor, about the proposed order of questions.

 3            THE COURT:  However you would like to proceed, go

 4    ahead.

 5            MR. VERHOEVEN:  Thank you.

 6        So this is the part where you raise your hand in the group

 7    if it calls for it.

 8        Do you or anyone close to you have any training,

 9    experience or special knowledge in -- and I'm going to list

10    some fields.  So listen carefully.

11        Vehicle design and manufacturing?  Raise your hand if you

12    have experience in that.

13            THE COURT:  I didn't hear the term.

14            MR. VERHOEVEN:  Vehicle design and manufacturing.

15            THE COURT:  All right.  All right.

16            MR. VERHOEVEN:  Self-driving vehicles?  Does anyone

17    have experience in self-driving vehicles?

18            PROSPECTIVE JUROR LEVIN:  I'm a --

19            THE COURT:  You need the microphone and you need to

20    state your name so that -- the reason for that is so the court

21    reporter can say who is speaking.

22            PROSPECTIVE JUROR LEVIN:  John Levin.  I have an

23    acquaintance or friend who has worked for a company developing

24    GIS or GPS technologies for self-driving cars.

25            MR. VERHOEVEN:  Where does your friend work?

JURY VOIR DIRE

1          **PROSPECTIVE JUROR LEVIN:**  Swift, Swift Technologies.

2     And I think they are just doing affordable devices so that

3     they're, you know, more prevalent.

4          **MR. VERHOEVEN:**  Do you know what your friend does

5     there?

6          **PROSPECTIVE JUROR LEVIN:**  I believe he's a director of

7     software development.  He doesn't talk about his job much other

8     than where he is and what they do.

9          **MR. VERHOEVEN:**  And can you tell me any more

10    specifically, besides sort of GPS-related, what he does?

11         **PROSPECTIVE JUROR LEVIN:**  Just the fact that he has

12    been a director for many, many years in different companies.

13    He's been through a lot of start-ups, where I've got some of

14    the tech background we've talked about.  And he goes back to

15    computer systems at the basic hardware level and writing

16    firmware and BIOS and stuff.  He's got a prevalent background,

17    is all I know.

18         **MR. VERHOEVEN:**  Has he told you anything about

19    driverless car technology that makes you come here with a

20    predisposition about any of that technology?

21         **PROSPECTIVE JUROR LEVIN:**  No.

22         **MR. VERHOEVEN:**  Okay.  Thank you.

23    Anyone else have any experience with driverless vehicles?

24    (No response.)

25         **MR. VERHOEVEN:**  No?

 1          All right.  What about optical lasers?  Anyone have

 2    experience with optical lasers?

 3          (No response.)

 4          **MR. VERHOEVEN:**  There is a technology called LiDAR.

 5    Has anyone heard of the technology LiDAR?

 6          Okay.  Let's see -- make sure I get the right person.  Is

 7    it Mr. Meyers; is that right?

 8          **PROSPECTIVE JUROR MEYERS:**  Yes.

 9          **MR. VERHOEVEN:**  Mr. Meyers, do you have any experience

10    with LiDAR?

11          **PROSPECTIVE JUROR MEYERS:**  I'm just familiar with the

12    term.  I know it's, like, an optical light, radar basically.

13    As much as I know.

14          **MR. VERHOEVEN:**  Okay.  Do you know what kind of light?

15          **PROSPECTIVE JUROR MEYERS:**  I think it's visible light.

16          **MR. VERHOEVEN:**  Okay.  Thank you.

17          Back to Mr. Levin.

18          **PROSPECTIVE JUROR LEVIN:**  Unrelated to driverless car,

19    in PG&E, I'm actually in the supply chain.  I used to work in

20    environmental and land management and as part of that, they

21    used LiDAR for their survey.  And I guess they set up the

22    devices and get a clear 3-D picture of, say, a substation and

23    such.  So I have awareness to that capacity.

24          **MR. VERHOEVEN:**  Okay.  Have you ever worked with LiDAR

25    technically?

 1            **PROSPECTIVE JUROR LEVIN:**  No.

 2            **MR. VERHOEVEN:**  Do you have an understanding of how it

 3   works technically?

 4            **PROSPECTIVE JUROR LEVIN:**  Very, very basic.  Just that

 5   it is a form of radar using light.

 6            **MR. VERHOEVEN:**  Okay.  Do you know what kind of light

 7   it uses?

 8            **PROSPECTIVE JUROR LEVIN:**  No.

 9            **MR. VERHOEVEN:**  Thank you.

10       Anyone else?

11       Okay.  Is it -- I don't want to mispronounce your name.

12            **PROSPECTIVE JUROR MAGAT:**  Magat.

13            **MR. VERHOEVEN:**  Magat.

14            **PROSPECTIVE JUROR MAGAT:**  Magat.

15       I don't know about LiDAR technology, but I've worked with

16   a lot of optical lasers at work with my microscopes and things

17   like that.

18            **MR. VERHOEVEN:**  All medical-related?

19            **PROSPECTIVE JUROR MAGAT:**  Pretty much, yeah, biology.

20            **MR. VERHOEVEN:**  What kind of lasers?

21            **PROSPECTIVE JUROR MAGAT:**  I've worked with UV and then

22   focal, IR, very complex microscopes, things like that.

23            **MR. VERHOEVEN:**  What did you say there?

24            **PROSPECTIVE JUROR MAGAT:**  Focal microscopy.  I think

25   it's called a white light laser that can do the whole spectrum

1    pretty much.

2            **MR. VERHOEVEN:**  IR is infrared?

3            **PROSPECTIVE JUROR MAGAT:**  Yeah.

4            **MR. VERHOEVEN:**  Okay.  Thank you.

5        Does anyone else have any experience with optical lasers

6    or LiDAR?

7        Mr. Regelman?

8            **PROSPECTIVE JUROR REGELMAN:**  Yes.

9            **MR. VERHOEVEN:**  Did I pronounce that correctly?

10            **PROSPECTIVE JUROR REGELMAN:**  Yes.

11            **MR. VERHOEVEN:**  What's your experience, sir?

12            **PROSPECTIVE JUROR REGELMAN:**  Just I'm working for a

13    company and we're testing controls, TV controls also, equipment

14    using IR signals.  It's considered as a laser, yes.

15            **MR. VERHOEVEN:**  And what's the nature of your

16    involvement specifically with IRCs?

17            **PROSPECTIVE JUROR REGELMAN:**  Just the testing, testing

18    the response to the IR signal.

19            **MR. EISEMAN:**  I'm sorry.  Do you work on testing the

20    IRCs themselves, or do you use them for testing?

21            **PROSPECTIVE JUROR REGELMAN:**  I use them for testing.

22            **MR. VERHOEVEN:**  So are you familiar with how IRCs

23    work?  Have you taken them apart, designed them, worked on them

24    at all?

25            **PROSPECTIVE JUROR REGELMAN:**  No, no.

JURY VOIR DIRE

1          MR. VERHOEVEN:  Right.  Let's go back again and ask,

2   anybody else have any experience with optical lasers or LiDAR?

3       (No response.)

4          MR. VERHOEVEN:  Nobody.  What about radar?  Does

5   anyone have any experience with radar?

6       Mr. Brown, is that right?  What's your experience?

7          PROSPECTIVE JUROR BROWN:  Yes.  Do I need the mic?

8          MR. VERHOEVEN:  Oh, yes, you do.  I'm sorry.

9          PROSPECTIVE JUROR BROWN:   In the Air Force I worked on

10  F-15s, so we used radar.

11         MR. VERHOEVEN:  And did you work on the actual radar

12  mechanisms and how they worked?  Did you design them or --

13         PROSPECTIVE JUROR BROWN:  I did.

14         MR. VERHOEVEN:  You did?  Okay.

15      Can you explain, give me some color on that?

16         PROSPECTIVE JUROR BROWN:  We worked on just aircraft

17  radar, so just -- like, just swapping the units out for the

18  jets.  Nothing too specific, basic.

19         MR. VERHOEVEN:  Did you repair the units?

20         PROSPECTIVE JUROR BROWN:  I did.

21         MR. VERHOEVEN:  So can you explain what kind of

22  repairs you would do?

23         PROSPECTIVE JUROR BROWN:  Usually it's more, like,

24  swapping or, like -- just, like, wire, troubleshooting.  But I

25  didn't take it apart and, like, build-it-back-together kind of

1    thing.

2            MR. VERHOEVEN:   Okay.   Any other experience besides

3    that in the military?

4            PROSPECTIVE JUROR BROWN:   No.

5            MR. VERHOEVEN:   Okay.   Thank you very much.

6        Anybody else for radar?   Any experience with radar?

7        (No response.)

8            MR. VERHOEVEN:   No?   Okay.   Thank you.

9        Does anyone have experience with semiconductor design?

10   Raise your hand if you have experience with semiconductor

11   design?

12       Mr. Lombard.

13           PROSPECTIVE JUROR LOMBARD:   I work in supply chain for

14   a semiconductor manufacturer based out of Livermore.

15           MR. VERHOEVEN:   And was that computer info systems?

16   Did you say?

17           PROSPECTIVE JUROR LOMBARD:   No, supply chain for Lam

18   Research.   They make semiconductor equipment.

19           MR. VERHOEVEN:   Lam Research, okay.   When you say

20   "supply chain," is that a separate company from --

21           PROSPECTIVE JUROR LOMBARD:   From Lam, yeah.   We supply

22   materials for them to build their machines.

23           MR. VERHOEVEN:   So what's the company you work for,

24   the name of the company?

25           PROSPECTIVE JUROR LOMBARD:   Gexpro Services,

1    G-e-x-p-r-o.

2            MR. VERHOEVEN:   And what's your position at Gexpro

3    Services?

4            PROSPECTIVE JUROR LOMBARD:   I'm a branch manager.

5            MR. VERHOEVEN:   And what does your job entail?

6            PROSPECTIVE JUROR LOMBARD:   I ensure that the

7    materials that Lam needs to make their machines arrive on time

8    and without flaws or defect.

9            MR. VERHOEVEN:   Without?

10           PROSPECTIVE JUROR LOMBARD:   Flaws or defects.  You

11   know, if -- there's a quality control involved with that.

12           MR. VERHOEVEN:   Do you get down into the science of

13   the products?

14           PROSPECTIVE JUROR LOMBARD:   Not to the science for

15   Lam's machines, but root cause analysis for parts that might

16   fail in the machine.

17           MR. VERHOEVEN:   So you get into the reasons why

18   something might fail or fixing something that --

19           PROSPECTIVE JUROR LOMBARD:   If there's a particular

20   problem with a part, you know, doing a root cause analysis.

21           MR. VERHOEVEN:   Could you give me a couple examples of

22   what that would be?

23           PROSPECTIVE JUROR LOMBARD:   Sure.  Say there is a

24   screw that's out of spec or improperly coated that's in the

25   chamber -- in the chamber that makes the silicon wafer.  It

 1  could cause rust or cause the surface of the wafer to be

 2  contaminated with a foreign particle.  In that case, you would

 3  do an 8-D, you know, ask the five whys, get to the root cause.

 4          MR. VERHOEVEN:  So it sounds like you're pretty

 5  technically adept?

 6          PROSPECTIVE JUROR LOMBARD:  Generally.  Not

 7  specifically to the design of an -- at your deposition machine,

 8  but --

 9          MR. VERHOEVEN:  Okay.  Thank you.

10      Anybody else, semiconductor design?  Anybody else work in

11  semiconductors, semiconductor design?

12      (No response.)

13          MR. VERHOEVEN:  Okay.  Electrical engineering?  Anyone

14  who is an electrical engineer here?

15      (No response.)

16          MR. VERHOEVEN:  Okay.  Product design and product

17  development?  Does anyone work in those fields?

18      (No response.)

19          MR. VERHOEVEN:  I think I know the answer, but I just

20  want a check of hands.  Anyone work in finance?  The

21  accountants will raise their hand.  Let me just make sure I've

22  got them.

23      (Brief pause.)

24          MR. VERHOEVEN:  And, Mr. Meyers, you're -- are you a

25  software engineer?

 1          **PROSPECTIVE JUROR MEYERS:**  Yeah.  I'm a software

 2   engineer at a financial tech company.  So I don't work with

 3   finance directly, but I work at a financial company.

 4          **MR. VERHOEVEN:**  Oh, at a financial company?

 5          **PROSPECTIVE JUROR MEYERS:**  Correct.

 6          **MR. VERHOEVEN:**  And that's Eqis?

 7          **PROSPECTIVE JUROR MEYERS:**  Eqis, yeah, E-q-i-s.

 8          **MR. VERHOEVEN:**  But you don't have any

 9   responsibilities for the counting and the financing?

10          **PROSPECTIVE JUROR MEYERS:**  No, no.

11          **MR. VERHOEVEN:**  Okay.  Thank you.

12      And, Mr. Helling, I already know your information.

13      Was there anybody else who raised your hand for

14   accounting?

15      (No response.)

16      Mr. Di Domenico, did I pronounce that right?

17          **PROSPECTIVE JUROR DI DOMENICO:**  Yes.

18          **MR. VERHOEVEN:**  You're listed as an accountant as

19   well.  What kind of accounting do you do?

20          **PROSPECTIVE JUROR DI DOMENICO:**  Well, right now I do

21   accounting for a women's clothing line and I help with if we

22   have to file any sort of reports, sales tax returns, AR.  And

23   any general accounting stuff I help out with, as well as

24   financial documents for auditors or CPAs, which we're going

25   through right now.

JURY VOIR DIRE

```
 1            MR. VERHOEVEN:  Thank you very much.
 2       Next.  Does anybody have any experience with trade secret
 3    law?  Any people have a side desire to learn trade secret law?
 4       (No response.)
 5            MR. VERHOEVEN:  I see a bunch of scowls.
 6       Okay.  Does anyone have knowledge of it through some
 7    experience in their life?
 8            THE COURT:  Ms. Magat raised her hand.
 9            MR. VERHOEVEN:  Ms. Magat, we'll wait for your...
10            PROSPECTIVE JUROR MAGAT:  Not a ton of experience, but
11    I sometimes have to read patents for work.
12            MR. VERHOEVEN:  Okay.  And you understand that a
13    patent is different from a trade secret?
14            PROSPECTIVE JUROR MAGAT:  I guess I didn't realize
15    that, no.
16            MR. VERHOEVEN:  Okay.  Well, let me just talk to the
17    jury a little bit about this generally.
18       So a patent is not the same thing as a trade secret.  A
19    patent is something you apply for with the government for an
20    invention, something that's new and unique that you invented.
21    That's what a patent is.
22       A trade secret is not a patent.  A trade secret is a
23    different type of what's called intellectual property.  And for
24    a trade secret, it doesn't need to be an invention.  It needs
25    to have -- say you're in a business.  It needs to have economic
```

 1    value to your business and you have to keep it secret.  So they

 2    are very different things.

 3         And it's important that -- you'll get instructed at the

 4    end of the case about the law.  I'm not telling you the law.

 5    I'm just saying, generally, those are two different animals.

 6         And is there anyone who would have problems with that

 7    distinction?

 8         (No response.)

 9         MR. VERHOEVEN:  Nobody thinks, well, if it's not an

10    invention, it shouldn't be a trade secret?

11         (No response.)

12         MR. VERHOEVEN:  Okay.

13         And I take it, Ms. Magat, that you haven't had any direct

14    involvement in trade secrets; is that right?

15         PROSPECTIVE JUROR MAGAT:  No.

16         MR. VERHOEVEN:  Okay.  What kind of patents?  What

17    subject matters were the patents?

18         PROSPECTIVE JUROR MAGAT:  They're usually for

19    therapeutics, pharmaceutical drugs.

