1   MICHAEL A. JACOBS (CA SBN 111664)
    MJacobs@mofo.com
2   ARTURO J. GONZÁLEZ (CA SBN 121490)
    AGonzalez@mofo.com
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California 94105-2482
    Tel:    415.268.7000 / Fax:   415.268.7522
5
    KAREN L. DUNN (*Pro Hac Vice*)
6   kdunn@bsfllp.com
    MICHAEL A. BRILLE (*Pro Hac Vice*)
7   mbrille@bsfllp.com
    BOIES SCHILLER FLEXNER LLP
8   1401 New York Avenue, N.W.
    Washington, D.C. 20005
9   Tel:    202.237.2727 / Fax:   202.237.6131

10  WILLIAM CARMODY (*Pro Hac Vice*)
    bcarmody@susmangodfrey.com
11  SHAWN J. RABIN (*Pro Hac Vice*)
    srabin@ susmangodfrey.com
12  SUSMAN GODFREY LLP
    1301 Avenue of the Americas, 32nd Floor
13  New York, NY 10019-6023
    Tel.:   212.336.8330 / Fax.:  212.336.8340
14

15  Attorneys for Defendants
    UBER TECHNOLOGIES, INC.
16  and OTTOMOTTO LLC

17

18                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
19                    SAN FRANCISCO DIVISION

20  WAYMO LLC,                          Case No. 3:17-cv-00939-WHA

                  Plaintiff,            **UBER'S AND OTTOMOTTO'S**
21                                      **BRIEF ON THE ADMISSIBILITY**
                                        **AND USE OF STROZ FRIEDBERG'S**
        v.                              **DUE DILIGENCE MATERIALS**
22
    UBER TECHNOLOGIES, INC.,            Judge:  The Honorable William Alsup
23  OTTOMOTTO LLC; OTTO TRUCKING LLC,   Trial Date: February 5, 2018

24                Defendants.

25

26

27

28

Waymo wants to admit the Stroz Report (TX 7912) and several of its exhibits (TX 5101, 5102, 5215, 7114, and 7418), including Stroz's memorandum of Anthony Levandowski's interview ("Levandowski Memo") (TX 7111) (collectively, the "Stroz Materials"). Waymo also intends to seek admission four sets of notes taken by Stroz employees during and after their interviews with Levandowski (TXs 8854, 8855, 8857, and 8858) (collectively, the "Fulginiti Notes"). These documents, however, are either themselves inadmissible hearsay or are so replete with embedded hearsay that they cannot be admitted for their truth.  Highlighted copies of each document with a cover page summarizing the hearsay issues with each one are attached to this brief.[1]

## I.      The Stroz Materials and Fulginiti Notes Are Replete With Hearsay Within Hearsay.

The vast majority of the Stroz Materials and the Fulginiti Notes are embedded hearsay—direct quotations and paraphrased reports of statements made by the diligenced employees—to which no exception or exclusion applies. The statements of the diligenced employees are not party admissions because they were made in the employees' personal capacity, and Stroz's recounting of those statements, even if made as an agent of Uber's outside counsel (or Uber), does not cure their hearsay nature. Courts routinely exclude "summaries, notes, and memoranda" of interviews by third-party investigators, including accounts of what was said to the investigators, as "hearsay-upon-hearsay." *United States v. Reyes*, 239 F.R.D. 591, 600 (N.D. Cal. 2006); *Golden v. World Sec. Bureau, Inc.*, 988 F. Supp. 2d 850, 858 (N.D. Ill. 2013) (excluding "interviews themselves or the second-level hearsay contained within them" conducted as part of internal investigation); *Hook v. Regents of Univ. of Cal.*, 394 F. App'x 522, 531 (10th Cir. 2010) (business records exception did not apply to interview notes and did not cure embedded hearsay in any event). Waymo bears the burden of proving an exception or exemption for each layer of hearsay. *United States v. Marguet-Pillado*, 560 F.3d 1078, 1086 (9th Cir. 2009) ("in either case,

---

[1] Uber continues to assert that the Stroz Report, its exhibits, and documents produced as a result of the Court's orders granting Waymo's Motion to Compel the Stroz Report (Dkts. 566, 685) and denying Uber's Motion to Quash Waymo's subpoena to Stroz Friedberg (Dkts. 670, 745), are protected by the attorney-client privilege, attorney work product, and common interest doctrines. Uber has preserved its appellate rights regarding those rulings and does not waive any such rights.

UBER'S BRIEF RE LIMITATIONS ON USE OF STROZ MATERIALS
CASE NO. 3:17-CV-00939-WHA

1    there is at least one more layer of hearsay, and to be admissible there must be an exception for

2    that layer also.").

3            A.  *The diligenced employees' statements are not party admissions.*

4            At the first level of hearsay, the diligenced employees' statements are not party

5    admissions of Ottomotto under Rule 801(d)(2)(D) because the employees did not make the

6    statements "within the scope of an employment or agency relationship." *United States v. Bonds*,

7    608 F.3d 495, 502 (9th Cir. 2010). Waymo previously took the position that "Levandowski

8    communicated with Stroz in his individual capacity rather than in his capacity as an officer of any

9    Otto entity" to overcome Uber's and Levandowski's privilege assertions. Dkt. 585 at 1:12-13; *see*

10   *id.* at 3:16-20 & n.3, 11:4-6. This Court agreed. *See* Dkt. 566 at 7-8, *aff'd*, Dkt. 685; Dkt. 670 at 2,

11   *aff'd*, Dkt. 745; *see also Waymo LLC v. Uber Techs., Inc.*, 870 F.3d 1350, 1363 (Fed. Cir. 2017).

12   Having gained an advantage by taking the position that the diligenced employees spoke to Stroz

13   as individuals, rather than as Otto employees, Waymo is now judicially estopped from taking the

14   opposite position. *E.g.*, *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir.

15   2001) ("Judicial estoppel is an equitable doctrine that precludes a party from gaining an

16   advantage by asserting one position, and then later seeking an advantage by taking a clearly

17   inconsistent position.").[2]

18           B.  *Levandowski's statements are inadmissible hearsay despite his unavailability.*

19           As to Levandowski, even if his Fifth Amendment invocation makes him unavailable, *see*

20   Fed. R. Evid. 804(a)(1), none of the exceptions to the rule against hearsay for an unavailable

21   witness—including the exception for statements against interest—apply. Fed. R. Evid. 804(b).

22   The proponent of an alleged statement against interest must establish the declarant "knew" when

23   making the statements that they "would tend to subject him to criminal or civil liability or to harm

24   his financial interests." *United States v. Bonds*, No. CR 07-00732 SI, 2009 WL 416445, at *7

25   (N.D. Cal. Feb. 19, 2009), *aff'd*, 608 F.3d 495 (9th Cir. 2010). Levandowski's statements to Stroz

26

27   _____

     [2] Waymo represented to Uber during the meet and confer process that it did not intend to seek to
28   admit the Stroz Materials as business records. Should Waymo change its position, Uber stands
     ready to submit a further brief explaining why the business records exception is inapplicable too.

were intended to induce Uber to enter into a transaction and indemnification agreement that stood to benefit Levandowski financially. Because his statements were in his financial interest, not against it, "the circumstances that allow the application of the hearsay exception—that no reasonable person would say this if it were not so—are not present here." *Bonds*, 2009 WL 416446, at *8.

C. *The Stroz materials are not rendered admissible due to agency.*

At the next level of hearsay, Stroz's recounting of what the diligenced employees may have said is not automatically admissible because Stroz was acting as MoFo's agent. Uber does not dispute that it authorized MoFo to retain Stroz to prepare the Stroz Report, and thus statements in the Report **made by Stroz** might be admissible for their truth under Rule 801(d)(2)(C). But the Stroz Materials in many places just regurgitate the diligenced employees' statements, quote documents and communications collected from their devices, or report data taken from those devices without additional analysis. For example, the Report's discussion of each diligenced employee begins with a lengthy summary of what he said when Stroz interviewed him. See TX-7912 at 8–11, 17–19, 24–25, 27–28, 30-31. These summaries are inadmissible hearsay for the reasons described above. And many of those statements are themselves hearsay reports. For example, Stroz reports "Ron called Levandowski, learned that the disks had already been destroyed, and relayed this information to Qi." *Id.* at 19. Stripped of their embedded hearsay and double hearsay, little remains of the Report; even less that has any material relevance to Waymo's claims.[3]

## II.  The Fulginiti Notes Are Inadmissible Hearsay.

The Fulginiti Notes consist almost solely of embedded hearsay and hearsay-within-hearsay, and cannot be admitted for any non-hearsay purpose. Fed. R. Evid. 802, 805. While the Fulginiti Notes appear to be notes Stroz investigators took during their interview with

---

[3] Sections I–III(C) of the Report (TX-7912 at 3-7) simply recite Stroz's engagement and methodology; while these passages are not embedded hearsay, they are also of marginal, if any, relevance to whether Uber improperly used any of Waymo's alleged trade secrets. Moreover, the same information is available in non-hearsay documents, such as Stroz's engagement letter and protocols, and Stroz's side letters with Levandowski. *See* TX 5223-26, 7656.

Levandowski, parts of the notes were made at different points in time, sometimes by two different authors. (*See* 10/17/17 Fulginiti Dep. 160:1–17, 164:5–15, 172:9–15, 177:5–15.) While Fulginiti's characterizations of Levandowski's out-of-court statements made in his personal capacity make up the bulk of the notes, the notes regularly intermingle up to three levels of hearsay, often in rapid succession and without any clear indication of who said what when. *See, e.g.*, TX-8855 at 18 ("What happens next. Go to Uber, I have some stuff I want to get rid of. Cam Nina and Travis. Cam says: …").) The Fulginiti Notes commingle statements from Levandowski's interviews with notations of "follow-up questions" and other information that was "not part of the Anthony Levandowski interview" but "must have gotten mixed in." (10/17/17 Fulginiti Dep. 177:5-15 (discussing TX-8858); *id.* at 162:3-13 (discussing TX-8854).) Even apart from this confusion as to whose statements are reflected in the handwritten notes (which is only made worse by the fact that TX-8854, 8857, and 8858 are black and white photocopies of the original, Fed. R. Evid. 1002), the embedded hearsay problems are insurmountable. The combination of authors, speakers, and subjects addressed in the notes also threatens to mislead and confuse the jury and renders any redaction effort futile; the notes should be excluded. *See* Fed. R. Evid. 403.

## III.     The Levandowski Forensic Findings Are Also Replete With Inadmissible Hearsay.

Similarly, TX 5101, a memo drafted by Stroz summarizing findings of their forensic analysis of Levandowski's devices, contains listings of data taken directly from Levandowski's devices and accounts, untransformed by Stroz's analysis; those embedded data are inadmissible hearsay. For example, the memo contains a listing of backup folders that Stroz simply copied out of a system file on Levandowski's laptop, *see* TX-5101 at 766, and a listing of file activity Stroz simply copied out of a log file from Dropbox, *id.* at 768–69. TX 7418 is even more problematic, as it is a rote listing of metadata from Levandowski's laptop without any selection or commentary by Stroz. Stroz's verbatim recitation of these hearsay sources does not convert them into admissions.

1

**IV.     The Stroz Materials Should Be Treated as Hearsay and Excluded for their Truth Pursuant To Rule 403 To Avoid Juror Confusion and Unfair Prejudice To Uber.**

2           If the Court admits the Stroz Materials at all, it should exercise its discretion under Rule

3   403 to exclude reliance on them to prove the truth of any matter asserted therein. Little of the

4   Stroz Materials are even potentially admissible for their truth; in light of the impracticability of

5   impressing upon the jury the complicated hearsay lines that apply, wholesale exclusion of the

6   Stroz Materials for their truth is the only way to avoid misleading the jury, causing unfair

7   prejudice to Uber, and wasting time attempting to explain the labyrinthine hearsay status of the

8   materials to the jury. Fed. R. Evid. 403. The Advisory Committee Notes to Rule 403 are clear that

9   "[i]n reaching a decision whether to exclude on grounds of unfair prejudice, consideration should

10   be given to the probable effectiveness *or lack of effectiveness* of a limiting instruction" (emphasis

11   added) and that "[t]he availability of other means of proof may also be an appropriate factor."

12   Waymo should be required to rely on non-hearsay evidence to prove its claims. Allowing the

13   Stroz Report and Exhibits into evidence for their truth will significantly and unfairly prejudice

14   Uber.

15           Finally, if Waymo lays appropriate foundation with a witness ***who received*** the Stroz

16   Materials, then the specific documents the witness received might be admissible for a non-

17   hearsay purpose.[4]  The Uber and Otto witnesses who received any of the Stroz Materials, and the

18   non-hearsay purpose for which they might be admissible, are set forth on the cover page of each

19   attached trial exhibit.

20   **V.     Conclusion**

21           For the foregoing reasons, the Court should exclude any reliance on the Stroz Materials or

22   the Fulginiti Notes for their truth, and should limit any use of these materials to non-hearsay

23   purposes, if any.

24

25

26

27   _____

[4]The Court has already excluded any witness's receipt in connection with this litigation. (7/26/17

28   Hr'g Tr. 125:15-24.)

1

2   Dated: February 5, 2018                    MORRISON & FOERSTER LLP
                                               BOIES SCHILLER FLEXNER LLP
3                                              SUSMAN GODFREY LLP

4
                                               By: */s/ Karen L. Dunn*
5                                                    KAREN L. DUNN

6                                              Attorneys for Defendants
                                               UBER TECHNOLOGIES, INC. and
7                                              OTTOMOTTO LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Waymo v. Uber*
**Case No. 3:17-cv-00939-WHA**

# APPENDIX A

## APPENDIX A

| Document | Description | Pre-Litigation Recipient Witnesses | Admissibility |
|---|---|---|---|
| TX-7912 Stroz Report | Summary Report - Project Unicorn Investigation | Adam Bentley; Angela Padilla; Eric Tate; John Gardner; Justin Suhr; Lior Ron<br><br>Uber believes, but cannot confirm, that Anthony Levandowski received the report. | Potentially admissible under Fed. R. Evid. 801(d)(2)(C) as to Stroz's own statements, if Waymo lays appropriate foundation.<br>Not admissible under any other provision of Fed. R. Evid. 801.<br>Not admissible under any provision of Fed. R. Evid. 803.<br>Not admissible under any provision of Fed. R. Evid. 804.<br>Embedded hearsay inadmissible under Fed. R. Evid. 805.<br><br>Because inadmissible embedded hearsay pervades the document, making a limiting instruction ineffective and ensuring jury confusion and unfair prejudice to Uber, the document should not be admitted for its truth to any degree. Fed. R. Evid. 403.<br><br>Potentially admissible for a non-hearsay purpose as to Uber witnesses listed to the left. |
| TX-7111 Exhibit 5 | Anthony Levandowski ("Levandowski") Redacted Interview Memorandum and Exhibits | *Adam Bentley; *Angela Padilla; *Cameron Poetzscher; Eric Tate; John Gardner; *Justin Suhr; *Nina Qi; *Salle Yoo | Potentially admissible under Fed. R. Evid. 801(d)(2)(C) as to Stroz's own statements, if Waymo lays appropriate foundation.<br>Not admissible under any other provision of Fed. R. Evid. 801.<br>Not admissible under any provision of Fed. R. Evid. 803.<br>Not admissible under any provision of Fed. R. Evid. 804.<br>Embedded hearsay inadmissible under Fed. R. Evid. 805.<br><br>Because inadmissible embedded hearsay pervades the document, making a limiting instruction ineffective and ensuring jury confusion and unfair prejudice to Uber, the document should not be admitted for its truth to any degree. Fed. R. Evid. 403.<br><br>Potentially admissible for a non-hearsay purpose as to Uber witnesses listed to the left. Witnesses marked with an asterisk received an identical document prior to the drafting of the Stroz Report, but never received the document as an Exhibit to the Report; questioning must be limited to avoid misleading the jury as to whether these witnesses ever received any of the Exhibts to the Report as such. Fed. R. Evid. 403. |
| TX-5215 Exhibit 6 | Lior Ron ("Ron") Redacted Interview Memorandum and Exhibits | *Adam Bentley; Eric Tate; John Gardner; *Justin Suhr; *Lior Ron | Potentially admissible under Fed. R. Evid. 801(d)(2)(C) as to Stroz's own statements, if Waymo lays appropriate foundation.<br>Not admissible under any other provision of Fed. R. Evid. 801.<br>Not admissible under any provision of Fed. R. Evid. 803.<br>Not admissible under any provision of Fed. R. Evid. 804.<br>Embedded hearsay inadmissible under Fed. R. Evid. 805.<br><br>Because inadmissible embedded hearsay pervades the document, making a limiting instruction ineffective and ensuring jury confusion and unfair prejudice to Uber, the document should not be admitted for its truth to any degree. Fed. R. Evid. 403.<br><br>Potentially admissible for a non-hearsay purpose as to Uber witnesses listed to the left. Witnesses marked with an asterisk received an identical document prior to the drafting of the Stroz Report, but never received the document as an Exhibit to the Report; questioning must be limited to avoid misleading the jury as to whether these witnesses ever received any of the Exhibts to the Report as such. Fed. R. Evid. 403. |
| TX-7418 Exhibit 15 | Last-Access Report re: Levandowski's Self-Identified Data | Eric Tate; John Gardner | Not admissible under any provision of Fed. R. Evid. 801.<br>Not admissible under any provision of Fed. R. Evid. 803.<br>Not admissible under any provision of Fed. R. Evid. 804.<br>Embedded hearsay inadmissible under Fed. R. Evid. 805.<br><br>Inadmissible for any non-hearsay purpose because Uber never received the document. Potentially admissible for a non-hearsay purpose as to Uber's outside counsel, but because the jury cannot be asked to speculate as to what advice Uber's attorneys may have provided, the risk of unfair prejudice substantially outweighs the negligible probative value and the document should be excluded. Fed. R. Evid. 40: |
| TX-7114 Exhibit 16 | Analysis Report of Last-Access Files from Levandowski's Self-Identified Data | Eric Tate; John Gardner | Not admissible under any provision of Fed. R. Evid. 801.<br>Not admissible under any provision of Fed. R. Evid. 803.<br>Not admissible under any provision of Fed. R. Evid. 804.<br>Embedded hearsay inadmissible under Fed. R. Evid. 805.<br><br>Inadmissible for any non-hearsay purpose because Uber never received the document. Potentially admissible for a non-hearsay purpose as to Uber's outside counsel, but because the jury cannot be asked to speculate as to what advice Uber's attorneys may have provided, the risk of unfair prejudice substantially outweighs the negligible probative value and the document should be excluded. Fed. R. Evid. 403. |
| TX-5101 Exhibit 17 | Levandowski Report of Preliminary Forensic Findings | Eric Tate; John Gardner | Potentially admissible under Fed. R. Evid. 801(d)(2)(C) as to Stroz's own statements, if Waymo lays appropriate foundation.<br>Not admissible under any provision of Fed. R. Evid. 801.<br>Not admissible under any provision of Fed. R. Evid. 803.<br>Not admissible under any provision of Fed. R. Evid. 804.<br>Embedded hearsay inadmissible under Fed. R. Evid. 805.<br><br>Inadmissible for any non-hearsay purpose because Uber never received the document. Potentially admissible for a non-hearsay purpose as to Uber's outside counsel, but because the jury cannot be asked to speculate as to what advice Uber's attorneys may have provided, the risk of unfair prejudice substantially outweighs the negligible probative value and the document should be excluded. Fed. R. Evid. 40: |

## APPENDIX A

| Document | Description | Pre-Litigation Recipient Witnesses | Admissibility |
|---|---|---|---|
| TX-5102 Exhibit 23 | Stroz Friedberg's Investigative Report re: Shred Works | Eric Tate; John Gardner | Potentially admissible under Fed. R. Evid. 801(d)(2)(C) as to Stroz's own statements, if Waymo lays appropriate foundation.<br>Not admissible under any  provision of Fed. R. Evid. 801.<br>Not admissible under any provision of Fed. R. Evid. 803.<br>Not admissible under any provision of Fed. R. Evid. 804.<br>Embedded hearsay inadmissible under Fed. R. Evid. 805.<br><br>Inadmissible for any non-hearsay purpose because Uber never received the document. Potentially admissible for a non-hearsay purpose as to Uber's outside counsel, but because the jury cannot be asked to speculate as to what advice Uber's attorneys may have provided, the risk of unfair prejudice substantially outweighs the negligible probative value and the document should be excluded. Fed. R. Evid. 403. |

*Waymo v. Uber*
**Case No. 3:17-cv-00939-WHA**

# TRIAL EXHIBIT 5101

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Anthony Levandowski and documents and communications taken from Levandowski's devices, including text messages and file metadata listings, and other sources, such as his Dropbox account history. *See* Br. § III.

- Fed. R. Evid. 403 – Because the document is replete with embedded hearsay, the Court should exercise its discretion under Rule 403 to exclude any reliance on the document for its truth, to prevent jury confusion about what fragments are admissible for truth, and resulting waste of time and prejudice to Uber. *See* Br. § IV.

- Designated witnesses who received this document pre-litigation are: Eric Tate and John Gardner. The document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV.

| Yellow Highlights | Hearsay Statements |
|---|---|

*Privileged & Confidential*

## MORRISON & FOERSTER LLP:
## PROJECT UNICORN

### ANTHONY LEVANDOWSKI PRELIMINARY FORENSIC FINDINGS:
### JULY 28, 2016

| | | | |
|---|---|---|---|
| ES001: | MACBOOK LAPTOP | ES002: | IPHONE |
| ES003: | ██████████ | ES004: | ██████████ |
| ES005: | ██████████ | ES006: | ██████████ |
| ES007: | ██████████ | ES008: | ██████████ |
| ES009: | ██████████ | ES010: | A@OT.TO |
| ES011: | A@OTTOMOTTO.COM | ES012: | ██████████ |
| ES027: | PERSONAL DROPBOX ACCOUNT | ES031: | PERSONAL DROBO NAS |
| ES034: | PERSONAL DESKTOP COMPUTER | ES045: | PERSONAL IPAD MINI |
| ES048: | PERSONAL IPAD 3 | ES057: | NEXUS TABLET |

### Evidence Summary

| # | Device Type | Device Name/Label | Date Received | Deleted Content | Data Copy/Transfer | Potentially Relevant Data found in Lab |
|---|---|---|---|---|---|---|
| ES001 | Computer | MacBook Laptop | 03/22/2016 | Yes | Yes | Yes |
| ES002 | Mobile Device | iPhone | 03/22/2016 | Yes | Yes | Yes |
| ES003 | Webmail | ██████████ | 03/22/2016 | N/A | N/A | No |
| ES004 | Webmail | ██████████ | 03/22/2016 | N/A | N/A | No |
| ES005 | Webmail | ██████████ | 03/22/2016 | N/A | N/A | No |
| ES006 | Webmail | ██████████ | 03/22/2016 | N/A | N/A | No |
| ES007 | Webmail | ██████████ | 03/22/2016 | N/A | N/A | No |
| ES008 | Webmail | ██████████ | 03/22/2016 | N/A | N/A | No |
| ES009 | Webmail | ██████████ | 03/22/2016 | N/A | N/A | No |
| ES010 | Webmail | a@ot.to | 03/22/2016 | N/A | N/A | No |
| ES011 | Webmail | a@ottomotto.com | 03/22/2016 | N/A | N/A | No |
| ES012 | Webmail | ██████████ | 03/22/2016 | N/A | N/A | No |
| ES027 | Cloud Account | Dropbox Account | 03/23/2016 | Yes | Yes | Yes |
| ES031 | Not Imaged | Drobo 2 NAS | 03/23/2016 | N/A | N/A | N/A |
| ES034 | Computer | Desktop Computer | 03/23/2016 | No | No | No |
| ES045 | Tablet | iPad Mini | 03/23/2016 | Yes | No | Yes |
| ES048 | Tablet | Ipad 3 | 03/23/2016 | Encrypted | Encrypted | Encrypted |
| ES057 | Tablet | Asus Nexus | 03/23/2016 | Not Imaged | Not Imaged | Not Imaged |
| ES059-85 | Servers | Levandowski Servers | 03/30/2016 | Not Imaged | Not Imaged | Not Imaged |

United States District Court
Northern District of California
**Trial Exhibit 5101**
Case No.____3:17-cv-00939-WHA____
Date Entered_____
By_____
Deputy Clerk

Exhibit 17
CONFIDENTIAL

003199533
UBER00312645

**TX-5101, Page 1 of 9**

Levandowski provided Stroz Friedberg with 18 sources of media between March 22, 2016 and March 23, 2016.  Each piece of media was preserved and returned to Levandowski except the following, which are being stored in Stroz Friedberg's evidence vault:

| # | Device Name/Label | Imaged | Comments |
|---|---|---|---|
| ES001: | MacBook Pro laptop | Yes | |
| ES031: | Personal Drobo NAS | No | Contains zero data |
| ES034: | CoolerMaster Desktop | Yes | |
| ES045: | iPad Mini | Yes | |
| ES048: | iPad 3 | Yes | Data is encrypted |
| ES057: | Asus Nexus Tablet | No | Password not provided |

On March 30, 2016, Stroz Friedberg arranged to have 27 desktops and/or servers collected from Levandowski's storage facility located at Nemo Building Systems 18231 Murphy Parkway, Lathrop, California.  At the request of the Clients, Stroz Friedberg did not create a forensic image of these devices and continues to store these devices in its evidence vault.

### Summary and Timeline of Key Findings

Levandowski stored and accessed Google files on his personal laptop.  Other Potentially Relevant files were accessed and subsequently deleted between 09/01/15 and 03/22/16.  He also used his iPhone 6S Plus to communicate with Ms. Morgan regarding Shred Works in addition to sending a reminder text to an unknown recipient to delete iMessages every night[1].

Levandowski indicated during his interview with Stroz Friedberg that he destroyed the five hard drives located within the Drobo2 storage device (ES031) and replaced those with new drives sometime in early March 2016.  Evidence suggests that the Drobo2 device was last connected to the MacBook Pro (ES001) on 03/08/16 and was being used, in part, to create backups of his personal laptop.

Lastly, Levandowski emptied the Trash on his MacBook Pro while he was at Stroz Friedberg's office on 03/22/16 at approximately 12:12 PM.

Below is a timeline of relevant events identified through analysis of Levandowski's devices.

- ∞   12-14-2015 – Approximately 24,000 Potentially Relevant files and folders were moved from a desktop folder to the Trash (ES001)
- ∞   12-22-2015 –USB device labelled "8GB" erased using MacBook Pro laptop (ES001)
- ∞   01-26-2016 – AL's last day at Google
- ∞   01-26-2016 – "USB device labelled "280" erased using MacBook Pro laptop (ES001)
- ∞   02-09-2016 – Approximately 20,000 items were moved to the Trash (ES001)
- ∞   02-10-2016 – 160 GB of free space become available on the MacBook Pro laptop (ES001)
- ∞   02-19-2016 – 8 GB SanDisk Cruzer erased using MacBook Pro laptop (ES001)

---

[1] This message is deleted and the Recipient field is no longer populated.

Exhibit 17
CONFIDENTIAL

003199533
UBER00312646

- ∞  02-26-2016 – Text from Rhian <mark>*"I'm gonna go get your stuff destroyed this afternoon btw. ill send you a bill and a pic/video"*</mark> (deleted) (ES002)
- ∞  03-01-2016 – Text from AL <mark>*"Ok good reminder to delete the iMessages every night"*</mark> (deleted) (ES002)
- ∞  03-01-2016 – Text from Rhian <mark>*"i've been paying for shredding on my card, since it's not technically a business expense for OM. LMK if I should expense it or send you a bill instead 😊"*</mark> (deleted) (ES002)
- ∞  03-01-2016 – Text from Rhian <mark>*"Ricardo, the shredder at ShredWorks, has a thing for these baby blues so he only charges me for about half the stuff they shred"*</mark> (deleted) (ES002)
- ∞  03-08-2016 – Last known time the Drobo2 was connected to the MacBook Pro. (ES001)
- ∞  03-13-2016 – Text from AL <mark>*"We're ready for junk King"*</mark> (deleted) (ES002)
- ∞  03-22-2016 – Trash emptied (during the interview with Stroz Friedberg) (ES001)

## Methodology

Stroz Friedberg analyzed each piece of media for evidence of:
1. data deletions or destruction;
2. file copy or transfer activity; and
3. the existence of Potentially Relevant content not sent to Relativity.

Stroz used several techniques to accomplish this depending on the media type.  Below are some examples of the techniques used during its analysis.

**<u>All Devices</u>**

<u>Potentially Relevant Data:</u> Stroz harvested and processed millions of files into Relativity, an eDiscovery review platform.  This data was reviewed separately for Potentially Relevant data.  Files not processed into Relativity, such as source code and pictures, were reviewed manually outside of Relativity.  Stroz also performed keyword searches across unallocated space (if applicable to the device) to identify any Potentially Relevant data.

**<u>Desktops and Laptops</u>**

<u>Deleted Content Review:</u> Stroz analyzed system logs, unallocated space, and other system artifacts to identify files that once existed on the device.  This information was then compared to the active files on the device to identify files no longer active on the device.

<u>File Copy or Transfer:</u> Stroz analyzed system logs and other artifacts to identify the connection of external media and access to cloud repositories.  Stroz then correlated that activity with other activity such as mass file access.

**<u>Mobile Devices</u>**

<u>Deleted Content Review:</u> Stroz analyzed databases and system artifacts to identify Potentially Relevant data.

Page | 3

Exhibit 17
**CONFIDENTIAL**

003199533
**UBER00312647**

**TX-5101, Page 3 of 9**

<u>File Copy or Transfer:</u> Stroz analyzed databases and system artifacts to identify access to cloud repositories and the existence of cloud storage apps.

**Removable Media**

<u>Deleted Content Review:</u> Stroz performed data carving across, and separately analyzed, unallocated space to identify files that may have once existed.

<u>File Copy or Transfer:</u> Stroz compared the serial numbers of each piece of media to those connected to in scope computers.  Stroz then compared file and system metadata to determine if files were copied between the devices.

**Device Level Findings**

**ES001: MacBook Pro**

**Summary of Deleted Content**

Stroz identified four external devices were connected to this laptop and subsequently erased/formatted between 09/01/15 and 02/16/16.  Below is a summary of those devices.

| Timestamp (Pacific) | Size | Device Name | Volume Name | Serial Number |
|---|---|---|---|---|
| 09/17/2015 23:09:36 | 130.2 MB | Unknown | "UNTITLED" | Unknown |
| 12/22/2015 02:06:39 | 8.06 GB | Unknown | "8GB" | Unknown |
| 01/26/2016 16:59:30 | 8.06 GB | Unknown | "280" | Unknown |
| 02/19/2016 01:41:46 | 8.06 GB | SanDisk Cruzer Media | "UNTITLED" | 0774700EACC0F75F |

Stroz identified evidence of several deleted files and folders; specifically:
1. A folder titled "280";
2. 64 files in the folder titled "Otto";
3. Approximately 89,000 files and folders deleted between November 2015 and March 2016;
   a. Approximately 24,000 of which were located in the folder "/Users/anthony/Desktop/boards/chauffeur-svn/.svn", before they were moved to the Trash on or around 12/14/2015; and
4. Approximately 20,000 files were deleted between 02/08/2016 and 02/09/2016.  A majority of those files were located in "_Source.sparsebundle" and "_Boards.sparsebundle"[2].

Stroz also identified evidence that the Trash folder was emptied on 03/22/16 around 12:12 PM, which is during Levandowski's interview with Stroz Friedberg.

Stroz identified evidence on or around 02/09/16 only 5.1 GB of free space was available on the laptop. The following day 165 GB of free space was available.

---

[2] A sparsebundle is a disk image file used on Mac OSX and is used to store data.

Exhibit 17
CONFIDENTIAL

003199533
UBER00312648

Stroz reviewed the unallocated space of the hard drive and found fragments of data related to Chauffeur.  Most of these fragments are only text strings of newsletter, email, and notes and cannot be associated with a date or a specific file.  Stroz compared these fragments to the active files on the computer.  The information identified in unallocated space appears to be duplicative to active file information. No additional relevant evidence was found within the unallocated space.

### Summary of Data Copy\Transfer

Stroz identified access to several cloud storage repositories including Slack, Egnyte, Google Drive, and Dropbox.  Review of the internet history shows accesses to Google Docs on 01/27/16 at 15:55 (UTC); specifically, a file named "Chauffeur TL weekly updates - Q4 2015 - Google Sheets." Further review of the laptop identified a file named "Chauffeur TL weekly updates - Q4 2015.xlsx" in the user's Download folder; the file was created on 1/11/16 and was last accessed on 02/24/16[3].  The Slack team collaboration site titled "280systems" and "ottomotto" ware accessed on 01/12/16 and 03/10/16 respectively, but no additional information regarding this activity was identified.

Stroz identified evidence of files accessed from the laptop to the Drobo 2 storage device (ES031). Evidence suggests that the Drobo2 was used to back up the laptop; the most recent backup was dated 02/08/2016.  Evidence suggests the Drobo 2 was last connected to the laptop on 03/08/2016.  Below are examples of entries found within system artifacts indicating the dates of the backup folders that once existed on the Drobo2[4].

- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-08-22-144755
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-08-29-203418
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-09-05-152019
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-09-17-023213
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-09-22-091427
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-10-02-223222
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-10-10-170129
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-10-17-114831
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-11-06-080600
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-11-21-202000
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-12-08-095641
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-12-15-120320
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2015-12-27-091416
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2016-01-09-190411
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2016-01-13-211821
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2016-01-30-090832
- ∞ /Volumes/Drobo2/Backups.backupdb/Erica's MacBook/2016-02-08-133657

### Summary of Potentially Relevant Data

Stroz Friedberg's forensic analysis identified Potentially Relevant data stored on this laptop.  For example, we located 71 files within the users' Download folder that contain the word "Chauffeur" in the file name.  Stroz also identified that the user synced his Google work email with the laptop and

---

[3] The last accessed dates can reflect file interaction with a user or a system process.  Stroz determined these timestamps to likely be the result of user interaction because they appear to be targeted access.

[4] The hostname for the MacBook Pro is labeled as "Erica's MacBook".

Page | 5

Exhibit 17
CONFIDENTIAL

003199533
UBER00312649

**TX-5101, Page 5 of 9**

approximately 50,000 messages were created on this computer on 09/20/14; 10 of which were last accessed between 09/01/15 and 01/28/16[5].

Stroz identified two pictures of chat messages dated 1/28/2016 in which Google employees informed Levandowski that they have decided to stay where they are.  At the time of this report, these have not been processed into Relativity.

Stroz identified approximately 24,000 files and folders in the folder "/Users/anthony/Desktop/boards/chauffeur-svn/.svn" that were moved to the Trash on or around 12/14/2015.  This information was found only within system artifacts; the files and folders themselves no longer reside on this device.

### ES002: iPhone 6S Plus

#### Summary of Deleted Content

Stroz identified evidence of file deletion on this device. For example, there are approximately 1,300 deleted chat messages; the following table shows some messages that relate to data destruction.

| Date (Pacific) | From | Body | Status |
|---|---|---|---|
| 3/1/2016 2:58:58 PM | ▮▮▮▮ Anthony Levandowski | Ok good reminder to delete the iMessages every night | Deleted |
| 2/26/2016 9:45:38 AM | ▮▮▮▮ Rhian Morgan | I'm gonna go get your stuff destroyed this afternoon btw. ill send you a bill and a pic/video☺ | Deleted |
| 3/1/2016 3:01:42 PM | ▮▮▮▮ Rhian Morgan | i've been paying for shredding on my card, since it's not technically a business expense for OM. LMK if I should expense it or send you a bill instead ☺ | Deleted |
| 3/1/2016 3:07:17 PM | ▮▮▮▮ Rhian Morgan | Ricardo, the shredder at ShredWorks, has a thing for these baby blues so he only charges me for about half the stuff they shred. ☺ | Deleted |
| 3/13/2016 4:44:21 PM | ▮▮▮▮ Anthony Levandowski | We're ready for junk King | Deleted |

#### Summary of Data Copy\Transfer
Stroz identified the Dropbox application installed on this device, including 14 files cached in the Dropbox archive.  These 14 files were reviewed and are not Potentially Relevant.

#### Summary of Potentially Relevant Data
Stroz Friedberg's forensic analysis identified Potentially Relevant data stored on this device (See Summary of Deleted Content).

---

[5] The last accessed dates can reflect file interaction with a user or a system process.  Stroz determined these timestamps to likely be the result of user interaction because they appear to be targeted access.

Page | 6

Exhibit 17
CONFIDENTIAL

003199533
UBER00312650

TX-5101, Page 6 of 9

**Webmail Accounts**

**Summary of Potentially Relevant Data**

Stroz has reviewed over a million files in Relativity as part of its on-going efforts to identify Potentially Relevant data.  The following email accounts have been reviewed in their entirety as part of that review; the full details of that analysis will be summarized in our final report.



| Stroz Evidence Number | Email Address | Potentially Relevant Self-Sent Emails Found |
|---|---|---|
| ES003 | ███████████ | No |
| ES004 | ███████████ | No |
| ES005 | ███████████ | No |
| ES006 | ███████████ | No |
| ES007 | ███████████ | No |
| ES008 | ███████████ | No |
| ES009 | ███████████ | No |
| ES010 | a@ot.to | No |
| ES011 | a@ottomotto.com | No |
| ES012 | ███████████ | No |

**ES027: Personal Dropbox Account**

**Summary of Deleted Content**

Stroz reviewed the Dropbox event logs for evidence of file deletion and identified several entries indicating various users including Anthony Levandowski, Colin Sebern, and Suzanna Musick deleted data from this account between September 2015 and January 2016.

**Summary of Data Copy\Transfer**

This account is a file storage repository which may be used to share files with individuals who have been given access to specific files and folders.  The general purpose of a Dropbox account is to store files that can be synchronized to and accessed from any device or a web browser.

**Summary of Potentially Relevant Data**

This account contains a folder titled "Chauffeur" which Levandowski identified as containing Potentially Relevant data.  Stroz reviewed the Dropbox event logs and identified the following events related to Potentially Relevant data.

| Date | Event |
|---|---|
| 1/22/2015 | 2014 K1 - NEMO 1.jpeg Added |
| 1/22/2015 | 2014 K1 - NEMO 2.jpeg Added |
| 1/22/2015 | 2014 K1 - NEMO 3.jpeg Added |
| 1/22/2015 | 2014 K1 - NEMO 4.jpeg Added |
| 1/22/2015 | 2014 K1 - NEMO 5.jpeg Added |
| 1/22/2015 | 2014 K1 - NEMO 6.jpeg Added |
| 1/22/2015 | 2014 K1 - NEMO 7.jpeg Added |

Exhibit 17
CONFIDENTIAL

003199533
UBER00312651

**TX-5101, Page 7 of 9**

| Date | Event |
|------|-------|
| 1/22/2015 | 2014 K1 - NEMO cover.jpeg Added |
| 10/3/2015 | You added the file Google chauffeur press update.pdf. |
| 10/8/2015 | You added the file 2014_0624EVtransitToGoogle ...e2014.pdf. |
| 10/30/2015 | You added the file Flyer epc600_610 Evaluation ...- V1.4.pdf. |
| 10/31/2015 | In ASL-MR, you added the file google anthony ticket back.pdf. |
| 10/31/2015 | In ASL-MR, you added the file Google Anthony Ticket.pdf. |
| 11/5/2015 | You edited the folder AXA talk at Google.key. |
| 11/5/2015 | You edited the folder axa talk at gcogle.key. |
| 11/5/2015 | You renamed the folder ExxonMobil Google copy.key to AXA talk at Google.key. |
| 11/5/2015 | You added the folder ExxonMobil Google copy.key. |
| 12/2/2015 | In ASL-MR, Suzanna Musick added 2014 K1 - NEMO 1.jpeg and 7 more files. |
| 12/2/2015 | In ASL-MR, Suzanna Musick renamed the folder 2014 K1 Nemo. |
| 12/5/2015 | You added the file Google lidars public disclosure.pdf. |
| 12/21/2015 | Test Report for HDL-64E S2 Laser Power Customer.pdf Added |
| 12/21/2015 | DSR, db.xml and Source Code Example Added |
| 12/21/2015 | In ASL-MR, you renamed the folder Topcon enclosure solidworks files. |
| 1/9/2016 | You moved the file SICK laser lms roadmap.pdf. |
| 1/28/2016 | In ASL-MR, Suzanna Musick edited the file Dogwood Furniture to NEMO...draft.xlsx. |
| 1/29/2016 | In ASL-MR, Suzanna Musick edited the file Dogwood Furniture to NEMO...draft.xlsx. |
| 1/30/2016 | You added the folder Truck setup. |
| 11/15/2015-01/29/2016 | 225 events regarding Colin Sebern adding \deleting files to the account between 11/15/2015 and 1/29/2016 (mostly related to the 'mirrors' folder) |

### ES031: Drobo 2

**Summary of Potentially Relevant Data**

Stroz Friedberg analyzed the five 4 TB hard drives contained within this device; each of which had been wiped and contained absolutely no data.  Specifically, Stroz Friedberg calculated the MD5 hash value[6] for each drive to confirm that they each contain all zeros.

### ES034: Cooler Master Desktop

**Summary of Deleted Content**

Stroz Friedberg's forensic analysis of this device identified no evidence of mass file deletion or wiping.

**Summary of Data Copy\Transfer**

Stroz Friedberg's forensic analysis of this device identified no evidence of data copy or transfer.

---

[6] MD5 is a widely used algorithm used to verify data integrity.  It is known to be the digital fingerprint of a file or set of data.

Page | 8

Exhibit 17
CONFIDENTIAL

003199533
UBER00312652

**Summary of Potentially Relevant Data**
Stroz Friedberg's forensic analysis of this device identified no Potentially Relevant data.

### ES045: iPad Mini

**Summary of Deleted Content**
Stroz Friedberg's forensic analysis of this device identified several deleted Notes, which were sent to the Stroz Review Team for further review.

**Summary of Data Copy\Transfer**
Stroz Friedberg's forensic analysis of this device identified no evidence of data copy or transfer.

**Summary of Potentially Relevant Data**
Stroz Friedberg's forensic analysis of this device identified no Potentially Relevant data.

### ES048: iPad 3

Stroz Friedberg identified that this device is encrypted and cannot be accessed without the iTunes backup password.  Stroz attempted all passwords provided by Levandowski; however, none were capable of decrypting the device.

### ES057: Asus Nexus Tablet

Stroz Friedberg identified that this device is locked and cannot be accessed. Levandowski informed Stroz that he does not remember the password for this device.

Exhibit 17
**CONFIDENTIAL**

003199533
**UBER00312653**

**TX-5101, Page 9 of 9**

*Waymo v. Uber*
**Case No. 3:17-cv-00939-WHA**

# TRIAL EXHIBIT 5102

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by employees of Shred Works. *See* Br. § I.

- Fed. R. Evid. 403 – Because the document is replete with embedded hearsay, the Court should exercise its discretion under Rule 403 to exclude any reliance on the document for its truth, to prevent jury confusion about what fragments are admissible for truth, and resulting waste of time and prejudice to Uber. *See* Br. § IV.

- Designated witnesses who received this document pre-litigation are: Eric Tate and John Gardner. The document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV.

| Yellow Highlights | Hearsay Statements |
|---|---|

**MEMORANDUM**

To:      File

From:   Stroz Friedberg

Date:   August 2, 2016

Re:      Memorandum:  Follow-Up Investigation regarding Shred Works Facility

_____

On April 3, 4, 6, and 11, 2016, Stroz Friedberg attempted to verify that Anthony Levandowski ("Levandowski") visited a shredding facility in March 2016 and disposed of five hard disk drives. Levandowski has stated ==that he paid cash at a commercial shredding facility near the Oakland airport.== He stated that ==he did not recall the date or the name of the facility and did not obtain a receipt.== Levandowski's attorney later informed us ==that the name of the facility was "Shed Works on High Street."==

Internet searches led us to believe that the facility was most likely Shred Works (http://shredworks.com/), an information security company with headquarters at 455 High Street in Oakland, California. Shred Works, which has been in business since 1993, provides hard drive shredding services and has an AAA certification from the National Association for Information Destruction.

**Site Visit to Shred Works on Sunday, April 3, 2016**

On Sunday, April 3 at approximately 2:30 p.m., a Stroz Friedberg investigator ("the Investigator") arrived at Shred Works' location at 455 High Street in Oakland, California and observed that the facility appeared closed. All visible entrances were chained shut and the Investigator saw no people inside the fence, although there was one car and multiple "Shred Works" trucks parked there. A call button at the personnel gate was pressed; no one answered the call. The Investigator took five photographs of the Shred Works facility, which are included below. The investigator remained at the site for another ten minutes, observed no activity, and departed at approximately 3:10 p.m.



1

United States District Court
Northern District of California
**Trial Exhibit 5102**
Case No.___3:17-cv-00939-WHA___
Date Entered_____
By_____
       Deputy Clerk

CONFIDENTIAL                                                    UBER00312684





**Site Visit to Shred Works on Monday, April 4, 2016**

On Monday, April 4, at approximately 9:10 a.m., two Stroz Friedberg Investigators ("the Investigators") visited the same Shred Works facility on High Street.

When the Investigators arrived, the facility was open. To better understand the hard drive shredding process, the Investigators attempted to have a blank hard drive shredded. The Investigators were directed by signs on the exterior of the building to a small, unoccupied lobby. Within the lobby, there were several surveillance cameras and a television that appeared to be providing a live feed of the facility shredding documents. On the wall, there was an electronic doorbell which appeared to have a camera attached to it. A sign next to the doorbell indicated that visitors should ring for service.

Upon ringing the doorbell, a female voice answered. The Investigators explained that they were interested in having a hard drive shredded and the female indicated that she would have someone meet the Investigators in the lobby. Shortly thereafter, an employee, later determined to be Jose A. Campos ("Campos"), met the Investigators in the lobby. The Investigators again explained that they were

2

CONFIDENTIAL

UBER00312685

interested in having a hard drive shredded. Campos inquired whether the Investigators wanted to observe the hard drive being shredded and the Investigators answered affirmatively.

Campos led the Investigators approximately 50 feet to a warehouse immediately adjacent to the lobby which was secured with a metal gate. Campos then advised that it appeared that the hard drive shredding machine was not presently at the facility and asked if it would be acceptable to leave the hard drive to be shredded when the shredding machine returned. The Investigators agreed and asked for more information about how the shredder worked. Campos explained that the shredder would physically destroy the hard drive and showed us a bin containing the output of other shredded hard drives. The Investigators confirmed that it would be impossible to recover data from the shredded hard drive pieces.  Not only were the shredded fragments very small, fragments from numerous hard drives were mixed together in the bin.[1]

Campos then inquired how the Investigators would be paying. The Investigators provided Campos with $20 in cash for the one hard drive and Campos returned $10 in cash for change. Campos then completed a receipt listing his name, the date, the time, the description of service, the method of payment, and the amount. Campos then requested that the Investigators sign the receipt. The Investigators noted that it appeared that three copies of the receipt were created. Campos provided the Investigators with the top copy of the receipt which was printed on white paper. The Investigators asked Campos if a receipt was created for every shredded hard drive. Campos indicated that a receipt is generated for every shredded hard drive as the facility uses the receipts for accounting purposes.

The Investigators then showed Campos a color digital photograph of Levandowski and asked if he had shredded a hard drive several weeks prior. Campos indicated that he did not recognize the individual in the photograph; however, he is not usually the person responsible for assisting people who want to shred hard drives. Campos stated that another employee, Ricardo, usually handles the shredding of hard drives. The Investigators asked if Ricardo was available and Campos indicated that he was not working that day but may be in tomorrow.

The Investigators then spoke with a female in the lobby and asked if it was possible for them to review the receipts to see if any matched our client's shredding request several weeks earlier.  Shortly thereafter, the female met the Investigators in the lobby and asked if they knew when the hard drives had been shredded. The Investigators advised that approximately five hard drives had been brought to the facility on or around March 17, 2016 to be shredded by a man named "Anthony" who paid in cash. The female returned to the back office to look for the receipt while the Investigators waited in the lobby.

A few minutes later, the female returned and advised that she did not see any receipts matching our criteria since March 15, 2016. The female advised that while the facility shreds a lot of hard drives, they often pick the hard drives up from customers rather than having them dropped off. The female advised that she did observe one receipt that did not have a name associated with it for six hard drives that were shredded on March 23, 2016 and paid for with cash.

---

[1] Shred Works has on its website a video of its hard drive shredding process: http://shredworks.com/ewaste/. This video appears to be consistent with the hard drive shredding process that was described to Stroz Friedberg Investigators. The bin the Investigators observed at the facility appeared to have similarly shredded hard drive pieces as displayed in the video.

3

CONFIDENTIAL

UBER00312686

As the Investigators were speaking with the female, an unidentified male employee, who appeared to be a manager, joined us in the lobby. The male employee asked what the Investigators were looking for and the Investigators advised that they were working with "Anthony" to determine whether there was any evidence of him shredding five hard drives on or around March 17, 2016. The Investigators asked the male how long they retain their receipts, and he indicated that they were preserved for years.

The Investigators showed the female and the male a digital color photograph of Levandowski but neither of them recognized him. The male advised that if the individual provided the date he came to the facility, it may be easier to locate a receipt. The Investigators departed again.

Shortly thereafter, the Investigators returned to the lobby of the facility and again made contact with the female by ringing the doorbell. The Investigators asked the female if she could search the receipts from March 1, 2016 to the present (expanding the scope of her review by several days) and she indicated that she would check.

The male employee the Investigators were speaking with earlier came back to the lobby and advised that they had located a receipt from March 14, 2016 for five hard drives that were shredded and paid for in cash. The male employee briefly showed the Investigators the receipt which appeared to have an illegible signature on it. The Investigators were unable to determine if the signature belonged to Levandowski. The Investigators did note that the time indicated on the receipt was 9:44 a.m. and that the person listed in the "assisted by" line was Ricardo. The male indicated that if the individual came to the facility with a photo ID and provided a matching signature, the individual could obtain a copy of the receipt. The male employee indicated that he would set the receipt aside for safekeeping. The Investigators thanked the male employee for his help and left the facility.

**Site Visit to Shred Works on Wednesday, April 6, 2016**

On Wednesday, April 6, at approximately 11:46 a.m., a Stroz Friedberg Investigator arrived at Shred Works on High Street, entered the lobby, and rang the doorbell for service.  Employee Ricardo Piceno ("Ricardo") walked by the lobby and asked if the investigator needed assistance. The Investigator advised Ricardo that he was attempting to obtain a receipt for several hard drives that had been shredded in or about the beginning-mid March 2016. The Investigator asked Ricardo if he was the employee normally responsible for shredding hard drives and he indicated that he was.

The Investigator then showed Ricardo several color digital photographs of Levandowski and asked Ricardo if he recognized the individual in the photographs as someone who previously shredded five hard drives. The Investigator told Ricardo that the individual had come to the facility in mid-March to shred five hard drives, observed the shredding process, and paid in cash.

Ricardo stated that he did not recognize the individual in the photographs.

The Investigator told Ricardo that the individual is tall, approximately 6' 3", and has a slight accent. Ricardo stated that he still did not recognize the individual and was not certain that he would remember him, even if he had helped him.

Shortly thereafter Juanita, the office manager, came to the lobby.  Juanita stated that she was aware of the request to obtain a receipt for the shredded hard drives.  Juanita advised that she could look for and provide the receipt if we provided her with a copy of the individual's signature for comparison.

4

Juanita also advised that if we provided a photograph of Levandowski, they would also review their video surveillance system.  The Investigator showed several color digital photographs of Levandowski to Juanita and she indicated that she did not recognize the individual; however, she does not normally interact with customers face-to-face. The Investigator thanked Juanita for her time and left the facility.

A few days later, a Stroz Friedberg Investigator emailed Juanita and provided her with examples of Levandowski's signatures that the Investigator had obtained from Levandowski when he signed various chain of custody forms related to his devices.  The Investigator asked Juanita to review the March 2016 receipts and, in particular, all receipts for March 11, 2016 (the day, we were later informed, Levandowski met with Uber, told them about the disks and subsequently claimed to have shredded the disks).

The Investigator also sent Juanita an email with photographs of Levandowski for video footage review but Juanita advised he Investigator that the VP of Operations, Greg, who has access to the old footage, was out of town for the next couple of weeks and that no one would be able to review the video footage until he returned.

On April 11, 2016, a Stroz Friedberg Investigator spoke with Juanita telephonically who advised the Investigator of the following:  (1) the facility did not possess a receipt for March 11, 2016 that reflected that five hard drives/disks were destroyed and paid for by the customer in cash; (2) there did not appear to be a receipt for March 11, 2016 that matched Levandowski's signature; and (3) the receipts are created the same day a customer brings in the materials to be destroyed, regardless of whether they drop them off or observe the destruction.  Juanita then refused to provide us with any additional information until her VP of Operations returned from his business trip.

The interviews of Shred Works employees and the Shred Works documents do not support Levandowski's contention that he took the five disks to Shred Works on the same day as his meeting with Uber, which was March 11, 2016.  Levandowski is fairly recognizable, and our interviews were conducted not long after the alleged event.  No one recognized him as having appeared on March 11, 2016 or any other date. The March 14, 2016 receipt for the destruction of five disks could better support the proposition that the disks were destroyed at Shred Works on a day later than Levandowski recalls, but there is no way to connect that receipt to Levandowski or the five Levandowski disks at issue.

5

**TX-5102, Page 5 of 5**

*Waymo v. Uber*
**Case No. 3:17-cv-00939-WHA**

# TRIAL EXHIBIT 5215

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Lior Ron, who participated in the Stroz diligence process in his individual capacity. *See* Br. § I.

- Fed. R. Evid. 805 – This document contains inadmissible hearsay within hearsay; namely, Lior Ron's recitation of out of court statements made by other declarants. *See* Br. § I.

- Fed. R. Evid. 403 – Because the document is replete with embedded hearsay, the Court should exercise its discretion under Rule 403 to exclude any reliance on the document for its truth, to prevent jury confusion about what fragments are admissible for truth, and resulting waste of time and prejudice to Uber. *See* Br. § IV.

- This exhibit contains references to, and attaches a copy of, Lior Ron's employment agreement, which Waymo stipulated that it would not make reference to in its case in chief. *See* Dkt. 425 at 4.

- Designated witnesses who received this document pre-litigation are: Eric Tate, John Gardner, Adam Bentley, Lior Ron, and Justin Suhr. Except through Suhr, the document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV. Only Tate and Gardner received this document as an Exhibit to the Stroz Report; the remaining witnesses received an identical document in April or May, 2016, well before the Stroz Report was written.

| Yellow Highlights | Hearsay Statements |
|---|---|
| Blue Highlights | Hearsay-within-Hearsay Statements |

MEMORDANUM

To:     Eric Amdursky

From:   Stroz Friedberg

Date:   April 12, 2016

Re:     DRAFT Interview Summary of Lior Ron

---

On March 22, 2016, Mary Fulginiti, Melanie Maugeri, and Hanley Chew interviewed Lior Ron at the offices of Stroz Friedberg on 101 Montgomery Street, Suite 2200, San Francisco, California 94104. On April 11, 2016, Mary Fulginiti and Hanley Chew conducted a follow-up interview of Lior Ron via telephone.

**Employment at Google**

Ron stated that he first worked for Google from April 7, 2007 to December 11, 2011. He began working for Motorola Mobility Holdings, Inc. ("Motorola") in January 2012 and then rejoined Google on or about November 5, 2014 after Google acquired Motorola. He remained at Google until January 13, 2016.

   Employment Documents and Training at Google

When Ron first joined Google, he recalled signing an employment agreement that contained nondisclosure, confidentiality and non-solicitation provisions. When he rejoined Google again in 2014, Ron signed an employment agreement which contained invention, nondisclosure provisions, among other things, as well as a document outlining roles and responsibilities. Ron stated that he participated in an online training course about how to treat privacy (i.e. private user data), but he could not recall any other training, policies or manuals.

Ron understood the provisions in his employment agreement to prohibit him from disclosing any of Google's confidential information and from soliciting Google employees to work for him after he left Google.

Ron was shown three documents: (1) Google Inc. At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement dated November 5, 2014; (2) Questionnaire for Diligenced Employees provided by Stroz Friedberg; and (3) Ron's Responses to Questionnaire for Diligenced employees. He reviewed each of the above and confirmed that they appeared to be true and correct copies of the documents. In addition, he confirmed that his responses to the Questionnaire were true and correct. These documents are attached hereto as Exhibits 1, 2, and 3, respectively.

On March 29, 2016, Stroz Friedberg received an email from Eric Amdursky containing additional information requested during Ron's interview, including the following documents: (1) a one page letter from Google regarding a transfer of your employment from Motorola Mobility Holdings, LLC to Google Inc.; (2) a memorandum from Google outlining anti-competition and document confidentiality requirements, among other things; and (3) Employment Eligibility Verification form. The email and above-referenced documents are attached hereto as Exhibit 4.

1

**CONFIDENTIAL**

United States District Court
Northern District of California
**Trial Exhibit 5215**
Case No.  3:17-cv-00939-WHA
Date Entered
By
Deputy Clerk

On April 2, 2016, Stroz Friedberg received an email from Eric Amdursky including additional information requested from Ron. This email and its attachment are attached hereto as Exhibit 5.

On April 9, 2016, Stroz Friedberg received an email from Eric Amdursky including additional information requested from Ron. This email is attached hereto as Exhibit 6.

On April 11 and 12, 2016, Stroz Friedberg received follow-up emails from Eric Amdursky and Ron with additional information from Ron. These emails are attached hereto as Exhibit 7.

Duties and Responsibilities at Google

From April 2007 to approximately April 2008, Ron was a Product Manager for Google Maps/Local, which was part of the GEO Division. The Geo Division also included Google Earth, Google Moon, Street View, Google Sky, My Maps, Google LBC, and Sketch Up, among others. During 2008 and 2009, Ron was a Senior Product Manager where he supervised one to two employees. Beginning in 2010 until his departure from Google in December 2011, Ron was the Group Product Manager for Google Places, also referred to as Google Local, where he supervised five to ten employees.

During this first term of employment at Google, Ron's duties and responsibilities included defining road maps for products, feature prioritization, and working with different teams to plan the development for road mapping. Initially, Ron had no supervisory responsibilities but those responsibilities gradually increased over time as described above.

In or about November 2014, Ron returned to Google after it acquired Motorola and was an advisor to various Google businesses including Alphabet, the parent company of Google. When he first rejoined Google, Ron was an advisor reporting to Jonathan Rosenberg. From in or about April 2015 to September 2015, Ron was an advisor to Niantic Inc., where he reconnected with John Hanke, and focused on games that engage in real world platforms, such as, Ingress (a video game that enable users to create and hack into things) and Field Trip (an Android application that provides information on points of interest around the world). From October 2015 to January 2016, Ron was an advisor to Waze and its Chief Executive Officer, Noam Bardin.

While he had no specific day-to-day responsibilities during his second term of employment with Google, Ron interacted with various groups and advised Google regarding the following projects: (1) Nest, (producer of home automation products) where he worked with Maxime Veron and provided personal coaching on how to run the business; (2) Replicant (robotics division), where he worked with Jonathan Rosenberg and Bhavesh Mehta; (3) Android Wear (producer of smartwatches and smart clothing), where he worked with David Singleton; (4) Waze, where he worked with Noam Bardin; (5) Cardboard (developer of virtual reality devices); (6) general research regarding new offerings at Google; and (7) expansion of market share with smart fashion, including interfacing with Michael Kors representatives. During this time, Ron had no supervisory responsibilities.

Ron identified the following individuals who he primarily worked with at Google from November 2014 to January 2016: Jonathan Rosenberg; John Hanke; David Singleton; Noam Bardin; and Bhavesh Mehta.

While at Google, in or about July 2015-October 2015, Ron became interested in learning more about the Chauffeur Project. He was curious about the self-driving car space and wanted to educate himself about it to determine if it was something he might be interested in at Google. Ron stated that he viewed some

2

**CONFIDENTIAL**

Google videos regarding the history of Chauffeur, examined the list of incoming press inquiries concerning Chauffeur, reviewed the directory of Chauffeur employees and accessed certain individual's calendars to determine a mutually convenient time to set up some meetings.

He met with the following individuals for approximately one hour each in or about July-October 2015: Chris Urmson; Daniel Chu; Chris Ludwick; and Abighit Ogale. He generally explored with each of them what they were doing with Chauffeur and some of the main challenges with the project, among other things. His best recollection of what he discussed with each individual is summarized below.

&#8734;  Chris Urmson

He spoke with Urmson about the commercialization side, the main challenges facing the Chauffeur Project and explored the possibility of assisting the team. Urmson told him he did not believe there was an immediate need in commercialization but that he should reach out to the unit's head of Business Development, Jennifer Haroon, who could explore possibilities with Ron. Ron thought about scheduling a meeting with Haroon, but he did not ultimately do so.

&#8734;  Daniel Chu

Daniel Chu was the Lead Project Manager for the project and sought Ron's advice on how to grow his own team, since Ron had managed approximately 100 employees at Motorola. They also discussed the main challenges ahead with the Chauffeur Project from a product perspective, including some of the user-interfacing challenges.

&#8734;  Chris Ludwick

Ron worked with Ludwick at Motorola. Ludwick was on Chu's team so the conversation was similar to the conversation he had with Chu. He also recalled speaking about sensor products and ways to describe the specifications for various products.

&#8734;  Abhijit Ogale

Ogale worked with Ron at Street View and Google Maps in 2009/2010. Ron was curious about how the Chauffeur Project was using computer vision to self-drive the cars. He was also interested in Ogale's opinion as to whether the cars could drive autonomously with computers. ████████████████
████████████████████████████████████████████

Side Projects at Google

During his tenure at Google, Ron stated that he engaged in a number of external side projects that were not Google-related as an owner, investor, and/or advisor. Ron stated that Google did not know about these projects, which included the following:

- &#8734;  Moon Express (advisor/investor) – space travel to the moon
- &#8734;  LocoMobi (advisor) – smart parking technology
- &#8734;  Plumzi (advisor) - interactive technology for children. Disney is an investor.
- &#8734;  Lark (advisor/investor) – personal online coach for your health
- &#8734;  Dojo (investor) – IT smart home digital security system
- &#8734;  SAY (investor) necklaces, smart jewelry

3

**CONFIDENTIAL**

- ∞ Jabe Mobile (investor) – sold to Google
- ∞ ZenDrive (investor) – insurance for ride-sharing companies
- ∞ Honor (investor) – elderly stay at home service

### Devices and Data Accessed at Google

During his most recent tenure at Google, Ron was only issued a MacBook Air, which he returned to Google when he left the company. Ron also had a personal Android Nexus 6, which synced with his Google work email.

#### Work Product

Ron stated that he created and/or worked on documents, presentations, spreadsheets and communications while at Google. Ron stated that he would access these items primarily through the Google Drive via his work laptop and externally through VPN from his work laptop as well. Ron accessed Google's network through his personal Nexus phone, including contacts, calendar, employee networks, "all hands," and the Google Drive. Google had security software installed on Ron's personal phone that allowed him to access Gmail and Google Docs. Google terminated Ron's access when he resigned. Ron stated that he did not use his personal laptop to access the Google network or any Google data/documents.

#### Personal Devices/Online Repositories

Ron denied storing any documents that he worked on for Google on any of his personal devices or in online repositories. He further explained that most of his work documents were stored on Google's internal G Drive and that none were on his external accounts.

#### Transfer of Files

Ron said he did not transfer any Google files to an external device and "very rarely" forwarded non-work related/non-confidential emails and/or contacts to his personal Gmail account. Ron stated that prior to leaving Google he did send a few emails, containing personal photographs, employee exit documents relating to benefits, and "public" presentations to his personal email account – [ ] Ron recalled in a follow-up email to Stroz Friedberg dated March 29, 2016 (Exhibit 4) that on the last day of his employment with Google he forwarded the following emails/photos/contacts from his Google account to his personal Gmail account: (1) LETV email regarding a Chinese company he helped introduce to Google. LETV was interested in starting a self-driving car division; (2) 2 personal photos; (3) 5 personal photos in archives; (4) Dropbox CEO contact; and (5) a Chinese self-driving car company that contacted Ron. He was not certain if it was a different company than LETV.

Ron stated that he did not copy, download or transfer any Google confidential or proprietary information (listed in his agreement) to any of his personal devices and that he does not possess any such information in electronic or hard copy form.

When asked if Ron transferred any contacts from Google, Ron stated that he did not take any employee lists but he may have some SMS and Snapchat communications with Google employees. Ron also stated that there may have been some Facebook communications with Google employees on a social level, and possibly, WeChat and Google Hangouts communications.

4

**CONFIDENTIAL**

*Files on MacBook Air from Motorola, Now Owned by Google*

Ron added that his personal MacBook Air, purchased in 2014, may contain information from Motorola, which includes information about the Motorola watch. Ron used this laptop from March 2014 to February 2016. This laptop was not used to access the Google Network. Ron stated that this was his primary computer at Motorola and he used this computer to access OttoMotto for a few days and then he purchased a new computer.

**Contacts With Google Employees About New Company Prior to Leaving Google**

Prior to leaving Google, Ron spoke with Anthony Levandowski. Ron also attended a barbeque at Levandowski's house, participated in a group meeting at Levandowski's house, and spoke with four/five additional Google employees one-on-one about the new company. Below is a summary of the meetings Ron attended and/or individuals he spoke with about the new company.

### Anthony Levandowski

Ron and Anthony Levandowski knew each other because Ron ran a competitive project at Google (i.e., map-making). According to Ron, in August or September of 2015, Ron reconnected with Levandowski and they started talking about projects they could work on together. As they brainstormed about the future, the idea of OttoMotto came about. Sometime during the fourth quarter of 2015, Ron and Levandowski discussed robot trucks in the United States, and safety issues related to trucking. They also discussed an after-market kit to convert existing cars into self-driving cars. Initially, Ron stated that he discussed these ideas with Levandowski only.

### Group Contacts with Google Employees

Ron stated that, beginning in November or December 2015, he started to socialize with other Chauffer team members. He recalled a social barbeque at Levandowski's house in or about November 2015 where he met some Chauffeur employees. He described this gathering as purely social, and that he took his wife and daughter to it as well.

Ron also recalled a gathering at Levandowski's house right before the holidays in December 2015 during which he made a group presentation on trucking automation. Ron stated that there was a market opportunity and his goal was to get the group excited. A group of Chauffer team members and other Google employees attended the meeting at Levandowski's house including, Laila Mathos, Pierre Droz, Don Burnette, Claire Delaunay, Brian Torcelini, Gaetan Pennecot, Brian (whose name he could not recall) from UX, among others. It was his understanding that they had been invited to the meeting through Levandowski's connections. After the meeting, Ron reached out to certain individuals who expressed an interest in the new company to set up meet-and-greets over coffee.

### One-on-One Contacts and Meetings with Google Employees

Ron stated that he met with the following individuals one-on-one.

∞ **Laila Mathos**

In December 2015, Ron met with Laila Mathos, who works with Google's Chauffeur Project. They arranged the meeting via SMS to see if she wanted to have coffee. Mathos had attended the group meeting at Levandowski's house and expressed interest in the new company to Ron. In December 2015,

**CONFIDENTIAL**

CONFIDENTIAL

Ron met with Mathos at a coffee shop and they discussed potentially her joining the new company. Levandowski was aware of Ron's meeting with Mathos and had given Ron contact information for Mathos. Mathos received a written offer to join OttoMotto before the holiday, but did not join the new company.

### ∞ Pierre-Yves Droz

In December 2015, Ron believes he arranged to meet with Pierre-Yves Droz, an Engineer for Google's Chauffer Project, via SMS. According to Ron, Droz had attended the group meeting and had expressed interest in the start-up. Ron stated that there are text messages between himself and Droz regarding meeting for coffee. Ron stated that Levandowski was aware of his meeting with Droz and had given Ron his contact information. Droz did not join the new company.

### ∞ Don Burnette

Don Burnette was an Engineer for Google's Chauffer Project. Burnette expressed interest in the startup, although Ron could not recall whether that expression of interest occurred at the group meeting or afterwards. Ron answered questions about the autonomous trucking market. Burnette informed Ron that he was planning on leaving Google. In December 2015, Ron met with Burnette at a coffee shop not on the premises of Google about the new company. Ron said there were Snap Chat communications with Burnette. Ron said Burnette received an offer to join OttoMotto and that Burnette joined in late February 2016.

### ∞ Claire Delaunay

Claire Delaunay was an Engineer for Google who worked in the Replicant division. Ron met with Delaunay in December 2015 and could not recall who reached out to whom and whether there were any written communications about the meeting. Ron had obtained her contact information from Levandowski. Ron had breakfast with Delaunay before she left Google, where Ron described the business of the new company (i.e., autonomous trucking). Delaunay received an offer to join OttoMotto and ultimately joined the company.

### ∞ Bryan Salesky

Ron stated that prior to leaving Google, in or about October/November 2015, there was a meeting with Levandowski, Bryan Salesky, who was Levandowski's manager, and various Uber executives at Uber to discuss a possible transaction. He could not recall any more specific information about the meeting.

Departure from Google

In late 2011, Ron left Google to join Motorola for a "challenge" and returned when the Motorola business unit was bought by Google. Ron stayed at Google after the transaction because he was researching ideas and wanted to explore new possibilities at Google. While doing so, Ron realized that he wanted to participate in a start-up company. He explored start-up ideas in messaging and artificial intelligence. Ron also spoke with some other companies, and had networking conversations.

Ron stated that just before leaving Google, during the first week of January 2015, he told Noam Bardin from Waze that he may want to leave. Ron recalled that Noam seemed "fine" with that prospect.

**CONFIDENTIAL**

CONFIDENTIAL

STROZ_0000867

**TX-5215, Page 6 of 48**

Ron resigned from Google on January 13, 2016.  He notified Bardin via email and requested that the 13th be his last day. Ron's employment and his network access privileges ended the same day. When asked why he did not give more notice, Ron stated that there was "no need to."

On the day he resigned, Alex Ondik from Human Resources contacted Ron and sent him an exit questionnaire and list of devices to return.  Ron was not present at Google on the day he resigned and ended up meeting with Ondik a few days later and returning his Google laptop.  At that time he participated in an exit interview and was asked to fill out an exit form. Ron stated that he told HR that he wanted to join a start-up.  Ron stated that he felt it was time to move on from Google, and that he had explored options both internally and externally.  He does not recall HR mentioning that he could not solicit employees nor does he recall signing any other documents at that time.

Ron stated that he did not access any files or even open his Google laptop after he resigned.  Ron did state that prior to his resignation, he accessed his Google laptop for personal information and emailed from his Google laptop to his personal Gmail account photos, "public" presentations, contacts and emails, among other things, as discussed in the *Transfer of Files* section above.  Ron also stated that he found copies of additional documents but could not recollect what they were.  He, thereafter, provided us a copy of his Exit Certificate from Google dated August 3, 2012 which is attached hereto as Exhibit 5 and other documents he signed and/or received upon rejoining Google in 2014.  See Exhibit 4.

Ron affirmed that he did not access, download, copy, export or transfer any Chauffer, Waze, Robotic information or data relating to inventions, research, trade secrets or third-parties.

### Google Seeks Additional Devices From Ron

During his exit interview, Google claimed Ron owned a few devices that he could not locate.  These purportedly missing devices included a Lenovo laptop, a Chromebook and a pair of Google Glasses. Ron stated that he does not know where these devices are and believes they were issued when he was either at Google the first time or when he was at Motorola.  Per Ron, none of the purportedly missing devices were issued when Ron returned to Google in November 2014.  Ron stated he likely returned them to Motorola.

Ron has not proactively checked his personal or storage devices for Google data or information and does not have any hard copies of data. Ron said Google did not ask him to certify that any Google data had been returned to the company.  He said Google asked him whether devices had been returned, and he may have signed something about returning the devices.

### Google Aware of New Company

Ron stated that he believes Google is aware that Levandowski left to start a company that focuses on robot trucks.  Ron is uncertain if Google is aware of Ron's participation in the new company.  Ron said Google is aware of the recruiting website and has access to the recruiting site to see if they have any issues with it. Ron also stated that Levandowski has been interfacing with John Krafcik, CEO of Google Self-Driving Cars.  Ron believes that Google is aware that they have a truck in development.

**CONFIDENTIAL**

CONFIDENTIAL

STROZ_0000868

Contacts with Google Employees Following Departure

Since leaving Google, a number of Google employees have reached out to Ron about joining OttoMotto. Ron has met with an employment attorney and is telling people, including his employees, not to solicit Google employees. Below is a list of the Google employees Ron has had contact with following his departure from Google.

∞   David Weikersdorfer

Since leaving Google, Ron met with David Weikersdorfer, an Engineer from Replicant, who expressed interest in joining the new company in January 2016. Ron said Weikersdorfer initiated contact by coming to Levandowski's house and asking Delaunay when it would be a good time to stop by. Ron met with Weikersdorfer at a coffee shop and shared with Weikersdorfer the plans for the business verbally. David was excited to join. Rhian Morgan, OttoMotto's HR manager, made him an offer and he ultimately joined OttoMotto.

∞   Daniel Ratner

Daniel Ratner, a Google X Engineer who heard from others that Ron and Levandowski had left, contacted Ron via SMS in January 2016. Ron told Ratner that he could not solicit him but was happy to talk socially. Ratner figured out what they were doing but Ron did not share the full details with him. Ron said that he is waiting for Ratner to resign, and that they saw each other recently at a family gathering.

Ron also said Ratner continued to express interest in the new company when they met in person for coffee. Ron described the new company and Ratner expressed explicit interest in becoming employed by the new company. Thereafter, Ron verbally discussed key terms of his potential employment.

Ron said Ratner knew OttoMotto would be excited if Ratner joined. HR discussed with Ratner what his position at the company would look like. Ratner resigned from Google in February 2016 and started working at OttoMotto "a few weeks ago."

∞   Ben (Ron could not recall his last name)

Sometime in February 2016, Ben, an Engineer with Replicant, also came to Levandowski's house while he still worked at Google because he knew Delaunay and Weikersdorfer. Ron speculated that Delaunay and Weikersdorfer told Ben about the business. Ron spoke with Ben about his role at Google and Ben expressed an interest in joining the new company. Someone (whom Ron could not recall) gave Ben an overview of the new company. Rhian Morgan, OttoMotto's HR manager, made Ben a verbal offer. Ben joined OttoMotto in mid-March 2016.

∞   Robbie Miller

Miller came to the Levandowski's house in January or February 2016. Ron could not recall who initiated the meeting, and suggested that possibly Levandowski did. Miller spoke with people who had not worked at Google about the new company and he expressed an interest in joining. Ron stated that Miller may have resigned without an offer from OttoMotto. OttoMotto made Miller an offer on March 21, 2016 which he accepted.

8

**CONFIDENTIAL**

STROZ_0000869

&infin;   Collin Sebern

Sebern left Google in October 2015.  Ron and Levandowski contacted Sebern after he left Google.  Ron did not know Sebern prior to this.  Initially, Sebern did consulting work for Levandowski and Ron for free.  Eventually, Ron and Levandowski started to pay Sebern and then offered him a job soon after OttoMotto was incorporated.

&infin;   Five Former Google Drivers

Five drivers who previously worked for Google are currently working for OttoMotto. These five drivers had been driving for the Chauffer Team but were fired between September and November 2015 for violating protocol.  Ron did not reach out to these drivers until after they left Google.

&infin;   Dan Gruver

Ron stated that he might have met Gruver, a Product Manager for Chauffeur, at Levandowski's house, but Ron does not recall having a real conversation with Gruver prior to Ron leaving Google.  Ron did approve an offer letter for Gruver.

Contacts with Uber

Ron stated that the initial contacts with Uber were between Levandowski and Uber and that he did not join in the meetings with Uber until sometime in October or (likely) November 2015.  Ron recalled five meetings during November and December 2015 and seven to ten meetings in total. Both Ron and Levandowski attended the meetings.

The first meeting was a meet-and-greet. Levandowski and Ron believed Uber was initially interested in a commercial agreement to license some technology and products.  Ron stated that Uber appeared to be more interested in the after-market kits.

Ron stated that he met with Uber before and after the holidays in December 2015 and after the group meeting at Levandowski's house.  He stated that Uber was interested in the fact that they might leave Google and start a new company. The December discussions evolved into whether or not Uber was interested in acquiring the new company.  Ron stated that they met with Travis Kalniak (Uber's CEO), Jeff Holden (Head of Products), Cameron Poetzscher (Head of Business Development), and Nina Qi (Member of the Business Development Group).  Ron also met with Brian Mclendon who used to work for Google but is now at Uber.  Ron could not recall which meetings he attended but said he was aware of what they were planning to do.  The discussions with Uber continued into January 2016.

Following OttoMotto's incorporation in February 2016, Ron and Levandowski have continued to have discussions with Uber on a broad variety of topics.  In addition to discussing staffing, Ron and Levandowski have been discussing with Uber OttoMotto's acquisition plan, growth plans, talent of the team, and growth projections.

Ron stated that OttoMotto is seeking investments and most OttoMotto employees are aware of Uber as a strategic partner only.

Ron stated that Uber has not specifically asked whether they have any Google data.  However, approximately one week before his interview (he could not recall the date), Ron, Levandowski and Uber had a discussion that Levandowski was in possession of certain Google confidential and proprietary

9

**CONFIDENTIAL**

information that Levandowski found when he was going through his personal devices. This discussion involved Kalniak, Poetzscher, Qi, Levandowski and Ron. According to Ron, Levandowski mentioned he had some hard disks with Google information and asked for advice. Kalniak said that "he doesn't want that shit coming to Uber," and that he did not want to know what happened to the disks as long as they do not land at Uber. Based on that discussion, Ron said Levandowski destroyed the disks after the meeting. Ron's recollection of the above meeting was vague.

Ron also stated that the same day he received a telephone call from Qi at Uber inquiring about the disks and advising them not to destroy them. Ron called Levandowski and learned that the disks had already been destroyed and relayed this information to Qi.

OttoMotto

Ron stated that OttoMotto was established on January 15, 2016. OttoMotto was initially called 280 Systems. Ron is the President and Chief Executive Officer. Levandowski joined a few weeks later as the Engineering Lead. Ron stated that there is no similarity between OttoMotto's and Google's businesses because OttoMotto has set out to develop trucks and after-market kits for cars. He said the business focus is on trucks while the cars are mapping the highway. Ron said that he has not relied upon Google information for the business and, to his knowledge, the source code is clean and no IP is being brought in.

However, Ron said that if they close the transaction with Uber, "they may be helping Uber compete with Google in some way," and that Uber is interested in the Chauffer product.

As of the date of the interview, OttoMotto has 25 to 26 employees and of these, approximately half previously worked at Googlers; approximately seven moved directly from Google to OttoMotto.

Levandowski was still working at Google when Ron began using Levandowski's house to work on OttoMotto.

When asked whether he would have left Google if OttoMotto was not in the works, Ron stated that he would not have at that time. However, Ron explained that he had been exploring other ideas and may have left for something else.

Staffing Protocols

OttoMotto finds employees through referrals and their recruiting website.

Specifically, OttoMotto solicits candidates by asking current employees for referrals. Ron said they ask employees who they know and are very explicit about the fact that they do not want to solicit Google employees. If Google employees contact them via the website or written communications, Ron said they have a protocol whereby the candidate meets with non-Google employees to learn more. Then applicants from Google interview with other non-Google employees. An offer is made verbally, followed by a written offer, only after they leave Google.

OttoMotto's employment letter includes strong language not to bring any prior employer data to OttoMotto. New employees are issued new laptops and are directed not to use any personal devices. Ron stated that there is currently no training, but they are in the process of establishing more guidelines. Going forward, OttoMotto is looking for employees with various engineering skill sets.

**CONFIDENTIAL**

CONFIDENTIAL                                                                 STROZ_0000871

As CEO, Ron's role in staffing is to approve compensation based on seniority, feedback, and the need for the role.

Ron stated that they have shared their staffing process with Uber, which is "okay" with the process. Uber can provide feedback about talent, but they do not approve or deny any candidates.

### Vendors

When asked if he had contacted any Google vendors, Ron stated that he believed that OttoMotto may have contacted some sensor/GPS providers, such as Applinix, which worked with Google as well, but he was not certain.

### Accounts/Online Repositories/Person Devices

The following accounts/repositories/devices were outlined by Ron in his response to Stroz Friedberg's Questionnaire for Diligenced Employees (attached hereto as Exhibit 3). Ron confirmed that the responses contained in Exhibit 3 were, to the best of his recollection, accurate and complete.

### Email Accounts

Ron said that he has five email accounts, two personal and three related to OttoMotto:

(OttoMotto was previously 280 Systems.)

Ron said that the majority of his personal emails are with ███████████, which he established in approximately 2008.

### Online Repositories

Ron stated that he has had four online repository accounts, but only two are active. All four online repository accounts are only accessible by Ron.

The first is a Google Drive account that he established approximately 10 years ago. Ron stated that he stored OttoMotto and Uber documents, as well as personal documents, on his personal Google Drive. Some of this information includes financial documents.

The second was a Dropbox account that he established approximately three years ago. Ron stored personal files in the Dropbox account. He also stored some information pertaining to OttoMotto in the Dropbox account, including market research and competitive research. The Dropbox account also includes information about prototyping on how to install a side mirror, but no information relating to Chauffer.

Ron has two inactive online repositories. The first is an OneDrive account that he established a few months ago. Ron stored personal documents in the account, and possibly Uber-related documents. The second is an iCloud account, which he established approximately one year ago. Ron used this account for personal purposes.

### Personal Devices

Ron listed the following personal individual devices in his possession: (1) MacBook Air (purchased in January 2016, used for personal and OttoMotto work, and shared with no one); (2) iPhone 6 (purchased

**CONFIDENTIAL**

CONFIDENTIAL

in 2016, used for personal and OttoMotto work, and shared with no one); (3) iMac (purchased mid-2015, used for personal and OttoMotto work, and shared with wife); (4) MacBook Air (purchased in approximately 2014 and is used for personal and OttoMotto work; shared with no one); (5) iPhone 4 (purchased in approximately 2014, used for personal purposes; and shared with no one); (6) Android Nexus 6 (purchased in 2015, was used to access the Google network when Ron worked at Google; also used for personal purposes, and shared with no one); and (7) iPad Mini (purchased 2015 for personal use and shared with wife).

## Affirmation

Ron affirmed that he had provided Stroz Friedberg with all the information of which he was aware and that the information that he provided was true and correct.

12

**CONFIDENTIAL**

CONFIDENTIAL

STROZ_0000873

# Exhibit 3 Redacted

CONFIDENTIAL

STROZ_0000874

Questionnaire for Diligenced Employees

Prior Employment

(1) When did you begin working for Acme?

April 2007

Left to work at Motorola - January 2012

Rejoined Google - 11/14

(2) What documents did you sign when you began working for Acme (i.e.,

nondisclosure/confidentiality agreement, non-solicitation agreement,

etc.)?

Employment agreement after rejoining Google at 11/14 attached

(3) In what department(s)/section(s) did you work for Acme? What was

your title(s) in those department(s)/section(s)?

2007-2012 Geo (Maps/Local) - Product lead

1/15 - 4/15 Alphabet - advisor

4/15-9/15 Niantic labs - advisor

10/15-1/16 Waze - advisor

(4) What were your duties/responsibilities for Acme?

Lead Product Manager Google Map/Local – 2007 until 2011

**CONFIDENTIAL**

Advisor to various Google businesses – 12/14-1/16

(5) What types of documents did you create/work on at Acme (i.e., Word, Excel, Powerpoint, etc.)?

Word, Excel, Powerpoint, Google docs/preso/sheets

(6) When you worked at Acme, were you issued a mobile device, or did you use a personal device to send/receive work-related emails?

Personal device

(7) When you worked at Acme, were you issued a laptop or other equipment? Or did you use your own personal devices to work on Acme documents?

Work laptop

(8) How would you access your Acme work documents from outside of the office?

On my work laptop: physical keyfob->usb entrance ->vpn

(a) If you transferred documents to a flash drive/CD/external device, where is that flash drive/CD/external device now and what computer did you use to access those documents?

I did not transfer files to an external device

**CONFIDENTIAL**

(b) If you connected through VPN, which computer did you use to

connect to VPN?

==MacBook air (returned to Google)==

(9) Are there any other personal devices through which you accessed Acme's

network?

==personal phone had Google security policy installed -> access to Gmail and Docs, but no longer== ==had access when I resigned from Google==

(10) When you worked at Acme, did you email documents that you worked

on for Acme to your personal email account? If so, how often did you do

this? What email accounts did you use? Were your personal email

accounts synched with your smartphone or PDA?

==Very rarely forwarded non-work related/non-confidential emails and contacts to personal Gmail== ==address.==

(11) When you worked at Acme, did you ever store any document that you

worked on for Acme on any personal digital devices (i.e., smartphones,

laptops, hard drives, thumb drives, etc.). If so, please identify those

devices?

==No==

(12) When you worked at Acme, did you ever store any data or information

that you worked on for Acme with an online data repository (i.e.,

**CONFIDENTIAL**

Dropbox, OneDrive, GoogleDocs, etc.)? Did you ever access any Acme

documents stored in any of the above mentioned accounts from a

personal computer?

Most docs were stored in Google's internal Gdrive, none were on any external accounts

(13) Other than the measures described above, did you backup your data at

Acme in any other manner? If so, please describe the manner in which

you backed up your data.

No

Decision to Leave Acme

(1) When did you leave Acme?

1/13/16

(2) Prior to leaving Acme, did you download/copy any information that you

worked on for Acme? If so, what information did you download/copy?

Where is this information currently located? Has any information been

transferred to your current company's computers/networks?

No, as mentioned I have forwarded few external non-work related emails to my personal Gmail

Personal Email Accounts

(1) How many personal email accounts do you have?

2 personal emails + 3 Otto emails (moved 2 domains since inception as we renamed)

(2) Please list all of your email accounts.

**CONFIDENTIAL**

STROZ_0000878

(a) For each email account, please list the password that we may use to access that account;

(b) For each email account, please list the approximate time it was established;

(c) For each email account, please describe what types of email you received or sent (i.e., personal, work, etc.);

(d) For each email account, please list all of the individuals that have access to that account;

(e) For each email account, please estimate the total number of emails in the account; and

(f) For each email account, please identify any encrypted data/information in each account and describe the encryption and the means for bypassing it.

████████████

password [Password provided separately]

established: ~8 years

access: myself

emails count: 73,219

no encryption

████████████

password: [Password provided separately]

established: 10+ years?

access: myself

**CONFIDENTIAL**

STROZ_0000879

email count: ~10K?

==no encryption==

████████████

password[Password provided separately]

established: Feb 2016

Access: myself

==Email count: few dozens==

==No encryption==

████████████

password: [Password provided separately]

established: Feb 2016

Access: myself

Email count: few dozens

==No encryption==

████████

password: [Password provided separately]

Established: Feb 2016

Access: myself

Email count: few dozens

No ==encryption==

(3) Please identify all devices you use/have used to access your personal

==CONFIDENTIAL==

email accounts.

After Q3 15:

MacBook air (personal that also access Moto network, not Google)

iPhone 4

iPhone 6

MacBook

iMac

Nexus 6

IPad Mini

Personal Digital Devices

(1) What digital devices (i.e., smartphone, laptop, desktop, hard drive, thumb

drive, etc.) do you currently own?

Macbook

(a) password:

(b) Purchased - Jan 2016

c) Access - myself

(d) Data stored: work(Ottomotto)/personal computer – email, docs

(e) Storage capacity: 256GB

(f) no encryption

(g) OS X

(h) not wiped/imaged

**CONFIDENTIAL**

iPhone

(a) password:

(b) Purchased - Jan 2016

c) Access - myself

(d) Data stored: work(Ottomotto)/personal computer – email, docs, photos

(e) Storage capacity: 128GB

(f) no encryption

(g) iOS

(h) not wiped/imaged


Mac

(a) password:

(b) Purchased – mid 2015?

c) Access – myself and my wife

(d) Data stored: work(Ottomotto)/personal computer – email, docs, photos

(e) Storage capacity: GB

(f) no encryption

(g) OS X

(h) not wiped/imaged


Macbook Air

(a) password:

(b) Purchased – 2014?

c) Access - myself


**CONFIDENTIAL**

(d) Data stored: personal computer – email, docs, photos , also used to access Moto network

(e) Storage capacity: 128GB

(f) no encryption

(g) iOS

(h) not wiped/imaged


iPhone 4

(a) password:

(b) Purchased – 2014?

c) Access - myself

(d) Data stored: personal– email, docs, photos

(e) Storage capacity: 16GB

(f) no encryption

(g) iOS

(h) not wiped/imaged


Nexus 6

(a) password:

(b) Purchased - 2015

c) Access - myself

(d) Data stored: work(used to access Google network while at Google)/personal– email, docs, photos

(e) Storage capacity: 16?GB

(f) no encryption

(g) Android M

(h) not wiped/imaged


**CONFIDENTIAL**

iPad Mini

(a) password:

(b) Purchased = 2015

c) Access = myself and my wife

(d) Data stored: personal computer – email, photos

(e) Storage capacity: ?GB

(f) no encryption

(g) OS X

(h) not wiped/imaged

(a) For each device, please list the password that we may use to access the data on that device;

(b) For each device, please list the approximate date that it was purchased or obtained;

(c) For each device, please list all individuals that have access to this device;

(d) For each device, please describe what type of data is stored on that device;

(e) For each device, please describe what the storage capacity is for each device;

(f) For each device, please identify any encrypted data on the device and describe the encryption and the means for bypassing it;

**CONFIDENTIAL**

STROZ_0000884

(g) For each laptop/desktop, please list the operating system for each

laptop/desktop; and

(h) For each device, please indicate whether the device has been wiped

or reimaged previously.

(2) What digital devices have you owned in the last five years that you no

longer own?

Lenovo thinkpad – personal 2012-2014 – thrown away (old)

Lenovo thinkpad – Google: 2011 – 2013. Unknown location. wasn't used in past 2+ years. Google is aware its lost.

Macbook Air  - 2013-2014 returned to Motorola

Macbook Air – 2014-Jan 2016 returned to Google

Chromebook – Google. 2011, was used for few months. Location unknown, haven't used in past 2 years. Google is aware its lost.

15+ phones while at Moto – changed every few weeks as part of my job.

Personal iPad: 2013-2014. Lost on plane

Private Macbook Air – 2012-2013 screen broken

(a) For each device, please list the approximate date that it was

purchased or obtained;

(b) For each device, please list the approximate date that you

disposed of the device; and

(c) For each device, please describe the reason you disposed of each

**CONFIDENTIAL**

CONFIDENTIAL

device.

Personal Online Data Repository

(1) What online data repositories (i.e., DropBox, OneDrive, GoogleDocs,

etc.) do you have an account with?

Google docs

    (a) 10 years ago?

    (b) Password: [To be provided later]

    (c) Me

    (d) Personal documents and early Ottomotto documents

    (e) 57GB

    (f) No encryption

Dropbox

    (a) 3 years ago?

    (b) Password: [To be provided later]

    (c) Me

    (d) Personal

    (e) 1GB

    (f) No encryption

One drive - non active

    (a) Few months ago

    (b) Password: [To be provided later]

**CONFIDENTIAL**

CONFIDENTIAL

(c) Me

(d) Personal documents

(e) 2 documents (not using actively)

(f) No encryption


iCloud - non active

(a) 1 years ago?

(b) Password: [To be provided later]

(c) Me

(d) Personal documents

(e) Few files

(f) No encryption


(a) For each account, please list the approximate date that you established the account;

(b) For each account, please provide the password that we may use to access the account;

(c) For each account, please list all the individuals that have access to that account;

(d) For each account, please describe the type of data/information that you have stored in each account;

(e) For each account, please describe the volume of data in each account; and

(f) For each account, please identify any encrypted data in each account and describe the encryption and the means for


**CONFIDENTIAL**

bypassing it.

(2) What devices do you use/have used to access your accounts with

online data repositories?

Most of the above devices – specifically Laptops

Hard Copies

(1) Do you have any hard copies of Acme data/information upon which

you worked? If so, please describe the data/information and the

location of the copy.

 No

Miscellaneous

(1) Other than what is referenced above, do you have access to any

device/media/network/location where the Acme data/information

upon which you worked is stored? If so, please identify the

device/media/network/location.

 No

**CONFIDENTIAL**

| | |
|---|---|
| Adrian | Aoun |
| Alicia | Adrikopoulous |
| Allan | Noble |
| Allan | Eustace |
| Amy | Lambert |
| Anand | Babu |
| Andrew | Lookingbill |
| Andrew | Conne-Picard |
| Anne | Aulia |
| Arda | Akman |
| Astro | Teller |
| Belle | Koven |
| Brian | McClendon |
| Chris | Uhlik |
| Courtney | Power |
| Daniel | Ratner |
| David | Eun |
| Diego | Ruspini |
| Drago | Anguelov |
| Emil | Aarfvidson |
| Hendrik | Dahlkamp |
| Isaac | Taylor |
| Jenni | Aldrich |
| Joakim | Aarfvidson |
| Joel | Truher |
| John | Hanke |
| Josh | Weaver |
| Kei | Kawai |
| Kelly | Allison |
| Kenny | Arimoto |
| Kevin | Reece |
| Kevin | Mathy |

**CONFIDENTIAL**

Confidential Work Product/Attorney-Client Privileged
Donahue Fitzgerald LLP
March 12, 2016

CONFIDENTIAL

STROZ_0000889

# Exhibit 4 Redacted

CONFIDENTIAL

STROZ_0000890

Hanley Chew

| | |
|---|---|
| **From:** | Amdursky, Eric <eamdursky@omm.com> |
| **Sent:** | Tuesday, March 29, 2016 3:58 PM |
| **To:** | Hanley Chew |
| **Subject:** | Lior's Follow-up Information |
| **Attachments:** | L Ron Transfer (1).pdf |

Hanley,

As I mentioned earlier today, here is the information that Lior said he would provide to you previously during his interview.

1. Transfer letter/employee contract that he signed when coming back from Motorola to Google in October 2014 (attached)

2. Name of departure HR person: Alex Ondik. Lior couldn't find his departure questionnaire so he believes he may have answered it from his Google issued account/laptop.

3. Gmail emails forwarded from Google account to private gmail on last day while cleaning computer:

- (few departure materials)
- LETV - Chinese company he helped put in touch with Google
- 2 Personal photos - Jan 12 3:42am
- 5 personal photos in archive - Jan 12 3:18am
- Dropbox CEO contact
- Chinese self driving car company contact that contacted Lior (no follow ups)


Before leaving Google - he sent a few emails - all personal (photos, contacts etc)

He will be happy to answer any additional questions you may have, including specifically any names he didn't remember during the interview if you think it will be useful for the process.

Eric J. Amdursky
O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, California 94025
Tel. (650) 473-2644
Fax (650) 473-2601

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

1

**CONFIDENTIAL**

# Google

Lior Ron

August 8, 2014

Dear Lior,

This letter confirms the transfer of your employment from Motorola Mobility Holdings, LLC ("MMH" or "Motorola") to Google Inc. ("Google") effective as of the planned start date indicated below or another date as may be determined by Google Inc. ("Start Date"). As of the Start Date, you will no longer be employed by MMH, and your employment will no longer be subject to the terms and conditions in your offer letter with MMH, except for those provisions which survive termination of employment (e.g. confidentiality obligations). Instead, you will be employed by Google and your employment will be subject to the terms and conditions in this Transfer Offer and the At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement attached hereto.

On behalf of Google, I am pleased to offer you the exempt position of Group Product Manager. This title is based on your most recent position at Google before your transfer to Motorola. Your title is subject to change and will be determined by your manager upon securing a new role. You will receive an annual salary of $██████ which will be paid biweekly. You are eligible to participate in the company discretionary bonus plan; your annual bonus target will be ██% of your base salary. The actual bonus amount could be larger or smaller than this amount, based on your performance, and the performance of the company. The exact bonus amount is at the sole discretion of Google. Both your base salary and the components of your bonus are subject to periodic review.

In addition, as a regular full-time employee you will be eligible for various benefits offered to similarly-situated Google employees in accordance with the terms of Google's policies and benefit plans. Among other things, these benefits currently include medical and dental insurance, life insurance, and a 401(k) retirement plan. You will be automatically enrolled in the pre-tax 401(k) plan at 10% into the Vanguard Target Retirement Trust, which is a portfolio of stocks and bonds that gradually becomes more conservative as your year of retirement approaches. You will be able to change your deferral amount and fund allocation upon your hire. The eligibility requirements and other information regarding these benefits are set forth in more detailed documents that are available from Google. For purposes of determining your eligibility to participate in, and your level of benefits under, Google's welfare benefit programs and policies, you will receive credit for your prior service with Google which means that your seniority date for these purposes will be considered June 12, 2006. No credit shall be given where such credit would result in duplication of benefits for the same period of service. With the exception of the "employment at-will" policy discussed herein, Google may, from time to time in its sole discretion, modify or eliminate its policies and the benefits offered to employees.

As consideration for the mutual covenants herein, including the transfer of your employment from MMH to Google, you and Google hereby agree to amend the terms and conditions of your performance award grant letter dated May 1, 2013 and your Google Inc. 2004 Stock Plan Performance Restricted Stock Unit Agreement dated May 1, 2013 (collectively, the "Grant Agreement"), which provided for the grant to you of the performance-based equity awards (the "Performance Awards"). Pursuant to the terms and conditions of the Grant Agreement, ██████ with ██████ of the Restricted Stock Units ("GSUs") are scheduled to vest on March 25, 2016, subject to your continued employment with Google and its subsidiaries (including MMH) through such date, with the actual number of GSUs that would be earned and vest determined by applying a company performance multiplier. Notwithstanding anything to the contrary in the Grant Agreement, you and Google hereby agree that the GSUs scheduled to vest on March 25, 2016 shall not be subject to a company performance multiplier and instead the number of GSUs that will vest will be equal to ██████ ██████ of the target number of Performance Awards reflected in the Grant Agreement, subject to your continued employment with Google through the vesting period. Except as expressly provided in this letter, all other terms and conditions of the Performance Awards, as reflected in the Grant Agreement, remain in effect.

You are being offered employment at Google based on your personal skills and experience, and not due to your knowledge of any confidential, proprietary or trade secret information of a prior or current employer or an entity, such as a university or college. Should you accept this offer, we do not want you to make use of or disclose any such information or to retain or disclose any materials from a prior or current employer. Likewise, as an employee of Google, it is likely that you will become knowledgeable about confidential trade secret and/or proprietary information related to the operations, products and services of Google and its clients. To protect the interests of both Google and its clients, all employees are required to read and sign the enclosed At Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement as a condition of employment with Google. This Agreement, which provides for arbitration of all disputes arising out of your employment, is enclosed for your review; you will be required to sign it on your first day of employment.

Google has a strict policy against insider trading, which prohibits, among other things, employees, contractors and temporary workers from trading Google stock during certain time periods and engaging in any derivative transactions in Google stock. It will be your responsibility to educate yourself regarding Google's insider trading policies and to ensure you are in full compliance. If you have any questions about Google's policy against insider trading, please contact Human Resources.

Document Integrity Verified

**CONFIDENTIAL**

EchoSign Transaction Number: ██████

If an export control license is required in connection with your employment, this offer is further contingent upon Google's receipt of the export control license and any similar approvals. Your employment with Google will commence following receipt of such export control license and governmental approvals; and is conditioned upon your (a) maintaining your employment with Google, and (b) continued compliance with all conditions and limitations contained in such a license. If for any reason such export control license and governmental approvals cannot be obtained within six (6) months from your date of signature, this offer will automatically terminate and have no force and effect.

Please understand that this letter does not constitute a contract of employment for any specific period of time, but will create an "employment at-will" relationship. This means that the employment relationship may be terminated with or without cause and with or without notice at any time by you or Google. No individual other than the Chief Executive Officer of Google has the authority to enter into any agreement for employment for a specified period of time or to make any agreement or representation contrary to Google's policy of employment at-will. Any such agreement or representation must be in writing and must be signed by the Chief Executive Officer. Your signature at the end of this letter confirms that no promises or agreements that are contrary to our at-will relationship have been committed to you during any of your pre-employment discussions with Google, and that this letter, along with the At Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement, contain our complete agreement regarding the terms and conditions of your employment.

We look forward to an early acceptance of this offer. Additionally, this offer and your employment are contingent upon satisfactory results from your background check and reference checks. To indicate your acceptance of Google's offer, please electronically sign and date the offer letter copy at the URL link provided in the email. A duplicate original is enclosed for your record.

Lior, we look forward to working with you.

Sincerely,

*Keith Wolfe*

Keith Wolfe
HR Director
Google Inc.

_Lior Ron_
Lior Ron @ b 14, 2.N.

_____          Oct 26, 2014
Lior Ron                           Date

✔ Document Integrity Verified          EchoSign Transaction Number: XDFYZ8A0W4H9H08R

CONFIDENTIAL

CONFIDENTIAL                                                    STROZ_0000893



To: Prospective Googlers
From: Google Staffing

Hello! We are delighted to offer you a position with Google, and we hope you'll decide to join us. As you're thinking about starting your job with us, we want to remind you of a few things that make good sense, but that may not be at the top of your mind.

First, as brought up with you during the recruiting process, we don't want you to violate any agreements you may have with your former employer about non-competition, trade secrets, or confidential information. This also includes nonsolicitation obligations.

Second, we'd like you to consider whether your personal investments or business relationships are consistent with the conflict of interest provisions of Google's Code of Conduct.

**A.  Non-Competition  Obligations,  Prior  Employers'  Trade  Secrets  and  Confidential Information**

You need to ensure that you are not prevented from accepting an offer or working for Google due to any restrictions you may have on your employment (e.g., non-competition agreement, confidential information obligations, or other restrictive provisions). We encourage you to look through any documents you may have signed with your current or prior employers to see if such clauses exist. You will probably want to talk to outside counsel of your own choosing about your obligations in this regard. If you accept an offer of employment, we expect you to be clear with us (your recruiter, or later, your manager) about any areas or projects in which you should not work for some period of time or indefinitely if you are prohibited due to confidential information obligations or, non-competition provisions. It becomes very difficult for us to effectively address issues later (like when we want to release a product or patent it) if there's any concern that you've used or it could be claimed you have used confidential or trade secret information belonging to another company in doing so.

If you have any questions about anything you might be asked to do in your new job at Google and how it might impact your obligations to a previous or current employer, please let someone at Google know as soon as possible. We will try to change assignments or otherwise address any such issues before they become a problem for you. Your obligations regarding confidential and trade secret information don't end when your employment with your previous employer ends. Even if this isn't an issue now, if it becomes one next week, next month, or even next year, you need to let us know.

If you decide to accept an offer with us, please take reasonable steps to ensure that you are not continuing to be exposed to confidential or trade secret information at your current employer. We don't want you to put yourself in a position where your company might wonder whether you were viewing or hearing information with the thought of what you might want to share with Google. This applies even if you haven't formally accepted or shared your decision with your employer.

Don't take materials in any format from your previous employer unless they are completely personal in nature. This includes electronic or hardcopy documents. It includes lists of contacts, clients, and suppliers. If that information isn't otherwise publicly available or commonly known. Sending emails or documents to a personal email account with the intent of then forwarding them on to your new Google email address or copying them/downloading them onto your Google machines is simply not okay with us, and we feel confident that your previous employer won't like

Document Integrity Verified                                          DocuSign Transaction Number: KDPFZ5K5M19KSld

**CONFIDENTIAL**

CONFIDENTIAL                                                                                              STROZ_0000894



it either! Also, don't destroy any documents or files belonging to your previous employer unless you have their agreement to do so.

If you're subject to a non-solicitation provision, please read it carefully and follow it for the period required. While your former co-workers can certainly decide on their own to contact you or Google about opportunities here, we don't want you to be the one who's initiating the contact on Google's behalf. Please advise any former co-workers who contact you that you're unable to pass along their information.

If you have any questions or concerns regarding any of this information, please contact our employment counsel at employment-legal@google.com.

**B. Conflicts of Interest:**

Google's Code of Conduct cautions its employees to avoid conflict of interest situations. A conflict of interest occurs when, because of your role at Google, you are in a position to influence a decision or situation that may result in personal gain for you or your friends or family at the expense of the company or our users. A conflict of interest can occur under a variety of situations, including:

- If a Googler also works for a company that is a customer, supplier or partner of Google or, worse yet, competes with Google,
- If a Googler has personal investments in companies that are customers, suppliers, partners or competitors of Google; or
- If a close friend or family member of a Googler has, or works for a company that has, a business relationship with Google and the Googler's job puts him or her in a position to influence that relationship.

The key to resolving any potential conflict of interest is disclosure and generally the earlier the disclosure the better. So please, take a read through our Code of Conduct, which can be found at http://investor.google.com/corporate/code-of-conduct.html and let us know as soon as possible whether you think a current situation might create a conflict of interest if you accept a job at Google.

You can forward any conflict of interest concerns you might have to code-of-conduct@google.com.

Thanks, and again, we look forward to welcoming you to Google!

Google Staffing

Revision 02.06.2009                    Google Inc.                                        2

C Document Integrity Verified                                    DocuSign Transaction Number: KDPPZCK/1413H088

**CONFIDENTIAL**



**Employment Eligibility Verification**

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

USCIS
Form I-9
OMB No. 1615-0047
Expires 03/31/2016

▶START HERE. Read instructions carefully before completing this form. The instructions must be available during completion of this form.
ANTI-DISCRIMINATION NOTICE: It is illegal to discriminate against work-authorized individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because the documentation presented has a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Attestation** (Employees must complete and sign Section 1 of Form I-9 no later than the first day of employment, but not before accepting a job offer.)

| Last Name (Family Name) | First Name (Given Name) | Middle Initial | Other Names Used (if any) |
|---|---|---|---|

| Address (Street Number and Name) | Apt. Number | City or Town | State | Zip Code |
|---|---|---|---|---|

| Date of Birth (mm/dd/yyyy) | U.S. Social Security Number | E-mail Address | Telephone Number |
|---|---|---|---|

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):

☐ A citizen of the United States

☐ A noncitizen national of the United States (See instructions)

☐ A lawful permanent resident (Alien Registration Number/USCIS Number) _____

☐ An alien authorized to work until (expiration date, if applicable, mm/dd/yyyy) _____. Some aliens may write "N/A" in this field. (See instructions)

For aliens authorized to work, provide your Alien Registration Number/USCIS Number OR Form I-94 Admission Number:

1. Alien Registration Number/USCIS Number: _____

OR

2. Form I-94 Admission Number: _____

If you obtained your admission number from CBP in connection with your arrival in the United States, include the following:

Foreign Passport Number: _____

Country of Issuance: _____

Some aliens may write "N/A" on the Foreign Passport Number and Country of Issuance fields. (See instructions)

3-D Barcode
Do Not Write In This Space

| Signature of Employee: | Date (mm/dd/yyyy): |
|---|---|

**Preparer and/or Translator Certification** (To be completed and signed if Section 1 is prepared by a person other than the employee.)

I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Signature of Preparer or Translator: | Date (mm/dd/yyyy): |
|---|---|

| Last Name (Family Name) | First Name (Given Name) |
|---|---|

| Address (Street Number and Name) | City or Town | State | Zip Code |
|---|---|---|---|

🛑 **Employer Completes Next Page** 🛑

Form I-9   03/08/13   N

Page 7 of 9

© Document Integrity Verified   Envelope Transaction Number: JOPPZtGt8V9Dt88

**CONFIDENTIAL**

CONFIDENTIAL

## Section 2. Employer or Authorized Representative Review and Verification

*(Employers or their authorized representative must complete and sign Section 2 within 3 business days of the employee's first day of employment. You must physically examine one document from List A OR examine a combination of one document from List B and one document from List C as listed on the "Lists of Acceptable Documents" on the next page of this form. For each document you review, record the following information: document title, issuing authority, document number, and expiration date, if any.)*

Employee Last Name, First Name and Middle Initial from Section 1:

| List A<br>Identity and Employment Authorization | OR | List B<br>Identity | AND | List C<br>Employment Authorization |
|---|---|---|---|---|
| Document Title: | | Document Title: | | Document Title: |
| Issuing Authority: | | Issuing Authority: | | Issuing Authority: |
| Document Number: | | Document Number: | | Document Number: |
| Expiration Date (if any)(mm/dd/yyyy): | | Expiration Date (if any)(mm/dd/yyyy): | | Expiration Date (if any)(mm/dd/yyyy): |
| Document Title: | | | | |
| Issuing Authority: | | | | |
| Document Number: | | | | |
| Expiration Date (if any)(mm/dd/yyyy): | | | | |
| Document Title: | | | | |
| Issuing Authority: | | | | |
| Document Number: | | | | |
| Expiration Date (if any)(mm/dd/yyyy): | | | | |

3-D Barcode
Do Not Write In This Space

### Certification

I attest, under penalty of perjury, that (1) I have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of my knowledge the employee is authorized to work in the United States.

The employee's first day of employment (mm/dd/yyyy): _____ (See instructions for exemptions.)

| Signature of Employer or Authorized Representative | Date (mm/dd/yyyy) | Title of Employer or Authorized Representative |
|---|---|---|
| Last Name (Family Name) | First Name (Given Name) | Employer's Business or Organization Name |

| Employer's Business or Organization Address (Street Number and Name) | City or Town | State | Zip Code |
|---|---|---|---|

## Section 3. Reverification and Rehires *(To be completed and signed by employer or authorized representative.)*

| A. New Name (if applicable) Last Name (Family Name) First Name (Given Name) Middle Initial | B. Date of Rehire (if applicable) (mm/dd/yyyy) |
|---|---|

C. If employee's previous grant of employment authorization has expired, provide the information for the document from List A or List C the employee presented that establishes current employment authorization in the space provided below.

| Document Title: | Document Number: | Expiration Date (if any)(mm/dd/yyyy): |
|---|---|---|

I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative: | Date (mm/dd/yyyy): | Print Name of Employer or Authorized Representative: |
|---|---|---|

Form I-9   03/08/13 N

Page 8 of 9

Document Integrity Verified

CONFIDENTIAL

STROZ_0000897

## LISTS OF ACCEPTABLE DOCUMENTS
### All documents must be UNEXPIRED

Employees may present one selection from List A
or a combination of one selection from List B and one selection from List C.

| LIST A | LIST B | LIST C |
|---|---|---|
| Documents that Establish Both Identity and Employment Authorization  OR | Documents that Establish Identity  AND | Documents that Establish Employment Authorization |
| 1.  U.S. Passport or U.S. Passport Card | 1.  Driver's license or ID card issued by a State or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color, and address | 1.  A Social Security Account Number card, unless the card includes one of the following restrictions: |
| 2.  Permanent Resident Card or Alien Registration Receipt Card (Form I-551) | | (1)  NOT VALID FOR EMPLOYMENT |
| | | (2)  VALID FOR WORK ONLY WITH INS AUTHORIZATION |
| 3.  Foreign passport that contains a temporary I-551 stamp or temporary I-551 printed notation on a machine-readable immigrant visa | | (3)  VALID FOR WORK ONLY WITH DHS AUTHORIZATION |
| | 2.  ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color, and address | 2.  Certification of Birth Abroad issued by the Department of State (Form FS-545) |
| 4.  Employment Authorization Document that contains a photograph (Form I-766) | | |
| 5.  For a nonimmigrant alien authorized to work for a specific employer because of his or her status: | 3.  School ID card with a photograph | 3.  Certification of Report of Birth issued by the Department of State (Form DS-1350) |
| a. Foreign passport; and | 4.  Voter's registration card | |
| b. Form I-94 or Form I-94A that has the following: | 5.  U.S. Military card or draft record | 4.  Original or certified copy of birth certificate issued by a State, county, municipal authority, or territory of the United States bearing an official seal |
| (1) The same name as the passport; and | 6.  Military dependent's ID card | |
| (2) An endorsement of the alien's nonimmigrant status as long as that period of endorsement has not yet expired and the proposed employment is not in conflict with any restrictions or limitations identified on the form | 7.  U.S. Coast Guard Merchant Mariner Card | 5.  Native American tribal document |
| | 8.  Native American tribal document | 6.  U.S. Citizen ID Card (Form I-197) |
| | 9.  Driver's license issued by a Canadian government authority | 7.  Identification Card for Use of Resident Citizen in the United States (Form I-179) |
| | **For persons under age 18 who are unable to present a document listed above:** | 8.  Employment authorization document issued by the Department of Homeland Security |
| 6.  Passport from the Federated States of Micronesia (FSM) or the Republic of the Marshall Islands (RMI) with Form I-94 or Form I-94A indicating nonimmigrant admission under the Compact of Free Association Between the United States and the FSM or RMI | 10.  School record or report card | |
| | 11.  Clinic, doctor, or hospital record | |
| | 12.  Day-care or nursery school record | |

Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274).

Refer to Section 2 of the instructions, titled "Employer or Authorized Representative Review and Verification," for more information about acceptable receipts.

C Document Integrity Verified
**CONFIDENTIAL**

CONFIDENTIAL

EchoSign Transaction Number: XCPFZXXW4F8H0BE

STROZ_0000898

GOOGLE INC.

AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT

As a condition of my employment with Google Inc., its subsidiaries, affiliates, successors or assigns (together "Google"), and in consideration of my receipt of confidential information, my employment with Google, and my receipt of any compensation Google is paying to me, I agree to the following terms of this At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "Agreement").

1.     **At-Will Employment.** MY EMPLOYMENT WITH GOOGLE IS FOR AN UNDEFINED DURATION AND IS AT-WILL EMPLOYMENT, WHICH MEANS IT MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT CAUSE OR NOTICE. NO REPRESENTATION TO THE CONTRARY IS AUTHORIZED OR VALID UNLESS MADE IN WRITING AND SIGNED BY THE CHIEF EXECUTIVE OFFICER OF GOOGLE INC.

2.     **Confidential Information.**

(a)     *Definition of Google Confidential Information.* "Google Confidential Information" means any proprietary or any information in any form that relates to Google or Google's business and that is not generally known. Examples include Google's non-public information that relates to its actual or anticipated business, research, development, products, services, technical data, customers, customer lists, markets, software, hardware, finances, employee data and evaluation, trade secrets or know-how, intellectual property rights, including but not limited to, Assigned Inventions (as defined below), unpublished or pending patent applications, and all related patent rights, and user data (i.e., any information directly or indirectly collected by Google from users of its services). Google Confidential Information also includes any information of third parties (e.g., Google's advertisers, collaborators, subscribers, customers, suppliers, partners, vendors, partners, licensees or licensors) that was provided to Google on a confidential basis. Google Confidential Information does not include any items that have become publicly known through no wrongful act of mine or others under a relevant confidentiality obligation. Nothing in this Agreement diminishes or limits employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

(b)     *Nonuse and Nondisclosure.* During and after my employment with Google, I will hold in the strictest confidence and take all reasonable precautions to prevent any unauthorized use or disclosure of Google Confidential Information (whether disclosed to me in anticipation of or during my employment by Google) and I will not use Google Confidential Information for any purpose other than for the benefit of Google in the scope of my employment, or (ii) disclose Google Confidential Information to any third party without the prior written authorization. I agree that all Google Confidential Information that I use or generate in connection with my employment belongs to Google (or third parties identified by Google). I understand that my unauthorized use or disclosure of Google Confidential Information during my employment or after my employment may lead to disciplinary action, up to and including termination and/or legal action.

(c)     *Former Employer Information / Ownership of Google Property.* I will not use or disclose in connection with my employment with Google or bring onto Google's electronic network, property, facilities, or systems (collectively, "Google Property") any proprietary information, trade secrets, or any confidential and belonging to any previous employer or other person or entity unless consented to in writing by such employer, person, or entity.

3.     **Inventions.**

(a)     *Definition of Inventions.* "Inventions" means inventions, designs, developments, ideas, concepts, techniques, devices, discoveries, formulae, processes, improvements, writings, records, original works of authorship, trademarks, trade secrets, all related know-how, and any other intellectual property, whether or not patentable or registrable under patent, copyright, or similar laws.

(b)     *Assignment of Inventions.* Except as provided in Section 3(f) below, Google Inc. will own all Inventions that I invented, developed, reduced to practice, or otherwise contributed to, solely or jointly with others, during my employment with Google (including Google Confidential Information) or with the use of Google's equipment, supplies, facilities, or Google Confidential Information, and any intellectual property rights in the Inventions (the "Assigned Inventions"). I will promptly disclose in writing to Google any Assigned Inventions and assign to Google my rights in any Assigned Inventions. I hereby irrevocably assign to Google Inc. my rights in all Assigned Inventions, and convey to Google Inc. ownership of any Assigned Inventions not yet in existence. All works of authorship made solely or jointly with others) within the scope of and during my employment with Google are "works made for hire" as defined in the United States Copyright Act. The decision whether or not to commercialize or market any Assigned Inventions is within Google's sole discretion and for Google's sole benefit, and that I will not claim any consideration as a result of Google's commercialization of any such Inventions.

(c)     *Prior Inventions.* I list in Exhibit A all Inventions that I solely or jointly made before my employment with Google (collectively, "Prior Inventions") and that I am not assigning to Google. I will not incorporate any Prior Inventions into any Assigned Inventions, product, or service of Google or otherwise use any Prior Inventions in the course of my employment with Google without the prior written permission. If I incorporate any Prior Invention into any Assigned Inventions, product, or service of Google, I hereby grant to Google a royalty-free, irrevocable, perpetual, transferable worldwide license (with the right to sublicense) to make, have made, use, import, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Invention.

(d)     *Maintenance of Records.* I agree to keep and maintain for Google detailed and accurate written records in any format that it

EP Date Nov 2010
C4 Version

Page 1 of 6

✔ Document Integrity Verified

**CONFIDENTIAL**

STROZ_0000899

**TX-5215, Page 38 of 48**

may specify of all Assigned Inventions that I make (solely or jointly with others) for Google.  The records are and remain the sole property of Google.

(e)     *Securing Intellectual Property Rights.*  I agree to assist Google (or its designee) at Google's expense to assign, secure, and enforce all intellectual property rights in any Assigned Inventions in any and all countries, disclose to Google all pertinent information and data, and sign any document that Google reasonably deems necessary. If Google is unable for any reason to secure my signature to any document required to assign, secure, and enforce any intellectual property rights in any Assigned Inventions, then I hereby irrevocably designate and appoint Google and its officers and agents as my agents and attorneys in fact to execute any documents on my behalf for this purpose. This power of attorney will be considered coupled with an interest and will be irrevocable.  My obligations under this Section 3(e) will continue after the termination of my employment with Google.

(f)     *Exception to Assignment.*  The provisions of this Agreement requiring disclosure and assignment of Inventions to Google do not apply to any invention that qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B).  While employed, I will advise Google promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and that I have not disclosed on Exhibit A for a confidential ownership determination.

4.      Conflicting Employment.

(a)     *Other Employment or Activities.*  During my employment with Google, I will not engage in any other employment or other activities or services directly related to the business in which Google is now involved, becomes involved, or has plans to become involved or that conflict with my obligations to Google without seeking and receiving permission in advance from Google's Ethics and Compliance team.

(b)     *Prior Agreements with Other Parties.*  My performance of all the terms of this Agreement and my duties as an employee of Google will not breach any invention assignment, proprietary information, confidentiality, or similar agreement with any former employer or other party.

5.      Return of Google Property and Information.

(a)     *Return of Google Property.*  Immediately upon termination of my employment with Google, I agree to deliver to Google and will not keep, recreate, or deliver to any other person or entity any documents and materials pertaining to my work with Google or containing any Google Confidential Information. I agree to deliver promptly all Google Property, as applicable, in my possession or control.  I agree, upon Google's request, to sign a document that I have fulfilled my responsibilities under this Agreement.

(b)     *Return of Google Information.*  Upon termination of my employment, I will make a prompt and reasonable search for any Google Confidential Information in my possession or control.  If I locate such information I will notify Google and provide a computer-useable copy of it.  I will cooperate reasonably with Google to verify that the necessary copying is completed and, when Google confirms compliance, I will delete fully all Google Confidential Information.

(c)     *Compliance.*  I have no reasonable expectation of privacy in any Google Property or in any other documents, equipment, or systems used to conduct the business of Google.  Google may audit and search any Google Property or such documents, equipment, or systems without further notice to me for any business-related purpose at Google's reasonable discretion.  I will provide Google with access to any documents, equipment, or systems used to conduct the business of Google immediately upon request.  I consent to Google taking reasonable steps to prevent unauthorized access to Google Property and Google Information.  I understand that I am not permitted to install any unauthorized applications or any applications that I do not have a license or authorization for use to any Google Property and I will refrain from copying any software that I do not have a license or authorization to use or using such software in a way that I do not have a license or authorization to use on Google Property. It is my responsibility to comply with Google's policies governing use of Google Property.

6.      Notification.  If my employment with Google ends, I consent to Google notifying my new employer or any third party about my obligations under this Agreement.

7.      Solicitation of Employees.  To the fullest extent permitted under applicable law, during my employment with Google and for twelve months immediately following its termination for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of Google's employees to leave their employment.

8.      Export Statement of Assurance.  In the course of my employment, Google may release to me items (including software, technology, systems, equipment, and components) subject to the Export Administration Regulations ("EAR") or the International Traffic in Arms Regulations ("ITAR").  I certify that I will not export, re-export, or release these items in violation of the EAR or ITAR and I will not disclose/export/re-export these items to any person other than as required in the scope of my employment with Google.  If I have any question regarding this Section 8, I immediately will contact the Legal Services Department before taking any actions.

9.      Code of Conduct.  I have read Google's Code of Conduct, which is available on the "Investor Relations" page of Google's public website.  I agree to comply with the terms of the Code of Conduct and report any violations of the Code of Conduct.

10.     Employee Handbook.  Google's Employee Handbook consists of "Core" policies listed in a table of contents on Google's "Employee Handbook" internal website, and that those policies incorporate by reference supplemental policies.  Within ten days of signing this Agreement, I will read the "Core" policies within Google's Employee Handbook, and comply with its policies, including supplemental policies, as they may be revised from time to time.

EW Date: Nov 2013
GA Version

Page 2 of 9

⟳ Document Integrity Verified

**CONFIDENTIAL**

DocuSign Transaction Number: XDPFZWVxHSH058

11.   **Use of Images**.  During my employment, Google or its agents may obtain images of me for subsequent use in materials. My name may or may not be included along with such images. I grant Google permission for such use of my images, both during and after my employment, and I understand that I will not receive any royalties or other compensation for this use.

13.   **Arbitration and Equitable Relief**

(a)   *Arbitration*.  IN CONSIDERATION OF MY EMPLOYMENT WITH GOOGLE, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES AND OTHER BENEFITS PAID TO ME BY GOOGLE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING GOOGLE AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF GOOGLE IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH GOOGLE OR THE TERMINATION OF MY EMPLOYMENT WITH GOOGLE, INCLUDING ANY BREACH OF THIS AGREEMENT, WILL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 1280 THROUGH 1294.2, INCLUDING SECTION 1283.05 (THE "RULES"), WHICH ARE AVAILABLE ON THE "CALIFORNIA LAW" PAGE OF "CALIFORNIA LEGISLATIVE INFORMATION" PUBLIC WEBSITE. I AGREE THAT I MAY ONLY COMMENCE AN ACTION IN ARBITRATION OR ASSERT COUNTERCLAIMS IN AN ARBITRATION, ON AN INDIVIDUAL BASIS AND, THUS, I HEREBY WAIVE MY RIGHT TO COMMENCE OR PARTICIPATE IN ANY CLASS OR COLLECTIVE ACTION(S) AGAINST GOOGLE, TO THE FULLEST EXTENT PERMITTED BY LAW. DISPUTES THAT I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE FAIR LABOR STANDARDS ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION, WRONGFUL TERMINATION AND ANY OTHER CONTRACTUAL, TORT OR STATUTORY CLAIMS UNDER FEDERAL, CALIFORNIA AND LOCAL LAWS, TO THE EXTENT ALLOWED BY LAW.  I UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT GOOGLE MAY HAVE WITH ME.

(b)   *Procedure*.  I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS") PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "JAMS RULES"), WHICH ARE AVAILABLE ON THE "RULES/CLAUSES" PAGE OF JAMS' PUBLIC WEBSITE, AND NO OTHER RULES FROM JAMS. I AGREE THAT THE ARBITRATOR WILL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, MOTIONS TO DISMISS OR TO STRIKE, DEMURRERS, AND MOTIONS FOR CLASS CERTIFICATION, PRIOR TO ANY ARBITRATION HEARING. I ALSO AGREE THAT THE ARBITRATOR WILL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, INCLUDING INJUNCTIVE RELIEF, AND THAT THE ARBITRATOR WILL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW. I AGREE THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. I UNDERSTAND THAT GOOGLE WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I WILL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW. I AGREE THAT THE ARBITRATOR WILL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THAT THE ARBITRATOR WILL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW WILL TAKE PRECEDENCE. I AGREE THAT THE DECISION OF THE ARBITRATOR WILL BE IN WRITING. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT WILL BE HELD IN SANTA CLARA COUNTY, CALIFORNIA.

(c)   *Remedy*.  EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION WILL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND GOOGLE.  ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER I NOR GOOGLE WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.  NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL GOOGLE POLICY, AND THE ARBITRATOR WILL NOT ORDER OR REQUIRE GOOGLE TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW. NOTHING IN THIS AGREEMENT OR IN THIS PROVISION IS INTENDED TO WAIVE THE PROVISIONAL RELIEF REMEDIES AVAILABLE UNDER THE RULES.

(d)   *Administrative Relief*.  I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD.  THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM.

(e)   *Voluntary Nature of Agreement*.  I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY GOOGLE OR ANYONE ELSE.  I ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND ITS TERMS, CONSEQUENCES, AND BINDING EFFECT.  I RECOGNIZE THAT *I AM WAIVING MY*

EF Date Nov 2013
CA Version

Ⓒ Document Integrity Verified

**CONFIDENTIAL**

CONFIDENTIAL

STROZ_0000901

**TX-5215, Page 40 of 48**

*RIGHT TO A JURY TRIAL.* I AGREE THAT I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

(f)   *Arbitration Clause; Governing Law.* THIS ARBITRATION CLAUSE IS ENTERED PURSUANT TO AND GOVERNED BY THE FEDERAL ARBITRATION ACT (9 U.S.C. SECTION 1, ET SEQ.), BUT IN ALL OTHER RESPECTS THIS AGREEMENT IS GOVERNED BY THE LAWS OF CALIFORNIA.

13.   General Provisions

(a)   *Governing Law; Consent to Personal Jurisdiction.* Except as provided in Section 12(f), this Agreement will be governed by the laws of the State of California except for its choice of law rules.  If any lawsuit is permitted under or related to this Agreement or my employment, I consent to the exclusive personal jurisdiction and venue of the state and federal courts located in California.

(b)   *Entire Agreement.* This Agreement, together with its Exhibits, and any executed written offer letter between Google and me, are the entire agreement between Google and me relating to my employment and any related matters and supersede all prior written and oral agreements, discussions, or representations.  If there are conflicts between this Agreement and the offer letter, this Agreement will control.  No change to this Agreement, other than amendments to Sections 3 and 4 relating to personal open-source projects in a format prepared by Google, will be effective unless in writing signed by Google [and] Chief Executive Officer.   Any change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

(c)   *Severability.* If one or more of the provisions in this Agreement are deemed void, the remaining provisions will continue in full force and effect.

(d)   *Successors and Assigns.* This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives and will be for the benefit of Google, its successors, and its assigns.  Google may assign this Agreement to anyone at any time without my consent.  There are no intended third-party beneficiaries to this Agreement.

(e)   *Waiver.* Waiver by Google of a breach of any provision of this Agreement will not waive its right to take action based on any other breach.

(f)   *Survivorship.* The rights and obligations of the parties to this Agreement will survive termination of my employment with Google.

Date: _____

_____
Signature

_____
Name of Employee (typed or printed)

Eff. Date Nov. 2012
CA Version

Page 4 of 6

Document Integrity Verified

**CONFIDENTIAL**

**TX-5215, Page 41 of 48**

Exhibit A

GOOGLE INC.
LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP

I understand that listing a project or an invention here does not mean that Google is granting me permission to continue working on the project or invention. This is only a listing of inventions or original works of authorship done prior to employment.

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| | | |

___ No inventions or improvements
___ Additional Sheets Attached

Signature of Employee: _____

Print Name of Employee: _____

Date:

BR Zone Nov 2013
DA version

Page 5 of 6

Document Integrity Verified

**CONFIDENTIAL**

STROZ_0000903

EXHIBIT B

GOOGLE INC.

CALIFORNIA LABOR CODE SECTION 2870
INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENTS

"(a)   Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2)   Result from any work performed by the employee for the employer.

(b)   To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

EP Date Nov 2013
EP Version

Page 6 of 6

Document Integrity Verified

**CONFIDENTIAL**

# Exhibit 7 Redacted

CONFIDENTIAL

STROZ_0000905

**Hanley Chew**

| | |
|---|---|
| **From:** | Lior Ron ▓▓▓▓▓ |
| **Sent:** | Tuesday, April 12, 2016 8:58 AM |
| **To:** | Mary Fulginiti |
| **Cc:** | eamdursky@omm.com; Hanley Chew |
| **Subject:** | Re: Follow-up Information and Interview with Lior |

I was away during my last day of employment so wasn't on campus to physically return it, I returned it few days after - I did not access files nor do I even think I opened it between the time of ending employment and the time I gave it back

Lior.

On Tue, Apr 12, 2016 at 8:55 AM, Mary Fulginiti <MFulginiti@strozfriedberg.com> wrote:
Great. And we have one more question.

1. Did Lior return his laptop on last day of employment - January 13, 2016 or did he take it home and return it a few days later. If he took it home did he access any Google files at that time and/or forward or copy any files/emails at that time.

Thanks.

Mary Fulginiti
Managing Director

STROZ FRIEDBERG
1925 Century Park East, Suite 1350
Los Angeles, CA 90067

T: 310.623.3280
M: 310.488.6274
F: 310.623.3277
mfulginiti@strozfriedberg.com

From: Amdursky, Eric [mailto:eamdursky@omm.com]
Sent: Monday, April 11, 2016 08:16 PM
To: Hanley Chew
Cc: Lior Ron ▓▓▓▓▓▓; Mary Fulginiti
Subject: Re: Follow-up Information and Interview with Lior

Mary and Hanley,

Set forth below are the names Lior recalls from memory that were at Anthony's house when he gave the informal presentation. Lior believes there were at least 5 more people there (in addition to those listed below), but since he didn't work with them before nor did he interact with them after, he does not remember their names.

Laila (Mateias?) - program manager

**CONFIDENTIAL**

CONFIDENTIAL                                                              STROZ_0000906

Pierre? (don't remember last name, engineer)

Dan Gruver? (not sure if he was actually there)

Don Burnette

Gueoton? (french engineer, not sure how to spell his name)

Claire Delaunay

Brian (Torecelini?) - ops

Brian ? - UX

Sent from my iPhone

On Apr 11, 2016, at 3:33 PM, Hanley Chew <HChew@StrozFriedberg.com> wrote:

Mary and I will call you in 5-10 minutes.


Thank you.


**From:** Lior Ron ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, April 11, 2016 3:25 PM
**To:** Amdursky, Eric
**Cc:** Mary Fulginiti; Hanley Chew
**Subject:** Re: Follow-up Information and Interview with Lior


Hi Mary, busy trying to get the deal to the finish line but happy to talk give me a call at 650-224-6201 thanks

On Monday, April 11, 2016, Amdursky, Eric <eamdursky@omm.com> wrote:

Mary - Lior is available now for few minutes if you want to call him.


**From:** Mary Fulginiti [mailto:MFulginiti@StrozFriedberg.com]
**Sent:** Sunday, April 10, 2016 5:36 PM
**To:** Amdursky, Eric; Hanley Chew
**Cc:** Lior Ron
**Subject:** RE: Follow-up Information and Interview with Lior


2

**CONFIDENTIAL**

Does 11 am tomorrow work for Lior?

Mary Fulginiti
Managing Director

## STROZ FRIEDBERG

1925 Century Park East, Suite 1350, Los Angeles, CA 90067

T: +1 310.623.3280
M: +1 310.488.6274
F: +1 310.623.3277
mfulginiti@strozfriedberg.com   www.strozfriedberg.com

This message and/or its attachments may contain information that is confidential and/or protected by privilege from disclosure. If you have reason to believe you are not the intended recipient, please immediately notify the sender by reply e-mail or by telephone, then delete this message (and any attachments), as well as all copies, including any printed copies. Thank you.

**From:** Amdursky, Eric [mailto:eamdursky@omm.com]
**Sent:** Saturday, April 09, 2016 1:55 PM
**To:** Hanley Chew; Mary Fulginiti
**Cc:** Lior Ron
**Subject:** Follow-up Information and Interview with Lior

Hanley and Mary,

Following up on our call from yesterday, Lior is available on Monday for the 30-60 minute interview you requested.  Let me know what time works for the two of you and if you need additional time.

In addition, Lior wanted to provide the following information that you requested:

- During his second stint at Google, Lior did not supervise anyone directly, but worked closely with David Singleton, Jonathan Rosenberg and John Hanke.

3

**CONFIDENTIAL**

STROZ_0000908

- With respect to the three people where he forgot their last names during the interview, they are Abhijit Ogale, Daniel Chu (a product manager Lior knew from the self-driving team) and Chris Ludwick (who he mistakenly referred to as Ben in the interview).

- Lior also wanted to reiterate for Stroz's record with respect to anyone that joined NewCo directly from Aspen and who Lior might have had contact:

- Anthony Levandowski

- Claire Delaunay (from robotic team at Aspen, not self driving) - Lior had breakfast with Claire after he left and before she left in which Lior described the business of NewCO. (autonomous trucking)

- Don Burnette (from self-driving project at Aspen) - Lior met Don at Anthony's house before leaving and Lior answered questions about the autonomous trucking market and informed Lior he was about to leave Aspen

- Daniel Ratner (a friend, from Google X/loon project) -  Lior met Daniel for coffee after Daniel approached Lior and showed interest in what Lior was doing after Lior told Dan he was leaving Aspen.  Lior described the company and Dan expressed explicit interest in becoming employed by NewCo.  Thereafter, Lior verbally discussed key terms of his potential employment.

- David Weikersdorfer (from robotic team at Google, not self-driving) - met for coffee and Lior described the trucking business to him

- Dan Gruver - Lior might have met Dan at Anthony's house, but Lior is not sure and does not recall having a real conversation prior to him leaving Aspen

- Robbie Miller - Lior met with Robbie briefly before he left Google, but didn't have a real conversation.

- Finally as discussed in his interview, Lior met a bunch of other Googlers that didn't join NewCo. at Anthony's house prior to leaving, where Lior prepared and presented a short presentation on the trucking market.

Please feel free to follow up with Lior on any of these issues on Monday. Thanks.

Eric J. Amdursky
O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, California 94025
Tel: (650) 473-2644
Fax (650) 473-2601

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

4

**CONFIDENTIAL**

*Waymo v. Uber*
**Case No. 3:17-cv-00939-WHA**

# TRIAL EXHIBIT 7111

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Anthony Levandowski, who participated in the Stroz diligence process in his individual capacity. *See* Br. § I.

- Fed. R. Evid. 805 – This document contains inadmissible hearsay within hearsay; namely, Anthony Levandowski's recitation of out of court statements made by other declarants. *See* Br. § I.

- Fed. R. Evid. 403 – Because the document is replete with embedded hearsay, the Court should exercise its discretion under Rule 403 to exclude any reliance on the document for its truth, to prevent jury confusion about what fragments are admissible for truth, and resulting waste of time and prejudice to Uber. *See* Br. § IV.

- This exhibit contains references to, and attaches a copy of, Anthony Levandowski's employment agreement, which Waymo stipulated that it would not make reference to in its case in chief. *See* Dkt. 425 at 4.

- Designated witnesses who received this document pre-litigation are: Eric Tate, John Gardner, Adam Bentley, Justin Suhr, Angela Padilla, Cameron Poetzscher, Nina Qi, and Salle Yoo. Except through Suhr, Padilla, Poetzscher, Qi, or Yoo, the document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV. Only Tate and Gardner received this document as an Exhibit to the Stroz Report; the remaining witnesses received an identical document in April 2016, well before the Stroz Report was written.

| Yellow Highlights | Hearsay Statements |
|---|---|
| Blue Highlights | Hearsay within Hearsay Statements |

**MEMORDANUM**

To:      John Gardner

From:  Stroz Friedberg

Date:   April 2, 2016

Re:     DRAFT Summary Interview of Anthony Levandowski

_____

On March 22 and 23, 2016, Mary Fulginiti, Melanie Maugeri, and Hanley Chew interviewed Anthony Levandowski at the offices of Stroz Friedberg on 101 Montgomery Street, Suite 2200, San Francisco, California  94104.  On April 1, 2016, Mary Fulginiti and Hanley Chew conducted a follow-up interview of Levandowski via telephone.

**Employment at Google**

Anthony stated that he began working for Google on April 9, 2007 when Google acquired Vutool, a company founded by Levandowski, [Multiple Names Redacted], which specialized in mapping technology.  Following the acquisition, all of the founders joined Google.  Vutool became Google's Street View Project, which is a technology that provides a panoramic view of streets for Google Maps and other apps.

       <u>Employment Documents and Training at Google</u>

When Levandowski joined Google, he signed an employment agreement which contained invention, nondisclosure, non-solicitation, and conflicting employment provisions, among other things.  Levandowski understood these provisions to prohibit him from disclosing any of Google's "secrets," and from approaching Google employees to work for him after he was no longer working at Google.  He also recalled that he could work on side projects while employed with Google provided they did not relate to Google business.  Levandowski recalled that Google provided training on how to handle queries and user data, but he did not recall any training regarding confidentiality or non-solicitation.  Levandowski was shown a copy of his signed At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement, which was attached to a February 1, 2016 letter from Google's legal counsel, Jade Wagner.  He reviewed said letter and agreement and confirmed that they were true and correct copies of said documents. They are attached hereto as Exhibit 3.

At the time that he started working for Google in 2007, Levandowski said that his title was Software Engineer on the Street View Project, also referred to internally as City Block. [Redacted] was his supervisor.  Levandowski's duties were to build out the vehicles worldwide. From 2008 through 2009, Levandowski worked on a project known as GEOS, which involved aerial imagery collection.  In 2008, he also set up operations in Mountain View and India to help

1

United States District Court
Northern District of California
**Trial Exhibit 7111**
Case No.   **3:17-cv-00939-WHA**
Date Entered _____
By _____
Deputy Clerk

CONFIDENTIAL

UBER00312509

**TX-7111, Page 1 of 37**

establish a database behind the maps.  The internal name for this project at Google was Ground Truth or GT.

In 2009, Levandowski left the Street View Project and joined the Chauffeur Project, which is also known internally as the Self Driving Car Project and SDC.  In 2011, Levandowski was promoted to Engineering Manager on the Chauffeur Project.  However, Levandowski stated that, despite his title, he acted primarily as a Product Manager.  In 2011, [Redacted] became Levandowski's supervisor.  In late 2014, [Redacted] became Levandowski's supervisor.  When asked what his responsibilities were he stated that he oversaw the design, production, installation, and software required for running the lasers, among other things.  He also helped draft legislation in Nevada regarding autonomous cars.  Some of the names for the prototype self-driving cars were Herbie, Kitt, Karr, Big Foot, Pribot, Ecto1, and Firefly.

He also consulted on a number of other projects at Google such as Cardboard (inexpensive virtual reality headsets) and Telepresence Robots (virtual reality headsets).  He said he never wrote any software code for any of the projects he worked on.

Levandowski stated that, at the end of his time at Google, he managed 25 employees.  He wrote the names of the individuals he managed on a separate piece of paper during the interview.  A copy of that document is attached hereto as Exhibit 5.  He had access to their compensation information, work evaluations, performance scores, home addresses and other managerial information as part of his duties and responsibilities.  Levandowski stated that some of this employee data would be located on his primary laptop, Apple MacBook Pro.  Levandowski said that he did not have HR access to the personnel files of the individuals who reported to him.

Stroz Friedberg interviewers showed Levandowski a list of names that was provided to us through his counsel marked Confidential Work Product/Attorney-Client Privileged and dated March 12, 2016.  He recognized the list as the one he created which included, to the best of his recollection, all of the individuals he worked with at Google during his tenure.  He also identified individuals on the list with whom he spoke before and after he founded OttoMotto and those individuals who are currently employed with OttoMotto.  A copy of said list with Levandowski's markings is attached hereto as Exhibit 4.  On a separate copy of the same list, he checked off individuals he worked closely with at Google.  This separately marked list is attached hereto as Exhibit 6.  When asked if he referenced a Google directory to compose this list he said he did not.  He said he referenced his contacts on his iPhone.

Levandowski identified the following individuals as those with whom he worked closely during his time at Google:  [Multiple Names Redacted].  See Exhibit 6.

<u>Side Projects at Google</u>

During his tenure at Google, Levandowski stated that he participated in a number of external side projects that were not Google-related as an owner, investor and/or advisor.  Levandowski

2

stated that Google was aware that its employees were engaging in external side projects, and did not object to them provided they did not compete or overlap with Google's businesses. Levandowski stressed that Google was aware, and approved, of all of his external side projects. Those projects are listed below.

- Future Game (owner) - a stock market predictor game.
- Prototype This - a television show on the Discovery Channel which featured robots delivering pizza.  This television show became the basis for Anthony's Robots, which Levandowski founded in 2008.  Levandowski stated that he never used any funds from Google for Anthony's Robots.
- Anthony's Robots (owner) – provided equipment hardware to help drive vehicles. Google acquired Anthony's Robots in October 2011.
- 510 Systems (investor) – Anthony's Robots used 510 Systems.  Levandowski was an investor in 510 Systems, beginning in 2005.  510 Systems was engaged in developing technology for mobile mapping.  Google acquired 510 Systems in October 2011.
- Tiramisu (advisor) – a small airplane that picks up items and octocopter that picks up people.
- Glimmer (investor) – three second video sharing.
- Date Knight (investor) – a dating companion app.
- Nemo Building System (owner) – modular building manufacturing company.
- East Bay Portfolio (investor) – real estate development fund.

<u>Devices and Data Accessed at Google</u>

Over the course of his time at Google, Levandowski was issued a number of devices.  Google gave him 2 Linux desktops and 6 laptops (2 Lenovo laptops, 2 Chromebooks, 1 Linux laptop, 1 Windows laptop) and a Blackberry.   When he left Google, Levandowski had 2 Linux desktops and 2 laptops, all of which he returned to Google.

Levandowski stated that, when he worked at Google, he created operational manuals and checklists (i.e., manuals on how to operate the Street View car, how the systems fit together etc.), design documents, both public and internal presentations, training information, and aerial imagery.  All of these documents were stored on the corporate Google Drive in the Google Docs folder.  Levandowski stated that he would access these documents primarily through Google Drive on his work devices.  Levandowski also stated that, although he used his Google-issued laptops to work on Google-related documents, he also used his personal laptop.[1]  Levandowski further stated that he stored Google documents on his personal devices, such as his laptop, phone, hard drives and thumb drives.  He also stated in his Diligenced Employee Questionnaire that he used his personal tablet, phone, laptop and desktop to access Google Docs (not the

---

[1] Levandowski explained that it was common for Google to enable the personal devices of its employees to access the corporate Google drive.

3

corporate network directly).  He further explained that he rarely accessed the Google network remotely with any of his devices.

Levandowski acknowledged that he did use USB's to transfer data from his desktop to the self-driving cars that his team was working on.  However, Levandowski stated that this was a common practice at Google and Google tracked the USB's used in these transfers very closely.  Levandowski stated that he returned all of the Google's USB's and destroyed all of the personal USB's in his possession because he had heard that they might contain spyware.[2]  When asked what information was present in the USB's  he destroyed, Levandowski stated that it was likely trade show information, vendor sheets, and files that he may have been moving.  Levandowski denied putting any source code or other proprietary Google information on any of his personal USB's.

Levandowski stated that he did email Google files to his personal email account, levandosky@gmail.com.  He noted that these files were mainly presentations or other information that was going to be shared publicly. When asked if he emailed himself any technical or proprietary information he stated, "No, I don't think so."

As discussed in more detail below in the Personal Devices section, Levandowski identified 3 places on his Apple MacBook Pro laptop, where Google-related information was stored:  (1) Downloads folder; (2) Dropbox folder; and (3) his Chauffeur folder.  He stated that this information was stored on his laptop in the normal course of his work at Google. He did not recall if he possessed any additional potentially proprietary and confidential information.

**Contacts With Google Employees About New Company**

Prior to leaving Google, Levandowski spoke with a number of Google employees about his start-up company.  According to Levandowski, these discussions occurred on a one-on-one basis, during social gatherings and/or in a group setting at his house.  Below is a list of the individuals he met with and a summary of what they discussed.

One-on-One Meetings with Google Employees

Levandowski identified the following Google employees he spoke with one-on-one concerning his start-up company: [Multiple Names Redacted].  Levandowski recalls that all of these individuals worked in close proximity with him so they typically talked in person.

Google Employees Who Joined OttoMotto[3]

- Lior Ron

---

[2] Levandowski stated that [Redacted], his supervisor at Google at the time, was aware of Levandowski's destruction of the USB's.

[3] Although OttoMotto was previously named 280 Systems, we refer to the new company as OttoMotto throughout for ease of reference.

4

Lior Ron and Levandowski knew each other because Ron ran a competitive project at Google (i.e., map making).  Ron contacted Levandowski in August 2015 to get together.  Their first meeting occurred over lunch on the Google campus where they talked about the status of the Chauffeur Project and about Ron possibly joining the Chauffeur team. Levandowski also told Ron about his dissatisfaction with the team and the direction of the project.

They had a follow-up meeting that weekend as they lived close to one another. They took a walk around the block.  Ron detailed what was going on with Google's new clothing technology. Levandowski and Ron also talked about robot trucks, the trucking market, and the opportunity for these trucks to be part of Alphabet (Google's holding company).  They also talked about aftermarket kits, which could convert existing cars into self-driving cars.  They discussed trying to do the above together and trying to figure out a way to do it at Google.

A few weeks later in early September 2015, Levandowski stated that things began to "solidify" in a meeting with Ron.  They discussed starting their own company. Levandowski wanted to think things through before doing anything and they both discussed possibly waiting until they left Google.

In September 2015, they met with a lawyer.  In mid-to-late September 2015, Levandowski and Ron began meeting with Uber.  (The subsequent meetings with Uber are described below.)

In or about November 2015, Levandowski and Ron realized that building something new at Google was too complicated and that they needed to leave so that they could pursue their interest in robot trucks.  They talked about their respective roles.  Levandowski would be responsible for building the technology and Ron would be responsible for running the business.

- [Redacted]

[Redacted] was a Software Engineer for Google's Chauffeur Project.  Levandowski knew [Redacted] was frustrated at Google.  [Redacted] and Levandowski had two in-person meetings on the Google campus in January 2016.  The first meeting was initiated by Levandowski when Levandowski asked [Redacted] how he was doing during a walk around the Google campus. Levandowski informed [Redacted] he was leaving Google to form a start-up company. The second meeting was initiated by [Redacted], who asked Levandowski additional questions about Levandowski's new venture.  [Redacted] received an offer to join OttoMotto prior to his departure from Google.  [Redacted] joined OttoMotto on February 25, 2016

- [Redacted]

[Redacted] was a Software Engineer for Google.  Levandowski and [Redacted] used to date and had many discussions concerning robots.  [Redacted] and Levandowski met three to four times concerning Levandowski's new venture, beginning in September 2015 and continuing through January 2016.  They discussed the software requirements for robot trucks.  [Redacted] left Google two weeks after Levandowski departed and joined OttoMotto.

5

CONFIDENTIAL

UBER00312513

- [Redacted]

[Redacted] was a Software Engineer at Google.  [Redacted] introduced [Redacted] to Levandowski.  Levandowski met with [Redacted] two times:  once at Google, and the second time near Levandowski's house.  They discussed Levandowski's new venture.  [Redacted] received an offer from OttoMotto in January 2106.  [Redacted] left Google in early March 2016 and joined OttoMotto.

### Google Employees Who Received An Offer But Did Not Join OttoMotto

- [Redacted]

[Redacted] is the lead Hardware Engineer for Google's Chauffeur Project.  Levandowski began speaking with [Redacted] in December 2015 about different options for a new start-up company.  Levandowski does not recall if he approached [Redacted] or vice versa.  At first, [Redacted] and Levandowski talked about doing the start-up at Alphabet but eventually decided to form a separate company.  They spoke regularly between December 2015 and January 2016 and often met at each other homes.  [Redacted] was more interested in the robot trucks, than the aftermarket kits.  [Redacted] wanted to be a founder and agreed to match Ron's stake and commit funds.  [Redacted] actively recruited employees to leave Google and join the new company.  [Redacted] even delivered offer letters to people.  In the end, [Redacted] did not end up joining OttoMotto because he had a "nervous breakdown" after Levandowski left Google.

- [Redacted]

[Redacted] is a Mechanical Engineer for Google's Chauffeur Project.   [Redacted] and Levandowski had three one-on-one meetings between December 2015 and January 2016.  Levandowski cannot recall who approached whom.  [Redacted] wanted to invest in Levandowski's new venture.  [Redacted] requested a specific number of engineers and wanted Levandowski to hire his brother.  [Redacted] received an offer from OttoMotto, but did not join the company.

- [Redacted]

[Redacted] is a Manufacturing Engineer for Google's Chauffeur Project.  After speaking with [Redacted], [Redacted] approached Levandowski.  They met three times between December 2015 and January 2016; usually during [Redacted]' regular bimonthly update meetings with Levandowski at Google.  They talked mainly about products, specifically robot trucks versus aftermarket kits.  During this time, [Redacted] was pregnant and asked Levandowski about the maternity leave policy and her potential role in the new company.  [Redacted] received an offer to join OttoMotto, but did not join the company.

- [Redacted]

6

UBER00312514

[Redacted] is a Mechanical Engineer for Google's Chauffeur Project.  [Redacted] and Levandowski met two times -- January 15, 2016 and January 23, 2016.  At the January 15th meeting, [Redacted] approached Levandowski and asked Levandowski what he was "up to." Levandowski replied that he was thinking of leaving Google and doing something in the robot truck space.  On January 23, 2106, [Redacted] approached Levandowski at work and asked if they could meet.  Later that day they met in the street near Levandowski's house and talked about salary and expectations.  Shortly after [Redacted] received an offer letter but did not end up joining the company.

- [Redacted]

[Redacted] is a Mechanical Engineer for Google's Chauffeur Project.  [Redacted] and Levandowski met four times between December 2015 and January 2016.  Levandowski does not recall who approached whom regarding the start-up company.  Their conversations in December 2015 centered on the business climate for autonomous vehicles and general strategies.  [Redacted] and Levandowski had had conversations in prior years about working on a project together at Google and there was a general understanding that if they could not do make it work at Google they would leave and launch a start-up company, but nothing specific.  [Redacted] and Levandowski started talking specifically about creating a separate company in January 2016.  [Redacted] sent Levandowski a text message requesting that he set up a meeting to discuss the new venture with other employees.  In January 2016, [Redacted] sent a calendar invite to several Google employees at their Google email addresses setting up an evening meeting to discuss the new company.  [Redacted] received an offer to join OttoMotto but did not do so.

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  [Redacted] approached Levandowski on January 15, 2016 after his discussions with Pierre [Redacted] and Luke [Redacted].  [Redacted] had heard from [Redacted] and [Redacted] about Levandowski's new venture and wanted to know if it would be based in San Francisco since he did not want a long commute.  [Redacted] and Levandowski did not have any additional communications about the new company.  [Redacted] received an offer to join OttoMotto but he did not do so.

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  [Redacted] and Levandowski met twice on the Google campus in January 2016.  The first meeting was initiated by [Redacted] who had heard about Levandowski's new venture and wanted to learn more about it. Levandowski told him to talk to other people about it.  The second meeting was initiated by Levandowski, who wanted to confirm [Redacted]'s interest in the new company and asked [Redacted] what he told others about joining Levandowski's new venture.  [Redacted] received an offer letter to join OttoMotto and signed it but did not ultimately join the company.

7

UBER00312515

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  [Redacted] initially approached [Redacted] about Levandowski's new venture.  [Redacted] followed up with [Redacted].  Levandowski met with [Redacted] three times in January 2016.  The first time [Redacted] tapped Levandowski on the shoulder at work and asked him to take a walk around the block.  During this first meeting, [Redacted] requested information about the new company.  [Redacted] requested a second meeting during the work day where they discussed his potential salary.  The third meeting occurred after work at [Redacted]'s request where they continued to discuss salary and [Redacted] expressed his interest in joining the new company.  [Redacted] received an offer to join OttoMotto, but did not do so.

- [Redacted]

[Redacted] is a Hardware Engineer for Google's Chauffeur Project.  Pierre [Redacted] initially approached [Redacted], who later initiated three meetings with Levandowski in January 2016.  In the three meetings, [Redacted] and Levandowski talked about more technical things, such as what types of sensors they should develop (cameras, radar) and why robots are important.  They also eventually talked about [Redacted]' compensation with Levandowski's new venture.  [Redacted] received an offer to join OttoMotto but decided not to join the company.

- [Redacted]

[Redacted] is a Mechanical Engineer for Google's Chauffeur Project.  Levandowski approached [Redacted] because Levandowski knew that [Redacted] was unhappy at Google and he wanted to "give him a heads up."  They had two meetings in late January 2016:  one at Google, and one at [Redacted]' house.  At the first meeting, Levandowski told him he was leaving the Chauffeur team to start a new company and that he needed a team.  They spoke about robot trucks and [Redacted] expressed an interest in joining the company.  At the second meeting the following day at [Redacted]' house, Levandowski made [Redacted] a verbal offer to join OttoMotto.  [Redacted] ultimately declined to join OttoMotto.

- **[REDACTED]**

[Redacted] is a User Experience Designer for Google.  [Redacted] and Levandowski had three meetings.  The first meeting occurred on January 5, 2016.  Levandowski approached [Redacted] at Google and said, "Do you want to talk?"  Levandowski told him about his concerns with the direction of the Chauffer Project and asked [Redacted] what he thought about the proposed new company.  The second meeting was unplanned and occurred approximately five days later when Levandowski was having coffee and discussing the new company with Matt [Redacted] at Philz Coffee Shop located in Palo Alto.  [Redacted] ran into them and joined the conversation.  The third meeting was a phone conversation initiated by [Redacted] in or about mid-January 2016.  Levandowski and [Redacted] talked about the plan going forward.  [Redacted] told Levandowski that he received more money to stay and asked if he could join Levandowski later.

8

Levandowski believed [Redacted] may have given [Redacted] an offer letter to join OttoMotto. [Redacted] did not join the company.

- [Redacted]

[Redacted] is a Program Manager for Google's Chauffeur Project.  He manages the "human" side of the car.  [Redacted] used to work for [Redacted] at Google.  [Redacted] initiated a conversation with Levandowski in January 2016 after a conversation he had with [Redacted] about the new company.  Levandowski told [Redacted] about his new venture with trucks and they briefly discussed compensation.  [Redacted] received an offer to join OttoMotto, but did not do so.  Levandowski believes that [Redacted], like [Redacted], received more money to remain at Google and will eventually join OttoMotto.

### Google Employees Who Did Not Receive An Offer To Join OttoMotto

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  [Redacted] approached Levandowski about joining Levandowski's new venture in January 2016.  They had two meetings on the Google campus and one discussion via telephone, which was initiated by [Redacted].  Also, there may be some text messages between the two.  They discussed potential compensation and [Redacted]'s role at the new company.   Levandowski did not encourage [Redacted] to leave Google because he felt that [Redacted] was too pushy.  The only reason that Levandowski was talking to [Redacted] was because [Redacted] was friends with [Redacted].

- [Redacted]

[Redacted] is a Product Manager for Google.   Levandowski initially reached out to [Redacted] in November 2015, but they didn't actually meet until January 2016.  At that time, they met in downtown San Francisco and discussed why trucks are important and the macro picture of Levandowski's new venture.  [Redacted] did not receive an offer to join OttoMotto.  Levandowski said there may have been a phone call or text message setting up a time to meet.

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  [Redacted] approached Levandowski in December 2015 and again in January 2016.  [Redacted] had heard that Levandowski was involved in a new venture and wanted to join.  Levandowski was not interested in [Redacted] joining his new venture and did not encourage him to leave Google.  [Redacted] did not receive an offer to join OttoMotto.

- [Redacted]

[Redacted] is a mechanic for Google.  [Redacted] was responsible for outfitting cars.  [Redacted] approached Levandowski in January 2016 at Google.  They talked about the plan for robot

9

**TX-7111, Page 9 of 37**

trucks and [Redacted]'s potential salary.  They met a second time in January 2016 at Google.  Levandowski approached [Redacted] and said, "Let's talk."  [Redacted] did not receive an offer, but [Redacted] was planning to wait until his bonus before leaving Google.

- [Redacted]

[Redacted] is a Technical Product Manager for Google.  [Redacted] and Levandowski worked together on the Street View Project.  They began speaking about working on a new project back beginning in December 2014 through January 2015.  In September 2015, [Redacted] and Levandowski talked about having their project be at Alphabet.  However, [Redacted] encouraged Levandowski to leave Google.  [Redacted] resigned from Google on January 4, 2016 and left on January 9, 2016.  Levandowski believes that [Redacted] will join him after [Redacted] returns from his vacation.

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  In or about January 2016, but prior to Levandowski's departure, Levandowski had lunch with [Redacted] at a restaurant near his house at [Redacted]'s request.   This was a follow-up conversation to one of the group meetings described below.  Levandowski discussed [Redacted]'s potential role at the new company as being similar to his current role at Google.

- [Redacted]

[Redacted] is a Technical Product Manager for Google.  [Redacted] was one of Levandowski's managers at Google.  [Redacted] expressed an interest in joining Levandowski, who believes that either [Redacted] or [Redacted] told [Redacted] about the new venture.

In September 2015, [Redacted] approached Levandowski and asked him to go to dinner.  During dinner, [Redacted] said to him, "I know something's up."  Levandowski did not trust [Redacted] and denied that anything was happening.

In October 2015, Lewandowski discovered that [Redacted] approached Uber about potentially selling the vehicle team.  Levandowski felt that if [Redacted] was talking to Uber as well, they should all sit down together to negotiate a transaction. Levandowski initiated a meeting between [Redacted], Uber, and himself in October 2015.  At that meeting, [Redacted] discovered that the level of discussion between Levandowski and Uber was much more advanced than [Redacted] had expected.

[Redacted] decided to remain at Google when Google offered him $10 million to stay.  [Redacted] was aware of what was going on with Levandowski, but was no longer involved in any discussions. He agreed to keep Levandowski's pursuits confidential.

- [Redacted]

10

[Redacted] was the Vice President of Product Management for Google's GEOS Project. [Redacted] left Google in mid-2015.  Ron and Levandowski spoke to [Redacted] in September 2015 about how to handle Google Legal, PR, and mechanics with regard to the new company. They also wanted [Redacted]'s insight on the aftermarket kits.  [Redacted] did not receive an offer to join OttoMotto.

### Group Contacts with Google Employee

Levandowski identified four group contacts that he had with Google employees while he was at Google concerning his new company.

The first group contact was a barbeque that Levandowski held at his house for the Laser team from Chauffer to celebrate a milestone in November 2015.  They discussed work matters. However, there were a few side discussions between [Redacted], [Redacted], [Redacted] and/or Levandowski concerning his new company.  Levandowski also spoke with Jonathan [Redacted], who observed [Redacted] speaking with Levandowski, and asked them what they were talking about.  Levandowski responded that they are thinking of leaving Google and starting a new company focused on robot trucks. Ron was invited to the barbeque with the intent of introducing him to some of the individuals who might join the new company.

The second contact was an evening meeting of about 15-20 individuals in December 2015 organized by Levandowski at his house.  This meeting was primarily organized by word of mouth.  Levandowski did not recall any text messages or other electronic communications disseminated about this meeting.  The individuals who attended included: [Redacted], [Redacted], [Redacted], [Redacted], [Redacted], [Redacted], [Redacted], Ron, [Redacted], [Redacted], Levandowski, [Redacted] and several individuals who did not work for Google.  The purpose of the meeting was to gather everyone who was interested in the new company and to discuss the proposed business.  Levandowski recalled that Ron might have done a presentation regarding the business of making robot trucks, but he was not certain.

The third group contact was a ski trip to Lake Tahoe in early January 2016 organized and paid for by Levandowski.  The ski trip was intended to be a team bonding exercise for the Chauffeur-Laser team.  It was not an official Google activity.  There were several side discussions between [Redacted], [Redacted], and Levandowski about how to build robot trucks without using any intellectual property from Google.  They believed that they could do this without any prior designs or intellectual property from Google.  Their intention was to build the robot trucks cleanly and from scratch.  They discussed rebuying some the same parts from various Google vendors, but they were not going to remake what Google had already made.

The fourth group contact was an evening meeting in late January 2016 (just before Levandowski resigned) organized by [Redacted] at Levandowski's house.  [Redacted], [Redacted], [Redacted], [Redacted], [Redacted], [Redacted], Wakerstoff, [Redacted], [Redacted], [Redacted], Ron, Levandowski, and several non-Google employees attended the meeting.  Levandowski believes [Redacted] may have sent a calendar invite.  The meeting was intended to discuss an exit

11

UBER00312519

**TX-7111, Page 11 of 37**

strategy from Google.  The plan was that Levandowski would resign in the following few days and others would follow.  [Redacted], [Redacted], and [Redacted] received offers that evening from Rhian Morgan, head of HR at OttoMotto.  They were encouraging people to leave Google.

On the Tuesday following this evening meeting, Levandowski and [Redacted] met about Levandowski's role at Google going forward.  [Redacted] was going to announce at the general team meeting later that day that Levandowski was leaving the Laser team but staying within Google.  Levandowski stated that this announcement was a complete charade and that Google wanted to replace him with someone more loyal.  At the general team meeting, after [Redacted] made his announcement and left the room, Levandowski stated that he was proud of the team and was undecided if he was leaving the company.

**Additional Contacts With Google Employees About Leaving**

In addition to the above discussions, Levandowski told the following individuals that he was leaving Google.

- [Redacted]

[Redacted] is a Software Engineer with Google's Chauffeur Project.  In or about November/December 2015, Levandowski and [Redacted] discussed the direction of the Chauffeur project and Levandowski's plans to possibly leave Google.  Levandowski was trying to determine whether [Redacted] was dissatisfied with Google.  [Redacted] told Levandowski to call him once he figured it all out.

- [Redacted]

[Redacted] is a Software Engineer with Google's Chauffeur Project.  In December 2015/January 2016 [Redacted] approached Levandowski about certain rumors that he was hearing.  Levandowski did not tell [Redacted] about his new company because he did not trust [Redacted].  Sometime thereafter, [Redacted] reached out via text messages to arrange a time to speak with Levandowski.  Levandowski confirmed that he could only speak about non-work related matters.  [Redacted] came to Levandowski's house and saw a large truck and Levandowski told him he was working on driverless trucks.  Levandowski told him he could not recruit him.

- [Redacted]

[Redacted] is a Software Engineer with Google's Chauffeur Project.  In January 2016, [Redacted] spoke with Levandowski about leaving Google and wanting to do something new.  [Redacted] was interested in robots that can deliver products to people's homes.  Levandowski believes he also told [Redacted] he was planning on leaving Google at this time.  They discussed the general state of robotic competitors but did not discuss Levandowski's new venture.  [Redacted] said he was worried that Levandowski might want to do something with Uber and he did not want to join a competitor.

12

CONFIDENTIAL

UBER00312520

- [Redacted]

[Redacted] is an Optical Engineer with Google's Chauffeur Project.  Levandowski told him he was leaving in January 2016 to make robot trucks.  Levandowski did not recruit [Redacted] but he knew [Redacted] was very interested in having [Redacted] join the new company.

**Departure from Google**

Levandowski departed from Google on approximately January 26, 2016.  However, Levandowski stated that he had been thinking of leaving Google since 2008.  At that time, Levandowski spoke to [Redacted], a member of the Chauffeur project.  They discussed the fact that human drivers were not particularly good, which led to the idea for Anthony's Robots.  However, Levandowski decided to stay at Google in 2008 because he felt that it was a great place to launch new projects.

In 2011, when [Redacted] became Levandowski's supervisor, there was some friction between the two and Levandowski considered leaving.  However, Levandowski believed that Google was still the right place to see things through and there was a possibility that things could turn around.

In 2015, as the deadline for launching the self-driving car approached, Levandowski felt that the Chauffeur project was on the wrong track.  Google was focusing more on the design of the car, and less on the technology.  Levandowski stated that he had some conversations with [Redacted], Google's CEO, and that [Redacted] was sympathetic.  Unfortunately, the focus of the Chauffer project did not change and Levandowski concluded, in late 2015, that it was time to move on.

On January 25, 2016, Levandowski sent [Redacted] an email stating that Levandowski felt he was ready to leave.  [Redacted] forwarded the email to [Redacted].  When Levandowski arrived at work on January 26, 2016, [Redacted] removed Levandowski's badge and escorted Levandowski to a conference room.   [Redacted] joined [Redacted] and Levandowski in the conference room to discuss why Levandowski was leaving.  [Redacted] told Levandowski that he heard that Levandowski was recruiting people.  Levandowski told [Redacted] that there are a lot of people who share his view about the direction of the project.

After the meeting, [Redacted] walked Levandowski to Levandowski's desk where Levandowski gathered his personal belongings.  At some point [Redacted] also asked Levandowski how things got to this point and how could he do this to the team.  [Redacted] then took Levandowski to another conference room where they were joined by [Redacted], the HR representative for the Chauffeur program.  [Redacted] asked Levandowski why he was leaving and Levandowski responded that he was having issues on the project.  [Redacted] asked Levandowski to return all of his Google property.  Levandowski indicated that it was present at his desk, which [Redacted] confirmed.  Levandowski also returned 2 laptops and desktops.

13

CONFIDENTIAL

UBER00312521

After [Redacted] and [Redacted] departed, Jade Morgan, a member of Google's legal team appeared via video conferencing to speak to Levandowski about his obligations under his confidentiality and non-solicitation agreements with Google.  Levandowski asked for guidance about how to respond to Google employees who approached him.  Morgan did not provide any advice.  Levandowski asked if he should say, "Happy to meet with you, but I can't talk about my work things because of my contractual obligations to Google."  Morgan and Levandowski verbally agreed to the language.  No documents were provided to Levandowski at this time.  After Levandowski left Google, [Redacted], Google's founder, and [Redacted], the head of Chauffer, each called Levandowski to ask what happened.  [Redacted] expressed his disappointment that Levandowski left and suggested he take a one month vacation and then come back.  [Redacted] asked Levandowski what he was going to do next and Levandowski responded that he might start a new company involving trucks.

[Redacted] and [Redacted] from Human Resources called as well and they had a nice social conversation.

**Contacts with Google Employees Following Departure**

Levandowski stated that a number of Google employees reached out to him about joining OttoMotto following his departure from Google including:  [Multiple Names Redacted].  Levandowski stated that he either replied to these individuals and told them he could not respond or he did not reply at all.  Levandowski stated that he discussed social matters, but nothing about OttoMotto.  Levandowski did not believe there were any written or electronic communications between himself and any Google employees concerning OttoMotto.  He did note that several Google employees had left Google on their own and explored the possibility of joining OttoMotto, including [Redacted], both of whom now work at OttoMotto.  He reiterated that he had no discussions with these individuals about OttoMotto until after they resigned from Google.  Since leaving Google, Levandowski stated that he has made it point to have no contact with any Google applicants until after they are hired.

**Destruction of Google Property Following Departure**

A few weeks after his departure (he could not recall the precise time frame), Levandowski was searching his house for anything that might belong to Google.  He discovered in his garage some tools (i.e., screwdrivers), pieces of aluminum, nonproprietary robot parts, and old Street View test prototype cameras, brackets to mount cameras on the cars, and an old network switch, among other things.  Levandowski put them in a box and later paid to have a company pick up these materials from his house and destroy them, i.e., crushed and melted down.  This occurred within a week or so prior to his interview.  Levandowski did not recall the name of the destruction company or the precise date.  He said that, although he believed the materials were not confidential or proprietary, he did not want to return it to Google for fear of sparking any unnecessary backlash.

14

In addition, while Levandowski was searching his home to gather all devices for the due diligence, he discovered that he possessed Google proprietary information on five disks in his Drobo 5D.  The Drobo 5D was located in a closet in a guest bedroom that he used to store old/unused devices.  The information included source code, design files, laser files, engineering documents and software related to the self-driving car.

Levandowski stated that he downloaded this information in the ordinary course of business while working at Google and used it to do his job.  He said the last time he used and/or accessed the information on the disk was in November/December 2014 and possibly January 2015.  Levandowski indicated that everyone at Google had access to the source code repository.  Levandowski said that he copied the software onto the disks off of his personal Apple MacBook Pro laptop in a True Crypt file.  He then inserted the disks into the car's computer for testing and then removed them and stored them in the Drobo 5D.

Once he discovered that he possessed this information, Levandowski contacted his attorney, John Garnder, and Lior Ron.  Ron was surprised but stated that they needed to inform Uber that they were in possession of this information.  At a regularly scheduled status meeting at Uber in early March 2016, Ron and Levandowski told Travis Kalanik (Uber's CEO), Cameron Poetzscher (Uber's Head of Business Development), and Nina Qi (a member of the Business Development Group), about the disks.  Levandowski told them that he found some Google-related files and that he wanted to get rid of them. He told them that there is "stuff on them I don't want you to have and you don't want to have."  Poetzscher stated that Ron and Levandowski should not delete the disks so that Uber could understand what was on the disks (for preservation and record keeping purposes).  Kalanik responded that they should not take advice from Poetzscher and that, if Ron and Levandowski possessed Google information, he did not want to know about it and did not want it at Uber.  Kalanik told Levandowski to "do what [he] need[ed] to do."  Levandowski understood this statement to mean that Kalanik wanted Levandowski to destroy the disks so he told Kalanik that he would destroy them.. In response, Kalanik nodded.  Poetzscher appeared uncomfortable with this decision.  Qi was quiet but appeared to be amused and astonished.  This conversation lasted approximately three minutes.  After the meeting ended, Levandowski took the disks to a shredder in Oakland near the airport and had the disks destroyed. He described the place as a "mom and pop shop."  He paid cash and did not receive a receipt.  He did not recall the name of the business.

Later that afternoon, following the destruction of the disks, Poetzscher called Levandowski and told him not to "shred" the disks.  Levandowski told Poetzscher that he had already destroyed the disks.  To which Poetzscher responded that Levandowski should not delete or shred anything else.  The next day (which he believes was Saturday morning, March 19, 2016) Poetzscher  called Levandowski again  to instruct him not to delete or shred anything else.  Over the weekend, Ron reiterated the same thing to Levandowski.  Levandowski does not believe that he shared the contents of the disks with Uber, only that they contained confidential information.

15

UBER00312523

**Contacts with Uber**

Levandowski stated that he first met Kalanik and Garret Camp (Uber's chairman) in 2012 when he gave them a ride the self-driving car.  They wanted to buy 20 cars right there but the cars were not ready to be sold.

In 2014, Thrun reintroduced Levandowski to Kalanik, who introduced Levandowski to Jeff Holden.  Levandowski had two telephone calls with Holden where Holden unsuccessfully attempted to convince Levandowski to leave Google for Uber.

On June 16, 2015, Brian McClendon left Google to join Uber.  In July or August 2015, McClendon met Levandowski twice for lunch.  Levandowski was uncertain who initiated the lunches.  McClendon and Levandowski talked at a high level about ideas concerning robots.  They did not specifically talk about a new start-up.  Levandowski did express his unhappiness at Google.  Levandowski might have asked how much Uber would be willing to pay for the Chauffer team.  Levandowski said that he wanted to have a market valuation for the Chauffer team.

Levandowski contacted McClendon for a third meeting in September 2015.  They talked about Uber buying lasers from a start-up for Uber's cars.  Levandowski met with McClendon, Poetzscher, and Qi at Uber later in September 2015.  They discussed the fact that Uber did not want to invest in a start-up, but was interested in being a beta customer.  Throughout September and October 2015, Poetzscher, Qi, Ron, and Levandowski met two additional times to discuss the details of a potential customer deal.

In October 2015, Kalanik contacted Levandowski directly.  They met and discussed robot cars.  Kalanik indicated that Uber did not want to be a customer and instead wanted to be more involved in Levandowski's new venture.  Kalanik talked to Levandowski about buying the robot vehicle technology.  Levandowski and Ron went to Uber after this meeting and discussed selling a non-existent company.  Poetscher and McClendon were present at this meeting.  It was at this point that Levandowski first seriously considered leaving Google.[4]

In November and December 2015, Levandowski and Ron began meeting with Uber twice a month to negotiate the details of a proposed transaction (i.e., price, tax structure, etc.).  Some combination of either Kalanik, Poetzscher, Qi, and John Bayer (head of Uber's robot cars division) were present at these meetings on behalf of Uber.

In January 2016, Levandowski, Ron and Uber reached a tentative understanding of the broad terms of the proposed transaction.  Levandowski felt that there was a clear path for Uber to acquire OttoMotto.  In February 2016, OttoMotto and Uber signed a term sheet.

Levandowski stated that there were email messages with McClendon and Holden in his personal email accounts.  However, Levandowski noted that there were a few text messages

---

[4] In October 2015, the meeting with [Redacted], Levandowski and Uber (which is described above) occurs as well.

16

CONFIDENTIAL

UBER00312524

with Poetzscher, approximately 30 text messages with Qi, approximately 20 text messages with Holden, and over 200 text messages with Kalanik.

Levandowski stated that he would still have left Google if the Uber opportunity did not exist. Levandowski believes that he can create the technology without infringing upon any patents by Google. His research at Uber will involve delivering lasers, deploying vehicles, and building the aftermarket kits. Although he will rely on his experience as an engineer during his time at Google, Levandowski will not rely on any information or data from Google.

Levandowski expects to be in charge of the robot vehicle technology at Uber. Other than Ron, no other OttoMotto employees know about the proposed Uber transaction. After he joins Uber, Levandowski stated that he will not be competing with Google. He will help build robot trucks and aftermarket kits.

**OttoMotto**

Levandowski stated OttoMotto is dedicated to designing trucks which will not require drivers and aftermarket kits for converting existing cars in self-driving cars. Levandowski believes that there is great profit potential in this market. He does not believe that OttoMotto is competing with Google because OttoMotto focuses on self-driving trucks that transport goods, while Google is focusing on self-driving cars that will transport people. The aftermarket kits are a secondary product. Levandowski stated that OttoMotto needs 50 employees (the majority of which have different engineering backgrounds (i.e., software, hardware, mechanical, etc.)) to execute its plan.

Levandowski estimated that OttoMotto currently has approximately 30 employees, 16 of whom are former Google employees. He estimated that only 5 or 6 Google employees recently left Google to join OttoMotto.

Levandowski said that the primary source for staffing OttoMotto is referrals. In addition, OttoMotto has a recruiter and a recruiting website with job postings. Levandowski's role in the hiring process is that he meets and interviews all non-Google applicants. Although he does not have the sole hiring authority, Levandowski can veto applicants. The hiring process involves interviews, evaluations and group discussions. Compensation is determined by either looking at an applicant's W2 and matching or determining their skill set and role at OttoMotto. There is a separate hiring process for Google employees. No former Google employees are allowed to meet, interview or evaluate current Google employees who apply.

OttoMotto has safeguards in place to prevent new employees from bringing intellectual property or confidential information from their former employers. OttoMotto has them sign a document confirming that they are not bringing in any information or data from their prior employers. Google employee applicants must confirm that they were not solicited. There is no training concerning the retention of information and data from former employers.

17

CONFIDENTIAL

All source code at OttoMotto has to be written and checked in.  The policy is that OttoMotto employees are not allowed to use their personal devices for work.

OttoMotto uses some of the same vendors as Google.  For example, OttoMotto uses the same vendors as Google to manufacture machine parts (but not the same machine parts as Google).  OttoMotto also purchases equipment, such as tools for circuit boards) from the same vendors as Google.

**Accounts/Online Repositories/Personal Devices**

Levandowski and/or his counsel were provided a Questionnaire for Diligenced Employees from Stroz Friedberg (attached hereto at Exhibit 1) which he supplied answers to in a document dated March 18, 2016 entitled Draft A. Levandowski Responses to Stroz Friedberg Questionnaire (attached hereto as Exhibit 2).  Levandowski confirmed that the responses contained in Exhibit 2 were, to the best of his recollection, accurate and complete.

<u>Email Accounts</u>

Levandowski stated that he had 10 email accounts: levandowski@gmail.com; levandowski@mac.com; anothy@levandowskiu.us; antlevandowski@gmail.com; alevandowski@hotmail.com; ucsfrobot@gmail.com; andysmith1979@gmail.com; a@ot.to; ottomotto.com; and dozerdeveloper@gmail.com.

Levandowski stated that 98% of his personal emails were in the levandowski@gmail.com account, which was established in approximately 2003.  Levandowski stated that he only used his a@ot.to; ottomotto.com; and dozerdeveloper@gmail.com accounts for work.  All of Levandowski's other email accounts were for personal use.

<u>Online Repositories</u>

Levandowski stated that he had only two online repository accounts.  The first was a Dropbox account that he established in 2010.  Levandowski stored both personal and work files in the Dropbox account and told us that it was common practice to share work files via Dropbox.  He shared some files with Ron Sebern, Michele Roderick (his former personal assistant), Stefanie Olsen (the mother of his children), Ognen Stojanovski (his attorney), and Suzanna Musick (his stepmother).  The Dropbox account synchs with his primary Apple laptop.

The second was a Google Drive account that he established in 2007.  Levandowski stored both personal and work files in the Google Drive account.  He is the only individual who has access to the Google Drive account.

<u>Personal Devices</u>

Levandowski listed the following personal individual devices in his possession:  (1) iPhone 6S (his primary phone which is for personal and work use and shared with no one); (2) iPad Mini (which is only for personal use and shared with his girlfriend); (3) iPad 3 (which is only for

CONFIDENTIAL                                                                                      UBER00312526

**TX-7111, Page 18 of 37**

personal use and shared with his girlfriend); (4) Nexus 7 (which is only for personal use and shared with no one); (5) Apple MacBook Pro laptop (which is for personal and work use and shared with his girlfriend); (6) Drobo 5D (which was described above in the section concerning the destruction of Google property after his departure); and (7) desktop machine (which is only for personal use and not shared with anyone).

Levandowski also mentioned that he had approximately 30 devices in storage – approximately 10 Dell servers, and 20 home built machines.  These 30 devices were part of 510 Systems.  After Google acquired 510 Systems, Google chose the computers and devices that it wanted to take.  The 10 Dell servers and 20 home built machines are the assets that Google did not want.  Levandowski stated that he has not accessed these devices since 2010 or 2011 and that they do not contain any Google information or data.  Levandowski speculated that these devices likely contained 510 Systems data and information.

Levandowski stated that he kept Google files on his personal Apple MacBook Pro laptop to conduct his work. He initially identified 3 locations where Google-related data and information were stored:  (1) the Downloads folder; (2) the Dropbox folder; and (3) the Chauffeur folder.  As he accessed his Chauffeur folder he found a subfolder entitled "Google" and seemed surprised at the amount of Google-related information that was on his laptop.  He does not recall when he last accessed these file folders but said some of the files are ones he would have used prior to his departure from Google.  The majority of the files, however, were not accessed in 2016.  He did not otherwise copy or remove any of this information from his laptop.

In addition, he also informed us that he had the following Google-related third party information stored on this laptop, some of which, he stated, may be publically known:  (1) vendor data sheet and updates; (2) presentations; and (3) manuals.

With regard to Google email, he initially told us he did not sync his Google mail with this laptop and that he only accessed it via the web.  However, during the interview he looked at his laptop and realized that at one point in time he had, indeed, synced his Google email – AnthonyL@google.com.  The most recent email appears to be from 2014.  Levandowski did not appear to know that the Google emails were on his laptop and appeared surprised when he located them.

**Affirmation**

Levandowski affirmed that the information he provided during his interview was true and correct.

19

# Exhibit 1

**CONFIDENTIAL**

**UBER00312528**

Questionnaire for Diligenced Employees

Prior Employment

(1)     When did you begin working for Acme?

(2)     What documents did you sign when you began working for Acme (i.e., nondisclosure/confidentiality agreement, non-solicitation agreement, etc.)?

(3)     In what department(s)/section(s) did you work for Acme?  What was your title(s) in those department(s)/section(s)?

(4)     What were your duties/responsibilities for Acme?

(5)     What types of documents did you create/work on at Acme (i.e., Word, Excel, Powerpoint, etc.)?

(6)     When you worked at Acme, were you issued a mobile device, or did you use a personal device to send/receive work-related emails?

(7)     When you worked at Acme, were you issued a laptop or other equipment? Or did you use your own personal devices to work on Acme documents?

(8)     How would you access your Acme work documents from outside of the office?

        (a)     If you transferred documents to a flash drive/CD/external device, where is that flash drive/CD/external device now and what computer did you use to access those documents?

        (b)     If you connected through VPN, which computer did you use to connect to VPN?

(9)     Are there any other personal devices through which you accessed Acme's network?

(10)    When you worked at Acme, did you email documents that you worked on for Acme to your personal email account?  If so, how often did you do this?  What email accounts did you use?  Were your personal email accounts synched with your smartphone or PDA?

(11)    When you worked at Acme, did you ever store any document that you worked on for Acme on any personal digital devices (i.e., smartphones, laptops, hard drives, thumb drives, etc.).  If so, please identify those devices?

(12)    When you worked at Acme, did you ever store any data or information that you worked on for Acme with an online data repository (i.e., Dropbox, OneDrive, GoogleDocs, etc.)?  Did you ever access any Acme

*Ex 1*

documents stored in any of the above mentioned accounts from a personal computer?

(13)   Other than the measures described above, did you backup your data at Acme in any other manner? If so, please describe the manner in which you backed up your data.

## Decision to Leave Acme

(1)   When did you leave Acme?

(2)   Prior to leaving Acme, did you download/copy any information that you worked on for Acme? If so, what information did you download/copy? Where is this information currently located? Has any information been transferred to your current company's computers/networks?

## Personal Email Accounts

(1)   How many personal email accounts do you have?

(2)   Please list all of your email accounts.

   (a)   For each email account, please list the password that we may use to access that account;

   (b)   For each email account, please list the approximate time it was established;

   (c)   For each email account, please describe what types of email you received or sent (i.e., personal, work, etc.);

   (d)   For each email account, please list all of the individuals that have access to that account;

   (e)   For each email account, please estimate the total number of emails in the account; and

   (f)   For each email account, please identify any encrypted data/information in each account and describe the encryption and the means for bypassing it.

(3)   Please identify all devices you use/have used to access your personal email accounts.

## Personal Digital Devices

(1)   What digital devices (i.e., smartphone, laptop, desktop, hard drive, thumb drive, etc.) do you currently own?

CONFIDENTIAL                                                      UBER00312530

(a)  For each device, please list the password that we may use to access the data on that device;

(b)  For each device, please list the approximate date that it was purchased or obtained;

(c)  For each device, please list all individuals that have access to this device;

(d)  For each device, please describe what type of data is stored on that device;

(e)  For each device, please describe what the storage capacity is for each device;

(f)  For each device, please identify any encrypted data on the device and describe the encryption and the means for bypassing it;

(g)  For each laptop/desktop, please list the operating system for each laptop/desktop; and

(h)  For each device, please indicate whether the device has been wiped or reimaged previously.

(2)  What digital devices have you owned in the last five years that you no longer own?

(a)  For each device, please list the approximate date that it was purchased or obtained;

(b)  For each device, please list the approximate date that you disposed of the device; and

(c)  For each device, please describe the reason you disposed of each device.

Personal Online Data Repository

(1)  What online data repositories (i.e., DropBox, OneDrive, GoogleDocs, etc.) do you have an account with?

(a)  For each account, please list the approximate date that you established the account;

(b)  For each account, please provide the password that we may use to access the account;

(c)  For each account, please list all the individuals that have access to that account;

(d)  For each account, please describe the type of data/information that you have stored in each account;

(e)  For each account, please describe the volume of data in each

account; and

    (f)    For each account, please identify any encrypted data in each account and describe the encryption and the means for bypassing it.

    (2)    What devices do you use/have used to access your accounts with online data repositories?

## Hard Copies

    (1)    Do you have any hard copies of Acme data/information upon which you worked? If so, please describe the data/information and the location of the copy.

## Miscellaneous

    (1)    Other than what is referenced above, do you have access to any device/media/network/location where the Acme data/information upon which you worked is stored? If so, please identify the device/media/network/location.

CONFIDENTIAL

UBER00312532

# Exhibit 3

**CONFIDENTIAL**

**UBER00312533**



February 1, 2016

**VIA Federal Express**

Anthony Levandowski
2330 Cowper St.
Palo Alto, CA 94301

Re:     Your Confidential Information and Non-Solicitation Obligations

Dear Anthony

The purpose of this letter is to remind you about the Confidential Information and Invention Assignment Agreement ("Agreement") you signed when you began your employment with Google.  Under the Agreement, you are:

1.   Prohibited from directly or indirectly soliciting Google employees to work for another employer in any capacity for one year after your departure from Google; and

2.   Required to preserve the confidentiality of Google's confidential, trade secret and/or proprietary information.

I've attached a copy of the Agreement to this letter.  Please take the opportunity to read through the entire document carefully and ensure that you understand and comply with it.  If we determine that you have violated the Agreement, we will not hesitate to pursue all available legal avenues to enforce Google's rights.

In addition, if you have not done so already, you need to immediately make arrangements with your Google Human Resources representative (or contact peopleops-help@google.com) to return all company property, including data, tools, software or hardware, communications, customer lists, or other documents that you created, received, or had access to during your employment.

If you or your legal representative have any questions or concerns about the content of this letter, please do not hesitate to contact me at your convenience at 650-214-4272.

We wish you all the best in your future endeavors.

Sincerely,

Jade Wagner
Corporate Counsel, Employment
Google Inc.

Encl.

3

GOOGLE INC.

AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT

This Agreement replaces and supersedes any and all prior versions of this document. As a condition of my continuing employment with Google Inc., its subsidiaries, affiliates, successors or assigns (together "the Company"), and in consideration of receipt of confidential information as well as my participation in the Google Chauffeur project, my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1.    **At-Will Employment.** I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE CHIEF EXECUTIVE OFFICER OF THE COMPANY. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE.

2.    **Confidential Information.**

*(a)    Company Information.* I understand that, as a result of my employment with the Company, I will obtain extensive and valuable Confidential Information belonging to the Company. I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Chief Executive Officer or the Board of Directors of the Company, any Company Confidential Information, except under a non-disclosure agreement duly authorized and executed by the Company. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that "Company Confidential Information" means any Company non-public information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans, or other information regarding Company's products or services and their marketing, the, identity of the Company's customers (including, but not limited to, customer lists and the identity of customers of the Company on whom I called or with whom I became acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information. I further understand that Company Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

*(b)    Former Employer Information.* I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

*(c)    Third Party Information.* I recognize that the Company may have received and in the future may receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators, their confidential or proprietary information ("Associated Third Party Confidential Information"). By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties.

EX. Date 4.28.08(revisions)
C4 version

Page 1 of 11

CONFIDENTIAL                                             UBER00312535

I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use or to disclose to any person, firm or corporation any Associated Third Party Confidential Information, except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties.   I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information during my employment will lead to disciplinary action, up to and including immediate termination and legal action by the Company.

*(d)*   *User Data.*   User Data consists of information directly or indirectly collected by Google from users of its services. User Data includes individual log files related to any user session or use of Google services or log files in the aggregate. User Data also includes personally identifiable information, which is information that can be directly associated with a specific person or entity, such as a name, address, telephone number, e-mail address, or information about activities that can be directly linked to a user, such as an IP address or cookie information. I agree to treat User Data as Company Confidential Information under this Agreement and to access, use and disclose User Data only as authorized by and in accordance with this Agreement and Company policies.

## 3.   **Inventions**

*(a)*   *Inventions Retained and Licensed.*   I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, and trade secrets, which were conceived in whole or in part by me prior to my employment with the Company to which I have any right, title or interest, which are subject to California Labor Code Section 2870 attached hereto as Exhibit B, and which relate to the Company's proposed business, products, or research and development (collectively referred to as "Prior Inventions"); which are not assigned to the Company hereunder, or, if no such list is attached, I represent and warrant that there are no such Prior Inventions.   To the extent the inventions, discoveries, original works of authorship, developments, improvements, and trade secrets set forth in Exhibit A were conceived in whole or in part by me during my employment with the Company, the Company has agreed that I am the sole owner of the inventions, discoveries, original works of authorship, developments, improvements, and trade secrets set forth in Exhibit A.  Furthermore, I represent and warrant that none of the Prior Inventions listed on Exhibit A of this Agreement will materially affect my ability to perform my obligations under this Agreement. The terms of my grant to the Company of a license to the inventions, discoveries, original works of authorship, developments, improvements, and trade secrets set forth in Exhibit A are provided in a side agreement between Google Inc., Anthony's Robots, LLC and myself dated May 19, 2009 (the "Side Agreement").   Other than the inventions, discoveries, original works of authorship, developments, improvements and trade secrets set forth in Exhibit A, if in the course of my employment with the Company, I incorporate any Prior Invention into or use any Prior Invention in connection with any product, process, service, technology or other work by or on behalf of the Company, I hereby grant to the Company a nonexclusive, royalty free, fully paid, irrevocable, perpetual, worldwide license, with the right to grant and authorize sublicenses, to make, have made, modify, use, import, offer for sale and sell such Prior Invention as part of or in connection with such product, process, service, technology or other work and to practice any method related thereto.

*(b)*   *Assignment of Inventions.*   I agree that other than those such inventions, discoveries, original works of authorship, developments, improvements, and trade secrets set forth in Exhibit A, and except as provided in Section 2 of the Side Agreement, I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under patent, copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time that I am in the employ of the Company (collectively referred to as "Inventions"), except as provided in Section 3(e) below.  I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope and/or and during the period of my employment with the Company and which are protectable by copyright are "works made for hire", as that term is defined in the United States Copyright Act.   I understand and agree that the decision whether or not to commercialize or market any Inventions developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

*EE Date 4.18.06krwoskowski*
*C6 version*

Page 2 of 11

CONFIDENTIAL

UBER00312536

(e)    *Maintenance of Records.*  I agree to keep and maintain adequate and current accurate and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company.  The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company.  The records are and will be available to and remain the sole property of the Company at all times.

(f)    *Patent and Copyright Registrations.*  I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths or affirmations, assignments and all other instruments which the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any rights relating thereto, and testifying in a suit or other proceeding relating to such Inventions.  I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement.  If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature with respect to any Inventions, including, without limitation, to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering such Inventions, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any papers, oaths and to do all other lawfully permitted acts with respect to such Inventions with the same legal force and effect as if executed by me.

(g)    *Exception to Assignment.*  I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any Invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B).  I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A.

4.    **Conflicting Employment**

(a)    *Current Obligations.*  I agree that other than as set forth in Sections 2 and 3 of the Side Agreement, I will not engage in any other employment, occupation, or consulting directly related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities, including, but not limited to, employment outside of the Company, membership on Boards of Directors or Advisory Boards other than the Company's, personal investments or establishing, maintaining or servicing business relationships with family or friends that conflict with my obligations to the Company.

(b)    *Prior Relationships.*  Other than as described in the Side Agreement, I represent that I have had no other agreements, relationships or commitments to any other person or entity that conflict with my obligations to the Company under this Agreement or my ability to perform the services for which I am being hired by the Company and, other than as allowed in the Side Agreement, will have no other agreements, relationships or commitments to any other person or entity that conflict with my obligations to the Company under this Agreement.  I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law.  I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices and documents), I have returned all property and confidential information belonging to all prior employers, and that failure to do so may result in my termination.  Moreover, in the event that the Company or any of its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor or successor corporations, or assigns is sued based on any obligation or agreement to which I am a party or am bound (other than my agreements with the Company), I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by the Company (the indemnitee), as well as any reasonable attorneys' fees and costs if the plaintiff

*Eff. Date 4 28.0Alevandowski*
*CA version*

Page 3 of 11

CONFIDENTIAL                                                                                    UBER00312537

is the prevailing party in such an action, in the event that the Company is the subject of any legal action based on factual allegations that, if true, would conflict with my obligations under this Agreement.

5.   **Returning Company Documents.** Upon separation from employment with the Company or on demand by the Company during my employment, I will immediately deliver to the Company, and will not keep in my possession, recreate or deliver to anyone else, any and all Company property, including, but not limited to, Confidential Information, User Data, Associated Third Party Confidential Information, as well as all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, photographs, charts, all documents and property, and reproductions of any of the aforementioned items that were developed by me pursuant to my employment with the Company, obtained by me in connection with my employment with the Company, or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to Section 3(e). I also consent to an exit interview to confirm my compliance with this Section 5.

6.   **Termination Certification.** Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as Exhibit C. I also agree to keep the Company advised of my home and business address for a period of one (1) year after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

7.   **Notification of New Employer.** In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

8.   **Solicitation of Employees.** I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity.

9.   **Export Statement of Assurance.** I recognize that, in the course of my employment, the Company may release to me items (including, but not limited to, software, technology, or systems, equipment and components) subject to the Export Administration Regulations ("EAR") or the International Traffic in Arms Regulations ("ITAR"). I hereby certify that I will not export, re-export or release these items in violation of the EAR or ITAR. In order to comply with this certification, I will not disclose/export/re-export these items to any person other than the persons in my working group as required in the performance of the job responsibilities assigned to me by the Company. I understand that if I have any question regarding whether a given disclosure/export/re-export is or would be contrary to this certification, I should immediately contact the Legal Services Department before taking any actions.

10.   **Code of Conduct Acknowledgment.** I acknowledge that I have read the Company's Code of Conduct; which is available on the Company's public website and can be found by clicking "About Google" and looking on the "Investor Relations" page of the site. I agree to adhere to the terms of the Code of Conduct and to report any violations of the Code.

11.   **Acknowledgment of Employee Handbook.** I acknowledge that I have read the Company's Employee Handbook which is available on the Company's internal website. I agree to abide by the policies and guidelines set forth in the Employee Handbook, as they may be revised from time to time.

12.   **Representations.** I agree to execute any proper oath or affirmation or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all terms of the Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

*Eff. Date 4.28 Uhlrevanlowski*
*CA version*

Page 4 of 11

CONFIDENTIAL

UBER00312538

TX-7111, Page 30 of 37

13.   **Audit.** I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, or documents that are used to conduct the business of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized or non-compliant applications to the Company's technology systems and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or web sites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone and technology systems to which I will have access in connection with my employment.

14.   **Permission for Use of Images.** I understand that during my employment with Google, agents of the company may take film, digital or other images of me, for subsequent use in non-commercial materials or collateral, including, but not limited to, the Company website (external and internal), annual reports, press day materials, internal presentations, analyst presentations, company, lobby or reception area stagings or productions, etc., without my prior consent, approval or review. My name may or may not be included along with my image. I hereby grant advance permission for such use of my image(s) by the Company, both during and after my employment, and I understand that I will not receive any royalties or other compensation for this use and I further agree to release and hold harmless any agent, employee, officer, director or other individual affiliated or working on behalf of the Company with respect to such use of my image(s).

15.   **Arbitration and Equitable Relief**

(a)   *Arbitration.* EXCEPT FOR CLAIMS ARISING UNDER THE SIDE AGREEMENT, WHICH WILL BE GOVERNED BY SECTION 8.3 OF THAT AGREEMENT, IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2, INCLUDING SECTION 1280.05 (THE "RULES") AND PURSUANT TO CALIFORNIA LAW. DISPUTES WHICH I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER STATE OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION AND WRONGFUL TERMINATION AND ANY STATUTORY CLAIMS. I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

(b)   *Procedure.* I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS"), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "JAMS RULES"). I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, MOTIONS TO DISMISS OR TO STRIKE, DEMURRERS, AND MOTIONS FOR CLASS CERTIFICATION, PRIOR TO ANY ARBITRATION HEARING. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE

*Eff. Date 4.28.08 levandowski*
*CA version*

CONFIDENTIAL

UBER00312539

TX-7111, Page 31 of 37

POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I SHALL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW SHALL TAKE PRECEDENCE. I AGREE THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN SANTA CLARA COUNTY, CALIFORNIA.

(c)   *Remedy.* EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, AND EXCEPT FOR CLAIMS ARISING UNDER THE SIDE AGREEMENT, WHICH WILL BE GOVERNED BY SECTION 8.3 OF THAT AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION. NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL COMPANY POLICY, AND THE ARBITRATOR SHALL NOT ORDER OR REQUIRE THE COMPANY TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW. NOTHING IN THIS AGREEMENT OR IN THIS PROVISION IS INTENDED TO WAIVE THE PROVISIONAL RELIEF REMEDIES AVAILABLE UNDER THE RULES.

(d)   *Administrative Relief.* I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM.

(e)   *Voluntary Nature of Agreement.* I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL.* FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

16.   **General Provisions**

(a)   *Governing law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of California without giving effect to any choice of law rules or principles that may result in the application of the laws of any jurisdiction other than California. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal jurisdiction of the state and federal courts located in California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

(b)   *Entire Agreement.* This Agreement, together with the Exhibits herein, my offer letter from the Company, and the Side Agreement set forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersede all prior discussions or representations between us including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral. In the event of

*Eff. Date 4.28.08levandowski*
*C4 version*

Page 6 of 11

CONFIDENTIAL

UBER00312540

a conflict between the terms of this Agreement and the terms of the Side Agreement, the Side Agreement shall prevail. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, other than amendments to paragraphs 3 and 4 relating to personal open source projects in a format prepared by the Company, will be effective unless in writing signed by the Chief Executive Officer of the Company and me. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

(c)   *Severability.*   If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d)   *Successors and Assigns.*   This Agreement will be binding upon my heirs, executors, assigns, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

(e)   *Waiver.*   Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

(f)   *Survivorship.*   The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date: _____

Signature _____

Anthony Levandowski

Name of Employee (typed or printed)

Page 7 of 11

CONFIDENTIAL

UBER00312541

Exhibit A

GOOGLE INC.

LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| 1. A method and apparatus for automated vehicle interaction with pedestrians for collaborative tasks | | #61168449 |
| 2. A method and apparatus for acquiring a road reference and real-time positioning information of a vehicle based on the retro-reflective paint of lane markings | | #61168310 |
| 3. A method and apparatus for sending off and retrieving an autonomous vehicle. | | #61168322 |
| 4. A method and apparatus for certifying the safety and drivability of a lane. | | #61168305 |
| 5. A method and apparatus for a vehicle sensing for increased autonomous lane change safety. | | #61168460 |
| 6. A method and apparatus for automated vehicle available parking space detection and guidance | | #61168471 |

*Eff. Date 4.24.08(revised task)*
*C4 version*

Page 8 of 11

CONFIDENTIAL

UBER00312542

TX-7111, Page 34 of 37

No information
Additional Sheets Attached

Signature of Employee: _____

Print Name of Employee: Anthony Levandowski

Date: _____

Eff. Date C28.08levandowski
CA version

Page 9 of 11

CONFIDENTIAL

UBER00312543

TX-7111, Page 35 of 37

EXHIBIT B

GOOGLE INC.

CALIFORNIA LABOR CODE SECTION 2870
INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENTS

(a)   Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2)   Result from any work performed by the employee for the employer.

(b)   To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

Eff. Date 4.28.08*************
C4 version

Page 10 of 11

CONFIDENTIAL

UBER00312544

EXHIBIT C

## TERMINATION CERTIFICATION

*This letter confirms that your employment with Google, Inc. (the "Company") has terminated. We extend our sincere thanks for all of your contributions and our best wishes to you in your future endeavors.*

*This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Google Inc., its subsidiaries, affiliates, successors or assigns (together, the "Company").*

I further certify that I have complied with all the terms of the Company's At Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I have informed the Company in the event I am subject to any litigation holds or similar request for record retention.

I further agree that, in compliance with the At Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement, I will adhere to my obligations to the Company contained in Section 2 (Confidential Information), Section 3 (Inventions), and Section 8 (Solicitation of Employees).

After leaving the Company's employment, I will be employed by _____ in the position of:

_____   I am / am not (circle one) subject to a litigation hold/request
for record retention.

I have also returned the following Google-issued equipment:

- Laptop
- Cell phone
- Purchasing card

- Badge
- Blackberry
- VPN card

- WAN card
- Other: _____

_____
*Signature of Employee*

_____
*Print Name*

_____
*Date*

_____
*Address for Notifications*

*Eff. Date 4.28.9B/crumb/mkt*
*CA version*

Page 11 of 11

CONFIDENTIAL

UBER00312545

*Waymo v. Uber*
# Case No. 3:17-cv-00939-WHA

# TRIAL EXHIBIT 7114

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, while the general file descriptions were drafted by Stroz employees, the file listings consist of nothing but metadata copied from Anthony Levandowski's laptop, untransformed by Stroz's analysis. *See* Br. § III.

- Designated witnesses who received this document pre-litigation are: Eric Tate and John Gardner. The document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV.

| Yellow Highlights | Hearsay Statements |
|---|---|

United States District Court
Northern District of California
**Trial Exhibit 7114**
Case No. __3:17-cv-00939-WHA__
Date Entered _____
By _____ Deputy Clerk
Arrae Wimberley, CSR 7778

EXHIBIT 7114
WITNESS: Kim
DATE: 9-26-17

| Row | File Ext | Last Accessed | Notes |
|---|---|---|---|
| 1 | pptx | 3/10/2016 16:06 | Apen confidential and proprietary presentation re: self driving car |
| 2 | pdf | 2/24/2016 23:00 | Research paper on travel time reliability |
| 3 | pptx | 3/10/2016 16:06 | Vendor branded presentation regarding test: |
| 4 | pdf | 10/6/2015 17:11 | Password protected file |
| 5 | mp4 | 1/24/2016 3:09 | Split screen video of realtime traffic and digital interpretation of same |
| 6 | mp4 | 9/21/2015 20:32 | Split screen video of realtime traffic and digital interpretation of same |
| 7 | pdf | 3/22/2016 11:33 | Photographs of vehicle components and software |
| 8 | mp4 | 3/22/2016 11:34 | Video of someone demonstrating a feature of the self driving car |
| 9 | mp4 | 9/21/2015 20:32 | Video of someone demonstrating a feature of the self driving car |
| 10 | pptx | 3/10/2016 16:06 | Apen confidential and proprietary presentation re: marketing |
| 11 | mp4 | 3/10/2016 16:06 | Video of "Friday Sync" meeting about the miles stones and details of the self driving car project. Dated 03/13/1! |
| 12 | mp4 | 3/22/2016 11:34 | Split screen video of realtime traffic and digital interpretation of same |
| 13 | ogv | 3/22/2016 11:34 | Split screen video of realtime traffic and digital interpretation of same |
| 14 | png | 3/10/2016 16:06 | Picture of close up of single component |
| 15 | png | 3/22/2016 11:34 | Picture of close up of multiple component: |
| 16 | png | 3/10/2016 16:06 | Picture of multiple components |
| 17 | png | 3/10/2016 16:06 | Picture of component of self driving car |
| 18 | pdf | 3/22/2016 11:33 | Motor vehicle accident report with photograph: |
| 19 | png | 3/10/2016 16:06 | Screenshot of browser of Aspen Slides of marketing material for autonomous vehicle |
| 20 | png | 3/22/2016 11:33 | Picture of comic related to self driving car |
| 21 | png | 3/10/2016 16:06 | Screenshot of browser of Aspen Slides of marketing material for autonomous vehicle |
| 22 | JPG | 10/2/2015 11:33 | Picture of component of self driving car |
| 23 | JPG | 10/2/2015 11:33 | Picture of component of self driving car |
| 24 | JPG | 10/2/2015 11:33 | Picture of component of self driving car |
| 25 | JPG | 10/2/2015 11:33 | Picture of component of self driving car |
| 26 | JPG | 10/2/2015 11:33 | Picture of component of self driving car |
| 27 | JPG | 10/2/2015 11:33 | Picture of component of self driving car |
| 28 | JPG | 10/2/2015 11:33 | Picture of component of self driving car |
| 29 | mp4 | 3/10/2016 16:06 | Close up video of a component of the self driving car |
| 30 | png | 3/10/2016 16:06 | Picture of aerial view of city |
| 31 | png | 3/22/2016 11:39 | Picture of aerial view of city |
| 32 | png | 3/10/2016 16:06 | Picture of aerial view of city |
| 33 | png | 3/10/2016 16:06 | Picture of closeup of component |
| 34 | png | 3/10/2016 16:06 | Picture of surface street sensors |
| 35 | doc | 12/26/2015 23:46 | Autonomous vehicles agenda with participants and maps |
| 36 | doc | 12/26/2015 23:46 | Autonomous vehicles agenda with participants |
| 37 | JPG | 3/10/2016 16:06 | Picture of closeup of component |
| 38 | JPG | 3/10/2016 16:06 | Picture of closeup of component |
| 39 | JPG | 3/10/2016 16:06 | Picture of closeup of component |
| 40 | JPG | 3/10/2016 16:06 | Picture of closeup of component |
| 41 | JPG | 3/10/2016 16:06 | Picture of closeup of component |
| 42 | JPG | 3/10/2016 16:06 | Picture of closeup of component |
| 43 | JPG | 3/10/2016 16:06 | Picture of closeup of component |
| 44 | png | 3/22/2016 11:35 | Picture of a cartoon depicting Android |
| 45 | png | 3/10/2016 16:06 | Picture of (confidential) camera advertisement materia |
| 46 | png | 3/10/2016 16:06 | Picture of readings from oscilloscope |

| # | Type | Date | Description |
|---|---|---|---|
| 47 | png | 3/22/2016 11:35 | Picture of Android marketing material |
| 48 | jpg | 12/26/2015 22:33 | Picture of what appears to be someone's eye |
| 49 | jpg | 12/26/2015 22:33 | Picture of what appears to be someone's eye |
| 50 | jpg | 12/26/2015 22:33 | Picture of what appears to be someone's eye |
| 51 | jpg | 12/26/2015 22:33 | Picture of what appears to be someone's eye |
| 52 | png | 3/10/2016 16:06 | Picture of microlens focal plane diagram |
| 53 | png | 3/10/2016 16:06 | Picture of microlens ray fan horizontal view diagram |
| 54 | pdf | 9/21/2015 20:34 | Article on pulsed operation of VCSELs |
| 55 | mov | 1/24/2016 13:09 | Video of autonomous vehicle test drive |
| 56 | rtf | 3/22/2016 11:38 | Note describing bumper sticker of car |
| 57 | JPG | 3/22/2016 11:38 | Picture of safety instructions related to self driving car |
| 58 | JPG | 3/22/2016 11:38 | Picture of virtual world on monitor |
| 59 | jpg | 10/2/2015 11:33 | Picture of self driving car and a person |
| 60 | jpg | 10/2/2015 11:33 | Picture of a person in a car |
| 61 | mp4 | 3/22/2016 11:35 | Split screen video of realtime traffic and digital interpretation of same |
| 62 | mp4 | 9/21/2015 20:32 | Split screen video of realtime traffic and digital interpretation of same |
| 63 | jpg | 3/22/2016 11:35 | Picture of simulation arrangement |
| 64 | png | 3/22/2016 11:35 | Picture of diagram of autonomous vehicle |
| 65 | wmv | 1/24/2016 13:09 | Public video (a PBS program about the self driving car) |
| 66 | wmv | 1/24/2016 13:09 | Public video (a PBS program about the self driving car) |
| 67 | pptx | 3/22/2016 11:33 | Aspen confidential presentation re: self-driving car |
| 68 | gslides | 9/21/2015 20:56 | Gslide link |
| 69 | xlsx | 9/21/2015 20:56 | Spreadsheet containing very little information. |
| 70 | MOV | 1/24/2016 13:09 | Close up video of component on interior of vehicle |
| 71 | rtf | 3/22/2016 11:33 | Note describing comments of a plan regarding self-driving car |
| 72 | rtf | 3/22/2016 11:38 | Note describing list of names and emails |
| 73 | key | 3/10/2016 16:06 | Presentation of the miles stones over time. |
| 74 | pdf | 3/22/2016 11:38 | Receipt for computer components |
| 75 | pptx | 3/22/2016 11:33 | Aspen confidential presentation re: self-driving car |
| 76 | pptx | 9/21/2015 20:34 | Aspen confidential presentation re: self-driving car |
| 77 | plugin | 1/19/2016 13:58 | System File |
| 78 | mp4 | 3/22/2016 11:35 | Split screen video of realtime traffic and digital interpretation of same |
| 79 | mp4 | 9/21/2015 20:32 | Split screen video of realtime traffic and digital interpretation of same |
| 80 | pptx | 3/10/2016 16:06 | External presentation re: connected car |
| 81 | pptx | 3/22/2016 11:38 | Vendor branded confidential presentation regarding Mobility Challenge |
| 82 | BMP | 10/2/2015 11:33 | Picture of electrical component |
| 83 | pdf | 3/22/2016 11:36 | Privacy policy statement |
| 84 | mp4 | 3/22/2016 11:35 | Split screen video of realtime traffic and digital interpretation of same |
| 85 | mp4 | 9/21/2015 20:32 | Split screen video of realtime traffic and digital interpretation of same |
| 86 | jpg | 3/22/2016 11:35 | Picture of a component |
| 87 | JPG | 3/22/2016 11:36 | Picture of electrical components |
| 88 | png | 3/22/2016 11:36 | Picture of line chart of temperature |
| 89 | pdf | 3/22/2016 11:36 | Internal email regarding laser |
| 90 | pdf | 9/21/2015 20:53 | Internal email regarding laser |
| 91 | plugin | 1/19/2016 13:58 | System File |
| 92 | png | 3/22/2016 11:36 | Picture of iPhone Screenshot of component |
| 93 | jpg | 3/22/2016 11:35 | Picture of self driving car |

| # | Type | Date | Description |
|---|---|---|---|
| 94 | plugin | 1/19/2016 13:58 | System File |
| 95 | pptx | 3/10/2016 16:06 | Presentation regarding Mobility Internet. Unbrandec |
| 96 | jpg | 10/2/2015 11:33 | Picture of a person in a car |
| 97 | pptx | 3/22/2016 11:36 | Diagram of Component |
| 98 | avi | 3/22/2016 11:36 | Digital interpretation of traffic crash in real time |
| 99 | proj | 3/22/2016 11:35 | Project file metadata (no content) |
| 100 | plugin | 1/19/2016 13:58 | System File |
| 101 | pdf | 10/8/2015 17:12 | Exam monitor rule list |
| 102 | jpg | 3/22/2016 11:35 | Picture of marketing materials of car |
| 103 | pdf | 3/22/2016 11:36 | Fiber optic products and applications specification |
| 104 | pdf | 10/29/2015 22:38 | Autonomous vehicles agenda with participants and maps |
| 105 | MOV | 1/24/2016 13:09 | Video of autonomous vehicle test drive |
| 106 | pptx | 3/10/2016 16:06 | Aspen confidential presentation re: self-driving car |
| 107 | pdf | 3/22/2016 11:37 | Vehicle component diagram marked confidential |
| 108 | plugin | 1/19/2016 13:58 | System File |
| 109 | BMP | 10/2/2015 11:33 | Picture of component |
| 110 | pdf | 3/22/2016 11:37 | Robot competition information |
| 111 | pptx | 3/10/2016 16:06 | Aspen confidential presentation re: self-driving car |
| 112 | numbers | 9/1/2015 15:22 | Spreadsheet containing a list of parts, quantities, and costs |
| 113 | pdf | 9/1/2015 15:22 | Internal email regarding lens |
| 114 | pptx | 3/10/2016 16:06 | Vendor branded confidential presentation regarding Mobility Challenge |
| 115 | ppt | 3/10/2016 16:06 | Aspen presentation re: self-driving car |
| 116 | jpg | 3/10/2016 16:06 | Presentation regarding Self driving car |
| 117 | pptx | 3/10/2016 16:06 | Picture of closeup of component |
| 118 | docx | 3/22/2016 11:39 | Document on autonomous vehicle compliance implications |
| 119 | pptx | 3/10/2016 16:06 | Aspen confidential and proprietary presentation re: marketing |
| 120 | pptx | 3/10/2016 16:06 | Aspen confidential and proprietary presentation re: business plar |
| 121 | pptx | 12/26/2015 23:32 | Aspen confidential presentation re: self-driving car |
| 122 | pdf | 10/3/2015 10:26 | Internal email regarding press update |
| 123 | pptx | 3/10/2016 16:06 | Aspen proprietary presentation re: component desigr |
| 124 | jpg | 3/10/2016 16:06 | Picture of comic related to self driving car |
| 125 | jpg | 10/2/2015 11:33 | Picture of self driving car |
| 126 | jpg | 10/2/2015 11:33 | Picture of a person in a car |
| 127 | jpg | 10/2/2015 11:33 | Picture of self driving car |
| 128 | JPG | 10/2/2015 11:33 | Picture of people monitoring the surroundings from a car |
| 129 | jpg | 10/7/2015 11:33 | Picture explaining components of a self driving car |
| 130 | pptx | 12/26/2015 23:32 | Aspen confidential presentation re: mapping project |
| 131 | ppt | 3/10/2016 16:06 | Aspen confidential presentation re: mapping project |
| 132 | m4v | 1/24/2016 13:09 | Internal Aspen video discussing feedback |
| 133 | png | 12/26/2015 23:32 | Picture of graph with LogMag and Hz |
| 134 | png | 3/22/2016 11:35 | Picture of self driving car |
| 135 | jpg | 3/22/2016 11:35 | Picture of self driving car |
| 136 | BMP | 10/7/2015 11:33 | Picture of active work on component |
| 137 | JPG | 3/10/2016 16:06 | Picture of a component |
| 138 | JPG | 3/10/2016 16:06 | Picture of a closeup of a component |
| 139 | JPG | 3/10/2016 16:06 | Picture of writing on a whiteboard |
| 140 | JPG | 3/10/2016 16:06 | Picture of diagram and writing on whiteboard |

| | | | |
|---|---|---|---|
| 141 | JPG | 3/10/2016 16:06 | Picture of self driving cars |
| 142 | JPG | 10/2/2015 11:33 | Picture of a bottle of Listerine |
| 143 | JPG | 10/2/2015 11:33 | Picture of a bottle of Listerine |
| 144 | JPG | 10/2/2015 11:33 | Picture of a cluttered table |
| 145 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 146 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 147 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 148 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 149 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 150 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 151 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 152 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 153 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 154 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 155 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 156 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 157 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 158 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 159 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 160 | JPG | 10/2/2015 11:33 | Picture of a screwdriver |
| 161 | JPG | 10/2/2015 11:33 | Picture of electrical components |
| 162 | JPG | 10/2/2015 11:33 | Picture of electrical components |
| 163 | JPG | 10/2/2015 11:33 | Picture of electrical components |
| 164 | JPG | 10/2/2015 11:33 | Picture of a person screwing in a component into something |
| 165 | JPG | 3/10/2016 16:06 | Picture of a component |
| 166 | JPG | 10/2/2015 11:33 | Picture of a component |
| 167 | JPG | 10/2/2015 11:33 | Picture of a person screwing in a component into something |
| 168 | JPG | 10/2/2015 11:33 | Picture of a person screwing in a component into something |
| 169 | JPG | 10/2/2015 11:33 | Picture of a component |
| 170 | JPG | 10/2/2015 11:33 | Picture of a person screwing in a component into something |
| 171 | JPG | 10/2/2015 11:33 | Picture of a component |
| 172 | JPG | 10/2/2015 11:33 | Picture of a person's hand holding a component |
| 173 | JPG | 10/2/2015 11:33 | Picture of a person's hand holding a component |
| 174 | JPG | 10/2/2015 11:33 | Picture of a person's hand holding a component |
| 175 | JPG | 10/2/2015 11:33 | Picture of a person's hand holding a component |
| 176 | JPG | 10/2/2015 11:33 | Picture of a person's hand drawing on a component |
| 177 | JPG | 10/2/2015 11:33 | Picture of a person's hand holding a component |
| 178 | JPG | 10/2/2015 11:33 | Picture of a tool |
| 179 | JPG | 10/2/2015 11:33 | Picture of a tool |
| 180 | JPG | 10/2/2015 11:34 | Picture of a tool |
| 181 | JPG | 10/2/2015 11:34 | Picture of a tool |
| 182 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 183 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 184 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 185 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 186 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 187 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |

**TX-7114, Page 4 of 8**

| # | Type | Date/Time | Description |
|---|---|---|---|
| 188 | JPG | 10/2/2015 11:34 | Picture of a person's hand holding a component |
| 189 | JPG | 10/2/2015 11:34 | Picture of a person's hand holding a component |
| 190 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 191 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 192 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 193 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 194 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 195 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 196 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 197 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 198 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 199 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 200 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 201 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 202 | JPG | 10/2/2015 11:34 | Picture of a component |
| 203 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 204 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 205 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 206 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 207 | JPG | 10/2/2015 11:34 | Picture of a person fixing a component |
| 208 | JPG | 10/2/2015 11:34 | Picture of a person holding a component |
| 209 | JPG | 10/2/2015 11:34 | Picture of a person drilling into a component |
| 210 | JPG | 3/10/2016 16:06 | Picture of printed and handwritten notes of an invention) |
| 211 | JPG | 3/10/2016 16:06 | Picture of a component |
| 212 | JPG | 3/10/2016 16:06 | Picture of a car and lot of people |
| 213 | JPG | 3/10/2016 16:06 | Picture of components |
| 214 | MOV | 3/10/2016 16:06 | Close up video of mechanical manufacturing process |
| 215 | JPG | 3/22/2016 11:35 | Picture of a car and lot of people |
| 216 | JPG | 3/22/2016 11:35 | Picture of a car and people posing in-front |
| 217 | JPG | 3/10/2016 16:06 | Picture of a component |
| 218 | JPG | 3/10/2016 16:06 | Picture of componenets and cars in what looks like a workshop |
| 219 | JPG | 3/10/2016 16:06 | Picture of a component |
| 220 | JPG | 3/10/2016 16:06 | Picture of a component |
| 221 | JPG | 3/10/2016 16:06 | Picture of a person holding a miniature car |
| 222 | JPG | 3/10/2016 16:06 | Picture of a hanging plant |
| 223 | JPG | 3/10/2016 16:06 | Picture of components |
| 224 | JPG | 3/10/2016 16:06 | Screenshot of a Aspen invoice |
| 225 | JPG | 3/10/2016 16:06 | Picture of muffins in a basket |
| 226 | MOV | 3/10/2016 16:06 | Close up video of mechanical manufacturing process |
| 227 | JPG | 3/10/2016 16:06 | Picture of a person making markings on a door |
| 228 | JPG | 12/27/2015 21:10 | Picture of a car and lot of people |
| 229 | JPG | 12/27/2015 21:09 | Picture of a self driving car |
| 230 | JPG | 10/2/2015 11:33 | Picture of a person holding a component |
| 231 | JPG | 10/2/2015 11:33 | Picture of components and electrical wires |
| 232 | JPG | 10/2/2015 11:33 | Picture of components and electrical wires |
| 233 | JPG | 10/2/2015 11:33 | Picture of components and electrical wires |
| 234 | png | 3/10/2016 16:06 | Picture of animated vehicle accident with graph of analysis |

| # | Type | Date/Time | Description |
|---|---|---|---|
| 235 | avi | 3/10/2016 16:06 | Digital interpretation of traffic crash in real time |
| 236 | avi | 3/10/2016 16:06 | Digital interpretation of traffic crash in real time |
| 237 | pptx | 12/26/2015 23:32 | Vendor branded presentation regarding tests mobility solution: |
| 238 | plist | 1/19/2016 13:58 | System File |
| 239 | plist | 1/19/2016 13:58 | System File |
| 240 | plist | 1/19/2016 13:58 | System File |
| 241 | plist | 1/19/2016 13:58 | System File |
| 242 | plist | 1/19/2016 13:58 | System File |
| 243 | plist | 1/19/2016 13:58 | System File |
| 244 | plist | 1/19/2016 13:58 | System File |
| 245 | plist | 1/19/2016 13:58 | System File |
| 246 | plist | 1/19/2016 13:58 | System File |
| 247 | plist | 1/19/2016 13:58 | System File |
| 248 | plist | 1/19/2016 13:58 | System File |
| 249 | plist | 1/19/2016 13:58 | System File |
| 250 | plist | 1/19/2016 13:58 | System File |
| 251 | plist | 3/22/2016 11:35 | System File |
| 252 | strings | 3/22/2016 11:35 | System File |
| 253 | png | 3/10/2016 16:06 | Picture of three graphs of current and range with data normalizatior |
| 254 | mov | 1/24/2016 13:09 | News segment about unicorn business model |
| 255 | avi | 1/24/2016 13:12 | Digital interpretation of world around moving vehicle |
| 256 | mov | 1/24/2016 13:12 | Time lapse video of component |
| 257 | mov | 1/24/2016 13:12 | Time lapse video of component |
| 258 | jpeg | 1/24/2016 13:12 | Picture of man |
| 259 | pdf | 10/2/2015 14:13 | Picture of man |
| 260 | mp4 | 9/1/2015 13:18 | Internal email regarding diffusers |
| 261 | MOV | 1/24/2016 13:09 | Video of people out in a field flying planes |
| 262 | MOV | 1/24/2016 13:09 | Video of mechanical components colliding |
| 263 | MOV | 1/24/2016 13:09 | Video of mechanical components colliding |
| 264 | pptx | 3/22/2016 11:35 | Aspen confidential and proprietary presentation re: self-driving car |
| 265 | pptx | 3/22/2016 11:35 | Note summarizing meeting events with respect to technology around cars |
| 266 | pptx | 1/24/2016 13:12 | Aspen confidential presentation re: self-driving car and safety |
| 267 | pptx | 1/24/2016 13:12 | Aspen confidential presentation re: self-driving car |
| 268 | pptx | 3/22/2016 11:35 | Aspen confidential and proprietary presentation re: self-driving car |
| 269 | pptx | 9/21/2015 20:32 | Aspen confidential and proprietary presentation re: self-driving car |
| 270 | pptx | 10/2/2015 11:33 | Aspen confidential presentation re: self-driving car |
| 271 | pptx | 10/2/2015 11:33 | Aspen presentation re: self-driving car |
| 272 | pptx | 3/22/2016 11:35 | Aspen presentation re: self-driving car |
| 273 | pptx | 9/21/2015 20:32 | Aspen presentation re: self-driving car |
| 274 | plugin | 1/19/2016 13:58 | System File |
| 275 | png | 3/22/2016 11:35 | Picture of Tesla login page |
| 276 | rtf | 3/22/2016 11:35 | Note describing marketing information regarding purpose of self-driving car |
| 277 | mov | 1/24/2016 13:09 | Video of senate testimony |
| 278 | pptx | 10/2/2015 14:13 | Presentation re: self-driving car |
| 279 | app | 1/19/2016 13:58 | Application file |
| 280 | app | 3/22/2016 11:35 | Application executable |
| 281 | mdimporter | 1/19/2016 13:58 | Program metadata (no content) |

| # | Type | Date | Description |
|---|---|---|---|
| 282 | qgenerator | 1/19/2016 13:58 | Software related file. |
| 283 | plugin | 1/19/2016 13:58 | System File |
| 284 | mp4 | 9/21/2015 20:32 | Close up video of a component of the self driving car |
| 285 | plugin | 1/19/2016 13:58 | System File |
| 286 | mov | 1/24/2016 13:09 | Digital interpretation of traffic in real time |
| 287 | JPG | 3/22/2016 11:35 | Picture of writing on a whiteboard |
| 288 | JPG | 3/22/2016 11:35 | Picture of drawing and writing on a whiteboard |
| 289 | AVI | 1/24/2016 13:09 | Video of people sitting inside warehouse |
| 290 | AVI | 1/24/2016 13:09 | Video of person sitting inside warehouse |
| 291 | AVI | 1/24/2016 13:09 | Video attached to remote controlled vehicle driving around warehouse |
| 292 | AVI | 1/24/2016 13:09 | Video of people inside warehouse |
| 293 | pdf | 10/2/2015 20:15 | Internal email regarding baby |
| 294 | | 3/22/2016 12:14 | System File |
| 295 | plugin | 1/19/2016 13:58 | System File |
| 296 | jpg | 3/10/2016 16:06 | Picture of a table involving money numbers and its graphical representation |
| 297 | jpg | 3/10/2016 16:06 | Picture of a table involving money numbers and its graphical representation |
| 298 | jpg | 3/10/2016 16:06 | Picture of a table involving money numbers and its graphical representation |
| 299 | JPG | 3/22/2016 11:35 | Picture of a car |
| 300 | JPG | 10/2/2015 20:15 | Picture of a car |
| 301 | JPG | 10/2/2015 20:15 | Picture of a car |
| 302 | plugin | 1/19/2016 13:58 | System File |
| 303 | png | 3/10/2016 16:06 | Picture of aerial view of city using application |
| 304 | avi | 1/24/2016 13:09 | Digital interpretation of traffic crash in real time |
| 305 | png | 3/10/2016 16:06 | Picture of credentials for internet access in Europe |
| 306 | ppt | 3/22/2016 11:35 | External presentation re: autonomous car |
| 307 | ppt | 3/22/2016 11:35 | External presentation re: self-driving car |
| 308 | png | 10/2/2015 20:15 | Picture of a component |
| 309 | jpg | 10/2/2015 20:15 | Picture of a component |
| 310 | mov | 1/24/2016 13:09 | Video of remote controlled mechanical device |
| 311 | pdf | 9/1/2015 15:22 | Legal code related to autonomous vehicles |
| 312 | png | 10/7/2015 20:15 | Picture of aerial view of cars at toll booth |
| 313 | png | 10/7/2015 20:15 | Picture of realtime traffic and digital interpretation of same |
| 314 | png | 10/7/2015 20:15 | Picture of screenshot of browser of social media |
| 315 | png | 10/7/2015 20:15 | Picture of screenshot of browser of social media |
| 316 | pptx | 10/7/2015 11:34 | Presentation of the miles stones over time. |
| 317 | avi | 3/22/2016 11:35 | Digital interpretation of traffic in real time |
| 318 | mp4 | 3/22/2016 11:35 | Split screen video of realtime traffic and digital interpretation of same |
| 319 | mp4 | 9/21/2015 20:32 | Split screen video of realtime traffic and digital interpretation of same |
| 320 | png | 10/2/2015 11:33 | Picture of simulation arrangement |
| 321 | mp4 | 3/22/2016 11:35 | Video of digital interpretation of traffic |
| 322 | mp4 | 9/21/2015 20:32 | Video of digital interpretation of traffic |
| 323 | mp4 | 3/22/2016 11:35 | Video of digital interpretation of traffic |
| 324 | mp4 | 9/21/2015 20:52 | Video of digital interpretation of traffic |
| 325 | pdf | 9/21/2015 20:53 | Internal email regarding brakes |
| 326 | pdf | 9/16/2015 10:07 | Internal email regarding simulations |
| 327 | pptx | 10/7/2015 11:34 | Confidential presentation regarding self driving car |
| 328 | pdf | 12/3/2015 22:51 | Photographs and videos related to internal testing of components |

| # | Type | Date | Description |
|---|------|------|-------------|
| 329 | pdf | 12/3/2015 22:51 | Laser component diagrams and metrics |
| 330 | png | 10/2/2015 20:13 | Picture of car |
| 331 | png | 10/2/2015 20:15 | Picture of car side view |
| 332 | jpg | 10/2/2015 20:15 | Picture of a golf car |
| 333 | mp4 | 9/22/2016 11:15 | Blank video |
| 334 | mp4 | 9/21/2015 20:29 | Blank video |
| 335 | mp4 | 9/22/2016 11:15 | Split screen video of realtime traffic and digital interpretation of same |
| 336 | mp4 | 9/21/2015 20:32 | Split screen video of realtime traffic and digital interpretation of same |
| 337 | mp4 | 1/24/2016 13:09 | Video of a part in motion. |
| 338 | mp4 | 1/24/2016 13:09 | Video of employees demonstrating testing |
| 339 | jpg | 10/2/2015 11:33 | Picture explaining drive modes of a self driving car |
| 340 | plugin | 1/19/2016 13:58 | System File |
| 341 | pdf | 3/13/2016 19:51 | Tax document |
| 342 | jpg | 10/2/2015 20:15 | Picture of a component |
| 343 | png | 9/21/2015 20:32 | Picture of realtime traffic and digital interpretation of same |
| 344 | png | 9/21/2015 20:32 | Picture of realtime traffic and digital interpretation of same |
| 345 | png | 9/21/2015 20:32 | Picture of digital interpretation of traffic |
| 346 | key | 11/5/2015 12:11 | Confidential presentation regarding self driving car which contains a number of split screen videos of real time traffic and digital interpretation of same |
| 347 | key | 11/5/2015 8:00 | Confidential presentation regarding self driving car which contains a number of split screen videos of real time traffic and digital interpretation of same |

*Waymo v. Uber*
## Case No. 3:17-cv-00939-WHA

# TRIAL EXHIBIT 7418

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; while the header identifying the document as Stroz work product and noting that "access" to a file may not indicate user activity, the remaining *over 200,000 pages* of the document consist of nothing but metadata copied from Anthony Levandowski's laptop, untransformed by Stroz's analysis.[1] *See* Br. § III.

- Fed. R. Evid. 403 – This document has little if any probative value. It poses a substantial danger of wasting time, misleading the jury, and prejudicing Uber, however, because it is more than 20,000 pages long, creating logistical challenges and potentially swaying the jury by its sheer volume. *See* Br. § IV.

- Designated witnesses who received this document pre-litigation are: Eric Tate and John Gardner. The document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV.

---

[1] To avoid burdening the Court, Uber has excerpted Trial Exhibit 7418 and filed just the first 10 pages.



# STROZ FRIEDBERG

## △ Digital Forensics

## Morrison Foerster: Project Unicorn
## Privileged and Confidential

### ES034A - Anthony Levandowski's Desktop Computer

**The last accessed time stamp can be modified by both user activity as well as system processes.**
**As such, the last accessed time stamp does not necessarily indicate user interaction with a file.**

| # | File Ext | Description | Last Accessed | File Created | Last Written | Logical Size |
|---|---|---|---|---|---|---|
| 1 | | Physical Disk, 500,118,192 Sectors 238.5GB | | | | 0 |
| 2 | | Volume, Sector 2048-206847, 100MB | | | | 4,096 |
| 3 | | Folder, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 552 |
| 4 | | File, Unallocated Clusters | | | | 129,396,736 |
| 5 | | File, Unallocated Clusters | | | | 4,096 |
| 6 | | File, Bitmap | | | | 32 |
| 7 | | File, Internal, Stream, System | | | | 32 |
| 8 | | File, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 131,072 |
| 9 | | File, Internal, Stream, System | | | | 263,776 |
| 10 | | File, Internal, Stream, System | | | | 4,096 |
| 11 | | File, Internal, Stream, System | | | | 4,096 |
| 12 | | File, Invalid Cluster, Hidden, System, Archive | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 0 |
| 13 | | File, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 0 |
| 14 | | File, Internal, Stream, System | | | | 471,855,104 |
| 15 | | File, Invalid Cluster, Hidden, System, Archive | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 0 |
| 16 | | File, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 0 |
| 17 | | File, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 8,192 |
| 18 | | File, Invalid Cluster, Hidden, System, Archive | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 0 |
| 19 | | File, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 14,400 |
| 20 | | File, Invalid Cluster, Hidden, System, Archive | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 0 |
| 21 | | File, Internal, Stream, System | | | | 56 |
| 22 | | File, Invalid Cluster, Hidden, System, Archive | 12/7/2014 4:27 | 12/7/2014 4:27 | 12/7/2014 4:27 | 0 |
| 23 | | File, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 2,560 |

**The last accessed time stamp can be modified by both user activity as well as system processes.**

**As such, the last accessed time stamp does not necessarily indicate user interaction with a file.**

| # | File Ext | Description | Last Accessed | File Created | Last Written | Logical Size |
|---|----------|-------------|---------------|--------------|--------------|--------------|
| 24 | | File, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 0 |
| 25 | | File, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 4,259,840 |
| 26 | | File, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 4,096 |
| 27 | | File, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 262,144 |
| 28 | | File, Invalid Cluster, Hidden, System, Archive | 9/17/2015 10:18 | 9/17/2015 10:18 | 9/17/2015 10:18 | 0 |
| 29 | | File, Invalid Cluster, Hidden, System, Archive | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 0 |
| 30 | | File, Invalid Cluster, Hidden, System, Archive | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 0 |
| 31 | | File, Invalid Cluster, Hidden, System, Archive | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 0 |
| 32 | | File, Invalid Cluster, Hidden, System, Archive | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 0 |
| 33 | | Folder, Internal, Hidden, System | 9/17/2015 11:13 | 9/17/2015 11:13 | 9/17/2015 11:13 | 552 |
| 34 | | File, Unallocated Clusters | | | | 146,115,248,128 |
| 35 | | File, Unallocated Clusters | | | | 4,096 |
| 36 | tmp | File, Deleted, Overwritten | 2/21/2016 23:28 | 2/21/2016 23:28 | 2/21/2016 23:28 | 4,776,420 |
| 37 | tmp | File, Deleted, Overwritten | 2/21/2016 23:28 | 2/21/2016 23:28 | 2/21/2016 23:28 | 128,696 |
| 38 | tmp | File, Deleted, Overwritten | 2/21/2016 23:28 | 2/21/2016 23:28 | 2/21/2016 23:28 | 42,871 |
| 39 | tmp | File, Deleted, Overwritten | 2/21/2016 23:28 | 2/21/2016 23:28 | 2/21/2016 23:28 | 3,176 |
| 40 | tmp | File, Deleted, Overwritten | 2/21/2016 23:27 | 2/21/2016 23:27 | 2/21/2016 23:27 | 1,566 |
| 41 | tmp | File, Deleted, Overwritten | 2/21/2016 23:27 | 2/21/2016 23:27 | 2/21/2016 23:27 | 623 |
| 42 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 12/7/2015 5:39 | 24,061 |
| 43 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 12/7/2015 5:39 | 88,257 |
| 44 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 18:11 | 2,411 |
| 45 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 18:07 | 2,411 |
| 46 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 18:12 | 2,411 |
| 47 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/27/2016 14:56 | 2,509 |
| 48 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/27/2016 14:56 | 2,509 |
| 49 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 18:05 | 2,154 |
| 50 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 18:08 | 2,154 |
| 51 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 18:11 | 3,242 |
| 52 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 18:03 | 3,242 |
| 53 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/13/2015 7:17 | 12,516 |
| 54 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/13/2015 7:12 | 2,618 |
| 55 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/24/2015 11:39 | 121,137 |
| 56 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/13/2015 7:13 | 77,817 |

**The last accessed time stamp can be modified by both user activity as well as system processes.**

**As such, the last accessed time stamp does not necessarily indicate user interaction with a file.**

| # | File Ext | Description | Last Accessed | File Created | Last Written | Logical Size |
|---|----------|-------------|---------------|--------------|--------------|--------------|
| 57 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/5/2016 3:22 | 67,228 |
| 58 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 11:35 | 112,242 |
| 59 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 11:32 | 150,693 |
| 60 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/28/2016 3:07 | 2,904 |
| 61 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/28/2016 3:07 | 2,904 |
| 62 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/28/2016 3:07 | 2,904 |
| 63 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/28/2016 3:07 | 2,904 |
| 64 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/28/2016 3:07 | 2,904 |
| 65 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/28/2016 3:07 | 2,904 |
| 66 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/28/2016 3:07 | 2,904 |
| 67 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/28/2016 3:07 | 2,904 |
| 68 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/5/2016 3:22 | 24,554 |
| 69 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/5/2016 3:22 | 36,865 |
| 70 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 11:30 | 23,551 |
| 71 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/8/2016 0:40 | 95,173 |
| 72 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 12/7/2015 5:37 | 38,460 |
| 73 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/5/2016 3:22 | 7,870 |
| 74 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 12/7/2015 5:37 | 19,462 |
| 75 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 12/7/2015 5:37 | 7,679 |
| 76 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/5/2016 3:22 | 296,655 |
| 77 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 12/7/2015 5:37 | 33,465 |
| 78 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 11:30 | 17,276 |
| 79 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 11:32 | 89,153 |
| 80 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 11/22/2015 11:35 | 81,658 |
| 81 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/5/2016 3:22 | 24,659 |
| 82 | manifest | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/5/2016 3:22 | 16,124 |
| 83 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 363,789 |
| 84 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 2,715 |
| 85 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,605 |
| 86 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,605 |
| 87 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,177 |
| 88 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 194,671 |
| 89 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,602 |

**STROZ FRIEDBERG**

Prepared on 2/5/2018

**The last accessed time stamp can be modified by both user activity as well as system processes.**

**As such, the last accessed time stamp does not necessarily indicate user interaction with a file.**

| # | File Ext | Description | Last Accessed | File Created | Last Written | Logical Size |
|---|----------|-------------|---------------|--------------|--------------|--------------|
| 90 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,602 |
| 91 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 92 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 93 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 10,177 |
| 94 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 10,174 |
| 95 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,602 |
| 96 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,602 |
| 97 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 24,635 |
| 98 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 14,871 |
| 99 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 10,749 |
| 100 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 10,476 |
| 101 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 102 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 12,873 |
| 103 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 13,805 |
| 104 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 22,349 |
| 105 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,604 |
| 106 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 107 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 10,169 |
| 108 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,603 |
| 109 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 5,403 |
| 110 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 10,741 |
| 111 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 112 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 5,493 |
| 113 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 114 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 10,169 |
| 115 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 4,702 |
| 116 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 10,737 |
| 117 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 5,800 |
| 118 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 207,947 |
| 119 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 13,381 |
| 120 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 55,889 |
| 121 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 122 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |

**STROZ FRIEDBERG**

Prepared on 2/5/2018

**The last accessed time stamp can be modified by both user activity as well as system processes.**

**As such, the last accessed time stamp does not necessarily indicate user interaction with a file.**

| # | File Ext | Description | Last Accessed | File Created | Last Written | Logical Size |
|---|----------|-------------|---------------|--------------|--------------|-------------|
| 123 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,793 |
| 124 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,169 |
| 125 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 5,493 |
| 126 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,605 |
| 127 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,169 |
| 128 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,741 |
| 129 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,605 |
| 130 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,169 |
| 131 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,741 |
| 132 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,605 |
| 133 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,741 |
| 134 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,740 |
| 135 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,740 |
| 136 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,169 |
| 137 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,604 |
| 138 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,169 |
| 139 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,741 |
| 140 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,605 |
| 141 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,603 |
| 142 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 4,702 |
| 143 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 14,695 |
| 144 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 11,495 |
| 145 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 13,624 |
| 146 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,741 |
| 147 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,798 |
| 148 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 26,077 |
| 149 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 37,274 |
| 150 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 20,202 |
| 151 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 5,533 |
| 152 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,190 |
| 153 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 5,943 |
| 154 | | File, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 262,144 |
| 155 | | File, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 4,096 |

**STROZ FRIEDBERG**

Prepared on 2/5/2018

**The last accessed time stamp can be modified by both user activity as well as system processes.**

**As such, the last accessed time stamp does not necessarily indicate user interaction with a file.**

| # | File Ext | Description | Last Accessed | File Created | Last Written | Logical Size |
|---|----------|-------------|---------------|--------------|--------------|--------------|
| 156 | | File, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 2,097,152 |
| 157 | | File, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 0 |
| 158 | | File, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 2,560 |
| 159 | | File, Internal, Stream, System | | | | 56 |
| 160 | | File, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 3,200 |
| 161 | | File, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 8,192 |
| 162 | | File, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 0 |
| 163 | | File, Internal, Stream, System | | | | 104,853,504 |
| 164 | | File, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 0 |
| 165 | | File, Internal, Stream, System | | | | 4,096 |
| 166 | | File, Internal, Stream, System | | | | 4,096 |
| 167 | | File, Internal, Stream, System | | | | 267,564 |
| 168 | | File, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 131,072 |
| 169 | | File, Internal, Stream, System | | | | 32 |
| 170 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 5,933 |
| 171 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 86,898 |
| 172 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,605 |
| 173 | | File, Bitmap | | | | 32 |
| 174 | | File, Unallocated Clusters | | | | 4,096 |
| 175 | | File, Unallocated Clusters | | | | 75,239,424 |
| 176 | | Volume, Sector 206848-499193855, 237.9GB | | | | 12,288 |
| 177 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 4,104 |
| 178 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,801 |
| 179 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,800 |
| 180 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,800 |
| 181 | | Folder, Internal, Hidden, System | 5/14/2014 0:21 | 5/14/2014 0:21 | 5/14/2014 0:21 | 552 |
| 182 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,801 |
| 183 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,801 |
| 184 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,800 |
| 185 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,605 |
| 186 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 11,228 |
| 187 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 19,175 |
| 188 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,605 |

**STROZ FRIEDBERG**

Prepared on 2/5/2018

**The last accessed time stamp can be modified by both user activity as well as system processes.**

**As such, the last accessed time stamp does not necessarily indicate user interaction with a file.**

| # | File Ext | Description | Last Accessed | File Created | Last Written | Logical Size |
|---|----------|-------------|---------------|--------------|--------------|--------------|
| 189 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 12,677 |
| 190 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 13,069 |
| 191 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 10,177 |
| 192 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 15,152 |
| 193 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 12,521 |
| 194 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:22 | 9,605 |
| 195 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 1,752 |
| 196 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 1,752 |
| 197 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,601 |
| 198 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 199 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 10,193 |
| 200 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 1,754 |
| 201 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 1,754 |
| 202 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 1,754 |
| 203 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 204 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:17 | 1,758 |
| 205 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 206 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,605 |
| 207 |  | File, Deleted, Overwritten | 2/22/2016 0:07 | 2/22/2016 0:07 | 2/22/2016 0:07 | 14,534 |
| 208 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:27 | 2/21/2016 23:27 | 1/30/2016 10:23 | 9,602 |
| 209 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 9,605 |
| 210 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,732 |
| 211 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,748 |
| 212 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 9,605 |
| 213 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,750 |
| 214 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,748 |
| 215 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,748 |
| 216 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,732 |
| 217 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,750 |
| 218 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,750 |
| 219 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,750 |
| 220 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,750 |
| 221 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |

**STROZ FRIEDBERG**

Prepared on 2/5/2018

**The last accessed time stamp can be modified by both user activity as well as system processes.**

**As such, the last accessed time stamp does not necessarily indicate user interaction with a file.**

| # | File Ext | Description | Last Accessed | File Created | Last Written | Logical Size |
|---|----------|-------------|---------------|--------------|--------------|--------------|
| 222 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 223 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 224 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,732 |
| 225 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 226 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,736 |
| 227 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,732 |
| 228 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,736 |
| 229 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,736 |
| 230 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,736 |
| 231 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 232 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 17,957 |
| 233 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 234 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,744 |
| 235 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,746 |
| 236 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,744 |
| 237 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,744 |
| 238 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 239 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,793 |
| 240 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,746 |
| 241 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,746 |
| 242 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 243 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,604 |
| 244 | | File, Deleted, Overwritten, Archive | 2/22/2016 0:07 | 10/30/2015 6:28 | 2/22/2016 0:07 | 13,098 |
| 245 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 246 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,742 |
| 247 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 248 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 249 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,732 |
| 250 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,604 |
| 251 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 252 | | File, Deleted, Overwritten, Archive | 10/30/2015 9:02 | 10/30/2015 7:24 | 10/30/2015 9:02 | 664 |
| 253 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,944 |
| 254 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |

**STROZ FRIEDBERG**

Prepared on 2/5/2018

**The last accessed time stamp can be modified by both user activity as well as system processes.**

**As such, the last accessed time stamp does not necessarily indicate user interaction with a file.**

| # | File Ext | Description | Last Accessed | File Created | Last Written | Logical Size |
|---|----------|-------------|---------------|--------------|--------------|-------------|
| 255 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,743 |
| 256 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,759 |
| 257 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 258 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 259 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,731 |
| 260 | | File, Deleted, Overwritten, Archive | 10/30/2015 7:21 | 10/30/2015 7:24 | 10/30/2015 7:21 | 389 |
| 261 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,601 |
| 262 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,605 |
| 263 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,731 |
| 264 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,731 |
| 265 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,732 |
| 266 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,733 |
| 267 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 9,601 |
| 268 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,733 |
| 269 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,732 |
| 270 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,733 |
| 271 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,733 |
| 272 | | File, Deleted, Overwritten, Archive | 10/30/2015 7:21 | 10/30/2015 7:24 | 10/30/2015 7:21 | 396 |
| 273 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,733 |
| 274 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,761 |
| 275 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 9,793 |
| 276 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 9,793 |
| 277 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 1,729 |
| 278 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 2,334 |
| 279 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 9,593 |
| 280 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 23,890 |
| 281 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 5,180 |
| 282 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 5,927 |
| 283 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 10,192 |
| 284 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 5,383 |
| 285 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 13,352 |
| 286 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 4,878 |
| 287 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 9,602 |

**STROZ FRIEDBERG**

Prepared on 2/5/2018

**The last accessed time stamp can be modified by both user activity as well as system processes.**

**As such, the last accessed time stamp does not necessarily indicate user interaction with a file.**

| # | File Ext | Description | Last Accessed | File Created | Last Written | Logical Size |
|---|---|---|---|---|---|---|
| 288 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 15,322 |
| 289 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 3,900 |
| 290 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 16,003 |
| 291 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 27,666 |
| 292 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 4,894 |
| 293 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 4,894 |
| 294 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 9,605 |
| 295 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 4,894 |
| 296 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 4,894 |
| 297 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 9,604 |
| 298 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 9,605 |
| 299 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:23 | 9,605 |
| 300 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 10,764 |
| 301 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 10,177 |
| 302 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 12,545 |
| 303 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 4,875 |
| 304 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 14,862 |
| 305 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 10,585 |
| 306 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 10,585 |
| 307 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 132,592 |
| 308 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 167,490 |
| 309 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:17 | 5,599 |
| 310 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 34,575 |
| 311 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:26 | 2/21/2016 23:26 | 1/30/2016 10:22 | 26,891 |
| 312 | | File, Deleted, Overwritten, Archive | 10/30/2015 8:06 | 10/30/2015 7:24 | 10/30/2015 8:06 | 43,190 |
| 313 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:25 | 2/21/2016 23:25 | 1/30/2016 10:22 | 9,605 |
| 314 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:25 | 2/21/2016 23:25 | 1/30/2016 10:22 | 36,758 |
| 315 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:25 | 2/21/2016 23:25 | 1/30/2016 10:22 | 48,783 |
| 316 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:25 | 2/21/2016 23:25 | 1/30/2016 10:17 | 5,497 |
| 317 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:25 | 2/21/2016 23:25 | 1/30/2016 10:22 | 15,281 |
| 318 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:25 | 2/21/2016 23:25 | 1/30/2016 10:22 | 9,604 |
| 319 | cat | File, Deleted, Overwritten, Archive | 2/21/2016 23:25 | 2/21/2016 23:25 | 1/30/2016 10:22 | 9,605 |
| 320 | mum | File, Deleted, Overwritten, Archive | 2/21/2016 23:25 | 2/21/2016 23:25 | 1/30/2016 10:17 | 2,108 |

**STROZ FRIEDBERG**

Prepared on 2/5/2018

*Waymo v. Uber*
## Case No. 3:17-cv-00939-WHA

# TRIAL EXHIBIT 7912

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Anthony Levandowski, Lior Ron, Colin Sebern, Soren Juelsgaard, and Don Burnette, all of whom participated in the Stroz diligence process in their individual capacity. *See* Br. § I.

- Fed. R. Evid. 805 – This document contains inadmissible hearsay within hearsay; namely, Anthony Levandowski's, Lior Ron's, Colin Sebern's, Soren Juelsgaard's, and Don Burnette's recitations of out of court statements made by other declarants. *See* Br. § I.

- Fed. R. Evid. 403 – Because the document is replete with embedded hearsay, the Court should exercise its discretion under Rule 403 to exclude any reliance on the document for its truth, to prevent jury confusion about what fragments are admissible for truth, and resulting waste of time and prejudice to Uber. *See* Br. § IV.

- This exhibit contains references to, and attaches copies of, the diligenced employees' Google employment agreement, which Waymo stipulated that it would not make reference to in its case in chief. *See* Dkt. 425 at 4.

- Disclosed witnesses who received this document pre-litigation are: Adam Bentley, Angela Padilla, Eric Tate, John Gardner, Justin Suhr, and Lior Ron. Except through Padilla or Suhr, the document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV.

| Yellow Highlights | Hearsay Statements |
|---|---|
| Blue Highlights | Hearsay within Hearsay Statements |



# STROZ FRIEDBERG

Prepared for
Morrison & Foerster LLP
O'Melveny & Myers LLP

Prepared by
Stroz Friedberg

August 5, 2016

Summary Report
Project Unicorn Investigation

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

OUTSIDE COUNSEL & ATTORNEYS-EYES-ONLY

United States District Court
Northern District of California
**Trial Exhibit 7912**
Case No.   3:17-cv-00939-WHA
Date Entered
By
Deputy Clerk

# TABLE OF CONTENTS

I. Scope of Engagement ........................................................................................ 3

II. Procedural History ........................................................................................... 3

III. Methodology .................................................................................................... 5

    A. Interviews ................................................................................................ 5

    B. Digital Forensics Preservation, Data Collection and Review ............... 6

    C. Document Review ................................................................................... 7

    D. Investigation of Levandowski's Disposal of Google Documents .......... 7

IV. Summary of Pertinent Findings Regarding the Diligenced Employees .......... 8

    A. Anthony Levandowski ............................................................................ 8

        1. Interview and Investigation .......................................................... 8

        2. Forensic Examination of Devices ............................................... 11

        3. Documents Identified During Stroz Friedberg's Review .......... 14

    B. Lior Ron ................................................................................................ 17

        1. Interview and Investigation ......................................................... 17

        2. Forensic Examination of Devices ............................................... 19

        3. Documents Identified During Stroz Friedberg's Review .......... 21

    C. Don Burnette ......................................................................................... 24

        1. Interview ...................................................................................... 24

        2. Forensic Examination of Devices ............................................... 25

        3. Documents Identified During Stroz Friedberg's Review .......... 26

    D. Soren Juelsgaard .................................................................................... 27

        1. Interview ...................................................................................... 27

        2. Forensic Examination of Devices ............................................... 28

        3. Documents Identified During Stroz Friedberg's Review .......... 29

    E. Colin Sebern ......................................................................................... 30

        1. Interview ...................................................................................... 30

        2. Forensic Examination of Devices ............................................... 31

        3. Documents Identified During Stroz Friedberg's Review .......... 32

OUTSIDE COUNSEL & ATTORNEYS-EYES-ONLY

STROZ_0000002

PRIVILEGED AND CONFIDENTIAL

## I.  SCOPE OF ENGAGEMENT

In March 2016, Stroz Friedberg was retained to conduct an independent investigation, under the direction and supervision of Morrison & Foerster LLP ("Morrison") and O'Melveny & Myers LLP ("O'Melveny"), on behalf of their respective clients Uber, Inc. ("Uber") and Ottomotto LLC ("Ottomotto"). Stroz Friedberg was tasked with investigating whether or not certain Ottomotto employees – Anthony Levandowski ("Levandowski"), Lior Ron ("Ron"), Don Burnette ("Burnette"), Soren Juelsgaard ("Juelsgaard"), and Colin Sebern ("Sebern") (collectively, the "Diligenced Employees") engaged in the following:

 a)  took with them or retained confidential and/or proprietary information from their former employer, Google, Inc. ("Google"), that might be relevant to counsel's determination that one or more of the Diligenced Employees may have violated their confidentiality agreements with Google; and

 b)  participated in actions that might be relevant to counsel's determination whether one or more of the Diligenced Employees breached their non-solicitation, non-compete, or fiduciary obligations in connection with their move to Ottomotto.

The scope of the investigation included conducting a series of interviews of the Diligenced Employees, forensically preserving 28 devices and 25 cloud-based repositories of data belonging to the Diligenced Employees, extracting user-created data from the devices, forensically downloading the data in the cloud-based repositories, processing the culled data into an electronic review platform, reviewing the documents in that platform, and conducting other investigative interviews.

## II.  PROCEDURAL HISTORY

The original parameters of the investigation were dictated by a protocol entered into among Stroz Friedberg, Uber and Morrison, and Ottomotto and O'Melveny on or about March 21, 2016 (the "March Protocol," attached as Exhibit 1).[1]  Stroz Friedberg also entered into two side letters, dated March 14 and 21, 2016, with John Gardner, counsel for Levandowski, which are attached as Exhibits 2 and 3, respectively. In these side letters, Stroz Friedberg agreed to not distribute to counsel for Uber and Ottomotto any Google information or data that Levandowski provided or we discovered during the investigation, except as specified in the March Protocol.

In April 2016, in the lead-up to Uber's signing of an agreement to purchase Ottomotto, and long before the investigation was completed, Morrison asked Stroz Friedberg to provide it with visibility into Stroz Friedberg's preliminary fact-finding and forensic analyses on a number of subjects. Specifically, Morrison sought access to: (a) Stroz Friedberg's memoranda regarding Stroz Friedberg's interviews of Levandowski and Ron, as well as the other Diligenced Employees; (b) forensic metadata and last access reports pertaining to all of the Diligenced Employees' devices; (c) last access reports with high-level descriptions of data Levandowski identified as Google data in the course of his interview (the "Self-Identified Data");[2]

---

[1]  All of the Exhibits referenced herein are included in an Appendix to this report.

[2]  The reports Stroz Friedberg previously produced to counsel are included as Exhibits 5-16 in the Appendix.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

and (d) an oral report of Stroz Friedberg's preliminary fact-finding pertaining to the disposal of certain Google data in March 2016 that Levandowski realized he had retained.

In April 2016, Stroz Friedberg previewed the requested data to O'Melveny and Gardner, who consented in e-mails and orally to the interim reporting on the condition that the interview memoranda be redacted in certain respects. Stroz Friedberg provided to Morrison the requested interim reporting, including the redacted interview memoranda. Thereafter, Stroz Friedberg continued its investigation.

On or about April 12, 2016, Stroz Friedberg delivered to Morrison, O'Melveny, and Gardner a revised investigation protocol (the "April Protocol," which was dated "As of March 4, 2016"). That revised protocol, attached as Exhibit 4, made explicit that Stroz Friedberg could issue interim reports and clarified that Morrison and O'Melveny were supervising the investigation and making all legal determinations, among other things. Gardner refused to sign the revised protocol on behalf of Levandowski.

With respect to the review and ultimate production to Morrison and Uber of documents and devices provided to Stroz Friedberg by the Diligenced Employees, the April Protocol provided as follows:

> At any time during, or at the end of, its investigation, if Stroz Friedberg believes that non-privileged, relevant documents or communications – whether active, deleted, or fragments – should be shared with O'Melveny and Morrison, it will first place those documents in a folder (the "Proposed Disclosure Folder") on Stroz Review for review by O'Melveny, Donahue, and Levine but shall not provide Morrison access to the Proposed Disclosure Folder. If O'Melveny, Donahue, and/or Levine claims that any of the documents subject to proposed disclosure are subject to attorney-client privilege, attorney work-product privilege, or other restriction on disclosure, O'Melveny, Donahue, and/or Levine will produce privilege logs to Morrison regarding such documents, and Stroz Friedberg will, unless and until the documents are cleared for disclosure by O'Melveny, Donahue, or Levine, remove the documents from the Proposed Disclosure Folder. In addition, if O'Melveny, Donahue, and/or Levine identify any documents in the Proposed Disclosure Folder to be "outside counsel-eyes-only" or "attorneys-eyes-only" (as such terms are defined below), Stroz Friedberg will move those documents to an outside counsel-eyes-only or attorneys-eyes only folder. Upon receiving written authorization from O'Melveny, Donahue, or Levine and only upon receiving such authorization, Stroz Friedberg will make the Proposed Disclosure Folder and the outside counsel-eyes-only or attorneys-eyes-only folder available to Morrison. If the Clients agree that Unicorn executives should have access to the Proposed Disclosure Folder, Stroz Friedberg will arrange for such access. Unicorn executives will not have access to the outside counsel or attorneys-eyes-only folder. Stroz Friedberg will not create for Unicorn executives user credentials that have access to the outside counsel or attorneys-eyes-only documents. Morrison attorneys will not give to Unicorn executives credentials to, or otherwise give access to the documents in, the outside counsel or attorneys-eyes only folder. The only documents and communications that Stroz Friedberg's independent report will rely on or reference will be documents contained in the approved Proposed Disclosure Folder, except to the extent that privileged communications contain substantive content that is relevant, in which case Stroz Friedberg may reference such substantive content in a manner that the parties mutually agree (or an arbitrator, if the parties cannot agree, determines) reasonably addresses the parties' respective concerns. Stroz Friedberg will issue its final report reflecting the materials contained in the Final Disclosure Folder only upon written authorization from both O'Melveny and Morrison.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

While counsel for Levandowski refused to sign onto the April Protocol, the parallel provision in the March Protocol was comparable.

A first-level review produced:   over 100,000 potentially relevant documents, e-mails, chats, and text messages extracted from the Diligenced Employees' computers, web-based e-mail and data repositories, and mobile devices;[3] over 74,000 potentially relevant pictures; and over 176,000 source code files.

In July 2016, given the large number of potentially relevant items, Stroz Friedberg performed a second-level review of those items. With the consent of Uber, Ottomotto, and the Diligenced Employees, this was not a document-by-document review of every potentially relevant item. Rather, Stroz Friedberg focused on attempting to identify exemplary or important documents pertaining to confidential Google information that had been retained or deleted, the solicitation of Google employees, or other potential breaches of fiduciary duties owed by the Diligenced Employees to Google. The methodologies used in this limited second-level review, included reviewing some documents, prioritizing search results from terms that yielded fewer false positives, running new search terms, and following file paths to folders of particular interest. In July and August 2016, Stroz Friedberg populated many of the results of this second-level review – and all of the documentary Exhibits to this report – into Proposed Disclosure Folders on the Stroz Friedberg Relativity platform, to which the Diligenced Employees' counsel were given access in order to code each document pursuant to the April Protocol.

In August 2016, counsel for the Diligenced Employees all consented to Stroz Friedberg producing this report on an outside counsel and attorneys-eyes-only basis, meaning that the report could be published by Stroz Friedberg to Morrison, O'Melveny, Donahue Fitzgerald LLP (counsel for Levandowski), Levine & Baker LLP (counsel for Ron), and in-house counsel at Uber and Ottomotto.

This report reflects Stroz Friedberg's methodology and findings based on the interviews of the Diligenced Employees, the device and web repository forensics, the review of documents and field interviews.

## III.   METHODOLOGY

### A.   INTERVIEWS

As part of its investigation, Stroz Friedberg separately interviewed each Diligenced Employee at our offices located at 101 Montgomery Street, Suite 2200, San Francisco, CA 94104. In advance of these interviews, Stroz Friedberg prepared questionnaires for each Diligenced Employee to complete. These questionnaires are included as exhibits to the Diligenced Employees' interview memoranda. Stroz Friedberg distributed drafts of the memoranda of the Levandowski and Ron interviews to their respective counsel. While counsel reserved their clients' rights with respect to accuracy, neither objected to any particular findings.

---

[3] For chat data, Relativity extracts each sent and received component in a chat as a separate object. Accordingly, the number of objects vastly exceeds the number of chat strings.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000005

PRIVILEGED AND CONFIDENTIAL

The dates of the Diligenced Employees' interviews are as follows:

- Anthony Levandowski (March 22 and 23, 2016). Redacted interview memorandum and exhibits attached as Exhibit 5;
- Lior Ron (March 22, 2016). Redacted interview memorandum and exhibits attached as Exhibit 6;
- Don Burnette (March 23, 2016). Redacted interview memorandum and exhibits attached as Exhibit 7;
- Soren Juelsgaard (March 24, 2016). Redacted interview memorandum and exhibits attached as Exhibit 8; and
- Colin Sebern (March 24, 2016). Redacted interview memorandum and exhibits attached as Exhibit 9.

### B. DIGITAL FORENSICS PRESERVATION, DATA COLLECTION AND REVIEW

Stroz Friedberg forensically collected 53 computers, tablets, smartphones, thumb drives, webmail accounts, and other cloud-based repositories from the Diligenced Employees (hereinafter, the "In-Scope Digital Media") and loaded and processed the active (i.e., non-deleted) user-created documents and communications into Stroz Friedberg's Relativity platform for review. Stroz Friedberg also analyzed in its forensic laboratory deleted files and forensic fragments from the unallocated space and the host-controlled area of the media, to the extent applicable, for relevant information.

With respect to the computers, beyond looking for potentially relevant documents, Stroz Friedberg also analyzed connections to removable media and cloud-based repositories to determine whether Google data was transferred via either of those methods. Stroz Friedberg analyzed the removable media produced by the Diligenced Employees and matched those items by serial number to the records in the Diligenced Employees' computers showing connections to removable media to verify that the production of removable media was complete. Stroz Friedberg also analyzed the removable media to determine whether Google media had been transferred from one device to another. With respect to smartphones, Stroz Friedberg looked for web repository applications (e.g., Dropbox) and analyzed phone-based databases for connections to web repositories to determine whether Google data was transferred to the cloud.

In the Relativity platform, Stroz Friedberg applied a set of keywords (see discussion below) to the harvested documents. The same key words were applied by forensic examiners to the deleted files, the unallocated space, and the host controlled area, as applicable. Stroz Friedberg used a team of engagement managers (who are former lawyers and prosecutors), forensic examiners, and cyber associates experienced in conducting investigations to perform first and second level reviews after keywords were applied. Over 1.5 million files were harvested or downloaded from devices and cloud-based repositories and processed into Relativity.

Where a Relativity-based review was infeasible (e.g. source code, picture files, video files, unallocated space keyword search hits), Stroz Friedberg staff manually reviewed the harvested data.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

## C.   DOCUMENT REVIEW

In accordance with the above-referenced Protocols agreed to by the parties, Stroz Friedberg: (1) processed/assessed over 1.5 million files into Relativity, identifying over 400,000 documents for further review; (2) reviewed over 47 gigabytes of Cellebrite data from the Diligenced Employees' mobile devices; (3) reviewed over 24,000 individual Google Chat messages ("Gchat messages"); (4) reviewed over 200,000 photos/videos; and e) identified over 176,000 source code files.[4]

Stroz Friedberg developed search criteria to search the In-Scope Digital Media. In doing so, Stroz Friedberg, at the direction of the parties, applied its understanding of the goal of the investigation and the knowledge gained during its interviews with the Diligenced Employees to develop a list of proposed search terms for each Diligenced Employee. Stroz Friedberg then distributed the proposed search criteria lists to O'Melveny, Donahue, and Levine. O'Melveny, Donahue, and Levine thereafter reviewed the search terms and designated any proposed search terms which should not be shared with Morrison because the terms themselves could convey confidential Google information. Stroz Friedberg then distributed to Morrison a list that contained only the search terms approved by O'Melveny, Donahue, and Levine for Morrison's final input and approval. Stroz Friedberg used the resulting search terms as part of its review of the documents harvested from the In-Scope Digital Media and its forensic review of the media.

Using search criteria provided by the parties and technology-aided-review tools, Stroz Friedberg then sought to identify and exclude documents that were potentially privileged from the relevant set. Stroz Friedberg thereafter sought to identify documents potentially relevant to the investigation for further legal review by counsel, as prescribed by the Protocol, by using investigative techniques and a range of industry standard analytical tools and e-Discovery technologies.  A detailed outline of the multi-faceted, tiered approach Stroz Friedberg undertook to take reasonable, proportionate, and effective measures to evaluate and triage the large volumes of data received in this matter is attached hereto as Exhibit 22.

Applying the above-referenced methodology, Stroz identified the following potentially relevant documents in its first-level review: (1) approximately 33,752 documents/files in Relativity; (2) approximately 68,111 Cellebrite documents/files; (3) approximately 1,134 Gchat messages; (4) approximately 74,847 pictures; and (5) approximately 176,803 source code files. After the second-level review, Stroz Friedberg foldered for outside counsel review 1,383 files in Relativity, including 69 Gchat messages and approximately 534 pictures. Since the source code files could not be identified further as either pertaining or not pertaining to Google, there was no second-level review of the source code files.

## D.   INVESTIGATION OF LEVANDOWSKI'S DISPOSAL OF GOOGLE DOCUMENTS

During Stroz Friedberg's interview of Levandowski, he stated that in March 2016, while searching his home to gather all devices for this investigation, he discovered that he possessed Google proprietary information on five disks in his Drobo 5D, which was located in a closet he used to store old and unused devices. The proprietary information included source code, design files, laser files, engineering documents, and software related to Google self-driving cars. In his interview with Stroz Friedberg, Levandowski stated that he destroyed the disks at a commercial shredding facility in Oakland, California. Levandowski provided Stroz Friedberg with the Drobo 5D, but, as expected, it contained no media and there was nothing to analyze.

---

[4] Soren Juelsgaard possessed the majority of the source code on his devices: 174,311 files.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000007

PRIVILEGED AND CONFIDENTIAL

Thereafter, Stroz Friedberg conducted an independent investigation to attempt to verify the destruction of the disks. The details of this investigation are described more fully below and a copy of this investigative memo is attached as Exhibit 23.

## IV.  SUMMARY OF PERTINENT FINDINGS REGARDING THE DILIGENCED EMPLOYEES

The following are summaries of Stroz Friedberg's findings for each Diligenced Employee.

### A.  ANTHONY LEVANDOWSKI

#### 1.  INTERVIEW AND INVESTIGATION

On March 22 and 23, 2016, Stroz Friedberg interviewed Levandowski. Levandowski worked at Google from April 9, 2007 to January 26, 2016. In 2011, he was promoted to Engineering Manager of the Chauffeur Project, where he remained until he left the company. During his interview, Levandowski informed Stroz Friedberg that he: (a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars.  Exhibit 5 is Stroz Friedberg's memorandum of Levandowski's interview.

*Retained Google Information or Data*

During the interview, Levandowski identified the following locations where Google-related data and information were stored on his personal laptop, an Apple MacBook Pro: (a) in two folders labeled "Chauffeur" and "Google;" (b) a Dropbox folder; and (c) the Downloads folder. He did not recall when he last accessed these folders, and he seemed surprised at the amount of Google-related information that was on his laptop. In addition, during the interview, Levandowski initially told us that he did not sync up his Google mail with this laptop, but then he looked at his laptop and, to his apparent surprise, discovered that he had synced his Google e-mail (anthonyl@google.com) with his laptop in 2014. Accordingly, his laptop contained a snapshot of his Google e-mail as of the date of the sync on September 20, 2014. Levandowski informed Stroz Friedberg that he also had other Google-related information stored on his laptop, such as vendor sheets, presentations, and manuals, some of which may have been publically known.

Levandowski explained that he used his personal laptop and devices, as well as his company devices, to access Google Docs, and that he stored Google data and documents on his personal devices as well in the normal course of his work at Google. He also said it was common practice to share work files via Dropbox. He stated that, in addition to his personal laptop, he also stored Google documents on his phone and various hard drives and thumb drives.

*Transferred Google Information or Data*

Levandowski also acknowledged that in the normal course of business at Google he e-mailed Google files to his personal webmail account at levandowski@gmail.com, but that to his recollection these files were mainly presentations or other information to be shared publically and not technical or proprietary information. He also indicated that in the normal course of business he used USB drives to transfer data

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

from his desktop to the self-driving cars that his teams were working on, but stated that he returned all of the Google USB drives and destroyed all of the personal USB drives in his possession because he heard they might contain spyware. He further stated that the information likely to have been on the destroyed USB drives included trade show information, vendor sheets, and Google files he may have been moving.

### Contacted Google Employees about His Start-Up Company

While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining his start-up company. The one-on-one meetings occurred at work with over 20 Google/Chauffer employees (during individual update meetings or around the Google campus), coffee shops, restaurants, homes, or telephonically. There were also four group meetings, two of which occurred with small groups of Google and/or Chauffeur employees at a barbeque at Levandowski's house and on a ski trip to Lake Tahoe. Two larger group meetings took place at Levandowski's house in approximately December 2015 and January 2016.[5] These meetings included approximately 15 to 20 Google and non-Google employees. The first large group meeting, in December 2015, was primarily organized by word of mouth and approximately half of the attendees were Google employees. They discussed the new business and Ron gave a short presentation regarding robotic trucks. The second large meeting took place at Levandowski's home, just prior to his resignation from Google on January 26, 2016. This meeting was organized by a Chauffeur team employee who sent Calendar invites to Google employees at their work e-mail addresses. To the best of Levandowski's recollection, approximately 10 of the attendees were Google employees. According to Levandowski, at this meeting they discussed an exit strategy from Google and actively encouraged the employees to leave Google.

Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google. According to Levandowski, as of the dates of his interview on March 22 and March 23, 2016, Ottomotto had approximately 30 employees, 16 of whom were former Google employees.

Following his departure from Google, Levandowksi stated that a number of Google employees reached out to him about joining Ottomotto. Levandowski said he had no discussions with these individuals about Ottomotto, unless they had already resigned from Google. He claimed that he has made it a point since his departure from Google to have no contact with any Google applicants until after they are hired by Ottomotto.

### Met with Uber Executives While Employed at Google

According to Levandowski, beginning in June 2015, while working at Google, he began to have meetings and conversations with various Uber executives, including Jeff Holden, Brian McClendon, Cameron Poetzscher, Nina Qi, and Travis Kalanick. At one point, Levandowski said that he asked Brian McClendon, who left Google to join Uber, how much Uber would be willing to pay for the Chauffeur team, claiming he wanted to have a market value for the team. According to Levandowski, these meetings progressed from September to December 2015, and escalated from Uber being a customer for after-market car kits to it acquiring Levandowski's start-up company. Levandowski said there were several text messages with the above-referenced individuals and over 200 messages to and/or from Kalanick. Levandowski acknowledged

---

[5] The Google employees Levandowski recalls meeting with, or attending these meetings, are outlined in his unredacted interview memorandum, which was produced to his counsel for review.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000009

PRIVILEGED AND CONFIDENTIAL

that his research at Uber will involve delivering lasers, deploying vehicles, and building after-market kits for cars, but emphasized that he did not intend to rely on any information or data from Google.

### Destroyed Personal Drobo Disks with Confidential Google Information

While searching his home for anything Google-related a few weeks after his departure from Google on January 26, 2016, Levandowksi stated that he discovered various equipment in his garage, including some tools, pieces of aluminum, robot parts, old Street View test prototype cameras, and brackets to mount cameras on cars. Just prior to his interview, Levandowski had a destruction company (whose name he could not recall) pick up the items and destroy them.

In addition, Levandowksi stated that he discovered that he possessed Google proprietary information on five disks in his personal Drobo 5D in a closet in his house. This information included source code, design files, laser files, engineering documents, and software related to Google self-driving cars. He said that he downloaded this information in the ordinary course of business while at Google and that the last time he accessed the information was between November 2014 and January 2015. Levandowski said that he copied the software onto the disks off of his personal Apple MacBook Pro. He stated that this was a common practice because the code on the disks would be inserted into the prototype driver-less cars to enable them to operate. He stated that he stored the disks in his personal Drobo 5D device.[6] He said that upon realizing he still had the disks, he immediately informed his attorney and brought this information to Uber's attention at a regularly scheduled status meeting in mid-March 2016. He stated that he could not recall the specific date of that meeting, but Stroz Friedberg was later informed by Morrison that the date of this meeting was March 11, 2016. At the meeting, Poetzscher instructed Levandowski not to destroy the disks and to preserve them for record keeping purposes. Levandowski stated that Kalanick wanted nothing to do with the disks and told Levandowski to "do what he needed to do." Levandowski said that following the meeting he brought the disks to a shredding facility in Oakland, later identified as Shred Works, and watched the disks as they were shredded. He stated that he paid cash and did not receive a receipt.

Stroz Friedberg investigators visited Shred Works on April 4 and 6, 2016, and spoke to its office manager telephonically on April 11, 2016, to try to confirm Levandowski's account. Stroz Friedberg investigators showed the employees a picture of Levandowski, but no one recognized him. In addition, the investigators were informed that all destructions are recorded on a triplicate, carbon-copy receipt that includes the name of the Shred Works' employee assisting the customer, the date, the time, a description of the service, and the method and amount of payment. The customer is then asked to sign the receipt and is given the top white copy. A manager for Shred Works reviewed the receipts for March 2016, and, in particular March 11, 2016, the date of Levandowski's meeting with Uber, but could not find one signed by Levandowski.[7] She did, however, find a receipt dated March 14, 2016 that indicated that five disks were destroyed and paid for in cash. The signature on the receipt was illegible.

In a deleted iMessage from Levandowski to an unknown recipient on March 11, 2016, Levandowski states, "I'll clean that shit out." See Exhibit 24. A few days later, on March 13, 2016, in another deleted iMessage

---

[6] Evidence suggests that Levandowski's Drobo 5D was being used to back up his MacBook Pro.

[7] Stroz Friedberg investigators provided Shred Works with examples of Levandowski's signatures that they obtained when Levandowski signed the chain of custody forms related to his devices.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000010

**TX-7912, Page 10 of 33**

PRIVILEGED AND CONFIDENTIAL

from Levandowski to an unknown recipient, Levandowski states "We're ready for junk King." See Exhibit 25. Junk King is a junk disposal service. It is unclear whether these messages are related or unrelated to the Drobo 5D disks. As set forth below, Stroz Friedberg has identified a number of communications that show that Levandowski and his colleagues were familiar with and did use Shred Works from time to time.

The interviews of Shred Works' employees and the Shred Works' documents do not confirm Levandowski's contention that he took the five disks to Shred Works on the same day as his meeting with Uber, which was March 11, 2016. Levandowski is fairly recognizable, and Stroz Friedberg's interviews were conducted not long after the alleged event. No one recognized him as having appeared on March 11, 2016 or any other date. The March 14, 2016 receipt for the destruction of five disks could better support the proposition that the disks were destroyed at Shred Works on a day later than Levandowski recalls, but there is no way to connect that receipt to Levandowski or the five Levandowski disks at issue. A copy of Stroz Friedberg's investigative report regarding Levandowski's five Drobo 5D disks is attached as Exhibit 23.

## 2.   FORENSIC EXAMINATION OF DEVICES

### Retained, Accessed, or Transferred Google Information or Data

Our forensic examination of Levandowski's devices and accounts corroborates his assertion that he stored and accessed Google files on his personal laptop in folders labeled "Chauffeur" and "Google." However, contrary to his belief that there were no or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google work e-mail messages that were downloaded onto Levandowski's computer on September 20, 2014. Ten of those e-mails were last accessed between September 1, 2015 and January 28, 2016. It is difficult to believe that Levandowski was not, prior to his interview, fully aware of the extent of the data that he had retained.

Most of the 10 e-mails referenced above were acceptances of Calendar invitations for internal "Chauffer" meetings that included a list of other Google employees who were invited to the meetings. The remaining e-mails contained: (a) a link to what appears to be one of Levandowski's Google Non-Disclosure Agreements; (b) handwritten notes and a drawing related to a "gimbal setup;" (c) an e-mail from the Chauffer-laser@google.com, which contains links to what appear to be Chauffer-related pictures; (d) an e-mail string with a California Department of Transportation research official regarding taking a test drive in, presumably, a Google self-driving car; and (e) a brief e-mail with Dmitri Dolgov regarding the timeframe for laser development. The 10 e-mails are attached hereto as Exhibit 26.

Stroz Friedberg also identified and analyzed approximately 347 files from his Self-Identified Data that were last accessed on Levandowski's MacBook Pro between September 1, 2015 and March 22, 2016. A copy of the last-accessed analysis was previously produced to counsel and is attached as Exhibit 16. These files, which contain proprietary information related to Levandowski's work at Google on the Chauffeur Project, include: confidential presentations regarding the self-driving car and its marketing and business plans; videos of features and test drives of the self-driving car; pictures of the self-driving car and multiple components; notes pertaining to plans for the self-driving car; diagrams of vehicle components marked confidential; system files; software files; and code regarding the self-driving car. Additional documents are outlined in the timeline and document review sections below.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000011

PRIVILEGED AND CONFIDENTIAL

Stroz Friedberg also identified access by Levandowski to several cloud storage repositories. A review of the internet history shows access to Google Docs on January 26 2016, the day of Levandowski's resignation. In particular, he accessed a file named "Chauffeur TL weekly updates – Q4 2015 – Google Sheets." Further review of the laptop identified a file with the same name in Levandowski's Downloads folder, which is attached as Exhibit 27. The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google).

Evidence also indicated that Levandowski accessed, along with other Ottomotto employees, an Ottomotto team site on the Slack collaboration platform (www.slack.com).[8] Levandowski was added as a user to this team site on November 18, 2015. Our review indicates that he accessed Slack twice on January 12, 2016, and again on March 10, 2016.

### Communicated with Google Employees

Stroz Friedberg identified two pictures of chat messages dated January 28, 2016, two days after Levandowski's departure, to Google employees referred to as Ionut and Rahim that reflect pitches by Levandowski to leave Google and join Ottomotto. See Exhibit 28.

### Deleted Relevant Files

Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016.  An example of this activity includes system logs indicating that on December 14, 2015, approximately 24,000 files were located within the folder path "/Users/Anthony/Desktop/boards/chauffeur-svn/." These same system logs indicate that on December 14, 2015, approximately 24,000 files were located within the folder path "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files indicates that they were source code and electronic design files relating to driverless cars. Attached as Exhibit 29 is a sample of the deleted file history, and a full history can be provided upon request. Given the timing, these deletions could be a good-faith effort by Levandowski to attempt to purge from his laptop Google confidential material prior to his departure.

Levandowski's iPhone 6S Plus[9] was used to communicate with, among others, Rhian Morgan, head of human resources for Ottomotto, regarding Shred Works.[10] In particular, between February 26 and March 1, 2016, there are three deleted chat messages between Levandowski and Morgan referring to Shred Works and/or the destruction of "stuff." See Exhibit 30. In addition, on March 13, 2016, Levandowski writes to an unknown recipient, "We're ready for junk King." See Exhibit 25.

---

[8]  The team name indicated in the URL is "280systems" which was set up on Novmber 10, 2015. At some point thereafter, the team site name was changed to Ottomotto.

[9]  Levandowski's iPhone 6S only contains messages and email data from February 6, 2016 to March 22, 2016 (the date Stroz Friedberg imaged the device). Levandowski did not identify a cloud account relating to this device on his questionnaire.  When asked during his interview about a cloud backup, Levandowski stated that he did have a cloud account but that it only backed up his Safari and News files on this device  The parties may want to seek access to this cloud account for further review and analysis.

[10]  There are approximately 1,300 deleted chat messages. As discussed before, each message in a thread is considered a separate object by Relativity. Accordingly, the 1,300 messages represent a much smaller number of actual threads.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000012

PRIVILEGED AND CONFIDENTIAL

Lastly, on March 1, 2016, Levandowski sent a text to an unknown recipient stating, "[D]elete the iMessages every night." See Exhibit 31. Levandowski also attempted to empty the Trash bin on his MacBook Pro while he was at Stroz Friedberg's office on March 22, 2016 at approximately 12:12 p.m., but our examination found no files were contained in his Trash at the time he attempted to empty it.

A more detailed forensic analysis of Levandowski's devices and accounts is included in Stroz Friedberg's report as Exhibit 17.

### Timeline of Relevant Activity on Levandowski's Devices

Below is a timeline of relevant events identified through analysis of Levandowski's devices:

- 12/14/2015 – Approximately 24,000 potentially relevant files and folders moved from a desktop folder to the Trash (ES001);[11]
- 12/21/2015 – DSR/Source Code Example and test report for HDL-64E S2 Laser Power Customer added to personal Dropbox account;
- 12/22/2015 – USB device labelled "8GB" erased using MacBook Pro laptop (ES001);
- 1/26/2016 – Levandowski's last day at Google;
- 1/26/2016 – USB device labelled "280" erased using MacBook Pro laptop (ES001);
- 2/9/2016 – Approximately 20,000 items moved to Trash (ES001);
- 2/10/2016 – 160 GB of free space became available on the MacBook Pro laptop (ES001);
- 2/19/2016 – 8 GB SanDisk Cruzer erased using MacBook Pro laptop (ES001);
- 2/26/2016 – Text from Rhian Morgan to Levandowski stating, "I'm gonna go get your stuff destroyed this afternoon btw. ill send you a bill and a pic/video" (deleted) (ES002);
- 3/1/2016 – Text from Levandowski to an unknown recipient stating, "Ok good reminder to delete the iMessages every night" (deleted) (ES002);
- 3/1/2016 – Text from Rhian Morgan to Levandowski stating, "i've been paying for shredding on my card, since it's not technically a business expense for OM. LMK if I should expense it or send you a bill instead 😊" (deleted) (ES002);
- 3/1/2016 – Text from Rhian Morgan to Levandowski stating, "Ricardo, the shredder at ShredWorks, has a thing for these baby blues so he only charges me for about half the stuff they shred" (deleted) (ES002);
- 3/8/2016 – Last known time the Drobo5 was connected to the MacBook Pro (ES001);
- 3/13/2016 – Text from Levandowski to unknown recipient stating, "We're ready for junk King" (deleted) (ES002); and
- 3/22/2016 – Trash emptied (during the interview with Stroz Friedberg) (ES001).

Many of these deletions may have been good faith attempts by Levandowski to purge retained Google material from his devices in accordance with his obligation not to retain confidential Google data. However, by March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to

---

[11] ES001 is Stroz Friedberg's internal evidence number for Levandowski's MacBook Pro Laptop. We numbered each device separately for all of the Diligenced Employees, which are contained in their respective forensic reports attached as Exhibits 17-21.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL                                                                 STROZ_0000013

PRIVILEGED AND CONFIDENTIAL

preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control. In addition, there was an effort by Levandowski and his Ottomotto colleagues to delete texts in real time. Stroz Friedberg did not re-interview Levandowski or others regarding their reason for this practice.

### 3. DOCUMENTS IDENTIFIED DURING STROZ FRIEDBERG'S REVIEW

#### Google Data or Information

Putting source code files aside, the vast majority of potentially relevant items were derived from Levandowski's sources of data, as opposed to those of the other Diligenced Employees. Relevant documents from Levandowski's devices and web-based repositories, including those from the Self-Identified Data, include the following:

- Pictures of a Google car, such as a Google car dash and Prius components/connections (Exhibit 32);
- Technical drawings and diagrams, such as a figure depicting radar technology, simulations, LIDAR-related diagram, and Google Confidential PBR 0.7 optical cavity drawing (Exhibit 33);
- Patent application for LIDAR (Exhibit 34);
- Videos, such as flashing lasers (Exhibit 35);
- Keynote files showing Google car road test (Exhibit 36);
- Source code "snippets" (Exhibit 37);
- E-mail messages from Levandowski's Google e-mail account discussing Chauffeur-related issues, simulation results, and a Calendar entry located in Trash regarding a meeting on March 18, 2016 at Levandowski's house (Exhibit 38);
- 1/28/2016 e-mail from Levandowski to unknown recipient regarding time to move on from Chauffeur and wanting to be in the driver's seat (Exhibit 39);
- Images of business cards (est. 185) located in a file path with folder named "Chauffer contacts" (Exhibit 40);
- Chauffeur group e-mail including, the Chauffeur-laser group e-mail discussing testing lasers and Chauffeur-all group e-mail discussing additions to 2081 (Exhibit 41);
- Presentations and PDF files, including information marked "Google Confidential and Proprietary" titled GBr Assembly Flowchart SOP (Exhibit 42), Chauffeur-LIDAR Simulations (Exhibit 43), "Confidential – do not share" files related to Chauffeur's business plan and 2014 funding ask (Exhibit 44), and a draft PBR v7 Laser Classification Memo (Exhibit 45); and
- Employee lists (Exhibit 46).

#### Formation of 280 Systems and Ottomotto

Levandowski's potentially relevant documents also contain some communications suggesting that details relating to the formation of Ottomotto may have taken place while he was still employed at Google.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

Depending on the timing, these materials may bear on Levandowski's fiduciary duty to Google.  The items include:

- 1/20/2016 note addressed to "S." (possibly Soren) regarding "metric I think we should spring to . . . Ford and any other oem will come begging to us to have us do a deal after we have this operating. Doing the ford deal now detracts focus and engineers from doing this and therefore should not happen. Ford isn't the only oem in town (there's a dozen that will work just fine). and even ford isn't going away, as we show more and more that the tech is real the more leverage we get and the more we can get what we want from them (speed and Mfg volume). [...] After we have our first 1,000 rides a day we scale as fast as possible. In my mind this battle will be won by the first team to get 10-20k cars unmanned on the streets. I also believe it is a winner take all in market by market regions. [...] Let's go kick ass!" (Exhibit 47);

- 2/25/2016 iMessage from Rhian Morgan to Levandowski stating, "Also when was your official last day at Google?  I want to date the sublease agreement to then" (Exhibit 48); and

- 3/11/2016 e-mail communication from Brad Templeton to Levandowski stating, "[...] Sure you just don't want to do cars instead of trucks? I've figured a way for the car companies to beat Chauffeur if they will let the self-drive unit be an autonomous start-up but give it a few special resources from the car company..."  Levandowski replies, "Ok fine, let's talk. When are you free?" (Exhibit 49).

<u>*Communications Regarding Recruiting Efforts of Google Employees*</u>

Levandowski's iPhone also contains e-mails, text communications and chat messages with other Diligenced Employees, Uber executives, former Google employees, and Ottomotto staff about recruiting people to Ottomotto, among other things. Below are some examples of these communications:

- 1/25/2016 employment offer letters to various Google employees (Exhibit 50);

- 1/28/2016 e-mail from Laila Mathos rejecting the offer to be part of 280 Systems (Exhibit 51);

- 2/6/2016 iMessage from Levandowski to Ron stating, "Don starts Monday.  He's moving his treadmill in today," with Ron replying, "This was one of the hardest pitch in history to convince someone to receive a pile of money"  (Exhibit 52);

- 2/8/2016 iMessage from Levandowski to Rhian Morgan stating, "They all need to sign nda, we were meeting at 12:00 today I think" (Exhibit 53);

- 2/9/2016 SMS message from David Wakeserstoffer to Levandowski stating, "Would it be possible to meet the 280 people who joined?  And it would be good to chat with Don...Can you maybe connect me to him?"  (Exhibit 54);

- 2/9/2016 iMessage from Rhian Morgan to Levandowski stating, "[A]nyways I talked them through some of the sensitivities and the importance of the confidentiality stuff we had them sign, but also hyped them up about how we're working on some cool stuff and that this is gonna be an awesome space for them to move into. . . ." (Exhibit 55);

- 2/10/2016 iMessage from Levandowski to Sebern stating, "Feel free to pressure Aaron!" (Exhibit 56);

- 2/11/2016 SMS message from Claire DeLaunay to Levandowski stating, "Alright I am ready to join your amazing adventure.  Can I start tomorrow?"  (Exhibit 57);

- 2/13/2016 iMessage from Rhian Morgan to Levandowski stating, "Others are down I think as long as we lock them down early next week" (Exhibit 58);

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

- 2/16/2016 iMessage from Levandowski to Rhian Morgan stating, "Let's ask everyone to get you 5 good names (no google people) to start the pipeline of recruiting" (Exhibit 59);

- 2/20/2016 iMessage from Ron to Levandowski stating, "[W]e're done with almost all of the issuance of shares, chasing Don jur and drew" (Exhibit 60);

- 2/22/2016 iMessage from Levandowski to an unidentified person stating, "Hey can you send me Aaron's contact details? Lior wants to give him a consultant confidentiality agreem [sic]..." (Exhibit 61);

- 2/22/2016 iMessage from Levandowski to Kalanick stating, "Its [sic] going amazing, just onboarded another 5 peeps today, 4 from former team...Looks like we're signing in a couple hours," with Kalanick replying, "Just reading text now...Pumped" (Exhibit 62); and

- 3/17/2016 iMessage from Levandowski to Kalanick stating, "I think I have a way to have both ATC and Bay Area peeps work on separate missions:  We focus on lasers and early roll out and he focuses on high quality/mass roll out.  We did this for streetview (ask bam), maps and early chauffeur and it worked super well.  I'll ping Jeff and run it by him."  Kalanick replies, "Interesting, it will be good to see how that model fits after we open kimono on fri" (Exhibit 63).

### *Additional Notes Files on Levandowski iPhone relating to Google and/or Ottomotto*

Levandowski's iPhone 6 also contains Notes with the following details:

- 9/17/2015 Note regarding "Senior Mgmt layer business lead / ceo," "doing business for Uber," and "how can it not have Google IP in it" (Exhibit 64);

- 1/7/2016 Note addressed to "L" [possibly a draft for Larry Page] regarding "Chauffeure is broken," "can't do it at Google" (Exhibit 65);

- 1/11/2016 Note regarding details about trucks, comparisons, and specifications (Exhibit 66); and 1/30/2016 Note stating, "I went back to Palo Alto and I rechecked the mail and makes sure I didn't miss anything from Google" (Exhibit 67).

### *Pictures and Videos*

Levandowski's relevant pictures and videos consist primarily of pictures related to the assembly of the Google self-driving car, the components of the car, and whiteboard snapshots of notes and diagrams including:

- Pictures of the construction process of Google car, such as components/connections and parts (Exhibit 68);

- GoPro video of self-driving vehicle test (Exhibit 69);

- Drawings and diagrams, such as figures depicting radar technology (Exhibit 70) and  simulations (Exhibit 71);

- Whiteboard pictures (Exhibit 72);

- Screenshots of text messages, meeting invitations, notes and e-mails (Exhibit 73);

- Electronic and hardware components (Exhibit 74);

- Images of computer screen contact lists and car (Exhibit 75);

- Flowchart of Chauffer software architecture (Exhibit 76); and

© 2016 Stroz Friedberg. All rights reserved.

STROZ_0000016

PRIVILEGED AND CONFIDENTIAL

- Pictures of business cards (Exhibit 77).

### Source Code Files

Approximately 734 source code files came from Levandowski's devices or accounts. Given Stroz Friedberg's lack of context, we could not determine whether these files were related to Google self-driving cars or otherwise constituted Google confidential information. A review of these files by Levandowski and/or a third-party expert could settle this issue, or they could be remediated in bulk.

While Levandowski retained, and in some cases, accessed Google confidential information after his departure from Google, Stroz Friedberg discovered no evidence indicating that he transferred any of that data to Ottomotto or other third parties.

B.   LIOR RON

1.   INTERVIEW AND INVESTIGATION

On March 22, 2016, Stroz Friedberg interviewed Ron. During his interview, Ron informed Stroz Friedberg that he worked at Google on two prior occasions. The first time was from April 7, 2007 to December 11, 2011. He then began working at Motorola, and he returned to Google on November 4, 2014, when Google acquired Motorola. He remained at Google until January 13, 2016.

During his interview, Ron informed Stroz Friedberg that he: (a) did not possess any Google information or data; (b) very rarely transferred information to his personal e-mail accounts; (c) met with some Google employees about the start-up company; (d) met with Uber executives and Levandowski, while employed at Google, about forming a new company; and (e) believed that five disks containing highly confidential Google information pertaining to self-driving cars were destroyed by Levandowski. Exhibit 6 is Stroz Friedberg's memorandum of Ron's interview.

### Did Not Retain Google Information or Data

Ron denied retaining any Google-related information. He stated that he accessed Google's network, including Google Drive, through his personal Nexus phone, but that such access was terminated when he resigned on January 13, 2016. He also stated that he did not use his personal laptop or any other personal devices to access the Google network or any Google data or documents.

### Transferred Some Google E-mails

Ron stated that he did not copy, download, or transfer any Google confidential or proprietary information to any of his personal devices and "very rarely" forwarded non-work related/non-confidential e-mails or contacts to his personal accounts. Ron acknowledged that, prior to leaving Google (on his last day); he forwarded some Google e-mails to his personal Gmail account, including employee exit documents, "public" presentations, and certain contacts. In particular, he said that he forwarded: (a) an e-mail regarding a Chinese company named LETV that was interested in starting a self-driving car division; (b) contact information for the Dropbox; (c) contacts for a Chinese self-driving car company that contacted Ron (he did not recall if it was the same company noted above); and (d) some personal photographs.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

### Met with Google Employees about Start-Up Company

Ron stated that while employed at Google he spoke with Levandowski about starting 280 Systems (thereafter renamed "Ottomotto"), attended a social barbeque for Chauffeur employees, and attended a group meeting at Levandowski's house in December 2015 where Ron gave a presentation on trucking automation. Ron recalled that the December 2015 meeting was just before the holidays and included a group of Chauffeur team members and other Google employees who had been invited to the meeting through Levandowski's connections. Ron identified seven Google employees in attendance, but did not recall the names of the other employees. After the meeting, Ron reached out to at least four Google employees who expressed an interest in the new company. He met with them over coffee and/or breakfast to discuss the new business and the possibility of them joining Ottomotto. Of the four, only one individual joined Ottomotto. Ron obtained most of the individuals' contact information from Levandowski.[12]

Following his departure from Google, Ron stated that a number of Google employees reached out to him about joining Ottomotto. Some of these individuals had already resigned from Google, but others were still employed. He specifically recalled telling most of these individuals, including his employees, that he could not solicit Google employees and tried to connect these individuals with individuals at Ottomotto who had not worked at Google. However, he did meet with at least three employees and discussed the new business and their potential participation. Each of these individuals ultimately received an offer and joined Ottomotto.

According to Ron, as of the date of his interview on March 22, 2016, Ottomotto had approximately 26 employees, 13 of whom previously worked at Google (7 of the 13 moved directly from Google to Ottomotto). Ron also emphasized that Ottomotto has put in place strict staffing protocols with regard to Google employees and that, if said employees contacted them, they have a protocol in place where the Google employee only meets with individuals who have not worked at Google to learn more about the company. Ron stated that an offer is made verbally, followed by a written offer, only after they leave Google. Ottomotto's employment letter also includes strong language about not bringing any prior employer data to Ottomotto. New employees also are issued new laptops and are directed not to use personal devices.

### Met with Uber Executives While Employed at Google

Ron stated that, beginning in October/November 2015 and while working at Google, he accompanied Levandowski to certain meetings with various Uber executives, including Jeff Holden, Brian McClendon, Cameron Poetzscher, Nina Qi and Travis Kalanick. Ron said that Uber was initially interested in a commercial agreement to license some technology and products (after-market car kits), but that as the conversation evolved Uber became interested in acquiring the new company which is focused on robotic trucks and after-market self-driving car kits. Ron did indicate that if they close the transaction with Uber, "They may be helping Uber compete with Google in some way," since Uber is interested in Google's Chauffeur Project.

### Destruction of Levandowski's Personal Drobo Disks with Confidential Google Information

Ron stated that approximately one week before his interview, Ron and Levandowski met with Uber executives Kalanick, Poetzscher, and Qi and discussed Levandowski's possession of proprietary Google

---

[12] The Google employees Ron recalls meeting with, or attending these meetings, are identified in his unredacted interview memorandum, which was produced to his counsel.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000018

PRIVILEGED AND CONFIDENTIAL

information. Per Ron, who claimed that his recollection of the meeting was poor, Kalanick said he did not want any of that data at Uber and he did not want to know what happened to the disks so long as they did not land at Uber. Based on that discussion, Ron said Levandowski destroyed the disks after the meeting. He also stated that thereafter he received a telephone call from Qi inquiring about the disks and advising Ron and Levandowski not to destroy them. Ron called Levandowski, learned that the disks had already been destroyed, and relayed this information to Qi. Ron stated that he could not recall any further details and seemed uncomfortable answering questions about this meeting.

## 2.   FORENSIC EXAMINATION OF DEVICES

### Retained, Accessed, or Transferred Google Information or Data

Stroz Friedberg's forensic examination of Ron's devices indicates that he accessed a Google Drive account from his iPhone 6S and his MacBook Laptop. However, we could not confirm if it related to his personal or work account.[13] In addition, he accessed, along with Levandowski and other Ottomotto employees, an Ottomotto team site on the Slack collaboration platform (www.slack.com). Our review indicates that Ron first accessed this site on November 17, 2015. Significantly, Stroz identified the Ottomotto team site on Slack being accessed via a web browser on Ron's MacBook Air laptop on January 1, 2016, during which time a file or folder labeled "Chauffeur_next_steps_-_we_need_team_Mac" was accessed. However, there is no evidence of potentially relevant files being transferred to Ron's devices.

Also, contrary to Ron's interview, our forensic examination also revealed that Ron used his MacBook Laptop to access Google's corporate intranet (MOMA) login screen between January 8, 2016 and March 12, 2016, well after he left Google, and that he stored potentially relevant data on several of his devices including his iPhone 6S, MacBook Laptop, MacBook Air Laptop, iPhone 5S, and iPad. Additional information regarding what he stored is included in the timeline and document review sections below.

In addition, Stroz Friedberg's analysis identified several active communications regarding Google employees, which were processed into Relativity for further review. Stroz Friedberg also observed potentially self-sent messages from lior@280systems.com regarding offer letters for Ottomotto employees, and scans of agreements for Ron, Juelsgaard, Claire Delaunay, Oleg Khainovski, Matt Grigsby, Asheem Linaval, Maxime Levandowski and Rhian Morgan, among other things.

### Deleted Relevant Files

Our analysis of Ron's MacBook Laptop and iMac indicates that these devices were used to conduct internet research regarding how to delete and destroy digital data in January 2016. His MacBook Laptop, iPad, and iCloud Backup also contain deleted communications with Levandowski regarding wiping and deleting data, among other things.

In addition, Stroz identified several items that were deleted between January 6, 2016 and January 22, 2016, including a Google-related document entitled "Chauffeur win plan.docx," which was deleted on March 22, 2016, shortly before Ron's interview with Stroz Friedberg. We do not possess this file, but an artifact on

---

[13] Stroz also found evidence that the Google Drive application was installed on Ron's iPhone 5S, but no additional information regarding data transfer was found.

© 2016 Stroz Friedberg. All rights reserved.

PRIVILEGED AND CONFIDENTIAL

the computer revealed Ron's access to it. Also, an iMessage from Levandowski saying, "I got Soren closed and Dan (both ex chauffeur)," was deleted on January 28, 2016. See Exhibit 78.

Stroz identified multiple internet searches conducted in January 2016 on Ron's iMac regarding data destruction, such as, "how to secretly delete files mac," "secure delete of trash on mac" and "how to permanently delete google drive files from my computer." Stroz Friedberg also recovered one deleted message between Ron and Levandowski on March 9, 2016 in which Levandowski instructed Ron to delete all messages on his PC and phone – "Make sure you delete all the messages tonight on both your PC and iPhone." See Exhibit 79.

There were also deleted chat messages on Ron's iPhone 5S that relate to Google, including discussions about "not incentivizing chauffeur employees more." Additional communications are listed in the timeline and document review sections below.

A more detailed forensic analysis of Ron's devices and accounts is included in Stroz Friedberg's report as Exhibit 18.

### *Timeline of Relevant Activity on Ron's Devices*

Below is a timeline of relevant events identified through analysis of Ron's devices:

- 1/1/2016 – Internet access to a Slack team site file or folder titled "Chauffer_next_steps_-_we_need_team_Mac" (ES015);
- 1/8/2016 – Internet access to https://login.corp.google.com (ES014);
- 1/12/2016 – Internet search "how to permanently delete google drive files from my computer" (ES058);
- 1/12/2016 – Internet search on "how to securely delete files mac" (ES058);
- 1/12/2016 – Internet access to "Moma Now" (ES014);
- 1/13/2016 – Internet search on "how to free up space on mac taken by secure erase" (ES058);
- 1/13/2016 – Ron leaves Google;
- 1/19/2016 – Internet search on "can a MacBook be recovered after formatting the OS" (ES058);
- 1/28/2016 – Chat message from Levandowski stating, "I got Soren closed and Dan (both ex chauffeur)" (deleted) (ES017);
- 1/31/2016 – Internet search on "secure delete of trash on mac" (ES058);
- 2/2/2016 – Internet search regarding "how to delete" certain information (ES014);
- 2/2/2016 – Chat message with Levandowski stating, "No problem, please re-wipe everything and start fresh vs just deleting my account if possible." (ES014);
- 3/9/2016 – Chat message from Levandowski stating, "Make sure you delete all the messages tonight on both your PC and iPhone" (ES024);
- 3/12/2016 – Internet access to "up.corp.google.com - MOMA Single Sign On" (ES014); and
- 3/22/2016 – A file labelled "Chauffer win plan.docx" is deleted, shortly before Ron's interview with Stroz Friedberg (ES015).

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

As is true with respect to Levandowski, Ron's deletions of Google data from his devices both before and after his departure from Google can be viewed as good-faith attempts to purge confidential data in accordance with his obligations to Google.  However, his deletion of Google data on the verge of his Stroz Friedberg interview displays poor judgment given the protocol in place. Although it is generally true that Ron retained very little Google confidential information after his departure from Google. In addition, as noted above, there was an effort by Ron, Levandowski, and their Ottomotto colleagues to delete text messages in real time.

### 3.   DOCUMENTS IDENTIFIED DURING STROZ FRIEDBERG'S REVIEW

Below are some examples of potentially relevant documents we identified that originated from Ron's devices.  They consist of Google confidential documents, e-mail and chat exchanges and notes pertaining to the startup.

#### Google Data or Information

- Google confidential material mostly related to Android wear including an Andriod wear test plan (Exhibit 80) and presentation regarding Google consumer surveys for smartwatches from April 2014 (Exhibit 81).

#### Communications with or about Google Employees Regarding Recruiting Efforts

- 12/24/2015 iMessage from Ron stating, "Waze - yes, the article is not well written but the government point stands. My friend is running this program for waze and will be poach able at some point as our bd lead, she's good. Need your help thinking how to position us as complimentary to waze and not competitor (since we will lead the effort to make them irrelevant after all) so we can get Noam and that team helping"  (Exhibit 82);

- 1/8/2016 SMS message from Ron to Claire Delaunay stating, "Hi Claire, it's Lior Ron....Anthony tells me all those great things about you, I thought I'll reach out and say hi :) Would love to meet in person over the weekend/Monday" (Exhibit 83);

- 1/8/2016 SMS message from Ron to Laila Mathos stating, "Hi Laila, it's Lior Ron....Anthony tells me all those great things about you, I thought I'll reach out to say hi :)... would love to meet in person over the weekend/Monday if you're around" (Exhibit 84);

- 1/21/2016 iMessage from Ron to Jur stating, "Hi Jur! Great connecting last night, looking forward to get going! I'll send the two of you the NDA later today, and we can aim to meet in person later tonight in SF, maybe around 6:30/6:45pm or so if that works, already engaged the immigration lawyer for sachin we'll get that set up soon" (Exhibit 85);

- 1/21/2016 iMessage from Rhian Morgan to Ron stating, "Hey is Will McCann someone we're offering to? He just called me looking for an offer letter but I haven't seen his name before. I told him I needed to follow up. Just trying to be careful in case info is leaking- probably paranoid I know!" (Exhibit 86);

- 1/21/2016 iMessage from Ron to Matt Sweeney stating, "Hey Matt! Great connecting last night, I'm going to send you the NDA later today if you can sign and send a photo/email back to me that will be great, we can aim to meet later tonight in SF, how about 5:30pm." Matt replies, "Sure I'll sign and scan it back to you. I work in Berkeley. I could meet up at 6ish is that cool? Where you thinking to meet?" (Exhibit 87);

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

- 1/23/2016 iMessage from Ron to an unknown recipient stating, "After that I'm dry on people until you intro more non Google folks, and we're ready to send any Google offers when you tell us" (Exhibit 88);

- 1/27/2016 iMessage from Rhian Morgan to Ron stating, "[I] think i made an error- i didn't give Pierre a letter for Colin because I know you've been speaking with him, and thought he was non-Google" (Exhibit 89);

- 1/28/2016 iMessage from Rhian Morgan to Ron stating, "[A]lso gonna bring this up w/ A when we speak in a bit but Ben Charrow reached out to me directly, I know he's a G guy, is it okay for me to respond? we aren't soliciting, he contacted me directly and the e-mail proves this [sic]" (Exhibit 90);

- 1/28/2016 iMessage from Levandowski to Ron stating, "Pierre is not coming 100% final [...] I got Soren closed and Dan (both ex-chauffeur) [...] Should get one more over the weekend" (Exhibit 91);

- 1/30/2016 iMessage from Laila Mathos to Ron stating, "Hi Lior, this is Laila. I sent a note to Anthony earlier this week but also wanted to write to you. It was a pleasure meeting you. I am sorry to not be a part of 280 with you and Anthony. I am sure it will be a wild success. I had to make a very difficult decision, but it now feels right with my family under our current circumstances. Have a great new venture and I hope we will stay in touch" (Exhibit 92);

- 1/31/2016 iMessage from Ron to Laila Mathos stating, "Thanks for sending the note Laila! Enjoyed getting to know you, and I fully support whatever decision is best for you , I'm not allowed to reach out or solicit googlers and intend to keep that, but hope we'll stay in touch socially and in the future, take care!" (Exhibit 93);

- 2/3/2016 iMessage from Ron to Levandowski stating, "Don has everything he needs ball is in his court to sign wanted to take one final look with lawyer time to go full court press now" (Exhibit 94);

- 2/3/2016 iMessage from Levandowski to Ron stating, "Don will pressure them to accept or leave [...] Once they join the power is in our hands" (Exhibit 95);

- 2/4/2016 iMessage from Levandowski to Ron stating, "If Claire has left Google let's get her to come by, but she must be no longer employed not just having resigned" (Exhibit 96);

- 2/4/2016 iMessage from Levandowski to Ron stating, "Missing were Colin, Matt Williams, Dan Gruver, Saturn, and three other eng likely to join from outside, plus 3-5 aspen missing guys/gals" (Exhibit 97);

- 2/5/2016 iMessage from Ron to Levandowski stating, "Colin told me about the driver situation, can't believe aspen done that, let's be careful about this [...] Although if well known on the team has some declarative value [...] as long as there is no other legal issue there." Levandowski replies, "If they are out of Google we are good" (Exhibit 98);

- 2/8/2016 iMessage from Rhian Morgan to Ron stating, "We went through the G self driving job listings and he pulled about 25 specs for me to condense as a lot of them overlap" Ron replies, "Ok cool, if you can send me the specs later tonight that Will be great" (Exhibit 99);

- 2/11/2016 SMS message from Daniel Gruver to Ron stating, "Hi Lior - this is Daniel - we met last night. Can I get email set up? If possible daniel@280. My personal email is ▮▮▮▮▮▮@gmail.com" (Exhibit 100);

- 2/14/2016 iMessage from Ron to Levandowski stating, "If you feel the tone of TK/Emil this morning was super aggressive we can strip out the fact we can't offer direct employment to people while still at aspen" (Exhibit 101);

- 2/21/2016 iMessage from Ron to Rhian Morgan stating, "[D]o we know if at Google everyone is full time or they also have contractors? the cost base is substantially different for what can be the same

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

service." Rhian Morgan replies, "They were a mix of contractors and full time at Google" (Exhibit 102);

- 2/22/2016 iMessage from Rhian Morgan to Ron stating, "I'm going to get the wet signatures for the 83b from Daniel Colin and Jur today. We need to figure out how quickly we need wet signatures from Don and Drew though" (Exhibit 103);

- 2/23/2016 iMessage from Ron to Burnette stating, "[W]e are 22 people as of today [...] another 4 joining by end of week [...] software room is stacked [...] claire, you, Jur, Yevgeny who starts tomorrow, David is week-two away [...] a bunch of folks in the pipeline" (Exhibit 104);

- 2/29/2016 iMessage from Nina Qi to Ron stating, "Hi Lior - are you free tomorrow (3/1) for 30 minutes to have a call with our employment lawyers to discuss your process with G employees? We are free from 2 to 5 pm" (Exhibit 105);

- 3/3/2016 iMessage from Sebern to Ron stating, "Woman I know is considering to go to Zoox from Google. She's a driver. Currently at Google. Zoom has offered her $36/hr and stock. Can we beat that?" Ron replies, "Sorry, Can't comment on Google employees or help solicit them, neither do you, thanks!" (Exhibit 106);

- 3/5/2016 iMessage from Levandowski to Ron stating, "So we need to make sure peeps sign two papers: 1) stating they understand the hiring process for google employees, 2) certifying that they complied with the paper and not bringing ip etc. (I assume we have this one already, but want to review it)" (Exhibit 107); and

3/11/2016 iMessage from Rhian Morgan to Ron stating, "[D]o you have dan ratner[']s cell phone number?  need to close the loop with him on dependents for health care" (Exhibit 108).

### Ottomotto Planning

- 9/21/2015 e-mail from Ron to Scott Offer at Motorola looking for IP lawyer recommendations that had experience dealing with Google and can be fully trusted to keep matters confidential (Exhibit 109);

- 10/24/2015-11/16/2015 e-mail exchange between Eyal Shinar, the CEO of Fundbox, and Ron initiating a brunch invitation and including a discussion of funding strategy (Exhibit 110);

- 12/24/2015 iMessage from Ron stating, "We don't want to be hostile to google at all.  We want to help them.  We just want to be the android of cars and uber of trucking..." (Exhibit 111);

- 2/29/2016 – 3/2/2016 internal Ottomotto e-mails discussing recruitment and emphasizing cannot solicit Google employees (Exhibit 112);

- 3/10/2016 - 3/12/2016 e-mail exchange forwarded to and introducing Ron to Innoviz commenting that "both sides are in stealth" (Exhibit 113); and

- Notes and lists regarding startup including note discussing four key risk areas for deal including, suit brought by Google (Exhibit 114), list of former "Moto Employees" (Exhibit 115) and August 2015 to October 2015 e-mail string between Ron and Jim Palmer of Martinez Palmer containing a list of names of possible candidates, including discussion of one individual that might be getting an offer from Google (Exhibit 116).

### Slack and Deletion Discussions

- 11/9/2015 iMessage from Ron to an unknown recipient stating, "There's tons of stuff I don't send you for security. Choose from the following options: regular gmail. New joint gmail account well both have login to, Dropbox folder, need to start getting things organized" (Exhibit 117);

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

- 11/10/2015 iMessage between Levandowski and Ron, where Levandowski discusses a "Dropbox folder," and Ron replies, "Cool...Let's try slack, secure and I know the CEO :) just invited you let me know, enable notifications on your mobile/desktop and we can communicate there" Levandowski replies, "OK sounds good" (Exhibit 118);

- 11/16/2015 iMessage to Ron from Levandowski stating, "Please Delete after use." Ron replies, "Thanks will do...Deleted, good call" (Exhibit 119);

- 12/18/2015 iMessage from Levandowski to Ron stating, "Let's do Slack and iMessage only;-)" Ron replies, "Ok" (Exhibit 120);

- 12/18/2015 iMessage from Ron to Levandowski stating, "My bad was thinking of copy pasting cutter e-mail to slack but passed, will not happen again." Levandowski replies, "No worries let's just keep it clean" (Exhibit 121);

- 12/29/2015 iMessage from an unknown person to Ron stating, "Uploaded offer letters to slack..." (Exhibit 122); and

- 3/9/2016 iMessage from Levandowski to Ron stating, "Make sure you delete all the messages tonight on both your PC and iPhone." (Exhibit 79).

### Pictures and Videos

Ron's media contained relevant pictures and videos primarily relating to autonomous vehicles, lasers, graphs, and whiteboard snapshots of notes and diagrams, including:

- Pictures of components/connections and parts of autonomous vehicles (Exhibit 123);

- Confidential material related to Long Range Lasers (Exhibit 124);

- Pictures and videos of digital interpretation of a car driving (Exhibit 125);

- Graphs of driving statistics (Exhibit 126); and

- Whiteboard pictures (Exhibit 127).

### Source Code Files

Approximately 62 source code files came from Ron's devices or accounts. Given Stroz Friedberg's lack of context, we could not determine whether these files were related to Google self-driving cars or otherwise constituted Google confidential information.

C. DON BURNETTE

1. INTERVIEW

On March 23, 2016, Stroz Friedberg interviewed Don Burnette. Burnette worked as a software engineer at Google for the Chauffeur Project from August 2010 to February 9, 2016. He started working for Ottomotto on February 29, 2016. During his interview, Burnette informed Stroz Friedberg that he: (a) did not possess any Google information or data; (b) never accessed Google's network with any of his personal devices; (c) never downloaded or transferred any Google data to his personal devices or accounts; and (d) prior to leaving Google, spoke with Ron and Levandowski about the start-up company. Exhibit 7 is Stroz Friedberg's memorandum of Burnette's interview.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

### Did Not Retain, Access or Transfer Google Information or Data

Burnette denied retaining any Google-related information and stated that he did not access, copy, download, or transfer any Google confidential or proprietary information to any of his personal devices during his employment or upon leaving Google. He stressed that he only used his work devices to access the Google network and Google documents.

### Met with Google Employees about the Start-Up Company

In December 2015, while still employed at Google, Burnette spoke with Levandowski concerning the automated vehicle space and attended a group meeting at Levandowski's house where Ron gave a presentation on trucking automation. Levandowski spoke to the group about wanting to start a company in the trucking space. Burnette stated that he had a side conversation with Ron and Levandowski at this meeting about the structure of the proposed company and what he could bring to the table. He recalled that at least seven Google employees were also in attendance, along with other non-Google employees. The meeting lasted one to two hours.

Burnette stated that about one week after the above-referenced meeting, he spoke with approximately three members of the laser team about the start-up and the risks associated with it. After that meeting, which was in plain view, Burnette was approached by his manager and asked if he was leaving. Burnette thereafter spoke with the head of the Chauffeur Project, who advised Burnette that Google would own all of the autonomous vehicle space and would "crush" Burnette if he left.

On February 9, 2016, Burnette contacted Ron to let him know he left Google and was interested in joining Ron and Levandowski. The following day, Burnette met with Ron and spoke with him about joining Ottomotto and certain deal points. He received an offer from Ottomotto on February 11, 2016 and accepted the position. His main role was to write code regarding the dynamics of how automated trucks work. He emphasized that he would not be relying on any information from Google since Ottomotto is in a different domain with a different approach. He said Google is focused on controlling cars on streets and Ottomotto is interested in controlling trucks on the freeways.

Burnette has referred several non-Google employees to Ottomotto. Also, he acknowledged that he has interviewed several people, but no one from Google. If the applicant was from Google, he would not interview him or her. He also stated that he believed there was a process in place at Ottomotto to prevent new employees from bringing information from their prior employers to Ottomotto.

2. FORENSIC EXAMINATION OF DEVICES

### Retained, Accessed or Transferred Google Information or Data

Stroz Friedberg's forensic examination of Burnette's devices confirms Burnette's representations that he did not store or transfer any Google data or information to his personal devices. Stroz Friedberg did find evidence that indicates that Burnette used his MacBook laptop to access Google's corporate intranet (MOMA) site login page both before (January 9, 2016) and after (March 21, 2016) he left Google. There is no forensic detail available on what Burnette viewed on MOMA in March 2016. He accessed Google Drive on all of his devices as well, but we were not able to determine if this access was personal or work-related.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000025

PRIVILEGED AND CONFIDENTIAL

In addition, Stroz observed an internet search on Burnette's MacBook Pro for "how to factory reset macbook pro" on March 4, 2016, which is the same day the operating system was installed, upgraded, or restored. His MacBook Pro was backing up to a Time Machine, which Stroz Friedberg did not receive, image, or analyze. Burnette also provided Stroz Friedberg with a 4 terabyte Synology device which we imaged but did not process for review per the parties' instructions. Stroz Friedberg conducted a preliminary review of this device and identified a number of personal GoPro and cinema movie videos. Further analysis would be necessary to determine if this device contains any relevant files.

### Deleted Potentially Relevant Files

Burnette's iPhone 6S Plus contains a deleted text message with an unknown party dated February 4, 2016 regarding "updates on Google front."

A more detailed forensic analysis of Burnette's devices and accounts is included in Stroz Friedberg's report as Exhibit 19.

### Timeline of Relevant Activity on Burnette's Devices

Below is a timeline of relevant events identified through analysis of Burnette's devices:

- 1/9/2016 – Access to MOMA (ES030);
- 2/4/2016 – Text message stating, "Let's do that, just finished chatting with Yevgeni. Also have doe updates on Google front" (Deleted) (ES037);
- 2/8/2016 – Access to MOMA (ES030);
- 2/9/2016 – Burnette leaves Google;
- 2/10/2016 – OS installed on MacBook Pro (ES030);
- 3/4/2016 – OS installed, upgraded, or restored on MacBook Pro (ES030);
- 3/4/2016 – Internet search performed on "how to factory reset macbook pro" (ES030);
- 3/15/2016 – Access to MOMA (ES030); and
- 3/21/2016 – Access to MOMA (ES030).

The installation of a new operating system on the MacBook Pro would have had the effect of deleting all of the current documents and e-mails on that machine. There is nothing to indicate that the installation of a new operating system on the MacBook Pro in February 2016 and possibly March 2016 is anything other than an action consistent with Burnette's compliance with his duty not to bring confidential material out of Google.

### 3. DOCUMENTS IDENTIFIED DURING STROZ FRIEDBERG'S REVIEW

Don Burnette's potentially relevant documents consist largely of what appear to be text messages and Gchat messages of a personal nature and do not specifically relate to the solicitation of Google employees or the use of Google intellectual property, except for one or two text messages noted below:

- Chats with occasional mentions of Google, most notably discussing piggybacking off Google's legislative work on April 6, 2016 (Exhibit 128);

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

* 2/4/2016 message from Burnette to Levandowski stating, "Let's do that, just finished chatting with Yevgeni. Also have doe updates on Google front" (Exhibit 129);

* 2/11/2016 iMessage from Burnette to Jur Van Den Berg stating, "Hey Jur, great news, Claire has decided to join and has already started! [...] I had a great conversation with David (the guy she worked with at Google and wanted to bring) about planning and control ideas and I think I got him hooked, he should also be joining soon." "It's all coming together" (Exhibit 130);

* 2/29/2016 iMessage from Burnette to Levandowski stating, "FYI, I have a few really awesome sw candidates in mind but nobody wants to work in SF. I just hope that we have good way to reach out to 'all of the talent' that you spoke of ☺" Levandowski responds, "Yeah, we are having a South Bay office too" (Exhibit 131);

* 3/3/2016 iMessage from Burnette to Levandowski stating, "Sasha left Google this morning. I've already reached out to him" [...] "He wants to come by today to chat" and "did you convince Sasha that our #1 priority is actually shipping something?" Levandowski replies, "I think so." Burnette replies, "good." Levandowski then states, "Great. Did you and him talk?" Burnette replies, "yes" and "tried to also convince him." Levandowski replies, "Hehe, I think he's in." (Exhibit 132); and

* 4/6/2016 draft e-mail indicating that Burnette was likely leaving to join a startup with Levandowski. (Exhibit 133).

### Pictures and Videos

Stroz Friedberg identified images from Burnette's computer that appear to be snippets of source code (Exhibit 134).

### Source Code Files

Approximately 1,603 source code files came from Burnette's devices or accounts. Given Stroz Friedberg's lack of context, we could not determine whether these files were related to Google self-driving cars or otherwise constituted Google confidential information.

### D.   SOREN JUELSGAARD

#### 1.   INTERVIEW

On March 24, 2016, Stroz Friedberg interviewed Soren Juelsgaard. During his interview, Juelsgaard informed Stroz Friedberg that he worked at Google from in or about October 2010 to approximately May 2011 as a hardware manager for the Chauffeur Project. Juelsgaard, however, appears to have been issued an offer letter dated August 1, 2011 (contingent upon the completion of the acquisition of 510 Systems) and a performance improvement letter on March 1, 2012, which indicates that his employment likely began in or about October 2011, and ended in May 2012.  After leaving Google, Juelsgaard worked at Nautilus, a construction company, on a robotic parking system.

During his interview, Juelsgaard stated that he: (a) did not possess any Google information or data; (b) never accessed Google's network with any of his personal devices; (c) never transferred any Google data to his personal devices or accounts; and (d) did not solicit any Google employees to work at Ottomotto, even though his non-solicitation agreement expired years ago. Exhibit 8 is Stroz Friedberg's memorandum of Juelsgaard's interview.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000027

PRIVILEGED AND CONFIDENTIAL

### Did Not Retain, Access or Transfer Google Information or Data

Juelsgaard stated that he only accessed Google's network through his work laptop. If he connected to Google's network through VPN, he would do it through his work laptop as well. He said that he did not use any personal devices to access any work-related communications and never transferred or stored any Google data on any flash drives, thumb drives, external drives, personal devices or online repositories.

### Met with Google Employees about the Start-Up Company

Juelsgaard stated that Levandowski contacted him on January 29, 2016, told him he was going to launch a start-up, and asked Juelsgaard if he wanted to be a part of it. Later that day they met for lunch and Levandowski told Juelsgaard he wanted to bring him on board as the director of engineering. Juelsgaard was concerned that another Google employee who he did not get along with might be joining the company, but Levandowski reassured him he was not. Juelsgaard began working at Ottomotto on February 3, 2016. His duties involve managing all hardware related to self-driving trucks. He said his work at Ottomotto is different than the work at Google in that he is only focused on trucking and big rigs, as opposed to cars.

Juelsgaard stated that two current Google employees contacted Juelsgaard while he was working at Ottomotto. They met for lunch, and Juelsgaard disclosed that he was working on a project with Levandowski. They did not talk in detail about Ottomotto or its business. In addition, in March 2016 he went to a truck rally in Oakland with approximately three to four Google employees. They spoke a little about Levandowski, but the rally was too loud to have a substantive conversation.

Juelsgaard stated that Ron told him not to solicit any Google employees, even though Juelsgaard was no longer bound by a non-solicitation agreement. Ron also told him that he could not discuss what they were doing with people outside of the start-up, and that if a current Google employee asked him about the company he could tell him/her that he is working with Levandowski at a start-up involving trucks. Juelsgaard stated that he does not participate in the interview process for any applicant from Google.

## 2. FORENSIC EXAMINATION OF DEVICES

### Retained, Accessed or Transferred Google Information or Data

Juelsgaard's devices and accounts do not appear to contain any Google-specific information or data of any consequence, with two possible caveats: (a) in Juelsgaard's Gmail account, sjuel@gmail.com, there is significant evidence of source code and scripts relating to lasers; and (b) on his devices we found 174,311 source code files. However, Stroz Friedberg cannot ascertain whether these items are Google information or data. For example, during our forensic review we identified potentially relevant self-sent messages containing: python scripts named laserbar.py and rtmp.py; laser backup containing C++ Code named LMS1xx_node.cpp and LMS1xx.cpp; and an attachment named dotemacs.dat. Given the large number of source code files in Juelsgaard's possession, he and/or a third party should clarify whether these materials constitute Google confidential information, or they could be remediated in bulk without a file-by-file review. It is important to note, that Juelsgaard only worked at Google for approximately seven months and more recently worked for Nautilus on robotic parking systems. Thus, it is possible that the above-referenced code pertains to his work at Nautilus. Without further information, we cannot confirm or disprove this.

© 2016 Stroz Friedberg. All rights reserved.

PRIVILEGED AND CONFIDENTIAL

Juelsgaard's MacBook Pro-1 appears to be used mostly for personal use. It contains two virtual machines which were used between 2012 and 2014 (after his employment with Google) for programming and testing relating to robotics and lasers. Additionally, there is a profile name "510s," which was created on January 8, 2010 and last used on May 8, 2012. This could relate to his former company, 510 Systems, which Google acquired in the fall of 2011.

Most of Juelsgaard's devices do not reveal any mass wipings or deletions. However, his USB contained approximately 1,500 deleted files, some of which are potentially relevant pictures and diagrams. Again, Stroz Friedberg does not have the context to rule these in or out as Google confidential information. As with the source code files, further review could be conducted by Juelsgaard or a third party with sufficient context, or these items could be remediated in bulk.

A more detailed forensic analysis of Juelsgaard's devices and accounts is included in Stroz Friedberg's report as Exhibit 20.

### 3.   DOCUMENTS IDENTIFIED DURING STROZ FRIEDBERG'S REVIEW

Other relevant documents from Juelsgaard include the following, although none seem of particular consequence. Aside from the Calendar entries in December 2016, Juelsgaard had no written communication with the Diligenced Employees until early February 2016, after he joined Ottomotto. He had exchanges with Levandowski, Ron, and Sebern, but nothing particularly relevant.

- 10/11/2010 e-mail with Alan Altmann describing how Juelsgaard's company is not funded by Google (Exhibit 135);
- 1/16/2012 e-mail chain regarding repair/service on COWls IP-2s HD (Exhibit 136);
- 1/24/2012 - 1/25/2012 Extended e-mail chain and report of COWI mobile mapping status as of January 30, 2012, including references to Topcon and Velodyne scanners (Exhibit 137);
- 9/11/2012 e-mail with George Lagui regarding the use of SICK LMS100 LiDAR to scan for cars (Exhibit 138);
- 8/26/2012 and 8/29/2012 e-mails regarding Safety System Logic that specifically references "Little Bear lasers" (Exhibit 139);
- 2012 Criterion task list forwarded to Juelsgaard and Levandowski (Exhibit 140);
- 12/2/2015 Calendar entry titled "Continue our conversation regarding Project" with detail "I'll call U" with Frantz Lohier @QCA.Qualcomm.com (Exhibit 141);
- 12/4/2015 Calendar entry titled "continue our venture planning," "will call you phone" with Frantz Lohier (see Exhibit 142);
- 1/28/2016 SMS message from Juelsgaard to his girlfriend, Lotti Hermansson, stating, "[S]igned NDA – talking stock options. Office in SF" (Exhibit 143);
- 3/31/2016 e-mail exchange with Nevra Kadioglu enticing her to work for Ottomotto (Exhibit 144);
- Bryon Majusiak's resume (Google employee on Chauffer team) (Exhibit 145); and
- Aaron Wilson's resume (Google employee on Chauffer team) (Exhibit 146).

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

**TX-7912, Page 29 of 33**

PRIVILEGED AND CONFIDENTIAL

*Pictures and Videos*

Stroz Friedberg's second level review of Juelsgaard's media produced 164 relevant pictures, including:

- Diagrams and flowcharts (Exhibit 147);
- Screenshots of a computer monitor (Exhibit 148); and
- Pictures of whiteboards and handwritten notes (Exhibit 149).

*Source Code Files*

174,311 source code files came from Juelsgaard's devices and accounts. Given Stroz Friedberg's lack of context, we could not determine whether these files were related to Google self-driving cars or otherwise constituted Google confidential information. Juelsgaard and/or a third party with better context could parse through these files, or, as mentioned herein, they could be remediated in bulk.

E.   COLIN SEBERN

1.   INTERVIEW

On March 24, 2016, Stroz Friedberg interviewed Colin Sebern. Sebern began working at Google in October 2012 and resigned on October 22, 2015.[14] Sebern was a program manager at Google, responsible for converting new cars into self-driving cars. He called himself a "glorified mechanic." He began working for Ottomotto in early 2016. During his interview, he stated that he: (a) did not possess any Google information or data; (b) never downloaded or transferred any Google data to his personal devices or accounts; and (c) did not solicit any Google employees to work at Ottomotto. Exhibit 9 is Stroz Friedberg's memorandum of Sebern's interview.

*Did Not Retain, Access or Transfer Google Information or Data*

Sebern stated that Google allowed its employee to access its Google Drive through their personal devices and that he did access it through his personal Apple iPhone. He emphasized, however, that he only accessed Google work documents on his Google work laptop and that he never e-mailed any Google information to his personal e-mail accounts. Sebern also confirmed that he only stored and backed-up his Google work documents on the corporate Google Drive and that he never stored any Google data or information on any flash drives, thumb drives, external drives, personal devices, or online repositories.

Sebern stated that, prior to his departure, he did not forward or transfer any Google data or information to himself or export any Google data. Sebern stated that he checked his personal e-mail and devices for Google information or data and said that they did not contain any code, user data, employee data, or any other kind of information or data from Google.

---

[14] Sebern was originally hired by Google as a contract employee through Adecco and was hired as a full-time Google employee on September 20, 2014.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

**TX-7912, Page 30 of 33**

PRIVILEGED AND CONFIDENTIAL

### *Met with Google Employees about the Start-Up Company*

Sebern stated that before leaving Google, he met with several Google employees, including Levandowski, but he did not discuss the start-up at that time.

On October 22, 2015, within a week of leaving Google, Levandowski contacted Sebern to see if Sebern wanted to join him as a consultant. The next day Sebern went to Ron's house and signed a consulting agreement and a non-disclosure agreement ("NDA"). After those documents were signed, Ron told Sebern that he and Levandowski were working on self-driving trucks.

For the next month, Sebern stated that he took photographs of mirrors on cars for Ron and Levandowski. He rented several vehicles to evaluate their mirror position and where the sensors and lasers on a self-driving vehicle should be mounted. In or about late December 2015 or early January 2016, Ron told Sebern they had started a new company involving self-driving trucks and asked him to join. Levandowski also encouraged him to join the start-up. In early 2016, Sebern was hired by Ottomotto as an engineer.

Sebern stated that one former and one current Google contract employee contacted Sebern to learn more about the new company, and Sebern brought them to Levandowski's house to see the operations. Neither of these individuals ended up joining Ottomotto.

Following these meetings, Sebern stressed that if anyone from Google contacted him he would not speak with them about Ottomotto. Instead, he would "hand them off" to human resources. He reiterated that Ottomotto has a separate interview process for Google employees and that he has never seen Levandowski or Ron speaking with an applicant from Google.

### 2. FORENSIC EXAMINATION OF DEVICES

Sebern's Apple iPhone was encrypted and thus Stroz Friedberg could not process or analyze this device. During his interview, Sebern provided Stroz Friedberg with a list of possible passwords, but none of them worked. Since Sebern's iPhone was encrypted, the only device that Stroz Friedberg could analyze was his MacBook Pro. There was virtually no data relating to Google or the subjects of our inquiry on Sebern's MacBook Pro with one possible caveat: Stroz Friedberg found 36 "TempZip" files that appear to contain source code. Stroz Friedberg does not have the context to assess whether these source code are Google confidential information.

It appears that the MacBook Pro was used to access an e-mail message on March 1, 2016 sent to colin@Ottomotto.com with the subject line "Junk King coming Tuesday 11am." See Exhibit 150. Interestingly, 57 gigabytes of additional free space became available on Sebern's MacBook Pro between March 23, 2016 and March 24, 2016, with approximately 900 files and folders being deleted on March 24, 2016, just prior to his interview with Stroz Friedberg. We reviewed the deleted files by name and did not locate any that appeared to be Google-related. We also identified four external devices connected to his laptop between March 17 and March 24, 2016, but Sebern did not provide those to us for review. We did not find any evidence of relevant data copy or transfer.

A more detailed forensic analysis of Sebern's devices and accounts is included in Stroz Friedberg's report as Exhibit 21.

© 2016 Stroz Friedberg. All rights reserved.

PRIVILEGED AND CONFIDENTIAL

3. DOCUMENTS IDENTIFIED DURING STROZ FRIEDBERG'S REVIEW

Sebern's relevant documents included the following, which do not appear to be of any great consequence:

- 2012 estimate to Google for Velodyne mounts (Exhibit 151);
- 1/16/2016 offer letter from 280 Systems (Exhibit 152);
- 1/21/2016 e-mail from Ron with pre-employment NDA (Exhibit 153);
- 1/25/2016 – 1/26/2016 e-mail to Ron asking to discuss offer letter, outlining work he did on the project over the weekend at Levandowski's request, and a discussion to set up time to talk (Exhibit 154);
- 2/3/2016 e-mail to Levandowski regarding driver's list (those no longer employed and those who might leave soon) (Exhibit 155); and
- 4/1/2016 e-mail from Sebern with no entry in "To" field, but the body of which states, "They have grabbed a handful of people from Chauffeur so far" (Exhibit 156).

Many of Sebern's files were ordinary, business-related files that did not contain proprietary information. Many files that were administrative in nature, for example Slack account change of e-mail address forms, FedEx tracking links, invitations to trade events, PayPal payment confirmation, truck brochures, documents relating to 280 Systems, Inc., and NDAs. Sebern also had a few files related to his employment at Google, including his offer letter and an employment policy document. There also were many e-mails related to Sebern's hobby of classic auto restoration and racing. These documents triggered many false positive hits on keywords.

### Pictures and Videos

Sebern's potentially relevant pictures and videos consist of 1,231 files, including:

- GoPro video of self- driving vehicle test (Exhibit 157);
- Diagrams of car components (Exhibit 158); and
- Pictures of cars and car parts (Exhibit 159).

### Source Code Files

93 source code files came from Sebern's devices and accounts. However, given Stroz Friedberg's lack of context, we could not determine whether these files were related to Google self-driving cars or otherwise constituted Google confidential information.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

**TX-7912, Page 32 of 33**

PRIVILEGED AND CONFIDENTIAL

BOSTON

CHICAGO

DALLAS

HONG KONG

LONDON

LOS ANGELES

MINNEAPOLIS

NEW YORK

SAN FRANCISCO

SEATTLE

WASHINGTON, DC

ZURICH

# STROZ FRIEDBERG

www.strozfriedberg.com

 @strozfriedberg

© 2016 Stroz Friedberg. All rights reserved.

**TX-7912, Page 33 of 33**

*Waymo v. Uber*
**Case No. 3:17-cv-00939-WHA**

# TRIAL EXHIBIT 8854

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Anthony Levandowski, who participated in the Stroz diligence process in his individual capacity. *See* Br. § II.

- Fed. R. Evid. 805 – This document contains inadmissible hearsay within hearsay; namely, Anthony Levandowski's recitation of out of court statements made by other declarants. *See* Br. § II.

- Fed. R. Evid. 1002 – The original document contains multiple different colors of writing. The different colors are attributable to different authors and/or were composed separately at different points in time. *See* Br. § II. The trial exhibit is a photocopy of the original document, which obscures the color differences.

- This document was never received by anyone outside of Stroz Friedberg. It is therefore inadmissible for any non-hearsay purpose as to Uber or Ottomotto.

*Note*: This document is handwritten and is not susceptible to highlighting.

Wanted (comp.) that
UBER so we have
a valuation. who have

20 meetings + lunch

UBER

an announcmnt from UBER
+ we had lunch
so you emailed him
(what he doesn
what
Gu neue

MET Travis / Garret

2012

< at event 2012 gave them a
ride in self drivg car

2014/2015 Sebastian intro. me to Travis. Travis
handed me to Jeff. Jeff Holden
tried to recruit me to Uber.

July 2015

I stalled!
I congratulate Brain
with UBER

(2) Fuyton
de Mr

Brian Follow-up meeting     (2) Brian to build
email     said at mtg - Traved mtg want to do. + invest in
a separate start-up to     do something

2 3wks     (3) Lunch w/ Brian - after cafe

Possibility in teamg up > a month google taken too long

Sept     (5)     early UBER — Anthony —

Brian McClendon     UBER     we start UBER
discussg
Cian Naren     they shakeg
partner
+ be a
This'll
neve
metric

customer deal
Sept     Fundws if future term / fundracr
figure out cost

2015     (6)     Cian Me. customer agreemt
NnA     licensg, fundg

chargg
Customer. 4
Into UBER !
(4) Brian
Cian
Me
discussg
customer dea
out.

say I want to fund — went to

United States District Court
Northern District of California
**Trial Exhibit 8854**
Case No. 3:17-cv-00939-WHA
Date Entered
By
Deputy Clerk



Lets get Uber to write an letter in exchange for

— help cement true value

CONFIDENTIAL                    STROZ_0021101

8pm - 2am.

Oct 2015 - ~~Having~~ Talk to TK + decide
what want to do -
— Educate him on Ubercars
— Travis said want deeper
deal — ~~but~~ transition from
customer to acquisition

Several come to sense a couple hours
'60 to UBes offer
— ~~Fots go~~

— ~~tk~~ Travis text Anthony to meet @ Uber
bigger deal / ~~meet~~

Oct / Nov. 2015 - Meet ~~at UBER~~

following week — CAM in person meeting Brian
Anthony
— Anthony double

Oct / Nov. @ UBes office
2015 ( merge w (Brian Selesky) — Men
and Uber meeting.

meeting in person with others teams to result

after Nov. 2015 told them stuff wasn't progressing )
meet w/ UBER

New
Then discuss what bigger deal be like.
They understood / main focus of
(area)
— specifics of what + did

Dec 2015 Discuss progress → Dec ~~Feb~~ you
— plan to acquire accuracy b/f left Google
— acquisition price
— teams
— term sheet

UB Travis — 1 on 1 w/ deal guys (CAM + NINA)
~~TENK BANGS~~ — ( RUNS Uber self Drive.)

UPDATE - real projects

Amil — Uber → Cam's boss

( 3 convos w/ him
mauy sure deal was alive

Post that meeting· wju + Liz

10—    generally Cam, Nina, Travis,
meeting          Juton, Jeff

& turn a month
finalize terms of Deal

@ Deal Terms
— Cautus about how Google contract

Nov/Dec  ws @, sol. emply  } taedus
         cent.

Timefus  ⟩ Showed Uber contract (cam
        — once became clear.

@ Patents - asked about patents

Veladini — went to make sure can
mauue lasers apart infrng patnts.

DUTIES UBER

delver laser
delver automated drive part
Devise Uber deploy vehicle faster +
int new markets
build kit to retfit new cars to

In charge of otto & otto a whole
own subsidy of Uber

Joining Uber

— just Lior + me knew about

— assuming.

NOBODY @ company Bridle lin liner
— NBSM currently whos at ~~Uber~~ Google lin

— Brian Schelman — ~~what say~~ I think
he told

CONFIDENTIAL                    STROZ_ 0021104

TX-8854, Page 5 of 20

DISCUSSING
leaving Google

(Sept.)

JOHN ~~Hanke~~ HANKE ⟩ — Brian McClendon Peer as
                                     Google Maps.
                                  — asked his advice about leaving

ferment
Google

Larry Page — done

JOHN Krafcik — done

— How to handle
— Google legal PR
— Business insight
      re: KIT Solution
—

OTTOMILA

OTTOSY

OTTOMOTO

— Build self-driving trucks so can
     drive w/out human dr
— KIT — sell set hardware to other
     car to become self driving.
— why people — interesting technical
                      aspect
             might solve
— Work similar to Google or self-driving
     both involve truck of self-driving

- Do you thin Ottomotto compete vy Google

- Kits someday

- Ever relied on intel info you learned
      experience vy Google

   relys on own memory of what
   I've seen + built


Want to 50 Earl types
   - ·30 Now
   when  SWE
            EE


STAFF Ottomotto
   referral -
   websites vy job postings
   recruiter -

Antony- meets/interviews all non Google
          employees - 1 of-
          ·Ultimate make go aot so dec

CONFIDENTIAL

Staff
Ottomotto

STROZ_ 0021106

DIFF For Google Candidates
- ~~only talk to Non-Google~~ Apple not only

[Don't Know]
  - INF of NonGoogle employes
  - Khan det-salary

Have Google workers en chabel comon.
  uf you abrupt leavy good

TEXT
Email

-Phone
calls

*Russell Smith "I would be entersted
  in have a Chat w/

NO IMPORT OF CODE —

N Traig —
Picture. & can't bring several med
  — " " tools / take home

<u>Vendors</u> — contacted same vendor univerdy
before

- Machine shop — masses part
- Purchase Equip. — gun cutter

<u>Adrian Aoun</u> — 24/7 — Dec 2015
works on diff team,
suggested I should leave
Google — talked w/ him about
leaving + joining his
start up

no longer @ Goo.
left Dec 2015

- spoke w/ him abt not
happy + should leave
- told him considery leav

<u>Freda Akuner</u> — Jan 2016
spoke w/ him abt
leaving google — Jan 2016
- slow order made a question I
wanted to answer in ten
- Not talked to him since
them

People
spoke w/

CONFIDENTIAL

STROZ_ 0021108



| Peter Avram | — Jan 2016 —
ME on
vehicle team
front intrafer
of Lidar

- asked if A. leaving
  you sure yes.
  no further

- asked what doing +
  said don't
  know

| Andrew Baster — Sweeney | — Jan 2016

DITTO
simple convo.

— //

| Clay Bavor | — Jan 24 told clay
leave asked clay
(He proprietary equpmt of
 yours @ Google)

WORKED
in
Siri

| Google Siri Project |

BUILT ① cardboard — cheap V.R headsets
      ② MegaPresence — making ROBOT move
         (Telepresence) in

Non Google Project ③ Soda Future game stuck
                      market old game

ROBOT arm
motion capture system

Sidl
Projects
Business

CONFIDENTIAL

STROZ_ 0021109

- Prototype This – TV Show ( showcased A. Roberts

- Anthony Roberts ] Oct 17, 2011
- STO. systems } acquired

[ - Darpa Grand Challenge – (pre Google) (Event for
      Liaison                                   Robotic comps

                                              ( generated
                                                testbeds

          GPS guided tractors
          GPS augmented bulldozer
          mobile mapping equipment

oregano  [ Vutool — to build streamer ( acquired
         [                                   2007 )
         ↳ Tiramisu — start underw prod'r they
                              Quadcopter

         ( Glimmir — side proj funded +
                          advised of D. Estrade

    ✓    ( Dale Knight   invested + advised

    ✗    ( Nemo — advise ≠ own
         Building System   modular building
                           manufactur company   antre
                                                  affili f

Aaron Cruny — — one convo to reconnect
see if he will become
advisor to Otto

left Google
2013 — as a consult

( altavision
startup )

Jonathan
Brian Dowdell — Jan 2016
— Follow up convo b/f
Lang

Lunch — text messages
@ rest re: coordine to
near lunc
home

— discuss his role in
Newco — same as
Google

— z phone — z messaging
accounts complicated
after leave Google
Anthony + Dave
had a conversation
re: issue in deploy
self dring cars

don't know

David Estrada
left Google
2012
Glinney — take over of
face

Atty
or
Chauff

Dave Ferguson
Stff | Google

Jan 2016
— talke to him abt
leaving Google
want to leave + do
something New

To2 | leary

— He was interested in
doing Amazon — Robot

— super worried you would
UBER — & want
to join complete

Bernard Fidric

& recruit

— told him leary in
Jan. 2016

— told him I wanted to
make Robot trucks

— & recruit

— (Pierre & really want to
him probably
meno

Tom
leary

CONFIDENTIAL                    STROZ_ 0021112

**TX-8854, Page 13 of 20**

Matt

Key People

AREH

sorry   Jules gaut

(Director Engr & hardwen
chauffeur
otto)

(works at ROBOT
Park Garage)
↳ ≠ directors

left
2011

Jan 2017
told him

leaving

– Recently hired
to help stay

George Laguin –
left Google
2011

→ Two hires Feb
first 2016 left
Recruited him

Asheem (Yuval)
Electrical
Engr
left Google (contract?)
2012

→ Recruited after
left Google

worked w/ A on
flying @ Travis.

Bryan Majeski (left 2012) — Bryan left
Google

me

Trying to
hire him

Robbie Miller

Sept 2015/few
conv.

spoke about
Newco last
week

Ops Manager

left _____ / maint oge.

joined Otto March 2016

absent

— Robbie came to me
why aren't we doing
self-driving trucks

— He leaves Feb 2016 — after he
leaves AL has convo w/
him _____

Robbie comes to house after
trip to Africa — wants
to know what dog gets
off left

must
tb exh
day 2

Eric Tate Questions

in     Info want     (Vendor) Shredded

Eric        ① - Name of Vendor in Ouncer
Tate                avg
            ② - no Written certification
                    This for

                ( We will —

            [ Dave ]

    ③    when did the 17,450 odd emails
            got into Anthony's dropbox acct

5 mins  — Dave was going to look @
        ④ —   Dropbox acct, to see when
        synced →  ask him when he synced to Dropbox
                        7 laptop
        ⑤ — March 22 — 22 — emails each
                touched — (time stamp)
                            corresponds to
                                time vs ST —

        ⑥   when did Anthony
I want them        bring it to @ abs Uinin
exceed dangerous loads    what — High sensitive Conf/Prop/Test
why did                INFO w/ SDC
he do it

Total TB - 24TB data

Forensic

Last Access Report ≠ (Date/Time)

File Extension → descripter of
doc. file type extension
extension

access for personnel report

→ Just a file type.

list of metadata fields.
who it is - "which device/ when accessed/
File type
last access
file size

Forensic analysis of all custodians -
USB/ LAPTOPS/ DESKTOPS - go - by Sunday
last access



Nick Munley — didn't talk to until aft he left Google + I left Gap

Andrew Schultz

cofund 510 systems
Chauff + EE

Jan 2016
- AS approche him
+ says he hears
stuff - AL said
guy to leave — once
out welcome to
talk to me +
+ no recruit
+ offer
+ solicit

Jack Tisdale

SE @ Google

(college classmate) Jack
@ OTP)
other people have pod
we should
out reach
join'

Nov/Dec 2015
lunch
- discused
direction of project
- AL confirmed guy
to leave once got
paid
+ JJ — tell him wher
me.

Micheal Toul
Google
ME (chuuk

after left

Tajium Bhu
Google
St. Chery

Theme analysis
2011 - led

1/2015
— He assumed
AZ about wanted
to start new
busines — I iNotter
on Date Knight
a pe

— Reached out via
text yu left
I want to tael t
yu — sent
him canned
resres

— lives near me
— he wanted valuation
of Uber from
Brian McClend

Dec/Jan — spoke about
2015/16  Lenny Gaylo — before
AZ leau

— Tajir head parmes t —
wanted to knun abt what

STROZ_ 0021118

— told him maybe do
 something of travelly
 + tell him about of
 trust

— Reached out via text
 messages to talk

— I can only talk abt
 now work stuff

— Came to house—saw
 truck — commented
 on unnecessary and useless travels.

— told him couldn't
 meet him

*Waymo v. Uber*
**Case No. 3:17-cv-00939-WHA**

# TRIAL EXHIBIT 8855

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Anthony Levandowski, who participated in the Stroz diligence process in his individual capacity. *See* Br. § II.

- Fed. R. Evid. 805 – This document contains inadmissible hearsay within hearsay; namely, Anthony Levandowski's recitation of out of court statements made by other declarants. *See* Br. § II.

- Fed. R. Evid. 403M – The original document contains multiple different colors of writing. The different colors are attributable to different authors and/or were composed separately at different points in time, which raises a risk of jury confusion. *See* Br. § II.

*Note*: This document contains handwriting and original highlights, and therefore is not susceptible to highlighting.

EXHIBIT

6855

3/22/16

Interview starts at 11:10

Anthony reviewed questionnaire. — T+Correct

Devices

We review the devices. Approx. 37.

iPhone 6s. primary phone. Personal and work. Any communication including Google. Got the phone Dec 2015. Shouldn't have google email. Used google apps. Didn't sync with email... used app. Google confirmed email was disabled at departure. Ottomotto email is on the device. Gmail app. Doesn't use default mail app. What accounts do you access on the iphone 6? Text messages, snapchat, imessage. Synce notes with gmail. Sync contacts with carddav. These should all exist in gmail. Had evernote before but not on the phone. Is phone syncing icloud? News, safari, only. Backup may be enabled.

What was the phone prior? Iphone 6 was wiped and given away.

Nexus was crushed.

Does not have any other phones.

Password protected itunes backup.

Ipad mini? Didn't bring it with him. Tablets are easy to get. Used to fly his helicopter... remote. Got in 2014. Girlfriend has access to the ipad mini. Should not include any relevant data.

Ipad 3? Got in 2013, used for personal use. Looking at Netflix video, games, personal pictures. Not syncing email. Dropbox may be installed but not connected and synced. GF has access... doesn't use

Nexus 7 hasn't been used. Project airplane controls. Not google related. Never synced mail. Set up dev email, set up site project how to pick up things on the ground. Testing only, no google IP. (side project funded by google, but not google related. Google exec funding it Tiramisu, now called Flyer) FilNow a startup called Kittyhawk, Tiramisu, Flyer.

Apple Laptop. Primary. Used for both work and personal. FileVault encrypted. Got it in 2013. GF has access. Uses it for everyting. For work, yes used it for Google. Uses it now for Ottomotto.

Google: email, presentation, no software, no code, no dev work, used it to work on docs. VM for windows, to configure tools. Work gmail, gdocs. What type of work doc, videos, presentations, datasheets. Anything related for chauffeur? All should be in a folder? Accessed email via web. Did not sync. All documents are synced with dropbox. Still has google related files on his laptop. Also has 3rd party documents. Including vendor updates (google vendors). Presentations given while at google. What sorts of Manuals? Parts they would buy and data sheets. Public documents and internal documents. Seems priviledged. Should all be contained in chauffeur. (we manually went through some files so some last updated time stamps may have been triggered). Most stuff should be in chauffeur.

Worked on streetview and maps previously. Laptop has proprietary data. There are some documents of other employees personal data confidential (management related docs) under chauffer.

Any other google or chauffer docs? No... He told (someone) he had some data he needed to return. Talked to Uber and one person said keep it, someone else said to get rid of the data. He asked if it was OK to delete, Uber said yes.



United States District Court
Northern District of California
**Trial Exhibit 8855**
Case No.   3:17-cv-00939-WHA
Date Entered
By
Deputy Clerk

STROZ_ 0021120

**TX-8855, Page 1 of 23**



Did you save any google work email? Not that I know of. Google work email.

Ottomotto: uses it for work , datasheets, spreadsheets, text files, no local emails. Uses webbrowser for gmail  check downloads folder. Files it online in dropbox, move a lot of stuff to google docs. Anything in Ottomotto that was copied from Google? NO. he was super careful about not copying anything over.

Filevault enabled. Have you wiped your laptop recent? No. but he may have wiped it in 2014. Reinstalled OS.

Dropbox Uses it to keep big files. Shredded all the drives. New drives not even formatted.

On to the next...

Desktop. Used as a gaming machine running windows 10. There is nothing on there. Pictures, no work email. Doesn't seem to be in scope.

10 Dell servers in storage. Lathrup, Ca. hasn't touched the, was never google property. Contains what is now google data. Vutool, 510 systems, and Anthony's Robots.

VuTool turned into Streetview.

510 moble mapping

Anthony's robots, wiring for robot cars.

Contained log of gps, indoor mapping tool, trials of different versions of camera and GPS mapping.

Made a list of what they wanted, these machines were part of what they didn't want.

Google took all the info and let theft these machines behind. Lets put them in storage. Google didn't instruct them to keep or destroy any of the assets so they kept them in storage. They delivered what they wanted and left behind the others.

20 Homebuilt machines were part of the same agreement. Doesn't know whats on them. Never used for google related work. Part of the assets Google didn't want. Not attached to these. Doesn't know how many or whats on them. May not even know where they are. Haven't accessed anything since 2010 or 2011. Employee workstations. Bought 510 later. Bought vutool in 2007??

10 email accounts. (gmail may have dual authentication). Anthony is going to disable 2 factor so we can pull down his accounts.

Cant disable it on his phone so he gives us authorization to use "authenticator" on his phone to access his gmail account.

Lists many devices to access emails in the past. He doesn't have possession of the items anymore.  If its not listed, he doesn't own it anymore.

10 email accounts.

Bulk of accounts are personal. Did you ever send yourself emails from google? Some but not many. He was cafeful about that.  There are emails from work to personal, but most are likely tax or personal in

CONFIDENTIAL

STROZ_ 0021121



nature. A few files he needed to print, but not substantial. We should search from

████████ @google.com.

@mac account is not used much,

@US, election stuff

UCFSRobot (promotional stuff) discount for printed cutout boards

Others were created for dating sites,

Osto is otto related.

External email accounts. Outside of google and otto gps on bulldozers.

Google encourages outside projects.

Work accounts

Set up 2016 oto.o March 1 2016. Should not contain anything prior to 2016 (nothing interesting)

Uses them now (otto) for work

Hard end date January 24ish. (January 15-Feb1).

Domain may have been established prior to Jan 24th, but email was setup after. When was the Admin created on the Otto accounts?

April 9, 2007 (started at Google). Through the Vutool acq. Sebastian Thrun, Andrew Lookingbill, Joakim Arfvidsson, Handrik Dahlkamp, (founders of Vutool) joined Google to start streetview.



Signed invention, employment, etc agreement. All received separate contracts.

What do the contracts obligate you to? Not to approach employees, and to keep their secrets a secret. He shouldn't tell others about their secrets.

Any special policies? Several levels of non solicit, there are people who cant solicit for a year or encourage to leave.

Any other obligations? Not solicit or disclose? Training courses, political, user privacy, etc. No training on non solicit or confidentiality. There was training on queries and user data, but nothing on IP related.

Took great care in user data.

What info did you have access to about other employees. Managed 25 people, he had access to salary bonus, etc. home address, work evals, performance rating scores, coach them for promotions, etc. only the 25 he managed. He didn't have HR access. Only has some data on Laptop.

Anthony is writing down the list of 25+ employees. Exhibit 5.

He went through his records to see what employees he used to work with or knew (to create the long exhausted list.

CONFIDENTIAL

Side work:  what is googles policy? Anything you did not related to google work, it was yours.  Google doesn't care unless its directly related.

Side projects while at Google?

Main work:  started in 2007-2008 Streetview.. roll out vehicles world wide.

2008-2009 airplane view aero imagery.  (GEOS)

2008- started mapping.  Setting up operations in Mountview and India, extract cities of stop signs, streetnames (GT, Ground Truth).  This is all confidential.  Requested to do a TV show to deliver pizza, started a company approved by Google.  Started Anthony's Robots (external non google company) 2008-2009.  Never used funds from Google.  Prototype this (tv show).  Discovery channel.

Finished US Maps, started google Chauffer in 2009.  Hardware done by Anthony's Robots, software at Google.  Sold 2011 to Google.  510 systems also brought into Google.  Wasn't involved in 510, just used their equipment (but he was an investor).  Started to invest in 510 in 2005.  Darpa Grandchallenge (robot competition), farming navigation for Tractors, Topcon then used for motorcycles, then tractors.

Google was aware of all side projects.  Manager was a mentor.  No secrets?  No policy really as long as its not competing.

Positions at Google:  years.

2007 Software Engineer to 2011.

2011-2012 Engineering manager but acted as product manager

2012-2016 Engineering Manager

Get shit done rolls.  2007-2011,  find out what needs to be done, do it, move on.

Wrote a bill to pass self driving car.

Never wrote any software code.  Technical project manager rolls.

Project names Streetview (City Block), Ground Truth, Chauffer, GEOS.  Help on various projects (carboard, tellapresence).  Chauffer (Selfdriving  car).

CONFIDENTIAL

STROZ_ 0021123



Interview starts-approximately 10:10.

Returned iphone to Anthony, took possession of large.

Talking about the email on the laptop. Ottomotto is not synced. Gmail from Google was synced.

Do you have access to Google work mail on their server? No, no way.

The messages were synced awhile ago.

What is on the cloud repsoitories? Ot.o and ottomotto.com, no google drives. Dropbox (personal) has Google work stuff which hasn't been touched (likely Chauffer docs).

Do you actively use this account? Yes

Apple Laptop not synced up for email, dropbox or any drive syncing. He does access drive separately through chrome browser, log into email. Ottomotto domain registered gmail domain.

Took possession of 3 ipads

Anthony forgets his password to one of the ipads and is attempting to remember the pattern. It may disable if too many incorrect attemtps are made.

Return to where we left off yesterday.

Hired in 2007 to work on streetview until 2008.

2008 and 2009 side project GEOS

2008 started to work on mapping in Mountview and India. Make the database behind maps.

2009 joined chauffer project,

Side job 2008 2009 worked on robot cars (deliver pizza).          — side Prget

Google saw it was possible and got excited. All of this was approved by Google.

This became Anthony's robots which was sold to Google.

510 systems predated Google. Laraison was the original name.          2011 sold

Sold 510 systems to Google in 2011.

Software Engineer supervisor Sebastian Thrun. 2007-2011 Chris Uhlick was his initially supervisor for a week or so.

2012 promoted . Sebastian still his boss then Chris Urmson

Later 2014 Bryan Salecky was then his supervisor.

Reference handwritten list of 25 employees.

Who else did you work with? References the typed long list he previously provided. A lot of them came from 510.

a lot rm
empyer can 570

CONFIDENTIAL

STROZ 0021124

The long list of employees is ALL employees he ever contacted during his time at Google.

How did you create the list? Went through the phone contact list. Gmail contacts.

Did you rely on internal contact list? No

Put an arrow next to those he worked with on a regular basis.

He will identify those employees he did group with projects with.

(talking to himself, may have found a mistake on the list).

(asked for the handwritten list back to make some adjustments)

What types of documents did you create while at google? Operational manual/ how to operate a street view car, how they systems fit together, lots of emails, some presentations, training information AERO imagery, internal presentation how to evaluate a product,

Where did you store these? On Google Drive.

Were you issued any devices? Yes, 2 desktops, 3 laptops, maybe 5 laptops (linux desktops) mac laptop, 2 chromebooks, 2 levono laptops, 1 linux, 1 windows. Blackberry.   Did they have a BYOD policy? No Google has the ability to install Gmail app and they control the settings from there.

When you resigned, what did you have? 2 desk, 2 laps

What happened to the others? They were returned.

Used Lenovo and personal laptops to access gdrive.

Did you ever plug in flash or external into google desktops? Yes, everyday, they used usb to move stuff onto the car. Usb to sata adapter.  Those were returned (tracked by Google).

All had asset tags

Ever us a personal usb on Google? Yes, its possible.  He had tons but destroyed them.  How?  Took them to-shredder and had them shred.  Bryan knew about this.

While on streetview, they had to identify all disks that went into any streetview car (2012).  Wifi sniffing.

He never destroyed Google property (assets).

They had vpn but he never used it.

Do you know what was on the usbs he destroyed? Trade-show stuff, vendor sheets, files he was moving around.

Any source code? No

Someone was leaving usb drives with spyware so he wanted to make sure he didn't have any.

Why no vpn? Too much of a hassle! Easier to go to office and work.

CONFIDENTIAL

STROZ_ 0021125

When you accessed Googles network, (Hanley lists all devices that may have connected to it).  Anthony confirms they all MAY have been used to access but nothing connected to corporate network,

Did you ever email yourself any Google files?  Only presentations or other docs he couldn't access otherwise (should all have attachements.

Scan in doc and forward to himself.

█████ @google.com to █████ @gmail.com

Any information regarding projects sent?  Don't think so.

Data sheets? No.

Nothing Technical?  No not likely

There may have been a morgan Stanley report.  Robot car analytics

No proprietary data? No don't think so

Did you store google info on any personal devices?  Laptop, the phone?  No usb or flash drive

He plans to tell us where he thinks "things may be"

There are 3 locations, downloads on the Mac, Dropbox, Chauffer folder, emails that were synced.

How did it get on there?  Through normal work activity.

This is his personal laptop.  They have a way to let people to use their own stuff.  No special documents to sign regarding their policy.

Did you store any data anywhere else online?  No, not that he can recall.

Very unlikely on any other devices.

Drobo (file storage).  That is where his computer was backing up to.  (Drobo 1 stopped working, Drobo 3 stopped working too)  he no longer has those.

Left Google Tuesday 1/26/2016     — RESIGNED

When did you first concider leaving and why?  I considered it in 2008.  He did the streetview thing and GT project.  He stayed because it's a great place to launch new projects.  In 2013 when he started to work for Chris, they don't like each other.  It was difficult.

How serious in 2008 and 2012.  He was talking to people (joel on the list).  The idea came about that human drivers are not good.  They wanted to be the first to do it.  He felt they went in the wrong direction with Chris.

After 2012 he stayed because it was still the right place to see things through.  There was a chance things could turn around.

2015 rolls around and they are approaching a deadline of launching the vehicles and its even more clear they are doing the wrong things.  The design was not relevant the technology is what was wrong.



CONFIDENTIAL

STROZ_ 0021126

Firefly, SDC, Chauffer, "the robots".

What did Google think? Everyone believed in it, Larry Page upset with the direction, Anthony is trying to lead the direction and it kept shifting back to the original course. It was time to move on. The mentality higher up was stifling the release. (too focused on safety).

Did you and Larry discuss a start up? No

Trucks not competitive with Google at the time.

He sent Larry and email shortly before he was ready to leave. He didn't respond but sent Chris a not that he resigned and then Chris escorted him out.

There is a clear course of action to resign and he must have deviated from that.

25th sent email to Larry (its in his Gmail) 2am

Larry forwarded to Chris

He shows up on the 26th. Chris Urmson removes Anthony's badge, escorts him to a conference room and Bryan joined the meeting and they discuss why Anthony is leaving.

They ask why he can leave, I hear you are recruiting people, (Chris was doing the talking).

Did you talk about recruiting people, he said there are people who have the same vision he does. They never asked who.

After the meeting, chris walked him to his desk, gathered his things, escorted him to a room and HR joined.

Chris and Anthony chatted about what went wrong…. Some weird conversation happened about how he could leave. Anthony asked if it was true that Chris left the group, Sergi told him chris was leaving. Chris returned to the group to stop Anthony from doing what he wound up doing. They at one point were room mates.

Anthony talked to HR (Chelsey) who calls legal person to come in.

15 minutes, what it means to leave Google. They talked about why he was leaving. She asked for his devices. All Google property was left behind.

Did they give you any instructions? No,

The chat with legal was about non solicitiation and confidential info. How do I go about it when people call if interested in joining his new project. "Happy to meet with you but I cant talk to you about my work things because I have contractual agreement I intend to honor with Google". They verbally agreed to the language. They would not provide him the language. No documents to sign. It was mailed later and we now have possession of what he received. (video conference not in person).

Did she ask you questions about the documents you previously signed? No.

No additional instructions.

Legal was Jade Wagner.

CONFIDENTIAL

STROZ_ 0021127

We revisit the conversation in the conference room when Chris mentioned he heard Anthony was recruiting people.  They later met with people to have one on ones to make sure they were not going to leave (hear say).  Nobody else left that day.

John Craftcheck called Anthony asking what happened.

Did you return all Google property on the day you left? I returned all the computers that day.

He has some other random parts he disposed of those later.  (streetview and maps).  Tools, pieces of aluminum, robot parts (nonproprietary), test cameras.  They were in the house in a box.  He found when he was looking for stuff to make sure he didn't have of anything.  He destroyed them.  Crushed and melted.  He paid to have them destroyed.  He doesn't know their name.  he didn't want to have anything left.  If he gave it back, he thought it would spark unnecessary back lash.

Did you know the files were on your computer before yesterday? No.

He was advised to not delete anything to show he didn't access anything.

We discussed why self remediation was not the best method at this point.

Stuff that is on Dropbox is historical, not created on the weeks prior to leaving.

Any hard copies?  No

Did you download copy or export?  Not with the intention of leaving.  Some stuff on the Apple laptop

R&D stuff? Yes

Technical? Yes

Customer? Yes

Software or hardware?  Maybe

Employee data?  Yes

Trade secrets? Yes

IP? No

Google just emailed him the rights agreement about inventions.

Any user data? No

3rd parties? Yes

He has this stuff because its customary to do this while at Google.  He didn't remember it was there.  Upon discovery the advice was not to delete.

Did you destroy anything else? Yes, the disk and some non sensitive was destroyed (the box of stuff).

The box of stuff was destroyed last week.

Did anyone tell you to destroy that stuff (from Uber?) no (they told me to destroy the disk)

CONFIDENTIAL

Did you check all your email and storage accounts?  Physical stuff, not digital media.

Did you check online stuff?  No

Your at google, unhappy, when did you first hear about OttoMotto?  Lior's timing was impeccable.  They discussed Lior joining Chauffer.  He ran a competitive project, (Map making).  They spoke a couple of times.  Their first meeting was on campus (august or sept 2015).

They talked about what was going on at Chauffer, Anthony tried to get him on the team.

They had a followup meeting on a Saturday or Sunday chat.  They live close by and walked around the neighborhood and talked about the robot trucks.  It wasn't a secret that he was unhappy.

Lior was telling him about Alphabet, the clothing technology.  Alphabet is a holding co for Google.  They discussed possibly having Trucks an Alphabet product.

They talked about the opportunity for Trucks in the market, aftermarket kits, etc.  More like the Tesla Autopilot.

He had chats with other people regarding how to make it work at Google.  The opportunity with Lior was a last option (?).

When did you start to talk about a startup?  A few weeks later.  2nd outside meeting, early September.

The Google CFO lives near by too.

Second outside meeting is when things started to solidify.  They discussed waiting until they leave or lets thing this through first.

When did you talk to Larry and Chris?  (wrong path converstion)  Jan 2015.  They discussed releasing the car, the agreed but then moved back to the original course.

It was clear to Anthony a week before he left that the path was not going in the direction that worked for him.

Every 2 weeks he met with his employees for 30 minutes to see how things are going.

How many group meetings? 3, 1 bbq, ski trip, 1pm gathering, 1 pm gathering at Anthony's house.

Matt Williams, Lior, others on team (Chauffer) Brian Cullha, Brian Tunellini (?)

When?

BBQ- whole laser team (perception) 1 software engineers December 2015 (harmless, people came over, very casual)

Ski trip- January 2016

Anthony was writing on the board about the meetings.

He had 1 on 1s and group chats

<u>1 on 1 (forming new company date)</u>

CONFIDENTIAL

STROZ_ 0021129

*not of his Pierre*

Discussion with Anthony regarding what they want to do. 30 minutes every 2 weeks.

Pierre (2012) (December 2015-Jan 26) did he initiate it? It was mutual about whats next. They were discussing the bonus payout. 4 year increments. If you left the company within 6 months, you got it all. They talked about lasers for drones, security. Electrical Engineer. #1 tech lead. They talked about trucks, and sort of interested, he was not interested in the kits. He was more interested if Arta, Sam, Liala were to join.

BBQ Social

Intro to Lior

Pierre, Gatean, Luke Washer, Drew Ulrich, Morriss, (side conversations at bbq)

Laser team chat with Brian Selleski          *B-Bque*

All hands Tues and Thurs

After talking to Chris and Brian about Anthony's future, they address the team that Anthony is moving off the laser team. Brian leaves the room and the team chats about it.

After the bbq people talked amongst themselves, Anthony didn't recruit anyone directly.

There might be some text messages.

One on Ones

Wanted to get their thoughts on trucks vs kits, exploring ideas.

Pierre (Dec 2015) regularly

Gaetan (Dec 2015) regularly

Will MCCann (Jan 15, 2016) 2 times

Drew (Dec 2015) 4 times

Bernard (not at all)

Liala Mathos (Dec 2015) regularly

Bliase Gassend (Jan 2016) 2 times

Anthony Hinton (not at all)

CONFIDENTIAL                                              STROZ_ 0021130

Ionut Iordache (same as Will)

Ski Trip

I stepped out for a break and returned within 5 minutes (see Handley's notes for diagram of what was written on the board)

Those who solicited Anthony- Bryan

High priority (those who showed interest)

*Pierre

Gaeton

Laila

Others who they spoke to "low"

Will

Drew

Blaise

Ionut

Luke

Rahin

Sam

Don

What did you talk about regarding new co and when? All communications were verbal

*Pierre: (talked about different options, he preferred trucks, he wanted to be a founder, wanted to match Lior's stake, committed to funds, had meetings at his house. Strat was to ask Chauffer, if they didn't they would try trucks at alpha, if not they would leave. He asked to help and bring on people. He wrote up and brought offer letters for people to join NewCo. (hardware engineer)

Gaeton: (much lighter than discussions with Pierre. He requested a specific number of engineers. He wanted to invest. He want Anthony to hire his brother and others Not Google employees) they met 3 times one on ones between Dec-Jan (mechanical Engineer)

Laila: (she approach him after talking to Pierre. They chatted, trucking vs kit, she wanted to understand maternity leave things (she was pregnant at the time). They met 3 times 1 on 1 between Dec and Jan (Manufacturing engineer) she sat close by, they talked in person.

CONFIDENTIAL

STROZ_ 0021131

Mark Shand: Anthony did not encourage him to leave Google. Mark initiated communication Dec. he approached him again in Jan. Anthony wasn't very interested in him. Mark heard about it and wanted in — 1 verbal meeting at Google.

Zach: 2 meeting (1 verbal chat 1 meeting at his house) he received an offer from Anthony. Anthony said he needed a team, he knew Zach was unhappy. They spoke at Zach's house and was given an offer letter. Anthony initiated it verbally.

Will MCCann: 2 discussions, 1 – 1 on 1 at Google. and 1 evening walking around (Jan 15 and 23rd). the 15th was him approaching asking what they were up to, Anthony said he was thinking of leaving and doing something in the robot car space. The evening meeting was to finalize his offer letter. Will requested the meeting. They discussed salary and offer. Will was given an offer prior to the meeting through Rhian. The offer may have come later (he did not end up joining).

Drew: discussed general business client. Discussed new focus project at Google. Started to talk about newco in Jan. they discussed a start up earlier but nothing specific. The idea was that the team would leave google to start something. Drew received an offer. He is a mechanical Engineer. Maybe a text about setting up an evening group discussion. Sent to Google email address. Anthony encouraged him leave Google.

Blaise: Anthony did not encourage him to leave google. He approached Anthony (seemed pushy) they had 3 discussions and seemed forceful. 2 were on campus, 1 off campus (on the phone). There are phone calls and text messages regarding comp, role and needs. Jan communications.

Ionut: 1 chat in person Jan 15, 2016. Talked about where the business would be base, he approached Anthony.

Luke: same as Ionut, 2 chats both at Google, initiated by luke first then Anthony followed up. All verbal. Second meeting was discussed location for newco. General conversation about what Luke heard from others. He wanted to know more. Anthony asked him to talk to the others. 2nd meeting was a follow up. He received and signed offer letter. Which has since expired.

Rahin: Hardware Engineer. Approached by Pierre. Follow up by Luke, 3rd time met with Anthony to discuss salary. Verbal communications at Google. 2nd meeting was at google (walk). 3rd meeting was likely after work. Anthony didn't initiate any meetings. Not texts or emails. Jan 2016. Received offer, not signed. Which has expired.

Sam: Hardware Engineer. Approached by Pierre. Later asked . (I stepped out of the room to have Don sign the COC). Break for lunch.

Sam initiated conversations. They talked about more technical things. Sensors they should develop. Why are robots important? Talked about compensation. Didn't talk about his role. No text or emails

Nick: Anthony reached out to him in November. They talked about macro pictures, why trucks are important. He didn't get an offer letter. 1 in person meeting. A few text about when and where to meet. They met downtown SF. Embarc and Market. They met in January 2016.

CONFIDENTIAL

STROZ_ 0021132

Don – 2 chats  Joined OttoMotto.  He was always frustrated with Google.  2 in person chats about Anthony leaving and what he was going to do.  Anthony initiated 1st meeting, Don initiated 2nd.  Jan 4-5 or 6.  2 meetings at google.  They are friends.  2nd meeting was about general discussion about what they would be doing.  Software engineer.  Offer letter was given before Anthony left Google.  They communicated a lot on a personal level.  He joined Feb 25ish.

Anthony was clear that he wanted to do this project at Google but it didn't seem to happen so he left to do this on his on.

Brian (user experience designer) one phone conversation.  1 planned in person.  Anthony walked up to his desk and said "do you want to talk" Jan 05, 2016.  They talked about the direction of the internal project.  They had 1 unplanned when Anthony was out with Matt and saw him at a coffee shop.  Brian joined the conversation.  Philz Coffee in Palo Alto.  3rd conversation was "we just got offered more money to stay, can I join you guys later?".  Same deal applied to the other Brian.  Pierre may have given him an offer letter.

Brian (operation –program manager) manages the human side of the car.  Used to work for Matt.  Anthony and Brian meet after he heard what was going on.  Seemed very interested.  Brian reached out to Anthony after he spoke with Matt.  Walked up to Anthony's desk.  Jan 2016.  He got an offer. (likely)

Matt Williams.  They spoke about this for a long time.  They used to work on Streetview together.  Dates back to Dec 2014 or Jan 2015.  Nothing concrete, but thinking about it.  Fast forward to Sept, he said as soon as he is paid he is going to leave.  Matt encourages Anthony to leave Google.  They discussed Alphabet, Matt doesn't agree that it's a good idea.  He is the first of Chauffer to leave.  He left Jan 4.  He will likely join when he returns from a long vacation.  No discussions about role or compensation..

Rikard grunnan- mechanic.  The outfits the cars.  He approached Anthony, they talk about money, the plan for team.  He didn't get an offer letter.  He was going to wait for his bonus.  Met in January twice.  Both meetings at Google.  Anthony walked up to him the second time.

Bryan Sellesky.  He was upset that he wasn't apart of the special compensation, he left and came back.  He was never approached, but expressed interest.  Anthony didn't give him any information.  He found out Anthony was recruiting from Seg.  Alex Blaise may have told him.  Not sure how he found out exactly.  Sept 2015 Bryan said " lets grab dinner," "I know something up".  Anthony denies there is a plan.  Bryan seems to want to join but Anthony doesn't trust him.  Bryan later contacts Uber (October).  He said he was talking to Uber to have the vehicle team and selling it to Uber.  Anthony said if he was talking to Uber he said they should all sit down with Uber together.  Anthony was introduced to Uber 2014.  When was the first meeting with Uber about new business.  October.

Bryan realizes the level of discussion was more advanced than he expected.  That evening he meets with his friends he decided to stay for 10m.  He was then aware of what was going on but not involved anymore.

CONFIDENTIAL

STROZ_ 0021133

Collin (user experience)

Lior:

They had several conversation, chats, text, meetings with Uber.  Anthony had the contacts with Uber.
There may be one accidental email to Google account about meeting.  (search Lior's email address on
Anthony's devices).  Maybe snapchat.

How did they begin?  How do we build something at Google.  It will likely be too complicated to do at
Google so we should just leave.  Nov or Dec is when they decided to make the move.

How did you see yourself in the company?  To build what needs to be built.

Group Meetings.

Laser Team BBQ to celebrate a mile stone.  Discussed work stuff.  There were a couple of side chats
about NewCo and related conversation. Lior was introduced to the group.  Nov 2015.

PN 1

Dec 2015.  20 people  Pierre, Gaetan, Drew, Liala, Luke, Lior.  Bunch of non google people.  About
everyone is interested, organized by Anthony.  no slide deck, just verbal discussion (Lior may have had a
pptx but not sure).  Liors presentation was about the truck.

Additional

Claire Delaunay

David Wakerstoffer

Brian Dowdall

Brian T

Brian C

Word of mouth invites

Ski Trip

Early Jan 2016.  Everyone from Laser team.  Some stragglers showed up.  Not an official google trip.
Team bonding and laser work.  Pierre and Gaeton and Anthony chatted about how to build from scratch
without using any IP.  They could do it without any prior designs or IP.

CONFIDENTIAL                                    STROZ_ 0021134

Who brought it up? Anthony asked if they could make a laser without using IP. Pierre said they could redo it or infringing on IP. The point of the laser interoperates the "world". Their intention was to do this clean and build it from scratch.

They would rebuy the same parts, but they were not going to remake what Google already made. Lior was not on this trip.

PN2

Drew organized meeting at Anthony's house to discuss an exit from Google. Confirm within the next couple of day Anthony would leave and the rest would follow.

Piere

Gateon

will

Liala

Brian Dowdall

Claire Delaunay: now work at Otto

David Wakerstoffer: now work at Otto

Ionut: received offer that night (he requested Anthony leave first)

Luke: received offer that night

Sam: received offer that night

Lior

Drew may have sent a calendar invite to peoples google accounts.   Other non google people there. Handed out extra offer letters.  Actively encouraging people to leave.


The next day (Tuesday), they have a chat with Brian Seleski about his role at Google going forward.  They discuss something before the 11 am weekly meeting.  Brian was going to announce Anthony was leaving the laser team but staying within Google.  100 % charade.

They go to the actually meeting.  They break the news, Brian leaves the room.  Anthony then opens up the room for discussion. Anthony mentioned he may be leaving if he cant find something within Google, Alphabet.

Why are you being replaced?  They wanted to put a more loyal person in charge of the team.

Anthony announced to the group that he was proud of the team and he was undecided if he was leaving the company.

Larry likes what he does but he doesn't have much say.  Chris doesn't like him.  Brian likes what he does but he knows he may be leaving.


CONFIDENTIAL

Anthony leaves the next day.

Who do you contact. Very very few at Google. He spoke with Chelsea, John kraftcheck, and Sergai.

Sergei didn't want him to leave. He mentions to both that he may start up a new company.

John, what happened?  He asked what he was going to do. He tries to find him a position back at Google.

Chelsea and her boss and bosses boss.  (Stacey Sullivan).

Social nice conversation.

A number of people reach out about joining Newco.  He responds that he cant respond or he doesn't respond. He answers social stuff but not about work. Anthony doesn't talk to anyone at Google.  No oral, written, or electronic.  Inbound but no outbound.

There are some people who left google on their own.

Claire:  they used to date and had many chats about robots.  She expressed interest in joining the newco.  How many times did you meet about NewCo?  4 times.  Started Sept 2015.  Software engineer.  Talked about the software requirements for a truck.  She left Google 2 weeks after Anthony

Met David about Newco 1 before and 1 after group meetings about Newco.  He was on a visa that needed to be transferred.  1st meeting at google, 2nd on the street by Anthony's house.  Left 2 weeks ago.

Dan Ratner used to work for Google but Anthony didn't talk to him.  Dan talked to Lior after he left Gooogle.

How many employees?  30

How many from google?  16 (10 of them were recent).

1st communications with Uber Sept.

Tell us what happened with the Disk   *Destruction Disc*

There was a meeting to check in about how things are going.  Anthony disclosed he went through his stuff that have sensitive Google data.

What was on it?  Source code, design files, high value. Engineering docs to create self driving car. (Googles) software required for driving the car.

How did you obtain it?  Through the work process.

*Destruct Disk*

CONFIDENTIAL

STROZ_ 0021136

How did they get on the hard disck?  Nature course of business.

Checked out code to work on it.  As early as December.

Did you create the files on the disk?  He got them off the personal mac.

What would it be called?  .tc truecrypt file.

Anyone from Google can pull data.  Common team password.

They were likely there for many years.

Found them the same time as the "box of stuff".

Who did you tell.  Attorney, Lior.

What happens next.  Go to Uber, I have some stuff I want to get rid of.  Cam Nina and Travis.

Cam says:  oh you should not delete that we need to see it and understand what in there.  (for preservation purposes"

Travis says: Don't take any advice from Cam. If you have google stuff I don't want know about it, I don't want it here, do what you need to do "

Anthony says:  I am going to delete it

Travis: nods

Cam clearly disagrees but does not object (visibly disagrees)

Nina:  is amused

What did you do then?  He left the meeting with the understanding to delete the data.  Took them to a shredder by the airport (Oakland).

How long was the conversation.  3 minutes.

Later that afternoon, Cam called and said "please don't shred them" Anthony said "too late", and then Cam said please don't delete or shred other things.

Cam called back again and said "I want to make sure you don't delete more stuff". (sometime over the weekend).  Lior also called and said they told him the same thing, he may have spoken to Nina.

Lior only knew there was confidential data on there.

What did Lior say when he found out you had the data.  He was surprised and said that they should tell Uber about it.  After the meeting it was clear the consensus was to delete it.

Lior never suggested to delete the data.

Was Cam upset that you destroyed the disks?

They all understood the disks would be deleted.

CONFIDENTIAL

Met Travis in 2012 and Garret Kamp, gave them laps in the self driving car. They wanted to buy 20 cars right there but they were not ready.


Late 2014, travis handed him off to Jeff Holden and tried to get him to join Uber.

Later he saw Brian had joined Uber and followup meeting about a separate business. 2 lunches in July or August 2015.

August Sept, Antony by himself, lets seek funding from you guys... started negotiating, (fund raising and purchase of future technology).

They said they didn't want to fund they wanted to be a beta customer,

Talk to TK to decide what to do. Travis doesn't want to just buy stuff they wanted to be more involved,

Started out them being a customer.

They go to Uber twice a month since Sept, (Brian, Cam, Nina, Jeff, TK)

They spoke to Travis and said they were thinking of leaving Google in Oct.,

Brian peels off (from Google). And their project kept moving forward.

1 meeting with Brian $ and Uber

During meetings at uber, do you discuss the Newco? No specifics, just that there is a New Co

When did they become aware? Second meeting.

Did Uber direct the hires? Not really, no specific names. General conversation about laser technology.

What happens December 2015

They progress further and further, price, tax structure,

Reached agreement December (started negotioning term sheet which was signed in Feb).

There was a plan to acq Otto before he left Google.

The group discussions were sparked by internal issues at Google.

John Bayers (runs Uber self driving car division).

Things are progressing but not as quickly as they hoped.

One other person at Uber Emil who is Cams boss. Only had 3 conversations. Make sure the deal was still on. Wanted to set up a corporate database to get people who worked on robots.

Would you have left Google if Uber wasn't there? Yes.

Who called who in June. Anthony congratulated Brian and Brian said, hey lets get lunch.

There was a later follow up

CONFIDENTIAL

STROZ_ 0021138

June 16th Brian left google to go to Uber.

What do you talk about at lunch? What Brian is doing there. How its going. They leave it as they should follow up. Brian follows up in July or Aug. They meet alone, in person. They talk about ideas ..

When you left the first meeting, did he encourage you? Anthony was not solicited.

2nd lunch 2 or 3 weeks later. He may have emailed about lunch? Anthony expresses unhappiness, they need additional robotic efforts. The don't discuss New Co. they leave the conversation by having a mutual interest.

██████████ @gmail.com

it would be interesting to have an offer from Uber to buy the Google team. They wanted to know the market value for the chauffer team. They never followed up on that. They wanted to put a price tag on the team.

Anthony reached out for the 3rd meeting. Uber said they were not going to get a price for the team. They got lunch in SF by Uber office. (with just Brian at Alta Café) they start discussing uber buying lasers from the start up for their cars.

4th meeting Bryan Cam Nina meeting at Uber (Sept or Oct). Discuss customer roll up, they don't intend to invest in a start up. They talk about being a customer,

5th Cam Nina and Lior Anthony (customer deal)

6th Bryan Cam Nina (verbal of what they might do)

Travis comes into the picture October at Uber office (Travis calls or text)

Only emails with Jeff and Bryan. Some texts with Cam. Nina 30 messages TK 200 messages Jeff 20 messages.

Travis is main contact.

All emails were deleted from gmail account. It was weird to have emails from Uber while still at Google.

Oct there is a 1 on 1 with Travis. They meet at Uber on Sunday. They talk high level robot stuff. This is the first long discussion with him, he doesn't know much about robot cars. He wanted to buy or nothing. 8pm to 2am. Bigger deal or smaller deal.

Met with someone at uber the following week. Cam and Bryan. Only Anthony no Lior. At Uber. They get on the same page. Next steps are if they want to do something like this. There are a total of about 20 meetings.

They then start to negotiate specifics. (nov-Dec) meetings now every other week.

Post the meeting with Saleski, the meetings have been regular and include Lior. Cam Nina Travis, John.

Continue meetings twice a month.

CONFIDENTIAL

STROZ_ 0021139

Did they ever ask about confidentiality? Yes,

They discussed with uber multiple times before leaving google (nov dec). they always said they would start from scratch. 3rd party called Velenime that has similar technology. Anthony said he could do it without infringing on any patents.

What sort of research? deliver lasers, help deploy vehicle quickly, help build kit. He expects to have a role to be in charge of the technology.

Not relying on Google technology to do the work for Uber.

Have you discussed with anyone about joining Uber? No, just Lior and Anthony.

Nobody that he knows of at Google know about the Uber deal. Brian may have guarded the secret but he may use it later to help him negotiate later. (all speculation).

John Hankey left, Larry Page, John Kraftcheck,

John Hankey started a game co from Google. Lior and Anthony talked to him about how to spin out trucks. He left within the last 6 months. Asked advice how to handle Google legal, PR, mechanics. Wanted insite on the kit solution. (sept 2015) he doenst know about Uber.

Are you anticipated duties at uber similar to google. Yes

Will they compete? He will help a division compete with Google, but he will help build trucks and kits which wont compete.

Describe otto: design trucks to eliminate a driver . kits? Sell hardware to install and have the car drive itself. Why pursue it? Its awesome. Great profit potential.

Both jobs involve making something with wheels without a driver.

Otto focuses on self driving trucks which is different from picking up people. The kits are secondary. Google wasn't doing any of this.

Rely on experience at Google, did not rely on information. Relying on understanding.

50 (individuals) skill sets, engineers

Do you have alternatives, yes

Source? Take referalls, recruiting spree from non google, referals non google, they have recruiter.

What is your role? Meet and interview all non google employees and evaluate. Not the sole person to hire. (has the power to veto)

New hires meet with individually with people, group discussion, offer

Have googlers contacted you about wanting to work at Otto. Yes, there are some more specific but he doesn't respond. They are all saved on his phone. Not taking any calls from Googleres.

How do you determine salary. Look at w2 and match.

CONFIDENTIAL                                                    STROZ_ 0021140

Glassdoor is used as a reference.

Based on skill set, that determines their role at Otto.

Is that different for Google. Totally separate process.

Expects process for Google employees is, interview with non google, they decide, rhian decides salary.

What safeguards are in place. Have them sign a piece of paper stating they are not brining in any data from last employer. Google employees confirm they were not solicited.

All code has to be written and checked in.

Any training? No

Policy? Yes, don't bring personal computers. Don't take any tools home.

Any 3rd party venors? Yes, they contact same vendors to make machine parts (not the same parts). They also purchase equipment (tooling for cuircut boards). They will contact same vendors.

Made a list from trade shows.


Agreements? Yes

Anything to add? Probably not

Anything you want to check? Sure but nothing right now

Have you provided everything? Yes

True and correct? Yes

Did you announce your departure? No

No press release? No

How do you think your departure will effect google? They will get press inquiries, slow them down.


Any other communications with these individuals you spoke to about your new co or leaving google.

Anthony is checking them off the list mary provided him.


Google side with Clay Bavor

Cardboard

Mega presence or Tela presence

CONFIDENTIAL

Clay still has some of his equipment.  A robot arm.


Non google side projects with clay

Future game (stock market predictor)


Prototype this

Anthony's robots

510 Systems

Darpa grand challenge into  Laraison which turned into 510 (gps bulldozers)



Glimmer (3 second video sharing).  Non google related.  Dead start up

Date Knight (non google side project)

Nemo (non google) modular building manufacturing company.

East Bay Portfolio (real estate development)

Brian Dowdall

CONFIDENTIAL

*Waymo v. Uber*
**Case No. 3:17-cv-00939-WHA**

# TRIAL EXHIBIT 8857

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Anthony Levandowski, who participated in the Stroz diligence process in his individual capacity. *See* Br. § II.

- Fed. R. Evid. 805 – This document contains inadmissible hearsay within hearsay; namely, Anthony Levandowski's recitation of out of court statements made by other declarants. *See* Br. § II.

- Fed. R. Evid. 1002 – The original document contains multiple different colors of writing. The different colors are attributable to different authors and/or were composed separately at different points in time. *See* Br. § II. The trial exhibit is a photocopy of the original document, which obscures the color differences.

*Note*: This document is handwritten and is not susceptible to highlighting.

CAMPAD®  RECYCLED

9:30
Uf Jan 26, 2016

ANTHONY (Levandowski) → 08
93
16

DOCS
→ Recognized Ex I + Ex 2 - Ex 2 best recollect

→ DEVICES

| iPhone 6s | - used personal / work
           - used @ Google
           - got it in Dec. 2015

Phones                mail
LATER          - used Google Apps - + sync
- Went together    ( removed acct + delete app )
  → come up w/
  reandent
                   install - App Security - +
- Don't Delete
- don't chay       - BEST knowledge any Google info on
- we will re-image    - any attorneto info -        ph
  + to make sure         - just email
  you + copy stuff
  in the computer    ← .using gmail app for attorneto
                       + use default app - at all

- email needed/del  - Use Text / iMessage
  computer so        Snapchat
  we have image      Email

                     iMessage

- local data         + Use What App.
- migrate that email Sync NOTES Through phone
  to a new personal  → sync contacts Through card dav
  email box            (syncs Through
                        email)
                       (opensource)

- DropBox,

United States District Court
Northern District of California
**Trial Exhibit 8857**
Case No. ___3:17-cv-00939-WHA___
Date Entered_____
By_____
          Deputy Clerk

CONFIDENTIAL                                    STROZ_0021155

- Previously had Evernote

( #

— sync to iCloud — Maybe

safari, News, iPhone backup

Britney
— only one has access to phone

( Previously used iPhone 6 — )
wiped it gave away

→ ( Galaxy Nexus — ~~crashed/tossed~~ )
#

~~Google Altos~~

# — Backed up phone to iTunes — DID you encrypt
. the backup.

( Need iTunes backup password )

iPad Mini ( didn't bring it — drop it this
afternoon )

— use to fly your drone (Quacopter)
— got it 2014
— girlfriend has access
— # use for work

iPad 3  2013 — use it for videos Netflix
playing games
personal reasons

STROZ_ 0021156

- fly Quaro
- Not syncing email.?
- dropBox may be installed as an app.
- Git ≠ use it

[Nexus 7] — 2014

- hasn't been used in awhile
- Plays w/ airplane controls
   — (work-related)
   — Not google / Ottomotto related

Software — Develop an application — trying to figure
   out how to pick up Ymup from
   airplane —

(NO Google owned IP)

   — ≠ use for google / ottomotto

[CALLED] side-project → Non google
"Tiramisu"               google employee funded
"Flier"                  side-project
                         Google aware

KittyHawk
   ╱    ╲
Tiramisu    Flier

every thing
— all otto files — are in folder / or on Google Drive
— Email though web

Apple Laptop — 2013 —    [ — Need Admin Password
                          [ — LAST Pass — passwords

① ≠  ② email    Primary Laptop
 DOT    locally    personal activities + Work
          organized
is synced    only
verbally
up to    for email    Encrypted
         any dev sync
NewCo    personal / ~~work~~ uses —
Servers
          work-related-uses →

Email
used it have it
synced at one
             point
— stored locally
2014

any devices
at NewCo                — used it for Work ig google
                        — use it for ottomotto         ② access
                                                         ottomotto
                     • email access - work email        drive though
Outlook PST on email • presentations                     ~~etc~~ Mac OS
stored locally       • ~~wi~~ no code/software          number + login info
                     • write docs - mainly though google +
                              drive

Bulk Google Work     • VM on there to configure tools     maybe
   Chauffeur             windows only                       WEB

                     ~~store~~ — need it to access work email
STUFF on             — Work docs ⊕ or presentations — google
LAPTOP                     ② = Manual — data sheets
BELONGS to                         ② Vendor specific Date
                     Google  ③ • Vendor specific Date
Google                                                 Sheets
— Google Folder      ✦ System diagram ✓ • Chauffeur
in chauffeur           of how the car
                       was                    (file/folder
                                              called chauff
                     — Work Trips organized

         — all stuff on folder called DropBox
              • chauffeur
              • stuff related to

· Things from 3rd parties
— updates to Vendors

(Chauffer/Google)

all    (Street View,    Google/Maps — Chauffer.)

Personal

Google — Attorney's Stuff
— offer look

8 Management
Related → Docs I signed' has Exhibits of everybody
Docs
→ confidential

Unless you archive
or migrated it into
Greenbox

- After Disks →

6  # Google wave — mail → 14,000 messages   currently
·Mac connects pulls
down next 2001~Pres

Otometto

→ use it for Otometto
→ data sheets, spreadsheets, text files
→ email locally — (not on computer)
only Web-based

— everything in Google Drs
— transfer anything from Chauff
     into ottomoto

Laptop — wiped & re-imaged

     * 2014 →

Drobo 5D
     — used it for keeping big files + backing up

     Took disks out + Destroyed

* drives in are new — not formatted
* No Data on it —

DESKTOP Machine  2015  —  10 gb.

     — windows 10
     — day minecraft, picture,
     — No work email
     —
monies
staff (presentation         270 figs)
Pictures

Dell servers / (in storage) 10

— Previous business

NOT
TURNED
IN
HERE

TOLD US

10 servers
20 work
stations

sold 3 business to Google

Vatoo! (street view

510 systems (culate meaning

Anthony Roberts

(laser + Drwelen
were for ___ robot

• In a Storage facility in Lathrop, CA

°

— Never had Google data on it

— But Google bought business

Google
1

— Most info from 510 Systems

— Lig of GPS ( data set from that )
— Indoor ( on How to make maps of
indoor
spaces
— Backhack,

(sycamore)   Trials.

— Everything on these servers is

List of Staff that Google wanted —

— Delivered that to Google

— ≠ direct you to do anything of
excess

—Mega agreement → staff delivered
to them

*

Home Built Machines (20)

2010
2011
— Previously from 510 system[4]
— ≠ Know whats on them & how many there are.
→ Havent been turned on since then

— Havent been used for google or bbw/th

— assets ≠ want

— Stored in same facility as Dell servers

— ≠ accessed since 2010/2011

— Employees - walk stairs.
—

≠
— OK to access accounts to obtain passwords



CONFIDENTIAL

STROZ_ 0021163



Google

April 2007 — acquisition here
- Sebastian Thrun
- Andrew Levenbill
- Joakim Arfvidsson
- Hendrik Dahlkamp
- Anthony S.

- Joined Google as a package + Mission
  Start Streetview

- Docs signed
  - obligated him to
    - not recruit people
    - keep Google secrets secret
    - say confidential info + tell peg

  Levels of Non-Solicitat.
    - after leave can't solicit

  Travis Coupee     ( not IP related )
    - user privacy issues
    - + receive any additional trans
      re soliciting

Joined Google
April 2007

CONFIDENTIAL

— NOT IP related
— did recie training re. User-related
training

— what info have access to re other employees

manage 25 endividuals ( help set salary
bonuses )
who are individuals

— compensation, evaluation,
performance rating
scores

—

Side Work [project]

— Googles Policy — anything you did NOT
related to what did @
Google — NOT Google

Google . Work

2017, 2018, — Build out "street View" vehicles
labeled "CozyGlide" — "CB"
2018-2009 — "Geos" — "Opaque Dragon"
"BrandTRUTH a GT" art imagi
2008 — MAPPING — setting up ( vehicles in mayer to
Mountain View + Dibia to exhibit city



CONFIDENTIAL

used for by company named Topcon

Google side project
    - as long as not compete
    - you were careful to let Google
        know about all side projects

Responsibilities

Titles
    Software Engineer - 2007 - (2012) (
    Engineering Manager - 2012
        (But acted like a product manager)
    ~~Product Manager~~
    chauffeur
    Engineering Manager - 2012 - Lyft

Resp - (worked on projects, got done what had
        to get done on projects)
    o participated in helping write what
        autonomous car is.
    o
    Never wrote code/software

→ Consulted on bunch other projects    follow up
        - Cardboard
        - Telepresence Robot

Supervisor
Sebastian **THRUN** (Primary supervisor
Chris Uhlich (

Chauffeur

(2012) - Engineer Manager

2012 - STOP supervisor Sebastian
2013-2015 - then supervisor Chris Urmson
1st 2014/2015 - Bryan Salesky

List of 25 people manage

- Those.

EMPLOYEE LIST
- phone contact (email contacts)
- # rely on internal company directs

CONFIDENTIAL
STROZ_ 0021168



CONFIDENTIAL



chauffer — internal?
→ Firefly — car (SDC)
robots

2015 - approaching dealers of luncing vehicles

- Don Building custom cars as opposed to focussing on technology

- internal milestone - project

Larry really Page really loves it - but the opset of direction going in
- wanted to pursue robot tech - @ Google
let end up going in that

political / internal / dynamics -

time to move on

# No Larry I am guy to this X! —
but I want to do trucks —

Larry decided to stay

Resign

- Sent email — Jan 25 — to Larry — got to resign

(Sent This email to myself)

Jan 26 - Chelo — grabs badge — sits down w/ Brian

CONFIDENTIAL

people he told leaving Google

Depos
Date

Exit Interview

Chris Urmson
Brian Salesky    (meeting w/ A. Shultz)

Bob

Others says

— How could you leave now
— I hear you have recruiting people
    — there are a lot of people share
      my view of where project
      goes.

conf
room    1  ___

Respond    — wasn't probe + trying to get out
                is fast as possible
          — (they sat down if orders to make sure not leave  A. Schultz)
    — After Chris walked me to desk — walked me
      outside

                        (used to be roommate,
                         brought him into
                         project)
used
conf                                 among Chris's
room    —  the featured           among Chris's   —
   2       Legal today
Chris           spoke about how did it get
                to this. what did he/we do
                wrong — slightly accusmm

                How could you do this to team
                trying to tear apart

                is it true that Chris — had
                quit the team — told him
                Sergi
        — factual based res

CONFIDENTIAL

He enters room — Chelsea
ety

what it means to leave Google

ask why — issues on project
- collected your badge
ask abt. computer
(showed Chris all docs)

legal comes in   Instructins — what obl. were
Nm sol.
con infrimat
- Durties conbey
beyond yor
employment
confident
NOT to solicit
Asked for guidence
(what I should feel
them)
- I understand what
I am say to if
they want
on the TV
-They would tell me what NOT
TO tell me say
- "Can't talk to

Jade Wagner

LEGAL ( on the TV )

Jade Wagner
I wanted to do cleanest
(yna possible)
- Came up w/ language
LEGAL said okay
Documents

- Hey — "Happy to meet
of you but I can't talk
about past/current work
Thing — I have counsel
object have to have."

↓ sign any docs



- retrieved all Google Property ?

(a) Returned 2 Lenovo laptops
                    + DESKTOPS

Looked in Garage    (b) ~~Returned~~ Parts work on for
non-property)        Street View + Map

                    (TOOLS, pieces of device,
                     Robot arms, old street view
                     Test Prototype Camera

insight further      (Home/Garage) straight - put in a
scrutiny             box - disposed of it
Stroz came + picked up Laptop  - Destroyed
                              - Crushed/melted down
Destroyed            (paid for destruction)
set of disks (sensitive info)  ~~Aaron~~ company to me

when?               DID THIS LAST WEEK
                    (week 3/14)

Download/copy anything from Google
- download/copy/export

(c) # or any online review
    to see if

CONFIDENTIAL                                    STROZ_0021174

Return Google Property

DISCI...

Destruct Stuff

→ DECIDING TO ~~devel~~ DO StaRT UP

①

August — Lior + I had lunch and
2015         had lunch to discuss him
Tuesday ~~lunch~~ lunch   getting into the space — chauffeur

~~August (21) 2015~~

agenda   — gave him states of chauffeurs
him        — ~~They to~~ ~~recruit~~ where car at
agenda    — told him about my ~~discussion~~ dissatisfaction of
                                                            Team
                                                          + direct

Sunday chart

Couple
Days later   ~~early~~ — Live 45 Blocks from each other

~~early~~
Sept        — ~~told~~ Lior detailed what doing up
2015         Alphabet — New closing tech nolog

aug 2015/    — ~~an~~ Talked about doing ~~at Trucks up~~
Sept                                                    alphabet

             — talked about DOING KIT — for
                after market — on highway
                (more like Tesla autopilot)

             — Discussg doing it together + lets
                figure out a way to make
~~Tesla~~      it work up Google.



Early
Sept
2015

— Following weese — met and took anthr
walk — (right by Google CEO's
haus)

— Things get more concrete — we should
do something —

Anthony — Hold in lots-think this through b/f do it

Sept
2015 — Levi + Anthony went to meet a lawyer
anray
— several fllw. up in pers
(a) text messages
— several meetings up uber
(b) — our Google email
may have sent one email to
his Google
(c) —          gmail

(d) snapychart

* How can we build something at Google
Too complicated — leave + build
something externally — (Nov/Dec)



— We talked d̶n̶'̶t̶ ~~special~~ result

Roles

Personal resp. for building technolog.

Lior → Person resp. for business



CONFIDENTIAL

STROZ_ 0021178

handing out after letter
to employes

┌─────────────────────┐
│  1 on 1 Reports     │
└─────────────────────┘

— sees me Qwithi + getting
Escited + had breakdown

— Discussions / people   every 2 weeks

Hardware
engineer

~ Pierre Droz ~   ~~says~~   starting talking
Later engineer   —Tech Lead    about forming new
of chauff    company 2012
#1 engineers

I recall who
approach
who

— 2015 December 2nd annual
1 on 1 — Anthony brought
it up — whats Next —
Tasked wht lasers faster
drones, Trucks, not
into KIT

Helped Plan many
Secondary chars

— Different options NewCo    concern who else going to
— He preferred Trucks    Join & more inclined
— Wanted Bes A Founder    to join if others going.
— agreed to commit funds    · Sam Linies
— Meetings @ House to    · anTa
  org strategy    · Liala
— ask how to help — Bring on
  people +    — Dreamwh — Jan 2016
  wrote offer to
  bring    — every 2 weeks
      — Talked about delivery 600K/
        5X/yr
      — Wanted to get Traught on
        what wanted to do

Mech
Engint    ~ Gaetan ~    December-Jan 2016
    regular chats
    every 2 weeks

✓ - Will McCann ——— Jan. 15 , Jan 24

✓ Drew Ulmer ——— Dec 15 + ~~int regularly~~
(4 times)

✓ ~~Kaila~~ Kaila Mathes — Dec 2015 — Jan.
(regular)

1 Blaise Gassend — Jan 2016 - a couple
- regular Google work + asks what
their

~~Audrey Hailey~~ ~~Dec~~ couple Jan many

~~Donut Dondans~~



Du 2a5
Barbeque — Pierre ( on New Co )
6aetan ( NewCo )
Mark Shand (not enrolled in dinner )
Luke Waehter ( NewCo )
Drew Ulrett ( NewCo )
Zach Morriss ( NewCo )
Lior ( New co )

Reba → helped entire. term to team people

Luke

Rahim

Sam Vanness

Matt Nick

Don Burnett

Mark

Zach

Communicats w/ Google Emplyes

defmely push
solicit push
to visit on proyt — [Pierie] — Neuro — medicon more multipleties
meile of general
google
( encouraged to visit to date
first at budget do new projet
mento leave budget start up
encouraged to leave @ google

— [Gaetan] — Dec/Jan 2016 —
— I remember uno.ntrated
— Discussions about what should be
building
— isally talkk
— requested speech. Engnes
— wanted to INEST
— wanted to ↑
— Ron / 3 times

encourage to leave Google   Dec/Jan earl
— [Laila] — met about 3 trits
Ron /                          fuller
Man.
Engnes
usually talked — ( Laila approached me after Pierie
at          ( chat about campany, what she
sign on          would do, marteenity leave pictires,
memory
— a already
maji standares
— really set trips up w: ment meet
— walky buy + say let's meet
at mest of regularly scheduled meenos



Jan 2016

Drew Meeks — 4 meetings

— Dec — Jan 2016

Mechanical
engineer Chauffeur

— Discussing mainly general
business demand for
autonom cars

— Antney brought it up
that we should ~~do~~ do
~~separate alphabet google~~
project at Google

— ~~starting to talking about~~

— general understand
if cant do it at google
then leave +
watched early Jan

— encourage him to learn bus

— offer letter

— sitting next to each other
lets grab dinner

— TEXT — from Drew — me about
setting up an early dinner
+ calendar it +
sent ~~an~~ an invite
to google address.

(2) mtg
PM — Drew

— interested in more discuss
forward + wanted to get
everyone in a room

CONFIDENTIAL
STROZ_ 0021185

**TX-8857, Page 31 of 51**

(Jan 2016) ( ____

<u>Blase</u>   — 3 discusn

Software
enrolled
Obaid

- came to me b/c funds of Ther
- Did same thing at STO — lidar
- Reshey on
- <u>I nstructed by Ther</u>
- <u>2 on premiss</u> (during work day)
- <u>I not</u> ( phone convo in meeting — he called
                                              Anthny )
- Phone calls / Text messgs
      comp, Role, things he wanted
  to recruit or encourage him to
      leave
- Relevently related  contract

                        meeting Jan 15, 2016
<u>DONUT</u>   — ( ____ in person to
         — ____ ____ / confirm from  week to
                                              want
                                                  SF
         — He approach me due to
              discuss of Uber / Ther
         — No other comment about
                                Newco

January 2016

**Luke** — 2 meetings @ Google
— ~~Both at Google~~
— First meeting — he was hesitant, said we were doing it (Pigment)
— Second meeting — Anthony reached out to him orally
— confirmed his interest in Neuro
— commute issue
— confirmed talk on talking to others.
— signed offer letter

Software ~~Mechanical~~ Engineers

Discussion how going + wanted to to find out more

**Rahim** Jan. 2016

Hardw — approached by Pierre
Tanner — 1st meeting — requested more info
my shoulder — 2nd meeting — requested by him
we'll let's @ Google — discuss salary offer
talk — 3rd meeting — more salary, offer
Will around (after week) expressed interest in ___
block — → hesitate contact at all
— → email / text
— so offer letter — expired

Jan 2016

Sam ± 3 meetings in per
                    Pete
Hardware
Engineer   — approached by Pete + then asked
              what was going

           — Sam initiated meeting of trying
              after talking to Pete

           — Talk about — more technical
              (± initiated          things
               over 2)         — what type of
                                  sensors dev.
                                 (cameras, radar)

                              — macro picture
                              — why Robot imp.

Gr          — compensation           Barcades/Marin
Don
Collin     [ Nick ]    — I in room    ( Downtown
Liur.                                    SF )
P+P              — Anthony reached out to
Claire            him, w/ Dec 2015 but
                  didn't
                 Met Jan 2016
                 — Discussion of Macro Picture
                    scenarios — why needs imp,
                    He wanted to do Truck not
                                                Ca
                 — + got offer
                 — maybe phone call



? SWE

Don Bennett

Knew frustrated of Google — Hao!
(1st) Z in person chats abt. Anthony
leaving + what going to do
(2nd)
— Anthony initiated meeting
   @ Google (went outside + took walk)
                    Don initiated
— 2nd meeting — following up — talked more
   @ Google                    about general topic
                              macro picture

— Got offer letter } Jan 2016 offer spike
  but before you left — 280 Systems
           a lot of
— Text / Comm. back + forth but
     nothing about Newco

— Joined Newco — end Feb 2016

Jan 2016

software
eng

**Mark Shand**

1
~~too~~ Meeting
@ Google
Anthony

- he approached / in Dec 2015
- refused to share info
  b/c ↑ trust + doesn't want

- I suspect new company +
  I want in

**Zach**
1 meeting ~~that~~ - late Jan 2016
~~that~~
~~I me~~
1 meeting @ his house

- Hey I am
  leary team -
  I knew unhappy
  he expressed
  interest in joining.

~~too~~ Anthony introduced it
just wanted us to
give him heads
up

a day late
~~later~~
- met at his house that
  day, discussed what we'd
  do, gave offer letter

User ~~Extreme~~
Lescoat

[Brian Collard] — ~~Uber Lux Deal~~

— + phone convo

~~Dec.~~ (ISP) In person meeting

Early
Jan
2016

I walked up to dest
+ asked "want to meet"

— ~~shared~~ concerns of
project - asked what
he thought about neuco

Jan 2016 — ~~2nd~~ meeting ( coffee shop
5 day                                    phil's
late          discuss when start comp

— then saw Matt + I tacky +
interested if matt exress
interest

— 3rd - phone convo — he called
me
— hey we just got offered
a lot of $ to stay logo
can we stay a couple
matters

— ~~to~~ Think he has an offer
with + possibly from Rene

## Brian Torcellini

Jan 2016

Program Manager
(runs entire
portion of Lunars
in Chauffeur.

— ① Verbal convo aft Matt
   tied him off of newco.

— Hey hear you doing something
   new (walked up to him
                    @ desk)
   — maybe
   — what want to do,
      Pueds

— Discussed career

— Get an offer

## MATT Willson

— talked about This to Capstone

— He was on StreetView
   + helped me negotiate

— Had convos dating back to
   Dec 2014/early 2015

— about status of project +
   thinking about Newco

— Fast Forward Dec./Jan. — pay to
   leave

CONFIDENTIAL

Technical
Project Man

(Brian
Torcellini's
Manager)

STROZ_ 0021192

— Matt encourages Anthony to
leave Google

— we talked about sep. team in
alphabet — but he want it

— Jan 4, 2016 — resigned Google

Rikard Gruyman — Jan 2016
operate Pers.               1st — he approached me
Project Manager             @ he heard doing
out field co.             Google something + I want
                                to join

                          — talk about $1,
                            Planning, Idea for
                            trucks        —

                                        inevitable on
        Left Google       2nd       — Anthony walked
        (2 weeks          @           up to desk +
         Anthony)       Google        said lets talk

SAVE                  [Sept. 2015]
    Claire — met w/ Claire about Newco
                    3 + 3 times (prior to group meet
Jan 2016 CONFIDENTIAL Spoke w/ her about technical details  STROZ_0021193

(Sept 2015) He says lets gues
demer - he stayed
I went to know what
guys on - he wants 87 ?
- Anthony tried him

**Brian Selesky**

( my manager )

— went away / came back

— Never solicited him
to leave

— multiple times —

Brian said I
know dog something +
I want in

I trust
him

— He talked to Sam + ~~Charlie~~
+ said I was
recruiting people to
to join me

penetrate

Jan. 2016

— Davis W.    @ google
met one b/c + one other guys never

6 feet
google
2 weeks
ago

Oct/Nov. 2015 —    get feel
curvy
he talks    cummunision / tries
mecople (on street)

Brian says trying to Uber - + discuss
having a bunch of google team leave +
join them. — take vehicle teader +
selling that patron to Uber

— he discussed who he wants to bring

CONFIDENTIAL    STROZ_0021194

[UBER]

✓ Introduced by UBER 2014

We invite him to meeting @ UBER —
realizes too discussion one
advanced, wants to join
NewCo, then says he will keep
this confidential BUT stay
@ Google b/c paid
10 million

[2/0X]

— see before



— Nov/Dec 2015 — BBQ
(BBQ) — laser team bbq to         Anthny's
        celebrate achievement        House

        — United Others

Ant'     — discussed remote work and staff

Brian Side    — side group   [Pierre]   [Pierre]   Cupe
[Brian Dowdall]              [Lee]      [Lee]      fully
(told him guy to            [Gaeton]    [Pierre]   out
do Robot car/truck                                 Newco
start up)     — Lior — to meet guys Microsoft
Seen Pierre + Anthny              join Newco
asked what tech abt
said things leaving +     — on my own
joining Newco
— how long recreate techno

(PM 1) — Dec 2015, Anthny House
               15-20 @
        — Pierre              Brian Dowdall
— Word of Mouth  Gaeton           Brian T
went at my house  [crossed out] New  Brian C.
* (no text, email,  Laila            Clare Delaunay
   snapchat)      Luke              Dario Wierzbicki
                  Lior              (SWG)
                  [crossed out]     (How many that
LIOR MEETING
ONLY     Purpose — had a bunch on convo —
              — introducing everyone
              — clarify story of business

Won Might Have Done a Presentate about
business of Robot Driver

SKi-TRip   Early Jan - Tahoe - Anthony
                                     Fails.

( laser -
creates a 3D
rendering yun (o)

- Everyone from Laser team
- WM Laser team
- 20 people

- Team bonding. ( No talk of
                         Otto )

- Side talks   Pierie ) How going to
               Gaetan )   build everything
                         from scratch vput
                         infriging on IP.

- Pierie - said we could do something new —
           vput ~~~~~ vs infring on IP

- Anthony - can we make a laser vput
            violate ~~~ anything we did

- Knew imp. to be clean - start from scratch

) - comfortable of using parts of Vendors
    to Re-Use

CONFIDENTIAL                    STROZ_ 0021197

— Can we do this from out #g
                                    scrath

Next Day +

(PM 2) — organized by Drew — @ Anthony's
                                                House

LATE January 20th bfe he resigned

⇒ Confirm in next cople days there
   would be day I quit first +
   How long people

                    LIOR  T.
⇒ stay  Peter Reid  Pierre —

Anthony                 Gaeten
Rohan                   Will
handed out              Drew
cople of Fri            Laura
letter                  @ Fowlr (regensting Anthony
                                  here first)
Lior          ↗ Luke
              Sam

         1st   Brian Tucetter  ?
         PM    Brian Cullname  ?
         meetng
               Claire D. ⟩ Both work there in
               David W.
               Brian Dowdall —

— instigated meetng, he may have

  sent calendr invit

— might have done someting
  extrely encurage people to leave + join
                                              NEWCO.

Notice Next Day!

Next DAY

Chat w/ Brian Selasky

E Mail to Cases
for Charlies

to coordinate my role going
forward

Todd took leave

→ To prep joint sneach
to group - being replaced b/c
went more loyal person
[MEETING] said it was an option that I may leave

Brian

deliver new role going forward +
committed to finding you a new
team a, to Brian said no they to
a place w/in
comp. or leave

- Brian leaving

- Open convo - whats up any of project

- I am proud of work

- I hope to stay close, likes for new opp.

- say I might The company

- I say there are things broken + what
dig

Response

Lacy - likes what I do          Chris + Love me,
John - "           Brian Selak - like who
I do stuff



→ A number of google employees
reach out to Anthony

After resigned

People Pinged Ant

— ones that talk about
work
  — Don't respond
  — or text/email
    canned response

  — small stuff

  — Don't refer them to
    anyone at comp

My UNDERSTANDING NOT OKAY
To talk to anyone from Goog

Not included any → — ORAL
                    — Written  } communicat
                    — No electr

UBER

— some people who left Google

(Brian McClendon) (Google employee)

Colin — No longer a Google employee when Anthony spoke of him.

Don Rafner — → talk about Lear

ME (street view)

works @ otto + Lior
reached out / after leaving Google
hardware
— joined Otto in March 2016

OTTOMOTTO

30 employee
16 from Google

10 recent Google hires
↓
- Don
- Collin
- Lior
- Claire
- Davy

UBER

Brain McClendon (Google employee
+ Ram Engl Mgr)

Convo w/    I have disks: Left
Lior       of sensitive info         delete
    TOLD LIOR - FIRST - said hey went to dark they
    + he said we should tell Uber about it.
    - Lior now we should purely desist of info so
         don't end up # of encryption

Meeting - 1-2 wks ago / Possible end of
 w/                        last week
UBER

         - Met w/ uber re: deal terms
Had this
years ago - Went though the my stuff +
           say DISKS w/ sensitive stuff
           ⟨5 DISKS⟩ → ⟨yes⟩

ENCRYPTED TrueCrypt  Google proprietary INFO - breathe (everytime
SoftTTT file          Source Code              need to
                      Design Files             → far. →     know —)
Source Code
Public code           ENGINEERING DOCUMENT
                      (Software) rel. to creating
→ Source Code remote  a self Dirty car
(common team          LARGE files
 personnel)           electrical Eng/software Comp.
                              required to
.TC
         Contains all
         Building Tech harly for SDC
         - Get files needed, encrypt image
         - Last Time Used Jan / Nov / Dec
                              occured

– who did you tell

- John Bardin
- Told Lior – + what was on disks
-

Regular status meeting w/ UBER

Cam (Head of Car Dev.) Lior
Nina (wife of Cam)        Anthony
Travis (

(3 mins)

END OF
MEETING

A = Hey I found some stuff/files I want to get rid of
them b/f we do DD)
~~Cam said~~

CAM – Don't delete that we need to see what's
in there + keep a copy for the record

Travis – Don't take any advice from Google
        If you have Google stuff I don't want
        to know about – I don't want it here
        and do what you need to do.

A – Just so you know I will delete → shred
    + you will so                          DISK

TK – Nods
CAM – ~~Skims~~ Non ~~Reverbal~~ Verbal signs of agreement
NINA – Pale / amused / astonished
I left meeting understanding that I was going to destroy the

near Oakland Apo.

brought them to shredding place in Oakland Apo.
saw them being shredded )     Didn't recall where name of facility

(*)(1) (UBER)
LATER That afternoon — I got a call
from CARL "please don't shred them
delete or shred those things"
I assume that but I shredded them

(2) UBER ( Sat morning 19 ))
Called me said next day — CARL —
and said — want to make sure ≠ delete

(3) LIOR ( SAT morning ) (over weekend)
I informed him that (carl + nina said) UBER ≠ want you
to delete more stuff

LIOR — just knew conf. info · never told
him + he never

*Waymo v. Uber*
## Case No. 3:17-cv-00939-WHA

# TRIAL EXHIBIT 8858

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Anthony Levandowski, who participated in the Stroz diligence process in his individual capacity. *See* Br. § II.

- Fed. R. Evid. 805 – This document contains inadmissible hearsay within hearsay; namely, Anthony Levandowski's recitation of out of court statements made by other declarants. *See* Br. § II.

- Fed. R. Evid. 1002 – The original document contains multiple different colors of writing. The different colors are attributable to different authors and/or were composed separately at different points in time. *See* Br. § II. The trial exhibit is a photocopy of the original document, which obscures the color differences.

*Note*: This document is handwritten and is not susceptible to highlighting.

) Sensito bunch of
disks to reuse for
exto - to clean house

② We had a bunch as laptops
of old hard
drives destroyed
( + Google)
C +

(Anthony will get
name of company)

→ small Mom + Pop shop —
have machines used to
shred
→ recall name    harder

Follow - up

**Questions**

paid
last ...
... visit
mark

[ Name of Vendor
- Receipt disks shredded   (→ purchase
                            → receipt   # paid
- any written verification / receipt
                went there.

DISKS

— other finds them @ house
— know how long been there
— when you last looked @ those
— How / when were they created
— why didn't use Google laptop (for work
                                stuff)

Chauffeur / Google / Gmail    use computer name
                              way that needed
                              to access some files before
approx                        left — couple days
— when you download these to DropBox    before
                                        left in
   when working at Google (→   removal cause
                               of business

— other than interview date, do you
   recall when you last looked at
   any of those files
— could it have been even later
— Google mcn'l — were you aware
   on laptop. — 6/4  locally then

CONFIDENTIAL                    STROZ_0021206

United States District Court
Northern District of California
**Trial Exhibit 8858**
Case No.   3:17-cv-00939-WHA
Date Entered
By
Deputy Clerk

Vast majorits not accessed 2016
some accessed that needed → ank no
recall → after leaving Google → of recall acess
→ expect before we th

Rhian MORGAN