*Waymo v. Uber*
**Case No. 3:17-cv-00939-WHA**

# TRIAL EXHIBIT 5102

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by employees of Shred Works. *See* Br. § I.

- Fed. R. Evid. 403 – Because the document is replete with embedded hearsay, the Court should exercise its discretion under Rule 403 to exclude any reliance on the document for its truth, to prevent jury confusion about what fragments are admissible for truth, and resulting waste of time and prejudice to Uber. *See* Br. § IV.

- Designated witnesses who received this document pre-litigation are: Eric Tate and John Gardner. The document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV.

| Yellow Highlights | Hearsay Statements |
|---|---|
|  |  |

# MEMORANDUM

To: File

From: Stroz Friedberg

Date: August 2, 2016

Re: Memorandum: Follow-Up Investigation regarding Shred Works Facility

_____

On April 3, 4, 6, and 11, 2016, Stroz Friedberg attempted to verify that Anthony Levandowski ("Levandowski") visited a shredding facility in March 2016 and disposed of five hard disk drives. Levandowski has stated that he paid cash at a commercial shredding facility near the Oakland airport. He stated that he did not recall the date or the name of the facility and did not obtain a receipt. Levandowski's attorney later informed us that the name of the facility was "Shed Works on High Street."

Internet searches led us to believe that the facility was most likely Shred Works (http://shredworks.com/), an information security company with headquarters at 455 High Street in Oakland, California. Shred Works, which has been in business since 1993, provides hard drive shredding services and has an AAA certification from the National Association for Information Destruction.

**Site Visit to Shred Works on Sunday, April 3, 2016**

On Sunday, April 3 at approximately 2:30 p.m., a Stroz Friedberg investigator ("the Investigator") arrived at Shred Works' location at 455 High Street in Oakland, California and observed that the facility appeared closed. All visible entrances were chained shut and the Investigator saw no people inside the fence, although there was one car and multiple "Shred Works" trucks parked there. A call button at the personnel gate was pressed; no one answered the call. The Investigator took five photographs of the Shred Works facility, which are included below. The investigator remained at the site for another ten minutes, observed no activity, and departed at approximately 3:10 p.m.



1

United States District Court
Northern District of California
**Trial Exhibit 5102**
Case No. 3:17-cv-00939-WHA
Date Entered_____
By_____
Deputy Clerk

CONFIDENTIAL

UBER00312684





**Site Visit to Shred Works on Monday, April 4, 2016**

On Monday, April 4, at approximately 9:10 a.m., two Stroz Friedberg Investigators ("the Investigators") visited the same Shred Works facility on High Street.

When the Investigators arrived, the facility was open. To better understand the hard drive shredding process, the Investigators attempted to have a blank hard drive shredded. The Investigators were directed by signs on the exterior of the building to a small, unoccupied lobby. Within the lobby, there were several surveillance cameras and a television that appeared to be providing a live feed of the facility shredding documents. On the wall, there was an electronic doorbell which appeared to have a camera attached to it. A sign next to the doorbell indicated that visitors should ring for service.

Upon ringing the doorbell, a female voice answered. The Investigators explained that they were interested in having a hard drive shredded and the female indicated that she would have someone meet the Investigators in the lobby. Shortly thereafter, an employee, later determined to be Jose A. Campos ("Campos"), met the Investigators in the lobby. The Investigators again explained that they were

2

interested in having a hard drive shredded. Campos inquired whether the Investigators wanted to observe the hard drive being shredded and the Investigators answered affirmatively.

Campos led the Investigators approximately 50 feet to a warehouse immediately adjacent to the lobby which was secured with a metal gate. Campos then advised that it appeared that the hard drive shredding machine was not presently at the facility and asked if it would be acceptable to leave the hard drive to be shredded when the shredding machine returned. The Investigators agreed and asked for more information about how the shredder worked. Campos explained that the shredder would physically destroy the hard drive and showed us a bin containing the output of other shredded hard drives. The Investigators confirmed that it would be impossible to recover data from the shredded hard drive pieces. Not only were the shredded fragments very small, fragments from numerous hard drives were mixed together in the bin.[1]

Campos then inquired how the Investigators would be paying. The Investigators provided Campos with $20 in cash for the one hard drive and Campos returned $10 in cash for change. Campos then completed a receipt listing his name, the date, the time, the description of service, the method of payment, and the amount. Campos then requested that the Investigators sign the receipt. The Investigators noted that it appeared that three copies of the receipt were created. Campos provided the Investigators with the top copy of the receipt which was printed on white paper. The Investigators asked Campos if a receipt was created for every shredded hard drive. Campos indicated that a receipt is generated for every shredded hard drive as the facility uses the receipts for accounting purposes.

The Investigators then showed Campos a color digital photograph of Levandowski and asked if he had shredded a hard drive several weeks prior. Campos indicated that he did not recognize the individual in the photograph; however, he is not usually the person responsible for assisting people who want to shred hard drives. Campos stated that another employee, Ricardo, usually handles the shredding of hard drives. The Investigators asked if Ricardo was available and Campos indicated that he was not working that day but may be in tomorrow.

The Investigators then spoke with a female in the lobby and asked if it was possible for them to review the receipts to see if any matched our client's shredding request several weeks earlier. Shortly thereafter, the female met the Investigators in the lobby and asked if they knew when the hard drives had been shredded. The Investigators advised that approximately five hard drives had been brought to the facility on or around March 17, 2016 to be shredded by a man named "Anthony" who paid in cash. The female returned to the back office to look for the receipt while the Investigators waited in the lobby.

