*Waymo v. Uber*
## Case No. 3:17-cv-00939-WHA

# TRIAL EXHIBIT 5215

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Lior Ron, who participated in the Stroz diligence process in his individual capacity. *See* Br. § I.

- Fed. R. Evid. 805 – This document contains inadmissible hearsay within hearsay; namely, Lior Ron's recitation of out of court statements made by other declarants. *See* Br. § I.

- Fed. R. Evid. 403 – Because the document is replete with embedded hearsay, the Court should exercise its discretion under Rule 403 to exclude any reliance on the document for its truth, to prevent jury confusion about what fragments are admissible for truth, and resulting waste of time and prejudice to Uber. *See* Br. § IV.

- This exhibit contains references to, and attaches a copy of, Lior Ron's employment agreement, which Waymo stipulated that it would not make reference to in its case in chief. *See* Dkt. 425 at 4.

- Designated witnesses who received this document pre-litigation are: Eric Tate, John Gardner, Adam Bentley, Lior Ron, and Justin Suhr. Except through Suhr, the document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV. Only Tate and Gardner received this document as an Exhibit to the Stroz Report; the remaining witnesses received an identical document in April or May, 2016, well before the Stroz Report was written.

| Yellow Highlights | Hearsay Statements |
|---|---|
| Blue Highlights | Hearsay-within-Hearsay Statements |

MEMORDANUM

To:      Eric Amdursky

From:   Stroz Friedberg

Date:    April 12, 2016

Re:     DRAFT Interview Summary of Lior Ron

---

On March 22, 2016, Mary Fulginiti, Melanie Maugeri, and Hanley Chew interviewed Lior Ron at the offices of Stroz Friedberg on 101 Montgomery Street, Suite 2200, San Francisco, California 94104. On April 11, 2016, Mary Fulginiti and Hanley Chew conducted a follow-up interview of Lior Ron via telephone.

**Employment at Google**

Ron stated that he first worked for Google from April 7, 2007 to December 11, 2011. He began working for Motorola Mobility Holdings, Inc. ("Motorola") in January 2012 and then rejoined Google on or about November 5, 2014 after Google acquired Motorola. He remained at Google until January 13, 2016.

Employment Documents and Training at Google

When Ron first joined Google, he recalled signing an employment agreement that contained nondisclosure, confidentiality and non-solicitation provisions. When he rejoined Google again in 2014, Ron signed an employment agreement which contained invention, nondisclosure provisions, among other things, as well as a document outlining roles and responsibilities. Ron stated that he participated in an online training course about how to treat privacy (i.e. private user data), but he could not recall any other training, policies or manuals.

Ron understood the provisions in his employment agreement to prohibit him from disclosing any of Google's confidential information and from soliciting Google employees to work for him after he left Google.

Ron was shown three documents: (1) Google Inc. At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement dated November 5, 2014; (2) Questionnaire for Diligenced Employees provided by Stroz Friedberg; and (3) Ron's Responses to Questionnaire for Diligenced employees. He reviewed each of the above and confirmed that they appeared to be true and correct copies of the documents. In addition, he confirmed that his responses to the Questionnaire were true and correct. These documents are attached hereto as Exhibits 1, 2, and 3, respectively.

On March 29, 2016, Stroz Friedberg received an email from Eric Amdursky containing additional information requested during Ron's interview, including the following documents: (1) a one page letter from Google regarding a transfer of your employment from Motorola Mobility Holdings, LLC to Google Inc.; (2) a memorandum from Google outlining anti-competition and document confidentiality requirements, among other things; and (3) Employment Eligibility Verification form. The email and above-referenced documents are attached hereto as Exhibit 4.

1

**CONFIDENTIAL**

United States District Court
Northern District of California

**Trial Exhibit 5215**

Case No.    3:17-cv-00939-WHA
Date Entered
By
         Deputy Clerk

On April 2, 2016, Stroz Friedberg received an email from Eric Amdursky including additional information requested from Ron. This email and its attachment are attached hereto as Exhibit 5.

On April 9, 2016, Stroz Friedberg received an email from Eric Amdursky including additional information requested from Ron. This email is attached hereto as Exhibit 6.

On April 11 and 12, 2016, Stroz Friedberg received follow-up emails from Eric Amdursky and Ron with additional information from Ron. These emails are attached hereto as Exhibit 7.

<u>Duties and Responsibilities at Google</u>

From April 2007 to approximately April 2008, Ron was a Product Manager for Google Maps/Local, which was part of the GEO Division. The Geo Division also included Google Earth, Google Moon, Street View, Google Sky, My Maps, Google LBC, and Sketch Up, among others. During 2008 and 2009, Ron was a Senior Product Manager where he supervised one to two employees. Beginning in 2010 until his departure from Google in December 2011, Ron was the Group Product Manager for Google Places, also referred to as Google Local, where he supervised five to ten employees.

During this first term of employment at Google, Ron's duties and responsibilities included defining road maps for products, feature prioritization, and working with different teams to plan the development for road mapping. Initially, Ron had no supervisory responsibilities but those responsibilities gradually increased over time as described above.

In or about November 2014, Ron returned to Google after it acquired Motorola and was an advisor to various Google businesses including Alphabet, the parent company of Google. When he first rejoined Google, Ron was an advisor reporting to Jonathan Rosenberg. From in or about April 2015 to September 2015, Ron was an advisor to Niantic Inc., where he reconnected with John Hanke, and focused on games that engage in real world platforms, such as, Ingress (a video game that enable users to create and hack into things) and Field Trip (an Android application that provides information on points of interest around the world). From October 2015 to January 2016, Ron was an advisor to Waze and its Chief Executive Officer, Noam Bardin.

While he had no specific day-to-day responsibilities during his second term of employment with Google, Ron interacted with various groups and advised Google regarding the following projects: (1) Nest, (producer of home automation products) where he worked with Maxime Veron and provided personal coaching on how to run the business; (2) Replicant (robotics division), where he worked with Jonathan Rosenberg and Bhavesh Mehta; (3) Android Wear (producer of smartwatches and smart clothing), where he worked with David Singleton; (4) Waze, where he worked with Noam Bardin; (5) Cardboard (developer of virtual reality devices); (6) general research regarding new offerings at Google; and (7) expansion of market share with smart fashion, including interfacing with Michael Kors representatives. During this time, Ron had no supervisory responsibilities.

Ron identified the following individuals who he primarily worked with at Google from November 2014 to January 2016: Jonathan Rosenberg; John Hanke; David Singleton; Noam Bardin; and Bhavesh Mehta.

While at Google, in or about July 2015-October 2015, Ron became interested in learning more about the Chauffeur Project. He was curious about the self-driving car space and wanted to educate himself about it to determine if it was something he might be interested in at Google. Ron stated that he viewed some

2

**CONFIDENTIAL**

Google videos regarding the history of Chauffeur, examined the list of incoming press inquiries concerning Chauffeur, reviewed the directory of Chauffeur employees and accessed certain individual's calendars to determine a mutually convenient time to set up some meetings.

He met with the following individuals for approximately one hour each in or about July-October 2015: Chris Urmson; Daniel Chu; Chris Ludwick; and Abighit Ogale. He generally explored with each of them what they were doing with Chauffeur and some of the main challenges with the project, among other things. His best recollection of what he discussed with each individual is summarized below.

∞  Chris Urmson

He spoke with Urmson about the commercialization side, the main challenges facing the Chauffeur Project and explored the possibility of assisting the team. Urmson told him he did not believe there was an immediate need in commercialization but that he should reach out to the unit's head of Business Development, Jennifer Haroon, who could explore possibilities with Ron. Ron thought about scheduling a meeting with Haroon, but he did not ultimately do so.

∞  Daniel Chu

Daniel Chu was the Lead Project Manager for the project and sought Ron's advice on how to grow his own team, since Ron had managed approximately 100 employees at Motorola. They also discussed the main challenges ahead with the Chauffeur Project from a product perspective, including some of the user-interfacing challenges.

∞  Chris Ludwick

Ron worked with Ludwick at Motorola. Ludwick was on Chu's team so the conversation was similar to the conversation he had with Chu. He also recalled speaking about sensor products and ways to describe the specifications for various products.

∞  Abhijit Ogale

Ogale worked with Ron at Street View and Google Maps in 2009/2010. Ron was curious about how the Chauffeur Project was using computer vision to self-drive the cars. He was also interested in Ogale's opinion as to whether the cars could drive autonomously with computers. ███████████████████
████████████████████████████████████████

Side Projects at Google

During his tenure at Google, Ron stated that he engaged in a number of external side projects that were not Google-related as an owner, investor, and/or advisor. Ron stated that Google did not know about these projects, which included the following:

∞  Moon Express (advisor/investor) – space travel to the moon
∞  LocoMobi (advisor) – smart parking technology
∞  Plumzi (advisor) - interactive technology for children. Disney is an investor.
∞  Lark (advisor/investor) – personal online coach for your health
∞  Dojo (investor) – IT smart home digital security system
∞  SAY (investor) necklaces, smart jewelry

3

**CONFIDENTIAL**

- ∞ Jabe Mobile (investor) – sold to Google
- ∞ ZenDrive (investor) – insurance for ride-sharing companies
- ∞ Honor (investor) – elderly stay at home service

Devices and Data Accessed at Google

During his most recent tenure at Google, Ron was only issued a MacBook Air, which he returned to Google when he left the company. Ron also had a personal Android Nexus 6, which synced with his Google work email.

*Work Product*

Ron stated that he created and/or worked on documents, presentations, spreadsheets and communications while at Google. Ron stated that he would access these items primarily through the Google Drive via his work laptop and externally through VPN from his work laptop as well. Ron accessed Google's network through his personal Nexus phone, including contacts, calendar, employee networks, "all hands," and the Google Drive. Google had security software installed on Ron's personal phone that allowed him to access Gmail and Google Docs. Google terminated Ron's access when he resigned. Ron stated that he did not use his personal laptop to access the Google network or any Google data/documents.

*Personal Devices/Online Repositories*

Ron denied storing any documents that he worked on for Google on any of his personal devices or in online repositories. He further explained that most of his work documents were stored on Google's internal G Drive and that none were on his external accounts.

