*Waymo v. Uber*
## Case No. 3:17-cv-00939-WHA

# TRIAL EXHIBIT 7111

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Anthony Levandowski, who participated in the Stroz diligence process in his individual capacity. *See* Br. § I.

- Fed. R. Evid. 805 – This document contains inadmissible hearsay within hearsay; namely, Anthony Levandowski's recitation of out of court statements made by other declarants. *See* Br. § I.

- Fed. R. Evid. 403 – Because the document is replete with embedded hearsay, the Court should exercise its discretion under Rule 403 to exclude any reliance on the document for its truth, to prevent jury confusion about what fragments are admissible for truth, and resulting waste of time and prejudice to Uber. *See* Br. § IV.

- This exhibit contains references to, and attaches a copy of, Anthony Levandowski's employment agreement, which Waymo stipulated that it would not make reference to in its case in chief. *See* Dkt. 425 at 4.

- Designated witnesses who received this document pre-litigation are: Eric Tate, John Gardner, Adam Bentley, Justin Suhr, Angela Padilla, Cameron Poetzscher, Nina Qi, and Salle Yoo. Except through Suhr, Padilla, Poetzscher, Qi, or Yoo, the document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV. Only Tate and Gardner received this document as an Exhibit to the Stroz Report; the remaining witnesses received an identical document in April 2016, well before the Stroz Report was written.

| Yellow Highlights | Hearsay Statements |
|---|---|
| Blue Highlights | Hearsay within Hearsay Statements |

**MEMORDANUM**

To:      John Gardner

From:   Stroz Friedberg

Date:   April 2, 2016

Re:      DRAFT Summary Interview of Anthony Levandowski

_____

On March 22 and 23, 2016, Mary Fulginiti, Melanie Maugeri, and Hanley Chew interviewed Anthony Levandowski at the offices of Stroz Friedberg on 101 Montgomery Street, Suite 2200, San Francisco, California  94104.  On April 1, 2016, Mary Fulginiti and Hanley Chew conducted a follow-up interview of Levandowski via telephone.

**Employment at Google**

Anthony stated that he began working for Google on April 9, 2007 when Google acquired Vutool, a company founded by Levandowski, [Multiple Names Redacted], which specialized in mapping technology.  Following the acquisition, all of the founders joined Google.  Vutool became Google's Street View Project, which is a technology that provides a panoramic view of streets for Google Maps and other apps.

<u>Employment Documents and Training at Google</u>

When Levandowski joined Google, he signed an employment agreement which contained invention, nondisclosure, non-solicitation, and conflicting employment provisions, among other things.  Levandowski understood these provisions to prohibit him from disclosing any of Google's "secrets," and from approaching Google employees to work for him after he was no longer working at Google.  He also recalled that he could work on side projects while employed with Google provided they did not relate to Google business.  Levandowski recalled that Google provided training on how to handle queries and user data, but he did not recall any training regarding confidentiality or non-solicitation.  Levandowski was shown a copy of his signed At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement, which was attached to a February 1, 2016 letter from Google's legal counsel, Jade Wagner.  He reviewed said letter and agreement and confirmed that they were true and correct copies of said documents. They are attached hereto as Exhibit 3.

At the time that he started working for Google in 2007, Levandowski said that his title was Software Engineer on the Street View Project, also referred to internally as City Block.  [Redacted] was his supervisor.  Levandowski's duties were to build out the vehicles worldwide.  From 2008 through 2009, Levandowski worked on a project known as GEOS, which involved aerial imagery collection.  In 2008, he also set up operations in Mountain View and India to help

1

United States District Court
Northern District of California
**Trial Exhibit 7111**
Case No.   **3:17-cv-00939-WHA**
Date Entered_____
By_____
Deputy Clerk

establish a database behind the maps.  The internal name for this project at Google was Ground Truth or GT.

In 2009, Levandowski left the Street View Project and joined the Chauffeur Project, which is also known internally as the Self Driving Car Project and SDC.  In 2011, Levandowski was promoted to Engineering Manager on the Chauffeur Project.  However, Levandowski stated that, despite his title, he acted primarily as a Product Manager.  In 2011, [Redacted] became Levandowski's supervisor.  In late 2014, [Redacted] became Levandowski's supervisor.  When asked what his responsibilities were he stated that he oversaw the design, production, installation, and software required for running the lasers, among other things.  He also helped draft legislation in Nevada regarding autonomous cars.  Some of the names for the prototype self-driving cars were Herbie, Kitt, Karr, Big Foot, Pribot, Ecto1, and Firefly.

He also consulted on a number of other projects at Google such as Cardboard (inexpensive virtual reality headsets) and Telepresence Robots (virtual reality headsets).  He said he never wrote any software code for any of the projects he worked on.

Levandowski stated that, at the end of his time at Google, he managed 25 employees.  He wrote the names of the individuals he managed on a separate piece of paper during the interview.  A copy of that document is attached hereto as Exhibit 5.  He had access to their compensation information, work evaluations, performance scores, home addresses and other managerial information as part of his duties and responsibilities.  Levandowski stated that some of this employee data would be located on his primary laptop, Apple MacBook Pro. Levandowski said that he did not have HR access to the personnel files of the individuals who reported to him.

Stroz Friedberg interviewers showed Levandowski a list of names that was provided to us through his counsel marked Confidential Work Product/Attorney-Client Privileged and dated March 12, 2016.  He recognized the list as the one he created which included, to the best of his recollection, all of the individuals he worked with at Google during his tenure.  He also identified individuals on the list with whom he spoke before and after he founded OttoMotto and those individuals who are currently employed with OttoMotto.  A copy of said list with Levandowski's markings is attached hereto as Exhibit 4.  On a separate copy of the same list, he checked off individuals he worked closely with at Google.  This separately marked list is attached hereto as Exhibit 6.  When asked if he referenced a Google directory to compose this list he said he did not.  He said he referenced his contacts on his iPhone.

Levandowski identified the following individuals as those with whom he worked closely during his time at Google:  [Multiple Names Redacted].  See Exhibit 6.

> Side Projects at Google

During his tenure at Google, Levandowski stated that he participated in a number of external side projects that were not Google-related as an owner, investor and/or advisor.  Levandowski

2

UBER00312510

stated that Google was aware that its employees were engaging in external side projects, and did not object to them provided they did not compete or overlap with Google's businesses. Levandowski stressed that Google was aware, and approved, of all of his external side projects. Those projects are listed below.

- Future Game (owner) - a stock market predictor game.
- Prototype This - a television show on the Discovery Channel which featured robots delivering pizza.  This television show became the basis for Anthony's Robots, which Levandowski founded in 2008.  Levandowski stated that he never used any funds from Google for Anthony's Robots.
- Anthony's Robots (owner) – provided equipment hardware to help drive vehicles. Google acquired Anthony's Robots in October 2011.
- 510 Systems (investor) – Anthony's Robots used 510 Systems.  Levandowski was an investor in 510 Systems, beginning in 2005.  510 Systems was engaged in developing technology for mobile mapping.  Google acquired 510 Systems in October 2011.
- Tiramisu (advisor) – a small airplane that picks up items and octocopter that picks up people.
- Glimmer (investor) – three second video sharing.
- Date Knight (investor) – a dating companion app.
- Nemo Building System (owner) – modular building manufacturing company.
- East Bay Portfolio (investor) – real estate development fund.

<u>Devices and Data Accessed at Google</u>

Over the course of his time at Google, Levandowski was issued a number of devices.  Google gave him 2 Linux desktops and 6 laptops (2 Lenovo laptops, 2 Chromebooks, 1 Linux laptop, 1 Windows laptop) and a Blackberry.   When he left Google, Levandowski had 2 Linux desktops and 2 laptops, all of which he returned to Google.

Levandowski stated that, when he worked at Google, he created operational manuals and checklists (i.e., manuals on how to operate the Street View car, how the systems fit together etc.), design documents, both public and internal presentations, training information, and aerial imagery.  All of these documents were stored on the corporate Google Drive in the Google Docs folder.  Levandowski stated that he would access these documents primarily through Google Drive on his work devices.  Levandowski also stated that, although he used his Google-issued laptops to work on Google-related documents, he also used his personal laptop.[1]  Levandowski further stated that he stored Google documents on his personal devices, such as his laptop, phone, hard drives and thumb drives.  He also stated in his Diligenced Employee Questionnaire that he used his personal tablet, phone, laptop and desktop to access Google Docs (not the

---

[1] Levandowski explained that it was common for Google to enable the personal devices of its employees to access the corporate Google drive.

