*Waymo v. Uber*
# Case No. 3:17-cv-00939-WHA

# TRIAL EXHIBIT 7912

**Uber Objections:**

- Fed. R. Evid. 802 – This document contains inadmissible hearsay; namely, out of court statements made by Anthony Levandowski, Lior Ron, Colin Sebern, Soren Juelsgaard, and Don Burnette, all of whom participated in the Stroz diligence process in their individual capacity. *See* Br. § I.

- Fed. R. Evid. 805 – This document contains inadmissible hearsay within hearsay; namely, Anthony Levandowski's, Lior Ron's, Colin Sebern's, Soren Juelsgaard's, and Don Burnette's recitations of out of court statements made by other declarants. *See* Br. § I.

- Fed. R. Evid. 403 – Because the document is replete with embedded hearsay, the Court should exercise its discretion under Rule 403 to exclude any reliance on the document for its truth, to prevent jury confusion about what fragments are admissible for truth, and resulting waste of time and prejudice to Uber. *See* Br. § IV.

- This exhibit contains references to, and attaches copies of, the diligenced employees' Google employment agreement, which Waymo stipulated that it would not make reference to in its case in chief. *See* Dkt. 425 at 4.

- Disclosed witnesses who received this document pre-litigation are: Adam Bentley, Angela Padilla, Eric Tate, John Gardner, Justin Suhr, and Lior Ron. Except through Padilla or Suhr, the document therefore cannot be admitted for a non-hearsay purpose of notice to Uber or Ottomotto. *See* Br. § IV.

| Yellow Highlights | Hearsay Statements |
|---|---|
| Blue Highlights | Hearsay within Hearsay Statements |



# STROZ FRIEDBERG

Prepared for
Morrison & Foerster LLP
O'Melveny & Myers LLP

Prepared by
Stroz Friedberg

August 5, 2016

Summary Report
Project Unicorn Investigation

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

OUTSIDE COUNSEL & ATTORNEYS-EYES-ONLY

United States District Court
Northern District of California
**Trial Exhibit 7912**
Case No. ___3:17-cv-00939-WHA___
Date Entered _____
By _____
Deputy Clerk

# TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | | Scope of Engagement | 3 |
| II. | | Procedural History | 3 |
| III. | | Methodology | 5 |
| | A. | Interviews | 5 |
| | B. | Digital Forensics Preservation, Data Collection and Review | 6 |
| | C. | Document Review | 7 |
| | D. | Investigation of Levandowski's Disposal of Google Documents | 7 |
| IV. | | Summary of Pertinent Findings Regarding the Diligenced Employees | 8 |
| | A. | Anthony Levandowski | 8 |
| | | 1. Interview and Investigation | 8 |
| | | 2. Forensic Examination of Devices | 11 |
| | | 3. Documents Identified During Stroz Friedberg's Review | 14 |
| | B. | Lior Ron | 17 |
| | | 1. Interview and Investigation | 17 |
| | | 2. Forensic Examination of Devices | 19 |
| | | 3. Documents Identified During Stroz Friedberg's Review | 21 |
| | C. | Don Burnette | 24 |
| | | 1. Interview | 24 |
| | | 2. Forensic Examination of Devices | 25 |
| | | 3. Documents Identified During Stroz Friedberg's Review | 26 |
| | D. | Soren Juelsgaard | 27 |
| | | 1. Interview | 27 |
| | | 2. Forensic Examination of Devices | 28 |
| | | 3. Documents Identified During Stroz Friedberg's Review | 29 |
| | E. | Colin Sebern | 30 |
| | | 1. Interview | 30 |
| | | 2. Forensic Examination of Devices | 31 |
| | | 3. Documents Identified During Stroz Friedberg's Review | 32 |

OUTSIDE COUNSEL & ATTORNEYS-EYES-ONLY

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

## I.   SCOPE OF ENGAGEMENT

In March 2016, Stroz Friedberg was retained to conduct an independent investigation, under the direction and supervision of Morrison & Foerster LLP ("Morrison") and O'Melveny & Myers LLP ("O'Melveny"), on behalf of their respective clients Uber, Inc. ("Uber") and Ottomotto LLC ("Ottomotto"). Stroz Friedberg was tasked with investigating whether or not certain Ottomotto employees – Anthony Levandowski ("Levandowski"), Lior Ron ("Ron"), Don Burnette ("Burnette"), Soren Juelsgaard ("Juelsgaard"), and Colin Sebern ("Sebern") (collectively, the "Diligenced Employees") engaged in the following:

  a) took with them or retained confidential and/or proprietary information from their former employer, Google, Inc. ("Google"), that might be relevant to counsel's determination that one or more of the Diligenced Employees may have violated their confidentiality agreements with Google; and

  b) participated in actions that might be relevant to counsel's determination whether one or more of the Diligenced Employees breached their non-solicitation, non-compete, or fiduciary obligations in connection with their move to Ottomotto.

The scope of the investigation included conducting a series of interviews of the Diligenced Employees, forensically preserving 28 devices and 25 cloud-based repositories of data belonging to the Diligenced Employees, extracting user-created data from the devices, forensically downloading the data in the cloud-based repositories, processing the culled data into an electronic review platform, reviewing the documents in that platform, and conducting other investigative interviews.

## II.   PROCEDURAL HISTORY

The original parameters of the investigation were dictated by a protocol entered into among Stroz Friedberg, Uber and Morrison, and Ottomotto and O'Melveny on or about March 21, 2016 (the "March Protocol," attached as Exhibit 1).[1]  Stroz Friedberg also entered into two side letters, dated March 14 and 21, 2016, with John Gardner, counsel for Levandowski, which are attached as Exhibits 2 and 3, respectively. In these side letters, Stroz Friedberg agreed to not distribute to counsel for Uber and Ottomotto any Google information or data that Levandowski provided or we discovered during the investigation, except as specified in the March Protocol.

In April 2016, in the lead-up to Uber's signing of an agreement to purchase Ottomotto, and long before the investigation was completed, Morrison asked Stroz Friedberg to provide it with visibility into Stroz Friedberg's preliminary fact-finding and forensic analyses on a number of subjects. Specifically, Morrison sought access to: (a) Stroz Friedberg's memoranda regarding Stroz Friedberg's interviews of Levandowski and Ron, as well as the other Diligenced Employees; (b) forensic metadata and last access reports pertaining to all of the Diligenced Employees' devices; (c) last access reports with high-level descriptions of data Levandowski identified as Google data in the course of his interview (the "Self-Identified Data");[2]

---

[1]  All of the Exhibits referenced herein are included in an Appendix to this report.

[2]  The reports Stroz Friedberg previously produced to counsel are included as Exhibits 5-16 in the Appendix.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000003

PRIVILEGED AND CONFIDENTIAL

and (d) an oral report of Stroz Friedberg's preliminary fact-finding pertaining to the disposal of certain Google data in March 2016 that Levandowski realized he had retained.

In April 2016, Stroz Friedberg previewed the requested data to O'Melveny and Gardner, who consented in e-mails and orally to the interim reporting on the condition that the interview memoranda be redacted in certain respects. Stroz Friedberg provided to Morrison the requested interim reporting, including the redacted interview memoranda. Thereafter, Stroz Friedberg continued its investigation.

On or about April 12, 2016, Stroz Friedberg delivered to Morrison, O'Melveny, and Gardner a revised investigation protocol (the "April Protocol," which was dated "As of March 4, 2016"). That revised protocol, attached as Exhibit 4, made explicit that Stroz Friedberg could issue interim reports and clarified that Morrison and O'Melveny were supervising the investigation and making all legal determinations, among other things. Gardner refused to sign the revised protocol on behalf of Levandowski.

With respect to the review and ultimate production to Morrison and Uber of documents and devices provided to Stroz Friedberg by the Diligenced Employees, the April Protocol provided as follows:

> At any time during, or at the end of, its investigation, if Stroz Friedberg believes that non-privileged, relevant documents or communications – whether active, deleted, or fragments – should be shared with O'Melveny and Morrison, it will first place those documents in a folder (the "Proposed Disclosure Folder") on Stroz Review for review by O'Melveny, Donahue, and Levine but shall not provide Morrison access to the Proposed Disclosure Folder. If O'Melveny, Donahue, and/or Levine claims that any of the documents subject to proposed disclosure are subject to attorney-client privilege, attorney work-product privilege, or other restriction on disclosure, O'Melveny, Donahue, and/or Levine will produce privilege logs to Morrison regarding such documents, and Stroz Friedberg will, unless and until the documents are cleared for disclosure by O'Melveny, Donahue, or Levine, remove the documents from the Proposed Disclosure Folder. In addition, if O'Melveny, Donahue, and/or Levine identify any documents in the Proposed Disclosure Folder to be "outside-counsel-eyes-only" or "attorneys-eyes-only" (as such terms are defined below), Stroz Friedberg will move those documents to an outside counsel-eyes-only or attorneys-eyes only folder. Upon receiving written authorization from O'Melveny, Donahue, or Levine and only upon receiving such authorization, Stroz Friedberg will make the Proposed Disclosure Folder and the outside counsel-eyes-only or attorneys-eyes-only folder available to Morrison. If the Clients agree that Unicorn executives should have access to the Proposed Disclosure Folder, Stroz Friedberg will arrange for such access. Unicorn executives will not have access to the outside counsel or attorneys-eyes-only folder. Stroz Friedberg will not create for Unicorn executives user credentials that have access to the outside counsel or attorneys-eyes-only documents. Morrison attorneys will not give to Unicorn executives credentials to, or otherwise give access to the documents in, the outside counsel or attorneys-eyes only folder. The only documents and communications that Stroz Friedberg's independent report will rely on or reference will be documents contained in the approved Proposed Disclosure Folder, except to the extent that privileged communications contain substantive content that is relevant, in which case Stroz Friedberg may reference such substantive content in a manner that the parties mutually agree (or an arbitrator, if the parties cannot agree, determines) reasonably addresses the parties' respective concerns. Stroz Friedberg will issue its final report reflecting the materials contained in the Final Disclosure Folder only upon written authorization from both O'Melveny and Morrison.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

**TX-7912, Page 4 of 33**

PRIVILEGED AND CONFIDENTIAL

While counsel for Levandowski refused to sign onto the April Protocol, the parallel provision in the March Protocol was comparable.

A first-level review produced: over 100,000 potentially relevant documents, e-mails, chats, and text messages extracted from the Diligenced Employees' computers, web-based e-mail and data repositories, and mobile devices;[3] over 74,000 potentially relevant pictures; and over 176,000 source code files.

In July 2016, given the large number of potentially relevant items, Stroz Friedberg performed a second-level review of those items. With the consent of Uber, Ottomotto, and the Diligenced Employees, this was not a document-by-document review of every potentially relevant item. Rather, Stroz Friedberg focused on attempting to identify exemplary or important documents pertaining to confidential Google information that had been retained or deleted, the solicitation of Google employees, or other potential breaches of fiduciary duties owed by the Diligenced Employees to Google. The methodologies used in this limited second-level review, included reviewing some documents, prioritizing search results from terms that yielded fewer false positives, running new search terms, and following file paths to folders of particular interest. In July and August 2016, Stroz Friedberg populated many of the results of this second-level review – and all of the documentary Exhibits to this report – into Proposed Disclosure Folders on the Stroz Friedberg Relativity platform, to which the Diligenced Employees' counsel were given access in order to code each document pursuant to the April Protocol.

