Volume 2

Pages 189 - 384

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

WAYMO, LLC                            )
            Plaintiff,                )
   vs.                                ) No. C 17-00939 WHA
                                      )
UBER TECHNOLOGIES, LLC., OTTO         )
TRUCKING, LLC, and OTTOMOTTO, LLC,    )
                                      )  San Francisco, California
            Defendants.               )  Monday
                                      )  February 5, 2018
_____)  7:30 a.m.

### TRANSCRIPT OF PROCEEDINGS

APPEARANCES:
For Plaintiff:              QUINN, EMANUEL, URQUHART, OLIVER
                            & SULLIVAN, LLP
                            50 California Street
                            22nd Floor
                            San Francisco, California 94111
                      BY:   CHARLES KRAMER VERHOEVEN, ESQ.
                            JORDAN R. JAFFE, ESQ.
                            DAVID ANDREW PERLSON, ESQ.
                            MELISSA J. BAILY, ESQ.
                            DAVID EISEMAN, ESQ.
                            ANDREA PALLIOS ROBERTS, ESQ.
                            JAMES DUBOIS JUDAH, ESQ.



                            QUINN, EMANUEL, URQUHART, OLIVER
                            & SULLIVAN, LLP
                            1299 Pennsylvania Avenue, NW
                            Suite 825
                            Washington, DC 20004
                      BY:   JARED WESTON NEWTON, ESQ.

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Debra L. Pas, CSR 11916, CRR, RMR
              Katherine Sullivan CSR 5812, CRR, RMR
              *Official Reporters - US District Court*

```
 1   APPEARANCES (Continued)

 2

     For Plaintiffs:         QUINN, EMANUEL, URQUHART & OLIVER
 3                              & SULLIVAN, LLP
                             865 South Figueroa Street
 4                           10th Floor
                             Los Angeles, California 90017
 5                       BY:  DUANE R. LYONS, ESQ.

 6

 7   For Defendants:         MORRISON & FOERSTER, LLP
                             425 Market Street
 8                           San Francisco, California 94105
                         BY:  ARTURO J. GONZÁLEZ, ESQ.
 9                            MICHAEL A. JACOBS, ESQ.
                              ESTHER KIM CHANG, ESQ.
10                            THOMAS J. PARDINI, ESQ.

11
                             MORRISON AND FOERSTER LLP
12                           707 Wilshire Boulevard
                             Suite 6000
13                           Los Angeles, California 90017
                         BY:  WENDY JOY RAY, ESQ.
14

15
     For Defendants:         BOIES, SCHILLER AND FLEXNER, LLP
16                           5301 Wisconsin Avenue, NW
                             Washington, DC 20015
17                       BY:  KAREN LEAH DUNN, ESQ.
                              MICHAEL A. BRILLE, ESQ.
18                            MARTHA LEA GOODMAN, ESQ.

19
                             BOIES, SCHILLER AND FLEXNER, LLP
20                           435 Tasso Street
                             Suite 205
21                           Palo Alto, California 94301
                         BY:  MEREDITH R. DEARBORN, ESQ.
22

23            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

24

25
```

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendants:          SUSMAN, GODFREY, LLP
                              1000 Louisiana Street
 3                            Suite 5100
                              Houston, Texas, 77002
 4                     BY:  JOSEPH S. GRINSTEIN, ESQ.

 5
                              SUSMAN, GODFREY, LLP
 6                            1301 Avenue of the Americas
                              32nd Floor
 7                            New York, New York 10019
                       BY:  WILLIAM CARMODY, ESQ.
 8                          SHAWN RABIN, ESQ.

 9
                              SUSMAN, GODFREY, LLP
10                            1201 Third Avenue
                              Suite 3800
11                            Seattle, Washington 98101
                       BY:  MATTHEW ROBERT BERRY, ESQ.
12

13
     Special Master:          FARELLA BRAUN & MARTEL, LLP
14                            Russ Building, 30th Floor
                              235 Montgomery Street
15                            San Francisco, California 94104
                       BY:  JOHN L. COOPER, ESQ.
16

17

18   Also Present:           DEMARRON BERKLEY

19                           ERIC MEYHOFER

20                           TONY WEST

21                           AARON BERGSTROM

22                                _   _   _

23

24

25
```

PROCEEDINGS

```
 1                    P R O C E E D I N G S
 2    FEBRUARY 5, 2018                              7:27 A.M.
 3                        ---oOo--
 4          THE COURT:  All right.  Please call the case.
 5          THE CLERK:  Calling Civil Action 17-939, Waymo LLC,
 6    versus Uber Technologies, Inc., et al.
 7       Counsel, please approach the podium and state your
 8    appearances for the record.
 9          MR. VERHOEVEN:  Good morning, Your Honor.  Charles
10    Verhoeven from Quinn Emanuel on behalf of Waymo.  With me is my
11    partners David Perlson, David Eiseman, James Judah, Andrea
12    Roberts, Duane Lyons and Jordan Jaffe.
13       We're ready to go, Your Honor.
14          MR. GONZÁLEZ:  Good morning, Your Honor.  Arturo
15    González, Michael Jacobs, Wendy Ray, Esther Kim Chang from
16    Morrison & Foerster for Uber and Otto.
17          MR. CARMODY:  Good morning, Your Honor.  Bill Carmody
18    here on behalf of Uber.  And with me we have Shawn Rabin at the
19    table and Joe Grinstein as well.
20          MS. DUNN:  Good morning, Your Honor.  Karen Dunn from
21    Boies Schiller Flexner for Uber and Ottomotto.  Michael Brille
22    and Meredith Dearborn and Martha Goodman are here with me.
23          MR. COOPER:  Good morning, Your Honor.  John Cooper,
24    Special Master.
25          THE COURT:  Thank you.
```

PROCEEDINGS

 1          So there's a long line of people who want to get in.   If

 2    all of you are lawyers, except for Mr. Cooper, you've got to

 3    squeeze into that front row if you're lawyers for one side or

 4    the other.   We have to have room for the members of the public,

 5    and you lawyers are taking up too much room.   So you don't have

 6    to adjust this very minute, but I want you to adjust.   This is

 7    unconscionable that the law firms would take up this much

 8    space.   So you lawyers here deal with this problem before -- in

 9    just a few minutes.

10          All right, next.   The reason the public is not in here now

11    is because you failed me once again and could not agree on

12    something simple.   You wanted an ordinary, plain English

13    shorthand version of the alleged trade secrets.   Well, you

14    couldn't agree on one of them.

15          Is there anyone here in the courtroom, who, if I blurt

16    this out, that they are going to...   I don't know.   You lawyers

17    tell me.   Is everyone here entitled to know secret information?

18          All right.   I'm going to blurt it out.

19          **MR. JAFFE:**  Excuse me.   Is everyone cleared to see AEO

20    information in here?   I don't know if that's the case.

21          (Members of the public exit the courtroom.)

22                  (Proceedings held under seal.)

23

24

25

PROCEEDINGS

1

2

3

4

5

6

7

8

9

10

11

12

13

14    (Brief pause while courtroom is opened to the public.)

15        THE COURT:  All right.  Welcome back.  Please be

16  seated.

17      All right.  Welcome, everyone.  And since we started the

18  case, we will recall the case now that the public is here.

19      Please call the case.

20        THE CLERK:  Recalling Civil Action 17-939, Waymo LLC

21  versus Uber Technologies, Inc., et al.

22      Counsel, please restate your appearances for the record.

23        MR. VERHOEVEN:  Good morning, Your Honor.  Charles

24  Verhoeven.  And with us is our corporate representative from

25  Waymo, Mr. Demarron Berkley.

PROCEEDINGS

 1    We also have the CEO of Waymo in the audience.  Please

 2  stand up.

 3    With me at counsel table, Your Honor, are my partners:

 4  Melissa Baily, James Judah, David Eiseman, Andrea Roberts,

 5  Duane Lyons, David Perlson, and Jordan Jaffe.

 6    We're ready to proceed, Your Honor.

 7         **THE COURT:**  Thank you.

 8         **MR. GONZÁLEZ:**  Good morning, Your Honor.  Arturo

 9  González, Michael Jacobs, Wendy Ray, Esther Kim Chang from

10  Morrison & Foerster.

11    Our client representative is here, Eric Meyhofer.  And,

12  also, Tony West, general counsel from Uber.

13         **THE COURT:**  Thank you.

14         **MR. CARMODY:**  Good morning, Your Honor.  Bill Carmody

15  here with Susman Godfrey.  We have with us here Shawn Rabin at

16  the table and Joe Grinstein as well.

17         **MS. DUNN:**  Good morning.  Karen Dunn from Boies

18  Schiller Flexner.  At counsel table is Michael Brille.  And in

19  the back, Meredith Dearborn and Martha Goodman.

20         **THE COURT:**  Welcome to all of you.

21    So we're here for the start of our trial.  We're waiting

22  on, I think, three members of the jury to arrive.  Seven have

23  arrived.  I have some items to bring up with you.

24    With respect to the structure of the trial, I had asked

25  you to agree, if you could, on how we will deal with reasonable

PROCEEDINGS

1   royalty.  And I read your statement over the weekend.

2        Does anyone want to say something beyond what's in their

3   statement?

4            MR. EISEMAN:  Not from Waymo, Your Honor.

5            MR. CARMODY:  We're fine as well, Your Honor.  Thank

6   you.

7            THE COURT:  All right.  Then the answer will be this.

8   You have 16 hours of evidence time.  You have to put in

9   whatever evidence you're going to put in on reasonable royalty

10  in that 16 hours.

11       There is a small chance, but some chance -- I don't want

12  to say small.  There is a chance that I will bifurcate the

13  argument on that so as not to over -- what's the word I'm

14  looking for? -- overwhelm the jury instructions.

15       But since you all have not been able to agree on it, I may

16  just roll the reasonable royalty into the jury instructions.

17  And that's what Waymo wants.  You may live to regret having

18  overwhelmed the jury instructions in that manner, but if

19  that's -- I can't get you lawyers to agree on much.

20       So, anyway, I'm not going to make a final ruling on

21  bifurcating the argument, but the evidence will not be

22  bifurcated.  You've got to roll that into your 16 hours.  All

23  right?

24           MR. EISEMAN:  Thank you, Your Honor.

25           THE COURT:  Thank you.  Okay.

PROCEEDINGS

1    Thank you for your list of the top 20 evidentiary rulings.
2    That will be very useful to me.
3        Here is another item.  When I came in this morning, I took
4    a look at the way you had reorganized my courtroom and I --
5    some things I did not quite like.  I'll just mention them.
6        There is a rat's nest of wiring that -- that white
7    cabling.  I don't like the way you have the white cabling set
8    up.  It intrudes into the jury box.  We'll leave it as it is
9    for today, but you've got to deal with that this afternoon and
10   get rid of it.
11       Also, when I came in, that little table was right up
12   against the jury box so that Mr. Verhoeven could lean into the
13   jury box.  I'm sure that was the IT people, not you, but you
14   can't do that.  You've got to have it -- you've got to respect
15   the jury and not get that close to them.  Where you have it now
16   is fine.  You could even be a little closer than where you
17   moved it to.  That would be fine.  But not as close as it was
18   indicated.
19       Also when I arrived, you had chairs protruding into the
20   well of the courtroom for yet one more member of your trial
21   team.  You've got nine there now; I guess you wanted ten.  It
22   was just too much, so I removed that one extra chair because
23   the well of the courtroom needs -- cannot be that cluttered.
24   So you have to -- nine lawyers per side is the -- is the world
25   record for my courtroom anyway.  So you'll just have to live

PROCEEDINGS

1   with nine and the others will be on the front row.

2       Thank you for the timeline.  We're going to print out

3   small copies of it and hand it out to the jury.  Does everybody

4   agree with that?  So they can make their own notes on it.  Any

5   problem with that?

6           **MR. VERHOEVEN:**  No, Your Honor.

7           **MR. GONZÁLEZ:**  That's fine, Your Honor.

8           **THE COURT:**  Okay.  Thank you.

9       I don't know.  I won't name any names, but somebody has a

10  witness who thinks he's important and wanted a private room.

11  No.  Sorry.  This is -- they are going to have to be just like

12  the rest of us.  And the public doesn't get a private room;

13  neither does that witness.  And neither of your side is going

14  to get a private room just because they're famous.

15      Okay.  Now we have a -- what you would call a housekeeping

16  matter, which concerns trying to load too much of a burden upon

17  my Courtroom Deputy.  And this concerns an email from someone

18  named Michelle Yang.

19      Is she here?

20          **MS. YANG:**  Yes, Your Honor.

21          **THE COURT:**  So, anyway, thank you for your email, but

22  what your email tends to do is put the burden of trying to

23  figure out when something should not be shown to the public or

24  to the jury or -- on my Deputy Courtroom Clerk.  That's not

25  going to work.  She's got a million other things going on.

PROCEEDINGS

```
 1        So I'm relying on the lawyers to jump up and tell me.

 2   Otherwise, the public may see your trade secrets, may see how

 3   your -- on the Uber side, how your trade secrets work.

 4        So you just have to help us with this, but it's not good

 5   enough to send us a protective "it's all your fault" type of

 6   email saying "if these things" -- no.  We're not going to do

 7   that for you.  You have to jump up and protect the record at

 8   the appropriate time.

 9        All right.  Then I think there was a -- yes, your list of

10   key individuals.  Thank you.  But it needs to have another

11   column for what their role in the case is.  Like, "CEO of

12   Uber."  That would be good, or something that will explain the

13   role in the case.  So I'm going to -- we're not going to hand

14   this one out until you all fix it.  I'm going to give you

15   another day to fix that one.

16        I have this question for you.  Ottomotto, who is the

17   corporate representative for Ottomotto here?

18        (Mr. Meyhofer raises his hand.)

19             THE COURT:  Who is that?

20             MR. CARMODY:  It's Eric Meyhofer, Your Honor.  He's

21   the same corporate representative for both defendants.

22             THE COURT:  Is Ottomotto a separate company?  What is

23   the relationship now, strictly speaking, between Uber and

24   Ottomotto, LLC?  No hemming and hawing.  I want an exact

25   answer.
```

PROCEEDINGS

```
 1          MR. CARMODY:  The short answer is, Your Honor, I don't
 2   know right now.  Obviously, Uber acquired it.  I believe it was
 3   a stock purchase.  So probably it's part of Uber, but I don't
 4   know.
 5       Karen, did you know?
 6          THE COURT:  How can you not know that at this point?
 7   Please give me a --
 8          MS. DUNN:  So Ottomotto is indirectly wholly owned by
 9   Uber.  And what that means is it's owned by a holding company,
10   but they don't have their -- it's not a separate entity that
11   would have a representative.
12          THE COURT:  Let's say the jury decides that there is a
13   billion-dollar verdict against Ottomotto but not against Uber.
14   Is Uber going to pay that?
15          MS. DUNN:  Yes.
16          THE COURT:  So Uber is good for whatever Ottomotto
17   gets hit on?
18          MS. DUNN:  Yes.
19          THE COURT:  All right.
20          MS. DUNN:  We hope that won't happen, Your Honor, but
21   your analysis is correct.
22          THE COURT:  All right.  So then Ottomotto corporate
23   representative is, again, who?
24          MR. CARMODY:  Eric Meyhofer, Your Honor.
25          THE COURT:  Very good.
```

PROCEEDINGS

1      So when the jury comes in, and in your opening statements,

2  please explain that Ottomotto, LLC is in the case and he is the

3  corporate representative for both, because it's -- we can't

4  leave the jury in the dark as to who Ottomotto is.  All right?

5      Thank you for your -- I think I already thanked you for

6  your top 20 list.

7      All right.  One of you filed an objection to the opening

8  statement by the other side.

9      Mr. Carmody, you told me last week that you two lawyers

10  were excellent lawyers and that you would not be making

11  objections to each other's opening statements.  And then, of

12  course, right over the weekend I get an email -- not an email,

13  but a filing by Uber saying that you do have an objection.

14      **MR. GONZÁLEZ:**  Your Honor, to clarify.  The objection

15  is not necessarily to the opening statement.  These are

16  exhibits that they have identified for the first few witnesses

17  of the trial.  Now, it's conceivable they may want to also use

18  it in opening.  I don't know.  And we did reserve our

19  objections to argument.

20      But having said that, if you're talking about the videos

21  issue, Your Honor --

22      **THE COURT:**  Yeah, that's what I'm -- that's what you

23  sent up.

24      **MR. GONZÁLEZ:**  That's right.  But just to be clear,

25  our concern is with respect to marketing materials in general,

PROCEEDINGS

1    and the videos are examples of that.  They've got a number of

2    videos that they've identified as potential trial exhibits with

3    the first few witnesses.  And they have one document in

4    particular that is just your classic marketing document that

5    talks about why they have driverless cars and how great they

6    are.

7          And it's our view that's not the issue for this jury.  And

8    so neither side should be introducing videos or marketing

9    documents to talk about how great their companies are.

10          **MR. VERHOEVEN:**  Your Honor, may I respond?

11          **THE COURT:**  Yes, please.

12          **MR. VERHOEVEN:**  Late, last night we got an email from

13   an attorney at Morrison & Foerster reneging on the agreement

14   that Mr. Carmody and I had and saying they would object to the

15   use of some exhibits that were videos if we were to use them in

16   our opening and asking us to disclose that information, both

17   which were in conflict with the personal agreement that we put

18   on the record between myself and Mr. Carmody.

19          **MR. CARMODY:**  Your Honor, let me jump in.  Listen, I

20   don't care about the opening, what he does.  We're talking

21   about witnesses.  Just as a point of clarification, we're not

22   reneging on anything.

23          **THE COURT:**  So if he wants to show these videos in his

24   opening, that's --

25          **MR. CARMODY:**  I say go for it.

PROCEEDINGS

