Volume 3

Pages 386 - 622

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | |
|---|---|
| WAYMO, LLC ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | No. C 17-00939 WHA |
| ) | |
| UBER TECHNOLOGIES, LLC., ) | |
| OTTO TRUCKING, LLC, and ) | |
| OTTOMOTTO, LLC ) | |
| ) | San Francisco, California |
| Defendants. ) | Tuesday |
| ) | February 6, 2018 |
| ) | 7:22 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
**For Plaintiff:**          QUINN, EMANUEL, URQUHART, OLIVER
                            & SULLIVAN, LLP
                            50 California Street
                            22nd Floor
                            San Francisco, California 94111
                   BY:  **CHARLES KRAMER VERHOEVEN, ESQ.**
                        **JORDAN R. JAFFE, ESQ.**
                        **DAVID ANDREW PERLSON, ESQ.**
                        **MELISSA J. BAILY, ESQ.**
                        **DAVID EISEMAN, ESQ.**
                        **ANDREA PALLIOS ROBERTS, ESQ.**
                        **JAMES DUBOIS JUDAH, ESQ.**

                            QUINN, EMANUEL, URQUHART, OLIVER
                            & SULLIVAN, LLP
                            1299 Pennsylvania Avenue, NW
                            Suite 825
                            Washington, DC 20004
                   BY:  **JARED WESTON NEWTON, ESQ.**

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

*Reported By:  Debra L. Pas, CSR 11916, CRR, RMR*
          *Katherine Sullivan CSR 5812, CRR, RMR*

**APPEARANCES (Continued)**

**For Plaintiffs:**       QUINN, EMANUEL, URQUHART & OLIVER
                          & SULLIVAN, LLP
                          865 South Figueroa Street
                          10th Floor
                          Los Angeles, California 90017
                    BY:  **DUANE R. LYONS, ESQ.**


**For Defendants:**       MORRISON & FOERSTER, LLP
                          425 Market Street
                          San Francisco, California 94105
                    BY:  **ARTURO J. GONZÁLEZ, ESQ.**
                         **MICHAEL A. JACOBS, ESQ.**
                         **ESTHER KIM CHANG, ESQ.**
                         **THOMAS J. PARDINI, ESQ.**


                          MORRISON AND FOERSTER LLP
                          707 Wilshire Boulevard
                          Suite 6000
                          Los Angeles, California 90017
                    BY:  **WENDY JOY RAY, ESQ.**


**For Defendants:**       BOIES, SCHILLER AND FLEXNER, LLP
                          5301 Wisconsin Avenue, NW
                          Washington, DC 20015
                    BY:  **KAREN LEAH DUNN, ESQ.**
                         **MICHAEL A. BRILLE, ESQ.**
                         **MARTHA LEA GOODMAN, ESQ.**


                          BOIES, SCHILLER AND FLEXNER, LLP
                          435 Tasso Street
                          Suite 205
                          Palo Alto, California 94301
                    BY:  **MEREDITH R. DEARBORN, ESQ.**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES:   (CONTINUED)**

**For Defendants:**          SUSMAN, GODFREY, LLP
                            1000 Louisiana Street
                            Suite 5100
                            Houston, Texas, 77002
                    BY:  **JOSEPH S. GRINSTEIN, ESQ.**


                            SUSMAN, GODFREY, LLP
                            1301 Avenue of the Americas
                            32nd Floor
                            New York, New York 10019
                    BY:  **WILLIAM CARMODY, ESQ.**
                         **SHAWN RABIN, ESQ.**


                            SUSMAN, GODFREY, LLP
                            1201 Third Avenue
                            Suite 3800
                            Seattle, Washington 98101
                    BY:  **MATTHEW ROBERT BERRY, ESQ.**


**Special Master:**          FARELLA BRAUN & MARTEL, LLP
                            Russ Building, 30th Floor
                            235 Montgomery Street
                            San Francisco, California 94104
                    BY:  **JOHN L. COOPER, ESQ.**


**Also Present:**            **DEMARRON BERKLEY**

                            **ERIC MEYHOFER**

                            **TONY WEST**

                            **AARON BERGSTROM**


                            —   —   —

```
 1   Tuesday, February 6, 2018                         7:22 a.m.

 2                   P-R-O-C-E-E-D-I-N-G-S

 3                        ---000---

 4   (The following proceedings were held in open court,

 5    outside the presence of the jury:)

 6       THE COURT:  Good morning, everyone.  Have a seat,

 7   please.

 8       What was it that was filed this morning that -- what was

 9   it that was filed this morning that Waymo hasn't had a chance

10   to respond to?

11       MR. EISEMAN:  Your Honor, we filed a brief this

12   morning responding to defendants' brief with respect to the

13   Stroz documents.

14       THE COURT:  Right.  I did see that.

15       MR. EISEMAN:  I --

16       THE COURT:  I thought there was something else that I

17   didn't -- what was it you wanted me to ask about?

18       Oh, there's one about Bill Gurley.  All right.  You need

19   to respond to that in due course.

20       MR. EISEMAN:  He's not going to be called today, Your

21   Honor, so we will.

22       THE COURT:  All right.  So, listen, I have a few

23   things to take up with you.

24       I received a huge packet, very thick.  And it's impossible

25   for an ordinary mortal to manhandle, so I had to then break it
```

1    up.

2        This is your deposition designations with all the

3    objections.  And I did get -- manage to get -- so I broke it

4    up.  And I'm giving you, now, my rulings on Mr. Bares.  The

5    clerk will hand this to you now.

6        Angie, would you hand this to Waymo.

7        But the rest of it I want you to redo -- I'm handing that

8    also to you -- because the ones that you highlighted in blue

9    was so dark I could hardly read it.  It took a magnifying

10   glass.  I mean, what was going through your mind when put it in

11   such a dark blue?  It might as well have been redacted.

12       That's number one.

13       Number two, you have so many pages in there that are just

14   lined out totally.  You don't need to put in the lined-out

15   pages, the ones that are totally lined out.  And I want you to

16   put one of these stickers on the pages where there is something

17   I've got to rule on.

18       I must have wasted half of my time going through page

19   after page that had nothing for me to rule on.  I want you to

20   put a tag on there, I'll turn right to it, I'll say "in" or

21   "out."  That's all I'll say.  Sometimes I'll say, "Out, 403."

22       All right.  So now you've got Mr. Bares.  So you've got to

23   resubmit these.

24           MR. JUDAH:  Yeah.  Thank you, Your Honor.

25           THE COURT:  And use -- like, yellow was good; but dark

1   blue, no good.  Okay.

2       Now, on your problem with the Stroz report, I'll tell you

3   what I think the answer is based on many years of trial work

4   and 19 years on this job.

5       Uber hired Stroz.  Now, I know that you say, "Oh, no, it

6   was MoFo that hired Stroz."  Uber set up this elaborate system.

7   Even put in the best light for Uber, Uber wanted to get at the

8   truth of what was going on.

9       So, to my mind, anything that those investigators at Stroz

10  wrote down as having been said by Levandowski or anyone else is

11  accurate and will -- that's just step one.  But Uber cannot be

12  heard to say that it's hearsay.  It's -- it is so attributable

13  to Uber, it would be an injustice to say that Uber gets to run

14  away from that due diligence report.

15      So step one is Uber's stuck with it, at least stuck with

16  the conclusion that the witness, whoever that was, told Stroz

17  that information.

18      Now, there's a second step.  It could be that that is

19  hearsay.  For example, if witness X said, "Hey, witness Y told

20  me that he did ABC," now, that's a different problem.  We will

21  certainly say that it's true that that was told to -- to the

22  Stroz people, but it's hearsay.  So we'd have to figure out, is

23  there a hearsay exception to that?

24      Now, I was shocked to find, I said, "Oh, this is great.

25  Look, the lawyers did something good.  It's only five pages."

```
 1   Who is it up there who told me five pages?

 2        I said, "For once, they came through."

 3        And she said, "No, there's 300 pages -- 300 exhibits down

 4   in the clerk's office somewhere."

 5        I said, "What?  300 exhibits?"

 6        Well, there's no way I can go through 300.  I've given you

 7   the ground rule, and you go through the 300 and you figure it

 8   out.

 9        You're stuck with that report on the Uber side.  Too bad

10   for Uber that you set up this elaborate system.  But you're

11   stuck with the fact that anything Stroz wrote down, it might as

12   well be that Uber wrote it down.  But, still, there could be a

13   subsidiary problem.

14        Now, I'm also going to rule that all of those people like

15   Levandowski and Lior, they were Ottomotto at the time.  I know

16   that they, on the Waymo side, took inconsistent positions on

17   that.  All right.  But, nevertheless, at the time of that

18   acquisition, they were Ottomotto.  And Ottomotto is in the

19   case; Ottomotto is a defendant.  So anything that they said

20   comes -- sails into evidence.  The Levandowski memo, for

21   example -- the interview notes, sails into evidence because he

22   was -- there are two steps and all that.

23        Now, there could be other people who are not at Ottomotto.

24   I'm saying those are -- those, we'll have to figure out some

25   other way that those get into evidence.
```

```
 1        That's the broad picture, number one.

 2        Broad picture number two is the entire thing comes into

 3   evidence from notice to Uber.  Even if it was just one lawyer

 4   at Uber who knew about it and read the report or even got the

 5   report and didn't read it, they're stuck with everything in

 6   there that came over -- over the transom to Uber.  That's for

 7   purposes of notice, meaning that they were on notice of all

 8   the, quote, bad acts, close quote, that were lurking there in

 9   the report.

10        Now, with the benefit of those two guidelines, I want you

11   to sort through the 300 on your own and bring to me the

12   problems that remain.

13        All right.  I think I'm done with my part.  Anything you

14   want to raise with me this morning?

15        MR. GONZÁLEZ:  One brief thing, Your Honor.

16        If you recall, we raised with you previously the issue of

17   these YouTube videos, basically commercials for Waymo.  And we

18   agreed that they could show one during opening statement.  At

19   some point, you recall they showed one with the three cars

20   driving around.

21        Now they want to show a different video to the witness

22   who's on the stand right now, Mr. Dolgov.  And our view is

23   enough is enough.  It's irrelevant.  It's prejudicial.

24        The jury doesn't need to see these cars driving around.

25   At one point, they pick up a blind guy and say, Aren't we great
```

 1   for giving this blind guy a ride?

 2       I just don't think we need that.  That's not the issue in

 3   trial.

 4            THE COURT:  All right.

 5            MR. JAFFE:  Your Honor, this is about a minute video.

 6   It goes through a little bit of history of the program.  And

 7   the part that Mr. González is referring to is the world's first

 8   autonomous ride, and I think it's an important part of the

 9   history of the company.

10       Dr. Dolgov was personally involved in that and can testify

11   as such.  I think it's important to give context in the history

12   and the development of the self-driving program.

13            THE COURT:  All right.  What do you say about the Good

14   Samaritan scene where the driverless car stops and picks up a

15   blind guy?

16            MR. JAFFE:  I'm sorry?

17            THE COURT:  What about the blind guy?

18            MR. JAFFE:  That's part of the video.  That's who they

19   took on the world's first autonomous drive was someone who was

20   blind.

21            MR. GONZÁLEZ:  And, Your Honor, it's hearsay.  You've

22   got somebody narrating, through the whole video, the history of

23   Waymo.  It's all hearsay.  And it's --

24            THE COURT:  But is it untrue?  Is it untrue what they

25   say --

1     **MR. GONZÁLEZ:**  I --

2     **THE COURT:**  -- in the video?

3     **MR. GONZÁLEZ:**  I don't know, Your Honor.

4     **THE COURT:**  Well, then, see, you -- why are you

5  objecting if it's not -- usually, you object when something's

6  untrue.  But you're just objecting for the sake of objecting.

7     **MR. GONZÁLEZ:**  No, we're objecting to it because it's

8  hearsay, Your Honor.  Because they've got a video that's a

9  commercial of the company that's got somebody talking, and what

10  they're saying is hearsay.

11     If they want to ask the witness, "When did you give the

12  first person a ride?" they can say it was in January of 2009 or

13  whatever.  He can give the history.

14     But you don't put on a video -- this is a -- you know

15  what?  Can we just play it for Your Honor?  It's one minute.

16  You need to see it to understand.

17     **THE COURT:**  All right.  Play it.  Let's see it.

18     **MR. GONZÁLEZ:**  Can you play it?  What -- you guys want

19  to --

20     **MR. JAFFE:**  Sure.

21     **THE COURT:**  By the way, is that screen -- that big

22  screen there seems blurry to me.  This screen is much clearer.

23  Maybe it's just me.  Does this one seem blurry to you?

24     **MR. JAFFE:**  A little bit.

25     **THE COURT:**  All right.  The one on the screen is

**PROCEEDINGS**

 1   sharp.  That one up there seems blurry.

 2       All right.  I'm watching -- is it going?

 3            **MR. JAFFE:**  For the record --

 4            **THE COURT:**  All right.  So what --

 5       (Video played.)

 6            **THE COURT:**  So what does it prove?  It is hearsay.

 7   What are you going to prove with this?

 8            **MR. JAFFE:**  We're not putting this into evidence.

 9   This is a demonstrative that goes with his testimony and his

10   explanation as to the history of the Project Chauffeur and some

11   of the developments over time.  I'm going to ask him on the

12   stand, can you explain to us what you're looking at and how

13   that relates to what you've just testified about?

14            **THE COURT:**  Why can't he just testify to it?

15            **MR. JAFFE:**  Well, these are visuals that accompany his

16   testimony.  And if the concern is the narrator, we can turn it

17   down.  I'm planning on asking him while the video is playing,

18   "Can you explain to us what we're looking at?"

19            **MR. GONZÁLEZ:**  Your Honor, I've just got to tell you.

20   You know, this case is not about who -- goody two-shoes.  You

21   know, they got this blind guy walking out to the car and

22   they've got the letters out there.  He's the CEO of the blind

23   center.

24       I mean, come on, you know, it's about eight trade secrets.

25   This is so far removed.  It's so far removed from the eight

**PROCEEDINGS**

1    trade secrets.  "Testing every day since 2009."  Is that really

2    true?  You don't have witnesses come in and say that on a

3    video.

4          THE COURT:  All right.  Here's the thing:  You can

5    show it.  Turn off the audio.  And he can narrate it under

6    oath.  And if I think it's too -- if he gets out of hand, I'm

7    going to give a strong admonition to the jury that you might

8    regret.  So don't abuse yourself.

9          All right.  What else?

10         MR. JAFFE:  Thank you, Your Honor.

11         MS. DUNN:  Good morning, Your Honor.

12         The parties have done, I think, a good job of working out

13    the issues related to Mr. Kalanick's testimony, but there are

14    two issues that remain.  The first is --

15         THE COURT:  Is he going to come today?

16         MS. DUNN:  As Waymo's witness, but I believe so.

17         THE COURT:  Okay.

18         MS. DUNN:  And actually as our witness due to an

19    agreement that we can go beyond the scope.  So one of these,

20    I'll handle; the other, Ms. Goodman will handle.

21         But the first also relates to a video, which is that

22    Mr. Kalanick received a text message from Mr. Levandowski where

23    Mr. Levandowski includes a link to the movie *Wall Street*, where

24    Michael Douglas gives an impassioned speech --

25         THE COURT:  I remember that.  That's one of the best

 1   moments in all of Hollywood.

 2        (Laughter.)

 3        **MS. DUNN:**  That's right.  And I'm glad Your Honor

 4   mentioned Hollywood.  It's a work of fiction, obviously.

 5   And --

 6        **THE COURT:**  I'm going to take judicial notice that

 7   it's all true.

 8        (Laughter.)

 9        **MS. DUNN:**  May be true for Michael Douglas, but this

10   is not a speech given by Mr. Kalanick.  So we believe this is

11   not relevant.

12      It is extremely prejudicial to play --

13        **THE COURT:**  Let's say it is fictional.  Let's say it

14   is totally fictional.  But if Levandowski says, "Hey, this guy

15   is telling my story, greed, greed, greed," why isn't that

16   totally admissible?

17        **MS. DUNN:**  Because it's completely attenuated from

18   anything in this case.

19      There's no indication Mr. Kalanick responded to this

20   message, that he remembers the message, that he ever looked at

21   the link, that he ever gave this speech, which is

22   Mr. Levandowski's suggestion.

23      It's unclear to me why this would come in.  There's

24   literally no argument to play a free-floating work of fiction

25   and movie.

```
 1        And even if Mr. Verhoeven makes some creative argument,
 2   you're still playing --
 3           THE COURT:  Wait.  Are you planning on putting in the
 4   entire movie?
 5        (Laughter.)
 6           THE COURT:  What are you trying to put in?
 7           MR. VERHOEVEN:  No, Your Honor.
 8        What -- and I can hand up the exhibit if you'd like to
 9   look at it.  It's a text message dated March 19th, right --
10   right when the Stroz investigation is going on, personally from
11   Mr. Levandowski to Mr. Kalanick's personal phone number.  And
12   the quote of the text is, "Here's the speech you need to give,
13   wink, wink."  And there's a link to the YouTube video.  And it
14   is indeed Michael Douglas's "greed is good" speech.
15        It's only about a minute long.  And I think it's highly
16   relevant to show that these guys were in cahoots and this was
17   something they were doing that shows their state of mind.  And
18   it's highly probative for the jury to see that they were both
19   privately talking in this manner, Your Honor.
20        It's something that he received.  If, for example --
21           THE COURT:  That who received?
22           MR. VERHOEVEN:  Kalanick.
23           THE COURT:  Kalanick.
24           MR. VERHOEVEN:  So, for example, if Kalanick received
25   a text that attached a document, I would be able to show him
```

**PROCEEDINGS**

1    the document and I would be able to say, you know, "Do you

2    remember this?  Did you read it?  Did you determine what it

3    was?"

4         And, you know, it's admissible.  And he can say whatever

5    he wants about it.  If he wants to say, you know, "I never saw

6    it," the jury will be entitled to believe or not believe that.

7         But this is a personal --

8         **THE COURT:**  Do we have any forensic evidence that he

9    clicked on the YouTube and actually watched it?

10        **MR. VERHOEVEN:**  All we have is a text message, Your

11   Honor.  We have to tell you, these text messages were all

12   deleted and forensically recovered.  But it was to him --

13        **THE COURT:**  This is one of the ones that was deleted

14   and then recovered; is that true?  I want you to be clear on

15   that.

16        **MR. VERHOEVEN:**  I don't know offhand, Your Honor, but

17   many, many of these texts were forensically recovered.

18        **THE COURT:**  Well, okay.  But --

19        **MR. VERHOEVEN:**  I can find out, Your Honor.

20        **THE COURT:**  That would be worth knowing.

21        **MR. VERHOEVEN:**  But --

22        **THE COURT:**  I'm going to wait until you have it ready

23   to go, but I'm not going to rule on whether or not -- I'm going

24   to wait to hear what Kalanick says about it before I decide

25   whether you get to show it.

**PROCEEDINGS**

1          **MR. VERHOEVEN:**  Well, how can he answer without seeing

2     what it was?

3          **THE COURT:**  Well, because he might recognize the text

4     message and might recognize the thing and say, "Yeah, I

5     remember that.  You know, that was a great movie.  That was --

6     I know the scene."

7          So he -- I don't know what he's going to say.  Did you ask

8     him at his deposition?

9          **MR. VERHOEVEN:**  No, I did not.  I don't think I had

10    this, Your Honor.

11         But it's to him.  And, under any other circumstance, I

12    would be able to show him a text that he received in the normal

13    course and ask him about the content of that text.

14         And if there's a link to another document, which this is,

15    I should be able to show him the document and say, "Did you

16    look at this?"

17         It's just like the text.  It's just a link --

18         **THE COURT:**  Maybe, I -- but your case is stronger if

19    he admits he actually did see it?

20         **MR. VERHOEVEN:**  Of course it is, yes.  But we're

21    talking about admissibility and whether I can show it to him

22    and ask him whether he saw it.

23         **THE COURT:**  You might be right anyway, but I still

24    want to wait.

25         Okay.  Go ahead.

PROCEEDINGS

1          **MS. DUNN:**  Your Honor, first of all, these texts we

2   all produced to Mr. Verhoeven.  And he never asked Mr. Kalanick

3   about this.  There is nothing to suggest that he clicked on

4   this link and watched this video.

5          **THE COURT:**  Wait.  Are you telling me that this is not

6   one of the recovered ones?  Does anyone actually know?  Both

7   sides just quote, think, close quote.  No one knows.

8          **MS. DUNN:**  Ms. Goodman will address this area.

9          **MS. GOODMAN:**  Judge, this text message was actually

10  produced by Mr. Levandowski.  It bears the Levandowski Bates

11  stamp.  And my recollection is these texts were produced in May

12  or June of this past year, prior to Mr. Kalanick's production

13  of text messages.

14         **THE COURT:**  When was Kalanick deposed?

15         **MS. GOODMAN:**  In July.  So this text message was

16  available.

17     I also want to note for the record that this Trial

18  Exhibit 10312, Waymo has added a printout of the -- of the web

19  page that isn't actually part of the production.

20     So the first page is a Levandowski document, and then

21  Waymo just added two pages to it, which makes the exhibit --

22         **THE COURT:**  I don't understand your point.

23         **MS. GOODMAN:**  That they added to the text message.

24  Mr. Kalanick did not receive this next page of the exhibit.

25  All he received was a link.

PROCEEDINGS

1          **MR. VERHOEVEN:**  We have no problem removing those

2     pages, Your Honor.  We were trying to give notice as to what

3     the link was.

4          **MS. DUNN:**  Well, the fact that Waymo is adding its own

5     visuals to exhibits that have been produced in this case is

6     disturbing and, I think, speaks to their motive in playing this

7     video, which the whole point is to sway the jury and play on

8     their emotions with no basis in fact or foundation.

9          This is -- you know, if Your Honor would like, there are

10    cases where courts have excluded similar evidence under a

11    similar circumstance.  I can read those cites into the record.

12    But I think given that -- it just seems to play a

13    free-floating piece of fiction movie where Michael Douglas is

14    saying "greed is good" is designed for one purpose and one

15    purpose only, and that purpose is not permitted.

16          **THE COURT:**  I'm not sure you're right about that.

17          **MR. VERHOEVEN:**  Your Honor --

18          **THE COURT:**  Part of the whole theory of the plaintiffs

19    here is Uber got greedy and wanted to jump on the subway and

20    cheat their way to the finish line.  And greed fits into that

21    narrative.

22          I don't know.  I --

23          **MS. DUNN:**  Well, not with Hollywood movies, Your

24    Honor.

25          I mean, if they want to use the evidence they actually

**PROCEEDINGS**

1    have in this case and ask Mr. Kalanick about that, that's one

2    thing.  They should be able to prove the case on the evidence

3    they have, not bring in, you know, Hollywood scenes.

4         **THE COURT:**  This is evidence -- this is evidence that

5    is part of the res gestae of the case.  Levandowski sends a

6    text with a link to the greed movie and says, "Wink, wink.

7    Give this speech."

8         All right.  I'm going to withhold ruling on this until I

9    see how the examination of Kalanick goes on this point.  So you

10   may have to do some serious work to lay the foundation.  But

11   maybe it comes in.  I'm not going to rule right now.

12        Okay.  You said you had two points.

13        **MS. DUNN:**  For the record, can I read the cites in

14   just so we have them?

15        **THE COURT:**  No.  You can read one cite in.

16        **MS. DUNN:**  All right.  635 F.3d 480.  It's an Eleventh

17   Circuit case from 2011.

18        **THE COURT:**  Great.  What else?  You said there were

19   two points.

20        **MS. DUNN:**  Ms. Goodman is going to handle the next

21   one.

22        **THE COURT:**  All right.  So say your name again,

23   please.

24        **MS. GOODMAN:**  Martha Goodman.

25        **THE COURT:**  Goodman.  All right.  Please, what's your

1    point?

2          **MS. GOODMAN:**  We understand from conferring with Waymo

3    that they would like to use a letter that Mr. Kalanick received

4    from a number of investors, in connection with his resignation,

5    that asks him to resign.

6          To be completely forthright, the letter says one thing

7    about this lawsuit but does not tie in the lawsuit to the

8    reasons that the investors are requesting the -- his

9    resignation.

10         **THE COURT:**  Could I see the letter, please?

11         **MS. GOODMAN:**  Yeah.

12         **MR. VERHOEVEN:**  By the way, that's a

13   misrepresentation.  We told them we are not going to use the

14   letter or try to put it into evidence.  We will only use it to

15   refresh his recollection.  He already testified in deposition

16   to the evidence we want to elicit.  And I want Your Honor to

17   know that we've said that.

18         **THE COURT:**  All right.  Well, what do you -- see,

19   there's --

20         **MR. VERHOEVEN:**  There's a bunch of stuff in that

21   letter that's not appropriate, and we never intend to use it.

22         **THE COURT:**  All right.  But when you use something to

23   refresh memory, you never say it out loud.

24         **MR. VERHOEVEN:**  That's correct, Your Honor.

25         **THE COURT:**  You just hand him the document, and you

**PROCEEDINGS**

1   don't do theatrics and say, "Oh, see this?  Does that refresh

2   your" -- no, you don't get to do that.  You just say, "Here's

3   Exhibit 916.  Please read that.  Does that refresh your

4   memory?"

5       And then let's say he says no.  That's it.  You don't get

6   to use it anymore.

7           **MR. VERHOEVEN:**  I understand, Your Honor.  And that's

8   exactly what we told them, contrary to counsel's

9   representation --

10          **THE COURT:**  All right.  Ms. Goodman, what's wrong with

11  that?

12          **MS. GOODMAN:**  Mr. Verhoeven is correct; he did tell me

13  that.

14      I didn't get to my next point, which was, after

15  Mr. Kalanick says "this doesn't refresh my recollection," they

16  then want to move on to his deposition testimony for

17  impeachment purposes, which they will mischaracterize because

18  he -- he answers one question and then continues on, which, if

19  Your Honor would like, I can read it to make clear that the way

20  in which they want to impeach him with this is improper.

21      So Mr. Verhoeven asked in deposition, "Did anyone" --

22          **THE COURT:**  Read slowly so I can follow.  Read slowly,

23  please.

24          **MS. GOODMAN:**  Sure.

25          "Did anyone indicate to you that the Waymo lawsuit

1       was a factor in your movement of the position out of the

2       CEO?"

3       The deponent:  "Yes."

4       **"Q.**       Who did that?

5       **"A.**       They didn't say it.  It wasn't like a thing

6       they said.  But it was in a letter that was given to

7       me -- that was told to me" --

8           **THE COURT:**  Look, I got it.  I just -- this is me

9   reading the newspapers, but I believe Mr. Kalanick was removed

10  or encouraged to leave for a long laundry list of problems that

11  had -- this case might have been one of them, but there was at

12  least five other things.

13          And it would be misleading to leave the impression with

14  the jury that he got fired on account of this case.  So that

15  whole subject is off.

16          **MR. VERHOEVEN:**  Well, Your Honor --

17          **THE COURT:**  Don't even go there, please.

18          **MR. VERHOEVEN:**  Can I just respond?

19          **THE COURT:**  No.  I understand your argument.

20          What is your argument?  Go ahead.  You can respond.

21          (Laughter.)

22          **MR. VERHOEVEN:**  The question is that I asked him, "Was

23  it one factor?"

24          **THE COURT:**  That's not enough.  Then we have to get

25  into all of the other bad things to explain he got fired for a

**PROCEEDINGS**

 1  whole -- this is a trick.  I'm not going to fall for it.

 2  You're not going to get into this.

 3       **MR. VERHOEVEN:**  Just for the record, so I can just

 4  plead my case, Your Honor, the reason we think this is

 5  important is it shows the significance -- they're trying to say

 6  this is nothing, these aren't real trade secrets, this isn't a

 7  big deal.

 8       And I think it shows it's a big deal.

 9       **THE COURT:**  No.  That's so far removed and attenuated

10  that doesn't even get halfway to first base.  So that subject

11  matter is off.  It's out, o-u-t.

12       All right.  You can appeal that one.

13       Okay.  Do you have anything more, Ms. Goodman?

14       **MS. GOODMAN:**  I have one housekeeping matter, but it

15  could wait until the end of the day if Your Honor wants to get

16  the jury in.

17       **THE COURT:**  Well, we'll see if the jury is present.

18  If they are, we'll get going.

19       Yes?

20       **MR. VERHOEVEN:**  I have a couple more, just to avoid

21  interruptions --

22       **THE COURT:**  The door is open, but I don't see anybody

23  there.

24       Please, go ahead.

25       **MR. VERHOEVEN:**  -- for the Kalanick cross.

PROCEEDINGS

1          So we're going to play, before Kalanick, the deposition

2     testimony of Mr. Bares.  And Mr. Bares took detailed notes of

3     meetings that he had with Mr. Kalanick and with the team.  And

4     those will be in evidence after his deposition is played and he

5     authenticates all of those documents, Your Honor.

6          And so I intend to ask him about a few entries in his

7     notes where he says "meeting with TK" and has a summary.  And

8     I -- I don't know for sure, but I think that they might jump up

9     and object to that as some sort of improper examination.

10              THE COURT:  Look, if it's already in evidence --

11              MR. VERHOEVEN:  Yes, Your Honor.

12              THE COURT:  -- and it refers to TK --

13              MR. VERHOEVEN:  Yes, Your Honor.

14              THE COURT:  -- you can ask TK about that event.

15              MR. VERHOEVEN:  Thank you.

16              THE COURT:  What's wrong with that?

17          MS. GOODMAN:  Your Honor, you already today said that

18     the Bares deposition clips weren't ready.  You weren't able --

19              THE COURT:  Well, I did the Bares.  I handed the Bares

20     back.

21          MS. GOODMAN:  Right.  So they won't actually be in

22     evidence before Mr. Kalanick testifies, unless somehow Waymo is

23     able to get the clips ready for you before Mr. Kalanick takes

24     the stand in about an hour.

25          MR. JUDAH:  Your Honor, fortunately, the section you

1   already made rulings on has those notes.  So that section,

2   subject to confirmation that we have accurately transcribed

3   what your rulings are, that will be ready to play, you know,

4   in -- within minutes.  So it will be before Mr. Kalanick.

5        **THE COURT:**  All right.  The notes that were taken

6   within Uber by Bares sail into evidence.  I don't see how you

7   can possibly keep those out unless you had normally scandalous

8   stuff that had nothing to do with this case.  So those are

9   going to come into evidence.  Those are your company documents.

10       **MS. DUNN:**  Your Honor, focusing for a second not on

11  the admissibility, but on the issue that Mr. Verhoeven brought

12  up, which is whether Mr. Kalanick can be cross-examined on the

13  notes of a co-worker.  I believe you have said in a previous

14  hearing, indicated that that's not permissible.

15       **THE COURT:**  Unless it's for impeachment.  Impeachment

16  is where you hold back the document in secret, don't put it

17  into evidence, but hold it back to surprise the witness.  And

18  I've said there it has to be true impeachment, meaning a

19  statement by Kalanick, not somebody else's notes.

20       But I made clear the last time that you -- I'm positive I

21  did.  If it's already in evidence, the document is already in

22  evidence, and it makes reference to TK, then you can say,

23  "Okay, here's the minutes from that meeting.  It refers to you.

24  Were you at that meeting?  Did you say the things that are

25  attributed to you?"

PROCEEDINGS

```
 1         So that's not a correct statement of my prior ruling.  I
 2    mean, I believe this is totally -- totally proper.  If it gets
 3    out of hand, I will put a stop to it.  But normally, this will
 4    be an okay way to proceed.
 5         MR. VERHOEVEN:  One last thing at the risk of
 6    irritating Your Honor.
 7         Mr. Kalanick, there is something that --
 8         THE COURT:  It's easy to do.
 9    (Laughter)
10         THE COURT:  It's not easy to do.  I'm not irritated.
11         MR. VERHOEVEN:  It concerns the Fifth Amendment.  So
12    Mr. Kalanick, part of the evidence in this case shows that --
13    of course you know Mr. Levandowski took the Fifth Amendment.
14    And we've taken discovery.
15         And the evidence shows that notwithstanding that position,
16    Mr. Kalanick argued against the board to keep him and wanted to
17    keep him.
18         THE COURT:  Keep who?
19         MR. VERHOEVEN:  Mr. Levandowski at the company.
20         THE COURT:  Uh-huh.
21         MR. VERHOEVEN:  And was an advocate to keep him even
22    though he had invoked the Fifth.
23         And, as you know, you've ruled a on motion in limine we
24    filed about noncooperation.  And I've noticed that in their --
25    they've given us some exhibits for their direct they're going
```

**PROCEEDINGS**

1  to do afterwards.  And they have the firing letter and they

2  have the letter about returning the two laptops.  So they're

3  going to go into noncooperation with this fellow, and it's not

4  fair to paint half the picture.

