Volume 4

Pages 623 - 858

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

WAYMO, LLC                          )
            Plaintiff,              )
   vs.                              ) No. C 17-00939 WHA
                                    )
UBER TECHNOLOGIES, LLC., OTTO       )
TRUCKING, LLC, and OTTOMOTTO, LLC,  )
                                    ) San Francisco, California
            Defendants.             ) Wednesday
                                    ) February 7, 2018
_____ ) 7:30 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
**For Plaintiff:**          QUINN, EMANUEL, URQUHART, OLIVER
                             & SULLIVAN, LLP
                            50 California Street
                            22nd Floor
                            San Francisco, California 94111
                    BY:     **CHARLES KRAMER VERHOEVEN, ESQ.**
                            **JORDAN R. JAFFE, ESQ.**
                            **DAVID ANDREW PERLSON, ESQ.**
                            **MELISSA J. BAILY, ESQ.**
                            **DAVID EISEMAN, ESQ.**
                            **ANDREA PALLIOS ROBERTS, ESQ.**
                            **JAMES DUBOIS JUDAH, ESQ.**


                            QUINN, EMANUEL, URQUHART, OLIVER
                             & SULLIVAN, LLP
                            1299 Pennsylvania Avenue, NW
                            Suite 825
                            Washington, DC 20004
                    BY:     **JARED WESTON NEWTON, ESQ.**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

*Reported By:* Debra L. Pas, CSR 11916, CRR, RMR
               Katherine Sullivan CSR 5812, CRR, RMR
               Official Reporters - US District Court

Debra L. Pas, CSR, CRR and Katherine Sullivan, CSR, CRR
Official Reporters - U.S. District Court - San Francisco, California
(415) 431-1477

```
 1   APPEARANCES (Continued)

 2

 3   For Plaintiffs:        QUINN, EMANUEL, URQUHART & OLIVER
                              & SULLIVAN, LLP
 4                          865 South Figueroa Street
                            10th Floor
 5                          Los Angeles, California 90017
                      BY:  DUANE R. LYONS, ESQ.
 6                         PATRICK THOMAS SCHMIDT, ESQ.

 7

 8

 9   For Defendants:        MORRISON & FOERSTER, LLP
                            425 Market Street
                            San Francisco, California 94105
10                    BY:  ARTURO J. GONZÁLEZ, ESQ.
                           MICHAEL A. JACOBS, ESQ.
11                         ESTHER KIM CHANG, ESQ.
                           THOMAS J. PARDINI, ESQ.
12

13

14   For Defendants:        BOIES, SCHILLER AND FLEXNER, LLP
                            5301 Wisconsin Avenue, NW
                            Washington, DC 20015
15                    BY:  KAREN LEAH DUNN, ESQ.

16

17                          BOIES, SCHILLER AND FLEXNER, LLP
                            435 Tasso Street
                            Suite 205
18                          Palo Alto, California 94301
                      BY:  MICHAEL BRILLE, ESQ.
19                         MEREDITH R. DEARBORN, ESQ.

20

21   For Defendants:        SUSMAN, GODFREY, LLP
                            1000 Louisiana Street
22                          Suite 5100
                            Houston, Texas, 77002
23                    BY:  JOSEPH S. GRINSTEIN, ESQ.

24

25          (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

```
 1   APPEARANCES:  (CONTINUED)

 2
     For Defendants:          SUSMAN, GODFREY, LLP
 3                            1301 Avenue of the Americas
                              32nd Floor
 4                            New York, New York 10019
                       BY:   WILLIAM CARMODY, ESQ.
 5                            SHAWN RABIN, ESQ.

 6

 7                            SUSMAN, GODFREY, LLP
                              1201 Third Avenue
 8                            Suite 3800
                              Seattle, Washington 98101
 9                     BY:   MATTHEW ROBERT BERRY, ESQ.

10

11

12   Special Master:         FARELLA BRAUN & MARTEL, LLP
                              Russ Building, 30th Floor
13                            235 Montgomery Street
                              San Francisco, California 94104
14                     BY:   JOHN L. COOPER, ESQ.

15

16   Also Present:           DEMARRON BERKLEY

17

18                           ERIC MEYHOFER

19                           TONY WEST

20                           NICOLE BARTOW

21                                 _   _   _

22

23

24

25
```

PROCEEDINGS

```
 1              P R O C E E D I N G S

 2    FEBRUARY 7, 2018                          7:31 A.M.

 3                      ---oOo--

 4        (Proceedings held in open court, outside

 5         the presence and hearing of the jury.)

 6            THE COURT:  Thank you.  Welcome.  Please be seated.

 7            THE CLERK:  Calling Civil Action 17-979, Waymo, LLC,

 8    v. Uber Technologies, Inc., et al.

 9        Counsel, please approach the podium and state your

10    appearances for the record.

11            THE COURT:  Just the lead lawyer.  You don't need the

12    long list.

13            MR. VERHOEVEN:  Good morning, Your Honor.  Charles

14    Verhoeven for Waymo.

15            THE COURT:  Thank you.

16            MS. DUNN:  Your Honor, Karen Dunn for Uber.

17            THE COURT:  All right.  The record will show there are

18    at least eight other lawyers at counsel table.  They have been

19    previously identified unless there is someone new.  If there's

20    someone new, I'd like to identify them.

21            MR. VERHOEVEN:  No, Your Honor.

22            MS. DUNN:  No, Your Honor.

23            THE COURT:  All right.  On Gurley, what is -- where

24    are we on Gurley?

25            MR. VERHOEVEN:  One minute, Your Honor.
```

PROCEEDINGS

1          (Counsel confer off the record.)

2          **MR. VERHOEVEN:**  Go ahead.  Just tell the judge what

3    you're --

4          **MS. DUNN:**  Your Honor, so it's possible this issue has

5    been resolved, but I want to make certain of that.

6          We got Waymo's filing, and they do say that they won't ask

7    Mr. Gurley about receipt of the Stroz report and they won't ask

8    improper questions.  I just want to make sure, which is what I

9    just said to Mr. Verhoeven, that his questioning does not verge

10   into asking Mr. Gurley for his opinion that he was misled or

11   that somebody committed fraud on him, because that would

12   obviously be an opinion formed after this lawsuit began and, in

13   fact, after he received the Stroz report, even if they don't

14   ask about that.

15         As I said, this could be resolved.

16         **THE COURT:**  Okay.  So what's Mr. Verhoeven say?

17         **MR. VERHOEVEN:**  I don't intend to go into his opinions

18   today of what happened before.  I intend to ask him about what

19   happened before.  And so --

20         **THE COURT:**  Are you going to ask him anything along

21   the lines of, If you had been told ABC, would that have been

22   material?

23         I have a feeling that's what you have in mind.

24         **MR. VERHOEVEN:**  I certainly would like to, but I'm not

25   going to in the interest of compromise.

PROCEEDINGS

1          THE COURT:  Well --

2          MR. VERHOEVEN:  Because Your Honor said -- Your

3    Honor's given me guidance earlier that you didn't want that, so

4    I'm not going to do it.

5          THE COURT:  Well, what can he possibly add to the

6    picture here then?

7          MR. VERHOEVEN:  He can add, Your Honor, that he was

8    told that the Stroz due diligence -- he was told by -- the

9    witnesses are all sequestered.

10       He was told by Mr. Kalanick and Mr. Poetzscher that they

11   had received a report from Stroz, and the report came back

12   clean.  And that was not true.  He hadn't received a report --

13         THE COURT:  Well, that --

14         MR. VERHOEVEN:  -- and the report had not come back

15   clean.

16         THE COURT:  Okay.  Let's just stop.  He's going to

17   recount a conversation with Kalanick, where Kalanick says, "We

18   did the report; it came back clean"?

19         MR. VERHOEVEN:  Not just a conversation.  It was a

20   presentation to the board that was made to induce them to

21   approve this deal.

22         THE COURT:  All right.  What's wrong with that part?

23         MS. DUNN:  Nothing is specifically wrong as an

24   evidentiary matter.  It doesn't seem, as Your Honor suggested

25   at the beginning, that that bears on the actual issues in this

PROCEEDINGS

```
 1   case.
 2        It seems strange to bring in Mr. Gurley just so he can
 3   say, I was -- and, actually, he's a little equivocal about what
 4   he was actually told.  That he came away with a positive
 5   impression of the diligence, I think that's true.
 6        I don't actually think anybody denies that they went to
 7   the board meeting and said, "We should do this deal."
 8        You know, it does not seem like a productive use of time,
 9   which is why I thought perhaps they were bringing him for a
10   different or additional reason since that seems not so
11   worthwhile to me or relevant.
12        MR. VERHOEVEN:  Your Honor, they moved in limine to
13   exclude this very testimony, and Your Honor denied it.  I don't
14   know why we're rearguing this right now.
15        THE COURT:  Well, I'm sure I denied it without
16   prejudice to individual questions; right?  Surely I did.
17        So the proffer that Mr. Verhoeven has given us is
18   acceptable to me.  It has some relevance to show that
19   gimmickry, I guess is the right word, was afoot to -- and it
20   may bear on the credibility of the witness who's on the stand.
21        So I think -- I think it has some relevance.  But it is
22   removed from the core issue, which is did Uber use or disclose
23   the eight trade secrets?
24        But if you stick to the offer of proof that you've given
25   me, I don't think it will take up much time, and I think it
```

PROCEEDINGS

1    will have some tangential relevance.  And so I'm going to say

2    that much is okay.  All right?

3            **MS. DUNN:**  That's fair, Your Honor.  Thank you very

4    much.

5            **THE COURT:**  All right.  Thank you.

6        Okay.  Any other issues before we get rolling here?

7            **MR. RABIN:**  Your Honor, just one housekeeping issue,

8    which is yesterday when we presented the objection that was

9    overruled as it related to the Stroz documents, the parties

10   meet late at night to meet and confer, and it would be helpful

11   if we had agreement that we do not need to keep asserting the

12   overruled objection to the various Stroz documents for record

13   purposes that we -- there's specifically two objections.

14       One was the objections that were articulated in the brief

15   that was filed and overruled yesterday.

16       And the second is simply the ongoing objection that we had

17   had to the order that ultimately went up to the Federal Circuit

18   about the privilege issues from pre-April of 2015.

19       And as long as our understanding is we have, you know,

20   objection to -- on those two bases, to those Stroz documents,

21   and that they're overruled, we don't need to continue making

22   them.  But I wanted to make sure that that was all right with

23   Your Honor.

24           **MR. EISEMAN:**  We have no objection to that, Your

25   Honor.

PROCEEDINGS

```
 1            THE COURT:  Well, the issue that went up to the
 2   Federal Circuit, of course you've already lost on that.  I
 3   don't know why you would want to preserve that.  You did go up.
 4   But, nevertheless, that will be reserved without having to
 5   state it each time.
 6            And the second one, where -- my main ruling yesterday was
 7   not -- did not reach every single possible question, but it did
 8   say the following:  Namely, that Uber is the one who set up
 9   this elaborate procedure with the due diligence report.  And
10   even looking at it from this most positive light and most
11   generous light, Uber was trying to get at the truth of, did
12   Levandowski have trade secrets?
13            And so it would -- to now say that it's hearsay and not
14   reliable is a contradiction of terms.  Uber wanted that
15   information.
16            So my view is that everything that they investigated at
17   Stroz under the due diligence regime is accurate as to what was
18   said to Stroz.  So I don't think you have to object to that
19   repeatedly.  That ruling you can reserve on and take an appeal
20   on that.
21            But -- and here's the big but -- there could be hearsay
22   within hearsay problems that you need to draw to my attention.
23   And those are question by question, document by document, and
24   you have to bring that up.
25            MR. RABIN:  Understood, Your Honor.
```

PROCEEDINGS

```
 1            THE COURT:  All right.  Okay.

 2            MR. EISEMAN:  That's fine, Your Honor.  And we have

 3   one related Stroz issue that may come up with a witness later

 4   today.  That's not the reports and the documents that you ruled

 5   on yesterday but instead some documents from the Stroz

 6   relativity database, some documents that came from

 7   Mr. Levandowski.  And --

 8            THE COURT:  All right.

 9            MR. EISEMAN:  -- if Your Honor has time to deal with

10   that right now, Mr. Schmidt will handle that.

11            THE COURT:  Give me the one -- two-sentence version of

12   what the problem is.

13            MR. EISEMAN:  The problem is that all we want to offer

14   these documents into evidence for is to show that they came

15   from Mr. Levandowski's computer and they were at Stroz.

16        We're not offering them for the truth of what's in the

17   documents; simply it's a matter of notice that the documents

18   came from Mr. Levandowski.  And we're trying to avoid having to

19   call a witness to go through document by document.  And that's

20   the issue.

21            THE COURT:  Why would it even matter?

22            MR. EISEMAN:  Because it's important to know that

23   documents that were on -- that were on Mr. Levandowski's

24   computer are Google documents.

25            THE COURT:  Well, are they any of the eight trade
```

PROCEEDINGS

```
 1    secrets?  Somebody back there says yes.

 2            MR. EISEMAN:  That's why I wanted Mr. Schmidt to

 3    handle it.

 4            MR. SCHMIDT:  Your Honor, the answer is yes.  Amongst

 5    these documents that Stroz recovered from Mr. Levandowski's

 6    computer are documents that not only reflect the eight trade

 7    secrets --

 8            THE COURT:  Huh-uh.  You just used a buzz word,

 9    "reflect."

10            MR. SCHMIDT:  Well --

11            THE COURT:  How about actually state as opposed to

12    reflect?  Do they state any of these trade secrets?

13            MR. SCHMIDT:  Well, Your Honor, some of the documents

14    are themselves trade secrets.  Trade Secret 90 --

15            THE COURT:  You are using such weasely language.

16    Look, let's simplify.  Why won't you just stipulate these

17    documents came from his computer?

18            MR. RABIN:  We have no problem stipulating that

19    certain documents came from his computer.  The problem we have

20    is when we submit them into evidence, you have to lay the

21    foundation for what they actually are.  Is it a picture of a

22    PCB board or is it a picture of a -- you know, part of a

23    dollhouse?

24        And it's not fair for a jury to receive documents into

25    evidence that they say came from Anthony Levandowski's computer
```

PROCEEDINGS

1    without a witness actually identifying what they are.

2         Your Honor's question raised the point.  They're going to

3    try and tell the jury, "Look, this document that came from his

4    computer must have been a trade secret."

5         But unless there's a witness who can sponsor what that

6    document actually is, then it can't come into evidence.

7              **THE COURT:**  All right.  Uber's right on this one.  You

8    are making a reasonable request, but it's not one that you're

9    entitled to.  It's just reasonable to try to speed the trial

10   along.

11        But you've got to do it the hard way.  Bring in a witness,

12   burn up some of your time.  Uber's trying to force you to burn

13   up your time, but they have the right to do that.

14        I'm sorry.  I'm not going to carry your water for you.  So

15   that's the end of that story.

16        So bring in a witness.

17             **MR. SCHMIDT:**  All right, Your Honor.

18             **THE COURT:**  All right.  Anything I can -- any more

19   damage I can do this morning?

20             **MR. RABIN:**  Thank you, Your Honor.

21             **MR. EISEMAN:**  Your Honor, if I could just hand up a

22   deposition transcript from Ms. Fulginiti, who we may be playing

23   later today.  There are no objections from the other side, so

24   we just want Your Honor to have a copy.

25             **THE COURT:**  All right.  So I don't need to review this

PROCEEDINGS

```
 1    for purposes of in or out; right?
 2              MR. EISEMAN:  You don't, Your Honor.
 3              THE COURT:  All right.  Thank you.
 4         Did you get your deposition teed up ready to go on that
 5    witness that I did?  McClendon, I think is his name.
 6              MR. JUDAH:  There is an update on that.
 7              MR. VERHOEVEN:  In light of your rulings, Your Honor,
 8    and in the interest of our short time, we're not going to play
 9    that deposition.
10              THE COURT:  You mean I wasted all that time.  I went
11    through it, it's an in, out, in, out, 403.  And now you're --
12    all right.  Okay.  Thank you.  It's okay.  You have the right
13    to do that.
14         All right.  Go ahead.
15              MR. JUDAH:  All right.  Your Honor, another
16    housekeeping.  Yesterday you requested the actual audio CDs of
17    the witness, Mr. Bares, who testified.  And we have those.
18    We'd like --
19              THE COURT:  It's just the ones that were shown now;
20    right?  Don't put in extra stuff.  Just the exact portions that
21    were shown to the jury.
22              MR. JUDAH:  That's correct.
23              THE COURT:  All right.  Go ahead.  Please -- is there
24    an identifying tag on there?
25              MR. JUDAH:  There is.
```

PROCEEDINGS

1          **THE COURT:**  What is it?

2          **MR. JUDAH:**  "Deposition of John Bares, played on

3  February 6th, 2018."

4          **THE COURT:**  Thank you.

5          **MR. RABIN:**  Counsel, do you have a copy for us so we

6  can check it?

7      And, Your Honor, if we can just hold off putting in this

8  evidence until we have a chance to review.  I'm sure it's fine,

9  but we would just want to make sure this was actually --

10         **THE COURT:**  Well, wait.  Let's be clear on this.  It's

11  not going to go into the jury room.  This is for purposes of

12  the court of appeals.

13         **MR. RABIN:**  Right.

14         **THE COURT:**  It's not going to go into the jury room.

15     If the jury wants to have a read-back, then we bring them

16  out here and we might replay it.  But it is not an item that

17  goes into the jury room.  All right.

18         **MR. RABIN:**  Thank you, Your Honor.

19         **MR. VERHOEVEN:**  I have one last thing, Your Honor.

20         **THE COURT:**  Sure.

21         **MR. VERHOEVEN:**  This relates to Mr. Kalanick and his

22  upcoming testimony.

23     Mr. Fisher, can you put up TX-4690 on the screen.

24     This relates to the "Greed is Good" video, Your Honor.

25         **THE COURT:**  The who?

PROCEEDINGS

1          MR. VERHOEVEN:  The "Greed is Good" video.

2          THE COURT:  Oh, "Greed is Good," yes.

3          MR. VERHOEVEN:  Yes.

4          THE COURT:  All right.

5          MR. VERHOEVEN:  One second, Your Honor.

6     It's TX-4690.

7          THE COURT:  I sure wish that these technical people

8    could grease the skids better so that there won't -- it really

9    takes away from your presentation when it takes ten seconds to

10   bring it up.

11         MR. VERHOEVEN:  Well, Mr. Fisher --

12         THE COURT:  You should read the riot act, and you

13   should read the riot act.

14         MR. VERHOEVEN:  I want to say, in Mr. Fisher's

15   defense, he's the best in the business.

16         THE COURT:  All right.

17         MR. VERHOEVEN:  So this is, Your Honor, something that

18   was created in discovery in this case, Your Honor.

19         THE COURT:  What is it?

20         MR. VERHOEVEN:  And it's -- it was a forensic analysis

21   of Mr. Kalanick's deleted text messages on his phone.  And we

22   recovered those.  The parties together recovered those.  And

23   this is a list.

24      And the "Greed is Good" was a deleted text that we

25   recovered.  And this is an -- this is the -- a spreadsheet of

PROCEEDINGS

```
 1   these deleted texts.

 2        And if you look at -- if we could pull up the "Greed is

 3   Good" one, Mr. Fisher.  Can we pull it out or not?

 4            THE COURT:  Wait.  Someone is --

 5            UNIDENTIFIED SPEAKER:  These text phone numbers are

 6   being shown to the whole gallery.

 7            MR. VERHOEVEN:  Let's bring it down from the gallery.

 8            THE COURT:  All right.  So turn the public part off.

 9        But what is your point?

10            MR. VERHOEVEN:  There's a column that's -- that

11   indicates whether or not the -- Mr. Kalanick read the texts.

12   They can tell that from the forensic analysis.

13        And you can see -- are we back on?

14            THE COURT:  There it is.

15            MR. VERHOEVEN:  I'll represent to you that it says --

16            THE COURT:  It says --

17            MR. VERHOEVEN:  -- "Here's the speech you need to

18   give, wink, wink."  And then it's got the same link to "Greed

19   is Good."  And the status is it was read.

20        So I know there's going to be a fight.  I didn't want to

21   have this fight in front of the jury.  He read it.  The

22   evidence shows he read it.  The evidence produced by the other

23   side --

24            THE COURT:  Is this chart that you're showing me going

25   to go into evidence?
```

PROCEEDINGS

 1          **MR. VERHOEVEN:**  We can if we need to, Your Honor.  It

 2   was created during discovery, but --

 3          **THE COURT:**  Do you have a sponsoring witness for this

 4   chart?

 5          **MR. VERHOEVEN:**  Well, I would hope we could work out a

 6   stipulation that this was -- this was something that was

 7   created by the attorneys as part of discovery to forensically

 8   recover the deleted texts.  This is not something that should

 9   be disputed.

10          **THE COURT:**  All right.  Ms. Dunn, what do you say?

11          **MS. DUNN:**  Well, the first thing I'll say is this was

12   not disclosed to us at all in advance of Mr. Kalanick's

13   testimony, what we just saw.

14          **THE COURT:**  Well, he said that you helped prepare the

15   chart.

16          **MS. DUNN:**  I'm not denying that.  It may well be true.

17   But this is -- Mr. Kalanick's exhibits, exhibits related to an

18   exam are supposed to be disclosed to us.  This was not.  There

19   are, in fact, some times when late exhibits are disclosed at

20   night.  This was not.

21       I think, first of all, that is not appropriate --

22          **THE COURT:**  But he's not proposing to use it with

23   Mr. Kalanick.  I'm sure Kalanick has never seen that chart.

24          **MR. VERHOEVEN:**  Right.

25          **THE COURT:**  But he's trying to explain to me that

1   there is a good-faith basis for believing the witness on the

2   stand read that "Greed is Good" text.

3       **MS. DUNN:**  Your Honor, I have no problem -- okay.  So

4   let's just take a step back.

5       Our objection is that it would be prejudicial, and the

6   point is to sway the jury, to play a movie.  I mean, is anyone

7   here aware that --

8       **THE COURT:**  Well, but it was a movie that the two key

9   actors in the case laughed about.

10      **MS. DUNN:**  Well, Your Honor, that is not in evidence.

11      And I don't think that this forensic spreadsheet shows --

12  maybe he read the text.  It doesn't show that he clicked on the

13  link.  It doesn't show that he was very inspired by Michael

14  Douglas's Academy Award-winning performance in *Wall Street*.

15      And the purpose of this, that Mr. Verhoeven is just dying

16  to play a movie, another movie, I should say, for the jury --

17      **THE COURT:**  What do you mean "another movie"?

18      **MR. SCHMIDT:**  Well, first they played a movie with a

19  blind person, to show the miracle of the cars.

20      **THE COURT:**  Well, that one was just promotional

21  material.  That wasn't a movie.

22      **MS. DUNN:**  I agree.  At least that's real.  This --

23  *Wall Street* is just a work of fiction.

24      There's no evidence that Mr. Kalanick clicked on the link,

25  that he saw the speech, that he was so inspired as to give the

PROCEEDINGS

1    speech.  All there is is a text from Mr. Levandowski which, by

2    the way, has an emoticon.  It does not actually say "wink,

3    wink" as Mr. Verhoeven has now twice represented to the Court.

4         And so the purpose of this is the same purpose that courts

5    have previously rejected, which is when you want to play songs

6    and movies designed to evoke emotional responses -- which this

7    one apparently did, having won Mr. Douglas the Best Actor

8    award -- that is the purpose here.

9         And Mr. Verhoeven knows it.  It's very apparent.  And he's

10   fighting very hard to be able to do that.  And we object.

11            MR. VERHOEVEN:  I can respond, Your Honor.  As Your

12   Honor noted yesterday, the theory of this case is that

13   Mr. Levandowski and Mr. Kalanick were in it together, and they

14   were planning to cheat.  And this goes right to it.  This is

15   part of the case, and this is probative to show that, in fact,

16   that was the case.

17        I don't know what -- why it -- what it is, is a link that

18   was sent with a text.  The text is now undisputedly read.  And

19   I should be able to show it, just like I'd be able to show

20   someone a document they admit they got, that had an attachment,

21   and ask him, "Did you read the attachment?"  And I get to show

22   the attachment.

23            THE COURT:  Well, I'm not sure about that.

24            MS. DUNN:  Also, if the person had not read the

25   attachment, it probably would not be shown to the jury because

PROCEEDINGS

1    there would be no foundation for it.  Here there is no

2    foundation.  There's no evidence, even if the text was read,

3    that the link was clicked on.  Mr. Kalanick did not respond to

4    the text.

5              **MR. VERHOEVEN:**  May I say one more thing before you

6    rule?

7              **THE COURT:**  Yes.

8              **MR. VERHOEVEN:**  We can't ask -- Mr. Levandowski

9    clearly found this, read it, or saw it and forwarded it.  We

10   can't ask him about it because he's taking the Fifth.

11             So we should, in fairness, be able to ask -- say, "Did you

12   receive this?"  If he denies it -- "Did you read it?"  If he

13   denies it, we knows that's not true.  If he -- if he says, "I

14   don't know," so be it.

15             But we should be able to show him the video and say, "Did

16   you open this?  Did you read this?  What was your reaction to

17   this?"

18             **THE COURT:**  All right.  Here's the answer:  I'm not

19   going to make a ruling on the video yet.  What I think you

20   should do, and you have the Court's blessings, is to say to

21   Mr. Kalanick the following:

22             "Mr. Kalanick, do you see this text message here?  Who is

23   that from?"

24             He'll presumably say Anthony.

25             "Read it to the jury."  Then he reads it out loud.

PROCEEDINGS

 1          And then -- remind me what the thing -- what it actually

 2    says.

 3              MR. VERHOEVEN:  It's a link to a YouTube video.

 4              THE COURT:  Yeah, but does it --

 5              MR. VERHOEVEN:  It doesn't identify the substance,

 6    so --

 7              MS. DUNN:  Maybe we should put up the exhibit so that

 8    Your Honor can actually see it.

 9              MR. VERHOEVEN:  Counsel.

10              MS. DUNN:  I apologize.

11          THE COURT:  Well, look.  You can go right up to the

12    moment of showing this video.  No.  Look.  It goes -- I'm

13    allowing you to do all of it.

14          Ms. Dunn, you lose on this.

15          And the reason is that even if he didn't look at it,

16    Levandowski did.  And Levandowski is the guy who allegedly

17    stole all the trade secrets and is -- so you have my

18    blessings --

19              MR. VERHOEVEN:  Thank you, Your Honor.

20              THE COURT:  -- to show the video to -- now, I'm not

21    saying this is a good use of your time.  Maybe it is.  I don't

22    know.  But that's coming out of your time.

23              MR. VERHOEVEN:  Yes, Your Honor.

24              THE COURT:  All right.  Ms. Dunn, I just -- you're

25    doing a great job for your client, but your client was doing

```
 1   these things.  This is not like he's making it up.  It's been
 2   black -- and then he deletes it and destroys the evidence.
 3        All right.  That's the ruling.  You can go for it.
 4        Let's bring the jury in and get started.
 5        Is the witness out there in the hall?  One of you get --
 6   somebody bring in the witness so we can get started.
 7        Angie, please bring in the jury.
 8        Mr. Kalanick, you can come on up here and resume the
 9   stand, please.  Thank you for being here on time.
10                        TRAVIS KALANICK,
11   called as a witness for the Plaintiff, having been previously
12   duly sworn, testified as follows:
13        THE CLERK:  All rise for the jury.
14        (Jury enters at 7:55 a.m.)
15        THE COURT:  Thank you.  Be seated.
16        All right.  So even before 8 o'clock.  Here's this
17   outstanding jury here on time, ready to do your country's work.
18   Thank you for that.
19        Yesterday when we broke, Mr. Kalanick was on the stand on
20   direct examination by Mr. Verhoeven.  And he can now resume the
21   examination.
22        Please, go ahead.
23        MR. VERHOEVEN:  Thank you, Your Honor.
24        Good morning.
25
```

<u>**DIRECT EXAMINATION (RESUMED)**</u>

**BY MR. VERHOEVEN:**

Q.   Good morning, Mr. Kalanick.

A.   Good morning.

Q.   Let's pick up right where we left off and look at, in your

binder, Exhibit 170 again.

A.   Yep.

      **MR. VERHOEVEN:**  This is in evidence, Your Honor.

     (Document displayed.)

      **THE COURT:**  Fine.

      **MR. VERHOEVEN:**  And can we go to page 11.  And do we

have all the screens on?  There we go.

**BY MR. VERHOEVEN:**

Q.   And, in particular, I'd like you to look at the part of

the page that has the January 21 meeting.  I put it on the

screen to make it easier to read.

    Do you see that?

A.   Yeah, I do.

Q.   And it says, "21 January meeting, TK."  That's you?

A.   That's correct.

Q.   And then it lists the other people, Emil, Cam, Bam.  It

goes on.

    Do you see that?

A.   Yes, I do.

Q.   And this is a meeting that you attended January 21, 2016;

KALANICK - DIRECT / VERHOEVEN

 1  correct?

 2  **A.**   Yeah, I assume that I attended a meeting on that time.

 3  These aren't my notes, though.

 4  **Q.**   And this concerns the NewCo transaction; right?

 5  **A.**   It looks like it.

 6  **Q.**   And it says "TK's advice."  That's you again; right?

 7  **A.**   Yeah.

 8  **Q.**   "TK's advice on legal.  Tell them we're going to do it.

 9  Ask how to minimize the risk, minimize the pain."

10       You said that, didn't you, sir?

11  **A.**   I don't remember saying it.

12  **Q.**   You deny saying it?

13  **A.**   No.

14  **Q.**   You agree it's possible you said it; right?

15  **A.**   Yeah.

16  **Q.**   You told them, and you wanted your management to do the

17  deal, to tell Legal "we're going to do the deal," and then ask

18  them to figure out how to minimize the pain and the risk.

19       Isn't that true, sir?

20  **A.**   At some point, I definitely wanted to do the deal.

21  **Q.**   And the risk you wanted to minimize was that Uber would be

22  sued by Google or Waymo; right?

23  **A.**   I think there's lots of risks in a deal.  That's certainly

24  one of them.

25  **Q.**   So one of the risks was that you would be sued by Google

```
 1   or Waymo; right?

 2   A.   Yes.

 3   Q.   And you knew that at the time; right?

 4   A.   Yes.

 5   Q.   Direct your attention in your binder to TX-273.

 6        Are you there?

 7   A.   Yeah.

 8   Q.   This is an email from John Bares, dated January 25th,

 9   2016, in which you are cc'd; correct?

10   A.   Yes.

11        MR. VERHOEVEN:   Your Honor, I move TX-273 into

12   evidence.

13        MS. DUNN:   No objection.

14        THE COURT:   Thank you.   In evidence.

15     (Trial Exhibit 273 received in evidence.)

16        MR. VERHOEVEN:   Can you publish it?

17     (Document displayed.)

18        MR. VERHOEVEN:   And, Mr. Fisher, can you pull up a

19   callout on this for ease.

20   BY MR. VERHOEVEN:

21   Q.   You see in the box I've pulled out, Mr. Kalanick, it's an

22   email from John Bares, January 25.   Do you see that?

