Volume 5

Pages 859 - 1090

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

WAYMO, LLC                        )
          Plaintiff,              )
   vs.                            ) No. C 17-00939 WHA
                                  )
UBER TECHNOLOGIES, LLC., OTTO     )
TRUCKING, LLC, and OTTOMOTTO, LLC,)
                                  ) San Francisco, California
          Defendants.            ) Thursday
                                  ) February 8, 2018
_____) 7:30 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
**For Plaintiff:**          QUINN, EMANUEL, URQUHART, OLIVER
                             & SULLIVAN, LLP
                            50 California Street
                            22nd Floor
                            San Francisco, California 94111
                    BY: **CHARLES KRAMER VERHOEVEN, ESQ.**
                        **JORDAN R. JAFFE, ESQ.**
                        **DAVID ANDREW PERLSON, ESQ.**
                        **MELISSA J. BAILY, ESQ.**
                        **DAVID EISEMAN, ESQ.**
                        **ANDREA PALLIOS ROBERTS, ESQ.**
                        **JAMES DUBOIS JUDAH, ESQ.**

                            QUINN, EMANUEL, URQUHART, OLIVER
                             & SULLIVAN, LLP
                            1299 Pennsylvania Avenue, NW
                            Suite 825
                            Washington, DC 20004
                    BY: **JARED WESTON NEWTON, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:* Debra L. Pas, CSR 11916, CRR, RMR
              Katherine Sullivan CSR 5812, CRR, RMR
              *Official Reporters - US District Court*

```
 1    APPEARANCES (Continued)

 2

 3    For Plaintiffs:         QUINN, EMANUEL, URQUHART & OLIVER
                                & SULLIVAN, LLP
 4                            865 South Figueroa Street
                              10th Floor
 5                            Los Angeles, California 90017
                        BY:  DUANE R. LYONS, ESQ.
 6                           PATRICK THOMAS SCHMIDT, ESQ.

 7

 8

 9    For Defendants:         MORRISON & FOERSTER, LLP
                              425 Market Street
                              San Francisco, California 94105
10                      BY:  ARTURO J. GONZÁLEZ, ESQ.
                             MICHAEL A. JACOBS, ESQ.
11                           ESTHER KIM CHANG, ESQ.
                             THOMAS J. PARDINI, ESQ.
12

13

14    For Defendants:         BOIES, SCHILLER AND FLEXNER, LLP
                              5301 Wisconsin Avenue, NW
                              Washington, DC 20015
15                      BY:  KAREN LEAH DUNN, ESQ.

16

17                            BOIES, SCHILLER AND FLEXNER, LLP
                              435 Tasso Street
                              Suite 205
18                            Palo Alto, California 94301
                        BY:  MICHAEL BRILLE, ESQ.
19                           MEREDITH R. DEARBORN, ESQ.

20

21    For Defendants:         SUSMAN, GODFREY, LLP
                              1000 Louisiana Street
22                            Suite 5100
                              Houston, Texas, 77002
23                      BY:  JOSEPH S. GRINSTEIN, ESQ.

24

25          (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

```
 1   APPEARANCES:   (CONTINUED)

 2
     For Defendants:          SUSMAN, GODFREY, LLP
 3                            1301 Avenue of the Americas
                              32nd Floor
 4                            New York, New York 10019
                        BY:  WILLIAM CARMODY, ESQ.
 5                           SHAWN RABIN, ESQ.

 6

 7                            SUSMAN, GODFREY, LLP
                              1201 Third Avenue
 8                            Suite 3800
                              Seattle, Washington 98101
 9                      BY:  MATTHEW ROBERT BERRY, ESQ.

10

11

12   Special Master:          FARELLA BRAUN & MARTEL, LLP
                              Russ Building, 30th Floor
13                            235 Montgomery Street
                              San Francisco, California 94104
14                      BY:  JOHN L. COOPER, ESQ.

15

16   Also Present:            DEMARRON BERKLEY

17

18                            ERIC MEYHOFER

19                            TONY WEST

20                            NICOLE BARTOW

21                              _   _   _

22

23

24

25
```

PROCEEDINGS

```
 1              P R O C E E D I N G S

 2   FEBRUARY 8, 2018                          7:30 A.M.

 3                    ---000--

 4      (The following proceedings were held in open court,

 5       outside the presence of the jury:)

 6           THE COURT:  Good morning.  Be seated.  Thank you.

 7           THE CLERK:  Calling Civil Action 17-939, Waymo LLC v.

 8   Uber Technologies, Inc.

 9      Counsel, please --

10           THE COURT:  Just the lead lawyers only.

11           THE CLERK:  -- state your appearances for the record.

12           MR. VERHOEVEN:  Good morning, Your Honor.  Charles

13   Verhoeven on behalf of Waymo.

14           MR. GONZÁLEZ:  Arturo González for Uber.

15           THE COURT:  Are we ready to roll?

16           MR. GONZÁLEZ:  Yes.

17           THE COURT:  You gave me interrogatory answers.

18      The answer is you get to read in all the additional stuff

19   that you want, but it comes out of your time.  All right?

20      So you've got to read the full answer or some part of the

21   answer, both sides if you want, but you can't cherry-pick the

22   answer.  But if you're adding to it, then it comes out of your

23   time.

24           MR. GONZÁLEZ:  All right.  Fine.

25      Your Honor, the way that we are going to get this into
```

PROCEEDINGS

1    evidence is that literally somebody will stand at the mic and

2    just read it?

3            THE COURT:   Correct.   We don't put the document in

4    evidence.   It gives it too much weight.

5            MR. GONZÁLEZ:   Your Honor, along those same lines,

6    yesterday, we filed some --

7            THE COURT:   And it would only be just if I made you

8    read the boilerplate objections and instructions.

9            MR. GONZÁLEZ:   And we're hoping that you don't require

10   that, Your Honor.

11           THE COURT:   I won't.   But it would be poetic justice

12   to require it.

13       (Laughter.)

14           MR. GONZÁLEZ:   Your Honor, if somebody is insisting on

15   that stuff being read, and you allow it, it should be the

16   person that wants it?

17           THE COURT:   What?

18           MR. GONZÁLEZ:   If somebody wants the whole general

19   objection stuff to be read, I hope you wouldn't allow it; but

20   if you do, they ought to read it themselves?

21           MR. EISEMAN:   We don't intend to read their

22   objections, Your Honor.   We just want to get the evidence into

23   the record, the substantive answer.

24           MR. GONZÁLEZ:   So we're good.

25           THE COURT:   So the public will understand what this is

PROCEEDINGS

1    all about, lawyers -- you propounded the interrogatory; right?

2           MR. EISEMAN:  Yes, Your Honor.

3           THE COURT:  And in your interrogatory, you had

4    definitions, then you had instructions.  And all of those

5    things ought to be read so that the jury can understand the

6    full interrogatory.  But I'm not going to require it unless

7    somebody wants it read, and then maybe we will.

8        All right.  Enough on that.

9           MR. GONZÁLEZ:  Your Honor, we have some requests for

10   admissions.  I'm just wondering if you want a hard copy.

11       These are requests for admissions that simply deal with

12   the inspections.

13           THE COURT:  I think I got that up here too.

14           MR. GONZÁLEZ:  Oh, great.  I wasn't sure.

15           THE COURT:  I was going to say read it all.

16           MR. GONZÁLEZ:  Yeah.

17           THE COURT:  Read it all.

18           MR. GONZÁLEZ:  Thank you.

19           THE COURT:  If somebody wants additional material read

20   in, it comes out of their time, but they can read it in.  Okay.

21   Great.  But it's not in evidence until it's read to the jury.

22       Same thing with stipulations.  They don't come in as a

23   piece of paper.

24       Yes, sir?

25           MR. JAFFE:  Good morning, Your Honor.  There are two

PROCEEDINGS

1   other issues for witnesses today.  One relates to the earrings,

2   if you remember that.

3           **THE COURT:**  Yeah.

4           **MR. JAFFE:**  They have disclosed them to use with one

5   of our witnesses today, Mr. Droz.

6       There's no foundation for these as anything for Mr. Droz.

7   He was presented with them in the deposition.  He had no idea

8   what they were.  He had no idea where they came from.  He had

9   no idea about anything.  And now they want to disclose them to

10  him and try to get him to get them into evidence.  But there's

11  no basis for that.  There's no foundation.

12          **THE COURT:**  Okay.  What do you say to that?

13          **MR. RABIN:**  A few things, Your Honor.

14      First, Mr. Droz will be able to lay the foundation that

15  these earrings are GBr2 PCB boards from Google.

16      Second, Mr. Droz will be able to say that these earrings,

17  which are publicly available, they've been in our possession,

18  they've been worn, will be able to say that they disclose the

19  trade secrets, at least one of them.  He can identify it on

20  these earrings that they say are the crown jewels.

21      It is proper foundation.

22          **THE COURT:**  Well, sounds like it's a jewel.

23      (Laughter.)

24          **MR. RABIN:**  It is proper foundation for Google's own

25  witness to identify their own circuit board that's in the

PROCEEDINGS

1   public domain.  And that's all we're going -- going to ask him

2   to do.

3            THE COURT:  That's enough foundation, isn't it?

4            MR. JAFFE:  There's one part that Mr. Rabin just

5   testified about which is not in the record at all, that these

6   are publicly available.  Who's going to testify to that?

7            THE COURT:  Maybe the witness.

8        Will the witness say that?

9            MR. RABIN:  First, the jury and the Court can take

10   notice of it.

11            THE COURT:  No, no.

12            MR. RABIN:  I have them.  Yes, the witness can say

13   whether they came from Google or not or whether they're in

14   Google's possession.

15            THE COURT:  Listen, I'll let you try.  You can try,

16   but you've got to lay a sufficient foundation before we let it

17   into evidence.

18            MR. RABIN:  Thank you, Your Honor.

19            THE COURT:  Now, on the Waymo side, you got to put in

20   "Greed is Good."

21            MR. GONZÁLEZ:  That's right.

22            THE COURT:  Greed is good.  And then, on their side,

23   they get to put in the earrings.  All right?  Well, maybe, if

24   they lay the foundation.

25        Is that it?

PROCEEDINGS

1          **MR. JAFFE:**  There's one other issue, Your Honor, with

2   regard to design-around information, so-called design-around

3   information.

4       We have disclosed for -- some exhibits for Mr. Haslim, who

5   is one of the Uber engineers, they disclosed an updated Fuji

6   device.

7       And I think there are two issues here.  Number one is

8   we're going to have a scope objection to try and getting in

9   this information in our case in chief.  If they want to argue

10  that they took out these alleged trade secrets, it's time to do

11  that in their case, not in our case, because we're --

12         **THE COURT:**  I thought you had agreed to let them

13  exceed the scope of direct.

14         **MR. JAFFE:**  Not with Mr. Haslim, Your Honor.

15         **THE COURT:**  Well, then maybe that will make that --

16  I'll have to wait and see what he testifies to on direct.  It

17  may be that you have a point well taken.

18         **MR. JAFFE:**  And then --

19         **THE COURT:**  But, on the other hand, it may not.

20      What do you say to that?  Why can't you just wait until

21  your case in chief?

22         **MR. JACOBS:**  We might, Your Honor.  I think you're

23  exactly right to see how well it comes in.  We'll see if it

24  fits within the scope.  If they ask him about Google trade --

25  to foreshadow an argument we may not have, if they ask him

PROCEEDINGS

```
 1   about TS5003 and he's designed around TS5003, that would seem

 2   to be within the scope.  But let's see what happens.

 3           MR. JAFFE:  There's also substantive objection to this

 4   design-around information, which we included in our amended

 5   pretrial brief, which is this information was not produced to

 6   us until two weeks before trial.  It was -- they disclosed it

 7   to us on the eve of trial.

 8           THE COURT:  Two weeks before this trial?

 9           MR. JAFFE:  This trial, January 15th, they disclosed

10   this new updated information to us.  In fact discovery, when we

11   asked them about it, it was just a plan.

12       And they're, in essence, trying to use the trial delays

13   that they created to take the time to redesign out these

14   alleged trade secrets.  And then they waited until two weeks

15   before trial to even tell us they were going to do it.

16           THE COURT:  All right.  What do you say to that?

17           MR. JACOBS:  I say a couple of things, Your Honor.

18       First, this was briefed by both sides going into the

19   pretrial conference.  They raised an objection to this

20   additional updated evidence of the status of the Fuji LiDAR in

21   their brief.  And we responded to it in detail.

22       We then show up at the pretrial conference, and Waymo

23   makes a strategic decision not to raise it before Your Honor.

24   We include it in our opening, and now we are being sandbagged.

25   So that's response number one.
```

869

PROCEEDINGS

1              **THE COURT:**  No, well, everyone's openings, as

2    Mr. Carmody himself said, is at risk of whether you'll get it

3    in.

4         But is it true that you only disclosed this two weeks

5    before the trial?

6              **MR. JACOBS:**  That is not true either, Your Honor.

7         So to review the bidding here, towards the close of the

8    regular fact discovery period, we made several disclosures of

9    the status of the design-arounds of Fuji.

10        We made those disclosures in interrogatory responses.

11   They filed a Motion in Limine Number 17.  This may sound

12   familiar, Your Honor.

13             **THE COURT:**  Well --

14             **MR. JACOBS:**  No, hang on.  It will when I tell you the

15   story.

16        They filed Motion in Limine Number 17 saying that these

17   disclosures were all too late.  We respond to Motion in Limine

18   Number 17.  We show up at that pretrial conference, and Waymo

19   makes a strategic decision on the record, "We are," quote,

20   "dropping Motion in Limine Number 17."  You said, "Dropping?"

21   They said, "Yes."  And then you embodied that in an order.

22        So now what's happened?  Yes, time has passed.  The exact

23   design-arounds that were foreshadowed that were described in

24   those interrogatory responses have actually been implemented in

25   the current prototype of Fuji, the current prototype that is in

PROCEEDINGS

1    the courtroom.

2        Out of an abundance of caution, we send them an email a

3    few weeks ago.  And we say, we just want to let you know that

4    what we told you was coming has come.  And Mr. Haslim will

5    testify to the following five or six points about the current

6    status of the exact design-arounds that we disclosed to you and

7    that you addressed in your expert report.

8        And they went -- there was a lot of objecting, and then

9    there was the briefing, and then we show up at the pretrial

10   conference and they drop their motion.

11       And, now, because this is a perfect time to try and throw

12   a monkey wrench into the case and all the witness preparation,

13   now they're raising it for the first time, when they could have

14   raised it at the pretrial conference and you could have

15   addressed it carefully.

16       **THE COURT:**  Well, let me ask you.  Are the -- excuse

17   me.

18       Are the design-arounds that are actually implemented the

19   exact same design-arounds that you said you were going to try

20   to implement?

21       **MR. JACOBS:**  Exactly.

22       **THE COURT:**  They are?  Okay.  And how long ago did you

23   disclose what they were going to be?

24       **MR. JACOBS:**  In August, Your Honor.

25       **MR. VERHOEVEN:**  Your Honor, may I respond?

PROCEEDINGS

1        **THE COURT:**  That sounds -- okay.

2        **MR. VERHOEVEN:**  To call this revisionist history is an

3    understatement.

4        What happened was the pretrial conference he's talking

5    about was before the first trial date.  It was in September.

6    And they had no evidence.  Okay?  They just had someone saying,

7    "Oh, we might do this and we could do that."  Discovery was

8    closed.  We were going to trial in a week.

9        We made the decision, hey, we're not going to do this one

10    because they have no evidence, Your Honor.  They didn't have

11    any evidence.  Go ahead.  Bring it on.  We'll cross them on

12    this because they have no evidence.

13        Now he's trying to say that, by doing that, we agreed

14    that, two weeks before the trial that was continued twice, they

15    can sandbag us with a whole bunch of new evidence, with

16    physical exhibits, with testimony that -- about events that

17    occurred after the discovery had been closed.  And he has the

18    audacity to say that we're sandbagging him.

19        Your Honor, this is classic undisclosed postdiscovery

20    sandbagging that they're doing on us.  And it's --

21        **THE COURT:**  But is it true that I issued an order that

22    said it had been withdrawn?  Show me the order.

23        **MR. JACOBS:**  Sure, Your Honor.  This is --

24        **MR. VERHOEVEN:**  But that was for the evidence they had

25    at the time, Your Honor.  This is evidence that they're raising

872

PROCEEDINGS

1    two weeks before trial, that we didn't even have notice of.

2    How can we -- how can we withdraw a motion in limine on

3    posttrial discovery that we didn't even know about?

4        At the time, all we knew -- all they had was a witness

5    saying -- or some document saying they could do this.

6            **THE COURT:**  Is this coming in -- who is the sponsoring

7    witness for this?

8            **MR. JACOBS:**  Mr. Haslim, Your Honor.

9            **THE COURT:**  Is this in the guise of an expert report?

10           **MR. JACOBS:**  No, Your Honor.  Mr. Verhoeven's outrage

11   is inversely proportional to the merits of his argument.

12       We send the email on January 15th.

13           **THE COURT:**  That should be a principle like

14   Bernoulli's principle.

15       (Laughter.)

16           **MR. JACOBS:**  I think so, Your Honor.  It's a law of

17   physics.

18       So, first of all, Your Honor, answering your question,

19   Docket 1885, MIL Number 17 Re Uber's design-arounds, "This

20   motion was withdrawn at the final pretrial conference."

21       So that's your order on MIL 17.

22       Now, here's the email we sent on January 15:

23           "Counsel, as Uber disclosed in its supplemental

24       responses to Common Interrogatories 1 and 4 on August 24,

25       2017, Uber has been working on redesigns of certain

PROCEEDINGS

 1     accused features of Fuji.  We write to disclose the status

 2     of that effort.  Please be informed that James Haslim may

 3     testify at trial to the following updated information

 4     regarding the Fuji redesigns.  The redesign disclosed" --

 5     I'm not going to disclose any confidential information I

 6     don't need to.

 7          "The redesign disclosed in the response to Common

 8     Interrogatory 4, with respect to alleged TS7, is complete

 9     and has been implemented in the transmit boards," et

10     cetera.

11     We went through each of the interrogatories that we had

12     given them before.  And then we subsequently offered Mr. Haslim

13     for deposition.  And although we don't intend to introduce any

14     updated documentary evidence, we updated our document

15     production on the status of the Fuji redesign.

16          **THE COURT:**  When was that?

17          **MR. JACOBS:**  The following week, Your Honor.

18          **THE COURT:**  Like, a week ago?

19          **MR. JACOBS:**  Depositions were being taken during that

20     period.  Other aspects of the factual record were being

21     updated.  Waymo made another strategic choice, don't take

22     Haslim's deposition because we want to be able to slow up the

23     day of Mr. Haslim's testimony and say, no, no, no, no, we

24     haven't had a chance, Your Honor.

25          That is false.

PROCEEDINGS

1           **MR. VERHOEVEN:**  Well, that's just silly.  We were

2   going a hundred miles an hour to trial, Your Honor.  And the

3   notion that we should have to interrupt our trial preparation

4   to go all the way back to assess a technical design-around when

5   we had no discovery about it -- by the way, the email he read

6   was January 15th.  Trial started -- the jury was selected

7   January 28th.  Okay?

8           We had none of this.  They sent us documents, Your Honor,

9   that they said showed this design-around.  Guess when they're

10  dated?  September and October of last year.

11          And they're sending it to us between the 15th -- I think

12  we got that on the 25th of January, two days before jury

13  selection, Your Honor.

14          Now, this is classic stuff that should be --

15          **THE COURT:**  I'm sorry.  You got what two days before?

16          **MR. VERHOEVEN:**  Two days before jury selection, we got

17  some documents that they said relate to these design-arounds

18  that they're suddenly saying, "You need to take a bunch of

19  discovery because we're going to introduce this into trial."

20  And those documents themselves are dated back in September and

21  October of last year.

22          This is all, you know, a situation where you have

23  absolutely no discovery.  It's sandbagging on us.  And for them

24  to point to a MIL -- first of all, even if you withdraw a MIL,

25  that doesn't mean you can't object to evidence later.

PROCEEDINGS

1    Second, the MIL concerned the state of the evidence in

2    September, when all there was was somebody saying, "We could do

3    this.  We might have a plan."

4        Discovery was closed.  Discovery was not reopened on this,

5    Your Honor.  Sure, there was some discovery going on.  We all

6    know about the Jacobs discovery, Your Honor.  We all know about

7    the Stroz discovery.  But that had nothing to do with this.

8        And there was no disclosure as of the close of discovery

9    of any of these design-arounds other than someone saying, "We

10   could do it."

11       And now they want to sandbag us, come in here and say, "Oh

12   we did it," and we don't have enough time to go back, to look,

13   to test what they've said, to see what it is.  You know, their

14   experts don't -- there's nothing in their expert report about

15   saying, "Here, I've analyzed this design-around that was

16   disclosed on January 15th, and it doesn't embody the trade

17   secrets."

18            **MR. JACOBS:**  That's false, Your Honor.

19            **MR. VERHOEVEN:**  This is classic sandbagging.  And

20   there's a process in place for disclosure in discovery so that

21   we have a fair opportunity to be able to test important things

22   like this.

23            **THE COURT:**  All right.

24       What do you say to that?

25            **MR. JACOBS:**  Your Honor, first of all, we did fully

PROCEEDINGS

```
 1    brief this, and there are the exhibits in the materials.  And
 2    this is not going to come up until after the break.
 3         So suggestion number one, we can give you that briefing
 4    again or give you the docket numbers.
 5              THE COURT:  We can dig it out; I just have no memory
 6    of it.  I'm sorry.
 7              MR. JACOBS:  I'm sorry?
 8              THE COURT:  I think this is the largest file in the
 9    history of the court.  Maybe not quite, but I don't have a
10    memory of what you're talking about.
11              MR. JACOBS:  Right.  So let us give you the briefing
12    on that.
13              THE COURT:  Fine.
14              MR. JACOBS:  Point number two, what happens is -- if
15    their position is adopted is the following:  Mr. Haslim gets on
16    the stand, and we can't ask him, "What is the status of the
17    Fuji redesign?"  Everything would have to be sort of a nunc pro
18    tunc.  "As of August, what were you considering?  How long was
19    it going to take?"
20         And the jury is going to get this kind of weird
21    impression.  What's going on here?  Why aren't they asking
22    about what happened currently?
23         So that's why we updated Waymo and said, Look, here's the
24    current status.  This is the same redesigns, but now time has
25    passed.  They have actually been implemented.  Take Haslim's
```

PROCEEDINGS

 1   deposition.  Find out how long they took.

 2       Both experts analyzed the redesigns from the standpoint of

 3   the claim of the trade secret and how the redesign bears on it.

 4   Mr. Haslim will opine on the redesigns.  He will say it's all

 5   derivative.  We will say that doesn't make any sense.

 6       But both experts have opined on it.

 7       So all that's new is that what was going to happen has now

 8   happened.  There's no new substance.  The sandbagging is that

 9   we had this all teed up for you at the pretrial conference

10   because they raised it, and then they didn't bring it up.

11       And that doesn't make any sense to us.  Why -- when you

12   fully brief something for the pretrial conference, and then you

13   show up and you don't raise it, I think we reasonably inferred

14   that we had outbriefed them and they had dropped it.

15       That's what happened with MIL 17.

16           **THE COURT:**  Excuse me.  We will wait until after the

17   direct examination of Haslim before I decide on this.

18           **MR. JACOBS:**  Thank you, Your Honor.

19           **THE COURT:**  Okay.

20           **MR. JACOBS:**  Would you like the briefing?

21           **THE COURT:**  I think my law clerk is indicating we have

22   it, so we don't need any more.

23       Okay.  Let's bring in the jury.

24           **MR. PERLSON:**  Your Honor, we have a couple --

25           **MR. VERHOEVEN:**  I have one really quick thing, Your

PROCEEDINGS

1  Honor.  Your Honor had -- Your Honor had in your order -- I

2  forgot the date -- on the omnibus motion --

3       **THE COURT:**  Yeah.

4       **MR. VERHOEVEN:**  -- had indicated that you would

5  instruct the jury with respect to the destruction of the

6  Drobo 5D.  And I would suggest that at the end of Mr. Friedberg

7  would be the appropriate time, because that is the evidence

8  that concerns the destruction of the Drobo 5D.

9       **THE COURT:**  I had a draft of that, and I think I left

10  it in chambers.  So I'll try to do that if I can get it out

11  here in time.

12       **MR. VERHOEVEN:**  Thank you, Your Honor.

13       **MR. PERLSON:**  Sorry, Your Honor.  One more thing

14  regarding the witness.  I think we'll -- the issue probably

15  would come up before the break.

16      We -- one of their lawyers, Mr. Tate, who appeared in this

17  case, you know, a lawyer for defendants, is on our list.  We

18  have one document that we want to get in through -- that we

19  want to get in.  There's no dispute.  I could --

20       **THE COURT:**  Give it to Katherine there, and she will

21  hand it to me.

22       **MR. PERLSON:**  These are Mr. Tate's notes of a call

23  that he had with Stroz Friedberg during the due diligence

24  investigation.

25       **THE COURT:**  What is your point?  You want me to

PROCEEDINGS

1   short-circuit this and admit it into evidence?

2           MR. PERLSON:  Well, we -- we said that we would not

3   call him if we would admit it.  And they're refusing, saying

4   that we need to call him.

5       And, additionally, it seems like they want to go -- try to

6   put their case on in our case in relation to him, and we don't

7   think that's fair.  All we want to do is just get this single,

8   undisputed document in.

9       And we thought that they were going to work with us on

10  this sort of thing.  We reached out to them, and they refused.

11          THE COURT:  I cannot steamroller over foundation for a

12  document's admissibility, so you will just have to call

13  Mr. Tate.

14      Now, whenever you have the same problem --

15          MR. BRILLE:  Understood, Your Honor.

16          THE COURT:  -- I'm going to remember this, and maybe

17  you will not get something into evidence.

18          MR. BRILLE:  Understood, Your Honor.

19          THE COURT:  All right?

20          MR. PERLSON:  Your Honor, this was their notice, given

21  that we're not going to be calling Mr. Tate this morning.

22          THE COURT:  You're not?

23          MR. PERLSON:  Yeah.

24          MR. VERHOEVEN:  We don't have the time.

25          THE COURT:  Okay.  It's your call.

PROCEEDINGS

```
 1        All right.  Let's bring in the jury.

 2    Do we --

 3            THE CLERK:  All rise for the jury.

 4    (Jury enters at 7:53 a.m.)

 5            THE COURT:  Welcome back.

 6    Be seated, everyone.

 7        We put on your chair a single page of lists of people in

 8    the case, witnesses and actors in the drama that is unfolding

 9    before your very eyes.  This is not everyone in the case, but

10    these are the ones that are most often referenced, I guess.

11        So we wanted to give you this handy-dandy who's who

12    scorecard so you could glance at it and remind yourselves who a

13    particular person was if they're on the list.  Now, they may

14    not be on the list.

15        All right.  Is our witness here?  Who is our witness?

16            MR. JAFFE:  Yes, Your Honor.

17            THE COURT:  All right.  Welcome back.

18            THE WITNESS:  Good morning, Your Honor.

19            THE COURT:  Mr. Friedberg; right?

20            THE WITNESS:  Yes, sir.

21            THE COURT:  Thank you.  Have a seat.  You're still

22    under oath.  Remember that, please.

