1  MICHAEL A. JACOBS (CA SBN 111664)
   MJacobs@mofo.com
2  ARTURO J. GONZÁLEZ (CA SBN 121490)
   AGonzalez@mofo.com
3  MORRISON & FOERSTER LLP
   425 Market Street
4  San Francisco, California  94105-2482
   Tel:  415.268.7000 / Fax:  415.268.7522
5
   KAREN L. DUNN (*Pro Hac Vice*)
6  kdunn@bsfllp.com
   MICHAEL BRILLE (*Pro Hac Vice*)
7  mbrille@bsfllp.com
   BOIES SCHILLER FLEXNER LLP
8  1401 New York Avenue, N.W.
   Washington DC  20005
9  Tel:  202.237.2727 / Fax:  202.237.6131

10  WILLIAM CARMODY (*Pro Hac Vice*)
    bcarmody@susmangodfrey.com
11  SHAWN RABIN (*Pro Hac Vice*)
    srabin@susmanGodfrey.com
12  SUSMAN GODFREY LLP
    1301 Avenue of the Americas, 32nd Floor
13  New York, NY  10019-6023
    Tel: 212.336.8330 / Fax: 212.336.8340
14

15  Attorneys for Defendants
    UBER TECHNOLOGIES, INC.
16  and OTTOMOTTO LLC

17              UNITED STATES DISTRICT COURT

18             NORTHERN DISTRICT OF CALIFORNIA

19               SAN FRANCISCO DIVISION

20  WAYMO LLC,                          | Case No.      3:17-cv-00939-WHA

21              Plaintiff,              | **PUBLIC RE-FILING IN RESPONSE TO COURT ORDER ON**

22       v.                            | **COMPREHENSIVE ADMINISTRATIVE MOTIONS TO**

23  UBER TECHNOLOGIES, INC.,            | **FILE UNDER SEAL (DKT. 2685)**
    OTTOMOTTO LLC; OTTO TRUCKING
24  LLC,

25              Defendants.

26

27

28

1    In accordance with the Court's Order on Comprehensive Administrative Motions to File

2  Under Seal (Dkt. 2685), Uber hereby re-files public versions of the documents whose sealing was

3  denied in whole or in part.

4  Dated: January 28, 2019                    MORRISON & FOERSTER LLP

5

6                                         By:  _____ /s/ Arturo J. González _____
                                               ARTURO J. GONZÁLEZ
7
                                               Attorneys for Defendants
8                                              UBER TECHNOLOGIES, INC. and
                                               OTTOMOTTO LLC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNREDACTED VERSION OF OPPOSITION
# SOUGHT TO BE
# FILED UNDER SEAL

Neel Chatterjee (SBN 173985)
*nchatterjee@goodwinlaw.com*
**GOODWIN PROCTER LLP**
135 Commonwealth Drive
Menlo Park, California 94025
Tel.: +1 650 752 3100
Fax.: +1 650 853 1038

Brett Schuman (SBN 189247)
*bschuman@goodwinlaw.com*
Rachel M. Walsh (SBN 250568)
*rwalsh@goodwinlaw.com*
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, California 94111
Tel.: +1 415 733 6000
Fax.: +1 415 677 9041

Attorneys for Defendant
Otto Trucking LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Waymo LLC,<br><br>   Plaintiff,<br><br>  v.<br><br>Uber Technologies, Inc.; Ottomotto LLC; Otto Trucking LLC,<br><br>   Defendants. | Case No. 3:17-cv-00939<br><br>**DEFENDANT OTTO TRUCKING'S OPPOSITION TO PLAINTIFF WAYMO LLC'S MOTION FOR ORDER TO SHOW CAUSE**<br><br>**[FILED UNDER SEAL]**<br><br>Date:   July 27, 2017<br>Time:   8:00 a.m.<br>Courtroom: 8, 19th Floor<br>Judge:   Honorable William H. Alsup<br>Trial Date: October 10, 2017 |

## I.  **INTRODUCTION**

Defendant Otto Trucking LLC ("Otto Trucking") respectfully submits this opposition to Plaintiff Waymo LLC's ("Waymo") motion for an order to show cause.  *See* Dkt. No. 677.  As to Otto Trucking, the motion should be denied in its entirety because none of Waymo's identified bases justifies a finding of contempt of the Court's Expedited Discovery Order (Dkt. No. 61) or the Preliminary Injunction Order (Dkt. Nos. 426, 433).  Waymo has not demonstrated that a contempt finding is appropriate for at least the following reasons:

Paying Mr. Levandowski money to repurchase his shares in Otto Trucking is not a reasonable step nor is it required by the Preliminary Injunction Order.  Requiring Otto Trucking to repurchase Mr. Levandowski's shares pursuant to a call right is not a reasonable step within Otto Trucking's power to comply; any such action would require Mr. Levandowski's own consent, forcing him to choose between state-ordered punitive action and his right against self-incrimination in violation of the Fifth Amendment.  Moreover, Waymo does not explain how repurchasing Mr. Levandowski's shares would even cause him to return any "downloaded materials."  Finally, while the Order generally requires Otto Trucking to exercise "the full extent" of its authority to force Mr. Levandowski to return "downloaded materials," Waymo never raised the idea of repurchasing Mr. Levandowski's shares during preliminary injunction briefing and, thus, the Court had no reason to specifically address such action in its Preliminary Injunction Order.  Otto Trucking cannot be in contempt for not taking actions that are not called for by the clear language of the Court's Order and that are based solely on Waymo's creative reading of the Otto Trucking LLC Agreement.

Otto Trucking was not required to disclose Mr. Levandowski's destruction of five discs. Waymo complains that Otto Trucking did not timely disclose Mr. Levandowski's destruction of five discs.  But the five discs have never been in Otto Trucking's possession, custody, or control, and Otto Trucking therefore was not obligated under the Expedited Discovery Order to disclose their destruction.  Moreover, Waymo has not shown that the five discs contained "downloaded materials" or even that Otto Trucking in fact knew that the discs were destroyed.  In any event, Waymo is now aware of this information, so a contempt finding would serve no purpose in securing Otto Trucking's further compliance with the Order.

1

1  <u>Otto Trucking cannot compel Stroz or MoFo to take any actions.</u>  Neither Stroz Friedberg

2  LLC ("Stroz") nor Morrison & Foerster LLP ("MoFo") are Otto Trucking's agents.  Waymo

3  successfully argued that Otto Trucking did not have standing to challenge a subpoena to Stroz

4  because it did not retain Stroz.  MoFo only became counsel to Otto Trucking after the lawsuit was

5  filed and was no longer counsel to Otto Trucking at the time of the injunction.  Otto Trucking thus

6  cannot, as Waymo suggests, force them to return any "downloaded materials."

7  **II.**    **LEGAL STANDARD**

8         "A district court has the power to adjudge in civil contempt any person who willfully

9  disobeys a specific and definite order of the court."  *Gifford v. Heckler*, 741 F.2d 263, 265 (9th Cir.

10  1984).  Civil contempt requires disobedience of "***a specific and definite court order*** by failure to

11  take all reasonable steps within the party's power to comply."  *Reno Air Racing Ass'n, Inc. v.*

12  *McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (emphasis added).  "Substantial compliance with the

13  court order is a defense to civil contempt, and is not vitiated by a few technical violations where

14  every reasonable effort has been made to comply."  *In re Dual-Deck Video Cassette Recorder*

15  *Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (quotations omitted).  A prima facie case of civil

16  contempt requires: "(1) the nonmoving party violated a specific and definite court order; (2) beyond

17  substantial compliance; (3) not based upon a reasonable and good faith interpretation of the order;

18  and (4) the foregoing has been shown by clear and convincing evidence."  *Perez v. RMRF*

19  *Enterprises, Inc.*, No. C 13-80059 SI, 2014 WL 3869935, at *3 (N.D. Cal. Aug. 6, 2014).  "If the

20  moving party establishes a prima facie case of contempt, the nonmoving party must show that [it]

21  took every reasonable step to comply with the Court's order."  *Id.*

22  **III.**    **ARGUMENT**

23         **A.**    **Otto Trucking Is Not in Contempt for Not Paying Mr. Levandowski Money to**

24              **Repurchase His Shares in Otto Trucking.**

25         Otto Trucking is not in contempt for refusing to repurchase Mr. Levandowski's shares in the

26  company pursuant to a call right.  Waymo's argument on this front fails for several reasons.

27         First, requiring Otto Trucking to repurchase Mr. Levandowski's shares is not "a reasonable

28  step within [Otto Trucking's] power to comply."  *Reno Air*, 452 F.3d at 1130; *see also Dual-Deck*

2

*Video*, 10 F.3d at 695.  Under Otto Trucking's LLC Agreement, the right to repurchase shares, or the call right, may be exercised "at the sole discretion of the Managing Members."  Declaration of Neel Chatterjee, Ex. 2 (First Amendment to LLC Agreement) ¶ 1.02.  Any actions taken by the company, including exercising the call right, can only be taken "if written consents setting forth the action so taken are signed by a majority of the Managing Members."  *Id.*, Ex. 1 (Otto Trucking LLC Agreement) ¶ 10(a)(ii).  In other words, the Managing Members, Mr. Levandowski and Mr. Ron, control Otto Trucking; indeed, nothing in the LLC Agreement empowers the LLC to take coercive action against a member, as the LLC exists for the members and not the other way around.  Thus, for the Court to require Otto Trucking to repurchase Mr. Levandowski's shares, Mr. Levandowski himself would have to consent.  This, however, results in the Court forcing Mr. Levandowski to either take punitive action against himself or waive his Fifth Amendment rights.  Such coercive state action is prohibited by the Fifth Amendment.  *See, e.g.*, *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977) (noting that "government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized"); *Malloy v. Hogan*, 378 U.S. 1, 8 (1964) (stating that the Fifth Amendment guarantees "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence").  Waymo's demand is thus unreasonable and cannot be the basis for a finding of contempt.

Second, Waymo's apparent belief that paying Mr. Levandowki money for his Otto Trucking shares would cause Mr. Levandowski to return allegedly downloaded materials is just unfounded speculation.  Waymo does not explain how taking such action will cause Mr. Levandowski to return any allegedly downloaded materials.

Third, although the Court ordered Defendants to "exercise the full extent of their corporate, employment, contractual, and other authority" to cause Mr. Levandowski to return downloaded materials, *see* Dkt. No. 433 at 23, the Order does not specifically and definitively direct Otto Trucking to repurchase Mr. Levandowski's Otto Trucking shares.  *See Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989) ("Civil contempt is appropriate only when a party fails to comply with a court order that is both ***specific and definite***.  Thus, to support a contempt motion, the

order alleged to have been disobeyed must be ***sufficiently specific***.") (internal citations omitted) (emphasis added).  Given that Waymo never raised such a proposed action during briefing on the preliminary injunction and raises it now to the Court for the first time, the Court had no reason to consider such action as part of its Preliminary Injunction Order.  Thus, it is not surprising that the Preliminary Injunction Order has no specific and definite language requiring Otto Trucking to repurchase Mr. Levandowski's shares.  Such a requirement is quite different than a contractual obligation telling Mr. Levandowski he should not retain materials from his prior employer as a condition of employment.

Fourth, even Waymo's counsel's own request is unclear.  It is not clear whether Waymo's counsel is suggesting that Otto Trucking should just "threaten to repurchase Mr. Levandowski's shares of Otto Trucking," Mot. at 14, or whether Waymo's counsel is suggesting that Otto Trucking should actually exercise the call right and pay Mr. Levandowski money to purchase his shares.  *Id.* at 15.  But, regardless of whatever Waymo's counsel is actually suggesting, Otto Trucking cannot be in contempt of the Court's Preliminary Injunction Order because the Order does not specifically and definitively require either of Waymo's counsel's suggestions.

**B.** **Otto Trucking Is Not in Contempt for Failing to Timely Disclose the Destruction of "Downloaded Materials."**

Otto Trucking is also not in contempt of the Expedited Discovery Order for failing to timely disclose Mr. Levandowski's destruction of "downloaded materials."  Several reasons warrant dismissing Waymo's complaints regarding Mr. Levandowski's destruction of five discs.

First, the Expedited Discovery Order required "defendants [to] produce for inspection all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them[,]" and, "[i]f any part of said downloaded material has been deleted, destroyed, or modified, then defendants shall state the extent thereof and produce all documents bearing on said deletion, destruction, or modification."  Dkt. No. 61 at 2.  The Order, including the disclosure requirement, covered only "downloaded materials" that were within Otto Trucking's possession, custody, or control—otherwise, Otto Trucking would be powerless to "produce for inspection" any such materials.  As Otto Trucking did not and does not

4

have in its possession, custody, or control the five discs—or any other "downloaded materials" for that matter—it was not obligated under the Order to disclose the destruction of those discs.[1]

Second, even assuming Otto Trucking had an obligation to disclose the destruction of "downloaded materials" not within its possession, custody, or control, Waymo has not demonstrated that Otto Trucking failed to comply. As a first matter, it is not clear, even now, whether the five discs Mr. Levandowski destroyed contained "downloaded materials." Further, Waymo has not shown that Otto Trucking even knew that the five discs were destroyed. The deposition testimony Waymo cites makes clear that Mr. Ron had no personal knowledge of the actions Mr. Levandowski took with respect to the five discs. *See* Ron Dep. Tr. (Dkt. No. 676-12) at 91:1-2 ("I'm not aware of the specifics of that material and what happened with that."), 91:9 ("I didn't know personally what happened."). Rather, Mr. Ron testified that he could only recall from his conversations with Mr. Levandowski that Uber would no longer be able to access the materials on the discs. *See id.* at 92:23-93:1 ("My impression from conversing with him, again -- it was a brief conversation -- that basically, you know, there's no way for Uber to sort of access those materials[.]"), 93:6-9 ("I don't recall exactly what he communicated. I recall that the impression I got from the conversation that basically there's no way for Uber to sort of access those materials now."). Without the requisite knowledge of destruction, there was nothing for Otto Trucking to disclose under the Court's Order.

Finally, Waymo should not be heard to complain because it now knows about the five discs. Even if disclosure was required from Otto Trucking, Otto Trucking is now in compliance with the Expedited Discovery Order.[2] As the Court has recognized, "[t]he purpose of civil contempt is to coerce compliance with the court's order rather than punish disobedience." *Perez v. i2a Techs., Inc.*, No. C 15-04963 WHA, 2015 WL 7753330, at *4 (N.D. Cal. Dec. 2, 2015) (citation omitted). At this point, a finding of civil contempt would do nothing further to secure Otto Trucking's compliance with the Court's Order; any such finding would only be punitive in nature and thus improper.

---

[1] To the extent Waymo contends that the five discs were in Otto Trucking's possession, custody, or control vis-à-vis Mr. Levandowski and that he should have disclosed the destruction of the discs, the Court requiring him to do so would constitute coercive state action in violation of his Fifth Amendment right against self-incrimination. *See Lefkowitz*, 431 U.S. at 806; *Malloy*, 378 U.S. at 8.

[2] At the very least, Otto Trucking is in "substantial compliance" with the Court's Order, which is a defense to civil contempt. *See Dual-Deck Video*, 10 F.3d at 695.

**C.      Otto Trucking Is Not in Contempt for Failing to Cause Stroz or MoFo to Return "Downloaded Materials."**

Otto Trucking cannot be in contempt for failing to compel either Stroz or MoFo to return "downloaded materials" because it has no legal relationship with those entities to do so.

With respect to Stroz, the only relationship it has with Otto Trucking is through a joint defense agreement, which does not permit Otto Trucking to compel production of another person's materials.  And Waymo already argued—successfully—to Judge Corley that Otto Trucking did not retain Stroz and therefore is not Otto Trucking's agent.  *See* Dkt. No. 631 at 2 (Waymo arguing in letter brief that "the evidence of record demonstrates that Stroz was not retained as an agent of attorneys representing Otto Trucking").  Waymo is judicially estopped from arguing to the contrary. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.") (quotations omitted).  The "law of the case" doctrine compels the same result, as Judge Corley already ruled that Stroz is not Otto Trucking's agent and Otto Trucking has no standing to challenge the Stroz subpoena.  *See* Dkt. No. 670 at 6-7 ("Otto Trucking offers no evidence that it retained Stroz or had any involvement in the Stroz investigation.  The Term Sheet required the retention of Stroz and Otto Trucking was not a party to the Term Sheet."); *United States v. Estrada-Lucas*, 651 F.2d 1261, 1263 (9th Cir. 1980) ("A decision of law in a case, once made, becomes the 'law of the case,' and should not be changed absent clear error in the original ruling or a change in the relevant circumstances.").  Otto Trucking is therefore powerless to compel Stroz to return materials.

Waymo is also wrong that Otto Trucking could compel MoFo to turn over any "downloaded materials" it may have.  As with Stroz, Otto Trucking has no relationship with MoFo other than through a joint defense agreement.  MoFo was hired by Otto Trucking shortly after this litigation was filed and then substituted out as Otto Trucking's counsel on May 3, 2017.  *See* Dkt. No. 347.  Moreover, Otto Trucking has never had possession of the so-called "downloaded materials" that Waymo claims to be in MoFo's possession.  MoFo was not counsel to Otto Trucking when it hired

Stroz; instead, Otto Trucking was represented by O'Melveny & Myers LLP.  Thus, to the extent

MoFo ever possessed any "downloaded materials," such materials did not belong to Otto Trucking

but rather to a different client.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Waymo's motion for an order to show

cause as to Otto Trucking.


Dated: July 5, 2017                                              Respectfully submitted,


                                                                By: <u>/s/ Neel Chatterjee</u>
                                                                    Neel Chatterjee (SBN 173985)
                                                                    *nchatterjee@goodwinlaw.com*
                                                                    **GOODWIN PROCTER LLP**
                                                                    135 Commonwealth Drive
                                                                    Menlo Park, California 94025
                                                                    Tel.: +1 650 752 3100
                                                                    Fax.: +1 650 853 1038

                                                                    Rachel M. Walsh (SBN 250568)
                                                                    *rwalsh@goodwinlaw.com*
                                                                    Brett Schuman (SBN 189247)
                                                                    *bschuman@goodwinlaw.com*
                                                                    **GOODWIN PROCTER LLP**
                                                                    Three Embarcadero Center
                                                                    San Francisco, California 94111
                                                                    Tel.: +1 415 733 6000
                                                                    Fax.: +1 415 677 9041

                                                                    *Attorneys for Defendant*
                                                                    *Otto Trucking LLC*

OTTO TRUCKING'S OPPOSITION TO WAYMO'S MOTION FOR OSC
CASE NO. 3:17- CV -00939

# UNREDACTED VERSION OF EXHIBIT 1
# SOUGHT TO BE
# FILED UNDER SEAL

## OTTO TRUCKING LLC

## LIMITED LIABILITY COMPANY AGREEMENT

### Dated and Effective as of April 6, 2016

The members listed in Schedule I hereto (together with any other Person that may become a Member hereunder, the "Members" and each a "Member") have formed Otto Trucking LLC, a limited liability company (the "Company"), pursuant to the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "Delaware Act") that from and after the date hereof shall be governed by, and operated pursuant to, the terms and provisions of this Limited Liability Company Agreement (this "Agreement").

ACCORDINGLY, the Members agree as follows:

1.      Definitions.

The defined terms used in this Agreement shall, unless the context otherwise requires, have the meanings ascribed to them below.

"Affiliate" means a Person that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. For purposes of this definition, "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Capital Account" means, with respect to any Member, the capital account maintained for such Member in accordance with Section 7(c).

"Capital Contribution" means a contribution by a Member to the capital of the Company pursuant to this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended. Any reference to a section of the Code shall include a reference to any amendatory or successor provision thereto.

"Company" shall have the meaning ascribed to it in the Preamble.

"Delaware Act" shall have the meaning ascribed to it in the Preamble.

"Distribution Threshold" shall mean, with respect to each Incentive Unit, an amount of Distributions specified by the Managing Members at the time of its issuance, which amount shall not be less than the amount of Distributions that would be distributed to the Members under Section 14.2(c) hereof if, at the time of the issuance of such Incentive Unit, all the assets of the Company were sold for their respective Fair Market Values, the liabilities of the Company were paid in full, and the remaining proceeds were distributed in accordance with Section 14.2(c); provided, that such amount shall be adjusted automatically for Capital Contributions in accordance with Section 7.3(b).

"Fiscal Year" means the period commencing on January 1 and ending on December 31 of year except as may otherwise be required by the Code or Treasury Regulations; provided, however, that (a) in the case of the Company's first fiscal year, "Fiscal Year" means the period from and including the date on which the Company is formed under the Delaware Act to and including the immediately following December 31 and (b) the final Fiscal Year of the Company shall end on the date on which the winding up of the Company is completed.

"Incentive Member" shall mean any Member that holds Incentive Units, but only to the extent of such holding.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

"Incentive Units" shall mean Units designated as Incentive Units in the Company, having the rights, designations, preferences and obligations set forth in this Agreement.

"Incentive Unit Agreement" shall mean any Incentive Unit Agreement between the Company and any Person pursuant to which any Incentive Units may be issued from time to time.

"Managing Members" means Anthony Levandowski and Lior Ron, and, if neither of such persons willing or able to serve as Managing Members, then the Managing Members shall be such Person or Persons who are determined in writing by holders of a majority in interest of the Units.

"Member" shall have the meaning ascribed to it in the Preamble.

"Percentage Interest" with respect to a Member means a fraction, expressed as a percentage, having as its numerator the total number of Units owned by the Member and as its denominator the total number of Units outstanding, each as of the time the Percentage Interest is to be determined.

"Person" shall be construed broadly and shall include an individual, a partnership, a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an individual retirement account, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Profit" and "Loss" means for each taxable year or other period, an amount equal to the Company's taxable income or tax loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

        (a)        any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss will be added to taxable income or tax loss;

        (b)        any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss, will be subtracted from taxable income or tax loss;

        (c)        gain or loss resulting from any disposition of Company assets with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of the property, notwithstanding that the adjusted tax basis of the property differs from its Book Basis;

        (d)        in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or tax loss, there will be taken into account depreciation for the taxable year or other period as determined in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

        (e)        any items specially allocated pursuant to Section 8(c) shall not be considered in determining Profit or Loss; and

        (f)        any increase or decrease to Capital Accounts as a result of any adjustment to the book value of Company assets pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or (g) shall constitute an item of Profit or Loss as appropriate.

"Sale of the Company" means (i) any sale of Units of the Company following which the holders of Units immediately prior to such sale own, directly or indirectly, less than fifty percent (50%) of all Units, (ii) any sale of interests in the Company following which the holders of such interests prior to such sale own, directly or indirectly, less than fifty percent (50%) of the combined voting power of the outstanding voting securities of the Company, (iii) any sale of all or substantially all of the assets of the Company and its subsidiaries taken as a whole, or (iv) any plan of reorganization, recapitalization, merger or consolidation involving the Company except for a reorganization, recapitalization, merger or consolidation where the holders of the combined voting power represented by the Units

2

of the Company immediately prior to such reorganization, recapitalization, merger or consolidation own, directly or indirectly, at least fifty percent (50%) of the combined voting power of the outstanding voting securities of the company or other entity resulting from such reorganization, recapitalization, merger or consolidation.

"Tax Basis" means, with respect to any item of Company property, the adjusted basis of such property as determined in accordance with the Code.

"Treasury Regulations" means the regulations promulgated by the U.S. Department of the Treasury under the Code.

"Unvested Incentive Unit" means any Incentive Unit that is not a Vested Incentive Unit.

"Vested Incentive Unit" means any Incentive Unit that has vested pursuant to the terms and conditions of (i) the Incentive Unit Agreement or other document pursuant to which such Incentive Unit was acquired by the initial holder thereof or (ii) any other document governing the vesting of such Incentive Unit.

2.      Name.  The name of the Company shall be Otto Trucking LLC, or such other name as the Managing Members may from time to time hereafter designate.

3.      Purpose.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and engaging in any and all activities necessary or incidental to the foregoing provided, however, that the Company is intended to be, and shall be operated as, an "operating company," within the meaning of United States Department of Labor Regulations Section 2510.3-101.

4.      Offices.

        (a)      The principal office of the Company is 2330 Cowper Street, Palo Alto, CA 94301.  The Company may locate its place of business and registered office at any other place or places from time to time.

        (b)      The registered office of the Company in the State of Delaware is located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, County of New Castle.  The registered agent of the Company for service of process at such address is Corporation Service Company.

5.      Term.  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of Delaware and shall continue until terminated in accordance with the provisions of this Agreement or the Delaware Act.

6.      Members and Units.

        (a)      Units Generally.  The name, address and number of Units of the initial Members are set forth opposite such Member's name in Schedule I.  One or more additional members of the Company may be admitted to the Company with the approval of the Managing Members.  Each Member, by signing this Agreement or a counterpart signature page hereto (a) agrees that if the laws of any jurisdiction in which the Company transacts business so require, the Managing Members shall take or cause to be taken all such actions required for the Company to qualify to transact business under such laws (including the filing of any necessary documents with the appropriate office in that jurisdiction), and (b) agrees and obligate themselves to execute, acknowledge and cause to be filed for record, as required by law, any amendments to the Company's certificate of formation that may be required by applicable law to reflect changes in the information included therein and/or for the continuation, preservation and operation of the Company as a limited liability company under the Delaware LLC Act.  Prior to the date of this Agreement, the Company has taken all actions required under Section 17711.13(b) of the California Revised Uniform Limited Liability Company Act ("CRULLCA") to cause Article 11 of the CRULLCA not to apply to the Company or any of the outstanding membership interests of the Company.  In furtherance of the foregoing, by execution of this Agreement or a counterpart signature page hereto, each of the Members hereby waives the application of Article 11 of the CRULLCA which affords, in certain circumstances and subject to the limitations set

3

forth therein, the holders of equity interests with dissenters' rights under the CRULLCA in respect of their equity in a limited liability company.

    (b)    <u>Incentive Units</u>

        (i)    <u>Equity Plans</u>. The Managing Members may create one or more incentive equity or profit interests plans for the Company which, among other things, may provide for the grant of options to acquire Units, the right to purchase Units, or the grant of Incentive Units intended to qualify as profits interests to employees and consultants of the Company (each, an "<u>Equity Plan</u>"). Unless otherwise set forth in an Equity Plan, no holder of an option or other right to acquire Units shall be a Member of the Company or have any rights as a Member of the Company until such time as such person acquires Units of the Company. In connection with the Conversion, the Company is adopting the Otto Trucking LLC Unit Incentive Plan, attached hereto as <u>Exhibit A</u>, which provides that 2,400,000 shall be available for award grant purposes under the plan.

        (ii)    <u>Options</u>. In the event an employee is granted an option to acquire Units in the Company and an employee exercises that option, to the extent permitted by law: (i) the Company shall be treated as having made a cash payment to the employee (representing compensation to such employee) in an amount equal to the sum of (a) the fair market value of the Units acquired by the employee pursuant to the exercise of the option on the date of exercise (taking into account for such purposes the Company's receipt of the exercise price on such option), minus (b) the exercise price paid by the employee under the option (such sum, the "<u>Spread Amount</u>"); (ii) the employee shall be treated as having made a Capital Contribution to the Company equal to the sum of (a) the exercise price paid by the employee under the option, and (b) the Spread Amount; and (iii) any deduction recognized by the Company that is attributable to the issuance of the Units pursuant to the exercise of a option shall be allocated to the existing Members of the Company in accordance with <u>Section 8</u>.

        (iii)    <u>Profits Interests</u>. The Company and each Member agree to treat each Incentive Unit granted to an Incentive Member pursuant to the Incentive Unit Agreement as a separate "profits interest" within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343. In accordance with Rev. Proc. 2001-43, 2001-2 CB 191, the Company shall treat each Incentive Member as the owner of its Incentive Units from the date such Incentive Units are granted, and shall file its IRS Form 1065, and issue appropriate Schedules K-1, to such Incentive Member, allocating to such Incentive Member its distributive share of all items of income, gain, loss, deduction and credit associated with such Incentive Units as if they were Vested Incentive Units. Each Incentive Member agrees to take into account such distributive share in computing its U.S. federal income tax liability for the entire period during which he, she or it holds such Incentive Units. The Company and each Member agree not to claim a deduction (as wages, compensation or otherwise) with respect to any Incentive Unit issued to an Incentive Member, either at the time of the grant of the Incentive Unit or at the time the Incentive Unit becomes a Vested Incentive Unit. The undertakings contained in this <u>Section 6(b)(i)</u> shall be construed in accordance with Section 4 of Rev. Proc. 2001-43. Each Incentive Member who receives an Unvested Incentive Unit (whether issued on or after the date hereof) agrees to timely and properly make an election under Section 83(b) of the Code with respect to each Unvested Incentive Unit received. The provisions of this <u>Section6(b)(i)</u> shall apply regardless of whether or not the Incentive Member files an election pursuant to Section 83(b) of the Code with respect to such Incentive Units.

        (iv)    Each Incentive Unit shall have a Distribution Threshold set forth in the Incentive Member's Incentive Unit Agreement, and the Incentive Member will be eligible to receive distributions with respect thereto to the extent provided in Sections 9 and 11. A Member's Distribution Threshold shall be adjusted automatically to take into account any

4

additional Capital Contributions made to the Company by a Member. The intent of this Section 6(b)(ii) is to ensure that all Incentive Units issued qualify as "profits interests" under Rev. Proc. 93-27 and Rev. Proc. 2001-43, and this Section 6(b)(i) and the other provisions of this Agreement shall be interpreted and applied consistently therewith.

(v)     The Managing Members may elect to cause the Company to make an election to value any Incentive Units prospectively issued by the Company as compensation for services to the Company at liquidation value (the "Safe Harbor Election"), as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to proposed Treasury Regulations Section 1.83-3(l) and IRS Notice 2005-43 (collectively, the "Proposed Rules"). Upon such election, the Managing Members shall cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election. Any such Safe Harbor Election shall be binding on the Company and on all of the Members with respect to all transfers of Incentive Units thereafter made by the Company while a Safe Harbor Election is in effect. A Safe Harbor Election once made may be revoked by the Managing Members as permitted by the Proposed Rules or any applicable rule.

7.     Ownership and Capital Contributions; Capital Accounts; Financings.

(a)     Units.

(i)     The Company shall be authorized to issue up to 10,000,000 units (the "Units"), which may include Incentive Units, from time to time. The Company may reissue any Units that have been cancelled or repurchased or acquired by the Company.

(ii)     If determined by the Managing Members, each Unit will be evidenced by a certificate of limited liability company interest issued by the Company in such form as is approved by the Managing Members (the "Membership Interest Certificates"). Each Unit shall be transferable only on the books of the Company, to be kept by the Secretary of the Company, on surrender thereof by the registered holder in person or by attorney-in-fact, and until so transferred, the Company may treat the registered holder of a Unit as the owner of such Unit evidenced thereby for all purposes. Nothing contained in this Section 7(a)(ii) shall be deemed to authorize or permit any Member to Transfer its Units except as otherwise permitted pursuant to Section 17. Each such Unit shall be a "security" governed by Article 8 of the Uniform Commercial Code as in effect in any jurisdiction in which it has been adopted. Each Membership Interest Certificate shall bear the legends set forth in Section 17.

(b)     Capital Contributions.

(i)     On or about the date hereof, each Member is making or shall be deemed to have made a Capital Contribution to the Company in the amount set forth on Schedule I in exchange for the number of Units set forth opposite such Member's name on Schedule I, which Units shall constitute all of the issued and outstanding equity securities of the Company as of the original date hereof. Other than the Capital Contributions set forth on Schedule I, no Member shall have any obligation to make any additional Capital Contributions to the Company.

(ii)     No Member nor other Person may make any additional Capital Contributions without the prior consent of the Managing Members. In the event of any Capital Contribution (other than the Capital Contributions set forth on Schedule I), the Company shall issue to the contributing Member or Person that number of additional Units, in exchange for such Capital Contribution, equal to the Capital Contribution Value divided by the Effective Price Per Unit. For purposes of this Agreement:

- the "Capital Contribution Value" shall be, with respect to any Capital Contribution made by a Member in any given offering, the amount of cash or other immediately available funds making up such Capital Contribution plus, if the receipt of any other property is permitted as a part of such Capital Contribution by the Members, the fair market value of

5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

OTTOTRUCKING00000009

any such other property making up such Capital Contribution, valued in good faith by the Managing Members, taking into account relevant markets (if any) in which such property is traded;

- the "Effective Price Per Unit" shall be, with respect to any given offering, the quotient obtained by dividing the Aggregate Company Value (before giving effect to such offering) by the total number of Units outstanding immediately prior to the issuance of any Units in connection with such offering; and

- the "Aggregate Company Value" shall be the aggregate fair market value of the Company, which value shall be determined in good faith by the Managing Members.

(c)     Establishment and Maintenance of Capital Accounts.

(i)     A separate Capital Account will be established and maintained for each Member for each class of Units held by such Member in accordance with this Section 7(c). Each Member's Capital Account shall equal such Member's Capital Contribution, adjusted in accordance with the provisions of Section 7(c)(ii) and Section 7(c)(iii). The initial Capital Account balance with respect to any Member's Incentive Units as of the date of the issuance of such Incentive Units shall be zero.

(ii)     Each Member's Capital Account with respect to a particular class of Units will from time to time be increased by:

(a)     the amount of money contributed by such Member to the Company with respect to such Units (including the amount of any Company liabilities which the Member assumes (within the meaning of Treasury Regulations Section 1.704-1(b)(2)(iv)(c));

(b)     the fair market value of property contributed by such Member to the Company with respect to such Units (net of any liabilities secured by such property that the Company is considered to assume or take subject to pursuant to Section 752 of the Code); and

(c)     allocations to such Member of Profits (or the amount of any item or items of income or gain included therein) with respect to such Units.

(iii)     Each Member's Capital Account with respect to its Units will from time to time be reduced by:

(a)     the amount of money distributed to such Member by the Company in respect of such Units (including the amount of such Member's individual liabilities for which the Company becomes directly and primarily liable);

(b)     the fair market value of property distributed to such Member by the Company (net of any liabilities secured by such property that such Member is considered to assume or take subject to pursuant to Section 752 of the Code); and

(c)     allocations to such Member of Losses and deduction (or items thereof).

(iv)     This Section 7(c) and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2, and they shall be interpreted and applied in a manner consistent with those Treasury Regulations. If the Managing Members determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or a Member), are computed in order to comply with those Treasury Regulations, the Managing Members may make such modification; *provided, however*, that the Managing Members

6

shall use reasonable efforts to ensure that no such modification materially and adversely affects the economic interests of any Member.

(v)     Each Member recognizes and intends that for federal and state income tax purposes, the Company will be classified as a partnership during any period that the Company has two or more Members, and the Members will not make any election or take any other action that would cause the relationship of the Members under this Agreement to be excluded from the application of all or any part of Subchapter K of Chapter 1 of Subtitle A of the Code, from any successor provisions to Subchapter K of the Code or from similar provisions of state law or the law of any foreign jurisdiction; provided, however, that the Company may be converted to a C corporation with the approval of a majority of the Units held by the Members.

(vi)     A Person who is substituted as a Member pursuant to this Agreement shall be deemed to have made the Capital Contributions, if any, attributable to the Units it is acquiring and shall succeed to the Capital Account of its transferor to the extent of the Units it is acquiring.

(vii)     Section 754 of the Code permits the Company to elect to adjust the basis of Company property on the transfer of an interest in the Company by sale or exchange, or on the death of a Member, and on the distribution of property by the Company to a Member.  Unless the Managing Members determine that it is unreasonable to make a Section 754 election after considering the interests of the Company and its Members, the Managing Members shall make such an election upon the occurrence of an event described in the preceding sentence.

(d)     Other Matters.  Except as otherwise set forth in Section 9(f), Section 11 and Section 17, no Member shall be entitled to receive a return on or of its Capital Contributions from the Company without the consent of the Members.  Under circumstances requiring a return of any Capital Contributions from the Company, no Member has the right to receive property other than cash except as specifically set forth in Sections 9(c) and 11, No Member shall receive any interest, salary, compensation, draw or reimbursement with respect to its Capital Contributions or its Capital Account, or for services rendered or expenses incurred on behalf of the Company or otherwise in its capacity as a Member, except as may otherwise be authorized by the Members.  Except as any Member may otherwise agree in writing, no Member shall be liable for the debts or any other obligations of the Company.

8.     Allocations of Profits and Losses.

(a)     Time of Allocations.  The Managing Members shall use reasonable efforts to determine and allocate all items of income, gain, loss, deduction and credit pursuant to this Section 8 within ninety days after the end of each Fiscal Year.

(b)     Profits and Losses.  Profits and Losses, and if necessary (in the reasonable judgment of the Managing Members), other items of income (including gross income), gain, loss, and deduction, for each Fiscal Year shall be allocated among the Members such that the applicable Capital Account of each Member, immediately after giving effect to such allocations, shall equal, as nearly as possible, the amount of the distributions that would be made to the Member during such Fiscal Year if (i) the Company were dissolved and terminated, (ii) its affairs were wound up and each asset with respect thereto were sold for its book value (except that any asset which was the subject of a disposition in such Fiscal Year shall be treated as if it were sold for cash equal to the sum of the amount received by the Company in any such disposition and the fair market value of any other property received by the Company in such disposition), (iii) all liabilities of the Company were satisfied, and (iv) the net assets of the Company were distributed to the Members in accordance with Section 9(b).

(c)     Special Allocations.

(i)     Notwithstanding any other provision of this Section 8, if there is a net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of Treasury Regulations Sections 1.704-2(d) and 1.704-2(i)) during the Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an

7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                  OTTOTRUCKING00000011

amount equal to its respective share of such net decrease during such year, determined pursuant to Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This Section 8(c) is intended to comply with the minimum gain chargeback requirement in such Treasury Regulations Section and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent of the exceptions provided in Treasury Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

(ii)   Notwithstanding any other provision of this Section 8 other than Section 8(c)(i) above, in the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii) (d)(4), (5) or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as promptly as possible; *provided, however*, that an allocation pursuant to this Section 8(c)(ii) shall be made only if and to the extent that a Member would have an Adjusted Capital Account Deficit in excess of such sum after all other allocations provided for in this Section 8 have been tentatively made as if this Article were not in this Agreement.

(iii)   In the event any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; *provided, however*, that an allocation pursuant to this Section 8(c)(iii) shall be made only if and to the extent that a Member would have an Adjusted Capital Account Deficit in excess of such sum after all other allocations provided for in this Section 8 have been tentatively made.

(iv)   Nonrecourse Deductions shall be specially allocated to the Members in proportion to their Percentage Interests.

(v)   Any Partner Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2.

(d)   Other Allocations.  If during any taxable year of the Company there is a change in any Member's Percentage Interest (including a complete termination of such Member's interest), allocations of Profits and Losses for such taxable year will take into account the varying Percentage Interests of the Members in any manner determined by the Managing Members consistent with the requirements of Section 706 of the Code; *provided, however*, that the Members hereby agree that the Managing Members may, in their sole discretion, use a "pro rata" method under Treasury Regulation Section 1.706-1(c)(2) in making such allocations, and that the Managing Members may instead, in its sole discretion, apply a "closing of the books" method in making such allocations.  In the event a Safe Harbor Election is made, the Managing Members shall cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election.  In addition, the Managing Members shall be authorized to make, in their sole discretion, appropriate amendments to the allocations of items pursuant to this Agreement (i) to properly allocate items of income, gain, loss, deduction and credit to those Members who bear the economic burden or benefit associated therewith, or (ii) otherwise to cause the Members to achieve the economic objectives of this Agreement (as reasonably determined by the Managing Members).

(e)   Reallocation.  If the Managing Members determine that the Code or any Treasury Regulations require allocations of items of income, gain, loss, deduction or credit different from those set forth in this Section 8, the Managing Members are hereby authorized to make new allocations in reliance on, but only to the extent required by, the Code and such Treasury Regulations, and no such new allocation will give rise to any claim or cause of action by any Member.

(f)   Allocation of Tax Items.  Except as otherwise provided in this Section 8, all items of income, gain, loss and deduction will be allocated among the Members for federal income tax purposes in the same manner as the corresponding allocation for Capital Account purposes.

8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                   OTTOTRUCKING00000012

(g)  Section 704(c) Allocations.  In the event that the fair market value of an item of Company property differs from its Tax Basis , allocations of depreciation, depletion, amortization, gain and loss with respect to such property will be made for federal income tax purposes in a manner that takes account of the variation between the Tax Basis and fair market value of such property in accordance with Section 704(c)(1)(A) of the Code and Treasury Regulations Section 1.704-1(b)(4)(i).  The Managing Members may select any reasonable method or methods for making such allocations, including, without limitation, any method described in Treasury Regulations Sections 1.704-3(b), (c), or (d).

(h)  Special Deemed Capital Contributions and Allocations.  If a Member incurs an expense (including any amounts that must be capitalized) on behalf of the Company and the expense is not reimbursed by the Company, then the Member shall be deemed to make a capital contribution to the Company in an amount equal to the amount of the expense and any deductions, depreciation or amortization with respect to such item shall be specially allocated to the Member that incurred the expense.

(i)  Reporting.  The Members acknowledge and are aware of the income tax consequences of the allocations made by Section 8 and hereby agree to be bound by the provisions of Section 8 in reporting their shares of Profits and Losses and other items of income, gain, loss, deduction and credit for federal, state and local income tax purposes.

9.  Distributions.

(a)  General.  Subject to Section 9(f), the Managing Members may elect to distribute or retain and reinvest any gains and capital to the Members.

(b)  Amount and Time of Distributions.  Except as set forth in Section 11, to the extent that the Company makes distributions to the Members pursuant to this Section 9 or pursuant to any other provision of this Agreement, all net proceeds will be distributed to the Members in respect of their Units pro rata based on the number of Units then held.

(c)  Distributions in Kind.  Distributions pursuant to this Section 9 may be made, at the sole discretion of the Managing Members, in cash or as in kind distributions of securities; *provided, however*, that the Managing Members will not distribute securities in kind unless (a) they are marketable securities, or (b) such distribution is in connection with a liquidation under Section 11.  Distributions consisting of both cash and securities shall be made, to the extent practicable, in pro rata portions of cash and such securities as to each Member receiving such distributions.  In the event of an in kind distribution by the Company, the Capital Accounts shall be adjusted with respect to the securities distributed in accordance with Section 7(d)(ii).

(d)  Distributions to Record Holders of Units.  Any distribution by the Company pursuant to the terms of this Section 9 or Section 11 to the Person shown on the Company's records as a Member or to its legal representatives, or to the assignee of the right to receive such distributions as provided herein, shall, to the fullest extent permitted by law, discharge the Company and the Managing Members of all liability to any other Person who may be interested in such distribution by reason of any other assignment or Transfer of such Member's Units for any reason (including an assignment or Transfer thereof by reason of death, incompetence, Bankruptcy or liquidation of such Member).  For purposes of the foregoing, the "Bankruptcy" of a Member shall mean the occurrence of any of the following:  (i) any governmental authority, or any court at the instance thereof, shall take possession of any substantial part of the property of that Member or shall assume control over the affairs or operations thereof, or a receiver or trustee shall be appointed, or a writ, order, attachment or garnishment shall be issued with respect to any substantial part thereof, and such possession, assumption of control, appointment, writ or order shall continue for a period of sixty consecutive days; (ii) a Member shall admit in writing its inability to pay its debts when due, or make an assignment for the benefit of creditors; or apply for or consent to the appointment of any receiver, trustee or similar officer or for all or any substantial part of its property; or shall institute (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debts, dissolution, liquidation, or similar proceeding under the laws of any jurisdiction; or (iii) a receiver, trustee or similar officer shall be appointed for such Member or with respect to all or any substantial part of its property without the application or consent of that Member, and such appointment shall continue undischarged or unstayed for a period of sixty (60) consecutive days or any bankruptcy, insolvency, reorganization, arrangements, readjustment of debt, dissolution,

9

liquidation or similar proceedings shall be instituted (by petition, application or otherwise) against that Member and shall remain undismissed for a period of sixty consecutive days.

(e)  Legal Restrictions on Distributions; Withholding.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of the Members' Units if such distribution would violate the Delaware Act or other applicable law.  The Company shall be authorized to withhold from distributions hereunder any amounts required to be withheld by applicable law, and such withholdings shall be treated for all purposes of the Agreement as if such amounts had been distributed hereunder.

(f)  Reserves.  The Managing Members may set aside reasonable reserves for anticipated liabilities, obligations or commitments of the Company.

(g)  Withholdings.  The Company shall be entitled to withhold any amounts required pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment or distribution to be made to a Member pursuant to this Agreement and shall pay such amounts to the appropriate taxing authority as required by law.  Any amounts so withheld shall be treated as amounts paid or distributed, as the case may be, to the Member with respect to whom such amount was withheld and shall be treated as a preliminary distribution of, and shall offset any, future amounts of distributions due to such Member under the provisions of Section 9(b).

10.  Management; Officers; Formation; Waiver of Information Rights; Other Matters.

(a)  *Managing Members.*

(i)  Full responsibility for management of the business and affairs of the Company shall be delegated to and vested in the Managing Members pursuant to Section 18-402 of the Delaware LLC Act, who shall have all of the authority of a "manager" under the Delaware Act.  Subject to the delegation of rights and powers provided for herein, the Managing Members shall have the sole right to manage the business of the Company and shall have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company, and to execute any document on behalf of the Company in all cases consistent with this Agreement.  No Member shall by reason of its status as such have any authority to act for and bind the Company.  Notwithstanding anything in this Agreement to the contrary, no Member shall by reason of its status as such have any right to vote on or approve any matter of the Company and the Managing Members shall have no obligation to submit any matter of the Company to a vote or approval of the Members.

(ii)  Any action that may be taken by the Managing Members under this Agreement may be taken without a meeting if written consents setting forth the action so taken are signed by a majority of the Managing Members.  Any Managing Member may resign at any time by giving written notice to the other Managing Member(s).  Any such resignation shall take effect at the time specified therein, or, if no time is specified, upon receipt thereof; and unless otherwise specified therein, acceptance of such resignation shall not be necessary to make it effective. Any vacancy caused by such resignation may be filled by action of the remaining Managing Members. If at any time there are no Managing Members of the Company, the Members shall have the limited voting authority to elect one Managing Member by an action of the Members holding at least a majority of the then-outstanding Units.

(b)  *Certain Actions.* The Company may, with the written consent of the Managing Members and without any other consent of any Member take any action with respect to the Company, including but not limited to the following:

(i)  except for the Capital Contributions set forth on Schedule I, require any Member to make any Capital Contribution;

(ii)  increase or decrease the authorized number of members constituting Managing Members or appoint any Person as a Managing Member;

(iii)  admit a new Member;

10

OTTOTRUCKING00000014

(iv)    consummate a Sale of the Company or an initial public offering of the Company's securities;

(v)     purchase or otherwise acquire any equity interest in any entity (other than a wholly-owned subsidiary of the Company); or

(vi)    permit any Member to Transfer any of its Units, other than in accordance with Section 17.

(c)    *Duties*.    No Managing Member shall be liable to the Company or any Member for any action taken in managing the business or the affairs of the Company if such Managing Member performs its duties in compliance with the standards contained herein and the Delaware Act. Notwithstanding anything herein to the contrary, **the Managing Members do not, shall not and will not owe any fiduciary duties of any kind whatsoever to any of the Members, by virtue of the role of each as a Managing Member**, including, but not limited to, the duties of due care and loyalty, whether such duties were established as of the date of this Agreement or any time hereafter, and whether established under common law, at equity or legislatively defined. It is the intention of the parties to this Agreement that any such fiduciary duties be affirmatively eliminated as permitted by Delaware law and under the Delaware Act and the Members hereby waive any rights with respect to such fiduciary duties.

(d)    *Officers*.    Officers of the Company (if any) may be designated and appointed by the Managing Members from time to time, to hold such positions and with such powers, as the Managing Members shall deem necessary or desirable. The initial officers of the Company shall be Anthony Levandowski as Executive Chairman and Lior Ron as President, Chief Executive Officer, and General Manager.

(e)    *Delegation by the Managing Members*.    The Managing Members may delegate such general or specific authority to the officers of the Company as they from time to time shall consider desirable, and the officers of the Company may, subject to any limitations imposed by the Managing Members, exercise the authority granted to them.

(f)    *Reimbursement of Expenses*. The Managing Members shall be reimbursed for all reasonable expenses incurred by them on behalf of the Company.

(g)    *Formation*.    The Members hereby ratify, confirm and approve any and all actions taken by the officers and their designees as an authorized person within the meaning of the Delaware Act (an "Authorized Person"), including, without limitation, the execution and filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware (the "DE Secretary of State") for the purpose of forming the Company.

11.    Dissolution.

(a)    Subject to the provisions of Section 11(b), the Company shall be dissolved and its affairs wound up and terminated upon the first to occur of the following:

(i)     the determination of the Managing Members to dissolve the Company; or

(ii)    the withdrawal of the Members or the occurrence of any other event causing a dissolution of the Company under Section 18-801 of the Delaware Act.

(b)    Upon dissolution of the Company, the Company's affairs shall be promptly wound up. The Company shall engage in no further business except as may be necessary, in the reasonable discretion of the Managing Members, to preserve the value of the Company's assets during the period of dissolution and liquidation. The assets of the Company shall be distributed first to satisfy or provide for the satisfaction of all liabilities of the Company to creditors, including liquidating expenses and obligations; and thereafter to the Members consistent with Section 9(b) and taking into account any amounts previously distributed pursuant to Section 9(b).

11

(c)     When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, a Certificate of Cancellation shall be executed and filed with the Secretary of State of Delaware in accordance with Section 18-203 of the Delaware Act.

(d)     No Member shall be personally liable for a deficit Capital Account balance of that Member, it being expressly understood that the distribution of liquidation proceeds shall be made solely from existing Company assets.

12.     <u>Limitation on Liability</u>.   Except as otherwise provided by the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Members shall not be obligated for any such debt, obligation or liability of the Company.

13.     <u>Indemnification</u>.

(a)     The Company shall, to the fullest extent permitted by law, indemnify each Managing Member and Member, any owner or principal of each Member, each officer, any Person that is a partner, officer, employee, agent or representative of each Member, and any other Persons as the Managing Members may reasonably designate from time to time (each, an "<u>Indemnitee</u>") from and against any and all losses, claims, damages, liabilities, costs and expenses (including attorneys' fees and costs), judgments, fines, settlements, and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, that relate to the operations of the Company in which any Indemnitee may be involved, or is threatened to be involved, as a party or otherwise, unless it is established that an act or omission of the Indemnitee was material to the matter giving rise to the claim, demand, action, suit or proceeding and (i) was committed in bad faith, (ii) was the result of active and deliberate dishonesty, or (iii) constituted gross negligence or willful misconduct or a willful breach of this Agreement or any other agreement to which such Indemnitee is a party.   Any indemnification pursuant to this <u>Section 13</u> shall be made only out of the assets of the Company, and the Members shall not be required to contribute or advance funds to the Company to enable the Company to satisfy its obligations under this <u>Section 13</u>.

(b)     Reasonable expenses incurred by an Indemnitee who is a party to a proceeding shall be paid or reimbursed by the Company in advance of the final disposition of the proceeding upon receipt by the Company of (i) a written affirmation by the Indemnitee of the Indemnitee's good faith belief that it is entitled to indemnification by the Company pursuant to this <u>Section 13</u> with respect to such expenses and proceeding, and (ii) a written undertaking by or on behalf of the Indemnitee, to and in favor of the Company, wherein the Indemnitee agrees to repay the amount if the Indemnitee shall ultimately be adjudged not to have been entitled to indemnification under this <u>Section 13</u>.

(c)     The provisions of this <u>Section 13</u> are for the benefit of the Indemnitees, their heirs, successors, assigns and administrators and shall not be deemed to create any rights for the benefit of any other Persons. In addition, the Company is hereby authorized to enter into such indemnification agreements with the Managing Members, each officer of the Company or any other Member as deemed to be appropriate by the Managing Members, in their sole discretion.

14.     <u>Severability</u>.   If any provision of this Agreement shall be determined to be illegal or unenforceable by any court of law, the remaining provisions shall be severable and enforceable in accordance with their terms.

15.     <u>Entire Agreement; Amendment</u>.   This Agreement and the other writings referred to herein contain the entire agreement with respect to the subject matter hereof and supersede all prior agreements and understandings with respect thereto.   Except as otherwise provided in this Agreement or the Delaware Act, this Agreement may be amended only by the written consent of the Managing Members.   Notwithstanding anything in this Agreement to the contrary, <u>Schedule I</u> to this Agreement shall be updated to reflect the issuance of additional equity interests in the Company and new counterpart signature pages to this Agreement shall be added to reflect the admission of any new Member.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                     OTTOTRUCKING00000016

16.     Governing Law; Jurisdiction.    The law of the State of Delaware, without regard to its conflicts of law principles, shall govern the validity of this Agreement, the construction and interpretation of its terms, the organization and internal affairs of the Company and the limited liability of any managers, officers, Member and other owners.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties only in the Court of Chancery of the State of Delaware, and each of the parties consents to the jurisdiction of such court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

17.     Transfer of Units; Legends.

        (a)     No Member may transfer, assign, encumber, hypothecate, pledge, convey in trust, gift, transfer by bequest, devise or descent or otherwise make the subject of disposition any Units or other equity interests of the Company unless such transaction is first approved in writing by Managing Members (which approval may be withheld for any reason).  For the avoidance of doubt, the following shall be considered a transfer, encumbrance or other disposition within the scope of the immediately preceding sentence: any decoupling of any partial interests in any Units or other equity interests in the Company by the Member to any other person (for example, a Member retaining any voting rights such Member may have with respect to its Units while transferring the economic rights associated with the same to another party, or vice versa).  Such restriction, however, shall not be applicable to: (i) any transfer by will or intestate succession upon death or any gratuitous transfer of the Units of the Company to any spouse or member of a Member's immediate family (including adopted children) or grandchildren (or the immediate family of any such person), or to a custodian, trustee (including a trustee of a voting trust), executor or other fiduciary for the account of his or her spouse or members of his or her immediate family (including adopted children) or grandchildren (or to the immediately family of any such person), or to a trust for himself or herself, or a charitable remainder trust; (ii) any sale to the public pursuant to an effective registration statement under the Securities Act of 1933, as amended;  or (iii) any bona fide gift to any charitable organization as defined in Section 501(c)(3) of the Internal Revenue Code. Upon surrender to the Company or the transfer agent of the Company of a certificate for Units duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the Company to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books. Upon receipt of proper transfer instructions from the registered owner of uncertificated Units such uncertificated Units shall be canceled and issuance of new equivalent uncertificated Units or certificated Units shall be made to the person entitled thereto and the transaction shall be recorded upon the books of the Company.

        (b)     In addition, no transfer of any Unit in the Company may be made to any person or entity if (1) in the opinion of legal counsel to the Company, it could result in the Company being treated as an association or publicly traded partnership taxable as a corporation; or (2) such transfer is effected through an "established securities market" or a "secondary market (or the substantial equivalent thereof)", within the meaning of Section 7704 of the Code.

        (c)     Any transfer of a Unit which is not made in compliance with the provisions of this Agreement shall be void, and the Company shall not recognize any such transfer.

        (d)     Each Membership Interest Certificate will be stamped or otherwise imprinted with a legend in substantially the following form:

        THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE
        SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE
        SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES ARE SUBJECT TO
        RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR
        RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE
        SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.
        INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL
        RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.  THE ISSUER OF THESE
        SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE
        SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                     OTTOTRUCKING00000017

RESALE IS IN COMPLIANCE WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERS AND PUBLIC OR PRIVATE RESALE INCLUDING, AMONG OTHER RESTRICTIONS, (A) THE RESTRICTIONS AND CONDITIONS SET FORTH IN A RESTRICTED UNIT PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE UNITS AND (B) THE RESTRICTIONS AND CONDITIONS SPECIFIED IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY DATED AS OF APRIL 6, 2016, AMONG THE PARTIES THERETO, AS IT MAY BE AMENDED, SUPPLEMENTED AND/OR RESTATED FROM TIME TO TIME, AND NO TRANSFER OF THESE SECURITIES WILL BE VALID OR EFFECTIVE UNTIL ALL SUCH CONDITIONS HAVE BEEN FULFILLED. COPIES OF SUCH AGREEMENTS MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OR OTHER OFFICER OF THE ISSUER OF SUCH SECURITIES.

18.     <u>Assignment</u>.  Any permitted new or substitute Member shall become a new Member of the Company with full rights and powers as a Member of the Company upon the execution of a counterpart signature page to this Agreement to evidence its written acceptance of the terms and provisions applicable to Members hereof.  To the extent any assignment, transfer or other disposition is given effect solely by operation of law, the assignee, transferee or recipient of such disposition, as the case may be, shall possess a mere economic interest only and shall not be admitted to the Company as a substitute Member.

19.     <u>Successors and Assigns</u>.  This Agreement binds the Members and their respective distributees, successors, and assigns and any other person claiming a right or benefit under or covered by this Agreement.

20.     <u>Waiver</u>.  No provision of this Agreement will be deemed to have been waived except if such waiver is contained in a written instrument executed by the party against which such waiver is to be enforced, and no such waiver will be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.  The rights and remedies of the parties under this Agreement are in addition to all other rights and remedies, at law or in equity, that they may have against the other parties hereto.

21.     <u>Notices</u>.  Any notice or other communication hereunder must be given in writing and (a) delivered in person, (b) transmitted by electronic mail or (c) sent by overnight courier or by certified or registered mail (postage prepaid, receipt requested) to the then current address of the Company or to the address of the applicable Member(s) set forth on Schedule I, or to such other address as the applicable party shall have last designated by such notice to the other parties. Where a notice is sent by next-day or second-day courier service, service of the notice shall be deemed to be effected by properly addressing, pre-paying and sending by next-day or second-day service through an internationally-recognized courier a letter containing the notice, with a confirmation of delivery, and to have been effected at the expiration of two (2) days after the letter containing the same is sent as aforesaid. Where a notice is sent by electronic mail, service of the notice shall be deemed to be effected by properly addressing and sending such notice through a transmitting organization, with a written confirmation of delivery, and to have been effected on the day the same is sent as aforesaid.

22.     <u>No Prohibited Transactions</u>.  Notwithstanding any other provision of this Agreement, no action shall be required of or be taken by any Member, Managing Member or the Company, and no provision of this Agreement shall be deemed or interpreted to permit any action by any Member, Managing Member or the Company, that would constitute a non-exempt prohibited transaction described in Section 4975 of the Code, or a pledging described in Section 408(e)(4) of the Code, and any such action taken shall be void from its beginning.

23.     <u>Construction; Headings</u>.  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                      OTTOTRUCKING00000018

IN WITNESS WHEREOF, the undersigned has duly executed this Otto Trucking LLC Limited Liability Company Agreement as of the date first written above.

**OTTO TRUCKING LLC,**
a Delaware limited liability company

By: _____
Name:  Anthony Levandowski
Title:  Managing Member

By: _____
Name:  Lior Ron
Title:  Managing Member

*Signature Page to Otto Trucking LLC Operating Agreement*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNREDACTED VERSION
OF EXHIBIT 2
SOUGHT TO BE
FILED UNDER SEAL

**FIRST AMENDMENT TO**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**OTTO TRUCKING LLC**

THIS FIRST AMENDMENT TO LIMITED LIABILITY COMPANY AGREEMENT ("**Amendment**"), dated as of August 17, 2016, of Otto Trucking LLC, a Delaware limited liability company (the "**Company**"), is entered into by and among the Company, Anthony Levandowski and Lior Ron, as the managing members of the Company (the "**Managing Members**").

**RECITALS**

A.     The Company was formed as a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., and the Members entered into that certain Limited Liability Company Agreement (the "**Agreement**") dated and effective as of April 6, 2016.

B.     Pursuant to Section 15 of the Agreement, the Agreement may be amended only by the written consent of the Managing Members.

C.     The Managing Members desire to amend the Agreement on the terms and conditions set forth in this Amendment.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, covenants, and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Managing Members hereby agree as follows:

1.01     <u>Defined Terms</u>.  Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Agreement.

1.02     <u>Amendment</u>.  The following shall be added as subsection (c) to Section 6 of the Agreement:

"(c)     <u>Call Right</u>.     The Company may, at any time at the sole discretion of the Managing Members, repurchase in one or more transactions, any Unit from any Member, and such Member shall be obligated to sell such Unit, at the Repurchase Price (as defined below) (the "**Call Right**").

(i)     The price per Unit to be paid by the Company upon settlement of the Company's Call Right (the "**Repurchase Price**") shall equal the fair market value of the Unit determined in good faith by the Managing Members as of the date of the Call Notice (as defined below) in their sole discretion (the "**Fair Market Value**").

(ii)     To exercise the Call Right, the Company must give written notice thereof to such Member (the "**Call Notice**") which must (i) be in writing and signed by an

1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

authorized officer of the Company, (ii) set forth the Company's intent to exercise the Call Right and contain the total number of Units the Company intends to repurchase pursuant to the Call Right, and (iii) be mailed or delivered in accordance with Section 21 hereof.

(iii)     The closing of any repurchase under this Section 6(c) shall be at a date to be specified by the Managing Members, such date to be no later than 30 days after the date of the Call Notice.  The Repurchase Price shall be paid at the closing or within five (5) business days thereafter in the form of a check or by cancellation of money purchase indebtedness against surrender by such Member of any certificate evidencing the Units with duly endorsed unit powers if any.  No adjustments shall be made to the Repurchase Price for fluctuations in the Fair Market Value of a Unit after the date of the Call Notice.

(iv)     In the event the Company exercises the Call Right pursuant to this Section 6(c) for less than all of the Units beneficially owned by such Member (such uncalled Units, the "**Remaining Units**"), the Company shall irrevocably forfeit, and no longer have, the Call Right with respect to the Remaining Units.

(vi)     Notwithstanding anything to the contrary, the Company may assign any or all of its rights under this Section 6(c) to one or more Members of the Company."

1.03     Amendment Controlling.  In the event of any inconsistency between the terms of this Amendment and the terms of the Agreement, the terms of this Amendment shall control.  Except to the extent expressly amended pursuant to this Amendment, the terms and provisions of the Agreement shall remain in full force and effect without modification and are hereby ratified by the parties.

1.04     Governing Law.  This Amendment shall be construed, enforced, and interpreted in accordance with the laws of the State of Delaware, without regard to conflicts of law provisions and principles thereof.

1.05     Entire Agreement.  This Amendment, together with the Agreement, sets forth all of the promises, agreements, conditions, and understandings between the parties respecting the subject matter hereof and supersedes all prior or contemporaneous negotiations, conversations, discussions, correspondence, memoranda, and agreements between the parties concerning such subject matter.

[Signatures on Following Page]

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN WITNESS WHEREOF, the undersigned hereby execute this Amendment as of the date first written above.

**OTTO TRUCKING LLC,**
a Delaware limited liability company

By: _____
Name:  Anthony Levandowski
Title:  Managing Member

By: _____
Name:  Lior Ron
Title:  Managing Member

**MANAGING MEMBERS:**

**Anthony Levandowski**

_____

**Lior Ron**

_____

3

1   MICHAEL A. JACOBS (CA SBN 111664)
    MJacobs@mofo.com
2   ARTURO J. GONZÁLEZ (CA SBN 121490)
    AGonzalez@mofo.com
3   ERIC A. TATE (CA SBN 178719)
    ETate@mofo.com
4   RUDY Y. KIM (CA SBN 199426)
    RudyKim@mofo.com
5   MORRISON & FOERSTER LLP
    425 Market Street
6   San Francisco, California  94105-2482
    Telephone:     415.268.7000
7   Facsimile:      415.268.7522

8   KAREN L. DUNN (*Pro Hac Vice*)
    kdunn@bsfllp.com
9   HAMISH P.M. HUME (*Pro Hac Vice*)
    hhume@bsfllp.com
10  BOIES SCHILLER FLEXNER LLP
    1401 New York Avenue, N.W.
11  Washington DC  20005
    Telephone:     202.237.2727
12  Facsimile:      202.237.6131

13  Attorneys for Defendants
    UBER TECHNOLOGIES, INC.
14  and OTTOMOTTO LLC

15                  UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                   SAN FRANCISCO DIVISION

18

19   WAYMO LLC,                        |   Case No.        3:17-cv-00939-WHA

20              Plaintiff,             |   **DEFENDANTS UBER TECHNOLOGIES, INC. AND**
                                           **OTTOMOTTO, LLC'S MOTION**
21         v.                              **FOR RELIEF FROM AND**
                                           **EMERGENCY MOTION FOR**
22   UBER TECHNOLOGIES, INC.,             **STAY OF NON-DISPOSITIVE**
     OTTOMOTTO LLC; OTTO TRUCKING LLC,    **PRETRIAL ORDER OF**
23                                         **MAGISTRATE JUDGE (DKT. 881)**
              Defendant.
24

25                                         Trial Date: October 10, 2017

26

27          **UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

28

1  **I.    INTRODUCTION**

2          Waymo is still fishing.  Despite extensive discovery and numerous inspections,[1] Waymo

3  has yet to uncover any evidence that Uber used any of Waymo's alleged trade secrets, as the

4  Court recently noted.[2]  Waymo has also now dropped three of its four asserted patents.

5  (Dkt.  841.)  Attempting to forage in previously unexplored territory, Waymo has persuaded

6  Judge Corley to broaden this case to non-LiDAR aspects of self-driving car technology,

7  specifically, certain software modules unrelated to LiDAR.  This software falls far outside the

8  scope of the specific trade secrets included in Waymo's lengthy trade secrets list.

9          Uber thus requests relief from Judge Corley's July 12, 2017 Order ("Order") compelling

10  production of non-LiDAR software modules.  (Dkt. 881 at 2:6-10.)[3]  The Order is contrary to law

11  because it expands discovery beyond Waymo's list of asserted trade secrets under Cal. Civ. Proc.

12  Code § 2019.210.  The scope of Waymo's Cal. Civ. Proc. Code § 2019.210 disclosure should

13  control the scope of discovery.  To the extent the Order was based on a finding that non-LiDAR

14  software was otherwise relevant to Waymo's asserted LiDAR software trade secret, it is also

15  clearly erroneous.

16          Waymo has put this case on a "fast track" and has insisted on an October trial date.[4]  The

17  Court admonished Waymo to narrow its trade secrets claims, because the "harder you make it as

18  plaintiff to get this case fairly prepared for trial," the "more pressure there is on that [trial] date."

19  

---

20          [1] To date, Waymo has propounded 390 RFPs, propounded 43 ROGs, and taken 20
depositions, in addition to informal discovery requests propounded after inspections and elsewhere.

21  Uber has produced to Waymo more than 26,000 documents, consisting of more than 86,000 pages.  It
has inspected Levandowski's workstation and Uber-issued phone and computer, along with the

22  devices of Uber engineers involved in LiDAR.  These inspections have spanned ten days and more
than 56 hours and are ongoing

23          [2] 6/29/2017 Hr'g Tr. at 52:25-53-7 ("You've been given access to everything that is
nonprivileged . . . , [a]nd you're having an extremely hard find time finding any of your trade

24  secrets that ever got into their product.")  (Dkt. 775.)

25          [3] Uber requests relief from one ruling in five lines from the July 12 Order and does not
object to the other eight rulings with respect to Uber.

26          Uber furthermore requests an immediate stay of the Order, limited to production of the
non-LiDAR software modules, pending a ruling on Uber's Motion for Relief.  The Order requires

27  Uber to produce the non-LiDAR software modules by July 18, 2017.

28          [4] 6/7/2017 Hr'g Tr. at 16:25-17:2 (The Court: "[Y]ou're the firm that said you wanted trial
on October 2nd.  Are you giving up on that?"  Mr. Judah: "No.") (Dkt. 625.)

DEFENDANTS' MOTION FOR RELIEF FROM AND EMERGENCY MOTION FOR STAY OF NON-DISPOSITIVE
PRETRIAL ORDER (DKT. 881); Case No. 3:17-cv-00939-WHA
dc-891725

1

1  (6/7/2017 Hr'g Tr. at 51:23-52:13.)  Waymo's case against Uber has focused entirely on alleged

2  misappropriation of LiDAR-related trade secrets,[5] and the deadline to amend its complaint has

3  passed.  (Dkt. 25-7 at 32 (TS No. 50); Dkt. 563 ¶ 2.)

4  **II.    ARGUMENT**

5      The July 12 Order found that the software modules at issue are responsive to Waymo's

6  Expedited Request for Production No. 20, seeking:  "All agreements and "software modules"

7  identified in Sections 2.8, 2.10 and 2.15 of the OTTOMOTTO DISCLOSURE SCHEDULES."

8  But, as Uber argued before Judge Corley, these non-LiDAR software modules are outside the

9  scope of the asserted trade secrets identified in Waymo's Cal. Civ. Proc. Code § 2019.210

10  disclosure.  (Dkt. 748-13 at 3.)

11      Cal. Civ. Proc. Code § 2019.210 requires plaintiff to identify the asserted trade secret with

12  "reasonable particularity" before commencing discovery.  As other Northern District courts have

13  concluded, this "early identification of trade secrets, as required by the statute . . . prevents

14  plaintiff from using the discovery process as a means to obtain the defendant's trade secrets; [and]

15  ***it frames the appropriate scope of discovery.***"  *Neothermia Corp. v. Rubicor Medical, Inc.*, 345

16  F. Supp. 2d 1042, 1044 (N.D. Cal. Nov. 15, 2014) (emphasis added); *see Via Techs., Inc. v. Asus*

17  *Computer Int'l*, Case No. 14-cv-03586-BLF, 2016 WL 1056139, at *2 (N.D. Cal. Mar. 17, 2016)

18  ("The scope of the Section 2019.210 disclosure controls the scope of discovery.").

19      In its list of 121 trade secrets, Waymo identified only one software-related trade secret—

20  software algorithms for predicting condensation in the LiDAR sensor's dome housing.  (*See* Dkt

21  25-7 at 32 (Jaffe Ex. 1, Trade Secret No. 50).)  Uber and Ottomotto will produce for inspection

22  "software algorithms for predicting condensation in the LiDAR sensor's dome housing," if any

23  exist.  But the five software modules at issue (i.e., "Otto Planner," "Otto Visualization," "Otto

---

24      [5]  (Dkt. No. 23 ¶ 2 ("Waymo experimented with, and ultimately developed, a number of

25  different cost-effective and high-performing laser sensors known as LiDAR."); ¶ 3 ( "Otto and

26  Uber are currently building and deploying (or intending to deploy) LiDAR systems (or system
   components) using Waymo's trade secret designs."); ¶ 4 ("[Mr. Levandowski] . . . attempt[ed] to

27  erase any forensic fingerprints that would show what he did with Waymo's valuable LiDAR
   designs once they had been downloaded to his computer."); ¶ 11 ( "In light of Defendants'

28  misappropriation and infringement of Waymo's LiDAR technology, Waymo brings this
   Complaint . . . ."); Dkt. 24 (Preliminary Injunction Motion).)

1  Framework," "Sensor Drivers," and "Otto Perception") are source code for operating Uber's and

2  Ottomotto's self-driving vehicles and not for predicting condensation in the LiDAR

3  housing.   (Dkt. 515-11 (Corporate Disclosures at Section 2.8).)  Because the software modules

4  do not relate to any of Waymo's 121 asserted trade secrets, they fall outside the scope of the

5  expedited discovery afforded by the Court's preliminary injunction order.

6         Unable to show that any of these Ottomotto software modules are LiDAR-related or have

7  any connection to its trade secret claims, Waymo argues that the software modules are

8  nonetheless relevant because its Trade Secret No. 85 is a project spreadsheet that Anthony

9  Levandowski allegedly downloaded, (i.e., "Chauffeur TL weekly updates – Q4 2015") that

10  describes "software development goals, challenges, and accomplishments."  (*See* Dkt. 682 at 4-5;

11  Dkt 25-7 at 48-49 (Jaffe Ex. 1, Trade Secret No. 85); Dkt. 25-20 (Jaffe Ex.14), attached hereto as

12  Ex. 1.)  But the spreadsheet contains no software algorithms or source code, and mere summaries

13  of "goals, challenges, and accomplishments" do not support expanded discovery.  *See Loop AI*

14  *Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1115 (N.D. Cal 2016) (catch-all trade secret list

15  identification of "Plaintiff's confidential information, including regarding problems experienced

16  with certain tests" did not "clearly refer to tangible trade secret material").

17         Waymo also argues that the non-LiDAR software is relevant to Defendants' potential

18  explanation that the Ottomotto software modules are "legitimate" assets that justify the potential

19  value of the performance-based incentive stock options offered to Ottomotto employees in

20  connection with the Ottomotto acquisition.  (Dkt. 682 at 5.)  But Waymo has not identified a

21  single authority stating that trade secrets discovery can extend to technology outside the scope of

22  its asserted trade secrets.  Waymo has taken extensive discovery through inspections of Uber's

23  LiDAR development (including inspections of source code for software related to Uber's LiDAR)

24  and many depositions of Uber witnesses.  Moreover, the document request at issue – Expedited

25  Request for Documents No. 20 – is, as its title indicates, an expedited discovery request.  The

26  Court granted Waymo expedited document discovery "[w]ith respect to its trade secret

27  misappropriation claims ***only***," and not to some ephemeral explanation that Uber has no intention

28  of offering in this case.  (*See* Dkt. 426 at 25 (emphasis in original).)

DEFENDANTS' MOTION FOR RELIEF FROM AND EMERGENCY MOTION FOR STAY OF NON-DISPOSITIVE
PRETRIAL ORDER (DKT. 881); Case No. 3:17-cv-00939-WHA
dc-891725

3

1

**III.     CONCLUSION**

2

In sum, the July 12 Order is contrary to law because it expands the scope of discovery

3

beyond the trade secrets identified by Waymo under Cal. Civ. Proc. Code § 2019.210.  It is now

4

only a month before the close of discovery and a few weeks before Waymo's August 1 deadline

5

to ***narrow*** its claims to the "less than ten" trade secrets it will take to trial.  (Dkt. 563 ¶ 10;

6

Dkt. 647.)  If Waymo wants to maintain its October 10 trial date, it should not be allowed to

7

expand its trade secret claims beyond its required disclosures.  Accordingly, Defendants' request

8

for stay and motion for relief should be granted.

9

Dated: July 17, 2017                               MORRISON & FOERSTER LLP

10

11

                                                   By:   */s/ Arturo J. González*

12

                                                         ARTURO J. GONZÁLEZ

13

                                                   Attorneys for Defendants
                                                   UBER TECHNOLOGIES, INC.

14

                                                   and OTTOMOTTO LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR RELIEF FROM AND EMERGENCY MOTION FOR STAY OF NON-DISPOSITIVE
PRETRIAL ORDER (DKT. 881); Case No. 3:17-cv-00939-WHA
dc-891725

4

# EXHIBIT 9

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**What was announced today?**

Today, Uber announced it is acquiring a 6-month startup, Otto, founded by a former Chauffeur team member. In addition, Volvo and Uber will spend $300m to create 100 vehicles for Uber to begin a pilot of self-driving cars TaaS (with two test drivers aboard) in Pittsburgh.

- <u>Bloomberg story that broke the news</u>
- <u>Uber blogpost</u>
- <u>Otto blogpost</u>
- <u>Volvo press release</u>
- If you're after a more sober look, here's a <u>Mashable</u> piece.

**What does this mean for Chauffeur?**

With FC16, we have a plan to be the first in the world to put a fully autonomous ride-sharing service on the road. We're confident that we have the technology and the team to do this. But as with any business, we should always take into account what competitors are doing (and we're going to do just that), but we remain confident that the right path is to bring this technology via TaaS, and to start first with FC16.

**Won't Otto use what they've learnt at Google to benefit Uber? Does this mean people are catching up?**

It's true that there will be some ex-Chauffeur team members joining Uber. Anthony Levandowski was a founding member of the team and he'll have insights on how we do things that he'll bring to Uber. However, developing a self-driving car is also a lot of work in testing, in building the software and infrastructure, and more importantly in having a strong team that can bring this technology to market. We don't believe Uber got good value for their acquisition of the Otto team.

**Why aren't we using a mixed fleet (with trained drivers) for FC16 if this is what Uber is doing?**

We could have done a mixed fleet years ago. However, our ultimate goal is to put a truly self-driving car on public roads and we're confident we can get there soon. Introducing a mixed fleet can be a distraction to our business, and also training wheels that become harder to take off from a public and regulatory perspective (for example, regulators may force us to keep test drivers in vehicles indefinitely until we've driven x billions of miles). We can see some benefit in a mixed fleet, so we'd be open to a plan that mitigates the above risks, such as a mixed fleet that includes true self-driving cars from the start.

**Did we try to talk to Uber or Lyft?**

Yes. And they've both indicated their willingness for us to partner with them with our vehicles. In fact Uber called us after today's announcement and they reiterated their desire to partner with us (which is perhaps a sign of the lack of confidence in their progress). We think today's announcement makes it less likely we would want to partner with them.

**Did we try to talk to Volvo?**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WAYMO-UBER-00001492

Yes. We have met with over a dozen OEMs this year, including Volvo. We were surprised they wanted to partner with Uber given the importance they place on safety, and developing this technology safely. However, the deal with Uber is non-exclusive for both parties and Volvo made it clear they will continue to develop their own autonomous technology independent of Uber. The XC90 is a good platform for autonomous cars but it does not have redundant steering, which is fine for Uber as they will have a driver on-board, but not a perfect fit for us as we want to go truly driverless (Volvo have indicated they don't intend to have a fully self-driving car until 2021).

**What are L&S saying about this?**
We don't think today's news ultimately affect our strategy and direction (and Sergey was supportive of our project as the X All-hands today). The founders have been really supportive of our direction and we'll get a chance to hear from them at one of our next all-hands.

**\*Bonus FAQ\*: What's the latest update on our term sheet with Alphabet?**
Getting our NewCo Term Sheet finalized is a high priority. There are 25 categories of terms in our term sheet; to date we have 14 agreed to, with 11 remaining to be finalized. Part of the delay is that the CorpDev folks have not been able to sync with Alphabet execs to get agreement on their side. We had initially hoped we'd get this part done tomorrow but it's looking like this will slip. We'll continue to keep everyone updated on our progress. (This should not affect our timeline to get New.Co established by year's end).

Neel Chatterjee (SBN 173985)
*nchatterjee@goodwinlaw.com*
**GOODWIN PROCTER** LLP
135 Commonwealth Drive
Menlo Park, California 94025
Tel.: +1 650 752 3100
Fax.: +1 650 853 1038

Brett Schuman (SBN 189247)
*bschuman@goodwinlaw.com*
Shane Brun (SBN 179079)
*sbrun@goodwinlaw.com*
Rachel M. Walsh (SBN 250568)
*rwalsh@goodwinlaw.com*
**GOODWIN PROCTER** LLP
Three Embarcadero Center
San Francisco, California 94111
Tel.: +1 415 733 6000
Fax.: +1 415 677 9041

Attorneys for Defendant
Otto Trucking LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| Waymo LLC,<br><br>Plaintiff,<br><br>v.<br><br>Uber Technologies, Inc.; Ottomoto LLC; Otto Trucking LLC,<br><br>Defendants. | Case No. 3:17-cv-00939-WHA<br><br>**DECLARATION OF BRENT SCHWARZ IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Courtroom:  8<br>Judge:  Hon. William Alsup<br>Trial:  October 10, 2017<br><br>Filed/Lodged Concurrently with:<br>1. Defendants' Motion for Summary Judgment<br>2. Proposed Judgment<br>3. Chang Declaration<br>4. Brun Declaration |

## UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1      I, BRENT SCHWARZ, declare:

2      1.      I am a Senior Manager of Business Operations at the Advanced Technologies

3      Group at Uber Technologies ("Uber"), assigned to Otto Trucking.  I was Senior Business

4      Operations Manager in charge of Self-Driving Trucks at Ottomotto LLC ("Ottomotto").   I am an

5      equity holder in Otto Trucking LLC ("Otto Trucking") and coordinate operations between Uber

6      and Otto Trucking (and its subsidiaries).  I have personal knowledge of the facts stated herein.  I

7      make this declaration based on personal knowledge and, if called as a witness, I could and would

8      testify competently to the matters set forth herein.  I make this declaration in support of

9      Defendant's Motion for Summary Judgment.

10      2.      Pursuant to the May, 2017 Framework Agreement between Uber and Otto

11      Trucking, having an effective date of April 11, 2016, Otto Trucking leased seven Volvo trucks

12      from Uber subsidiary, Ottomotto. (the "Leased Trucks").  Those trucks are now owned by Uber as

13      a result of its acquisition of Ottomotto.

14      3.      Otto Trucking has a wholly owned subsidiary, Otto Transport LLC.  Otto Transport

15      currently owns three Volvo VNL670 tandem axle sleeper trucks and one Peterbilt truck (the "Otto

16      Transport Trucks").  The Volvo trucks were purchased by Otto Transport in May, 2017.  The

17      Peterbilt truck was purchased by Otto Transport in August, 2017.

18      4.      Each of the Leased and Otto Transport Trucks has been equipped with LiDAR

19      systems purchased from Velodyne LiDAR, Inc., a third party vendor.  Specifically, each of the

20      Leased and Otto Transport Trucks has been equipped with Velodyne VLP-16 and HDL-64E

21      LiDAR systems.

22      5.      Uber or Ottomotto purchased the above Velodyne LiDAR systems and leased these

23      systems to Otto Trucking.  These Velodyne LiDAR systems were installed onto the Leased and

24      Otto Transport Trucks by either Ottomotto or Uber employees.

25      6.      No Leased or Otto Transport Truck has ever been equipped with the Spider or Fuji

26      LiDAR system.

27      7.      Neither Otto Trucking nor Otto Transport has ever made, used, sold, offered for

28      sale, or imported into the U.S. either the Spider or Fuji LiDAR system.

ACTIVE/92373220.1                                    1

DECLARATION OF BRENT SCHWARZ IN SUPPORT OF   CASE NO. 3:17-CV-00939-WHA
DEFENDANTS' MSJ

1       I declare under penalty of perjury under the laws of the United States that  the foregoing is

2   true and correct. Executed this 31st day of August, 2017 in San Francisco, California.

3

4                                                          */s/ Brent Schwarz*

5                                                        BRENT SCHWARZ

6

7   **ATTESTATION OF E-FILED SIGNATURE**

8       I, Michael A. Jacobs, am the ECF User whose ID and password are being used to file this

9   Declaration.  In compliance with General Order 45, X.B., I hereby attest that Brent Schwarz has

10   concurred in this filing.

11   Dated:  August 31, 2017                          */s/ Michael A. Jacobs*

12                                                  MICHAEL A. JACOBS

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# *EXHIBIT 3*

*UNREDACTED VERSION
OF DOCUMENT
SOUGHT TO BE SEALED*

# *EXHIBIT 3*

Highly Confidential – Attorneys' Eyes Only

**United States District Court**

**Northern District of California, San Francisco Division**

**Civil Action No. 3:17-CV-00939-WHA**

**WAYMO LLC**

**v.**

**UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING**

**LLC**

---

**Expert Report of**

**Michael J. Wagner**

**August 24, 2017**

Highly Confidential – Attorneys' Eyes Only

21.     In August 2016, Uber acquired Ottomotto, which at the time had over 90 employees.[36] After the acquisition, Uber retired the Otto name and integrated all of its self-driving efforts under its Advanced Technologies Group.[37]

### 4.   Otto Trucking LLC

22.     Otto Trucking LLC is a limited liability company with its principal place of business located at 737 Harrison Street, San Francisco, CA.[38]

23.     Anthony Levandowski and Lior Ron founded Otto Trucking on February 1, 2016.[39]  As explained by Lior Ron, "Otto Trucking is basically a legal holding entity. It doesn't have any IP; it doesn't have any R&D activities; doesn't have any employees; doesn't have any ongoing activity of any sort."[40]  Cameron Poetzscher, Uber's Vice President of Corporate Development, stated that "Otto Trucking is largely just an LLC" and "just an entity with … very little, if any, operations or employees."[41]

24.     However, as Mr. Poetzscher also explained, Otto Trucking LLC has a "contract with Uber or one of its affiliates to be acquired by Uber."[42]  Uber's option period to acquire Otto Trucking opens on August 31, 2017, and closes on November 30, 2017.[43] If Uber does not acquire Otto Trucking during that period, Uber will be obligated to (i) become a 50% owner in Otto Trucking and (ii) to license Uber's self-driving technology (including all trade secrets) exclusively to Otto Trucking (even vis-à-vis Uber) for use in the commercialization of self-driving trucks.[44]

---

[36]  Uber, "Rethinking Transportation," August 18, 2016, <https://newsroom.uber.com/rethinking-transportation/>, accessed August 16, 2017. [2.14]

[37]  Uber, "The Future of Trucking," <https://www.uber.com/info/atg/truck/>, accessed August 16, 2017. [2.13]

[38]  First Amended Complaint, ¶ 15, p. 6. [2.1]

[39]  First Amended Complaint, ¶ 49, p. 12. [2.1]

[40]  Deposition of Lior Ron, April 19, 2017, p. 13. [2.18]

[41]  Deposition of Cameron Poetzscher, June 19, 2017, pp. 292, 370. [2.19]

[42]  Deposition of Cameron Poetzscher, June 19, 2017, p. 370. [2.19]

[43]  Plaintiff's First Supplemental Objections and Responses to Otto Trucking, LLC's First Set of Interrogatories (Nos. 1-14), p. 126. [7.7]

[44]  Plaintiff's First Supplemental Objections and Responses to Otto Trucking, LLC's First Set of Interrogatories (Nos. 1-14), pp. 126-127. [7.7]

# EXHIBIT 6

# ENTIRE EXHIBIT

# SUBMITTED UNDER SEAL

June 20, 2017

Travis Kalanick
1455 Market St. #400
San Francisco, CA 94103

Dear Travis:

On behalf of Benchmark, First Round Capital, Menlo Ventures, Lowercase Capital, and Fidelity Investments, we are writing to express our profound concerns about Uber's future, its willingness to fully embrace the changes that are needed to move forward, and your ability to implement them.

We all believe in Uber's mission. We are deeply grateful for your vision and tireless efforts over the last eight years, which have created a company whose technology and workforce have transformed the world's idea of transportation.

A series of recent revelations, however, continues to affect Uber's business and put the mission at risk. Among the enormously troubling developments that have recently come to light are the issues of discrimination, harassment, and retaliation that prompted the Holder Report, as well as publicly reported allegations about the behavior of Uber's senior executives in connection with the India rape incident and other matters. The ongoing Waymo trade secret litigation and Greyball investigation are also extremely serious and unresolved.

We believe that the cultural values of Uber need to be transformed to embrace transparency, diversity and social responsibility alongside growth and the bottom line. We believe that this transformation is possible – and is necessary for Uber to succeed operationally and as a respected member of the community. The public perception is that Uber fundamentally lacks ethical and moral values. Uber has a clear opportunity to engage positively with its employees, drivers and customers to change the company, correct this perception and achieve Uber's full potential.

As shareholders representing approximately 40% of Uber's voting shares and 28% of Uber's overall stock, we believe the company must immediately take concrete steps to address these issues and strengthen Uber. The company must change at its core. If Uber does not adequately address the company's ethical, cultural, and governance issues now, Uber's operations and reputation will continue to erode, to the detriment of the company and all of its stakeholders, including you.

To that end, we believe that the company must take certain concrete steps to enhance its leadership and culture. Please know that we remain fully supportive of Uber's mission and the incredibly positive role Uber can play in communities around the world. But that positive role— and Uber's full value for all its stakeholders —cannot be realized unless Uber achieves a new

Pltf EXHIBIT 916
WITNESS: Gurley
DATE: 8-24-17
Anrae Wimberley, CSR 7778

BENCHMARK-WAYMO_00000168

level of trust, social responsibility and transparency through the adoption of values that transcend the negative business practices and culture of the past. With these changes we firmly believe Uber can ensure its future as one of the most important companies Silicon Valley has ever produced.

Below are the steps that we believe are imperative to serve this end:

*First*, you need to immediately and permanently resign as CEO and transition this leadership role to capable hands. We strongly believe a change in leadership—coupled with effective Board oversight, governance improvements, and other immediate actions—is necessary for Uber to move forward. We need a trusted, experienced, and energetic new CEO who can help Uber navigate through its many current issues, and achieve its full potential.

*Second*, Uber's current governance structures, including the composition and structure of the Board of Directors, are no longer appropriate for a $70 billion company with over 14,000 employees. The new CEO must report to an independent Board that will exercise appropriate oversight, which will help the company attract the most qualified candidates for CEO. Further, as you know, the Holder Report calls for the appointment of additional independent Board members. To that end, you should fill two of the three Board seats you control (retaining one for yourself) with truly independent directors who comply with the Holder Report's recommendations for qualification for service on the Board as an independent—that is, they should be experienced, unbiased, and come from diverse backgrounds. They should also have the unanimous support of all the directors. You should also commit to apply the same standards to any future appointments to those two Board seats.

*Third*, new leadership from a revitalized Board and a new CEO will allow Uber to begin the critical process of healing and rebuilding to resume its path to success. You should support a board led CEO search committee, with an independent chairperson, and the inclusion of a representative of senior management and a representative of the driver community. We believe CEO candidates must have not only a fully articulated strategic vision and expert management skills to lead Uber, but—equally important—the ability to establish the ethical, values-based culture Uber needs to move forward.

*Fourth*, the company should immediately hire an adequately experienced interim or permanent Chief Financial Officer. Uber has shown an unwillingness to hire and retain experienced executives, especially in the finance area. The company has intentionally operated without a properly qualified executive in the top finance role for over two years. The interests of all of Uber's stakeholders would be served by urgently addressing this need for financial expertise in management.

We hope you will agree to move forward with us on this path, and look forward to your response.

CONFIDENTIAL

BENCHMARK-WAYMO_00000169

# EXHIBIT 13
# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4                          --oOo--

5      WAYMO LLC,

6                     Plaintiff,

                                      Case

7      vs.                            No. 3:17-cv-00939-WHA

8      UBER TECHNOLOGIES, INC.;

       OTTOMOTTO LLC; OTTO TRUCKING LLC,

9

                       Defendants.

10     _____/

11

12

13

14        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16      VIDEOTAPED DEPOSITION OF JOHN WILLIAM GURLEY

17              THURSDAY, AUGUST 24, 2017

18

19

20

21     Reported by:

22     Anrae Wimberley

23     CSR No. 7778

24     Job No.  2687934

25     PAGES 1 - 182

                                          Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4                     --oOo--
 5    WAYMO LLC,
 6                  Plaintiff,
                                      Case
 7    vs.                      No.  3:17-cv-00939-WHA
 8    UBER TECHNOLOGIES, INC.;
      OTTOMOTTO LLC; OTTO TRUCKING LLC,
 9
                  Defendants.
10    _____/
11
12
13        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14
15             Transcript of video-recorded deposition of
16    JOHN WILLIAM GURLEY taken at Morrison & Foerster LLP,
17    425 Market Street, 33rd Floor, San Francisco,
18    California, beginning at 8:37 a.m. and ending at 1:09
19    p.m. on Thursday, August 24, 2017, before Anrae
20    Wimberley, Certified Shorthand Reporter No. 7778.
21
22
23
24
25
                                          Page  2
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | know where that technology was evolving relative to | 08:58:16 |
| 2 | our service. | 08:58:17 |
| 3 | Q.   And how often did this come up with the | 08:58:21 |
| 4 | board? | 08:58:22 |
| 5 | A.   I would say only -- around Carnegie Mellon | 08:58:39 |
| 6 | and Otto were the only two times where it was | 08:58:43 |
| 7 | discussed in depth.  I don't think it was a frequent | 08:58:50 |
| 8 | topic of every board meeting. | 08:58:52 |
| 9 | Q.   Are you still with -- on the board at Uber? | 08:59:05 |
| 10 | A.   I am not. | 08:59:06 |
| 11 | Q.   When did you cease being on the board? | 08:59:08 |
| 12 | A.   I believe it was mid to late June of this | 08:59:17 |
| 13 | year. | 08:59:17 |
| 14 | Q.   And I may have asked this and, if I did, I | 08:59:22 |
| 15 | apologize. | 08:59:22 |
| 16 | But when did you first become a board member? | 08:59:25 |
| 17 | A.   In January of 2011. | 08:59:27 |
| 18 | Q.   When you were a member of the board, is it a | 08:59:33 |
| 19 | fair statement to say that you were very engaged with | 08:59:37 |
| 20 | the company? | 08:59:41 |
| 21 | MR. FLUMENBAUM:  Objection as to form. | 08:59:51 |
| 22 | THE WITNESS:  I'll answer yes.  There's a question | 08:59:54 |
| 23 | as to whether -- like relative to what, you know. | 08:59:58 |
| 24 | BY MR. VERHOEVEN: | 08:59:58 |
| 25 | Q.   Is it fair to say that you were the most | 09:00:00 |

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A.    I did not.                                    09:12:20

2    Q.    Then it continues on that sentence,           09:12:22

3  "Ottomotto is expected to de-risk our current laser   09:12:26

4  approach."                                            09:12:26

5         You understand that meant that purchasing      09:12:31

6  Ottomotto would give you laser technology and,        09:12:36

7  therefore, de-risk what you're currently doing?       09:12:39

8    MR. FLUMENBAUM:  Objection as to form.              09:12:43

9    THE WITNESS:  Like I said, there wasn't much        09:12:48

10  discussion on that particular topic, nor would I     09:12:51

11  suggest that the board as a whole has much deep      09:12:55

12  knowledge on laser technology, so I think it would be 09:12:57

13  taken as it's given.                                 09:13:00

14  BY MR. VERHOEVEN:                                    09:13:00

15    Q.    Did you understand that the rationale for the 09:13:06

16  deal was to de-risk Uber's current laser approach?   09:13:12

17    A.    That's written here, so I wouldn't object to  09:13:22

18  that notion.                                         09:13:23

19    Q.    You don't disagree with that.                09:13:25

20    A.    No, I do not.                                09:13:26

21    Q.    The second bullet in that cell says,         09:13:34

22  "Ottomotto could significantly enhance our overall AV 09:13:38

23  efforts and potentially accelerate current time      09:13:42

24  frames."                                             09:13:42

25         Do you see that?                              09:13:43

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.    I don't recall any.                    10:32:33

 2        Q.    Who comprised the executive team at that    10:32:38

 3   time?                                             10:32:38

 4        A.    I don't know if I'll get them all.  I think  10:32:52

 5   at that time Emil Michael was still there.  Twaun  10:32:56

 6   Pham.  Rachel Whetstone.  Liane Hornsey.  Sally Yoo,  10:33:04

 7   but Sally's on the legal team.  Jeff Holden.  Gautam  10:33:13

 8   Gupta was still there at that time, I believe.  I'm  10:33:26

 9   probably leaving somebody out.                   10:33:28

10        Q.    Was Travis on the team?                10:33:30

11        A.    Yeah, I mean, he's CEO, so, yeah.  Jeff Jones  10:33:37

12   may have left by then.                            10:33:39

13        Q.    Did Mr. Kalanick agree, when you expressed  10:33:45

14   this to the executive team, that Mr. Levandowski  10:33:48

15   should be terminated?                             10:33:52

16        A.    I don't recall if I had a direct discussion  10:33:55

17   with him, although probably at a board level, it was  10:33:58

18   the general understanding of the team that he did not  10:34:04

19   want to terminate Anthony.                        10:34:06

20        Q.    Do you recall what the reasons -- that he  10:34:17

21   stated for why he did not --                      10:34:19

22        A.    Yeah, the statement I remember is that he  10:34:21

23   didn't do anything wrong, so why should we terminate  10:34:24

24   him?                                              10:34:25

25        Q.    And what was said in response to that?  And  10:34:32
```

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | if you can recall, who said it?  For example, did | 10:34:42 |
| 2 | someone say, then why is he taking the Fifth? | 10:34:45 |
| 3 | MR. BRILLE:  Object to form. | 10:34:47 |
| 4 | THE WITNESS:  I can certainly say that my opinion | 10:34:53 |
| 5 | at that moment in time was that his taking the Fifth | 10:34:56 |
| 6 | should result in his termination, based on my best | 10:35:02 |
| 7 | knowledge of how that situation should be dealt with. | 10:35:06 |
| 8 | BY MR. VERHOEVEN: | 10:35:06 |
| 9 | Q.   And did -- you referenced conversations with | 10:35:10 |
| 10 | the board on this subject? | 10:35:12 |
| 11 | A.   Yes. | 10:35:12 |
| 12 | Q.   How many such conversations were there? | 10:35:16 |
| 13 | A.   I can't remember specifically, but my general | 10:35:21 |
| 14 | recollection is that it spanned multiple board | 10:35:24 |
| 15 | meetings. | 10:35:31 |
| 16 | Q.   And your position to the board was that he | 10:35:34 |
| 17 | should be terminated? | 10:35:35 |
| 18 | A.   Yes. | 10:35:35 |
| 19 | Q.   And you made that clear on the first of these | 10:35:41 |
| 20 | multiple board meetings? | 10:35:43 |
| 21 | A.   Once I'd gotten up to speed and had proper | 10:35:48 |
| 22 | knowledge of what I thought was the best to do, | 10:35:55 |
| 23 | which -- as I said earlier, there was a time window | 10:35:58 |
| 24 | where that happened.  So it wasn't -- my voicing of | 10:36:06 |
| 25 | this opinion wasn't immediate, like right after he | 10:36:09 |

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | him and terminate, for the reasons that I've | 10:46:50 |
| 2 | discussed. | 10:46:51 |
| 3 | Q.   Right. | 10:46:51 |
| 4 | So -- but I'm asking you specifically, at the | 10:46:54 |
| 5 | board meeting, Kalanick repeated his view -- | 10:46:59 |
| 6 | A.   Right. | 10:47:00 |
| 7 | Q.   -- that Levandowski didn't do anything | 10:47:02 |
| 8 | wrong -- | 10:47:03 |
| 9 | A.   I think I understand your question? | 10:47:04 |
| 10 | I don't remember if there were specific | 10:47:06 |
| 11 | conversations that said, well, if he didn't do | 10:47:08 |
| 12 | anything wrong, why would he plead the Fifth?  I don't | 10:47:10 |
| 13 | remember if that happened.  It might have. | 10:47:13 |
| 14 | Q.   Well, do you remember -- was there response | 10:47:15 |
| 15 | to Mr. Kalanick at the meeting, after he made that | 10:47:19 |
| 16 | statement, just generally?  There was a discussion; | 10:47:25 |
| 17 | right? | 10:47:26 |
| 18 | A.   Yeah, I think there was a discussion and I | 10:47:28 |
| 19 | think -- and I don't recall exactly who chimed in, but | 10:47:32 |
| 20 | there was others, like me, that felt that taking the | 10:47:38 |
| 21 | Fifth should be dealt with. | 10:47:40 |
| 22 | Q.   And who were those people? | 10:47:42 |
| 23 | A.   I just said I don't recall exactly who was on | 10:47:45 |
| 24 | that point of view. | 10:47:46 |
| 25 | Q.   Do you remember anyone on the board that you | 10:47:49 |

Page 94

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | order that was public? | 10:59:58 |
| 2 | A.   I didn't have any perspectives that were | 11:00:08 |
| 3 | outside of a discussion from counsel on that topic. | 11:00:13 |
| 4 | Q.   Why didn't Uber fire Mr. Levandowski upon the | 11:00:20 |
| 5 | issuance of the preliminary injunction? | 11:00:23 |
| 6 | A.   I can't speak to that because I wasn't in a | 11:00:32 |
| 7 | position to have authority to make that decision. | 11:00:35 |
| 8 | Q.   Who was? | 11:00:36 |
| 9 | A.   Presumably Travis, the CEO. | 11:00:39 |
| 10 | Q.   So the board didn't have authority to direct | 11:00:42 |
| 11 | that -- I thought you -- withdrawn. | 11:00:46 |
| 12 | I thought you previously mentioned that you | 11:00:48 |
| 13 | had recommended that he be terminated -- | 11:00:50 |
| 14 | A.   I had.  I had. | 11:00:52 |
| 15 | Q.   -- at a board meeting. | 11:00:53 |
| 16 | A.   Yeah. | 11:00:54 |
| 17 | Q.   But the board didn't have authority to order | 11:00:56 |
| 18 | that? | 11:00:57 |
| 19 | A.   The board did not order that, if that's your | 11:01:00 |
| 20 | question. | 11:01:00 |
| 21 | Q.   But they had the authority to? | 11:01:03 |
| 22 | A.   I suppose they could have made a motion and | 11:01:06 |
| 23 | voted to do that. | 11:01:08 |
| 24 | Q.   And you encouraged the board to do that? | 11:01:11 |
| 25 | A.   I encouraged the board to terminate once I | 11:01:13 |

Page 102

| | | |
|---|---|---|
| 1 | had an understanding of what my interpretation was of | 11:01:18 |
| 2 | him pleading the Fifth.  And my efforts around | 11:01:22 |
| 3 | creating the committee were my avenue to try and see | 11:01:27 |
| 4 | that through. | 11:01:27 |
| 5 | Q.   After the issuance of the preliminary | 11:01:36 |
| 6 | injunction order, did you have any discussions with | 11:01:39 |
| 7 | Mr. Kalanick about terminating Mr. Levandowski? | 11:01:42 |
| 8 | A.   Not specifically related to that event. | 11:01:47 |
| 9 | Q.   Okay.  So it didn't cause you to have any | 11:01:50 |
| 10 | more conversations with Mr. Kalanick? | 11:01:54 |
| 11 | A.   No.  But I had already determined that I | 11:01:56 |
| 12 | thought the best course of action was termination.  So | 11:01:58 |
| 13 | like I was not more compelled; I was already | 11:02:02 |
| 14 | compelled. | 11:02:04 |
| 15 | Q.   Did you discuss the preliminary injunction | 11:02:05 |
| 16 | order with Mr. Kalanick and repeat your | 11:02:09 |
| 17 | recommendation? | 11:02:10 |
| 18 | A.   Not outside of a privileged conversation, no. | 11:02:14 |
| 19 | Q.   Was there a board meeting about the | 11:02:19 |
| 20 | preliminary injunction? | 11:02:20 |
| 21 | A.   I don't remember if there was one called.  I | 11:02:23 |
| 22 | don't think so.  There were lots of board meetings at | 11:02:27 |
| 23 | this moment in time. | 11:02:29 |
| 24 | Q.   Do you recall receiving -- withdrawn. | 11:02:34 |
| 25 | Did you ask to see the due diligence report | 11:02:39 |

Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And it's possible you communicated that to | 11:41:22 |
| 2 | Mr. Levandowski -- or to Mr. Kalanick? | 11:41:25 |
| 3 | A.   It's possible, but I don't have -- | 11:41:26 |
| 4 | MR. FLUMENBAUM:  Not Levandowski. | 11:41:27 |
| 5 | THE WITNESS:  Right. | 11:41:28 |
| 6 | I don't have specific recollection of having | 11:41:31 |
| 7 | done that, but it's possible. | 11:41:33 |
| 8 | BY MR. VERHOEVEN: | 11:41:33 |
| 9 | Q.   It's more than likely; right? | 11:41:35 |
| 10 | A.   I don't know. | 11:41:37 |
| 11 | MR. FLUMENBAUM:  Objection.  Objection. | 11:41:38 |
| 12 | MR. VERHOEVEN:  Do you want to take a break? | 11:41:42 |
| 13 | MR. FLUMENBAUM:  Sure.  Let's take a short break. | 11:41:44 |
| 14 | THE VIDEOGRAPHER:  This marks the end of DVD No. 2 | 11:41:47 |
| 15 | in the deposition of William Gurley.  We're off the | 11:41:49 |
| 16 | record at 11:41 a.m. | 11:41:51 |
| 17 | (Recess taken.) | 11:41:51 |
| 18 | (Plaintiff's Exhibit 915 was marked.) | 11:52:45 |
| 19 | THE VIDEOGRAPHER:  Back on the record. | 11:52:53 |
| 20 | This the beginning of DVD No. 3, and the time | 11:52:56 |
| 21 | is 11:52 a.m. | 11:52:58 |
| 22 | BY MR. VERHOEVEN: | 11:52:58 |
| 23 | Q.   By May of 2017, were you aware that some | 11:53:07 |
| 24 | investors of Uber wanted Mr. Kalanick to resign as | 11:53:13 |
| 25 | CEO? | 11:53:14 |

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | view to Travis about a number of issues that had been | 12:07:55 |
| 2 | developing over the course of 2017. | 12:07:58 |
| 3 | MR. BRILLE:  I'm going to note my objection to | 12:07:59 |
| 4 | this exhibit, to the extent it is unsigned.  And it is | 12:08:03 |
| 5 | unclear to me, at least, what this document is. | 12:08:06 |
| 6 | THE WITNESS:  Okay. | 12:08:09 |
| 7 | BY MR. VERHOEVEN: | 12:08:09 |
| 8 | Q.   Did someone in this group send this exhibit | 12:08:19 |
| 9 | to Mr. Kalanick? | 12:08:21 |
| 10 | A.   It was presented to him by two of the -- two | 12:08:25 |
| 11 | of my partners at Benchmark. | 12:08:28 |
| 12 | Q.   Which partners? | 12:08:29 |
| 13 | A.   Matt Cohler and Peter Fenton. | 12:08:32 |
| 14 | Q.   Was it presented in person? | 12:08:38 |
| 15 | A.   Yes. | 12:08:38 |
| 16 | Q.   Where? | 12:08:40 |
| 17 | A.   In a hotel in Chicago. | 12:08:42 |
| 18 | Q.   Did Mr. Kalanick have any advance indication | 12:08:51 |
| 19 | that this was going to be presented to him? | 12:08:57 |
| 20 | A.   There had been a number of one-on-one | 12:09:06 |
| 21 | conversations that related to trying to find solutions | 12:09:13 |
| 22 | to move past some of the many issues outlined here. | 12:09:17 |
| 23 | Some of that related to a COO search. | 12:09:20 |
| 24 | Some of those related to various other | 12:09:24 |
| 25 | alternatives, like coaching and that kind of thing. | 12:09:28 |

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Some of those had been had, not just with me,    12:09:32

2    but with Matt and Trav- -- and Travis.    12:09:35

3    But there was not a -- there was nothing that    12:09:42

4    said, "Hey, we're bringing" -- there was not a    12:09:45

5    communication that said, "Hey, we're about to bring    12:09:49

6    you this letter."    12:09:50

7    It was, like, "We need to desperately sit    12:09:53

8    down and talk," and then the letter was presented.    12:09:56

9    Q.    Were you aware of the contents of this letter    12:09:58

10    before it was presented?    12:10:00

11    A.    Yes.    12:10:00

12    Q.    Did you review it?    12:10:01

13    A.    Yes.    12:10:01

14    Q.    In the third paragraph of Exhibit 916 it    12:10:06

15    starts with:    12:10:06

16    "A series of recent revelations, however,    12:10:10

17    continues to affect Uber's business and put the    12:10:13

18    mission at risk."    12:10:15

19    Do you see that?    12:10:16

20    A.    Um-hum.    12:10:17

21    Q.    And later in the paragraph there's a    12:10:18

22    reference to the "ongoing Waymo trade secret    12:10:20

23    litigation."    12:10:23

24    Do you see that?    12:10:24

25    A.    Correct.   Yes.    12:10:24

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | happened at the meeting? | 12:18:01 |
| 2 | A.   Yes. | |
| 3 | Q.   What did they say? | 12:18:03 |
| 4 | A.   I'll start at a high level.  Like there was a | 12:18:10 |
| 5 | lot of conversations back and forth. | 12:18:12 |
| 6 | There were discussions of -- you know, there | 12:18:24 |
| 7 | was a lot of discussion about the details of these | 12:18:27 |
| 8 | recommendations and how they would manifest themselves | 12:18:30 |
| 9 | in an agreement. | 12:18:31 |
| 10 | There were edits of that back and forth in a | 12:18:36 |
| 11 | separate document that he eventually signed. | 12:18:41 |
| 12 | And there are questions about disclosures, | 12:18:47 |
| 13 | what we would do or not do if he agreed to these | 12:18:52 |
| 14 | things, or refrain from doing. | 12:19:00 |
| 15 | That's the general recollection. | 12:19:06 |
| 16 | Q.   And that all happened at the one meeting? | 12:19:09 |
| 17 | A.   I think there were a series of meetings over | 12:19:11 |
| 18 | an extended period of time. | 12:19:13 |
| 19 | Q.   Did -- did Mr. Kalanick agree to resign as | 12:19:18 |
| 20 | CEO as part of that first meeting? | 12:19:22 |
| 21 | A.   I don't -- when you say "first meeting," I | 12:19:29 |
| 22 | think they met and -- and broke up and met and broke | 12:19:35 |
| 23 | up and met and broke up several times. | 12:19:36 |
| 24 | So I don't have enough information to know | 12:19:40 |
| 25 | whether he had agreed on that one point in the very | 12:19:43 |

Page 152

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Do you see that? | 12:30:24 |
| 2 | A.    Yes. | 12:30:25 |
| 3 | Q.    And this refers, in part, to your prior | 12:30:30 |
| 4 | testimony that if Benchmark had known about the | 12:30:35 |
| 5 | information contained in the Stroz report, it would | 12:30:37 |
| 6 | never have agreed to this amendment, right? | 12:30:45 |
| 7 | MR. BRILLE:  Object to the form. | 12:30:46 |
| 8 | MR. FLUMENBAUM:  Object to the form. | 12:30:47 |
| 9 | You can answer. | |
| 10 | BY MR. VERHOEVEN: | |
| 11 | Q.    Well, you're correct.  Let me rephrase. | 12:30:51 |
| 12 | This refers to your prior testimony that | 12:30:54 |
| 13 | Benchmark never would have approved the transaction | 12:30:56 |
| 14 | had it been aware of the Stroz report, correct? | 12:31:02 |
| 15 | MR. BRILLE:  Same objection. | 12:31:03 |
| 16 | MR. FLUMENBAUM:  Objection as to form, but you | 12:31:05 |
| 17 | may -- | 12:31:06 |
| 18 | THE WITNESS:  The only clarification I would make | 12:31:08 |
| 19 | is that there are many other matters, also. | 12:31:10 |
| 20 | BY MR. VERHOEVEN: | |
| 21 | Q.    Yeah. | |
| 22 | A.    But this is one of those.  Yes, correct. | 12:31:14 |
| 23 | Q.    But it's your contention that Benchmark would | 12:31:18 |
| 24 | not have approved the amended certificate of | 12:31:18 |
| 25 | incorporation referenced here, or the voting | 12:31:22 |

Page 160

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | With respect to the Otto acquisition, there's | 12:33:57 |
| 2 | actually more detail later in the complaint.  But it's | 12:34:00 |
| 3 | become public knowledge, not involving the Stroz | 12:34:05 |
| 4 | report, that at the time the board was asked to | 12:34:09 |
| 5 | approve this, that -- that Travis and other members of | 12:34:13 |
| 6 | the management team had knowledge that there were five | 12:34:16 |
| 7 | disks that were in Anthony's possession, and that he | 12:34:23 |
| 8 | said there was Google information on those disks.  So | 12:34:25 |
| 9 | that's now in the public record. | 12:34:29 |
| 10 | When you look at the -- we've already been | 12:34:32 |
| 11 | through it.  But you look at the deal, and the fact | 12:34:35 |
| 12 | that so much of it weighed on him and the fact that | 12:34:39 |
| 13 | there were large indemnity provisions put aside | 12:34:45 |
| 14 | specifically for him, I don't know of a way you could | 12:34:50 |
| 15 | possibly present that to a board and say that this was | 12:34:53 |
| 16 | clean diligence and -- and that be okay.  Like, I -- I | 12:35:02 |
| 17 | can't fathom that. | 12:35:05 |
| 18 | BY MR. VERHOEVEN: | |
| 19 | Q.   When you referred to "him," you're referring | 12:35:08 |
| 20 | to Mr. Levandowski, right, in that answer? | 12:35:10 |
| 21 | MR. BRILLE:  Object to form. | 12:35:13 |
| 22 | THE WITNESS:  It's in the public record that -- | 12:35:15 |
| 23 | that the Uber executives were aware -- I'll -- I'll | 12:35:17 |
| 24 | try not to use pronouns -- were aware that Anthony | 12:35:21 |
| 25 | Levandowski had the five disks. | 12:35:24 |

Page 163

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.    Yes, this section.  That's fair.  Correct.    12:38:46

 2        Q.    You've referenced there's a -- I'm sorry.     12:39:07

 3   The complaint references:                                12:39:12

 4            "Kalanick praised Levandowski as one of the     12:39:15

 5   world's leading autonomous engineers and an             12:39:20

 6   entrepreneur with a real sense of urgency.              12:39:24

 7            "Kalanick further described Levandowski as      12:39:26

 8   his brother from another mother."                        12:39:30

 9            The allegation is -- and your belief is --      12:39:34

10   that he was saying all that, but withholding the        12:39:37

11   information he had from the Stroz investigation;         12:39:41

12   right?                                                   12:39:41

13        MR. BRILLE:  Object to form.                        12:39:44

14        MR. FLUMENBAUM:  Object to form.  You can try to    12:39:46

15   answer that.                                             12:39:49

16        THE WITNESS:  These are -- these are taken from --  12:39:50

17   from -- as you can see, from public statements that he   12:39:53

18   made.                                                    12:39:54

19            His praise for Anthony in these public venues   12:39:59

20   is consistent with what he presented at the board        12:40:03

21   level, and so there's no inconsistency here.             12:40:06

22            I -- and as you -- as you assert, he did not    12:40:12

23   disclose these other details, you know.  And I -- and    12:40:17

24   I had mentioned, and they're later in here in the        12:40:20

25   complaint, that some of that is now public with regard   12:40:23
```

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | to the five-disk matter. | 12:40:26 |
| 2 | BY MR. VERHOEVEN: | 12:40:26 |
| 3 | Q.   The last sentence of this paragraph says: | 12:40:29 |
| 4 | "In discussing the Otto transaction in 2016, | 12:40:32 |
| 5 | Kalanick repeatedly emphasized to Gurley and other | 12:40:36 |
| 6 | board members that Uber's acquisition of Otto, | 12:40:39 |
| 7 | employment of Anthony Levandowski, would be | 12:40:41 |
| 8 | transformative for Uber's business." | 12:40:44 |
| 9 | Do you see that? | 12:40:45 |
| 10 | A.   I do. | 12:40:46 |
| 11 | Q.   What is that referring to? | 12:40:48 |
| 12 | A.   Once again, consistent with what we discussed | 12:40:53 |
| 13 | earlier, there was a -- a big part of the argument for | 12:40:57 |
| 14 | why we needed to do this transaction was to employ | 12:41:01 |
| 15 | Anthony Levandowski, who -- who Mr. Kalanick believed | 12:41:04 |
| 16 | was one of the leading experts on autonomous vehicles | 12:41:07 |
| 17 | in -- in the -- in the world. | 12:41:10 |
| 18 | Q.   Was employing Anthony Levandowski worth | 12:41:14 |
| 19 | $680 million? | 12:41:17 |
| 20 | MR. BRILLE:  Object to form. | 12:41:17 |
| 21 | MR. FLUMENBAUM:  Object to form.  We've sort of | 12:41:19 |
| 22 | been over this. | 12:41:20 |
| 23 | You can answer it again. | 12:41:22 |
| 24 | THE WITNESS:  Yeah, I don't -- I don't mind going | 12:41:24 |
| 25 | over it again. | 12:41:25 |

Page 167

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            Do you see it's sprinkled through the          12:54:57

 2    paragraph there?                                        12:54:58

 3       A.    Yes.                                           12:54:58

 4       Q.    When we testified earlier about this -- I      12:55:02

 5    don't want to go over it again -- I think you just      12:55:05

 6    said -- you and I just said "the Stroz report."         12:55:09

 7            But were you referencing, specifically in       12:55:11

 8    this time period, the interim findings of the Stroz     12:55:14

 9    investigation?                                          12:55:16

10       MR. FLUMENBAUM:  Objection as to form.               12:55:19

11    BY MR. VERHOEVEN:                                       12:55:19

12       Q.    When you testified about if something had      12:55:22

13    been disclosed, if the Stroz report had been            12:55:25

14    disclosed, more accurately what you meant is if the     12:55:28

15    interim findings of the Stroz report -- of the Stroz    12:55:30

16    investigation had been disclosed; is that right?        12:55:33

17       A.    This particular complaint was based on all     12:55:44

18    that information that was in the public record.          12:55:46

19            There are documents related to this lawsuit     12:55:50

20    that highlight that, as of this date, there were these  12:55:54

21    interim findings available.                             12:55:55

22       Q.    Right.                                         12:55:59

23       A.    And we're merely highlighting that those were  12:55:59

24    never disclosed to the board.                           12:56:01

25       Q.    Okay.  I direct your attention to paragraph    12:56:12
```

Page 171

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Nina Qi and Cameron. | 12:59:24 |
| 2 | Q.   So with respect to the Waymo dispute or | 12:59:29 |
| 3 | the -- withdrawn. | 12:59:30 |
| 4 | With respect to the Otto acquisition, this | 12:59:35 |
| 5 | phrase you interpret to reference those two | 12:59:37 |
| 6 | individuals? | 12:59:38 |
| 7 | A.   Yes. | 12:59:38 |
| 8 | Q.   Has either of those two individuals been | 12:59:47 |
| 9 | terminated, to your knowledge? | 12:59:49 |
| 10 | A.   No. | 12:59:49 |
| 11 | Q.   All right. | |
| 12 | MR. FLUMENBAUM:  Can I have a -- all right. | 13:00:05 |
| 13 | Forget it.  Go ahead. | 13:00:07 |
| 14 | MR. VERHOEVEN:  So what did you want to talk to | 13:00:10 |
| 15 | him about? | 13:00:10 |
| 16 | MR. FLUMENBAUM:  No, just go ahead. | 13:00:13 |
| 17 | MR. VERHOEVEN:  Okay. | 13:00:13 |
| 18 | BY MR. VERHOEVEN: | |
| 19 | Q.   There came a time in which you resigned from | 13:00:16 |
| 20 | the board of Uber? | 13:00:17 |
| 21 | A.   Correct. | 13:00:17 |
| 22 | Q.   When was that, roughly? | 13:00:19 |
| 23 | A.   I think it was a couple of days after Travis | 13:00:27 |
| 24 | signed the resignation letter we've already looked at. | 13:00:32 |
| 25 | Q.   Why did you resign? | 13:00:45 |

Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    The members of -- of our partnership and I | 13:00:49 |
| 2 | had a lengthy discussion about trying to -- whether or | 13:00:56 |
| 3 | not it made sense to swap out the board member that | 13:01:00 |
| 4 | represented Benchmark with Uber, in an effort to try | 13:01:04 |
| 5 | and move things forward in a positive direction. | 13:01:08 |
| 6 | The -- the conversations and back and forth | 13:01:13 |
| 7 | and events that led to the meeting in Chicago, I think | 13:01:16 |
| 8 | it's safe to say, had a strain on the relationship | 13:01:21 |
| 9 | between myself and -- and Mr. Kalanick.  And it was | 13:01:29 |
| 10 | merely a decision from our firm to try and put a new | 13:01:35 |
| 11 | foot forward to try and create kind of a new day and | 13:01:39 |
| 12 | new relationship with the board. | 13:01:41 |
| 13 | Q.    Did you have any discussions with anyone at | 13:01:45 |
| 14 | Uber about your resignation before you resigned? | 13:01:48 |
| 15 | A.    I did not. | 13:01:49 |
| 16 | Q.    What about with other board members? | 13:01:51 |
| 17 | A.    I did not. | 13:01:53 |
| 18 | Q.    Have you had any conversations with anybody | 13:02:01 |
| 19 | at Uber since you've resigned from the board? | 13:02:04 |
| 20 | A.    Yeah.  There were -- there were numerous | 13:02:04 |
| 21 | conversations, as part of the handoff process I was | 13:02:13 |
| 22 | involved in, all of those committees.  I wanted to | 13:02:16 |
| 23 | make sure that -- that my partner got the benefit of | 13:02:19 |
| 24 | the -- you know, the transfer of information, that | 13:02:23 |
| 25 | kind of thing.  We had a lot of meetings to make sure | 13:02:26 |

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          FEDERAL CERTIFICATE OF DEPOSITION OFFICER
 2          I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
      declare:
 3          That, prior to being examined, the witness named
      in the foregoing deposition was by me duly sworn
 4      pursuant to Section 30(f)(1) of the Federal Rules of
      Civil Procedure and the deposition is a true record of
 5      the testimony given by the witness;
 6          That said deposition was taken down by me in
      shorthand at the time and place therein named and
 7      thereafter reduced to text under my direction;
 8          --X---    That the witness was requested to
      review the transcript and make any changes to the
 9      transcript as a result of that review pursuant to
      Section 30(e) of the Federal Rules of Civil Procedure;
10          -----    No changes have been provided by the
      witness during the period allowed;
11          -----    The changes made by the witness are
12      appended to the transcript;
13          -----    No request was made that the transcript
      be reviewed pursuant to Section 30(e) of the Federal
14      Rules of Civil Procedure.
15          I further declare that I have no interest in the
      event of the action.
16          I declare under penalty of perjury under the laws
17      of the United States of America that the foregoing is
      true and correct.
18          WITNESS my hand this 25th day of August, 2017.
19
20
21
22
23
24
25          ANRAE WIMBERLEY, CSR NO. 7778
```

Page 182

# EXHIBIT 1
# SEALED

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4                  --oOo--

5    WAYMO LLC,

6              Plaintiff,

                              Case

7    vs.                      No. 3:17-cv-00939-WHA

8    UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING LLC,

9

               Defendants.

10   _____/

11

12

13

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16    VIDEOTAPED DEPOSITION OF JOHN WILLIAM GURLEY

17            THURSDAY, AUGUST 24, 2017

18

19

20

21   Reported by:

22   Anrae Wimberley

23   CSR No. 7778

24   Job No.  2687934

25   PAGES 1 - 182

                                        Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4                    --oOo--

 5   WAYMO LLC,

 6              Plaintiff,

                                   Case

 7   vs.                          No.  3:17-cv-00939-WHA

 8   UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING LLC,

 9

              Defendants.

10   _____/

11

12

13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15          Transcript of video-recorded deposition of

16   JOHN WILLIAM GURLEY taken at Morrison & Foerster LLP,

17   425 Market Street, 33rd Floor, San Francisco,

18   California, beginning at 8:37 a.m. and ending at 1:09

19   p.m. on Thursday, August 24, 2017, before Anrae

20   Wimberley, Certified Shorthand Reporter No. 7778.

21

22

23

24

25

                                           Page  2
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    APPEARANCES:

 2    For Plaintiff Waymo LLC:

 3              QUINN EMANUEL URQUHART & SULLIVAN LLP

 4              BY:  CHARLES K. VERHOEVEN, ESQ.

 5              JAMES JUDAH, ESQ.

 6              50 California Street, 22nd Floor

 7              San Francisco, CA 94111

 8              (415) 875-6600

 9              charlesverhoeven@quinnemanuel.com

10              jamesjudah@quinnemanuel.com

11

12    For Defendants Uber Technologies, Inc.; Ottomotto LLC:

13              BOIES SCHILLER FLEXNER LLP

14              BY:  MICHAEL A. BRILLE, ESQ.

15              EDWARD H. TAKASHIMA, ESQ.

16              1401 New York Avenue NW

17              Washington, DC 20005

18              (202) 237-9608

19              mbrille@bsfllp.com

20                   -and-

21              MORRISON & FOERSTER LLP

22              BY: MICHAEL A. JACOBS, ESQ.

23              425 Market Street, 33rd Floor

24              San Francisco, California 94105-2482

25              (415) 268-7455 mjacobs@mofo.com
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    APPEARANCES:

 2    For Defendant Otto Trucking LLC:

 3              GOODWIN PROCTER LLP

 4              BY:  TODD A. BOOCK, ESQ.

 5              601 South Figueroa Street, 41st Floor

 6              Los Angeles, California 90017

 7              (213) 426-2560

 8              tboock@goodwinlaw.com

 9

10    For the Deponent:

11              PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

12              BY:  MARTIN FLUMENBAUM, ESQ.

13              CHRISTINA A. BUNTING, ESQ.

14              1285 Avenue of the Americas

15              New York, New York 10019-6064

16              (212) 373-3191

17              mflumenbaum@paulweiss.com

18

19    Also Present:

20              VERITEXT LEGAL SOLUTIONS

21              WARREN NGUYEN, VIDEOGRAPHER

22              (415) 274-9977

23              SFDepo@veritext.com

24

25              AARON BERGSTROM, Seniro Counsel for Uber
```

Page 4

```
 1                    I N D E X

 2

 3    EXAMINATION BY:                              PAGE

 4    MR. VERHOEVEN                                  10

 5

 6                      --oOo--

 7

 8

 9                    E X H I B I T S

10    EXHIBIT        DESCRIPTION                   PAGE

11    Exhibit 910    Presentation documents entitled,   33

12                   "Project Zing Review"; Bates Nos.

13                   UBER00109871 through  877

14

15    Exhibit 911    Minutes of Special Meeting, Board   73

16                   of Directors, 4/11/16; Bates Nos.

17                   UBER00101482 through 498

18

19    Exhibit 912    Minutes of Meeting, Board of        98

20                   Directors, 4/10/17; Bates Nos.

21                   UBER00101479 through 481

22

23    Exhibit 913    Minutes of Meeting, Board of       108

24                   Directors, 5/15/17; Bates Nos.

25                   UBER00101499 through 500
```

Page 5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                E X H I B I T S  (Cont'd)

 2   EXHIBIT          DESCRIPTION                      PAGE

 3   Exhibit 914      Minutes of Meeting, Board of      117

 4                    Directors, 5/22/17; Bates Nos.

 5                    UBER00101501 through 504

 6

 7   Exhibit 915      Minutes of Meeting, Board of      132

 8                    Directors, 5/25/17; Bates Nos.

 9                    UBER00101505 through 506

10

11   Exhibit 916      Letter dated 6/20/17 to Kalanick; 139

12                    Bates Nos. BENCHMARK-WAYMO_

13                    00000168 through 169

14

15   Exhibit 917      Compilation of documents in re    153

16                    public filing in Delaware; Bates

17                    Nos. BENCHMARK-WAYMO_00000039

18                    through 105

19

20   Exhibit 918      Verified Complaint; 38 pages      157

21                            --oOo--

22

23

24

25

                                                   Page  6
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

2                        PAGE  LINE

3                         47      5

4                         48     22

5                         49      6

6                         49     12

7                         49     17

8                         51      8

9                         63      2

10                        87     20

11                        88      7

12                        89      3

13                        90      5

14                        90     22

15                        92      3

16                       107     15

17                       125     23

18                       126     12

19                       127     12

20                       127     16

21                       127     22

22                       128      2

23

24

25

                                            Page  7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THURSDAY, AUGUST 24, 2017; SAN FRANCISCO, CALIFORNIA; | |
| 2 | 8:37 A.M. | |
| 3 | - - - | |
| 4 | THE VIDEOGRAPHER:  We're on the record at 8:37 on | 08:37:51 |
| 5 | August 24th, 2017. | 08:37:53 |
| 6 | Please note that microphones are sensitive | 08:37:56 |
| 7 | and may pick up whispering, private conversation and | 08:37:59 |
| 8 | cellular interference.  Please turn off all cell | 08:38:03 |
| 9 | phones or place them away from the microphones, as | 08:38:06 |
| 10 | they can interfere with the deposition audio. | 08:38:10 |
| 11 | Audio and video recording will be taking | 08:38:12 |
| 12 | place unless all parties agree to go off the record. | 08:38:16 |
| 13 | This is Media Unit 1 of the video-recorded | 08:38:18 |
| 14 | deposition of William Gurley, taken by the counsel of | 08:38:22 |
| 15 | the plaintiff in the matter Waymo LLC versus Uber | 08:38:27 |
| 16 | Technologies, Inc., et al., filed in the United States | 08:38:30 |
| 17 | District Court, Northern District of California, | 08:38:33 |
| 18 | San Francisco Division, Case No. 17-cv-00939. | 08:38:41 |
| 19 | My name is Warren Nguyen from the firm of | 08:38:46 |
| 20 | Veritext Legal Solutions, and I'm the videographer. | 08:38:49 |
| 21 | The court reporter is Anrae Wimberley with | 08:38:52 |
| 22 | Veritext Legal Solutions. | 08:38:53 |
| 23 | I'm not related to any party in this action, | 08:38:57 |
| 24 | nor am I financially interested in the outcome in any | 08:39:00 |
| 25 | way. | 08:39:00 |

Page 8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | If there are any objections to the | 08:39:02 |
| 2 | proceeding, please state them at the time of your | 08:39:04 |
| 3 | appearance, beginning with the noticing attorney. | 08:39:07 |
| 4 | Will counsel please state your appearances. | 08:39:10 |
| 5 | MR. VERHOEVEN:  Charles Verhoeven, Quinn Emanuel, | |
| 6 | on behalf of Waymo. | 08:39:13 |
| 7 | MR. JUDAH:  James Judah, Quinn Emanuel, on behalf | 08:39:14 |
| 8 | of Waymo. | 08:39:17 |
| 9 | MR. FLUMENBAUM:  Martin Flumenbaum, Paul Weiss | 08:39:17 |
| 10 | Rifkind Wharton & Garrison, on behalf of Mr. Gurley. | 08:39:22 |
| 11 | MS. BUNTING:  Kristina Bunting, Paul Weiss Rifkind | 08:39:22 |
| 12 | Wharton & Garrison, on behalf of Mr. Gurley. | 08:39:28 |
| 13 | MR. BRILLE:  Mike Brille, Boies Schiller & | 08:39:29 |
| 14 | Flexner, on behalf of Uber. | 08:39:31 |
| 15 | MR. TAKASHIMA:  Ed Taskahima, Boies Schiller & | 08:39:31 |
| 16 | Flexner, for Uber and Ottomotto. | 08:39:34 |
| 17 | MR. BERGSTROM:  Aaron Bergstrom, in-house counsel | 08:39:35 |
| 18 | for Uber. | |
| 19 | MR. JACOBS:  Michael Jacobs, Morrison & Foerster, | 08:39:37 |
| 20 | for Uber and Ottomotto. | 08:39:39 |
| 21 | MR. BOOCK:  Todd Boock from Goodwin & Procter on | 08:39:42 |
| 22 | behalf of Otto Trucking LLC. | 08:39:43 |
| 23 | THE VIDEOGRAPHER:  Will the court reporter please | 08:39:47 |
| 24 | swear in the witness. | 08:39:48 |
| 25 | // | 08:39:48 |

Page 9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                 JOHN WILLIAM GURLEY,

 2          sworn as a witness by the Certified

 3        Shorthand Reporter, testified as follows:

 4                     EXAMINATION

 5   BY MR. VERHOEVEN:                              08:39:48

 6       Q.   Good morning, Mr. Gurley.            08:40:02

 7       A.   Good morning.                        08:40:03

 8       Q.   Could you just state your full name for the  08:40:05

 9   record.                                       08:40:06

10       A.   John William Gurley.                 08:40:08

11       Q.   By whom are you currently employed?  08:40:11

12       A.   Benchmark Capital.                   08:40:12

13       Q.   And what is your position?           08:40:13

14       A.   I'm a general partner.               08:40:15

15       Q.   Can you -- how long have you been a general  08:40:18

16   partner at Benchmark?                         08:40:20

17       A.   Since '99.                           08:40:22

18       Q.   Do you have any knowledge about the Benchmark  08:40:27

19   initial investment into Uber?                 08:40:30

20       A.   Yes.                                 08:40:30

21       Q.   What was your relationship to that?  08:40:33

22       A.   I was the lead partner on effecting the  08:40:36

23   investment in January of 2011.                08:40:40

24       Q.   So just to clarify, the investment became  08:40:45

25   effective in January of 2011?                 08:40:47
```

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 08:40:47 |
| 2 | Q.   What was the nature of Uber's business at | 08:40:54 |
| 3 | that time? | 08:40:54 |
| 4 | A.   To the best of my recollection, the company | 08:41:01 |
| 5 | was operating a service that allowed you to book a | 08:41:06 |
| 6 | black car.  I think we're only operating in | 08:41:09 |
| 7 | San Francisco at the time. | 08:41:10 |
| 8 | Q.   Did there come a time when you became aware | 08:41:15 |
| 9 | of the subject of AV technology? | 08:41:20 |
| 10 | MR. FLUMENBAUM:  Just so the record is clear -- | 08:41:25 |
| 11 | BY MR. VERHOEVEN: | 08:41:25 |
| 12 | Q.   Automatic vehicle, autonomous vehicle? | 08:41:28 |
| 13 | MR. BRILLE:  Objection; form. | 08:41:32 |
| 14 | MR. BOOCK:  Same objection. | |
| 15 | BY MR. VERHOEVEN: | |
| 16 | Q.   Did there come a time when you became aware | 08:41:35 |
| 17 | of autonomous vehicle technology? | 08:41:37 |
| 18 | MR. FLUMENBAUM:  Can one objection as to form | 08:41:39 |
| 19 | stand for everybody?  Is that the rule here? | 08:41:42 |
| 20 | MR. BRILLE:  Yes, that would be okay with me. | 08:41:45 |
| 21 | MR. FLUMENBAUM:  Is that okay? | 08:41:46 |
| 22 | MR. BOOCK:  That's fine for us. | 08:41:48 |
| 23 | MR. VERHOEVEN:  Yes. | 08:41:49 |
| 24 | MR. FLUMENBAUM:  I don't want to have to chime in | 08:41:50 |
| 25 | after somebody else does it. | 08:41:53 |

Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. VERHOEVEN: | 08:41:53 |
| 2 | Q.   Do you have the question in might? | 08:41:56 |
| 3 | MR. FLUMENBAUM:  You can ask for it to be | 08:41:58 |
| 4 | repeated. | 08:41:58 |
| 5 | THE WITNESS:  No.  No.  I'm fine. | 08:42:01 |
| 6 | Yes. | |
| 7 | BY MR. VERHOEVEN: | |
| 8 | Q.   When was that? | 08:42:02 |
| 9 | A.   I don't have a specific recollection of that | 08:42:04 |
| 10 | date in -- the window. | 08:42:05 |
| 11 | Q.   Was it after you -- excuse me. | 08:42:07 |
| 12 | Was it after Benchmark had invested in Uber? | 08:42:12 |
| 13 | A.   Yes. | 08:42:12 |
| 14 | Q.   Given that you don't have a specific window, | 08:42:16 |
| 15 | can you ballpark it for me, what year it was? | 08:42:26 |
| 16 | MR. FLUMENBAUM:  Objection as to form. | 08:42:32 |
| 17 | THE WITNESS:  My best recollection would be that | 08:42:35 |
| 18 | it -- around the time that it became part of the | 08:42:37 |
| 19 | public lexicon, you know, or slightly before, but I | 08:42:41 |
| 20 | don't recall exactly when that was. | 08:42:43 |
| 21 | BY MR. VERHOEVEN: | 08:42:43 |
| 22 | Q.   When did you first discuss this subject with | 08:42:48 |
| 23 | Mr. Kalanick? | 08:42:51 |
| 24 | MR. FLUMENBAUM:  Objection as to form. | 08:42:51 |
| 25 | You may answer. | 08:42:54 |

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't have a specific recollection | 08:42:55 |
| 2 | of the first time. | 08:42:57 |
| 3 | BY MR. VERHOEVEN: | 08:42:57 |
| 4 | Q.   Do you have a recollection of discussing this | 08:43:00 |
| 5 | technology with Mr. Kalanick? | 08:43:03 |
| 6 | A.   I'm certain that it was discussed at some | 08:43:05 |
| 7 | point, yes. | 08:43:06 |
| 8 | Q.   What's your best estimate of what that point | 08:43:09 |
| 9 | was? | 08:43:09 |
| 10 | A.   My best guess would be probably 2015, | 08:43:16 |
| 11 | beginning of 2015, something like that. | 08:43:18 |
| 12 | Q.   Okay.  Could you tell me what Mr. Kalanick | 08:43:23 |
| 13 | said to you? | 08:43:26 |
| 14 | A.   I don't have specific recollection of | 08:43:28 |
| 15 | specific language. | 08:43:30 |
| 16 | Q.   Generally? | 08:43:32 |
| 17 | A.   Mr. Kalanick had a -- has a strong belief, | 08:43:50 |
| 18 | that I think is mirrored in his comments in the public | 08:43:53 |
| 19 | record, that this was an important technology related | 08:43:56 |
| 20 | to Uber. | 08:43:58 |
| 21 | Q.   Related to what? | 08:44:07 |
| 22 | MR. FLUMENBAUM:  "Related to Uber." | 08:44:09 |
| 23 | THE WITNESS:  Sorry. | 08:44:10 |
| 24 | BY MR. VERHOEVEN: | 08:44:10 |
| 25 | Q.   Sorry. | 08:44:10 |

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   That's okay. | 08:44:11 |
| 2 | Q.   And why did he say it was related to Uber? | 08:44:16 |
| 3 | A.   I think there's also a lot of public | 08:44:23 |
| 4 | discourse about this notion, but there's -- obviously, | 08:44:29 |
| 5 | because the service is reliant on vehicles, to the | 08:44:32 |
| 6 | extent the vehicles became automated, it had the | 08:44:35 |
| 7 | potential to impact the business and its relationship | 08:44:39 |
| 8 | with drivers and all those things. | 08:44:42 |
| 9 | Q.   He told you it was really important to Uber's | 08:44:45 |
| 10 | business; right? | 08:44:47 |
| 11 | MR. BRILLE:  Objection; form. | 08:44:49 |
| 12 | MR. FLUMENBAUM:  You may answer. | 08:44:50 |
| 13 | THE WITNESS:  I think it's a fair statement. | 08:44:52 |
| 14 | BY MR. VERHOEVEN: | 08:44:52 |
| 15 | Q.   Okay.  Did he tell you it was an existential | 08:44:54 |
| 16 | threat? | 08:44:56 |
| 17 | A.   He was quoted publicly as saying that.  I | 08:44:59 |
| 18 | don't recall him telling me specifically that. | 08:45:01 |
| 19 | Q.   Did you agree with him? | 08:45:03 |
| 20 | A.   I don't agree with that assertion. | 08:45:05 |
| 21 | Q.   Okay.  Do you think that autonomous vehicle | 08:45:09 |
| 22 | technology is important to Uber? | 08:45:12 |
| 23 | A.   It could be important. | 08:45:13 |
| 24 | Q.   When would it not be important? | 08:45:16 |
| 25 | A.   Well, there's an argument that the technology | 08:45:19 |

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | threatens the service provider.  I don't think, from | 08:45:23 |
| 2 | my own point of view, that anything Boeing builds | 08:45:28 |
| 3 | threatens United or Delta's business, from my point of | 08:45:31 |
| 4 | view.  I have a different point of view on that topic | 08:45:37 |
| 5 | than he does. | 08:45:38 |
| 6 | Q.   Okay.  In what instances would it be a | 08:45:40 |
| 7 | threat? | 08:45:41 |
| 8 | MR. FLUMENBAUM:  Objection as to form. | 08:45:45 |
| 9 | Could you be a little more clear, given his | 08:45:47 |
| 10 | prior answer? | 08:45:48 |
| 11 | BY MR. VERHOEVEN: | 08:45:48 |
| 12 | Q.   Okay.  I asked you, quote, "Do you think that | 08:46:10 |
| 13 | autonomous vehicle" -- the whole question isn't in | 08:46:17 |
| 14 | there. | 08:46:17 |
| 15 | I asked you whether you thought autonomous | 08:46:20 |
| 16 | vehicle technology would be important to Uber, and you | 08:46:23 |
| 17 | said, "It could be important." | 08:46:24 |
| 18 | Do you remember that? | 08:46:25 |
| 19 | A.   Yes. | 08:46:25 |
| 20 | Q.   Okay.  Why could it be important? | 08:46:29 |
| 21 | A.   There are cars that underline the operations | 08:46:34 |
| 22 | of the service.  There are drivers that are in those | 08:46:37 |
| 23 | cars.  There's the relationships between the drivers | 08:46:40 |
| 24 | and the -- that are important to the company.  And so | 08:46:43 |
| 25 | if this new technology came along that displaced | 08:46:47 |

Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | them -- this is well documented in the public | 08:46:50 |
| 2 | discourse -- that would cause relationship issues for | 08:46:52 |
| 3 | the company with its drivers. | 08:46:54 |
| 4 |     Q.   You have competitors to Uber? | 08:46:59 |
| 5 |     A.   Yes. | 08:46:59 |
| 6 |     Q.   Can you name some? | 08:47:01 |
| 7 |     A.   In different -- in Asia, there's Grab.  In | 08:47:10 |
| 8 | India, there's Ola.  In the U.S., there's Lyft.  In | 08:47:15 |
| 9 | Latin America there's 99Taxi.  There's Careem. | 08:47:21 |
| 10 |     Q.   So -- | |
| 11 |     MR. FLUMENBAUM:  Hold on. | 08:47:23 |
| 12 |         Are you finished with your answer? | 08:47:27 |
| 13 |     THE WITNESS:  I didn't know how exhaustive he | 08:47:29 |
| 14 | wanted me to be. | 08:47:30 |
| 15 | BY MR. VERHOEVEN: | 08:47:30 |
| 16 |     Q.   In the United States. | 08:47:33 |
| 17 |     A.   In the United States.  Lyft.  There were | 08:47:33 |
| 18 | others.  I don't know if they're still operational. | 08:47:37 |
| 19 |     Q.   So if Lyft had the autonomous vehicle | 08:47:42 |
| 20 | technology that worked and passed through the | 08:47:45 |
| 21 | regulatory hurdles before Uber, would that be a threat | 08:47:49 |
| 22 | to Uber? | 08:47:50 |
| 23 |     MR. FLUMENBAUM:  Objection as to form. | 08:47:52 |
| 24 |         You may answer. | 08:47:53 |
| 25 |     THE WITNESS:  And no one else had; is that the | 08:47:56 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | implication? | 08:47:57 |
| 2 | BY MR. VERHOEVEN: | 08:47:57 |
| 3 | Q.   Yes. | 08:47:58 |
| 4 | A.   Sure.  Yes.  Theoretically.  Actually, let me | 08:48:02 |
| 5 | step back. | 08:48:03 |
| 6 | That would be heavily dependent on the cost | 08:48:05 |
| 7 | of the vehicle.  Because if the vehicle cost 5X more | 08:48:09 |
| 8 | than a traditional vehicle, it would more than offset | 08:48:13 |
| 9 | the cost of the driver, in which case I don't think it | 08:48:16 |
| 10 | would have an impact at all. | 08:48:17 |
| 11 | Q.   What is the cost to Uber for the human driver | 08:48:20 |
| 12 | expressed as a percentage of dollar revenue, if you | 08:48:28 |
| 13 | know? | 08:48:28 |
| 14 | A.   What percentage of the revenue goes to the | 08:48:32 |
| 15 | driver? | 08:48:33 |
| 16 | Q.   Yes. | 08:48:34 |
| 17 | A.   I don't know if that's privileged or not.  I | 08:48:37 |
| 18 | just don't know. | 08:48:39 |
| 19 | MR. BRILLE:  So we have a protective order in the | 08:48:42 |
| 20 | case.  And it is definitely highly confidential.  And | 08:48:45 |
| 21 | we will designate anything that is business | 08:48:47 |
| 22 | confidential -- | 08:48:48 |
| 23 | THE WITNESS:  Okay. | |
| 24 | MR. FLUMENBAUM:  Is it -- do I have to invoke the | 08:48:52 |
| 25 | protective order for purposes of this deposition? | 08:48:54 |

Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. BRILLE:  You do not.  We have an agreement | 08:48:56 |
| 2 | with the other side that we designate transcripts | 08:48:59 |
| 3 | after they come out, and we will take care of | 08:49:01 |
| 4 | something like that. | 08:49:02 |
| 5 | MR. FLUMENBAUM:  So as far as I'm concerned, this | 08:49:04 |
| 6 | is -- so any business confidential information -- | 08:49:06 |
| 7 | MR. BRILLE:  Correct. | 08:49:07 |
| 8 | MR. FLUMENBAUM:  -- he can testify to? | 08:49:08 |
| 9 | MR. BRILLE:  Yes, that is correct. | 08:49:09 |
| 10 | MR. FLUMENBAUM:  Okay.  And I don't have to -- do | 08:49:09 |
| 11 | I get to review the transcript as well? | 08:49:13 |
| 12 | MR. BRILLE:  Yes.  Absolutely. | 08:49:14 |
| 13 | MR. FLUMENBAUM:  Okay.  So I just want to make | 08:49:15 |
| 14 | sure that I have that opportunity as well. | 08:49:18 |
| 15 | MR. BRILLE:  Yeah. | 08:49:19 |
| 16 | MR. FLUMENBAUM:  And in the meantime, who can | 08:49:21 |
| 17 | share this deposition? | 08:49:23 |
| 18 | MR. BRILLE:  In -- | 08:49:27 |
| 19 | MR. FLUMENBAUM:  Until we review this stuff? | 08:49:29 |
| 20 | MR. VERHOEVEN:  Should we go off the record for | 08:49:30 |
| 21 | this. | |
| 22 | MR. BRILLE:  Let's go off the record, yes. | 08:49:33 |
| 23 | THE VIDEOGRAPHER:  Off the record at 8:49 a.m. | 08:49:36 |
| 24 | (Discussion off the record.) | 08:49:55 |
| 25 | THE VIDEOGRAPHER:  Back on the record at 8:49 a.m. | 08:49:58 |

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. VERHOEVEN: | 08:49:58 |
| 2 |    Q.   I think you're allowed to answer the | 08:50:02 |
| 3 | question. | 08:50:02 |
| 4 |    A.   I honestly don't have the documents right in | 08:50:04 |
| 5 | front of me, so -- | 08:50:05 |
| 6 |    Q.   Of course. | |
| 7 |    A.   And I would also say different services have | 08:50:08 |
| 8 | different answers on this, so there's no specifics. | 08:50:11 |
| 9 | But somewhere between, you know, 75 and 80 percent, | 08:50:15 |
| 10 | typically, of the revenue goes to the driver. | 08:50:19 |
| 11 |    Q.   And so if you didn't have to pay drivers and | 08:50:23 |
| 12 | you could use an autonomous vehicle for your service, | 08:50:26 |
| 13 | that would be a huge competitive advantage, assuming | 08:50:29 |
| 14 | others couldn't do that? | 08:50:32 |
| 15 |    A.   Depends on the depreciation cost of the car. | 08:50:36 |
| 16 | If the vehicle costs five times more than a standard | 08:50:40 |
| 17 | car, you have to eat that depreciation cost to deliver | 08:50:40 |
| 18 | that service. | |
| 19 |    Q.   But if the vehicle is roughly similarly | 08:50:43 |
| 20 | priced as a regular car, there would be a huge | 08:50:46 |
| 21 | advantage for the first mover in that technology; | 08:50:50 |
| 22 | right? | 08:50:50 |
| 23 |    MR. FLUMENBAUM:  Objection as to form. | 08:50:52 |
| 24 |       You're speculating. | 08:50:54 |
| 25 |    MR. VERHOEVEN:  Counsel, I don't know if you're | 08:50:56 |

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | familiar with Judge Alsup's rules, but he does not | 08:50:59 |
| 2 | allow anything -- you're not allowed to say anything | 08:51:03 |
| 3 | more than "object to form." | 08:51:04 |
| 4 | MR. FLUMENBAUM:  Okay.  Objection as to form. | 08:51:06 |
| 5 | BY MR. VERHOEVEN: | 08:51:06 |
| 6 | Q.   Do you have the question in mind? | 08:51:08 |
| 7 | A.   No one has delivered a fully autonomous | 08:51:10 |
| 8 | vehicle that could operate in a massive service at | 08:51:14 |
| 9 | scale.  So knowing -- presuming that you know the cost | 08:51:17 |
| 10 | of that would be speculative, from my point of view. | 08:51:21 |
| 11 | So, yes, if you could do it, then, yes, that would be | 08:51:25 |
| 12 | true. | 08:51:25 |
| 13 | Q.   If you could -- if you were a first mover | 08:51:27 |
| 14 | with working, approved autonomous vehicles in your | 08:51:33 |
| 15 | business model, that entity would have a huge | 08:51:37 |
| 16 | advantage competitively? | 08:51:39 |
| 17 | MR. FLUMENBAUM:  Objection; form. | 08:51:40 |
| 18 | THE WITNESS:  If you could move millions of units | 08:51:43 |
| 19 | at scale at a price that's equivalent to a normal car, | 08:51:47 |
| 20 | which, I would argue, is very hard to prove someone | 08:51:50 |
| 21 | could do at this moment in time.  But, yes. | 08:51:53 |
| 22 | BY MR. VERHOEVEN: | 08:51:53 |
| 23 | Q.   Okay.  And that's why Mr. Kalanick was really | 08:51:57 |
| 24 | interested in developing autonomous vehicle | 08:51:59 |
| 25 | technology; right? | 08:52:01 |

Page 20

```
 1        MR. FLUMENBAUM:  Objection as to form.       08:52:06

 2        THE WITNESS:  I think that's fair.           08:52:08

 3   BY MR. VERHOEVEN:                                 08:52:08

 4     Q.   Did you -- in this conversation we're talking   08:52:16

 5   about with Mr. Kalanick, did you express to him your   08:52:22

 6   view on whether Uber should move forward with this    08:52:27

 7   technology?                                       08:52:29

 8        MR. BRILLE:  Objection; form.                08:52:33

 9        THE WITNESS:  Keep going?                    08:52:34

10   BY MR. VERHOEVEN:                                 08:52:34

11     Q.   Every time there's an objection to form, you   08:52:38

12   still have to answer.                             08:52:39

13        MR. FLUMENBAUM:  You have to answer.  I'm not

14   going to tell you not to.

15        THE WITNESS:  Okay, great.

16        So, yes, we did have those discussions,      08:52:41

17   including the points that I just made.  We also   08:52:44

18   discussed the notion that it wouldn't be critical --  08:52:50

19   and this is similar to what you were saying.  It's not   08:52:54

20   critical for a service provider, a ridesharing service   08:52:59

21   provider, to be the leader in this technology.    08:53:03

22        It's critical that someone else not have     08:53:05

23   unfettered access to differentiated technology.  So   08:53:11

24   that if -- in other words, if the automated car were   08:53:15

25   commoditized, then it would probably have zero impact   08:53:19
```

                                                Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | on the state of affairs in the service provider | 08:53:22 |
| 2 | industry. | 08:53:22 |
| 3 | BY MR. VERHOEVEN: | 08:53:22 |
| 4 | Q.   Mr. Kalanick wanted to be the first with a | 08:53:25 |
| 5 | vehicle that had this technology in the marketplace, | 08:53:27 |
| 6 | didn't he? | 08:53:28 |
| 7 | MR. FLUMENBAUM:  Objection as to form. | 08:53:31 |
| 8 | THE WITNESS:  I don't have specific recollection | 08:53:32 |
| 9 | that he said, I definitely want to be first in this | 08:53:36 |
| 10 | technology.  But that's different from whether or not | 08:53:41 |
| 11 | he did want to be first.  I just don't have a specific | 08:53:43 |
| 12 | recollection. | 08:53:44 |
| 13 | BY MR. VERHOEVEN: | 08:53:44 |
| 14 | Q.   So he never told you that he wanted to be the | 08:53:47 |
| 15 | first mover with this technology? | 08:53:50 |
| 16 | A.   I don't have a recollection of that specific | 08:53:52 |
| 17 | statement. | 08:53:53 |
| 18 | Q.   He never told you that it would be a huge | 08:53:55 |
| 19 | advantage if you were the first company out there in | 08:53:59 |
| 20 | the market with this technology? | 08:54:02 |
| 21 | A.   I don't recall that specific statement, but I | 08:54:04 |
| 22 | also recall conversations where -- the flip side of | 08:54:09 |
| 23 | that, where as long as the -- you're not second -- | 08:54:15 |
| 24 | like that was a frequent topic.  As long as you're not | 08:54:19 |
| 25 | far behind, which gets back to this notion of | 08:54:23 |

Page 22

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | potential commoditization of that technology. | 08:54:27 |
| 2 | Q.   So you're saying -- you don't recall if he | 08:54:30 |
| 3 | said it's important to be first, but as long as you're | 08:54:34 |
| 4 | not second, that's okay? | 08:54:35 |
| 5 | A.   Yes, we had that conversation.  There's a | 08:54:37 |
| 6 | difference. | 08:54:38 |
| 7 | Q.   Okay.  Did there come a time when Uber | 08:54:46 |
| 8 | started investing its money into this technology, this | 08:54:52 |
| 9 | autonomous vehicle technology? | 08:54:54 |
| 10 | A.   Yes. | 08:54:54 |
| 11 | Q.   When was that? | 08:54:55 |
| 12 | A.   My first recollection of a substantial effort | 08:54:59 |
| 13 | related to the Carnegie Mellon transaction. | 08:55:05 |
| 14 | Q.   And what do you mean when you say "the | 08:55:07 |
| 15 | Carnegie Mellon transaction"? | 08:55:08 |
| 16 | A.   Once again, I think this is public record, so | 08:55:14 |
| 17 | you could find it with a Google search, but there was | 08:55:17 |
| 18 | a large transaction that involved some of the | 08:55:20 |
| 19 | employees of Carnegie Mellon coming on board -- or | 08:55:24 |
| 20 | some of the people associated with Carnegie Mellon | 08:55:26 |
| 21 | coming on board.  And we set up a research | 08:55:30 |
| 22 | headquarters for autonomous in Pittsburgh. | 08:55:33 |
| 23 | Q.   So was that a transaction with the group that | 08:55:37 |
| 24 | came over?  You said there was a large transaction. | 08:55:44 |
| 25 | MR. BRILLE:  Objection; form. | 08:55:45 |

Page 23

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't understand the question. | 08:55:48 |
| 2 | BY MR. VERHOEVEN: | 08:55:48 |
| 3 | Q.   Well, you said there's a large transaction in | 08:55:50 |
| 4 | which a number of Carnegie Mellon folks came over. | 08:55:54 |
| 5 | A.   Correct. | 08:55:54 |
| 6 | Q.   And you set up a lab, or whatever you want to | 08:55:58 |
| 7 | call it, in Pittsburgh; right? | 08:55:59 |
| 8 | A.   Right. | 08:55:59 |
| 9 | Q.   And so my question was, when you say "a large | 08:56:03 |
| 10 | transaction," are you referring to like a single | 08:56:05 |
| 11 | transaction where the whole group came over -- | 08:56:08 |
| 12 | A.   I don't remember exactly if there were | 08:56:10 |
| 13 | multiple pieces in that.  I'm just referring to it as | 08:56:13 |
| 14 | a single event. | 08:56:15 |
| 15 | Q.   Did the board review and approve that? | 08:56:18 |
| 16 | A.   I believe so. | 08:56:19 |
| 17 | Q.   Okay.  And what did Mr. -- who presented | 08:56:26 |
| 18 | the -- who recommended it to the board? | 08:56:29 |
| 19 | A.   I don't have specific recollection of like | 08:56:36 |
| 20 | who presented it, but I -- my best guess would be that | 08:56:42 |
| 21 | it was Mr. Kalanick. | 08:56:43 |
| 22 | Q.   But you don't remember what he said in | 08:56:45 |
| 23 | connection with that? | 08:56:47 |
| 24 | A.   I don't, not at this moment in time. | 08:56:50 |
| 25 | Q.   Do you remember any discussions by the board | 08:56:59 |

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | about the importance of this technology, autonomous | 08:57:05 |
| 2 | vehicle technology? | 08:57:07 |
| 3 | MR. FLUMENBAUM:  At around the time of the | 08:57:08 |
| 4 | Carnegie Mellon issue? | 08:57:10 |
| 5 | MR. VERHOEVEN:  I asked my question; you can't | 08:57:12 |
| 6 | edit it. | 08:57:15 |
| 7 | BY MR. VERHOEVEN: | 08:57:15 |
| 8 | Q.   Go ahead. | |
| 9 | MR. BRILLE:  But he can ask for clarification. | 08:57:17 |
| 10 | MR. VERHOEVEN:  There's no -- you can object to | 08:57:19 |
| 11 | form or you can object on privilege grounds, nothing | 08:57:22 |
| 12 | else. | 08:57:23 |
| 13 | MR. FLUMENBAUM:  Objection as to form. | 08:57:27 |
| 14 | BY MR. VERHOEVEN: | 08:57:27 |
| 15 | Q.   Okay.  Do you recall any discussions at the | 08:57:29 |
| 16 | board level about the importance of this technology? | 08:57:33 |
| 17 | A.   Only -- yes, but only in a general sense.  I | 08:57:36 |
| 18 | don't recall any specific one-on-one conversation. | 08:57:41 |
| 19 | Q.   So when you say "in a general sense," you | 08:57:44 |
| 20 | mean in the sense of a presentation being made to the | 08:57:47 |
| 21 | group? | 08:57:48 |
| 22 | A.   No, I just mean in the sense that it was | 08:57:54 |
| 23 | discussed more than once that autonomous technology | 08:58:02 |
| 24 | was important to ridesharing and that we needed to | 08:58:07 |
| 25 | have an understanding of that, an effort in that, and | 08:58:13 |

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | know where that technology was evolving relative to | 08:58:16 |
| 2 | our service. | 08:58:17 |
| 3 | Q.   And how often did this come up with the | 08:58:21 |
| 4 | board? | 08:58:22 |
| 5 | A.   I would say only -- around Carnegie Mellon | 08:58:39 |
| 6 | and Otto were the only two times where it was | 08:58:43 |
| 7 | discussed in depth.  I don't think it was a frequent | 08:58:50 |
| 8 | topic of every board meeting. | 08:58:52 |
| 9 | Q.   Are you still with -- on the board at Uber? | 08:59:05 |
| 10 | A.   I am not. | 08:59:06 |
| 11 | Q.   When did you cease being on the board? | 08:59:08 |
| 12 | A.   I believe it was mid to late June of this | 08:59:17 |
| 13 | year. | 08:59:17 |
| 14 | Q.   And I may have asked this and, if I did, I | 08:59:22 |
| 15 | apologize. | 08:59:22 |
| 16 | But when did you first become a board member? | 08:59:25 |
| 17 | A.   In January of 2011. | 08:59:27 |
| 18 | Q.   When you were a member of the board, is it a | 08:59:33 |
| 19 | fair statement to say that you were very engaged with | 08:59:37 |
| 20 | the company? | 08:59:41 |
| 21 | MR. FLUMENBAUM:  Objection as to form. | 08:59:51 |
| 22 | THE WITNESS:  I'll answer yes.  There's a question | 08:59:54 |
| 23 | as to whether -- like relative to what, you know. | 08:59:58 |
| 24 | BY MR. VERHOEVEN: | 08:59:58 |
| 25 | Q.   Is it fair to say that you were the most | 09:00:00 |

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | engaged board member with respect to Uber? | 09:00:03 |
| 2 | MR. FLUMENBAUM:  Objection as to form. | 09:00:14 |
| 3 | THE WITNESS:  It's possible.  It would be | 09:00:15 |
| 4 | conjecture from my point solely because I don't know | 09:00:19 |
| 5 | of all the other meetings that the other board members | 09:00:22 |
| 6 | may or may not have been having. | 09:00:24 |
| 7 | BY MR. VERHOEVEN: | 09:00:24 |
| 8 | Q.  Do you feel as though you were the most | 09:00:26 |
| 9 | engaged board member? | 09:00:28 |
| 10 | MR. BRILLE:  Objection; form. | 09:00:29 |
| 11 | MR. FLUMENBAUM:  Objection as to form. | 09:00:29 |
| 12 | THE WITNESS:  It's possible. | 09:00:32 |
| 13 | BY MR. VERHOEVEN: | 09:00:32 |
| 14 | Q.  Can you think of anyone else on the board who | 09:00:35 |
| 15 | was more engaged than you? | 09:00:38 |
| 16 | A.  No. | 09:00:41 |
| 17 | Q.  You were also -- in addition to being a | 09:00:45 |
| 18 | member of the board of directors, you were also on the | 09:00:48 |
| 19 | compensation committee; is that right? | 09:00:50 |
| 20 | A.  That is correct. | 09:00:51 |
| 21 | Q.  And what was your role on the compensation | 09:00:55 |
| 22 | committee? | 09:00:58 |
| 23 | A.  Compensation committee would look over all | 09:01:02 |
| 24 | material compensation requests for new hires.  We'd | 09:01:11 |
| 25 | get involved in review process, bonus determination. | 09:01:20 |

Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  Anything else, generally? | 09:01:24 |
| 2 | A.   Look after the long-term compensation | 09:01:30 |
| 3 | structure of the company and how those programs work | 09:01:34 |
| 4 | and are set up, how they scale. | 09:01:37 |
| 5 | Q.   Were you on any other committees at Uber | 09:01:41 |
| 6 | besides the compensation committee? | 09:01:43 |
| 7 | A.   I joined the audit committee in, I believe, | 09:01:48 |
| 8 | March.  It might have been February.  Sometime in | 09:01:53 |
| 9 | the -- early 2017. | 09:01:55 |
| 10 | Q.   You said the audit committee? | 09:01:59 |
| 11 | A.   Yes. | 09:01:59 |
| 12 | Q.   And what were your responsibilities on the | 09:02:02 |
| 13 | audit committee? | 09:02:04 |
| 14 | A.   To interface with PwC, our lead auditor, to | 09:02:10 |
| 15 | review the status of the audits.  To interface with | 09:02:21 |
| 16 | the internal audit function.  To interface with the | 09:02:25 |
| 17 | compliance function.  To work with the other members | 09:02:28 |
| 18 | of the committee on all those topics. | 09:02:30 |
| 19 | Q.   What is the compliance function? | 09:02:35 |
| 20 | A.   Like many other companies, Uber has a chief | 09:02:41 |
| 21 | compliance officer that looks after internal | 09:02:47 |
| 22 | investigation, whistle-blower claims, those kind of | 09:02:51 |
| 23 | things. | 09:02:52 |
| 24 | Q.   Were you on any other committees when you | 09:02:55 |
| 25 | were working at Uber? | 09:02:56 |

Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   Yes.                                    09:02:58

 2        MR. FLUMENBAUM:  Objection; form.            09:02:59

 3   BY MR. VERHOEVEN:                                 09:02:59

 4        Q.   What were they?                         09:03:01

 5        A.   There was a committee put together -- a 09:03:03

 6   special committee put together to look after Waymo 09:03:07

 7   litigation.  There was a committee put together for 09:03:11

 8   the Holder investigation.  And there was a search  09:03:15

 9   committee put together for the COO search.         09:03:19

10        Q.   When was the committee on the Waymo issue 09:03:28

11   formed?                                            09:03:30

12        A.   I believe mid to late May.               09:03:34

13        Q.   Are you familiar with the fact that the court 09:03:45

14   in the Waymo litigation in the Northern District of 09:03:49

15   California issued a preliminary injunction?         09:03:51

16        MR. FLUMENBAUM:  Um --                         09:03:55

17        MR. VERHOEVEN:  Just asking if he knows about it. 09:03:58

18        MR. FLUMENBAUM:  Right.                        09:03:58

19        If your knowledge is solely based on           09:04:00

20   conversations with counsel, then I don't believe you 09:04:04

21   can answer that question.                           09:04:06

22        We are -- I'm under instructions to            09:04:09

23   preserve -- by the company that Mr. Gurley is to    09:04:14

24   preserve all privileges that the company has.  And I 09:04:17

25   received a letter to that effect, and I'm going to   09:04:20
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | follow that instruction. | 09:04:26 |
| 2 | But -- so to the extent that you know about | 09:04:29 |
| 3 | the preliminary injunction from other sources other | 09:04:32 |
| 4 | than counsel, and that could include public -- | 09:04:38 |
| 5 | THE WITNESS:  Yeah, it was in the media, so I'm | 09:04:40 |
| 6 | aware of it from that. | 09:04:43 |
| 7 | MR. FLUMENBAUM:  Okay. | 09:04:43 |
| 8 | BY MR. VERHOEVEN: | |
| 9 | Q.   Relative to that event, was the committee | 09:04:49 |
| 10 | formed before or after? | 09:04:53 |
| 11 | A.   To the best of my knowledge, after. | 09:04:55 |
| 12 | Q.   Who was on that committee? | 09:05:00 |
| 13 | A.   I believe myself, David Bonderman and Arianna | 09:05:07 |
| 14 | Huffington. | 09:05:10 |
| 15 | Q.   All right.  Have you exhausted the list of | 09:05:16 |
| 16 | committees that you can recall being on? | 09:05:19 |
| 17 | A.   Yes. | 09:05:20 |
| 18 | Q.   Is it a fair statement to say that in the | 09:05:44 |
| 19 | years 2016, '15 and until you left the board in '17, | 09:05:52 |
| 20 | that you were in regular contact with Mr. Kalanick | 09:05:56 |
| 21 | about Uber? | 09:05:59 |
| 22 | MR. FLUMENBAUM:  Objection as to form. | 09:06:00 |
| 23 | You may answer. | 09:06:02 |
| 24 | THE WITNESS:  So certainly he -- we were both | 09:06:09 |
| 25 | present at most board meetings, so we had contact | 09:06:13 |

Page 30

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | through that.  In terms of one-on-one contact, there | 09:06:17 |
| 2 | would be periods where there would be lots of it, | 09:06:20 |
| 3 | typically around recruiting, that kind of thing, and | 09:06:23 |
| 4 | then there would be periods where there wouldn't be | 09:06:26 |
| 5 | much.  So it wasn't consistent through that time | 09:06:29 |
| 6 | frame. | 09:06:30 |
| 7 | BY MR. VERHOEVEN: | 09:06:30 |
| 8 | Q.   Around May 2016, is it fair to say that you | 09:06:35 |
| 9 | were in regular contact with Mr. Kalanick concerning | 09:06:38 |
| 10 | his management of Uber? | 09:06:41 |
| 11 | A.   I just want to be careful with the definition | 09:06:52 |
| 12 | of "regular."  I'd say consistent amount of contact | 09:06:56 |
| 13 | that we have with all the types of companies that we | 09:07:00 |
| 14 | invest in.  It wasn't abnormally high or low. | 09:07:07 |
| 15 | Q.   When did you first -- you | 09:07:13 |
| 16 | referenced -- withdrawn. | 09:07:16 |
| 17 |      You referenced the Otto transaction earlier | 09:07:20 |
| 18 | in your testimony. | 09:07:21 |
| 19 | A.   Um-hum. | 09:07:22 |
| 20 | Q.   When did you first learn about the | 09:07:24 |
| 21 | possibility of that transaction? | 09:07:26 |
| 22 | A.   Shortly before the board approved it. | 09:07:30 |
| 23 | Q.   When did the board approve it? | 09:07:34 |
| 24 | A.   I don't have the date in front of me. | 09:07:37 |
| 25 | Q.   Who told you about it before the board | 09:07:45 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    approved it?  How did you learn about it?          09:07:47

 2        A.   I don't have a specific recollection.  It's  09:07:49

 3    common -- it was fairly common during my board tenure  09:07:53

 4    at Uber to get a call from either Emil Michael or  09:07:58

 5    Cameron a day or two before a board meeting to brief  09:08:03

 6    us on something.  And that may have happened in that  09:08:06

 7    case.  I don't have a specific recollection, but that  09:08:09

 8    would be the standard protocol.                    09:08:11

 9        Q.   Did you do any investigation or diligence  09:08:13

10    into the transaction yourself before approving it?  09:08:17

11        A.   No.                                       09:08:17

12        Q.   Why not?                                  09:08:19

13        A.   There was a discussion at the board level  09:08:22

14    about the due diligence that had been done, and I  09:08:25

15    relied on that conveyance.                         09:08:28

16        Q.   So the only discussion you had about the  09:08:29

17    diligence was at the meeting in which the transaction  09:08:32

18    was approved?                                      09:08:33

19        A.   Correct.   Correct.                       09:08:34

20        MR. VERHOEVEN:  Let's get out the board . . . this  09:08:51

21    been previously marked?                            09:08:53

22        MR. JUDAH:  It has been.                       09:08:57

23        MR. VERHOEVEN:  Can we mark another one?       09:09:00

24        MR. JUDAH:  Yes.                               09:09:01

25        MR. VERHOEVEN:  Can you mark this as Exhibit 910.  09:09:06
```

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              (Plaintiff's Exhibit 910 was marked.)        09:09:35

 2   BY MR. VERHOEVEN:

 3       Q.   Mr. Gurley, take a look at Exhibit 910.        09:09:38

 4            And my first question will be, do you          09:09:41

 5   recognize this document?                                09:09:44

 6            (Witness reviews document.)                    09:10:13

 7       A.   Yes, I believe these are the slides that were  09:10:15

 8   presented to the board in that meeting that we were     09:10:18

 9   just discussing.                                        09:10:19

10       Q.   The meeting in which the Otto transaction was  09:10:22

11   approved?                                               09:10:23

12       A.   Yes.                                           09:10:23

13       Q.   It says, "Project Zing Review."               09:10:27

14            What does "Zing" refer to?                     09:10:29

15       A.   I don't have any data on that topic.           09:10:31

16       Q.   Would it be fair to conclude that it refers    09:10:34

17   to the Otto transaction?                                09:10:36

18       A.   Yes.                                           09:10:36

19       Q.   And it's dated April 11th, 2016.               09:10:40

20            Do you see that?                               09:10:41

21       A.   Yes.                                           09:10:41

22       Q.   Is that the day in which the board approved    09:10:45

23   the Otto transaction?                                   09:10:46

24       A.   I would presume so.                            09:10:54

25       Q.   The second page -- direct your attention to    09:10:57
```

Page 33

```
 1    the second page where it says, "Deal Overview."  And    09:11:01

 2    in particular, under the row that says, "Rationale"      09:11:06

 3    and the column that says, "Consumer Lasers," I want to   09:11:10

 4    ask you a couple questions.                              09:11:12

 5           Do you see it says, "Lasers are critical to       09:11:18

 6    Uber's AV development and Ottomotto is expected to       09:11:23

 7    de-risk our current laser approach"?                     09:11:25

 8       A.    Yes, I see that.                                09:11:30

 9       Q.    Who was making this presentation?               09:11:39

10       A.    To the best of my memory, it was                09:11:41

11    Mr. Kalanick.                                            09:11:41

12       Q.    And what was your understanding of what he      09:11:45

13    meant when he said, "Lasers are critical to Uber's AV    09:11:50

14    development"?                                            09:11:51

15       MR. FLUMENBAUM:  Objection as to form.                09:11:51

16           You may answer.                                   09:11:54

17       THE WITNESS:  To the best of my memory, we didn't     09:11:57

18    spend a lot of time dwelling on that topic.  My best     09:12:03

19    inference of what that would mean is simply that         09:12:08

20    lasers are important to autonomous vehicles from the     09:12:11

21    company's point of view.                                 09:12:13

22    BY MR. VERHOEVEN:                                        09:12:13

23       Q.    Well, it says, "critical"; right?               09:12:13

24       A.    It does.                                        09:12:16

25       Q.    Did you disagree with that statement?           09:12:19
```

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    I did not. | 09:12:20 |
| 2 | Q.    Then it continues on that sentence, | 09:12:22 |
| 3 | "Ottomotto is expected to de-risk our current laser | 09:12:26 |
| 4 | approach." | 09:12:26 |
| 5 | You understand that meant that purchasing | 09:12:31 |
| 6 | Ottomotto would give you laser technology and, | 09:12:36 |
| 7 | therefore, de-risk what you're currently doing? | 09:12:39 |
| 8 | MR. FLUMENBAUM:  Objection as to form. | 09:12:43 |
| 9 | THE WITNESS:  Like I said, there wasn't much | 09:12:48 |
| 10 | discussion on that particular topic, nor would I | 09:12:51 |
| 11 | suggest that the board as a whole has much deep | 09:12:55 |
| 12 | knowledge on laser technology, so I think it would be | 09:12:57 |
| 13 | taken as it's given. | 09:13:00 |
| 14 | BY MR. VERHOEVEN: | 09:13:00 |
| 15 | Q.    Did you understand that the rationale for the | 09:13:06 |
| 16 | deal was to de-risk Uber's current laser approach? | 09:13:12 |
| 17 | A.    That's written here, so I wouldn't object to | 09:13:22 |
| 18 | that notion. | 09:13:23 |
| 19 | Q.    You don't disagree with that. | 09:13:25 |
| 20 | A.    No, I do not. | 09:13:26 |
| 21 | Q.    The second bullet in that cell says, | 09:13:34 |
| 22 | "Ottomotto could significantly enhance our overall AV | 09:13:38 |
| 23 | efforts and potentially accelerate current time | 09:13:42 |
| 24 | frames." | 09:13:42 |
| 25 | Do you see that? | 09:13:43 |

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   Yes.                                     09:13:43

 2        MR. FLUMENBAUM:   "Timelines."                09:13:47

 3   BY MR. VERHOEVEN:

 4        Q.   "Timelines."                             09:13:48

 5        Do you see that?                              09:13:49

 6        A.   Yes, I do.                               09:13:50

 7        Q.   Why did Mr. Kalanick think that the Ottomotto   09:13:56

 8   transaction could accelerate timelines?           09:13:58

 9        A.   On this topic, there was more discussion.  I    09:14:02

10   think it's a general belief with all the companies we     09:14:08

11   work with that in order to be successful in new   09:14:13

12   endeavors, you have to have the right people on board.    09:14:17

13   And this entire transaction, as it was presented and     09:14:21

14   discussed with the board, was about helping us get the    09:14:25

15   right people on board who could be helpful in our 09:14:28

16   autonomous efforts.                               09:14:30

17        Q.   So getting the right people on board would      09:14:33

18   accelerate your timelines?                        09:14:35

19        A.   Yes.                                     09:14:35

20        Q.   Okay.  And then when you say getting "the       09:14:43

21   right people," if you look down to the row -- same       09:14:46

22   column, but the row that says, "Terms," you'll see 09:14:51

23   there's a bullet that says, "Minimum of 25 engineers     09:14:54

24   to join Uber.  Could be as many as 50 to 100."    09:14:57

25        Do you see that?                             09:14:59
```

                                                Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 09:14:59 |
| 2 | Q.   You understood at the time that Uber was | 09:15:03 |
| 3 | formed by former employees of Waymo/Google? | 09:15:08 |
| 4 | MR. BRILLE:  Objection; form. | 09:15:08 |
| 5 | You said, "Uber." | 09:15:10 |
| 6 | MR. VERHOEVEN:  Thank you for catching that. | 09:15:14 |
| 7 | BY MR. VERHOEVEN: | 09:15:14 |
| 8 | Q.   You understood that Otto was formed by former | 09:15:19 |
| 9 | employees from Waymo and Google? | 09:15:22 |
| 10 | MR. FLUMENBAUM:  Objection as to form. | 09:15:25 |
| 11 | You may -- | 09:15:25 |
| 12 | THE WITNESS:  It was -- it was my knowledge that | 09:15:30 |
| 13 | some of the employees of Otto were from Google, yes. | 09:15:34 |
| 14 | BY MR. VERHOEVEN: | 09:15:34 |
| 15 | Q.   Well, this phrase, "minimum of 25 engineers," | 09:15:37 |
| 16 | that was a term of the acquisition; right? | 09:15:40 |
| 17 | A.   It's listed here, yes. | 09:15:45 |
| 18 | Q.   And that was a reference to former | 09:15:48 |
| 19 | Google/Waymo engineers; right? | 09:15:52 |
| 20 | A.   I don't have any data that would suggest that | 09:15:55 |
| 21 | that -- that's relating to Otto engineers, as I | 09:16:00 |
| 22 | interpret this. | 09:16:02 |
| 23 | Q.   You don't remember that part of the value of | 09:16:05 |
| 24 | the transaction was Otto had this expertise that they | 09:16:08 |
| 25 | developed while they worked at Google on lasers? | 09:16:12 |

Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        MR. BRILLE:  Objection; form.                09:16:14

 2        THE WITNESS:  I have no recollection, nor do I   09:16:18

 3   have any data that suggests that this was specifically  09:16:22

 4   tied to Google engineers.  And that was my          09:16:24

 5   interpretation of your question.                     09:16:28

 6   BY MR. VERHOEVEN:                                    09:16:28

 7        Q.   Well, if you said the goal was to get the  09:16:31

 8   right people to accelerate timelines, did you ask any  09:16:36

 9   questions or was there any discussions of whether    09:16:38

10   these 25 engineers were the, quote-unquote, right    09:16:41

11   people?                                              09:16:43

12        A.   By that moment in time, because of the     09:16:46

13   efforts in Pittsburgh that we've already discussed,  09:16:50

14   you know, I would presume that the company itself had  09:16:53

15   knowledge of who the right people were or who they   09:16:56

16   weren't.  And so I don't think it would be typical for  09:17:01

17   the board to go down into that depth and say, well,  09:17:05

18   what do you mean?  Are you sure these are the right   09:17:08

19   people?  That just wouldn't be a standard practice.  09:17:11

20        Q.   Is it your testimony here that, as of this  09:17:14

21   date, you had no knowledge that part of this -- value  09:17:19

22   of this transaction was obtaining the at least        09:17:24

23   know-how of engineers who had experience working with  09:17:31

24   Google?                                              09:17:32

25        MR. FLUMENBAUM:  Objection as to form.          09:17:35
```

Page 38

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. BRILLE:  Same objection. | 09:17:39 |
| 2 | THE WITNESS:  I would state it differently, which | 09:17:43 |
| 3 | is, the goal was to get engineers that were good at | 09:17:50 |
| 4 | autonomous, just as if we were going out to get | 09:17:53 |
| 5 | engineers good at AI or engineers good at machine | 09:17:57 |
| 6 | learning.  Where those people had developed that was | 09:18:00 |
| 7 | not material to the transaction, as long as they were | 09:18:04 |
| 8 | experienced. | 09:18:06 |
| 9 | BY MR. VERHOEVEN: | 09:18:06 |
| 10 | Q.   Is it your testimony, sir, that you didn't | 09:18:09 |
| 11 | know that most of these engineers referred to here | 09:18:12 |
| 12 | came from Google? | 09:18:14 |
| 13 | A.   I knew that some of them did, for sure, and | 09:18:18 |
| 14 | we already talked about that. | 09:18:21 |
| 15 | Q.   Which ones did you know did? | 09:18:23 |
| 16 | A.   I didn't have specifics.  I knew Anthony did. | 09:18:26 |
| 17 | Q.   And what was his position at Otto? | 09:18:30 |
| 18 | A.   As far as I understand it, he was the leader | 09:18:36 |
| 19 | of the effort. | 09:18:38 |
| 20 | Q.   And as far as you understand it, he put the | 09:18:40 |
| 21 | team together; right? | 09:18:41 |
| 22 | A.   I don't have any data to dispute that notion. | 09:18:47 |
| 23 | I would assume that.  I don't know that for a fact. | 09:18:50 |
| 24 | Q.   Was there value in this acquisition due to | 09:18:54 |
| 25 | the fact that you'd be making Mr. Levandowski part of | 09:18:58 |

Page  39

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Uber? | 09:19:00 |
| 2 | A.   That was a strong argument for doing the | 09:19:03 |
| 3 | transaction, yes. | 09:19:04 |
| 4 | Q.   And why was it a strong argument? | 09:19:08 |
| 5 | A.   Mr. Kalanick presented to the board that he | 09:19:12 |
| 6 | was one of the premier minds in the world on | 09:19:16 |
| 7 | autonomous vehicles and that it would be a benefit to | 09:19:18 |
| 8 | the company if he became an employee. | 09:19:20 |
| 9 | Q.   Did Mr. Kalanick also say that he had a team | 09:19:24 |
| 10 | of engineers from Google with him? | 09:19:30 |
| 11 | A.   He had a team of engineers.  It was my | 09:19:32 |
| 12 | presumption that some of them were from Google, but I | 09:19:35 |
| 13 | don't have data to suggest all of them were or that | 09:19:39 |
| 14 | that was part -- | 09:19:40 |
| 15 | Q.   I'm just asking if he told you that at the | 09:19:43 |
| 16 | meeting, that part of the value was that -- in | 09:19:44 |
| 17 | addition to the fact that Mr. Levandowski was heading | 09:19:49 |
| 18 | up Ottomotto, was the additional fact that he had | 09:19:55 |
| 19 | hired a team to work with him that used to work with | 09:19:59 |
| 20 | him at Google? | 09:20:00 |
| 21 | MR. BRILLE:  Objection; form. | 09:20:09 |
| 22 | THE WITNESS:  There's nothing in here that reads | 09:20:11 |
| 23 | exactly as you're saying it.  Certainly we were left | 09:20:15 |
| 24 | with the impression that they were -- that he had left | 09:20:19 |
| 25 | Google and put together a team and that some of those | 09:20:22 |

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | people were from Google.  I don't have knowledge as to | 09:20:25 |
| 2 | the exact percentage. | 09:20:27 |
| 3 | BY MR. VERHOEVEN: | 09:20:27 |
| 4 | Q.   Right, but did he say that at the meeting or | 09:20:31 |
| 5 | something to that effect? | 09:20:32 |
| 6 | MR. FLUMENBAUM:  Objection as to form. | 09:20:43 |
| 7 | THE WITNESS:  I don't have a specific recollection | 09:20:44 |
| 8 | of exactly what was said.  I was left with the | 09:20:47 |
| 9 | impression that some of them came from Google, which | 09:20:50 |
| 10 | we already discussed. | 09:20:52 |
| 11 | BY MR. VERHOEVEN: | 09:20:52 |
| 12 | Q.   Why was there a condition in the terms of the | 09:21:01 |
| 13 | acquisition that required Uber to have a minimum of 25 | 09:21:08 |
| 14 | engineers? | 09:21:11 |
| 15 | MR. BRILLE:  Objection; form. | 09:21:19 |
| 16 | THE WITNESS:  I didn't create that term, so I | 09:21:21 |
| 17 | don't know the specifics.  I could speculate, | 09:21:23 |
| 18 | but . . . | 09:21:25 |
| 19 | BY MR. VERHOEVEN: | 09:21:25 |
| 20 | Q.   Can you think of any other acquisition you've | 09:21:28 |
| 21 | been involved in in your career that had a similar | 09:21:30 |
| 22 | term that required a minimum of a certain number of | 09:21:34 |
| 23 | engineers before you acquired the company? | 09:21:38 |
| 24 | A.   I'm aware of transactions that require a | 09:21:41 |
| 25 | certain number of people to come over and join. | 09:21:43 |

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   Because sometimes in an acquisition, people say, I      09:21:46

2   don't want to work for that company and so they don't   09:21:48

3   come over.  And so you'll put a minimum requirement on   09:21:52

4   employee retention.                                      09:21:54

5       Q.   In your experience, what would that number     09:21:57

6   typically be?                                            09:21:59

7       A.   Some percentage of the employees.              09:22:01

8       Q.   Did you know how many employees Ottomotto had  09:22:07

9   at this time?                                            09:22:07

10      A.   I do not.                                       09:22:08

11      Q.   As a board member, you didn't inform yourself  09:22:16

12  as to how big the company was?                           09:22:19

13      A.   I don't have recollection of anyone asking     09:22:21

14  that question.                                           09:22:22

15      Q.   You knew it was a start-up; right?             09:22:25

16      A.   Yes.                                            09:22:27

17      Q.   You knew it had only existed for a few         09:22:31

18  months; right?                                           09:22:32

19      A.   Yes.                                            09:22:36

20      Q.   You knew it didn't sell any products; right?   09:22:38

21      A.   Yes.                                            09:22:38

22      Q.   What was its value, if it didn't sell any      09:22:47

23  products and it had only existed for a few months?      09:22:49

24      A.   As I had stated previously, there was an       09:22:53

25  argument made about Anthony and his individual          09:22:57

Page  42

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | talents.  And, you know, there was points made about | 09:23:01 |
| 2 | the impact at having the right people on board could | 09:23:06 |
| 3 | have on our ability to execute. | 09:23:08 |
| 4 | Q.  So it was the knowledge of Mr. Levandowski | 09:23:11 |
| 5 | and the 25 engineers?  That was the value? | 09:23:16 |
| 6 | MR. FLUMENBAUM:  Objection; form. | 09:23:19 |
| 7 | THE WITNESS:  From my perspective, yes. | 09:23:22 |
| 8 | BY MR. VERHOEVEN: | 09:23:22 |
| 9 | Q.  The next bullet below the "Minimum" bullet in | 09:23:26 |
| 10 | the same cell says, "Uber will indemnify a minimum of | 09:23:31 |
| 11 | five key employees and Ottomotto for specific claims | 09:23:36 |
| 12 | from former employees, e.g." -- | 09:23:41 |
| 13 | MR. FLUMENBAUM:  You're misreading it. | |
| 14 | MR. BRILLE:  Objection; form. | 09:23:43 |
| 15 | MR. FLUMENBAUM:  You misread it. | 09:23:46 |
| 16 | BY MR. VERHOEVEN: | 09:23:46 |
| 17 | Q.  -- "former employers" -- | 09:23:47 |
| 18 | MR. VERHOEVEN:  Thank you again. | |
| 19 | BY MR. VERHOEVEN:: | |
| 20 | Q.  -- "(e.g. IP, non-solicit), subject to | 09:23:51 |
| 21 | certain restrictions and limitations." | 09:23:54 |
| 22 | Do you see that bullet? | 09:23:55 |
| 23 | A.  I do. | 09:23:57 |
| 24 | Q.  This is a reference to former Google | 09:23:59 |
| 25 | employees; right? | 09:24:01 |

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        MR. FLUMENBAUM:  Objection as to form.          09:24:03
 2        MR. BRILLE:  Same objection.                    09:24:05
 3        THE WITNESS:  I don't know if all five of them are  09:24:07
 4   former Google, but I'm not saying they're not.  I just  09:24:11
 5   don't know.                                          09:24:12
 6   BY MR. VERHOEVEN:                                    09:24:12
 7        Q.    You know at this time that there's a      09:24:13
 8   possibility that Google/Waymo would bring suit if you  09:24:17
 9   acquired Ottomotto; right?                           09:24:21
10        MR. FLUMENBAUM:  Objection as to form.          09:24:29
11        THE WITNESS:  I think it would be safe to say that  09:24:33
12   the notion -- the presence of indemnity would imply  09:24:40
13   that there's a non-zero probability, but I didn't have  09:24:43
14   any specific reason to believe that it was a high    09:24:47
15   probability; otherwise, that would be a risky term.  09:24:52
16   BY MR. VERHOEVEN:                                    09:24:52
17        Q.    Are you aware of any acquisition agreements  09:24:57
18   in which the buyer indemnifies the seller?           09:25:03
19        A.    I think that that has happened in other   09:25:19
20   transactions.  I don't have any specifics, but it    09:25:22
21   doesn't sound farfetched to me.                      09:25:25
22        Q.    Typically, it's fair to say that the      09:25:27
23   indemnification runs the other way, that the seller  09:25:31
24   will indemnify the buyer if there's claims; right?   09:25:34
25        A.    Sometimes those are highly negotiated issues.  09:25:42
```

Page  44

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  For example, in our business, we push back on the type    09:25:46

2  of indemnity you just talked about because it doesn't    09:25:50

3  allow us to distribute funds to our LPs because we    09:25:55

4  would have to have holdback for liability.  So we    09:25:59

5  actually do everything we can not to get into the    09:26:01

6  situation you just discussed.    09:26:02

7      Q.   Typically, to the extent there is    09:26:04

8  indemnification in the acquisitions, it's the seller    09:26:08

9  who indemnifies the buyer --    09:26:10

10      A.   I've see that -- like I said, that's    09:26:12

11  something we try to avoid.    09:26:14

12      Q.   You can't say whether that's a typical use of    09:26:16

13  the indemnification clause?    09:26:19

14      MR. FLUMENBAUM:  Object to form.    09:26:19

15      MR. BRILLE:  Object to form.    09:26:20

16      THE WITNESS:  In my experience, it's atypical    09:26:22

17  because we push back against it.  Referring to the    09:26:25

18  notion of the seller indemnifying.    09:26:28

19  BY MR. VERHOEVEN:    09:26:28

20      Q.   Can you identify a single transaction that    09:26:30

21  you're aware of in which the buyer indemnifies the    09:26:36

22  seller for activities prior to the acquisition?    09:26:43

23      A.   I don't have immediate recollection of a deal    09:26:46

24  like that.    09:26:47

25      Q.   Was there a discussion of why there was an    09:26:55

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    indemnification in this transaction from Uber to          09:27:02

2    Ottomotto for acts of the employees of Ottomotto prior    09:27:07

3    to the acquisition?                                        09:27:08

4         A.   Yes, there was discussion of the indemnity.     09:27:12

5         Q.   Okay.   What do you remember?                    09:27:13

6         MR. BRILLE:  Objection.                               09:27:13

7              I'm just going to instruct the witness,          09:27:16

8    Mr. Gurley, to the extent that it would require you to     09:27:18

9    disclose conversations that you had with lawyers about     09:27:21

10   that issue, I would instruct you not to answer.  If        09:27:24

11   you can answer the question without disclosing such        09:27:27

12   communications, you may answer the question.               09:27:29

13        MR. FLUMENBAUM:  We're talking specifically about     09:27:30

14   the board meeting.                                         09:27:31

15        MR. BRILLE:  It is, correct.                          09:27:33

16        MR. FLUMENBAUM:  So --                                09:27:33

17        MR. BRILLE:  So just so you have that --              09:27:36

18        MR. FLUMENBAUM:  We're just focused on the board      09:27:39

19   meeting.                                                   09:27:39

20        THE WITNESS:  So there was -- questions came up       09:27:46

21   about why we were providing indemnity like this.  And     09:27:49

22   it was -- it was disclosed to the board that it was       09:27:55

23   important to the team on the other side.  And I think     09:28:00

24   the primary point that was made by Mr. Kalanick and       09:28:08

25   the company was that there had been a due diligence       09:28:11

                                                   Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | effort done and that it had come back in a clean | 09:28:16 |
| 2 | result and that, based on that due diligence, we | 09:28:21 |
| 3 | should be comfortable moving forward. | 09:28:23 |
| 4 | BY MR. VERHOEVEN: | 09:28:23 |
| 5 | Q.   So what did Mr. Kalanick say about this due | 09:28:28 |
| 6 | diligence effort? | 09:28:29 |
| 7 | A.   There weren't many details discussed.  It | 09:28:35 |
| 8 | was -- at that moment in time at the board meeting, it | 09:28:37 |
| 9 | was stated that there had been a third-party hired -- | 09:28:41 |
| 10 | MR. BRILLE:  I'm going to interrupt here. | 09:28:44 |
| 11 | THE WITNESS:  Okay. | 09:28:44 |
| 12 | MR. BRILLE:  And I'm going to instruct the witness | 09:28:46 |
| 13 | not to answer the question. | 09:28:48 |
| 14 | The due diligence effort, as you know, | 09:28:49 |
| 15 | Charlie, has -- privilege has been asserted over that. | 09:28:53 |
| 16 | Whether -- | |
| 17 | MR. VERHOEVEN:  You don't need to make a speech. | 09:28:55 |
| 18 | You can either instruct or whatnot.  I don't need a | 09:28:56 |
| 19 | speech to coach the witness. | 09:29:00 |
| 20 | MR. BOOCK:  Can the privilege objections be mutual | 09:29:03 |
| 21 | for all parties as well -- | 09:29:04 |
| 22 | MR. VERHOEVEN:  Sure, if you all want to take a | 09:29:05 |
| 23 | privilege on a meeting we've been talking about for | 09:29:06 |
| 24 | half an hour. | 09:29:08 |
| 25 | MR. BRILLE:  First of all, there's no coaching | 09:29:10 |

Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   going on, so don't accuse me of that.              09:29:14

 2       MR. VERHOEVEN:  Well, then don't do it.        09:29:16

 3       MR. BRILLE:  Don't accuse me of that, Charlie. 09:29:16

 4   Okay.  I'm lodging a privilege objection and I'm going 09:29:19

 5   to instruct the witness not to answer the question. 09:29:21

 6   Don't throw around false accusations in depositions. 09:29:25

 7       MR. VERHOEVEN:  Then just either instruct or   09:29:26

 8   don't.  You don't need to explain your reasons.     09:29:30

 9   BY MR. VERHOEVEN:                                   09:29:30

10       Q.  So are you going to follow the instruction 09:29:35

11   not to answer that question?                        09:29:37

12       MR. FLUMENBAUM:  I think we have to until the   09:29:38

13   judge clarifies it.                                 09:29:40

14           I want to point out for you that there's   09:29:42

15   discussion in this that's consistent with what     09:29:45

16   Mr. Gurley has already testified to.  So if you want 09:29:48

17   to stick to this, I think you could probably get more 09:29:53

18   information.                                        09:29:55

19       MR. VERHOEVEN:  Well, we'll see.                09:29:56

20       MR. FLUMENBAUM:  All right.                     09:29:57

21   BY MR. VERHOEVEN:                                   09:29:57

22       Q.  So what did Mr. Kalanick say about the due  09:30:05

23   diligence effort at the meeting?                    09:30:06

24       MR. BRILLE:  Same instruction.                  09:30:07

25   BY MR. VERHOEVEN:                                   09:30:07
```

Page 48

| | | |
|---|---|---|
| 1 | Q.   What was the subject of the due diligence? | 09:30:13 |
| 2 | A.   There was -- to the best of my knowledge, | 09:30:16 |
| 3 | there was not much more detail than what I've already | 09:30:20 |
| 4 | said, that a third party was hired and that it came | 09:30:24 |
| 5 | back clean. | 09:30:25 |
| 6 | Q.   What was the third party looking for? | 09:30:27 |
| 7 | MR. BRILLE:  Same instruction. | 09:30:28 |
| 8 | Do not answer. | 09:30:29 |
| 9 | BY MR. VERHOEVEN: | 09:30:29 |
| 10 | Q.   Was the subject of the due diligence whether | 09:30:32 |
| 11 | or not there had been a violation of -- withdrawn. | 09:30:37 |
| 12 | Was the substance of the due diligence | 09:30:39 |
| 13 | whether or not these key employees had taken IP from | 09:30:47 |
| 14 | their former employer? | 09:30:48 |
| 15 | MR. BRILLE:  Same instruction. | 09:31:01 |
| 16 | BY MR. VERHOEVEN: | 09:31:01 |
| 17 | Q.   Did you say anything about the subject of | 09:31:03 |
| 18 | indemnification at the meeting? | 09:31:11 |
| 19 | MR. BRILLE:  Same instruction.  It's the same | 09:31:16 |
| 20 | instruction. | 09:31:17 |
| 21 | To the extent he's talking about it with his | 09:31:19 |
| 22 | lawyers -- | 09:31:20 |
| 23 | MR. VERHOEVEN:  Do you want to confer with him? | 09:31:23 |
| 24 | I'll go off the record if you want to. | 09:31:25 |
| 25 | MR. FLUMENBAUM:  He's not talking about | 09:31:26 |

Page 49

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | communications with lawyers or not. | 09:31:28 |
| 2 | MR. BRILLE:  I don't know if he is or not.  If | 09:31:30 |
| 3 | he's -- | |
| 4 | MR. VERHOEVEN:  Let's go off the record. | 09:31:31 |
| 5 | MR. FLUMENBAUM:  There's no reason to go off the | 09:31:33 |
| 6 | record. | 09:31:33 |
| 7 | MR. BRILLE:  I'm going to instruct.  The | 09:31:35 |
| 8 | instruction stands. | 09:31:39 |
| 9 | MR. FLUMENBAUM:  To the extent that you recall | 09:31:44 |
| 10 | saying something to the board as a whole which is not | 09:31:47 |
| 11 | based on conversations with counsel, you can answer | 09:31:50 |
| 12 | that question.  I don't believe that -- | 09:31:53 |
| 13 | MR. BRILLE:  If it's not based -- I'm still | 09:31:55 |
| 14 | concerned about the disclosure of the privileged | 09:31:58 |
| 15 | discussions in this context. | 09:31:59 |
| 16 | MR. FLUMENBAUM:  I've already said that we're | 09:32:01 |
| 17 | going to follow your instruction on that. | 09:32:04 |
| 18 | MR. BRILLE:  Yeah, the whole -- in this case, the | 09:32:06 |
| 19 | whole substance of the disclosure report, privilege | 09:32:09 |
| 20 | has been asserted.  We're going to maintain that | 09:32:11 |
| 21 | privilege.  I'm instructing the witness not to answer | 09:32:13 |
| 22 | the question. | 09:32:14 |
| 23 | MR. BOOCK:  We join in all of that. | 09:32:19 |
| 24 | MR. VERHOEVEN:  So you will instruct on any | 09:32:20 |
| 25 | question I ask this witness about -- going forward | 09:32:24 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | about this bullet in row that says, "Terms" and column | 09:32:30 |
| 2 | that says, "Computer Lasers" that refers to | 09:32:33 |
| 3 | indemnification? | 09:32:35 |
| 4 | MR. BRILLE:  I will instruct based on the specific | 09:32:38 |
| 5 | questions you ask, Charlie.  And I don't need your | 09:32:43 |
| 6 | colloquy on the record. | 09:32:45 |
| 7 | BY MR. VERHOEVEN: | 09:32:45 |
| 8 | Q.   What did you say about the indemnification? | 09:32:47 |
| 9 | MR. BRILLE:  Same instructions. | 09:32:48 |
| 10 | BY MR. VERHOEVEN: | |
| 11 | Q.   Do you recall anyone -- you already said | 09:32:53 |
| 12 | that. | 09:32:53 |
| 13 | Other than Mr. Kalanick, who else | 09:32:56 |
| 14 | discussed -- in the board said anything about the | 09:33:00 |
| 15 | indemnification issue? | 09:33:02 |
| 16 | A.   I don't have a specific recollection of who | 09:33:07 |
| 17 | said exactly what. | 09:33:08 |
| 18 | Q.   Yes or no; did you ask a question about this | 09:33:11 |
| 19 | issue at the meeting? | 09:33:12 |
| 20 | A.   It's possible, but I don't recall. | 09:33:19 |
| 21 | Q.   You recall that questions were asked; right? | 09:33:22 |
| 22 | A.   Yes. | 09:33:22 |
| 23 | Q.   But you don't recall who asked them? | 09:33:27 |
| 24 | A.   I don't. | 09:33:28 |
| 25 | Q.   What was the question that was asked? | 09:33:31 |

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    I just don't have a specific recollection of | 09:33:35 |
| 2 | the exact wording in the meeting.  There was multiple | 09:33:39 |
| 3 | slides dedicated to indemnity, and I know it was | 09:33:44 |
| 4 | discussed. | 09:33:44 |
| 5 | Q.    Okay.  Direct your attention to -- there's | 09:34:05 |
| 6 | little control numbers on the bottom right. | 09:34:08 |
| 7 | Do you see those? | 09:34:09 |
| 8 | A.    Yes. | 09:34:09 |
| 9 | Q.    Direct your attention to the page that ends | 09:34:11 |
| 10 | in 874.  And this slide is entitled, "Walkaway Rights | 09:34:20 |
| 11 | and Indemnity Obligations." | 09:34:23 |
| 12 | Do you see that? | 09:34:24 |
| 13 | A.    Um-hum. | 09:34:25 |
| 14 | Q.    So I'm first going to ask you about the | 09:34:31 |
| 15 | section on this page that has the heading, "When Can | 09:34:36 |
| 16 | We Walk Away?" | 09:34:38 |
| 17 | Do you remember a discussion about when Uber | 09:34:47 |
| 18 | could walk away from the transaction? | 09:34:50 |
| 19 | A.    I have a recollection that it was generally | 09:35:00 |
| 20 | discussed, yes. | 09:35:01 |
| 21 | Q.    And one of the -- one of the reasons, under | 09:35:06 |
| 22 | the terms of the acquisition, for which Uber could | 09:35:12 |
| 23 | walk away is if they were substantially restricted | 09:35:16 |
| 24 | from using Ottomotto's IP; right? | 09:35:19 |
| 25 | A.    Yes.  I see that here. | 09:35:28 |

Page 52

| | | |
|---|---|---|
| 1 | Q. Do you have an understanding of what IP | 09:35:31 |
| 2 | Ottomotto developed in the few months that it existed? | 09:35:35 |
| 3 | A. I do not. | 09:35:40 |
| 4 | Q. Well, that's what you're purchasing it for; | 09:35:44 |
| 5 | right? | 09:35:45 |
| 6 | MR. BRILLE:  Objection as to form. | 09:35:48 |
| 7 | THE WITNESS:  I had already conveyed that my | 09:35:50 |
| 8 | interpretation of the primary motivation for the deal | 09:35:53 |
| 9 | was to get the talented people. | 09:35:58 |
| 10 | BY MR. VERHOEVEN: | 09:35:58 |
| 11 | Q. It wasn't to get any IP? | 09:36:00 |
| 12 | MR. BRILLE:  Same objection. | 09:36:05 |
| 13 | MR. FLUMENBAUM:  He just objected as to form.  You | 09:36:07 |
| 14 | may answer. | 09:36:08 |
| 15 | THE WITNESS:  It wasn't -- in my recollection of | 09:36:11 |
| 16 | the board meeting and how this was presented, that was | 09:36:14 |
| 17 | not listed as one of the primary reasons.  And just to | 09:36:21 |
| 18 | help shed more light on that, you know, acqui-hires | 09:36:24 |
| 19 | are common occurrences in Silicon Valley. | 09:36:28 |
| 20 | BY MR. VERHOEVEN: | 09:36:28 |
| 21 | Q. Well, if it wasn't important, then why was it | 09:36:31 |
| 22 | listed as one of three conditions under which Uber | 09:36:34 |
| 23 | could walk away from this entire transaction? | 09:36:38 |
| 24 | MR. BRILLE:  Objection; form. | 09:36:42 |
| 25 | THE WITNESS:  My own interpretation is that you | 09:36:45 |

Page 53

| | | |
|---|---|---|
| 1 | could have walkaway rights that aren't necessarily | 09:36:48 |
| 2 | tied to something being most critically important. | 09:36:52 |
| 3 | You just may want to protect against that situation. | 09:36:56 |
| 4 | BY MR. VERHOEVEN: | 09:36:56 |
| 5 | Q.   Isn't that saying that if -- didn't you | 09:36:57 |
| 6 | understand that this was saying that, under the | 09:37:00 |
| 7 | acquisition agreement, if Google sues Ottomotto and | 09:37:06 |
| 8 | succeeds in restricting Ottomotto's use of IP, that | 09:37:13 |
| 9 | would be one of three bases here under which Uber | 09:37:16 |
| 10 | could walk away from the transaction? | 09:37:19 |
| 11 | MR. FLUMENBAUM:   Objection as to form. | 09:37:26 |
| 12 | THE WITNESS:   As some of the employees were from | 09:37:27 |
| 13 | there in this list of former employer, yes, I would | 09:37:31 |
| 14 | agree with that. | 09:37:33 |
| 15 | BY MR. VERHOEVEN: | 09:37:33 |
| 16 | Q.   If you look below the dotted line, you see | 09:37:59 |
| 17 | where it says, "Diligence employees commit | 09:38:03 |
| 18 | post-signing bad acts (specific list of factual | 09:38:08 |
| 19 | actions)." | 09:38:11 |
| 20 | And it has an asterisk that says, "See | 09:38:13 |
| 21 | appendix for summary of diligence process." | 09:38:18 |
| 22 | Do you see that? | 09:38:19 |
| 23 | A.   I do. | 09:38:20 |
| 24 | Q.   What's that referring to? | 09:38:24 |
| 25 | A.   I actually don't know. | 09:38:29 |

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.    Have you ever seen a deal that referred to,    09:38:32

2    quote-unquote, bad acts?    09:38:35

3    A.    That is not a phrase I'm familiar with other    09:38:38

4    than here.    09:38:39

5    Q.    Were you surprised that that was on this    09:38:41

6    slide?    09:38:42

7    A.    One thing that we haven't discussed, which is    09:38:53

8    on the previous slide, is the windowing concept of    09:38:57

9    this transaction.  So my interpretation of that at the    09:39:01

10   time was that if people did bad things in that window,    09:39:05

11   that we would have a right to remove indemnification.    09:39:12

12   Q.    What things would those be?    09:39:18

13   A.    I don't have this list, so I don't know.  I    09:39:21

14   think one could assume it would be things that would    09:39:23

15   make you not want to indemnify.    09:39:26

16   Q.    You understood that that was referring to    09:39:30

17   misappropriation of trade secrets; right?    09:39:34

18   A.    I don't.  Once again, I don't have that list,    09:39:38

19   so I don't know.    09:39:40

20   Q.    If you look over on the right of this page,    09:39:53

21   under the heading, "Do We Still Indemnify?" --    09:39:55

22       Do you see that?    09:40:01

23   A.    Yes.    09:40:02

24   Q.    -- the first bullet says, "Yes, for    09:40:04

25   diligenced employees in Ottomotto (relating to actions    09:40:09

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | of diligenced employees) for the following claims." | 09:40:13 |
| 2 | And the first claim listed is, "IP/trade secret | 09:40:19 |
| 3 | misappropriation or infringement." | 09:40:22 |
| 4 | So does that refresh your recollection that | 09:40:28 |
| 5 | the indemnification they're talking about was for | 09:40:32 |
| 6 | trade secret misappropriation? | 09:40:35 |
| 7 | (Witness reviews document.) | 09:40:51 |
| 8 | A.    My recollection, once again, about the entire | 09:40:54 |
| 9 | indemnity issue was that the reason that the company | 09:40:59 |
| 10 | was encouraged -- the board was encouraged to be | 09:41:04 |
| 11 | comfortable with these types of terms was tied to the | 09:41:10 |
| 12 | fact that there had been diligence done and it was | 09:41:13 |
| 13 | clean. | 09:41:13 |
| 14 | Q.    But you understood, at the time that you | 09:41:16 |
| 15 | approved the deal, that the indemnity provisions as | 09:41:23 |
| 16 | part of the deal indemnified these employees, these | 09:41:28 |
| 17 | diligenced employees, for claims of trade secret | 09:41:31 |
| 18 | misappropriation; correct? | 09:41:33 |
| 19 | A.    I think, for the diligenced employees, yes, | 09:41:40 |
| 20 | that's what this says. | 09:41:41 |
| 21 | Q.    Did it seem unusual that the purchaser of | 09:41:46 |
| 22 | this transaction would be indemnifying these employees | 09:41:50 |
| 23 | for past trade secret misappropriation? | 09:41:56 |
| 24 | MR. BRILLE:  Objection; form. | 09:42:02 |
| 25 | THE WITNESS:  I don't want to sound intentionally | 09:42:05 |

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | redundant, but my response to that is that this was | 09:42:10 |
| 2 | discussed.  And it was discussed because we were | 09:42:20 |
| 3 | taking on this obligation, as you're describing it, | 09:42:26 |
| 4 | and that the reason the -- we needed to do it was it | 09:42:31 |
| 5 | was important to the team that was selling, and the | 09:42:34 |
| 6 | reason that the board should be comfortable with it | 09:42:37 |
| 7 | was because of the diligence process. | 09:42:40 |
| 8 | BY MR. VERHOEVEN: | 09:42:40 |
| 9 | Q.   Did you have a concern about it? | 09:42:42 |
| 10 | A.   Very likely that I asked questions about it, | 09:43:02 |
| 11 | which would take me right back to what I just conveyed | 09:43:05 |
| 12 | to you. | 09:43:06 |
| 13 | Q.   Well, what do you remember saying? | 09:43:08 |
| 14 | A.   I don't remember any specifics. | 09:43:11 |
| 15 | Q.   Well, generally, did you say, what's up with | 09:43:14 |
| 16 | this?  Did you inquire about it? | 09:43:17 |
| 17 | A.   It's highly possible that I did, which led to | 09:43:22 |
| 18 | the conversation that I've already described. | 09:43:24 |
| 19 | Q.   So is it fair to say that you were concerned | 09:43:25 |
| 20 | about it? | 09:43:26 |
| 21 | MR. FLUMENBAUM:  Objection as to form. | 09:43:30 |
| 22 | You may answer. | 09:43:32 |
| 23 | THE WITNESS:  I think it's highly possible I | 09:43:34 |
| 24 | inquired about it.  And I would be inquiring about it | 09:43:37 |
| 25 | to make sure that we weren't taking on some | 09:43:40 |

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   unnecessary liability or obligation.  And, once again,   09:43:45

2   the reason that was given and the reason that the   09:43:49

3   board approved the deal, despite this, relates to that   09:43:54

4   discussion of --   09:43:55

5   BY MR. VERHOEVEN:

6       Q.   I'm just asking --   09:43:57

7       MR. FLUMENBAUM:  You're interrupting.  I don't   09:43:58

8   believe Judge Alsup would approve of that.   09:44:08

9           Finish your answer, please.

10      THE WITNESS:   -- that discussion about the   09:44:09

11  diligence process.   09:44:11

12  BY MR. VERHOEVEN:   09:44:11

13      Q.   I'm just asking if you were concerned about   09:44:13

14  it at the meeting.   09:44:14

15      MR. FLUMENBAUM:  Asked and answered.   09:44:15

16      THE WITNESS:  I don't have a specific recollection   09:44:16

17  of whether I was concerned.  It was an issue that was   09:44:21

18  discussed.  It's highly probable that I brought that   09:44:25

19  up because that's something I would ask about.  And I   09:44:30

20  already told you how we discussed it and what the   09:44:34

21  response was.   09:44:34

22  BY MR. VERHOEVEN:   09:44:34

23      Q.   It was highly unusual, wouldn't you agree,   09:44:39

24  for a buyer in an acquisition agreement to indemnify   09:44:42

25  employees from the seller for past acts of trade   09:44:50

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    secret misappropriation?                           09:44:52

2        MR. FLUMENBAUM:  Objection as to form.        09:44:56

3        THE WITNESS:  I don't have a universal sample to   09:45:00

4    know whether that's highly unusual or not.  Like I   09:45:03

5    said, there are slides dedicated to it, so it was a   09:45:05

6    topic of discussion.  And I already told you how it   09:45:09

7    was discussed and what the rationale was for        09:45:13

8    supporting it.                                      09:45:14

9    BY MR. VERHOEVEN:                                   09:45:14

10       Q.    Have you ever been in a                   09:45:15

11   transaction -- withdrawn.                           09:45:18

12             Can you name any transaction that you've been   09:45:21

13   involved in, other than this one, which had a       09:45:23

14   provision that indemnified employees of the seller for   09:45:30

15   past trade secret misappropriation?                 09:45:32

16       A.    I don't have a specific recollection of one,   09:45:35

17   no.                                                 09:45:35

18       Q.    On its face, that doesn't make sense, does   09:45:40

19   it?                                                 09:45:40

20       MR. FLUMENBAUM:  Objection as to form.          09:45:41

21       MR. BRILLE:  Yeah.                              09:45:42

22       MR. FLUMENBAUM:  Please reword that question.   09:45:44

23   BY MR. VERHOEVEN:                                   09:45:44

24       Q.    On its face, that doesn't make sense, does   09:45:47

25   it?                                                 09:45:47

                                                    Page 59

```
 1        MR. FLUMENBAUM:  Objection as to form.        09:45:48

 2        MR. BRILLE:  Same.                            09:45:51

 3        THE WITNESS:  If -- I can answer, but I'm just 09:45:55

 4   going to be --                                    09:45:56

 5        MR. FLUMENBAUM:  Repeat it again.             09:45:58

 6        THE WITNESS:  It came up.  It was listed as a 09:46:02

 7   requirement of the -- it was discussed as a       09:46:05

 8   requirement of the sellers to get the deal done.  And 09:46:08

 9   so we discussed it and whether or not it would -- it 09:46:11

10   would result in an unusually large liability or   09:46:17

11   obligations.  And the reason that the board was told 09:46:22

12   that this was not a big deal was because of the due 09:46:25

13   diligence process.                                09:46:26

14   BY MR. VERHOEVEN:                                 09:46:26

15        Q.  So a requirement of the deal getting done, 09:46:31

16   requirement that Ottomotto insisted on of the deal 09:46:34

17   getting done, is that Uber would indemnify these  09:46:39

18   diligenced employees for future lawsuits for      09:46:43

19   misappropriation of trade secrets?                09:46:45

20        A.  That's my best recollection of . . .     09:46:49

21        Q.  Have you ever heard of that being a      09:46:50

22   requirement in any other acquisition?             09:46:53

23        A.  I don't have specific knowledge or       09:46:58

24   remembrance of any other.                         09:47:00

25        Q.  Did you ask why that was a requirement?  09:47:03
```

                                                    Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        MR. FLUMENBAUM:  Objection; form.              09:47:06
 2        THE WITNESS:  I don't remember if that particular    09:47:09
 3   topic was discussed.                                  09:47:11
 4   BY MR. VERHOEVEN:                                     09:47:11
 5        Q.   Did it concern you that Ottomotto was      09:47:19
 6   insisting on this specific indemnification as a       09:47:23
 7   requirement for them being purchased?                 09:47:26
 8        MR. BRILLE:  Objection; form.                   09:47:31
 9        THE WITNESS:  It certainly provoked questions,  09:47:32
10   which we've discussed.                                09:47:34
11   BY MR. VERHOEVEN:                                     09:47:34
12        Q.   But you don't recall whether you asked those  09:47:40
13   questions?                                            09:47:41
14        A.   I do not.                                   09:47:42
15        Q.   What were the questions?  I know the       09:47:44
16   explanation.                                          09:47:45
17             What were the questions?                    09:47:47
18        MR. FLUMENBAUM:  Objection as to form.          09:47:49
19        THE WITNESS:  I just don't have specific        09:47:52
20   recollection of specific questions, just a remembrance  09:47:56
21   of the general discussion.                            09:47:58
22   BY MR. VERHOEVEN:                                     09:47:58
23        Q.   Was the question asked, what did the due   09:48:01
24   diligence turn up?                                    09:48:02
25        A.   Once again, not remembering specific       09:48:07
```

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | statements that were made, the general perception I | 09:48:10 |
| 2 | had -- | 09:48:11 |
| 3 | MR. BRILLE:  Let me just interject here. | 09:48:13 |
| 4 | Mr. Gurley, in answering that question, I | 09:48:16 |
| 5 | would ask you not to disclose the content or the | 09:48:19 |
| 6 | substance of the due diligence, the results of it or | 09:48:22 |
| 7 | anything else.  I will instruct you not to answer | 09:48:25 |
| 8 | that. | 09:48:26 |
| 9 | MR. FLUMENBAUM:  If you can answer -- I think | 09:48:33 |
| 10 | you've already said -- | 09:48:35 |
| 11 | THE WITNESS:  Yeah, it would be repetitive of | 09:48:38 |
| 12 | something I already said, which was there was -- the | 09:48:41 |
| 13 | board was left with a generic opinion that the due | 09:48:46 |
| 14 | diligence process had been clean and positive. | 09:48:49 |
| 15 | BY MR. VERHOEVEN: | 09:48:49 |
| 16 | Q.   And what was that based on? | 09:48:50 |
| 17 | A.   It wasn't discussed at the meeting, that I | 09:48:55 |
| 18 | recall. | 09:48:55 |
| 19 | Q.   So you're convinced the whole board was left | 09:49:01 |
| 20 | with the impression that it was clean? | 09:49:04 |
| 21 | A.   That's my impression, yes. | 09:49:06 |
| 22 | Q.   Without discussing it? | 09:49:07 |
| 23 | MR. FLUMENBAUM:  Objection; form. | 09:49:11 |
| 24 | THE WITNESS:  I didn't say it wasn't discussed.  I | 09:49:14 |
| 25 | said it was discussed. | 09:49:15 |

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   BY MR. VERHOEVEN:                                     09:49:15

 2       Q.   Okay.   So what was discussed about the     09:49:16

 3   results of the due diligence?                        09:49:18

 4       MR. BRILLE:   Objection.   Instruct not to answer. 09:49:20

 5           How many times are you going to ask this and 09:49:23

 6   make us instruct?                                    09:49:24

 7       MR. VERHOEVEN:   We'll move.   Mr. Gurley will have 09:49:36

 8   to come back.                                        09:49:38

 9   BY MR. VERHOEVEN:                                    09:49:38

10       Q.   Go to the page 875.                         09:49:52

11           Do you see here there's the appendix about  09:49:58

12   the detailed indemnity summary?                      09:50:01

13       A.   Yes.                                        09:50:03

14       Q.   So you knew at this time that there had been 09:50:12

15   this due diligence investigation; right?             09:50:15

16       A.   Yes.                                        09:50:19

17       Q.   The third-party forensic expert performed due 09:50:25

18   diligence on Mr. Levandowski and four other employees; 09:50:30

19   right?                                               09:50:30

20       A.   You're reading the first bullet?            09:50:35

21       Q.   Yes.                                        09:50:36

22       A.   Yes.                                        09:50:37

23       Q.   What was your understanding of the meaning of 09:50:42

24   "forensic expert"?                                   09:50:43

25       A.   I didn't have one.   Other than how you would 09:50:53
```

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    just interpret this sentence here.   There was no                09:50:56

2    further explanation, that I recall.                              09:51:00

3        Q.    Did you know what a forensic expert was,              09:51:04

4    generally?                                                       09:51:05

5        A.    That phrase creates a general concept in my           09:51:14

6    brain.                                                           09:51:15

7        Q.    And what would that be?                               09:51:17

8        A.    Someone who's experienced at determining             09:51:20

9    detailed investigative results.                                 09:51:32

10       Q.    Would it be fair that you interpreted this to         09:51:34

11   being that the expert would have looked at                      09:51:37

12   Mr. Levandowski's computer files?                               09:51:43

13       A.    As I already mentioned, I don't have any             09:51:46

14   recollection of the diligence process being discussed           09:51:51

15   in detail at the meeting.   So anything I -- that I             09:51:56

16   would speculate would be solely from my own                     09:52:00

17   interpretation of reading the deck, at that moment in           09:52:05

18   time.                                                            09:52:05

19       Q.    At that moment in time, did you interpret the        09:52:08

20   first bullet here to be saying that a third-party               09:52:15

21   forensic expert had looked to see if there was any              09:52:20

22   trade secret misappropriation by Anthony?                       09:52:23

23       MR. BRILLE:   Objection to form.                            09:52:28

24       THE WITNESS:   I would have assumed that to be part        09:52:34

25   of the process, but once again, the details of the              09:52:38

Page 64

| 1 | process weren't discussed at that meeting. | 09:52:41 |
| 2 | BY MR. VERHOEVEN: | 09:52:41 |
| 3 | Q.    The next bullet -- or two bullets down, the | 09:52:44 |
| 4 | third bullet down, says, "Uber received report from | 09:52:48 |
| 5 | both forensic expert and outside counsel." | 09:52:51 |
| 6 | Do you see that? | 09:52:52 |
| 7 | A.    Yes. | 09:52:53 |
| 8 | Q.    What was the report that's being referred to | 09:52:56 |
| 9 | there? | 09:52:57 |
| 10 | MR. FLUMENBAUM:  Just limit your answer to what | 09:53:02 |
| 11 | was done at the board meeting and not what you may | 09:53:06 |
| 12 | have heard from counsel afterwards. | 09:53:08 |
| 13 | THE WITNESS:  At that moment in time, I didn't | 09:53:11 |
| 14 | know the specifics of this such report. | 09:53:16 |
| 15 | BY MR. VERHOEVEN: | 09:53:16 |
| 16 | Q.    Did you ask to see the report? | 09:53:18 |
| 17 | A.    Did not. | 09:53:20 |
| 18 | Q.    Why not? | 09:53:21 |
| 19 | A.    Once again, we were relying on the assertion | 09:53:29 |
| 20 | that was made to the board that the diligence effort | 09:53:33 |
| 21 | had been positive. | 09:53:35 |
| 22 | Q.    And who made that assertion? | 09:53:37 |
| 23 | A.    My recollection is it was Mr. Kalanick. | 09:53:39 |
| 24 | There's some chance that it was one of the deal -- one | 09:53:46 |
| 25 | of the executives that worked on the deal, like | 09:53:48 |

Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Cameron. | 09:53:49 |
| 2 | Q.   The next bullet says, "Based on our review of | 09:53:52 |
| 3 | facts, Uber decided to move forward with signing of | 09:53:55 |
| 4 | the put-call agreement." | 09:53:56 |
| 5 | Do you see that? | 09:53:58 |
| 6 | A.   Yes. | 09:53:58 |
| 7 | Q.   Is it fair that -- that whoever it was who | 09:54:04 |
| 8 | was speaking on this slide was saying -- was that they | 09:54:10 |
| 9 | had to complete this diligence report before Uber | 09:54:13 |
| 10 | could decide whether to move forward or not? | 09:54:16 |
| 11 | MR. BRILLE:  Objection to form. | 09:54:19 |
| 12 | THE WITNESS:  Ask that again.  I'm not sure I | 09:54:25 |
| 13 | understand the question. | 09:54:26 |
| 14 | BY MR. VERHOEVEN: | 09:54:26 |
| 15 | Q.   So was it your understanding that getting the | 09:54:31 |
| 16 | results of the diligence report and reviewing those | 09:54:35 |
| 17 | was a requirement before Uber would move forward and | 09:54:38 |
| 18 | sign the put-call agreement? | 09:54:41 |
| 19 | MR. BRILLE:  Object to form. | 09:54:43 |
| 20 | MR. FLUMENBAUM:  Object to form as well. | 09:54:44 |
| 21 | THE WITNESS:  I didn't have that specific point of | 09:54:51 |
| 22 | view. | 09:54:53 |
| 23 | BY MR. VERHOEVEN: | 09:54:53 |
| 24 | Q.   How did you interpret that phrase, "Based on | 09:54:55 |
| 25 | our review of the facts, Uber decided to move | 09:54:58 |

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | forward"? | 09:54:59 |
| 2 | A.   Once again, consistent with what I said many | 09:55:02 |
| 3 | times, to me that says, and it was consistent with the | 09:55:05 |
| 4 | discussion and disclosure at the meeting, that the due | 09:55:11 |
| 5 | diligence effort had been clean and that, as a result, | 09:55:14 |
| 6 | we were comfortable moving forward. | 09:55:18 |
| 7 | Q.   Okay.  So as a result of it being clean, then | 09:55:22 |
| 8 | Uber was comfortable moving forward? | 09:55:25 |
| 9 | A.   That was my -- that's my recollection. | 09:55:27 |
| 10 | Q.   So all I'm saying is that was a requirement | 09:55:29 |
| 11 | for Uber to move forward; right? | 09:55:33 |
| 12 | MR. BRILLE:  Object to form. | 09:55:34 |
| 13 | MR. FLUMENBAUM:  Object to form. | 09:55:38 |
| 14 | MR. VERHOEVEN:  You can only -- we've already | 09:55:40 |
| 15 | agreed -- | 09:55:41 |
| 16 | MR. FLUMENBAUM:  We were talking at the same time. | 09:55:43 |
| 17 | MR. BRILLE:  We're trying our best. | 09:55:45 |
| 18 | THE WITNESS:  Yeah, I'm not sure of the exact | 09:55:49 |
| 19 | wordsmith -- I'm not sure what you're trying to get at | 09:55:52 |
| 20 | that I'm not answering, but I'm open to try it again. | 09:55:57 |
| 21 | MR. FLUMENBAUM:  Can I suggest something to you, | 09:56:02 |
| 22 | Mr. -- | 09:56:02 |
| 23 | MR. VERHOEVEN:  Let's just move on. | 09:56:04 |
| 24 | MR. FLUMENBAUM:  Okay. | 09:56:04 |
| 25 | BY MR. VERHOEVEN: | 09:56:04 |

Page 67

```
 1        Q.   Under the same page, on the right-hand side,    09:56:38
 2   under the heading, "Exclusions from Indemnity," do you    09:56:42
 3   see that?                                                 09:56:43
 4        A.   Yes.                                            09:56:43
 5        Q.   The first bullet says, "If diligenced           09:56:47
 6   employees lie during forensic due diligence process       09:56:52
 7   and it's discovered later, employees will not receive     09:56:56
 8   indemnity for claims based on those untruthful acts."     09:57:00
 9        MR. BRILLE:  Objection, you read that incorrectly.   09:57:05
10   BY MR. VERHOEVEN:                                         09:57:05
11        Q.   "Facts."
12             Well, you can read it.  Have you read it?       09:57:08
13        A.   I have.                                         09:57:08
14        Q.   Okay.  What's that a reference to?              09:57:11
15        A.   I don't know if that particular bullet point    09:57:19
16   was discussed in the meeting, so it's purely my           09:57:22
17   interpretation of reading it.  But it suggests that if    09:57:27
18   the people who had gone through the diligence process,    09:57:31
19   it's later found out, were untruthful during that         09:57:34
20   process, that they will lose the indemnity.               09:57:40
21        Q.   And then the second bullet says, "If            09:57:42
22   diligenced employees commit any post-signing bad          09:57:46
23   acts," per a specific list.                               09:57:49
24             Do you see that?                                09:57:49
25        A.   Yes.                                            09:57:49
```

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.    And that's the same bad acts we talked about    09:57:52

2    before?    09:57:53

3    A.    I would presume, based on the fact that it    09:57:55

4    was mentioned in the slide before.    09:57:58

5    Q.    Did you understand that the due diligence    09:58:00

6    that the forensic expert was looking for included    09:58:05

7    pre-signing bad acts, as we've been using that term?    09:58:10

8    A.    Not at the moment in time that this deal was    09:58:17

9    approved.    09:58:17

10    Q.    What was your understanding of what the    09:58:22

11    subject of the due diligence was then?    09:58:29

12    MR. FLUMENBAUM:  Again, focused on the board    09:58:31

13    meeting.    09:58:33

14    THE WITNESS:  Consistent with what I said before,    09:58:35

15    it was only discussed generically at the meeting.    09:58:40

16    BY MR. VERHOEVEN:    09:58:40

17    Q.    So you didn't know?    09:58:44

18    MR. FLUMENBAUM:  Objection as to form.    09:58:53

19    THE WITNESS:  I would just state that we    09:58:55

20    had -- this is a rather large company that had done    09:58:58

21    numerous transactions and had a large deal team and a    09:59:02

22    large legal team and external lawyers involved.  And I    09:59:07

23    think it was -- it would be a safe presumption that    09:59:11

24    the details of that effort were done in an appropriate    09:59:17

25    way, as the board would interpret any discussion about    09:59:22

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | a particular action within the development team or the | 09:59:26 |
| 2 | marketing team or anything else. | 09:59:28 |
| 3 | BY MR. VERHOEVEN: | 09:59:28 |
| 4 | Q.   So just to close the loop, did you have an | 09:59:56 |
| 5 | understanding at the meeting of what the subject of | 09:59:58 |
| 6 | the due diligence was? | 10:00:01 |
| 7 | A.   Not a specific one, no. | 10:00:03 |
| 8 | Q.   Okay.  Do you remember anything else that was | 10:00:29 |
| 9 | discussed about the acquisition at the board meeting? | 10:00:32 |
| 10 | A.   Yes.  There was quite a bit of discussion | 10:00:40 |
| 11 | about the form of the -- of how the . . . there's a | 10:00:58 |
| 12 | lot of discussion about the fact that the cost of the | 10:01:00 |
| 13 | transaction was tied specifically to milestones. | 10:01:05 |
| 14 | There's quite a bit of discussion about that topic. | 10:01:11 |
| 15 | Q.   What do you recall -- can you tell me | 10:01:15 |
| 16 | generally what was discussed on this -- | 10:01:18 |
| 17 | A.   Sure.  So when you're entering into a | 10:01:21 |
| 18 | transaction that has a headline valuation number | 10:01:25 |
| 19 | that's large, as this one does, and a rather | 10:01:30 |
| 20 | early-stage company, that provokes questions.  And so | 10:01:35 |
| 21 | there was a lot of discussion about, you know, does it | 10:01:39 |
| 22 | really make sense -- even though there have since been | 10:01:44 |
| 23 | acqui-hires like -- in the autonomous space, like GM | 10:01:47 |
| 24 | paid a billion for Cruze.  But despite that, there | 10:01:50 |
| 25 | were a lot of discussion about whether it really made | 10:01:54 |

Page  70

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| 1 | sense to spend this amount of money for such an | 10:01:58 |
| 2 | early-stage company. | 10:01:59 |
| 3 | And the rationale that was provided to the | 10:02:01 |
| 4 | board was that the majority of the value was tied to | 10:02:06 |
| 5 | milestones.  And so if -- if the team failed to hit | 10:02:11 |
| 6 | those milestones way into the future, then there would | 10:02:16 |
| 7 | actually be no cost or minimal cost to the | 10:02:19 |
| 8 | organization -- to Uber. | 10:02:20 |
| 9 | Q.    Did you review the milestones? | 10:02:24 |
| 10 | A.    I do believe we did a cursory review of the | 10:02:31 |
| 11 | milestones.  That's my best recollection. | 10:02:34 |
| 12 | Q.    Do you remember that they were highly | 10:02:37 |
| 13 | aggressive? | 10:02:39 |
| 14 | A.    There was a discussion that if we hit those | 10:02:43 |
| 15 | milestones, it would be such a positive outcome, that | 10:02:45 |
| 16 | the cost of the transaction would look like it was | 10:02:51 |
| 17 | cheap rather than expensive because that would be so | 10:02:54 |
| 18 | good for the company if those were achieved. | 10:02:57 |
| 19 | Q.    Did anyone at the meeting express the concern | 10:03:00 |
| 20 | that the milestones weren't realistic? | 10:03:03 |
| 21 | A.    I expressed concern about milestone deals in | 10:03:08 |
| 22 | general. | 10:03:09 |
| 23 | Q.    What did you say? | 10:03:10 |
| 24 | A.    Just that it's been my experience that in -- | 10:03:12 |
| 25 | with other companies, that when you have a large group | 10:03:17 |

Page  71

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    of employees where all of their compensation is tied        10:03:21

2    to specific targets, that it's hard to get them to           10:03:24

3    focus on the objectives of the overall organization          10:03:28

4    because they get so distracted and only care about           10:03:31

5    that, and that it leads to dysfunction down the road.        10:03:36

6    And I have a specific recollection of making that            10:03:37

7    point.                                                       10:03:38

8        Q.    Was there any discussion of whether the            10:03:41

9    milestones were achievable in reality?                       10:03:44

10       A.    It's possible.  I don't have specific              10:03:55

11   recollection of that.                                        10:03:56

12       Q.    Do you recall anyone being concerned that the     10:03:58

13   timetable in the milestones was not realistic?              10:04:03

14       A.    Actually, I do have one thing.  I made            10:04:06

15   specific comments that the profitability assumptions        10:04:10

16   in the trucking deal were not realistic.  I made that       10:04:16

17   point.                                                      10:04:17

18       Q.    Okay.  And you made that to Mr. Kalanick or       10:04:21

19   to the board generally?                                     10:04:23

20       A.    I think to the board generally and certainly      10:04:26

21   at other points in time to others.                          10:04:28

22       Q.    Did you get a response to that statement at       10:04:35

23   the board meeting?                                          10:04:37

24       A.    The response that I heard was that the team       10:04:42

25   members of the trucking deal, you know, had confidence      10:04:46

Page  72

1    in them and that if they wanted to value those as    10:04:51

2    realistic, that that was their prerogative.    10:04:55

3        Q.    They took the risk?    10:04:56

4        A.    Yeah.    10:04:56

5        Q.    Did that satisfy you?  Or did you still have    10:05:04

6    a concern?    10:05:06

7        A.    Both with regard to the Otto Trucking    10:05:20

8    milestones and with regard to generic milestone deals,    10:05:25

9    that's a general perception of mine.  So I still had a    10:05:28

10   concern, which I raised.    10:05:33

11       Q.    I'm going to hand -- well, before I do that,    10:05:38

12   anything else that you remembered being discussed at    10:05:41

13   the board meeting concerning acquisition?    10:05:45

14       A.    No.    10:05:45

15       MR. VERHOEVEN:  I'm going to mark as Exhibit 911    10:06:02

16   some highly redacted minutes of special meeting of    10:06:06

17   board of directors, Uber Technologies, Inc., dated    10:06:11

18   April 11th, 2016.    10:06:13

19           (Plaintiff's Exhibit 911 was marked.)    10:06:23

20       MR. BOOCK:  Counsel, during a break -- during a    10:06:29

21   break, could you have a copy for Otto Trucking made of    10:06:33

22   the prior exhibit?  You're not passing any exhibits    10:06:38

23   down.    10:06:38

24       MR. VERHOEVEN:  I'm sorry.  I didn't know there    10:06:39

25   were going to be however many people are here.  This    10:06:39

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | is MoFo's offices.  I think maybe they could make a | 10:06:44 |
| 2 | copy for you. | 10:06:46 |
| 3 | BY MR. VERHOEVEN: | 10:06:46 |
| 4 | Q.   Do you recognize this document? | 10:06:49 |
| 5 |      First of all, I'll represent to you that | 10:06:52 |
| 6 | these big blank spaces that say "redacted" were | 10:06:57 |
| 7 | blocked out by counsel for Uber -- | 10:07:01 |
| 8 | A.   Okay. | 10:07:03 |
| 9 | Q.   -- not by us. | 10:07:05 |
| 10 | A.   Okay.  Thank you. | 10:07:07 |
| 11 | Q.   So do you recognize this document? | 10:07:09 |
| 12 | A.   Yes. | 10:07:10 |
| 13 | Q.   What is it? | 10:07:11 |
| 14 | A.   It's minutes for the board meeting that we | 10:07:15 |
| 15 | just discussed. | 10:07:16 |
| 16 | MR. VERHOEVEN:  All right.  That's all I have on | 10:07:35 |
| 17 | that. | 10:07:35 |
| 18 |      How long have we been going?  Does anyone | 10:07:42 |
| 19 | need a break? | 10:07:43 |
| 20 | MR. FLUMENBAUM:  Do you want to take a short | 10:07:45 |
| 21 | break?  We can take a short break. | 10:07:47 |
| 22 | MR. VERHOEVEN:  I'm switching subjects. | 10:07:49 |
| 23 | MR. FLUMENBAUM:  Let's take a five-minute break. | 10:07:53 |
| 24 | THE VIDEOGRAPHER:  This marks the end of DVD No. 1 | 10:07:56 |
| 25 | in the deposition of William Gurley.  We're off the | 10:07:59 |

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    record at 10:07 a.m.                              10:08:04

 2         (Recess taken.)                              10:08:04

 3         THE VIDEOGRAPHER:  Back on the record.  This is   10:21:54

 4    the beginning of DVD No. 2, and the time is 10:21 a.m.   10:21:59

 5    BY MR. VERHOEVEN:                                 10:21:59

 6         Q.   Mr. Gurley, when did you learn of the   10:22:03

 7    allegations in the complaint filed by Waymo in   10:22:07

 8    District Court in California?                     10:22:08

 9         A.   I don't have any recollection of knowing   10:22:16

10    about it prior to it being a public event.       10:22:21

11         Q.   So you learned about it from the press?   10:22:24

12         A.   It's my recollection.  There's a chance we   10:22:27

13    were notified as a board earlier, but I don't have   10:22:30

14    recollection of that.                            10:22:31

15         Q.   Did you know that this might happen?    10:22:35

16         A.   I suppose.  I mean, anybody can sue anybody,   10:22:49

17    so I guess there's a knowledge that it could happen,   10:22:52

18    but I wasn't anticipating it happening.          10:22:55

19         Q.   Did you read the complaint?            10:23:03

20         A.   I don't think I read the detailed complaint.   10:23:07

21         Q.   Did you learn what the allegations were?   10:23:10

22         MR. FLUMENBAUM:  Objection.                 10:23:11

23         And if you learned it from talking to       10:23:14

24    counsel --                                       10:23:16

25         THE WITNESS:  Right.                        10:23:18
```

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  -- just say that you can't answer | 10:23:20 |
| 2 | that question. | 10:23:21 |
| 3 | MR. VERHOEVEN:  Can we have a yes or no and then | 10:23:23 |
| 4 | he can answer if he learned it from counsel, so I know | 10:23:26 |
| 5 | if he learned about it in the first place? | 10:23:29 |
| 6 | MR. BRILLE:  Yes. | 10:23:31 |
| 7 | BY MR. VERHOEVEN: | 10:23:31 |
| 8 | Q.   Did you learn about the allegations of the | 10:23:34 |
| 9 | complaint? | 10:23:35 |
| 10 | A.   Yes. | 10:23:35 |
| 11 | Q.   And when was that? | 10:23:36 |
| 12 | A.   To the best of my recollection, around the | 10:23:39 |
| 13 | time that it was filed and went public. | 10:23:42 |
| 14 | Q.   And what was your understanding of those | 10:23:44 |
| 15 | allegations? | 10:23:45 |
| 16 | MR. FLUMENBAUM:  Do you have any understanding | 10:23:46 |
| 17 | other than through counsel? | 10:23:47 |
| 18 | THE WITNESS:  From what I've read in the press. | 10:23:50 |
| 19 | MR. FLUMENBAUM:  You want him to answer based on | 10:23:55 |
| 20 | his knowledge through the press? | 10:23:57 |
| 21 | MR. VERHOEVEN:  I want him to answer the question, | 10:24:00 |
| 22 | if he can. | 10:24:01 |
| 23 | THE WITNESS:  Based on my knowledge from reading | 10:24:02 |
| 24 | articles in the press, there were claims of trade | 10:24:07 |
| 25 | secret theft and solicitation of employees and | 10:24:14 |

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | specific accusations related to the downloading of the | 10:24:20 |
| 2 | 14,000 or so files. | 10:24:23 |
| 3 | BY MR. VERHOEVEN: | 10:24:23 |
| 4 | Q.   Did you speak with anyone at Uber about the | 10:24:27 |
| 5 | veracity of that allegation about the 14,000 files | 10:24:30 |
| 6 | being downloaded? | 10:24:32 |
| 7 | MR. FLUMENBAUM:  Can he answer yes? | 10:24:35 |
| 8 | MR. BRILLE:  He can answer yes, and then we'll | 10:24:37 |
| 9 | take it a step at a time.  Or no, as the case may be. | 10:24:45 |
| 10 | THE WITNESS:  When the company the size of Google | 10:24:49 |
| 11 | sues one of the companies you're on the board of, I'm | 10:24:52 |
| 12 | 100 percent certain that discussions ensued.  I don't | 10:24:55 |
| 13 | have specific recollection of -- a detailed | 10:24:59 |
| 14 | recollection of a specific discussion.  I'm sure there | 10:25:05 |
| 15 | were many. | 10:25:06 |
| 16 | BY MR. VERHOEVEN: | 10:25:06 |
| 17 | Q.   Did you discuss it with any nonlawyers, such | 10:25:08 |
| 18 | as perhaps, Mr. Kalanick? | 10:25:11 |
| 19 | A.   I don't recall having a specific one-on-one | 10:25:14 |
| 20 | conversation with Travis about this topic. | 10:25:20 |
| 21 | Q.   Do you remember any discussions you had where | 10:25:22 |
| 22 | there weren't lawyers in the room? | 10:25:25 |
| 23 | A.   Not specifically. | 10:25:26 |
| 24 | Q.   So you can't say one way or another whether | 10:25:31 |
| 25 | you had any conversations with -- | 10:25:33 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I think it's highly likely.  I just don't | 10:25:36 |
| 2 | recall the details of any specific conversation. | 10:25:39 |
| 3 | Q.   Tell me about what you recall about these | 10:25:41 |
| 4 | conversations. | 10:25:42 |
| 5 | MR. FLUMENBAUM:  Again, exclude anything that -- | 10:25:47 |
| 6 | THE WITNESS:  With a lawyer. | 10:25:49 |
| 7 | MR. FLUMENBAUM:  -- you had with counsel. | 10:25:50 |
| 8 | BY MR. VERHOEVEN: | 10:25:50 |
| 9 | Q.   So the question is:  Did you ask Travis or | 10:25:54 |
| 10 | anybody else at Uber about the veracity of the | 10:25:58 |
| 11 | allegations concerning Levandowski's downloading of | 10:26:03 |
| 12 | the 14,000 files? | 10:26:04 |
| 13 | A.   There were numerous discussions that involved | 10:26:07 |
| 14 | company counsel, external counsel that I presume are | 10:26:12 |
| 15 | privileged, numerous.  What I'm struggling to | 10:26:16 |
| 16 | recollect is if I had conversations with nonattorneys | 10:26:20 |
| 17 | about what you're asking, and I don't have specific | 10:26:25 |
| 18 | recollection. | 10:26:26 |
| 19 | Q.   Well, did you have any conversations -- | 10:26:31 |
| 20 | A.   Highly likely. | 10:26:32 |
| 21 | Q.   Well, what do you remember saying in those | 10:26:35 |
| 22 | circumstances? | 10:26:37 |
| 23 | MR. FLUMENBAUM:  Again, limit your answer to | 10:26:39 |
| 24 | conversations where counsel was not present, to the | 10:26:42 |
| 25 | extent you can remember those. | 10:26:44 |

Page 78

| | | |
|---|---|---|
| 1 | THE WITNESS:  I'd be reaching.  I don't have | 10:26:48 |
| 2 | specific recollection of -- it's highly likely it | 10:26:54 |
| 3 | happened because it's such a critical and meaningful | 10:26:57 |
| 4 | event.  The substantive conversations are much more | 10:27:01 |
| 5 | likely to have been with the attorneys because of the | 10:27:04 |
| 6 | nature of the event. | 10:27:05 |
| 7 | BY MR. VERHOEVEN: | 10:27:05 |
| 8 | Q.   So you're saying the only conversations you | 10:27:07 |
| 9 | can recall are with attorneys? | 10:27:09 |
| 10 | A.   Yes. | 10:27:09 |
| 11 | Q.   But you would agree that the filing of the | 10:27:25 |
| 12 | complaint was a highly critical event; right? | 10:27:35 |
| 13 | A.   Yes. | 10:27:35 |
| 14 | Q.   When did you learn -- let me back up. | 10:27:47 |
| 15 | Did there come a point when you learned that | 10:27:52 |
| 16 | Mr. Levandowski was asserting the Fifth Amendment? | 10:27:55 |
| 17 | A.   Yes. | 10:27:55 |
| 18 | Q.   And when did you learn that? | 10:27:59 |
| 19 | A.   I don't have any recollection of knowing that | 10:28:07 |
| 20 | ahead of it being general public knowledge. | 10:28:10 |
| 21 | Q.   Did you learn it from the press then? | 10:28:13 |
| 22 | A.   It's possible. | 10:28:14 |
| 23 | Q.   What was your reaction to that? | 10:28:18 |
| 24 | A.   It -- it's not a topic that I had much | 10:28:28 |
| 25 | familiarity with, so my reaction was to try to find | 10:28:32 |

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | out whether it was common or not and why it was | 10:28:34 |
| 2 | happening and, you know, what the company's response | 10:28:39 |
| 3 | should be. | 10:28:40 |
| 4 | Q.   So you weren't concerned when you read it? | 10:28:43 |
| 5 | A.   I didn't say that. | 10:28:44 |
| 6 | Q.   Were you concerned when you read it? | 10:28:47 |
| 7 | A.   I was unaware of how to react to it, and so I | 10:28:53 |
| 8 | sought knowledge to have a broader understanding of | 10:28:56 |
| 9 | it. | 10:28:57 |
| 10 | Q.   You know generally what taking the Fifth is; | 10:29:01 |
| 11 | right? | 10:29:01 |
| 12 | A.   Yeah, but I didn't have a prior knowledge as | 10:29:05 |
| 13 | to what it meant in this situation.  But then I sought | 10:29:10 |
| 14 | that out. | 10:29:11 |
| 15 | Q.   Well, you knew when you take the Fifth, | 10:29:13 |
| 16 | you're refusing to answer questions -- | 10:29:15 |
| 17 | A.   I understand. | 10:29:16 |
| 18 | Q.   -- on the ground that you might incriminate | 10:29:19 |
| 19 | yourself; right? | 10:29:21 |
| 20 | A.   I understand. | 10:29:22 |
| 21 | Q.   And you knew that at the time? | 10:29:23 |
| 22 | A.   I did.  I didn't have a -- I didn't have a | 10:29:27 |
| 23 | full understanding of the -- how unusual -- I didn't | 10:29:34 |
| 24 | have an understanding in that context, but then I did | 10:29:37 |
| 25 | shortly thereafter. | 10:29:38 |

Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And were you concerned about it? | 10:29:40 |
| 2 | A.   Yes. | 10:29:40 |
| 3 | Q.   Did you do anything about it? | 10:29:45 |
| 4 | A.   I asked a lot of questions about him doing | 10:29:51 |
| 5 | that and what the proper response from the company | 10:29:54 |
| 6 | should be. | 10:29:56 |
| 7 | Q.   And what response did you get from the | 10:29:58 |
| 8 | company? | 10:29:59 |
| 9 | MR. BRILLE:  Objection. | 10:29:59 |
| 10 | I'm going to instruct the witness that to the | 10:30:02 |
| 11 | extent it would call for you to disclose | 10:30:05 |
| 12 | attorney-client privilege communications, that you | 10:30:07 |
| 13 | exclude those from your answer. | 10:30:09 |
| 14 | MR. BOOCK:  And I would agree that Otto Trucking | 10:30:09 |
| 15 | joins in all of Uber and Otto's objections. | 10:30:19 |
| 16 | MR. FLUMENBAUM:  Can you answer that question | 10:30:19 |
| 17 | without divulging conversations that you had with | 10:30:22 |
| 18 | counsel for Uber? | 10:30:25 |
| 19 | THE WITNESS:  So as I attempted to understand the | 10:30:33 |
| 20 | situation more broadly and talked to our own | 10:30:40 |
| 21 | counsel -- | 10:30:43 |
| 22 | MR. FLUMENBAUM:  You can't talk about your own | 10:30:45 |
| 23 | counsel, conversations with your own counsel. | 10:30:48 |
| 24 | THE WITNESS:  At any rate, I came to believe that | 10:30:51 |
| 25 | the appropriate action in a situation like this would | 10:30:54 |

Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| 1 | be for the company to terminate based on taking the | 10:30:57 |
| 2 | Fifth. | 10:30:59 |
| 3 | BY MR. VERHOEVEN: | 10:30:59 |
| 4 | Q.   Okay.  And what was the time -- what was the | 10:31:03 |
| 5 | span of time from when you first read about it in the | 10:31:08 |
| 6 | press to when you came to that conclusion? | 10:31:10 |
| 7 | A.   To the best of my recollection, a couple | 10:31:17 |
| 8 | weeks. | 10:31:18 |
| 9 | Q.   And did you express that view? | 10:31:26 |
| 10 | A.   Yes. | 10:31:26 |
| 11 | Q.   To whom? | 10:31:30 |
| 12 | A.   There were some conversations with members of | 10:31:33 |
| 13 | the executive team.  I don't remember exactly who or | 10:31:36 |
| 14 | when.  There's some conversations with legal that are | 10:31:40 |
| 15 | privileged.  But I also expressed it to the board. | 10:31:45 |
| 16 | Q.   What do you remember about any discussions | 10:31:50 |
| 17 | with the executive team on this subject? | 10:31:53 |
| 18 | A.   There were members of the executive team that | 10:32:02 |
| 19 | also agreed that termination was the right course of | 10:32:06 |
| 20 | action. | 10:32:06 |
| 21 | Q.   And who were those members? | 10:32:08 |
| 22 | A.   I don't recall specifically.  I talked to a | 10:32:11 |
| 23 | lot of executive team members. | 10:32:13 |
| 24 | Q.   Were there members who did not think that | 10:32:16 |
| 25 | that was the right course of action? | 10:32:18 |

Page 82

```
 1        A.   I don't recall any.                      10:32:33

 2        Q.   Who comprised the executive team at that  10:32:38

 3   time?                                               10:32:38

 4        A.   I don't know if I'll get them all.  I think  10:32:52

 5   at that time Emil Michael was still there.  Twaun   10:32:56

 6   Pham.  Rachel Whetstone.  Liane Hornsey.  Sally Yoo, 10:33:04

 7   but Sally's on the legal team.  Jeff Holden.  Gautam 10:33:13

 8   Gupta was still there at that time, I believe.  I'm  10:33:26

 9   probably leaving somebody out.                      10:33:28

10        Q.   Was Travis on the team?                   10:33:30

11        A.   Yeah, I mean, he's CEO, so, yeah.  Jeff Jones 10:33:37

12   may have left by then.                              10:33:39

13        Q.   Did Mr. Kalanick agree, when you expressed 10:33:45

14   this to the executive team, that Mr. Levandowski    10:33:48

15   should be terminated?                               10:33:52

16        A.   I don't recall if I had a direct discussion 10:33:55

17   with him, although probably at a board level, it was 10:33:58

18   the general understanding of the team that he did not 10:34:04

19   want to terminate Anthony.                          10:34:06

20        Q.   Do you recall what the reasons -- that he  10:34:17

21   stated for why he did not --                        10:34:19

22        A.   Yeah, the statement I remember is that he  10:34:21

23   didn't do anything wrong, so why should we terminate 10:34:24

24   him?                                                10:34:25

25        Q.   And what was said in response to that?  And 10:34:32
```

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | if you can recall, who said it?  For example, did | 10:34:42 |
| 2 | someone say, then why is he taking the Fifth? | 10:34:45 |
| 3 | MR. BRILLE:  Object to form. | 10:34:47 |
| 4 | THE WITNESS:  I can certainly say that my opinion | 10:34:53 |
| 5 | at that moment in time was that his taking the Fifth | 10:34:56 |
| 6 | should result in his termination, based on my best | 10:35:02 |
| 7 | knowledge of how that situation should be dealt with. | 10:35:06 |
| 8 | BY MR. VERHOEVEN: | 10:35:06 |
| 9 | Q.   And did -- you referenced conversations with | 10:35:10 |
| 10 | the board on this subject? | 10:35:12 |
| 11 | A.   Yes. | 10:35:12 |
| 12 | Q.   How many such conversations were there? | 10:35:16 |
| 13 | A.   I can't remember specifically, but my general | 10:35:21 |
| 14 | recollection is that it spanned multiple board | 10:35:24 |
| 15 | meetings. | 10:35:31 |
| 16 | Q.   And your position to the board was that he | 10:35:34 |
| 17 | should be terminated? | 10:35:35 |
| 18 | A.   Yes. | 10:35:35 |
| 19 | Q.   And you made that clear on the first of these | 10:35:41 |
| 20 | multiple board meetings? | 10:35:43 |
| 21 | A.   Once I'd gotten up to speed and had proper | 10:35:48 |
| 22 | knowledge of what I thought was the best to do, | 10:35:55 |
| 23 | which -- as I said earlier, there was a time window | 10:35:58 |
| 24 | where that happened.  So it wasn't -- my voicing of | 10:36:06 |
| 25 | this opinion wasn't immediate, like right after he | 10:36:09 |

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | pled the Fifth.  It took me a while to ascertain the | 10:36:14 |
| 2 | right answer for this situation. | 10:36:16 |
| 3 | Q.   Did you explain to the board why you thought | 10:36:18 |
| 4 | he should be terminated? | 10:36:19 |
| 5 | A.   Yes. | 10:36:19 |
| 6 | Q.   What did you say? | 10:36:21 |
| 7 | A.   I said, based on all the research I've done, | 10:36:25 |
| 8 | that that's the appropriate action for a company at | 10:36:29 |
| 9 | this moment in time, when someone pleads the Fifth. | 10:36:32 |
| 10 | Q.   And when you say "research" that you've done, | 10:36:34 |
| 11 | can you summarize what you did? | 10:36:36 |
| 12 | A.   Well, I want to be careful.  Some of those | 10:36:38 |
| 13 | conversations were me reaching out to people who were | 10:36:41 |
| 14 | experienced on those matters, which would inherently | 10:36:45 |
| 15 | go to lawyers. | 10:36:46 |
| 16 | Q.   Can you identify the lawyers that you | 10:36:48 |
| 17 | consulted? | 10:36:49 |
| 18 | A.   Certainly Steve Spurlock, who is a lawyer | 10:36:54 |
| 19 | that works for Benchmark. | 10:36:57 |
| 20 | Q.   Any outside counsel? | 10:37:01 |
| 21 | A.   He may have reached out.  I don't know | 10:37:06 |
| 22 | specifically who he talked to. | 10:37:09 |
| 23 | MR. VERHOEVEN:  And I assume, Counsel, you'll | 10:37:12 |
| 24 | instruct if I ask about the substance of his | 10:37:15 |
| 25 | conversation? | 10:37:16 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        MR. FLUMENBAUM:  Correct.                    10:37:18

 2   BY MR. VERHOEVEN:                                 10:37:18

 3        Q.   Any other things you did to research besides  10:37:25

 4   talk to Steve Spurlock?                           10:37:33

 5        A.   Not that I have specific recollection of, but  10:37:35

 6   I'm sure I -- I did as much work as I did to come up  10:37:42

 7   to that point of view.  I just don't remember exactly  10:37:45

 8   who I talked to.                                  10:37:46

 9        Q.   Did you read the complaint?            10:37:48

10        A.   I don't have -- I don't have memory of  10:37:51

11   reading the exact complaint.  I may have, but I don't  10:37:55

12   remember.                                         10:37:55

13        Q.   Did you read the motion for preliminary  10:37:57

14   injunction?                                       10:37:58

15        A.   It's possible, but I don't recall precisely.  10:38:03

16        Q.   Do you remember reading any legal pleadings  10:38:07

17   that were filed in around the time you were doing your  10:38:10

18   research?                                         10:38:11

19        A.   I certainly made myself aware of the issues.  10:38:23

20   I just don't know if it was precisely by reading the  10:38:27

21   complaint.                                        10:38:28

22        Q.   Did you have an understanding as to why, when  10:38:31

23   someone asserts the Fifth Amendment, you thought they  10:38:34

24   should be terminated?                             10:38:36

25        MR. FLUMENBAUM:  Objection as to form.      10:38:42
```

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. VERHOEVEN: | 10:38:42 |
| 2 | Q.   Let me withdraw that. | 10:38:44 |
| 3 | Did you have an understanding as to the | 10:38:45 |
| 4 | reasons why, in these circumstances here, when | 10:38:48 |
| 5 | Mr. Levandowski asserted the Fifth Amendment, that he | 10:38:52 |
| 6 | should be terminated? | 10:38:53 |
| 7 | A.   Yeah, as I understood a couple of things, | 10:38:56 |
| 8 | one, that that was generally considered to be best | 10:39:00 |
| 9 | practice and so that's a reason in and of itself.  I | 10:39:04 |
| 10 | believe that he is required to be cooperative as part | 10:39:09 |
| 11 | of indemnity claims and that kind of thing, so this | 10:39:16 |
| 12 | is, by definition, being noncooperative. | 10:39:19 |
| 13 | And there was also -- as I'm sure you're | 10:39:34 |
| 14 | aware, there were assertions by the judge in the case | 10:39:37 |
| 15 | that suggested that he had a strong bias for that | 10:39:42 |
| 16 | action. | 10:39:43 |
| 17 | Q.   For what action? | 10:39:44 |
| 18 | A.   For terminating.  That's my interpretation of | 10:39:48 |
| 19 | it. | 10:40:04 |
| 20 | Q.   Did there come a time when you learned that | 10:40:06 |
| 21 | Mr. Levandowski did, indeed, download the 14,000 | 10:40:11 |
| 22 | files? | 10:40:12 |
| 23 | MR. BRILLE:  Object to the form. | 10:40:23 |
| 24 | THE WITNESS:  I don't have any knowledge of that | 10:40:25 |
| 25 | that wouldn't qualify for privileged conversation. | 10:40:30 |

Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. VERHOEVEN: | 10:40:30 |
| 2 | Q.   Well, yes or no? | 10:40:32 |
| 3 | MR. FLUMENBAUM:  He's answered your question.  I'm | 10:40:36 |
| 4 | going to tell him -- instruct him not to answer on the | 10:40:40 |
| 5 | basis of privilege. | 10:40:41 |
| 6 | BY MR. VERHOEVEN: | 10:40:41 |
| 7 | Q.   You had -- you learned something along those | 10:40:45 |
| 8 | lines from counsel; is that what you're saying? | 10:40:48 |
| 9 | MR. FLUMENBAUM:  Objection as to form.  And I'm | 10:40:50 |
| 10 | going to instruct him not to answer that question on | 10:40:53 |
| 11 | privilege grounds. | 10:40:55 |
| 12 | MR. BRILLE:  Same instruction. | 10:40:58 |
| 13 | MR. VERHOEVEN:  Just asking him about his state of | 10:41:01 |
| 14 | mind. | 10:41:02 |
| 15 | MR. FLUMENBAUM:  Well, you're not doing it | 10:41:04 |
| 16 | appropriately. | 10:41:04 |
| 17 | MR. VERHOEVEN:  Okay.  Tell me how to do it | 10:41:06 |
| 18 | appropriately. | 10:41:07 |
| 19 | MR. FLUMENBAUM:  First of all, you don't have a | 10:41:09 |
| 20 | time frame.  You have not excluded conversations with | 10:41:12 |
| 21 | counsel.  You have not excluded events that have | 10:41:15 |
| 22 | occurred subsequent, so -- you know. | 10:41:19 |
| 23 | MR. VERHOEVEN:  I asked him if there came a time | 10:41:21 |
| 24 | when he learned -- | 10:41:23 |
| 25 | MR. FLUMENBAUM:  Ask your question. | 10:41:24 |

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. VERHOEVEN:  Okay.  I'll repeat it. | 10:41:26 |
| 2 | BY MR. VERHOEVEN: | 10:41:26 |
| 3 | Q.   Did there come a time, Mr. Gurley, when you | 10:41:29 |
| 4 | learned that Mr. Levandowski, in fact, did download | 10:41:33 |
| 5 | the 14,000 files? | 10:41:35 |
| 6 | MR. BRILLE:  Mr. Gurley, in answering that | 10:41:37 |
| 7 | question, I'm going to instruct you not to answer the | 10:41:39 |
| 8 | question if the only way you can answer the question | 10:41:42 |
| 9 | is to divulge the content of attorney-client | 10:41:46 |
| 10 | communications. | 10:41:47 |
| 11 | THE WITNESS:  Okay. | 10:41:49 |
| 12 | MR. FLUMENBAUM:  Instruction stands. | 10:41:51 |
| 13 | MR. VERHOEVEN:  All right.  It will go on our | 10:41:53 |
| 14 | motion.  Can I ask him what time he learned it? | 10:41:57 |
| 15 | MR. FLUMENBAUM:  If he learned it. | 10:41:59 |
| 16 | BY MR. VERHOEVEN: | 10:41:59 |
| 17 | Q.   Okay.  If you learned it, can you tell me | 10:42:02 |
| 18 | approximately when you learned it? | 10:42:04 |
| 19 | MR. BRILLE:  I'm going to object to the form. | 10:42:07 |
| 20 | Same objection -- I'm going to instruct.  The question | 10:42:10 |
| 21 | is improper and seeks to elicit attorney-client | 10:42:13 |
| 22 | privileged discussions.  The way you're phrasing it is | 10:42:16 |
| 23 | the way it seeks to elicit that type of information. | 10:42:19 |
| 24 | MR. VERHOEVEN:  His counsel just suggested that. | 10:42:22 |
| 25 | MR. BRILLE:  No, he did not. | 10:42:28 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. VERHOEVEN:  I thought you said that if he | 10:42:29 |
| 2 | learned it -- | 10:42:30 |
| 3 | MR. FLUMENBAUM:  Why don't you start over and -- | 10:42:33 |
| 4 | BY MR. VERHOEVEN: | |
| 5 | Q.  If you learned that Mr. Levandowski did, | 10:42:37 |
| 6 | indeed, download the 14,000 files, when did you learn | 10:42:41 |
| 7 | it? | 10:42:41 |
| 8 | MR. BRILLE:  Object to the form of the question | 10:42:43 |
| 9 | instruct the witness not to answer.  As phrased, it is | 10:42:45 |
| 10 | designed to elicit attorney-client privileged | 10:42:48 |
| 11 | information. | 10:42:49 |
| 12 | MR. FLUMENBAUM:  Correct, I agree with that. | 10:42:52 |
| 13 | MR. VERHOEVEN:  The fact of when the board learned | 10:42:54 |
| 14 | about something? | 10:42:54 |
| 15 | MR. BRILLE:  As phrased, you are seeking to -- | 10:42:58 |
| 16 | MR. FLUMENBAUM:  You are asking questions -- now | 10:43:00 |
| 17 | you're saying the board.  That's not part of your | 10:43:03 |
| 18 | question. | 10:43:04 |
| 19 | MR. VERHOEVEN:  Okay. | 10:43:05 |
| 20 | MR. FLUMENBAUM:  Please start again. | 10:43:07 |
| 21 | BY MR. VERHOEVEN: | 10:43:07 |
| 22 | Q.  Did there come a time when the board learned | 10:43:10 |
| 23 | that Mr. Levandowski did, in fact, download the 14,000 | 10:43:13 |
| 24 | files? | 10:43:14 |
| 25 | MR. BRILLE:  Mr. Gurley, I'm going to give you the | 10:43:16 |

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | same instruction.  To the extent you can answer that | 10:43:18 |
| 2 | question without revealing the content of | 10:43:20 |
| 3 | attorney-client privileged communications, you may do | 10:43:23 |
| 4 | so; otherwise, I will instruct you not to answer. | 10:43:26 |
| 5 | BY MR. VERHOEVEN: | 10:43:26 |
| 6 | Q.   It's a yes-or-no question? | 10:43:31 |
| 7 | MR. FLUMENBAUM:  He can't answer that question as | 10:43:32 |
| 8 | worded, based on the instruction from Uber's counsel. | 10:43:37 |
| 9 | MR. VERHOEVEN:  Are you instructing him now? | 10:43:39 |
| 10 | MR. FLUMENBAUM:  Correct. | 10:43:40 |
| 11 | MR. VERHOEVEN:  Even if there's not -- he learned | 10:43:42 |
| 12 | it through a non-attorney communication? | 10:43:44 |
| 13 | MR. BRILLE:  That wasn't the instruction. | 10:43:46 |
| 14 | MR. VERHOEVEN:  So that's what I understood the | 10:43:48 |
| 15 | instruction to be, that he could answer if -- | 10:43:51 |
| 16 | MR. FLUMENBAUM:  From a non -- from -- | 10:43:56 |
| 17 | MR. VERHOEVEN:  Let me ask the question again. | 10:43:58 |
| 18 | BY MR. VERHOEVEN: | 10:43:58 |
| 19 | Q.   Did there come a time when the board learned | 10:44:01 |
| 20 | in a board meeting that Mr. Levandowski, in fact, did | 10:44:05 |
| 21 | download the 14,000 files? | 10:44:09 |
| 22 | MR. BRILLE:  Same instruction.  To the extent that | 10:44:12 |
| 23 | you can answer that question without revealing the | 10:44:14 |
| 24 | content of attorney-client privilege -- | 10:44:16 |
| 25 | THE WITNESS:  I'm not aware of a non-privileged | 10:44:19 |

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | discussion where the board shared that knowledge. | 10:44:24 |
| 2 | BY MR. VERHOEVEN: | 10:44:24 |
| 3 | Q.   Was there a privileged instance that you | 10:44:26 |
| 4 | can't talk about that exists that's responsive to my | 10:44:32 |
| 5 | question; yes or no? | 10:44:34 |
| 6 | MR. BRILLE:  As phrased, it calls for the | 10:44:35 |
| 7 | disclosure of attorney-client privileged information. | 10:44:37 |
| 8 | I instruct you not to answer at all. | 10:44:40 |
| 9 | THE WITNESS:  Understood. | 10:44:41 |
| 10 | MR. VERHOEVEN:  I'll move on.  We've got a good | 10:44:45 |
| 11 | enough record for our motion. | 10:44:46 |
| 12 | BY MR. VERHOEVEN: | 10:44:46 |
| 13 | Q.   Let's go back to discussions that we were | 10:44:52 |
| 14 | talking about at the board meeting about the Fifth | 10:44:56 |
| 15 | Amendment. | 10:44:56 |
| 16 | Do you remember that? | 10:44:58 |
| 17 | A.   Um-hum.  Yes. | 10:44:59 |
| 18 | Q.   You had described for me the statements that | 10:45:06 |
| 19 | you made generally at that meeting, or at least that | 10:45:09 |
| 20 | you can recall. | 10:45:10 |
| 21 | A.   Right. | 10:45:11 |
| 22 | Q.   What did Mr. Kalanick say in response at that | 10:45:15 |
| 23 | meeting? | 10:45:17 |
| 24 | A.   To the best of my knowledge, what he said, as | 10:45:19 |
| 25 | I've already stated to you, is that he felt that | 10:45:23 |

Page 92

| | | |
|---|---|---|
| 1 | Anthony hadn't done anything wrong and, therefore, it | 10:45:27 |
| 2 | would be unfair to terminate him for pleading the | 10:45:30 |
| 3 | Fifth. | 10:45:31 |
| 4 | Q.    Okay.   That was the answer you gave when I | 10:45:34 |
| 5 | asked about conversations with the executive team.  So | 10:45:36 |
| 6 | he said the same thing at the board meetings? | 10:45:39 |
| 7 | A.    Yes. | 10:45:39 |
| 8 | Q.    And did anyone at the board meeting ask the | 10:45:43 |
| 9 | question, then why is he asserting the Fifth Amendment | 10:45:46 |
| 10 | if he didn't do anything wrong? | 10:45:49 |
| 11 | A.    I don't know if that question was | 10:45:56 |
| 12 | specifically asked, but I wouldn't be surprised if it | 10:45:59 |
| 13 | was. | 10:45:59 |
| 14 | Q.    What discussion do you remember concerning | 10:46:04 |
| 15 | this statement that Mr. Kalanick said about him not | 10:46:08 |
| 16 | doing anything wrong? | 10:46:10 |
| 17 | A.    Nothing other than the simple statement. | 10:46:21 |
| 18 | Q.    But what do you remember, how the board | 10:46:22 |
| 19 | reacted?  Did they say -- he said he didn't do | 10:46:26 |
| 20 | anything wrong.  What did the board say in response to | 10:46:29 |
| 21 | that? | 10:46:30 |
| 22 | A.    Just because I had better recollection | 10:46:33 |
| 23 | because it was on my mind at the time, my belief was | 10:46:39 |
| 24 | that if he felt compelled to do this, that the board | 10:46:43 |
| 25 | should -- or the company should take action against | 10:46:48 |

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | him and terminate, for the reasons that I've | 10:46:50 |
| 2 | discussed. | 10:46:51 |
| 3 | Q.   Right. | 10:46:51 |
| 4 | So -- but I'm asking you specifically, at the | 10:46:54 |
| 5 | board meeting, Kalanick repeated his view -- | 10:46:59 |
| 6 | A.   Right. | 10:47:02 |
| 7 | Q.   -- that Levandowski didn't do anything | 10:47:02 |
| 8 | wrong -- | 10:47:03 |
| 9 | A.   I think I understand your question? | 10:47:06 |
| 10 | I don't remember if there were specific | 10:47:06 |
| 11 | conversations that said, well, if he didn't do | 10:47:08 |
| 12 | anything wrong, why would he plead the Fifth?  I don't | 10:47:10 |
| 13 | remember if that happened.  It might have. | 10:47:13 |
| 14 | Q.   Well, do you remember -- was there response | 10:47:15 |
| 15 | to Mr. Kalanick at the meeting, after he made that | 10:47:19 |
| 16 | statement, just generally?  There was a discussion; | 10:47:25 |
| 17 | right? | 10:47:26 |
| 18 | A.   Yeah, I think there was a discussion and I | 10:47:28 |
| 19 | think -- and I don't recall exactly who chimed in, but | 10:47:32 |
| 20 | there was others, like me, that felt that taking the | 10:47:38 |
| 21 | Fifth should be dealt with. | 10:47:40 |
| 22 | Q.   And who were those people? | 10:47:42 |
| 23 | A.   I just said I don't recall exactly who was on | 10:47:45 |
| 24 | that point of view. | 10:47:46 |
| 25 | Q.   Do you remember anyone on the board that you | 10:47:49 |

Page 94

| | | |
|---|---|---|
| 1 | can identify? | 10:47:50 |
| 2 | A.   I'd be speculating. | 10:47:56 |
| 3 | Q.   So as a result -- as a result of the first | 10:47:59 |
| 4 | meeting of the board on this subject, was anything | 10:48:05 |
| 5 | done to Mr. Levandowski? | 10:48:09 |
| 6 | A.   Not immediately. | 10:48:12 |
| 7 | Q.   Do you remember anything else that was | 10:48:20 |
| 8 | discussed about the Waymo case or Mr. Levandowski | 10:48:24 |
| 9 | during this initial meeting? | 10:48:43 |
| 10 | A.   There were generic discussions about how we | 10:48:46 |
| 11 | would respond and who would be representing that kind | 10:48:50 |
| 12 | of thing.  There were other discussions that were | 10:48:53 |
| 13 | privileged with those representatives. | 10:48:56 |
| 14 | Q.   Anything that wasn't the subject of attorney | 10:49:00 |
| 15 | advice? | 10:49:01 |
| 16 | A.   Yeah, eventually, I made the proposition to | 10:49:09 |
| 17 | the board that, in light of all the facts in the | 10:49:16 |
| 18 | situation, that we should create a special committee | 10:49:18 |
| 19 | to oversee this litigation. | 10:49:27 |
| 20 | Q.   And what was the response of the board to | 10:49:30 |
| 21 | that suggestion? | 10:49:31 |
| 22 | A.   Eventually -- it was positive, because | 10:49:35 |
| 23 | eventually the committee was created, but it took a | 10:49:40 |
| 24 | while.  There was a lot of back and forth. | 10:49:42 |
| 25 | Q.   Okay.  So at the initial meeting, it | 10:49:45 |

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   wasn't --                                          10:49:46

2       A.   I don't know if that was discussed -- there   10:49:48

3   were lots of meetings, and I don't remember exactly   10:49:50

4   which one it came up.  But somewhere along the way, I   10:49:53

5   proposed that it would be a good idea to create a    10:49:57

6   special committee.                                  10:49:58

7       Q.   And then at that meeting, whenever it was,   10:50:01

8   did you get a response to that?                     10:50:02

9       A.   It wasn't effected when it was first      10:50:06

10  proposed.                                           10:50:07

11      Q.   Okay.  Did Mr. Kalanick have a response to   10:50:09

12  that?                                               10:50:10

13      A.   Part of the reason that I was proposing that   10:50:35

14  we put the committee together was to potentially get   10:50:38

15  the authority to take the action that I had already   10:50:41

16  told you I felt was the right move for the company.   10:50:45

17  And so in light of the fact that he didn't agree with   10:50:48

18  that decision, you know, that led to a discussion   10:50:53

19  about whether this committee was the right thing to do   10:50:56

20  or not.                                             10:50:58

21      Q.   And he was against it?                     10:51:00

22      A.   It required lots of negotiations.  So      10:51:06

23  "against it" is strong because it was eventually     10:51:09

24  passed, but it wasn't -- a lot of discussion, you    10:51:15

25  know, ensued about whether it was appropriate or not.   10:51:17

Page  96

1    Q.   And which side of the discussion was he on?    10:51:19

2  For or against?    10:51:23

3    MR. FLUMENBAUM:  Objection as to form.    10:51:29

4    THE WITNESS:  I can't say equivocally that he was    10:51:38

5  100 percent against it because, once again, it ended    10:51:41

6  up being passed.  And I think that resolution was    10:51:44

7  unanimous when it was created.  But there was a lot of    10:51:48

8  discussion about whether the committee should have the    10:51:50

9  right to recommend change or effect change, those kind    10:51:55

10  of things, that went back and forth.  And that was    10:51:57

11  done probably through a lawyer.  I don't know.  So I    10:52:02

12  wasn't privy to all of the responses to someone else.    10:52:06

13  BY MR. VERHOEVEN:

14    Q.   Do you recall Mr. Kalanick saying anything on    10:52:10

15  the subject?    10:52:11

16    A.   Not other than just a general belief that I    10:52:23

17  think he understood what I wanted the end result to    10:52:28

18  be.  And so I think from that -- and he was not in    10:52:34

19  favor of that, so I think that led to discussions    10:52:37

20  about whether it made sense or not.    10:52:40

21    Q.   And on the subject of whether the committee    10:52:42

22  could make a recommendation, did he argue that the    10:52:47

23  committee should not --    10:52:49

24    A.   I don't know specifically.  Because it was    10:52:51

25  done through -- the negotiation -- you know, we were    10:52:56

Page  97

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | proposing certain language and it was negotiated.  But | 10:53:01 |
| 2 | eventually, you know, we got to where we wanted to be. | 10:53:05 |
| 3 |     Q.    Was there any discussion of whether or not | 10:53:07 |
| 4 | Mr. Kalanick should be on a special committee? | 10:53:10 |
| 5 |     A.    I think part of the reasoning for the special | 10:53:15 |
| 6 | committee was to make sure it was independent.  So the | 10:53:20 |
| 7 | opposite, that he shouldn't be on the committee. | 10:53:25 |
| 8 |     Q.    So the whole purpose was to have a committee | 10:53:28 |
| 9 | that had independent people? | 10:53:30 |
| 10 |     A.    Yes. | 10:53:30 |
| 11 |     Q.    And Mr. Kalanick was not an independent | 10:53:32 |
| 12 | person on this issue? | 10:53:34 |
| 13 |     MR. FLUMENBAUM:  Objection as to form. | 10:53:35 |
| 14 |     THE WITNESS:  I did not believe so.  I can't speak | 10:53:39 |
| 15 | for the others. | 10:53:41 |
| 16 |     MR. VERHOEVEN:  Do you have the board . . . | 10:53:59 |
| 17 | BY MR. VERHOEVEN: | |
| 18 |     Q.    Just for authentication purposes, I'm going | 10:54:35 |
| 19 | to show you a document marked as 912. | 10:54:38 |
| 20 |         (Plaintiff's Exhibit 912 was marked.) | 10:54:50 |
| 21 |     MR. FLUMENBAUM:  Can I have a copy? | 10:54:51 |
| 22 |     MR. VERHOEVEN:  Yes. | 10:54:52 |
| 23 | BY MR. VERHOEVEN: | 10:54:52 |
| 24 |     Q.    Again, the heavy redactions on this document | 10:54:59 |
| 25 | that block out the document were created by counsel | 10:55:07 |

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | for Uber, so I apologize for that. | 10:55:12 |
| 2 | Can you identify this document, to the extent | 10:55:21 |
| 3 | that it's disclosed? | 10:55:22 |
| 4 | A. It appears to be the minutes from an April | 10:55:27 |
| 5 | 10th board meeting. | 10:55:28 |
| 6 | Q. Would you have -- to the extent you can | 10:55:36 |
| 7 | recall -- we're talking about this whole conversation | 10:55:40 |
| 8 | about the Fifth Amendment and whatnot. Would that | 10:55:44 |
| 9 | have been started at least by this April 10th, 2017 | 10:55:51 |
| 10 | meeting? | 10:55:52 |
| 11 | A. I don't know. I don't think so. | 10:55:59 |
| 12 | Q. Well, I'll represent that it was public that | 10:56:03 |
| 13 | Mr. Levandowski had taken the Fifth before this time. | 10:56:07 |
| 14 | A. Okay. | 10:56:07 |
| 15 | Q. Does that change your answer? | 10:56:09 |
| 16 | A. No, because I had already mentioned to you | 10:56:12 |
| 17 | that there was -- it took me a while -- my experience | 10:56:17 |
| 18 | set of being involved in companies in this particular | 10:56:21 |
| 19 | situation is low, so it took me a while to get an | 10:56:25 |
| 20 | understanding of what I felt was the right course of | 10:56:28 |
| 21 | action. | 10:56:30 |
| 22 | Q. Do you remember any discussion about the | 10:56:35 |
| 23 | Waymo litigation on April 10th, 2017 board meeting? | 10:56:40 |
| 24 | A. I do not. | 10:56:41 |
| 25 | Q. Okay. There came a time when Uber made a | 10:56:57 |

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | decision to remove Mr. Levandowski from working in the | 10:57:03 |
| 2 | area of LiDAR. | 10:57:06 |
| 3 | Are you familiar with that? | 10:57:07 |
| 4 | A.   Um-hum. | 10:57:08 |
| 5 | Q.   "Yes"? | |
| 6 | A.   Yes. | 10:57:09 |
| 7 | Q.   Were you involved in that decision? | 10:57:14 |
| 8 | A.   The board was informed of that decision.  I | 10:57:23 |
| 9 | wouldn't say that the board was involved in that | 10:57:26 |
| 10 | decision.  I think it was a response to many of the | 10:57:36 |
| 11 | conversations that were being had about what is the | 10:57:39 |
| 12 | appropriate course of action in light of everything | 10:57:42 |
| 13 | that's happened. | 10:57:43 |
| 14 | Q.   Do you remember when that decision was made? | 10:57:46 |
| 15 | A.   I do not. | 10:57:47 |
| 16 | Q.   When the board was apprised of the decision, | 10:57:51 |
| 17 | had the decision been communicated to Levandowski yet? | 10:57:57 |
| 18 | A.   I don't know. | 10:57:58 |
| 19 | Q.   Did the board approve it or were they just | 10:58:00 |
| 20 | apprised of it after the fact? | 10:58:03 |
| 21 | A.   I don't have specific recollection.  I don't | 10:58:10 |
| 22 | think that was something that there was a -- like a | 10:58:15 |
| 23 | board vote and approval of. | 10:58:17 |
| 24 | Q.   Did you read the preliminary injunction order | 10:58:24 |
| 25 | in this case? | 10:58:25 |

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Not that I recall. | 10:58:29 |
| 2 | Q.   You became aware that there was a preliminary | 10:58:33 |
| 3 | injunction; right? | 10:58:34 |
| 4 | A.   Um-hum. | 10:58:35 |
| 5 | Q.   "Yes"? | |
| 6 | A.   Yes. | 10:58:36 |
| 7 | Q.   When did you become aware of that? | 10:58:39 |
| 8 | A.   I don't remember the specific date. | 10:58:40 |
| 9 | Q.   How did you learn about it? | 10:58:45 |
| 10 | A.   I don't know if it was through a process like | 10:58:48 |
| 11 | this or in the press.  I don't know.  I'm sure it was | 10:58:53 |
| 12 | discussed at some point in the board meeting, but with | 10:58:57 |
| 13 | lawyers present. | 10:58:59 |
| 14 | Q.   What was your reaction when you learned of | 10:59:01 |
| 15 | it? | 10:59:02 |
| 16 | A.   Just an interpretation of what Google was | 10:59:22 |
| 17 | trying to signal by making that decision, to seek an | 10:59:27 |
| 18 | injunction. | 10:59:28 |
| 19 | Q.   Did you -- were you informed of or learned of | 10:59:34 |
| 20 | the reasoning behind the decision in the public | 10:59:39 |
| 21 | opinion issued by the judge? | 10:59:41 |
| 22 | A.   State the question again. | 10:59:45 |
| 23 | Q.   Did you become aware of the reasoning | 10:59:48 |
| 24 | underlying the decision by the judge to issue a | 10:59:53 |
| 25 | preliminary injunction, which was stated in the actual | 10:59:57 |

Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | order that was public? | 10:59:58 |
| 2 | A.    I didn't have any perspectives that were | 11:00:08 |
| 3 | outside of a discussion from counsel on that topic. | 11:00:13 |
| 4 | Q.    Why didn't Uber fire Mr. Levandowski upon the | 11:00:20 |
| 5 | issuance of the preliminary injunction? | 11:00:23 |
| 6 | A.    I can't speak to that because I wasn't in a | 11:00:32 |
| 7 | position to have authority to make that decision. | 11:00:35 |
| 8 | Q.    Who was? | 11:00:36 |
| 9 | A.    Presumably Travis, the CEO. | 11:00:39 |
| 10 | Q.    So the board didn't have authority to direct | 11:00:42 |
| 11 | that -- I thought you -- withdrawn. | 11:00:46 |
| 12 | I thought you previously mentioned that you | 11:00:48 |
| 13 | had recommended that he be terminated -- | 11:00:50 |
| 14 | A.    I had.  I had. | 11:00:52 |
| 15 | Q.    -- at a board meeting. | 11:00:53 |
| 16 | A.    Yeah. | 11:00:54 |
| 17 | Q.    But the board didn't have authority to order | 11:00:56 |
| 18 | that? | 11:00:57 |
| 19 | A.    The board did not order that, if that's your | 11:01:00 |
| 20 | question. | 11:01:00 |
| 21 | Q.    But they had the authority to? | 11:01:03 |
| 22 | A.    I suppose they could have made a motion and | 11:01:06 |
| 23 | voted to do that. | 11:01:08 |
| 24 | Q.    And you encouraged the board to do that? | 11:01:11 |
| 25 | A.    I encouraged the board to terminate once I | 11:01:13 |

Page 102

| 1 | had an understanding of what my interpretation was of | 11:01:18 |
| 2 | him pleading the Fifth.  And my efforts around | 11:01:22 |
| 3 | creating the committee were my avenue to try and see | 11:01:27 |
| 4 | that through. | 11:01:27 |
| 5 | Q.   After the issuance of the preliminary | 11:01:36 |
| 6 | injunction order, did you have any discussions with | 11:01:39 |
| 7 | Mr. Kalanick about terminating Mr. Levandowski? | 11:01:42 |
| 8 | A.   Not specifically related to that event. | 11:01:47 |
| 9 | Q.   Okay.  So it didn't cause you to have any | 11:01:50 |
| 10 | more conversations with Mr. Kalanick? | 11:01:54 |
| 11 | A.   No.  But I had already determined that I | 11:01:56 |
| 12 | thought the best course of action was termination.  So | 11:01:58 |
| 13 | like I was not more compelled; I was already | 11:02:02 |
| 14 | compelled. | 11:02:04 |
| 15 | Q.   Did you discuss the preliminary injunction | 11:02:05 |
| 16 | order with Mr. Kalanick and repeat your | 11:02:09 |
| 17 | recommendation? | 11:02:10 |
| 18 | A.   Not outside of a privileged conversation, no. | 11:02:14 |
| 19 | Q.   Was there a board meeting about the | 11:02:19 |
| 20 | preliminary injunction? | 11:02:20 |
| 21 | A.   I don't remember if there was one called.  I | 11:02:23 |
| 22 | don't think so.  There were lots of board meetings at | 11:02:27 |
| 23 | this moment in time. | 11:02:29 |
| 24 | Q.   Do you recall receiving -- withdrawn. | 11:02:34 |
| 25 | Did you ask to see the due diligence report | 11:02:39 |

Page 103

| | | |
|---|---|---|
| 1 | that was referenced in the board | 11:02:42 |
| 2 | meeting -- board -- withdrawn. | 11:02:46 |
| 3 | Did you ask for the diligence report that was | 11:02:49 |
| 4 | referenced in Exhibit 910 as a result of reading the | 11:02:56 |
| 5 | preliminary injunction order? | 11:02:58 |
| 6 | MR. FLUMENBAUM:  I'll let him answer yes or no to | 11:03:00 |
| 7 | that, but I don't want that to be a waiver. | 11:03:02 |
| 8 | Will you agree to that? | 11:03:04 |
| 9 | MR. VERHOEVEN:  Agreed. | 11:03:05 |
| 10 | MR. FLUMENBAUM:  You can answer that yes or no. | 11:03:06 |
| 11 | THE WITNESS:  Yes. | 11:03:08 |
| 12 | BY MR. VERHOEVEN: | 11:03:08 |
| 13 | Q.   Did you ask for it? | 11:03:10 |
| 14 | MR. FLUMENBAUM:  Same rule? | 11:03:11 |
| 15 | MR. VERHOEVEN:  Yes. | 11:03:14 |
| 16 | BY MR. VERHOEVEN: | 11:03:14 |
| 17 | Q.   Yes or no? | 11:03:16 |
| 18 | A.   Yes. | 11:03:16 |
| 19 | Q.   Did you read it? | 11:03:18 |
| 20 | MR. FLUMENBAUM:  Again, same rule? | 11:03:20 |
| 21 | MR. VERHOEVEN:  Yes. | 11:03:21 |
| 22 | MR. FLUMENBAUM:  You can answer that yes or no. | 11:03:24 |
| 23 | THE WITNESS:  Yes. | 11:03:26 |
| 24 | BY MR. VERHOEVEN: | 11:03:26 |
| 25 | Q.   And that was around May 12th of this year? | 11:03:30 |

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  You can answer that yes or no. | 11:03:34 |
| 2 | THE WITNESS:  I don't have any notes in front of | 11:03:36 |
| 3 | me.  That sounds like it would be in the general time | 11:03:38 |
| 4 | frame, but I . . . it could be off, you know, by a | 11:03:45 |
| 5 | week or two.  I don't have the specific date. | 11:03:48 |
| 6 | BY MR. VERHOEVEN: | 11:03:48 |
| 7 | Q.   In that range? | 11:03:49 |
| 8 | A.   In that range. | 11:03:50 |
| 9 | Q.   Why did you ask for it? | 11:03:52 |
| 10 | MR. FLUMENBAUM:  Again, I'll let you answer that | 11:03:57 |
| 11 | question, but don't talk about any conversations that | 11:04:06 |
| 12 | you had with either Uber's counsel or your personal | 11:04:10 |
| 13 | counsel at this point. | 11:04:14 |
| 14 | THE WITNESS:  As I already referenced, I felt that | 11:04:22 |
| 15 | this litigation, the one we're involved in today, was | 11:04:26 |
| 16 | critical and important to the company.  Once I had | 11:04:30 |
| 17 | gotten up to speed on Anthony's decision to plead the | 11:04:35 |
| 18 | Fifth and the fact that we should be terminating, I | 11:04:39 |
| 19 | felt that it was my duty as a board member to try and | 11:04:42 |
| 20 | know as much as possible about this situation so I | 11:04:45 |
| 21 | could advise the company in the best possible way. | 11:04:54 |
| 22 | BY MR. VERHOEVEN: | 11:04:54 |
| 23 | Q.   After you read the diligence report, did you | 11:04:59 |
| 24 | take any action based on reading it?  Yes or no? | 11:05:06 |
| 25 | MR. FLUMENBAUM:  Again, no waiver; correct? | 11:05:08 |

Page 105

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. VERHOEVEN:  Correct. | 11:05:10 |
| 2 | MR. FLUMENBAUM:  You can answer that. | 11:05:15 |
| 3 | THE WITNESS:  I did not take any immediate | 11:05:30 |
| 4 | specific action related to that. | 11:05:35 |
| 5 | BY MR. VERHOEVEN: | 11:05:35 |
| 6 | Q.   What about non-immediate specific action? | 11:05:39 |
| 7 | MR. FLUMENBAUM:  Again, I don't want to have to | 11:05:54 |
| 8 | say this.  Do we have -- this whole line of | 11:05:56 |
| 9 | questioning, not going to be any argument of the | 11:05:59 |
| 10 | waiver -- | 11:05:59 |
| 11 | MR. VERHOEVEN:  Agreed.  Agreed. | 11:06:01 |
| 12 | MR. FLUMENBAUM:  Because I have to obey the waiver | 11:06:03 |
| 13 | rules here. | 11:06:04 |
| 14 | MR. VERHOEVEN:  Agreed. | 11:06:05 |
| 15 | MR. FLUMENBAUM:  Okay. | 11:06:05 |
| 16 | THE WITNESS:  I'm not aware of anything that | 11:06:29 |
| 17 | specifically ties to that investigation in terms of my | 11:06:35 |
| 18 | action. | 11:06:36 |
| 19 | BY MR. VERHOEVEN: | 11:06:36 |
| 20 | Q.   You gave a copy of the diligence report to | 11:06:39 |
| 21 | your personal counsel at Paul Weiss; right? | 11:06:43 |
| 22 | MR. FLUMENBAUM:  Again? | 11:06:45 |
| 23 | MR. VERHOEVEN:  I have a continuing agreement with | 11:06:47 |
| 24 | you. | 11:06:48 |
| 25 | MR. FLUMENBAUM:  All right. | 11:06:48 |

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yes. | 11:06:51 |
| 2 | BY MR. VERHOEVEN: | 11:06:51 |
| 3 | Q.  Why did you do that? | 11:06:52 |
| 4 | A.  I think it's consistent with what I said | 11:06:55 |
| 5 | before.  I was trying to understand the details of the | 11:07:02 |
| 6 | litigation and the situation and make sure that I was | 11:07:07 |
| 7 | as informed as I possibly could be. | 11:07:11 |
| 8 | Q.  Were you concerned -- withdrawn. | 11:07:14 |
| 9 | Did you send it to your personal lawyer to | 11:07:16 |
| 10 | make sure that you did the right things with respect | 11:07:19 |
| 11 | to this lawsuit? | 11:07:22 |
| 12 | MR. BRILLE:  Object to form. | 11:07:28 |
| 13 | THE WITNESS:  Yes. | 11:07:29 |
| 14 | BY MR. VERHOEVEN: | 11:07:29 |
| 15 | Q.  Did you send it to him to ensure that you | 11:07:33 |
| 16 | were protected from liability? | 11:07:34 |
| 17 | MR. FLUMENBAUM:  Objection.  I'm going to instruct | 11:07:35 |
| 18 | him not to answer that. | 11:07:40 |
| 19 | BY MR. VERHOEVEN: | 11:07:40 |
| 20 | Q.  Was there any other reason that you sent a | 11:07:43 |
| 21 | copy of this specific report to your personal lawyer? | 11:07:47 |
| 22 | MR. FLUMENBAUM:  Other than what he's answered? | 11:07:49 |
| 23 | MR. VERHOEVEN:  Yes. | 11:07:50 |
| 24 | THE WITNESS:  And just -- you keep saying | 11:07:56 |
| 25 | "personal."  Paul Weiss represents Benchmark, our | 11:07:59 |

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | firm.  He's not my personal lawyer. | 11:08:01 |
| 2 | BY MR. VERHOEVEN: | 11:08:01 |
| 3 | Q.   So he wasn't your personal lawyer? | 11:08:04 |
| 4 | A.   Yeah. | 11:08:05 |
| 5 | Q.   Okay.  Thanks for clarifying that. | 11:08:08 |
| 6 | The question is outstanding. | 11:08:11 |
| 7 | Was there any other reason other than what | 11:08:14 |
| 8 | you testified to -- | 11:08:15 |
| 9 | A.   No. | 11:08:16 |
| 10 | Q.   And then you gave a copy to | 11:08:21 |
| 11 | Shearman & Sterling; is that right? | 11:08:23 |
| 12 | A.   It's possible. | 11:08:30 |
| 13 | Q.   Why would you give a copy to | 11:08:33 |
| 14 | Shearman & Sterling? | 11:08:34 |
| 15 | A.   They had been hired to represent the | 11:08:36 |
| 16 | independent committee that had been put together. | 11:08:40 |
| 17 | Q.   I see. | 11:08:40 |
| 18 | MR. VERHOEVEN:  Can I get . . . . | 11:09:05 |
| 19 | Let's mark as Exhibit 913 a copy of board | 11:09:24 |
| 20 | minutes dated May 15th, 2017. | 11:09:28 |
| 21 | (Plaintiff's Exhibit 913 was marked.) | 11:09:47 |
| 22 | BY MR. VERHOEVEN: | 11:09:47 |
| 23 | Q.   Can you identify this, again, | 11:09:49 |
| 24 | redacted-by-Uber document? | 11:09:52 |
| 25 | (Witness reviews document.) | 11:10:16 |

Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Okay. | 11:10:16 |
| 2 | Q.   Can you identify that for me. | 11:10:18 |
| 3 | A.   It's the minutes from a May 15th board | 11:10:21 |
| 4 | meeting of Uber. | 11:10:23 |
| 5 | Q.   And you attended that meeting; right? | 11:10:25 |
| 6 | A.   Yes. | 11:10:25 |
| 7 | Q.   And one of the subjects discussed at that | 11:10:29 |
| 8 | meeting was a report on the Waymo litigation? | 11:10:33 |
| 9 | A.   Correct. | 11:10:35 |
| 10 | MR. VERHOEVEN:  And I assume, Counsel, that if I | 11:10:39 |
| 11 | ask any questions about the substance of that report, | 11:10:41 |
| 12 | you'll instruct the witness not to answer? | 11:10:43 |
| 13 | MR. FLUMENBAUM:  That's correct.  Based on Uber | 11:10:48 |
| 14 | taking the Fifth on that. | 11:10:49 |
| 15 | MR. VERHOEVEN:  Oh, it's their fault. | 11:10:52 |
| 16 | MR. FLUMENBAUM:  It's no one's fault.  It's either | 11:10:54 |
| 17 | privileged or it's not privileged. | 11:10:57 |
| 18 | BY MR. VERHOEVEN: | 11:10:57 |
| 19 | Q.   If you turn to the second page, Mr. Gurley. | 11:10:59 |
| 20 | A.   Yes. | 11:11:01 |
| 21 | Q.   You see it says, "The board then further | 11:11:04 |
| 22 | discussed the impact on the company of continuing to | 11:11:09 |
| 23 | employ Mr. Levandowski"? | 11:11:11 |
| 24 | Do you see that? | 11:11:12 |
| 25 | A.   Yes. | 11:11:12 |

Page 109

1   Q.   Can you describe for me that discussion.              11:11:15

2   A.   I think it's consistent with what we've              11:11:19

3   already discussed before, which is, there was a           11:11:27

4   growing, I think, consensus that the appropriate          11:11:33

5   action to take in this situation was termination.         11:11:36

6   Q.   Did termination occur after this meeting?            11:11:42

7   I'm sorry.                                                 11:11:43

8        Did termination occur as a result of this            11:11:46

9   meeting?                                                   11:11:47

10  A.   I don't think so.                                     11:11:48

11  Q.   Why not?                                              11:11:49

12  A.   I don't recall exactly why not, but I know in        11:11:55

13  my -- I know specifically that the committee was          11:12:01

14  formed prior to the termination.                          11:12:05

15  Q.   Okay.                                                 11:12:06

16  A.   And I think the committee was formed after          11:12:10

17  this.  I seem to recall, I should say.                     11:12:12

18  Q.   Is it fair to say that, at this point in            11:12:15

19  time, Mr. Kalanick was aggressively trying to block       11:12:19

20  efforts to terminate Mr. Levandowski?                     11:12:22

21  MR. BRILLE:  Object to form.                              11:12:25

22  THE WITNESS:  I can't assert -- I can't qualify           11:12:30

23  the aggressive part, but it is my interpretation that     11:12:34

24  he was not in favor of termination.                       11:12:38

25  BY MR. VERHOEVEN:                                          11:12:38

Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Was he trying to block it? | 11:12:41 |
| 2 | A.   I would say he was arguing that we should | 11:12:47 |
| 3 | not. | 11:12:48 |
| 4 | Q.   He was the lead person arguing that; right? | 11:12:51 |
| 5 | A.   From my perspective, correct. | 11:12:54 |
| 6 | Q.   Was there anyone else on the board arguing | 11:12:56 |
| 7 | that at this point in time? | 11:12:58 |
| 8 | A.   I do not recall anyone else having a strong | 11:13:02 |
| 9 | opinion of that on that side of the argument. | 11:13:05 |
| 10 | Q.   What about prior board meetings?  Did anyone | 11:13:09 |
| 11 | other than Mr. Levandowski [sic] argue that | 11:13:13 |
| 12 | termination was inappropriate -- | 11:13:15 |
| 13 | MR. FLUMENBAUM:  Objection as to form. | 11:13:17 |
| 14 | BY MR. VERHOEVEN: | 11:13:17 |
| 15 | Q.   -- at the board meetings? | 11:13:19 |
| 16 | MR. FLUMENBAUM:  Objection as to form. | 11:13:21 |
| 17 | I think you misspoke. | 11:13:22 |
| 18 | BY MR. VERHOEVEN: | 11:13:22 |
| 19 | Q.   Oh.  Thank you. | 11:13:25 |
| 20 | What about other prior board meetings?  Did | 11:13:27 |
| 21 | anyone other than Mr. Kalanick argue that termination | 11:13:30 |
| 22 | was inappropriate? | 11:13:32 |
| 23 | A.   Not that I'm aware of. | 11:13:34 |
| 24 | Q.   At this point in time, of this board meeting, | 11:13:44 |
| 25 | Mr. Levandowski was refusing to cooperate with Uber; | 11:13:49 |

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    right?                                             11:13:49

 2        A.   That is my interpretation of the pleading the   11:13:54

 3    Fifth.                                             11:13:56

 4        Q.   So yes?                                   11:13:57

 5        A.   Yes.                                      11:13:57

 6        Q.   And he had been refusing to cooperate from   11:14:01

 7    the beginning of the complaint all the way through   11:14:04

 8    this point; right?                                 11:14:05

 9        MR. FLUMENBAUM:  Objection as to form.         11:14:12

10        THE WITNESS:  I didn't have specific conversations   11:14:15

11    with him.  I don't even know if I ever have.  And so   11:14:19

12    my interpretation of the noncooperation started with   11:14:23

13    the pleading of the Fifth.                         11:14:25

14    BY MR. VERHOEVEN:                                  11:14:25

15        Q.   Okay.                                     11:14:26

16        A.   That's the only knowledge I have.         11:14:28

17        Q.   All right.  So I think I may have asked this,   11:14:38

18    but let me just try it:  This reference about       11:14:42

19    discussing the further impact of the company, was   11:14:45

20    anything new discussed at this meeting than what    11:14:48

21    you've already testified to?                       11:14:50

22        A.   There were discussions about whether, you   11:14:57

23    know, him leaving would impact employee morale or   11:15:06

24    retention within the group that he was leading.  That   11:15:09

25    even was discussed in the decision to move him, you   11:15:15
```

                                                Page 112

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    know, into a different role at the company.  And so          11:15:18

2    there were a lot of discussions about that topic.            11:15:21

3        Q.   Can you summarize those discussions for me,         11:15:24

4    as best you recall?                                          11:15:26

5        A.   Sure.  There were arguments made that a lot         11:15:29

6    of the people that worked in his department were loyal       11:15:35

7    to him and that if he were terminated, we might have a       11:15:38

8    retention problem in the autonomous.  There were other       11:15:42

9    people that had different points of view on that.            11:15:44

10       Q.   And which people had different points of            11:15:47

11   view?                                                        11:15:48

12            Let me withdraw that.                               11:15:49

13            Who was making that argument?  Was it               11:15:51

14   Mr. Kalanick?                                                11:15:52

15       A.   Yes.                                                11:15:52

16       Q.   Anyone else?                                        11:15:54

17       A.   It's possible.  It's possible.  I don't            11:16:00

18   recall, but it's possible that someone on the HR team        11:16:04

19   or something else might have validated that point of         11:16:07

20   view.                                                        11:16:08

21       Q.   Did anyone on the board argue in favor of          11:16:10

22   that point of view?                                          11:16:12

23       A.   Not -- not in any meaningful way.                   11:16:19

24       Q.   Did you respond to that in any of these            11:16:22

25   meetings?                                                    11:16:23

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   To that assertion? | 11:16:24 |
| 2 | Q.   Yeah. | 11:16:26 |
| 3 | A.   It's possible -- yeah, I think I made the | 11:16:39 |
| 4 | point that if someone, you know, retains loyalty to | 11:16:44 |
| 5 | someone who is pleading the Fifth in a situation like | 11:16:47 |
| 6 | this, it may not be the type of employees that we want | 11:16:50 |
| 7 | to retain anyway. | 11:16:52 |
| 8 | Q.   Was there any discussion about what happens | 11:17:00 |
| 9 | with respect to compensation if Mr. Levandowski is | 11:17:05 |
| 10 | removed from LiDAR and/or terminated?  When I say | 11:17:12 |
| 11 | "compensation," I mean both him and his team. | 11:17:15 |
| 12 | A.   Not at that moment in time. | 11:17:18 |
| 13 | Q.   Not at the May 15th? | 11:17:22 |
| 14 | A.   Right. | 11:17:22 |
| 15 | Q.   What impact was discussed that | 11:17:28 |
| 16 | would -- withdrawn. | 11:17:30 |
| 17 | This sentence here refers to, quote, "Board | 11:17:33 |
| 18 | then further discussed the impact on the company of | 11:17:39 |
| 19 | continuing to employ Mr. Levandowski." | 11:17:42 |
| 20 | What do you remember about the discussion of | 11:17:44 |
| 21 | what the impact on the company would be if he wasn't | 11:17:48 |
| 22 | terminated? | 11:17:49 |
| 23 | A.   If he wasn't terminated -- yeah, so this I | 11:17:52 |
| 24 | think relates to something we also discussed.  There | 11:17:55 |
| 25 | was -- it's kind of circular since we're still | 11:17:59 |

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   involved in that litigation at this very moment in      11:18:03
 2   time, but it's fairly obvious that the judge had        11:18:06
 3   strong opinions about our nontermination of Anthony.    11:18:10
 4   And so you're making -- you're having discussions       11:18:14
 5   about the risk of that calculation and also --          11:18:16
 6       MR. FLUMENBAUM:  I don't want you to discuss        11:18:18
 7   anything legally --                                     11:18:21
 8       THE WITNESS:  I think that was discussed -- I       11:18:23
 9   think that was discussed generally, but that would be   11:18:26
10   the line of reasoning.                                  11:18:27
11   BY MR. VERHOEVEN:                                       11:18:27
12       Q.   That there might be adverse legal             11:18:32
13   consequences?                                           11:18:33
14       A.   Sure.                                          11:18:34
15       Q.   Any other impacts discussed?                   11:18:36
16       A.   It's possible we discussed negative corporate  11:18:39
17   image impact.                                           11:18:42
18       Q.   And what was discussed about that?             11:18:44
19       A.   I'd go back to what I stated earlier.  If the  11:18:49
20   general expectation of best practice in an area is to   11:18:53
21   terminate and you're not, it's going to infer           11:18:57
22   reflection to the external world on why you're acting   11:19:01
23   in a way that's inconsistent with best practice.        11:19:04
24       Q.   And by that you mean the internal world would  11:19:08
25   think that's not appropriate?                           11:19:09
```

Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A.    External world.                              11:19:09

2    Q.    External world?                              11:19:12

3    A.    Correct.

4    Q.    Let me ask it so we get a clear record.      11:19:12

5          By that statement, you mean that the external 11:19:15

6    world would think that's not appropriate?         11:19:18

7    A.    Correct.                                     11:19:18

8    Q.    And that would have a negative impact on --  11:19:21

9    A.    Could have, yes.                             11:19:22

10   Q.    Let me finish the question.                  11:19:23

11         That would have a negative impact on the     11:19:26

12   company's image?                                   11:19:28

13       MR. FLUMENBAUM:  Objection as to form.         11:19:29

14       THE WITNESS:  Yeah.  I would just state it in my 11:19:32

15   own words, which is, it could be having a negative 11:19:35

16   impact.  Hard to prove, but something that was of  11:19:39

17   concern, yes.                                      11:19:41

18   BY MR. VERHOEVEN:                                  11:19:41

19   Q.    Okay.  Anything else on the subject of the   11:19:43

20   impact to the company to continue to employ        11:19:46

21   Mr. Levandowski that you can recall?               11:19:48

22   A.    No.                                          11:19:48

23   Q.    The end result of this meeting was that the  11:19:57

24   board decided that -- to not terminate him at that 11:20:01

25   point in time; right?                              11:20:02

                                            Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      A.   I believe that's correct.  I don't         11:20:04

 2   have -- there were several board meetings around this   11:20:07

 3   moment in time.  And eventually one of them, there was   11:20:09

 4   termination, not far from this date.  The only         11:20:16

 5   sequencing, as I said, that I'm certain of is that     11:20:19

 6   there was a board meeting where the committee was       11:20:23

 7   created.  And then at the very next board meeting, at   11:20:26

 8   the start of the meeting, Travis recommended            11:20:29

 9   terminating Anthony.                                    11:20:31

10      Q.   Before the special committee was set up?       11:20:36

11      A.   After.                                          11:20:37

12      Q.   Okay.                                           11:20:38

13      MR. VERHOEVEN:  Let's mark as Exhibit 914 minutes    11:20:49

14   of a meeting of board of directors of Uber dated May    11:20:53

15   22nd, 2017.                                             11:20:55

16          (Plaintiff's Exhibit 914 was marked.)           11:21:14

17   BY MR. VERHOEVEN:                                       11:21:14

18      Q.   Take a second and look at that.                11:21:16

19          My first question will be, can you identify     11:21:19

20   this document?                                          11:21:19

21      A.   This is the minutes of the May 22nd meeting    11:21:25

22   of Uber Technologies.                                   11:21:29

23      Q.   Before we get into the document, let me just   11:21:32

24   ask you:  Typically how often does the board meet for  11:21:38

25   Uber, the Uber board meet?                              11:21:41
```

Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Prior to 2017, the Uber board met | 11:21:50 |
| 2 | predominantly quarterly. | 11:21:53 |
| 3 | Q.   Once a quarter? | 11:21:54 |
| 4 | A.   Yes. | 11:21:54 |
| 5 | Q.   And did that change in 2017? | 11:21:57 |
| 6 | A.   Yes. | 11:21:57 |
| 7 | Q.   Why? | 11:21:59 |
| 8 | A.   There were numerous issues that were of | 11:22:04 |
| 9 | importance that were impacting the company that | 11:22:07 |
| 10 | resulted in the board taking more frequent board | 11:22:11 |
| 11 | meetings, including the Waymo litigation. | 11:22:14 |
| 12 | Q.   Okay.  So this is -- this reflects the | 11:22:18 |
| 13 | minutes of a May 22 board meeting; right? | 11:22:21 |
| 14 | A.   Correct. | 11:22:21 |
| 15 | Q.   And is this the meeting in which the special | 11:22:27 |
| 16 | committee on the Waymo dispute was created? | 11:22:30 |
| 17 | A.   Correct. | 11:22:30 |
| 18 | Q.   You were at this meeting? | 11:22:34 |
| 19 | A.   It says I was by telephone. | 11:22:36 |
| 20 | Q.   Were you the one who suggested the creation | 11:22:40 |
| 21 | of a special committee? | 11:22:42 |
| 22 | A.   That is my belief, yes.  The original -- | 11:22:43 |
| 23 | Q.   And we already talked about -- | |
| 24 | A.   -- idea for it, yes. | 11:22:47 |
| 25 | Q.   Sorry about that. | 11:22:48 |

Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | We already talked about the back-and-forth on | 11:22:52 |
| 2 | that discussion; right? | 11:22:53 |
| 3 | A.   Right. | 11:22:53 |
| 4 | Q.   Is there anything, looking at this document, | 11:22:56 |
| 5 | that you remember in addition to what you've already | 11:22:58 |
| 6 | talked about? | 11:22:59 |
| 7 | A.   No.  Simply that the appendix is the | 11:23:05 |
| 8 | resolution that was passed. | 11:23:08 |
| 9 | Q.   You see, in the paragraph under letter 1, the | 11:23:15 |
| 10 | second-to-last sentence says, "The board had a lengthy | 11:23:22 |
| 11 | discussion regarding the creation of such special | 11:23:25 |
| 12 | committee during which each member of the board | 11:23:28 |
| 13 | contributed"? | 11:23:29 |
| 14 | Do you see that? | 11:23:30 |
| 15 | A.   Yes. | 11:23:31 |
| 16 | Q.   Do you remember what any of these board | 11:23:39 |
| 17 | members said at this meeting? | 11:23:41 |
| 18 | A.   I don't remember a particular member having a | 11:23:56 |
| 19 | specific point of view other than my own.  There were | 11:23:59 |
| 20 | discussions that relate to the wording that ended up | 11:24:04 |
| 21 | in the proposition -- or in the resolution about | 11:24:07 |
| 22 | whether a committee should have the ability to take | 11:24:11 |
| 23 | action or direct action and whether it was appropriate | 11:24:15 |
| 24 | for a board to step into that role or not and whether | 11:24:20 |
| 25 | they were impeding on the rights of management in | 11:24:22 |

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | doing so.  And that has been part of the spirited | 11:24:27 |
| 2 | discussion around the back-and-forth on the | 11:24:29 |
| 3 | resolution. | 11:24:30 |
| 4 | Q.   Mr. Kalanick was against the committee having | 11:24:33 |
| 5 | the authority; correct? | 11:24:34 |
| 6 | A.   That is my recollection. | 11:24:36 |
| 7 | Q.   And the discussion was spirited? | 11:24:38 |
| 8 | A.   Yes. | 11:24:39 |
| 9 | Q.   What do you mean by that? | 11:24:42 |
| 10 | A.   People had strong points of view, including | 11:24:47 |
| 11 | myself. | 11:24:50 |
| 12 | Q.   Was a vote taken? | 11:24:56 |
| 13 | A.   I believe this was past unanimously.  That's | 11:25:05 |
| 14 | my recollection.  Does this say? | 11:25:08 |
| 15 | MR. FLUMENBAUM:  Can I guide him to where it says? | 11:25:11 |
| 16 | MR. VERHOEVEN:  Yes. | 11:25:13 |
| 17 | MR. FLUMENBAUM:  It says in the first paragraph. | 11:25:15 |
| 18 | THE WITNESS:  Yeah, unanimous.  That was my . . . | 11:25:18 |
| 19 | BY MR. VERHOEVEN: | 11:25:18 |
| 20 | Q.   So why did Mr. Kalanick -- he was a board | 11:25:23 |
| 21 | member at the time, Mr. Kalanick; right? | 11:25:24 |
| 22 | A.   Correct. | 11:25:24 |
| 23 | Q.   Why did he vote for it? | 11:25:27 |
| 24 | A.   You would have to ask him.  I did state | 11:25:29 |
| 25 | earlier that eventually he came around and agreed to | 11:25:34 |

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   this.                                                          11:25:44

2        Q.   So this special committee was authorized to         11:25:50

3   investigate the issues relating to the Waymo dispute,         11:25:54

4   make findings and recommendations to the board, among        11:25:58

5   other things?                                                 11:25:59

6        A.   Yes.                                                 11:25:59

7        Q.   Did the special committee make findings?            11:26:05

8        A.   As we were getting the special committee set        11:26:15

9   up, employing counsel for this -- yeah, I mean,               11:26:20

10  eventually there were several meetings of this special        11:26:23

11  committee.  I've left the board, so I don't know              11:26:27

12  what's continuing to happen there.  And obviously it          11:26:30

13  relates to this litigation, but, yes, there have been         11:26:32

14  lots of meetings of the committee.                            11:26:35

15       Q.   So by this date, you had left the board?            11:26:44

16       A.   No.                                                 11:26:44

17       Q.   Okay.                                                11:26:45

18       A.   No.  No.  No.  But this was just -- the             11:26:49

19  committee hadn't met.  The committee was formed.             11:26:52

20       Q.   I see.                                               11:26:52

21            By the time that any findings or                    11:26:55

22  recommendations -- well, let me put it a different            11:26:58

23  way.                                                          11:26:59

24            No findings and recommendations had been made       11:27:01

25  before you left the board, or had they?                       11:27:05

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A.    I'd say -- well, I mean, none . . . the    11:27:16

2   initial impetus of pushing to have this created was to    11:27:22

3   ensure that we made the right decision around    11:27:25

4   termination.   And prior to this committee getting off    11:27:29

5   the ground and acting in the next board meeting,    11:27:33

6   Travis recommended that action.   Since then, this    11:27:38

7   committee went on and existed and met frequently to    11:27:44

8   discuss this very litigation, but all those    11:27:47

9   conversations would be privileged.    11:27:48

10       MR. VERHOEVEN:  Our thing went down.  How long    11:27:52

11   have we been going?    11:27:54

12       THE VIDEOGRAPHER:  An hour and six minutes.    11:27:56

13       MR. VERHOEVEN:  Well, let's just keep going then.    11:28:01

14   BY MR. VERHOEVEN:    11:28:01

15       Q.   You said Travis made that recommendation in    11:28:03

16   your last answer.  I'm just not clear what you meant    11:28:06

17   by that.    11:28:07

18       A.   At the next board meeting after this, at the    11:28:10

19   beginning of the meeting, Travis started by    11:28:12

20   recommending the termination of Anthony, before the    11:28:16

21   committee got off and going.    11:28:18

22       Q.   I see.    11:28:18

23        So it's your belief that the board -- or    11:28:21

24   excuse me.    11:28:22

25        Is it your belief that the special committee    11:28:28

Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | never made formal findings and recommendations? | 11:28:31 |
| 2 | A.   No, I didn't say that. | 11:28:33 |
| 3 | Q.   Okay.   What you're saying is that the | 11:28:36 |
| 4 | decision on termination had been made before they made | 11:28:39 |
| 5 | any findings and recommendations? | 11:28:41 |
| 6 | A.   Correct. | 11:28:41 |
| 7 | Q.   And by the time you left, they hadn't made | 11:28:45 |
| 8 | any formal findings and recommendations otherwise? | 11:28:52 |
| 9 | A.   I don't have any answer -- I don't have | 11:28:53 |
| 10 | anything to convey on that that would be outside of | 11:28:56 |
| 11 | privilege. | 11:28:58 |
| 12 | Q.   Well, yes or no, did they make any findings | 11:29:00 |
| 13 | and recommendations? | 11:29:01 |
| 14 | A.   "Findings" is a very generic term. | 11:29:07 |
| 15 | Q.   I'm just reading off of the -- | 11:29:09 |
| 16 | A.   Yeah.   Yeah.   I'm certain that they made | 11:29:12 |
| 17 | findings. | 11:29:13 |
| 18 | Q.   Did they make those in writing? | 11:29:17 |
| 19 | A.   I do not know. | 11:29:19 |
| 20 | Q.   How was the members of the special committee | 11:29:42 |
| 21 | chosen? | 11:29:45 |
| 22 | A.   There's a common refrain in many of these | 11:29:53 |
| 23 | committees that the three people that ended up on them | 11:29:59 |
| 24 | were the same, which were me and David Bonderman and | 11:30:02 |
| 25 | Arianna Huffington, which were the same of some of the | |

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | other committees.  And it was a result of deemed | 11:30:08 |
| 2 | independence and, I think, availability. | 11:30:13 |
| 3 | And so two of the board members were | 11:30:16 |
| 4 | cofounders -- early employees and/or cofounders, | 11:30:21 |
| 5 | Garrett and Ryan.  So they typically weren't | 11:30:25 |
| 6 | considered independent for these types of committees. | 11:30:27 |
| 7 | Q.   Okay. | |
| 8 | A.   Yasir had just joined, but lives in Saudi | 11:30:31 |
| 9 | Arabia so it's difficult for him to be present.  And | 11:30:36 |
| 10 | so the end result of those things is that most of | 11:30:39 |
| 11 | these committees had those three people, including | 11:30:43 |
| 12 | myself. | 11:30:44 |
| 13 | Q.   Okay.  As part of the special committee, did | 11:30:58 |
| 14 | you conduct any interviews with Uber employees or | 11:31:03 |
| 15 | officers? | 11:31:05 |
| 16 | A.   I'm not aware of the committee conducting | 11:31:12 |
| 17 | direct interviews, no. | 11:31:15 |
| 18 | Q.   You see -- if you would turn to page with the | 11:31:19 |
| 19 | 503 on the back of the control number. | 11:31:25 |
| 20 | If you look at that, "The board expressly | 11:31:30 |
| 21 | delegates to the special committee the authority to | 11:31:33 |
| 22 | conduct interviews"? | 11:31:34 |
| 23 | A.   Understood. | 11:31:35 |
| 24 | Q.   Does that refresh your recollection? | 11:31:37 |
| 25 | A.   No.  No.  I understand that they had the | 11:31:39 |

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | authority.  I'm unaware of any direct interviews | 11:31:43 |
| 2 | conducted by the committee to an employee. | 11:31:48 |
| 3 | Q.   Under Item 1 -- | 11:31:50 |
| 4 | A.   I mean, other than legal conversations, where | 11:31:53 |
| 5 | you're asking a lawyer about the case, but not | 11:31:56 |
| 6 | interviewing a non-legal executive for the purpose of | 11:32:02 |
| 7 | investigation, not direct. | 11:32:04 |
| 8 | Q.   Okay.  What about interviews of Stroz? | 11:32:09 |
| 9 | A.   I'm unaware of any. | 11:32:12 |
| 10 | Q.   And under Item 1? | 11:32:15 |
| 11 | A.   I'm unaware of any -- of any direct from a | 11:32:19 |
| 12 | committee member. | 11:32:20 |
| 13 | Q.   Did somebody interview Stroz? | 11:32:25 |
| 14 | A.   I don't know.  Possible. | 11:32:26 |
| 15 | Q.   And then just to follow up on your earlier | 11:32:28 |
| 16 | answer, on Item 1 on this page, the committee retained | 11:32:33 |
| 17 | Shearman & Sterling? | 11:32:38 |
| 18 | A.   Correct. | 11:32:39 |
| 19 | Q.   As a result of this meeting, I take it the | 11:32:59 |
| 20 | decision to terminate Mr. Levandowski has still not | 11:33:03 |
| 21 | been made? | 11:33:04 |
| 22 | A.   That is correct. | 11:33:05 |
| 23 | Q.   As of this time, May 22, 2017, was the board | 11:33:18 |
| 24 | aware of the veracity of the claim of whether | 11:33:22 |
| 25 | Mr. Levandowski had improperly downloaded files? | 11:33:28 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  Objection. | 11:33:29 |
| 2 | MR. BRILLE:  Objection. | 11:33:29 |
| 3 | MR. FLUMENBAUM:  You want to exclude counsel from | 11:33:31 |
| 4 | any discussions with the board?  I can't let him | 11:33:39 |
| 5 | answer that question as worded. | 11:33:43 |
| 6 | MR. VERHOEVEN:  So you're instructing him on just | 11:33:45 |
| 7 | general statements -- | 11:33:47 |
| 8 | MR. FLUMENBAUM:  No, on privilege. | 11:33:49 |
| 9 | BY MR. VERHOEVEN: | 11:33:49 |
| 10 | Q.   As of May 22, had the board received -- this | 11:34:08 |
| 11 | is a yes or no. | 11:34:08 |
| 12 | As of May 22, had the board received any | 11:34:13 |
| 13 | report on the veracity of the allegation that | 11:34:16 |
| 14 | Mr. Levandowski had downloaded 14,000 files? | 11:34:25 |
| 15 | MR. FLUMENBAUM:  I'm going to instruct him not to | 11:34:27 |
| 16 | answer that question as worded, based on privilege. | 11:34:33 |
| 17 | MR. VERHOEVEN:  Is there a way I could word it | 11:34:36 |
| 18 | that you would say is not privileged? | 11:34:38 |
| 19 | MR. FLUMENBAUM:  Other than either documents | 11:34:44 |
| 20 | received that are still claimed to be privileged in | 11:34:48 |
| 21 | this situation, did the board receive any reports from | 11:34:54 |
| 22 | anyone other than counsel, and then your . . . | 11:34:58 |
| 23 | MR. VERHOEVEN:  Okay. | 11:34:59 |
| 24 | BY MR. VERHOEVEN: | |
| 25 | Q.   Can you answer that question? | 11:35:00 |

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  I think you have to rephrase it. | 11:35:03 |
| 2 | MR. VERHOEVEN:  I don't want to make a mistake. | 11:35:05 |
| 3 | Let me reread what you said then. | 11:35:07 |
| 4 | BY MR. VERHOEVEN: | 11:35:07 |
| 5 | Q.   Other than either documents received that are | 11:35:14 |
| 6 | still claimed to be privileged in this situation, did | 11:35:17 |
| 7 | the board receive any reports from anyone other than | 11:35:20 |
| 8 | counsel with respect to the download of the 14,000 | 11:35:25 |
| 9 | files? | 11:35:26 |
| 10 | A.   No. | 11:35:27 |
| 11 | Q.   And this is a yes or no. | 11:35:33 |
| 12 | Did the board receive a report from counsel | 11:35:36 |
| 13 | on that subject matter? | 11:35:38 |
| 14 | MR. FLUMENBAUM:  Instruction not to answer. | 11:35:41 |
| 15 | BY MR. VERHOEVEN: | 11:35:41 |
| 16 | Q.   As of May 22, did the board have any | 11:35:48 |
| 17 | information, any factual information, not legal | 11:35:52 |
| 18 | advice, but factual information about the allegation | 11:35:57 |
| 19 | that Mr. Levandowski had downloaded 14,000 files? | 11:36:01 |
| 20 | MR. FLUMENBAUM:  Instruction not to answer. | 11:36:03 |
| 21 | BY MR. VERHOEVEN: | 11:36:03 |
| 22 | Q.   As of this date, did the board know one way | 11:36:15 |
| 23 | or the other whether Stroz had documents that | 11:36:24 |
| 24 | Mr. Levandowski had taken from Google? | 11:36:27 |
| 25 | MR. FLUMENBAUM:  Instruction not to answer. | 11:36:29 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MR. VERHOEVEN:                                    11:36:29

 2        Q.   Did you know one way or the other?         11:36:31

 3        MR. FLUMENBAUM:   Instruction not to answer.    11:36:53

 4    BY MR. VERHOEVEN:                                    11:36:53

 5        Q.   If you had known that it was true that     11:36:55

 6    Mr. Levandowski downloaded 14,000 Google files and  11:37:01

 7    then went to Otto and was purchased by Uber, would you 11:37:06

 8    have done anything about that?                       11:37:08

 9        MR. BRILLE:   Object to form.                   11:37:09

10        MR. FLUMENBAUM:   You may answer that question as 11:37:11

11    worded.                                             11:37:12

12        THE WITNESS:   When would I have known that?    11:37:16

13    BY MR. VERHOEVEN:

14        Q.   I'm saying, if you would've known that --

15        A.   At what point in time would I have known  11:37:18

16    that?                                               11:37:19

17        Q.   Any point in time.                         11:37:21

18        A.   Well, if I had known that, I would have    11:37:24

19    objected to the transaction, if I had known that at 11:37:29

20    the date of that transaction.                       11:37:31

21        Q.   Okay.  So if you had known that -- if you had 11:37:33

22    known the results of the due diligence report, would 11:37:37

23    you have objected to the transaction?               11:37:39

24        MR. BRILLE:   Object to form.                   11:37:47

25        MR. FLUMENBAUM:   We're making assumptions as to 11:37:55
```

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | what's in the due diligence report, so -- is there a | 11:37:58 |
| 2 | way you can rephrase that question? | 11:38:02 |
| 3 |    MR. VERHOEVEN:  I don't think so.  I'm asking the | 11:38:06 |
| 4 | witness -- I'll ask it again. | 11:38:08 |
| 5 | BY MR. VERHOEVEN: | 11:38:08 |
| 6 |    Q.   Without revealing the substance of the | 11:38:11 |
| 7 | diligence report, if you had known about it at the | 11:38:16 |
| 8 | time of the transaction, would you have objected to | 11:38:19 |
| 9 | moving forward with the transaction? | 11:38:22 |
| 10 |    MR. BRILLE:  Object to form. | 11:38:23 |
| 11 |    MR. FLUMENBAUM:  Would you agree that follows our | 11:38:25 |
| 12 | non-waiver -- | 11:38:26 |
| 13 |    MR. VERHOEVEN:  Yes. | 11:38:28 |
| 14 |    THE WITNESS:  Yes. | 11:38:32 |
| 15 |    MR. VERHOEVEN:  And if I ask why, I assume I'll | 11:38:40 |
| 16 | get an instruction? | 11:38:41 |
| 17 |    MR. FLUMENBAUM:  You will until that report is | 11:38:42 |
| 18 | released. | 11:38:44 |
| 19 |    MR. VERHOEVEN:  Okay. | 11:38:44 |
| 20 | BY MR. VERHOEVEN: | |
| 21 |    Q.   Was that -- withdrawn. | 11:38:48 |
| 22 |       Would you have considered that to be material | 11:38:52 |
| 23 | information with respect to whether to approve the | 11:38:57 |
| 24 | transaction or not? | 11:38:59 |
| 25 |    MR. FLUMENBAUM:  Same -- not going to argue | 11:39:03 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | waiver? | 11:39:03 |
| 2 | MR. VERHOEVEN:  Correct. | 11:39:04 |
| 3 | MR. BRILLE:  Object to form. | 11:39:05 |
| 4 | MR. FLUMENBAUM:  You can answer yes or no. | 11:39:07 |
| 5 | THE WITNESS:  Yes. | 11:39:08 |
| 6 | BY MR. VERHOEVEN: | 11:39:08 |
| 7 | Q.  What was your reaction when you saw -- when | 11:39:32 |
| 8 | you read the Stroz report with respect to the fact | 11:39:37 |
| 9 | that it was not disclosed to the board at the time of | 11:39:39 |
| 10 | the acquisition?  Were you upset? | 11:39:43 |
| 11 | MR. BRILLE:  I'll object to form. | 11:39:46 |
| 12 | MR. FLUMENBAUM:  I'll object to the form also. | 11:39:49 |
| 13 | Again I'll let him answer that without claim of | 11:39:55 |
| 14 | waiver. | 11:39:56 |
| 15 | MR. VERHOEVEN:  Yes. | 11:39:56 |
| 16 | THE WITNESS:  Yes. | 11:39:58 |
| 17 | BY MR. VERHOEVEN: | 11:39:58 |
| 18 | Q.  Why? | 11:40:00 |
| 19 | MR. BRILLE:  Same objections. | 11:40:01 |
| 20 | MR. VERHOEVEN:  I'm asking for his reaction. | 11:40:03 |
| 21 | MR. FLUMENBAUM:  So you got -- you got his answer. | 11:40:06 |
| 22 | He can't answer more than that without going into | 11:40:09 |
| 23 | substance. | 11:40:10 |
| 24 | BY MR. VERHOEVEN: | 11:40:10 |
| 25 | Q.  Did you call up Mr. Levandowski after reading | 11:40:13 |

Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | it and accost him about it? | 11:40:15 |
| 2 | I'm sorry.  Let me withdraw that. | 11:40:16 |
| 3 | Did you call him -- | 11:40:18 |
| 4 | MR. FLUMENBAUM:  Maybe we should take a break. | 11:40:20 |
| 5 | MR. VERHOEVEN:  Just one more. | 11:40:22 |
| 6 | BY MR. VERHOEVEN: | 11:40:22 |
| 7 | Q.  Did you call up Mr. Kalanick or e-mail him or | 11:40:25 |
| 8 | something, in any way communicate with him, to accost | 11:40:29 |
| 9 | him about the fact that this was not disclosed prior | 11:40:32 |
| 10 | to the board making the decision to acquire? | 11:40:37 |
| 11 | MR. BRILLE:  Object to form. | 11:40:38 |
| 12 | THE WITNESS:  I don't know if there was -- I don't | 11:40:40 |
| 13 | know if I called him directly or specifically. | 11:40:43 |
| 14 | BY MR. VERHOEVEN: | 11:40:43 |
| 15 | Q.  Did you have a conversation? | 11:40:45 |
| 16 | A.  With anybody? | 11:40:47 |
| 17 | Q.  With Mr. Kalanick. | 11:40:50 |
| 18 | A.  Yeah, I don't know -- I don't know if I had a | 11:40:53 |
| 19 | direct . . . I just don't remember. | 11:40:56 |
| 20 | Q.  You don't remember expressing any anger to | 11:41:00 |
| 21 | him about it? | 11:41:04 |
| 22 | A.  It's possible.  There's a lot going on at the | 11:41:16 |
| 23 | time. | 11:41:16 |
| 24 | Q.  You were angry about it, weren't you? | 11:41:19 |
| 25 | A.  I was. | 11:41:20 |

Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And it's possible you communicated that to | 11:41:22 |
| 2 | Mr. Levandowski -- or to Mr. Kalanick? | 11:41:25 |
| 3 | A.   It's possible, but I don't have -- | 11:41:26 |
| 4 | MR. FLUMENBAUM:  Not Levandowski. | 11:41:27 |
| 5 | THE WITNESS:  Right. | 11:41:28 |
| 6 | I don't have specific recollection of having | 11:41:31 |
| 7 | done that, but it's possible. | 11:41:33 |
| 8 | BY MR. VERHOEVEN: | 11:41:33 |
| 9 | Q.   It's more than likely; right? | 11:41:35 |
| 10 | A.   I don't know. | 11:41:37 |
| 11 | MR. FLUMENBAUM:  Objection.  Objection. | 11:41:38 |
| 12 | MR. VERHOEVEN:  Do you want to take a break? | 11:41:42 |
| 13 | MR. FLUMENBAUM:  Sure.  Let's take a short break. | 11:41:44 |
| 14 | THE VIDEOGRAPHER:  This marks the end of DVD No. 2 | 11:41:47 |
| 15 | in the deposition of William Gurley.  We're off the | 11:41:49 |
| 16 | record at 11:41 a.m. | 11:41:51 |
| 17 | (Recess taken.) | 11:41:51 |
| 18 | (Plaintiff's Exhibit 915 was marked.) | 11:52:45 |
| 19 | THE VIDEOGRAPHER:  Back on the record. | 11:52:53 |
| 20 | This the beginning of DVD No. 3, and the time | 11:52:56 |
| 21 | is 11:52 a.m. | 11:52:58 |
| 22 | BY MR. VERHOEVEN: | 11:52:58 |
| 23 | Q.   By May of 2017, were you aware that some | 11:53:07 |
| 24 | investors of Uber wanted Mr. Kalanick to resign as | 11:53:13 |
| 25 | CEO? | 11:53:14 |

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   By May . . . | 11:53:27 |
| 2 | Q.   That's three months ago. | 11:53:30 |
| 3 | A.   Yeah.  I'm just trying to remember when some | 11:53:33 |
| 4 | of those conversations first started. | 11:53:36 |
| 5 |      I can't -- I can't be specific about whether | 11:53:40 |
| 6 | by May.  Certainly around that time frame people had | 11:53:46 |
| 7 | started to ask that question. | 11:53:48 |
| 8 | Q.   And who are those people? | 11:53:56 |
| 9 | A.   Well, a lot of -- I think many journalists | 11:53:59 |
| 10 | had begun to ask that question.  So you'd see | 11:54:02 |
| 11 | editorials in the Financial Times, New York Times, | 11:54:08 |
| 12 | like there's a lot of -- I don't know exactly when | 11:54:10 |
| 13 | they ran.  I think they were around that time frame. | 11:54:12 |
| 14 |      But I don't -- I don't recall a specific May | 11:54:20 |
| 15 | conversation with a specific investor about it. | 11:54:24 |
| 16 | Q.   Well, do you recall that you -- at around | 11:54:27 |
| 17 | that time, not specific date or anything -- that you | 11:54:31 |
| 18 | had conversations with investors on that topic? | 11:54:34 |
| 19 | A.   It's possible.  I mean, I -- it may even be | 11:54:40 |
| 20 | probable.  I just don't -- I don't -- I don't know | 11:54:41 |
| 21 | about at that moment in time who I -- exactly who I | 11:54:44 |
| 22 | talked to about that topic. | 11:54:46 |
| 23 | Q.   What do you remember about first -- to the | 11:54:49 |
| 24 | extent that you can make it chronological, can you | 11:54:54 |
| 25 | tell me what you remember first about that topic? | 11:54:58 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Well, there are a number of instances that | 11:55:00 |
| 2 | had happened in the company in 2017, and that had led | 11:55:05 |
| 3 | to a general perception in the public that that might | 11:55:09 |
| 4 | be the right answer, which -- | 11:55:11 |
| 5 | Q.   Okay. | |
| 6 | A.   -- which, as I mentioned, was discussed in | 11:55:16 |
| 7 | some of the leading financial publications around the | 11:55:19 |
| 8 | globe. | 11:55:20 |
| 9 | And naturally that's going to cause -- you | 11:55:23 |
| 10 | know when something has that much open discussion, | 11:55:27 |
| 11 | it's going to lead to other people discussing what the | 11:55:31 |
| 12 | right action is one way or another in terms of | 11:55:34 |
| 13 | ensuring the long-term health and success of the | 11:55:39 |
| 14 | organization. | 11:55:40 |
| 15 | Q.   Okay.  And after these articles came out, | 11:55:44 |
| 16 | were you contacted by any investors about the subject? | 11:55:48 |
| 17 | A.   I was contacted frequently by investors about | 11:55:54 |
| 18 | the state of the overall company.  And as the company | 11:55:58 |
| 19 | ran into these multiple issues, the frequency of those | 11:56:05 |
| 20 | inquiries would go up.  And it -- it wasn't uncommon | 11:56:10 |
| 21 | for that question to come up around that time frame, | 11:56:14 |
| 22 | but certainly a little bit later for sure. | 11:56:17 |
| 23 | Q.   Okay.  Maybe June? | 11:56:19 |
| 24 | A.   Yeah. | 11:56:19 |
| 25 | Q.   Okay. | 11:56:20 |

Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.    Yeah.
 2        Q.    And did those investors have the view that     11:56:26
 3   Mr. Kalanick should not -- should be removed from the     11:56:28
 4   position of CEO?                                          11:56:30
 5        A.    Some.  Some did.  Some -- not all.             11:56:34
 6        Q.    Okay.  Do you remember any investors that did  11:56:36
 7   have that view?                                           11:56:38
 8        A.    Certainly the investors that signed on to the  11:56:45
 9   letter that was presented to Mr. Kalanick in Chicago      11:56:47
10   came to that point of view.                               11:56:50
11        Q.    Okay.  Any others that you remember?           11:56:52
12        A.    Yes, there are others.                         11:57:09
13        Q.    Can you remember them?                         11:57:11
14        MR. FLUMENBAUM:  If it's a nonprivileged             11:57:16
15   conversation.  We'll -- we'll invoke whatever the         11:57:20
16   confidentiality is in terms of the release of the         11:57:25
17   transcript.                                               11:57:25
18             But if it's nonprivileged, I believe you have   11:57:28
19   to respond to that.                                       11:57:31
20        THE WITNESS:  There were -- there were               11:57:40
21   other -- well, there -- Uber has some investors that      11:57:44
22   are -- typically invest in public companies, and so       11:57:51
23   they're more mutual funds, that kind of thing.            11:57:54
24             And several of them had expressed that -        11:57:58
25   either -- either that they were certain that that was     11:58:00
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   the right answer or they were questioning whether that      11:58:03

2   was the right answer.   And I heard that, also, from         11:58:07

3   some of the seed investors.                                  11:58:09

4   BY MR. VERHOEVEN:                                            11:58:09

5       Q.    Which mutual funds?                                11:58:15

6             This is all protected.   It's not going to go      11:58:22

7   anywhere.                                                    11:58:23

8       THE WITNESS:   (Directed to deponent's counsel:)        11:58:26

9   What does that mean, it would be redacted?                   11:58:26

10      MR. VERHOEVEN:   No.   It's -- by court order it         11:58:28

11  cannot be disclosed.                                         11:58:30

12      MR. BRILLE:   Is it necessary to disclose, Charlie?      11:58:31

13  I'll defer to you.   I'm just saying it -- it seems          11:58:33

14  very highly sensitive.                                       11:58:35

15      MR. VERHOEVEN:   I'm asking the question.                11:58:35

16      THE WITNESS:   It is sensitive.                          11:58:37

17      MR. VERHOEVEN:   I'm asking the question.                11:58:38

18      MR. FLUMENBAUM:   We will make sure that this is         11:58:42

19  totally redacted.                                            11:58:45

20      MR. BRILLE:   Yes.   We will rule it the highest         11:58:46

21  protection available under the court order.                  11:58:49

22      THE WITNESS:   Glade Brook, Wellington, Capital          11:58:53

23  Group.                                                       11:58:54

24             On the seed side, David Sacks, Antonio            11:59:03

25  Gracias.                                                      11:59:09

Page 136

1    I don't know that it's limited to that, but          11:59:11

2    those are the ones that come to mind.                 11:59:13

3    BY MR. VERHOEVEN:                                      11:59:13

4        Q.    Can you think of anybody else?              11:59:15

5        MR. FLUMENBAUM:   Other than the ones you --      11:59:22

6        THE WITNESS:   Yeah.   All the ones on --         11:59:24

7        MR. VERHOEVEN:   Yeah.   I mean, I'm just probing 11:59:27

8    his recollection.                                     11:59:28

9        MR. FLUMENBAUM:   Right.   But he gave you two.  He 11:59:29

10   gave you the group that signed the letter.            11:59:30

11       MR. VERHOEVEN:   I know what he gave me.           11:59:32

12       MR. FLUMENBAUM:   Okay.   I just want to make sure. 11:59:33

13       THE WITNESS:   Fidelity is on the letter, but they 11:59:36

14   were of that opinion.                                 11:59:37

15   BY MR. VERHOEVEN:                                      11:59:37

16       Q.    Can you recall any others?                  11:59:45

17       A.    I'm trying.   I -- that's all -- that's all I 11:59:56

18   remember at this time.                                11:59:56

19       Q.    Was one of the reasons why these folks were 12:00:10

20   in favor of removing Mr. Kalanick from his position as 12:00:15

21   CEO the Waymo litigation?                             12:00:18

22       A.    Yes.                                        12:00:19

23       Q.    Did you hear that from multiple investors?  12:00:29

24       A.    The letter that was presented that was      12:00:41

25   authored by five investor groups included that        12:00:45

Page 137

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | comment.  So I guess the de facto answer is yes, | 12:00:49 |
| 2 | because there were multiple parties to that letter, | 12:00:52 |
| 3 | and everyone signed on to that letter. | 12:00:54 |
| 4 | Q.   That was a significant reason for the | 12:00:57 |
| 5 | conclusion in that letter that Mr. Kalanick should be | 12:00:59 |
| 6 | removed from CEO? | 12:01:01 |
| 7 | MR. FLUMENBAUM:  Objection as to form. | 12:01:03 |
| 8 | THE WITNESS:  It's -- it's significant and one of | 12:01:06 |
| 9 | many. | 12:01:08 |
| 10 | BY MR. VERHOEVEN: | 12:01:08 |
| 11 | Q.   You felt that the way that the acquisition | 12:01:18 |
| 12 | was handled was an example of company mismanagement, | 12:01:23 |
| 13 | right? | 12:01:24 |
| 14 | MR. BRILLE:  Object to form. | 12:01:31 |
| 15 | MR. FLUMENBAUM:  You've -- this is in -- you've | 12:01:31 |
| 16 | already -- we already covered this area before.  I | 12:01:36 |
| 17 | mean . . . | |
| 18 | MR. VERHOEVEN:  Are you instructing him? | 12:01:37 |
| 19 | MR. FLUMENBAUM:  I -- I'm not -- I'm not -- are | 12:01:39 |
| 20 | you trying to get privileged communications?  I'm | 12:01:42 |
| 21 | not . . . | |
| 22 | MR. VERHOEVEN:  No.  Can he answer? | 12:01:45 |
| 23 | MR. FLUMENBAUM:  You can answer it if you . . . | 12:01:47 |
| 24 | THE WITNESS:  Yes.  I -- I believe it had | 12:01:49 |
| 25 | the -- had there been more disclosures around the | 12:01:55 |

Page 138

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    acquisition, that we may not have done the              12:01:58

 2    acquisition.  And I believe that had we terminated      12:02:01

 3    Anthony, upon him pleading the Fifth, that that would   12:02:05

 4    have been a much better interest for the company as a   12:02:08

 5    whole.                                                  12:02:09

 6    BY MR. VERHOEVEN:                                       12:02:09

 7        Q.   Did other investors share that view?          12:02:13

 8        A.   I don't recall having that specific           12:02:17

 9    conversation about that specific topic with people     12:02:20

10    outside of the group.                                  12:02:22

11        Q.   The group that signed the letter?             12:02:24

12        A.   The group that signed the letter.  The group  12:02:27

13    that signed the letter authored it and bought into all 12:02:30

14    of the points of view that are expressed in the        12:02:32

15    letter.                                                 12:02:32

16        MR. VERHOEVEN:  Let's get the June 20 letter.      12:02:41

17            (Plaintiff's Exhibit 916 was marked.)          12:03:08

18        THE REPORTER:  This is marked Exhibit 916.  There  12:03:08

19    was a prior exhibit marked before we went back on the  12:03:08

20    record.                                                 12:03:08

21        MR. VERHOEVEN:  Yeah.  Let's do 915 before we go   12:03:11

22    to this.  I forgot about that one.                     12:03:12

23    BY MR. VERHOEVEN:                                       12:03:08

24        Q.   So put that aside, Mr. Gurley.                12:03:15

25        A.   Oh, put that aside?                           12:03:18
```

Page 139

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        MR. FLUMENBAUM:  This is 916?              12:03:20

 2   BY MR. VERHOEVEN:                               12:03:20

 3        Q.   Yes.  But just one housekeeping matter here.

 4             Take a look at 915.                   12:03:34

 5             I didn't hand it out, did I?          12:03:37

 6        A.   No, sir.

 7        Q.   Can you identify Exhibit 915?         12:03:50

 8        A.   915, board minutes from May 25th of Uber   12:03:55

 9   Technologies.                                   12:03:55

10        Q.   And you attended this meeting?        12:03:57

11        A.   Yes.                                  12:04:00

12        Q.   What happened at this meeting?        12:04:04

13        A.   My --                                 12:04:14

14        Q.   The last meeting, just for your information,   12:04:16

15   was May 22?                                     12:04:18

16        A.   Yeah.  My -- my -- my best recollection is   12:04:20

17   this is the meeting that Travis recommended     12:04:21

18   terminating Anthony Levandowski.                12:04:24

19        Q.   Under Item 1, the only thing that's not   12:04:33

20   redacted by counsel for Waymo says:            12:04:37

21             "The board discussed various employees and   12:04:40

22   certain contractual matters related to the Waymo   12:04:42

23   litigation."                                    12:04:43

24             Do you see that?                      12:04:44

25        A.   Did you mean counsel of Uber?         12:04:46
```

Page 140

| | | |
|---|---|---|
| 1 | Q.    Yeah.  What did I say?  Counsel for Uber. | 12:04:50 |
| 2 | A.    Okay.  What's the question? | 12:04:52 |
| 3 | Q.    It says here: | 12:04:53 |
| 4 | "The board discussed various employees and | 12:04:55 |
| 5 | certain contractual matters related to the Waymo | 12:04:58 |
| 6 | litigation." | 12:04:59 |
| 7 | Do you see that? | 12:05:00 |
| 8 | A.    Um-hum. | 12:05:00 |
| 9 | Q.    What are the -- what is this reference to | 12:05:04 |
| 10 | "certain contractual matters"? | 12:05:06 |
| 11 | MR. FLUMENBAUM:  Again, to the extent that your | 12:05:09 |
| 12 | testimony would involve privileged communications -- | 12:05:12 |
| 13 | THE WITNESS:  Right. | |
| 14 | MR. FLUMENBAUM:  -- you're not at liberty to | 12:05:14 |
| 15 | discuss that. | 12:05:15 |
| 16 | THE WITNESS:  I would say this specifically | 12:05:19 |
| 17 | related to legal discussions that was privileged. | 12:05:24 |
| 18 | MR. VERHOEVEN:  Uber's counsel didn't redact this | 12:05:26 |
| 19 | sentence. | 12:05:27 |
| 20 | MR. BRILLE:  That's because the sentence itself is | 12:05:32 |
| 21 | not privileged.  But perhaps conversations that relate | 12:05:33 |
| 22 | to these topics may be privileged. | 12:05:36 |
| 23 | BY MR. VERHOEVEN: | 12:05:36 |
| 24 | Q.    Was there discussion about how a decision to | 12:05:40 |
| 25 | terminate may affect various employees within Uber? | 12:05:44 |

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A.   I don't know if there was a discussion on      12:05:53

2    this date at that moment in time.   Eventually there   12:05:56

3    were discussions about that.                         12:05:58

4    Q.   And can you summarize those for me?            12:06:01

5    MR. BRILLE:   And I would just say, Mr. Gurley, to   12:06:04

6    the extent that they don't include legal advice.     12:06:12

7    THE WITNESS:   Yeah.   Just a general concern about   12:06:14

8    retention, on the topic we had talked about before.   12:06:17

9    There were questions about whether certain           12:06:18

10   employees would feel like their individual packages   12:06:24

11   would be impacted by this -- by this action, and would   12:06:29

12   that then affect retention.                          12:06:31

13   BY MR. VERHOEVEN:                                     12:06:31

14   Q.   And is that because their individual packages   12:06:34

15   were conditioned on milestones?                      12:06:37

16   A.   It related to that, yes.                        12:06:39

17   Q.   And so the gist of it would be if               12:06:42

18   Mr. Levandowski is gone, they're not going to make   12:06:45

19   their milestones --                                 12:06:46

20   A.   Might that impact, yes.                         12:06:48

21   Q.   Yes.   Let me finish the question, though.      12:06:50

22   A.   Okay.                                           12:06:52

23   Q.   So the gist of the discussion was if            12:06:52

24   Mr. Levandowski is gone, that might impact the       12:06:54

25   milestones; and, hence, the compensation of these   12:06:57

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | employees? | 12:06:58 |
| 2 | A.   Yes.   And I don't -- I just want -- yes, but | 12:07:00 |
| 3 | I want to clarify. | 12:07:02 |
| 4 | I remember that being a general discussion at | 12:07:04 |
| 5 | some point in time.   I can't ascertain that that's the | 12:07:07 |
| 6 | exact one referenced on that date. | 12:07:09 |
| 7 | Q.   Well, this sentence concerns that subject | 12:07:11 |
| 8 | matter; right? | 12:07:12 |
| 9 | A.   Potentially. | 12:07:15 |
| 10 | Q.   Do you have any reason to believe that it | 12:07:18 |
| 11 | wasn't on the date that -- | 12:07:19 |
| 12 | A.   No. | 12:07:21 |
| 13 | Q.   -- the decision was made to terminate | 12:07:21 |
| 14 | Mr. Levandowski? | 12:07:22 |
| 15 | A.   No. | 12:07:22 |
| 16 | Q.   Okay.   All right. | 12:07:27 |
| 17 | Now, let's go to 915. | 12:07:29 |
| 18 | MR. FLUMENBAUM:   916? | 12:07:31 |
| 19 | MR. VERHOEVEN:   916. | 12:07:33 |
| 20 | THE WITNESS:   Yeah. | 12:07:34 |
| 21 | BY MR. VERHOEVEN: | 12:07:34 |
| 22 | Q.   Can you identify this document? | 12:07:37 |
| 23 | A.   Yeah.   This was a letter that was authored by | 12:07:41 |
| 24 | the investors in Uber that are mentioned in the first | 12:07:45 |
| 25 | paragraph, first sentence, to express their point of | 12:07:50 |

Page 143

1    view to Travis about a number of issues that had been          12:07:55

2    developing over the course of 2017.                            12:07:58

3        MR. BRILLE:  I'm going to note my objection to            12:07:59

4    this exhibit, to the extent it is unsigned.  And it is         12:08:03

5    unclear to me, at least, what this document is.                12:08:06

6        THE WITNESS:  Okay.                                        12:08:09

7    BY MR. VERHOEVEN:                                              12:08:09

8        Q.    Did someone in this group send this exhibit         12:08:19

9    to Mr. Kalanick?                                               12:08:21

10       A.    It was presented to him by two of the -- two        12:08:25

11   of my partners at Benchmark.                                   12:08:28

12       Q.    Which partners?                                      12:08:29

13       A.    Matt Cohler and Peter Fenton.                        12:08:32

14       Q.    Was it presented in person?                          12:08:38

15       A.    Yes.                                                 12:08:38

16       Q.    Where?                                               12:08:40

17       A.    In a hotel in Chicago.                               12:08:42

18       Q.    Did Mr. Kalanick have any advance indication        12:08:51

19   that this was going to be presented to him?                    12:08:57

20       A.    There had been a number of one-on-one               12:09:06

21   conversations that related to trying to find solutions        12:09:13

22   to move past some of the many issues outlined here.           12:09:17

23             Some of that related to a COO search.               12:09:20

24             Some of those related to various other              12:09:24

25   alternatives, like coaching and that kind of thing.           12:09:28

                                            Page 144

1    Some of those had been had, not just with me,    12:09:32

2    but with Matt and Trav- -- and Travis.    12:09:35

3    But there was not a -- there was nothing that    12:09:42

4    said, "Hey, we're bringing" -- there was not a    12:09:45

5    communication that said, "Hey, we're about to bring    12:09:49

6    you this letter."    12:09:50

7    It was, like, "We need to desperately sit    12:09:53

8    down and talk," and then the letter was presented.    12:09:56

9    Q.    Were you aware of the contents of this letter    12:09:58

10    before it was presented?    12:10:00

11    A.    Yes.    12:10:00

12    Q.    Did you review it?    12:10:01

13    A.    Yes.    12:10:01

14    Q.    In the third paragraph of Exhibit 916 it    12:10:06

15    starts with:    12:10:06

16    "A series of recent revelations, however,    12:10:10

17    continues to affect Uber's business and put the    12:10:13

18    mission at risk."    12:10:15

19    Do you see that?    12:10:16

20    A.    Um-hum.    12:10:17

21    Q.    And later in the paragraph there's a    12:10:18

22    reference to the "ongoing Waymo trade secret    12:10:20

23    litigation."    12:10:23

24    Do you see that?    12:10:24

25    A.    Correct.    Yes.    12:10:24

Page  145

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Is that one of the series of revelations | 12:10:27 |
| 2 | referred to in the first sentence? | 12:10:30 |
| 3 | A.   Yes. | 12:10:30 |
| 4 | Q.   So the litigation in your view, or in the | 12:10:37 |
| 5 | view of the groups referenced in this letter, put | 12:10:42 |
| 6 | Uber's mission at risk; fair? | 12:10:46 |
| 7 | MR. FLUMENBAUM:   The letter speaks for itself. | 12:10:50 |
| 8 | THE WITNESS:   I would -- I would just say that the | 12:10:53 |
| 9 | totality of the events is what's referenced in the | 12:10:57 |
| 10 | first sentence. | 12:10:59 |
| 11 | You and I had already discussed that -- right | 12:11:01 |
| 12 | before the break -- the thing that -- specifically | 12:11:04 |
| 13 | with regard to Waymo -- that -- that could have been | 12:11:08 |
| 14 | avoided, is -- could have not done the deal and you | 12:11:13 |
| 15 | could have made that determination -- termination | 12:11:14 |
| 16 | effort sooner, both of which I think would have been | 12:11:19 |
| 17 | way better for the company, in light of where we stand | 12:11:22 |
| 18 | today. | 12:11:23 |
| 19 | And so -- | 12:11:24 |
| 20 | BY MR. VERHOEVEN: | 12:11:24 |
| 21 | Q.   In addition -- | 12:11:25 |
| 22 | MR. BRILLE:  Wait, wait. | 12:11:27 |
| 23 | MR. FLUMENBAUM:  Hold it.  Let him finish, please. | 12:11:27 |
| 24 | You interrupted him. | 12:11:29 |
| 25 | Go ahead, Bill. | 12:11:30 |

Veritext Legal Solutions
866 299-5127

1    THE WITNESS:   Anyway, so my recollection and view    12:11:33

2    of the point of that sentence relates to those    12:11:35

3    decisions that were made by him.    12:11:38

4    BY MR. VERHOEVEN:    12:11:38

5    Q.   In addition to the "you could haves" that you    12:11:41

6    just gave, another "you could have" is you could have    12:11:44

7    disclosed the diligence report, right, before the    12:11:47

8    acquisition?    12:11:48

9    A.   Sure.   Yes, that is true.    12:11:49

10    Q.   Okay.   The last sentence of the paragraph    12:11:51

11    says:    12:11:51

12    "The ongoing Waymo trade secret litigation,"    12:11:54

13    and then it refers to it as "extremely serious."    12:11:57

14    Do you see that?    12:11:59

15    A.   Yes.    12:11:59

16    Q.   What did you mean by -- or what did Benchmark    12:12:04

17    mean by "extremely serious"?    12:12:07

18    A.   Well, this was authored by the group.   So --    12:12:10

19    and edited by the group.   So it was the point of view    12:12:15

20    from everybody.    12:12:15

21    I -- I think I'm already on record in this    12:12:18

22    deposition as saying that I take, you know, litigation    12:12:19

23    from a company like the size of Google very seriously.    12:12:24

24    So I think this is consistent with that.    12:12:27

25    Q.   Any other explanation of --    12:12:29

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    No. | 12:12:30 |
| 2 | Q.    Did the group believe that the allegations | 12:12:43 |
| 3 | were extremely serious? | 12:12:48 |
| 4 | MR. BRILLE:   Object to form. | 12:12:49 |
| 5 | MR. FLUMENBAUM:   Objection as to form. | 12:12:56 |
| 6 | THE WITNESS:  I -- I don't recall a discussion | 12:12:58 |
| 7 | specifically about whether the allegations are -- were | 12:13:01 |
| 8 | serious. | 12:13:02 |
| 9 | I think any litigation of this size or scope | 12:13:06 |
| 10 | is obviously -- if it could be avoided it would be | 12:13:09 |
| 11 | much better for the company.  We'd all be better off | 12:13:12 |
| 12 | if -- if we weren't focused on this and could be | 12:13:16 |
| 13 | focused on serving the customers. | 12:13:21 |
| 14 | BY MR. VERHOEVEN: | 12:13:21 |
| 15 | Q.    The next paragraph, take a look at it. | 12:13:23 |
| 16 | A.    Yep. | 12:13:25 |
| 17 | Q.    The -- in the middle of that paragraph | 12:13:29 |
| 18 | there's a sentence that starts with "The public | 12:13:32 |
| 19 | perception." | 12:13:32 |
| 20 | Do you see that? | 12:13:34 |
| 21 | A.    Um-hum. | 12:13:34 |
| 22 | Q.    I'll read it into the record. | 12:13:36 |
| 23 | "The public perception is that Uber | 12:13:38 |
| 24 | fundamentally lacks ethical and moral values." | 12:13:42 |
| 25 | Do you see that? | 12:13:44 |

Page  148

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.     Yep. | 12:13:45 |
| 2 | Q.     And your understanding that this perception | 12:13:50 |
| 3 | of lacking -- withdrawn. | 12:13:54 |
| 4 | This reference to "lacks ethical and moral | 12:13:58 |
| 5 | values" in this sentence is, in part, a reference to | 12:14:01 |
| 6 | the Waymo litigation, correct? | 12:14:03 |
| 7 | MR. BRILLE:  Object to form. | 12:14:07 |
| 8 | THE WITNESS:  I don't think it's a specific | 12:14:08 |
| 9 | reflection on that.  I think there -- as -- there are | 12:14:14 |
| 10 | numerous other issues that had been going on in the | 12:14:18 |
| 11 | company. | 12:14:18 |
| 12 | And I think if you read those articles that I | 12:14:21 |
| 13 | mentioned that were calling for the board to ask him | 12:14:25 |
| 14 | to resign, that created this public perception, you | 12:14:31 |
| 15 | would see much more references around that to other | 12:14:34 |
| 16 | things. | 12:14:36 |
| 17 | BY MR. VERHOEVEN: | 12:14:36 |
| 18 | Q.     Based on what you know now, including your | 12:14:39 |
| 19 | review of the diligence report, don't you believe that | 12:14:45 |
| 20 | the conduct of Mr. Kalanick and his team, with respect | 12:14:50 |
| 21 | to the Otto acquisition, reflected a lack of ethical | 12:14:58 |
| 22 | and moral values? | 12:15:01 |
| 23 | MR. BRILLE:  Object to form. | 12:15:08 |
| 24 | THE WITNESS:  I don't know.  For me, that | 12:15:12 |
| 25 | particular thing is really a question of materiality | 12:15:15 |

Page  149

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | and whether you feel a responsibility of disclosure, | 12:15:22 |
| 2 | which gets into understanding the criticality of | 12:15:28 |
| 3 | something, whether or not you're withholding | 12:15:32 |
| 4 | information that could be critical in that | 12:15:35 |
| 5 | decision-making process. | 12:15:36 |
| 6 | I can't speak to the reasoning for them | 12:15:42 |
| 7 | making those decisions; and, therefore, then apply | 12:15:45 |
| 8 | some type of label like this. | 12:15:49 |
| 9 | I certainly think, as is expressed later | 12:15:52 |
| 10 | in -- in our legal action, that it -- that it crossed | 12:15:56 |
| 11 | a line of violating fraud and fiduciary duty. | 12:16:02 |
| 12 | And so to the extent that you want to wrap | 12:16:04 |
| 13 | those into those words, I guess you could, but I | 12:16:07 |
| 14 | don't -- I -- I wouldn't tie that specifically to that | 12:16:11 |
| 15 | label. | 12:16:11 |
| 16 | That's not what we were thinking about when | 12:16:13 |
| 17 | we wrote that.  This says the "public perception is," | 12:16:17 |
| 18 | and I think that public perception, which is well | 12:16:20 |
| 19 | documented in a bunch of articles, was driven more by | 12:16:23 |
| 20 | other activities. | 12:16:24 |
| 21 | BY MR. VERHOEVEN: | 12:16:24 |
| 22 | Q.   You believe that Mr. Kalanick committed fraud | 12:16:26 |
| 23 | on the board of directors by failing to disclose the | 12:16:30 |
| 24 | facts underlying the Otto acquisition, right? | 12:16:34 |
| 25 | A.   Yes. | 12:16:35 |

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        MR. BRILLE:  Object to form.              12:16:36

 2        THE WITNESS:  Yes.                         12:16:37

 3   BY MR. VERHOEVEN:                               12:16:37

 4     Q.   And you would agree that that would not be  12:16:39

 5   ethical or moral, to commit such a fraud?       12:16:42

 6        MR. BRILLE:  Same objection.               12:16:44

 7        THE WITNESS:  I think that's a fair statement.  12:16:45

 8   This sentence talks about the public perception of  12:16:48

 9   Uber, and I don't think that relates to that action  12:16:51

10   because the public doesn't have a perception of that  12:16:54

11   act.                                            12:16:56

12        THE REPORTER:  You have microphones on, gentlemen.  12:17:28

13   I just wanted to let you know.

14        MR. VERHOEVEN:  I was just asking if there was

15   anything else in the letter.

16   BY MR. VERHOEVEN:                               12:17:28

17     Q.   You agree with the statements in this letter;  12:17:32

18   right?                                          12:17:32

19     A.   I do.                                    12:17:33

20     Q.   Do you have any knowledge of the substance of  12:17:39

21   the conversation in Chicago between your two partners  12:17:42

22   and Mr. Kalanick?                               12:17:45

23     A.   Only what I heard secondhand, yes.  I wasn't  12:17:51

24   present -- I wasn't dialed in.                  12:17:56

25     Q.   Did your two partners report to you what  12:18:00
```

Page 151

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    happened at the meeting?                              12:18:01

2        A.    Yes.                                        12:18:03

3        Q.    What did they say?                          12:18:03

4        A.    I'll start at a high level.   Like there was a   12:18:10

5    lot of conversations back and forth.                 12:18:12

6             There were discussions of -- you know, there   12:18:24

7    was a lot of discussion about the details of these   12:18:27

8    recommendations and how they would manifest themselves   12:18:30

9    in an agreement.                                      12:18:31

10            There were edits of that back and forth in a   12:18:36

11   separate document that he eventually signed.         12:18:41

12            And there are questions about disclosures,   12:18:47

13   what we would do or not do if he agreed to these     12:18:52

14   things, or refrain from doing.                       12:19:00

15            That's the general recollection.            12:19:06

16       Q.    And that all happened at the one meeting?   12:19:09

17       A.    I think there were a series of meetings over   12:19:11

18   an extended period of time.                          12:19:13

19       Q.    Did -- did Mr. Kalanick agree to resign as   12:19:18

20   CEO as part of that first meeting?                   12:19:22

21       A.    I don't -- when you say "first meeting," I   12:19:29

22   think they met and -- and broke up and met and broke   12:19:35

23   up and met and broke up several times.               12:19:36

24            So I don't have enough information to know   12:19:40

25   whether he had agreed on that one point in the very   12:19:43

                                        Page 152

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | first meeting or not.  I just know that -- where they | 12:19:46 |
| 2 | got to by the end of the day. | 12:19:47 |
| 3 | Q.    Was it announced to the public that he was | 12:19:50 |
| 4 | resigning that day? | 12:19:52 |
| 5 | A.    I don't believe there was an official | 12:19:53 |
| 6 | announcement that day. | 12:19:56 |
| 7 | Q.    What about the following day? | 12:19:59 |
| 8 | A.    I don't know when -- I don't have a specific | 12:20:05 |
| 9 | date on when Uber announced this. | 12:20:08 |
| 10 | (Discussion off the record.) | 12:20:22 |
| 11 | BY MR. VERHOEVEN: | 12:20:22 |
| 12 | Q.    All right.  I'm going to mark as Exhibit 917 | 12:20:25 |
| 13 | a Benchmark document from your firm that we just | 12:20:30 |
| 14 | received this morning. | 12:20:31 |
| 15 | A.    Okay. | 12:20:32 |
| 16 | Q.    For the record, it's Benchmark-Waymo-39 | 12:20:35 |
| 17 | through 105. | 12:20:43 |
| 18 | (Plaintiff's Exhibit 917 was marked.) | 12:21:01 |
| 19 | BY MR. VERHOEVEN: | 12:21:01 |
| 20 | Q.    It's a compilation of documents, it appears, | 12:21:04 |
| 21 | and it's got a -- on the front page, if you look at | 12:21:10 |
| 22 | the top right -- | 12:21:11 |
| 23 | MR. FLUMENBAUM:  May I have a copy, please? | 12:21:14 |
| 24 | MR. VERHOEVEN:  Do we have copies? | 12:21:16 |
| 25 | MR. FLUMENBAUM:  Thank you. | 12:21:18 |

Page 153

| | | |
|---|---|---|
| 1 | MR. VERHOEVEN:  I think that's all we have. | 12:21:20 |
| 2 | Hey, we got them by e-mail this morning.  If | 12:21:28 |
| 3 | you have a com- -- if you have a complaint you should | 12:21:28 |
| 4 | talk to the person who produced it. | 12:21:32 |
| 5 | MR. FLUMENBAUM:  Well, just so the record is | 12:21:35 |
| 6 | clear, we produced it by e-mail at the request of | 12:21:39 |
| 7 | Waymo and -- | 12:21:42 |
| 8 | MR. VERHOEVEN:  While we're here in | 12:21:44 |
| 9 | Morrison & Foerster. | 12:21:45 |
| 10 | MR. FLUMENBAUM:  The subpoena was returnable today | 12:21:48 |
| 11 | at -- it was returnable today at your -- at your | 12:21:51 |
| 12 | offices. | 12:21:52 |
| 13 | We produced it by e-mail at your request in a | 12:21:56 |
| 14 | timely fashion, and these documents are part of, I | 12:22:02 |
| 15 | believe, Exhibit A.  It's all part of the public | 12:22:04 |
| 16 | filing in Delaware, so it's not something that you | 12:22:09 |
| 17 | didn't have before. | 12:22:12 |
| 18 | MR. VERHOEVEN:  Okay.  So you'll represent this is | 12:22:13 |
| 19 | part of a public filing in Delaware? | 12:22:16 |
| 20 | MR. FLUMENBAUM:  I believe it was.  I have to take | 12:22:18 |
| 21 | a look at it, but I believe it was.  I didn't check on | 12:22:22 |
| 22 | this particular one, but it's my understanding. | 12:22:26 |
| 23 | BY MR. VERHOEVEN: | 12:22:26 |
| 24 | Q.   Mr. Gurley, do you have an understanding of | 12:22:30 |
| 25 | what your counsel referenced to with respect to this | 12:22:33 |

Page 154

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | public filing in Delaware? | 12:22:37 |
| 2 | What's he talking about? | 12:22:38 |
| 3 | A.   I presume he's talking about the lawsuit that | 12:22:43 |
| 4 | was filed between Benchmark and Mr. Kalanick. | 12:22:47 |
| 5 | Q.   Okay.  So with the understanding that these | 12:22:49 |
| 6 | are exhibits in connection with that suit? | 12:22:53 |
| 7 | A.   I -- | |
| 8 | Q.   That's what counsel is representing; right? | 12:22:56 |
| 9 | A.   Okay. | 12:22:58 |
| 10 | MR. VERHOEVEN:  Are you representing that, | 12:23:00 |
| 11 | Counsel? | 12:23:01 |
| 12 | MR. FLUMENBAUM:  I believe that that's what this | 12:23:03 |
| 13 | reflects. | 12:23:04 |
| 14 | BY MR. VERHOEVEN: | 12:23:04 |
| 15 | Q.   Okay.  Let's turn to Exhibit A. | 12:23:06 |
| 16 | A.   Okay. | |
| 17 | Q.   And my first question is:  Can you identify | 12:23:13 |
| 18 | this document? | 12:23:14 |
| 19 | A.   I believe this is the letter that was signed | 12:23:19 |
| 20 | with -- by Travis at the end of the day of that | 12:23:22 |
| 21 | meeting. | 12:23:23 |
| 22 | Q.   Okay.  So you had some negotiation back and | 12:23:29 |
| 23 | forth and then this got signed? | 12:23:31 |
| 24 | A.   Correct. | 12:23:31 |
| 25 | Q.   So does that refresh your recollection that | 12:23:34 |

Page 155

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | he resigned on the same day as the meeting? | 12:23:40 |
| 2 | A.   Yeah, yeah.  I -- I wasn't trying to say he | 12:23:42 |
| 3 | didn't.  You -- you had said in the first meeting, and | 12:23:45 |
| 4 | they met and broke, just like we've been doing, met | 12:23:49 |
| 5 | and broke.  So I was just -- it was just a question of | 12:23:51 |
| 6 | the definition of "first." | 12:23:52 |
| 7 | So it did happen all in one day. | 12:23:55 |
| 8 | Q.   Okay. | |
| 9 | A.   It was over a series of long -- many hours, I | 12:23:59 |
| 10 | think. | 12:23:59 |
| 11 | Q.   Okay.  And here he says, second-to-the-last | 12:24:00 |
| 12 | paragraph: | 12:24:02 |
| 13 | "I will make a public announcement of the | 12:24:04 |
| 14 | foregoing no later than 5:00 p.m. PDT Thursday, June | 12:24:08 |
| 15 | 22, 2017." | |
| 16 | Does that refresh your recollection as to | 12:24:13 |
| 17 | when it was announced? | 12:24:15 |
| 18 | A.   Well, this was his commitment to announce.  I | 12:24:18 |
| 19 | don't know exactly when it was announced, which was | 12:24:21 |
| 20 | your question. | |
| 21 | Q.   You don't have any reason to believe it | 12:24:24 |
| 22 | wasn't announced, do you? | 12:24:25 |
| 23 | A.   It was clearly announced. | 12:24:28 |
| 24 | MR. VERHOEVEN:  What number was that? | 12:24:40 |
| 25 | THE REPORTER:  That one was 17, 917. | 12:24:43 |

Page 156

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. VERHOEVEN:  All right.  Coming up to the end | 12:25:04 |
| 2 | here right on schedule. | 12:25:12 |
| 3 | Let's mark as 917 -- | 12:25:15 |
| 4 | MR. FLUMENBAUM:  918. | 12:25:16 |
| 5 | MR. VERHOEVEN:  -- 918 a draft of a verified | 12:25:23 |
| 6 | complaint, Benchmark Capital Partners versus Travis | 12:25:31 |
| 7 | Kalanick and Uber Technologies. | 12:25:34 |
| 8 | (Plaintiff's Exhibit 918 was marked.) | 12:25:43 |
| 9 | MR. FLUMENBAUM:  I believe you said draft, as | 12:25:45 |
| 10 | opposed to a verified complaint. | 12:25:49 |
| 11 | MR. VERHOEVEN:  Let's see.  Was it signed?  It has | 12:25:56 |
| 12 | E-signatures on it.  So you'll represent this was | 12:26:00 |
| 13 | filed? | 12:26:00 |
| 14 | MR. FLUMENBAUM:  I believe it was.  That's my | 12:26:03 |
| 15 | understanding of what was produced. | 12:26:04 |
| 16 | MR. VERHOEVEN:  Okay.  So with that clarification, | 12:26:06 |
| 17 | can you identify Exhibit 918? | 12:26:09 |
| 18 | MR. FLUMENBAUM:  Can I have a copy, please? | 12:26:11 |
| 19 | Thank you. | 12:26:13 |
| 20 | THE WITNESS:  I believe this is the lawsuit we | 12:26:24 |
| 21 | just discussed. | 12:26:26 |
| 22 | BY MR. VERHOEVEN: | 12:26:26 |
| 23 | Q.  Did you approve the filing of this lawsuit? | 12:26:28 |
| 24 | A.  I did. | 12:26:29 |
| 25 | Q.  Did you review the complaint before it was | 12:26:30 |

Page 157

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | filed? | 12:26:31 |
| 2 | A.   Yes. | 12:26:31 |
| 3 | Q.   Do you agree with what the statements are in | 12:26:34 |
| 4 | the complaint? | 12:26:35 |
| 5 | A.   I do. | 12:26:35 |
| 6 | Q.   I'd direct your attention to page 5 of -- I'm | 12:26:55 |
| 7 | sorry -- to paragraph 5 of the complaint. | 12:27:01 |
| 8 | Do you see it says: | 12:27:21 |
| 9 | "Kalanick intentionally concealed and failed | 12:27:29 |
| 10 | to disclose his gross mismanagement and other | 12:27:32 |
| 11 | misconduct at Uber." | 12:27:34 |
| 12 | Do you see that? | 12:27:38 |
| 13 | A.   Yes. | 12:27:40 |
| 14 | Q.   And then it continues: | 12:27:41 |
| 15 | "These matters included, among others, | 12:27:45 |
| 16 | Kalanick's personal involvement in causing Uber to | 12:27:49 |
| 17 | acquire a self-driving vehicle start-up that, | 12:27:53 |
| 18 | according to a confidential report, not disclosed to | 12:27:56 |
| 19 | Benchmark at the time (the 'Stroz report'), allegedly | 12:28:04 |
| 20 | harbored trade secrets stolen from a competitor." | 12:28:08 |
| 21 | Do you see that? | 12:28:09 |
| 22 | A.   Yes. | 12:28:09 |
| 23 | Q.   And that's a reference to the Waymo | 12:28:12 |
| 24 | litigation and the facts that -- let me rephrase. | 12:28:22 |
| 25 | That's referring to the Otto acquisition? | 12:28:27 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Correct. | 12:28:27 |
| 2 | MR. FLUMENBAUM:  Objection as to form. | 12:28:30 |
| 3 | MR. BRILLE:  Objection as to form. | 12:28:31 |
| 4 | THE WITNESS:  Sorry. | 12:28:31 |
| 5 | MR. FLUMENBAUM:  You can answer. | 12:28:32 |
| 6 | BY MR. VERHOEVEN: | 12:28:32 |
| 7 | Q.    And Mr. Kalanick's personal conduct, with | 12:28:38 |
| 8 | respect to the Otto acquisition, constituted gross | 12:28:44 |
| 9 | mismanagement and misconduct. | 12:28:45 |
| 10 | That's what you're saying here; right? | 12:28:47 |
| 11 | A.    Yes. | 12:28:47 |
| 12 | Q.    And the specific actions that this is | 12:28:56 |
| 13 | referencing to that Mr. Kalanick undertook, are those | 12:29:01 |
| 14 | the actions you've already testified to or is there | 12:29:03 |
| 15 | anything in addition to that? | 12:29:05 |
| 16 | A.    I think we've already discussed it. | 12:29:09 |
| 17 | Q.    Okay.  I direct your attention to paragraph | 12:29:31 |
| 18 | 6. | 12:29:45 |
| 19 | And the second -- take a second and review | 12:29:56 |
| 20 | that. | 12:29:57 |
| 21 | A.    (Witness reviews document.) | |
| 22 | Q.    Do you see at the start it says: | 12:30:12 |
| 23 | "Kalanick knew Benchmark never would have | 12:30:14 |
| 24 | approved," and then it goes on, "if Benchmark had | 12:30:20 |
| 25 | known the truth about Kalanick's prior conduct." | 12:30:24 |

Page 159

| | | |
|---|---|---|
| 1 | Do you see that? | 12:30:24 |
| 2 | A.    Yes. | 12:30:25 |
| 3 | Q.    And this refers, in part, to your prior | 12:30:30 |
| 4 | testimony that if Benchmark had known about the | 12:30:35 |
| 5 | information contained in the Stroz report, it would | 12:30:37 |
| 6 | never have agreed to this amendment, right? | 12:30:45 |
| 7 | MR. BRILLE:  Object to the form. | 12:30:46 |
| 8 | MR. FLUMENBAUM:  Object to the form. | 12:30:47 |
| 9 | You can answer. | |
| 10 | BY MR. VERHOEVEN: | |
| 11 | Q.    Well, you're correct.  Let me rephrase. | 12:30:51 |
| 12 | This refers to your prior testimony that | 12:30:54 |
| 13 | Benchmark never would have approved the transaction | 12:30:56 |
| 14 | had it been aware of the Stroz report, correct? | 12:31:02 |
| 15 | MR. BRILLE:  Same objection. | 12:31:03 |
| 16 | MR. FLUMENBAUM:  Objection as to form, but you | 12:31:05 |
| 17 | may -- | 12:31:06 |
| 18 | THE WITNESS:  The only clarification I would make | 12:31:08 |
| 19 | is that there are many other matters, also. | 12:31:10 |
| 20 | BY MR. VERHOEVEN: | |
| 21 | Q.    Yeah. | |
| 22 | A.    But this is one of those.  Yes, correct. | 12:31:14 |
| 23 | Q.    But it's your contention that Benchmark would | 12:31:18 |
| 24 | not have approved the amended certificate of | 12:31:18 |
| 25 | incorporation referenced here, or the voting | 12:31:22 |

Page 160

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | agreement, if it had known the real facts behind the | 12:31:25 |
| 2 | Otto acquisition, isn't it? | 12:31:28 |
| 3 | MR. BRILLE:  Object to form. | 12:31:29 |
| 4 | MR. FLUMENBAUM:  You may answer. | 12:31:30 |
| 5 | THE WITNESS:  Along with other things.  But, yes. | 12:31:32 |
| 6 | That was one of -- of many other things. | 12:31:36 |
| 7 | BY MR. VERHOEVEN: | 12:31:36 |
| 8 | Q.   The next sentence says: | 12:31:46 |
| 9 | "Kalanick also understood that these matters, | 12:31:49 |
| 10 | once revealed, would likely force him to resign as | 12:31:53 |
| 11 | Uber's CEO." | 12:31:54 |
| 12 | Do you see that? | 12:31:55 |
| 13 | A.   I do. | 12:31:56 |
| 14 | Q.   And one of those matters is the facts | 12:32:00 |
| 15 | underlying the Otto acquisition, correct? | 12:32:02 |
| 16 | MR. BRILLE:  Object to form. | 12:32:04 |
| 17 | MR. FLUMENBAUM:  You may answer. | 12:32:05 |
| 18 | THE WITNESS:  Yes, one of those facts. | 12:32:08 |
| 19 | BY MR. VERHOEVEN: | 12:32:08 |
| 20 | Q.   And throughout this sentence, if it refers to | 12:32:21 |
| 21 | these matters, your answer would be the same, that | 12:32:24 |
| 22 | included in the matters would be the Otto transaction? | 12:32:28 |
| 23 | MR. FLUMENBAUM:  Objection as to form.  But . . . | 12:32:32 |
| 24 | BY MR. VERHOEVEN: | |
| 25 | Q.   I mean, you can see the next -- okay.  I was | |

Page 161

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | trying to shorten it. | 12:32:35 |
| 2 | The next sentence says: | 12:32:36 |
| 3 | "Kalanick, therefore, knowingly concealed | 12:32:38 |
| 4 | these matters from Benchmark and Uber's board to | 12:32:43 |
| 5 | obtain, for his personal benefit . . ." | 12:32:47 |
| 6 | And then it goes on.  Do you see that? | 12:32:49 |
| 7 | A.   Yes. | 12:32:51 |
| 8 | Q.   "These matters" reference, in part, the Otto | 12:32:55 |
| 9 | acquisition? | 12:32:56 |
| 10 | A.   In part. | 12:32:57 |
| 11 | Q.   And the testimony you gave about it earlier | 12:32:59 |
| 12 | today? | 12:33:00 |
| 13 | A.   That is correct. | 12:33:00 |
| 14 | Q.   Okay.  Why would the -- in your view, why | 12:33:12 |
| 15 | would the facts underlying the Otto acquisition, if | 12:33:16 |
| 16 | known by Benchmark and the board, likely have forced | 12:33:21 |
| 17 | Travis Kalanick to resign? | 12:33:24 |
| 18 | MR. BRILLE:  Object to form. | 12:33:27 |
| 19 | MR. FLUMENBAUM:  Objection to form.  But again, | 12:33:28 |
| 20 | you can't disclose any of the specifics that are in | 12:33:32 |
| 21 | the Stroz report. | 12:33:34 |
| 22 | THE WITNESS:  Understood. | 12:33:39 |
| 23 | So one, just reiterating, like, there were | 12:33:46 |
| 24 | multiple incidents that led us to this conclusion and | 12:33:50 |
| 25 | assess this belief in this lawsuit. | 12:33:54 |

Page 162

| | | |
|---|---|---|
| 1 | With respect to the Otto acquisition, there's | 12:33:57 |
| 2 | actually more detail later in the complaint.  But it's | 12:34:00 |
| 3 | become public knowledge, not involving the Stroz | 12:34:05 |
| 4 | report, that at the time the board was asked to | 12:34:09 |
| 5 | approve this, that -- that Travis and other members of | 12:34:13 |
| 6 | the management team had knowledge that there were five | 12:34:16 |
| 7 | disks that were in Anthony's possession, and that he | 12:34:23 |
| 8 | said there was Google information on those disks.  So | 12:34:25 |
| 9 | that's now in the public record. | 12:34:29 |
| 10 | When you look at the -- we've already been | 12:34:32 |
| 11 | through it.  But you look at the deal, and the fact | 12:34:35 |
| 12 | that so much of it weighed on him and the fact that | 12:34:39 |
| 13 | there were large indemnity provisions put aside | 12:34:45 |
| 14 | specifically for him, I don't know of a way you could | 12:34:50 |
| 15 | possibly present that to a board and say that this was | 12:34:53 |
| 16 | clean diligence and -- and that be okay.  Like, I -- I | 12:35:02 |
| 17 | can't fathom that. | 12:35:05 |
| 18 | BY MR. VERHOEVEN: | |
| 19 | Q.  When you referred to "him," you're referring | 12:35:08 |
| 20 | to Mr. Levandowski, right, in that answer? | 12:35:10 |
| 21 | MR. BRILLE:  Object to form. | 12:35:13 |
| 22 | THE WITNESS:  It's in the public record that -- | 12:35:15 |
| 23 | that the Uber executives were aware -- I'll -- I'll | 12:35:17 |
| 24 | try not to use pronouns -- were aware that Anthony | 12:35:21 |
| 25 | Levandowski had the five disks. | 12:35:24 |

Page 163

| | | |
|---|---|---|
| 1 | When -- when I was talking about -- you know, | 12:35:26 |
| 2 | this is the largest recipient of the proceeds from the | 12:35:32 |
| 3 | acquisition and the leader of the group and the one | 12:35:38 |
| 4 | that stands to benefit the most from the | 12:35:40 |
| 5 | indemnification.  So calling the diligence clean, when | 12:35:45 |
| 6 | you have this fact, is a -- is misrepresentation, you | 12:35:53 |
| 7 | know, from my point of view. | 12:35:57 |
| 8 | BY MR. VERHOEVEN: | 12:35:57 |
| 9 | Q.   Okay.  Thank you. | 12:35:58 |
| 10 | And why do you think Mr. Kalanick knowingly | 12:36:16 |
| 11 | concealed those issues? | 12:36:18 |
| 12 | MR. FLUMENBAUM:  Objection to form. | 12:36:22 |
| 13 | MR. BRILLE:  Objection to form. | 12:36:24 |
| 14 | BY MR. VERHOEVEN: | 12:36:24 |
| 15 | Q.   Well, let me read the complaint.  Paragraph | 12:36:25 |
| 16 | 6: | |
| 17 | "Kalanick, therefore, knowingly concealed | 12:36:30 |
| 18 | these matters from Benchmark and Uber's board." | 12:36:34 |
| 19 | And then it goes on.  Do you see that? | 12:36:34 |
| 20 | A.   I do. | 12:36:35 |
| 21 | Q.   Why do you think he did? | 12:36:36 |
| 22 | A.   I'd be speculating as to his intent.  I don't | 12:36:40 |
| 23 | know. | 12:36:40 |
| 24 | Q.   Well, it says here: | 12:36:40 |
| 25 | "For his personal benefit, the unilateral | 12:36:47 |

Page 164

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | right to pack the board with three additional | 12:36:50 |
| 2 | directors of his choosing." | |
| 3 | You stand by that statement; right? | 12:36:52 |
| 4 | A.   I do. | 12:36:53 |
| 5 | Q.   Any other reasons? | 12:36:55 |
| 6 | A.   I -- I -- I'd be guessing that -- what his | 12:37:02 |
| 7 | intentions were. | 12:37:03 |
| 8 | Q.   Did you ever talk to Mr. Kalanick about why | 12:37:05 |
| 9 | he concealed the facts underlying the Otto | 12:37:08 |
| 10 | transaction? | 12:37:09 |
| 11 | A.   I have not. | 12:37:10 |
| 12 | Q.   What about with other executive management at | 12:37:14 |
| 13 | Uber? | 12:37:30 |
| 14 | A.   Well, not outside of conversations that were | 12:37:34 |
| 15 | privileged with the -- with the legal team. | 12:37:36 |
| 16 | Q.   I direct your attention to paragraph 33. | 12:38:05 |
| 17 | It's on page 15 of Exhibit 918. | 12:38:08 |
| 18 | MR. FLUMENBAUM:  I'm sorry.  Hold on. | 12:38:10 |
| 19 | Thank you. | 12:38:11 |
| 20 | BY MR. VERHOEVEN: | 12:38:11 |
| 21 | Q.   Are you ready for questions? | 12:38:27 |
| 22 | A.   Yes. | 12:38:27 |
| 23 | Q.   Is this the place where you testified earlier | 12:38:30 |
| 24 | the deal -- the details of the Otto transaction were | 12:38:35 |
| 25 | set forth in more detail, this section entitled -- | 12:38:44 |

Page 165

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes, this section.  That's fair.  Correct. | 12:38:46 |
| 2 | Q.   You've referenced there's a -- I'm sorry. | 12:39:07 |
| 3 | The complaint references: | 12:39:12 |
| 4 | "Kalanick praised Levandowski as one of the | 12:39:15 |
| 5 | world's leading autonomous engineers and an | 12:39:20 |
| 6 | entrepreneur with a real sense of urgency. | 12:39:24 |
| 7 | "Kalanick further described Levandowski as | 12:39:26 |
| 8 | his brother from another mother." | 12:39:30 |
| 9 | The allegation is -- and your belief is -- | 12:39:34 |
| 10 | that he was saying all that, but withholding the | 12:39:37 |
| 11 | information he had from the Stroz investigation; | 12:39:41 |
| 12 | right? | 12:39:41 |
| 13 | MR. BRILLE:  Object to form. | 12:39:44 |
| 14 | MR. FLUMENBAUM:  Object to form.  You can try to | 12:39:46 |
| 15 | answer that. | 12:39:49 |
| 16 | THE WITNESS:  These are -- these are taken from -- | 12:39:50 |
| 17 | from -- as you can see, from public statements that he | 12:39:53 |
| 18 | made. | 12:39:54 |
| 19 | His praise for Anthony in these public venues | 12:39:59 |
| 20 | is consistent with what he presented at the board | 12:40:03 |
| 21 | level, and so there's no inconsistency here. | 12:40:06 |
| 22 | I -- and as you -- as you assert, he did not | 12:40:12 |
| 23 | disclose these other details, you know.  And I -- and | 12:40:17 |
| 24 | I had mentioned, and they're later in here in the | 12:40:20 |
| 25 | complaint, that some of that is now public with regard | 12:40:23 |

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | to the five-disk matter. | 12:40:26 |
| 2 | BY MR. VERHOEVEN: | 12:40:26 |
| 3 | Q.   The last sentence of this paragraph says: | 12:40:29 |
| 4 | "In discussing the Otto transaction in 2016, | 12:40:32 |
| 5 | Kalanick repeatedly emphasized to Gurley and other | 12:40:36 |
| 6 | board members that Uber's acquisition of Otto, | 12:40:39 |
| 7 | employment of Anthony Levandowski, would be | 12:40:41 |
| 8 | transformative for Uber's business." | 12:40:44 |
| 9 | Do you see that? | 12:40:45 |
| 10 | A.   I do. | 12:40:46 |
| 11 | Q.   What is that referring to? | 12:40:48 |
| 12 | A.   Once again, consistent with what we discussed | 12:40:53 |
| 13 | earlier, there was a -- a big part of the argument for | 12:40:57 |
| 14 | why we needed to do this transaction was to employ | 12:41:01 |
| 15 | Anthony Levandowski, who -- who Mr. Kalanick believed | 12:41:04 |
| 16 | was one of the leading experts on autonomous vehicles | 12:41:07 |
| 17 | in -- in the -- in the world. | 12:41:10 |
| 18 | Q.   Was employing Anthony Levandowski worth | 12:41:14 |
| 19 | $680 million? | 12:41:17 |
| 20 | MR. BRILLE:  Object to form. | 12:41:17 |
| 21 | MR. FLUMENBAUM:  Object to form.  We've sort of | 12:41:19 |
| 22 | been over this. | 12:41:20 |
| 23 | You can answer it again. | 12:41:22 |
| 24 | THE WITNESS:  Yeah, I don't -- I don't mind going | 12:41:24 |
| 25 | over it again. | 12:41:25 |

Veritext Legal Solutions
866 299-5127

1          That -- that discussion did take place at a          12:41:27

2   board meeting, as we had discussed.          12:41:28

3          The argument was to why that headline figure          12:41:32

4   was not un- -- was not unreasonable related to the          12:41:37

5   notion of the milestones that we've previously          12:41:41

6   discussed.          12:41:42

7   BY MR. VERHOEVEN:          12:41:42

8      Q.   I direct your attention to paragraph 67.          12:42:14

9      A.   Oh, wow.          12:42:15

10      Q.   Page 30.  All right.  Take a second and read          12:42:31

11   it and tell me when you're ready to answer questions.          12:42:32

12      MR. FLUMENBAUM:  Paragraph 67?          12:42:36

13      MR. VERHOEVEN:  Paragraph 67.          12:42:38

14          (Witness reviews document.)          12:42:49

15      THE WITNESS:  Okay.          12:42:50

16   BY MR. VERHOEVEN:          12:42:50

17      Q.   And this -- this references:          12:42:51

18          "Kalanick's fraudulent statements and          12:42:54

19   omissions breached his fiduciary duties, including,"          12:42:57

20   and then it gets more specific.          12:42:59

21          Do you see that?          12:43:00

22      A.   Um-hum.          12:43:01

23      Q.   Which of Mr. Kalanick's statements related to          12:43:08

24   the Otto transaction breached his fiduciary duties?          12:43:13

25      A.   It would seem obvious that this statement          12:43:22

Page 168

| | | |
|---|---|---|
| 1 | that was made to the board that the diligence, which, | 12:43:26 |
| 2 | as we already ascertained, was remarkably critical to | 12:43:33 |
| 3 | the transaction, in light of the presence of the | 12:43:34 |
| 4 | indemnity and all those things, was clean, left me -- | 12:43:37 |
| 5 | and I can't speak for the other board members -- with | 12:43:40 |
| 6 | an impression that is remarkably different from that | 12:43:44 |
| 7 | that I hold today. | 12:43:46 |
| 8 | Q.   And I take it it's your belief that his | 12:43:55 |
| 9 | omission of that critical information during his | 12:44:00 |
| 10 | presentation also constituted fraud and a breach of | 12:44:09 |
| 11 | his fiduciary duties? | 12:44:11 |
| 12 | MR. BRILLE:  Object to form. | 12:44:12 |
| 13 | THE WITNESS:  That is correct.  Once again, this | 12:44:14 |
| 14 | statement refers to other issues also.  But with | 12:44:20 |
| 15 | regard to that specific issue, you are correct. | 12:44:24 |
| 16 | BY MR. VERHOEVEN: | 12:44:24 |
| 17 | Q.   Does anything else come to mind, still on | 12:44:47 |
| 18 | paragraph 67 -- understanding it's a general | 12:44:52 |
| 19 | statement, but focusing specifically on the Otto | 12:44:55 |
| 20 | acquisition portion of it. | 12:44:57 |
| 21 | A.   Um-hum. | 12:44:59 |
| 22 | Q.   Does anything else come to mind, in addition | 12:45:02 |
| 23 | to what you've already testified to, that was either a | 12:45:09 |
| 24 | statement or omission by Mr. Kalanick that breached | 12:45:13 |
| 25 | his fiduciary duties or constituted fraud? | 12:45:17 |

Page 169

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Related to that particular transaction? | 12:45:25 |
| 2 | Q.    Right.  Or related to Otto, related to | 12:45:28 |
| 3 | Mr. Levandowski. | 12:45:29 |
| 4 | A.    Yeah.  Yeah. | 12:45:31 |
| 5 | No, not that we haven't previously discussed. | 12:45:34 |
| 6 | MR. VERHOEVEN:  Perhaps we should take a short | 12:46:02 |
| 7 | break, and I'll just review -- I may have another five | 12:46:06 |
| 8 | minutes of questions -- | 12:46:07 |
| 9 | MR. FLUMENBAUM:  Okay.  Great. | 12:46:08 |
| 10 | MR. VERHOEVEN:  -- but I'm coming up to the end. | 12:46:10 |
| 11 | MR. FLUMENBAUM:  Great. | 12:46:12 |
| 12 | THE VIDEOGRAPHER:  Off the record at 12:46 p.m. | 12:46:14 |
| 13 | (Recess taken.) | 12:46:15 |
| 14 | THE VIDEOGRAPHER:  Back on the record at 12:54 | 12:54:08 |
| 15 | p.m. | 12:54:08 |
| 16 | BY MR. VERHOEVEN: | 12:54:08 |
| 17 | Q.    I direct your attention to paragraph 37 of | 12:54:17 |
| 18 | Exhibit 918, the Benchmark complaint. | 12:54:22 |
| 19 | A.    Um-hum. | 12:54:23 |
| 20 | Q.    And read 37 to yourself and tell me when | 12:54:27 |
| 21 | you're ready to answer questions. | 12:54:29 |
| 22 | (Witness reviews document.) | 12:54:48 |
| 23 | A.    Okay. | 12:54:49 |
| 24 | Q.    So earlier -- well, I direct your attention | 12:54:52 |
| 25 | to the phrase "interim findings." | 12:54:54 |

Page 170

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Do you see it's sprinkled through the | 12:54:57 |
| 2 | paragraph there? | 12:54:58 |
| 3 | A.   Yes. | 12:54:58 |
| 4 | Q.   When we testified earlier about this -- I | 12:55:02 |
| 5 | don't want to go over it again -- I think you just | 12:55:05 |
| 6 | said -- you and I just said "the Stroz report." | 12:55:09 |
| 7 | But were you referencing, specifically in | 12:55:11 |
| 8 | this time period, the interim findings of the Stroz | 12:55:14 |
| 9 | investigation? | 12:55:16 |
| 10 | MR. FLUMENBAUM:   Objection as to form. | 12:55:19 |
| 11 | BY MR. VERHOEVEN: | 12:55:19 |
| 12 | Q.   When you testified about if something had | 12:55:22 |
| 13 | been disclosed, if the Stroz report had been | 12:55:25 |
| 14 | disclosed, more accurately what you meant is if the | 12:55:28 |
| 15 | interim findings of the Stroz report -- of the Stroz | 12:55:30 |
| 16 | investigation had been disclosed; is that right? | 12:55:33 |
| 17 | A.   This particular complaint was based on all | 12:55:44 |
| 18 | that information that was in the public record. | 12:55:46 |
| 19 | There are documents related to this lawsuit | 12:55:50 |
| 20 | that highlight that, as of this date, there were these | 12:55:54 |
| 21 | interim findings available. | 12:55:55 |
| 22 | Q.   Right. | 12:55:59 |
| 23 | A.   And we're merely highlighting that those were | 12:55:59 |
| 24 | never disclosed to the board. | 12:56:01 |
| 25 | Q.   Okay.   I direct your attention to paragraph | 12:56:12 |

Page 171

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | 77 of the complaint, Exhibit 918. | 12:56:16 |
| 2 | There's a sentence in here that says: | 12:56:33 |
| 3 | "At the time, Benchmark could not have known | 12:56:38 |
| 4 | of the matters Kalanick intentionally concealed, many | 12:56:42 |
| 5 | of which were within Kalanick's exclusive knowledge or | 12:56:46 |
| 6 | only known to Kalanick and an 'inner circle' of Uber | 12:56:53 |
| 7 | executives loyal to him (many of whom have since been | 12:56:57 |
| 8 | terminated or forced to resign due to the misconduct | 12:57:01 |
| 9 | described above)." | 12:57:06 |
| 10 | Do you see that sentence? | 12:57:08 |
| 11 | A.   Um-hum. | 12:57:10 |
| 12 | Q.   Who was in Kalanick's inner circle, as | 12:57:13 |
| 13 | referenced in this paragraph, to the extent you have | 12:57:19 |
| 14 | knowledge? | 12:57:19 |
| 15 | A.   Sure.  The -- once again, I would reiterate | 12:57:24 |
| 16 | that this complaint and this paragraph reference many | 12:57:29 |
| 17 | issues, not just those related to -- to the Otto | 12:57:33 |
| 18 | acquisition.  And so that phrase may or may not have | 12:57:38 |
| 19 | applicability to what we're discussing today. | 12:57:41 |
| 20 | You know, when you look at the parenthetical | 12:57:44 |
| 21 | phrase about -- | 12:57:49 |
| 22 | Q.   I'm just asking about who the -- who the | 12:57:51 |
| 23 | inner circle is. | 12:57:53 |
| 24 | A.   I -- I was getting to that. | 12:57:55 |
| 25 | Q.   Okay. | |

Page 172

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   So when you look at the phrase about | 12:57:59 |
| 2 | termination or forced to resign -- | 12:58:02 |
| 3 | THE WITNESS:  Is this part confidential also? | 12:58:04 |
| 4 | Because I -- I . . . | 12:58:07 |
| 5 | MR. FLUMENBAUM:  I think the resignations are all | 12:58:10 |
| 6 | public, aren't they? | 12:58:11 |
| 7 | MR. BRILLE:  The fact of a resignation is | 12:58:14 |
| 8 | probably -- is not privileged, the fact of a | 12:58:18 |
| 9 | resignation.  To the extent that you -- | 12:58:22 |
| 10 | THE WITNESS:  I just don't want to get to -- you | 12:58:25 |
| 11 | know. | 12:58:25 |
| 12 | BY MR. VERHOEVEN: | 12:58:25 |
| 13 | Q.   Okay.  I'm not asking you about the | 12:58:36 |
| 14 | parenthetical.  I'm just asking the words "inner | 12:58:39 |
| 15 | circle." | 12:58:40 |
| 16 | A.   Yeah, I know.  It informs it though. | 12:58:43 |
| 17 | Well, let me just state this. | 12:58:50 |
| 18 | With regard to the specific Otto acquisition, | 12:58:55 |
| 19 | you know, as noted in 38, there were -- I think it's | 12:59:02 |
| 20 | 38.  Yeah.  There were -- you know, you have two other | 12:59:06 |
| 21 | parties there that were aware of this fact about the | 12:59:09 |
| 22 | five disks that weren't -- that wasn't disclosed to | 12:59:15 |
| 23 | the board, so there's -- there's two names right | 12:59:18 |
| 24 | there. | 12:59:18 |
| 25 | Q.   What are the two names, for the record? | 12:59:18 |

Page 173

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Nina Qi and Cameron. | 12:59:24 |
| 2 | Q.   So with respect to the Waymo dispute or | 12:59:29 |
| 3 | the -- withdrawn. | 12:59:30 |
| 4 | With respect to the Otto acquisition, this | 12:59:35 |
| 5 | phrase you interpret to reference those two | 12:59:37 |
| 6 | individuals? | 12:59:38 |
| 7 | A.   Yes. | 12:59:38 |
| 8 | Q.   Has either of those two individuals been | 12:59:47 |
| 9 | terminated, to your knowledge? | 12:59:49 |
| 10 | A.   No. | 12:59:49 |
| 11 | Q.   All right. | |
| 12 | MR. FLUMENBAUM:  Can I have a -- all right. | 13:00:05 |
| 13 | Forget it.  Go ahead. | 13:00:07 |
| 14 | MR. VERHOEVEN:  So what did you want to talk to | 13:00:10 |
| 15 | him about? | 13:00:10 |
| 16 | MR. FLUMENBAUM:  No, just go ahead. | 13:00:13 |
| 17 | MR. VERHOEVEN:  Okay. | 13:00:13 |
| 18 | BY MR. VERHOEVEN: | |
| 19 | Q.   There came a time in which you resigned from | 13:00:16 |
| 20 | the board of Uber? | 13:00:17 |
| 21 | A.   Correct. | 13:00:17 |
| 22 | Q.   When was that, roughly? | 13:00:19 |
| 23 | A.   I think it was a couple of days after Travis | 13:00:27 |
| 24 | signed the resignation letter we've already looked at. | 13:00:32 |
| 25 | Q.   Why did you resign? | 13:00:45 |

Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    The members of -- of our partnership and I | 13:00:49 |
| 2 | had a lengthy discussion about trying to -- whether or | 13:00:56 |
| 3 | not it made sense to swap out the board member that | 13:01:00 |
| 4 | represented Benchmark with Uber, in an effort to try | 13:01:04 |
| 5 | and move things forward in a positive direction. | 13:01:08 |
| 6 | The -- the conversations and back and forth | 13:01:13 |
| 7 | and events that led to the meeting in Chicago, I think | 13:01:16 |
| 8 | it's safe to say, had a strain on the relationship | 13:01:21 |
| 9 | between myself and -- and Mr. Kalanick.  And it was | 13:01:29 |
| 10 | merely a decision from our firm to try and put a new | 13:01:35 |
| 11 | foot forward to try and create kind of a new day and | 13:01:39 |
| 12 | new relationship with the board. | 13:01:41 |
| 13 | Q.    Did you have any discussions with anyone at | 13:01:45 |
| 14 | Uber about your resignation before you resigned? | 13:01:48 |
| 15 | A.    I did not. | 13:01:49 |
| 16 | Q.    What about with other board members? | 13:01:51 |
| 17 | A.    I did not. | 13:01:53 |
| 18 | Q.    Have you had any conversations with anybody | 13:02:01 |
| 19 | at Uber since you've resigned from the board? | 13:02:04 |
| 20 | A.    Yeah.  There were -- there were numerous | 13:02:04 |
| 21 | conversations, as part of the handoff process I was | 13:02:13 |
| 22 | involved in, all of those committees.  I wanted to | 13:02:16 |
| 23 | make sure that -- that my partner got the benefit of | 13:02:19 |
| 24 | the -- you know, the transfer of information, that | 13:02:23 |
| 25 | kind of thing.  We had a lot of meetings to make sure | 13:02:26 |

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    that that was so . . .                              13:02:27

 2        Q.   Did your partner assume all the positions  13:02:29

 3    that you had?                                        13:02:31

 4        A.   Yes, with the exception that I believe that 13:02:34

 5    some of the special committees have been rolled into 13:02:37

 6    one, called a special matters committee.             13:02:41

 7        Q.   Okay.  Can you elucidate on that?  Which -- 13:02:43

 8    which ones were combined into that committee?        13:02:46

 9        A.   I think the one that was looking into the   13:02:48

10    Holder issues, the one -- there was -- actually, I had 13:02:54

11    left one out from earlier, because I believe there was 13:03:00

12    a special committee tied to -- to the Vitas Greyball  13:03:05

13    investigation.  And the Waymo lawsuit evolved, then   13:03:08

14    rolled into a single committee now.  That happened    13:03:12

15    after I left.                                         13:03:13

16        Q.   Who's on that committee?                    13:03:15

17        A.   I believe Matt Cohler, David Trujillo, and  13:03:19

18    Arianna Huffington.                                   13:03:21

19        Q.   And as far as you know, that committee is -- 13:03:34

20    is still extant, still exists?                        13:03:38

21        A.   As far as I know, that's correct.           13:03:40

22        Q.   Okay.  Did you have any conversations with  13:03:43

23    Arianna Huffington about the Uber acquisition of Otto? 13:04:01

24        A.   I don't recall any conversations with Arianna 13:04:06

25    specifically about the acquisition, no.              13:04:08
```

Page 176

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q. Did Ms. Huffington participate and contribute | 13:04:13 |
| 2 | to these board meetings we went through on this | 13:04:16 |
| 3 | subject? | 13:04:17 |
| 4 | A. I don't recall any specific commentary | 13:04:21 |
| 5 | related to the board meeting -- that she made related | 13:04:24 |
| 6 | to the board meeting around the Otto acquisition. | 13:04:29 |
| 7 | The purpose of many of these special | 13:04:32 |
| 8 | committees is -- is expressly legal in nature. And so | 13:04:38 |
| 9 | there were lots of communications in those meetings | 13:04:41 |
| 10 | that I would assume were privileged. | 13:04:44 |
| 11 | So I have recollection of those conversations | 13:04:47 |
| 12 | but not -- I don't remember her opining directly on | 13:04:51 |
| 13 | the Otto acquisition. | 13:04:53 |
| 14 | Q. Do you believe she did? | 13:04:56 |
| 15 | A. I -- I don't -- I don't recall. | 13:04:58 |
| 16 | Q. Do you recall sending Ms. Huffington a copy | 13:05:05 |
| 17 | of the Stroz report? | 13:05:07 |
| 18 | A. I don't recall doing that. | 13:05:11 |
| 19 | Q. Why would you have done that, if you did? | 13:05:16 |
| 20 | MR. BRILLE: Object to form. | 13:05:17 |
| 21 | BY MR. VERHOEVEN: | 13:05:17 |
| 22 | Q. Okay. I'll represent that you did. | 13:05:19 |
| 23 | A. Okay. If I did, it would likely relate to | 13:05:23 |
| 24 | the fact that we were both on the -- on the special | 13:05:25 |
| 25 | committee to look into the -- to manage the Waymo | 13:05:32 |

Page 177

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    litigation.                                          13:05:33

2        Q.   Did you have a discussion with her about the   13:05:34

3    report?                                              13:05:35

4        MR. FLUMENBAUM:  You can answer -- you can answer   13:05:38

5    that yes or no, if you recall.                       13:05:40

6        THE WITNESS:  I -- I -- I just don't recall.     13:05:46

7    BY MR. VERHOEVEN:                                    13:05:46

8        Q.   Do you think you would have?               13:05:49

9        MR. FLUMENBAUM:  Objection as to form.          13:05:51

10       THE WITNESS:  It's possible.                    13:05:52

11   BY MR. VERHOEVEN:                                    13:05:52

12       Q.   I mean, you sent it to her?                13:05:55

13       A.   Okay.  If I did, then, it's likely that I   13:05:58

14   did.                                                 13:05:58

15       Q.   Have a conversation?                       13:05:59

16       A.   Yeah.                                       13:06:02

17       Q.   You can't remember the substance of any    13:06:02

18   conversation?                                        13:06:04

19       MR. FLUMENBAUM:  Asked and answered.            13:06:08

20       THE WITNESS:  I -- I don't recall any specifics.   13:06:11

21       MR. VERHOEVEN:  You're supposed to only object to   13:06:12

22   form.                                                13:06:13

23   BY MR. VERHOEVEN:                                    13:06:13

24       Q.   What about Mr. Bonderman?  Did you send a   13:06:19

25   copy of the report to him?                           13:06:21

                                            Page 178

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   I don't recall.                     13:06:22

 2        Q.   Do you remember any conversations you had    13:06:26

 3   with Mr. Bonderman about the report or the Otto    13:06:31

 4   acquisition?                                      13:06:32

 5        A.   There were numerous discussions, as part of  13:06:38

 6   the special committee, that may or may not have   13:06:43

 7   involved the report, but those would be privileged.  13:06:46

 8        Q.   Was there lawyers in every meeting of the   13:06:49

 9   special committee?                               13:06:51

10        A.   Yes.                                    13:06:51

11        Q.   Who were they?                         13:06:53

12        A.   It was Patrick Robbins from Shearman.   13:06:57

13        Q.   Anyone else?  Any other firms?         13:07:03

14        A.   No.  No.  Not as that -- not while I was a  13:07:06

15   member of the committee.                         13:07:07

16        Q.   Do you remember any conversations with   13:07:10

17   Mr. Bonderman outside of this -- of the committee  13:07:14

18   concerning the Otto acquisition?                 13:07:20

19        A.   I don't remember any specific conversations.  13:07:32

20   I would say that it's my opinion that he was also of  13:07:40

21   the belief that Anthony should have been terminated as  13:07:43

22   soon as he pled the Fifth.                       13:07:45

23        Q.   Is that based on conversations with him   13:07:47

24   generally?                                       13:07:49

25        A.   Yes.                                    13:07:49
```

Page 179

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And you -- can you recall the specifics of | 13:07:51 |
| 2 | any of those conversations? | 13:07:52 |
| 3 | A.   I don't remember any of the specifics. | 13:07:55 |
| 4 | Q.   Did he contribute during board meetings on | 13:07:57 |
| 5 | this subject? | 13:07:59 |
| 6 | A.   Yes. | 13:07:59 |
| 7 | Q.   Can you remember what he said in any of those | 13:08:01 |
| 8 | meetings? | 13:08:02 |
| 9 | A.   I -- I don't.  I just know that his -- I know | 13:08:04 |
| 10 | that that was his point of view. | 13:08:06 |
| 11 | MR. VERHOEVEN:  Thank you very much, Mr. Gurley. | 13:08:28 |
| 12 | I have no further questions at this time. | 13:08:31 |
| 13 | We have, as you've noticed, several privilege | 13:08:34 |
| 14 | instructions which are currently in dispute.  And if | 13:08:39 |
| 15 | there's a ruling that certain documents have to be | 13:08:43 |
| 16 | produced, we -- just so you know, we may take the | 13:08:47 |
| 17 | position that you have to come back and answer some | 13:08:49 |
| 18 | questions about that. | 13:08:50 |
| 19 | THE WITNESS:  Okay. | 13:08:50 |
| 20 | MR. VERHOEVEN:  Thank you very much for your time. | 13:08:53 |
| 21 | THE WITNESS:  Thank you. | |
| 22 | MR. FLUMENBAUM:  Anybody else? | 13:08:54 |
| 23 | MR. BRILLE:  Not here, no. | 13:08:56 |
| 24 | MR. FLUMENBAUM:  Thank you.  Thank you all. | 13:08:58 |
| 25 | THE VIDEOGRAPHER:  This concludes today's | 13:09:01 |

Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1       deposition of William Gurley, consisting of three        13:09:04

2    DVDs.                                                        13:09:05

3           We're off the record at 1:09 p.m.                     13:09:09

4           (Whereupon, the deposition was adjorned at

5           1:09 p.m.)

6

7

8

9

10

11

12

13

14            _____

15                 JOHN WILLIAM GURLEY

16

17

18

19

20

21

22

23

24

25

                                                        Page 181
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          FEDERAL CERTIFICATE OF DEPOSITION OFFICER

2       I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby declare:

3       That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn

4 pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of

5 the testimony given by the witness;

6       That said deposition was taken down by me in shorthand at the time and place therein named and

7 thereafter reduced to text under my direction;

8      --X---    That the witness was requested to review the transcript and make any changes to the

9 transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure;

10      -----    No changes have been provided by the witness during the period allowed;

11      -----    The changes made by the witness are

12 appended to the transcript;

13      -----    No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal

14 Rules of Civil Procedure.

15       I further declare that I have no interest in the event of the action.

16       I declare under penalty of perjury under the laws

17 of the United States of America that the foregoing is true and correct.

18       WITNESS my hand this 25th day of August, 2017.

19

20

21

22

23

24

25         ANRAE WIMBERLEY, CSR NO. 7778

Veritext Legal Solutions
866 299-5127

# *EXHIBIT 3*

## *UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

# *EXHIBIT 3*

**Exhibit D**

**IP License Terms**

**DEFINITIONS**

**Trucking Business:** The business of the development, manufacture and commercialization of autonomous or semi-autonomous Class 6 or above off-road or on-road vehicles used for over-the-road or long-haul purposes (including over-the-road or long-haul routes that go through or end in a city or location other than a long-haul roadway) and related equipment and services, but not local or short-haul operations. For clarity, distribution center to distribution center operations shall be deemed long-haul.

**Direct Competitor:** Shall mean (i) a party in the transportation-as-a-service industry (whether direct or indirect), including but not limited to on-demand ridesharing and car rental services, including, without limitation, Lyft, Didi Kuaidi, OlaCabs, GrabTaxi and any of their respective affiliates (controlled by or under common control) and/or successors, and (ii) Alphabet and any of its affiliates (controlled by or under common control) and/or successors. [*On-demand ridesharing to be further defined in definitive agreement.*]

**Licensed IP:** That IP owned by Unicorn and its affiliates related to laser sensors, perception, planning algorithms, simulation environment, collected sensor data and maps created from that data (including related map information) related to controlled access highways, testing framework (regression as well as unit, hardware and functional tests ), including source and build environment for the foregoing, to support autonomous operation of vehicles that is reasonably useful or necessary for the Trucking Business.

**LICENSE CONSTRUCT**

**License:**

Unicorn will grant New Trucking Company a worldwide, royalty-free, exclusive (except as provided below), nontransferable (except as provided below), non-sublicenseable (except as provided below), license to use and exploit the Licensed IP to develop, make, use, offer and sell products and services solely in the field of the Trucking Business ("Field").

- The license shall be exclusive in the Field; provided that if New Trucking Company ceases to operate the Trucking Business (except in connection with a permitted Company Sale) or upon a New Trucking Company bankruptcy, liquidation or dissolution, Unicorn will have the right to revoke the exclusivity.
- Unicorn is willing to allow the sublicense of the Licensed IP in the following scenarios: (i) limited access to a third party performing development or testing services for New Trucking Company in the Field, subject to confidentiality obligations and other reasonable restrictions under the circumstances and (ii) sales to customers solely as an integrated part of a New Trucking Company commercial product or service in the Field.

- Unicorn is willing to allow the license to be transferred as part of an acquisition of all or substantially all of the equity or all or substantially all of the assets of New Trucking Company ("Company Sale") to any acquirer, except to any acquirer that is (x) a Direct Competitor or (y) primarily in the on-demand local or short-haul delivery logistics business, provided Unicorn shall receive prior written notice of such Company Sale. For clarity, New Trucking Company shall be free to consummate a Company Sale at any time without restriction if the Licensed IP is not included as part of the Company Sale and the license is terminated.

**Non-Blocking License Back:**

New Trucking Company will grant Unicorn a non-exclusive, worldwide, perpetual, irrevocable, royalty-free license to use and exploit any patent rights arising from or related to modifications, derivatives, improvements or enhancements of the Licensed IP created by or for New Trucking Company (or any permitted successor and/or affiliate thereof). The field of use for such license shall not include the Trucking Business so long as (i) the license to the Licensed IP remains in effect and (ii) the exclusivity applicable to the license to the Licensed IP remains in effect.

**Restrictions:**

Licensed IP may never be licensed, sold or provided to a third party on a stand-alone basis.

Source code and algorithms in the Licensed IP may never be shared with any party, other than approved sublicensees performing development or test services, without Unicorn's prior written approval, which shall be granted in Unicorn's sole discretion.

New Trucking Company can't sell products or services that include Licensed IP to a Direct Competitor.

**Termination:**

The license may be terminated by Unicorn in the event of (i) a material breach by New Trucking Company of the license rights and restrictions related to the Licensed IP (which shall be subject to a periodic Unicorn audit right upon Unicorn's reasonable advance notice) that is not cured, if capable of cure, within 30 days of notice of such breach or such further time as may be reasonably required, not to exceed 60 days, provided the New Trucking Company has commenced cure within such 30 days and diligently pursues to completion; or (ii) any transfer of the license in connection with a Company Sale in violation of the Company Sale restrictions set forth above.  For purposes of clarity, an unintentional breach of any such restriction on the sale of products or services may be cured by Company ceasing such sales and using commercially reasonable efforts to regain possession of any delivered products or services within the applicable cure period.

                          OTTOTRUCKING00002926