# UNREDACTED VERSION OF EXHIBIT 1 SOUGHT TO BE FILED UNDER SEAL

OTTO TRUCKING LLC

LIMITED LIABILITY COMPANY AGREEMENT

Dated and Effective as of April 6, 2016

The members listed in Schedule I hereto (together with any other Person that may become a Member hereunder, the "Members" and each a "Member") have formed Otto Trucking LLC, a limited liability company (the "Company"), pursuant to the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "Delaware Act") that from and after the date hereof shall be governed by, and operated pursuant to, the terms and provisions of this Limited Liability Company Agreement (this "Agreement").

ACCORDINGLY, the Members agree as follows:

1.  Definitions.

The defined terms used in this Agreement shall, unless the context otherwise requires, have the meanings ascribed to them below.

"Affiliate" means a Person that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. For purposes of this definition, "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Capital Account" means, with respect to any Member, the capital account maintained for such Member in accordance with Section 7(c).

"Capital Contribution" means a contribution by a Member to the capital of the Company pursuant to this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended. Any reference to a section of the Code shall include a reference to any amendatory or successor provision thereto.

"Company" shall have the meaning ascribed to it in the Preamble.

"Delaware Act" shall have the meaning ascribed to it in the Preamble.

"Distribution Threshold" shall mean, with respect to each Incentive Unit, an amount of Distributions specified by the Managing Members at the time of its issuance, which amount shall not be less than the amount of Distributions that would be distributed to the Members under Section 14.2(c) hereof if, at the time of the issuance of such Incentive Unit, all the assets of the Company were sold for their respective Fair Market Values, the liabilities of the Company were paid in full, and the remaining proceeds were distributed in accordance with Section 14.2(c); provided, that such amount shall be adjusted automatically for Capital Contributions in accordance with Section 7.3(b).

"Fiscal Year" means the period commencing on January 1 and ending on December 31 of year except as may otherwise be required by the Code or Treasury Regulations; provided, however, that (a) in the case of the Company's first fiscal year, "Fiscal Year" means the period from and including the date on which the Company is formed under the Delaware Act to and including the immediately following December 31 and (b) the final Fiscal Year of the Company shall end on the date on which the winding up of the Company is completed.

"Incentive Member" shall mean any Member that holds Incentive Units, but only to the extent of such holding.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

"Incentive Units" shall mean Units designated as Incentive Units in the Company, having the rights, designations, preferences and obligations set forth in this Agreement.

"Incentive Unit Agreement" shall mean any Incentive Unit Agreement between the Company and any Person pursuant to which any Incentive Units may be issued from time to time.

"Managing Members" means Anthony Levandowski and Lior Ron, and, if neither of such persons willing or able to serve as Managing Members, then the Managing Members shall be such Person or Persons who are determined in writing by holders of a majority in interest of the Units.

"Member" shall have the meaning ascribed to it in the Preamble.

"Percentage Interest" with respect to a Member means a fraction, expressed as a percentage, having as its numerator the total number of Units owned by the Member and as its denominator the total number of Units outstanding, each as of the time the Percentage Interest is to be determined.

"Person" shall be construed broadly and shall include an individual, a partnership, a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an individual retirement account, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Profit" and "Loss" means for each taxable year or other period, an amount equal to the Company's taxable income or tax loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(a)  any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss will be added to taxable income or tax loss;

(b)  any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss, will be subtracted from taxable income or tax loss;

(c)  gain or loss resulting from any disposition of Company assets with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of the property, notwithstanding that the adjusted tax basis of the property differs from its Book Basis;

(d)  in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or tax loss, there will be taken into account depreciation for the taxable year or other period as determined in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)  any items specially allocated pursuant to Section 8(c) shall not be considered in determining Profit or Loss; and

(f)  any increase or decrease to Capital Accounts as a result of any adjustment to the book value of Company assets pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or (g) shall constitute an item of Profit or Loss as appropriate.

"Sale of the Company" means (i) any sale of Units of the Company following which the holders of Units immediately prior to such sale own, directly or indirectly, less than fifty percent (50%) of all Units, (ii) any sale of interests in the Company following which the holders of such interests prior to such sale own, directly or indirectly, less than fifty percent (50%) of the combined voting power of the outstanding voting securities of the Company, (iii) any sale of all or substantially all of the assets of the Company and its subsidiaries taken as a whole, or (iv) any plan of reorganization, recapitalization, merger or consolidation involving the Company except for a reorganization, recapitalization, merger or consolidation where the holders of the combined voting power represented by the Units

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                            OTTOTRUCKING00000006

of the Company immediately prior to such reorganization, recapitalization, merger or consolidation own, directly or indirectly, at least fifty percent (50%) of the combined voting power of the outstanding voting securities of the company or other entity resulting from such reorganization, recapitalization, merger or consolidation.

"Tax Basis" means, with respect to any item of Company property, the adjusted basis of such property as determined in accordance with the Code.

"Treasury Regulations" means the regulations promulgated by the U.S. Department of the Treasury under the Code.

"Unvested Incentive Unit" means any Incentive Unit that is not a Vested Incentive Unit.

"Vested Incentive Unit" means any Incentive Unit that has vested pursuant to the terms and conditions of (i) the Incentive Unit Agreement or other document pursuant to which such Incentive Unit was acquired by the initial holder thereof or (ii) any other document governing the vesting of such Incentive Unit.

