# EXHIBIT 1
# SEALED

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4                    --oOo--

5    WAYMO LLC,

6              Plaintiff,

                                  Case

7    vs.                     No. 3:17-cv-00939-WHA

8    UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING LLC,

9

               Defendants.

10   _____/

11

12

13

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16     VIDEOTAPED DEPOSITION OF JOHN WILLIAM GURLEY

17              THURSDAY, AUGUST 24, 2017

18

19

20

21   Reported by:

22   Anrae Wimberley

23   CSR No. 7778

24   Job No.  2687934

25   PAGES 1 - 182

                                      Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4                       --oOo--

5    WAYMO LLC,

6               Plaintiff,

                                      Case

7    vs.                      No.  3:17-cv-00939-WHA

8    UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING LLC,

9

                Defendants.

10   _____/

11

12

13       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15           Transcript of video-recorded deposition of

16   JOHN WILLIAM GURLEY taken at Morrison & Foerster LLP,

17   425 Market Street, 33rd Floor, San Francisco,

18   California, beginning at 8:37 a.m. and ending at 1:09

19   p.m. on Thursday, August 24, 2017, before Anrae

20   Wimberley, Certified Shorthand Reporter No. 7778.

21

22

23

24

25

                                          Page  2
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    APPEARANCES:

 2    For Plaintiff Waymo LLC:

 3            QUINN EMANUEL URQUHART & SULLIVAN LLP

 4            BY:  CHARLES K. VERHOEVEN, ESQ.

 5            JAMES JUDAH, ESQ.

 6            50 California Street, 22nd Floor

 7            San Francisco, CA 94111

 8            (415) 875-6600

 9            charlesverhoeven@quinnemanuel.com

10            jamesjudah@quinnemanuel.com

11

12    For Defendants Uber Technologies, Inc.; Ottomotto LLC:

13            BOIES SCHILLER FLEXNER LLP

14            BY:  MICHAEL A. BRILLE, ESQ.

15            EDWARD H. TAKASHIMA, ESQ.

16            1401 New York Avenue NW

17            Washington, DC 20005

18            (202) 237-9608

19            mbrille@bsfllp.com

20                    -and-

21            MORRISON & FOERSTER LLP

22            BY: MICHAEL A. JACOBS, ESQ.

23            425 Market Street, 33rd Floor

24            San Francisco, California 94105-2482

25            (415) 268-7455 mjacobs@mofo.com
```

Page 3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    APPEARANCES:

 2    For Defendant Otto Trucking LLC:

 3              GOODWIN PROCTER LLP

 4              BY:  TODD A. BOOCK, ESQ.

 5              601 South Figueroa Street, 41st Floor

 6              Los Angeles, California 90017

 7              (213) 426-2560

 8              tboock@goodwinlaw.com

 9

10    For the Deponent:

11              PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

12              BY:  MARTIN FLUMENBAUM, ESQ.

13              CHRISTINA A. BUNTING, ESQ.

14              1285 Avenue of the Americas

15              New York, New York 10019-6064

16              (212) 373-3191

17              mflumenbaum@paulweiss.com

18

19    Also Present:

20              VERITEXT LEGAL SOLUTIONS

21              WARREN NGUYEN, VIDEOGRAPHER

22              (415) 274-9977

23              SFDepo@veritext.com

24

25              AARON BERGSTROM, Seniro Counsel for Uber
```

Page 4

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    I N D E X

 2

 3    EXAMINATION BY:                              PAGE

 4    MR. VERHOEVEN                                  10

 5

 6                    --oOo--

 7

 8

 9                E X H I B I T S

10    EXHIBIT       DESCRIPTION                    PAGE

11    Exhibit 910    Presentation documents entitled,   33

12                   "Project Zing Review"; Bates Nos.

13                   UBER00109871 through  877

14

15    Exhibit 911    Minutes of Special Meeting, Board  73

16                   of Directors, 4/11/16; Bates Nos.

17                   UBER00101482 through 498

18

19    Exhibit 912    Minutes of Meeting, Board of        98

20                   Directors, 4/10/17; Bates Nos.

21                   UBER00101479 through 481

22

23    Exhibit 913    Minutes of Meeting, Board of       108

24                   Directors, 5/15/17; Bates Nos.

25                   UBER00101499 through 500
```

Page 5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              E X H I B I T S   (Cont'd)

 2    EXHIBIT          DESCRIPTION                     PAGE

 3    Exhibit 914     Minutes of Meeting, Board of      117

 4                    Directors, 5/22/17; Bates Nos.

 5                    UBER00101501 through 504

 6

 7    Exhibit 915     Minutes of Meeting, Board of      132

 8                    Directors, 5/25/17; Bates Nos.

 9                    UBER00101505 through 506

10

11    Exhibit 916     Letter dated 6/20/17 to Kalanick; 139

12                    Bates Nos. BENCHMARK-WAYMO_

13                    00000168 through 169

14

15    Exhibit 917     Compilation of documents in re    153

16                    public filing in Delaware; Bates

17                    Nos. BENCHMARK-WAYMO_00000039

18                    through 105

19

20    Exhibit 918     Verified Complaint; 38 pages      157

21                            --oOo--

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

2                       PAGE LINE

3                        47      5

4                        48     22

5                        49      6

6                        49     12

7                        49     17

8                        51      8

9                        63      2

10                       87     20

11                       88      7

12                       89      3

13                       90      5

14                       90     22

15                       92      3

16                      107     15

17                      125     23

18                      126     12

19                      127     12

20                      127     16

21                      127     22

22                      128      2

23

24

25

                                            Page  7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      THURSDAY, AUGUST 24, 2017; SAN FRANCISCO, CALIFORNIA;

 2                        8:37 A.M.

 3                         - - -

 4      THE VIDEOGRAPHER:  We're on the record at 8:37 on    08:37:51

 5   August 24th, 2017.                                      08:37:53

 6            Please note that microphones are sensitive     08:37:56

 7   and may pick up whispering, private conversation and    08:37:59

 8   cellular interference.  Please turn off all cell        08:38:03

 9   phones or place them away from the microphones, as      08:38:06

10   they can interfere with the deposition audio.           08:38:10

11            Audio and video recording will be taking       08:38:12

12   place unless all parties agree to go off the record.    08:38:16

13            This is Media Unit 1 of the video-recorded     08:38:18

14   deposition of William Gurley, taken by the counsel of   08:38:22

15   the plaintiff in the matter Waymo LLC versus Uber       08:38:27

16   Technologies, Inc., et al., filed in the United States  08:38:30

17   District Court, Northern District of California,        08:38:33

18   San Francisco Division, Case No. 17-cv-00939.           08:38:41

19            My name is Warren Nguyen from the firm of      08:38:46

20   Veritext Legal Solutions, and I'm the videographer.     08:38:49

21            The court reporter is Anrae Wimberley with     08:38:52

22   Veritext Legal Solutions.                               08:38:53

23            I'm not related to any party in this action,   08:38:57

24   nor am I financially interested in the outcome in any   08:39:00

25   way.                                                    08:39:00
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | If there are any objections to the | 08:39:02 |
| 2 | proceeding, please state them at the time of your | 08:39:04 |
| 3 | appearance, beginning with the noticing attorney. | 08:39:07 |
| 4 | Will counsel please state your appearances. | 08:39:10 |
| 5 | MR. VERHOEVEN:  Charles Verhoeven, Quinn Emanuel, | |
| 6 | on behalf of Waymo. | 08:39:13 |
| 7 | MR. JUDAH:  James Judah, Quinn Emanuel, on behalf | 08:39:14 |
| 8 | of Waymo. | 08:39:17 |
| 9 | MR. FLUMENBAUM:  Martin Flumenbaum, Paul Weiss | 08:39:17 |
| 10 | Rifkind Wharton & Garrison, on behalf of Mr. Gurley. | 08:39:22 |
| 11 | MS. BUNTING:  Kristina Bunting, Paul Weiss Rifkind | 08:39:22 |
| 12 | Wharton & Garrison, on behalf of Mr. Gurley. | 08:39:28 |
| 13 | MR. BRILLE:  Mike Brille, Boies Schiller & | 08:39:29 |
| 14 | Flexner, on behalf of Uber. | 08:39:31 |
| 15 | MR. TAKASHIMA:  Ed Taskahima, Boies Schiller & | 08:39:31 |
| 16 | Flexner, for Uber and Ottomotto. | 08:39:34 |
| 17 | MR. BERGSTROM:  Aaron Bergstrom, in-house counsel | 08:39:35 |
| 18 | for Uber. | |
| 19 | MR. JACOBS:  Michael Jacobs, Morrison & Foerster, | 08:39:37 |
| 20 | for Uber and Ottomotto. | 08:39:39 |
| 21 | MR. BOOCK:  Todd Boock from Goodwin & Procter on | 08:39:42 |
| 22 | behalf of Otto Trucking LLC. | 08:39:43 |
| 23 | THE VIDEOGRAPHER:  Will the court reporter please | 08:39:47 |
| 24 | swear in the witness. | 08:39:48 |
| 25 | // | 08:39:48 |

Page 9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    JOHN WILLIAM GURLEY,

 2              sworn as a witness by the Certified

 3          Shorthand Reporter, testified as follows:

 4                        EXAMINATION

 5   BY MR. VERHOEVEN:                                  08:39:48

 6       Q.   Good morning, Mr. Gurley.               08:40:02

 7       A.   Good morning.                           08:40:03

 8       Q.   Could you just state your full name for the   08:40:05

 9   record.                                          08:40:06

10       A.   John William Gurley.                    08:40:08

11       Q.   By whom are you currently employed?     08:40:11

12       A.   Benchmark Capital.                      08:40:12

13       Q.   And what is your position?              08:40:13

14       A.   I'm a general partner.                  08:40:15

15       Q.   Can you -- how long have you been a general   08:40:18

16   partner at Benchmark?                            08:40:20

17       A.   Since '99.                              08:40:22

18       Q.   Do you have any knowledge about the Benchmark   08:40:27

19   initial investment into Uber?                    08:40:30

20       A.   Yes.                                    08:40:30

21       Q.   What was your relationship to that?     08:40:33

22       A.   I was the lead partner on effecting the   08:40:36

23   investment in January of 2011.                   08:40:40

24       Q.   So just to clarify, the investment became   08:40:45

25   effective in January of 2011?                    08:40:47
```

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 08:40:47 |
| 2 | Q.   What was the nature of Uber's business at | 08:40:54 |
| 3 | that time? | 08:40:54 |
| 4 | A.   To the best of my recollection, the company | 08:41:01 |
| 5 | was operating a service that allowed you to book a | 08:41:06 |
| 6 | black car.  I think we're only operating in | 08:41:09 |
| 7 | San Francisco at the time. | 08:41:10 |
| 8 | Q.   Did there come a time when you became aware | 08:41:15 |
| 9 | of the subject of AV technology? | 08:41:20 |
| 10 | MR. FLUMENBAUM:  Just so the record is clear -- | 08:41:25 |
| 11 | BY MR. VERHOEVEN: | 08:41:25 |
| 12 | Q.   Automatic vehicle, autonomous vehicle? | 08:41:28 |
| 13 | MR. BRILLE:  Objection; form. | 08:41:32 |
| 14 | MR. BOOCK:  Same objection. | |
| 15 | BY MR. VERHOEVEN: | |
| 16 | Q.   Did there come a time when you became aware | 08:41:35 |
| 17 | of autonomous vehicle technology? | 08:41:37 |
| 18 | MR. FLUMENBAUM:  Can one objection as to form | 08:41:39 |
| 19 | stand for everybody?  Is that the rule here? | 08:41:42 |
| 20 | MR. BRILLE:  Yes, that would be okay with me. | 08:41:45 |
| 21 | MR. FLUMENBAUM:  Is that okay? | 08:41:46 |
| 22 | MR. BOOCK:  That's fine for us. | 08:41:48 |
| 23 | MR. VERHOEVEN:  Yes. | 08:41:49 |
| 24 | MR. FLUMENBAUM:  I don't want to have to chime in | 08:41:50 |
| 25 | after somebody else does it. | 08:41:53 |

Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. VERHOEVEN: | 08:41:53 |
| 2 | Q.   Do you have the question in might? | 08:41:56 |
| 3 | MR. FLUMENBAUM:  You can ask for it to be | 08:41:58 |
| 4 | repeated. | 08:41:58 |
| 5 | THE WITNESS:  No.  No.  I'm fine. | 08:42:01 |
| 6 | Yes. | |
| 7 | BY MR. VERHOEVEN: | |
| 8 | Q.   When was that? | 08:42:02 |
| 9 | A.   I don't have a specific recollection of that | 08:42:04 |
| 10 | date in -- the window. | 08:42:05 |
| 11 | Q.   Was it after you -- excuse me. | 08:42:07 |
| 12 | Was it after Benchmark had invested in Uber? | 08:42:12 |
| 13 | A.   Yes. | 08:42:12 |
| 14 | Q.   Given that you don't have a specific window, | 08:42:16 |
| 15 | can you ballpark it for me, what year it was? | 08:42:26 |
| 16 | MR. FLUMENBAUM:  Objection as to form. | 08:42:32 |
| 17 | THE WITNESS:  My best recollection would be that | 08:42:35 |
| 18 | it -- around the time that it became part of the | 08:42:37 |
| 19 | public lexicon, you know, or slightly before, but I | 08:42:41 |
| 20 | don't recall exactly when that was. | 08:42:43 |
| 21 | BY MR. VERHOEVEN: | 08:42:43 |
| 22 | Q.   When did you first discuss this subject with | 08:42:48 |
| 23 | Mr. Kalanick? | 08:42:51 |
| 24 | MR. FLUMENBAUM:  Objection as to form. | 08:42:51 |
| 25 | You may answer. | 08:42:54 |

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't have a specific recollection | 08:42:55 |
| 2 | of the first time. | 08:42:57 |
| 3 | BY MR. VERHOEVEN: | 08:42:57 |
| 4 | Q.   Do you have a recollection of discussing this | 08:43:00 |
| 5 | technology with Mr. Kalanick? | 08:43:03 |
| 6 | A.   I'm certain that it was discussed at some | 08:43:05 |
| 7 | point, yes. | 08:43:06 |
| 8 | Q.   What's your best estimate of what that point | 08:43:09 |
| 9 | was? | 08:43:09 |
| 10 | A.   My best guess would be probably 2015, | 08:43:16 |
| 11 | beginning of 2015, something like that. | 08:43:18 |
| 12 | Q.   Okay.  Could you tell me what Mr. Kalanick | 08:43:23 |
| 13 | said to you? | 08:43:26 |
| 14 | A.   I don't have specific recollection of | 08:43:28 |
| 15 | specific language. | 08:43:30 |
| 16 | Q.   Generally? | 08:43:32 |
| 17 | A.   Mr. Kalanick had a -- has a strong belief, | 08:43:50 |
| 18 | that I think is mirrored in his comments in the public | 08:43:53 |
| 19 | record, that this was an important technology related | 08:43:56 |
| 20 | to Uber. | 08:43:58 |
| 21 | Q.   Related to what? | 08:44:07 |
| 22 | MR. FLUMENBAUM:  "Related to Uber." | 08:44:09 |
| 23 | THE WITNESS:  Sorry. | 08:44:10 |
| 24 | BY MR. VERHOEVEN: | 08:44:10 |
| 25 | Q.   Sorry. | 08:44:10 |

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      A.   That's okay.                              08:44:11

 2      Q.   And why did he say it was related to Uber?  08:44:16

 3      A.   I think there's also a lot of public      08:44:23

 4   discourse about this notion, but there's -- obviously,  08:44:29

 5   because the service is reliant on vehicles, to the  08:44:32

 6   extent the vehicles became automated, it had the   08:44:35

 7   potential to impact the business and its relationship  08:44:39

 8   with drivers and all those things.                08:44:42

 9      Q.   He told you it was really important to Uber's  08:44:45

10   business; right?                                  08:44:47

11      MR. BRILLE:  Objection; form.                  08:44:49

12      MR. FLUMENBAUM:  You may answer.               08:44:50

13      THE WITNESS:  I think it's a fair statement.   08:44:52

14   BY MR. VERHOEVEN:                                 08:44:52

15      Q.   Okay.  Did he tell you it was an existential  08:44:54

16   threat?                                           08:44:56

17      A.   He was quoted publicly as saying that.  I  08:44:59

18   don't recall him telling me specifically that.    08:45:01

19      Q.   Did you agree with him?                   08:45:03

20      A.   I don't agree with that assertion.        08:45:05

21      Q.   Okay.  Do you think that autonomous vehicle  08:45:09

22   technology is important to Uber?                  08:45:12

23      A.   It could be important.                    08:45:13

24      Q.   When would it not be important?           08:45:16

25      A.   Well, there's an argument that the technology  08:45:19
```

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | threatens the service provider.  I don't think, from | 08:45:23 |
| 2 | my own point of view, that anything Boeing builds | 08:45:28 |
| 3 | threatens United or Delta's business, from my point of | 08:45:31 |
| 4 | view.  I have a different point of view on that topic | 08:45:37 |
| 5 | than he does. | 08:45:38 |
| 6 | Q.   Okay.  In what instances would it be a | 08:45:40 |
| 7 | threat? | 08:45:41 |
| 8 | MR. FLUMENBAUM:  Objection as to form. | 08:45:45 |
| 9 | Could you be a little more clear, given his | 08:45:47 |
| 10 | prior answer? | 08:45:48 |
| 11 | BY MR. VERHOEVEN: | 08:45:48 |
| 12 | Q.   Okay.  I asked you, quote, "Do you think that | 08:46:10 |
| 13 | autonomous vehicle" -- the whole question isn't in | 08:46:17 |
| 14 | there. | 08:46:17 |
| 15 | I asked you whether you thought autonomous | 08:46:20 |
| 16 | vehicle technology would be important to Uber, and you | 08:46:23 |
| 17 | said, "It could be important." | 08:46:24 |
| 18 | Do you remember that? | 08:46:25 |
| 19 | A.   Yes. | 08:46:25 |
| 20 | Q.   Okay.  Why could it be important? | 08:46:29 |
| 21 | A.   There are cars that underline the operations | 08:46:34 |
| 22 | of the service.  There are drivers that are in those | 08:46:37 |
| 23 | cars.  There's the relationships between the drivers | 08:46:40 |
| 24 | and the -- that are important to the company.  And so | 08:46:43 |
| 25 | if this new technology came along that displaced | 08:46:47 |

Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | them -- this is well documented in the public | 08:46:50 |
| 2 | discourse -- that would cause relationship issues for | 08:46:52 |
| 3 | the company with its drivers. | 08:46:54 |
| 4 | Q.   You have competitors to Uber? | 08:46:59 |
| 5 | A.   Yes. | 08:46:59 |
| 6 | Q.   Can you name some? | 08:47:01 |
| 7 | A.   In different -- in Asia, there's Grab.  In | 08:47:10 |
| 8 | India, there's Ola.  In the U.S., there's Lyft.  In | 08:47:15 |
| 9 | Latin America there's 99Taxi.  There's Careem. | 08:47:21 |
| 10 | Q.   So -- | |
| 11 | MR. FLUMENBAUM:  Hold on. | 08:47:23 |
| 12 | Are you finished with your answer? | 08:47:27 |
| 13 | THE WITNESS:  I didn't know how exhaustive he | 08:47:29 |
| 14 | wanted me to be. | 08:47:30 |
| 15 | BY MR. VERHOEVEN: | 08:47:30 |
| 16 | Q.   In the United States. | 08:47:33 |
| 17 | A.   In the United States.  Lyft.  There were | 08:47:33 |
| 18 | others.  I don't know if they're still operational. | 08:47:37 |
| 19 | Q.   So if Lyft had the autonomous vehicle | 08:47:42 |
| 20 | technology that worked and passed through the | 08:47:45 |
| 21 | regulatory hurdles before Uber, would that be a threat | 08:47:49 |
| 22 | to Uber? | 08:47:50 |
| 23 | MR. FLUMENBAUM:  Objection as to form. | 08:47:52 |
| 24 | You may answer. | 08:47:53 |
| 25 | THE WITNESS:  And no one else had; is that the | 08:47:56 |

Page 16

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | implication? | 08:47:57 |
| 2 | BY MR. VERHOEVEN: | 08:47:57 |
| 3 | Q.   Yes. | 08:47:58 |
| 4 | A.   Sure.  Yes.  Theoretically.  Actually, let me | 08:48:02 |
| 5 | step back. | 08:48:03 |
| 6 | That would be heavily dependent on the cost | 08:48:05 |
| 7 | of the vehicle.  Because if the vehicle cost 5X more | 08:48:09 |
| 8 | than a traditional vehicle, it would more than offset | 08:48:13 |
| 9 | the cost of the driver, in which case I don't think it | 08:48:16 |
| 10 | would have an impact at all. | 08:48:17 |
| 11 | Q.   What is the cost to Uber for the human driver | 08:48:20 |
| 12 | expressed as a percentage of dollar revenue, if you | 08:48:28 |
| 13 | know? | 08:48:28 |
| 14 | A.   What percentage of the revenue goes to the | 08:48:32 |
| 15 | driver? | 08:48:33 |
| 16 | Q.   Yes. | 08:48:34 |
| 17 | A.   I don't know if that's privileged or not.  I | 08:48:37 |
| 18 | just don't know. | 08:48:39 |
| 19 | MR. BRILLE:  So we have a protective order in the | 08:48:42 |
| 20 | case.  And it is definitely highly confidential.  And | 08:48:45 |
| 21 | we will designate anything that is business | 08:48:47 |
| 22 | confidential -- | 08:48:48 |
| 23 | THE WITNESS:  Okay. | |
| 24 | MR. FLUMENBAUM:  Is it -- do I have to invoke the | 08:48:52 |
| 25 | protective order for purposes of this deposition? | 08:48:54 |

Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. BRILLE:  You do not.  We have an agreement | 08:48:56 |
| 2 | with the other side that we designate transcripts | 08:48:59 |
| 3 | after they come out, and we will take care of | 08:49:01 |
| 4 | something like that. | 08:49:02 |
| 5 | MR. FLUMENBAUM:  So as far as I'm concerned, this | 08:49:04 |
| 6 | is -- so any business confidential information -- | 08:49:06 |
| 7 | MR. BRILLE:  Correct. | 08:49:07 |
| 8 | MR. FLUMENBAUM:  -- he can testify to? | 08:49:08 |
| 9 | MR. BRILLE:  Yes, that is correct. | 08:49:09 |
| 10 | MR. FLUMENBAUM:  Okay.  And I don't have to -- do | 08:49:09 |
| 11 | I get to review the transcript as well? | 08:49:13 |
| 12 | MR. BRILLE:  Yes.  Absolutely. | 08:49:14 |
| 13 | MR. FLUMENBAUM:  Okay.  So I just want to make | 08:49:15 |
| 14 | sure that I have that opportunity as well. | 08:49:18 |
| 15 | MR. BRILLE:  Yeah. | 08:49:19 |
| 16 | MR. FLUMENBAUM:  And in the meantime, who can | 08:49:21 |
| 17 | share this deposition? | 08:49:23 |
| 18 | MR. BRILLE:  In -- | 08:49:27 |
| 19 | MR. FLUMENBAUM:  Until we review this stuff? | 08:49:29 |
| 20 | MR. VERHOEVEN:  Should we go off the record for | 08:49:30 |
| 21 | this. | |
| 22 | MR. BRILLE:  Let's go off the record, yes. | 08:49:33 |
| 23 | THE VIDEOGRAPHER:  Off the record at 8:49 a.m. | 08:49:36 |
| 24 | (Discussion off the record.) | 08:49:55 |
| 25 | THE VIDEOGRAPHER:  Back on the record at 8:49 a.m. | 08:49:58 |

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MR. VERHOEVEN:                                    08:49:58

 2        Q.   I think you're allowed to answer the       08:50:02

 3    question.                                           08:50:02

 4        A.   I honestly don't have the documents right in  08:50:04

 5    front of me, so --                                  08:50:05

 6        Q.   Of course.                                 08:50:08

 7        A.   And I would also say different services have  08:50:08

 8    different answers on this, so there's no specifics.  08:50:11

 9    But somewhere between, you know, 75 and 80 percent,  08:50:15

10    typically, of the revenue goes to the driver.       08:50:19

11        Q.   And so if you didn't have to pay drivers and  08:50:23

12    you could use an autonomous vehicle for your service,  08:50:26

13    that would be a huge competitive advantage, assuming  08:50:29

14    others couldn't do that?                            08:50:32

15        A.   Depends on the depreciation cost of the car.  08:50:36

16    If the vehicle costs five times more than a standard  08:50:40

17    car, you have to eat that depreciation cost to deliver  08:50:40

18    that service.                                       08:50:43

19        Q.   But if the vehicle is roughly similarly     08:50:43

20    priced as a regular car, there would be a huge       08:50:46

21    advantage for the first mover in that technology;    08:50:50

22    right?                                              08:50:50

23        MR. FLUMENBAUM:  Objection as to form.           08:50:52

24            You're speculating.                         08:50:54

25        MR. VERHOEVEN:  Counsel, I don't know if you're  08:50:56
```

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | familiar with Judge Alsup's rules, but he does not | 08:50:59 |
| 2 | allow anything -- you're not allowed to say anything | 08:51:03 |
| 3 | more than "object to form." | 08:51:04 |
| 4 | MR. FLUMENBAUM:  Okay.  Objection as to form. | 08:51:06 |
| 5 | BY MR. VERHOEVEN: | 08:51:06 |
| 6 | Q.   Do you have the question in mind? | 08:51:08 |
| 7 | A.   No one has delivered a fully autonomous | 08:51:10 |
| 8 | vehicle that could operate in a massive service at | 08:51:14 |
| 9 | scale.  So knowing -- presuming that you know the cost | 08:51:17 |
| 10 | of that would be speculative, from my point of view. | 08:51:21 |
| 11 | So, yes, if you could do it, then, yes, that would be | 08:51:25 |
| 12 | true. | 08:51:25 |
| 13 | Q.   If you could -- if you were a first mover | 08:51:27 |
| 14 | with working, approved autonomous vehicles in your | 08:51:33 |
| 15 | business model, that entity would have a huge | 08:51:37 |
| 16 | advantage competitively? | 08:51:39 |
| 17 | MR. FLUMENBAUM:  Objection; form. | 08:51:40 |
| 18 | THE WITNESS:  If you could move millions of units | 08:51:43 |
| 19 | at scale at a price that's equivalent to a normal car, | 08:51:47 |
| 20 | which, I would argue, is very hard to prove someone | 08:51:50 |
| 21 | could do at this moment in time.  But, yes. | 08:51:53 |
| 22 | BY MR. VERHOEVEN: | 08:51:53 |
| 23 | Q.   Okay.  And that's why Mr. Kalanick was really | 08:51:57 |
| 24 | interested in developing autonomous vehicle | 08:51:59 |
| 25 | technology; right? | 08:52:01 |

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  Objection as to form. | 08:52:06 |
| 2 | THE WITNESS:  I think that's fair. | 08:52:08 |
| 3 | BY MR. VERHOEVEN: | 08:52:08 |
| 4 | Q.   Did you -- in this conversation we're talking | 08:52:16 |
| 5 | about with Mr. Kalanick, did you express to him your | 08:52:22 |
| 6 | view on whether Uber should move forward with this | 08:52:27 |
| 7 | technology? | 08:52:29 |
| 8 | MR. BRILLE:  Objection; form. | 08:52:33 |
| 9 | THE WITNESS:  Keep going? | 08:52:34 |
| 10 | BY MR. VERHOEVEN: | 08:52:34 |
| 11 | Q.   Every time there's an objection to form, you | 08:52:38 |
| 12 | still have to answer. | 08:52:39 |
| 13 | MR. FLUMENBAUM:  You have to answer.  I'm not | |
| 14 | going to tell you not to. | |
| 15 | THE WITNESS:  Okay, great. | |
| 16 | So, yes, we did have those discussions, | 08:52:41 |
| 17 | including the points that I just made.  We also | 08:52:44 |
| 18 | discussed the notion that it wouldn't be critical -- | 08:52:50 |
| 19 | and this is similar to what you were saying.  It's not | 08:52:54 |
| 20 | critical for a service provider, a ridesharing service | 08:52:59 |
| 21 | provider, to be the leader in this technology. | 08:53:03 |
| 22 | It's critical that someone else not have | 08:53:05 |
| 23 | unfettered access to differentiated technology.  So | 08:53:11 |
| 24 | that if -- in other words, if the automated car were | 08:53:15 |
| 25 | commoditized, then it would probably have zero impact | 08:53:19 |

Page 21

```
 1   on the state of affairs in the service provider      08:53:22
 2   industry.                                             08:53:22
 3   BY MR. VERHOEVEN:                                     08:53:22
 4       Q.   Mr. Kalanick wanted to be the first with a  08:53:25
 5   vehicle that had this technology in the marketplace,  08:53:27
 6   didn't he?                                            08:53:28
 7       MR. FLUMENBAUM:  Objection as to form.            08:53:31
 8       THE WITNESS:  I don't have specific recollection  08:53:32
 9   that he said, I definitely want to be first in this   08:53:36
10   technology.  But that's different from whether or not 08:53:41
11   he did want to be first.  I just don't have a specific 08:53:43
12   recollection.                                         08:53:44
13   BY MR. VERHOEVEN:                                     08:53:44
14       Q.   So he never told you that he wanted to be the 08:53:47
15   first mover with this technology?                     08:53:50
16       A.   I don't have a recollection of that specific 08:53:52
17   statement.                                            08:53:53
18       Q.   He never told you that it would be a huge     08:53:55
19   advantage if you were the first company out there in  08:53:59
20   the market with this technology?                      08:54:02
21       A.   I don't recall that specific statement, but I 08:54:04
22   also recall conversations where -- the flip side of   08:54:09
23   that, where as long as the -- you're not second --    08:54:15
24   like that was a frequent topic.  As long as you're not 08:54:19
25   far behind, which gets back to this notion of         08:54:23
```

Page 22

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   potential commoditization of that technology.          08:54:27

