1  Neel Chatterjee (SBN 173985)
   *nchatterjee@goodwinlaw.com*
2  **GOODWIN PROCTER LLP**
   135 Commonwealth Drive
3  Menlo Park, California 94025
   Tel.: +1 650 752 3100
4  Fax.: +1 650 853 1038

5  Brett Schuman (SBN 189247)
   *bschuman@goodwinlaw.com*
6  Shane Brun (SBN 179079)
   *sbrun@goodwinlaw.com*
7  Rachel M. Walsh (SBN 250568)
   *rwalsh@goodwinlaw.com*
8  **GOODWIN PROCTER LLP**
   Three Embarcadero Center
9  San Francisco, California 94111
   Tel.: +1 415 733 6000
10 Fax.: +1 415 677 9041

11 Hong-An Vu (SBN 266268)
   *hvu@goodwinlaw.com*
12 **GOODWIN PROCTER LLP**
   601 S. Figueroa Street, 41st Floor
13 Los Angeles, California  90017
   Tel.: +1 213 426 2500
14 Fax.: +1 213 623 1673

15 *Attorneys for Defendant: Otto Trucking LLC*

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

16

17       **UNITED STATES DISTRICT COURT**

18       **NORTHERN DISTRICT OF CALIFORNIA**

         **SAN FRANCISCO DIVISION**

19 Waymo LLC,                           Case No. 3:17-cv-00939-WHA

20          Plaintiff,                  **DEFENDANT OTTO TRUCKING LLC'S OPPOSITION TO PLAINTIFF WAYMO**
21       v.                             **LLC'S MOTION TO EXCLUDE OTTO TRUCKING'S DAMAGES EXPERT**
                                        **JAMES MALACKOWSKI PURSUANT TO**
22 Uber Technologies, Inc.; Ottomotto LLC; Otto   **RULE 702 AND *DAUBERT***
   Trucking LLC,
23
            Defendants.                 Date:         September 27, 2017
24                                      Time:         8:00 a.m.
                                        Courtroom:    8 (19th Floor)
25                                      Judge:        Hon. William Alsup
                                        Trial:        October 10, 2017
26
                                        Filed/Lodged Concurrently with:
27                                      1.  Declaration of Neel Chatterjee

28

## I.   __INTRODUCTION__

Otto Trucking respectfully requests that the Court deny Waymo's motion to exclude Otto Trucking's damages expert, James Malackowski.  Mr. Malackowski is a preeminent licensing and damages expert with 30 years of experience.  Waymo does not challenge Mr. Malackowski's qualifications.  Nor does Waymo even attempt to discuss the record evidence and reasoning that support Mr. Malackowski's damages opinions.  Instead, Waymo asks the Court to exclude Mr. Malackowski's damages opinions related to Otto Trucking based solely on the ground that his opinions are allegedly improper legal conclusions.[1]  Waymo is incorrect.

In this litigation — indeed, in its current motion — Waymo has openly admitted that it has no specific damages theory as related to Otto Trucking.  *See* Waymo's Motion to Exclude Otto Trucking's Damages Expert James Malackowski Pursuant to Rule 702 and *Daubert* ("Mot."). at 4.  Consistent with this admission, Waymo's expert, Michael Wagner, sets forth damages opinions for unjust enrichment and reasonable royalty based only on facts relating to Uber and Ottomotto — not Otto Trucking.  For Otto Trucking, Mr. Wagner readily admits he cannot quantify any damages, royalties or unjust enrichment. In his deposition, Mr. Wagner went so far as to say he has not even investigated whether any compensation is due.  In response to Mr. Wagner's report, Mr. Malackowski explains that (1) there should be no separate damages against Otto Trucking for any alleged misappropriation and, relatedly, (2) Mr. Wagner has failed to address any separate recovery from Otto Trucking.  These are not legal conclusions, and there really should be no dispute that Mr. Malackowski is permitted to analyze and criticize the methodology of Waymo's experts.

Despite no evidence of any calculation by Mr. Wagner, Waymo nevertheless takes issue with Mr. Malackowski's opinions because he does not address its purported damages theories based on joint and several liability and vicarious liability.  *See id.*  Oddly enough, these liability issues are legal issues that Mr. Malackowski properly did not address (and that have already been presented to the Court, *see* Dkt. No. 1423 at 19-20; Dkt. No. 1637 at 8-14) (briefing on Otto Trucking's summary

---

[1] Mr. Malackowski's report contains additional opinions relating to (a) the unreliability of Mr. Wagner's unjust enrichment opinions, (b) Mr. Wagner's failure to demonstrate that a permanent injunction is appropriate, and (c) the unreliability of the opinions of Waymo's other expert, Jim Timmins.  Waymo has not sought to exclude any of these opinions.

DEFENDANT OTTO TRUCKING'S OPPOSITION TO WAYMO LLC'S          CASE NO. 3:17-CV-00939
MOTION TO EXCLUDE OTTO TRUCKING'S DAMAGES EXPERT

judgment motion)).  Indeed, Waymo's own expert Mr. Wagner does not discuss joint and several

liability or vicarious liability in his report.  It thus appears that Waymo, through this motion, is

improperly attempting to have these legal liability issues adjudged in its favor.  But it is well-settled

that a *Daubert* motion cannot be used in this fashion.  *See, e.g.*, *Colton Crane Co., LLC v. Terex*

*Cranes Wilmington, Inc.*, No. CV 08-8525 PSG (PJWx), 2010 WL 2035800, at *1 (C.D. Cal. May

19, 2010) ("[M]otions *in limine* should not be used as disguised motions for summary judgment.").

In short, Mr. Malackowski's opinions are both based on the specific facts of this case and

responsive to Mr. Wagner's report.  These opinions are within the purview of Rule 702 and should

be heard by a jury in open court.  Waymo's motion should be denied.

## II.   **MR. MALACKOWSKI'S OPINIONS**

Mr. Malackowski sets forth two opinions in his expert report related to damages as to Otto

Trucking: (1) there should be no separate damages recovery from Otto Trucking, *see* Declaration of

Neel Chatterjee ("Chaterjee Decl."), Ex. 1 ("Malackowski Rept.") at 41-43; and (2) Waymo's

expert, Mr. Wagner, fails to separately address monetary recovery from Otto Trucking, *see id.* at 43-

50.

First, Mr. Malackowski opines that there should be no separate recovery against Otto

Trucking.  He explains that, under the facts of this case, any recovery against Uber or Ottomotto will

resolve Waymo's claims such that Waymo will be fully compensated for any alleged

misappropriation.  In particular, Mr. Malackowski discusses three possible factual scenarios in the

case:

> Regardless of the outcome of this litigation, it will satisfy Waymo's claim against
> Otto Trucking.  First, should Waymo prevail on the merits of this case and be granted
> an injunction, Uber will be precluded from utilizing the subject matter of the asserted
> trade secrets, and the AV-related technology licensed from Uber to Otto Trucking
> would consequently exclude the asserted trade secrets.
>
> Second, if Waymo prevails on the merits of this case but is denied an injunction, the
> monetary recovery Waymo receives from Uber would satisfy Waymo with respect to
> all uses Uber makes of the alleged trade secrets, including those of its non-exclusive
> licensee, Otto Trucking.  As set forth above, there is no record evidence that Otto
> Trucking has or will achieve any cost savings of its own relating to the alleged use of
> the asserted trade secrets.

2

1    Third, if Waymo loses on the merits of this case, then the fact finder would have
     concluded that neither Uber or Otto Trucking misappropriated the alleged trade
2    secrets, and no recovery will be due Waymo from Uber or Otto Trucking.

3

4    *Id.* at 43.

5        Second, Mr. Malackowski details how Mr. Wagner failed to address separate monetary

6    recovery from Otto Trucking.  Mr. Malackowski first directs attention to Mr. Wagner's assertion that

7    there are certain measures of damages for Otto Trucking that he could not quantify:

8    The Wagner Report fails to address monetary recovery from Otto Trucking.
     According to Mr. Wagner:
9

10   "other benefits to Defendants that I cannot quantify at this time include:

11      • The unjust enrichment to Otto Trucking based on the potential consideration
          to be paid if Uber exercises its option to acquire Otto Trucking.

12      • The unjust enrichment to Otto Trucking or Uber based on employing LiDAR
          systems with reduced expenses in the future…"
13

14   *Id.* at 43 (quoting Wagner Rept. at 121).  Mr. Malackowski further explains that, in addition to these

15   excluded calculations, Mr. Wagner's unjust enrichment and reasonable royalty calculations do not

16   take into account any facts related to Otto Trucking.  *See id.* at 43 ("Wagner also failed to address

17   Otto Trucking in either of his alternative measures of unjust enrichment."), 44 ("Mr. Wagner

18   likewise fails to address Otto Trucking in his reasonable royalty analysis[.]").  As Mr. Malackowski

19   points out, "[t]he introduction to Mr. Wagner's unjust enrichment analysis in fact confirms that his

20   analyses do not relate to Otto Trucking":

21   "I discuss and quantify unjust enrichment *to Uber* measured in two alternative ways:
     measured by accelerated AV development and measured by saved development
22   expenses.  I also discuss unjust enrichment *to Ottomotto* measured by the acquisition
     by Uber.  I also discuss other ways in which the Defendants have been unjustly
23   enriched that I'm unable to quantify at this time."

24   *Id.* at 43-44 (quoting Wagner Rept. at 103-104; emphasis in Malackowski Rept.).

25       Mr. Wagner has since confirmed at deposition that he did no separate work or analysis as to

26   Otto Trucking.  *See* Chatterjee Decl., Ex. 2 (Wagner Rough Dep. Tr.) at 123:25–124:4 ("Q. Okay.

27   You're not offering any opinions in this case as to any damages caused to Waymo specific to [ ] Otto

28   Trucking; is that right?  A. That's correct."), 135:7-11 ("Q. Approximately what percentage of your

3

1   64 hours, Mr. Wagner, did you spend focusing on calculating damages specific to my client, Otto

2   Trucking?  A. Zero."), 131:7-11 ("Q. You didn't do any separate calculation of the amount that Otto

3   Trucking would have agreed to pay Waymo at a hypothetical negotiation set during that same time

4   period, correct?  A. That is accurate.").

5   **III.   ARGUMENT**

6           Mr. Malackowski's expert opinions are based upon his extensive prior experience, tied

7   directly to facts of the case, and directly responsive to Mr. Wagner's damages opinions.    Moreover,

8   Mr. Malackowski's responsive opinions are precisely the types of opinions contemplated by the

9   Federal Rules.  *See, e.g.*, *Nehara v. California*, No. 1:10-CV-00491 JLT, 2013 WL 5670867, at *2

10  (E.D. Cal. Oct. 16, 2013) ("A party may file a 'rebuttal' expert report to 'contradict or rebut

11  evidence' offered by another party in its initial expert disclosures.") (citing Fed. R. Civ. P.

12  26(a)(2)(D)(ii)).  Mr. Malackowski should be permitted to testify before the jury as to these

13  opinions, as such testimony will assist the jury in understanding Mr. Wagner's opinions as well as

14  the evidence (or lack thereof) that Waymo sets forth to support its damages against Otto Trucking.

15  *See* Fed. R. Evid. 702.

16          Setting aside its broad complaints of improper legal conclusions, Waymo fails to provide any

17  specific analysis as to how Mr. Malackowski's opinions constitute legal conclusions.  Waymo's

18  single cited case, *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051 (9th Cir. 2008),

19  highlights the deficiencies in its "legal conclusion" argument.  In that case, the expert's excluded

20  testimony all related to improper recitations and applications of the law.  The district court excluded

21  the following legal explanations and conclusions :

22          (1) sections that discuss the UCC and/or apply the UCC to the facts of this case; (2)
            sections that discuss non-UCC law and/or apply non-UCC law to the facts of this
23          case; (3) sections that discuss agency law and/or apply agency law to the facts of this
            case; (4) sections that discuss the parties' legal rights, duties, and obligations under
24          the law; (5) sections that label the parties' actions as "wrongful" or "intentional"
            under the law; and (6) sections that discuss the appropriate formula to calculate
25          damages under the law.

26  *Id.* at 1058.  Here, in contrast, Mr. Malackowski does not recite or explain any laws in his expert

27  report, nor does he attempt to apply any laws.  And Waymo certainly has not identified any such

28

DEFENDANT OTTO TRUCKING'S OPPOSITION TO WAYMO LLC'S        CASE NO. 3:17-CV-00939
MOTION TO EXCLUDE OTTO TRUCKING'S DAMAGES EXPERT

laws in its motion.  To the contrary, as discussed above, Mr. Malackowski's report is limited to interpretation of the facts of this case and the theories presented in the Wagner report.

Waymo's arguments related to joint and several liability and vicarious liability can be summarily dismissed.  *See* Mot. at 4-5.  Those legal issues are not discussed by either parties' damages expert and are entirely unrelated to Mr. Malackowski's qualifications or the soundness of his methodology under Rule 702 or *Daubert*.  Waymo can litigate the merits of its liability theories outside the context of a *Daubert* motion.

## IV.   **CONCLUSION**

For the reasons set forth above, Waymo's motion to exclude Mr. Malackowski should be denied.

Dated:   September 22, 2017                    Respectfully submitted,

                                              By:    /s/   Neel Chatterjee
                                                     Neel Chatterjee
                                                     *nchatterjee@goodwinlaw.com*
                                                     Brett Schuman
                                                     *bschuman@goodwinlaw.com*
                                                     Shane Brun
                                                     *sbrun@goodwinlaw.com*
                                                     Rachel M. Walsh
                                                     *rwalsh@goodwinlaw.com*
                                                     Hong-An Vu
                                                     *hvu@goodwinlaw.com*
                                                     **GOODWIN PROCTER** LLP

                                              *Attorneys for Defendant: Otto Trucking LLC*

DEFENDANT OTTO TRUCKING'S OPPOSITION TO WAYMO LLC'S          CASE NO. 3:17-CV-00939
MOTION TO EXCLUDE OTTO TRUCKING'S DAMAGES EXPERT

1
2

**CERTIFICATE OF SERVICE**

3    I hereby certify that I electronically filed the foregoing document including all of its

4 attachments with the Clerk of the Court for the United States District Court for the Northern

5 District of California by using the CM/ECF system on **September 22, 2017**.  I further certify that

6 all participants in the case are registered CM/ECF users and that service of the publicly filed

7 documents will be accomplished by the CM/ECF system.

8    I certify under penalty of perjury that the foregoing is true and correct.  Executed on

9 **September 22, 2017**.

10                                          /s/   Neel Chatterjee
11                                              NEEL CHATTERJEE

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT OTTO TRUCKING'S OPPOSITION TO WAYMO LLC'S        CASE NO. 3:17-CV-00939
MOTION TO EXCLUDE OTTO TRUCKING'S DAMAGES EXPERT

# EXHIBIT 2

## UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 2

2714429AMG.txt

|  |  |  |
|---|---|---|
|  | 1 | ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT |
|  | 2 |  |
| 09:34:28 | 3 | THE VIDEOGRAPHER:  Good morning.  We are |
| 09:34:29 | 4 | going on the record at 9:34, on September 22 of the |
| 09:34:35 | 5 | Year 2017.  Please understand microphones are very |
| 09:34:42 | 6 | sensitive, and they may pick up whispering ad |
| 09:34:44 | 7 | private conversations and cellular interference. |
| 09:34:49 | 8 | Please turn off your cell phones or place |
| 09:34:51 | 9 | them away from the microphones, as they may |
| 09:34:54 | 10 | interfere with the audio.  Audio and video recording |
| 09:34:57 | 11 | will continue to take place unless all parties agree |
| 09:35:01 | 12 | to go off of the record. |
| 09:35:03 | 13 | This is Disc 1, Volume I in the video |
| 09:35:06 | 14 | deposition of Michael J. Wagner, taken by counsel |
| 09:35:10 | 15 | for Defendants in the matter of Waymo LLC v. Uber |
| 09:35:16 | 16 | Technologies.  It's filed in the United States |
| 09:35:19 | 17 | District Court, for the Northern District of |
| 09:35:21 | 18 | California, Case No. 17-cv-00939-WHA. |
| 09:35:29 | 19 | This is being taken at Morrison & |
| 09:35:31 | 20 | Foerster.  They're at 425 Market Street in |
| 09:35:35 | 21 | San Francisco.  My name is Kevin Foor, and I am here |
| 09:35:40 | 22 | with Mary Goff-Sharma, and we are from Veritext. |
| 09:35:45 | 23 | I'm not related to any party nor am I financially |
| 09:35:49 | 24 | interested in the outcome in any way. |
| 09:35:52 | 25 | Counsel and -- and all present in the |

2714429AMG.txt

12:08:16 23   Otto Trucking LLC.   Do you know who Otto Trucking

12:08:18 24   is?

12:08:19 25        A    I do.


123


1        ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT

12:08:20  2        Q    Who is Otto what's your understanding of

12:08:22  3   what Otto Trucking is?

12:08:23  4        A    Well, I -- I believe it's a company that's

12:08:25  5   owned by -- principally owned by Mr. Levandowski and

12:08:32  6   Lior.

12:08:34  7             And it is in -- has signed an -- an

12:08:37  8   acquisition of purchase agreement with Uber where it

12:08:43  9   it's Uber's discretion to purchase that company

12:08:46 10   between now and sometime in November.   And it is a

12:08:49 11   company that is focused on applying LiDAR technology

12:08:53 12   to trucks.

12:08:56 13        Q    Do you know whether Otto Trucking has any

12:08:58 14   employees?

12:08:59 15        A    Well, my understanding is they do not at

12:09:01 16   least from the last facts that I have.

12:09:04 17        Q    Do you have any understanding of as to

12:09:04 18   whether Otto Trucking does any research and

12:09:07 19   development activities?

12:09:12 20        A    I -- I I don't know whether they do or not

12:09:16 21   I understand that Uber is advancing development

12:09:18 22   funds to them.   So I -- I would think they do.   But

12:09:22 23   whether that's done with actually being done by Uber

12:09:26 24   and not your client, I don't know.

2714429AMG.txt
12:09:29 25        Q    Okay.   You're not offering any opinions in

124

1         ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT
12:09:31  2    this case as to any damages caused to Waymo specific
12:09:36  3    to oath Otto Trucking; is that right?
12:09:38  4        A    That's correct.
12:09:38  5        Q    Okay.   And so then your damages -- I'm
12:09:44  6    going to walk through briefly -- not in the level of
12:09:46  7    detail that Uber's counsel did -- but I just want to
12:09:48  8    walk through you principal opinions in this case.
12:09:50  9             You have offered two unjust enrichment
12:09:55 10    unjust enrichment calculations and a reasonable
12:09:58 11    royalty measure, correct?
12:10:00 12        A    That's fair.
12:10:01 13        Q    Okay.   The first unjust enrichment measure
12:10:05 14    values the accelerated development to -- that Uber
12:10:10 15    was able to achieve through the alleged
12:10:13 16    misappropriation of these nine trade secrets, right?
12:10:16 17        A    Yes.
12:10:17 18        Q    And -- and your opinion -- that -- we'll
12:10:20 19    call that your first unjust enrichment opinion.
12:10:24 20             That opinion is based upon internal Uber
12:10:28 21    documents showing some accelerated development,
12:10:31 22    correct?
12:10:32 23        A    That's fair.
12:10:34 24        Q    That opinion is not based upon any Otto
12:10:36 25    Trucking documents; is that right?

Page 117

2714429AMG.txt

12:16:07  8   that word -- the caveats you're referring to

12:16:09  9   regarding the applicability of your unjust

12:16:12  10  enrichment damage theories, those caveats are Uber

12:16:17  11  acquires Otto Trucking and that Uber shares some of

12:16:21  12  the technology it's developing using the allegedly

12:16:25  13  misappropriated trade secrets with Otto Trucking; is

12:16:28  14  that right?

12:16:28  15       A   That's -- that's -- again, that's my

12:16:30  16  conclusion -- or that would be my opinion as a

12:16:33  17  damages expert.

12:16:33  18       Q   If both of those assumptions are true,

12:16:36  19  then your damages opinions -- your unjust enrichment

12:16:39  20  damages opinions may have some applicability to Otto

12:16:41  21  Trucking, correct?

12:16:44  22           MR. EISEMAN:  Objection as to form.

12:16:44  23       A   That's fair.

12:16:49  24       Q   (BY MR. BERRY) You also have a reasonable

12:16:53  25  royalty rate calculation.  And that measures the

131

1         ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT

12:16:55  2   amount that Uber would have agreed to pay Waymo in

12:16:58  3   this hypothetical negotiation set in the --

12:17:01  4   somewhere in the December 15 -- August -- between

12:17:05  5   December '15 and August 2016 time period, right?

12:17:09  6       A   Correct?

12:17:09  7       Q   You didn't do any separate calculation of

12:17:11  8   the amount that Otto Trucking would have agreed to

12:17:15  9   pay Waymo at a hypothetical negotiation set during

Page 123

2714429AMG.txt

12:17:20 10   that same time period, correct?

12:17:22 11          A      That is accurate.

12:17:23 12          Q      Okay.   And then for the reasonable royalty

12:17:25 13   calculation that you did, you start with a baseline

12:17:28 14   of Uber's unjust enrichment.   And then you adjusted

12:17:32 15   upward based on some analysis you have done of

12:17:36 16   certain of the Georgia-Pacific factors.   Namely 4,

12:17:38 17   5, 6, 8, and 11, correct?

12:17:42 18          A      Those are the only ones that had any

12:17:45 19   impact on changing the number from the baseline.

12:17:47 20   That is correct.

12:17:48 21          Q      And -- and Factor 5 -- this is addressed

12:17:52 22   in your report at paragraphs 399 to 401 -- that --

12:17:55 23   that factor deals with the commercial relationship

12:17:58 24   between Waymo and Uber and some documents that you

12:18:02 25   referred regarding the -- the potential competitive

132

             1          ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT

12:18:08  2   relationship between those two companies, right?

12:18:10  3          A      Yes.

12:18:11  4          Q      That analysis in Factor 5 is -- is

12:18:13  5   inapplicable to -- to my client Otto Trucking --

12:18:16  6          A      Yeah --

12:18:16  7          Q      -- right?

12:18:16  8          A      -- as discussed in my report, that is

12:18:19  9   correct.

12:18:20 10          Q      Right.   And -- and Factor 8 deals with

12:18:25 11   expected future profitability.   And you analyzed

2714429AMG.txt

12:20:30 16        Q    So as we sit here today based on the work

12:20:33 17   you have done so far up to and including today, you

12:20:36 18   don't have an opinion of what damages Waymo would be

12:20:39 19   entitled to under that hypothetical verdict --

12:20:41 20             MR. EISEMAN:   Objection.

12:20:41 21        Q    -- is that fair (talking over each other

12:20:42 22   -- check *)?

12:20:43 23             MR. EISEMAN:   Objection as to form.

12:20:43 24        A    I do not.

12:20:44 25        Q    (BY MR. SCHUMAN) In -- in response to some

                                                              135

            1              ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT

12:20:50 2    of the questions you got from Uber's counsel, you --

12:20:55 3    you mentioned that you personally spent

12:20:58 4    approximately 64 hours total working on -- working

12:21:01 5    on your opinions in this case.   Obviously, your

12:21:04 6    staff spent many more hours than that.

12:21:06 7              Approximately what percentage of your

12:21:09 8    64 hours, Mr. Wagner, did you spend focusing on

12:21:14 9    calculating damages specific to my client, Otto

12:21:16 10   Trucking?

12:21:17 11        A    Zero.

12:21:25 12        Q    Just bear with me a second.

12:21:27 13        A    But I could approximate -- it's exactly

12:21:31 14   64.0 hours through September 15.   And it's been 13.4

12:21:39 15   hours since then before today

12:21:39 16        Q    I would --

12:21:40 17        A    -- between September 15 and today (talking

                              Page 127

UNREDACTED VERSION OF EXHIBIT 1 SOUGHT TO BE FILED UNDER SEAL IN ITS ENTIRETY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

   _____

5  WAYMO LLC,                            )

6              Plaintiff,                )

7      vs.                               ) Case No.

8  UBER TECHNOLOGIES, INC.;              ) 17-cv-00939-WHA

9  OTTOMOTTO, LLC; OTTO TRUCKING LLC, )

10             Defendants.               )

   _____)

11

12       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14       VIDEOTAPED DEPOSITION OF MICHAEL J. WAGNER

15              San Francisco, California

16             Friday, September 22, 2017

17                    Volume I

18

19

20  Reported by:

21  MARY J. GOFF

22  CSR No. 13427

23  Job No. 2714429

24

25  PAGES 1-145

                                        Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5      _____

 6    WAYMO LLC,                          )

 7              Plaintiff,                )

 8       vs.                              ) Case No.

 9    UBER TECHNOLOGIES, INC.;            ) 17-cv-00939-WHA

10    OTTOMOTTO, LLC; OTTO TRUCKING LLC, )

11              Defendants.               )

12    _____)

13

14               HIGHLY CONFIDENTIAL

15

16       Videotaped Deposition of MICHAEL J. WAGNER,

17       Volume I, taken on behalf of Defendants,

18       at Morrison & Foerster, 425 market Street,

19       33rd Floor, San Francisco, beginning at

20       9:34 a.m. and ending at 12:30 p.m., on

21       September 22, 2017, before MARY GOFF, Certified

22       Shorthand Reporter No. 13427.

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    Yeah, but I -- he thinks -- he thinks my | 12:07:51 |
| 2 | profile is not as good as my straight face. | 12:07:53 |
| 3 | THE VIDEOGRAPHER:  What he said.  Do you | 12:07:57 |
| 4 | want to stay on or -- we can stay on. | 12:07:59 |
| 5 | EXAMINATION BY COUNSEL FOR THE DEFENDANTS | 12:08:03 |
| 6 | BY MR. SCHUMAN: | 12:08:04 |
| 7 | Q    All right.  Good afternoon, Mr. Wagner. | 12:08:07 |
| 8 | A    Good afternoon, Mr. Schuman. | 12:08:10 |
| 9 | Q    Mr. Wagner, I represent a company called | 12:08:14 |
| 10 | Otto Trucking LLC.  Do you know who Otto Trucking | 12:08:16 |
| 11 | is? | 12:08:18 |
| 12 | A    I do. | 12:08:19 |
| 13 | Q    Who is Otto -- what's your understanding | 12:08:20 |
| 14 | of who Otto Trucking is? | 12:08:21 |
| 15 | A    Well, I -- I believe it's a company that's | 12:08:23 |
| 16 | owned by -- principally owned by Mr. Levandowski and | 12:08:25 |
| 17 | Lior. | 12:08:32 |
| 18 | And it is in -- has signed an -- an | 12:08:34 |
| 19 | acquisition of purchase agreement with Uber where | 12:08:37 |
| 20 | it -- it's Uber's discretion to purchase that | 12:08:42 |
| 21 | company between now and sometime in November.  And | 12:08:45 |
| 22 | it is a company that is focused on applying LiDAR | 12:08:48 |
| 23 | technology to trucks. | 12:08:52 |
| 24 | Q    Do you know whether Otto Trucking has any | 12:08:56 |
| 25 | employees? | 12:08:58 |

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    Well, my understanding is they do not, at | 12:08:59 |
| 2 | least from the last facts that I have. | 12:09:01 |
| 3 | Q    Do you have any understanding as to | 12:09:04 |
| 4 | whether Otto Trucking does any research and | 12:09:04 |
| 5 | development activities? | 12:09:07 |
| 6 | A    I -- I -- I don't know whether they do or | 12:09:12 |
| 7 | not.  I understand that Uber is advancing | 12:09:15 |
| 8 | development funds to them, so I -- I would think | 12:09:18 |
| 9 | they do.  But whether that's done with -- actually | 12:09:21 |
| 10 | being done by Uber and not your client, I -- I don't | 12:09:25 |
| 11 | know. | 12:09:28 |
| 12 | Q    Okay.  You're not offering any opinions in | 12:09:29 |
| 13 | this case as to any damages caused to Waymo specific | 12:09:31 |
| 14 | to Otto Trucking; is that right? | 12:09:36 |
| 15 | A    That's correct. | 12:09:38 |
| 16 | Q    Okay.  And so then your damages -- I'm | 12:09:38 |
| 17 | going to walk through briefly -- not in the level of | 12:09:44 |
| 18 | detail that Uber's counsel did, but I just want to | 12:09:46 |
| 19 | walk through your -- your principal opinions in this | 12:09:48 |
| 20 | case. | 12:09:50 |
| 21 | You have offered two unjust enrichment | 12:09:50 |
| 22 | calculations and a -- and a reasonable royalty | 12:09:55 |
| 23 | measure, correct? | 12:09:59 |
| 24 | A    That's fair. | 12:10:00 |
| 25 | Q    Okay.  The first unjust enrichment measure | 12:10:01 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | values the accelerated development to -- that Uber | 12:10:05 |
| 2 | was able to achieve through the alleged | 12:10:10 |
| 3 | misappropriation of these nine trade secrets, right? | 12:10:13 |
| 4 | A    Yes. | 12:10:16 |
| 5 | Q    And -- and your opinion -- that -- we'll | 12:10:17 |
| 6 | call that your first unjust enrichment opinion. | 12:10:20 |
| 7 | That opinion is based on internal Uber | 12:10:24 |
| 8 | documents showing some accelerated development, | 12:10:28 |
| 9 | correct? | 12:10:31 |
| 10 | A    That's fair. | 12:10:32 |
| 11 | Q    That opinion is not based on any Otto | 12:10:34 |
| 12 | Trucking documents; is that right? | 12:10:36 |
| 13 | A    It is not. | 12:10:40 |
| 14 | Q    So would you agree with me then that your | 12:10:42 |
| 15 | first unjust -- unjust enrichment theory is not | 12:10:45 |
| 16 | applicable to Otto Trucking? | 12:10:48 |
| 17 | MR. EISEMAN:  Objection as to form. | 12:10:50 |
| 18 | A    You know, I -- what I would say is that | 12:10:51 |
| 19 | unless Uber exercises its option to purchase Otto | 12:10:56 |
| 20 | Trucking or shares this accelerated depreciation -- | 12:11:01 |
| 21 | or accelerated development with Otto Trucking, then | 12:11:04 |
| 22 | my calculations have nothing to do with your client. | 12:11:10 |
| 23 | Q    (BY MR. SCHUMAN) Right.  And as we sit | 12:11:15 |
| 24 | here today, you know that Uber has not exercised the | 12:11:15 |
| 25 | option to the purchase Otto Trucking, right? | 12:11:18 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    I -- I don't know that.  But those facts | 12:11:21 |
| 2 | have not been brought to my attention.  And if it | 12:11:23 |
| 3 | had happened, I fully expect I would be aware of it. | 12:11:26 |
| 4 | Q    Right.  And the accelerated -- sharing the | 12:11:30 |
| 5 | accelerated development with Otto Trucking, what did | 12:11:33 |
| 6 | you mean by that? | 12:11:36 |
| 7 | A    Well, if -- if -- if as a result of Uber | 12:11:36 |
| 8 | accelerating development of LiDAR on their veh -- on | 12:11:43 |
| 9 | their vehicles for their transportation as a | 12:11:46 |
| 10 | service, they -- they're also -- then by Otto | 12:11:48 |
| 11 | Trucking -- and Otto Trucking is going to get into | 12:11:51 |
| 12 | the market one or two years earlier than they | 12:11:54 |
| 13 | otherwise would -- then I think it might be | 12:11:58 |
| 14 | appropriate to your client.  But unless those facts | 12:12:00 |
| 15 | occur, what I have calculated has nothing to do with | 12:12:03 |
| 16 | your client. | 12:12:05 |
| 17 | Q    All right.  And as we sit here today, you | 12:12:06 |
| 18 | do know that those facts that you have just in your | 12:12:07 |
| 19 | last answer summarized have not occurred yet, right? | 12:12:10 |
| 20 | A    That's correct. | 12:12:13 |
| 21 | Q    Your second unjust enrichment calculation | 12:12:14 |
| 22 | is based on the cost that -- that you have opined | 12:12:16 |
| 23 | Uber saved in its development of autonomous vehicles | 12:12:20 |
| 24 | through alleged use of these nine trade secrets, | 12:12:25 |
| 25 | right? | 12:12:29 |

Page 129

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    Yes. | 12:12:29 |
| 2 | Q    And again, that's based on Uber documents | 12:12:29 |
| 3 | showing a $20 million per-month run rate for its R&D | 12:12:33 |
| 4 | program on autonomous vehicles, right? | 12:12:39 |
| 5 | A    Yeah, documents and I believe deposition | 12:12:42 |
| 6 | testimony of Mr. Bares. | 12:12:44 |
| 7 | Q    Fair.  Right.  And -- and so your second | 12:12:45 |
| 8 | unjust enrichment calculation is not based on any | 12:12:48 |
| 9 | Otto Trucking-specific evidence; is that fair? | 12:12:50 |
| 10 | A    That is fair. | 12:12:55 |
| 11 | Q    So your second unjust enrichment | 12:12:55 |
| 12 | calculation, would you agree with me, is not | 12:12:57 |
| 13 | applicable to Otto Trucking? | 12:13:00 |
| 14 | MR. EISEMAN:  Objection as to form. | 12:13:02 |
| 15 | A    Yes, with the same caveats as I discussed | 12:13:02 |
| 16 | on the first calculation. | 12:13:05 |
| 17 | Q    (BY MR. SCHUMAN) Right.  So assume -- | 12:13:07 |
| 18 | assume for purposes of this question that Otto | 12:13:08 |
| 19 | Trucking pays Uber some amount of money for the work | 12:13:11 |
| 20 | that Uber employees are -- are doing on | 12:13:18 |
| 21 | autonomous -- the development of autonomous trucks. | 12:13:22 |
| 22 | Have you seen any evidence in the | 12:13:25 |
| 23 | materials you reviewed as to what Otto Trucking's | 12:13:28 |
| 24 | burn rate is for that development? | 12:13:32 |
| 25 | A    No. | 12:13:35 |

Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q    Okay.  Did -- on the list of materials you | 12:13:36 |
| 2 | reviewed or at least considered is the Brent Schwarz | 12:13:39 |
| 3 | deposition. | 12:13:44 |
| 4 |      Do you recall reviewing any portions of | 12:13:45 |
| 5 | Mr. Schwarz's deposition? | 12:13:47 |
| 6 | A    I personally do not. | 12:13:48 |
| 7 | Q    You have a separate section of your | 12:13:55 |
| 8 | report -- and we were just covering this with Uber's | 12:13:58 |
| 9 | counsel -- unjust enrichment related to Trade Secret | 12:14:02 |
| 10 | No. 90.  And I think you have an $8 million unjust | 12:14:04 |
| 11 | enrichment figure for that; is -- | 12:14:08 |
| 12 | A    Yes -- | 12:14:10 |
| 13 | Q    -- that right? | 12:14:10 |
| 14 | A    -- that's correct. | 12:14:11 |
| 15 | Q    And that is -- that -- is that based on | 12:14:12 |
| 16 | any Otto Trucking documents or evidence? | 12:14:15 |
| 17 | A    No. | 12:14:17 |
| 18 | Q    Does that theory have any applicability to | 12:14:18 |
| 19 | Otto Trucking? | 12:14:20 |
| 20 |      MR. EISEMAN:  Objection as to form. | 12:14:21 |
| 21 | A    You know, I -- no, again, with the same | 12:14:22 |
| 22 | caveats.  And -- and I personally believe that my | 12:14:26 |
| 23 | work is only relevant unless client is -- you will | 12:14:28 |
| 24 | have no role at the trial, because your client will | 12:14:32 |
| 25 | be owned by Uber.  And I assume Uber's counsel will | 12:14:35 |

Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | be representing their interests at that point.  But | 12:14:38 |
| 2 | I -- that's only way I see my work as relevant to | 12:14:41 |
| 3 | your client. | 12:14:44 |
| 4 | Q    (BY MR. SCHUMAN) Right.  So the same | 12:14:49 |
| 5 | caveat -- the same caveats that you're referring to | 12:14:49 |
| 6 | in that answer are -- are the sort of -- we'll call | 12:14:51 |
| 7 | them speculative future possibility that Uber | 12:14:54 |
| 8 | acquires Otto Trucking and shares some of these | 12:14:58 |
| 9 | benefits that you have quantified with Otto Trucking | 12:15:01 |
| 10 | in the future; is -- | 12:15:04 |
| 11 | MR. EISEMAN:  Objection. | 12:15:05 |
| 12 | Q    (BY MR. SCHUMAN) -- that -- | 12:15:05 |
| 13 | MR. EISEMAN:  Objection.  Sorry. | 12:15:06 |
| 14 | Q    (BY MR. SCHUMAN) Am I -- | 12:15:07 |
| 15 | MR. EISEMAN:  Objection as to form. | 12:15:09 |
| 16 | Q    (BY MR. SCHUMAN) I didn't ask the question | 12:15:09 |
| 17 | yet.  Do you understand that -- do I understand your | 12:15:10 |
| 18 | caveats correctly? | 12:15:14 |
| 19 | MR. EISEMAN:  Objection as to form. | 12:15:15 |
| 20 | A    Yes.  If you took just the | 12:15:16 |
| 21 | word "speculative" out of your question, I would | 12:15:18 |
| 22 | agree with what you said. | 12:15:21 |
| 23 | I mean -- yeah, I don't know whether | 12:15:24 |
| 24 | they're going to get acquired or not.  But you know, | 12:15:25 |
| 25 | clearly your -- your client is -- is getting a lot | 12:15:27 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of funds from Uber.  Uber is forwarding -- committed | 12:15:29 |
| 2 | to forward a lot of funds to your client.  There -- | 12:15:32 |
| 3 | there is a -- a deal done that your client -- client | 12:15:34 |
| 4 | will have to accept and Uber can force on your | 12:15:38 |
| 5 | client, if they want to. | 12:15:41 |
| 6 | I don't know what their mind-set is right | 12:15:43 |
| 7 | now, and I don't know how much development on the | 12:15:45 |
| 8 | truck has been done as to whether Uber believes it's | 12:15:47 |
| 9 | appropriate to purchase your client. | 12:15:51 |
| 10 | So I don't think it's wild speculation, | 12:15:54 |
| 11 | but I clearly do not know whether it will happen or | 12:15:56 |
| 12 | not.  But then all the caveats apply. | 12:16:00 |
| 13 | Q    (BY MR. SCHUMAN) Right.  So fair enough. | 12:16:03 |
| 14 | Taking out the word "speculative."  I know we don't | 12:16:03 |
| 15 | like using that word.  The caveats you're referring | 12:16:06 |
| 16 | to regarding the applicability of your unjust | 12:16:09 |
| 17 | enrichment damage theories, those caveats are Uber | 12:16:12 |
| 18 | acquires Otto Trucking and that Uber shares some of | 12:16:17 |
| 19 | the technology it's developing using the allegedly | 12:16:21 |
| 20 | misappropriated trade secrets with Otto Trucking; is | 12:16:25 |
| 21 | that right? | 12:16:28 |
| 22 | A    That's -- that's -- again, that's my | 12:16:28 |
| 23 | conclusion -- or that would be my opinion as a | 12:16:30 |
| 24 | damage expert. | 12:16:33 |
| 25 | Q    If both of those assumptions are true, | 12:16:33 |