20         MR. VERHOEVEN:  Okay.  Thank you.

21         What about buying or selling companies?  Anybody here

22    bought a company, sold a company, been a part of an M&A team or

23    part of the structure of a company that evaluates potential

24    purchases or sales?  Raise your hand.

25         (No response.)

1          **MR. VERHOEVEN:**  Nobody?

2      So I guess this goes more to our software folks.  Anybody

3  in your job involved with forensic analysis of data systems?

4  By "forensic," I mean let's go back and see what somebody did.

5  Or let's go back and see what the data was.  So you're going

6  backward and you're forensically analyzing the data.

7      Mr. Levin.

8          **PROSPECTIVE JUROR LEVIN:**  I don't think it directly

9  applies, but prior to PG&E was in tech operations for

10  start-ups.  And for systems they were running, we would go

11  through logs to identify and do a root cause analysis and

12  corrective action.  Again, it's at a much higher level than --

13  than this.

14          **MR. VERHOEVEN:**  Right.  So you go through logs?

15          **PROSPECTIVE JUROR LEVIN:**  Yeah.

16          **MR. VERHOEVEN:**  Anything more specific than that?

17          **PROSPECTIVE JUROR LEVIN:**  Work with engineering to

18  take corrective action.  If we found something that needed to

19  be done, then give them feedback.  And they would be part of

20  the process as well.

21          **MR. VERHOEVEN:**  Okay.

22      Anybody else?  Forensic analysis?

23      Mr. Regelman.

24          **PROSPECTIVE JUROR REGELMAN:**  I don't know if analyzing

25  logs is considered like this analysis.  This is what I do.  I

1    go back to the previous stage and analyze what's happened and

2    see where there's a failure and report if there is a failure to

3    the developers.

4         MR. VERHOEVEN:  So you go back and look at -- if

5    there's a failure, you go back and look at the logs to try and

6    figure out what happened?

7         PROSPECTIVE JUROR REGELMAN:  Right.

8         MR. VERHOEVEN:  Do you do anything else with the logs?

9         PROSPECTIVE JUROR REGELMAN:  No, I don't think so.

10        MR. VERHOEVEN:  Okay.  Thank you.

11        Last -- last general question about occupations is data

12   security.  Does anybody's job involve data security?

13        Okay.  Mr. Levin.

14        PROSPECTIVE JUROR LEVIN:  Just, in tech ops security

15   is everything and keeping your systems running.  You know, if

16   you've got a computer server and it gets rootkitted and someone

17   takes over, then you've lost your business.

18        So I definitely manage firewalls, routers, switches,

19   networks; installed, managed, et cetera.

20        MR. VERHOEVEN:  Are there people at PG&E that are --

21   is there a department in charge of security?

22        PROSPECTIVE JUROR LEVIN:  There is.  I'm not

23   associated with that.

24        MR. VERHOEVEN:  Okay.  So how would your daily work

25   involve -- touch on that?

JURY VOIR DIRE

 1          **PROSPECTIVE JUROR LEVIN:**  Right now, it doesn't.  In

 2    the past, it had when I was in tech ops, technology experience.

 3          **MR. VERHOEVEN:**  Tell me about that, tech ops and your

 4    experience.

 5          **PROSPECTIVE JUROR LEVIN:**  The companies I work for,

 6    you know, a voice-over IP provider that I was running all the

 7    tech operations.  There's a broadband wireless company that I

 8    was working with.  Another one was basically a platform as a

 9    service, as they like to call themselves, where you're

10    delivering all the data lines, servers, services on top of the

11    servers.  And that's managing the data center, routers,

12    switches, data lines.  Just everything that --

13          **MR. VERHOEVEN:**  You were responsible for almost

14    everything, then, in those jobs; is that right?

15          **PROSPECTIVE JUROR LEVIN:**  Yeah.

16          **MR. VERHOEVEN:**  Okay.  Got it.

17       Was there anybody else for data security?

18       Ms. Bowen.

19          **PROSPECTIVE JUROR BOWEN:**  Only as it relates to

20    patient medical records.

21          **MR. VERHOEVEN:**  Okay.

22          **PROSPECTIVE JUROR BOWEN:**  So I don't --

23          **MR. VERHOEVEN:**  That's very important.

24          **PROSPECTIVE JUROR BOWEN:**  Yeah.  And we are trusted

25    not to access data that we're not supposed to, but that's it.

1          **MR. VERHOEVEN:**  Okay.  Thank you.

2      Ms. --

3          **PROSPECTIVE JUROR MARSHALL:**  Marshall.

4          **MR. VERHOEVEN:**  -- Marshall.  Thank you.

5          **PROSPECTIVE JUROR MARSHALL:**  It's the same as Juror

6  Number 1, medical information.

7          **MR. VERHOEVEN:**  So keeping the medical information

8  private so it doesn't get out to the public and people's names

9  and things like that?

10         **PROSPECTIVE JUROR MARSHALL:**  Correct.  As well as

11  uploading data to the state.  In the State of California, they

12  require inpatient and same-day surgery data to be uploaded to

13  them.

14         **MR. VERHOEVEN:**  But your experience doesn't involve

15  setting up the security system itself and the software or

16  anything like that?

17         **PROSPECTIVE JUROR MARSHALL:**  No.  My job is to provide

18  the data to them in a file and to work any error reports so

19  that the data becomes formal.

20         **MR. VERHOEVEN:**  Okay.  Thank you very much.

21         **PROSPECTIVE JUROR POSADAS:**  Mine just involved medical

22  records --

23         **MR. VERHOEVEN:**  Just for the record, it's Mr. Posadas?

24         **PROSPECTIVE JUROR POSADAS:**  Yes, sir.  So as an

25  optician working for Kaiser, I access medical records for the

```
 1   patient information regarding their prescription.

 2         MR. VERHOEVEN:  And so you want to keep that --

 3         PROSPECTIVE JUROR POSADAS:  That's confidential,

 4   period.

 5         MR. VERHOEVEN:  Got it.  Got it.

 6      Ms. Collard?

 7         PROSPECTIVE JUROR COLLARD:  Yeah, fifth in line here,

 8   patient medical records.

 9         MR. VERHOEVEN:  Okay.  And Mr. Regelman again?

10         PROSPECTIVE JUROR REGELMAN:  At some period of time, I

11   work as real estate appraiser.  So I supposed to keep full

12   property records and clients' records.

13         MR. VERHOEVEN:  Okay.  I missed what you said.  For

14   some period of time, you worked where?

15         PROSPECTIVE JUROR REGELMAN:  Real estate appraiser.

16         MR. VERHOEVEN:  Okay.

17         PROSPECTIVE JUROR REGELMAN:  I appraise the

18   properties.

19         MR. VERHOEVEN:  Okay.  And that's important to keep

20   confidential?

21         PROSPECTIVE JUROR REGELMAN:  Yes.

22         MR. VERHOEVEN:  Okay.  I got it.

23      Have any of you ever owned a business?  Okay.

24         THE COURT:  Keep your hands up, please.  Higher.  One,

25   two, three.  Okay.
```

1    **MR. VERHOEVEN:**  Mr. Perazzo -- did I pronounce that

2  right?

3         **PROSPECTIVE JUROR PERAZZO:**  Yes.

4    **MR. VERHOEVEN:**  Tell me about your business.

5         **PROSPECTIVE JUROR PERAZZO:**  My wife's business.  She

6  has a medical billing company.  Now that we're married,

7  technically we own it together, but it is her business.

8    **MR. VERHOEVEN:**  You're a co-owner?

9         **PROSPECTIVE JUROR PERAZZO:**  By marriage.

10    **MR. VERHOEVEN:**  Is that a question you don't want to

11  answer yet?

12         **PROSPECTIVE JUROR PERAZZO:**  I don't know the right way

13  to answer that.  We're married, and it's her business, so...

14    **MR. VERHOEVEN:**  Okay.

15         **PROSPECTIVE JUROR PERAZZO:**  I don't know how that

16  goes.

17    **MR. VERHOEVEN:**  Okay.  Do you have any

18  responsibilities in the business?

19         **PROSPECTIVE JUROR PERAZZO:**  Just what she tells me to

20  do.

21     (Laughter.)

22         **PROSPECTIVE JUROR PERAZZO:**  Go to the bank, go to the

23  PO box.  Husband duties, yes.

24    **MR. VERHOEVEN:**  Okay.  But no formal title or anything

25  like that?

JURY VOIR DIRE

```
 1            PROSPECTIVE JUROR PERAZZO:  No, not involved in the

 2   actual medical billing itself.

 3            MR. VERHOEVEN:  Then I think we had Ms. Stoney.

 4            PROSPECTIVE JUROR STONEY:  Yes.  I currently own my

 5   own company.

 6            MR. VERHOEVEN:  Okay.  And what's the name of the

 7   company?

 8            PROSPECTIVE JUROR STONEY:  TheMessageCrafter.com.

 9            MR. VERHOEVEN:  And what's the business?

10            PROSPECTIVE JUROR STONEY:  I'm a writing coach, writer

11   and editor.

12            MR. VERHOEVEN:  Okay.  So what does your business --

13   what services does your business provide.

14            PROSPECTIVE JUROR STONEY:  I provide writing coach

15   services, writing and editing to individuals and small-business

16   owners.

17            MR. VERHOEVEN:  How long have you had the business?

18            PROSPECTIVE JUROR STONEY:  It will be five years in

19   August.

20            MR. VERHOEVEN:  Were there any other employees besides

21   yourself?

22            PROSPECTIVE JUROR STONEY:  No.  My husband functions

23   as something of a financial manager for me.

24            MR. VERHOEVEN:  Okay.  Thank you very much.

25       Who else do we have?  Mr. Levin again.
```

1          **PROSPECTIVE JUROR LEVIN:**  You can tell I like holding

2     the microphone.

3          I'd say don't ask about my career path, but before I got

4     into technology, I was a locksmith for a while and I owned my

5     own locksmith company.

6          And within technology, because it was start-ups, there

7     were a lot of ups and downs.  So I also had periods where I was

8     working as a consultant just to continue earning money between

9     companies, you know, losing venture capital, et cetera.

10         **MR. VERHOEVEN:**  So how long ago was the locksmith

11    company?

12         **PROSPECTIVE JUROR LEVIN:**  Through the '90's for about

13    six years.  That could be considered related to security too,

14    but it's physical rather than technical.  Just hardware,

15    physical locks.

16         **MR. VERHOEVEN:**  All right.  And then these other

17    companies where you weren't the technical owner, but you were a

18    consultant to them?

19         **PROSPECTIVE JUROR LEVIN:**  Right.

20         **MR. VERHOEVEN:**  Okay.  Thank you very much.

21         Ms. Collard?

22         **PROSPECTIVE JUROR COLLARD:**  Yeah.  I guess it's

23    considered a business.  My brother and sister and I are equal

24    partners in a family camp business.

25         **MR. VERHOEVEN:**  Okay.  And can you explain what that

JURY VOIR DIRE

1   is.

2          **PROSPECTIVE JUROR COLLARD:**  It's a summer camp for

3   ward children 7 to 17 that's located up in the Northern

4   California Trinity Alps area.  We inherited it from our

5   grandparents, and it's been a summer camp for close to

6   100 years.

7          **MR. VERHOEVEN:**  How many people would you say are in

8   the summer camp on an average summer?

9          **PROSPECTIVE JUROR COLLARD:**  150, 200.

10          **MR. VERHOEVEN:**  So you have a staff?

11          **PROSPECTIVE JUROR COLLARD:**  Yes.

12          **MR. VERHOEVEN:**  And who is responsible for running

13   that business?

14          **PROSPECTIVE JUROR COLLARD:**  My brother.

15          **MR. VERHOEVEN:**  Okay.  And you're a co-owner, I take

16   it?

17          **PROSPECTIVE JUROR COLLARD:**  Yes.

18          **MR. VERHOEVEN:**  Do you have any responsibilities with

19   respect to the business yourself besides co-ownership?

20          **PROSPECTIVE JUROR COLLARD:**  No.  We have bi-annual

21   meetings.  And if there is a big project, you know, I put my

22   two cents in, but no.

23          **MR. VERHOEVEN:**  Okay.

24          **PROSPECTIVE JUROR COLLARD:**  Other than that, no.

25          **MR. VERHOEVEN:**  Thank you.

```
 1          And then Mr. Regelman.

 2               PROSPECTIVE JUROR REGELMAN:  It's real estate

 3     appraising business.  I got it for ten years.

 4               MR. VERHOEVEN:  For ten years?

 5               PROSPECTIVE JUROR REGELMAN:  Yeah.  And I don't have

 6     it anymore.

 7               MR. VERHOEVEN:  Okay.  What was the name of the

 8     business?

 9               PROSPECTIVE JUROR REGELMAN:  Gregory Regelman,

10     Residential Real Estate Appraiser.

11               MR. VERHOEVEN:  Okay.

12               PROSPECTIVE JUROR REGELMAN:  Something like that.

13               MR. VERHOEVEN:  Did you get a -- does being a real

14     estate appraiser require you to get some sort of --

15               PROSPECTIVE JUROR REGELMAN:  Yeah, I was certified.  I

16     got licensed and I was certified, California-certified real

17     estate appraiser.

18               MR. VERHOEVEN:  Okay.  And approximately what

19     timeframe was that ten-year period?

20               PROSPECTIVE JUROR REGELMAN:  From '05, 2005 to 2015.

21               MR. VERHOEVEN:  Okay.  Thank you very much.

22               THE COURT:  Mr. Brown has his hand up.

23               MR. VERHOEVEN:  Oh, I'm sorry.

24          Mr. Brown?

25               PROSPECTIVE JUROR BROWN:  I have a business license
```

1    for Airbnb.  I don't know.  I guess that counts as a company.

2         MR. VERHOEVEN:  And can you explain to me -- I've

3    never used Airbnb, so can you explain to me what it means to

4    have a business license for that?

5         PROSPECTIVE JUROR BROWN:  So I guess recently the city

6    had required that anyone that does any Airbnb hosting has to

7    get this license.  So I just started that up last year.

8         MR. VERHOEVEN:  Okay.  All right.  Thank you.

9         And anyone else, just for completeness, have any ownership

10   in a business besides people who have already --

11       Okay.  Mr. Sandoval?

12        PROSPECTIVE JUROR SANDOVAL:  I'm a landlord.  I own

13   some apartments.

14        MR. VERHOEVEN:  Okay.  Are those in the city?

15        PROSPECTIVE JUROR SANDOVAL:  In Oakland and Manteca.

16        MR. VERHOEVEN:  Roughly, how many?

17        PROSPECTIVE JUROR SANDOVAL:  Units is about 13.

18        MR. VERHOEVEN:  13.

19       Do you have employees besides yourself?

20        PROSPECTIVE JUROR SANDOVAL:  I have co-owners with me,

21   my brothers.

22        MR. VERHOEVEN:  Okay.

23        PROSPECTIVE JUROR SANDOVAL:  No employees.

24        MR. VERHOEVEN:  And then what -- what's your

25   responsibility besides ownership?

JURY VOIR DIRE

```
 1          PROSPECTIVE JUROR SANDOVAL:  Just to make sure

 2    everything is -- bills are paid on time and people has all the,

 3    you know, gas, electricity, all the utilities.

 4          MR. VERHOEVEN:  Okay.  Thank you, sir.

 5       Anyone else, just for completeness, have an ownership

 6    interest in a business?

 7       (No response.)

 8          MR. VERHOEVEN:  Okay.

 9       (Brief pause.)

10          MR. VERHOEVEN:  I'm just looking through the general

11    questions because I think His Honor has already asked several

12    of these.

13       Does anyone here have like a close relationship with a

14    lawyer?  You've got to raise your hand up higher.

15       This is Ms. Magat?

16          PROSPECTIVE JUROR MAGAT:  Yeah.  My cousin is a

17    lawyer, and we were roommates for about three years.

18          MR. VERHOEVEN:  So did any of his legal knowledge rub

19    off on you?

20          PROSPECTIVE JUROR MAGAT:  I don't think so.

21          MR. VERHOEVEN:  Okay.  I take it you didn't learn

22    anything about trade secret law from him?

23          PROSPECTIVE JUROR MAGAT:  No.

24          MR. VERHOEVEN:  Okay.  Do you know, is he still a

25    lawyer?
```

1           **PROSPECTIVE JUROR MAGAT**:  He is not.