A few minutes later, the female returned and advised that she did not see any receipts matching our criteria since March 15, 2016. The female advised that while the facility shreds a lot of hard drives, they often pick the hard drives up from customers rather than having them dropped off. The female advised that she did observe one receipt that did not have a name associated with it for six hard drives that were shredded on March 23, 2016 and paid for with cash.

---

[1] Shred Works has on its website a video of its hard drive shredding process: http://shredworks.com/ewaste/. This video appears to be consistent with the hard drive shredding process that was described to Stroz Friedberg Investigators. The bin the Investigators observed at the facility appeared to have similarly shredded hard drive pieces as displayed in the video.

3

As the Investigators were speaking with the female, an unidentified male employee, who appeared to be a manager, joined us in the lobby. The male employee asked what the Investigators were looking for and the Investigators advised that they were working with "Anthony" to determine whether there was any evidence of him shredding five hard drives on or around March 17, 2016. The Investigators asked the male how long they retain their receipts, and he indicated that they were preserved for years.

The Investigators showed the female and the male a digital color photograph of Levandowski but neither of them recognized him. The male advised that if the individual provided the date he came to the facility, it may be easier to locate a receipt. The Investigators departed again.

Shortly thereafter, the Investigators returned to the lobby of the facility and again made contact with the female by ringing the doorbell. The Investigators asked the female if she could search the receipts from March 1, 2016 to the present (expanding the scope of her review by several days) and she indicated that she would check.

The male employee the Investigators were speaking with earlier came back to the lobby and advised that they had located a receipt from March 14, 2016 for five hard drives that were shredded and paid for in cash. The male employee briefly showed the Investigators the receipt which appeared to have an illegible signature on it. The Investigators were unable to determine if the signature belonged to Levandowski. The Investigators did note that the time indicated on the receipt was 9:44 a.m. and that the person listed in the "assisted by" line was Ricardo. The male indicated that if the individual came to the facility with a photo ID and provided a matching signature, the individual could obtain a copy of the receipt. The male employee indicated that he would set the receipt aside for safekeeping. The Investigators thanked the male employee for his help and left the facility.

**Site Visit to Shred Works on Wednesday, April 6, 2016**

On Wednesday, April 6, at approximately 11:46 a.m., a Stroz Friedberg Investigator arrived at Shred Works on High Street, entered the lobby, and rang the doorbell for service. Employee Ricardo Piceno ("Ricardo") walked by the lobby and asked if the investigator needed assistance. The Investigator advised Ricardo that he was attempting to obtain a receipt for several hard drives that had been shredded in or about the beginning-mid March 2016. The Investigator asked Ricardo if he was the employee normally responsible for shredding hard drives and he indicated that he was.

The Investigator then showed Ricardo several color digital photographs of Levandowski and asked Ricardo if he recognized the individual in the photographs as someone who previously shredded five hard drives. The Investigator told Ricardo that the individual had come to the facility in mid-March to shred five hard drives, observed the shredding process, and paid in cash.

Ricardo stated that he did not recognize the individual in the photographs.

The Investigator told Ricardo that the individual is tall, approximately 6' 3", and has a slight accent. Ricardo stated that he still did not recognize the individual and was not certain that he would remember him, even if he had helped him.

Shortly thereafter Juanita, the office manager, came to the lobby. Juanita stated that she was aware of the request to obtain a receipt for the shredded hard drives. Juanita advised that she could look for and provide the receipt if we provided her with a copy of the individual's signature for comparison.

4

Juanita also advised that if we provided a photograph of Levandowski, they would also review their video surveillance system. The Investigator showed several color digital photographs of Levandowski to Juanita and she indicated that she did not recognize the individual; however, she does not normally interact with customers face-to-face. The Investigator thanked Juanita for her time and left the facility.

A few days later, a Stroz Friedberg Investigator emailed Juanita and provided her with examples of Levandowski's signatures that the Investigator had obtained from Levandowski when he signed various chain of custody forms related to his devices. The Investigator asked Juanita to review the March 2016 receipts and, in particular, all receipts for March 11, 2016 (the day, we were later informed, Levandowski met with Uber, told them about the disks and subsequently claimed to have shredded the disks).

The Investigator also sent Juanita an email with photographs of Levandowski for video footage review but Juanita advised the Investigator that the VP of Operations, Greg, who has access to the old footage, was out of town for the next couple of weeks and that no one would be able to review the video footage until he returned.

On April 11, 2016, a Stroz Friedberg Investigator spoke with Juanita telephonically who advised the Investigator of the following: (1) the facility did not possess a receipt for March 11, 2016 that reflected that five hard drives/disks were destroyed and paid for by the customer in cash; (2) there did not appear to be a receipt for March 11, 2016 that matched Levandowski's signature; and (3) the receipts are created the same day a customer brings in the materials to be destroyed, regardless of whether they drop them off or observe the destruction. Juanita then refused to provide us with any additional information until her VP of Operations returned from his business trip.

The interviews of Shred Works employees and the Shred Works documents do not support Levandowski's contention that he took the five disks to Shred Works on the same day as his meeting with Uber, which was March 11, 2016. Levandowski is fairly recognizable, and our interviews were conducted not long after the alleged event. No one recognized him as having appeared on March 11, 2016 or any other date. The March 14, 2016 receipt for the destruction of five disks could better support the proposition that the disks were destroyed at Shred Works on a day later than Levandowski recalls, but there is no way to connect that receipt to Levandowski or the five Levandowski disks at issue.

CONFIDENTIAL                                                                                                         UBER00312688