*Transfer of Files*

Ron said he did not transfer any Google files to an external device and "very rarely" forwarded non-work related/non-confidential emails and/or contacts to his personal Gmail account. Ron stated that prior to leaving Google he did send a few emails, containing personal photographs, employee exit documents relating to benefits, and "public" presentations to his personal email account – ▬▬▬▬▬▬▬ Ron recalled in a follow-up email to Stroz Friedberg dated March 29, 2016 (Exhibit 4) that on the last day of his employment with Google he forwarded the following emails/photos/contacts from his Google account to his personal Gmail account: (1) LETV email regarding a Chinese company he helped introduce to Google. LETV was interested in starting a self-driving car division; (2) 2 personal photos; (3) 5 personal photos in archives; (4) Dropbox CEO contact; and (5) a Chinese self-driving car company that contacted Ron. He was not certain if it was a different company than LETV.

Ron stated that he did not copy, download or transfer any Google confidential or proprietary information (listed in his agreement) to any of his personal devices and that he does not possess any such information in electronic or hard copy form.

When asked if Ron transferred any contacts from Google, Ron stated that he did not take any employee lists but he may have some SMS and Snapchat communications with Google employees. Ron also stated that there may have been some Facebook communications with Google employees on a social level, and possibly, WeChat and Google Hangouts communications.

4

**CONFIDENTIAL**

*Files on MacBook Air from Motorola, Now Owned by Google*

Ron added that his personal MacBook Air, purchased in 2014, may contain information from Motorola, which includes information about the Motorola watch. Ron used this laptop from March 2014 to February 2016. This laptop was not used to access the Google Network. Ron stated that this was his primary computer at Motorola and he used this computer to access OttoMotto for a few days and then he purchased a new computer.

**Contacts With Google Employees About New Company Prior to Leaving Google**

Prior to leaving Google, Ron spoke with Anthony Levandowski. Ron also attended a barbeque at Levandowski's house, participated in a group meeting at Levandowski's house, and spoke with four/five additional Google employees one-on-one about the new company. Below is a summary of the meetings Ron attended and/or individuals he spoke with about the new company.

### Anthony Levandowski

Ron and Anthony Levandowski knew each other because Ron ran a competitive project at Google (i.e., map-making). According to Ron, in August or September of 2015, Ron reconnected with Levandowski and they started talking about projects they could work on together. As they brainstormed about the future, the idea of OttoMotto came about. Sometime during the fourth quarter of 2015, Ron and Levandowski discussed robot trucks in the United States, and safety issues related to trucking. They also discussed an after-market kit to convert existing cars into self-driving cars. Initially, Ron stated that he discussed these ideas with Levandowski only.

### Group Contacts with Google Employees

Ron stated that, beginning in November or December 2015, he started to socialize with other Chauffer team members. He recalled a social barbeque at Levandowski's house in or about November 2015 where he met some Chauffeur employees. He described this gathering as purely social, and that he took his wife and daughter to it as well.

Ron also recalled a gathering at Levandowski's house right before the holidays in December 2015 during which he made a group presentation on trucking automation. Ron stated that there was a market opportunity and his goal was to get the group excited. A group of Chauffer team members and other Google employees attended the meeting at Levandowski's house including, Laila Mathos, Pierre Droz, Don Burnette, Claire Delaunay, Brian Torcelini, Gaetan Pennecot, Brian (whose name he could not recall) from UX, among others. It was his understanding that they had been invited to the meeting through Levandowski's connections. After the meeting, Ron reached out to certain individuals who expressed an interest in the new company to set up meet-and-greets over coffee.

### One-on-One Contacts and Meetings with Google Employees

Ron stated that he met with the following individuals one-on-one.

### ∞ Laila Mathos

In December 2015, Ron met with Laila Mathos, who works with Google's Chauffeur Project. They arranged the meeting via SMS to see if she wanted to have coffee. Mathos had attended the group meeting at Levandowski's house and expressed interest in the new company to Ron. In December 2015,

5

**CONFIDENTIAL**

STROZ_0000866

Ron met with Mathos at a coffee shop and they discussed potentially her joining the new company. Levandowski was aware of Ron's meeting with Mathos and had given Ron contact information for Mathos. Mathos received a written offer to join OttoMotto before the holiday, but did not join the new company.

### ∞   Pierre-Yves Droz

In December 2015, Ron believes he arranged to meet with Pierre-Yves Droz, an Engineer for Google's Chauffer Project, via SMS. According to Ron, Droz had attended the group meeting and had expressed interest in the start-up. Ron stated that there are text messages between himself and Droz regarding meeting for coffee. Ron stated that Levandowski was aware of his meeting with Droz and had given Ron his contact information. Droz did not join the new company.

### ∞   Don Burnette

Don Burnette was an Engineer for Google's Chauffer Project. Burnette expressed interest in the startup, although Ron could not recall whether that expression of interest occurred at the group meeting or afterwards. Ron answered questions about the autonomous trucking market. Burnette informed Ron that he was planning on leaving Google. In December 2015, Ron met with Burnette at a coffee shop not on the premises of Google about the new company. Ron said there were Snap Chat communications with Burnette. Ron said Burnette received an offer to join OttoMotto and that Burnette joined in late February 2016.

### ∞   Claire Delaunay

Claire Delaunay was an Engineer for Google who worked in the Replicant division. Ron met with Delaunay in December 2015 and could not recall who reached out to whom and whether there were any written communications about the meeting. Ron had obtained her contact information from Levandowski. Ron had breakfast with Delaunay before she left Google, where Ron described the business of the new company (i.e., autonomous trucking). Delaunay received an offer to join OttoMotto and ultimately joined the company.

### ∞   Bryan Salesky

Ron stated that prior to leaving Google, in or about October/November 2015, there was a meeting with Levandowski, Bryan Salesky, who was Levandowski's manager, and various Uber executives at Uber to discuss a possible transaction. He could not recall any more specific information about the meeting.

Departure from Google

In late 2011, Ron left Google to join Motorola for a "challenge" and returned when the Motorola business unit was bought by Google. Ron stayed at Google after the transaction because he was researching ideas and wanted to explore new possibilities at Google. While doing so, Ron realized that he wanted to participate in a start-up company. He explored start-up ideas in messaging and artificial intelligence. Ron also spoke with some other companies, and had networking conversations.

Ron stated that just before leaving Google, during the first week of January 2015, he told Noam Bardin from Waze that he may want to leave. Ron recalled that Noam seemed "fine" with that prospect.

**CONFIDENTIAL**

STROZ_0000867

Ron resigned from Google on January 13, 2016.  He notified Bardin via email and requested that the 13th be his last day. Ron's employment and his network access privileges ended the same day. When asked why he did not give more notice, Ron stated that there was "no need to."

On the day he resigned, Alex Ondik from Human Resources contacted Ron and sent him an exit questionnaire and list of devices to return.  Ron was not present at Google on the day he resigned and ended up meeting with Ondik a few days later and returning his Google laptop.  At that time he participated in an exit interview and was asked to fill out an exit form. Ron stated that he told HR that he wanted to join a start-up. Ron stated that he felt it was time to move on from Google, and that he had explored options both internally and externally.  He does not recall HR mentioning that he could not solicit employees nor does he recall signing any other documents at that time.

Ron stated that he did not access any files or even open his Google laptop after he resigned.  Ron did state that prior to his resignation, he accessed his Google laptop for personal information and emailed from his Google laptop to his personal Gmail account photos, "public" presentations, contacts and emails, among other things, as discussed in the *Transfer of Files* section above.  Ron also stated that he found copies of additional documents but could not recollect what they were.  He, thereafter, provided us a copy of his Exit Certificate from Google dated August 3, 2012 which is attached hereto as Exhibit 5 and other documents he signed and/or received upon rejoining Google in 2014.  See Exhibit 4.

Ron affirmed that he did not access, download, copy, export or transfer any Chauffer, Waze, Robotic information or data relating to inventions, research, trade secrets or third-parties.

### Google Seeks Additional Devices From Ron

During his exit interview, Google claimed Ron owned a few devices that he could not locate.  These purportedly missing devices included a Lenovo laptop, a Chromebook and a pair of Google Glasses. Ron stated that he does not know where these devices are and believes they were issued when he was either at Google the first time or when he was at Motorola.  Per Ron, none of the purportedly missing devices were issued when Ron returned to Google in November 2014.  Ron stated he likely returned them to Motorola.

Ron has not proactively checked his personal or storage devices for Google data or information and does not have any hard copies of data. Ron said Google did not ask him to certify that any Google data had been returned to the company.  He said Google asked him whether devices had been returned, and he may have signed something about returning the devices.

### Google Aware of New Company

Ron stated that he believes Google is aware that Levandowski left to start a company that focuses on robot trucks.  Ron is uncertain if Google is aware of Ron's participation in the new company.  Ron said Google is aware of the recruiting website and has access to the recruiting site to see if they have any issues with it.  Ron also stated that Levandowski has been interfacing with John Krafcik, CEO of Google Self-Driving Cars.  Ron believes that Google is aware that they have a truck in development.

**CONFIDENTIAL**

CONFIDENTIAL

STROZ_0000868

Contacts with Google Employees Following Departure

Since leaving Google, a number of Google employees have reached out to Ron about joining OttoMotto. Ron has met with an employment attorney and is telling people, including his employees, not to solicit Google employees. Below is a list of the Google employees Ron has had contact with following his departure from Google.

∞   David Weikersdorfer

Since leaving Google, Ron met with David Weikersdorfer, an Engineer from Replicant, who expressed interest in joining the new company in January 2016.  Ron said Weikersdorfer initiated contact by coming to Levandowski's house and asking Delaunay when it would be a good time to stop by.  Ron met with Weikersdorfer at a coffee shop and shared with Weikersdorfer the plans for the business verbally. David was excited to join.  Rhian Morgan, OttoMotto's HR manager, made him an offer and he ultimately joined OttoMotto.

∞   Daniel Ratner

Daniel Ratner, a Google X Engineer who heard from others that Ron and Levandowski had left, contacted Ron via SMS in January 2016.  Ron told Ratner that he could not solicit him but was happy to talk socially.  Ratner figured out what they were doing but Ron did not share the full details with him. Ron said that he is waiting for Ratner to resign, and that they saw each other recently at a family gathering.

Ron also said Ratner continued to express interest in the new company when they met in person for coffee.  Ron described the new company and Ratner expressed explicit interest in becoming employed by the new company.  Thereafter, Ron verbally discussed key terms of his potential employment.

Ron said Ratner knew OttoMotto would be excited if Ratner joined.  HR discussed with Ratner what his position at the company would look like.  Ratner resigned from Google in February 2016 and started working at OttoMotto "a few weeks ago."