3

corporate network directly).  He further explained that he rarely accessed the Google network remotely with any of his devices.

Levandowski acknowledged that he did use USB's to transfer data from his desktop to the self-driving cars that his team was working on.  However, Levandowski stated that this was a common practice at Google and Google tracked the USB's used in these transfers very closely.  Levandowski stated that he returned all of the Google's USB's and destroyed all of the personal USB's in his possession because he had heard that they might contain spyware.[2]  When asked what information was present in the USB's  he destroyed, Levandowski stated that it was likely trade show information, vendor sheets, and files that he may have been moving.  Levandowski denied putting any source code or other proprietary Google information on any of his personal USB's.

Levandowski stated that he did email Google files to his personal email account, levandosky@gmail.com.  He noted that these files were mainly presentations or other information that was going to be shared publicly.  When asked if he emailed himself any technical or proprietary information he stated, "No, I don't think so."

As discussed in more detail below in the Personal Devices section, Levandowski identified 3 places on his Apple MacBook Pro laptop, where Google-related information was stored:  (1) Downloads folder; (2) Dropbox folder; and (3) his Chauffeur folder.  He stated that this information was stored on his laptop in the normal course of his work at Google. He did not recall if he possessed any additional potentially proprietary and confidential information.

**Contacts With Google Employees About New Company**

Prior to leaving Google, Levandowski spoke with a number of Google employees about his start-up company.  According to Levandowski, these discussions occurred on a one-on-one basis, during social gatherings and/or in a group setting at his house.  Below is a list of the individuals he met with and a summary of what they discussed.

<u>One-on-One Meetings with Google Employees</u>

Levandowski identified the following Google employees he spoke with one-on-one concerning his start-up company: [Multiple Names Redacted].  Levandowski recalls that all of these individuals worked in close proximity with him so they typically talked in person.

<u>Google Employees Who Joined OttoMotto</u>[3]

- <u>Lior Ron</u>

---

[2] Levandowski stated that [Redacted], his supervisor at Google at the time, was aware of Levandowski's destruction of the USB's.

[3] Although OttoMotto was previously named 280 Systems, we refer to the new company as OttoMotto throughout for ease of reference.

4

Lior Ron and Levandowski knew each other because Ron ran a competitive project at Google (i.e., map making). Ron contacted Levandowski in August 2015 to get together. Their first meeting occurred over lunch on the Google campus where they talked about the status of the Chauffeur Project and about Ron possibly joining the Chauffeur team. Levandowski also told Ron about his dissatisfaction with the team and the direction of the project.

They had a follow-up meeting that weekend as they lived close to one another. They took a walk around the block. Ron detailed what was going on with Google's new clothing technology. Levandowski and Ron also talked about robot trucks, the trucking market, and the opportunity for these trucks to be part of Alphabet (Google's holding company). They also talked about aftermarket kits, which could convert existing cars into self-driving cars. They discussed trying to do the above together and trying to figure out a way to do it at Google.

A few weeks later in early September 2015, Levandowski stated that things began to "solidify" in a meeting with Ron. They discussed starting their own company. Levandowski wanted to think things through before doing anything and they both discussed possibly waiting until they left Google.

In September 2015, they met with a lawyer. In mid-to-late September 2015, Levandowski and Ron began meeting with Uber. (The subsequent meetings with Uber are described below.)

In or about November 2015, Levandowski and Ron realized that building something new at Google was too complicated and that they needed to leave so that they could pursue their interest in robot trucks. They talked about their respective roles. Levandowski would be responsible for building the technology and Ron would be responsible for running the business.

- [Redacted]

[Redacted] was a Software Engineer for Google's Chauffeur Project. Levandowski knew [Redacted] was frustrated at Google. [Redacted] and Levandowski had two in-person meetings on the Google campus in January 2016. The first meeting was initiated by Levandowski when Levandowski asked [Redacted] how he was doing during a walk around the Google campus. Levandowski informed [Redacted] he was leaving Google to form a start-up company. The second meeting was initiated by [Redacted], who asked Levandowski additional questions about Levandowski's new venture. [Redacted] received an offer to join OttoMotto prior to his departure from Google. [Redacted] joined OttoMotto on February 25, 2016

- [Redacted]

[Redacted] was a Software Engineer for Google. Levandowski and [Redacted] used to date and had many discussions concerning robots. [Redacted] and Levandowski met three to four times concerning Levandowski's new venture, beginning in September 2015 and continuing through January 2016. They discussed the software requirements for robot trucks. [Redacted] left Google two weeks after Levandowski departed and joined OttoMotto.

5

CONFIDENTIAL

UBER00312513

- [Redacted]

[Redacted] was a Software Engineer at Google.  [Redacted] introduced [Redacted] to Levandowski.  Levandowski met with [Redacted] two times:  once at Google, and the second time near Levandowski's house.  They discussed Levandowski's new venture.  [Redacted] received an offer from OttoMotto in January 2106.  [Redacted] left Google in early March 2016 and joined OttoMotto.

### Google Employees Who Received An Offer But Did Not Join OttoMotto

- [Redacted]

[Redacted] is the lead Hardware Engineer for Google's Chauffeur Project.  Levandowski began speaking with [Redacted] in December 2015 about different options for a new start-up company.  Levandowski does not recall if he approached [Redacted] or vice versa.  At first, [Redacted] and Levandowski talked about doing the start-up at Alphabet but eventually decided to form a separate company.  They spoke regularly between December 2015 and January 2016 and often met at each other homes.  [Redacted] was more interested in the robot trucks, than the aftermarket kits.  [Redacted] wanted to be a founder and agreed to match Ron's stake and commit funds.  [Redacted] actively recruited employees to leave Google and join the new company.  [Redacted] even delivered offer letters to people.  In the end, [Redacted] did not end up joining OttoMotto because he had a "nervous breakdown" after Levandowski left Google.

- [Redacted]

[Redacted] is a Mechanical Engineer for Google's Chauffeur Project.   [Redacted] and Levandowski had three one-on-one meetings between December 2015 and January 2016.  Levandowski cannot recall who approached whom.  [Redacted] wanted to invest in Levandowski's new venture.  [Redacted] requested a specific number of engineers and wanted Levandowski to hire his brother.  [Redacted] received an offer from OttoMotto, but did not join the company.

- [Redacted]

[Redacted] is a Manufacturing Engineer for Google's Chauffeur Project.  After speaking with [Redacted], [Redacted] approached Levandowski.  They met three times between December 2015 and January 2016; usually during [Redacted]' regular bimonthly update meetings with Levandowski at Google.  They talked mainly about products, specifically robot trucks versus aftermarket kits.  During this time, [Redacted] was pregnant and asked Levandowski about the maternity leave policy and her potential role in the new company.  [Redacted] received an offer to join OttoMotto, but did not join the company.

- [Redacted]

6

UBER00312514

**TX-7111, Page 6 of 37**

[Redacted] is a Mechanical Engineer for Google's Chauffeur Project.  [Redacted] and Levandowski met two times -- January 15, 2016 and January 23, 2016.  At the January 15th meeting, [Redacted] approached Levandowski and asked Levandowski what he was "up to." Levandowski replied that he was thinking of leaving Google and doing something in the robot truck space.  On January 23, 2106, [Redacted] approached Levandowski at work and asked if they could meet.  Later that day they met in the street near Levandowski's house and talked about salary and expectations.  Shortly after [Redacted] received an offer letter but did not end up joining the company.

- [Redacted]

[Redacted] is a Mechanical Engineer for Google's Chauffeur Project.  [Redacted] and Levandowski met four times between December 2015 and January 2016.  Levandowski does not recall who approached whom regarding the start-up company.  Their conversations in December 2015 centered on the business climate for autonomous vehicles and general strategies.  [Redacted] and Levandowski had had conversations in prior years about working on a project together at Google and there was a general understanding that if they could not do make it work at Google they would leave and launch a start-up company, but nothing specific. [Redacted] and Levandowski started talking specifically about creating a separate company in January 2016.  [Redacted] sent Levandowski a text message requesting that he set up a meeting to discuss the new venture with other employees.  In January 2016, [Redacted] sent a calendar invite to several Google employees at their Google email addresses setting up an evening meeting to discuss the new company.  [Redacted] received an offer to join OttoMotto but did not do so.

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  [Redacted] approached Levandowski on January 15, 2016 after his discussions with Pierre [Redacted] and Luke [Redacted].  [Redacted] had heard from [Redacted] and [Redacted] about Levandowski's new venture and wanted to know if it would be based in San Francisco since he did not want a long commute.  [Redacted] and Levandowski did not have any additional communications about the new company.   [Redacted] received an offer to join OttoMotto but he did not do so.