In August 2016, counsel for the Diligenced Employees all consented to Stroz Friedberg producing this report on an outside counsel and attorneys-eyes-only basis, meaning that the report could be published by Stroz Friedberg to Morrison, O'Melveny, Donahue Fitzgerald LLP (counsel for Levandowski), Levine & Baker LLP (counsel for Ron), and in-house counsel at Uber and Ottomotto.

This report reflects Stroz Friedberg's methodology and findings based on the interviews of the Diligenced Employees, the device and web repository forensics, the review of documents and field interviews.

## III. METHODOLOGY

### A. INTERVIEWS

As part of its investigation, Stroz Friedberg separately interviewed each Diligenced Employee at our offices located at 101 Montgomery Street, Suite 2200, San Francisco, CA 94104. In advance of these interviews, Stroz Friedberg prepared questionnaires for each Diligenced Employee to complete. These questionnaires are included as exhibits to the Diligenced Employees' interview memoranda. Stroz Friedberg distributed drafts of the memoranda of the Levandowski and Ron interviews to their respective counsel. While counsel reserved their clients' rights with respect to accuracy, neither objected to any particular findings.

---

[3] For chat data, Relativity extracts each sent and received component in a chat as a separate object. Accordingly, the number of objects vastly exceeds the number of chat strings.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000005

PRIVILEGED AND CONFIDENTIAL

The dates of the Diligenced Employees' interviews are as follows:

- Anthony Levandowski (March 22 and 23, 2016). Redacted interview memorandum and exhibits attached as Exhibit 5;
- Lior Ron (March 22, 2016). Redacted interview memorandum and exhibits attached as Exhibit 6;
- Don Burnette (March 23, 2016). Redacted interview memorandum and exhibits attached as Exhibit 7;
- Soren Juelsgaard (March 24, 2016). Redacted interview memorandum and exhibits attached as Exhibit 8; and
- Colin Sebern (March 24, 2016). Redacted interview memorandum and exhibits attached as Exhibit 9.

## B.  DIGITAL FORENSICS PRESERVATION, DATA COLLECTION AND REVIEW

Stroz Friedberg forensically collected 53 computers, tablets, smartphones, thumb drives, webmail accounts, and other cloud-based repositories from the Diligenced Employees (hereinafter, the "In-Scope Digital Media") and loaded and processed the active (i.e., non-deleted) user-created documents and communications into Stroz Friedberg's Relativity platform for review. Stroz Friedberg also analyzed in its forensic laboratory deleted files and forensic fragments from the unallocated space and the host-controlled area of the media, to the extent applicable, for relevant information.

With respect to the computers, beyond looking for potentially relevant documents, Stroz Friedberg also analyzed connections to removable media and cloud-based repositories to determine whether Google data was transferred via either of those methods. Stroz Friedberg analyzed the removable media produced by the Diligenced Employees and matched those items by serial number to the records in the Diligenced Employees' computers showing connections to removable media to verify that the production of removable media was complete. Stroz Friedberg also analyzed the removable media to determine whether Google media had been transferred from one device to another. With respect to smartphones, Stroz Friedberg looked for web repository applications (e.g., Dropbox) and analyzed phone-based databases for connections to web repositories to determine whether Google data was transferred to the cloud.

In the Relativity platform, Stroz Friedberg applied a set of keywords (see discussion below) to the harvested documents. The same key words were applied by forensic examiners to the deleted files, the unallocated space, and the host controlled area, as applicable. Stroz Friedberg used a team of engagement managers (who are former lawyers and prosecutors), forensic examiners, and cyber associates experienced in conducting investigations to perform first and second level reviews after keywords were applied. Over 1.5 million files were harvested or downloaded from devices and cloud-based repositories and processed into Relativity.

Where a Relativity-based review was infeasible (e.g. source code, picture files, video files, unallocated space keyword search hits), Stroz Friedberg staff manually reviewed the harvested data.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000006

PRIVILEGED AND CONFIDENTIAL

## C.   DOCUMENT REVIEW

In accordance with the above-referenced Protocols agreed to by the parties, Stroz Friedberg: (1) processed/assessed over 1.5 million files into Relativity, identifying over 400,000 documents for further review; (2) reviewed over 47 gigabytes of Cellebrite data from the Diligenced Employees' mobile devices; (3) reviewed over 24,000 individual Google Chat messages ("Gchat messages"); (4) reviewed over 200,000 photos/videos; and e) identified over 176,000 source code files.[4]

Stroz Friedberg developed search criteria to search the In-Scope Digital Media. In doing so, Stroz Friedberg, at the direction of the parties, applied its understanding of the goal of the investigation and the knowledge gained during its interviews with the Diligenced Employees to develop a list of proposed search terms for each Diligenced Employee. Stroz Friedberg then distributed the proposed search criteria lists to O'Melveny, Donahue, and Levine. O'Melveny, Donahue, and Levine thereafter reviewed the search terms and designated any proposed search terms which should not be shared with Morrison because the terms themselves could convey confidential Google information. Stroz Friedberg then distributed to Morrison a list that contained only the search terms approved by O'Melveny, Donahue, and Levine for Morrison's final input and approval. Stroz Friedberg used the resulting search terms as part of its review of the documents harvested from the In-Scope Digital Media and its forensic review of the media.

Using search criteria provided by the parties and technology-aided-review tools, Stroz Friedberg then sought to identify and exclude documents that were potentially privileged from the relevant set. Stroz Friedberg thereafter sought to identify documents potentially relevant to the investigation for further legal review by counsel, as prescribed by the Protocol, by using investigative techniques and a range of industry standard analytical tools and e-Discovery technologies.   A detailed outline of the multi-faceted, tiered approach Stroz Friedberg undertook to take reasonable, proportionate, and effective measures to evaluate and triage the large volumes of data received in this matter is attached hereto as Exhibit 22.

Applying the above-referenced methodology, Stroz identified the following potentially relevant documents in its first-level review: (1) approximately 33,752 documents/files in Relativity; (2) approximately 68,111 Cellebrite documents/files; (3) approximately 1,134 Gchat messages; (4) approximately 74,847 pictures; and (5) approximately 176,803 source code files. After the second-level review, Stroz Friedberg foldered for outside counsel review 1,383 files in Relativity, including 69 Gchat messages and approximately 534 pictures. Since the source code files could not be identified further as either pertaining or not pertaining to Google, there was no second-level review of the source code files.

## D.   INVESTIGATION OF LEVANDOWSKI'S DISPOSAL OF GOOGLE DOCUMENTS

During Stroz Friedberg's interview of Levandowski, he stated that in March 2016, while searching his home to gather all devices for this investigation, he discovered that he possessed Google proprietary information on five disks in his Drobo 5D, which was located in a closet he used to store old and unused devices. The proprietary information included source code, design files, laser files, engineering documents, and software related to Google self-driving cars. In his interview with Stroz Friedberg, Levandowski stated that he destroyed the disks at a commercial shredding facility in Oakland, California. Levandowski provided Stroz Friedberg with the Drobo 5D, but, as expected, it contained no media and there was nothing to analyze.

---

[4] Soren Juelsgaard possessed the majority of the source code on his devices: 174,311 files.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000007

PRIVILEGED AND CONFIDENTIAL

Thereafter, Stroz Friedberg conducted an independent investigation to attempt to verify the destruction of the disks. The details of this investigation are described more fully below and a copy of this investigative memo is attached as Exhibit 23.

## IV.  SUMMARY OF PERTINENT FINDINGS REGARDING THE DILIGENCED EMPLOYEES

The following are summaries of Stroz Friedberg's findings for each Diligenced Employee.

### A.  ANTHONY LEVANDOWSKI

#### 1.  INTERVIEW AND INVESTIGATION

On March 22 and 23, 2016, Stroz Friedberg interviewed Levandowski. Levandowski worked at Google from April 9, 2007 to January 26, 2016. In 2011, he was promoted to Engineering Manager of the Chauffeur Project, where he remained until he left the company. During his interview, Levandowski informed Stroz Friedberg that he: (a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars.  Exhibit 5 is Stroz Friedberg's memorandum of Levandowski's interview.

### Retained Google Information or Data

During the interview, Levandowski identified the following locations where Google-related data and information were stored on his personal laptop, an Apple MacBook Pro: (a) in two folders labeled "Chauffeur" and "Google;" (b) a Dropbox folder; and (c) the Downloads folder. He did not recall when he last accessed these folders, and he seemed surprised at the amount of Google-related information that was on his laptop. In addition, during the interview, Levandowski initially told us that he did not sync up his Google mail with this laptop, but then he looked at his laptop and, to his apparent surprise, discovered that he had synced his Google e-mail (anthonyl@google.com) with his laptop in 2014. Accordingly, his laptop contained a snapshot of his Google e-mail as of the date of the sync on September 20, 2014. Levandowski informed Stroz Friedberg that he also had other Google-related information stored on his laptop, such as vendor sheets, presentations, and manuals, some of which may have been publically known.

Levandowski explained that he used his personal laptop and devices, as well as his company devices, to access Google Docs, and that he stored Google data and documents on his personal devices as well in the normal course of his work at Google. He also said it was common practice to share work files via Dropbox. He stated that, in addition to his personal laptop, he also stored Google documents on his phone and various hard drives and thumb drives.

### Transferred Google Information or Data

Levandowski also acknowledged that in the normal course of business at Google he e-mailed Google files to his personal webmail account at levandowski@gmail.com, but that to his recollection these files were mainly presentations or other information to be shared publically and not technical or proprietary information. He also indicated that in the normal course of business he used USB drives to transfer data

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

from his desktop to the self-driving cars that his teams were working on, but stated that he returned all of the Google USB drives and destroyed all of the personal USB drives in his possession because he heard they might contain spyware. He further stated that the information likely to have been on the destroyed USB drives included trade show information, vendor sheets, and Google files he may have been moving.

### Contacted Google Employees about His Start-Up Company

While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining his start-up company. The one-on-one meetings occurred at work with over 20 Google/Chauffer employees (during individual update meetings or around the Google campus), coffee shops, restaurants, homes, or telephonically. There were also four group meetings, two of which occurred with small groups of Google and/or Chauffeur employees at a barbeque at Levandowski's house and on a ski trip to Lake Tahoe. Two larger group meetings took place at Levandowski's house in approximately December 2015 and January 2016.[5] These meetings included approximately 15 to 20 Google and non-Google employees. The first large group meeting, in December 2015, was primarily organized by word of mouth and approximately half of the attendees were Google employees. They discussed the new business and Ron gave a short presentation regarding robotic trucks. The second large meeting took place at Levandowski's home, just prior to his resignation from Google on January 26, 2016. This meeting was organized by a Chauffeur team employee who sent Calendar invites to Google employees at their work e-mail addresses. To the best of Levandowski's recollection, approximately 10 of the attendees were Google employees. According to Levandowski, at this meeting they discussed an exit strategy from Google and actively encouraged the employees to leave Google.

Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google. According to Levandowski, as of the dates of his interview on March 22 and March 23, 2016, Ottomotto had approximately 30 employees, 16 of whom were former Google employees.

Following his departure from Google, Levandowksi stated that a number of Google employees reached out to him about joining Ottomotto. Levandowski said he had no discussions with these individuals about Ottomotto, unless they had already resigned from Google. He claimed that he has made it a point since his departure from Google to have no contact with any Google applicants until after they are hired by Ottomotto.

### Met with Uber Executives While Employed at Google

According to Levandowski, beginning in June 2015, while working at Google, he began to have meetings and conversations with various Uber executives, including Jeff Holden, Brian McClendon, Cameron Poetzscher, Nina Qi, and Travis Kalanick. At one point, Levandowski said that he asked Brian McClendon, who left Google to join Uber, how much Uber would be willing to pay for the Chauffeur team, claiming he wanted to have a market value for the team. According to Levandowski, these meetings progressed from September to December 2015, and escalated from Uber being a customer for after-market car kits to it acquiring Levandowski's start-up company. Levandowski said there were several text messages with the above-referenced individuals and over 200 messages to and/or from Kalanick. Levandowski acknowledged

---

[5] The Google employees Levandowski recalls meeting with, or attending these meetings, are outlined in his unredacted interview memorandum, which was produced to his counsel for review.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

that his research at Uber will involve delivering lasers, deploying vehicles, and building after-market kits for cars, but emphasized that he did not intend to rely on any information or data from Google.

### Destroyed Personal Drobo Disks with Confidential Google Information

While searching his home for anything Google-related a few weeks after his departure from Google on January 28, 2016, Levandowksi stated that he discovered various equipment in his garage, including some tools, pieces of aluminum, robot parts, old Street View test prototype cameras, and brackets to mount cameras on cars. Just prior to his interview, Levandowski had a destruction company (whose name he could not recall) pick up the items and destroy them.

In addition, Levandowksi stated that he discovered that he possessed Google proprietary information on five disks in his personal Drobo 5D in a closet in his house. This information included source code, design files, laser files, engineering documents, and software related to Google self-driving cars. He said that he downloaded this information in the ordinary course of business while at Google and that the last time he accessed the information was between November 2014 and January 2015. Levandowski said that he copied the software onto the disks off of his personal Apple MacBook Pro. He stated that this was a common practice because the code on the disks would be inserted into the prototype driver-less cars to enable them to operate. He stated that he stored the disks in his personal Drobo 5D device.[6] He said that upon realizing he still had the disks, he immediately informed his attorney and brought this information to Uber's attention at a regularly scheduled status meeting in mid-March 2016. He stated that he could not recall the specific date of that meeting, but Stroz Friedberg was later informed by Morrison that the date of this meeting was March 11, 2016. At the meeting, Poetzscher instructed Levandowski not to destroy the disks and to preserve them for record keeping purposes. Levandowski stated that Kalanick wanted nothing to do with the disks and told Levandowski to "do what he needed to do." Levandowski said that following the meeting he brought the disks to a shredding facility in Oakland, later identified as Shred Works, and watched the disks as they were shredded. He stated that he paid cash and did not receive a receipt.

Stroz Friedberg investigators visited Shred Works on April 4 and 6, 2016, and spoke to its office manager telephonically on April 11, 2016, to try to confirm Levandowski's account.  Stroz Friedberg investigators showed the employees a picture of Levandowski, but no one recognized him. In addition, the investigators were informed that all destructions are recorded on a triplicate, carbon-copy receipt that includes the name of the Shred Works' employee assisting the customer, the date, the time, a description of the service, and the method and amount of payment. The customer is then asked to sign the receipt and is given the top white copy. A manager for Shred Works reviewed the receipts for March 2016, and, in particular March 11, 2016, the date of Levandowski's meeting with Uber, but could not find one signed by Levandowski.[7] She did, however, find a receipt dated March 14, 2016 that indicated that five disks were destroyed and paid for in cash. The signature on the receipt was illegible.

In a deleted iMessage from Levandowski to an unknown recipient on March 11, 2016, Levandowski states, "I'll clean that shit out." See Exhibit 24.  A few days later, on March 13, 2016, in another deleted iMessage

---

[6] Evidence suggests that Levandowski's Drobo 5D was being used to back up his MacBook Pro.

[7] Stroz Friedberg investigators provided Shred Works with examples of Levandowski's signatures that they obtained when Levandowski signed the chain of custody forms related to his devices.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000010

PRIVILEGED AND CONFIDENTIAL

from Levandowski to an unknown recipient, Levandowski states "We're ready for junk King." See Exhibit 25. Junk King is a junk disposal service. It is unclear whether these messages are related or unrelated to the Drobo 5D disks. As set forth below, Stroz Friedberg has identified a number of communications that show that Levandowski and his colleagues were familiar with and did use Shred Works from time to time.

The interviews of Shred Works' employees and the Shred Works' documents do not confirm Levandowski's contention that he took the five disks to Shred Works on the same day as his meeting with Uber, which was March 11, 2016. Levandowski is fairly recognizable, and Stroz Friedberg's interviews were conducted not long after the alleged event. No one recognized him as having appeared on March 11, 2016 or any other date. The March 14, 2016 receipt for the destruction of five disks could better support the proposition that the disks were destroyed at Shred Works on a day later than Levandowski recalls, but there is no way to connect that receipt to Levandowski or the five Levandowski disks at issue. A copy of Stroz Friedberg's investigative report regarding Levandowski's five Drobo 5D disks is attached as Exhibit 23.

### 2. FORENSIC EXAMINATION OF DEVICES

#### Retained, Accessed, or Transferred Google Information or Data

Our forensic examination of Levandowski's devices and accounts corroborates his assertion that he stored and accessed Google files on his personal laptop in folders labeled "Chauffer" and "Google." However, contrary to his belief that there were no or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google work e-mail messages that were downloaded onto Levandowski's computer on September 20, 2014. Ten of those e-mails were last accessed between September 1, 2015 and January 28, 2016. It is difficult to believe that Levandowski was not, prior to his interview, fully aware of the extent of the data that he had retained.

Most of the 10 e-mails referenced above were acceptances of Calendar invitations for internal "Chauffer" meetings that included a list of other Google employees who were invited to the meetings. The remaining e-mails contained: (a) a link to what appears to be one of Levandowski's Google Non-Disclosure Agreements; (b) handwritten notes and a drawing related to a "gimbal setup;" (c) an e-mail from the Chauffer-laser@google.com, which contains links to what appear to be Chauffer-related pictures; (d) an e-mail string with a California Department of Transportation research official regarding taking a test drive in, presumably, a Google self-driving car; and (e) a brief e-mail with Dmitri Dolgov regarding the timeframe for laser development. The 10 e-mails are attached hereto as Exhibit 26.

Stroz Friedberg also identified and analyzed approximately 347 files from his Self-Identified Data that were last accessed on Levandowski's MacBook Pro between September 1, 2015 and March 22, 2016. A copy of the last-accessed analysis was previously produced to counsel and is attached as Exhibit 16. These files, which contain proprietary information related to Levandowski's work at Google on the Chauffeur Project, include: confidential presentations regarding the self-driving car and its marketing and business plans; videos of features and test drives of the self-driving car; pictures of the self-driving car and multiple components; notes pertaining to plans for the self-driving car; diagrams of vehicle components marked confidential; system files; software files; and code regarding the self-driving car. Additional documents are outlined in the timeline and document review sections below.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL                                                          STROZ_0000011

PRIVILEGED AND CONFIDENTIAL

Stroz Friedberg also identified access by Levandowski to several cloud storage repositories. A review of the internet history shows access to Google Docs on January 26 2016, the day of Levandowski's resignation. In particular, he accessed a file named "Chauffeur TL weekly updates – Q4 2015 – Google Sheets." Further review of the laptop identified a file with the same name in Levandowski's Downloads folder, which is attached as Exhibit 27. The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google).

Evidence also indicated that Levandowski accessed, along with other Ottomotto employees, an Ottomotto team site on the Slack collaboration platform (www.slack.com).[8] Levandowski was added as a user to this team site on November 18, 2015. Our review indicates that he accessed Slack twice on January 12, 2016, and again on March 10, 2016.

### Communicated with Google Employees

Stroz Friedberg identified two pictures of chat messages dated January 28, 2016, two days after Levandowski's departure, to Google employees referred to as Ionut and Rahim that reflect pitches by Levandowski to leave Google and join Ottomotto. See Exhibit 28.

### Deleted Relevant Files

Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016. An example of this activity includes system logs indicating that on December 14, 2015, approximately 24,000 files were located within the folder path "/Users/Anthony/Desktop/boards/chauffeur-svn/." These same system logs indicate that on December 14, 2015, approximately 24,000 files were located within the folder path "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files indicates that they were source code and electronic design files relating to driverless cars. Attached as Exhibit 29 is a sample of the deleted file history, and a full history can be provided upon request. Given the timing, these deletions could be a good-faith effort by Levandowski to attempt to purge from his laptop Google confidential material prior to his departure.

Levandowski's iPhone 6S Plus[9] was used to communicate with, among others, Rhian Morgan, head of human resources for Ottomotto, regarding Shred Works.[10] In particular, between February 26 and March 1, 2016, there are three deleted chat messages between Levandowski and Morgan referring to Shred Works and/or the destruction of "stuff." See Exhibit 30. In addition, on March 13, 2016, Levandowski writes to an unknown recipient, "We're ready for junk King." See Exhibit 25.

---

[8]  The team name indicated in the URL is "280systems" which was set up on Novmber 10, 2015. At some point thereafter, the team site name was changed to Ottomotto.

[9]  Levandowski's iPhone 6S only contains messages and email data from February 6, 2016 to March 22, 2016 (the date Stroz Friedberg imaged the device). Levandowski did not identify a cloud account relating to this device on his questionnaire. When asked during his interview about a cloud backup, Levandowski stated that he did have a cloud account but that it only backed up his Safari and News files on this device. The parties may want to seek access to this cloud account for further review and analysis.

[10]  There are approximately 1,300 deleted chat messages. As discussed before, each message in a thread is considered a separate object by Relativity. Accordingly, the 1,300 messages represent a much smaller number of actual threads.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

Lastly, on March 1, 2016, Levandowski sent a text to an unknown recipient stating, "[D]elete the iMessages every night." See Exhibit 31. Levandowski also attempted to empty the Trash bin on his MacBook Pro while he was at Stroz Friedberg's office on March 22, 2016 at approximately 12:12 p.m., but our examination found no files were contained in his Trash at the time he attempted to empty it.

A more detailed forensic analysis of Levandowski's devices and accounts is included in Stroz Friedberg's report as Exhibit 17.