```
 1          THE COURT:  Well, then I'm not going to -- what do you
 2     say to that, Mr. González?
 3          MR. GONZÁLEZ:  What I say to that, Your Honor, is that
 4     what we said when we made the agreement is that we're not
 5     waiving any objections to whatever they might want to say in
 6     opening.  So, in other words, you use something at your own
 7     risk that it may not come into evidence.
 8          So my issue is the first couple of witnesses they have, as
 9     exhibits that they want to bring into evidence, videos and
10     these marketing documents.  That's our concern.
11          I'm talking about the evidence that the jury is going to
12     see, not about whatever they might do in opening.
13          THE COURT:  All right.  Look, are you going to show
14     these in your opening?
15          MR. VERHOEVEN:  Two very, very short clips that I'm
16     going to show in my opening to give the jury an idea of what a
17     self-driving vehicle is and to give the jury an idea of what a
18     point cloud is, which is what the car sees with LiDAR, Your
19     Honor.  And there is absolutely nothing wrong with them.  And
20     we also think there's nothing wrong with having witnesses who
21     know what they are put them into evidence.
22          But I don't know why we're talking about my opening
23     statement when we already had an agreement.  This is -- I feel
24     like I'm negotiating with two different people who have two
25     different positions here.
```

PROCEEDINGS

1      **MR. GONZÁLEZ:**  I'm not talking about the opening at

2  all.  I'm talking about the evidence through witnesses.

3      **THE COURT:**  This is what's known as Soviet style

4  negotiation.  What's mine is mine, and what's yours is

5  negotiable.

6      Here's what we're going to do.  You show whatever you want

7  in your opening.  That doesn't mean it comes into evidence

8  later.

9      **MR. VERHOEVEN:**  Yes, sir.

10      **THE COURT:**  It may or may not.  The benefit of it is

11  at least I get to see and decide for myself if it's too

12  prejudicial.

13      But Mr. Carmody agreed.  He's standing by his word.  So

14  thank you for being an honorable lawyer, Mr. Carmody.

15      I'm not saying that Mr. González is not, but I'm just

16  saying that for the opening statement, thank you for solving

17  this problem.

18      All right.

19      **MR. GONZÁLEZ:**  Your Honor, the reason we raised it is

20  because when this comes up with a witness in the chair, it

21  won't be as easy as just show it to me, Judge Alsup, so that

22  the jury can't see it, because it has sound.  So I'm just

23  wondering logistically.

24      **THE COURT:**  He's going to play the sound too, I

25  assume.

1    Are you going to play the sound in your opening?

2         MR. VERHOEVEN:  Yes.

3         MR. GONZÁLEZ:  My point is that there are videos that

4    will not be used in opening, and I'm just wondering how Your

5    Honor would like to handle objections to those.  How can we get

6    you to see them without the jury seeing or hearing them?

7    That's the issue that I'm raising.

8         THE COURT:  Possibly I will look at them on my

9    computer, I guess.  Why don't you put them on a disk and let me

10   look at them on my computer so that I can -- I'll just do it

11   myself, and then I'll tell you the answer.  That's the best I

12   can do.

13        MR. GONZÁLEZ:  Thank you, Your Honor.

14        THE COURT:  All right.  So are we ready to proceed and

15   bring in the jury?

16        MR. VERHOEVEN:  Your Honor, I'd like to have a second

17   to set up.  I'm going to move the lectern and -- may I do that?

18        THE COURT:  Yeah, go ahead.  Start right now.

19        MR. GONZÁLEZ:  Your Honor, while he's doing that --

20        THE COURT:  I'm going to give them preliminary

21   instructions.  It will take five minutes, but, very quickly

22   we'll be into the opening statement.

23        Yes, Mr. González.

24        MR. GONZÁLEZ:  So I don't want to slow things down,

25   but I want to note this for the record.

PROCEEDINGS

1      We had an in limine motion that dealt with witnesses who

2  are not disclosed.  And you indicated that we would take those

3  one at a time, and you would weigh a number of factors in terms

4  of deciding whether or not they get to call that witness and

5  what the witness can say.

6      The very first witness that they want to call is the CEO

7  of Waymo, who was not disclosed in their Rule 26 originally.

8  He was not disclosed in the supplemental Rule 26.  They just

9  disclosed him a couple weeks ago.  So I've asked them, are they

10 at least willing to limit the scope of his testimony to what he

11 said in deposition, and they haven't even agreed to that.

12     So I just want to note for the record -- right at the

13 outset, I just want to know what your rules are going to be.

14 They've got the CEO coming in who wasn't disclosed at all until

15 a couple weeks ago, and it's unclear to me what he's even going

16 to say.

17          **THE COURT:**  Just a minute.

18     Do we have the jury here?

19          **THE CLERK:**  We're missing one.

20          **THE COURT:**  All right.

21     What do you say to that?

22          **MS. ROBERTS:**  Your Honor, so Mr. Krafcik appeared on

23 our trial witness list in September.  You'll recall this is our

24 third time trying to go to trial.  So our witness list has been

25 the same with the exception of the new areas of discovery that

1  we went into with the Stroz report and the Jacobs letter.

2       So he has been on our witness list since September.  He

3  has been on Uber's initial disclosures since April 3rd, their

4  very first one.  He was on their initial disclosures on

5  June 21st.  They identified him as a top 10 witness to depose

6  on June 22nd.  They deposed him in early August.

7       And the subject matter of the testimony that he's going to

8  provide, which is disclosed in our trial witness list provided

9  back in September, overlaps significantly with the subject

10  matter that they disclosed in their June 21st initial

11  disclosures.

12       So there's no surprise here, no prejudice, no harm.

13  They've deposed him.

14       THE COURT:  Is all that true?

15       MR. GONZÁLEZ:  Well, Your Honor, part of it is.  What

16  still isn't clear to me, they're not willing to commit that his

17  testimony is going to be within the four corners of his

18  deposition.  So if the rule is going to be that he can come in

19  and say things that are not in his deposition, then I think

20  that ought to apply both ways.

21       THE COURT:  Well, you could have asked that question

22  in a deposition, but maybe you -- maybe you decided not to.

23  It's hard for me to -- you had the chance in the deposition to

24  ask whatever you wanted; right?

25       MR. GONZÁLEZ:  Well, Yes, Your Honor, but the

PROCEEDINGS

1   deposition came before he was designated as a trial witness.

2   And you understand the difference.  You take a deposition, you

3   ask questions.  Well, if we had known that he was going to be a

4   trial witness on A, B, C, and D, we obviously would have

5   inquired.

6        So all I'm -- I'm just -- I know that there's a lot on

7   your plate, Your Honor, and we don't want to burden you.  I

8   just want to note this for the record right out of the gate so

9   that, when it's our turn to put on our case, they don't start

10  making technical objections.  This is the guy --

11       **THE COURT:**  I'm going to give you the same slack they

12  are getting.

13       **MR. GONZÁLEZ:**  Thank you, Your Honor.

14       **THE COURT:**  They are getting away with a little bit

15  here, but it's not a huge amount.

16       Mr. Carmody, did you want to say something?

17       **MR. CARMODY:**  I've got the point, Your Honor.

18       **THE COURT:**  What is it?

19       **MR. CARMODY:**  So this is a witness who -- she's

20  right -- is on our witness list.  We may go a little bit

21  outside the scope of their examination.  Not knowing what they

22  are going to ask him, I don't know.  I would just suggest to

23  the Court that we get a little bit of leeway there so that we

24  don't have to recall him.

25       **THE COURT:**  I don't know until we get there.  I may or

PROCEEDINGS

1   may not allow you to interrupt the flow of the plaintiff's

2   case.  You can always call him back.

3        **MR. GONZÁLEZ:**  Understood.

4        **THE COURT:**  You can always call him back.  And even if

5   -- even if this is Mr. Big of All Time, he will be at your beck

6   and call and have to cancel all trips to Asia and everywhere

7   else he planned to go so that he can be at your beck and call

8   if they don't want to allow you to exceed the scope of the

9   direct.

10       **MR. GONZÁLEZ:**  Thank you, Your Honor.  We'll take it

11  one question at a time.

12       **THE COURT:**  Bring in the jury, please.

13       **MR. JACOBS:**  Your Honor.

14       **THE COURT:**  Wait a minute.  It's 8:00 o'clock,

15  Mr. Jacobs.

16       **MR. JACOBS:**  I know.

17       **MR. VERHOEVEN:**  Can we have a quick sidebar, Your

18  Honor?  It's important.

19       (Sealed proceedings held at side bar.)

20

21

22

23

24

25

PROCEEDINGS

1

2

3          (Proceedings held in open court.)

4               **THE COURT:**  All right.  We're ready.

5               **THE CLERK:**  All rise for the jury.

6          (Jury enters the courtroom at 8:02 a.m.)

7               **THE COURT:**  Why don't you scoot down?

8          All right.  Welcome, everyone.  Everyone be seated,

9     please.

10         Welcome, members of the jury.  Thank you for being on

11    time.  We're going to get started with the opening statements

12    in just a moment.  First, we'll start things off the proper way

13    and the Clerk will now call the case and counsel will please

14    make their appearances.

15              **THE CLERK:**  Calling Civil Action 17-939, Waymo LLC

16    versus Uber Technologies, Inc., et al.

17         Counsel, please state your appearances for the record.

18              **MR. VERHOEVEN:**  Good morning, Your Honor.  Good

19    morning, members of the jury.  My name is Charles Verhoeven.

20    And with us here at counsel table is Demarron Berkley -- he is

21    our corporate representative of my client, Waymo -- and my

22    partners Melissa Baily, Jordan Jaffe, David Perlson, Duane

23    Lyons, Andrea Roberts, David Eiseman and James Judah.

24              **THE COURT:**  All right.  Thank you on the Waymo side.

25         All right.  On the Uber/Ottomotto side, Mr. Carmody.

1          **MR. CARMODY:**  Good morning, everybody.  I'm Bill

2    Carmody with the law firm Susman Godfrey.  I'm here on behalf

3    of Uber, and I have a few other Susman Godfrey lawyers.

4          I have Shawn Rabin and Joe Grinstein here, Arturo

5    González.  We have Karen Dunn, Michael Brille.  The corporate

6    representative for both the defendants in this case of Uber and

7    Ottomotto is Eric Meyhofer.  We have Michael Jacobs.  We have,

8    on behalf of Uber, Nicole Bartow.

9          Thanks, everyone.

10         **THE COURT:**  All right.  Okay.  Ready to get started

11   over there?  Good.  You've got your notepads.

12         So let me give you two minutes of preliminary

13   instructions, and then we're going to go straight to the

14   opening statements.

15                **PRELIMINARY JURY INSTRUCTIONS**

16         **THE COURT:**  At the end of the case, it's going to be

17   your job to decide what the correct verdict is; who wins, who

18   loses.  That will be your job.  My job will be to give you the

19   instructions of law that apply.  I will do that at the end, and

20   I may do some of that even sooner, but for present purposes,

21   the lawyers will explain some of the elements of the proof.

22         But at the end of the case, it's like a scorecard.  You

23   line up the elements of proof that are required.  Then you line

24   up the things that you think have or have not been proven and

25   you see whether or not those elements of proof have been met.

PRELIMINARY JURY INSTRUCTIONS

 1    If the elements of proof have been met, then you must rule for

 2    the party that has proven their case, which in this case would

 3    be the plaintiff.

 4         On the other hand, if the plaintiff has fallen short on

 5    even one element of proof, then you have to rule for the other

 6    side.  That's the way it works.

 7         So I'll give you detailed instructions on that later on,

 8    but your job is to be very careful to pay attention to the

 9    evidence.  Sometimes you're going to have to decide who's more

10    correct; whether the light really was red or whether the light

11    really was green, that kind of a thing.

12         So you have to do witness credibility.  You have to

13    decide -- maybe both sides have good, credible cases and you

14    have to decide which one is the more persuasive.  It's up to

15    you.  But you have to pay close attention.  It's like the

16    laboratory experiment that I referred to during our -- during

17    our jury selection process.

18         Now, because -- because you decide the case based on what

19    is the evidence presented here in the courtroom -- evidence --

20    I need to tell you again you must not go online and try to look

21    anything up about the case or read newspaper stories about the

22    case or magazine stories about the case.  You can do all that

23    later after the case is over; but for present purposes, no, you

24    cannot do that.  That would be wrong because that might

25    influence how you see the case when you're supposed to be

1    presenting -- deciding it based on what's presented here.

2        The great thing about a trial is you sit back and see what

3    the lawyers present to you as evidence and then base your

4    verdict on that.  So no going on Facebook and telling people

5    you're on the jury or any of those other social media things.

6    No telling your friends.  Just maybe your loved ones.  You can

7    say, "I'm on the Waymo v. Uber case."  That's okay.  But don't

8    let them talk to you about the case.

9        All right.  Now, for opening statement purposes and, in

10   fact, for the entire trial I want to repeat one thing that I

11   said during the jury selection.  This is a cardinal rule, a

12   cardinal rule.  Not one word a lawyer ever says is evidence.

13   You've got nine lawyers at each table.  Not one word they ever

14   say is evidence unless I tell you specifically you may consider

15   it as evidence.

16       There will be a few exceptions.  Like, when they read

17   deposition testimony in, I'll tell you that's evidence.  But

18   when they give their opening statements and their closing

19   arguments and when they are asking questions of a witness, it

20   is not evidence.

21       It's what the -- the evidence is what the witness says.

22   That's evidence.  So if a lawyer were to ask a witness, "Isn't

23   it true the light was red?" and the witness says, "I don't

24   know" or "I don't remember," all that proves is the evidence

25   part is -- the witness doesn't remember.

1    Don't get confused by that and get back into the jury room

2  and say somebody out there said the light was red.  I remember

3  it.  Somebody said the light was red.  The rest of you have to

4  be able to say, "Oh, no, no.  That was just the lawyer talking.

5  Just the lawyer talking."  That's zero, z-e-r-o, evidence.

6    It doesn't count for anything in terms of evidence.  It

7  counts for a lot for the opening statements and the closings,

8  but this is the single biggest way a jury can go wrong, is to

9  get confused by what the lawyers say versus what the evidence

10 says.  So I make -- I make a strong point of this.  So as the

11 case goes through, you keep that distinction in mind.

12    It's up to you whether you take notes or not.  I'll just

13 leave it to your own judgment.  These are for your own private

14 use and not to share with each other.

15    So now we're going to have the opening statements.  Each

16 side has about 70 minutes to present their opening statement.

17 And these are -- you're so lucky to be in a case with these

18 lawyers.  These are outstanding -- some of the best lawyers in

19 the United States are in this -- are at these two tables right

20 now, and you're going to get a chance to see them perform, and

21 they will do an excellent job.  Remember, though, that not one

22 word they say is evidence.

23    (Laughter.)

24    **THE COURT:**  Mr. Verhoeven, at this time you may make

25 the opening statement on behalf of Waymo.  The floor is yours.

 1          **MR. VERHOEVEN:**  Thank you, Your Honor.

 2                      **OPENING STATEMENT**

 3          **MR. VERHOEVEN:**  Good morning again, members of the

 4     jury.  Let me start by again thanking you for coming in this

 5     morning and for serving, doing your civic duty here.  It's very

 6     much appreciated by everyone here.

 7          Let me start by just giving you a general description of

 8     this case.  This case is about two competitors where one of the

 9     competitors decided that they needed to win at all costs; that

10     losing was not an option; that they would do anything that they

11     needed to do to win no matter what.  No matter if it meant

12     breaking some rules.  No matter if it meant doing the wrong

13     thing.  And in this case no matter if it meant taking trade

14     secrets from the competitor.

15          This case concerns driverless car technology, as you

16     probably heard from the voir dire we did, and there is a

17     technological race going on right now.

18          My client, Waymo, used to be part of Google and just

19     recently became Waymo.  And back when it was Google in 2009, it

20     started developing what is called a moonshot.  And some

21     engineers decided, hey, wouldn't it be cool if we could develop

22     self-driving cars?  Wouldn't it be great for everybody?  And

23     what the evidence will show is that, when other people found

24     out about it, they kind of laughed at us because no one thought

25     that was even possible.

1    But Google put in years and years and years of effort,

2    testing, driving hundreds and hundreds of thousands of miles,

3    learning from what they did, and got themselves to a place in

4    around 2014, '15 where people in the industry started saying,

5    "Wait a minute.  They are going to do it.  This is feasible."

6    And that's when the race started happening.

7        Today every car company in the world is trying to develop

8    self-driving car technology.  There is a big competition, and

9    Google is in the lead.  Google is now Waymo.  A several-year

10   lead because it was the one that developed it in the first

11   place.

12       This case is about the defendant Uber making a decision

13   that it had to develop this technology in order for its

14   business model to survive.  It's about a company that decided

15   if it didn't develop this technology, it would go out of

16   business.  And so the CEO of Uber, Mr. Travis Kalanick, made a

17   decision to invest heavily in it.

18       And at first Uber did it the right way.  They went and

19   they hired engineers from a university, Carnegie Mellon

20   University.  They set up the research department to try and

21   develop this technology.  But they couldn't catch up.  By

22   playing fair, it wasn't working because Google is way too far

23   ahead.

24       What the evidence is going to show in this case is

25   Mr. Kalanick, the CEO at the time of Uber, made a decision that

1   winning was more important than obeying the law.  He made a

2   decision to cheat.  Because for him, winning at all costs, no

3   matter what, was his culture and was what he was going to do.

4        The evidence is going to show that he targeted and hired

5   away from Waymo one of its key engineers who had been with the

6   Chauffeur Development Program -- that's the name of the Google

7   program -- since its inception.  And this is an engineer that

8   had a lot of experience in developing customized technology

9   called LiDAR.

10       And I'll explain what that is in a little bit, but LiDAR

11  is a technology -- if you've ever seen a self-driving car

12  that's got that spinning thing on the top, that's the LiDAR.

13  And that's what allows the car to see.  It's critical.  It's

14  the eyes of the car.  And Uber didn't have it and Uber couldn't

15  figure out how to do it.

16       And so the evidence is going to show that Mr. Kalanick and

17  his team engaged in a plan that they kept secret to induce

18  Mr. Levandowski to come over, pay him millions of dollars tied

19  specifically to whether or not he actually developed this

20  technology in a very short time frame, and caused him to come

21  over and copy the technology they had already developed for

22  Waymo.

23       You'll see documents as I continue, their own words,

24  internal documents from Uber where they -- the CEO of the

25  company says, "We want to find cheat codes."  Now, I didn't

 1   know what cheat codes was because I'm too old, but I understand

 2   that when you play video games, a cheat code is something that

 3   allows you to skip what you need to do to get to the next

 4   level.

 5        Well, that's the CEO of the company saying, "We want to

 6   use Levandowski to find these cheat codes."  In their own

 7   words, written documents, Mr. Kalanick said he wanted to use

 8   Levandowski to leapfrog Google.

 9        This case, it reminds me of a story I read -- and I'm

10   showing my age here -- in the '80s about a woman named Rosie

11   Ruiz.  I don't know if you've ever heard of her, but Rosie Ruiz

12   wanted -- really wanted to win the Boston Marathon, but she

13   wasn't really that good.  But she really wanted to win at all

14   costs, and so she decided to cheat.

15        And Rosie Ruiz started running the marathon, then jumped

16   on the subway, and then jumped off the subway toward the end of

17   the marathon and ran in and won the marathon.  She cheated.

18   She took a shortcut.  Well, they found out about that and she

19   didn't win the marathon after all.

20        And that's why we're here today.  We're bringing this case

21   because Uber is cheating.  They took our technology in an

22   effort to win this race at all costs, and that constitutes

23   misappropriation of our trade secrets, and it's wrong, and it's

24   something we're here to rectify.

25        Now, I have a series of slides here that will show up on

 1   your screens up here.  And I'd like to start with a more

 2   detailed presentation by describing to you a little bit about

 3   my client, Google and Waymo.

 4       Can we turn on the --

 5           THE COURT:  Just make sure.  Is it showing up in the

 6   jury box?

 7       (Jury panel nodding affirmatively.)

 8           THE COURT:  All right.  Jury says yes.

 9           MR. VERHOEVEN:  Not showing up on ours.

10           THE COURT:  Nor mine.

11       (Document displayed)

12           MR. VERHOEVEN:  There it goes.  Thank you, Mr. Fisher.

13       My clicker is not working, Mr. Fisher, so that's not good.

14       Can we go to the next slide?  One more.

15       (Document displayed)

16           MR. VERHOEVEN:  Let me start by talking about Google.

17   I'm sure you've all heard of Google.  Google is a classic

18   Silicon Valley story.  It was started in a garage.

19       This is a picture of the two founders of Google, Larry

20   Page and Sergey Brin, in the garage.  It was Susan Wojcinski's

21   garage.  She's also part of Google now.  But it's a classic

22   entrepreneurial story.  They came up with this great idea for a

23   search algorithm, and the rest is history.

24       Today we know Google for a lot of its products.  We have

25   Google Search.  We have Google Maps.  We have email called

OPENING STATEMENT / VERHOEVEN

 1   Gmail.  YouTube.  My kids live on YouTube.  All these services

 2   are free.  All these services make us all have a better life.

 3       So the plaintiff in this case is called Waymo.  Waymo

 4   is -- used to be part of what was Google's -- it's called

 5   Google X, where they did their moonshots, where they did their

 6   things that maybe it would work, maybe it wouldn't work, but

 7   they really wanted to try it.  And so Waymo started out as a

 8   program called the Chauffeur Program.  And then recently it was

 9   created as a subsidiary because it started getting beyond

10   research and into application, and now it's called Waymo.

11       As I explained, the Waymo project, or the Chauffeur

12   Project, started in 2009, and there has been a ton of work

13   that's gone into it.

14       Now, as you can see, this is a picture of the current

15   Waymo car.  It's a self-driving car, Chrysler Pacifica.  Waymo

16   is currently operating this car in the Bay Area, in Phoenix.

17   Also tested it in Austin, Texas; Kirkland, Washington.

18       Waymo has instituted what it calls an Early Rider Program

19   in Phoenix where a person -- a member of the public can order

20   one of these, and it comes, and they can get in.  And in this

21   particular one there is a driver in the car just for safety,

22   but the car drives itself.  And there has been a more recent

23   program where members of the public can order a car that has no

24   driver in it and it just drives by itself.  It's fascinating.

25       As I said, Waymo is ahead of the pack because they started

OPENING STATEMENT / VERHOEVEN

1   a long time ago.

2        Here is a video, just to give you a sense of how this

3   technology works.

4        (Videotape played in open court, not reported.)

5        **MR. VERHOEVEN:**  These are three cars.  You see them on

6   the left.  Those are the passengers on the right, and there is

7   nobody driving the cars.

8        In the first car you can see there is no one there.  It's

9   driving itself.  If you look to the right, you see the map.

10  You see -- that's what you see on the screen of the car.

11       This is the second car.  And this is the third car.

12  Again, nobody is driving.  Folks are sitting in the back seat.

13  It works perfectly.

14       So this is truly revolutionary technology.  And it's going

15  to have a lot of benefits for everyone, everyone in the world

16  once it becomes normalized and used by everyone.  It's going to

17  -- and the evidence will show this.  It's going to improve

18  safety.  Very important.  Tens of thousands of people just in

19  this country die every year in car wrecks.  Believe it or not,

20  these cars work better than humans work them.  And so that will

21  decrease the number of accidents dramatically and save

22  thousands and thousands of lives.

23       There will be less traffic congestion.  You know how

24  terrible it is to drive around here.  And you get these people

25  who don't know how to drive and they cut in and they cut out

1    and they tailgate, and it causes all these traffic jams.  Well,

2    these cars would be set up to drive perfectly and so they won't

3    do those kind of things.

4         And there will be less traffic jams and there will be less

5    cars on the road because people can just order one of these

6    things and it will come, pick them up, and take them wherever

7    they need to go.

8         That will provide new mobility options.  Say, you've got

9    some high school kids and you're too busy to take them to

10   school one morning.  You could just take one -- order one of

11   these cars.  It comes.  Takes them, takes them to school.  It

12   will free you up.  You don't need another person to help you

13   out.

14        This is also true for people with disabilities or elderly

15   people, who in the past would have to call their daughter or

16   son or somebody to help them go to the grocery store or get one

17   place to another.

18        There's just literally hundreds and hundreds of

19   applications that this new technology has that will benefit

20   folks all over the world.

21        Now, this case is about a specific aspect of this

22   technology.  It's called LiDAR, and that stands for Light

23   Imaging Detection and Ranging.  This is a picture of one of

24   Waymo's custom-made LiDARs.  This is the thing that's inside

25   the little bubble on the top of those driverless cars.

1    And what this thing does is it spins around really fast

2    and it shoots out thousands and thousands of points of infrared

3    lasers.  And what happens is these lasers go out, bounce off

4    the objects all around them and come back in.  And these

5    devices then record what -- what the reflection is and are able

6    to establish a 3-D world that the computers in the cars can

7    actually see, just like you can see with your own eyes, except

8    it's 360 degrees all the time.

9        To give you an idea of this, I'm going to show you what's

10   called a point cloud.  And this is basically what the car sees

11   when it has this -- this LiDAR working.

12       So there you see -- that's actually what -- that's the

13   reflection that comes back from these millions of lasers going

14   out, spinning around all the time.  The reflection comes back

15   and that's what the car sees right there.  So it's pretty cool.

16       So LiDAR is really, really important for driverless cars

17   because it's the eyes.  It's like if you -- if you needed to

18   drive a car and you didn't have vision, you wouldn't be able to

19   drive the car.  And it's the same thing with driverless cars.

20   The LiDAR is the thing that gives it the vision so that it can

21   drive safely.

22       This case involves, as I said at the beginning, an

23   engineer that worked at Waymo's and Chauffeur's Driverless Car

24   Program.  His name is Anthony Levandowski.  He's on the right

25   there in that picture, and he has been with -- he was with the

1   Chauffeur Program from the inception, and his focus was on

2   making these custom LiDARs.

3       And the evidence will show that over the years, as Google

4   kept doing these miles and trying different scenarios and

5   learning what worked and didn't work, Mr. Levandowski developed

6   multiple of these custom LiDAR systems that were refined and

7   more refined and more refined, and went from being way too

8   expensive for a car to being cost efficient.  You could

9   actually put it on a car and it would be the right price, that

10  people could actually buy it if they wanted it.  And basically

11  moving the technology from something in a laboratory to