5      I mean, the -- here -- what was going on, what the truth

6  is, Mr. Kalanick was strongly advocating to keep him,

7  notwithstanding he wasn't cooperating with the -- or not --

8  notwithstanding that he was asserting the Fifth is what I

9  should say.  We think he was cooperating but was still

10  asserting the Fifth.

11         THE COURT:  Well, what was it that you're wanting in

12  evidence that I'm supposed to rule on now?

13         MR. VERHOEVEN:  That Mr. Levandowski had taken the

14  Fifth and that Mr. Kalanick still did not think he should be

15  fired --

16         THE COURT:  Here's the way I think -- it may be a good

17  point, but let's do this:  You -- don't cover this in your --

18  wait until you see what they cover.

19         MR. VERHOEVEN:  Yes, Your Honor.

20         THE COURT:  And then it may be crystal clear that you

21  should be allowed to do this.

22         MR. VERHOEVEN:  Thank you, Your Honor.

23         THE COURT:  And I'm not saying yet that.  I'm just

24  saying with the benefit of -- they're going to exceed the scope

25  of your cross.

PROCEEDINGS

```
 1          MR. VERHOEVEN:  Yes, sir.

 2          THE COURT:  That's already been agreed to.  Then you

 3   get to cross on that.

 4       And if it seems only fair that the Fifth Amendment --

 5   eventually I think it's going to come out anyway.  It's a

 6   question of timing.  But I still am -- I'm still considering

 7   the 403 implications, and it could be that depending on how you

 8   pitch it with the witness, that it's only fair to bring out the

 9   Fifth Amendment point.

10          MR. VERHOEVEN:  Thank you, Your Honor.

11          MS. DUNN:  Your Honor, just for the record, because we

12   may not get to discuss this later, I don't intend to elicit

13   anything from Mr. Kalanick that would open the door to this in

14   particular because, as Your Honor has recognized, the mention

15   of the Fifth Amendment can be extremely prejudicial.  And

16   that's why Your Honor has put in place a process where he will

17   evaluate the questions to be posed to Mr. Levandowski, should

18   he appear and invoke.

19       And so we would strenuously object to raising this during

20   Mr. Kalanick's examination in a broad way that is not policed

21   and enforced by the Court.

22          THE COURT:  Well, all right.  But listen, Levandowski

23   is maybe the central witness in the case.  The jury will be

24   wanting to hear from him.  If he is not brought in to testify,

25   the jury is going to say Waymo didn't prove its case.
```

 1          **MS. DUNN:**  Your Honor, I'm not relitigating that.

 2          **THE COURT:**  So that it's going to -- they have the

 3   right to bring him in and show how hard they tried, and the guy

 4   has taken the Fifth Amendment.  And, well, you know, that -- so

 5   I think very likely it's going to come into evidence, but I

 6   feel like we ought to wait and see how the whole case develops

 7   before we make that final decision.  Nevertheless, if you open

 8   the door, it's going to come in on Kalanick.

 9       Okay.  Let's bring in our jury.

10          **MR. VERHOEVEN:**  Thank you, Your Honor.

11          **MS. DUNN:**  Thank you, Your Honor.

12          **THE COURT:**  Everyone's here.  We're going to bring in

13   the jury.  What?

14          **MR. JACOBS:**  We can do this now or later on.

15       I believe they're sealing the courtroom for Mr. Bares'

16   deposition testimony without a reason to keep the public out.

17          **THE COURT:**  I don't think there's anything in Bares'

18   deposition that I saw that would warrant sealing the courtroom.

19   What's going on there?

20          **MR. JUDAH:**  Your Honor, so we divided up the Bares'

21   testimony in order to minimize courtroom sealing; the nonsealed

22   version and the sealed version.  The only one you reviewed was

23   the public one.  The non -- the one that we request to be

24   sealed is testimony relating to Trade Secret 25.  And you've

25   not seen that one yet.

1          **THE COURT:**  Well, all right.  We won't get to that

2    today.  Is that right?  Mr. Jacobs is looking like you didn't

3    say it quite right.

4          **MR. JUDAH:**  So our goal is going to be to get you the

5    revised annotated designations.  Mr. Bares' testimony can be

6    broken up with respect between the public and the nonpublic.

7    So I think we could play the sealed Bares next time we seal the

8    courtroom.

9          **THE COURT:**  Yes, but Mr. Jacobs is saying that what

10   you want to hide from the public does not deserve to be hidden

11   from the public.

12          In fact, look, I want to say, this is for you newspaper

13   reporters out there, in the sealed portion, only about

14   two-thirds of it deserved to be sealed.  There were things

15   about LiDAR, there were things about -- like these promotional

16   ads that you've put up there that the public could have seen.

17   And you can't do --

18          Make sure that door is closed.

19          One thing that bothers me about Waymo's case is you are

20   leaving the impression with the jury that you invented LiDAR,

21   that you invented self-driving cars, and that that's what this

22   case is about.

23          At some point, if this continues, I'm going to have to

24   interject and say, "No, it's about eight very specific things."

25          By putting that stuff under seal that looked like

**PROCEEDINGS**

 1    promotional videos, you're making it look like, "Oh, this must

 2    be secret.  We had to exclude the public.  This must be a great

 3    secret.  It's LiDAR.  My God, it's LiDAR."

 4        You did not invent LiDAR.  And next time we go into a

 5    sealed record, it's going to be -- it's going to be these eight

 6    things and these eight things only.  So we're not going to

 7    exclude the public and leave false impressions with the jury

 8    the way you did yesterday.

 9        You're mostly guilty, but, at your own risk, your side was

10    a little guilty too.

11        So there.  All right.

12        **MR. JACOBS:**  So, Your Honor, I understood that they

13    submitted the entire transcript to you.  If that's not the

14    case, then we have a different procedural problem.

15        **THE COURT:**  Look.  You're going to get to call this

16    guy once.  And if I decide later that the stuff you want to do

17    under seal doesn't deserve it, then you don't get to use it at

18    all.  So you -- you decide which way you want to jump on that.

19        **MR. JAFFE:**  Your Honor, if I may address the sealing

20    issue briefly.

21        **THE COURT:**  Yeah.

22        **MR. JAFFE:**  Regarding Mr. Bares' sealed testimony,

23    Mr. Bares is the primary witness on the case regarding the Uber

24    side of the Trade Secret 25 because, as we've already talked

25    about at length, Mr. Levandowski is taking the Fifth Amendment.

**PROCEEDINGS**

1    So what we have are notes of conversations with Mr. Bares

2    and Mr. Levandowski talking about content from Trade Secret 25.

3    And what Mr. Bares -- his sealed testimony is walking through

4    these notes.  And what the sealed portion is about is him

5    talking about the notes.

6    And we're going to put up the notes when they get into

7    evidence --

8    **THE COURT:**  All right.  If that's all true, then I

9    agree that ought to be under seal.

10    Is that all true?

11    **MR. JACOBS:**  Well, it is partially true.  It is their

12    allegation relating to Trade Secret 25.

13    But you've commented on this alleged trade secret before.

14    And I'll obscure the exact examples to avoid any issue.

15    This is the case where they say there's a scenario, dog

16    running into street, and the car has to watch out for the

17    car -- for the dog running into the street.

18    And you'll recall from the opening, on the left side

19    there's this -- there's the basic scenario, dog running into

20    the street.  And then on the right side are the specific

21    parameters that they've clarified are the scope of the trade

22    secret.

23    When you read this transcript, Your Honor, that they're

24    proposing to seal, you'll find none of that.  You'll find none

25    of those specific parameters.

1        **THE COURT:**  All right.  Then you've got to hand it up.

2   Hand up the proposed sealed part to me so I can review it at a

3   break.

4        **MR. JAFFE:**  Your Honor, there are two issues.  Number

5   one is, as I mentioned, what is going to go with his testimony

6   is a picture of the notes.  That's issue one.  So it's not just

7   the testimony.  The jury is going to be looking at both, and

8   they need to see both to understand the context.  That's issue

9   one.

10       Issue two is, this is the same thing they were doing on --

11   when we were trying to negotiate the short descriptions and

12   they wouldn't come up with one.  They want to litigate the

13   scope of our trade secrets not in front of the jury.  They

14   don't want the jury to decide these things.  They want to have

15   them decided in the course of sealing the courtroom, which is

16   improper.

17       They -- this is their argument, that these things aren't

18   secret.  That's fine, but that's for the jury to decide; not to

19   unseal them and put them out in the public domain.

20       **THE COURT:**  But you abused it yesterday by putting

21   LiDAR up there on the screen like you invented LiDAR.  That

22   should never have been under seal.  That should have been

23   done -- I want the public -- we're just going to exclude the

24   public when we get down to these eight trade secrets.  That's

25   it.

 1          **MR. JAFFE:**  Understood, Your Honor.

 2          **MR. JACOBS:**  Your Honor, I think you should look at

 3   the whole transcript.  And, of course, the document, if there's

 4   an issue with the document, we've got a protocol for that.  The

 5   document doesn't have to be shown to the -- to the gallery.

 6   But Mr. Bares' testimony is at a level of generality that is

 7   impossible to --

 8          **THE COURT:**  I have to see it.  And also give me

 9   that -- those handwritten notes so I can follow it.  I'll look

10   at that at a break.

11          **MR. JACOBS:**  Thank you, Your Honor.

12          **THE COURT:**  We've got to get going.  It's 8 o'clock.

13   There's no more.

14          **MR. JUDAH:**  Your Honor, if I could -- just one point.

15   So, for Mr. Bares, we would like to play the nonsealed

16   testimony before Mr. Kalanick, so --

17          **THE COURT:**  Well, if it turns out that something

18   should have been in the unsealed part, it's going to be

19   excluded most likely because you've been playing games with

20   this.  So you can play whatever you want to that I've already

21   approved.

22          **MR. JUDAH:**  I think -- well, there's one issue.  So

23   the counter-designations are -- there's no highlighting issue.

24   It's all yellow, and I flagged them.  So the

25   counter-designations for the public portion, which is when it's

1  in a separate --

2          THE COURT:  Wait a minute.  You mean I didn't rule on

3  that?  I thought I had.  You were supposed to put everything in

4  there.

5          MR. JAFFE:  Everything was in that packet, but you

6  only reviewed the first appendix in the packet.

7          THE COURT:  Well, what -- in the first appendix, it

8  should have been both sides' submissions.

9          MR. JUDAH:  It was.  It was -- well, it was Waymo's,

10  and then the -- within that first section was Waymo's

11  designations and the completeness objections.  And then the

12  counters were as --

13          THE COURT:  All right.  Give it to me, and I'll -- I

14  thought I had reviewed the entire thing.

15      All right.  So let's bring in the jury.

16          MR. JAFFE:  Your Honor, I have just one procedural

17  point.

18          THE COURT:  No, no.  Well, what is that?

19          MR. JAFFE:  It's for -- it's regarding Dolgov's

20  testimony.

21          THE COURT:  All right.

22          MR. JAFFE:  We had talked yesterday about doing a

23  public versus a sealed session.  And I had asked Your Honor's

24  guidance whether you wanted to do an open direct, open cross,

25  closed direct, closed cross.  And I wanted to get Your Honor's

**PROCEEDINGS**

1    guidance whether that was still the case or whether you wanted

2    to do it in one --

3              **THE COURT:**  Do everything.  I mean, you can do it

4    publicly first, including the cross, and then we'll have a

5    sealed part.

6              **MR. JAFFE:**  Thank you, Your Honor.

7              **THE COURT:**  All right.  Now, bring in our jury,

8    please.

9         (Jury enters at 8:02 a.m.)

10             **THE COURT:**  Thank you. Thank you.  Welcome back.

11   Everyone be seated.

12        I want to say how great it is to have a jury like you that

13   is here on time and so attentive and ready to go.  So thank you

14   for that.

15        All right.  Is our witness here?

16             **MR. JAFFE:**  He's here, Your Honor.

17             **THE COURT:**  Remind us his name, Dolgov?

18             **MR. JAFFE:**  Dr. Dolgov, that's correct, Your Honor.

19             **THE COURT:**  Yes, all right.

20        Okay.  Welcome back.  Please have a seat.  I remind you

21   you're still under oath.  Please adjust the microphone so it

22   will catch your voice.

23                        <u>DMITRI DOLGOV</u>,

24   called as a witness for the Plaintiff, having been previously

25   sworn, testified as follows:

DOLGOV - DIRECT / JAFFE

1          **THE COURT:**  And, ladies and gentlemen, remember we had

2    ten minutes of direct testimony from this witness yesterday.

3    And now we're going to resume right there, okay, where we left

4    off.

5          Please go ahead, Mr. Jaffe.

6                    **DIRECT EXAMINATION (RESUMED)**

7    **BY MR. JAFFE:**

8    **Q.**   Good morning, Mr. Dolgov.

9    **A.**   Good morning.

10   **Q.**   If you recall, when we left off yesterday afternoon you

11   were explaining Waymo's self-driving car technology.  And, in

12   particular, we were talking about those four questions.

13         I want to go back in time in history.  When -- in the

14   first days of Project Chauffeur, Google's self-driving project,

15   could Waymo's technology answer those four questions?

16   **A.**   Not in a way that would allow them to drive on public

17   roads.

18   **Q.**   Did there come a time when Project Chauffeur was ready to

19   take its cars on public roads?

20   **A.**   Yes.  I think middle of 2009 is when.

21   **Q.**   Where did you decide to drive them?

22   **A.**   We mostly drove around the Bay Area.

23   **Q.**   Did you pick any particular routes?

24   **A.**   Yeah.  We had -- actually, we had a milestone that we

25   created for ourselves to drive ten very specific routes.

**DOLGOV - DIRECT / JAFFE**

1    Q.   And can you give some examples of what those routes were?

2    A.   Yeah.  We had a -- I think a couple kind of going around

3    Lake Tahoe and through the mountains.  We had one that spent a

4    lot of time on freeways.  I think it went through all of the

5    bridges in the Bay Area.  And another one that started in

6    Mountain View and went to San Francisco.  Each one was about a

7    hundred miles long.

8    Q.   What criteria did you use to pick these routes?

9    A.   So we picked them to sample all the different conditions

10   that cars might encounter.  Mountainous roads, urban

11   environments.  So we really wanted to understand the full

12   complexity of the problem that we were facing here.

13   Q.   Did you achieve the milestone that you mentioned?

14   A.   We did.

15   Q.   How long did that take?

16   A.   It took us about a year and three-quarters.  I think it's

17   the fall of 2010 when we finished the last one.

18   Q.   Did Project Chauffeur have any other significant goals in

19   these early days?

20   A.   We did.  Another one was to drive 100,000 miles in full

21   autonomous mode.

22   Q.   You said -- I think you said 100,000 miles.  Why 100,000

23   miles?

24   A.   So this was -- back in those days, this was a huge number.

25   It was orders of magnitude more than, you know, cars have

DOLGOV - DIRECT / JAFFE

1   driven in that, you know, autonomous mode at that point.  And

2   we wanted to gain experience.

3   Q.   Has Waymo continued to accumulate test miles through

4   today?

5   A.   Yes.

6   Q.   About how many miles has -- test miles in autonomous mode

7   has Waymo contributed or driven today?

8   A.   We're, I think, just a bit over 4 million miles.

9   Q.   I'd like to talk now about some of the specific technology

10  in the hardware in Waymo's self-driving car.

11       Could you please give us an overview of the sensors that

12  are on Waymo's self-driving car?

13  A.   Sure.  We have lasers or LiDARs.  We have cameras.  We

14  have radars.  And we have some microphones.

15           MR. JAFFE:   Okay.  If we could show WDX3-7 at this

16  time, please.

17       (Photograph displayed.)

18  BY MR. JAFFE:

19  Q.   Are these the sensors that you were just referring to?

20  A.   That's right.

21  Q.   Okay.  Is one of these sensors most important to Waymo's

22  self-driving technology?

23  A.   The way we built the system, I would say that the LiDAR

24  provides primary functionality for most of the modules that are

25  critical for the performance of our system.

**DOLGOV - DIRECT / JAFFE**

1   Q.   Why is that?

2   A.   So the LiDAR gives you very rich data about the 3D

3   structure of the world that is incredibly useful for computers

4   to understand what's happening around them.

5   Q.   We -- we're going to hear a lot about LiDAR in this case.

6   We've heard about it already.  Can you briefly please explain

7   for the jury what is LiDAR and how does it work?

8   A.   Sure.  So at a very high level, the LiDAR will shoot out a

9   pulse of light into the world, and that pulse of light will,

10  most of the time, hit something and then come back.  So you can

11  measure that reflection.  So you can time how long it takes

12  that light to travel out and back and combine that with the

13  speed of light.  And you can measure the distance to whatever

14  that light happened to hit.

15  Q.   Why is that useful in self-driving vehicles?

16  A.   So, you know, you do it not just once.  You do it kind of

17  millions of times.  You send out, you know, millions of these

18  pulses every second and you do it all around you.  So, you

19  know, you measure kind of the distance to all of the things

20  around you and, you know, combined, that gives you this 3D

21  picture of the world around you.

22          **MR. JAFFE:**  If we could -- Mr. Fisher, if we could put

23  up WDX3-8, please.

24          (Photograph displayed.)

25

DOLGOV - DIRECT / JAFFE

1    BY MR. JAFFE:

2    Q.    Can you explain what we're looking at here in this

3    picture?

4    A.    Sure.  This is our car.  That's the model that you see in

5    the middle driving through a parking lot.  And what you're

6    seeing is the output of its sensors.

7    Q.    In a situation like what we're seeing in this picture, in

8    this video, how might the self-driving car use the LiDAR data?

9         (Video playing.)

10   A.    What you're seeing is all of the points that come back

11   from the lasers.  And, you know, that tells us that, for

12   example, the road in front of us is clear.  It shows us, you

13   know, these returns from the cars in the parking lot.  So, you

14   know, that is information useful to our car that helps

15   understand that those are the relevant objects in the

16   environment.

17   Q.    Thanks.

18        If you could slow down a little bit, that would be

19   helpful.  Thank you.

20        Okay.  Dr. Dolgov, where do the LiDAR sensors on Waymo's

21   current car -- or current cars come from?

22   A.    We build them.

23   Q.    Are these sensors available to buy off the shelf?

24   A.    No.

25   Q.    Why doesn't Waymo buy LiDAR sensors in the open market?

DOLGOV - DIRECT / JAFFE

1    A.    They don't exist.

2    Q.    Over the years, about how many custom LiDARs has Waymo

3    designed over time?

4    A.    About six major models.

5    Q.    And then just to conclude in the open session before we go

6    into the closed session.

7         MR. JAFFE:   If we can show WDX10, the video that we

8    looked at this morning, Mr. Fisher.

9    BY MR. JAFFE:

10   Q.    And we're going to play it without the sound.

11        (Video played.)

12   Q.    Can you explain to the jury, after we get through this one

13   part, the -- what we are looking at?

14   A.    So we are looking at the video that we at Waymo put

15   together to share with the world when we created the company,

16   and show some of the technology and some of the milestones we

17   went through.

18   Q.    And what are these different cars that we're looking at?

19   A.    Oh, these are the different generations of cars and

20   self-driving hardware that we built over the years.  And we had

21   a prototype of the golf cart that you saw, then we started with

22   a Prius, then we used the Lexus.  Then we built up this

23   marshmallow-looking thing.  We called it the Firefly.  And I

24   think those are the generations that you're seeing in this

25   video.

1  **Q.**  And what's -- what's happening in the video right now with

2  the gentleman in the back of the car?

3  **A.**  Oh, this is from 2015.  This gentleman is Steve Mahan.  He

4  happens to be blind, and he is driving through, you know,

5  public roads in a car that has no steering wheel or pedals.

6  And this is a big milestone for us in the fall of 2015.

7  **Q.**  You've been working in this industry for a number of years

8  now.  How does it feel that self-driving cars is now kind of

9  becoming a reality?

10  **A.**  Amazing.

11      And I've been working on this for quite a while, as you

12  said, since 2009.  So it's been an incredible journey to see

13  this go from, like, the very basic research or the DARPA

14  competition days where we just had cars operate like either in

15  a desert or a fake environment to, you know, at this point,

16  we're going to have cars without human drivers on regular

17  roads.

18          **MR. JAFFE:**  Thank you, Dr. Dolgov.  This is all the

19  questions I have for the open session.

20          **THE COURT:**  I want you to be considering the following

21  because we are yanking the public around here.  And that is,

22  after the public session, we go to the next witness.  And then

23  we -- so that we're not constantly moving people in and out.

24  And then when we have a convenient point, we'll bring this

25  witness back for the private -- for the secret part.

1          MR. JAFFE:  I think this is the only witness where

2    we're going to have to go under seal today.

3          THE COURT:  Well, then, it might be good to do this in

4    tandem with a break where the public can go enjoy themselves

5    and get some coffee, and them have a longer break, maybe.  I'll

6    think about it, but I -- it's important that we -- this is a

7    public trial, except where there's good cause and I can

8    rearrange.  You see the point.

9       All right.  Are you going to cross-examine, Mr. González?

10         MR. GONZÁLEZ:  Yes, Your Honor, we will.  And we're

11   fine with what you proposed with going on to the next witness

12   and then --

13         THE COURT:  All right.  Good.  Please -- please go

14   over there to where Mr. Jaffe is, so you'll get closer to the

15   witness.

16         MR. GONZÁLEZ:  May I approach, Your Honor?

17         THE COURT:  You may.

18                       <u>**CROSS-EXAMINATION**</u>

19   BY MR. GONZÁLEZ:

20   **Q.**   Sir, I'd like to clarify one thing at the outset.  Can you

21   and I agree that Google Waymo did not invent LiDAR?

22   **A.**   That's true.

23   **Q.**   In fact, before you came to Google, you worked on

24   autonomous vehicles at Stanford; right?

25   **A.**   That's true.

 1   Q.   And that Stanford autonomous vehicle that you worked on

 2   had a Velodyne LiDAR; correct?

 3   A.   It did.

 4   Q.   And that LiDAR had 64 laser beams; right?

 5   A.   Yes.

 6   Q.   So you would agree that having 64 laser beams is not a

 7   secret?

 8   A.   No, it's not.

 9   Q.   And from 2006 to 2009, you worked on self-driving cars for

10   Toyota; correct?

11   A.   That's correct.

12   Q.   And Toyota also used a Velodyne LiDAR; correct?

13   A.   That's correct.  That was one of the LiDARs that we had on

14   our cars.

15   Q.   With 64 beams; right?

16   A.   That was one of them.  I believe so, yeah.

17   Q.   And you understand that the cars that Uber has driving

18   around also have a Velodyne LiDAR; correct?

19   A.   Yeah, I think so.  Yeah.

20   Q.   And Google -- or Waymo, you don't contend that your trade

21   secrets are in the Velodyne LiDAR, do you?

22   A.   No, I don't believe so.

23   Q.   All right.  Now, you gave some testimony about goals,

24   different goals.

25        One of the things that Google has done is it has set up

DOLGOV - CROSS / GONZÁLEZ

1   bonus programs for your engineers to motivate them to reach

2   those goals; right?

3   A.   That's correct.

4   Q.   One of the bonus programs that has been set up to motivate

5   the engineers is that when you apply for a patent, you get

6   $5,000; right?

7   A.   I think that number has changed throughout the years, so

8   that came off the top of my head.  And I think we might have a

9   different program at Waymo.  So I'm not sure about the numbers.

10  Q.   Okay.  You get money if you apply for a patent, and you

11  just don't remember the exact amount because it may have

12  changed over time.  Is that fair?

13  A.   So there are a couple of -- you know, the part about time,

14  that's true.  And there's also different stages of the process.

15       Like I said, you get money when you apply for the patent.

16  Then there's an invention disclosure and other steps.  And I

17  can't quite remember, you know, when you get the money and, you

18  know, how much.

19  Q.   Okay.  But, in any event, one thing we can agree on is

20  that if you apply for a patent and get it, you're going to get

21  money as a bonus from Google; correct?

22  A.   At some point in time and place, yes.

23  Q.   And, in fact, you have applied for a number of different

24  patents; correct?

25  A.   I think I'm an inventor listed on a number of patents,

1  yeah.

2  **Q.**   And you --

3  **A.**   I didn't apply personally on all of them.

4  **Q.**   I'm sorry.

5      Sometimes you are a sole inventor and sometimes you're

6  listed as an inventor with other people; correct?

7  **A.**   That's correct.

8  **Q.**   And if it's two of you, if you and another engineer get

9  together and come up with a great idea and apply for a patent,

10  you both will get $5,000; right?

11  **A.**   I think there's a scheme where, you know, it doesn't just,

12  you know, grow linearly with, like, adding more people.

13  Everybody gets the same number.  I think what you said about

14  two people might be true.  But then, yeah, if you add more,

15  then it just caps at the total amount and you have to split it.

16  **Q.**   Okay.  I want to make sure the jury understood that.

17      If there's just two inventors, then you would each get the

18  same monetary bonus; but if there's more than two, then you

19  would have to split it up.  Is that generally --

20  **A.**   Yes.  That's my recollection of the program that at least

21  Google had at some point in time, yeah.

22  **Q.**   Okay.  Well, that program was there when Mr. Levandowski

23  was there; true?

24  **A.**   For part of it, yeah.  I think Google ramped down that

25  program.

**DOLGOV - CROSS / GONZÁLEZ**

1   **Q.**   Now, you understand that this trial is about eight

2   specific trade secrets; right?

3   **A.**   I think so, yeah.

4   **Q.**   Those are ideas that presumably, according to Google,

5   somebody at Google came up with; right?

6   **A.**   Yes.

7   **Q.**   And tell the jury who received the bonus for those great

8   ideas that they're claiming are trade secrets?

9   **A.**   So I guess on trade secrets, the best I understand, it is

10   some information that a number of people developed and is, you

11   know, something that is valuable and proprietary to us.

12       It is not clearly mapped as, like, the inventors on a

13   patent system.  So some of the stuff, I imagine, many, many,

14   many people all across the team contributed to the entirety of

15   what is --

16           **THE COURT:**  Is your answer nobody?

17           **THE WITNESS:**  No.  I think my answer is many, many

18   people.

19           **THE COURT:**  Many people got bonuses for trade secrets.

20   Is that what you're saying?

21           **THE WITNESS:**  No, no.  I think the question was, who

22   contributed to the trade secrets?

23           **THE COURT:**  No, no.  You're not answering his

24   question.

25       Ask your question again.

**DOLGOV - CROSS / GONZÁLEZ**

1   BY MR. GONZÁLEZ:

2   Q.   There are eight trade secrets in this case, just eight.

3   Tell the jury, who are the people that got bonuses for these

4   eight things that are supposedly great ideas that are of --

5          THE COURT:  Well, wait a minute.

6   BY MR. GONZÁLEZ:

7   Q.   -- that are ideas that are valuable?

8          THE COURT:  Wait.

9          MR. GONZÁLEZ:  Okay.  I'll stop the question after

10  trade secrets.

11     (Laughter.)

12         THE COURT:  You were okay for a while.

13     (Laughter.)

14         MR. GONZÁLEZ:  Let me rephrase it, Your Honor.

15  BY MR. GONZÁLEZ:

16  Q.   Tell the jury, who are the people that got bonuses for

17  these eight trade secrets?

18         THE COURT:  Fair question.

19     Please answer.

20         THE WITNESS:  I don't know.

21  BY MR. GONZÁLEZ:

22  Q.   Nobody did; isn't that right?

23  A.   I don't think we do trade secrets to bonus mappings.

24  Q.   Right.  So that if somebody came up with a great idea and

25  they applied for a patent, they get money.  But if it's just a

 1  trade secret, then you don't; right?

 2  **A.**    I wouldn't call it just a trade secret.

 3          **MR. JAFFE:**  Your Honor?

 4          **THE COURT:**  Yes?

 5          **MR. JAFFE:**  I'd object on relevance ground here, and

 6  it's confusing the jury for the reason that Mr. Verhoeven --

 7          **THE COURT:**  Overruled.  This is a proper line of

 8  cross-examination.

 9      Please continue.

10  **BY MR. GONZÁLEZ:**

11  **Q.**    Sir, whoever it is -- and the jury hasn't heard

12  testimony -- do you know?  You said earlier that you supervise

13  hundreds of engineers; right?

14  **A.**    That's correct.

15  **Q.**    Do you know?  Can you tell us, who are the engineers that

16  came up with the eight trade secrets that this trial is about?

17  **A.**    I can't name specific names.  It was a number of people

18  throughout the team for, you know, many years.  So it's hard

19  for me to very precisely answer that question.

20  **Q.**    Was there ever a hallelujah moment?  Was there ever a

21  moment when you were told about any of these eight trade

22  secrets and you said, "Wow, what a great idea"?  Was there ever

23  a moment like that?

24  **A.**    We have a number of hallelujah -- like, you know, big

25  moments where people solve a really hard problem and they get

1   excited and tell me about it.

2       Actually, I don't think I know the full eight trade

3   secrets that you're talking about, so I don't think I can

4   answer that question well.  And even for the ones that I know,

5   the process goes back years and maybe -- also, I don't think I

6   can give a very crisp answer.

7   Q.   You're telling me you're sitting here right now, you don't

8   even know what the eight trade secrets are that we're here to

9   try?  You don't know?

10  A.   I know some.

11  Q.   Okay.  Of the eight, how many do you know?

12  A.   I am mostly familiar with two.

13  Q.   All right.  Do you have numbers?

14          THE COURT:  Wait, wait.

15          MR. JAFFE:  Your Honor, I just want to be careful

16  about --

17          MR. GONZÁLEZ:  Just numbers.  Just numbers.

18  BY MR. GONZÁLEZ:

19  Q.   Do you have the numbers?  The jury has got a list of them

20  in their book somewhere.  I think we gave them a sheet of

21  paper.

22          Do you have the numbers of the two you're familiar with?

23  A.   No.

24  Q.   Okay.

25          THE COURT:  You can use a shorthand version.  You've

1   agreed that we can use shorthand versions; right?

2          MR. GONZÁLEZ:  Yes.

3          THE COURT:  All right.  Why don't you hand that list

4   to the witness.  Maybe he can identify the two he's talking

5   about.

6          MR. GONZÁLEZ:  Precisely.  May I just point something

7   out to the witness?

8   BY MR. GONZÁLEZ:

9   Q.   So what you're allowed to say is what's in the parens.  Do

10  you see the brackets, the parens?

11         THE COURT:  Or the number.

12  BY MR. GONZÁLEZ:

13  Q.   Yeah, or the number.  So can you please identify for the

14  jury the number and then just read what's in the parens that

15  goes along with that number.

16         MR. GONZÁLEZ:  And I'm going to stand here, Your

17  Honor, just for a minute because I may need -- well, I'll move.

18  BY MR. GONZÁLEZ:

19  Q.   So what are the two trade secrets that you are familiar

20  with?

21  A.   So you want the number and the description in parens?

22  Q.   Please.

23  A.   It's Number 25, self-driving car test scenarios and

24  specifications.  And Number 111, MBr, LiDAR design to avoid.

25  Q.   All right.  Let's take 111 as an example, the LiDAR

**DOLGOV - CROSS / GONZÁLEZ**

1  design.  Can you tell the jury who came up with that trade

2  secret?

3  A.    You know, there are a number of people who were involved.

4  And what I understand is claimed as a secret both on the

5  hardware side and on the software side, but it's not like there

6  was a specific set of people that we've identified, to the best

7  of my knowledge.

8  Q.    Okay.  So understanding we're having a jury trial, you're

9  not even prepared to say who came up with Trade Secret 111, are

10 you?

11 A.    I don't have specific names.

12 Q.    Okay.  Can you tell us when -- when did someone come up

13 with Trade Secret 111?

14 A.    So this is a design to avoid.  So this is, you know,

15 something that we've built up experience on.  I would -- you

16 know, I can give you a rough time frame.  I think it was about

17 2011.

18 Q.    Can you imagine in your mind a moment when this trade

19 secret came to your attention?

20 A.    I think I can, you know, subject to this being, you know,

21 a few years -- quite a few years ago.  I can roughly recall the

22 time when I and other folks on the team had the realization

23 that I think is captured by this trade secret.

24 Q.    Okay.  At that moment when you had the realization, did

25 anybody get any kind of bonus for that?

1    A.    Not that I'm aware of.

2    Q.    And, by the way, from time to time, you report to

3    management about how your team is doing; right?