23   A.   I do.

24   Q.   And you're cc'd; right?

25   A.   That's correct.
```

**KALANICK - DIRECT / VERHOEVEN**

 1   Q.   And in this email, Mr. Bares is talking generally about

 2   value of the deal; right?

 3   A.   I'm trying to find that in here.

 4   Q.   "NewCo equity calculator."  Do you see that in the subject

 5   line?

 6   A.   I do.

 7   Q.   So, generally, this discussion is about how much to pay;

 8   right?

 9   A.   I have no idea.  I'd have to review the email.

10   Q.   Okay.  You don't deny you got this email, sir?

11   A.   No, I don't.

12   Q.   And then you see in paragraph 1, Mr. Bares says, "Now, of

13   course, the X factor is that with NewCo we get a team that

14   knows each other."  And then he says "has IP in their heads."

15        Do you see that?

16   A.   I do.

17   Q.   And IP again, that refers to intellectual property?

18   A.   I would assume so.

19   Q.   And Mr. Bares is telling you in January that the X factor

20   of the NewCo deal is that the team, quote, has IP, intellectual

21   property, in their heads; right?

22   A.   It appears to be so, yes.

23   Q.   You don't deny getting this, do you?

24   A.   I do not.

25   Q.   You don't deny reading this, do you?

1   A.    No.   I don't remember reading it, but it's very possible I

2   did.

3   Q.    And intellectual property includes trade secrets, doesn't

4   it, sir?

5   A.    Yes.

6   Q.    Let's go to another exhibit in your binder, sir.

7   A.    Okay.

8   Q.    TX-277.

9         Do you see this is an email from Cameron Poetzscher, dated

10  January 28, to yourself?

11  A.    Yeah, I see it.

12          MR. VERHOEVEN:   Your Honor, I move to admit TX-277.

13          MS. DUNN:   No objection.

14          THE COURT:   Received.

15      (Trial Exhibit 277 received in evidence.)

16          MR. VERHOEVEN:   Publish it.   Mr. Fisher, can you pull

17  it out.

18      (Document displayed.)

19  BY MR. VERHOEVEN:

20  Q.    So, for the jury to see, I'll repeat, you see it's from

21  Mr. Poetzscher, at the top, dated January 28, 2016.

22        Do you know when Mr. Levandowski quit at Google?

23  A.    I don't know the exact date, but I'm assuming it's in

24  January.

25  Q.    Okay.   Right around this time; right?

1    A.    Again, I know sometime in January.

2    Q.    And then Mr. Poetzscher says to you, "TK, did you tell

3    Anthony that you would indemnify them if they get sued by G as

4    part of or after the deal?  They're under that impression."

5          Do you see that, sir?

6    A.    I do.

7    Q.    And G is Google?

8    A.    I would assume so, yes.  I think so.

9    Q.    And Anthony is Anthony Levandowski?

10   A.    Correct.

11   Q.    And Mr. Poetzscher is asking you -- because he doesn't

12   know, even though he's running the deal -- did you tell Anthony

13   that you would indemnify them if they got sued?  Isn't that

14   what he's saying here?

15   A.    I think that's what he's saying, yes.

16   Q.    And did you?

17   A.    I don't believe I did.  I think he asked for indemnity,

18   and we ultimately agreed that we should.

19   Q.    Then why is Mr. Poetzscher asking you if you did it?

20   A.    I don't know.  We ultimately indemnified him.

21   Q.    Well, you told Mr. Levandowski, sir, didn't you, that

22   Listen, if Google sues you because of this deal we want you to

23   do, we'll indemnify you; right?

24   A.    We ultimately did, yes.

25   Q.    It's your testimony, sir, that you don't remember

1  discussing indemnification at all as part of this NewCo deal,

2  isn't it?

3  **A.**   I don't remember specific conversations, but I generally

4  understood that he wanted to be indemnified and that we did

5  indemnify him.  Once we generally agreed to do that, I sent it

6  to the deal and legal teams to sort of work through those

7  details.

8          **MR. VERHOEVEN:**  Can we play, Mr. Fisher, from

9  Mr. Kalanick's July 27, 2017, deposition, page 235, lines 12

10 through 14.

11         (Video played.)

12 **BY MR. VERHOEVEN:**

13 **Q.**   You don't recall ever speaking with Mr. Cameron -- excuse

14 me -- with Cameron Poetzscher about indemnifying

15 Mr. Levandowski if he got sued by Google as part of the deal;

16 right?

17 **A.**   I don't remember a specific conversation, but that doesn't

18 mean that it didn't happen.

19         **MR. VERHOEVEN:**  Let's play from your deposition,

20 July 27, 2017, page 234, 8 through 13.

21         (Video played.)

22 **BY MR. VERHOEVEN:**

23 **Q.**   Now, let's go to March -- the March time frame of 2016.

24 **A.**   Okay.

25 **Q.**   During the March time period, you and Mr. Levandowski were

1   personally texting back and forth with each other, weren't you?

2   **A.**   I assume so, yeah.

3   **Q.**   You and Mr. Levandowski over this time period exchanged

4   literally hundreds of text messages, didn't you?

5   **A.**   I haven't counted, but it sounds -- sounds reasonable.

6   **Q.**   And isn't it true, sir, that during this time your phone

7   that you used to text was configured to a setting that would

8   autodelete all of your text messages every 30 days?

9   **A.**   Yes.  I had a 30-day autodelete setting, correct.

10  **Q.**   After 30 days, the texts you sent would disappear?

11  **A.**   That's correct.

12  **Q.**   And you also communicated with Mr. Levandowski during this

13  time period using an application called Telegram; right?

14  **A.**   That's correct.

15  **Q.**   And Telegram is a chat application where the messages only

16  last for a certain amount of time and then they disappear;

17  right?

18  **A.**   That's correct.

19  **Q.**   And you used the Telegram application to communicate with

20  Mr. Levandowski regarding ATG business; right?

21  **A.**   Yes.  I'd say that was probably later in 2016 but probably

22  not during the deal.

23  **Q.**   Turn in your binder to TX-10275, please.

24  **A.**   10275?

25  **Q.**   Yes, sir.

1    **A.**    Okay.  Hold on.

2        There we go.  Okay.

3    **Q.**    If you flip through this, you see that these are a series

4    of text messages between yourself and Mr. Levandowski; correct?

5    **A.**    Correct.

6        **MR. VERHOEVEN:**  Your Honor, I move TX-10275 into

7    evidence.

8        **MS. DUNN:**  No objection.

9        **THE COURT:**  10275 received.

10    (Trial Exhibit 10275 received in evidence.)

11    **BY MR. VERHOEVEN:**

12    **Q.**    Direct your attention to the second page of these texts.

13        **MR. VERHOEVEN:**  And for the jury's benefit, these

14    black boxes are personal telephone numbers that we didn't want

15    the public to have.  So that's what those are there.

16    **BY MR. VERHOEVEN:**

17    **Q.**    This is a text from yourself to Mr. Levandowski; correct?

18    **A.**    Appears to be so.

19    **Q.**    You sent it on March 1st, 2016; right?

20    **A.**    Looks like it, yes.

21    **Q.**    And you texted to him, quote, burn the village.

22        Do you see that?

23    **A.**    I do, yes.

24    **Q.**    What did you mean by "burn the village"?

25    **A.**    I don't know.  I'm not sure what it's referring to.

1    Q.    Well, you wrote it.  What did you mean?

2    A.    It was two years ago, and it was a one-line text.  I just

3    don't remember.

4    Q.    You don't have any idea what it means?

5    A.    No.

6    Q.    Well, Mr. Levandowski knew what it meant, though, didn't

7    he?

8    A.    I don't know.

9    Q.    Well, turn to the next page.

10   A.    Okay.

11   Q.    Do you see he texted back to you on March 1st, 2016, same

12   day?

13   A.    Okay.

14   Q.    Right?

15   A.    Yep.

16   Q.    And he said, "Yup."  Sounds like he knew what you meant?

17   A.    It does, yeah.

18   Q.    You have no idea what you're talking about?

19   A.    No idea.

20   Q.    Direct your attention to page 20 of your texts.  Do you

21   see this is a text from Mr. Levandowski to yourself?

22   A.    Okay.

23   Q.    Do you agree?

24   A.    Yes.

25   Q.    And this is also dated March 1st, 2016; correct?

1   **A.**   Correct.

2   **Q.**   And Mr. Levandowski tells you, quote, I just see this as a

3   race and we need to win, second place is first loser.

4        Do you see that, sir?

5   **A.**   I do.

6   **Q.**   And you agree with that, don't you?

7   **A.**   Well, I first heard it from my high school football coach,

8   but yes.

9   **Q.**   And you're talking about the race to develop driverless

10  car technology; correct?

11  **A.**   Yeah.  That's correct.

12  **Q.**   And you agree with Mr. Levandowski that the two of you

13  thought that second place was first loser in this technology;

14  right?

15  **A.**   That's correct.

16  **Q.**   And you and he were determined to make sure you weren't

17  the first loser; right?

18  **A.**   Correct.

19  **Q.**   Let's just, for the record, look at page 22.  This is your

20  text back to him in response; correct?

21  **A.**   Looks like it, yeah.

22        **MS. DUNN:**  Objection, Your Honor.  There's a text in

23  between those two.

24        **THE WITNESS:**  Oh.

25        **THE COURT:**  Okay.  Go back over the one --

1              **MR. VERHOEVEN:**  Thank you, Your Honor.

2   **BY MR. VERHOEVEN:**

3   **Q.**  Take a look at the time stamp where you say "agreed."

4   It's March 1st, 2016.

5   **A.**  Okay.  So that's 22 or 21?

6   **Q.**  That is 22.  The one on the screen here, sir.

7   **A.**  Sorry.  I was looking at the stamp.

8   **Q.**  That's where you say "agreed"?

9   **A.**  Yeah.  Yes.

10  **Q.**  And you see the time stamp?

11  **A.**  I do.

12  **Q.**  And it says March 1st, 2016?

13  **A.**  Yes.

14  **Q.**  Explain to the jury what those numbers next to it mean.

15  **A.**  I'm not sure what you mean.  What numbers?  What are we

16  talking about?

17  **Q.**  9:03:15.

18  **A.**  I'm going to guess that's the time stamp?

19  **Q.**  Right.  So what does it say?

20  **A.**  "9:03 a.m. UTC+0."

21  **Q.**  And 15 seconds?

22  **A.**  Oh, I'm sorry.  And 15 seconds.

23       But it's a UTC time, so maybe that's eight hours forward.

24  I don't know.

25  **Q.**  Let's look at the text on page 20.

**KALANICK - DIRECT / VERHOEVEN**

1    A.    Page 20.  Okay.  Yep.

2    Q.    This is the text from Mr. Levandowski, where he says, "I

3    see this as a race and we need to win."

4    A.    Yeah.

5    Q.    "Second place is first loser"; right?

6    A.    Yeah.

7    Q.    What's the time stamp on there?

8    A.    It's 9:02:59.

9    Q.    So 9:02 and 59 seconds?

10   A.    Yeah.

11   Q.    Go back to 22.

12   A.    Okay.

13   Q.    9:03 and 15 seconds.  Do you see that?

14   A.    Yeah.

15   Q.    So you responded in 16 seconds?

16   A.    Appears to be so.

17   Q.    You're responding to that text, aren't you, sir?

18   A.    Yeah.  Probably.

19   Q.    Let's go to -- let's go in your binder to Exhibit TX-5460.

20   A.    5460.

21   Q.    TX-5460.

22   A.    Apologies.

23   Q.    No problem.

24   A.    Okay.  There we go.

25   Q.    And this is also a text from Mr. Levandowski to yourself;

KALANICK - DIRECT / VERHOEVEN

1    correct?

2    A.    Yes.

3            MR. VERHOEVEN:  Your Honor, I move TX-5460 into

4    evidence.

5            MS. DUNN:  No objection.

6            THE COURT:  Thank you.  Received.

7        (Trial Exhibit 5460 received in evidence.)

8            MR. VERHOEVEN:  Put it on the screen.

9        (Document displayed.)

10   BY MR. VERHOEVEN:

11   Q.    So, again, we see this is from Mr. Levandowski to

12   yourself.

13   A.    Yeah.

14   Q.    Dated the same day, March 1st, 2016.

15   A.    Yep.

16   Q.    And Mr. Levandowski says to you, quote, We need to think

17   through the strategy to take all the shortcuts we can find,

18   close quote.

19        Do you see that?

20   A.    Yes.

21   Q.    And the strategy he's talking about is the development of

22   LiDAR technology, isn't it?

23   A.    At the -- I don't think so, but I am not sure exactly.

24   Probably not.

25   Q.    So he's talking about something totally unrelated to the

1   deal?

2   **A.**   Right.  My guess is it's autonomy generally.

3   **Q.**   So you would agree at least that the strategy for which he

4   wanted to find all the shortcuts he could find with you was

5   autonomy, was driverless car technology; right?

6   **A.**   Yeah.  Probably.

7   **Q.**   All right.  Let's go to another exhibit.  This is TX-8009

8   in your binder.

9        Are you there?

10  **A.**   Yeah.

11  **Q.**   This is a text from -- another text from Mr. Levandowski

12  to yourself, dated March 17, 2016; correct?

13  **A.**   Yes.

14        **MR. VERHOEVEN:**  Your Honor, I move TX-8009 into

15  evidence.

16        **MS. DUNN:**  No objection.

17        **THE COURT:**  Received.

18        (Trial Exhibit 8009 received in evidence.)

19        (Document displayed.)

20  **BY MR. VERHOEVEN:**

21  **Q.**   And we can see here, now that it's published, that it's a

22  text from Mr. Levandowski to Mr. Kalanick, dated March 17.  And

23  Mr. Levandowski says, quote, Absolutely, just itching to roll

24  out this tech and win.

25        Do you see that?

 1    **A.**    I do.

 2    **Q.**    And the technology he's talking about was autonomous

 3    vehicle technology; correct?

 4    **A.**    Yes.

 5    **Q.**    Mr. Levandowski told you he has the tech and he's itching

 6    to roll it out; right?

 7    **A.**    He didn't say that he has the tech; he just said he's

 8    itching to roll it out.

 9    **Q.**    Let's play it from your deposition dated October 2, 2017,

10    from page 456/25 through 457/6.

11          (Video played.)

12          **THE COURT:**  I'm sorry.  It went by too fast.  Can you

13    replay that again, that clip.

14    **BY MR. VERHOEVEN:**

15    **Q.**    Mr. Levandowski also says in the text that he wants to

16    win; right?

17    **A.**    That's correct.

18    **Q.**    And like Mr. Levandowski, you wanted to win too?

19    **A.**    That's correct.

20    **Q.**    Please turn in your binder to Exhibit TX-10312.

21    **A.**    Okay.

22    **Q.**    Are you there?

23    **A.**    Yeah.

24    **Q.**    This is a text that Mr. Levandowski sent to you on

25    March 21, 2016; correct?

**KALANICK - DIRECT / VERHOEVEN**

1  **A.**    That appears to be the case, yeah.

2              **MR. VERHOEVEN:**  Your Honor, I move TX-10312 into

3  evidence.

4              **MS. DUNN:**  Your Honor, we'll just state our objection

5  for the record.

6              **THE COURT:**  I'm sorry.  Give me the number again.

7              **MR. VERHOEVEN:**  Certainly.  It's TX-10312, at page --

8              **THE COURT:**  All right.  Received in evidence.

9  Objection overruled.

10      (Trial Exhibit 10312 received in evidence.)

11              **MR. VERHOEVEN:**  Publish it, please.

12      (Document displayed.)

13  **BY MR. VERHOEVEN:**

14  **Q.**    And here we can see that this is the text from

15  Mr. Levandowski to you; correct?

16  **A.**    Yes.

17  **Q.**    And it's dated -- I misspoke.  It's dated March 19, 2016.

18  Do you see that?

19  **A.**    Oh, sorry.  Yeah, I do.

20  **Q.**    And Mr. Levandowski says, quote, Here's the speech you

21  need to give.  And that's a little winky sign; right?

22  **A.**    It's a winky face, yes.

23  **Q.**    And you read this text; right?

24  **A.**    I assume so.

25  **Q.**    And next to the winky face is a link to a YouTube video.

KALANICK - DIRECT / VERHOEVEN

 1   Do you see that?

 2   **A.**    Yeah, I do.

 3        **MR. VERHOEVEN:**  Let's play that YouTube video.

 4      (Video played.)

 5   **BY MR. VERHOEVEN:**

 6   **Q.**    You clicked on that link, didn't you, sir?

 7   **A.**    I don't know.

 8   **Q.**    You wouldn't remember that if you clicked on that?

 9   **A.**    I would -- I think I would.  There's a winky face right

10   there.

11   **Q.**    And I saw that winky face.

12   **A.**    Yeah.

13   **Q.**    That's a famous speech, isn't it, sir?

14   **A.**    It's a movie; it's fake.

15   **Q.**    Yeah.  It's called *Wall Street*; right?

16   **A.**    I think so, yeah.

17   **Q.**    And it's the "Greed is Good" speech; right?

18   **A.**    I don't know the name of it, but I've seen the video

19   before -- the movie, I guess.

20   **Q.**    Now, during this time period in March of 2016,

21   Mr. Levandowski was also texting you directly about something

22   called the Stroz due diligence investigation; right?

23   **A.**    That's possible.

24   **Q.**    You're aware generally that, as part of the deal, the

25   lawyers set up a -- hired a company called Stroz to do some due

1    diligence; right?

2    A.    That's correct.

3    Q.    And as part of that, they -- the company Stroz -- the

4    entity Stroz was inquiring into Mr. Levandowski about what he

5    had on his computers and asking questions of him; right?

6    A.    Yeah, I think that's -- that was part of the process.

7    Q.    Now, let's go to TX-376 in your binder.

8         MR. VERHOEVEN:  Let's move it into evidence, TX-376.

9         Can we publish it?

10        THE COURT:  Please go ahead.  In evidence.

11        (Trial Exhibit 376 received in evidence.)

12   BY MR. VERHOEVEN:

13   Q.    Are you there, Mr. Kalanick?

14   A.    Yes, I am.

15   Q.    Okay.  So this is another text from Mr. Levandowski to

16   yourself.  This one is dated March 21st, 2016.  Do you see it?

17   A.    I do.

18   Q.    And he's responding to you.  He says, quote, Yes, we were

19   slow on two items.  They were the diligence questionnaires

20   (dumb questions like how many email accounts I have), and

21   product design questionnaires for IP check.

22        Do you see that?

23   A.    I do.

24   Q.    What question were you asking him?

25   A.    I don't remember.  I don't remember.

**KALANICK - DIRECT / VERHOEVEN**

1   Q.   You were asking him about the due diligence; right?

2   A.   It's possible.

3   Q.   And he's telling you that they just had dumb questions.

4   Do you see that?

5   A.   I think that -- yeah, that's one part of what he's telling

6   me, yes.

7   Q.   You didn't text him back and say, "Those aren't dumb

8   questions; you need to be careful," did you?

9   A.   I don't know how I responded.

10  Q.   You don't remember, do you?

11  A.   That's correct.

12  Q.   Let's turn to another exhibit, please, in your binder.

13  TX-8011.

14          MR. VERHOEVEN:   Any objection to 8011?

15          MS. DUNN:   No objection.

16          MR. VERHOEVEN:   Put it up, Your Honor?

17          THE COURT:   Yes.

18      (Trial Exhibit 8011 received in evidence.)

19      (Document displayed.)

20  BY MR. VERHOEVEN:

21  Q.   Here's another text from Mr. Levandowski to yourself.   Do

22  you see that?

23  A.   Yep.

24  Q.   And this one is dated March 21st, 2016, same day; right?

25  A.   Yep.

1  **Q.**   And in this one, Mr. Levandowski says, quote, I am

2  squeezing our attorneys like toothpaste too.   Thanks for

3  pushing.   It really is helping.

4       Do you see that?

5  **A.**   I do.

6  **Q.**   Do you remember squeezing the attorneys like toothpaste?

7  **A.**   No, not exactly.

8  **Q.**   You don't dispute that you read this, do you?

9  **A.**   No.

10 **Q.**   Let's look at another exhibit.   This is already in

11 evidence.

12      **MR. VERHOEVEN:**   That was in evidence; right, Your

13 Honor?

14      **THE COURT:**   8011 is in evidence.

15      **MR. VERHOEVEN:**   Yes.

16 **BY MR. VERHOEVEN:**

17 **Q.**   Let's go to TX-0378.

18      **MR. VERHOEVEN:**   Is there any objection to this one?

19      **MS. DUNN:**   No objection.

20      **THE WITNESS:**   Say the number one more time.

21      **MR. VERHOEVEN:**   Sure.   0378.

22      **THE WITNESS:**   0378.

23      **THE COURT:**   Any objection?

24      **MR. VERHOEVEN:**   There was no objection.

25      **THE COURT:**   All right.   Received in evidence.

KALANICK - DIRECT / VERHOEVEN

```
 1          (Trial Exhibit 0378 received in evidence.)
 2          THE WITNESS:  0378.  I don't know if that's here.
 3   Hold on.  I don't have -- I see --
 4          THE COURT:  Counsel, go up there to the witness
 5   bench --
 6          THE WITNESS:  I gotcha.
 7          THE COURT:  -- and help him find the exhibit.
 8          THE WITNESS:  I got it.
 9          THE COURT:  He's found it.  All right.
10          THE WITNESS:  Yeah.
11          MR. VERHOEVEN:  Put it on the screen.  Can we pull out
12   the highlighting there.
13          (Document displayed.)
14   BY MR. VERHOEVEN:
15   Q.   You see this is an email from Mr. Levandowski, and the
16   subject matter says "Whiteboard translation TK points."
17   A.   Yes, I see that.
18          MR. VERHOEVEN:  Before I go into this -- I apologize I
19   didn't raise this earlier, Your Honor -- there's some profanity
20   in this.  I don't know if there's an issue with that --
21          THE COURT:  We've seen --
22          MR. VERHOEVEN:  -- what your policy is with that.
23          THE COURT:  I don't know what -- I can't read it.  The
24   print's too small.  It's part of the evidence.
25          MR. VERHOEVEN:  Okay.
```

1          **THE COURT:**  It's in evidence.  Proceed.

2    BY MR. VERHOEVEN:

3    **Q.**   All right.  Direct your attention to the attachment.  So

4    the TK refers to you; right?

5          Before we do that, let's just look at the attachment,

6    Mr. Fisher, the whole thing.

7          There's a whiteboard right there; right?

8    **A.**   Correct.

9    **Q.**   And it's hard to read.  I can make it bigger if you want,

10   but that's your handwriting, isn't it?

11   **A.**   Yes, it is.

12   **Q.**   All right.

13         **MR. VERHOEVEN:**  Now, let's go to the pullout.

14   BY MR. VERHOEVEN:

15   **Q.**   And you wrote -- this is also a meeting with

16   Mr. Levandowski; right?  Remember this?

17   **A.**   I would assume so.

18   **Q.**   Yeah.  And you wrote here, "Pittsburg ++ - I know some

19   shit."

20   **A.**   Yeah.

21   **Q.**   Do you see that?

22   **A.**   I do.

23   **Q.**   Mr. Levandowski had told you that "I know some shit"; is

24   that right?

25   **A.**   I don't know.  I'm guessing.  I mean, maybe there's

**KALANICK - DIRECT / VERHOEVEN**

1    something there that -- I'm not sure what that means exactly.

2    **Q.**   You wrote it down.

3    **A.**   It was two years ago.

4    **Q.**   You were at the meeting?

5    **A.**   That -- that's true.

6    **Q.**   Do you deny that this is Mr. Levandowski saying to you "I

7    know some shit"?

8    **A.**   No.  I mean, it could be that -- it could be that -- we

9    were trying to figure out how Pittsburgh team and San Francisco

10   team could work together well.  Them sort of understanding that

11   each team brought something to the party is how you get people

12   to work together.

13        And Pittsburgh was the only place we were doing autonomy,

14   and adding a West Coast presence was like unsettling for folks

15   who thought everything was going to be done at their -- at

16   their facility.

17   **Q.**   So Levandowski saying, hey, I know some shit that's going

18   to help, isn't he talking about the fact that he knows all

19   about how to make lasers?

20   **A.**   No, that's not it.  You see this like "Ying Yang

21   complementary" --

22   **Q.**   Thank you.  Thank you, sir.

23   **A.**   Sorry.

24   **Q.**   You deny that that's what he's saying?

25   **A.**   I -- state the question again.

KALANICK - DIRECT / VERHOEVEN

1  Q.   Isn't it true that what he means by, at this meeting, when

2  he said, "I know some shit" --

3  A.   No.

4  Q.   -- is he's talking about the laser technology that he

5  knows?

6  A.   I don't --

7  Q.   Yes or no, sir?

8  A.   I don't believe so.

9  Q.   Let's go to -- in your binder to TX-0911.

10        MR. VERHOEVEN:  Any objection?

11        MS. DUNN:  No.

12        THE COURT:  In evidence.

13     (Trial Exhibit 911 received in evidence.)

14        MR. VERHOEVEN:  Can we put it up, please.

15     (Document displayed.)

16  BY MR. VERHOEVEN:

17  Q.   These are the minutes of a special meeting of the board of

18  directors at Uber Technologies, dated April 11, 2016; correct?

19  A.   Correct.

20  Q.   And this is the board meeting where the board considered

21  and approved the acquisition of Ottomotto; correct?

22  A.   That's correct.

23  Q.   And you see in the minutes it says, quote, Mr. Kalanick

24  and Mr. Poetzscher led the discussion regarding a potential

25  acquisition and described key aspects of the proposed

1   transaction.

2        Do you see that, sir?

3   **A.**    I do.

4   **Q.**    You deny those minutes are accurate?

5   **A.**    No.  They seem accurate.  I did the first part of the

6   meeting.  He did the second part.

7   **Q.**    Please turn in your binder to TX-0910.

8   **A.**    0910.

9              **MR. VERHOEVEN:**  Any objection?

10             **MS. DUNN:**  No objection.

11             **THE COURT:**  Received.

12        (Trial Exhibit 0910 received in evidence.)

13             **MR. VERHOEVEN:**  Can you put it on the screen, please.

14        (Document displayed.)

15  **BY MR. VERHOEVEN:**

16  **Q.**    Do you see this says "Project Zing Review," and it's also

17  dated April 11, 2016?

18  **A.**    That's correct.

19  **Q.**    Zing refers to the Ottomotto transaction?

20  **A.**    Yes, I think so.

21  **Q.**    And you and Mr. Cameron -- excuse me, Mr. Poetzscher

22  presented this slide deck to the board as part of the

23  presentation to the board in connection with approving the

24  transaction; correct?

25  **A.**    So I did a preamble to this presentation, and then Cameron

1    presented the presentation itself.

2    **Q.**   Are you saying you weren't involved in this presentation,

3    sir?

4    **A.**   I said that I did the preamble to the presentation.  I did

5    not present the slides.

6    **Q.**   You didn't say anything at this meeting except a preamble?

7    **A.**   I may have said something during the meeting.  I just

8    didn't present the slides.

9    **Q.**   Let's go to page 2 of these slides.

10        And you see it says "Deal Overview," and on the left it

11   says "Rationale"?

12           **MR. VERHOEVEN:**  Can we pull that out a little bit

13   bigger.

14   **BY MR. VERHOEVEN:**

15   **Q.**   I have it there highlighted on the screen.  You see it

16   says "Rationale"?

17   **A.**   Yeah.

18   **Q.**   And this is the presentation to the board; right?

19   **A.**   That's correct.

20   **Q.**   So the rationale for the deal, that's what that's

21   referring to?

22   **A.**   Yeah.

23   **Q.**   And it says, quote, Lasers are critical to Uber's

24   autonomous vehicle development, and Ottomotto is expected to

25   de-risk our current laser approach, closed quote.

**KALANICK - DIRECT / VERHOEVEN**

1           Do you see that?

2     A.    I do.

3     Q.    And that was presented as the rationale for the deal;

4     right?

5     A.    One of the rationale, yes.

6     Q.    You see it also says -- there's another rationale that it

7     would accelerate current timelines?

8     A.    That's correct.

9     Q.    So it would help you win this race; right?

10    A.    Yes.

11    Q.    Now, if you look at the bottom portion, it says "Terms."

12    Do you see that?

13    A.    Yes, I do.

14    Q.    And what's the number there, 592 million?

15    A.    That's correct.

16    Q.    And that would be paid to Mr. Levandowski and Ottomotto

17    if -- it says "tied to the achievement of technical

18    milestones."

19          Do you see that?

20    A.    I -- I do.

21    Q.    And so they wouldn't get paid unless they achieved these

22    technical milestones; right?

23    A.    If they get those mile -- if they hit the technical

24    milestones, then they will get paid that 20 percent.  If they

25    don't hit the technical milestones, ultimately, they could

**KALANICK - DIRECT / VERHOEVEN**

 1   still get the entire payment.

 2   **Q.**   Yeah, you said that yesterday.

 3   **A.**   Yeah.

 4   **Q.**   Let's say that they fail and they can't develop the

 5   technology.

 6   **A.**   Yeah.

 7   **Q.**   How are they going to hit the other milestones?

 8   **A.**   Well, we were already buying lasers from a bunch of

 9   vendors.  And so if those vendors could scale their production

10   of lasers, then our own laser wasn't necessary but we could

11   still build all the software to get us to autonomous vehicles.

12   **Q.**   So let me see if I understand this.

13        The whole rationale for the deal is that they can build

14   lasers.  And you're saying that they would get paid 80 percent

15   of the 592 million if they failed to deliver the lasers.  Is

16   that what you're saying, sir?

17   **A.**   No, that's not what I'm saying.  The whole rationale of

18   the deal was not that they build lasers.  It was a small part

19   of the deal.

20   **Q.**   It's a small part of the deal.

21   **A.**   That's correct.

22   **Q.**   Okay.

23   **A.**   20 percent.

24   **Q.**   It also says "Uber will indemnify claims from former

25   employers (e.g. IP)."  Do you see that?

**KALANICK - DIRECT / VERHOEVEN**

1   A.   Yes, I do.

2   Q.   IP, intellectual property; right?

3   A.   Yes.

4   Q.   That's IP just like we saw in Mr. Bares' email that

5   referred to IP in these guys' heads; right?  That's IP?

6   A.   Yes.

7   Q.   And this is saying if Google sues for this, that we've

8   promised that we will indemnify Ottomotto; correct?

9   A.   Not necessarily.  It was under certain -- my guess is

10  under certain conditions.

11  Q.   Okay.  Subject to certain restrictions and limitations;

12  right?

13  A.   Yeah.  Like I'm -- I'm just guessing there's a number

14  of --

15  Q.   We don't want you to guess, sir.

16  A.   Yeah.

17  Q.   Okay?

18  A.   Fair enough.

19  Q.   All right.  But, nonetheless, this says "Uber will

20  indemnify claims from former employees (e.g. IP)."  It says it

21  right there?

22  A.   Yes, it does.

23  Q.   And the board was told that; right?

24  A.   Yes, it was.

25  Q.   Direct your attention to page 5 of Exhibit 910.

```
 1            MR. VERHOEVEN:  And can we pull out the square that

 2   says "Pre-signing Due Diligence."

 3   BY MR. VERHOEVEN:

 4   Q.   Is that highlighted on the screen for you, sir?

 5   A.   Yes, I see that.

 6   Q.   And here, this is part of the presentation to the board;

 7   correct?

 8   A.   Yes.  Well, it's the appendix.  I'm not sure if this slide

 9   was presented.

10   Q.   The board had the slide deck?

11   A.   I'm not sure.  I don't know.

12   Q.   Okay.  You don't know whether the board would have the

13   slide deck?

14   A.   Correct.

15   Q.   Okay.  "Third-party forensic expert performed DD."  That's

16   referring to Stroz; right?

17   A.   Yes.

18   Q.   And then it says "Uber received report from that

19   third-party forensic expert."

20        Do you see that, sir?

21   A.   I do.

22   Q.   And then it continues, "Based on our review of the facts,

23   Uber decided to move forward with signing."

24        Do you see that?

25   A.   Yes, I do.
```

KALANICK - DIRECT / VERHOEVEN

1  Q.   What did you say to the board about the due diligence in

2  connection with the indemnity?

3  A.   I'm not sure I said anything about it.

4  Q.   You didn't say anything?

5  A.   I don't believe I did.

6  Q.   But the board was told on April 11th -- withdrawn.

7       In fact, you never received any report from the forensic

8  expert, did you?

9  A.   Well, I personally did not.

10  Q.   And you didn't receive any interim reporting prior to this

11  April 11th board meeting from Stroz, did you?

12  A.   I personally did not.

13  Q.   You aren't even aware that there was an expert report,

14  were you?  Excuse me.  I withdraw that question.

15          MR. VERHOEVEN:  Get my tenses right, Your Honor.

16  BY MR. VERHOEVEN:

17  Q.   At the time, you were not even aware that there was any

18  report; right?

19  A.   That's correct.

20  Q.   You never read the Stroz report, did you?

21  A.   I wasn't aware that Legal had been working on a Stroz

22  report.

23  Q.   You haven't read the Stroz report, have you?

24  A.   That's correct.

25  Q.   Ever?

1    A.    That's correct.

2    Q.    Now, you're the CEO.  You could have looked at -- at the

3    time you're the CEO.  You could have looked at anything you

4    wanted; right?

5    A.    Technically, yes.

6    Q.    You don't even know if the Stroz report was sent to any

7    one of your other board members; right?

8    A.    I think ultimately it was.

9    Q.    At the time?

10   A.    At the time, no.  I think it was a legal process.

11   Q.    The board was told that you had conducted a review of the

12   facts and decided to move forward with signing, wasn't it, sir?

13   A.    It was -- it was told that Uber had conducted a review of

14   the facts.

15   Q.    You told the board that the due diligence had come up

16   clean, didn't you, sir?

17   A.    I did not.

18   Q.    Mr. Poetzscher told the board the due diligence had come

19   up clean, didn't he?

20   A.    I don't remember him saying that.

21   Q.    Did you tell the board what the results were from the

22   forensic expert?

23   A.    I did not.

24   Q.    Did Mr. Poetzscher?

25   A.    I don't remember him doing that, no.  We believed that the

KALANICK - DIRECT / VERHOEVEN

1   diligence --

2   Q.   Thank you, sir.

3   A.   Okay.

4   Q.   The Stroz investigation was looking at, in part, whether

5   Mr. Levandowski had committed bad acts; isn't that true?

6   A.   I wasn't in the details of the diligence.  It was a legal

7   and deal team process.

8   Q.   Do you know that the Stroz investigation was investigating

9   the subject of bad acts?

10  A.   I did not know that, no.  They were --

11  Q.   Did your -- did any briefing you received prior to

12  April 11th include anything about bad acts?

13  A.   I received briefing from legal, sort of status updates on

14  the diligence process.

15  Q.   Let's play from your deposition dated July 27, 2017, at

16  page 153, 22 through 24.

17       (Video played.)

18  BY MR. VERHOEVEN:

19  Q.   You don't remember seeing any documents referring to bad

20  acts associated with this transaction; right?

21  A.   That's correct.

22  Q.   You never read any documents or agreements that talked

23  about bad acts in connection with this transaction; right?

24  A.   That's correct.

25  Q.   Turn in your binder, please, to TX-285.

KALANICK - DIRECT / VERHOEVEN

 1            MR. VERHOEVEN:  And I'd like to know, is that objected

 2    to?

 3            MS. DUNN:  No objection.

 4            MR. VERHOEVEN:  Move TX-285 into evidence.

 5            THE COURT:  All right.  Received.

 6        (Trial Exhibit 285 received in evidence.)

 7        (Document displayed.)

 8            MR. VERHOEVEN:  Can we pull up the little text there

 9    so it's easier to read.

10            THE WITNESS:  Okay.

11    BY MR. VERHOEVEN:

12    Q.   Do you see this?  It says "Agreement and Plan of Merger"?

13    A.   I do see that.

14    Q.   This is the acquisition agreement that the board approved

15    on April 11th, after your presentation; correct?

16    A.   That's correct.

17    Q.   Turn to page 51.

18            MR. VERHOEVEN:  And can we highlight -- there we go.

19    BY MR. VERHOEVEN:

20    Q.   Is that your signature on page 51?

21    A.   Yes, it is.

22    Q.   So you signed this agreement; correct?

23    A.   Yes, I did.

24    Q.   Isn't it true, sir, that you didn't even read this

25    agreement before you signed it?

KALANICK - DIRECT / VERHOEVEN

1    A.    That's correct.

2    Q.    There was also an indemnification agreement between Uber

3    and Mr. Levandowski that was entered into on the very same day,

4    April 11th, 2016.  Do you remember that?

5    A.    Yes.

6    Q.    Turn in your binder to TX-743, please.

7              MR. VERHOEVEN:  And any objection?

8              MS. DUNN:  No objection.

9              THE COURT:  Received.

10         (Trial Exhibit 743 received in evidence.)

11             MR. VERHOEVEN:  Put it up.

12         (Document displayed.)

13             MR. VERHOEVEN:  And can we highlight the top or pull

14   up the top, please, Mr. Fisher.  Just the top, please.  There

15   we go.

16   BY MR. VERHOEVEN:

17   Q.    This is the indemnification agreement; right?

18   A.    I believe that to be the case.

19   Q.    Now, it's your testimony that you don't even recognize

20   this indemnification agreement, isn't it?

21   A.    I've never seen -- I've never read the indemnification

22   agreement.

23   Q.    Let's play from your deposition dated July 27, 2017, from

24   page 276/25 through 277/5.

25         (Video played.)

**KALANICK - DIRECT / VERHOEVEN**

1   BY MR. VERHOEVEN:

2   Q.   Direct your attention to page 19.  That's your signature,

3   isn't it, sir?

4   A.   Yes, it is.

5   Q.   You signed this indemnification agreement; right?

6   A.   Yes, I did.

7   Q.   But you didn't even bother to read this document before

8   you signed it, did you, sir?

9   A.   No.  I signed --

10  Q.   Thank you, sir.

11  A.   -- hundreds of documents a month.

12  Q.   Thank you, sir.

13  A.   All right.

14  Q.   And it's your testimony that you're not even familiar with

15  the terms of this indemnification agreement; right?

16  A.   That's correct.

17  Q.   Under this agreement, Uber agreed to indemnify

18  Mr. Levandowski for bad acts that he committed prior to

19  April 11th; isn't that true, sir?

20  A.   I am not familiar with the details of the indemnification

21  agreement, but that is my understanding.

22        MR. VERHOEVEN:  Let's go -- let's pull up TX-743.

23  Let's pull out the whereas clause, please, Mr. Fisher.

24        (Document displayed.)

25

1    BY MR. VERHOEVEN:

2    Q.   All right.  Can you see that on the screen?

3    A.   I can.

4    Q.   It says, quote, Whereas, the parties agree that any claim

5    that has arisen out of or resulted from any pre-signing bad

6    acts committed by or on behalf of any member of the company

7    group by a diligenced employee" -- Mr. Levandowski was a

8    diligenced employee; right?

9    A.   Correct.

10   Q.   -- "and/or committed by any diligenced employee that

11   reasonably arises or results from any facts," and then it goes

12   on.  It says, "It shall" --

13            MR. VERHOEVEN:  Can we highlight, Mr. Fisher.

14   BY MR. VERHOEVEN:

15   Q.   -- "constitute an indemnifiable claim."

16        Do you see that?

17   A.   I do.

18   Q.   So this is saying that the company will indemnify

19   Mr. Levandowski if he gets sued for committing bad acts prior

20   to April 11th; right?

21            MS. DUNN:  Objection, Your Honor.  Foundation.

22            THE COURT:  Sustained.

23        Since he said he has not read it, you're asking him to

24   make conclusions about a long document that -- on the fly.

25        You can ask him what his understanding back at the time

KALANICK - DIRECT / VERHOEVEN

1  was.

2         MR. VERHOEVEN:  Thank you, Your Honor.

3         THE COURT:  But I have a feeling that this is going to

4  take up too much time.  So please proceed in a different way.

5         MR. VERHOEVEN:  Thank you, Your Honor.

6  BY MR. VERHOEVEN:

7  Q.   You see here that the bad acts is defined?

8  A.   Yes, I do.

9  Q.   And you see it concludes, "misappropriation by an

10 employee ... of any trade secrets from a former employer."  Do

11 you see that?

12 A.   Yeah.  I think that's -- it's a longer sentence than that,

13 but, yes, I do see that.

14 Q.   It says at least that, doesn't it?

15 A.   It does.

16 Q.   Now, it's your testimony -- withdrawn.

17      Other than --

18         MR. VERHOEVEN:  We can put that down, Mr. Fisher.

19 BY MR. VERHOEVEN:

20 Q.   Other than the Ottomotto deal and this specific

21 indemnification agreement, isn't it true, sir, that you've

22 never heard of an indemnification agreement that uses the words

23 "pre-signing bad acts"?

24 A.   That's correct.

25 Q.   Let's move on.  I'd like to show exhibit -- or please turn

```
 1    in your binder to TX-0682.