23            THE WITNESS:  Yes, Your Honor.

24            THE COURT:  All right.  Let's continue with your

25    examination.  Okay.  Good.
```

1           **ERIC FRIEDBERG**,

2    called as a witness for the Plaintiff, having been duly sworn,

3    testified as follows:

4           **MR. VERHOEVEN:**  Good morning, Your Honor.

5           **THE COURT:**  Good morning.

6           **MR. VERHOEVEN:**  Good morning, Mr. Friedberg.

7       Good morning, members of the jury.

8           **JURORS:**  Good morning.

9           **DIRECT EXAMINATION (resumed)**

10   BY MR. VERHOEVEN:

11   **Q.**   We were talking yesterday about the due diligence

12   investigation that Stroz conducted.

13       As part of that investigation, Stroz's assignment was

14   limited to the five diligenced employees; right?

15   **A.**   No.  Of the employees, yes, it was limited to five of

16   them.  But we had other interviews as well.

17   **Q.**   Okay.  Stroz did not examine any of the Ottomotto files;

18   correct?

19   **A.**   Not exactly.  When the diligenced employees came to our

20   offices and we asked them to give us their -- all of their

21   webmail accounts, among the webmail accounts that they

22   volunteered access to and that we preserved were certain Otto

23   accounts.

24   **Q.**   You did not go over to Ottomotto's offices and look at

25   their files, did you, sir?

**FRIEDBERG - DIRECT / VERHOEVEN**

1   A.   I don't know if they had offices, but we did not go

2   anywhere, no.

3   Q.   And besides these individuals and looking at what they

4   had, you didn't go beyond that and say, "I want to look at all

5   the Ottomotto files"; right?

6   A.   Again, I don't know whether there were Ottomotto servers

7   or not, but we didn't -- that was not the scope of our

8   assignment.  Our scope of assignment was primarily their

9   personal devices.

10  Q.   So if there were Google documents on the Ottomotto

11  servers, that's not within the scope of something you would

12  have discovered; right?

13  A.   Not necessarily, because when we did the -- again, it

14  wasn't the primary goal of what we were doing.  But when we

15  examined the 53 sources of evidence, both their devices and

16  their webmail accounts, there was information potentially that

17  would have pointed us to that kind of information, and we may

18  have followed up in that regard.

19  Q.   You did not look at Ottomotto's servers, did you, sir?

20  Yes or no?

21  A.   Again, I don't know if there were Ottomotto servers, but

22  they were not within our scope of --

23  Q.   Did you look at the Ottomotto servers?  Yes or no?

24  A.   If you're representing to me that there were Ottomotto

25  servers -- and I'll accept that -- we did not look at those.

**FRIEDBERG - DIRECT / VERHOEVEN**

1  Q.   So you did not look at any Ottomotto servers.  Is that

2  your testimony?

3  A.   That's my testimony.

4  Q.   Okay.  So you don't know, because you didn't look at them,

5  if there was Google information on them, do you, sir?

6  A.   Again, our scope of work was their -- their personal

7  devices.

8  Q.   Is that yes?

9  A.   No, we had certain Ottomotto sources of data.  If there

10  were sources beyond that, we didn't look at those, no.

11  Q.   You can't foreclose, based on what you've seen -- you

12  cannot say definitively to this jury whether Google information

13  reached the Ottomotto servers or Uber, can you?

14  A.   I can't say definitively.  Our review didn't show that

15  documents left these personal devices or their webmail accounts

16  and went to the Ottomotto systems, to the extent it existed.

17      But I can't say that there were other systems and that

18  they might -- data might have gotten to such systems from some

19  other way other than devices we looked at.

20  Q.   Let's play from your deposition at page 87, lines 3

21  through 14.

22      (Video played, not reported.)

23  Q.   And you can't say one way or the other to this jury

24  whether any Google confidential -- sorry.

25      And you can't say one way or another to this jury whether

1    any Google confidential information made its way onto the

2    servers of Uber, can you?

3    **A.**   I can't say whether it got there from some other route,

4    no.

5         From what I saw from the devices, I only saw one text

6    message on an Otto device that related to Google.  A short text

7    message.  And we saw that from one of the computers.

8         There was a reference to one of those text messages up on

9    an Otto webmail account.  But we -- I couldn't say that from a

10   source other than what we examined, no, that data may have

11   gotten to Otto or Uber from some other way.  That was outside

12   the scope.

13   **Q.**   Let's read from your deposition, page 85, lines 20,

14   through 86, line 6.

15        (Video played, not reported.)

16   **Q.**   Turn in your binder to exhibit --

17        **MR. BRILLE:**  Your Honor, just -- I'm going to object.

18   I think this is improper impeachment.

19        **THE COURT:**  Overruled.

20   **BY MR. VERHOEVEN:**

21   **Q.**   Turn in your binder to TX-10388, please.

22   **A.**   103 --

23   **Q.**   10388.

24        **MR. VERHOEVEN:**  Is there any objection to 10388?

25        **THE COURT:**  Received in evidence.  You've got to be

FRIEDBERG - CROSS / BRILLE

1  faster.

2          MR. BRILLE:  I will.

3          THE COURT:  We are not going to let you burn up their

4  time.  That's what's going on here.  You've got to be Johnny on

5  the spot and say "no objection."  No burning up their time like

6  that.

7      (Trial Exhibit 10388 received in evidence.)

8          MR. VERHOEVEN:  Thank you, Your Honor.

9          THE COURT:  I'll give you ten extra seconds.

10         MR. VERHOEVEN:  Well, thank you, Your Honor.  I wanted

11 to get that into evidence, so I'll pass the witness.

12         THE COURT:  Well, wait a minute.  Oh, that is in

13 evidence.  Okay.

14     Next.  Who's next?

15     Please remind the jury who you are.

16         MR. BRILLE:  Thank you, Your Honor.

17     May I approach, Your Honor?

18     Good morning, ladies and gentlemen.  My name is Michael

19 Brille, and I am one of the counsel for Uber.

20                   **CROSS-EXAMINATION**

21 BY MR. BRILLE:

22 Q.  Good morning, Mr. Friedberg.

23 A.  Good morning.

24 Q.  Would you please tell the jury a bit about your

25 professional background before you joined Stroz Friedberg.

1  **A.**    I'm a lawyer by training.   I was at Skadden Arps, a law

2  firm in Manhattan, for eight years.

3        After that, I went to the U.S. Attorney's Office in the

4  Eastern District of New York, which is Brooklyn.   I was a

5  federal prosecutor there.   I was the chief of the narcotics

6  unit there and the deputy chief of the narcotics unit.   Then I

7  became the lead computer crime prosecutor at the

8  U.S. Attorney's Office.

9        After the U.S. Attorney's Office, I joined my FBI friend

10 and business associate, Ed Stroz, who founded Stroz Friedberg,

11 and we ran Stroz Friedberg for the last 17 years.   And then Aon

12 Corporation bought Stroz Friedberg in October of 2016.

13 **Q.**    And, Mr. Friedberg, we talked a little bit about -- we

14 talked a lot, actually, about the work you've done in

15 connection with the Ottomotto transaction.   Can you give the

16 jury a sense of the experience of the team that you had working

17 on that matter for you.

18 **A.**    Sure.   We conducted a pre-M&A due diligence for --

19            **THE COURT:**   The jury's not going to understand that.

20            **THE WITNESS:**   Oh, sorry.

21            **THE COURT:**   -- pre-M&A.

22            **THE WITNESS:**   I apologize, Your Honor.

23            **THE COURT:**   Come on.   Some of them will.   A lot of

24 them won't.

25        You lawyers have got to make sure we all understand what

1   the testimony is.

2   **BY MR. BRILLE:**

3   **Q.**   And, Mr. Friedberg, I -- let's not go into the details of

4   pre-M&A due diligence at this point.

5   **A.**   I'm sorry.

6   **Q.**   What I -- what my specific question is, is could you give

7   them just a sense, a brief sense, of the experience of the team

8   that you --

9   **A.**   Sure.

10   **Q.**   -- put together in order to do the work that you did.

11   **A.**   Sorry about that.

12          So we had a team of 50 people.  Approximately three or

13   four forensic examiners were reviewing the devices that the

14   diligenced employees gave us.  There was 28 devices, 23 webmail

15   accounts.  And so they were doing deep forensics on those,

16   looking for confidential information and the like.

17          We had an electronic discovery team because off those

18   devices we took about 1.5 million files.  And you had to

19   process those into an engine and a platform to review those.

20          So we had probably 10, 15 people working in the background

21   to do that processing.  And then we had about 10 people

22   reviewing those documents for relevant material.  And then we

23   had three -- two former federal prosecutors doing the --

24   interviews of Mr. Levandowski and Mr. Ron, the other diligenced

25   employees, and doing field investigation.

1   Q.   And in terms of Stroz Friedberg's work more generally, can

2   you explain to the jury sort of what types of clients you

3   typically work for.

4   A.   Corporate clients, government clients, individuals.

5   Q.   And what types of government clients has Stroz Friedberg

6   done work for?

7   A.   SEC, the FTC, the U.S. Attorney's offices around the

8   country.

9   Q.   Has Stroz Friedberg done work for Google?

10  A.   Yes.

11          MR. VERHOEVEN:  Objection.

12          THE COURT:  What's the objection?

13          MR. VERHOEVEN:  I just asked counsel something and he

14  represented, but let -- let's just move on, Your Honor.

15          THE COURT:  Well, objection's overruled.

16  BY MR. BRILLE:

17  Q.   Now, Mr. Friedberg, I'd like to direct your attention to

18  Trial Exhibit 7912.

19       (Document displayed.)

20  Q.   And this is -- we talked about this yesterday.  This is a

21  copy of your final report?

22  A.   Yes.

23  Q.   Can you give the jury a sense of -- oh, strike that.

24       How would you describe the level of thoroughness that went

25  into this report, from your perspective?

1   **A.**   It was about 3,000 hours of work across the 50 people,

2   looking through these devices and all the emails and the

3   documents and the chats and the pictures that we collected.

4       We started off with about a million and a half documents.

5   We boiled that down to about 400,000.  Then the next cut was

6   about 103,000 and 74,000 pictures.  And then we reviewed that

7   to see whether in that data was Google confidential information

8   or other emails and chats that related to the issues in the

9   case.

10      And then we did field investigation relating to the Drobo,

11  whether the Drobo disks had been destroyed.

12      And then we did interviews of the five diligenced

13  employees.

14      And then we collated all that data into a report that led

15  to our final conclusions about what the diligenced employees --

16  what Google confidential information the diligenced employees

17  had retained.

18  **Q.**   Mr. Friedberg, I'd like to show you another exhibit --

19          **THE COURT:**  Can you explain to the jury what a

20  diligenced employee is.

21          **THE WITNESS:**  Oh, yes.  Thank you, sir.

22      So that was just a term in the case.  The scope of our

23  work was to interview and collect the devices and the webmail

24  accounts of five of the Ottomotto employees.  So it was Anthony

25  Levandowski, Lior Ron, Burnette, Juelsgaard, and one other.

1          **THE COURT:**  It will come to you.

2      Those are the -- in other words, diligenced employee means

3  ones you investigated?

4          **THE WITNESS:**  Correct, sir.

5          **THE COURT:**  Okay.

6          **THE WITNESS:**  Thank you.

7  **BY MR. BRILLE:**

8  **Q.**   Now, Mr. Friedberg, I'd like to pull up for you Trial

9  Exhibit 0354.

10  **A.**   Yes.

11  **Q.**   You looked at this yesterday.  I believe you testified

12  that this was your engagement letter --

13  **A.**   Yes.

14  **Q.**   -- for this engagement?

15      Were there any particular procedures that were put in

16  place during your review related to the handling of any

17  confidential information that you may have found during the

18  diligence process?

19  **A.**   Yes.

20  **Q.**   And can you describe generally what those procedures were?

21  **A.**   Generally, we were getting information from these five

22  individuals that had gone to Ottomotto.  And we were looking

23  for, essentially, confidential information that was from

24  Google.

25      And we wanted to take care.  And the substance of the

1    protocol was to make sure that if we found any materials, that

2    that kind of material didn't make its way to Uber itself -- in

3    other words, to the executives at Uber -- because they're not

4    supposed to have it.

5        So what we did was we had a protocol whereby the five

6    Ottomotto employees, their lawyers, to review what we found.

7    And if anything was confidential, they were supposed to mark it

8    what we call "attorneys' eyes only" so that only attorneys

9    could see it, and it wouldn't go to the Uber executives

10   themselves so that we wouldn't actually create what we call

11   taint or a bigger problem as a result of the review.

12   Q.   And were those procedures followed throughout your

13   investigation?

14   A.   Yes.

15   Q.   Now, Mr. Friedberg, there came a time when, in fact, Stroz

16   learned that Mr. Levandowski had, in fact, retained

17   confidential information on his personal devices; correct?

18   A.   Correct.

19   Q.   How did you learn that?

20   A.   Well, he walked in on that first day, which was

21   March 22nd, was the day -- first day we interviewed him, he

22   brought his physical devices in and he gave us all the

23   passwords to his webmail, his Otto account, his Google docs.

24   And then when he -- we walked through the devices -- and the

25   first one, I think, was his MacBook Pro -- and we said, "Hey,

1    is there any Google confidential information on this?"  And he

2    pointed us to a series of folders.  He was like, "Look, I think

3    I have confidential information in these folders.

4         And we first identified that Google confidential

5    information by him pointing us to it.

6              MR. VERHOEVEN:  I object, Your Honor.  And I move to

7    strike on the grounds that this witness was not even at the

8    interview.

9              THE COURT:  Were you at the interview?

10             THE WITNESS:  No, sir.  This is off the memorandum

11   that we've been talking about.

12             THE COURT:  Is what you just said in the memorandum?

13             THE WITNESS:  Yes.

14             THE COURT:  Is that true?

15             MR. VERHOEVEN:  Not all that detail, Your Honor, no.

16             THE COURT:  Well, you've got to stick to what you

17   know.  I'm not going to strike your testimony if it was in the

18   report because the other side has put in the report; right?

19        So if the report is in, no harm has been done.  But you're

20   not supposed to testify like some freewheeling expert and then

21   give -- you're a percipient fact witness.  That means you've

22   got to stick to what you know of your own firsthand knowledge.

23        Counsel, remember that.

24        Now, if it's in the report, I'll let you show him a line

25   item in the report.  And then if he was present at the time of

1   that, maybe he can elaborate.

2           MR. BRILLE:  Now, may I ask a couple of clarifying

3   questions that --

4           THE COURT:  Yeah, sure.

5   BY MR. BRILLE:

6   Q.   Mr. Friedberg, the report that we're talking about, did

7   you have any involvement in that?

8   A.   Yes.  I --

9   Q.   I'm sorry.  And can you explain to the jury what your role

10  was in connection with the preparation of the report?

11  A.   Sure.  There's two things.  One, there's the report

12  itself --

13  Q.   Yes.

14  A.   -- which you just showed me.  But then yesterday,

15  Mr. Verhoeven was citing from the Anthony Levandowski interview

16  memorandum, which was prepared by Hanley Chew and Mary

17  Fulginiti.  Two prosecutors wrote that, and I supervised --

18  Q.   My question is more specific --

19  A.   Sorry.

20  Q.   -- in terms of the report itself, the actual August

21  report.

22  A.   Yes.

23  Q.   And that would be -- let's just pull it up if we can.

24  That would be Trial Exhibit 7912.

25  A.   Yes.

**FRIEDBERG - CROSS / BRILLE**

1   Q.   What role did you have in this report?

2   A.   I was the primary drafter of this report.

3   Q.   Now, in terms of -- let me show you Trial Exhibit 5101.

4       (Document displayed.)

5   Q.   And this is a document that you were shown yesterday;

6   correct?

7   A.   Yes.

8   Q.   And can you remind the jury what this document is?

9   A.   This is the forensic report relating to Anthony

10  Levandowski's devices and sources of webmail and web-based

11  documents.

12  Q.   I'd like to --

13  A.   This is our forensic report.

14  Q.   I'd like you to turn to page 4 of 9, if you will.

15      And do you see the -- at sort of towards the middle of the

16  page, there are those four numbered paragraphs there.

17      Do you recall Mr. Verhoeven yesterday asking you several

18  questions about that section?

19  A.   Yes.

20  Q.   Now, what device is being referred to as being examined

21  with -- in connection with that information?

22  A.   That was Anthony Levandowski's MacBook Pro, which is --

23  Q.   His laptop?

24  A.   Correct.

25  Q.   How did Stroz obtain that laptop?

 1   **A.**   He brought it in to his interview pursuant to the

 2   protocol.

 3   **Q.**   Was his --

 4         **MR. VERHOEVEN:**  Objection.  Foundation.

 5         **THE COURT:**  Were you there?

 6         **THE WITNESS:**  No, Judge.  I was the -- again, that's

 7   in the report.  I'm just summarizing what's in the report.

 8         **THE COURT:**  Point to where it's in the report.  But,

 9   otherwise, you don't have personal knowledge.

10        So, Counsel --

11         **MR. BRILLE:**  Yes.

12         **THE COURT:**  -- find where it is in the report.

13         **MR. BRILLE:**  So, I can move on, Your Honor, and --

14         **THE COURT:**  Well, I'm going to strike --

15         **MR. BRILLE:**  Yes.

16         **THE COURT:**  I'm striking the answer.

17        The jury will disregard that comment about Levandowski

18   brought it in.  Maybe it's true; maybe it's not.  But this

19   witness can't tell us that.  He wasn't there at the moment.

20        So if it's in the report, rely on the report.

21   **BY MR. BRILLE:**

22   **Q.**   Let's -- let's -- if you could, Mr. Friedberg, I'm going

23   to direct your attention to the top of -- let's go back to the

24   cover of this exhibit, please, the first page.

25        Do you see that paragraph there -- that chart there,

1    Mr. Friedberg?  The bottom chart, not those.

2    **A.**    Yes.

3    **Q.**    Okay.  And do you see the line entry there that says

4    "ES001 computer"?

5    **A.**    Yes.

6    **Q.**    What does that refer to?

7    **A.**    That refers to Anthony Levandowski's MacBook Pro, his

8    laptop.

9    **Q.**    And that was one of the devices that was examined during

10   the diligence review?

11   **A.**    Yes.

12   **Q.**    Now, do you have any personal knowledge of what happened

13   to -- of whether or not that device was ever returned to

14   Mr. Levandowski?

15   **A.**    Yes.

16   **Q.**    And can you tell the jury what your knowledge is of that.

17   **A.**    That device was not returned to Mr. Levandowski.

18   **Q.**    And where is -- has that -- where is that device now?

19   **A.**    That device is in the Stroz Friedberg evidence room at 101

20   Montgomery in our offices in San Francisco.

21   **Q.**    And has it been there continuously throughout the time

22   since you obtained it?

23   **A.**    To my knowledge, yes.  I saw it two days ago in the room.

24   **Q.**    I'd like to direct your attention to another document that

25   I believe you were shown yesterday.  It's Trial Exhibit 7114.

1        (Document displayed.)

2   **Q.**   And can you remind the jury what this document is,

3   Mr. Friedberg?

4   **A.**   During the interim reporting in that pre-April 11th area,

5   Morrison & Foerster asked us to explain whether or not, with

6   respect to the confidential -- some of the confidential

7   information that Mr. Levandowski had identified, whether some

8   of that data had -- when it had most recently been accessed.

9        And so we performed a partial report.  There was a folder

10  on that computer called Chauffeur.  It was in his downloads

11  folder and a subfolder called Chauffeur.  And we did an

12  analysis of the last access date of that Chauffeur data.

13  **Q.**   So let me just hold you there.  When you say -- what I

14  want the jury to understand, if you could explain it to them as

15  simple as possible --

16  **A.**   Sure.

17  **Q.**   -- when you say "last accessed," what does that mean in

18  the context of a document like this?

19  **A.**   So a computer has certain information on it called

20  metadata.  It's sort of data about the data.  And it will tell

21  you when the file was created and when it was last accessed.

22       That last accessed can be -- and if a file is last

23  accessed, the metadata in the document or the computer is

24  updated as to the date and time of the last access.  That last

25  accessed date can change as a result of either human

1    intervention, such as opening the document or searching the

2    folder, or an automated process.

3         So we ran an analysis to figure out, of that Google

4    confidential information, when some of it -- when that was --

5    that -- the documents in that folder were last accessed.

6    Q.   And, again, I just want to understand the terminology, not

7    necessarily -- when you say "an automated process," what do you

8    mean?

9    A.   It could be a variety of things.  It could be a virus

10   scan.  It could be a process whereby there's synchronization

11   between the Dropbox folder and the local folder and the

12   synchronization updates the last accessed date.

13        So it's either human intervention or some kind of

14   automated process.

15   Q.   Now, from this report, was Stroz able to tell from the

16   information in it whether these files were accessed by a person

17   or some -- this automated process that you described?

18        MR. VERHOEVEN:  Objection, Your Honor.  This witness

19   did not prepare this report.

20        THE COURT:  Well, nevertheless, if you know of your

21   own personal knowledge the answer to the question, then you

22   have to answer.  But if you have to infer something, then you

23   can't do that.

24        So go ahead.

25        THE WITNESS:  Your Honor, I wasn't the forensic

1  examiner.  I have an understanding of what that person's

2  findings might be, but I didn't perform the analysis.

3          THE COURT:  I think you need to ask -- I'm going to

4  sustain the objection for now.  Ask it a different way maybe.

5          MR. BRILLE:  I'll move on, Your Honor.  I -- there are

6  other witnesses who will testify to this.

7          THE COURT:  Great.

8  BY MR. BRILLE:

9  Q.   Let's talk about another topic that you -- was raised

10 yesterday, the issue of these Drobo disks.  Do you recall your

11 testimony about that yesterday?

12 A.   Yes.

13 Q.   Now, I want to show you again Exhibit 7912, which is your

14 report, Stroz's report.

15 A.   Yes.

16 Q.   And I'd like to direct your attention to page 10 of that

17 report.

18 A.   Yes.

19 Q.   And this is a page you were shown yesterday by

20 Mr. Verhoeven.  Do you recall that?

21 A.   Yes.

22 Q.   Now, in the middle paragraph, near the bottom, do you see

23 a sentence that starts "Levandowski stated"?

24 A.   Yes.

25 Q.   "Levandowski stated that Kalanick."  Do you see that?

1    A.    Yes.

2    Q.    And in that sentence, it says "Levandowski stated that

3    Kalanick wanted nothing to do with the disks and told

4    Levandowski to do what he needed to do."

5          Do you see that?

6    A.    Yes.

7    Q.    And then it says "Levandowski said that following the

8    meeting he brought the disks to a shredding facility in

9    Oakland, later identified as Shred Works, and watched the disks

10   as they were shredded.  He stated that he paid cash and did not

11   receive a receipt."

12         Do you see that?

13   A.    Yes.

14   Q.    Okay.  Now, do you see the next paragraph below that?  And

15   I'll blow it up for you.  And that starts with "Stroz Friedberg

16   investigators visited Shred Works on April 4th and 6th, 2016."

17         Do you see that?

18   A.    Yes.

19   Q.    Was that part of the follow-up on that particular issue?

20   A.    Yes.

21   Q.    Later in the same paragraph, do you see a sentence that

22   says "A manager for Shred Works reviewed"?

23         Do you see that?

24   A.    Yes.

25   Q.    And then it goes -- it says "A manager for Shred Works

FRIEDBERG - CROSS / BRILLE

1   reviewed the receipts for March 2016, and, in particular,

2   March 11, 2016, the date of Levandowski's meeting with Uber,

3   but could not find one signed by Levandowski."

4        Do you see that?

5   A.   Yes.

6   Q.   Then the last sentence says "She did, however, find a

7   receipt dated March 14, 2016, that indicated that five disks

8   were destroyed and paid for in cash."

9        Do you see that?

10  A.   Yes.

11  Q.   And is that something that was reported to Uber prior to

12  the signing of the protocol agreement on April 11th?

13  A.   Yes.  I and the rest of my team gave an oral report to --

14  not to Uber because I wasn't dealing with Uber.  Actually, I

15  was dealing with Uber's counsel, outside counsel,

16  Morrison & Foerster.  And I reported to them efforts to confirm

17  the -- orally the substance of our attempts to confirm the

18  shredding of the disks at the Shred Works facility.

19  Q.   Now, I'd like to turn you now to page 17 of your report.

20  Do you see the sentence sort of towards the top there that

21  says -- and this wasn't something you were asked about

22  yesterday, so I want to blow this up.

23       Do you see the sentence that says "While Levandowski

24  retained and in some cases accessed Google confidential

25  information after his departure from Google, Stroz Friedberg

 1  discovered no evidence indicating that he transferred any of

 2  that data to Ottomotto or other third parties"?

 3      Do you see that?

 4  A.   Yes.

 5  Q.   How did Stroz Friedberg come to that conclusion?

 6  A.   So we performed forensics on approximately 28 devices and

 7  looked at things like internet history to see whether files

 8  were moving from these devices to Otto.

 9      We looked at emails and chats to see whether or not --

10  hundreds of thousands of them, to see whether or not anybody

11  was discussing whether they had sent this confidential

12  information to Otto.

13      We looked at -- we did a removable media analysis to

14  figure out whether some of the removed -- some of the files had

15  been copied to, like, USB thumb drives or anything, because

16  sometimes when that happens it leaves a residue of what files

17  were copied to the thumb drive.  And if we had found that, we

18  would have followed up on that.  But we didn't see any of that.

19      So we took those kind of investigative actions on all the

20  devices.  And we also looked at all the email and web devices

21  to see whether they were just emailing themselves the Google

22  confidential information from their personal accounts to Otto

23  accounts or somewhere else.

24  Q.   Does that conclusion apply to the laptop that was retained

25  by Stroz?

FRIEDBERG - REDIRECT / VERHOEVEN

1  A.   Yes.

2  Q.   Does it apply to the other devices that Stroz collected

3  from Mr. Levandowski?

4  A.   Yes.  As I said, we found one text message that was up on

5  some Otto Slack site.  It wasn't Google confidential

6  information, but we did find one odd, like, seven-word text

7  message up there.  But, with the exception of that, we didn't

8  find anything that seemed to have flowed from the devices to

9  Otto.

10 Q.   Does Stroz stand by that conclusion today?

11 A.   Yes.

12       MR. BRILLE:  Pass the witness, Your Honor.

13       THE COURT:  All right.  Thank you.

14       MR. VERHOEVEN:  Very briefly, Your Honor, can we pull

15 up the report, TX-7912.  And go to page 11.

16                 **REDIRECT EXAMINATION**

17 BY MR. VERHOEVEN:

18 Q.   Now, counsel showed you a paragraph on the previous page

19 about the Shred Works interviews.  Remember that?

20 A.   Yes, sir.

21       MR. VERHOEVEN:  Okay.  Let's blow up the second-to-top

22 paragraph.

23 BY MR. VERHOEVEN:

24 Q.   This is from your report; right?

25 A.   Yes.

FRIEDBERG - REDIRECT / VERHOEVEN

1   Q.   And it says, quote, The interviews of Shred Works

2   employees and the Shred Works documents do not confirm

3   Levandowski's contention that he took the five disks to Shred

4   Works on the same day as his meeting with Uber, which was

5   March 11th, 2016.

6        That's an accurate statement; right?

7   A.   Correct.

8   Q.   And that's something that you told Uber; right?

9   A.   Correct.

10  Q.   Now --

11  A.   I was dealing with Uber's outside counsel; I never talked

12  to Uber per se.

13  Q.   You told Uber's attorney; right?

14  A.   Yeah, Uber's attorney.

15  Q.   At Morrison & Foerster?

16  A.   Yes.

17  Q.   And they were representing Uber?

18  A.   Yes.

19  Q.   Okay.  Now, you testified about making sure that things

20  were secure and didn't go over and there weren't any external

21  devices that were attached to the laptop.  Did you testify

22  about that just now?

23  A.   That's not what I said, but I talked about external

24  devices.  I did not say there was no external devices attached

25  to the laptop.

1   Q.   Didn't you say you looked into it?

2   A.   Yes.

3   Q.   Okay.  Direct your attention to Exhibit 5101.

4        THE COURT:  Is that in evidence?

5        MR. VERHOEVEN:  It's in evidence, Your Honor.

6        (Document displayed.)

7   BY MR. VERHOEVEN:

8   Q.   This is the forensic report; right?

9   A.   Yes.

10  Q.   Go to page 4.

11       MR. VERHOEVEN:  Can we pull out the summary of deleted

12  content.

13  BY MR. VERHOEVEN:

14  Q.   And then it says, you see, "Stroz identified four external

15  devices that were connected to this laptop and subsequently

16  erased/formatted between 9/1/15 and February 16th, 2016.  Below

17  is a summary of those devices."

18       Do you see that, sir?

19  A.   Yes, sir.

20  Q.   And there's four devices; right?

21  A.   Correct.

22  Q.   Stroz never examined or looked for or obtained any of the

23  USB devices listed in this table, did it?

24  A.   We never obtained them, no.

25       MR. VERHOEVEN:  Pass the witness, Your Honor.

```
 1            THE COURT:  May the witness be excused?

 2            MR. BRILLE:  No further questions, Your Honor.  The

 3   witness may be excused.

 4            THE COURT:  All right.  You're --

 5            THE WITNESS:  Thank you, Your Honor.

 6            THE COURT:  Anyone want to hold the witness for

 7   recall?

 8            MR. VERHOEVEN:  No, we don't.

 9            THE COURT:  You're free to go.  Thank you, sir.

10            THE WITNESS:  Thank you, Judge.

11        (Witness excused.)

12            THE COURT:  Next witness.

13            MR. VERHOEVEN:  Plaintiff calls Melanie Maugeri.

14            THE CLERK:  Will the witness please approach the

15   witness stand.

16            THE COURT:  Okay.  Welcome to the court.  Please raise

17   your right hand.

18                        MELANIE MAUGERI,

19   called as a witness for the Plaintiff, having been duly sworn,

20   testified as follows:

21            THE CLERK:  Please state your name --

22            THE COURT:  Welcome again.  You've got to speak right

23   into the microphone.

24            THE CLERK:  Spell your last name for the record.

25            THE WITNESS:  My name is Melanie Maugeri,
```

```
 1   M-a-u-g-e-r-i.

 2              THE COURT:  Welcome.  Go ahead, Counsel.

 3                     DIRECT EXAMINATION

 4   BY MR. VERHOEVEN:

 5   Q.   Good morning, Ms. Maugeri.

 6   A.   Good morning.

 7   Q.   I see you brought your own water supply.

 8   A.   Yes, I did.

 9   Q.   All right.  You were formerly employed at Stroz Friedberg;

10   correct?

11   A.   Correct.

12   Q.   And your title at that -- when you were employed was

13   manager of digital forensics?

14   A.   That's correct.

15   Q.   You were involved in the due diligence investigation that

16   Stroz carried out for Uber in relation to Mr. Levandowski?

17   A.   The due diligence investigation for counsel.

18   Q.   For counsel for Uber?

19   A.   Correct.

20   Q.   And that concerned Mr. Levandowski?

21   A.   Correct.

22   Q.   Okay.  And you oversaw the forensics investigation of

23   Mr. Levandowski's devices?

24   A.   That's correct.

25   Q.   If you could turn in your binder, please, to Exhibit 5101.
```

**MAUGERI - DIRECT / VERHOEVEN**

 1   It's TX-5101.

 2   **A.**   Yes.

 3   **Q.**   This is in evidence.  We'll put it on the screen, if you

 4   would like to look at the screen.  Either way, it's fine.

 5   **A.**   Okay.

 6   **Q.**   This is the forensic findings report for the personal

 7   devices and document sources that Mr. Levandowski turned over

 8   to Stroz Friedberg; correct?

 9   **A.**   That's correct.

10   **Q.**   And you drafted this forensics findings report; correct?

11   **A.**   Correct.

12   **Q.**   The report was prepared on July 28th, 2016?

13   **A.**   That's correct.

14   **Q.**   Direct your attention to page 1.  And at the top there --

15   you can bring that out -- there are various sources listed;

16   right?

17   **A.**   Yes.

18   **Q.**   And this is an exhaustive list of all the devices and

19   sources that Mr. Levandowski identified and turned over to

20   Stroz?

21   **A.**   Yes.

22   **Q.**   Now, Mr. Levandowski -- you were present at his interview?

23   **A.**   Yes.

24   **Q.**   And Mr. Levandowski admitted to you during his interview

25   that he had Google proprietary information in these sources and

 1  devices that he identified; correct?

 2  **A.**   In so many words, yes.

 3  **Q.**   And during this interview and investigation, you became

 4  aware that Levandowski had devices and sources that were not

 5  identified in this list; correct?

 6  **A.**   Additional devices, yes.

 7  **Q.**   For example, you became aware of external media devices

 8  that Stroz did not receive; correct?

 9  **A.**   That's correct.

10  **Q.**   Direct your attention to page 4.

11        **MR. VERHOEVEN:**   And can we pull up the summary of

12  deleted content.

13        (Document displayed.)

14  **BY MR. VERHOEVEN:**

15  **Q.**   Here you identify four external devices that were

16  connected to Mr. Levandowski's laptop and then subsequently

17  erased or formatted between September 1, 2015, and

18  February 16th, 2016; correct?

19  **A.**   That's correct.

20  **Q.**   These are external devices that you determined had been

21  connected to Mr. Levandowski's Apple MacBook Pro laptop

22  computer; correct?

23  **A.**   Correct.

24  **Q.**   And you became aware of an unknown external device that

25  had a volume name "Untitled"; right?

1   A.   Correct.

2   Q.   And one with a volume name "8GB"; right?

3   A.   Right.

4   Q.   And another with the volume name "280"; right?

5   A.   Correct.  Yes.

6   Q.   Did you discover the significance of 280 during your

7   investigation?

8   A.   Yes.

9   Q.   Tell the jury.

10   A.   280 is -- I can only speculate that 280 is 280 Systems,

11   which was another name --

12          MR. BRILLE:  Objection.

13          MR. GONZÁLEZ:  Your Honor, if the witness is

14   speculating, I ask that that answer be stricken.

15          THE COURT:  Well, start over.  We'll strike that

16   answer.

17      No speculation, but tell us what you can tell us about

18   that subject from your own memory.  All right?  But no

19   speculating.

20          MR. VERHOEVEN:  May I ask a question?

21          THE COURT:  Go ahead.  Ask a new question.

22          MR. VERHOEVEN:  Thank you.

23   BY MR. VERHOEVEN:

24   Q.   During your investigation, you became aware that the

25   entity known as Ottomotto previously was called 280 Systems;

1   right?

2   **A.**   Correct.

3   **Q.**   And this file said "280"; right?

4   **A.**   The volume name was "280."

5   **Q.**   Of this external device?

6   **A.**   Yes.

7   **Q.**   And you also became aware of another media device with a

8   volume name "Untitled"; right?

9   **A.**   Yes.

10  **Q.**   And Levandowski didn't give Stroz any of those media

11  devices, did he?

12  **A.**   No.

13  **Q.**   You felt that these four external devices were material

14  sources of information to investigate, didn't you?

15  **A.**   I felt they were worth noting because they were external

16  media sources that were connected to the laptop.

17  **Q.**   Let's play from your deposition at page 77, lines 10

18  through 16.

19       (Video played, not reported.)

20  **Q.**   But these devices were never investigated, were they?

21  **A.**   No.

22  **Q.**   Now, in addition, this table on page 4 of Exhibit 5101

23  does not even include all of the external media devices that

24  were connected to Mr. Levandowski's laptop computer, does it?

25  **A.**   It identifies the external media sources that were

**MAUGERI - DIRECT / VERHOEVEN**

 1   identified within the date range of interest.

 2   Q.   Let's play from your deposition at page 84, line 15,

 3   through page 85, line 1.

 4        (Video played, not reported.)

 5   Q.   You stand by that testimony; right?

 6   A.   Yes, but I could elaborate on that.

 7   Q.   Thank you.

 8   A.   Okay.

 9   Q.   Thank you.  You'll have a chance when counsel for Uber

10   asks you questions.

11   A.   Okay.

12   Q.   It's correct that Stroz found and you found evidence of

13   additional external media that were connected to the

14   Levandowski laptop but that you did not identify in this table;

15   correct?

16   A.   Correct.

17   Q.   One of the devices that was turned over to Stroz by

18   Mr. Levandowski was a Drobo storage device; correct?

19   A.   Correct.

20   Q.   But during your investigation, you learned that, in

21   addition to that device Mr. Levandowski turned over, he had at

22   least two other Drobos in his possession previously; correct?

23   A.   Can you repeat that question.

24   Q.   Yeah.

25        Isn't it true that Mr. Levandowski had at least two other

1   Drobos in his possession previously other than the one he

2   turned over?

3   **A.**   He mentioned that in his interview, yes.

4   **Q.**   And that's not reported in the report, is it?

5   **A.**   No.

6   **Q.**   Why wasn't that reported?

7   **A.**   Because he didn't turn those devices over to Stroz

8   Friedberg.

9   **Q.**   Let's play from your deposition page 157, line 21, through

10  158, line 2.

11       (Video played, not reported.)

12  **Q.**   Your investigation indicated that Levandowski deleted

13  24,000 files on or around December 14, 2015; correct?

14  **A.**   Am I allowed to comment on that deposition clip?

15       **THE COURT:**  No, not yet.  The other side can ask you a

16  question.

17       Sometimes I will allow you to elaborate, but this one

18  doesn't call for that.  So let's move to the next question.

19       **THE WITNESS:**  Can you repeat your question.

20  BY MR. VERHOEVEN:

21  **Q.**   Sure.

22       Your investigation indicated that Levandowski deleted

23  24,000 files on or about December 14, 2015.  Direct your

24  attention to page 4, Exhibit 5101.

25  **A.**   That's correct.

1   Q.   Now, you were not able to identify whether those 24,000

2   files were transferred somewhere else before Mr. Levandowski

3   deleted them on December 14th, 2015; correct?

4   A.   That's correct.

5   Q.   You didn't specifically dig in and identify whether any

6   external media were connected to Mr. Levandowski's laptop on or

7   around this December 14th, 2015, date; correct?

8   A.   That sounds correct.

9   Q.   So if Mr. Levandowski took the 24,000 files on his laptop,

10  backed them up to a Drobo and then copied them somewhere else,

11  that's information that Stroz would not have identified in

12  their investigation; correct?

13  A.   The part about it being backed up to the Drobo would be

14  reflected on page 5.  Whether or not they were transferred

15  elsewhere would not have been able to be determined.

16  Q.   Let's play from your deposition at page 289, lines 14

17  through 23.

18       (Video played, not reported.)

19  Q.   Now, it wasn't your responsibility, as you understood your

20  assignment, to investigate the possibility that these 24,000

21  files may have been propagated to other locations; right?

22  A.   So these -- these files were identified in an artifact

23  that records historical information.  These files were not

24  resident on the computer.  So it's difficult to determine what

25  happened to these files since they were deleted and they were