2. Name. The name of the Company shall be Otto Trucking LLC, or such other name as the Managing Members may from time to time hereafter designate.

3. Purpose. The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and engaging in any and all activities necessary or incidental to the foregoing provided, however, that the Company is intended to be, and shall be operated as, an "operating company," within the meaning of United States Department of Labor Regulations Section 2510.3-101.

4. Offices.

(a) The principal office of the Company is 2330 Cowper Street, Palo Alto, CA 94301. The Company may locate its place of business and registered office at any other place or places from time to time.

(b) The registered office of the Company in the State of Delaware is located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, County of New Castle. The registered agent of the Company for service of process at such address is Corporation Service Company.

5. Term. The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of Delaware and shall continue until terminated in accordance with the provisions of this Agreement or the Delaware Act.

6. Members and Units.

(a) Units Generally. The name, address and number of Units of the initial Members are set forth opposite such Member's name in Schedule I. One or more additional members of the Company may be admitted to the Company with the approval of the Managing Members. Each Member, by signing this Agreement or a counterpart signature page hereto (a) agrees that if the laws of any jurisdiction in which the Company transacts business so require, the Managing Members shall take or cause to be taken all such actions required for the Company to qualify to transact business under such laws (including the filing of any necessary documents with the appropriate office in that jurisdiction), and (b) agrees and obligate themselves to execute, acknowledge and cause to be filed for record, as required by law, any amendments to the Company's certificate of formation that may be required by applicable law to reflect changes in the information included therein and/or for the continuation, preservation and operation of the Company as a limited liability company under the Delaware LLC Act. Prior to the date of this Agreement, the Company has taken all actions required under Section 17711.13(b) of the California Revised Uniform Limited Liability Company Act ("CRULLCA") to cause Article 11 of the CRULLCA not to apply to the Company or any of the outstanding membership interests of the Company. In furtherance of the foregoing, by execution of this Agreement or a counterpart signature page hereto, each of the Members hereby waives the application of Article 11 of the CRULLCA which affords, in certain circumstances and subject to the limitations set

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                                             OTTOTRUCKING00000007

forth therein, the holders of equity interests with dissenters' rights under the CRULLCA in respect of their equity in a limited liability company.

    (b)    <u>Incentive Units</u>

        (i)    <u>Equity Plans</u>. The Managing Members may create one or more incentive equity or profit interests plans for the Company which, among other things, may provide for the grant of options to acquire Units, the right to purchase Units, or the grant of Incentive Units intended to qualify as profits interests to employees and consultants of the Company (each, an "<u>Equity Plan</u>"). Unless otherwise set forth in an Equity Plan, no holder of an option or other right to acquire Units shall be a Member of the Company or have any rights as a Member of the Company until such time as such person acquires Units of the Company. In connection with the Conversion, the Company is adopting the Otto Trucking LLC Unit Incentive Plan, attached hereto as <u>Exhibit A</u>, which provides that 2,400,000 shall be available for award grant purposes under the plan.

        (ii)    <u>Options</u>. In the event an employee is granted an option to acquire Units in the Company and an employee exercises that option, to the extent permitted by law: (i) the Company shall be treated as having made a cash payment to the employee (representing compensation to such employee) in an amount equal to the sum of (a) the fair market value of the Units acquired by the employee pursuant to the exercise of the option on the date of exercise (taking into account for such purposes the Company's receipt of the exercise price on such option), minus (b) the exercise price paid by the employee under the option (such sum, the "<u>Spread Amount</u>"); (ii) the employee shall be treated as having made a Capital Contribution to the Company equal to the sum of (a) the exercise price paid by the employee under the option, and (b) the Spread Amount; and (iii) any deduction recognized by the Company that is attributable to the issuance of the Units pursuant to the exercise of a option shall be allocated to the existing Members of the Company in accordance with <u>Section 8</u>.

        (iii)    Profits Interests. The Company and each Member agree to treat each Incentive Unit granted to an Incentive Member pursuant to the Incentive Unit Agreement as a separate "profits interest" within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343. In accordance with Rev. Proc. 2001-43, 2001-2 CB 191, the Company shall treat each Incentive Member as the owner of its Incentive Units from the date such Incentive Units are granted, and shall file its IRS Form 1065, and issue appropriate Schedules K-1, to such Incentive Member, allocating to such Incentive Member its distributive share of all items of income, gain, loss, deduction and credit associated with such Incentive Units as if they were Vested Incentive Units. Each Incentive Member agrees to take into account such distributive share in computing its U.S. federal income tax liability for the entire period during which he, she or it holds such Incentive Units. The Company and each Member agree not to claim a deduction (as wages, compensation or otherwise) with respect to any Incentive Unit issued to an Incentive Member, either at the time of the grant of the Incentive Unit or at the time the Incentive Unit becomes a Vested Incentive Unit. The undertakings contained in this <u>Section 6(b)(i)</u> shall be construed in accordance with Section 4 of Rev. Proc. 2001-43. Each Incentive Member who receives an Unvested Incentive Unit (whether issued on or after the date hereof) agrees to timely and properly make an election under Section 83(b) of the Code with respect to each Unvested Incentive Unit received. The provisions of this <u>Section6(b)(i)</u> shall apply regardless of whether or not the Incentive Member files an election pursuant to Section 83(b) of the Code with respect to such Incentive Units.