 2       Q.   So you're saying -- you don't recall if he    08:54:30

 3   said it's important to be first, but as long as you're 08:54:34

 4   not second, that's okay?                               08:54:35

 5       A.   Yes, we had that conversation.  There's a     08:54:37

 6   difference.                                            08:54:38

 7       Q.   Okay.  Did there come a time when Uber        08:54:46

 8   started investing its money into this technology, this 08:54:52

 9   autonomous vehicle technology?                         08:54:54

10       A.   Yes.                                           08:54:54

11       Q.   When was that?                                08:54:55

12       A.   My first recollection of a substantial effort 08:54:59

13   related to the Carnegie Mellon transaction.            08:55:05

14       Q.   And what do you mean when you say "the        08:55:07

15   Carnegie Mellon transaction"?                          08:55:08

16       A.   Once again, I think this is public record, so 08:55:14

17   you could find it with a Google search, but there was  08:55:17

18   a large transaction that involved some of the          08:55:20

19   employees of Carnegie Mellon coming on board -- or     08:55:24

20   some of the people associated with Carnegie Mellon     08:55:26

21   coming on board.  And we set up a research             08:55:30

22   headquarters for autonomous in Pittsburgh.             08:55:33

23       Q.   So was that a transaction with the group that 08:55:37

24   came over?  You said there was a large transaction.    08:55:44

25       MR. BRILLE:  Objection; form.                      08:55:45
```

Page 23

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't understand the question. | 08:55:48 |
| 2 | BY MR. VERHOEVEN: | 08:55:48 |
| 3 | Q.   Well, you said there's a large transaction in | 08:55:50 |
| 4 | which a number of Carnegie Mellon folks came over. | 08:55:54 |
| 5 | A.   Correct. | 08:55:54 |
| 6 | Q.   And you set up a lab, or whatever you want to | 08:55:58 |
| 7 | call it, in Pittsburgh; right? | 08:55:59 |
| 8 | A.   Right. | 08:55:59 |
| 9 | Q.   And so my question was, when you say "a large | 08:56:03 |
| 10 | transaction," are you referring to like a single | 08:56:05 |
| 11 | transaction where the whole group came over -- | 08:56:08 |
| 12 | A.   I don't remember exactly if there were | 08:56:10 |
| 13 | multiple pieces in that.  I'm just referring to it as | 08:56:13 |
| 14 | a single event. | 08:56:15 |
| 15 | Q.   Did the board review and approve that? | 08:56:18 |
| 16 | A.   I believe so. | 08:56:19 |
| 17 | Q.   Okay.  And what did Mr. -- who presented | 08:56:26 |
| 18 | the -- who recommended it to the board? | 08:56:29 |
| 19 | A.   I don't have specific recollection of like | 08:56:36 |
| 20 | who presented it, but I -- my best guess would be that | 08:56:42 |
| 21 | it was Mr. Kalanick. | 08:56:43 |
| 22 | Q.   But you don't remember what he said in | 08:56:45 |
| 23 | connection with that? | 08:56:47 |
| 24 | A.   I don't, not at this moment in time. | 08:56:50 |
| 25 | Q.   Do you remember any discussions by the board | 08:56:59 |

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | about the importance of this technology, autonomous | 08:57:05 |
| 2 | vehicle technology? | 08:57:07 |
| 3 | MR. FLUMENBAUM:  At around the time of the | 08:57:08 |
| 4 | Carnegie Mellon issue? | 08:57:10 |
| 5 | MR. VERHOEVEN:  I asked my question; you can't | 08:57:12 |
| 6 | edit it. | 08:57:15 |
| 7 | BY MR. VERHOEVEN: | 08:57:15 |
| 8 | Q.   Go ahead. | |
| 9 | MR. BRILLE:  But he can ask for clarification. | 08:57:17 |
| 10 | MR. VERHOEVEN:  There's no -- you can object to | 08:57:19 |
| 11 | form or you can object on privilege grounds, nothing | 08:57:22 |
| 12 | else. | 08:57:23 |
| 13 | MR. FLUMENBAUM:  Objection as to form. | 08:57:27 |
| 14 | BY MR. VERHOEVEN: | 08:57:27 |
| 15 | Q.   Okay.  Do you recall any discussions at the | 08:57:29 |
| 16 | board level about the importance of this technology? | 08:57:33 |
| 17 | A.   Only -- yes, but only in a general sense.  I | 08:57:36 |
| 18 | don't recall any specific one-on-one conversation. | 08:57:41 |
| 19 | Q.   So when you say "in a general sense," you | 08:57:44 |
| 20 | mean in the sense of a presentation being made to the | 08:57:47 |
| 21 | group? | 08:57:48 |
| 22 | A.   No, I just mean in the sense that it was | 08:57:54 |
| 23 | discussed more than once that autonomous technology | 08:58:02 |
| 24 | was important to ridesharing and that we needed to | 08:58:07 |
| 25 | have an understanding of that, an effort in that, and | 08:58:13 |

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | know where that technology was evolving relative to | 08:58:16 |
| 2 | our service. | 08:58:17 |
| 3 | Q.   And how often did this come up with the | 08:58:21 |
| 4 | board? | 08:58:22 |
| 5 | A.   I would say only -- around Carnegie Mellon | 08:58:39 |
| 6 | and Otto were the only two times where it was | 08:58:43 |
| 7 | discussed in depth.  I don't think it was a frequent | 08:58:50 |
| 8 | topic of every board meeting. | 08:58:52 |
| 9 | Q.   Are you still with -- on the board at Uber? | 08:59:05 |
| 10 | A.   I am not. | 08:59:06 |
| 11 | Q.   When did you cease being on the board? | 08:59:08 |
| 12 | A.   I believe it was mid to late June of this | 08:59:17 |
| 13 | year. | 08:59:17 |
| 14 | Q.   And I may have asked this and, if I did, I | 08:59:22 |
| 15 | apologize. | 08:59:22 |
| 16 | But when did you first become a board member? | 08:59:25 |
| 17 | A.   In January of 2011. | 08:59:27 |
| 18 | Q.   When you were a member of the board, is it a | 08:59:33 |
| 19 | fair statement to say that you were very engaged with | 08:59:37 |
| 20 | the company? | 08:59:41 |
| 21 | MR. FLUMENBAUM:  Objection as to form. | 08:59:51 |
| 22 | THE WITNESS:  I'll answer yes.  There's a question | 08:59:54 |
| 23 | as to whether -- like relative to what, you know. | 08:59:58 |
| 24 | BY MR. VERHOEVEN: | 08:59:58 |
| 25 | Q.   Is it fair to say that you were the most | 09:00:00 |

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | engaged board member with respect to Uber? | 09:00:03 |
| 2 | MR. FLUMENBAUM:  Objection as to form. | 09:00:14 |
| 3 | THE WITNESS:  It's possible.  It would be | 09:00:15 |
| 4 | conjecture from my point solely because I don't know | 09:00:19 |
| 5 | of all the other meetings that the other board members | 09:00:22 |
| 6 | may or may not have been having. | 09:00:24 |
| 7 | BY MR. VERHOEVEN: | 09:00:24 |
| 8 | Q.   Do you feel as though you were the most | 09:00:26 |
| 9 | engaged board member? | 09:00:28 |
| 10 | MR. BRILLE:  Objection; form. | 09:00:29 |
| 11 | MR. FLUMENBAUM:  Objection as to form. | 09:00:29 |
| 12 | THE WITNESS:  It's possible. | 09:00:32 |
| 13 | BY MR. VERHOEVEN: | 09:00:32 |
| 14 | Q.   Can you think of anyone else on the board who | 09:00:35 |
| 15 | was more engaged than you? | 09:00:38 |
| 16 | A.   No. | 09:00:41 |
| 17 | Q.   You were also -- in addition to being a | 09:00:45 |
| 18 | member of the board of directors, you were also on the | 09:00:48 |
| 19 | compensation committee; is that right? | 09:00:50 |
| 20 | A.   That is correct. | 09:00:51 |
| 21 | Q.   And what was your role on the compensation | 09:00:55 |
| 22 | committee? | 09:00:58 |
| 23 | A.   Compensation committee would look over all | 09:01:02 |
| 24 | material compensation requests for new hires.  We'd | 09:01:11 |
| 25 | get involved in review process, bonus determination. | 09:01:20 |

Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  Anything else, generally? | 09:01:24 |
| 2 | A.   Look after the long-term compensation | 09:01:30 |
| 3 | structure of the company and how those programs work | 09:01:34 |
| 4 | and are set up, how they scale. | 09:01:37 |
| 5 | Q.   Were you on any other committees at Uber | 09:01:41 |
| 6 | besides the compensation committee? | 09:01:43 |
| 7 | A.   I joined the audit committee in, I believe, | 09:01:48 |
| 8 | March.  It might have been February.  Sometime in | 09:01:53 |
| 9 | the -- early 2017. | 09:01:55 |
| 10 | Q.   You said the audit committee? | 09:01:59 |
| 11 | A.   Yes. | 09:01:59 |
| 12 | Q.   And what were your responsibilities on the | 09:02:02 |
| 13 | audit committee? | 09:02:04 |
| 14 | A.   To interface with PwC, our lead auditor, to | 09:02:10 |
| 15 | review the status of the audits.  To interface with | 09:02:21 |
| 16 | the internal audit function.  To interface with the | 09:02:25 |
| 17 | compliance function.  To work with the other members | 09:02:28 |
| 18 | of the committee on all those topics. | 09:02:30 |
| 19 | Q.   What is the compliance function? | 09:02:35 |
| 20 | A.   Like many other companies, Uber has a chief | 09:02:41 |
| 21 | compliance officer that looks after internal | 09:02:47 |
| 22 | investigation, whistle-blower claims, those kind of | 09:02:51 |
| 23 | things. | 09:02:52 |
| 24 | Q.   Were you on any other committees when you | 09:02:55 |
| 25 | were working at Uber? | 09:02:56 |

Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      A.   Yes.                                      09:02:58

 2      MR. FLUMENBAUM:  Objection; form.             09:02:59

 3   BY MR. VERHOEVEN:                                 09:02:59

 4      Q.   What were they?                           09:03:01

 5      A.   There was a committee put together -- a   09:03:03

 6   special committee put together to look after Waymo  09:03:07

 7   litigation.  There was a committee put together for 09:03:11

 8   the Holder investigation.  And there was a search   09:03:15

 9   committee put together for the COO search.          09:03:19

10      Q.   When was the committee on the Waymo issue  09:03:28

11   formed?                                             09:03:30

12      A.   I believe mid to late May.                 09:03:34

13      Q.   Are you familiar with the fact that the court 09:03:45

14   in the Waymo litigation in the Northern District of 09:03:49

15   California issued a preliminary injunction?         09:03:51

16      MR. FLUMENBAUM:  Um --                          09:03:55

17      MR. VERHOEVEN:  Just asking if he knows about it. 09:03:58

18      MR. FLUMENBAUM:  Right.                         09:03:58

19           If your knowledge is solely based on       09:04:00

20   conversations with counsel, then I don't believe you 09:04:04

21   can answer that question.                          09:04:06

22           We are -- I'm under instructions to        09:04:09

23   preserve -- by the company that Mr. Gurley is to   09:04:14

24   preserve all privileges that the company has.  And I 09:04:17

25   received a letter to that effect, and I'm going to  09:04:20
```

Page 29

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | follow that instruction. | 09:04:26 |
| 2 | But -- so to the extent that you know about | 09:04:29 |
| 3 | the preliminary injunction from other sources other | 09:04:32 |
| 4 | than counsel, and that could include public -- | 09:04:38 |
| 5 | THE WITNESS:  Yeah, it was in the media, so I'm | 09:04:40 |
| 6 | aware of it from that. | 09:04:43 |
| 7 | MR. FLUMENBAUM:  Okay. | 09:04:43 |
| 8 | BY MR. VERHOEVEN: | |
| 9 | Q.   Relative to that event, was the committee | 09:04:49 |
| 10 | formed before or after? | 09:04:53 |
| 11 | A.   To the best of my knowledge, after. | 09:04:55 |
| 12 | Q.   Who was on that committee? | 09:05:00 |
| 13 | A.   I believe myself, David Bonderman and Arianna | 09:05:07 |
| 14 | Huffington. | 09:05:10 |
| 15 | Q.   All right.  Have you exhausted the list of | 09:05:16 |
| 16 | committees that you can recall being on? | 09:05:19 |
| 17 | A.   Yes. | 09:05:20 |
| 18 | Q.   Is it a fair statement to say that in the | 09:05:44 |
| 19 | years 2016, '15 and until you left the board in '17, | 09:05:52 |
| 20 | that you were in regular contact with Mr. Kalanick | 09:05:56 |
| 21 | about Uber? | 09:05:59 |
| 22 | MR. FLUMENBAUM:  Objection as to form. | 09:06:00 |
| 23 | You may answer. | 09:06:02 |
| 24 | THE WITNESS:  So certainly he -- we were both | 09:06:09 |
| 25 | present at most board meetings, so we had contact | 09:06:13 |

Page 30

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | through that.  In terms of one-on-one contact, there | 09:06:17 |
| 2 | would be periods where there would be lots of it, | 09:06:20 |
| 3 | typically around recruiting, that kind of thing, and | 09:06:23 |
| 4 | then there would be periods where there wouldn't be | 09:06:26 |
| 5 | much.  So it wasn't consistent through that time | 09:06:29 |
| 6 | frame. | 09:06:30 |
| 7 | BY MR. VERHOEVEN: | 09:06:30 |
| 8 | Q.   Around May 2016, is it fair to say that you | 09:06:35 |
| 9 | were in regular contact with Mr. Kalanick concerning | 09:06:38 |
| 10 | his management of Uber? | 09:06:41 |
| 11 | A.   I just want to be careful with the definition | 09:06:52 |
| 12 | of "regular."  I'd say consistent amount of contact | 09:06:56 |
| 13 | that we have with all the types of companies that we | 09:07:00 |
| 14 | invest in.  It wasn't abnormally high or low. | 09:07:07 |
| 15 | Q.   When did you first -- you | 09:07:13 |
| 16 | referenced -- withdrawn. | 09:07:16 |
| 17 | You referenced the Otto transaction earlier | 09:07:20 |
| 18 | in your testimony. | 09:07:21 |
| 19 | A.   Um-hum. | 09:07:22 |
| 20 | Q.   When did you first learn about the | 09:07:24 |
| 21 | possibility of that transaction? | 09:07:26 |
| 22 | A.   Shortly before the board approved it. | 09:07:30 |
| 23 | Q.   When did the board approve it? | 09:07:34 |
| 24 | A.   I don't have the date in front of me. | 09:07:37 |
| 25 | Q.   Who told you about it before the board | 09:07:45 |

Page 31

| | | |
|---|---|---|
| 1 | approved it?  How did you learn about it? | 09:07:47 |
| 2 | A.   I don't have a specific recollection.  It's | 09:07:49 |
| 3 | common -- it was fairly common during my board tenure | 09:07:53 |
| 4 | at Uber to get a call from either Emil Michael or | 09:07:58 |
| 5 | Cameron a day or two before a board meeting to brief | 09:08:03 |
| 6 | us on something.  And that may have happened in that | 09:08:06 |
| 7 | case.  I don't have a specific recollection, but that | 09:08:09 |
| 8 | would be the standard protocol. | 09:08:11 |
| 9 | Q.   Did you do any investigation or diligence | 09:08:13 |
| 10 | into the transaction yourself before approving it? | 09:08:17 |
| 11 | A.   No. | 09:08:17 |
| 12 | Q.   Why not? | 09:08:19 |
| 13 | A.   There was a discussion at the board level | 09:08:22 |
| 14 | about the due diligence that had been done, and I | 09:08:25 |
| 15 | relied on that conveyance. | 09:08:28 |
| 16 | Q.   So the only discussion you had about the | 09:08:29 |
| 17 | diligence was at the meeting in which the transaction | 09:08:32 |
| 18 | was approved? | 09:08:33 |
| 19 | A.   Correct.   Correct. | 09:08:34 |
| 20 | MR. VERHOEVEN:  Let's get out the board . . . this | 09:08:51 |
| 21 | been previously marked? | 09:08:53 |
| 22 | MR. JUDAH:  It has been. | 09:08:57 |
| 23 | MR. VERHOEVEN:  Can we mark another one? | 09:09:00 |
| 24 | MR. JUDAH:  Yes. | 09:09:01 |
| 25 | MR. VERHOEVEN:  Can you mark this as Exhibit 910. | 09:09:06 |

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | (Plaintiff's Exhibit 910 was marked.) | 09:09:35 |
| 2 | BY MR. VERHOEVEN: | |
| 3 | Q.   Mr. Gurley, take a look at Exhibit 910. | 09:09:38 |
| 4 | And my first question will be, do you | 09:09:41 |
| 5 | recognize this document? | 09:09:44 |
| 6 | (Witness reviews document.) | 09:10:13 |
| 7 | A.   Yes, I believe these are the slides that were | 09:10:15 |
| 8 | presented to the board in that meeting that we were | 09:10:18 |
| 9 | just discussing. | 09:10:19 |
| 10 | Q.   The meeting in which the Otto transaction was | 09:10:22 |
| 11 | approved? | 09:10:23 |
| 12 | A.   Yes. | 09:10:23 |
| 13 | Q.   It says, "Project Zing Review." | 09:10:27 |
| 14 | What does "Zing" refer to? | 09:10:29 |
| 15 | A.   I don't have any data on that topic. | 09:10:31 |
| 16 | Q.   Would it be fair to conclude that it refers | 09:10:34 |
| 17 | to the Otto transaction? | 09:10:36 |
| 18 | A.   Yes. | 09:10:36 |
| 19 | Q.   And it's dated April 11th, 2016. | 09:10:40 |
| 20 | Do you see that? | 09:10:41 |
| 21 | A.   Yes. | 09:10:41 |
| 22 | Q.   Is that the day in which the board approved | 09:10:45 |
| 23 | the Otto transaction? | 09:10:46 |
| 24 | A.   I would presume so. | 09:10:54 |
| 25 | Q.   The second page -- direct your attention to | 09:10:57 |

Page 33

| | | |
|---|---|---|
| 1 | the second page where it says, "Deal Overview." And | 09:11:01 |
| 2 | in particular, under the row that says, "Rationale" | 09:11:06 |
| 3 | and the column that says, "Consumer Lasers," I want to | 09:11:10 |
| 4 | ask you a couple questions. | 09:11:12 |
| 5 | Do you see it says, "Lasers are critical to | 09:11:18 |
| 6 | Uber's AV development and Ottomotto is expected to | 09:11:23 |
| 7 | de-risk our current laser approach"? | 09:11:25 |
| 8 | A.    Yes, I see that. | 09:11:30 |
| 9 | Q.    Who was making this presentation? | 09:11:39 |
| 10 | A.    To the best of my memory, it was | 09:11:41 |
| 11 | Mr. Kalanick. | 09:11:41 |
| 12 | Q.    And what was your understanding of what he | 09:11:45 |
| 13 | meant when he said, "Lasers are critical to Uber's AV | 09:11:50 |
| 14 | development"? | 09:11:51 |
| 15 | MR. FLUMENBAUM:   Objection as to form. | 09:11:51 |
| 16 | You may answer. | 09:11:54 |
| 17 | THE WITNESS:   To the best of my memory, we didn't | 09:11:57 |
| 18 | spend a lot of time dwelling on that topic. My best | 09:12:03 |
| 19 | inference of what that would mean is simply that | 09:12:08 |
| 20 | lasers are important to autonomous vehicles from the | 09:12:11 |
| 21 | company's point of view. | 09:12:13 |
| 22 | BY MR. VERHOEVEN: | 09:12:13 |
| 23 | Q.    Well, it says, "critical"; right? | 09:12:13 |
| 24 | A.    It does. | 09:12:16 |
| 25 | Q.    Did you disagree with that statement? | 09:12:19 |

Page  34

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.     I did not.                                        09:12:20

2      Q.     Then it continues on that sentence,              09:12:22

3  "Ottomotto is expected to de-risk our current laser         09:12:26

4  approach."                                                  09:12:26

5             You understand that meant that purchasing        09:12:31

6  Ottomotto would give you laser technology and,              09:12:36

7  therefore, de-risk what you're currently doing?             09:12:39

8      MR. FLUMENBAUM:   Objection as to form.                 09:12:43

9      THE WITNESS:   Like I said, there wasn't much           09:12:48

10  discussion on that particular topic, nor would I           09:12:51

11  suggest that the board as a whole has much deep            09:12:55

12  knowledge on laser technology, so I think it would be      09:12:57

13  taken as it's given.                                       09:13:00

14  BY MR. VERHOEVEN:                                          09:13:00

15      Q.     Did you understand that the rationale for the   09:13:06

16  deal was to de-risk Uber's current laser approach?         09:13:12

17      A.     That's written here, so I wouldn't object to    09:13:22

18  that notion.                                               09:13:23

19      Q.     You don't disagree with that.                   09:13:25

20      A.     No, I do not.                                   09:13:26

21      Q.     The second bullet in that cell says,            09:13:34

22  "Ottomotto could significantly enhance our overall AV      09:13:38

23  efforts and potentially accelerate current time           09:13:42

24  frames."                                                   09:13:42

25             Do you see that?                                09:13:43

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 09:13:43 |
| 2 | MR. FLUMENBAUM:  "Timelines." | 09:13:47 |
| 3 | BY MR. VERHOEVEN: | |
| 4 | Q.   "Timelines." | 09:13:48 |
| 5 | Do you see that? | 09:13:49 |
| 6 | A.   Yes, I do. | 09:13:50 |
| 7 | Q.   Why did Mr. Kalanick think that the Ottomotto | 09:13:56 |
| 8 | transaction could accelerate timelines? | 09:13:58 |
| 9 | A.   On this topic, there was more discussion.  I | 09:14:02 |
| 10 | think it's a general belief with all the companies we | 09:14:08 |
| 11 | work with that in order to be successful in new | 09:14:13 |
| 12 | endeavors, you have to have the right people on board. | 09:14:17 |
| 13 | And this entire transaction, as it was presented and | 09:14:21 |
| 14 | discussed with the board, was about helping us get the | 09:14:25 |
| 15 | right people on board who could be helpful in our | 09:14:28 |
| 16 | autonomous efforts. | 09:14:30 |
| 17 | Q.   So getting the right people on board would | 09:14:33 |
| 18 | accelerate your timelines? | 09:14:35 |
| 19 | A.   Yes. | 09:14:35 |
| 20 | Q.   Okay.  And then when you say getting "the | 09:14:43 |
| 21 | right people," if you look down to the row -- same | 09:14:46 |
| 22 | column, but the row that says, "Terms," you'll see | 09:14:51 |
| 23 | there's a bullet that says, "Minimum of 25 engineers | 09:14:54 |
| 24 | to join Uber.  Could be as many as 50 to 100." | 09:14:57 |
| 25 | Do you see that? | 09:14:59 |

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 09:14:59 |
| 2 | Q.   You understood at the time that Uber was | 09:15:03 |
| 3 | formed by former employees of Waymo/Google? | 09:15:08 |
| 4 | MR. BRILLE:  Objection; form. | 09:15:08 |
| 5 | You said, "Uber." | 09:15:10 |
| 6 | MR. VERHOEVEN:  Thank you for catching that. | 09:15:14 |
| 7 | BY MR. VERHOEVEN: | 09:15:14 |
| 8 | Q.   You understood that Otto was formed by former | 09:15:19 |
| 9 | employees from Waymo and Google? | 09:15:22 |
| 10 | MR. FLUMENBAUM:  Objection as to form. | 09:15:25 |
| 11 | You may -- | 09:15:25 |
| 12 | THE WITNESS:  It was -- it was my knowledge that | 09:15:30 |
| 13 | some of the employees of Otto were from Google, yes. | 09:15:34 |
| 14 | BY MR. VERHOEVEN: | 09:15:34 |
| 15 | Q.   Well, this phrase, "minimum of 25 engineers," | 09:15:37 |
| 16 | that was a term of the acquisition; right? | 09:15:40 |
| 17 | A.   It's listed here, yes. | 09:15:45 |
| 18 | Q.   And that was a reference to former | 09:15:48 |
| 19 | Google/Waymo engineers; right? | 09:15:52 |
| 20 | A.   I don't have any data that would suggest that | 09:15:55 |
| 21 | that -- that's relating to Otto engineers, as I | 09:16:00 |
| 22 | interpret this. | 09:16:02 |
| 23 | Q.   You don't remember that part of the value of | 09:16:05 |
| 24 | the transaction was Otto had this expertise that they | 09:16:08 |
| 25 | developed while they worked at Google on lasers? | 09:16:12 |

Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        MR. BRILLE:  Objection; form.              09:16:14

2        THE WITNESS:  I have no recollection, nor do I   09:16:18

3    have any data that suggests that this was specifically   09:16:22

4    tied to Google engineers.  And that was my       09:16:24

5    interpretation of your question.                 09:16:28

6    BY MR. VERHOEVEN:                                09:16:28

7        Q.   Well, if you said the goal was to get the   09:16:31

8    right people to accelerate timelines, did you ask any   09:16:36

9    questions or was there any discussions of whether   09:16:38

10   these 25 engineers were the, quote-unquote, right   09:16:41

11   people?                                          09:16:43

12       A.   By that moment in time, because of the   09:16:46

13   efforts in Pittsburgh that we've already discussed,   09:16:50

14   you know, I would presume that the company itself had   09:16:53

15   knowledge of who the right people were or who they   09:16:56

16   weren't.  And so I don't think it would be typical for   09:17:01

17   the board to go down into that depth and say, well,   09:17:05

18   what do you mean?  Are you sure these are the right   09:17:08

19   people?  That just wouldn't be a standard practice.   09:17:11

20       Q.   Is it your testimony here that, as of this   09:17:14

21   date, you had no knowledge that part of this -- value   09:17:19

22   of this transaction was obtaining the at least       09:17:24

23   know-how of engineers who had experience working with   09:17:31

24   Google?                                          09:17:32

25       MR. FLUMENBAUM:  Objection as to form.       09:17:35
```

Page 38

1        MR. BRILLE:  Same objection.                    09:17:39

2        THE WITNESS:  I would state it differently, which   09:17:43

3   is, the goal was to get engineers that were good at   09:17:50

4   autonomous, just as if we were going out to get       09:17:53

5   engineers good at AI or engineers good at machine     09:17:57

6   learning.  Where those people had developed that was  09:18:00

7   not material to the transaction, as long as they were 09:18:04

8   experienced.                                           09:18:06

9   BY MR. VERHOEVEN:                                      09:18:06

10       Q.    Is it your testimony, sir, that you didn't  09:18:09

11   know that most of these engineers referred to here    09:18:12

12   came from Google?                                      09:18:14

13       A.    I knew that some of them did, for sure, and 09:18:18

14   we already talked about that.                         09:18:21

15       Q.    Which ones did you know did?                09:18:23

16       A.    I didn't have specifics.  I knew Anthony did. 09:18:26

17       Q.    And what was his position at Otto?          09:18:30

18       A.    As far as I understand it, he was the leader 09:18:36

19   of the effort.                                         09:18:38

20       Q.    And as far as you understand it, he put the 09:18:40

21   team together; right?                                  09:18:41

22       A.    I don't have any data to dispute that notion. 09:18:47

23   I would assume that.  I don't know that for a fact.   09:18:50

24       Q.    Was there value in this acquisition due to  09:18:54

25   the fact that you'd be making Mr. Levandowski part of 09:18:58

Page  39

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Uber?                                                      09:19:00

2        A.   That was a strong argument for doing the          09:19:03

3    transaction, yes.                                          09:19:04

4        Q.   And why was it a strong argument?                 09:19:08

5        A.    Mr. Kalanick presented to the board that he      09:19:12

6    was one of the premier minds in the world on               09:19:16

7    autonomous vehicles and that it would be a benefit to      09:19:18

8    the company if he became an employee.                      09:19:20

9        Q.   Did Mr. Kalanick also say that he had a team      09:19:24

10   of engineers from Google with him?                         09:19:30

11       A.   He had a team of engineers.   It was my          09:19:32

12   presumption that some of them were from Google, but I      09:19:35

13   don't have data to suggest all of them were or that        09:19:39

14   that was part --                                           09:19:40

15       Q.    I'm just asking if he told you that at the       09:19:43

16   meeting, that part of the value was that -- in             09:19:44

17   addition to the fact that Mr. Levandowski was heading      09:19:49

18   up Ottomotto, was the additional fact that he had          09:19:55

19   hired a team to work with him that used to work with       09:19:59

20   him at Google?                                             09:20:00

21       MR. BRILLE:   Objection; form.                         09:20:09

22       THE WITNESS:   There's nothing in here that reads      09:20:11

23   exactly as you're saying it.   Certainly we were left      09:20:15

24   with the impression that they were -- that he had left     09:20:19

25   Google and put together a team and that some of those      09:20:22

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   people were from Google.  I don't have knowledge as to    09:20:25
 2   the exact percentage.                                     09:20:27
 3   BY MR. VERHOEVEN:                                         09:20:27
 4       Q.   Right, but did he say that at the meeting or    09:20:31
 5   something to that effect?                                 09:20:32
 6       MR. FLUMENBAUM:  Objection as to form.                09:20:43
 7       THE WITNESS:  I don't have a specific recollection    09:20:44
 8   of exactly what was said.  I was left with the            09:20:47
 9   impression that some of them came from Google, which      09:20:50
10   we already discussed.                                     09:20:52
11   BY MR. VERHOEVEN:                                         09:20:52
12       Q.   Why was there a condition in the terms of the   09:21:01
13   acquisition that required Uber to have a minimum of 25    09:21:08
14   engineers?                                                09:21:11
15       MR. BRILLE:  Objection; form.                         09:21:19
16       THE WITNESS:  I didn't create that term, so I        09:21:21
17   don't know the specifics.  I could speculate,             09:21:23
18   but . . .                                                 09:21:25
19   BY MR. VERHOEVEN:                                         09:21:25
20       Q.   Can you think of any other acquisition you've   09:21:28
21   been involved in in your career that had a similar        09:21:30
22   term that required a minimum of a certain number of       09:21:34
23   engineers before you acquired the company?                09:21:38
24       A.   I'm aware of transactions that require a        09:21:41
25   certain number of people to come over and join.          09:21:43
```

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Because sometimes in an acquisition, people say, I | 09:21:46 |
| 2 | don't want to work for that company and so they don't | 09:21:48 |
| 3 | come over.   And so you'll put a minimum requirement on | 09:21:52 |
| 4 | employee retention. | 09:21:54 |
| 5 | Q.   In your experience, what would that number | 09:21:57 |
| 6 | typically be? | 09:21:59 |
| 7 | A.   Some percentage of the employees. | 09:22:01 |
| 8 | Q.   Did you know how many employees Ottomotto had | 09:22:07 |
| 9 | at this time? | 09:22:07 |
| 10 | A.   I do not. | 09:22:08 |
| 11 | Q.   As a board member, you didn't inform yourself | 09:22:16 |
| 12 | as to how big the company was? | 09:22:19 |
| 13 | A.   I don't have recollection of anyone asking | 09:22:21 |
| 14 | that question. | 09:22:22 |
| 15 | Q.   You knew it was a start-up; right? | 09:22:25 |
| 16 | A.   Yes. | 09:22:27 |
| 17 | Q.   You knew it had only existed for a few | 09:22:31 |
| 18 | months; right? | 09:22:32 |
| 19 | A.   Yes. | 09:22:36 |
| 20 | Q.   You knew it didn't sell any products; right? | 09:22:38 |
| 21 | A.   Yes. | 09:22:38 |
| 22 | Q.   What was its value, if it didn't sell any | 09:22:47 |
| 23 | products and it had only existed for a few months? | 09:22:49 |
| 24 | A.   As I had stated previously, there was an | 09:22:53 |
| 25 | argument made about Anthony and his individual | 09:22:57 |

Page  42

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | talents.  And, you know, there was points made about | 09:23:01 |
| 2 | the impact at having the right people on board could | 09:23:06 |
| 3 | have on our ability to execute. | 09:23:08 |
| 4 | Q.  So it was the knowledge of Mr. Levandowski | 09:23:11 |
| 5 | and the 25 engineers?  That was the value? | 09:23:16 |
| 6 | MR. FLUMENBAUM:  Objection; form. | 09:23:19 |
| 7 | THE WITNESS:  From my perspective, yes. | 09:23:22 |
| 8 | BY MR. VERHOEVEN: | 09:23:22 |
| 9 | Q.  The next bullet below the "Minimum" bullet in | 09:23:26 |
| 10 | the same cell says, "Uber will indemnify a minimum of | 09:23:31 |
| 11 | five key employees and Ottomotto for specific claims | 09:23:36 |
| 12 | from former employees, e.g." -- | 09:23:41 |
| 13 | MR. FLUMENBAUM:  You're misreading it. | |
| 14 | MR. BRILLE:  Objection; form. | 09:23:43 |
| 15 | MR. FLUMENBAUM:  You misread it. | 09:23:46 |
| 16 | BY MR. VERHOEVEN: | 09:23:46 |
| 17 | Q.  -- "former employers" -- | 09:23:47 |
| 18 | MR. VERHOEVEN:  Thank you again. | |
| 19 | BY MR. VERHOEVEN:: | |
| 20 | Q.  -- "(e.g. IP, non-solicit), subject to | 09:23:51 |
| 21 | certain restrictions and limitations." | 09:23:54 |
| 22 | Do you see that bullet? | 09:23:55 |
| 23 | A.  I do. | 09:23:57 |
| 24 | Q.  This is a reference to former Google | 09:23:59 |
| 25 | employees; right? | 09:24:01 |

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        MR. FLUMENBAUM:  Objection as to form.           09:24:03

 2        MR. BRILLE:  Same objection.                     09:24:05

 3        THE WITNESS:  I don't know if all five of them are  09:24:07

 4    former Google, but I'm not saying they're not.  I just  09:24:11

 5    don't know.                                          09:24:12

 6    BY MR. VERHOEVEN:                                    09:24:12

 7        Q.    You know at this time that there's a       09:24:13

 8    possibility that Google/Waymo would bring suit if you  09:24:17

 9    acquired Ottomotto; right?                           09:24:21

10        MR. FLUMENBAUM:  Objection as to form.           09:24:29

11        THE WITNESS:  I think it would be safe to say that  09:24:33

12    the notion -- the presence of indemnity would imply  09:24:40

13    that there's a non-zero probability, but I didn't have  09:24:43

14    any specific reason to believe that it was a high   09:24:47

15    probability; otherwise, that would be a risky term.  09:24:52

16    BY MR. VERHOEVEN:                                    09:24:52

17        Q.    Are you aware of any acquisition agreements  09:24:57

18    in which the buyer indemnifies the seller?           09:25:03

19        A.    I think that that has happened in other    09:25:19

20    transactions.  I don't have any specifics, but it    09:25:22

21    doesn't sound farfetched to me.                      09:25:25

22        Q.    Typically, it's fair to say that the       09:25:27

23    indemnification runs the other way, that the seller  09:25:31

24    will indemnify the buyer if there's claims; right?   09:25:34

25        A.    Sometimes those are highly negotiated issues.  09:25:42
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | For example, in our business, we push back on the type | 09:25:46 |
| 2 | of indemnity you just talked about because it doesn't | 09:25:50 |
| 3 | allow us to distribute funds to our LPs because we | 09:25:55 |
| 4 | would have to have holdback for liability.  So we | 09:25:59 |
| 5 | actually do everything we can not to get into the | 09:26:01 |
| 6 | situation you just discussed. | 09:26:02 |
| 7 | Q.   Typically, to the extent there is | 09:26:04 |
| 8 | indemnification in the acquisitions, it's the seller | 09:26:08 |
| 9 | who indemnifies the buyer -- | 09:26:10 |
| 10 | A.   I've see that -- like I said, that's | 09:26:12 |
| 11 | something we try to avoid. | 09:26:14 |
| 12 | Q.   You can't say whether that's a typical use of | 09:26:16 |
| 13 | the indemnification clause? | 09:26:19 |
| 14 | MR. FLUMENBAUM:  Object to form. | 09:26:19 |
| 15 | MR. BRILLE:  Object to form. | 09:26:20 |
| 16 | THE WITNESS:  In my experience, it's atypical | 09:26:22 |
| 17 | because we push back against it.  Referring to the | 09:26:25 |
| 18 | notion of the seller indemnifying. | 09:26:28 |
| 19 | BY MR. VERHOEVEN: | 09:26:28 |
| 20 | Q.   Can you identify a single transaction that | 09:26:30 |
| 21 | you're aware of in which the buyer indemnifies the | 09:26:36 |
| 22 | seller for activities prior to the acquisition? | 09:26:43 |
| 23 | A.   I don't have immediate recollection of a deal | 09:26:46 |
| 24 | like that. | 09:26:47 |
| 25 | Q.   Was there a discussion of why there was an | 09:26:55 |

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | indemnification in this transaction from Uber to | 09:27:02 |
| 2 | Ottomotto for acts of the employees of Ottomotto prior | 09:27:07 |
| 3 | to the acquisition? | 09:27:08 |
| 4 | A.    Yes, there was discussion of the indemnity. | 09:27:12 |
| 5 | Q.    Okay.   What do you remember? | 09:27:13 |
| 6 | MR. BRILLE:  Objection. | 09:27:13 |
| 7 | I'm just going to instruct the witness, | 09:27:16 |
| 8 | Mr. Gurley, to the extent that it would require you to | 09:27:18 |
| 9 | disclose conversations that you had with lawyers about | 09:27:21 |
| 10 | that issue, I would instruct you not to answer.  If | 09:27:24 |
| 11 | you can answer the question without disclosing such | 09:27:27 |
| 12 | communications, you may answer the question. | 09:27:29 |
| 13 | MR. FLUMENBAUM:  We're talking specifically about | 09:27:30 |
| 14 | the board meeting. | 09:27:31 |
| 15 | MR. BRILLE:  It is, correct. | 09:27:33 |
| 16 | MR. FLUMENBAUM:  So -- | 09:27:33 |
| 17 | MR. BRILLE:  So just so you have that -- | 09:27:36 |
| 18 | MR. FLUMENBAUM:  We're just focused on the board | 09:27:39 |
| 19 | meeting. | 09:27:39 |
| 20 | THE WITNESS:  So there was -- questions came up | 09:27:46 |
| 21 | about why we were providing indemnity like this.  And | 09:27:49 |
| 22 | it was -- it was disclosed to the board that it was | 09:27:55 |
| 23 | important to the team on the other side.  And I think | 09:28:00 |
| 24 | the primary point that was made by Mr. Kalanick and | 09:28:08 |
| 25 | the company was that there had been a due diligence | 09:28:11 |

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    effort done and that it had come back in a clean        09:28:16

2    result and that, based on that due diligence, we        09:28:21

3    should be comfortable moving forward.                   09:28:23

4    BY MR. VERHOEVEN:                                       09:28:23

5         Q.    So what did Mr. Kalanick say about this due  09:28:28

6    diligence effort?                                       09:28:29

7         A.    There weren't many details discussed.  It    09:28:35

8    was -- at that moment in time at the board meeting, it  09:28:37

9    was stated that there had been a third-party hired --   09:28:41

10        MR. BRILLE:  I'm going to interrupt here.          09:28:44

11        THE WITNESS:  Okay.                                09:28:44

12        MR. BRILLE:  And I'm going to instruct the witness 09:28:46

13   not to answer the question.                             09:28:48

14        The due diligence effort, as you know,             09:28:49

15   Charlie, has -- privilege has been asserted over that.  09:28:53

16   Whether --                                              09:28:53

17        MR. VERHOEVEN:  You don't need to make a speech.   09:28:55

18   You can either instruct or whatnot.  I don't need a     09:28:56

19   speech to coach the witness.                            09:29:00

20        MR. BOOCK:  Can the privilege objections be mutual 09:29:03

21   for all parties as well --                              09:29:04

22        MR. VERHOEVEN:  Sure, if you all want to take a    09:29:05

23   privilege on a meeting we've been talking about for     09:29:06

24   half an hour.                                           09:29:08

25        MR. BRILLE:  First of all, there's no coaching     09:29:10

Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    going on, so don't accuse me of that.              09:29:14