Page 133

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | then your damages opinions -- your unjust enrichment | 12:16:36 |
| 2 | damages opinions may have some applicability to Otto | 12:16:39 |
| 3 | Trucking, correct? | 12:16:41 |
| 4 | MR. EISEMAN:  Objection as to form. | 12:16:44 |
| 5 | A    That's fair. | 12:16:44 |
| 6 | Q    (BY MR. SCHUMAN) You also have a | 12:16:49 |
| 7 | reasonable royalty rate calculation, and that | 12:16:52 |
| 8 | measures the amount that Uber would have agreed to | 12:16:55 |
| 9 | pay Waymo in this hypothetical negotiation set in | 12:16:57 |
| 10 | the -- somewhere in the December 15 -- August -- | 12:17:01 |
| 11 | between December '15 and August 2016 time period, | 12:17:04 |
| 12 | right? | 12:17:08 |
| 13 | A    Correct. | 12:17:09 |
| 14 | Q    You didn't do any separate calculation of | 12:17:09 |
| 15 | the amount that Otto Trucking would have agreed to | 12:17:11 |
| 16 | pay Waymo at a hypothetical negotiation set during | 12:17:15 |
| 17 | that same time period, correct? | 12:17:20 |
| 18 | A    That is accurate. | 12:17:22 |
| 19 | Q    Okay.  And then for the reasonable royalty | 12:17:23 |
| 20 | calculation that you did, you start with a baseline | 12:17:25 |
| 21 | of Uber's unjust enrichment.  And then you adjusted | 12:17:28 |
| 22 | upward based on some analysis you have done of | 12:17:32 |
| 23 | certain of the Georgia-Pacific factors.  Namely 4, | 12:17:36 |
| 24 | 5, 6, 8, and 11, correct? | 12:17:38 |
| 25 | A    Those are the only ones that had any | 12:17:42 |

Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | impact on changing the number from the baseline. | 12:17:45 |
| 2 | That is correct. | 12:17:47 |
| 3 | Q    And -- and Factor 5 -- this is addressed | 12:17:48 |
| 4 | in your report at paragraphs 399 to 401 -- that -- | 12:17:52 |
| 5 | that factor deals with the commercial relationship | 12:17:55 |
| 6 | between Waymo and Uber and some documents that you | 12:17:58 |
| 7 | referred regarding the -- the potential competitive | 12:18:02 |
| 8 | relationship between those two companies, right? | 12:18:08 |
| 9 | A    Yes. | 12:18:10 |
| 10 | Q    That analysis in Factor 5 is -- is | 12:18:11 |
| 11 | inapplicable to -- to my client Otto Trucking -- | 12:18:13 |
| 12 | A    Yeah -- | 12:18:16 |
| 13 | Q    -- correct? | 12:18:16 |
| 14 | A    -- as discussed in my report, that is | 12:18:16 |
| 15 | correct. | 12:18:19 |
| 16 | Q    Right.  And -- and Factor 8 deals with | 12:18:20 |
| 17 | expected future profitability.  And you analyzed | 12:18:25 |
| 18 | Waymo's and Uber's projections for profitability of | 12:18:29 |
| 19 | autonomous vehicles. | 12:18:36 |
| 20 | And in your view, that factor counseled in | 12:18:36 |
| 21 | favor of some enhancement to the baseline for the | 12:18:38 |
| 22 | reasonable royalty calculation, right? | 12:18:42 |
| 23 | A    That's fair. | 12:18:44 |
| 24 | Q    Okay.  And -- and you were working with | 12:18:45 |
| 25 | Waymo and Uber projections there, not any | 12:18:48 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | projections from Otto Trucking, right? | 12:18:51 |
| 2 | A    Correct.  I don't believe I have seen any | 12:18:52 |
| 3 | projections for your client -- | 12:18:54 |
| 4 | Q    Right. | 12:18:56 |
| 5 | A    -- and so I poss -- I could not have | 12:18:56 |
| 6 | possibly considered them. | 12:18:58 |
| 7 | Q    Okay.  You answered my next question, so | 12:18:59 |
| 8 | that'll make us go a little faster. | 12:19:01 |
| 9 | Factor 11 talks about the extent of the | 12:19:04 |
| 10 | use of the invention.  This is addressed at | 12:19:06 |
| 11 | paragraphs 424 and 428 of your report.  And again, | 12:19:09 |
| 12 | you find that that factor pushes the base -- the -- | 12:19:12 |
| 13 | the reasonable royalty baseline up a little bit | 12:19:13 |
| 14 | because of your assumptions based on the work of | 12:19:17 |
| 15 | others that -- that Uber has used these trade | 12:19:21 |
| 16 | secrets, right? | 12:19:24 |
| 17 | A    Yes. | 12:19:25 |
| 18 | Q    And you -- you have not done or are -- at | 12:19:28 |
| 19 | least -- have -- have you seen any evidence of any | 12:19:30 |
| 20 | use of any of these trade secrets by my client, Otto | 12:19:33 |
| 21 | Trucking? | 12:19:36 |
| 22 | MR. EISEMAN:  Objection as to form. | 12:19:37 |
| 23 | A    I have not. | 12:19:37 |
| 24 | Q    (BY MR. SCHUMAN) And so your analysis of | 12:19:41 |
| 25 | Factor 11 is inapplicable to my client, Otto | 12:19:42 |

Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Trucking, right? | 12:19:46 |
| 2 | MR. EISEMAN:  Objection as to form. | 12:19:47 |
| 3 | A    Based on the information that I have at | 12:19:48 |
| 4 | this time, that is correct. | 12:19:50 |
| 5 | Q    (BY MR. SCHUMAN) Okay.  Mr. Wagner, if the | 12:19:53 |
| 6 | jury finds that -- and this is the hypothetical, so | 12:19:55 |
| 7 | it's -- follow me here.  If the jury finds that Uber | 12:19:57 |
| 8 | and Ottomotto -- strike that.  I'm going to start | 12:20:01 |
| 9 | over. | 12:20:05 |
| 10 | Hypothetical:  If at trial in this case | 12:20:05 |
| 11 | the jury finds in favor of Uber -- Uber and | 12:20:06 |
| 12 | Ottomotto -- so a defense verdict for them -- but | 12:20:10 |
| 13 | against Otto Trucking on liability, what's your | 12:20:13 |
| 14 | opinion as to the damages that Waymo would be | 12:20:17 |
| 15 | entitled to as to my client, Otto Trucking? | 12:20:20 |
| 16 | MR. EISEMAN:  Objection as to form. | 12:20:23 |
| 17 | A    I would need more facts to know if there's | 12:20:24 |
| 18 | any relevance of what I have done would apply to | 12:20:25 |
| 19 | your client in that hypothetical. | 12:20:28 |
| 20 | Q    (BY MR. SCHUMAN) So as you sit here today | 12:20:30 |
| 21 | based on the work you have done so far up to and | 12:20:32 |
| 22 | including today, you don't have an opinion of what | 12:20:35 |
| 23 | damages Waymo would be entitled to under that | 12:20:38 |
| 24 | hypothetical verdict -- | 12:20:40 |
| 25 | MR. EISEMAN:  Objection. | 12:20:41 |

Page 137

| | | |
|---|---|---|
| 1 | Q     (BY MR. SCHUMAN) -- is that fair? | 12:20:41 |
| 2 | MR. EISEMAN:  Objection as to form. | 12:20:43 |
| 3 | A     I do not. | 12:20:43 |
| 4 | Q     (BY MR. SCHUMAN) In -- in response to some | 12:20:44 |
| 5 | of the questions you got from Uber's counsel, you -- | 12:20:50 |
| 6 | you mentioned that you personally spent | 12:20:55 |
| 7 | approximately 64 hours total working on -- working | 12:20:58 |
| 8 | on your opinions in this case.  Obviously, your | 12:21:01 |
| 9 | staff spent many more hours than that. | 12:21:04 |
| 10 | Approximately what percentage of your | 12:21:06 |
| 11 | 64 hours, Mr. Wagner, did you spend focusing on | 12:21:09 |
| 12 | calculating damages specific to my client, Otto | 12:21:14 |
| 13 | Trucking? | 12:21:16 |
| 14 | A     Zero. | 12:21:17 |
| 15 | Q     Just bear with me a second. | 12:21:25 |
| 16 | A     But I could -- the approximate -- it's | 12:21:27 |
| 17 | exactly 64.0 hours through September 15.  And it's | 12:21:30 |
| 18 | been 13.4 hours since then before today. | 12:21:36 |
| 19 | Q     I would -- | 12:21:39 |
| 20 | A     -- between September 15 and today. | 12:21:40 |
| 21 | Q     In response to some questions from Uber's | 12:21:44 |
| 22 | counsel, I think you made clear that your damages | 12:21:45 |
| 23 | are based on Uber's use of -- alleged use of the | 12:21:46 |
| 24 | trade secrets in its development of its autonomous | 12:21:53 |
| 25 | vehicles. | 12:21:56 |