2           **MR. VERHOEVEN**:  Okay.  Thank you very much.

3       Mr. Perazzo?

4           **PROSPECTIVE JUROR PERAZZO**:  Yes.  A long-time friend,

5   Patricia, has been my wife's friend for years.  And she was

6   kind of her counsel and guidance when she opened her business.

7           **MR. VERHOEVEN**:  Okay.  And is she still in the

8   practice of law?

9           **PROSPECTIVE JUROR PERAZZO**:  Yes.

10          **MR. VERHOEVEN**:  And what does she primarily do?

11          **PROSPECTIVE JUROR PERAZZO**:  The firm she works at in

12  Novato, they dealt a lot with the mesothelioma cases and

13  settlements.  And then she has a private practice here in the

14  city, and I don't know exactly what she's into.  It might be

15  personal injury.  I'm not positive.

16          **MR. VERHOEVEN**:  Do you know if she's on the plaintiff

17  side or defense side usually?

18          **PROSPECTIVE JUROR PERAZZO**:  Defense.

19          **MR. VERHOEVEN**:  Defense side usually?

20          **PROSPECTIVE JUROR PERAZZO**:  Yeah.

21          **MR. VERHOEVEN**:  Okay.  And have you and her talked

22  about the law at all?

23          **PROSPECTIVE JUROR PERAZZO**:  Oh, God, yeah.

24          **MR. VERHOEVEN**:  You have?

25          **PROSPECTIVE JUROR PERAZZO**:  Well, she loves to talk

```
 1    about it.  It doesn't take much.  I could ask her any question,
 2    and it's a good hour.
 3            MR. VERHOEVEN:  What areas have you learned about in
 4    the law?
 5            PROSPECTIVE JUROR PERAZZO:  A lot of real estate.
 6            MR. VERHOEVEN:  Okay.
 7            PROSPECTIVE JUROR PERAZZO:  You know, just what she
 8    knows.  A lot about the mesothelioma, the details, just what
 9    she does.  And that's about it.  Just general stuff.
10            MR. VERHOEVEN:  What about intellectual property, like
11    patents or copyrights or trade secrets?
12            PROSPECTIVE JUROR PERAZZO:  No, she does not get into
13    that.
14            MR. VERHOEVEN:  She doesn't do any of that?
15            PROSPECTIVE JUROR PERAZZO:  No.
16            MR. VERHOEVEN:  Thank you.
17        Anyone else?  Mr. Helling?
18            PROSPECTIVE JUROR HELLING:  I have a friend from high
19    school that I have kept in contact with that's a bankruptcy
20    attorney.
21            MR. VERHOEVEN:  Okay.  He does bankruptcy work?
22            PROSPECTIVE JUROR HELLING:  Yeah.
23            THE COURT:  Anyone else?
24        (No response.)
25            MR. VERHOEVEN:  All right.  I have some specific
```

```
 1   questions --

 2            THE COURT:  We'll do about four minutes or so, and

 3   then we're going to take a break.

 4            MR. VERHOEVEN:  Okay.

 5            THE COURT:  But go ahead and start on your specific

 6   questions.

 7            MR. VERHOEVEN:  Thank you, Your Honor.

 8        Mr. Sandoval, I didn't write down fast enough who your

 9   employer was.

10            PROSPECTIVE JUROR SANDOVAL:  It's Hogarth at Apple.

11            MR. VERHOEVEN:  Can you spell it for me?

12            PROSPECTIVE JUROR SANDOVAL:  H-o-r-g-a-r-h, something

13   like that, Hogarth.

14            MR. VERHOEVEN:  Okay.  What does the company do?

15            PROSPECTIVE JUROR SANDOVAL:  We do print -- it's a

16   graphic design.  We do -- we making sure -- my position is

17   making sure all files are ready for print when we send it to

18   the press.

19            MR. VERHOEVEN:  Okay.  Okay.  Thank you.

20        Ms. Magat?  Did I get it right?

21            PROSPECTIVE JUROR MAGAT:  Yes.

22            MR. VERHOEVEN:  On your form -- you've already told

23   the judge this, but on your form that you filled out, you've

24   listed that you are familiar with Waymo's accusations.  And you

25   said to Judge Alsup that you haven't really learned anything
```

 1    more than what's in this case.

 2          Do you remember what you read?  Was it a newspaper

 3    article?

 4          **PROSPECTIVE JUROR MAGAT:**  Maybe I misread it.  It said

 5    something about IP and self-driving.

 6          No, I just -- I copied the case name, and I pasted it in

 7    and I saw a legal document that said something, the heading.

 8    And then as I was doing that, I thought this is probably not a

 9    good idea.  And then I read up on researching a case outside of

10    the trial, and that's when I saw there could be a fine or a

11    mistrial or something like that.  So I stopped.

12          **MR. VERHOEVEN:**  Very careful.

13          Before you did that, though, did you pull up any of the

14    articles that came up on the search?

15          **PROSPECTIVE JUROR MAGAT:**  No.  I just did the one, and

16    then I thought about it.

17          **MR. VERHOEVEN:**  Okay.  So you don't know anything

18    specific about any of the witnesses in the case?

19          **PROSPECTIVE JUROR MAGAT:**  No.

20          **MR. VERHOEVEN:**  Do you know anything about any of the

21    rulings the Court has made?

22          **PROSPECTIVE JUROR MAGAT:**  No.

23          **MR. VERHOEVEN:**  Okay.  That takes care of that, Your

24    Honor.

25          Ms. Stoney, you also put in your form that you have heard

```
 1   a little about the case in the news?

 2            PROSPECTIVE JUROR STONEY:  Yes.  Just that.  I

 3   understood that Waymo was going to -- was getting ready to sue

 4   Uber.

 5            MR. VERHOEVEN:  Okay.  Did you read any articles?

 6            PROSPECTIVE JUROR STONEY:  No.

 7            MR. VERHOEVEN:  Okay.  Do you know anything about what

 8   the specific claims are?

 9            PROSPECTIVE JUROR STONEY:  No.

10            MR. VERHOEVEN:  What about -- do you know any of the

11   witness names?

12            PROSPECTIVE JUROR STONEY:  No.

13            MR. VERHOEVEN:  Or the story of the case?

14            PROSPECTIVE JUROR STONEY:  No.

15            MR. VERHOEVEN:  Okay.  All right.

16       Then Mr. Lombard.  Mr. Lombard is down here, Number 3 in

17   the back.

18            THE COURT:  That Mr. Lombard.

19            MR. VERHOEVEN:  You also said, when asked if you read

20   anything about the case, that both are trying to develop

21   self-driving cars?

22            PROSPECTIVE JUROR LOMBARD:  That is correct.

23            MR. VERHOEVEN:  Have you read any articles on the

24   lawsuit?

25            PROSPECTIVE JUROR LOMBARD:  So on the technology
```

1    section of Google news, I read it quite frequently.  Specifics?

2    I know that Uber was --

3          **MR. VERHOEVEN:**  I'm not asking you to tell -- just say

4    generally.

5          **PROSPECTIVE JUROR LOMBARD:**  Yeah, I've read a few

6    articles over the last six months or so.

7          **MR. VERHOEVEN:**  So have you learned, for example, what

8    -- some of the things that Waymo is contending?

9          **PROSPECTIVE JUROR LOMBARD:**  Negative.

10          **MR. VERHOEVEN:**  Can you tell me without -- I don't

11   want you to tell everything in front of the jury, but can you

12   tell me what articles you read?  I know Google News --

13          **PROSPECTIVE JUROR LOMBARD:**  I think I read a ruling

14   where -- I read an article where it ruled that Uber couldn't

15   operate self-driving cars in the city.

16          **MR. VERHOEVEN:**  Okay.

17          **PROSPECTIVE JUROR LOMBARD:**  But as far as reading

18   comprehension or retention, I think I just skimmed through it.

19   I don't recall the specifics of the article, but...

20          **MR. VERHOEVEN:**  Okay.  It was more than one article,

21   though; right?

22          **PROSPECTIVE JUROR LOMBARD:**  I read that section all

23   the time.  I -- I probably read maybe five, six articles over

24   the course of the last six months or so.

25          **MR. VERHOEVEN:**  Okay.  And that would be Google

 1    business section in the aggregator site?

 2              **PROSPECTIVE JUROR LOMBARD:**  It's in the technology

 3    section.

 4              **MR. VERHOEVEN:**  So if I go to Google News and I go to

 5    Technology, you read that section that comes up?

 6              **PROSPECTIVE JUROR LOMBARD:**  I skim through all the

 7    sections on a daily basis.  I've seen reference to self-driving

 8    cars, Tesla included.

 9              **MR. VERHOEVEN:**  All right.

10              **THE COURT:**  Is this a good place to break?

11              **MR. VERHOEVEN:**  Your Honor, it's a good place, yeah.

12              **THE COURT:**  All right.  So I have two questions, and

13    then we're going to take a break.

14         Mr. Helling, I noticed on your questionnaire that you say

15    you own stock in Google or Alphabet; is that true?

16              **PROSPECTIVE JUROR HELLING:**  Yeah, yeah.

17              **THE COURT:**  And which is it?  Is it Google or is it

18    Alphabet?

19              **PROSPECTIVE JUROR HELLING:**  I think it's both.

20              **THE COURT:**  Okay.  And then, Ms. Collard, you might

21    try, if you can, to consult your mom to -- you know, during the

22    break to see -- if you can, to see if you can get any more

23    information about what the prognosis is for your being able to

24    serve all the way through till the end.  All right?

25              **PROSPECTIVE JUROR COLLARD:**  Okay.

1           **THE COURT:**  I know it's just a tiny additional piece

2     of information, but it might be useful.

3           **PROSPECTIVE JUROR COLLARD:**  Yeah, it's just hard to

4     determine.  Like, last year this time, she broke her hip.  You

5     know, the year before that, she got the flu.  Yeah, there's no

6     real telling, but I will.

7           **THE COURT:**  All right.  Very good.

8        Okay.  What we're going to do now is take another

9     15-minute break and, when you come back, resume roughly the --

10    all of you, the same seat and everyone else approximately the

11    same seat.  And I'm going to say that we're about halfway

12    through the process.  It's now 11:00 o'clock, and we're about

13    halfway through the process.

14       All right.  Thank you very much.  We'll see you --

15    remember the admonition.  We'll see you in 15 minutes.

16          **THE CLERK:**  All rise for the jury.  Court in recess.

17       (Jury exits the courtroom at 11:03 a.m.)

18          **THE COURT:**  Everyone be seated.

19       Is there any prospective juror still here in the

20    courtroom?  If so, raise your hand.

21       (No response.)

22          **THE COURT:**  I guess no one -- I think we're good

23    there.  All right.

24       You used just about -- just a minute, that's not right --

25    almost 40 minutes of your time.  What I recommend we do is --

1   I'll do whatever you want to do, but you might want to save

2   some follow-up time for after their voir dire on the other

3   side.

4           **MR. VERHOEVEN:**  Yes, I would, Your Honor.

5           **THE COURT:**  So maybe the thing to do is -- so even if

6   you get a full hour, you're down to about 20 minutes left.

7           **MR. VERHOEVEN:**  Yeah.

8           **THE COURT:**  And I -- I can't promise you you'll get an

9   hour, but I will give you some rebuttal time.

10      So are you ready to go on your side?

11          **MR. GONZÁLEZ:**  Yes.

12          **THE COURT:**  All right.

13          **MR. GONZÁLEZ:**  With one exception.

14          **THE COURT:**  What's that?

15          **MR. GONZÁLEZ:**  I just wanted to ask the Court what the

16  Court's intention was with respect to Mr. Helling, Number 14,

17  who owns stock in Google.

18          **THE COURT:**  Well, I think you all ought to tell me.

19      But isn't that a conflict, and shouldn't he be excused?

20          **MR. VERHOEVEN:**  I think we'd have to ask him some

21  questions.  I didn't get a chance to ask him the nature that.

22          **MR. GONZÁLEZ:**  I think it's an automatic cause, Your

23  Honor, when somebody owns stock in the company that's got a

24  financial interest in the case.

25          **THE COURT:**  Isn't that right?

JURY VOIR DIRE

 1          MR. VERHOEVEN:  I'd need to follow up and ask him what

 2   the nature of the ownership is.  I think I am entitled to at

 3   least a question or two to figure out what it is.

 4          THE COURT:  All right.  But if it turns out that he

 5   directly owns Alphabet and Google --

 6          MR. VERHOEVEN:  It just depends.  If it's something

 7   that's in a mutual fund and he has no idea how much it is, that

 8   might be one thing.  If it's -- he has 50,000 bucks in it --

 9          THE COURT:  If it's a mutual fund, I might excuse it,

10   but if it's -- even that would depend.  But if he's a direct

11   owner, I think --

12          MR. VERHOEVEN:  Exactly.  So I just wanted to figure

13   it out.

14          THE COURT:  All right.  So whenever we come back, then

15   you need to ask those questions.

16          MR. VERHOEVEN:  Yes, sir.

17          THE COURT:  And then you'll get to go.  Because it's

18   no point -- we ought to get our new person into the box.

19          MR. GONZÁLEZ:  That's exactly my suggestion, Your

20   Honor.  I'd prefer to have a full box and not waste any of my

21   time on Number 14.  That's what I was going to suggest.

22          MR. VERHOEVEN:  Speaking of that, Your Honor, this

23   entire voir dire I was doing was on the parties' joint

24   submission of voir dire and --

25          MR. GONZÁLEZ:  Oh, no, no, no, no.  He's going to say

 1 | now that half of that time should be mine.  Oh, no, no.

 2 |          **MR. VERHOEVEN:**  No, I'm not going to say that, sir.

 3 |          **MR. GONZÁLEZ:**  Okay.  All right.

 4 |          **MR. PERLSON:**  Please don't --

 5 |          **MR. GONZÁLEZ:**  Okay.  Fine.

 6 |          **MR. VERHOEVEN:**  But I just wanted you to know, Your

 7 | Honor, that what I was running through was the joint submission

 8 | proposed for voir dire.

 9 |          **THE COURT:**  That's fine, but you were allowed to pick

10 | the questions you wanted to ask.

11 |          **MR. VERHOEVEN:**  That's true, Your Honor.

12 |          **THE COURT:**  You don't have to ask questions that you

13 | don't care so much about.

14 |          **MR. VERHOEVEN:**  Yes.  All I'm saying is that I was

15 | going through this joint proposed set of questions.  And that

16 | took a little bit longer than if that had been done before I

17 | started.

18 |          **THE COURT:**  If I had asked those questions, you would

19 | have reasked them.  So I know how that works.  So it's better

20 | just to let you jump into it.

21 |      All right.  So we'll do Mr. Helling.  Then, after that,

22 | you will reserve time.  He goes next, Mr. González.  And then

23 | you'll get some time at the end.

24 |          **MR. GONZÁLEZ:**  Your Honor, may I just -- again, I'm

25 | sorry, but I just want to clarify this.