∞   Ben (Ron could not recall his last name)

Sometime in February 2016, Ben, an Engineer with Replicant, also came to Levandowski's house while he still worked at Google because he knew Delaunay and Weikersdorfer.  Ron speculated that Delaunay and Weikersdorfer told Ben about the business.  Ron spoke with Ben about his role at Google and Ben expressed an interest in joining the new company.  Someone (whom Ron could not recall) gave Ben an overview of the new company.  Rhian Morgan, OttoMotto's HR manager, made Ben a verbal offer.  Ben joined OttoMotto in mid-March 2016.

∞   Robbie Miller

Miller came to the Levandowski's house in January or February 2016.  Ron could not recall who initiated the meeting, and suggested that possibly Levandowski did.  Miller spoke with people who had not worked at Google about the new company and he expressed an interest in joining.  Ron stated that Miller may have resigned without an offer from OttoMotto.  OttoMotto made Miller an offer on March 21, 2016 which he accepted.

8

**CONFIDENTIAL**

STROZ_0000869

### ∞ Collin Sebern

Sebern left Google in October 2015. Ron and Levandowski contacted Sebern after he left Google. Ron did not know Sebern prior to this. Initially, Sebern did consulting work for Levandowski and Ron for free. Eventually, Ron and Levandowski started to pay Sebern and then offered him a job soon after OttoMotto was incorporated.

### ∞ Five Former Google Drivers

Five drivers who previously worked for Google are currently working for OttoMotto. These five drivers had been driving for the Chauffer Team but were fired between September and November 2015 for violating protocol. Ron did not reach out to these drivers until after they left Google.

### ∞ Dan Gruver

Ron stated that he might have met Gruver, a Product Manager for Chauffeur, at Levandowski's house, but Ron does not recall having a real conversation with Gruver prior to Ron leaving Google. Ron did approve an offer letter for Gruver.

Contacts with Uber

Ron stated that the initial contacts with Uber were between Levandowski and Uber and that he did not join in the meetings with Uber until sometime in October or (likely) November 2015. Ron recalled five meetings during November and December 2015 and seven to ten meetings in total. Both Ron and Levandowski attended the meetings.

The first meeting was a meet-and-greet. Levandowski and Ron believed Uber was initially interested in a commercial agreement to license some technology and products. Ron stated that Uber appeared to be more interested in the after-market kits.

Ron stated that he met with Uber before and after the holidays in December 2015 and after the group meeting at Levandowski's house. He stated that Uber was interested in the fact that they might leave Google and start a new company. The December discussions evolved into whether or not Uber was interested in acquiring the new company. Ron stated that they met with Travis Kalniak (Uber's CEO), Jeff Holden (Head of Products), Cameron Poetzscher (Head of Business Development), and Nina Qi (Member of the Business Development Group). Ron also met with Brian Mclendon who used to work for Google but is now at Uber. Ron could not recall which meetings he attended but said he was aware of what they were planning to do. The discussions with Uber continued into January 2016.

Following OttoMotto's incorporation in February 2016, Ron and Levandowski have continued to have discussions with Uber on a broad variety of topics. In addition to discussing staffing, Ron and Levandowski have been discussing with Uber OttoMotto's acquisition plan, growth plans, talent of the team, and growth projections.

Ron stated that OttoMotto is seeking investments and most OttoMotto employees are aware of Uber as a strategic partner only.

Ron stated that Uber has not specifically asked whether they have any Google data. However, approximately one week before his interview (he could not recall the date), Ron, Levandowski and Uber had a discussion that Levandowski was in possession of certain Google confidential and proprietary

**CONFIDENTIAL**

CONFIDENTIAL

information that Levandowski found when he was going through his personal devices. This discussion involved Kalniak, Poetzscher, Qi, Levandowski and Ron.  According to Ron, Levandowski mentioned he had some hard disks with Google information and asked for advice.  Kalniak said that "he doesn't want that shit coming to Uber," and that he did not want to know what happened to the disks as long as they do not land at Uber.  Based on that discussion, Ron said Levandowski destroyed the disks after the meeting.  Ron's recollection of the above meeting was vague.

Ron also stated that the same day he received a telephone call from Qi at Uber inquiring about the disks and advising them not to destroy them.  Ron called Levandowski and learned that the disks had already been destroyed and relayed this information to Qi.

OttoMotto

Ron stated that OttoMotto was established on January 15, 2016.  OttoMotto was initially called 280 Systems.  Ron is the President and Chief Executive Officer.  Levandowski joined a few weeks later as the Engineering Lead.  Ron stated that there is no similarity between OttoMotto's and Google's businesses because OttoMotto has set out to develop trucks and after-market kits for cars.  He said the business focus is on trucks while the cars are mapping the highway.  Ron said that he has not relied upon Google information for the business and, to his knowledge, the source code is clean and no IP is being brought in.

However, Ron said that if they close the transaction with Uber, "they may be helping Uber compete with Google in some way," and that Uber is interested in the Chauffer product.

As of the date of the interview, OttoMotto has 25 to 26 employees and of these, approximately half previously worked at Googlers; approximately seven moved directly from Google to OttoMotto.

Levandowski was still working at Google when Ron began using Levandowski's house to work on OttoMotto.

When asked whether he would have left Google if OttoMotto was not in the works, Ron stated that he would not have at that time.  However, Ron explained that he had been exploring other ideas and may have left for something else.

Staffing Protocols

OttoMotto finds employees through referrals and their recruiting website.

Specifically, OttoMotto solicits candidates by asking current employees for referrals. Ron said they ask employees who they know and are very explicit about the fact that they do not want to solicit Google employees.  If Google employees contact them via the website or written communications, Ron said they have a protocol whereby the candidate meets with non-Google employees to learn more. Then applicants from Google interview with other non-Google employees.  An offer is made verbally, followed by a written offer, only after they leave Google.

OttoMotto's employment letter includes strong language not to bring any prior employer data to OttoMotto.  New employees are issued new laptops and are directed not to use any personal devices.  Ron stated that there is currently no training, but they are in the process of establishing more guidelines.  Going forward, OttoMotto is looking for employees with various engineering skill sets.

10

**CONFIDENTIAL**

As CEO, Ron's role in staffing is to approve compensation based on seniority, feedback, and the need for the role.

Ron stated that they have shared their staffing process with Uber, which is "okay" with the process. Uber can provide feedback about talent, but they do not approve or deny any candidates.

### Vendors

When asked if he had contacted any Google vendors, Ron stated that he believed that OttoMotto may have contacted some sensor/GPS providers, such as Applinix, which worked with Google as well, but he was not certain.

### Accounts/Online Repositories/Person Devices

The following accounts/repositories/devices were outlined by Ron in his response to Stroz Friedberg's Questionnaire for Diligenced Employees (attached hereto as Exhibit 3). Ron confirmed that the responses contained in Exhibit 3 were, to the best of his recollection, accurate and complete.

### Email Accounts

Ron said that he has five email accounts, two personal and three related to OttoMotto:

(OttoMotto was previously 280 Systems.)

Ron said that the majority of his personal emails are with ███████, which he established in approximately 2008.

### Online Repositories

Ron stated that he has had four online repository accounts, but only two are active. All four online repository accounts are only accessible by Ron.

The first is a Google Drive account that he established approximately 10 years ago. Ron stated that he stored OttoMotto and Uber documents, as well as personal documents, on his personal Google Drive. Some of this information includes financial documents.

The second was a Dropbox account that he established approximately three years ago. Ron stored personal files in the Dropbox account. He also stored some information pertaining to OttoMotto in the Dropbox account, including market research and competitive research. The Dropbox account also includes information about prototyping on how to install a side mirror, but no information relating to Chauffer.

Ron has two inactive online repositories. The first is an OneDrive account that he established a few months ago. Ron stored personal documents in the account, and possibly Uber-related documents. The second is an iCloud account, which he established approximately one year ago. Ron used this account for personal purposes.

### Personal Devices

Ron listed the following personal individual devices in his possession: (1) MacBook Air (purchased in January 2016, used for personal and OttoMotto work, and shared with no one); (2) iPhone 6 (purchased

11

**CONFIDENTIAL**

in 2016, used for personal and OttoMotto work, and shared with no one); (3) iMac (purchased mid-2015, used for personal and OttoMotto work, and shared with wife); (4) MacBook Air (purchased in approximately 2014 and is used for personal and OttoMotto work; shared with no one); (5) iPhone 4 (purchased in approximately 2014, used for personal purposes; and shared with no one); (6) Android Nexus 6 (purchased in 2015, was used to access the Google network when Ron worked at Google; also used for personal purposes, and shared with no one); and (7) iPad Mini (purchased 2015 for personal use and shared with wife).

### Affirmation

Ron affirmed that he had provided Stroz Friedberg with all the information of which he was aware and that the information that he provided was true and correct.

12

**CONFIDENTIAL**

CONFIDENTIAL

STROZ_0000873

# Exhibit 3 Redacted

CONFIDENTIAL

STROZ_0000874

Questionnaire for Diligenced Employees

Prior Employment

(1) When did you begin working for Acme?

April 2007

Left to work at Motorola - January 2012

Rejoined Google - 11/14

(2) What documents did you sign when you began working for Acme (i.e.,

nondisclosure/confidentiality agreement, non-solicitation agreement,

etc.)?

Employment agreement after rejoining Google at 11/14 attached

(3) In what department(s)/section(s) did you work for Acme? What was

your title(s) in those department(s)/section(s)?

2007-2012 Geo (Maps/Local) - Product lead

1/15 - 4/15 Alphabet - advisor

4/15-9/15 Niantic labs - advisor

10/15-1/16 Waze - advisor

(4) What were your duties/responsibilities for Acme?

Lead Product Manager Google Map/Local – 2007 until 2011

**CONFIDENTIAL**

Advisor to various Google businesses – 12/14-1/16

(5) What types of documents did you create/work on at Acme (i.e., Word, Excel, Powerpoint, etc.)?

Word, Excel, Powerpoint, Google docs/preso/sheets

(6) When you worked at Acme, were you issued a mobile device, or did you use a personal device to send/receive work-related emails?

Personal device

(7) When you worked at Acme, were you issued a laptop or other equipment? Or did you use your own personal devices to work on Acme documents?

Work laptop

(8) How would you access your Acme work documents from outside of the office?

On my work laptop: physical keyfob->usb entrance ->vpn

(a) If you transferred documents to a flash drive/CD/external device, where is that flash drive/CD/external device now and what computer did you use to access those documents?

I did not transfer files to an external device

**CONFIDENTIAL**

(b) If you connected through VPN, which computer did you use to

connect to VPN?