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  [Redacted] and Levandowski met twice on the Google campus in January 2016.  The first meeting was initiated by [Redacted] who had heard about Levandowski's new venture and wanted to learn more about it. Levandowski told him to talk to other people about it.  The second meeting was initiated by Levandowski, who wanted to confirm [Redacted]'s interest in the new company and asked [Redacted] what he told others about joining Levandowski's new venture.  [Redacted] received an offer letter to join OttoMotto and signed it but did not ultimately join the company.

7

CONFIDENTIAL

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  [Redacted] initially approached [Redacted] about Levandowski's new venture.  [Redacted] followed up with [Redacted].  Levandowski met with [Redacted] three times in January 2016.  The first time [Redacted] tapped Levandowski on the shoulder at work and asked him to take a walk around the block.  During this first meeting, [Redacted] requested information about the new company.  [Redacted] requested a second meeting during the work day where they discussed his potential salary.  The third meeting occurred after work at [Redacted]'s request where they continued to discuss salary and [Redacted] expressed his interest in joining the new company.  [Redacted] received an offer to join OttoMotto, but did not do so.

- [Redacted]

[Redacted] is a Hardware Engineer for Google's Chauffeur Project.  Pierre [Redacted] initially approached [Redacted], who later initiated three meetings with Levandowski in January 2016.  In the three meetings, [Redacted] and Levandowski talked about more technical things, such as what types of sensors they should develop (cameras, radar) and why robots are important.  They also eventually talked about [Redacted]' compensation with Levandowski's new venture.  [Redacted] received an offer to join OttoMotto but decided not to join the company.

- [Redacted]

[Redacted] is a Mechanical Engineer for Google's Chauffeur Project.  Levandowski approached [Redacted] because Levandowski knew that [Redacted] was unhappy at Google and he wanted to "give him a heads up."  They had two meetings in late January 2016:  one at Google, and one at [Redacted]' house.  At the first meeting, Levandowski told him he was leaving the Chauffeur team to start a new company and that he needed a team.  They spoke about robot trucks and [Redacted] expressed an interest in joining the company.  At the second meeting the following day at [Redacted]' house, Levandowski made [Redacted] a verbal offer to join OttoMotto.  [Redacted] ultimately declined to join OttoMotto.

- **[REDACTED]**

[Redacted] is a User Experience Designer for Google.  [Redacted] and Levandowski had three meetings.  The first meeting occurred on January 5, 2016.  Levandowski approached [Redacted] at Google and said, "Do you want to talk?"  Levandowski told him about his concerns with the direction of the Chauffer Project and asked [Redacted] what he thought about the proposed new company.  The second meeting was unplanned and occurred approximately five days later when Levandowski was having coffee and discussing the new company with Matt [Redacted] at Philz Coffee Shop located in Palo Alto.  [Redacted] ran into them and joined the conversation.  The third meeting was a phone conversation initiated by [Redacted] in or about mid-January 2016.  Levandowski and [Redacted] talked about the plan going forward.  [Redacted] told Levandowski that he received more money to stay and asked if he could join Levandowski later.

8

CONFIDENTIAL

UBER00312516

Levandowski believed [Redacted] may have given [Redacted] an offer letter to join OttoMotto. [Redacted] did not join the company.

- [Redacted]

[Redacted] is a Program Manager for Google's Chauffeur Project.  He manages the "human" side of the car.  [Redacted] used to work for [Redacted] at Google.  [Redacted] initiated a conversation with Levandowski in January 2016 after a conversation he had with [Redacted] about the new company.  Levandowski told [Redacted] about his new venture with trucks and they briefly discussed compensation.  [Redacted] received an offer to join OttoMotto, but did not do so.  Levandowski believes that [Redacted], like [Redacted], received more money to remain at Google and will eventually join OttoMotto.

Google Employees Who Did Not Receive An Offer To Join OttoMotto

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  [Redacted] approached Levandowski about joining Levandowski's new venture in January 2016.  They had two meetings on the Google campus and one discussion via telephone, which was initiated by [Redacted].  Also, there may be some text messages between the two.  They discussed potential compensation and [Redacted]'s role at the new company.   Levandowski did not encourage [Redacted] to leave Google because he felt that [Redacted] was too pushy.  The only reason that Levandowski was talking to [Redacted] was because [Redacted] was friends with [Redacted].

- [Redacted]

[Redacted] is a Product Manager for Google.   Levandowski initially reached out to [Redacted] in November 2015, but they didn't actually meet until January 2016.  At that time, they met in downtown San Francisco and discussed why trucks are important and the macro picture of Levandowski's new venture.  [Redacted] did not receive an offer to join OttoMotto.  Levandowski said there may have been a phone call or text message setting up a time to meet.

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  [Redacted] approached Levandowski in December 2015 and again in January 2016.  [Redacted] had heard that Levandowski was involved in a new venture and wanted to join.  Levandowski was not interested in [Redacted] joining his new venture and did not encourage him to leave Google.  [Redacted] did not receive an offer to join OttoMotto.

- [Redacted]

[Redacted] is a mechanic for Google.  [Redacted] was responsible for outfitting cars.  [Redacted] approached Levandowski in January 2016 at Google.  They talked about the plan for robot

9

CONFIDENTIAL

UBER00312517

trucks and [Redacted]'s potential salary.  They met a second time in January 2016 at Google. Levandowski approached [Redacted] and said, "Let's talk."  [Redacted] did not receive an offer, but [Redacted] was planning to wait until his bonus before leaving Google.

- [Redacted]

[Redacted] is a Technical Product Manager for Google.  [Redacted] and Levandowski worked together on the Street View Project.  They began speaking about working on a new project back beginning in December 2014 through January 2015.  In September 2015, [Redacted] and Levandowski talked about having their project be at Alphabet.  However, [Redacted] encouraged Levandowski to leave Google.  [Redacted] resigned from Google on January 4, 2016 and left on January 9, 2016.  Levandowski believes that [Redacted] will join him after [Redacted] returns from his vacation.

- [Redacted]

[Redacted] is a Software Engineer for Google's Chauffeur Project.  In or about January 2016, but prior to Levandowski's departure, Levandowski had lunch with [Redacted] at a restaurant near his house at [Redacted]'s request.   This was a follow-up conversation to one of the group meetings described below.  Levandowski discussed [Redacted]'s potential role at the new company as being similar to his current role at Google.

- [Redacted]

[Redacted] is a Technical Product Manager for Google.  [Redacted] was one of Levandowski's managers at Google.  [Redacted] expressed an interest in joining Levandowski, who believes that either [Redacted] or [Redacted] told [Redacted] about the new venture.

In September 2015, [Redacted] approached Levandowski and asked him to go to dinner.  During dinner, [Redacted] said to him, "I know something's up."  Levandowski did not trust [Redacted] and denied that anything was happening.

In October 2015, Levandowski discovered that [Redacted] approached Uber about potentially selling the vehicle team.  Levandowski felt that if [Redacted] was talking to Uber as well, they should all sit down together to negotiate a transaction. Levandowski initiated a meeting between [Redacted], Uber, and himself in October 2015.  At that meeting, [Redacted] discovered that the level of discussion between Levandowski and Uber was much more advanced than [Redacted] had expected.

[Redacted] decided to remain at Google when Google offered him $10 million to stay. [Redacted] was aware of what was going on with Levandowski, but was no longer involved in any discussions. He agreed to keep Levandowski's pursuits confidential.

- [Redacted]

10

CONFIDENTIAL

UBER00312518

[Redacted] was the Vice President of Product Management for Google's GEOS Project. [Redacted] left Google in mid-2015.  Ron and Levandowski spoke to [Redacted] in September 2015 about how to handle Google Legal, PR, and mechanics with regard to the new company. They also wanted [Redacted]'s insight on the aftermarket kits.  [Redacted] did not receive an offer to join OttoMotto.

### Group Contacts with Google Employee

Levandowski identified four group contacts that he had with Google employees while he was at Google concerning his new company.

The first group contact was a barbeque that Levandowski held at his house for the Laser team from Chauffer to celebrate a milestone in November 2015.  They discussed work matters. However, there were a few side discussions between [Redacted], [Redacted], [Redacted] and/or Levandowski concerning his new company.  Levandowski also spoke with Jonathan [Redacted], who observed [Redacted] speaking with Levandowski, and asked them what they were talking about.  Levandowski responded that they are thinking of leaving Google and starting a new company focused on robot trucks. Ron was invited to the barbeque with the intent of introducing him to some of the individuals who might join the new company.