### Timeline of Relevant Activity on Levandowski's Devices

Below is a timeline of relevant events identified through analysis of Levandowski's devices:

- 12/14/2015 – Approximately 24,000 potentially relevant files and folders moved from a desktop folder to the Trash (ES001);[11]

- 12/21/2015 – DSR/Source Code Example and test report for HDL-64E S2 Laser Power Customer added to personal Dropbox account;

- 12/22/2015 – USB device labelled "8GB" erased using MacBook Pro laptop (ES001);

- 1/26/2016 – Levandowski's last day at Google;

- 1/26/2016 – USB device labelled "280" erased using MacBook Pro laptop (ES001);

- 2/9/2016 – Approximately 20,000 items moved to Trash (ES001);

- 2/10/2016 – 160 GB of free space became available on the MacBook Pro laptop (ES001);

- 2/19/2016 – 8 GB SanDisk Cruzer erased using MacBook Pro laptop (ES001);

- 2/26/2016 – Text from Rhian Morgan to Levandowski stating, "I'm gonna go get your stuff destroyed this afternoon btw. ill send you a bill and a pic/video" (deleted) (ES002);

- 3/1/2016 – Text from Levandowski to an unknown recipient stating, "Ok good reminder to delete the iMessages every night" (deleted) (ES002);

- 3/1/2016 – Text from Rhian Morgan to Levandowski stating, "i've been paying for shredding on my card, since it's not technically a business expense for OM. LMK if I should expense it or send you a bill instead ☺" (deleted) (ES002);

- 3/1/2016 – Text from Rhian Morgan to Levandowski stating, "Ricardo, the shredder at ShredWorks, has a thing for these baby blues so he only charges me for about half the stuff they shred" (deleted) (ES002);

- 3/8/2016 – Last known time the Drobo5 was connected to the MacBook Pro (ES001);

- 3/13/2016 – Text from Levandowski to unknown recipient, stating, "We're ready for junk King" (deleted) (ES002); and

- 3/22/2016 – Trash emptied (during the interview with Stroz Friedberg) (ES001).

Many of these deletions may have been good faith attempts by Levandowski to purge retained Google material from his devices in accordance with his obligation not to retain confidential Google data. However, by March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to

---

[11] ES001 is Stroz Friedberg's internal evidence number for Levandowski's MacBook Pro Laptop. We numbered each device separately for all of the Diligenced Employees, which are contained in their respective forensic reports attached as Exhibits 17-21.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL                                                    STROZ_0000013

**TX-7912, Page 13 of 33**

PRIVILEGED AND CONFIDENTIAL

preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control. In addition, there was an effort by Levandowski and his Ottomotto colleagues to delete texts in real time. Stroz Friedberg did not re-interview Levandowski or others regarding their reason for this practice.

### 3.   DOCUMENTS IDENTIFIED DURING STROZ FRIEDBERG'S REVIEW

#### Google Data or Information

Putting source code files aside, the vast majority of potentially relevant items were derived from Levandowski's sources of data, as opposed to those of the other Diligenced Employees. Relevant documents from Levandowski's devices and web-based repositories, including those from the Self-Identified Data, include the following:

- Pictures of a Google car, such as a Google car dash and Prius components/connections (Exhibit 32);
- Technical drawings and diagrams, such as a figure depicting radar technology, simulations, LIDAR-related diagram, and Google Confidential PBR 0.7 optical cavity drawing (Exhibit 33);
- Patent application for LIDAR (Exhibit 34);
- Videos, such as flashing lasers (Exhibit 35);
- Keynote files showing Google car road test (Exhibit 36);
- Source code "snippets" (Exhibit 37);
- E-mail messages from Levandowski's Google e-mail account discussing Chauffeur-related issues, simulation results, and a Calendar entry located in Trash regarding a meeting on March 18, 2016 at Levandowski's house (Exhibit 38);
- 1/28/2016 e-mail from Levandowski to unknown recipient regarding time to move on from Chauffeur and wanting to be in the driver's seat (Exhibit 39);
- Images of business cards (est. 185) located in a file path with folder named "Chauffer contacts" (Exhibit 40);
- Chauffeur group e-mail including, the Chauffeur-laser group e-mail discussing testing lasers and Chauffeur-all group e-mail discussing additions to 2081 (Exhibit 41);
- Presentations and PDF files, including information marked "Google Confidential and Proprietary" titled GBr Assembly Flowchart SOP (Exhibit 42), Chauffeur-LIDAR Simulations (Exhibit 43), "Confidential – do not share" files related to Chauffeur's business plan and 2014 funding ask (Exhibit 44), and a draft PBR v7 Laser Classification Memo (Exhibit 45); and
- Employee lists (Exhibit 46).

#### Formation of 280 Systems and Ottomotto

Levandowski's potentially relevant documents also contain some communications suggesting that details relating to the formation of Ottomotto may have taken place while he was still employed at Google.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

Depending on the timing, these materials may bear on Levandowski's fiduciary duty to Google. The items include:

- 1/20/2016 note addressed to "S." (possibly Soren) regarding "metric I think we should spring to . . . Ford and any other oem will come begging to us to have us do a deal after we have this operating. Doing the ford deal now detracts focus and engineers from doing this and therefore should not happen. Ford isn't the only oem in town (there's a dozen that will work just fine). and even ford isn't going away, as we show more and more that the tech is real the more leverage we get and the more we can get what we want from them (speed and Mfg volume). [...] After we have our first 1,000 rides a day we scale as fast as possible. In my mind this battle will be won by the first team to get 10-20k cars unmanned on the streets. I also believe it is a winner take all in market by market regions. [...] Let's go kick ass!" (Exhibit 47);

- 2/25/2016 iMessage from Rhian Morgan to Levandowski stating, "Also when was your official last day at Google?  I want to date the sublease agreement to then" (Exhibit 48); and

- 3/11/2016 e-mail communication from Brad Templeton to Levandowski stating, "[...] Sure you just don't want to do cars instead of trucks? I've figured a way for the car companies to beat Chauffeur if they will let the self-drive unit be an autonomous start-up but give it a few special resources from the car company..."  Levandowski replies, "Ok fine, let's talk. When are you free?" (Exhibit 49).

<u>Communications Regarding Recruiting Efforts of Google Employees</u>

Levandowski's iPhone also contains e-mails, text communications and chat messages with other Diligenced Employees, Uber executives, former Google employees, and Ottomotto staff about recruiting people to Ottomotto, among other things. Below are some examples of these communications:

- 1/25/2016 employment offer letters to various Google employees (Exhibit 50);

- 1/28/2016 e-mail from Laila Mathos rejecting the offer to be part of 280 Systems (Exhibit 51);

- 2/6/2016 iMessage from Levandowski to Ron stating, "Don starts Monday.  He's moving his treadmill in today," with Ron replying, "This was one of the hardest pitch in history to convince someone to receive a pile of money"  (Exhibit 52);

- 2/8/2016 iMessage from Levandowski to Rhian Morgan stating, "They all need to sign nda, we were meeting at 12:00 today I think" (Exhibit 53);

- 2/9/2016 SMS message from David Wakeserstoffer to Levandowski stating, "Would it be possible to meet the 280 people who joined?  And it would be good to chat with Don...Can you maybe connect me to him?"  (Exhibit 54);

- 2/9/2016 iMessage from Rhian Morgan to Levandowski stating, "[A]nyways I talked them through some of the sensitivities and the importance of the confidentiality stuff we had them sign, but also hyped them up about how we're working on some cool stuff and that this is gonna be an awesome space for them to move into. . . ." (Exhibit 55);

- 2/10/2016 iMessage from Levandowski to Sebern stating, "Feel free to pressure Aaron!" (Exhibit 56);

- 2/11/2016 SMS message from Claire DeLaunay to Levandowski stating, "Alright I am ready to join your amazing adventure.  Can I start tomorrow?"  (Exhibit 57);

- 2/13/2016 iMessage from Rhian Morgan to Levandowski stating, "Others are down I think as long as we lock them down early next week" (Exhibit 58);

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

- 2/16/2016 iMessage from Levandowski to Rhian Morgan stating, "Let's ask everyone to get you 5 good names (no google people) to start the pipeline of recruiting" (Exhibit 59);

- 2/20/2016 iMessage from Ron to Levandowski stating, "[W]e're done with almost all of the issuance of shares, chasing Don jur and drew" (Exhibit 60);

- 2/22/2016 iMessage from Levandowski to an unidentified person stating, "Hey can you send me Aaron's contact details? Lior wants to give him a consultant confidentiality agreem [sic]...." (Exhibit 61);

- 2/22/2016 iMessage from Levandowski to Kalanick stating, "Its [sic] going amazing, just onboarded another 5 peeps today, 4 from former team...Looks like we're signing in a couple hours," with Kalanick replying, "Just reading text now...Pumped" (Exhibit 62); and

- 3/17/2016 iMessage from Levandowski to Kalanick stating, "I think I have a way to have both ATC and Bay Area peeps work on separate missions:  We focus on lasers and early roll out and he focuses on high quality/mass roll out.  We did this for streetview (ask bam), maps and early chauffeur and it worked super well.  I'll ping Jeff and run it by him."  Kalanick replies, "Interesting, it will be good to see how that model fits after we open kimono on fri" (Exhibit 63).


### Additional Notes Files on Levandowski iPhone relating to Google and/or Ottomotto

Levandowski's iPhone 6 also contains Notes with the following details:

- 9/17/2015 Note regarding "Senior Mgmt layer business lead / ceo," "doing business for Uber," and "how can it not have Google IP in it" (Exhibit 64);

- 1/7/2016 Note addressed to "L" [possibly a draft for Larry Page] regarding "Chauffeure is broken," "can't do it at Google" (Exhibit 65);

- 1/11/2016 Note regarding details about trucks, comparisons, and specifications (Exhibit 66); and 1/30/2016 Note stating, "I went back to Palo Alto and I rechecked the mail and makes sure I didn't miss anything from Google" (Exhibit 67).


### Pictures and Videos

Levandowski's relevant pictures and videos consist primarily of pictures related to the assembly of the Google self-driving car, the components of the car, and whiteboard snapshots of notes and diagrams including:

- Pictures of the construction process of Google car, such as components/connections and parts (Exhibit 68);

- GoPro video of self-driving vehicle test (Exhibit 69);

- Drawings and diagrams, such as figures depicting radar technology (Exhibit 70) and  simulations (Exhibit 71);

- Whiteboard pictures (Exhibit 72);

- Screenshots of text messages, meeting invitations, notes and e-mails (Exhibit 73);

- Electronic and hardware components (Exhibit 74);

- Images of computer screen contact lists and car (Exhibit 75);

- Flowchart of Chauffer software architecture (Exhibit 76); and

© 2018 Stroz Friedberg. All rights reserved.

CONFIDENTIAL                                          STROZ_0000016

PRIVILEGED AND CONFIDENTIAL

- Pictures of business cards (Exhibit 77).

### Source Code Files

Approximately 734 source code files came from Levandowski's devices or accounts. Given Stroz Friedberg's lack of context, we could not determine whether these files were related to Google self-driving cars or otherwise constituted Google confidential information. A review of these files by Levandowski and/or a third-party expert could settle this issue, or they could be remediated in bulk.