12  something that you could mass produce and put on a car.

13      Now, let me talk about the defendant in this case, Uber.

14  Uber is a very different company.  Uber was founded by Travis

15  Kalanick and another fellow, Garrett Camp, in 2009.

16  Mr. Kalanick was the CEO of Uber beginning in 2010 until about

17  June 2017.

18      Most of you are probably familiar with Uber, too.  Uber

19  offers a mobile application that you can put on your phone and

20  you can use it to order a car.  And it -- you can -- you put

21  your credit card in there and that takes care of it.  You don't

22  have to get your cash out and pay, and a lot of people like

23  that.  I call it ride-sharing technology.

24      Google's technology involves using human drivers.  But in

25  around 2014 Mr. Kalanick, the CEO of Uber, made a determination

1    that Uber needed to develop its own driverless car technology.

2    And here is a transcript from an interview he gave to

3    Bloomberg.  "TK" is Travis Kalanick.

4         "At a high level, Uber is racing towards the

5         future, doing everything we can to catch up to Google

6         on autonomy.  Self-driving, when applied to ride

7         sharing, is the future."

8    And he continues that:

9         "If Uber is not there, we will be out of

10        business."

11   So he made a decision, we're going to be out of business

12   unless we develop this technology for ourselves.

13        And so, as I said, he went out and he hired some folks

14   from Carnegie Mellon and set up a development project in

15   Pittsburgh.

16        This is a picture of John Bares.  He was the founder and

17   head of this development project.  It was called Autonomous

18   Vehicle Center for Uber.  His boss is Brian McClendon.  That's

19   the BAM there.

20        As you can see, they had a lot of problems trying to catch

21   up.  And Mr. Bares, these are his notes.

22        In September of 2015:

23        "Rush to laser.  Team really strained on trying

24        to figure out best sensor."

25        And he writes:

1              "My strain, personal strain, increasing pressure

2         to catch up seven years and deploy 100,000 cars in

3         2020."

4         Uber was simply unable, playing fair, to close this gap so

5    that it might be able to catch up to Google.

6         Here is another -- this is an email to Mr. Kalanick.  And

7    in this email -- this is an Uber document.  Jeff Holden, an

8    executive at Uber, says:

9              "We started from a huge gap with Google, and I

10        think we've all been sobered by how hard it is to

11        close that gap, even with exceptional effort."

12        And then he recommends:

13             "We should double down on laser."

14        That's the LiDAR technology that I was telling you about.

15        So what happened is, the evidence will show, Mr. Kalanick

16   determined we're not going to cut it.  We're not going to make

17   it by playing fair.  And he made a decision.  And his decision

18   was to cheat.  He decided to take the subway.

19        And the evidence is going to show a trail, which I'm going

20   to go through here, of knowing effort to induce Mr. Levandowski

21   from Waymo, to take the trade secret technology he had already

22   developed at Waymo for these custom LiDARs, and bring it and

23   copy it at Uber.  And the story starts here.

24        This is an interview summary from Mr. Levandowski in which

25   he told the interviewer that in October 2015 Mr. Kalanick

 1   contacted him directly.  And I've highlighted a portion of
 2   this.
 3        "Levandowski and Ron" -- Ron is a fellow by the name of
 4   Lior Ron, and he ended up being Levandowski's partner in
 5   leaving Waymo and starting up with Uber.
 6        So Levandowski and Ron went to Uber after this meeting and
 7   discussed selling a nonexistent company.  Selling a nonexistent
 8   company, that doesn't make any sense.
 9        At this time Mr. Levandowski and Mr. Ron were Waymo Google
10   employees.  So they went over to Uber and they started saying,
11   "Hey, what if we" -- Uber said to them, "Hey, what if you set
12   up a company and we paid you a bunch of money to come develop
13   this LiDAR technology?"
14        And Mr. Levandowski said it was at this point that he
15   first seriously considered leaving Uber.
16        The evidence shows that right after that, there's a
17   pattern in which the -- these two individuals started covering
18   their tracks.  And we've redacted out some personal information
19   from these texts, which you can see.  In November
20   Mr. Levandowski is instructing people to delete:
21             "Please delete these texts after use."
22        And Mr. Ron says:
23             "Deleted.  Good call."
24        The evidence is going to show that, repeatedly,
25   Mr. Levandowski inappropriately and secretly downloaded

1   confidential and proprietary Google documents concerning this

2   driverless car program on the very same day he was meeting with

3   Uber executives about moving over to Uber and developing their

4   LiDAR.

5        And here is some evidence.  On December 11th, this is a

6   meeting notice from Uber and it talks about NewCo meeting with

7   Anthony and Lior.  That's what they called this new company

8   that didn't exist yet, that they were going to pay millions of

9   dollars to.  And it happened on December 11th.

10       Well, the evidence is going to show that my client

11  conducted an investigation and found out that on that very same

12  day, December 11th, Mr. Levandowski downloaded 14,000 files of

13  Google proprietary information from an SVN server.

14       The evidence is going to show -- and this is an image from

15  a report investigating this -- that Mr. Levandowski on that

16  very same day, December 14th, transferred those files -- it

17  says 24,000, but it's actually the 14,000.  And the transfer

18  resulted in a bunch of junk files, which our expert will show,

19  transferred those to his personal laptop.

20       And you can see the file name, if you focus on file names,

21  "Chauffeur SVN."  It's the same server information that he

22  downloaded.

23       And these files contained source code, electronic design

24  files, all kinds of technical and proprietary files about

25  Waymo's Driverless Car Program, about Waymo's custom LiDAR.

1   And the evidence will show he took that as part of his plan

2   with Uber to take and misuse Waymo's technology.

3       The evidence of Mr. Levandowski and Mr. Ron trying to hide

4   their tracks continues.  We have gotten access to some of their

5   texts back and forth.

6       And here is some more in December, where Mr. Levandowski

7   says:

8           "Let's do Slack and iMessage only, wink, wink."

9       Well, Slack is a place where you can communicate and store

10  files in a cloud, but there would be no way to track it from

11  Waymo.  And iMessage is a messaging service that's off of the

12  Google Waymo system, and it wouldn't be able to be tracked as

13  well.  Mr. Ron says okay.

14      The evidence is going to show that Mr. Kalanick was

15  driving this; that he was the one who wanted this.  He was the

16  one who decided to break the rule.

17      And so here are some notes from Mr. Bares in December 22.

18  "Meeting with TK."  That's Mr. Kalanick.  And TK says, "What we

19  want" -- what we want from Mr. Levandowski -- "all their data."

20  "Pound of flesh" and, most importantly, "IP."

21      What's IP?  IP is intellectual property.  It's a lawyer

22  term, intellectual property.  IP includes trade secret

23  technology.  It's property.  It's -- it's not just something

24  that's open for anybody.  It belongs to somebody.  That's why

25  they call it intellectual property.

1      So he knew that what he wanted from Mr. Levandowski was

2   Google Waymo's property, its intellectual property.

3      The evidence further shows, if you go to January 3rd, an

4   email to Mr. Kalanick.  The subject line, "NewCo Plan."  And

5   the plan is to pull Anthony and team into Uber.  Uber Super

6   Duper, was the code name for the project "$."  The code name

7   suggested by Mr. Kalanick for this whole project was "$."

8      And then this memorialization of the meeting with

9   Mr. Kalanick:

10         "This laser is the sauce.  "AL" -- that's Anthony

11         Levandowski -- "laser ends up being critical to AV" --

12         autonomous vehicle -- "success.  No clear substitute."

13      So they're meeting with Levandowski and they're

14   determining that his knowledge that he developed while he was

15   at Waymo, these custom LiDAR products is the secret sauce.

16   It's the thing that's critical if they're going to be able to

17   make a self-driving car.  There's no clear substitute to taking

18   what he knows about LiDAR and using it for their own

19   technology.

20      And, once again, Mr. Levandowski inappropriately downloads

21   Waymo Google proprietary information on the very same day that

22   he's meeting with Uber.  Here is -- the day is January 4th.

23   What the evidence will show is that just before meeting Uber on

24   this day, he accessed these files which are in his report on

25   the bottom of this slide.  This is slide number 25.

1     And you'll see in the -- we're going to have a
2  confidential portion of the opening that the judge will explain
3  to you, but what you'll see in that session is that this
4  directly relates to one of the trade secrets that we're
5  contending that Uber misused right before the meeting.
6      And then after the meeting, later that day, 8:00 o'clock
7  p.m., our forensic analysis shows that he downloaded several
8  other highly proprietary files for himself to use as part of
9  his project.
10     It happened again on January 12th.  The very same day that
11  he met with Uber people, he downloads a file.
12     So this is an email from Cameron Poetzscher, who is one of
13  the deal team, to try to make this deal happen at Uber.  He is
14  an executive.  And he says:
15         "Sounds like Jeff/BAM/Bares' convo with AL" --
16     that's Levandowski -- "went well."
17     That was a conversation the day before, January 11.  And
18  the forensic analysis shows on January 11th, later in the day,
19  Mr. Levandowski downloads a file.
20     This isn't just any file, by the way.  This file is the
21  Chauffeur TL Weekly Updates Q4 2015 file.  That's the file that
22  is the entire plan for the project, for the entire development
23  project at Waymo for Q4 2015.  Within it are weekly updates of
24  what people accomplished in all of the different technological
25  areas and what they wanted to accomplish next.

1          Week by week by week by week, it's a complete layout of

2     all the details of what Waymo is doing in Q4 2015.  He

3     downloads that the same day after his meeting with Uber.  There

4     is no -- this is not a coincidence that he's repeatedly

5     downloading files the same day that he's meeting with Uber.

6          There is more evidence that's more circumstantial here,

7     but on January 12 Mr. Bares, who is the head of the ATC

8     program, met with the -- sends an email to another executive at

9     Uber saying -- and, remember, Mr. Bares is the head of their

10    program, technological guy.  He says:

11              "I'm in SF" -- that's San Francisco.  "I'm in SF

12         working something that I can't talk about.  Wonderful,

13         huh?"

14         That's because it was secret.  What they were doing, they

15    weren't even telling the people in Pittsburgh.  They are

16    keeping it a secret.  He couldn't even talk to his other

17    employees about it.

18         Then he says:

19              "I'm trying to swag a dream case long-range

20         laser.  Really want to hear your input, but this is

21         dream land - meaning what would we really want if we

22         could get it?"

23         He's talking with Mr. Levandowski.  And Mr. Levandowski

24    is:  I've got all this technology.  What do you want?  Tell me

25    what you need and we can talk about what I can give you.

1      This is January 12th.  Mr. Levandowski is still working at

2   Waymo, Google.

3      This is a very important email or meeting note.  This is

4   another meeting note from Mr. Bares dated January 21st.  It

5   reflects a meeting with Mr. Kalanick and several executives.

6   And I'd encourage you to read the yellow highlighting.

7          "TK's advice on legal:  Tell them we're going to

8       do it.  Ask how to minimize risk, minimize pain."

9      This is Kalanick saying:  We're going to do it no matter

10   what the legal implications are, legal department.  It's going

11   to happen.  Accept that fact.  Now you go figure out a way to

12   minimize the legal implications of this.  Win at all costs.

13   Second place is for losers.  Find the cheat codes.

14      This is compelling evidence of what they are up to here.

15      Just a few days later, on January 25th, Mr. Bares is

16   talking about what the value of paying these guys to come over

17   would be.  And he says in a written document to Mr. Kalanick

18   that the X factor of the deal -- the X factor, the special

19   thing that makes it better than anything else -- is that they

20   have -- quote, has IP in their heads.

21      Now, IP -- remember what IP is?  Intellectual property.

22   Trade secrets.  Not that they're an expert in the field.  Not

23   that they're a really good engineer, but they have Google's

24   intellectual property in their heads which they can give and

25   copy for Uber.  That's what makes the deal -- that's the X

1    factor for the deal.

2         Mr. Levandowski -- Mr. Levandowski resigned without notice

3    on January 27th.  This is another report -- a page from a

4    report investigating this matter in which an entity known as

5    Stroz said:

6              "A review of the internet history shows access to

7         Google Docs on January 26."

8         That's the day before he left, the day before he left.  In

9    particular, he accessed a file named "Chauffeur TL Weekly

10   Updates, June 4, 2015."

11        Remember that file?  That's the one that had all that

12   information about what Waymo is doing.  He accessed it again.

13             "Further review of the laptop identified a file

14        with the same name in Levandowski's downloads folder,"

15        which is attached as Exhibit 27."

16        He downloaded it to his personal laptop the day before he

17   left, the entire plan for Waymo.  He wasn't happy that he had

18   one from a week ago.  He wanted the latest and greatest version

19   of that plan, so he downloaded it the day before he left.

20        The evidence goes on and it goes on and on.  I'm not going

21   to have time to go through it all.  But the evidence goes on

22   that right after he left, he -- he asked Mr. Kalanick, and

23   Mr. Kalanick agreed that he would indemnify Mr. Levandowski if

24   Google sued him for taking trade secrets.

25        And you'll hear evidence from Uber witnesses that, indeed,

1    Mr. Levandowski said, "I'm not going to do this.  I'm not going

2    to do this deal unless you indemnify me if they sue me for

3    taking this stuff."

4        That was a deal breaker for him.  Have to do it.  And they

5    agreed to do it.

6        Here we have texts showing exactly what I'm talking about.

7    This is March 1, a text from Mr. Levandowski to Mr. Kalanick:

8            "I just see this as a race and we need to win.

9        Second place is first loser."

10       Another text, same day, from Mr. Levandowski to

11   Mr. Kalanick:

12           "We need to think through the strategy to take

13       all the shortcuts we can find.  Want to get on that

14       subway."

15       Another text, a few days later, from Mr. Ron,

16   memorializing a conversation he had with Mr. Kalanick on

17   March 13th:

18           "TK, this is all about winning.  To win, we have

19       to cross the finish line first.  Losing is not an

20       option."

21       The evidence will show that on April 11th, Uber did a deal

22   to buy this company, this NewCo that didn't exist.  Once

23   Mr. Levandowski left, they gave it a name.  It's called

24   Ottomotto.  Ottomotto is one of the defendants in this case,

25   and Uber purchased it.

1     And in the terms of the deal, there were milestones that
2  Mr. Levandowski had to meet.  And if he met them, he would get
3  hundreds and hundreds of millions of dollars.
4     And this is the presentation that was made to the board of
5  Uber and explained the rationale for the deal.
6           "Lasers are critical to Uber's autonomous vehicle
7           development, and Ottomotto is expected to de-risk our
8           current laser approach.  It's expected to accelerate
9           current timelines in the race."
10  The "Structure of the Deal" slide for the presentation.
11  Levandowski and his group are going to get paid $592 million.
12  Now, Mr. Levandowski didn't even have this company until he
13  left Waymo at the end of January.  So this is two months later.
14  And they're saying, oh, he's worth -- him and his guys are
15  worth $592 million, but they hadn't done anything yet.  They
16  hadn't created anything yet.  What were they buying?  They were
17  buying the IP technology.
18     The structure of the deal said that all of these payments
19  were tied to the achievement of the technical milestones.  So
20  they're saying to Levandowski:  We're going to give you
21  millions of dollars, but you've got to deliver and you have to
22  deliver these technical milestones really, really fast.
23     And the evidence will show, faster than anybody could --
24  who didn't already have them and copy them to do them.
25     And then it said Uber will indemnify -- as part of the

OPENING STATEMENT / VERHOEVEN

1  deal, they agreed Uber will indemnify Mr. Levandowski.

2  "Indemnify" means that if you get sued, we'll pay for your

3  legal expenses.  If there's a judgment against you for a

4  million dollars, we'll pay for that, too.  It's

5  indemnification.

6      And they agreed, Uber will indemnify Levandowski and his

7  group from, quote, claims from former employees, e.g., IP,

8  intellectual property.

9      In fact, the indemnification agreement -- the

10  indemnification agreement specifically referred to bad acts.

11  This is a copy of the indemnification agreement that's signed

12  by Mr. Kalanick.

13      And bad acts is defined as:

14          "Misappropriation by an employee of any trade

15      secrets of such employee's former employer."

16      So this is saying, look, if you get sued for bad acts --

17  i.e., taking trade secrets from your employer -- we're going to

18  pay for that.  We're going to indemnify you.

19      And, finally, when the deal was signed a few days later,

20  Ottomotto received $21 million up front.

21      What happened after the deal was signed?  Levandowski went

22  into war mode.

23      And here is another Bares note, "Top priorities from

24  Travis Kalanick."  The redirected top priorities.  And there it

25  is right there:

1          "Cheat codes.  Find them.  Use them."

2       See that there?  He wanted them to cheat.  Find the cheat

3  codes for the video game so that you can jump and leapfrog.

4       Under "Tone" it's recorded as:

5          "The golden time is over.  It's war time.  Going

6           slower is not an option anymore.  Top down versus

7           bottom up.  In each area what we do we -- we do what

8           we need to do to win, then figure out how to get

9           there.  Reality that matters is catching up.  This is

10          the only reality that matters."

11      Now, a little bit later in that same day Mr. Bares notes

12  a, quote/unquote, jam session with Mr. Kalanick.  And he

13  records that Mr. Kalanick wants Anthony Levandowski to allow us

14  to leapfrog, to jump on the subway, to leapfrog Google and

15  allow them to catch up.

16      Finally, on May 13th Mr. Holden sent Mr. Kalanick another

17  email talking about this war.

18          "This war for self-driving is truly existential

19          for Google.  We'll either start up our second S curve

20          of growth or we'll die.  We have two-story arcs.  The

21          battle is about what we need to do to get ourselves

22          into a sufficiently competitive position before

23          December that G" -- Google -- "doesn't walk away with

24          the crown for future ride-sharing.  The war is a

25          long-term defeat for Google."

1    Evidence is going to show that the CEO of Waymo met with

2  the CEO of Uber in July of 2016.  This is after Mr. Levandowski

3  has left.  This is after Uber has secretly signed this deal

4  which they signed in April.  This is when Mr. Levandowski and

5  his group are using trade secrets to develop -- that Waymo had

6  to develop their technology.  And what happens at this meeting?

7    Well, you'll hear the testimony.  Uber never mentioned any

8  of it.  Doesn't mention that it's hired Levandowski.  Doesn't

9  mention that there's agreements that it signed.  It's

10 telling -- it shows what they knew what they were up to.

11   And the evidence is going to show that Mr. Kalanick fibbed

12 when he told the press once he announced the deal.  So back to

13 this Bloomberg transcript, the interview.  He says:

14          "So just to close the loop, you meet with TED.

15   The technology isn't ready.  When did you reconnect?"

16   I'm sorry, "You meet at TED."  That's a TED conference.

17 So he meets Levandowski at a TED conference.  The technology

18 isn't ready.  When did you reconnect with Levandowski?

19   Kalanick says:

20          "We reconnected after he got Otto up and

21    running."

22   Well, we just saw the documents that show that's not true.

23 In fact, their plan before anything happened, when Levandowski

24 was still at Waymo, was to set up this fake company and then

25 purchase the company to make it look like they were doing

 1   something that was legitimate, when they weren't.

 2        When they announced the deal, Kalanick informed the public

 3   that Mr. Levandowski would be put in charge of Uber's

 4   self-driving car program.  And he referred to him, quote, I

 5   feel like we're brothers from another mother.

 6        Now, when I sit down, my friend, Mr. Carmody, is going to

 7   stand up and he's going to tell you from their side what the

 8   evidence is going to show.

 9        What I would like to tell you, but we're going -- and we

10   are going to do it -- it's going to be in a confidential

11   session -- is what the actual technology they took is.  What

12   the specific things that you can look and you can see:  Was

13   that Waymo and is that Uber?  This LiDAR technology.

14        And there is tons of evidence.  There is -- you'll see for

15   your own eyes, direct copy.  But I can't talk about that in

16   this session because, obviously, we can't reveal our trade

17   secrets to the press.

18        But I know that -- I suspect that Mr. Carmody is going to

19   stand up in this session and say, "Hey, there's no real trade

20   secrets here.  This is just common stuff.  And they're just

21   trying to prevent Mr. Levandowski from leaving and doing what

22   he wants to do."

23        And I suspect they're going to point to an email, a stray

24   email from a gentleman named Sasha Zbrozek, and point out that

25   he mentioned -- let me tell you who he is.

1          He was the administrator of that SVN server, where the

2    14,000 files were downloaded.  And we asked him, once we had

3    figured out what was going on, to figure out what -- there was

4    downloads by Mr. Levandowski because he was the administrator

5    at the time.

6          And he created a stray email in which he said that he

7    considered the information "low value enough that we even

8    considered hosting it off of Google's infrastructure."

9          He's going to stand up and say:  That means there aren't

10   any trade secrets; that Google itself thought everything was

11   low value.

12         Well, you need to wait until the confidential section, and

13   you'll -- of the openings, and you'll see for yourself that's

14   not true.  But you should know that this engineer, number one,

15   he wasn't in the LiDAR program.  He didn't even know that LiDAR

16   technology would be trade secret or not.

17         Two, he was talking about, as opposed to personal

18   identifying information, which is the most secret thing that

19   Waymo or Google has -- your information is the most secret.

20   You cannot let that ever get out.  That's more important even

21   than our trade secret technology.  And so you're going to hear

22   a lot of hand-waving about this single email.

23         And, finally, if that's true, if everything is so low

24   value, why did you just see all of these documents from the CEO

25   of the company talking about this technology?  The secret

1   sauce.  The X factor.

2       There's another thing you may hear from the other side, is

3   we hired an investigative firm before we did the deal to look

4   into and make sure that Mr. Levandowski didn't take the

5   information and bring it to Uber and that this firm downloaded

6   the devices and secured them, quarantined them somehow, so that

7   nothing came over to Uber.

8       And I don't have enough time to go into that in detail,

9   but the evidence is going to show that they didn't quarantine

10  everything; that they didn't even look at Ottomotto's files.

11  They didn't even looking at Levandowski's cloud accounts.  They

12  gave Levandowski back his cell phone, which had all kinds of

13  stuff on it.

14      They squeezed the Stroz investigation and asked them for a

15  report when they -- and the evidence will show they sent back

16  to them, "We haven't even reviewed 1 percent of the data that

17  we need to review."

18      And then just a few days later they did this deal, not

19  knowing what the Stroz report would be.  In fact, the little

20  they knew when they did this deal on April 11th raised hundreds

21  of red flags because Stroz provided an interim report that said

22  that Levandowski had massive amounts of Google documents on his

23  laptop; that he had tried to delete some of those, and that

24  they sent them one of the file -- one of the file folders, and

25  they didn't have time to look at the documents, but they had

1   time enough to characterize them.  And you'll see hundreds of

2   documents that Stroz labeled "Google Proprietary Presentation,"

3   "Google Proprietary Specification," "Google Proprietary."  A

4   whole long list was delivered to the attorneys for Uber before

5   they did the deal on April 11th.  What did they do?  They did

6   the deal anyway.

7         So when you hear that this was all put in a vault or

8   quarantined, the evidence is not going to show that.  The

9   evidence is going to show that this whole Stroz investigation,

10  just like the creation of Ottomotto, was a sham.

11        You remember the email that I asked you to think about

12  where Mr. Kalanick says to the Legal Department:  Tell them

13  we're going to do it.  Ask them how to minimize the pain.  The

14  Stroz report is going to show what the attorneys came up with

15  to try and minimize the pain, but there was no question that

16  they were doing this deal no matter what happened at Stroz.

17        Finally, I'd like to talk a little bit about how Waymo has

18  been harmed by all this.  And you're going to hear evidence

19  about that, but for purposes of my opening, let me just show

20  you what the parties who did this deal thought about the value

21  of this technology.

22        Mr. Bares, who I've told you about, on December 20th took

23  some notes in advance of a Levandowski meeting.  And it's kind

24  of hard to read, but it says he would bring filter device about

25  what to try and not try, dot, dot, dot.

OPENING STATEMENT / VERHOEVEN

 1      Then it is:

 2           "A day with him and our team could save us months

 3           toward 2020, which is our goal, (month equals 20

 4           million run rate)."

 5      That's how valuable they thought this technology was.

 6      Mr. Ron, who was on the other side of the transaction with

 7   Mr. Levandowski, created a text where he talks about the value

 8   of the deal.  And he says:

 9           "Accelerate 300 to $500 million a year.  Cut at

10           least a year, probably more.  Plus accelerate - reduce

11           capital cost to compete with Google in the meantime.

12           Few hundred millions on top."

13      They knew this was -- technology was very valuable and

14   that taking it would be very harmful to Waymo.

15      And then, finally, their own presentation, where they

16   calculated the present value of what they thought the

17   incremental EBIT -- Earnings Before Interest and Taxes --

18   contribution of the deal would be to Uber.  They had a bunch of

19   ranges.  The lowest was $836 million, and the highest was

20   $3,923,000,000.

21      So, members of the jury, we're here, like I said, because

22   Uber decided to take the subway.  They decided winning was more

23   important than competing fairly and obeying the rules.

24      I ask you to listen to the evidence carefully, and I thank

25   you for your time.

1      **THE COURT:**  All right, Mr. Verhoeven.  Thank you.

2      **MR. VERHOEVEN:**  Your Honor, are we going to tell the

3   jury about the closed session?

4      **THE COURT:**  Well, I need to ask -- yes.  We're going

5   to have a -- you're going to have a public session, right,

6   Mr. Carmody?

7      **MR. CARMODY:**  I am, Your Honor.

8      **THE COURT:**  And then we will have the closed session,

9   where the public is excused, where you two can talk about the

10  alleged trade secrets.

11     But let me ask you this:  We've only been here an hour.

12  Can you all go about 30 more minutes before we take a break?

13     (Jury panel nodding affirmatively.)

14     **THE COURT:**  Are you ready to start now?

15     **MR. CARMODY:**  I guess so, Your Honor.

16     **THE COURT:**  Well, what does that mean?

17     **MR. CARMODY:**  I was going to ask for a restroom break,

18  but --

19     **THE COURT:**  No, we'll accommodate you.

20     We're going to take a 15-minute break at this time.

21  Please remember my admonition, meaning no talking about the

22  case yet.  It will be your duty to talk about the case at the

23  end of it, but not yet.  Just talk about the Super Bowl or

24  something else.

25     All right.  The Clerk will take you into the jury room.