4    A.    I do.

5    Q.    You give them updates; correct?

6    A.    Correct.

7    Q.    Can you identify for this jury any update ever to your

8    management where you said to management, "Wow, look what we've

9    come up with," and where you identify any of the eight trade

10   secrets to management as a new idea or discovery?

11   A.    So for the one we just discussed, it was a design to

12   avoid, it was a very small group of us at that point.  So I

13   think my management at that point was directly involved in the

14   process.  So, you know, it was kind of a group realization.

15        The other one that we just spoke about, you know, it's --

16   it's something that I'm sure came up in the process of our

17   discussion of updates.

18   Q.    Well, you now have a list of the other six.  And I don't

19   want to take too much time, but I want to give you an

20   opportunity to answer this question.

21        Can you identify any moment when you ever reported to

22   management that any of those other six things -- I won't say

23   what they are, but you can see them -- are some new discovery

24   that you just made?  Can you identify any moment in time when

25   you did that?

1    **A.**   Just to be clear, when I did it to my management, not when

2    somebody else did it to theirs?

3    **Q.**   I tell you what, whatever you remember.  If you remember a

4    moment when you told management, tell us that.  If you remember

5    a moment when somebody else told management, "Wow, look what we

6    just discovered," tell us that.

7    **A.**   So this is -- you know, maybe it's easier for me just to

8    speak to the ones that we just discussed.  The other ones, I

9    see about a paragraph.  And, you know, I'd have to go look more

10   carefully.

11       I think there's a lot of really technical juicy stuff in

12   all of those.  So there are specific aspects of this that I'm

13   sure all of us had, you know, aha moments, but I would have to

14   take a lot more time.

15       For the ones we just talked about, I'm sure there are aha

16   moments with --

17           **THE COURT:**  Well, he's not asking what you're sure of;

18   he's asking you, do you have an actual memory of the moment

19   when you told management, "Look at what a great idea we came up

20   with."  And then the follow-up question is going to be "show us

21   the memo," most likely.

22       So you need to have an actual memory that you did this or

23   that it was a verbal conversation, whatever it was.  But to say

24   "I'm sure" is not answering his question.

25           **THE WITNESS:**  No.

**DOLGOV - CROSS / GONZÁLEZ**

1          THE COURT:  All right.  Next question.

2          MR. GONZÁLEZ:  Your Honor, I would like to briefly

3    show the jury a patent, Trial Exhibit 1049.

4          THE COURT:  What?

5          MR. GONZÁLEZ:  I'd like to show the jury, briefly, a

6    patent, Exhibit 1049, just to very briefly show them what a

7    patent is.

8          THE COURT:  All right.

9       What's wrong with that?

10          MR. JAFFE:  Your Honor, we objected on foundation

11    grounds.  And I don't believe it was actually --

12          THE COURT:  Well, he's an inventor on patents.

13          MR. JAFFE:  If it's the patent that I'm thinking of,

14    he's not an inventor on it.

15          MR. GONZÁLEZ:  It's a Google patent, Your Honor.

16          THE COURT:  What's that?  I think I -- we'll see where

17    it goes.

18       Go ahead.  Overruled.  Please go ahead.

19

20

21

22

23

24

25

1   BY MR. GONZÁLEZ:

2   Q.   Turn to Exhibit 1049, please.

3        (Document displayed.)

4   Q.   Just very briefly, sir, you understand that this is a

5   patent and the applicant is Google on this patent; correct?

6   A.   Yes.

7   Q.   And when you talk about patents, do you normally describe

8   them by using the last three numbers of the patent number?  Do

9   you see that?

10  A.   I'm not sure.

11  Q.   And the date of the patent, just this example that I

12  picked, is 2014; right?

13  A.   That's right.

14  Q.   And then it lists the number of inventors that the jury

15  sees.  And it includes a number of people that they may have

16  already heard about:  Gaetan, Pierre, Anthony Levandowski.  Do

17  you see that?

18  A.   I do.

19  Q.   This is an example of an idea where a number of different

20  people contributed and, therefore, they are all listed as

21  inventors; right?

22  A.   That's correct.

23  Q.   And you understand that patents are publicly available;

24  correct?

25  A.   Yes, once they're -- well, once some are published.  I

1    think some are not publicly disclosed.

2    **Q.**    Once the patent is actually issued, once you actually get

3    the patent like this, you understand that that's publicly

4    available; correct?

5    **A.**    Right.

6    **Q.**    So, for example, the various patents that you've gotten,

7    you understand that those are available for the public to

8    review; right?

9    **A.**    Yes.

10   **Q.**    And so you understand that what is in the patent is not a

11   trade secret?  You understand that; right?

12   **A.**    I mean, I'm not a lawyer, but yes, it seems -- that sounds

13   right.

14   **Q.**    All right.  Just a couple more questions.

15          **MR. GONZÁLEZ:**  Andrew, turn to page 7, please.

16       (Document displayed.)

17   **BY MR. GONZÁLEZ:**

18   **Q.**    So that, for example, this patent has this figure,

19   Figure 4 on page 7.  And you understand that this is a PCB

20   board; correct?

21   **A.**    I would have to look at the rest of it.

22          **THE COURT:**  Please take your time and do whatever you

23   need to do to answer the question.

24          **THE WITNESS:**  So let me -- I guess, let me try to find

25   the reference to this figure.

1          Okay.  So I see a description of that figure, and it

2     states that it's an example transmit block.

3     BY MR. GONZÁLEZ:

4     Q.   All right.  You understand this is a transmit block?

5     A.   Yes.

6     Q.   And is that sometimes referred to as the PCB board?

7     A.   So the PCB board might be, you know, part of that or an

8     entirety of it.  Now we're getting into technicalities.

9     Q.   All right.  Fine.  And this transmit block shows that on

10    one side it's curved.  Do you see that?

11    A.   Yes.

12    Q.   And the general shape of it is like a rectangle; right?

13    A.   Like a -- I don't know -- trapezoid, yeah.

14    Q.   And those little things -- underneath the curve, you see

15    it looks like a T, they're in green now?

16    A.   Yeah.

17    Q.   Those are the diodes; right?

18    A.   Dials?

19    Q.   Diodes, the lasers?

20    A.   Yeah.

21    Q.   And then, if you go just below that, you see there's,

22    like, three circles --

23              MR. GONZÁLEZ:  Andrew, can you go to the middle

24    circle.  There you go.

25

1  BY MR. GONZÁLEZ:

2  Q.   You see those two middle circles?

3  A.   I do.

4  Q.   Those are holes in the block; correct?

5  A.   They look like holes to me, yeah.

6       MR. GONZÁLEZ:  And then can you do the outline,

7  Andrew.

8  BY MR. GONZÁLEZ:

9  Q.   And do you see what's in yellow?  That is the outline of a

10  shim that goes between the transmit blocks; correct?

11  A.   So it's an outline of a shim, I guess, but what's another

12  side of it?  I guess it's not here.

13  Q.   It's the outline of a shim; correct?

14  A.   Yeah.

15  Q.   And so you would agree that none of the things that I just

16  mentioned are secret; right?

17  A.   They're public as part of the patent.

18  Q.   Let me ask you, sir, a couple of quick questions about

19  Exhibit 1248 --

20       MR. GONZÁLEZ:  -- Your Honor, which I move into

21  evidence.  There's no objection to it.

22       THE COURT:  Is 1248 the patent?

23       MR. GONZÁLEZ:  No, Your Honor.  1248 is an email.

24       THE COURT:  I'm sorry.  I'm confused.  What is it

25  you're moving into evidence?

1          **MR. GONZÁLEZ:**  Oh, I'm sorry.  I do move the patent

2    into evidence, 1049.

3          **THE COURT:**  Any objection?

4          **MR. JAFFE:**  No objection, Your Honor.

5          **THE COURT:**  Thank you.  Received in evidence.

6       (Trial Exhibit 1049 received in evidence.)

7          **MR. GONZÁLEZ:**  And then, Your Honor -- thank you for

8    clarifying -- I move into evidence Trial Exhibit 1248, which is

9    an email chain that the witness is involved in.

10         **THE COURT:**  Any objection to 1248?

11         **MR. JAFFE:**  No objections, Your Honor.

12         **THE COURT:**  Thank you.  Thank you.  Received.

13      (Trial Exhibit 1248 received in evidence.)

14      (Photograph displayed.)

15         **MR. GONZÁLEZ:**  Just briefly, Andrew, can you

16   please ...

17   **BY MR. GONZÁLEZ:**

18   **Q.**   The top email is an internal Google email.  And this is a

19   two-page chain.

20         **MR. GONZÁLEZ:**  Andrew, can you go to the bottom of the

21   first page.  Here we go.

22   **BY MR. GONZÁLEZ:**

23   **Q.**   This is an email that you wrote at the bottom on

24   August 18th, 2016; right?

25   **A.**   Yeah.

**DOLGOV - CROSS / GONZÁLEZ**

1  Q.   And you say -- well, one of the persons you're writing to

2  is John.  Do you see that, "John"?

3  A.   I do.

4  Q.   That's the CEO, Mr. Krafcik; right?

5  A.   I believe so.

6  Q.   All right.  The jury met him yesterday.

7       And you say, "One of the significant effects of today's

8  Otto/Uber news is increased attrition risk for us"; right?

9  A.   Yeah.

10  Q.   And the news was that Otto was going to be acquired by

11  Uber; right?

12  A.   Yeah.

13  Q.   And then you wrote, "Uber has always been pretty

14  aggressive at recruiting, but one of the main barriers for

15  folks on our team was geography.  Now that the core

16  self-driving effort will be in San Francisco and Palo Alto, the

17  competition for talent will get much more serious."

18       Do you see that?

19  A.   I do.

20  Q.   And what you meant there is that, before the acquisition,

21  if you wanted to work on Uber's self-driving program, most of

22  the people were located out of Pittsburgh; right?

23  A.   That's what I meant.

24  Q.   And there are a lot of people that just don't want to live

25  in Pittsburgh; right?  Too cold?

DOLGOV - CROSS / GONZÁLEZ

1   A.   Yeah, I guess part of the reasons.

2   Q.   But your point was that now that Uber is involved here

3   locally, it's going to be harder for us to keep our people

4   because they might be more inclined to move to Uber; right?

5   That was your point?

6   A.   That was one of the factors, yeah.

7   Q.   And you were very concerned about that, weren't you?

8   A.   Very concerned?  I always care a lot about retaining our,

9   you know, talented people.  So that was one of those points

10  where I think it kind of bubbled up in my mind.

11          MR. GONZÁLEZ:  Andrew, next slide.

12  BY MR. GONZÁLEZ:

13  Q.   And your email continues.  You say, "I believe Anthony

14  will much more aggressively go after higher value targets on

15  our team"; right?

16  A.   Yeah.

17  Q.   "Anthony" is Mr. Levandowski?

18  A.   Yeah.

19  Q.   And you're alerting management, saying, hey, guys, we

20  might be losing more of our people; right?

21  A.   I was worried that Anthony was going to reach out and

22  basically poach some of the best people, yeah.

23          MR. GONZÁLEZ:  Next.  Andrew, can you ...

24  BY MR. GONZÁLEZ:

25  Q.   And then Joanne Chin responds to your email.  She is the

DOLGOV - CROSS / GONZÁLEZ

1   head of HR at Waymo; correct?

2   **A.**    That's right.

3   **Q.**    And she responds and says, "Dmitri, your points align with

4   the conversations I had yesterday after the news, and I share

5   your concerns"; right?

6   **A.**    Yeah, that's what it says.

7   **Q.**    Sir, will you please look at Exhibit 1136.

8   **A.**    I'm sorry.  1136?  I'm not sure I have that.

9           **THE COURT:**  I'm sorry.  Is this one that's secret or

10   something?

11           **MR. GONZÁLEZ:**  1136.

12           **THE COURT:**  Angie, they want you to turn off the -- I

13   don't understand.  What do you want us to do?

14           **MR. GONZÁLEZ:**  I don't need to do anything right now

15   other than have the witness look at 1136.

16           **THE COURT:**  It's not on the screen yet; right?

17           **MR. GONZÁLEZ:**  Correct.

18           **THE COURT:**  Don't put it on any screens yet.

19           **MR. GONZÁLEZ:**  I don't --

20   **BY MR. GONZÁLEZ:**

21   **Q.**    You see 1136?

22   **A.**    I do.

23   **Q.**    Are you generally familiar with this document?

24   **A.**    I'm not sure about the exact specific version, but it

25   looks familiar.

1  **Q.**  All right.  And if you look at page 10 of that document.

2  The top part.  Sir, the top part.

3  **A.**  Oh, top part.  Okay.

4  **Q.**  Got a bunch of boxes on there?

5  **A.**  Yeah.

6  **Q.**  Do you understand, generally speaking, that those are

7  different parts of the autonomous vehicle?

8  **A.**  Well, it's the -- it describes the various aspects of the

9  technology that contribute to our system.

10       **MR. GONZÁLEZ:**  All right.  Your Honor, I'd like to

11  display just this one page, page 10 of Exhibit 1136.

12       **THE COURT:**  Well, is that -- what do you say?

13       **MR. JAFFE:**  Your Honor, we understood that they were

14  only going to be playing this on the screen and then ask him

15  questions about it.  We need to look more specifically at this

16  page -- it looks like highly technical information -- before we

17  display this to the gallery.

18       **MR. GONZÁLEZ:**  I can display it, Your Honor, to the

19  jurors for now.  I don't think there's anything big that --

20       **THE COURT:**  Well, is this in evidence yet?

21       **MR. GONZÁLEZ:**  No, Your Honor.  I move in page 10 of

22  Exhibit 1136, so I can display it to the jury.

23       **THE COURT:**  All right.  Is there any objection to that

24  much?

25       **MR. JAFFE:**  No objection.

 1          THE COURT:  All right.

 2      (Trial Exhibit 1136 - Page 10 received in evidence.)

 3          THE COURT:  Then the clerk will show that page only to

 4  the jury box.  You don't need to show it to me.  Just inside

 5  the jury box.

 6      And if somebody out there manages to see it on the -- you

 7  know, jump up and let me know that we're not doing it right.

 8      Okay.  Over there in the jury box, do you now have what --

 9  is that over there yet, Angie?

10      Okay.  You should be able to see it, but don't put it up

11  there and don't put it on my screen.  Just put it in the jury

12  box.  Is that possible?

13      Okay.  I think we're doing it right.  But you still have

14  it or not?

15          MR. GONZÁLEZ:  No.

16          THE COURT:  Okay.  Now, it went off.  Okay.  We can't

17  do that.  I'm sorry.  That's beyond --

18          MR. GONZÁLEZ:  Can we show it to the jurors and the

19  lawyers and Your Honor and the witness?  Just black out --

20          THE COURT:  Yeah, but then it will go up on this big

21  screen, I think, the way you lawyers have set this up.

22          TECHNICIAN:  Your Honor, at this point, the projector

23  is still projecting.  I think we can just block the projector

24  for now.  The gallery line is blocked.

25          MR. GONZÁLEZ:  Here you go.  Problem solved.

 1   Technology.  Good.  Can we try it again?

 2          **THE COURT:**  All right.  Let's try it again.

 3          **MR. GONZÁLEZ:**  All right.  Great.  So the jurors have

 4   it in front of them.

 5   **BY MR. GONZÁLEZ:**

 6   **Q.**   So, sir, I don't want to spend a lot of time on this, but

 7   you just basically said what I wanted to elicit.  These are all

 8   different components of a driverless vehicle; right?

 9   **A.**   That's correct.

10          **MR. GONZÁLEZ:**  And, Andrew, can you -- Andrew, can you

11   bring up the top left?

12   **BY MR. GONZÁLEZ**

13   **Q.**   And for the record, there has got to be maybe 15 different

14   boxes here of information, and they have smaller boxes inside;

15   right?

16   **A.**   That's right.

17   **Q.**   Okay.  And I just want to call your attention to just one

18   box, which is the sensors on the upper left-hand side has four

19   different boxes inside.  Do you see that?

20   **A.**   I do.

21   **Q.**   You understand that the eight trade secrets that we're

22   here to discuss all come from the top box of that box, which

23   says "Lasers."  Do you see that?

24   **A.**   I think that's right.  Although, they might not be that

25   correct, complete mappings.

**DOLGOV - CROSS / GONZÁLEZ**

1   Q.   Okay.  You can't -- you don't see any other box on here

2   that the eight trade secrets come from, do you?

3   A.   So, you know, for example, the one we talked about

4   earlier, the 111, I think, in my mind, the scope of that would

5   encompass more than just that box.

6   Q.   Okay.  Fair enough.

7   A.   The learning is distributed throughout the entire system.

8   Q.   All right.  Fair enough.  The other seven, you agree, come

9   just from that one box?

10  A.   You know, this I'm less familiar with than the other

11  stuff, so I would have to follow it a little more carefully.

12  Q.   All right, sir.  Just a couple more questions.

13       One of the things that you do at Google and at Waymo, of

14  course, is you give evaluations, written evaluations to your

15  engineers; correct?

16  A.   You mean performance evaluations?

17  Q.   Yes.

18  A.   Yeah.

19  Q.   Can you identify a single evaluation -- oh, and, of

20  course, one of the things you say in your evaluations is you

21  commend people when they come up with a great idea; right?

22  A.   So it's usually a little bit broader than that.  Right.

23  In the performance evaluation, like, you don't list, you know,

24  very specific bright ideas that they had.  You know, you give a

25  summarized overall performance of an individual.

**DOLGOV - REDIRECT / JAFFE**

1   Q.   You're telling me that if somebody came up with a great

2   idea that was a breakthrough, what, you have a rule that you

3   don't mention that in written evaluations for that employee?

4   A.   No, we have no such rule.

5   Q.   Okay.  Can you identify a single evaluation of any

6   employee where you or anybody at Google or Waymo said, "Great

7   job coming up with any of these trade secrets"?

8        I realize you may not have called them trade secrets.  But

9   whatever they are, can you think of a single evaluation where

10  that feedback was given to an employee?  Where somebody said,

11  "Great job coming up with this"?  Anything?

12  A.   I can't think of that specific, you know, congratulatory

13  note, specifically mapping to the entirety of these trade

14  secrets, no.

15  Q.   Or any of the trade secrets?

16  A.   You know, some components, maybe like the mapping of --

17  you know, the trade secret, no.

18          **MR. GONZÁLEZ:**  All right.  Thank you.  That's all I

19  have.

20          **THE COURT:**  Okay.  Let's go to the redirect on the

21  public part.

22          **MR. JAFFE:**  Thank you, Your Honor.

23                    <u>**REDIRECT EXAMINATION**</u>

24  BY MR. JAFFE:

25  Q.   Dr. Dolgov, let's pick up where Mr. González left off.

**DOLGOV - REDIRECT / JAFFE**

1      We were looking at page TX1136 -- excuse me, Exhibit

2   TX1136.  And he asked you a question about these different

3   boxes that were on that page, on page 10.  Do you remember

4   that?

5   **A.**   I do.

6   **Q.**   Okay.  Can you go -- well, and the box he was asking you

7   about was the one labeled "sensors."  Is that right?

8   **A.**   Right.

9   **Q.**   Okay.  Can you go to page 17.  There's a line in this

10  document, there's a category "Sensors."  Do you see that?

11  **A.**   I do.

12  **Q.**   And then it says -- and I'm just going to read this out

13  loud because we're not displaying it publicly, but this is a --

14  it says:  "Current assumption.  A mixture of sensors are

15  essential for self-driving."  Do you see that?

16  **A.**   I do.

17  **Q.**   Do you agree with that?

18  **A.**   I do.

19  **Q.**   Why?

20  **A.**   So they -- each sensor has something that it is very good

21  at.  And, you know, putting them together, it gives you, in my

22  opinion, the best system.

23  **Q.**   But we heard from Mr. González or -- he was asking you,

24  you're saying it's only one box that -- why -- if they're

25  essential, why is there only one box?

**DOLGOV - REDIRECT / JAFFE**

1   A.   Well, and I think measuring, you know, their impact of

2   something by counting boxes is not the metrics that I would

3   use, especially in a context of a slide that's describing, you

4   know, maybe some other set of boxes.

5   Q.   And Mr. González was asking you who did what about when.

6        Let's just go back and talk about this in terms of your

7   experience.

8        In 2011, when you referred to for Trade Secret 111, who

9   was on the software team with you?

10  A.   There were a number of people.  You want to try me to

11  recall the names?

12  Q.   Yeah, so any of the names that you recall regarding the

13  MBr project.

14  A.   Michael Montonaro.  Should I talk about the area or just

15  the names?

16  Q.   The names.

17  A.   Mike Montonaro, Jaijun Zhu, Nathaniel Fairfield, Chris

18  Urmson, myself.  Maybe Hector Hee, but I'm not certain about

19  that one.

20  Q.   And in terms of folks that worked on the MBr LiDAR design

21  on the hardware side, do you remember who was on the LiDAR team

22  at that time?

23  A.   Pierre-Yves Droz, Anthony Levandowski.  I think Andrew

24  Schultz probably contributed.  I can try to recall other names,

25  but -- Gaetan.  Can't remember the last name.

**DOLGOV - REDIRECT / JAFFE**

1   Q.   Thank you.

2        All right.  And Mr. González asked -- he put a patent in

3   front of you.  Remember that?

4   A.   I do.

5   Q.   To be clear, was it -- were you looking at whether any of

6   that patent disclosed any of the trade secrets in this case?

7   A.   No, I don't think that was the question that I got.

8   Q.   And is it fair to say that -- well, let me ask it

9   differently.

10       With regard to Trade Secret 25 --

11  A.   Yeah.

12  Q.   -- who contributed to that, that -- what's described there

13  in that trade secret, the self-driving car specifications and

14  scenarios?

15  A.   Many people across the team for, you know, a number of

16  years.  So, again, I can't be identifying the specific people

17  just because the time is so long and the number of people is so

18  large, it's hard for me to do.

19  Q.   And about how long did it take to come up with the data

20  that's included in that trade secret?

21  A.   Years.  You know, the experience is probably, you know,

22  from day one of the project.

23  Q.   And when was that?

24  A.   2009.

25           MR. JAFFE:  Thank you.

1           **THE COURT:**  All right.  Can we excuse the witness?

2           **MR. GONZÁLEZ:**  Just one question.  One question.

3                    <u>**RECROSS EXAMINATION**</u>

4   BY MR. GONZÁLEZ:

5   **Q.**   Sir, the first time that you ever saw a document that

6   identified those eight things as trade secrets is when I handed

7   you that document right in that chair; true?

8   **A.**   We're getting into maybe some privileged conversations

9   that I had with in-house attorneys where I might have seen it.

10  **Q.**   Okay.  Let me rephrase it.

11          Before this lawsuit was filed, you had never seen any

12  document that identified any of these things as trade secrets;

13  true?

14  **A.**   True.

15          **MR. GONZÁLEZ:**  Thank you.

16          **THE COURT:**  All right.  May the witness -- no, we have

17  to have the private session; right?

18          **MR. JAFFE:**  That's correct, Your Honor.

19          **THE COURT:**  All right.  So tell me how long that's

20  going to last.  Just on your direct, how long will that be?

21          **MR. JAFFE:**  I should be about 15 minutes or less.

22          **THE COURT:**  All right.  Here's what we're going to do.

23  I think it will be more efficient.  Members of the public, I'm

24  going to excuse you now.  We're going to do the private part of

25  this witness.  And then at the end of that, I'm going to give

1    the jury a 15-minute break.  So effectively what I'm doing is

2    giving you maybe like a 40 or 50-minute break, would be my

3    estimate.  So everyone -- members of the public and all people

4    not cleared under the protective order need to leave.  Thank

5    you.

6         While everyone is leaving, if anyone can hear me in the

7    overflow room, there's been an error.  So come see me so we

8    don't have this thing broadcast.  And, also, if anybody in the

9    rest of the building --

10        (Laughter)

11          THE COURT:  -- can hear me, let me know because I

12   don't trust this system that we have 100 percent, even though I

13   do trust my courtroom deputy.

14        (Sealed proceedings Page 460, Line 1, through Page

15         474, Line 7.)

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

```
 1    //

 2    //

 3    //

 4    //

 5    //

 6    //

 7    //

 8         (Sealed proceedings concluded.)

 9         THE COURT:  Just a minute.

10    Just to give the jury a heads-up, who's going to be our

11    next witness?

12         MR. LYONS:  Gary Brown.

13         THE COURT:  All right.  Should that be done in public?

14         MR. LYONS:  Yes, Your Honor.

15         THE COURT:  All right.  We'll take our 15-minute break

16    now.  Remember my admonition.

17    Thank you, ladies and gentlemen.

18         THE CLERK:  All rise for the jury.

19    (Jury out at 9:08 a.m.)

20         THE COURT:  Thank you.  Be seated.  Our witness can

21    step down.  Clear away the witness bench so we'll have a fresh

22    start.

23    I have just a comment for you.  It's up to you how you'll

24    make your record, but, Mr. Jaffe, there were many times there

25    where you used the present tense, "How does Waymo do its LiDAR
```

1    now?"  It may become important in the case how Waymo did it at

2    the time Levandowski was there.  And those could be entirely

3    different things.  I've seen this problem come up in other

4    trials, and the lawyers seem to have a fixation in asking the

5    present tense.

6         It's up to you how you want to make your record, but if it

7    turns out that it's important, the verb tense, I want both

8    sides to know I'm putting you on notice, it sometimes is

9    important, and the other side might call you on it or the Court

10   of Appeals.  So take that to heart.

11        We'll take our break now.

12             MR. JAFFE:  Thank you.

13             THE COURT:  Yes, sir.

14             MR. VERHOEVEN:  I had one quick thing.  You'll recall

15   yesterday, after Mr. Carmody's direct, I raised the issue of

16   the distinction between patents and trade secrets.

17        During the cross of this latest witness, phrases were used

18   like "great idea," "new discovery," "hallelujah moment" in

19   talking about the trade secrets, Your Honor.

20        And then, of course, the patent was shown as well.  And I

21   think that's further perpetuating a confusion -- a potential

22   confusion with the jury.

23             THE COURT:  I'm hoping that I can come back on the

24   bench and -- since you lawyers have failed me again, I'm going

25   to give my own instruction on the difference.

PROCEEDINGS

```
 1          MR. VERHOEVEN:  Thank you very much, Your Honor.

 2          THE COURT:  All right.  Thank you.

 3          MR. JUDAH:  Your Honor, there's one other point.  We

 4   have the revised highlighted versions.  I think that they're

 5   legible for the designations.  If I could pass these up, and

 6   you can review them when you have an opportunity.

 7          THE COURT:  This is on Bares?

 8          MR. JUDAH:  This is Bares, yes.  The completeness with

 9   Bares, and then also Brian McClendon.

10              (Recess taken at 9:10 a.m.)

11              (Proceedings resumed at 9:25 a.m.)

12              (Discussion off the record.)

13          THE COURT:  All right.  Everyone be seated.

14          MR. VERHOEVEN:  I believe that it was given to

15   Mr. Eiseman, but we'll double-check and confirm.

16          THE COURT:  Well, no, but somebody gave something to

17   Angie, I thought, at the very end.  Who was that?

18          MR. VERHOEVEN:  That was Mr. Judah, Mr. James Judah,

19   and that was the sealed portions for Your Honor's review.  Did

20   you get that, Your Honor?

21          THE COURT:  I never got it.

22          MR. VERHOEVEN:  Oh.

23          THE COURT:  So it never got past there.  So you all

24   figure it out.  I can't solve every problem.

25      All right.  Let's bring in the jury.
```

**PROCEEDINGS**

```
 1        All right.  I found it.  It was my fault, I guess.

 2             MR. VERHOEVEN:  You have it, Your Honor?

 3             THE COURT:  Yes, I do.

 4             MR. VERHOEVEN:  Okay.  Thank you.

 5             THE CLERK:  All rise for the jury.

 6        (Jury enters at 9:27 a.m.)

 7             THE COURT:  Welcome back.  Please be seated.

 8        Before the next witness, your judge, meaning me, wants to

 9   give you an explanation of a couple of things in this case that

10   I think will mean more to you now that you've heard some of the

11   evidence than if I had given this straight off the bat.

12        Now, at the end of the case, I will give you very

13   detailed, even in writing, instructions about the law and what

14   needs to be proven.

15        So what I'm going to do now is a little bit better than

16   quick and dirty, but it is a preliminary instruction about the

17   difference between patents on the one hand and trade secrets on

18   the other.  Okay?  Because this has already come up a couple of

19   times.

20        Remember, our case involves trade secrets; it does not

21   involve patents.  So, nevertheless, comparisons have been made.

22   So we need to understand that.

23        So let me start first with patents.  A patent is issued by

24   the federal government.  It's right there in the Constitution,

25   actually.  If you go back and look at the Constitution, patents
```

1   are referred to there.

2        And a patent is a grant by the United States of America to

3   an inventor to have the exclusive use of an invention for --

4   I've lost track.  They changed this.  Is it 21 years now?  21

5   years.  All right.  Used to be 17, but they changed it to 21.

6        So, to take an example, someone invents a particular

7   widget.  They apply for a patent.  It's all done in secret.

8   The Patent Office looks at it and decides whether or not it is

9   a new invention.  It has to be something new, not in the prior

10  art.  It has to be something new and also useful.

11       So if the patent office thinks that it meets those

12  qualifications, then they issue the patent.  And the patent --

13  the PTO, the U.S. Patent and Trademark Office issues the

14  patent.  Sometimes we have litigation over the validity of

15  those patents, but that's a different point.

16       So then the owner of the patent has the exclusive right to

17  use and -- make, sell, or use that widget in the United States.

18  This is very important.  They have the exclusive right to do

19  it.  No one else can do it without their okay.

20       So even if one of you decided, if somebody else invented

21  the same thing on their own, in their own little workshop, and

22  thought they were the inventor, no, they lose out to the patent

23  unless they get an earlier patent.  But it's whoever invents it

24  first winds up getting the patent, and then everyone else has

25  got to get a license from them or they just can't use it.

**PROCEEDINGS**

 1          All right?  So that's the patent.

 2          And, by the way, once the patent is issued, it's public

 3     for all the world to see.  So part of the tradeoff is that, in

 4     exchange for telling the world about this patent and this

 5     invention, the public gets to see it, and then you -- and then

 6     commerce and innovation can build on that information.  But in

 7     exchange for that disclosure, the inventor gets this 21-year

 8     exclusive right.

 9          Now, that's kind of what a patent is.  Let me see if

10     there's anything else I wanted to cover.

11          All right.  So a trade secret is something that is

12     different in many respects.  I'll say how it's similar.

13          This term you've heard, IP -- intellectual property, IP --

14     usually is used to mean both patents and trade secrets and

15     copyrights, trademarks, lots of things.  It's a very broad

16     term.  But once you get down to comparing patents and trade

17     secrets, they are different in many important ways.

18          A trade secret is something that you don't apply for some

19     patent somewhere.  No government agency issues a trade secret.

20     Instead, it's something that the -- typically, a company or a

21     small business, or a big business, would come up with and

22     develop their own way of doing something, and they kept it

23     secret.  And that has value -- economic value because it is

24     secret and has value to them.  And they take reasonable efforts

25     to keep it a secret.

```
 1          So that's what a trade secret is.  Now, if it's
 2    generally -- it always concerns information.  Information.  And
 3    if that information, though, is already known generally to the
 4    public, then it can't qualify.  It cannot qualify as a trade
 5    secret because it's already generally known.
 6          And so that -- so part of what Waymo has got to prove here
 7    is its alleged trade secrets were not generally known.  It
 8    would be one of the elements that it needs to prove.
 9          Now, another important way that the trade secrets are
10    different is that -- remember I said for patents the owner gets
11    the exclusive right to use, make, or sell the widget, and
12    nobody else can do it without their permission.
13          But where trade secrets are concerned, if you have one
14    company over here and one company here, and one of them
15    develops its own trade secret, the other -- the other company
16    is entitled to develop its trade secrets.  And they may or may
17    not be the same thing.  But if they do happen to be the same
18    thing, that's okay.
19          What you can't do, though, is steal somebody else's trade
20    secrets.  That's a no-no.  You can't do that.  But if you
21    independently develop your own trade secrets, the fact that
22    somebody else has got a trade secret that looks just like it or
23    close to it, too bad.  You can't sue them over that.  You can
24    only sue over stealing or misappropriating somebody else's
25    trade secrets.
```

**PROCEEDINGS**

1    So, remember, I said that for patents you get the

2  nationwide exclusive right to make, use, or sell.  That doesn't

3  apply at all in trade secrets.  Somebody else has the right at

4  any time to develop their own trade secrets.