 2              MR. VERHOEVEN:  This is in evidence, Your Honor.

 3         (Document displayed.)

 4              MR. VERHOEVEN:  And can we pull up --

 5    BY MR. VERHOEVEN:

 6    Q.   I'll give you a chance to get there.

 7    A.   I'm here.

 8              MR. VERHOEVEN:  Can we pull up the excerpt that I'd

 9    like to show, Mr. Fisher.

10    BY MR. VERHOEVEN:

11    Q.   This is on page 1.  And you see the date is April 28th,

12    2016?

13    A.   I do see that, yes.

14    Q.   So the deal was signed April 11th; right?

15    A.   Yes.

16    Q.   So this is just a little bit later; right?

17    A.   Yes.

18    Q.   And this is Mr. Bares' notes.  And TK is you?

19    A.   Yes.

20    Q.   It says "top priorities from TK."  Do you see that?

21    A.   Yes.

22    Q.   And then on the right it says "cheat codes.  Find them.

23    Use them."

24         You said that at this meeting, didn't you, sir?

25    A.   It's quite possible.
```

**KALANICK - DIRECT / VERHOEVEN**

1   Q.   If we can go to page 2.  And we pull out -- this is the --

2   I'll represent this is the same April 28 meeting.

3   A.   Okay.

4   Q.   Okay?

5   A.   Yep.  Page 2.  All right.

6   Q.   It says "tone"?

7   A.   Yeah.

8   Q.   And it says "The golden time is over.  It's wartime."

9   A.   Yes.

10  Q.   Do you see that?

11  A.   I do.

12  Q.   You said that to the team, didn't you, sir?

13  A.   It sounds like something I would say.

14  Q.   And you said "Going slower is not an option anymore";

15  right?

16  A.   Yes.

17  Q.   And then you said "In each area, what do we do to win?

18  Then figure out how to get there."

19       You said that too, didn't you?

20  A.   Yeah, it sounds like something I would say.

21  Q.   Let's turn in your binder to TX-0682.

22  A.   Yep.

23  Q.   Is that the same exhibit?  I apologize.  It's the same

24  exhibit.

25       Turn to page 6.

1              MR. VERHOEVEN:  If we could pull out from page 6,

2    please.

3    BY MR. VERHOEVEN:

4    Q.   This is Mr. Bares' notes again.  It says "TK."  That's

5    you; right?

6    A.   Yeah.

7    Q.   "TK jam on how to move faster."

8         That's that jam session you talked about yesterday; right?

9    A.   That's correct.

10   Q.   So you're having a jam session on how to move faster;

11   right?

12   A.   Yep.

13   Q.   And you say that you "want AL to allow us to leapfrog,"

14   don't you?

15   A.   Yes.

16   Q.   And AL is Mr. Levandowski?

17   A.   That's correct.

18   Q.   And leapfrog is jumping over somebody else, isn't it?

19   A.   Yeah, something like that.

20   Q.   Yeah.  And you were talking about Google, weren't you?

21   A.   Possibly.  I don't know.  I don't know if it was

22   specifically about them.

23   Q.   Please turn in your binder to the document -- a document

24   that's been marked as TX-383.

25   A.   TX-383.

1          Okay.  Okay.

2               MR. VERHOEVEN:  Any objection to 383?

3               MS. DUNN:  No objection, Your Honor.

4               THE COURT:  Thank you.  Received in evidence.

5          (Trial Exhibit 383 received in evidence.)

6               MR. VERHOEVEN:  Publish it, please.

7          (Document displayed.)

8    BY MR. VERHOEVEN:

9    Q.   There is a text --

10              MS. DUNN:  Pardon -- I apologize.

11   BY MR. VERHOEVEN:

12   Q.   This is a text from Mr. Levandowski.

13              MR. VERHOEVEN:  Is there an objection?

14              THE COURT:  I'm not sure.  Ms. Dunn, are you --

15              MS. DUNN:  I'm not objecting to the exhibit.  There

16   was a discussion to not display part of this to the public.  So

17   that's all we would ask.

18              MR. VERHOEVEN:  Is it the telephone number?

19              MS. DUNN:  Can I?  Sorry.

20         (Counsel confer off the record.)

21              MR. VERHOEVEN:  Okay.  Let's just display -- there's

22   some personal information, Your Honor, that apparently didn't

23   get redacted.

24        So can we just display this to -- not the public but just

25   on the screens here?

1              THE WITNESS:  That's fine.

2              THE COURT:  All right.  Angie, please try to do that.

3       Okay.  Let's go.

4              MR. VERHOEVEN:  Otherwise, there's no objection to

5       this exhibit?

6              MS. DUNN:  Otherwise, no objection.  Thank you.

7              THE COURT:  It's in evidence.

8    BY MR. VERHOEVEN:

9    Q.   And you see here this is a text from Mr. Levandowski?

10   A.   Yeah.

11   Q.   And he says -- and it's dated May 5, 2016?

12   A.   That's correct.

13   Q.   And he says, quote, Driving to SF to meet with Scott ATC

14   laser guy and guide the team, close quote.

15        Do you see that?

16   A.   Yes.

17   Q.   SF is San Francisco?

18   A.   Yes.

19   Q.   Scott is Scott Boehmke?

20   A.   Sounds like it could be, yeah.  I don't know.

21   Q.   Scott Boehmke is part of Uber's ATC program in Pittsburgh?

22   A.   I'm not familiar with last names.  I know somebody named

23   Scott.

24   Q.   And this person you know named Scott was in charge of the

25   LiDAR laser effort at Uber's ATC program in Pittsburgh; isn't

**KALANICK - DIRECT / VERHOEVEN**

1  that true, sir?

2  **A.**   I don't know.  I -- I've met Haslim as well.  So I thought

3  he was running that effort.  But I'm not in the specifics of

4  who ran what on -- at this level.

5  **Q.**   Scott was in charge specifically of the LiDAR laser

6  effort; right, sir?

7  **A.**   I don't know.

8  **Q.**   Levandowski is telling you that he's meeting with him to

9  guide the team; right?

10  **A.**   That appears to be the case, yes.

11  **Q.**   To guide the laser team?

12  **A.**   Yes.

13  **Q.**   All right.  Let's move on.

14      Now, we had -- at the very beginning of this examination,

15  I asked you about an interview you had with Bloomberg.  Do you

16  remember that?

17  **A.**   Yes, I do.

18  **Q.**   And we had some problem getting it on the screen.  So

19  rather than -- I'll try it without the article.

20      You remember you had an interview; right?

21  **A.**   I do.

22  **Q.**   And isn't it true, sir, that in this interview the

23  interviewer from Bloomberg asked you when you reconnected with

24  Levandowski since the last time you met him?

25  **A.**   I don't remember that, but it could have happened.

1    Q.    Turn in your binder to TX-291, at page 7.

2    A.    Yep.  Was there a certain page?

3    Q.    Page 7.

4    A.    Okay.

5          Okay.

6    Q.    Do you see where it -- there's a question from a fellow

7    named Max.  And there's a reference to TED.  Do you see that?

8    A.    Yeah.  I see that, yeah.

9    Q.    Does this refresh your recollection that you were asked

10   when you reconnected with Mr. Levandowski after a TED

11   conference?

12   A.    Yeah, well, I see that, the question.  I see that

13   question, yes.

14   Q.    And you told Bloomberg that you reconnected with

15   Mr. Levandowski after Mr. Levandowski got Otto up and running,

16   didn't you, sir?

17   A.    I don't remember saying that, but it's very possible I

18   could have.

19   Q.    Do you dispute that?

20   A.    Well, I didn't meet Anthony at TED in the first place,

21   so --

22   Q.    Do you dispute that you told this reporter, in connection

23   with the announcement of this deal, that you reconnected with

24   Mr. Levandowski after he got Otto up and running?

25   A.    It's possible.  I just don't know.

**KALANICK - DIRECT / VERHOEVEN**

1   Q.   Do you think the reporter is lying?

2   A.   I don't -- is this from the report?

3          THE COURT:   Don't answer it.

4      Mr. Verhoeven, that's an argumentative question.  It's out

5   of bounds.  You'll have to bring in the reporter if you want to

6   get that in evidence.

7          MR. VERHOEVEN:   Okay, Your Honor.

8          THE COURT:   So let's move on.

9   BY MR. VERHOEVEN:

10  Q.   In fact, you did not reconnect with Mr. Levandowski after

11  he got Otto up and running; right?

12  A.   That's correct.  We started talking to him before he got

13  Otto up and running.

14  Q.   Now, after the deal was done, you -- you put

15  Mr. Levandowski in charge of Uber's entire driverless car

16  program; right?

17  A.   That is correct.

18  Q.   So you made him in charge of the entire thing; right?

19  A.   That is correct.

20  Q.   And isn't it true, sir, that you personally considered at

21  the time that Mr. Levandowski was a brother from another

22  mother?

23  A.   That's something I said a couple of times, yes.

24          MR. VERHOEVEN:   Thank you.  I pass the witness.

25          THE COURT:   All right.  We're going to start with the

1    other side and then -- unless the jury needs to take a bathroom

2    break or otherwise needs to go into the jury room, then -- all

3    right.  We'll go for about another 20 minutes, and then we'll

4    take our first break.

5         Ms. Dunn, it's your turn.

6         MS. DUNN:  Thank you, Your Honor.

7                     CROSS-EXAMINATION

8    BY MS. DUNN:

9    Q.   We're on the clock, so I have my stopwatch.

10        Good morning, Mr. Kalanick.

11   A.   Good morning.

12   Q.   Mr. Kalanick, did you want to get ahead in the race for

13   self-driving cars?

14   A.   Yes.

15   Q.   Did you compete aggressively for the best engineers in the

16   world to do that?

17   A.   Yes.

18        THE COURT:  May I suggest that you scoot the base back

19   about two inches closer, of the microphone, so that it's closer

20   to your voice.  And it will be easier for the --

21        MS. DUNN:  I can also be louder.  How about that?

22        THE COURT:  Well, no, it will pick it up; it's just

23   not close to your voice.

24   BY MS. DUNN:

25   Q.   Mr. Kalanick, did you compete aggressively for the best

1    engineers in the world to get ahead in the race for

2    self-driving cars?

3    **A.**    Yes.

4    **Q.**    And did you hire people from Google to help you do that?

5              **MR. VERHOEVEN:**  Objection.

6              **THE WITNESS:**  Yes.

7              **MR. VERHOEVEN:**  Leading.

8              **THE COURT:**  Sustained.

9    **BY MS. DUNN:**

10   **Q.**    Where did you find those people that you hired to get

11   ahead in the race of self-driving cars?

12             **MR. VERHOEVEN:**  Same objection.

13             **THE COURT:**  All right.  I need to explain something to

14   the -- wait.

15        Well, that's not a leading question.  Where?

16             **MR. VERHOEVEN:**  Well, the rest of the sentence is,

17   Your Honor.

18             **THE COURT:**  That one is overruled.

19        But I need to explain, since I'm interrupting, something

20   to the jury.

21        You may be thinking that Mr. Verhoeven wants to have it

22   both ways.  All he did was ask leading questions; right?  A

23   leading question is one that suggests the answer, like "Isn't

24   it true the light was red?"

25        And as soon as Ms. Dunn gets up there and asks a leading

 1    question, Mr. Verhoeven jumps up and objects.  So you may be

 2    over there thinking he's trying to have it both ways.

 3          That's a legal term, "having it both ways."

 4          (Laughter.)

 5          THE COURT:  But, actually, it's okay.  Here's the

 6    reason:  Ms. Dunn is allied with this witness.  And the

 7    time-honored rule is that the lawyer allied with the witness

 8    should not ask leading questions except on -- there are a few

 9    minor exceptions that I won't get into.

10          They're supposed to ask questions like "What did you do?

11    Who did you meet?  When did that happen?"  Open-ended

12    questions.

13          On the other hand, the side that is not allied with the

14    witness, like Mr. Verhoeven, gets to ask leading questions

15    because that lawyer wants to make a specific point.  "Isn't it

16    true the light was red?"

17          So it's okay for one side to ask leading questions but the

18    other side not.  I find that jurors get confused over this and

19    think the lawyer is trying to do something the other side --

20    you know, objecting when they do it.  But no, there's a very

21    good reason for this difference.

22          All right.  So, on preliminary matters, I will let you

23    lead; but, otherwise, no, you cannot lead the witness.

24          All right.  Let's go ahead.

25          MS. DUNN:  Thank you, Your Honor.

1  BY MS. DUNN:

2  Q.   Mr. Kalanick, I'm just going to ask you this directly.

3       To what extent was Anthony Levandowski hired in order to

4  get Google's trade secrets?

5  A.   To no extent at all.

6  Q.   Please explain to this jury why you hired him.

7  A.   We hired -- we hired Anthony because we felt that he was

8  incredibly visionary, a very good technologist.  And he was

9  also -- you know, he was also very charming.

10      And we wanted to not just understand how all the

11 technologies sort of could be put together to make driverless

12 cars a reality but having a vision for what that means for

13 cities, how that changes the way cities work, and how to sort

14 of couple that with a ride-sharing system.

15      And he had -- he really had a vision for how to make that

16 work that was compelling.  And that's -- that's why we hired

17 him.

18 Q.   And how do you feel about him now?

19 A.   Look, this has been a difficult process.  He had some --

20 this was -- this makes it not as great as what we thought it

21 was at the beginning.

22 Q.   And you testified that you were interested in

23 Mr. Levandowski because of your desire to work in self-driving

24 cars; is that right?

25 A.   That's correct.

1    Q.    Why was self-driving technology so important to you as CEO

2    of Uber?

3    A.    It was important because, of course, self-driving makes it

4    more safe, makes getting around cities more safe.  It also

5    makes it more efficient.

6          And, ultimately, self-driving is part of the future.  And

7    Uber wants to be part of that future.  And so we need to

8    continue to innovate as well.  And that's why we must be part

9    of that.

10   Q.    So I'm going to take just a small step back.  And

11   Mr. Verhoeven asked you if you're the founder of Uber --

12   A.    Yes.

13   Q.    -- is that right?

14   A.    That's correct.

15   Q.    How did you come up with the idea for Uber?

16   A.    You know, it was actually my cofounder's idea, a friend of

17   mine named Garrett Camp.

18         We were in Paris at a tech conference.  And quite often in

19   Paris you can't get a taxi, can't get around.  It's kind of

20   like San Francisco pre-Uber.  You're doing a lot of walking and

21   a lot driving.  So if you're in Paris and you're not driving,

22   you're walking home.

23         And we're walking home late at night.  He said, "I want to

24   push a button and get a ride."  And it's sort of one of those

25   smack-your-head moments, like, what a simple, simple idea.

1  It's really complex technology to make it a reality, but that

2  was the beginnings of Uber.

3  **Q.**   And you're no longer CEO; is that right?

4  **A.**   That's correct.

5  **Q.**   But you were CEO.  What was it like to be CEO of Uber?

6  **A.**   It was -- it was a lot of fun.  And it was different at

7  different times because, when we first got started, imagine,

8  like, six people being around a table, and that's your whole

9  team.

10       And day in, day out, you just dream what Uber could be.

11  But as it grew, it becomes this huge thing.  It's not just your

12  team of six; now you have 15,000 people in 85 countries, in

13  basically every major city in the world.

14       And your job sort of goes from being the team of six, kind

15  of in the trenches trying to figure out what the future is

16  going to look like, to empowering literally thousands of teams

17  of six to have that same feeling for their city, for the

18  technology they're building.  But it was always just a lot of

19  fun.  It was a different thing to solve every day and a new

20  thing to invent every day.  It was great.

21  **Q.**   And when it came to self-driving technology, as CEO, what

22  was your first priority?

23  **A.**   The number one priority for self-driving is you've got to

24  get the best people, the best engineers and the best

25  scientists, to make this a reality, because it's not like this

1    is already defined.  It's not like it already exists.  You

2    literally have to invent things that don't exist yet.

3        And nobody solved it.  And this is why we are all still

4    driving or in a car with somebody who is.  It hasn't been

5    solved yet.

6    Q.   Tell us how you first thought about getting into the

7    self-driving business.

8    A.   Well, look, in -- let's see -- summer, late summer of

9    2013, we got an investment from Google.  In fact, when we were

10   closing the deal, I was meeting with Larry Page.  And they

11   picked me up in a self-driving car to meet with Larry Page.

12   And I'm like, that's pretty cool.

13       And the general understanding was, hey, look, Google's

14   doing this self-driving thing.  Uber is doing this ride-sharing

15   thing.  Maybe we can -- we can figure out a way to put those

16   two together and partner up to make that future happen.

17   Q.   So you said Google invested.  When was that?

18   A.   That was August 2013.

19   Q.   Okay.  And at that time in August of 2013, from your

20   perspective, what was the relationship between the two

21   companies?

22   A.   It was kind of like -- it was kind of like a little

23   brother with a big brother.  It may be hard to sort of grok

24   right now, but at the time Uber was maybe -- I don't know -- a

25   couple hundred employees; pretty small.  And, you know, look,

 1   Google was this huge partner of ours, investor on the board.

 2       I looked at, you know, David Drummond and Larry Page kind

 3   of as mentors; but, again, that's the little brother maybe --

 4   maybe trying to get more of their time than they were willing

 5   to give.  But, nonetheless, it was a good relationship.

 6   Q.   And at that time, did you consider Google to be a

 7   competitor?

 8   A.   I did not.

 9   Q.   And at some point, did you start to hear rumors that

10   Google was going to compete with Uber in the ride-sharing

11   space?

12   A.   Yeah.  That happened in sort of -- we started hearing

13   those rumors in May 2014.

14   Q.   And what did you do when you heard those rumors?

15   A.   Well, we -- we constantly would just reach out to Google

16   and say, Look, we heard these rumors.  We're not sure what

17   that's about.  We still want to partner with you.  We still

18   think it's a good idea.  We do the ride-sharing thing, you do

19   the autonomy thing and self-driving thing, and we can put those

20   together.

21       So we were just constantly reaching out, saying, We're

22   hearing rumors you're going to do the ride-sharing thing

23   yourself and the autonomy thing yourself and not partner, but

24   we were sort of optimistic in trying to figure out a way to

25   partner.

 1  Q.    If you look in your binder on Exhibit 1771.

 2          THE COURT:  Is that in evidence yet?

 3          MS. DUNN:  No, but I think there's no objection.

 4      Mr. Verhoeven?

 5          THE COURT:  1771.  Any objection?

 6          MR. VERHOEVEN:  No objection, Your Honor.

 7          THE COURT:  Received in evidence.

 8      (Trial Exhibit 1771 received in evidence.)

 9      (Document displayed.)

10          THE WITNESS:  Okay.

11  BY MS. DUNN:

12  Q.    Okay.  Do you recognize this email to be an email exchange

13  with -- between you and David Drummond, the chief legal officer

14  of Google?

15  A.    Yes, I do.

16  Q.    Dated March 7, 2015?

17  A.    Yes.

18          MS. DUNN:  Your Honor, we offer 1771 into evidence.

19          THE COURT:  In evidence.  Thanks.

20          MS. DUNN:  Great.

21  BY MS. DUNN:

22  Q.    All right.  If we could just focus at the first email in

23  this chain.  It's from blank to blank.  The subject is Intel.

24  A.    Yeah.

25  Q.    And it says, "Heard from a reliable source that Google

1   will be starting a self-driving service in MV in 3 months."

2       Is MV Mountain View?

3   A.   I believe so, yeah.

4   Q.   Okay.  And it looks like you forward this email to

5   Mr. Drummond.  Can you explain to the jury what this is.

6   A.   Yeah.  So somebody sent me an email telling me this,

7   giving me information about whether or how Google might be

8   rolling out a ride-sharing service, obviously counter to an

9   understanding I thought we had.

10      You don't know if it's true or not, so I'm forwarding to

11  David Drummond saying, I don't know if this is true.  And David

12  Drummond is on our board.  Saying, hey, look, I thought we had

13  an understanding.  Maybe like, let's talk.  Let's talk about

14  it.  Let's see if we can partner because we still would love to

15  partner on this.

16  Q.   Okay.  So your email says "Is the below true?  We get

17  stuff like this more than I would like.  Without any dialogue,

18  we get pushed into the assumption that Google is competing in

19  the short term and has probably been planning to do so for

20  quite a bit longer than has been let on.  I hope I'm wrong

21  here.  Just need to do a meeting with Larry ASAP."

22      And Larry is Mr. Page?

23  A.   That's correct.

24  Q.   And why did you want a meeting with Larry?

25  A.   Well, look, I mean, that's who I thought I had the

 1   understanding with.  And every time we would try to talk about

 2   partnership, it would always go back to Larry Page saying it's

 3   not -- that he didn't want to have that meeting or it wasn't

 4   quite time to have that meeting or we just got no answer.  So

 5   it was apparent that he was kind of calling the shots on this.

 6           MS. DUNN:  Your Honor, I'd like to -- sorry.  Retract

 7   that.

 8   BY MS. DUNN:

 9   Q.   Mr. Kalanick, please turn in your binder to Exhibit 1770.

10   A.   Okay.

11           MS. DUNN:  Is there any objection?

12           MR. VERHOEVEN:  One second.

13       No objection, Your Honor.

14           MS. DUNN:  All right.  Your Honor, we'd like to

15   move --

16           THE COURT:  Received in evidence.

17       (Trial Exhibit 1770 received in evidence.)

18       (Document displayed.)

19   BY MS. DUNN:

20   Q.   Mr. Kalanick, do you recognize this email to be another

21   email exchange between yourself and Mr. Drummond a few months

22   earlier than the one we just saw, this one from January of

23   2015?

24   A.   That's correct.

25   Q.   Okay.  And if we could go to the first email in that

 1    exchange, where you say, "Just got the transcript from the Q&A

 2    at the Detroit Auto Show.  Urmson" -- is that Chris Urmson?

 3    A.   Yes.

 4    Q.   "Chris Urmson is openly discussing rolling out an

 5    autonomous vehicle ride-sharing service.  I'm thinking it's

 6    time to have a chat with Larry directly."

 7         Mr. Kalanick, did you ever get a chance to speak with

 8    Mr. Page?

 9    A.   Yes.  Eventually.  I think it was a bit after this, yes.

10    Q.   Okay.  When was that?

11    A.   I feel like it was in the spring, so maybe a few months,

12    three or four months after this.

13    Q.   And was that meeting after Uber had already hired the

14    group from Carnegie Mellon University?

15    A.   Yeah.  We just weren't getting any traction talking about

16    partnerships, so we then acquired the CMU team in Pittsburgh

17    and started our own autonomous sort of self-driving effort.

18    Q.   Okay.  And where did that meeting take place?

19    A.   That took place at Google.

20    Q.   Okay.  And please explain to us what you remember of that

21    meeting.

22    A.   You know, look, we were there to do -- to continue to talk

23    about partnership.  That was a very common theme for us.  Larry

24    was fairly upset with us about us acquiring the CMU team and

25    starting an autonomy effort for ourselves that competed with

1    what they were doing.

2    Q.   Do you remember what he said to you at that meeting?

3    A.   He sort of was a little angsty and said, "Why are you

4    doing my thing?" and was just upset.

5    Q.   And was this prior to the acquisition of Otto and

6    Mr. Levandowski's team?

7    A.   Yes, that was prior to that.

8    Q.   Okay.  Let's talk a little bit about your conversations

9    with Mr. Levandowski.  This is something Mr. Verhoeven also

10   asked you about.

11        When did you personally get involved in those

12   conversations with Mr. Levandowski?

13   A.   December 2015.

14   Q.   And prior to your involvement, had Uber executives already

15   been speaking to Mr. Levandowski?

16   A.   I believe they had been speaking to him for at least a

17   couple of months, maybe a few.  I'm not sure exactly how long.

18   Q.   How well did you know Mr. Levandowski when you first got

19   involved?

20   A.   I didn't know him at all.

21   Q.   And did you try to get to know him better?

22   A.   Yes.

23   Q.   And when Mr. Verhoeven asked you whether you remembered a

24   specific meeting on December 20th, you didn't remember that

25   specific meeting, but do you remember generally in that period

1    of time what you and Mr. Levandowski discussed?

2    A.   Yeah, generally.

3         I mean, it started out with -- I think there were

4    conversations about he's going to start a company.  Was

5    basically seeing if he could be -- if he could be a vendor, a

6    supplier to our company, or potentially could he work at Uber.

7    That was obviously something we were more interested in.  And

8    then there's sort of the combination of the two, I think, that

9    we ended up at.

10        And, you know, it's sort of early on it was more about

11   customer-vendor, and over time it became more about how do we

12   bring him on board at Uber.

13   Q.   And please tell the jury, Mr. Kalanick, at any point, if

14   at all, during those discussions did you ask Mr. Levandowski to

15   bring Google information to Uber?

16   A.   I did not, never.

17   Q.   And at any point, if at all, in those discussions, did

18   Mr. Levandowski tell you he was going to bring Google

19   information to Uber?

20   A.   Absolutely not.

21   Q.   All right.  Apart from the allegations that Waymo has made

22   in its complaint, have you ever heard from anyone that

23   Mr. Levandowski downloaded files from Google for the purpose of

24   bringing them to Uber or to Otto?

25   A.   Never.  Not from anybody.

KALANICK - CROSS / DUNN

1    Q.   I'm going to ask you about a few things that Mr. Verhoeven

2    covered in his examination, but the first thing I'm going to

3    ask you is whether you recall if Mr. Verhoeven asked you any

4    questions about Uber taking Google's trade secrets?

5    A.   Can you restate the question?

6    Q.   Do you remember whether Mr. Verhoeven asked you any

7    questions in his examination about whether Uber took Google's

8    trade secrets?

9    A.   I don't remember anything specifically, but I can confirm

10   that -- well, I think that -- I've already said what I said.

11          MS. DUNN:   All right.   I'd like to put Exhibit TX-170,

12   which is in evidence, on the screen.

13       (Document displayed.)

14   BY MS. DUNN:

15   Q.   All right.   Mr. Kalanick, you've seen these already.

16   These are Mr. Bares', John Bares' notes?

17   A.   Yes.

18   Q.   The jury met him via video yesterday.

19       What was Mr. Bares' job at Uber, just to remind the jury?

20   A.   Well, when we first acquired the CMU team, he ran the

21   autonomy effort, what was called ATC at the time and ultimately

22   ATG.   So he was the first head of our autonomy efforts.

23   Q.   Okay.   If you look at the first page, at the very top it

24   says "NewCo."   Do you see that?

25   A.   Yes, I do.

1  Q.   Okay.  And was NewCo the company that Mr. Levandowski was

2  planning to start when you were meeting with him?

3  A.   It was a code name for the company, yes.

4  Q.   Okay.  And if you look down on that first page, there's a

5  line that says "Deal, buy a laser."

6        MS. DUNN:  Can we highlight that?

7  BY MS. DUNN:

8  Q.   Do you see that, "buy a laser"?

9  A.   I sure do.

10 Q.   Okay.  At some point in late December, early January, was

11 Uber considering being a customer of Anthony Levandowski's

12 company-to-be?

13 A.   Yes.

14 Q.   Okay.

15 A.   That's correct.

16 Q.   And at some point, did Uber decide instead to acquire

17 them?

18 A.   Yes, that's correct.

19 Q.   Okay.  If you then go down the page, there's the part that

20 Mr. Verhoeven asked you about, where it says "Meeting with TK."

21 Does that -- do you see that?

22 A.   Yeah.

23 Q.   Okay.

24        MS. DUNN:  And if we could put up the part that says

25 "Risk," as well as the next part, that would be helpful.  Next

1    to "TK what we want."

2    **BY MS. DUNN:**

3    **Q.**    So it says "Risk.  They get bought by a competitor or

4    their product enables their competitor."

5         What's that about, if you know?

6    **A.**    And, again, these aren't my notes, but if they -- if we

7    have a supplier and somebody's -- somebody's supplying you that

8    product but then they -- I guess they fail on the first batch,

9    well, then you don't have a product.  Or if they get bought by

10   a competitor and then they stop making your product that you

11   are depending on, then that's an issue.

12       Or you can help them make a product that they then sell to

13   your competitor, which is also a thing.

14   **Q.**    So better to acquire them than to be a customer; is that

15   the point?

16   **A.**    Sometimes, yes.

17   **Q.**    Okay.  And the next part says "Cam pay at milestones,"

18   which was eventually an aspect of the acquisition; is that

19   right?

20   **A.**    Look, milestones were certainly part of the acquisition.

21   It -- I didn't write these notes, so --

22   **Q.**    Okay.  And as an acquirer, did Uber start to think about

23   what it would want in the deal from NewCo?

24   **A.**    Of course.

25   **Q.**    Okay.  And did Uber want -- if it was going to make a deal

1   with NewCo to have its IT, it's intellectual property?

2   A.   I mean, when you acquire something, you do acquire the

3   developed intellectual property of the company that you

4   acquire.

5   Q.   Why?

6   A.   Well, that's part of the acquisition; right?  So at the

7   time of the acquisition, they had autonomous trucks that were

8   going up and down 280.  I got to take a couple rides in them.

9   It was fun.  The -- but, sorry, I digress.

10       The people develop -- they develop technology.  That is

11   the basis of a company.  And then, when you acquire them, you

12   acquire that IP.

13   Q.   Mr. Kalanick, what is John Bares like?  You know him;

14   right?

15   A.   Yeah.  So John Bares is a professor at CMU.  Pretty

16   earnest guy.  You know, just very straightforward.  And a

17   little bit of aw-shucks kind of feel to him.  And an overall

18   good guy.  He's always looking to learn.  And I -- I loved

19   working with him.

20   Q.   All right.  And he apparently took notes in meetings?

21   A.   Yes.

22   Q.   Pages and pages and pages of notes?

23   A.   Yes.

24   Q.   All right.  And so if someone had gone to a meeting with

25   John Bares, you say he's an earnest, straightforward guy, and

 1   they said, "Let's steal all of Google's IP," do you think John

 2   Bares would have just sat there and sat quietly typing up his

 3   notes?

 4           MR. VERHOEVEN:  Objection.  Leading.

 5           THE COURT:  And argumentative.  Sustained.

 6   BY MS. DUNN:

 7   Q.   Mr. Kalanick, when you said "IP," when you say "cheat

 8   codes," what did John Bares do?

 9           MR. VERHOEVEN:  Objection.  Foundation.

10           THE COURT:  If you remember, you can answer.  But you

11   must remember before you give that answer.

12           THE WITNESS:  Okay.  Fair enough.

13       Can you ask the question one more time?

14   BY MS. DUNN:

15   Q.   I'll rephrase the question because it's fair.

16       At these meetings you sat at with John Bares, what did he

17   do?

18   A.   I mean, he participated in the meetings.  He was a thought

19   partner.  You know, we had these jam sessions like I talked

20   about, a -- it was like a jazz ensemble-type thing, and he had

21   his own ideas about how autonomy should work, and he

22   participated in those meetings.

23   Q.   Okay.  So yesterday you helped us understand jam sesh.

24   A.   Yeah.

25   Q.   Today, help us understand cheat codes.

1    **A.**   Cheat codes are like, you know, way -- elegant solutions

2    to problems that haven't already been thought of.

3        There's a lot of examples I can give, like one might be

4    Tesla cars.  Right?  People buy Tesla cars.  They cost, I don't

5    know, 40 grand, sometimes a lot more.  But there's a lot of

6    them on the road.

7        But, in the meantime, Tesla also has a bunch of sensors in

8    that car that pulls data in that helps their autopilot feature,

9    which is kind of autonomy-like, get better.  They've got people

10   paying Tesla to help their self-driving effort do better.  We

11   would consider that a cheat code, for example.

12       Uber has to -- Uber has to understand how long it takes to

13   get from Point A to Point B on the road.  You request a car.

14   We tell you how many minutes it takes.  If the car gets stuck

15   behind a red light, that car's going to be late.  If it gets

16   stuck behind five, it's going to be really late.

17       How do we know what are all -- what's every state of every

18   red light between you and the car?  Well, we could put a video

19   camera on every corner to see what the state of that light is

20   so that we could give you an accurate time, or we can use the

21   motion sensors in the driver app, because they have the driver

22   app on the phone and we can determine when those cars stop,

23   that we can determine when they're at a red light.

24       And you do that across an entire city and now, instead of

25   spending a billion dollars on video cameras, you now have

1  written a small amount of code that determines when cars are at

2  red lights and you have a realtime view of what the state of

3  every traffic light is in the city.  And not just in one city

4  but in 500 cities.  So that's like an example of a cheat code.

5        THE COURT:  All right.  We need to -- you can ask

6  another couple of questions, but we need to take our break.  So

7  I want you to find a resting point.

8        MS. DUNN:  Your Honor, I probably have ten minutes

9  left total.

10        THE COURT:  What?  How much?

11        MR. SCHMIDT:  Ten, but I'm happy to also take a break

12  and go on from there.

13        THE COURT:  Well, I think we need to take a break now.

14        MS. DUNN:  Sure.

15        THE COURT:  All right.  Remember the admonition.  No

16  talking to each other.  See you back here in 15 minutes.

17        THE CLERK:  All rise for the jury.

18        (Jury out at 9:22 a.m.)

19        THE COURT:  Okay.  Everyone be seated.  The witness

20  can step down.  And you can take your bathroom break too and be

21  back here in 15 minutes, please.

22        THE WITNESS:  And I go that direction?

23        THE COURT:  Yeah, you go right through the double

24  doors there, please.  Thank you.

25        Counsel, you had given me, I believe yesterday or this

1   morning, a binder that you proposed to give to the jury that

2   has in it the timeline and the trade secret list and the

3   witness -- the key witnesses.

4       I don't like giving a big thick binder like this because

5   it's too inconvenient.  But we've already given them the

6   timeline and the trade secret list, and I'm going to hand out

7   the one further, this witness list that you improved on, which

8   I think is a fine key witness list.  And we will give that one

9   to the jury and let them fold it into their steno pads.

10      Any problem with that?  Is that okay with both sides?

11          MR. GONZÁLEZ:  That's fine, Your Honor.

12          THE COURT:  Wait a minute.

13          MR. GONZÁLEZ:  I'm sorry.  I'm being told that we may

14   not have agreed to that version, Your Honor, so --

15          THE COURT:  Well, then I'm going to hand it back to

16   you.  And when I come back, you two figure out -- see, who was

17   it?  It was on the Waymo side that gave this to my courtroom

18   deputy and made it sound like this was agreed to.  So you -- in

19   the break, you work out any disagreements that you have on

20   this.  I don't want to -- I'm not going to hand it out to the

21   jury unless it's agreed on.

22          MR. EISEMAN:  We'll figure it out, Your Honor.

23          THE COURT:  All right.  Thank you.  All right.  See

24   you in 15.

25                  (Recess taken at 9:24 a.m.)