```
 1   no longer active on the device.
 2   Q.   Let's play from your deposition at page 130, line 24,
 3   through 131/7.
 4        (Video played, not reported.)
 5   Q.   If your clients had given you more time, you would have
 6   been able to identify any other external media that these
 7   24,000 files may have been transferred to by Mr. Levandowski;
 8   isn't that true?
 9   A.   We may have.
10   Q.   But it was your understanding that that job was outside
11   the scope of the protocol; right?
12   A.   The protocol -- the protocol states that -- I would need
13   to look at the protocol, but the protocol describes or asks or
14   requests the data transfer.
15        So the transfer of data would have been part of the
16   protocol, but, again, these files were found in an artifact;
17   they were not active on the device.  So it's difficult to
18   determine what happened with these files because they're no
19   longer active on the computer.
20   Q.   Digging into where these files may have been transferred,
21   in your understanding, was something further than what you
22   understood the protocol to be?
23   A.   Because they were deleted, yes.
24   Q.   So that's yes?
25   A.   Yes.
```

1  Q.   During your investigation, you discovered sources of

2  potential Google information that you did not investigate

3  further because they were deemed outside the scope of the

4  investigation; right?

5  A.   Can you give me an example?

6  Q.   I'd like to play from your deposition at page 36, lines 5

7  through 12.

8       (Video played, not reported.)

9  Q.   One such source was a collaborative website platform known

10  as Slack; correct?

11  A.   Correct.

12  Q.   And Stroz identified a file or folder of interest on the

13  Ottomotto Slack site; right?

14  A.   A file or folder of interest, yes.

15  Q.   And that file or folder of interest was labeled

16  "Chauffeur"; right?

17  A.   I would have to reference the report to see what the

18  actual title was.

19  Q.   Direct your attention to Exhibit 7912, which is the

20  summary report, at page 19.

21       MR. VERHOEVEN:   I'm not sure this is in evidence, Your

22  Honor, so I would like to move Exhibit 7912 into evidence.

23       Oh, it is in evidence?

24       I apologize.   It is in evidence, Your Honor.

25       (Document displayed.)

1   BY MR. VERHOEVEN:

2   Q.    Does that refresh your recollection as to the name of the

3   Slack site, the file on the Slack site, Chauffeur?

4   A.    Yes.  The title of it is

5   Chauffeur_next_steps_-_we_need_team_Mac, with underscores.

6   Q.    Now, Stroz never analyzed or collected any data from the

7   Slack site, did it?

8   A.    No.

9   Q.    And at that time of the investigation, you would have been

10  interested in reviewing the Slack site if you had access to it;

11  right?

12  A.    Correct.

13  Q.    In addition, Levandowski identified Google information on

14  his personal Dropbox account; correct?

15  A.    Correct.

16  Q.    And after the discovery of Google information on

17  Mr. Levandowski's personal Dropbox account, your forensics lab

18  and team recommended that the password to the Dropbox account

19  be changed; correct?

20  A.    Correct.

21  Q.    But at the direction of counsel for Uber, you did not

22  change the password for the Dropbox account; correct?

23  A.    Correct.

24  Q.    And the instruction not to change the password for the

25  Dropbox account was against your professional recommendation,

1    wasn't it?

2    A.    That's fair.

3    Q.    Stroz also wasn't asked to look at Ottomotto computers or

4    other sources, right, at Ottomotto?

5    A.    Yeah, the personal devices were the devices that we were

6    requested to inspect.

7    Q.    So you didn't look at any Ottomotto computers or servers

8    or Ottomotto sources; correct?

9    A.    Some of the devices that we received appeared to have been

10   related to Ottomotto, but the protocol was for personal

11   devices.

12   Q.    So you didn't look at an Ottomotto server or an Ottomotto

13   computer.  You only looked at the personal devices; fair?

14   A.    We didn't look at any Ottomotto servers, but some of the

15   laptops appeared to have been Ottomotto-related.

16   Q.    You didn't go over to Ottomotto's offices and sit down and

17   do a forensic analysis of the computers in those offices, did

18   you?

19   A.    No.

20   Q.    Based on the investigation that you conducted, you cannot

21   answer whether any confidential Google proprietary information

22   ever reached Uber's servers, can you?

23   A.    I cannot say that, no.

24   Q.    And you cannot foreclose the possibility that Google

25   information reached Uber's servers from sources that you did

MAUGERI - CROSS / GONZÁLEZ

 1  not investigate, can you?

 2  **A.**    No, I cannot.

 3          **MR. VERHOEVEN:**  Thank you, Ms. Maugeri.

 4      I pass the witness, Your Honor.

 5          **THE COURT:**  Thank you.

 6      Cross-examination.

 7          **MR. GONZÁLEZ:**  Thank you, Your Honor.

 8                    <u>**CROSS-EXAMINATION**</u>

 9  BY MR. GONZÁLEZ:

10  **Q.**    Good morning.

11  **A.**    Good morning.

12  **Q.**    Ms. Maugeri, did you and your colleagues work very hard on

13  this due diligence?

14  **A.**    Absolutely.

15  **Q.**    Did you work late into the evenings?

16          **MR. VERHOEVEN:**  Your Honor, this is leading, but --

17          **THE COURT:**  It is leading.  Sustained.

18  BY MR. GONZÁLEZ:

19  **Q.**    Were there days when you worked beyond the ordinary 9:00

20  to 5:00 time period?

21  **A.**    Yes.

22  **Q.**    How often?

23  **A.**    Pretty much the entirety of the investigation.

24  **Q.**    Did you work weekends?

25  **A.**    Yes.

 1   Q.   Did you think that Uber was trying to make a sincere

 2   effort to prevent Google information from coming to --

 3           MR. VERHOEVEN:   Objection.   Leading and foundation.

 4           THE COURT:   Sustained.

 5   BY MR. GONZÁLEZ:

 6   Q.   Did you ever conclude in your mind that Uber was not

 7   making a sincere effort to prevent Google information from

 8   coming to Uber?

 9   A.   So from my perspective, our role in the forensic lab was

10   to identify the information that was laid out in the protocol

11   and to present that to counsel to help them make an informed

12   decision regarding that acquisition.

13   Q.   And did you personally make a sincere effort to identify

14   any such information?

15   A.   Yes, I did.

16   Q.   You mentioned that some of the devices appear to have been

17   Otto-related.   Can you tell us what you mean by that?

18   A.   So some of the email addresses that were provided to us to

19   collect and examine had Ottomotto domain names.   Some of the

20   devices had Ottomotto branding on them, but most of them

21   appeared to have been personal devices.

22   Q.   And you mentioned a Dropbox.   How did you get access to

23   the information in the Dropbox?

24   A.   So the actual Dropbox account itself, Mr. Levandowski and

25   the other individuals provided the credentials to those

```
 1   accounts.
 2   Q.   With respect to all of the accounts that you looked at,
 3   whether they were computers or email accounts or Gmail or
 4   whatever else, did these five employees give you all the
 5   passwords so that you could freely look at everything on those
 6   accounts?
 7   A.   Yes.
 8   Q.   And did your company take an image or a picture of the
 9   information that was in the Dropbox?
10   A.   Yes.
11   Q.   Do you still have that?
12   A.   I personally don't, but I'm sure Stroz Friedberg has a
13   copy of that collection.
14   Q.   Thank you.  That's what I meant.
15        I want to talk about the day when you first met
16   Mr. Levandowski for your interview.
17   A.   Yes.
18   Q.   You were there?
19   A.   Yes, I was.
20   Q.   Did he personally bring his devices to the interview?
21   A.   Yes, he did.
22   Q.   And did he give them to you?
23   A.   Yes, he did.
24   Q.   Did Mr. Levandowski himself show you where on his laptop
25   you could find Google information?
```

1   A.   Yes, he did.

2   Q.   And as far as you know, did you give Mr. Levandowski back

3   these materials after your interview?

4   A.   Mr. Levandowski received his phone back after the

5   interview.

6   Q.   Did you take a picture or image of the phone before you

7   gave it back to him?

8   A.   Yes.

9   Q.   Other than his cell phone, did you keep all of the other

10  devices at Stroz?

11  A.   The physical devices, yes.

12  Q.   Ma'am, I'd like to show you --

13          MR. GONZÁLEZ:   May I approach, Your Honor?

14          THE COURT:   Sure.

15  BY MR. GONZÁLEZ:

16  Q.   -- Exhibit 7418.

17      Do you recognize Exhibit 7418 as being one of the exhibits

18  to the Stroz report?

19  A.   Yes.

20  Q.   And would you please tell the jury what it is?

21  A.   So this is a metadata report that shows information about

22  certain files on Mr. Levandowski's device, his MacBook laptop.

23          MR. GONZÁLEZ:   Your Honor, I move 7418 into evidence.

24          MR. VERHOEVEN:   No objection, Your Honor.

25          THE COURT:   Received.

```
 1          (Trial Exhibit 7418 received in evidence.)

 2          (Document displayed.)

 3               MR. GONZÁLEZ:  Andrew, can you highlight the top

 4     sentence, please.  And can you blow that up.  It's hard to

 5     read.

 6          (Document displayed.)

 7     BY MR. GONZÁLEZ:

 8     Q.   I want to read to you what's at the very top.  First of

 9     all it, says "Anthony Levandowski's MacBook laptop."  Is that

10     the laptop that he gave you at the interview?

11     A.   Yes, it is.

12     Q.   And it says this:  "The last-accessed timestamp can be

13     modified by both user activity as well as system processes."

14          Do you see that?

15     A.   Yes.

16     Q.   User activity, does that mean a human being actually

17     accessing it?

18     A.   Yes.

19     Q.   What does system processes mean?

20     A.   So there are certain processes that happen on a computer

21     where it will touch a file and could potentially trigger the

22     last access time.

23     Q.   And so the next sentence of the document reads, "As such,

24     the last accessed time stamp does not necessarily indicate user

25     interaction with a file."
```

MAUGERI - CROSS / GONZÁLEZ

```
 1          Do you see that?
 2   A.    I do, yes.
 3   Q.    So, basically, it means when the date comes up as last
 4   accessed, that doesn't mean that a human being actually went in
 5   and accessed the file on that date.  Is that what that means?
 6          MR. VERHOEVEN:  Objection.  Leading.
 7   BY MR. GONZÁLEZ:
 8   Q.    Tell me what it means.
 9          MR. GONZÁLEZ:  I'm just trying to cut to the chase,
10   Your Honor.
11   BY MR. GONZÁLEZ:
12   Q.    Tell me what it means, that sentence.
13   A.    So it means that the last access time can be triggered by
14   a human touching the file, opening the file, clicking on the
15   file.  Or it could also mean that a system process was being
16   conducted and the last access time was triggered.  Or the user
17   opened a folder and didn't necessarily look at the file but
18   another action happened that triggered the last access time.
19          So it could indicate both a user interaction or a program
20   or system interaction.
21   Q.    Meaning the computer may have accessed it itself; is that
22   right?
23   A.    Touched it, yes --
24   Q.    Okay.  And --
25   A.    -- I think is a better word.
```

1    Q.    And when you did your report and you came up with these

2    last accessed dates, could you tell one way or the other

3    whether a human being accessed that file or whether the

4    computer did?

5    A.    Not from just the metadata alone.

6           MR. GONZÁLEZ:   All right.  I'd like to display, Your

7    Honor, Exhibit 7114, which is in evidence.

8         (Document displayed.)

9    BY MR. GONZÁLEZ:

10   Q.    And I'd like you -- it's probably easiest on the screen.

11          MR. GONZÁLEZ:   If we can, please, Andrew, let's --

12   let's take page 4, the 11:33.  There you go.

13   BY MR. GONZÁLEZ:

14   Q.    Now, ma'am, I notice something about this document.  This

15   is the last -- do you recognize this document?  It's in your

16   binder as Exhibit 7114.

17   A.    Oh, sorry.  I missed the first one.

18         Yes, I recognize this.

19   Q.    All right.  Just briefly, tell the jury, please, what it

20   is.

21   A.    This is a description of specific files that we identified

22   on the computer.  They're descriptions of the files to protect

23   any privileged information that may be on the file.

24   Q.    And this is something that you put together at the request

25   of the lawyer for Uber?

 1   A.   One of the counsel, yes.

 2   Q.   All right.  In other words, the -- one of the lawyers

 3   asked you to put together information on last accessed?

 4   A.   Correct.

 5   Q.   And I notice, ma'am, that -- I'm just going to use one

 6   example in the interest of time.

 7   A.   Sure.

 8   Q.   There are many, many, many documents or items, whatever

 9   these are, files, that were accessed in the exact same minute.

10   Do you see that?  I'm just showing one example where 38

11   documents -- are these documents or files?  What are these?

12           THE COURT:  You can't testify.

13           MR. GONZÁLEZ:  That's why I'm asking.

14           THE COURT:  Well, you were trying to testify that you

15   counted 38.

16           MR. GONZÁLEZ:  Oh.

17           THE COURT:  We don't do that here.

18           MR. GONZÁLEZ:  Okay.  All right.

19           THE COURT:  All right.  You can get the witness to say

20   it, but you don't get to say it.

21           MR. GONZÁLEZ:  All right.

22   BY MR. GONZÁLEZ:

23   Q.   Are these documents or files or something else?

24   A.   Files.

25   Q.   All right.  These files -- the jury can count them for

1  themselves if they'd like to, but these files, do you see that

2  at 11:33 there are a whole bunch up on the screen for the exact

3  same minute?

4  **A.**   Yes.

5  **Q.**   Is that an example of a computer accessing files?  Is that

6  what it would look like?

7  **A.**   So there are several things that could trigger the

8  entire -- I don't know where these files are located, but

9  there's several things that can happen where multiple files are

10  accessed at the same exact time.  So if they're all contained

11  in the same folder, that folder being accessed --

12          **MR. VERHOEVEN:**  Your Honor, I object to opinion

13  testimony with no foundation as what that -- this has to do

14  with anything on the document.

15          **THE COURT:**  Do you know what you're talking about?

16  (Laughter.)

17          **THE WITNESS:**  Yes, I do.

18          **THE COURT:**  All right.

19  (Laughter.)

20          **THE COURT:**  Then there's foundation.

21  Please continue with your answer.

22          **THE WITNESS:**  So if an entire folder was accessed or

23  opened, there could be something that triggered every single

24  file in that folder to have the last access time triggered.

25          There could be a process that was being run that could --

1    that could trigger all of that.

2         There's multiple things that could cause a bunch of files

3    having the same last accessed time.

4    BY MR. GONZÁLEZ:

5    Q.   Thank you ma'am.

6         When you say "a process," can you give the jury a couple

7    of examples that nontechnical people like me might understand?

8    What do you mean by "a process"?

9    A.   Something going on on the computer that's not necessarily

10   a human activity or a human interaction.

11        So it could be -- it could be anything from a scan being

12   run to a human actually touching a folder, to some other system

13   process that's running on, that the human really can't see,

14   that's going on behind the scenes.

15   Q.   What about a software update?

16   A.   It could potentially access files.  It's a very sensitive

17   time stamp, so a lot of things can trigger that time stamp, the

18   last accessed time.

19   Q.   All right.

20        MR. GONZÁLEZ:  Andrew, could you go to the next slide,

21   please.

22   BY MR. GONZÁLEZ:

23   Q.   And I'm going to show you something else.  I took some

24   examples of some of these files.  One of them is a "Picture of

25   a bottle of Listerine."  One of them is a "Picture of a

 1   cluttered table."  One is "Picture of a screwdriver."

 2          MR. GONZÁLEZ:  And for the record, I'm reading from

 3   pages 4 and 5 of Exhibit 7114.

 4   BY MR. GONZÁLEZ:

 5   Q.   And it also has "A person holding a miniature car."  It

 6   has a "Picture of a hanging plant."

 7          MR. VERHOEVEN:  We've got some more testimony here,

 8   Your Honor.  I object.

 9          MR. GONZÁLEZ:  I'm reading into the record what's on

10   the screen that the jury's looking at.

11          MR. VERHOEVEN:  And it's also beyond the scope.

12          THE COURT:  All right.  What is your point?

13          MR. GONZÁLEZ:  Well, I've got --

14          THE COURT:  What is the question?

15          MR. GONZÁLEZ:  I've got one more to read.  I don't

16   want to forget the muffins.

17   BY MR. GONZÁLEZ:

18   Q.   "Picture of muffins in a basket."

19        Is this the sort of thing that can happen when a computer

20   does this process update, that it would pick up miscellaneous

21   things like this, a hanging plant and muffins in a basket?

22          MR. VERHOEVEN:  Again, he's arguing, Your Honor.

23          MR. GONZÁLEZ:  I'm asking a question.

24          THE COURT:  All right.  I think this is -- so this

25   is -- you need to be very careful here.  And if you're going to

```
1   give an answer on this, it has to be fair and balanced, so to

2   speak.

3        But, first of all, are you qualified to answer that

4   question?

5             MR. GONZÁLEZ:  I can rephrase the question, Your

6   Honor.

7             THE COURT:  No.  We're not going back through all

8   that.

9        (Laughter.)

10            THE WITNESS:  I'm qualified as a forensic expert to

11  answer a question about how computer systems operate.  And I

12  can answer the question in the sense that there are many things

13  that could trigger a last access time of a file.  And that's

14  both user interaction or program interaction or system

15  interaction.

16       And I can leave it at that.

17  BY MR. GONZÁLEZ:

18  Q.  All right.  So --

19            THE COURT:  All right.  Let's move on.

20  BY MR. GONZÁLEZ:

21  Q.  So just yes or no, ma'am.  You tell from the work that you

22  did in this engagement whether the picture of muffins in a

23  basket is something that a human being went in to look at or

24  whether the computer did it on its own?

25  A.  I can't tell that from this report.
```

1      MR. GONZÁLEZ:  Thank you.  That's all I have.

2      THE COURT:  All right.

3      MR. VERHOEVEN:  Very briefly, Your Honor.

4                  <u>REDIRECT EXAMINATION</u>

5   BY MR. VERHOEVEN:

6   Q.   You were asked about last access dates by Mr. González.

7   You looked into whether or not you could determine what caused

8   the last access dates, didn't you?

9   A.   We did.

10  Q.   In fact, you asked Mr. Levandowski about that, didn't you?

11  A.   I recall, yes.

12  Q.   Let's -- let's turn to Exhibit 5091.

13      MR. VERHOEVEN:  Which I've pulled into evidence.  Or,

14  no, it's not in evidence.  5081.  I'm sorry.  I messed up.

15  5081, declaration of Mr. Levandowski.

16      MR. GONZÁLEZ:  Was it disclosed to this witness?

17      MR. VERHOEVEN:  It was disclosed for Mr. Friedberg.

18      MR. GONZÁLEZ:  Oh.

19  Your Honor, I object on hearsay grounds.

20      THE COURT:  It is hearsay.  I don't see how in the

21  world you can get that into evidence.

22      MR. VERHOEVEN:  A sworn declaration from

23  Mr. Levandowski?

24      THE COURT:  It's hearsay.

25      MR. VERHOEVEN:  For the understanding of their

```
 1    investigation as to what he knew?
 2              THE COURT:  Correcto.
 3              MR. VERHOEVEN:  What?
 4              THE COURT:  Correct.  You're not going to be allowed
 5    to put hearsay in.
 6              MR. VERHOEVEN:  Did -- I can ask this witness what she
 7    understands about what happened in the transaction; right?
 8              THE COURT:  You can ask her anything in her personal
 9    knowledge, of course.
10              MR. VERHOEVEN:  Okay.
11    BY MR. VERHOEVEN:
12    Q.  Mr. Levandowski was asked if he knew whether or not these
13    updates were machine updates or his updates; correct?
14    A.  I don't know.
15    Q.  You don't remember that?
16    A.  I vaguely remember a conversation but not enough to speak
17    to it.
18    Q.  Mr. Levandowski told you that he did not know, didn't he?
19    A.  He -- Mr. Levandowski did not tell me personally anything.
20    Q.  Did you have an understanding that Mr. Levandowski did not
21    know?
22              MR. GONZÁLEZ:  Objection.  That calls for speculation.
23              THE COURT:  Well, first, I thought you said you didn't
24    remember.  What is the state of your memory on this?
25              THE WITNESS:  So what I remember is there was a
```

MAUGERI - REDIRECT / VERHOEVEN

1   conversation about having Mr. Levandowski come into Stroz

2   Friedberg and sit with us to determine whether or not he

3   accessed these files or didn't access these files.

4        That did not happen.  And I don't know anything about his

5   deposition, if he -- I don't know anything about that.

6        THE COURT:  All right.  Now, if there's something in

7   the declaration that might refresh her memory, you can show it

8   to her and have her read it in silence.  And perhaps she will

9   remember more.  That much you can do.  But the declaration

10  itself will not come into evidence.

11       MR. VERHOEVEN:  Thank you, Your Honor.  I am going to

12  move on --

13       THE COURT:  All right.

14       MR. VERHOEVEN:  -- in the interest of time.

15  BY MR. VERHOEVEN:

16  Q.   But just to circle back, you were unable to determine what

17  caused the update, whether it was human or machine?

18  A.   No.

19  Q.   That means yes, you could not determine?

20  A.   Could you repeat the question?

21  Q.   Sure.

22       THE COURT:  Don't use all those double negatives.

23       (Laughter.)

24       THE COURT:  That's the problem.  Just say "Were you

25  able to determine whether it was A or B?"

MAUGERI - REDIRECT / VERHOEVEN

```
 1              THE WITNESS:  Thank you.
 2         (Laughter.)
 3              THE COURT:  Yeah.
 4              MR. VERHOEVEN:  I'm learning all the time.
 5         (Laughter.)
 6    BY MR. VERHOEVEN:
 7    Q.    So can you answer the judge's question?
 8    A.    Can you repeat the question?
 9         (Laughter.)
10              THE COURT:  Were you able to determine whether or not
11    the identical dates were due to human interaction or computer
12    interaction?
13              THE WITNESS:  No, not definitively.
14    BY MR. VERHOEVEN:
15    Q.    Mr. Levandowski could have transferred all those files,
16    that were listed, all at the same time; right?
17              MR. GONZÁLEZ:  Speculation.
18              THE COURT:  Well, this is within the realm.  You
19    wanted her to speculate that the machine caused it.  I'm going
20    to let your opponent speculate as to Levandowski caused it.
21         Go ahead.  Answer that speculative question.
22              THE WITNESS:  It's possible.
23    BY MR. VERHOEVEN:
24    Q.    Okay.  Direct your attention to 7114, TX-7114, which
25    Mr. González showed you.
```

**MAUGERI - REDIRECT / VERHOEVEN**

1          (Document displayed.)

2     **Q.**   This is the sheet that he showed you.   Remember this,

3     where he has the muffins?

4     **A.**   Yes, I remember the muffins.

5               **MR. VERHOEVEN:**   Okay.   Let's just pull up a portion of

6     this.   In fact, let's just pull up row 1.

7     **BY MR. VERHOEVEN:**

8     **Q.**   In addition to the muffins, what does row 1 show that he

9     had?

10    **A.**   "Aspen confidential and proprietary presentation regarding

11    self-driving car."

12    **Q.**   And Aspen is Google; right?

13    **A.**   Correct.

14    **Q.**   And let's go to row 29.   What does that say?

15    **A.**   "Closeup video of a component of" a self -- "of the

16    self-driving car."

17    **Q.**   Let's go to the next page.   Let's go to line -- row 64.

18    **A.**   "Picture of a diagram of autonomous vehicle."

19    **Q.**   67.

20    **A.**   "Aspen confidential presentation regarding self-driving

21    car."

22    **Q.**   75.

23    **A.**   "Aspen confidential presentation regarding self-driving

24    car."

25    **Q.**   76.

1  A.   "Aspen confidential presentation regarding self-driving

2  car."

3  Q.   These files are together with the muffins; right?

4  A.   I don't know if they're located in the same folder as the

5  muffins, but they're on the same report as the muffins.

6       MR. VERHOEVEN:  Thank you.  No further questions, Your

7  Honor.

8       MR. GONZÁLEZ:  I think I have just one.

9       Andrew, can you please display page 17 from 7912.

10      (Document displayed.)

11                    **RECROSS-EXAMINATION**

12 BY MR. GONZÁLEZ:

13 Q.   Ma'am, the Stroz report says, in part, "Stroz Friedberg

14 discovered no evidence indicating that he transferred any of

15 that data to Ottomotto or other third parties."  And the "he"

16 is referencing Mr. Levandowski.

17      Do you agree with that conclusion?

18 A.   Yes, I do.

19      MR. GONZÁLEZ:  Thank you, Your Honor.

20      THE COURT:  All right.  One question.

21                  **REDIRECT EXAMINATION**

22 BY MR. VERHOEVEN:

23 Q.   But you cannot foreclose the possibility, based on your

24 investigation, that Google confidential information made its

25 way onto Uber's servers; correct?

MAUGERI - FURTHER REDIRECT / VERHOEVEN

1    A.    That's correct.

2              MR. VERHOEVEN:  Thank you.

3              THE COURT:  The witness will now be excused, unless

4    somebody wants to keep her for recall.

5              MR. GONZÁLEZ:  That's fine, Your Honor.

6              THE COURT:  All right.

7              MR. VERHOEVEN:  Yes, she's excused.

8              THE COURT:  All right.  Thank you.  Thank you.  Have a

9    good day.  You're excused.

10             THE WITNESS:  Thank you.

11             THE COURT:  Leave all our documents here, though.

12             THE WITNESS:  Okay.

13        (Witness excused.)

14             THE COURT:  All right.  We're going to take a break.

15   All that talk about muffins --

16        (Laughter.)

17             THE COURT:  -- has got me hungry.  Maybe you all can

18   have a muffin in the jury room.  15 minutes.

19        (Jury out at 9:09 a.m.)

20             THE COURT:  Be seated.  When is Haslim going to come?

21             MR. VERHOEVEN:  It's -- I'll let Mr. -- oh.

22             MR. EISEMAN:  Your Honor, we have -- one, two, three,

23   four --

24             MR. GONZÁLEZ:  Most likely --

25             MR. VERHOEVEN:  -- about seven or eight witnesses to

1    go before we get to him.

2        THE COURT:  All right.  And he's the one that we have

3    the issue on about the design-around?

4        MR. VERHOEVEN:  Yes, Your Honor.

5        MR. GRINSTEIN:  Your Honor, Joe Grinstein for Uber.

6    I'm not sure that's actually correct.

7        For example, Mr. Pennecot is going to testify before

8    Mr. Haslim.  And if asked the question, "Does Fuji reflect

9    certain aspects of, say, Trade Secret 2," the only truthful

10   answer will be "No."  And if a different question was asked,

11   "Did an older version of Fuji reflect certain aspects of Trade

12   Secret 2," the answer may be different.

13       But in order to give truthful testimony if asked a

14   question, which they may well ask, this issue is going to come

15   up.

16       THE COURT:  Well, I don't know how you're going to

17   phrase your questions, so we will wait and see.  But if you

18   are -- if you do ask a question, "Isn't it true that Fuji works

19   ABC," and you're using the present tense, then that's -- he can

20   testify to it.

21       On the other hand, if you stick to what the earlier system

22   was, then maybe you don't open that door.  So you need to

23   proceed with caution.

24       MR. JAFFE:  Thank you, Your Honor.

25       THE COURT:  And I am inclined to do this.  I want to

**PROCEEDINGS**

 1    just tell you I've been thinking about it.

 2         I'm inclined to say that what Uber's trying to do here is

 3    not quite fair.  Yes, it's true that you said back in August

 4    that you were going to try to make these changes, and that part

 5    can come in.

 6         But to unload this new information on them two weeks

 7    before the trial, they would have had to get an expert report.

 8    It's just too much.

 9         So I'm inclined to say you can tell the story, back in

10    August you were planning on doing it; you went to work on it.

11    And then I'll tell the jury, if need be, because of -- we're

12    not going to get into whether it succeeded or not.  And if you

13    abuse it, I'm going to say it wasn't fair to your opponent to

14    spring that on them two weeks before the trial.

15              **MR. JACOBS:**  Your Honor --

16              **THE COURT:**  I'm not making a final decision, but I

17    want you to stay away from this problem of what the -- the

18    design-arounds and whether they wound up working or not.

19         You can put it in the time frame of last August or

20    September and that they were hoping it would work, expected it

21    would work, but they -- but to try to do that now, I just

22    don't see -- I'm going to give you a chance to talk me out of

23    this, but I feel like you've been unfair to the other side.

24         Now, they're being unfair to you.  No, you're being unfair

25    to them.  You want to force them to use up time or call

**PROCEEDINGS**

1   Mr. Tate.  And here you are, after doing that little maneuver,

2   you want me to bail you out on something that should have been

3   disclosed a long time ago.

4        All right.  What do you want to say?

5        **MR. JACOBS:**  Your Honor, I think that what I would

6   propose is this.  They're calling these witnesses now in their

7   case.  And if we adopt a narrow view of the scope of our

8   permissible friendly cross-examination, then if the questions

9   adhere to the form that you proposed to them, in their case we

10  do not need to get into the redesigns.  We can get into them --

11  or the current status of the redesigns.

12       Then you can take a look at the papers.  You can see what

13  happened and how we teed this up for the pretrial conference

14  and how they decided not to bring it up at the pretrial

15  conference.

16       **THE COURT:**  That was then.  But now -- that was then.

17  But after that, you unloaded brand-new information on them.

18       **MR. JACOBS:**  But then we teed them up -- sorry -- for

19  the most recent pretrial conference.

20       So you can see the back-and-forth, how limited the update

21  is.  If we were giving them whole new redesigns, if the

22  technical information had changed such that they actually

23  needed to do some new analysis by their expert of the scope of

24  the relationship of the alleged trade secret to the proposed

25  designs, then that would have been a more substantive change.

**PROCEEDINGS**

1    All that has happened is that what was predicted to happen

2    did happen.  And that's what we told them.  So I don't want --

3        **THE COURT:**  But you're predicting also that it works.

4    Sometimes when you do a design-around, there's a flaw lurking

5    there, and it has to be exercised through millions of

6    possibilities.  And you want Mr. Haslim to say it works fine.

7    And I --

8        **MR. JACOBS:**  All I want Mr. Haslim to say is that this

9    is the current working prototype of Fuji version 2.5 and that

10   there are two of those that are being tested.

11       **THE COURT:**  I'm going to -- we'll go slowly on this.

12   I have a feeling you'll open the door.  And then I have no

13   sympathy for you; it will all sail in.

14       But if you don't open the door, then I'm inclined to not

15   let the new information in.  But I can't say for -- I've got to

16   go think more on this.

17       **MR. JACOBS:**  And all I would ask, Your Honor, is that

18   you adjust that just slightly, that you would be inclined not

19   to let that in in their case when they're putting on our

20   witnesses.  But I really ask you to go look carefully at the

21   briefing because I think we were -- I think we were fully

22   aboveboard with them on this.

23       **THE COURT:**  All right.  We'll take 15 minutes.

24       **MR. JACOBS:**  Thank you, Your Honor.

25           (Recess taken at 9:16 a.m.)

PROCEEDINGS

```
 1              (Proceedings resumed at 9:30 a.m.)