        (iv)    Each Incentive Unit shall have a Distribution Threshold set forth in the Incentive Member's Incentive Unit Agreement, and the Incentive Member will be eligible to receive distributions with respect thereto to the extent provided in Sections 9 and 11. A Member's Distribution Threshold shall be adjusted automatically to take into account any

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

additional Capital Contributions made to the Company by a Member. The intent of this Section 6(b)(ii) is to ensure that all Incentive Units issued qualify as "profits interests" under Rev. Proc. 93-27 and Rev. Proc. 2001-43, and this Section 6(b)(i) and the other provisions of this Agreement shall be interpreted and applied consistently therewith.

(v) The Managing Members may elect to cause the Company to make an election to value any Incentive Units prospectively issued by the Company as compensation for services to the Company at liquidation value (the "Safe Harbor Election"), as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to proposed Treasury Regulations Section 1.83-3(l) and IRS Notice 2005-43 (collectively, the "Proposed Rules"). Upon such election, the Managing Members shall cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election. Any such Safe Harbor Election shall be binding on the Company and on all of the Members with respect to all transfers of Incentive Units thereafter made by the Company while a Safe Harbor Election is in effect. A Safe Harbor Election once made may be revoked by the Managing Members as permitted by the Proposed Rules or any applicable rule.

7. Ownership and Capital Contributions; Capital Accounts; Financings.

(a) Units.

(i) The Company shall be authorized to issue up to 10,000,000 units (the "Units"), which may include Incentive Units, from time to time. The Company may reissue any Units that have been cancelled or repurchased or acquired by the Company.

(ii) If determined by the Managing Members, each Unit will be evidenced by a certificate of limited liability company interest issued by the Company in such form as is approved by the Managing Members (the "Membership Interest Certificates"). Each Unit shall be transferable only on the books of the Company, to be kept by the Secretary of the Company, on surrender thereof by the registered holder in person or by attorney-in-fact, and until so transferred, the Company may treat the registered holder of a Unit as the owner of such Unit evidenced thereby for all purposes. Nothing contained in this Section 7(a)(ii) shall be deemed to authorize or permit any Member to Transfer its Units except as otherwise permitted pursuant to Section 17. Each such Unit shall be a "security" governed by Article 8 of the Uniform Commercial Code as in effect in any jurisdiction in which it has been adopted. Each Membership Interest Certificate shall bear the legends set forth in Section 17.

(b) Capital Contributions.

(i) On or about the date hereof, each Member is making or shall be deemed to have made a Capital Contribution to the Company in the amount set forth on Schedule I in exchange for the number of Units set forth opposite such Member's name on Schedule I, which Units shall constitute all of the issued and outstanding equity securities of the Company as of the original date hereof. Other than the Capital Contributions set forth on Schedule I, no Member shall have any obligation to make any additional Capital Contributions to the Company.

(ii) No Member nor other Person may make any additional Capital Contributions without the prior consent of the Managing Members. In the event of any Capital Contribution (other than the Capital Contributions set forth on Schedule I), the Company shall issue to the contributing Member or Person that number of additional Units, in exchange for such Capital Contribution, equal to the Capital Contribution Value divided by the Effective Price Per Unit. For purposes of this Agreement:

- the "Capital Contribution Value" shall be, with respect to any Capital Contribution made by a Member in any given offering, the amount of cash or other immediately available funds making up such Capital Contribution plus, if the receipt of any other property is permitted as a part of such Capital Contribution by the Members, the fair market value of

5

any such other property making up such Capital Contribution, valued in good faith by the Managing Members, taking into account relevant markets (if any) in which such property is traded;

- the "Effective Price Per Unit" shall be, with respect to any given offering, the quotient obtained by dividing the Aggregate Company Value (before giving effect to such offering) by the total number of Units outstanding immediately prior to the issuance of any Units in connection with such offering; and

- the "Aggregate Company Value" shall be the aggregate fair market value of the Company, which value shall be determined in good faith by the Managing Members.

(c) Establishment and Maintenance of Capital Accounts.

(i) A separate Capital Account will be established and maintained for each Member for each class of Units held by such Member in accordance with this Section 7(c). Each Member's Capital Account shall equal such Member's Capital Contribution, adjusted in accordance with the provisions of Section 7(c)(ii) and Section 7(c)(iii). The initial Capital Account balance with respect to any Member's Incentive Units as of the date of the issuance of such Incentive Units shall be zero.

(ii) Each Member's Capital Account with respect to a particular class of Units will from time to time be increased by:

(a) the amount of money contributed by such Member to the Company with respect to such Units (including the amount of any Company liabilities which the Member assumes (within the meaning of Treasury Regulations Section 1.704-1(b)(2)(iv)(c));

(b) the fair market value of property contributed by such Member to the Company with respect to such Units (net of any liabilities secured by such property that the Company is considered to assume or take subject or pursuant to Section 752 of the Code); and

(c) allocations to such Member of Profits (or the amount of any item or items of income or gain included therein) with respect to such Units.