 2        MR. VERHOEVEN:  Well, then don't do it.        09:29:16

 3        MR. BRILLE:  Don't accuse me of that, Charlie. 09:29:16

 4    Okay.  I'm lodging a privilege objection and I'm going 09:29:19

 5    to instruct the witness not to answer the question.  09:29:21

 6    Don't throw around false accusations in depositions.  09:29:25

 7        MR. VERHOEVEN:  Then just either instruct or   09:29:26

 8    don't.  You don't need to explain your reasons.    09:29:30

 9    BY MR. VERHOEVEN:                                  09:29:30

10        Q.  So are you going to follow the instruction 09:29:35

11    not to answer that question?                       09:29:37

12        MR. FLUMENBAUM:  I think we have to until the  09:29:38

13    judge clarifies it.                                09:29:40

14            I want to point out for you that there's   09:29:42

15    discussion in this that's consistent with what    09:29:45

16    Mr. Gurley has already testified to.  So if you want 09:29:48

17    to stick to this, I think you could probably get more 09:29:53

18    information.                                       09:29:55

19        MR. VERHOEVEN:  Well, we'll see.               09:29:56

20        MR. FLUMENBAUM:  All right.                    09:29:57

21    BY MR. VERHOEVEN:                                  09:29:57

22        Q.  So what did Mr. Kalanick say about the due 09:30:05

23    diligence effort at the meeting?                   09:30:06

24        MR. BRILLE:  Same instruction.                 09:30:07

25    BY MR. VERHOEVEN:                                  09:30:07
```

Page 48

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What was the subject of the due diligence? | 09:30:13 |
| 2 | A.   There was -- to the best of my knowledge, | 09:30:16 |
| 3 | there was not much more detail than what I've already | 09:30:20 |
| 4 | said, that a third party was hired and that it came | 09:30:24 |
| 5 | back clean. | 09:30:25 |
| 6 | Q.   What was the third party looking for? | 09:30:27 |
| 7 | MR. BRILLE:  Same instruction. | 09:30:28 |
| 8 | Do not answer. | 09:30:29 |
| 9 | BY MR. VERHOEVEN: | 09:30:29 |
| 10 | Q.   Was the subject of the due diligence whether | 09:30:32 |
| 11 | or not there had been a violation of -- withdrawn. | 09:30:37 |
| 12 | Was the substance of the due diligence | 09:30:39 |
| 13 | whether or not these key employees had taken IP from | 09:30:47 |
| 14 | their former employer? | 09:30:48 |
| 15 | MR. BRILLE:  Same instruction. | 09:31:01 |
| 16 | BY MR. VERHOEVEN: | 09:31:01 |
| 17 | Q.   Did you say anything about the subject of | 09:31:03 |
| 18 | indemnification at the meeting? | 09:31:11 |
| 19 | MR. BRILLE:  Same instruction.  It's the same | 09:31:16 |
| 20 | instruction. | 09:31:17 |
| 21 | To the extent he's talking about it with his | 09:31:19 |
| 22 | lawyers -- | 09:31:20 |
| 23 | MR. VERHOEVEN:  Do you want to confer with him? | 09:31:23 |
| 24 | I'll go off the record if you want to. | 09:31:25 |
| 25 | MR. FLUMENBAUM:  He's not talking about | 09:31:26 |

Page 49

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    communications with lawyers or not.              09:31:28

 2        MR. BRILLE:  I don't know if he is or not.  If   09:31:30

 3    he's --

 4        MR. VERHOEVEN:  Let's go off the record.     09:31:31

 5        MR. FLUMENBAUM:  There's no reason to go off the  09:31:33

 6    record.                                          09:31:33

 7        MR. BRILLE:  I'm going to instruct.  The      09:31:35

 8    instruction stands.                              09:31:39

 9        MR. FLUMENBAUM:  To the extent that you recall  09:31:44

10    saying something to the board as a whole which is not  09:31:47

11    based on conversations with counsel, you can answer  09:31:50

12    that question.  I don't believe that --          09:31:53

13        MR. BRILLE:  If it's not based -- I'm still   09:31:55

14    concerned about the disclosure of the privileged  09:31:58

15    discussions in this context.                     09:31:59

16        MR. FLUMENBAUM:  I've already said that we're  09:32:01

17    going to follow your instruction on that.        09:32:04

18        MR. BRILLE:  Yeah, the whole -- in this case, the  09:32:06

19    whole substance of the disclosure report, privilege  09:32:09

20    has been asserted.  We're going to maintain that  09:32:11

21    privilege.  I'm instructing the witness not to answer  09:32:13

22    the question.                                    09:32:14

23        MR. BOOCK:  We join in all of that.          09:32:19

24        MR. VERHOEVEN:  So you will instruct on any   09:32:20

25    question I ask this witness about -- going forward  09:32:24
```

Page 50

```
 1    about this bullet in row that says, "Terms" and column     09:32:30

 2    that says, "Computer Lasers" that refers to                09:32:33

 3    indemnification?                                           09:32:35

 4        MR. BRILLE:  I will instruct based on the specific     09:32:38

 5    questions you ask, Charlie.  And I don't need your         09:32:43

 6    colloquy on the record.                                    09:32:45

 7    BY MR. VERHOEVEN:                                          09:32:45

 8        Q.   What did you say about the indemnification?       09:32:47

 9        MR. BRILLE:  Same instructions.                        09:32:48

10    BY MR. VERHOEVEN:                                          09:32:50

11        Q.   Do you recall anyone -- you already said          09:32:53

12    that.                                                      09:32:53

13             Other than Mr. Kalanick, who else                 09:32:56

14    discussed -- in the board said anything about the          09:33:00

15    indemnification issue?                                     09:33:02

16        A.   I don't have a specific recollection of who       09:33:07

17    said exactly what.                                         09:33:08

18        Q.   Yes or no; did you ask a question about this      09:33:11

19    issue at the meeting?                                      09:33:12

20        A.   It's possible, but I don't recall.                09:33:19

21        Q.   You recall that questions were asked; right?      09:33:22

22        A.   Yes.                                              09:33:22

23        Q.   But you don't recall who asked them?              09:33:27

24        A.   I don't.                                          09:33:28

25        Q.   What was the question that was asked?             09:33:31
```

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I just don't have a specific recollection of | 09:33:35 |
| 2 | the exact wording in the meeting.  There was multiple | 09:33:39 |
| 3 | slides dedicated to indemnity, and I know it was | 09:33:44 |
| 4 | discussed. | 09:33:44 |
| 5 | Q.   Okay.  Direct your attention to -- there's | 09:34:05 |
| 6 | little control numbers on the bottom right. | 09:34:08 |
| 7 | Do you see those? | 09:34:09 |
| 8 | A.   Yes. | 09:34:09 |
| 9 | Q.   Direct your attention to the page that ends | 09:34:11 |
| 10 | in 874.  And this slide is entitled, "Walkaway Rights | 09:34:20 |
| 11 | and Indemnity Obligations." | 09:34:23 |
| 12 | Do you see that? | 09:34:24 |
| 13 | A.   Um-hum. | 09:34:25 |
| 14 | Q.   So I'm first going to ask you about the | 09:34:31 |
| 15 | section on this page that has the heading, "When Can | 09:34:36 |
| 16 | We Walk Away?" | 09:34:38 |
| 17 | Do you remember a discussion about when Uber | 09:34:47 |
| 18 | could walk away from the transaction? | 09:34:50 |
| 19 | A.   I have a recollection that it was generally | 09:35:00 |
| 20 | discussed, yes. | 09:35:01 |
| 21 | Q.   And one of the -- one of the reasons, under | 09:35:06 |
| 22 | the terms of the acquisition, for which Uber could | 09:35:12 |
| 23 | walk away is if they were substantially restricted | 09:35:16 |
| 24 | from using Ottomotto's IP; right? | 09:35:19 |
| 25 | A.   Yes.  I see that here. | 09:35:28 |

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Do you have an understanding of what IP | 09:35:31 |
| 2 | Ottomotto developed in the few months that it existed? | 09:35:35 |
| 3 | A.   I do not. | 09:35:40 |
| 4 | Q.   Well, that's what you're purchasing it for; | 09:35:44 |
| 5 | right? | 09:35:45 |
| 6 | MR. BRILLE:  Objection as to form. | 09:35:48 |
| 7 | THE WITNESS:  I had already conveyed that my | 09:35:50 |
| 8 | interpretation of the primary motivation for the deal | 09:35:53 |
| 9 | was to get the talented people. | 09:35:58 |
| 10 | BY MR. VERHOEVEN: | 09:35:58 |
| 11 | Q.   It wasn't to get any IP? | 09:36:00 |
| 12 | MR. BRILLE:  Same objection. | 09:36:05 |
| 13 | MR. FLUMENBAUM:  He just objected as to form.  You | 09:36:07 |
| 14 | may answer. | 09:36:08 |
| 15 | THE WITNESS:  It wasn't -- in my recollection of | 09:36:11 |
| 16 | the board meeting and how this was presented, that was | 09:36:14 |
| 17 | not listed as one of the primary reasons.  And just to | 09:36:21 |
| 18 | help shed more light on that, you know, acqui-hires | 09:36:24 |
| 19 | are common occurrences in Silicon Valley. | 09:36:28 |
| 20 | BY MR. VERHOEVEN: | 09:36:28 |
| 21 | Q.   Well, if it wasn't important, then why was it | 09:36:31 |
| 22 | listed as one of three conditions under which Uber | 09:36:34 |
| 23 | could walk away from this entire transaction? | 09:36:38 |
| 24 | MR. BRILLE:  Objection; form. | 09:36:42 |
| 25 | THE WITNESS:  My own interpretation is that you | 09:36:45 |

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | could have walkaway rights that aren't necessarily | 09:36:48 |
| 2 | tied to something being most critically important. | 09:36:52 |
| 3 | You just may want to protect against that situation. | 09:36:56 |
| 4 | BY MR. VERHOEVEN: | 09:36:56 |
| 5 | Q.   Isn't that saying that if -- didn't you | 09:36:57 |
| 6 | understand that this was saying that, under the | 09:37:00 |
| 7 | acquisition agreement, if Google sues Ottomotto and | 09:37:06 |
| 8 | succeeds in restricting Ottomotto's use of IP, that | 09:37:13 |
| 9 | would be one of three bases here under which Uber | 09:37:16 |
| 10 | could walk away from the transaction? | 09:37:19 |
| 11 | MR. FLUMENBAUM:   Objection as to form. | 09:37:26 |
| 12 | THE WITNESS:   As some of the employees were from | 09:37:27 |
| 13 | there in this list of former employer, yes, I would | 09:37:31 |
| 14 | agree with that. | 09:37:33 |
| 15 | BY MR. VERHOEVEN: | 09:37:33 |
| 16 | Q.   If you look below the dotted line, you see | 09:37:59 |
| 17 | where it says, "Diligence employees commit | 09:38:03 |
| 18 | post-signing bad acts (specific list of factual | 09:38:08 |
| 19 | actions)." | 09:38:11 |
| 20 | And it has an asterisk that says, "See | 09:38:13 |
| 21 | appendix for summary of diligence process." | 09:38:18 |
| 22 | Do you see that? | 09:38:19 |
| 23 | A.   I do. | 09:38:20 |
| 24 | Q.   What's that referring to? | 09:38:24 |
| 25 | A.   I actually don't know. | 09:38:29 |

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.    Have you ever seen a deal that referred to,    09:38:32

2    quote-unquote, bad acts?    09:38:35

3    A.    That is not a phrase I'm familiar with other    09:38:38

4    than here.    09:38:39

5    Q.    Were you surprised that that was on this    09:38:41

6    slide?    09:38:42

7    A.    One thing that we haven't discussed, which is    09:38:53

8    on the previous slide, is the windowing concept of    09:38:57

9    this transaction.  So my interpretation of that at the    09:39:01

10    time was that if people did bad things in that window,    09:39:05

11    that we would have a right to remove indemnification.    09:39:12

12    Q.    What things would those be?    09:39:18

13    A.    I don't have this list, so I don't know.  I    09:39:21

14    think one could assume it would be things that would    09:39:23

15    make you not want to indemnify.    09:39:26

16    Q.    You understood that that was referring to    09:39:30

17    misappropriation of trade secrets; right?    09:39:34

18    A.    I don't.  Once again, I don't have that list,    09:39:38

19    so I don't know.    09:39:40

20    Q.    If you look over on the right of this page,    09:39:53

21    under the heading, "Do We Still Indemnify?" --    09:39:55

22    Do you see that?    09:40:01

23    A.    Yes.    09:40:02

24    Q.    -- the first bullet says, "Yes, for    09:40:04

25    diligenced employees in Ottomotto (relating to actions    09:40:09

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | of diligenced employees) for the following claims." | 09:40:13 |
| 2 | And the first claim listed is, "IP/trade secret | 09:40:19 |
| 3 | misappropriation or infringement." | 09:40:22 |
| 4 | So does that refresh your recollection that | 09:40:28 |
| 5 | the indemnification they're talking about was for | 09:40:32 |
| 6 | trade secret misappropriation? | 09:40:35 |
| 7 | (Witness reviews document.) | 09:40:51 |
| 8 | A.   My recollection, once again, about the entire | 09:40:54 |
| 9 | indemnity issue was that the reason that the company | 09:40:59 |
| 10 | was encouraged -- the board was encouraged to be | 09:41:04 |
| 11 | comfortable with these types of terms was tied to the | 09:41:10 |
| 12 | fact that there had been diligence done and it was | 09:41:13 |
| 13 | clean. | 09:41:13 |
| 14 | Q.   But you understood, at the time that you | 09:41:16 |
| 15 | approved the deal, that the indemnity provisions as | 09:41:23 |
| 16 | part of the deal indemnified these employees, these | 09:41:28 |
| 17 | diligenced employees, for claims of trade secret | 09:41:31 |
| 18 | misappropriation; correct? | 09:41:33 |
| 19 | A.   I think, for the diligenced employees, yes, | 09:41:40 |
| 20 | that's what this says. | 09:41:41 |
| 21 | Q.   Did it seem unusual that the purchaser of | 09:41:46 |
| 22 | this transaction would be indemnifying these employees | 09:41:50 |
| 23 | for past trade secret misappropriation? | 09:41:56 |
| 24 | MR. BRILLE:  Objection; form. | 09:42:02 |
| 25 | THE WITNESS:  I don't want to sound intentionally | 09:42:05 |

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | redundant, but my response to that is that this was | 09:42:10 |
| 2 | discussed.  And it was discussed because we were | 09:42:20 |
| 3 | taking on this obligation, as you're describing it, | 09:42:26 |
| 4 | and that the reason the -- we needed to do it was it | 09:42:31 |
| 5 | was important to the team that was selling, and the | 09:42:34 |
| 6 | reason that the board should be comfortable with it | 09:42:37 |
| 7 | was because of the diligence process. | 09:42:40 |
| 8 | BY MR. VERHOEVEN: | 09:42:40 |
| 9 | Q.   Did you have a concern about it? | 09:42:42 |
| 10 | A.   Very likely that I asked questions about it, | 09:43:02 |
| 11 | which would take me right back to what I just conveyed | 09:43:05 |
| 12 | to you. | 09:43:06 |
| 13 | Q.   Well, what do you remember saying? | 09:43:08 |
| 14 | A.   I don't remember any specifics. | 09:43:11 |
| 15 | Q.   Well, generally, did you say, what's up with | 09:43:14 |
| 16 | this?  Did you inquire about it? | 09:43:17 |
| 17 | A.   It's highly possible that I did, which led to | 09:43:22 |
| 18 | the conversation that I've already described. | 09:43:24 |
| 19 | Q.   So is it fair to say that you were concerned | 09:43:25 |
| 20 | about it? | 09:43:26 |
| 21 | MR. FLUMENBAUM:  Objection as to form. | 09:43:30 |
| 22 | You may answer. | 09:43:32 |
| 23 | THE WITNESS:  I think it's highly possible I | 09:43:34 |
| 24 | inquired about it.  And I would be inquiring about it | 09:43:37 |
| 25 | to make sure that we weren't taking on some | 09:43:40 |

Page 57

1   unnecessary liability or obligation.  And, once again,     09:43:45

2   the reason that was given and the reason that the           09:43:49

3   board approved the deal, despite this, relates to that      09:43:54

4   discussion of --                                            09:43:55

5   BY MR. VERHOEVEN:

6        Q.   I'm just asking --                                09:43:57

7        MR. FLUMENBAUM:  You're interrupting.  I don't         09:43:58

8   believe Judge Alsup would approve of that.                  09:44:08

9             Finish your answer, please.

10       THE WITNESS:  -- that discussion about the             09:44:09

11  diligence process.                                          09:44:11

12  BY MR. VERHOEVEN:                                           09:44:11

13       Q.   I'm just asking if you were concerned about       09:44:13

14  it at the meeting.                                          09:44:14

15       MR. FLUMENBAUM:  Asked and answered.                   09:44:15

16       THE WITNESS:  I don't have a specific recollection     09:44:16

17  of whether I was concerned.  It was an issue that was       09:44:21

18  discussed.  It's highly probable that I brought that        09:44:25

19  up because that's something I would ask about.  And I       09:44:30

20  already told you how we discussed it and what the           09:44:34

21  response was.                                               09:44:34

22  BY MR. VERHOEVEN:                                           09:44:34

23       Q.   It was highly unusual, wouldn't you agree,        09:44:39

24  for a buyer in an acquisition agreement to indemnify        09:44:42

25  employees from the seller for past acts of trade            09:44:50

Page 58

1    secret misappropriation?                                09:44:52

2       MR. FLUMENBAUM:  Objection as to form.               09:44:56

3       THE WITNESS:  I don't have a universal sample to     09:45:00

4    know whether that's highly unusual or not.  Like I      09:45:03

5    said, there are slides dedicated to it, so it was a     09:45:05

6    topic of discussion.  And I already told you how it     09:45:09

7    was discussed and what the rationale was for            09:45:13

8    supporting it.                                          09:45:14

9    BY MR. VERHOEVEN:                                       09:45:14

10      Q.   Have you ever been in a                         09:45:15

11   transaction -- withdrawn.                               09:45:18

12           Can you name any transaction that you've been   09:45:21

13   involved in, other than this one, which had a           09:45:23

14   provision that indemnified employees of the seller for  09:45:30

15   past trade secret misappropriation?                     09:45:32

16      A.   I don't have a specific recollection of one,    09:45:35

17   no.                                                     09:45:35

18      Q.   On its face, that doesn't make sense, does      09:45:40

19   it?                                                     09:45:40

20      MR. FLUMENBAUM:  Objection as to form.               09:45:41

21      MR. BRILLE:  Yeah.                                   09:45:42

22      MR. FLUMENBAUM:  Please reword that question.        09:45:44

23   BY MR. VERHOEVEN:                                       09:45:44

24      Q.   On its face, that doesn't make sense, does      09:45:47

25   it?                                                     09:45:47

                                                   Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        MR. FLUMENBAUM:  Objection as to form.        09:45:48

 2        MR. BRILLE:  Same.                            09:45:51

 3        THE WITNESS:  If -- I can answer, but I'm just 09:45:55

 4   going to be --                                     09:45:56

 5        MR. FLUMENBAUM:  Repeat it again.             09:45:58

 6        THE WITNESS:  It came up.  It was listed as a 09:46:02

 7   requirement of the -- it was discussed as a        09:46:05

 8   requirement of the sellers to get the deal done.  And 09:46:08

 9   so we discussed it and whether or not it would -- it 09:46:11

10   would result in an unusually large liability or    09:46:17

11   obligations.  And the reason that the board was told 09:46:22

12   that this was not a big deal was because of the due 09:46:25

13   diligence process.                                 09:46:26

14   BY MR. VERHOEVEN:                                  09:46:26

15        Q.  So a requirement of the deal getting done, 09:46:31

16   requirement that Ottomotto insisted on of the deal 09:46:34

17   getting done, is that Uber would indemnify these   09:46:39

18   diligenced employees for future lawsuits for       09:46:43

19   misappropriation of trade secrets?                 09:46:45

20        A.  That's my best recollection of . . .      09:46:49

21        Q.  Have you ever heard of that being a       09:46:50

22   requirement in any other acquisition?              09:46:53

23        A.  I don't have specific knowledge or        09:46:58

24   remembrance of any other.                          09:47:00

25        Q.  Did you ask why that was a requirement?   09:47:03
```

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  Objection; form. | 09:47:06 |
| 2 | THE WITNESS:  I don't remember if that particular | 09:47:09 |
| 3 | topic was discussed. | 09:47:11 |
| 4 | BY MR. VERHOEVEN: | 09:47:11 |
| 5 | Q.   Did it concern you that Ottomotto was | 09:47:19 |
| 6 | insisting on this specific indemnification as a | 09:47:23 |
| 7 | requirement for them being purchased? | 09:47:26 |
| 8 | MR. BRILLE:  Objection; form. | 09:47:31 |
| 9 | THE WITNESS:  It certainly provoked questions, | 09:47:32 |
| 10 | which we've discussed. | 09:47:34 |
| 11 | BY MR. VERHOEVEN: | 09:47:34 |
| 12 | Q.   But you don't recall whether you asked those | 09:47:40 |
| 13 | questions? | 09:47:41 |
| 14 | A.   I do not. | 09:47:42 |
| 15 | Q.   What were the questions?  I know the | 09:47:44 |
| 16 | explanation. | 09:47:45 |
| 17 | What were the questions? | 09:47:47 |
| 18 | MR. FLUMENBAUM:  Objection as to form. | 09:47:49 |
| 19 | THE WITNESS:  I just don't have specific | 09:47:52 |
| 20 | recollection of specific questions, just a remembrance | 09:47:56 |
| 21 | of the general discussion. | 09:47:58 |
| 22 | BY MR. VERHOEVEN: | 09:47:58 |
| 23 | Q.   Was the question asked, what did the due | 09:48:01 |
| 24 | diligence turn up? | 09:48:02 |
| 25 | A.   Once again, not remembering specific | 09:48:07 |

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | statements that were made, the general perception I | 09:48:10 |
| 2 | had -- | 09:48:11 |
| 3 | MR. BRILLE:  Let me just interject here. | 09:48:13 |
| 4 | Mr. Gurley, in answering that question, I | 09:48:16 |
| 5 | would ask you not to disclose the content or the | 09:48:19 |
| 6 | substance of the due diligence, the results of it or | 09:48:22 |
| 7 | anything else.  I will instruct you not to answer | 09:48:25 |
| 8 | that. | 09:48:26 |
| 9 | MR. FLUMENBAUM:  If you can answer -- I think | 09:48:33 |
| 10 | you've already said -- | 09:48:35 |
| 11 | THE WITNESS:  Yeah, it would be repetitive of | 09:48:38 |
| 12 | something I already said, which was there was -- the | 09:48:41 |
| 13 | board was left with a generic opinion that the due | 09:48:46 |
| 14 | diligence process had been clean and positive. | 09:48:49 |
| 15 | BY MR. VERHOEVEN: | 09:48:49 |
| 16 | Q.  And what was that based on? | 09:48:50 |
| 17 | A.  It wasn't discussed at the meeting, that I | 09:48:55 |
| 18 | recall. | 09:48:55 |
| 19 | Q.  So you're convinced the whole board was left | 09:49:01 |
| 20 | with the impression that it was clean? | 09:49:04 |
| 21 | A.  That's my impression, yes. | 09:49:06 |
| 22 | Q.  Without discussing it? | 09:49:07 |
| 23 | MR. FLUMENBAUM:  Objection; form. | 09:49:11 |
| 24 | THE WITNESS:  I didn't say it wasn't discussed.  I | 09:49:14 |
| 25 | said it was discussed. | 09:49:15 |

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MR. VERHOEVEN:                                    09:49:15

 2         Q.   Okay.  So what was discussed about the     09:49:16

 3    results of the due diligence?                        09:49:18

 4         MR. BRILLE:  Objection.  Instruct not to answer. 09:49:20

 5              How many times are you going to ask this and 09:49:23

 6    make us instruct?                                    09:49:24

 7         MR. VERHOEVEN:  We'll move.  Mr. Gurley will have 09:49:36

 8    to come back.                                        09:49:38

 9    BY MR. VERHOEVEN:                                    09:49:38

10         Q.   Go to the page 875.                        09:49:52

11              Do you see here there's the appendix about 09:49:58

12    the detailed indemnity summary?                      09:50:01

13         A.   Yes.                                       09:50:03

14         Q.   So you knew at this time that there had been 09:50:12

15    this due diligence investigation; right?            09:50:15

16         A.   Yes.                                       09:50:19

17         Q.   The third-party forensic expert performed due 09:50:25

18    diligence on Mr. Levandowski and four other employees; 09:50:30

19    right?                                               09:50:30

20         A.   You're reading the first bullet?           09:50:35

21         Q.   Yes.                                       09:50:36

22         A.   Yes.                                       09:50:37

23         Q.   What was your understanding of the meaning of 09:50:42

24    "forensic expert"?                                   09:50:43

25         A.   I didn't have one.  Other than how you would 09:50:53
```

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | just interpret this sentence here.  There was no | 09:50:56 |
| 2 | further explanation, that I recall. | 09:51:00 |
| 3 | Q.    Did you know what a forensic expert was, | 09:51:04 |
| 4 | generally? | 09:51:05 |
| 5 | A.    That phrase creates a general concept in my | 09:51:14 |
| 6 | brain. | 09:51:15 |
| 7 | Q.    And what would that be? | 09:51:17 |
| 8 | A.    Someone who's experienced at determining | 09:51:20 |
| 9 | detailed investigative results. | 09:51:32 |
| 10 | Q.    Would it be fair that you interpreted this to | 09:51:34 |
| 11 | being that the expert would have looked at | 09:51:37 |
| 12 | Mr. Levandowski's computer files? | 09:51:43 |
| 13 | A.    As I already mentioned, I don't have any | 09:51:46 |
| 14 | recollection of the diligence process being discussed | 09:51:51 |
| 15 | in detail at the meeting.  So anything I -- that I | 09:51:56 |
| 16 | would speculate would be solely from my own | 09:52:00 |
| 17 | interpretation of reading the deck, at that moment in | 09:52:05 |
| 18 | time. | 09:52:05 |
| 19 | Q.    At that moment in time, did you interpret the | 09:52:08 |
| 20 | first bullet here to be saying that a third-party | 09:52:15 |
| 21 | forensic expert had looked to see if there was any | 09:52:20 |
| 22 | trade secret misappropriation by Anthony? | 09:52:23 |
| 23 | MR. BRILLE:  Objection to form. | 09:52:28 |
| 24 | THE WITNESS:  I would have assumed that to be part | 09:52:34 |
| 25 | of the process, but once again, the details of the | 09:52:38 |

Page 64

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | process weren't discussed at that meeting. | 09:52:41 |
| 2 | BY MR. VERHOEVEN: | 09:52:41 |
| 3 | Q.    The next bullet -- or two bullets down, the | 09:52:44 |
| 4 | third bullet down, says, "Uber received report from | 09:52:48 |
| 5 | both forensic expert and outside counsel." | 09:52:51 |
| 6 | Do you see that? | 09:52:52 |
| 7 | A.    Yes. | 09:52:53 |
| 8 | Q.    What was the report that's being referred to | 09:52:56 |
| 9 | there? | 09:52:57 |
| 10 | MR. FLUMENBAUM:  Just limit your answer to what | 09:53:02 |
| 11 | was done at the board meeting and not what you may | 09:53:06 |
| 12 | have heard from counsel afterwards. | 09:53:08 |
| 13 | THE WITNESS:  At that moment in time, I didn't | 09:53:11 |
| 14 | know the specifics of this such report. | 09:53:16 |
| 15 | BY MR. VERHOEVEN: | 09:53:16 |
| 16 | Q.    Did you ask to see the report? | 09:53:18 |
| 17 | A.    Did not. | 09:53:20 |
| 18 | Q.    Why not? | 09:53:21 |
| 19 | A.    Once again, we were relying on the assertion | 09:53:29 |
| 20 | that was made to the board that the diligence effort | 09:53:33 |
| 21 | had been positive. | 09:53:35 |
| 22 | Q.    And who made that assertion? | 09:53:37 |
| 23 | A.    My recollection is it was Mr. Kalanick. | 09:53:39 |
| 24 | There's some chance that it was one of the deal -- one | 09:53:46 |
| 25 | of the executives that worked on the deal, like | 09:53:48 |

Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Cameron. | 09:53:49 |
| 2 | Q.   The next bullet says, "Based on our review of | 09:53:52 |
| 3 | facts, Uber decided to move forward with signing of | 09:53:55 |
| 4 | the put-call agreement." | 09:53:56 |
| 5 | Do you see that? | 09:53:58 |
| 6 | A.   Yes. | 09:53:58 |
| 7 | Q.   Is it fair that -- that whoever it was who | 09:54:04 |
| 8 | was speaking on this slide was saying -- was that they | 09:54:10 |
| 9 | had to complete this diligence report before Uber | 09:54:13 |
| 10 | could decide whether to move forward or not? | 09:54:16 |
| 11 | MR. BRILLE:  Objection to form. | 09:54:19 |
| 12 | THE WITNESS:  Ask that again.  I'm not sure I | 09:54:25 |
| 13 | understand the question. | 09:54:26 |
| 14 | BY MR. VERHOEVEN: | 09:54:26 |
| 15 | Q.   So was it your understanding that getting the | 09:54:31 |
| 16 | results of the diligence report and reviewing those | 09:54:35 |
| 17 | was a requirement before Uber would move forward and | 09:54:38 |
| 18 | sign the put-call agreement? | 09:54:41 |
| 19 | MR. BRILLE:  Object to form. | 09:54:43 |
| 20 | MR. FLUMENBAUM:  Object to form as well. | 09:54:44 |
| 21 | THE WITNESS:  I didn't have that specific point of | 09:54:51 |
| 22 | view. | 09:54:53 |
| 23 | BY MR. VERHOEVEN: | 09:54:53 |
| 24 | Q.   How did you interpret that phrase, "Based on | 09:54:55 |
| 25 | our review of the facts, Uber decided to move | 09:54:58 |

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    forward"?                                                    09:54:59

2        A.   Once again, consistent with what I said many       09:55:02

3    times, to me that says, and it was consistent with the      09:55:05

4    discussion and disclosure at the meeting, that the due       09:55:11

5    diligence effort had been clean and that, as a result,      09:55:14

6    we were comfortable moving forward.                          09:55:18

7        Q.   Okay.   So as a result of it being clean, then     09:55:22

8    Uber was comfortable moving forward?                         09:55:25

9        A.   That was my -- that's my recollection.             09:55:27

10       Q.   So all I'm saying is that was a requirement        09:55:29

11   for Uber to move forward; right?                             09:55:33

12       MR. BRILLE:   Object to form.                            09:55:34

13       MR. FLUMENBAUM:   Object to form.                        09:55:38

14       MR. VERHOEVEN:   You can only -- we've already           09:55:40

15   agreed --                                                    09:55:41

16       MR. FLUMENBAUM:   We were talking at the same time.      09:55:43

17       MR. BRILLE:   We're trying our best.                     09:55:45

18       THE WITNESS:   Yeah, I'm not sure of the exact           09:55:49

19   wordsmith -- I'm not sure what you're trying to get at       09:55:52

20   that I'm not answering, but I'm open to try it again.        09:55:57

21       MR. FLUMENBAUM:   Can I suggest something to you,        09:56:02

22   Mr. --                                                       09:56:02

23       MR. VERHOEVEN:   Let's just move on.                     09:56:04

24       MR. FLUMENBAUM:   Okay.                                  09:56:04

25   BY MR. VERHOEVEN:                                            09:56:04

                                                    Page 67

1       Q.    Under the same page, on the right-hand side,          09:56:38

2    under the heading, "Exclusions from Indemnity," do you          09:56:42

3    see that?                                                       09:56:43

4       A.    Yes.                                                   09:56:43

5       Q.    The first bullet says, "If diligenced                 09:56:47

6    employees lie during forensic due diligence process            09:56:52

7    and it's discovered later, employees will not receive          09:56:56

8    indemnity for claims based on those untruthful acts."          09:57:00

9       MR. BRILLE:   Objection, you read that incorrectly.   09:57:05

10    BY MR. VERHOEVEN:                                              09:57:05

11       Q.    "Facts."                                             09:57:08

12             Well, you can read it.   Have you read it?            09:57:08

13       A.    I have.                                               09:57:08

14       Q.    Okay.   What's that a reference to?                   09:57:11

15       A.    I don't know if that particular bullet point         09:57:19

16    was discussed in the meeting, so it's purely my                09:57:22

17    interpretation of reading it.   But it suggests that if       09:57:27

18    the people who had gone through the diligence process,        09:57:31

19    it's later found out, were untruthful during that             09:57:34

20    process, that they will lose the indemnity.                    09:57:40

21       Q.    And then the second bullet says, "If                 09:57:42

22    diligenced employees commit any post-signing bad             09:57:46

23    acts," per a specific list.                                    09:57:49

24             Do you see that?                                      09:57:49

25       A.    Yes.                                                  09:57:49

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And that's the same bad acts we talked about | 09:57:52 |
| 2 | before? | 09:57:53 |
| 3 | A.   I would presume, based on the fact that it | 09:57:55 |
| 4 | was mentioned in the slide before. | 09:57:58 |
| 5 | Q.   Did you understand that the due diligence | 09:58:00 |
| 6 | that the forensic expert was looking for included | 09:58:05 |
| 7 | pre-signing bad acts, as we've been using that term? | 09:58:10 |
| 8 | A.   Not at the moment in time that this deal was | 09:58:17 |
| 9 | approved. | 09:58:17 |
| 10 | Q.   What was your understanding of what the | 09:58:22 |
| 11 | subject of the due diligence was then? | 09:58:29 |
| 12 | MR. FLUMENBAUM:   Again, focused on the board | 09:58:31 |
| 13 | meeting. | 09:58:33 |
| 14 | THE WITNESS:   Consistent with what I said before, | 09:58:35 |
| 15 | it was only discussed generically at the meeting. | 09:58:40 |
| 16 | BY MR. VERHOEVEN: | 09:58:40 |
| 17 | Q.   So you didn't know? | 09:58:44 |
| 18 | MR. FLUMENBAUM:   Objection as to form. | 09:58:53 |
| 19 | THE WITNESS:   I would just state that we | 09:58:55 |
| 20 | had -- this is a rather large company that had done | 09:58:58 |
| 21 | numerous transactions and had a large deal team and a | 09:59:02 |
| 22 | large legal team and external lawyers involved.  And I | 09:59:07 |
| 23 | think it was -- it would be a safe presumption that | 09:59:11 |
| 24 | the details of that effort were done in an appropriate | 09:59:17 |
| 25 | way, as the board would interpret any discussion about | 09:59:22 |

Page 69

1   a particular action within the development team or the      09:59:26

2   marketing team or anything else.                            09:59:28

3   BY MR. VERHOEVEN:                                           09:59:28

4       Q.   So just to close the loop, did you have an         09:59:56

5   understanding at the meeting of what the subject of         09:59:58

6   the due diligence was?                                      10:00:01

7       A.   Not a specific one, no.                            10:00:03

8       Q.   Okay.   Do you remember anything else that was     10:00:29

9   discussed about the acquisition at the board meeting?       10:00:32

10      A.   Yes.   There was quite a bit of discussion         10:00:40

11  about the form of the -- of how the . . . there's a         10:00:58

12  lot of discussion about the fact that the cost of the       10:01:00

13  transaction was tied specifically to milestones.            10:01:05

14  There's quite a bit of discussion about that topic.         10:01:11

15      Q.   What do you recall -- can you tell me              10:01:15

16  generally what was discussed on this --                     10:01:18

17      A.   Sure.   So when you're entering into a             10:01:21

18  transaction that has a headline valuation number            10:01:25

19  that's large, as this one does, and a rather                10:01:30

20  early-stage company, that provokes questions.   And so      10:01:35

21  there was a lot of discussion about, you know, does it      10:01:39

22  really make sense -- even though there have since been      10:01:44

23  acqui-hires like -- in the autonomous space, like GM        10:01:47

24  paid a billion for Cruze.   But despite that, there         10:01:50

25  were a lot of discussion about whether it really made       10:01:54

Page  70

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | sense to spend this amount of money for such an | 10:01:58 |
| 2 | early-stage company. | 10:01:59 |
| 3 | And the rationale that was provided to the | 10:02:01 |
| 4 | board was that the majority of the value was tied to | 10:02:06 |
| 5 | milestones.  And so if -- if the team failed to hit | 10:02:11 |
| 6 | those milestones way into the future, then there would | 10:02:16 |
| 7 | actually be no cost or minimal cost to the | 10:02:19 |
| 8 | organization -- to Uber. | 10:02:20 |
| 9 | Q.   Did you review the milestones? | 10:02:24 |
| 10 | A.   I do believe we did a cursory review of the | 10:02:31 |
| 11 | milestones.  That's my best recollection. | 10:02:34 |
| 12 | Q.   Do you remember that they were highly | 10:02:37 |
| 13 | aggressive? | 10:02:39 |
| 14 | A.   There was a discussion that if we hit those | 10:02:43 |
| 15 | milestones, it would be such a positive outcome, that | 10:02:45 |
| 16 | the cost of the transaction would look like it was | 10:02:51 |
| 17 | cheap rather than expensive because that would be so | 10:02:54 |
| 18 | good for the company if those were achieved. | 10:02:57 |
| 19 | Q.   Did anyone at the meeting express the concern | 10:03:00 |
| 20 | that the milestones weren't realistic? | 10:03:03 |
| 21 | A.   I expressed concern about milestone deals in | 10:03:08 |
| 22 | general. | 10:03:09 |
| 23 | Q.   What did you say? | 10:03:10 |
| 24 | A.   Just that it's been my experience that in -- | 10:03:12 |
| 25 | with other companies, that when you have a large group | 10:03:17 |