Page 138

```
 1              If the evidence at trial shows that my          12:22:01

 2      client, Otto Trucking, has not used any of those       12:22:04

 3      trade secrets, would you agree with me that your       12:22:07

 4      opinions are irrelevant to Otto Trucking?              12:22:10

 5              MR. EISEMAN:  Objection as to form.            12:22:13

 6        A    I'm not giving you a legal opinion.  But        12:22:16

 7      as -- my judgment as a damage expert, you are          12:22:17

 8      correct.                                                12:22:20

 9        Q    (BY MR. SCHUMAN) You mentioned that you         12:22:29

10      had documents in this case from Uber with its own      12:22:31

11      modeling of the benefits of -- of -- well, let me --   12:22:38

12      let me ask it -- strike that.  Let me start that       12:22:44

13      question again.                                         12:22:47

14              Do you remember some testimony you gave in     12:22:48

15      response to Uber's counsel where you characterized     12:22:49

16      some of the information you got from -- that you       12:22:52

17      were able to review from Uber as the Rosetta Stone     12:22:55

18      in your field?                                          12:22:57

19              Do you remember that --                         12:22:59

20        A    I --                                             12:22:59

21        Q    -- testimony?                                    12:22:59

22        A    -- do remember that.                             12:23:00

23        Q    And -- and what is the information again        12:23:01

24      that you characterize as being the Rosetta Stone in    12:23:03

25      your field?                                             12:23:05
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    Well, you know, I -- well, let me -- let | 12:23:06 |
| 2 | me give you an example of another case that I | 12:23:07 |
| 3 | testified in last year in a similar fact situation | 12:23:10 |
| 4 | of this case where there's no product in the market | 12:23:13 |
| 5 | yet.  There's regulatory approvals that need to be | 12:23:16 |
| 6 | done that weren't done yet; that there would be no | 12:23:20 |
| 7 | commercialization for years into the future.  And I | 12:23:21 |
| 8 | had the business plans of the company that took the | 12:23:24 |
| 9 | trade secrets. | 12:23:30 |
| 10 | Now, there they provided me the model, and | 12:23:31 |
| 11 | they never made a calculation of what the impact | 12:23:36 |
| 12 | would be on them to accelerate the development by | 12:23:39 |
| 13 | any amount of time.  I had to get into their model, | 12:23:43 |
| 14 | understand the logic, and make that calculation | 12:23:46 |
| 15 | myself. | 12:23:47 |
| 16 | In this case I have the same thing in that | 12:23:49 |
| 17 | I have projections done at the time of the alleged | 12:23:51 |
| 18 | theft by the party who was alleged to have taken the | 12:23:55 |
| 19 | trade secrets. | 12:23:59 |
| 20 | But they have even gone to the next step | 12:24:01 |
| 21 | of actually quantifying the impact of acceleration, | 12:24:04 |
| 22 | and so that's why I say it's the Rosetta Stone. | 12:24:07 |
| 23 | Normally I have to do more work than I did in this | 12:24:09 |
| 24 | case, but Uber has done it for me. | 12:24:12 |
| 25 | Q    Right.  And have you seen any similar | 12:24:17 |

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | documents from my client, Otto Trucking? | 12:24:20 |
| 2 | A    I knew that was next question.  The answer | 12:24:23 |
| 3 | is no.  And you're closing the loop. | 12:24:25 |
| 4 | MR. SCHUMAN:  Why don't we take a | 12:24:32 |
| 5 | two-minute break.  I don't think I have anything | 12:24:33 |
| 6 | more, but why don't we just -- | 12:24:36 |
| 7 | MR. BERRY:  I actually have a couple of | 12:24:36 |
| 8 | questions. | 12:24:38 |
| 9 | MR. SCHUMAN:  Well, I'm not sure I'm done | 12:24:38 |
| 10 | yet.  I just want to -- | 12:24:40 |
| 11 | MR. BERRY:  Okay. | 12:24:41 |
| 12 | MR. SCHUMAN:  -- take a two-minute break | 12:24:41 |
| 13 | and make sure.  And then if you have something else. | 12:24:41 |
| 14 | MR. BERRY:  Okay. | 12:24:44 |
| 15 | MR. SCHUMAN:  -- you guys can take that | 12:24:45 |
| 16 | up. | 12:24:46 |
| 17 | THE VIDEOGRAPHER:  It's 12:24 p.m.  We're | 12:24:47 |
| 18 | going off the record. | 12:24:49 |
| 19 | (A break was taken from 12:24 p.m. to | 12:24:51 |
| 20 | 12:28 p.m.) | 12:25:12 |
| 21 | THE VIDEOGRAPHER:  We are back on the | 12:28:09 |
| 22 | record.  It's 12:28 p.m. | 12:28:09 |
| 23 | Q    (BY MR. SCHUMAN) Mr. Wagner, did either | 12:28:15 |
| 24 | the Quinn firm or Waymo ask you or your firm to | 12:28:17 |
| 25 | prepare any damages opinions specific to my client, | 12:28:22 |

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Otto Trucking? | 12:28:27 |
| 2 | A    I don't recall that specific instruction. | 12:28:28 |
| 3 | Q    As you sit here today, do you plan to do | 12:28:31 |
| 4 | any work between now and the time of trial on | 12:28:33 |
| 5 | developing opinions regarding damages specific to my | 12:28:38 |
| 6 | client, Otto Trucking? | 12:28:45 |
| 7 | A    No. | 12:28:46 |
| 8 | MR. SCHUMAN:  Okay.  I have no further | 12:28:47 |
| 9 | questions for you.  Thank you for your time. | 12:28:49 |
| 10 | A    Thank you. | 12:28:52 |
| 11 | MR. EISEMAN:  Mr. Berry, what do you | 12:28:56 |
| 12 | consider this -- these questions?  Do you consider | 12:28:58 |
| 13 | them to be redirect? | 12:28:59 |
| 14 | MR. BERRY:  I haven't even thought about | 12:29:02 |
| 15 | how to characterize it. | 12:29:03 |
| 16 | EXAMINATION BY COUNSEL FOR THE DEFENDANTS | 12:29:08 |
| 17 | BY MR. BERRY: | 12:29:12 |
| 18 | Q    Mr. Wagner, I had a -- a couple of | 12:29:12 |
| 19 | questions.  The first is:  Your opinions in this | 12:29:13 |
| 20 | case assume that Uber is going to go to market and | 12:29:15 |
| 21 | commercialize its AV technology using the Fuji | 12:29:19 |
| 22 | LiDAR, right? | 12:29:23 |
| 23 | MR. EISEMAN:  Objection as to form. | 12:29:24 |
| 24 | A    I -- again, I -- I think that's assumed. | 12:29:24 |
| 25 | But again, that's a better question for | 12:29:27 |

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      I, MARY J. GOFF, CSR No. 13427, Certified

2  Shorthand Reporter of the State of California,

3  certify;

4      That the foregoing proceedings were taken

5  before me at the time and place herein set forth, at

    which time the witness declared under penalty of

6  perjury; that the testimony of the witness and all

7  objections made at the time of the examination were

8  recorded stenographically by me and were thereafter

9  transcribed under my direction and supervision; that

10  the foregoing is a full, true, and correct

11  transcript of my shorthand notes so taken and of the

12  testimony so given;

13     That before completion of the deposition,

14  review of the transcript (  ) was (XX) was not

15  requested:  (  ) that the witness has failed or

    refused to approve the transcript.

16     I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties, nor of any

19  of the parties.

20     I declare under penalty of perjury under the

21  laws of California that the foregoing is true and

22  correct, dated this 23rd day of September, 2017.

23

24

25     MARY J. GOFF, CSR No. 13427

Page 145

1   Neel Chatterjee (SBN 173985)
    *nchatterjee@goodwinlaw.com*
2   **GOODWIN PROCTER** LLP
    135 Commonwealth Drive
3   Menlo Park, California 94025
    Tel.: +1 650 752 3100
4   Fax.: +1 650 853 1038

5   Brett Schuman (SBN 189247)
    *bschuman@goodwinlaw.com*
6   Shane Brun (SBN 179079)
    *sbrun@goodwinlaw.com*
7   Rachel M. Walsh (SBN 250568)
    *rwalsh@goodwinlaw.com*
8   **GOODWIN PROCTER** LLP
    Three Embarcadero Center
9   San Francisco, California 94111
    Tel.: +1 415 733 6000
10  Fax.: +1 415 677 9041

11  Hong-An Vu (SBN 266268)
    *hvu@goodwinlaw.com*
12  **GOODWIN PROCTER** LLP
    601 S. Figueroa Street, 41st Floor
13  Los Angeles, California  90017
    Tel.: +1 213 426 2500
14  Fax.: +1 213 623 1673

15  *Attorneys for Defendant: Otto Trucking LLC*

**UNREDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED**

16

17                    **UNITED STATES DISTRICT COURT**

                    **NORTHERN DISTRICT OF CALIFORNIA**

18                      **SAN FRANCISCO DIVISION**

19  Waymo LLC,                          | Case No. 3:17-cv-00939-WHA

20              Plaintiff,              | **DEFENDANT OTTO TRUCKING LLC'S
                                        | OPPOSITION TO PLAINTIFF WAYMO
21      v.                              | LLC'S MOTION TO EXCLUDE OTTO
                                        | TRUCKING'S DAMAGES EXPERT
22  Uber Technologies, Inc.; Ottomotto LLC; Otto | JAMES MALACKOWSKI PURSUANT TO
    Trucking LLC,                       | RULE 702 AND *DAUBERT*
23
            Defendants.                 |
24                                      | Date:        September 27, 2017
                                        | Time:        8:00 a.m.
25                                      | Courtroom:   8 (19th Floor)
                                        | Judge:       Hon. William Alsup
26                                      | Trial:       October 10, 2017

27                                      | Filed/Lodged Concurrently with:
                                        | 1.  Declaration of Neel Chatterjee

28

---

1

## I.     __INTRODUCTION__

2        Otto Trucking respectfully requests that the Court deny Waymo's motion to exclude Otto

3   Trucking's damages expert, James Malackowski.  Mr. Malackowski is a preeminent licensing and

4   damages expert with 30 years of experience.  Waymo does not challenge Mr. Malackowski's

5   qualifications.  Nor does Waymo even attempt to discuss the record evidence and reasoning that

6   support Mr. Malackowski's damages opinions.  Instead, Waymo asks the Court to exclude Mr.

7   Malackowski's damages opinions related to Otto Trucking based solely on the ground that his

8   opinions are allegedly improper legal conclusions.[1]  Waymo is incorrect.

9        In this litigation — indeed, in its current motion — Waymo has openly admitted that it has

10  no specific damages theory as related to Otto Trucking.  *See* Waymo's Motion to Exclude Otto

11  Trucking's Damages Expert James Malackowski Pursuant to Rule 702 and *Daubert* ("Mot."). at 4.

12  Consistent with this admission, Waymo's expert, Michael Wagner, sets forth damages opinions for

13  unjust enrichment and reasonable royalty based only on facts relating to Uber and Ottomotto — not

14  Otto Trucking.  For Otto Trucking, Mr. Wagner readily admits he cannot quantify any damages,

15  royalties or unjust enrichment. In his deposition, Mr. Wagner went so far as to say he has not even

16  investigated whether any compensation is due.  In response to Mr. Wagner's report, Mr.

17  Malackowski explains that (1) there should be no separate damages against Otto Trucking for any

18  alleged misappropriation and, relatedly, (2) Mr. Wagner has failed to address any separate recovery

19  from Otto Trucking.  These are not legal conclusions, and there really should be no dispute that Mr.

20  Malackowski is permitted to analyze and criticize the methodology of Waymo's experts.

21        Despite no evidence of any calculation by Mr. Wagner, Waymo nevertheless takes issue with

22  Mr. Malackowski's opinions because he does not address its purported damages theories based on

23  joint and several liability and vicarious liability.  *See id.*  Oddly enough, these liability issues are

24  legal issues that Mr. Malackowski properly did not address (and that have already been presented to

25  the Court, *see* Dkt. No. 1423 at 19-20; Dkt. No. 1637 at 8-14) (briefing on Otto Trucking's summary

26

27  [1] Mr. Malackowski's report contains additional opinions relating to (a) the unreliability of Mr.
    Wagner's unjust enrichment opinions, (b) Mr. Wagner's failure to demonstrate that a permanent

28  injunction is appropriate, and (c) the unreliability of the opinions of Waymo's other expert, Jim
    Timmins.  Waymo has not sought to exclude any of these opinions.

DEFENDANT OTTO TRUCKING'S OPPOSITION TO WAYMO LLC'S        CASE NO. 3:17-CV-00939
MOTION TO EXCLUDE OTTO TRUCKING'S DAMAGES EXPERT

1    judgment motion)). Indeed, Waymo's own expert Mr. Wagner does not discuss joint and several

2    liability or vicarious liability in his report.  It thus appears that Waymo, through this motion, is

3    improperly attempting to have these legal liability issues adjudged in its favor.  But it is well-settled

4    that a *Daubert* motion cannot be used in this fashion.  *See, e.g.*, *Colton Crane Co., LLC v. Terex*

5    *Cranes Wilmington, Inc.*, No. CV 08-8525 PSG (PJWx), 2010 WL 2035800, at *1 (C.D. Cal. May

6    19, 2010) ("[M]otions *in limine* should not be used as disguised motions for summary judgment.").

7           In short, Mr. Malackowski's opinions are both based on the specific facts of this case and

8    responsive to Mr. Wagner's report.  These opinions are within the purview of Rule 702 and should

9    be heard by a jury in open court.  Waymo's motion should be denied.

10   **II.    MR. MALACKOWSKI'S OPINIONS**

11          Mr. Malackowski sets forth two opinions in his expert report related to damages as to Otto

12   Trucking: (1) there should be no separate damages recovery from Otto Trucking, *see* Declaration of

13   Neel Chatterjee ("Chaterjee Decl."), Ex. 1 ("Malackowski Rept.") at 41-43; and (2) Waymo's

14   expert, Mr. Wagner, fails to separately address monetary recovery from Otto Trucking, *see id.* at 43-

15   50.

16          First, Mr. Malackowski opines that there should be no separate recovery against Otto

17   Trucking.  He explains that, under the facts of this case, any recovery against Uber or Ottomotto will

18   resolve Waymo's claims such that Waymo will be fully compensated for any alleged

19   misappropriation.  In particular, Mr. Malackowski discusses three possible factual scenarios in the

20   case:

21          Regardless of the outcome of this litigation, it will satisfy Waymo's claim against
22          Otto Trucking.  First, should Waymo prevail on the merits of this case and be granted
            an injunction, Uber will be precluded from utilizing the subject matter of the asserted
23          trade secrets, and the AV-related technology licensed from Uber to Otto Trucking
            would consequently exclude the asserted trade secrets.

24          Second, if Waymo prevails on the merits of this case but is denied an injunction, the
25          monetary recovery Waymo receives from Uber would satisfy Waymo with respect to
            all uses Uber makes of the alleged trade secrets, including those of its non-exclusive
26          licensee, Otto Trucking.  As set forth above, there is no record evidence that Otto
            Trucking has or will achieve any cost savings of its own relating to the alleged use of
            the asserted trade secrets.

27

28

2

DEFENDANT OTTO TRUCKING'S OPPOSITION TO WAYMO LLC'S          CASE NO. 3:17-CV-00939
MOTION TO EXCLUDE OTTO TRUCKING'S DAMAGES EXPERT

1       Third, if Waymo loses on the merits of this case, then the fact finder would have
concluded that neither Uber or Otto Trucking misappropriated the alleged trade
2       secrets, and no recovery will be due Waymo from Uber or Otto Trucking.

3

4    *Id.* at 43.

5         Second, Mr. Malackowski details how Mr. Wagner failed to address separate monetary

6 recovery from Otto Trucking.  Mr. Malackowski first directs attention to Mr. Wagner's assertion that

7 there are certain measures of damages for Otto Trucking that he could not quantify:

8       The Wagner Report fails to address monetary recovery from Otto Trucking.
According to Mr. Wagner:
9

10      "other benefits to Defendants that I cannot quantify at this time include:

11        •  The unjust enrichment to Otto Trucking based on the potential consideration
to be paid if Uber exercises its option to acquire Otto Trucking.

12        •  The unjust enrichment to Otto Trucking or Uber based on employing LiDAR
systems with reduced expenses in the future…"
13

14 *Id.* at 43 (quoting Wagner Rept. at 121).  Mr. Malackowski further explains that, in addition to these

15 excluded calculations, Mr. Wagner's unjust enrichment and reasonable royalty calculations do not

16 take into account any facts related to Otto Trucking.  *See id.* at 43 ("Wagner also failed to address

17 Otto Trucking in either of his alternative measures of unjust enrichment."), 44 ("Mr. Wagner

18 likewise fails to address Otto Trucking in his reasonable royalty analysis[.]").  As Mr. Malackowski

19 points out, "[t]he introduction to Mr. Wagner's unjust enrichment analysis in fact confirms that his

20 analyses do not relate to Otto Trucking":

21      "I discuss and quantify unjust enrichment *to Uber* measured in two alternative ways:
measured by accelerated AV development and measured by saved development
22      expenses.  I also discuss unjust enrichment *to Ottomotto* measured by the acquisition
by Uber.  I also discuss other ways in which the Defendants have been unjustly
23      enriched that I'm unable to quantify at this time."

24 *Id.* at 43-44 (quoting Wagner Rept. at 103-104; emphasis in Malackowski Rept.).

25        Mr. Wagner has since confirmed at deposition that he did no separate work or analysis as to

26 Otto Trucking.  *See* Chatterjee Decl., Ex. 2 (Wagner Rough Dep. Tr.) at 123:25–124:4 ("Q. Okay.

27 You're not offering any opinions in this case as to any damages caused to Waymo specific to [ ] Otto

28 Trucking; is that right?  A. That's correct."), 135:7-11 ("Q. Approximately what percentage of your

3

64 hours, Mr. Wagner, did you spend focusing on calculating damages specific to my client, Otto Trucking?  A. Zero."), 131:7-11 ("Q. You didn't do any separate calculation of the amount that Otto Trucking would have agreed to pay Waymo at a hypothetical negotiation set during that same time period, correct?  A. That is accurate.").

## III.   ARGUMENT

Mr. Malackowski's expert opinions are based upon his extensive prior experience, tied directly to facts of the case, and directly responsive to Mr. Wagner's damages opinions.    Moreover, Mr. Malackowski's responsive opinions are precisely the types of opinions contemplated by the Federal Rules.  *See, e.g.*, *Nehara v. California*, No. 1:10-CV-00491 JLT, 2013 WL 5670867, at *2 (E.D. Cal. Oct. 16, 2013) ("A party may file a 'rebuttal' expert report to 'contradict or rebut evidence' offered by another party in its initial expert disclosures.") (citing Fed. R. Civ. P. 26(a)(2)(D)(ii)).  Mr. Malackowski should be permitted to testify before the jury as to these opinions, as such testimony will assist the jury in understanding Mr. Wagner's opinions as well as the evidence (or lack thereof) that Waymo sets forth to support its damages against Otto Trucking. *See* Fed. R. Evid. 702.

Setting aside its broad complaints of improper legal conclusions, Waymo fails to provide any specific analysis as to how Mr. Malackowski's opinions constitute legal conclusions.  Waymo's single cited case, *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051 (9th Cir. 2008), highlights the deficiencies in its "legal conclusion" argument.  In that case, the expert's excluded testimony all related to improper recitations and applications of the law.  The district court excluded the following legal explanations and conclusions :

> (1) sections that discuss the UCC and/or apply the UCC to the facts of this case; (2) sections that discuss non-UCC law and/or apply non-UCC law to the facts of this case; (3) sections that discuss agency law and/or apply agency law to the facts of this case; (4) sections that discuss the parties' legal rights, duties, and obligations under the law; (5) sections that label the parties' actions as "wrongful" or "intentional" under the law; and (6) sections that discuss the appropriate formula to calculate damages under the law.

*Id.* at 1058.  Here, in contrast, Mr. Malackowski does not recite or explain any laws in his expert report, nor does he attempt to apply any laws.  And Waymo certainly has not identified any such

DEFENDANT OTTO TRUCKING'S OPPOSITION TO WAYMO LLC'S        CASE NO. 3:17-CV-00939
MOTION TO EXCLUDE OTTO TRUCKING'S DAMAGES EXPERT

laws in its motion.  To the contrary, as discussed above, Mr. Malackowski's report is limited to interpretation of the facts of this case and the theories presented in the Wagner report.

Waymo's arguments related to joint and several liability and vicarious liability can be summarily dismissed.  *See* Mot. at 4-5.  Those legal issues are not discussed by either parties' damages expert and are entirely unrelated to Mr. Malackowski's qualifications or the soundness of his methodology under Rule 702 or *Daubert*.  Waymo can litigate the merits of its liability theories outside the context of a *Daubert* motion.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Waymo's motion to exclude Mr. Malackowski should be denied.


Dated:   September 22, 2017                    Respectfully submitted,


                                              By:    /s/   Neel Chatterjee
                                                     Neel Chatterjee
                                                     *nchatterjee@goodwinlaw.com*
                                                     Brett Schuman
                                                     *bschuman@goodwinlaw.com*
                                                     Shane Brun
                                                     *sbrun@goodwinlaw.com*
                                                     Rachel M. Walsh
                                                     *rwalsh@goodwinlaw.com*
                                                     Hong-An Vu
                                                     *hvu@goodwinlaw.com*
                                                     **GOODWIN PROCTER** **LLP**

                                                     *Attorneys for Defendant: Otto Trucking LLC*

DEFENDANT OTTO TRUCKING'S OPPOSITION TO WAYMO LLC'S          CASE NO. 3:17-CV-00939
MOTION TO EXCLUDE OTTO TRUCKING'S DAMAGES EXPERT

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing document including all of its

attachments with the Clerk of the Court for the United States District Court for the Northern

District of California by using the CM/ECF system on **September 22, 2017**.  I further certify that

all participants in the case are registered CM/ECF users and that service of the publicly filed

documents will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on

**September 22, 2017**.

<u>/s/   Neel Chatterjee</u>
NEEL CHATTERJEE

DEFENDANT OTTO TRUCKING'S OPPOSITION TO WAYMO LLC'S      CASE NO. 3:17-CV-00939
MOTION TO EXCLUDE OTTO TRUCKING'S DAMAGES EXPERT

# EXHIBIT 2

## UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 2

2714429AMG.txt

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT                  |
|        | 2  |                                                              |
| 09:34:28 | 3 | THE VIDEOGRAPHER:  Good morning.  We are                    |
| 09:34:29 | 4 | going on the record at 9:34, on September 22 of the         |
| 09:34:35 | 5 | Year 2017.  Please understand microphones are very          |
| 09:34:42 | 6 | sensitive, and they may pick up whispering ad               |
| 09:34:44 | 7 | private conversations and cellular interference.            |
| 09:34:49 | 8 | Please turn off your cell phones or place                   |
| 09:34:51 | 9 | them away from the microphones, as they may                 |
| 09:34:54 | 10 | interfere with the audio.  Audio and video recording       |
| 09:34:57 | 11 | will continue to take place unless all parties agree       |
| 09:35:01 | 12 | to go off of the record.                                    |
| 09:35:03 | 13 | This is Disc 1, Volume I in the video                      |
| 09:35:06 | 14 | deposition of Michael J. Wagner, taken by counsel          |
| 09:35:10 | 15 | for Defendants in the matter of Waymo LLC v. Uber          |
| 09:35:16 | 16 | Technologies.  It's filed in the United States             |
| 09:35:19 | 17 | District Court, for the Northern District of               |
| 09:35:21 | 18 | California, Case No. 17-cv-00939-WHA.                       |
| 09:35:29 | 19 | This is being taken at Morrison &                          |
| 09:35:31 | 20 | Foerster.  They're at 425 Market Street in                 |
| 09:35:35 | 21 | San Francisco.  My name is Kevin Foor, and I am here       |
| 09:35:40 | 22 | with Mary Goff-Sharma, and we are from Veritext.           |
| 09:35:45 | 23 | I'm not related to any party nor am I financially          |
| 09:35:49 | 24 | interested in the outcome in any way.                       |
| 09:35:52 | 25 | Counsel and -- and all present in the                      |

1

2714429AMG.txt

12:08:16 23   Otto Trucking LLC.   Do you know who Otto Trucking

12:08:18 24   is?

12:08:19 25           A     I do.

123

1             ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT

12:08:20  2        Q     Who is Otto what's your understanding of

12:08:22  3   what Otto Trucking is?

12:08:23  4        A     Well, I -- I believe it's a company that's

12:08:25  5   owned by -- principally owned by Mr. Levandowski and

12:08:32  6   Lior.

12:08:34  7             And it is in -- has signed an -- an

12:08:37  8   acquisition of purchase agreement with Uber where it

12:08:43  9   it's Uber's discretion to purchase that company

12:08:46 10   between now and sometime in November.   And it is a

12:08:49 11   company that is focused on applying LiDAR technology

12:08:53 12   to trucks.

12:08:56 13        Q     Do you know whether Otto Trucking has any

12:08:58 14   employees?

12:08:59 15        A     Well, my understanding is they do not at

12:09:01 16   least from the last facts that I have.

12:09:04 17        Q     Do you have any understanding of as to

12:09:04 18   whether Otto Trucking does any research and

12:09:07 19   development activities?

12:09:12 20        A     I -- I I don't know whether they do or not

12:09:16 21   I understand that Uber is advancing development

12:09:18 22   funds to them.   So I -- I would think they do.   But

12:09:22 23   whether that's done with actually being done by Uber

12:09:26 24   and not your client, I don't know.

                          Page 116

2714429AMG.txt

12:09:29 25          Q     Okay.   You're not offering any opinions in

                                                                    124

          1          ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT

12:09:31  2     this case as to any damages caused to Waymo specific

12:09:36  3     to oath Otto Trucking; is that right?

12:09:38  4          A     That's correct.

12:09:38  5          Q     Okay.   And so then your damages -- I'm

12:09:44  6     going to walk through briefly -- not in the level of

12:09:46  7     detail that Uber's counsel did -- but I just want to

12:09:48  8     walk through you principal opinions in this case.

12:09:50  9               You have offered two unjust enrichment

12:09:55 10     unjust enrichment calculations and a reasonable

12:09:58 11     royalty measure, correct?

12:10:00 12          A     That's fair.

12:10:01 13          Q     Okay.   The first unjust enrichment measure

12:10:05 14     values the accelerated development to -- that Uber

12:10:10 15     was able to achieve through the alleged

12:10:13 16     misappropriation of these nine trade secrets, right?

12:10:16 17          A     Yes.

12:10:17 18          Q     And -- and your opinion -- that -- we'll

12:10:20 19     call that your first unjust enrichment opinion.

12:10:24 20               That opinion is based upon internal Uber

12:10:28 21     documents showing some accelerated development,

12:10:31 22     correct?

12:10:32 23          A     That's fair.

12:10:34 24          Q     That opinion is not based upon any Otto

12:10:36 25     Trucking documents; is that right?

                            Page 117

2714429AMG.txt

12:16:07  8  that word -- the caveats you're referring to

12:16:09  9  regarding the applicability of your unjust

12:16:12  10  enrichment damage theories, those caveats are Uber

12:16:17  11  acquires Otto Trucking and that Uber shares some of

12:16:21  12  the technology it's developing using the allegedly

12:16:25  13  misappropriated trade secrets with Otto Trucking; is

12:16:28  14  that right?

12:16:28  15      A    That's -- that's -- again, that's my

12:16:30  16  conclusion -- or that would be my opinion as a

12:16:33  17  damages expert.

12:16:33  18      Q    If both of those assumptions are true,

12:16:36  19  then your damages opinions -- your unjust enrichment

12:16:39  20  damages opinions may have some applicability to Otto

12:16:41  21  Trucking, correct?

12:16:44  22          MR. EISEMAN:   Objection as to form.

12:16:44  23      A    That's fair.

12:16:49  24      Q    (BY MR. BERRY) You also have a reasonable

12:16:53  25  royalty rate calculation.   And that measures the

131

1          ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT

12:16:55  2  amount that Uber would have agreed to pay Waymo in

12:16:58  3  this hypothetical negotiation set in the --

12:17:01  4  somewhere in the December 15 -- August -- between

12:17:05  5  December '15 and August 2016 time period, right?

12:17:09  6      A    Correct?

12:17:09  7      Q    You didn't do any separate calculation of

12:17:11  8  the amount that Otto Trucking would have agreed to

12:17:15  9  pay Waymo at a hypothetical negotiation set during

2714429AMG.txt

12:17:20 10    that same time period, correct?

12:17:22 11         A    That is accurate.

12:17:23 12         Q    Okay.  And then for the reasonable royalty

12:17:25 13    calculation that you did, you start with a baseline

12:17:28 14    of Uber's unjust enrichment.  And then you adjusted

12:17:32 15    upward based on some analysis you have done of

12:17:36 16    certain of the Georgia-Pacific factors.  Namely 4,

12:17:38 17    5, 6, 8, and 11, correct?

12:17:42 18         A    Those are the only ones that had any

12:17:45 19    impact on changing the number from the baseline.

12:17:47 20    That is correct.

12:17:48 21         Q    And -- and Factor 5 -- this is addressed

12:17:52 22    in your report at paragraphs 399 to 401 -- that --

12:17:55 23    that factor deals with the commercial relationship

12:17:58 24    between Waymo and Uber and some documents that you

12:18:02 25    referred regarding the -- the potential competitive

132

              1         ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT

12:18:08  2    relationship between those two companies, right?

12:18:10  3         A    Yes.

12:18:11  4         Q    That analysis in Factor 5 is -- is

12:18:13  5    inapplicable to -- to my client Otto Trucking --

12:18:16  6         A    Yeah --

12:18:16  7         Q    -- right?

12:18:16  8         A    -- as discussed in my report, that is

12:18:19  9    correct.

12:18:20 10         Q    Right.  And -- and Factor 8 deals with

12:18:25 11    expected future profitability.  And you analyzed

2714429AMG.txt

12:20:30 16        Q    So as we sit here today based on the work

12:20:33 17    you have done so far up to and including today, you

12:20:36 18    don't have an opinion of what damages Waymo would be

12:20:39 19    entitled to under that hypothetical verdict --

12:20:41 20             MR. EISEMAN:   Objection.

12:20:41 21        Q    -- is that fair (talking over each other

12:20:42 22    -- check *)?

12:20:43 23             MR. EISEMAN:   Objection as to form.

12:20:43 24        A    I do not.

12:20:44 25        Q    (BY MR. SCHUMAN) In -- in response to some

                                                                        135

         1             ROUGH ASCII--NOT FINAL CERTIFIED TRANSCRIPT

12:20:50 2     of the questions you got from Uber's counsel, you --

12:20:55 3     you mentioned that you personally spent

12:20:58 4     approximately 64 hours total working on -- working

12:21:01 5     on your opinions in this case.   Obviously, your

12:21:04 6     staff spent many more hours than that.

12:21:06 7             Approximately what percentage of your

12:21:09 8     64 hours, Mr. Wagner, did you spend focusing on

12:21:14 9     calculating damages specific to my client, Otto

12:21:16 10    Trucking?

12:21:17 11        A    Zero.

12:21:25 12        Q    Just bear with me a second.

12:21:27 13        A    But I could approximate -- it's exactly

12:21:31 14    64.0 hours through September 15.   And it's been 13.4

12:21:39 15    hours since then before today

12:21:39 16        Q    I would --

12:21:40 17        A    -- between September 15 and today (talking

                                   Page 127

UNREDACTED
VERSION OF EXHIBIT 1
SOUGHT TO BE FILED
UNDER SEAL IN ITS
ENTIRETY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

  _____

5   WAYMO LLC,                            )

6                  Plaintiff,             )

7      vs.                                ) Case No.

8   UBER TECHNOLOGIES, INC.;              ) 17-cv-00939-WHA

9   OTTOMOTTO, LLC; OTTO TRUCKING LLC, )

10                 Defendants.            )

  _____)

11

12      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14      VIDEOTAPED DEPOSITION OF MICHAEL J. WAGNER

15              San Francisco, California

16             Friday, September 22, 2017

17                    Volume I

18

19

20   Reported by:

21   MARY J. GOFF

22   CSR No. 13427

23   Job No. 2714429

24

25   PAGES 1-145

                                        Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5    _____

6    WAYMO LLC,                          )

7               Plaintiff,               )

8       vs.                              ) Case No.

9    UBER TECHNOLOGIES, INC.;            ) 17-cv-00939-WHA

10   OTTOMOTTO, LLC; OTTO TRUCKING LLC, )

11              Defendants.              )

12   _____)

13

14              HIGHLY CONFIDENTIAL

15

16      Videotaped Deposition of MICHAEL J. WAGNER,

17      Volume I, taken on behalf of Defendants,

18      at Morrison & Foerster, 425 market Street,

19      33rd Floor, San Francisco, beginning at

20      9:34 a.m. and ending at 12:30 p.m., on

21      September 22, 2017, before MARY GOFF, Certified

22      Shorthand Reporter No. 13427.

23

24

25

                                        Page  2

| | | |
|---|---|---|
| 1 | A    Yeah, but I -- he thinks -- he thinks my | 12:07:51 |
| 2 | profile is not as good as my straight face. | 12:07:53 |
| 3 | THE VIDEOGRAPHER:  What he said.  Do you | 12:07:57 |
| 4 | want to stay on or -- we can stay on. | 12:07:59 |
| 5 | EXAMINATION BY COUNSEL FOR THE DEFENDANTS | 12:08:03 |
| 6 | BY MR. SCHUMAN: | 12:08:04 |
| 7 | Q    All right.  Good afternoon, Mr. Wagner. | 12:08:07 |
| 8 | A    Good afternoon, Mr. Schuman. | 12:08:10 |
| 9 | Q    Mr. Wagner, I represent a company called | 12:08:14 |
| 10 | Otto Trucking LLC.  Do you know who Otto Trucking | 12:08:16 |
| 11 | is? | 12:08:18 |
| 12 | A    I do. | 12:08:19 |
| 13 | Q    Who is Otto -- what's your understanding | 12:08:20 |
| 14 | of who Otto Trucking is? | 12:08:21 |
| 15 | A    Well, I -- I believe it's a company that's | 12:08:23 |
| 16 | owned by -- principally owned by Mr. Levandowski and | 12:08:25 |
| 17 | Lior. | 12:08:32 |
| 18 | And it is in -- has signed an -- an | 12:08:34 |
| 19 | acquisition of purchase agreement with Uber where | 12:08:37 |
| 20 | it -- it's Uber's discretion to purchase that | 12:08:42 |
| 21 | company between now and sometime in November.  And | 12:08:45 |
| 22 | it is a company that is focused on applying LiDAR | 12:08:48 |
| 23 | technology to trucks. | 12:08:52 |
| 24 | Q    Do you know whether Otto Trucking has any | 12:08:56 |
| 25 | employees? | 12:08:58 |

Page 126

| | | |
|---|---|---|
| 1 | A   Well, my understanding is they do not, at | 12:08:59 |
| 2 | least from the last facts that I have. | 12:09:01 |
| 3 | Q   Do you have any understanding as to | 12:09:04 |
| 4 | whether Otto Trucking does any research and | 12:09:04 |
| 5 | development activities? | 12:09:07 |
| 6 | A   I -- I -- I don't know whether they do or | 12:09:12 |
| 7 | not.  I understand that Uber is advancing | 12:09:15 |
| 8 | development funds to them, so I -- I would think | 12:09:18 |
| 9 | they do.  But whether that's done with -- actually | 12:09:21 |
| 10 | being done by Uber and not your client, I -- I don't | 12:09:25 |
| 11 | know. | 12:09:28 |
| 12 | Q   Okay.  You're not offering any opinions in | 12:09:29 |
| 13 | this case as to any damages caused to Waymo specific | 12:09:31 |
| 14 | to Otto Trucking; is that right? | 12:09:36 |
| 15 | A   That's correct. | 12:09:38 |
| 16 | Q   Okay.  And so then your damages -- I'm | 12:09:38 |
| 17 | going to walk through briefly -- not in the level of | 12:09:44 |
| 18 | detail that Uber's counsel did, but I just want to | 12:09:46 |
| 19 | walk through your -- your principal opinions in this | 12:09:48 |
| 20 | case. | 12:09:50 |
| 21 | You have offered two unjust enrichment | 12:09:50 |
| 22 | calculations and a -- and a reasonable royalty | 12:09:55 |
| 23 | measure, correct? | 12:09:59 |
| 24 | A   That's fair. | 12:10:00 |
| 25 | Q   Okay.  The first unjust enrichment measure | 12:10:01 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | values the accelerated development to -- that Uber | 12:10:05 |
| 2 | was able to achieve through the alleged | 12:10:10 |
| 3 | misappropriation of these nine trade secrets, right? | 12:10:13 |
| 4 | A    Yes. | 12:10:16 |
| 5 | Q    And -- and your opinion -- that -- we'll | 12:10:17 |
| 6 | call that your first unjust enrichment opinion. | 12:10:20 |
| 7 | That opinion is based on internal Uber | 12:10:24 |
| 8 | documents showing some accelerated development, | 12:10:28 |
| 9 | correct? | 12:10:31 |
| 10 | A    That's fair. | 12:10:32 |
| 11 | Q    That opinion is not based on any Otto | 12:10:34 |
| 12 | Trucking documents; is that right? | 12:10:36 |
| 13 | A    It is not. | 12:10:40 |
| 14 | Q    So would you agree with me then that your | 12:10:42 |
| 15 | first unjust -- unjust enrichment theory is not | 12:10:45 |
| 16 | applicable to Otto Trucking? | 12:10:48 |
| 17 | MR. EISEMAN:  Objection as to form. | 12:10:50 |
| 18 | A    You know, I -- what I would say is that | 12:10:51 |
| 19 | unless Uber exercises its option to purchase Otto | 12:10:56 |
| 20 | Trucking or shares this accelerated depreciation -- | 12:11:01 |
| 21 | or accelerated development with Otto Trucking, then | 12:11:04 |
| 22 | my calculations have nothing to do with your client. | 12:11:10 |
| 23 | Q    (BY MR. SCHUMAN) Right.  And as we sit | 12:11:15 |
| 24 | here today, you know that Uber has not exercised the | 12:11:15 |
| 25 | option to the purchase Otto Trucking, right? | 12:11:18 |

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    I -- I don't know that.  But those facts | 12:11:21 |
| 2 | have not been brought to my attention.  And if it | 12:11:23 |
| 3 | had happened, I fully expect I would be aware of it. | 12:11:26 |
| 4 | Q    Right.  And the accelerated -- sharing the | 12:11:30 |
| 5 | accelerated development with Otto Trucking, what did | 12:11:33 |
| 6 | you mean by that? | 12:11:36 |
| 7 | A    Well, if -- if -- if as a result of Uber | 12:11:36 |
| 8 | accelerating development of LiDAR on their veh -- on | 12:11:43 |
| 9 | their vehicles for their transportation as a | 12:11:46 |
| 10 | service, they -- they're also -- then by Otto | 12:11:48 |
| 11 | Trucking -- and Otto Trucking is going to get into | 12:11:51 |
| 12 | the market one or two years earlier than they | 12:11:54 |
| 13 | otherwise would -- then I think it might be | 12:11:58 |
| 14 | appropriate to your client.  But unless those facts | 12:12:00 |
| 15 | occur, what I have calculated has nothing to do with | 12:12:03 |
| 16 | your client. | 12:12:05 |
| 17 | Q    All right.  And as we sit here today, you | 12:12:06 |
| 18 | do know that those facts that you have just in your | 12:12:07 |
| 19 | last answer summarized have not occurred yet, right? | 12:12:10 |
| 20 | A    That's correct. | 12:12:13 |
| 21 | Q    Your second unjust enrichment calculation | 12:12:14 |
| 22 | is based on the cost that -- that you have opined | 12:12:16 |
| 23 | Uber saved in its development of autonomous vehicles | 12:12:20 |
| 24 | through alleged use of these nine trade secrets, | 12:12:25 |
| 25 | right? | 12:12:29 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    Yes. | 12:12:29 |
| 2 | Q    And again, that's based on Uber documents | 12:12:29 |
| 3 | showing a $20 million per-month run rate for its R&D | 12:12:33 |
| 4 | program on autonomous vehicles, right? | 12:12:39 |
| 5 | A    Yeah, documents and I believe deposition | 12:12:42 |
| 6 | testimony of Mr. Bares. | 12:12:44 |
| 7 | Q    Fair.  Right.  And -- and so your second | 12:12:45 |
| 8 | unjust enrichment calculation is not based on any | 12:12:48 |
| 9 | Otto Trucking-specific evidence; is that fair? | 12:12:50 |
| 10 | A    That is fair. | 12:12:55 |
| 11 | Q    So your second unjust enrichment | 12:12:55 |
| 12 | calculation, would you agree with me, is not | 12:12:57 |
| 13 | applicable to Otto Trucking? | 12:13:00 |
| 14 | MR. EISEMAN:  Objection as to form. | 12:13:02 |
| 15 | A    Yes, with the same caveats as I discussed | 12:13:02 |
| 16 | on the first calculation. | 12:13:05 |
| 17 | Q    (BY MR. SCHUMAN) Right.  So assume -- | 12:13:07 |
| 18 | assume for purposes of this question that Otto | 12:13:08 |
| 19 | Trucking pays Uber some amount of money for the work | 12:13:11 |
| 20 | that Uber employees are -- are doing on | 12:13:18 |
| 21 | autonomous -- the development of autonomous trucks. | 12:13:22 |
| 22 | Have you seen any evidence in the | 12:13:25 |
| 23 | materials you reviewed as to what Otto Trucking's | 12:13:28 |
| 24 | burn rate is for that development? | 12:13:32 |
| 25 | A    No. | 12:13:35 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q    Okay.  Did -- on the list of materials you | 12:13:36 |
| 2 | reviewed or at least considered is the Brent Schwarz | 12:13:39 |
| 3 | deposition. | 12:13:44 |
| 4 | Do you recall reviewing any portions of | 12:13:45 |
| 5 | Mr. Schwarz's deposition? | 12:13:47 |
| 6 | A    I personally do not. | 12:13:48 |
| 7 | Q    You have a separate section of your | 12:13:55 |
| 8 | report -- and we were just covering this with Uber's | 12:13:58 |
| 9 | counsel -- unjust enrichment related to Trade Secret | 12:14:02 |
| 10 | No. 90.  And I think you have an $8 million unjust | 12:14:04 |
| 11 | enrichment figure for that; is -- | 12:14:08 |
| 12 | A    Yes -- | 12:14:10 |
| 13 | Q    -- that right? | 12:14:10 |
| 14 | A    -- that's correct. | 12:14:11 |
| 15 | Q    And that is -- that -- is that based on | 12:14:12 |
| 16 | any Otto Trucking documents or evidence? | 12:14:15 |
| 17 | A    No. | 12:14:17 |
| 18 | Q    Does that theory have any applicability to | 12:14:18 |
| 19 | Otto Trucking? | 12:14:20 |
| 20 | MR. EISEMAN:  Objection as to form. | 12:14:21 |
| 21 | A    You know, I -- no, again, with the same | 12:14:22 |
| 22 | caveats.  And -- and I personally believe that my | 12:14:26 |
| 23 | work is only relevant unless client is -- you will | 12:14:28 |
| 24 | have no role at the trial, because your client will | 12:14:32 |
| 25 | be owned by Uber.  And I assume Uber's counsel will | 12:14:35 |

Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | be representing their interests at that point.  But | 12:14:38 |
| 2 | I -- that's only way I see my work as relevant to | 12:14:41 |
| 3 | your client. | 12:14:44 |
| 4 | Q    (BY MR. SCHUMAN) Right.  So the same | 12:14:49 |
| 5 | caveat -- the same caveats that you're referring to | 12:14:49 |
| 6 | in that answer are -- are the sort of -- we'll call | 12:14:51 |
| 7 | them speculative future possibility that Uber | 12:14:54 |
| 8 | acquires Otto Trucking and shares some of these | 12:14:58 |
| 9 | benefits that you have quantified with Otto Trucking | 12:15:01 |
| 10 | in the future; is -- | 12:15:04 |
| 11 | MR. EISEMAN:  Objection. | 12:15:05 |
| 12 | Q    (BY MR. SCHUMAN) -- that -- | 12:15:05 |
| 13 | MR. EISEMAN:  Objection.  Sorry. | 12:15:06 |
| 14 | Q    (BY MR. SCHUMAN) Am I -- | 12:15:07 |
| 15 | MR. EISEMAN:  Objection as to form. | 12:15:09 |
| 16 | Q    (BY MR. SCHUMAN) I didn't ask the question | 12:15:09 |
| 17 | yet.  Do you understand that -- do I understand your | 12:15:10 |
| 18 | caveats correctly? | 12:15:14 |
| 19 | MR. EISEMAN:  Objection as to form. | 12:15:15 |
| 20 | A    Yes.  If you took just the | 12:15:16 |
| 21 | word "speculative" out of your question, I would | 12:15:18 |
| 22 | agree with what you said. | 12:15:21 |
| 23 | I mean -- yeah, I don't know whether | 12:15:24 |
| 24 | they're going to get acquired or not.  But you know, | 12:15:25 |
| 25 | clearly your -- your client is -- is getting a lot | 12:15:27 |

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of funds from Uber.   Uber is forwarding -- committed | 12:15:29 |
| 2 | to forward a lot of funds to your client.   There -- | 12:15:32 |
| 3 | there is a -- a deal done that your client -- client | 12:15:34 |
| 4 | will have to accept and Uber can force on your | 12:15:38 |
| 5 | client, if they want to. | 12:15:41 |
| 6 |           I don't know what their mind-set is right | 12:15:43 |
| 7 | now, and I don't know how much development on the | 12:15:45 |
| 8 | truck has been done as to whether Uber believes it's | 12:15:47 |
| 9 | appropriate to purchase your client. | 12:15:51 |
| 10 |           So I don't think it's wild speculation, | 12:15:54 |
| 11 | but I clearly do not know whether it will happen or | 12:15:56 |
| 12 | not.   But then all the caveats apply. | 12:16:00 |
| 13 |      Q     (BY MR. SCHUMAN) Right.  So fair enough. | 12:16:03 |
| 14 | Taking out the word "speculative."  I know we don't | 12:16:03 |
| 15 | like using that word.  The caveats you're referring | 12:16:06 |
| 16 | to regarding the applicability of your unjust | 12:16:09 |
| 17 | enrichment damage theories, those caveats are Uber | 12:16:12 |
| 18 | acquires Otto Trucking and that Uber shares some of | 12:16:17 |
| 19 | the technology it's developing using the allegedly | 12:16:21 |
| 20 | misappropriated trade secrets with Otto Trucking; is | 12:16:25 |
| 21 | that right? | 12:16:28 |
| 22 |      A    That's -- that's -- again, that's my | 12:16:28 |
| 23 | conclusion -- or that would be my opinion as a | 12:16:30 |
| 24 | damage expert. | 12:16:33 |
| 25 |      Q    If both of those assumptions are true, | 12:16:33 |

Page 133

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | then your damages opinions -- your unjust enrichment | 12:16:36 |
| 2 | damages opinions may have some applicability to Otto | 12:16:39 |
| 3 | Trucking, correct? | 12:16:41 |
| 4 | MR. EISEMAN:  Objection as to form. | 12:16:44 |
| 5 | A    That's fair. | 12:16:44 |
| 6 | Q    (BY MR. SCHUMAN) You also have a | 12:16:49 |
| 7 | reasonable royalty rate calculation, and that | 12:16:52 |
| 8 | measures the amount that Uber would have agreed to | 12:16:55 |
| 9 | pay Waymo in this hypothetical negotiation set in | 12:16:57 |
| 10 | the -- somewhere in the December 15 -- August -- | 12:17:01 |
| 11 | between December '15 and August 2016 time period, | 12:17:04 |
| 12 | right? | 12:17:08 |
| 13 | A    Correct. | 12:17:09 |
| 14 | Q    You didn't do any separate calculation of | 12:17:09 |
| 15 | the amount that Otto Trucking would have agreed to | 12:17:11 |
| 16 | pay Waymo at a hypothetical negotiation set during | 12:17:15 |
| 17 | that same time period, correct? | 12:17:20 |
| 18 | A    That is accurate. | 12:17:22 |
| 19 | Q    Okay.  And then for the reasonable royalty | 12:17:23 |
| 20 | calculation that you did, you start with a baseline | 12:17:25 |
| 21 | of Uber's unjust enrichment.  And then you adjusted | 12:17:28 |
| 22 | upward based on some analysis you have done of | 12:17:32 |
| 23 | certain of the Georgia-Pacific factors.  Namely 4, | 12:17:36 |
| 24 | 5, 6, 8, and 11, correct? | 12:17:38 |
| 25 | A    Those are the only ones that had any | 12:17:42 |

Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | impact on changing the number from the baseline. | 12:17:45 |
| 2 | That is correct. | 12:17:47 |
| 3 | Q    And -- and Factor 5 -- this is addressed | 12:17:48 |
| 4 | in your report at paragraphs 399 to 401 -- that -- | 12:17:52 |
| 5 | that factor deals with the commercial relationship | 12:17:55 |
| 6 | between Waymo and Uber and some documents that you | 12:17:58 |
| 7 | referred regarding the -- the potential competitive | 12:18:02 |
| 8 | relationship between those two companies, right? | 12:18:08 |
| 9 | A    Yes. | 12:18:10 |
| 10 | Q    That analysis in Factor 5 is -- is | 12:18:11 |
| 11 | inapplicable to -- to my client Otto Trucking -- | 12:18:13 |
| 12 | A    Yeah -- | 12:18:16 |
| 13 | Q    -- correct? | 12:18:16 |
| 14 | A    -- as discussed in my report, that is | 12:18:16 |
| 15 | correct. | 12:18:19 |
| 16 | Q    Right.  And -- and Factor 8 deals with | 12:18:20 |
| 17 | expected future profitability.  And you analyzed | 12:18:25 |
| 18 | Waymo's and Uber's projections for profitability of | 12:18:29 |
| 19 | autonomous vehicles. | 12:18:36 |
| 20 |         And in your view, that factor counseled in | 12:18:36 |
| 21 | favor of some enhancement to the baseline for the | 12:18:38 |
| 22 | reasonable royalty calculation, right? | 12:18:42 |
| 23 | A    That's fair. | 12:18:44 |
| 24 | Q    Okay.  And -- and you were working with | 12:18:45 |
| 25 | Waymo and Uber projections there, not any | 12:18:48 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | projections from Otto Trucking, right? | 12:18:51 |
| 2 | A    Correct.  I don't believe I have seen any | 12:18:52 |
| 3 | projections for your client -- | 12:18:54 |
| 4 | Q    Right. | 12:18:56 |
| 5 | A    -- and so I poss -- I could not have | 12:18:56 |
| 6 | possibly considered them. | 12:18:58 |
| 7 | Q    Okay.  You answered my next question, so | 12:18:59 |
| 8 | that'll make us go a little faster. | 12:19:01 |
| 9 | Factor 11 talks about the extent of the | 12:19:04 |
| 10 | use of the invention.  This is addressed at | 12:19:06 |
| 11 | paragraphs 424 and 428 of your report.  And again, | 12:19:09 |
| 12 | you find that that factor pushes the base -- the -- | 12:19:12 |
| 13 | the reasonable royalty baseline up a little bit | 12:19:13 |
| 14 | because of your assumptions based on the work of | 12:19:17 |
| 15 | others that -- that Uber has used these trade | 12:19:21 |
| 16 | secrets, right? | 12:19:24 |
| 17 | A    Yes. | 12:19:25 |
| 18 | Q    And you -- you have not done or are -- at | 12:19:28 |
| 19 | least -- have -- have you seen any evidence of any | 12:19:30 |
| 20 | use of any of these trade secrets by my client, Otto | 12:19:33 |
| 21 | Trucking? | 12:19:36 |
| 22 | MR. EISEMAN:  Objection as to form. | 12:19:37 |
| 23 | A    I have not. | 12:19:37 |
| 24 | Q    (BY MR. SCHUMAN) And so your analysis of | 12:19:41 |
| 25 | Factor 11 is inapplicable to my client, Otto | 12:19:42 |

Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Trucking, right? | 12:19:46 |
| 2 | MR. EISEMAN:  Objection as to form. | 12:19:47 |
| 3 | A    Based on the information that I have at | 12:19:48 |
| 4 | this time, that is correct. | 12:19:50 |
| 5 | Q    (BY MR. SCHUMAN) Okay.  Mr. Wagner, if the | 12:19:53 |
| 6 | jury finds that -- and this is the hypothetical, so | 12:19:55 |
| 7 | it's -- follow me here.  If the jury finds that Uber | 12:19:57 |
| 8 | and Ottomotto -- strike that.  I'm going to start | 12:20:01 |
| 9 | over. | 12:20:05 |
| 10 | Hypothetical:  If at trial in this case | 12:20:05 |
| 11 | the jury finds in favor of Uber -- Uber and | 12:20:06 |
| 12 | Ottomotto -- so a defense verdict for them -- but | 12:20:10 |
| 13 | against Otto Trucking on liability, what's your | 12:20:13 |
| 14 | opinion as to the damages that Waymo would be | 12:20:17 |
| 15 | entitled to as to my client, Otto Trucking? | 12:20:20 |
| 16 | MR. EISEMAN:  Objection as to form. | 12:20:23 |
| 17 | A    I would need more facts to know if there's | 12:20:24 |
| 18 | any relevance of what I have done would apply to | 12:20:25 |
| 19 | your client in that hypothetical. | 12:20:28 |
| 20 | Q    (BY MR. SCHUMAN) So as you sit here today | 12:20:30 |
| 21 | based on the work you have done so far up to and | 12:20:32 |
| 22 | including today, you don't have an opinion of what | 12:20:35 |
| 23 | damages Waymo would be entitled to under that | 12:20:38 |
| 24 | hypothetical verdict -- | 12:20:40 |
| 25 | MR. EISEMAN:  Objection. | 12:20:41 |

Page 137

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q    (BY MR. SCHUMAN) -- is that fair? | 12:20:41 |
| 2 | MR. EISEMAN:  Objection as to form. | 12:20:43 |
| 3 | A    I do not. | 12:20:43 |
| 4 | Q    (BY MR. SCHUMAN) In -- in response to some | 12:20:44 |
| 5 | of the questions you got from Uber's counsel, you -- | 12:20:50 |
| 6 | you mentioned that you personally spent | 12:20:55 |
| 7 | approximately 64 hours total working on -- working | 12:20:58 |
| 8 | on your opinions in this case.  Obviously, your | 12:21:01 |
| 9 | staff spent many more hours than that. | 12:21:04 |
| 10 | Approximately what percentage of your | 12:21:06 |
| 11 | 64 hours, Mr. Wagner, did you spend focusing on | 12:21:09 |
| 12 | calculating damages specific to my client, Otto | 12:21:14 |
| 13 | Trucking? | 12:21:16 |
| 14 | A    Zero. | 12:21:17 |
| 15 | Q    Just bear with me a second. | 12:21:25 |
| 16 | A    But I could -- the approximate -- it's | 12:21:27 |
| 17 | exactly 64.0 hours through September 15.  And it's | 12:21:30 |
| 18 | been 13.4 hours since then before today. | 12:21:36 |
| 19 | Q    I would -- | 12:21:39 |
| 20 | A    -- between September 15 and today. | 12:21:40 |
| 21 | Q    In response to some questions from Uber's | 12:21:44 |
| 22 | counsel, I think you made clear that your damages | 12:21:45 |
| 23 | are based on Uber's use of -- alleged use of the | 12:21:46 |
| 24 | trade secrets in its development of its autonomous | 12:21:53 |
| 25 | vehicles. | 12:21:56 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | If the evidence at trial shows that my | 12:22:01 |
| 2 | client, Otto Trucking, has not used any of those | 12:22:04 |
| 3 | trade secrets, would you agree with me that your | 12:22:07 |
| 4 | opinions are irrelevant to Otto Trucking? | 12:22:10 |
| 5 | MR. EISEMAN:  Objection as to form. | 12:22:13 |
| 6 | A    I'm not giving you a legal opinion.  But | 12:22:16 |
| 7 | as -- my judgment as a damage expert, you are | 12:22:17 |
| 8 | correct. | 12:22:20 |
| 9 | Q    (BY MR. SCHUMAN) You mentioned that you | 12:22:29 |
| 10 | had documents in this case from Uber with its own | 12:22:31 |
| 11 | modeling of the benefits of -- of -- well, let me -- | 12:22:38 |
| 12 | let me ask it -- strike that.  Let me start that | 12:22:44 |
| 13 | question again. | 12:22:47 |
| 14 | Do you remember some testimony you gave in | 12:22:48 |
| 15 | response to Uber's counsel where you characterized | 12:22:49 |
| 16 | some of the information you got from -- that you | 12:22:52 |
| 17 | were able to review from Uber as the Rosetta Stone | 12:22:55 |
| 18 | in your field? | 12:22:57 |
| 19 | Do you remember that -- | 12:22:59 |
| 20 | A    I -- | 12:22:59 |
| 21 | Q    -- testimony? | 12:22:59 |
| 22 | A    -- do remember that. | 12:23:00 |
| 23 | Q    And -- and what is the information again | 12:23:01 |
| 24 | that you characterize as being the Rosetta Stone in | 12:23:03 |
| 25 | your field? | 12:23:05 |

Page 139

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    Well, you know, I -- well, let me -- let      12:23:06

 2   me give you an example of another case that I           12:23:07

 3   testified in last year in a similar fact situation      12:23:10

 4   of this case where there's no product in the market     12:23:13

 5   yet.  There's regulatory approvals that need to be      12:23:16

 6   done that weren't done yet; that there would be no      12:23:20

 7   commercialization for years into the future.  And I    12:23:21

 8   had the business plans of the company that took the     12:23:24

 9   trade secrets.                                          12:23:30

10        Now, there they provided me the model, and        12:23:31

11   they never made a calculation of what the impact        12:23:36

12   would be on them to accelerate the development by       12:23:39

13   any amount of time.  I had to get into their model,     12:23:43

14   understand the logic, and make that calculation         12:23:46

15   myself.                                                 12:23:47

16        In this case I have the same thing in that         12:23:49

17   I have projections done at the time of the alleged      12:23:51

18   theft by the party who was alleged to have taken the    12:23:55

19   trade secrets.                                          12:23:59

20        But they have even gone to the next step           12:24:01

21   of actually quantifying the impact of acceleration,     12:24:04

22   and so that's why I say it's the Rosetta Stone.         12:24:07

23   Normally I have to do more work than I did in this      12:24:09

24   case, but Uber has done it for me.                      12:24:12

25        Q    Right.  And have you seen any similar         12:24:17
```

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | documents from my client, Otto Trucking? | 12:24:20 |
| 2 | A    I knew that was next question.  The answer | 12:24:23 |
| 3 | is no.  And you're closing the loop. | 12:24:25 |
| 4 | MR. SCHUMAN:  Why don't we take a | 12:24:32 |
| 5 | two-minute break.  I don't think I have anything | 12:24:33 |
| 6 | more, but why don't we just -- | 12:24:36 |
| 7 | MR. BERRY:  I actually have a couple of | 12:24:36 |
| 8 | questions. | 12:24:38 |
| 9 | MR. SCHUMAN:  Well, I'm not sure I'm done | 12:24:38 |
| 10 | yet.  I just want to -- | 12:24:40 |
| 11 | MR. BERRY:  Okay. | 12:24:41 |
| 12 | MR. SCHUMAN:  -- take a two-minute break | 12:24:41 |
| 13 | and make sure.  And then if you have something else. | 12:24:41 |
| 14 | MR. BERRY:  Okay. | 12:24:44 |
| 15 | MR. SCHUMAN:  -- you guys can take that | 12:24:45 |
| 16 | up. | 12:24:46 |
| 17 | THE VIDEOGRAPHER:  It's 12:24 p.m.  We're | 12:24:47 |
| 18 | going off the record. | 12:24:49 |
| 19 | (A break was taken from 12:24 p.m. to | 12:24:51 |
| 20 | 12:28 p.m.) | 12:25:12 |
| 21 | THE VIDEOGRAPHER:  We are back on the | 12:28:09 |
| 22 | record.  It's 12:28 p.m. | 12:28:09 |
| 23 | Q    (BY MR. SCHUMAN) Mr. Wagner, did either | 12:28:15 |
| 24 | the Quinn firm or Waymo ask you or your firm to | 12:28:17 |
| 25 | prepare any damages opinions specific to my client, | 12:28:22 |

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Otto Trucking? | 12:28:27 |
| 2 |     A    I don't recall that specific instruction. | 12:28:28 |
| 3 |     Q    As you sit here today, do you plan to do | 12:28:31 |
| 4 | any work between now and the time of trial on | 12:28:33 |
| 5 | developing opinions regarding damages specific to my | 12:28:38 |
| 6 | client, Otto Trucking? | 12:28:45 |
| 7 |     A    No. | 12:28:46 |
| 8 |       MR. SCHUMAN:  Okay.  I have no further | 12:28:47 |
| 9 | questions for you.  Thank you for your time. | 12:28:49 |
| 10 |     A    Thank you. | 12:28:52 |
| 11 |       MR. EISEMAN:  Mr. Berry, what do you | 12:28:56 |
| 12 | consider this -- these questions?  Do you consider | 12:28:58 |
| 13 | them to be redirect? | 12:28:59 |
| 14 |       MR. BERRY:  I haven't even thought about | 12:29:02 |
| 15 | how to characterize it. | 12:29:03 |
| 16 |     EXAMINATION BY COUNSEL FOR THE DEFENDANTS | 12:29:08 |
| 17 | BY MR. BERRY: | 12:29:12 |
| 18 |     Q  Mr. Wagner, I had a -- a couple of | 12:29:12 |
| 19 | questions.  The first is:  Your opinions in this | 12:29:13 |
| 20 | case assume that Uber is going to go to market and | 12:29:15 |
| 21 | commercialize its AV technology using the Fuji | 12:29:19 |
| 22 | LiDAR, right? | 12:29:23 |
| 23 |       MR. EISEMAN:  Objection as to form. | 12:29:24 |
| 24 |     A    I -- again, I -- I think that's assumed. | 12:29:24 |
| 25 | But again, that's a better question for | 12:29:27 |

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    I, MARY J. GOFF, CSR No. 13427, Certified

2  Shorthand Reporter of the State of California,

3  certify;

4    That the foregoing proceedings were taken

5  before me at the time and place herein set forth, at

   which time the witness declared under penalty of

6  perjury; that the testimony of the witness and all

7  objections made at the time of the examination were

8  recorded stenographically by me and were thereafter

9  transcribed under my direction and supervision; that

10  the foregoing is a full, true, and correct

11  transcript of my shorthand notes so taken and of the

12  testimony so given;

13    That before completion of the deposition,

14  review of the transcript (  ) was (XX) was not

15  requested:   (   ) that the witness has failed or

   refused to approve the transcript.

16    I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties, nor of any

19  of the parties.

20    I declare under penalty of perjury under the

21  laws of California that the foregoing is true and

22  correct, dated this 23rd day of September, 2017.

23

24    _____

25    MARY J. GOFF, CSR No. 13427

                                    Page 145

# Exhibit N

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5       _____

6    WAYMO LLC,                    )

7              Plaintiff,          )

8          v.                      ) Case No.