1          Is the procedure going to be that counsel will ask

2     Mr. Helling some questions and then the Court will make the

3     decision on whether he should be --

4          **THE COURT:**  Well, I may consult with you.  And if it's

5     a close call, I'll give you some -- you know, if it's clear he

6     owns it, I think you ought to just stipulate; if it's not

7     clear, then we may need a sidebar or excuse the jury --

8          **MR. VERHOEVEN:**  I'll nod my head, and then you can

9     know that we're okay with the --

10         **THE COURT:**  Well, or -- or you just say on the record

11    that you -- that the -- that you're agreeable to the Court's

12    motion, I guess is the way to put it.  If that's -- that way,

13    it will be something on the record as opposed to nodding your

14    head.

15         **MR. VERHOEVEN:**  Yes.  Yes, Your Honor.

16         **THE COURT:**  All right.  We'll take a few minutes

17    ourselves.  Thank you.

18         (Whereupon there was a recess in the proceedings

19          from 11:09 a.m. until 11:23 a.m.)

20         **THE COURT:**  We're ready to bring in the prospective

21    jurors.

22         Anything, Mr. Verhoeven?

23         **MR. VERHOEVEN:**  As Your Honor said, in the interest of

24    the shortness of life, we will agree to excuse the witness

25    without him having to ask further questions.

 1          **THE COURT:**  That's very good.  Thank you.

 2      So I will excuse him as soon as he comes back in.

 3      Bring in the jury, please, and be ready with the next

 4  name, please, Angie.

 5      (Jury enters the courtroom at 11:24 a.m.)

 6          **THE COURT:**  All right.  We're missing Ms. Marshall.

 7  And we -- all right.  Can my CSO look in the hall and see if

 8  Ms. Marshall is coming down the hall?

 9      (Brief pause.)

10          **THE COURT SECURITY OFFICER:**  Two more are walking down

11  the hallway.

12      (Brief pause.)

13          **THE COURT:**  Okay.  I think everyone is present.

14  Please have a seat.

15      Okay.  Mr. Helling, I have to excuse you on account of you

16  owning stock in one side or the other here, which wouldn't look

17  right.  Even though I'm sure you could be fair, it's just not

18  right.  So I have to excuse you, and you go back to the jury

19  assembly room and tell them what happened.

20      And while we're doing that, just out of an abundance of

21  caution, do any of the rest of you think you or your spouse or

22  your partner or -- at that level -- you, your spouse, your

23  partner -- own stock in either side in this case?

24      Okay.  Ms. Collard, you need to have the microphone.

25          **PROSPECTIVE JUROR COLLARD:**  Like I put on the piece of

 1   paper, I don't know because I have a 401(k) with my company and

 2   that I work for, and I don't know specifically what they invest

 3   in, but it's primarily stocks.

 4          THE COURT:  Is it a mutual fund?

 5          PROSPECTIVE JUROR COLLARD:  No.

 6          THE COURT:  So who controls -- who controls who

 7   invests?

 8          PROSPECTIVE JUROR COLLARD:  It's under Fidelity, and

 9   it's a 2030 plan.  And it's 99 percent in stocks and 1 percent

10   in bonds.  That's all I know.

11          THE COURT:  All right.  Well, would you, for the

12   duration of this case -- it sounds like a mutual fund to me.

13          PROSPECTIVE JUROR COLLARD:  It may well be.  I'm

14   not -- obviously -- yeah.

15          THE COURT:  Well, would you commit during the pendency

16   of this case not to go look and see what Fidelity has invested

17   in?

18          PROSPECTIVE JUROR COLLARD:  Yes.  I haven't looked

19   ever before.  I probably -- yes, I can commit to not looking

20   for the duration, yes.

21          THE COURT:  Well, thank you for that.

22       Good.  Anyone else?

23       Ms. Bowen, do you have the --

24          PROSPECTIVE JUROR BOWEN:  Same.

25          THE COURT:  Same thing?  Same promise?

1      **PROSPECTIVE JUROR BOWEN:**  Same thing; same promise.

2      **THE COURT:**  Thank you.

3      Anyone else?

4      All right.  Now --

5      **MR. VERHOEVEN:**  One more.

6      **THE COURT:**  Oh, one more.

7      Ms. Di Domenico.

8      **PROSPECTIVE JUROR DI DOMENICO:**  My husband controls

9  all of our investments, buying and selling.  So I have no idea.

10  And I could commit to not asking him -- or I could ask him.  I

11  have no idea.

12      (Laughter.)

13      **THE COURT:**  Well, has he ever said that you own stock

14  in Google or --

15      **PROSPECTIVE JUROR DI DOMENICO:**  He brags about it all

16  the time, but it's like Charlie Brown's teacher to me.  I don't

17  really pay attention.  That's probably a really ignorant thing

18  to say, but I really don't --

19      **THE COURT:**  For the moment, I'm going to leave it that

20  you promised me that you don't know --

21      **PROSPECTIVE JUROR DI DOMENICO:**  I don't know.

22      **THE COURT:**  -- and you won't find out until the case

23  is over.

24      **PROSPECTIVE JUROR DI DOMENICO:**  Yes, I can promise you

25  that.

1    **THE COURT:**  I want to think about whether that's the

2  right thing to do or not, but -- all right.  Let me -- let's

3  leave it at that for the moment.

4       Anyone else?

5       All right.  Mr. Levin.

6    **PROSPECTIVE JUROR LEVIN:**  I have the exact same

7  Fidelity 401(k).  And rather than it being a 20/30, I moved it

8  from a 20/30 to a large cap/small cap/international.  I can't

9  even tell you if there is tech stocks in there.  I'm thinking

10  it was, but I won't look at it.

11   **THE COURT:**  All right.  So do you promise me that

12  until the verdict is in, you won't go to look and see what

13  stocks that fund has invested in?

14   **PROSPECTIVE JUROR LEVIN:**  I have never even seen the

15  capability to see what the breakdown is in the categories; it's

16  just a matter of snatching the distribution per the

17  recommendation.

18   **THE COURT:**  So --

19   **PROSPECTIVE JUROR LEVIN:**  I would not, and I can say I

20  will not.

21   **THE COURT:**  All right.  Thank you.

22       Anyone else?

23       All right.  Mr. Regelman.

24   **PROSPECTIVE JUROR REGELMAN:**  Your Honor, this is the

25  same story, mutual funds.  It could -- could have it or may not

 1   have it.  I don't know.

 2           **THE COURT:**  You don't know.  All right.  But during

 3   the duration of the trial, will you promise me that you won't

 4   go look to see whether Google or Uber or anyone else involved

 5   in this case is in that portfolio?

 6           **PROSPECTIVE JUROR REGELMAN:**  Of course I promise,

 7   yeah.

 8           **THE COURT:**  Anyone else?

 9      Ms. Chu?

10           **PROSPECTIVE JUROR CHU:**  I have the same situation.

11   I'm not sure if I own any or not.

12           **THE COURT:**  All right.  Do you promise me you'll --

13           **PROSPECTIVE JUROR CHU:**  Yes, I promise.

14           **THE COURT:**  You won't look?

15           **PROSPECTIVE JUROR CHU:**  Yeah.

16           **THE COURT:**  All right.  Thank you.

17      All right.  Anyone else?

18      (No response.)

19           **THE COURT:**  Great.  Now, we need to replace

20   Mr. Helling.  Please call a name.

21           **THE CLERK:**  Mr. Gary Fields, F-i-e-l-d-s.

22           **THE COURT:**  And still good morning.

23           **PROSPECTIVE JUROR FIELDS:**  How are you doing?

24           **THE COURT:**  All right.

25      (Brief pause.)

```
 1              THE COURT:  So, all right.  Just stay put.

 2              PROSPECTIVE JUROR FIELDS:  No worries.

 3              THE COURT:  I need for the lawyers to look at the

 4     answer to 9(b) and then we may need to have a talk.

 5          (Brief pause.)

 6              THE COURT:  Do you two -- do you have an agreement?

 7              MR. GONZÁLEZ:  I don't --

 8              THE COURT:  In other words, can you treat it as a --

 9              MR. GONZÁLEZ:  No, I don't think so.  I think -- I

10     think changing the answer, Your Honor --

11              THE COURT:  Do we go with the changed answer?  Is that

12     acceptable?

13              MR. VERHOEVEN:  Your Honor, I thought -- well, I'm

14     willing to go by the ground rules.  I can't tell if there's a

15     changed answer or not.

16              THE COURT:  Let me see this.

17          Mr. Fields?

18              PROSPECTIVE JUROR FIELDS:  Yeah.

19              THE COURT:  Look at your questionnaire, and look at

20     9(b).

21              PROSPECTIVE JUROR FIELDS:  I messed up.

22              THE COURT:  Well, which did you intend to tell us?

23              PROSPECTIVE JUROR FIELDS:  No.

24              THE COURT:  No?

25              PROSPECTIVE JUROR FIELDS:  Yeah.
```

```
 1              THE COURT:  All right.  Then you can go have a seat

 2     over there in the jury box.  And my Clerk will come copy this.

 3         All right.  Mr. Fields, how good is your eyesight?

 4              PROSPECTIVE JUROR FIELDS:  Good.  I can read that.

 5              THE COURT:  Can you see it?

 6              PROSPECTIVE JUROR FIELDS:  Yeah.

 7              THE COURT:  Please go down and give us the basic info.

 8              PROSPECTIVE JUROR FIELDS:  Okay.  Name:  Gary Fields.

 9         State of residence:  Santa Rosa.

10         High school diploma.

11         Right now I work for AT&T as a lineman, part of the CWA

12     Union.

13         My hobbies are race cars.  My daughter races dirt cars.

14         I'm married.  My wife is a bookkeeper.  She owns her own

15     business.  I have twin girls that are 20.

16         And my prior jury service, I have served on a civil court

17     case, I believe with you, about six years ago.

18              THE COURT:  Really?

19              PROSPECTIVE JUROR FIELDS:  Yes.  I've only been

20     summoned twice.

21              THE COURT:  I think I remember you.

22              PROSPECTIVE JUROR FIELDS:  In 48 years I've been

23     summoned twice, both times here.

24         Never in law enforcement and never a party in court.

25              THE COURT:  What kind of case was that again?
```

```
 1              PROSPECTIVE JUROR FIELDS:  It was a civil case.

 2          THE COURT:  What did it involve?

 3              PROSPECTIVE JUROR FIELDS:  City of San Jose Police

 4   Department.

 5          THE COURT:  Okay.  I think I remember.  Good for you.

 6              PROSPECTIVE JUROR FIELDS:  And we did reach a verdict

 7   on that.

 8          THE COURT:  All right.  Good.

 9       Okay.  So have you heard all the questions asked so far?

10              PROSPECTIVE JUROR FIELDS:  Yes.

11          THE COURT:  Would you have raised your hand to any of

12   those questions?

13              PROSPECTIVE JUROR FIELDS:  No.

14          THE COURT:  Okay.  How about did you hear my

15   explanation about what a jury does?

16              PROSPECTIVE JUROR FIELDS:  Yes.

17          THE COURT:  And are you able to do that?

18              PROSPECTIVE JUROR FIELDS:  Yes.

19          THE COURT:  How about did you hear about the internet

20   and no going on the internet?

21              PROSPECTIVE JUROR FIELDS:  Yep.

22          THE COURT:  Are you able to stay off the internet

23   until the case is over?

24              PROSPECTIVE JUROR FIELDS:  Yes, I am.

25          THE COURT:  Have you read anything about this case so
```

1   far?

2           **PROSPECTIVE JUROR FIELDS:**  Just like -- same thing.

3   Through threads and stuff, I just browse through the internet

4   all the time.

5           **THE COURT:**  But that could be -- that could be

6   terrible.

7           **PROSPECTIVE JUROR FIELDS:**  The only thing I've heard

8   -- read about it was that Google was suing Uber, and that was

9   all I read.  Just the headline.

10           **THE COURT:**  Right.  Okay.  I'm going to let the

11   lawyers ask you more questions.

12           **PROSPECTIVE JUROR FIELDS:**  Okay.

13           **THE COURT:**  But before I do that, I have a question

14   for everybody.

15       But I'll give it to you, Mr. Fields -- is it Field or

16   Fields?

17           **PROSPECTIVE JUROR FIELDS:**  Fields, "s."

18           **THE COURT:**  "s," all right.

19       At the end of the case -- here are the things that the

20   jury has got to do:  Listen carefully to the evidence and keep

21   straight what is evidence versus lawyer talk.  Then at the end

22   of the case decide the case based on the evidence and to follow

23   the instructions of law that the judge gives.

24       It's my job to tell you what the law is, and then you've

25   got to follow the law as I give it to you.  And then you decide

 1  the case based on the evidence, whether the evidence measures

 2  up or not.

 3      And you have to be fair and impartial to both sides.  What

 4  that means is you can't have some bias one way or the other.

 5      Now, of course as the evidence comes in, you will lean one

 6  way or the other based on the evidence.  That's perfectly okay.

 7  That's what the trial is all about.

 8      But you cannot have a leaning one way or the other just

 9  based on something before you even came to court.  All right?

10      So let me ask you, are you able to follow your

11  responsibility faithfully as a juror in this case?

12          **PROSPECTIVE JUROR FIELDS**:  Yes.

13          **THE COURT**:  All right.

14      How about the rest of you?  Raise your hand if you think

15  you're able to do that.

16      (Show of hands.)

17          **THE COURT**:  Okay.  Everybody has raised their hand.

18  Good.  All right.  Thank you.

19      Okay.  At this time Mr. Verhoeven, the guy from Iowa, is

20  going to reserve some of his time to go later so that we can

21  give the other side a chance to ask you some questions, and

22  then we'll come back to Mr. Verhoeven.

23      All right.  So I'm going to say that we're about halfway

24  through this process.  And we're not going to finish by 1:00

25  o'clock today.  That would be in a normal day, but I think we

1   would be lucky to be done by 2:00 today.  So, please, we'll

2   give you a short time for lunch, but -- but I'm just giving you

3   a heads-up.  I don't think we're going to be done before 2:00

4   o'clock.

5       Now, Mr. Arturo Gonzàlez is going to be asking the

6   questions for the defense side.

7       The floor is all yours.  Please proceed.

8           MR. GONZÁLEZ:  Thank you, Your Honor.

9       So like Mr. Verhoeven, I'd like to thank all of you for

10  being here.  There are a lot of people who sadly just ignore

11  the court subpoenas when they get them.  And the justice system

12  doesn't work without a jury.

13      In fact, I was really pleased to hear a couple of you say

14  you were honored to be here.  It really is an honor to sit in

15  judgment of your fellow peers.

16          THE COURT:  The court reporter is signaling that she

17  can't hear you.  And the people in the back of the room need to

18  hear all of your comments so that I can ask them if they heard

19  them all when they come forward.

20      So please use the microphone if you can.

21          MR. GONZÁLEZ:  I will do that, Your Honor.

22      Second, just a little bit of background.  You're sharing a

23  lot of information with us, so I will do the same thing counsel

24  did and share a little bit of information about me.

25      I was born in Auburn, California, gold country.  I was

1    raised in Roseville, California, which, at the time, was a

2    railroad town basically.

3         I went to college at UC Davis, and after graduating from

4    UC Davis with a degree in political science, I went to law

5    school.  I went to Harvard Law School on the east coast.  When

6    I graduated from law school, I knew I wanted to come home, so I

7    came back to San Francisco and I have been practicing law here

8    for 32 years.

9         I'm married.  Valentine's Day will be my 31st anniversary.

10   I made the right decision.  I've got four children.  My --

11   three boys.  My oldest son is a graduate from UC Davis,

12   followed dad's footsteps, got a degree in religious studies.

13   He's now the youth director and music director at a Catholic

14   church in Hayward.

15        My second son graduated from UC Davis.  He is now studying

16   for a PhD there in environmental toxicology.  He's very

17   interested in how chemicals affect the human brain.