==MacBook air (returned to Google)==

(9) Are there any other personal devices through which you accessed Acme's

network?

==personal phone had Google security policy installed -> access to Gmail and Docs, but no longer== ==had access== when I resigned from Google

(10) When you worked at Acme, did you email documents that you worked

on for Acme to your personal email account? If so, how often did you do

this? What email accounts did you use? Were your personal email

accounts synched with your smartphone or PDA?

==Very rarely forwarded== non-work ==related/non-confidential emails and contacts to personal Gmail== ==address.==

(11) When you worked at Acme, did you ever store any document that you

worked on for Acme on any personal digital devices (i.e., smartphones,

laptops, hard drives, thumb drives, etc.). If so, please identify those

devices?

==No==

(12) When you worked at Acme, did you ever store any data or information

that you worked on for Acme with an online data repository (i.e.,

**CONFIDENTIAL**

Dropbox, OneDrive, GoogleDocs, etc.)? Did you ever access any Acme

documents stored in any of the above mentioned accounts from a

personal computer?

Most docs were stored in Google's internal Gdrive, none were on any external accounts

(13) Other than the measures described above, did you backup your data at

Acme in any other manner? If so, please describe the manner in which

you backed up your data.



Decision to Leave Acme

(1) When did you leave Acme?

1/13/16

(2) Prior to leaving Acme, did you download/copy any information that you

worked on for Acme? If so, what information did you download/copy?

Where is this information currently located? Has any information been

transferred to your current company's computers/networks?

No, as mentioned I have forwarded few external non-work related emails to my personal Gmail

Personal Email Accounts

(1) How many personal email accounts do you have?

2 personal emails + 3 Otto emails (moved 2 domains since inception as we renamed)

(2) Please list all of your email accounts.

**CONFIDENTIAL**

(a) For each email account, please list the password that we may use
to access that account;

(b) For each email account, please list the approximate time it was
established;

(c) For each email account, please describe what types of email you
received or sent (i.e., personal, work, etc.);

(d) For each email account, please list all of the individuals that have
access to that account;

(e) For each email account, please estimate the total number of emails
in the account; and

(f) For each email account, please identify any encrypted
data/information in each account and describe the encryption and
the means for bypassing it.

████████████████

password [Password provided separately]

established: ~8 years

access: myself

emails count: 73,219

no encryption

██████████████████

password: [Password provided separately]

established: 10+ years?

access: myself

**CONFIDENTIAL**

STROZ_0000879

email count: ~10K?

==no encryption==

███████████

password[Password provided separately]

established: Feb 2016

Access: myself

==Email count: few dozens==

==No encryption==

█████████████

password: [Password provided separately]

established: Feb 2016

Access: myself

Email count: few dozens

==No encryption==

███████

password: [Password provided separately]

Established: Feb 2016

Access: myself

Email count: few dozens

No ==encryption==

(3) Please identify all devices you use/have used to access your personal

==CONFIDENTIAL==

email accounts.

After Q3 15:


MacBook air (personal that also access Moto network, not Google)

iPhone 4

iPhone 6

MacBook

iMac

Nexus 6

iPad Mini


Personal Digital Devices

(1) What digital devices (i.e., smartphone, laptop, desktop, hard drive, thumb

drive, etc.) do you currently own?


Macbook

(a) password:

(b) Purchased - Jan 2016

c) Access - myself

(d) Data stored: work(Ottomotto)/personal computer – email, docs

(e) Storage capacity: 256GB

(f) no encryption

(g) OS X

(h) not wiped/imaged


**CONFIDENTIAL**

STROZ_0000881

iPhone

(a) password:

(b) Purchased - Jan 2016

c) Access - myself

(d) Data stored: work(Ottomotto)/personal computer – email, docs, photos

(e) Storage capacity: 128GB

(f) no encryption

(g) iOS

(h) not wiped/imaged


Mac

(a) password:

(b) Purchased – mid 2015?

c) Access – myself and my wife

(d) Data stored: work(Ottomotto)/personal computer – email, docs, photos

(e) Storage capacity: GB

(f) no encryption

(g) OS X

(h) not wiped/imaged


Macbook Air

(a) password:

(b) Purchased – 2014?

c) Access - myself


**CONFIDENTIAL**

STROZ_0000882

(d) Data stored: personal computer – email, docs, photos , also used to access Moto network

(e) Storage capacity: 128GB

(f) no encryption

(g) iOS

(h) not wiped/imaged

iPhone 4

(a) password:

(b) Purchased – 2014?

c) Access - myself

(d) Data stored: personal– email, docs, photos

(e) Storage capacity: 16GB

(f) no encryption

(g) iOS

(h) not wiped/imaged

Nexus 6

(a) password:

(b) Purchased - 2015

c) Access - myself

(d) Data stored: work(used to access Google network while at Google)/personal– email, docs, photos

(e) Storage capacity: 16?GB

(f) no encryption

(g) Android M

(h) not wiped/imaged

**CONFIDENTIAL**

CONFIDENTIAL

iPad Mini

(a) password:

(b) Purchased – 2015

c) Access – myself and my wife

(d) Data stored: personal computer – email, photos

(e) Storage capacity: ?GB

(f) no encryption

(g) OS X

(h) not wiped/imaged

(a) For each device, please list the password that we may use to access the data on that device;

(b) For each device, please list the approximate date that it was purchased or obtained;

(c) For each device, please list all individuals that have access to this device;

(d) For each device, please describe what type of data is stored on that device;

(e) For each device, please describe what the storage capacity is for each device;

(f) For each device, please identify any encrypted data on the device and describe the encryption and the means for bypassing it;

**CONFIDENTIAL**

STROZ_0000884

(g) For each laptop/desktop, please list the operating system for each

laptop/desktop; and

(h) For each device, please indicate whether the device has been wiped

or reimaged previously.

(2) What digital devices have you owned in the last five years that you no

longer own?

Lenovo thinkpad – personal 2012-2014 – thrown away (old)

Lenovo thinkpad – Google: 2011 – 2013. Unknown location. wasn't used in past 2+ years. Google is aware its lost.

Macbook Air  - 2013-2014 returned to Motorola

Macbook Air – 2014-Jan 2016 returned to Google

Chromebook – Google. 2011, was used for few months. Location unknown, haven't used in past 2 years. Google is aware its lost.

15+ phones while at Moto – changed every few weeks as part of my job.

Personal iPad: 2013-2014. Lost on plane

Private Macbook Air – 2012-2013 screen broken

(a) For each device, please list the approximate date that it was

purchased or obtained;

(b) For each device, please list the approximate date that you

disposed of the device; and

(c) For each device, please describe the reason you disposed of each

**CONFIDENTIAL**

CONFIDENTIAL

device.

Personal Online Data Repository

(1) What online data repositories (i.e., DropBox, OneDrive, GoogleDocs,

etc.) do you have an account with?

Google docs

    (a) 10 years ago?

    (b) Password: [To be provided later]

    (c) Me

    (d) Personal documents and early Ottomotto documents

    (e) 57GB

    (f) No encryption

Dropbox

    (a) 3 years ago?

    (b) Password: [To be provided later]

    (c) Me

    (d) Personal

    (e) 1GB

    (f) No encryption

One drive - non active

    (a) Few months ago

    (b) Password: [To be provided later]

**CONFIDENTIAL**

STROZ_0000886

(c) Me

(d) Personal documents

(e) 2 documents (not using actively)

(f) No encryption


iCloud - non active

(a) 1 years ago?

(b) Password: [To be provided later]

(c) Me

(d) Personal documents

(e) Few files

(f) No encryption


(a) For each account, please list the approximate date that you

established the account;

(b) For each account, please provide the password that we may

use to access the account;

(c) For each account, please list all the individuals that have access

to that account;

(d) For each account, please describe the type of data/information

that you have stored in each account;

(e) For each account, please describe the volume of data in each

account; and

(f) For each account, please identify any encrypted data in each

account and describe the encryption and the means for


**CONFIDENTIAL**

STROZ_0000887

bypassing it.

(2) What devices do you use/have used to access your accounts with

online data repositories?

Most of the above devices – specifically Laptops

Hard Copies

(1) Do you have any hard copies of Acme data/information upon which

you worked? If so, please describe the data/information and the

location of the copy.



Miscellaneous

(1) Other than what is referenced above, do you have access to any

device/media/network/location where the Acme data/information

upon which you worked is stored? If so, please identify the

device/media/network/location.



**CONFIDENTIAL**

| | |
|---|---|
| Adrian | Aoun |
| Alicia | Adrikopoulous |
| Allan | Noble |
| Allan | Eustace |
| Amy | Lambert |
| Anand | Babu |
| Andrew | Lookingbill |
| Andrew | Conne-Picard |
| Anne | Aulla |
| Arda | Akman |
| Astro | Teller |
| Belle | Koven |
| Brian | McClendon |
| Chris | Uhlik |
| Courtney | Power |
| Daniel | Ratner |
| David | Eun |
| Diego | Ruspini |
| Drago | Anguelov |
| Emil | Aarfvidson |
| Hendrik | Dahlkamp |
| Isaac | Taylor |
| Jenni | Aldrich |
| Joakim | Aarfvidson |
| Joel | Truher |
| John | Hanke |
| Josh | Weaver |
| Kei | Kawai |
| Kelly | Allison |
| Kenny | Arimoto |
| Kevin | Reece |
| Kevin | Mathy |

Confidential Work Product/Attorney-Client Privileged
Donahue Fitzgerald LLP
March 12, 2016

**CONFIDENTIAL**

CONFIDENTIAL

STROZ_0000889

Exhibit 4 Redacted

STROZ_0000890

## Hanley Chew

| | |
|---|---|
| From: | Amdursky, Eric <eamdursky@omm.com> |
| Sent: | Tuesday, March 29, 2016 3:58 PM |
| To: | Hanley Chew |
| Subject: | Lior's Follow-up Information |
| Attachments: | L Ron Transfer (1).pdf |

Hanley,

As I mentioned earlier today, here is the information that Lior said he would provide to you previously during his interview.

1. Transfer letter/employee contract that be signed when coming back from Motorola to Google in October 2014 (attached)

2. Name of departure HR person: Alex Ondik. Lior couldn't find his departure questionnaire so he believes he may have answered it from his Google issued account/laptop.