The second contact was an evening meeting of about 15-20 individuals in December 2015 organized by Levandowski at his house.  This meeting was primarily organized by word of mouth.  Levandowski did not recall any text messages or other electronic communications disseminated about this meeting.  The individuals who attended included: [Redacted], [Redacted], [Redacted], [Redacted], [Redacted], [Redacted], [Redacted], Ron, [Redacted], [Redacted], Levandowski, [Redacted] and several individuals who did not work for Google.  The purpose of the meeting was to gather everyone who was interested in the new company and to discuss the proposed business.  Levandowski recalled that Ron might have done a presentation regarding the business of making robot trucks, but he was not certain.

The third group contact was a ski trip to Lake Tahoe in early January 2016 organized and paid for by Levandowski.  The ski trip was intended to be a team bonding exercise for the Chauffeur-Laser team.  It was not an official Google activity.  There were several side discussions between [Redacted], [Redacted], and Levandowski about how to build robot trucks without using any intellectual property from Google.  They believed that they could do this without any prior designs or intellectual property from Google.  Their intention was to build the robot trucks cleanly and from scratch.  They discussed rebuying some the same parts from various Google vendors, but they were not going to remake what Google had already made.

The fourth group contact was an evening meeting in late January 2016 (just before Levandowski resigned) organized by [Redacted] at Levandowski's house.  [Redacted], [Redacted], [Redacted], [Redacted], [Redacted], [Redacted], Wakerstoff, [Redacted], [Redacted], [Redacted], Ron, Levandowski, and several non-Google employees attended the meeting.  Levandowski believes [Redacted] may have sent a calendar invite.  The meeting was intended to discuss an exit

CONFIDENTIAL

UBER00312519

TX-7111, Page 11 of 37

strategy from Google.  The plan was that Levandowski would resign in the following few days and others would follow.  [Redacted], [Redacted], and [Redacted] received offers that evening from Rhian Morgan, head of HR at OttoMotto.  They were encouraging people to leave Google.

On the Tuesday following this evening meeting, Levandowski and [Redacted] met about Levandowski's role at Google going forward.  [Redacted] was going to announce at the general team meeting later that day that Levandowski was leaving the Laser team but staying within Google.  Levandowski stated that this announcement was a complete charade and that Google wanted to replace him with someone more loyal.  At the general team meeting, after [Redacted] made his announcement and left the room, Levandowski stated that he was proud of the team and was undecided if he was leaving the company.

**Additional Contacts With Google Employees About Leaving**

In addition to the above discussions, Levandowski told the following individuals that he was leaving Google.

- [Redacted]

[Redacted] is a Software Engineer with Google's Chauffeur Project.  In or about November/December 2015, Levandowski and [Redacted] discussed the direction of the Chauffeur project and Levandowski's plans to possibly leave Google.  Levandowski was trying to determine whether [Redacted] was dissatisfied with Google.  [Redacted] told Levandowski to call him once he figured it all out.

- [Redacted]

[Redacted] is a Software Engineer with Google's Chauffeur Project.  In December 2015/January 2016 [Redacted] approached Levandowski about certain rumors that he was hearing.  Levandowski did not tell [Redacted] about his new company because he did not trust [Redacted].  Sometime thereafter, [Redacted] reached out via text messages to arrange a time to speak with Levandowski.  Levandowski confirmed that he could only speak about non-work related matters.  [Redacted] came to Levandowski's house and saw a large truck and Levandowski told him he was working on driverless trucks.  Levandowski told him he could not recruit him.

- [Redacted]

[Redacted] is a Software Engineer with Google's Chauffeur Project.  In January 2016, [Redacted] spoke with Levandowski about leaving Google and wanting to do something new.  [Redacted] was interested in robots that can deliver products to people's homes.  Levandowski believes he also told [Redacted] he was planning on leaving Google at this time.  They discussed the general state of robotic competitors but did not discuss Levandowski's new venture.  [Redacted] said he was worried that Levandowski might want to do something with Uber and he did not want to join a competitor.

12

CONFIDENTIAL

UBER00312520

- [Redacted]

[Redacted] is an Optical Engineer with Google's Chauffeur Project.  Levandowski told him he was leaving in January 2016 to make robot trucks.  Levandowski did not recruit [Redacted] but he knew [Redacted] was very interested in having [Redacted] join the new company.

**Departure from Google**

Levandowski departed from Google on approximately January 26, 2016.  However, Levandowski stated that he had been thinking of leaving Google since 2008.  At that time, Levandowski spoke to [Redacted], a member of the Chauffeur project.  They discussed the fact that human drivers were not particularly good, which led to the idea for Anthony's Robots.  However, Levandowski decided to stay at Google in 2008 because he felt that it was a great place to launch new projects.

In 2011, when [Redacted] became Levandowski's supervisor, there was some friction between the two and Levandowski considered leaving.  However, Levandowski believed that Google was still the right place to see things through and there was a possibility that things could turn around.

In 2015, as the deadline for launching the self-driving car approached, Levandowski felt that the Chauffeur project was on the wrong track.  Google was focusing more on the design of the car, and less on the technology.  Levandowski stated that he had some conversations with [Redacted], Google's CEO, and that [Redacted] was sympathetic.  Unfortunately, the focus of the Chauffer project did not change and Levandowski concluded, in late 2015, that it was time to move on.

On January 25, 2016, Levandowski sent [Redacted] an email stating that Levandowski felt he was ready to leave.  [Redacted] forwarded the email to [Redacted].  When Levandowski arrived at work on January 26, 2016, [Redacted] removed Levandowski's badge and escorted Levandowski to a conference room.  [Redacted] joined [Redacted] and Levandowski in the conference room to discuss why Levandowski was leaving.  [Redacted] told Levandowski that he heard that Levandowski was recruiting people.  Levandowski told [Redacted] that there are a lot of people who share his view about the direction of the project.

After the meeting, [Redacted] walked Levandowski to Levandowski's desk where Levandowski gathered his personal belongings.  At some point [Redacted] also asked Levandowski how things got to this point and how could he do this to the team.  [Redacted] then took Levandowski to another conference room where they were joined by [Redacted], the HR representative for the Chauffeur program.  [Redacted] asked Levandowski why he was leaving and Levandowski responded that he was having issues on the project.  [Redacted] asked Levandowski to return all of his Google property.  Levandowski indicated that it was present at his desk, which [Redacted] confirmed.  Levandowski also returned 2 laptops and desktops.

13

After [Redacted] and [Redacted] departed, Jade Morgan, a member of Google's legal team appeared via video conferencing to speak to Levandowski about his obligations under his confidentiality and non-solicitation agreements with Google.  Levandowski asked for guidance about how to respond to Google employees who approached him.  Morgan did not provide any advice.  Levandowski asked if he should say, "Happy to meet with you, but I can't talk about my work things because of my contractual obligations to Google."  Morgan and Levandowski verbally agreed to the language.  No documents were provided to Levandowski at this time.  After Levandowski left Google, [Redacted], Google's founder, and [Redacted], the head of Chauffer, each called Levandowski to ask what happened.  [Redacted] expressed his disappointment that Levandowski left and suggested he take a one month vacation and then come back.  [Redacted] asked Levandowski what he was going to do next and Levandowski responded that he might start a new company involving trucks.

[Redacted] and [Redacted] from Human Resources called as well and they had a nice social conversation.

**Contacts with Google Employees Following Departure**

Levandowski stated that a number of Google employees reached out to him about joining OttoMotto following his departure from Google including:  [Multiple Names Redacted].  Levandowski stated that he either replied to these individuals and told them he could not respond or he did not reply at all.  Levandowski stated that he discussed social matters, but nothing about OttoMotto.  Levandowski did not believe there were any written or electronic communications between himself and any Google employees concerning OttoMotto.  He did note that several Google employees had left Google on their own and explored the possibility of joining OttoMotto, including [Redacted], both of whom now work at OttoMotto.  He reiterated that he had no discussions with these individuals about OttoMotto until after they resigned from Google.  Since leaving Google, Levandowski stated that he has made it point to have no contact with any Google applicants until after they are hired.