While Levandowski retained, and in some cases, accessed Google confidential information after his departure from Google, Stroz Friedberg discovered no evidence indicating that he transferred any of that data to Ottomotto or other third parties.

## B.   LIOR RON

### 1.   INTERVIEW AND INVESTIGATION

On March 22, 2016, Stroz Friedberg interviewed Ron. During his interview, Ron informed Stroz Friedberg that he worked at Google on two prior occasions. The first time was from April 7, 2007 to December 11, 2011. He then began working at Motorola, and he returned to Google on November 4, 2014, when Google acquired Motorola. He remained at Google until January 13, 2016.

During his interview, Ron informed Stroz Friedberg that he: (a) did not possess any Google information or data; (b) very rarely transferred information to his personal e-mail accounts; (c) met with some Google employees about the start-up company; (d) met with Uber executives and Levandowski, while employed at Google, about forming a new company; and (e) believed that five disks containing highly confidential Google information pertaining to self-driving cars were destroyed by Levandowski. Exhibit 6 is Stroz Friedberg's memorandum of Ron's interview.

### Did Not Retain Google Information or Data

Ron denied retaining any Google-related information. He stated that he accessed Google's network, including Google Drive, through his personal Nexus phone, but that such access was terminated when he resigned on January 13, 2016. He also stated that he did not use his personal laptop or any other personal devices to access the Google network or any Google data or documents.

### Transferred Some Google E-mails

Ron stated that he did not copy, download, or transfer any Google confidential or proprietary information to any of his personal devices and "very rarely" forwarded non-work related/non-confidential e-mails or contacts to his personal accounts. Ron acknowledged that, prior to leaving Google (on his last day), he forwarded some Google e-mails to his personal Gmail account, including employee exit documents, "public" presentations, and certain contacts. In particular, he said that he forwarded: (a) an e-mail regarding a Chinese company named LETV that was interested in starting a self-driving car division; (b) contact information for the Dropbox; (c) contacts for a Chinese self-driving car company that contacted Ron (he did not recall if it was the same company noted above); and (d) some personal photographs.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

### Met with Google Employees about Start-Up Company

Ron stated that while employed at Google he spoke with Levandowski about starting 280 Systems (thereafter renamed "Ottomotto"), attended a social barbeque for Chauffeur employees, and attended a group meeting at Levandowski's house in December 2015 where Ron gave a presentation on trucking automation. Ron recalled that the December 2015 meeting was just before the holidays and included a group of Chauffeur team members and other Google employees who had been invited to the meeting through Levandowski's connections. Ron identified seven Google employees in attendance, but did not recall the names of the other employees. After the meeting, Ron reached out to at least four Google employees who expressed an interest in the new company. He met with them over coffee and/or breakfast to discuss the new business and the possibility of them joining Ottomotto. Of the four, only one individual joined Ottomotto. Ron obtained most of the individuals' contact information from Levandowski.[12]

Following his departure from Google, Ron stated that a number of Google employees reached out to him about joining Ottomotto. Some of these individuals had already resigned from Google, but others were still employed. He specifically recalled telling most of these individuals, including his employees, that he could not solicit Google employees and tried to connect these individuals with individuals at Ottomotto who had not worked at Google. However, he did meet with at least three employees and discussed the new business and their potential participation. Each of these individuals ultimately received an offer and joined Ottomotto.

According to Ron, as of the date of his interview on March 22, 2016, Ottomotto had approximately 28 employees, 13 of whom previously worked at Google (7 of the 13 moved directly from Google to Ottomotto). Ron also emphasized that Ottomotto has put in place strict staffing protocols with regard to Google employees and that, if said employees contacted them, they have a protocol in place where the Google employee only meets with individuals who have not worked at Google to learn more about the company. Ron stated that an offer is made verbally, followed by a written offer, only after they leave Google. Ottomotto's employment letter also includes strong language about not bringing any prior employer data to Ottomotto. New employees also are issued new laptops and are directed not to use personal devices.

### Met with Uber Executives While Employed at Google

Ron stated that, beginning in October/November 2015 and while working at Google, he accompanied Levandowski to certain meetings with various Uber executives, including Jeff Holden, Brian McClendon, Cameron Poetzscher, Nina Qi and Travis Kalanick. Ron said that Uber was initially interested in a commercial agreement to license some technology and products (after-market car kits), but that as the conversation evolved Uber became interested in acquiring the new company which is focused on robotic trucks and after-market self-driving car kits. Ron did indicate that if they close the transaction with Uber, "They may be helping Uber compete with Google in some way," since Uber is interested in Google's Chauffeur Project.

### Destruction of Levandowski's Personal Drobo Disks with Confidential Google Information

Ron stated that approximately one week before his interview, Ron and Levandowski met with Uber executives Kalanick, Poetzscher, and Qi and discussed Levandowski's possession of proprietary Google

---

[12] The Google employees Ron recalls meeting with, or attending these meetings, are identified in his unredacted interview memorandum, which was produced to his counsel.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

information. Per Ron, who claimed that his recollection of the meeting was poor, Kalanick said he did not want any of that data at Uber and he did not want to know what happened to the disks so long as they did not land at Uber. Based on that discussion, Ron said Levandowski destroyed the disks after the meeting. He also stated that thereafter he received a telephone call from Qi inquiring about the disks and advising Ron and Levandowski not to destroy them. Ron called Levandowski, learned that the disks had already been destroyed, and relayed this information to Qi. Ron stated that he could not recall any further details and seemed uncomfortable answering questions about this meeting.

## 2.   FORENSIC EXAMINATION OF DEVICES

### Retained, Accessed, or Transferred Google Information or Data

Stroz Friedberg's forensic examination of Ron's devices indicates that he accessed a Google Drive account from his iPhone 6S and his MacBook Laptop. However, we could not confirm if it related to his personal or work account.[13] In addition, he accessed, along with Levandowski and other Ottomotto employees, an Ottomotto team site on the Slack collaboration platform (www.slack.com). Our review indicates that Ron first accessed this site on November 17, 2015. Significantly, Stroz identified the Ottomotto team site on Slack being accessed via a web browser on Ron's MacBook Air laptop on January 1, 2016, during which time a file or folder labeled "Chauffeur_next_steps_-_we_need_team_Mac" was accessed. However, there is no evidence of potentially relevant files being transferred to Ron's devices.

Also, contrary to Ron's interview, our forensic examination also revealed that Ron used his MacBook Laptop to access Google's corporate intranet (MOMA) login screen between January 8, 2016 and March 12, 2016, well after he left Google, and that he stored potentially relevant data on several of his devices including his iPhone 6S, MacBook Laptop, MacBook Air Laptop, iPhone 5S, and iPad. Additional information regarding what he stored is included in the timeline and document review sections below.

In addition, Stroz Friedberg's analysis identified several active communications regarding Google employees, which were processed into Relativity for further review. Stroz Friedberg also observed potentially self-sent messages from lior@280systems.com regarding offer letters for Ottomotto employees, and scans of agreements for Ron, Juelsgaard, Claire Delaunay, Oleg Khainovski, Matt Grigsby, Asheem Linaval, Maxime Levandowski and Rhian Morgan, among other things.

### Deleted Relevant Files

Our analysis of Ron's MacBook Laptop and iMac indicates that these devices were used to conduct internet research regarding how to delete and destroy digital data in January 2016. His MacBook Laptop, iPad, and iCloud Backup also contain deleted communications with Levandowski regarding wiping and deleting data, among other things.

In addition, Stroz identified several items that were deleted between January 6, 2016 and January 22, 2016, including a Google-related document entitled "Chauffeur win plan.docx," which was deleted on March 22, 2016, shortly before Ron's interview with Stroz Friedberg. We do not possess this file, but an artifact on

---

[13] Stroz also found evidence that the Google Drive application was installed on Ron's iPhone 5S, but no additional information regarding data transfer was found.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000019

PRIVILEGED AND CONFIDENTIAL

the computer revealed Ron's access to it. Also, an iMessage from Levandowski saying, "I got Soren closed and Dan (both ex chauffeur)," was deleted on January 28, 2016. See Exhibit 78.

Stroz identified multiple internet searches conducted in January 2016 on Ron's iMac regarding data destruction, such as, "how to secretly delete files mac," "secure delete of trash on mac" and "how to permanently delete google drive files from my computer." Stroz Friedberg also recovered one deleted message between Ron and Levandowski on March 9, 2016 in which Levandowski instructed Ron to delete all messages on his PC and phone – "Make sure you delete all the messages tonight on both your PC and iPhone." See Exhibit 79.

There were also deleted chat messages on Ron's iPhone 5S that relate to Google, including discussions about "not incentivizing chauffeur employees more." Additional communications are listed in the timeline and document review sections below.

A more detailed forensic analysis of Ron's devices and accounts is included in Stroz Friedberg's report as Exhibit 18.

### Timeline of Relevant Activity on Ron's Devices

Below is a timeline of relevant events identified through analysis of Ron's devices:

- 1/1/2016 – Internet access to a Slack team site file or folder titled "Chauffer_next_steps_-_we_need_team_Mac" (ES015);
- 1/8/2016 – Internet access to https://login.corp.google.com (ES014);
- 1/12/2016 – Internet search "how to permanently delete google drive files from my computer" (ES058);
- 1/12/2016 – Internet search on "how to securely delete files mac" (ES058);
- 1/12/2016 – Internet access to "Moma Now" (ES014);
- 1/13/2016 – Internet search on "how to free up space on mac taken by secure erase" (ES058);
- 1/13/2016 – Ron leaves Google;
- 1/19/2016 – Internet search on "can a MacBook be recovered after formatting the OS" (ES058);
- 1/28/2016 – Chat message from Levandowski stating, "I got Soren closed and Dan (both ex chauffeur)" (deleted) (ES017);
- 1/31/2016 – Internet search on "secure delete of trash on mac" (ES058);
- 2/2/2016 – Internet search regarding "how to delete" certain information (ES014);
- 2/2/2016 – Chat message with Levandowski stating, "No problem, please re-wipe everything and start fresh vs just deleting my account if possible." (ES014);
- 3/9/2016 – Chat message from Levandowski stating, "Make sure you delete all the messages tonight on both your PC and iPhone" (ES024);
- 3/12/2016 – Internet access to "up.corp.google.com - MOMA Single Sign On" (ES014); and
- 3/22/2016 – A file labelled "Chauffer win plan.docx" is deleted, shortly before Ron's interview with Stroz Friedberg (ES015).

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000020

PRIVILEGED AND CONFIDENTIAL

As is true with respect to Levandowski, Ron's deletions of Google data from his devices both before and after his departure from Google can be viewed as good-faith attempts to purge confidential data in accordance with his obligations to Google.  However, his deletion of Google data on the verge of his Stroz Friedberg interview displays poor judgment given the protocol in place. Although it is generally true that Ron retained very little Google confidential information after his departure from Google. In addition, as noted above, there was an effort by Ron, Levandowski, and their Ottomotto colleagues to delete text messages in real time.