```
 1          THE CLERK:  All rise for the jury.

 2      (Jury exits the courtroom at 9:05 a.m.)

 3          THE COURT:  Be seated.

 4      Mr. Carmody, you may arrange things the way you want them.

 5  How much time would be public and how much time will be

 6  private?

 7          MR. CARMODY:  My best guess, Your Honor, is the public

 8  session be about a half hour, and the bulk of our opening will

 9  be the private session.

10          THE COURT:  All right.  So, members of the public,

11  when we get to the part where I have to excuse you, I apologize

12  in advance.  You can see the problem.  The alleged trade

13  secrets won't be secret anymore if you get to report on it.  So

14  we -- we will have to excuse everybody but those people who are

15  cleared under the protective order at that point.

16      All right.  So we'll take a 15-minute break at this time.

17  Thank you.

18      (Whereupon there was a recess in the proceedings

19       from 9:06 a.m. until 9:23 a.m.)

20          THE COURT:  Welcome back.  Be seated.

21      So before we bring the jury in, have you reviewed the

22  handout that my Law Clerk -- the handout about the alleged

23  trade secrets?

24          MR. GONZÁLEZ:  We did, Your Honor.  That's fine.

25          THE COURT:  Both sides?
```

1      **MR. VERHOEVEN:**  We haven't seen it.

2      **THE COURT:**  Yes, you have.

3      **MR. VERHOEVEN:**  It's fine, Your Honor.

4      **THE COURT:**  All right.  Then how about the timeline,

5  which is just a copy of what you have up there?  Is that okay

6  too?

7      **MR. GONZÁLEZ:**  Yes, Your Honor.

8      **MR. VERHOEVEN:**  Yes, Your Honor.

9      **THE COURT:**  So my Law Clerk will place those two

10  things on each seat.

11      I understand there is an issue about -- well, you wanted

12  to have a sidebar about someone being able to stay here during

13  the nonpublic part.  Have you worked that out between you?  If

14  not -- if not, we'll -- let's do this.  At the time we begin

15  the private part, we will -- you can come forward and be heard.

16  All right?

17      **MR. VERHOEVEN:**  Yes, Your Honor.

18      **THE COURT:**  All right.

19      Mr. Carmody, are you now prepared?  Have you got it all

20  set up the way you want?

21      **MR. CARMODY:**  We do, Your Honor.  Thank you.

22      **THE COURT:**  All right.  Let's bring back our jury,

23  please.  You used 55 of your 70 minutes.

24      **MR. VERHOEVEN:**  Thank you, Your Honor.

25      **THE COURT:**  All right.

1          (Brief pause.)

2          THE COURT:  Mr. Carmody, I'm going to explain to them

3     what the handouts are.  You can stand there if you wish, but it

4     will take about 30 seconds.

5          THE CLERK:  All rise for the jury.

6          (Jury enters the courtroom at 9:25 a.m.)

7          THE COURT:  Welcome back.  Be seated, please.

8          Now, before we resume, you will see that we put two

9     handouts on your chair, and one of these is the timeline that

10    the lawyers have been good enough to agree on.

11         This timeline is not every important date in the case.

12    Really, there would be more dates in there if it was every

13    single one, but it's just a general representation of some of

14    the important dates in the case.  And over many trials I have

15    found that if the jury has a simple enough framework on a big

16    board like that, it helps you, the jury, fit the testimony in

17    as one witness after another comes in.

18         When they refer to some meeting that happened on January

19    X, 2016, or '17, then you can glance at the timeline and kind

20    of get a feel for where it fits in.

21         That's all it is.  It's not really evidence in the case.

22    It's -- it's just a demonstrative calendar aid to help you.

23         So you can keep your own personal copy of this and tuck it

24    in the back -- fold it over and tuck it in the back of your

25    steno pad and consult it as you wish.  You don't even have to

 1    consult it.  That's up to you.  It's there for your

 2    convenience.

 3         The second one is a list of the alleged trade secrets in

 4    summary form, a single page.  There will be much more evidence

 5    presented at trial about them than is on that one page, but

 6    both sides thought it would be a good idea to give you

 7    something like this as a handy-dandy, very quick-and-dirty

 8    summary so that you can keep it straight.  Again, there will be

 9    more evidence about it.  And the list itself is not evidence.

10         Now, this particular one, you've got to keep secret for

11    the rest of your life until I give you instructions to the

12    contrary, which I might, of course.  But this one, because it

13    does summarize the alleged trade secrets, it has to be kept

14    secret for the time being.

15         Now, I'm in no way saying they qualify as trade secrets;

16    that's for you to decide.  I'm not saying they don't qualify;

17    that's again for you to decide.  But in order to even preserve

18    the option, we've got to keep it secret for the time being.

19         So that one, that one requires special handling on your

20    part.  But you're the jury.  You get it.

21         Okay.  Got that part?  If I was you, I would fold them in

22    half, stick them in the back of your steno pads and consult

23    them as you feel you wish you want to.

24         Mr. Carmody, are you now prepared?

25              **MR. CARMODY:**  I think so, Your Honor.  Thank you.

 1          **THE COURT:**  Now, remember, this is Mr. Carmody.  He

 2   represents both defendants.  And now he will give the opening

 3   statement on their behalf.

 4       The floor is yours.

 5          **MR. CARMODY:**  Thank you, Your Honor.

 6                          **OPENING STATEMENT**

 7          **MR. CARMODY:**  That was quite a story we just heard.  A

 8   tale of conspiracy between Anthony Levandowski on one hand and

 9   Uber on the other.  I want to tell you right up front, it

10   didn't happen.  There's no conspiracy.  There's no cheating.

11   Period.  End of story.

12       I'm Bill Carmody.  I'm here on behalf of Uber.  And we've

13   waited a long time to be here with you before a jury of our

14   peers because, as jurors, you're able to dig deeper and

15   separate these sensational emails you see from the truth.

16       Now, Anthony Levandowski is not a party in this case.  So

17   what Waymo wants you to believe is Anthony Levandowski got

18   together with Uber as part of some grand conspiracy to cheat

19   and take trade secrets.  But, like most conspiracy theories, it

20   just doesn't make sense once you hear the whole story.

21       Let me give you a couple of examples of things that are

22   really important facts that you didn't hear in the last hour or

23   so.

24       First, Waymo wants you to believe that Uber paid hundreds

25   of millions of dollars for Levandowski's company to get trade

1    secrets.  That's what the payment was for.  Not true.

2        What Waymo doesn't tell you is that there was $100,000

3    paid to Anthony Levandowski and his company.  $100,000, not

4    hundreds and hundreds of millions of dollars.  You saw the

5    592 million.  Didn't happen.  The big, big dollars would only

6    come if these performance milestones were met and Uber became

7    top of the heap in this self-driving car business.

8        You know what Waymo didn't tell you?  That Google had that

9    same program.  They didn't tell you that Google had that very

10   same program.  And you know what the purpose of Google's

11   program was?  To make Anthony Levandowski rich if their

12   Chauffeur Program succeeded.

13       Larry, who's being talked about, is the co-founder, CEO of

14   Google and his directive was that if this Chauffeur Program

15   succeeds, make Anthony Levandowski rich.  And you know what you

16   didn't hear?  Anthony Levandowski was paid by Google

17   $120 million.

18       We have -- we have Waymo wanting to make this whole deal

19   and the dollar signs being thrown around for this Uber

20   acquisition of Otto.  They want to make it sound suspicious,

21   when they did the very same thing themselves.

22       There's another thing they said that's really important

23   here.  The whole gist of this opening was that this conspiracy

24   results in Uber getting the crown jewels, getting Waymo's crown

25   jewels.  Not true.

1    You know the downloads he's been talking about the whole

2    time.  If you take a look on this big timeline -- it's

3    December 11 -- it says:

4            "Levandowski accesses Google's SVN server and

5        downloads."

6    These downloads, according to the engineer who designed

7    the server -- he's a fellow who designs -- the Google engineer,

8    he designs circuit boards himself, what's at issue in this

9    case.  He designs circuit boards.  He designed a server.  He

10   decided where things go, where things don't go.

11   Let's see what he said, and then let's talk about what

12   counsel didn't tell you about the importance or non-importance

13   of these downloads taken by Anthony Levandowski while he was at

14   Google.

15   The engineer at Google, he says it's all electronic

16   designs, schematics and PCB layouts -- those are printed

17   circuit board layouts, what you're going to be hearing a lot

18   about in this case -- and the component library for their

19   creation.

20           "It was considered low value enough that we had

21       even considered hosting it off the Google

22       infrastructure."

23   Counsel described this email, I believe, as a stray email.

24   He didn't tell you that this email was written by this Google

25   engineer to who?  The Waymo lawyers.  The Waymo lawyers before

1  this suit was filed.  That's the fair context of this email.

2      And you know it's bad when they got to mention it in their

3  part of the opening to try to explain it away.  These

4  documents, the whole basis of what Waymo says triggered this

5  lawsuit, they are unimportant, these downloads.

6      And you know what else Waymo didn't tell you?  That Uber

7  never got any proprietary information.  Let me step back and

8  say this again.

9      You've heard all these examples about the race, Rosie Ruiz

10  cheating to win the Boston Marathon; right?  Waymo, in this

11  case, was the race official.  You know why?  Not once or twice

12  or three or four, five, or six or seven or eight or nine times,

13  not ten, but 11 different times Waymo, as the race official,

14  comes over to Uber to inspect all -- inspect the LiDAR we make,

15  inspecting the computers, inspecting everything to make sure

16  there's no cheating.

17      And you know what happens?  There is not a single piece of

18  Google proprietary information at Uber, not the 14,000 --

19  forget about the 14,000 downloads.  I'm talking about nothing.

20  Zero.  That's it.  Period.  They don't want to talk about that.

21      What else isn't Waymo telling you in this case?  That

22  Anthony Levandowski -- who you heard his name a whole bunch of

23  times.  They are not telling you that these downloads -- they

24  say the theft here of the trade secrets, which somehow are in

25  Fuji, they don't tell you that Anthony Levandowski had nothing

 1   to do with the part of Fuji at issue here.

 2        Let me say that again, because this is the elephant in the

 3   whole courtroom.

 4        You hear -- you see the sensational emails.  You hear

 5   about Anthony Levandowski.  If I'm you, I'm like, uh-oh, this

 6   doesn't look so good for Uber.  So let me say this again.

 7   He -- obviously, Anthony Levandowski did some things at Google

 8   he shouldn't have done, but there is no connection whatsoever

 9   between any files he downloaded, all these little emails, and

10   what's in here.

11        What's in here comes from people at Uber, real engineers,

12   other engineers, who bring to bear their engineering talents,

13   not stealing Waymo's trade secrets.  They're bringing to bear

14   what they know in their head, what they've learned in their

15   lives, all the engineering skills, all the publicly-known ideas

16   they have to work on part of this LiDAR at issue.

17        This turns out that Waymo has the same thing in part of

18   its LiDAR.  But the point that's so fundamental to this case is

19   Waymo doesn't own every idea in its LiDAR.  I mean, nobody can

20   own engineering concepts and engineering talent that every

21   LiDAR engineer brings to bear.  Nobody can own publicly known

22   ideas that we can all look up on the internet or books or

23   patents.

24        That's why, at the end of this case, the most important

25   thing for you all to do is to determine if the engineering

1   concepts that we're going to be talking about more in the

2   private session, which are the heart of this case, whether

3   they're trade secrets at all.

4        Waymo bears the burden of establishing that each and every

5   one of these so-called trade secrets are actual trade secrets.

6   And to do so, they've got to hit the small target downfield

7   there.  And it's because engineers, California and everywhere

8   else in America, are free to go from one job to the other.

9   They don't get a lobotomy in between.  They bring all their

10  engineering talent, all the skills they've learned, their

11  education, the publicly known stuff they've worked with, and

12  they can work on the very same technology in the new company.

13  That's okay.  The only thing that's not okay is if they take

14  their former employer's trade secrets.

15       Now, I want you to meet here the engineers, the very

16  talented engineers at Uber who are responsible for designing

17  and building the very small little part of this LiDAR that's at

18  issue in this case.  There's three of them.  They're all going

19  to come and testify.

20       We have Gaetan Pennecot, James Haslim and Scott Boehmke.

21  And they are going to tell you that Anthony Levandowski had

22  nothing to do with their work here.  They're going to tell you

23  there's no trade secrets here.  What they did is what every

24  LiDAR engineer does on a daily basis.  They make decisions and

25  solve problems based on what's in their head, what they've

OPENING STATEMENT / CARMODY

1   learned in life.

2       And so when we step back here and think about this, at the

3   end of the case what you're going to realize is the tech here

4   tells the truth.  And when I have a chance in the closed

5   session, when the public is gone, I'm going to walk through,

6   painfully, a little slow, but all the different so-called trade

7   secrets to show you that they're just not.

8       So you might be saying:  Well, if Waymo is suing Uber and

9   these aren't real trade secrets, why are we even here?  How did

10  we get this far?  What's this all about?

11      It started a few years back at Uber, before there was ever

12  a Waymo.  What Google decided is -- Google was concerned.  Let

13  me just tell you right up front.  Google was concerned about

14  its biggest competitive threat.  You know its biggest

15  competitive threat is Uber.

16      What Uber -- excuse me.  What Google was doing was saying:

17  Hmm, we've got this self-driving car program.  How do we make

18  the big bucks here?  And so what they realized is the way to

19  make the big dollars in a self-driving car program is to

20  compete against Uber in its ride-sharing business.

21      And we're going to show you an internal Google

22  presentation from a couple years ago that we get because of

23  this lawsuit.  And it talks about entering this ride-sharing

24  market -- TaaS up top means Transportation as a Service --

25  talking about how formidable Uber is and, importantly, scheming

1  behind the scenes as to what it would take to consume all of

2  Uber's profits in 2025.

3      Uber, around the same time, realizes the future of its

4  ride-sharing business is to get into self-driving cars.  And so

5  what Uber does is it goes to the epicenter of robotics.  It's

6  Pittsburgh, Pennsylvania.  It's Carnegie Mellon University.  I

7  mean, they're second to none up there.

8      They go up, Uber does, and acquires -- puts together a

9  several-hundred-million-dollar deal and acquires a renowned

10 group of engineers to start Uber's self-driving car program.

11 The initials ATG stand for the Advanced Technology Group.  And

12 it's headquartered up in Pittsburgh, and you can see the

13 results of this deal up on the screen.  But there's also folks

14 in the group that are right here in San Francisco.

15     And I want to take a moment and introduce you to Eric

16 Meyhofer.

17     Eric, would you stand up a second?

18     (Mr. Meyhofer rises.)

19     **MR. CARMODY:**  Eric is here with us as a representative

20 of both of the defendants in this case.  Eric is the head of

21 the whole ATG company-wide in Uber.  He's going to be here for

22 the public portions of the case that he's allowed to see.

23     (Interruption in the proceedings.)

24     **THE COURT:**  I'm very sorry.  I have been doing this

25 job 19 years.  This is the first time signals have come in from

1   outer space.  And it makes me wonder if -- there are so many

2   issues this raises, but what we're going to do -- with

3   apologies to Mr. Carmody.  It's not his fault at all.  He had

4   nothing to do with this.

5       We're going to ask you to go back into the jury room until

6   I can sort this out, and then we'll bring you back in here.

7   Please remember my admonition.

8       Thank you.

9           **THE CLERK:**  All rise for the jury.

10      (Jury exits the courtroom at 9:45 a.m.)

11          **THE COURT:**  The public can be excused.  You can stay

12  here, if you wish.

13      I don't know what this is.  My courtroom court reporter

14  thinks it's Judge Breyer's courtroom on 17.  She recognizes

15  Lashanda's voice.  Why in the tarnation this would be coming

16  through on our system, it just is not right.  I cannot even --

17  I won't even venture an explanation.  So we've got to sort this

18  out.

19      This makes me wonder, well, does that mean that every

20  trade secret that we're going to be talking about is going out

21  to all the other courtrooms?  That would be crazy.

22      So your judge is not too happy about this.  So we've got

23  to sort it out.  Be ready to go in a few minutes.

24      (Jury exits the courtroom at 9:47 a.m.)

25      Counsel, in my moment of need, the IT people naturally

 1  have abandoned me, but possibly -- this is just my theory.  She

 2  was using the wireless mic on number 17 floor, and our receiver

 3  on 19 was picking it up.  That's a crazy theory, but that's the

 4  best I can come up with.

 5      We've turned that -- we've turned our wireless mic off.  I

 6  don't know why our wireless mic would have been on to begin

 7  with, but it was -- it's off now; right?

 8          THE CLERK:  Yes.

 9          THE COURT:  So if that was the problem, maybe we're

10  okay.  I -- we're not picking it up any more.  I'm -- I hate

11  for a lawyer to have this happen in the middle of their

12  opening.

13      Do you want to -- I'll do whatever you want.  Do you want

14  to proceed?  Do you want to wait?  What's your druthers?

15          MR. CARMODY:  I guess the bottom line, Your Honor, is

16  I would like -- we do have some slides.  I'd like to be able to

17  show those.

18          THE COURT:  We will.  Can we -- is the rest of our

19  system going to work, Angie?

20          THE CLERK:  Yes, Your Honor.

21          THE COURT:  So the slides will work, I think.

22          MR. CARMODY:  What are we missing then?

23          THE COURT:  Nothing.  The wireless mic is the only

24  thing that will be off, and we don't need that.

25          MR. CARMODY:  And I guess I have a question.  Could I

 1  borrow a minute from the court maybe to kind of get back on

 2  track where I was there?

 3          THE COURT:  Yes.

 4          MR. CARMODY:  Thank you.

 5          THE COURT:  Okay.  Here's what we're going to do.

 6  We're going to try it.  And I am giving you a extra

 7  commendation for putting up with this nonsense.  And then you,

 8  if it turns out you get -- it happens again, then I don't know.

 9  We'll figure out something fair.  But this is not the way to

10  run a railroad.

11      Yes?

12          MR. VERHOEVEN:  All that's fine with me, Your Honor.

13  I'm just a little concerned about the confidential session, if

14  we're not sure that we're not broadcasting somewhere else.  It

15  would be nice if we had assurance there.

16          THE COURT:  Well, when the IT people get here, we'll

17  ask them that very question.

18          MR. VERHOEVEN:  Okay.

19          THE COURT:  That's a fair point.

20      All right.  So let's do this.  Let's -- but you've only --

21  you've only used up 13 minutes, and I'm going to give you a

22  couple more.  So you've got a long way to go before you even

23  get to that part; right?

24          MR. CARMODY:  Yes, yes.

25          THE COURT:  So maybe by then the IT people will show

 1    up.  Okay?

 2        All right.  So let's bring back our jury and stumble

 3    ahead.

 4        **MR. CARMODY:**  Your Honor, what I'm hearing from the

 5    tech guy is the system is gone.

 6        **MR. GONZÁLEZ:**  We need to make sure everything is

 7    working before we bring them in.

 8        **THE COURT:**  Angie, power up the overhead projector.

 9    Okay.  Make sure everything else that you want is working.

10        Kanu, look in the jury box...

11        **MR. CARMODY:**  I'm all set.  I got a sneak preview.

12        **THE COURT:**  All right.  So we're ready to go.  Thank

13    you.

14        (Jury enters the courtroom at 10:00 a.m.)

15        **THE COURT:**  All right.  Welcome back.  You all will

16    eventually learn that if you come in in order, you don't have

17    to step across each other.

18        All right.  Now, the mystery signal from outer space, we

19    don't quite know yet.  And Mr. Carmody is being a good sport

20    about it and is willing to go ahead even though I can't give

21    him a guarantee that it won't recur.  So he's willing to do

22    that.

23        Bear with him in case this happens again.  We're trying to

24    save you time.  That's what's going on here.  We don't want to

25    waste your time.  So I'm giving him a couple of extra minutes

 1   to get back on track.

 2        Mr. Carmody, please continue.

 3        **MR. CARMODY:**  Thank you, Your Honor.

 4        What I was talking about before our little break is what

 5   this case is really about, which is Waymo wanting to stop its

 6   biggest competitive threat, Uber.

 7        And we kind of finished with talking about Uber realizing

 8   the future of its own ride-sharing business was getting into

 9   self-driving cars and how they went up to Pittsburgh,

10   Pennsylvania and got a whole bunch of engineers and a big-time,

11   several-hundred-million-dollar deal from car dealer robotics up

12   there.

13        And you can see the results on the screen.

14        Now, what happens as soon as this news gets public?  The

15   very next day the head of Google's self-driving car program,

16   Chauffeur, his name is Chris Urmson, he sends an email that I'm

17   going to show you to the founders of Google, Larry Page and

18   Sergey Brin, telling them -- sounding the alarm, telling them

19   that the Google program that you've heard is so many, so many

20   years ahead, they weren't playing to win anymore.

21        Let's take a look at what Mr. Urmson says to Larry Page

22   and Sergey Brin.  He says:

23             "We have invested in self-driving cars, but over

24        the last six months we've stopped playing to win and

25        instead are now playing to minimize downside."

1    He says Uber is acquiring the people that he wanted to get

2  about a year and a half ago, but was denied the opportunity to

3  do so.

4    He considers potentially hiring away people from Uber who

5  might be important to Google.

6    He concludes with:

7        "We have a choice.  The choice between being the

8        headline or footnote on history's book on the next

9        revolution in transportation.  Let's make the right

10       choice."

11   That's what he says.  You know why he says it?  Because he

12  realizes he knows that the lifeblood of a self-driving car

13  program is engineering talent.  Google then had the best

14  engineers, but they were scared to lose them to Uber.  They

15  knew -- the only way -- Google knew the only way they could

16  possibly win in the self-driving car market was to get and to

17  retain the top engineering talent.

18   You know why?  In Silicon Valley today's technology is

19  kind of yesterday's news.  It goes so fast.  It's like, you

20  know, we buy a computer or bring a phone home and by the time

21  you we get home it's outdated.

22   What they're looking for, what Google is looking for, what

23  Uber is looking for are the most talented engineers who could

24  build tomorrow's technology.  That's what this is all about.

25  And so just two days after this email, this head of

 1  self-driving car over at Google, you know what he does?  He

 2  puts together a list.  He puts together a list of employees he

 3  doesn't want Uber to get.

 4      But the Chauffeur engineers aren't happy.  Anthony

 5  Levandowski is not happy.  And Anthony Levandowski leaves.  And

 6  look who's upset.  Larry Page, the founder.  You know, Mr. Big

 7  at Google.  He is not happy about this.  And we see that Larry

 8  Page is upset because the folks that were the head of Chauffeur

 9  allowed Anthony Levandowski to leave.

10      Larry Page is worried that Anthony Levandowski is going to

11  start something competitive.  And Larry Page is upset that

12  Anthony Levandowski leaves.  And guess what?  Google still owes

13  them his $120 million bonus.  Fifty was paid.  He's still got

14  another 70 to go, and he walks out the door.  But when Anthony

15  Levandowski leaves, the floodgates open.  Other engineers, and

16  lots of them, go to Anthony Levandowski's new start-up called

17  Ottomotto.

18      And we can see here Chris Urmson -- remember the fellow

19  who just wrote the email alerting Larry Page and Sergey Brin --

20  he gets replaced by a gentleman by the name of John Krafcik, an

21  automobile executive who comes over to become the new kind of

22  CEO of Chauffeur.  And now he's the CEO of Waymo.

23      He comes in after a couple more people leave.  I mean,

24  they're just going like this (snapping fingers).  And he says,

25  "We need a plan."

1        I'm going to tell you what the plan is.  The plan is they

2   bring in the lawyers.  They bring in the investigators.  And

3   for Anthony Levandowski and 13 other people who went to join

4   Anthony Levandowski's new company, they forensically search

5   everything.  I mean, cloud storage, hard drives, emails.  There

6   is not a thing that remains untouched.

7        What happens next is word gets out to the public that Uber

8   is going to be acquiring Ottomotto, Anthony Levandowski's

9   company.  And we can see a senior engineer at Google, who's

10  saying:

11           "One of the significant effects of today's

12      Otto/Uber news is increased risk of attrition for us."

13       It's all about Google worrying about their talent, their

14  engineers leaving.  And he goes on to say:

15           "This, combined with interesting and plentiful

16      exit opportunities" -- and he goes on to name some --

17      "makes Chauffeur look less competitive from the

18      financial perspective, so I think we should be

19      seriously concerned."

20       Google is seriously concerned because Uber could catch up

21  to its own self -- it's own stalled self-driving car program.

22  And what do we have next?  We get to see, because of this

23  lawsuit, all these internal -- these are all internal Google

24  documents.

25       You know what this one is?  This is lawyers and

OPENING STATEMENT / CARMODY

1  investigators.  And we now find out after the fact that Google

2  is even contemplating trying to prevent Uber from acquiring

3  Anthony Levandowski's company, Ottomotto.

4      And think about this for a second.  This -- we go back to

5  the timeline.  I'm going to tell you, this is written here,

6  August -- excuse me.  It's written August of 2016, but at a

7  time when Google has no idea that Anthony Levandowski has

8  downloaded anything improperly.

9      So you say to yourself, why are they trying to break up --

10  why is Google trying to prevent Uber from acquiring Ottomotto?

11  I mean, what could be the reason?  What's going to become

12  apparent to you in this case, it's not about Uber taking Waymo

13  or Google's technology.  It's about us getting their top

14  talent.  I mean, that's what this case is about.  And we can

15  see it right here.

16      And what happens next?  The lawyers latch on -- after this

17  whole big forensic review I was telling you about, they latch

18  on to these downloads.  And so they go to this internal

19  engineer at Google, this fellow who I said is so good he

20  actually designs these circuit boards.  He designed -- he sets

21  up the server.  He determines what goes where.  He's not just

22  a -- you know, some junior leaguer there.

23      He says to the lawyers, when the lawyers are saying:  Look

24  what we found.  What does this mean?  He says:  It doesn't mean

25  anything.  It's low value.  It was so low value we had even

1    considered hosting it off the Google infrastructure.

2        That's what he says.  That's what he tells the lawyers

3    before this suit is ever filed.  Yet, the lawyers want to go

4    forward, as lawyers do, and file a lawsuit anyway.  So they go

5    back to this same engineer again.

6        And listen to what he says.  He tells the lawyers:

7            "I'm a little leery because both of those

8        numbers" --

9        And the numbers he's talking about are the amount of the

10   14,000 downloads and the size of those downloads.

11       He says:

12           "Those numbers aren't really meaningful to any

13       narrative.  It also has a chilling effect on being a

14       hardware engineer.  We all do full checkouts."

15       And a "full checkout" is when you hook your computer up to

16   the server and if you follow Google's instructions, all the

17   files come.  The whole server is downloaded on your computer.

18       But what he says that should have been important to

19   Waymo's lawyers, but wasn't, is the whole thing makes him

20   uncomfortable to think that the lawyers are trying to ascribe

21   suspicion to it.  And, folks, the very next day this lawsuit is

22   filed.  The very next day.

23       And after this lawsuit is filed, what happens?  Well,

24   Waymo teams up with Uber's arch competitor, Lyft, in the

25   ride-sharing space.  And the parent company of both Waymo and

OPENING STATEMENT / CARMODY

1    Google, a company called Alphabet, invests a billion dollars in

2    Lyft.

3         The point that I want you to consider as you go through

4    the evidence is why this suit was brought in the first instance

5    if these files which supposedly triggered the suit weren't

6    important, the engineer who stored the files told that to the

7    lawyers, but the suit was filed anyway.

8         Now that we've talked a little bit about why we're here,

9    let's move on and talk about why Uber wanted to acquire Anthony

10   Levandowski's company, Ottomotto.

11        Even after the whole big Carnegie robotics deal up in

12   Pittsburgh, Uber was hungry for more top talent.  Uber was

13   willing to pay top dollar for top talent wherever it came from.

14   I mean, it could have been Apple, Tesla, Google, some college

15   campus.

16        You know, the Golden State Warriors a couple years ago won

17   more basketball games than anybody, but they lost the

18   championship.  So they went out and got Kevin Durant, who was

19   maybe the top free agent around.

20        Uber was the same way.  Uber had built an amazing

21   self-driving car team in San Francisco and in Pittsburgh, but

22   they wanted more.  And they thought their Kevin Durant was

23   Anthony Levandowski.  And why did they think that?

24        Folks, it is absolutely undisputed that Anthony

25   Levandowski is brilliant.  He is a pioneer in the autonomous

1    vehicle business.  He -- when he was at Berkeley, he did a

2    self-driving motorcycle that's now in the Smithsonian in

3    Washington, D.C.  And he convinces Travis Kalanick he can make

4    self-driving cars a reality at Google -- excuse me, at Uber.

5         And as we are here today, and knowing everything we know,

6    Uber regrets ever bringing Anthony Levandowski on board.  And

7    the reason they do so is because for all his time at Uber, all

8    Uber has to show for Anthony Levandowski is this lawsuit.  I

9    mean, this is it.

10        So let me talk a little bit about what Uber did to make

11   sure that, when Anthony Levandowski came over with all the

12   other engineers at Ottomotto, that none of anything they had,

13   no proprietary information that they may have had from Google,

14   could possibly come to Uber.

15        The way this starts off is, in Silicon Valley, when

16   engineers move from company to company, the standard deal is

17   companies say, Here, sign on the dotted line.  We have an

18   agreement.  And please tell us and affirm that you're not

19   bringing your former employer's intellectual property or

20   proprietary information to us.  We don't want it.

21        That's the way it works.  That's what Google does.  That's

22   the standard.

23        Uber here, because it had agreed to indemnify

24   Mr. Levandowski, that was one of the terms of him coming on

25   board here, Uber did a lot more.  Uber went out and hired one

OPENING STATEMENT / CARMODY

1   of America's preeminent forensics firms called Stroz Friedberg,

2   a firm that Google itself uses.

3        And what Stroz Friedberg did was kind of set up a safety

4   net.  What they did is they interviewed -- and you saw some of

5   the interview notes before from counsel.  They interviewed a

6   lot of people.  They collected all the computer devices from

7   the leadership of Ottomotto for the purpose to ensure that it

8   didn't get over to Uber.

9        And like all nets, there are some holes here.  But the

10  evidence is going to show you that none of the eight so-called

11  trade secrets -- which is what this case is really, really

12  about -- ever make it to Uber.  That's what happened.

13       And so you hear counsel, though, talk about Stroz, talk

14  about the indemnity, talk about sensational emails.  And of

15  course they're going to be talking about that because they

16  don't want to talk about the technology this case is based on.

17       It's like when you talk to a politician about a real issue

18  and they switch and start giving you an answer about dirt on

19  their opponent.  I mean, you should be thinking, anytime in

20  this case Waymo is talking about something other than these

21  eight so-called trade secrets, you should ask yourself why.

22       Now, Waymo wants you to believe that this whole case can

23  turn on whether Uber bought a business -- bought a company from

24  someone who is untrustworthy.  I mean, that's really the gist

25  of what happened in about the last 50 minutes.

OPENING STATEMENT / CARMODY

1      If you buy a company with some new code that's supposedly

2  not yet formed, there's something funky going on.  That's what

3  they say.  But that's not the issue in this case, folks.  And

4  if it was, Google would be in real trouble.  You know why?

5  Years and years earlier, at a time when Google knew Anthony

6  Levandowski wasn't trustworthy, you know what they did?  They

7  bought two companies from him.

8      I'm going to take you back for a moment to the year 2011.

9  Anthony Levandowski is an employee at Chauffeur, the

10 self-driving car program over at Google.  And he's got a couple

11 of side businesses.  He's competing with Chauffeur doing

12 self-driving cars, doing LiDAR.  It turns out he's not

13 forthright with Google about his involvement.  Forget not being

14 forthright.  He lies to Google about his activity in these

15 businesses.

16      Yet Larry Page wants Google to go ahead anyway and buy

17 these companies from Anthony Levandowski.  And if we take a

18 look right here at an email, you're looking at an internal

19 email back in the year 2011, at Google, where one of their

20 senior executives, a gentleman by the name of David Lawee, he

21 says, "As Google, I suppose I'm prepared to take the risk with

22 Anthony."  He's taking the risk and buying these companies

23 because Larry Page said that's what you need to do.

24      But he says, "I can say definitively that if I was

25 choosing a business partner to start a company with, there is

1    no way in hell I'd proceed."

2         And so Google knew how untrustworthy Anthony Levandowski

3    was.  He doesn't get fired.  You know what happens?  We saw

4    this email earlier.  Larry Page directs David Lawee, the

5    gentleman who just wrote the last email, to make Anthony

6    Levandowski rich if Chauffeur succeeds.

7         And so what happens is Google buys these two side

8    businesses from Anthony Levandowski, the ones he lied about,

9    for 20 million and then incentivizes him.  He gets another

10   $120 million from Google.

11        Uber was just like Google, though.  Uber was prepared,

12   from the words of Mr. Lawee, was prepared to take the risk with

13   Anthony Levandowski because he was the hottest guy around.  He

14   was the hottest commodity in the whole autonomous vehicle

15   business.

16        And just like Google, the fact that Uber went forward and

17   brought onboard some rock star engineer doesn't mean they're

18   guilty of wrongdoing.

19        I mean, you're going to be hearing in the next couple of

20   weeks about this fellow, Anthony Levandowski.  You're going to

21   hear that he has a pattern of surprising -- unusual may be a

22   fairer word -- of unusual behavior that goes way, way back.  We

23   know it certainly goes back to his early days, 2010 or so at

24   Google.  It probably goes back way before that.

25        You're going to hear that Anthony Levandowski is now rich

OPENING STATEMENT / CARMODY

 1   because of all the money Google paid him.  And you're going to

 2   hear that this guy, Anthony Levandowski, is able to somehow

 3   convince Silicon Valley titans like Larry Page and Sergey Brin,

 4   the founders of Google, and Travis Kalanick, the founder of

 5   Uber, that they needed him.  They needed to bring him on board,

 6   and they needed to keep him on board even though there were

 7   warning signs that he wasn't trustworthy.

 8       And you're going to hear that Uber fired Anthony

 9   Levandowski.  And I bet you at the end of this case there's a

10   couple of you that are kind of struggling to understand why

11   this young, brilliant, rich man did some of the things he did.

12   But Anthony Levandowski is not on trial here.  It's Uber.

13       And your job at the end of this case is to determine, is

14   Uber liable for misappropriating these eight engineering

15   concepts that Waymo claims to be trade secrets?  To do so,

16   you're going to have to go back and, first and foremost,

17   decide, based on the evidence that both sides present, whether

18   or not Waymo can meet its burden to show that what's in here,

19   in a little, little, small part -- I can turn it around -- it's

20   right in here -- if the little stuff you're going to be talking

21   about, that we talk about in the tech session, if those are

22   trade secrets or are they just the concepts, the engineering

23   concepts that Uber's engineers are free to use because it's

24   their everyday knowledge in their head and what's otherwise in

25   the public realm.

1    At the end of this case, you're going to realize what

2    matters is the technology.  It's not Anthony Levandowski.

3    You're going to get beyond, I believe, at some point, these

4    emails, and you're going to say, oh, it's a trade secret case.

5    What's the tech?  And you're going to realize the tech tells

6    the truth.

7        We've waited a long time to be here.  We are here because

8    we believe in this.  And we are finally, for the first time

9    ever, in front of people outside these companies who sign the

10   little fancy piece of paper, we're going to be able to reveal

11   the tech that this case turns on.  And you're going to be able

12   to see that Waymo's actual claims, they just don't hold water.

13       And so once the public leaves the courtroom, I'm going to

14   spend the rest of my time, the bulk of my time, on the tech,

15   what this case is really all about.

16       Thanks.

17       **THE COURT:**  All right.  Thank you, Mr. Carmody.

18   Are we now -- we're about to proceed to the nonpublic

19   part.  Are all of you over there ready to go forward, and can

20   we proceed without another break?

21       (Jurors nod heads.)

22       **THE COURT:**  Good.  Now, before I excuse everyone, my

23   law clerk has told me something that -- I hate to even bring

24   this up, but she says there's someone on Twitter pretending to

25   be me.

1       (Laughter)

2           **THE COURT:**  I don't have a Twitter account.  I

3    couldn't tell you how to use it if I -- I don't do those things

4    for obvious reasons.  And I don't have a Twitter account.  So

5    whoever it is who is pretending to be me is an impostor.  So

6    there.  Good luck to you.  Don't be taken in by that.

7       All right.  The second thing is that I got a note that

8    indicates my theory is probably correct, that our receiver was

9    picking up handheld mic signals from a different floor, which

10   should not have happened.  But -- so maybe we are -- we're

11   getting closer to identifying that problem.  Excuse me.

12      Now, at this time I need to excuse everyone in the

13   courtroom who was not cleared under the protective order so

14   that we can go into the private part of the proceeding.

15      And I'm going to direct my deputy courtroom clerk, turn

16   off any broadcast of this to anywhere.  Turn off these overflow

17   courtroom cameras, everything.  All right.

18      So let's -- my apologies to the public.  This is going to

19   take about an hour, I think.

20      So go ahead.  Please exit.

21      (Members of the public exit the courtroom.)

22      (Page 276, Line 1 through Page 309, Line 14 were

23       placed under seal by Order of the Court.)

24   //

25   //

**PROCEEDINGS**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (Sealed proceedings concluded.)

16          THE COURT:  All right.  We will take a 15-minute break

17  and come back and start hearing our first witness.  Please

18  remember the admonition.  No talking about the case.

19      Thank you for your close attention.  We'll see in you 15

20  minutes.

21      (Jury out at 11:20 a.m.)

22          THE COURT:  Be seated.  All right.  We've got our

23  first witness ready to go?

24          MR. VERHOEVEN:  Yes, Your Honor.

25          THE COURT:  All right.  15 minutes and we'll start.

1          **MR. VERHOEVEN:**  I had one thing I want to raise --

2          **THE COURT:**  Yes.

3          **MR. VERHOEVEN:**  -- and I think that the jury may be

4    significantly confused about what a trade secret is because

5    counsel kept saying that it needs to be an invention and it

6    needs to be obvious, which is a patent, not a trade secret.

7          And so I'm concerned, if they don't have any guidance,

8    that they're going to think that trade secrets need to be like

9    inventions.

10         And my suggestion is that there's some sort of preliminary

11   instruction as to what a trade secret is so that they can have

12   that understanding, because right now the statement is -- the

13   language that was used was patent language -- invention, novel,

14   obviousness -- not the trade secret standard, which is has

15   economic value, not generally known, and you maintain its

16   secrecy.

17         So I'm a little concerned about that, Your Honor.

18         **MR. CARMODY:**  The short comeback, of course, Your

19   Honor, is a trade secret is novel.  If it was in the public

20   realm, it wouldn't be a secret.  But that can all be cured.

21         Listen, there was not an objection, but, you know, even if

22   there was, this is something that is going to be cured, if I

23   did something wrong, which I didn't, in the Court's

24   instructions to the jury.

25         **THE COURT:**  Well, it may be wise to give some kind of

**PROCEEDINGS**

1    preliminary instruction as we go along.

2        Can't you two agree on a paragraph that would explain the

3    difference between patents and trade secrets?

4            MR. VERHOEVEN:  I'm sure we can, Your Honor.

5            MR. CARMODY:  I would like to use the Court's.  I

6    mean, I thought what you did was the best.  And I would say if

7    you want to give that to them preliminarily.  A while back in

8    your penultimate jury instructions you hit that.

9            THE COURT:  I don't think I had anything about patents

10   in there.

11           MR. CARMODY:  No, but I mean in terms of explaining

12   what a trade secret is.  It's right there.

13           THE COURT:  But I'm saying, we need to also

14   distinguish between trade secrets and patents.  That's your

15   point.

16           MR. VERHOEVEN:  Yes.  And remember from the jury

17   selection voir dire one of the people thought that trade

18   secrets were patents.

19       So when we start using language like novelty and

20   invention, that is not the things that -- if you read the

21   instructions, those are not the standards of trade secrets.

22   Doesn't have economic value.  It is not generally known.  And

23   do you take reasonable steps to keep it confidential?

24       And so the standard for something being an invention is

25   much more significant.  And I think it's important for the

1   jurors to know that that's a different thing in order so

2   they're not confused.

3           THE COURT:  I'm inviting you both to meet and confer

4   and come up with a -- otherwise I have to do it myself.

5           MR. CARMODY:  We will do so.

6           THE COURT:  And I do think it needs to be explained to

7   the jury in due course.  I don't think it's an emergency item.

8       All right.  So when I come back, we'll call our first

9   witness.

10          MR. VERHOEVEN:  Thank you, Your Honor.

11                  (Recess taken at 11:23 a.m.)

12                  (Proceedings resumed at 11:38 a.m.)

13      (The following proceedings were held in open court,

14       outside the presence of the jury:)

15          THE COURT:  All right.  Be seated, please.  Thank you.

16      Ready to go back to work?

17          MR. VERHOEVEN:  Yes, Your Honor.

18          THE COURT:  I apologize.  I don't know why I can't get

19  them to turn the air -- have you told --

20          THE CLERK:  Yes.

21          THE COURT:  I'm going to issue a court order --

22      (Laughter)

23          THE COURT:  -- to the GSA and have them come and stand

24  right there and explain to me why it's 82 degrees in here.

25      Okay.  Is Waymo ready to present its first witness?

1        **MR. VERHOEVEN:**  We are.  Just point of order, to make

2   sure we have the sequestration rule in effect.

3        **THE COURT:**  What do you mean sequestration?

4        **MR. VERHOEVEN:**  Any percipient witnesses.

5        **THE COURT:**  Oh.  All right.  So anybody who is a

6   witness in the case --

7        **MR. VERHOEVEN:**  For Uber.

8        **THE COURT:**  Well, even for your side.

9        **MR. VERHOEVEN:**  Yes, that too.

10        **THE COURT:**  Both sides have got to exit stage left,

11   except for the courtroom representatives.

12      Okay.

13        **MR. GONZÁLEZ:**  Your Honor, just briefly, I want to put

14   an agreement on the record.  The video that we had concerns

15   about, that they played in opening, we've agreed to withdraw

16   our objection to that video, which I believe is Exhibit 10261.

17   In exchange, Waymo has agreed to withdraw Exhibit 10260 and are

18   not offering it in evidence at the trial.

19        **THE COURT:**  Agreed?

20        **MR. VERHOEVEN:**  Agreed.

21        **THE COURT:**  Okay.  Problem solved.

22      Let's bring our jury in --

23        **MR. VERHOEVEN:**  Took a while.

24        **THE COURT:**  -- we'll get started.

25      We're back on the public session.  We're going to turn

**PROCEEDINGS**

 1   back on these cameras to the overflow room.  I think people are

 2   over there.  That's what I'm told.  I don't know that for

 3   certain, but we'll turn the cameras back on and bring in our

 4   jury so we can call the first witness.

 5       While that's happening, for those of you out there -- and

 6   this is a high-tech case, but here's what I do up here.  One of

 7   my few jobs.  I keep a column of witnesses and how much time

 8   each side uses.  Just an old-fashioned pencil-and-paper thing.

 9   And then when they run out of time, they run out of time.  And

10   that's -- isn't that great in a high-tech case like this, this

11   ole pencil comes in handy.  Even has an eraser.

12       All right.

13           THE CLERK:  All rise for the jury.

14       (Jury enters at 11:41 a.m.)

15           THE COURT:  Okay.  Great.  I see you're all in order.

16   Welcome back.  Be seated.

17       And now we're going to start with the evidence.

18       I want you to know both sides have a certain amount of

19   evidence time.  I keep track of it myself, to the minute.  And

20   when they run out of time, they run out of time.

21       So this is encouraging both sides to be efficient in their

22   use of your time, which is very important to us.  But they both

23   have agreed that the allocations are fair.  There is some

24   outside chance we would end the case by the end of next week,

25   but it could go into the following week.  And then we'd have

**PROCEEDINGS**