5    Now, they have to legitimately develop their own.  As I

6  say, you can't misappropriate somebody else's trade secret.

7  But every company -- every company has the right to develop

8  their own and then use it.  And it doesn't matter if it's the

9  same as somebody else's trade secret.

10    So at the end of the case, I'm going to give you more

11  detailed instructions.  But, for present purposes, I wanted to

12  try to explain to you the difference between patents on the one

13  hand and trade secrets on the other.

14    Okay.  One last thing.  One of you told my clerk that the

15  last witness on the stand, you could not hear.  I totally

16  understand because there were a few moments when I found it

17  hard to hear.  And what I want you to do, if you find yourself

18  in that position again, is raise your hand and say, "I can't

19  hear the witness."  I want you to -- you know, this entire

20  exercise is for you.  So you have to raise your hand and let us

21  know you can't see something or you can't hear something.  So

22  please take that into account.

23    All right.  Next witness, please.

24    **MR. LYONS:**  Thank you, Your Honor.  The plaintiff

25  calls Gary Brown.

BROWN - DIRECT / LYONS

1              **THE COURT:**  Gary Brown.

2              **THE CLERK:**  Will the witness please approach the

3    witness stand.

4              **THE COURT:**  Okay.  Mr. Brown, welcome.  And please

5    raise your right hand and take an oath to tell the truth.

6                   **GARY THOMAS BROWN**,

7    called as a witness for the Plaintiff, having been duly sworn,

8    testified as follows:

9              **THE COURT:**  Okay.  Welcome again, Mr. Brown.  Please

10   have a seat.

11        See how my microphone moves around?  Yours does too.  It

12   has to be close enough to catch your voice so all those people

13   back there can hear you.

14        Say your name, please.

15             **THE WITNESS:**  Gary Thomas Brown.

16             **THE COURT:**  All right.  That's good, I think.

17        Counsel, remind the jury who you are and then please

18   proceed.

19             **MR. LYONS:**  Good morning, ladies and gentlemen.  My

20   name is Duane Lyons.

21                  **DIRECT EXAMINATION**

22   BY MR. LYONS:

23   **Q.**   Good morning, Mr. Brown.

24   **A.**   Good morning.

25   **Q.**   Where are you employed?

BROWN - DIRECT / LYONS

1   A.   Google.

2   Q.   How long have you worked at Google?

3   A.   Since August 2013.

4   Q.   Could you tell us briefly about your educational

5   background.

6   A.   In May 2011, I received a bachelor's in cybersecurity and

7   a master's in enterprise computing from the Stevens Institute

8   of Technology in Hoboken, New Jersey.

9   Q.   What did you do after you received your degrees from

10   Stevens?

11   A.   I worked for the Federal Reserve Bank of New York as an

12   intrusion analyst on their national incident response team.

13   Q.   What is an intrusion analyst?

14   A.   We would investigate suspected attacks on bank computers

15   and networks to determine whether they were real or not.

16   Q.   How long did you work at the Federal Reserve?

17   A.   A little over two years.

18   Q.   And why did you leave?

19   A.   I got an offer from Google.

20   Q.   So you've been at Google now for a little over four years;

21   is that correct?

22   A.   That is correct.

23   Q.   And what do you do for Google?

24   A.   I'm a forensic analyst investigating security incidents.

25   Q.   And what are your responsibilities as a forensic analyst?

BROWN - DIRECT / LYONS

1   A.   We investigate security incidents.

2   Q.   Do you know who Anthony Levandowski is?

3   A.   I do.

4   Q.   And were you part of a forensic investigation conducted by

5   Google into his activities on the network at Google?

6   A.   Yes.

7   Q.   Are you familiar with something called the SVN server?

8   A.   I am.

9   Q.   What is the SVN server?

10  A.   It's a repository of design files that pertain to

11  self-driving cars.

12  Q.   Did you investigate suspected activity on the SVN server

13  on December 11, 2015, at approximately 6:40 p.m.?

14  A.   Yes.

15  Q.   And what tools did you use as part of your investigation

16  of activity on the SVN server that day?

17  A.   I reviewed several log sources that pertained to hosts and

18  networks of Google's.

19  Q.   Speaking about the logs, do you recall the logs that you

20  reviewed?

21  A.   Yes.  There were DNS logs, DHCP logs, SVN logs, Google

22  network flow logs, Bit9 logs, and records for Armada and GRR.

23  Q.   Did you also review records from Google Drive?

24  A.   Yes.

25  Q.   Now, with regard to these logs, have you used them in

BROWN - DIRECT / LYONS

1  connection with your duties as a forensic analyst at Google?

2  A.   I have.

3  Q.   And what type of information is generally reflected on

4  these types of logs?

5  A.   Information pertaining to the systems on which they're

6  recorded.

7  Q.   Do these logs reflect date, time, and that type of

8  information?

9  A.   They do.

10 Q.   And how is the date, time, and information that's on these

11 logs generated?

12 A.   The system on which the logs are recorded generates them.

13 Q.   Have you found the information to be reliable and

14 accurate?

15 A.   I have.

16 Q.   Is the information that appears on these logs recorded at

17 or near the time of the event that the log actually reflects?

18 A.   Yes.

19 Q.   And was it the practice at Google to have these logs

20 generated in the course of regularly conducted business

21 activity?

22 A.   It is.

23 Q.   And is it the regular practice at Google to utilize these

24 types of logs?

25 A.   It is.

BROWN - DIRECT / LYONS

1   Q.   Now, you said you were investigating activity on the SVN

2   server.  Do you recall that?

3   A.   Yes.

4   Q.   Does that server have a website address?

5   A.   The SVN server was audited at yakshaves.com.

6   Q.   And did you make an effort to determine whether the

7   computer accessed the SVN server located yakshaves.com on

8   December 11, 2015, at approximately 6:40 p.m.?

9   A.   Yes.

10  Q.   What did you do?

11  A.   I reviewed DNS logs for Google's network to determine what

12  machines were making lookups of that domain.

13  Q.   And when you reviewed the DNS logs, did you determine how

14  many computers accessed the SVN server on December 11th at

15  approximately 6:40 p.m.?

16  A.   There was one.

17       MR. LYONS:  Can I have Exhibit 4879 on the screen for

18  the witness, please.

19  BY MR. LYONS:

20  Q.   Do you recognize what's on the screen as Exhibit 4879?

21  A.   Yes.

22  Q.   And what it is?

23  A.   This is a DNS log for the computer that made the lookup to

24  yakshaves.com.

25       MR. LYONS:  Your Honor, move the admission of 4879 and

1   ask that it be published to the jury.

2           MR. GONZÁLEZ:  No objection, Your Honor.

3           THE COURT:  Received.

4       (Trial Exhibit 4879 received in evidence.)

5       (Document displayed.)

6   BY MR. LYONS:

7   Q.   So this is a DNS log.  Did you prepare a demonstrative

8   regarding this log activity that you believed might be helpful

9   in explaining your testimony to the jury?

10  A.   Yes.

11          MR. LYONS:  Can I have the demonstrative 4-4 before

12  the witness and the jury.  It's a demonstrative, so no

13  objection.

14  BY MR. LYONS:

15  Q.   So is this the demonstrative that you prepared?

16  A.   Yes.

17  Q.   And does this reflect a particular line from the DNS log

18  activity that you reviewed on that day?

19  A.   Yes, 0745.

20  Q.   With the regard to the column that says "Query," it says

21  "yakshaves.com."  What is that?

22  A.   That's the domain at which the SVN server resided.

23  Q.   Are you familiar with the term "IP address"?

24  A.   Yes.

25  Q.   What is an IP address?

BROWN - DIRECT / LYONS

1  **A.**    It's a set of numbers that help computers communicate on

2  the internet.

3  **Q.**    Is that an IP address associated with yakshaves.com?

4  **A.**    Yes.  It's 108.59.84.174.

5  **Q.**    Now, looking at the DNS log, were you able to identify the

6  IP address of the computer that was used to access

7  yakshaves.com at that time?

8  **A.**    Yes.  A machine on Google's network with the IP address

9  100.98.165.23 had made the request.

10  **Q.**    Once you had the IP address for the computer, what

11  information did you need to determine whose computer it was?

12  **A.**    The machine's MAC address.

13  **Q.**    And did you make an effort to obtain the MAC address?

14  **A.**    Yes, I reviewed DHCP logs.

15  **Q.**    Let's start with, what is a MAC address?

16  **A.**    It's a unique hardware identifier like a serial number for

17  a device that connects to networks.

18  **Q.**    Okay.  You mentioned a DHCP log.  How do you use a DHCP

19  log to identify the MAC address?

20  **A.**    DHCP logs show the hardware identifiers associated with IP

21  addresses for a period of time.

22           **MR. LYONS:**  Can I have Exhibit 4850 on the screen for

23  the witness.

24           Your Honor, if I hadn't done so, I'd like to move 4879, if

25  I haven't done that already.

```
 1              THE COURT:  4879 is in evidence.

 2   BY MR. LYONS:

 3   Q.   Do you have Exhibit 4850 before you on the screen?

 4   A.   Yes.

 5   Q.   Okay.  And do you recognize that?

 6   A.   I do.

 7   Q.   What is it?

 8   A.   This is a DHCP log for records pertaining to the IP

 9   address that had made that lookup to yakshakes.com on

10   December 11, 2015.

11              MR. LYONS:  Move admission of Plaintiff's

12   Exhibit 4850.

13              MR. GONZÁLEZ:  No objection, Your Honor.

14              THE COURT:  Thank you.  Received.

15        (Trial Exhibit 4850 received in evidence.)

16        (Document displayed.)

17   BY MR. LYONS:

18   Q.   Now, looking at 4850, you see there's a bunch of numbers

19   here.  Looking at column C, what's in column C?

20   A.   That's the IP address that we had previously shown making

21   the DNS lookup for yakshaves.com.

22   Q.   And what's in column B?

23   A.   The MAC address for unique hardware identifier associated

24   with that IP at that time.

25   Q.   And there's also a column E that says "Host Name."  Do you
```

**BROWN - DIRECT / LYONS**

 1   see that?

 2   **A.**   Yes.

 3   **Q.**   What is that?

 4   **A.**   That is the name that that machine was advertising to the

 5   network at that time.

 6   **Q.**   At this point in time, did you have an idea whose computer

 7   this was?

 8   **A.**   I did.

 9   **Q.**   And whose computer did you believe it to be at the time?

10   **A.**   Anthony Levandowski's.

11   **Q.**   Now, did you also prepare for your testimony today a

12   demonstrative regarding your investigation?

13   **A.**   Yes.

14   **Q.**   Would that demonstrative assist you in explaining your

15   testimony to the jury?

16   **A.**   It would.

17         **MR. LYONS:**   Your Honor, may I please have DX4-1 before

18   the witness.

19   **BY MR. LYONS:**

20   **Q.**   Do you recognize that?

21   **A.**   I do.

22   **Q.**   Is that the demonstrative you prepared?

23   **A.**   Yes.

24         **MR. LYONS:**   Can I have that published, Your Honor?

25         **THE COURT:**   Sure.

BROWN - DIRECT / LYONS

```
1              (Document displayed.)
2    BY MR. LYONS:
3    Q.   So could you explain what's shown --
4              THE COURT:  So I better explain to the jury something,
5    though.  These things -- they call demonstratives -- will not
6    be in evidence in the jury room.  So if there's something on
7    there that you want to remember, you've got to take a note of
8    it because this will not be in the jury room.
9         It's not evidence.  It's a shorthand way to demonstrate
10   something that we allow in trials.  But it's not evidence
11   itself.  So if you want to make a note of anything, make a
12   note.  But this won't be in the jury room.
13        Thank you.
14   BY MR. LYONS:
15   Q.   So, Mr. Brown, is this a demonstrative that you prepared
16   regarding your investigation for activity between
17   December 11th and 18th of 2015?
18   A.   Yes.
19   Q.   And in the first slide on the left-hand side, you see
20   there's a couple of computers and some information on there.
21   What's on there?
22   A.   This shows that for December 11th, 2015, I had queried
23   lookups of the SVN server at yakshaves.com and had identified
24   an IP address for a machine on Google's network that was making
25   that request.  And then reviewing DHCP logs, I was able to pair
```

1   that IP to the device that was making that request at that

2   time.

3   Q.   Did you do anything else to confirm that the computer

4   belonged to Anthony Levandowski?

5   A.   I did.

6   Q.   What did you do?

7   A.   I queried the MAC address in Armada.

8   Q.   What is Armada?

9   A.   Armada is an internal system that helps track inventory.

10  Q.   And have you used Armada to look up MAC addresses in the

11  past?

12  A.   I have.

13  Q.   And have you found the information in Armada to be

14  reliable and accurate?

15  A.   Yes.

16          MR. LYONS:   Your Honor, may I have Exhibit 4840

17  admitted at this time?

18          THE COURT:   4840.  Any objection?

19          MR. GONZÁLEZ:   No objection.

20          THE COURT:   Received.

21      (Trial Exhibit 4840 received in evidence.)

22      (Document displayed.)

23  BY MR. LYONS:

24  Q.   Now, what are we looking at in Exhibit 4840?

25  A.   This is an Armada report for a laptop issued to Anthony

1   Levandowski.

2   **Q.**   And if we go to two lines up from the bottom of the

3   screen, you see it says "Armada:user_primary."  Do you see

4   that?

5   **A.**   Yes.

6   **Q.**   What -- what is that information?

7   **A.**   This shows that the primary user of that device was

8   anthonyl@google.com, which is Anthony Levandowski's user name.

9          **MR. LYONS:**  Can we go to demonstrative 4-2, please.

10  **BY MR. LYONS**

11  **Q.**   And we filled in your chart a little bit further.  What's

12  depicted on this portion of your chart?

13  **A.**   Armed with the MAC address for the machine that had made

14  the lookup to yakshaves.com, I then searched that MAC address

15  in Armada and confirmed that the device making the request was

16  issued to Anthony Levandowski.

17  **Q.**   What did you do next, after you determined that it was

18  Mr. Levandowski's computer that accessed the SVN server on that

19  day?

20  **A.**   I reviewed Google network flow logs as well as the SVN

21  server log to determine the extent of activity.

22  **Q.**   You mentioned the -- the flow logs.  What is a flow log?

23  **A.**   A flow log is a record of network communications between

24  two devices.

25          **MR. LYONS:**  Can I have Exhibit 4852, please, admitted?

```
 1              THE COURT:  Any objection?

 2              MR. GONZÁLEZ:  No objection, Your Honor.

 3              THE COURT:  Thank you.  Received.

 4         (Trial Exhibit 4852 received in evidence.)

 5         (Document displayed.)

 6    BY MR. LYONS:

 7    Q.   We have 4852 on the screen, and they're a bunch of numbers

 8    here.  Let's start just with Column A.  What is in Column A?

 9    A.   The time of the connection.

10    Q.   And then in Column C, what's in Column C?

11    A.   The IP address of the device initiating the connection.

12    Q.   And what's in Column E?

13    A.   The recipient or destination device.

14    Q.   Okay.  In this case, in Column C on line 2 -- I think it's

15    the first one there -- what computer is that?

16    A.   That's Anthony Levandowski's laptop on Google's network.

17    Q.   And then it's making a request for a device in Column E.

18    What is in Column E?

19    A.   That is the IP address of the SVN server.

20    Q.   If we go down one line, you'll see that the information in

21    column C and E are switched.  What is indicated by that?

22    A.   Typically a response.  In Column 2, the Levandowski laptop

23    was making a request to the SVN server for a file.  And in

24    line 3, the server is responding in kind with that file.

25    Q.   Now --
```

**BROWN - DIRECT / LYONS**

1  **A.**   And this pattern goes on for a period of roughly 43

2  minutes.

3  **Q.**   And that's what's reflected in the rest of the log until

4  the end of it?

5  **A.**   Yes.

6  **Q.**   How much data was transferred during that time period?

7  **A.**   Roughly 10 gigabytes.

8  **Q.**   Did you make any effort to determine the exact number of

9  files that were downloaded during that session?

10  **A.**   Yes, through review of the SVN log.

11       **MR. LYONS:**  Can I have Exhibit 4881 marked for

12  identification.

13       **THE COURT:**  Do you want us to mark it?  I thought

14  these were premarked.

15       **MR. LYONS:**  No, I'm sorry.  Premarked, Your Honor.  I

16  apologize.  4881 is before the witness, Your Honor.

17       **THE COURT:**  All right.  Did you want to move it in

18  evidence?

19       **MR. LYONS:**  Yes, I'm going to move it at this time.

20       **THE COURT:**  All right.  Any objection?

21       **MR. GONZÁLEZ:**  No objection.

22       **THE COURT:**  Received.

23     (Trial Exhibit 4881 received in evidence.)

24  **BY MR. LYONS:**

25  **Q.**   What's depicted on 4881?

BROWN - DIRECT / LYONS

1   A.   There is activity for anthonyl@google.com for activity on

2   the SVN server on December 11th, 2015.

3   Q.   Okay.  And were you able to determine the number of files

4   downloaded by reviewing this particular log?

5   A.   Yes.  I counted 14,107 files.

6   Q.   And what was the -- the gigabyte size for that download?

7   A.   It constituted 9.74 gigabytes.

8        MR. LYONS:  Can I go to demonstrative 4-3.

9   BY MR. LYONS:

10  Q.   Now, what's depicted on the third slide on this

11  demonstrative?

12  A.   Through a review of Google network flow records and the

13  SVN log, I determined that 14,107 files, constituting 9.74

14  gigabytes, had been downloaded from the SVN server to Anthony

15  Levandowski's laptop.

16  Q.   Now, knowing Mr. Levandowski had downloaded those files,

17  did you do anything to determine what happened to those files?

18  A.   Yes.  I reviewed Bit9 logs to determine if the files had

19  made their way off the machine.

20  Q.   What is Bit9?

21  A.   Bit9 is an application that runs on our Windows machines

22  that records, among other things, attachments and detachments

23  of removable drives, like thumb drives.

24       MR. LYONS:  At this time, I'd move admission of

25  Exhibit 4846.

1      **MR. GONZÁLEZ:**  No objection, Your Honor.

2      **THE COURT:**  Received.

3      (Trial Exhibit 4846 received in evidence.)

4      (Document displayed.)

5  **BY MR. LYONS:**

6  **Q.**   Now what is Exhibit 4846?

7  **A.**   This is a Bit9 log for Anthony Levandowski's laptop for

8  December 14th, 2015.

9  **Q.**   And did you prepare a demonstrative to assist you in

10 describing your testimony about the use of the Bit9 logs?

11 **A.**   Yes.

12      **MR. LYONS:**  Can I have 4-5 before the witness, please.

13 **BY MR. LYONS:**

14 **Q.**   Looking at -- just for the record, this is your analysis

15 of Exhibit 4846, but in particular, Column Rows G and 8;

16 correct?

17 **A.**   Rows 3 and 8, that's correct.

18 **Q.**   Now, with regards to the information in Row 3, there are

19 three areas that are highlighted in red, and the first says,

20 "Device TS-RDF5 transcend."  Do you see that?

21 **A.**   I do.

22 **Q.**   What do you recognize that to be?

23 **A.**   This is a make and model of a device.  In this case, a USB

24 memory card reader.

25 **Q.**   What is a memory card reader?

**BROWN - DIRECT / LYONS**

1    **A.**    It's an adapter for a memory card.

2    **Q.**    And what's a memory card?

3    **A.**    A small electronic device that stores information,

4    commonly found in cameras and other small electronics.

5    **Q.**    And can you put the memory card inside the card reader?

6    **A.**    Yes.   The card would go into a reader, and that would

7    allow data to be transferred between a computer and the memory

8    card.

9    **Q.**    Now, in the second line, there's something that says

10   "device attached."  Do you see that?

11   **A.**    Yes.

12   **Q.**    What does that refer to?

13   **A.**    It being plugged in.

14   **Q.**    And then the third line, there's a date and time stamp.

15   **A.**    Yes.

16   **Q.**    What is that?

17   **A.**    That is December 14th, 2015, at 5:37 p.m. UTC, which is

18   the same as GMT, or Greenwich Mean Time, and translates to 9:37

19   in the morning, California time.

20   **Q.**    So putting it all together, what did that particular line

21   indicate to you?

22   **A.**    On the morning of December 14th, 2015, a memory card

23   reader was attached to Anthony Levandowski's laptop.

24   **Q.**    And going down --

25        **THE COURT:**  Can I interrupt for one second.

**BROWN - DIRECT / LYONS**

```
 1        When you say "Anthony Levandowski's laptop," do you mean
 2   one issued by the company to him or do you mean his own
 3   personal machine?  It's unclear what you mean.
 4        THE WITNESS:  A -- the device that had been issued by
 5   the company to him.
 6        THE COURT:  All right.  Thank you.
 7   BY MR. LYONS:
 8   Q.   Looking down at Row 8, you'll see the same three red
 9   line -- or red indicators, and the second line says "device
10   detached."  What does that refer to?
11   A.   It being unplugged.
12        MR. LYONS:  Can we go to demonstrative 4-6.
13   BY MR. LYONS:
14   Q.   And what's depicted in this portion of your demonstrative?
15   A.   On December 14th, three days after the download from the
16   SVN server, a USB card reader, presumably with card attached,
17   was plugged into Anthony Levandowski's laptop for a period of
18   roughly eight hours before being disconnected at 6:14 p.m.
19   California time.
20   Q.   Now, as part of your investigation, did you make any
21   efforts to determine what happened to this computer?
22   A.   I did.
23   Q.   What did you do?
24   A.   I reviewed GRR records for the device.
25   Q.   How do you spell that?
```

1  A.    G-R-R.

2  Q.    And what does "GRR" stand for?

3  A.    I've heard it referred to as Google rapid response or GRR

4  response rig, but we just call it GRR.

5  Q.    And what does it do?

6  A.    It's a remote forensics tool that, when connected to the

7  Internet, will phone home to a server every 15 minutes to

8  receive instructions.

9            MR. LYONS:  Can I have Exhibit 4842 in evidence?

10           MR. GONZÁLEZ:  No objection, Your Honor.

11           THE COURT:  Thank you.  Received.

12       (Trial Exhibit 4842 received in evidence.)

13       (Document displayed.)

14  BY MR. LYONS:

15  Q.    Could you just describe how you use those -- excuse me.

16  Let me stop for a second.

17       Is this the GRR record that you were referring to?

18  A.    Yes.

19  Q.    Okay.  Could you tell the jury how you use the GRR record

20  to determine what happened to the computer.

21  A.    GRR records information about the machines that phone

22  home.  In this case, the time that the operating system was

23  installed, which in this case is December 18th, 2015.

24       Another piece of information that it records is the

25  operating system running.  And what's curious about this is on

1   December 18th, 2015, the machine was reinstalled as a Linux

2   device, and it had previously been a Windows device.

3   **Q.**   What was significant about the reinstall of this device

4   with a Linux operating system?

5   **A.**   The operating system that had been on it and all artifacts

6   on it would have been erased.

7   **Q.**   And did you prepare a demonstrative to describe this?

8   **A.**   Yes.

9          **MR. LYONS:**   And can we go to 4-8.

10  **BY MR. LYONS:**

11  **Q.**   So now, what -- what's depicted in this portion of your

12  demonstrative?

13  **A.**   On December 18th, roughly four days after the connection

14  of the USB card reader, the device was erased and reimaged as a

15  different operating system.

16  **Q.**   What happened to the data that was on the device?

17  **A.**   It's gone.

18  **Q.**   Now, for the last 15 minutes or so, you've been describing

19  certain information that you obtained from this computer.  How

20  is it that you were able to obtain that data since the computer

21  had been erased?

22  **A.**   When these machines are connected to the Internet, they

23  send their logs back to Google's infrastructure for events

24  where the device may become unrecoverable.

25  **Q.**   Did you document, in your investigative findings, in

**BROWN - DIRECT / LYONS**

```
 1  something called a machine forensics log?

 2  A.    Yes.

 3         MR. LYONS:  And move admission of Exhibit 2260.

 4         MR. GONZÁLEZ:  No objection, Your Honor.

 5         THE COURT:  Okay.  Did you say 2260?

 6         MR. LYONS:  Yes.

 7         THE COURT:  All right.  Thank you.  In evidence.

 8      (Trial Exhibit 2260 received in evidence.)

 9      (Document displayed.)

10  BY MR. LYONS:

11  Q.    Now, one last exhibit, Mr. Brown.  Did you do any analysis

12  of any other file transfers by Mr. Levandowski?

13  A.    Yes.

14  Q.    Okay.  Specifically, did you conduct an investigation into

15  his access of Google Drive?

16  A.    I did.

17  Q.    And what is Google Drive?

18  A.    Google Drive is cloud storage for files and documents.

19         MR. LYONS:  Can I have Exhibit 5031 -- let's -- I'll

20  move the admission of 5031 at this time.

21         MR. GONZÁLEZ:  No objection.

22         THE COURT:  Received.

23      (Trial Exhibit 5031 received in evidence.)

24      (Document displayed.)

25
```

```
 1   BY MR. LYONS:

 2   Q.   Can you describe what's depicted in Exhibit 5031?

 3   A.   This is not 5031.

 4        (Document displayed.)

 5             THE COURT:  Sorry.  What's happening here?

 6             MR. LYONS:  I, apparently, have the wrong exhibit.

 7             THE WITNESS:  Oh, the next tab, please.

 8   BY MR. LYONS:

 9   Q.   I'm sorry.  Is that the right exhibit?

10   A.   Yes.

11   Q.   Okay.  What is it?

12             THE COURT:  What exhibit number is that one now?

13             MR. LYONS:  5031.

14             THE COURT:  All right.

15             MR. LYONS:  I believe the computer operator put the

16   wrong exhibit up.

17             THE COURT:  We're -- we're good.  Go ahead.

18             THE WITNESS:  This is Google Drive download activity

19   for Anthony Levandowski for the time period October 14th, 2015

20   through his departure.

21   BY MR. LYONS:

22   Q.   Did you prepare a demonstrative reflecting activity on --

23   in January 2016?

24   A.   Yes.

25             MR. LYONS:  Can I have 4-7 on the screen.
```

504
**BROWN - CROSS / GONZÁLEZ**

1   BY MR. LYONS:

2   Q.   And what's depicted in this demonstrative?

3   A.   Downloads by Anthony Levandowski from Google Drive for

4   January 4th, 2016, as well as January 11th, 2016.

5         MR. LYONS:   I have nothing further, Your Honor.   Pass

6   the witness.

7         THE COURT:   Thank you.

8                        CROSS-EXAMINATION

9   BY MR. GONZÁLEZ:

10  Q.   Sir, you were not the only person working on the

11  examination of Mr. Levandowski's computers, were you?

12  A.   No.

13  Q.   For example, there's a person named Kristinn Gudjonsson

14  that also worked on it; correct?

15  A.   That is correct.

16  Q.   And I -- I don't think you were asked when you did this

17  work, so I want to ask you some questions about that.

18       You understand that Mr. Gudjonsson's work began in

19  February of 2016, correct?

20  A.   That sounds correct.

21  Q.   Literally the week after Mr. Levandowski left, you all

22  started examining his computers; right?

23  A.   I did not, but I believe it was looked at.

24  Q.   And you started the very next month in March; right?

25  A.   That is incorrect.

1          **MR. GONZÁLEZ:**  Andrew, can we play 338, line 7 to 9.

2      (Counsel confer off record.)

3          **MR. GONZÁLEZ:**  Can we play it, Your Honor?

4          **THE COURT:**  Is this from the deposition?

5          **MR. GONZÁLEZ:**  Yes, Your Honor.

6          **THE COURT:**  Before, let me tell the jury.  Sometimes

7      they videotape these depositions.  You've already seen some

8      where they read from a transcript.  This one we're going to get

9      to see in video form, but it -- the same principles and rules

10     apply.  This is prior sworn testimony of the same witness.

11         **MR. LYONS:**  Can I just have a second, Your Honor, with

12     counsel?  I don't have the depo transcript.  It's not in the

13     binder.

14         **MR. GONZÁLEZ:**  It is in your binder.

15         **MR. LYONS:**  Can I have the date, Counsel?

16         **MR. GONZÁLEZ:**  Can we play it now, Your Honor?

17         **THE COURT:**  Please roll the tape.

18     (Videotaped deposition played but not reported.)

19         **MR. GONZÁLEZ:**  All right.  And the deposition, for the

20     record, Your Honor, was on September 6th, 2017.

21     **BY MR. GONZÁLEZ:**

22     **Q.**   Sir, I'd like to ask you about a few exhibits.  I'd like

23     to start with 2241.  Do you see the binder to the left?

24     **A.**   Yes.

25     **Q.**   The series of emails that you were part of.  If you look,

1    2241 is an email chain.  Do you see at the very top, there's an

2    email to you?  Do you see that?

3    **A.**   Yes.

4         **MR. GONZÁLEZ:**   Now, Your Honor, move 2241 into

5    evidence.

6         **THE COURT:**   Any objection?  Any objection?

7         **MR. LYONS:**   No objection.

8         **THE COURT:**   Thank you.  Received in evidence.

9         (Trial Exhibit 2241 received in evidence.)

10   **BY MR. GONZÁLEZ:**

11   **Q.**   All right.  The top email is May 3, 2016.  This is around

12   the time period that you're doing work on this matter; correct?

13   **A.**   You had previously referred to --

14   **Q.**   This is the time period that you're doing work on this

15   matter; right?

16   **A.**   Yes.

17   **Q.**   And the email is from an investigator at Google; correct?

18   **A.**   Yes.

19        **MR. GONZÁLEZ:**   And, Andrew, if you could, in the

20   interest of time, go to page 6.

21   **BY MR. GONZÁLEZ:**

22   **Q.**   On February 3rd, 2016, there's an email from Chelsea

23   Bailey to Kristinn.

24        Kristinn is the person who you mentioned earlier,

25   Gudjonsson.  Mr. Gudjonsson is also working on this

**BROWN - CROSS / GONZÁLEZ**

1   investigation; correct?

2   **A.**   Yes.

3   **Q.**   "Hi, Kristinn.  Hope you're well.  We have a former

4   employee whose laptop we'd like to have forensics run on."

5   Right?

6   **A.**   Yes.

7   **Q.**   That's February 3rd.  That's the week after

8   Mr. Levandowski leaves; correct?

9   **A.**   I believe so.

10          **MR. GONZÁLEZ:**  And if you can go, Andrew, to click 3.

11  BY MR. GONZÁLEZ:

12  **Q.**   On February 8, Chelsea Bailey thanks Kristinn, "as well as

13  if there may have been any trade secret compromise."

14      Do you see that?

15  **A.**   I do see that.

16  **Q.**   And at the bottom, "Can you help us find out if there's

17  evidence of trade secret compromise."  Right?

18  **A.**   I see that.

19  **Q.**   So one of the things that you all were looking for was

20  whether or not Mr. Levandowski had taken any trade secrets;

21  right?

22          **MR. LYONS:**  Objection, Your Honor.  No foundation with

23  regard to this witness because he said "you all" as opposed

24  what --

25          **MR. GONZÁLEZ:**  Let me -- let me rephrase.

**BROWN - CROSS / GONZÁLEZ**

1  BY MR. GONZÁLEZ:

2  Q.   You understood from this email that you received that one

3  of the things that Mr. Gudjonsson was looking for was whether

4  Mr. Levandowski stole trade secrets; right?

5  A.   I can't speak for Mr. Gudjonsson.

6  Q.   All right.

7        MR. GONZÁLEZ:   Let's go to clip 4.

8  BY MR. GONZÁLEZ

9  Q.   There's another email.  This one's February 16.  It's part

10  of this chain.  "Stacy is aware and has discussed with David

11  Drummond?  Stacy is Stacy Sullivan; correct?

12  A.   I have no idea.

13  Q.   Do you -- David Drummond is the top lawyer at Google; is

14  that right?

15  A.   I believe he is a lawyer at Google.

16  Q.   Do you know that he's the top lawyer, the general counsel

17  for Alphabet, Google's parent company?

18  A.   That's possible.

19  Q.   "Also, L and S seemed to have some interest in this

20  topic."

21        Do you see that?

22  A.   I do see that.

23  Q.   You understand "L and S" is Larry Page and Sergey Brin,

24  the founders of the Google; correct?

25  A.   I was asked about this in my deposition.  My response was

**BROWN - CROSS / GONZÁLEZ**

 1    I don't know.

 2    **Q.**   Do you have any reason to think it's any other L and S?

 3    **A.**   I didn't even recall seeing this email until it was put in

 4    front of me in my deposition.

 5    **Q.**   All right.