```
 1                  (Proceedings resumed at 9:43 a.m.)

 2          THE COURT:  Be seated.

 3      Let's go ahead and bring the jury back.

 4      While the jury is being assembled, Counsel, please

 5  remember that anything shown on this overhead screen does not

 6  get transcribed.  Does not get transcribed.  It will just say

 7  "Video played" in the transcript.

 8      That's why you have to give that version to the court

 9  reporter.  It's unfair for you to expect court reporters to

10  transcribe audio coming from a video.  Sometimes I notice --

11  I'm bringing this up because one of them tried, and it's not

12  the right thing to do.

13      You lawyers have got to keep in mind that, if you want it

14  in the transcript, it's got to be the spoken word here in

15  court, not an audio word.  All right?

16          MR. VERHOEVEN:  Yes, Your Honor.  Real quick

17  housekeeping.

18          THE COURT:  Yeah.

19          MR. VERHOEVEN:  We've conferred over the break and

20  reached agreement to shorten time.

21      We are going to forego calling the next witness,

22  Mr. Poetzscher.  And, in exchange, I believe Uber has agreed to

23  the admissibility of two exhibits.

24          THE COURT:  All right.  What are those two?

25          MR. VERHOEVEN:  TX-259 and TX-263.
```

1        And this is obviously without prejudice of their right to

2   call Mr. Poetzscher in their case in chief.

3            THE COURT:  Is that agreed to?

4            MR. GONZÁLEZ:  That's correct, Your Honor.

5            THE COURT:  Thank you.  Those two are now in evidence.

6        (Trial Exhibits 259 and 263 received in evidence.)

7            THE COURT:  And as soon as the jury comes in, we'll

8   roll right along.

9        Kanu, do you have that list of key witnesses to hand out?

10  No?  All right.  We'll do it at the next break.

11           MR. GONZÁLEZ:  Your Honor, there may be an issue.

12           THE COURT:  All right.  Well, is there one?

13           MR. EISEMAN:  No, we worked out the issues.  It's just

14  being reprinted, Your Honor.

15           THE COURT:  All right.  Okay.  Well, you'll bring in

16  the ten copies, so you can just hand it up to the jury.  Thank

17  you for working that out.

18       We're ready.  Let's go.

19           THE CLERK:  All rise for the jury.

20       (Jury enters at 9:45 a.m.)

21           THE COURT:  Welcome back.  Be seated.

22       All right.  Ms. Dunn, please continue.

23           MS. DUNN:  Thank you, Your Honor.

24  BY MS. DUNN:

25  Q.   Mr. Kalanick, when you were talking with Mr. Verhoeven, he

**KALANICK - CROSS / DUNN**

 1   asked you about an indemnity agreement that Uber would

 2   indemnify Google -- or Anthony Levandowski.

 3        Do you remember that?

 4   **A.**   Yes.

 5   **Q.**   Okay.  And you said that at Uber you had agreed to the

 6   indemnity; right?

 7   **A.**   Yes.

 8   **Q.**   That Uber had agreed?

 9        And you also said that you did that in part because it was

10   thought that Google might bring a lawsuit.

11   **A.**   That's correct.

12   **Q.**   Why did Uber think that Google might bring a lawsuit?

13   **A.**   I mean, look, it started back at the CMU acquisition.

14   Larry was just very angry, just upset that we were doing his

15   thing.  And --

16        **THE COURT:**  Explain.  The jury's not going to remember

17   what CMU means.

18        **THE WITNESS:**  Sorry.  Carnegie Melon University.

19   That's a university in -- right around Pittsburgh where lots of

20   professors and scientists that do robotics and autonomous

21   technology.  Sorry, I --

22        **THE COURT:**  All right.  I interrupted you, so please

23   continue with your answer.

24        **THE WITNESS:**  Maybe restate the question because I got

25   a little lost here.  Sorry.

1  BY MS. DUNN:

2  Q.   The question was, why did Uber think that Google might

3  bring a lawsuit following the Otto acquisition?

4  A.   So when we acquired the CMU team and we were eventually --

5  we acquired it because we couldn't get meetings and we couldn't

6  figure out if they were still up for partnering.

7       When we finally got the meeting, Larry made it very clear

8  that he was very upset with us and not happy that we were doing

9  autonomy.  And everything we would get in terms of a signal

10  from other people who knew him or knew people around him was

11  that generally Google was super not happy, unpumped, about us

12  doing this.

13       And so when you go and hire a group of people, a large

14  group of people, acquire a company where a large group of

15  people, you know, come from there, you know, that competitive

16  thing, those competitive juices get flowing, and that means

17  there is a higher likelihood of a lawsuit of some kind.

18  Q.   Now, you acknowledged that you did not read the merger

19  agreement or the indemnity treatment.  Is that correct?

20  A.   That's correct.

21  Q.   Why not?

22  A.   Well, as CEO of a big company, you're getting literally

23  hundreds of documents to sign a month.  Hundreds.

24       And think of each of those things you're signing is almost

25  like when you go get a mortgage or buy a house.  Like reading

1    every single page, like, will take you -- could take you a

2    week.  But I'm getting hundreds of those a month.

3        And so what you do is you have your legal department

4    review the documents, summarize them, and then present them to

5    you to sign.  And sometimes you actually have to sort of

6    empower them to make judgment calls.

7        When you get to be a 15,000-person organization, the CEO

8    can't read every document and read every word in every

9    document.  It's just not possible at that scale.  But on

10   important deals, you still have to have some kind of summary of

11   what's going on, but you may not be in all the details of every

12   clause of every contract that exists.

13   Q.   Now, Mr. Verhoeven also asked you about a number of emails

14   you had with Mr. Levandowski.  And I'm just going to put one of

15   those on the screen.  Trial Exhibit 10275.  And also,

16   Mr. Kalanick, if you look in your white binder, the one right

17   behind you, you'll find it there.

18            THE COURT:  Is that an email or a text?  I can't tell.

19            MS. DUNN:  It's a text exchange.

20   BY MS. DUNN:

21   Q.   And I'll direct you to pages 20, 21, and 22.

22   A.   10275; is that right?

23   Q.   That's right.

24            MS. DUNN:  And if we could put -- is it possible to do

25   a side-by-side with 20 and 22?

 1          **THE WITNESS:**  Okay.  So what page?  I'm sorry.

 2   BY MS. DUNN:

 3   **Q.**   Turn to page 20, please.

 4   **A.**   Okay.  Yeah.

 5   **Q.**   It's the text that says something about "second place is

 6   first loser."  Do you see that?

 7   **A.**   Yeah, I see it.

 8          **MS. DUNN:**  Okay.  Can we put that up, and can we make

 9   it big so people can see it, please.  Thanks.  All right.

10   Great.

11          And then put up page 22, the response.  If you keep it up

12   on the screen.  Is that Mr. Guevera or Mr. Fisher?  Thank you.

13   All right.

14          (Document displayed.)

15   BY MS. DUNN:

16   **Q.**   So the text --

17          **MS. DUNN:**  If we can blow it up.

18   BY MS. DUNN:

19   **Q.**   -- on page 20 says "I just see this as a race and we need

20   to win.  Second place is first loser."

21          Do you see that?

22   **A.**   Yes.

23   **Q.**   Okay.  And then Mr. Verhoeven also asked you about

24   page 22.

25          **MS. DUNN:**  And if we could keep both of these on the

KALANICK - CROSS / DUNN

```
 1    screen at the same time.
 2    BY MS. DUNN:
 3    Q.    And that says "agreed."
 4    A.    Yes.
 5    Q.    Right?
 6          And he asked you about the time stamps on these text
 7    messages; right?
 8    A.    Yes, he did.
 9          MS. DUNN:  Can we see them both at the -- at the same
10    time, please.
11          (Document displayed.)
12          MS. DUNN:  All right.  Great.
13          THE WITNESS:  That's pretty good.  Okay.
14    BY MS. DUNN:
15    Q.    This is when we appreciate the tech people very much.
16    A.    Yeah.
17    Q.    All right.  So this says "I just see this as a race and we
18    need to win.  Second place is first loser."
19          And then Mr. Verhoeven showed you the text that says
20    "agreed"; right?
21    A.    Yes.
22    Q.    Okay.  If you look at page 21, you can see the text in
23    between these two that Mr. Verhoeven skipped over.  Do you see
24    that?
25    A.    Yes, I do.
```

1    Q.    Okay.  And what does that say?

2    A.    It says "transportation is social graph of the physical

3    world."

4    Q.    Okay.  And so if you look at the time stamps,

5    Mr. Kalanick, your "agreed" follows the text that says

6    "transportation is a social graph of physical world."

7         Do you see that?

8    A.    Yes.

9    Q.    All right.  Mr. Verhoeven also asked you --

10         THE COURT:  Wait.  Go back over that again.  So put

11   the one up there about the transportation is the graph.  Who

12   wrote that one?

13        It went by me too fast.  Could you put it back up there.

14        I'm sorry.  You can do it later.  I -- all right.  This

15   it?  Is this it?

16        MS. DUNN:  That's it.

17        (Document displayed.)

18   BY MS. DUNN:

19   Q.    So this was the text --

20        THE COURT:  What's confusing me is I -- it went by so

21   fast.  Who is it -- let me ask the witness.  Who is it that

22   raised that?  You?

23        THE WITNESS:  I'm sending this to Anthony.

24        THE COURT:  And then -- and you said something like

25   transportation --

1           THE WITNESS:  Is the social graph of the physical

2    world.

3           THE COURT:  -- graph of the physical world.  And

4    that's at 9:03 UTC.

5           THE WITNESS:  9:03:11, yeah.

6           THE COURT:  All right.

7           THE WITNESS:  I think basically "agreed," that comes

8    after -- yeah, I'm not sure what -- I'm not sure.

9           THE COURT:  But who was it that wrote "agreed"?

10          THE WITNESS:  That -- was that me?  Hold on.  Yeah, it

11   looks like it's from me.

12          THE COURT:  So you're agreeing with your own comment?

13   I don't understand.

14          THE WITNESS:  I'm not sure.

15          THE COURT:  What are you agreeing with?

16          THE WITNESS:  I don't know.  It's been a long time

17   since these texts.

18          THE COURT:  All right.  Let's go ahead.

19          MS. DUNN:  It's good to show all the texts, I think.

20   BY MS. DUNN:

21   Q.   All right.  Mr. Kalanick, Mr. Verhoeven also asked you

22   about the April 11th board meeting.  Did you -- when you talked

23   to the board on April 11th, about this deal, did you feel

24   comfortable moving forward with the deal?

25   A.   Yes, I did.

KALANICK - CROSS / DUNN

1   Q.   Okay.  And did you convey that to the board?

2   A.   Yes.  Generally, yes.

3   Q.   Okay.  And by that point in time, had you had any

4   discussions with Mr. Levandowski on the topic of bringing

5   Google IP to Uber?

6   A.   Only that we're making sure that no content from any

7   previous employer comes over to Uber.

8   Q.   Do you remember a meeting in July 2016, that you attended

9   with Mr. Krafcik, the CEO of Waymo?

10  A.   Yes, I do.

11  Q.   Okay.  And this was prior to the Otto acquisition.  And

12  did you tell Mr. Krafcik at this meeting about the Otto

13  acquisition?

14  A.   No.

15  Q.   Why not?

16  A.   Because we had basically hired people, but we hadn't

17  announced it publicly.  And it just didn't seem appropriate to

18  tell somebody something that was confidential that we hadn't

19  announced publicly yet, especially if it's a competitor.

20  Q.   And at that meeting, did anyone from Google mention that

21  Google wanted to consume Uber's profits?

22          MR. VERHOEVEN:  Objection.  Leading.

23          THE COURT:  It's -- that is a leading question.

24  Please rephrase it.

25          MS. DUNN:  I can rephrase.

1   BY MS. DUNN:

2   Q.   What indications at that meeting -- what express

3   indications, if any, did you get at that meeting that Google

4   had decided to compete with Uber?

5            MR. VERHOEVEN:   Same objection.

6            THE COURT:   No.   Just ask what, if anything, was said

7   on the subject of Google at that meeting.   That would be okay.

8   BY MS. DUNN:

9   Q.   Okay.   What if anything was said on the subject of Google

10   at that meeting?

11   A.   Look, the -- this meeting was a repeat of many meetings

12   we've had before, which is we're going to them really

13   interested in partnering in some fashion.   We do the

14   ride-sharing thing.   We're starting to do the autonomy thing.

15       But they've been doing the autonomy thing for a bit

16   longer.   Maybe we can find a way to take our efforts and

17   partner to get to the future faster.   And so we're always just

18   sort of going that direction, and they're generally not

19   receptive.

20   Q.   And after the acquisition was announced, was there any

21   outreach to Waymo to inform them of the acquisition?

22   A.   Yes.

23   Q.   And what happened then?

24   A.   Look, we -- I think it was Emil Michael reached out to

25   Krafcik and said, hey, look, we had some news today.   Let's get

 1   on the phone.  And Krafcik responded with --

 2            MR. VERHOEVEN:  Objection.  Hearsay.

 3            THE COURT:  Yes.

 4            MR. VERHOEVEN:  And foundation, Your Honor.  He wasn't

 5   even there.

 6            THE COURT:  Were you there?

 7            THE WITNESS:  Where?

 8            THE COURT:  Did you personally hear this about

 9   Krafcik?

10            THE WITNESS:  There was an email exchange between Emil

11   and Krafcik, but that's all I've seen.  I wasn't on the phone

12   call that they had.

13            THE COURT:  Well, I'm going to allow the testimony.  I

14   may have to give a -- a limiting instruction, but I want to

15   hear it first.  But the basic -- even though you're normally

16   right.  Their own internal communications would be inadmissible

17   hearsay.  That part is correct.

18        But, nevertheless, the -- they may come in for the purpose

19   of showing what -- proving up the transaction, to use a looser

20   term.

21        So I'm going to allow the question.  So please ask it

22   again.

23   BY MS. DUNN:

24   Q.   Mr. Kalanick, what are you aware of that was communicated

25   at the executive level from Uber to Google following the Otto

```
 1   acquisition?
 2           THE COURT:  Well, now, see "aware of," that calls for
 3   hearsay.
 4           MS. DUNN:  Okay.
 5           THE COURT:  So you can ask him what he communicated to
 6   Uber -- I'm sorry -- to Google or what he overheard somebody
 7   else communicating, but he can't say he under -- I know lawyers
 8   like this, but no -- he understands something got communicated.
 9   That doesn't work.
10           MS. DUNN:  Okay.
11           THE COURT:  At least when there's an objection.
12           MS. DUNN:  I can move on, Your Honor.
13   BY MS. DUNN:
14   Q.   Mr. Kalanick, following the Otto acquisition, did you
15   personally have any conversations with any Google executives?
16   A.   Yes.  Yes, I did.
17   Q.   And which Google executive was that?
18   A.   Larry Page.
19   Q.   When did you speak with Mr. Page?
20   A.   That was a phone call in October of 2016, yeah.
21   Q.   So that phone call happened before this lawsuit was filed
22   but after the Otto acquisition?
23   A.   Correct.
24   Q.   How did the conversation come about with Mr. Page?
25   A.   We had heard that -- we had heard through different folks
```

1  that Larry Page was upset about a different kind of technology.

2      Google had been working on flying cars for some time.  And

3  they were under the impression -- at least we heard that they

4  were under the impression that we were building flying cars,

5  too, maybe again doing their thing.

6      And I wanted to call him and let him know that we are not

7  building flying cars.  Though it sounds pretty cool, we're not

8  doing it.  If flying cars are made, if Google makes them, I

9  will make sure that our 50 million or so customers at the time

10 can push a button and get a flying car.

11     But that was it.  And then, of course, just saying, "Hey,

12 look, maybe we can partner."  And that was just our general

13 theme.

14 Q.   And did you and Mr. Page have any discussion about

15 self-driving cars in addition to flying cars?

16 A.   Look, again, I tried to broach the subject of a

17 partnership.  And he was -- you know, he again was just upset

18 with us.  And he had -- you know, he was upset that we were

19 taking all his people.  And he kept saying, You're taking our

20 people.  You're taking our IP.

21     And sort of -- it was confusing because I kept telling

22 him, We are recruiting lots of your people.  I think people can

23 work where they want to work, but your people are not your IP.

24     And I'm like, If you have an issue on IP, like we have

25 very -- we feel like we have very clean processes to make sure

1    nobody who we hire that comes from your company, they're not

2    bringing stuff over.  We're happy to open -- you know, open our

3    facilitates up or, you know, have your people talk to my people

4    to figure out -- so we can prove that that's the case.

5    **Q.**   What, if anything, did Mr. Page say in that conversation

6    in October of 2016, about Mr. Levandowski?

7    **A.**   He didn't say anything about him.

8    **Q.**   What, if anything, did Mr. Page say in that October 2016

9    conversation about Google files?

10   **A.**   He didn't say anything.

11   **Q.**   What, if anything, did Mr. Page say in that October 2016

12   conversation about Google's trade secrets?

13   **A.**   Nothing.

14          **MS. DUNN:**  Your Honor, I pass the witness.

15          **THE COURT:**  Thank you.

16   And we now go back to the other side.

17          **MR. VERHOEVEN:**  Just a couple of questions, Your

18   Honor.

19                  <u>**REDIRECT EXAMINATION**</u>

20   **BY MR. VERHOEVEN:**

21   **Q.**   Mr. Kalanick, I think I read in the press that you've been

22   playing a lot of video games lately.  Is that true?

23   **A.**   When I'm between gigs, I play iPhone games sometimes.

24   **Q.**   You like playing video games?

25   **A.**   Like -- iPhone games is my thing.

1  Q.   In the context of video games, you know what a cheat code

2  is, don't you, sir?

3  A.   Yes, I do.  Yes.

4  Q.   It's a code you can use so you don't have to actually do

5  the game, but you can cheat and get to the next level.  Isn't

6  that true, sir?

7  A.   Well, I think -- yes, but those codes in those games are

8  put there on purpose by the publisher of those games.  And they

9  want the game players to have those codes.

10 Q.   Well, if the game players can't do the work they're

11 supposed to do, then they can go get the cheat code; isn't that

12 true, sir?

13 A.   No, it's just part of the fun of the game.  That's just a

14 game.

15 Q.   Well, in any event, you agree that a cheat code allows you

16 to skip ahead and not have to do the game and do the work to

17 get from one level to the other; yes?

18 A.   No.

19        MR. VERHOEVEN:  Thank you.  I have no further

20 questions.

21        MS. DUNN:  No questions, Your Honor.

22        THE COURT:  All right.  May this witness be excused,

23 or does anyone want him on recall?

24        MR. VERHOEVEN:  We can excuse the witness, Your Honor.

25        MS. DUNN:  Yes, Your Honor.  He can be excused.

```
 1          THE COURT:  All right.  Mr. Kalanick, good news.
 2   You're free to go.  You can go on vacation anywhere you want to
 3   go.  You're not going to be called back, or at least they're
 4   releasing you from any subpoenas.
 5       So please have a good day and good luck.  Thank you.
 6          THE WITNESS:  Thank you.
 7       (Witness excused.)
 8          THE COURT:  Next witness.
 9          MS. BAILY:  Waymo calls Nina Qi.
10          THE COURT:  Ms. Baily, how do you spell that name?
11          MS. BAILY:  Q-i.
12          THE COURT:  Q-i.  Thank you.
13          THE CLERK:  Will the witness please approach the
14   witness stand.
15          THE COURT:  Good morning to you.
16       Stand somewhere over there, please, and take the oath to
17   tell the truth.
18                          NINA QI,
19   called as a witness for the Plaintiff, having been duly sworn,
20   testified as follows:
21          THE COURT:  All right.  Welcome.  Have a seat up
22   there.
23          THE CLERK:  Please state your name for the Court, and
24   spell your last name for the court reporter.
25          THE WITNESS:  Sure.  It's Nina Qi.  Last name is
```

```
 1   spelled Q-i.
 2           THE COURT:  All right.  And you need to be about that
 3   close to the mic for it to catch your voice.  About like that.
 4       You ready?
 5           THE WITNESS:  Yes.
 6           THE COURT:  Go ahead, Counsel.
 7           MS. BAILY:  Your Honor, may I approach with a binder?
 8           THE COURT:  Please do.
 9                       DIRECT EXAMINATION
10   BY MS. BAILY:
11   Q.   Ms. Qi, you used to work at Uber; correct?
12   A.   Yes.
13   Q.   You worked at Uber from September 2015 to July 2017;
14   correct?
15   A.   Yes, that's correct.
16   Q.   Your title was manager, corporate development; correct?
17   A.   Yes, when I first started.
18   Q.   Did your title change after that?
19   A.   Yes.
20   Q.   You got a promotion?
21   A.   I did.
22   Q.   To what?
23   A.   I became senior manager of corporate development.
24   Q.   And during your time at Uber, you reported to Cameron
25   Poetzscher; is that correct?
```

**QI - DIRECT / BAILY**

 1   A.    Yes, that's correct.

 2   Q.    And did he lead corporate development at Uber?

 3   A.    Yes.

 4   Q.    While you were at Uber, your responsibilities included

 5   working on mergers and acquisitions; right?

 6   A.    Yes, that was one of my responsibilities.

 7   Q.    And you were involved in Uber's acquisition of NewCo,

 8   which became Ottomotto, from start to finish; right?

 9   A.    Yes.  That's correct.

10   Q.    As part of that work, you were involved in determining the

11   value of that deal to Uber; correct?

12   A.    Yes.

13   Q.    And you actually helped create an analysis to ultimately

14   determine the value of the deal to Uber; right?

15   A.    I created several analysis, but yes.

16   Q.    Can you take a look in your binder at Exhibit 298, please.

17   A.    Okay.

18   Q.    That's an email you wrote; correct?

19   A.    Yes.  It looks like it.

20         MS. BAILY:  I'd request Exhibit 298 be moved into

21   evidence.

22         MR. BRILLE:  No objection.

23         THE COURT:  Thank you.  Received in evidence.

24   (Trial Exhibit 298 received in evidence.)

25   (Document displayed.)

1    BY MS. BAILY:

2    Q.   This is an email you sent to Mr. McClendon and

3    Mr. Poetzscher, dated January 26, 2016.  Do you see that?

4    A.   Yes.

5    Q.   The subject is "NewCo value."  Do you see that?

6    A.   Yes.

7    Q.   And then it says there is an attachment,

8    "NewCoReview_01-15.16B.pptx."  Do you see that?

9    A.   Yes.

10   Q.   Now, take a look at Exhibit 299 in your binder, please.

11   A.   Yes.

12   Q.   The attachment to that email; right?

13   A.   Yes, I think so.

14        MS. BAILY:  I'd ask that Exhibit 299 be moved into

15   evidence.

16        MR. BRILLE:  No objection.

17        THE COURT:  Received.

18      (Trial Exhibit 299 received in evidence.)

19        MS. BAILY:  Let's put it up, please.

20      (Document displayed.)

21   BY MS. BAILY:

22   Q.   This presentation is from January 2016; correct?

23   A.   Yes, it looks like it.

24   Q.   There's a chart in this presentation with the heading

25   "NewCo can shorten AV timeline by 1-2 years while de-risking

```
 1   our current laser approach."

 2        Do you see that?

 3   A.   Yes.

 4   Q.   Now, focused on the "NewCo can shorten AV timeline by 1-2

 5   years," that information was shared with you by Brian McClendon

 6   and John Bares; correct?

 7   A.   Yes, that's correct.

 8   Q.   And, at the time, John Bares was the head of self-driving

 9   at Uber; right?

10   A.   Yes.

11   Q.   And he had been having technical discussions with

12   Mr. Levandowski related to the acquisition; right?

13   A.   That, I'm not sure.

14   Q.   Well, you know that Mr. Bares was having -- was meeting

15   with Mr. Levandowski; right?

16   A.   No, I don't know that.

17        MS. BAILY:  Please play Ms. Qi, Volume 1, lines 43/11

18   to 16.

19        THE COURT:  Just while you're doing that, I'll remind

20   the jury that these playbacks are under-oath testimony that

21   you -- it counts just as much as testimony presented here in

22   court.  So remember that admonition I gave you earlier.

23        All right.  Let's roll the tape.

24        (Video played.)

25
```

QI - DIRECT / BAILY

1    BY MS. BAILY

2    Q.    Now, Brian McClendon was the other person who shared with

3    you that NewCo can shorten the AV timeline by one to two years;

4    right?

5    A.    Could potentially shorten, yes.

6    Q.    And Mr. McClendon was the vice president of engineering at

7    the time; right?

8    A.    Yes, I believe so.

9    Q.    He was Mr. Bares' boss?

10   A.    Yes, I believe so.

11   Q.    And Brian McClendon also had technical discussions with

12   Mr. Levandowski related to the acquisition; right?

13   A.    To be honest, I'm not sure.  I don't remember today.

14   Q.    Well, you recall that Mr. McClendon was involved in the

15   negotiations that lead to the Otto acquisition; right?

16   A.    He was involved in the beginning, but then he stopped

17   being involved.

18   Q.    Well, for a period of time, he was actually the internal

19   technical point of contact for your team, the team at Uber who

20   was working on the acquisition; right?

21   A.    Yes.  He did serve as our internal technical person.

22   Q.    So Mr. Bares and Mr. McClendon were involved in the deal

23   on the technical side.  And at least Mr. Bares talked to

24   Mr. Levandowski, and then they shared with you NewCo can

25   shorten the AV timeline by one to two years; right?

```
 1   A.    I'm not exactly sure about the timing, but, yes, at one

 2   point John Bares and Brian McClendon told me that, if the deal

 3   worked out, there could be a potential acceleration by one to

 4   two years.

 5   Q.    And that was in January of 2016; correct?

 6   A.    Yes, it was around that time.

 7   Q.    And this chart is some analysis you did related to that

 8   information; right?

 9   A.    Yes.

10   Q.    And the chart says, the second heading there says, "PV of

11   incremental EBIT contribution outweighs NewCo's equity

12   compensation."

13         Do you see that?

14   A.    Yes.

15   Q.    And PV is present value; right?

16   A.    Yes.  That's correct.

17   Q.    And EBIT is earnings before income and taxes; correct?

18   A.    Yes.

19   Q.    And what you're saying here is that the value of

20   accelerating Uber's AV timeline by one to two years, that value

21   is much greater than what Uber expected to have to pay for

22   NewCo; correct?

23   A.    In the context of this analysis, yes, the value of the

24   EBIT contribution would be greater than NewCo's compensation.

25   Q.    And looking at this chart, you actually have three
```

 1    analyses that are depicted here; right?

 2    A.   Yes.

 3    Q.   And the first analysis --

 4         MS. BAILY:   If we could just bring up the first bar

 5    all the way on the left.

 6    BY MS. BAILY:

 7    Q.   That analysis concludes that the value of accelerating

 8    development was $836 million to $1,690,000,000; right?

 9    A.   Yes.  In this context, that's correct.

10    Q.   So it says "836" on the bottom, but the values are in

11    millions; right?

12    A.   Yes.  That's correct.

13    Q.   And this analysis that we have here, that was based on an

14    internal Uber model with baseline city coverage; right?

15    A.   Yes, I did use an internal Uber model.

16    Q.   And that internal model you used for this analysis had

17    baseline city coverage; right?

18    A.   In the version that I looked at, there was a scenario that

19    was -- I don't know if it was titled "baseline city coverage,"

20    but it was in that vein, yes.

21    Q.   You created this chart; right?

22    A.   I did.

23    Q.   And the chart says "baseline city coverage" under your

24    first model; right?

25    A.   Yes.

```
 1   Q.   Now, the second analysis -- let's go to the second bar.

 2        The second analysis you did concluded that the value of

 3   accelerating development was between $1.585 billion and

 4   $2.610 billion; right?

 5   A.   Yes.

 6   Q.   And that's based on the same internal Uber model; right?

 7   A.   Yes.

 8   Q.   But with optimistic city coverage; correct?

 9   A.   Again, I don't remember if the model called it optimistic

10   or not; but, yes, I see that.

11   Q.   And then the third valuation that you did, you used a

12   different method called a multiples approach; right?

13   A.   Yes.

14   Q.   And that analysis resulted in a value of between

15   $765 million and $3,923,000,000; correct?

16   A.   Yes.

17   Q.   Now, take a look in your binder at Exhibit 7304.

18   A.   Okay.

19   Q.   You prepared this spreadsheet in connection with your work

20   on Uber's acquisition of NewCo; right?

21   A.   Yes.

22        MS. BAILY:   I'd ask that Exhibit 7304 be moved into

23   evidence.