 2         THE COURT:  Be seated.  Anything for the judge, or can

 3    I bring in the jury?

 4         MR. VERHOEVEN:  Just the request that the jury be

 5    instructed on the Drobo list.

 6         THE COURT:  You got sidetracked.  I don't have it

 7    anymore.  Just a second.

 8       (Pause.)

 9       (Jury enters at 9:32 a.m.)

10         THE COURT:  Okay.  Welcome back.

11       All right.  Yes, sir?

12         MR. GONZÁLEZ:  Your Honor, may we have a five-second

13    sidebar?

14         THE COURT:  No.  Sorry.

15         MR. GONZÁLEZ:  Thank you.

16         THE COURT:  I need to tell you something that has a

17    little bit to do with the witnesses that you just heard.  And

18    the lawyers asked me to read this to you, and you may treat it

19    as evidence.

20       "The Court" -- meaning me -- "previously ordered Uber to

21    state by March 31, 2017" -- that's last year, about a year ago.

22    I'll start over.

23       "The Court previously ordered Uber to state by March 31,

24    2017, the extent, if any, to which files or documents

25    downloaded or taken from Google by Mr. Levandowski had been
```

1   deleted, destroyed, or modified.

2         "Uber knew since March 2016 that Mr. Levandowski said he

3   had destroyed five disks of Google information that was in his

4   possession.

5         "Uber, however, did not disclose this information to Waymo

6   until early June 2017, approximately two months after the

7   March 31 deadline.

8         "It is up to you, the jury, to decide what, if anything,

9   to infer based upon these facts that I have just given to you,

10  plus the other evidence in the case."

11        All right.  Next witness.

12              MR. VERHOEVEN:  Waymo calls Mr. John Gurley.

13              THE CLERK:  Will the witness please approach the

14  witness stand.

15              THE COURT:  Welcome, Mr. Gurley.  Raise your right

16  hand, please.

17                        JOHN GURLEY,

18  called as a witness for the Plaintiff, having been duly sworn,

19  testified as follows:

20              THE CLERK:  Please be seated.  State your name for the

21  court and spell your last name.

22              THE COURT:  You get the record for being the tallest

23  person.  So you need to crank your microphone up some so it

24  will catch your voice.

25              THE WITNESS:  My name is John William Gurley.  Last

1    name is spelled G-u-r-l-e-y.

2              **THE COURT:**  Thank you.

3         Go ahead, Counsel.

4                       **DIRECT EXAMINATION**

5    BY MR. VERHOEVEN:

6    **Q.**   Good morning, Mr. Gurley.

7    **A.**   Good morning.

8    **Q.**   You are currently employed by Benchmark Capital?

9    **A.**   Correct.

10   **Q.**   That's a venture capital firm?

11   **A.**   Yes.

12   **Q.**   You're a general partner at Benchmark Capital?

13   **A.**   I am.

14   **Q.**   And you've been a general partner at Benchmark Capital

15   since 1999?

16   **A.**   Correct.

17   **Q.**   Benchmark Capital made an investment in Uber in January of

18   2011; right?

19   **A.**   Yes.

20   **Q.**   And you were the lead partner at Benchmark Capital for

21   that investment; right?

22   **A.**   Yes.

23   **Q.**   Yes?

24   **A.**   Yes.

25   **Q.**   At the same time Benchmark Capital made that investment in

1    January of 2011, you joined Uber's board of directors; correct?

2    A.   Correct.

3    Q.   And you were a member of Uber's board of directors for

4    over six years, from January 11th until June of last year;

5    correct?

6    A.   Correct.

7    Q.   You were also on a special committee that Uber's board of

8    directors put together to look after this litigation in this

9    case; right?

10   A.   Correct.

11   Q.   Is it fair to say that, when you were a member of Uber's

12   board of directors, you were very engaged with the company?

13   A.   Yes.

14   Q.   You can't think of any other Uber board members during

15   that time who were more engaged with Uber than you; correct?

16   A.   It's -- it's a fair statement, although there's knowledge

17   I don't have of whether the other board members might have been

18   doing other things in a more engaged way, which is possible.  I

19   just might not have that knowledge.

20   Q.   You can't think, sitting here, of anyone else on the board

21   who is more engaged than you; right?

22   A.   Correct.

23   Q.   Now, the first time you learned of the possibility of the

24   Ottomotto transaction was shortly before the board meeting

25   where it was approved; correct?

GURLEY - DIRECT EXAMINATION / VERHOEVEN

1    A.    Correct.

2    Q.    You personally didn't do any investigation or diligence

3    into the transaction before approving it; correct?

4    A.    I didn't do any independent investigation.  We had a board

5    meeting, and a discussion ensued at that board meeting.

6    Q.    So prior to that board meeting, you hadn't done any

7    investigation or diligence into the transaction; correct?

8    A.    No.

9    Q.    Correct?

10   A.    Correct, I have not.  Nor would I in any other situation

11   that was like that.

12   Q.    Fair to say the only discussion you had about the

13   diligence into the Ottomotto transaction was at the board

14   meeting in which the transaction was approved?

15   A.    Prior to the approval, correct.

16   Q.    Could you please turn in your binder to TX-910 in

17   evidence.  You can flip through those if you would like.

18         These are the slides that were presented to the board at

19   that meeting where the Ottomotto transaction was approved;

20   correct?

21   A.    Yes.

22   Q.    And that meeting took place on April 11th, 2016; correct?

23   A.    Correct.

24   Q.    Who was making the presentation to the board?

25   A.    My recollection is that Travis Kalanick led the majority

1    of the presentation and that Cameron may have participated as

2    well.

3    Q.   At the time Mr. Kalanick presented these slides, you knew

4    that Ottomotto was a start-up that had only existed for a few

5    months; correct?

6    A.   I knew it was a very young start-up.  I don't know if I

7    knew exactly the number of months.

8    Q.   Let's play from your deposition at page 42, lines 15

9    through 19.

10        (Video played, not reported.)

11   Q.   You also knew that Ottomotto didn't sell any products;

12   right?

13   A.   Well, you said "few" there, and two to three when you

14   asked me just now.  Just a clarification.

15   Q.   You also knew that Ottomotto didn't sell any products;

16   right?

17   A.   Yes.

18   Q.   Direct your attention to page 2.

19            MR. VERHOEVEN:  And can we pull out the "terms" box.

20   BY MR. VERHOEVEN:

21   Q.   And you'll see the bottom bullet in that box says, quote,

22   Uber will indemnify a minimum of five key employees and

23   Ottomotto for specific claims by former employers, e.g., IP.

24        And then it goes on.  Do you see that, sir?

25   A.   Yes.

GURLEY - DIRECT EXAMINATION / VERHOEVEN

1   Q.   You're not aware of any other transaction, other than this

2   one, in which the buyer indemnified the seller for activities

3   prior to the acquisition, are you, sir?

4   A.   I am not involved in a transaction other than this one

5   that I'm aware of where that is true.  I don't have a universal

6   knowledge of all transactions to be able to comment on that.

7        But, for me, it was atypical.

8   Q.   Atypical.

9        When Mr. Kalanick presented these slides, members of the

10  board asked questions about why Uber was agreeing to provide

11  indemnity like this; right?

12  A.   That is correct.

13  Q.   And Mr. Kalanick told the board that the indemnity was

14  important to Mr. Levandowski and the Ottomotto team; correct?

15  A.   Yes.

16  Q.   Mr. Kalanick told the board that Uber hired a third party

17  to conduct due diligence into Mr. Levandowski and Ottomotto;

18  correct?

19  A.   That is correct.

20  Q.   And Mr. Kalanick told the board that the due diligence had

21  come back clean; right?

22  A.   I was left with the perception after the presentation that

23  the due diligence work had come back clean or positive, yes.

24  Q.   Mr. Kalanick said that at the meeting, didn't he?

25  A.   I was left with that impression; I don't know if he used

 1    that exact phrase or not.

 2    Q.   Your understanding is that a third party was hired, and it

 3    came back clean; right?

 4    A.   That is my understanding, correct.

 5    Q.   And that's based on the presentation that was made at the

 6    board meeting; correct?

 7    A.   Yes.

 8    Q.   Other than the Ottomotto acquisition, you've never heard

 9    of a deal that referred to bad acts; correct?

10    A.   That is correct.

11    Q.   You can't name any other transaction that you've been

12    involved in, other than the Ottomotto deal, that had a

13    provision that indemnified employees of the seller for past

14    trade secret misappropriation; correct?

15    A.   That is correct.

16    Q.   And you've never even heard of another acquisition in

17    which the seller required that the buyer indemnify them for

18    future lawsuits for misappropriation of trade secrets; correct?

19    A.   In my experience, I have not.

20         MR. VERHOEVEN:   Thank you.   Pass the witness.

21         THE COURT:   Thank you.

22         MS. DUNN:   I have the opposite problem from

23    Mr. Gurley.

24

25

1                        **<u>CROSS-EXAMINATION</u>**

2    **BY MS. DUNN:**

3    **Q.**   Mr. Gurley, I'm Karen Dunn.  I'm one of the lawyers for

4    Uber.  And I just have a few questions for you this morning.

5    **A.**   Okay.

6    **Q.**   Mr. Gurley, you're no longer a member of the board at

7    Uber?

8    **A.**   That is correct.

9    **Q.**   And, as a member of the board at Uber, you voted to

10   approve the Otto deal; is that right?

11   **A.**   That is correct.

12   **Q.**   All right.  And that vote was unanimous?

13   **A.**   That is correct.

14   **Q.**   Okay.  And at the time you voted to approve the Otto deal

15   along with all the other members of the board, you knew that

16   the indemnity had the buyer indemnifing the seller; is that

17   correct?

18            **MR. VERHOEVEN:**  I'm just going to object.  This is all

19   leading, Your Honor.

20            **THE COURT:**  Well, he's not on the board anymore;

21   right?

22            **THE WITNESS:**  I'm not.

23            **THE COURT:**  So I'm going to say it's okay for you to

24   lead this particular witness.

25            **MS. DUNN:**  Thank you, Your Honor.

1  BY MS. DUNN:

2  Q.   Mr. Gurley, I'll just restate for ease.

3       At the time that you and the other members of the board

4  voted to approve the Otto acquisition, it was clear at that

5  time that it was an acquisition where the buyer, Uber, was

6  indemnifing the seller, Otto?

7  A.   Yes.

8  Q.   Is that right?

9  A.   That is correct.

10 Q.   And, at that time, you did not think that the indemnity

11 was far-fetched, did you?

12      MR. VERHOEVEN:   Objection.   Leading.

13      And, Your Honor, just for the record, Benchmark is a

14 current major stockholder and his partner is on the board.

15      THE COURT:   Well, I'm still going to let her do a

16 cross with the leading questions.

17      All right.   The question was, "Did you think the indemnity

18 was far-fetched?"

19      THE WITNESS:   I thought it was atypical, as I said

20 before.   And, because of that, there was a lot of discussion

21 about it.

22      MS. DUNN:   I'm going to read, Your Honor, from

23 Mr. Gurley's October 24, 2017, deposition.

24      THE COURT:   All right.   Now, you need to read it

25 exactly, including anything that's -- you know, things that

1  lawyers say in between that might give meaning to the answer.

2  But read it exactly.

3       And, again, this is evidence that the jury can consider.

4       Please go ahead.

5           MS. DUNN:  (Reading)

6       "QUESTION:  Are you aware of any acquisition

7       agreements in which the buyer indemnifies the seller?

8       "ANSWER:  I think that that has happened in other

9       transactions.  I don't have any specifics, but it

10      doesn't sound far-fetched to me."

11 BY MS. DUNN:

12 Q.  Mr. Gurley, you were asked by Mr. Verhoeven whether

13 Mr. Kalanick told you at the board meeting that the due

14 diligence had come back clean.  Do you remember that?

15 A.  Yes.

16 Q.  And your testimony is that you don't remember specifics

17 that were made at the board meeting about what the diligence

18 turned up; isn't that right?

19 A.  I was left with the impression in the board meeting that

20 the diligence had turned up nothing.

21          MS. DUNN:  Your Honor, I'm going to read from

22 Mr. Gurley's August 24, 2017, deposition.

23          THE COURT:  What page and line, please?

24          MS. DUNN:  61/23 to 62/14.

25          THE COURT:  Go ahead.

1          MS. DUNN:  There is an interspersed objection to

2    instruct Mr. Gurley not to answer revealing anything that is

3    privileged, but nothing substantive.  And we can show the

4    transcript on the screen.

5          THE COURT:  Go ahead.  Put it on the screen and read

6    it thoroughly into the record.

7          MS. DUNN:  Thank you, Your Honor.

8          "Q.          Was the question asked, what did the due

9          diligence turn up?

10         "A.          Once again, not remembering specific

11         statements that were made, the general perception that

12         I had, yeah, it would be repetitive of something I

13         already said, which was there was -- the board was

14         left with a generic opinion that the due diligence

15         process had been clean and positive."

16   BY MS. DUNN:

17   Q.   And, Mr. Gurley, as to the assertion that the diligence

18   effort had been positive, you are not completely sure if

19   Mr. Kalanick made that statement or if that statement had been

20   made by one of the deal team members, possibly Mr. Percher;

21   isn't that right?

22   A.   In an effort to be as helpful as possible, I'll state

23   generically what happened, and then we can get into esoteric

24   details if we want to.

25         There was a discussion about the indemnity.  There was a

1    discussion about it being atypical.  That led to questions

2    about why we were okay with that.  That led to a discussion

3    about the due diligence that had been done.  And we as a group

4    made a decision that we're going to move forward because the

5    due diligence was okay.

6         And so I don't --

7    **Q.**  Mr. Gurley --

8    **A.**  -- know whether it was -- I can't remember specifically

9    the words that were said from two years ago, and I don't know

10   whether -- which member of the management team may have exactly

11   said this or that.  But that's the general story of what

12   happened.

13   **Q.**  I appreciate it, and I understand.

14   **A.**  Okay.

15   **Q.**  And I just want to confirm.

16        So when you're testifying that you remember the diligence

17   came back positive, as you just testified, you can't remember

18   what management -- what member of the management team actually

19   said that, can you?

20   **A.**  Okay.

21   **Q.**  Is that a yes?

22   **A.**  Yes.

23   **Q.**  Thank you.

24        And as far as you know, Mr. Gurley, no trade secrets have

25   ever come from Google to Uber or Otto, isn't that right?

**CRAIN - DIRECT / BAILY**

```
 1   A.    As far as I know, yes.

 2              MS. DUNN:  Thank you, sir.  I pass the witness.

 3              THE COURT:  All right.  May the witness be excused?

 4              MR. VERHOEVEN:  I have no further questions, Your

 5   Honor, and the witness may be excused.

 6              THE COURT:  All right.

 7         Agreed?

 8              MR. GONZÁLEZ:  Yes.

 9              MS. DUNN:  Agreed.

10              THE COURT:  Thank you.  Mr. Gurley, thank you, sir.

11         (Witness excused.)

12              THE COURT:  Next witness.

13              MS. BAILY:  Waymo calls Andy Crain.

14              THE CLERK:  Will the witness please approach the

15   witness stand.

16              THE COURT:  Welcome, Mr. Crain.  Please raise your

17   right hand to take an oath to tell the truth.

18                        CRAIN CRAIN,

19   called as a witness for the Plaintiff, having been duly sworn,

20   testified as follows:

21              THE CLERK:  Please state your name for the court and

22   spell your last name for the record.