(iii) Each Member's Capital Account with respect to its Units will from time to time be reduced by:

(a) the amount of money distributed to such Member by the Company in respect of such Units (including the amount of such Member's individual liabilities for which the Company becomes directly and primarily liable);

(b) the fair market value of property distributed to such Member by the Company (net of any liabilities secured by such property that such Member is considered to assume or take subject or pursuant to Section 752 of the Code); and

(c) allocations to such Member of Losses and deduction (or items thereof).

(iv) This Section 7(c) and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2, and they shall be interpreted and applied in a manner consistent with those Treasury Regulations. If the Managing Members determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or a Member), are computed in order to comply with those Treasury Regulations, the Managing Members may make such modification; *provided, however,* that the Managing Members

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

shall use reasonable efforts to ensure that no such modification materially and adversely affects the economic interests of any Member.

(v) Each Member recognizes and intends that for federal and state income tax purposes, the Company will be classified as a partnership during any period that the Company has two or more Members, and the Members will not make any election or take any other action that would cause the relationship of the Members under this Agreement to be excluded from the application of all or any part of Subchapter K of Chapter 1 of Subtitle A of the Code, from any successor provisions to Subchapter K of the Code or from similar provisions of state law or the law of any foreign jurisdiction; provided, however, that the Company may be converted to a C corporation with the approval of a majority of the Units held by the Members.

(vi) A Person who is substituted as a Member pursuant to this Agreement shall be deemed to have made the Capital Contributions, if any, attributable to the Units it is acquiring and shall succeed to the Capital Account of its transferor to the extent of the Units it is acquiring.

(vii) Section 754 of the Code permits the Company to elect to adjust the basis of Company property on the transfer of an interest in the Company by sale or exchange, or on the death of a Member, and on the distribution of property by the Company to a Member. Unless the Managing Members determine that it is unreasonable to make a Section 754 election after considering the interests of the Company and its Members, the Managing Members shall make such an election upon the occurrence of an event described in the preceding sentence.

(d) Other Matters. Except as otherwise set forth in Section 9(f), Section 11 and Section 17, no Member shall be entitled to receive a return on or of its Capital Contributions from the Company without the consent of the Members. Under circumstances requiring a return of any Capital Contributions from the Company, no Member has the right to receive property other than cash except as specifically set forth in Sections 9(c) and 11, No Member shall receive any interest, salary, compensation, draw or reimbursement with respect to its Capital Contributions or its Capital Account, or for services rendered or expenses incurred on behalf of the Company or otherwise in its capacity as a Member, except as may otherwise be authorized by the Members. Except as any Member may otherwise agree in writing, no Member shall be liable for the debts or any other obligations of the Company.

8. Allocations of Profits and Losses.

(a) Time of Allocations. The Managing Members shall use reasonable efforts to determine and allocate all items of income, gain, loss, deduction and credit pursuant to this Section 8 within ninety days after the end of each Fiscal Year.

(b) Profits and Losses. Profits and Losses, and if necessary (in the reasonable judgment of the Managing Members), other items of income (including gross income), gain, loss, and deduction, for each Fiscal Year shall be allocated among the Members such that the applicable Capital Account of each Member, immediately after giving effect to such allocations, shall equal, as nearly as possible, the amount of the distributions that would be made to the Member during such Fiscal Year if (i) the Company were dissolved and terminated, (ii) its affairs were wound up and each asset with respect thereto were sold for its book value (except that any asset which was the subject of a disposition in such Fiscal Year shall be treated as if it were sold for cash equal to the sum of the amount received by the Company in any such disposition and the fair market value of any other property received by the Company in such disposition), (iii) all liabilities of the Company were satisfied, and (iv) the net assets of the Company were distributed to the Members in accordance with Section 9(b).

(c) Special Allocations.

(i) Notwithstanding any other provision of this Section 8, if there is a net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of Treasury Regulations Sections 1.704-2(d) and 1.704-2(i)) during the Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

amount equal to its respective share of such net decrease during such year, determined pursuant to Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This Section 8(c) is intended to comply with the minimum gain chargeback requirement in such Treasury Regulations Section and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent of the exceptions provided in Treasury Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

(ii) Notwithstanding any other provision of this Section 8 other than Section 8(c)(i) above, in the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii) (d)(4), (5) or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as promptly as possible; *provided, however*, that an allocation pursuant to this Section 8(c)(ii) shall be made only if and to the extent that a Member would have an Adjusted Capital Account Deficit in excess of such sum after all other allocations provided for in this Section 8 have been tentatively made as if this Article were not in this Agreement.

(iii) In the event any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; *provided, however*, that an allocation pursuant to this Section 8(c)(iii) shall be made only if and to the extent that a Member would have an Adjusted Capital Account Deficit in excess of such sum after all other allocations provided for in this Section 8 have been tentatively made.

(iv) Nonrecourse Deductions shall be specially allocated to the Members in proportion to their Percentage Interests.

(v) Any Partner Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2.