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   of employees where all of their compensation is tied      10:03:21

2   to specific targets, that it's hard to get them to        10:03:24

3   focus on the objectives of the overall organization       10:03:28

4   because they get so distracted and only care about        10:03:31

5   that, and that it leads to dysfunction down the road.     10:03:36

6   And I have a specific recollection of making that         10:03:37

7   point.                                                    10:03:38

8       Q.   Was there any discussion of whether the         10:03:41

9   milestones were achievable in reality?                   10:03:44

10      A.   It's possible.  I don't have specific            10:03:55

11  recollection of that.                                     10:03:56

12      Q.   Do you recall anyone being concerned that the   10:03:58

13  timetable in the milestones was not realistic?           10:04:03

14      A.   Actually, I do have one thing.  I made          10:04:06

15  specific comments that the profitability assumptions     10:04:10

16  in the trucking deal were not realistic.  I made that    10:04:16

17  point.                                                   10:04:17

18      Q.   Okay.  And you made that to Mr. Kalanick or     10:04:21

19  to the board generally?                                  10:04:23

20      A.   I think to the board generally and certainly    10:04:26

21  at other points in time to others.                       10:04:28

22      Q.   Did you get a response to that statement at     10:04:35

23  the board meeting?                                       10:04:37

24      A.   The response that I heard was that the team     10:04:42

25  members of the trucking deal, you know, had confidence   10:04:46

Page  72

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   in them and that if they wanted to value those as        10:04:51

2   realistic, that that was their prerogative.              10:04:55

3       Q.    They took the risk?                            10:04:56

4       A.    Yeah.                                          10:04:56

5       Q.    Did that satisfy you?  Or did you still have   10:05:04

6   a concern?                                               10:05:06

7       A.    Both with regard to the Otto Trucking          10:05:20

8   milestones and with regard to generic milestone deals,   10:05:25

9   that's a general perception of mine.  So I still had a    10:05:28

10  concern, which I raised.                                 10:05:33

11      Q.    I'm going to hand -- well, before I do that,   10:05:38

12  anything else that you remembered being discussed at     10:05:41

13  the board meeting concerning acquisition?                10:05:45

14      A.    No.                                            10:05:45

15      MR. VERHOEVEN:  I'm going to mark as Exhibit 911     10:06:02

16  some highly redacted minutes of special meeting of       10:06:06

17  board of directors, Uber Technologies, Inc., dated       10:06:11

18  April 11th, 2016.                                        10:06:13

19          (Plaintiff's Exhibit 911 was marked.)           10:06:23

20      MR. BOOCK:  Counsel, during a break -- during a     10:06:29

21  break, could you have a copy for Otto Trucking made of   10:06:33

22  the prior exhibit?  You're not passing any exhibits      10:06:38

23  down.                                                    10:06:38

24      MR. VERHOEVEN:  I'm sorry.  I didn't know there      10:06:39

25  were going to be however many people are here.  This     10:06:39

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | is MoFo's offices.  I think maybe they could make a | 10:06:44 |
| 2 | copy for you. | 10:06:46 |
| 3 | BY MR. VERHOEVEN: | 10:06:46 |
| 4 | Q.   Do you recognize this document? | 10:06:49 |
| 5 | First of all, I'll represent to you that | 10:06:52 |
| 6 | these big blank spaces that say "redacted" were | 10:06:57 |
| 7 | blocked out by counsel for Uber -- | 10:07:01 |
| 8 | A.   Okay. | 10:07:03 |
| 9 | Q.   -- not by us. | 10:07:05 |
| 10 | A.   Okay.  Thank you. | 10:07:07 |
| 11 | Q.   So do you recognize this document? | 10:07:09 |
| 12 | A.   Yes. | 10:07:10 |
| 13 | Q.   What is it? | 10:07:11 |
| 14 | A.   It's minutes for the board meeting that we | 10:07:15 |
| 15 | just discussed. | 10:07:16 |
| 16 | MR. VERHOEVEN:  All right.  That's all I have on | 10:07:35 |
| 17 | that. | 10:07:35 |
| 18 | How long have we been going?  Does anyone | 10:07:42 |
| 19 | need a break? | 10:07:43 |
| 20 | MR. FLUMENBAUM:  Do you want to take a short | 10:07:45 |
| 21 | break?  We can take a short break. | 10:07:47 |
| 22 | MR. VERHOEVEN:  I'm switching subjects. | 10:07:49 |
| 23 | MR. FLUMENBAUM:  Let's take a five-minute break. | 10:07:53 |
| 24 | THE VIDEOGRAPHER:  This marks the end of DVD No. 1 | 10:07:56 |
| 25 | in the deposition of William Gurley.  We're off the | 10:07:59 |

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | record at 10:07 a.m. | 10:08:04 |
| 2 | (Recess taken.) | 10:08:04 |
| 3 | THE VIDEOGRAPHER:  Back on the record.  This is | 10:21:54 |
| 4 | the beginning of DVD No. 2, and the time is 10:21 a.m. | 10:21:59 |
| 5 | BY MR. VERHOEVEN: | 10:21:59 |
| 6 | Q.   Mr. Gurley, when did you learn of the | 10:22:03 |
| 7 | allegations in the complaint filed by Waymo in | 10:22:07 |
| 8 | District Court in California? | 10:22:08 |
| 9 | A.   I don't have any recollection of knowing | 10:22:16 |
| 10 | about it prior to it being a public event. | 10:22:21 |
| 11 | Q.   So you learned about it from the press? | 10:22:24 |
| 12 | A.   It's my recollection.  There's a chance we | 10:22:27 |
| 13 | were notified as a board earlier, but I don't have | 10:22:30 |
| 14 | recollection of that. | 10:22:31 |
| 15 | Q.   Did you know that this might happen? | 10:22:35 |
| 16 | A.   I suppose.  I mean, anybody can sue anybody, | 10:22:49 |
| 17 | so I guess there's a knowledge that it could happen, | 10:22:52 |
| 18 | but I wasn't anticipating it happening. | 10:22:55 |
| 19 | Q.   Did you read the complaint? | 10:23:03 |
| 20 | A.   I don't think I read the detailed complaint. | 10:23:07 |
| 21 | Q.   Did you learn what the allegations were? | 10:23:10 |
| 22 | MR. FLUMENBAUM:  Objection. | 10:23:11 |
| 23 | And if you learned it from talking to | 10:23:14 |
| 24 | counsel -- | 10:23:16 |
| 25 | THE WITNESS:  Right. | 10:23:18 |

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  -- just say that you can't answer | 10:23:20 |
| 2 | that question. | 10:23:21 |
| 3 | MR. VERHOEVEN:  Can we have a yes or no and then | 10:23:23 |
| 4 | he can answer if he learned it from counsel, so I know | 10:23:26 |
| 5 | if he learned about it in the first place? | 10:23:29 |
| 6 | MR. BRILLE:  Yes. | 10:23:31 |
| 7 | BY MR. VERHOEVEN: | 10:23:31 |
| 8 | Q.   Did you learn about the allegations of the | 10:23:34 |
| 9 | complaint? | 10:23:35 |
| 10 | A.   Yes. | 10:23:35 |
| 11 | Q.   And when was that? | 10:23:36 |
| 12 | A.   To the best of my recollection, around the | 10:23:39 |
| 13 | time that it was filed and went public. | 10:23:42 |
| 14 | Q.   And what was your understanding of those | 10:23:44 |
| 15 | allegations? | 10:23:45 |
| 16 | MR. FLUMENBAUM:  Do you have any understanding | 10:23:46 |
| 17 | other than through counsel? | 10:23:47 |
| 18 | THE WITNESS:  From what I've read in the press. | 10:23:50 |
| 19 | MR. FLUMENBAUM:  You want him to answer based on | 10:23:55 |
| 20 | his knowledge through the press? | 10:23:57 |
| 21 | MR. VERHOEVEN:  I want him to answer the question, | 10:24:00 |
| 22 | if he can. | 10:24:01 |
| 23 | THE WITNESS:  Based on my knowledge from reading | 10:24:02 |
| 24 | articles in the press, there were claims of trade | 10:24:07 |
| 25 | secret theft and solicitation of employees and | 10:24:14 |

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | specific accusations related to the downloading of the | 10:24:20 |
| 2 | 14,000 or so files. | 10:24:23 |
| 3 | BY MR. VERHOEVEN: | 10:24:23 |
| 4 |     Q.   Did you speak with anyone at Uber about the | 10:24:27 |
| 5 | veracity of that allegation about the 14,000 files | 10:24:30 |
| 6 | being downloaded? | 10:24:32 |
| 7 |     MR. FLUMENBAUM:  Can he answer yes? | 10:24:35 |
| 8 |     MR. BRILLE:  He can answer yes, and then we'll | 10:24:37 |
| 9 | take it a step at a time.  Or no, as the case may be. | 10:24:45 |
| 10 |     THE WITNESS:  When the company the size of Google | 10:24:49 |
| 11 | sues one of the companies you're on the board of, I'm | 10:24:52 |
| 12 | 100 percent certain that discussions ensued.  I don't | 10:24:55 |
| 13 | have specific recollection of -- a detailed | 10:24:59 |
| 14 | recollection of a specific discussion.  I'm sure there | 10:25:05 |
| 15 | were many. | 10:25:06 |
| 16 | BY MR. VERHOEVEN: | 10:25:06 |
| 17 |     Q.   Did you discuss it with any nonlawyers, such | 10:25:08 |
| 18 | as perhaps, Mr. Kalanick? | 10:25:11 |
| 19 |     A.   I don't recall having a specific one-on-one | 10:25:14 |
| 20 | conversation with Travis about this topic. | 10:25:20 |
| 21 |     Q.   Do you remember any discussions you had where | 10:25:22 |
| 22 | there weren't lawyers in the room? | 10:25:25 |
| 23 |     A.   Not specifically. | 10:25:26 |
| 24 |     Q.   So you can't say one way or another whether | 10:25:31 |
| 25 | you had any conversations with -- | 10:25:33 |

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I think it's highly likely.  I just don't | 10:25:36 |
| 2 | recall the details of any specific conversation. | 10:25:39 |
| 3 | Q.   Tell me about what you recall about these | 10:25:41 |
| 4 | conversations. | 10:25:42 |
| 5 | MR. FLUMENBAUM:  Again, exclude anything that -- | 10:25:47 |
| 6 | THE WITNESS:  With a lawyer. | 10:25:49 |
| 7 | MR. FLUMENBAUM:  -- you had with counsel. | 10:25:50 |
| 8 | BY MR. VERHOEVEN: | 10:25:50 |
| 9 | Q.   So the question is:  Did you ask Travis or | 10:25:54 |
| 10 | anybody else at Uber about the veracity of the | 10:25:58 |
| 11 | allegations concerning Levandowski's downloading of | 10:26:03 |
| 12 | the 14,000 files? | 10:26:04 |
| 13 | A.   There were numerous discussions that involved | 10:26:07 |
| 14 | company counsel, external counsel that I presume are | 10:26:12 |
| 15 | privileged, numerous.  What I'm struggling to | 10:26:16 |
| 16 | recollect is if I had conversations with nonattorneys | 10:26:20 |
| 17 | about what you're asking, and I don't have specific | 10:26:25 |
| 18 | recollection. | 10:26:26 |
| 19 | Q.   Well, did you have any conversations -- | 10:26:31 |
| 20 | A.   Highly likely. | 10:26:32 |
| 21 | Q.   Well, what do you remember saying in those | 10:26:35 |
| 22 | circumstances? | 10:26:37 |
| 23 | MR. FLUMENBAUM:  Again, limit your answer to | 10:26:39 |
| 24 | conversations where counsel was not present, to the | 10:26:42 |
| 25 | extent you can remember those. | 10:26:44 |

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I'd be reaching.  I don't have | 10:26:48 |
| 2 | specific recollection of -- it's highly likely it | 10:26:54 |
| 3 | happened because it's such a critical and meaningful | 10:26:57 |
| 4 | event.  The substantive conversations are much more | 10:27:01 |
| 5 | likely to have been with the attorneys because of the | 10:27:04 |
| 6 | nature of the event. | 10:27:05 |
| 7 | BY MR. VERHOEVEN: | 10:27:05 |
| 8 | Q.   So you're saying the only conversations you | 10:27:07 |
| 9 | can recall are with attorneys? | 10:27:09 |
| 10 | A.   Yes. | 10:27:09 |
| 11 | Q.   But you would agree that the filing of the | 10:27:25 |
| 12 | complaint was a highly critical event; right? | 10:27:35 |
| 13 | A.   Yes. | 10:27:35 |
| 14 | Q.   When did you learn -- let me back up. | 10:27:47 |
| 15 | Did there come a point when you learned that | 10:27:52 |
| 16 | Mr. Levandowski was asserting the Fifth Amendment? | 10:27:55 |
| 17 | A.   Yes. | 10:27:55 |
| 18 | Q.   And when did you learn that? | 10:27:59 |
| 19 | A.   I don't have any recollection of knowing that | 10:28:07 |
| 20 | ahead of it being general public knowledge. | 10:28:10 |
| 21 | Q.   Did you learn it from the press then? | 10:28:13 |
| 22 | A.   It's possible. | 10:28:14 |
| 23 | Q.   What was your reaction to that? | 10:28:18 |
| 24 | A.   It -- it's not a topic that I had much | 10:28:28 |
| 25 | familiarity with, so my reaction was to try to find | 10:28:32 |

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | out whether it was common or not and why it was | 10:28:34 |
| 2 | happening and, you know, what the company's response | 10:28:39 |
| 3 | should be. | 10:28:40 |
| 4 | Q.   So you weren't concerned when you read it? | 10:28:43 |
| 5 | A.   I didn't say that. | 10:28:44 |
| 6 | Q.   Were you concerned when you read it? | 10:28:47 |
| 7 | A.   I was unaware of how to react to it, and so I | 10:28:53 |
| 8 | sought knowledge to have a broader understanding of | 10:28:56 |
| 9 | it. | 10:28:57 |
| 10 | Q.   You know generally what taking the Fifth is; | 10:29:01 |
| 11 | right? | 10:29:01 |
| 12 | A.   Yeah, but I didn't have a prior knowledge as | 10:29:05 |
| 13 | to what it meant in this situation.  But then I sought | 10:29:10 |
| 14 | that out. | 10:29:11 |
| 15 | Q.   Well, you knew when you take the Fifth, | 10:29:13 |
| 16 | you're refusing to answer questions -- | 10:29:15 |
| 17 | A.   I understand. | 10:29:16 |
| 18 | Q.   -- on the ground that you might incriminate | 10:29:19 |
| 19 | yourself; right? | 10:29:21 |
| 20 | A.   I understand. | 10:29:22 |
| 21 | Q.   And you knew that at the time? | 10:29:23 |
| 22 | A.   I did.  I didn't have a -- I didn't have a | 10:29:27 |
| 23 | full understanding of the -- how unusual -- I didn't | 10:29:34 |
| 24 | have an understanding in that context, but then I did | 10:29:37 |
| 25 | shortly thereafter. | 10:29:38 |

Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And were you concerned about it? | 10:29:40 |
| 2 | A.   Yes. | 10:29:40 |
| 3 | Q.   Did you do anything about it? | 10:29:45 |
| 4 | A.   I asked a lot of questions about him doing | 10:29:51 |
| 5 | that and what the proper response from the company | 10:29:54 |
| 6 | should be. | 10:29:56 |
| 7 | Q.   And what response did you get from the | 10:29:58 |
| 8 | company? | 10:29:59 |
| 9 | MR. BRILLE:  Objection. | 10:29:59 |
| 10 | I'm going to instruct the witness that to the | 10:30:02 |
| 11 | extent it would call for you to disclose | 10:30:05 |
| 12 | attorney-client privilege communications, that you | 10:30:07 |
| 13 | exclude those from your answer. | 10:30:09 |
| 14 | MR. BOOCK:  And I would agree that Otto Trucking | 10:30:09 |
| 15 | joins in all of Uber and Otto's objections. | 10:30:10 |
| 16 | MR. FLUMENBAUM:  Can you answer that question | 10:30:19 |
| 17 | without divulging conversations that you had with | 10:30:22 |
| 18 | counsel for Uber? | 10:30:25 |
| 19 | THE WITNESS:  So as I attempted to understand the | 10:30:33 |
| 20 | situation more broadly and talked to our own | 10:30:40 |
| 21 | counsel -- | 10:30:43 |
| 22 | MR. FLUMENBAUM:  You can't talk about your own | 10:30:45 |
| 23 | counsel, conversations with your own counsel. | 10:30:48 |
| 24 | THE WITNESS:  At any rate, I came to believe that | 10:30:51 |
| 25 | the appropriate action in a situation like this would | 10:30:54 |

Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | be for the company to terminate based on taking the | 10:30:57 |
| 2 | Fifth. | 10:30:59 |
| 3 | BY MR. VERHOEVEN: | 10:30:59 |
| 4 | Q.   Okay.  And what was the time -- what was the | 10:31:03 |
| 5 | span of time from when you first read about it in the | 10:31:08 |
| 6 | press to when you came to that conclusion? | 10:31:10 |
| 7 | A.   To the best of my recollection, a couple | 10:31:17 |
| 8 | weeks. | 10:31:18 |
| 9 | Q.   And did you express that view? | 10:31:26 |
| 10 | A.   Yes. | 10:31:26 |
| 11 | Q.   To whom? | 10:31:30 |
| 12 | A.   There were some conversations with members of | 10:31:33 |
| 13 | the executive team.  I don't remember exactly who or | 10:31:36 |
| 14 | when.  There's some conversations with legal that are | 10:31:40 |
| 15 | privileged.  But I also expressed it to the board. | 10:31:45 |
| 16 | Q.   What do you remember about any discussions | 10:31:50 |
| 17 | with the executive team on this subject? | 10:31:53 |
| 18 | A.   There were members of the executive team that | 10:32:02 |
| 19 | also agreed that termination was the right course of | 10:32:06 |
| 20 | action. | 10:32:06 |
| 21 | Q.   And who were those members? | 10:32:08 |
| 22 | A.   I don't recall specifically.  I talked to a | 10:32:11 |
| 23 | lot of executive team members. | 10:32:13 |
| 24 | Q.   Were there members who did not think that | 10:32:16 |
| 25 | that was the right course of action? | 10:32:18 |

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   I don't recall any.                      10:32:33

 2        Q.   Who comprised the executive team at that 10:32:38

 3   time?                                              10:32:38

 4        A.   I don't know if I'll get them all.  I think  10:32:52

 5   at that time Emil Michael was still there.  Twaun  10:32:56

 6   Pham.  Rachel Whetstone.  Liane Hornsey.  Sally Yoo,  10:33:04

 7   but Sally's on the legal team.  Jeff Holden.  Gautam  10:33:13

 8   Gupta was still there at that time, I believe.  I'm  10:33:26

 9   probably leaving somebody out.                     10:33:28

10        Q.   Was Travis on the team?                  10:33:30

11        A.   Yeah, I mean, he's CEO, so, yeah.  Jeff Jones  10:33:37

12   may have left by then.                             10:33:39

13        Q.   Did Mr. Kalanick agree, when you expressed  10:33:45

14   this to the executive team, that Mr. Levandowski   10:33:48

15   should be terminated?                              10:33:52

16        A.   I don't recall if I had a direct discussion  10:33:55

17   with him, although probably at a board level, it was  10:33:58

18   the general understanding of the team that he did not  10:34:04

19   want to terminate Anthony.                         10:34:06

20        Q.   Do you recall what the reasons -- that he  10:34:17

21   stated for why he did not --                       10:34:19

22        A.   Yeah, the statement I remember is that he  10:34:21

23   didn't do anything wrong, so why should we terminate  10:34:24

24   him?                                               10:34:25

25        Q.   And what was said in response to that?  And  10:34:32
```

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | if you can recall, who said it?  For example, did | 10:34:42 |
| 2 | someone say, then why is he taking the Fifth? | 10:34:45 |
| 3 | MR. BRILLE:  Object to form. | 10:34:47 |
| 4 | THE WITNESS:  I can certainly say that my opinion | 10:34:53 |
| 5 | at that moment in time was that his taking the Fifth | 10:34:56 |
| 6 | should result in his termination, based on my best | 10:35:02 |
| 7 | knowledge of how that situation should be dealt with. | 10:35:06 |
| 8 | BY MR. VERHOEVEN: | 10:35:06 |
| 9 | Q.   And did -- you referenced conversations with | 10:35:10 |
| 10 | the board on this subject? | 10:35:12 |
| 11 | A.   Yes. | 10:35:12 |
| 12 | Q.   How many such conversations were there? | 10:35:16 |
| 13 | A.   I can't remember specifically, but my general | 10:35:21 |
| 14 | recollection is that it spanned multiple board | 10:35:24 |
| 15 | meetings. | 10:35:31 |
| 16 | Q.   And your position to the board was that he | 10:35:34 |
| 17 | should be terminated? | 10:35:35 |
| 18 | A.   Yes. | 10:35:35 |
| 19 | Q.   And you made that clear on the first of these | 10:35:41 |
| 20 | multiple board meetings? | 10:35:43 |
| 21 | A.   Once I'd gotten up to speed and had proper | 10:35:48 |
| 22 | knowledge of what I thought was the best to do, | 10:35:55 |
| 23 | which -- as I said earlier, there was a time window | 10:35:58 |
| 24 | where that happened.  So it wasn't -- my voicing of | 10:36:06 |
| 25 | this opinion wasn't immediate, like right after he | 10:36:09 |

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | pled the Fifth.  It took me a while to ascertain the | 10:36:14 |
| 2 | right answer for this situation. | 10:36:16 |
| 3 | Q.   Did you explain to the board why you thought | 10:36:18 |
| 4 | he should be terminated? | 10:36:19 |
| 5 | A.   Yes. | 10:36:19 |
| 6 | Q.   What did you say? | 10:36:21 |
| 7 | A.   I said, based on all the research I've done, | 10:36:25 |
| 8 | that that's the appropriate action for a company at | 10:36:29 |
| 9 | this moment in time, when someone pleads the Fifth. | 10:36:32 |
| 10 | Q.   And when you say "research" that you've done, | 10:36:34 |
| 11 | can you summarize what you did? | 10:36:36 |
| 12 | A.   Well, I want to be careful.  Some of those | 10:36:38 |
| 13 | conversations were me reaching out to people who were | 10:36:41 |
| 14 | experienced on those matters, which would inherently | 10:36:45 |
| 15 | go to lawyers. | 10:36:46 |
| 16 | Q.   Can you identify the lawyers that you | 10:36:48 |
| 17 | consulted? | 10:36:49 |
| 18 | A.   Certainly Steve Spurlock, who is a lawyer | 10:36:54 |
| 19 | that works for Benchmark. | 10:36:57 |
| 20 | Q.   Any outside counsel? | 10:37:01 |
| 21 | A.   He may have reached out.  I don't know | 10:37:06 |
| 22 | specifically who he talked to. | 10:37:09 |
| 23 | MR. VERHOEVEN:  And I assume, Counsel, you'll | 10:37:12 |
| 24 | instruct if I ask about the substance of his | 10:37:15 |
| 25 | conversation? | 10:37:16 |

Page 85

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:   Correct. | 10:37:18 |
| 2 | BY MR. VERHOEVEN: | 10:37:18 |
| 3 | Q.   Any other things you did to research besides | 10:37:25 |
| 4 | talk to Steve Spurlock? | 10:37:33 |
| 5 | A.   Not that I have specific recollection of, but | 10:37:35 |
| 6 | I'm sure I -- I did as much work as I did to come up | 10:37:42 |
| 7 | to that point of view.  I just don't remember exactly | 10:37:45 |
| 8 | who I talked to. | 10:37:46 |
| 9 | Q.   Did you read the complaint? | 10:37:48 |
| 10 | A.   I don't have -- I don't have memory of | 10:37:51 |
| 11 | reading the exact complaint.  I may have, but I don't | 10:37:55 |
| 12 | remember. | 10:37:55 |
| 13 | Q.   Did you read the motion for preliminary | 10:37:57 |
| 14 | injunction? | 10:37:58 |
| 15 | A.   It's possible, but I don't recall precisely. | 10:38:03 |
| 16 | Q.   Do you remember reading any legal pleadings | 10:38:07 |
| 17 | that were filed in around the time you were doing your | 10:38:10 |
| 18 | research? | 10:38:11 |
| 19 | A.   I certainly made myself aware of the issues. | 10:38:23 |
| 20 | I just don't know if it was precisely by reading the | 10:38:27 |
| 21 | complaint. | 10:38:28 |
| 22 | Q.   Did you have an understanding as to why, when | 10:38:31 |
| 23 | someone asserts the Fifth Amendment, you thought they | 10:38:34 |
| 24 | should be terminated? | 10:38:36 |
| 25 | MR. FLUMENBAUM:   Objection as to form. | 10:38:42 |

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    BY MR. VERHOEVEN:                                  10:38:42

2        Q.   Let me withdraw that.                     10:38:44

3             Did you have an understanding as to the   10:38:45

4    reasons why, in these circumstances here, when     10:38:48

5    Mr. Levandowski asserted the Fifth Amendment, that he   10:38:52

6    should be terminated?                              10:38:53

7        A.   Yeah, as I understood a couple of things,   10:38:56

8    one, that that was generally considered to be best   10:39:00

9    practice and so that's a reason in and of itself.  I   10:39:04

10   believe that he is required to be cooperative as part   10:39:09

11   of indemnity claims and that kind of thing, so this   10:39:16

12   is, by definition, being noncooperative.           10:39:19

13            And there was also -- as I'm sure you're   10:39:34

14   aware, there were assertions by the judge in the case   10:39:37

15   that suggested that he had a strong bias for that   10:39:42

16   action.                                            10:39:43

17       Q.   For what action?                          10:39:44

18       A.   For terminating.  That's my interpretation of   10:39:48

19   it.                                                10:40:04

20       Q.   Did there come a time when you learned that   10:40:06

21   Mr. Levandowski did, indeed, download the 14,000   10:40:11

22   files?                                             10:40:12

23       MR. BRILLE:  Object to the form.               10:40:23

24       THE WITNESS:  I don't have any knowledge of that   10:40:25

25   that wouldn't qualify for privileged conversation.   10:40:30

                                          Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    BY MR. VERHOEVEN:                                    10:40:30

2        Q.   Well, yes or no?                            10:40:32

3        MR. FLUMENBAUM:  He's answered your question.  I'm  10:40:36

4    going to tell him -- instruct him not to answer on the  10:40:40

5    basis of privilege.                                  10:40:41

6    BY MR. VERHOEVEN:                                    10:40:41

7        Q.   You had -- you learned something along those  10:40:45

8    lines from counsel; is that what you're saying?      10:40:48

9        MR. FLUMENBAUM:  Objection as to form.  And I'm  10:40:50

10   going to instruct him not to answer that question on  10:40:53

11   privilege grounds.                                   10:40:55

12       MR. BRILLE:  Same instruction.                   10:40:58

13       MR. VERHOEVEN:  Just asking him about his state of  10:41:01

14   mind.                                                10:41:02

15       MR. FLUMENBAUM:  Well, you're not doing it        10:41:04

16   appropriately.                                       10:41:04

17       MR. VERHOEVEN:  Okay.  Tell me how to do it       10:41:06

18   appropriately.                                       10:41:07

19       MR. FLUMENBAUM:  First of all, you don't have a   10:41:09

20   time frame.  You have not excluded conversations with  10:41:12

21   counsel.  You have not excluded events that have      10:41:15

22   occurred subsequent, so -- you know.                 10:41:19

23       MR. VERHOEVEN:  I asked him if there came a time  10:41:21

24   when he learned --                                   10:41:23

25       MR. FLUMENBAUM:  Ask your question.              10:41:24
```

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. VERHOEVEN:  Okay.  I'll repeat it. | 10:41:26 |
| 2 | BY MR. VERHOEVEN: | 10:41:26 |
| 3 | Q.   Did there come a time, Mr. Gurley, when you | 10:41:29 |
| 4 | learned that Mr. Levandowski, in fact, did download | 10:41:33 |
| 5 | the 14,000 files? | 10:41:35 |
| 6 | MR. BRILLE:  Mr. Gurley, in answering that | 10:41:37 |
| 7 | question, I'm going to instruct you not to answer the | 10:41:39 |
| 8 | question if the only way you can answer the question | 10:41:42 |
| 9 | is to divulge the content of attorney-client | 10:41:46 |
| 10 | communications. | 10:41:47 |
| 11 | THE WITNESS:  Okay. | 10:41:49 |
| 12 | MR. FLUMENBAUM:  Instruction stands. | 10:41:51 |
| 13 | MR. VERHOEVEN:  All right.  It will go on our | 10:41:53 |
| 14 | motion.  Can I ask him what time he learned it? | 10:41:57 |
| 15 | MR. FLUMENBAUM:  If he learned it. | 10:41:59 |
| 16 | BY MR. VERHOEVEN: | 10:41:59 |
| 17 | Q.   Okay.  If you learned it, can you tell me | 10:42:02 |
| 18 | approximately when you learned it? | 10:42:04 |
| 19 | MR. BRILLE:  I'm going to object to the form. | 10:42:07 |
| 20 | Same objection -- I'm going to instruct.  The question | 10:42:10 |
| 21 | is improper and seeks to elicit attorney-client | 10:42:13 |
| 22 | privileged discussions.  The way you're phrasing it is | 10:42:16 |
| 23 | the way it seeks to elicit that type of information. | 10:42:19 |
| 24 | MR. VERHOEVEN:  His counsel just suggested that. | 10:42:22 |
| 25 | MR. BRILLE:  No, he did not. | 10:42:28 |

Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. VERHOEVEN:  I thought you said that if he | 10:42:29 |
| 2 | learned it -- | 10:42:30 |
| 3 | MR. FLUMENBAUM:  Why don't you start over and -- | 10:42:33 |
| 4 | BY MR. VERHOEVEN: | |
| 5 | Q.   If you learned that Mr. Levandowski did, | 10:42:37 |
| 6 | indeed, download the 14,000 files, when did you learn | 10:42:41 |
| 7 | it? | 10:42:41 |
| 8 | MR. BRILLE:  Object to the form of the question | 10:42:43 |
| 9 | instruct the witness not to answer.  As phrased, it is | 10:42:45 |
| 10 | designed to elicit attorney-client privileged | 10:42:48 |
| 11 | information. | 10:42:49 |
| 12 | MR. FLUMENBAUM:  Correct, I agree with that. | 10:42:52 |
| 13 | MR. VERHOEVEN:  The fact of when the board learned | 10:42:54 |
| 14 | about something? | 10:42:54 |
| 15 | MR. BRILLE:  As phrased, you are seeking to -- | 10:42:58 |
| 16 | MR. FLUMENBAUM:  You are asking questions -- now | 10:43:00 |
| 17 | you're saying the board.  That's not part of your | 10:43:03 |
| 18 | question. | 10:43:04 |
| 19 | MR. VERHOEVEN:  Okay. | 10:43:05 |
| 20 | MR. FLUMENBAUM:  Please start again. | 10:43:07 |
| 21 | BY MR. VERHOEVEN: | 10:43:07 |
| 22 | Q.   Did there come a time when the board learned | 10:43:10 |
| 23 | that Mr. Levandowski did, in fact, download the 14,000 | 10:43:13 |
| 24 | files? | 10:43:14 |
| 25 | MR. BRILLE:  Mr. Gurley, I'm going to give you the | 10:43:16 |

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | same instruction.  To the extent you can answer that | 10:43:18 |
| 2 | question without revealing the content of | 10:43:20 |
| 3 | attorney-client privileged communications, you may do | 10:43:23 |
| 4 | so; otherwise, I will instruct you not to answer. | 10:43:26 |
| 5 | BY MR. VERHOEVEN: | 10:43:26 |
| 6 | Q.   It's a yes-or-no question? | 10:43:31 |
| 7 | MR. FLUMENBAUM:  He can't answer that question as | 10:43:32 |
| 8 | worded, based on the instruction from Uber's counsel. | 10:43:37 |
| 9 | MR. VERHOEVEN:  Are you instructing him now? | 10:43:39 |
| 10 | MR. FLUMENBAUM:  Correct. | 10:43:40 |
| 11 | MR. VERHOEVEN:  Even if there's not -- he learned | 10:43:42 |
| 12 | it through a non-attorney communication? | 10:43:44 |
| 13 | MR. BRILLE:  That wasn't the instruction. | 10:43:46 |
| 14 | MR. VERHOEVEN:  So that's what I understood the | 10:43:48 |
| 15 | instruction to be, that he could answer if -- | 10:43:51 |
| 16 | MR. FLUMENBAUM:  From a non -- from -- | 10:43:56 |
| 17 | MR. VERHOEVEN:  Let me ask the question again. | 10:43:58 |
| 18 | BY MR. VERHOEVEN: | 10:43:58 |
| 19 | Q.   Did there come a time when the board learned | 10:44:01 |
| 20 | in a board meeting that Mr. Levandowski, in fact, did | 10:44:05 |
| 21 | download the 14,000 files? | 10:44:09 |
| 22 | MR. BRILLE:  Same instruction.  To the extent that | 10:44:12 |
| 23 | you can answer that question without revealing the | 10:44:14 |
| 24 | content of attorney-client privilege -- | 10:44:16 |
| 25 | THE WITNESS:  I'm not aware of a non-privileged | 10:44:19 |

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | discussion where the board shared that knowledge. | 10:44:24 |
| 2 | BY MR. VERHOEVEN: | 10:44:24 |
| 3 | Q.   Was there a privileged instance that you | 10:44:26 |
| 4 | can't talk about that exists that's responsive to my | 10:44:32 |
| 5 | question; yes or no? | 10:44:34 |
| 6 | MR. BRILLE:  As phrased, it calls for the | 10:44:35 |
| 7 | disclosure of attorney-client privileged information. | 10:44:37 |
| 8 | I instruct you not to answer at all. | 10:44:40 |
| 9 | THE WITNESS:  Understood. | 10:44:41 |
| 10 | MR. VERHOEVEN:  I'll move on.  We've got a good | 10:44:45 |
| 11 | enough record for our motion. | 10:44:46 |
| 12 | BY MR. VERHOEVEN: | 10:44:46 |
| 13 | Q.   Let's go back to discussions that we were | 10:44:52 |
| 14 | talking about at the board meeting about the Fifth | 10:44:56 |
| 15 | Amendment. | 10:44:56 |
| 16 | Do you remember that? | 10:44:58 |
| 17 | A.   Um-hum.  Yes. | 10:44:59 |
| 18 | Q.   You had described for me the statements that | 10:45:06 |
| 19 | you made generally at that meeting, or at least that | 10:45:09 |
| 20 | you can recall. | 10:45:10 |
| 21 | A.   Right. | 10:45:11 |
| 22 | Q.   What did Mr. Kalanick say in response at that | 10:45:15 |
| 23 | meeting? | 10:45:17 |
| 24 | A.   To the best of my knowledge, what he said, as | 10:45:19 |
| 25 | I've already stated to you, is that he felt that | 10:45:23 |