9    UBER TECHNOLOGIES, INC.;      ) 3:17-cv-00939-WHA

10   OTTOMOTTO LLC;                )

11   OTTO TRUCKING,                )

12             Defendants.         )

13   _____)

14

15     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16

17      VIDEOTAPED DEPOSITION OF EDWARD RUSSO

18          WEDNESDAY, DECEMBER 20, 2017

19

20

21    REPORTED BY:

22    PAUL J. FREDERICKSON, CCR, CSR

23    JOB NO. 2771335

24

25    PAGES 1 - 367

                                    Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | information in that deck about Uber's | 15:36:19 |
| 2 | competitors being reviewed with some of the | 15:36:22 |
| 3 | members of ATG? | 15:36:24 |
| 4 | A.    That's my recollection. | 15:36:25 |
| 5 | Q.    Let me show you previously marked | 15:36:45 |
| 6 | Exhibit 9206. | 15:36:45 |
| 7 | [Document passed to the witness.] | 15:36:46 |
| 8 | Q.    Have you seen this document | 15:37:13 |
| 9 | before? | 15:37:14 |
| 10 | A.    Yes. | 15:37:14 |
| 11 | Q.    In what context? | 15:37:16 |
| 12 | A.    As I recall, I prepared it shortly | 15:37:19 |
| 13 | after I was hired. | 15:37:24 |
| 14 | Q.    Did you give it to anyone else | 15:37:26 |
| 15 | in -- on your team? | 15:37:28 |
| 16 | A.    I submitted it to Mr. Gicinto, | 15:37:29 |
| 17 | yes. | 15:37:33 |
| 18 | Q.    Did he give you feedback? | 15:37:34 |
| 19 | A.    Yeah, I mean, he thanked me for | 15:37:36 |
| 20 | the -- the document, and then that was about | 15:37:39 |
| 21 | it.  I don't -- I don't recall us ever doing | 15:37:43 |
| 22 | anything with it. | 15:37:46 |
| 23 | Q.    This says "Draft" on each page. | 15:37:46 |
| 24 | Do you recall whether there were other versions | 15:37:48 |
| 25 | of this document? | 15:37:50 |

Page 295

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    As I recall, this was the only, | 15:37:51 |
| 2 | the only one I prepared, and that's why it says | 15:37:54 |
| 3 | draft because it never -- never went any | 15:37:57 |
| 4 | further. | 15:37:59 |
| 5 | Q.    Did Mr. Gicinto ask you to prepare | 15:37:59 |
| 6 | this? | 15:38:03 |
| 7 | A.    Yes. | 15:38:03 |
| 8 | Q.    And where did the information in | 15:38:03 |
| 9 | this document come from? | 15:38:06 |
| 10 | A.    Everything in this document would | 15:38:10 |
| 11 | have come from -- I'd have to read the -- the | 15:38:12 |
| 12 | whole thing. | 15:38:15 |
| 13 | Q.    Well, let me ask a different | 15:38:28 |
| 14 | question. | 15:38:30 |
| 15 | A.    Yes. | 15:38:31 |
| 16 | Q.    If you look at the -- on the | 15:38:32 |
| 17 | second page -- | 15:38:35 |
| 18 | A.    Right. | 15:38:35 |
| 19 | Q.    -- it says "Collection strategy." | 15:38:36 |
| 20 | And what's that intended to convey? | 15:38:37 |
| 21 | A.    Collection strategy. | 15:38:48 |
| 22 | [Pause.] | 15:38:48 |
| 23 | A.    The whole -- it's intended to | 15:39:13 |
| 24 | convey just that, how we would do our research | 15:39:15 |
| 25 | into the various competitors. | 15:39:19 |

Page 296

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | And -- so you're -- what you're | 15:54:40 |
| 2 | saying -- we talked about Iden earlier; | 15:54:40 |
| 3 | correct? | 15:54:43 |
| 4 | A.    Right, yep. | 15:54:43 |
| 5 | Q.    And you had said that you believed | 15:54:43 |
| 6 | all of these Idens, C, D, E, F, G and H, were | 15:54:45 |
| 7 | Chinese competitors? | 15:54:53 |
| 8 | A.    There were other competitors.  I | 15:54:55 |
| 9 | believe the majority of them were Chinese, yes. | 15:54:57 |
| 10 | Q.    But what you're saying here is | 15:55:00 |
| 11 | that Iden I and Iden J are -- are | 15:55:01 |
| 12 | identifications of the ATG group at Uber -- | 15:55:06 |
| 13 | A.    Uh-huh. | 15:55:11 |
| 14 | Q.    -- and the Otto company -- | 15:55:12 |
| 15 | A.    Right. | 15:55:12 |
| 16 | Q.    -- respectively; is that right? | 15:55:14 |
| 17 | A.    Yes. | 15:55:16 |
| 18 | Q.    And then it says: | 15:55:21 |
| 19 | "The purpose of these meetings | 15:55:22 |
| 20 | will be to gather assessment on the claims of | 15:55:23 |
| 21 | competitors as to their progress in the AV | 15:55:25 |
| 22 | race" -- | 15:55:27 |
| 23 | A.    Right. | 15:55:27 |
| 24 | Q.    -- "and then to identify which | 15:55:27 |
| 25 | specific techniques and technologies are likely | 15:55:29 |

Page 313

| | | |
|---|---|---|
| 1 | to lead to success and which are red herrings." | 15:55:32 |
| 2 | Do you know if this was done? | 15:55:34 |
| 3 | A.    It was not done. | 15:55:35 |
| 4 | Q.    Do you know why? | 15:55:36 |
| 5 | A.    Yeah.  Again, this, this document | 15:55:38 |
| 6 | I prepared at Mr. Gicinto's request last year. | 15:55:41 |
| 7 | It was conceptual in nature, and most of what's | 15:55:46 |
| 8 | in here we never did.  We didn't actually make | 15:55:50 |
| 9 | any kind of concerted effort until after the | 15:55:56 |
| 10 | meeting with -- with Mr. Ron, and that's when | 15:55:58 |
| 11 | those requirements came in. | 15:56:00 |
| 12 | Q.    Do you see that after internal | 15:56:07 |
| 13 | resources, there's a little asterisk? | 15:56:09 |
| 14 | A.    Internal resources, little | 15:56:09 |
| 15 | asterisk.  Yes. | 15:56:14 |
| 16 | Q.    I'm looking at page 626. | 15:56:15 |
| 17 | A.    Yes. | 15:56:17 |
| 18 | Q.    Okay. | 15:56:17 |
| 19 | And does that asterisk refer to | 15:56:17 |
| 20 | what's on page 628, the asterisk there, the | 15:56:19 |
| 21 | note? | 15:56:23 |
| 22 | A.    Yes. | 15:56:35 |
| 23 | Q.    Okay. | 15:56:35 |
| 24 | And is what's being conveyed here | 15:56:44 |
| 25 | that when you're meeting with some of the | 15:56:47 |

Page 314

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | employer? | 16:01:45 |
| 2 | A.    We never did it, so the question | 16:01:46 |
| 3 | is hypothetical.  But, of course, it would have | 16:01:47 |
| 4 | mattered. | 16:01:49 |
| 5 | Q.    Well, you were suggesting that | 16:01:49 |
| 6 | that's one thing that should be done here in | 16:01:51 |
| 7 | this document; right? | 16:01:53 |
| 8 | A.    That could be done, sure. | 16:01:54 |
| 9 | Q.    Okay. | 16:01:54 |
| 10 | And did you discuss that with | 16:01:56 |
| 11 | Mr. Gicinto? | 16:01:58 |
| 12 | A.    I don't recall having that | 16:02:02 |
| 13 | discussion with him specifically, no. | 16:02:04 |
| 14 | Q.    All right. | 16:02:04 |
| 15 | Do you recall having a discussion | 16:02:08 |
| 16 | with anyone in your group? | 16:02:11 |
| 17 | A.    About that? | 16:02:12 |
| 18 | Q.    Yes. | 16:02:12 |
| 19 | A.    No.  Again, I prepared this | 16:02:14 |
| 20 | document and shared it with Mr. Gicinto. | 16:02:15 |
| 21 | Essentially, I mean, it never really went | 16:02:19 |
| 22 | anywhere.  We never ended up doing or executing | 16:02:21 |
| 23 | any of this. | 16:02:25 |
| 24 | Q.    Well, you executed some of it? | 16:02:27 |
| 25 | A.    Some of it, yes. | 16:02:28 |

Page 319

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            C E R T I F I C A T E

 2

 3            I, PAUL J. FREDERICKSON, CA

 4    Certified Shorthand Reporter No. 13164 and

 5    WA Certified Court Reporter No. 2419, do

 6    hereby certify:

 7

 8            That prior to being examined,

 9    the witness named in the foregoing

10    deposition was by me duly sworn or affirmed

11    to testify to the truth, the whole truth and

12    nothing but the truth;

13

14            That said deposition was taken

15    down by me in shorthand at the time and

16    place therein named, and thereafter reduced

17    to print by means of computer-aided

18    transcription; and the same is a true,

19    correct and complete transcript of said

20    proceedings.

21

22            I further certify that I am not

23    interested in the outcome of the action.