18        My third boy is also at UC Davis.  He's a sophomore.  He

19   says he's going to be a lawyer.  We'll see about that.  I'm not

20   trying to put pressure on him.

21        And then I have a daughter who works at HomeGoods.

22        I live in San Ramon, in the East Bay.  Been living there

23   about seven years.  Before that I lived for 20 years in

24   San Leandro and San Lorenzo.

25             THE COURT:  I hate to tell you this, but on

```
 1   Valentine's Day, we will be in session.

 2        (Laughter.)

 3        THE COURT:  So don't think about any motion for a

 4   continuance.

 5        MR. GONZÁLEZ:  I appreciate that.  I have yet to have

 6   that discussion, Your Honor.

 7        So let me say a couple of things first to the panel

 8   generally, and then I'll ask some specific follow-up questions.

 9        First, just in general, is there anybody here who thinks

10   that, because Uber has been sued, they must have done something

11   wrong?

12        (Brief pause.)

13        MR. GONZÁLEZ:  Or does anybody think that --

14        THE COURT:  Wait, wait, wait, wait.  Give them a

15   chance to raise their hand.  That's a fair question.

16        Anybody over there think that just because Uber has been

17   sued, they must have done something wrong?  If so, raise your

18   hand.

19        (No response.)

20        THE COURT:  All right.  No one raised their hand.

21        Next question.

22        MR. GONZÁLEZ:  All right.  One of the things that will

23   be somewhat challenging for us -- I try cases for plaintiff and

24   for defendant.  One of the things that's difficult for a

25   defendant is that we go second.
```

 1          And what that means is that, as the evidence comes in, for

 2     the most part, it will be plaintiff putting their witnesses on

 3     first.  And we'll be able to ask them questions, but they get

 4     to decide who testifies first, second, third.  And they get to

 5     use all their time.  And we've just got to sit there and wait

 6     patiently.

 7          So the question I have is -- and there are some people in

 8     life who, when they hear two or three people say something,

 9     they begin to believe it, and they don't change their mind no

10     matter what else anybody says.  There are other people in life

11     who can remain open-minded and wait and totally hear both sides

12     of the story.

13          So the question is:  Is there anybody on this jury who

14     would have a problem with waiting to hear both sides before you

15     make a decision?

16          (No response.)

17          **MR. GONZÁLEZ:**  Okay, thank you.

18          This part wasn't clear to me, but have any of you worked

19     for a company where you were in charge of maintaining the

20     secrecy of something that the company considered a trade

21     secret?

22          **THE COURT:**  Okay.  Ms. Magat is raising her hand.  So

23     let's pass the microphone to Ms. Magat.  She raised her hand.

24          **MR. GONZÁLEZ:**  Are you going to tell me that it was an

25     IP, a patent?

 1          **PROSPECTIVE JUROR MAGAT:**  Yes.

 2          **THE COURT:**  Let's hear what she has to say.

 3       Please go ahead.

 4          **PROSPECTIVE JUROR MAGAT:**  I do have to keep a lot of

 5    things secret that are IP-related, not trade secret-related.

 6          **MR. GONZÁLEZ:**  All right.  Fair enough.

 7          Since you have the microphone, one of the questions that

 8    I'm going to ask is:  Do any of you know anybody who is an Uber

 9    driver, a Lyft driver or a taxi driver?

10          And I know you have taxi drivers, so hold onto the mic.

11          Anybody else know somebody -- I remember one hand went up

12    for Lyft, and then your brother is Uber.

13          Let's start here with Ms. Magat.  You said you had family

14    members who drive taxis.  Can you just elaborate on that a

15    little bit?

16          **PROSPECTIVE JUROR MAGAT:**  My cousin and my uncle and

17    my dad's cousin.  I'm not exactly sure.

18          **MR. GONZÁLEZ:**  And do you know how long they've been

19    driving the taxis?

20          **PROSPECTIVE JUROR MAGAT:**  My dad's cousin, probably

21    around five years.  My uncle and my cousin, maybe two years

22    now.

23          **MR. GONZÁLEZ:**  Have they ever said anything to you

24    about how they feel about Uber?

25          **PROSPECTIVE JUROR MAGAT:**  They have.

1         **MR. GONZÁLEZ:**  Okay.  You see why I'm asking?  And

2   without getting into a lot of detail -- in fact, I may not want

3   to get into any detail.

4       Look, I want to be candid with you all.  There, obviously,

5   is some tension between Uber and taxi companies because they're

6   competing.  So based on whatever it is that your relatives may

7   have said to you, do you have a feeling one way or the other

8   about Uber?

9         **PROSPECTIVE JUROR MAGAT:**  No.  I've used all of the

10  kinds of transportation.  So I don't really think I do.

11        **MR. GONZÁLEZ:**  All right.  Sometimes you use Uber;

12  sometimes you use a taxi?

13        **PROSPECTIVE JUROR MAGAT:**  And Lyft, all of them.

14        **MR. GONZÁLEZ:**  So, again, regardless of what your

15  relatives might have said to you, you believe that you can

16  fairly judge Uber in this case based on the evidence that will

17  come from the witnesses?

18        **PROSPECTIVE JUROR MAGAT:**  Yes.

19        **MR. GONZÁLEZ:**  All right.  Thank you very much.

20      Ms. Stoney?

21        **PROSPECTIVE JUROR STONEY:**  Yes.

22        **MR. GONZÁLEZ:**  Who is it that you know?

23        **PROSPECTIVE JUROR STONEY:**  I'm a part of a networking

24  group and three of the members of the networking group drive

25  for Uber.

 1          **MR. GONZÁLEZ:**  And have you heard anything from any of

 2   those three Uber drivers that leads you to think you could not

 3   be fair to Uber?

 4          **PROSPECTIVE JUROR STONEY:**  No.

 5          **MR. GONZÁLEZ:**  All right.  Thank you.

 6      And I know your brother was an Uber driver.  That would be

 7   Mr. Sandoval.  Actually, the Lyft juror is no longer here.

 8      Anybody else know anybody else that drives a -- yes.

 9          **PROSPECTIVE JUROR LEVIN:**  I have a neighbor who drives

10   for Uber.  So I know him and I know that he drives for Uber.

11   Yet, we've never had conversation about the company or -- my

12   son has considered and has talked with him about which he would

13   make more money working for, but that's about the extent of it.

14          **MR. GONZÁLEZ:**  And how long has your neighbor been

15   driving for Uber?

16          **PROSPECTIVE JUROR LEVIN:**  I would say four or five

17   years.  He used to own a restaurant that he shut down.  And

18   since doing that, he has been driving and seems happy.

19          **MR. GONZÁLEZ:**  Okay.

20      Anybody else?

21      Thank you.

22      Yes.  Mr. Regelman, please.

23          **PROSPECTIVE JUROR REGELMAN:**  My cousin husband, he was

24   a taxi driver and -- for about ten years.  But we're not close.

25   And we never discuss this situation.

1          MR. GONZÁLEZ:  Where?  Where was your relative a taxi

2     driver?

3          PROSPECTIVE JUROR REGELMAN:  Yeah.

4          MR. GONZÁLEZ:  Where at?

5          PROSPECTIVE JUROR REGELMAN:  I don't know.  I never

6     even see him.  He's taxi.

7          MR. GONZÁLEZ:  Fair enough.  But you never had any

8     discussions with your relative about Uber?

9          PROSPECTIVE JUROR REGELMAN:  No, we don't.

10         MR. GONZÁLEZ:  Thank you, sir.  Appreciate that very

11    much.

12       Anybody else?

13       (No response.)

14         MR. GONZÁLEZ:  Okay.  This might seem like an unusual

15    question, but have any of you ever canceled an Uber account?

16       (No response.)

17         MR. GONZÁLEZ:  All right.  And you can see why I'm

18    asking these questions.

19       Have any of you ever made a complaint about an Uber

20    driver?  Maybe you had a bad experience.  My client -- oh, I

21    was about to say my client would be pleased, but, yes,

22    Mr. Sandoval, your hand went up.

23         PROSPECTIVE JUROR SANDOVAL:  My son, he -- one time he

24    was in San Francisco.  He was trying to go back home and he

25    called Uber.  And I guess the guy was making circles.  And he

1   -- I guess he didn't see him or something.  And the kid was --

2   like, he never picked him up.  So my son ended up getting a

3   taxi because the guy never -- he show up, say, five minutes,

4   something like that, or ten.  He never showed up.

5       And because my son has issues, so he was, like, freaking

6   out.  So he just called a taxi and said, "Forget it.  I'm not

7   ever going to use Uber."  So I delete his account out of his

8   iPhone.

9           MR. GONZÁLEZ:  All right.  Well, thank you.  That's

10  exactly the kind of information -- I'm very sorry to hear that

11  your son had that experience.  It sounds like your son wanted

12  an Uber, the Uber was driving in circles and never found your

13  son or something, and so your son ended up taking a taxi?

14          PROSPECTIVE JUROR SANDOVAL:  Yeah.

15          MR. GONZÁLEZ:  Okay.  Again, I'm sorry to hear that

16  your son had that experience.

17      Is there anything about that experience that makes you

18  think you cannot be fair to Uber in this case?

19          PROSPECTIVE JUROR SANDOVAL:  I don't know.  No, I

20  don't think so.

21          MR. GONZÁLEZ:  You will listen to all of the evidence

22  from the witnesses and then decide based on the evidence?

23          PROSPECTIVE JUROR SANDOVAL:  Yes.

24          MR. GONZÁLEZ:  While you have the microphone,

25  Mr. Sandoval, I believe you said you have a son at Oregon

1    State?

2            **PROSPECTIVE JUROR SANDOVAL:**  My daughter is at

3    Portland State.

4            **MR. GONZÁLEZ:**  What is your daughter studying?

5            **PROSPECTIVE JUROR SANDOVAL:**  She is changing her major

6    every time, so no idea.

7            **MR. GONZÁLEZ:**  Trust me, I get it.

8            **PROSPECTIVE JUROR SANDOVAL:**  Yes.

9            **MR. GONZÁLEZ:**  You just can't change too many times or

10   it gets more expensive.

11           **PROSPECTIVE JUROR SANDOVAL:**  But when they -- my son

12   and my daughter gets together, she -- for some reason, she is

13   against Uber and my son used to like Uber.  So they always

14   fighting each other.

15           **MR. GONZÁLEZ:**  Ah.  Okay.

16           **PROSPECTIVE JUROR SANDOVAL:**  My daughter is more Lyft.

17   So -- so I don't know the reasons, but yeah.

18           **MR. GONZÁLEZ:**  All right.  Let me just take one second

19   here.  My client is always sad to hear when somebody prefers

20   Lyft.

21       Is there anything about the fact that your daughter

22   doesn't like Uber and she prefers Lyft that makes you think you

23   can't be fair?

24           **PROSPECTIVE JUROR SANDOVAL:**  No.

25           **MR. GONZÁLEZ:**  All right.  Thank you.  Thank you very

 1   much.

 2        Ms. Stoney, there is one follow-up question while the mic

 3   is there.  A couple of things.

 4        First, your husband is retired?

 5             **PROSPECTIVE JUROR STONEY:**  Yes.

 6             **MR. GONZÁLEZ:**  What did your husband do?

 7             **PROSPECTIVE JUROR STONEY:**  He was a researcher for

 8   PG&E.

 9             **MR. GONZÁLEZ:**  And then you said one of the things

10   that you do is you teach people how to write better?

11             **PROSPECTIVE JUROR STONEY:**  Yes.

12             **MR. GONZÁLEZ:**  Have you worked with lawyers?

13             **PROSPECTIVE JUROR STONEY:**  No.

14             **MR. GONZÁLEZ:**  You probably should.

15        (Laughter.)

16             **MR. GONZÁLEZ:**  All right.  Let's -- Mr. Lombard, sir,

17   thank you for your service.

18        During what years did you serve in the Marines?

19             **PROSPECTIVE JUROR LOMBARD:**  1994 to 2001.

20             **MR. GONZÁLEZ:**  Thank you.

21        If we could go to Number 9, Mr. Perazzo.

22             **PROSPECTIVE JUROR PERAZZO:**  Yes.

23             **MR. GONZÁLEZ:**  Sir, I think you might be the one that

24   had a son at Oregon State.

25             **PROSPECTIVE JUROR PERAZZO:**  I do.

1             **MR. GONZÁLEZ:**  I got the two confused.

2        What is your son studying?

3             **PROSPECTIVE JUROR PERAZZO:**  He was in the College of

4     Science, and then -- now he's in College of Agriculture,

5     fisheries and wildlife and natural resources preservation.

6             **MR. GONZÁLEZ:**  Your life-long friend who's a lawyer,

7     do you know where that lawyer practices?  Is it a solo

8     practice?  Law firm?

9             **PROSPECTIVE JUROR PERAZZO:**  It's a law firm.  She

10    lives in Novato.  You want the name?

11            **MR. GONZÁLEZ:**  Sure.

12            **PROSPECTIVE JUROR PERAZZO:**  Brayton Purcell.

13            **MR. GONZÁLEZ:**  Okay.

14            **PROSPECTIVE JUROR PERAZZO:**  And then she has her own

15    practice here in the city.

16            **MR. GONZÁLEZ:**  Okay.  And do you know what kind of law

17    she practices here in the city?

18            **PROSPECTIVE JUROR PERAZZO:**  I don't know specifically,

19    no.

20            **MR. GONZÁLEZ:**  Okay.  All right.  Now if we can -- why

21    don't we pass the microphone forward since it's here.

22        Ms. Bowen, I just want to make sure I understand, on a

23    daily basis, your job.

24        Can you just tell me generally, what do you do?

25            **PROSPECTIVE JUROR BOWEN:**  So I am the manager of the

1   department.  I oversee probably seven to nine people per shift.

2   I take care of time cards.  I go to meetings and work on

3   special projects, monitor productivity, things like that.

4           MR. GONZÁLEZ:  The seven to nine people that you

5   supervise, what do they do, just generally?

6           PROSPECTIVE JUROR BOWEN:  They do respiratory therapy,

7   patient care.

8           MR. GONZÁLEZ:  Okay.  Thank you.  Thank you very much.

9       Mr. Brown, I didn't get the -- you have a bachelor's

10  degree from San Francisco State?

11          PROSPECTIVE JUROR BROWN:  Correct.

12          MR. GONZÁLEZ:  When did you receive the degree, and

13  what was it in?

14          PROSPECTIVE JUROR BROWN:  It was 2010 in business

15  management.

16          MR. GONZÁLEZ:  And can you tell me just a little bit

17  more about what you did in the Air Force?  I heard you say that

18  you worked on F-15s.  What did you do?

19          PROSPECTIVE JUROR BROWN:  So the pilots would go up

20  and fly for an hour or two, and they will come down with

21  problems because the jets are really old.  So we would

22  troubleshoot those problems just to correct them.  But I -- I

23  didn't actually work on the parts.

24      It's just like something would come down, like, radar is

25  broken.  Then we troubleshoot it and swap it with a newer part

 1   of the same thing.

 2           MR. GONZÁLEZ:  And how long did you serve in the Air

 3   Force?

 4           PROSPECTIVE JUROR BROWN:  Four years.

 5           MR. GONZÁLEZ:  And when did you leave the Air Force?

 6           PROSPECTIVE JUROR BROWN:  2007.

 7           MR. GONZÁLEZ:  Thank you, sir.  Appreciate it very

 8   much.  Thank you for your service.

 9       If we could pass, please, to -- is it Ms. Marshall?

10           PROSPECTIVE JUROR MARSHALL:  Yes.

11           MR. GONZÁLEZ:  Same question that I asked Ms. Bowen.

12       Can you just tell me a little bit more, on a daily basis,

13   what is it that you do?