3. Gmail emails forwarded from Google account to private gmail on last day while cleaning computer:

- (few departure materials)
- LETV - Chinese company he helped put in touch with Google
- 2 Personal photos - Jan 12 3:42am
- 5 personal photos in archive - Jan 12 3:18am
- Dropbox CEO contact
- Chinese self driving car company contact that contacted Lior (no follow ups)


Before leaving Google - he sent a few emails - all personal (photos, contacts etc)

He will be happy to answer any additional questions you may have, including specifically any names he didn't remember during the interview if you think it will be useful for the process.

Eric J. Amdursky
O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, California 94025
Tel. (650) 473-2644
Fax (650) 473-2601

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

1

**CONFIDENTIAL**



Lior Ron

August 8, 2014

Dear Lior,

This letter confirms the transfer of your employment from Motorola Mobility Holdings, LLC ("MMH" or "Motorola") to Google Inc. ("Google") effective as of the planned start date indicated below or another date as may be determined by Google Inc. ("Start Date"). As of the Start Date, you will no longer be employed by MMH, and your employment will no longer be subject to the terms and conditions in your offer letter with MMH, except for those provisions which survive termination of employment (e.g. confidentiality obligations). Instead, you will be employed by Google and your employment will be subject to the terms and conditions in this Transfer Offer and the At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement attached hereto.

On behalf of Google, I am pleased to offer you the exempt position of Group Product Manager. This title is based on your most recent position at Google before your transfer to Motorola. Your title is subject to change and will be determined by your manager upon securing a new role. You will receive an annual salary of $▓▓▓ which will be paid biweekly. You are eligible to participate in the company discretionary bonus plan; your annual bonus target will be ▓▓% of your base salary. The actual bonus amount could be larger or smaller than this amount, based on your performance, and the performance of the company. The exact bonus amount is at the sole discretion of Google. Both your base salary and the components of your bonus are subject to periodic review.

In addition, as a regular full-time employee you will be eligible for various benefits offered to similarly-situated Google employees in accordance with the terms of Google's policies and benefit plans. Among other things, these benefits currently include medical and dental insurance, life insurance, and a 401(k) retirement plan. You will be automatically enrolled in the pre-tax 401(k) plan at 10% into the Vanguard Target Retirement Trust, which is a portfolio of stocks and bonds that gradually becomes more conservative as your year of retirement approaches. You will be able to change your deferral amount and fund allocation upon your hire. The eligibility requirements and other information regarding these benefits are set forth in more detailed documents that are available from Google. For purposes of determining your eligibility to participate in, and your level of benefits under, Google's welfare benefit programs and policies, you will receive credit for your prior service with Google which means that your seniority date for these purposes will be considered June 12, 2006. No credit shall be given where such credit would result in duplication of benefits for the same period of service. With the exception of the "employment at will" policy discussed herein, Google may, from time to time in its sole discretion, modify or eliminate its policies and the benefits offered to employees.

As consideration for the mutual covenants herein, including the transfer of your employment from MMH, to Google, you and Google hereby agree to amend the terms and conditions of your performance award grant letter dated May 1, 2013 and your Google Inc. 2004 Stock Plan Performance Restricted Stock Unit Agreement dated May 1, 2013 (collectively, the "Grant Agreement"), which provided for the grant to you of the performance-based equity awards (the "Performance Awards"). Pursuant to the terms and conditions of the Grant Agreement, ▓▓▓▓▓ with ▓▓▓▓▓ of the Restricted Stock Units ("GSUs") are scheduled to vest on March 25, 2016, subject to your continued employment with Google and its subsidiaries (including MMH) through such date, with the actual number of GSUs that would be earned and vest determined by applying a company performance multiplier. Notwithstanding anything to the contrary in the Grant Agreement, you and Google hereby agree that the GSUs scheduled to vest on March 25, 2016 shall not be subject to a company performance multiplier and instead the number of GSUs that will vest will be equal to ▓▓▓▓▓ ▓▓▓▓ of the target number of Performance Awards reflected in the Grant Agreement, subject to your continued employment with Google through the vesting period. Except as expressly provided in this letter, all other terms and conditions of the Performance Awards, as reflected in the Grant Agreement, remain in effect.

You are being offered employment at Google based on your personal skills and experience, and not due to your knowledge of any confidential, proprietary or trade secret information of a prior or current employer or an entity, such as a university or college. Should you accept this offer, we do not want you to make use of or disclose any such information or to retain or disclose any materials from a prior or current employer. Likewise, as an employee of Google, it is likely that you will become knowledgeable about confidential trade secret and/or proprietary information related to the operations, products and services of Google and its clients. To protect the interests of both Google and its clients, all employees are required to read and sign the enclosed At Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement as a condition of employment with Google. This Agreement, which provides for arbitration of all disputes arising out of your employment, is enclosed for your review; you will be required to sign it on your first day of employment.

Google has a strict policy against insider trading, which prohibits, among other things, employees, contractors and temporary workers from trading Google stock during certain time periods and engaging in any derivative transactions in Google stock. It will be your responsibility to educate yourself regarding Google's insider trading policies and to ensure you are in full compliance. If you have any questions about Google's policy against insider trading, please contact Human Resources.

Ⓒ Document Integrity Verified

EchoSign Transaction Number: ADPF23T0kH9m588

**CONFIDENTIAL**

STROZ_0000892

If an export control license is required in connection with your employment, this offer is further contingent upon Google's receipt of the export control license and any similar approvals. Your employment with Google will commence following receipt of such export control license and governmental approvals; and is conditioned upon your (a) maintaining your employment with Google, and (b) continued compliance with all conditions and limitations contained in such a license. If for any reason such export control license and governmental approvals cannot be obtained within six (6) months from your date of signature, this offer will automatically terminate and have no force and effect.

Please understand that this letter does not constitute a contract of employment for any specific period of time, but will create an "employment at-will" relationship. This means that the employment relationship may be terminated with or without cause and with or without notice at any time by you or Google. No individual other than the Chief Executive Officer of Google has the authority to enter into any agreement for employment for a specified period of time or to make any agreement or representation contrary to Google's policy of employment at-will. Any such agreement or representation must be in writing and must be signed by the Chief Executive Officer. Your signature at the end of this letter confirms that no promises or agreements that are contrary to our at-will relationship have been committed to you during any of your pre-employment discussions with Google, and that this letter, along with the At Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement, contain our complete agreement regarding the terms and conditions of your employment.

We look forward to an early acceptance of this offer. Additionally, this offer and your employment are contingent upon satisfactory results from your background check and reference checks. To indicate your acceptance of Google's offer, please electronically sign and date the offer letter copy at the URL link provided in the email. A duplicate original is enclosed for your record.

Lior, we look forward to working with you.

Sincerely,

Keith Wolfe
HR Director
Google Inc.

_____    Oct 28, 2014
Lior Ron                   Date

CONFIDENTIAL

CONFIDENTIAL                          STROZ_0000893

TX-5215, Page 32 of 48



To: Prospective Googlers
From: Google Staffing

Hello! We are delighted to offer you a position with Google, and we hope you'll decide to join us. As you're thinking about starting your job with us, we want to remind you of a few things that make good sense, but that may not be at the top of your mind.

First, as brought up with you during the recruiting process, we don't want you to violate any agreements you may have with your former employer about non-competition, trade secrets, or confidential information. This also includes nonsolicitation obligations.

Second, we'd like you to consider whether your personal investments or business relationships are consistent with the conflict of interest provisions of Google's Code of Conduct.

**A. Non-Competition Obligations, Prior Employers' Trade Secrets and Confidential Information**

You need to ensure that you are not prevented from accepting an offer or working for Google due to any restrictions you may have on your employment (e.g., non-competition agreement, confidential information obligations, or other restrictive provisions). We encourage you to look through any documents you may have signed with your current or prior employers to see if such clauses exist. You will probably want to talk to outside counsel of your own choosing about your obligations in this regard. If you accept an offer of employment, we expect you to be clear with us (your recruiter, or later, your manager) about any areas or projects in which you should not work for some period of time or indefinitely if you are prohibited due to confidential information obligations or, non-competition provisions. It becomes very difficult for us to effectively address issues later (like when we want to release a product or patent it) if there's any concern that you've used or it could be claimed you have used confidential or trade secret information belonging to another company in doing so.

If you have any questions about anything you might be asked to do in your new job at Google and how it might impact your obligations to a previous or current employer, please let someone at Google know as soon as possible. We will try to change assignments or otherwise address any such issues before they become a problem for you. Your obligations regarding confidential and trade secret information don't end when your employment with your previous employer ends. Even if this isn't an issue now, if it becomes one next week, next month, or even next year, you need to let us know.

If you decide to accept an offer with us, please take reasonable steps to ensure that you are not continuing to be exposed to confidential or trade secret information at your current employer. We don't want you to put yourself in a position where your company might wonder whether you were viewing or hearing information with the thought of what you might want to share with Google. This applies even if you haven't formally accepted or shared your decision with your employer.

Don't take materials in any format from your previous employer unless they are completely personal in nature. This includes electronic or hardcopy documents. It includes lists of contacts, clients, and suppliers. If that information isn't otherwise publicly available or commonly known. Sending emails or documents to a personal email account with the intent of then forwarding them on to your new Google email address or copying them/downloading them onto your Google machines is simply not okay with us, and we feel confident that your previous employer won't like

C Document Integrity Verified
**CONFIDENTIAL**

CONFIDENTIAL                                                                  STROZ_0000894

DocuSign Transaction Number 3CPFZ5X7eh19r39d



it either! Also, don't destroy any documents or files belonging to your previous employer unless you have their agreement to do so.

If you're subject to a non-solicitation provision, please read it carefully and follow it for the period required. While your former co-workers can certainly decide on their own to contact you or Google about opportunities here, we don't want you to be the one who's initiating the contact on Google's behalf. Please advise any former co-workers who contact you that you're unable to pass along their information.

If you have any questions or concerns regarding any of this information, please contact our employment counsel at employment-legal@google.com.

**B. Conflicts of Interest:**

Google's Code of Conduct cautions its employees to avoid conflict of interest situations.  A conflict of interest occurs when, because of your role at Google, you are in a position to influence a decision or situation that may result in personal gain for you or your friends or family at the expense of the company or our users.  A conflict of interest can occur under a variety of situations, including:

- If a Googler also works for a company that is a customer, supplier or partner of Google or, worse yet, competes with Google,
- If a Googler has personal investments in companies that are customers, suppliers, partners or competitors of Google; or
- If a close friend or family member of a Googler has, or works for a company that has, a business relationship with Google and the Googler's job puts him or her in a position to influence that relationship.