**Destruction of Google Property Following Departure**

A few weeks after his departure (he could not recall the precise time frame), Levandowski was searching his house for anything that might belong to Google.  He discovered in his garage some tools (i.e., screwdrivers), pieces of aluminum, nonproprietary robot parts, and old Street View test prototype cameras, brackets to mount cameras on the cars, and an old network switch, among other things.  Levandowski put them in a box and later paid to have a company pick up these materials from his house and destroy them, i.e., crushed and melted down.  This occurred within a week or so prior to his interview.  Levandowski did not recall the name of the destruction company or the precise date.  He said that, although he believed the materials were not confidential or proprietary, he did not want to return it to Google for fear of sparking any unnecessary backlash.

CONFIDENTIAL                                                                                                    UBER00312522

**TX-7111, Page 14 of 37**

In addition, while Levandowski was searching his home to gather all devices for the due diligence, he discovered that he possessed Google proprietary information on five disks in his Drobo 5D. The Drobo 5D was located in a closet in a guest bedroom that he used to store old/unused devices. The information included source code, design files, laser files, engineering documents and software related to the self-driving car.

Levandowski stated that he downloaded this information in the ordinary course of business while working at Google and used it to do his job. He said the last time he used and/or accessed the information on the disk was in November/December 2014 and possibly January 2015. Levandowski indicated that everyone at Google had access to the source code repository. Levandowski said that he copied the software onto the disks off of his personal Apple MacBook Pro laptop in a True Crypt file. He then inserted the disks into the car's computer for testing and then removed them and stored them in the Drobo 5D.

Once he discovered that he possessed this information, Levandowski contacted his attorney, John Garnder, and Lior Ron. Ron was surprised but stated that they needed to inform Uber that they were in possession of this information. At a regularly scheduled status meeting at Uber in early March 2016, Ron and Levandowski told Travis Kalanik (Uber's CEO), Cameron Poetzscher (Uber's Head of Business Development), and Nina Qi (a member of the Business Development Group), about the disks. Levandowski told them that he found some Google-related files and that he wanted to get rid of them. He told them that there is "stuff on them I don't want you to have and you don't want to have." Poetzscher stated that Ron and Levandowski should not delete the disks so that Uber could understand what was on the disks (for preservation and record keeping purposes). Kalanik responded that they should not take advice from Poetzscher and that, if Ron and Levandowski possessed Google information, he did not want to know about it and did not want it at Uber. Kalanik told Levandowski to "do what [he] need[ed] to do." Levandowski understood this statement to mean that Kalanik wanted Levandowski to destroy the disks so he told Kalanik that he would destroy them.. In response, Kalanik nodded. Poetzscher appeared uncomfortable with this decision. Qi was quiet but appeared to be amused and astonished. This conversation lasted approximately three minutes. After the meeting ended, Levandowski took the disks to a shredder in Oakland near the airport and had the disks destroyed. He described the place as a "mom and pop shop." He paid cash and did not receive a receipt. He did not recall the name of the business.

Later that afternoon, following the destruction of the disks, Poetzscher called Levandowski and told him not to "shred" the disks. Levandowski told Poetzscher that he had already destroyed the disks. To which Poetzscher responded that Levandowski should not delete or shred anything else. The next day (which he believes was Saturday morning, March 19, 2016) Poetzscher called Levandowski again to instruct him not to delete or shred anything else. Over the weekend, Ron reiterated the same thing to Levandowski. Levandowski does not believe that he shared the contents of the disks with Uber, only that they contained confidential information.

15

CONFIDENTIAL

UBER00312523

**Contacts with Uber**

Levandowski stated that he first met Kalanik and Garret Camp (Uber's chairman) in 2012 when he gave them a ride the self-driving car.  They wanted to buy 20 cars right there but the cars were not ready to be sold.

In 2014, Thrun reintroduced Levandowski to Kalanik, who introduced Levandowski to Jeff Holden.  Levandowski had two telephone calls with Holden where Holden unsuccessfully attempted to convince Levandowski to leave Google for Uber.

On June 16, 2015, Brian McClendon left Google to join Uber.  In July or August 2015, McClendon met Levandowski twice for lunch.  Levandowski was uncertain who initiated the lunches.  McClendon and Levandowski talked at a high level about ideas concerning robots. They did not specifically talk about a new start-up.  Levandowski did express his unhappiness at Google.  Levandowski might have asked how much Uber would be willing to pay for the Chauffer team.  Levandowski said that he wanted to have a market valuation for the Chauffer team.

Levandowski contacted McClendon for a third meeting in September 2015.  They talked about Uber buying lasers from a start-up for Uber's cars.  Levandowski met with McClendon, Poetzscher, and Qi at Uber later in September 2015.  They discussed the fact that Uber did not want to invest in a start-up, but was interested in being a beta customer.  Throughout September and October 2015, Poetzscher, Qi, Ron, and Levandowski met two additional times to discuss the details of a potential customer deal.

In October 2015, Kalanik contacted Levandowski directly.  They met and discussed robot cars. Kalanik indicated that Uber did not want to be a customer and instead wanted to be more involved in Levandowski's new venture.  Kalanik talked to Levandowski about buying the robot vehicle technology.  Levandowski and Ron went to Uber after this meeting and discussed selling a non-existent company.  Poetscher and McClendon were present at this meeting.  It was at this point that Levandowski first seriously considered leaving Google.[4]

In November and December 2015, Levandowski and Ron began meeting with Uber twice a month to negotiate the details of a proposed transaction (i.e., price, tax structure, etc.).  Some combination of either Kalanik, Poetzscher, Qi, and John Bayer (head of Uber's robot cars division) were present at these meetings on behalf of Uber.

In January 2016, Levandowski, Ron and Uber reached a tentative understanding of the broad terms of the proposed transaction.  Levandowski felt that there was a clear path for Uber to acquire OttoMotto.  In February 2016, OttoMotto and Uber signed a term sheet.

Levandowski stated that there were email messages with McClendon and Holden in his personal email accounts.  However, Levandowski noted that there were a few text messages

---

[4] In October 2015, the meeting with [Redacted], Levandowski and Uber (which is described above) occurs as well.

CONFIDENTIAL                                                                                    UBER00312524

with Poetzscher, approximately 30 text messages with Qi, approximately 20 text messages with Holden, and over 200 text messages with Kalanik.

Levandowski stated that he would still have left Google if the Uber opportunity did not exist. Levandowski believes that he can create the technology without infringing upon any patents by Google.  His research at Uber will involve delivering lasers, deploying vehicles, and building the aftermarket kits.  Although he will rely on his experience as an engineer during his time at Google, Levandowski will not rely on any information or data from Google.

Levandowski expects to be in charge of the robot vehicle technology at Uber.  Other than Ron, no other OttoMotto employees know about the proposed Uber transaction.  After he joins Uber, Levandowski stated that he will not be competing with Google.  He will help build robot trucks and aftermarket kits.

**OttoMotto**

Levandowski stated OttoMotto is dedicated to designing trucks which will not require drivers and aftermarket kits for converting existing cars in self-driving cars.  Levandowski believes that there is great profit potential in this market.  He does not believe that OttoMotto is competing with Google because OttoMotto focuses on self-driving trucks that transport goods, while Google is focusing on self-driving cars that will transport people.  The aftermarket kits are a secondary product.  Levandowski stated that OttoMotto needs 50 employees (the majority of which have different engineering backgrounds (i.e., software, hardware, mechanical, etc.)) to execute its plan.

Levandowski estimated that OttoMotto currently has approximately 30 employees, 16 of whom are former Google employees.  He estimated that only 5 or 6 Google employees recently left Google to join OttoMotto.

Levandowski said that the primary source for staffing OttoMotto is referrals.  In addition, OttoMotto has a recruiter and a recruiting website with job postings.  Levandowski's role in the hiring process is that he meets and interviews all non-Google applicants.  Although he does not have the sole hiring authority, Levandowski can veto applicants.  The hiring process involves interviews, evaluations and group discussions.  Compensation is determined by either looking at an applicant's W2 and matching or determining their skill set and role at OttoMotto. There is a separate hiring process for Google employees.  No former Google employees are allowed to meet, interview or evaluate current Google employees who apply.

OttoMotto has safeguards in place to prevent new employees from bringing intellectual property or confidential information from their former employers.  OttoMotto has them sign a document confirming that they are not bringing in any information or data from their prior employers.  Google employee applicants must confirm that they were not solicited.  There is no training concerning the retention of information and data from former employers.

17

CONFIDENTIAL                                                     UBER00312525

**TX-7111, Page 17 of 37**

All source code at OttoMotto has to be written and checked in. The policy is that OttoMotto employees are not allowed to use their personal devices for work.