> 3.   DOCUMENTS IDENTIFIED DURING STROZ FRIEDBERG'S REVIEW

Below are some examples of potentially relevant documents we identified that originated from Ron's devices.  They consist of Google confidential documents, e-mail and chat exchanges and notes pertaining to the startup.

### *Google Data or Information*

* Google confidential material mostly related to Android wear including an Andriod wear test plan (Exhibit 80) and presentation regarding Google consumer surveys for smartwatches from April 2014 (Exhibit 81).

### *Communications with or about Google Employees Regarding Recruiting Efforts*

* 12/24/2015 iMessage from Ron stating, "Waze - yes, the article is not well written but the government point stands. My friend is running this program for waze and will be poach able at some point as our bd lead, she's good. Need your help thinking how to position us as complimentary to waze and not competitor (since we will lead the effort to make them irrelevant after all) so we can get Noam and that team helping"  (Exhibit 82);

* 1/8/2016 SMS message from Ron to Claire Delaunay stating, "Hi Claire, it's Lior Ron....Anthony tells me all those great things about you, I thought I'll reach out and say hi :) Would love to meet in person over the weekend/Monday" (Exhibit 83);

* 1/8/2016 SMS message from Ron to Laila Mathos stating, "Hi Laila, it's Lior Ron....Anthony tells me all those great things about you, I thought I'll reach out to say hi :)... would love to meet in person over the weekend/Monday if you're around" (Exhibit 84);

* 1/21/2016 iMessage from Ron to Jur stating, "Hi Jur! Great connecting last night, looking forward to get going! I'll send the two of you the NDA later today, and we can aim to meet in person later tonight in SF, maybe around 6:30/6:45pm or so if that works, already engaged the immigration lawyer for sachin we'll get that set up soon" (Exhibit 85);

* 1/21/2016 iMessage from Rhian Morgan to Ron stating, "Hey is Will McCann someone we're offering to? He just called me looking for an offer letter but I haven't seen his name before. I told him I needed to follow up. Just trying to be careful in case info is leaking- probably paranoid I know!" (Exhibit 86);

* 1/21/2016 iMessage from Ron to Matt Sweeney stating, "Hey Matt! Great connecting last night, I'm going to send you the NDA later today if you can sign and send a photo/email back to me that will be great, we can aim to meet later tonight in SF, how about 5:30pm." Matt replies, "Sure I'll sign and scan it back to you. I work in Berkeley. I could meet up at 6ish is that cool? Where you thinking to meet?" (Exhibit 87);

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000021

PRIVILEGED AND CONFIDENTIAL

- 1/23/2016 iMessage from Ron to an unknown recipient stating, "After that I'm dry on people until you intro more non Google folks, and we're ready to send any Google offers when you tell us" (Exhibit 88);

- 1/27/2016 iMessage from Rhian Morgan to Ron stating, "[I] think i made an error- i didn't give Pierre a letter for Colin because I know you've been speaking with him, and thought he was non-Google" (Exhibit 89);

- 1/28/2016 iMessage from Rhian Morgan to Ron stating, "[A]lso gonna bring this up w/ A when we speak in a bit but Ben Charrow reached out to me directly, I know he's a G guy, is it okay for me to respond? we aren't soliciting, he contacted me directly and the e-mail proves tha [sic]" (Exhibit 90);

- 1/28/2016 iMessage from Levandowski to Ron stating, "Pierre is not coming 100% final [...] I got Soren closed and Dan (both ex-chauffeur) [...] Should get one more over the weekend" (Exhibit 91);

- 1/30/2016 iMessage from Laila Mathos to Ron stating, "Hi Lior, this is Laila. I sent a note to Anthony earlier this week but also wanted to write to you. It was a pleasure meeting you. I am sorry to not be a part of 280 with you and Anthony. I am sure it will be a wild success. I had to make a very difficult decision, but it now feels right with my family under our current circumstances. Have a great new venture and I hope we will stay in touch" (Exhibit 92);

- 1/31/2016 iMessage from Ron to Laila Mathos stating, "Thanks for sending the note Laila! Enjoyed getting to know you, and I fully support whatever decision is best for you , I'm not allowed to reach out or solicit googlers and intend to keep that, but hope we'll stay in touch socially and in the future, take care!" (Exhibit 93);

- 2/3/2016 iMessage from Ron to Levandowski stating, "Don has everything he needs ball is in his court to sign wanted to take one final look with lawyer time to go full court press now" (Exhibit 94);

- 2/3/2016 iMessage from Levandowski to Ron stating, "Don will pressure them to accept or leave [...] Once they join the power is in our hands" (Exhibit 95);

- 2/4/2016 iMessage from Levandowski to Ron stating, "If Claire has left Google let's get her to come by, but she must be no longer employed not just having resigned" (Exhibit 96);

- 2/4/2016 iMessage from Levandowski to Ron stating, "Missing were Colin, Matt Williams, Dan Gruver, Saturn, and three other eng likely to join from outside, plus 3-5 aspen missing guys/gals" (Exhibit 97);

- 2/5/2016 iMessage from Ron to Levandowski stating, "Colin told me about the driver situation, can't believe aspen done that, let's be careful about this [...] Although if well known on the team has some declarative value [...] as long as there is no other legal issue there." Levandowski replies, "If they are out of Google we are good" (Exhibit 98);

- 2/8/2016 iMessage from Rhian Morgan to Ron stating, "We went through the G self driving job listings and he pulled about 25 specs for me to condense as a lot of them overlap" Ron replies, "Ok cool, if you can send me the specs later tonight that Will be great" (Exhibit 99);

- 2/11/2016 SMS message from Daniel Gruver to Ron stating, "Hi Lior - this is Daniel - we met last night. Can I get email set up? If possible daniel@280. My personal email is ███████@gmail.com" (Exhibit 100);

- 2/14/2016 iMessage from Ron to Levandowski stating, "If you feel the tone of TK/Emil this morning was super aggressive we can strip out the fact we can't offer direct employment to people while still at aspen" (Exhibit 101);

- 2/21/2016 iMessage from Ron to Rhian Morgan stating, "[D]o we know if at Google everyone is full time or they also have contractors? the cost base is substantially different for what can be the same

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

service." Rhian Morgan replies, "They were a mix of contractors and full time at Google" (Exhibit 102);

- 2/22/2016 iMessage from Rhian Morgan to Ron stating, "I'm going to get the wet signatures for the 83b from Daniel Colin and Jur today. We need to figure out how quickly we need wet signatures from Don and Drew though" (Exhibit 103);

- 2/23/2016 iMessage from Ron to Burnette stating, "[W]e are 22 people as of today [...] another 4 joining by end of week [...] software room is stacked [...] claire, you, Jur, Yevgeny who starts tomorrow, David is week-two away [...] a bunch of folks in the pipeline" (Exhibit 104);

- 2/29/2016 iMessage from Nina Qi to Ron stating, "Hi Lior - are you free tomorrow (3/1) for 30 minutes to have a call with our employment lawyers to discuss your process with G employees? We are free from 2 to 5 pm" (Exhibit 105);

- 3/3/2016 iMessage from Sebern to Ron stating, "Woman I know is considering to go to Zoox from Google.  She's a driver.  Currently at Google.  Zoom has offered her $36/hr and stock.  Can we beat that?"  Ron replies, "Sorry, Can't comment on Google employees or help solicit them, neither do you, thanks!"  (Exhibit 106);

- 3/5/2016 iMessage from Levandowski to Ron stating, "So we need to make sure peeps sign two papers: 1) stating they understand the hiring process for google employees, 2) certifying that they complied with the paper and not bringing ip etc. (I assume we have this one already, but want to review it)" (Exhibit 107); and

3/11/2016 iMessage from Rhian Morgan to Ron stating, "[D]o you have dan ratner[']s cell phone number?  need to close the loop with him on dependents for health care" (Exhibit 108).

### Ottomotto Planning

- 9/21/2015 e-mail from Ron to Scott Offer at Motorola ==looking for IP lawyer recommendations that had experience dealing with Google and can be fully trusted to keep matters confidential== (Exhibit 109);

- 10/24/2015-11/16/2015 e-mail exchange between Eyal Shinar, the CEO of Fundbox, and Ron ==initiating a brunch invitation and including a discussion of funding strategy== (Exhibit 110);

- 12/24/2015 iMessage from Ron stating, =="We don't want to be hostile to google at all.  We want to help them.  We just want to be the android of cars and uber of trucking..."== (Exhibit 111);

- 2/29/2016 – 3/2/2016 internal Ottomotto e-mails discussing recruitment and emphasizing cannot solicit Google employees (Exhibit 112);

- 3/10/2016 - 3/12/2016 e-mail exchange forwarded to and introducing Ron to Innoviz commenting that "both sides are in stealth" (Exhibit 113); and

- Notes and lists regarding startup including note discussing four key risk areas for deal including, suit brought by Google (Exhibit 114), list of former "Moto Employees" (Exhibit 115) and August 2015 to October 2015 e-mail string between Ron and Jim Palmer of Martinez Palmer containing a list of names of possible candidates, including discussion of one individual that might be getting an offer from Google (Exhibit 116).

### Slack and Deletion Discussions

- 11/9/2015 iMessage from Ron to an unknown recipient stating, =="There's tons of stuff I don't send you for security. Choose from the following options: regular gmail. New joint gmail account well both have login to, Dropbox folder, need to start getting things organized"== (Exhibit 117);

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

- 11/10/2015 iMessage between Levandowski and Ron, where Levandowski discusses a "Dropbox folder," and Ron replies, "Cool...Let's try slack, secure and I know the CEO :) just invited you let me know, enable notifications on your mobile/desktop and we can communicate there" Levandowski replies, "OK sounds good" (Exhibit 118);

- 11/16/2015 iMessage to Ron from Levandowski stating, "Please Delete after use." Ron replies, "Thanks will do...Deleted, good call" (Exhibit 119);

- 12/18/2015 iMessage from Levandowski to Ron stating, "Let's do Slack and iMessage only.-)" Ron replies, "Ok" (Exhibit 120);

- 12/18/2015 iMessage from Ron to Levandowski stating, "My bad was thinking of copy pasting cutter e-mail to slack but passed, will not happen again." Levandowski replies, "No worries let's just keep it clean" (Exhibit 121);

- 12/29/2015 iMessage from an unknown person to Ron stating, "Uploaded offer letters to slack..." (Exhibit 122); and

- 3/9/2016 iMessage from Levandowski to Ron stating, "Make sure you delete all the messages tonight on both your PC and iPhone." (Exhibit 79).

### Pictures and Videos

Ron's media contained relevant pictures and videos primarily relating to autonomous vehicles, lasers, graphs, and whiteboard snapshots of notes and diagrams, including:

- Pictures of components/connections and parts of autonomous vehicles (Exhibit 123);

- Confidential material related to Long Range Lasers (Exhibit 124);

- Pictures and videos of digital interpretation of a car driving (Exhibit 125);

- Graphs of driving statistics (Exhibit 126); and

- Whiteboard pictures (Exhibit 127).