```
 1   the arguments and all that.
 2        So I -- we're not even close to a point where I can see
 3   the -- we're just starting on the time.
 4        So you're going to get absorbed into the evidence.  It
 5   will be most interesting to you.
 6        At this time Waymo gets to call its first witness.  Please
 7   do so.
 8        MR. VERHOEVEN:  Thank you, Your Honor.  Waymo calls
 9   John Krafcik.
10        THE COURT:  All right.  Wonderful.  Please stand
11   somewhere in there and raise your right hand.  The clerk will
12   swear you in.
13                         JOHN KRAFCIK,
14   called as a witness for the Plaintiff, having been duly sworn,
15   testified as follows:
16        THE COURT:  Great.  Have a seat.  And --
17        THE WITNESS:  I'm John Krafcik.  It's K-R-A-F, like
18   Frank, C-I-K.
19        THE COURT:  K-R-A -- say it again.
20        THE WITNESS:  F, like Frank, C-I-K.
21        THE COURT:  C-I-K.  All right.  And welcome to you.
22   And you need to keep your voice about this close to the mic so
23   everyone out there can hear you.  And if anybody on the jury
24   ever gets to the point where you cannot hear, raise your hand
25   so I can make sure we cure that.
```

1          All right.  Mr. Verhoeven, the floor is all yours.

2              MR. VERHOEVEN:  Thank you, Your Honor.

3                    **DIRECT EXAMINATION**

4    BY MR. VERHOEVEN:

5    Q.   Good morning, Mr. Krafcik.

6    A.   Good morning.

7    Q.   Would you please introduce yourself to the jury?

8    A.   I'm John Krafcik.  I am the CEO of Waymo.  And I joined

9    Google in September 2015, to lead the self-driving car project.

10   Q.   And can you explain to the jury, what is Waymo?

11   A.   So Waymo is sort of an independent entity within a company

12   called Alphabet, which is Google's parent company now.

13        Our mission in the world is to bring self-driving cars to

14   fruition so that people and things can move around safely and

15   easily.

16   Q.   Do you have an understanding as to when Google began

17   working on self-driving cars?

18   A.   Yeah.  It was around 2009.

19   Q.   Okay.  And when did it become -- and this was the

20   Chauffeur program; is that correct?

21   A.   It started as the Chauffeur program, yeah.

22   Q.   When did it become Waymo?

23   A.   It became Waymo at the start of 2017.  So January 1st,

24   2017.

25   Q.   When did you join Waymo?

**KRAFCIK - DIRECT / VERHOEVEN**

1   **A.**   So I joined the Google self-driving car project, before it

2   was actually called Waymo, on September 28th, 2015.

3   **Q.**   So you haven't been there from 2009 up to that point;

4   right?

5   **A.**   Correct, yeah.  I joined in 2015.

6   **Q.**   Okay.  What was your occupation before Waymo?

7   **A.**   So just before Waymo, I was the president of a company

8   called TrueCar.  TrueCar, I think of as a car buyer platform

9   that brings car buyers and car dealers together to find a fair

10  price.

11  **Q.**   And before that?

12  **A.**   Prior to that, I worked at Hyundai, Hyundai Motor America,

13  for ten years.  I was the CEO of the U.S. Hyundai operations

14  for about five years, and prior to that I was the guy in charge

15  of product planning and pricing and strategy for Hyundai in the

16  U.S.

17  **Q.**   And could you summarize for the jury your education,

18  please, sir?

19  **A.**   Yeah.  I have a B.S. in mechanical engineering from

20  Stanford.  And I got a management degree from MIT Sloan School.

21  **Q.**   Do you have any focus within mechanical engineering?

22  **A.**   I would describe myself as sort of a broad mechanical

23  engineer.

24  **Q.**   All right.  Seems like you've been in the car industry for

25  your whole career?

1   **A.**   Yeah.  Sort of hate to admit how long it's been.  It's

2   going on three decades.

3   **Q.**   Why is that, sir?

4   **A.**   I grew up in a big family.  I was the eighth of eight

5   kids, five older brothers.  My dad was a tool and die maker.  I

6   have been fascinated with cars since I was about two years old.

7   Sort of always knew I would be in this space.

8   **Q.**   What's the first car you bought?

9   **A.**   Interesting story.  First car I bought with my own money

10  was a 1973 Ford Capri.  I bought it when I was living in

11  Connecticut and moving out to Stanford.  So I drove it across

12  the country way back when in 1979.

13       And I think I bought it for $1,200.  Sold it after I

14  graduated from Stanford for $1,500.  And I ended up putting

15  150,000 miles on that car.

16  **Q.**   Sounds like good.

17       Can you tell the jury what led you to take the job at

18  Waymo?

19  **A.**   Yeah.  So I saw this as a great opportunity.  Sort of a

20  once-in-a-lifetime opportunity.

21       Before Hyundai, I was a chief engineer at Ford.  I worked

22  at Ford for 14 years.  The last seven of those years I was

23  chief engineer for cars like the Ford Expedition and the

24  Lincoln Navigator.  And I learned sometime during my experience

25  at Ford what I wanted to do with my life.  And it came down to

1  figuring out a way for people to be safe in their cars.  And

2  I've always been motivated personally by figuring out a way to

3  reduce fatalities in this space.

4      So at Ford I did it by using technologies like antilock

5  braking systems, electronic stability control, side-impact air

6  bags, and putting them on our SUVs.

7      And when I got to Hyundai, the idea there, they were

8  selling inexpensive cars, and the theme that I had was let's

9  put all of that safety equipment on all of our cars, even our

10  inexpensive $10,000 Hyundai Accents.  And so we helped move the

11  industry in safety with moves like that.

12      That ended up being a really inspirational part of my

13  life.

14      So when Google reached out to me with this opportunity to

15  work on this amazing technology, it was really interesting to

16  me because the statistics out there are pretty interesting.  If

17  you look at all the people who die in car crashes every year,

18  it's about 35,000 in the U.S.  It's 1.2 million globally.

19  That's like a 737, a big airplane, with 140 people on it

20  crashing every hour of every day and everyone dying on that

21  plane.  That's how many people die in car crashes.

22      The idea that what Google was doing, before it became

23  Waymo, of taking the human element out of those crashes,

24  because humans are responsible for about 94 percent of those

25  fatalities; it's human error.  The idea that we could fix this

1    with our technology so that so many people wouldn't die was

2    incredibly appealing.  That was my inspiration to come.

3              MR. VERHOEVEN:  Can we put up on the screen

4    Slide WDX22.

5         Can you see that, members of the jury?

6    BY MR. VERHOEVEN:

7    Q.   Okay.  What are we looking at there, Mr. Krafcik?

8    A.   Yeah, that is our current self-driving car.  It's a

9    Chrysler Pacifica.  It's a plug-in hybrid.  And you can see on

10   top of the car it's got some interesting sensors.  There's a

11   big LiDAR in a camera dome on top of that car.  And you can see

12   other LiDAR on the side and in front of the car.

13        So that's the car that we've been working on that can make

14   its way around the world all by itself without a human driver.

15   Q.   And I know -- I don't want to get into too deep in the

16   science, but can you summarize how does it do that?  How do the

17   Waymo cars -- or how are they able to drive themselves?  What

18   are the general things they're doing?

19   A.   In very high level, the first thing the car needs to

20   figure out, just like we humans, is where are we in the world?

21   So we have really detailed maps, HD maps that we create using

22   our LiDAR.  And that places the car in an exact spot in the

23   world.

24        And so we know all the stationary objects.  And then with

25   those sensors we have cameras and radar and LiDAR.  We're

1   picking up all the other objects that might be moving about

2   that weren't in the map.  Things like people, pedestrians,

3   bicyclists, other cars.  That helps us understand where those

4   things are that we shouldn't run into.

5       And then with the really great computer that's in the car,

6   we plot our way through the world.  We calculate a path through

7   the world that's designed to avoid any and all of those

8   obstacles to get you from Point A to Point B.

9   Q.   And how does LiDAR work?

10  A.   LiDAR, it's rather complicated technology, but you can

11  think of it as something that's throwing out beams of light,

12  photons.  And once it sees an object, those photons come back,

13  they bounce back to the radar, or to the LiDAR.  And with that

14  we can figure out precisely how far away objects are.  We can

15  paint the world with these beams of light and figure out where

16  everything is very precisely.

17  Q.   Okay.  How does Waymo ensure that its cars are safe so

18  that there's no human being driving them?

19  A.   Yeah.  It's the thing that we're most focused on.  We're

20  driven by safety at Waymo.

21       So there's a lot.  First of all, I mentioned the LiDAR.

22  We have six different LiDARs.  That LiDAR paints 360 degrees

23  all the way around the car.  We have radar, which six different

24  radars, which are also looking 360 degrees around the car.  And

25  a total of 19 different cameras that are also painting the

1    world with a 360-degree view of the world.

2         Those three sensing modalities give us a lot of overlap

3    and redundancy, so if there's a problem with one, we can use

4    the others.

5         As I mentioned, we have a really big computer with a lot

6    of computer power to help us process all that information that

7    comes through the sensors.

8         Then we go an extra step further by putting redundancies

9    into that base Chrysler Pacifica platform.  So, for example, we

10   have a redundant steering system in that car in case something

11   goes wrong with the main steering system, and we have a

12   redundant braking system in case something goes wrong with the

13   primary brake system.  So there's always a backup.

14   Q.   Do you have an understanding of how many miles Waymo has

15   driven and tested its vehicles?

16   A.   All totaled on real roads in what we call autonomous mode,

17   over 4 million miles so far.  Those real-world miles are super

18   important.  We do a lot more miles, though, in what we call

19   simulation.  Sort of think of it as in the cloud, driving in

20   the cloud.

21        Last year, in 2017, we drove 2.7 billion miles.  So we

22   take that combination of real-world miles, we make those

23   real-world scenarios that we run into even more complicated and

24   interesting, and then we test our cars and software in the

25   cloud for billions and billions of miles to make sure that it's

**KRAFCIK - DIRECT / VERHOEVEN**