 6              **MR. GONZÁLEZ:**   And then clip 5.

 7    **BY MR. GONZÁLEZ:**

 8    **Q.**   On March 8, 2016, this is from page 2, right there in the

 9    middle "plus Gary Brown."  Do you see that?

10    **A.**   Yes.

11    **Q.**   That's when were you added to this email string; correct?

12    **A.**   That is correct.

13    **Q.**   Sir, could you please turn to 2232.

14              **MR. GONZÁLEZ:**   Or, Andrew, could you please play 2260,

15    which is in evidence, that he was just shown.

16    **BY MR. GONZÁLEZ:**

17    **Q.**   This is one of the documents, sir -- let me call your

18    attention first to this document which your lawyer just showed

19    you.  This is one of the documents you saw.  It says,

20    "Examiners:  Kiddi and someguyiknow."

21         Do you see that?

22    **A.**   Yes.

23    **Q.**   Who is "someguyiknow"?

24    **A.**   That's me.

25    **Q.**   And "Kiddi," who is Kiddi?

1   A.    Kristinn Gudjonsson.

2   Q.    All right.  Now, let's go back to 2232.

3         2232, these are notes of a meeting that you participated

4   in on August 23, 2016; correct?

5   A.    Possible.

6   Q.    That's the same date that Uber's acquisition with Otto

7   closed; right?

8   A.    It would appear so.

9   Q.    Do you remember that on the same date that Uber's

10  acquisition of Otto closed, you participated in a meeting with

11  Kristinn Gudjonsson and with a roomful of lawyers?

12  A.    I may have.

13  Q.    Do you have any reason to think that you did not?

14  A.    No, but I don't recall it.

15  Q.    You'll notice on the participants, meeting participants,

16  you are listed, someguyiknow; correct?

17  A.    Yes.

18  Q.    And do you recall meeting with lawyers from a law firm

19  called Keker & Van Nest?

20  A.    Yes.

21  Q.    And do you recall that Kristinn was in that meeting,

22  Mr. Gudjonsson?

23  A.    When I say I'm familiar with meetings with Keker &

24  Van Nest, there were multiple.  And Kristinn may have been a

25  part of some of them.

**BROWN - CROSS / GONZÁLEZ**

1  Q.   All right.  Do you have any reason to believe that 2232 is

2  anything other than notes of that meeting?

3  A.   No.

4       MR. GONZÁLEZ:   Your Honor, I'd move 2232 into

5  evidence.

6       MR. LYONS:   Objection.  No foundation.

7       THE COURT:   Sustained for now.

8       MR. GONZÁLEZ:   Your Honor, you had indicated earlier

9  that we might, from time to time, be able to use an exhibit

10  with a representation that the foundation would be laid later.

11       THE COURT:   Yes.

12  BY MR. GONZÁLEZ:

13  Q.   Under "author" -- you see the top of the document under

14  "author"?

15  A.   Yes.

16  Q.   "Kiddi," that's Kristinn Gudjonsson; right?

17  A.   Yes.

18       MR. GONZÁLEZ:   Your Honor, we'll bring in

19  Mr. Gudjonsson, if we have to, to lay the foundation as the

20  author.  This is --

21       THE COURT:   All right.  I'll -- can I see the

22  document, actually?

23       MR. GONZÁLEZ:   The scribbles are mine.

24       THE COURT:   You say this is a forgery?

25       MR. LYONS:   No, Your Honor.  There was no foundation

**BROWN - CROSS / GONZÁLEZ**

1   for this witness.  That was the only objection I have.

2           **THE COURT:**  Well, but counsel is going to bring in

3   Kiddi --

4           **MR. GONZÁLEZ:**  Mr. Gudjonsson.

5           **THE COURT:**  -- to lay the foundation, if need be.

6           **MR. LYONS:**  Your Honor, I'll let the exhibit come in

7   subject to being able to look at it.  But I have no objection

8   on authenticity grounds or anything like that.

9           **THE COURT:**  2232 is in evidence.

10       (Trial Exhibit 2232 received in evidence.)

11  BY MR. GONZÁLEZ:

12  **Q.**   All right.  This is the first page of 2232.

13          **MR. GONZÁLEZ:**  Andrew, can you please just go to the

14  date for now and some of the participants.

15  BY MR. GONZÁLEZ:

16  **Q.**   August 23, 2016, the date our deal closes.

17       You are someguyiknow; right?

18  **A.**   I am.

19  **Q.**   Mybarra and rmeny, kvn, those are outside lawyers that you

20  brought in -- that your employer brought in from Keker &

21  Van Nest; correct?

22  **A.**   That seems possible.

23  **Q.**   And you recognize other names as being lawyers here, don't

24  you?

25  **A.**   Yes.

1   Q.   Which ones do you recognize as being lawyers -- in-house

2   lawyers at Google?

3   A.   Blackhart.

4   Q.   What about michaelpfyl, right above blackhart?

5   A.   I'm unfamiliar with him.  I've seen his name on things,

6   but I'm not sure if he's a lawyer.

7   Q.   Fair enough.  What about Laurie Abraham?

8   A.   Can you point that out?

9   Q.   Right -- right before you is Kiddi.

10  A.   That's Abraham Lu.  He's a security analyst.

11  Q.   All right.  So you have this meeting.  And it says -- the

12  second bullet says "Background introduced for all parties

13  involved."  Did you see that bullet right there?  It says

14  "Background introduced for all parties involved."  Do you see

15  that?

16  A.   I do see that.

17  Q.   Who was the person who was speaking about the background

18  to educate everybody?

19  A.   I have no idea.  As I mentioned before, the notes would

20  imply that I was at this meeting, but I could not tell you who

21  wrote what line and who spoke what line that was transposed.

22          MR. GONZÁLEZ:  Andrew, next clip, please.

23  BY MR. GONZÁLEZ:

24  Q.   I'm going to ask you just a couple of these entries.

25  A.   Sure.

1   **Q.**   "He" -- referring to Mr. Levandowski.   "He announced that

2   he wanted to start his own company that was involved in

3   autonomous trucks which would not be a direct competitor to

4   Google.   That was the general agreement."

5       Do you see that?

6   **A.**   I do see that.

7   **Q.**   Do you recall somebody discussing at this meeting that

8   there was an agreement that Mr. Levandowski could start his own

9   company as long as he didn't compete with Google?

10  **A.**   I don't specifically recall that.

11  **Q.**   Do you have any recollection at all as to what that means

12  when it says "that was the general agreement"?   Do you have any

13  recollection of what that means?

14  **A.**   I don't know.   I don't know how these agreements work when

15  people leave the company.

16  **Q.**   All right.   And then below that, the next highlighted

17  item, "Uber is generally considered to be Chauffeur's main

18  competitor, which" --

19      You recall that being discussed; correct?

20  **A.**   Possibly.

21  **Q.**   You understood that at the time?

22  **A.**   One of -- everybody has a -- some type of self-driving car

23  endeavor these days.

24  **Q.**   All right.   And then it says, "Which contradicts what they

25  learned from Anthony with his intent to not be in the same

**BROWN - CROSS / GONZÁLEZ**

1    space and compete against Google."

2        Do you recall that being discussed?

3    A.   Not specifically.

4    Q.   Do you recall there being discussion that there was an

5    agreement or an understanding with Mr. Levandowski that it was

6    okay as long as he didn't get into the same space and compete

7    against Google?

8    A.   I don't.  I was not part of those discussions or these

9    interviews or any of that.

10   Q.   All right.  The next item at the bottom says, "If Google

11   were to take actions on preventing the acquisition, we need to

12   move as quickly as possible."

13       Do you see that?

14   A.   I do see that.

15   Q.   The acquisition there, preventing the acquisition, that's

16   Uber's acquisition of Otto; correct?

17   A.   Possibly.

18   Q.   Do you recall that being discussed in this room while you

19   were sitting there with a bunch of lawyers?

20   A.   Not specifically.

21   Q.   Now, I want to pause right here.  You gave a lot of

22   testimony about all of these things that you looked at about

23   the SVN server.  Do you recall that?

24   A.   I do.

25   Q.   When did you do that work?

**BROWN - CROSS / GONZÁLEZ**

1   A.    Sometime in the summer of 2016.

2   Q.    Summer of 2016?

3   A.    Yes.  Sometime between maybe July and October.

4   Q.    When you began doing your work in March and you saw

5   Mr. Gudjonsson was doing work in February, did either one of

6   you look at the SVN server at that time?

7   A.    No.

8   Q.    Nobody asked you to; right?

9   A.    No.

10  Q.    And neither one of you thought, hey, that's an important

11  place to look?  Neither one of you thought that; right?

12  A.    Uhm --

13          MR. LYONS:  I'll object.

14          MR. GONZÁLEZ:  I'll rephrase.  I'll rephrase.

15  BY MR. GONZÁLEZ:

16  Q.    You didn't think that that was an important place to look,

17  did you?

18  A.    I was not familiar with the entirety of Waymo's

19  infrastructure at that time.

20  Q.    All right.  Let me have you turn, sir, to 2211.

21          2211 is another email chain that you're part of; correct?

22  A.    Yes.

23          MR. GONZÁLEZ:  Move 2211 into evidence, Your Honor.

24          MR. LYONS:  No objection, Your Honor.  I'll just note

25  it's beyond the scope of direct.

```
 1              THE COURT:  Received.

 2          (Trial Exhibit 2211 received in evidence.)

 3          (Document displayed.)

 4              MR. GONZÁLEZ:  The top email, please.

 5   BY MR. GONZÁLEZ:

 6   Q.   The date is August 23rd of 2016.  Do you see that?

 7   A.   I do.

 8   Q.   That's the same exact date that you had the meeting with

 9   all these lawyers; right?

10   A.   Seems so.

11              MR. GONZÁLEZ:  Andrew, can we go to the page before.

12   Okay.

13   BY MR. GONZÁLEZ:

14   Q.   On the second page of this email chain, there's an email

15   from Kevin Vosen.  Do you see that name?

16   A.   Yes.

17   Q.   Kevin Vosen is the top lawyer, the general counsel, for

18   Waymo; correct?

19   A.   It's possible.

20   Q.   Do you know -- you don't know the name?

21   A.   I've heard the name before.  I don't know what his title

22   is.

23   Q.   You know he's a lawyer?

24   A.   He could be.

25   Q.   Okay.  It says, "Based on discussions with Drummond this
```

1    morning, we should accelerate our investigation."

2        You understand that to be David Drummond?

3    A.   That seems plausible.

4    Q.   "We also need to decide when and whether to notify Uber of

5    our concerns or potential concerns."

6        Do you see that?

7    A.   I do see that.

8    Q.   Are you aware of any notification to Uber, before this

9    lawsuit was filed, that Anthony Levandowski or Uber had

10   allegedly done anything wrong?

11   A.   I'm not party to any of these intercompany communications,

12   so I wouldn't be able to speak to that.

13   Q.   Number 3, this is the bottom of the first page.  "John K.

14   has now said he wants this investigation done in a week."

15       Do you see that?

16   A.   I do see that.

17   Q.   That's John Krafcik?

18   A.   Could be.

19   Q.   Do you know of any other John K.?

20   A.   No, but I don't know if at that time I knew of John

21   Krafcik.

22   Q.   Mr. Krafcik is the CEO of the company; correct?

23   A.   I'm aware of that now.

24   Q.   Do you recall that there was a lot of pressure to get this

25   done quickly?

BROWN - CROSS / GONZÁLEZ

1   A.   No more than any other incident that we handle.

2   Q.   Do you recall that management was eager to find something,

3   anything, that they could use to try to stop that deal?

4   A.   I don't report directly to lawyers, and our management

5   trusts us to do our job.

6   Q.   All right.  Could you turn, please, to 2242.

7        This is another email chain that you're part of; correct?

8   A.   Yes.

9            MR. GONZÁLEZ:  Move 2242 into evidence, Your Honor.

10           MR. LYONS:  No objection, Your Honor.  Note again this

11   is beyond the scope of direct.

12           THE COURT:  Well, it bears on this general subject

13   matter that you got into, so that objection is overruled.

14       2242 in evidence.

15       (Trial Exhibit 2242 received in evidence.)

16       (Document displayed.)

17  BY MR. GONZÁLEZ:

18  Q.   Sir, I want to start on the second page of the email.

19           MR. GONZÁLEZ:  Andrew, can you put up the first.

20  BY MR. GONZÁLEZ:

21  Q.   Thomas Gorman -- that's a name I don't think we've heard

22  yet.

23       Thomas Gorman is yet another lawyer from the law firm

24  Keker & Van Nest, that Google hired to help with this

25  investigation; correct?

**BROWN - CROSS / GONZÁLEZ**

1    A.    Tom Gorman, I believe, is a lawyer at Keker & Van Nest.

2    Q.    All right.  And you've had a lot of communications with

3    that lawyer; correct?

4    A.    I've spoken with Tom, yes.

5    Q.    Okay.  And on September 13 --

6              MR. GONZÁLEZ:  Back, Andrew.

7    BY MR. GONZÁLEZ:

8    Q.    On September 13, Mr. Gorman is asking Kristinn and Gary --

9    that's Mr. Gudjonsson and you; right?

10   A.    Yes.

11   Q.    He's asking, "Have you finished reviewing all of the

12   Xoogler's laptops"; right?

13   A.    Yes.

14   Q.    And, by the way, that's not a typo.  "Xooglers" means

15   former Google employees; right?

16   A.    That is correct.

17   Q.    Once they leave, you call them Xooglers.  I don't even

18   know how to pronounce that, but that's what that means; right?

19   A.    Yes.

20   Q.    Okay.  And they're asking you if you've finished reviewing

21   all of the Xoogler laptops.  Do you see that?

22   A.    Yes.

23   Q.    Because at that time you weren't just looking at

24   Mr. Levandowski's laptop, you were looking at everybody who

25   left and was now at Uber; isn't that right?

**BROWN - CROSS / GONZÁLEZ**

1    A.    It's hard to enumerate specifically.

2    Q.    All right.  You were looking at lots of different people

3    who had left; right?

4    A.    We were investigating multiple individuals.

5    Q.    Okay.  More than a dozen; right?

6    A.    I don't know.

7    Q.    Okay.

8              MR. GONZÁLEZ:  Andrew, next one, Number 2.

9    BY MR. GONZÁLEZ:

10   Q.    Then you write back on September 15th, "So I met with

11   Keker & Van Next" -- that's what KVN means; right?

12   A.    Yes.

13   Q.    "I met with KVN external lawyers today, and they have some

14   requests with a super aggressive timeline, like as soon as

15   humanly possible."

16      Now you're telling us that there was no big hurry to get

17   this done?  It was just a normal investigation?

18   A.    So when I say no more than our regular security incidents,

19   we have different priorities to different incidents where -- a

20   P0 is suspected compromise, live actor, very time sensitive.

21   And P4 is not so urgent, you know, put it below other things.

22   Q.    Okay.  The lawyers that Google hired to investigate were

23   telling you "as soon as humanly possible"; right?

24   A.    It would appear so.

25   Q.    Can you turn to 2215?

1          (Witness complied.)

2   **Q.**   The very top email of this chain is an email that you were

3   copied on; correct?

4   **A.**   Yes.

5          **MR. GONZÁLEZ:**  Your Honor, I'd move 2215 into

6   evidence.

7          **MR. LYONS:**  Without objection.

8          **THE COURT:**  Thank you.

9      It's in evidence.

10     (Trial Exhibit 2215 received in evidence.)

11  **BY MR. GONZÁLEZ**

12  **Q.**   Just for the jury to know, the date October 7, 2016,

13  you're still working on this; right?

14  **A.**   Possibly.

15  **Q.**   The email I just showed you a second ago where the lawyers

16  said get it done as humanly possible, were you done with it by

17  now?

18  **A.**   What was the date on that?

19  **Q.**   I believe it was September 15.

20  **A.**   And what was your question?

21  **Q.**   Were you done?

22  **A.**   I don't know.

23  **Q.**   All right.  And it's to Mr. Gorman and to you; right?

24  **A.**   Yes.

25  **Q.**   Mr. Gorman being the lawyer; right?

**BROWN - CROSS / GONZÁLEZ**

1    A.    Yes.

2    Q.    "Anthony had two laptops assigned to him, and he also had

3    a workstation."

4          Now, a couple of points.  I think the judge made one of

5    them, which is that the laptop that this stuff was downloaded

6    onto was a Google laptop; right?

7    A.    Please clarify which stuff.

8    Q.    The 14,000 files that you just testified about.

9    A.    Those files were downloaded to a laptop that had been

10   assigned to him.

11   Q.    By Google?

12   A.    Yes.

13   Q.    All right.  And then he also had a workstation; right?

14   A.    Yes.

15   Q.    A workstation is like a computer that you have on your

16   desk; right?

17   A.    Like a desktop.

18   Q.    A desktop.  Thank you.

19         And that desktop, you never got to examine it, did you?

20   A.    It had been returned to inventory and repurposed.

21   Q.    Because Anthony Levandowski's desktop, even though you

22   were in the middle of an investigation, Google wiped it clean

23   and assigned it to somebody else; right?

24   A.    It had been collected and repurposed.

25   Q.    Okay.  Let's just -- let me try some plain English.  When

BROWN - CROSS / GONZÁLEZ

 1   you say "repurposed," Google wiped it clean and assigned it to

 2   another employee in the middle of an investigation; right?

 3   A.   At some point, they -- I'm not sure when it was collected.

 4   Q.   Well, the dates are on the screen, sir.

 5            THE COURT:  Listen -- well, you're not answering his

 6   question.  Let's take it.

 7        Was it wiped clean?

 8            THE WITNESS:  It was.

 9            THE COURT:  And was it assigned to somebody else?

10            THE WITNESS:  Yes, it was.

11   BY MR. GONZÁLEZ:

12   Q.   And it was reassigned to another user on February 24th, as

13   indicated up there on the email; right?

14   A.   Yes.

15   Q.   And that's right in the middle of your investigation;

16   right?

17   A.   Possibly.  I would need to look at the exact date that

18   even the first laptops got to us.

19   Q.   Okay.

20            MR. LYONS:  Can the witness finish the answer?

21   BY MR. GONZÁLEZ

22   Q.   I'm sorry.  I thought you were finished.

23            THE COURT:  Please finish your answer.

24            THE WITNESS:  It's also worth noting that we had no

25   reason to believe -- there was no evidence of anything

**BROWN - CROSS / GONZÁLEZ**

 1   particularly unusual going on, on that device as opposed to the

 2   download that I walked through earlier where we had identified

 3   his laptop.

 4   **BY MR. GONZÁLEZ:**

 5   **Q.**   As of February 24th -- or, actually, February 18th, when

 6   it was reformatted, had anybody even inspected his workstation?

 7                **THE COURT:**  What year is --

 8                **MR. GONZÁLEZ:**  This is 2016, Your Honor.  This is just

 9   a few weeks after Mr. Levandowski leaves, it's reformatted.

10   **BY MR. GONZÁLEZ**

11   **Q.**   Nobody had even examined it before it was reformatted;

12   isn't that true?

13   **A.**   I don't know that we examined anything that belonged to

14   him by February 18th, 2016.

15   **Q.**   All right.  So just to be clear, it wasn't erased because

16   somebody examined it and concluded there was no evidence that

17   might be helpful; right?

18   **A.**   I believe that to be correct.

19   **Q.**   Next clip.

20        All right.  October 5, 2016, Mr. Gorman, the lawyer hired

21   by Google from Keker & Van Nest is writing an email.  And this

22   is his response to Mr. Gudjonsson.  The email that I just sent

23   you, this is Mr. Gorman's response.  And what he says is, he

24   refers --

25                **MR. GONZÁLEZ:**  Andrew, can you highlight

1   December 11th.

2   **BY MR. GONZÁLEZ:**

3   **Q.**   Do you see that date, December 11th?

4   **A.**   I do.

5   **Q.**   He's referring to the download that you just talked about;

6   right?

7   **A.**   Yes.

8   **Q.**   And what he says about those documents is "those aren't

9   the crown jewels."  That's what your own lawyer said about

10  these documents; right?

11  **A.**   Those words are said.

12  **Q.**   Sir, just a couple more questions.

13       So when Mr. Levandowski downloaded the 14,000 files on

14  December 11th, did any alarm bells go off anywhere?

15  **A.**   Not on December 11th, to my knowledge.

16  **Q.**   Who was the person at Google, at that time, who's

17  responsible for making sure that when somebody downloads 14,000

18  files, they have a legitimate reason to do that?  Who's

19  responsible for that back then?

20  **A.**   I'm not sure.

21  **Q.**   Nobody -- nobody at Google supervised that SVN repository

22  to monitor who was downloading the entire database.  Nobody did

23  that; right?

24  **A.**   I don't know.

25  **Q.**   If these documents were important, don't you think that

BROWN - REDIRECT EXAMINATION / LYONS

1   would be a good idea, is to put somebody in charge of keeping

2   an eye on the repository so that if somebody downloads

3   everything, maybe somebody might ask a question about, "Hey,

4   why did you do that?"

5       Do you think that would have been a good idea from a

6   security standpoint?

7   A.   Possible, but it's very hard to detect malicious insiders.

8   Q.   But it's not hard to detect when somebody downloads the

9   entire database.  That's not hard, is it?

10  A.   I don't know.

11  Q.   Thank you.

12          MS. DUNN:  That's all I have, Your Honor.

13          MR. LYONS:  Can I have a second, Your Honor?

14          THE COURT:  Okay.

15      (Discussion held off the record amongst Plaintiff's

16       counsel.)

17                  <u>REDIRECT EXAMINATION</u>

18  BY MR. LYONS

19  Q.   Just a few questions, sir.

20      With regard to the time that you worked on this

21  investigation, when did you start?

22  A.   With respect to Mr. Levandowski's devices?

23  Q.   Yes.

24  A.   Sometime in the summer of 2016.

25  Q.   Now, during the time that you started looking at his

BROWN - REDIRECT EXAMINATION / LYONS

1   devices, did you look at a number of different types of

2   devices?

3   A.   Yes.

4   Q.   Okay.  When is the first time that you looked at the

5   laptop that you found the downloads on?

6   A.   Probably around October.

7   Q.   So with regards to counsel's comments about a lot of

8   things that you worked on, with regards to the download, the

9   first time that you looked at that particular computer was in

10  October; is that correct?

11  A.   That is correct.

12  Q.   Okay.  And how is it that you began looking at the laptop

13  in October?

14  A.   We had received information that it was suspected Anthony

15  Levandowski had downloaded files from the SVN server.

16  Q.   To his laptop?

17  A.   Yes.

18  Q.   Now, with regards to the workstation that you referred to

19  earlier that you said had been re-inventoried and put back into

20  use, you recall that testimony?

21  A.   I do.

22  Q.   Okay.  With regard to that laptop, I think counsel

23  indicated to you that the lap- -- excuse me, that the

24  workstation was collected in February, 2016?

25  A.   Yes.

BROWN - REDIRECT EXAMINATION / LYONS

1  Q.   Okay.  And at that time, to your knowledge, was there any

2  suspicion that Mr. Levandowski had improperly used the

3  workstation?

4  A.   No.

5  Q.   With regards to the devices that you were working on in

6  March that you were shown exhibits about, what devices with

7  regard to Mr. Levandowski were you looking at?

8  A.   None.

9  Q.   Now, with regard to other individuals in March of 2016,

10  were you looking at other devices?

11  A.   I was.

12  Q.   Okay.  But with regards to Mr. Levandowski, when is the

13  first device that you looked at with regard to him?

14  A.   Sometime in the summer of 2016.  Thank you for allowing me

15  to clarify.

16  Q.   And what was the -- the first device that you looked at

17  with regard to him?

18  A.   Anthony Levandowski, would have been the Windows laptop

19  that had become a Linux laptop.

20  Q.   So with regard to counsel's comments about all of the

21  activity that other people were doing, with regards to the work

22  that you did as a witness who's here testifying today, you

23  first started your work in the summer of 2016; is that correct?

24  A.   Yes.

25  Q.   Now, you were asked some questions about the SVN server

BROWN - REDIRECT EXAMINATION / LYONS

1   and security on the SVN server; right?

2   A.   Yes.

3   Q.   Are you here to testify today about the security

4   precautions of the SVN server?

5   A.   Not particularly.

6   Q.   So with regard to whether it would be a good idea to do

7   certain things with regard to the SVN server, are you in a

8   position to testify about what you think is a good idea about

9   what should be done?

10  A.   I don't believe so.

11  Q.   Okay.  Did you set up the SVN server?

12  A.   I did not.

13  Q.   Okay.  With regard to the work you did regarding the SVN

14  server, you did some investigation about downloads from that

15  particular server; correct?

16  A.   Yes.

17  Q.   And that was what you testified about?

18  A.   Yes.

19  Q.   The drive download that you discussed with regards to the

20  card reader, you recall that testimony?

21  A.   Yes.

22  Q.   Okay.  There was a laptop that was his workstation laptop?

23  A.   Yes.

24  Q.   And then there was a transcend device that was accessed or

25  that -- excuse me, plugged into the computer; correct?

BROWN - REDIRECT EXAMINATION / LYONS

1    A.    That is correct.

2    Q.    And then the device was removed; correct?

3    A.    Yes.

4    Q.    Okay.  Now, with regard to the workstation laptop that he

5    had, that was reformatted; correct?

6    A.    Yes.

7    Q.    Okay.  Now, as you sit here today, did you personally

8    investigate whether Mr. Levandowski removed any files from his

9    workstation that you examined, the laptop that you examined,

10   and put it on a personal computer that did not belong to

11   Google?

12   A.    The granularity of the logs available to us did not

13   include that visibility and any artifacts that would have

14   allowed us to confirm or refute that happening were erased with

15   the reimage.

16   Q.    So with regard to the work that you did, as you sit here

17   today, you have no personal knowledge as to whether

18   Mr. Levandowski took the card reader and put it into some other

19   device?

20   A.    I have no knowledge, no.

21   Q.    Okay.  If we wanted to find that out, we'd have to bring a

22   different witness to court?

23   A.    Yes.

24   Q.    Okay.  With regard to the information that you do know,

25   though, did you have an opinion as to whether it was

BROWN - REDIRECT EXAMINATION / LYONS

1    appropriate for Mr. Levandowski to remove the information from

2    the SVN server and put it onto a card reader?

3              **MR. GONZÀLEZ:**  Objection.  Relevance, Your Honor.

4    403.  His opinion, I'm not sure is proper.

5              **MR. LYONS:**  Your Honor, if I may --

6              **THE COURT:**  Present day opinion is excluded.

7    Sustained.

8    **BY MR. LYONS**

9    **Q.**   With regard to whether it was appropriate to remove the

10   information from the SVN server and put it on a device that was

11   not a Google-issued device, do you have an understanding as to

12   whether that's appropriate for Google employees?

13             **MR. GONZÀLEZ:**  Same objection, Your Honor.

14             **THE COURT:**  Well, no.  You asked questions like,

15   "Don't you think it would have been a good idea?"

16             **MR. GONZÀLEZ:**  Fine.  Let him answer.

17             **THE COURT:**  All right.  So this is about the same, so

18   he can --

19             **MR. GONZÀLEZ:**  Appreciate that.

20             **THE COURT:**  Fair enough.  Go ahead.  Ask that

21   question.

22             **THE WITNESS:**  This type of removal is against policy.

23             **MR. LYONS:**  Thank you.  Nothing further.

24             **THE COURT:**  All right.  May the witness be excused?

25             **MR. GONZÀLEZ:**  As a concession to the shortness of

 1   life, yes.

 2        (Laughter.)

 3        **THE COURT:**  Okay.  Thank you, Mr. Brown.  You're free

 4   to go.

 5        **THE WITNESS:**  Thank you.

 6        **THE COURT:**  Have a good day.

 7        **THE WITNESS:**  You too, Your Honor.

 8        (Witness excused.)

 9        **THE COURT:**  We're going to -- we're going to go on to

10   our next witness and probably interrupt him in the middle, but

11   I want to push on unless somebody over there in the jury box

12   needs a break.

13        (No response.)

14        **THE COURT:**  Seeing no hands shoot up, I'm going to ask

15   the plaintiff to call the next witness.

16        **MR. PERLSON:**  Good morning, Your Honor.  David

17   Perlson.  Waymo calls William Grossman.

18        **THE COURT:**  William Grossman?

19        **THE WITNESS:**  Yes.

20        **THE COURT:**  Raise your right hand, please.

21                    **WILLIAM  GROSSMAN**,

22   called as a witness for the plaintiff, having been duly sworn,

23   testified as follows:

24        **THE WITNESS:**  I do.

25        **THE CLERK:**  Please be seated.  Speak directly into the

GROSSMAN - DIRECT EXAMINATION / PERLSON

1  microphone.  State your name for the court, and spell your last

2  name, please.

3         THE WITNESS:  My name is William Grossman, and my last

4  name is spelled G-R-O-S-S-M-A-N.

5         THE COURT:  All right.  Welcome again.

6      Counsel, go ahead.

7         MR. PERLSON:  Okay.  Thank you, Your Honor.

8      Your Honor, just for notice, there's going to be a few

9  portions -- a few exhibits that will be shown to the jury only

10 that can't be shown to the gallery.

11        THE COURT:  Remind us when we get there.

12        MR. PERLSON:  Absolutely, Your Honor.

13                     **DIRECT EXAMINATION**

14 BY MR. PERLSON

15 Q.   Good morning.  Can you please introduce yourself to the

16 jury?

17 A.   Yeah, hi.  My name's William Grossman.

18 Q.   And where do you live, Mr. Grossman?

19 A.   I live in Palo Alto.

20 Q.   Where did you grow up?

21 A.   I grew up in Northern California.  I was born in Lodi and

22 I went to high school in Davis.

23 Q.   And where do you work now?

24 A.   I work at Waymo.

25 Q.   When did you start working at Waymo?

GROSSMAN - DIRECT EXAMINATION / PERLSON

1  A.   I began at Waymo in roughly 2014.  Back then, it was the

2  self-driving car project part of Google and it recently became

3  part of -- recently became Waymo.

4  Q.   Did you go to college?

5  A.   I did.

6  Q.   Where?

7  A.   I went to UC Berkeley here in the Bay, and I studied

8  mechanical engineering.

9  Q.   Did you go to graduate school?

10  A.   I did.  After UC Berkeley, I went to Stanford and I did a

11  Master's in mechanical engineering as well, with a sub-focus on

12  embedded systems.

13  Q.   Embedded systems, what's that?

14  A.   Embedded systems is the study of low-level electronic

15  hardware with low-level software, and you combine the two and

16  it's what makes up a lot of smart products that you would use

17  on a daily basis.

18       So, like a smart doorknob would be an embedded system,

19  coffeemakers can be embedded systems; that type of thing.

20  Q.   Did you have any jobs in between Stanford and Waymo?

21  A.   Yeah, I did.  After I graduated Stanford, I moved to

22  San Francisco and started working at a company called ODG, and

23  we were making augmented reality glasses.

24       After that, I started a company with two friends and we

25  were doing large scale aerial imaging using drones.

GROSSMAN - DIRECT EXAMINATION / PERLSON

1    Q.    Why did you join Waymo?

2    A.    I joined Waymo because I -- because the technology is

3    really cool and compelling to me.  It's a good fit with my

4    background.  They were looking for somebody with my particular

5    set of skills and I had -- I knew people that were working

6    there and they -- you know, they said it was a pretty good

7    environment, so I -- so I joined them.

8    Q.    Okay.  And what do you do at Waymo?

9    A.    So my job title is hardware engineer, and I work on the

10   SDS architecture group.

11   Q.    SDS architecture, what's that?

12   A.    So SDS stands for self-driving systems and it encompasses

13   all of the hardware that we build that's necessary to put on a

14   car to make it self-driving, all the extra hardware.

15        And the architecture group is responsible for working with

16   a lot of the different teams, the -- the LiDAR teams, the radar

17   teams, the computer teams, all the different pieces of

18   hardware, the embedded electronics teams, that bring all of

19   their different disciplines together.

20        And the architecture group kind of managed that coming

21   together and make sure that it all comes together well and

22   makes the car drive itself.

23   Q.    Do you work with -- do you work on the laser team that

24   develops LiDAR at Waymo?

25   A.    I do not.

GROSSMAN - DIRECT EXAMINATION / PERLSON

1   Q.   Do you work with the laser team?

2   A.   I have worked with them in the past, yes.

3   Q.   Do you work with PCBs at Waymo?

4   A.   I have, yeah.

5   Q.   And what's a PCB?

6   A.   Yeah.  So a PCB is a printed circuit board and it's a

7   substrate, typically very thin, that you would solder

8   electronic components onto, typically called chips.  You might

9   have heard of those.