24        THE COURT:   Any objection?

25        MR. BRILLE:   No objection.
```

1          **THE COURT:**  Thank you.  Received in evidence.

2          (Trial Exhibit 7304 received in evidence.)

3          (Document displayed.)

4  **BY MS. BAILY:**

5  **Q.**    Now, Exhibit 7304 is a series of Excel spreadsheets;

6  right?

7  **A.**    Yes.

8  **Q.**    And this is essentially the work that you did that

9  underlies the chart that we were looking at; right?

10  **A.**    Yes, this is the backup to it.

11  **Q.**    Backup.

12          So this backup shows, for example, how you got to your

13  first analysis of 835 million to $1.6 billion in the baseline

14  case; right?

15  **A.**    Yes, it has some of that.

16  **Q.**    And the next Excel spreadsheet shows how you calculated

17  the optimistic case; right?

18  **A.**    Yes, it looks like it.

19  **Q.**    And then the final spreadsheet shows how you valued the

20  one to two years in accelerated development using the multiples

21  approach; right?

22  **A.**    Yes, that's correct.

23  **Q.**    Now, in your email summarizing all of this -- so let's go

24  back to Exhibit 298.

25          You say in the first paragraph -- again, this is the email

 1    to your boss, Mr. Poetzscher, and then to Brian McClendon, who

 2    is vice president of engineering -- you tell them the numbers

 3    are "very compelling."  Do you see that?

 4    A.   Yes.

 5    Q.   And you were referring to the numbers we just talked about

 6    in the chart and in the backup; right?

 7    A.   Yes.

 8    Q.   And they're very compelling because the benefit to Uber of

 9    acquiring NewCo, as measured by your analysis, was so much

10    greater than what Uber thought it would have to pay to acquire

11    it; right?

12    A.   Yes, but only if assuming the deal worked out and they

13    were actually able to deliver acceleration by one to two years.

14    The numbers did look very good.

15    Q.   And the people who told you about accelerate one to two

16    years were executives on the technical side of the negotiation

17    and the acquisition; right?

18    A.   Yes.

19         MS. BAILY:  We can put that down.  Thank you.

20    BY MS. BAILY:

21    Q.   Now, when you were working on the negotiations that led to

22    the Otto acquisition, you communicated with other people by

23    text; is that right?

24    A.   Yes.  That's correct.

25    Q.   You communicated with Mr. Levandowski by text; correct?

```
 1   A.    Yes.

 2   Q.    And the reason you communicated with Mr. Levandowski by

 3   text was because he told you to keep communication off email

 4   and to only use text or phone; correct?

 5   A.    Yes, that's correct.

 6   Q.    Then at some point Mr. Levandowski asked you to delete all

 7   of your texts with him; right?

 8   A.    Yes.

 9   Q.    And you deleted them; right?

10   A.    Yes.

11   Q.    So as far as you're concerned, all of your texts with

12   Mr. Levandowski about the acquisition, they no longer exist;

13   correct?

14   A.    I don't know if they don't exist.  At some point, I did

15   delete some of the texts.  But then, after that, we continued

16   to have conversations, to which I did not delete those texts.

17   Q.    You deleted your texts at some point after you had been

18   having discussions with Mr. Levandowski about the acquisition;

19   right?

20   A.    I honestly don't remember what time frame, but at some

21   point I did delete the texts, yes.

22   Q.    So there were texts that were deleted; correct?

23   A.    Yes.

24   Q.    And Mr. Levandowski asked you to delete them; right?

25   A.    Yes.
```

QI - CROSS EXAMINATION / BRILLE

1  **Q.**   And you can't access any of those texts anymore; right?

2  You deleted them?

3  **A.**   Me personally, no.

4         **MS. BAILY:**   Thank you, Your Honor.   I pass the

5  witness.

6         **THE COURT:**   Please remind the jury of who you are.

7         **MR. BRILLE:**   I will do that, Your Honor.   Thank you.

8      Good morning, ladies and gentlemen.   My name is Michael

9  Brille.   I represent Uber.

10                  <u>CROSS-EXAMINATION</u>

11  BY MR. BRILLE

12  **Q.**   Good morning, Ms. Qi.

13  **A.**   Good morning.

14  **Q.**   I'd like to pull up again Trial Exhibit 299.   It's one of

15  the -- it's the charts you were asked about.

16  **A.**   Sure.

17  **Q.**   I'd like to start with that.

18      (Document displayed.)

19  **Q.**   Do you see that?

20  **A.**   Yes.

21  **Q.**   Some basic questions about that slide, Ms. Qi.

22      When you prepared that slide, to what extent, if any, were

23  you trying to value any self-driving car technologies?

24  **A.**   I wasn't.

25  **Q.**   And to what extent, if any, were you trying to value any

1   LiDAR or laser technologies?

2   **A.**    I wasn't.

3   **Q.**    To what extent, if any, were you trying to value any

4   parts, any of the little parts that go up to making a laser or

5   LiDAR?

6   **A.**    I wasn't.

7   **Q.**    Can you explain to the jury, given your experience, what

8   were you trying to do with this analysis?

9   **A.**    Yeah, sure.  So part of my role on this deal was to really

10  figure out and help determine how much Uber would be willing to

11  pay for the deal.

12        So as part of that, I did a lot of various analyses that

13  really meant to serve as reference points to help drive the --

14  or help guide the purchase price negotiations.  So this was one

15  of the analysis I worked on.

16        And in this case, I had assumed, assuming that the deal

17  worked out and everything was great, what would it look like if

18  Uber's revenue and profits -- what would it look like for

19  Uber's revenue and profits if the AV acceleration and the

20  acceleration of the technological development actually happened

21  by one to two years.  And this is kind of the work that I did

22  for this.

23  **Q.**    Ms. Qi, you didn't get any -- asked any questions about

24  yourself.  So just very quickly, could you tell the jury a

25  little bit about yourself?  Let's start with where you grew up.

QI - CROSS EXAMINATION / BRILLE

```
 1   A.    Yeah, sure.  So I was born in China and I came to the U.S.
 2   which I was six.  My dad was getting a PhD at Penn State, and
 3   my mom and me joined him in state college.
 4         And then we spent a year in Jersey while my dad was
 5   finishing up his postdoc at Rutgers.
 6         And then, after that, we moved to a really small town in
 7   Western New York called Corning, New York, where I finished
 8   middle school and high school.
 9   Q.    And how did you make your way to California?
10   A.    Well, so I applied to Stanford University for undergrad.
11   You know, coming from a small town, I really wanted to go
12   somewhere different.
13         I had visited Stanford at -- after my junior year and just
14   kind of fell in love with the campus, and the weather was
15   amazing, too, as well.  And luckily I was able to get in.
16         And that's kind of how I eventually made my way out to
17   California.
18   Q.    And what did you major in at Stanford?
19   A.    So I majored in economics and psychology.  I was always
20   really interested in how people made decisions and how
21   environment, culture, society influenced them.  And I always
22   thought that econ and psych were the perfect intersection of
23   the two.
24   Q.    Now, you said you joined Uber, I believe, in
25   September 2015; is that right?
```

QI - CROSS EXAMINATION / BRILLE

1  A.   Yes, that's correct.

2  Q.   And how long had you actually worked at Uber before you

3  started working on the Ottomotto transaction?

4  A.   Maybe a couple weeks.

5  Q.   And to that point in your career what experience, if any,

6  did you have, if any, with self-driving car technologies at

7  all?

8  A.   None.

9  Q.   And can you -- at a high level, could you explain what

10  your role was on the transaction team?

11  A.   Yeah, sure.  I helped Cam, which is my boss, to help

12  negotiate the deal and project manage the deal from start to

13  finish.

14  Q.   Now, do you still work at Uber?

15  A.   No, I don't.

16  Q.   And when did you leave?

17  A.   I left in July of 2017.

18  Q.   So let's go back now to that slide you were shown during

19  your direct examination, Trial Exhibit 299.

20  A.   Sure.

21  Q.   And my first question's a broad one.  Could you explain to

22  the jury or describe for them the difficulty of an analysis

23  like this.

24  A.   Yeah.  It was extremely difficult.  Usually when you do

25  these type of valuations, you have a company that's been around

QI - CROSS EXAMINATION / BRILLE

1  for awhile to have some historical financials, or at the very

2  least, it's an industry that's been around for awhile, so you

3  kind of know that historical data can help you project what the

4  future could look like.

5      But in this case, this technology was brand new and the

6  company didn't have any revenues or profits.  So it was really

7  difficult to figure out what it could look like in the future,

8  and I had to make a lot of assumptions.

9      Like, for instance, I had to estimate, you know, the

10 number of cities we were going to launch, when we were going to

11 launch the cities, the number of fully autonomous vehicle trips

12 that we were going to take, how much we were going to charge,

13 how -- how it would cost Uber to operate this.

14     At the end of the day, I really did give it my best shot,

15 but it really was just an educated guess.

16 **Q.**   And Ms. Qi, was this the only way you looked at the

17 analysis in terms of the deal?

18 **A.**   No, it wasn't.

19 **Q.**   And can you explain to the jury what some of the other

20 ways the analysis was looked at?

21 **A.**   Yeah, sure.  So Uber had acquired another company called

22 Carnegie Robotics, and that was a formation of our self-driving

23 unit.  So I looked at the purchase price for that.

24     I also looked at -- in the market, there were a couple

25 other laser startups that were fundraising for money, and I

QI - CROSS EXAMINATION / BRILLE

1    looked at what investors were willing to pay for those

2    companies.  And then ultimately we asked Anthony how much he

3    wanted and really used that as the main determining factor.

4    Q.   Ms. Qi, I'd like to turn your attention back to trial

5    Exhibit 7304.  This is another document you were shown in your

6    direct examination.

7    A.   Okay.

8         (Document displayed.)

9    Q.   And I believe you testified that this was the spreadsheet

10   that you used to create the slide that is Trial Exhibit 299?

11   A.   Yes.  This is a backup.

12   Q.   Okay.  Where did the model come from?

13   A.   So I used a lot of the numbers from the Project Rubicon

14   model.

15   Q.   And what was that?

16   A.   To my understanding, it was at that time Uber's business

17   and go-to-market strategy for self-driving vehicles.

18   Q.   Had you used the Rubicon model before?

19   A.   No.  I didn't even know it existed.

20   Q.   Had you -- did you use it again after you did this

21   analysis?

22   A.   No.

23   Q.   Do you have any understanding of what happened to the

24   Rubicon model going forward after you used it?

25        MS. BAILY:  Objection.  Hearsay.

 1              **THE COURT:**  Overruled.

 2         Please answer.

 3              **THE WITNESS:**  So my understanding was that, over time,

 4    this model was no longer used.

 5    **BY MR. BRILLE**

 6    **Q.**   So I'd like to direct your attention now, if I could, to

 7    some of the entries on this model.

 8    **A.**   Sure.

 9    **Q.**   And do you see that there is a section here, it's

10    underneath the first section.  It says "One Year Accelerated

11    Technological Capabilities."  Do you see that?

12    **A.**   Yes.

13    **Q.**   And underneath there you see there is a line that says

14    "Total AV Vehicle Trips."  Do you see that?

15    **A.**   Yes.

16    **Q.**   And can you explain to the jury what information is

17    reflected in that line there?

18    **A.**   Yeah.  This is the number of autonomous vehicle trips that

19    is without a safety driver that Uber was going to operate per

20    year.

21    **Q.**   And at the time you did this analysis, what did you

22    project for 2016?

23    **A.**   255.

24    **Q.**   And you did this analysis in January 2016?

25    **A.**   Yes, that's correct.

QI - CROSS EXAMINATION / BRILLE

1   **Q.**   And how many self-driving trips did Uber take in 2016

2   without a safety driver?

3   **A.**   Based on my knowledge, none.

4   **Q.**   And, again, if you look, what did your analysis project

5   for 2017?

6   **A.**   Approximately 295,000.

7   **Q.**   And at the time you left Uber in July of 2017, how many

8   self-driving vehicle trips had Uber taken without a safety

9   driver?

10   **A.**   Based on my knowledge, none.

11   **Q.**   And finally, what did you project for 2018, which is this

12   year?

13   **A.**   Looks like it's around 33 million.

14   **Q.**   So, Ms. Qi, what is -- given what you just described, what

15   is -- what does that information, in light of what actually

16   happened, tell you about your analysis?

17   **A.**   I think it really just reiterated how difficult it was to

18   do an analysis; that we were trying to project what the future

19   could look like without any historical data or financials.  And

20   ultimately, you know, I guess just our estimates just didn't

21   pan out.

22   **Q.**   Now, did you show -- did you show the slide that is at 299

23   to anyone at Uber?

24   **A.**   I did.

25   **Q.**   And who did you show it to?

1    **A.**    I showed it to Cam and Bryan.

2    **Q.**    And for what purpose?

3    **A.**    For them to review, because I wanted to get their input.

4    **Q.**    And did you ever review the slide with Mr. Kalanick?

5    **A.**    No, I did not.

6    **Q.**    Or the Uber Board of Directors?

7    **A.**    No.

8    **Q.**    Do you know of anyone at Uber who relied on that analysis

9    to make decisions about the Ottomotto transaction?

10   **A.**    Not that I'm aware of.

11   **Q.**    Now, Ms. Qi, you understand that in this case Waymo is

12   accusing Uber of stealing certain of its trade secrets.  Do you

13   understand that?

14   **A.**    Yes.

15   **Q.**    At the time you did this analysis, were you aware of any

16   Google trade secrets for self-driving cars?

17   **A.**    No, I wasn't.

18   **Q.**    Were you trying to value any of the alleged trade secrets

19   in this case?

20   **A.**    Definitely not.

21   **Q.**    Do you know what any of those alleged trade secrets are?

22   **A.**    No.

23   **Q.**    Okay.  Just one final.  You were asked at the end of your

24   direct examination about a request Mr. Levandowski made of you

25   to delete texts.  Do you recall that?

```
 1    A.    Yes.

 2    Q.    And you said that you -- well, you honored his request?

 3    A.    Yes.

 4    Q.    Why did you do that?

 5    A.    Well, M&A deals usually are very confidential.  There's

 6    always a risk that it could leak out and then someone else

 7    could come in and the deal could completely just get blown up.

 8          So in that context, if Anthony felt like deleting those

 9    texts would mean that the deal would remain private and would

10    not get leaked out, I was happy to honor that.  We've done a

11    lot of different things to ensure privacy of M&A deals.  So

12    this, to me, did not seem to be, you know, out of the ordinary

13    at all.

14              MR. BRILLE:  Pass the witness, Your Honor.

15              THE COURT:  All right.  Ms. Baily.

16                       REDIRECT EXAMINATION

17    BY MS. BAILY

18    Q.    Ms. Qi, you were asked whether you did any work to value

19    LiDAR or other pieces of autonomous vehicle technology.  Do you

20    recall that?

21    A.    Yes.

22    Q.    And you don't have any degrees in any kind of technical

23    field; right?

24    A.    No.

25    Q.    So you were relying on others to give you the information
```

QI - REDIRECT / BAILY

1  you needed to perform your analysis; right?

2  A.   Yes.

3  Q.   And one of those people was the vice president of

4  engineering at Uber, correct, Mr. McClendon?

5  A.   Yes.

6  Q.   Now, you also testified that you didn't have much

7  experience with the Rubicon model; right?

8  A.   Yes.

9       MS. BAILY:   If you could bring up, Mr. Fisher, Exhibit

10  98?

11       (Document displayed.)

12  BY MS. BAILY

13  Q.   Now, in your second paragraph, it says:

14       "I worked on this with Jamie and Justin."

15       Do you see that?

16  A.   Yes.

17  Q.   Who are Jamie and Justin?

18  A.   At that time they were part of ATG, the self-driving car

19  unit, and they focused, I believe, on strategy.

20  Q.   And they worked on the Rubicon model; right?

21  A.   I don't know for a fact, but they did give me the model.

22  Q.   And you worked with Jamie and Justin on your analysis;

23  right?

24  A.   No, I didn't.   The deal was confidential, so I couldn't

25  tell them that much, only that I needed the model and for them

1   to walk me through the model.

2   **Q.**  Well, in your email to your boss and to the vice president

3   of engineering, you said:

4       "I worked on this," attaching your email, "with Jamie and

5   Justin."   Right?

6   **A.**  Yes.

7   **Q.**  And you also say:

8        "I took the latest Rubicon model which shows a

9       conservative case for number of AV trips."

10   And then you describe how you altered them to assess, in

11   your analysis, the value of NewCo; right?

12   **A.**  Yes, that's correct.

13   **Q.**  And let's just look at the bottom of the chart we were

14   looking at before, Exhibit 299.

15   (Document displayed.)

16   **Q.**  If you look at the general assumptions, you say:

17   "Based on Rubicon model's most conservative case."

18   Right?

19   **A.**  Yes.

20   **Q.**  And then you say years that you focused on; right?

21   **A.**  Yes.

22   **Q.**  And then you actually use a discount rate to get the

23   present value; right?

24   **A.**  Yes.

25   **Q.**  And the discount rate reflects risk, because you're

1    projecting the future; right?  So that value takes into account

2    some uncertainty with future projections; right?

3    **A.**    I don't know that's necessarily the case, but it does take

4    into account the fact that money today is worth more than money

5    tomorrow because you have it.

6    **Q.**    But the values that you were shown in the Excel

7    spreadsheet that you looked at, ultimately those values were

8    discounted to reflect the present value in 2016; right?

9    **A.**    Yes, that's correct.

10   **Q.**    Thank you.

11        **MR. BRILLE:**  Just one question, Your Honor.

12                     **RECROSS-EXAMINATION**

13   **BY MR. BRILLE**

14   **Q.**    Ms. Qi, the discount rate at -- can you explain to the

15   jury how that bears upon your analysis?

16   **A.**    Yeah.  So usually when you're doing projections like this,

17   you are projecting out from today to 35 years in the future.

18   And the assumption is that if you have money today, it's worth

19   more than if you have money tomorrow; right?  So what you need

20   to do is bring all those projections from the future into

21   today's, a dollar amount.  So that's how the discount rate is

22   used.

23        The number reflects how risky you think that is, so

24   potentially how risky you -- you can actually achieve those

25   numbers.

```
 1        But, again, it's really just bringing the value from the
 2   future to the present.
 3             MR. BRILLE:  No further questions, Your Honor.
 4             THE COURT:  All right.  May we excuse this witness?
 5             MS. BAILY:  From our perspective, yes.
 6             MR. BRILLE:  Yes, Your Honor.
 7             THE COURT:  Okay.  Ms. Qi, thank you.  You're free to
 8   go.  Have a good day.
 9             THE WITNESS:  Thank you.
10        (Witness excused.)
11             THE COURT:  Next witness.
12             MR. PERLSON:  Good morning, Your Honor.  Waymo calls
13   Lior Ron.
14             THE COURT:  Okay.
15             THE CLERK:  Will the witness please approach the
16   witness stand.
17             THE COURT:  Welcome.  Please stand somewhere in there
18   and raise your right hand.  The Clerk will swear you in.
19                         LIOR RON,
20   called as a witness for the Plaintiff, having been duly sworn,
21   testified as follows:
22             THE WITNESS:  I do.
23             THE COURT:  All right.  Thank you.  Have a seat.
24   Welcome.
25             THE WITNESS:  Thank you.
```

```
 1              THE COURT:  You see how my mic moves all around?

 2   Yours does too.  It needs to be close to your voice so everyone

 3   in the courtroom can hear you.

 4              THE WITNESS:  Okay.

 5              THE COURT:  So please state your full name.

 6              THE WITNESS:  Lior Ron.  First name L-I-O-R.  Last

 7   name Ron, R-O-N.

 8              THE COURT:  All right.  Thank you.

 9         And, counsel, reintroduce yourself to the jury, please.

10              MR. PERLSON:  Sure, Your Honor.  David Perlson,

11   counsel for Waymo.

12              THE COURT:  All right.
```

**DIRECT EXAMINATION**

```
14   BY MR. PERLSON

15   Q.   Good morning, Mr. Ron.

16        Mr. Ron, you currently work at Uber; is that correct?

17   A.   Yes, I do.

18   Q.   And before you worked at Uber, like Mr. Levandowski, you

19   used to work at Google; right?

20   A.   Yes, I did.

21   Q.   And before joining Uber, you founded 280 Systems; is that

22   correct?

23   A.   Yes, I have.

24   Q.   280 Systems became Ottomotto?

25   A.   Yes, that's correct.
```

RON - DIRECT EXAMINATION / PERLSON

1    Q.    Now, you and Mr. Levandowski were the two largest

2    shareholders of Ottomotto; correct?

3    A.    Yes, that's correct.

4    Q.    Now, but unlike Mr. Levandowski, you did not work on

5    autonomous driving technology while you were at Google;

6    correct?

7    A.    That's correct.

8    Q.    In fact, you've never done any work on autonomous driving

9    at any company; right?

10   A.    Yes.

11   Q.    And even at Otto, you didn't do any engineering work

12   relating to autonomous driving technology?

13   A.    No, I have not.

14   Q.    You've never developed LiDAR?

15   A.    No, I did not.

16   Q.    And now that you're at Uber, you still don't do any

17   engineering work on autonomous driving; right?

18   A.    That's correct.

19   Q.    In fact, you haven't touched anything engineering related

20   in 10 to 15 years; fair?

21   A.    That's fair, yes.

22   Q.    Okay.  Well, let's discuss a little bit of the history of

23   Ottomotto.

24         Now, you and Mr. Levandowski first discussed forming

25   Ottomotto in the second half of 2015?

RON - DIRECT EXAMINATION / PERLSON

1    A.    Yes, that's correct.

2    Q.    And you also began meeting with Uber in the second half of

3    2015; right?

4    A.    Yes, that's correct.

5    Q.    And this was when you were both still at Google?

6    A.    Uh-huh.

7    Q.    And in November 2015, you set up a Slack site to use as a

8    channel to communicate with Mr. Levandowski; right?

9    A.    Yes, I have.

10   Q.    And if you could turn to 5413 in your binder that's in

11   front of you, TX.

12   A.    I'm sorry.   51...

13   Q.    5413.

14   A.    Yes.

15   Q.    Okay.  And this is an invitation to Mr. Levandowski from

16   you to join the 280 Slack site; correct?

17   A.    Yes, that's correct.

18   Q.    Okay.

19         MR. PERLSON:  Can we -- Your Honor, I'd move to admit

20   5413.

21         MR. CARMODY:  No objection, Your Honor.

22         THE COURT:  Received.

23         (Trial Exhibit 5413 received in evidence.)

24         MR. PERLSON:  Please put it up on the screen.

25         (Document displayed.)

1            MR. PERLSON:   Thank you.

2    BY MR. PERLSON

3    Q.   Now, this Slack site was separate from your and

4    Mr. Levandowski's Google emails that you both had because

5    you -- when you worked there?

6    A.   Yes, that's correct.

7    Q.   And so you could communicate with Mr. Levandowski using

8    the Slack site without Google knowing about it; right?

9    A.   Yes, that's correct.

10   Q.   I'd like you to turn to Exhibit 5213.

11        (Witness complied.)

12   Q.   Do you recognize this as a text message from

13   Mr. Levandowski to yourself?

14        (Brief pause.)

15   A.   Yes.

16   Q.   Yes?

17   A.   I do.

18            MR. PERLSON:   And, Your Honor, I would like to admit

19   TX-5213.

20            MR. CARMODY:   Your Honor, I'm going to object.  It's

21   old rule stuff.  It's not an admission.

22            THE COURT:   All right.  May I see the exhibit, 5213?

23            MR. PERLSON:   Your Honor, I don't think it's hearsay.

24   It's a -- it's a message from Levandowski to Mr. Ron telling

25   him to do something.  That's not hearsay.

1          **MR. CARMODY:**  Short response, Your Honor.  It's being

2     used for its truth.  It's an old Google time document.  It's

3     not an admission.  Ottomotto was not yet formed.  This was back

4     when they were at Google.

5          **THE COURT:**  Yes, I understand your point, but the

6     contents of this are in the nature of a transaction, not in the

7     nature of repeating some fact like the light at the traffic

8     signal was red.  This is a proposal to do something, and

9     that -- so it's like when you have a contract case.  You have

10     to prove up the contract like, "I offer to buy your car for a

11     hundred dollars."  Then the other side says, "Accepted."  And

12     that's not hearsay.  That's a transaction.

13          So the objection is overruled.  This is not hearsay.  5213

14     is in evidence.

15          (Trial Exhibit 5213 received in evidence.)

16     **BY MR. PERLSON**

17     **Q.**   So, again, this is a message from Mr. Levandowski to

18     yourself on December 18, 2015; correct?

19     **A.**   Yes, that is correct.

20     **Q.**   And he tells you "Let's do Slack and iMessage only."  And

21     there's a little wink there; right?

22     **A.**   Yes, I see the wink.

23     **Q.**   And this is while you were both working at Google; right?

24     **A.**   Yes, that's correct.

25     **Q.**   And at the same time that you were discussing the

 1  formation of Ottomotto and meeting with Uber; right?

 2  **A.**   Yes, that's correct.

 3  **Q.**   Okay.  If you could turn to 4296, please?

 4       Now, while -- while you were -- but before I ask you about

 5  that, while you were discussing the formation of Ottomotto and

 6  meeting with Uber, you and Levandowski, you reminded each other

 7  to delete text messages; true?

 8  **A.**   No, that's not correct.

 9  **Q.**   Okay.  Well, let me look at -- if I could direct you to

10  Exhibit 4296.

11          **MR. PERLSON:**  Your Honor, I'd like to admit this.

12          **MR. CARMODY:**  No objection.

13          **THE COURT:**  Received.

14       (Trial Exhibit 4296 received in evidence.)

15          **MR. PERLSON:**  Please put it up.

16       (Document displayed.)

17  **BY MR. PERLSON**

18  **Q.**   This is a message from Mr. Levandowski to yourself.  It's

19  an iMessage.  Do you see that?

20  **A.**   Yes, I do.

21  **Q.**   That's basically a text message; right?

22  **A.**   That's correct.

23  **Q.**   Okay.  And Mr. Levandowski is telling you:

24          "Please delete after use."

25       Do you see that?

1   A.   Yes, I do.

2   Q.   Now, I'd like to turn you to TX-4297, please.

3        (Witness complied.)

4   Q.   Do you recognize this as an iMessage from yourself to

5   Mr. Levandowski?

6   A.   Yes, I do.

7            MR. PERLSON:  I would like to move this into evidence,

8   please.

9            MR. CARMODY:  No objection.

10           THE COURT:  Received.

11       (Trial Exhibit 4297 received in evidence)

12       (Document displayed)

13  BY MR. PERLSON

14  Q.   Mr. Ron, in this evidence, you respond:

15       "Deleted.  Good call."

16       Do you see that?

17  A.   Yes, I do.

18  Q.   Now, in November 2015 you registered the domain 280

19  Systems; correct?

20  A.   Yes, I did.

21  Q.   If you could turn to TX-4316, please.

22       (Witness complied.)

23  Q.   Do you recognize this as an email from yourself to

24  Mr. Levandowski with the formation of 280systems.com?

25  A.   The registration of the 280 Systems domain, yes.

1          **MR. PERLSON:**  Your Honor, I ask that 4316 be admitted

2   into evidence.

3          **MR. CARMODY:**  No objection, Your Honor.

4          **THE COURT:**  Thank you.  4316.

5      (Trial Exhibit 4316 received in evidence.)

6      (Document displayed.)

7   BY MR. PERLSON

8   Q.   And if you'd look at this email, it's dated November 16,

9   2015; right?

10  A.   Yes, it is.

11  Q.   You're still both working at Google; right?

12  A.   That's correct.

13  Q.   Well, let's -- in December of 2015, you were already

14  interviewing lawyers on behalf of 280 Systems; right?

15  A.   That's correct.

16  Q.   Let me point you to Exhibit 5146, please, in your binder.

17      (Witness complied.)

18  Q.   Do you recognize this as an iMessage or text message from

19  yourself to Mr. Levandowski -- I'm sorry, from Mr. Levandowski

20  to you?

21  A.   Yes, I do.

22          **MR. PERLSON:**  I ask that 5146 be admitted, please.

23          **MR. CARMODY:**  No objection.

24          **THE COURT:**  Received.

25      (Trial Exhibit 5146 received in evidence)

1  BY MR. PERLSON

2  Q.   In this message Mr. Levandowski tells you:

3          "From Cam, just double-checked with Legal and

4       Orrick works for Lyft.  So we wouldn't be able to

5       share any info with them and would really prefer you

6       choose O'Melveny or Goodwin Procter."

7       Do you see that?

8  A.   Yes, I do.

9  Q.   And "Cam," that refers to Mr. Poetzscher who works at

10 Uber?

11 A.   That's correct.

12 Q.   So Mr. Levandowski is relaying the fact that

13 Mr. Poetzscher of Uber has certain preferences of which law

14 firms Ottomotto should hire; right?

15 A.   That's correct.  I think we were also talking with Lyft,

16 so they were just concerned that we wouldn't talk with

17 attorneys that were working for Lyft as well, which we have.

18 We were talking with attorneys working for Lyft as well.

19 Q.   Okay.  My question was:  Uber was recommending lawyers to

20 Ottomotto that they would use in the transaction; true?

21      Yes?

22 A.   Yes.

23 Q.   All right.  If you could turn to 5413, please?

24 A.   I'm sorry.  5..?

25 Q.   5413 -- I'm sorry, 4314.  Didn't mean to trip you up

1    there.

2         (Witness complied.)

3    Q.   You see this as an email that you wrote?

4    A.   Yes, it's an email that I helped draft.

5    Q.   Okay.

6         MR. PERLSON:   We'd ask that 4314 be admitted into

7    evidence.

8         MR. CARMODY:   No objection.

9         THE COURT:   All right.   Received.

10        (Trial Exhibit 4314 received in evidence)

11        (Document displayed)

12   BY MR. PERLSON

13   Q.   Now, you wrote this email for Mr. Levandowski to send to

14   Larry Page at Google; right?

15   A.   Yes.   I think we both drafted it together.

16   Q.   Well, this was something that you were helping

17   Mr. Levandowski draft; right?

18   A.   Correct.

19   Q.   And Mr. Levandowski is the CEO of Google?

20   A.   No, that's not correct.

21   Q.   At the time he was?

22   A.   No, Mr. Levandowski was not the CEO of Google.

23   Q.   Oh, I'm sorry.   That is absolutely true.

24        I think I already established it, so I'll move on.   But,

25   anyways, on behalf of Mr. Levandowski, you wrote:

1            "Uber and others are ramping up quickly and are

2       only two years behind at this point."

3       Do you see that?

4  **A.**   Yes, I can see that.

5  **Q.**   But you didn't work at the autonomous driving field at

6  Google; right?

7  **A.**   That's correct.

8  **Q.**   And then you also wrote in this document:

9            "The team is not moving fast enough due to a

10      combination of risk aversion and lack of urgency.  We

11      need to move faster."

12      Do you see that?

13  **A.**   Yes, I do.

14  **Q.**   You had no basis to say anything about that because you

15  didn't work on the team; right?

16  **A.**   Correct.  As I said, we drafted that together.

17  **Q.**   Okay.  But you weren't even -- and then, on behalf of

18  Mr. Levandowski, you wrote:

19            "We have the team Lisa, now we need Mac."

20       Do you see that?

21  **A.**   Yes, I do.

22  **Q.**   Now, Mr. Levandowski eventually sent an email to Mr. Page

23  regarding the state of Project Chauffeur; right?

24  **A.**   I -- I don't know.

25  **Q.**   Okay.  Well, if we could go to TX-1898, which is already

RON - DIRECT EXAMINATION / PERLSON

```
 1   admitted.

 2         (Document displayed.)

 3   Q.    Now, you see it's an email from Mr. Levandowski to Larry

 4   Page.  Do you see that?

 5   A.    Yes, I can see that.

 6   Q.    And the date of this document is January 9th, 2016?

 7   A.    Yes, I can see that.

 8   Q.    And that's just eight days after the draft email that we

 9   looked earlier at, TX-4314?

10   A.    Yes, it is.

11   Q.    And if you look at the title of it, it says, "Team Mac

12   urgently needed."

13   A.    Yes, I can see that.

14   Q.    And that was the language that was in your January 1st

15   email, too, right, regarding Team Mac?

16   A.    Yes, that is.

17   Q.    Let me point you to TX-5822, please.

18         (Witness complied.)

19   Q.    Do you recognize this as a text message between yourself

20   and Mr. Levandowski?