23              THE WITNESS:  Andy Crain.  Last name C-r-a-i-n.

24

25
```

1          <u>DIRECT EXAMINATION</u>

2     BY MS. BAILY:

3     Q.   Good morning, Mr. Crain.

4     A.   Good morning.

5     Q.   Can you introduce yourself to the jury, please.

6     A.   Yes.  My name is Andy Crain.  I work as the vice president

7     of forensics for a consulting firm called Lighthouse.  I live

8     in the Portland, Oregon, area.  I'm married, with two young

9     children.

10    Q.   You mentioned forensics.  What is forensics?

11    A.   So forensics for me is computer forensics.  And, more

12    specifically, the analysis of digital evidence, where we're

13    looking at evidence after the fact, trying to essentially

14    reconstruct a picture of what's happened on a computer.

15    Q.   And how long have you worked in the field of computer

16    forensics?

17    A.   Since 2001.

18    Q.   How many forensic investigations have you been involved

19    in?

20    A.   Many hundreds.

21    Q.   Do you have specialized training in computer forensics?

22    A.   I do.  Over the years, I've completed a variety of

23    different training courses about different pieces of forensics.

24    I've also earned a number of computer forensics industry

25    certifications.

**CRAIN - DIRECT / BAILY**

1           These are certifications that require kind of multiple

2    modules of testing, periodic renewal based on continuing

3    education requirements.  Some of them are kind of alphabet

4    soup.  I have one called Certified BlackLight Examiner, which

5    is specific to Mac computers.

6    Q.   Have you ever given expert testimony in the field of

7    computer forensics?

8    A.   I have.  I've testified about 20 times between depositions

9    and trials.

10   Q.   Mr. Crain, are you being paid for your time in this case?

11   A.   I just receive a salary from my employer, and then my

12   employer bills an hourly rate for my time.

13   Q.   What is that hourly rate?

14   A.   We charge $325 an hour for forensic analysis and $350 an

15   hour for testimony work.

16   Q.   Does that payment depend in any way on the outcome of this

17   case?

18   A.   No, it does not.

19   Q.   Were you retained as an expert witness for Waymo in this

20   case?

21   A.   Yes, I was.

22   Q.   What were you asked to do?

23   A.   So my role was to try to help determine if the Stroz

24   investigation had been effective at identifying and

25   quarantining Google information that may have been retained by

1   Mr. Levandowski or the other diligenced employees.

2   **Q.**   What did you do to investigate that issue?

3   **A.**   So my team and I analyzed a variety of evidentiary data

4   sets -- these are the evidence that we heard about in prior

5   testimony -- that Stroz captured.  And we were essentially

6   looking for the presence of Google information or evidence

7   indicating that Google information may have been transferred to

8   devices that were not provided to Stroz.

9   **Q.**   And what did you conclude as a result of your forensics

10  investigation?

11  **A.**   In the course of our work, we located evidence indicating

12  that the 14,107 files that we heard Mr. Brown testify about

13  were copied onto the personal MacBook of Mr. Levandowski as

14  well as being transferred from that computer to external

15  storage media.

16  **Q.**   Let's back up and talk about your forensic investigation

17  step by step.  Okay?

18  **A.**   Okay.

19  **Q.**   What was the first thing you did in your investigation?

20  **A.**   The very first thing was to go to the offices of Stroz

21  here in San Francisco and pick up copies of the evidence.

22         And, from there, we kind of began work with specific focus

23  on the personal MacBook of Mr. Levandowski.

24  **Q.**   Did you take an inventory of the files that were stored on

25  Mr. Levandowski's laptop?

1    A.    Yes, we did, as well as a variety of the other evidentiary

2    data sets.  We essentially prepare listings, like a big table,

3    in Excel of the files and folders that are stored on each

4    device.

5            MS. BAILY:  Can we publish Exhibit 12047 only to the

6    witness, please.

7    BY MS. BAILY:

8    Q.    Let me know when you have it, Mr. Crain.

9    A.    Yes, I can see it now.

10   Q.    What is this?

11   A.    So this is the file and folder listings that I was just

12   describing.

13           MS. BAILY:  Your Honor, we'd move into evidence

14   Exhibit 10247.

15           MR. GONZÁLEZ:  No objection, Your Honor.

16           THE COURT:  10247 in evidence.

17   (Trial Exhibit 10247 received in evidence.)

18   (Document displayed.)

19           MS. BAILY:  Mr. Fisher, could you please publish that.

20   BY MS. BAILY:

21   Q.    Mr. Crain, could you very quickly walk us through just the

22   fields -- the high-level fields in this exhibit.

23   A.    Sure.

24          So Column A is path.  That's just the directory path that

25   the file is stored in on the computer.  And there's probably

 1    columns as we scroll out there.  Thank you.

 2        The file extension, the size of the file.  Some of the

 3    dates associated with the file, like when it was created, last

 4    written, last accessed.  We heard some testimony about that.

 5        The name of the file.  These are the types of metadata

 6    that we heard described earlier that the computer stores

 7    relative to the files on the device.

 8    Q.   Now, I think you had testified that, after you picked up

 9    the devices, you started your investigation with

10    Mr. Levandowski's personal laptop?

11    A.   Correct.

12    Q.   Why did you do that?

13    A.   Well, at the point I came into this investigation, Google

14    had already identified that Mr. Levandowski had downloaded the

15    14,107 files using his Google-issued laptop and then had

16    connected an SD card reader to that computer in December of

17    2015.

18        So it was kind of a logical place for us to pick up to see

19    if we could find evidence relative to SD cards, the 14,000

20    files around that time frame.

21    Q.   Did you find evidence that the SD card that had been

22    plugged into Levandowski's -- Mr. Levandowski's Google laptop

23    had then been connected to Mr. Levandowski's personal laptop?

24    A.   Yes, we did.

25    Q.   Did you find evidence that the 14,107 Google files that

1   were on that SD card were copied from that card to

2   Mr. Levandowski's personal laptop?

3   **A.**   Yes, we did.

4   **Q.**   Let's take each of those separately.

5        How did you conclude that Mr. Levandowski inserted the

6   memory card into his personal laptop?

7   **A.**   We used a forensic artifact, which is called FS events.

8   **Q.**   What is FS events?

9   **A.**   So FS events is an artifact specific to the Mac operating

10  system.   I believe it stands for file system events.   And it

11  creates a log of certain activities that have happened on that

12  computer -- excuse me -- on that computer.

13  **Q.**   Does FS events capture everything that's happened on a

14  computer?

15  **A.**   No.   It doesn't give us a complete record of everything,

16  but it does provide reliable and helpful information about

17  things like files being created, files being deleted.   And, in

18  this instance, external media being connected.

19  **Q.**   Were you able to look at the FS events artifact from

20  Mr. Levandowski's personal laptop?

21  **A.**   Yes.   So that artifact is part of the forensic image of

22  that laptop that Stroz had captured in March of 2016 when

23  Mr. Levandowski delivered it to Stroz.

24        **MS. BAILY:**   Mr. Fisher, can we publish to the witness

25  only Exhibit 5119.

 1              THE WITNESS:  I can see it.

 2   BY MS. BAILY:

 3   Q.   Mr. Crain, what is this?

 4   A.   So this is the FS events artifact that we've been

 5   discussing from the Levandowski personal MacBook.

 6            MS. BAILY:  Your Honor, I'd move to introduce into

 7   evidence Exhibit 5119.

 8            MR. GONZÁLEZ:  No objection.

 9            THE COURT:  Received.

10        (Trial Exhibit 5119 received in evidence.)

11            MS. BAILY:  Let's publish this.

12        (Document displayed.)

13   BY MS. BAILY:

14   Q.   Mr. Crain, can you explain to us how you used the FS

15   events file to conclude that Mr. Levandowski connected the

16   memory card with the Google files to his personal laptop.

17   A.   Sure.  So we talked a moment ago about how the -- we knew

18   that on around 6:14 p.m. on December the 14th, 2015, the card

19   reader had been disconnected from the Google laptop.  So we

20   zeroed right in on that time and after that to see what was

21   happening on the personal MacBook.

22   Q.   And did you find anything at 6:14 p.m. on December 14th on

23   the personal laptop?

24   A.   Yes, we did.

25            MS. BAILY:  Mr. Fisher, you can you go to cell

1    F186871.

2    **BY MS. BAILY:**

3    **Q.**   Mr. Crain, once this comes up --

4         **MS. BAILY:**  This should be published, please.

5         (Document displayed.)

6    **BY MS. BAILY:**

7    **Q.**   So you can see here Mr. Fisher has the box around the cell

8    that I just described.  And, Mr. Crain, can you tell us what

9    you see here?

10   **A.**   So this is FS events telling us that a volume with the

11   name "64GB" is being created or mounted on the computer.  So

12   that tells us that that device with that volume name is being

13   connected to the personal MacBook at that time.

14   **Q.**   Now, we had talked about this time being the same time

15   that the device had been disconnected from the Google laptop.

16   But here it says 2:14 a.m.  Can you explain that?

17   **A.**   Sure.  So you see the UTC there.  It's just a time zone

18   adjustment.  Many computer artifacts store date and time values

19   in this UTC time zone.  So when you do the adjustment,

20   02:14 a.m. on December the 15th correlates to 6:14 p.m. on

21   December the 14th in San Francisco.

22   **Q.**   And that was the time that the SD card reader had been

23   disconnected from Mr. Levandowski's Google laptop; correct?

24   **A.**   That's correct.

25   **Q.**   How were you able to determine that the Google files were

CRAIN - DIRECT / BAILY

1  copied from the memory card to Mr. Levandowski's personal

2  laptop?

3  A.   We can determine that from FS events as well.

4        MS. BAILY:   Mr. Fisher, can we go to cell D187156.

5        (Document displayed.)

6  BY MS. BAILY:

7  Q.   Do you see that highlighted there?

8  A.   I do.

9  Q.   Tell the jury what we're looking at, please.

10 A.   So here we see a new folder being created on the desktop

11 of the personal MacBook.  And that folder is given the name

12 "Boards."

13 Q.   Was anything copied into the Boards folder?

14 A.   Yes, it was.

15 Q.   How can you tell?

16 A.   So in the lines that follow in FS events, we see a

17 subfolder get created, and then we start to see the 14,107

18 files be populated into that directory structure.

19       MS. BAILY:   Let's go to cell D187910.

20 BY MS. BAILY:

21 Q.   Mr. Crain, what do you see here?

22 A.   So this is another folder being created with the name

23 "Chauffeur-svn."  It's a subfolder to the board's folder that

24 we just saw get created.

25 Q.   Is this folder being created on Mr. Levandowski's personal

1   laptop?

2   **A.**   That's correct.

3   **Q.**   What is Chauffeur-svn, in your understanding?

4   **A.**   My understanding is Chauffeur was the name of the Google

5   self-driving car project, and SVN is essentially the server at

6   Google from where Mr. Levandowski downloaded the 14,107 files.

7   **Q.**   Now, could you determine whether all those Google files

8   were copied into this folder on Mr. Levandowski's personal

9   laptop?

10   **A.**   Yes, we could.

11   **Q.**   And what did you conclude?

12   **A.**   So we compared the 14,107 files by name, as evidenced by

13   the SVN log on the Google side, to the 14,107 files being

14   copied onto the personal MacBook here, as evidenced by FS

15   events, and found that they were a perfect match by name.

16   **Q.**   So now the Google files have gone from the SD card to

17   Mr. Levandowski's personal laptop.  What then happens to the SD

18   memory card that the Google files had been on?

19   **A.**   FS events will show us that the card is then disconnected.

20        **MS. BAILY:**  Mr. Fisher, can you bring up G215362.

21        (Document displayed.)

22   **BY MS. BAILY:**

23   **Q.**   What does this show, Mr. Crain?

24   **A.**   So similar to the connection event we talked about a

25   moment ago, you see unmounted there is the flag.  This is

CRAIN - DIRECT / BAILY

1  telling us that that volume named 64GB is being unmounted or

2  disconnected from the personal MacBook.

3  Q.   And at the time it's disconnected, are Google's files

4  still on the memory card?

5  A.   I believe they are.

6  Q.   And do you know where the memory card is now?

7  A.   I don't.  I don't believe it was part of the devices that

8  Mr. Levandowski provided to Stroz.

9  Q.   And Stroz did not provide you with the SD memory card?

10  A.   That's correct.  I have never seen this evidence.  I don't

11  know where it is.

12  Q.   Did you find any evidence of what happened to the Google

13  files that are now on Mr. Levandowski's personal laptop?

14  A.   Yes.  So after the disconnection of the card, the files

15  are placed into what's called a sparse bundle.

16  Q.   So we've heard a little bit about sparse bundles already.

17  Can you just remind the jury what a sparse bundle is?

18  A.   So a sparse bundle is, again, specific to the Mac

19  operating system.  It's essentially a container file much like

20  a zip file, really, that allows you to compress the contents.

21       You might be able to move the file around more easily at

22  that point.  And also of note, that once the files are in the

23  sparse bundle, the 14,107 files are not detectable by name

24  anymore.

25  Q.   And how do you know that the Google files were put into a

1    sparse bundle?

2    A.    FS events tells us that again.

3         MS. BAILY:  Okay.  Let's go to E216906.

4         (Document displayed.)

5    BY MS. BAILY:

6    Q.    What does this show, Mr. Crain?

7    A.    So the highlighted line here just shows the creation of

8    the sparse bundle file with the name "boards.sparsebundle."

9    You see that it's for the path "document/nox."

10   Q.    How about the lines below that?  What do they show?

11   A.    So a bunch of these lines that follow that say "bands,"

12   this evidences the 14,107 files being copied into that sparse

13   bundle.  Those bands are how a sparse bundle stores its

14   contents.

15   Q.    Do you know, Mr. Crain, what happened after the Google

16   files were copied from the Boards folder on Mr. Levandowski's

17   laptop on its desktop to the boards.sparsebundle?  What

18   happened after that?

19        THE COURT:  Wait, wait, wait.  Now you're confusing me

20   because you referred to Levandowski's laptop and then I think

21   you said "or desktop."

22        MS. BAILY:  Sorry.  It's the desktop of the laptop.

23   But let me just ask it more straightforward.

24        THE COURT:  Let's be clear here.

25

 1  BY MS. BAILY:

 2  Q.   What happened after the Google files were copied from the

 3  Boards folder on the laptop to the boards.sparsebundle on the

 4  laptop?

 5  A.   So the copy that was made onto the Boards folder of the

 6  desktop -- and I don't mean desktop computer, excuse me --

 7  those files were then deleted.

 8  Q.   Were the 14,107 Google files still somewhere on

 9  Mr. Levandowski's personal laptop?

10  A.   Yes.  They're still in the sparse bundle at that point.

11          THE COURT:  When you refer to personal laptop, is that

12  the Mac?

13          THE WITNESS:  Yes.

14          THE COURT:  What's it's called, Mac Pro?

15          THE WITNESS:  MacBook Pro, I think is the full name.

16          THE COURT:  All right.  So you've been using those

17  interchangeably, but those are the -- that's the same unit.

18          THE WITNESS:  It is.  Excuse me.  Sorry.

19          THE COURT:  Okay.

20          MS. BAILY:  Thank you, Your Honor.

21      Mr. Fisher, let's go to E234492.

22      (Document displayed.)

23  BY MS. BAILY:

24  Q.   Mr. Crain, what does this show?

25  A.   So this section of FS events is showing the 14,107 files

1   that had been copied into the Boards folder being removed from

2   the computer's trash.

3   Q.   And just to be clear, at this point, are the 14,107 Google

4   files still on Mr. Levandowski's laptop?

5   A.   Yes, in the sparse bundle format.

6   Q.   Did you find any evidence of what happened to that sparse

7   bundle containing the Google files?

8   A.   Yes.  We determined that there were at least two more

9   identical copies of the sparse bundle created.

10  Q.   And how do you know that?

11  A.   We determined that using a different forensic artifact,

12  something we called Nox plist.

13  Q.   What is Nox plist?

14  A.   So in Mac, plist is a type of file that stores settings

15  and configuration-type info for an application.  So the Nox

16  application that was used to create the sparse bundle, its

17  settings file is the Nox plist.

18  Q.   Did you obtain a Nox plist file from Mr. Levandowski's

19  laptop?

20  A.   Yes, I did.  That file is a piece of the forensic image of

21  Mr. Levandowski's personal MacBook that was captured.

22  Q.   Could you please take a look in the binder in front of you

23  at Exhibit TX-5124.

24       Once you have it, is that the Nox plist file from

25  Mr. Levandowski's laptop?

1  A.    Yes.   This is what's called the Nox saved backup info,

2  which is part of the Nox plist file we're discussing.

3           MS. BAILY:  Your Honor, I'd move into evidence

4  Exhibit 5124.

5           MR. GONZÁLEZ:  No objection, Your Honor.

6           THE COURT:  Thank you.  Received.

7       (Trial Exhibit 5124 received in evidence.)

8  BY MS. BAILY:

9  Q.    It's now up on the screen.

10      Mr. Crain, what does this show in rows 10 through 12?

11  A.    So if we could scoot over a little.  I can't really see 10

12  through 12.  I'm sorry.  To the left.  Are we seeing the line

13  numbers?

14      Anyways the highlighted lines, I think, are 10 through 12.

15  So here, we're seeing the three copies of the sparse bundle

16  with the names _boards, boards, and _boardscopy.

17  Q.    Now, can you -- Mr. Crain, did you see any evidence that

18  any of these three sparse bundles were being transferred from

19  Mr. Levandowski's computer to some other device?

20  A.    Yes, I did.

21  Q.    How many instances did you find?

22  A.    We found two instances of that sparse bundle being stored

23  on external media, but it's important to note there could be

24  more.

25  Q.    So let's take that step by step.

CRAIN - DIRECT / BAILY

1      What's the first instance that you found of a sparse

2    bundle with the 14,107 Google documents being transferred from

3    Mr. Levandowski's computer to some other device?

4    A.    The first example is depicted on the screen in line 12,

5    where we can see that the copy with the name _boardscopy is

6    stored on the Drobo 2 device.

7    Q.    And can you quickly remind the jury what a Drobo device

8    is.  We've heard that already.

9    A.    It became famous this week.

10      A Drobo is essentially an external storage device.  It's

11   about the size of a shoebox.  It has trays that you can insert

12   hard drives into.  And it results in you having a very

13   large-capacity external storage device.

14   Q.    And which sparse bundle was copied onto the Drobo?

15   A.    So we have evidence here, as I mentioned in line 12, the

16   one with the name _boardscopy.

17   Q.    You said there was another instance where you saw proof

18   that a sparse bundle containing the Google files was

19   transferred from the laptop to some other device.  What's the

20   second example?

21   A.    Second example was around December the 27th, 2015, where

22   FS events showed us that one of the sparse bundles had been

23   deleted and then very shortly thereafter was recreated on the

24   laptop.

25   Q.    And what does that tell you?

**CRAIN - DIRECT / BAILY**

1   A.   That tells us that it -- it had to come back onto the

2   laptop from somewhere, hence an external location.

3   Q.   And can you tell which external device the Google files

4   were on such that they could come back onto the laptop?

5   A.   In that December 27th event, we could not conclusively

6   establish which external storage device they came back from.

7   There were several different external storage devices being

8   connected and disconnected that day.

9   Q.   Okay.  And we'll look at that in a moment.

10      In addition to the two examples of the transfer activity

11  that you described, do you know whether those were the only

12  times that the sparse bundles were transferred off of

13  Mr. Levandowski's computer to some other device?

14  A.   We can't know conclusively that those are the only ones

15  because the act of transferring the sparse bundle off of the

16  computer is not specifically recorded.  We have to rely on

17  separate evidence like the Nox plist to make that

18  determination.

19  Q.   Did you do any work to determine what external devices

20  were connected to Mr. Levandowski's laptop while Google's files

21  were on the laptop?

22  A.   Yes, we did.

23  Q.   What did you find?

24  A.   So we examined a variety of different forensic artifacts

25  that are part of that forensic image of the Levandowski

1  personal MacBook, and we essentially summarized all that in a

2  table.

3  Q.   Can you look in your binder.  It might be behind something

4  called 5123.

5  A.   Okay.

6  Q.   Is this the summary you prepared of the external devices?

7  A.   Yes, it is.

8        MS. BAILY:  Your Honor, we're going to show this as a

9  demonstrative DX1.

10       THE COURT:  All right.  Go ahead.

11     (Document displayed.)

12  BY MS. BAILY:

13  Q.   Can you describe --

14       THE COURT:  Let me say to the jury, this is not going

15  to be in evidence in the jury room because it's only to

16  illustrate the testimony, as Counsel has said.  So if there's

17  something in there you want to remember, you better make a note

18  of it.

19     All right.  Go ahead.

20  BY MS. BAILY:

21  Q.   All right.  Just remind the jury now again what this is,

22  now that they can see it.

23  A.   So this is the table summarizing the various evidence of

24  external storage devices that were connected to the Levandowski

25  personal MacBook after December the 14th, 2015, when we found

1   that the 14,000 files had been copied onto the computer.

2   **Q.**   And just to be clear, were all of these devices connected

3   to the laptop while the 14,000 files were still on the laptop?

4   **A.**   At least most of them.  We also saw some evidence that at

5   some point the sparse bundle, or at least one of the sparse

6   bundles, had been deleted from the laptop.  I think that's

7   February the 9th.

8       So you can see a number of these are in between

9   December 14th, 2015, and February 9th, 2016.  And then you

10  have, I think, evidence of a few that postdate February 9th,

11  2016.

12  **Q.**   And did you include the postdated ones because you

13  couldn't determine exactly when the other sparse bundles may

14  have been deleted from the laptop?

15  **A.**   That's part of the reason, yes.

16  **Q.**   So just remind the jury, then, of the date range on which

17  you know that the 14,000 files were on the laptop.

18  **A.**   In between December the 14th, 2015, and at least

19  February 9th, 2016.

20  **Q.**   So what conclusions can you draw from the summary you

21  prepared with respect to the devices that were connected

22  between those two dates?

23  **A.**   You have a lot of devices that were not provided to Stroz

24  and which were connected during the time period that we know he

25  possessed the 14,107 files.  So we can't foreclose that those

CRAIN - DIRECT / BAILY

 1  files might be on any of these devices.

 2  Q.   Now, I see a line item here where the volume name is

 3  "NEWCO."  What does that mean?

 4  A.   So that would be the volume name that was given to that

 5  device, essentially, as it was formatted.

 6  Q.   So a human gave the name NEWCO to an external device?

 7  A.   Almost certainly.  Sometimes devices come with a generic

 8  name.  So like two lines below, store and go, my sense is

 9  that's probably a generic out-of-the-box one.  I don't think

10  NEWCO, especially in this context, would be a generic one.

11  Q.   And what do you know about the external device that was

12  named NewCo?

13  A.   So, again, FS events, as depicted on the table, gives us

14  evidence that that device was connected and disconnected from

15  the Levandowski personal MacBook on January 14th and

16  January 15th, 2016.

17  Q.   And that's within the range of time that we know that the

18  14,000 Google files were on the laptop?

19  A.   Correct.

20  Q.   Let's just look at the underlying evidence.  Let's go to

21  FS events.  Let's look at E414154.

22       Mr. Crain, what does this show?

23  A.   So this is FS events showing what I just described, the

24  connection of a volume or a device with the volume name "NEWCO"

25  to the Levandowski personal MacBook.

1  Q.   And just to be clear for the record, we're now looking at

2  Exhibit 5119.

3       Let's go to E414202.

4       Mr. Crain, what does this show?

5  A.   I think this is the second instance that we were just

6  describing of the device we're calling named NEWCO being

7  disconnected from the Levandowski personal MacBook.

8  Q.   So could the 14,107 Google files been transferred from

9  Mr. Levandowski's personal laptop to an external device named

10  NEWCO?

11  A.   Certainly.

12  Q.   What is your understanding of what NewCo means in the

13  context of this case?

14  A.   I've just been attending the trial this week and

15  understand, I guess, that was the shorthand or the code name

16  for the entity that Mr. Levandowski was going to form that

17  later became Ottomotto.

18  Q.   And did you want to do anything to confirm that the Google

19  files were transferred from Mr. Levandowski's computer to the

20  NEWCO device?

21  A.   Sure.  We'd want to examine the device.

22  Q.   Did you try to do that?

23  A.   I didn't have access to the device.

24  Q.   Why is that?

25  A.   This device wasn't provided to Stroz.

CRAIN - DIRECT / BAILY

1  Q.   And so Stroz couldn't provide it to you?

2  A.   Correct.

3  Q.   Having walked through at least this portion of your

4  investigation, can you tell the jury, what was your overall

5  conclusion based on your entire forensics investigation in this

6  case?

7  A.   Well, the evidence of the 14,107 files being copied onto

8  the personal MacBook, transferred to external media, and this

9  evidence of external media that wasn't provided to Stroz, leads

10  me to conclude that the Stroz investigation was not effective

11  at quarantining Google information.

12  Q.   Could the 14,000 Google files be with Mr. Levandowski?

13       MR. GONZÁLEZ:   Objection, Your Honor.   Calls for

14  speculation.   He's (inaudible).

15       THE COURT:   That calls for speculation.

16  BY MS. BAILY:

17  Q.   Well, the evidence, Mr. Crain, your forensics

18  investigation, tell us again what it showed with respect to

19  where the 14,000 Google files are now.

20  A.   Well, we identified that they were on the 64-gig SD card,

21  at one point on the laptop, transferred to the Drobo 2 device,

22  and then, obviously, the inability to foreclose whether they

23  could have gone to all of these other external devices that

24  were connected and not provided.

25  Q.   Do you know where the SD memory card is?

 1   A.   No, I do not.

 2   Q.   And you don't know where this NewCo device is?

 3   A.   I do not.

 4   Q.   You didn't get those from Stroz?

 5   A.   That's correct.

 6        MS. BAILY:  Pass the witness.

 7        THE COURT:  Okay.  Let's go to Mr. González.

 8        MR. GONZÁLEZ:  Thank you, Your Honor.

 9                     CROSS-EXAMINATION

10   BY MR. GONZÁLEZ:

11   Q.   Sir, you said that the 14,000 files were transferred to a

12   Drobo device; right?

13   A.   In the form of the sparse bundle, yes.

14   Q.   You don't have any evidence that they were actually

15   transferred to any other device, do you?

16   A.   That's kind of the whole point, is that we don't have the

17   devices to examine.

18   Q.   Do you have any evidence that the files were transferred

19   to any other device?  Just yes or no.

20   A.   With the obvious inclusion of the 64-gig card, I don't

21   have affirmative evidence of that because we don't have the

22   devices to examine.

23   Q.   Sir, there were three other people who helped you with

24   your research; true?

25   A.   Correct.

1   Q.   And you, yourself, spent hundreds of hours on this

2   engagement, didn't you?

3   A.   I did.

4   Q.   And the other three people on your team also spent

5   hundreds of hours on this engagement; right?

6   A.   Certainly communally, certain different amounts.

7   Q.   After spending hundreds of hours with three colleagues, do

8   you have any evidence that the 14,000 files ever made to it an

9   Uber computer?

10   A.   I didn't examine any Uber computers.

11   Q.   Is the answer no?

12   A.   No, that wasn't my role in the investigation.

13   Q.   Do you have any evidence that any of the 14,000 files ever

14   made it to an Uber server?

15   A.   Same answer.

16   Q.   How about Otto?  Do you have any evidence, after hundreds

17   of hours, that anything ever made it to an Otto computer or

18   server?

19   A.   No.  Same answer.  I didn't analyze any of that stuff.

20   Q.   Thank you.

21          THE COURT:  Any more?

22                    REDIRECT EXAMINATION

23   BY MS. BAILY

24   Q.   Mr. Crain, is there any evidence to suggest that the

25   14,000 files did not make its way -- make their way onto the

 1  NewCo device that was connected to Mr. Levandowski's computer

 2  while the 14,000 files were on that computer?

 3       MR. GONZÁLEZ:  Objection, Your Honor.  That's a jury

 4  issue.  "Suggest" is vague and calls for speculation.

 5       MS. BAILY:  I'm just asking the same questions that

 6  Mr. González just asked, Your Honor.

 7       THE COURT:  Go ahead.  Overruled.  Please answer the

 8  question.

 9       THE WITNESS:  I'm sorry.  Could you say your question

10  one more time again?  I'm a little distracted.

11  BY MS. BAILY

12  Q.   Sure.

13       Do you have any evidence that suggests that the 14,000

14  Google files were not transferred to the NewCo device that was

15  connected to his computer while the 14,000 files were on that

16  computer?

17  A.   No.  We cannot foreclose that.

18       MS. BAILY:  Thank you.

19       THE COURT:  I've got a question.  These 14,000 files

20  -- let me start over.

21       I understand that you have the ability to identify what

22  external drive or storage device is attached; right?

23       THE WITNESS:  Correct.

24       THE COURT:  All right.  And what I'm confused on is,

25  are you also able to know, for the 14,000 files that are on the

1   computer itself, can you tell whether or not those 14,000 went

2   over to a particular storage device, like the Drobo thing, or

3   are you just saying it's a possibility?

4         THE WITNESS:  So the transfer itself is not recorded.

5   So we don't have direct evidence of that.  The way that we get