(d) Other Allocations. If during any taxable year of the Company there is a change in any Member's Percentage Interest (including a complete termination of such Member's interest), allocations of Profits and Losses for such taxable year will take into account the varying Percentage Interests of the Members in any manner determined by the Managing Members consistent with the requirements of Section 706 of the Code; *provided, however*, that the Members hereby agree that the Managing Members may, in their sole discretion, use a "pro rata" method under Treasury Regulation Section 1.706-1(c)(2) in making such allocations, and that the Managing Members may instead, in its sole discretion, apply a "closing of the books" method in making such allocations. In the event a Safe Harbor Election is made, the Managing Members shall cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election. In addition, the Managing Members shall be authorized to make, in their sole discretion, appropriate amendments to the allocations of items pursuant to this Agreement (i) to properly allocate items of income, gain, loss, deduction and credit to those Members who bear the economic burden or benefit associated therewith, or (ii) otherwise to cause the Members to achieve the economic objectives of this Agreement (as reasonably determined by the Managing Members).

(e) Reallocation. If the Managing Members determine that the Code or any Treasury Regulations require allocations of items of income, gain, loss, deduction or credit different from those set forth in this Section 8, the Managing Members are hereby authorized to make new allocations in reliance on, but only to the extent required by, the Code and such Treasury Regulations, and no such new allocation will give rise to any claim or cause of action by any Member.

(f) Allocation of Tax Items. Except as otherwise provided in this Section 8, all items of income, gain, loss and deduction will be allocated among the Members for federal income tax purposes in the same manner as the corresponding allocation for Capital Account purposes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    OTTOTRUCKING00000012

(g) <u>Section 704(c) Allocations</u>. In the event that the fair market value of an item of Company property differs from its Tax Basis, allocations of depreciation, depletion, amortization, gain and loss with respect to such property will be made for federal income tax purposes in a manner that takes account of the variation between the Tax Basis and fair market value of such property in accordance with Section 704(c)(1)(A) of the Code and Treasury Regulations Section 1.704-1(b)(4)(i). The Managing Members may select any reasonable method or methods for making such allocations, including, without limitation, any method described in Treasury Regulations Sections 1.704-3(b), (c), or (d).

(h) <u>Special Deemed Capital Contributions and Allocations</u>. If a Member incurs an expense (including any amounts that must be capitalized) on behalf of the Company and the expense is not reimbursed by the Company, then the Member shall be deemed to make a capital contribution to the Company in an amount equal to the amount of the expense and any deductions, depreciation or amortization with respect to such item shall be specially allocated to the Member that incurred the expense.

(i) <u>Reporting</u>. The Members acknowledge and are aware of the income tax consequences of the allocations made by <u>Section 8</u> and hereby agree to be bound by the provisions of <u>Section 8</u> in reporting their shares of Profits and Losses and other items of income, gain, loss, deduction and credit for federal, state and local income tax purposes.

9. <u>Distributions</u>.

(a) <u>General</u>. Subject to <u>Section 9(f)</u>, the Managing Members may elect to distribute or retain and reinvest any gains and capital to the Members.

(b) <u>Amount and Time of Distributions</u>. Except as set forth in <u>Section 11</u>, to the extent that the Company makes distributions to the Members pursuant to this <u>Section 9</u> or pursuant to any other provision of this Agreement, all net proceeds will be distributed to the Members in respect of their Units pro rata based on the number of Units then held.

(c) <u>Distributions in Kind</u>. Distributions pursuant to this <u>Section 9</u> may be made, at the sole discretion of the Managing Members, in cash or as in kind distributions of securities; *provided, however*, that the Managing Members will not distribute securities in kind unless (a) they are marketable securities, or (b) such distribution is in connection with a liquidation under <u>Section 11</u>. Distributions consisting of both cash and securities shall be made, to the extent practicable, in pro rata portions of cash and such securities as to each Member receiving such distributions. In the event of an in kind distribution by the Company, the Capital Accounts shall be adjusted with respect to the securities distributed in accordance with <u>Section 7(d)(ii)</u>.

(d) <u>Distributions to Record Holders of Units</u>. Any distribution by the Company pursuant to the terms of this <u>Section 9</u> or <u>Section 11</u> to the Person shown on the Company's records as a Member or to its legal representatives, or to the assignee of the right to receive such distributions as provided herein, shall, to the fullest extent permitted by law, discharge the Company and the Managing Members of all liability to any other Person who may be interested in such distribution by reason of any other assignment or Transfer of such Member's Units for any reason (including an assignment or Transfer thereof by reason of death, incompetence, Bankruptcy or liquidation of such Member). For purposes of the foregoing, the "<u>Bankruptcy</u>" of a Member shall mean the occurrence of any of the following: (i) any governmental authority, or any court at the instance thereof, shall take possession of any substantial part of the property of that Member or shall assume control over the affairs or operations thereof, or a receiver or trustee shall be appointed, or a writ, order, attachment or garnishment shall be issued with respect to any substantial part thereof, and such possession, assumption of control, appointment, writ or order shall continue for a period of sixty consecutive days; (ii) a Member shall admit in writing its inability to pay its debts when due, or make an assignment for the benefit of creditors; or apply for or consent to the appointment of any receiver, trustee or similar officer or for all or any substantial part of its property; or shall institute (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debts, dissolution, liquidation, or similar proceeding under the laws of any jurisdiction; or (iii) a receiver, trustee or similar officer shall be appointed for such Member or with respect to all or any substantial part of its property without the application or consent of that Member, and such appointment shall continue undischarged or unstayed for a period of sixty (60) consecutive days or any bankruptcy, insolvency, reorganization, arrangements, readjustment of debt, dissolution,

9

liquidation or similar proceedings shall be instituted (by petition, application or otherwise) against that Member and shall remain undismissed for a period of sixty consecutive days.