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Anthony hadn't done anything wrong and, therefore, it | 10:45:27 |
| 2 | would be unfair to terminate him for pleading the | 10:45:30 |
| 3 | Fifth. | 10:45:31 |
| 4 | Q.    Okay.   That was the answer you gave when I | 10:45:34 |
| 5 | asked about conversations with the executive team.  So | 10:45:36 |
| 6 | he said the same thing at the board meetings? | 10:45:39 |
| 7 | A.    Yes. | 10:45:39 |
| 8 | Q.    And did anyone at the board meeting ask the | 10:45:43 |
| 9 | question, then why is he asserting the Fifth Amendment | 10:45:46 |
| 10 | if he didn't do anything wrong? | 10:45:49 |
| 11 | A.    I don't know if that question was | 10:45:56 |
| 12 | specifically asked, but I wouldn't be surprised if it | 10:45:59 |
| 13 | was. | 10:45:59 |
| 14 | Q.    What discussion do you remember concerning | 10:46:04 |
| 15 | this statement that Mr. Kalanick said about him not | 10:46:08 |
| 16 | doing anything wrong? | 10:46:10 |
| 17 | A.    Nothing other than the simple statement. | 10:46:21 |
| 18 | Q.    But what do you remember, how the board | 10:46:22 |
| 19 | reacted?  Did they say -- he said he didn't do | 10:46:26 |
| 20 | anything wrong.  What did the board say in response to | 10:46:29 |
| 21 | that? | 10:46:30 |
| 22 | A.    Just because I had better recollection | 10:46:33 |
| 23 | because it was on my mind at the time, my belief was | 10:46:39 |
| 24 | that if he felt compelled to do this, that the board | 10:46:43 |
| 25 | should -- or the company should take action against | 10:46:48 |

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    him and terminate, for the reasons that I've        10:46:50

 2    discussed.                                           10:46:51

 3        Q.   Right.                                      10:46:51

 4             So -- but I'm asking you specifically, at the  10:46:54

 5    board meeting, Kalanick repeated his view --         10:46:59

 6        A.   Right.                                       10:46:59

 7        Q.   -- that Levandowski didn't do anything      10:47:02

 8    wrong --                                             10:47:03

 9        A.   I think I understand your question?         10:47:06

10             I don't remember if there were specific     10:47:06

11    conversations that said, well, if he didn't do      10:47:08

12    anything wrong, why would he plead the Fifth?  I don't  10:47:10

13    remember if that happened.  It might have.          10:47:13

14        Q.   Well, do you remember -- was there response  10:47:15

15    to Mr. Kalanick at the meeting, after he made that  10:47:19

16    statement, just generally?  There was a discussion;  10:47:25

17    right?                                               10:47:26

18        A.   Yeah, I think there was a discussion and I  10:47:28

19    think -- and I don't recall exactly who chimed in, but  10:47:32

20    there was others, like me, that felt that taking the  10:47:38

21    Fifth should be dealt with.                          10:47:40

22        Q.   And who were those people?                  10:47:42

23        A.   I just said I don't recall exactly who was on  10:47:45

24    that point of view.                                  10:47:46

25        Q.   Do you remember anyone on the board that you  10:47:49
```

Page 94

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | can identify? | 10:47:50 |
| 2 | A.  I'd be speculating. | 10:47:56 |
| 3 | Q.  So as a result -- as a result of the first | 10:47:59 |
| 4 | meeting of the board on this subject, was anything | 10:48:05 |
| 5 | done to Mr. Levandowski? | 10:48:09 |
| 6 | A.  Not immediately. | 10:48:12 |
| 7 | Q.  Do you remember anything else that was | 10:48:20 |
| 8 | discussed about the Waymo case or Mr. Levandowski | 10:48:24 |
| 9 | during this initial meeting? | 10:48:43 |
| 10 | A.  There were generic discussions about how we | 10:48:46 |
| 11 | would respond and who would be representing that kind | 10:48:50 |
| 12 | of thing.  There were other discussions that were | 10:48:53 |
| 13 | privileged with those representatives. | 10:48:56 |
| 14 | Q.  Anything that wasn't the subject of attorney | 10:49:00 |
| 15 | advice? | 10:49:01 |
| 16 | A.  Yeah, eventually, I made the proposition to | 10:49:09 |
| 17 | the board that, in light of all the facts in the | 10:49:16 |
| 18 | situation, that we should create a special committee | 10:49:18 |
| 19 | to oversee this litigation. | 10:49:27 |
| 20 | Q.  And what was the response of the board to | 10:49:30 |
| 21 | that suggestion? | 10:49:31 |
| 22 | A.  Eventually -- it was positive, because | 10:49:35 |
| 23 | eventually the committee was created, but it took a | 10:49:40 |
| 24 | while.  There was a lot of back and forth. | 10:49:42 |
| 25 | Q.  Okay.  So at the initial meeting, it | 10:49:45 |

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    wasn't --                                              10:49:46

2        A.   I don't know if that was discussed -- there   10:49:48

3    were lots of meetings, and I don't remember exactly    10:49:50

4    which one it came up.  But somewhere along the way, I  10:49:53

5    proposed that it would be a good idea to create a      10:49:57

6    special committee.                                     10:49:58

7        Q.   And then at that meeting, whenever it was,    10:50:01

8    did you get a response to that?                        10:50:02

9        A.   It wasn't effected when it was first         10:50:06

10   proposed.                                              10:50:07

11       Q.   Okay.  Did Mr. Kalanick have a response to   10:50:09

12   that?                                                  10:50:10

13       A.   Part of the reason that I was proposing that 10:50:35

14   we put the committee together was to potentially get  10:50:38

15   the authority to take the action that I had already   10:50:41

16   told you I felt was the right move for the company.   10:50:45

17   And so in light of the fact that he didn't agree with 10:50:48

18   that decision, you know, that led to a discussion     10:50:53

19   about whether this committee was the right thing to do 10:50:56

20   or not.                                               10:50:58

21       Q.   And he was against it?                        10:51:00

22       A.   It required lots of negotiations.  So        10:51:06

23   "against it" is strong because it was eventually      10:51:09

24   passed, but it wasn't -- a lot of discussion, you     10:51:15

25   know, ensued about whether it was appropriate or not. 10:51:17

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        Q.   And which side of the discussion was he on?       10:51:19

2   For or against?                                              10:51:23

3       MR. FLUMENBAUM:  Objection as to form.                   10:51:29

4        THE WITNESS:  I can't say equivocally that he was       10:51:38

5   100 percent against it because, once again, it ended         10:51:41

6   up being passed.  And I think that resolution was            10:51:44

7   unanimous when it was created.  But there was a lot of       10:51:48

8   discussion about whether the committee should have the       10:51:50

9   right to recommend change or effect change, those kind       10:51:55

10  of things, that went back and forth.  And that was           10:51:57

11  done probably through a lawyer.  I don't know.  So I         10:52:02

12  wasn't privy to all of the responses to someone else.        10:52:06

13  BY MR. VERHOEVEN:

14       Q.   Do you recall Mr. Kalanick saying anything on      10:52:10

15  the subject?                                                 10:52:11

16       A.   Not other than just a general belief that I        10:52:23

17  think he understood what I wanted the end result to          10:52:28

18  be.  And so I think from that -- and he was not in           10:52:34

19  favor of that, so I think that led to discussions            10:52:37

20  about whether it made sense or not.                          10:52:40

21       Q.   And on the subject of whether the committee        10:52:42

22  could make a recommendation, did he argue that the           10:52:47

23  committee should not --                                      10:52:49

24       A.   I don't know specifically.  Because it was         10:52:51

25  done through -- the negotiation -- you know, we were         10:52:56

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | proposing certain language and it was negotiated.  But | 10:53:01 |
| 2 | eventually, you know, we got to where we wanted to be. | 10:53:05 |
| 3 | Q.   Was there any discussion of whether or not | 10:53:07 |
| 4 | Mr. Kalanick should be on a special committee? | 10:53:10 |
| 5 | A.   I think part of the reasoning for the special | 10:53:15 |
| 6 | committee was to make sure it was independent.  So the | 10:53:20 |
| 7 | opposite, that he shouldn't be on the committee. | 10:53:25 |
| 8 | Q.   So the whole purpose was to have a committee | 10:53:28 |
| 9 | that had independent people? | 10:53:30 |
| 10 | A.   Yes. | 10:53:30 |
| 11 | Q.   And Mr. Kalanick was not an independent | 10:53:32 |
| 12 | person on this issue? | 10:53:34 |
| 13 | MR. FLUMENBAUM:  Objection as to form. | 10:53:35 |
| 14 | THE WITNESS:  I did not believe so.  I can't speak | 10:53:39 |
| 15 | for the others. | 10:53:41 |
| 16 | MR. VERHOEVEN:  Do you have the board . . . | 10:53:59 |
| 17 | BY MR. VERHOEVEN: | 10:54:35 |
| 18 | Q.   Just for authentication purposes, I'm going | 10:54:35 |
| 19 | to show you a document marked as 912. | 10:54:38 |
| 20 | (Plaintiff's Exhibit 912 was marked.) | 10:54:50 |
| 21 | MR. FLUMENBAUM:  Can I have a copy? | 10:54:51 |
| 22 | MR. VERHOEVEN:  Yes. | 10:54:52 |
| 23 | BY MR. VERHOEVEN: | 10:54:52 |
| 24 | Q.   Again, the heavy redactions on this document | 10:54:59 |
| 25 | that block out the document were created by counsel | 10:55:07 |

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | for Uber, so I apologize for that. | 10:55:12 |
| 2 | Can you identify this document, to the extent | 10:55:21 |
| 3 | that it's disclosed? | 10:55:22 |
| 4 | A.   It appears to be the minutes from an April | 10:55:27 |
| 5 | 10th board meeting. | 10:55:28 |
| 6 | Q.   Would you have -- to the extent you can | 10:55:36 |
| 7 | recall -- we're talking about this whole conversation | 10:55:40 |
| 8 | about the Fifth Amendment and whatnot.  Would that | 10:55:44 |
| 9 | have been started at least by this April 10th, 2017 | 10:55:51 |
| 10 | meeting? | 10:55:52 |
| 11 | A.   I don't know.  I don't think so. | 10:55:59 |
| 12 | Q.   Well, I'll represent that it was public that | 10:56:03 |
| 13 | Mr. Levandowski had taken the Fifth before this time. | 10:56:07 |
| 14 | A.   Okay. | 10:56:07 |
| 15 | Q.   Does that change your answer? | 10:56:09 |
| 16 | A.   No, because I had already mentioned to you | 10:56:12 |
| 17 | that there was -- it took me a while -- my experience | 10:56:17 |
| 18 | set of being involved in companies in this particular | 10:56:21 |
| 19 | situation is low, so it took me a while to get an | 10:56:25 |
| 20 | understanding of what I felt was the right course of | 10:56:28 |
| 21 | action. | 10:56:30 |
| 22 | Q.   Do you remember any discussion about the | 10:56:35 |
| 23 | Waymo litigation on April 10th, 2017 board meeting? | 10:56:40 |
| 24 | A.   I do not. | 10:56:41 |
| 25 | Q.   Okay.  There came a time when Uber made a | 10:56:57 |

Page 99

| | | |
|---|---|---|
| 1 | decision to remove Mr. Levandowski from working in the | 10:57:03 |
| 2 | area of LiDAR. | 10:57:06 |
| 3 | Are you familiar with that? | 10:57:07 |
| 4 | A.   Um-hum. | 10:57:08 |
| 5 | Q.   "Yes"? | |
| 6 | A.   Yes. | 10:57:09 |
| 7 | Q.   Were you involved in that decision? | 10:57:14 |
| 8 | A.   The board was informed of that decision.  I | 10:57:23 |
| 9 | wouldn't say that the board was involved in that | 10:57:26 |
| 10 | decision.  I think it was a response to many of the | 10:57:36 |
| 11 | conversations that were being had about what is the | 10:57:39 |
| 12 | appropriate course of action in light of everything | 10:57:42 |
| 13 | that's happened. | 10:57:43 |
| 14 | Q.   Do you remember when that decision was made? | 10:57:46 |
| 15 | A.   I do not. | 10:57:47 |
| 16 | Q.   When the board was apprised of the decision, | 10:57:51 |
| 17 | had the decision been communicated to Levandowski yet? | 10:57:57 |
| 18 | A.   I don't know. | 10:57:58 |
| 19 | Q.   Did the board approve it or were they just | 10:58:00 |
| 20 | apprised of it after the fact? | 10:58:03 |
| 21 | A.   I don't have specific recollection.  I don't | 10:58:10 |
| 22 | think that was something that there was a -- like a | 10:58:15 |
| 23 | board vote and approval of. | 10:58:17 |
| 24 | Q.   Did you read the preliminary injunction order | 10:58:24 |
| 25 | in this case? | 10:58:25 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Not that I recall. | 10:58:29 |
| 2 | Q.   You became aware that there was a preliminary | 10:58:33 |
| 3 | injunction; right? | 10:58:34 |
| 4 | A.   Um-hum. | 10:58:35 |
| 5 | Q.   "Yes"? | |
| 6 | A.   Yes. | 10:58:36 |
| 7 | Q.   When did you become aware of that? | 10:58:39 |
| 8 | A.   I don't remember the specific date. | 10:58:40 |
| 9 | Q.   How did you learn about it? | 10:58:45 |
| 10 | A.   I don't know if it was through a process like | 10:58:48 |
| 11 | this or in the press.  I don't know.  I'm sure it was | 10:58:53 |
| 12 | discussed at some point in the board meeting, but with | 10:58:57 |
| 13 | lawyers present. | 10:58:59 |
| 14 | Q.   What was your reaction when you learned of | 10:59:01 |
| 15 | it? | 10:59:02 |
| 16 | A.   Just an interpretation of what Google was | 10:59:22 |
| 17 | trying to signal by making that decision, to seek an | 10:59:27 |
| 18 | injunction. | 10:59:28 |
| 19 | Q.   Did you -- were you informed of or learned of | 10:59:34 |
| 20 | the reasoning behind the decision in the public | 10:59:39 |
| 21 | opinion issued by the judge? | 10:59:41 |
| 22 | A.   State the question again. | 10:59:45 |
| 23 | Q.   Did you become aware of the reasoning | 10:59:48 |
| 24 | underlying the decision by the judge to issue a | 10:59:53 |
| 25 | preliminary injunction, which was stated in the actual | 10:59:57 |

Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | order that was public? | 10:59:58 |
| 2 | A.   I didn't have any perspectives that were | 11:00:08 |
| 3 | outside of a discussion from counsel on that topic. | 11:00:13 |
| 4 | Q.   Why didn't Uber fire Mr. Levandowski upon the | 11:00:20 |
| 5 | issuance of the preliminary injunction? | 11:00:23 |
| 6 | A.   I can't speak to that because I wasn't in a | 11:00:32 |
| 7 | position to have authority to make that decision. | 11:00:35 |
| 8 | Q.   Who was? | 11:00:36 |
| 9 | A.   Presumably Travis, the CEO. | 11:00:39 |
| 10 | Q.   So the board didn't have authority to direct | 11:00:42 |
| 11 | that -- I thought you -- withdrawn. | 11:00:46 |
| 12 | I thought you previously mentioned that you | 11:00:48 |
| 13 | had recommended that he be terminated -- | 11:00:50 |
| 14 | A.   I had.  I had. | 11:00:52 |
| 15 | Q.   -- at a board meeting. | 11:00:53 |
| 16 | A.   Yeah. | 11:00:54 |
| 17 | Q.   But the board didn't have authority to order | 11:00:56 |
| 18 | that? | 11:00:57 |
| 19 | A.   The board did not order that, if that's your | 11:01:00 |
| 20 | question. | 11:01:00 |
| 21 | Q.   But they had the authority to? | 11:01:03 |
| 22 | A.   I suppose they could have made a motion and | 11:01:06 |
| 23 | voted to do that. | 11:01:08 |
| 24 | Q.   And you encouraged the board to do that? | 11:01:11 |
| 25 | A.   I encouraged the board to terminate once I | 11:01:13 |

Page 102

| | | |
|---|---|---|
| 1 | had an understanding of what my interpretation was of | 11:01:18 |
| 2 | him pleading the Fifth.  And my efforts around | 11:01:22 |
| 3 | creating the committee were my avenue to try and see | 11:01:27 |
| 4 | that through. | 11:01:27 |
| 5 | Q.   After the issuance of the preliminary | 11:01:36 |
| 6 | injunction order, did you have any discussions with | 11:01:39 |
| 7 | Mr. Kalanick about terminating Mr. Levandowski? | 11:01:42 |
| 8 | A.   Not specifically related to that event. | 11:01:47 |
| 9 | Q.   Okay.  So it didn't cause you to have any | 11:01:50 |
| 10 | more conversations with Mr. Kalanick? | 11:01:54 |
| 11 | A.   No.  But I had already determined that I | 11:01:56 |
| 12 | thought the best course of action was termination.  So | 11:01:58 |
| 13 | like I was not more compelled; I was already | 11:02:02 |
| 14 | compelled. | 11:02:04 |
| 15 | Q.   Did you discuss the preliminary injunction | 11:02:05 |
| 16 | order with Mr. Kalanick and repeat your | 11:02:09 |
| 17 | recommendation? | 11:02:10 |
| 18 | A.   Not outside of a privileged conversation, no. | 11:02:14 |
| 19 | Q.   Was there a board meeting about the | 11:02:19 |
| 20 | preliminary injunction? | 11:02:20 |
| 21 | A.   I don't remember if there was one called.  I | 11:02:23 |
| 22 | don't think so.  There were lots of board meetings at | 11:02:27 |
| 23 | this moment in time. | 11:02:29 |
| 24 | Q.   Do you recall receiving -- withdrawn. | 11:02:34 |
| 25 | Did you ask to see the due diligence report | 11:02:39 |

Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    that was referenced in the board              11:02:42

 2    meeting -- board -- withdrawn.                 11:02:46

 3         Did you ask for the diligence report that was    11:02:49

 4    referenced in Exhibit 910 as a result of reading the  11:02:56

 5    preliminary injunction order?                  11:02:58

 6         MR. FLUMENBAUM:  I'll let him answer yes or no to  11:03:00

 7    that, but I don't want that to be a waiver.    11:03:02

 8              Will you agree to that?              11:03:04

 9         MR. VERHOEVEN:  Agreed.                   11:03:05

10         MR. FLUMENBAUM:  You can answer that yes or no.   11:03:06

11         THE WITNESS:  Yes.                        11:03:08

12    BY MR. VERHOEVEN:                              11:03:08

13         Q.   Did you ask for it?                  11:03:10

14         MR. FLUMENBAUM:  Same rule?               11:03:11

15         MR. VERHOEVEN:  Yes.                      11:03:14

16    BY MR. VERHOEVEN:                              11:03:14

17         Q.   Yes or no?                           11:03:16

18         A.   Yes.                                 11:03:16

19         Q.   Did you read it?                     11:03:18

20         MR. FLUMENBAUM:  Again, same rule?        11:03:20

21         MR. VERHOEVEN:  Yes.                      11:03:21

22         MR. FLUMENBAUM:  You can answer that yes or no.   11:03:24

23         THE WITNESS:  Yes.                        11:03:26

24    BY MR. VERHOEVEN:                              11:03:26

25         Q.   And that was around May 12th of this year?   11:03:30
```

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  You can answer that yes or no. | 11:03:34 |
| 2 | THE WITNESS:  I don't have any notes in front of | 11:03:36 |
| 3 | me.  That sounds like it would be in the general time | 11:03:38 |
| 4 | frame, but I . . . it could be off, you know, by a | 11:03:45 |
| 5 | week or two.  I don't have the specific date. | 11:03:48 |
| 6 | BY MR. VERHOEVEN: | 11:03:48 |
| 7 | Q.   In that range? | 11:03:49 |
| 8 | A.   In that range. | 11:03:50 |
| 9 | Q.   Why did you ask for it? | 11:03:52 |
| 10 | MR. FLUMENBAUM:  Again, I'll let you answer that | 11:03:57 |
| 11 | question, but don't talk about any conversations that | 11:04:06 |
| 12 | you had with either Uber's counsel or your personal | 11:04:10 |
| 13 | counsel at this point. | 11:04:14 |
| 14 | THE WITNESS:  As I already referenced, I felt that | 11:04:22 |
| 15 | this litigation, the one we're involved in today, was | 11:04:26 |
| 16 | critical and important to the company.  Once I had | 11:04:30 |
| 17 | gotten up to speed on Anthony's decision to plead the | 11:04:35 |
| 18 | Fifth and the fact that we should be terminating, I | 11:04:39 |
| 19 | felt that it was my duty as a board member to try and | 11:04:42 |
| 20 | know as much as possible about this situation so I | 11:04:45 |
| 21 | could advise the company in the best possible way. | 11:04:54 |
| 22 | BY MR. VERHOEVEN: | 11:04:54 |
| 23 | Q.   After you read the diligence report, did you | 11:04:59 |
| 24 | take any action based on reading it?  Yes or no? | 11:05:06 |
| 25 | MR. FLUMENBAUM:  Again, no waiver; correct? | 11:05:08 |

Page 105

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. VERHOEVEN:  Correct. | 11:05:10 |
| 2 | MR. FLUMENBAUM:  You can answer that. | 11:05:15 |
| 3 | THE WITNESS:  I did not take any immediate | 11:05:30 |
| 4 | specific action related to that. | 11:05:35 |
| 5 | BY MR. VERHOEVEN: | 11:05:35 |
| 6 | Q.   What about non-immediate specific action? | 11:05:39 |
| 7 | MR. FLUMENBAUM:  Again, I don't want to have to | 11:05:54 |
| 8 | say this.  Do we have -- this whole line of | 11:05:56 |
| 9 | questioning, not going to be any argument of the | 11:05:59 |
| 10 | waiver -- | 11:05:59 |
| 11 | MR. VERHOEVEN:  Agreed.  Agreed. | 11:06:01 |
| 12 | MR. FLUMENBAUM:  Because I have to obey the waiver | 11:06:03 |
| 13 | rules here. | 11:06:04 |
| 14 | MR. VERHOEVEN:  Agreed. | 11:06:05 |
| 15 | MR. FLUMENBAUM:  Okay. | 11:06:05 |
| 16 | THE WITNESS:  I'm not aware of anything that | 11:06:29 |
| 17 | specifically ties to that investigation in terms of my | 11:06:35 |
| 18 | action. | 11:06:36 |
| 19 | BY MR. VERHOEVEN: | 11:06:36 |
| 20 | Q.   You gave a copy of the diligence report to | 11:06:39 |
| 21 | your personal counsel at Paul Weiss; right? | 11:06:43 |
| 22 | MR. FLUMENBAUM:  Again? | 11:06:45 |
| 23 | MR. VERHOEVEN:  I have a continuing agreement with | 11:06:47 |
| 24 | you. | 11:06:48 |
| 25 | MR. FLUMENBAUM:  All right. | 11:06:48 |

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yes. | 11:06:51 |
| 2 | BY MR. VERHOEVEN: | 11:06:51 |
| 3 | Q.   Why did you do that? | 11:06:52 |
| 4 | A.   I think it's consistent with what I said | 11:06:55 |
| 5 | before.  I was trying to understand the details of the | 11:07:02 |
| 6 | litigation and the situation and make sure that I was | 11:07:07 |
| 7 | as informed as I possibly could be. | 11:07:11 |
| 8 | Q.   Were you concerned -- withdrawn. | 11:07:14 |
| 9 | Did you send it to your personal lawyer to | 11:07:16 |
| 10 | make sure that you did the right things with respect | 11:07:19 |
| 11 | to this lawsuit? | 11:07:22 |
| 12 | MR. BRILLE:  Object to form. | 11:07:28 |
| 13 | THE WITNESS:  Yes. | 11:07:29 |
| 14 | BY MR. VERHOEVEN: | 11:07:29 |
| 15 | Q.   Did you send it to him to ensure that you | 11:07:33 |
| 16 | were protected from liability? | 11:07:34 |
| 17 | MR. FLUMENBAUM:  Objection.  I'm going to instruct | 11:07:35 |
| 18 | him not to answer that. | 11:07:40 |
| 19 | BY MR. VERHOEVEN: | 11:07:40 |
| 20 | Q.   Was there any other reason that you sent a | 11:07:43 |
| 21 | copy of this specific report to your personal lawyer? | 11:07:47 |
| 22 | MR. FLUMENBAUM:  Other than what he's answered? | 11:07:49 |
| 23 | MR. VERHOEVEN:  Yes. | 11:07:50 |
| 24 | THE WITNESS:  And just -- you keep saying | 11:07:56 |
| 25 | "personal."  Paul Weiss represents Benchmark, our | 11:07:59 |

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | firm.  He's not my personal lawyer. | 11:08:01 |
| 2 | BY MR. VERHOEVEN: | 11:08:01 |
| 3 | Q.   So he wasn't your personal lawyer? | 11:08:04 |
| 4 | A.   Yeah. | 11:08:05 |
| 5 | Q.   Okay.  Thanks for clarifying that. | 11:08:08 |
| 6 | The question is outstanding. | 11:08:11 |
| 7 | Was there any other reason other than what | 11:08:14 |
| 8 | you testified to -- | 11:08:15 |
| 9 | A.   No. | 11:08:16 |
| 10 | Q.   And then you gave a copy to | 11:08:21 |
| 11 | Shearman & Sterling; is that right? | 11:08:23 |
| 12 | A.   It's possible. | 11:08:30 |
| 13 | Q.   Why would you give a copy to | 11:08:33 |
| 14 | Shearman & Sterling? | 11:08:34 |
| 15 | A.   They had been hired to represent the | 11:08:36 |
| 16 | independent committee that had been put together. | 11:08:40 |
| 17 | Q.   I see. | 11:08:40 |
| 18 | MR. VERHOEVEN:  Can I get . . . . | 11:09:05 |
| 19 | Let's mark as Exhibit 913 a copy of board | 11:09:24 |
| 20 | minutes dated May 15th, 2017. | 11:09:28 |
| 21 | (Plaintiff's Exhibit 913 was marked.) | 11:09:47 |
| 22 | BY MR. VERHOEVEN: | 11:09:47 |
| 23 | Q.   Can you identify this, again, | 11:09:49 |
| 24 | redacted-by-Uber document? | 11:09:52 |
| 25 | (Witness reviews document.) | 11:10:16 |

Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Okay. | 11:10:16 |
| 2 | Q.    Can you identify that for me. | 11:10:18 |
| 3 | A.    It's the minutes from a May 15th board | 11:10:21 |
| 4 | meeting of Uber. | 11:10:23 |
| 5 | Q.    And you attended that meeting; right? | 11:10:25 |
| 6 | A.    Yes. | 11:10:25 |
| 7 | Q.    And one of the subjects discussed at that | 11:10:29 |
| 8 | meeting was a report on the Waymo litigation? | 11:10:33 |
| 9 | A.    Correct. | 11:10:35 |
| 10 | MR. VERHOEVEN:  And I assume, Counsel, that if I | 11:10:39 |
| 11 | ask any questions about the substance of that report, | 11:10:41 |
| 12 | you'll instruct the witness not to answer? | 11:10:43 |
| 13 | MR. FLUMENBAUM:  That's correct.  Based on Uber | 11:10:48 |
| 14 | taking the Fifth on that. | 11:10:49 |
| 15 | MR. VERHOEVEN:  Oh, it's their fault. | 11:10:52 |
| 16 | MR. FLUMENBAUM:  It's no one's fault.  It's either | 11:10:54 |
| 17 | privileged or it's not privileged. | 11:10:57 |
| 18 | BY MR. VERHOEVEN: | 11:10:57 |
| 19 | Q.    If you turn to the second page, Mr. Gurley. | 11:10:59 |
| 20 | A.    Yes. | 11:11:01 |
| 21 | Q.    You see it says, "The board then further | 11:11:04 |
| 22 | discussed the impact on the company of continuing to | 11:11:09 |
| 23 | employ Mr. Levandowski"? | 11:11:11 |
| 24 | Do you see that? | 11:11:12 |
| 25 | A.    Yes. | 11:11:12 |

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| 1 | Q. | Can you describe for me that discussion. | 11:11:15 |
| 2 | A. | I think it's consistent with what we've | 11:11:19 |
| 3 | | already discussed before, which is, there was a | 11:11:27 |
| 4 | | growing, I think, consensus that the appropriate | 11:11:33 |
| 5 | | action to take in this situation was termination. | 11:11:36 |
| 6 | Q. | Did termination occur after this meeting? | 11:11:42 |
| 7 | | I'm sorry. | 11:11:43 |
| 8 | | Did termination occur as a result of this | 11:11:46 |
| 9 | | meeting? | 11:11:47 |
| 10 | A. | I don't think so. | 11:11:48 |
| 11 | Q. | Why not? | 11:11:49 |
| 12 | A. | I don't recall exactly why not, but I know in | 11:11:55 |
| 13 | | my -- I know specifically that the committee was | 11:12:01 |
| 14 | | formed prior to the termination. | 11:12:05 |
| 15 | Q. | Okay. | 11:12:06 |
| 16 | A. | And I think the committee was formed after | 11:12:10 |
| 17 | | this.  I seem to recall, I should say. | 11:12:12 |
| 18 | Q. | Is it fair to say that, at this point in | 11:12:15 |
| 19 | | time, Mr. Kalanick was aggressively trying to block | 11:12:19 |
| 20 | | efforts to terminate Mr. Levandowski? | 11:12:22 |
| 21 | | MR. BRILLE:  Object to form. | 11:12:25 |
| 22 | | THE WITNESS:  I can't assert -- I can't qualify | 11:12:30 |
| 23 | | the aggressive part, but it is my interpretation that | 11:12:34 |
| 24 | | he was not in favor of termination. | 11:12:38 |
| 25 | | BY MR. VERHOEVEN: | 11:12:38 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1      Q.   Was he trying to block it?                    11:12:41

2      A.   I would say he was arguing that we should     11:12:47

3   not.                                                  11:12:48

4      Q.   He was the lead person arguing that; right?   11:12:51

5      A.   From my perspective, correct.                 11:12:54

6      Q.   Was there anyone else on the board arguing    11:12:56

7   that at this point in time?                           11:12:58

8      A.   I do not recall anyone else having a strong   11:13:02

9   opinion of that on that side of the argument.         11:13:05

10     Q.   What about prior board meetings?  Did anyone  11:13:09

11  other than Mr. Levandowski [sic] argue that           11:13:13

12  termination was inappropriate --                      11:13:15

13     MR. FLUMENBAUM:  Objection as to form.             11:13:17

14  BY MR. VERHOEVEN:                                     11:13:17

15     Q.   -- at the board meetings?                     11:13:19

16     MR. FLUMENBAUM:  Objection as to form.             11:13:21

17          I think you misspoke.                         11:13:22

18  BY MR. VERHOEVEN:                                     11:13:22

19     Q.   Oh.  Thank you.                               11:13:25

20          What about other prior board meetings?  Did   11:13:27

21  anyone other than Mr. Kalanick argue that termination 11:13:30

22  was inappropriate?                                    11:13:32

23     A.   Not that I'm aware of.                        11:13:34

24     Q.   At this point in time, of this board meeting, 11:13:44

25  Mr. Levandowski was refusing to cooperate with Uber;  11:13:49
```

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   right?                                              11:13:49

 2       A.   That is my interpretation of the pleading the   11:13:54

 3   Fifth.                                              11:13:56

 4       Q.   So yes?                                    11:13:57

 5       A.   Yes.                                       11:13:57

 6       Q.   And he had been refusing to cooperate from   11:14:01

 7   the beginning of the complaint all the way through   11:14:04

 8   this point; right?                                  11:14:05

 9       MR. FLUMENBAUM:  Objection as to form.          11:14:12

10       THE WITNESS:  I didn't have specific conversations   11:14:15

11   with him.  I don't even know if I ever have.  And so   11:14:19

12   my interpretation of the noncooperation started with   11:14:23

13   the pleading of the Fifth.                          11:14:25

14   BY MR. VERHOEVEN:                                   11:14:25

15       Q.   Okay.                                      11:14:26

16       A.   That's the only knowledge I have.          11:14:28

17       Q.   All right.  So I think I may have asked this,   11:14:38

18   but let me just try it:  This reference about        11:14:42

19   discussing the further impact of the company, was    11:14:45

20   anything new discussed at this meeting than what     11:14:48

21   you've already testified to?                        11:14:50

22       A.   There were discussions about whether, you   11:14:57

23   know, him leaving would impact employee morale or    11:15:06

24   retention within the group that he was leading.  That   11:15:09

25   even was discussed in the decision to move him, you   11:15:15
```

Page 112

1  know, into a different role at the company.  And so    11:15:18

2  there were a lot of discussions about that topic.      11:15:21

3      Q.   Can you summarize those discussions for me,   11:15:24

4  as best you recall?                                    11:15:26

5      A.   Sure.  There were arguments made that a lot   11:15:29

6  of the people that worked in his department were loyal 11:15:35

7  to him and that if he were terminated, we might have a 11:15:38

8  retention problem in the autonomous.  There were other 11:15:42

9  people that had different points of view on that.      11:15:44

10     Q.   And which people had different points of      11:15:47

11 view?                                                  11:15:48

12          Let me withdraw that.                         11:15:49

13          Who was making that argument?  Was it         11:15:51

14 Mr. Kalanick?                                          11:15:52

15     A.   Yes.                                          11:15:52

16     Q.   Anyone else?                                  11:15:54

17     A.   It's possible.  It's possible.  I don't       11:16:00

18 recall, but it's possible that someone on the HR team  11:16:04

19 or something else might have validated that point of   11:16:07

20 view.                                                  11:16:08

21     Q.   Did anyone on the board argue in favor of     11:16:10

22 that point of view?                                    11:16:12

23     A.   Not -- not in any meaningful way.             11:16:19

24     Q.   Did you respond to that in any of these       11:16:22

25 meetings?                                              11:16:23

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    To that assertion? | 11:16:24 |
| 2 | Q.    Yeah. | 11:16:26 |
| 3 | A.    It's possible -- yeah, I think I made the | 11:16:39 |
| 4 | point that if someone, you know, retains loyalty to | 11:16:44 |
| 5 | someone who is pleading the Fifth in a situation like | 11:16:47 |
| 6 | this, it may not be the type of employees that we want | 11:16:50 |
| 7 | to retain anyway. | 11:16:52 |
| 8 | Q.    Was there any discussion about what happens | 11:17:00 |
| 9 | with respect to compensation if Mr. Levandowski is | 11:17:05 |
| 10 | removed from LiDAR and/or terminated?  When I say | 11:17:12 |
| 11 | "compensation," I mean both him and his team. | 11:17:15 |
| 12 | A.    Not at that moment in time. | 11:17:18 |
| 13 | Q.    Not at the May 15th? | 11:17:22 |
| 14 | A.    Right. | 11:17:22 |
| 15 | Q.    What impact was discussed that | 11:17:28 |
| 16 | would -- withdrawn. | 11:17:30 |
| 17 | This sentence here refers to, quote, "Board | 11:17:33 |
| 18 | then further discussed the impact on the company of | 11:17:39 |
| 19 | continuing to employ Mr. Levandowski." | 11:17:42 |
| 20 | What do you remember about the discussion of | 11:17:44 |
| 21 | what the impact on the company would be if he wasn't | 11:17:48 |
| 22 | terminated? | 11:17:49 |
| 23 | A.    If he wasn't terminated -- yeah, so this I | 11:17:52 |
| 24 | think relates to something we also discussed.  There | 11:17:55 |
| 25 | was -- it's kind of circular since we're still | 11:17:59 |