24

25
```

Page 366

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           Witness my hand this 21st day

2     of December 2017.

3

4

5

6           PAUL J. FREDERICKSON, CCR, CSR

7           WA CCR 2419   CA CSR 13164

8           Expiration date:  March 31, 2018

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                Page 367

UNREDACTED VERSION
OF EXHIBIT 2
SOUGHT TO BE
FILED UNDER SEAL

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Neel Chatterjee (SBN 173985)
*nchatterjee@goodwinlaw.com*
**GOODWIN PROCTER LLP**
135 Commonwealth Drive
Menlo Park, California 94025
Tel.: +1 650 752 3100
Fax.: +1 650 853 1038

Rachel M. Walsh (SBN 250568)
*rwalsh@goodwinlaw.com*
Brett Schuman (SBN 189247)
*bschuman@goodwinlaw.com*
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, California 94111
Tel.: +1 415 733 6000
Fax.: +1 415 677 9041

Attorneys for Defendant
Otto Trucking LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Waymo LLC,<br><br>Plaintiff,<br><br>v.<br><br>Uber Technologies, Inc.; Ottomotto LLC; Otto Trucking LLC,<br><br>Defendants. | Case No. 3:17-cv-00939<br><br>**DEFENDANT OTTO TRUCKING LLC'S OBJECTIONS AND RESPONSES TO PLAINTIFF WAYMO LLC'S THIRD SET OF EXPEDITED INTERROGATORIES**<br><br>**Trial Date:  October 10, 2017** |

PROPOUNDING PARTY:   Plaintiff:  WAYMO LLC

RESPONDING PARTY:   Defendant: OTTO TRUCKING LLC

SET NO.:   Third Set of Expedited Interrogatories

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Interrogatories were asked of, or statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

## GENERAL OBJECTIONS

1.      Otto Trucking objects to each and every Interrogatory to the extent it seeks to impose obligations and demands upon Otto Trucking beyond those required by Federal Rules of Civil Procedure 26 and 33, and the applicable Local Civil Rules of the United States District Court for the Northern District of California ("Local Rules").

2.      Otto Trucking objects to each and every Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the work product doctrine, or any other privileges or reasons for non-production.  Waymo's discovery will not be construed to seek such information.  Inadvertent disclosure of privileged information is not intended to be, and may not be construed as, a waiver of any applicable privilege or similar basis for non-disclosure.

3.      Otto Trucking objects to these Interrogatories to the extent they seek information concerning matters or issues beyond the scope of the allegations in the Amended Complaint on the grounds that such discovery is overbroad, unduly burdensome, and neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Otto Trucking objects to each Interrogatory to the extent that it is unlimited in time and scope, especially in light of the expedited nature of the propounded Interrogatories.

5.      Otto Trucking reserves all rights under the Rules of Civil Procedure to amend or supplement its responses as additional information is discovered.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 21:

Describe in detail the development of the FAC lenses used by DEFNDANTS in their LIDAR designs and devices, including who contributed to the design, and when and how the lens prescription, material, and manufacturer were first selected and evolved over time, and the identity, by Bates Number of the DOCUMENTS evidencing the same.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 21:**

Otto Trucking incorporates each of its general objections by reference.  Otto Trucking further objects to this Interrogatory as not "reasonably narrow" or relevant to its "trade secret misappropriation claims only," as required by the Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief.  (Dkt. No. 464).

Subject to and without waiving the foregoing objections, Otto Trucking responds as follows: Otto Trucking does not and has not developed FAC lenses in LiDAR designs or devices.  Otto Trucking does not have information responsive to Interrogatory No. 21.

**INTERROGATORY NO. 22:**

Describe in detail the development of the photodetectors and photodetector circuits implemented by UBER or OTTO for LIDAR, including who contributed to the design and when, and the identity  by Bates Number,  of the DOCUMENTS evidencing the same.

**RESPONSE TO INTERROGATORY NO.  22:**

Otto Trucking incorporates each of its general objections by reference.  Otto Trucking further objects to this Interrogatory as not "reasonably narrow" or relevant to its "trade secret misappropriation claims only," as required by the Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief.  (Dkt. No. 464).

Subject to and without waiving the foregoing objections, Otto Trucking responds as follows: Otto Trucking does not and has not developed photodetectors or photodetector circuits.  Otto Trucking does not have information responsive to Interrogatory No. 22.

**INTERROGATORY NO. 23:**

Describe in detail the development of  DEFENDANTS' amplified fiber laser for LIDAR, including who contributed to the design, how the fiber stages, lengths, and doping concentrations were first selected and evolved over time, how the materials and manufacturer were first selected and evolved over time, and the identity, by Bates Number, of the documents evidencing the same.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 23:**

Otto Trucking incorporates each of its general objections by reference.  Otto Trucking further objects to this Interrogatory as not "reasonably narrow" or relevant to its "trade secret misappropriation claims only," as required by the Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief.  (Dkt. No. 464).

Subject to and without waiving the foregoing objections, Otto Trucking responds as follows: Otto Trucking does not and has not developed amplified fiber lasers, or fiber stages, lengths and doping concentrations of amplified fiber lasers.  Otto Trucking does not have information responsive to Interrogatory No. 23.

**INTERROGATORY NO. 24:**

Identify the components of DEFENDANTS' self-driving vehicles that LEVANDOWSKI contributed to.

**RESPONSE TO INTERROGATORY NO. 24:**

Otto Trucking incorporates each of its general objections by reference.  Otto Trucking further objects to this Interrogatory as not "reasonably narrow" or relevant to its "trade secret misappropriation claims only," as required by the Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief.  (Dkt. No. 464).  Otto Trucking objects to the terms "components" and "contributed to" as vague and ambiguous.

Subject to and without waiving the foregoing objections, Otto Trucking responds as follows: Otto Trucking and its wholly owned subsidiary Otto Transport LLC own a number of trucks, some of which use self-driving technology from third parties other than Uber or Ottomotto.  To the extent that Otto Trucking has made use of any self-driving vehicle technology, it has only used LiDAR products from Velodyne or Ibeo.  To the best of Otto Trucking's knowledge, Mr. Levandowski has not built hardware or software for self-driving vehicle technology used by Otto Trucking.

**INTERROGATORY NO. 25:**

Identify the components of DEFENDANTS' self-driving vehicles that LEVANDOWSKI did not contribute to.

**4**

DEFENDANT OTTO TRUCKING LLC'S OBJECTIONS AND RESPONSES TO PLAINTIFF WAYMO LLC'S THIRD SET OF
EXPEDITED INTERROGATORIES (CASE NO.: 3:17-CV-00939-WHA)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

on April 28, 2017 in Defendants' Privilege Log Associated with March 31, 2017 Production of Documents, on May 1, 2017 in Defendants' Privilege Log Associated with March 31, 2017 Production of Documents, and on May 22, 2017 in Uber Technologies, Inc. and Ottomotto LLC's Privilege Log 5.22.2017 (O'Melveny & Myers LLP).  Otto Trucking is not aware of further information responsive to this Interrogatory.

**INTERROGATORY NO. 27:**

Describe the meetings that took place in San Francisco between LEVANDOWSKI and UBER on or around January 12, 2016, including an identification of who was present (whether in person or telephonically) and the subject matter of what was discussed.

**RESPONSE TO INTERROGATORY NO.  27:**

Otto Trucking incorporates each of its general objections by reference.  Otto Trucking further objects to this Interrogatory as not "reasonably narrow" or relevant to its "trade secret misappropriation claims only," as required by the Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief.  (Dkt. No. 464).  Otto Trucking further objects to this Request to the extent that it seeks communications protected by the joint defense or common interest privilege.  Otto Trucking further objects to this Request to the extent that it seeks communications protected by the attorney client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity.

Subject to and without waiving the foregoing objections, Otto Trucking responds as follows: Otto Trucking does not have information responsive to Interrogatory No. 27.  Otto Trucking's predecessor, 280 Systems LLC, was incorporated on February 1, 2016, and as such Otto Trucking was not present at that meeting.

**INTERROGATORY NO. 28:**

Describe any alternate LIDAR designs that UBER or OTTO considered for Fuji that did not include █████████████████████████████████████████ and identify, by Bates Number, the documents evidencing the same.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 28:**

Otto Trucking incorporates each of its general objections by reference.  Otto Trucking further objects to this Interrogatory as not "reasonably narrow" or relevant to its "trade secret misappropriation claims only," as required by the Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief.  (Dkt. No. 464).  Otto Trucking objects to this Interrogatory as vague and ambiguous in its use of the term "Otto."  As such, Otto Trucking will respond with respect to Otto Trucking.  Otto Trucking objects to this Interrogatory as overly broad and unduly burdensome, in particular in its use of the term "any" alternate LiDAR designs.

Subject to and without waiving the foregoing objections, Otto Trucking responds as follows: Otto Trucking has not considered any LiDAR designs for Fuji or for any other project.  Otto Trucking does not have information responsive to Interrogatory No. 28.

Dated:  June 20, 2017                                 Respectfully submitted,


                                                      By:  */s/ Neel Chatterjee*

                                                            Neel Chatterjee
                                                            *nchatterjee@goodwinlaw.com*
                                                            GOODWIN PROCTER LLP
                                                            135 Commonwealth Drive
                                                            Menlo Park, California 94025
                                                            Tel.:  +1 650 752 3100
                                                            Fax.:  +1 650 853 1038

                                                            Brett Schuman
                                                            *bschuman@goodwinlaw.com*
                                                            Rachel M. Walsh
                                                            *rwalsh@goodwinlaw.com*
                                                            GOODWIN PROCTER LLP
                                                            Three Embarcadero Center
                                                            San Francisco, California 94111
                                                            Tel.:  +1 415 733 6000
                                                            Fax.:  +1 415 677 9041

                                                            *Attorneys for Defendant*
                                                            OTTO TRUCKING LLC

# EXHIBIT  1

*UNREDACTED VERSION*
*OF DOCUMENT(S)*
*SOUGHT TO BE SEALED*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David Perlson (Cal. Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa J. Baily (Cal. Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Cal. Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan R. Jaffe (Cal. Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California  94111-4788
(415) 875-6600
(415) 875-6700 facsimile

Attorneys for Plaintiff WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO, LLC; OTTO TRUCKING<br>LLC,<br><br>Defendants. | Case No. 17-cv-00939-JCS<br><br>**PLAINTIFF'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO OTTO TRUCKING, LLC'S FIRST SET OF INTERROGATORIES (NOS. 1-14)** |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   INTERROGATORY NO. 10:

2        Identify all damage, including a specific calculation of monetary damages, caused by any

3   alleged misappropriation of trade secrets by Otto Trucking.

4

5   RESPONSE TO INTERROGATORY NO. 10:

6        Waymo incorporates by reference its General Objections.  Waymo further objects to this

7   interrogatory on the grounds that it is vague and ambiguous, including with respect to the phrase

8   "all damage."  Waymo further objects to this request to the extent it is compound, complex, and

9   contains multiple subparts.  Waymo further objects to this interrogatory as premature to the extent

10  it calls for information that is subject to expert testimony.  Waymo will provide expert testimony

11  in accordance with the Court's procedural schedule.

12       Subject to and without waiving the foregoing General and Specific Objections, Waymo

13  responds as follows:

14       Waymo believes it has suffered and is suffering irreparable harm as a result of Otto

15  Trucking's trade secret misappropriation.  In addition, Waymo believes it is entitled to damages

16  for Otto Trucking's trade secret misappropriation, particularly to the extent Otto Trucking has

17  used Waymo's trade secrets to fast-track LiDAR development for its own benefit or for the benefit

18  of Ottomotto or Uber.  Waymo is continuing its discovery into the nature and extent of Otto

19  Trucking's use of Waymo's trade secrets for its benefit, for the benefit of Ottomotto, and/or for the

20  benefit of Uber.  Waymo is also continuing its discovery into the role of Otto Trucking vis-à-vis

21  Ottomotto and Uber as a conduit of misappropriated information from Mr. Levandowski and

22  Ottomotto/Uber.   A specific calculation of monetary damages caused by Otto Trucking's

23  misappropriation cannot be provided until this discovery is more substantially complete.

24       Waymo expects to calculate past damages based on lost profits, unjust enrichment, and

25  reasonable royalty metrics.  To the extent an injunction is not granted, Waymo will also seek

26  damages, based on these same metrics, tied to any continuing use of Waymo's trade secrets.

27       Inputs to Waymo's damages analysis vis-à-vis Otto Trucking include, for example: the

28  extent, duration, and purpose of trade secret misappropriation; estimates of future profits and cash

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   flows to be earned by Otto Trucking (or those benefiting from its trade secret misappropriation)

2   and Waymo; assessments and projections regarding the relevant markets, competition therein, and

3   the relevant parties' competitive positions; investment in LiDAR technology (in time, capital,

4   engineering costs, and other expenditures); and valuations of the relevant technology.  Discovery

5   on these subjects is ongoing.

6       Waymo further seeks a judgment that this case is exceptional and an award of Waymo's

7   costs and reasonable attorneys' fees.  Waymo also seeks an accounting of all sales and revenues,

8   together with pre-judgment and post-judgment interest.  Waymo further seeks enhanced damages

9   for Defendants' willful and malicious conduct in misappropriating Waymo's trade secrets,

10  punitive damages, and other relief including but not limited to disgorgement of profits from unjust

11  enrichment.  Waymo seeks any other relief available under applicable law.  It would be premature

12  to estimate the amount of damages at this time.

13      Discovery is ongoing and Waymo reserves the right to supplement – and anticipates

14  regularly supplementing – this response after further discovery and investigation into Otto

15  Trucking's misappropriation of Waymo's trade secrets and the benefits obtained by Defendants as

16  a result of that misappropriation.

17

18  <u>FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10</u>:

19      Waymo objects to this interrogatory on the grounds that it is vague and ambiguous,

20  including with respect to the phrase "all damage."  Waymo further objects to this interrogatory to

21  the extent it is compound, complex, and contains multiple subparts.  Waymo further objects to this

22  interrogatory as premature to the extent it calls for information that is subject to expert testimony.

23  Waymo will provide expert testimony in accordance with the Court's procedural schedule.

24      Subject to and without waiving the foregoing objections, Waymo responds as follows:

25      Waymo's technical expert is continuing to assess Defendants' use of Waymo's trade

26  secrets; such assessments will ultimately inform the damages analysis in this case.  Moreover,

27  Defendants have not yet responded to Waymo's damages-related discovery requests.  Therefore,

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  Waymo's expert has not concluded his analysis and is not expected to do so until the time that

2  expert reports are due on August 24, 2017.

3       Discovery in this case is ongoing, and Waymo is still waiting for substantive responses to

4  its Fourth Set of Requests for Production (Nos. 266-297) and First Set of Common and Specific

5  Interrogatories, all of which relate to damages.   Specifically, Waymo expects Defendants'

6  responses to the following document requests and interrogatories to inform its response to this

7  interrogatory, and Waymo expects to supplement its response to this interrogatory when it

8  receives Defendants' document production and interrogatory responses:

9
10
- DOCUMENTS sufficient to show UBER's market capitalization and internal valuation of itself on a quarterly basis, from the year prior to the year in which UBER first contemplated developing autonomous vehicles through the present.

11
12
13
- DOCUMENTS sufficient to show the impact of developing autonomous vehicles on Uber's internal valuation of itself from the year prior to the year in which UBER first contemplated developing autonomous vehicles through the present.

14
15
16
- DOCUMENTS describing UBER's development of autonomous vehicles as necessary to the continued viability of UBER or to the continued viability of any aspect of UBER's business, INCLUDING but not limited to characterizations of a competitor's development or deployment of autonomous vehicles as an existential threat to UBER.

17
18
19
- DOCUMENTS sufficient to show each iteration of DEFENDANTS' plan to launch any autonomous vehicles in any geographic region from the time DEFENDANTS first contemplated developing or deploying autonomous vehicles to the present.

20
21
22
- DOCUMENTS sufficient to show DEFENDANTS' estimates of the size of the ridesharing market and DEFENDANTS' share of that market in the United States for each of the last six years on a quarterly basis. To the extent DEFENDANTS break out such estimates by geography (region, city, etc.), those estimates should also be provided.

23
24
25
26
27
28
- DOCUMENTS sufficient to show DEFENDANTS' forecasts of the size of the ride-sharing market, the percentage of the ride-sharing market that will be serviced by autonomous vehicles, and DEFENDANTS' share of that market in the United States (by autonomous vehicles and vehicles driven by contractors) for any period of time forecasted by UBER, on a quarterly basis. To the extent DEFENDANTS break out such estimates by geography (country, region, city, etc.), those estimates should also be provided. To the extent DEFENDANTS create different forecasts based on different assumptions, documents REGARDING each forecast – with documents sufficient to show the assumptions for each – should be provided.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- DOCUMENTS sufficient to show DEFENDANTS' forecasts REGARDING the number of DEFENDANTS' ride-sharing vehicles in the United States (by autonomous vehicles and vehicles driven by contractors), for any period of time forecasted by UBER —broken out by on a quarterly basis. To the extent DEFENDANTS break out such estimates by geography (country, region, city, etc.), those estimates should also be provided. To the extent DEFENDANTS create different forecasts based on different assumptions, documents REGARDING each forecast – with documents sufficient to show the assumptions for each – should be provided.

- DOCUMENTS sufficient to show DEFENDANTS' business plans, strategic plans, operating plans, marketing plans, financial plans, sales plans, and investment plans for its ridesharing business, INCLUDING projections for revenue generation and profitability.

- DOCUMENTS sufficient to show DEFENDANTS' business plans, strategic plans, operating plans, marketing plans, financial plans, sales plans, and investment plans for its autonomous vehicle program, INCLUDING projections for revenue generation and profitability of the autonomous vehicle program.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of any barriers to entry in the ride-sharing market and the status of any attempts by DEFENDANTS to enforce such barriers against competitors INCLUDING WAYMO, INCLUDING investments and infrastructure needed.

- DOCUMENTS REGARDING DEFENDANTS' discussion of WAYMO or its business, INCLUDING DEFENDANTS' analysis of WAYMO's impact or potential impact on the ridesharing market or on UBER.

- DOCUMENTS sufficient to identify the date that UBER first considered deploying autonomous vehicles.

- DOCUMENTS sufficient to identify the date that UBER first considered developing its own autonomous vehicles.

- DOCUMENTS sufficient to identify the date that UBER first considered developing its own in-house LiDAR.

- DOCUMENTS REGARDING the importance of a first-mover advantage in commercializing autonomous vehicles, INCLUDING any estimates of the market shares of other entrants that are not first to market.

- DOCUMENTS REGARDING the importance of LiDAR, INCLUDING the importance of low-cost LiDAR, to DEFENDANTS' ability to compete.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- DOCUMENTS REGARDING the relative value of safety (vis-à-vis, for example, cost and timing of entry into relevant markets) in the commercialization of autonomous vehicles.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of WAYMO's technological lead REGARDING autonomous vehicle technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO), and documents sufficient to show how DEFENDANTS' analysis or estimates have changed over time.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of how WAYMO's technological lead over DEFENDANTS REGARDING autonomous vehicle technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO) changed after Uber's acquisition of OTTOMOTTO and OTTO TRUCKING.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of WAYMO's technological lead REGARDING LiDAR technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO), and documents sufficient to show how DEFENDANTS' analysis or estimates have changed over time.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of how WAYMO's technological lead over DEFENDANTS REGARDING LiDAR technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO) changed after UBER's acquisition of OTTOMOTTO and OTTO TRUCKING.

- DOCUMENTS sufficient to show DEFENDANTS' comparisons of the cost and profitability of a human-driven versus an autonomous vehicle in a ride-sharing fleet.

- DOCUMENTS sufficient to show the historical and current cost of DEFENDANTS' autonomous vehicles, broken down by component, and dating back to the inception of DEFENDANTS' autonomous vehicle program. As noted in the Instructions above, to the extent DEFENDANTS can provide separate information for each Defendant, DEFENDANTS should do so.

- DOCUMENTS sufficient to show DEFENDANTS' total financial investment including but not limited to employee time, purchase of capital equipment, and outside consultants, by quarter, into its efforts to develop in-house LiDAR. As noted in the Instructions above, to the extent DEFENDANTS can provide separate information for each Defendant, DEFENDANTS should do so.

- DOCUMENTS sufficient to show DEFENDANTS' investment, in terms of time including but not limited to engineers, software developers, managers, and executives (broken out be each category of employee), into its efforts to develop in-house LiDAR. As noted in the Instructions above, to the extent DEFENDANTS

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

can provide separate information for each Defendant, DEFENDANTS should do so.

- Patent licenses or agreements relating to LiDAR.

- DOCUMENTS sufficient to show the impact to DEFENDANTS of having to redesign Fuji to avoid using the trade secrets identified in response to UBER's interrogatory No. 1.

- DOCUMENTS sufficient to show any valuation (whether conducted by UBER or by a third party) of the assets and technology acquired in the acquisition of Otto by Uber, INCLUDING valuations performed for the purpose of purchase price accounting or any other purpose.

- DOCUMENTS sufficient to show any DEFENDANTS' projected revenue, gross margin, and operating profit for any division including autonomous vehicles.

- DOCUMENTS sufficient to show any the financials, INCLUDING profit and loss statements and balance sheet, for OTTOMOTTO, OTTO TRUCKING, and any division of UBER including autonomous vehicles.

- DOCUMENTS sufficient to show DEFENDANTS' approved requests for capital expenditure authorizations related to its autonomous vehicle program, INCLUDING R&D expenditures, technology/equipment acquisitions, and marketing expenditures.

- Describe in detail the impact, including financial impact, to DEFENDANTS of having to redesign Fuji to avoid using the trade secrets identified in response to UBER's Interrogatory No. 1.

- To the extent DEFENDANTS contend they will be irreparably harmed by a permanent injunction prohibiting the use of WAYMO's trade secrets in this case, describe in detail the factual and legal bases for that contention.

- Describe in detail DEFENDANTS' investment in developing in-house LiDAR. This should include DEFENDANTS' financial investment, as well as DEFENDANTS' investment in terms of time and personnel.

- Describe in detail [OTTOMOTTO and OTTO TRUCKING's] efforts to place a value on OTTOMOTTO and/or OTTO TRUCKING or their respective assets and technology as part of UBER'S acquisition of OTTOMOTTO and/or OTTO TRUCKING, either prior to or following the acquisition.

- Describe in detail UBER's efforts to place a value on OTTOMOTTO and/or OTTO TRUCKING or their respective assets and technology as part of the acquisition, either prior to or following the acquisition, including but not limited to the efforts described by Nina Qi during her deposition at Rough Tr. 192:4-199:15.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- IDENTIFY the date that UBER first considered developing its own in-house LiDAR and the date UBER began developing its own in-house LiDAR (to the extent it differs from the date UBER began considering it), and describe in detail UBER's reasons for wanting to develop its own in-house LiDAR.

**Damages for Violations of Defense of Trade Secrets Act and California Uniform Trade Secret Act**

Uber, Ottomotto, and Otto Trucking are jointly and severally liable for damages in this case.   Ottomotto and Otto Trucking are the corporate vehicles for the misappropriation of Waymo's trade secrets for the benefit of Uber.   Anthony Levandowski officially formed Ottomotto on January 15, 2016 (while he was simultaneously employed by Waymo, consulting with Uber on Uber's self-driving car project, and negotiating the acquisition of Ottomotto).   He officially formed Otto Trucking on February 1, 2016 (five days after resigning from Waymo and while he was consulting with Uber on Uber's self-driving car project and negotiating the acquisition of Otto Trucking).   Mr. Levandowski was acting for all three Defendants at various times in order to facilitate the misappropriation of Waymo's trade secrets.

Uber entered into Agreements and Plans of Merger with each of Ottomotto and Otto Trucking on the same date, within weeks of the formation of those entities.   (UBER00016757; UBER00016453).   Pursuant to its Agreement and Plan of Merger, Otto Trucking was obligated and continues to be obligated to assign all of its intellectual property to Ottomotto (which has now been acquired by Uber).   (UBER00016757.)   Pending completion of the Otto Trucking acquisition by Uber, Anthony Levandowski remains one of two managing members of Otto Trucking and holds ███████████████████████████████████████████████████.   (OTTOTRUCKING00000004.)   Uber has an exclusive option to acquire Otto Trucking between August 31, 2017 and November 30, 2017.   (UBER00016757 at -764, -819.)   If Uber does not acquire Otto Trucking during that period, Uber will be obligated to (i) become a 50% owner in Otto Trucking and (ii) to license Uber's self-driving technology (including all trade secrets) exclusively to Otto Trucking (even vis-à-vis Uber) for use in the commercialization of self-driving trucks.   (UBER00016757 at -772.)

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  Otto Trucking is jointly and severally liable for all damages caused by Defendants'

2  misappropriation of Waymo's trade secrets, including Defendants' unjust enrichment resulting

3  from Defendants' misappropriation, any reasonable royalty assessed as a result of Defendants'

4  misappropriation, and any exemplary damages, attorneys' fees, expert fees, and costs awarded as a

5  result of Defendants' misappropriation.

6  ***Unjust Enrichment Damages***

7  Uber, Ottomotto, and Otto Trucking have been unjustly enriched due to their

8  misappropriation of Waymo's trade secrets.  There are several measures that can be used to

9  quantify the unjust enrichment to Defendants.  One measure of the unjust enrichment to

10  Defendants is the value that was paid (or will be paid) by Uber for Ottomotto and Otto Trucking

11  (collectively, "Otto").  When Uber began negotiating with Mr. Levandowski, Otto was a company

12  that did not exist, and did not have any products.  (Qi Tr. 146:8-18.)  And at that time, Uber was

13  aware that he still had confidential information from Waymo.  (Bares Tr. at 179:14-18.)  John

14  Bares, Operations Director in Uber's Advanced Technology Group, was personally responsible for

15  negotiating aspects of Uber's acquisition of Otto on Uber's behalf, including a series of technical

16  milestones regarding LiDAR.  He admitted that having access to Waymo's specifications for

17  medium and long-range LiDAR would have been useful for someone trying to build medium and

18  long-range LiDAR at Uber because Waymo is "eight years ahead" and "had custom lasers."  (*Id.*

19  179:19-180:12.)  Defendants do not dispute that Mr. Levandowski had access to Waymo's files at

20  this time—as a result of both his ongoing employment at Waymo, and his illicit downloads.

21  Uber and Otto began negotiating the term sheet for the acquisition of Otto in January and

22  February 2016, with the final term sheet executed on February 22, 2016.  (UBER00017518-578;

23  UBER00069043-064.)  For at least some of this period, Mr. Levandowski was still an employee of

24  Google.  Because Otto had no products when Uber and Otto began negotiating (Qi Tr. 146:8-18),

25  the only things of value to be acquired by Uber were likely (1) the engineers that Uber acquired;

26  and (2) Waymo's technology.  Therefore, the misappropriated trade secrets represented a

27  significant portion of the assets acquired by Uber, as well as the talents of the employees that

28  would be engaged in connection with  the acquisition.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    Uber and Otto entered into the formal Agreement and Plan of Merger on April 11, 2016.

2  (UBER00016453-16523; UBER00016757.)  Prior to entering into the agreement, Uber's Board of

3  Directors approved the acquisition.   Discovery regarding Uber's internal valuation of Otto

4  (including information regarding the assumptions underlying Uber's internal valuation of Otto)

5  will further inform Waymo's unjust enrichment analysis.  However, Nina Qi testified that Uber

6  told its Board that the overall value of the deal at the time was about $590 million. (Qi Tr. at 100-

7  103.)  Although Uber's payment to Otto was conditioned on certain milestones that stretched for

8  some time into the future, this value is a reasonable measure of the present value of the transaction

9  given that it was the value presented to Uber's Board of Directors in the Board's consideration and

10  approval of the acquisition.

11    Another measure of the unjust enrichment to Defendants is the present value of the

12  additional cash flows that Defendants will earn as a result of Uber's accelerated development of

13  self-driving car technology.  Uber expected that acquiring Otto would accelerate the development

14  of its LiDAR technology.  For example, when considering the acquisition, Uber estimated that

15  acquiring Otto could shorten its autonomous vehicle timeline by one to two years.

16  (UBER00069030-033 at '033.)  Even under its "most conservative case," Uber estimated the

17  increased present value of incremental profit (as measured by EBIT, or Earnings Before Interest

18  and Taxes) from Otto's technology would be between $836 million and $1.69 billion.

19  (UBER00069030-033 at '033.)  In addition to the increased profits, Uber recognized Waymo was

20  a threat to its entire existence, potentially placing its entire business at risk—something that,

21  according   to   public   reports,   is   worth   approximately   $70   billion.   (*See*

22  https://techcrunch.com/2017/06/21/kalanick-is-out-but-ubers-vcs-royally-screwed-up-too-say-

23  industry-watchers/).  For example, Uber's then-CEO was quoted as follows: "The minute it was

24  clear to us that our friends in Mountain View were going to be getting in the ride sharing space,

25  we needed to make sure there is an alternative [self-driving car].  Because if there is not, we're not

26  going to have any business."  He also described developing an autonomous vehicle as "basically

27  existential for us." (UBER00006042-047 at '043; UBER00006035-041 at '037; UBER00064472-

28  473; LEV_001940-051 at '940.)  In messaging notes related to the acquisition, Uber's then-CEO

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    noted "Autonomous transportation is very possibly a winner-take-all, and thus existential for

2    Uber." (UBER00064468-469 at '468.)  Similarly, Jeff Holden, Uber's Chief Product Officer,

3    wrote:  "This war for self-driving is truly existential for Uber: we'll either start up our second S

4    curve of growth or we'll die.  There might be in-between cases, but it's definitely easy to see how

5    the extremes could play out."  Discussing the competition with Google, Mr. Holden discusses the

6    battle and the war: "The *battle* is about what we need to do to get ourselves into a sufficiently

7    competitive position before December that G doesn't walk away with the crown for future of ride

8    sharing.  It's about establishing beach heads, being in the game in a credible way.  The *war* is

9    the long-term defeat of G and others so we afford ourselves the opportunity to extend our massive

10   scale business into the future.  This will be about who gets NSD self-driving to scale first."

11   (UBER00070108-110 at '108.)

12           Another measure of unjust enrichment to Defendants is the expected cost savings to

13   Defendants from using Waymo's trade secrets in Uber's LiDAR systems.  Waymo has obtained

14   significant cost savings by developing custom, in-house LiDAR systems using its trade secrets.

15   Waymo's custom, in-house solution is much cheaper than options offered by third party vendors;

16   as explained in more detail in Waymo's response to Interrogatory No. 6, a mid-range LiDAR from

17   Velodyne costs approximately $70,000.   Uber has also recently purchased third-party LiDAR

18   units from ███████████████████  (UBER00086529.)  By contrast, the materials needed for

19   Waymo's own mid-range GBr3 LiDAR system, which uses the trade secrets at issue in this case,

20   cost just over $5,000.  (*See* Waymo's Response to Interrogatory No. 6 and all supplements

21   thereto.)

22           Due to the misappropriation of Waymo's trade secrets, Defendants will likely benefit from

23   many years of future cost savings due to employing Waymo's trade secrets in Uber's LiDAR

24   systems.  While considering the acquisition of Otto, Uber itself recognized the significant cost

25   savings from building custom lasers, noting savings of "up to $45M of one-time savings (@ 1,000

26   units)" and "up to $80M per year of ongoing savings (@ 1,000 units)."  (UBER00068983.)  And it

27   is clear that Uber is scaling production quickly:  at the end of 2016, Uber estimated that it would

28   need approximately 120,000 to 150,000 lenses for 2017 and 500,000 for 2018. (UBER00054959-

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   962 at '959.)  Since Uber's LiDAR system uses 64 lenses, these estimates indicate that Uber is

2   planning to manufacture between 1,875 and 2,344 LiDAR systems in 2017, and 7,812 LiDAR

3   systems in 2018.

4        Another measure of unjust enrichment to Defendants is the expected cost savings due to

5   reduced development expenses from using Waymo's trade secrets in Uber's LiDAR systems.

6   While considering the acquisition of Otto, Uber recognized one important benefit was that the

7   acquisition   "decreases   total   investment   in   [Autonomous   Vehicle]   development."

8   (UBER00068983)  An internal Uber email estimates that Uber's acquisition of Otto saved Uber at

9   least a year in the race to large scale autonomous vehicle deployment, and describes Uber's next

10  best choice as building the team internally with a two to four year lag versus what the Otto team

11  would bring.  (UBER00060147-156 at '147.)  One way to measure the costs that Defendants saved

12  through their misappropriation of Waymo's trade secrets is by looking at the costs that Waymo

13  incurred to develop those trade secrets.  As discussed in Waymo's response to interrogatory 6,

14  Waymo has incurred up to $1.1 billion to develop the trade secrets.  (*See* Waymo's 7/13

15  Supplemental Response to Interrogatory No. 6 and all supplements thereto.)

16       Waymo anticipates that Defendants will argue that the measures of unjust enrichment

17  discussed above are measures of value for the entirety of the company (Otto) acquired by Uber.

18  Waymo expects to rebut any evidence presented by Defendants that a portion of any value can be

19  attributed to any contributions other than Waymo's trade secrets.  Nonetheless, Waymo addresses

20  apportionment below.

21       Otto had no products when Uber and Otto began negotiating.  (Qi Tr. 146:8-18.)  And

22  Otto's profit and loss statement for January through March 2016 reflects less than $1.4 million of

23  expenses.  (UBER00060164 and UBER00060165).  Therefore, the only things of value to be

24  acquired by Uber were likely (1) the engineers that Uber acquired; and (2) Waymo's technology.

25  Waymo is still conducting discovery regarding what assets (if any) Otto had when Uber decided to

26  acquire it.  To the extent Otto had any working products or technology by the time Uber agreed to

27  acquire it, Waymo's unjust enrichment analysis would account for that by deducting the value of

28  Otto's then-existing technology.  However, as previously discussed, Waymo expects the large

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1 majority of the measures of value discussed above to be attributable to the value of the stolen

2 information and engineers that Uber acquired in the transaction.

3       With respect to the value of the engineers Uber acquired from Otto, talented engineers in

4 the autonomous vehicle field are few and far between.  In particular, some of the engineers who

5 left Waymo to join Otto, and who were eventually acquired by Uber, had very specialized skill

6 sets, including Don Burnette, Claire Delaunay, Gaetan Pennecot and Mr. Levandowski himself.

7 These engineers would likely be worth more than an average engineer, and more than even an

8 average autonomous vehicle engineer.  Waymo is still obtaining discovery regarding Uber's

9 valuation of the engineers that it acquired, but  one public estimate of the value of engineers in the

10 autonomous vehicle industry is $10 million per engineer.

11 (https://www.recode.net/2016/9/17/12943214/sebastian-thrun-self-driving-talent-pool).

12       With respect to development expenses, it is possible that Defendants would not have had

13 to incur all of the development expenses Waymo incurred if Defendants had developed the trade

14 secrets themselves (rather than misappropriating them from Waymo).  Although Waymo is still

15 seeking discovery on how long Uber spent in its autonomous vehicle development efforts before

16 acquiring Otto, Waymo understands that Uber had been developing autonomous vehicle

17 technology prior to its discussions with Otto.  Uber may argue that in calculating Uber's unjust

18 enrichment based on Waymo's development expenses, it may be appropriate to include only a

19 portion of  Waymo's total development expenses.  To date, Defendants have not produced

20 evidence regarding their LiDAR development efforts necessary to conduct such an apportionment.

21 However, as discussed above, Uber believed that it could save development expenses by acquiring

22 Otto.  Specifically, Uber estimated that the acquisition would speed up its autonomous vehicle

23 timeline by one to two years, and would speed up its laser development by two to four years.

24 Thus, one estimate of the potential savings as a result of Defendants obtaining Waymo's

25 technology is the one to two years of average development expense that Uber estimated it would

26 save in developing autonomous vehicle technology, which can be expressed as a percentage of

27 Uber's total development expenses.  Another measure of the potential savings as a result of

28 Defendants obtaining Waymo's technology is the difference between the amount of money

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  Waymo has spent in developing autonomous vehicle technology and the amount of money that

2  Defendants have spent.  Another measure of the potential savings can be calculated based on the

3  proportion of development expenses that Waymo has spent in developing LiDAR technology in

4  relation to the other technologies in autonomous vehicles.   Waymo reserves its right to

5  supplement this response if and when Defendants produce the information necessary to conduct an

6  apportionment regarding development expenses.

7          In addition, if Uber is able to deploy autonomous vehicles in its fleet, its operational costs

8  for its entire ridesharing business would likely drop substantially, in part because it would not

9  have to share any revenue with its drivers.

10          Waymo is under a Court order to narrow its list of asserted trade secrets to less than ten by

11  August 1.  After Waymo completes this narrowing, Waymo will consider how to apportion the

12  value of the trade secrets that Mr. Levandowski and Defendants misappropriated to account for the

13  trade secrets that it will bring to trial in this case.  However, Waymo suspects that a substantial

14  portion of the unjust enrichment would be attributable to the most valuable trade secrets.  Since

15  Uber and Waymo are racing to commercialize autonomous vehicles, accelerating the development

16  timeline was important to Uber.  (UBER00070108-110 at '108.).  Thus, Waymo presumes that

17  Defendants made use of the most important and most valuable trade secrets first.

18          ***Reasonable Royalty Damages***

19          If the Court were to determine that damages based on the unjust enrichment caused by

20  Defendants' misappropriation of the trade secrets is not provable, the Court "may order payment

21  of a reasonable royalty for no longer than the period of time the use could have been prohibited"

22  pursuant to the provisions of the California Uniform Trade Secrets Act.  Cal. Civ. P. § 3426.3(b).

23  A reasonable royalty is also available under the Defend Against Trade Secrets Act.  18 U.S.C. §

24  1836(b)(3)(A)(iii) ("in lieu of damages measured by any other methods, the damages caused by

25  the misappropriation measured by imposition of liability for a reasonable royalty for the

26  misappropriator's unauthorized disclosure or use of the trade secret").

27          Waymo's damages expert will analyze and compute the amount of reasonable royalty

28  damages payable to Waymo by Defendants due to the misappropriation of the trade secrets based

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   on the documents and information produced by Waymo, Defendants and third parties during

2   discovery, as well as independent research conducted by Waymo's damages expert.  Specifically,

3   Waymo's expert will, among other things, opine as to the appropriate reasonable royalty, either in

4   the form of a lump sum payment or a running royalty rate, or a combination of both.

5        As discussed above, Defendants have not yet responded to Waymo's damages-related

6   discovery requests.  Therefore, Waymo's expert has not concluded his analysis and is not expected

7   to do so until the time that expert reports are due on August 24, 2017.

8        At present, Waymo anticipates that its expert's computations of a reasonable royalty

9   adequate to compensate for Defendants' infringement will involve an analytical approach and/or a

10  hypothetical negotiation approach.  An analytical approach is used to determine a royalty that

11  leaves the infringer with a "normal" rate of return for the use of its products embodying the trade

12  secrets or to calculate a royalty based on the increased profitability due to the use of the trade

13  secrets in Defendants' products.  In other words, an analytical approach will determine, or isolate,

14  the financial benefit or value that Defendants obtained through their misappropriation of trade

15  secrets.

16       Waymo anticipates that its expert's determination of reasonable royalty damages under an

17  analytical approach or a hypothetical negotiation approach will be based on, among other things,

18  analysis of sales and profit projections, analyst forecasts, profitability information and other

19  documents and records produced by Waymo, Defendants, and third parties.  In addition to the

20  foregoing, Waymo's expert may utilize documents and materials referred to and recognized as

21  relevant to the determination of the cost savings achieved by the Defendants due to their

22  misappropriation.   In addition to the foregoing, Waymo's expert may utilize documents and

23  materials referred to and recognized as relevant to the determination of a reasonable royalty or

24  other damages computations in cases such as *Georgia- Pacific*, among others.

25       At present, Waymo's understanding of the primary considerations that Waymo's expert

26  will analyze with respect to the hypothetical negotiation approach are summarized below.

27       *Impact on Waymo's future expected profits* - Waymo expects that its future success is

28  critically dependent on its technological lead in autonomous vehicles. (WAYMO-UBER-

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  00004108-131 at '109, '111; Chu Tr. 12:3-7, 45:19-24)   Defendants' misappropriation of

2  Waymo's trade secrets shortens the technological lead that Waymo has in autonomous vehicles.

3  For example, when considering the acquisition of Ottomotto and Otto Trucking, Uber estimated

4  that Otto's technology could shorten its autonomous vehicle timeline by one to two years.

5  (UBER00069030-033 at '033.)  Moreover, if Uber does not exercise its Call Option with respect

6  to Otto Trucking, yet another Waymo competitor will have had the benefit of Waymo's

7  misappropriated trade secrets.  Given the importance of Waymo's technological lead, this would

8  likely have a significant impact on its ability to earn profits.

9       *Waymo's policy to protect and maintain its trade secrets* – Waymo has sought to protect its

10  trade secrets and has not disclosed the trade secrets to third parties, and it has not licensed its trade

11  secrets.  Waymo takes robust measures to protect its LiDAR trade secrets.  As a condition of

12  employment, Waymo requires all employees to enter into written agreements to maintain the

13  confidentiality of proprietary and trade secret information, and not to misuse such information.

14  Waymo also enforces an employee code of conduct that explains employees' strict obligations to

15  maintain the secrecy of confidential information, and requires employee training in security

16  procedures.  Droz Decl. ¶ 30.

17       Waymo also takes reasonable measures to mark confidential and proprietary information,

18  such as documents and other materials, with visible legends designating them as such when

19  sharing them outside of Waymo, subject to NDAs or other confidentiality agreements.

20  Disclosures to vendors are limited to the subject matter necessary for the vendor's engagement and

21  do not reveal the entirety of a given LiDAR system or design.  Waymo employs reasonable efforts

22  to secure physical facilities by restricting access and employing locks, cameras, guards, and other

23  security measures.  *Id.* ¶¶ 33-37; Janosko Decl. ¶ 22.

24       Waymo uses Subversion (SVN) — a revision control system — to store its electrical

25  design information. All traffic (both ingress to and egress from) the SVN repository is encrypted.

26  All traffic is authenticated against a list of authorized users before access to the repository is

27  granted, and users do not share credentials — all accesses are unique to specific users. Access

28  control lists are audited monthly and stale users are aggressively purged. The SVN server is

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

password protected and accessible through specialized software. *Id*. ¶¶ 23-25. Additionally, Waymo imposes network security measures and access policies that restrict the access and dissemination of certain confidential and proprietary trade secret information to only teams that are working on projects related to that information. For example, Google employees working on projects with no relation to Waymo or self-driving cars could not (and cannot) access Waymo's confidential and proprietary schematics. They are distributed on a "need to know" basis. Droz Decl. ¶ 32. Google's networks generally are also secured through Network Access Control ("NAC") procedures, Access Control Lists ("ACLs"), and restricted access privileges. Janosko Decl. ¶¶ 13-16.

Google employs a variety of security mechanisms to prevent network intruders or attackers who may compromise Waymo's trade secret information. Google also secures employees' devices and credentials against attacks through monitoring and logging practices, as well as regular security updates. *Id*. ¶¶ 7-12, 20.

Google secures its production infrastructure in progressive layers starting from the physical security of data centers, continuing on to the security of the hardware and software that underlie the infrastructure, and finally, the technical constraints and processes in place to support operational security. Google employs many hundreds of engineers dedicated to security and privacy distributed across all of Google, including many who are recognized industry authorities. These engineers work to protect Google's production servers from malware utilizing tools such as binary verification. Google also has an incident management process for security events that may affect the confidentiality, integrity, or availability of systems or data *Id*. ¶¶ 17-21.

Waymo incorporates by reference its Response to Interrogatory No. 7 and all supplements thereto.

*Competitive relationship between Waymo and Uber and Otto Trucking* – Waymo recognizes that Uber is the most significant competitor in the transportation as a service (TaaS) business. (WAYMO-UBER-00004175-194 at '184-185)  Similarly, Uber recognizes Waymo is a significant competitor.  In fact, as discussed above, Uber has described Waymo as an existential threat to its TAAS business: "This war for self-driving is truly existential for Uber: we'll either

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  start up our second S curve of growth or we'll die." (UBER00070108-110 at '108.)  Internal Uber

2  documents indicate that Uber believes it is in intense competition with Waymo:  Discussing the

3  competition with Google, Mr. Holden discusses the battle and the war: "The *battle* is about what

4  we need to do to get ourselves into a sufficiently competitive position before December that G