14           PROSPECTIVE JUROR MARSHALL:  I manage individuals to

15   assign a specific classification system to the diagnoses and

16   procedures on inpatient and same-day surgery cases.

17       I also help distribute different work lists for them --

18   the coders to work.  They're called coders who assign that

19   specific classification system.

20           MR. GONZÁLEZ:  Do you supervise the coders?

21           PROSPECTIVE JUROR MARSHALL:  Yes.  I'm their manager.

22           MR. GONZÁLEZ:  How many coders do you supervise?

23           PROSPECTIVE JUROR MARSHALL:  I supervise -- we have

24   five employees, but then we have outsourced workers.  So it's a

25   total of about 20-plus individuals.

```
 1              MR. GONZÁLEZ:  All right.  So, like, temporary

 2    workers?

 3              PROSPECTIVE JUROR MARSHALL:  No.  They're from a

 4    different company who come in.

 5              MR. GONZÁLEZ:  I see.

 6              PROSPECTIVE JUROR MARSHALL:  They have to be

 7    specialized for that field.

 8              MR. GONZÁLEZ:  And you supervise them as well?

 9              PROSPECTIVE JUROR MARSHALL:  I am part of that, yes.

10              MR. GONZÁLEZ:  Thank you very much.  I appreciate

11    that.

12              PROSPECTIVE JUROR MARSHALL:  You're welcome.

13              MR. GONZÁLEZ:  Ms. Chu?

14              PROSPECTIVE JUROR CHU:  Yes.

15              MR. GONZÁLEZ:  You have a Bachelor's degree?

16              PROSPECTIVE JUROR CHU:  Yeah.

17              MR. GONZÁLEZ:  Can you tell me, when did you graduate

18    and where did you graduate from and what did you study?

19              PROSPECTIVE JUROR CHU:  I graduated in 2014.  I

20    studied communications from U.C. Davis.

21              MR. GONZÁLEZ:  Oh, good school.

22         (Laughter.)

23              MR. GONZÁLEZ:  And what do you do today?  What is your

24    -- generally speaking, your daily job duties?

25              PROSPECTIVE JUROR CHU:  I assign healthcare providers
```

 1   to clients that need home care assistance to live for -- for

 2   them to live independently.

 3          MR. GONZÁLEZ:  Do you do any supervision or follow-up

 4   of the people that you assign?

 5          PROSPECTIVE JUROR CHU:  Just check in to make sure if

 6   they show up.  But other than that, not really.

 7          MR. GONZÁLEZ:  You're not involved in reviewing the

 8   quality of their work?

 9          PROSPECTIVE JUROR CHU:  No.

10          MR. GONZÁLEZ:  Okay.  Thank you very much.

11      Mr. Posadas, you work for Kaiser?

12          PROSPECTIVE JUROR POSADAS:  Yes, I do.

13          MR. GONZÁLEZ:  It wasn't real clear to me.  Same

14   thing, on a daily basis, what do you do there?

15          PROSPECTIVE JUROR POSADAS:  I'm an optical dispenser,

16   optician.  Basically think of it as a pharmacist for the

17   optometrist.  They test the patient.  They write up the Rx.

18   They transition them to us.

19      We go over recommendations based on their prescription.

20   You know, we help them select glasses.  And if the patient has

21   a problem with the prescription, we troubleshoot what the

22   problem is.  That time, it does involve looking at their

23   medical records to see what the prescription is or what the

24   acuities are.  And we are bound by HIPAA.

25          MR. GONZÁLEZ:  I get that.  And how long have you done

1  that with Kaiser?

2          PROSPECTIVE JUROR POSADAS:  11 years.  But prior to

3  that, I worked for LensCrafters off and on for six years.

4          MS. BAILEY:  Eleven years Kaiser and six years

5  LensCrafters?

6          PROSPECTIVE JUROR POSADAS:  Yes.

7          MR. GONZÁLEZ:  And at LensCrafters, did you do

8  essentially the same thing?

9          PROSPECTIVE JUROR POSADAS:  Yes.

10          MR. GONZÁLEZ:  Great.  Thank you very much.

11      Mr. Levin, we've heard from you a lot already.  Is there

12  anything that you've heard from either side or from the Court

13  that makes you think you can't be fair to both sides?

14          PROSPECTIVE JUROR LEVIN:  No, there's not.

15          MR. GONZÁLEZ:  And whatever you read didn't influence

16  you one way or the other?

17          PROSPECTIVE JUROR LEVIN:  No, it does not.

18          MR. GONZÁLEZ:  So coming into this trial, we're both

19  starting from the same spot?

20          PROSPECTIVE JUROR LEVIN:  Yes.

21          MR. GONZÁLEZ:  Thank you, sir.  Appreciate that.

22      Ms. Collard, my notes tell me that on your questionnaire

23  you indicated that you might know somebody who works for one of

24  the companies?

25          PROSPECTIVE JUROR COLLARD:  I do.  I have a distant,

 1   distant, distant relative of some sort that works for Google.

 2           MR. GONZÁLEZ:  All right.  A distant, distant relative

 3   of some sort?

 4           PROSPECTIVE JUROR COLLARD:  I couldn't even tell you.

 5           MR. GONZÁLEZ:  I might be okay with that.

 6           PROSPECTIVE JUROR COLLARD:  Okay.

 7           MR. GONZÁLEZ:  So do you know what the person does for

 8   Google?

 9           PROSPECTIVE JUROR COLLARD:  No.

10           MR. GONZÁLEZ:  All right.  So that wouldn't influence

11   you one way or the other?

12           PROSPECTIVE JUROR COLLARD:  I haven't talked to him in

13   probably eight, ten years.

14           MR. GONZÁLEZ:  Okay.  All right.  Thank you very much.

15   If you can pass it to Ms. Di Domenico.

16      Same question I asked a couple people earlier.  On a daily

17   basis what do you do?  I know you work with numbers, but kind

18   of what do you do?

19           PROSPECTIVE JUROR DI DOMENICO:  Well, I'm responsible

20   for all the billing.  I have to file any sales tax reports.  I

21   have to go to the banks, check the deposits.  Pretty much now

22   it's pretty basic accounting, daily functions that I do with

23   the exception of the sales tax reports and helping with the

24   yearly audits.

25           MR. GONZÁLEZ:  And do you do this just for one company

1    or for multiple companies?

2                **PROSPECTIVE JUROR DI DOMENICO:**  Just one company.

3           **MR. GONZÁLEZ:**  And how long have you been doing that?

4                **PROSPECTIVE JUROR DI DOMENICO:**  I've been there since

5    April of 2016 -- I'm sorry -- June of 2016.  Before that, I

6    worked as a general ledger manager for a company that was --

7    had employees all the over the United States and Canada.

8           **MR. GONZÁLEZ:**  All right.  And what company was that?

9                **PROSPECTIVE JUROR DI DOMENICO:**  It was called American

10   Merchandising Specialists.

11          **MR. GONZÁLEZ:**  And how long did you work there?

12               **PROSPECTIVE JUROR DI DOMENICO:**  12 years, until they

13   closed the office in Brentwood, and now I have to commute to

14   Concord.

15          **MR. GONZÁLEZ:**  That's unfortunate.

16               **PROSPECTIVE JUROR DI DOMENICO:**  I know.

17          **MR. GONZÁLEZ:**  So during the 12-year span, just

18   generally, what did you do for them?

19               **PROSPECTIVE JUROR DI DOMENICO:**  I pretty much did

20   annual report filings.  I would be part of budgetary, financial

21   plannings.  We had gone through -- so many different times when

22   a company was going to buy us out, I would help with the due

23   diligence and then the owner would back out at the last minute

24   and -- taxes.

25          **MR. GONZÁLEZ:**  Who did you report to during that

1    12-year span?

2              **PROSPECTIVE JUROR DI DOMENICO:**  CFO.

3         **MR. GONZÁLEZ:**  You have a daughter in college?

4              **PROSPECTIVE JUROR DI DOMENICO:**  I do.

5         **MR. GONZÁLEZ:**  What school and --

6              **PROSPECTIVE JUROR DI DOMENICO:**  Rutgers University in

7    New Jersey.

8         **MR. GONZÁLEZ:**  Wow.  Congratulations.  What is she

9    studying?

10             **PROSPECTIVE JUROR DI DOMENICO:**  Well, she was studying

11   going into social services, but I think most of the people in

12   my family are trying to talk her out of it.  So I don't know if

13   she switched up yet or not.  She's an older college student.

14   She's just turned 25.

15        **MR. GONZÁLEZ:**  All right.  Wonderful.  Thank you.  If

16   you could please pass to it Mr. Meyers.

17      Mr. Meyers, you're a software engineer?

18             **PROSPECTIVE JUROR MEYERS:**  Yes.

19        **MR. GONZÁLEZ:**  And I heard your answers to the prior

20   questions.  Can you clarify for me a little bit, on a daily

21   basis, you know, what do you do?

22             **PROSPECTIVE JUROR MEYERS:**  So I'm doing product

23   development for a financial services company.  So we're sort

24   of, like, building -- it's a website-based thing and I'm sort

25   of the front-end specialist/technical lead of the engineering

 1    team.

 2         **MR. GONZÁLEZ:**  So is your work primarily involved in

 3    the website or with some other product?  That's what I didn't

 4    understand.

 5         **PROSPECTIVE JUROR MEYERS:**  Both.  We're a fairly small

 6    team, so everyone has to wear sort of a lot of hats.  But my

 7    specialty is much more on the front end of the site, the sort

 8    of user experience.

 9         **MR. GONZÁLEZ:**  I see.  Can you give me a specific

10    example of the kind of thing you might do to enhance user

11    experience?

12         **PROSPECTIVE JUROR MEYERS:**  Yeah.  So one of the

13    products we did was we rewrote one of our older-style

14    applications to be a lot more fluid and reactive.  So we wrote

15    something that was written in a much older language that had a

16    lot of page callbacks and was sort of slow.  And we wrote it

17    all in JavaScript using modern technology.  So it was building

18    new pages and making callbacks to the server, that kind of

19    thing.

20         **MR. GONZÁLEZ:**  Is the idea behind your work to make it

21    easier for the consumer to use the website?

22         **PROSPECTIVE JUROR MEYERS:**  Yes, that is a big part of

23    my work.

24         **MR. GONZÁLEZ:**  Thank you.  I appreciate that

25    clarification.

JURY VOIR DIRE

```
1          PROSPECTIVE JUROR MEYERS:  Uh-huh.

2       MR. GONZÁLEZ:  Mr. Fields?

3          PROSPECTIVE JUROR FIELDS:  Yes.

4       MR. GONZÁLEZ:  You said your wife was a bookkeeper?

5          PROSPECTIVE JUROR FIELDS:  Yeah.

6       MR. GONZÁLEZ:  Is she independently employed?

7          PROSPECTIVE JUROR FIELDS:  Yeah, she's independently

8   employed.  She only has, like, two clients and they are both

9   friends.

10      MR. GONZÁLEZ:  Okay.  How long has she done that?

11         PROSPECTIVE JUROR FIELDS:  Five years, six years.

12      MR. GONZÁLEZ:  And how long have you been with AT&T?

13         PROSPECTIVE JUROR FIELDS:  20.

14      MR. GONZÁLEZ:  Okay.  And have you been a lineman the

15  entire time?

16         PROSPECTIVE JUROR FIELDS:  Yeah.

17      MR. GONZÁLEZ:  And what part of the area do you work

18  in?

19         PROSPECTIVE JUROR FIELDS:  The copper -- the copper

20  portion of it.  So it's getting slimmer and slimmer.

21      MR. GONZÁLEZ:  Do you find that, for new developments,

22  things are going underground?

23         PROSPECTIVE JUROR FIELDS:  Yeah.  Everything is going

24  fiber.

25      MR. GONZÁLEZ:  All right.  Thank you.  I appreciate
```

 1   that very much.

 2       I have just a couple more questions.  You've all been very

 3   cooperative, and we appreciate that very much.

 4       Sometimes jurors will know something but they don't say it

 5   because we don't ask the right question.  I have encountered

 6   that situation before.

 7       And so -- and so now every time a pick a jury, I ask this

 8   question before I sit down:  Is there anything else that we

 9   have not asked you that you think we should know about you that

10   might impact our analysis in this case in determining whether

11   you can be fair jurors?  Anything else?

12       Because I learn a lot of things, right, when I ask people.

13   You know, I've learned about, you know, the poor experience

14   with one of our drivers not picking up one of our customers.

15   And that's something we need to know.

16       Anything, anybody?

17       (No response.)

18       **MR. GONZÁLEZ:**  All right.  So as I said at the

19   beginning -- and my apologies to the back row if you didn't

20   hear me -- one of the things that is challenging for us as a

21   defendant is that we have to sit and wait.  It's almost like

22   somebody is throwing rocks at you and you're just sitting there

23   taking the hit.

24       But we will have evidence as well, quite obviously.  When

25   the plaintiffs are complete with their case, we'll have an

 1   opportunity to present our witnesses and at the end  there will

 2   be oral argument.

 3        And all I ask is that you remain open-minded.  We very

 4   much appreciate your coming here.  We very much appreciate your

 5   patience.

 6        I know it's tough sitting here for two hours while lawyers

 7   ask questions, but it's an important part of the system.  And

 8   the only thing that we ask is that you be fair, wait to hear

 9   all of the evidence.

10        The judge will then tell you what the law is.  There is

11   one person in this room who is going to tell you what the law

12   is, one person.  He's the guy wearing the robe, who, by the

13   way, was appointed by the President of the United States.

14        So we will present the evidence as best we can.  The judge

15   will tell you the law and then, hopefully, at some point, maybe

16   two and a half weeks from now, I'll stand here again and we'll

17   have an argument about what the law and the facts are.  But I

18   ask that you simply wait patiently until that moment comes

19   before you make your final decision.

20        Thank you very much.

21        **THE COURT:**  All right.  Before Mr. Verhoeven asks more

22   questions -- and he has some time left -- I should have asked

23   this question:  Do any of you 16 know any of the other people

24   here in the courtroom?  Sometimes that happens.  The lawyers,

25   the clients, any of them?  Do you to happen to know them?  If

1   so, raise your hand.

2         (No response.)

3               **THE COURT:**  Okay.  No one.

4         Do any of you happen to know each other?  Like two of you

5   seemed like you had a PG&E connection.  Do you happen to know

6   each other?

7         Ms. Bowen, you need the microphone, though.

8               **PROSPECTIVE JUROR BOWEN:**  I do know one of the other

9   potential jurors sitting there.

10              **THE COURT:**  Back there.  I see a hand going up.

11              **PROSPECTIVE JUROR BOWEN:**  Yes.

12              **THE COURT:**  Okay.  If he gets to come forward, then

13   we'll deal with it.  We're not there yet.

14        Anybody else?

15        (No response.)

16              **THE COURT:**  All right.  Good.

17        I want to ask again a variation of what Mr. González asked

18   because it's impossible for us to anticipate all of the issues

19   that could come up.

20        So is there something about your past that -- or some

21   opinion that you may have that causes you to want to at least

22   let us know it before the final selection is made?

23        Because what the lawyers are going to do is take your

24   answer.  Then they get to -- they get to remove three of you,

25   and the ones who are left are the jury.  That's the way it

 1   works.  So they make important decisions based on what you've

 2   told us so far.

 3       So this is your chance, and not only your chance, but I

 4   ask you to think in candor:  Is there something you would like

 5   for us to know about you that might be influential in some

 6   small way in who gets selected for the jury?  All right.

 7       So raise your hand if there's something like that that you

 8   feel we should know.  And don't be afraid, please.  Anything is

 9   okay.  There's no right or wrong answer here.