The key to resolving any potential conflict of interest is disclosure and generally the earlier the disclosure the better.  So please, take a read through our Code of Conduct, which can be found at http://investor.google.com/corporate/code-of-conduct.html and let us know as soon as possible whether you think a current situation might create a conflict of interest if you accept a job at Google.

You can forward any conflict of interest concerns you might have to code-of-conduct@google.com.

Thanks, and again, we look forward to welcoming you to Google!

Google Staffing

Revision 02.06.2009                    Google Inc.                                                2

Ⓒ Document Integrity Verified                                         EchoSign Transaction Number: XDPPZGKAN5HD58

**CONFIDENTIAL**

CONFIDENTIAL                                                          STROZ_0000895



**Employment Eligibility Verification**

Department of Homeland Security
U.S. Citizenship and Immigration Services

USCIS
Form I-9
OMB No. 1615-0047
Expires 03/31/2016

►START HERE.  Read instructions carefully before completing this form. The instructions must be available during completion of this form.
ANTI-DISCRIMINATION NOTICE:  It is illegal to discriminate against work-authorized individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because the documentation presented has a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Attestation** (Employees must complete and sign Section 1 of Form I-9 no later than the first day of employment, but not before accepting a job offer.)

| Last Name (Family Name) | First Name (Given Name) | Middle Initial | Other Names Used (if any) |
|---|---|---|---|

| Address (Street Number and Name) | Apt. Number | City or Town | State | Zip Code |
|---|---|---|---|---|

| Date of Birth (mm/dd/yyyy) | U.S. Social Security Number | E-mail Address | Telephone Number |
|---|---|---|---|

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):

☐ A citizen of the United States

☐ A noncitizen national of the United States (See instructions)

☐ A lawful permanent resident (Alien Registration Number/USCIS Number) _____

☐ An alien authorized to work until (expiration date, if applicable, mm/dd/yyyy) _____ . Some aliens may write "N/A" in this field. (See instructions)

For aliens authorized to work, provide your Alien Registration Number/USCIS Number OR Form I-94 Admission Number:

1. Alien Registration Number/USCIS Number: _____

OR

2. Form I-94 Admission Number: _____

If you obtained your admission number from CBP in connection with your arrival in the United States, include the following:

Foreign Passport Number: _____

Country of Issuance: _____

Some aliens may write "N/A" on the Foreign Passport Number and Country of Issuance fields. (See instructions)

3-D Barcode
Do Not Write in This Space

| Signature of Employee: | Date (mm/dd/yyyy): |
|---|---|

**Preparer and/or Translator Certification** (To be completed and signed if Section 1 is prepared by a person other than the employee.)

I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Signature of Preparer or Translator: | Date (mm/dd/yyyy): |
|---|---|

| Last Name (Family Name) | First Name (Given Name) |
|---|---|

| Address (Street Number and Name) | City or Town | State | Zip Code |
|---|---|---|---|

🛑  *Employer Completes Next Page*  🛑

Form I-9  03/08/13  N

Page 7 of 9

Ⓒ Document Integrity Verified

CONFIDENTIAL

Lexilign Transaction Number 1OPPZ5G5HB1308

## Section 2. Employer or Authorized Representative Review and Verification

*(Employers or their authorized representative must complete and sign Section 2 within 3 business days of the employee's first day of employment. You must physically examine one document from List A OR examine a combination of one document from List B and one document from List C as listed on the "Lists of Acceptable Documents" on the next page of this form. For each document you review, record the following information: document title, issuing authority, document number, and expiration date, if any.)*

Employee Last Name, First Name and Middle Initial from Section 1:

| List A<br>Identity and Employment Authorization | OR | List B<br>Identity | AND | List C<br>Employment Authorization |
|---|---|---|---|---|
| Document Title: | | Document Title: | | Document Title: |
| Issuing Authority: | | Issuing Authority: | | Issuing Authority: |
| Document Number: | | Document Number: | | Document Number: |
| Expiration Date (if any)(mm/dd/yyyy): | | Expiration Date (if any)(mm/dd/yyyy): | | Expiration Date (if any)(mm/dd/yyyy): |
| Document Title: | | | | |
| Issuing Authority: | | | | |
| Document Number: | | | | |
| Expiration Date (if any)(mm/dd/yyyy): | | | | |
| Document Title: | | | | |
| Issuing Authority: | | | | |
| Document Number: | | | | |
| Expiration Date (if any)(mm/dd/yyyy): | | | | 3-D Barcode<br>Do Not Write In This Space |

### Certification

I attest, under penalty of perjury, that (1) I have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of my knowledge the employee is authorized to work in the United States.

The employee's first day of employment (mm/dd/yyyy): _____ (See instructions for exemptions.)

| Signature of Employer or Authorized Representative | Date (mm/dd/yyyy) | Title of Employer or Authorized Representative |
|---|---|---|
| Last Name (Family Name) | First Name (Given Name) | Employer's Business or Organization Name |
| Employer's Business or Organization Address (Street Number and Name) | City or Town | State | Zip Code |

## Section 3. Reverification and Rehires *(To be completed and signed by employer or authorized representative.)*

| A. New Name (if applicable) Last Name (Family Name) First Name (Given Name) | Middle Initial | B. Date of Rehire (if applicable) (mm/dd/yyyy) |
|---|---|---|

C. If employee's previous grant of employment authorization has expired, provide the information for the document from List A or List C the employee presented that establishes current employment authorization in the space provided below.

| Document Title: | Document Number: | Expiration Date (if any)(mm/dd/yyyy): |
|---|---|---|

I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative: | Date (mm/dd/yyyy): | Print Name of Employer or Authorized Representative: |
|---|---|---|

Form I-9   03/08/13 N

Document Integrity Verified     Envelope Transaction Number: XOPPCXXXXX-XXXX

**CONFIDENTIAL**

CONFIDENTIAL                                                STROZ_0000897

**TX-5215, Page 36 of 48**

## LISTS OF ACCEPTABLE DOCUMENTS
### All documents must be UNEXPIRED

Employees may present one selection from List A
or a combination of one selection from List B and one selection from List C.

| LIST A<br>Documents that Establish<br>Both Identity and<br>Employment Authorization | LIST B<br>Documents that Establish<br>Identity | LIST C<br>Documents that Establish<br>Employment Authorization |
|---|---|---|
| 1. U.S. Passport or U.S. Passport Card | 1. Driver's license or ID card issued by a State or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color, and address | 1. A Social Security Account Number card, unless the card includes one of the following restrictions:<br>(1) NOT VALID FOR EMPLOYMENT<br>(2) VALID FOR WORK ONLY WITH INS AUTHORIZATION<br>(3) VALID FOR WORK ONLY WITH DHS AUTHORIZATION |
| 2. Permanent Resident Card or Alien Registration Receipt Card (Form I-551) | | |
| 3. Foreign passport that contains a temporary I-551 stamp or temporary I-551 printed notation on a machine-readable immigrant visa | 2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color, and address | 2. Certification of Birth Abroad issued by the Department of State (Form FS-545) |
| 4. Employment Authorization Document that contains a photograph (Form I-766) | 3. School ID card with a photograph | 3. Certification of Report of Birth issued by the Department of State (Form DS-1350) |
| 5. For a nonimmigrant alien authorized to work for a specific employer because of his or her status: | 4. Voter's registration card | 4. Original or certified copy of birth certificate issued by a State, county, municipal authority, or territory of the United States bearing an official seal |
| a. Foreign passport; and | 5. U.S. Military card or draft record | |
| b. Form I-94 or Form I-94A that has the following: | 6. Military dependent's ID card | 5. Native American tribal document |
| (1) The same name as the passport; and | 7. U.S. Coast Guard Merchant Mariner Card | 6. U.S. Citizen ID Card (Form I-197) |
| (2) An endorsement of the alien's nonimmigrant status as long as that period of endorsement has not yet expired and the proposed employment is not in conflict with any restrictions or limitations identified on the form. | 8. Native American tribal document | 7. Identification Card for Use of Resident Citizen in the United States (Form I-179) |
| | 9. Driver's license issued by a Canadian government authority | 8. Employment authorization document issued by the Department of Homeland Security |
| 6. Passport from the Federated States of Micronesia (FSM) or the Republic of the Marshall Islands (RMI) with Form I-94 or Form I-94A indicating nonimmigrant admission under the Compact of Free Association Between the United States and the FSM or RMI | For persons under age 18 who are unable to present a document listed above: | |
| | 10. School record or report card | |
| | 11. Clinic, doctor, or hospital record | |
| | 12. Day-care or nursery school record | |

Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274).

Refer to Section 2 of the instructions, titled "Employer or Authorized Representative Review and Verification," for more information about acceptable receipts.

Form I-9   03/08/13  N

Page 9 of 9

© Document Integrity Verified

**CONFIDENTIAL**

CONFIDENTIAL

echoSign Transaction Number XCPFZXXV4Y16H3BE

STROZ_0000898

GOOGLE INC.

AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT

As a condition of my employment with Google Inc., its subsidiaries, affiliates, successors or assigns (together "Google"), and in consideration of my receipt of confidential information, my employment with Google, and my receipt of any compensation Google is paying to me, I agree to the following terms of this At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "Agreement").

1.      **At-Will Employment.**  MY EMPLOYMENT WITH GOOGLE IS FOR AN UNDEFINED DURATION AND IS AT-WILL EMPLOYMENT, WHICH MEANS IT MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT CAUSE OR NOTICE.  NO REPRESENTATION TO THE CONTRARY IS AUTHORIZED OR VALID UNLESS MADE IN WRITING AND SIGNED BY THE CHIEF EXECUTIVE OFFICER OF GOOGLE INC.

2.      **Confidential Information.**

(a)      *Definition of Google Confidential Information.*  "Google Confidential Information" means any proprietary, any information in any form that relates to Google or Google's business and that is not generally known.  Examples include Google's non-public information that relates to its actual or anticipated business, products or services, research, development, individual data, customers, customer lists, markets, software, hardware, finances, employee data and evaluation, trade secrets or know-how, intellectual property rights, including but not limited to, Assigned Inventions (as defined below), unpublished or pending patent applications, and all related patent rights, and user data (i.e., any information directly or indirectly collected by Google from users of its services). Google Confidential Information also includes any information of third parties (e.g., Google's advertisers, collaborators, subscribers, customers, suppliers, partners, vendors, partners, licensees or licensors) that was provided to Google on a confidential basis. Google Confidential Information does not include any items that have become publicly known through no wrongful act of mine or others under a relevant confidentiality obligation.  Nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

(b)      *Nonuse and Nondisclosure.*  During and after my employment with Google, I will hold in the strictest confidence and take all reasonable precautions to prevent any unauthorized use or disclosure of Google Confidential Information (whether disclosed to me in anticipation of or during my employment by Google), and I will not use Google Confidential Information for any purpose other than for the benefit of Google in the scope of my employment, or (ii) disclose Google Confidential Information to any third party without the prior written authorization. I agree that all Google Confidential Information that I use or generate in connection with my employment belongs to Google (or their parties identified by Google). I understand that my unauthorized use or disclosure of Google Confidential Information during my employment or after my employment may lead to disciplinary action, up to and including termination and/or legal action.