OttoMotto uses some of the same vendors as Google. For example, OttoMotto uses the same vendors as Google to manufacture machine parts (but not the same machine parts as Google). OttoMotto also purchases equipment, such as tools for circuit boards) from the same vendors as Google.

**Accounts/Online Repositories/Personal Devices**

Levandowski and/or his counsel were provided a Questionnaire for Diligenced Employees from Stroz Friedberg (attached hereto at Exhibit 1) which he supplied answers to in a document dated March 18, 2016 entitled Draft A. Levandowski Responses to Stroz Friedberg Questionnaire (attached hereto as Exhibit 2). Levandowski confirmed that the responses contained in Exhibit 2 were, to the best of his recollection, accurate and complete.

<u>Email Accounts</u>

Levandowski stated that he had 10 email accounts: levandowski@gmail.com; levandowski@mac.com; anothy@levandowskiu.us; antlevandowski@gmail.com; alevandowski@hotmail.com; ucsfrobot@gmail.com; andysmith1979@gmail.com; a@ot.to; ottomotto.com; and dozerdeveloper@gmail.com.

Levandowski stated that 98% of his personal emails were in the levandowski@gmail.com account, which was established in approximately 2003. Levandowski stated that he only used his a@ot.to; ottomotto.com; and dozerdeveloper@gmail.com accounts for work. All of Levandowski's other email accounts were for personal use.

<u>Online Repositories</u>

Levandowski stated that he had only two online repository accounts. The first was a Dropbox account that he established in 2010. Levandowski stored both personal and work files in the Dropbox account and told us that it was common practice to share work files via Dropbox. He shared some files with Ron Sebern, Michele Roderick (his former personal assistant), Stefanie Olsen (the mother of his children), Ognen Stojanovski (his attorney), and Suzanna Musick (his stepmother). The Dropbox account synchs with his primary Apple laptop.

The second was a Google Drive account that he established in 2007. Levandowski stored both personal and work files in the Google Drive account. He is the only individual who has access to the Google Drive account.

<u>Personal Devices</u>

Levandowski listed the following personal individual devices in his possession: (1) iPhone 6S (his primary phone which is for personal and work use and shared with no one); (2) iPad Mini (which is only for personal use and shared with his girlfriend); (3) iPad 3 (which is only for

18

CONFIDENTIAL

UBER00312526

personal use and shared with his girlfriend); (4) Nexus 7 (which is only for personal use and shared with no one); (5) Apple MacBook Pro laptop (which is for personal and work use and shared with his girlfriend); (6) Drobo 5D (which was described above in the section concerning the destruction of Google property after his departure); and (7) desktop machine (which is only for personal use and not shared with anyone).

Levandowski also mentioned that he had approximately 30 devices in storage – approximately 10 Dell servers, and 20 home built machines.  These 30 devices were part of 510 Systems.  After Google acquired 510 Systems, Google chose the computers and devices that it wanted to take. The 10 Dell servers and 20 home built machines are the assets that Google did not want. Levandowski stated that he has not accessed these devices since 2010 or 2011 and that they do not contain any Google information or data.  Levandowski speculated that these devices likely contained 510 Systems data and information.

Levandowski stated that he kept Google files on his personal Apple MacBook Pro laptop to conduct his work. He initially identified 3 locations where Google-related data and information were stored:   (1) the Downloads folder; (2) the Dropbox folder; and (3) the Chauffeur folder. As he accessed his Chauffeur folder he found a subfolder entitled "Google" and seemed surprised at the amount of Google-related information that was on his laptop.  He does not recall when he last accessed these file folders but said some of the files are ones he would have used prior to his departure from Google.  The majority of the files, however, were not accessed in 2016.  He did not otherwise copy or remove any of this information from his laptop.

In addition, he also informed us that he had the following Google-related third party information stored on this laptop, some of which, he stated, may be publically known:  (1) vendor data sheet and updates; (2) presentations; and (3) manuals.

With regard to Google email, he initially told us he did not sync his Google mail with this laptop and that he only accessed it via the web.  However, during the interview he looked at his laptop and realized that at one point in time he had, indeed, synced his Google email – AnthonyL@google.com.  The most recent email appears to be from 2014.  Levandowski did not appear to know that the Google emails were on his laptop and appeared surprised when he located them.

**Affirmation**

Levandowski affirmed that the information he provided during his interview was true and correct.

19

CONFIDENTIAL

UBER00312527

**TX-7111, Page 19 of 37**

# Exhibit 1

**CONFIDENTIAL**

**UBER00312528**

Questionnaire for Diligenced Employees

Prior Employment

(1)   When did you begin working for Acme?

(2)   What documents did you sign when you began working for Acme (i.e., nondisclosure/confidentiality agreement, non-solicitation agreement, etc.)?

(3)   In what department(s)/section(s) did you work for Acme?  What was your title(s) in those department(s)/section(s)?

(4)   What were your duties/responsibilities for Acme?

(5)   What types of documents did you create/work on at Acme (i.e., Word, Excel, Powerpoint, etc.)?

(6)   When you worked at Acme, were you issued a mobile device, or did you use a personal device to send/receive work-related emails?

(7)   When you worked at Acme, were you issued a laptop or other equipment? Or did you use your own personal devices to work on Acme documents?

(8)   How would you access your Acme work documents from outside of the office?

   (a)   If you transferred documents to a flash drive/CD/external device, where is that flash drive/CD/external device now and what computer did you use to access those documents?

   (b)   If you connected through VPN, which computer did you use to connect to VPN?

(9)   Are there any other personal devices through which you accessed Acme's network?

(10)  When you worked at Acme, did you email documents that you worked on for Acme to your personal email account?  If so, how often did you do this?  What email accounts did you use?  Were your personal email accounts synched with your smartphone or PDA?

(11)  When you worked at Acme, did you ever store any document that you worked on for Acme on any personal digital devices (i.e., smartphones, laptops, hard drives, thumb drives, etc.).  If so, please identify those devices?

(12)  When you worked at Acme, did you ever store any data or information that you worked on for Acme with an online data repository (i.e., Dropbox, OneDrive, GoogleDocs, etc.)?  Did you ever access any Acme

*Ex 1*

CONFIDENTIAL

UBER00312529

documents stored in any of the above mentioned accounts from a personal computer?

(13)   Other than the measures described above, did you backup your data at Acme in any other manner? If so, please describe the manner in which you backed up your data.

## Decision to Leave Acme

(1)   When did you leave Acme?

(2)   Prior to leaving Acme, did you download/copy any information that you worked on for Acme? If so, what information did you download/copy? Where is this information currently located? Has any information been transferred to your current company's computers/networks?

## Personal Email Accounts

(1)   How many personal email accounts do you have?

(2)   Please list all of your email accounts.

  (a)   For each email account, please list the password that we may use to access that account;

  (b)   For each email account, please list the approximate time it was established;

  (c)   For each email account, please describe what types of email you received or sent (i.e., personal, work, etc.);

  (d)   For each email account, please list all of the individuals that have access to that account;

  (e)   For each email account, please estimate the total number of emails in the account; and

  (f)   For each email account, please identify any encrypted data/information in each account and describe the encryption and the means for bypassing it.

(3)   Please identify all devices you use/have used to access your personal email accounts.

## Personal Digital Devices

(1)   What digital devices (i.e., smartphone, laptop, desktop, hard drive, thumb drive, etc.) do you currently own?

CONFIDENTIAL

(a) For each device, please list the password that we may use to access the data on that device;

(b) For each device, please list the approximate date that it was purchased or obtained;

(c) For each device, please list all individuals that have access to this device;

(d) For each device, please describe what type of data is stored on that device;

(e) For each device, please describe what the storage capacity is for each device;

(f) For each device, please identify any encrypted data on the device and describe the encryption and the means for bypassing it;

(g) For each laptop/desktop, please list the operating system for each laptop/desktop; and

(h) For each device, please indicate whether the device has been wiped or reimaged previously.

(2) What digital devices have you owned in the last five years that you no longer own?

(a) For each device, please list the approximate date that it was purchased or obtained;

(b) For each device, please list the approximate date that you disposed of the device; and

(c) For each device, please describe the reason you disposed of each device.

Personal Online Data Repository

(1) What online data repositories (i.e., DropBox, OneDrive, GoogleDocs, etc.) do you have an account with?

(a) For each account, please list the approximate date that you established the account;

(b) For each account, please provide the password that we may use to access the account;

(c) For each account, please list all the individuals that have access to that account;

(d) For each account, please describe the type of data/information that you have stored in each account;

(e) For each account, please describe the volume of data in each

account; and

    (f)    For each account, please identify any encrypted data in each account and describe the encryption and the means for bypassing it.