### Source Code Files

Approximately 62 source code files came from Ron's devices or accounts. Given Stroz Friedberg's lack of context, we could not determine whether these files were related to Google self-driving cars or otherwise constituted Google confidential information.

C.   DON BURNETTE

1.   INTERVIEW

On March 23, 2016, Stroz Friedberg interviewed Don Burnette. Burnette worked as a software engineer at Google for the Chauffeur Project from August 2010 to February 9, 2016. He started working for Ottomotto on February 29, 2016. During his interview, Burnette informed Stroz Friedberg that he: (a) did not possess any Google information or data; (b) never accessed Google's network with any of his personal devices; (c) never downloaded or transferred any Google data to his personal devices or accounts; and (d) prior to leaving Google, spoke with Ron and Levandowski about the start-up company. Exhibit 7 is Stroz Friedberg's memorandum of Burnette's interview.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

### Did Not Retain, Access or Transfer Google Information or Data

Burnette denied retaining any Google-related information and stated that he did not access, copy, download, or transfer any Google confidential or proprietary information to any of his personal devices during his employment or upon leaving Google. He stressed that he only used his work devices to access the Google network and Google documents.

### Met with Google Employees about the Start-Up Company

In December 2015, while still employed at Google, Burnette spoke with Levandowski concerning the automated vehicle space and attended a group meeting at Levandowski's house where Ron gave a presentation on trucking automation. Levandowski spoke to the group about wanting to start a company in the trucking space. Burnette stated that he had a side conversation with Ron and Levandowski at this meeting about the structure of the proposed company and what he could bring to the table. He recalled that at least seven Google employees were also in attendance, along with other non-Google employees. The meeting lasted one to two hours.

Burnette stated that about one week after the above-referenced meeting, he spoke with approximately three members of the laser team about the start-up and the risks associated with it. After that meeting, which was in plain view, Burnette was approached by his manager and asked if he was leaving. Burnette thereafter spoke with the head of the Chauffeur Project, who advised Burnette that Google would own all of the autonomous vehicle space and would "crush" Burnette if he left.

On February 9, 2016, Burnette contacted Ron to let him know he left Google and was interested in joining Ron and Levandowski. The following day, Burnette met with Ron and spoke with him about joining Ottomotto and certain deal points. He received an offer from Ottomotto on February 11, 2016 and accepted the position. His main role was to write code regarding the dynamics of how automated trucks work. He emphasized that he would not be relying on any information from Google since Ottomotto is in a different domain with a different approach. He said Google is focused on controlling cars on streets and Ottomotto is interested in controlling trucks on the freeways.

Burnette has referred several non-Google employees to Ottomotto. Also, he acknowledged that he has interviewed several people, but no one from Google. If the applicant was from Google, he would not interview him or her. He also stated that he believed there was a process in place at Ottomotto to prevent new employees from bringing information from their prior employers to Ottomotto.

2.   FORENSIC EXAMINATION OF DEVICES

### Retained, Accessed or Transferred Google Information or Data

Stroz Friedberg's forensic examination of Burnette's devices confirms Burnette's representations that he did not store or transfer any Google data or information to his personal devices. Stroz Friedberg did find evidence that indicates that Burnette used his MacBook laptop to access Google's corporate intranet (MOMA) site login page both before (January 9, 2016) and after (March 21, 2016) he left Google. There is no forensic detail available on what Burnette viewed on MOMA in March 2016. He accessed Google Drive on all of his devices as well, but we were not able to determine if this access was personal or work-related.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000025

PRIVILEGED AND CONFIDENTIAL

In addition, Stroz observed an internet search on Burnette's MacBook Pro for "how to factory reset macbook pro" on March 4, 2016, which is the same day the operating system was installed, upgraded, or restored. His MacBook Pro was backing up to a Time Machine, which Stroz Friedberg did not receive, image, or analyze. Burnette also provided Stroz Friedberg with a 4 terabyte Synology device which we imaged but did not process for review per the parties' instructions. Stroz Friedberg conducted a preliminary review of this device and identified a number of personal GoPro and cinema movie videos. Further analysis would be necessary to determine if this device contains any relevant files.

### Deleted Potentially Relevant Files

Burnette's iPhone 6S Plus contains a deleted text message with an unknown party dated February 4, 2016 regarding "updates on Google front."

A more detailed forensic analysis of Burnette's devices and accounts is included in Stroz Friedberg's report as Exhibit 19.

### Timeline of Relevant Activity on Burnette's Devices

Below is a timeline of relevant events identified through analysis of Burnette's devices:

- 1/9/2016 – Access to MOMA (ES030);
- 2/4/2016 – Text message stating, "Let's do that, just finished chatting with Yevgeni. Also have doe updates on Google front" (Deleted) (ES037);
- 2/8/2016 – Access to MOMA (ES030);
- 2/9/2016 – Burnette leaves Google;
- 2/10/2016 – OS installed on MacBook Pro (ES030);
- 3/4/2016 – OS installed, upgraded, or restored on MacBook Pro (ES030);
- 3/4/2016 – Internet search performed on "how to factory reset macbook pro" (ES030);
- 3/15/2016 – Access to MOMA (ES030); and
- 3/21/2016 – Access to MOMA (ES030).

The installation of a new operating system on the MacBook Pro would have had the effect of deleting all of the current documents and e-mails on that machine. There is nothing to indicate that the installation of a new operating system on the MacBook Pro in February 2016 and possibly March 2016 is anything other than an action consistent with Burnette's compliance with his duty not to bring confidential material out of Google.

### 3.   DOCUMENTS IDENTIFIED DURING STROZ FRIEDBERG'S REVIEW

Don Burnette's potentially relevant documents consist largely of what appear to be text messages and Gchat messages of a personal nature and do not specifically relate to the solicitation of Google employees or the use of Google intellectual property, except for one or two text messages noted below:

- Chats with occasional mentions of Google, most notably discussing piggybacking off Google's legislative work on April 6, 2016 (Exhibit 128);

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL                                                                                  STROZ_0000026

PRIVILEGED AND CONFIDENTIAL

- 2/4/2016 message from Burnette to Levandowski stating, "Let's do that, just finished chatting with Yevgeni. Also have doe updates on Google front" (Exhibit 129);

- 2/11/2016 iMessage from Burnette to Jur Van Den Berg stating, "Hey Jur, great news, Claire has decided to join and has already started! [...] I had a great conversation with David (the guy she worked with at Google and wanted to bring) about planning and control ideas and I think I got him hooked, he should also be joining soon." "It's all coming together" (Exhibit 130);

- 2/29/2016 iMessage from Burnette to Levandowski stating, "FYI, I have a few really awesome sw candidates in mind but nobody wants to work in SF. I just hope that we have good way to reach out to 'all of the talent' that you spoke of ☺" Levandowski responds, "Yeah, we are having a South Bay office too" (Exhibit 131);

- 3/3/2016 iMessage from Burnette to Levandowski stating, "Sasha left Google this morning. I've already reached out to him" [...] "He wants to come by today to chat" and "did you convince Sasha that our #1 priority is actually shipping something?" Levandowski replies, "I think so." Burnette replies, "good." Levandowski then states, "Great. Did you and him talk?" Burnette replies, "yes" and "tried to also convince him." Levandowski replies, "Hehe, I think he's in." (Exhibit 132); and

- 4/6/2016 draft e-mail indicating that Burnette was likely leaving to join a startup with Levandowski. (Exhibit 133).

### Pictures and Videos

Stroz Friedberg identified images from Burnette's computer that appear to be snippets of source code (Exhibit 134).

### Source Code Files

Approximately 1,603 source code files came from Burnette's devices or accounts. Given Stroz Friedberg's lack of context, we could not determine whether these files were related to Google self-driving cars or otherwise constituted Google confidential information.

### D.   SOREN JUELSGAARD

#### 1.   INTERVIEW

On March 24, 2016, Stroz Friedberg interviewed Soren Juelsgaard. During his interview, Juelsgaard informed Stroz Friedberg that he worked at Google from in or about October 2010 to approximately May 2011 as a hardware manager for the Chauffeur Project. Juelsgaard, however, appears to have been issued an offer letter dated August 1, 2011 (contingent upon the completion of the acquisition of 510 Systems) and a performance improvement letter on March 1, 2012, which indicates that his employment likely began in or about October 2011, and ended in May 2012.  After leaving Google, Juelsgaard worked at Nautilus, a construction company, on a robotic parking system.

During his interview, Juelsgaard stated that he: (a) did not possess any Google information or data; (b) never accessed Google's network with any of his personal devices; (c) never transferred any Google data to his personal devices or accounts; and (d) did not solicit any Google employees to work at Ottomotto, even though his non-solicitation agreement expired years ago. Exhibit 8 is Stroz Friedberg's memorandum of Juelsgaard's interview.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

### Did Not Retain, Access or Transfer Google Information or Data

Juelsgaard stated that he only accessed Google's network through his work laptop. If he connected to Google's network through VPN, he would do it through his work laptop as well. He said that he did not use any personal devices to access any work-related communications and never transferred or stored any Google data on any flash drives, thumb drives, external drives, personal devices or online repositories.

### Met with Google Employees about the Start-Up Company

Juelsgaard stated that Levandowski contacted him on January 29, 2016, told him he was going to launch a start-up, and asked Juelsgaard if he wanted to be a part of it. Later that day they met for lunch and Levandowski told Juelsgaard he wanted to bring him on board as the director of engineering. Juelsgaard was concerned that another Google employee who he did not get along with might be joining the company, but Levandowski reassured him he was not. Juelsgaard began working at Ottomotto on February 3, 2016. His duties involve managing all hardware related to self-driving trucks. He said his work at Ottomotto is different than the work at Google in that he is only focused on trucking and big rigs, as opposed to cars.

Juelsgaard stated that two current Google employees contacted Juelsgaard while he was working at Ottomotto. They met for lunch, and Juelsgaard disclosed that he was working on a project with Levandowski. They did not talk in detail about Ottomotto or its business. In addition, in March 2016 he went to a truck rally in Oakland with approximately three to four Google employees. They spoke a little about Levandowski, but the rally was too loud to have a substantive conversation.

Juelsgaard stated that Ron told him not to solicit any Google employees, even though Juelsgaard was no longer bound by a non-solicitation agreement. Ron also told him that he could not discuss what they were doing with people outside of the start-up, and that if a current Google employee asked him about the company he could tell him/her that he is working with Levandowski at a start-up involving trucks. Juelsgaard stated that he does not participate in the interview process for any applicant from Google.