```
 1   very, very safe.
 2   Q.   Are you confident that Waymo's cars are safe?
 3   A.   I'm very confident.
 4   Q.   Do you have any children?
 5   A.   I do.  I have two.
 6   Q.   Can you tell the jury a little bit about them?
 7   A.   My son -- my son, Alex, I like to refer to him as a
 8   younger, better-looking version of me.  He's 25.  He works for
 9   Tesla.
10       My daughter, Onika (phonetic) is 20.  She is a music,
11   history, and Russian major at Oberlin College.  And, yeah,
12   she's the light of my life too.  Two great kids.
13   Q.   Would you put those kids in a driverless Waymo car?
14   A.   Absolutely.
15   Q.   Tell us about the status or state of Google when you took
16   over and then went into the CEO position at Waymo in 2015.
17   A.   Yeah.  It was -- it was an interesting time.  So, again,
18   we're back in September 2015.  The project had been underway
19   roughly six years.  It had made really important pivotal
20   advances in advancing the art of self-driving car technology.
21       And it was time, and I think Larry Page and Sergey Brin
22   saw the opportunity, to now move the project from what was like
23   an R&D project to a commercial project, a project that could
24   really help the world by getting those self-driving cars out
25   there to make a difference.
```

1    And I think that's one of the reasons they were interested
2  in me.  I was someone who had run large businesses at scale.
3  We built a lot of cars at Ford.  We built a lot of cars at
4  Hyundai.  I had some sense of what we needed to do in terms of
5  partnership but also something you called scaling, building a
6  big business, to get this thing ready to bring our technology
7  to the world.

8  Q.   And just generally, what have you been doing since
9  joining?

10 A.   Pretty much that.  So we've certainly grown the company a
11 lot.  We've hired hundreds of engineers because it is a very
12 difficult problem.  We're getting better and better.  We've
13 advanced the technology since I have joined.  A whole evolution
14 of hardware at this point.

15    We've signed partnership deals with companies like
16 Chrysler and others to help us bring this technology to market.
17 We even have partnerships now with companies like Avis and
18 AutoNation, because we have to figure out how are we going to
19 keep these cars maintained when they're out in the world?  And
20 there are lots of other great companies out there who are very,
21 very good at that.

22 Q.   I'm going to show you a video, the one I showed in my
23 opening statement.  And I'm going to ask you to just walk
24 through, and I will be going pretty fast, so walk through and
25 just kind of explain to the jury what they're looking at.

 1          MR. VERHOEVEN:  For the record, Your Honor, this is

 2   from the pilot program in Arizona.

 3          (Video played while witness testified as follows:)

 4          THE WITNESS:  Yes.  So this is a pretty important day

 5   for us.  So we actually did -- this day was in October of 2017.

 6   And we put three different Chrysler Pacifica self-driving cars

 7   on the road in a suburb of Phoenix and had all three of those

 8   cars driving together through the world without any humans in

 9   the front row.

10          The cars were completely driven by Waymo technology, the

11   computers and the sensors.

12          These are -- these are Waymo employees in the car.

13   BY MR. VERHOEVEN:

14   Q.    That says Waymo 1?

15   A.    Yeah.  We had three different cars.  There's Waymo 1.  And

16   you can get -- on the right-hand side you can see the screen is

17   split, with three different groups of Waymo employees.

18          There's Car 2, and Car 3 behind it.

19          And they're each taking different routes, after we got

20   started, to different endpoints in this community in Phoenix.

21   Q.    So that's Waymo 1?

22   A.    There's Waymo 1.

23   Q.    What's that in the middle on the right?

24   A.    So that's -- that in-car display is what you would see if

25   you were in the backseat. So those close to the second row have

1    access to the screen.  This shows what the car is seeing in the

2    world.  We try to give the folks in the second row an

3    indication of what it is the car sees so they can feel safe.

4    **Q.**   That's Car 3.

5         Back to Car 1?

6    **A.**   Back to Car 1.  Here we are entering an intersection.  So

7    the car is picking up the traffic signals.  Waiting, of course,

8    for it to turn green.

9         So Waymo 1, the first car, has finished its ride.

10   **Q.**   What's this here?

11   **A.**   This is our depot in Phoenix.  So this gives you an

12   indication.  I mentioned scaling; right?  We're going to need a

13   lot of cars.  That gave you a look at our primary depot in

14   Phoenix, which has room to hold literally hundreds of cars so

15   that we can serve that city.

16   **Q.**   Thank you, sir.

17        Can we go to Slide WDX2-3.

18        Now, again, just for the record, what is Project Chauffeur

19   or what was it?

20   **A.**   Yeah.  So when the project started, they came up with this

21   name "Chauffeur."  Was sort of a clever name, I guess, for a

22   self-driving car company.  But this is the very early days of

23   that project.

24   **Q.**   And what are we looking at here?  Who are these people?

25   **A.**   Looks like some of the early members.  You can see Chris

1  Urmson on the left, Jiajun, and Dmitri Dolgov, that's Standard

2  Chatter (phonetic), and then Anthony Levandowski on the far

3  right.

4  **Q.**    So Anthony is on the far right with the hat on?

5  **A.**    Yes.

6  **Q.**    Okay.  Have you met Mr. Levandowski?

7  **A.**    I have.

8  **Q.**    What was his title when you arrived at Waymo?

9  **A.**    He was leading the LiDAR team at that time.

10  **Q.**    What was your impression of him?

11  **A.**    I have to say he was an interesting character.  You know,

12  he had -- he had done a lot of things prior to my arriving at

13  what was then Chauffeur, the Google self-driving car project.

14      And as I did with a lot of these folks on the screen here

15  and elsewhere on the team, as the new guy, the new CEO of this

16  project, I sought to learn a little bit about each of these

17  people so I could figure out, you know, what was a good place

18  for them to be, what might be a good development path for them,

19  that sort of thing.

20  **Q.**    When you were working with Mr. Levandowski, did he ever

21  express dissatisfaction with the program or his job?

22  **A.**    I think it's fair to say about Anthony that he always had

23  this little bit of disappointment.  Right?  Not necessarily a

24  bad thing.  Something that would drive anyone to want to do

25  more and do better.  That's fair.

1  Q.  Do you remember him sending an email saying, "Chauffeur is

2  broken and we need to speed things up"?

3  A.  I have seen that email, but he didn't -- he didn't send

4  that one to me.

5  Q.  Okay.  Did he tell you things that basically that he

6  thought the program was broken and what needed to be done?

7  A.  He had indicated from time to time the sorts of things

8  that he might be interested in in doing that were different,

9  perhaps, than what others on the project were thinking.

10      I think that's fairly common.  And that was one of my jobs

11  coming in, what was the right direction for the project and

12  where should we take things.

13  Q.  Did you agree with -- I assume he discussed some of those

14  with you?

15  A.  We did, yeah.  We talked about some things.

16  Q.  Did you agree with all of what he was saying or disagree

17  with some and agree with others?

18  A.  I think it's fair to say there were some things that made

19  sense and some things that were clearly wrong.  It's -- it

20  might be one way to summarize Anthony's perspective at this

21  time as I was seeing it was, and maybe you've heard this phrase

22  before, "Move Fast and Break Things."

23      There are aspects of move fast that are really great.  The

24  break things part is very challenging when you're dealing with

25  a car and people's lives.  And that's where we had some

1  challenges.

2  **Q.**   Did he want -- well, did you have the same view of safety

3  as he did?

4  **A.**   I think it's fair to say we had different points of view

5  on safety, yeah.

6  **Q.**   Can you give me a couple of examples?

7  **A.**   Sure.  We were -- we were introducing the Pacifica.  And I

8  mentioned we put redundant steering and braking systems just in

9  case something went wrong with the primary systems.  Anthony

10  had a strong point of view that we didn't need those

11  redundancies.  I couldn't imagine putting a car on the road

12  without that level of redundancy, knowing the issues that can

13  happen with a steering system or a braking system.

14  **Q.**   Did you ever hear any rumors that Mr. Levandowski was

15  going to move to Uber while he was working there?

16  **A.**   I never heard anything directly from Anthony.  There was

17  an investigation that was done, I understand, before I arrived,

18  that looked at that or questioned that.

19  **Q.**   And do you know what the result of that was?

20          **MR. CARMODY:**  Your Honor, at this point, he wasn't

21  there.  It's hearsay.

22          **THE COURT:**  Sustained.

23  **BY MR. VERHOEVEN:**

24  **Q.**   Okay.  During the time you were there -- well, let me back

25  up.

1       Did Mr. Levandowski resign from Waymo?

2   A.   He did.

3   Q.   Did he give notice?

4   A.   Not to me.

5   Q.   Okay.  How did you learn that he had quit?

6   A.   I remember that day.  I remember that day very well.  I

7   was in a meeting with a couple of my teammates.  And I got an

8   email from Larry Page saying something like Anthony had just

9   resigned.

10  Q.   What was your reaction?

11  A.   Oh, complete surprise.

12  Q.   And why is that?

13  A.   As I had mentioned, Anthony was someone I was trying to

14  get to know and understand.  And we had had discussions in the

15  days before this day.  And, you know, he didn't mention

16  anything like this.

17  Q.   Okay.  What did you do when you learned he had resigned?

18  Did you do anything?

19  A.   There was a lot going on this morning -- or that

20  particular morning.

21       We understood that he was still there.  And I had had a

22  10:30 appointment on my calendar with him.  So my expectation

23  was I would be able to catch up with him at that time, at

24  10:30.

25       But between finding out and that 10:30 time slot, I went

1    on with the meetings that I had that morning.

2    **Q.**   Did you attempt to speak to Mr. Levandowski on the day he

3    was there, when he resigned?

4    **A.**   I did, yeah.

5    **Q.**   Did you reach him?

6    **A.**   Yeah, we ended up talking by phone around lunchtime.

7    **Q.**   Do you have a recollection of the conversation?

8    **A.**   It's vivid, yeah.

9    **Q.**   Okay.  Can you describe that conversation to the jury.

10   **A.**   Yes.  So we connected by phone.  And my -- you know, the

11   first words out of my mouth were something like --

12        **MR. CARMODY:**  Your Honor, I was letting a little of

13   this go.  This is hearsay.  It's recounting a conversation with

14   Anthony Levandowski.

15        **THE COURT:**  That's true.

16     What's your answer to that?

17        **MR. VERHOEVEN:**  My answer to that is unavailability,

18   Your Honor.

19        **THE COURT:**  Sustained.

20        **MR. VERHOEVEN:**  He was also working for the defendant

21   Ottomotto at the same time.

22        **MR. CARMODY:**  He wasn't, actually.

23        **THE COURT:**  Well, apparently he had already resigned.

24   So that won't work.

25        **MR. VERHOEVEN:**  I offer it for state of mind of

 1   Mr. Krafcik and what he was told about what was going to

 2   happen.

 3          MR. CARMODY:  Mr. Krafcik's state of mind isn't

 4   relevant, Your Honor.

 5          THE COURT:  This is one where I will have to hear the

 6   proffer out of the presence of the jury and let you know

 7   afterwards.  You have to move to something else.  We'll deal

 8   with it later.  But possibly it comes in to prove up the

 9   transaction.

10          MR. VERHOEVEN:  Thank you, Your Honor.

11   BY MR. VERHOEVEN:

12   Q.   Did you keep in touch with Mr. Levandowski after he

13   resigned?

14   A.   I did, absolutely.

15   Q.   And, just generally, without talking about substance, what

16   did you -- what was the nature of your communications?

17   A.   We had occasional text messages, just trying to figure out

18   what it was that he was really up to.

19   Q.   And what was your purpose in communicating with him?

20   A.   We didn't have a good sense of what he was doing.

21          At this point, based on the disappointment that I had

22   personally felt when he left without telling me, my perspective

23   on him shifted rather considerably.  And he had gone from

24   someone who I had considered a friend to someone who I

25   considered an enemy.  I needed to understand what he was doing.

KRAFCIK - DIRECT / VERHOEVEN

```
 1   I felt like I was following that old song you might have heard,
 2   "Keep your friends close and your enemies closer."  We needed
 3   to understand what he was doing, so I maintained that
 4   relationship.
 5   Q.   Did you have any meetings with Mr. Kalanick in the summer
 6   of 2016?
 7   A.   We did.
 8   Q.   And do you remember when the meeting was?
 9   A.   It was summer.  It was before news of the acquisition had
10   broke.
11   Q.   And the purpose of the meeting?
12   A.   Discussing -- broadly speaking, discussing partnership
13   opportunities.
14   Q.   And who did you meet with?
15   A.   Travis Kalanick and Neel Michael, their business
16   development lead.  David Drummond and I joined on the Waymo
17   Google side.
18   Q.   Can you describe what happened at that meeting?
19   A.   There was a lot of just general discussion.  It felt, you
20   know, honestly, fairly empty.  And I don't have a total
21   recollection of everything that we discussed, but I do remember
22   one thing very vividly, because, at the time, it didn't seem in
23   context or apropos of anything else that was said.
24        He said -- this is Travis Kalanick -- "You know, we don't
25   give up 1 percent of the company lightly," something like that.
```

1      And that didn't make any sense to me at the time.  But

2   later in the summer, after the acquisition came out and the

3   purchase price of Otto was shown to be about 1 percent of Uber,

4   it suddenly made sense that he had had that thought on his mind

5   in the context of our own partnership discussion.

6   Q.    Did he tell you during the meeting that he had already

7   acquired Ottomotto?

8   A.    No, of course not.

9   Q.    Did he say anything about Mr. Levandowski?

10  A.    No.

11  Q.    Let's talk for a second, in conclusion, about why we're

12  here.  Why did Waymo file this lawsuit?

13  A.    So we believe in competition.  We believe in fair

14  competition.  We believe in accelerating the technology that's

15  going to help save a lot of lives in this world.

16      What we came to find was that aspects of our technology

17  were taken from us in an unfair fashion.  And it was important

18  for us to correct that.

19  Q.    Did you call Uber before you filed a lawsuit?

20  A.    I did not.

21  Q.    And why not?

22  A.    If you had been in that room weeks before the Uber Otto

23  acquisition and the guy across the table doesn't talk anything

24  at all about this and talks about partnership, there just

25  wasn't that level of trust there.  We didn't have that sort of

```
 1   relationship.
 2            MR. VERHOEVEN:  Thank you, Your Honor.  I'll pass the
 3   witness.
 4            THE COURT:  Cross-examination.
 5            MR. CARMODY:  Thank you, Your Honor.
 6                        CROSS-EXAMINATION
 7   BY MR. CARMODY:
 8   Q.   Good afternoon, sir.
 9   A.   Hello.
10            THE COURT:  May I suggest that you use the --
11            MR. CARMODY:  Yes.
12            THE COURT:  -- the other one there so that you will be
13   closer to the witness.
14            MR. CARMODY:  I like that idea.  Thank you, Your
15   Honor.
16   BY MR. CARMODY:
17   Q.   Sir, I clocked you about a minute and half ago talking
18   about that meeting you had in the summer, in July of 2016,
19   where you -- I think your words were "No, of course not," that
20   Otto wasn't mentioned and Anthony Levandowski wasn't mentioned.
21   Did I hear you correctly?
22            THE COURT:  May I ask you to move the mic so it will
23   catch your voice a little better.  Thank you.
24   BY MR. CARMODY:
25   Q.   Did I hear you correctly?
```

1   **A.**    That's right.

2   **Q.**    Let's go to your sworn testimony, your deposition.

3          **MR. CARMODY:**  I'm reading in, Your Honor, page 251,

4   lines 14 through 19:

5              "And did the name Anthony Levandowski come up during

6          this meeting at all?

7              "Possibly.  I don't -- I don't remember.

8              "Did Otto come up at all during this meeting at all?

9              "Again, possible.  I don't -- I don't remember."

10          Now, sir --

11          **THE COURT:**  Wait, wait.  Let me explain to the jury.

12          In preparing a case like this for trial, both sides get

13   the opportunity to ask for documents from the other side.  And,

14   for that matter, from people not even involved in the lawsuit.

15   They also get to take what are called depositions, where

16   witnesses come, they take an oath to tell the truth, and a

17   court reporter like the one we have here takes it all down and

18   it gets transcribed into a booklet.  And then these are

19   available, subject to the rules of evidence, to be used at

20   trial.

21          So to speed things along, one of the ways I allow lawyers

22   to do what Mr. Carmody did, he can read exactly -- and it has

23   to be exactly -- what was in the deposition.  Question, then

24   answer, question, and then answer.

25          And did you do that, Mr. Carmody?  Was it read exactly?

 1              **MR. CARMODY:**  I did my best, Your Honor.  If I missed

 2   a word, I apologize.  I don't think I missed a word.

 3              **THE COURT:**  Okay.  So then that is -- I told you what

 4   the lawyers say is never evidence.  This is an exception.  It

 5   just moves it along.  And he has to read it exactly that way,

 6   no spin, no nothing, exactly.  So you can take into account

 7   what you just heard as prior testimony of the witness on the

 8   stand.

 9        Thank you.  Please proceed.

10              **MR. CARMODY:**  Thank you, Your Honor.

11   **BY MR. CARMODY:**

12   **Q.**   And, by the way, sir, when you swore at your deposition,

13   that was about six months ago; correct?

14   **A.**   I don't recall specifically.  Sounds about right, yeah.

15   **Q.**   At a time when it was closer to the meeting you were

16   testifying about; fair?

17   **A.**   Fair.

18   **Q.**   Okay.  Now, let's talk together about when you joined.

19   You talked with your counsel about the status of affairs when

20   you joined.

21        Let's look together at Exhibit 1249, please.  Should be in

22   your book.

23   **A.**   This one?

24   **Q.**   Yes.

25   **A.**   Okay.

 1   Q.   We see here --

 2          MR. CARMODY:  Do you have it on the big screen?

 3       Exhibit 1249 is agreed to that it's admitted, Your Honor.

 4          THE COURT:  All right.  1249 is in evidence.  Please

 5   put it up on the screen.

 6       (Trial Exhibit 1249 received in evidence.)

 7       (Document displayed.)

 8          THE COURT:  Now, I'm going to let the public see it.

 9   Everybody sees it.  1249 is in.

10          MR. CARMODY:  Yes, sir.

11          THE COURT:  Okay.  What's the question?

12   BY MR. CARMODY:

13   Q.   The question is, sir, we're looking together at an email

14   that you received from a gentleman by the name Astro Teller;

15   correct?

16   A.   Correct.

17   Q.   Let's talk about who he is first.  Quickly, he is a

18   scientist and he is then the head of Google X; correct?

19   A.   That's correct.

20   Q.   Which Chauffeur was a part of then; correct?

21   A.   Not at that time, but prior to.

22   Q.   Okay.  And you're a new employee at the time.  You're

23   about 60 days into your job; is that fair?

24   A.   That's right.

25   Q.   Okay.  And so what we see here is Astro Teller sending you

 1  this email, and he's also sending it to Chris Urmson.  You were

 2  here for opening statement; correct?

 3  A.   Correct.

 4  Q.   And Chris Urmson was your kind of predecessor, kind of

 5  running Chauffeur; fair?

 6  A.   Yes.

 7  Q.   Okay.  And now here's what he says:  He says, "Hey, guys.

 8  Larry" -- and he's referring to Larry Page; correct?

 9  A.   Almost certainly.

10  Q.   -- "was talking to me about Anthony and wondering what the

11  chances are if we lose him and wondering if there is any way it

12  still makes sense for us to keep Anthony with us and engaged."

13       Correct?

14  A.   Yeah, I can see that he wrote that.

15  Q.   Okay.  And then we have him talking about, "I think Larry

16  is just worried about helping the competition."

17       Correct?

18  A.   Yeah.  I can see Astro wrote that, uh-huh.

19  Q.   And that was your understanding at the time of what

20  Larry Page believed; correct?

21  A.   I don't know that that's necessarily fair to say.  I can

22  see that Astro said that, though, yeah.

23  Q.   Come on.  In real life, when you get this email, are you

24  doubting when the guy above you, Astro Teller, is telling you

25  what Larry Page is thinking, are you having some doubts?  I

1   mean, are you sending him back an email saying, "Whoa.  Are you

2   kidding?  I mean, why is Larry so concerned?"

3       Did that happen?

4   **A.**   Well, I think one of the reasons Larry brought me to the

5   project was to make an assessment of the situation and how we

6   could move the project forward to commercialization, yeah.

7   **Q.**   My question again, when you're told -- and is Astro Teller

8   a little higher up on the food chain than you?

9   **A.**   No.  Same.

10  **Q.**   You're 60 days in your job, and you hear from him that

11  Larry Page is just worried about helping the competition.

12      My question is, putting yourself back there at that point

13  in time, did you take that statement as true?

14  **A.**   I think I took that statement as I need to understand more

15  about Anthony myself so that I could make a judgment.

16  **Q.**   So you can't tell us now whether or not, when you received

17  that email, you thought that Larry Page was worried about

18  Anthony Levandowski helping the competition?

19  **A.**   I can just tell you how I responded to that, right.

20          **THE COURT:**  No, no.  Counsel is asking you a fair

21  question, and you're not quite answering it.

22      Ask it again, and give him a direct yes-or-no answer.

23      Ask the question again.

24  **BY MR. CARMODY:**

25  **Q.**   Sir, when you received this email that's up on the big

1  screen right now, Exhibit 1249, and we have Astro telling --

2  Astro Teller telling you, "I think Larry is just worried about

3  Anthony helping the competition," is that a statement at the

4  time you believed to be accurate?

5          THE COURT:  You can say yes or no and then explain.

6          THE WITNESS:  I can say possibly.  I wanted to learn

7  more.  I am new in the role at this point.

8  BY MR. CARMODY:

9  Q.    Sir, you personally believed, back in this November 2015

10 time, the time the email was written, that if Anthony

11 Levandowski left and worked for a Google competitor, that that

12 could certainly help Google's competition; correct?

13 A.    That's true.

14 Q.    Okay.  And you knew Anthony Levandowski had a bonus of

15 $120 million; correct?

16 A.    I knew he had a large bonus potential, yeah.

17 Q.    One-two-zero?

18 A.    Correct.

19 Q.    The biggest of anyone, I think you swore to, that you know

20 of at Google; right?

21 A.    On the Chauffeur project, yes.

22 Q.    Okie-doke.

23       Now, take a look at -- there is an email reference by

24 counsel.

25          MR. CARMODY:  Let's put up 1898.  Is that okay?  We'll

1    offer 1898 into evidence.

2             MR. VERHOEVEN:  We have no objection if foundation is

3    laid, Your Honor.  No other objection.

4             THE COURT:  1898 subject to foundation.  All right.

5    BY MR. CARMODY:

6    Q.   Sir, if you take a look in your little book there, what

7    we're looking at here is an email that you received from

8    Larry Page; correct?

9         (Document displayed.)

10   A.   It's three pages.  So --

11   Q.   1898.

12   A.   Oh, I'm sorry.  I'm on the wrong -- my apologies.  Yes.

13            THE COURT:  It's in evidence.  Foundation is

14   sufficient.

15        (Trial Exhibit 1898 received in evidence.)

16            MR. CARMODY:  Okay.

17   BY MR. CARMODY:

18   Q.   Now, let's take a look here.  What we have is Larry Page

19   is forwarding you an email that he received from Anthony

20   Levandowski; correct?

21   A.   That's correct.

22   Q.   Larry Page also copies Google's -- his cofounder, Sergey

23   Brin; correct?

24   A.   That's correct, yes.

25   Q.   And it appears to me that he's kind of giving you some

 1  insight of an email that he got from Anthony so you could see

 2  it; correct?

 3  **A.**   He's forwarding it on to me, yeah.

 4  **Q.**   Okay.  And to put things in context, then, we are in --

 5  the date is January 9th of 2016; correct?

 6  **A.**   Correct.

 7  **Q.**   So when we look at the timeline, we're about three or so

 8  weeks after Anthony Levandowski does these downloads; correct?

 9  **A.**   Yes.

10  **Q.**   We're a couple of weeks before Anthony Levandowski leaves

11  Google; correct?

12  **A.**   Correct.

13  **Q.**   And he's going over your head to Larry Page; correct?

14  **A.**   Yes.

15  **Q.**   Okay.  And when we take a look right there, it says --

16  under the "happy new year" thing it says "Chauffeur is broken";

17  correct?

18  **A.**   Yeah, I see that he wrote that.

19  **Q.**   And then we look further underneath that and we see,

20  "We're losing our tech advantage fast"; correct?

21  **A.**   Yeah, I see that he wrote that.

22  **Q.**   And below that, he writes that "part of our team seems to

23  be afraid to ship"; correct?

24  **A.**   Yes, I see that he wrote that.

25  **Q.**   And if we go further together, sir, in the second-to-last

**KRAFCIK - CROSS / CARMODY**

1    paragraph, what we can see is, in the second sentence, he

2    writes that "John and I spoke about the above concerns."

3         And he's referring to you; correct?

4    **A.**   He must be, yes.

5    **Q.**   "But he" -- referring to you -- "seems focused on

6    executing the Ford deal"; correct?

7    **A.**   I see that he said that, yes.

8    **Q.**   And then what we see, sir --

9              **MR. CARMODY:**  Go back.  Can we highlight the subject

10   matter, it says, "Team Mac."

11   **BY MR. CARMODY**

12   **Q.**   You know the old folklore of the Silicon Valley story

13   about Team Mac; correct?

14   **A.**   I have come to learn that, yes.

15   **Q.**   For all of our sake here, that was when Steve Jobs, the

16   Apple founder, was working at Apple.  He was on Team Lisa.

17   They were developing a computer.  He apparently had a little

18   mishap.  He says, "I want to go start my own team."  That was

19   Team Mac, and what came of that was the Macintosh; fair?

20   **A.**   As far as I'm aware, yeah.

21   **Q.**   And so what Anthony Levandowski is talking about and going

22   over your head to Larry Page about is wanting to do a Team Mac

23   within Google to compete basically against you and Chauffeur;

24   fair?

25   **A.**   No idea.

**KRAFCIK - CROSS / CARMODY**

1   Q.   Okay.  So you're telling us at the time when you're

2   looking at this -- I'm guessing -- you know, you're 60 days

3   into your job.  You're -- wait, now you're probably 120 days

4   into your job.  You got Anthony Levandowski going over your

5   head to Larry Page, you know, Mr. Big there.  And you're not

6   sure -- I mean, you must have looked at this pretty closely at

7   the time; fair?

8   A.   Yes.  Fair.

9   Q.   Okay.  Did it concern you when Anthony Levandowski is

10  talking about starting a Team Mac to compete against you and a

11  little -- you know, Waymo that you were becoming CEO of?  It

12  wasn't Waymo then, but you're the top dog; right?

13  A.   Honestly, it's fair to say I didn't understand -- I

14  mentioned I came to know what Team Mac was.  I think that

15  reference probably went over my head when I saw that.

16  Q.   Okay.  Now, you talked earlier with your own counsel about

17  when Anthony Levandowski left, you were kind of blindsided; he

18  was your enemy.  Fair?

19  A.   Yes.

20  Q.   Okay.  And I think the expression you used was "keep your

21  friends close; your enemies closer"; correct?

22  A.   Yes.

23  Q.   And what you did in terms of keeping your enemy close --

24  and let's be sure about this.

25       When Anthony Levandowski leaves Google, did you trust him?

**KRAFCIK - CROSS / CARMODY**

1   **A.**   I had grave doubts.

2   **Q.**   Okay.  Because we saw on the big screen in the opening

3   statement, it was 1642, where Larry Page was upset because

4   Anthony Levandowski was leaving the company and the leaders had

5   said -- didn't trust him.

6        Were you one of those leaders who didn't trust Anthony

7   Levandowski at the time he left?

8   **A.**   Before he left, I was developing my own point of view.  It

9   hadn't firmly cemented.  I think it's fair to say, after he

10  left, yeah, I had gone into the camp of, holy cow, we can't

11  trust this guy.

12  **Q.**   Okay.  So to be fair about it, we have him leaving on

13  January 26 of 2016 -- maybe the 27th.  I may be a day off.

14  Then he's your enemy.  You don't trust him; correct?

15  **A.**   Correct.

16  **Q.**   Okay.  But let me see if I have this right.  You were

17  texting each other back and forth a whole lot; correct?

18  **A.**   We had some texts back and forth, yeah.

19  **Q.**   I clocked over a hundred of them.  Does that sound about

20  right?

21  **A.**   Yeah.

22  **Q.**   Okay.  You're talking to him on the phone; correct?

23  **A.**   Maybe just the one time on the day that he left.  I'm not

24  sure about other phone calls.  It's possible.

25  **Q.**   You went to dinner with him after he left?

**KRAFCIK - CROSS / CARMODY**