10      And their PCB is the basis of almost all modern

11  electronics.  So if you open your cell phone, if you open your

12  watch, if you open -- even your coffeemaker will have a PCB in

13  it these days.

14  Q.   And before you joined Waymo, did you have experience with

15  PCBs?

16  A.   Yes, I did.

17  Q.   About how many years have you worked with them?

18  A.   I -- in grad school, I've worked with them.  I've designed

19  them.  I've had them manufactured.  I've debugged them, which

20  is just a fancy way of saying you troubleshoot issues with the

21  PCBs.  It's maybe been at least ten years now.

22  Q.   How many different types of PCBs have you seen over the

23  years?

24  A.   Thousands.  Many.

25          MR. PERLSON:  Your Honor, I'm going to show -- if you

1   could turn to TX-4835 in your binder?

2       Mr. Fisher, we can show just the top part of this is in --

3   we can show --

4           MR. GONZÁLEZ:  Do you have a binder?

5       (Whereupon exhibit binder was tendered to counsel.)

6   BY MR. PERLSON

7   Q.   Do you recognize this email?

8   A.   Yes, I do.

9   Q.   And what is it?

10  A.   This is an email that I received on December 13, 2016.

11  It's from Eri Suzuki and was sent to me.

12          MR. PERLSON:  Your Honor, we move to admit TX-4835.

13          MR. GONZÁLEZ:  No objection.

14          THE COURT:  Received.

15      (Trial Exhibit 4835 received in evidence.)

16  BY MR. PERLSON

17  Q.   Mr. Grossman, what is Gorilla Circuits?

18  A.   Gorilla Circuits is a vendor down in San Jose that

19  manufactures PCBs.

20  Q.   Does Waymo work with Gorilla Circuits?

21  A.   Yeah, we have in the past.  Different groups have worked

22  with Gorilla Circuits.

23  Q.   And have you worked with Gorilla Circuits in the past?

24  A.   Yeah.  I've worked within groups that have had our PCBs

25  manufactured within -- with Gorilla Circuits, yes.

GROSSMAN - DIRECT EXAMINATION / PERLSON

1    Q.   Where were you when you got this email in December 2016?

2    A.   I was sitting at my desk in front of my computer down at

3    our headquarters in Mountain View.

4    Q.   Were you expecting to receive this email from Ms. Suzuki?

5    A.   No, I was not.

6    Q.   Do you see the -- if you look on the email, there's some

7    addresses from Gorilla Circuits.  Do you see that?

8    A.   In the -- in the "To" line?  Yeah.

9    Q.   And then in the "cc" line, there's an

10   uber@gorillacircuits.com?

11   A.   Uh-huh.

12   Q.   Did you know what that was at the time you received it?

13   A.   No, I didn't.

14   Q.   Now, if you look at the subject of the email, it says,

15   "Otto Files."  Do you see that?

16   A.   Yes.

17   Q.   When you got this email, did you know what Otto files was?

18   A.   I did not.

19   Q.   Had you heard the name Otto before?

20   A.   Yeah.  I had heard of Otto in the context of a

21   self-driving company that was recently started by some -- some

22   former Waymo employees, including Anthony Levandowski.

23   Q.   Okay.  Does this email have any attachments to it?

24   A.   Yeah.  It says right here it's got a zip folder,

25   "manufacturing docs for Fuji laser."

GROSSMAN - DIRECT EXAMINATION / PERLSON

1  Q.  Okay.

2          MR. PERLSON:  Mr. Fisher, if you could pull up the

3  native portion of that?  Open that up.  Okay.

4          (Document displayed.)                           .

5  BY MR. PERLSON

6  Q.  So first of all, what's a zip -- what's a zip file?

7  A.  A zip file is a compression of lots of different

8  documents, and you compress it so that it's smaller and you can

9  send it more quickly through the internet.

10  Q.  So what was in this zip file?

11  A.  So this zip file contained a fab package, as we call it in

12  the industry.  It's everything that you need to be able to

13  manufacture that specific PCB.  So there's multiple files and

14  folders within the -- within here that contain all that

15  information.

16          MR. PERLSON:  And so for this portion, Your Honor,

17  we'd just like to show one of these attachments to the jury and

18  not have it shown to the gallery.

19          THE COURT:  Fine.

20          MR. PERLSON:  Well, if you could pull up the Fuji

21  laser TX-100 assembly drawing, please?

22          (Document displayed)

23          THE WITNESS:  Yeah.

24  BY MR. PERLSON

25  Q.  Okay.  So do you recognize this document?

GROSSMAN - DIRECT EXAMINATION / PERLSON

1   **A.**   Yes, I do.

2   **Q.**   And what is it?

3   **A.**   This is a 2D drawing of the PCB in question that was in

4   the attachments to the email.

5   **Q.**   Okay.  And does it have any -- does this -- does this

6   specification on it indicate a particular company it's

7   associated with?

8         **MR. RABIN:**  No.Not that I can tell or not that I -- I

9   could tell.  It just says -- it's got the title down here "Fuji

10  Laser TX," you know, so on.

11  **Q.**   Did you know what Fuji was at the time that you received

12  this email in December 2016?

13  **A.**   No, I didn't.

14  **Q.**   Okay.  What was your reaction when you -- when you saw

15  this attachment to the email?

16  **A.**   I was a little surprised and confused that it looked like

17  one of the PCBs that we have in one of our LiDAR systems.

18  **Q.**   And which PCB is that?

19  **A.**   This is the -- so it looks like the -- the GBr3 transmit

20  board.

21  **Q.**   What's the GBr3 transmit board?

22  **A.**   So GBr is a LiDAR, and within it are lots of PCBs.  And

23  the GBr3 transmit board is one of those PCBs.  And it houses,

24  or it has soldered onto it, laser diodes.

25       And that PCB is what actually shoots out the lasers that

GROSSMAN - DIRECT EXAMINATION / PERLSON

1   form sort of a -- one of the key components of the LiDAR

2   system.  That's the photons leaving the little -- the LiDAR

3   unit.

4   Q.   Okay.  If you could turn in your folder to TX --

5   demonstrative TX-2963?

6        MR. PERLSON:  This, again, I'd like to show to the

7   jury and not to the gallery.

8        THE COURT:  Okay.  Make sure that this is not being

9   shown publicly, just to the jury and counsel.

10      (Photograph displayed.)

11       THE WITNESS:  Where does -- oh, okay, I see it.

12  BY MR. PERLSON

13  Q.   Yeah.  What's -- what's in this photo?

14  A.   So this is a photo of a stackup of GBr3 transmit boards.

15       MR. PERLSON:  Mr. Fisher, can you put this

16  demonstrative 29 -- or 2863 next to the blow-up you had of the

17  assembly drawing?

18      (Documents displayed side-by-side.)

19  BY MR. PERLSON

20  Q.   Why is that you -- what was it in the specification that

21  you saw attached to the Gorilla email in December 2016 that

22  made you think that it looked like the GBr3 that's pictured on

23  the right?

24  A.   Yeah.  So you can just take a -- take a look at the two

25  boards.  They're very similar, but there's some key structure

GROSSMAN - DIRECT EXAMINATION / PERLSON

1    to it that's really important.

2        So three sides are flat, and that's not particularly

3    interesting, but the one side, the left side here has a concave

4    structure.  And then even within that concave structure, there

5    are very specific spacings and angles of the edge of the PCB

6    which are very unusual.  Like, you wouldn't -- you wouldn't

7    just see that randomly.

8        And so it caught my eye and that's -- that's what, you

9    know, made me think that it was our board.

10   Q.   Okay.  When you -- when you got the email and after you

11   looked at it, did you contact -- did you respond to Gorilla?

12   A.   I did not.

13   Q.   Why not?

14   A.   I don't know.  I was a little confused about what I was

15   looking at and...

16   Q.   Well, what did you do?

17   A.   So I contacted my manager and showed him the email and the

18   attachments.

19   Q.   Why did you do that?

20   A.   I wanted to get his opinion on what I should do and kind

21   of escalate upwards.

22   Q.   Okay.  And who's your manager?

23   A.   My manager is Ryan Andrade.

24   Q.   And then what did you do after Mister -- after you talked

25   with Mr. Andrade?

GROSSMAN - DIRECT EXAMINATION / PERLSON

1   A.    So I spoke with Mister -- with Ryan and we decided that it

2   would be best to go talk to one of the leaders on the laser

3   team who was very familiar with this board and can kind of tell

4   us if this was our -- actually our board, and that was

5   Pierre-Yves Droz.

6   Q.    Okay.  So did you go talk to him?

7   A.    I did, yes.

8   Q.    Okay.  And what -- what happened when you talked with him?

9   A.    So we -- I went and spoke with Pierre.  We went to a

10  conference room.  I showed him the email, showed him the

11  attachments.  And we -- he took a look at them and then we

12  decided that we should get Dmitri Dolgov involved.  And Dmitri

13  is the VP of Engineering, so he's sort of the top engineer at

14  Waymo.

15  Q.    Okay.  Why did you decide to do that?

16  A.    Again, we were sort of escalating things as we thought

17  this looked more and more like our board, and so we wanted to

18  get higher levels of management involved.

19  Q.    Okay.  And so now you've got Mr. Dolgov involved.  What

20  did you do after that?

21  A.    So Dmitri joined us.  So it was Pierre, Dmitri and myself

22  sitting in the conference room.  We showed him the files as

23  well.  And at that point, we decided that we should get Legal

24  involved.

25  Q.    And why was that?

GROSSMAN - CROSS-EXAMINATION / GONZÁLEZ

1   **A.**   Well, we thought that it looked like our board and that --

2   that the right thing to do was to, you know, get Legal

3   involved.

4   **Q.**   Okay.  And did you -- after -- and so did you send it to

5   Legal?

6   **A.**   Yeah.

7   **Q.**   Okay.  And that's the email you got in December '16, the

8   Gorilla email?

9   **A.**   Yes.  Correct.

10  **Q.**   After you sent the -- this email to Legal, did you show

11  the email and attachments to anybody else?

12  **A.**   I did not.

13          **MR. PERLSON:**  No further questions, Your Honor.

14          **THE COURT:**  Thank you.

15                          <u>**CROSS-EXAMINATION**</u>

16  BY MR. GONZÀLEZ

17  **Q.**   Mr. Grossman, I'd like to clarify something.

18          **MR. GONZÁLEZ:**  Andrew, can we put up Page 7 of

19  Exhibit 1307 for the jury only?

20      Andrew, blow up the drawing on the upper left, the board

21  on the upper left.

22      (Document displayed.)

23          **MR. GONZÁLEZ:**  Okay.  Can you turn it off?  I said not

24  for public.  Turn it off, those two.

25      Try that again.  Only the jury and counsel.  If we could

1    please display Page 7.

2         (Document displayed.)

3         MR. GONZÀLEZ:  There we go.  I'm assuming the jurors

4    can see a board in front of them.

5    BY MR. GONZÀLEZ

6    Q.   Sir, I just want to clarify one little thing.

7    A.   Yes.

8    Q.   The reason you thought the shape was like yours because

9    three sides were flat, and that I can understand, and you said

10   one was concave?

11   A.   Yes.

12   Q.   Concave basically means, like, a curve; right?

13   A.   Yes.

14   Q.   Okay.  All right.

15         MR. GONZÁLEZ:  Andrew, can we show a side-by-side of

16   this -- well, I'm sorry.

17        Andrew, put up for the public -- put up for the public

18   Page 7 from Exhibit 1049.

19         (Document displayed)

20   BY MR. GONZÁLEZ

21   Q.   Sir, just looking at that drawing on the bottom, three are

22   flat; right?

23   A.   Yes.

24   Q.   And one is concave; correct?

25   A.   That is correct.

 1   Q.   Okay.  Now --

 2             MR. GONZÁLEZ:  Madam Clerk, I'm sorry.  No more

 3   public, just the jury.

 4        Andrew, can we do a side-by-side?

 5        (Document displayed)

 6   BY MR. GONZÁLEZ

 7   Q.   This is Page 7 from Exhibit 1307, which was the Gorilla

 8   email, and Page 7 from Exhibit 1049, which is the publicly

 9   available patent.

10        Sir, both of these have three flat sides and one concave

11   side; correct?

12   A.   I can't see anymore.

13   Q.   You can't see it on your screen either?

14   A.   No.

15             THE COURT:  Just a minute.  Can we --

16             THE WITNESS:  I can see it now.

17   BY MR. GONZÀLEZ

18   Q.   You can see it there?

19   A.   Yes.

20   Q.   They both have three sides and one curved or concave;

21   correct?

22   A.   That is correct.

23   Q.   And the one on the right that you're looking at on the

24   right, you see the -- how it's got three holes on the

25   right-hand side?  See those three?

1   A.   Yeah.  Okay.

2   Q.   The one in the middle, you see the one in the middle is a

3   little bit bigger.  You understand that to be a guide hole;

4   correct?

5   A.   If you're telling me that that's a guide hole, okay.

6   Q.   You don't have any reason to dispute that?

7   A.   No.  I don't have any specific information about it.

8   Q.   All right.  And then the -- you see the circle that goes

9   around -- it's not a circle.  The part that goes around those

10  squares, that part there?

11  A.   Yes.

12  Q.   You understand that's a spacer; correct?

13  A.   Again, I don't know that it's a spacer, but, sure, if

14  you're telling me it is.

15  Q.   Right.

16        MR. GONZÁLEZ:  Thank you, Your Honor.  That's all I

17  have.

18        MR. PERLSON:  Can we keep that up, the comparison?

19  Can you put that back up?  Not to the public.

20        THE CLERK:  Not to the public?

21        MR. PERLSON:  Not to the public, just to the jury.  Is

22  it up?

23        THE COURT:  So you need to do the video feed to this

24  side of the room; right?  So they can put it back up there the

25  way it was.  And the gallery is off, please.  Jury and witness,

1    okay.

2         Well, it was up there and then it went away.

3              **MR. PERLSON:**  Now I can't see it.

4    **BY MR. PERLSON**

5    **Q.**  Well, I think he showed you the patent.  Is it on the left

6    or the right?  Because I can't see it.

7    **A.**  I think it was on the right.

8    **Q.**  Okay.

9              **THE COURT:**  It's not up here at all.

10             **THE CLERK:**  Just a second.

11             **THE COURT:**  What happened to the side-by-side

12   comparison?

13             **MR. GUEVARA:**  The gallery monitor is still on, so I'm

14   not -- until we have that off, I can't show it.

15             **THE COURT:**  Angie, switch it so that the right side of

16   the room is able to do inputs, and then they will put the --

17   there we go.  It's up on the screen -- well, then it went away

18   again.  What are you lawyers doing to me?

19             **MR. GUEVARA:**  The gallery monitor is still on, Your

20   Honor.

21             **THE COURT:**  All right.  Here's the answer.  It's your

22   examination.  Your technical people have got to put it up.

23        Those people have failed us.  Somebody has failed us, but

24   it's your exam.  So if you can't get it up there yourself, too

25   bad.

GROSSMAN - CROSS-EXAMINATION / GONZÁLEZ

1         MR. PERLSON:  I think I can work around it, Your

2    Honor.

3         THE COURT:  All right.  Work around it.

4         MR. PERLSON:  Did you get a cross binder?  Did you

5    hand up a cross binder for him?

6         (Whereupon binder was tendered to the witness.)

7         MR. PERLSON:  Can I get one too?

8         (Whereupon binder was tendered to counsel.)

9         MR. PERLSON:  Thank you.

10   BY MR. PERLSON:

11   Q.   Okay.  So if you could turn to, I guess it is 1049, which

12   is the -- the patent in Figure 4 that he showed you.

13   A.   Yes.  Figure 4.  Okay.

14   Q.   Okay.  And then -- now, you were asked about this, and you

15   pointed out that there were three sides and one of them was

16   curved; remember?

17   A.   Yes.

18   Q.   And you pointed out that there were a couple of holes on

19   it?

20   A.   Yes.

21   Q.   Okay.  If we could -- I think we should be able to do

22   this, show just to the jury the GBr3 demonstrative.  Can you do

23   that?  I think that should get us where we need to be.

24        (Photograph displayed.)

25        MR. PERLSON:  Okay.

1   BY MR. PERLSON

2   Q.   Now, other than the fact that there are three sides and a

3   curve and maybe a couple holes, are there other differences --

4   are there differences between the -- the board shown in

5   Figure 4 of the patent and the GBr3 in the demonstrative?

6   A.   The GBr3 transmit board, yeah.  So if you look closely,

7   there's a few differences.  One of them is the spacing of the

8   structure within the concave side is not uniform.  Whereas, in

9   the -- in the patent's, it looks much more uniform.

10   Q.   Okay.  Anything else?  Any other differences?

11   A.   Yeah.  If you look -- and this is part of what struck my

12   eye initially.  The angles of the edges are very specific, and

13   there's sort of a flow to them.  Whereas, on the patent the

14   angles of the edge are -- they seem to all be the same.  The

15   top portions look the same and the bottom portions look the

16   same.

17        MR. PERLSON:  No further questions, Your Honor.

18        THE COURT:  Thank you.

19   Anything more?

20        MR. GONZÁLEZ:  Just one, sir.

21   Your Honor, I would like to play from his deposition,

22   Page 17, Lines 10 to 16.

23        THE COURT:  Is that within the scope of what we just

24   heard?

25        MR. GONZÁLEZ:  It's exactly.

1        **MR. PERLSON:**  Your Honor, there's not even a question.

2        **MR. GONZÁLEZ:**  It's to impeach the answer he just

3   gave.

4        **THE COURT:**  Okay.  It's fair.  Go ahead.  Play the --

5   roll the tape.

6        **MR. GONZÁLEZ:**  17/10 to 16.

7       (Videotape played in open court, not reported.)

8        **THE COURT:**  Is that it?

9        **MR. GONZÁLEZ:**  That's it.

10       **THE COURT:**  Thank you.

11                    <u>REDIRECT EXAMINATION</u>

12  BY MR. PERLSON:

13  **Q.**   Mr. Grossman, one last question.  Were you shown the

14  patent at your deposition in relation to this question that

15  Mr. González asked you about in his examination?

16  **A.**   No.

17       **MR. PERLSON:**  No further questions.

18       **THE COURT:**  All right.  I'm going to excuse the

19  witness.

20       **MR. GONZÁLEZ:**  Nothing else, Your Honor.

21       **THE COURT:**  Mr. Grossman, thank you.  You're free to

22  go.  Have a good day.

23       **THE WITNESS:**  Thank you.

24      (Witness excused.)

25       **THE COURT:**  Okay.  We're going to take our break now

PROCEEDINGS

 1    for 15 minutes.  Remember the admonition.

 2            THE CLERK:  All rise for the jury.

 3        (Jury exits the courtroom at 10:58 a.m.)

 4            THE COURT:  Angie, I need you back here, please.

 5    Everyone be seated.

 6        All right.  You lawyers explain to me what happened there

 7    such that counsel for Waymo was unable to get the Arturo

 8    Gonzalez side to do the fair thing and show the very slide you

 9    had used.

10            MR. GONZÁLEZ:  I don't know, Your Honor.

11        Come up.

12            THE COURT:  Was it our fault or was it -- whose fault

13    was it?  Because this cannot happen again.

14            MR. GONZÁLEZ:  I'm going to have our trial tech answer

15    the question.

16            MR. GUEVARA:  Your Honor, the Clerk has master control

17    on what goes up and down on the screens.  So I believe there

18    might have been a, you know, malfunction on what she was

19    pressing to turn off.

20            THE CLERK:  There was a delay --

21            THE COURT:  What happened?

22            THE CLERK:  There was a little bit of a delay whenever

23    I would click on his side.

24            THE COURT:  How long a delay?

25            THE CLERK:  About a two-second delay.

PROCEEDINGS

1          THE COURT:  Well, then we waited, like, two minutes.

2   So --

3          THE CLERK:  But then --

4          THE COURT:  What?  What?

5          THE CLERK:  Then I tried the other side --

6          THE COURT:  Here is what I want you to do -- let's get

7   your technical person up here, too.

8          MR. PERLSON:  This is Mr. Ryan Fisher, Your Honor.

9          THE COURT:  Mr. Fisher.

10      What's your name?

11          MR. GUEVARA:  Andrew Guevara, for the record, Your

12   Honor.

13          THE COURT:  Listen, here's the deal.  You three -- and

14   I'm including the Deputy Courtroom Clerk -- have got to be

15   pronto, no delays.

16      And whenever the other side wants to borrow a slide that

17   you showed when Mr. González was doing his cross, it's only

18   fair.  He had every right to ask you to put that back up there.

19   You can't play games and say, "Oh, sorry.  Too late."  No games

20   are going to be played that way.

21      So if there was a glitch here, you three, including the

22   Courtroom Deputy Clerk, you've got to figure out what the

23   protocol is going to be so that it doesn't happen again.

24   That's point one.

25      Point two is, there's too much of a delay between

PROCEEDINGS

1    Mr. González saying we're going to show the deposition, and

2    then 45 seconds later it comes on the screen.  The time of this

3    jury is too important.  It's got to be one second.  Two

4    seconds, I can stand.  But if it's going to be longer than

5    that, then forget the impeachment.

6         Same thing on your side.  You've got to be instant.

7         All right.  Enough on that.  Thank you.  I know you'll do

8    a good job.

9              MR. GUEVARA:  Thank you, Your Honor.

10             THE COURT:  I have a different question now about the

11   substance.

12        I thought I had made a ruling that that Gorilla Circuits

13   thing, that you could not suggest for one second that that was

14   a trade secret, that spacing.  Didn't I have -- I went down and

15   I -- didn't I have an order on that about eight months ago?

16   What am I thinking of?

17             MR. GONZÁLEZ:  Your Honor, I recall the Court

18   expressing great skepticism about the notion that it was a

19   trade secret.  I don't recall there being an actual order to

20   that effect.

21             THE COURT:  No, we went through all of the -- we went

22   through all of the directions the diodes were placed and the

23   idea that -- and it turned out those two sets of diodes were so

24   far off that there's no way it could be a trade secret.  I

25   mean, at least -- no, maybe it could be a trade secret, but

PROCEEDINGS

```
1   there was no way you were doing the same thing.

2       I could have sworn that I've made that ruling.

3           MR. GONZÁLEZ:  I recall -- Your Honor, I believe what

4   the Court is referring to is Trade Secret 96.  That may be what

5   the Court is recalling.

6           THE COURT:  I don't remember the numbers.

7           MR. GONZÁLEZ:  But, in any event, we --

8           THE COURT:  But that's out of the case, isn't it?

9   Didn't I knock 96 out?

10          MR. GONZÁLEZ:  Yes.  Yes, you did.

11          THE COURT:  All right.  If you suggest to the jury

12  that there is some trade secrets in that Gorilla thing, I'm

13  going to be upset with you.

14          MR. PERLSON:  Your Honor, I don't think I did.  In

15  fact, it was actually -- it was -- it was them who was

16  comparing it.  It was Mr. González on his examination who was

17  comparing it to the public document and suggesting that it was

18  the same as the public document.

19          THE COURT:  Well, but this was after you laid all

20  kinds of suspicious things on the jury, saying, "Oh, it's got

21  three flat sides.  It's got a curve.  My God, it's got a curve

22  and three flat sides."

23      I mean, you were the one that was suggesting they were

24  copying your design.

25          MR. GONZÁLEZ:  It was worse than that, Your Honor.
```

PROCEEDINGS

 1    They --

 2              MR. PERLSON:  Well, wait a minute, Your Honor --

 3              THE COURT:  Wait, wait.

 4              MR. PERLSON:  I should be able to respond.

 5              THE COURT:  Yes, you should.

 6              MR. PERLSON:  First of all, Your Honor, what we have

 7    heard in this case -- and you heard it in Mr. González's

 8    examination of Mr. Brown.  They went through in detail saying

 9    that this is all just a competitive thing; that this isn't

10    about substance and that the timing of this, that we've known

11    about this for months.

12         And then right at -- you know, and then, in February,

13    we're finally fed up and that we feel that we need to bring a

14    trade secret action.

15         The jury needs to know that we found out about this and

16    had the first, you know, tangible evidence from Uber that they

17    were copying our stuff.  And it was the basis of the board and

18    the receipt of that Gorilla email that did that.  And the fact

19    that -- and the story behind it and how it happened directly

20    rebuts the narrative that they have been pushing the last day.

21         I have no way of telling that story without --

22              THE COURT:  All right.  I accept what you say is fair

23    game, but I think you -- you went further and insinuated into

24    that story that -- that there was copying of that particular

25    PCB board and you put the transmit board up there to show the

```
 1   similarities.

 2        To me, that suggested something that had been knocked out

 3   of the case by the judge.

 4        MR. GONZÁLEZ:  Your Honor, I have a suggestion.  And

 5   this is what the problem was, and I probably should have

 6   objected.

 7        The problem is, they shielded it from the public.  That's

 8   the problem.  They didn't show the public that email they got

 9   from Gorilla suggesting, as you've said throughout, that we've

10   got to shield stuff from the public that's a secret.  That's my

11   concern.

12        So here is what I suggest.  I think we should show the

13   side-by-side to the public right now, and I think Your Honor

14   should tell the jury that, you know, in hindsight the public

15   should have been allowed to see what was on the screen during

16   the examination of Mr. Grossman.  And that's all.

17        THE COURT:  Oh, we're not going to do that yet.  But

18   we -- I'm going to see how this develops.

19        MR. PERLSON:  Your Honor --

20        THE COURT:  You know, you have been attached to that

21   Gorilla Circuits email.  You have squirmed left and right

22   trying to figure out some way to build your case around it.

23   And even though 96 got thrown into oblivion, you're still

24   trying to find some way to screw that into the case and it has

25   nothing to do with any trade secret that's in play.
```

PROCEEDINGS

```
1         So I -- I'm a little upset about that, but I'm not going
2    to make some ruling now.  We're going to see how it develops
3    further.  Maybe I will do a curative instruction in due course.
4              MR. GONZÁLEZ:  Your Honor, can we show a side-by-side
5    to the public?
6              THE COURT:  No.
7              MR. GONZÁLEZ:  Okay.  Your Honor --
8              THE COURT:  We're moving on.  We're moving on.
9              MR. GONZÁLEZ:  Yeah, I have a housekeeping matter.
10        Would Your Honor or Your Honor's Clerk, or both of you,
11   like copies of these witness binders?  I don't want to fill you
12   with binders, but --
13             THE COURT:  Actually, I don't want them.
14             MR. GONZÁLEZ:  Okay.
15             THE COURT:  I've -- it just piles up up here.  I don't
16   have space.  I don't have time to read all these things.  I
17   look at it on the screen as it comes up.  That's what I have to
18   do.
19             MR. GONZÁLEZ:  All right.
20             THE COURT:  And then if I need to see a hard copy,
21   which I have once, I'll ask you for it.
22             MR. GONZÁLEZ:  Thank you.
23             THE COURT:  All right.  What's your housekeeping?
24             MR. VERHOEVEN:  The next witness we were going to call
25   is Mr. Bares.
```

PROCEEDINGS

```
 1              THE COURT:  Right.
 2              MR. VERHOEVEN:  Your Honor has ruled on --
 3              THE COURT:  I gave you back -- did you give them
 4    the --
 5              MR. VERHOEVEN:  Yes.  We have those and we've
 6    incorporated those, but I'm told that there wasn't any ruling
 7    on whether the stuff we thought was -- should be sealed,
 8    appropriately should be sealed.
 9         My request would just be --
10              THE COURT:  However you presented it to me, I'm going
11    to let you go with it as public, and then the part you gave me
12    as proposed seal.  I haven't got the time.  I've just got to
13    trust you to do it right.
14              MR. VERHOEVEN:  Okay.  So we will seal that little bit
15    at the end, or we could do it before we bring everybody in.
16              THE COURT:  I wish you two would work the sealed part
17    out.
18         Now, the next part, is it going to be public so that --
19              MR. VERHOEVEN:  So it's Mr. Bares and so he's got a
20    little bit that's, we say, sealed.  And then the vast majority
21    is public.
22         So we could do the sealed at the end or the beginning.
23    It's up --
24              THE COURT:  Will it flow right if you do it --
25              MR. VERHOEVEN:  We could do it later on when there's
```

PROCEEDINGS

```
 1  another sealed portion.
 2           THE COURT:  Why don't we do this.  Do the public part
 3  and then go to your next public witness.  And I will do a
 4  placeholder for the jury and say, for their convenience, we're
 5  not going to clear the courtroom.  And we'll come back and pick
 6  up a short piece of under-seal material from Mr. Bares.
 7           MR. VERHOEVEN:  Thank you, Your Honor.
 8           THE COURT:  And then you can do that whenever --
 9  whenever it's convenient for the public.
10           MR. VERHOEVEN:  I appreciate that.
11           THE COURT:  Yes, sir.  What can I do for you?
12           MR. RABIN:  That's fine, Your Honor.  I was responding
13  to the Bares issues.
14           THE COURT:  Fine.  Thank you.  We will take 15
15  minutes.
16       (Whereupon there was a recess in the proceedings
17         from 11:08 a.m. until 11:20 a.m.)
18           THE COURT:  Next witness, please.
19           MR. VERHOEVEN:  Your Honor, Waymo calls John Bares by
20  video testimony.
21           THE COURT:  All right.
22           MR. VERHOEVEN:  Just by way of background, Your Honor,
23  Mr. Bares was Uber's founder and director of Uber's Advanced
24  Technology Center.
25           THE COURT:  What's the date of the deposition, please?
```

PROCEEDINGS

1          **MR. CARMODY:**  And I want to clarify something.  He

2    wasn't Uber's founder.

3      I think that's what you said.

4          **MR. VERHOEVEN:**  He was the founder of the Advanced

5    Technology Center.  That's the autonomy effort.

6          **MR. CARMODY:**  He wasn't the founder.  He was employed

7    there.

8          **THE COURT:**  All right.  So, remember, this is a great

9    example.  What the lawyers say is never evidence.  And you see

10   right here, they can't even agree on something.

11     So that's -- it's probably going to be in the testimony

12   that we're going to hear, so that will help set the stage.  And

13   if it doesn't there, then somebody else will testify to

14   whatever the correct answer is.

15     I would like to know the date of the deposition.

16         **MR. JUDAH:**  Your Honor, there were two depositions,

17   June 19th and --

18         **THE COURT:**  June 19th, last year.  And what else?

19         **MR. JUDAH:**  I'm sorry.  June 16th, 2017 and

20   August 11th, 2017.

21         **THE COURT:**  Very good.  Thank you.

22     Okay.  Now, we're about to hear something you haven't seen

23   yet, which is a witness is going to be appearing and testifying

24   under oath by video, but it's all in the can.  This is an old

25   deposition from last year -- not old, but last year.  It's not

563
PROCEEDINGS

```
 1   videotaped live from the east coast.  No.  This is something
 2   that's already been taken.
 3        The lawyers have trimmed it down to just what you need to
 4   hear.  And so it may jump around a little bit, but it counts
 5   just as much as testimony from the stand.  It is under oath,
 6   and both sides had an opportunity to examine the witness.
 7        So I think it's at least fair to say that Mr. Bares,
 8   B-a-r-e-s, is affiliated with the Uber side of the case.
 9        All right.  Now, roll the tape.
10             MR. VERHOEVEN:  Just a question.  Is there a switch to
11   turn down the lights a little bit?
12             THE CLERK:  Turn down the rights?  I can.
13             THE COURT:  I think we can turn it down about halfway
14   in order to help the jury see better.
15             MR. VERHOEVEN:  Thank you, Your Honor.
16             THE COURT:  Sure.
17        About halfway.  It's kind of like the Grand Lake Theater
18   in Oakland.
19        (Laughter.)
20             THE COURT:  All right.
21                        JOHN BARES,
22   called as a witness for the Plaintiff herein, testified via
23   videotaped deposition played in open court, not reported.
24             THE COURT:  Is that it?
25             MR. JUDAH:  That is, Your Honor.  And we would like to
```

PROCEEDINGS

```
 1   move into evidence certain exhibits from that testimony.

 2              THE COURT:  All right.  Go ahead.

 3              MR. JUDAH:  Exhibit Nos. 170.

 4              THE COURT:  Any objection?

 5              MR. RABIN:  Not beyond those that were in the clip

 6   sheet that we supplied to Your Honor.

 7              THE COURT:  170 is in.  What's next?

 8              MR. JUDAH:  TX-171.

 9              MR. RABIN:  No objection.

10              THE COURT:  In.

11              MR. JUDAH:  TX-367.

12              MR. RABIN:  No objection.

13              THE COURT:  In.

14              MR. JUDAH:  TX-433.

15              MR. RABIN:  No objection.

16              THE COURT:  In.

17              MR. JUDAH:  TX-459.

18              MR. RABIN:  Not beyond those we provided to Your

19   Honor.

20              THE COURT:  I don't know what that means, but --

21              MR. RABIN:  It's in the clip sheet.

22              THE COURT:  -- 459 is in.

23        You're going to have to -- I don't know what you're

24   referring to.

25        Okay.  Next.
```

PROCEEDINGS

1           MR. JUDAH:  TX-662.

2           MR. RABIN:  No objection.

3           THE COURT:  In.

4           MR. JUDAH:  TX-663.

5           MR. RABIN:  No objection.

6           THE COURT:  In.

7           MR. JUDAH:  TX-668.

8           MR. RABIN:  No objection.

9           THE COURT:  In.

10          MR. JUDAH:  TX-674.

11          MR. RABIN:  No objection.

12          THE COURT:  In.

13          MR. JUDAH:  TX-678.

14          MR. RABIN:  No objection.

15          THE COURT:  In.

16          MR. JUDAH:  And TX-682.

17          MR. RABIN:  No objection.

18          THE COURT:  Thank you. In.

19      (Trial Exhibits 170, 171, 367, 433, 459, 662, 663,

20          668, 674, 678, 682 received in evidence.)