21   A.    Yes.

22            MR. PERLSON:  I ask that 5822 be admitted, please.

23            MR. CARMODY:  That's fine.

24            THE COURT:  Thank you.  In.

25         (Trial Exhibit 5822 received in evidence.)
```

1              **MR. PERLSON:**  Please put it on the screen.

2         (Document displayed.)

3    **BY MR. PERLSON:**

4    Q.   Mr. Levandowski writes:

5              "Hey, can you write me an email I should send to

6         Bryan of how he should announce that he is replacing

7         me on the laser team."

8         Do you see that?

9    A.   Yes, I can see that.

10   Q.   So he's asking you to write an email for him?

11   A.   Yes, he did.

12   Q.   And Bryan, that refers to Bryan Salesky?

13   A.   Yes, I think so.  His manager, I believe.

14   Q.   And he was the manager at Project Chauffeur at the time?

15   A.   He was a manager.  I'm not sure what -- exactly what was

16   his role.

17   Q.   But he was working on Project Chauffeur?

18   A.   Yes.

19   Q.   And the next sentence says:

20             "He asked me to do that, and I think it's a great

21        opportunity to set up evidence that I was pushed out."

22        See that?

23   A.   Yes, I can see that.

24   Q.   So Mr. Levandowski said he wanted to set up evidence to

25   make it look like he was pushed out of Project Chauffeur.

1   That's what he said?

2   **A.**   That's what he wrote in this text message.

3   **Q.**   And when he sent you this message, Levandowski was still

4   at Google; right?

5   **A.**   Correct.  He was still at Google, and I believe the team

6   did -- basically about to replace him, or that's what he shared

7   with me, that they had already hired his replacement

8   essentially.

9   **Q.**   Okay.  But he was still working at Google at that time?

10  **A.**   Correct.

11  **Q.**   Hadn't left yet?

12  **A.**   Yes.

13  **Q.**   Now, you actually resigned from Google the very next day,

14  on January 13th; right?

15  **A.**   Yes.  That's correct.

16  **Q.**   And when you left Google, you didn't give them, like, an

17  advance two weeks' notice; right?

18  **A.**   No, I did not.

19  **Q.**   You said, "I'm leaving," and you left?

20  **A.**   Yes.  I didn't have any managerial duties at the time.

21  **Q.**   Okay.  But, again, you just left.  No advance notice;

22  right?

23  **A.**   Correct.

24  **Q.**   And you formed Ottomotto two days later, January 15th?

25  **A.**   Yes, I believe that's correct.

1    Q.    Well, let's look at TX-5077, please.

2          (Witness complied.)

3                MR. CARMODY:  No objection.

4                MR. PERLSON:  I appreciate that.

5          Could we have it admitted, 5077?  I had a preemptive "no

6    objection."

7                MR. CARMODY:  No objection.  It's fine.

8                THE COURT:  Okay.  Thank you.  In.

9          (Trial Exhibit 5077 received in evidence.)

10         (Document displayed.)

11   BY MR. PERLSON

12   Q.   Is this the document indicating the formation of Ottomotto

13   on January 15th, 2016?

14   A.   I think so, yes.

15   Q.   When Ottomotto was formed, it was being run out of

16   Mr. Levandowski's house; right?

17   A.   No, that's not correct.

18   Q.   Well, it was being run out of his house at the beginning

19   of Ottomotto, early in Ottomotto?

20   A.   Later on, yes.

21   Q.   Okay.  But in the early portions of Ottomotto's history,

22   it's being run out of his house; right?

23   A.   Not initially, but later on, yes.

24   Q.   But, again, that's not what I'm asking.

25         In the early portion of its history, Ottomotto was being

1    run out of Mr. Levandowski's house?

2    **A.**    Yes.

3    **Q.**    Now, even after you formed Ottomotto and you both had left

4    Google, you and Mr. Levandowski still reminded each other to

5    delete text messages; true?

6    **A.**    No, that's not correct.

7    **Q.**    Okay.  Well, let's -- if you could look at TX-5467,

8    please.

9    **A.**    I'm sorry.  Can you repeat the number?

10   **Q.**    5467.

11        (Witness complied.)

12   **Q.**    You recognize this as a text message that Mr. Levandowski

13   sent you on March 9th, 2016?

14   **A.**    Yes.

15        **MR. PERLSON:**  I'd like to move 5467 into evidence,

16   please.

17        **MR. CARMODY:**  That's fine.

18        **THE COURT:**  Thank you.  In evidence.

19    (Trial Exhibit 5467 received in evidence.)

20    (Document displayed.)

21   **BY MR. PERLSON:**

22   **Q.**    In this message, Mr. Levandowski reminds you to:

23        "Make sure you delete all the messages tonight on

24        both your PC and iPhone."

25        Do you see that?

RON - DIRECT EXAMINATION / PERLSON

1   A.   Yes, I can.

2        And he did remind me from time to time.  You were asking

3   me if we were reminding each other, which is not true.  He

4   reminded me from time to time, and I didn't think much of it.

5   Q.   And you followed this direction; right?

6   A.   Sometimes; sometimes not.

7   Q.   But Mr. Levandowski asked you to do it?

8   A.   From time to time, yes.

9   Q.   Just like in this email?

10  A.   Correct.

11  Q.   And when Uber acquired Ottomotto, Ottomotto issued new

12  laptops to everyone as soon as they joined; right?

13  A.   That is correct.  That was our policy.

14  Q.   And that included Mr. Levandowski?

15  A.   That is correct.

16  Q.   But Ottomotto never implemented a specific policy to

17  prevent Mr. Levandowski from bringing his personal laptop to

18  work at Otto, did it?

19  A.   No, I don't believe so.  We trusted the employees.

20  Q.   And you're not aware of any specific Uber policies that

21  prevented Levandowski from bringing his personal laptop to Uber

22  either; right?

23  A.   No, I'm not aware of Uber's policies.

24  Q.   Okay.  I'd like to direct you to TX-903, please.

25  A.   I'm sorry.  903?

RON - DIRECT EXAMINATION / PERLSON

1   Q.   TX-903.

2        (Brief pause.)

3   Q.   Is this a document that you received from Mr. Levandowski

4   on November 2nd, 2016?

5   A.   I'm sorry.  Can you repeat the number?  903?

6   Q.   Yeah.

7        THE COURT:  Counsel, maybe you've got to go up there

8   and help him find it.

9        MR. PERLSON:  Okay.

10       THE WITNESS:  I haven't received 903.

11  BY MR. PERLSON

12  Q.   Well, it's 0903 in your binder.

13  A.   Okay.

14  Q.   Do you recognize this as a document that you received from

15  Mr. Levandowski on November 2nd, 2016?

16  A.   I don't recall this specific email.

17  Q.   Well, if you could turn to 523 in your set.  523, please.

18  A.   Yes.

19  Q.   And go to page 26, please.

20       (Witness complied.)

21  Q.   If you look, there is an entry 549 on that page.

22  A.   Yes, I can see that.

23  Q.   And it refers to UBER75555?

24  A.   Yes, I can see that.

25  Q.   Okay.  And it's a November 2nd email -- or November 2nd

RON - DIRECT EXAMINATION / PERLSON

1    document.  Do you see that?

2    **A.**    Yes.

3    **Q.**    Okay.  Does that refresh your recollection at all?

4    **A.**    No, I think this was an email that was sent for a very

5    broad distribution list.  So I might have been one of the

6    recipients, but I don't remember specifically reading through

7    it.

8           **MR. PERLSON:**  Your Honor, I'd like to introduce 903.

9           **MR. CARMODY:**  We object, Your Honor.  There's no

10   foundation whatsoever.

11          **THE COURT:**  So far, sustained.  Not in evidence.

12   **BY MR. PERLSON**

13   **Q.**    Now, Mr. Ron, when you were discussing partnering with

14   Uber, you discussed that Ottomotto could accelerate Uber in the

15   self-driving market; is that true?

16   **A.**    I don't remember that specific language.

17   **Q.**    Well, is it true?

18   **A.**    It might.  I don't remember the specific language.

19   **Q.**    Okay.

20          **MR. PERLSON:**  Can we play from Mr. Ron's October 2nd

21   deposition 59/3 to 9.

22          (Videotape played in open court, not reported.)

23   **BY MR. PERLSON**

24   **Q.**    And it was your view that Ottomotto could accelerate Uber

25   in the self-driving market; right?

1  **A.**    I think that was one of the potentials, yes.

2  **Q.**    Okay.  I'd like to direct you to TX-4313, please.

3       (Witness complied.)

4  **Q.**    Do you recognize this as a -- it looks like it's an email

5  from yourself to yourself from January 2nd, 2016?

6  **A.**    Yeah.  I think that's a draft of some of the thoughts at

7  that time.

8         **MR. PERLSON:**  Okay.  Your Honor, I'd like to admit

9  4313, please.

10         **MR. CARMODY:**  No objection, Your Honor.

11         **THE COURT:**  Thank you.  Received.

12       (Trial Exhibit 4313 received in evidence.)

13       (Document displayed.)

14  **BY MR. PERLSON:**

15  **Q.**    This is a set of talking points to review with Uber; is

16  that correct?

17  **A.**    I believe so, yes.

18  **Q.**    Now, the first line of the email says:

19         "Connect on concrete vision."

20       Then it goes on to say:

21         "Help Uber win the self-driving race."

22       Do you see that?

23  **A.**    Yes, I can see that.

24  **Q.**    And so one of the talking points that you were discussing

25  with Uber was how to win the self-driving race; correct?

1    A.   That was one of the talking points, along with creating a

2    truck business and other talking points in the document, yes.

3    Q.   And then under "Value," you wrote:

4             "Accelerate 300 to $500 million a year.  Cut at

5         least a year, probably more."

6    Do you see that?

7    A.   Yes, I can see that.

8    Q.   And then another point was that -- so that was the

9    acceleration could be worth between 300 and $500 million a

10   year; right?

11   A.   Yes, I can see that.

12   Q.   And on the next line you write:

13            "Reduce capital costs to compete with G in the

14        meantime.  Few hundred millions on top."

15   Do you see that?

16   A.   Yes, I can see that.

17   Q.   And then, further down, it says:

18            "Trucking, $700 billion a year potential."

19   Do you see that?

20   A.   Yes.  We were very excited about the potential in the

21   trucking market, to do self-driving trucks.

22   Q.   And you wrote $700 billion a year potential?

23   A.   That's the size of the trucking market in the United

24   States, yes.

25   Q.   Now, look at 5472, please.

RON - DIRECT EXAMINATION / PERLSON

1   A.   Sorry.  57?

2   Q.   5472, please.

3        This is an email from yourself -- or a text from yourself

4   to Mr. Levandowski?

5   A.   Yes, that's correct.

6   Q.   Dated March 6th, 2016?

7   A.   Yes.

8   Q.   Okay.

9            MR. PERLSON:  Could we please move 5472 into evidence?

10           MR. CARMODY:  No objection.

11           THE COURT:  Thank you.  Received.

12       (Trial Exhibit 5472 received in evidence.)

13  BY MR. PERLSON

14  Q.   And, actually, look at the time stamp there.  It's

15  actually March 13, 2016.  Do you see that?

16  A.   Yes, I do.

17  Q.   And it says "TK."  Do you see that?

18  A.   Yes.

19  Q.   That's Travis Kalanick?

20  A.   Yes.

21  Q.   Next to "TK," you write:

22           "This is all about winning."

23       Right?

24  A.   That's correct.

25  Q.   And under that, it says:

1              "To win, we have to cross the finish line first.

2         Losing is not an option."

3         Correct?

4    A.   That's correct.

5    Q.   These were things that Mr. Kalanick told you; right?

6    A.   No, those are things that we prepared for discussion with

7    Travis.  We were just worried about the team at Uber at that

8    point and on the overall deal.  We're not sure it's the right

9    thing for us to even partner with Uber.

10   Q.   So you told -- you wanted to tell Mr. Kalanick that to win

11   -- that it's all about winning?

12   A.   Yes.  We wanted to share some of the concerns we had with

13   the team.  As you can see in the line after, Google is only

14   here because of team leadership spirit, not because of

15   technology.

16        We just wanted to share some of our concerns with the Uber

17   team at the time and really discuss if it's the right thing for

18   us to do, to partner with Uber.

19   Q.   Sir, it says:

20              "To win, we have to cross the finish line first.

21        Losing is not an option."

22        This is --

23             MR. CARMODY:  I'm sorry.  Can we see the next line so

24   we can see -- so we're not --

25             MR. PERLSON:  Your Honor, he can ask him about that on

1    redirect.  I'm asking about this line.

2            MR. CARMODY:  It's an optional completeness objection,

3    Your Honor, 106.

4            THE COURT:  All right.  Show him the rest of the

5    remaining lines in the email.

6        (Document displayed.)

7    BY MR. PERLSON

8    Q.   But in an email that you wrote to Mr. Levandowski, under

9    "TK," it says:

10            "To win, we have to cross the finish line first.

11        Losing is not an option."

12        Your words; yes?  Yes or no?

13   A.   Yes.

14   Q.   Now, Mr. Ron, today you actually still have an ongoing

15   business relationship with Mr. Levandowski; correct?

16   A.   How is that so?  I'm sorry.  Can you explain?

17            THE COURT:  That's a vague question.

18        MR. PERLSON:  Okay.  Well --

19            THE COURT:  I'm sustaining the witness's objection.

20        (Laughter.)

21        MR. PERLSON:  Fair enough, Your Honor.

22   BY MR. PERLSON

23   Q.   You still own a business, a company, with Mr. Levandowski;

24   true?

25   A.   We are both -- have interests and shareholders in a

RON - CROSS EXAMINATION / CARMODY

1    holding company.

2         MR. PERLSON:  Thank you, Your Honor.  No further

3    questions.

4         THE COURT:  All right.

5      Mr. Carmody, your turn.

6         MR. CARMODY:  Thank you, Your Honor.

7                    <u>CROSS EXAMINATION</u>

8    BY MR. CARMODY

9    Q.    Good morning, Mr. Ron.  How are you?

10   A.    Good morning.  Good.  Thanks for asking.

11   Q.    There was some discussion about text messages between

12   yourself and Mr. Levandowski.  Remember that?

13   A.    Yes, I do.

14   Q.    You deleted some text messages.  Why was that?

15   A.    Anthony asked me to delete messages from time to time.  I

16   didn't think much of it.  He was a discreet person.  So

17   sometimes I complied and sometimes I didn't.

18   Q.    Did you and Mr. Levandowski ever use text messages to

19   discuss any self-driving car technology?

20   A.    No.  We have never discussed technology in text messages.

21   Q.    Now, you understand through this lawsuit that

22   Mr. Levandowski downloads some files while he's at Google back

23   in December of 2015?

24   A.    I understand that through the lawsuit.  I wasn't aware of

25   that before.

1   Q.   And that's my question.  Did you ever -- in your

2   discussions with Mr. Levandowski, did the two of you ever

3   discuss any files he may have downloaded while he was at

4   Google?

5   A.   No, we have not.

6   Q.   Did you, in your discussions with Mr. Levandowski, ever

7   discuss self-driving car technology?

8   A.   No.  Just on a high level, but not specifics.

9   Q.   Did you and Mr. Levandowski ever discuss any potential

10  Google trade secrets?

11  A.   No, we have not.

12  Q.   To this day, sir, are you aware of any what you believe to

13  be Google trade secrets?

14  A.   No, I'm not.

15  Q.   Do you have any understanding of self-driving car

16  technology?

17  A.   No.  Just on a very high level but not the specifics.

18  Q.   Do you have any reason to believe that any self-driving

19  car technology that was once part and parcel of Google ever

20  made its way into your little company called Ottomotto?

21  A.   No, I don't have any reason to believe that.

22  Q.    And why is that, sir?

23  A.   Well, a few reasons.  One, we had a very strict policy in

24  place asking employees to sign, as part of their employment

25  contract, that they wouldn't bring any IP from outside of the

1  company to Ottomotto.  We had that very clear and we

2  communicated that both verbally and in writing to the

3  employees.

4       Second, and I think it's important to remember, we were a

5  small team of folks that were very passionate about bringing

6  the safety technology to a new market to self-driving trucks,

7  and that's a market that nobody was actually doing anything

8  about.  And we were actually proud we left big companies,

9  Apple, Tesla, Google, and we are very proud to innovate and

10  create new things, not copy old stuff.

11       So I'm pretty sure if there was such a thing, some of the

12  team will speak out because, again, that was not the team

13  spirit.

14  **Q.**  Thank you, sir.

15       Now, we hear your accent.  Is English your first language?

16  **A.**  No, it's not.

17  **Q.**  Where are you from, sir?

18  **A.**  I was born and raised in Israel, just outside of Haifa.

19  **Q.**  And how and when do you come to the United States?

20  **A.**  I started my undergrad and master in Technion, Israel

21  Institute of Technology, and then served as a captain in the

22  Israel military.  And packed up my suitcase four days after

23  leaving the military and moved to the Bay Area to study in

24  Stanford.

25  **Q.**  And where did you -- what did you study at Stanford, sir?

1    A.    I always aspired to be entrepreneur, so I studied business

2    at the Stanford business school.

3    Q.    Okay.  And after you got out of Stanford business school,

4    you end up at Google?

5    A.    Yes, that's correct.

6    Q.    Give us the time.

7    A.    I joined the Google Maps team in 2007.

8    Q.    And is that how you come to meet Anthony Levandowski?

9    A.    Yes.  We met a handful of times as colleagues on the

10   Google Maps team in 2007.

11   Q.    And do you then develop a friendship with him?

12   A.    No.  We actually didn't stay in touch.  I lost track of

13   Anthony and his whereabouts, and we got reconnected at Google

14   in 2015.

15   Q.    And how did that come about?

16   A.    I came back to Google because I had -- for a short time I

17   was at Motorola.  So I came back to Google and got reconnected

18   with a bunch of colleagues, and Anthony was one of them.

19   Q.    And take us back, if you will, sir, to that time.  So it

20   sounds like it's about the early fall of 2015?

21   A.    Yes, that's about right.

22   Q.    So take us through the kind of relationship you're

23   developing with Mr. Levandowski.  What happens?

24   A.    Well, I reconnected with him, and he just shared with me

25   some of his frustration from the Chauffeur Project, just the

1  overall lack of focus and direction and just very slow

2  progress.  And that was the frustration that I think was shared

3  among a large group of people at that project.

4  Q.  And what role did you have in terms -- I mean, were you

5  his sounding board or --

6  A.  Yes.  So we just started discussing -- I want to help, so

7  we started discussing ways in which we can help the Google

8  Chauffeur Project of potentially accelerating or being more

9  focused.  That's how our conversation started.

10 Q.  And was there a point in time when you talked about doing

11 something together?

12 A.  Yes.  So then after that initial period, we've concluded

13 actually the best way to help is to focus on something brand

14 new, which is commercial transportation, which is so important

15 to the economy; and nobody, including Google, was paying any

16 attention or really focused on bringing safety technology to

17 that market.  So we decided to pursue essentially a project

18 developing self-driving trucks.

19 Q.  Now, the self-driving trucks was that big market you

20 talked about with counsel; correct?

21 A.  Correct.  That's a very big market.

22 Q.  And tell us about the form of the business.  In other

23 words, what I hear you saying is you and Anthony Levandowski

24 got together and you were intrigued by this idea of

25 self-driving trucks; fair?

1   **A.**   That's fair, yeah.  We were intrigued and actually very

2   motivated to help with that problem.  Thousands of unnecessary

3   deaths by truck accidents every year in the U.S.

4        So then we explored couple of options to basically develop

5   that project.  The first option was to actually build another

6   team pursuing self-driving trucks at Google in parallel to the

7   existing Chauffeur team.

8   **Q.**   Is that what we saw -- is that what Team Mac refers to?

9   **A.**   Correct.  That refers to an Apple history.  They basically

10  set up two teams, Team Lisa and Team Mac, to pursue personal

11  computing.  And we thought along those lines, we could set up a

12  new team in Google to pursue that self-driving vision.

13  **Q.**   And you also mentioned, sir, there were a couple other

14  options.  What were they?

15  **A.**   So the first option was to do a team within Google.  If

16  that wouldn't work out, the second option was to actually start

17  the company but still being funded by Google.  Google has done

18  that with numerous companies in the past.  And we thought

19  because self-driving trucks is very complementary to

20  self-driving cars, there's a way we can actually get Google

21  interested in funding that startup.

22        And then the third option was, if that doesn't work out,

23  we can actually leave, do a startup and be funded by other

24  sources, either venture capital money -- we've met many of

25  those -- or by another strategy partner.  Uber being one of

 1   those, Lyft being another, and many others.

 2   **Q.**   And during this point, this time frame, are you talking to

 3   Google and Lyft and some other companies?

 4   **A.**   Correct.   Basically, we're not sure what's the right

 5   direction, and we sort of kept going back and forth between

 6   options and just developing those options.

 7        So we're talking with Google about building a team in

 8   Google, but we were also preparing to potentially leave and

 9   talking with Uber, Lyft, and other venture capitalists.

10   **Q.**   We understand you now work at Uber.   What is your role at

11   Uber?

12   **A.**   I do, and I head up the trucking division at Uber.

13   **Q.**   Okay.   And why didn't you and Mr. Levandowski, with his

14   new company that you wanted to start up, why didn't you end up

15   at either Google or Lyft or somewhere else?

16   **A.**   I always believed the potential for self-driving trucks

17   and trucks in general is just enormous.   The ability to save

18   life, to help with a big part of the economy, I always thought

19   this is really the opportunity to help.

20        And what was the deciding factor for us is Google

21   eventually was not interested in doing anything with

22   self-driving trucks.   Lyft, we actually had an offer on the

23   table, but Lyft was not interested in actually supporting

24   trucks and starting a trucks division.   But Uber was.   And we

25   thought it's the best place to actually start a full trucking

RON - CROSS EXAMINATION / CARMODY

 1   operation.

 2   Q.   Now, will you take a look, sir, at this timeline that the

 3   parties have put together.  You see it says December 11th.  And

 4   that's the date that Mr. Levandowski downloads files while he's

 5   a Google employee.

 6        Do you see that?

 7   A.   Yes, I can see that.

 8   Q.   At that point in time, certainly what I'm hearing you say

 9   is you and Mr. Levandowski talked about doing a company

10   together, one of these three options you discussed; correct?

11   A.   Yes, that's correct.

12   Q.   As of that date, sir, was there any determination made of

13   what option ultimately you were going to pursue?

14   A.   No, there was no determination.

15   Q.   Now, let's fast forward, if we can, in time.  Let's

16   leapfrog, if you will, past December 11th and go into this

17   January of 2016 time frame.  Okay?

18   A.   Okay.

19   Q.   Now, I'd like to have you look -- can you look at your

20   binder, sir, at Exhibit 3226, please?

21        Here you go.

22        (Whereupon binder was tendered to the witness.)

23   A.   Thank you.  3220...

24   Q.   3226.

25        **MR. PERLSON:**  Which one is this?

```
 1            MR. CARMODY:  3226.

 2   BY MR. CARMODY

 3   Q.   And what it is, sir, there's a bunch of texts back and

 4   forth.  I'd like you to put your eyes on two pages, please.

 5   One's the --

 6   A.   I'm sorry.  Can you repeat the number?  32...?

 7   Q.   Well, it's Exhibit 3226.  Do you have that?

 8   A.   I do.  Do you want to refer to 3224 or 3226?

 9   Q.   3226.

10            THE COURT:  Why don't you help the witness find it,

11   please.

12            THE WITNESS:  Okay.  This one?

13   BY MR. CARMODY

14   Q.   Yes, sir.

15            And now we're going to go to the bottom right, if you

16   will.  And you see these little numbers on the bottom?  Yes,

17   you got it.  See these little numbers?

18   A.   Yeah.

19   Q.   Go to numbers 268.

20   A.   260- --

21   Q.   267 and 268, please.

22   A.   Yes.  Uh-huh.

23   Q.   Okay.  We see some texts back and forth --

24   A.   Yes.

25   Q.   -- between yourself and Mr. Levandowski?
```

1   **A.**   Yes, I see that.

2   **Q.**   And we see the date of the texts are January 22nd of 2016;

3   correct?

4   **A.**   Yes.

5           **MR. CARMODY:**  I offer, Your Honor, Exhibit 3226.

6           **MR. PERLSON:**  Objection, Your Honor.  It's hearsay.

7           **MR. CARMODY:**  803.3, Your Honor.  It evidences

8   Mr. Levandowski's state of mind, which, you know, is the heart

9   of this case, what he's thinking and what he's planning to do

10  during the time they say he's colluding with Uber.

11          **THE COURT:**  Can I see the exhibit?

12          **MR. CARMODY:**  Of course, Your Honor.  I have a copy.

13  Mine's a little marked up, but I think you get the drift.

14      (Whereupon document was tendered to the Court.)

15          **MR. CARMODY:**  It's that page, Your Honor, and the page

16  that follows it.  There are two texts in a row.

17      (Brief pause.)

18          **THE COURT:**  You want to put in evidence page 267 and

19  268?

20          **MR. CARMODY:**  Yes, Your Honor.

21          **THE COURT:**  And then not the rest of the exhibit.

22          **MR. CARMODY:**  That's fine.  We can excise that, yes,

23  Your Honor.

24          **THE COURT:**  All right.  Well, on the -- again, it's

25  like the problem before.  These are admissible.  The hearsay

 1   objection is not well taken on account of this is like proving

 2   up a transaction.

 3        So those two pages are going to be in evidence.  What is

 4   the exhibit number, though?

 5             MR. CARMODY:  It's 3226, Your Honor.

 6             THE COURT:  And pages 267 --

 7             MR. CARMODY:  And 268.

 8             THE COURT:  Thank you.  All right.  Go ahead.

 9        (Trial Exhibit 3226, pages 267 and 268 received in

10         evidence)

11        (Document displayed)

12   BY MR. CARMODY

13   Q.   Now, if we take a look here on the big screen, what we see

14   here is -- we're back in -- we're at January 22nd.  Okay?  And

15   so these downloads that have been talked about, sir, happen in

16   December.

17        Now we're past this.  We're right around here in the

18   timeline (indicating), and we have Anthony Levandowski sending

19   you a text --

20             MR. PERLSON:  Objection, Your Honor.  He's testifying

21   now.

22             THE COURT:  It does sound like summation.  So what is

23   your question instead of --

24   BY MR. CARMODY

25   Q.   The question is, would you read us what Mr. Levandowski is

1   texting you on January 22nd, 2016?

2   A.   Yeah.  He texted me that:

3        "We need to have hard terms from TK" -- that's

4   Travis -- "no vest, 100bp, report et cetera.  No

5   compromises."

6   Q.   And these are the terms of the deal you want with Uber?

7   A.   Correct.  We were negotiating with Uber at that point and

8   we were not sure that that's the right venue for us, so...

9   Q.   And were you also negotiating with Lyft and others at that

10  time?

11  A.   Correct, including still being in touch with Google on

12  potential funding.  Just not sure what's the right thing for us

13  to do at that point.

14  Q.   And let's see what Anthony Levandowski says to you next.

15       (Document displayed.)

16  Q.   Would you read that -- would you read that to us, sir?

17  A.   Yes.  He said:

18        "Or else we destroy him."

19  Q.   And who is the "him"?

20  A.   Him is Travis.  It's a very Anthony language, yes.

21  Q.   Okay.  Now, in the next exhibit, sir, I'd like you to take

22  a look -- and maybe we can make this quicker.  I'm going to

23  offer 3227, which is another text exchange a few days later

24  between yourself and Mr. Levandowski.

25  A.   Yes.

```
 1              MR. PERLSON:  No objection, Your Honor.

 2              THE COURT:  Thank you.  Received in evidence.

 3         (Trial Exhibit  3227 received in evidence.)

 4              MR. CARMODY:  Would you click on 227 up there?

 5         (Document displayed.)

 6    BY MR. CARMODY

 7    Q.   Now, let's take a look at this, sir.  So now we're a

 8    couple days after Mr. Levandowski's talking about destroying

 9    Travis Kalanick if he doesn't meet the terms of the deal --

10              THE COURT:  Wait, wait.  Now wait.  You're -- you're

11    insinuating lawyer argument into your questions.

12              MR. CARMODY:  Okay.

13              THE COURT:  So just ask a fresh question instead of

14    saying he's talking about destroying -- no.  That's -- we

15    already covered that part, so now cover a new point.

16              MR. CARMODY:  Thank you, Your Honor.

17    BY MR. CARMODY

18    Q.   If we take a look here, we have the date.  Walk us through

19    this text, please.  It is January 23rd, 2016.

20    A.   This is a text from Anthony to myself saying:

21              "I am super pumped" -- that's Anthony -- "about

22         negotiating this Monday with LP" -- that's Larry

23         Page -- "and JK" -- that's John Krafcik.

24    Q.   And what was -- what sort of negotiations are going on?

25    A.   We were still negotiating with Google, potentially them
```

1    investing in us, as a very complementary business to them in

2    the area of self-driving trucks.

3          I think John was about to visit us and he was in

4    connection with Anthony.  So we discussed the option where

5    Google will potentially fund us.

6          And from our perspective, we had a lot of options on the

7    table.  We really wanted to pursue that vision of self-driving

8    trucks, and we're just not sure what's the right option.

9          And one of the concern I had was, you know, at that point

10   we're very complementary to Google.  If we are to partner with

11   Uber, I was concerned that will be deemed somewhat competitive

12   by Google at that point.

13   **Q.**   And the final question, sir, is you had a lot of

14   discussions with Mr. Levandowski around this time.  Did you

15   have any basis whatsoever to believe that Mr. Levandowski had

16   some sort of a collusive deal with anybody at Uber?

17   **A.**   No, I do not have any basis to believe that.

18              **MR. CARMODY:**  Thank you.  I'll pass, Your Honor.

19              **THE COURT:**  All right.  Redirect.

20                    <u>**REDIRECT EXAMINATION**</u>

21   BY MR. PERLSON

22   **Q.**   So you were shown a text about negotiating with

23   Mr. Kalanick or else destroying him; right?

24   **A.**   Yes, that's correct.

25   **Q.**   You didn't -- you didn't destroy Mr. Kalanick, did you?

1    A.   No, we did not.

2    Q.   You were still in negotiations?

3    A.   We had a very long and very, very tough negotiation on

4    many aspects of the deal.

5    Q.   Right.  And you ultimately ended up with a deal that,

6    subject to milestones, would have netted Otto close to

7    $600 million; right?

8    A.   That was the quoted number in the press, but the reality

9    is we didn't hit any of those milestones and two years to that

10   date I've netted $20,000 from that transaction.

11   Q.   That's not the question I asked you, sir.

12        The question I asked you is:  The deal you negotiated, is

13   that subject to milestones?  If you meet them, you would earn

14   almost $600 million; right?

15   A.   That is correct.

16   Q.   Now, you mentioned Lyft a few times.  But you didn't have

17   any term sheet with Lyft, did you?

18   A.   We were pretty close to actually getting a term sheet from

19   Lyft.

20   Q.   Did you have a term sheet with Lyft?

21   A.   We have discussed dollar numbers with Lyft, and we had a

22   written offer on the table.

23   Q.   Okay.  Was there -- there's no term sheet agreement?

24   A.   We did not progress to a full term sheet agreement.

25   Q.   Okay.  And there were no technical milestones with Lyft?

1    A.    We had milestones with Lyft.

2    Q.    Okay.  Not agreed?

3    A.    Agreed verbally, but nothing approved as to a term sheet.

4    Q.    So you're saying that you had an agreement with Lyft?

5    A.    We did have very broad discussions with Lyft on

6    milestones.

7    Q.    Sir, you are saying that you had an agreement with Lyft

8    regarding your new company, an actual agreement?  That's what

9    your testimony is now?

10   A.    No.  We had verbal discussions with Lyft.

11   Q.    Okay.  So you didn't have any indemnification agreement

12   with Lyft, did you?

13   A.    We never signed a term sheet with them.

14   Q.    Okay.  So, sir, answer my question, please.  You had no

15   indemnification agreement with Lyft; right?

16   A.    That's correct.

17   Q.    You had no agreement with Lyft to indemnify you from bad

18   acts; right?

19   A.    That's correct.

20         MR. PERLSON:  No further questions, Your Honor.

21         THE COURT:  Anything more?

22                    RECROSS-EXAMINATION

23   BY MR. CARMODY

24   Q.    Did the negotiations with Lyft -- you said you had a

25   verbal understanding.  You had the offer.  Did they ever get

1    far enough where there was any discussion of indemnity?

2    **A.**    No, they did not.

3    **Q.**    And how much money did you get from coming over to Uber in

4    this big deal where you had numbers in the nine figures?  How

5    much money did you ultimately get?

6    **A.**    I got a salary cut, and we didn't end up hitting any of

7    the milestones and -- and so I got $20,000 from the initial

8    proceeding, the $100,000 I was paid for the deal.

9                **MR. CARMODY:**  Thanks.

10               **THE COURT:**  May the witness now be excused?

11               **MR. CARMODY:**  Fine with Uber, Your Honor.

12               **MR. PERLSON:**  Yes, Your Honor.

13               **THE COURT:**  Mr. Ron, thank you for coming.  You're

14   excused in the trial.  Have a good day.

15               **THE WITNESS:**  Thank you.

16        (Witness excused.)

17               **THE COURT:**  Okay.  It's time for our next break.

18        Please remember, don't talk about the case among

19   yourselves.  It will be your duty to do that later, but you've

20   got to keep an open mind in the meantime and -- and don't talk

21   about the case in the jury room yet.

22        All right.  We'll see you in 15 minutes.

23               **THE CLERK:**  All rise for the jury.

24        (Jury exits the courtroom at 11:27 a.m.)

25               **THE COURT:**  Be seated.

PROCEEDINGS

```
 1        Any issues for the judge?  Hearing none, I'm going to --
 2   is there any issue for the judge?
 3            MR. GONZÁLEZ:  Just one second, Your Honor.
 4        (Discussion held off the record amongst defense
 5         counsel.)
 6            MR. GONZÁLEZ:  Nothing, Your Honor.
 7            THE COURT:  Anything?
 8            MR. VERHOEVEN:  The only thing I'm going to do, and we
 9   talked about this so I won't belabor it, but the next witness
10   is Mr. Friedberg from Stroz.  And he submitted a declaration as
11   part of this litigation authenticating these documents that we
12   were talking about this morning.
13        We sent them a list, a very small list of the documents
14   that he's already authenticated.  And their position is I have
15   to go through each one of those exhibits and essentially say,
16   "Is that the Bates range of your -- of the documents that you
17   signed the declaration on?"
18        It's just silly.  So I'm -- I'm urging, once again, that
19   I -- that we can just agree to this.
20        I mean, the man has submitted a declaration as part of
21   this litigation certifying that these documents are authentic,
22   and we have it and I don't know why there's a dispute.
23            MR. RABIN:  May I respond, Your Honor?
24            THE COURT:  Yes.
25            MR. RABIN:  We have tried to give them as much as we
```

PROCEEDINGS

 1   possibly can to take this witness out of play for purposes of

 2   what they need to meet their evidentiary burden.  We stipulate

 3   that the documents are authentic.  We've stipulated with them

 4   where the documents came from.

 5        The only problem is how then do you get whatever these

 6   documents are, whether they're a picture of a PCB board or

 7   whether they're picture of a dollhouse, before the jury without

 8   the jury having a basis to understand what the documents are?

 9        This -- Mr. Friedberg can't -- can't lay the foundation

10   for the substance of the document to be before the jury.  And

11   so there has to be a witness who can actually say what the

12   document is.

13        Now, if it's an email, we're not so worried about that.

14   This -- you know, the jury can see what an email is as long as

15   it doesn't have something that's confusing.

16        The problem is if there's pictures or diagrams, then

17   that's not fair because the jury's not going to have any idea

18   to be able to determine what they -- what they're looking at.

19   All they're going to know is this was, for example, on

20   Mr. Levandowski's computer.

21        But it would be unfair and prejudicial for the jury to

22   think, well, this looks like a PCB board, so maybe it's a trade

23   secret, when it could be, you know, something completely

24   different because there's nobody to lay the foundation for what

25   the document actually is.

799

PROCEEDINGS

1              THE COURT:  Look.  You've got to do it the hard way.

2              MR. VERHOEVEN:  Well, can I just --

3              THE COURT:  I'm not going to force them to do

4      something that -- I don't know who's being unreasonable here,

5      but we'll have to just go through them one at a time.

6              MR. VERHOEVEN:  Can I have a quick response?

7              THE COURT:  Yes.

8              MR. VERHOEVEN:  There's a very small number from these

9      exhibits that our expert is going to talk about and --

10             THE COURT:  Whose expert?

11             MR. VERHOEVEN:  Our expert.

12             THE COURT:  Yeah?

13             MR. VERHOEVEN:  He's going to tell the -- all we're

14     trying to establish is these came from Levandowski's computer,

15     and then our expert's going to describe what they are.

16        It's just authenticity.  That's the only reason we're

17     talking about this.  And he just said that they're willing to

18     agree they're authentic.

19        We have a witness who will describe them, Your Honor.  I

20     just don't want them to say, "You can't use these documents

21     because you haven't moved them in with Stroz."  And they're

22     just going to take our time.  I mean, there's just -- it's just

23     gamesmanship, frankly.

24             THE COURT:  Well, you wouldn't be guilty of that at

25     any point, would you?

PROCEEDINGS

```
 1        (Laughter.)