6   there is by using some sort of separate evidence that, in some

7   situations, can prove that.

8      So the example of the Nox plist, which keeps information

9   about the Nox application, the Nox application interacted with

10  that sparse bundle as it was stored on Drobo and, therefore,

11  recorded it in the plist.

12     So you sometimes can determine that, but it's through the

13  use of separate evidence, not direct evidence of the transfer

14  itself.

15        THE COURT:  Well, okay.  But in this case were you

16  able to determine definitively whether or not the 14,000 files

17  went from the computer to any other particular storage device?

18        THE WITNESS:  Not definitively.  Again, with the

19  exception that we knew they were on the 64 gig SD card to begin

20  with.

21        MS. BAILY:  Your Honor, can I just ask two questions

22  to the --

23        THE COURT:  Yeah.  Go ahead.

24  BY MS. BAILY

25  Q.   You did give two instances where you found that other

1  evidence of transfer of the 14,000 files; right?

2  A.    Correct.  We talked about that.

3  Q.    So there were two instances where you could confirm the

4  transfer of the 14,000 files to an external device?

5  A.    Sure.  The first being Drobo via the Nox plist and the

6  second being that deletion event and recreation event on the

7  27th, where it had to come from somewhere but we couldn't say

8  specifically which device it came from.

9  Q.    So in that instance, you know that the 14,000 files were

10  on an external device.  You don't know the name of it in that

11  instance, but they had to be there to then be copied back onto

12  the device.  That's the additional proof that a transfer

13  happened; right?

14  A.    Correct.

15  Q.    And with respect to all of the other devices that were

16  connected to Mr. Levandowski's computer at the time that the

17  14,000 files were on the computer, it is possible that they

18  were transferred to those other devices; correct?

19  A.    That's correct.

20  Q.    It's just because transfers aren't recorded directly, if

21  nothing else happened with the files during the transfer, then

22  you can't figure it out one way or the other; right?

23  A.    Correct.  If somebody doesn't go and open a file back from

24  the external location, something like that, we might not know.

25  Q.    So the 14,000 files, after your investigation, they could

1  still be -- they could have been transferred to the device

2  called NewCo which was connected to the laptop while the 14,000

3  files were there?

4  **A.**   We can't foreclose that.

5           **THE COURT:**  All right.

6           **MR. GONZÁLEZ:**  Your Honor, if I may.

7                    <u>**RECROSS-EXAMINATION**</u>

8  **BY MR. GONZÁLEZ**

9  **Q.**   Briefly.  You just said it's possible the 14,000 files

10  were transferred to another device; right?

11  **A.**   Correct.  We can't foreclose that.

12  **Q.**   But you don't have any proof that that happened, do you?

13  **A.**   I think you asked me this before.  I don't have

14  affirmative proof because I don't have the devices and the

15  transfer itself isn't logged.

16  **Q.**   All right.  Thank you.

17           **THE COURT:**  All right.  May Mr. Crain be excused?

18           **MS. BAILY:**  Yes, Your Honor.

19           **MR. GONZÁLEZ:**  Yes.

20           **THE COURT:**  Okay.  Mr. Crain, thank you for your

21  testimony.  Have a good day.

22       (Witness excused.)

23           **THE COURT:**  Next witness.

24           **MR. PERLSON:**  Good morning, Your Honor.  Waymo calls

25  Michael Janosko.

 1          THE COURT:  Good morning.  Welcome.  Please raise your

 2    right hand.

 3                        **MICHAEL JANOSKO**,

 4    called as a witness for the Plaintiff, having been duly sworn,

 5    testified as follows:

 6          THE WITNESS:  I do.

 7          THE CLERK:  Please state your name for the Court, and

 8    spell your last name for the record.

 9          THE WITNESS:  Michael Janosko, last name spelled

10    J-a-n-o-s-k-o.

11          THE COURT:  Welcome again.

12       Go ahead, Counsel.

13                      **DIRECT EXAMINATION**

14    BY MR. PERLSON

15    Q.   Good morning.  Once again, I'm David Perlson, counsel for

16    Waymo.

17       Mr. Janosko, where do you live?

18    A.   I live in San Francisco.

19    Q.   Are you married?

20    A.   I am.

21    Q.   Do you have any kids?

22    A.   I have a two-and-a-half-year-old son, Jack.

23    Q.   Where do you work?

24    A.   I work as a security engineering manager at Google.

25    Q.   Let's talk a little bit about your background.  Did you go

JANOSKO - DIRECT EXAMINATION / PERLSON

1    to college?

2    **A.**    Yes.  I went to Syracuse University, where I studied

3    computer engineering.  And then I got my Master's degree from

4    Syracuse University as well in computer engineering with a

5    focus on information assurance.

6    **Q.**    What's information assurance?

7    **A.**    It's basically computer security.

8    **Q.**    How did you end up in the security field?

9    **A.**    So, growing up I always had an interest in computers.  So

10   I was kind of intrigued in seeing them be more and more a part

11   of everyday life.

12        And then as I got into college, I saw this -- this

13   reliance on the security of those computers as being really

14   critical.  And it was kind of like a puzzle that, as a security

15   professional, I could kind of start to help people figure out

16   and secure those computers.

17   **Q.**    Did you work anywhere besides Google after getting your

18   graduate degree?

19   **A.**    Yes.  I started a short stint in the Air Force as a

20   contractor.  After that I went to Ernst & Young, where I did

21   assessments for Fortune 500 companies, helped them find

22   vulnerabilities and fix them.

23        And then I moved to the west coast, to Kaiser Permanente,

24   where I led a team that was focused on keeping the medical

25   devices and the healthcare systems that were connected to

JANOSKO - DIRECT EXAMINATION / PERLSON

 1  patients and delivered care safe.

 2  Q.   So when did you start working at Google?

 3  A.   In February 2016.

 4  Q.   And why did you go to Google?

 5  A.   I had an opportunity to work with what I believe is the

 6  best security team in the world.  Google is an innovative

 7  company.  And being part of the security of that innovation

 8  felt like a really exciting opportunity.

 9  Q.   How many people are on Google's security team?

10  A.   Last I checked, over 750.

11  Q.   And are you on a team within the larger security group?

12  A.   Yes.  I'm part of the Enterprise Infrastructure Protection

13  team.

14  Q.   Okay.  That's a bit of a mouthful.  What is the Enterprise

15  Infrastructure Protection team?

16  A.   We call it EIP for short because it's easier to say.  And

17  EIP is basically like the corporate security function for

18  Google.

19  Q.   Do you manage any teams within the -- within that group?

20  A.   So within EIP, I manage two teams:  the Platform

21  Security team and the Vendor Response team.

22  Q.   And what do those two teams do?

23  A.   The Platform Security team keeps the devices that are

24  managed by Google and Googlers use to do their jobs safe,

25  harden them from attack.

1       And the Vendor Response team, at Google we have a lot of

2   vendors.  So we want to make sure that they have the access

3   that's appropriate to do their job.

4   Q.   And how many people report to you?

5   A.   Ten.

6   Q.   Does your work at Google relate to Waymo at all?

7   A.   So Google is part of the Alphabet corporate structure, one

8   of the 'bets.  And Waymo is another one of the 'bets.  And

9   Google has been around for quite some time.  So as these --

10  these other 'bets exist and they use a lot of the

11  infrastructure that Google provides and manages.

12  Q.   So do your responsibilities in securing Google platforms

13  and services, does that involve also providing security

14  services for things -- Google services that Waymo uses?

15  A.   Yes.

16  Q.   Does Waymo use Google-managed devices in security?

17  A.   They do.

18  Q.   How do you know that?

19  A.   I personally verified it.  We have an inventory system

20  that shows the devices that are active, and I've used Waymo

21  user names to see those individuals being active on these

22  devices.

23  Q.   Since you've been at Google, you know, how has Google

24  enabled employees who use the Google infrastructure to do that

25  in a secure way?

 1   A.   So that's a very complicated question.  It's a very long,

 2   drawn-out answer.

 3        It's basically asking how you secure a company.  And you

 4   have to know a lot of the details of it because security can be

 5   injected into all layers of technology.

 6        But I think it's helpful to picture this in terms of,

 7   like, a simple kind of day-to-day.  Let's say someone using a

 8   Google-managed device opens their laptop to use Drive or their

 9   email.  They make a request to that site in their browser.

10   That goes over a network and it -- that request is fulfilled by

11   one of our data centers which is running that service.

12   Q.   You say the data center.  Can you tell the jury what a

13   data center is.

14   A.   A data center is a big building that holds all of Google's

15   computers, and there is many of them around the world.

16   Q.   Okay.  And what do these computers do?

17   A.   So they basically run Google services.  So anytime you go

18   to Google.com and do a search, if you use, like, email, Gmail,

19   if you use our Google cloud environment, that's all run out of

20   those data centers.

21   Q.   Do the data centers contain any data associated with these

22   applications?

23   A.   Yeah.  Absolutely.  To run these services they have to

24   have both the code that runs the software that you access in

25   the services, but, also, the data that -- that you're accessing

JANOSKO - DIRECT EXAMINATION / PERLSON

1    as well.

2    **Q.**   What sort of security protections do these data centers

3    have?

4    **A.**   So they have -- they have an extensive number of security

5    controls, but you think of it in terms of the physical building

6    itself.  It has a big fence around it, a gate, a guardhouse.

7    In order to get into the building, you need badge access if

8    you're authorized.  There's retinal scanners.  And then even

9    once you're in the data center itself with the computers, those

10   computers are locked in cages.

11   **Q.**   Any other tools securing those data centers?

12   **A.**   To operate a computing infrastructure at a scale of

13   Google, which is billions and billions of users around the

14   world, you -- we have customized that hardware that runs the

15   services and, also, the software on top of that.

16       So that customization has allowed us to be very precise

17   about what we expect to run on there, which is a security

18   feature.  It means that we can ensure that only those things

19   are running on there.

20   **Q.**   Does the security group have -- provide any security tools

21   for the devices that Google employees use?

22   **A.**   So one of the teams that I manage is Platform Security,

23   and they're responsible with securing those devices.

24   **Q.**   Okay.  And how do you do that?

25   **A.**   So we -- we generally think of three types of -- we try to

1  think of about three types of attack that we want to protect

2  against.  The first one is kind of phishing user names and

3  passwords.

4  Q.   Okay.  So, phishing.  What's phishing?

5  A.   So phishing is a type of attack where a malicious

6  individual will try to trick you into giving up, like, your

7  username and password or enter it into a website that they can

8  steal it from.

9  Q.   And what sort of tools does Google use to prevent

10 phishing?

11 A.   One of the primary tools to prevent this type of attack is

12 to educate the users to spot this type of malicious activity.

13      So when a new person starts at Google, they have to go

14 through an extensive in-person training to understand and raise

15 their awareness and spot these type of attacks.  We have an

16 annual refresher where they get refreshed on that.

17      And then also we have a security and privacy awareness

18 month where there's materials distributed around offices, and

19 it also highlights these type of attacks.

20 Q.   What other types of attacks are out there that need to be

21 protected against?

22 A.   So the second type we think of is -- we want to prevent

23 the installation of malicious software or viruses on laptops.

24 Q.   Okay.  Can you provide more details what you mean by

25 "malicious software"?

JANOSKO - DIRECT EXAMINATION / PERLSON

1   A.   So, basically, if someone is trying to compromise the

2   user, they might send them a program to run which will allow

3   them to take over their machine.

4   Q.   So what do you try to do to -- what sort of tools are

5   there available at Google to attempt to prevent that?

6   A.   So certainly you think of, like, antivirus and patching

7   and -- I think everyone has experienced that prompt that you

8   have to patch your computer because there's been a security

9   fraud.  So that helps prevent those programs from being

10  installed.

11       But one area I think we're kind of leading the industry in

12  is around whitelisting.

13  Q.   What's whitelisting?

14  A.   Whitelisting is a technology, a security concept, where we

15  have an agent running on the laptops, and it only allows the

16  software that we know to be approved to run.

17  Q.   And why does that provide additional sort of protection?

18  A.   Because in this instance with whitelisting, we only have

19  to define the things that we know to be good.  Right?  So we

20  have the known good.  Another -- other products -- or other

21  type of technologies, like antivirus, rely on knowing all the

22  bad things.

23       So it's a lot easier to know the good and define them --

24  that stays pretty static, right -- than kind of have to define

25  all the bad things which is constantly revolving.

JANOSKO - DIRECT EXAMINATION / PERLSON

1  Q.   Can you provide a practical example of how whitelisting is

2  used at Google?

3  A.   So our Android operating system, which is on our mobile

4  phones, is, by policy, locked to only install applications from

5  the Google Play Store.  So it's whitelisted for those

6  applications.

7  Q.   Any other type of attacks on devices that Google seeks to

8  protect against?

9  A.   When we're talking about mobile devices and laptops, you

10  think of lost and stolen devices as well; right?  So we want to

11  protect against the unauthorized access to these devices if

12  they are lost or stolen.

13  Q.   And how does Google try to do that?

14  A.   So we do that -- first, we want to make sure that if they

15  do fall into the hands of a malicious individual, you -- you

16  can't get access to it.  So the screen is locked.  You have to

17  log into it.  And we enforce that by policy.

18       The second way is, should someone get access to the hard

19  drive, one thing you can do is you can try to read the data on

20  the hard drive without logging in.  So we want to assure that

21  that data is encrypted or scrambled so that it's protected from

22  that type of attack.

23  Q.   Are there any other sort of tools that Google uses to

24  protect devices that Google employees use?

25  A.   So across all of the different platforms that we manage,

JANOSKO - DIRECT EXAMINATION / PERLSON

1  we have monitoring and detection capabilities so that we have a

2  signal and we can inspect the processes that are running, the

3  software that's running on each of these platforms, and monitor

4  them for malicious types of activity.

5  **Q.**   These activities that -- or these tools that we've been

6  discussing regarding protecting devices at Google, do those

7  apply to devices that people at Waymo use?

8  **A.**   Yes.

9  **Q.**   And how do you know that?

10  **A.**   Because I verified that they're using Google-managed

11  devices.

12  **Q.**   So if I'm using a Google-managed device and I want to

13  access one of these services, like cloud, what sort of security

14  controls exist in between the device and the data center?

15  **A.**   So we're talking about networks now.  So if I come into a

16  Google office, the first thing that -- that my computer does is

17  it authenticates to the network.  It uses a technology called

18  802.1X to authenticate the device, that we know about it and

19  it's authorized to use the network.

20  **Q.**   So once you're on the corporate network, does that mean

21  you can see anything within Google?

22  **A.**   No.  We employ network segmentation, which basically

23  breaks the corporate network into a series of segments.  And

24  between those segments, we regulate access with access control

25  lists.

JANOSKO - DIRECT EXAMINATION / PERLSON

1    Q.    What's an access control list?

2    A.    So it's a security technology similar to whitelisting,

3    where you define the allowed paths, the allowed network

4    communications across those different trust zones.  And you

5    enforce only those types of communications and you deny the

6    ones that don't match that pattern.

7    Q.    If I'm not on the corporate -- the Google -- well, let me

8    start again.

9         If a Google employee is not using the -- a corporate

10   network but using a Google-managed device, what security

11   controls would apply there?

12   A.    So, again, we want to be very protective of that data as

13   it leaves the computer.  So services that we access use

14   encryption, again that scrambling technology, to put a wrapper

15   around that data and protect it from eavesdropping in transit.

16   Q.    What if, like, a Google employee was using a

17   non-Google-issued device on a non-Google network?  What sort of

18   security tools would be available there?

19   A.    So it's against policy to do that.  But if someone were to

20   break that policy and access the service that way, they'd still

21   be protected by that wrapper and they'd still have to be

22   authorized to use the service they're logging into and, you

23   know, the username and password, for instance.

24   Q.    Have the tools that we've been -- and methods that we've

25   been describing -- or that you've been describing, have those

JANOSKO - DIRECT EXAMINATION / PERLSON

1    been around since you've been at Google?

2    A.    Yes.

3    Q.    And did they exist before that?

4    A.    Yes.

5    Q.    How do you know that?

6    A.    As I started at Google and I started to learn about my

7    role, I verified kind of the projects that have been executed,

8    the technologies that existed so I could, you know, just start

9    to lead the team.

10   Q.    Are you familiar with the Google cloud platform?

11   A.    I am.

12   Q.    What's the Google cloud platform?

13   A.    So it's a service that allows users of the service to

14   virtualize hardware, computer systems, so that they can install

15   and manage their own servers.

16   Q.    Where is this -- the Google cloud platform hosted or

17   operated out of?

18   A.    It's hosted in our data centers, and it's running in our

19   production environment.

20   Q.    So is Google cloud afforded the same security tools that

21   protect the data centers that we talked about earlier?

22   A.    Yes.

23          MR. PERLSON:  No further questions, Your Honor.

24          THE COURT:  Cross-examination.

25

1                    <u>CROSS-EXAMINATION</u>

2    BY MR. GONZÁLEZ

3    Q.   Sir, you understand that Anthony Levandowski downloaded

4    14,000 files from something that's called SVN server; right?

5    A.   Yes.

6         MR. PERLSON:   Objection, Your Honor.   Lack of

7    foundation.

8         THE COURT:   Well, he says he knows.

9         MR. PERLSON:   Okay.   Well, he answered too quick.

10        THE COURT:   All right.   So he -- go ahead.   Overruled.

11   BY MR. GONZÁLEZ

12   Q.   I don't think you were asked any question about the

13   servers, so I'd like to ask you a few things about that.

14        First, you personally have never accessed the SVN server

15   yourself, have you?

16        MR. PERLSON:   Your Honor, just acknowledge that it's

17   beyond the scope of my direct.   I didn't ask him any questions

18   about the SVN server.

19        THE COURT:   It's okay to -- it's okay for counsel on

20   cross-examination to show the scope of what the witness did.

21   And sometimes it's more convenient to show what he did not do.

22   It's perfectly okay.

23        All right.   Overruled.

24   BY MR. GONZÁLEZ

25   Q.   Sir, your group doesn't have any involvement at all -- or

1    let's go to December 2015.

2        In December 2015 your group didn't have any involvement at

3    all with the security protocols for the SVN server; true?

4    **A.**    So I wasn't employed at Google at that time, so I don't

5    know the conversations that happened.

6        However, I do know that the infrastructure that Subversion

7    is hosted on, the Google cloud infrastructure, employs the

8    controls that I testified about.

9    **Q.**    Sir, do you recall your deposition being taken last year?

10   **A.**    Yes.

11   **Q.**    As of last year, your group didn't have any involvement in

12   the security protocols for the SVN server; true?

13   **A.**    So the Subversion server itself literally hosted in the

14   cloud is running on top of the Google infrastructure --

15       **THE COURT:**  I don't think you're being fair to

16   Mr. González.  I think you can answer that question "yes" or

17   "no" and then give an explanation.

18       **THE WITNESS:**  Okay.

19       **THE COURT:**  You started off with the word "so" and

20   veered off into a speech.

21       So ask that question again, and give a "yes," "no" answer.

22   **BY MR. GONZÁLEZ**

23   **Q.**    Last year did your group have any involvement in the

24   security protocols for the SVN server?

25   **A.**    Not to my knowledge.

1  Q.   And with respect to credentials, you were not familiar

2  with the way the SVN server protects credentials; true?

3  A.   That is correct.

4  Q.   In the work that you do there's a term called "stale

5  user"; right?

6  A.   Yes, I've heard that term.

7  Q.   Sometimes when people get permission to access some

8  electronic database and they don't access it for a long time,

9  their permission is revoked; correct?

10 A.   That's one way to handle stale users, yes.

11 Q.   And that's because you're a stale user; right?  Correct?

12 A.   Yes.

13 Q.   Now, with respect to the SVN server, if somebody didn't

14 access that for months, you don't know whether that user's

15 credentials would expire, do you?

16      THE COURT:  That's impossible to understand.  I

17 honestly -- try it a different way.  I --

18      MR. GONZÁLEZ:  Your Honor --

19      THE COURT:  Ask that a different way.

20      MR. GONZÁLEZ:  I'll try it a different way.

21 BY MR. GONZÁLEZ

22 Q.   If someone has permission to log on to the SVN server but

23 they don't do it for months, they don't log on for many months,

24 you don't know whether that user's credentials would be

25 revoked, do you?

1    A.    I understand that there's a process in place to review the

2    appropriateness of access -- the accounts on the server and

3    their appropriateness for access to that server.

4    Q.    But if somebody doesn't use it for three months, you don't

5    know whether that user's credentials would expire, do you?

6    A.    I don't know if it would be appropriate that they expire.

7    Q.    You don't know one way or the other if they would, do you?

8    A.    I can't say.

9    Q.    And sticking to that server, in December of 2015 if an

10   employee from Google had logged on and downloaded the entire

11   repository, the security team at Google wouldn't investigate

12   that, would you?

13   A.    I -- I don't know if they would investigate that or not

14   because that isn't in itself necessarily malicious.

15          MR. GONZÁLEZ:    Andrew, can we play 23, Lines 10 to 16

16   from Volume 1 of his deposition on August 23rd of last year?

17       (Videotape played in open court, not reported.)

18   BY MR. GONZÁLEZ

19   Q.    Now, this SVN repository, Google created instructions that

20   were made available to its employees before December of 2015 on

21   how to access the SVN repository; true?

22   A.    I'm not -- I don't -- I don't know.

23   Q.    Did you know that in December of 2015 if somebody at

24   Google followed Google's own instructions for logging on to

25   that repository, everything in the repository would

JANOSKO - CROSS-EXAMINATION / GONZÁLEZ

1    automatically be downloaded to that person's computer?  Did you

2    know that?

3            MR. PERLSON:  Your Honor, he's testifying.

4    Specifically, he's repeatedly asking questions that he knows

5    the witness doesn't have answers to.  He's testifying to the

6    jury.

7            MR. GONZÁLEZ:  I don't know whether he knows this or

8    not.  If he doesn't know, that's fantastic.

9            THE COURT:  Well, and the form of the question was not

10   correct.  It was assuming facts not in evidence.  So you can

11   ask him, "Do you know whether or not."

12           MR. GONZÁLEZ:  I will do that.

13           THE COURT:  That's okay.  You can do that.

14           MR. GONZÁLEZ:  Got it.

15           THE COURT:  But not the way you phrased it.

16           MR. GONZÁLEZ:  Got it.

17   BY MR. GONZÁLEZ

18   Q.   Sir, do you know whether or not in December of 2015, if

19   someone was following Google's own instructions for logging on,

20   do you know whether or not the entire database would

21   automatically be downloaded onto the person's computer?

22   A.   No, I don't know.

23   Q.   Do you know whether or not that would happen today if

24   somebody logged on today following Google's instructions?

25   A.   I don't -- I'm not familiar with these instructions that

 1   you speak of, so I -- I can't speak to them.

 2   **Q.**   You said you have 750 people on the security team.  Please

 3   tell the jury, of the 750 people, who was responsible for

 4   supervising this SVN repository to make sure they kept an eye

 5   on whether or not anybody downloaded everything?  Who was

 6   responsible for that?

 7   **A.**   So, certainly, I don't know what everyone is doing on a

 8   daily basis in Google.  I -- I can tell you that within the

 9   Google cloud environment, we rely on those protections at the

10   lower levels to secure the data that's housed in there.

11   **Q.**   Is there any person you can think of, anybody at all,

12   whose job responsibility included, "Hey, you keep an eye on the

13   SVN server and if anybody downloads everything, you've got to,

14   you know, ask questions"?  Anybody?  Was there anybody who was

15   in charge of supervising that?

16   **A.**   I don't -- I don't know that downloading all the data on a

17   Subversion server is necessarily a malicious act.  It's what

18   you do with that data after you download it.

19         **MR. GONZÁLEZ:**  Can we have an answer to my question,

20   Your Honor?

21         **MR. PERLSON:**  Your Honor, he already asked the same

22   question before and he already answered it.

23         **MR. GONZÁLEZ:**  It was not -- it was not answered.

24         **THE COURT:**  Well, your question was who, if anyone, at

25   Google, and then a very long speech.

1    So do you know of anyone at Google whose job it is to do

2    what counsel suggested?  Give us a name, if so.

3        THE WITNESS:  All right.  With regards to the specific

4    Subversion service, no, I don't know.

5    BY MR. GONZÁLEZ

6    Q.   All right.  Sir, can you think of any repository of data,

7    whether you want to call it a server or a database or something

8    else, at Google that has trade secret information in it?

9        Can you think of any server or database where the

10   instructions that are given to employees by Google would lead

11   to an automatic download of everything in that server?

12       MR. PERLSON:  Your Honor, that's a compound question.

13       THE COURT:  It's very compound and hard to follow.

14   Sustained.

15   BY MR. GONZÁLEZ

16   Q.   Can you think of any server at Google where -- that

17   contains trade secret information that automatically downloads

18   the entire database when somebody logs on?

19       MR. PERLSON:  Objection, Your Honor.  Also calls for a

20   legal conclusion.

21       THE COURT:  No, no.  I don't understand that

22   objection.

23       If you understand the question -- I think I do -- please

24   answer it.

25       THE WITNESS:  I think that your question's predicated

1   on me knowing all the servers and the systems at Google, which

2   I don't pretend to know.  And so I can't speak to whether, you

3   know, these behave in the way that you're asking.

4   **BY MR. GONZÁLEZ**

5   **Q.**   I'm just asking if you can identify any server within

6   Google that behaves that way; that automatically downloads the

7   entire database when somebody follows the instructions to log

8   in?

9   **A.**   To my -- to my knowledge, I don't know.

10          **THE COURT:**  Okay.  All right.  Let's go redirect.

11          **MR. PERLSON:**  Just a few questions.

12                  <u>**REDIRECT EXAMINATION**</u>

13   **BY MR. PERLSON**

14   **Q.**   First, the SVN server, is that something that your team is

15   tasked with at all?

16   **A.**   No.  We don't have direct responsibilities around that

17   service itself.

18   **Q.**   And do you understand where the SVN server is hosted?

19   **A.**   It's hosted in -- as I understand it, in the Google cloud.

20   **Q.**   And so does it have the protections of the Google cloud?

21   **A.**   So all the protections I described and testified towards

22   around the data centers and also the systems that access it,

23   the Google-managed devices, those have those protections I

24   testified towards.

25   **Q.**   And the SVN server -- we talked about credentials -- can

PROCEEDINGS

1  someone just look up on Google, do a Google search and find the

2  SVN server?

3  **A.**   Not to my knowledge.  You have to be an authorized Waymo

4  engineer to even know that this thing exists, and if so, you

5  need to be -- have username and password for that service.

6  **Q.**   You were also asked about certain investigations.  Is that

7  something that's in your team specifically?

8  **A.**   No.  The investigation of malicious activities inside

9  Google is not part of my direct team.

10          **MR. PERLSON:**  No further questions, Your Honor.

11          **THE COURT:**  All right.  May the witness be excused?

12          **MR. GONZÁLEZ:**  Yes, Your Honor.  Thank you.

13          **THE COURT:**  All right.  Mr. Janosko, have a good day.

14  You're excused.  Thank you.

15          **THE WITNESS:**  Thank you.

16      (Witness excused.)

17          **THE COURT:**  I think it's -- if the witness is short

18  next, we'll go ahead, but otherwise I want to take a break.

19          **MR. LYONS:**  Let's take a break then, Your Honor.  I

20  think he's going to be about 15, 20 minutes on direct.

21          **THE COURT:**  All right.  We'll do that.  Fifteen-minute

22  break.  Remember the admonition, please.  Thank you.

23          **THE CLERK:**  All rise for the jury.

24      (Jury exits the courtroom at 10:56 a.m.)

25          **THE COURT:**  All right.  Be seated.

PROCEEDINGS