        (e)    <u>Legal Restrictions on Distributions; Withholding</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of the Members' Units if such distribution would violate the Delaware Act or other applicable law.  The Company shall be authorized to withhold from distributions hereunder any amounts required to be withheld by applicable law, and such withholdings shall be treated for all purposes of the Agreement as if such amounts had been distributed hereunder.

        (f)    <u>Reserves</u>.  The Managing Members may set aside reasonable reserves for anticipated liabilities, obligations or commitments of the Company.

        (g)    <u>Withholdings</u>.  The Company shall be entitled to withhold any amounts required pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment or distribution to be made to a Member pursuant to this Agreement and shall pay such amounts to the appropriate taxing authority as required by law.  Any amounts so withheld shall be treated as amounts paid or distributed, as the case may be, to the Member with respect to whom such amount was withheld and shall be treated as a preliminary distribution of, and shall offset any, future amounts of distributions due to such Member under the provisions of <u>Section 9(b)</u>.

10.    <u>Management; Officers; Formation; Waiver of Information Rights; Other Matters</u>.

        (a)    *Managing Members*.

        (i)    Full responsibility for management of the business and affairs of the Company shall be delegated to and vested in the Managing Members pursuant to Section 18 402 of the Delaware LLC Act, who shall have all of the authority of a "manager" under the Delaware Act.  Subject to the delegation of rights and powers provided for herein, the Managing Members shall have the sole right to manage the business of the Company and shall have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company, and to execute any document on behalf of the Company in all cases consistent with this Agreement.  No Member shall by reason of its status as such have any authority to act for and bind the Company.  Notwithstanding anything in this Agreement to the contrary, no Member shall by reason of its status as such have any right to vote on or approve any matter of the Company and the Managing Members shall have no obligation to submit any matter of the Company to a vote or approval of the Members.

        (ii)    Any action that may be taken by the Managing Members under this Agreement may be taken without a meeting if written consents setting forth the action so taken are signed by a majority of the Managing Members.  Any Managing Member may resign at any time by giving written notice to the other Managing Member(s).  Any such resignation shall take effect at the time specified therein, or, if no time is specified, upon receipt thereof; and unless otherwise specified therein, acceptance of such resignation shall not be necessary to make it effective.  Any vacancy caused by such resignation may be filled by action of the remaining Managing Members.  If at any time there are no Managing Members of the Company, the Members shall have the limited voting authority to elect one Managing Member by an action of the Members holding at least a majority of the then-outstanding Units.

        (b)    *Certain Actions*. The Company may, with the written consent of the Managing Members and without any other consent of any Member take any action with respect to the Company, including but not limited to the following:

        (i)    except for the Capital Contributions set forth on <u>Schedule I</u>, require any Member to make any Capital Contribution;

        (ii)    increase or decrease the authorized number of members constituting Managing Members or appoint any Person as a Managing Member;

        (iii)    admit a new Member;

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    OTTOTRUCKING00000014

    (iv) consummate a Sale of the Company or an initial public offering of the Company's securities;

    (v) purchase or otherwise acquire any equity interest in any entity (other than a wholly-owned subsidiary of the Company); or

    (vi) permit any Member to Transfer any of its Units, other than in accordance with Section 17.

  (c) *Duties.* No Managing Member shall be liable to the Company or any Member for any action taken in managing the business or the affairs of the Company if such Managing Member performs its duties in compliance with the standards contained herein and the Delaware Act. Notwithstanding anything herein to the contrary, **the Managing Members do not, shall not and will not owe any fiduciary duties of any kind whatsoever to any of the Members, by virtue of the role of each as a Managing Member**, including, but not limited to, the duties of due care and loyalty, whether such duties were established as of the date of this Agreement or any time hereafter, and whether established under common law, at equity or legislatively defined. It is the intention of the parties to this Agreement that any such fiduciary duties be affirmatively eliminated as permitted by Delaware law and under the Delaware Act and the Members hereby waive any rights with respect to such fiduciary duties.

  (d) *Officers.* Officers of the Company (if any) may be designated and appointed by the Managing Members from time to time, to hold such positions and with such powers, as the Managing Members shall deem necessary or desirable. The initial officers of the Company shall be Anthony Levandowski as Executive Chairman and Lior Ron as President, Chief Executive Officer, and General Manager.

  (e) *Delegation by the Managing Members.* The Managing Members may delegate such general or specific authority to the officers of the Company as they from time to time shall consider desirable, and the officers of the Company may, subject to any limitations imposed by the Managing Members, exercise the authority granted to them.

  (f) *Reimbursement of Expenses.* The Managing Members shall be reimbursed for all reasonable expenses incurred by them on behalf of the Company.

  (g) *Formation.* The Members hereby ratify, confirm and approve any and all actions taken by the officers and their designees as an authorized person within the meaning of the Delaware Act (an "Authorized Person"), including, without limitation, the execution and filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware (the "DE Secretary of State") for the purpose of forming the Company.