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | involved in that litigation at this very moment in | 11:18:03 |
| 2 | time, but it's fairly obvious that the judge had | 11:18:06 |
| 3 | strong opinions about our nontermination of Anthony. | 11:18:10 |
| 4 | And so you're making -- you're having discussions | 11:18:14 |
| 5 | about the risk of that calculation and also -- | 11:18:16 |
| 6 | MR. FLUMENBAUM:  I don't want you to discuss | 11:18:18 |
| 7 | anything legally -- | 11:18:21 |
| 8 | THE WITNESS:  I think that was discussed -- I | 11:18:23 |
| 9 | think that was discussed generally, but that would be | 11:18:26 |
| 10 | the line of reasoning. | 11:18:27 |
| 11 | BY MR. VERHOEVEN: | 11:18:27 |
| 12 | Q.    That there might be adverse legal | 11:18:32 |
| 13 | consequences? | 11:18:33 |
| 14 | A.    Sure. | 11:18:34 |
| 15 | Q.    Any other impacts discussed? | 11:18:36 |
| 16 | A.    It's possible we discussed negative corporate | 11:18:39 |
| 17 | image impact. | 11:18:42 |
| 18 | Q.    And what was discussed about that? | 11:18:44 |
| 19 | A.    I'd go back to what I stated earlier.  If the | 11:18:49 |
| 20 | general expectation of best practice in an area is to | 11:18:53 |
| 21 | terminate and you're not, it's going to infer | 11:18:57 |
| 22 | reflection to the external world on why you're acting | 11:19:01 |
| 23 | in a way that's inconsistent with best practice. | 11:19:04 |
| 24 | Q.    And by that you mean the internal world would | 11:19:08 |
| 25 | think that's not appropriate? | 11:19:11 |

Page  115

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| 1 | A. | External world. | 11:19:09 |
| 2 | Q. | External world? | |
| 3 | A. | Correct. | |
| 4 | Q. | Let me ask it so we get a clear record. | 11:19:12 |
| 5 | | By that statement, you mean that the external | 11:19:15 |
| 6 | | world would think that's not appropriate? | 11:19:18 |
| 7 | A. | Correct. | 11:19:18 |
| 8 | Q. | And that would have a negative impact on -- | 11:19:21 |
| 9 | A. | Could have, yes. | 11:19:22 |
| 10 | Q. | Let me finish the question. | 11:19:23 |
| 11 | | That would have a negative impact on the | 11:19:26 |
| 12 | | company's image? | 11:19:28 |
| 13 | | MR. FLUMENBAUM:  Objection as to form. | 11:19:29 |
| 14 | | THE WITNESS:  Yeah.  I would just state it in my | 11:19:32 |
| 15 | | own words, which is, it could be having a negative | 11:19:35 |
| 16 | | impact.  Hard to prove, but something that was of | 11:19:39 |
| 17 | | concern, yes. | 11:19:41 |
| 18 | | BY MR. VERHOEVEN: | 11:19:41 |
| 19 | Q. | Okay.  Anything else on the subject of the | 11:19:43 |
| 20 | | impact to the company to continue to employ | 11:19:46 |
| 21 | | Mr. Levandowski that you can recall? | 11:19:48 |
| 22 | A. | No. | 11:19:48 |
| 23 | Q. | The end result of this meeting was that the | 11:19:57 |
| 24 | | board decided that -- to not terminate him at that | 11:20:01 |
| 25 | | point in time; right? | 11:20:02 |

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   I believe that's correct.  I don't        11:20:04

 2    have -- there were several board meetings around this   11:20:07

 3    moment in time.  And eventually one of them, there was  11:20:09

 4    termination, not far from this date.  The only          11:20:16

 5    sequencing, as I said, that I'm certain of is that      11:20:19

 6    there was a board meeting where the committee was       11:20:23

 7    created.  And then at the very next board meeting, at   11:20:26

 8    the start of the meeting, Travis recommended            11:20:29

 9    terminating Anthony.                                    11:20:31

10        Q.   Before the special committee was set up?       11:20:36

11        A.   After.                                         11:20:37

12        Q.   Okay.                                          11:20:38

13        MR. VERHOEVEN:  Let's mark as Exhibit 914 minutes   11:20:49

14    of a meeting of board of directors of Uber dated May    11:20:53

15    22nd, 2017.                                             11:20:55

16             (Plaintiff's Exhibit 914 was marked.)          11:21:14

17    BY MR. VERHOEVEN:                                       11:21:14

18        Q.   Take a second and look at that.                11:21:16

19             My first question will be, can you identify    11:21:19

20    this document?                                          11:21:19

21        A.   This is the minutes of the May 22nd meeting    11:21:25

22    of Uber Technologies.                                   11:21:29

23        Q.   Before we get into the document, let me just   11:21:32

24    ask you:  Typically how often does the board meet for   11:21:38

25    Uber, the Uber board meet?                              11:21:41
```

Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1       A.    Prior to 2017, the Uber board met      11:21:50

 2   predominantly quarterly.                          11:21:53

 3       Q.    Once a quarter?                          11:21:54

 4       A.    Yes.                                     11:21:54

 5       Q.    And did that change in 2017?            11:21:57

 6       A.    Yes.                                     11:21:57

 7       Q.    Why?                                     11:21:59

 8       A.    There were numerous issues that were of 11:22:04

 9   importance that were impacting the company that   11:22:07

10   resulted in the board taking more frequent board  11:22:11

11   meetings, including the Waymo litigation.         11:22:14

12       Q.    Okay.  So this is -- this reflects the  11:22:18

13   minutes of a May 22 board meeting; right?         11:22:21

14       A.    Correct.                                 11:22:21

15       Q.    And is this the meeting in which the special  11:22:27

16   committee on the Waymo dispute was created?       11:22:30

17       A.    Correct.                                 11:22:30

18       Q.    You were at this meeting?               11:22:34

19       A.    It says I was by telephone.             11:22:36

20       Q.    Were you the one who suggested the creation  11:22:40

21   of a special committee?                           11:22:42

22       A.    That is my belief, yes.  The original -- 11:22:43

23       Q.    And we already talked about --           11:22:47

24       A.    -- idea for it, yes.                     11:22:47

25       Q.    Sorry about that.                        11:22:48
```

                                              Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | We already talked about the back-and-forth on | 11:22:52 |
| 2 | that discussion; right? | 11:22:53 |
| 3 | A.   Right. | 11:22:53 |
| 4 | Q.   Is there anything, looking at this document, | 11:22:56 |
| 5 | that you remember in addition to what you've already | 11:22:58 |
| 6 | talked about? | 11:22:59 |
| 7 | A.   No.   Simply that the appendix is the | 11:23:05 |
| 8 | resolution that was passed. | 11:23:08 |
| 9 | Q.   You see, in the paragraph under letter 1, the | 11:23:15 |
| 10 | second-to-last sentence says, "The board had a lengthy | 11:23:22 |
| 11 | discussion regarding the creation of such special | 11:23:25 |
| 12 | committee during which each member of the board | 11:23:28 |
| 13 | contributed"? | 11:23:29 |
| 14 | Do you see that? | 11:23:30 |
| 15 | A.   Yes. | 11:23:31 |
| 16 | Q.   Do you remember what any of these board | 11:23:39 |
| 17 | members said at this meeting? | 11:23:41 |
| 18 | A.   I don't remember a particular member having a | 11:23:56 |
| 19 | specific point of view other than my own.   There were | 11:23:59 |
| 20 | discussions that relate to the wording that ended up | 11:24:04 |
| 21 | in the proposition -- or in the resolution about | 11:24:07 |
| 22 | whether a committee should have the ability to take | 11:24:11 |
| 23 | action or direct action and whether it was appropriate | 11:24:15 |
| 24 | for a board to step into that role or not and whether | 11:24:20 |
| 25 | they were impeding on the rights of management in | 11:24:22 |

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | doing so.   And that has been part of the spirited | 11:24:27 |
| 2 | discussion around the back-and-forth on the | 11:24:29 |
| 3 | resolution. | 11:24:30 |
| 4 | Q.   Mr. Kalanick was against the committee having | 11:24:33 |
| 5 | the authority; correct? | 11:24:34 |
| 6 | A.   That is my recollection. | 11:24:36 |
| 7 | Q.   And the discussion was spirited? | 11:24:38 |
| 8 | A.   Yes. | 11:24:39 |
| 9 | Q.   What do you mean by that? | 11:24:42 |
| 10 | A.   People had strong points of view, including | 11:24:47 |
| 11 | myself. | 11:24:50 |
| 12 | Q.   Was a vote taken? | 11:24:56 |
| 13 | A.   I believe this was past unanimously.   That's | 11:25:05 |
| 14 | my recollection.   Does this say? | 11:25:08 |
| 15 | MR. FLUMENBAUM:   Can I guide him to where it says? | 11:25:11 |
| 16 | MR. VERHOEVEN:   Yes. | 11:25:13 |
| 17 | MR. FLUMENBAUM:   It says in the first paragraph. | 11:25:15 |
| 18 | THE WITNESS:   Yeah, unanimous.   That was my . . . | 11:25:18 |
| 19 | BY MR. VERHOEVEN: | 11:25:18 |
| 20 | Q.   So why did Mr. Kalanick -- he was a board | 11:25:23 |
| 21 | member at the time, Mr. Kalanick; right? | 11:25:24 |
| 22 | A.   Correct. | 11:25:24 |
| 23 | Q.   Why did he vote for it? | 11:25:27 |
| 24 | A.   You would have to ask him.   I did state | 11:25:29 |
| 25 | earlier that eventually he came around and agreed to | 11:25:34 |

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   this.                                                11:25:44

2        Q.    So this special committee was authorized to   11:25:50

3   investigate the issues relating to the Waymo dispute,   11:25:54

4   make findings and recommendations to the board, among   11:25:58

5   other things?                                         11:25:59

6        A.    Yes.                                       11:25:59

7        Q.    Did the special committee make findings?   11:26:05

8        A.    As we were getting the special committee set   11:26:15

9   up, employing counsel for this -- yeah, I mean,       11:26:20

10  eventually there were several meetings of this special   11:26:23

11  committee.  I've left the board, so I don't know       11:26:27

12  what's continuing to happen there.  And obviously it   11:26:30

13  relates to this litigation, but, yes, there have been   11:26:32

14  lots of meetings of the committee.                    11:26:35

15       Q.    So by this date, you had left the board?   11:26:44

16       A.    No.                                        11:26:44

17       Q.    Okay.                                      11:26:45

18       A.    No.  No.  No.  But this was just -- the    11:26:49

19  committee hadn't met.  The committee was formed.      11:26:52

20       Q.    I see.                                     11:26:52

21            By the time that any findings or            11:26:55

22  recommendations -- well, let me put it a different    11:26:58

23  way.                                                  11:26:59

24            No findings and recommendations had been made   11:27:01

25  before you left the board, or had they?              11:27:05

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A.    I'd say -- well, I mean, none . . . the    11:27:16

2    initial impetus of pushing to have this created was to    11:27:22

3    ensure that we made the right decision around    11:27:25

4    termination.    And prior to this committee getting off    11:27:29

5    the ground and acting in the next board meeting,    11:27:33

6    Travis recommended that action.    Since then, this    11:27:38

7    committee went on and existed and met frequently to    11:27:44

8    discuss this very litigation, but all those    11:27:47

9    conversations would be privileged.    11:27:48

10    MR. VERHOEVEN:  Our thing went down.  How long    11:27:52

11    have we been going?    11:27:54

12    THE VIDEOGRAPHER:  An hour and six minutes.    11:27:56

13    MR. VERHOEVEN:  Well, let's just keep going then.    11:28:01

14    BY MR. VERHOEVEN:    11:28:01

15    Q.    You said Travis made that recommendation in    11:28:03

16    your last answer.  I'm just not clear what you meant    11:28:06

17    by that.    11:28:07

18    A.    At the next board meeting after this, at the    11:28:10

19    beginning of the meeting, Travis started by    11:28:12

20    recommending the termination of Anthony, before the    11:28:16

21    committee got off and going.    11:28:18

22    Q.    I see.    11:28:18

23    So it's your belief that the board -- or    11:28:21

24    excuse me.    11:28:22

25    Is it your belief that the special committee    11:28:28

Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | never made formal findings and recommendations? | 11:28:31 |
| 2 | A. No, I didn't say that. | 11:28:33 |
| 3 | Q. Okay. What you're saying is that the | 11:28:36 |
| 4 | decision on termination had been made before they made | 11:28:39 |
| 5 | any findings and recommendations? | 11:28:41 |
| 6 | A. Correct. | 11:28:41 |
| 7 | Q. And by the time you left, they hadn't made | 11:28:45 |
| 8 | any formal findings and recommendations otherwise? | 11:28:52 |
| 9 | A. I don't have any answer -- I don't have | 11:28:53 |
| 10 | anything to convey on that that would be outside of | 11:28:56 |
| 11 | privilege. | 11:28:58 |
| 12 | Q. Well, yes or no, did they make any findings | 11:29:00 |
| 13 | and recommendations? | 11:29:01 |
| 14 | A. "Findings" is a very generic term. | 11:29:07 |
| 15 | Q. I'm just reading off of the -- | 11:29:09 |
| 16 | A. Yeah. Yeah. I'm certain that they made | 11:29:12 |
| 17 | findings. | 11:29:13 |
| 18 | Q. Did they make those in writing? | 11:29:17 |
| 19 | A. I do not know. | 11:29:19 |
| 20 | Q. How was the members of the special committee | 11:29:42 |
| 21 | chosen? | 11:29:45 |
| 22 | A. There's a common refrain in many of these | 11:29:53 |
| 23 | committees that the three people that ended up on them | 11:29:59 |
| 24 | were the same, which were me and David Bonderman and | 11:30:02 |
| 25 | Arianna Huffington, which were the same of some of the | |

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    other committees.  And it was a result of deemed          11:30:08

2    independence and, I think, availability.                  11:30:13

3              And so two of the board members were            11:30:16

4    cofounders -- early employees and/or cofounders,          11:30:21

5    Garrett and Ryan.  So they typically weren't              11:30:25

6    considered independent for these types of committees.     11:30:27

7         Q.   Okay.

8         A.   Yasir had just joined, but lives in Saudi       11:30:31

9    Arabia so it's difficult for him to be present.  And      11:30:36

10   so the end result of those things is that most of         11:30:39

11   these committees had those three people, including        11:30:43

12   myself.                                                   11:30:44

13        Q.   Okay.  As part of the special committee, did    11:30:58

14   you conduct any interviews with Uber employees or         11:31:03

15   officers?                                                 11:31:05

16        A.   I'm not aware of the committee conducting       11:31:12

17   direct interviews, no.                                    11:31:15

18        Q.   You see -- if you would turn to page with the   11:31:19

19   503 on the back of the control number.                    11:31:25

20             If you look at that, "The board expressly       11:31:30

21   delegates to the special committee the authority to       11:31:33

22   conduct interviews"?                                      11:31:34

23        A.   Understood.                                     11:31:35

24        Q.   Does that refresh your recollection?            11:31:37

25        A.   No.  No.  I understand that they had the        11:31:39

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    authority.   I'm unaware of any direct interviews          11:31:43

2    conducted by the committee to an employee.                 11:31:48

3        Q.    Under Item 1 --                                  11:31:50

4        A.    I mean, other than legal conversations, where    11:31:53

5    you're asking a lawyer about the case, but not             11:31:56

6    interviewing a non-legal executive for the purpose of      11:32:02

7    investigation, not direct.                                 11:32:04

8        Q.    Okay.   What about interviews of Stroz?          11:32:09

9        A.    I'm unaware of any.                              11:32:12

10       Q.    And under Item 1?                                11:32:15

11       A.    I'm unaware of any -- of any direct from a       11:32:19

12   committee member.                                          11:32:20

13       Q.    Did somebody interview Stroz?                    11:32:25

14       A.    I don't know.   Possible.                        11:32:26

15       Q.    And then just to follow up on your earlier       11:32:28

16   answer, on Item 1 on this page, the committee retained     11:32:33

17   Shearman & Sterling?                                       11:32:38

18       A.    Correct.                                         11:32:39

19       Q.    As a result of this meeting, I take it the       11:32:59

20   decision to terminate Mr. Levandowski has still not        11:33:03

21   been made?                                                 11:33:04

22       A.    That is correct.                                 11:33:05

23       Q.    As of this time, May 22, 2017, was the board     11:33:18

24   aware of the veracity of the claim of whether              11:33:22

25   Mr. Levandowski had improperly downloaded files?           11:33:28

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  Objection. | 11:33:29 |
| 2 | MR. BRILLE:  Objection. | 11:33:29 |
| 3 | MR. FLUMENBAUM:  You want to exclude counsel from | 11:33:31 |
| 4 | any discussions with the board?  I can't let him | 11:33:39 |
| 5 | answer that question as worded. | 11:33:43 |
| 6 | MR. VERHOEVEN:  So you're instructing him on just | 11:33:45 |
| 7 | general statements -- | 11:33:47 |
| 8 | MR. FLUMENBAUM:  No, on privilege. | 11:33:49 |
| 9 | BY MR. VERHOEVEN: | 11:33:49 |
| 10 | Q.   As of May 22, had the board received -- this | 11:34:08 |
| 11 | is a yes or no. | 11:34:08 |
| 12 | As of May 22, had the board received any | 11:34:13 |
| 13 | report on the veracity of the allegation that | 11:34:16 |
| 14 | Mr. Levandowski had downloaded 14,000 files? | 11:34:25 |
| 15 | MR. FLUMENBAUM:  I'm going to instruct him not to | 11:34:27 |
| 16 | answer that question as worded, based on privilege. | 11:34:33 |
| 17 | MR. VERHOEVEN:  Is there a way I could word it | 11:34:36 |
| 18 | that you would say is not privileged? | 11:34:38 |
| 19 | MR. FLUMENBAUM:  Other than either documents | 11:34:44 |
| 20 | received that are still claimed to be privileged in | 11:34:48 |
| 21 | this situation, did the board receive any reports from | 11:34:54 |
| 22 | anyone other than counsel, and then your . . . | 11:34:58 |
| 23 | MR. VERHOEVEN:  Okay. | 11:34:59 |
| 24 | BY MR. VERHOEVEN: | |
| 25 | Q.   Can you answer that question? | 11:35:00 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  I think you have to rephrase it. | 11:35:03 |
| 2 | MR. VERHOEVEN:  I don't want to make a mistake. | 11:35:05 |
| 3 | Let me reread what you said then. | 11:35:07 |
| 4 | BY MR. VERHOEVEN: | 11:35:07 |
| 5 | Q.   Other than either documents received that are | 11:35:14 |
| 6 | still claimed to be privileged in this situation, did | 11:35:17 |
| 7 | the board receive any reports from anyone other than | 11:35:20 |
| 8 | counsel with respect to the download of the 14,000 | 11:35:25 |
| 9 | files? | 11:35:26 |
| 10 | A.   No. | 11:35:27 |
| 11 | Q.   And this is a yes or no. | 11:35:33 |
| 12 | Did the board receive a report from counsel | 11:35:36 |
| 13 | on that subject matter? | 11:35:38 |
| 14 | MR. FLUMENBAUM:  Instruction not to answer. | 11:35:41 |
| 15 | BY MR. VERHOEVEN: | 11:35:41 |
| 16 | Q.   As of May 22, did the board have any | 11:35:48 |
| 17 | information, any factual information, not legal | 11:35:52 |
| 18 | advice, but factual information about the allegation | 11:35:57 |
| 19 | that Mr. Levandowski had downloaded 14,000 files? | 11:36:01 |
| 20 | MR. FLUMENBAUM:  Instruction not to answer. | 11:36:03 |
| 21 | BY MR. VERHOEVEN: | 11:36:03 |
| 22 | Q.   As of this date, did the board know one way | 11:36:15 |
| 23 | or the other whether Stroz had documents that | 11:36:24 |
| 24 | Mr. Levandowski had taken from Google? | 11:36:27 |
| 25 | MR. FLUMENBAUM:  Instruction not to answer. | 11:36:29 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    BY MR. VERHOEVEN:                                    11:36:29

2        Q.   Did you know one way or the other?          11:36:31

3        MR. FLUMENBAUM:   Instruction not to answer.     11:36:53

4    BY MR. VERHOEVEN:                                    11:36:53

5        Q.   If you had known that it was true that      11:36:55

6    Mr. Levandowski downloaded 14,000 Google files and  11:37:01

7    then went to Otto and was purchased by Uber, would you  11:37:06

8    have done anything about that?                       11:37:08

9        MR. BRILLE:   Object to form.                    11:37:09

10       MR. FLUMENBAUM:   You may answer that question as  11:37:11

11   worded.                                              11:37:12

12       THE WITNESS:   When would I have known that?     11:37:16

13   BY MR. VERHOEVEN:

14       Q.   I'm saying, if you would've known that --

15       A.   At what point in time would I have known    11:37:18

16   that?                                                11:37:19

17       Q.   Any point in time.                          11:37:21

18       A.   Well, if I had known that, I would have     11:37:24

19   objected to the transaction, if I had known that at  11:37:29

20   the date of that transaction.                        11:37:31

21       Q.   Okay.   So if you had known that -- if you had  11:37:33

22   known the results of the due diligence report, would  11:37:37

23   you have objected to the transaction?                11:37:39

24       MR. BRILLE:   Object to form.                    11:37:47

25       MR. FLUMENBAUM:   We're making assumptions as to  11:37:55

                                             Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | what's in the due diligence report, so -- is there a | 11:37:58 |
| 2 | way you can rephrase that question? | 11:38:02 |
| 3 | MR. VERHOEVEN:  I don't think so.  I'm asking the | 11:38:06 |
| 4 | witness -- I'll ask it again. | 11:38:08 |
| 5 | BY MR. VERHOEVEN: | 11:38:08 |
| 6 | Q.   Without revealing the substance of the | 11:38:11 |
| 7 | diligence report, if you had known about it at the | 11:38:16 |
| 8 | time of the transaction, would you have objected to | 11:38:19 |
| 9 | moving forward with the transaction? | 11:38:22 |
| 10 | MR. BRILLE:  Object to form. | 11:38:23 |
| 11 | MR. FLUMENBAUM:  Would you agree that follows our | 11:38:25 |
| 12 | non-waiver -- | 11:38:26 |
| 13 | MR. VERHOEVEN:  Yes. | 11:38:28 |
| 14 | THE WITNESS:  Yes. | 11:38:32 |
| 15 | MR. VERHOEVEN:  And if I ask why, I assume I'll | 11:38:40 |
| 16 | get an instruction? | 11:38:41 |
| 17 | MR. FLUMENBAUM:  You will until that report is | 11:38:42 |
| 18 | released. | 11:38:44 |
| 19 | MR. VERHOEVEN:  Okay. | 11:38:44 |
| 20 | BY MR. VERHOEVEN: | |
| 21 | Q.   Was that -- withdrawn. | 11:38:48 |
| 22 | Would you have considered that to be material | 11:38:52 |
| 23 | information with respect to whether to approve the | 11:38:57 |
| 24 | transaction or not? | 11:38:59 |
| 25 | MR. FLUMENBAUM:  Same -- not going to argue | 11:39:03 |

Page 129

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | waiver? | 11:39:03 |
| 2 | MR. VERHOEVEN:  Correct. | 11:39:04 |
| 3 | MR. BRILLE:  Object to form. | 11:39:05 |
| 4 | MR. FLUMENBAUM:  You can answer yes or no. | 11:39:07 |
| 5 | THE WITNESS:  Yes. | 11:39:08 |
| 6 | BY MR. VERHOEVEN: | 11:39:08 |
| 7 | Q.   What was your reaction when you saw -- when | 11:39:32 |
| 8 | you read the Stroz report with respect to the fact | 11:39:37 |
| 9 | that it was not disclosed to the board at the time of | 11:39:39 |
| 10 | the acquisition?  Were you upset? | 11:39:43 |
| 11 | MR. BRILLE:  I'll object to form. | 11:39:46 |
| 12 | MR. FLUMENBAUM:  I'll object to the form also. | 11:39:49 |
| 13 | Again I'll let him answer that without claim of | 11:39:55 |
| 14 | waiver. | 11:39:56 |
| 15 | MR. VERHOEVEN:  Yes. | 11:39:56 |
| 16 | THE WITNESS:  Yes. | 11:39:58 |
| 17 | BY MR. VERHOEVEN: | 11:39:58 |
| 18 | Q.   Why? | 11:40:00 |
| 19 | MR. BRILLE:  Same objections. | 11:40:01 |
| 20 | MR. VERHOEVEN:  I'm asking for his reaction. | 11:40:03 |
| 21 | MR. FLUMENBAUM:  So you got -- you got his answer. | 11:40:06 |
| 22 | He can't answer more than that without going into | 11:40:09 |
| 23 | substance. | 11:40:10 |
| 24 | BY MR. VERHOEVEN: | 11:40:10 |
| 25 | Q.   Did you call up Mr. Levandowski after reading | 11:40:13 |

Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | it and accost him about it? | 11:40:15 |
| 2 | I'm sorry.  Let me withdraw that. | 11:40:16 |
| 3 | Did you call him -- | 11:40:18 |
| 4 | MR. FLUMENBAUM:  Maybe we should take a break. | 11:40:20 |
| 5 | MR. VERHOEVEN:  Just one more. | 11:40:22 |
| 6 | BY MR. VERHOEVEN: | 11:40:22 |
| 7 | Q.   Did you call up Mr. Kalanick or e-mail him or | 11:40:25 |
| 8 | something, in any way communicate with him, to accost | 11:40:29 |
| 9 | him about the fact that this was not disclosed prior | 11:40:32 |
| 10 | to the board making the decision to acquire? | 11:40:37 |
| 11 | MR. BRILLE:  Object to form. | 11:40:38 |
| 12 | THE WITNESS:  I don't know if there was -- I don't | 11:40:40 |
| 13 | know if I called him directly or specifically. | 11:40:43 |
| 14 | BY MR. VERHOEVEN: | 11:40:43 |
| 15 | Q.   Did you have a conversation? | 11:40:45 |
| 16 | A.   With anybody? | 11:40:47 |
| 17 | Q.   With Mr. Kalanick. | 11:40:50 |
| 18 | A.   Yeah, I don't know -- I don't know if I had a | 11:40:53 |
| 19 | direct . . . I just don't remember. | 11:40:56 |
| 20 | Q.   You don't remember expressing any anger to | 11:41:00 |
| 21 | him about it? | 11:41:04 |
| 22 | A.   It's possible.  There's a lot going on at the | 11:41:16 |
| 23 | time. | 11:41:16 |
| 24 | Q.   You were angry about it, weren't you? | 11:41:19 |
| 25 | A.   I was. | 11:41:20 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And it's possible you communicated that to | 11:41:22 |
| 2 | Mr. Levandowski -- or to Mr. Kalanick? | 11:41:25 |
| 3 | A.   It's possible, but I don't have -- | 11:41:26 |
| 4 | MR. FLUMENBAUM:  Not Levandowski. | 11:41:27 |
| 5 | THE WITNESS:  Right. | 11:41:28 |
| 6 | I don't have specific recollection of having | 11:41:31 |
| 7 | done that, but it's possible. | 11:41:33 |
| 8 | BY MR. VERHOEVEN: | 11:41:33 |
| 9 | Q.   It's more than likely; right? | 11:41:35 |
| 10 | A.   I don't know. | 11:41:37 |
| 11 | MR. FLUMENBAUM:  Objection.  Objection. | 11:41:38 |
| 12 | MR. VERHOEVEN:  Do you want to take a break? | 11:41:42 |
| 13 | MR. FLUMENBAUM:  Sure.  Let's take a short break. | 11:41:44 |
| 14 | THE VIDEOGRAPHER:  This marks the end of DVD No. 2 | 11:41:47 |
| 15 | in the deposition of William Gurley.  We're off the | 11:41:49 |
| 16 | record at 11:41 a.m. | 11:41:51 |
| 17 | (Recess taken.) | 11:41:51 |
| 18 | (Plaintiff's Exhibit 915 was marked.) | 11:52:45 |
| 19 | THE VIDEOGRAPHER:  Back on the record. | 11:52:53 |
| 20 | This the beginning of DVD No. 3, and the time | 11:52:56 |
| 21 | is 11:52 a.m. | 11:52:58 |
| 22 | BY MR. VERHOEVEN: | 11:52:58 |
| 23 | Q.   By May of 2017, were you aware that some | 11:53:07 |
| 24 | investors of Uber wanted Mr. Kalanick to resign as | 11:53:13 |
| 25 | CEO? | 11:53:14 |

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   By May . . . | 11:53:27 |
| 2 | Q.   That's three months ago. | 11:53:30 |
| 3 | A.   Yeah.  I'm just trying to remember when some | 11:53:33 |
| 4 | of those conversations first started. | 11:53:36 |
| 5 | I can't -- I can't be specific about whether | 11:53:40 |
| 6 | by May.  Certainly around that time frame people had | 11:53:46 |
| 7 | started to ask that question. | 11:53:48 |
| 8 | Q.   And who are those people? | 11:53:56 |
| 9 | A.   Well, a lot of -- I think many journalists | 11:53:59 |
| 10 | had begun to ask that question.  So you'd see | 11:54:02 |
| 11 | editorials in the Financial Times, New York Times, | 11:54:08 |
| 12 | like there's a lot of -- I don't know exactly when | 11:54:10 |
| 13 | they ran.  I think they were around that time frame. | 11:54:12 |
| 14 | But I don't -- I don't recall a specific May | 11:54:20 |
| 15 | conversation with a specific investor about it. | 11:54:24 |
| 16 | Q.   Well, do you recall that you -- at around | 11:54:27 |
| 17 | that time, not specific date or anything -- that you | 11:54:31 |
| 18 | had conversations with investors on that topic? | 11:54:34 |
| 19 | A.   It's possible.  I mean, I -- it may even be | 11:54:40 |
| 20 | probable.  I just don't -- I don't -- I don't know | 11:54:41 |
| 21 | about at that moment in time who I -- exactly who I | 11:54:44 |
| 22 | talked to about that topic. | 11:54:46 |
| 23 | Q.   What do you remember about first -- to the | 11:54:49 |
| 24 | extent that you can make it chronological, can you | 11:54:54 |
| 25 | tell me what you remember first about that topic? | 11:54:58 |

Page 133

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.    Well, there are a number of instances that     11:55:00
 2   had happened in the company in 2017, and that had led     11:55:05
 3   to a general perception in the public that that might     11:55:09
 4   be the right answer, which --                            11:55:11
 5        Q.    Okay.
 6        A.    -- which, as I mentioned, was discussed in     11:55:16
 7   some of the leading financial publications around the    11:55:19
 8   globe.                                                    11:55:20
 9           And naturally that's going to cause -- you       11:55:23
10   know when something has that much open discussion,       11:55:27
11   it's going to lead to other people discussing what the   11:55:31
12   right action is one way or another in terms of           11:55:34
13   ensuring the long-term health and success of the         11:55:39
14   organization.                                            11:55:40
15        Q.    Okay.  And after these articles came out,     11:55:44
16   were you contacted by any investors about the subject?   11:55:48
17        A.    I was contacted frequently by investors about 11:55:54
18   the state of the overall company.  And as the company    11:55:58
19   ran into these multiple issues, the frequency of those   11:56:05
20   inquiries would go up.  And it -- it wasn't uncommon      11:56:10
21   for that question to come up around that time frame,     11:56:14
22   but certainly a little bit later for sure.               11:56:17
23        Q.    Okay.  Maybe June?                            11:56:19
24        A.    Yeah.                                         11:56:19
25        Q.    Okay.                                         11:56:20
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A.    Yeah.