5  doesn't walk away with the crown for future of ride sharing.  It's about establishing beach heads,

6  being in the game in a credible way.  The *war* is the long-term defeat of G and others so we

7  afford ourselves the opportunity to extend our massive scale business into the future.  This will be

8  about who gets NSD self-driving to scale first." (UBER00070108-110 at '108.)  If Uber does not

9  exercise its Call Option with respect to Otto Trucking, Waymo will be facing two competitors

10  who have had the benefit of Waymo's trade secrets.

11  *Development cost savings to Uber* – As discussed in more detail above, Uber has likely

12  realized significant cost savings in terms of its development timeline.  While considering the

13  acquisition of Otto, Uber recognized one important benefit was that the acquisition "decreases

14  total investment in [Autonomous Vehicle] development." (UBER00068983)  An Uber email

15  estimates that Uber's acquisition of Otto saved Uber at least a year in the race to large scale

16  autonomous vehicle deployment, and describes Uber's next best choice as building the team

17  internally with a two to four year lag versus what the Otto team would bring.  (UBER00060147-

18  156 at '147.)  One way to measure the costs that Defendants saved through their misappropriation

19  of Waymo's trade secrets is by looking at the costs that Waymo incurred to develop those trade

20  secrets.  As discussed in Waymo's response to interrogatory 6, Waymo has incurred up to $1.1

21  billion to develop the trade secrets. (*See* Waymo's 7/13 Supplemental Response to Interrogatory

22  No. 6 and all supplements thereto.)

23  *Increased future expected profits to Uber and/or Otto Trucking* – As discussed above in

24  the unjust enrichment section, Uber expected that acquiring Ottomotto and Otto Trucking would

25  accelerate the development of its LiDAR technology, and under its "most conservative case,"

26  Uber estimated the increased present value of incremental profit would be between $836 million

27  and $1.69 billion.  (UBER00069030-033 at '033.)

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    *LiDAR system cost savings* – Waymo has obtained significant cost savings by developing

2    custom, in-house LiDAR systems using its trade secrets, and Waymo expects that by

3    misappropriating Waymo's trade secrets, Defendants will be able to obtain similar results.

4    Waymo's custom, in-house solution is much cheaper than options offered by third party vendors;

5    as explained in more detail above and in Waymo's response to Interrogatory No. 6, a mid-range

6    LiDAR from Velodyne costs approximately $70,000.   By contrast, the materials needed for

7    Waymo's own mid-range GBr3 LiDAR system, which uses the trade secrets at issue in this case,

8    cost just over $5,000.   (*See* Waymo's Response to Interrogatory No. 6 and all supplements

9    thereto.)  Uber has also recently purchased third-party LiDAR units from ████████████

10   each.  (UBER00086529.)

11         Due to the misappropriation of Waymo's trade secrets, Defendants will likely benefit from

12   many years of future cost savings due to employing Waymo's trade secrets in Uber's LiDAR

13   systems.  While considering the acquisition of Otto, Uber itself recognized the significant cost

14   savings from building custom lasers, noting savings of "up to $45M of one-time savings (@ 1,000

15   units)" and "up to $80M per year of ongoing savings (@ 1,000 units)." (UBER00068983.)  And it

16   is clear that Uber is scaling production quickly:  at the end of 2016, Uber estimated that it would

17   need approximately 120,000 to 150,000 lenses for 2017 and 500,000 for 2018. (UBER00054959-

18   962 at '959.)  Since Uber's LiDAR system uses 64 lenses, these estimates indicate that Uber is

19   planning to manufacture between 1,875 and 2,344 LiDAR systems in 2017, and 7,812 LiDAR

20   systems in 2018.

21         In addition, if Uber is able to deploy autonomous vehicles in its fleet, its operational costs

22   for its ridesharing business would likely drop substantially, in part because it would not have to

23   share any revenue with its drivers.

24         *Valuation of Uber's acquisition* – As discussed above, Waymo is still obtaining discovery

25   regarding Uber's internal valuation of Otto.  However, Nina Qi testified that the Board was told

26   the overall value of the deal at the time was about $590 million. (Qi Tr. at 100-103.)

27

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    *Unjust Enrichment / Reasonable Royalty Related To Otto Trucking's Use Of Waymo's*
2    *Trade Secrets (Separate From Its Acquisition And Disclosure Of Those Trade Secrets To*
3    *Ottomotto and Uber)*

4         Otto Trucking is also separately liable for damages with respect to its own use of Waymo's
5    trade secrets, including through its subsidiary Otto Transport, which currently operates trucks for
6    the benefit of Uber's freight program.   (OTTOTRUCKING00002750.)   Discovery is ongoing
7    regarding the use of Waymo's trade secrets by Otto Trucking and its subsidiaries pending the
8    completion of the acquisition by Uber.   Waymo's technical expert is continuing to assess
9    Defendants' use of Waymo's trade secrets; such assessments will ultimately inform the damages
10   analysis in this case.   Moreover, Defendants have not yet responded to Waymo's damages-related
11   discovery requests.   Therefore, Waymo's expert has not concluded his analysis and is not expected
12   to do so until the time that expert reports are due on August 24, 2017.

13        *Punitive Damages, Attorneys Costs and Fees –*

14        Defendants' trade secret misappropriation has been willful and malicious.  If willful and
15   malicious trade secret misappropriation exists, both CUTSA and DTSA allow punitive damages
16   up to two times any damages award.  *See* Cal. Civil Code Section § 3426.3 *and* 18 U.S.C. §
17   1836(b)(3)(C).   If willful and malicious misappropriation exists, CUTSA and DTSA also allow
18   recovery of attorneys' fees and costs.  *See* § 3426.4 *and* 18 U.S.C. § 1836(b)(3)(D).  In addition to
19   attorneys' fees, Waymo is also eligible to receive reasonable expert fees under CUTSA.  § 3426.4.

20        While discovery is not complete and Waymo has still not seen the Stroz due diligence
21   report (which Waymo expects will bear on this issue), the evidence to date indicates that Uber and
22   Anthony Levandowski were in league with one another to port Waymo's trade secrets to Uber
23   going as far back as May 2015.  (Dkt. 712, Ex. 1 (logging discussions between Uber and Mr.
24   Levandowski beginning on May 20, 2015 "wherein Anthony Levandowski mentioned LiDAR to
25   any officer, director, employee, agent, supplier, or consultant of defendants").)  Uber continued to
26   meet with Mr. Levandowski throughout the fall of 2015.  (Dkt. 712, Ex. 1 (logging five meetings
27   with Mr. Levandowski regarding LiDAR between October 2015 and December 11, 2015).)  Uber
28   met with Mr. Levandowski to discuss LiDAR on the very same day that he downloaded 14,000

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  proprietary files from Waymo servers, (Dkt. 712 Ex. 1; Dkt. 23, ¶ 44), and again a few weeks later

2  on the same day Mr. Levandowski downloaded additional proprietary information from Waymo.

3  (Ex. 263; Dkt. 24-2 ¶ 22.)

4       When Uber began meeting with Otto, Otto did not have any products.  (Qi Tr. 146:8-18.)

5  Instead, Uber acquired Mr. Levandowski's company because of its "[e]xperience w/ automotive

6  efforts of competitors":

> 7   Anthony and his close team have developed several generations of mid and long
>     range laser that we now believe is critical to AV autonomy (day and night).  Not
> 8   only do they have the several generations of experience but also know how to
>     improve on the next gen devices that they would build for us.  We have yet to find
> 9   anyone else in the world with this know-how. . . . Second, just rubbing shoulders
>     with this team and having them advise us all over AV has a decent chance of
> 10  saving Uber at least a year off of the race to large scale AV deployment. . . .  My
>     point is that there is more value here (considerable) than 25 disparate engineers that
> 11  we would pick up from 25 different places.  This is a team that knows each other
>     knows the tech, knows the potholes and can jam at incredible rate (we hope) to help
> 12  solve some of our most pressing challenges.

13   (Ex. 271 at 1.)  While Mr. Bares refers to the "team" that Mr. Levandowski was going to bring to

14  his new company, there was no team in place other than Mr. Levandowski and Mr. Ron at the time

15  of this email.

16       Given Uber's scheme to buy Waymo's "tech" and "know how" through Mr. Levandowski

17  (and the corporate entities Ottomotto and Otto Trucking), Uber began anticipating litigation with

18  Waymo almost immediately.  The day after Mr. Levandowski resigned from Waymo, Uber was

19  already discussing indemnity with Mr. Levandowski and Lior Ron.  (Ex. 277, January 28, 2016

20  email from Cameron Poetzscher asking Travis Kalanick, "[d]id you tell Anthony that you would

21  indemnify them if they get sued by G as part of or after the deal?  They're under that impression.")

22  By February 5, 2016, the parties were specifically discussing indemnity for "Bad Acts," *including*

23  "downloading of files of [Google]."  (UBER00017265 at -73, Email between Uber representatives

24  and Lior Ron discussing "Timing of Indemnity / Closing Conditions," and an "Example list of

25  Specified Bad Acts," which included "downloading of files of [Google]".)

26       Having agreed to indemnify Mr. Levandowski for "downloading of files of [Google]" and

27  having agreed to indemnify Ottomotto and Otto Trucking for Bad Acts including trade secret

28  misappropriation, Uber then set up a forensic due diligence investigation designed specifically to

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   uncover – or confirm – the downloaded Waymo files in Otto's or Mr. Levandowski's possession.

2   The existence and sheer scope of this investigation is proof enough that Uber knew Mr.

3   Levandowski had Waymo materials:  it was, and remains, a process that was unprecedented for

4   Uber.  (Poetzscher Tr. at 128:11-25; Qi Rough Tr. at 243:17-244:3.)  As part of the investigation,

5   Stroz took and analyzed the electronic devices of five different Otto employees, including both

6   their personal and work devices.  (*See* Ron Tr. at 96:3-19.)  Despite this, the Uber witnesses

7   responsible for overseeing the investigation testified that the diligenced employees did not seem

8   upset by the scope of the investigation that Uber requested; instead, they were "okay with it."  (Qi

9   Rough Tr. at 223:22-224:6.)  The most likely explanation for that is, of course, that all parties

10  already knew what Uber was looking for—stolen Waymo files.

11        Although Uber must have known about the downloaded files when it agreed to indemnify

12  Mr. Levandowski and set up the forensic investigation, Uber almost certainly found out that Mr.

13  Mr. Levandowski had downloaded materials when the diligence process got underway.   To

14  motivate Mr. Levandowski to disclose *all* of his "Bad Acts" to Stroz, Uber created an elaborate

15  incentive structure:   as long as Mr. Levandowski disclosed his "Bad Acts" (including

16  "downloading of files of [Google]") to Stroz, Uber would indemnify him.  (UBER00017265 at -

17  73-74; Dkt. 566 at 3.)  If Mr. Levandowski did not disclose "Bad Acts" to Stroz, Levandowski

18  could not seek indemnification from Uber for those "Bad Acts" later.  (*Id.*)  Although Waymo has

19  still not seen the due diligence report that Stroz produced, all evidence indicates that Mr.

20  Levandowski accepted this offer and disclosed the existence of the stolen information to Uber and

21  Stroz.   Defendants have never disputed that Stroz has some of the stolen information in its

22  possession as a result of the due diligence process, and Uber recently admitted that its lawyers

23  have also possessed the stolen information for over a year by virtue of their involvement in the due

24  diligence process.  (Dkt. 677-8.)

25        ***At the very latest***, Uber learned that Mr. Levandowski had downloaded Waymo materials

26  in his possession on March 11, 2016 when Mr. Levandowski told Uber outright.  As Uber has

27  explained: "On or about March 11, 2016, Mr. Levandowski reported to [Travis] Kalanick, Nina Qi

28  and Cameron Poetzscher at Uber as well as Lior Ron that he had identified five discs in his

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   possession containing Google information." (Dkt. 695 at 4.)  Uber's accounting indicates that Mr.

2   Levandowski and Mr. Kalanick had a meeting to discuss LIDAR on the same day. (Dkt. 712, Ex.

3   1 at No. 63.)  Since receiving this interrogatory response, Waymo has deposed three of the four

4   individuals to whom Mr. Levandowski made this admission, and all three confirmed that Mr.

5   Levandowski did indeed reveal that he had Google "stuff" in his possession during an in-person

6   meeting with Uber on March 11, 2016.  (Ron Tr., 25:23-26:18; Poetzscher Tr., 249:3-250:9; Qi

7   Rough Tr., 271:11-273:20.)  Uber now insists that Mr. Levandowski subsequently destroyed the

8   materials (raising other serious concerns, including concerns regarding the integrity of Stroz's

9   investigation), but the point remains:  Uber was aware of Mr. Levandowski taking confidential

10  Waymo information files as of March 11, 2016, and Uber acquired Mr. Levandowski's company

11  anyway.  And even after finding out that he had Waymo materials in his possession on March 11,

12  2016, Uber *never* took *any* steps to prohibit Mr. Levandowski from using his "treasure trove of

13  files" in his work at Uber.

14      Waymo also seeks prejudgment interest on the damages awarded for the misappropriation

15  of trade secrets at the California statutory prejudgment interest rate of seven percent (7%).

16

17  INTERROGATORY NO. 11:

18      Identify all facts supporting your contention that Waymo owns each of the alleged trade

19  secrets identified in Waymo's 2019 Disclosure.

20

21  RESPONSE TO INTERROGATORY NO. 11:

22      Waymo incorporates by reference its General Objections.  Waymo further objects to this

23  interrogatory on the grounds that it is overbroad, unduly burdensome, and oppressive, including to

24  the extent that it asks Waymo to "identify all facts."  Waymo further objects to this request to the

25  extent it is compound, complex, and contains multiple subparts.

26      Subject to and without waiving the foregoing General and Specific Objections, Waymo

27  responds as follows:

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

DATED:  July 25, 2017                     QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                          By _/s/ Charles K. Verhoeven_
                                              Charles K. Verhoeven
                                              Attorneys for WAYMO LLC

# Exhibit 1

*UNREDACTED VERSION
OF DOCUMENT(S)
SOUGHT TO BE SEALED*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David Perlson (Cal. Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa J. Baily (Cal. Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Cal. Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan R. Jaffe (Cal. Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California  94111-4788
(415) 875-6600
(415) 875-6700 facsimile

Attorneys for Plaintiff WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC<br><br>            Plaintiffs,<br><br>        v.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO, LLC; OTTO TRUCKING<br>LLC,<br><br>            Defendants. | Case No. 17-cv-00939-JCS<br><br>**PLAINTIFF'S FIRST SUPPLEMENTAL<br>OBJECTIONS AND RESPONSES TO<br>OTTO TRUCKING, LLC'S FIRST SET OF<br>INTERROGATORIES (NOS. 1-14)** |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  INTERROGATORY NO. 10:

2      Identify all damage, including a specific calculation of monetary damages, caused by any

3  alleged misappropriation of trade secrets by Otto Trucking.

4

5  RESPONSE TO INTERROGATORY NO. 10:

6      Waymo incorporates by reference its General Objections.  Waymo further objects to this

7  interrogatory on the grounds that it is vague and ambiguous, including with respect to the phrase

8  "all damage."  Waymo further objects to this request to the extent it is compound, complex, and

9  contains multiple subparts.  Waymo further objects to this interrogatory as premature to the extent

10  it calls for information that is subject to expert testimony.  Waymo will provide expert testimony

11  in accordance with the Court's procedural schedule.

12      Subject to and without waiving the foregoing General and Specific Objections, Waymo

13  responds as follows:

14      Waymo believes it has suffered and is suffering irreparable harm as a result of Otto

15  Trucking's trade secret misappropriation.  In addition, Waymo believes it is entitled to damages

16  for Otto Trucking's trade secret misappropriation, particularly to the extent Otto Trucking has

17  used Waymo's trade secrets to fast-track LiDAR development for its own benefit or for the benefit

18  of Ottomotto or Uber.  Waymo is continuing its discovery into the nature and extent of Otto

19  Trucking's use of Waymo's trade secrets for its benefit, for the benefit of Ottomotto, and/or for the

20  benefit of Uber.  Waymo is also continuing its discovery into the role of Otto Trucking vis-à-vis

21  Ottomotto and Uber as a conduit of misappropriated information from Mr. Levandowski and

22  Ottomotto/Uber.   A specific calculation of monetary damages caused by Otto Trucking's

23  misappropriation cannot be provided until this discovery is more substantially complete.

24      Waymo expects to calculate past damages based on lost profits, unjust enrichment, and

25  reasonable royalty metrics.  To the extent an injunction is not granted, Waymo will also seek

26  damages, based on these same metrics, tied to any continuing use of Waymo's trade secrets.

27      Inputs to Waymo's damages analysis vis-à-vis Otto Trucking include, for example: the

28  extent, duration, and purpose of trade secret misappropriation; estimates of future profits and cash

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  flows to be earned by Otto Trucking (or those benefiting from its trade secret misappropriation)

2  and Waymo; assessments and projections regarding the relevant markets, competition therein, and

3  the relevant parties' competitive positions; investment in LiDAR technology (in time, capital,

4  engineering costs, and other expenditures); and valuations of the relevant technology.  Discovery

5  on these subjects is ongoing.

6       Waymo further seeks a judgment that this case is exceptional and an award of Waymo's

7  costs and reasonable attorneys' fees.  Waymo also seeks an accounting of all sales and revenues,

8  together with pre-judgment and post-judgment interest.  Waymo further seeks enhanced damages

9  for Defendants' willful and malicious conduct in misappropriating Waymo's trade secrets,

10  punitive damages, and other relief including but not limited to disgorgement of profits from unjust

11  enrichment.  Waymo seeks any other relief available under applicable law.  It would be premature

12  to estimate the amount of damages at this time.

13       Discovery is ongoing and Waymo reserves the right to supplement – and anticipates

14  regularly supplementing – this response after further discovery and investigation into Otto

15  Trucking's misappropriation of Waymo's trade secrets and the benefits obtained by Defendants as

16  a result of that misappropriation.

17

18  <u>FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10</u>:

19       Waymo objects to this interrogatory on the grounds that it is vague and ambiguous,

20  including with respect to the phrase "all damage."  Waymo further objects to this interrogatory to

21  the extent it is compound, complex, and contains multiple subparts.  Waymo further objects to this

22  interrogatory as premature to the extent it calls for information that is subject to expert testimony.

23  Waymo will provide expert testimony in accordance with the Court's procedural schedule.

24       Subject to and without waiving the foregoing objections, Waymo responds as follows:

25       Waymo's technical expert is continuing to assess Defendants' use of Waymo's trade

26  secrets; such assessments will ultimately inform the damages analysis in this case.  Moreover,

27  Defendants have not yet responded to Waymo's damages-related discovery requests.  Therefore,

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   Waymo's expert has not concluded his analysis and is not expected to do so until the time that

2   expert reports are due on August 24, 2017.

3         Discovery in this case is ongoing, and Waymo is still waiting for substantive responses to

4   its Fourth Set of Requests for Production (Nos. 266-297) and First Set of Common and Specific

5   Interrogatories, all of which relate to damages.   Specifically, Waymo expects Defendants'

6   responses to the following document requests and interrogatories to inform its response to this

7   interrogatory, and Waymo expects to supplement its response to this interrogatory when it

8   receives Defendants' document production and interrogatory responses:

- DOCUMENTS sufficient to show UBER's market capitalization and internal valuation of itself on a quarterly basis, from the year prior to the year in which UBER first contemplated developing autonomous vehicles through the present.

- DOCUMENTS sufficient to show the impact of developing autonomous vehicles on Uber's internal valuation of itself from the year prior to the year in which UBER first contemplated developing autonomous vehicles through the present.

- DOCUMENTS describing UBER's development of autonomous vehicles as necessary to the continued viability of UBER or to the continued viability of any aspect of UBER's business, INCLUDING but not limited to characterizations of a competitor's development or deployment of autonomous vehicles as an existential threat to UBER.

- DOCUMENTS sufficient to show each iteration of DEFENDANTS' plan to launch any autonomous vehicles in any geographic region from the time DEFENDANTS first contemplated developing or deploying autonomous vehicles to the present.

- DOCUMENTS sufficient to show DEFENDANTS' estimates of the size of the ridesharing market and DEFENDANTS' share of that market in the United States for each of the last six years on a quarterly basis. To the extent DEFENDANTS break out such estimates by geography (region, city, etc.), those estimates should also be provided.

- DOCUMENTS sufficient to show DEFENDANTS' forecasts of the size of the ride-sharing market, the percentage of the ride-sharing market that will be serviced by autonomous vehicles, and DEFENDANTS' share of that market in the United States (by autonomous vehicles and vehicles driven by contractors) for any period of time forecasted by UBER, on a quarterly basis. To the extent DEFENDANTS break out such estimates by geography (country, region, city, etc.), those estimates should also be provided. To the extent DEFENDANTS create different forecasts based on different assumptions, documents REGARDING each forecast – with documents sufficient to show the assumptions for each – should be provided.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- DOCUMENTS sufficient to show DEFENDANTS' forecasts REGARDING the number of DEFENDANTS' ride-sharing vehicles in the United States (by autonomous vehicles and vehicles driven by contractors), for any period of time forecasted by UBER —broken out by on a quarterly basis. To the extent DEFENDANTS break out such estimates by geography (country, region, city, etc.), those estimates should also be provided. To the extent DEFENDANTS create different forecasts based on different assumptions, documents REGARDING each forecast – with documents sufficient to show the assumptions for each – should be provided.

- DOCUMENTS sufficient to show DEFENDANTS' business plans, strategic plans, operating plans, marketing plans, financial plans, sales plans, and investment plans for its ridesharing business, INCLUDING projections for revenue generation and profitability.

- DOCUMENTS sufficient to show DEFENDANTS' business plans, strategic plans, operating plans, marketing plans, financial plans, sales plans, and investment plans for its autonomous vehicle program, INCLUDING projections for revenue generation and profitability of the autonomous vehicle program.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of any barriers to entry in the ride-sharing market and the status of any attempts by DEFENDANTS to enforce such barriers against competitors INCLUDING WAYMO, INCLUDING investments and infrastructure needed.

- DOCUMENTS REGARDING DEFENDANTS' discussion of WAYMO or its business, INCLUDING DEFENDANTS' analysis of WAYMO's impact or potential impact on the ridesharing market or on UBER.

- DOCUMENTS sufficient to identify the date that UBER first considered deploying autonomous vehicles.

- DOCUMENTS sufficient to identify the date that UBER first considered developing its own autonomous vehicles.

- DOCUMENTS sufficient to identify the date that UBER first considered developing its own in-house LiDAR.

- DOCUMENTS REGARDING the importance of a first-mover advantage in commercializing autonomous vehicles, INCLUDING any estimates of the market shares of other entrants that are not first to market.

- DOCUMENTS REGARDING the importance of LiDAR, INCLUDING the importance of low-cost LiDAR, to DEFENDANTS' ability to compete.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- DOCUMENTS REGARDING the relative value of safety (vis-à-vis, for example, cost and timing of entry into relevant markets) in the commercialization of autonomous vehicles.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of WAYMO's technological lead REGARDING autonomous vehicle technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO), and documents sufficient to show how DEFENDANTS' analysis or estimates have changed over time.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of how WAYMO's technological lead over DEFENDANTS REGARDING autonomous vehicle technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO) changed after Uber's acquisition of OTTOMOTTO and OTTO TRUCKING.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of WAYMO's technological lead REGARDING LiDAR technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO), and documents sufficient to show how DEFENDANTS' analysis or estimates have changed over time.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of how WAYMO's technological lead over DEFENDANTS REGARDING LiDAR technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO) changed after UBER's acquisition of OTTOMOTTO and OTTO TRUCKING.

- DOCUMENTS sufficient to show DEFENDANTS' comparisons of the cost and profitability of a human-driven versus an autonomous vehicle in a ride-sharing fleet.

- DOCUMENTS sufficient to show the historical and current cost of DEFENDANTS' autonomous vehicles, broken down by component, and dating back to the inception of DEFENDANTS' autonomous vehicle program. As noted in the Instructions above, to the extent DEFENDANTS can provide separate information for each Defendant, DEFENDANTS should do so.

- DOCUMENTS sufficient to show DEFENDANTS' total financial investment including but not limited to employee time, purchase of capital equipment, and outside consultants, by quarter, into its efforts to develop in-house LiDAR. As noted in the Instructions above, to the extent DEFENDANTS can provide separate information for each Defendant, DEFENDANTS should do so.

- DOCUMENTS sufficient to show DEFENDANTS' investment, in terms of time including but not limited to engineers, software developers, managers, and executives (broken out be each category of employee), into its efforts to develop in-house LiDAR. As noted in the Instructions above, to the extent DEFENDANTS

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

can provide separate information for each Defendant, DEFENDANTS should do so.

- Patent licenses or agreements relating to LiDAR.

- DOCUMENTS sufficient to show the impact to DEFENDANTS of having to redesign Fuji to avoid using the trade secrets identified in response to UBER's interrogatory No. 1.

- DOCUMENTS sufficient to show any valuation (whether conducted by UBER or by a third party) of the assets and technology acquired in the acquisition of Otto by Uber, INCLUDING valuations performed for the purpose of purchase price accounting or any other purpose.

- DOCUMENTS sufficient to show any DEFENDANTS' projected revenue, gross margin, and operating profit for any division including autonomous vehicles.

- DOCUMENTS sufficient to show any the financials, INCLUDING profit and loss statements and balance sheet, for OTTOMOTTO, OTTO TRUCKING, and any division of UBER including autonomous vehicles.

- DOCUMENTS sufficient to show DEFENDANTS' approved requests for capital expenditure authorizations related to its autonomous vehicle program, INCLUDING R&D expenditures, technology/equipment acquisitions, and marketing expenditures.

- Describe in detail the impact, including financial impact, to DEFENDANTS of having to redesign Fuji to avoid using the trade secrets identified in response to UBER's Interrogatory No. 1.

- To the extent DEFENDANTS contend they will be irreparably harmed by a permanent injunction prohibiting the use of WAYMO's trade secrets in this case, describe in detail the factual and legal bases for that contention.

- Describe in detail DEFENDANTS' investment in developing in-house LiDAR. This should include DEFENDANTS' financial investment, as well as DEFENDANTS' investment in terms of time and personnel.

- Describe in detail [OTTOMOTTO and OTTO TRUCKING's] efforts to place a value on OTTOMOTTO and/or OTTO TRUCKING or their respective assets and technology as part of UBER'S acquisition of OTTOMOTTO and/or OTTO TRUCKING, either prior to or following the acquisition.

- Describe in detail UBER's efforts to place a value on OTTOMOTTO and/or OTTO TRUCKING or their respective assets and technology as part of the acquisition, either prior to or following the acquisition, including but not limited to the efforts described by Nina Qi during her deposition at Rough Tr. 192:4-199:15.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- IDENTIFY the date that UBER first considered developing its own in-house LiDAR and the date UBER began developing its own in-house LiDAR (to the extent it differs from the date UBER began considering it), and describe in detail UBER's reasons for wanting to develop its own in-house LiDAR.

**Damages for Violations of Defense of Trade Secrets Act and California Uniform Trade Secret Act**

Uber, Ottomotto, and Otto Trucking are jointly and severally liable for damages in this case. Ottomotto and Otto Trucking are the corporate vehicles for the misappropriation of Waymo's trade secrets for the benefit of Uber. Anthony Levandowski officially formed Ottomotto on January 15, 2016 (while he was simultaneously employed by Waymo, consulting with Uber on Uber's self-driving car project, and negotiating the acquisition of Ottomotto). He officially formed Otto Trucking on February 1, 2016 (five days after resigning from Waymo and while he was consulting with Uber on Uber's self-driving car project and negotiating the acquisition of Otto Trucking). Mr. Levandowski was acting for all three Defendants at various times in order to facilitate the misappropriation of Waymo's trade secrets.

Uber entered into Agreements and Plans of Merger with each of Ottomotto and Otto Trucking on the same date, within weeks of the formation of those entities. (UBER00016757; UBER00016453). Pursuant to its Agreement and Plan of Merger, Otto Trucking was obligated and continues to be obligated to assign all of its intellectual property to Ottomotto (which has now been acquired by Uber). (UBER00016757.) Pending completion of the Otto Trucking acquisition by Uber, Anthony Levandowski remains one of two managing members of Otto Trucking and holds ███████████████████████████████████████████. (OTTOTRUCKING00000004.) Uber has an exclusive option to acquire Otto Trucking between August 31, 2017 and November 30, 2017. (UBER00016757 at -764, -819.) If Uber does not acquire Otto Trucking during that period, Uber will be obligated to (i) become a 50% owner in Otto Trucking and (ii) to license Uber's self-driving technology (including all trade secrets) exclusively to Otto Trucking (even vis-à-vis Uber) for use in the commercialization of self-driving trucks. (UBER00016757 at -772.)

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    Otto Trucking is jointly and severally liable for all damages caused by Defendants'

2    misappropriation of Waymo's trade secrets, including Defendants' unjust enrichment resulting

3    from Defendants' misappropriation, any reasonable royalty assessed as a result of Defendants'

4    misappropriation, and any exemplary damages, attorneys' fees, expert fees, and costs awarded as a

5    result of Defendants' misappropriation.

6        ***Unjust Enrichment Damages***

7        Uber, Ottomotto, and Otto Trucking have been unjustly enriched due to their

8    misappropriation of Waymo's trade secrets.   There are several measures that can be used to

9    quantify the unjust enrichment to Defendants.   One measure of the unjust enrichment to

10    Defendants is the value that was paid (or will be paid) by Uber for Ottomotto and Otto Trucking

11    (collectively, "Otto").   When Uber began negotiating with Mr. Levandowski, Otto was a company

12    that did not exist, and did not have any products.  (Qi Tr. 146:8-18.)  And at that time, Uber was

13    aware that he still had confidential information from Waymo.  (Bares Tr. at 179:14-18.)   John

14    Bares, Operations Director in Uber's Advanced Technology Group, was personally responsible for

15    negotiating aspects of Uber's acquisition of Otto on Uber's behalf, including a series of technical

16    milestones regarding LiDAR.   He admitted that having access to Waymo's specifications for

17    medium and long-range LiDAR would have been useful for someone trying to build medium and

18    long-range LiDAR at Uber because Waymo is "eight years ahead" and "had custom lasers."  (*Id.*

19    179:19-180:12.)  Defendants do not dispute that Mr. Levandowski had access to Waymo's files at

20    this time—as a result of both his ongoing employment at Waymo, and his illicit downloads.

21        Uber and Otto began negotiating the term sheet for the acquisition of Otto in January and

22    February 2016, with the final term sheet executed on February 22, 2016.  (UBER00017518-578;

23    UBER00069043-064.)  For at least some of this period, Mr. Levandowski was still an employee of

24    Google.  Because Otto had no products when Uber and Otto began negotiating (Qi Tr. 146:8-18),

25    the only things of value to be acquired by Uber were likely (1) the engineers that Uber acquired;

26    and (2) Waymo's technology. Therefore, the misappropriated trade secrets represented a

27    significant portion of the assets acquired by Uber, as well as the talents of the employees that

28    would be engaged in connection with  the acquisition.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    Uber and Otto entered into the formal Agreement and Plan of Merger on April 11, 2016.

2  (UBER00016453-16523; UBER00016757.)  Prior to entering into the agreement, Uber's Board of

3  Directors approved the acquisition.   Discovery regarding Uber's internal valuation of Otto

4  (including information regarding the assumptions underlying Uber's internal valuation of Otto)

5  will further inform Waymo's unjust enrichment analysis.  However, Nina Qi testified that Uber

6  told its Board that the overall value of the deal at the time was about $590 million. (Qi Tr. at 100-

7  103.)  Although Uber's payment to Otto was conditioned on certain milestones that stretched for

8  some time into the future, this value is a reasonable measure of the present value of the transaction

9  given that it was the value presented to Uber's Board of Directors in the Board's consideration and

10  approval of the acquisition.

11    Another measure of the unjust enrichment to Defendants is the present value of the

12  additional cash flows that Defendants will earn as a result of Uber's accelerated development of

13  self-driving car technology.  Uber expected that acquiring Otto would accelerate the development

14  of its LiDAR technology.  For example, when considering the acquisition, Uber estimated that

15  acquiring Otto could shorten its autonomous vehicle timeline by one to two years.

16  (UBER00069030-033 at '033.)  Even under its "most conservative case," Uber estimated the

17  increased present value of incremental profit (as measured by EBIT, or Earnings Before Interest

18  and Taxes) from Otto's technology would be between $836 million and $1.69 billion.

19  (UBER00069030-033 at '033.)  In addition to the increased profits, Uber recognized Waymo was

20  a threat to its entire existence, potentially placing its entire business at risk—something that,

21  according    to    public    reports,    is    worth    approximately    $70    billion.    (*See*

22  https://techcrunch.com/2017/06/21/kalanick-is-out-but-ubers-vcs-royally-screwed-up-too-say-

23  industry-watchers/).  For example, Uber's then-CEO was quoted as follows: "The minute it was

24  clear to us that our friends in Mountain View were going to be getting in the ride sharing space,

25  we needed to make sure there is an alternative [self-driving car].  Because if there is not, we're not

26  going to have any business."  He also described developing an autonomous vehicle as "basically

27  existential for us." (UBER00006042-047 at '043; UBER00006035-041 at '037; UBER00064472-

28  473; LEV_001940-051 at '940.)  In messaging notes related to the acquisition, Uber's then-CEO

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  noted "Autonomous transportation is very possibly a winner-take-all, and thus existential for

2  Uber." (UBER00064468-469 at '468.)   Similarly, Jeff Holden, Uber's Chief Product Officer,

3  wrote: "This war for self-driving is truly existential for Uber: we'll either start up our second S

4  curve of growth or we'll die.  There might be in-between cases, but it's definitely easy to see how

5  the extremes could play out."  Discussing the competition with Google, Mr. Holden discusses the

6  battle and the war: "The *battle* is about what we need to do to get ourselves into a sufficiently

7  competitive position before December that G doesn't walk away with the crown for future of ride

8  sharing.  It's about establishing beach heads, being in the game in a credible way.  The *war* is

9  the long-term defeat of G and others so we afford ourselves the opportunity to extend our massive

10  scale business into the future.  This will be about who gets NSD self-driving to scale first."

11  (UBER00070108-110 at '108.)

12      Another measure of unjust enrichment to Defendants is the expected cost savings to

13  Defendants from using Waymo's trade secrets in Uber's LiDAR systems.  Waymo has obtained

14  significant cost savings by developing custom, in-house LiDAR systems using its trade secrets.

15  Waymo's custom, in-house solution is much cheaper than options offered by third party vendors;

16  as explained in more detail in Waymo's response to Interrogatory No. 6, a mid-range LiDAR from

17  Velodyne costs approximately $70,000.  Uber has also recently purchased third-party LiDAR

18  units from ▮▮▮▮▮▮▮▮▮▮▮▮▮ (UBER00086529.)  By contrast, the materials needed for

19  Waymo's own mid-range GBr3 LiDAR system, which uses the trade secrets at issue in this case,

20  cost just over $5,000.  (*See* Waymo's Response to Interrogatory No. 6 and all supplements

21  thereto.)

22      Due to the misappropriation of Waymo's trade secrets, Defendants will likely benefit from

23  many years of future cost savings due to employing Waymo's trade secrets in Uber's LiDAR

24  systems.  While considering the acquisition of Otto, Uber itself recognized the significant cost

25  savings from building custom lasers, noting savings of "up to $45M of one-time savings (@ 1,000

26  units)" and "up to $80M per year of ongoing savings (@ 1,000 units)."  (UBER00068983.)  And it

27  is clear that Uber is scaling production quickly:  at the end of 2016, Uber estimated that it would

28  need approximately 120,000 to 150,000 lenses for 2017 and 500,000 for 2018. (UBER00054959-

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  962 at '959.)  Since Uber's LiDAR system uses 64 lenses, these estimates indicate that Uber is

2  planning to manufacture between 1,875 and 2,344 LiDAR systems in 2017, and 7,812 LiDAR

3  systems in 2018.

4       Another measure of unjust enrichment to Defendants is the expected cost savings due to

5  reduced development expenses from using Waymo's trade secrets in Uber's LiDAR systems.

6  While considering the acquisition of Otto, Uber recognized one important benefit was that the

7  acquisition "decreases total investment in [Autonomous Vehicle] development."

8  (UBER00068983)  An internal Uber email estimates that Uber's acquisition of Otto saved Uber at

9  least a year in the race to large scale autonomous vehicle deployment, and describes Uber's next

10  best choice as building the team internally with a two to four year lag versus what the Otto team

11  would bring.  (UBER00060147-156 at '147.)  One way to measure the costs that Defendants saved

12  through their misappropriation of Waymo's trade secrets is by looking at the costs that Waymo

13  incurred to develop those trade secrets.  As discussed in Waymo's response to interrogatory 6,

14  Waymo has incurred up to $1.1 billion to develop the trade secrets.  (*See* Waymo's 7/13

15  Supplemental Response to Interrogatory No. 6 and all supplements thereto.)

16       Waymo anticipates that Defendants will argue that the measures of unjust enrichment

17  discussed above are measures of value for the entirety of the company (Otto) acquired by Uber.

18  Waymo expects to rebut any evidence presented by Defendants that a portion of any value can be

19  attributed to any contributions other than Waymo's trade secrets.  Nonetheless, Waymo addresses

20  apportionment below.

21       Otto had no products when Uber and Otto began negotiating.  (Qi Tr. 146:8-18.)  And

22  Otto's profit and loss statement for January through March 2016 reflects less than $1.4 million of

23  expenses.  (UBER00060164 and UBER00060165).  Therefore, the only things of value to be

24  acquired by Uber were likely (1) the engineers that Uber acquired; and (2) Waymo's technology.

25  Waymo is still conducting discovery regarding what assets (if any) Otto had when Uber decided to

26  acquire it.  To the extent Otto had any working products or technology by the time Uber agreed to

27  acquire it, Waymo's unjust enrichment analysis would account for that by deducting the value of

28  Otto's then-existing technology.  However, as previously discussed, Waymo expects the large

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  majority of the measures of value discussed above to be attributable to the value of the stolen

2  information and engineers that Uber acquired in the transaction.

3          With respect to the value of the engineers Uber acquired from Otto, talented engineers in

4  the autonomous vehicle field are few and far between.  In particular, some of the engineers who

5  left Waymo to join Otto, and who were eventually acquired by Uber, had very specialized skill

6  sets, including Don Burnette, Claire Delaunay, Gaetan Pennecot and Mr. Levandowski himself.

7  These engineers would likely be worth more than an average engineer, and more than even an

8  average autonomous vehicle engineer.  Waymo is still obtaining discovery regarding Uber's

9  valuation of the engineers that it acquired, but  one public estimate of the value of engineers in the

10 autonomous      vehicle      industry      is      $10      million      per      engineer.

11 (https://www.recode.net/2016/9/17/12943214/sebastian-thrun-self-driving-talent-pool).

12         With respect to development expenses, it is possible that Defendants would not have had

13 to incur all of the development expenses Waymo incurred if Defendants had developed the trade

14 secrets themselves (rather than misappropriating them from Waymo).  Although Waymo is still

15 seeking discovery on how long Uber spent in its autonomous vehicle development efforts before

16 acquiring Otto, Waymo understands that Uber had been developing autonomous vehicle

17 technology prior to its discussions with Otto.  Uber may argue that in calculating Uber's unjust

18 enrichment based on Waymo's development expenses, it may be appropriate to include only a

19 portion of  Waymo's total development expenses.  To date, Defendants have not produced

20 evidence regarding their LiDAR development efforts necessary to conduct such an apportionment.

21 However, as discussed above, Uber believed that it could save development expenses by acquiring

22 Otto.  Specifically, Uber estimated that the acquisition would speed up its autonomous vehicle

23 timeline by one to two years, and would speed up its laser development by two to four years.

24 Thus, one estimate of the potential savings as a result of Defendants obtaining Waymo's

25 technology is the one to two years of average development expense that Uber estimated it would

26 save in developing autonomous vehicle technology, which can be expressed as a percentage of

27 Uber's total development expenses.  Another measure of the potential savings as a result of

28 Defendants obtaining Waymo's technology is the difference between the amount of money

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  Waymo has spent in developing autonomous vehicle technology and the amount of money that

2  Defendants have spent.  Another measure of the potential savings can be calculated based on the

3  proportion of development expenses that Waymo has spent in developing LiDAR technology in

4  relation to the other technologies in autonomous vehicles.  Waymo reserves its right to

5  supplement this response if and when Defendants produce the information necessary to conduct an

6  apportionment regarding development expenses.

7  In addition, if Uber is able to deploy autonomous vehicles in its fleet, its operational costs

8  for its entire ridesharing business would likely drop substantially, in part because it would not

9  have to share any revenue with its drivers.

10  Waymo is under a Court order to narrow its list of asserted trade secrets to less than ten by

11  August 1.  After Waymo completes this narrowing, Waymo will consider how to apportion the

12  value of the trade secrets that Mr. Levandowski and Defendants misappropriated to account for the

13  trade secrets that it will bring to trial in this case.  However, Waymo suspects that a substantial

14  portion of the unjust enrichment would be attributable to the most valuable trade secrets.  Since

15  Uber and Waymo are racing to commercialize autonomous vehicles, accelerating the development

16  timeline was important to Uber.  (UBER00070108-110 at '108.).  Thus, Waymo presumes that

17  Defendants made use of the most important and most valuable trade secrets first.

18  ***Reasonable Royalty Damages***

19  If the Court were to determine that damages based on the unjust enrichment caused by

20  Defendants' misappropriation of the trade secrets is not provable, the Court "may order payment

21  of a reasonable royalty for no longer than the period of time the use could have been prohibited"

22  pursuant to the provisions of the California Uniform Trade Secrets Act.  Cal. Civ. P. § 3426.3(b).

23  A reasonable royalty is also available under the Defend Against Trade Secrets Act.  18 U.S.C. §

24  1836(b)(3)(A)(iii) ("in lieu of damages measured by any other methods, the damages caused by

25  the misappropriation measured by imposition of liability for a reasonable royalty for the

26  misappropriator's unauthorized disclosure or use of the trade secret").

27  Waymo's damages expert will analyze and compute the amount of reasonable royalty

28  damages payable to Waymo by Defendants due to the misappropriation of the trade secrets based

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  on the documents and information produced by Waymo, Defendants and third parties during

2  discovery, as well as independent research conducted by Waymo's damages expert.  Specifically,

3  Waymo's expert will, among other things, opine as to the appropriate reasonable royalty, either in

4  the form of a lump sum payment or a running royalty rate, or a combination of both.

5       As discussed above, Defendants have not yet responded to Waymo's damages-related

6  discovery requests.  Therefore, Waymo's expert has not concluded his analysis and is not expected

7  to do so until the time that expert reports are due on August 24, 2017.

8       At present, Waymo anticipates that its expert's computations of a reasonable royalty

9  adequate to compensate for Defendants' infringement will involve an analytical approach and/or a

10  hypothetical negotiation approach.  An analytical approach is used to determine a royalty that

11  leaves the infringer with a "normal" rate of return for the use of its products embodying the trade

12  secrets or to calculate a royalty based on the increased profitability due to the use of the trade

13  secrets in Defendants' products.  In other words, an analytical approach will determine, or isolate,

14  the financial benefit or value that Defendants obtained through their misappropriation of trade

15  secrets.

16       Waymo anticipates that its expert's determination of reasonable royalty damages under an

17  analytical approach or a hypothetical negotiation approach will be based on, among other things,

18  analysis of sales and profit projections, analyst forecasts, profitability information and other

19  documents and records produced by Waymo, Defendants, and third parties.  In addition to the

20  foregoing, Waymo's expert may utilize documents and materials referred to and recognized as

21  relevant to the determination of the cost savings achieved by the Defendants due to their

22  misappropriation.  In addition to the foregoing, Waymo's expert may utilize documents and

23  materials referred to and recognized as relevant to the determination of a reasonable royalty or

24  other damages computations in cases such as *Georgia- Pacific*, among others.

25       At present, Waymo's understanding of the primary considerations that Waymo's expert

26  will analyze with respect to the hypothetical negotiation approach are summarized below.

27       *Impact on Waymo's future expected profits* - Waymo expects that its future success is

28  critically dependent on its technological lead in autonomous vehicles. (WAYMO-UBER-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   00004108-131 at '109, '111; Chu Tr. 12:3-7, 45:19-24)   Defendants' misappropriation of

2   Waymo's trade secrets shortens the technological lead that Waymo has in autonomous vehicles.

3   For example, when considering the acquisition of Ottomotto and Otto Trucking, Uber estimated

4   that Otto's technology could shorten its autonomous vehicle timeline by one to two years.

5   (UBER00069030-033 at '033.)   Moreover, if Uber does not exercise its Call Option with respect

6   to Otto Trucking, yet another Waymo competitor will have had the benefit of Waymo's

7   misappropriated trade secrets.   Given the importance of Waymo's technological lead, this would

8   likely have a significant impact on its ability to earn profits.

9       *Waymo's policy to protect and maintain its trade secrets* – Waymo has sought to protect its

10   trade secrets and has not disclosed the trade secrets to third parties, and it has not licensed its trade

11   secrets.   Waymo takes robust measures to protect its LiDAR trade secrets.   As a condition of

12   employment, Waymo requires all employees to enter into written agreements to maintain the

13   confidentiality of proprietary and trade secret information, and not to misuse such information.

14   Waymo also enforces an employee code of conduct that explains employees' strict obligations to

15   maintain the secrecy of confidential information, and requires employee training in security

16   procedures.   Droz Decl. ¶ 30.

17       Waymo also takes reasonable measures to mark confidential and proprietary information,

18   such as documents and other materials, with visible legends designating them as such when

19   sharing them outside of Waymo, subject to NDAs or other confidentiality agreements.

20   Disclosures to vendors are limited to the subject matter necessary for the vendor's engagement and

21   do not reveal the entirety of a given LiDAR system or design.   Waymo employs reasonable efforts

22   to secure physical facilities by restricting access and employing locks, cameras, guards, and other