10       (No response.)

11       **THE COURT:**  You've all led such interesting lives,

12   there's nothing to volunteer.  Okay.  All right.  Great.

13       Okay.  Mr. Verhoeven, you -- you have some time left.

14   Would you like to follow up on Mr. González's questions?

15       **MR. VERHOEVEN:**  Well, I did have one more question,

16   but Mr. González stole my thunder.

17       I was going to ask you if you were -- if I had just asked

18   you some question that that would be really important to the

19   case, and I think you've already answered that question, so I

20   won't ask it again.

21       Other than that, I don't have any other questions, other

22   than to say thank you for your commitment.  This is a big

23   commitment, and I understand that.  And I'm sure everyone in

24   this room understands it as well and thanks you as well.

25       **THE COURT:**  Thank you, Mr. Verhoeven.

 1          Again, I want to come back to the most important question,

 2     which is, if you are selected, will you fairly listen to the

 3     evidence without bias presented by both sides and at the end

 4     decide this case fairly based upon the evidence and the

 5     instructions of law that the Court gives you?

 6          Raise your hand if you will do so.

 7          (Show of hands.)

 8              THE COURT:  The record shows all have raised their

 9     hands.

10          All right.  Counsel, can we pass the panel for cause?

11              MR. GONZÁLEZ:  Yes, Your Honor.

12              MR. VERHOEVEN:  We have none.

13              THE COURT:  In other words, we can pass for cause?

14              MR. VERHOEVEN:  Yes, Your Honor.  Pardon me.

15              THE COURT:  All right.  Very well.

16          Okay.  So are we ready to proceed to selection or do you

17     need time to consult with your clients?  If so, I'll give you a

18     few moments.

19              MR. GONZÁLEZ:  If we could have just a few moments,

20     Your Honor.

21              THE COURT:  All right.  How much time do you need?

22              MR. GONZÁLEZ:  Ten minutes?

23              THE COURT:  Does that work?

24              MR. VERHOEVEN:  Works for us, Your Honor.

25              THE COURT:  All right.  So let me give you all on the

1   dais -- yes, were you about to raise your hand, Mr. Fields?

2        **PROSPECTIVE JUROR FIELDS**:  No.

3        **THE COURT**:  Okay.  All right.  I'm going to use this

4   as an opportunity.  If you are selected, it's like being

5   drafted into the United States Army.  You are here for good and

6   you can't then say, "Oh, Judge, I forgot to tell you I've got

7   this wedding to go to on X day."  Too bad.

8        So is there anything else over there that anyone wants to

9   say before we move to final selection?

10       All right.  So Ms. -- don't tell me -- Ms. Di Domenico,

11  you need the microphone though.

12       **PROSPECTIVE JUROR DI DOMENICO**:  The only thing that

13  has me concerned is coming from Brentwood, the way I'll get

14  here is by BART.  And I can promise you that I will get on the

15  BART at the appropriate time.  But if something happens from

16  there, you have me a little stressed out that people are going

17  to be waiting, looking at the ceiling, counting things.

18       That's my only concern.  I just want to throw that out

19  there.  I mean, nothing's happened in a while, but you keep

20  saying that people are going to be waiting.

21       **THE COURT**:  Listen, if you leave in time for the --

22  and catch the BART in time to be here on what would be a normal

23  schedule, you know -- we can take into account minor delays but

24  not -- and there's a major delay, of course, we'd forgive you

25  for that.  We will not get on -- get on to you for that.  That

 1   would be okay.

 2            **PROSPECTIVE JUROR DI DOMENICO:**  Okay.

 3            **THE COURT:**  You know it's a big district, and so we'll

 4   live with that.  All right.  But you're good to bring it up.

 5   Thank you.

 6        Anything else you want to bring up?

 7            **PROSPECTIVE JUROR DI DOMENICO:**  No.

 8            **THE COURT:**  Anyone else?

 9        (No response.)

10            **THE COURT:**  So -- great.  All right.  So do you want

11   to take -- why don't we do this:  To give the lawyers plenty of

12   time to consult with their clients, we'll take a 15-minute

13   break at this time.  Then we'll come back, and the lawyers will

14   tell us who the jury is going to be.

15        So you all take a 15-minute break and remember my

16   admonition.  No talking about the case with anybody and no

17   consulting on the -- on the internet.

18        We will be back here in 15 minutes.  Thank you.

19            **THE CLERK:**  All rise.  Court is in recess.

20        (Prospective Jurors exit the courtroom at 12:14 p.m.)

21            **THE COURT:**  Is the courtroom now clear of all the

22   prospective jurors?

23        Everyone be seated.

24        Is there anyone here who is a prospective juror?

25        (No response.)

 1          **THE COURT:**  I guess not.

 2      Counsel, I apologize for what I'm about to tell you, and I

 3  did not realize this had happened.

 4      My Law Clerk tells me that we did not give you Mr. Fields'

 5  questionnaire, and I -- that's an oversight.  So we're giving

 6  it to you now, and I'll reopen the voir dire if anybody really

 7  thinks you need it.  It's up to you.  I'm not going to question

 8  it.  If you want to reopen it, we'll reopen it.

 9      Have you now got it?

10          **MR. VERHOEVEN:**  I just read it, Your Honor.  We don't

11  need to reopen.

12          **MR. GONZÁLEZ:**  Just 30 seconds, Your Honor.

13          **THE COURT:**  Take your time.

14      (Discussion held off the record amongst defense

15      counsel.)

16          **MR. GONZÁLEZ:**  We're fine, Your Honor.  Thank you for

17  pointing that out.  It was one of the things I had in my

18  outline, and I just skipped it.  Thank you.

19          **THE COURT:**  You're good with it as we are and you

20  don't need to reopen; is that correct?

21          **MR. VERHOEVEN:**  That's correct, Your Honor.

22          **MR. GONZÁLEZ:**  That's correct, Your Honor.

23          **THE COURT:**  All right.  Very well.  Thank you.

24      All right.  So I'm going to go off the bench for 10 or

25  12 minutes and let you all consult.  Let's make sure the way it

 1   will work.

 2       Mr. Verhoeven, you will stand first and thank and excuse

 3   whoever you wish.

 4            MR. VERHOEVEN:  Yes, Your Honor.

 5            THE COURT:  The challenge will then go to Mr. González

 6   and back to you.  If we get to the point where we have two

 7   passes -- now, a pass counts as a challenge; right?  You

 8   understand that?

 9            MR. VERHOEVEN:  Yes, Your Honor.

10            MR. GONZÁLEZ:  I just wanted to clarify that, Your

11   Honor.

12            THE COURT:  The pass counts.

13            MR. GONZÁLEZ:  If they go and I pass, I just use the

14   bullet?

15            THE COURT:  What?

16            MR. GONZÁLEZ:  If they knock off a juror and then I

17   pass, that pass is one of my three challenges?

18            THE COURT:  Right.  That's right.  And then if they --

19   because what you're doing is saying, "I'm happy with the lowest

20   number, 10."

21            MR. GONZÁLEZ:  That's right.

22            THE COURT:  And, again, it's by seat number.  But if

23   -- if you pass but they don't pass, we keep going until all the

24   challenges are used.  But if there are two consecutive passes,

25   then we're done.

1           MR. GONZÁLEZ:  Exactly.

2           THE COURT:  Okay?

3           MR. VERHOEVEN:  Yes, Your Honor.

4           MR. GONZÁLEZ:  Your Honor, I just want to state what's

5    obvious, is that when we're both done with whatever challenges

6    we're going to have, we're going to take -- the lowest ten will

7    be our jury.

8           THE COURT:  That's right.  And if you use up all your

9    challenges, there are only ten.

10          MR. GONZÁLEZ:  Exactly.

11          THE COURT:  It's by seat number, not the order in

12   which they were called forward.  You understand that?

13          MR. GONZÁLEZ:  Yes.

14          THE COURT:  So we go across from 1 is Ms. Bowen, all

15   the way over to Number 8, who is Mr. Regelman.  And then Number

16   9 is Perazzo?

17          MR. VERHOEVEN:  Yep.

18          THE COURT:  Going all the way over to 16,

19   Ms. Di Domenico.  Okay?  So that's the -- that's the order.

20          MR. GONZÁLEZ:  Thank you.

21          THE COURT:  All right.  Go consult with your clients.

22   I'll see you in a few minutes.

23       (Whereupon there was a recess in the proceedings

24          from 12:18 p.m. until 12:35 p.m.)

25          MR. EISEMAN:  Your Honor, I think you wanted the

 1  parties to hand up the jurors they struck per agreement.  We'll

 2  hand those back.

 3          MR. GONZÁLEZ:  We'll do that as soon as we're done,

 4  Your Honor.

 5          MR. VERHOEVEN:  That's it.

 6      (Whereupon document was tendered to the Court.)

 7          THE COURT:  On the copies of the questionnaires that

 8  you receive, I'm going to let you hold onto those, but I want

 9  those under seal for -- you know, to protect the privacy of the

10  jurors.

11          MR. GONZÁLEZ:  Understood, Your Honor.

12          THE COURT:  And are both sides ready once

13  Mr. Verhoeven comes back?

14          MR. GONZÁLEZ:  Yes, Your Honor.

15          MR. EISEMAN:  Yes.

16      (Brief pause.)

17          MR. VERHOEVEN:  Your Honor, this is Mr. Verhoeven, if

18  you were waiting for me.  David Eiseman told you you might be

19  waiting for me.

20          THE COURT:  Are you ready to go?

21          MR. VERHOEVEN:  Yeah.

22          THE COURT:  Let's bring back all of the prospective

23  jurors.

24      (Prospective Jurors enter the courtroom at 12:38 p.m.)

25          THE COURT:  Be seated everyone, please.

 1        And wait a minute.  One more is coming.

 2        (Brief pause.)

 3            **THE COURT:**  All right.  I think we're ready now.

 4        You know, one thing I forgot to do, and I -- Ms. Collard,

 5   I had asked you to see if you could get ahold of your mom.  And

 6   did you have any more information to report on that front?  So

 7   I neglected to circle back to you and I -- which I just

 8   remembered.

 9        So I'm going to ask you if that -- if you have any news to

10   report that would change things?

11            **PROSPECTIVE JUROR COLLARD:**  No, I do not.

12            **THE COURT:**  Okay.  Then we're just going to go forward

13   with you as a potential member of the jury.  And if you get

14   selected, then we -- we will just deal with the problem with

15   your mom if it does occur.  All right?

16            **PROSPECTIVE JUROR COLLARD:**  Okay.

17            **THE COURT:**  You have to say "yes" or "no".

18            **PROSPECTIVE JUROR COLLARD:**  Yes.

19            **THE COURT:**  Okay.  Good.

20        So, ladies and gentlemen, you are the final 16.  We're

21   going to go down to the final 10 in just a few moments, and you

22   will see how this works.  There is no need for me to explain

23   how it works; you will just see how it works as it happens.

24        And if you are one of the remaining ten, then

25   congratulations.  And I'll explain how -- at the end how the

1    dust settles, so to speak.

2          But before I turn it over to the lawyers, I want to -- I

3    just want to say I've seen so many -- one of the great honors

4    in my life in this job is the juries.  I can't tell you how

5    much I respect and have almost reverential respect for what the

6    juries do in our U.S. District Courts.  So your willingness to

7    serve and to serve your country is one of the great strengths

8    of our system.  So thank you for that.

9          I wish we could keep all 16 of you.  You would all be

10   great jurors, but we only need ten and it would be unfair to

11   ask all of you to serve.

12         So at this time the lawyers get to challenge -- challenge

13   is really -- to excuse, really.  That's the better word, thank

14   and excuse up to three per side.

15         So the challenge will first lie with Mr. Verhoeven for the

16   plaintiff.

17         Mr. Verhoeven.

18         **MR. VERHOEVEN:**  Thank you, Your Honor.  Plaintiff

19   Waymo would like to thank and excuse Mr. Levin.

20         **THE COURT:**  All right.  Mr. Levin, you -- you know how

21   I feel.  Thank you for your willingness to serve and please go

22   back to the jury assembly room and tell them what happened.

23   Good luck to you, sir.

24         **PROSPECTIVE JUROR LEVIN:**  Thank you very much.

25         (Prospective Juror Levin exits the courtroom.)

 1          **THE COURT:**  And challenge lies with defense.

 2          **MR. GONZÁLEZ:**  Thank you, Your Honor.  Uber would like

 3   to thank and excuse Juror Number 11, Mr. Lombard.

 4          **THE COURT:**  Number 11, Mr. Lombard.

 5      Mr. Lombard, please go back to the jury assembly room,

 6   tell them what happened.

 7          (Prospective Juror Lombard exits the courtroom.)

 8          **THE COURT:**  Challenge now lies with plaintiff.

 9          **MR. VERHOEVEN:**  Thank you, Your Honor.  Plaintiff

10   would like to thank and excuse Ms. Magat.

11          **THE COURT:**  Ms. Magat, thank you.  Good luck to you.

12   All right.

13          (Prospective Juror Magat exits the courtroom.)

14          **THE COURT:**  All right.  And?

15          **MR. GONZÁLEZ:**  Thank you, Your Honor.  Uber would like

16   to thank and excuse Juror Number 3, Ms. Marshall.

17          **THE COURT:**  Ms. Marshall, thank you.  You're excused.

18   Please go back to the jury assembly room with the thanks of the

19   court.

20          (Prospective Juror Marshall exits the courtroom).

21          **THE COURT:**  Now two to go.

22      Mr. Verhoeven.

23          **MR. VERHOEVEN:**  Thank you, Your Honor.  Plaintiff

24   would like to thank and excuse Mr. Meyers.

25          **THE COURT:**  Ms. -- Mr. Meyers?

1          **MR. VERHOEVEN:**  Correct, Your Honor.

2       (Prospective Juror Meyers exits the courtroom.)

3          **MR. GONZÁLEZ:**  Can I have just one moment, Your Honor?

4          **THE COURT:**  All right.

5       (Discussion held off the record.)

6          **MR. GONZÁLEZ:**  Thank you, Your Honor.  Uber would like

7    to thank and excuse Juror Number 12, Ms. Stoney.

8          **THE COURT:**  Ms. Stoney.  Yes.  Okay.  The Court thanks

9    you, and please go back to the jury assembly room.  Tell them

10   what happened.

11         **PROSPECTIVE JUROR STONEY:**  You're welcome.

12      (Prospective Juror Stoney exits the courtroom).

13         **THE COURT:**  We now have ten of you left.  I'm going to

14   ask, Ms. Collard, if you and the others on the front row would

15   close ranks and have five -- come to the five seats closest to

16   me.  And then you two who are on the outlier seats, if you will

17   go up to the back row, and all of you scoot down so that we're

18   five and five.

19      Okay.  Congratulations to you.  You are the jury who will

20   decide this important case.  And I ask you now to stand and

21   raise your right hand.  The clerk will swear you in.

22      (Jury panel sworn.)

23         **THE COURT:**  Thank you.  Very good.  Be seated.

24      At this time, it's my pleasure to excuse all of the rest

25   of the potential jurors.  Thank you for your willingness to

1   serve.  Please go back to the jury assembly room and tell them

2   that you have been excused by the Court.

3       (Prospective Jurors exit the courtroom.)

4       **THE COURT:**  All right, everyone.  Please be seated.

5   We only need to detain you a few more minutes today.

6       And so here is what will happen.  I'm going to give you a

7   short admonition.  Then you can go back to your new home away

8   from home in the jury room and -- where Angie will give you

9   your badge and give you some -- just a heads-up and the hints

10  on how to get in and out of the building in the morning and a

11  notepad for you to take notes with, if you wish.