(c)      *Former Employer Information / Ownership of Google Property.*  I will not use or disclose in connection with my employment with Google or bring onto Google's electronic devices, software, property, facilities, or systems (collectively, "Google Property") any proprietary information, trade secrets, or any intellectual property belonging to any previous employer or other person or entity unless consented to in writing by such employer, or entity.

3.      **Inventions.**

(a)      *Definition of Inventions.*  "Inventions" means inventions, designs, developments, ideas, concepts, techniques, devices, discoveries, formulae, processes, improvements, writings, records, original works of authorship, trademarks, trade secrets, all related know-how, and any other intellectual property, whether or not patentable or registrable under patent, copyright, or similar laws.

(b)      *Assignment of Inventions.*  Except as provided in Section 3(f) below, Google Inc. will own all Inventions that I invented, developed, reduced to practice, or otherwise contributed to, solely or jointly with others, during my employment with Google (including Google Inc. working hours or with the use of Google's equipment, supplies, facilities, or Google Confidential Information, and any intellectual property rights in the Inventions (the "Assigned Inventions").  I will promptly disclose in writing to Google any Assigned Inventions and assign to Google my rights in any Assigned Inventions.  I hereby irrevocably assign to Google Inc. my rights in all Assigned Inventions, and convey to Google Inc. ownership of any Assigned Inventions not yet in existence. All works of authorship made solely or jointly with others) within the scope of and during my employment with Google are "works made for hire" as defined in the United States Copyright Act.  The decision whether or not to commercialize or market any Assigned Inventions is within Google's sole discretion and for Google's sole benefit, and that I will not claim any consideration as a result of Google's commercialization of any such Inventions.

(c)      *Prior Inventions.*  I list in Exhibit A all inventions that I solely or jointly made before my employment with Google (collectively, "Prior Inventions") and that I am not assigning to Google.  I will not incorporate any Prior Inventions into any Assigned Inventions, product, or service of Google or otherwise use any Prior Inventions in the course of my employment with Google without its prior written permission.  If I incorporate any Prior Inventions into a Prior Invention into any Assigned Inventions, product, or service of Google, I hereby grant to Google a royalty-free, irrevocable, perpetual, transferable worldwide license (with the right to sublicense) to make, have made, use, import, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Invention.

(d)      *Maintenance of Records.*  I agree to keep and maintain for Google detailed and accurate written records in any format that it

EP Data Nov 2010
CA Version

Page 1 of 6

Ⓒ Document Integrity Verified

CONFIDENTIAL                                                                                                          STROZ_0000899

**TX-5215, Page 38 of 48**

may specify of all Assigned Inventions that I make (solely or jointly with others) for Google.  The records are and remain the sole property of Google.

(e)   *Securing Intellectual Property Rights.*  I agree to assist Google (or its designee) at Google's expense to assign, secure, and enforce all intellectual property rights in any Assigned Inventions in any and all countries, disclose to Google all pertinent information and data, and sign any document that Google reasonably deems necessary. If Google is unable for any reason to secure my signature to any document required to assign, secure, and enforce any intellectual property rights in any Assigned Inventions, then I hereby irrevocably designate and appoint Google and its officers and agents as my agents and attorneys in fact to execute any documents on my behalf for this purpose. This power of attorney will be considered coupled with an interest and will be irrevocable. My obligations under this Section 3(e) will continue after the termination of my employment with Google.

(f)   *Exception to Assignments.*  The provisions of this Agreement requiring disclosure and assignment of Inventions to Google do not apply to any invention that qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B).  While employed, I will advise Google promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and that I have not disclosed on Exhibit A for a confidential ownership determination.

4.   **Conflicting Employment.**

(a)   *Other Employment or Activities.* During my employment with Google, I will not engage in any other employment or other activities or services directly related to the business in which Google is now involved, becomes involved, or has plans to become involved or that conflict with my obligations to Google without seeking and receiving permission in advance from Google's Ethics and Compliance team.

(b)   *Prior Agreements with Other Parties.* My performance of all the terms of this Agreement and my duties as an employee of Google will not breach any invention assignment, proprietary information, confidentiality, or similar agreement with any former employer or other party.

5.   **Return of Google Property and Information.**

(a)   *Return of Google Property.*  Immediately upon termination of my employment with Google, I agree to deliver to Google and will not keep, recreate, or deliver to any other person or entity any documents and materials pertaining to my work with Google or containing any Google Confidential Information. I agree to cover promptly all Google Property, as applicable, in my possession or control.  I agree, upon Google's request, to sign a document that I have fulfilled my responsibilities under this Agreement.

(b)   *Return of Google Information.*  Upon termination of my employment, I will make a prompt and reasonable search for any Google Confidential Information in my possession or control.  If I locate such information I will notify Google and provide a computer-useable copy of it.  I will cooperate reasonably with Google to verify that the necessary copying is completed and, when Google confirms compliance, I will delete fully all Google Confidential Information.

(c)   *Compliance.*  I have no reasonable expectation of privacy in any Google Property or in any other documents, equipment, or systems used to conduct the business of Google.  Google may audit and search any Google Property or such documents, equipment, or systems without further notice to me for any business-related purpose at Google's reasonable discretion.  I will provide Google with access to any documents, equipment, or systems used to conduct the business of Google immediately upon request. I consent to Google taking reasonable steps to prevent unauthorized access to Google Property and Google Information. I understand that I am not permitted to load any unauthorized applications or any applications that I do not have a license or authorization for use to any Google Property and that I will refrain from copying any software that I do not have a license or authorization to use or using such software in a way that I do not have a license or authorization to use on Google Property. It is my responsibility to comply with Google's policies governing use of Google Property.

6.   **Notification.**  If my employment with Google ends, I consent to Google notifying my new employer or any third party about my obligations under this Agreement.

7.   **Solicitation of Employees.**  To the fullest extent permitted under applicable law, during my employment with Google and for twelve months immediately following its termination for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of Google's employees to leave their employment.

8.   **Export Statement of Assurance.**  In the course of my employment, Google may release to me items (including software, technology, systems, equipment, and components) subject to the Export Administration Regulations ("EAR") or the International Traffic in Arms Regulations ("ITAR"). I certify that I will not export, re-export, or release these items in violation of the EAR or ITAR and I will not disclose/export/re-export these items to any person other than as required in the scope of my employment with Google. If I have any question regarding this Section 8, I immediately will contact the Legal Services Department before taking any actions.

9.   **Code of Conduct.**  I have read Google's Code of Conduct, which is available on the "Investor Relations" page of Google's public website.  I agree to comply with the terms of the Code of Conduct and report any violations of the Code of Conduct.

10.   **Employee Handbook.**  Google's Employee Handbook consists of "Core" policies listed in a table of contents on Google's "Employee Handbook" internal website, and that those policies incorporate by reference supplemental policies.  Within ten days of signing this Agreement, I will read the "Core" policies within Google's Employee Handbook, and comply with its policies, including supplemental policies, as they may be revised from time to time.

*EW Date: Nov 2013*
*GA Version*

Page 2 of 9

Ⓒ Document Integrity Verified
**CONFIDENTIAL**
DocuSign Transaction Number: ACPFZ3KVeH9H358

11. **Use of Images**.  During my employment, Google or its agents may obtain images of me for subsequent use in materials. My name may or may not be included along with such images. I grant Google permission for such use of my images, both during and after my employment, and I understand that I will not receive any royalties or other compensation for this use.

13. **Arbitration and Equitable Relief**

(a) _Arbitration_.  IN CONSIDERATION OF MY EMPLOYMENT WITH GOOGLE, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES AND OTHER BENEFITS PAID TO ME BY GOOGLE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING GOOGLE AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF GOOGLE IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH GOOGLE OR THE TERMINATION OF MY EMPLOYMENT WITH GOOGLE, INCLUDING ANY BREACH OF THIS AGREEMENT, WILL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 1280 THROUGH 1294.2, INCLUDING SECTION 1283.05 (THE "RULES"), WHICH ARE AVAILABLE ON THE "CALIFORNIA LAW" PAGE OF "CALIFORNIA LEGISLATIVE INFORMATION" PUBLIC WEBSITE.  I AGREE THAT I MAY ONLY COMMENCE AN ACTION IN ARBITRATION OR ASSERT COUNTERCLAIMS IN AN ARBITRATION, ON AN INDIVIDUAL BASIS AND, THUS, I HEREBY WAIVE MY RIGHT (THE COMMENCE OR PARTICIPATE IN ANY CLASS OR COLLECTIVE ACTION(S) AGAINST GOOGLE, TO THE FULLEST EXTENT PERMITTED BY LAW.  DISPUTES THAT I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE FMA LABOR STANDARDS ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION, WRONGFUL TERMINATION AND ANY OTHER CONTRACTUAL, TORT OR STATUTORY CLAIMS UNDER FEDERAL, CALIFORNIA AND LOCAL LAWS, TO THE EXTENT ALLOWED BY LAW.  I UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT GOOGLE MAY HAVE WITH ME.

(b) _Procedure_.  I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS") PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "JAMS RULES"), WHICH ARE AVAILABLE ON THE "RULES/CLAUSES" PAGE OF JAMS PUBLIC WEBSITE, AND NO OTHER RULES FROM JAMS.  I AGREE THAT THE ARBITRATOR WILL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, MOTIONS TO DISMISS OR TO STRIKE, DEMURRERS, AND MOTIONS FOR CLASS CERTIFICATION, PRIOR TO ANY ARBITRATION HEARING.  I ALSO AGREE THAT THE ARBITRATOR WILL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, INCLUDING INJUNCTIVE RELIEF, AND THAT THE ARBITRATOR WILL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW.  I AGREE THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF.  I UNDERSTAND THAT GOOGLE WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I WILL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW.  I AGREE THAT THE ARBITRATOR WILL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THAT THE ARBITRATOR WILL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW.  TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW WILL TAKE PRECEDENCE.  I AGREE THAT THE DECISION OF THE ARBITRATOR WILL BE IN WRITING.  I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT WILL BE HELD IN SANTA CLARA COUNTY, CALIFORNIA.