    (2)    What devices do you use/have used to access your accounts with online data repositories?

## Hard Copies

    (1)    Do you have any hard copies of Acme data/information upon which you worked?  If so, please describe the data/information and the location of the copy.

## Miscellaneous

    (1)    Other than what is referenced above, do you have access to any device/media/network/location where the Acme data/information upon which you worked is stored?  If so, please identify the device/media/network/location.

CONFIDENTIAL

UBER00312532

# Exhibit 3

**CONFIDENTIAL**

**UBER00312533**



Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

Main 650.253.0000
Fax 650.253.0001
www.google.com

February 1, 2016

**VIA Federal Express**

Anthony Levandowski
2330 Cowper St.
Palo Alto, CA 94301

Re:     Your Confidential Information and Non-Solicitation Obligations

Dear Anthony

The purpose of this letter is to remind you about the Confidential Information and Invention Assignment Agreement ("Agreement") you signed when you began your employment with Google.  Under the Agreement, you are:

1.  Prohibited from directly or indirectly soliciting Google employees to work for another employer in any capacity for one year after your departure from Google; and

2.  Required to preserve the confidentiality of Google's confidential, trade secret and/or proprietary information.

I've attached a copy of the Agreement to this letter.  Please take the opportunity to read through the entire document carefully and ensure that you understand and comply with it.  If we determine that you have violated the Agreement, we will not hesitate to pursue all available legal avenues to enforce Google's rights.

In addition, if you have not done so already, you need to immediately make arrangements with your Google Human Resources representative (or contact peopleops-help@google.com) to return all company property, including data, tools, software or hardware, communications, customer lists, or other documents that you created, received, or had access to during your employment.

If you or your legal representative have any questions or concerns about the content of this letter, please do not hesitate to contact me at your convenience at 650-214-4272.

We wish you all the best in your future endeavors.

Sincerely,

Jade Wagner
Corporate Counsel, Employment
Google Inc.

Encl.

3

CONFIDENTIAL

UBER00312534

GOOGLE INC.

AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT

This Agreement replaces and supersedes any and all prior versions of this document. As a condition of my continuing employment with Google Inc., its subsidiaries, affiliates, successors or assigns (together "the Company"), and in consideration of receipt of confidential information as well as my participation in the Google Chauffeur project, my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1.    **At-Will Employment.** I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE CHIEF EXECUTIVE OFFICER OF THE COMPANY. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE.

2.    **Confidential Information.**

(a)    *Company Information.* I understand that, as a result of my employment with the Company, I will obtain extensive and valuable Confidential Information belonging to the Company. I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Chief Executive Officer or the Board of Directors of the Company, any Company Confidential Information, except under a non-disclosure agreement duly authorized and executed by the Company. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that "Company Confidential Information" means any Company non-public information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans, or other information regarding Company's products or services and their marketing, the identity of the Company's customers (including, but not limited to, customer lists and the identity of customers of the Company on whom I called or with whom I became acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information. I further understand that Company Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

(b)    *Former Employer Information.* I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c)    *Third Party Information.* I recognize that the Company may have received and in the future may receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators, their confidential or proprietary information ("Associated Third Party Confidential Information"). By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties.

*[ ]? Date 4.26.06Greenbreck*
*C4 version*

CONFIDENTIAL

UBER00312535

I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use or to disclose to any person, firm or corporation any Associated Third Party Confidential Information, except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties.  I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information during my employment will lead to disciplinary action, up to and including immediate termination and legal action by the Company.

(d)     *User Data.*  User Data consists of information directly or indirectly collected by Google from users of its services. User Data includes individual log files related to any user session or use of Google services or log files in the aggregate. User Data also includes personally identifiable information, which is information that can be directly associated with a specific person or entity, such as a name, address, telephone number, e-mail address, or information about activities that can be directly linked to a user, such as an IP address or cookie information. I agree to treat User Data as Company Confidential Information under this Agreement and to access, use and disclose User Data only as authorized by and in accordance with this Agreement and Company policies.

3.      **Inventions**

(a)     *Inventions Retained and Licensed.*  I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, and trade secrets, which were conceived in whole or in part by me prior to my employment with the Company to which I have any right, title or interest, which are subject to California Labor Code Section 2870 attached hereto as Exhibit B, and which relate to the Company's proposed business, products, or research and development (collectively referred to as "Prior Inventions"); which are not assigned to the Company hereunder, or, if no such list is attached, I represent and warrant that there are no such Prior Inventions.     To the extent the inventions, discoveries, original works of authorship, developments, improvements, and trade secrets set forth in Exhibit A were conceived in whole or in part by me during my employment with the Company, the Company has agreed that I am the sole owner of the inventions, discoveries, original works of authorship, developments, improvements, and trade secrets set forth in Exhibit A. Furthermore, I represent and warrant that none of the Prior Inventions listed on Exhibit A of this Agreement will materially affect my ability to perform my obligations under this Agreement. The terms of my grant to the Company of a license to the inventions, discoveries, original works of authorship, developments, improvements, and trade secrets set forth in Exhibit A are provided in a side agreement between Google Inc., Anthony's Robots, LLC and myself dated May 19, 2009 (the "Side Agreement").  Other than the inventions, discoveries, original works of authorship, developments, improvements and trade secrets set forth in Exhibit A, if in the course of my employment with the Company, I incorporate any Prior Invention into or use any Prior Invention in connection with any product, process, service, technology or other work by or on behalf of the Company, I hereby grant to the Company a nonexclusive, royalty free, fully paid, irrevocable, perpetual, worldwide license, with the right to grant and authorize sublicenses, to make, have made, modify, use, import, offer for sale and sell such Prior Invention as part of or in connection with such product, process, service, technology or other work and to practice any method related thereto.

(b)     *Assignment of Inventions.*  I agree that other than those such inventions, discoveries, original works of authorship, developments, improvements, and trade secrets set forth in Exhibit A, and except as provided in Section 2 of the Side Agreement, I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under patent, copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time that I am in the employ of the Company (collectively referred to as "Inventions"), except as provided in Section 3(e) below. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope and of and during the period of my employment with the Company and which are protectable by copyright are "works made for hire", as that term is defined in the United States Copyright Act.  I understand and agree that the decision whether or not to commercialize or market any Inventions developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

*EE Date 4.18.08krrowlowski*
*C8 version*

Page 2 of 11

(e)  *Maintenance of Records*.  I agree to keep and maintain adequate and current accurate and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company.  The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company.  The records are and will be available to and remain the sole property of the Company at all times.

(f)  *Patent and Copyright Registrations*.  I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths or affirmations, assignments and all other instruments which the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any rights relating thereto, and testifying in a suit or other proceeding relating to such Inventions.  I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement.  If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature with respect to any Inventions, including, without limitation, to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering such Inventions, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any papers, oaths and to do all other lawfully permitted acts with respect to such Inventions with the same legal force and effect as if executed by me.

(g)  *Exception to Assignment*.  I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any Invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B).  I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A.

4.  **Conflicting Employment**

(a)  *Current Obligations*.  I agree that other than as set forth in Sections 2 and 3 of the Side Agreement,, I will not engage in any other employment, occupation, or consulting directly related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities, including, but not limited to, employment outside of the Company, membership on Boards of Directors or Advisory Boards other than the Company's, personal investments or establishing, maintaining or servicing business relationships with family or friends that conflict with my obligations to the Company.

(b)  *Prior Relationships*.  Other than as described in the Side Agreement, I represent that I have had no other agreements, relationships or commitments to any other person or entity that conflict with my obligations to the Company under this Agreement or my ability to perform the services for which I am being hired by the Company and, other than as allowed in the Side Agreement, will have no other agreements, relationships or commitments to any other person or entity that conflict with my obligations to the Company under this Agreement   I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law.  I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices and documents), I have returned all property and confidential information belonging to all prior employers, and that failure to do so may result in my termination.  Moreover, in the event that the Company or any of its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor or successor corporations, or assigns is sued based on any obligation or agreement to which I am a party or am bound (other that my agreements with the Company), I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by the Company (the indemnitee), as well as any reasonable attorneys' fees and costs if the plaintiff

CONFIDENTIAL                                                                                      UBER00312537

is the prevailing party in such an action, in the event that the Company is the subject of any legal action based on factual allegations that, if true, would conflict with my obligations under this Agreement.