## 2.   FORENSIC EXAMINATION OF DEVICES

### Retained, Accessed or Transferred Google Information or Data

Juelsgaard's devices and accounts do not appear to contain any Google-specific information or data of any consequence, with two possible caveats: (a) in Juelsgaard's Gmail account, sjuel@gmail.com, there is significant evidence of source code and scripts relating to lasers; and (b) on his devices we found 174,311 source code files. However, Stroz Friedberg cannot ascertain whether these items are Google information or data. For example, during our forensic review we identified potentially relevant self-sent messages containing: python scripts named laserbar.py and rtmp.py; laser backup containing C++ Code named LMS1xx_node.cpp and LMS1xx.cpp; and an attachment named dotemacs.dat. Given the large number of source code files in Juelsgaard's possession, he and/or a third party should clarify whether these materials constitute Google confidential information, or they could be remediated in bulk without a file-by-file review. It is important to note, that Juelsgaard only worked at Google for approximately seven months and more recently worked for Nautilus on robotic parking systems. Thus, it is possible that the above-referenced code pertains to his work at Nautilus. Without further information, we cannot confirm or disprove this.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000028

PRIVILEGED AND CONFIDENTIAL

Juelsgaard's MacBook Pro-1 appears to be used mostly for personal use. It contains two virtual machines which were used between 2012 and 2014 (after his employment with Google) for programming and testing relating to robotics and lasers. Additionally, there is a profile name "510s," which was created on January 8, 2010 and last used on May 8, 2012. This could relate to his former company, 510 Systems, which Google acquired in the fall of 2011.

Most of Juelsgaard's devices do not reveal any mass wipings or deletions. However, his USB contained approximately 1,500 deleted files, some of which are potentially relevant pictures and diagrams. Again, Stroz Friedberg does not have the context to rule these in or out as Google confidential information. As with the source code files, further review could be conducted by Juelsgaard or a third party with sufficient context, or these items could be remediated in bulk.

A more detailed forensic analysis of Juelsgaard's devices and accounts is included in Stroz Friedberg's report as Exhibit 20.

### 3. DOCUMENTS IDENTIFIED DURING STROZ FRIEDBERG'S REVIEW

Other relevant documents from Juelsgaard include the following, although none seem of particular consequence. Aside from the Calendar entries in December 2016, Juelsgaard had no written communication with the Diligenced Employees until early February 2016, after he joined Ottomotto. He had exchanges with Levandowski, Ron, and Sebern, but nothing particularly relevant.

- 10/11/2010 e-mail with Alan Altmann describing how Juelsgaard's company is not funded by Google (Exhibit 135);

- 1/16/2012 e-mail chain regarding repair/service on COWls IP-2s HD (Exhibit 136);

- 1/24/2012 - 1/25/2012 Extended e-mail chain and report of COWl mobile mapping status as of January 30, 2012, including references to Topcon and Velodyne scanners (Exhibit 137);

- 9/11/2012 e-mail with George Lagui regarding the use of SICK LMS100 LiDAR to scan for cars (Exhibit 138);

- 8/26/2012 and 8/29/2012 e-mails regarding Safety System Logic that specifically references "Little Bear lasers" (Exhibit 139);

- 2012 Criterion task list forwarded to Juelsgaard and Levandowski (Exhibit 140);

- 12/2/2015 Calendar entry titled "Continue our conversation regarding Project" with detail "I'll call U" with Frantz Lohier @QCA.Qualcomm.com (Exhibit 141);

- 12/4/2015 Calendar entry titled "continue our venture planning," "will call you phone" with Frantz Lohier (see Exhibit 142);

- 1/28/2016 SMS message from Juelsgaard to his girlfriend, Lotti Hermansson, stating, "[S]igned NDA – talking stock options. Office in SF" (Exhibit 143);

- 3/31/2016 e-mail exchange with Nevra Kadioglu enticing her to work for Ottomotto (Exhibit 144);

- Bryon Majusiak's resume (Google employee on Chauffer team) (Exhibit 145); and

- Aaron Wilson's resume (Google employee on Chauffer team) (Exhibit 146).

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

*Pictures and Videos*

Stroz Friedberg's second level review of Juelsgaard's media produced 164 relevant pictures, including:

- Diagrams and flowcharts (Exhibit 147);
- Screenshots of a computer monitor (Exhibit 148); and
- Pictures of whiteboards and handwritten notes (Exhibit 149).

*Source Code Files*

174,311 source code files came from Juelsgaard's devices and accounts. Given Stroz Friedberg's lack of context, we could not determine whether these files were related to Google self-driving cars or otherwise constituted Google confidential information. Juelsgaard and/or a third party with better context could parse through these files, or, as mentioned herein, they could be remediated in bulk.

E.   COLIN SEBERN

1.   INTERVIEW

On March 24, 2016, Stroz Friedberg interviewed Colin Sebern. Sebern began working at Google in October 2012 and resigned on October 22, 2015.[14] Sebern was a program manager at Google, responsible for converting new cars into self-driving cars. He called himself a "glorified mechanic." He began working for Ottomotto in early 2016. During his interview, he stated that he: (a) did not possess any Google information or data; (b) never downloaded or transferred any Google data to his personal devices or accounts; and (c) did not solicit any Google employees to work at Ottomotto. Exhibit 9 is Stroz Friedberg's memorandum of Sebern's interview.

*Did Not Retain, Access or Transfer Google Information or Data*

Sebern stated that Google allowed its employee to access its Google Drive through their personal devices and that he did access it through his personal Apple iPhone. He emphasized, however, that he only accessed Google work documents on his Google work laptop and that he never e-mailed any Google information to his personal e-mail accounts. Sebern also confirmed that he only stored and backed-up his Google work documents on the corporate Google Drive and that he never stored any Google data or information on any flash drives, thumb drives, external drives, personal devices, or online repositories.

Sebern stated that, prior to his departure, he did not forward or transfer any Google data or information to himself or export any Google data. Sebern stated that he checked his personal e-mail and devices for Google information or data and said that they did not contain any code, user data, employee data, or any other kind of information or data from Google.

---

[14] Sebern was originally hired by Google as a contract employee through Adecco and was hired as a full-time Google employee on September 20, 2014.

© 2016 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

STROZ_0000030

PRIVILEGED AND CONFIDENTIAL

### Met with Google Employees about the Start-Up Company

Sebern stated that before leaving Google, he met with several Google employees, including Levandowski, but he did not discuss the start-up at that time.

On October 22, 2015, within a week of leaving Google, Levandowski contacted Sebern to see if Sebern wanted to join him as a consultant. The next day Sebern went to Ron's house and signed a consulting agreement and a non-disclosure agreement ("NDA"). After those documents were signed, Ron told Sebern that he and Levandowski were working on self-driving trucks.

For the next month, Sebern stated that he took photographs of mirrors on cars for Ron and Levandowski. He rented several vehicles to evaluate their mirror position and where the sensors and lasers on a self-driving vehicle should be mounted. In or about late December 2015 or early January 2016, Ron told Sebern they had started a new company involving self-driving trucks and asked him to join. Levandowski also encouraged him to join the start-up. In early 2016, Sebern was hired by Ottomotto as an engineer.

Sebern stated that one former and one current Google contract employee contacted Sebern to learn more about the new company, and Sebern brought them to Levandowski's house to see the operations. Neither of these individuals ended up joining Ottomotto.

Following these meetings, Sebern stressed that if anyone from Google contacted him he would not speak with them about Ottomotto. Instead, he would "hand them off" to human resources. He reiterated that Ottomotto has a separate interview process for Google employees and that he has never seen Levandowski or Ron speaking with an applicant from Google.

### 2.  FORENSIC EXAMINATION OF DEVICES

Sebern's Apple iPhone was encrypted and thus Stroz Friedberg could not process or analyze this device. During his interview, Sebern provided Stroz Friedberg with a list of possible passwords, but none of them worked. Since Sebern's iPhone was encrypted, the only device that Stroz Friedberg could analyze was his MacBook Pro.  There was virtually no data relating to Google or the subjects of our inquiry on Sebern's MacBook Pro with one possible caveat: Stroz Friedberg found 36 "TempZip" files that appear to contain source code. Stroz Friedberg does not have the context to assess whether these source code are Google confidential information.

It appears that the MacBook Pro was used to access an e-mail message on March 1, 2016 sent to colin@Ottomotto.com with the subject line "Junk King coming Tuesday 11am." See Exhibit 150. Interestingly, 57 gigabytes of additional free space became available on Sebern's MacBook Pro between March 23, 2016 and March 24, 2016, with approximately 900 files and folders being deleted on March 24, 2016, just prior to his interview with Stroz Friedberg.  We reviewed the deleted files by name and did not locate any that appeared to be Google-related. We also identified four external devices connected to his laptop between March 17 and March 24, 2016, but Sebern did not provide those to us for review. We did not find any evidence of relevant data copy or transfer.

A more detailed forensic analysis of Sebern's devices and accounts is included in Stroz Friedberg's report as Exhibit 21.

© 2016 Stroz Friedberg. All rights reserved.

STROZ_0000031

PRIVILEGED AND CONFIDENTIAL

### 3. DOCUMENTS IDENTIFIED DURING STROZ FRIEDBERG'S REVIEW

Sebern's relevant documents included the following, which do not appear to be of any great consequence:

- 2012 estimate to Google for Velodyne mounts (Exhibit 151);
- 1/16/2016 offer letter from 280 Systems (Exhibit 152);
- 1/21/2016 e-mail from Ron with pre-employment NDA (Exhibit 153);
- 1/25/2016 – 1/26/2016 e-mail to Ron asking to discuss offer letter, outlining work he did on the project over the weekend at Levandowski's request, and a discussion to set up time to talk (Exhibit 154);
- 2/3/2016 e-mail to Levandowski regarding driver's list (those no longer employed and those who might leave soon) (Exhibit 155); and
- 4/1/2016 e-mail from Sebern with no entry in "To" field, but the body of which states, "They have grabbed a handful of people from Chauffeur so far" (Exhibit 156).

Many of Sebern's files were ordinary, business-related files that did not contain proprietary information. Many files that were administrative in nature, for example Slack account change of e-mail address forms, FedEx tracking links, invitations to trade events, PayPal payment confirmation, truck brochures, documents relating to 280 Systems, Inc., and NDAs. Sebern also had a few files related to his employment at Google, including his offer letter and an employment policy document. There also were many e-mails related to Sebern's hobby of classic auto restoration and racing. These documents triggered many false positive hits on keywords.

#### Pictures and Videos

Sebern's potentially relevant pictures and videos consist of 1,231 files, including:

- GoPro video of self-driving vehicle test (Exhibit 157);
- Diagrams of car components (Exhibit 158); and
- Pictures of cars and car parts (Exhibit 159).

#### Source Code Files

93 source code files came from Sebern's devices and accounts. However, given Stroz Friedberg's lack of context, we could not determine whether these files were related to Google self-driving cars or otherwise constituted Google confidential information.

© 2018 Stroz Friedberg. All rights reserved.

CONFIDENTIAL

**TX-7912, Page 32 of 33**

PRIVILEGED AND CONFIDENTIAL

BOSTON

CHICAGO

DALLAS

HONG KONG

LONDON

LOS ANGELES

MINNEAPOLIS

NEW YORK

SAN FRANCISCO

SEATTLE

WASHINGTON, DC

ZURICH

# STROZ FRIEDBERG

www.strozfriedberg.com

 @strozfriedberg

OUTSIDE COUNSEL & ATTORNEYS-EYES-ONLY     33                © 2018 Stroz Friedberg. All rights reserved.

CONFIDENTIAL                                                                                    STROZ_0000033