```
 1   A.    I think we had a lunch, yeah.

 2          THE COURT:  Well, wait.  He said you went to dinner

 3   and you said, "We had a lunch, yes."  You've got to -- he's

 4   saying dinner.  Are you saying dinner or lunch?

 5          THE WITNESS:  I believe it was lunch.

 6          THE COURT:  All right.  So let's -- okay.  Go ahead.

 7   BY MR. CARMODY:

 8   Q.    So your testimony is you never had dinner with Anthony

 9   Levandowski after he left Google?  That's your testimony?

10   A.    It's my recollection, correct.

11   Q.    Can we take it to the bank, or are you saying that's your

12   recollection?

13   A.    I remember having lunch with him at Five Guys, very

14   firmly, yeah.

15   Q.    Okay.  So we have you talking to him about the name of his

16   new company, which he calls Ottomotto; correct?

17   A.    Or just Otto.

18   Q.    Otto.  You gave him the okie-doke, and you thought that

19   was a good idea?

20   A.    We checked with folks at Google and thought, yeah, that

21   wouldn't be a problem.

22   Q.    You referred Anthony Levandowski to a media consultant who

23   was your friend so that person can kind of keep tabs on Anthony

24   Levandowski; correct?

25   A.    Be our consultant, correct.
```

**KRAFCIK - CROSS / CARMODY**

1  Q.   Okay.  And, to be fair, but you don't consider Anthony

2  Levandowski to be your friend.  He's your enemy; right?

3  A.   Correct.

4  Q.   And so you're doing all this to keep tabs on your enemy,

5  to keep your enemy close; right?  And you're reporting the

6  results you get to Larry Page and Sergey Brin; correct?

7  A.   Correct.

8  Q.   Okay.  Now, what I want to do is turn to Exhibit --

9         MR. CARMODY:  Let's go to 1362, please.

10  We agreed it's admitted, 1362.

11         THE COURT:  Agreed?

12         MR. VERHOEVEN:  Yes, Your Honor.

13         THE COURT:  All right.  1362 received in evidence.

14  Thank you.

15     (Trial Exhibit 1362 received in evidence.)

16  BY MR. CARMODY:

17  Q.   Sir, are you -- take a look, please.  You have 1362 handy?

18  A.   I do.

19  Q.   Wonderful.

20     Let's put it up on the big screen.

21     So what we're looking at here, let's start with the email

22  on the bottom.  This is an email that you received from this

23  engineer named Dmitri Dolgov; correct?

24  A.   Correct.

25  Q.   And this is, you know, while you're on the job all of

1    about four months; correct?

2    **A.**   Yes.

3    **Q.**   And he's one of the senior engineers over at Google then;

4    fair?

5    **A.**   Yeah.

6    **Q.**   So what we see is, in the second line that says "So we

7    think."

8          **MR. CARMODY:**   If you can highlight that, please,

9    Mrs. Foley.

10   **BY MR. CARMODY:**

11   **Q.**   He's telling you, "As we think more about retention at

12   Chauffeur, here is some more accurate data on the three people

13   from the software team we just lost to competitors over the

14   last year."  Do you see that?

15   **A.**   I do, yes.

16   **Q.**   And he's talking about trying to keep people and the fact

17   that folks are leaving; fair?

18   **A.**   That's fair, yes.

19   **Q.**   Okay.  If we look to the very bottom under "of course,"

20   and he says, "But the competition right now is pretty fierce,

21   and there are companies" -- he says "there are several

22   companies (Tesla, Apple, Uber, Toyota) that are stalking our

23   folks, and they seem willing to burn a lot of cash to try to

24   catch up to us."

25        Did I read that accurately?

1  A.    Yes.

2  Q.    And was that something that was an accurate statement of

3  fact at the time?

4  A.    Yeah.  The competition then was very keen for talent, and

5  it remains so.

6  Q.    And talent is a big deal in your business; fair?

7  A.    Fair.

8  Q.    Okay.  And so you as CEO, you want to come in, you want to

9  retain talent; correct?

10 A.    Of course.  Yes.

11 Q.    Okay.  And so we can look up top of the page now.  We see

12 yet another -- we see a quick response by you, and then we see

13 Mr. Dolgov writing you yet another email on the subject of

14 retention.

15       And this is just -- I mean, gosh, you're there less than

16 four months; right?

17 A.    Correct.  Yeah.

18 Q.    Okay.  We see, "Yeah, the competition has been pretty

19 ridiculous, especially since Uber started playing in this

20 space."

21       And he goes on to talk about "The skill set of the people

22 who work on the onboard stuff is very specialized, with a

23 pretty small talent pool, so things will even get more

24 cutthroat as the focus on L4 grows across the industry."

25       And he goes on to talk about "retention and hiring is the

1   number one priority for 2016"; correct?

2   **A.**   Correct.  Yes.

3   **Q.**   And this is something that you were concerned about at the

4   time?

5   **A.**   Certainly, yeah.  Priority for a CEO would always be

6   making sure you've got good talent, holding on to that talent.

7   **Q.**   And then a week later, if we take a look at the date,

8   Anthony Levandowski, within a week of this email, he's out the

9   door; correct?

10  **A.**   Correct.

11  **Q.**   And you told us he blindsided you; correct?

12  **A.**   Yes.

13  **Q.**   And it's fair to say that after Anthony Levandowski leaves

14  to do his start-up called Otto, other Google engineers are

15  leaving to join him; correct?

16  **A.**   That's true.

17  **Q.**   Okay.  Now, take a look, 1907.

18       **THE COURT:**  Are you offering it in evidence?

19       **MR. CARMODY:**  Yes, I am.

20       **THE COURT:**  Any objection to 1907?

21       **MR. VERHOEVEN:**  One moment, Your Honor.  I'm finding

22  it.

23       No objection.

24       **THE COURT:**  Thank you.  Received in evidence.

25       (Trial Exhibit 1907 received in evidence.)

1          (Document displayed.)

2     BY MR. CARMODY:

3     Q.    So here we are looking at a little email string, sir.  And

4     what's going on, if you take kind of a quick look here, we're

5     now -- we'll fast-forward a few months later, in July of 2016.

6     And what we have is word that Marlon is leaving; correct?

7     A.    Correct.

8     Q.    And he was kind of a top-notch laser guy that y'all liked

9     at Google; correct?

10    A.    Yeah.

11    Q.    Okay.  And then you have -- and you're obviously

12    concerned; fair?

13    A.    Uh-huh.  Yeah.  We described him as an ace, hands-on

14    technician.

15    Q.    And this is kind of like this isn't just one or two.

16    We've got a lot of people over time walking out your door over

17    to Anthony Levandowski's Otto; fair?

18    A.    Yeah.  We definitely had some people moving to Otto, yes.

19    Q.    And so what we have you doing is, if you take a look at

20    the email to the top, it's obviously concerning because you're

21    sending this and forwarding this to Sergey Brin, who is the

22    cofounder of Google.  And he's way above your pay grade;

23    correct?

24    A.    He's someone who I would interact with almost on a daily

25    basis, though, right.

1    Q.   And what I see you tell him here is, "FYI, Sergey.  We

2    lost another laser guy to Otto.  This fellow was a ace hands-on

3    tech who we converted," and it goes on.

4         Accurate?

5    A.   Yes.

6    Q.   You didn't want to see him leave; correct?

7    A.   Correct.

8    Q.   And then we have here you're talking about the hiring

9    freeze over at Chauffeur, and you're saying, "Our hiring freeze

10   and the attractive self-driving car offers out there are

11   definitely impacting us."

12        Correct?

13   A.   Yeah, that's what I wrote.

14   Q.   It was making it tough for you in your job to retain the

15   good engineers you had; fair?

16   A.   Fair.

17   Q.   Okay.

18             MR. CARMODY:  Next, 1131.

19             THE COURT:  Any objection?

20             MR. VERHOEVEN:  Here it is.  No objection.

21             THE COURT:  One more time on the number.  I'm sorry.

22             MR. CARMODY:  Excuse me, sir.  1131.

23             THE COURT:  1131 received in evidence.

24        (Trial Exhibit 1131 received in evidence.)

25

KRAFCIK - CROSS / CARMODY

1   BY MR. CARMODY:

2   Q.   So we're looking at, now, yet another kind of string with

3   a couple emails here.  And we have yet another employee

4   leaving, Sameer; correct?

5   A.   Correct.

6   Q.   And Sameer again comes over to Anthony Levandowski's Otto;

7   correct?

8   A.   Yes.

9   Q.   And up top I can see you writing, "FYI, two more people to

10  Otto.  Need a plan."

11  A.   Right.  That was Sameer and Marlon, yes.

12  Q.   You're concerned, in fairness?

13  A.   Uh-huh.

14  Q.   You wanted to keep Sameer; correct?

15  A.   Yeah.

16  Q.   You wanted to keep Marlon?

17  A.   We wanted to retain our people, for sure.

18  Q.   Okay.  And let's take a look now, sir, at 1648, please.

19        MR. CARMODY:  Okay?

20        MR. VERHOEVEN:  No objection.

21        THE COURT:  Thank you.  1648?

22     (Trial Exhibit 1648 received in evidence.)

23        MR. CARMODY:  Yes, Your Honor.

24  BY MR. CARMODY:

25  Q.   Do you have that handy, sir?

1   A.   I do.

2   Q.   Let's start on the back, the last page.  It's an email

3   string we're looking at.  The first email in the chain first

4   chronologically.  Okay?

5        It's from Dmitri Dolgov.  And it's one that I showed parts

6   of in the opening statement.  So we see him saying on the

7   bottom of the page, "One of the significant effects of today's

8   Otto Uber news is increased attrition risk for us."  Correct?

9   A.   Yeah, correct.  That's what he wrote.

10  Q.   And, now, to put the timing at all in context, you joined,

11  you tell us, in late September of '15.  We are now August of

12  2016.  And between now -- and between those times, you lost

13  some key people; correct?

14  A.   We had some attrition during that time, sure.

15  Q.   And we see here him writing, "Otto's quick exit with a

16  large dollar amount is having a strong impression, so we have

17  another wave of good people reconsidering their options."

18       Correct?

19  A.   Correct.

20  Q.   Then if we take a look on the top of the next page, what

21  we can see is talking about some recent departures.

22       And then what we see, toward the bottom of that paragraph,

23  is what I talked about in the opening statement, him talking

24  about all the exit -- plentiful exit opportunities out there.

25  Mr. Dolgov says, "I think we should be seriously concerned."

**KRAFCIK - CROSS / CARMODY**

1        Do you see that, sir?

2   **A.**   I'm looking for that reference.

3   **Q.**   It is on the very last page of the email, sir, probably

4   bottom of the first full paragraph.

5   **A.**   Got it.

6   **Q.**   And that's what he says; correct?

7   **A.**   Yeah.  I can see that he wrote that, uh-huh.

8   **Q.**   And were you seriously concerned as well?

9   **A.**   I think, yeah, my job as the CEO is to always be concerned

10  about hiring great people and retaining our great people.

11  **Q.**   And then, right below that, he says, "Uber has always been

12  pretty aggressive in recruiting."

13        And he goes on to say, with the advent of the Uber

14  acquiring Otto, he thinks the competition with Uber is going to

15  be more serious, the competition for talent.

16        Do you see that, sir?

17  **A.**   I do.

18  **Q.**   And that was your belief as well; fair?

19  **A.**   It's reasonable, uh-huh.

20  **Q.**   Okay.  And if we kind of stop for a moment and talk about

21  where you are yourself as the new CEO here -- I mean, you were

22  CEO of Chauffeur then, correct, but it was still part of

23  Google?

24  **A.**   Correct.

25  **Q.**   But you're the top guy; right?

KRAFCIK - CROSS / CARMODY

1    A.   Uh-huh.

2    Q.   And it seems to me like you're bleeding.  We have here --

3    tell me if these names I got right of people who have left.

4         We know Anthony Levandowski.  And I'm not going to talk

5    about the little people; I'm going to talk about the -- kind of

6    the heavyweights.

7         We have Anthony Levandowski; correct?

8    A.   Correct.

9    Q.   You've got Chris Urmson, who was your predecessor -- I

10   mean, heavyweight there, who we saw the email from in the

11   opening statement when he was sounding the alarm to Sergey Brin

12   and Larry Page -- he quit too; correct?

13   A.   Correct.

14   Q.   We have Jaijun, the founder of the whole software, he

15   walks out?

16   A.   Jaijun was a senior software lead; yeah.

17   Q.   Gone too?

18   A.   Jaijun, yeah.

19   Q.   Okay.  We have Bryan Salesky who was the head of hardware.

20   He leaves too; correct?

21   A.   Uh-huh.

22   Q.   We have Russell Smith, one of the founders and a senior

23   engineer.  He leaves too; correct?

24   A.   Correct.

25   Q.   You have Dave Ferguson, another senior engineer, leaving

KRAFCIK - CROSS / CARMODY

1   too; correct?

2   A.   Correct.

3   Q.   And this all happens within the first nine months of you

4   coming in to take over; correct?

5   A.   Roughly speaking, yeah.

6   Q.   It put you in a pretty difficult situation it seems?

7   A.   You know, you have to recognize the size of the team at

8   that time.  There were hundreds and hundreds of us.  So, yeah,

9   it makes sense that there would be some attrition.

10  Q.   Well, let's take a look at 1255.

11          MR. CARMODY:  Okay?

12          MR. VERHOEVEN:  No objection, Your Honor.

13          THE COURT:  Thank you.  Received.

14      (Trial Exhibit 1255 received in evidence.)

15  BY MR. CARMODY:

16  Q.   So we're taking a look at Exhibit 1255, which is a

17  one-page summary that you send out to the people who are the

18  board of directors for Waymo, and you think you swore that it

19  could have gone to the Alphabet board as well; correct?

20  A.   Yes.

21  Q.   Okay.

22  A.   Yeah.  Yes.

23  Q.   So you're wanting to make sure, in your first year on the

24  job, when you're sending something out to all the big people,

25  you know, the directors of your company and of the parent

1   company, you want to get it right; correct?

2   A.   Correct.

3   Q.   Let's see what you say.  You talk about some highlights,

4   but then below you reference lowlights and challenges.

5        And if we take a look from the very first word and kind of

6   highlight the next two sentences, what we can see is you're

7   talking about "Increasing hype and competitive intensity in the

8   self-driving car space has led to significant retention

9   challenges.  We've lost key software, hardware, and operations

10  manufacturing supply chain talent at all levels."

11       Did I read that accurately?

12  A.   You did.

13  Q.   And was that an accurate statement of fact at the time you

14  wrote it?

15  A.   Absolutely, yeah.

16  Q.   Now, this is sent out in late 2016; correct?

17  A.   Yes.

18  Q.   This lawsuit that we're all here for today together was

19  filed in February 2017; correct?

20  A.   Correct.

21  Q.   And you understand that -- if -- and, by the way, just

22  shortly, not long after the lawsuit, a couple of months later,

23  you understand that Waymo teams up with Lyft; correct?

24  A.   After the lawsuit was filed, yeah.

25  Q.   And your parent company -- not yours, but Waymo's parent

1    company, Alphabet, makes a big billion-dollar investment in

2    Lyft; correct?

3    A.    Very recently, yeah.

4    Q.    And you know Lyft is the big competitor Uber has in the

5    ride-sharing space; fair?

6    A.    In the U.S., correct.

7    Q.    Okay.  And, now, you understand the trial we're all here

8    for today involves eight -- what Waymo claims to be trade

9    secrets; correct?

10   A.    Correct.

11   Q.    And when you had your deposition taken that I read from

12   earlier in this case, you didn't know what the trade secrets

13   were; correct?

14   A.    Not the specific details, yeah.  I'm not a LiDAR engineer.

15   Q.    That's fair.  I mean, you're an engineer; right?  But

16   you're not a LiDAR engineer.  And I think your sworn testimony

17   was "I just know they relate to LiDAR."  Is that fair?

18   A.    That's correct.

19   Q.    Okay.  So you obviously didn't know any more about those

20   trade secrets then than you did before the filing of the suit;

21   correct?

22   A.    Correct.

23   Q.    Fair to say at the filing of the suit you're the CEO.  And

24   while you knew your company was going to file a lawsuit against

25   Uber on eight -- what you claim to be trade secrets, you didn't

 1  know what they were; correct?

 2  **A.**   At the time, there were more than eight.

 3  **Q.**   Okay.  Let's be fair about it.  You knew you were

 4  asserting trade secrets; correct?

 5  **A.**   Correct.

 6  **Q.**   Okay.  But you say you didn't know what they were;

 7  correct?

 8  **A.**   I was relying on our expert LiDAR engineers and lawyers,

 9  yes.

10  **Q.**   But as CEO, you authorized the suit?

11  **A.**   Correct.

12  **Q.**   At the time you authorized the suit, you hadn't -- even

13  though you're a mechanical engineer, you didn't do any

14  scrubbing to try to understand what these kind of so-called

15  trade secrets were; correct?

16  **A.**   I absolutely trusted my technical and legal team, for

17  sure.

18  **Q.**   Now, Waymo, you have a lot of patents?

19  **A.**   Yes.

20  **Q.**   You believe you have a lot of trade secrets?

21  **A.**   Certainly.

22  **Q.**   You have a list of those patents; correct?

23  **A.**   Me personally, or --

24  **Q.**   I'm sorry, sir.  Your company.

25  **A.**   I would not -- yes.

1   Q.    Okay.  What I haven't found is, have you ever seen, before

2   today, a list that your company keeps of all its claimed trade

3   secrets?

4   A.    Me personally?

5   Q.    Yeah.

6   A.    No.

7   Q.    I mean, is there a list that engineers who work at Waymo

8   and want to go somewhere else can go to Waymo's competitor but

9   can look back and say, "My gosh, I just want to make sure, when

10  I get to my competitor, I want to look at this list to say I

11  better not go there"?  There is no such list, is there?

12  A.    I'm not aware of such list.

13          MR. CARMODY:  I'll pass the witness, Your Honor.

14          THE COURT:  All right.

15      Any redirect?

16          MR. VERHOEVEN:  Yes, Your Honor.

17                    <u>REDIRECT EXAMINATION</u>

18  BY MR. VERHOEVEN:

19  Q.    Counsel mentioned several people that left, and discussed

20  with you competition for talent.

21      I take it that there is significant competition in this

22  field for talent?

23  A.    For sure.  I mean, we've been working in this space a long

24  time.  I think we've helped move the space along with all the

25  miles that we've driven, all the technologies that we have

**KRAFCIK - REDIRECT / VERHOEVEN**

1   invented, and it has made for a very interesting space.

2   There's a lot of competition now.

3   **Q.**   One of the individuals that Mr. Carmody listed was Chris

4   Urm- -- say it for me.

5   **A.**   Chris Urmson, yes.

6   **Q.**   Thank you.

7       What was his position before he left?

8   **A.**   He was leading the technical side of the Chauffeur

9   self-driving car project.

10  **Q.**   Where did he go?

11  **A.**   He left and then started his own new company.

12  **Q.**   Has Waymo filed a lawsuit against him for misappropriation

13  of trade secrets?

14          **MR. CARMODY:**  Objection, Your Honor.

15          **THE COURT:**  Was this one of the people that you

16  referenced earlier?

17          **MR. CARMODY:**  Yeah.  Definitely, yeah.  But I'm

18  talking about "did you file a lawsuit against" him.

19          **THE COURT:**  Well, overruled.

20      Answer the question.

21          **THE WITNESS:**  No, we did not.

22  **BY MR. VERHOEVEN:**

23  **Q.**   Jaijun was another one Mr. Carmody referenced.  What was

24  his position, as best you know, at Waymo?

25  **A.**   He was a senior software engineer with expertise in what

KRAFCIK - REDIRECT / VERHOEVEN

 1  we call perception.

 2  Q.    And where did he go?

 3  A.    He started his own company called Neuro.

 4  Q.    Has Waymo filed any lawsuits or accused him of trade

 5  secret misappropriation?

 6  A.    We have not.

 7  Q.    What about Brian Salesky, what was his position at Waymo?

 8  A.    Brian led the hardware team.

 9  Q.    And where did he go when he left?

10  A.    He formed his own company called Argo AI.

11  Q.    And has Waymo accused him of misappropriation of trade

12  secrets?

13  A.    We have not.

14  Q.    Filed a lawsuit?

15  A.    No.

16  Q.    Russell Smith was another name Mr. Carmody mentioned.  He

17  left Waymo.  Do you know where he went?

18  A.    He might have gone to Neuro as well, but I'm not

19  absolutely positive.

20  Q.    And was there any suit that Waymo filed or accusation they

21  made of trade secret misappropriation?

22  A.    We did not.

23  Q.    David Ferguson was another person Mr. Carmody mentioned.

24  Same question.  Where did he go?

25  A.    He cofounded Neuro with Jaijun.

**KRAFCIK - REDIRECT / VERHOEVEN**

1   Q.    Okay.  That's their own start-up company?

2   A.    Correct.

3   Q.    And did Waymo sue him or accuse him of trade secret

4   misappropriation?

5   A.    We did not.

6   Q.    If you could turn back to the exhibit that Mr. Carmody

7   showed you, Exhibit 1362.

8        **MR. VERHOEVEN:**  Could we put that on the screen?

9        (Document displayed.)

10        **MR. VERHOEVEN:**  And can we highlight the bottom

11   pullout paragraph before the D on the bottom of it.

12   **BY MR. VERHOEVEN:**

13   Q.    And do you remember being shown the sentence, "But the

14   competition right now is pretty fierce, and there are several

15   companies (Tesla, Apple, Uber, Toyota, et cetera) that are

16   stalking our folks, and they seem very willing to burn a lot of

17   cash to try to catch up to us."

18        Do you see that?

19   A.    I see that.

20   Q.    Did you file a lawsuit against Apple for trade secret

21   misappropriation?

22   A.    No, we did not.

23   Q.    What about Tesla?  Did you accuse them of misappropriating

24   your trade secrets?

25   A.    No.

1   **Q.**   What about Toyota?

2   **A.**   No.

3   **Q.**   Why did you sue Uber for misappropriation of trade

4   secrets?

5   **A.**   Because we had evidence and information that indicated

6   that's what they had done.

7           **MR. VERHOEVEN:**  Thank you.  I'll pass the witness.

8           **MR. CARMODY:**  I have, I think, three questions, Your

9   Honor.

10          **THE COURT:**  Go ahead.

11                      <u>**RECROSS-EXAMINATION**</u>

12  BY MR. CARMODY:

13  **Q.**   Sir, you talked about a half dozen folks that left and

14  they started their new companies?

15  **A.**   Yes.

16  **Q.**   You have no clue what the specifics of their technology is

17  at those new companies; correct?

18  **A.**   We know generally the space of these competitors, sure.

19  **Q.**   Sir, my question was, do you, John Krafcik, know the

20  specific technology these other companies are using?

21  **A.**   Me specifically?  No.

22  **Q.**   Okay.  None of these people went to Uber; correct?

23  **A.**   Correct.

24  **Q.**   And, finally, sir, of all those companies, none of them is

25  situated like Uber, where they're directly competing with Waymo

1    to do self-driving cars in the ride-sharing business; correct?

2    **A.**   Not necessarily.  We don't know which way those companies

3    could go.  They could certainly enable a ride-sharing service.

4    **Q.**   Sir, as we sit here today -- and you're under oath -- are

5    any of those other companies competing like Uber is directly

6    against Waymo with self-driving cars in the ride-sharing space?

7    **A.**   I can say you're correct.  They are not in the

8    ride-sharing space today.

9              **MR. CARMODY:**  Thank you, sir.

10             **THE COURT:**  May --

11             **MR. VERHOEVEN:**  Couple of questions?

12             **THE COURT:**  Really?

13             **MR. VERHOEVEN:**  Two questions.

14             **THE COURT:**  Then he'll want two questions.

15    (Laughter)

16             **THE COURT:**  Go ahead.

17                        <u>REDIRECT EXAMINATION</u>

18    **BY MR. VERHOEVEN:**

19    **Q.**   Is Tesla a competitor for driverless cars?

20    **A.**   Not necessarily full driverless cars, but they have

21    driverless technology.

22    **Q.**   What about Apple?  Are they trying to develop this

23    technology?

24    **A.**   They are working on it.

25    **Q.**   What about Toyota?

PROCEEDINGS