21          THE COURT:  All right.  I wanted to give each side a

22  30-second opportunity to explain to the jury who NewCo was and

23  who -- is it Tyto? -- that you all assume the jury has a

24  laser-sharp memory and remembers every little detail.  And it's

25  even harder for me after all this time to keep all this

1    straight.  So you get 30 seconds to explain to the jury.

2         This is not evidence, ladies and gentlemen.  Not evidence.

3    Zero, zero, zero.  However, it will be helpful to you for the

4    lawyers to give you a refresher course on who NewCo was and who

5    Tyto was.

6         Time is ticking.  One, two.  Please go ahead.

7              MR. VERHOEVEN:  Okay.  Thank you, your Honor.

8         So the next witness you're going to hear is Mr. Kalanick,

9    and I'll to ask him about this, but NewCo is the code name that

10   for part of the time Uber was using to describe their efforts

11   to hire Mr. Levandowski and was referring to a company that the

12   evidence will show was being -- didn't exist yet and was going

13   to be formed in the future.  And so that's why they called it

14   NewCo.

15        The other entity --

16             MR. RABIN:  Tyto.

17             MR. VERHOEVEN:  -- Tyto is a company --

18             THE COURT:  Well, can you -- was NewCo what became

19   Ottomotto?

20             MR. VERHOEVEN:  That's right.

21             THE COURT:  All right.  Why don't you say that?

22             MR. VERHOEVEN:  I'm sorry, Your Honor.

23             THE COURT:  All right.

24             MR. VERHOEVEN:  This is a company that eventually

25   became Ottomotto, which is a defendant in this case.

PROCEEDINGS

1          **THE COURT:**  All right.  Thank you.

2     Your turn.

3          **MR. RABIN:**  Thank you.

4     So what you will hear later on in the trial is NewCo was

5  an idea for a new company that could have been developed into

6  several different kinds of companies.

7          As you heard, one of the original ideas of NewCo was an

8  independent company that would simply license its technology to

9  Uber independently as a separate entity, and that was option --

10 one of the options.

11         There was another option where they would work with

12 Google.  There was another option where they would work with

13 Uber.

14         And in all of these iterations, the NewCo name was simply

15 the idea for these various options of forming a new company

16 that Mr. Levandowski and Mr. Ron were working on.

17         **THE COURT:**  And how about Tyto?

18         **MR. RABIN:**  Tyto?

19         **THE COURT:**  There was a reference -- yes.  There was a

20 reference up there to "T-Y-T-O."

21         **MR. RABIN:**  Tyto is a separate company that was in the

22 laser space.  And eventually Ottomotto, which was the entity

23 that was ultimately formed, Ottomotto purchased Tyto later in

24 the summer of the 2016 time period.

25         **THE COURT:**  All right.

PROCEEDINGS

1           **MR. PERLSON:**  Your Honor, can I just add one thing

2    briefly to that for Tyto?  Is that it was a -- the evidence

3    will show that Tyto was a company that was controlled by

4    Anthony Levandowski, and that had been started even before Otto

5    had existed, and was started by and controlled by

6    Mr. Levandowski while he was working at Google.

7           **MR. RABIN:**  Yeah.  That's -- we agree.  He formed Tyto

8    actually while he was a Google employee.  And while he was a

9    Google employee, he formed this company and continued to have

10   this company.  You'll hear evidence as to whether Google knew

11   about it throughout the course of the trial.

12          **THE COURT:**  All right.  That -- none of that's

13   evidence, but it helps you frame the issues.

14       All right.  So I plan to push on now with the next

15   witness, unless one of the members of the jury needs a restroom

16   break.  If so, raise your hand.

17       (No response.)

18          **THE COURT:**  I'm not seeing a hand go up.

19       Counsel, you -- we used up, I think, 34 minutes on that,

20   and you need to tell me how it breaks down after the jury

21   leaves for the day.

22       All right.  Please call your next witness.

23          **MR. VERHOEVEN:**  Thank you, Your Honor.  Waymo calls

24   Travis Kalanick.

25          **THE COURT:**  All right.

KALANICK - DIRECT EXAMINATION / VERHOEVEN

 1          **THE COURT:**  Will the witness please come to the

 2    witness stand?

 3       Okay.  Welcome.  Please stand somewhere in there.  Raise

 4    your right hand to take an oath to tell the truth, please.

 5                      <u>**TRAVIS KALANICK,**</u>,

 6    called as a witness for the Plaintiff, having been duly sworn,

 7    testified as follows:

 8          **THE WITNESS:**  I do.

 9          **THE CLERK:**  Thank you.  State your name for the record

10    and spell your last name for the record.

11          **THE WITNESS:**  Okay.  My name is Travis Kalanick.

12          **THE COURT:**  Okay.  Welcome.

13       First question.

14          **MR. VERHOEVEN:**  May I approach to give the witness an

15    exhibit binder?

16          **THE COURT:**  Please do.

17       (Tendered binder to witness.)

18                   <u>**DIRECT EXAMINATION**</u>

19    BY MR. VERHOEVEN

20    **Q.**   Good afternoon, Mr. Kalanick.

21    **A.**   Good afternoon.

22    **Q.**   You were a founder of Uber; correct?

23    **A.**   That is correct.

24    **Q.**   And you're currently on Uber's Board of Directors?

25    **A.**   That is correct.

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1   **Q.**   And you are a former CEO of Uber; correct?

2   **A.**   That is correct.

3   **Q.**   You began your tenure as CEO of Uber in 2010?

4   **A.**   Yes.

5   **Q.**   And you resigned as the CEO in June of last year?

6   **A.**   That is correct.

7   **Q.**   Uber's business is ride-sharing; correct?

8   **A.**   Yes.

9   **Q.**   You agree that autonomous vehicles are going to be safer

10  than human-driven vehicles; right?

11  **A.**   Yes.

12  **Q.**   Autonomous vehicles are also going to be cheaper than

13  human-driven vehicles; agree?

14  **A.**   Eventually, yes.

15  **Q.**   And it's your belief that in order for Uber to exist in

16  the future, it will need to be a leader in the autonomous

17  vehicle space; correct?

18  **A.**   Yes.

19  **Q.**   Please turn in your binder -- your binder is organized in

20  numerical order with TX numbers in it.

21  **A.**   Okay.

22  **Q.**   So please turn in your binder to TX-0291.

23  **A.**   Okay.

24  **Q.**   This is a transcript of an interview with *Bloomberg*

25  *Business Week* that you attended on July 25th, 2016; correct?

 1   **A.**   It appears to be so, yes.

 2          **MR. VERHOEVEN:**  Your Honor, I move Exhibit 0291 into

 3   evidence.

 4          **MS. DUNN:**  Your Honor, this is a transcript of a news

 5   article, so we object on hearsay ground.

 6          **THE COURT:**  Sustained so far.

 7   **BY MR. VERHOEVEN**

 8   **Q.**   And you see it says "TK" and there's a back-and-forth and

 9   one of the responses is "TK"?

10   **A.**   Yes, I do.

11   **Q.**   Is that your name?

12   **A.**   Yes.

13   **Q.**   And did you give this interview?

14   **A.**   Yes, I did.

15          **MR. VERHOEVEN:**  I move into evidence again.

16          **THE COURT:**  That's not enough.  You've got to ask him

17   if it accurately reported what he -- what he said in the

18   interview.

19   **BY MR. VERHOEVEN**

20   **Q.**   Have you reviewed this transcript before?

21   **A.**   Not in detail.

22   **Q.**   Did you look at it at your deposition?

23   **A.**   Briefly.

24   **Q.**   Are you aware -- do you think that this transcript

25   accurately reflects your answers?

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1   A.   I don't know.

2   Q.   Well, let's go to the specific questions.

3         MR. VERHOEVEN:   Can we go to page -- just one second,

4   your Honor.

5         (Brief pause.)

6         MR. VERHOEVEN:   I apologize, Your Honor.   I don't

7   think this will be confidential.

8   BY MR. VERHOEVEN

9   Q.   If you'd direct your attention to the first page.

10  A.   Yeah.

11  Q.   And you see the -- there's an entry that says "Max colon"?

12  A.   Yeah.   There -- there's several of them.

13  Q.   The top one?

14  A.   Yeah.

15  Q.   "Max colon," do you see that?

16  A.   Yes, I do.

17  Q.   And do you see the question he asks?

18  A.   Yes I do.

19  Q.   And please read your answer.

20  A.   "At a high level" --

21  Q.   No.   You can read it to yourself, because there's an

22  objection to the exhibit.

23  A.   Sorry.

24         (Witness complied.)

25  A.   Yes, I've read it.

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1    Q.   Is that statement accurate?

2    A.   I believe it would be accurate; correct.

3    Q.   We direct your attention to the lower place in the page

4    that starts with "The future," your answer that starts with

5    "The future."

6    A.   Okay.

7    Q.   Would you please read that?

8         (Witness complied.)

9    A.   Okay.

10   BY MR. VERHOEVEN

11   Q.   Is that an accurate statement as well?

12   A.   I believe it to be accurate, yes.

13        MR. VERHOEVEN:  Your Honor, I move to admit at least

14   these answers that he's testified, so I can show them to the

15   jury, into evidence.

16        THE COURT:  All right.  That's -- that's -- I'm going

17   to allow that, but what's your -- what's your objection to

18   that?

19        MS. DUNN:  We don't object to to -- to counsel asking

20   him about the statements in the article.  That's no problem.

21   We object to admission of the news article, and it's still a

22   news article.

23        THE COURT:  Well, here's what we're going to do.  How

24   long are these answers?

25        MR. VERHOEVEN:  They're short, Your Honor, but this

 1    is -- all right.  I mean --

 2              THE COURT:  Look.  Just do this.  Read it out loud --

 3              MR. VERHOEVEN:  Well, I can just play it on the board

 4    for the first page.  I don't think there's an objection to

 5    that, is there?

 6              THE COURT:  If everything on the first page has been

 7    vouched for by the witness, then you can do that, too.

 8    BY MR. VERHOEVEN

 9    Q.   Mr. Kalanick, can you read the first entry that I asked

10    you to look at for the record?

11    A.   Out loud?

12    Q.   Out loud.

13    A.   Okay.

14              "At a high level, Uber is racing towards the

15         future, doing everything we can to catch up to Google

16         on autonomy, something we have been working on since

17         late 2014.  Self-driving, when applied to

18         ride-sharing, is the future.  If only one entity is

19         really far ahead, then Uber won't be a part of that

20         future.  The minute it was clear that Google was

21         getting into the ride-sharing space, we realized we

22         needed to make sure there was an alternative, because

23         if there is not, we will be out of business."

24    Q.   And that's an accurate statement as far as you're

25    concerned?

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1    A.    Yes.

2    Q.    And you stand by that today?

3    A.    I do.

4    Q.    Can you please read into the record the second excerpt I

5    asked you to look at earlier?

6    A.    Absolutely.  Okay.

7               "The future is driverless and we have to be part

8          of that future.  We see lots of people talking about

9          driverless ride-sharing, Tesla the other day.  For us

10         it's existential.  We are the ride-sharing platform of

11         choice at the moment, but if we want to continue to

12         be, we have to be part of the future and keep

13         innovating."

14   Q.    Now, you -- is that also an accurate statement?

15   A.    Yes, it is.

16   Q.    And you stand by that today?

17   A.    I do.

18   Q.    Can you explain to the jury, what does the word

19   "existential" mean?

20   A.    It's similar to this part where it says we would be out of

21   business, is that if you're -- if you're running a technology

22   company or you are working at a technology company and you are

23   not making new innovations, new things that people want, then

24   you become part of the past.

25   Q.    Meaning, you would cease to exist?

1    **A.**    Yeah.   Yeah.   Or it could -- it can take a long time, but

2    eventually, yes.

3    **Q.**    Turn in your binder to TX-0387.

4        (Witness complied.)

5    **A.**    Okay.

6    **Q.**    Do you recognize this is an email from yourself dated

7    August 16th to Rachel Whetstone and some others?

8    **A.**    Okay.   I see that, yes.

9            **MR. VERHOEVEN:**   Move to admit TX-0387, Your Honor.

10           **MS. DUNN:**   No objection.

11           **THE COURT:**   Received in evidence.

12       (Trial Exhibit 0387 received in evidence.)

13           **MR. VERHOEVEN:**   Please publish it on the screen.

14       Can we pull out about the top -- yeah, about the quarter,

15   please.

16       (Document displayed.)

17   **BY MR. VERHOEVEN**

18   **Q.**    So that's your name on the top.   And I want you to look

19   at --

20           **MR. VERHOEVEN:**   That's the wrong part.   Go back,

21   please.

22       There it is, right down at the bottom.   It starts with

23   "autonomous transportation."

24       (Document displayed.)

25           **MR. VERHOEVEN:**   There it is.

1   BY MR. VERHOEVEN

2   Q.   So you wrote this email, right?

3   A.   I believe so.   I'm still trying to find this part.

4   Q.   It's at the bottom.

5   A.   Okay.   Yeah, yeah, yeah.

6   Q.   It's on the screen there, too?

7   A.   Yep.   Yeah, I got it, yeah.

8   Q.   And you wrote:

9        "Autonomous transportation is very possibly a

10       winner-take-all and, thus, existential for Uber."

11       Do you see that?

12  A.   Yes.

13  Q.   What does "winner-take-all" mean?

14  A.   Well, it's -- it's similar to, like, Google and the search

15  business, is that you get certain network effects around

16  particular technology and because it's -- it's the leader, it

17  actually can provide the system and the service better than

18  anything else -- anybody else.

19  Q.   And what does it mean to say "winner-take-all" then?   Does

20  that mean the other -- the other non-winners lose?

21  A.   Not necessarily.   Again, I think the best example in

22  technology would be the search business, when you have Google

23  versus Bing in Microsoft, is that Microsoft maybe has

24  30 percent of the search queries, but they -- but they cannot

25  provide it economically enough, so they lose money generally as

1    a business.  Whereas, Google makes all -- all of the profits.

2    Q.   I'm going to ask you some questions about the Pittsburgh

3    ATC team.  Okay?

4    A.   Yeah.

5    Q.   Explain to the jury what ATC stands for.

6    A.   It means Advanced Technology Center.

7    Q.   And that -- it was your idea to start Uber's self-driving

8    car program in late 2014; right?

9    A.   Not exactly.  It was actually Jeff Holden's idea, but one

10   that I supported fully.

11   Q.   You agreed that that would be something that you fully

12   supported?

13   A.   Absolutely, yes.

14   Q.   And as of January 1, 2015 is it correct that the project

15   was still being put together?

16   A.   Can you repeat the question?  I'm sorry.

17   Q.   As of January 1, 2015, the project, the ATC group, was

18   still being put together; correct?

19   A.   No, I wouldn't say that.  It was put together in early --

20   sort of late 2014, early 2015.

21   Q.   I would like to play from your deposition --

22        MR. VERHOEVEN:  This is July 27th, 2017, Your Honor,

23   Page 163, 8 through 15.

24        THE COURT:  All right.  Please roll the tape.

25        (Videotape played in open court, not reported.)

1   BY MR. VERHOEVEN

2   Q.   Many of the early employees at the Pittsburgh center were

3   formerly associated with Carnegie Mellon University?

4   A.   That's correct.

5   Q.   Sir, you were unhappy with the progress and the pace of

6   development being achieved at the Pittsburgh center; isn't that

7   true?  You wanted the group to move faster?

8   A.   At some point that is definitely true.  I think that

9   there's a date, sort of, when that occurred, but yes.

10   Q.   And by the end of 2015 you agree Uber's autonomous vehicle

11   program was highly dependent on third-party vendors for its

12   lasers; correct?

13   A.   That is correct, yes.

14   Q.   It had a project to develop an in-house LiDAR system; is

15   that right?

16   A.   I believe that to be true, yes.

17   Q.   But those laser prototypes were at that time really

18   expensive and too big to be commercially viable; right?

19   A.   It's probably true.  I don't know about the big part, but

20   certainly the expensive part.

21   Q.   Let's play from your deposition dated October 2, 2017,

22   Page 394, Lines 22 through 25.

23        (Videotape played in open court, not reported.)

24   BY MR. VERHOEVEN

25   Q.   Given this lack of progress, you needed someone that had

1   experience in transitioning from professor-like prototypes to

2   products that would be cost efficient, products that could be

3   mass produced; right?

4   **A.**   Yes.   Though I wouldn't characterize it as lack of

5   progress.   We definitely needed to get a commercial orientation

6   in the effort.

7   **Q.**   You had a need to get someone who had experience in

8   transitioning from a professor-like prototype to products that

9   would be cost efficient and could be mass produced; right?

10  **A.**   That is correct.

11  **Q.**   Now, you agree Google had been working on autonomous

12  vehicles for much longer than Uber?

13  **A.**   Yes.

14  **Q.**   Since 2009; right?

15  **A.**   Correct.   Or I -- I don't know the exact date when Google

16  started working on it, but certainly earlier than us, a lot

17  earlier.

18  **Q.**   And you agree that Oogle -- "Oogle," sorry.

19      You agree that Google is the industry leader in autonomous

20  vehicles; right?

21  **A.**   I think that's the general perception right now.

22  **Q.**   Okay.

23  **A.**   It's a fair statement.

24  **Q.**   You believe they are in the lead; right?

25  **A.**   Yes.

1   Q.   And they were in the lead in 2015 and 2016; right?

2   A.   Correct.

3   Q.   Now, there came a time in the fall of 2015 when your

4   company, Uber, approached Mr. Levandowski; right?

5   A.   Yes.

6   Q.   And there is a fellow named Cameron Poetzscher, I believe

7   is how you pronounce it; is that right?

8   A.   Yes.

9   Q.   Tell the jury who he was in that time frame, the fall of

10   2015?

11   A.   He worked on our business development team and corporate

12   development team, transactions ranging from investment to

13   strategic -- strategic deals that we're doing he was involved

14   in, including something like an acquisition.

15   Q.   Mr. Poetzscher was primarily driving the train on the Uber

16   side for earlier discussions with Mr. Levandowski; correct?

17   A.   I'm not sure if he was leading those discussions or not.

18   Q.   Let's play from your deposition dated July 27, 2017,

19   Page 141, Line 25, through 142, Line 7.

20       (Videotape played in open court, not reported.)

21   Q.   For the record, Mr. Poetzscher was vice president of

22   corporate development at Uber at the time; correct?

23   A.   That sounds right.

24   Q.   Now, you were also involved in discussions with your

25   management team about this negotiation with Levandowski;

1  correct?

2  **A.**   I think I got involved in those discussions in late '15,

3  maybe December time frame.

4  **Q.**   So, yes, you were also involved?

5  **A.**   Yes.

6  **Q.**   Now, in your initial discussion with Mr. Levandowski, he

7  told you that he wanted to do trucking, not cars; right?

8  **A.**   Yeah.  He said he wanted to do -- I think his initial

9  plans were trucking and lasers.

10  **Q.**   And then in 2015, you and Mr. Levandowski discussed the

11  purchase by Uber of a NewCo; right?

12  **A.**   Real quick, could you say the date again?  I didn't hear

13  the first part.

14  **Q.**   In 2015.

15  **A.**   It's -- I'm not sure if it was end of December 2015 or

16  early 2016, but in that time period.

17  **Q.**   You discussed, in that time period, the purchase by Uber

18  of a nonexistent company, didn't you?

19  **A.**   He was very adamant -- yes.  So the answer is yes.  He was

20  very adamant about starting a company and we were very adamant

21  about hiring him.

22  **Q.**   So the answer to my question that you discussed a purchase

23  by Uber of a nonexistent company, a company that did not exist,

24  is yes; correct?

25  **A.**   Correct.

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1    Q.   Thank you.

2         So I think you've already said this, but you and

3    Levandowski had conversations in late December about him

4    leaving Google and coming over to your team; right?

5    A.   That's correct, yes.

6    Q.   Turn in your binder, please, to TX-8002.

7         (Witness complied.)

8    A.   And could you say that number one more time?

9    Q.   Sure.  8002.

10   A.   Okay.

11   Q.   You recognize this as an Uber visitor badge from

12   Mr. Levandowski?

13   A.   Yes.

14         **MR. VERHOEVEN:**  Your Honor, I move TX-8002 into

15   evidence.

16         **MS. DUNN:**  No objection.

17         **THE COURT:**  Thank you.  Received.

18       (Trial Exhibit 8002 received in evidence.)

19         **MR. VERHOEVEN:**  Put it on the screen, please.

20       And blow it up.

21       (Document displayed.)

22   **BY MR. VERHOEVEN**

23   Q.   Is that Mr. Levandowski's picture?

24   A.   That's -- it looks like him.

25   Q.   And it says here that he's visiting on December 20th,

1    2015; right?

2    **A.**    Yes, it does.

3    **Q.**    Mr. Levandowski was there to see you, wasn't he?

4    **A.**    It appears by the badge, yes.

5    **Q.**    And you met with him on that date?

6    **A.**    It's very possible.  I don't remember the specific

7    meeting, but it's very, very possible.

8    **Q.**    What did you say to him, what did he say to you at this

9    meeting?

10   **A.**    I don't remember.

11   **Q.**    You don't remember?

12   **A.**    No.

13   **Q.**    In the fall of 2015, John Bares was an executive at Uber;

14   right?

15   **A.**    That's correct.

16   **Q.**    And at that time, Mr. Bares was in charge of Uber's

17   driverless car program; right?

18   **A.**    Yes.

19   **Q.**    And that's the program that was referred to internally as

20   the ATC program; correct?

21   **A.**    Correct.

22   **Q.**    Mr. Bares was one of the original members of the team in

23   Pittsburgh; correct?

24   **A.**    Yes.

25   **Q.**    And in December of 2015, he was running the group in

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1   Pittsburgh; right?

2   **A.**   That's correct.

3   **Q.**   Now, you -- generally, you had meetings with Mr. Bares in

4   December of 2015 to discuss a potential deal with

5   Mr. Levandowski where Uber would purchase a NewCo; right?

6   **A.**   I had a number of meetings with him, yes.

7   **Q.**   Turn in your binder to TX-170, please.

8       (Witness complied.)

9           **MR. VERHOEVEN:**   This is in evidence now, Your Honor?

10          **THE COURT:**   Yes, it's already in.

11          **MR. VERHOEVEN:**   May we put it up on the screen?   It's

12   TX-170.

13      (Document displayed.)

14   **BY MR. VERHOEVEN**

15   **Q.**   And I'll represent to you that these are Mr. Bares' notes.

16       I'll direct your attention to the first page at the

17   bottom.

18          **MR. VERHOEVEN:**   Can we blow that up?

19      (Document enlarged.)

20   **BY MR. VERHOEVEN:**

21   **Q.**   You can see it on the screen, sir?

22   **A.**   I sure do.

23   **Q.**   Okay.   You see that entry, quote, meeting with TK, close

24   quote?

25   **A.**   I do see that.

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1    **Q.**   "TK" is you; right?

2    **A.**   Yes.

3    **Q.**   And you met with Mr. Bares on December 22, didn't you?

4    **A.**   I don't remember a specific date for a meeting.

5    **Q.**   Well, do you have any reason to believe his notes are

6    wrong?

7    **A.**   No.  I don't see a date on the notes, though.

8    **Q.**   Okay.  Direct your attention to -- just one second.

9         Direct your attention to the following page, which is a

10   continuation.  Do you see it's a continuation of his notes from

11   that meeting?

12   **A.**   Okay.

13              **MR. VERHOEVEN:**  And can we put the -- where is it?

14   From the very top "TK:  What we want," and bring that up?

15        (Document displayed.)

16   **BY MR. VERHOEVEN:**

17   **Q.**   "TK" is you; correct?

18   **A.**   Yes.

19   **Q.**   And Mr. Bares' notes is saying that you're telling the

20   team what you want; right?

21   **A.**   Looks like it, yes.

22   **Q.**   And this is in reference to the NewCo deal, isn't it?

23   **A.**   I don't know.

24   **Q.**   Do you see Cam says "pay at milestones"?

25   **A.**   I see that, yes.

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1   Q.   And milestones are part of the deal; right?

2   A.   I mean, milestones are definitely part of the Otto deal,

3   yes.

4   Q.   And --

5   A.   These aren't my notes, so I --

6   Q.   And if you look at the list here, what they're talking

7   about is driverless car technology; right?

8   A.   It appears to be so.

9           MS. DUNN:   Objection, Your Honor.

10      And, also, I'm not sure the proper foundation has been

11   laid for this line of questioning.

12          THE COURT:   Sustained.

13   BY MR. VERHOEVEN

14   Q.   Did you tell the group that what you wanted was a pound of

15   flesh?

16   A.   I mean, I don't know specifically.  It's a term I use from

17   time to time, but I don't know.

18   Q.   Do you deny that you said it?

19   A.   No.

20   Q.   Did you tell this group that what you wanted was

21   intellectual property?

22          MS. DUNN:   Same objection, Your Honor.

23          THE COURT:   That's a proper question.   Overruled.

24      Please answer.

25          THE WITNESS:   I don't remember saying that.

1    BY MR. VERHOEVEN

2    Q.   Do you deny you said it?

3    A.   No.

4    Q.   "IP" there at the bottom, that stands for intellectual

5    property; right?

6    A.   Most likely, yes.

7    Q.   And you know what intellectual property is; right?

8    A.   I do.

9    Q.   Intellectual property includes trade secrets, doesn't it?

10   A.   Yes.

11   Q.   It's property that belongs to somebody, isn't it?  That's

12   why the word "property" is in it?

13   A.   That's fair.

14   Q.   I direct your attention to TX-4174 in your binder.

15   A.   Okay.

16   Q.   You agree that you had meetings with Mr. Levandowski in

17   January of 2016; right?

18   A.   Yes.

19   Q.   And if you look at TX-417 -- this -- well, take a look

20   TX-4174.  And specifically there's a picture on page 3.

21   A.   Picture on page 3?  Yeah.

22   Q.   You're in the bottom right corner.  That's your smile;

23   right?

24   A.   I think so.  I'll take it.

25   Q.   So you were at the meeting that's referenced here?

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1   **A.**    Yeah.

2   **Q.**    You see on the first page, it says, "Notes from meeting on

3   January 3."  It's the second left bullet.

4   **A.**    Yeah, I do.

5   **Q.**    So these are notes prepared of a meeting you were at;

6   right?

7   **A.**    So you're saying these are notes of the whiteboard here?

8   Is that what's going on?

9   **Q.**    Yes.

10  **A.**    Okay.  Yeah, yeah.

11          **MR. VERHOEVEN:**  Your Honor, I move TX-1474 into

12  evidence.

13          **MS. DUNN:**  Objection, Your Honor.  These are not

14  Mr. Kalanick's notes, and they're not an exact replication of

15  what's on the whiteboard with this picture.

16      So we have no objection to the whiteboard, but the notes,

17  there is no foundation.

18          **THE COURT:**  Sustained so far.

19  BY MR. VERHOEVEN

20  **Q.**    Take a look at the notes, sir.

21  **A.**    Yes.

22  **Q.**    Do those appear to you to be notes of the substance of the

23  meeting that you had?

24  **A.**    I mean, there's a lot of similarities for sure.  I

25  would -- I don't think it's exactly the same, but there's a lot

1   of similarities.

2   **Q.**   I direct your attention to TX -- just a second -- 262.

3   This is an email -- are you there?

4   **A.**   Yeah.

5   **Q.**   This is an email from Jeff Holden.  Tell the jury who Jeff

6   Holden is.

7   **A.**   Jeff Holden is the chief product officer at Uber, and was

8   sort of the -- one of the core architects behind the creation

9   of our autonomy program.

10  **Q.**   Now, we've already established that the meeting occurred

11  on January 3.  We looked at that; right?

12  **A.**   Yes.

13  **Q.**   I'll represent that that was a Sunday.  I went back and

14  looked.

15       Now, this is an email to you for two days later,

16  January 5th.  Do you see that?

17  **A.**   I do.

18  **Q.**   And Mr. Holden has invited you to edit the following

19  document.  Do you see that?

20  **A.**   I do.

21  **Q.**   And he says, quote -- well, let's --

22          **MR. VERHOEVEN:**  I'd like to move into evidence TX-262.

23          **MS. DUNN:**  No objection, Your Honor.

24          **THE COURT:**  Received.

25       (Trial Exhibit 262 received in evidence.)

1          **MR. VERHOEVEN:**  Bring it up on the screen.

2          (Document displayed.)

3   **BY MR. VERHOEVEN**

4   **Q.**   So we see this is dated two days later, and it's directed

5   towards yourself.  And it's -- the subject line is "NewCo

6   Plan - Invitation to Edit."

7          Do you see that?

8   **A.**   I do.

9   **Q.**   And NewCo refers to the company that doesn't exist yet

10  that you and Mr. Levandowski were planning; right?

11  **A.**   No.

12  **Q.**   It refers to the company that would become Ottomotto?

13  **A.**   Yes.

14  **Q.**   And you'll see next to the picture of Mr. Holden, he says,

15  quote:

16          "A doc I started to capture, state on the NewCo

17      discussions."

18          Do you see that?

19  **A.**   I do.

20  **Q.**   Now, turning back to Exhibit 4174.  This is the notes that

21  Mr. Holden sent you, isn't it?

22  **A.**   Hold on a second.  4174.  It's just hard to thumb through

23  all this.

24          (Brief pause.)

25  **A.**   Yeah, it -- I would assume so.  I mean, the notes and the

 1  whiteboard are similar, yes.

 2          MR. VERHOEVEN:  Your Honor, I again move to admit

 3  Trial Exhibit 4174.

 4          MS. DUNN:  No objection.

 5          THE COURT:  All right.  Received.

 6      (Trial Exhibit 4174 received in evidence.)

 7  BY MR. VERHOEVEN

 8  Q.   Okay.  Let's go back.

 9      (Document displayed)

10  Q.   Let's go back to the first page of 4174, which is up on

11  the screen now.

12          MR. VERHOEVEN:  If we can just pull out the bullet

13  that says "Notes from meeting on January 3."

14      (Document enlarged.)

15  BY MR. VERHOEVEN

16  Q.   The screenshots of the whiteboard are what's being

17  referenced because they're attached to what the notes are

18  about; right?

19  A.   Yeah, I don't know if these are exactly the same.  I'd

20  have to compare, but --

21  Q.   The document --

22  A.   -- there's a lot of similarities.

23  Q.   The document contains notes of a jam session you had with

24  Mr. Levandowski at Uber's offices on January 3rd; right?

25  A.   That's correct.

1   Q.   And during this jam session with Mr. Levandowski -- oh,

2   before I go on, you used the phrase "jam session"?

3   A.   Yes.

4   Q.   Can you explain, what do you mean by "jam session"?

5   A.   So it's like a kind of a reference to, like, if you had a

6   jazz ensemble, they sort of -- they have ideas.  They start

7   somewhere.  It's ad hoc, but eventually it sort of comes

8   together into beautiful music.

9        So a jam sesh is when you get a bunch of interesting

10  creative people in a room, and they're talking about an idea,

11  and it eventually becomes something interesting and innovative.

12  Q.   And your jam session on January 3rd, you were working on

13  ideas with respect to LiDAR lasers; right?

14  A.   I don't remember -- or sorry.  I would say no, I do not

15  remember that.