 2            THE COURT:  You've got to do it the hard way for now,

 3    but if I -- listen.  On the Uber side, if I see that this is

 4    going in an unfair way, I'm just going to wave my hands and

 5    direct that they all come into evidence --

 6            MR. RABIN:  Yes, Your Honor.

 7            THE COURT:  -- and overrule you in the presence of the

 8    jury.  And my advice to you is to be reasonable and avoid that

 9    scenario.

10            MR. RABIN:  And we came up with a proposal, Your

11    Honor, which was --

12            THE COURT:  I don't want to hear it.

13            MR. RABIN:  Okay.

14            THE COURT:  I'm going to hear it in front of the jury.

15        We'll take 15 minutes.

16            THE CLERK:  Court is in recess.

17        (Whereupon there was a recess in the proceedings

18          from 11:31 a.m. until 11:53 a.m.)

19            THE COURT:  Back to work.  Bring in the jury.

20            MR. VERHOEVEN:  We have an agreement real quick.

21            THE COURT:  All right.  Let's have it.

22            MR. VERHOEVEN:  After I was kvetching, they came

23    around and said we have an agreement.

24            MR. RABIN:  So our -- taking your guidance, we will

25    not object as long as their expert properly lays the foundation
```

PROCEEDINGS

 1   for what each of the documents are.  We won't object that it's

 2   the expert that's trying to get them into evidence.

 3          **MR. VERHOEVEN:**  In other words, they'll stipulate --

 4          **THE COURT:**  Of course the expert's not going to know

 5   what they are.  How are you going to meet that?  He can't --

 6   the expert can't have personal knowledge to lay foundation.  He

 7   can only say what he thinks it is.

 8          **MR. VERHOEVEN:**  Well, what we're interested in is

 9   that -- is not running into a problem with the chain of custody

10   from these documents coming from Mr. Levandowski's computer

11   through Stroz and the production to -- in this litigation.  And

12   they are not going to raise that as a problem, is what they're

13   saying, as long as we show the document and talk about it.

14   They just don't want to do a blanket agreement that every

15   single document Stroz produced comes in.

16          **MR. RABIN:**  Right.

17          **MR. VERHOEVEN:**  Is that right?

18          **MR. RABIN:**  The chain of custody part's 100 percent

19   correct.

20       Their expert still has to go through the document,

21   identify what it was.  And obviously, in order for the expert

22   to do that, it had to have been disclosed by the expert in

23   their report.

24       But if they can lay all those pieces, then we will give

25   them leeway on their evidentiary obstacle they've got.

PROCEEDINGS

```
 1              THE COURT:  I hope there's an agreement.

 2         (Laughter.)

 3              THE COURT:  All right.  Let's bring in the jury.

 4              MR. RABIN:  Thank you, Your Honor.

 5         (Jury enters the courtroom at 11:55 a.m.)

 6              THE COURT:  All right.  Welcome back.  Be seated.

 7         Now, next witness.

 8              MR. VERHOEVEN:  Thank you, Your Honor.  Waymo calls

 9    Eric Friedberg, who is on the stand already.

10              THE COURT:  All right.  Please raise your right hand.

11                          ERIC FRIEDBERG,

12    called as a witness for the Plaintiff, having been duly sworn,

13    testified as follows:

14              THE WITNESS:  I do.

15              THE CLERK:  Please be seated.

16              THE COURT:  All right.  Thank you.  Welcome.

17              THE WITNESS:  Thank you.

18              THE COURT:  Sit down.  Move the mic around so that --

19    it goes up and down -- it will catch your voice.  So do that.

20         Say your name, please.

21              THE WITNESS:  Eric Friedberg.

22              THE COURT:  That's good.  Thank you.

23         Go ahead, Counsel.

24              MR. VERHOEVEN:  Thank you, Your Honor?

25
```

1          <u>**DIRECT EXAMINATION**</u>

2     **BY MR. VERHOEVEN**

3     **Q.**   Good morning, Mr. Friedberg.

4     **A.**   Good morning.

5     **Q.**   You are currently a co-president of the firm Stroz

6     Friedberg?

7     **A.**   Stroz Friedberg, yes.

8     **Q.**   Stroz.  Thank you.  I was always wondering how that was

9     pronounced.  Stroz Friedberg.

10         And you were one of its founders?

11    **A.**   I joined the firm in the first three months.  Ed founded

12    the firm and I joined shortly thereafter.

13    **Q.**   Okay.  I'm going to refer to the firm as just, I guess,

14    Stroz.  Is that okay?

15    **A.**   Yes, sir.

16    **Q.**   You don't mind being cut out of the name?

17    **A.**   I do not.

18    **Q.**   All right.  What is Stroz's business?

19    **A.**   Stroz Friedberg is a consulting and technical services

20    firm that focuses on digital forensics, computer crime

21    response, computer security, electronic discovery,

22    investigations, and due diligence.

23    **Q.**   Uber and Ottomotto retained your firm in approximately

24    March of -- March 4, 2016 to conduct an investigation; correct?

25    **A.**   Yes, sir.

1    Q.    Can we -- I'd like to show the witness Exhibit 354.

2              MR. VERHOEVEN:   Is there any objection?

3              MR. BRILLE:   No objection.

4              THE COURT:   54 is in evidence.

5         (Trial Exhibit 54 received in evidence.)

6              MR. VERHOEVEN:   Put it on the screen, please.

7    BY MR. VERHOEVEN

8    Q.    Turn to it in your binder, if you would like.

9         (Document displayed.)

10   Q.    You recognize this document as the engagement letter for

11   this due diligence investigation; correct?

12   A.    It's missing the protocol that's supposed to be attached

13   to it, but it's the engagement letter, yes.

14   Q.    Okay.  With that clarification.  And the date is

15   March 4th, 2016?

16   A.    Correct.

17   Q.    And one of the signatories on the back is a lawyer from

18   the law firm O'Melveny Meyers on behalf of Ottomotto; is that

19   right?

20   A.    Correct.

21   Q.    And there is another signature there by a fellow named

22   Eric Tate, who is a lawyer at Morrison Foerster; right?

23   A.    Correct.

24   Q.    And he is representing Uber; is that right?

25   A.    That's right.

1    Q.   Okay.  Isn't it true, sir, that at the time you were

2    retained you did not have an understanding of the proposed

3    corporate event that might be occurring between Uber and

4    Ottomotto?

5    A.   Correct.  I mean, not in any detail.

6    Q.   Now, you conducted the investigation and you prepared a

7    summary report detailing Stroz's findings as a result of this

8    engagement; correct?

9    A.   Could you repeat the question, please?

10   Q.   Sure.  Your firm prepared a summary report -- I believe

11   it's dated August 4th, 2016 -- in which you reported your

12   findings with respect to this investigation.

13   A.   Yes, sir.

14   Q.   Okay.  And I'd like to show the witness Exhibit 7912.

15            MR. VERHOEVEN:  Is there any objection?

16            MR. BRILLE:  There is no objection.

17            THE COURT:  7192?

18            MR. VERHOEVEN:  7912.

19            THE COURT:  Is there any objection?

20            MR. BRILLE:  No.

21            MR. VERHOEVEN:  7912.

22            THE COURT:  Received in evidence.

23        (Trial Exhibit 7912 received in evidence.)

24            MR. VERHOEVEN:  And we just put the first page up on

25   this.

1          Mr. Fisher, can we pull out the middle part there with the

2     words on it?

3          (Document displayed)

4     BY MR. VERHOEVEN

5     Q.   So this is the report that you just mentioned; correct?

6     A.   Yes, sir.

7     Q.   And I was wrong.  It's August 5, 2016; right?

8     A.   Yes, sir.

9     Q.   It was prepared for Morrison Foerster, which is the

10    attorneys for Uber; right?

11    A.   Correct.

12    Q.   And for O'Melveny Meyers, who are the attorneys for

13    Ottomotto; correct?

14    A.   Correct.

15          MR. VERHOEVEN:  We can put that down.

16          (Document removed from display.)

17    BY MR. VERHOEVEN

18    Q.   Stroz's due diligence investigation -- and I'm just going

19    to refer to it as "the due diligence investigation" and you'll

20    know I'm talking about this one; right?

21    A.   Yes.

22    Q.   Stroz's due diligence investigation began approximately

23    the third week in March, right, of 2016?

24    A.   Approximately, yes.

25    Q.   And on -- right at the beginning, just a week or two into

1    it, Uber's attorney asked you to complete everything by

2    April 3; right?

3    **A.**    They asked us if we could, as I recall.

4    **Q.**    Let's look at Exhibit 5078.

5              **MR. VERHOEVEN:**  Is there any objection to this one?

6              **MR. BRILLE:**  No.

7              **MR. VERHOEVEN:**  5078, Your Honor.

8              **THE COURT:**  All right.  Received in evidence.

9         (Trial Exhibit 5078 received in evidence.)

10             **MR. VERHOEVEN:**  Put it up, please.

11        And can we pull up the email at the bottom from Hanley

12   Chew?

13        (Document displayed)

14   **BY MR. VERHOEVEN:**

15   **Q.**    Who is Hanley Chew?

16   **A.**    Hanley Chew was a managing director of our firm who was

17   one of the engagement managers on the case.  He was a former

18   cyber prosecutor from the U.S. Attorney's Office in

19   San Francisco.

20   **Q.**    And he says:

21        "I received a call from Eric Tate this evening."

22        Now, Eric Tate is the attorney for Uber; right?

23   **A.**    Correct.

24   **Q.**    (As read).

25        "I received a call from Eric Tate this evening.

1        He wanted to know (1) if it was possible to complete

2        everything, including the report, by April 3."

3        Do you see that?

4   **A.**   Correct.

5   **Q.**   And then how much it would cost.  And if it wasn't

6   possible, what's the soonest it could reasonably be done and

7   how much cost.

8        Do you see that?

9   **A.**   Correct.  Yes.

10  **Q.**   I don't know if you said this, but if you did, I

11  apologize.

12       Mr. Chew was the managing director of Stroz's

13  San Francisco office at the time?

14  **A.**   Yes, sir.

15  **Q.**   And he was working on the due diligence investigation?

16  **A.**   Yes.

17  **Q.**   Now, moving up the chain, there are two responses from a

18  person named Mary Fulginiti.  Is that the name?

19  **A.**   Fulginiti, yes.

20  **Q.**   Fulginiti.  And the first one is:

21       "You said no way; right?"

22       To Hanley Chew.

23       And then the second one up above:

24       "You need to help manage expectations.  This is

25       impossible."

1      And it goes on.  Do you see that?

2    A.    Yes.

3    Q.    Does that accurately reflect your team's view of the

4    ability to complete this thing by just a few days later,

5    April 3rd?

6    A.    That's Mary's take on her personal scheduling, but at the

7    time we were not able to complete the investigation because

8    there ended up being so much more data than we thought we would

9    encounter at the beginning.

10   Q.    You told Uber that Stroz couldn't complete everything,

11   including the report, by April 3; right?

12   A.    Correct.

13   Q.    Now, let's turn to Exhibit 7661 in your binder.

14        MR. VERHOEVEN:  We would like to move that.  Is there

15   any objection?

16        MR. BRILLE:  No objection.

17        THE COURT:  Received in evidence.

18        (Trial Exhibit 7661 received in evidence.)

19        MR. VERHOEVEN:  7661.  And now if we could blow up --

20   yeah, right there.

21        (Document displayed.)

22   BY MR. VERHOEVEN

23   Q.    This is an email from you; correct?

24   A.    Yes.

25   Q.    And it's dated April 1?

1    A.    Yes.

2    Q.    And it's to Mr. Tate, among others.  Do you see that?

3    A.    Yes.

4    Q.    And the first sentence says -- you're telling Mr. Tate and

5    some of these other folks:

6              "I'd say right now we have reviewed less than

7         1 percent of the data that we need to analyze because

8         we've only partially examined the self-identified

9         data, which is a miniscule part of the 500gb."

10        Do you see that?

11   A.    Correct.

12   Q.    What is 500gb?

13   A.    500 gigabytes of data.

14   Q.    Then we skip the next sentence.  Two sentences further, it

15   says:

16             "We don't know right now, of course, how much of

17        the 500gb is Aspen data."

18        What's Aspen?

19   A.    That was a name for Google.  Google data.

20   Q.    A code name for Google data?

21   A.    Yeah.  The case -- the code name for Google data.

22   Q.    (As read).

23             "And we don't have it readily calculated."

24        And then it goes on.  The next sentence says:

25             "The point is, we've substantively examined

1    almost none of the 500 gigabytes."

2        And then it goes on.  Do you see that?

3    A.    Yes.

4    Q.    And this is what you told the attorney for Uber on

5    April 1st, 2016; correct?

6    A.    Correct.

7        Mr. Verhoeven, can I please clarify something?

8    Q.    You can clarify things on your counsel's -- you still work

9    for Uber; right?

10   A.    We are still performing work for Uber, yes.

11   Q.    In connection with this litigation; right?

12   A.    Yes.

13   Q.    Okay.

14       MR. BRILLE:  Your Honor, just to clarify --

15       MR. VERHOEVEN:  Excuse me.

16       MR. BRILLE:  -- if Mr. Verhoeven is referring to me,

17   I'm not Mr. Friedberg's counsel.

18   BY MR. VERHOEVEN

19   Q.    The firm Stroz still works for Uber in connection with

20   this litigation; correct?

21   A.    Correct.

22   Q.    Thank you.

23       Now, it's your understanding that the April 3 deadline

24   ended up getting moved to April 11th, 2016; correct?

25   A.    I don't know if it was a deadline, but Uber wanted us to

 1  tell them a certain amount of information by April 11th for a

 2  reason that they did not disclose to us at the time.

 3  **Q.**   Okay.  The put-call agreement -- the acquisition agreement

 4  in which Uber acquired Ottomotto was signed on April 11th.  You

 5  know that now; right?

 6  **A.**   I do not know that now.  I've never seen the put-call

 7  agreement.  I understand that to be the case, but I don't know

 8  it for a fact.

 9  **Q.**   Okay.  But you understand now that that's the date of the

10  agreement?

11  **A.**   Again, I've never seen the agreement.  I was told that at

12  or about that time was when the put-call agreement was entered

13  into.

14  **Q.**   Okay.  You were not able to complete your investigation by

15  April 11th, were you?

16  **A.**   No.

17  **Q.**   You made clear to Uber through its attorney that Stroz had

18  way more work to do; right?

19  **A.**   Correct.

20       **THE COURT:**  Is that a pun, "way more work"?

21       (Laughter.)

22       **MR. VERHOEVEN:**  I didn't think of that, but that's

23  good.

24       **THE COURT:**  I have been up here paying attention to

25  everything.

FRIEDBERG - DIRECT EXAMINATION / VERHOEVEN

```
 1        (Laughter.)
 2            MR. VERHOEVEN:  Now you've lost my train of thought,
 3   Your Honor.
 4   BY MR. VERHOEVEN
 5   Q.   In your view, everybody understood that -- and you
 6   communicated to everybody, that Stroz's work wasn't done by
 7   that date; right?
 8   A.   Correct.
 9   Q.   Now, in April, before April 11th, Uber's lawyers at
10   Morrison Foerster asked Stroz to provide at least some
11   preliminary findings before April 11th; right?
12   A.   Correct.
13   Q.   And let's look at Exhibit 7912.
14            MR. VERHOEVEN:  And I wonder if that could be admitted
15   into evidence, Counsel?
16            MR. BRILLE:  7912 is already in evidence.
17            MR. VERHOEVEN:  Oh, it's in evidence already.  I
18   apologize, Your Honor.  It's the summary report.
19            THE COURT:  All right.  It's already in.  Go ahead.
20   BY MR. VERHOEVEN
21   Q.   And, you know, I don't need to use this unless you need
22   your recollection refreshed, so let's just go quickly.
23        These interim reports that you provided were given long
24   before the investigation was completed; right?
25   A.   We completed the investigation with about three or four
```

1    more actual weeks of work after this.

2    Q.    Let's look at -- we'll just pull it up.   7912, let's go to

3    page 3.

4    A.    Yes.

5    Q.    And pull up the paragraph that starts "In April 2016."

6          (Document displayed)

7    A.    Yes.

8    Q.    It says:

9                "In April 2016, in the lead-up to Uber's signing

10         an agreement to purchase Ottomotto, and long before

11         the investigation was completed, Morrison asked Stroz

12         to provide it with visibility."

13         And then it goes on.   Do you see that?

14   A.    Yes.

15   Q.    That's accurate; right?

16   A.    Yes.

17   Q.    And then it says:

18               "Specifically, Morrison" --

19         And, again, that's the law firm representing Uber; right?

20   A.    Correct.

21   Q.    (As read)

22               "-- sought access..."

23         And he lists some things.   The first one:

24               "(a) Stroz Friedberg's memoranda regarding its

25         interviews with Levandowski and Ron."

FRIEDBERG - DIRECT EXAMINATION / VERHOEVEN

1    **A.**    Correct.

2    **Q.**    Do you see that?

3         And that's Anthony Levandowski and Lior Ron; correct?

4    **A.**    Yes.

5    **Q.**    And, in fact, you provided those interview summaries to

6    Uber's attorneys before April 11th; right?

7    **A.**    Correct.

8    **Q.**    And let's -- let's just stop there with (a) and talk about

9    that for a second.

10        **MR. VERHOEVEN:**  So the diligenced employees'

11   interviews, I'd like to introduce Exhibit 7111 into evidence.

12        Is there any objection?

13        **MR. BRILLE:**  No objection.

14        **THE COURT:**  Thank you.  Received in evidence.

15        **MR. VERHOEVEN:**  Is that in?

16        **THE COURT:**  Yes, it's in.

17   (Trial Exhibit 7111 received in evidence.)

18        **MR. VERHOEVEN:**  And can we bring up the top of it?

19   (Document displayed.)

20   **BY MR. VERHOEVEN:**

21   **Q.**    And you see this is from Stroz; correct?

22   **A.**    Correct.

23   **Q.**    And it's dated April 2, 2016.  So that's before the

24   April 11th date; correct?

25   **A.**    Correct.

1    **Q.**   And it's "Re: Draft Summary Interview of Anthony

2    Levandowski"; right?

3    **A.**   Yes.

4    **Q.**   Now, this memorandum is labeled as a Draft in the subject

5    line, but this is the most current and up-to-date version of

6    the interview memorandum; correct?

7    **A.**   I believe that's right.

8         **THE COURT:**   That's unclear to me.  You mean -- you

9    mean, as of even today that this is the most current and

10   up-to-date version, even as of today?  And by that, I mean

11   there was no subsequent --

12        **THE WITNESS:**   Yes.  We should probably have taken the

13   "Draft" off of it when we finalized it.  But as it was produced

14   to Morrison & Foerster on April 2nd, it is the final version

15   essentially.

16        **THE COURT:**   Okay.  I got it now.  Thank you.

17      Go ahead.

18   **BY MR. VERHOEVEN**

19   **Q.**   So for the record, even though this says "Draft," it's the

20   final version; right?

21   **A.**   To the best of my recollection, yes.

22   **Q.**   And this summarizes your team's interview with

23   Mr. Levandowski on April 2nd; correct -- or, I'm sorry, on

24   March 22 and March 23; correct?

25   **A.**   Correct.

FRIEDBERG - DIRECT EXAMINATION / VERHOEVEN

```
 1   Q.   Now, let's go to page 4 of 7111 --

 2           MR. VERHOEVEN:  One second, Your Honor.

 3       (Counsel confer off the record.)

 4   BY MR. VERHOEVEN

 5   Q.   Let's go to the first page of the interview summary.  And

 6   the second page --

 7           MR. VERHOEVEN:  I'm sorry, Your Honor.  I have a typo

 8   on my...

 9       Page 4.  There you go.  Perfect.

10       And the third full paragraph down, can you pull it up,

11   please?

12       (Document displayed.)

13   BY MR. VERHOEVEN

14   Q.   So this is Stroz saying that:

15           "As discussed in more detail below in the

16       Personal Devices section, Levandowski identified three

17       places on his Apple MacBook Pro laptop where

18       Google-related information was stored: (1) downloads

19       folder; (2) Dropbox folder; and (3) his Chauffeur

20       folder."

21       So he identified for you that there were Google documents

22   on his laptop, and you put that in the interview summary;

23   right?