```
 1        Is there any business for the judge?
 2             MR. PERLSON:  Not from us, Your Honor.
 3             THE COURT:  Okay.
 4             MR. GONZÁLEZ:  Not -- I don't think so, Your Honor.
 5   Thank you.
 6             THE COURT:  All right.
 7             THE CLERK:  Court is in recess.
 8        (Whereupon there was a recess in the proceedings
 9         from 10:56 a.m. until 11:19 a.m.)
10        (Proceedings held in open court, outside
11         the presence and hearing of the jury.)
12             MR. GONZÁLEZ:  Your Honor, I had asked for a quick
13   sidebar because I wanted to mention something.  I'll mention it
14   now.
15        The next witness is Sasha.  You heard a lot about Sasha.
16   I've got just a handful of questions for him that would require
17   disclosure of the alleged trade secrets, and I have a
18   suggestion for the Court's consideration.
19        My suggestion is, especially because we're late in the
20   day, is that both sides -- I think all of their examination is
21   public.  Ninety-five percent of mine is public.  I think we
22   ought to just do the public part, go on to the next witness,
23   but reserve no more than ten minutes -- I can probably do it in
24   five -- at the end of the day so you can -- and have Sasha sit
25   in the hallway, send the public home, bring Sasha back in and
```

1    do a closed session, as opposed to making the public go out and

2    then come back.  That's my suggestion.

3         THE COURT:  Well, we will, but we're going to stop at

4    1:00 o'clock.  I won't go past 1:00 o'clock.

5         MR. GONZÁLEZ:  Understood.  So if we can just get him

6    back in here at ten till, I will finish by 1:00.

7         MR. LYONS:  Your Honor, that's fine as long as this

8    witness is done today and we reserve -- and counsel --

9         THE COURT:  I can't promise you that.

10        MR. LYONS:  Well, then, I think it's unfair to the

11   witness to have us break in the middle of his examination so

12   that counsel can do whatever he wants to do and ask him five

13   minutes of questions that may carry him over until tomorrow.

14        MR. GONZÁLEZ:  No, Your Honor.  I'm telling you in

15   good faith that if we start him up at ten minutes till, I don't

16   think there will be any problem getting him done today.

17        THE COURT:  We'll try the González approach and see if

18   it works.

19        Now let's bring in the jury.

20        (Jury enters the courtroom at 11:21 a.m.)

21        THE COURT:  Welcome.  Be seated.

22        Next witness.

23        MR. LYONS:  Plaintiff calls Sasha Zbrozek.

24        THE COURT:  Okay.

25

1    **ALEXANDER ZBROZEK**,

2    called as a witness for the Plaintiff, having been duly sworn,

3    testified as follows:

4            **THE WITNESS:**  I do.

5            **THE CLERK:**  Please state your name for the Court and

6    spell your last name for the record.

7            **THE WITNESS:**  Certainly.  I am Alexander Zbrozek,

8    spelled Zulu, Bravo, Romeo, October, Zulu, Echo, Kilo.

9            **THE COURT:**  You all over there follow that?

10       All right.  Go ahead.

11                       **DIRECT EXAMINATION**

12   BY MR. LYONS

13   **Q.**   Good morning, Mr. Zbrozek.  Who do you work for?

14   **A.**   I work for Waymo.

15   **Q.**   And let me just ask you something about your college

16   background.  Where did you go to college?

17   **A.**   Stanford.

18   **Q.**   And did you receive a degree from Stanford?

19   **A.**   I did.

20   **Q.**   When?

21   **A.**   2010.

22   **Q.**   And what was your degree in?

23   **A.**   Electrical engineering.

24   **Q.**   What was your first job after graduating from Stanford?

25   **A.**   I worked for Mission Motors.

ZBROZEK - DIRECT EXAMINATION / LYONS

1   Q.    What did you do for Mission Motors?

2   A.    I was an electrical engineer.

3   Q.    How long were you an electrical engineer at Mission

4   Motors?

5   A.    A shade more than a year.

6   Q.    What did you do after leaving Mission Motors?

7   A.    I joined the Google self-driving car project.

8   Q.    And what was your -- let me ask you this way.  How long

9   have you been at Google?

10  A.    About six and a half years, minus a short stint at Tesla.

11  Q.    You said you had a short stint at Tesla.  When did that

12  happen?

13  A.    That was in early 2016.

14  Q.    How long did you leave the company for?

15  A.    Seven weeks.

16  Q.    And did you go back immediately after that seven-week

17  period?

18  A.    I had a couple weeks of unemployment and rejoined Waymo

19  and came back to the radar team.

20  Q.    Are you familiar with something called the SVN server?

21  A.    I am.

22  Q.    What is the SVN server?

23  A.    It's a file store, a repository for storing all of the

24  electrical engineering information for the self-driving car

25  program.  All the schematics, the layouts, all the designs.

1  Q.   Can you briefly explain how engineers work with the files

2  on the SVN.

3  A.   Sure.  We will download the entire repository, usually the

4  present-day snapshot.  We'll make changes that are relevant to

5  their work, and then we'll upload back whatever they have

6  changed.

7  Q.   Who set up the current version of the SVN server?

8  A.   I did.

9  Q.   And when did you set it up?

10  A.   That was March of 2015.

11  Q.   And what caused you to set up the SVN server in March of

12  2015?

13  A.   Our previous SVN solution hosted on Google code was

14  running out of storage space and it was difficult to get more

15  as the service was being shut down.

16  Q.   Were you for a period of time the administrator for the

17  SVN server?

18  A.   Briefly, yes.

19       MR. LYONS:  Can I have Exhibit 4952 in evidence?  I

20  believe there's no objection from counsel.

21       MR. GONZÁLEZ:  You want to move it?

22       MR. LYONS:  Move it in, yes.

23       MR. GONZÁLEZ:  There's no objection.

24       THE COURT:  All right.  In evidence.

25       (Trial Exhibit 4952 received in evidence)

1          (Document displayed)

2    BY MR. LYONS

3    Q.   Do you see on the screen before you a set of instructions?

4    A.   I do.

5    Q.   And could you tell the jury what those instructions are

6    for?

7    A.   Yeah.  These are the getting-started instructions for new

8    users to both Altium, our CAD tool, and Subversion, our file

9    storage.

10   Q.   Who made these instructions?

11   A.   I wrote these.

12   Q.   Now, let's go to where it says "connecting to SVN."

13          MR. LYONS:  And if we could highlight that, please,

14   Mr. Fisher?

15        (Document displayed.)

16   BY MR. LYONS

17   Q.   The first step says:

18              "Download and install for TortoiseSVN."

19   Do you see that?

20   A.   I do.

21   Q.   What is that?

22   A.   Tortoise is software that communicates to Subversion

23   servers.  It is a client and it makes requests for files and

24   allows you to upload them back up.

25   Q.   Now, step 2 says:

1              "Pick a place in your file system in which to

2        check out the repository."

3        And it continues on from there.  Do you see that?

4   A.   I do.

5   Q.   What's going on there?

6   A.   It's just asking the user where they would like the files

7   that they're about to retrieve to appear.

8   Q.   Step 3 says "Right click," and then "Select SVN Checkout

9   and enter yakshaves.com."

10       Do you see that?

11  A.   I do.

12  Q.   What is yakshaves.com?

13  A.   That's the domain that points to the Subversion server.

14  Q.   Just for the record, is that still the domain --

15  A.   Not anymore.

16  Q.   -- that hosts the SVN server?

17  A.   Not anymore.

18  Q.   Why did you change it?

19  A.   Well, once it became public, it was obviously necessary to

20  get a new domain.

21  Q.   Was the name or the domain name yakshaves.com that was

22  hosting the SVN server publicly known?

23  A.   Not really, no.

24  Q.   Who had access to the domain yakshaves.com?

25  A.   Folks could get access to the data hosted at yakshaves.com

 1   only if they were credentialed users.  That was hardware

 2   engineers at Waymo.

 3   Q.    Now, what happens if you right-click and select SVN

 4   checkout and enter yakshaves.com?

 5   A.    Then you'd be asked for username and password.

 6   Q.    And how did an engineer at Waymo get username and

 7   password?

 8   A.    They would email the administrator of the server and

 9   request one.

10   Q.    And the administrator would give them username?

11   A.    Yeah.  The -- the standard was for that username to be the

12   same as their email address.

13   Q.    And what about the password?

14   A.    That was randomly generated.

15   Q.    Did you hand out passwords when you were the

16   administrator?

17   A.    I did.

18   Q.    How did you generate passwords?

19   A.    I generated long random strings, like 18, 20-plus

20   characters.

21   Q.    Now, if you entered username and a password that the

22   administrator had given you rights to, what would happen?

23   A.    If you followed these directions verbatim, you would

24   download a full checkout of the repository.

25   Q.    Were you involved in the investigation into

1    Mr. Levandowski's activities on the SVN server?

2    **A.**    Yes.

3    **Q.**    And when did you first get involved in

4    Mr. Levandowski's -- in the -- into the investigation regarding

5    Mr. Levandowski's activities on the SVN server?

6    **A.**    September 2016.

7    **Q.**    And were you asked to do anything in particular?

8    **A.**    I was asked to retrieve his activity against the server.

9            **MR. LYONS:**  Can I have Exhibit 2219 before the

10   witness?

11       Your Honor, I believe there's no objection to this

12   exhibit, so I ask it be published to the jury.

13           **THE COURT:**  Is it already in evidence or not?

14           **MR. LYONS:**  I'm asking to move it in and publish it to

15   the jury.

16           **MR. GONZÁLEZ:**  That's fine.

17           **THE COURT:**  All right.  In evidence.

18       (Trial Exhibit 2219 received in evidence)

19           **MR. LYONS:**  Can I ask -- Mr. Fisher, can you go to

20   Page 7 of this exhibit?  And you see there's an email there.

21   If you could just blow up the bottom email, please?

22       (Document displayed)

23   **BY MR. LYONS**

24   **Q.**    Says -- it's an email from Tom Lue to Nick Vines and

25   yourself.  Do you see that?

ZBROZEK - DIRECT EXAMINATION / LYONS

1    A.    I do.

2    Q.    And then beneath that, it says:

3              "Per my chat with you both individually, I'm

4          connecting you with Tom Gorman."

5          Do you see that?

6    A.    I do.

7    Q.    Who's Tom Gorman?

8    A.    A lawyer from KVN.

9    Q.    And did Mr. Gorman make a request of you?

10   A.    He did.

11   Q.    What did he ask you to do?

12   A.    He asked me to investigate Subversion logs activity for a

13   handful of users.

14   Q.    And did you do that?

15   A.    I did.

16   Q.    Did you determine in that review how many times

17   Mr. Levandowski had accessed the SVN server?

18   A.    I did.

19   Q.    And did you determine when he last accessed the SVN

20   server?

21   A.    I did.

22   Q.    Did you report that back to Mr. Gorman?

23   A.    I did.

24         **MR. LYONS:**  Can I have, Mr. Fisher, Page 4 of this

25   exhibit?

 1          Now, you see in the Summary section there, if you could

 2    blow up the name Anthony Levandowski in -- that -- the whole

 3    box is fine.

 4          (Document displayed.)

 5    **BY MR. LYONS**

 6    Q.   What is this information referenced here in the email?

 7    A.   I'm explaining when each of these users had last used the

 8    Subversion service.

 9    Q.   And it says that Mr. Levandowski's last access was

10    December 11th, 2015.  Do you see that?

11    A.   I do.

12              **MR. LYONS:**  Now, can we go to Page 2 of this exhibit?

13          (Document displayed)

14    **BY MR. LYONS**

15    Q.   And you see you received some questions from Mr. Gorman

16    several weeks later on October 5th at the bottom of the page.

17    And if we go to the first question he asks you:

18          "He only accessed SVN the one time on 12/11/2015.

19           That's a little strange, isn't it?"

20          Do you see that?

21    A.   I do.

22    Q.   And did you answer that question?

23    A.   I did.

24    Q.   If you see above that, you wrote:

25              "He was a high-level manager."

1        And it continues on from there.  Do you see that?

2   A.   I do.

3   Q.   And it continued on:

4        "It's not particularly surprising that he might

5        check things out once in the misguided dream of maybe

6        making an individual contribution or maybe taking a

7        look at the progress of a widget.  It clearly wasn't

8        part of his routine.  Doesn't ring the alarm bells for

9        me."

10       Do you see that?

11  A.   I do.

12  Q.   What did you mean by it doesn't ring the alarm bells for

13  you?

14  A.   Well, so doing a checkout of the repository is normal and

15  expected.  It is part of the instructions, and it is part of

16  the day-to-day routine of practicing hardware engineers at

17  Waymo.

18       MR. LYONS:  Mr. Fisher, can I have Exhibit 2218 before

19  the witness?

20       (Document displayed.)

21  BY MR. LYONS

22  Q.   Mr. Zbrozek, do you recognize this email that's on the

23  screen before you?

24  A.   Yes.

25       MR. JAFFE:  Move admission of Exhibit 2218.

1          **MR. GONZÁLEZ:**  No objection.

2          **THE COURT:**  Received.

3       (Trial Exhibit 2218 received in evidence)

4          **MR. LYONS:**  Can I ask, Mr. Fisher, go to page 5 of

5    this exhibit?

6       Can you blow up the first paragraph at the -- the second

7    paragraph from the bottom that says, "Well, Anthony's log

8    speaks to the number of files."

9       (Document displayed.)

10   **BY MR. LYONS**

11   **Q.**   Do you see that?

12   **A.**   I see that.

13   **Q.**   It continues on from there in the end of the second line:

14          "I'm a little leery because those of those

15       numbers" -- well, excuse me.

16          "I'm a little leery because both of those numbers

17       aren't really meaningful to any narrative.  It also

18       has a chilling effect on being a hardware engineer.

19       We all do full checkouts and makes me uncomfortable to

20       think that lawyers are trying to ascribe suspicion to

21       it."

22       Do you see that?

23   **A.**   Yes, I do.

24   **Q.**   Now, specifically what conduct were you referring to in

25   this paragraph?

1   A.   I was specifically referring to doing a full checkout.  I

2   did not think that it was appropriate to think that that

3   activity on its own was suspicious, given that that is normal

4   and expected for contributing members of our program.

5            MR. LYONS:  Can I have demonstrative WDX7-2 displayed.

6        And there's no objection to this, Your Honor.

7        (Document displayed.)

8   BY MR. LYONS

9   Q.   Now, this was a demonstrative that was shown during

10  opening statement by defense counsel.  That's your picture

11  there.  Do you see that?

12  A.   I do.

13  Q.   We've blown up the part that says "Makes Me

14  Uncomfortable."

15       Do you see that?

16  A.   I do.

17  Q.   Did anything about Mr. Levandowski's download of the SVN

18  server make you uncomfortable?

19  A.   Not at the time.

20  Q.   At the time that you made this statement, what did you

21  know about the December 11th download by Mr. Levandowski?

22  A.   I knew that it looked like it was a full checkout of the

23  repository.

24  Q.   Did that cause you any alarm bells?

25  A.   No, it didn't.

1   Q.   I would like to show you another demonstrative that we've

2   used in this case.

3          **MR. LYONS:**   Can I have 4-8 on the screen?   Actually

4   display it.

5        (Document displayed.)

6   **BY MR. LYONS**

7   Q.   So this is a demonstrative we used previously.   And with

8   regard to the activity that's occurred on December 11th, you'll

9   see that they're the first three slides there.

10       Do you see that?

11  A.   I do.

12  Q.   And with regards to the information that you had about

13  Mr. Levandowski's activities, did you have any information

14  about his activities beyond December 11th?

15  A.   No, I did not.

16  Q.   In terms of the full extent of information you had about

17  Mr. Levandowski's activities when you wrote these emails, what

18  was the full extent of the activity that you were aware of?

19  A.   I was aware of that center panel, that Anthony had

20  downloaded the repository, and that was all.

21  Q.   Were you aware that on December 11th, the same day that he

22  downloaded files, he met with Uber to talk to them about

23  selling a company that didn't even exist?

24  A.   No, I did not.

25  Q.   The fourth panel shows that he put a Transcend card reader

1    onto his computer and then removed it.  Were you aware of that

2    when you wrote your email?

3    A.   No, I was not.

4    Q.   The fifth panel says that he reformatted his computer and

5    wiped it clean on December 18th.  Were you aware of that

6    activity?

7    A.   No, I was not.

8    Q.   So knowing -- and I think, if I recall your email, you

9    said the information you had did not ring any alarm bells.  Is

10   that what you wrote?

11   A.   Yes.

12   Q.   Knowing all the information that's on that screen, does

13   that ring any alarm bells for you?

14        MR. GONZÁLEZ:  Your Honor, relevance as to whether it

15   rings alarm bells today.

16        THE COURT:  Sustained.

17   BY MR. LYONS

18   Q.   Let me ask you to take a look at Exhibit 2219.

19        MR. LYONS:  And if we could go to Bates stamp 86886,

20   which is page 2 of this email?

21      (Document displayed.)

22   BY MR. LYONS

23   Q.   And if we go to the bottom email, the last line just

24   before "Tom," it says:

25           "What exactly is in this SVN system? PCB designs?

1          something else? any other hardware designs?"

2          Do you see that?

3    A.   I do.

4    Q.   If we go up to the email that begins "It's all

5    electronics."  Do you see that?

6    A.   I do.

7    Q.   Was that your response to Mr. Gorman's question?

8    A.   Yes, it was.

9    Q.   And you write:

10             "It's all electronics designs, schematics, and

11         PCB layouts, and the component library for their

12         creation.  It was considered low value enough that we

13         even considered hosting it off Google infrastructure."

14         Do you see that?

15   A.   I do.

16   Q.   What did you mean by that?  Excuse me.  What did you mean

17   by "low value" there?

18   A.    What I meant was that I was making a comparison to all of

19   the other data that Google holds, code and algorithms and the

20   data on which that software operates, basically the full corpus

21   of information in Google's possession.

22   Q.   Had you made any other comparisons about information on

23   the SVN server prior to sending this email?

24   A.   Quite some time before, when I was first setting it up, I

25   made precisely the same comparison and made more explicit the

1   things to which I was making that comparison.

2          MR. LYONS:  I'd move admission of Exhibit 2216.

3          MR. GONZÁLEZ:  No objection.

4          THE COURT:  All right.  In evidence.

5      (Trial Exhibit 2216 received in evidence.)

6   BY MR. LYONS

7   Q.   Can we -- well, let's go to the first page so you can tell

8   the jury what this document is.

9          (Document displayed.)

10  Q.   Do you see this is an email that you sent to Bryan Salesky

11  on March 12, 2015?

12  A.   Yes.

13  Q.   Was that around the time that you were setting up the SVN

14  server?

15  A.   It was when we were evaluating our options and just prior

16  to setting up the new server, yes.

17  Q.   If then we go to page 2 of this exhibit, there is a

18  paragraph that begins "Ideally."  Do you see that?

19  A.   I do.

20  Q.   You say:

21          "Ideally, we'd be allowed to store this data

22      wherever we like.  It's not code.  It's not user data.

23      It's pretty low value."

24      And it continues on from there.  Do you see that?

25  A.   I do.

1  Q.   What did you mean in that instance when you said, "It's

2  not code.  It's not user data.  It's pretty low value"?

3  A.   Well, once again, I was making the same comparison as

4  later, saying that, you know, the things that are of highest

5  value at Google are the software and the algorithms and the

6  user data processed by those software and algorithms.

7  Q.   Did you tell Mr. Gorman that when you responded to his

8  email back in October of 2016?

9  A.   I believe that I later clarified in that thread, yes.

10       MR. LYONS:  Can we go to Exhibit 2219?  And let's just

11  go to -- let's go back to page 2 of that exhibit.

12       (Document displayed.)

13  BY MR. LYONS

14  Q.   If you look at the bottom, Mr. Gorman writes:

15           "What exactly is in this SVN system?"

16       And you write back:

17           "It's all electronics.  It was considered low

18       value enough."

19       We talked about that.

20       And if we could go just up to the top of that page.  I

21  think it's the second paragraph from the top.

22       And he writes:

23           "If these schematics are considered low value,

24       then where is the high-value stuff stored, sensor

25       designs, et cetera?"

1    Do you see that?

2  **A.**   I do.

3  **Q.**   If we go to the first page of this exhibit and we look at

4  just the bottom of the page for a second, just to get the time

5  stamp, Mr. Gorman sent that email at 5:18; right?

6  **A.**   Yes.

7  **Q.**   And then you responded 5:39, some 21 minutes later; right?

8  **A.**   That's right.

9  **Q.**   And you wrote:

10    "At least historically, high value has been

11    algorithms and software.  The hardware (at all levels)

12    was a second-class citizen.  Maybe opinions have

13    changed."

14    Do you see that?

15  **A.**   That's right.

16  **Q.**   What did you mean by that?

17  **A.**   Well, the same thing that I had meant in all the other

18  instances.  I was making a comparison between this particular

19  data to the complete trove of all of the IP of a

20  multi-hundred-billion-dollar company.

21  **Q.**   Now, you weren't here during opening statement.  I want to

22  show you a slide that Uber showed during its opening.

23    **MR. LYONS:**   The demonstrative number is DX7-1.

24    (Document displayed.)

25

1    BY MR. LYONS

2    Q.    Now, this is a slide that Mr. González played during

3    opening.  You see there's your picture again.  And he's

4    referencing this Gorman email that you sent on October 5th,

5    earlier that day, at 3:42 p.m.  Do you see that?

6    A.    Yes, I do.

7    Q.    And you see that heading says "Low-Value Tech."  Do you

8    see that?

9    A.    I do.

10   Q.    And I guess in this context -- oh, "tech" stands for

11   technology; right?

12   A.    I can only assume so.

13   Q.    Okay.  Well, you work at Waymo.  Is the work you do low

14   value?

15   A.    I hope not.

16   Q.    Do you consider yourself a low-value worker?

17   A.    Certainly not.

18   Q.    Do you believe that the technology in the SVN server is

19   low-value technology?

20   A.    In an absolute sense, certainly not.

21   Q.    Why do you say that?

22   A.    It's everything you need to build all of the electronics

23   for a self-driving car.  Like, clearly, there's a lot of value

24   there.

25          MR. LYONS:  Nothing further.

1          **THE COURT:**  All right.

2      Cross-examination.

3                          <u>**CROSS-EXAMINATION**</u>

4  **BY MR. GONZÁLEZ**

5  **Q.**    Sir, I want to slow it down just a little bit and clarify

6  one thing that you said.

7      You said that when people follow the instructions that you

8  wrote for logging on to the SVN server, there would be a full

9  checkout; right?

10  **A.**    That's right.

11  **Q.**    And that would be of the entire repository; correct?

12  **A.**    To clarify, it's a current snapshot of the entire

13  repository.

14  **Q.**    So the most recent version of every single document would

15  be automatically downloaded to your laptop if you're logging in

16  via a laptop; is that right?

17  **A.**    Yes.  It would be automatically downloaded to whatever

18  computer you're using.

19  **Q.**    Did anybody at Google say to you, "You know what, Sasha?

20  That's not a good idea to have everything automatically

21  downloaded because we've got some trade secrets in here"?

22      Did anybody say that to you?

23  **A.**    No.

24  **Q.**    When you set up the SVN repository, there were no tools

25  for monitoring what people were doing with their Subversion

ZBROZEK - CROSS-EXAMINATION / GONZÁLEZ

1   account; true?

2   **A.**   No.

3            **THE COURT:**  Well, that's ambiguous.

4            **THE WITNESS:**  All right.  Let me clarify --

5            **THE COURT:**  No, it's not true?  So you've got to --

6   you clarify it, please.

7            **THE WITNESS:**  No, that's not entirely true.

8            **MR. GONZÁLEZ:**  Andrew, can we play from the

9   August 18th, 2017 deposition, page 98, lines 9 to 12?

10       (Videotape played in open court, not reported.)

11  **BY MR. GONZÁLEZ**

12  **Q.**   And you do not know whether anyone at Google monitors

13  log-ins to the SVN server; correct?

14  **A.**   No, I do not.

15  **Q.**   And you don't know if anyone at Google monitors checkouts

16  so that when people download the entire repository, you don't

17  know if anybody even monitors that, do you?

18  **A.**   No.  But nobody monitors when you get water from the

19  fridge either.

20  **Q.**   You understand that your employer is alleging in this case

21  that there are trade secrets in the SVN repository?  You

22  understand that, don't you?

23  **A.**   I haven't actually been paying much attention to the

24  complaints; but, sure, I suppose.

25  **Q.**   A little different than the water cooler, can we agree?

1    A.    Yes and no; right?  It's normal activity either way.

2    Q.    You don't know whether anyone ever looks to see who has

3    downloaded the entire repository; true?

4    A.    Could you repeat that, please?

5    Q.    Yes.  You don't know whether anyone at Google ever comes

6    to inspect to see how many people have downloaded the entire

7    SVN repository; true?

8    A.    No, I don't believe that anyone inspects exactly who has

9    accessed the server in what way, though the access control list

10   is audited frequently.

11   Q.    And if somebody tries to access the SVN server, somebody

12   is trying to break in or hack the server, you don't know if

13   there's a system to notify the administrator that that has

14   happened; true?

15   A.    Google compute engine actually has a lot of automated

16   intrusion detection tools.

17          MR. GONZÁLEZ:  Andrew, can we play 122, line 21,

18   through 123, line 11?

19       (Videotape played in open court, not reported.)

20          MR. LYONS:  Your Honor, I'm going to object.  This is

21   not impeachment.  This is a different question than what

22   counsel asked.  Counsel asked about hacking, and this doesn't

23   referring to hacking.

24          THE COURT:  Do you still work at Waymo?

25          THE WITNESS:  Yes.

1    **THE COURT:**  All right.  Under Rule 32, a deposition

2    can be used for any purpose and does not have to be

3    impeachment.

4        **MR. GONZÁLEZ:**  Andrew, can we --

5    **BY MR. GONZÁLEZ**

6    Q.   I want to go back now over those three emails that you

7    were shown.  I want to take them in chronological order.  You

8    can follow along on the screen or you can look in the binder.

9        **MR. GONZÁLEZ:**  Andrew, can we start with 2216?

10       (Document displayed.)

11   **BY MR. GONZÁLEZ**

12   Q.   All right.  First of all, in March of 2015 you were having

13   an email exchange with Bryan Salesky; right?

14   A.   That's right.

15   Q.   And Bryan Salesky is your boss' boss; right?

16   A.   That's right.

17   Q.   And as of that point, the current situation, as you're

18   describing it to your boss' boss, is that the place where the

19   documents used to be was a service on its deathbed; right?

20   A.   Well, almost used to be.  The files still existed at this

21   point; but, yeah, more or less.

22   Q.   And you refer -- in the second line, Andrew -- to a

23   skeleton crew that runs that service; right?

24   A.   Yes.

25   Q.   And so what you're trying to do is you're trying to figure

1   out, gee, what are we going to do?  We're running out of space,

2   I've got a skeleton crew.  We've got to figure out what to do

3   with these files.  That's the --

4        MR. LYONS:  Objection.  The question is compound.

5   There were three questions there.

6        THE COURT:  It's also a very morbid email.

7   "Deathbed."  "Skeleton."

8      (Laughter.)

9        MR. GONZÁLEZ:  I will withdraw it.

10        THE COURT:  Ask a new -- it was compound and

11   argumentative.

12        MR. GONZÁLEZ:  Let's go to the next slide.

13      (Document displayed.)

14   BY MR. GONZÁLEZ

15   Q.   One of the things that you considered was putting the

16   information on a third-party server outside of Google; correct?

17   A.   Yes.  That's right.

18   Q.   And you had concerns that that might raise political

19   problems.  Some people may not want information outside of

20   Google; is that right?

21   A.   Yes.  I was trying to have a thorough listing of our

22   available options.

23        MR. GONZÁLEZ:  Next, Andrew.

24      (Document displayed.)

25

 1   BY MR. GONZÁLEZ

 2   Q.   And then you write to your boss's boss in 2015, a year and

 3   a half before the downloads:

 4          "Ideally, we'd be allowed to store this data

 5       wherever we like -- it's not code.  It's not user

 6       data.  It's pretty low value."

 7       That's what you wrote; right?

 8   A.   Yes.

 9   Q.   Now, you didn't write in any of your communications at

10   that time anything about this information containing trade

11   secrets, did you?

12   A.   No.  I also don't actually know what a trade secret really

13   is.

14   Q.   You know what confidential information is?

15   A.   Yes.

16   Q.   You didn't tell your boss's boss, "Oh, by the way, this

17   has important confidential information."

18       You didn't say that either?

19   A.   That was obvious.  This was not his first introduction to

20   the system.

21          MR. GONZÁLEZ:  All right.  Let's go to 2219.

22       Andrew, next.

23       (Document displayed.)

24   BY MR. GONZÁLEZ

25   Q.   Tom Gorman, KVN -- that's Keker Van Nest; right?

1    **A.**   Yes.

2    **Q.**   And he's writing to you in 2016 telling you they want to

3    check two systems and one of them is SVN; right?

4    **A.**   That's right.

5    **Q.**   And they want you to check a number of employees who you

6    understood were now working with Mr. Levandowski; right?

7    **A.**   I understood that they had left.

8         **MR. GONZÁLEZ:**  Next, Andrew.

9         (Document displayed.)

10   **BY MR. GONZÁLEZ**

11   **Q.**   And you concluded that six of the eight never accessed the

12   SVN server at all; right?

13   **A.**   Within the launch window, yes.

14   **Q.**   Within the --

15        **THE COURT:**  I didn't understand your answer.  Repeat

16   it.

17        **THE WITNESS:**  What I did not realize at the time that

18   I had written this email was that the -- was that the data that

19   I was looking at extended for about a year prior to the

20   investigation.  And so "no access ever" is slightly strong.  It

21   should say "no access within this period."

22   **BY MR. GONZÁLEZ**

23   **Q.**   Wasn't it just five months of data that you preserved at

24   Google?

25   **A.**   It's one year.

1        MR. GONZÁLEZ:  Next, Andrew.

2      (Document displayed.)

3  BY MR. GONZÁLEZ

4  Q.   Then you're asked by Mr. Gorman, who is a lawyer who you

5  understand is investigating these employees; right?

6  A.   Yes, that's right.

7  Q.   "What -- what exactly is in this system?"

8        MR. GONZÁLEZ:  Andrew, the response?

9      (Document displayed.)

10  BY MR. GONZÁLEZ

11  Q.   And this is what you gave the response, using the same

12  exact phrase that you had used back in 2015, "low value";

13  right?

14  A.   Yes, that's right.

15  Q.   And then you say:

16        "It was low value enough that we even considered

17        hosting it off of Google infrastructure."

18        Right?

19  A.   Yes, that's right.

20  Q.   And that's what I just showed you, that slide, that you

21  wrote to your boss's boss?

22  A.   Yes, we evaluated that option.

23  Q.   Now, when you wrote to the lawyer who was investigating

24  this case, you didn't tell him, "Oh, this is important

25  confidential information," did you?

1    A.    No.  That should have been self-evident.

2    Q.    And you didn't tell him that there were trade secrets in

3    this server, did you?

4    A.    I still don't know what that means.

5    Q.    To this day, you don't know what a trade secret is?

6    A.    I have been trying not to learn the legal definition.

7    Q.    Has anybody from Google given you any guidance whatsoever

8    on what is and what is not a trade secret?

9          MR. LYONS:  I'm going to object, Your Honor, on

10   privilege grounds.

11         MR. GONZÁLEZ:  He says he doesn't know.

12         THE COURT:  It's too argumentative.  Move on to

13   something else.  Sustained.

14         MR. GONZÁLEZ:  Andrew, can we go to 2218?

15     (Document displayed.)

16   BY MR. GONZÁLEZ

17   Q.    When you say here "We all do full checkouts," what you're

18   referring to is the fact -- by "full checkout" you're talking

19   about downloading the entire database; correct?

20   A.    The full snapshot, yes.

21         MR. GONZÁLEZ:  Next, Andrew.

22     (Document displayed.)

23   BY MR. GONZÁLEZ

24   Q.    All right.  So you tell the lawyers "low value."  You

25   expressed a concern that we saw earlier.

1      And then you get an email from Shana Stanton.  Do you see

2  that?

3  A.   Yes, I do.

4  Q.   February 22, 2017, the day before this lawsuit is filed;

5  right?

6  A.   I suppose so.

7  Q.   Shana Stanton is in the courtroom, isn't she?

8  A.   Yes.

9  Q.   In the front row?

10 A.   I can't see.

11 Q.   She's wearing black there, right behind the monitor, here

12 in the front row?

13 A.   Oh, she's a little bit shaded, but yes.

14 Q.   All right.  And she's a lawyer for Google; correct?

15 A.   I think so.

16 Q.   And she writes to you the day before this lawsuit is filed

17 and says:

18         "We want to also be able to say that SVN contains

19     only internal confidential stuff."

20     Do you see that?

21 A.   I do.

22 Q.   That's what Google's lawyer told you the day before this

23 lawsuit is filed; true?

24 A.   I believe so.

25 Q.   She didn't ask you whether everything is confidential.

1    She's telling you what Google wants to be able to say; true?

2          MR. LYONS:  Objection.  Argumentative.

3          THE COURT:  No.  It's a little argumentative, but I'll

4    allow the question.  Please answer.

5          THE WITNESS:  Could you repeat the question, please.

6    BY MR. GONZÁLEZ

7    Q.   She didn't ask you whether the information was

8    confidential; she told you that that's what Google wanted to

9    say.  True?

10   A.   It is.  And I rebutted.

11   Q.   And you understood that when she said "We want to be able

12   to say that it only contains confidential information," you

13   understood she was talking about the complaint, the lawsuit

14   that was going to be filed; true?

15   A.   No, I didn't know that.

16   Q.   Sir, have you made any changes to the instructions that

17   you wrote for logging in to the SVN repository?

18   A.   I'm sure I have at some point.

19   Q.   But today, even today if somebody follows your

20   instructions to log in to the SVN repository, everything in

21   that database is downloaded; true?

22   A.   Yes.  That's right.

23   Q.   By the way, during your many years as an engineer, you've

24   plugged in all kinds of devices into your laptop; true?

25   A.   Yes.

1           **MR. GONZÁLEZ:**  Your Honor, I have a few more

2    questions, as I indicated, that I think would be in closed

3    session.

4           **THE COURT:**  All right.  Let's -- we'll take that up in

5    a bit, but let's go back to the redirect.

6           **MR. LYONS:**  Just a few questions on redirect, Your

7    Honor.

8                        **REDIRECT EXAMINATION**

9           **MR. LYONS:**  Can I have Exhibit 2219 on the screen?

10   And just go to the portion of the email that -- excuse me --

11   2218.  I apologize.  It's the first page.  We were just looking

12   at it.

13   **BY MR. LYONS**

14   **Q.**  Let's just go to the portion that counsel was referring

15   to, the email from Shana, where she asks you about confidential

16   information.

17        Do you see that?

18        (Document displayed.)

19   **Q.**  And she says:

20             "We want to also be able to say that SVN contains

21        only internal confidential stuff."

22        Let me just stop there for a second.  I believe counsel

23   asked you some questions.  And he said, "You understood she was

24   talking about the complaint" and stuff.  And you said no.

25        Did I understand that correctly?

ZBROZEK - REDIRECT EXAMINATION / LYONS

1   A.   That's right.

2   Q.   What did you think she was referring to in that portion of

3   the email?

4   A.   I believe she was talking about the contents of the

5   Subversion server.

6   Q.   And was it your understanding that most of the contents on

7   the Subversion server were confidential?

8   A.   The overwhelming majority, yes.

9   Q.   And did you feel that was something that needed

10  explanation to the team who worked on the Subversion server?

11  A.   No.  They know what's in there.

12  Q.   And in terms of it being confidential, was it your

13  understanding that the people who worked on the Subversion

14  server did not know it was confidential?

15  A.   No, they knew.

16  Q.   How is it that you come to that understanding that they

17  knew it was confidential?

18       MR. GONZÁLEZ:  Your Honor, I'm going to move to strike

19  that answer.  "They knew" is speculative.

20       MR. LYONS:  He asked the question, Your Honor.

21       THE COURT:  Well, the -- I'm going to leave the record

22  alone as it is, but the -- the judge does not like the form of

23  question "is it your understanding" --

24       MR. LYONS:  Okay.

25       THE COURT:  -- because that calls for hearsay, triple

1    hearsay.  It's not a -- it just calls for wild speculation.

2        So, please.  I'm going to sustain the next time you use

3    that form of question.

4            MR. LYONS:  I'll ask -- I'll ask it slightly

5    differently.

6    BY MR. LYONS

7    Q.   Why was a Subversion server password protected?

8    A.   Because we wanted to protect the contents of the

9    information that was in it.

10   Q.   Now, I believe, if you continue on in that portion of the

11   email, she refers to someone named Pierre.  Do you see that?

12   A.   Yes, I do.

13   Q.   And do you know who that is?

14   A.   Yes, I do.

15   Q.   Who's Pierre?

16   A.   Pierre is one of my fellow hardware engineers on the

17   program.

18   Q.   You were asked a question that came up on your deposition

19   about setting up tools regarding the SVN server.  Do you recall

20   that testimony?

21   A.   Yes, I do.

22   Q.   Did you set up any tools regarding activity on the SVN

23   server?

24   A.   No, I did not personally set up any tools.

25   Q.   Were you aware of the existence of any tools regarding

ZBROZEK - REDIRECT EXAMINATION / LYONS

 1  security on the SVN server?

 2  **A.**   I was aware that there were some tools that is GCE

 3  provided, but they were automatic.   I didn't have to do

 4  anything.

 5  **Q.**   Your instructions that counsel -- what is GCB?

 6  **A.**   GCE.

 7  **Q.**   GCE.

 8  **A.**   The Google Compute Engine.

 9  **Q.**   Your instructions about the use of the SVN server --

10       **MR. LYONS:**   Can I have 4952 on the screen?   It's in

11  evidence.

12       (Document displayed.)

13  **BY MR. LYONS**

14  **Q.**   Those were your instructions.

15       Did you include in your instructions an instruction that

16  said people should insert a USB device or card reader and

17  download the contents of the SVN server?

18  **A.**   No.

19  **Q.**   Now, Mr. González -- are you familiar with a man by the

20  name of Gary Brown?

21  **A.**   Yes.

22  **Q.**   He testified earlier in this case.

23       And you've met Mr. González actually before today;

24  correct?

25  **A.**   That's right.

1    Q.    Now, when Mr. Brown was on the witness stand, Mr. González

2    asked him about alarm bells as it relates to the SVN server.  I

3    can't do it with nearly the flare of Mr. González, but he said:

4    "Hey, do you think it would have been a good idea from a

5    security standpoint to have somebody maybe ask a question or

6    keep an eye on the repository, that if you download something,

7    why did you do that?"

8              MR. GONZÁLEZ:  Objection, Your Honor.  It's improper

9    to ask about a question I asked another witness.

10             THE COURT:  Well, not necessarily.  It might be

11   proper.

12             MR. LYONS:  I'll rephrase the question.

13             THE COURT:  Well, what are you trying to get at here?

14   BY MR. LYONS

15   Q.    Do you think it would be a good idea from a security

16   standpoint to have alarm bells ring every time somebody

17   downloads the contents of the SVN server?

18   A.    False positives are not ever really useful.  This is a

19   normal activity.  I don't need to know about it.

20   Q.    Why is it a normal activity?

21   A.    This is both something we prescribe to the hardware

22   engineers to do and something that is necessary for them to

23   accomplish their goal.

24   Q.    Is it -- are you saying it's necessary for the engineers

25   to have access to the SVN server so they can work on the

1    self-driving car project?

2            **MR. GONZÁLEZ:**  Objection.  Leading.

3            **THE COURT:**  Very.  So sustained.

4    **BY MR. LYONS**

5    **Q.**   Why is it necessary to have engineers have access to the

6    contents of the SVN server?

7    **A.**   The contents of that server are our work product.  If we

8    are to make progress, we have to be able to access and update

9    and improve our work product.

10           **MR. LYONS:**  Nothing further.

11           **THE COURT:**  Anything more?

12           **MR. GONZÁLEZ:**  Yes, Your Honor, briefly.

13                        <u>RECROSS-EXAMINATION</u>

14   **BY MR. GONZÁLEZ**

15   **Q.**   You were asked whether the SVN server is password

16   protected.  If you wanted to log in to Google and you're an

17   employee, everything is password protected; right?

18   **A.**   Can you clarify?  It's a big system.

19   **Q.**   If you just want to send an email to somebody, it's

20   password protected, right?

21   **A.**   Well, sort of.  Have you logged into that computer before?

22   Like, it may have a saved credential.

23   **Q.**   All right.

24           **MR. GONZÁLEZ:**  Andrew, can we go to 2218?  Right

25   there.

1       (Document displayed.)

2  BY MR. GONZÁLEZ

3  Q.   This is what counsel just asked you about.  When you

4  received this email the day before this lawsuit was filed from

5  Shana Stanton, she added three people to the email chain.  Do

6  you see that?

7  A.   I do.

8  Q.   James, Jordan and Melissa.  Do you see that?

9  A.   Yes, I do.

10 Q.   Those are three of the lawyers representing Google in this

11 trial; true?

12 A.   I have no idea who they are.

13       MR. GONZÁLEZ:   Andrew, go to the top.

14      (Document displayed.)

15 BY MR. GONZÁLEZ

16 Q.   See Jordan Jaffe, the lawyer over there with the red tie?

17 Do you recognize Mr. Jaffe?

18 A.   I don't think we've ever met.

19 Q.   Melissa Baily examined the witness earlier today.  Do you

20 recognize her?

21 A.   I've seen her around.

22 Q.   James Judah was here earlier.  I don't see him.

23 A.   I wouldn't recognize him.  I'm sorry.

24 Q.   So when your lawyer is writing to you telling you what

25 they want to be able to say, she is adding to that email chain

 1 | three lawyers from another law firm; true?

 2 |         **MR. LYONS:**  Objection.  Argumentative.

 3 |         **THE WITNESS:**  I don't know what --

 4 |         **THE COURT:**  Wait, wait, wait.  All right.  Overruled.

 5 |    Please answer.

 6 |         **THE WITNESS:**  I don't know where they are from.  And

 7 | you helpfully blacked it out, so I can't tell you now.

 8 |         **MR. GONZÁLEZ:**  Thank you, sir.

 9 |    That's all I have, Your Honor.

10 |         **THE COURT:**  All right.  We'll have to finish your

11 | testimony up a bit later.  That would be about 50 minutes.

12 |    So please go outside in the hallway so that we can deal

13 | with another witness, and then we'll call you back in.

14 |         **THE WITNESS:**  May I steal this?

15 |         **THE COURT:**  You may take it.

16 |    (Laughter.)

17 |    (Witness steps down.)

18 |         **THE COURT:**  Okay.  All right.  Let's bring your next

19 | witness forward.

20 |         **MR. JAFFE:**  Your Honor, plaintiff Waymo calls

21 | Pierre-Yves Droz.

22 |         **THE COURT:**  Okay.  Bring him forward.

23 |         **MR. JAFFE:**  And for scheduling purposes, some of his

24 | testimony is also needing to be sealed relating to the

25 | substance of the alleged trade secrets.  But we can try and get

 1  through as much of that now and then --

 2          THE COURT:  All right.

 3          MR. JAFFE:  -- stick to the sealed record.

 4          THE COURT:  Okay.

 5          THE CLERK:  May the witness please approach the

 6  witness stand.

 7          THE COURT:  Please raise your right hand.

 8                      PIERRE-YVES DROZ,

 9  called as a witness for the Plaintiff, having been duly sworn,

10  testified as follows:

11          THE WITNESS:  I do.

12          THE CLERK:  Please be seated.

13      State your full name for the record and spell your last

14  name.

15          THE WITNESS:  My name is Pierre-Yves Droz.

16          THE COURT:  Spell that last name, please.

17          THE WITNESS:  Last name D-R-O-Z.

18          THE COURT:  D-R-O-Z, good.  Thank you.

19      Go ahead, Counsel.

20                      DIRECT EXAMINATION

21  BY MR. JAFFE

22  Q.  Good afternoon.

23  A.  Good afternoon.

24  Q.  Mr. Droz, where do you work?

25  A.  I work at Waymo.

DROZ - DIRECT EXAMINATION / JAFFE

1   Q.   What do you do at Waymo?

2   A.   I'm the technical division leader on the LiDAR team here.

3   Q.   I think we all can hear a little bit of an accent.  If you

4   can slow down and help us out.

5        Where are you from originally?

6   A.   I'm from France.

7   Q.   When did you move to the United States?

8   A.   I moved to the U.S. about 15 years ago.

9   Q.   Why did you move to the United States?

10  A.   To study originally, and I ended up staying.

11  Q.   Where did you study?

12  A.   I studied at UC Berkeley.

13  Q.   Did you get a degree from Berkeley?

14  A.   I did.  I got a Master's in electrical engineering and

15  political science.

16  Q.   Where do you live now?

17  A.   I live in Los Altos.

18  Q.   And have you lived in the Bay Area since you went to

19  Berkeley?

20  A.   Yes.

21  Q.   Do you have a family?

22  A.   I do.  I'm married.  I have two kids, two boys.

23  Q.   And how long have you worked for Waymo and Google?

24  A.   So I have -- it will be seven years now.

25  Q.   When did you join Google?

DROZ - DIRECT EXAMINATION / JAFFE

1    A.    I joined Google in October 2011.

2    Q.    Before you joined Google, where did you work?

3    A.    I worked in a startup called 510 Systems, 510 Systems.

4    Q.    And what was your role in the startup?

5    A.    So I was the -- in charge of, like, research and

6    developments.  I also was one of the founders of the startup.

7    Q.    One of the founders?

8    A.    One of the founders.

9    Q.    Were there co-founders?

10   A.    Yes.  So initials, I was one of the founders, and Anthony

11   Levandowski was also one of the founders.

12   Q.    So Anthony Levandowski?

13   A.    Anthony Levandowski.

14   Q.    Okay.  And you mentioned your role at 510 Systems.  What

15   was Mr. Levandowski's role at that company?

16   A.    So Anthony was leading the company on a part-time basis.

17   He, you know, doing the strategy.  He was not very involved in

18   day to day.

19   Q.    And we've talked a little bit about it.  What did 510

20   Systems do?

21   A.    510 Systems did a mapping systems originally and then we

22   also did self-driving car technology and LiDARs.

23   Q.    If you could slow down for the court reporter.

24   A.    Yeah.  I'm sorry.

25   Q.    You said self-driving car technology?

DROZ - DIRECT EXAMINATION / JAFFE

1   A.   Self-driving car technology.

2   Q.   And what kind of technology, kind of zooming in a little

3   bit, did you work on at 510?

4   A.   So I worked at -- toward the end, I worked more

5   specifically on the LiDAR technology.

6   Q.   LiDAR?

7   A.   LiDAR.

8   Q.   We've heard about it a lot in this case, but I don't think

9   we've heard about it for a few witnesses.  Can you just give a

10  brief explanation what LiDAR is?

11  A.   So LiDAR is a device, a sensor that can -- uses light to

12  measure distance to objects.  And so it senses, like, laser

13  pulses of light and the time it take for those pulses to go to

14  a target and come back.  And that, you know, is the device to

15  measure the -- what is space around the car.

16  Q.   510 Systems, they didn't invent LiDAR; right?

17  A.   No, we did not.

18  Q.   Were there other LiDARs that you could buy off the shelf,

19  so to speak?

20  A.   Yes, there were.

21  Q.   Can you give an example of one, please?

22  A.   So one example would be the Velodyne HDL-64.

23  Q.   HDL-64?

24  A.   64.

25  Q.   If you could buy these LiDARs off the shelf, why would you

 1   build your own?

 2   **A.**   And so the Velodyne is a very expensive -- all of those

 3   LiDARs are very expensive.  They also didn't work very well for

 4   our automotive.  They're very fragile.  And so we thought that

 5   we could fix that.

 6   **Q.**   And is LiDAR important to self-driving cars?

 7   **A.**   It is.  The -- it's acting as the eyes of the car.  That's

 8   the maintenance here that is used to drive the car.

 9   **Q.**   What was the first custom LiDAR that you worked on in

10   developing at 510 Systems?

11   **A.**   We worked on this device that we called LBr or Little

12   Bear.

13   **Q.**   Little Bear?

14   **A.**   Little Bear.

15   **Q.**   And I think we've heard some bear names already.  What is

16   Little Bear?  Where did you get that name from?

17   **A.**   And so Little Bear came from the -- at 510 we used to name

18   our projects based on the -- the mountains of Colorado, and one

19   of them's called Mount Little Bear, so...

20   **Q.**   What happened to 510 Systems?

21   **A.**   510 Systems was acquired by Google.

22   **Q.**   Did you join Google as part of the acquisition?

23   **A.**   I did.

24   **Q.**   Did you join a specific project within Google?

25   **A.**   Yes.  I joined the Project Chauffeur, which is the

1   self-driving project at Google.

2   Q.    When you joined Google, was Google already using LiDAR for

3   its self-driving car project?

4   A.    They were, yes.

5   Q.    What kind of LiDAR were they using?

6   A.    So they were using the Velodyne HDL-64.

7   Q.    After you joined Google, what was the first LiDAR that you

8   began working on?

9   A.    So we worked both on the LiDAR called Mama Bear, MBr; and

10  Papa Bear, PBr.

11  Q.    Okay.  We've got more bear names.

12        What's -- can you explain the naming scheme, going from

13  Little Bear to Mama Bear and Papa Bear, please?

14  A.    So when we started working at Google, we decided to change

15  the -- the naming scheme of them.  Because our first LiDAR's

16  called Little Bear, we decided to go ahead for a bear theme.

17  Q.    Okay.  So one of the LiDARs you mentioned is Papa Bear; is

18  that right?

19  A.    That is correct.

20  Q.    What -- was Papa Bear the same kind of design as the

21  Velodyne that Google was already using at the time?

22  A.    No.  Papa Bear was a long-range LiDAR.  Velodyne is more

23  like a midrange LiDAR.

24  Q.    You mentioned long range; is that right?

25  A.    Yes.

DROZ - DIRECT EXAMINATION / JAFFE

1   Q.   Why were you and Google's self-driving car project

2   building a long-range LiDAR for self-driving?

3   A.   So we -- you know, we realized that -- with experience

4   driving the car on the road, that for some specific scenario,

5   specific things happening on the road, we definitely needed

6   this long-range capabilities.  We needed to see really far away

7   from the car.

8   Q.   And is a long-range LiDAR, is that different from a

9   mid-range LiDAR, which I think you mentioned earlier?

10  A.   Yes.  They usually have different -- different resolution.

11  They can see much further.  They usually are a more powerful

12  laser source.

13  Q.   And the last thing you said is a more powerful what?

14  A.   Laser source.

15  Q.   Laser source.

16  A.   That's what generates the lights inside the...

17  Q.   How did Google initially implement this long-range LiDAR

18  with this more powerful light source?

19  A.   So the first device we built, we used an off-the-shelf

20  light source, and it's called -- it's called fiber laser.  And

21  we, you know --

22  Q.   Hold on.  Let me stop you there, actually.  "Fiber laser,"

23  new term.  Can you please explain what a fiber laser is to the

24  jury.

25  A.   Okay.  So a fiber laser is a device where you take a

1    little laser, something that makes light, not much light, and

2    then you send it into this optical fiber.  And this fiber, you

3    know, you make a coil of the fiber.  And as the light

4    propagates on the fiber, it gets amplified.  And what started

5    as a very small pulse of light ends up a very large pulse of

6    light at the end of it.

7    **Q.**    Okay.  And these first Papa Bear LiDARs, these first

8    long-range LiDARs, where did you get the fiber lasers from?

9    **A.**    It was an off-the-shelf unit that we had.

10   **Q.**    And after you did that, did you keep using off-the-shelf

11   fiber lasers?

12   **A.**    No.  We eventually designed our own.

13   **Q.**    Can you explain the process that you and your colleagues

14   at Google went through to develop your own fiber laser.

15   **A.**    So we had to -- I think we spent about, like, a year

16   trying different fibers and the -- and it didn't go, like, very

17   far like that.  And then we hired another engineer who -- who,

18   you know, designed a working prototype in about a year as well.

19   **Q.**    What was the total time that Google spent before it could

20   develop its own fiber laser design?

21   **A.**    It was about two years of trial and errors.

22   **Q.**    When did Google create the first version of its PBr?

23   **A.**    So the first version was in 2012.

24   **Q.**    And, again, we're talking about the long-range --

25   **A.**    Long-range LiDAR.

DROZ - DIRECT EXAMINATION / JAFFE

1    Q.    Okay.  Does Waymo still use this Papa Bear LiDAR today?

2    A.    No.  I mean, we use a more advanced version of it.  The

3    one in 2012 was pretty far from the one today.

4    Q.    Sorry.  What was that?

5    A.    It's pretty different from the one we use today.

6    Q.    Thank you.

7          What happened to these early ones that you were just

8    talking about, the early versions of the Papa Bear LiDAR?

9    A.    So the very first prototype we put in a car was a big

10   wooden box.  And today I think it's in the museum.

11   Q.    It's in a museum?

12   A.    It's in a museum.

13   Q.    Does that one in the museum with the wooden box, does that

14   have this custom fiber laser that Google developed?

15   A.    No.  It's mostly off-the-shelf parts.

16   Q.    And do you remember how much it cost to buy these

17   off-the-shelf fiber lasers?

18   A.    I think they were around $10,000.

19   Q.    You say $10,000?

20   A.    $10,000, yes.

21   Q.    If you can just speak a little bit more into the

22   microphone.

23   A.    I'm sorry.

24   Q.    Thank you.

25         All right.  I have a physical exhibit for you.  This is