11. Dissolution.

  (a) Subject to the provisions of Section 11(b), the Company shall be dissolved and its affairs wound up and terminated upon the first to occur of the following:

    (i) the determination of the Managing Members to dissolve the Company; or

    (ii) the withdrawal of the Members or the occurrence of any other event causing a dissolution of the Company under Section 18-801 of the Delaware Act.

  (b) Upon dissolution of the Company, the Company's affairs shall be promptly wound up. The Company shall engage in no further business except as may be necessary, in the reasonable discretion of the Managing Members, to preserve the value of the Company's assets during the period of dissolution and liquidation. The assets of the Company shall be distributed first to satisfy or provide for the satisfaction of all liabilities of the Company to creditors, including liquidating expenses and obligations; and thereafter to the Members consistent with Section 9(b) and taking into account any amounts previously distributed pursuant to Section 9(b).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY  OTTOTRUCKING00000015

(c)     When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, a Certificate of Cancellation shall be executed and filed with the Secretary of State of Delaware in accordance with Section 18-203 of the Delaware Act.

(d)     No Member shall be personally liable for a deficit Capital Account balance of that Member, it being expressly understood that the distribution of liquidation proceeds shall be made solely from existing Company assets.

12.    <u>Limitation on Liability</u>.  Except as otherwise provided by the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Members shall not be obligated for any such debt, obligation or liability of the Company.

13.    <u>Indemnification</u>.

(a)     The Company shall, to the fullest extent permitted by law, indemnify each Managing Member and Member, any owner or principal of each Member, each officer, any Person that is a partner, officer, employee, agent or representative of each Member, and any other Persons as the Managing Members may reasonably designate from time to time (each, an "<u>Indemnitee</u>") from and against any and all losses, claims, damages, liabilities, costs and expenses (including attorneys' fees and costs), judgments, fines, settlements, and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, that relate to the operations of the Company in which any Indemnitee may be involved, or is threatened to be involved, as a party or otherwise, unless it is established that an act or omission of the Indemnitee was material to the matter giving rise to the claim, demand, action, suit or proceeding and (i) was committed in bad faith, (ii) was the result of active and deliberate dishonesty, or (iii) constituted gross negligence or willful misconduct or a willful breach of this Agreement or any other agreement to which such Indemnitee is a party.  Any indemnification pursuant to this <u>Section 13</u> shall be made only out of the assets of the Company, and the Members shall not be required to contribute or advance funds to the Company to enable the Company to satisfy its obligations under this <u>Section 13</u>.

(b)     Reasonable expenses incurred by an Indemnitee who is a party to a proceeding shall be paid or reimbursed by the Company in advance of the final disposition of the proceeding upon receipt by the Company of (i) a written affirmation by the Indemnitee of the Indemnitee's good faith belief that it is entitled to indemnification by the Company pursuant to this <u>Section 13</u> with respect to such expenses and proceeding, and (ii) a written undertaking by or on behalf of the Indemnitee, to and in favor of the Company, wherein the Indemnitee agrees to repay the amount if the Indemnitee shall ultimately be adjudged not to have been entitled to indemnification under this <u>Section 13</u>.

(c)     The provisions of this <u>Section 13</u> are for the benefit of the Indemnitees, their heirs, successors, assigns and administrators and shall not be deemed to create any rights for the benefit of any other Persons. In addition, the Company is hereby authorized to enter into such indemnification agreements with the Managing Members, each officer of the Company or any other Member as deemed to be appropriate by the Managing Members, in their sole discretion.

14.    <u>Severability</u>.  If any provision of this Agreement shall be determined to be illegal or unenforceable by any court of law, the remaining provisions shall be severable and enforceable in accordance with their terms.

15.    <u>Entire Agreement; Amendment</u>.  This Agreement and the other writings referred to herein contain the entire agreement with respect to the subject matter hereof and supersede all prior agreements and understandings with respect thereto.  Except as otherwise provided in this Agreement or the Delaware Act, this Agreement may be amended only by the written consent of the Managing Members.  Notwithstanding anything in this Agreement to the contrary, <u>Schedule I</u> to this Agreement shall be updated to reflect the issuance of additional equity interests in the Company and new counterpart signature pages to this Agreement shall be added to reflect the admission of any new Member.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                                           OTTOTRUCKING00000016

16.     Governing Law; Jurisdiction.   The law of the State of Delaware, without regard to its conflicts of law principles, shall govern the validity of this Agreement, the construction and interpretation of its terms, the organization and internal affairs of the Company and the limited liability of any managers, officers, Member and other owners.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties only in the Court of Chancery of the State of Delaware, and each of the parties consents to the jurisdiction of such court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