2    Q.    And did those investors have the view that    11:56:26

3    Mr. Kalanick should not -- should be removed from the    11:56:28

4    position of CEO?    11:56:30

5    A.    Some.   Some did.   Some -- not all.    11:56:34

6    Q.    Okay.   Do you remember any investors that did    11:56:36

7    have that view?    11:56:38

8    A.    Certainly the investors that signed on to the    11:56:45

9    letter that was presented to Mr. Kalanick in Chicago    11:56:47

10   came to that point of view.    11:56:50

11   Q.    Okay.   Any others that you remember?    11:56:52

12   A.    Yes, there are others.    11:57:09

13   Q.    Can you remember them?    11:57:11

14   MR. FLUMENBAUM:   If it's a nonprivileged    11:57:16

15   conversation.   We'll -- we'll invoke whatever the    11:57:20

16   confidentiality is in terms of the release of the    11:57:25

17   transcript.    11:57:25

18        But if it's nonprivileged, I believe you have    11:57:28

19   to respond to that.    11:57:31

20   THE WITNESS:   There were -- there were    11:57:40

21   other -- well, there -- Uber has some investors that    11:57:44

22   are -- typically invest in public companies, and so    11:57:51

23   they're more mutual funds, that kind of thing.    11:57:54

24        And several of them had expressed that -    11:57:58

25   either -- either that they were certain that that was    11:58:00

Page 135

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | the right answer or they were questioning whether that | 11:58:03 |
| 2 | was the right answer.  And I heard that, also, from | 11:58:07 |
| 3 | some of the seed investors. | 11:58:09 |
| 4 | BY MR. VERHOEVEN: | 11:58:09 |
| 5 | Q.   Which mutual funds? | 11:58:15 |
| 6 | This is all protected.  It's not going to go | 11:58:22 |
| 7 | anywhere. | 11:58:23 |
| 8 | THE WITNESS:  (Directed to deponent's counsel:) | |
| 9 | What does that mean, it would be redacted? | 11:58:26 |
| 10 | MR. VERHOEVEN:  No.  It's -- by court order it | 11:58:28 |
| 11 | cannot be disclosed. | 11:58:30 |
| 12 | MR. BRILLE:  Is it necessary to disclose, Charlie? | 11:58:31 |
| 13 | I'll defer to you.  I'm just saying it -- it seems | 11:58:33 |
| 14 | very highly sensitive. | 11:58:35 |
| 15 | MR. VERHOEVEN:  I'm asking the question. | 11:58:35 |
| 16 | THE WITNESS:  It is sensitive. | 11:58:37 |
| 17 | MR. VERHOEVEN:  I'm asking the question. | 11:58:38 |
| 18 | MR. FLUMENBAUM:  We will make sure that this is | 11:58:42 |
| 19 | totally redacted. | 11:58:45 |
| 20 | MR. BRILLE:  Yes.  We will rule it the highest | 11:58:46 |
| 21 | protection available under the court order. | 11:58:49 |
| 22 | THE WITNESS:  Glade Brook, Wellington, Capital | 11:58:53 |
| 23 | Group. | 11:58:54 |
| 24 | On the seed side, David Sacks, Antonio | 11:59:03 |
| 25 | Gracias. | 11:59:09 |

Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       I don't know that it's limited to that, but      11:59:11

2  those are the ones that come to mind.      11:59:13

3  BY MR. VERHOEVEN:      11:59:13

4       Q.   Can you think of anybody else?      11:59:15

5       MR. FLUMENBAUM:   Other than the ones you --      11:59:22

6       THE WITNESS:   Yeah.   All the ones on --      11:59:24

7       MR. VERHOEVEN:   Yeah.   I mean, I'm just probing      11:59:27

8  his recollection.      11:59:28

9       MR. FLUMENBAUM:   Right.   But he gave you two.   He      11:59:29

10  gave you the group that signed the letter.      11:59:30

11       MR. VERHOEVEN:   I know what he gave me.      11:59:32

12       MR. FLUMENBAUM:   Okay.   I just want to make sure.      11:59:33

13       THE WITNESS:   Fidelity is on the letter, but they      11:59:36

14  were of that opinion.      11:59:37

15  BY MR. VERHOEVEN:      11:59:37

16       Q.   Can you recall any others?      11:59:45

17       A.   I'm trying.   I -- that's all -- that's all I      11:59:56

18  remember at this time.      11:59:56

19       Q.   Was one of the reasons why these folks were      12:00:10

20  in favor of removing Mr. Kalanick from his position as      12:00:15

21  CEO the Waymo litigation?      12:00:18

22       A.   Yes.      12:00:19

23       Q.   Did you hear that from multiple investors?      12:00:29

24       A.   The letter that was presented that was      12:00:41

25  authored by five investor groups included that      12:00:45

Page 137

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | comment.  So I guess the de facto answer is yes, | 12:00:49 |
| 2 | because there were multiple parties to that letter, | 12:00:52 |
| 3 | and everyone signed on to that letter. | 12:00:54 |
| 4 | Q.   That was a significant reason for the | 12:00:57 |
| 5 | conclusion in that letter that Mr. Kalanick should be | 12:00:59 |
| 6 | removed from CEO? | 12:01:01 |
| 7 | MR. FLUMENBAUM:  Objection as to form. | 12:01:03 |
| 8 | THE WITNESS:  It's -- it's significant and one of | 12:01:06 |
| 9 | many. | 12:01:08 |
| 10 | BY MR. VERHOEVEN: | 12:01:08 |
| 11 | Q.   You felt that the way that the acquisition | 12:01:18 |
| 12 | was handled was an example of company mismanagement, | 12:01:23 |
| 13 | right? | 12:01:24 |
| 14 | MR. BRILLE:  Object to form. | 12:01:31 |
| 15 | MR. FLUMENBAUM:  You've -- this is in -- you've | 12:01:31 |
| 16 | already -- we already covered this area before.  I | 12:01:36 |
| 17 | mean . . . | |
| 18 | MR. VERHOEVEN:  Are you instructing him? | 12:01:37 |
| 19 | MR. FLUMENBAUM:  I -- I'm not -- I'm not -- are | 12:01:39 |
| 20 | you trying to get privileged communications?  I'm | 12:01:42 |
| 21 | not . . . | |
| 22 | MR. VERHOEVEN:  No.  Can he answer? | 12:01:45 |
| 23 | MR. FLUMENBAUM:  You can answer it if you . . . | 12:01:47 |
| 24 | THE WITNESS:  Yes.  I -- I believe it had | 12:01:49 |
| 25 | the -- had there been more disclosures around the | 12:01:55 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    acquisition, that we may not have done the          12:01:58

 2    acquisition.  And I believe that had we terminated  12:02:01

 3    Anthony, upon him pleading the Fifth, that that would 12:02:05

 4    have been a much better interest for the company as a 12:02:08

 5    whole.                                               12:02:09

 6    BY MR. VERHOEVEN:                                    12:02:09

 7        Q.    Did other investors share that view?      12:02:13

 8        A.    I don't recall having that specific       12:02:17

 9    conversation about that specific topic with people  12:02:20

10    outside of the group.                               12:02:22

11        Q.    The group that signed the letter?         12:02:24

12        A.    The group that signed the letter.  The group 12:02:27

13    that signed the letter authored it and bought into all 12:02:30

14    of the points of view that are expressed in the     12:02:32

15    letter.                                             12:02:32

16        MR. VERHOEVEN:  Let's get the June 20 letter.  12:02:41

17            (Plaintiff's Exhibit 916 was marked.)      12:03:08

18        THE REPORTER:  This is marked Exhibit 916.  There 12:03:08

19    was a prior exhibit marked before we went back on the 12:03:08

20    record.                                             12:03:08

21        MR. VERHOEVEN:  Yeah.  Let's do 915 before we go 12:03:11

22    to this.  I forgot about that one.                  12:03:12

23    BY MR. VERHOEVEN:                                   12:03:12

24        Q.    So put that aside, Mr. Gurley.            12:03:15

25        A.    Oh, put that aside?                       12:03:18
```

Page 139

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FLUMENBAUM:  This is 916? | 12:03:20 |
| 2 | BY MR. VERHOEVEN: | 12:03:20 |
| 3 | Q.   Yes.  But just one housekeeping matter here. | |
| 4 | Take a look at 915. | 12:03:34 |
| 5 | I didn't hand it out, did I? | 12:03:37 |
| 6 | A.   No, sir. | |
| 7 | Q.   Can you identify Exhibit 915? | 12:03:50 |
| 8 | A.   915, board minutes from May 25th of Uber | 12:03:55 |
| 9 | Technologies. | 12:03:55 |
| 10 | Q.   And you attended this meeting? | 12:03:57 |
| 11 | A.   Yes. | 12:04:00 |
| 12 | Q.   What happened at this meeting? | 12:04:04 |
| 13 | A.   My -- | 12:04:14 |
| 14 | Q.   The last meeting, just for your information, | 12:04:16 |
| 15 | was May 22? | 12:04:18 |
| 16 | A.   Yeah.  My -- my -- my best recollection is | 12:04:20 |
| 17 | this is the meeting that Travis recommended | 12:04:21 |
| 18 | terminating Anthony Levandowski. | 12:04:24 |
| 19 | Q.   Under Item 1, the only thing that's not | 12:04:33 |
| 20 | redacted by counsel for Waymo says: | 12:04:37 |
| 21 | "The board discussed various employees and | 12:04:40 |
| 22 | certain contractual matters related to the Waymo | 12:04:42 |
| 23 | litigation." | 12:04:43 |
| 24 | Do you see that? | 12:04:44 |
| 25 | A.   Did you mean counsel of Uber? | 12:04:46 |

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.    Yeah.  What did I say?  Counsel for Uber.    12:04:50

2    A.    Okay.  What's the question?    12:04:52

3    Q.    It says here:    12:04:53

4          "The board discussed various employees and    12:04:55

5    certain contractual matters related to the Waymo    12:04:58

6    litigation."    12:04:59

7          Do you see that?    12:05:00

8    A.    Um-hum.    12:05:00

9    Q.    What are the -- what is this reference to    12:05:04

10   "certain contractual matters"?    12:05:06

11       MR. FLUMENBAUM:  Again, to the extent that your    12:05:09

12   testimony would involve privileged communications --    12:05:12

13       THE WITNESS:  Right.    12:05:13

14       MR. FLUMENBAUM:  -- you're not at liberty to    12:05:14

15   discuss that.    12:05:15

16       THE WITNESS:  I would say this specifically    12:05:19

17   related to legal discussions that was privileged.    12:05:24

18       MR. VERHOEVEN:  Uber's counsel didn't redact this    12:05:26

19   sentence.    12:05:27

20       MR. BRILLE:  That's because the sentence itself is    12:05:32

21   not privileged.  But perhaps conversations that relate    12:05:33

22   to these topics may be privileged.    12:05:36

23   BY MR. VERHOEVEN:    12:05:36

24       Q.    Was there discussion about how a decision to    12:05:40

25   terminate may affect various employees within Uber?    12:05:44

Page 141

1    A.   I don't know if there was a discussion on          12:05:53

2  this date at that moment in time.   Eventually there        12:05:56

3  were discussions about that.                                12:05:58

4    Q.   And can you summarize those for me?                  12:06:01

5    MR. BRILLE:   And I would just say, Mr. Gurley, to        12:06:04

6  the extent that they don't include legal advice.            12:06:12

7    THE WITNESS:   Yeah.   Just a general concern about       12:06:14

8  retention, on the topic we had talked about before.         12:06:17

9         There were questions about whether certain           12:06:18

10  employees would feel like their individual packages        12:06:24

11  would be impacted by this -- by this action, and would     12:06:29

12  that then affect retention.                                12:06:31

13  BY MR. VERHOEVEN:                                           12:06:31

14    Q.   And is that because their individual packages       12:06:34

15  were conditioned on milestones?                            12:06:37

16    A.   It related to that, yes.                            12:06:39

17    Q.   And so the gist of it would be if               12:06:42

18  Mr. Levandowski is gone, they're not going to make         12:06:45

19  their milestones --                                        12:06:46

20    A.   Might that impact, yes.                             12:06:48

21    Q.   Yes.   Let me finish the question, though.          12:06:50

22    A.   Okay.                                               12:06:52

23    Q.   So the gist of the discussion was if                12:06:52

24  Mr. Levandowski is gone, that might impact the             12:06:54

25  milestones; and, hence, the compensation of these         12:06:57

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    employees?                                                    12:06:58

2        A.    Yes.   And I don't -- I just want -- yes, but      12:07:00

3    I want to clarify.                                            12:07:02

4             I remember that being a general discussion at       12:07:04

5    some point in time.   I can't ascertain that that's the      12:07:07

6    exact one referenced on that date.                           12:07:09

7        Q.    Well, this sentence concerns that subject          12:07:11

8    matter; right?                                               12:07:12

9        A.    Potentially.                                       12:07:15

10       Q.    Do you have any reason to believe that it          12:07:18

11   wasn't on the date that --                                   12:07:19

12       A.    No.                                                12:07:21

13       Q.    -- the decision was made to terminate             12:07:21

14   Mr. Levandowski?                                             12:07:22

15       A.    No.                                                12:07:22

16       Q.    Okay.   All right.                                 12:07:27

17            Now, let's go to 915.                               12:07:29

18       MR. FLUMENBAUM:   916?                                   12:07:31

19       MR. VERHOEVEN:   916.                                    12:07:33

20       THE WITNESS:   Yeah.                                     12:07:34

21   BY MR. VERHOEVEN:                                            12:07:34

22       Q.    Can you identify this document?                    12:07:37

23       A.    Yeah.   This was a letter that was authored by     12:07:41

24   the investors in Uber that are mentioned in the first        12:07:45

25   paragraph, first sentence, to express their point of         12:07:50

                                                    Page 143

1    view to Travis about a number of issues that had been        12:07:55

2    developing over the course of 2017.                          12:07:58

3         MR. BRILLE:  I'm going to note my objection to          12:07:59

4    this exhibit, to the extent it is unsigned.  And it is       12:08:03

5    unclear to me, at least, what this document is.              12:08:06

6         THE WITNESS:  Okay.                                     12:08:09

7    BY MR. VERHOEVEN:                                            12:08:09

8         Q.   Did someone in this group send this exhibit        12:08:19

9    to Mr. Kalanick?                                             12:08:21

10        A.   It was presented to him by two of the -- two       12:08:25

11   of my partners at Benchmark.                                 12:08:28

12        Q.   Which partners?                                    12:08:29

13        A.   Matt Cohler and Peter Fenton.                      12:08:32

14        Q.   Was it presented in person?                        12:08:38

15        A.   Yes.                                                12:08:38

16        Q.   Where?                                             12:08:40

17        A.   In a hotel in Chicago.                             12:08:42

18        Q.   Did Mr. Kalanick have any advance indication       12:08:51

19   that this was going to be presented to him?                  12:08:57

20        A.   There had been a number of one-on-one              12:09:06

21   conversations that related to trying to find solutions       12:09:13

22   to move past some of the many issues outlined here.          12:09:17

23             Some of that related to a COO search.              12:09:20

24             Some of those related to various other             12:09:24

25   alternatives, like coaching and that kind of thing.          12:09:28

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Some of those had been had, not just with me,   12:09:32

2   but with Matt and Trav- -- and Travis.   12:09:35

3      But there was not a -- there was nothing that   12:09:42

4   said, "Hey, we're bringing" -- there was not a   12:09:45

5   communication that said, "Hey, we're about to bring   12:09:49

6   you this letter."   12:09:50

7      It was, like, "We need to desperately sit   12:09:53

8   down and talk," and then the letter was presented.   12:09:56

9      Q.   Were you aware of the contents of this letter   12:09:58

10   before it was presented?   12:10:00

11      A.   Yes.   12:10:00

12      Q.   Did you review it?   12:10:01

13      A.   Yes.   12:10:01

14      Q.   In the third paragraph of Exhibit 916 it   12:10:06

15   starts with:   12:10:06

16      "A series of recent revelations, however,   12:10:10

17   continues to affect Uber's business and put the   12:10:13

18   mission at risk."   12:10:15

19      Do you see that?   12:10:16

20      A.   Um-hum.   12:10:17

21      Q.   And later in the paragraph there's a   12:10:18

22   reference to the "ongoing Waymo trade secret   12:10:20

23   litigation."   12:10:23

24      Do you see that?   12:10:24

25      A.   Correct.  Yes.   12:10:24

Page  145

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.    Is that one of the series of revelations              12:10:27

2    referred to in the first sentence?                         12:10:30

3    A.    Yes.                                                  12:10:30

4    Q.    So the litigation in your view, or in the            12:10:37

5    view of the groups referenced in this letter, put          12:10:42

6    Uber's mission at risk; fair?                              12:10:46

7    MR. FLUMENBAUM:   The letter speaks for itself.            12:10:50

8    THE WITNESS:   I would -- I would just say that the        12:10:53

9    totality of the events is what's referenced in the         12:10:57

10   first sentence.                                            12:10:59

11       You and I had already discussed that -- right          12:11:01

12   before the break -- the thing that -- specifically         12:11:04

13   with regard to Waymo -- that -- that could have been       12:11:08

14   avoided, is -- could have not done the deal and you        12:11:13

15   could have made that determination -- termination          12:11:14

16   effort sooner, both of which I think would have been       12:11:19

17   way better for the company, in light of where we stand     12:11:22

18   today.                                                     12:11:23

19       And so --                                              12:11:24

20   BY MR. VERHOEVEN:                                          12:11:24

21       Q.   In addition --                                    12:11:25

22   MR. BRILLE:  Wait, wait.                                   12:11:27

23   MR. FLUMENBAUM:  Hold it.  Let him finish, please.         12:11:27

24   You interrupted him.                                       12:11:29

25       Go ahead, Bill.                                        12:11:30

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       THE WITNESS:  Anyway, so my recollection and view          12:11:33

2   of the point of that sentence relates to those                12:11:35

3   decisions that were made by him.                              12:11:38

4   BY MR. VERHOEVEN:                                             12:11:38

5       Q.   In addition to the "you could haves" that you        12:11:41

6   just gave, another "you could have" is you could have         12:11:44

7   disclosed the diligence report, right, before the             12:11:47

8   acquisition?                                                  12:11:48

9       A.   Sure.  Yes, that is true.                            12:11:49

10      Q.   Okay.  The last sentence of the paragraph            12:11:51

11  says:                                                         12:11:51

12           "The ongoing Waymo trade secret litigation,"         12:11:54

13  and then it refers to it as "extremely serious."              12:11:57

14           Do you see that?                                     12:11:59

15      A.   Yes.                                                 12:11:59

16      Q.   What did you mean by -- or what did Benchmark        12:12:04

17  mean by "extremely serious"?                                  12:12:07

18      A.   Well, this was authored by the group.  So --        12:12:10

19  and edited by the group.  So it was the point of view         12:12:15

20  from everybody.                                               12:12:15

21           I -- I think I'm already on record in this           12:12:18

22  deposition as saying that I take, you know, litigation        12:12:19

23  from a company like the size of Google very seriously.        12:12:24

24  So I think this is consistent with that.                      12:12:27

25      Q.   Any other explanation of --                          12:12:29

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   No. | 12:12:30 |
| 2 | Q.   Did the group believe that the allegations | 12:12:43 |
| 3 | were extremely serious? | 12:12:48 |
| 4 | MR. BRILLE:   Object to form. | 12:12:49 |
| 5 | MR. FLUMENBAUM:   Objection as to form. | 12:12:56 |
| 6 | THE WITNESS:   I -- I don't recall a discussion | 12:12:58 |
| 7 | specifically about whether the allegations are -- were | 12:13:01 |
| 8 | serious. | 12:13:02 |
| 9 | I think any litigation of this size or scope | 12:13:06 |
| 10 | is obviously -- if it could be avoided it would be | 12:13:09 |
| 11 | much better for the company.   We'd all be better off | 12:13:12 |
| 12 | if -- if we weren't focused on this and could be | 12:13:16 |
| 13 | focused on serving the customers. | 12:13:21 |
| 14 | BY MR. VERHOEVEN: | 12:13:21 |
| 15 | Q.   The next paragraph, take a look at it. | 12:13:23 |
| 16 | A.   Yep. | 12:13:25 |
| 17 | Q.   The -- in the middle of that paragraph | 12:13:29 |
| 18 | there's a sentence that starts with "The public | 12:13:32 |
| 19 | perception." | 12:13:32 |
| 20 | Do you see that? | 12:13:34 |
| 21 | A.   Um-hum. | 12:13:34 |
| 22 | Q.   I'll read it into the record. | 12:13:36 |
| 23 | "The public perception is that Uber | 12:13:38 |
| 24 | fundamentally lacks ethical and moral values." | 12:13:42 |
| 25 | Do you see that? | 12:13:44 |

Page 148

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yep. | 12:13:45 |
| 2 | Q.    And your understanding that this perception | 12:13:50 |
| 3 | of lacking -- withdrawn. | 12:13:54 |
| 4 | This reference to "lacks ethical and moral | 12:13:58 |
| 5 | values" in this sentence is, in part, a reference to | 12:14:01 |
| 6 | the Waymo litigation, correct? | 12:14:03 |
| 7 | MR. BRILLE:  Object to form. | 12:14:07 |
| 8 | THE WITNESS:  I don't think it's a specific | 12:14:08 |
| 9 | reflection on that.  I think there -- as -- there are | 12:14:14 |
| 10 | numerous other issues that had been going on in the | 12:14:18 |
| 11 | company. | 12:14:18 |
| 12 | And I think if you read those articles that I | 12:14:21 |
| 13 | mentioned that were calling for the board to ask him | 12:14:25 |
| 14 | to resign, that created this public perception, you | 12:14:31 |
| 15 | would see much more references around that to other | 12:14:34 |
| 16 | things. | 12:14:36 |
| 17 | BY MR. VERHOEVEN: | 12:14:36 |
| 18 | Q.    Based on what you know now, including your | 12:14:39 |
| 19 | review of the diligence report, don't you believe that | 12:14:45 |
| 20 | the conduct of Mr. Kalanick and his team, with respect | 12:14:50 |
| 21 | to the Otto acquisition, reflected a lack of ethical | 12:14:58 |
| 22 | and moral values? | 12:15:01 |
| 23 | MR. BRILLE:  Object to form. | 12:15:08 |
| 24 | THE WITNESS:  I don't know.  For me, that | 12:15:12 |
| 25 | particular thing is really a question of materiality | 12:15:15 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | and whether you feel a responsibility of disclosure, | 12:15:22 |
| 2 | which gets into understanding the criticality of | 12:15:28 |
| 3 | something, whether or not you're withholding | 12:15:32 |
| 4 | information that could be critical in that | 12:15:35 |
| 5 | decision-making process. | 12:15:36 |
| 6 | I can't speak to the reasoning for them | 12:15:42 |
| 7 | making those decisions; and, therefore, then apply | 12:15:45 |
| 8 | some type of label like this. | 12:15:49 |
| 9 | I certainly think, as is expressed later | 12:15:52 |
| 10 | in -- in our legal action, that it -- that it crossed | 12:15:56 |
| 11 | a line of violating fraud and fiduciary duty. | 12:16:02 |
| 12 | And so to the extent that you want to wrap | 12:16:04 |
| 13 | those into those words, I guess you could, but I | 12:16:07 |
| 14 | don't -- I -- I wouldn't tie that specifically to that | 12:16:11 |
| 15 | label. | 12:16:11 |
| 16 | That's not what we were thinking about when | 12:16:13 |
| 17 | we wrote that.  This says the "public perception is," | 12:16:17 |
| 18 | and I think that public perception, which is well | 12:16:20 |
| 19 | documented in a bunch of articles, was driven more by | 12:16:23 |
| 20 | other activities. | 12:16:24 |
| 21 | BY MR. VERHOEVEN: | 12:16:24 |
| 22 | Q.   You believe that Mr. Kalanick committed fraud | 12:16:26 |
| 23 | on the board of directors by failing to disclose the | 12:16:30 |
| 24 | facts underlying the Otto acquisition, right? | 12:16:34 |
| 25 | A.   Yes. | 12:16:35 |

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. BRILLE:  Object to form. | 12:16:36 |
| 2 | THE WITNESS:  Yes. | 12:16:37 |
| 3 | BY MR. VERHOEVEN: | 12:16:37 |
| 4 | Q.   And you would agree that that would not be | 12:16:39 |
| 5 | ethical or moral, to commit such a fraud? | 12:16:42 |
| 6 | MR. BRILLE:  Same objection. | 12:16:44 |
| 7 | THE WITNESS:  I think that's a fair statement. | 12:16:45 |
| 8 | This sentence talks about the public perception of | 12:16:48 |
| 9 | Uber, and I don't think that relates to that action | 12:16:51 |
| 10 | because the public doesn't have a perception of that | 12:16:54 |
| 11 | act. | 12:16:56 |
| 12 | THE REPORTER:  You have microphones on, gentlemen. | 12:17:28 |
| 13 | I just wanted to let you know. | |
| 14 | MR. VERHOEVEN:  I was just asking if there was | |
| 15 | anything else in the letter. | |
| 16 | BY MR. VERHOEVEN: | 12:17:28 |
| 17 | Q.   You agree with the statements in this letter; | 12:17:32 |
| 18 | right? | 12:17:32 |
| 19 | A.   I do. | 12:17:33 |
| 20 | Q.   Do you have any knowledge of the substance of | 12:17:39 |
| 21 | the conversation in Chicago between your two partners | 12:17:42 |
| 22 | and Mr. Kalanick? | 12:17:45 |
| 23 | A.   Only what I heard secondhand, yes.  I wasn't | 12:17:51 |
| 24 | present -- I wasn't dialed in. | 12:17:56 |
| 25 | Q.   Did your two partners report to you what | 12:18:00 |

Page 151

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | happened at the meeting? | 12:18:01 |
| 2 | A. Yes. | |
| 3 | Q. What did they say? | 12:18:03 |
| 4 | A. I'll start at a high level. Like there was a | 12:18:10 |
| 5 | lot of conversations back and forth. | 12:18:12 |
| 6 | There were discussions of -- you know, there | 12:18:24 |
| 7 | was a lot of discussion about the details of these | 12:18:27 |
| 8 | recommendations and how they would manifest themselves | 12:18:30 |
| 9 | in an agreement. | 12:18:31 |
| 10 | There were edits of that back and forth in a | 12:18:36 |
| 11 | separate document that he eventually signed. | 12:18:41 |
| 12 | And there are questions about disclosures, | 12:18:47 |
| 13 | what we would do or not do if he agreed to these | 12:18:52 |
| 14 | things, or refrain from doing. | 12:19:00 |
| 15 | That's the general recollection. | 12:19:06 |
| 16 | Q. And that all happened at the one meeting? | 12:19:09 |
| 17 | A. I think there were a series of meetings over | 12:19:11 |
| 18 | an extended period of time. | 12:19:13 |
| 19 | Q. Did -- did Mr. Kalanick agree to resign as | 12:19:18 |
| 20 | CEO as part of that first meeting? | 12:19:22 |
| 21 | A. I don't -- when you say "first meeting," I | 12:19:29 |
| 22 | think they met and -- and broke up and met and broke | 12:19:35 |
| 23 | up and met and broke up several times. | 12:19:36 |
| 24 | So I don't have enough information to know | 12:19:40 |
| 25 | whether he had agreed on that one point in the very | 12:19:43 |

Page 152

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | first meeting or not.  I just know that -- where they | 12:19:46 |
| 2 | got to by the end of the day. | 12:19:47 |
| 3 | Q.    Was it announced to the public that he was | 12:19:50 |
| 4 | resigning that day? | 12:19:52 |
| 5 | A.    I don't believe there was an official | 12:19:53 |
| 6 | announcement that day. | 12:19:56 |
| 7 | Q.    What about the following day? | 12:19:59 |
| 8 | A.    I don't know when -- I don't have a specific | 12:20:05 |
| 9 | date on when Uber announced this. | 12:20:08 |
| 10 | (Discussion off the record.) | 12:20:22 |
| 11 | BY MR. VERHOEVEN: | 12:20:22 |
| 12 | Q.    All right.  I'm going to mark as Exhibit 917 | 12:20:25 |
| 13 | a Benchmark document from your firm that we just | 12:20:30 |
| 14 | received this morning. | 12:20:31 |
| 15 | A.    Okay. | 12:20:32 |
| 16 | Q.    For the record, it's Benchmark-Waymo-39 | 12:20:35 |
| 17 | through 105. | 12:20:43 |
| 18 | (Plaintiff's Exhibit 917 was marked.) | 12:21:01 |
| 19 | BY MR. VERHOEVEN: | 12:21:01 |
| 20 | Q.    It's a compilation of documents, it appears, | 12:21:04 |
| 21 | and it's got a -- on the front page, if you look at | 12:21:10 |
| 22 | the top right -- | 12:21:11 |
| 23 | MR. FLUMENBAUM:  May I have a copy, please? | 12:21:14 |
| 24 | MR. VERHOEVEN:  Do we have copies? | 12:21:16 |
| 25 | MR. FLUMENBAUM:  Thank you. | 12:21:18 |

Page 153

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. VERHOEVEN:  I think that's all we have. | 12:21:20 |
| 2 | Hey, we got them by e-mail this morning.  If | 12:21:28 |
| 3 | you have a com- -- if you have a complaint you should | 12:21:28 |
| 4 | talk to the person who produced it. | 12:21:32 |
| 5 | MR. FLUMENBAUM:  Well, just so the record is | 12:21:35 |
| 6 | clear, we produced it by e-mail at the request of | 12:21:39 |
| 7 | Waymo and -- | 12:21:42 |
| 8 | MR. VERHOEVEN:  While we're here in | 12:21:44 |
| 9 | Morrison & Foerster. | 12:21:45 |
| 10 | MR. FLUMENBAUM:  The subpoena was returnable today | 12:21:48 |
| 11 | at -- it was returnable today at your -- at your | 12:21:51 |
| 12 | offices. | 12:21:52 |
| 13 | We produced it by e-mail at your request in a | 12:21:56 |
| 14 | timely fashion, and these documents are part of, I | 12:22:02 |
| 15 | believe, Exhibit A.  It's all part of the public | 12:22:04 |
| 16 | filing in Delaware, so it's not something that you | 12:22:09 |
| 17 | didn't have before. | 12:22:12 |
| 18 | MR. VERHOEVEN:  Okay.  So you'll represent this is | 12:22:13 |
| 19 | part of a public filing in Delaware? | 12:22:16 |
| 20 | MR. FLUMENBAUM:  I believe it was.  I have to take | 12:22:18 |
| 21 | a look at it, but I believe it was.  I didn't check on | 12:22:22 |
| 22 | this particular one, but it's my understanding. | 12:22:26 |
| 23 | BY MR. VERHOEVEN: | 12:22:26 |
| 24 | Q.   Mr. Gurley, do you have an understanding of | 12:22:30 |
| 25 | what your counsel referenced to with respect to this | 12:22:33 |

Page 154

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | public filing in Delaware? | 12:22:37 |
| 2 | What's he talking about? | 12:22:38 |
| 3 | A.   I presume he's talking about the lawsuit that | 12:22:43 |
| 4 | was filed between Benchmark and Mr. Kalanick. | 12:22:47 |
| 5 | Q.   Okay.  So with the understanding that these | 12:22:49 |
| 6 | are exhibits in connection with that suit? | 12:22:53 |
| 7 | A.   I -- | |
| 8 | Q.   That's what counsel is representing; right? | 12:22:56 |
| 9 | A.   Okay. | 12:22:58 |
| 10 | MR. VERHOEVEN:  Are you representing that, | 12:23:00 |
| 11 | Counsel? | 12:23:01 |
| 12 | MR. FLUMENBAUM:  I believe that that's what this | 12:23:03 |
| 13 | reflects. | 12:23:04 |
| 14 | BY MR. VERHOEVEN: | 12:23:04 |
| 15 | Q.   Okay.  Let's turn to Exhibit A. | 12:23:06 |
| 16 | A.   Okay. | |
| 17 | Q.   And my first question is:  Can you identify | 12:23:13 |
| 18 | this document? | 12:23:14 |
| 19 | A.   I believe this is the letter that was signed | 12:23:19 |
| 20 | with -- by Travis at the end of the day of that | 12:23:22 |
| 21 | meeting. | 12:23:23 |
| 22 | Q.   Okay.  So you had some negotiation back and | 12:23:29 |
| 23 | forth and then this got signed? | 12:23:31 |
| 24 | A.   Correct. | 12:23:31 |
| 25 | Q.   So does that refresh your recollection that | 12:23:34 |

Page 155

| | | |
|---|---|---|
| 1 | he resigned on the same day as the meeting? | 12:23:40 |
| 2 | A.   Yeah, yeah.  I -- I wasn't trying to say he | 12:23:42 |
| 3 | didn't.  You -- you had said in the first meeting, and | 12:23:45 |
| 4 | they met and broke, just like we've been doing, met | 12:23:49 |
| 5 | and broke.  So I was just -- it was just a question of | 12:23:51 |
| 6 | the definition of "first." | 12:23:52 |
| 7 | So it did happen all in one day. | 12:23:55 |
| 8 | Q.   Okay. | |
| 9 | A.   It was over a series of long -- many hours, I | 12:23:59 |
| 10 | think. | 12:23:59 |
| 11 | Q.   Okay.  And here he says, second-to-the-last | 12:24:00 |
| 12 | paragraph: | 12:24:02 |
| 13 | "I will make a public announcement of the | 12:24:04 |
| 14 | foregoing no later than 5:00 p.m. PDT Thursday, June | 12:24:08 |
| 15 | 22, 2017." | |
| 16 | Does that refresh your recollection as to | 12:24:13 |
| 17 | when it was announced? | 12:24:15 |
| 18 | A.   Well, this was his commitment to announce.  I | 12:24:18 |
| 19 | don't know exactly when it was announced, which was | 12:24:21 |
| 20 | your question. | |
| 21 | Q.   You don't have any reason to believe it | 12:24:24 |
| 22 | wasn't announced, do you? | 12:24:25 |
| 23 | A.   It was clearly announced. | 12:24:28 |
| 24 | MR. VERHOEVEN:  What number was that? | 12:24:40 |
| 25 | THE REPORTER:  That one was 17, 917. | 12:24:43 |

Page 156

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. VERHOEVEN:  All right.  Coming up to the end | 12:25:04 |
| 2 | here right on schedule. | 12:25:12 |
| 3 | Let's mark as 917 -- | 12:25:15 |
| 4 | MR. FLUMENBAUM:  918. | 12:25:16 |
| 5 | MR. VERHOEVEN:  -- 918 a draft of a verified | 12:25:23 |
| 6 | complaint, Benchmark Capital Partners versus Travis | 12:25:31 |
| 7 | Kalanick and Uber Technologies. | 12:25:34 |
| 8 | (Plaintiff's Exhibit 918 was marked.) | 12:25:43 |
| 9 | MR. FLUMENBAUM:  I believe you said draft, as | 12:25:45 |
| 10 | opposed to a verified complaint. | 12:25:49 |
| 11 | MR. VERHOEVEN:  Let's see.  Was it signed?  It has | 12:25:56 |
| 12 | E-signatures on it.  So you'll represent this was | 12:26:00 |
| 13 | filed? | 12:26:00 |
| 14 | MR. FLUMENBAUM:  I believe it was.  That's my | 12:26:03 |
| 15 | understanding of what was produced. | 12:26:04 |
| 16 | MR. VERHOEVEN:  Okay.  So with that clarification, | 12:26:06 |
| 17 | can you identify Exhibit 918? | 12:26:09 |
| 18 | MR. FLUMENBAUM:  Can I have a copy, please? | 12:26:11 |
| 19 | Thank you. | 12:26:13 |
| 20 | THE WITNESS:  I believe this is the lawsuit we | 12:26:24 |
| 21 | just discussed. | 12:26:26 |
| 22 | BY MR. VERHOEVEN: | 12:26:26 |
| 23 | Q.   Did you approve the filing of this lawsuit? | 12:26:28 |
| 24 | A.   I did. | 12:26:29 |
| 25 | Q.   Did you review the complaint before it was | 12:26:30 |

Page 157

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | filed? | 12:26:31 |
| 2 | A.   Yes. | 12:26:31 |
| 3 | Q.   Do you agree with what the statements are in | 12:26:34 |
| 4 | the complaint? | 12:26:35 |
| 5 | A.   I do. | 12:26:35 |
| 6 | Q.   I'd direct your attention to page 5 of -- I'm | 12:26:55 |
| 7 | sorry -- to paragraph 5 of the complaint. | 12:27:01 |
| 8 | Do you see it says: | 12:27:21 |
| 9 | "Kalanick intentionally concealed and failed | 12:27:29 |
| 10 | to disclose his gross mismanagement and other | 12:27:32 |
| 11 | misconduct at Uber." | 12:27:34 |
| 12 | Do you see that? | 12:27:38 |
| 13 | A.   Yes. | 12:27:40 |
| 14 | Q.   And then it continues: | 12:27:41 |
| 15 | "These matters included, among others, | 12:27:45 |
| 16 | Kalanick's personal involvement in causing Uber to | 12:27:49 |
| 17 | acquire a self-driving vehicle start-up that, | 12:27:53 |
| 18 | according to a confidential report, not disclosed to | 12:27:56 |
| 19 | Benchmark at the time (the 'Stroz report'), allegedly | 12:28:04 |
| 20 | harbored trade secrets stolen from a competitor." | 12:28:08 |
| 21 | Do you see that? | 12:28:09 |
| 22 | A.   Yes. | 12:28:09 |
| 23 | Q.   And that's a reference to the Waymo | 12:28:12 |
| 24 | litigation and the facts that -- let me rephrase. | 12:28:22 |
| 25 | That's referring to the Otto acquisition? | 12:28:27 |

Page 158

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Correct. | 12:28:27 |
| 2 | MR. FLUMENBAUM:  Objection as to form. | 12:28:30 |
| 3 | MR. BRILLE:  Objection as to form. | 12:28:31 |
| 4 | THE WITNESS:  Sorry. | 12:28:31 |
| 5 | MR. FLUMENBAUM:  You can answer. | 12:28:32 |
| 6 | BY MR. VERHOEVEN: | 12:28:32 |
| 7 | Q.   And Mr. Kalanick's personal conduct, with | 12:28:38 |
| 8 | respect to the Otto acquisition, constituted gross | 12:28:44 |
| 9 | mismanagement and misconduct. | 12:28:45 |
| 10 | That's what you're saying here; right? | 12:28:47 |
| 11 | A.   Yes. | 12:28:47 |
| 12 | Q.   And the specific actions that this is | 12:28:56 |
| 13 | referencing to that Mr. Kalanick undertook, are those | 12:29:01 |
| 14 | the actions you've already testified to or is there | 12:29:03 |
| 15 | anything in addition to that? | 12:29:05 |
| 16 | A.   I think we've already discussed it. | 12:29:09 |
| 17 | Q.   Okay.  I direct your attention to paragraph | 12:29:31 |
| 18 | 6. | 12:29:45 |
| 19 | And the second -- take a second and review | 12:29:56 |
| 20 | that. | 12:29:57 |
| 21 | A.   (Witness reviews document.) | |
| 22 | Q.   Do you see at the start it says: | 12:30:12 |
| 23 | "Kalanick knew Benchmark never would have | 12:30:14 |
| 24 | approved," and then it goes on, "if Benchmark had | 12:30:20 |
| 25 | known the truth about Kalanick's prior conduct." | 12:30:24 |

Page 159

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Do you see that? | 12:30:24 |
| 2 | A.   Yes. | 12:30:25 |
| 3 | Q.   And this refers, in part, to your prior | 12:30:30 |
| 4 | testimony that if Benchmark had known about the | 12:30:35 |
| 5 | information contained in the Stroz report, it would | 12:30:37 |
| 6 | never have agreed to this amendment, right? | 12:30:45 |
| 7 | MR. BRILLE:  Object to the form. | 12:30:46 |
| 8 | MR. FLUMENBAUM:  Object to the form. | 12:30:47 |
| 9 | You can answer. | |
| 10 | BY MR. VERHOEVEN: | |
| 11 | Q.   Well, you're correct.  Let me rephrase. | 12:30:51 |
| 12 | This refers to your prior testimony that | 12:30:54 |
| 13 | Benchmark never would have approved the transaction | 12:30:56 |
| 14 | had it been aware of the Stroz report, correct? | 12:31:02 |
| 15 | MR. BRILLE:  Same objection. | 12:31:03 |
| 16 | MR. FLUMENBAUM:  Objection as to form, but you | 12:31:05 |
| 17 | may -- | 12:31:06 |
| 18 | THE WITNESS:  The only clarification I would make | 12:31:08 |
| 19 | is that there are many other matters, also. | 12:31:10 |
| 20 | BY MR. VERHOEVEN: | |
| 21 | Q.   Yeah. | |
| 22 | A.   But this is one of those.  Yes, correct. | 12:31:14 |
| 23 | Q.   But it's your contention that Benchmark would | 12:31:18 |
| 24 | not have approved the amended certificate of | 12:31:18 |
| 25 | incorporation referenced here, or the voting | 12:31:22 |

Page 160

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | agreement, if it had known the real facts behind the | 12:31:25 |
| 2 | Otto acquisition, isn't it? | 12:31:28 |
| 3 |     MR. BRILLE:  Object to form. | 12:31:29 |
| 4 |     MR. FLUMENBAUM:  You may answer. | 12:31:30 |
| 5 |     THE WITNESS:  Along with other things.  But, yes. | 12:31:32 |
| 6 | That was one of -- of many other things. | 12:31:36 |
| 7 | BY MR. VERHOEVEN: | 12:31:36 |
| 8 |     Q.   The next sentence says: | 12:31:46 |
| 9 |        "Kalanick also understood that these matters, | 12:31:49 |
| 10 | once revealed, would likely force him to resign as | 12:31:53 |
| 11 | Uber's CEO." | 12:31:54 |
| 12 |        Do you see that? | 12:31:55 |
| 13 |     A.   I do. | 12:31:56 |
| 14 |     Q.   And one of those matters is the facts | 12:32:00 |
| 15 | underlying the Otto acquisition, correct? | 12:32:02 |
| 16 |     MR. BRILLE:  Object to form. | 12:32:04 |
| 17 |     MR. FLUMENBAUM:  You may answer. | 12:32:05 |
| 18 |     THE WITNESS:  Yes, one of those facts. | 12:32:08 |
| 19 | BY MR. VERHOEVEN: | 12:32:08 |
| 20 |     Q.   And throughout this sentence, if it refers to | 12:32:21 |
| 21 | these matters, your answer would be the same, that | 12:32:24 |
| 22 | included in the matters would be the Otto transaction? | 12:32:28 |
| 23 |     MR. FLUMENBAUM:  Objection as to form.  But . . . | 12:32:32 |
| 24 | BY MR. VERHOEVEN: | |
| 25 |     Q.   I mean, you can see the next -- okay.  I was | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | trying to shorten it. | 12:32:35 |
| 2 | The next sentence says: | 12:32:36 |
| 3 | "Kalanick, therefore, knowingly concealed | 12:32:38 |
| 4 | these matters from Benchmark and Uber's board to | 12:32:43 |
| 5 | obtain, for his personal benefit . . ." | 12:32:47 |
| 6 | And then it goes on.  Do you see that? | 12:32:49 |
| 7 | A.   Yes. | 12:32:51 |
| 8 | Q.   "These matters" reference, in part, the Otto | 12:32:55 |
| 9 | acquisition? | 12:32:56 |
| 10 | A.   In part. | 12:32:57 |
| 11 | Q.   And the testimony you gave about it earlier | 12:32:59 |
| 12 | today? | 12:33:00 |
| 13 | A.   That is correct. | 12:33:00 |
| 14 | Q.   Okay.  Why would the -- in your view, why | 12:33:12 |
| 15 | would the facts underlying the Otto acquisition, if | 12:33:16 |
| 16 | known by Benchmark and the board, likely have forced | 12:33:21 |
| 17 | Travis Kalanick to resign? | 12:33:24 |
| 18 | MR. BRILLE:  Object to form. | 12:33:27 |
| 19 | MR. FLUMENBAUM:  Objection to form.  But again, | 12:33:28 |
| 20 | you can't disclose any of the specifics that are in | 12:33:32 |
| 21 | the Stroz report. | 12:33:34 |
| 22 | THE WITNESS:  Understood. | 12:33:39 |
| 23 | So one, just reiterating, like, there were | 12:33:46 |
| 24 | multiple incidents that led us to this conclusion and | 12:33:50 |
| 25 | assess this belief in this lawsuit. | 12:33:54 |

Page 162

| | | |
|---|---|---|
| 1 | With respect to the Otto acquisition, there's | 12:33:57 |
| 2 | actually more detail later in the complaint.  But it's | 12:34:00 |
| 3 | become public knowledge, not involving the Stroz | 12:34:05 |
| 4 | report, that at the time the board was asked to | 12:34:09 |
| 5 | approve this, that -- that Travis and other members of | 12:34:13 |
| 6 | the management team had knowledge that there were five | 12:34:16 |
| 7 | disks that were in Anthony's possession, and that he | 12:34:23 |
| 8 | said there was Google information on those disks.  So | 12:34:25 |
| 9 | that's now in the public record. | 12:34:29 |
| 10 | When you look at the -- we've already been | 12:34:32 |
| 11 | through it.  But you look at the deal, and the fact | 12:34:35 |
| 12 | that so much of it weighed on him and the fact that | 12:34:39 |
| 13 | there were large indemnity provisions put aside | 12:34:45 |
| 14 | specifically for him, I don't know of a way you could | 12:34:50 |
| 15 | possibly present that to a board and say that this was | 12:34:53 |
| 16 | clean diligence and -- and that be okay.  Like, I -- I | 12:35:02 |
| 17 | can't fathom that. | 12:35:05 |
| 18 | BY MR. VERHOEVEN: | |
| 19 | Q.   When you referred to "him," you're referring | 12:35:08 |
| 20 | to Mr. Levandowski, right, in that answer? | 12:35:10 |
| 21 | MR. BRILLE:  Object to form. | 12:35:13 |
| 22 | THE WITNESS:  It's in the public record that -- | 12:35:15 |
| 23 | that the Uber executives were aware -- I'll -- I'll | 12:35:17 |
| 24 | try not to use pronouns -- were aware that Anthony | 12:35:21 |
| 25 | Levandowski had the five disks. | 12:35:24 |

Page 163

```
 1            When -- when I was talking about -- you know,    12:35:26

 2    this is the largest recipient of the proceeds from the   12:35:32

 3    acquisition and the leader of the group and the one      12:35:38

 4    that stands to benefit the most from the                 12:35:40

 5    indemnification.  So calling the diligence clean, when   12:35:45

 6    you have this fact, is a -- is misrepresentation, you    12:35:53

 7    know, from my point of view.                             12:35:57

 8    BY MR. VERHOEVEN:                                        12:35:57

 9        Q.   Okay.  Thank you.                               12:35:58

10            And why do you think Mr. Kalanick knowingly      12:36:16

11    concealed those issues?                                  12:36:18

12        MR. FLUMENBAUM:  Objection to form.                  12:36:22

13        MR. BRILLE:  Objection to form.                      12:36:24

14    BY MR. VERHOEVEN:                                        12:36:24

15        Q.   Well, let me read the complaint.  Paragraph     12:36:25

16    6:                                                       12:36:30

17            "Kalanick, therefore, knowingly concealed        12:36:30

18    these matters from Benchmark and Uber's board."          12:36:34

19            And then it goes on.  Do you see that?           12:36:34

20        A.   I do.                                           12:36:35

21        Q.   Why do you think he did?                        12:36:36

22        A.   I'd be speculating as to his intent.  I don't   12:36:40

23    know.                                                    12:36:40

24        Q.   Well, it says here:                             12:36:40

25            "For his personal benefit, the unilateral        12:36:47
```

Page 164

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | right to pack the board with three additional | 12:36:50 |
| 2 | directors of his choosing." | |
| 3 | You stand by that statement; right? | 12:36:52 |
| 4 | A.   I do. | 12:36:53 |
| 5 | Q.   Any other reasons? | 12:36:55 |
| 6 | A.   I -- I -- I'd be guessing that -- what his | 12:37:02 |
| 7 | intentions were. | 12:37:03 |
| 8 | Q.   Did you ever talk to Mr. Kalanick about why | 12:37:05 |
| 9 | he concealed the facts underlying the Otto | 12:37:08 |
| 10 | transaction? | 12:37:09 |
| 11 | A.   I have not. | 12:37:10 |
| 12 | Q.   What about with other executive management at | 12:37:14 |
| 13 | Uber? | 12:37:30 |
| 14 | A.   Well, not outside of conversations that were | 12:37:34 |
| 15 | privileged with the -- with the legal team. | 12:37:36 |
| 16 | Q.   I direct your attention to paragraph 33. | 12:38:05 |
| 17 | It's on page 15 of Exhibit 918. | 12:38:08 |
| 18 | MR. FLUMENBAUM:  I'm sorry.  Hold on. | 12:38:10 |
| 19 | Thank you. | 12:38:11 |
| 20 | BY MR. VERHOEVEN: | 12:38:11 |
| 21 | Q.   Are you ready for questions? | 12:38:27 |
| 22 | A.   Yes. | 12:38:27 |
| 23 | Q.   Is this the place where you testified earlier | 12:38:30 |
| 24 | the deal -- the details of the Otto transaction were | 12:38:35 |
| 25 | set forth in more detail, this section entitled -- | 12:38:44 |

Page 165

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes, this section.  That's fair.  Correct. | 12:38:46 |
| 2 | Q.   You've referenced there's a -- I'm sorry. | 12:39:07 |
| 3 | The complaint references: | 12:39:12 |
| 4 | "Kalanick praised Levandowski as one of the | 12:39:15 |
| 5 | world's leading autonomous engineers and an | 12:39:20 |
| 6 | entrepreneur with a real sense of urgency. | 12:39:24 |
| 7 | "Kalanick further described Levandowski as | 12:39:26 |
| 8 | his brother from another mother." | 12:39:30 |
| 9 | The allegation is -- and your belief is -- | 12:39:34 |
| 10 | that he was saying all that, but withholding the | 12:39:37 |
| 11 | information he had from the Stroz investigation; | 12:39:41 |
| 12 | right? | 12:39:41 |
| 13 | MR. BRILLE:  Object to form. | 12:39:44 |
| 14 | MR. FLUMENBAUM:  Object to form.  You can try to | 12:39:46 |
| 15 | answer that. | 12:39:49 |
| 16 | THE WITNESS:  These are -- these are taken from -- | 12:39:50 |
| 17 | from -- as you can see, from public statements that he | 12:39:53 |
| 18 | made. | 12:39:54 |
| 19 | His praise for Anthony in these public venues | 12:39:59 |
| 20 | is consistent with what he presented at the board | 12:40:03 |
| 21 | level, and so there's no inconsistency here. | 12:40:06 |
| 22 | I -- and as you -- as you assert, he did not | 12:40:12 |
| 23 | disclose these other details, you know.  And I -- and | 12:40:17 |
| 24 | I had mentioned, and they're later in here in the | 12:40:20 |
| 25 | complaint, that some of that is now public with regard | 12:40:23 |

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | to the five-disk matter. | 12:40:26 |
| 2 | BY MR. VERHOEVEN: | 12:40:26 |
| 3 | Q.   The last sentence of this paragraph says: | 12:40:29 |
| 4 | "In discussing the Otto transaction in 2016, | 12:40:32 |
| 5 | Kalanick repeatedly emphasized to Gurley and other | 12:40:36 |
| 6 | board members that Uber's acquisition of Otto, | 12:40:39 |
| 7 | employment of Anthony Levandowski, would be | 12:40:41 |
| 8 | transformative for Uber's business." | 12:40:44 |
| 9 | Do you see that? | 12:40:45 |
| 10 | A.   I do. | 12:40:46 |
| 11 | Q.   What is that referring to? | 12:40:48 |
| 12 | A.   Once again, consistent with what we discussed | 12:40:53 |
| 13 | earlier, there was a -- a big part of the argument for | 12:40:57 |
| 14 | why we needed to do this transaction was to employ | 12:41:01 |
| 15 | Anthony Levandowski, who -- who Mr. Kalanick believed | 12:41:04 |
| 16 | was one of the leading experts on autonomous vehicles | 12:41:07 |
| 17 | in -- in the -- in the world. | 12:41:10 |
| 18 | Q.   Was employing Anthony Levandowski worth | 12:41:14 |
| 19 | $680 million? | 12:41:17 |
| 20 | MR. BRILLE:  Object to form. | 12:41:17 |
| 21 | MR. FLUMENBAUM:  Object to form.  We've sort of | 12:41:19 |
| 22 | been over this. | 12:41:20 |
| 23 | You can answer it again. | 12:41:22 |
| 24 | THE WITNESS:  Yeah, I don't -- I don't mind going | 12:41:24 |
| 25 | over it again. | 12:41:25 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        That -- that discussion did take place at a      12:41:27
2    board meeting, as we had discussed.                  12:41:28
3        The argument was to why that headline figure     12:41:32
4    was not un- -- was not unreasonable related to the   12:41:37
5    notion of the milestones that we've previously       12:41:41
6    discussed.                                           12:41:42
7    BY MR. VERHOEVEN:                                     12:41:42
8        Q.   I direct your attention to paragraph 67.    12:42:14
9        A.   Oh, wow.                                     12:42:15
10       Q.   Page 30.  All right.  Take a second and read 12:42:31
11   it and tell me when you're ready to answer questions. 12:42:32
12       MR. FLUMENBAUM:  Paragraph 67?                    12:42:36
13       MR. VERHOEVEN:  Paragraph 67.                     12:42:38
14           (Witness reviews document.)                   12:42:49
15       THE WITNESS:  Okay.                               12:42:50
16   BY MR. VERHOEVEN:                                     12:42:50
17       Q.   And this -- this references:                 12:42:51
18           "Kalanick's fraudulent statements and         12:42:54
19   omissions breached his fiduciary duties, including,"  12:42:57
20   and then it gets more specific.                       12:42:59
21           Do you see that?                              12:43:00
22       A.   Um-hum.                                      12:43:01
23       Q.   Which of Mr. Kalanick's statements related to 12:43:08
24   the Otto transaction breached his fiduciary duties?   12:43:13
25       A.   It would seem obvious that this statement    12:43:22

                                              Page 168

| | | |
|---|---|---|
| 1 | that was made to the board that the diligence, which, | 12:43:26 |
| 2 | as we already ascertained, was remarkably critical to | 12:43:33 |
| 3 | the transaction, in light of the presence of the | 12:43:34 |
| 4 | indemnity and all those things, was clean, left me -- | 12:43:37 |
| 5 | and I can't speak for the other board members -- with | 12:43:40 |
| 6 | an impression that is remarkably different from that | 12:43:44 |
| 7 | that I hold today. | 12:43:46 |
| 8 | Q.   And I take it it's your belief that his | 12:43:55 |
| 9 | omission of that critical information during his | 12:44:00 |
| 10 | presentation also constituted fraud and a breach of | 12:44:09 |
| 11 | his fiduciary duties? | 12:44:11 |
| 12 | MR. BRILLE:  Object to form. | 12:44:12 |
| 13 | THE WITNESS:  That is correct.  Once again, this | 12:44:14 |
| 14 | statement refers to other issues also.  But with | 12:44:20 |
| 15 | regard to that specific issue, you are correct. | 12:44:24 |
| 16 | BY MR. VERHOEVEN: | 12:44:24 |
| 17 | Q.   Does anything else come to mind, still on | 12:44:47 |
| 18 | paragraph 67 -- understanding it's a general | 12:44:52 |
| 19 | statement, but focusing specifically on the Otto | 12:44:55 |
| 20 | acquisition portion of it. | 12:44:57 |
| 21 | A.   Um-hum. | 12:44:59 |
| 22 | Q.   Does anything else come to mind, in addition | 12:45:02 |
| 23 | to what you've already testified to, that was either a | 12:45:09 |
| 24 | statement or omission by Mr. Kalanick that breached | 12:45:13 |
| 25 | his fiduciary duties or constituted fraud? | 12:45:17 |

Page 169

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Related to that particular transaction? | 12:45:25 |
| 2 | Q.   Right.  Or related to Otto, related to | 12:45:28 |
| 3 | Mr. Levandowski. | 12:45:29 |
| 4 | A.   Yeah.  Yeah. | 12:45:31 |
| 5 | No, not that we haven't previously discussed. | 12:45:34 |
| 6 | MR. VERHOEVEN:  Perhaps we should take a short | 12:46:02 |
| 7 | break, and I'll just review -- I may have another five | 12:46:06 |
| 8 | minutes of questions -- | 12:46:07 |
| 9 | MR. FLUMENBAUM:  Okay.  Great. | 12:46:08 |
| 10 | MR. VERHOEVEN:  -- but I'm coming up to the end. | 12:46:10 |
| 11 | MR. FLUMENBAUM:  Great. | 12:46:12 |
| 12 | THE VIDEOGRAPHER:  Off the record at 12:46 p.m. | 12:46:14 |
| 13 | (Recess taken.) | 12:46:15 |
| 14 | THE VIDEOGRAPHER:  Back on the record at 12:54 | 12:54:08 |
| 15 | p.m. | 12:54:08 |
| 16 | BY MR. VERHOEVEN: | 12:54:08 |
| 17 | Q.   I direct your attention to paragraph 37 of | 12:54:17 |
| 18 | Exhibit 918, the Benchmark complaint. | 12:54:22 |
| 19 | A.   Um-hum. | 12:54:23 |
| 20 | Q.   And read 37 to yourself and tell me when | 12:54:27 |
| 21 | you're ready to answer questions. | 12:54:29 |
| 22 | (Witness reviews document.) | 12:54:48 |
| 23 | A.   Okay. | 12:54:49 |
| 24 | Q.   So earlier -- well, I direct your attention | 12:54:52 |
| 25 | to the phrase "interim findings." | 12:54:54 |

Page 170

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Do you see it's sprinkled through the | 12:54:57 |
| 2 | paragraph there? | 12:54:58 |
| 3 | A.   Yes. | 12:54:58 |
| 4 | Q.   When we testified earlier about this -- I | 12:55:02 |
| 5 | don't want to go over it again -- I think you just | 12:55:05 |
| 6 | said -- you and I just said "the Stroz report." | 12:55:09 |
| 7 | But were you referencing, specifically in | 12:55:11 |
| 8 | this time period, the interim findings of the Stroz | 12:55:14 |
| 9 | investigation? | 12:55:16 |
| 10 | MR. FLUMENBAUM:   Objection as to form. | 12:55:19 |
| 11 | BY MR. VERHOEVEN: | 12:55:19 |
| 12 | Q.   When you testified about if something had | 12:55:22 |
| 13 | been disclosed, if the Stroz report had been | 12:55:25 |
| 14 | disclosed, more accurately what you meant is if the | 12:55:28 |
| 15 | interim findings of the Stroz report -- of the Stroz | 12:55:30 |
| 16 | investigation had been disclosed; is that right? | 12:55:33 |
| 17 | A.   This particular complaint was based on all | 12:55:44 |
| 18 | that information that was in the public record. | 12:55:46 |
| 19 | There are documents related to this lawsuit | 12:55:50 |
| 20 | that highlight that, as of this date, there were these | 12:55:54 |
| 21 | interim findings available. | 12:55:55 |
| 22 | Q.   Right. | 12:55:59 |
| 23 | A.   And we're merely highlighting that those were | 12:55:59 |
| 24 | never disclosed to the board. | 12:56:01 |
| 25 | Q.   Okay.   I direct your attention to paragraph | 12:56:12 |

Page 171

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| 1 | 77 of the complaint, Exhibit 918. | 12:56:16 |
| 2 | There's a sentence in here that says: | 12:56:33 |
| 3 | "At the time, Benchmark could not have known | 12:56:38 |
| 4 | of the matters Kalanick intentionally concealed, many | 12:56:42 |
| 5 | of which were within Kalanick's exclusive knowledge or | 12:56:46 |
| 6 | only known to Kalanick and an 'inner circle' of Uber | 12:56:53 |
| 7 | executives loyal to him (many of whom have since been | 12:56:57 |
| 8 | terminated or forced to resign due to the misconduct | 12:57:01 |
| 9 | described above)." | 12:57:06 |
| 10 | Do you see that sentence? | 12:57:08 |
| 11 | A.   Um-hum. | 12:57:10 |
| 12 | Q.   Who was in Kalanick's inner circle, as | 12:57:13 |
| 13 | referenced in this paragraph, to the extent you have | 12:57:19 |
| 14 | knowledge? | 12:57:19 |
| 15 | A.   Sure.  The -- once again, I would reiterate | 12:57:24 |
| 16 | that this complaint and this paragraph reference many | 12:57:29 |
| 17 | issues, not just those related to -- to the Otto | 12:57:33 |
| 18 | acquisition.  And so that phrase may or may not have | 12:57:38 |
| 19 | applicability to what we're discussing today. | 12:57:41 |
| 20 | You know, when you look at the parenthetical | 12:57:44 |
| 21 | phrase about -- | 12:57:49 |
| 22 | Q.   I'm just asking about who the -- who the | 12:57:51 |
| 23 | inner circle is. | 12:57:53 |
| 24 | A.   I -- I was getting to that. | 12:57:55 |
| 25 | Q.   Okay. | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   So when you look at the phrase about | 12:57:59 |
| 2 | termination or forced to resign -- | 12:58:02 |
| 3 | THE WITNESS:  Is this part confidential also? | 12:58:04 |
| 4 | Because I -- I . . . | 12:58:07 |
| 5 | MR. FLUMENBAUM:  I think the resignations are all | 12:58:10 |
| 6 | public, aren't they? | 12:58:11 |
| 7 | MR. BRILLE:  The fact of a resignation is | 12:58:14 |
| 8 | probably -- is not privileged, the fact of a | 12:58:18 |
| 9 | resignation.  To the extent that you -- | 12:58:22 |
| 10 | THE WITNESS:  I just don't want to get to -- you | 12:58:25 |
| 11 | know. | 12:58:25 |
| 12 | BY MR. VERHOEVEN: | 12:58:25 |
| 13 | Q.   Okay.  I'm not asking you about the | 12:58:36 |
| 14 | parenthetical.  I'm just asking the words "inner | 12:58:39 |
| 15 | circle." | 12:58:40 |
| 16 | A.   Yeah, I know.  It informs it though. | 12:58:43 |
| 17 | Well, let me just state this. | 12:58:50 |
| 18 | With regard to the specific Otto acquisition, | 12:58:55 |
| 19 | you know, as noted in 38, there were -- I think it's | 12:59:02 |
| 20 | 38.  Yeah.  There were -- you know, you have two other | 12:59:06 |
| 21 | parties there that were aware of this fact about the | 12:59:09 |
| 22 | five disks that weren't -- that wasn't disclosed to | 12:59:15 |
| 23 | the board, so there's -- there's two names right | 12:59:18 |
| 24 | there. | 12:59:18 |
| 25 | Q.   What are the two names, for the record? | 12:59:18 |

Page 173

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Nina Qi and Cameron. | 12:59:24 |
| 2 | Q.   So with respect to the Waymo dispute or | 12:59:29 |
| 3 | the -- withdrawn. | 12:59:30 |
| 4 | With respect to the Otto acquisition, this | 12:59:35 |
| 5 | phrase you interpret to reference those two | 12:59:37 |
| 6 | individuals? | 12:59:38 |
| 7 | A.   Yes. | 12:59:38 |
| 8 | Q.   Has either of those two individuals been | 12:59:47 |
| 9 | terminated, to your knowledge? | 12:59:49 |
| 10 | A.   No. | 12:59:49 |
| 11 | Q.   All right. | |
| 12 | MR. FLUMENBAUM:  Can I have a -- all right. | 13:00:05 |
| 13 | Forget it.  Go ahead. | 13:00:07 |
| 14 | MR. VERHOEVEN:  So what did you want to talk to | 13:00:10 |
| 15 | him about? | 13:00:10 |
| 16 | MR. FLUMENBAUM:  No, just go ahead. | 13:00:13 |
| 17 | MR. VERHOEVEN:  Okay. | 13:00:13 |
| 18 | BY MR. VERHOEVEN: | |
| 19 | Q.   There came a time in which you resigned from | 13:00:16 |
| 20 | the board of Uber? | 13:00:17 |
| 21 | A.   Correct. | 13:00:17 |
| 22 | Q.   When was that, roughly? | 13:00:19 |
| 23 | A.   I think it was a couple of days after Travis | 13:00:27 |
| 24 | signed the resignation letter we've already looked at. | 13:00:32 |
| 25 | Q.   Why did you resign? | 13:00:45 |

Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   The members of -- of our partnership and I | 13:00:49 |
| 2 | had a lengthy discussion about trying to -- whether or | 13:00:56 |
| 3 | not it made sense to swap out the board member that | 13:01:00 |
| 4 | represented Benchmark with Uber, in an effort to try | 13:01:04 |
| 5 | and move things forward in a positive direction. | 13:01:08 |
| 6 | The -- the conversations and back and forth | 13:01:13 |
| 7 | and events that led to the meeting in Chicago, I think | 13:01:16 |
| 8 | it's safe to say, had a strain on the relationship | 13:01:21 |
| 9 | between myself and -- and Mr. Kalanick.  And it was | 13:01:29 |
| 10 | merely a decision from our firm to try and put a new | 13:01:35 |
| 11 | foot forward to try and create kind of a new day and | 13:01:39 |
| 12 | new relationship with the board. | 13:01:41 |
| 13 | Q.   Did you have any discussions with anyone at | 13:01:45 |
| 14 | Uber about your resignation before you resigned? | 13:01:48 |
| 15 | A.   I did not. | 13:01:49 |
| 16 | Q.   What about with other board members? | 13:01:51 |
| 17 | A.   I did not. | 13:01:53 |
| 18 | Q.   Have you had any conversations with anybody | 13:02:01 |
| 19 | at Uber since you've resigned from the board? | 13:02:04 |
| 20 | A.   Yeah.  There were -- there were numerous | 13:02:04 |
| 21 | conversations, as part of the handoff process I was | 13:02:13 |
| 22 | involved in, all of those committees.  I wanted to | 13:02:16 |
| 23 | make sure that -- that my partner got the benefit of | 13:02:19 |
| 24 | the -- you know, the transfer of information, that | 13:02:23 |
| 25 | kind of thing.  We had a lot of meetings to make sure | 13:02:26 |

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    that that was so . . .                              13:02:27

 2        Q.   Did your partner assume all the positions  13:02:29

 3    that you had?                                        13:02:31

 4        A.   Yes, with the exception that I believe that 13:02:34

 5    some of the special committees have been rolled into 13:02:37

 6    one, called a special matters committee.             13:02:41

 7        Q.   Okay.  Can you elucidate on that?  Which --  13:02:43

 8    which ones were combined into that committee?        13:02:46

 9        A.   I think the one that was looking into the   13:02:48

10    Holder issues, the one -- there was -- actually, I had 13:02:54

11    left one out from earlier, because I believe there was 13:03:00

12    a special committee tied to -- to the Vitas Greyball  13:03:05

13    investigation.  And the Waymo lawsuit evolved, then   13:03:08

14    rolled into a single committee now.  That happened    13:03:12

15    after I left.                                         13:03:13

16        Q.   Who's on that committee?                     13:03:15

17        A.   I believe Matt Cohler, David Trujillo, and   13:03:19

18    Arianna Huffington.                                   13:03:21

19        Q.   And as far as you know, that committee is -- 13:03:34

20    is still extant, still exists?                        13:03:38

21        A.   As far as I know, that's correct.            13:03:40

22        Q.   Okay.  Did you have any conversations with   13:03:43

23    Arianna Huffington about the Uber acquisition of Otto? 13:04:01

24        A.   I don't recall any conversations with Arianna 13:04:06

25    specifically about the acquisition, no.               13:04:08
```

Page 176

1      Q.   Did Ms. Huffington participate and contribute          13:04:13

2    to these board meetings we went through on this               13:04:16

3    subject?                                                       13:04:17

4      A.   I don't recall any specific commentary                 13:04:21

5    related to the board meeting -- that she made related         13:04:24

6    to the board meeting around the Otto acquisition.             13:04:29

7            The purpose of many of these special                  13:04:32

8    committees is -- is expressly legal in nature.  And so        13:04:38

9    there were lots of communications in those meetings           13:04:41

10   that I would assume were privileged.                          13:04:44

11           So I have recollection of those conversations         13:04:47

12   but not -- I don't remember her opining directly on           13:04:51

13   the Otto acquisition.                                         13:04:53

14     Q.   Do you believe she did?                                13:04:56

15     A.   I -- I don't -- I don't recall.                        13:04:58

16     Q.   Do you recall sending Ms. Huffington a copy            13:05:05

17   of the Stroz report?                                          13:05:07

18     A.   I don't recall doing that.                             13:05:11

19     Q.   Why would you have done that, if you did?              13:05:16

20     MR. BRILLE:  Object to form.                                13:05:17

21   BY MR. VERHOEVEN:                                             13:05:17

22     Q.   Okay.  I'll represent that you did.                    13:05:19

23     A.   Okay.  If I did, it would likely relate to            13:05:23

24   the fact that we were both on the -- on the special           13:05:25

25   committee to look into the -- to manage the Waymo            13:05:32

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | litigation. | 13:05:33 |
| 2 | Q.   Did you have a discussion with her about the | 13:05:34 |
| 3 | report? | 13:05:35 |
| 4 | MR. FLUMENBAUM:  You can answer -- you can answer | 13:05:38 |
| 5 | that yes or no, if you recall. | 13:05:40 |
| 6 | THE WITNESS:  I -- I -- I just don't recall. | 13:05:46 |
| 7 | BY MR. VERHOEVEN: | 13:05:46 |
| 8 | Q.   Do you think you would have? | 13:05:49 |
| 9 | MR. FLUMENBAUM:  Objection as to form. | 13:05:51 |
| 10 | THE WITNESS:  It's possible. | 13:05:52 |
| 11 | BY MR. VERHOEVEN: | 13:05:52 |
| 12 | Q.   I mean, you sent it to her? | 13:05:55 |
| 13 | A.   Okay.  If I did, then, it's likely that I | 13:05:58 |
| 14 | did. | 13:05:58 |
| 15 | Q.   Have a conversation? | 13:05:59 |
| 16 | A.   Yeah. | |
| 17 | Q.   You can't remember the substance of any | 13:06:02 |
| 18 | conversation? | 13:06:04 |
| 19 | MR. FLUMENBAUM:  Asked and answered. | 13:06:08 |
| 20 | THE WITNESS:  I -- I don't recall any specifics. | 13:06:11 |
| 21 | MR. VERHOEVEN:  You're supposed to only object to | 13:06:12 |
| 22 | form. | 13:06:13 |
| 23 | BY MR. VERHOEVEN: | 13:06:13 |
| 24 | Q.   What about Mr. Bonderman?  Did you send a | 13:06:19 |
| 25 | copy of the report to him? | 13:06:21 |

Page 178

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      A.   I don't recall.                        13:06:22

 2      Q.   Do you remember any conversations you had    13:06:26

 3  with Mr. Bonderman about the report or the Otto    13:06:31

 4  acquisition?                                       13:06:32

 5      A.   There were numerous discussions, as part of  13:06:38

 6  the special committee, that may or may not have    13:06:43

 7  involved the report, but those would be privileged.  13:06:46

 8      Q.   Was there lawyers in every meeting of the    13:06:49

 9  special committee?                                 13:06:51

10      A.   Yes.                                       13:06:51

11      Q.   Who were they?                             13:06:53

12      A.   It was Patrick Robbins from Shearman.       13:06:57

13      Q.   Anyone else?   Any other firms?            13:07:03

14      A.   No.   No.   Not as that -- not while I was a  13:07:06

15  member of the committee.                           13:07:07

16      Q.   Do you remember any conversations with      13:07:10

17  Mr. Bonderman outside of this -- of the committee  13:07:14

18  concerning the Otto acquisition?                   13:07:20

19      A.   I don't remember any specific conversations.  13:07:32

20  I would say that it's my opinion that he was also of  13:07:40

21  the belief that Anthony should have been terminated as  13:07:43

22  soon as he pled the Fifth.                          13:07:45

23      Q.   Is that based on conversations with him      13:07:47

24  generally?                                          13:07:49

25      A.   Yes.                                        13:07:49
```

Page 179

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And you -- can you recall the specifics of | 13:07:51 |
| 2 | any of those conversations? | 13:07:52 |
| 3 | A.   I don't remember any of the specifics. | 13:07:55 |
| 4 | Q.   Did he contribute during board meetings on | 13:07:57 |
| 5 | this subject? | 13:07:59 |
| 6 | A.   Yes. | 13:07:59 |
| 7 | Q.   Can you remember what he said in any of those | 13:08:01 |
| 8 | meetings? | 13:08:02 |
| 9 | A.   I -- I don't.  I just know that his -- I know | 13:08:04 |
| 10 | that that was his point of view. | 13:08:06 |
| 11 | MR. VERHOEVEN:  Thank you very much, Mr. Gurley. | 13:08:28 |
| 12 | I have no further questions at this time. | 13:08:31 |
| 13 | We have, as you've noticed, several privilege | 13:08:34 |
| 14 | instructions which are currently in dispute.  And if | 13:08:39 |
| 15 | there's a ruling that certain documents have to be | 13:08:43 |
| 16 | produced, we -- just so you know, we may take the | 13:08:47 |
| 17 | position that you have to come back and answer some | 13:08:49 |
| 18 | questions about that. | 13:08:50 |
| 19 | THE WITNESS:  Okay. | 13:08:50 |
| 20 | MR. VERHOEVEN:  Thank you very much for your time. | 13:08:53 |
| 21 | THE WITNESS:  Thank you. | |
| 22 | MR. FLUMENBAUM:  Anybody else? | 13:08:54 |
| 23 | MR. BRILLE:  Not here, no. | 13:08:56 |
| 24 | MR. FLUMENBAUM:  Thank you.  Thank you all. | 13:08:58 |
| 25 | THE VIDEOGRAPHER:  This concludes today's | 13:09:01 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       deposition of William Gurley, consisting of three       13:09:04

2       DVDs.                                                   13:09:05

3               We're off the record at 1:09 p.m.              13:09:09

4               (Whereupon, the deposition was adjorned at

5               1:09 p.m.)

6

7

8

9

10

11

12

13

14                   _____

15                         JOHN WILLIAM GURLEY

16

17

18

19

20

21

22

23

24

25

                                                     Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1            FEDERAL CERTIFICATE OF DEPOSITION OFFICER

2        I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
declare:

3        That, prior to being examined, the witness named
in the foregoing deposition was by me duly sworn

4    pursuant to Section 30(f)(1) of the Federal Rules of
Civil Procedure and the deposition is a true record of

5    the testimony given by the witness;

6        That said deposition was taken down by me in
shorthand at the time and place therein named and

7    thereafter reduced to text under my direction;

8        --X---    That the witness was requested to
review the transcript and make any changes to the

9    transcript as a result of that review pursuant to
Section 30(e) of the Federal Rules of Civil Procedure;

10        -----    No changes have been provided by the
witness during the period allowed;

11        -----    The changes made by the witness are

12    appended to the transcript;

13        -----    No request was made that the transcript
be reviewed pursuant to Section 30(e) of the Federal

14    Rules of Civil Procedure.

15        I further declare that I have no interest in the
event of the action.

16        I declare under penalty of perjury under the laws

17    of the United States of America that the foregoing is
true and correct.

18        WITNESS my hand this 25th day of August, 2017.

19

20

21

22

23

24            ANRAE WIMBERLEY, CSR NO. 7778

25

                                                Page 182