23   security measures.   *Id.* ¶¶ 33-37; Janosko Decl. ¶ 22.

24       Waymo uses Subversion (SVN) — a revision control system — to store its electrical

25   design information. All traffic (both ingress to and egress from) the SVN repository is encrypted.

26   All traffic is authenticated against a list of authorized users before access to the repository is

27   granted, and users do not share credentials — all accesses are unique to specific users. Access

28   control lists are audited monthly and stale users are aggressively purged. The SVN server is

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  password protected and accessible through specialized software. *Id*. ¶¶ 23-25. Additionally,

2  Waymo imposes network security measures and access policies that restrict the access and

3  dissemination of certain confidential and proprietary trade secret information to only teams that

4  are working on projects related to that information. For example, Google employees working on

5  projects with no relation to Waymo or self-driving cars could not (and cannot) access Waymo's

6  confidential and proprietary schematics. They are distributed on a "need to know" basis. Droz

7  Decl. ¶ 32. Google's networks generally are also secured through Network Access Control

8  ("NAC") procedures, Access Control Lists ("ACLs"), and restricted access privileges. Janosko

9  Decl. ¶¶ 13-16.

10      Google employs a variety of security mechanisms to prevent network intruders or attackers

11  who may compromise Waymo's trade secret information. Google also secures employees' devices

12  and credentials against attacks through monitoring and logging practices, as well as regular

13  security updates. *Id*. ¶¶ 7-12, 20.

14      Google secures its production infrastructure in progressive layers starting from the physical

15  security of data centers, continuing on to the security of the hardware and software that underlie

16  the infrastructure, and finally, the technical constraints and processes in place to support

17  operational security. Google employs many hundreds of engineers dedicated to security and

18  privacy distributed across all of Google, including many who are recognized industry authorities.

19  These engineers work to protect Google's production servers from malware utilizing tools such as

20  binary verification. Google also has an incident management process for security events that may

21  affect the confidentiality, integrity, or availability of systems or data *Id*. ¶¶ 17-21.

22      Waymo incorporates by reference its Response to Interrogatory No. 7 and all supplements

23  thereto.

24      *Competitive relationship between Waymo and Uber and Otto Trucking* – Waymo

25  recognizes that Uber is the most significant competitor in the transportation as a service (TaaS)

26  business. (WAYMO-UBER-00004175-194 at '184-185)  Similarly, Uber recognizes Waymo is a

27  significant competitor.  In fact, as discussed above, Uber has described Waymo as an existential

28  threat to its TAAS business: "This war for self-driving is truly existential for Uber: we'll either

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  start up our second S curve of growth or we'll die." (UBER00070108-110 at '108.)  Internal Uber

2  documents indicate that Uber believes it is in intense competition with Waymo:  Discussing the

3  competition with Google, Mr. Holden discusses the battle and the war: "The *battle* is about what

4  we need to do to get ourselves into a sufficiently competitive position before December that G

5  doesn't walk away with the crown for future of ride sharing.  It's about establishing beach heads,

6  being in the game in a credible way.  The *war* is the long-term defeat of G and others so we

7  afford ourselves the opportunity to extend our massive scale business into the future.  This will be

8  about who gets NSD self-driving to scale first." (UBER00070108-110 at '108.)  If Uber does not

9  exercise its Call Option with respect to Otto Trucking, Waymo will be facing two competitors

10  who have had the benefit of Waymo's trade secrets.

11      *Development cost savings to Uber* – As discussed in more detail above, Uber has likely

12  realized significant cost savings in terms of its development timeline.  While considering the

13  acquisition of Otto, Uber recognized one important benefit was that the acquisition "decreases

14  total investment in [Autonomous Vehicle] development." (UBER00068983)  An Uber email

15  estimates that Uber's acquisition of Otto saved Uber at least a year in the race to large scale

16  autonomous vehicle deployment, and describes Uber's next best choice as building the team

17  internally with a two to four year lag versus what the Otto team would bring.  (UBER00060147-

18  156 at '147.)  One way to measure the costs that Defendants saved through their misappropriation

19  of Waymo's trade secrets is by looking at the costs that Waymo incurred to develop those trade

20  secrets.  As discussed in Waymo's response to interrogatory 6, Waymo has incurred up to $1.1

21  billion to develop the trade secrets. (*See* Waymo's 7/13 Supplemental Response to Interrogatory

22  No. 6 and all supplements thereto.)

23      *Increased future expected profits to Uber and/or Otto Trucking* – As discussed above in

24  the unjust enrichment section, Uber expected that acquiring Ottomotto and Otto Trucking would

25  accelerate the development of its LiDAR technology, and under its "most conservative case,"

26  Uber estimated the increased present value of incremental profit would be between $836 million

27  and $1.69 billion.  (UBER00069030-033 at '033.)

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1      *LiDAR system cost savings* – Waymo has obtained significant cost savings by developing

2   custom, in-house LiDAR systems using its trade secrets, and Waymo expects that by

3   misappropriating Waymo's trade secrets, Defendants will be able to obtain similar results.

4   Waymo's custom, in-house solution is much cheaper than options offered by third party vendors;

5   as explained in more detail above and in Waymo's response to Interrogatory No. 6, a mid-range

6   LiDAR from Velodyne costs approximately $70,000.   By contrast, the materials needed for

7   Waymo's own mid-range GBr3 LiDAR system, which uses the trade secrets at issue in this case,

8   cost just over $5,000.   (*See* Waymo's Response to Interrogatory No. 6 and all supplements

9   thereto.)  Uber has also recently purchased third-party LiDAR units from ███████████

10   each.  (UBER00086529.)

11      Due to the misappropriation of Waymo's trade secrets, Defendants will likely benefit from

12   many years of future cost savings due to employing Waymo's trade secrets in Uber's LiDAR

13   systems.   While considering the acquisition of Otto, Uber itself recognized the significant cost

14   savings from building custom lasers, noting savings of "up to $45M of one-time savings (@ 1,000

15   units)" and "up to $80M per year of ongoing savings (@ 1,000 units)."  (UBER00068983.)  And it

16   is clear that Uber is scaling production quickly:  at the end of 2016, Uber estimated that it would

17   need approximately 120,000 to 150,000 lenses for 2017 and 500,000 for 2018. (UBER00054959-

18   962 at '959.)  Since Uber's LiDAR system uses 64 lenses, these estimates indicate that Uber is

19   planning to manufacture between 1,875 and 2,344 LiDAR systems in 2017, and 7,812 LiDAR

20   systems in 2018.

21      In addition, if Uber is able to deploy autonomous vehicles in its fleet, its operational costs

22   for its ridesharing business would likely drop substantially, in part because it would not have to

23   share any revenue with its drivers.

24      *Valuation of Uber's acquisition* – As discussed above, Waymo is still obtaining discovery

25   regarding Uber's internal valuation of Otto.  However, Nina Qi testified that the Board was told

26   the overall value of the deal at the time was about $590 million. (Qi Tr. at 100-103.)

27

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

*Unjust Enrichment / Reasonable Royalty Related To Otto Trucking's Use Of Waymo's Trade Secrets (Separate From Its Acquisition And Disclosure Of Those Trade Secrets To Ottomotto and Uber)*

Otto Trucking is also separately liable for damages with respect to its own use of Waymo's trade secrets, including through its subsidiary Otto Transport, which currently operates trucks for the benefit of Uber's freight program.  (OTTOTRUCKING00002750.)   Discovery is ongoing regarding the use of Waymo's trade secrets by Otto Trucking and its subsidiaries pending the completion of the acquisition by Uber.   Waymo's technical expert is continuing to assess Defendants' use of Waymo's trade secrets; such assessments will ultimately inform the damages analysis in this case.  Moreover, Defendants have not yet responded to Waymo's damages-related discovery requests.  Therefore, Waymo's expert has not concluded his analysis and is not expected to do so until the time that expert reports are due on August 24, 2017.

*Punitive Damages, Attorneys Costs and Fees –*

Defendants' trade secret misappropriation has been willful and malicious.  If willful and malicious trade secret misappropriation exists, both CUTSA and DTSA allow punitive damages up to two times any damages award.  *See* Cal. Civil Code Section § 3426.3 *and* 18 U.S.C. § 1836(b)(3)(C).  If willful and malicious misappropriation exists, CUTSA and DTSA also allow recovery of attorneys' fees and costs.  *See* § 3426.4 *and* 18 U.S.C. § 1836(b)(3)(D).  In addition to attorneys' fees, Waymo is also eligible to receive reasonable expert fees under CUTSA.  § 3426.4.

While discovery is not complete and Waymo has still not seen the Stroz due diligence report (which Waymo expects will bear on this issue), the evidence to date indicates that Uber and Anthony Levandowski were in league with one another to port Waymo's trade secrets to Uber going as far back as May 2015.  (Dkt. 712, Ex. 1 (logging discussions between Uber and Mr. Levandowski beginning on May 20, 2015 "wherein Anthony Levandowski mentioned LiDAR to any officer, director, employee, agent, supplier, or consultant of defendants").)  Uber continued to meet with Mr. Levandowski throughout the fall of 2015.  (Dkt. 712, Ex. 1 (logging five meetings with Mr. Levandowski regarding LiDAR between October 2015 and December 11, 2015).)  Uber met with Mr. Levandowski to discuss LiDAR on the very same day that he downloaded 14,000

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  proprietary files from Waymo servers, (Dkt. 712 Ex. 1; Dkt. 23, ¶ 44), and again a few weeks later

2  on the same day Mr. Levandowski downloaded additional proprietary information from Waymo.

3  (Ex. 263; Dkt. 24-2 ¶ 22.)

4  When Uber began meeting with Otto, Otto did not have any products.  (Qi Tr. 146:8-18.)

5  Instead, Uber acquired Mr. Levandowski's company because of its "[e]xperience w/ automotive

6  efforts of competitors":

> Anthony and his close team have developed several generations of mid and long
> range laser that we now believe is critical to AV autonomy (day and night).  Not
> only do they have the several generations of experience but also know how to
> improve on the next gen devices that they would build for us.  We have yet to find
> anyone else in the world with this know-how. . . . Second, just rubbing shoulders
> with this team and having them advise us all over AV has a decent chance of
> saving Uber at least a year off of the race to large scale AV deployment. . . .  My
> point is that there is more value here (considerable) than 25 disparate engineers that
> we would pick up from 25 different places.  This is a team that knows each other
> knows the tech, knows the potholes and can jam at incredible rate (we hope) to help
> solve some of our most pressing challenges.

13  (Ex. 271 at 1.)  While Mr. Bares refers to the "team" that Mr. Levandowski was going to bring to

14  his new company, there was no team in place other than Mr. Levandowski and Mr. Ron at the time

15  of this email.

16  Given Uber's scheme to buy Waymo's "tech" and "know how" through Mr. Levandowski

17  (and the corporate entities Ottomotto and Otto Trucking), Uber began anticipating litigation with

18  Waymo almost immediately.  The day after Mr. Levandowski resigned from Waymo, Uber was

19  already discussing indemnity with Mr. Levandowski and Lior Ron.  (Ex. 277, January 28, 2016

20  email from Cameron Poetzscher asking Travis Kalanick, "[d]id you tell Anthony that you would

21  indemnify them if they get sued by G as part of or after the deal?  They're under that impression.")

22  By February 5, 2016, the parties were specifically discussing indemnity for "Bad Acts," *including*

23  "downloading of files of [Google]."  (UBER00017265 at -73, Email between Uber representatives

24  and Lior Ron discussing "Timing of Indemnity / Closing Conditions," and an "Example list of

25  Specified Bad Acts," which included "downloading of files of [Google]".)

26  Having agreed to indemnify Mr. Levandowski for "downloading of files of [Google]" and

27  having agreed to indemnify Ottomotto and Otto Trucking for Bad Acts including trade secret

28  misappropriation, Uber then set up a forensic due diligence investigation designed specifically to

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   uncover – or confirm – the downloaded Waymo files in Otto's or Mr. Levandowski's possession.

2   The existence and sheer scope of this investigation is proof enough that Uber knew Mr.

3   Levandowski had Waymo materials:  it was, and remains, a process that was unprecedented for

4   Uber.  (Poetzscher Tr. at 128:11-25; Qi Rough Tr. at 243:17-244:3.)  As part of the investigation,

5   Stroz took and analyzed the electronic devices of five different Otto employees, including both

6   their personal and work devices.  (*See* Ron Tr. at 96:3-19.)  Despite this, the Uber witnesses

7   responsible for overseeing the investigation testified that the diligenced employees did not seem

8   upset by the scope of the investigation that Uber requested; instead, they were "okay with it."  (Qi

9   Rough Tr. at 223:22-224:6.)  The most likely explanation for that is, of course, that all parties

10   already knew what Uber was looking for—stolen Waymo files.

11         Although Uber must have known about the downloaded files when it agreed to indemnify

12   Mr. Levandowski and set up the forensic investigation, Uber almost certainly found out that Mr.

13   Mr. Levandowski had downloaded materials when the diligence process got underway.   To

14   motivate Mr. Levandowski to disclose *all* of his "Bad Acts" to Stroz, Uber created an elaborate

15   incentive  structure:    as  long  as  Mr.  Levandowski  disclosed  his  "Bad  Acts"  (including

16   "downloading of files of [Google]") to Stroz, Uber would indemnify him.  (UBER00017265 at -

17   73-74; Dkt. 566 at 3.)  If Mr. Levandowski did not disclose "Bad Acts" to Stroz, Levandowski

18   could not seek indemnification from Uber for those "Bad Acts" later.  (*Id.*)  Although Waymo has

19   still  not  seen  the  due  diligence  report  that  Stroz  produced,  all  evidence  indicates  that  Mr.

20   Levandowski accepted this offer and disclosed the existence of the stolen information to Uber and

21   Stroz.   Defendants have never disputed that Stroz has some of the stolen information in its

22   possession as a result of the due diligence process, and Uber recently admitted that its lawyers

23   have also possessed the stolen information for over a year by virtue of their involvement in the due

24   diligence process.  (Dkt. 677-8.)

25         ***At the very latest***, Uber learned that Mr. Levandowski had downloaded Waymo materials

26   in his possession on March 11, 2016 when Mr. Levandowski told Uber outright.  As Uber has

27   explained: "On or about March 11, 2016, Mr. Levandowski reported to [Travis] Kalanick, Nina Qi

28   and Cameron Poetzscher at Uber as well as Lior Ron that he had identified five discs in his

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

possession containing Google information." (Dkt. 695 at 4.) Uber's accounting indicates that Mr. Levandowski and Mr. Kalanick had a meeting to discuss LIDAR on the same day. (Dkt. 712, Ex. 1 at No. 63.) Since receiving this interrogatory response, Waymo has deposed three of the four individuals to whom Mr. Levandowski made this admission, and all three confirmed that Mr. Levandowski did indeed reveal that he had Google "stuff" in his possession during an in-person meeting with Uber on March 11, 2016. (Ron Tr., 25:23-26:18; Poetzscher Tr., 249:3-250:9; Qi Rough Tr., 271:11-273:20.) Uber now insists that Mr. Levandowski subsequently destroyed the materials (raising other serious concerns, including concerns regarding the integrity of Stroz's investigation), but the point remains: Uber was aware of Mr. Levandowski taking confidential Waymo information files as of March 11, 2016, and Uber acquired Mr. Levandowski's company anyway. And even after finding out that he had Waymo materials in his possession on March 11, 2016, Uber *never* took *any* steps to prohibit Mr. Levandowski from using his "treasure trove of files" in his work at Uber.

Waymo also seeks prejudgment interest on the damages awarded for the misappropriation of trade secrets at the California statutory prejudgment interest rate of seven percent (7%).

INTERROGATORY NO. 11:

Identify all facts supporting your contention that Waymo owns each of the alleged trade secrets identified in Waymo's 2019 Disclosure.

RESPONSE TO INTERROGATORY NO. 11:

Waymo incorporates by reference its General Objections. Waymo further objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, and oppressive, including to the extent that it asks Waymo to "identify all facts." Waymo further objects to this request to the extent it is compound, complex, and contains multiple subparts.

Subject to and without waiving the foregoing General and Specific Objections, Waymo responds as follows:

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   DATED:  July 25, 2017                      QUINN EMANUEL URQUHART & SULLIVAN,
                                               LLP
2

3                                              By  /s/ Charles K. Verhoeven
                                                   Charles K. Verhoeven
4                                                  Attorneys for WAYMO LLC

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

*[CORRECTED]*
*UNREDACTED VERSION*
*OF DOCUMENT(S)*
*SOUGHT TO BE SEALED*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David Perlson (Cal. Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa J. Baily (Cal. Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Cal. Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan R. Jaffe (Cal. Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California  94111-4788
(415) 875-6600
(415) 875-6700 facsimile

Attorneys for Plaintiff WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC<br><br>        Plaintiffs,<br><br>      v.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO, LLC; OTTO TRUCKING<br>LLC,<br><br>        Defendants. | Case No. 17-cv-00939-JCS<br><br>**PLAINTIFF'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO OTTO TRUCKING, LLC'S FIRST SET OF INTERROGATORIES (NOS. 1-14)** |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  INTERROGATORY NO. 10:

2     Identify all damage, including a specific calculation of monetary damages, caused by any

3  alleged misappropriation of trade secrets by Otto Trucking.

4

5  RESPONSE TO INTERROGATORY NO. 10:

6     Waymo incorporates by reference its General Objections.  Waymo further objects to this

7  interrogatory on the grounds that it is vague and ambiguous, including with respect to the phrase

8  "all damage."  Waymo further objects to this request to the extent it is compound, complex, and

9  contains multiple subparts.  Waymo further objects to this interrogatory as premature to the extent

10  it calls for information that is subject to expert testimony.  Waymo will provide expert testimony

11  in accordance with the Court's procedural schedule.

12     Subject to and without waiving the foregoing General and Specific Objections, Waymo

13  responds as follows:

14     Waymo believes it has suffered and is suffering irreparable harm as a result of Otto

15  Trucking's trade secret misappropriation.  In addition, Waymo believes it is entitled to damages

16  for Otto Trucking's trade secret misappropriation, particularly to the extent Otto Trucking has

17  used Waymo's trade secrets to fast-track LiDAR development for its own benefit or for the benefit

18  of Ottomotto or Uber.  Waymo is continuing its discovery into the nature and extent of Otto

19  Trucking's use of Waymo's trade secrets for its benefit, for the benefit of Ottomotto, and/or for the

20  benefit of Uber.  Waymo is also continuing its discovery into the role of Otto Trucking vis-à-vis

21  Ottomotto and Uber as a conduit of misappropriated information from Mr. Levandowski and

22  Ottomotto/Uber.  A specific calculation of monetary damages caused by Otto Trucking's

23  misappropriation cannot be provided until this discovery is more substantially complete.

24     Waymo expects to calculate past damages based on lost profits, unjust enrichment, and

25  reasonable royalty metrics.  To the extent an injunction is not granted, Waymo will also seek

26  damages, based on these same metrics, tied to any continuing use of Waymo's trade secrets.

27     Inputs to Waymo's damages analysis vis-à-vis Otto Trucking include, for example: the

28  extent, duration, and purpose of trade secret misappropriation; estimates of future profits and cash

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   flows to be earned by Otto Trucking (or those benefiting from its trade secret misappropriation)

2   and Waymo; assessments and projections regarding the relevant markets, competition therein, and

3   the relevant parties' competitive positions; investment in LiDAR technology (in time, capital,

4   engineering costs, and other expenditures); and valuations of the relevant technology.  Discovery

5   on these subjects is ongoing.

6           Waymo further seeks a judgment that this case is exceptional and an award of Waymo's

7   costs and reasonable attorneys' fees.  Waymo also seeks an accounting of all sales and revenues,

8   together with pre-judgment and post-judgment interest.  Waymo further seeks enhanced damages

9   for Defendants' willful and malicious conduct in misappropriating Waymo's trade secrets,

10  punitive damages, and other relief including but not limited to disgorgement of profits from unjust

11  enrichment.  Waymo seeks any other relief available under applicable law.  It would be premature

12  to estimate the amount of damages at this time.

13          Discovery is ongoing and Waymo reserves the right to supplement – and anticipates

14  regularly supplementing – this response after further discovery and investigation into Otto

15  Trucking's misappropriation of Waymo's trade secrets and the benefits obtained by Defendants as

16  a result of that misappropriation.

17

18  FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

19          Waymo objects to this interrogatory on the grounds that it is vague and ambiguous,

20  including with respect to the phrase "all damage."  Waymo further objects to this interrogatory to

21  the extent it is compound, complex, and contains multiple subparts.  Waymo further objects to this

22  interrogatory as premature to the extent it calls for information that is subject to expert testimony.

23  Waymo will provide expert testimony in accordance with the Court's procedural schedule.

24          Subject to and without waiving the foregoing objections, Waymo responds as follows:

25          Waymo's technical expert is continuing to assess Defendants' use of Waymo's trade

26  secrets; such assessments will ultimately inform the damages analysis in this case.  Moreover,

27  Defendants have not yet responded to Waymo's damages-related discovery requests.  Therefore,

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  Waymo's expert has not concluded his analysis and is not expected to do so until the time that

2  expert reports are due on August 24, 2017.

3          Discovery in this case is ongoing, and Waymo is still waiting for substantive responses to

4  its Fourth Set of Requests for Production (Nos. 266-297) and First Set of Common and Specific

5  Interrogatories, all of which relate to damages.   Specifically, Waymo expects Defendants'

6  responses to the following document requests and interrogatories to inform its response to this

7  interrogatory, and Waymo expects to supplement its response to this interrogatory when it

8  receives Defendants' document production and interrogatory responses:

- DOCUMENTS sufficient to show UBER's market capitalization and internal valuation of itself on a quarterly basis, from the year prior to the year in which UBER first contemplated developing autonomous vehicles through the present.

- DOCUMENTS sufficient to show the impact of developing autonomous vehicles on Uber's internal valuation of itself from the year prior to the year in which UBER first contemplated developing autonomous vehicles through the present.

- DOCUMENTS describing UBER's development of autonomous vehicles as necessary to the continued viability of UBER or to the continued viability of any aspect of UBER's business, INCLUDING but not limited to characterizations of a competitor's development or deployment of autonomous vehicles as an existential threat to UBER.

- DOCUMENTS sufficient to show each iteration of DEFENDANTS' plan to launch any autonomous vehicles in any geographic region from the time DEFENDANTS first contemplated developing or deploying autonomous vehicles to the present.

- DOCUMENTS sufficient to show DEFENDANTS' estimates of the size of the ridesharing market and DEFENDANTS' share of that market in the United States for each of the last six years on a quarterly basis. To the extent DEFENDANTS break out such estimates by geography (region, city, etc.), those estimates should also be provided.

- DOCUMENTS sufficient to show DEFENDANTS' forecasts of the size of the ride-sharing market, the percentage of the ride-sharing market that will be serviced by autonomous vehicles, and DEFENDANTS' share of that market in the United States (by autonomous vehicles and vehicles driven by contractors) for any period of time forecasted by UBER, on a quarterly basis. To the extent DEFENDANTS break out such estimates by geography (country, region, city, etc.), those estimates should also be provided. To the extent DEFENDANTS create different forecasts based on different assumptions, documents REGARDING each forecast – with documents sufficient to show the assumptions for each – should be provided.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- DOCUMENTS sufficient to show DEFENDANTS' forecasts REGARDING the number of DEFENDANTS' ride-sharing vehicles in the United States (by autonomous vehicles and vehicles driven by contractors), for any period of time forecasted by UBER —broken out by on a quarterly basis. To the extent DEFENDANTS break out such estimates by geography (country, region, city, etc.), those estimates should also be provided. To the extent DEFENDANTS create different forecasts based on different assumptions, documents REGARDING each forecast – with documents sufficient to show the assumptions for each – should be provided.

- DOCUMENTS sufficient to show DEFENDANTS' business plans, strategic plans, operating plans, marketing plans, financial plans, sales plans, and investment plans for its ridesharing business, INCLUDING projections for revenue generation and profitability.

- DOCUMENTS sufficient to show DEFENDANTS' business plans, strategic plans, operating plans, marketing plans, financial plans, sales plans, and investment plans for its autonomous vehicle program, INCLUDING projections for revenue generation and profitability of the autonomous vehicle program.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of any barriers to entry in the ride-sharing market and the status of any attempts by DEFENDANTS to enforce such barriers against competitors INCLUDING WAYMO, INCLUDING investments and infrastructure needed.

- DOCUMENTS REGARDING DEFENDANTS' discussion of WAYMO or its business, INCLUDING DEFENDANTS' analysis of WAYMO's impact or potential impact on the ridesharing market or on UBER.

- DOCUMENTS sufficient to identify the date that UBER first considered deploying autonomous vehicles.

- DOCUMENTS sufficient to identify the date that UBER first considered developing its own autonomous vehicles.

- DOCUMENTS sufficient to identify the date that UBER first considered developing its own in-house LiDAR.

- DOCUMENTS REGARDING the importance of a first-mover advantage in commercializing autonomous vehicles, INCLUDING any estimates of the market shares of other entrants that are not first to market.

- DOCUMENTS REGARDING the importance of LiDAR, INCLUDING the importance of low-cost LiDAR, to DEFENDANTS' ability to compete.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- DOCUMENTS REGARDING the relative value of safety (vis-à-vis, for example, cost and timing of entry into relevant markets) in the commercialization of autonomous vehicles.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of WAYMO's technological lead REGARDING autonomous vehicle technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO), and documents sufficient to show how DEFENDANTS' analysis or estimates have changed over time.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of how WAYMO's technological lead over DEFENDANTS REGARDING autonomous vehicle technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO) changed after Uber's acquisition of OTTOMOTTO and OTTO TRUCKING.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of WAYMO's technological lead REGARDING LiDAR technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO), and documents sufficient to show how DEFENDANTS' analysis or estimates have changed over time.

- DOCUMENTS sufficient to show DEFENDANTS' analysis of how WAYMO's technological lead over DEFENDANTS REGARDING LiDAR technology (INCLUDING DEFENDANTS' estimates of the time, personnel, and investment needed to close the gap between DEFENDANTS and WAYMO) changed after UBER's acquisition of OTTOMOTTO and OTTO TRUCKING.

- DOCUMENTS sufficient to show DEFENDANTS' comparisons of the cost and profitability of a human-driven versus an autonomous vehicle in a ride-sharing fleet.

- DOCUMENTS sufficient to show the historical and current cost of DEFENDANTS' autonomous vehicles, broken down by component, and dating back to the inception of DEFENDANTS' autonomous vehicle program. As noted in the Instructions above, to the extent DEFENDANTS can provide separate information for each Defendant, DEFENDANTS should do so.

- DOCUMENTS sufficient to show DEFENDANTS' total financial investment including but not limited to employee time, purchase of capital equipment, and outside consultants, by quarter, into its efforts to develop in-house LiDAR. As noted in the Instructions above, to the extent DEFENDANTS can provide separate information for each Defendant, DEFENDANTS should do so.

- DOCUMENTS sufficient to show DEFENDANTS' investment, in terms of time including but not limited to engineers, software developers, managers, and executives (broken out be each category of employee), into its efforts to develop in-house LiDAR. As noted in the Instructions above, to the extent DEFENDANTS

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

can provide separate information for each Defendant, DEFENDANTS should do so.

- Patent licenses or agreements relating to LiDAR.

- DOCUMENTS sufficient to show the impact to DEFENDANTS of having to redesign Fuji to avoid using the trade secrets identified in response to UBER's interrogatory No. 1.

- DOCUMENTS sufficient to show any valuation (whether conducted by UBER or by a third party) of the assets and technology acquired in the acquisition of Otto by Uber, INCLUDING valuations performed for the purpose of purchase price accounting or any other purpose.

- DOCUMENTS sufficient to show any DEFENDANTS' projected revenue, gross margin, and operating profit for any division including autonomous vehicles.

- DOCUMENTS sufficient to show any the financials, INCLUDING profit and loss statements and balance sheet, for OTTOMOTTO, OTTO TRUCKING, and any division of UBER including autonomous vehicles.

- DOCUMENTS sufficient to show DEFENDANTS' approved requests for capital expenditure authorizations related to its autonomous vehicle program, INCLUDING R&D expenditures, technology/equipment acquisitions, and marketing expenditures.

- Describe in detail the impact, including financial impact, to DEFENDANTS of having to redesign Fuji to avoid using the trade secrets identified in response to UBER's Interrogatory No. 1.

- To the extent DEFENDANTS contend they will be irreparably harmed by a permanent injunction prohibiting the use of WAYMO's trade secrets in this case, describe in detail the factual and legal bases for that contention.

- Describe in detail DEFENDANTS' investment in developing in-house LiDAR. This should include DEFENDANTS' financial investment, as well as DEFENDANTS' investment in terms of time and personnel.

- Describe in detail [OTTOMOTTO and OTTO TRUCKING's] efforts to place a value on OTTOMOTTO and/or OTTO TRUCKING or their respective assets and technology as part of UBER'S acquisition of OTTOMOTTO and/or OTTO TRUCKING, either prior to or following the acquisition.

- Describe in detail UBER's efforts to place a value on OTTOMOTTO and/or OTTO TRUCKING or their respective assets and technology as part of the acquisition, either prior to or following the acquisition, including but not limited to the efforts described by Nina Qi during her deposition at Rough Tr. 192:4-199:15.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- IDENTIFY the date that UBER first considered developing its own in-house LiDAR and the date UBER began developing its own in-house LiDAR (to the extent it differs from the date UBER began considering it), and describe in detail UBER's reasons for wanting to develop its own in-house LiDAR.

**Damages for Violations of Defense of Trade Secrets Act and California Uniform Trade Secret Act**

Uber, Ottomotto, and Otto Trucking are jointly and severally liable for damages in this case. Ottomotto and Otto Trucking are the corporate vehicles for the misappropriation of Waymo's trade secrets for the benefit of Uber. Anthony Levandowski officially formed Ottomotto on January 15, 2016 (while he was simultaneously employed by Waymo, consulting with Uber on Uber's self-driving car project, and negotiating the acquisition of Ottomotto). He officially formed Otto Trucking on February 1, 2016 (five days after resigning from Waymo and while he was consulting with Uber on Uber's self-driving car project and negotiating the acquisition of Otto Trucking). Mr. Levandowski was acting for all three Defendants at various times in order to facilitate the misappropriation of Waymo's trade secrets.

Uber entered into Agreements and Plans of Merger with each of Ottomotto and Otto Trucking on the same date, within weeks of the formation of those entities. (UBER00016757; UBER00016453). Pursuant to its Agreement and Plan of Merger, Otto Trucking was obligated and continues to be obligated to assign all of its intellectual property to Ottomotto (which has now been acquired by Uber). (UBER00016757.) Pending completion of the Otto Trucking acquisition by Uber, Anthony Levandowski remains one of two managing members of Otto Trucking and holds ███████████████████████████████ of its shares. (OTTOTRUCKING00000004.) Uber has an exclusive option to acquire Otto Trucking between August 31, 2017 and November 30, 2017. (UBER00016757 at -764, -819.) If Uber does not acquire Otto Trucking during that period, Uber will be obligated to (i) become a 50% owner in Otto Trucking and (ii) to license Uber's self-driving technology (including all trade secrets) exclusively to Otto Trucking (even vis-à-vis Uber) for use in the commercialization of self-driving trucks. (UBER00016757 at -772.)

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    Otto Trucking is jointly and severally liable for all damages caused by Defendants'

2   misappropriation of Waymo's trade secrets, including Defendants' unjust enrichment resulting

3   from Defendants' misappropriation, any reasonable royalty assessed as a result of Defendants'

4   misappropriation, and any exemplary damages, attorneys' fees, expert fees, and costs awarded as a

5   result of Defendants' misappropriation.

6    ***Unjust Enrichment Damages***

7    Uber, Ottomotto, and Otto Trucking have been unjustly enriched due to their

8   misappropriation of Waymo's trade secrets.  There are several measures that can be used to

9   quantify the unjust enrichment to Defendants.  One measure of the unjust enrichment to

10   Defendants is the value that was paid (or will be paid) by Uber for Ottomotto and Otto Trucking

11   (collectively, "Otto").  When Uber began negotiating with Mr. Levandowski, Otto was a company

12   that did not exist, and did not have any products.  (Qi Tr. 146:8-18.)  And at that time, Uber was

13   aware that he still had confidential information from Waymo.  (Bares Tr. at 179:14-18.)  John

14   Bares, Operations Director in Uber's Advanced Technology Group, was personally responsible for

15   negotiating aspects of Uber's acquisition of Otto on Uber's behalf, including a series of technical

16   milestones regarding LiDAR.  He admitted that having access to Waymo's specifications for

17   medium and long-range LiDAR would have been useful for someone trying to build medium and

18   long-range LiDAR at Uber because Waymo is "eight years ahead" and "had custom lasers."  (*Id.*

19   179:19-180:12.)  Defendants do not dispute that Mr. Levandowski had access to Waymo's files at

20   this time—as a result of both his ongoing employment at Waymo, and his illicit downloads.

21    Uber and Otto began negotiating the term sheet for the acquisition of Otto in January and

22   February 2016, with the final term sheet executed on February 22, 2016.  (UBER00017518-578;

23   UBER00069043-064.)  For at least some of this period, Mr. Levandowski was still an employee of

24   Google.  Because Otto had no products when Uber and Otto began negotiating (Qi Tr. 146:8-18),

25   the only things of value to be acquired by Uber were likely (1) the engineers that Uber acquired;

26   and (2) Waymo's technology. Therefore, the misappropriated trade secrets represented a

27   significant portion of the assets acquired by Uber, as well as the talents of the employees that

28   would be engaged in connection with  the acquisition.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    Uber and Otto entered into the formal Agreement and Plan of Merger on April 11, 2016.

2    (UBER00016453-16523; UBER00016757.)  Prior to entering into the agreement, Uber's Board of

3    Directors approved the acquisition.   Discovery regarding Uber's internal valuation of Otto

4    (including information regarding the assumptions underlying Uber's internal valuation of Otto)

5    will further inform Waymo's unjust enrichment analysis.  However, Nina Qi testified that Uber

6    told its Board that the overall value of the deal at the time was about $590 million. (Qi Tr. at 100-

7    103.)  Although Uber's payment to Otto was conditioned on certain milestones that stretched for

8    some time into the future, this value is a reasonable measure of the present value of the transaction

9    given that it was the value presented to Uber's Board of Directors in the Board's consideration and

10    approval of the acquisition.

11    Another measure of the unjust enrichment to Defendants is the present value of the

12    additional cash flows that Defendants will earn as a result of Uber's accelerated development of

13    self-driving car technology.  Uber expected that acquiring Otto would accelerate the development

14    of its LiDAR technology.  For example, when considering the acquisition, Uber estimated that

15    acquiring Otto could shorten its autonomous vehicle timeline by one to two years.

16    (UBER00069030-033 at '033.)  Even under its "most conservative case," Uber estimated the

17    increased present value of incremental profit (as measured by EBIT, or Earnings Before Interest

18    and Taxes) from Otto's technology would be between $836 million and $1.69 billion.

19    (UBER00069030-033 at '033.)  In addition to the increased profits, Uber recognized Waymo was

20    a threat to its entire existence, potentially placing its entire business at risk—something that,

21    according   to   public   reports,   is   worth   approximately   $70   billion.    (*See*

22    https://techcrunch.com/2017/06/21/kalanick-is-out-but-ubers-vcs-royally-screwed-up-too-say-

23    industry-watchers/).  For example, Uber's then-CEO was quoted as follows: "The minute it was

24    clear to us that our friends in Mountain View were going to be getting in the ride sharing space,

25    we needed to make sure there is an alternative [self-driving car].  Because if there is not, we're not

26    going to have any business."  He also described developing an autonomous vehicle as "basically

27    existential for us." (UBER00006042-047 at '043; UBER00006035-041 at '037; UBER00064472-

28    473; LEV_001940-051 at '940.)  In messaging notes related to the acquisition, Uber's then-CEO

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    noted "Autonomous transportation is very possibly a winner-take-all, and thus existential for

2    Uber." (UBER00064468-469 at '468.)   Similarly, Jeff Holden, Uber's Chief Product Officer,

3    wrote:  "This war for self-driving is truly existential for Uber: we'll either start up our second S

4    curve of growth or we'll die.  There might be in-between cases, but it's definitely easy to see how

5    the extremes could play out."  Discussing the competition with Google, Mr. Holden discusses the

6    battle and the war: "The *battle* is about what we need to do to get ourselves into a sufficiently

7    competitive position before December that G doesn't walk away with the crown for future of ride

8    sharing.  It's about establishing beach heads, being in the game in a credible way.  The *war* is

9    the long-term defeat of G and others so we afford ourselves the opportunity to extend our massive

10   scale business into the future.  This will be about who gets NSD self-driving to scale first."

11   (UBER00070108-110 at '108.)

12          Another measure of unjust enrichment to Defendants is the expected cost savings to

13   Defendants from using Waymo's trade secrets in Uber's LiDAR systems.  Waymo has obtained

14   significant cost savings by developing custom, in-house LiDAR systems using its trade secrets.

15   Waymo's custom, in-house solution is much cheaper than options offered by third party vendors;

16   as explained in more detail in Waymo's response to Interrogatory No. 6, a mid-range LiDAR from

17   Velodyne costs approximately $70,000.   Uber has also recently purchased third-party LiDAR

18   units from ████████████████████ UBER00086529.)  By contrast, the materials needed for

19   Waymo's own mid-range GBr3 LiDAR system, which uses the trade secrets at issue in this case,

20   cost just over $5,000.   (*See* Waymo's Response to Interrogatory No. 6 and all supplements

21   thereto.)

22          Due to the misappropriation of Waymo's trade secrets, Defendants will likely benefit from

23   many years of future cost savings due to employing Waymo's trade secrets in Uber's LiDAR

24   systems.  While considering the acquisition of Otto, Uber itself recognized the significant cost

25   savings from building custom lasers, noting savings of "up to $45M of one-time savings (@ 1,000

26   units)" and "up to $80M per year of ongoing savings (@ 1,000 units)." (UBER00068983.)  And it

27   is clear that Uber is scaling production quickly:  at the end of 2016, Uber estimated that it would

28   need approximately 120,000 to 150,000 lenses for 2017 and 500,000 for 2018. (UBER00054959-

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  962 at '959.)  Since Uber's LiDAR system uses 64 lenses, these estimates indicate that Uber is

2  planning to manufacture between 1,875 and 2,344 LiDAR systems in 2017, and 7,812 LiDAR

3  systems in 2018.

4    Another measure of unjust enrichment to Defendants is the expected cost savings due to

5  reduced development expenses from using Waymo's trade secrets in Uber's LiDAR systems.

6  While considering the acquisition of Otto, Uber recognized one important benefit was that the

7  acquisition    "decreases    total    investment    in    [Autonomous    Vehicle]    development."

8  (UBER00068983)  An internal Uber email estimates that Uber's acquisition of Otto saved Uber at

9  least a year in the race to large scale autonomous vehicle deployment, and describes Uber's next

10  best choice as building the team internally with a two to four year lag versus what the Otto team

11  would bring.  (UBER00060147-156 at '147.)  One way to measure the costs that Defendants saved

12  through their misappropriation of Waymo's trade secrets is by looking at the costs that Waymo

13  incurred to develop those trade secrets.  As discussed in Waymo's response to interrogatory 6,

14  Waymo has incurred up to $1.1 billion to develop the trade secrets.  (*See* Waymo's 7/13

15  Supplemental Response to Interrogatory No. 6 and all supplements thereto.)

16    Waymo anticipates that Defendants will argue that the measures of unjust enrichment

17  discussed above are measures of value for the entirety of the company (Otto) acquired by Uber.

18  Waymo expects to rebut any evidence presented by Defendants that a portion of any value can be

19  attributed to any contributions other than Waymo's trade secrets.  Nonetheless, Waymo addresses

20  apportionment below.

21    Otto had no products when Uber and Otto began negotiating.  (Qi Tr. 146:8-18.)  And

22  Otto's profit and loss statement for January through March 2016 reflects less than $1.4 million of

23  expenses.  (UBER00060164 and UBER00060165).  Therefore, the only things of value to be

24  acquired by Uber were likely (1) the engineers that Uber acquired; and (2) Waymo's technology.

25  Waymo is still conducting discovery regarding what assets (if any) Otto had when Uber decided to

26  acquire it.  To the extent Otto had any working products or technology by the time Uber agreed to

27  acquire it, Waymo's unjust enrichment analysis would account for that by deducting the value of

28  Otto's then-existing technology.  However, as previously discussed, Waymo expects the large

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   majority of the measures of value discussed above to be attributable to the value of the stolen

2   information and engineers that Uber acquired in the transaction.

3          With respect to the value of the engineers Uber acquired from Otto, talented engineers in

4   the autonomous vehicle field are few and far between.  In particular, some of the engineers who

5   left Waymo to join Otto, and who were eventually acquired by Uber, had very specialized skill

6   sets, including Don Burnette, Claire Delaunay, Gaetan Pennecot and Mr. Levandowski himself.

7   These engineers would likely be worth more than an average engineer, and more than even an

8   average autonomous vehicle engineer.  Waymo is still obtaining discovery regarding Uber's

9   valuation of the engineers that it acquired, but  one public estimate of the value of engineers in the

10   autonomous        vehicle        industry        is        $10        million        per        engineer.

11   (https://www.recode.net/2016/9/17/12943214/sebastian-thrun-self-driving-talent-pool).

12          With respect to development expenses, it is possible that Defendants would not have had

13   to incur all of the development expenses Waymo incurred if Defendants had developed the trade

14   secrets themselves (rather than misappropriating them from Waymo).  Although Waymo is still

15   seeking discovery on how long Uber spent in its autonomous vehicle development efforts before

16   acquiring Otto, Waymo understands that Uber had been developing autonomous vehicle

17   technology prior to its discussions with Otto.  Uber may argue that in calculating Uber's unjust

18   enrichment based on Waymo's development expenses, it may be appropriate to include only a

19   portion of  Waymo's total development expenses.  To date, Defendants have not produced

20   evidence regarding their LiDAR development efforts necessary to conduct such an apportionment.

21   However, as discussed above, Uber believed that it could save development expenses by acquiring

22   Otto.  Specifically, Uber estimated that the acquisition would speed up its autonomous vehicle

23   timeline by one to two years, and would speed up its laser development by two to four years.

24   Thus, one estimate of the potential savings as a result of Defendants obtaining Waymo's

25   technology is the one to two years of average development expense that Uber estimated it would

26   save in developing autonomous vehicle technology, which can be expressed as a percentage of

27   Uber's total development expenses.  Another measure of the potential savings as a result of

28   Defendants obtaining Waymo's technology is the difference between the amount of money

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    Waymo has spent in developing autonomous vehicle technology and the amount of money that

2    Defendants have spent.  Another measure of the potential savings can be calculated based on the

3    proportion of development expenses that Waymo has spent in developing LiDAR technology in

4    relation to the other technologies in autonomous vehicles.    Waymo reserves its right to

5    supplement this response if and when Defendants produce the information necessary to conduct an

6    apportionment regarding development expenses.

7           In addition, if Uber is able to deploy autonomous vehicles in its fleet, its operational costs

8    for its entire ridesharing business would likely drop substantially, in part because it would not

9    have to share any revenue with its drivers.

10          Waymo is under a Court order to narrow its list of asserted trade secrets to less than ten by

11   August 1.  After Waymo completes this narrowing, Waymo will consider how to apportion the

12   value of the trade secrets that Mr. Levandowski and Defendants misappropriated to account for the

13   trade secrets that it will bring to trial in this case.  However, Waymo suspects that a substantial

14   portion of the unjust enrichment would be attributable to the most valuable trade secrets.  Since

15   Uber and Waymo are racing to commercialize autonomous vehicles, accelerating the development

16   timeline was important to Uber.  (UBER00070108-110 at '108.).  Thus, Waymo presumes that

17   Defendants made use of the most important and most valuable trade secrets first.

18          ***Reasonable Royalty Damages***

19          If the Court were to determine that damages based on the unjust enrichment caused by

20   Defendants' misappropriation of the trade secrets is not provable, the Court "may order payment

21   of a reasonable royalty for no longer than the period of time the use could have been prohibited"

22   pursuant to the provisions of the California Uniform Trade Secrets Act.  Cal. Civ. P. § 3426.3(b).

23   A reasonable royalty is also available under the Defend Against Trade Secrets Act.  18 U.S.C. §

24   1836(b)(3)(A)(iii) ("in lieu of damages measured by any other methods, the damages caused by

25   the misappropriation measured by imposition of liability for a reasonable royalty for the

26   misappropriator's unauthorized disclosure or use of the trade secret").

27          Waymo's damages expert will analyze and compute the amount of reasonable royalty

28   damages payable to Waymo by Defendants due to the misappropriation of the trade secrets based

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  on the documents and information produced by Waymo, Defendants and third parties during

2  discovery, as well as independent research conducted by Waymo's damages expert.  Specifically,

3  Waymo's expert will, among other things, opine as to the appropriate reasonable royalty, either in

4  the form of a lump sum payment or a running royalty rate, or a combination of both.

5      As discussed above, Defendants have not yet responded to Waymo's damages-related

6  discovery requests.  Therefore, Waymo's expert has not concluded his analysis and is not expected

7  to do so until the time that expert reports are due on August 24, 2017.

8      At present, Waymo anticipates that its expert's computations of a reasonable royalty

9  adequate to compensate for Defendants' infringement will involve an analytical approach and/or a

10  hypothetical negotiation approach.  An analytical approach is used to determine a royalty that

11  leaves the infringer with a "normal" rate of return for the use of its products embodying the trade

12  secrets or to calculate a royalty based on the increased profitability due to the use of the trade

13  secrets in Defendants' products.  In other words, an analytical approach will determine, or isolate,

14  the financial benefit or value that Defendants obtained through their misappropriation of trade

15  secrets.

16      Waymo anticipates that its expert's determination of reasonable royalty damages under an

17  analytical approach or a hypothetical negotiation approach will be based on, among other things,

18  analysis of sales and profit projections, analyst forecasts, profitability information and other

19  documents and records produced by Waymo, Defendants, and third parties.  In addition to the

20  foregoing, Waymo's expert may utilize documents and materials referred to and recognized as

21  relevant to the determination of the cost savings achieved by the Defendants due to their

22  misappropriation.  In addition to the foregoing, Waymo's expert may utilize documents and

23  materials referred to and recognized as relevant to the determination of a reasonable royalty or

24  other damages computations in cases such as *Georgia- Pacific*, among others.

25      At present, Waymo's understanding of the primary considerations that Waymo's expert

26  will analyze with respect to the hypothetical negotiation approach are summarized below.

27      *Impact on Waymo's future expected profits* - Waymo expects that its future success is

28  critically dependent on its technological lead in autonomous vehicles. (WAYMO-UBER-

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  00004108-131 at '109, '111; Chu Tr. 12:3-7, 45:19-24)   Defendants' misappropriation of

2  Waymo's trade secrets shortens the technological lead that Waymo has in autonomous vehicles.

3  For example, when considering the acquisition of Ottomotto and Otto Trucking, Uber estimated

4  that Otto's technology could shorten its autonomous vehicle timeline by one to two years.

5  (UBER00069030-033 at '033.)  Moreover, if Uber does not exercise its Call Option with respect

6  to Otto Trucking, yet another Waymo competitor will have had the benefit of Waymo's

7  misappropriated trade secrets.  Given the importance of Waymo's technological lead, this would

8  likely have a significant impact on its ability to earn profits.

9      *Waymo's policy to protect and maintain its trade secrets* – Waymo has sought to protect its

10  trade secrets and has not disclosed the trade secrets to third parties, and it has not licensed its trade

11  secrets.  Waymo takes robust measures to protect its LiDAR trade secrets.  As a condition of

12  employment, Waymo requires all employees to enter into written agreements to maintain the

13  confidentiality of proprietary and trade secret information, and not to misuse such information.

14  Waymo also enforces an employee code of conduct that explains employees' strict obligations to

15  maintain the secrecy of confidential information, and requires employee training in security

16  procedures.  Droz Decl. ¶ 30.

17      Waymo also takes reasonable measures to mark confidential and proprietary information,

18  such as documents and other materials, with visible legends designating them as such when

19  sharing them outside of Waymo, subject to NDAs or other confidentiality agreements.

20  Disclosures to vendors are limited to the subject matter necessary for the vendor's engagement and

21  do not reveal the entirety of a given LiDAR system or design.  Waymo employs reasonable efforts

22  to secure physical facilities by restricting access and employing locks, cameras, guards, and other

23  security measures.  *Id.* ¶¶ 33-37; Janosko Decl. ¶ 22.

24      Waymo uses Subversion (SVN) — a revision control system — to store its electrical

25  design information. All traffic (both ingress to and egress from) the SVN repository is encrypted.

26  All traffic is authenticated against a list of authorized users before access to the repository is

27  granted, and users do not share credentials — all accesses are unique to specific users. Access

28  control lists are audited monthly and stale users are aggressively purged. The SVN server is

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  password protected and accessible through specialized software. *Id.* ¶¶ 23-25. Additionally,

2  Waymo imposes network security measures and access policies that restrict the access and

3  dissemination of certain confidential and proprietary trade secret information to only teams that

4  are working on projects related to that information. For example, Google employees working on

5  projects with no relation to Waymo or self-driving cars could not (and cannot) access Waymo's

6  confidential and proprietary schematics. They are distributed on a "need to know" basis. Droz

7  Decl. ¶ 32. Google's networks generally are also secured through Network Access Control

8  ("NAC") procedures, Access Control Lists ("ACLs"), and restricted access privileges. Janosko

9  Decl. ¶¶ 13-16.

10  Google employs a variety of security mechanisms to prevent network intruders or attackers

11  who may compromise Waymo's trade secret information. Google also secures employees' devices

12  and credentials against attacks through monitoring and logging practices, as well as regular

13  security updates. *Id.* ¶¶ 7-12, 20.

14  Google secures its production infrastructure in progressive layers starting from the physical

15  security of data centers, continuing on to the security of the hardware and software that underlie

16  the infrastructure, and finally, the technical constraints and processes in place to support

17  operational security. Google employs many hundreds of engineers dedicated to security and

18  privacy distributed across all of Google, including many who are recognized industry authorities.

19  These engineers work to protect Google's production servers from malware utilizing tools such as

20  binary verification. Google also has an incident management process for security events that may

21  affect the confidentiality, integrity, or availability of systems or data *Id.* ¶¶ 17-21.

22  Waymo incorporates by reference its Response to Interrogatory No. 7 and all supplements

23  thereto.

24  *Competitive relationship between Waymo and Uber and Otto Trucking* – Waymo

25  recognizes that Uber is the most significant competitor in the transportation as a service (TaaS)

26  business. (WAYMO-UBER-00004175-194 at '184-185)  Similarly, Uber recognizes Waymo is a

27  significant competitor.  In fact, as discussed above, Uber has described Waymo as an existential

28  threat to its TAAS business: "This war for self-driving is truly existential for Uber: we'll either

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   start up our second S curve of growth or we'll die." (UBER00070108-110 at '108.)  Internal Uber

2   documents indicate that Uber believes it is in intense competition with Waymo:  Discussing the

3   competition with Google, Mr. Holden discusses the battle and the war: "The *battle* is about what

4   we need to do to get ourselves into a sufficiently competitive position before December that G

5   doesn't walk away with the crown for future of ride sharing.  It's about establishing beach heads,

6   being in the game in a credible way.  The *war* is the long-term defeat of G and others so we

7   afford ourselves the opportunity to extend our massive scale business into the future.  This will be

8   about who gets NSD self-driving to scale first." (UBER00070108-110 at '108.)  If Uber does not

9   exercise its Call Option with respect to Otto Trucking, Waymo will be facing two competitors

10  who have had the benefit of Waymo's trade secrets.

11      *Development cost savings to Uber* – As discussed in more detail above, Uber has likely

12  realized significant cost savings in terms of its development timeline.  While considering the

13  acquisition of Otto, Uber recognized one important benefit was that the acquisition "decreases

14  total investment in [Autonomous Vehicle] development." (UBER00068983)  An Uber email

15  estimates that Uber's acquisition of Otto saved Uber at least a year in the race to large scale

16  autonomous vehicle deployment, and describes Uber's next best choice as building the team

17  internally with a two to four year lag versus what the Otto team would bring.  (UBER00060147-

18  156 at '147.)  One way to measure the costs that Defendants saved through their misappropriation

19  of Waymo's trade secrets is by looking at the costs that Waymo incurred to develop those trade

20  secrets.  As discussed in Waymo's response to interrogatory 6, Waymo has incurred up to $1.1

21  billion to develop the trade secrets. (*See* Waymo's 7/13 Supplemental Response to Interrogatory

22  No. 6 and all supplements thereto.)

23      *Increased future expected profits to Uber and/or Otto Trucking* – As discussed above in

24  the unjust enrichment section, Uber expected that acquiring Ottomotto and Otto Trucking would

25  accelerate the development of its LiDAR technology, and under its "most conservative case,"

26  Uber estimated the increased present value of incremental profit would be between $836 million

27  and $1.69 billion.  (UBER00069030-033 at '033.)

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    *LiDAR system cost savings* – Waymo has obtained significant cost savings by developing

2   custom, in-house LiDAR systems using its trade secrets, and Waymo expects that by

3   misappropriating Waymo's trade secrets, Defendants will be able to obtain similar results.

4   Waymo's custom, in-house solution is much cheaper than options offered by third party vendors;

5   as explained in more detail above and in Waymo's response to Interrogatory No. 6, a mid-range

6   LiDAR from Velodyne costs approximately $70,000.   By contrast, the materials needed for

7   Waymo's own mid-range GBr3 LiDAR system, which uses the trade secrets at issue in this case,

8   cost just over $5,000.   (*See* Waymo's Response to Interrogatory No. 6 and all supplements

9   thereto.)  Uber has also recently purchased third-party LiDAR units from ███████████

10   each.  (UBER00086529.)

11    Due to the misappropriation of Waymo's trade secrets, Defendants will likely benefit from

12   many years of future cost savings due to employing Waymo's trade secrets in Uber's LiDAR

13   systems.   While considering the acquisition of Otto, Uber itself recognized the significant cost

14   savings from building custom lasers, noting savings of "up to $45M of one-time savings (@ 1,000

15   units)" and "up to $80M per year of ongoing savings (@ 1,000 units)." (UBER00068983.)  And it

16   is clear that Uber is scaling production quickly:  at the end of 2016, Uber estimated that it would

17   need approximately 120,000 to 150,000 lenses for 2017 and 500,000 for 2018. (UBER00054959-

18   962 at '959.)  Since Uber's LiDAR system uses 64 lenses, these estimates indicate that Uber is

19   planning to manufacture between 1,875 and 2,344 LiDAR systems in 2017, and 7,812 LiDAR

20   systems in 2018.

21    In addition, if Uber is able to deploy autonomous vehicles in its fleet, its operational costs

22   for its ridesharing business would likely drop substantially, in part because it would not have to

23   share any revenue with its drivers.

24    *Valuation of Uber's acquisition* – As discussed above, Waymo is still obtaining discovery

25   regarding Uber's internal valuation of Otto.  However, Nina Qi testified that the Board was told

26   the overall value of the deal at the time was about $590 million. (Qi Tr. at 100-103.)

27

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1       *Unjust Enrichment / Reasonable Royalty Related To Otto Trucking's Use Of Waymo's*

2   *Trade Secrets (Separate From Its Acquisition And Disclosure Of Those Trade Secrets To*

3   *Ottomotto and Uber)*

4       Otto Trucking is also separately liable for damages with respect to its own use of Waymo's

5   trade secrets, including through its subsidiary Otto Transport, which currently operates trucks for

6   the benefit of Uber's freight program.   (OTTOTRUCKING00002750.)   Discovery is ongoing

7   regarding the use of Waymo's trade secrets by Otto Trucking and its subsidiaries pending the

8   completion of the acquisition by Uber.   Waymo's technical expert is continuing to assess

9   Defendants' use of Waymo's trade secrets; such assessments will ultimately inform the damages

10  analysis in this case.   Moreover, Defendants have not yet responded to Waymo's damages-related

11  discovery requests.   Therefore, Waymo's expert has not concluded his analysis and is not expected

12  to do so until the time that expert reports are due on August 24, 2017.

13      *Punitive Damages, Attorneys Costs and Fees –*

14      Defendants' trade secret misappropriation has been willful and malicious.   If willful and

15  malicious trade secret misappropriation exists, both CUTSA and DTSA allow punitive damages

16  up to two times any damages award.   *See* Cal. Civil Code Section § 3426.3 *and* 18 U.S.C. §

17  1836(b)(3)(C).   If willful and malicious misappropriation exists, CUTSA and DTSA also allow

18  recovery of attorneys' fees and costs.   *See* § 3426.4 *and* 18 U.S.C. § 1836(b)(3)(D).   In addition to

19  attorneys' fees, Waymo is also eligible to receive reasonable expert fees under CUTSA.   § 3426.4.

20      While discovery is not complete and Waymo has still not seen the Stroz due diligence

21  report (which Waymo expects will bear on this issue), the evidence to date indicates that Uber and

22  Anthony Levandowski were in league with one another to port Waymo's trade secrets to Uber

23  going as far back as May 2015.   (Dkt. 712, Ex. 1 (logging discussions between Uber and Mr.

24  Levandowski beginning on May 20, 2015 "wherein Anthony Levandowski mentioned LiDAR to

25  any officer, director, employee, agent, supplier, or consultant of defendants").)   Uber continued to

26  meet with Mr. Levandowski throughout the fall of 2015.   (Dkt. 712, Ex. 1 (logging five meetings

27  with Mr. Levandowski regarding LiDAR between October 2015 and December 11, 2015).)   Uber

28  met with Mr. Levandowski to discuss LiDAR on the very same day that he downloaded 14,000

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1 proprietary files from Waymo servers, (Dkt. 712 Ex. 1; Dkt. 23, ¶ 44), and again a few weeks later

2 on the same day Mr. Levandowski downloaded additional proprietary information from Waymo.

3 (Ex. 263; Dkt. 24-2 ¶ 22.)

4        When Uber began meeting with Otto, Otto did not have any products.  (Qi Tr. 146:8-18.)

5 Instead, Uber acquired Mr. Levandowski's company because of its "[e]xperience w/ automotive

6 efforts of competitors":

> Anthony and his close team have developed several generations of mid and long
> range laser that we now believe is critical to AV autonomy (day and night).  Not
> only do they have the several generations of experience but also know how to
> improve on the next gen devices that they would build for us.  We have yet to find
> anyone else in the world with this know-how. . . . Second, just rubbing shoulders
> with this team and having them advise us all over AV has a decent chance of
> saving Uber at least a year off of the race to large scale AV deployment. . . .  My
> point is that there is more value here (considerable) than 25 disparate engineers that
> we would pick up from 25 different places.  This is a team that knows each other
> knows the tech, knows the potholes and can jam at incredible rate (we hope) to help
> solve some of our most pressing challenges.

13 (Ex. 271 at 1.)  While Mr. Bares refers to the "team" that Mr. Levandowski was going to bring to

14 his new company, there was no team in place other than Mr. Levandowski and Mr. Ron at the time

15 of this email.

16        Given Uber's scheme to buy Waymo's "tech" and "know how" through Mr. Levandowski

17 (and the corporate entities Ottomotto and Otto Trucking), Uber began anticipating litigation with

18 Waymo almost immediately.  The day after Mr. Levandowski resigned from Waymo, Uber was

19 already discussing indemnity with Mr. Levandowski and Lior Ron.  (Ex. 277, January 28, 2016

20 email from Cameron Poetzscher asking Travis Kalanick, "[d]id you tell Anthony that you would

21 indemnify them if they get sued by G as part of or after the deal?  They're under that impression.")

22 By February 5, 2016, the parties were specifically discussing indemnity for "Bad Acts," *including*

23 "downloading of files of [Google]."  (UBER00017265 at -73, Email between Uber representatives

24 and Lior Ron discussing "Timing of Indemnity / Closing Conditions," and an "Example list of

25 Specified Bad Acts," which included "downloading of files of [Google]".)

26        Having agreed to indemnify Mr. Levandowski for "downloading of files of [Google]" and

27 having agreed to indemnify Ottomotto and Otto Trucking for Bad Acts including trade secret

28 misappropriation, Uber then set up a forensic due diligence investigation designed specifically to

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    uncover – or confirm – the downloaded Waymo files in Otto's or Mr. Levandowski's possession.

2    The existence and sheer scope of this investigation is proof enough that Uber knew Mr.

3    Levandowski had Waymo materials:  it was, and remains, a process that was unprecedented for

4    Uber.  (Poetzscher Tr. at 128:11-25; Qi Rough Tr. at 243:17-244:3.)  As part of the investigation,

5    Stroz took and analyzed the electronic devices of five different Otto employees, including both

6    their personal and work devices.  (*See* Ron Tr. at 96:3-19.)  Despite this, the Uber witnesses

7    responsible for overseeing the investigation testified that the diligenced employees did not seem

8    upset by the scope of the investigation that Uber requested; instead, they were "okay with it."  (Qi

9    Rough Tr. at 223:22-224:6.)  The most likely explanation for that is, of course, that all parties

10   already knew what Uber was looking for—stolen Waymo files.

11         Although Uber must have known about the downloaded files when it agreed to indemnify

12   Mr. Levandowski and set up the forensic investigation, Uber almost certainly found out that Mr.

13   Mr. Levandowski had downloaded materials when the diligence process got underway.   To

14   motivate Mr. Levandowski to disclose *all* of his "Bad Acts" to Stroz, Uber created an elaborate

15   incentive structure:   as long as Mr. Levandowski disclosed his "Bad Acts" (including

16   "downloading of files of [Google]") to Stroz, Uber would indemnify him.  (UBER00017265 at -

17   73-74; Dkt. 566 at 3.)  If Mr. Levandowski did not disclose "Bad Acts" to Stroz, Levandowski

18   could not seek indemnification from Uber for those "Bad Acts" later.  (*Id.*)  Although Waymo has

19   still not seen the due diligence report that Stroz produced, all evidence indicates that Mr.

20   Levandowski accepted this offer and disclosed the existence of the stolen information to Uber and

21   Stroz.   Defendants have never disputed that Stroz has some of the stolen information in its

22   possession as a result of the due diligence process, and Uber recently admitted that its lawyers

23   have also possessed the stolen information for over a year by virtue of their involvement in the due

24   diligence process.  (Dkt. 677-8.)

25         ***At the very latest***, Uber learned that Mr. Levandowski had downloaded Waymo materials

26   in his possession on March 11, 2016 when Mr. Levandowski told Uber outright.  As Uber has

27   explained: "On or about March 11, 2016, Mr. Levandowski reported to [Travis] Kalanick, Nina Qi

28   and Cameron Poetzscher at Uber as well as Lior Ron that he had identified five discs in his

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  possession containing Google information." (Dkt. 695 at 4.) Uber's accounting indicates that Mr.

2  Levandowski and Mr. Kalanick had a meeting to discuss LIDAR on the same day. (Dkt. 712, Ex.

3  1 at No. 63.) Since receiving this interrogatory response, Waymo has deposed three of the four

4  individuals to whom Mr. Levandowski made this admission, and all three confirmed that Mr.

5  Levandowski did indeed reveal that he had Google "stuff" in his possession during an in-person

6  meeting with Uber on March 11, 2016. (Ron Tr., 25:23-26:18; Poetzscher Tr., 249:3-250:9; Qi

7  Rough Tr., 271:11-273:20.) Uber now insists that Mr. Levandowski subsequently destroyed the

8  materials (raising other serious concerns, including concerns regarding the integrity of Stroz's

9  investigation), but the point remains: Uber was aware of Mr. Levandowski taking confidential

10  Waymo information files as of March 11, 2016, and Uber acquired Mr. Levandowski's company

11  anyway. And even after finding out that he had Waymo materials in his possession on March 11,

12  2016, Uber *never* took *any* steps to prohibit Mr. Levandowski from using his "treasure trove of

13  files" in his work at Uber.

14     Waymo also seeks prejudgment interest on the damages awarded for the misappropriation

15  of trade secrets at the California statutory prejudgment interest rate of seven percent (7%).

16

17  INTERROGATORY NO. 11:

18     Identify all facts supporting your contention that Waymo owns each of the alleged trade

19  secrets identified in Waymo's 2019 Disclosure.

20

21  RESPONSE TO INTERROGATORY NO. 11:

22     Waymo incorporates by reference its General Objections. Waymo further objects to this

23  interrogatory on the grounds that it is overbroad, unduly burdensome, and oppressive, including to

24  the extent that it asks Waymo to "identify all facts." Waymo further objects to this request to the

25  extent it is compound, complex, and contains multiple subparts.

26     Subject to and without waiving the foregoing General and Specific Objections, Waymo

27  responds as follows:

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   DATED:  July 25, 2017                    QUINN EMANUEL URQUHART & SULLIVAN,
                                             LLP
2

3                                            By  /s/ Charles K. Verhoeven

4                                                Charles K. Verhoeven
                                                 Attorneys for WAYMO LLC
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 16

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  MICHAEL A. JACOBS (CA SBN 111664)
   MJacobs@mofo.com
2  ARTURO J. GONZÁLEZ (CA SBN 121490)
   AGonzalez@mofo.com
3  ERIC A. TATE (CA SBN 178719)
   ETate@mofo.com
4  RUDY Y. KIM (CA SBN 199426)
   RKim@mofo.com
5  MORRISON & FOERSTER LLP
   425 Market Street
6  San Francisco, California  94105-2482
   Telephone:     415.268.7000
7  Facsimile:      415.268.7522

8  KAREN L. DUNN (*Pro Hac Vice*)
   kdunn@bsfllp.com
9  HAMISH P.M. HUME (*Pro Hac Vice*)
   hhume@bsfllp.com
10 BOIES SCHILLER FLEXNER LLP
   1401 New York Avenue, N.W.
11 Washington DC  20005
   Telephone:     202.237.2727
12 Facsimile:      202.237.6131

13 Attorneys for Defendants
   UBER TECHNOLOGIES, INC.
14 and OTTOMOTTO LLC

15                UNITED STATES DISTRICT COURT

16               NORTHERN DISTRICT OF CALIFORNIA

17                  SAN FRANCISCO DIVISION

18 WAYMO LLC,                          Case No.       3:17-cv-00939-WHA

19              Plaintiff,             **DEFENDANTS UBER
                                       TECHNOLOGIES, INC. AND
20      v.                             OTTOMOTTO LLC'S OBJECTIONS
                                       AND RESPONSES TO WAYMO'S
21 UBER TECHNOLOGIES, INC.,            THIRD SET OF REQUESTS FOR
   OTTOMOTTO LLC; OTTO TRUCKING LLC,   PRODUCTION OF DOCUMENTS
22                                     (NOS. 153-265)**
              Defendants.
23                                     Trial Date: October 2, 2017

24

25

26

27

28

**REQUEST FOR PRODUCTION NO. 199:**

DOCUMENTS sufficient to show ███████████████████████████
████████████████████████████████████████████████████████████████

**RESPONSE TO REQUEST FOR PRODUCTION NO. 199:**

Defendants have made available for inspection Uber's facilities, email, computers, documents, design files, and source code in San Francisco and Pittsburgh on eight occasions. In doing so, Uber has made available for inspection over 383,000 emails and documents; the devices of Scott Boehmke, John Bares, Anthony Levandowski, Gaetan Pennecot, Daniel Gruver, and James Haslim; and all four locations at which there is ongoing LiDAR development. To date, Waymo has conducted approximately 55 hours of inspection, with additional requests for investigation.

Defendants will produce non-privileged documents, if such documents exist and can be located through a reasonably diligent search, sufficient to show ████████████████████
████████████████████████████████████████████████████████████████
█████████████

To the extent this Request seeks anything other than the previously described information, Defendants object to this Request as unreasonably overbroad, irrelevant, outside the scope of this litigation, harassing, and not proportional to the needs of the case, including to the extent that it requests information about LiDAR designs developed by third-parties and/or implicates non-disclosure agreements with third parties. Defendants further object to this Request to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine or that is otherwise privileged or protected from discovery. Defendants further object to this Request on the ground that the phrase "considered or implemented" is vague and ambiguous.

**REQUEST FOR PRODUCTION NO. 200:**

DOCUMENTS sufficient to show all self-driving car test scenarios that informed, drove, or influenced any LiDAR design considered or implemented by DEFENDANTS.

DEFENDANTS' OBJECTIONS AND RESPONSES TO THIRD SET OF REQUESTS FOR PRODUCTION (NOS. 153-265)
Case No. 3:17-cv-00939-WHA
pa-1791825

38

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

**RESPONSE TO REQUEST FOR PRODUCTION NO. 200:**

Defendants have already produced documents responsive to this Request, including without limitation, documents produced in connection with Notices of Deposition for Asheem Linaval.  Specifically, Defendants produced PowerPoint presentations, notes, and calculations from the custodial files of Scott Boehmke.

In addition, Defendants have made available for inspection Uber's facilities, email, computers, documents, design files, and source code in San Francisco and Pittsburgh on eight occasions.  In doing so, Uber has made available for inspection over 383,000 emails and documents; the devices of Scott Boehmke, John Bares, Anthony Levandowski, Gaetan Pennecot, Daniel Gruver, and James Haslim; and all four locations at which there is ongoing LiDAR development.  To date, Waymo has conducted approximately 55 hours of inspection, with additional requests for investigation.

Defendants will produce additional non-privileged documents, if such documents exist and can be located through a reasonably diligent search, sufficient to show additional self-driving test scenarios used for Defendants' LiDAR designs.

To the extent this Request seeks anything other than the previously described information, Defendants also object to this Request as unreasonably overbroad, irrelevant, outside the scope of this litigation, harassing, and not proportional to the needs of the case, including to the extent that it requests information about LiDAR designs developed by third-parties and/or implicates non-disclosure agreements with third parties.  Defendants also object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks "all" "self-driving car test scenarios[.]"  Defendants further object to this Request to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine or that is otherwise privileged or protected from discovery.  Defendants further object to the use of the phrases "self-driving car test scenarios," "informed, drove, or influenced," and "considered or implemented" are vague and ambiguous.

DEFENDANTS' OBJECTIONS AND RESPONSES TO THIRD SET OF REQUESTS FOR PRODUCTION (NOS. 153-265)
Case No. 3:17-cv-00939-WHA
pa-1791825

39

# EXHIBIT 1

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

| | |
|---|---|
| **From:** | Jordan Jaffe |
| **To:** | Kim, Rudy Y.; Felipe Corredor; UberWaymoMoFoAttorneys; BSF_EXTERNAL_UberWaymoLit@bsfllp.com; DG-GPOttoTruckingWaymo@goodwinlaw.com |
| **Cc:** | QE-Waymo; John Cooper; Matthew Cate |
| **Subject:** | RE: Waymo v. Uber - Waymo"s notice regarding trade secret narrowing |
| **Date:** | Sunday, August 06, 2017 9:56:58 PM |

---

**- External Email -**

---

WAYMO HIGHLY CONFIDENTIAL INFORMATION / ATTORNEYS EYES ONLY

Rudy,

Your concerns are misplaced.  In the first instance, Defendants have had Waymo's full list of 121 trade secrets, including Trade Secret Nos. 25, 90, 96, and 111, since Waymo's filing of its motion for a preliminary injunction nearly five months ago.  However, never before have you raised concern that the description of those trade secrets, or any other trade secrets on Waymo's trade secret disclosure under CCP section 2019.210, are "vague and/or overbroad."  Defendants have thus waived any contention that Waymo's formulation of its trade secrets lack the requisite particularity, and your belated concerns on that issue are misplaced.  Indeed, at the March 16 hearing in this case, Judge Alsup told Defendants that "there is a [trade secret] list, and we have got to go forward.  And you can't hold back and say: Oh, no, we don't know this, we don't know that."  Mar. 16, 2017 Hearing Tr. at 19:24-20:1.

Moreover, even considering your concerns about Trade Secret Nos. 25, 90, 96, and 111 on the merits, your stated concerns are meritless.  Trade Secret Nos. 25, 90, and 96 relate to specific cited documents that provide great detail and particularity as to each of those trade secrets.

As to Trade Secret No. 25, your assertion that the three specific, detailed cited documents contain "general concepts in the public domain" is meritless.  The information contained in those documents is Waymo's trade secret information. ███████████████████████████████████████████████████████████████████

████ (Jaffe Ex. 3 at 1), is highly confidential trade secret information derived from Waymo's years of self-driving car experience. ████████████████████████████████████████████████████████████████ is similarly highly confidential trade secret information that could only have been arrived at thanks to Waymo's years of self-driving car experience.  As but one example, ████████████████████████████████████████████████████████████████████████████████████████████████████████████ (Jaffe Ex. 3 at 1), is as specific as it gets—and such information amounts to Waymo's highly confidential trade secrets.  The three documents are filled with such ████████████████████████████████████ ████████████████  None of this information is a "general concept[] in the public domain," and all of that information is specific and particular.

As to Trade Secret No. 90, we don't understand how one can be accused of "broadly claim[ing]" information contained in a six-page document—one that no one disputes that Mr. Levandowski personally downloaded on his way out the door of Waymo.  The technical details regarding Waymo's custom fiber laser design as reflected in the cited presentation is a trade secret.  Indeed, all of Waymo's specific implementations of its custom fiber lasers are its trade secrets—including the implementation reflected in Trade Secret Nos. 48 and 90.

As to Trade Secret No. 96, it is again not credible to claim that it "broadly claims 'design schematics and layouts contained in' a folder containing *detailed engineering schematics*."  By your own admission, this trade secret covers "detailed engineering schematics" and is thus a very detailed and particularized trade secret.  Waymo's

specific implementation of a LiDAR transmit board reflected in those schematics is a trade secret, and one example of the 14,000 files that Mr. Levandowski personally downloaded and Uber has misappropriated.

Indeed, as to both Trade Secret Nos. 90 and 96, the Court has already noted that Waymo's specific implementation of its LiDAR designs unquestionably qualify as trade secrets. *See, e.g.*, May 3, 2017 Sealed Morning Hearing Tr. at 15:16-22 ("All right.  Well, I'm telling you, you're in a lot of trouble with that because I came up with a very simple example right off the bat that would fit that and it's not -- that's something so obvious to the -- to a seventh grader, wherever you get trigonometry, that, I don't know, your -- however, your specific implementation, I think, would be a trade secret."); May 3, 2017 Sealed Afternoon Hearing Tr. at 44:11-13 ("Trade secrets are about how you implement your design.  It doesn't have to be -- qualify for a patent.  It's about implementation.").

Finally, as to Trade Secret No. 111, Waymo's trade secret disclosure describes that the specific know-how was tied to █████████████████████████████████████████████████████████ ████████████████████████████████████████ and further explains that this know-how includes ███ ██████████████████████████████████████████████ Waymo's trade secret disclosure thus provides great detail and particularity as to ███████████████████████████████████████████████ █████████—highly confidential information that is very valuable to Defendants and other competitors.

We trust this lays your concerns to rest.  If not, we are available to meet and confer on Monday.

Best regards,

Jordan R. Jaffe

---

**From:** Jordan Jaffe
**Sent:** Saturday, August 05, 2017 8:37 AM
**To:** Kim, Rudy Y. <RudyKim@mofo.com>; Felipe Corredor <felipecorredor@quinnemanuel.com>; UberWaymoMoFoAttorneys <UberWaymoMoFoAttorneys@mofo.com>; BSF_EXTERNAL_UberWaymoLit@bsfllp.com; DG-GPOttoTruckingWaymo@goodwinlaw.com
**Cc:** QE-Waymo <qewaymo@quinnemanuel.com>; John Cooper <JCooper@fbm.com>; Matthew Cate <MCate@fbm.com>
**Subject:** RE: Waymo v. Uber - Waymo's notice regarding trade secret narrowing

Rudy,

Confirming receipt of your Friday evening email. It raises new issues concerning the descriptions of trade secrets that have been in Uber's possession for approximately five months now.  Nevertheless, we are preparing a response as expeditiously as possible given the timing of your email.

Best regards,

Jordan R. Jaffe // Quinn Emanuel // 415.498.0556 // jordanjaffe@quinnemanuel.com

---

**From:** Kim, Rudy Y.
**Sent:** Friday, August 4, 2017 8:44 PM
**To:** Felipe Corredor; UberWaymoMoFoAttorneys; BSF_EXTERNAL_UberWaymoLit@bsfllp.com; DG-GPOttoTruckingWaymo@goodwinlaw.com
**Cc:** QE-Waymo; John Cooper; Matthew Cate

**Subject:** RE: Waymo v. Uber - Waymo's notice regarding trade secret narrowing

Quinn Team:

We write to confer regarding the nine trade secrets that you identified on Tuesday. That was supposed to be a list of specific, particularized trade secrets to streamline this case for trial. Instead, at least four of them are vague and/or overbroad and do not give us adequate opportunity to prepare our defense for trial. The concerns we have are as follows:

- **Trade Secret No. 25** – broadly claims ███████████████████████████████████████████████████████████████████████████████ in those documents. Much of the disclosures in those documents appear to be general concepts in the public domain, and Waymo has not specified what specific information it considers to be its trade secret.

- **Trade Secret No. 90** – broadly claims "the technical information contained in" a six page document, without identifying what specific information Waymo contends is a trade secret. At the very minimum, Waymo should confirm that it no longer contends that Trade Secret No. 48 (which is arguably subsumed in Trade Secret No. 90) is a trade secret, which has been confirmed by Waymo's own witnesses at deposition. Waymo should further identify what else is contained in the six page document that it contends is a trade secret.

- **Trade Secret No. 96** – broadly claims "design schematics and layouts contained in" a folder containing detailed engineering schematics. Waymo fails to identify with particularity what aspects of those detailed design schematics and layouts it considers to be its trade secret, and what specific elements it intends to argue were misappropriated at trial. This appears to be a deliberate attempt to circumvent Judge Alsup's order by including a broad catchall "trade secret" that encompasses other trade secrets (e.g., Trade Secret 1, Trade Secret 4, Trade Secret 5, Trade Secret 6, Trade Secret 8, Trade Secret 15, etc.)

- **Trade Secret No. 111** – broadly claims "know-how regarding the risks and costs" of a particular LiDAR design that Waymo apparently tried and abandoned. Waymo fails to identify with particularity what specific "know-how" it considers to be a trade secret and what specific elements it intends to argue was misappropriated at trial.

I am available to confer with you at any time this weekend. Given how close we are to trial, we will file a motion to strike these secrets if they are not withdrawn or clarified.

I look forward to conferring with you. Please clarify your alleged trade secrets and let me know what time this weekend you are available to confer.

Rudy

---

**From:** Felipe Corredor [mailto:felipecorredor@quinnemanuel.com]
**Sent:** Tuesday, August 01, 2017 11:40 PM
**To:** UberWaymoMoFoAttorneys; BSF_EXTERNAL_UberWaymoLit@bsfllp.com; DG-GPOttoTruckingWaymo@goodwinlaw.com
**Cc:** QE-Waymo; John Cooper; Matthew Cate
**Subject:** Waymo v. Uber - Waymo's notice regarding trade secret narrowing

- External Email -

---

Counsel and Special Master Cooper,

Please see attached.

Regards,
Felipe

**Felipe Corredor**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6448 Direct
415.875.6600 Main Office Number
415.875.6700 FAX
felipecorredor@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

====================================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email.

# EXHIBIT 16

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

1  MICHAEL A. JACOBS (CA SBN 111664)
   MJacobs@mofo.com
2  ARTURO J. GONZÁLEZ (CA SBN 121490)
   AGonzalez@mofo.com
3  ERIC A. TATE (CA SBN 178719)
   ETate@mofo.com
4  RUDY Y. KIM (CA SBN 199426)
   RKim@mofo.com
5  MORRISON & FOERSTER LLP
   425 Market Street
6  San Francisco, California  94105-2482
   Telephone:     415.268.7000
7  Facsimile:      415.268.7522

8  KAREN L. DUNN (*Pro Hac Vice*)
   kdunn@bsfllp.com
9  HAMISH P.M. HUME (*Pro Hac Vice*)
   hhume@bsfllp.com
10 BOIES SCHILLER FLEXNER LLP
   1401 New York Avenue, N.W.
11 Washington DC  20005
   Telephone:     202.237.2727
12 Facsimile:      202.237.6131

13 Attorneys for Defendants
   UBER TECHNOLOGIES, INC.
14 and OTTOMOTTO LLC

15                UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17                 SAN FRANCISCO DIVISION

18 WAYMO LLC,                          | Case No.        3:17-cv-00939-WHA

19             Plaintiff,              | **DEFENDANTS UBER
                                       | TECHNOLOGIES, INC. AND
20      v.                            | OTTOMOTTO LLC'S OBJECTIONS
                                       | AND RESPONSES TO WAYMO'S
21 UBER TECHNOLOGIES, INC.,           | THIRD SET OF REQUESTS FOR
   OTTOMOTTO LLC; OTTO TRUCKING LLC,  | PRODUCTION OF DOCUMENTS
22                                     | (NOS. 153-265)**
             Defendants.
23                                     | Trial Date: October 2, 2017

24
25
26
27
28

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

1  **REQUEST FOR PRODUCTION NO. 199:**

2      DOCUMENTS sufficient to show ████████████████████████████

3  ████████████████████████████████████████████████████████████

4  **RESPONSE TO REQUEST FOR PRODUCTION NO. 199:**

5      Defendants have made available for inspection Uber's facilities, email, computers,

6  documents, design files, and source code in San Francisco and Pittsburgh on eight occasions.  In

7  doing so, Uber has made available for inspection over 383,000 emails and documents; the devices

8  of Scott Boehmke, John Bares, Anthony Levandowski, Gaetan Pennecot, Daniel Gruver, and

9  James Haslim; and all four locations at which there is ongoing LiDAR development.  To date,

10  Waymo has conducted approximately 55 hours of inspection, with additional requests for

11  investigation.

12      Defendants will produce non-privileged documents, if such documents exist and can be

13  located through a reasonably diligent search, sufficient to show ████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████

16      To the extent this Request seeks anything other than the previously described information,

17  Defendants object to this Request as unreasonably overbroad, irrelevant, outside the scope of this

18  litigation, harassing, and not proportional to the needs of the case, including to the extent that it

19  requests information about LiDAR designs developed by third-parties and/or implicates non-

20  disclosure agreements with third parties.  Defendants further object to this Request to the extent

21  that it seeks information protected by the attorney-client privilege or the work product doctrine or

22  that is otherwise privileged or protected from discovery.  Defendants further object to this

23  Request on the ground that the phrase "considered or implemented" is vague and ambiguous.

24

25  **REQUEST FOR PRODUCTION NO. 200:**

26      DOCUMENTS sufficient to show all self-driving car test scenarios that informed, drove,

27  or influenced any LiDAR design considered or implemented by DEFENDANTS.

28

1    **RESPONSE TO REQUEST FOR PRODUCTION NO. 200:**

2        Defendants have already produced documents responsive to this Request, including

3    without limitation, documents produced in connection with Notices of Deposition for Asheem

4    Linaval.  Specifically, Defendants produced PowerPoint presentations, notes, and calculations

5    from the custodial files of Scott Boehmke.

6        In addition, Defendants have made available for inspection Uber's facilities, email,

7    computers, documents, design files, and source code in San Francisco and Pittsburgh on eight

8    occasions.  In doing so, Uber has made available for inspection over 383,000 emails and

9    documents; the devices of Scott Boehmke, John Bares, Anthony Levandowski, Gaetan Pennecot,

10   Daniel Gruver, and James Haslim; and all four locations at which there is ongoing LiDAR

11   development.  To date, Waymo has conducted approximately 55 hours of inspection, with

12   additional requests for investigation.

13       Defendants will produce additional non-privileged documents, if such documents exist

14   and can be located through a reasonably diligent search, sufficient to show additional self-driving

15   test scenarios used for Defendants' LiDAR designs.

16       To the extent this Request seeks anything other than the previously described information,

17   Defendants also object to this Request as unreasonably overbroad, irrelevant, outside the scope of

18   this litigation, harassing, and not proportional to the needs of the case, including to the extent that

19   it requests information about LiDAR designs developed by third-parties and/or implicates non-

20   disclosure agreements with third parties.  Defendants also object to this Request as overbroad,

21   unduly burdensome, and not proportional to the needs of the case to the extent that it seeks "all"

22   "self-driving car test scenarios[.]"  Defendants further object to this Request to the extent that it

23   seeks information protected by the attorney-client privilege or the work product doctrine or that is

24   otherwise privileged or protected from discovery.  Defendants further object to the use of the

25   phrases "self-driving car test scenarios," "informed, drove, or influenced," and "considered or

26   implemented" are vague and ambiguous.

27

28

DEFENDANTS' OBJECTIONS AND RESPONSES TO THIRD SET OF REQUESTS FOR PRODUCTION (NOS. 153-265)
Case No. 3:17-cv-00939-WHA
pa-1791825

39

# EXHIBIT 1

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

| | |
|---|---|
| **From:** | Jordan Jaffe |
| **To:** | Kim, Rudy Y.; Felipe Corredor; UberWaymoMoFoAttorneys; BSF_EXTERNAL_UberWaymoLit@bsfllp.com; DG-GPOttoTruckingWaymo@goodwinlaw.com |
| **Cc:** | QE-Waymo; John Cooper; Matthew Cate |
| **Subject:** | RE: Waymo v. Uber - Waymo"s notice regarding trade secret narrowing |
| **Date:** | Sunday, August 06, 2017 9:56:58 PM |

- External Email -

WAYMO HIGHLY CONFIDENTIAL INFORMATION / ATTORNEYS EYES ONLY

Rudy,

Your concerns are misplaced.  In the first instance, Defendants have had Waymo's full list of 121 trade secrets, including Trade Secret Nos. 25, 90, 96, and 111, since Waymo's filing of its motion for a preliminary injunction nearly five months ago.  However, never before have you raised concern that the description of those trade secrets, or any other trade secrets on Waymo's trade secret disclosure under CCP section 2019.210, are "vague and/or overbroad."  Defendants have thus waived any contention that Waymo's formulation of its trade secrets lack the requisite particularity, and your belated concerns on that issue are misplaced.  Indeed, at the March 16 hearing in this case, Judge Alsup told Defendants that "there is a [trade secret] list, and we have got to go forward.  And you can't hold back and say: Oh, no, we don't know this, we don't know that."  Mar. 16, 2017 Hearing Tr. at 19:24-20:1.

Moreover, even considering your concerns about Trade Secret Nos. 25, 90, 96, and 111 on the merits, your stated concerns are meritless.  Trade Secret Nos. 25, 90, and 96 relate to specific cited documents that provide great detail and particularity as to each of those trade secrets.

As to Trade Secret No. 25, your assertion that the three specific, detailed cited documents contain "general concepts in the public domain" is meritless.  The information contained in those documents is Waymo's trade secret information. ███████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
███████ (Jaffe Ex. 3 at 1), is highly confidential trade secret information derived from Waymo's years of self-driving car experience. ████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████is similarly highly confidential trade secret information that could only have been arrived at thanks to Waymo's years of self-driving car experience.  As but one example, █████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
(Jaffe Ex. 3 at 1), is as specific as it gets—and such information amounts to Waymo's highly confidential trade secrets.  The three documents are filled with such ███████████████████████████████████████
█████████████████████████████ None of this information is a "general concept[] in the public domain," and all of that information is specific and particular.

As to Trade Secret No. 90, we don't understand how one can be accused of "broadly claim[ing]" information contained in a six-page document—one that no one disputes that Mr. Levandowski personally downloaded on his way out the door of Waymo.  The technical details regarding Waymo's custom fiber laser design as reflected in the cited presentation is a trade secret.  Indeed, all of Waymo's specific implementations of its custom fiber lasers are its trade secrets—including the implementation reflected in Trade Secret Nos. 48 and 90.

As to Trade Secret No. 96, it is again not credible to claim that it "broadly claims 'design schematics and layouts contained in' a folder containing ***detailed engineering schematics***."  By your own admission, this trade secret covers "detailed engineering schematics" and is thus a very detailed and particularized trade secret.  Waymo's

specific implementation of a LiDAR transmit board reflected in those schematics is a trade secret, and one example of the 14,000 files that Mr. Levandowski personally downloaded and Uber has misappropriated.

Indeed, as to both Trade Secret Nos. 90 and 96, the Court has already noted that Waymo's specific implementation of its LiDAR designs unquestionably qualify as trade secrets. *See, e.g.*, May 3, 2017 Sealed Morning Hearing Tr. at 15:16-22 ("All right. Well, I'm telling you, you're in a lot of trouble with that because I came up with a very simple example right off the bat that would fit that and it's not -- that's something so obvious to the -- to a seventh grader, wherever you get trigonometry, that, I don't know, your -- however, your specific implementation, I think, would be a trade secret."); May 3, 2017 Sealed Afternoon Hearing Tr. at 44:11-13 ("Trade secrets are about how you implement your design. It doesn't have to be -- qualify for a patent. It's about implementation.").

Finally, as to Trade Secret No. 111, Waymo's trade secret disclosure describes that the specific know-how was tied to ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████ and further explains that this know-how includes ███ ████████████████████████████████████████████████ Waymo's trade secret disclosure thus provides great detail and particularity as to ███████████████████████████████████████████████████ ████████████—highly confidential information that is very valuable to Defendants and other competitors.

We trust this lays your concerns to rest. If not, we are available to meet and confer on Monday.

Best regards,

Jordan R. Jaffe

---

**From:** Jordan Jaffe
**Sent:** Saturday, August 05, 2017 8:37 AM
**To:** Kim, Rudy Y. <RudyKim@mofo.com>; Felipe Corredor <felipecorredor@quinnemanuel.com>; UberWaymoMoFoAttorneys <UberWaymoMoFoAttorneys@mofo.com>; BSF_EXTERNAL_UberWaymoLit@bsfllp.com; DG-GPOttoTruckingWaymo@goodwinlaw.com
**Cc:** QE-Waymo <qewaymo@quinnemanuel.com>; John Cooper <JCooper@fbm.com>; Matthew Cate <MCate@fbm.com>
**Subject:** RE: Waymo v. Uber - Waymo's notice regarding trade secret narrowing

Rudy,

Confirming receipt of your Friday evening email. It raises new issues concerning the descriptions of trade secrets that have been in Uber's possession for approximately five months now. Nevertheless, we are preparing a response as expeditiously as possible given the timing of your email.

Best regards,

Jordan R. Jaffe // Quinn Emanuel // 415.498.0556 // jordanjaffe@quinnemanuel.com

---

**From:** Kim, Rudy Y.
**Sent:** Friday, August 4, 2017 8:44 PM
**To:** Felipe Corredor; UberWaymoMoFoAttorneys; BSF_EXTERNAL_UberWaymoLit@bsfllp.com; DG-GPOttoTruckingWaymo@goodwinlaw.com
**Cc:** QE-Waymo; John Cooper; Matthew Cate

**Subject:** RE: Waymo v. Uber - Waymo's notice regarding trade secret narrowing

Quinn Team:

We write to confer regarding the nine trade secrets that you identified on Tuesday.  That was supposed to be a list of specific, particularized trade secrets to streamline this case for trial.  Instead, at least four of them are vague and/or overbroad and do not give us adequate opportunity to prepare our defense for trial.  The concerns we have are as follows:

- **Trade Secret No. 25 – broadly claims** ███████████████████████████████████████████████ in those documents.  Much of the disclosures in those documents appear to be general concepts in the public domain, and Waymo has not specified what specific information it considers to be its trade secret.

- **Trade Secret No. 90** – broadly claims "the technical information contained in" a six page document, without identifying what specific information Waymo contends is a trade secret.  At the very minimum, Waymo should confirm that it no longer contends that Trade Secret No. 48 (which is arguably subsumed in Trade Secret No. 90) is a trade secret, which has been confirmed by Waymo's own witnesses at deposition.  Waymo should further identify what else is contained in the six page document that it contends is a trade secret.

- **Trade Secret No. 96** – broadly claims "design schematics and layouts contained in" a folder containing detailed engineering schematics.  Waymo fails to identify with particularity what aspects of those detailed design schematics and layouts it considers to be its trade secret, and what specific elements it intends to argue were misappropriated at trial.  This appears to be a deliberate attempt to circumvent Judge Alsup's order by including a broad catchall "trade secret" that encompasses other trade secrets (e.g., Trade Secret 1, Trade Secret 4, Trade Secret 5, Trade Secret 6, Trade Secret 8, Trade Secret 15, etc.)

- **Trade Secret No. 111** – broadly claims "know-how regarding the risks and costs" of a particular LiDAR design that Waymo apparently tried and abandoned.  Waymo fails to identify with particularity what specific "know-how" it considers to be a trade secret and what specific elements it intends to argue was misappropriated at trial.

I am available to confer with you at any time this weekend.  Given how close we are to trial, we will file a motion to strike these secrets if they are not withdrawn or clarified.

I look forward to conferring with you.  Please clarify your alleged trade secrets and let me know what time this weekend you are available to confer.

Rudy

---

**From:** Felipe Corredor [mailto:felipecorredor@quinnemanuel.com]
**Sent:** Tuesday, August 01, 2017 11:40 PM
**To:** UberWaymoMoFoAttorneys; BSF_EXTERNAL_UberWaymoLit@bsfllp.com; DG-GPOttoTruckingWaymo@goodwinlaw.com
**Cc:** QE-Waymo; John Cooper; Matthew Cate
**Subject:** Waymo v. Uber - Waymo's notice regarding trade secret narrowing

**- External Email -**

---

Counsel and Special Master Cooper,

Please see attached.

Regards,
Felipe

**Felipe Corredor**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6448 Direct
415.875.6600 Main Office Number
415.875.6700 FAX
felipecorredor@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email.