12      And then she's going to escort you to the double doors and

13  you can go home.  That won't take long at all, and you'll be

14  out of here soon.

15      And then I will stay with the lawyers to get ourselves all

16  teed up for the next session, which, for you, will be Monday

17  morning.  So today is what?  Wednesday, right?  So Thursday

18  goes by.  Friday goes by.  You have the whole weekend.  Then

19  you come here Monday.  7:45 you need to be in the jury room.

20      Now, one of the things I'm going to do my best, and I

21  think I can come through for you, coffee and hot doughnuts --

22  not hot doughnuts, hot coffee and doughnuts.

23      Okay.  And then -- then when 8:00 o'clock comes, we're

24  going to come out here and we're going to hear the opening

25  statements, and then we'll go right to the first witness.

1    And my pledge to you is to try to run an efficient, fair

2    trial so that I don't waste your time.  So when you're here in

3    the courthouse ready to hear evidence, I'm going to say to the

4    lawyers, "Bring out the jury, we're going to hear evidence."

5    We're not going to hear motions to do X or motions to do Y.

6    I'm going to try to be mindful of the sacrifice that you're

7    making.

8        Okay.  My one -- the thing I have to say to you -- and

9    this is a real order.  This is not just window dressing.

10       You cannot go on the internet and research this case.  You

11   cannot read articles about this case.  You cannot receive any

12   information about this case or about the lawyers or about me.

13       You have to stay pure on this front.  You can't talk to

14   your friends, your loved ones other than to say you're on the

15   case of *Waymo versus Uber*.  It's about self-driving cars,

16   period.  That's it.  Nothing more.

17       Don't let somebody talk to you.  And, in fact, if somebody

18   tries to talk to you about the case, you ought to come see me

19   and let me know that someone has approached you.  This is so

20   important, that you not research and do your own thing.

21       The great thing about a trial is you sit back and let the

22   lawyers do all the work.  They present the evidence to you --

23   it's like the laboratory thing again.  They present the

24   evidence to you.  And it either is going to measure up, or it's

25   not going to measure up.  But you don't go do your own homework

1   to fill in the gaps.  That would be a travesty.  You can't do

2   that.  You must make them do the work and pay close attention,

3   try your hardest.

4       Okay.  Anybody have questions about that?  Don't even come

5   close to violating that, but anybody have questions about it?

6       (No response.)

7               THE COURT:  All right.  You can't go on Facebook and

8   say what you're doing.  Don't go on and say -- don't even go on

9   Facebook and say, "I'm on the Uber case."  No.  Because then

10  your Facebook friends will be trying to tell you, "Oh, that's

11  great.  Here's the way you should vote."

12      No.  No, don't do that.  It might even be a good idea to

13  get off Facebook for a while or those things that I don't even

14  know how to use.  So don't -- please, I -- it's a Court order,

15  but I beg you not to do it and put us in the position where

16  we've got to have evidentiary hearings.

17      In other cases where somebody has violated this, we have

18  to have an evidentiary hearing.  Put you on the stand under

19  oath.  The lawyers cross-examine you to find out how much

20  you've learned and how -- I can't -- don't go there.  Do it the

21  right way.  This is a real order.  Okay?

22      All right.  Anything the lawyers want me to add or

23  subtract?

24               MR. GONZÁLEZ:  No, Your Honor.

25               MR. VERHOEVEN:  Just -- I think you already said this,

 1  Your Honor, but the fact that we're not allowed to talk to the

 2  jurors.

 3          THE COURT:  Yes, that's a good point.

 4      In the mornings when you come to court, or at any point,

 5  you will at some point cross paths with these excellent lawyers

 6  and they won't say much to you.  The most they'll say is "good

 7  morning."  And you might think, "oh, that lawyer, they're being

 8  so rude."

 9          Actually, it's the opposite.  They're being respectful.

10  They're being respectful of the important job that you have.

11  And they do not want you to think that they're trying to

12  ingratiate themselves with you by talking about the latest

13  football score.  No, they're not going to do that.  And so you

14  need to know that they're being respectful and not in any way

15  trying to be rude to you.  Okay?

16      Anything else that the lawyers think I should bring up?

17          MR. VERHOEVEN:  No, Your Honor.

18          THE COURT:  All right.  So you all have a great, long

19  break.  And then remember my admonitions.

20      Please go with Angie into the -- into the room here, the

21  jury room.  And then the next time I'm going to see you will be

22  when we convene on Monday morning at 7:45 a.m.

23      You can get here earlier, by the way.  You can get here as

24  early as 6:00 and we will be ready for you.  We're here even

25  before that.  We will have it probably ready by 6:30 a.m.

1    anyway with the hot coffee.  We will do our best on that.

2         So you can come earlier, but you have got to be here by

3    7:45 in the morning.  That will be all next week and so forth,

4    continue on until the case is done.

5         Okay.  Please go with Angie to the jury room.

6              THE CLERK:  All rise for the jury.

7         (Jury exits the courtroom at 12:52 p.m.)

8              THE COURT:  Thank you.  Be seated.

9         All right.  I have about run out of things to do.  But if

10   you all have issues for me, I would be happy to hear them now.

11             MR. PERLSON:  Your Honor, we do have one.  I don't

12   know if it's a housekeeping issue but, as you recall, there was

13   the sliver of documents that Morrison & Foerster had.

14        We had a dispute with Judge Corley.  And Judge Corley had

15   ordered, ordered Uber to provide a stipulation so that we could

16   authenticate the documents and get them into evidence.

17        They are now backing out of that and refusing to comply

18   with that order, claiming that because Your Honor raised

19   evidentiary rulings regarding our ability to get in evidence

20   regarding their maintaining the sliver, that somehow they no

21   longer have an obligation to enter into the stipulation that

22   allows us to authenticate these documents.

23        Your Honor, these are, you know, documents, as you recall,

24   these are photographs that Levandowski had; screenshots.  And

25   this is -- you know, we -- we didn't want to -- they've been

 1   stringing us along for weeks and weeks after the Court made

 2   this ruling.

 3        We did not want to have to interrupt and go back to

 4   Judge Corley.  But at this point, given the fact that they've

 5   now told us they won't agree to the stipulation they were

 6   ordered to do, we feel we have to raise it with the Court.

 7        MR. GONZÁLEZ:  Very briefly, Your Honor.  This is not

 8   an issue.  I'll say right now, we'll stipulate even on the

 9   record that we're not going to argue about where the sliver

10   came from.  That's not going to be an issue.

11        The sliver that MoFo got came from Stroz.  And the

12   information from the sliver came from Mr. Levandowski's

13   computer.  There's not going to be a dispute about that.

14        It's simply a matter of the language that's currently in

15   the order and then wanting to add something.  We'll work this

16   out in the next few days.  But I'm representing to you right

17   now we're going to have a fight about the sliver in general.  I

18   don't think there's going to be a fight.  I think your order

19   disposed of certain issues.  But with respect to

20   authentication, where the sliver came from, it's not going to

21   be an issue.

22        MR. PERLSON:  We just want to make sure that we're

23   able to demonstrate, which is what the stipulation was supposed

24   to do, was that these documents came from Mr. Levandowski's

25   computers.

1          **MR. GONZÁLEZ:**  That's correct.  That's correct.  I'm

2    telling you right now, we're not going to fight you on that.

3          **THE COURT:**  Do the stipulation.  Maybe that's good

4    enough.  But, please, do the stipulation without prejudice to

5    other issues of admissibility.

6          **MR. GONZÁLEZ:**  Exactly.  All we're trying to do is

7    simplify it.

8       What I'm representing is there's not going to be an issue.

9    The sliver came from Stroz, came from Anthony's computer.

10   There's won't be an issue, Your Honor.  It could be two

11   sentences.  Right now it's like two pages.

12      Thank you.

13         **THE COURT:**  All right.  Anything more that you need to

14   work out with the judge?

15         **MR. EISEMAN:**  One very brief housekeeping issue, Your

16   Honor.

17      Your Honor's order has the parties submitting the rolling

18   list of witnesses to chambers.  Do you want that filed on the

19   public record, or are we supposed to email them to your order

20   box?

21         **THE COURT:**  I think putting them on the public record

22   is fine.  That way the public can decide if they want to show

23   up that day.

24         **MR. EISEMAN:**  Thank you, Your Honor.

25         **MR. GONZÁLEZ:**  And, Your Honor, I'll just give you

 1   notice and give them notice, we're going to submit our list

 2   tomorrow.   Our first witnesses are going to be called in their

 3   case, most of them by agreement.  I told you that yesterday.

 4          THE COURT:  Wait a minute.  Say that again.

 5          MR. EISEMAN:  No.

 6          THE COURT:  They get to call witnesses first.

 7          MR. GONZÁLEZ:  No, I understand that.  But they've

 8   agreed that we can question Mr. Kalanick and a couple of other

 9   people during their case-in-chief.  And I mentioned that last

10   time we were here.

11          THE COURT:  That's what I think you said; right?

12          MR. VERHOEVEN:  Well, we would object to that.

13       The procedure is we're telling them who the first seven

14   we're going to call.  They should be telling us who the first

15   seven they're going to call.

16       If we've reached an agreement that one of them will be

17   taken care of in our case-in-chief, they're not going to call

18   that person in their first seven.  But we're still entitled to

19   know who the first seven witnesses are.

20          THE COURT:  Well, no.  Look.  If you're going out of

21   turn, in other words if you're going to exceed the direct,

22   then --

23          MR. GONZÁLEZ:  We have to designate that person.

24          THE COURT:  I guess that's right.

25          MR. GONZÁLEZ:  That's what we're doing.

 1          THE COURT:  Well, what's the problem then?

 2          MR. VERHOEVEN:  We won't have any notice of, when they

 3    start their case-in-chief, the first seven that they're going

 4    to call.

 5          THE COURT:  Yeah, but they've got a long time before

 6    they have to give you the case-in-chief.

 7          MR. VERHOEVEN:  Like the no good deed goes unpunished.

 8      We agreed that they could exceed direct so that we could

 9    save some time in the case, and at the risk of them putting

10    their case on in the middle of our case.  But now they're

11    saying we don't get notice of the first seven in their

12    case-in-chief.

13          MR. GONZÁLEZ:  No, we're not saying that at all.

14          THE COURT:  You're going to give notice 38 hours, or

15    whatever it is, before you put on your first witness in your

16    case-in-chief.

17          MR. GONZÁLEZ:  Yeah.  Precisely.

18          THE COURT:  Are you planning on calling these three

19    back in your case?

20          MR. GONZÁLEZ:  Probably not, Your Honor.  Obviously we

21    reserve the right, if something comes up after they testify,

22    but probably not.

23      They'll be getting a rolling list.

24          THE COURT:  Well, if you do, then you've got to put

25    them on the list then.  But for present purposes, they control

1   who comes in.  And it sounds like they've given you permission

2   to exceed the scope of direct.

3        All right.  Is that right?  I'm not ruling that they can

4   exceed the scope of direct.

5             MR. VERHOEVEN:  Well, we may have to rethink about it.

6   But we have done that in the interest of compromise with

7   respect to three witnesses, Your Honor.

8             THE COURT:  Well, look.  If you've given them your

9   word and you've agreed to it, you ought to stand by your word.

10       On the other hand, if it's still in flux then I don't care

11  whether you gave them permission or not.

12            MR. VERHOEVEN:  Okay.

13            THE COURT:  It's your case.  You put it on the way you

14  want to put it on.

15            MR. VERHOEVEN:  We will.  Thank you, Your Honor.

16            THE COURT:  But if you have stipulated, you ought to

17  stick to your promise.

18       Okay.  I don't know if you have or not.

19            MR. GONZÁLEZ:  We put it on the record yesterday.

20            MR. VERHOEVEN:  Well, we had no idea they'd be taking

21  this position, but --

22            THE COURT:  Well, what is the position that bothers

23  you?

24            MR. VERHOEVEN:  That --

25            THE COURT:  I still don't understand.

1      **MR. VERHOEVEN:**  We're telling them the first seven in

2  our case-in-chief.  And they're going to subtract from their

3  duty to tell us their first seven the people that we call who

4  are their witnesses.

5      **THE COURT:**  What do you want their first list to look

6  like?

7      **MR. VERHOEVEN:**  The first seven they're going to call

8  in their case-in-chief, so that we can get prepared.

9      **THE COURT:**  You want that now though.

10      **MR. VERHOEVEN:**  That was the rule, I thought.

11      **MR. PERLSON:**  There was an order, I thought, Your

12  Honor, that had indicated that the day after jury selection

13  both parties were supposed to provide their first seven.

14      **THE COURT:**  Did I say that?  What did I say?  Did I

15  say that you had to give your list the day after jury

16  selection?

17      **MR. GONZÁLEZ:**  You did, Your Honor, which, frankly, we

18  were a little confused about because, as you know, it's hard

19  for us to know who we're going to call or the order.  Depends

20  on what they were going to do.  But we were going to go ahead

21  and in good faith give them a list.  And some of the people

22  will be called in their case.

23      **THE COURT:**  Well, what's wrong with that?  I don't

24  remember.  I would have thought that I would have said that

25  just the plaintiff has to give notice.  If I said that, then

JURY VOIR DIRE

1    I'll stick with it.  If I said that you had to give a list of

2    seven by tomorrow, you should do that.

3              MR. GONZÁLEZ:  That's exactly what we're doing, Your

4    Honor.

5              THE COURT:  And then if there is -- what is it, 38

6    hours?

7              MR. GONZÁLEZ:  Yes.

8              THE COURT:  All right.  Thirty-eight hours before, if

9    you've got a good reason, you can modify it.

10             MR. GONZÁLEZ:  Yeah.  That's what we're doing, Your

11   Honor.

12             THE COURT:  Don't jack them around.  You know, I know

13   all the big-firm gimmicky trips.

14             MR. GONZÁLEZ:  No.

15             THE COURT:  And you will not like it if it turns out

16   that you have misled them as to who you're going to call.

17             MR. GONZÁLEZ:  No, not at all, Your Honor.  The only

18   thing I'm making clear, which is why I'm glad I raised this,

19   because I don't want there to be an issue, I'm simply making

20   clear that some of our first seven will be called during their

21   case-in-chief because they've agreed to it.  And I didn't want

22   there to be a dispute later about that.

23             THE COURT:  Well, why don't you give them ten, then,

24   if your first --

25             MR. VERHOEVEN:  Let's try to work it out, Your Honor,

 1   so you don't have to deal with it.

 2           THE COURT:  I don't want to deal with it.

 3           MR. VERHOEVEN:  Yeah.

 4           THE COURT:  You lawyers, here I am telling the jury

 5   how great you are, and now you're giving me something like

 6   this.

 7      (Laughter)

 8           MR. VERHOEVEN:  Well, I apologize, Your Honor, but,

 9   again, it would have been nice to know they were taking this

10   position when they asked us for the deal.

11      Let me just try to work it out so you don't have to be

12   bothered with it.

13           MR. VERHOEVEN:  Thank you.

14           MR. GONZÁLEZ:  Thank you, Your Honor.

15           THE COURT:  All right.  I'm ready to call it quits for

16   now.  Anything more you have to raise with me?

17           MR. GONZÁLEZ:  I think we're good, Your Honor.  Thank

18   you very much.

19           THE COURT:  You've got to have your first witness

20   ready to go, because we'll definitely get to at least one,

21   maybe two witnesses.

22           MR. VERHOEVEN:  We're ready, Your Honor.

23           THE COURT:  All right.  You be ready to go.

24      Okay.  Good luck to both sides.

25      (Counsel thank the Court.)

## **CERTIFICATE OF REPORTERS**

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_(signature)_

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_(signature)_

Katherine Sullivan, CSR 5812, CRR, RMR

Wednesday, January 31, 2018