(c) _Remedy_.  EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION WILL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND GOOGLE.  ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER I NOR GOOGLE WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.  NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL GOOGLE POLICY, AND THE ARBITRATOR WILL NOT ORDER OR REQUIRE GOOGLE TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW.  NOTHING IN THIS AGREEMENT OR IN THIS PROVISION IS INTENDED TO WAIVE THE PROVISIONAL RELIEF REMEDIES AVAILABLE UNDER THE RULES.

(d) _Administrative Relief_.  I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD.  THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM.

(e) _Voluntary Nature of Agreement_.  I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY GOOGLE OR ANYONE ELSE.  I ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND ITS TERMS, CONSEQUENCES, AND BINDING EFFECT.  I RECOGNIZE THAT _I AM WAIVING MY_

Eff. Date Nov 2013
CA Version

Ⓒ Document Integrity Verified

**CONFIDENTIAL**

CONFIDENTIAL

STROZ_0000901

*RIGHT TO A JURY TRIAL.* I AGREE THAT I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

(f)    *Arbitration Clause, Governing Law.* THIS ARBITRATION CLAUSE IS ENTERED PURSUANT TO AND GOVERNED BY THE FEDERAL ARBITRATION ACT (9 U.S.C. SECTION 1. ET SEQ.), BUT IN ALL OTHER RESPECTS THIS AGREEMENT IS GOVERNED BY THE LAWS OF CALIFORNIA.

13.    General Provisions

(a)    *Governing Law; Consent to Personal Jurisdiction.* Except as provided in Section 12(f), this Agreement will be governed by the laws of the State of California except for its choice of law rules. If any lawsuit is permitted under or related to this Agreement or my employment, I consent to the exclusive personal jurisdiction and venue of the state and federal courts located in California.

(b)    *Entire Agreement.* This Agreement, together with its Exhibits, and any executed written offer letter between Google and me, are the entire agreement between Google and me relating to my employment and any related matters and supersede all prior written and oral agreements, discussions, or representations. If there are conflicts between this Agreement and the offer letter, this Agreement will control. No change to this Agreement, other than amendments to Sections 3 and 4 relating to personal open-source projects in a format prepared by Google, will be effective unless in writing signed by Google [and] Chief Executive Officer. Any change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

(c)    *Severability.* If one or more of the provisions in this Agreement are deemed void, the remaining provisions will continue in full force and effect.

(d)    *Successors and Assigns.* This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives and will be for the benefit of Google, its successors, and its assigns. Google may assign this Agreement to anyone at any time without my consent. There are no intended third-party beneficiaries to this Agreement.

(e)    *Waiver.* Waiver by Google of a breach of any provision of this Agreement will not waive its right to take action based on any other breach.

(f)    *Survivorship.* The rights and obligations of the parties to this Agreement will survive termination of my employment with Google.

Date: _____                _____
                                                                                  Signature

                                                                                  _____
                                                                                  Name of Employee (typed or printed)

Eff. Date Nov. 2013
C4 Version

Page 4 of 6

Ⓒ Document Integrity Verified                                                EchoSign Transaction Number: XCPHOXVW...

**CONFIDENTIAL**

CONFIDENTIAL                                                                    STROZ_0000902

Exhibit A

GOOGLE INC.
LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP

I understand that listing a project or an invention here does not mean that Google is granting me permission to continue working on the project or invention. This is only a listing of inventions or original works of authorship done prior to employment.

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

___ No inventions or improvements
___ Additional Sheets Attached

Signature of Employee: _____

Print Name of Employee: _____

Date:

BR Zone Nov 2013
CA version

Page 5 of 6

Document Integrity Verified

**CONFIDENTIAL**

EXHIBIT B

GOOGLE INC.

CALIFORNIA LABOR CODE SECTION 2870
INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENTS

"(a)   Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2)   Result from any work performed by the employee for the employer.

(b)   To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

Eff. Date Nov. 2013
EX Version

Page 6 of 6

Document Integrity Verified

**CONFIDENTIAL**

# Exhibit 7 Redacted

CONFIDENTIAL

STROZ_0000905

**Hanley Chew**

| | |
|---|---|
| **From:** | Lior Ron ▮ |
| **Sent:** | Tuesday, April 12, 2016 8:58 AM |
| **To:** | Mary Fulginiti |
| **Cc:** | eamdursky@omm.com; Hanley Chew |
| **Subject:** | Re: Follow-up Information and Interview with Lior |

I was away during my last day of employment so wasn't on campus to physically return it, I returned it few days after - I did not access files nor do I even think I opened it between the time of ending employment and the time I gave it back

Lior.

On Tue, Apr 12, 2016 at 8:55 AM, Mary Fulginiti <MFulginiti@strozfriedberg.com> wrote:

Great. And we have one more question.

1. Did Lior return his laptop on last day of employment - January 13, 2016 or did he take it home and return it a few days later. If he took it home did he access any Google files at that time and/or forward or copy any files/emails at that time.

Thanks.

Mary Fulginiti
Managing Director

STROZ FRIEDBERG
1925 Century Park East, Suite 1350
Los Angeles, CA 90067

T: 310.623.3280
M: 310.488.6274
F: 310.623.3277
mfulginiti@strozfriedberg.com

**From:** Amdursky, Eric [mailto:eamdursky@omm.com]
**Sent:** Monday, April 11, 2016 08:16 PM
**To:** Hanley Chew
**Cc:** Lior Ron ▮; Mary Fulginiti
**Subject:** Re: Follow-up Information and Interview with Lior

Mary and Hanley,

Set forth below are the names Lior recalls from memory that were at Anthony's house when he gave the informal presentation. Lior believes there were at least 5 more people there (in addition to those listed below). but since he didn't work with them before nor did he interact with them after, he does not remember their names.

Laila (Mateias?) - program manager

ː

**CONFIDENTIAL**

STROZ_0000906

Pierre? (don't remember last name, engineer)

Dan Gruver? (not sure if he was actually there)

Don Burnette

Gueoton? (french engineer, not sure how to spell his name)

Claire Delaunay

Brian (Torecelini?) - ops

Brian ? - UX

Sent from my iPhone

On Apr 11, 2016, at 3:33 PM, Hanley Chew <HChew@StrozFriedberg.com> wrote:

> Mary and I will call you in 5-10 minutes.
>
>
>
> Thank you.
>
>
>
> **From:** Lior Ron ███████████████
> **Sent:** Monday, April 11, 2016 3:25 PM
> **To:** Amdursky, Eric
> **Cc:** Mary Fulginiti; Hanley Chew
> **Subject:** Re: Follow-up Information and Interview with Lior
>
>
>
> Hi Mary, busy trying to get the deal to the finish line but happy to talk give me a call at 650-224-6201 thanks
>
> On Monday, April 11, 2016, Amdursky, Eric <eamdursky@omm.com> wrote:
>
> Mary - Lior is available now for few minutes if you want to call him.
>
>
>
> **From:** Mary Fulginiti [mailto:MFulginiti@StrozFriedberg.com]
> **Sent:** Sunday, April 10, 2016 5:36 PM
> **To:** Amdursky, Eric; Hanley Chew
> **Cc:** Lior Ron
> **Subject:** RE: Follow-up Information and Interview with Lior

2

**CONFIDENTIAL**

Does 11 am tomorrow work for Lior?

Mary Fulginiti
Managing Director

## STROZ FRIEDBERG

1925 Century Park East, Suite 1350, Los Angeles, CA 90067

T: +1 310.623.3280
M: +1 310.488.6274
F: +1 310.623.3277
mfulginiti@strozfriedberg.com   www.strozfriedberg.com

This message and/or its attachments may contain information that is confidential and/or protected by privilege from disclosure. If you have reason to believe you are not the intended recipient, please immediately notify the sender by reply e-mail or by telephone, then delete this message (and any attachments), as well as all copies, including any printed copies. Thank you.

**From:** Amdursky, Eric [mailto:eamdursky@omm.com]
**Sent:** Saturday, April 09, 2016 1:55 PM
**To:** Hanley Chew; Mary Fulginiti
**Cc:** Lior Ron
**Subject:** Follow-up Information and Interview with Lior

Hanley and Mary,

Following up on our call from yesterday, Lior is available on Monday for the 30-60 minute interview you requested.  Let me know what time works for the two of you and if you need additional time.

In addition, Lior wanted to provide the following information that you requested:

• During his second stint at Google, Lior did not supervise anyone directly, but worked closely with David Singleton, Jonathan Rosenberg and John Hanke.

3

**CONFIDENTIAL**

CONFIDENTIAL

- With respect to the three people where he forgot their last names during the interview, they are Abhijit Ogale, Daniel Chu (a product manager Lior knew from the self-driving team) and Chris Ludwick (who he mistakenly referred to as Ben in the interview).

- Lior also wanted to reiterate for Stroz's record with respect to anyone that joined NewCo directly from Aspen and who Lior might have had contact:

- Anthony Levandowski

- Claire Delaunay (from robotic team at Aspen, not self driving) - Lior had breakfast with Claire after he left and before she left in which Lior described the business of NewCo. (autonomous trucking)

- Don Burnette (from self-driving project at Aspen) - Lior met Don at Anthony's house before leaving and Lior answered questions about the autonomous trucking market and informed Lior he was about to leave Aspen

- Daniel Ratner (a friend, from Google X/loon project) - Lior met Daniel for coffee after Daniel approached Lior and showed interest in what Lior was doing after Lior told Dan he was leaving Aspen. Lior described the company and Dan expressed explicit interest in becoming employed by NewCo. Thereafter, Lior verbally discussed key terms of his potential employment.

- David Weikersdorfer (from robotic team at Google, not self-driving) - met for coffee and Lior described the trucking business to him

- Dan Gruver - Lior might have met Dan at Anthony's house, but Lior is not sure and does not recall having a real conversation prior to him leaving Aspen

- Robbie Miller - Lior met with Robbie briefly before he left Google, but didn't have a real conversation.

- Finally as discussed in his interview, Lior met a bunch of other Googlers that didn't join NewCo. at Anthony's house prior to leaving, where Lior prepared and presented a short presentation on the trucking market.

Please feel free to follow up with Lior on any of these issues on Monday. Thanks.

Eric J. Amdursky
O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, California 94025
Tel. (650) 473-2644
Fax (650) 473-2601

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

4

**CONFIDENTIAL**