5.   **Returning Company Documents**.  Upon separation from employment with the Company or on demand by the Company during my employment, I will immediately deliver to the Company and will not keep in my possession, recreate or deliver to anyone else, any and all Company property, including, but not limited to, Confidential Information, User Data, Associated Third Party Confidential Information, as well as all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, photographs, charts, all documents and property, and reproductions of any of the aforementioned items that were developed by me pursuant to my employment with the Company, obtained by me in connection with my employment with the Company, or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to Section 3(c).   I also consent to an exit interview to confirm my compliance with this Section 5.

6.   **Termination Certification**.  Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as Exhibit C.  I also agree to keep the Company advised of my home and business address for a period of one (1) year after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

7.   **Notification of New Employer**.  In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

8.   **Solicitation of Employees**.  I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity.

9.   **Export Statement of Assurance**.  I recognize that, in the course of my employment, the Company may release to me items (including, but not limited to, software, technology, or systems, equipment and components) subject to the Export Administration Regulations ("EAR") or the International Traffic in Arms Regulations ("ITAR").  I hereby certify that I will not export, re-export or release these items in violation of the EAR or ITAR.  In order to comply with this certification, I will not disclose/export/re-export these items to any person other than the persons in my working group as required in the performance of the job responsibilities assigned to me by the Company.  I understand that if I have any question regarding whether a given disclosure/export/re-export is or would be contrary to this certification, I should immediately contact the Legal Services Department before taking any actions.

10.   **Code of Conduct Acknowledgement**.  I acknowledge that I have read the Company's Code of Conduct, which is available on the Company's public website and can be found by clicking "About Google" and looking on the "Investor Relations" page of the site.  I agree to adhere to the terms of the Code of Conduct and to report any violations of the Code.

11.   **Acknowledgement of Employee Handbook**.  I acknowledge that I have read the Company's Employee Handbook which is available on the Company's internal website.  I agree to abide by the policies and guidelines set forth in the Employee Handbook, as they may be revised from time to time.

12.   **Representations**.  I agree to execute any proper oath or affirmation or verify any proper document required to carry out the terms of this Agreement.  I represent that my performance of all terms of the Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company.  I hereby represent and warrant that I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

*Eff. Date 1.28 Uhlryanjowski*
*CA version*

Page 4 of 11

CONFIDENTIAL

UBER00312538

13.   **Audit.** I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, or documents that are used to conduct the business of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized or non-compliant applications to the Company's technology systems and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or web sites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone and technology systems to which I will have access in connection with my employment.

14.   **Permission for Use of Images.** I understand that during my employment with Google, agents of the company may take film, digital or other images of me, for subsequent use in non-commercial materials or collateral, including, but not limited to, the Company website (external and internal), annual reports, press day materials, internal presentations, analyst presentations, company, lobby or reception area stagings or productions, etc., without my prior consent, approval or review. My name may or may not be included along with my image. I hereby grant advance permission for such use of my image(s) by the Company, both during and after my employment, and I understand that I will not receive any royalties or other compensation for this use and I further agree to release and hold harmless any agent, employee, officer, director or other individual affiliated or working on behalf of the Company with respect to such use of my image(s).

15.   **Arbitration and Equitable Relief**

(a)   *Arbitration.* EXCEPT FOR CLAIMS ARISING UNDER THE SIDE AGREEMENT, WHICH WILL BE GOVERNED BY SECTION 8.3 OF THAT AGREEMENT, IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2, INCLUDING SECTION 1281.05 (THE "RULES") AND PURSUANT TO CALIFORNIA LAW. DISPUTES WHICH I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER STATE OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION AND WRONGFUL TERMINATION AND ANY STATUTORY CLAIMS. I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

(b)   *Procedure.* I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS"), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "JAMS RULES"). I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, MOTIONS TO DISMISS OR TO STRIKE, DEMURRERS, AND MOTIONS FOR CLASS CERTIFICATION, PRIOR TO ANY ARBITRATION HEARING. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE

*Eff. Date 4.28.08 levandowski*
*CA version*

CONFIDENTIAL

UBER00312539

**TX-7111, Page 31 of 37**

POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I SHALL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW SHALL TAKE PRECEDENCE. I AGREE THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN SANTA CLARA COUNTY, CALIFORNIA.

(c)    *Remedy*. EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, AND EXCEPT FOR CLAIMS ARISING UNDER THE SIDE AGREEMENT, WHICH WILL BE GOVERNED BY SECTION 8.3 OF THAT AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION. NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL COMPANY POLICY, AND THE ARBITRATOR SHALL NOT ORDER OR REQUIRE THE COMPANY TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW. NOTHING IN THIS AGREEMENT OR IN THIS PROVISION IS INTENDED TO WAIVE THE PROVISIONAL RELIEF REMEDIES AVAILABLE UNDER THE RULES.

(d)    *Administrative Relief*. I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM.

(e)    *Voluntary Nature of Agreement*. I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL*. FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

16.    **General Provisions**

(a)    *Governing law; Consent to Personal Jurisdiction*. This Agreement will be governed by the laws of the State of California without giving effect to any choice of law rules or principles that may result in the application of the laws of any jurisdiction other than California. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal jurisdiction of the state and federal courts located in California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

(b)    *Entire Agreement*. This Agreement, together with the Exhibits herein, my offer letter from the Company, and the Side Agreement set forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersede all prior discussions or representations between us including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral. In the event of

*Eff. Date 4.28.08/Levandowski*
*C4 version*

Page 6 of 11

a conflict between the terms of this Agreement and the terms of the Side Agreement, the Side Agreement shall prevail. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, other than amendments to paragraphs 3 and 4 relating to personal open source projects in a format prepared by the Company, will be effective unless in writing signed by the Chief Executive Officer of the Company and me. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

(c)     *Severability.*  If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d)     *Successors and Assigns.*  This Agreement will be binding upon my heirs, executors, assigns, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

(e)     *Waiver.*  Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

(f)     *Survivorship.*  The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date: _____

_____
Signature

Anthony Levandowski
Name of Employee (typed or printed)

EX. Doc 4.28 (Menalanti)
C4 version

Page 7 of 11

CONFIDENTIAL

UBER00312541

Exhibit A

GOOGLE INC.

LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| 1. A method and apparatus for automated vehicle interaction with pedestrians for collaborative tasks | | #61168449 |
| 2. A method and apparatus for acquiring a road reference and real-time positioning information of a vehicle based on the retro-reflective paint of lane markings | | #61168310 |
| 3. A method and apparatus for sending off and retrieving an autonomous vehicle. | | #61168322 |
| 4. A method and apparatus for certifying the safety and drivability of a lane. | | #61168305 |
| 5. A method and apparatus for a vehicle sensing for increased autonomous lane change safety. | | #61168460 |
| 6. A method and apparatus for automated vehicle available parking space detection and guidance | | #61168471 |

*Eif Date 4 24 00(revanlovsk)*
*C4 version*

Page 8 of 11

CONFIDENTIAL

UBER00312542

TX-7111, Page 34 of 37

No Additional Sheets Attached

Signature of Employee: _A. Leva.Eli._

Print Name of Employee: _Anthony Levandowski_

Date: _____

Eff. Date C20.00levandowski
CA version

Page 9 of 11

CONFIDENTIAL

UBER00312543

## EXHIBIT B

### GOOGLE INC.

### CALIFORNIA LABOR CODE SECTION 2870
### INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENTS

(a)  Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2)   Result from any work performed by the employee for the employer.

(b)   To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

CONFIDENTIAL                                                                    UBER00312544

**TX-7111, Page 36 of 37**

EXHIBIT C

## TERMINATION CERTIFICATION

*This letter confirms that your employment with Google, Inc. (the "Company") has terminated. We extend our sincere thanks for all of your contributions and our best wishes to you in your future endeavors.*

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Google Inc., its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's At Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I have informed the Company in the event I am subject to any litigation holds or similar request for record retention.

I further agree that, in compliance with the At Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement, I will adhere to my obligations to the Company contained in Section 2 (Confidential Information), Section 3 (Inventions), and Section 8 (Solicitation of Employees).

After leaving the Company's employment, I will be employed by _____ in the position of:

_____ I am / am not (circle one) subject to a litigation hold/request for record retention.

I have also returned the following Google-issued equipment:

- Laptop
- Cell phone
- Purchasing card
- Badge
- Blackberry
- VPN card
- WAN card
- Other: _____

_____

*Signature of Employee*

_____

*Print Name*

_____

*Date*

_____

*Address for Notifications*

*Eff. Date 4.28.9 Heweavbr.mkt*
*CA version*

Page 11 of 11

CONFIDENTIAL

UBER00312545