```
 1    A.    Certainly.

 2          MR. CARMODY:   One question.

 3          THE COURT:  Go ahead.

 4                    CROSS-EXAMINATION

 5    BY MR. VERHOEVEN:

 6    Q.    You talked earlier about how important LiDAR is; correct?

 7    A.    Correct.

 8    Q.    Elon Musk doesn't use LiDAR at Tesla, does he?

 9    A.    He does disagree on this point.

10    Q.    He doesn't use LiDAR at Tesla; correct?

11    A.    Not yet.

12          (Laughter)

13          MR. CARMODY:   Thank you.

14          THE COURT:  All right.  Now, I need to keep the

15    witness.  Can he be excused, is what I'm asking?  But since I

16    said I would take up out of the presence of the jury the

17    conversation that you wanted to get into evidence, if you are

18    giving up on that or don't need it or whatever, then we can let

19    the witness go.  But, otherwise, I've got to keep him here

20    while we excuse the jury.

21          MR. CARMODY:   We agree, Your Honor, he can be excused.

22          MR. VERHOEVEN:   The witness may be excused.  We've

23    reached agreement, Your Honor.

24          THE COURT:  All right.  You reached agreement?

25          MR. VERHOEVEN:   We avoided the issue.
```

```
 1          THE COURT:  Sir, you're free to go.  You're
 2   discharged.  You don't need to respond to any other subpoenas.
 3   Have a great day.
 4          THE WITNESS:  Thank you.
 5       (Witness excused.)
 6          THE COURT:  All right.  So we have ten minutes before
 7   the magic hour of 1:00.  Do we have another witness ready to
 8   go?  Can you make good use of the time?
 9          MR. JAFFE:  Yes, Your Honor.  But before we call --
10   our next witness is Dmitri Dolgov.  Some of his testimony is
11   going to go into the substance of the trade secrets, and I
12   wanted to ask Your Honor's guidance on whether to do an open
13   session, then an open cross-examination, followed by --
14          THE COURT:  We have 10 minutes, and we're going to do
15   it all public.  So you all figure it out.  Whenever you run out
16   of public questions, the other side gets to ask public
17   questions.
18          MR. JAFFE:  Thank you, Your Honor.
19          THE COURT:  All right.
20          THE CLERK:  Will the witness approach the witness
21   stand.
22          THE COURT:  Please raise your right hand.
23                       DMITRI DOLGOV,
24   called as a witness for the Plaintiff, having been duly sworn,
25   testified as follows:
```

```
 1              THE COURT:  Okay.  Welcome.  Have a seat.

 2              THE CLERK:  State your name for the court, and spell

 3   your last name for the record, please.

 4              THE WITNESS:  Dmitri Dolgov.  Last name is

 5   D-O-L-G-O-V.

 6              THE COURT:  Everybody over there hear okay?

 7         All right.  Be sure you speak so this thing catches your

 8   voice.  That will be good.

 9         Counsel, go ahead.

10              MR. JAFFE:  Thank you, Your Honor.

11                       DIRECT EXAMINATION

12   BY MR. JAFFE:

13   Q.   Good afternoon.  Can you please introduce yourself to the

14   jury.

15   A.   Good afternoon.  My name is Dmitri Dolgov.

16   Q.   Where do you live?

17   A.   I live in Palo Alto.

18   Q.   Do you have a family?

19   A.   I do.  My wife and I have two young kids.  I have a boy

20   who is four and a half and a daughter who is about a year old.

21   Q.   Are you employed?

22   A.   I am.

23   Q.   Where?

24   A.   Waymo.

25   Q.   How long have you worked at Waymo?
```

**DOLGOV - DIRECT / JAFFE**

1    A.    Since the company was created in early 2017.

2    Q.    Where did you work before that?

3    A.    Before that, I worked at Google.

4    Q.    Is there a relationship between your work at Google and

5    your work now at Waymo?

6    A.    Yes, there is.   The project that I worked on at Google

7    later became Waymo.

8    Q.    What is your position at Waymo?

9    A.    I am the VP of engineering.

10   Q.    And can you give us a sense of what the VP of engineering

11   at Waymo does?

12   A.    Yeah.   I am responsible for the self-driving technology,

13   the hardware and software parts of it.

14   Q.    How many people report to you as the vice president of

15   engineering?

16   A.    About 430.

17   Q.    Let's talk a little bit about your background.   Did you go

18   to college?

19   A.    I did.

20   Q.    Where did you go to college?

21   A.    My first degree I got in Moscow from the Moscow Institute

22   of Physics and Technology.

23   Q.    Did you receive --

24        **THE COURT:**   You need to speak more into the

25   microphone.   You're fading out.

**DOLGOV - DIRECT / JAFFE**

1          **THE WITNESS:**  Okay.

2   **BY MR. JAFFE:**

3   **Q.**   Did you receive any advanced degrees after that?

4   **A.**   I did.  I also got a master's in applied physics and math,

5   also from the Moscow Institute of Physics and Technology.  Then

6   I got a master's and a Ph.D. in computer science from the

7   University of Michigan.

8   **Q.**   What did you do after receiving your Ph.D.?

9   **A.**   I was a researcher for Toyota Research Institute.

10  **Q.**   What did you work on as a researcher at Toyota?

11  **A.**   I continued my work on the AI specifically, an area that

12  we call motion planning, specifically as it applies to

13  self-driving vehicles.

14  **Q.**   You mentioned motion planning.  What does that mean?

15  **A.**   It's an area of AI and robotics where, basically, you

16  know, in this case, self-driving cars can figure out how

17  they're going to move through space.  Where are they going to

18  go and how fast are they going to move.

19  **Q.**   You said AI.  What does that stand for?

20  **A.**   Artificial intelligence.

21  **Q.**   Were you working on any specific projects at the Toyota

22  Research Institute?

23  **A.**   I was.  I worked through a collaboration with Stanford

24  University on the DARPA Urban Challenge Competition.

25  **Q.**   We got another acronym here.  Can you explain what DARPA

**DOLGOV - DIRECT / JAFFE**

1    is, please.

2    **A.**    DARPA is a federal agency that funds a lot of research in

3    basic science and engineering.

4    **Q.**    Okay.  So we know what DARPA is.  What is the DARPA Urban

5    Challenge?

6    **A.**    DARPA Urban Challenge was one of the competitions they

7    organized.  It was the third one they organized in self-driving

8    vehicles.  Specifically, the Urban Challenge was run on kind of

9    a mock city.  They took an abandoned air base and they created

10   kind of a mock town there.  And they had a bunch of

11   self-driving vehicles and regular cars that had to navigate

12   through that space.

13   **Q.**    What was your involvement in that challenge or

14   competition?

15   **A.**    I was part of Stanford's team.  I was one of the software

16   engineers.  And I worked on motion planning, as we discussed,

17   specifically helping our cars navigate through parking lots.

18   **Q.**    After this DARPA Urban Challenge, what did you do next?

19   **A.**    After that, I joined Google.

20   **Q.**    How did you come to be employed at Google?

21   **A.**    Sebastian Thrun, who was the lead for the Stanford team

22   and the professor with whom I collaborated, invited me to join.

23   **Q.**    When you joined Google, what kind of technology were you

24   working on there?

25   **A.**    So we were continuing to work on self-driving cars and

1  taking the next step from that basic research.

2  **Q.**   Did the project come to have a name that you were working

3  on?

4  **A.**   Yeah, we called it Project Chauffeur.

5  **Q.**   How many people were on Project Chauffeur at the

6  beginning?

7  **A.**   The first year, it was about a dozen.

8  **Q.**   Was the Google project, Project Chauffeur, was that

9  different from the prior work that you were doing in academia?

10  **A.**   Well, it was an evolution of that area of research.  You

11  know, the whole goal of creating the project was to take that

12  urban research and take the next step and bring closer to

13  product and get the technology to drive on public roads.

14  **Q.**   At that time, in 2009, were there many companies

15  developing self-driving cars to go on public roads?

16  **A.**   In those early days, I don't think there were any

17  companies who were driving on public roads.

18  **Q.**   We have a couple of minutes.  We'll see if we can try and

19  get through some of this.

20      We heard from Mr. Krafcik about Waymo's technology.  I

21  want to talk about it in a little bit more detail.

22      Dr. Dolgov, can you explain how Waymo's self-driving

23  technology works?  In other words, what is a self-driving car?

24  **A.**   Well, it -- basically, building a self-driving car

25  involves building the hardware and the software to equip the

 1    vehicle with the sort of reasoning and perception and

 2    decision-making that all of us do when we drive our cars on

 3    real roads and helping them develop the technology to deal with

 4    all the complexity.

 5    Q.   Do you have some slides to help explain this?

 6    A.   Yes.

 7              MR. JAFFE:   If we can put up WDX3-1, please.

 8         (Document displayed.)

 9    BY MR. JAFFE:

10    Q.   Dr. Dolgov, can you explain what we're looking at here on

11    this slide?

12    A.   This is a slide at a high level that describes the four

13    main things that a self-driving car has to do to achieve this

14    task.   And it's basically similar to what a human would do.

15    You have to ask these four steps:

16         Where am I?   You have to see and understand what's around

17    you.   You have to predict and anticipate what will happen next.

18    And, finally, you have to take that information into account

19    and figure out what you yourself are going to do in this

20    environment.

21    Q.   Let's see how many we can get through here.

22         If we can pull up WDX3-2, please, Mr. Fisher.

23         All right.   Dr. Dolgov, can you explain how Waymo's

24    self-driving car technology answers the first question of,

25    Where am I?

DOLGOV - DIRECT / JAFFE

1    **A.**   Our cars use maps, and that's what you see in this

2    picture.   The car in the middle, the white one, is showing the

3    position of our vehicle.   And as it's driving around, it is

4    taking the data from the sensors, and it aligns it to the map

5    we've prebuilt.   And as we align one to the other, our cars are

6    able to position -- rather, figure out their position with

7    respect to the map.

8         **MR. JAFFE:**   Let's go to the next slide.

9    **BY MR. JAFFE:**

10   **Q.**   How does Waymo's self-driving car technology answer this

11   second question of, What's around me?

12   **A.**   So, once again, we use the sensors that our cars have

13   onboard.   And they find relevant objects in the environment

14   around them.   And this is what you are seeing here on the

15   slide, where every object is shown with different colors.   And

16   there are a few cars here, some pedestrians, and I think a

17   cyclist or two.

18   **Q.**   All right.   Next slide, if we can look at that.

19        How does Waymo's self-driving car technology answer

20   question number 3, What will happen next?

21   **A.**   Right.   Like a human, experience is what matters.   And so

22   you get better -- as you drive, you get better at predicting

23   and anticipating what other people are going to do.

24        So this is what our cars do as well.   They learn how

25   people interact with one another.   They understand how other

1   people affect our actions, and vice versa.

2       And what we're seeing on this picture is, for every

3   object, we drew a line or curve that shows the future possible

4   path for that object.

5   **Q.**   All right.  Let's look at the last question, question

6   number 4.  How does Waymo's self-driving car technology answer

7   this last question, What should I do?

8   **A.**   The cars take all the information that we just discussed,

9   their position, the things around them, the predicted futures,

10  and you combine that with their understanding of the rules of

11  driving and you can't go through red lights or you need to stop

12  at a stop sign, as well as an understanding of the social

13  aspect of driving.

14      And then, based on that, they figure out where they want

15  to go, and they actuate the car to execute those maneuvers.

16          **MR. JAFFE:**  Thank you, Dr. Dolgov.

17      Now is probably a good time to break.

18          **THE COURT:**  Okay.  Very well.  That's what we'll do.

19      To the jury, we're finished with our first day.

20  Congratulations to you, and thank you for your attention.  And

21  I ask you to be back here at 7:45 in the morning again.  And we

22  will resume, I guess, with this witness --

23          **MR. JAFFE:**  Right.

24          **THE COURT:**  -- no later than 8:00 a.m.

25      So please remember the admonition.  No speaking with

```
 1   anyone about the case.  Don't do any research about the case.

 2   Don't read any papers.  No -- no nothing.  You know what I

 3   mean.  Please honor what I've said on that.

 4        Have a good evening.  We'll see you back here tomorrow.

 5   Thank you.

 6             THE CLERK:  All rise for the jury.

 7        (Jury out at 1:02 p.m.)

 8             THE COURT:  All right.  Be seated.  The witness may

 9   step down.  The witness can go back out in the hallway.  I want

10   to do some business with the lawyers.  I'll see you here at

11   7:30 in the morning.

12        All right.  Counsel, do you have any issues for me to take

13   up, or are we in recess for the day?

14             MR. BRILLE:  Your Honor, just one very quick issue.

15   The document issue went very smoothly today.  We've been

16   meeting quite regularly on documents and hope to work

17   everything out in advance.

18        But as we move through the witnesses, I think we're going

19   to start seeing some documents that are more controversial;

20   namely, the documents related to the Stroz investigation.  We

21   probably are going to have some pretty significant

22   disagreements on those.

23        And I was wondering whether or not the Court would find it

24   useful for to us submit a short brief with those documents so

25   we can point out to the Court sort of what the real issues are
```

**PROCEEDINGS**

 1    and allow them to make arguments with respect to admissibility

 2    on these issues.

 3            THE COURT:  Give me an example.

 4            MR. BRILLE:  So, for example, the Anthony Levandowski

 5    interview memorandum.  We have lodged objections.  The document

 6    itself is hearsay.  It contains hearsay within hearsay.  It's

 7    embedded hearsay throughout the document.  We pointed that out.

 8            And they've come back to us and said they want to offer it

 9    for its truth.  And we don't think that they should be able to

10    do that.  We think there are numerous issues with that.  The

11    Stroz report itself has similar issues.  And I think these are

12    complicated issues.

13            So what we propose is that we submit a very short filing

14    with you so you can see the documents.  You can have the

15    statements in front of you.  We can isolate them for you and

16    you can make --

17            THE COURT:  When you say "short," what do you mean?

18            MR. BRILLE:  I'm proposing a document no more than

19    five pages.

20            THE COURT:  How many exhibits?

21            MR. BRILLE:  I believe we have -- let me just --

22            MR. EISEMAN:  I think it's seven exhibits, Your Honor.

23            MR. BRILLE:  I think it's seven so far of the ones

24    that have been identified.

25            THE COURT:  Well, all right.  Let me ask the other

1   side.

2       Mr. Eiseman, how many of these actually made their way to

3   Uber?

4       **MR. EISEMAN:**  These are the Stroz report, the report

5   and all the exhibits -- or some of the exhibits to the report.

6   So they all made it to them.  They all made it -- their way to

7   them.

8       **THE COURT:**  Who at Uber saw them?

9       **MR. EISEMAN:**  Well, various people in the legal

10  department and other executives at some point in time.

11      **THE COURT:**  But before the deal was done, how many saw

12  them?

13      **MR. EISEMAN:**  I think it was the members of the legal

14  department.

15      **MR. BRILLE:**  I think, actually, also -- Your Honor, it

16  also depends on the document.  Some people saw some documents

17  at different times.  They were restricted to certain people.

18      And, you know, our biggest issue is that they're offering

19  them for the truth.  And we are saying that they suffer from

20  irreparable hearsay issues, both in terms of the document

21  themselves and the embedded hearsay.

22      **MR. EISEMAN:**  Your Honor, we think a brief may make

23  sense.  We think we'll be able to lay out a whole series of

24  exceptions to the hearsay rule, because the report was prepared

25  by Stroz, which was an agent of both Uber and Ottomotto, and

1    then to various employees who were interviewed.

2         THE COURT:  All right.  All right.  You can do this --

3    when do you want to submit it to me?

4         MR. BRILLE:  I could get ours in by the end of the

5    day, if you would like.  Just the pace of the -- with the pace

6    of witnesses, I'm not sure it's going to come up tomorrow.  I'm

7    certainly not trying to jam them in terms of time.

8         MR. EISEMAN:  If we could get it in by tomorrow

9    morning, Your Honor, that would be helpful.

10        THE COURT:  Right.  How about 6:00 a.m. tomorrow

11   morning?

12        MR. EISEMAN:  Thank you, Your Honor.

13        MR. BRILLE:  Thank you, Your Honor.

14        THE COURT:  You lawyers don't sleep anyway; right?

15        MR. BRILLE:  We don't.

16        THE COURT:  I have no sympathy.  I used to do it too.

17   So this is why you get paid a thousand dollars an hour, is to

18   stay up all night.

19        Okay.  Good.  We have a plan.

20        What else can I help you with?

21        MR. BRILLE:  Thank you, Your Honor.

22        MR. EISEMAN:  I think that's all from our side, Your

23   Honor.

24        MR. VERHOEVEN:  That's it.

25        THE COURT:  All right.  So I -- I would like to ask,

```
 1    if you both agree, for the two lawyers I spoke with at the
 2    sidebar this morning to come see me in chambers for just a
 3    moment, unless that is all moot.
 4            MR. VERHOEVEN:  We would be happy to.  Could we have a
 5    short break, before we do that, to inform ourselves?
 6            THE COURT:  Yes.  Okay.
 7            MR. VERHOEVEN:  Five minutes?
 8            THE COURT:  Five minutes will be fine.  My law clerk
 9    or my deputy will escort you in in five minutes.
10        Are we done for today?
11            MR. VERHOEVEN:  Yes, Your Honor.
12            THE COURT:  All right.  See you all at 7:30 in the
13    morning.  Thank you.
14        (Whereupon at 1:07 p.m. further proceedings
15         were adjourned until Tuesday, February 6, 2018
16         at 7:30 a.m.)
17
18
19
20
21
22
23
24
25
```

## I N D E X

Preliminary Jury Instructions                        211    2
Opening Statement by Mr. Verhoeven                    215    2
Opening Statement by Mr. Carmody                      250    2
Sealed Opening Statement by Mr. Jaffe                 277    2
Sealed Opening Statement by Mr. Carmody               289    2


**PLAINTIFF'S WITNESSES**                            **PAGE**   **VOL.**

**KRAFCIK, JOHN**
(SWORN)                                               315    2
Direct Examination by Mr. Verhoeven                   316    2
Cross-Examination by Mr. Carmody                      335    2
Redirect Examination by Mr. Verhoeven                 362    2
Recross-Examination by Mr. Carmody                    366    2
Further Redirect Examination by Mr. Verhoeven         367    2
Further Recross-Examination by Mr. Carmody            368    2


**DOLGOV, DMITRI**
(SWORN)                                               369    2
Direct Examination by Mr. Jaffe                       370    2

—  —  —

384

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1249 | | 338 | 2 |
| 1898 | | 342 | 2 |
| 1362 | | 348 | 2 |
| 1907 | | 352 | 2 |
| 1131 | | 354 | 2 |
| 1648 | | 354 | 2 |
| 1255 | | 358 | 2 |

‒ ‒ ‒

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Katherine Sullivan, CSR 5812, CRR, RMR

Monday, February 5, 2018