16  Q.   Let's play from your deposition dated October 2, 2017,

17  Page 371, Lines 7 through 15.

18       MS. DUNN:  Your Honor, I let the last one go, even

19  though I would have said it was improper impeachment.

20       I just ask for the opportunity to check whether it is

21  proper or not.

22       THE COURT:  Is Mr. Kalanick still on the board of

23  directors?

24       MS. DUNN:  He is.

25       THE COURT:  Then it comes in under Rule 32 for any

1    purpose.

2         Objection overruled.  Please play it.

3         (Videotape played in open court, not reported.)

4    BY MR. VERHOEVEN

5    Q.   I direct your attention to Page 5 of the Exhibit 4174.

6    A.   I have Page 4 but not Page 5.  It says 4 of 4.

7    Q.   Maybe I have a typo.

8              MR. VERHOEVEN:  Could you blow up the picture, please?

9    BY MR. VERHOEVEN

10   Q.   Okay.  This is the right picture.  I apologize,

11   Mr. Kalanick.  It's page 4.  And I can blow this up so you can

12   see it easier.

13             MR. VERHOEVEN:  Can we blow up the middle of the left?

14   There you go.

15        (Document enlarged.)

16   BY MR. VERHOEVEN

17   Q.   By the way, whose handwriting is this?  Do you know?

18   A.   That's mine.

19   Q.   Your handwriting?

20   A.   Yes.

21   Q.   And then under Item 3 on the board, read what it says.

22   A.   "Laser is the sauce."

23   Q.   So during this jam session, you discussed the fact that

24   laser is the sauce; correct?

25   A.   Yes.  I think it was probably a description of our sesh,

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1  yes.

2  **Q.**   And what that meant is that lasers are the sauce to make

3  autonomous vehicles work; right?

4  **A.**   It's close.   I would say it's an important part of making

5  autonomous work.   It doesn't work without it.

6  **Q.**   Let's play from your deposition, October 2nd, 2017, Page

7  337, Lines 12 through 15.

8      It's Page 377, Lines 12 through 15, from the October 2nd,

9  2017 deposition.

10     (Videotape played in open court, not reported.)

11 **BY MR. VERHOEVEN**

12 **Q.**   If you want to make an autonomous vehicle, you must have a

13 viable way to get lasers at scale; isn't that true?

14 **A.**   That is correct.

15 **Q.**   And Uber didn't have that sauce prior to the Ottomotto

16 acquisition, did it?

17 **A.**   That's correct.

18 **Q.**   At the time of this meeting in early January 2016,

19 Mr. Levandowski was a Google employee; right?

20 **A.**   That's correct.

21 **Q.**   In your meeting with him on a Sunday; right?

22 **A.**   Yes.

23 **Q.**   And at that time you knew generally what areas he was

24 working on at Google; right?

25 **A.**   Generally, yes.

1   Q.   Well, you knew that the work -- his work at Google was

2   focused on the hardware and sensor side of autonomous vehicles;

3   right?

4   A.   Yes.

5   Q.   In particular, LiDAR sensors; right?

6   A.   Yes.

7   Q.   This summary of your meeting was notes concerning a

8   potential acquisition of a company to be formed in the future;

9   correct?

10  A.   That's correct.

11  Q.   I direct your attention back to page 2 of Exhibit 4174.

12       I'm sorry, page 1.

13  A.   Page 1 of?

14       **MR. VERHOEVEN:**  There you go.  Page 1 of Exhibit 4174.

15  Pull up the same box, Mr. Fisher.

16       Thank you very much.

17       (Document displayed.)

18  **BY MR. VERHOEVEN:**

19  Q.   Do you see it on the screen there, sir?

20  A.   I sure do.

21  Q.   And so, again, this is the notes from the January 3

22  meeting.  And it says "possible outcomes."

23       Do you see that?

24  A.   I do.

25  Q.   And one of the possible outcomes was:

 1              "Uber Super Duper, or USD, so could be Code

 2       Name $."

 3       Do you see that?

 4  **A.**   I do.

 5  **Q.**   And "Code Name $" is -- withdrawn.

 6       At the meeting, you talked about Uber Super Duper, didn't

 7  you?

 8  **A.**   Yes.

 9  **Q.**   And you were the one who suggested the code name

10  Project $; right?

11  **A.**   Yeah.

12  **Q.**   And that's the code name you wanted to use for the

13  purchase of this yet-to-be-formed company by Uber; right?

14  **A.**   That's correct.  It was just short for USD.

15  **Q.**   Turn in your binder, please, to Exhibit TX-262.

16       (Witness complied.)

17          **MR. VERHOEVEN:**  I'm informed that's the one I had to

18  go to to get in the earlier one.  So that's been covered, Your

19  Honor.

20  **BY MR. VERHOEVEN**

21  **Q.**   So please turn to TX-367 in your binder.

22  **A.**   367, okay.

23  **Q.**   This is in evidence, so we may put it on the screen.

24       (Document displayed.)

25  **Q.**   And, again, these are Mr. Bares' notes, I'll represent to

1    you.

2    **A.**    Okay.

3    **Q.**    Please go to Page 40 of these notes in your binder.

4    **A.**    Page 40.  Oh, that's me.  Okay.

5              **MR. VERHOEVEN:**  And can we pull out where it -- on the

6    top left, enlarge that?

7         (Document enlarged.)

8    **BY MR. VERHOEVEN**

9    **Q.**    Do you see that, sir?

10   **A.**    Yeah, I do.

11   **Q.**    "TK" refers to you; right?

12   **A.**    Sure does.

13   **Q.**    And there's a date here, January 4th of 2016; right?

14   **A.**    Yes.

15   **Q.**    So that's the Monday after the Sunday meeting you had;

16   right?

17   **A.**    Yes.

18   **Q.**    The jam session?

19   **A.**    Correct.

20   **Q.**    Okay.  And then you'll see some notes.

21              **MR. VERHOEVEN:**  Can we expand that down, please?

22   Thank you.

23   **BY MR. VERHOEVEN**

24   **Q.**    You'll see some notes in the second column down.  It says

25   "AL."  Do you see that?

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1   A.   Yeah.

2   Q.   That's Mr. Levandowski; right?

3   A.   Yes.

4   Q.   And then it says:

5           "TK met up with him over the weekend and is a big

6        fan."

7        Do you see that?

8   A.   I do.

9   Q.   That's a reference to your meeting with him on Sunday;

10  right?

11  A.   That's correct.  I mean, I would assume so.

12  Q.   And you, indeed, were a big fan; right?

13  A.   I was.

14  Q.   And then if you look down at the second-to-last row being

15  in this box, it says:

16          "TK believes that lasers will be the longest pole

17       and we need access to this tech (this part is easy)."

18       Do you see that?

19  A.   I do.

20  Q.   By "the longest pole" you meant that if Uber didn't start

21  working on lasers and get them developed, lasers could be the

22  thing that slows down all of Uber's other autonomous vehicle

23  efforts; isn't that true, sir?

24  A.   Yes.  Something like that, yes.

25  Q.   Two rows up it says:

1           "Lasers, data, advice are the three things."

2       Do you see that?

3   A.   I do.

4   Q.   Those are the three things that Uber wanted from the

5   transaction; is that right?

6   A.   I'm not sure what this is referring to.  I'm not sure.

7   Q.   Did Uber want lasers from the transaction?

8   A.   We wanted somebody who could build a team that could make

9   lasers.

10  Q.   Did Uber want lasers?  Did they want to buy lasers from

11  this company?

12  A.   Our initial discussions were they were going to make

13  lasers and sell them to us, but my guess is we wanted somebody

14  to build a team that made lasers.

15  Q.   Well, you wanted to switch the transaction over from a

16  vendor relationship to an acquisition; right?

17  A.   That's correct.

18  Q.   And the reason you wanted to do that was because

19  Mr. Levandowski was focused on trucking; right?

20  A.   I mean, they were still doing trucking after too.  It was

21  just better as an acquisition -- look, I wanted to hire

22  Anthony, and he wanted to start a company.  And so I tried to

23  come up with a situation where he could -- where he could feel

24  like he started a company and I could feel like I hired him.

25  Q.   You wanted to acquire him to make sure that he focused

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1   most of his time on self-driving cars and not trucks; right?

2   **A.**   I mean, we definitely wanted focus on self-driving cars.

3   It was the number one priority for us.

4   **Q.**   I direct your attention to -- in your binder to TX-0113.

5   **A.**   0113?

6   **Q.**   Correct.

7   **A.**   Okay.

8   **Q.**   This is an email that you received on January 9th, 2016;

9   correct?

10  **A.**   Yes.

11         **MR. VERHOEVEN:**   Your Honor, I'd move TX-0113 into

12  evidence.

13         **MS. DUNN:**   No objection.

14         **THE COURT:**   Thank you.   Received.

15      (Trial Exhibit 0113 received in evidence)

16         **MR. VERHOEVEN:**   Put it on the screen.

17      Can we pull out the -- make it larger, the top email.   No.

18  I'm sorry.   The bottom email.

19      (Document displayed.)

20         **MR. VERHOEVEN:**   Thank you.

21  BY MR. VERHOEVEN

22  **Q.**   So this portion of the email is an email from yourself to

23  Mr. Holden, Mr. Poetzscher and to Emil Michael; right?

24  **A.**   Yes.

25  **Q.**   And the subject is "Project $"; right?

 1   **A.**   That is correct.

 2   **Q.**   And by that, you're referencing the project involving

 3   Mr. Levandowski; correct?

 4   **A.**   That's correct.

 5   **Q.**   And then you ask, "Where we at with Anthony?"  Right?

 6   **A.**   Yes.

 7        **MR. VERHOEVEN:**  And then if we could go to the email

 8   above it?

 9        (Document displayed.)

10   **BY MR. VERHOEVEN**

11   **Q.**   Mr. Poetzscher says in response, you'll see:

12        "He came back to us with proposed milestones

13        yesterday (see attached), but no proposed dollars."

14   Do you see that?

15   **A.**   I do.

16   **Q.**   And what is this reference to milestones?

17   **A.**   So he had to achieve certain things to get a certain

18   amount of equity; right?

19        So when you hire somebody, typically you'll have a vesting

20   schedule.  Over time, they earn a certain amount of equity.

21        This is a situation where, yes, there was time, but there

22   were also milestones that they had to make in order to get that

23   equity.

24   **Q.**   They wouldn't get paid until they achieved some technical

25   milestones; right?

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1    A.   So the majority of the milestones -- so the answer is yes,

2    but a majority of the milestones --

3    Q.   Thank you, sir.  I don't need you to -- the question is --

4    A.   That's fair.

5    Q.   -- that he wouldn't get paid until he achieved the

6    technical milestones.

7         Those technical milestones were before any other

8    milestones, weren't they?

9    A.   Yes, but he could get paid without achieving those

10   technical milestones if the overall goal of the initiative was

11   successful.

12   Q.   Let's direct your attention to the attachment --

13        MR. VERHOEVEN:  Mr. Fisher, can we please -- there's

14   been a request not to publish this to the press, so I'm going

15   to respect that.  Just publish it to the attorneys and the

16   jurors.

17        THE COURT:  What number is that?

18        MR. VERHOEVEN:  This is an attachment to Exhibit 113,

19   Your Honor.

20        MS. DUNN:  Your Honor, it's fine with us to show the

21   gallery.

22        MR. VERHOEVEN:  Oh, okay.

23        Let's put it on the screen.

24        THE COURT:  Okay.  Back we go.

25        MR. VERHOEVEN:  And then can we enlarge it, the whole

KALANICK - DIRECT EXAMINATION / VERHOEVEN

```
 1    thing.

 2         That's fine.

 3         (Document displayed.)

 4    BY MR. VERHOEVEN

 5    Q.   So these are the milestones attached to the email that

 6    Mr. Cameron sent you; right?

 7    A.   They may be.  They very well may be.

 8    Q.   Take a look at the document.

 9    A.   Is there a number here that I can --

10    Q.   113.

11    A.   113.  Okay, got it.  Okay.

12         All right.  So this is part of the same email.  Okay.

13    Q.   So these are the milestones attached to the email

14    Mr. Poetzscher sent you; right?

15    A.   It appears to be so.

16    Q.   And if you take a look at this, on the left it says,

17    "laser - long range."  Do you see that?

18    A.   I do.

19    Q.   And then it talks about things that need to happen.  "Need

20    to be a prototype in a first car."  Do you see that?

21    A.   Yes.

22    Q.   And it has to have a 250 -- is that meter range sensing?

23    A.   It appears to be so, yes.

24    Q.   It has to be able to sense a pedestrian wearing a black

25    Northface jacket and jeans; right?
```

1   **A.**   That's correct.

2   **Q.**   And it has to have 400,000 points per second; right?

3   **A.**   Looks like it, yes.

4   **Q.**   And a configurable horizontal scan rate and area; right?

5   **A.**   Correct.

6   **Q.**   And for this long-range laser, there's a percentage on the

7   right.  Do you see that?

8   **A.**   Yes.

9   **Q.**   And that percentage is the percentage of the total amount

10   they get paid if they met that milestone; right?

11   **A.**   That's correct.

12   **Q.**   6 percent; right?

13   **A.**   Yes.

14   **Q.**   And do you recall how much the total contingent payments

15   were in the eventual deal you made?

16   **A.**   I think it was somewhere around 590 million, something

17   like that.

18   **Q.**   $590 million.  So if Mr. Levandowski made this milestone

19   on time, he gets 6 percent of that; right?

20   **A.**   That's correct.

21   **Q.**   And then another milestone is --

22   **A.**   This was the whole team gets it, not just Levandowski, to

23   be clear.

24   **Q.**   Another milestone is -- you see down there "mid-range" --

25        Well, before we go on to that, on the right-hand side,

1    after they make this protocol long-range laser, once they

2    deliver 50 of them to you, they get 7 percent more of that

3    $500 million; right?

4    **A.**    That's correct.

5    **Q.**    And if they can make one that's mass-manufacturing ready,

6    they get another 7 percent of that 500-something million

7    dollars; right?

8    **A.**    That's correct.

9    **Q.**    Okay.  And that's the long-range laser technical

10   milestones, that's what that's referring to?

11   **A.**    Yes.

12   **Q.**    And there is a different type of laser you wanted, too;

13   right?

14   **A.**    It appears to be so, yes.

15   **Q.**    The mid-range laser; right?

16   **A.**    Yes.

17   **Q.**    And if they could develop a prototype of a mid-range laser

18   that had 100 channels that increased -- increased the range 150

19   meters and increased the frame rate to 15 hertz with software

20   support integration, they get another 6 percent of the

21   500-something million dollars; right?

22   **A.**    That's what this says, yes.

23   **Q.**    But if they didn't do that, they wouldn't get that

24   6 percent; right?

25   **A.**    That is not correct.

KALANICK - DIRECT EXAMINATION / VERHOEVEN

1  Q.   Okay.

2          THE COURT:   We have one minute to go.

3          MR. VERHOEVEN:   I'll just finish this document, Your

4  Honor, if that's okay.

5          THE COURT:   We'll see at 1:00 o'clock.   I'll give you

6  two minutes to finish.

7          MR. VERHOEVEN:   I only need one minute.

8          THE COURT:   All right.   You take one minute.

9  BY MR. VERHOEVEN

10  Q.   And then if you look to the right-hand side below that

11  mid-range entry -- are you with me?

12  A.   Yeah, I'm with you.   I'm with you.

13  Q.   If they deliver 50 lasers that meet those requirements,

14  they get another 7 percent of the 500 and -- what did you

15  say? -- $590 million?

16  A.   Yes.

17  Q.   They get another 7 percent of the $590 million; right?

18  A.   That's correct.

19  Q.   And if they get it good enough that it can be mass

20  manufactured, they get yet another 7 percent of the

21  $590 million; right?

22  A.   That's correct.

23  Q.   So there are incentives built in here -- and these

24  milestones were pretty aggressive, weren't they?

25  A.   I don't know.   I don't know what all the milestones are,

KALANICK - DIRECT EXAMINATION / VERHOEVEN

 1  because there's probably some timing to this.

 2  **Q.**   Right.  You didn't know that the milestones -- your team

 3  didn't tell you the milestones were aggressive?

 4  **A.**   I just don't know what they are on here.  I wasn't in

 5  the -- I was not making this document.

 6  **Q.**   You'd agree that the deal that you entered into with

 7  payments conditioned on these technical milestones provided a

 8  great incentive for Mr. Levandowski to meet these technical

 9  milestones, wouldn't you?

10       **MS. DUNN:**  Objection, Your Honor.  Assumes facts.

11  He's not established that these were the actual milestones of

12  the deal.

13       **THE COURT:**  Overruled.

14    Please answer.

15       **THE WITNESS:**  Can you ask the question one more time?

16  **BY MR. VERHOEVEN**

17  **Q.**   Yes.  I hope I don't get another objection.

18    You would agree that the way this deal was set up, where

19  Mr. Levandowski and team would get these percentage payments if

20  they made technical milestones by a particular deadline,

21  provided a huge incentive for them not to -- not to miss the

22  deadlines and to develop this technology within the deadlines

23  as soon as they could; right?

24  **A.**   Yes, but they could still get --

25  **Q.**   Thank you, sir.

PROCEEDINGS

1          THE COURT:  Well, no.  Go ahead, finish your answer.

2          THE WITNESS:  They could still get the entire

3  incentive without hitting those deadlines.

4          THE COURT:  All right.  Let's break at this moment.

5      Mr. Kalanick, you've got to be here at 7:30 in the

6  morning.  We'll continue with your testimony at that time.

7      The jury will now go back into the jury room.  You're

8  excused for the day.  But we'll see you at 7:45 in the morning.

9  I thank you for your close attention.

10          THE CLERK:  All rise for the jury.

11      (Jury exits the courtroom at 1:02 p.m.)

12          THE COURT:  All right.  Mr. Kalanick, you can exit

13  stage left and we'll see you in the morning.  Thank you.

14      (Witness steps down.)

15          THE COURT:  All right.  Everyone else be seated.

16          MR. VERHOEVEN:  I'm sorry.  Just for the record, the

17  rule is that no talking to the witness over the evening; right?

18  Is that your ground rule?

19          THE COURT:  That is correct.

20      Now, he has his own lawyer, so I can't -- I'm not going to

21  stop him from talking to his own lawyer, but these lawyers over

22  here should not talk to him while he's on cross-examination.

23  All right?

24          MR. VERHOEVEN:  Thank you, Your Honor.

25          THE COURT:  Now, I have a few things to bring up with

 1   you.

 2        I misspoke a minute ago on the deposition of Bares.  It's

 3   actually 44 minutes that you used up.  So tell me how that

 4   breaks down.

 5             MR. VERHOEVEN:  I thought we got away with one.

 6             THE COURT:  You almost did, but I -- I got some rule

 7   here.  Okay.  Go ahead.

 8             MR. RABIN:  So both parties were treated the same way.

 9   We believe the completeness objections would go to the party

10   designating the original testimony --

11             THE COURT:  No, that's not the way it works.  No.

12   Whoever put it in there has to bear the burden of the time.

13             MR. RABIN:  Okay.  So Waymo would be charged with

14   28 minutes and 43 seconds --

15             THE COURT:  And what about you?

16             MR. RABIN:  Uber would be charged with 13 and 55.

17             THE COURT:  Well, that doesn't add up to 44.

18             MR. RABIN:  The run time shows 42:38 according to the

19   clip sheet.

20             THE COURT:  Well, I don't -- my run time is 44.  I'm

21   giving 30 minutes to Uber -- I'm sorry, to Waymo, 30.  And 14

22   goes to Uber.

23        All right?

24             MR. RABIN:  Your Honor, we also have reached

25   agreements as relates to some exhibits to enter into evidence.

PROCEEDINGS

```
 1              THE COURT:  Fine.

 2              MR. RABIN:  Can I just read them to you?

 3              THE COURT:  How many there are?

 4              MR. RABIN:  About 13, I think.

 5              THE COURT:  Oh, goodness.  All right.  Go slowly.

 6              MR. RABIN:  332.  333.  346.  770.  803.  1088.  1089.

 7     1096.  1353.  1895.  1991.  2116.  3239.  3564.  And 3574.

 8              THE COURT:  3574?

 9              MR. RABIN:  Yes, Your Honor.

10              THE COURT:  All right.  All of those received in

11     evidence; is that right?

12              MR. EISEMAN:  Yes, Your Honor.

13              THE COURT:  Okay.  Great.  Thank you.

14          (Trial Exhibits 332, 333, 346, 770, 803, 1088, 1089,

15            1096, 1353,1895, 1991, 2116, 3239, 3564, 3574

16          received in evidence)

17              THE COURT:  I have two more things.  Are there any

18     depositions that I need to rule on and give to you for

19     tomorrow's use?  In other words, do you plan on playing

20     depositions like we did today with Bares so I can turn my

21     attention to that?

22              MR. JUDAH:  I -- yes, Your Honor.  Brian McClendon, we

23     are also going to be playing and we have rulings on those.

24              THE COURT:  What?

25              MR. JUDAH:  Brian McClendon, we're also going to be
```

 1   playing and I believe you've given us rulings on it.

 2          THE COURT:  I've already given you ruling on -- are

 3   you sure?

 4          MR. JUDAH:  I believe so.

 5          THE COURT:  I don't remember doing that.

 6          MR. JUDAH:  Perhaps not.  It was handed in along with

 7   the Bares --

 8          THE COURT:  Yes, I handed them back, but I did it in

 9   order to get you to do it my way.

10          MR. JUDAH:  We'll resubmit it.

11          THE COURT:  All right.  Work with Angie because I need

12   to get it today if I'm going to work on it.

13      All right.  So McClendon will be your only one; right?

14          MR. PERLSON:  Yes, Your Honor.

15          THE COURT:  Great.  Thank you.

16      And then for the benefit of the record -- you don't have

17   to do this today or tomorrow, but remember, you've got to do it

18   eventually.  For the benefit of the record on appeal, you need

19   to put in a disk that has the exact deposition video that's

20   been played.  It can't have an extra word or two.  It's got to

21   be exactly what the jury saw.

22      I know you have the ability to do this, but it has to be

23   done eventually.  Otherwise, your record on appeal will be

24   inadequate or at least a gap in it.

25      All right.  I think that's all that I have for -- on my

PROCEEDINGS

1    list.

2         **MS. GOODMAN:**  Your Honor, I mentioned I had one

3    housekeeping matter, which is Waymo disclosed its first expert

4    witness and Uber's cross-exam disclosures would be due this

5    afternoon.

6         Based on your Honor's comments at the last pretrial

7    conference, we understand documents that the expert did not

8    rely upon would not have to be disclosed as that would be sort

9    of proper impeachment for an expert.  We just wanted to clarify

10   that with Your Honor.

11        **THE COURT:**  Well, if it's for impeachment only.

12        Now, remember, it won't come into evidence.  Just the --

13   the little passage would be -- would be read into the record in

14   front of the jury.  So that's one thing to keep in mind.

15        But the -- there is a rule -- and I'm -- I'm blanking on

16   it.  There are limits on what you can on cross-examination try

17   to impeach the expert with because they did not consider

18   something, and I don't have that clearly in mind right now.

19        So I just don't want to just give you a blank check to

20   confront the expert with whatever you think happens to help

21   your case.  So I -- I don't know.  Give me an example so that I

22   can help you understand the problem.

23        **MS. DUNN:**  So let's say that an expert has an opinion

24   about a fact or about an aspect of this case, but he did not

25   look at exhibits that would be relevant to his opinion.

PROCEEDINGS

```
 1          In my experience, it's possible to use those with the
 2   experts.  They're part of the record in the case or they'll be
 3   proved up later.  And then the expert can say, you know, no,
 4   this wouldn't change any opinion or, you know, I didn't
 5   actually consider this or whatever.  But that does not have to
 6   be disclosed.
 7          It's not like pulling out things in the world, the broader
 8   world at large.
 9          THE COURT:  Well, all right.  It's okay -- there are
10   two parts to the answer.
11          It's okay to say to the expert, "Did you consider records
12   within your own client's company on the very subject that you
13   are testifying to today?"
14          Answer, "No."
15          And then you feign shock and surprise.
16          And then you say, "What?  You didn't ask your own" -- I
17   guess it would be Waymo.  "You didn't ask Waymo for that file
18   that would have shown how many -- how quickly they were able to
19   solve that problem?"
20          "Uh, no."
21          Now, but for you then to -- and then you could say, "Well,
22   if there were evidence" -- you have to have a good faith
23   basis -- "that they solved the problem in five minutes and
24   14 seconds, would that change your opinion?"
25          And he says, "No."
```

 1        And you say, "Really?  Something they could do in five

 2    minutes and 14 seconds wouldn't change your opinion?

 3        "No."

 4        But I -- for you then to parade in front of him a bunch of

 5    documents that he has not seen and you're going to otherwise be

 6    able to get into evidence, I'm not so sure that that -- you can

 7    go down that path.  But you can certainly do the first thing.

 8        MS. DUNN:  I think the second path, Your Honor, is

 9    fairly standard to show the expert things in the case that

10    would bear on his opinion.  Our question really is whether we

11    need to disclose that or not.

12        THE COURT:  Well, are you trying to get it into

13    evidence or are you trying just to --

14        MS. DUNN:  No, every -- I'm sorry, Your Honor.

15        THE COURT:  Is it going to come into evidence later or

16    --

17        MS. DUNN:  Or already in evidence, one or the other.

18        THE COURT:  Well, if it's already in evidence -- okay.

19    Well, that -- well, you didn't tell me that.

20        If it's already in evidence, then you can use it for

21    impeachment and you don't have to give any disclosure on that

22    if it's for true impeachment.  But it would have to be

23    something that really does contradict what the witness has

24    said.  It can't be just you're building point by point your

25    overall case-in-chief argument.  It's got to be -- let's say

PROCEEDINGS

```
 1   that -- let's say that the witness says, "In my opinion" --
 2   well, let's say it's a Waymo witness.  And the Waymo witness
 3   says, "In my opinion, Uber would not have made their milestones
 4   for 20 years."  That's what the witness says.  And they
 5   desperately needed Levandowski to cut that back.
 6       And you've got an internal document from Waymo that says
 7   they can do it in three years.  And then you -- sure, I'd let
 8   you do that, but I am not --
 9           MS. DUNN:  This is a --
10           THE COURT:  I'm not going to -- I'm just not going to
11   allow you to hijack their case with trying to build your own
12   argument document by document on things that -- unless it just
13   cries out that he should have considered it.
14           MS. DUNN:  Well, that's -- that's a circumstance, Your
15   Honor, is that if you have an expert who's rendering an opinion
16   and that there are exhibits in the case that are in or coming
17   in and that --
18           THE COURT:  Well, in or coming in are two different
19   things.
20           MS. DUNN:  Well, in a previous hearing you said that
21   we could use --
22           THE COURT:  If you convince me you're going to get it
23   in somehow.
24           MS. DUNN:  Right.
25           THE COURT:  But sometimes I hear that and it never
```

PROCEEDINGS

 1  comes in.

 2       **MS. DUNN:**  All right.  So tabling that for a second.

 3     You know, we wouldn't use with the experts exhibits that

 4  were not germane to the issues that he was opining on,

 5  obviously, but I do think that -- that if the expert's going to

 6  opine on issues in the case, that we should be able to ask him

 7  about evidence in the case that bear on those opinions.

 8       **THE COURT:**  If you have a document that's already in

 9  evidence that directly contradicts a point that is being made

10  by the expert, it's okay with me for you to use that as

11  impeachment and not disclose it.

12     But if it's big-firm impeachment, which is a sideswipe and

13  it doesn't directly hit them, I'm going to probably say you're

14  out of luck on that and save it for your own expert.

15       **MS. DUNN:**  Your Honor, I --

16       **THE COURT:**  But it's got to be clear.  It can't be

17  big-firm impeachment.

18       **MS. DUNN:**  We don't want to do big-firm impeachment.

19  And I think the answer may be we'll just disclose.

20       **THE COURT:**  Well, good.

21       **MS. DUNN:**  So there you go.

22       **THE COURT:**  That solved that problem, but you --

23  still, I -- I'll give you some flexibility to use the kind of

24  impeachment that I -- that I'm talking about.

25       **MS. DUNN:**  Thank you.

PROCEEDINGS

```
 1              THE COURT:  All right.  What else do you want to bring
 2   up with the judge?
 3              MR. VERHOEVEN:  Nothing from plaintiff, Your Honor.
 4              THE COURT:  How about over there?
 5              MR. CARMODY:  Nothing else, Your Honor.
 6              THE COURT:  Great.  So we'll see you at 7:30 in the
 7   morning.
 8         Oh, give us a heads up.  Who's going to come after
 9   Mr. Kalanick?
10              MR. PERLSON:  Mr. McClendon.  Mr. McClendon by video
11   will be up, and it's pretty short.
12              THE COURT:  All right.  So I need to get that
13   McClendon thing done today.
14         All right, everybody.  See you tomorrow.  Have a good day.
15         (Whereupon at 1:14 p.m. further proceedings were
16          adjourned until Wednesday, February 7, 2018 at
17          7:30 a.m.)
18
19
20
21
22
23
24
25
```

<pre>
1                            I N D E X

2


3        PLAINTIFF'S WITNESSES                       PAGE   VOL.

4


5        DOLGOV, DMITRI
           (PREVIOUSLY SWORN)                         421    3
6        Direct Examination resumed by Mr. Jaffe      422    3
         Cross-Examination by Mr. González            429    3
7        Redirect Examination by Mr. Jaffe            454    3
         Recross-Examination by Mr. González          458    3
8        Sealed Direct Examination by Mr. Jaffe       461    3
         Sealed Cross-Examination by Mr. González     472    3

9


10       BROWN, GARY THOMAS
           (SWORN)                                    482    3
11       Direct Examination by Mr. Lyons              482    3
         Cross-Examination by Mr. González            504    3
12       Redirect Examination by Mr. Lyons            527    3

13


14       GROSSMAN, WILLIAM
           (SWORN)                                    533    3
15       Direct Examination by Mr. Perlson            534    3
         Cross-Examination  Mr. Gonzàlez              545    3
16       Redirect Examination by Mr. Perlson          552    3

17


18       BARES, JOHN
         VIDEOTAPED TESTIMONY                         563    3

19

20       KALANICK, TRAVIS
           (SWORN)                                    569    3
21       Direct Examination by Mr. Verhoeven          569    3

22                            -   -   -

23

24

25
</pre>

*Debra L. Pas, CSR, CRR and Katherine Sullivan, CSR, CRR*
*Official Reporters - U.S. District Court - San Francisco, California*
*(415) 431-1477*

620

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1049 | | 446 | 3 |
| 1248 | | 446 | 3 |
| 1136 - page 10 | | 451 | 3 |
| 602 (sealed) | | 466 | 3 |
| 4039 (sealed) | | 471 | 3 |
| 4879 | | 487 | 3 |
| 4850 | | 489 | 3 |
| 4840 | | 492 | 3 |
| 4852 | | 494 | 3 |
| 4881 | | 495 | 3 |
| 4846 | | 497 | 3 |
| 4842 | | 500 | 3 |
| 2260 | | 502 | 3 |
| 5031 | | 502 | 3 |
| 2241 | | 506 | 3 |
| 2232 | | 512 | 3 |
| 2211 | | 517 | 3 |
| 2242 | | 519 | 3 |
| 2215 | | 522 | 3 |
| 4835 | | 538 | 3 |
| 170 | | 565 | 3 |
| 171 | | 565 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 367 | | 565 | 3 |
| 433 | | 565 | 3 |
| 459 | | 565 | 3 |
| 662 | | 565 | 3 |
| 663 | | 565 | 3 |
| 668 | | 565 | 3 |
| 674 | | 565 | 3 |
| 678 | | 565 | 3 |
| 682 | | 565 | 3 |
| 0387 | | 576 | 3 |
| 8002 | | 583 | 3 |
| 262 | | 590 | 3 |
| 4174 | | 592 | 3 |
| 0113 | | 601 | 3 |
| 332 | | 611 | 3 |
| 333 | | 611 | 3 |
| 346 | | 611 | 3 |
| 770 | | 611 | 3 |
| 803 | | 611 | 3 |
| 1088 | | 611 | 3 |
| 1089 | | 611 | 3 |
| 1096 | | 611 | 3 |

622

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1353 | | 611 | 3 |
| 1895 | | 611 | 3 |
| 1991 | | 611 | 3 |
| 2116 | | 611 | 3 |
| 3239 | | 611 | 3 |
| 3564 | | 611 | 3 |
| 3574 | | 611 | 3 |

– – –

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Katherine Sullivan, CSR 5812, CRR, RMR

Tuesday, February 6, 2018