24   A.   Yes.  When he came in for his interview to our offices and

25   displayed his Apple MacBook Pro, we asked him, was there any
```

1    Google confidential information or Google-related information

2    on that computer, and he pointed us to these particular folders

3    on the computer as having Google information in it.

4    **Q.**   And you -- you forwarded this information contained in

5    this interview summary to Uber's attorney prior to April 11th;

6    right?

7    **A.**   Yes.

8    **Q.**   Now, Mr. Levandowski also admitted in his interview that

9    he had retained what he referred to as a Drobo 5D device used

10   to store Google confidential information.

11       Do you remember that?

12   **A.**   That's not quite what he said, but that's --

13   **Q.**   Let's go to page 15.  Let's not make any -- let's make

14   sure we're there.

15       We're at page 15?

16   **A.**   Yes.

17   **Q.**   Top paragraph.

18       (Document displayed.)

19   **Q.**   So let me just read what it says:

20           "In addition, while Levandowski was searching his

21       home to gather all devices for the due diligence, he

22       discovered that he possessed Google proprietary

23       information on five disks of his Drobo 5D.  The

24       Drobo 5D was located in a closet in a guestroom that

25       he used to store old/unused devices.  The information

1          included source code, design files, laser files,

2          engineering documents, and software related to the

3          self-driving car."

4          So you put that in there in the interview summary and sent

5     that on to Uber's attorneys; right?

6     A.    Yes.  My only issue was -- I just want to make clear that

7     in that interview he had claimed that as of the date of the

8     interview, he had destroyed that material.

9     Q.    I'm going to get to that.

10    A.    Yeah.  Fine.  So I just wanted to make that clear.

11    Q.    Okay.

12    A.    But, yes, he admitted that at one point he had located

13    this Drobo 5D in his closet and it had those Google-related

14    information in it.

15    Q.    And for the record, a Drobo 5D is an enclosure for

16    removable storage media; correct?

17    A.    Correct.

18    Q.    So you store information on disks in there?

19    A.    Correct.  It has five disks in it.

20    Q.    And a Drobo 5D, you can sync that with a computer or a

21    laptop and then move information from the disk to the laptop or

22    vice-versa; right?

23    A.    Correct.

24    Q.    Now, Mr. Levandowski told Stroz -- and this is getting to

25    your point -- that after discovering the Drobo with the Google

FRIEDBERG - DIRECT EXAMINATION / VERHOEVEN

1   confidential information on it, he informed Uber executives

2   about it.   Remember that?

3   **A.**   Yes.

4   **Q.**   And the interview summary has his rendition of what

5   happened at this meeting; correct?

6   **A.**   Correct.

7   **Q.**   I direct your attention to page 15, the third paragraph.

8        (Document displayed.)

9        **MR. BRILLE:**   Your Honor, I'm going to object to this

10   as hearsay.

11        **THE COURT:**   All right.   Can I see the paragraph?

12        **MR. VERHOEVEN:**   Yes, you may, Your Honor.   It's on the

13   screen.

14        **MR. BRILLE:**   Your Honor, should we take it down while

15   you're looking at it?

16        **THE COURT:**   You can take it down everywhere else,

17   but --

18        **MR. VERHOEVEN:**   It's admitted into evidence.   It's

19   already admitted.

20        **MR. BRILLE:**   Your Honor, our understanding of your

21   prior rulings were that these documents were admitted subject

22   to specific objections to hearsay within hearsay.   That is what

23   my objection is to this particular passage.

24        **THE COURT:**   Well, can I have -- was it already -- it

25   was admitted into evidence a few moments ago, I guess.

1          **MR. VERHOEVEN:**  Yeah.  My understanding was, Your

2     Honor, that specific documents had to be -- could be objected

3     to for hearsay within hearsay, but if there's no objection to

4     hearsay and it's admitted, then it's admitted.

5          **THE COURT:**  Well, can you put it up on the screen for

6     me to read and no one else?  Is that doable?  Or is that

7     beyond --

8          **MR. VERHOEVEN:**  I can hand it up to you.

9          **THE COURT:**  Here it comes.

10     (Whereupon document was tendered to the Court.)

11          **THE COURT:**  And the page number again?

12          **MR. VERHOEVEN:**  It is page 15, third paragraph.  And

13     we're talking about basically the first half of the paragraph

14     that recounts a discussion.

15          **THE COURT:**  15?  Page 15?

16          **MR. VERHOEVEN:**  Yes, sir.  Third paragraph.  And just

17     for Your Honor's background --

18          **THE COURT:**  The one that says "Once he discovered"?

19          **MR. VERHOEVEN:**  Yes.

20          **THE COURT:**  Just a minute.

21          **MR. PERLSON:**  So can I just tell you who these people

22     are?

23          **THE COURT:**  Well, I think I know all the names.

24          **MR. VERHOEVEN:**  Okay.

25          (Brief pause.)

1        **THE COURT:**  Now, at the date of the interview, was

2   Levandowski -- he was with Ottomotto; right?

3        **MR. VERHOEVEN:**  That's correct, Your Honor.  As was

4   Mr. Ron.

5        **THE COURT:**  And are they the sources of this

6   information?

7        **MR. VERHOEVEN:**  Mr. Levandowski is on this particular

8   paragraph.

9        And, of course, all these people are -- all of these --

10  the most obvious response to the objection is a party admission

11  is not hearsay under the Federal Rules.

12       **THE COURT:**  All right.  So I'm going to allow this,

13  but let me give a slight cautionary note to the jury.

14       This is a -- ordinarily a hearsay document.  However, for

15  reasons I don't need to go into now, it falls within an

16  exception and can come into evidence for all purposes.

17       Except I give you a word of caution that occasionally it

18  refers -- even if Levandowski said these things to the witness

19  on the stand, he is in some of these instances repeating

20  something somebody else told him.

21       And you all know how hearsay can get out of hand.  When I

22  say something to you and you say something, pretty soon it gets

23  completely goofed up.

24       So you need to take into account the possibility that in

25  the recounting of what it is that somebody told Levandowski,

1    that Levandowski got it a little off, or maybe a lot off, or it

2    could be completely untrue.  It could be completely true.

3         I trust you to give it good critical analysis and think

4    about it for yourself.  That's all I need to say at this point

5    to the jury.

6         So why don't you -- let's read -- show the jury the entire

7    paragraph, I guess is what we ought to do.

8              MR. VERHOEVEN:  Thank you, Your Honor.

9         (Document displayed.)

10   BY MR. VERHOEVEN

11   Q.   Now, before we get into this paragraph, Mr. Friedberg, in

12   context, you're conducting an investigation.  And it's your

13   understanding, correct me if I'm wrong, that -- your

14   expectation is that these individuals would come in and tell

15   the truth at their interviews; right?

16   A.   When you're doing an investigation, you hope people tell

17   the truth, and sometimes they do and sometimes they don't.  So

18   our job was to, to some degree, try to sort that out and figure

19   out what was the truth about what happened.

20   Q.   But the folks you were interviewing were supposed to tell

21   you the truth; right?

22   A.   Supposed to, yes.

23   Q.   And they were supposed to preserve evidence, weren't they?

24   A.   That's a very complex question that covers a whole bunch

25   of different events.  So to some degree, yes; but to some

1    degree -- you know, in Levandowski's case, there's an argument

2    that to the extent that he had Google confidential information,

3    you know, he was trying to delete the material in a normal

4    course --

5    Q.   That's --

6    A.   -- because he wasn't allowed to bring it over.

7    Q.   That's not what I'm asking.

8         THE COURT:  No, no, no.  He was responding to your

9    question.

10        MR. VERHOEVEN:  Okay.

11        THE COURT:  It was a fair comment by the witness, so I

12   -- you're -- I think you ought to -- you went to a lot of

13   trouble to get me to rule on this, so let's let the jury -- let

14   the jury read that paragraph.  So put it up on the screen.

15        MR. VERHOEVEN:  I'll circle back to that then.  Let's

16   put it back on the screen.

17      (Document displayed.)

18   BY MR. VERHOEVEN:

19   Q.   Now, this is -- by way of background, this is discussing

20   the Drobo 5D; right?

21   A.   Yes.

22   Q.   Yes?

23   A.   Drobo 5D, yes.  The disks in the Drobo 5D, not the

24   enclosure.

25   Q.   So the summary says:

1              "Once he discovered that he possessed this

2          information, Levandowski contacted his attorney, John

3          Gardner, and Lior Ron."

4          And then it goes down further and talks about a meeting at

5     Uber.

6              **MR. VERHOEVEN:**  So can we highlight that.

7     **BY MR. VERHOEVEN:**

8     **Q.**   Meeting at Uber in early March 2016.  And the folks at the

9     meeting included Travis Kalanick, Uber's CEO; Cameron

10    Poetzscher, Uber's head of business development; and Nina Qi, a

11    member of the business development group; right?

12    **A.**   Yes.

13    **Q.**   And the interview summary says -- and this is

14    Levandowski's version:

15             "Levandowski told them that he found some

16         Google-related files and that he wanted to get rid of

17         them.  He told them that there's 'stuff on them that I

18         don't want you to have and you don't want to have.'"

19         Is that right?

20    **A.**   Yes.  That's what he said happened in the meeting.

21    **Q.**   And then it continues:

22             "Poetzscher said that Ron and Levandowski should

23         not delete the disks so that Uber could understand

24         what was on them (for preservation and recordkeeping

25         purposes)."

1            Do you see that?

2    **A.**    Yes.

3    **Q.**    And that was what the protocol was; right?  You weren't

4    supposed to delete stuff off the devices, is part of the

5    protocol?

6    **A.**    This happened before we met with Levandowski and Ron.  So

7    they came in on the --

8    **Q.**    Can you answer my -- can you answer my question?

9            **THE COURT:**  Well, he -- his answer's a fair -- you're

10   saying that the comment about the destruction of the disks,

11   that if it is true, occurred before you got involved.

12           Is that -- is that what you're saying?  Tell us clearly

13   what you're trying to say.

14           **THE WITNESS:**  It -- it's a little more complicated

15   than that because the -- the engagement letter contemplated

16   that these individuals would come to us with their devices.

17   And that engagement letter was entered into as of March, early

18   March.

19           This meeting took place in the March 11th, March -- around

20   March 11th area, but they didn't come to us, and we didn't have

21   any contact with Levandowski or Ron until March 22nd.

22           So I don't know whether they were -- I can't remember

23   whether they were aware of the protocol --

24           **THE COURT:**  Who's "they"?

25           **THE WITNESS:**  Sorry.  Levandowski and Ron.  I don't

FRIEDBERG - DIRECT EXAMINATION / VERHOEVEN

1    know if they were aware of the protocol at this time --

2              THE COURT:  At what time?

3              THE WITNESS:  At the time of this meeting, which

4    supposedly was on March 11th.

5              THE COURT:  All right.  Next question.

6    BY MR. VERHOEVEN

7    Q.   Let me just foundationally:  You were retained before the

8    March 11 meeting; right?

9    A.   Yes.

10   Q.   And there was a protocol that was in place before the

11   March 11 meeting; right?

12   A.   Correct.

13   Q.   Okay.  And that protocol included that the diligenced

14   employees should not delete information on their devices;

15   correct?

16   A.   Correct.

17   Q.   Okay.  You don't know what Uber's attorney said to

18   Levandowski, but you know that; right?

19   A.   Correct.  I don't know whether that was communicated to

20   them.

21   Q.   Okay.  All right.  But doing -- doing that was -- whoever

22   said it, whoever knew about it, just the fact of doing that

23   violated the protocol, didn't it, sir?

24   A.   I think that's a complicated issue, but for the reason

25   that there's -- for the reason that there's potentially an

1   obligation to delete data that they identify --

2   **Q.**   I didn't ask you about your legal analysis of the

3   obligation.  The protocol said don't do it; right?

4   **A.**   The protocol contemplated that they could come to us with

5   the devices that they had, yes.

6   **Q.**   Without deleting information?

7   **A.**   Correct.

8   **Q.**   And they -- and Mr. Levandowski is saying here he deleted

9   five disks of information; right?

10  **A.**   Correct.

11  **Q.**   And that's a violation of the protocol; right?

12  **A.**   I would say that if he saw that protocol and he knew the

13  protocol, it would have been -- it would have been a violation

14  of it, yes.  I just don't know whether it was an intentional

15  violation of the protocol on his behalf.

16  **Q.**   Okay.  I'm not asking you to interpret whether there's an

17  intentional requirement in the protocol.  The protocol says

18  you're not supposed to delete stuff off your devices; right?

19  **A.**   I don't remember that it -- I don't think it says that.

20  It just says that they are expected to come in with their

21  personal devices for us to examine.

22  **Q.**   All right.  We'll get to the specifics of that in a

23  minute.  Let's keep going with this summary.

24          So let's go back.  I think we're talking about:

25              "Levandowski told them that he found some

 1          Google-related files and that he wanted to get rid of

 2          them.  He told them that there is 'stuff on them I

 3          don't want you to have and don't' -- or 'stuff on them

 4          I don't want you to have and don't'" --

 5                  **THE COURT:**  "And you don't want to have."

 6                  **MR. VERHOEVEN:**  -- "'and you don't want'" -- thank

 7  you, Your Honor.  It's getting late.

 8  **BY MR. VERHOEVEN**

 9  **Q.**   -- "'and you don't want to have.'"

10          Then:

11              "Poetzscher stated that Ron and Levandowski

12          should not delete the disks so that Uber could

13          understand what was on the disks (for preservation and

14          recordkeeping purposes)."

15          Then "Kalanick" -- that's the then CEO of Uber; correct?

16  **A.**   Yes.

17  **Q.**   -- "responded that they should not take the advice of

18  Poetzscher and that if Ron and Levandowski possessed Google

19  information, he did not want to know about it and did not want

20  it at Uber.

21          Kalanick told Levandowski to, quote, do what he needed to

22  do, closed quote.

23          Do you see that?

24  **A.**   Correct.

25  **Q.**   (As read)

1              "Levandowski understood this statement to mean

2         that Kalanick wanted Levandowski to destroy the disks,

3         so he told Kalanick that he would destroy them.  In

4         response, Kalanick nodded.  Poetzscher appeared

5         uncomfortable with this decision.  Qi was quiet but

6         appeared to be amused and astonished."

7         And then it continues:

8              "After the meeting ended, Levandowski took the

9         disks to a shredder in Oakland near the airport and

10        had the disks destroyed."

11        And that is what was in the interview summary that you

12   sent to Uber's attorney before April 11th; correct?

13   **A.**   Correct.

14        **MR. VERHOEVEN:**  Can we put up TX-81 -- well, let me

15   just ask, can we admit TX-81?  This is, for the record,

16   Attachment A that details the diligenced employee due diligence

17   process.

18        **THE COURT:**  Somebody is hacking and coughing back

19   there.  Do you need a cough drop?

20        I need the jury to have the undivided attention of the

21   lawyers and when you bring up static from the rear, we can't

22   hear up here.  So please remain quiet or go out in the hallway.

23        Mr. Verhoeven, what is the problem?  Let's move this

24   along.

25        **MR. VERHOEVEN:**  This is Exhibit A to the term sheet.

FRIEDBERG - DIRECT EXAMINATION / VERHOEVEN

 1   There's no objection to the term sheet, is there?

 2       Thank you.

 3               THE COURT:  What is Exhibit 81?

 4               MR. VERHOEVEN:  TX-81.  I'll represent it's Exhibit A

 5   to the February 22 term sheet, which we'll introduce as well,

 6   Your Honor.

 7               THE COURT:  All right.  Any objection?

 8               MR. BRILLE:  I think he can lay a foundation.  I don't

 9   know if this witness has ever seen it.

10               THE COURT:  Well, it's not in evidence yet, but

11   proceed.  I'm not going to proceed without me at least looking

12   at it.

13       Are you going to have another witness who can put this

14   into evidence, Mr. Verhoeven?

15               MR. VERHOEVEN:  You know what?  I'll do this --

16   connect the dots when I talk to him about the term sheet, Your

17   Honor.

18               THE COURT:  All right.  Great.

19               MR. VERHOEVEN:  Thank you.

20   BY MR. VERHOEVEN:

21   Q.  Now, Stroz -- Stroz, I'm sorry -- conducted an

22   investigation to try and determine whether Levandowski had, in

23   fact, destroyed the disks as he claimed; correct?

24   A.  Correct.

25   Q.  And as of April 11th, Stroz was unable to confirm that he

1  had destroyed those disks; isn't that true?

2  **A.**    We were not able to obtain definitive information that he

3  had destroyed them; correct.

4  **Q.**    Now, there's a second piece of information --

5         **MR. VERHOEVEN:**  I don't know if we still have that A,

6  B, C slide from the Stroz report.

7  **BY MR. VERHOEVEN**

8  **Q.**    Maybe you can just remember.

9         A second piece of interim information that was provided

10  before April 11th was something called a "Last Accessed

11  Report."  Do you recall that?

12  **A.**    Yes, I do.

13  **Q.**    And that title means that Stroz is trying to figure out

14  the most recent date on which files, certain files in

15  Levandowski's self-identified folders, were accessed; correct?

16  **A.**    Correct.

17  **Q.**    And prior to April 11th, Stroz was able to identify that

18  347 files from Levandowski's self-identified data had been

19  accessed between September 1, 2015, and March 22, 2016;

20  correct?

21  **A.**    I don't remember the exact dates off the top of my head.

22  It was 347 files.  Those dates seem approximately right.

23         And the conclusion was that the forensic metadata showed

24  that the files had been accessed either by him personally

25  taking some action with respect to those or by some

1    automatic -- automated process touching those files, yes.

2    **Q.**    I'll represent that that spreadsheet is attached as

3    Exhibit 16 to your Stroz report.  Does that sound right?

4    **A.**    There were a number of last-accessed spreadsheets, so I --

5    the one related to the self-identified documents that was 347

6    files, I don't remember the exhibit number.

7              **MR. VERHOEVEN:**  Let's show Exhibit 7114.

8         Is there any objection to this exhibit?

9              **MR. JACOBS:**  No objection.

10             **MR. VERHOEVEN:**  If you'll put it up, please.

11             **THE COURT:**  It's in evidence.

12        (Trial Exhibit 7114 received in evidence.)

13        (Document displayed.)

14   **BY MR. VERHOEVEN**

15   **Q.**    Does this refresh your recollection that this is a --

16   well, it's not a refresh your recollection.

17        This is the last-accessed sheet or spreadsheet that you

18   created; correct?

19   **A.**    Correct.

20   **Q.**    And just to walk through how it works, there's four

21   columns; right?

22   **A.**    Correct.

23   **Q.**    And a "Row" is the first one and that's numerical?

24   **A.**    Correct.

25   **Q.**    And then "File Extension" tells you the type of file; is

FRIEDBERG - DIRECT EXAMINATION / VERHOEVEN

1    that right?

2    **A.**    Yes.

3    **Q.**    Then the "Last Accessed" tells you the last accessed date;

4    correct?

5    **A.**    Yes.

6    **Q.**    And "Notes" gives a summary of what's in the file; right?

7    **A.**    Yes.  It was a -- we created that summary.  It doesn't

8    come directly from the computers.

9    **Q.**    Correct.  And you -- Stroz, I should say, sent this

10   document to Uber's attorneys prior to April 11th; correct?

11   **A.**    Yes, sir.

12   **Q.**    As part of your interim report; correct?

13   **A.**    Correct.

14   **Q.**    And let's see what this -- what this shows.  At Row 1:

15           "Aspen confidential and proprietary presentation

16         re self-driving car."

17         Aspen is Google; right?

18   **A.**    Correct.

19   **Q.**    It's the code name for Google.

20         So Uber knew he had a Google confidential and proprietary

21   presentation regarding self-driving cars on his laptop and it

22   appears to be last accessed in March; right?

23           **MR. BRILLE:**  Objection.  Foundation, speculation.

24   **BY MR. VERHOEVEN**

25   **Q.**    You sent this to Uber --

1              **THE COURT:**  Sustained for now.

2   **BY MR. VERHOEVEN**

3   **Q.**  You sent this to Uber; right?

4   **A.**  We sent this document to Uber, yes.

5   **Q.**  And --

6   **A.**  Not Uber.  To Uber's outside counsel, Morrison & Foerster.

7   **Q.**  Uber's attorney?

8   **A.**  Correct.

9   **Q.**  And then if you look through this -- for example, go to

10  Row 10:

11              "Aspen confidential and proprietary

12       presentation."

13       Go to Row 17:

14              "Picture of a component of a self-driving car."

15       Row 106:  Another:

16              "Aspen confidential presentation re self-driving

17       car."

18  **A.**  Yes.

19  **Q.**  That's Google; right?  Last accessed March 10.

20       Go to 111:  Aspen -- another Aspen confidential

21  presentation regarding self-driving car, accessed March 10.

22       112:

23              "Spreadsheet containing a list of parts,

24       quantities, and costs."

25       119:  Another Aspen confidential and proprietary

1  presentation.

2      120 --

3          THE COURT:  You've got to ask a question every now and

4  then.

5      (Laughter.)

6          THE COURT:  Has he read it correctly?

7          THE WITNESS:  Yes, he did.

8  BY MR. VERHOEVEN

9  Q.   Have I read this correctly?

10     And if you -- it goes on and on, doesn't it, sir, with

11 Aspen information?

12 A.   It identifies Aspen or Google confidential information as

13 having been in that Chauffeur folder, yes.

14 Q.   A lot of it; right?

15 A.   There are 347 files in this particular exhibit.

16 Q.   And, again, Stroz sent this to Uber's attorney before the

17 decision was made to acquire Ottomotto on April 11th; correct?

18 A.   Again, I don't know what the nature of the corporate event

19 was on April 11th.  I believe it's a put-call agreement.  But

20 if that's what you're referring to, yes, we sent it to them

21 before that date.

22         MR. VERHOEVEN:  Just trying to edit myself, Your

23 Honor.

24 BY MR. VERHOEVEN

25 Q.   Now, as of April 11th, beyond this spreadsheet and the

1   interview summaries we talked about, Stroz hadn't been able to

2   do anything else; right?  In other words, Stroz hadn't been

3   able to forensically examine the devices; correct?

4   **A.**   Not exactly so, but we had in process -- we were

5   processing it on 1.5 million files.  We were starting our

6   forensic work on all the other diligenced employees' devices.

7        So we were in the process in that early April period of

8   ramping up the investigation and dealing with the huge amount

9   of data.  We just hadn't reported out on it yet.

10       So it's not as if we weren't doing anything, but as of

11  April 11th, we weren't in a position to report out on that.

12  **Q.**   As of April 3rd, you reviewed less than 1 percent of the

13  500 gigabytes, not to mention all the other stuff; right?

14  **A.**   Yes.  I'm just saying there was work being done between

15  April 3rd and April 11th.  We just didn't report out on it

16  before April 11th.

17  **Q.**   Before April 11th Uber's lawyers had not instructed you to

18  do an analysis to determine whether Mr. Levandowski's Drobo

19  device had been connected to his other machines that he brought

20  in; is that right?

21  **A.**   That analysis happened later.

22  **Q.**   And an external media connection analysis is very

23  important for a forensic analysis, isn't it?

24  **A.**   Yes.

25  **Q.**   It allows you to follow the trail of a file that might

 1  have been transferred; right?

 2  A.   Correct.

 3  Q.   Now, let's move on to your ultimate report.  And this is

 4  the one that was dated, I guess, August 5th, as we looked at

 5  it, that's in evidence.

 6       Actually, let's start after April 11th and move to that.

 7  A.   Okay.

 8  Q.   So isn't it correct that after April 11th, in mid-April,

 9  Uber put your investigation on a hiatus?

10  A.   Yes.  We were pens down for a number of weeks.

11  Q.   And your investigation didn't resume until July?

12  A.   Correct.

13  Q.   And isn't it the case that once the investigation resumed,

14  Stroz identified key issues that were only identified after

15  Uber had signed this put-call agreement on April 11th?

16       In other words -- let me ask it differently.  Isn't it the

17  case that additional key issues were identified after

18  April 11th?

19  A.   Yes.  We made substantial findings after 11th, April 11th,

20  and substantial findings before as well.

21  Q.   For example, after April 11th, Stroz performed a forensic

22  analysis of Mr. Levandowski's laptop; correct?

23  A.   Yes.  We completed our investigation of his laptop after

24  April 11th.

25  Q.   And that also -- that forensic -- there's a forensic

 1   report prepared on that; correct?

 2   A.   Correct.

 3   Q.   And that summarizes Stroz's analysis of file copy or

 4   transfer activity; correct?

 5   A.   Correct.

 6            MR. VERHOEVEN:   I'd like to move into evidence Exhibit

 7   5101.  Any objection?

 8            MR. BRILLE:   No objection.

 9            THE COURT:   5101 is in evidence.

10        (Trial Exhibit 5101 received in evidence.)

11        (Document displayed.)

12   BY MR. VERHOEVEN

13   Q.   Can you identify for the jury what is Exhibit 5101?

14   A.   This is our report on the forensic examination of Anthony

15   Levandowski's -- could you scroll down for a minute?

16   Q.   Sure.

17   A.   Let me just look at it.

18   Q.   It's in your binder as well.

19   A.   Yes, of Anthony Levandowski's devices and Webmail

20   accounts.  We collected, I believe, nine physical devices from

21   him and nine cloud-based repositories, including Webmail,

22   Dropbox, and other cloud-based repositories of data.

23        So I think there were a total of 18 sources of data.  And

24   this is the report of our analysis -- our forensic analysis of

25   primarily the devices.

1   Q.   And I direct your attention to line 3(a) of this report --

2   page 4, I'm sorry.  I direct your attention to page 4.

3   A.   Yes.

4   Q.   And if you look at the "Stroz identified" paragraph under

5   the box.

6        MR. VERHOEVEN:  Can you pull it out, please?

7        (Document displayed.)

8   BY MR. VERHOEVEN

9   Q.   Can you see there's lines 1, 2, 3, 4?

10  A.   Yes.

11  Q.   And so I'm directing your attention to 3(a).

12       MR. VERHOEVEN:  If you had could highlight 3(a), the

13  whole thing.

14  BY MR. VERHOEVEN

15  Q.   So this is a -- this is an analysis of Mr. Levandowski's

16  personal laptop; right?

17  A.   Correct.

18  Q.   And it says:

19       "Stroz identified evidence of several deleted

20       files and folders.  Specifically," then it goes on.

21       Then to 3(a), it says:

22       "...approximately 24,000 files."

23       So those had been deleted; right?

24  A.   Yes.

25  Q.   (As read)

1              ""... of which were located in the folder

2         users/anthony/desktop/boards/chauffeur-svn/.svn."

3         Do you see that?

4    **A.**   Yes.

5    **Q.**   Can you explain to the jury what that is, that thing I

6    just read?

7    **A.**   That's the file path where the documents are, so the

8    subdirectors and the subfolders as to where those 24,000

9    documents were.

10   **Q.**   And what does it tell you, this file path?

11   **A.**   Well, it specifically shows you that the user name was --

12   the user profile was Anthony.  That's his profile.  And it was

13   on the desktop in a folder called boards, and then a subfolder

14   called chauffeur/svn, and then in a further folder called .svn.

15   **Q.**   Okay.  The sentence continues that these were located on

16   this folder but then were moved to trash on or around

17   December 14, 2015.

18   **A.**   Yes.

19   **Q.**   So they were -- they were destroyed or deleted, at least

20   this particular folder, on December 14th, 2015; is that right?

21   **A.**   Yes.

22   **Q.**   And that's what you determined?

23   **A.**   Yes.

24   **Q.**   You weren't able to forensically recover these 24,000

25   files; correct?

FRIEDBERG - DIRECT EXAMINATION / VERHOEVEN

1   A.   No.

2   Q.   If you look at line 4, it says:

3          "Approximately 20,000 files were deleted between

4   February 8th to February 9, 2016."

5   Do you see that?

6   A.   Yes --

7   Q.   And then it continues:

8          "A majority of those files were located in

9   _Source.sparsebundle and _Boards.sparsebundle."

10   Do you see that?

11   A.   Yes.

12   Q.   What did those -- are those code names?  What are those?

13   A.   No.  A sparsebundle is a name for essentially a compressed

14   container of files.  So it's a container of files that you use

15   a compression utility on to make it smaller.

16   Q.   Now, do you notice a similarity between the board

17   sparsebundle bundle and the file name for the 24,000 files?

18   A.   Not really.  That's not how it works.

19   Q.   Do you see that they both have a reference to boards?

20   A.   Right.  There is the name "boards" in both directories,

21   but that doesn't --

22   Q.   And boards --

23   A.   I'm just saying it doesn't necessarily mean that there's a

24   similarity in the files themselves that are in the folders.

25   Q.   The folders are similar?

1    **A.**    The folders have the same name in them, right.

2    **Q.**    One could conclude that perhaps the same files are in the

3    folders with the same name.   One is an encrypted file and one

4    is not; right?

5    **A.**    That's speculation.

6    **Q.**    Did you look into it?

7    **A.**    I don't think we were able to determine that there was

8    overlap between the 20,000 files that were deleted on

9    February 8th and the 24,000 files that were deleted in December

10   of 2015.

11   **Q.**    Stroz did not attempt to determine whether the 20,000

12   files noted in line 4 were simply a sparsebundle bundle copy of

13   the same 24,000 files noted in line 3; correct?

14   **A.**    No, that's not correct.   I -- we didn't -- it's not that

15   we didn't try to look at that; I don't think our ultimate

16   conclusion was that they were the same files.   I don't think we

17   had enough information to make that conclusion.

18   **Q.**    So you couldn't tell one way or the other?

19   **A.**    Correct.

20   **Q.**    Earlier we were discussing the -- now we're still on your

21   final report.   We were talking earlier about your interim

22   reports.

23   **A.**    Yes.

24   **Q.**    And we talked about learning some stuff about the Drobo 5D

25   in the interview summary.   Remember that?   Just to set the

 1    stage.

 2    A.    Yes.

 3    Q.    Okay.  Now, in your final report you had some more

 4    information about the Drobo 5D; right?

 5    A.    Could you -- I would need more information about what

 6    you're questioning me about.

 7    Q.    Okay.  Let's go to your Exhibit 5101, the forensic report,

 8    at page 5.

 9    A.    Okay.

10         MR. VERHOEVEN:  And can we highlight from "Stroz

11    identified" and get maybe half that list -- or the whole list?

12         (Document displayed.)

13    BY MR. VERHOEVEN

14    Q.    So this is from Stroz's forensic report on

15    Mr. Levandowski; correct?

16    A.    Correct.

17    Q.    Okay.

18         "Stroz identified evidence of files accessed from

19         the laptop to the Drobo 2 storage device."

20         And that's the same as the Drobo 5D we were talking about;

21    right?

22         (Brief pause.)

23    Q.    Do you not know?

24    A.    I'm not sure about that.

25    Q.    Well, the person who performed this analysis would know;

1    right?

2    **A.**    Correct.

3    **Q.**    And who was that?

4    **A.**    Melanie Maugeri.

5    **Q.**    It says:

6         "Evidence suggests that the Drobo 2 was used to

7    back up the laptop.  The most recent backup was dated

8    February 8th, 2016."

9    **A.**    Yes.

10   **Q.**    (As read)

11        "The evidence suggests that the Drobo 2 was last

12   connected to the laptop on March 8, 2016."

13   **A.**    Yes.

14   **Q.**    Right?

15        So your coworker took a look at the laptop and was able to

16   determine that this Drobo 2 was accessed the last time in March

17   and the entire thing was backed up in February; right?

18   **A.**    That's right.

19   **Q.**    And you understand that Mr. Levandowski had left Google by

20   February; right?

21   **A.**    I think it was January 26th.

22   **Q.**    Right.  So he was gone.  He wasn't at Google anymore;

23   right?

24   **A.**    Correct.

25   **Q.**    So let's remember those dates:  February 8, 2016, and

1    March 8, 2016.

2         Now, let's go to Exhibit 7111, the Levandowski interview

3    memo, and look at page 15.

4              **MR. VERHOEVEN:**  Can we pull out "Levandowski stated,"

5    that one paragraph?

6              **THE COURT:**  The one we went over earlier?

7              **MR. PERLSON:**  No.  Different paragraph, Your Honor.

8    Same interview summary.

9              **THE COURT:**  The paragraph above that.  Is that it?

10   "Levandowski stated."

11             **MR. VERHOEVEN:**  Yes, Your Honor.  Exactly.

12             **THE COURT:**  All right.  So let's put that up on the

13   screen so the jury can follow this.

14             **MR. VERHOEVEN:**  Let's put them both on the screen.

15        (Document displayed.)

16   **BY MR. VERHOEVEN:**

17   **Q.**   This is -- so let's refresh.  That's a great idea.

18        So the first paragraph is Mr. Levandowski's story that he

19   told you at his interview; that he was just -- he was getting

20   ready for the interview, searching his home to get all these

21   devices to bring in, and he discovered these disks.  And they

22   were located in a closet in his guest bedroom that he used to

23   store old, unused devices.

24        That's what he told you; right?

25   **A.**   He didn't tell me that, but that's what he told my team

FRIEDBERG - DIRECT EXAMINATION / VERHOEVEN

 1  members, yes.

 2  **Q.**   And then in the next paragraph he said -- it's the second

 3  sentence I want you to look at.

 4  **A.**   Yes.

 5  **Q.**   Okay.

 6          "He said the last time he used and/or accessed

 7          the information on the disk was in November/December

 8          2014, and possibly January 15."

 9          Now, the forensic report that your coworker discovered

10  talks about the Drobo 2 being accessed in February of 2016;

11  right?  And in March of 2016; correct?

12  **A.**   Yes.

13          Can I just see that page again?

14          **MR. VERHOEVEN:**   Can we put that back up?

15          **THE WITNESS:**   I have it here.   Thank you.

16          **MR. VERHOEVEN:**   That's exhibit --

17          **THE WITNESS:**   I have it.

18  **BY MR. VERHOEVEN:**

19  **Q.**   You have it.   Exhibit 5101, page 5.

20  **A.**   Yes, that's right.   February 16 and March 16.

21  **Q.**   And we'll ask -- what was the name of the individual?

22  **A.**   Melanie Maugeri.

23  **Q.**   -- Ms. Maugeri whether this Drobo 2 relates to the

24  Drobo 5D.

25  **A.**   I think it does, but you should confirm it with her if

1    you're going to call her.

2    **Q.**   So you now think you're kind of refreshed on that?

3    **A.**   I think that's right.

4    **Q.**   Yes.  Okay.

5         And so the forensic report showed that he was being a

6    little bit less than truthful, wasn't he?

7    **A.**   It looks like the -- well, he's either not remembering it,

8    although it was pretty close -- you know, we interviewed him

9    pretty close in time to those two events.  We interviewed him

10   March 22nd.  So the events are earlier in March.  And then just

11   in February.

12        So it was either not remembering it correctly or possibly

13   not being truthful about it.

14   **Q.**   Well, let's look what he said in his interview memo again.

15   7111, at page 15.  "In addition" -- this is your summary of his

16   interview?

17   **A.**   Yes.

18   **Q.**   (As read)

19             "While Levandowski was searching his home to

20         gather all devices, he discovered that he had this."

21        Right?  It was located in a closet in the guest room that

22   he used to store old unused devices.

23        That's not credible now that you know the last accessed

24   dates of this Drobo 2, is it, sir?

25   **A.**   Probably not.

1    Q.   He wasn't telling the truth, was he?

2    A.   Again, I'm not the ultimate decider of, you know, sort of

3    truth and, you know, the credibility of it.  But it certainly

4    would -- gave us pause.

5    Q.   And this report was provided to Uber; right?

6    A.   Yes.  "This report" meaning the final report?

7    Q.   That's correct.

8    A.   The final report was provided to Uber's outside counsel

9    and inside counsel in -- on August 5th.

10   Q.   Yes.  It was given to Uber's attorney; right?

11   A.   Attorneys, yeah.

12   Q.   Eric Tate of Morrison & Foerster?

13   A.   Eric Tate of Morrison & Foerster, yes.

14        THE COURT:  All right.  Is this a good place to break

15   for the day?

16        MR. VERHOEVEN:  Yes, Your Honor.

17        THE COURT:  Great.  Good.

18        We're going to break.  I want to give you a heads-up.  By

19   my math the plaintiff has used up 40 percent, almost, of their

20   time, and the other side not quite as much.  But we are making

21   good progress.

22        I thank you for your close attention.  And, please,

23   remember all of my admonitions.  We'll see you back here

24   tomorrow at the normal time.

25        THE CLERK:  All rise for the jury.

PROCEEDINGS

```
 1        (Jury exits the courtroom at 12:59 p.m.)

 2            THE COURT:  All right.  Be seated.

 3      The witness may -- you have to be back here at 7:30 in the

 4  morning.

 5            THE WITNESS:  Yes, sir.

 6            THE COURT:  Can you do that?

 7            THE WITNESS:  No problem.

 8            THE COURT:  All right.  We'll see you then.

 9            MR. VERHOEVEN:  He flew in from New York, so he should

10  be okay.

11            THE COURT:  What?

12            MR. VERHOEVEN:  He flew in from New York.

13            THE COURT:  What do you mean, he flew to New York?

14            MR. VERHOEVEN:  He's from New York.  I'm just saying

15  the time difference --

16            THE COURT:  Oh, I see.

17      So you flew out here from New York?

18            THE WITNESS:  Yes, sir.

19            THE COURT:  I didn't realize that.  Okay.  Have a good

20  day.  We'll see you in the morning.

21      (Witness steps down.)

22            THE COURT:  Counsel, here is my count.  The plaintiff

23  has used 377 of your 960 minutes, 377 out of your 960.  The

24  other side has used 186 of your 960.  So there we go.

25      Anything I can do for the lawyers and help you with before
```

1   we adjourn for the day?

2          MR. GONZÁLEZ:  Very briefly, Your Honor.  I know it's

3   been a long day, and I don't want this to sound like a

4   complaint, but today --

5          THE COURT:  It will anyway; right?

6          MR. GONZÁLEZ:  Well, today during the trial, Your

7   Honor, the plaintiff withdrew the two witnesses who were

8   supposed to be right after Mr. Kalanick.  That caused us a

9   problem because we then had to scramble to get the witnesses

10  who were supposed to be after them here on time.

11         Now, we were able to do that today, but I just need -- you

12  know, I've got a list here, Your Honor, of 11 or 12 witnesses,

13  half of whom I wouldn't call if I were them.  So I wanted to

14  say two things.

15         Number one, they are running out of time, and I don't want

16  to hear a complaint later that they need more time.

17         But number two is just a request that if they're going to

18  withdraw some of these names, they please tell us before we're

19  in court in trial, because it makes it difficult for us to get

20  witnesses here when we're not given any notice.

21         MR. VERHOEVEN:  A quick response, Your Honor.

22         Mr. McClendon was an eight-minute videotape that we

23  withdrew.  And I apologize Your Honor had to review that.

24         Mr. Poetzscher is somebody they're going to call in their

25  case in chief anyway.  And the reason that we made that

PROCEEDINGS

 1  decision was we didn't know what -- how the testimony of

 2  Mr. Kalanick would be.  And these were hostile witnesses.  And

 3  we have a burden of proof that we needed -- if we were unable

 4  to establish something, we needed this backup.  So we had to

 5  give notice.

 6      This would not be the -- I'd understand his complaint if

 7  this was a situation where these were our witnesses, but --

 8  and, frankly, I -- I told them about this and they agreed

 9  wholeheartedly.

10      So we're going to work together, but, you know, any notion

11  that we're trying to play fast and loose is just unfounded.

12          MR. GONZÁLEZ:  No, and that's not the notion, which is

13  why I said I didn't want to make it sound like a complaint.

14  It's just a request that we be given more notice.

15      If there's a witness that they think can be withdrawn if

16  we stipulate to an exhibit, I'd just ask that we be given more

17  notice so we can work that out and get our witnesses here on

18  time.  That's all.

19      And I did want to put on the record, though, Your Honor --

20  and I know I already have -- I do have a concern that they're

21  burning through their time, which is fine.  But we're trying to

22  be conservative on minutes.  And I just don't want there to be

23  an issue later where they're asking you for more time after

24  we've been conservative on minutes, assuming the 960 is a real

25  number.

PROCEEDINGS

```
 1        That's all.
 2        THE COURT:  Okay.  Those two speeches do not come out
 3   of anybody's time.
 4        (Laughter.)
 5        MR. GONZÁLEZ:  Your Honor, I do have -- I'm sorry --
 6   the page that you asked for for the juror binder.
 7        THE COURT:  What?  Is that the -- is that the --
 8        MR. EISEMAN:  This contains the corrections that the
 9   parties agreed to, Your Honor.
10        THE COURT:  All right.  Hand that over to my Law
11   Clerk, and we'll get it into the jury box tomorrow.
12        All right.  I think you both have tried enough cases to
13   know the right thing to do when you're going to cancel a
14   witness.
15        And I'm not saying Waymo violated that or...  Just try
16   your best to cooperate, because when it's their turn, you're
17   going to have the same problem and I'll give them as much
18   flexibility as you're taking for yourself.
19        MR. VERHOEVEN:  Understood, Your Honor.
20        THE COURT:  Now, who are our next witnesses?  Let's --
21   give us a heads-up on the next two or three witnesses.
22        MR. GONZÁLEZ:  On the list, Your Honor, they have
23   Melanie Maugeri from Stroz; Bill Gurley; Eric Tate; Andy Crain,
24   one of their technical experts; Matt Henley; Rick Jacobs, who I
25   want to discuss for 30 seconds; Michael Janosko; Sasha --
```

PROCEEDINGS

1              THE COURT:  I just asked for two or three.

2              MR. GONZÁLEZ:  I stopped reading, Your Honor.

3              THE COURT:  All right.  So here is what I -- the

4    reason I bring it up is at some point the plaintiff has got to

5    prove that these trade secrets found their way into the system,

6    and that means we're going to close the courtroom.  And I --

7    for the benefit of the gallery, I would like to be efficient in

8    doing that.

9         So can you come up with ways to avoid yanking the public

10   in and out of the courtroom?

11             MR. VERHOEVEN:  We've lumped it --

12             THE COURT:  That's what I want you to think about.

13             MR. VERHOEVEN:  We've lumped that all together, Your

14   Honor.  That's why it hasn't been dispersed in here.  We're

15   going to do that as a big tranche of witnesses altogether.

16             THE COURT:  Tomorrow, are we going to reach that

17   point?

18             MR. VERHOEVEN:  I don't think so.

19             MR. GONZÁLEZ:  I withdraw my comment about Mr. Jacobs.

20   We're going to have a discussion.

21             THE COURT:  All right.

22             MR. VERHOEVEN:  It looks like we've exhausted the

23   Court's patience anyway.

24             THE COURT:  I don't know.  I have an endless supply of

25   patience.

PROCEEDINGS

1        Thank you.  See you in the morning.

2            **MR. VERHOEVEN:**  Thank you, Your Honor.

3            **THE CLERK:**  Court in recess.

4        (Whereupon at 1:06 p.m. further proceedings

5         were adjourned until Thursday, February 8, 2017

6         at 8:30 a.m.)

*Debra L. Pas, CSR, CRR and Katherine Sullivan, CSR, CRR*
*Official Reporters - U.S. District Court - San Francisco, California*
*(415) 431-1477*

856

<u>I N D E X</u>

| **PLAINTIFF'S WITNESSES** | <u>PAGE</u> | <u>VOL.</u> |
|---|---|---|

**KALANICK, TRAVIS**

| | | |
|---|---|---|
| (PREVIOUSLY SWORN) | 644 | 4 |
| Direct Examination resumed by Mr. Verhoeven | 645 | 4 |
| Cross-Examination by Ms. Dunn | 692 | 4 |
| Redirect Examination by Mr. Verhoeven | 728 | 4 |

**QI, NINA**

| | | |
|---|---|---|
| (SWORN) | 730 | 4 |
| Direct Examination by Ms. Baily | 731 | 4 |
| Cross Examination Mr. Brille | 742 | 4 |
| Redirect Examination by Ms. Baily | 751 | 4 |
| Recross Examination by Mr. Brille | 754 | 4 |

**RON, LIOR**

| | | |
|---|---|---|
| (SWORN) | 755 | 4 |
| Direct Examination by Mr. Perlson | 756 | 4 |
| Cross Examination  Mr. Carmody | 780 | 4 |
| Redirect Examination by Mr. Perlson | 793 | 4 |
| Recross-Examination by Mr. Carmody | 795 | 4 |

**FRIEDBERG, ERIC**

| | | |
|---|---|---|
| (SWORN) | 802 | 4 |
| Direct Examination by Mr. Verhoeven | 803 | 4 |

-   -   -

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 273 | | 647 | 4 |
| 277 | | 649 | 4 |
| 10275 | | 653 | 4 |
| 5460 | | 658 | 4 |
| 8009 | | 659 | 4 |
| 10312 | | 661 | 4 |
| 376 | | 663 | 4 |
| 8011 | | 664 | 4 |
| 378 | | 666 | 4 |
| 911 | | 669 | 4 |
| 910 | | 670 | 4 |
| 285 | | 679 | 4 |
| 743 | | 680 | 4 |
| 383 | | 687 | 4 |
| 1771 | | 700 | 4 |
| 1770 | | 702 | 4 |
| 259 | | 715 | 4 |
| 263 | | 715 | 4 |
| 298 | | 732 | 4 |
| 299 | | 733 | 4 |
| 7304 | | 739 | 4 |

# **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 5413 | | 758 | 4 |
| 5213 | | 760 | 4 |
| 4296 | | 761 | 4 |
| 4297 | | 762 | 4 |
| 4316 | | 763 | 4 |
| 5146 | | 763 | 4 |
| 4314 | | 765 | 4 |
| 5822 | | 767 | 4 |
| 5077 | | 770 | 4 |
| 5467 | | 771 | 4 |
| 4313 | | 775 | 4 |
| 5472 | | 777 | 4 |
| 3226, pages 267 and 268 | | 790 | 4 |
| 3227 | | 792 | 4 |
| 54 | | 804 | 4 |
| 7912 | | 805 | 4 |
| 5078 | | 807 | 4 |
| 7661 | | 809 | 4 |
| 7111 | | 815 | 4 |
| 7114 | | 833 | 4 |
| 5101 | | 839 | 4 |

—    —    —

CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Katherine Sullivan, CSR 5812, CRR, RMR

Wednesday, February 7, 2018