```
 1    TX-4178.
 2              MR. JAFFE:  I understand there are no objections to
 3    this?
 4              MR. GRINSTEIN:  No objection.
 5              THE COURT:  Thank you.
 6              MR. JAFFE:  May I approach the witness, Your Honor?
 7              THE COURT:  You may.
 8         (Whereupon document was tendered to the witness.)
 9    BY MR. JAFFE
10    Q.   Mr. Droz, do you recognize the thing that I've put in
11    front of you?
12    A.   Yes, I do.
13    Q.   What is it?
14    A.   This is the latest version of the PBr, of Papa Bear.  This
15    is version seven.
16    Q.   I'm sorry.  If you could slow down a little bit, please.
17    A.   Sorry.
18    Q.   Yeah.
19         And you said -- what version is this?
20    A.   It's version seven.
21    Q.   All right.  We mentioned long range.  Earlier we talked a
22    little bit about mid-range.  What was the first mid-range LiDAR
23    you tried to build at Google?
24    A.   So there was a device that we called MBr, or Mama Bear.
25    Q.   All right, Mama Bear.  Is Mama Bear used on Waymo's cars
```

1   today?

2   **A.**   It is not.

3   **Q.**   Okay.  And at a high level, why is it not on the cars?

4   **A.**   So we -- you know, we spent about a year and a half

5   developing this and -- when we put it on the car and tried to

6   use it, we discovered something was not -- would not work and

7   so we had to give that up.

8   **Q.**   Did Google at that time give up developing its own

9   mid-range self-driving car LiDAR?

10  **A.**   No, we did not.

11  **Q.**   What did you do instead?

12  **A.**   We went back to the drawing board and designed a new

13  device.

14  **Q.**   What was that device called?

15  **A.**   So it's called GBr, or Grizzly Bear.

16  **Q.**   Got another bear.  Grizzly Bear?

17  **A.**   Grizzly Bear.

18  **Q.**   Okay.  When did you start developing Grizzly Bear?

19  **A.**   That was in -- at the very end of 2012.

20  **Q.**   And was this similar design to -- to the Velodyne or was

21  it different?

22  **A.**   It was, you know, different.  It was smaller.  Lower cost.

23  More robust.  High resolution.

24  **Q.**   How many laser beams did it have?

25  **A.**   It had 64.

1    Q.   And is that the same or different from the Velodyne?

2    A.   It's the same number as Velodyne.

3    Q.   Did you file for a patent on any aspect of that design?

4    A.   We did.

5    Q.   And what aspect was that?

6    A.   So we filed a patent on the -- on the way -- on the lens

7    architecture.  So the GBr uses the single lens architecture,

8    which is same lens for transmit and receive.  And that's what

9    this patent was about.

10   Q.   Did you or Google disclose the entire Grizzly Bear design

11   in the context of that patent?

12   A.   No, no, no.  Just the -- what is eventually the single

13   lens design.

14   Q.   All right.  I'm going to hand up another exhibit, TX-4074.

15          MR. JAFFE:  I understand there's no objection?

16          MR. GRINSTEIN:  No objection.

17      (Whereupon document was tendered to the witness.)

18          MR. JAFFE:  I'm not sure, for the record, if I moved

19   into evidence the first one, TX --

20          THE COURT:  4178 is in evidence.  Both are in

21   evidence.

22          MR. JAFFE:  Thank you.

23      (Trial Exhibits 4178 and 4074 received in evidence).

24   BY MR. JAFFE

25   Q.   All right.  The last device I just put up on the witness

 1   stand, what is that?

 2   **A.**   This is the GBr2.

 3   **Q.**   Is this GRb2, is that on Waymo's self-driving cars today?

 4   **A.**   No, it's not.

 5   **Q.**   What is on Waymo's self-driving car for the mid-range?

 6   **A.**   The GBr3, the later version of this.

 7   **Q.**   Grizzly Bear 3?

 8   **A.**   Grizzly Bear 3.

 9   **Q.**   Okay.  And at a high level, without going into any

10   confidential information, can you tell me what's different

11   about Grizzly Bear 2 and 3?

12   **A.**   So in GBr3, we kept improving the resolution.

13   **Q.**   When did you start working on the GBr3 design?

14   **A.**   That was in the summer 2015.

15   **Q.**   I have another physical exhibit.  This is TX-4075.

16           **MR. GRINSTEIN:**  No objection.

17           **THE COURT:**  It's in evidence.

18       (Trial Exhibit 4075 received in evidence)

19           **MR. JAFFE:**  Thank you.

20       (Whereupon document was tendered to the witness.)

21   **BY MR. JAFFE**

22   **Q.**   For TX-4075, what is that device?

23   **A.**   So that device is GBr3.

24   **Q.**   And from over here, I -- they look pretty similar to me.

25   How can you tell the difference between GBr3 and GBr2?

DROZ - DIRECT EXAMINATION / JAFFE

1    A.    And so one example, the -- this seal here on the top is

2    rectangular on the GBr2 and square on GBr3.  That's one of the

3    difference.

4    Q.    How much does a GBr3 cost Waymo?

5    A.    GBr3 today costs about $4,000.

6    Q.    How does that compare to the Velodyne?

7    A.    So the Velodyne was about $75,000.

8    Q.    All right.  I want to change gears for a little bit and

9    talk about these designs.  Are Waymo's LiDAR designs kept

10   confidential?

11   A.    Yes, they are.

12   Q.    And is -- did that policy apply when Mr. Levandowski

13   worked at Google?

14   A.    It did, yes.

15   Q.    How does Google protect the confidentiality of its LiDAR

16   designs?

17   A.    So we use different things.  So that -- for anything

18   that's digital, all the files, all the -- we apply different

19   security measures, you know, encryption, passwords --

20   Q.    Sir, can you slow down, please.

21   A.    I'm sorry.

22         Encryption, passwords.  We have a very strong history of

23   security, computer security.

24         And we -- for anything that's physical, the -- you know,

25   the buildings are locked.  You know, we have badge readers,

1   guards.   The -- you know, we usually ask employees to check, if

2   someone comes behind them, that they have a badge.   We had once

3   seen someone ask, you know, Sergey Brin, the founder, if they

4   could see their badge.

5   Q.   Okay.   Are there any trainings designed to protect Waymo's

6   confidential information?

7   A.   Yes.   We -- all the employees have to go through the

8   security training every year.

9   Q.   What about -- does Waymo or -- and Google before that, do

10  they share or have they shared their design with third parties?

11  A.   So we'd never share the whole design, but sometimes we

12  have to communicate with suppliers, for example, to -- you

13  know, for them to manufacture parts, we need them to know what

14  to manufacture.

15      So that, in this case, on a need-to-know basis, we'll give

16  them only the details they need.   And we will do that under an

17  agreement, an NDA or a contract for confidentiality.

18  Q.   What about dealing with confidential documents?

19  A.   So we -- we usually mark those documents.   We mark those

20  documents.

21  Q.   How do you mark them?

22  A.   So that they're not showing confidential or proprietary --

23  Q.   What about the -- we've seen some videos of the Waymo cars

24  driving along the road with presumably the LiDARs on top.   How

25  do you protect someone from going in and grabbing one and

 1  looking at the designs then?

 2  **A.**   Well, from the outside, you know, the dome is usually

 3  black, so you can't really see directly the design.  And the --

 4  you know, there is always someone with the car, someone from

 5  Waymo or Google with the car.

 6       And at night, you know, the cars are locked in the Google

 7  facility, in the Waymo facility.

 8  **Q.**   Can you please turn to TX-1071 in your witness binder?

 9  **A.**   I'm sorry.  You said 1- --

10  **Q.**   1071.

11       (Witness complied.)

12  **Q.**   Are you familiar with the article that's shown there?

13  **A.**   I am.

14  **Q.**   Did you read it around the time it came out?

15  **A.**   I did.

16       **MR. JAFFE:**  Your Honor, I'd like to move into evidence

17  TX-1071, not for the truth of the matter asserted.

18       **MR. GRINSTEIN:**  Objection.  Hearsay.  It is for the

19  truth of the matter asserted.

20       **THE COURT:**  All right.  Given me the exhibit number

21  again.

22       **MR. JAFFE:**  1071.

23       **THE COURT:**  71.  Well, let me see that, please.

24       **MR. JAFFE:**  Your Honor, can I ask some follow-up

25  questions?

1      **THE COURT:**  Go ahead.  But I -- I'll need to see it.

2      **MR. JAFFE:**  Sure.

3      (Whereupon document was tendered to the Court.)

4      **THE COURT:**  Go ahead and ask your questions, though.

5  **BY MR. JAFFE**

6  **Q.**   Mr. Droz, when you received this article that we're

7  speaking about, what was your reaction?

8  **A.**   I think part of it was a little bit of pride.  I mean, you

9  know, this specifically explains how the product, the price --

10     **MR. GRINSTEIN:**  Your Honor, if he's going to disclose

11  the substance of a hearsay article, we need a ruling on the

12  hearsay objection.

13     **THE COURT:**  All right.  Hang on a minute.

14     This is just a newspaper -- this is just a newspaper

15  article.  And it is too much of a risk that it would get

16  treated by the jury as good evidence as opposed to being just a

17  newspaper story.

18     So the objection is sustained.

19     **MR. JAFFE:**  Thank you, Your Honor.

20  **BY MR. JAFFE**

21  **Q.**   All right.  Let's change topics.  And we've heard about

22  this -- an SVN server.  Do you use that, an SVN server at

23  Waymo?

24  **A.**   I do.

25  **Q.**   Okay.  And what is on this SVN server?

1    A.   So that's where we store all our electrical engineering

2    files.

3    Q.   And can you relate those engineering files to the LiDARs

4    that you have sitting in front of you?

5    A.   Yes.  All the design files and the schematics, the layout

6    files, for -- and simulation files as well for those LiDARs are

7    on there.

8              MR. JAFFE:  Your Honor, permission to approach.

9              THE COURT:  Yeah.

10   BY MR. JAFFE

11   Q.   I'm handing you physical Exhibit TX-4881.

12        (Whereupon exhibit was tendered to the witness.)

13   Q.   Mr. Droz, do you understand what's on that hard drive?

14   A.   I do.

15   Q.   What is it?

16   A.   That was the files contained by the SVN as of

17   December 2015.

18             MR. JAFFE:  Your Honor, I'd like to please move into

19   evidence TX-4881.

20             MR. GRINSTEIN:  No objection.

21             THE COURT:  Thank you.  In evidence.

22        (Trial Exhibit 4881 received in evidence.)

23   BY MR. JAFFE

24   Q.   We heard some testimony earlier.  I want to ask you one

25   specific question.  Does what's contained on that SVN server,

DROZ - DIRECT EXAMINATION / JAFFE

1   is it internal confidential stuff?

2   **A.**   Yes.

3   **Q.**   Okay.  And if you can refer to it by number, I put the

4   trade secret list in the front of your witness binder, and just

5   use the number.  I don't want you to speak any of the content

6   of the trade secrets.

7   **A.**   Okay.

8   **Q.**   But which ones of the trade secrets are included on that

9   hard drive I just handed you with the SVN server?

10  **A.**   That would be Trade Secret Number 2, 7, and 14.

11  **Q.**   Okay.

12       All right.  I want to change topics again.  I want to talk

13  about Mr. Levandowski's departure from Google.  Do you remember

14  when he left Google?

15  **A.**   Yes.  He left Google in January of 2016.

16  **Q.**   When did you find out he was leaving Google?

17  **A.**   He told me at the beginning of January -- January.

18  **Q.**   Was it a surprise to you that he was leaving Google?

19  **A.**   Not entirely.  He had talked to me before that, in the

20  summer of 2015, about wanting to leave Google.

21  **Q.**   And can you tell me about the conversations that you had

22  with Mr. Levandowski in the summer of 2015?

23  **A.**   So at the time we had dinner in a restaurant.  He told me

24  that he had had a phone call or a conference with -- a meeting

25  or phone call with an executive at Uber, Brian McClendon.  And

DROZ - DIRECT EXAMINATION / JAFFE

1   that Brian told him that they were interested in some --

2   acquiring the Google LiDAR team and that if Anthony was

3   creating a company, hiring that team, they will acquire the

4   company.

5   **Q.**   How did you react to that?

6   **A.**   I told him it was a very bad idea.

7   **Q.**   Bad idea?

8   **A.**   Yes.  Really bad idea.

9   **Q.**   Did there come another time when you had another

10  conversation with Mr. Levandowski about leaving Google?

11  **A.**   At the beginning of January 2015.

12  **Q.**   What happened in that conversation?

13  **A.**   So in that conversation he told me that he was, you know,

14  considering doing a new startup and, you know, that startup

15  would be doing self-driving trucks.

16  **Q.**   Did that startup -- was it going to have any specific

17  LiDAR technology?

18  **A.**   Yes.  He was talking about developing LiDAR technology

19  there as well.

20  **Q.**   Sorry.  Can you say that again.

21  **A.**   He was talking about developing LiDAR technology there as

22  well.

23  **Q.**   Did he tell you what kind of LiDAR technology he wanted to

24  develop at his new startup?

25  **A.**   He was interested in long-range LiDAR.

1  **Q.**   Did he compare what he was proposing to any of Google's

2  LiDARs?

3  **A.**   Yeah.  He compared it to PBr.

4  **Q.**   What did he say?

5  **A.**   He said he would want to replicate the design.

6  **Q.**   Replicate?

7  **A.**   Replicate.

8  **Q.**   Did you agree to join Mr. Levandowski's new venture at

9  that time?

10  **A.**   So, you know, the way he presented it, that, you know, he

11  wanted to create a company, that the premises are very

12  different than what he had said about in that summer.  You

13  know, he said that the company would be a sister company to

14  Google, that he was talking to the founders.  And so at that

15  time it seemed like a good opportunity, so I agreed to join the

16  company.

17  **Q.**   Did you think you could use Google's technology at this

18  new company?

19  **A.**   So he -- he told me at the time that he would -- you know,

20  they were seeking approval from the founders, trying to make a

21  cross-license or -- so in those conditions it seemed -- it

22  seemed -- yes, it seemed something like that.

23  **Q.**   What did you do after you agreed to join Mr. Levandowski's

24  new company in January 2016?

25  **A.**   So I helped him plan for the company.  The -- he also told

DROZ - DIRECT EXAMINATION / JAFFE

1    me to talk to some of the Google employees, so I did that.

2    Q.    Did you end up joining Mr. Levandowski's new company?

3    A.    No, I did not.  The -- you know, over this month there's

4    -- you know, I learned about a meeting with Uber.  I learned

5    about things that made more and more -- made it sound as if,

6    you know, it was -- it was actually the idea that he had

7    presented in the summer of 2015.  And so those doubts started

8    to add, and I pulled the plug.

9    Q.    Thank you.

10          MR. JAFFE:   There are a number of documents that I

11   don't think there are objections to, but we're also not going

12   to show them to the gallery.

13   BY MR. JAFFE

14   Q.    Mr. Droz, can you turn to TX-530?

15         (Witness complied.)

16   A.    Yes.

17   Q.    Do you recognize this document?

18   A.    Yes, I do.

19   Q.    At a high level, what is it?

20   A.    This is a drawing of the transmit block on GBr.

21         MR. PERLSON:   Your Honor, I'd like to please move into

22   evidence TX-530.

23         MR. GRINSTEIN:   No objection.

24         THE COURT:   530 is in.

25         (Trial Exhibit 530 received in evidence.)

DROZ - DIRECT EXAMINATION / JAFFE

1          (Document displayed, not shown to the gallery.)

2    BY MR. JAFFE

3    Q.   Can you please turn to TX-4076?

4          THE COURT:  What's the problem?

5          MR. PERLSON:  These monitors are showing.  I'm just

6    turning them around.

7          (Brief pause.)

8    BY MR. JAFFE

9    Q.   Do you have it?

10   A.   Yeah, I do.

11   Q.   Okay.  And, again, without going into confidential

12   information, what is TX-4076?

13   A.   TX-4076 is a document that describes how the transmit

14   block -- the specifications and the requirements for the GBr

15   transmit block.

16         MR. JAFFE:  Your Honor, I'd like to please admit

17   TX-4076.

18         MR. GRINSTEIN:  No objection.

19         THE COURT:  4076 is in.

20         (Trial Exhibit 4076 received in evidence.)

21   BY MR. JAFFE

22   Q.   And now to conclude the public session, how does it make

23   you feel about Uber's allegations in this case that Waymo's

24   trade secrets are not valuable and generally known in terms of

25   your work at Google?

1   A.   Pretty sad.  I mean, there is a lot of work for me and a

2   lot of people at Google and Waymo, and seeing them described

3   this way seems pretty unfair.

4        MR. JAFFE:  That's all the questions I have for the

5   public session.

6        THE COURT:  All right.  Let's have the public

7   cross-examination.

8                    <u>CROSS-EXAMINATION</u>

9   BY MR. GRINSTEIN

10  Q.   Good morning, Mr. Droz.  My name is Joe Grinstein.  I'm a

11  lawyer for Uber.  We haven't met.  It's nice to meet you from

12  ten feet away.

13       Mr. Droz, you mentioned that you joined Google from 510

14  Systems; is that correct?

15  A.   That is correct.

16  Q.   And a lot of the people who came over from 510 Systems to

17  join Google were included as part of the Chauffeur bonus

18  program; is that correct?

19  A.   That's my understanding.

20  Q.   And you're one of those people; right?

21  A.   That's correct.

22  Q.   As part of that Chauffeur bonus program, in 2015 you

23  received a bonus of approximately $9 million; is that correct?

24  A.   That is correct.

25  Q.   And you expect that next year you are going to receive

DROZ - CROSS-EXAMINATION / GRINSTEIN

1  another bonus payment as part of that bonus program; correct?

2  A.   Correct.

3  Q.   And if the valuation of Waymo stays the same, your bonus

4  next year will be approximately $9 million again; correct?

5  A.   That's my understanding.

6  Q.   If the valuation of Waymo goes up, your bonus actually may

7  go up; correct?

8  A.   Yes.

9  Q.   And in 2023 you're expecting another bonus from part of

10  the Chauffeur bonus program.  Again, if the valuation of Waymo

11  stays the same, it will be $9 million; correct?

12  A.   No.  It -- it will be half of that.

13  Q.   It will be half of that.

14       So sitting here today, you're looking at another

15  $13 million of bonus in the future if the valuation of Waymo

16  stays the same?

17  A.   That's my understanding.

18  Q.   If the valuation of Waymo falls, your bonus may fall; is

19  that fair?

20  A.   Yes, that's my understanding.

21  Q.   And in the future if Uber beats Waymo in the market for

22  self-driving cars, that's something that could cause the

23  valuation of Waymo to fall, isn't it?

24  A.   Yes, it could.  That would be speculation, but yes.

25  Q.   One of the last things you were discussing before you

DROZ - CROSS-EXAMINATION / GRINSTEIN

1   broke and concluded your conversation with your counsel was a

2   discussion about your interactions with Mr. Levandowski in

3   January 2016.

4        Do you remember having that conversation with Waymo's

5   counsel just now?

6   A.   Yes.

7   Q.   And I think you testified, am I correct, that

8   Mr. Levandowski told you in January 2016 that he was intending

9   to replicate the PBr technology in his new LiDAR company;

10  correct?

11  A.   Yes.  Yes.

12  Q.   You did not at that time interpret that to mean that

13  Mr. Levandowski was going to steal anything from Waymo; isn't

14  that true?

15  A.   I originally considered that that's what he meant.  And

16  then he -- you know, that I told him that.  And, you know,

17  that's what he wanted to do.  After that, he brought up the

18  subject of the cross-license and, you know, the agreement with

19  the founders.

20  Q.   I'd just like a clear answer to my question because I'm

21  afraid I didn't quite understand that.

22  A.   Okay.

23  Q.   At the time he told you he was intending to replicate the

24  PBr technology at his new startup, you personally didn't think

25  he was telling you "I'm about to steal something"; correct?

1   A.   Originally, that's what I thought he meant.

2   Q.   Because after he told you that, you went around Google and

3   solicited Google employees to go join Mr. Levandowski's venture

4   with you; correct?

5   A.   In between the two was a very big important fact, the fact

6   that he told me that -- I confronted him about that and he told

7   me that, "Oh, no.  The venture will be about using Google

8   technology under a cross-license," some kind of agreement with

9   the founders.

10  Q.   Let me try this question again.

11       After he told you he was intending to replicate the PBr

12  technology at his new startup, you went around Google and

13  solicited Google employees to join the startup?  Yes or no.

14  A.   Yes, under the conditions stated.

15  Q.   And, in fact, you handed out offer letters to those other

16  Google employees; correct?

17  A.   I did.

18  Q.   You wouldn't have done that if you thought Mr. Levandowski

19  was about to steal something; right?

20  A.   I would not have, no.

21  Q.   Now, it's fair to say that in January 2016, if Google had

22  known that Mr. Levandowski was about to steal something, Google

23  probably would have been concerned about that; is that fair?

24  A.   Yes.

25  Q.   Yet, after this conversation you had with Mr. Levandowski,

1    you didn't go and tell your bosses anything about

2    Mr. Levandowski replicating Google technology; is that correct?

3    **A.**   Well, Anthony was telling me and showed me, you know,

4    emails he had, you know, with Sergey and Larry.  And so, you

5    know, I thought that, you know, he was actually, like -- you

6    know, that he was discussing it with the founders.  I don't see

7    why --

8    **Q.**   Is the answer to my question, yes, you didn't go tell your

9    bosses?

10   **A.**   I did not go tell my boss, no.

11   **Q.**   And, in fact, you never told anyone about this particular

12   conversation with Mr. Levandowski until this litigation got

13   started; isn't that right?

14   **A.**   I don't think I did, no.

15   **Q.**   Even after you started to have doubts about

16   Mr. Levandowski and you decided "I'm not going to go join 280

17   Systems at the end of January 2016," those doubts were creeping

18   in your head, but you still did not go and tell any of your

19   bosses about this conversation you had with Mr. Levandowski; is

20   that correct?

21   **A.**   Well, those were doubts.  No, I did not tell anybody.

22   **Q.**   You talked earlier about some of the confidentiality

23   protections that Waymo provides to its information.  And I

24   guess that applied to Google as well?

25   **A.**   Yes.

1  Q.   And just so the jury is clear, when did Waymo come into

2  existence?

3  A.   That was, I think, in January 2017.  I'm not sure of the

4  exact date.

5  Q.   So whenever we're talking about Mr. Levandowski, we're

6  always talking about Google and not Waymo?

7  A.   I think so.

8  Q.   Now, during your work at 510 Systems and later at Google,

9  from time to time employees would take home old versions of

10  LiDAR devices; isn't that correct?

11  A.   I think from time to time employees would, to be quite

12  fair.  I know of instances where this happened.

13  Q.   I mean, for example, you took home a 510 device and used

14  it for an art project, art display at Burning Man; right?

15  A.   Yes, I did.

16  Q.   And you also --

17  A.   I don't think it was a 510 device.

18  Q.   It was a 510 device; right?

19  A.   It was something -- it was a LiDAR off-the-shelf, like a

20  seek LiDAR.

21  Q.   You also took home from Google old versions, junked

22  versions, whatever you want to call them, of Teddy Bear and

23  Papa Bear; isn't that right?

24  A.   I did that once.  Anthony actually had told me to do that.

25  He had told me I could take mementoes.  And I brought it back a

 1  few month later.

 2  Q.   The answer is yes?

 3  A.   The answer is yes.

 4  Q.   And you didn't think anything was wrong with that because

 5  you got permission to do it; right?

 6  A.   I got permission from my boss, my manager, Anthony, that's

 7  right.

 8  Q.   So you don't see anything wrong with people taking home

 9  devices from Google, you know, these old LiDAR devices, if they

10  have the permission of their bosses; is that fair?

11  A.   At the time I thought that was the case.  Now I know it's

12  not something I --

13  Q.   In fact, the only reason you returned the Papa Bear and

14  the Teddy Bear device was because this controversy with

15  Mr. Levandowski got started and you started to think maybe it's

16  not so good I have these souvenir devices at home; isn't that

17  correct?

18  A.   Well, when -- you know, when he left and I started to

19  learn a lot of -- a lot of lies that he told me, I started to

20  reconsider the sort of information he gave me.  That was one of

21  them.  And at that point I --

22  Q.   Sir, is the answer to my question yes?

23  A.   I'm sorry.  Can you repeat the question exactly?

24  Q.   My question was, in fact, the reason you returned this PBr

25  and this Teddy Bear device, the only reason you returned those

1    devices was because the Anthony Levandowski allegations came

2    out and you thought, "You know what?  It looks better.  Why

3    don't I send them back?"

4    **A.**   That was not because of the allegations, I think, no.

5    **Q.**   All right.  Let's take a look at your deposition.  This is

6    the August 22nd Otto 30(b)(6) deposition, page 31, lines 3

7    through 13.

8          **THE COURT:**  We're getting to the point where we need

9    to go back to the other witness if you plan on finishing him

10   today.

11         **MR. GRINSTEIN:**  Can we just have that deposition?

12         **THE COURT:**  All right.  Let's do the deposition and

13   we'll break with this witness.

14         **MR. GRINSTEIN:**  Actually, can you go down a little

15   further from there, sir?

16      (Document displayed.)

17         **THE COURT:**  Okay.  You have read it out loud exactly

18   the way it is on the screen, and then it will be in the record.

19   Go ahead.

20         **MR. GRINSTEIN:**  I'm at line 19.

21   **BY MR. GRINSTEIN**

22   **Q.**   (As read)

23      "QUESTION:  And why did you bring the TBr board back?

24      "ANSWER:  So that was a -- that was a hole-enclosed

25         device on a TBr and a PBr.  The -- you know, after

SEALED PROCEEDINGS

1    Anthony left and things got a bit complicated -- not

2    complicated -- sorry, that things got -- there was a

3    lot of -- there was a lot of information that Anthony,

4    like, had fed me that I thought was -- that -- I

5    reconsidered at the time, and then having those

6    devices home was more information that I considered as

7    probably not being a good idea."

8         **MR. GRINSTEIN:**  Your Honor, we can go to Mr. Zbrozek.

9         **THE COURT:**  All right.  Yes, sir.

10        **MR. JAFFE:**  Your Honor, that's -- that's exactly --

11   almost exactly what he said.  It's not proper impeachment.

12        **THE COURT:**  Overruled.

13   Okay.  You've got to be back here in the morning at 7:30,

14   please.

15   So you can step out.

16   (Witness steps down.)

17        **THE COURT:**  We need to bring back in Sasha --

18        **MR. LYONS:**  We're getting him now, Your Honor.

19        **THE COURT:**  All right.

20        **MR. LYONS:**  Your Honor, this would be a good time to

21   excuse the public.

22        **THE COURT:**  Yeah.  We will now excuse all members of

23   the public.  I'm sorry.  We have no choice.  I've explained

24   why.

25        (Members of the public exit the courtroom.)

**SEALED PROCEEDINGS**

1        (Sealed proceedings Page 1077, Line 1, through

2     Page 1087, Line 2.)

**SEALED PROCEEDINGS**

1

2

3      (Whereupon at 1:00 p.m. further proceedings

4       were adjourned until Friday, February 9, 2018

5       at 7:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**PLAINTIFF'S WITNESSES**          **PAGE**  **VOL.**

**FRIEDBERG, ERIC**

| | PAGE | VOL. |
|---|---|---|
| (SWORN) | 881 | 5 |
| Direct Examination resumed by Mr. Verhoeven | 881 | 5 |
| Cross-Examination by Mr. Brille | 885 | 5 |
| Redirect Examination by Mr. Verhoeven | 903 | 5 |

**MAUGERI, MELANIE**

| | PAGE | VOL. |
|---|---|---|
| (SWORN) | 906 | 5 |
| Direct Examination by Mr. Verhoeven | 907 | 5 |
| Cross-Examination by Mr. González | 919 | 5 |
| Redirect Examination by Mr. Verhoeven | 931 | 5 |
| Recross-Examination by Mr. González | 936 | 5 |
| Further Redirect Examination by Mr. Verhoeven | 936 | 5 |

**GURLEY, JOHN**

| | PAGE | VOL. |
|---|---|---|
| (SWORN) | 943 | 5 |
| Direct Examination by Mr. Verhoeven | 944 | 5 |
| Cross-Examination by Ms. Dunn | 950 | 5 |

**ANDY, CRAIN**

| | PAGE | VOL. |
|---|---|---|
| (SWORN) | 955 | 5 |
| Direct Examination by Ms. Baily | 956 | 5 |
| Cross-Examination by Mr. González | 978 | 5 |
| Redirect Examination by Ms. Baily | 979 | 5 |
| Recross-Examination by Mr. Gonzàlez | 983 | 5 |

**JANOSKO, MICHAEL**

| | PAGE | VOL. |
|---|---|---|
| (SWORN) | 984 | 5 |
| Direct Examination by Mr. Perlson | 984 | 5 |
| Cross-Examination Mr. Gonzàlez | 996 | 5 |
| Redirect Examination by Mr. Perlson | 1003 | 5 |

*Debra L. Pas, CSR, CRR and Katherine Sullivan, CSR, CRR*
*Official Reporters - U.S. District Court - San Francisco, California*
*(415) 431-1477*

<u>**I N D E X**</u>

**PLAINTIFF'S WITNESSES**                         <u>**PAGE**</u>  <u>**VOL.**</u>


<u>**ZBROZEK, ALEXANDER**</u>
(SWORN)                                            1007   5
Direct Examination by Mr. Lyons                   1007   5
Cross-Examination  Mr. Gonzàlez                   1026   5
Redirect Examination by Mr. Lyons                 1037   5
Recross-Examination by Mr. Gonzàlez              1042   5


<u>**DROVES, PIERRE-YVES**</u>
(SWORN)                                            1045   5
Direct Examination by Mr. Jaffe                   1045   5
Cross-Examination  Mr. Grinstein                  1068   5

- - -

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 10388 | | 885 | 5 |
| 7418 | | 923 | 5 |
| 10247 | | 959 | 5 |
| 5119 | | 962 | 5 |
| 5124 | | 970 | 5 |
| 4952 | | 1009 | 5 |
| 2219 | | 1013 | 5 |
| 2218 | | 1017 | 5 |
| 2216 | | 1022 | 5 |
| 4178, 4074 | | 1056 | 5 |
| 4075 | | 1057 | 5 |
| 4881 | | 1062 | 5 |
| 530 | | 1066 | 5 |
| 4076 | | 1067 | 5 |

— — —

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Katherine Sullivan, CSR 5812, CRR, RMR

Thursday, February 8, 2018