17.     Transfer of Units; Legends.

(a)     No Member may transfer, assign, encumber, hypothecate, pledge, convey in trust, gift, transfer by bequest, devise or descent or otherwise make the subject of disposition any Units or other equity interests of the Company unless such transaction is first approved in writing by Managing Members (which approval may be withheld for any reason).  For the avoidance of doubt, the following shall be considered a transfer, encumbrance or other disposition within the scope of the immediately preceding sentence: any decoupling of any partial interests in any Units or other equity interests in the Company by the Member to any other person (for example, a Member retaining any voting rights such Member may have with respect to its Units while transferring the economic rights associated with the same to another party, or vice versa).  Such restriction, however, shall not be applicable to: (i) any transfer by will or intestate succession upon death or any gratuitous transfer of the Units of the Company to any spouse or member of a Member's immediate family (including adopted children) or grandchildren (or the immediate family of any such person), or to a custodian, trustee (including a trustee of a voting trust), executor or other fiduciary for the account of his or her spouse or members of his or her immediate family (including adopted children) or grandchildren (or to the immediately family of any such person), or to a trust for himself or herself, or a charitable remainder trust; (ii) any sale to the public pursuant to an effective registration statement under the Securities Act of 1933, as amended;  or (iii) any bona fide gift to any charitable organization as defined in Section 501(c)(3) of the Internal Revenue Code.  Upon surrender to the Company or the transfer agent of the Company of a certificate for Units duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the Company to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books. Upon receipt of proper transfer instructions from the registered owner of uncertificated Units such uncertificated Units shall be canceled and issuance of new equivalent uncertificated Units or certificated Units shall be made to the person entitled thereto and the transaction shall be recorded upon the books of the Company.

(b)     In addition, no transfer of any Unit in the Company may be made to any person or entity if (1) in the opinion of legal counsel to the Company, it could result in the Company being treated as an association or publicly traded partnership taxable as a corporation; or (2) such transfer is effected through an "established securities market" or a "secondary market (or the substantial equivalent thereof)", within the meaning of Section 7704 of the Code.

(c)     Any transfer of a Unit which is not made in compliance with the provisions of this Agreement shall be void, and the Company shall not recognize any such transfer.

(d)     Each Membership Interest Certificate will be stamped or otherwise imprinted with a legend in substantially the following form:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.  THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                              OTTOTRUCKING00000017

RESALE IS IN COMPLIANCE WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERS AND PUBLIC OR PRIVATE RESALE INCLUDING, AMONG OTHER RESTRICTIONS, (A) THE RESTRICTIONS AND CONDITIONS SET FORTH IN A RESTRICTED UNIT PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE UNITS AND (B) THE RESTRICTIONS AND CONDITIONS SPECIFIED IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY DATED AS OF APRIL 6, 2016, AMONG THE PARTIES THERETO, AS IT MAY BE AMENDED, SUPPLEMENTED AND/OR RESTATED FROM TIME TO TIME, AND NO TRANSFER OF THESE SECURITIES WILL BE VALID OR EFFECTIVE UNTIL ALL SUCH CONDITIONS HAVE BEEN FULFILLED. COPIES OF SUCH AGREEMENTS MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OR OTHER OFFICER OF THE ISSUER OF SUCH SECURITIES.

18. <u>Assignment</u>.  Any permitted new or substitute Member shall become a new Member of the Company with full rights and powers as a Member of the Company upon the execution of a counterpart signature page to this Agreement to evidence its written acceptance of the terms and provisions applicable to Members hereof.  To the extent any assignment, transfer or other disposition is given effect solely by operation of law, the assignee, transferee or recipient of such disposition, as the case may be, shall possess a mere economic interest only and shall not be admitted to the Company as a substitute Member.

19. <u>Successors and Assigns</u>.  This Agreement binds the Members and their respective distributees, successors, and assigns and any other person claiming a right or benefit under or covered by this Agreement.

20. <u>Waiver</u>.  No provision of this Agreement will be deemed to have been waived except if such waiver is contained in a written instrument executed by the party against which such waiver is to be enforced, and no such waiver will be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.  The rights and remedies of the parties under this Agreement are in addition to all other rights and remedies, at law or in equity, that they may have against the other parties hereto.

21. <u>Notices</u>.  Any notice or other communication hereunder must be given in writing and (a) delivered in person, (b) transmitted by electronic mail or (c) sent by overnight courier or by certified or registered mail (postage prepaid, receipt requested) to the then current address of the Company or to the address of the applicable Member(s) set forth on <u>Schedule I</u>, or to such other address as the applicable party shall have last designated by such notice to the other parties. Where a notice is sent by next-day or second-day courier service, service of the notice shall be deemed to be effected by properly addressing, pre-paying and sending by next-day or second-day service through an internationally-recognized courier a letter containing the notice, with a confirmation of delivery, and to have been effected at the expiration of two (2) days after the letter containing the same is sent as aforesaid. Where a notice is sent by electronic mail, service of the notice shall be deemed to be effected by properly addressing and sending such notice through a transmitting organization, with a written confirmation of delivery, and to have been effected on the day the same is sent as aforesaid.

22. <u>No Prohibited Transactions</u>.  Notwithstanding any other provision of this Agreement, no action shall be required of or be taken by any Member, Managing Member or the Company, and no provision of this Agreement shall be deemed or interpreted to permit any action by any Member, Managing Member or the Company, that would constitute a non-exempt prohibited transaction described in Section 4975 of the Code, or a pledging described in Section 408(e)(4) of the Code, and any such action taken shall be void from its beginning.

23. <u>Construction; Headings</u>.  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                                          OTTOTRUCKING00000018

IN WITNESS WHEREOF, the undersigned has duly executed this Otto Trucking LLC Limited Liability Company Agreement as of the date first written above.

OTTO TRUCKING LLC,
a Delaware limited liability company

By: _____
Name: Anthony Levandowski
Title: Managing Member

By: _____
Name: Lior Ron
Title: Managing Member

*Signature Page to Otto Trucking LLC Operating Agreement*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY