# EXHIBIT 1

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

   _____

5   WAYMO LLC,                          )

6                Plaintiff,             )

7       vs.                             ) Case No.

8   UBER TECHNOLOGIES, INC.;            ) 17-cv-00939-WHA

9   OTTOMOTTO, LLC; OTTO TRUCKING LLC,  )

10               Defendants.            )

    _____)

11

12        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14        VIDEOTAPED DEPOSITION OF MICHAEL J. WAGNER

15               San Francisco, California

16              Friday, September 22, 2017

17                     Volume I

18

19

20   Reported by:

21   MARY J. GOFF

22   CSR No. 13427

23   Job No. 2714429

24

25   PAGES 1-145

                                          Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | |
|---|---|
| 1 UNITED STATES DISTRICT COURT | 1 APPEARANCES CONTINUED: |
| 2 NORTHERN DISTRICT OF CALIFORNIA | 2 |
| 3 SAN FRANCISCO DIVISION | 3 For Defendants Uber and Ottomotto |
| 4 | 4 Morrison & Foerster LLP |
| 5 _____ | 5 BY: RACHEL S. DOLPHIN |
| 6 WAYMO LLC,            ) | 6 Attorney at Law |
| 7 Plaintiff,     ) | 7 425 Market Street |
| 8 vs.            ) Case No. | 8 33rd Floor |
| 9 UBER TECHNOLOGIES, INC.;     ) 17-cv-00939-WHA | 9 San Francisco, California 94105 |
| 10 OTTOMOTTO, LLC; OTTO TRUCKING LLC, ) | 10 rdolphin@mofo.com |
| 11 Defendants.     ) | 11 415-268-7263 |
| 12 _____ ) | 12 |
| 13 | 13 For Defendant Otto Trucking LLC |
| 14 HIGHLY CONFIDENTIAL | 14 Goodwin Procter LLP |
| 15 | 15 BY: BRETT SCHUMAN |
| 16 Videotaped Deposition of MICHAEL J. WAGNER, | 16 Attorney at Law |
| 17 Volume I, taken on behalf of Defendants, | 17 Three Embarcadero Center |
| 18 at Morrison & Foerster, 425 market Street, | 18 San Francisco, California 94111 |
| 19 33rd Floor, San Francisco, beginning at | 19 bschuman@goodwinlaw.com |
| 20 9:34 a.m. and ending at 12:30 p.m., on | 20 415-733-6021 |
| 21 September 22, 2017, before MARY GOFF, Certified | 21 |
| 22 Shorthand Reporter No. 13427. | 22 Also Present |
| 23 | 23 Kevin Foor, Videographer |
| 24 | 24 |
| 25 | 25 |
| Page 2 | Page 4 |

| | |
|---|---|
| 1 APPEARANCES: | 1 I N D E X |
| 2 | 2 |
| 3 For Plaintiff | 3 WITNESS            EXAMINATION |
| 4 Quinn Emanuel Urquhart & Sullivan, LLP | 4 MICHAEL J. WAGNER |
| 5 BY: DAVID EISEMAN | 5 Volume I |
| 6 Attorneys at Law | 6 BY MR. BERRY          7, 142 |
| 7 50 California Street | 7 BY MR. SCHUMAN          126 |
| 8 22nd Floor | 8 |
| 9 San Francisco, California 94111 | 9 |
| 10 davideiseman@quinnemanuel.com | 10 EXHIBITS |
| 11 415-875-6600 | 11 NUMBER      DESCRIPTION      PAGES |
| 12 | 12 Exhibit 2271 Expert Report of      18 |
| 13 For Defendant Uber | 13 Michael J. Wagner, 8/24/17 |
| 14 Susman Godfrey LLP | 14 Exhibit 2272 Expert Reply Report of      18 |
| 15 BY: MATTHEW R. BERRY | 15 Michael J. Wagner, 9/14/17, Vol A |
| 16 Attorney at Law | 16 Exhibit 2273 Project Rubicon, 2019      52 |
| 17 1201 Third Avenue | 17 Volume Recommendation, 5/20/16 |
| 18 Suite 3800 | 18 Exhibit 2274 Defendants' Second Supplemental      91 |
| 19 Seattle, Washington 98101 | 19 Responses to Waymo's First Set of |
| 20 mberry@susmangodfrey.com | 20 Common Interrogatories Nos. 1-3 |
| 21 206-373-7394 | 21 Exhibit 2275 Kit for OTR Trucking Market      98 |
| 22 | 22 |
| 23 | 23 PREVIOUSLY MARKED EXHIBITS: |
| 24 | 24 Exhibit 299 NewCo Review, Qi Exhibit 299      69 |
| 25 | 25 |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       San Francisco, California
2       Friday, September 22, 2017
3       9:34 a.m.
4       THE VIDEOGRAPHER:  Good morning.  We are
5   going on the record at 9:34, on September 22 of the       09:34:29
6   Year 2017.  Please understand microphones are very       09:34:35
7   sensitive, and they may pick up whispering ad       09:34:42
8   private conversations and cellular interference.       09:34:44
9       Please turn off your cell phones or place       09:34:49
10   them away from the microphones, as they may       09:34:51
11   interfere with the audio.  Audio and video recording       09:34:54
12   will continue to take place unless all parties agree       09:34:57
13   to go off of the record.       09:35:01
14       This is Disc 1, Volume I in the video       09:35:03
15   deposition of Michael J. Wagner, taken by counsel       09:35:06
16   for Defendants in the matter of Waymo LLC v. Uber       09:35:10
17   Technologies.  It's filed in the United States       09:35:16
18   District Court, for the Northern District of       09:35:19
19   California, Case No. 17-cv-00939-WHA.       09:35:21
20       This is being taken at Morrison &       09:35:29
21   Foerster.  They're at 425 Market Street in       09:35:35
22   San Francisco.  My name is Kevin Foor, and I am here       09:35:35
23   with Mary Goff-Sharma, and we are from Veritext.       09:35:40
24   I'm not related to any party nor am I financially       09:35:45
25   interested in the outcome in any way.       09:35:49

Page 6

1       Counsel and -- and all present in the       09:35:52
2   room, everyone attending remotely will now state       09:35:54
3   their appearances for the record, please       09:35 58
4       MR  BERRY:  Matt Berry from Susman Godfrey       09:36 01
5   on behalf of Uber       09:36:03
6       MS  DOLPHIN:  Rachel Dolphin, Morrison &       09:36:04
7   Foerster, on behalf of Uber and Ottomotto       09:36:05
8       MR  SCHUMAN:  Brett Schuman, from Goodwin       09:36 09
9   Procter, on behalf of Otto Trucking LLC       09:36:09
10       MR  EISEMAN:  David Eiseman, from Quinn       09:36:12
11   Emanuel, on behalf of Plaintiff Waymo       09:36:13
12       MICHAEL J  WAGNER,       09:36:16
13   being first duly sworn or affirmed to testify to the       09:36:16
14   truth, the whole truth, and nothing but the truth,       09:36:16
15   was examined and testified as follows:       09:36:16
16       09:36:16
17   EXAMINATION BY COUNSEL FOR THE DEFENDANTS       09:36:16
18  BY MR  BERRY:       09:36:25
19   Q   Good morning, sir       09:36:26
20   A   Good morning       09:36:26
21   Q   Could you please state your name?       09:36:27
22   A   Michael Joseph Wagner       09:36:29
23   Q   I would like to talk to you first about       09:36:30
24   when you were retained, some of the details about       09:36:33
25   your retention here       09:36:34

Page 7

1       When were you first retained?       09:36:35
2   A   Well, I was first contacted on June 13 of       09:36:37
3   2017, to run conflicts to see if I could be       09:36:41
4   considered as an expert for Waymo.       09:36:45
5       I -- then I had a more substantive       09:36:48
6   conversation on June 15.  I don't think I was       09:36:50
7   retained at that point, because I was told they were       09:36:54
8   still considering another expert besides me.  And       09:36:56
9   then I think shortly after that I was retained, but       09:36:59
10   I can't give you the date.       09:37:02
11   Q   Within days?       09:37:03
12   A   Within days.       09:37:04
13   Q   Who retained you?       09:37:05
14   A   The -- the law firm of Quinn Emanuel.       09:37:09
15   Q   And, sir, when you did you start work in       09:37:11
16   this case?       09:37:14
17   A   I would say I probably didn't do much in       09:37:14
18   the way of substantive work until July of this year.       09:37:17
19   Q   And, sir, your hourly rate is 895 an hour;       09:37:23
20   is that right?       09:37:27
21   A   Yes.       09:37:28
22   Q   And is it also correct that you receive a       09:37:28
23   portion of Litinomics' revenues?       09:37:31
24   A   For other professionals that bill time to       09:37:33
25   this project, depending on their level, I get a       09:37:35

Page 8

1   percentage of what they charge and we collect.       09:37:38
2   Q   And, sir, how many individuals at       09:37:40
3   Litinomics have billed time to this matter?       09:37:42
4   A   Eight.       09:37:45
5   Q   How many hours total have you billed?       09:37:49
6   A   Through our last bill, which is       09:37:52
7   September 15, I have billed 64 hours.       09:37:54
8   Q   That -- those hours run through       09:38:01
9   September 15?       09:38:03
10   A   Through September 15.       09:38:04
11   Q   What about the eight others at Litinomics?       09:38:07
12   How many hours have they billed total?       09:38:12
13   A   Well, the total billing through that date       09:38:14
14   is 1,189.4 hours.  So subtract 64 from that, and       09:38:16
15   that's the others.       09:38:24
16   Q   And what are the billing rates for the       09:38:25
17   others?  What's -- what's the range there?       09:38:27
18   A   You know, I would say the senior-most       09:38:30
19   person that billed time besides me is around 550 an       09:38:33
20   hour, and probably the cheapest is about $175 an       09:38:36
21   hour.       09:38:41
22   Q   Sir, what's the total dollar value of the       09:38:41
23   billing in this case?       09:38:44
24   A   $418,437.       09:38:45
25   Q   Sir, is this the first time that you have       09:38:56

Page 9

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 10**

1 been retained by Quinn Emanuel?                    09:38:58
2    A    No.                                         09:39:00
3    Q    How many times have you been?               09:39:01
4    A    You know, I -- I -- I have been in this     09:39:03
5 business for 40 years.  You know, I would say I have 09:39:04
6 probably done 10 to 12 cases with Quinn Emanuel.    09:39:07
7    Q    What about -- have you been retained by     09:39:11
8 Google before?                                      09:39:13
9    A    Yes.                                        09:39:13
10    Q    How many times?                            09:39:14
11    A    One -- I know for sure once.  I think      09:39:14
12 twice.                                             09:39:23
13    Q    And, sir, do you have a deposition         09:39:24
14 scheduled for tomorrow?                            09:39:26
15    A    No.  I have a deposition scheduled for     09:39:28
16 Monday, Tuesday, and Friday of next week.          09:39:30
17    Q    And where is the deposition on Monday?     09:39:33
18    A    I don't know the location yet.  I'm hoping 09:39:35
19 it's the Bay Area, but it may be Texas.  I still    09:39:37
20 haven't been told.                                 09:39:42
21    Q    And would you have been available to sit   09:39:43
22 for a deposition tomorrow?                         09:39:46
23    A    It's possible I could have set tomorrow.   09:39:48
24    Q    Sir, are you submitting a Declaration in   09:39:51
25 support of Waymo's opposition to the Daubert motion 09:39:53

**Page 11**

1 against you?                                        09:39:57
2    A    No one has asked me to do that             09:39:58
3    Q    You have no plan to do so?                  09:40:00
4    A    Well, I think it's due today  And I think   09:40:01
5 you're going to monopolize most of my day, so I     09:40 04
6 would say probably not                             09:40:07
7    Q    You -- you have not been asked to do --     09:40:08
8    A    I --                                        09:40:09
9    Q    -- so?                                      09:40:09
10    A    I have not been asked                      09:40:10
11    Q    Sir, how many cases have you worked on     09:40:20
12 where you have provided a damages model in excess of 09:40:22
13 $1 billion?                                         09:40:25
14    A    Probably two other cases                   09:40:30
15    Q    What were those cases?                     09:40:32
16    A    One was the Apple/Samsung trial where      09:40:33
17 although I was a Defendant, my initial damage claim 09:40:37
18 in that case was in excess of a billion dollars for 09:40:39
19 the Defendant                                      09:40:42
20         The -- I believe the Apple number was like 09:40:43
21 2 3 billion  So it was a significantly less, but it 09:40:46
22 was still in excess of a billion dollars           09:40:50
23         The other case was -- and I -- I           09:40:52
24 apologize  I can't remember the -- the -- the       09:40:57
25 Plaintiff, but the Defendant was DaimlerChrysler    09:40:59

**Page 12**

1 And I believe the award in the case was 900 million. 09:41:01
2    Q    And who was your client in that case or --  09:41:08
3    A    That's --                                   09:41:11
4    Q    -- which side were you on?                  09:41:11
5    A    -- I was on the Plaintiff's side --         09:41:12
6    Q    Okay.                                       09:41:14
7    A    -- and -- like, I can remember the venue    09:41:14
8 was in Oregon.  And you can probably find it on my  09:41:18
9 CV.  And if you showed me on -- my CV, I could find 09:41:23
10 it for you.                                         09:41:24
11    Q    And, sir, you testified at trial in that   09:41:25
12 case?                                               09:41:28
13    A    I did.                                      09:41:29
14    Q    And the award, you said, was how much?     09:41:30
15    A    I think it was -- I think -- my            09:41:31
16 recollection was 900 million.                       09:41:32
17    Q    And, sir, you have had your opinions       09:41:36
18 excluded by courts in past cases; is that correct?  09:41:43
19    A    I have had -- in -- in -- in one case in my 09:41:47
20 career I was completely excluded.  I have a number  09:41:48
21 of the cases where some portions of my work were not 09:41:51
22 permitted to be introduced at trial.              09:41:54
23    Q    In which case was it completely excluded?  09:41:56
24 Were you completely excluded?                      09:41:59
25    A    Intellectual Ventures versus Xilinx.       09:41:59

**Page 13**

1    Q    In Delaware?                                09:42:02
2    A    Yes.  In front of Judge Stark.             09:42:03
3    Q    And then in other cases, certain of your    09:42:08
4 opinions have been excluded, but not all; is that   09:42:11
5 fair?                                               09:42:14
6    A    Correct.  Yes, that's -- that's fair.       09:42:15
7    Q    And how many cases would that be?          09:42:16
8    A    I -- I want to say nine or 10.             09:42:18
9    Q    When was the most recent one?               09:42:21
10    A    I -- I -- I have no recollection of that.   09:42:22
11    Q    Was it recently?                           09:42:26
12    A    You know, probably in the last couple of   09:42:32
13 years, but I -- I really don't have any recollection 09:42:33
14 when the last one was.                             09:42:36
15    Q    Sir, had you had an opinion excluded for   09:42:38
16 failure to consider relevant evidence?             09:42:39
17    A    Yes, that -- that was, I                   09:42:44
18 think, the grounds in the Xilinx matter.           09:42:44
19    Q    And, sir, have you had an opinion excluded 09:42:48
20 as not reliable?                                   09:42:51
21    A    Probably.  For that one portion that was   09:42:54
22 excluded, I would think probably that was a reason  09:42:58
23 at -- at least once or twice.                      09:43:01
24    Q    And, sir, have you had an opinion excluded 09:43:02
25 as being too speculative?                          09:43:04

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A    Well, you cited one where it was a method    09:43:07
2  patent, and the judge sustained -- or did not grant    09:43:10
3  any of the Daubert motions against me except for    09:43:13
4  one.  And that was on the royalty base, and it was    09:43:15
5  for your firm.    09:43:18
6         Yeah.  And that -- and he said it was    09:43:20
7  speculation to apply my rate, which he wasn't going    09:43:22
8  to allow the jury to hear.  But I had no base    09:43:25
9  because your client and your law firm couldn't give    09:43:28
10  me the -- the amount of use.    09:43:31
11    Q    So -- so the answer to my question was    09:43:33
12  yes?    09:43:34
13    A    Yes.    09:43:35
14    Q    And that was Judge Settle?    09:43:35
15    A    I don't remember the name of the judge.    09:43:37
16    Q    Whatever the name of the judge was, he    09:43:39
17  excluded your opinion as too speculative, correct?    09:43:40
18    A    Well, yeah.  At -- in the royalty base,    09:43:43
19  which is normally something that, you know, I don't    09:43:44
20  have much, you know, opinion about, it's -- it's    09:43:47
21  normally something that's assembled and I apply a    09:43:49
22  rate to.  The -- what I provide value to is the    09:43:52
23  rate, and that was not excluded.    09:43:55
24    Q    Sir, that was your opinion in that case    09:43:57
25  that was excluded, right?    09:43:59

Page 14

1    A    Well, I didn't have an opinion on use, so    09:44:00
2  no, there was no opinion on use.    09:44:02
3         I was instructed by you -- your firm to    09:44:04
4  assume all of the products sold by Ford, practiced    09:44:08
5  the method.    09:44:12
6    Q    Sir, it was your opinion that was    09:44:13
7  excluded, right?    09:44:15
8    A    With -- with that explanation, yes.    09:44:16
9    Q    And you're saying it wasn't your fault?    09:44:18
10    A    No.  Because I asked them.  I asked them    09:44:20
11  to do a survey.  They didn't.  I knew that -- I    09:44:22
12  knew -- I know what you have to do on method    09:44:25
13  patents, and -- and I knew it was a problem.    09:44:27
14    Q    Did you sign your report in that case?    09:44:30
15    A    I did.    09:44:32
16    Q    And it was your opinion, right?    09:44:33
17    A    The opinions that I expressed in my report    09:44:35
18  were mine.    09:44:37
19    Q    Sir, in this case in your report you have    09:44:38
20  a portion where it has "Documents Considered,"    09:44:40
21  right?    09:44:42
22    A    Correct.    09:44:43
23    Q    And you identified 2,586 documents in your    09:44:44
24  Opening Report that were considered, right?    09:44:48
25    A    Correct.  Listed on 131 pages.    09:44:50

Page 15

1    Q    How many of those 2,586 documents did you    09:44:53
2  personally look at?    09:44:56
3    A    Well, I only looked at -- at -- there may    09:44:57
4  be a few beyond that.  I -- I looked at the    09:45:00
5  documents that are in Volumes 2 through 9 of my    09:45:02
6  report, the ones that I'm relying upon.  But I'm    09:45:05
7  sure I read a couple of other ones, but I can't tell    09:45:09
8  you the number.    09:45:12
9    Q    So the documents in Volumes 2 through 9    09:45:13
10  are the ones that you considered?    09:45:16
11    A    Yes.    09:45:18
12    Q    Okay.    09:45:18
13    A    No.  I relied upon.    09:45:18
14    Q    And you replied upon.    09:45:19
15    A    All of the 2,586 documents were considered    09:45:19
16  by either me or my staff.    09:45:23
17    Q    Okay.  But for the documents in Volumes 2    09:45:25
18  through 9, you personally looked at each of those?    09:45:27
19    A    Yes.    09:45:30
20    Q    And those are the documents that you're    09:45:30
21  relying on?    09:45:32
22    A    Correct.    09:45:32
23    Q    And if they're -- the document is not    09:45:33
24  identified in Volumes 2 through 9, you're not    09:45:34
25  relying on it; is that fair?    09:45:38

Page 16

1    A    No.  Because I -- I also submitted a Reply    09:45:41
2  Report.  And if there's another document at Tabs B    09:45:44
3  or C, I'm relying upon that as well.  With that    09:45:47
4  clarification, the answer is yes.    09:45:49
5    Q    Okay.  So let's move on to your Reply    09:45:51
6  Report then.  And it identifies 3,017 documents    09:45:52
7  considered, right?    09:45:56
8    A    Correct.    09:45:58
9    Q    And does that list of 3,017 documents    09:45:58
10  include all the ones that you identified in your    09:46:02
11  Opening Report?    09:46:05
12    A    I would assume so, yes.    09:46:11
13    Q    So the difference between the two that --    09:46:18
14  the additional documents considered would be 431, is    09:46:20
15  that about right?    09:46:24
16    A    I haven't done the math.  But every number    09:46:26
17  you have said so far is accurate, so I'll accept    09:46:28
18  your --    09:46:30
19    Q    Is --    09:46:31
20    A    -- representation.    09:46:31
21    Q    -- is there a way to identify which are    09:46:31
22  the new documents that you looked at for your    09:46:34
23  written -- Reply Report?    09:46:36
24    A    Yes, I could -- I guess you could do a    09:46:40
25  document compare between the two.    09:46:41

Page 17

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  Q   Let me go ahead and hand you copies of    09:46:43
2  your reports.                               09:46:46
3      (Exhibit 2271 was marked for           09:47:25
4  identification and is attached to the transcript.)   09:47:25
5  Q   (BY MR. BERRY) Sir, I have handed you   09:47:51
6  what's been marked as Exhibit 2271, which is your   09:47:53
7  Opening Report, and Exhibit 2272, which is your Rely   09:47:56
8  Report.                                     09:48:00
9      (Exhibit 2272 was marked for           09:48:01
10 identification and is attached to the transcript.)   09:48:01
11 Q   (BY MR. BERRY) Do you have those?       09:48:02
12 A   I do.                                   09:48:03
13 Q   Would you look at Exhibit 2272, your Reply   09:48:03
14 Report, and show me how we can identify which are   09:48:06
15 the new documents you considered for your reply.   09:48:10
16 A   Well, I would have to also use          09:48:13
17 Exhibit 2271.                              09:48:15
18 Q   Absolutely.                            09:48:17
19 A   The both lists are in alphabetical order.   09:48:19
20 So again, you would have to go through and do a   09:48:59
21 document compare.                          09:49:03
22      And whenever a new document with that   09:49:04
23 letter is included in Exhibit 2272, that would be in   09:49:06
24 addition to a document that was on the list of   09:49:13
25 documents considered in Exhibit 2271.      09:49:15

Page 18

1  Q   But sitting here right now, sir, you can't   09:49:19
2  tell us what the new documents are that you   09:49:21
3  considered for your Reply Report?          09:49:24
4  A   Well, I mean, I could tell you a small   09:49:26
5  subset of them.  As an example, you know,   09:49:28
6  Mr. Malackowski's report and Mr. Bratic's report, I   09:49:30
7  know those are new.                        09:49:34
8  Q   Do you, sir, have a list of documents --   09:49:35
9  additional documents that you considered for your   09:49:37
10 your Reply Report?                         09:49:40
11 A   Nothing has been prepared for at least my   09:49:40
12 view, except for the document that's attached as   09:49:43
13 Tab 4 to Exhibit 2272.                     09:49:47
14 Q   And the only way to use your reports to   09:49:50
15 identify the new documents you considered for the   09:49:54
16 Reply Report is to go through 3,000 documents to try   09:49:56
17 to match them up?                          09:50:00
18 A   No.  There's another way.  And probably   09:50:02
19 the more important way to determine the new   09:50:04
20 documents I'm replying upon is, again, by looking at   09:50:08
21 documents that are in Tabs B -- or Lines B and C or   09:50:12
22 looking at the footnotes in the report that refer to   09:50:14
23 a volume tab reference with a "B" or a "C" in it.   09:50:17
24 Q   So all documents in Tabs B and C are new   09:50:22
25 documents that you considered for your Reply Report?   09:50:25

Page 19

1  A   I believe that's correct.  Because if --   09:50:27
2  if it was a document that already existed, I think   09:50:28
3  the reference in the footnote would be to one of the   09:50:31
4  original Volumes 2 through 9.              09:50:34
5  Q   And, sir, for your Reply Report we have   09:50:36
6  your list of documents considered.  But if we want   09:50:38
7  to find out which documents you actually relied   09:50:41
8  upon, those are the documents in Tabs B and C?   09:50:43
9  A   Yes.                                   09:50:46
10 Q   And -- and no other document?           09:50:47
11 A   Correct.                               09:50:48
12 Q   Sir, you signed your Opening Report on   09:50:59
13 August 24, 2017; is that right?            09:51:01
14 A   Yes.                                   09:51:04
15 Q   And Mr. Bratic served his report on      09:51:04
16 September 7, 2017?                         09:51:07
17 A   Yes.                                   09:51:08
18 Q   And then you served a Reply Report on   09:51:09
19 September 14, 2017, right?                  09:51:13
20 A   Yes.                                   09:51:15
21 Q   And in your Reply Report, sir, you say   09:51:15
22 that, None of the opinions expressed by Mr. Bratic   09:51:18
23 or Mr. Malackowski has caused me to change the   09:51:21
24 opinions and conclusions -- and conclusions that I   09:51:24
25 reached in my Opening Report.  And I continue to   09:51:26

Page 20

1  hold the opinions and conclusions expressed in my   09:51:30
2  Opening Report.                            09:51:33
3      And that was true, sir, when you submitted   09:51:34
4  your Reply Report, right?                  09:51:36
5  A   Yes.                                   09:51:39
6  Q   And does that remain true today?        09:51:40
7  A   Yes.                                   09:51:42
8  Q   Sir, the Stroz report has recently been   09:51:46
9  produced.  Have you seen a copy of that?   09:51:50
10 A   I don't believe so.                    09:51:52
11 Q   Do you know what the Stroz report is?   09:51:52
12 A   I don't believe so.  Oh -- oh, yeah.  I'm   09:51:54
13 sorry.  Yes, I do.                         09:51:56
14 Q   And --                                 09:51:57
15 A   I know what it is.  I have not seen it.   09:51:58
16 Q   Has your team seen it?                  09:52:00
17 A   To my knowledge, they have not.  They have   09:52:02
18 not communicated that to me, if they have.   09:52:05
19 Q   And that's not something that you need for   09:52:05
20 the opinions that you rendered in -- in your -- in   09:52:08
21 your report, right?                        09:52:09
22 A   Well, I --                             09:52:11
23      MR. EISEMAN:  Object as to the form.   09:52:12
24 A   -- I think in my first report I did      09:52:13
25 actually say that if -- if I had that information, I   09:52:15

Page 21

6 (Pages 18 - 21)

**Page 22**

1 would look at it, and it may or may not affect my 09:52:17
2 opinion.  I -- I don't know whether it would be. 09:52:22
3     Q   (BY MR. BERRY) Sir, have you asked for a 09:52:23
4 copy of the Stroz report? 09:52:25
5     A   No. 09:52:27
6     Q   And, sir, a couple of Excel files were 09:52:33
7 produced yesterday.  Did you receive a copy of them? 09:52:38
8     A   Could you restate your question? 09:52:41
9     Q   A couple of Excel files were produced 09:52:42
10 yesterday.  Have you received a copy of them? 09:52:45
11     A   Oh, from -- by -- produced by you?  No, I 09:52:47
12 have not seen them. 09:52:48
13     Q   Okay.  Has your team -- have you received 09:52:50
14 them? 09:52:52
15     A   Not to my knowledge. 09:52:53
16     Q   Has your team received them? 09:52:53
17     A   Not to my knowledge. 09:52:56
18     Q   Are you aware of -- about them? 09:52:57
19     A   No. 09:52:59
20     Q   Okay.  Sir, is it fair to say that as of 09:52:59
21 today, Waymo has not lost any profits due to any 09:53:14
22 misappropriation of these nine trade secrets? 09:53:17
23     A   Yes. 09:53:20
24     Q   And is it fair to say as of today that 09:53:20
25 Uber has not realized any profits due to the alleged 09:53:22

**Page 23**

1 misappropriation of these trade -- of these trade 09:53:27
2 secrets? 09:53:29
3     A   Yes. 09:53:29
4     Q   And, sir, you have full access to Waymo's 09:53:31
5 financial records; is that fair? 09:53:36
6     A   I think that's fair. 09:53:38
7     Q   You had access to its accounting records? 09:53:39
8     A   If I chose to look at them, yes. 09:53:42
9     Q   And you had access to their business 09:53:44
10 models? 09:53:46
11     A   Yes. 09:53:47
12     Q   And their forecasts? 09:53:47
13     A   Yes. 09:53:49
14     Q   And despite having full access to Waymo's 09:53:49
15 records, you don't have enough information to 09:53:52
16 quantify the expected future lost profits to Waymo, 09:53:55
17 correct? 09:53:59
18     A   That is correct. 09:54:01
19     Q   What are you missing? 09:54:02
20     A   Well, I -- I want to understand how 09:54:03
21 they're modeling the future and the -- the model, 09:54:05
22 which would be the equivalent of the Rubicon model 09:54:09
23 for your client. 09:54:12
24         But -- and I talked to a -- I want to say 09:54:14
25 her name is Jennifer Haroon, who was kind of head of 09:54:17

**Page 24**

1 that modeling effort. 09:54:23
2         But based on the way the model was 09:54:25
3 constructed, I didn't believe it would be a good 09:54:27
4 basis for me to adjust to understand what a -- a 09:54:30
5 one- to-two-year early entry by your client would do 09:54:33
6 to Waymo's projected financial performance. 09:54:38
7     Q   So, sir, you looked into doing a lost 09:54:43
8 profits model for -- on behalf of Waymo, but 09:54:46
9 concluded that it was not possible? 09:54:48
10     A   Well, with the information that I had, I 09:54:49
11 wasn't comfortable in doing it. 09:54:51
12     Q   I want to ask you some -- some general 09:54:55
13 questions about your opinions and conclusions in 09:54:58
14 this case.  Sir, when did you assume that Uber's 09:55:01
15 LiDAR unit would be ready for commercialization? 09:55:05
16     A   Well, who -- who -- can you -- whose -- 09:55:09
17 was it -- 09:55:13
18     Q   Uber's. 09:55:14
19     A   Uber's.  I -- I don't know when it would 09:55:15
20 be ready.  I think that based on the opinions I have 09:55:19
21 expressed, that -- they would be in 13 cities by 09:55:23
22 2022. 09:55:28
23     Q   Sir, do you know the assumption that you 09:55:29
24 made -- let me ask a different question. 09:55:33
25         According to your report and the work that 09:55:36

**Page 25**

1 you have done, when did you assume that Uber's LiDAR 09:55:38
2 unit would be ready for commercialization? 09:55:42
3     A   I don't have a date  I assumed that it 09:55:45
4 would be ready based on the base case projections 09:55:47
5 made by Uber  They didn't articulate that exact 09:55:54
6 fact in their -- the information that I saw, so I 09:55:57
7 can't tell you that exact date 09:55:59
8     Q   So you don't know? 09:56:00
9     A   I don't know 09:56:02
10     Q   So when did you assume that Uber's 09:56:03
11 software for its autonomous vehicles would be ready 09:56:05
12 to be commercialized? 09:56:09
13     A   Well, again, before commercialization, it 09:56:10
14 would have to be  But again, since I don't have the 09:56:13
15 date of the -- the actual first commercialization, I 09:56:15
16 don't know the answer to that question 09:56:19
17     Q   Sir, what about the -- the cameras for 09:56:21
18 Uber's autonomous vehicles?  When did you assume 09:56:24
19 they would be ready for commercialization? 09:56:26
20     A   It -- the same answer as for the software 09:56:28
21 That -- all of their hardware and software must be 09:56:31
22 operational and effective before they commercialize 09:56:34
23 the product 09:56:37
24     Q   So you don't have a date? 09:56:38
25     A   I don't have a date 09:56:40

7 (Pages 22 - 25)

**Page 26**

1   Q   When did you assume that Uber would first   09:56:41
2   launch an autonomous vehicle?   09:56:44
3   A   I -- I don't have that fact memorized.   09:56:46
4   And I don't believe, based on the information   09:56:48
5   that -- that I saw, I know the exact first city or   09:56:51
6   date that they were going to commercialize.   09:56:54
7   Q   Let me make it easier.  In what year did   09:56:59
8   you assume that Uber would first commercialize an   09:57:02
9   autonomous vehicle?   09:57:04
10   A   Well, I -- I assume that -- the only thing   09:57:08
11   I assumed, I should say, is that by 2022, there   09:57:09
12   would be 13 cities.   09:57:12
13      I don't know if they entered all those   09:57:14
14   13 cities in 2022 or there was a rollout before   09:57:17
15   that, say, starting in 2020 and -- and '21.  I don't   09:57:20
16   know that.   09:57:24
17   Q   Was that relevant to your analysis?   09:57:26
18   A   No.  Because I was basing my numbers on   09:57:27
19   what your client was forecasting as their base case.   09:57:29
20   Q   Did you ask anybody what their rollout   09:57:35
21   would be for launching the autonomous vehicles?   09:57:37
22   A   I don't remember asking anyone that   09:57:40
23   question.   09:57:42
24   Q   Did you re -- review any documents that   09:57:43
25   had a proposed launch schedule for Uber's autonomous   09:57:45

**Page 27**

1   vehicles?   09:57:47
2   A   You know, I think in some of the Rubicon   09:57:48
3   models that I have looked at, it's -- it's possible   09:57:50
4   that information is in there.  But that wasn't a   09:57:52
5   necessary input to me to do my work, so I didn't   09:57:54
6   focus on it.   09:57:58
7   Q   So the date on which Uber would be   09:58:00
8   launching autonomous vehicles is not a necessary   09:58:03
9   input for your model?   09:58:04
10   A   No.  Because your client for business   09:58:06
11   purposes modeled all of that for me.   09:58:07
12   Q   Sir, how many autonomous vehicles did you   09:58:15
13   assume that Uber would launch by the year 2017?   09:58:18
14   A   2017?  I don't know.  I -- I think that --   09:58:22
15   the only recollection I have, a number between 2017   09:58:28
16   and 2022, was that Uber was going to purchase around   09:58:33
17   15,000 vehicles in 2019.   09:58:36
18   Q   How many autonomous vehicles did you   09:58:40
19   assume that Uber would launch in 2018?   09:58:42
20   A   Again, I -- I don't know that.  It's --   09:58:45
21   it's the same number that your client was   09:58:47
22   forecasting in their base case.   09:58:49
23   Q   For Uber operating in 2018, did you assume   09:58:52
24   that Uber would have -- be operating an autonomous   09:58:57
25   vehicle?   09:59:01

**Page 28**

1   A   I -- again, I assume they would be, but I   09:59:02
2   don't know that.  And -- and I can be corrected if   09:59:04
3   you show me more detail of the plans that your   09:59:08
4   client had that I'm relying upon.   09:59:11
5   Q   And, sir, it was not relevant to your   09:59:14
6   opinions whether or not Uber was going to be   09:59:16
7   launching in 2018?   09:59:18
8   A   I think that's relevant to my conclusions,   09:59:20
9   yes.   09:59:21
10   Q   But you just don't know one way or the   09:59:22
11   other whether they actually plan to do so?   09:59:26
12   A   Right.  And it's not necessary.  Because   09:59:27
13   I'm not doing a -- a city-by-city vehicle usage, all   09:59:29
14   of those assumptions.   09:59:33
15      I'm using the assumptions that your client   09:59:35
16   used, not in connection with this litigation, for   09:59:37
17   for their both operational decisions and strategic   09:59:39
18   decisions to enter this market.   09:59:42
19      And it's not necessary for me to know that   09:59:44
20   that level of detail because it's your client's   09:59:46
21   estimates, their belief at the time that's relevant   09:59:50
22   to me.   09:59:54
23   Q   Sir, did you look to see whether the   09:59:55
24   information you have relied upon assumed that Uber   09:59:58
25   would be launching in 2019?   10:00:01

**Page 29**

1   A   Well, since they're going to be buying   10:00:05
2   15,000 cars, I -- I believe they would be launched.   10:00:07
3   But -- but I don't know that, and I don't know   10:00:10
4   where --   10:00:11
5   Q   And --   10:00:11
6   A   -- even though I have some recollection   10:00:11
7   that they're going to be starting in the Phoenix   10:00:13
8   area, but I -- I'm -- I'm not certain of that.   10:00:16
9   Q   And in the work that you did for your   10:00:18
10   opinions in this case, when you mentioned Uber   10:00:20
11   launching, are you assuming launching with or   10:00:24
12   without a safety driver?   10:00:25
13   A   Again, the assumption I have is whatever   10:00:29
14   your client was planning on doing.  I would assume   10:00:32
15   that they would initially launch with a safety   10:00:34
16   driver.   10:00:38
17   Q   At what point would they convert over to   10:00:39
18   no safety driver?   10:00:42
19   A   When they believed that they would have a   10:00:44
20   vehicle that was safe enough that a safety driver   10:00:46
21   was no longer needed.   10:00:49
22   Q   And what year would that be, sir?   10:00:50
23   A   Again, I don't -- I didn't memorize that   10:00:53
24   fact.  I don't know.   10:00:55
25   Q   And the presence of a safety driver in an   10:00:56

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 30**

1  autonomous vehicle is very important for the   10:00:58
2  financial projections of profits --   10:01:00
3        MR. EISEMAN:  Object --   10:01:04
4  Q   (BY MR. BERRY) -- for Uber, right?   10:01:04
5        MR. EISEMAN:  -- objection as to form   10:01:05
6  A   I -- I agree that's an important input,   10:01:06
7  because drivers is the most significant cost in   10:01:08
8  Uber's service   10:01:13
9  Q   (BY MR. BERRY) And, sir, you can't say   10:01:14
10  sitting here right now at what point you assumed   10:01:15
11  Uber would start not using safety drivers?   10:01:19
12  A   Well, again, the only thing -- again, the   10:01:22
13  assumption I made is that -- that all of the   10:01:24
14  assumptions that your client made are reasonable,   10:01:27
15  conservative, and was the best judgment of your   10:01:33
16  client at the time they made the projections   10:01:37
17        So you keep saying it's my assumption.   10:01:42
18  I'm just assuming that your client, who knows this   10:01:44
19  industry far better than I would -- and this would   10:01:47
20  be a very different conversation if I was making up   10:01:50
21  assumptions -- that -- that this is the best   10:01:54
22  evidence that I have   10:01:56
23  Q   Sir, how many trips did you assume that   10:01:57
24  Uber would make with an autonomous vehicle in 2017?   10:02:00
25  A   Again, it's the -- I assumed that the   10:02:03

**Page 31**

1  number that's in the model -- the Rubicon model is   10:02:06
2  the number that would have occurred.  That detail   10:02:08
3  hasn't been provided to me.   10:02:12
4  Q   Sir, did you assume there would be any   10:02:13
5  trips made in 2017 with an autonomous vehicle?   10:02:16
6  A   I -- I didn't make any such assumption.   10:02:19
7  But if you communicate to me and show me that your   10:02:21
8  client did have that in the base plan I'm using,   10:02:25
9  then the answer is yes.  If they're not, the answer   10:02:29
10  is no.   10:02:31
11  Q   And it -- that level of detail was not   10:02:32
12  relevant to what you did to arrive at your opinions   10:02:34
13  in this case; is that fair?   10:02:37
14  A   Yeah.  I would be wasting my client's   10:02:38
15  money if I went to that level of detail in the   10:02:41
16  model.   10:02:44
17  Q   Sir, who did you assume Uber's competitors   10:02:45
18  would be in 2018 with an autonomous vehicle?   10:02:47
19  A   Google.   10:02:52
20  Q   Who else?   10:02:52
21  A   I mean -- I think -- I think the only one   10:02:53
22  that would probably have operations at that time   10:02:55
23  would be Waymo, slash, Google.   10:02:57
24  Q   When did you assume that Waymo would   10:02:59
25  launch its autonomous vehicle?   10:03:01

**Page 32**

1  A   I -- I think it was either the end of this   10:03:04
2  year or the beginning of next year.   10:03:06
3  Q   Would that be with or without a safety   10:03:08
4  driver?   10:03:11
5  A   I think it's with a safety driver.   10:03:12
6  Q   At what point did you assume that Waymo is   10:03:14
7  going to get rid of a safety driver?   10:03:16
8  A   I didn't make any such assumption.   10:03:18
9  Q   Sir, do you know if it's legal or illegal   10:03:21
10  in Pittsburgh to carry passengers with an autonomous   10:03:23
11  vehicle without a safety driver?   10:03:27
12        MR. EISEMAN:  Objection as to form.   10:03:29
13  A   I -- I don't know.  But -- but based on   10:03:30
14  everything that I understand, it would -- my   10:03:32
15  expectation as of today, it would be illegal.   10:03:34
16  Q   (BY MR. BERRY) And, sir, do you know in   10:03:36
17  Singapore whether it would be legal or illegal to   10:03:38
18  carry passengers in an autonomous vehicle without a   10:03:42
19  safety driver?   10:03:45
20  A   I --   10:03:45
21        MR. EISEMAN:  Objection as to form.   10:03:46
22  A   -- I don't.   10:03:47
23  Q   (BY MR. BERRY) Did --   10:03:48
24  A   Not as of today.   10:03:48
25  Q   Did you look into that question?   10:03:49

**Page 33**

1  A   No.   10:03:51
2  Q   What did you assume Uber's cost per   10:03:53
3  autonomous vehicle would be when it launched?   10:03:57
4  A   I don't think I have that fact memorized.   10:04:02
5  I think I have -- I have seen some information on   10:04:04
6  that subject, but it's whatever the cost is that was   10:04:07
7  in this base plan.   10:04:10
8  Q   And whatever that cost was is not relevant   10:04:11
9  to the method that you took in this?   10:04:14
10  A   Well --   10:04:15
11  Q   -- case?   10:04:15
12  A   -- well, it's relevant to, but it's not   10:04:15
13  necessary that I understand it or critique it or   10:04:18
14  accept it.   10:04:22
15        Because I -- I judge, as an expert, that   10:04:22
16  your client, who has sophisticated financial people   10:04:25
17  who use teams of experts to vet and come up with the   10:04:27
18  assumptions in the model, were far more informed and   10:04:31
19  qualified to make those assumptions than me.   10:04:35
20  Q   And, sir, when you say "teams of experts,"   10:04:38
21  what teams of experts are you referring to?   10:04:40
22  A   It -- it's the people listed on the   10:04:41
23  project you -- you -- Rubicon documents.   10:04:43
24  Q   Who are those people?   10:04:46
25  A   I don't have those memorized.  If you show   10:04:47

9 (Pages 30 - 33)

1 me documents behind Volume 5, Tab 9, I can give you        10:04:49
2 a list        10:04:54
3      Q   How did you assume that the cost of Uber's        10:04:54
4 autonomous vehicle would change over time?        10:04:58
5      A   It would decrease significantly        10:04:59
6      Q   By how much?        10:05:01
7      A   Again, I don't have that fact memorized        10:05:02
8      Q   Sir, in what year did you assume that Uber        10:05:10
9 would first make a profit off its autonomous        10:05:13
10 vehicles?        10:05:16
11      A   Again, I -- I don't know that fact I        10:05:18
12 don't know I have seen that detail  I have only        10:05:20
13 seen net present value calculations, the results of        10:05:23
14 those        10:05:25
15          I -- I do know based on my experience        10:05:27
16 that -- that they're going to lose money for a        10:05:28
17 while, and then eventually they will make money        10:05:31
18      Q   Sir, at what point are they going to turn        10:05:37
19 it around and start making a profit?        10:05:37
20      A   Again, I don't recall seeing that level of        10:05:40
21 detail        10:05:40
22      Q   You just don't know?        10:05:42
23      A   I don't know        10:05:45
24      Q   Can you say whether they're going to make        10:05:46
25 a profit or expect to make a profit in 2018?        10:05:47

1      A   I -- I don't know that.  But based on        10:05:49
2 everything that I understand, it would be -- I would        10:05:51
3 be very surprised if they would.        10:05:52
4      Q   And, sir, have you arrived at any        10:05:54
5 conclusion on whether or not Uber is expected to        10:05:56
6 make a profit in 2019 --        10:05:58
7      A   No.        10:06:01
8      Q   -- on -- on its autonomous vehicle?        10:06:01
9      A   No.        10:06:02
10      Q   Sir, can you tell me what profits Uber is        10:06:06
11 expected to have from its autonomous vehicle program        10:06:12
12 in 2020?        10:06:15
13      A   No.  By -- year by year, I cannot tell        10:06:17
14 you.        10:06:20
15      Q   And, sir, that was not relevant to the        10:06:20
16 analysis you did?        10:06:22
17      A   No.  It's totally relevant to -- to what        10:06:23
18 I'm doing, as I have explained to you a number of        10:06:26
19 times.        10:06:28
20      Q   So, sir, we have been talking about        10:06:28
21 profits.  Let's talk about revenues.  When did you        10:06:30
22 assume that Uber would get its first dollar in        10:06:32
23 revenue from its autonomous vehicle program?        10:06:35
24      A   Again, it -- to be consistent with        10:06:37
25 previous answers, I don't know when they're        10:06:39

1 launching.  But as soon as they launch, I assume        10:06:41
2 they're going to charge for their service.        10:06:44
3          THE COURT REPORTER:  Wait.        10:06:45
4      Q   (BY MR. BERRY) And, sir, you just don't        10:06:45
5 know what year it's going to be?        10:06:46
6      A   Yeah.  Again, I would expect it's before        10:06:48
7 2019.  But exactly when, I don't know.        10:06:52
8      Q   And the level of expected revenues by year        10:06:54
9 for Uber's autonomous vehicle program was not        10:06:57
10 relevant to the type of analysis you did?        10:07:00
11      A   Well, no.  It's relevant.  But it's not        10:07:02
12 necessary for me to know and -- and understand that        10:07:04
13 level of detail.        10:07:06
14      Q   Sir, did you personally try to project        10:07:14
15 Uber's profits going into the future?        10:07:18
16      A   No.        10:07:20
17      Q   Did you, sir, try to project Uber's        10:07:21
18 revenues going into the future?        10:07:23
19      A   No.        10:07:25
20      Q   Sir, in which cities did you assume that        10:07:29
21 Uber would launch in 2018?        10:07:35
22      A   Again, I -- I have seen a schedule of        10:07:38
23 that, and I don't know the order and time of -- of        10:07:40
24 their entry to different geographic markets.  For        10:07:45
25 some reason I have a recollection that Phoenix was        10:07:48

1 one of the first.  I mean, I know that Singapore is        10:07:50
2 on that list, and that's why you asked the question.        10:07:55
3          And there were, you know, a dozen other        10:07:58
4 cities, but -- but I -- I -- I don't remember the        10:08:00
5 order and when they were going to start.        10:08:03
6      Q   In -- for that list of cities that Uber is        10:08:06
7 going to launch in, as of today, in how many cities        10:08:10
8 is it legal to transport people in an autonomous        10:08:15
9 vehicle without a safety driver?        10:08:19
10          MR. EISEMAN:  Objection as to form.        10:08:21
11      A   I -- I don't know the answer to the        10:08:22
12 question, but it would be my expectation that none.        10:08:24
13      Q   (BY MR. BERRY) For the work that you did        10:08:30
14 in this case, sir, did you assume that Uber, through        10:08:32
15 2021, is going to have limitations on the types of        10:08:36
16 roads that it can transport people -- transport        10:08:40
17 people on using its autonomous vehicle?        10:08:42
18      A   I -- I -- I think -- again, I haven't        10:08:45
19 studied this, but I believe that your client did        10:08:48
20 model that.  That -- depending on, you know, when        10:08:50
21 they had long-range LiDAR capable of driving at        10:08:55
22 greater speeds, until they had that, they would be        10:08:58
23 at launch -- on streets where they're less than        10:09:01
24 50 miles an hour.        10:09:05
25      Q   And, sir, did you look at that modeling?        10:09:05

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 38**

1    A   I mean, I looked at some -- I didn't look   10:09:08
2  at the modeling.  I looked at some of the   10:09:08
3  assumptions that they were making.   10:09:11
4    Q   And were those assumptions reasonable?   10:09:13
5    A   Again, based on my reviewing them, they --   10:09:14
6  they looked reasonable to me, but I'm not an expert   10:09:16
7  in this industry.   10:09:20
8    Q   Did you ask for Waymo to -- to retain an   10:09:21
9  expert in the industry?   10:09:23
10   A   No.   10:09:25
11   Q   You didn't think that one was needed?   10:09:26
12   A   Not for what I was doing.   10:09:29
13   Q   Sir, you were talking about possible speed   10:09:32
14 limitations on Uber's autonomous vehicle, right?   10:09:35
15   A   Yes.   10:09:38
16   Q   What about daytime versus nighttime?  Any   10:09:38
17 limitations there?   10:09:43
18   A   Yes.  It -- there's weather related, and   10:09:44
19 there's day and nighttime as well that I have seen.   10:09:46
20   Q   What's the weather-related limitations?   10:09:49
21   A   I -- I think -- well, it's precipitation.   10:09:50
22 And -- and I think that snow is a lot harder than   10:09:50
23 rain.   10:09:54
24   Q   And one of the cities that you assumed   10:09:56
25 Uber would launch in by 2022 is Chicago, right?   10:10:00

**Page 39**

1    A   I believe that's correct   10:10:04
2    Q   And how is the weather in Chicago in the   10:10:04
3  wintertime going to affect Uber's profits using   10:10:08
4  autonomous vehicles?   10:10:09
5    MR EISEMAN:  Objection as to form   10:10:12
6    A   Well, with global warming and my   10:10:13
7  conversations with people, the winters are   10:10:14
8  getting -- getting a lot milder  But no  It can be   10:10:16
9  brutally cold and snowy in Chicago in the winter   10:10:17
10   Q   You just know one --   10:10:22
11   THE COURT REPORTER:  Wait   10:10:25
12   A   You have got to slow down   10:10:25
13   THE COURT REPORTER:  Thank you   10:10:25
14   Q   (BY MR  BERRY) You just don't know one way   10:10:25
15 or the other, right?   10:10:27
16   A   I don't   10:10:29
17   Q   And did you -- let me ask a different   10:10:29
18 question   10:10:37
19   So you mentioned one potential competitor   10:10:43
20 to Uber is Waymo  What about others?  By 2022, did   10:10:45
21 you assume that other competitors would be in the   10:10:50
22 autonomous vehicle market?   10:10:53
23   A   I -- I didn't  I -- I'm not aware of   10:10:55
24 seeing documents that tell me who either my client   10:10:59
25 or your client thought would be there  I -- I   10:11:02

**Page 40**

1  would -- again, based on what I know, I would guess   10:11:05
2  the third might be Tesla   10:11:09
3    Q   That's just a guess?   10:11:12
4    A   Well, I know that they have autonomous   10:11:14
5  vehicle capabilities  I understand that they are   10:11:16
6  not to the Level 4, Level 5 capability  And they   10:11:19
7  don't even use LiDAR  But I do understand they have   10:11:25
8  some plans on possibly entering this business   10:11:28
9    Q   So, sir, LiDAR is not essential for an   10:11:32
10 autonomous vehicle?   10:11:34
11   MR  EISEMAN:  Objection as to form   10:11:35
12   A   I think it is to do Level 4 or 5, but not   10:11:36
13 Level 3  And -- and that's been told to me by   10:11:40
14 technical experts  That's not my professional   10:11:46
15 opinion   10:11:47
16   THE COURT REPORTER:  Told to me by?   10:11:47
17   A   By technical experts  That is not my   10:11:47
18 professional opinion   10:11:49
19   Q   (BY MR  BERRY) So for competitors, sir,   10:11:50
20 you have mentioned Waymo and Tesla  Did you assume   10:11:52
21 that any other competitor would join the autonomous   10:11:56
22 vehicle market by 2022?   10:11:58
23   A   No  Again, I know that Ford is expressing   10:12:00
24 some interest in this area, but I have no idea when   10:12 03
25 their planned entry is   10:12:07

**Page 41**

1    Q   The entry of competitors into the   10:12:09
2  autonomous vehicle market is relevant to forecasting   10:12:11
3  future profits for Uber, correct?   10:12:17
4    A   If they are going to enter the   10:12:19
5  transportation-as-a-service segment, yes.   10:12:22
6    Q   When did you assume that autonomous   10:12:26
7  vehicles would be available for consumers to   10:12:29
8  purchase?   10:12:32
9    A   I haven't made such an assumption, but I   10:12:33
10 -- I would like you to tell me that, because I'm   10:12:35
11 probably going to be one of the first buyers, as   10:12:37
12 Mr. Schuman knows.   10:12:40
13   Q   Did you assume that it would be before or   10:12:43
14 after 2022?   10:12:44
15   A   I think it'll be around then, but I don't   10:12:47
16 -- I haven't made any assumption one way or the   10:12:49
17 other.   10:12:52
18   Q   The -- when consumers can purchase an   10:12:53
19 autonomous vehicle, that would impact Uber's   10:12:58
20 profits, correct?   10:13:01
21   MR. EISEMAN:  Objection as to form.   10:13:02
22   A   I -- I think at the margin it would, but I   10:13:04
23 don't think it would be a significant impact.   10:13:08
24   Q   (BY MR. BERRY) And that's not something   10:13:10
25 you have looked at, right?   10:13:11

11 (Pages 38 - 41)

1    A   Pardon me?                     10:13:13
2    Q   That's not something that you looked at in   10:13:14
3 this case?                            10:13:15
4    A   No                            10:13:15
5    Q   What about accidents with autonomous   10:13:17
6 vehicles? How many accidents did you assume would   10:13:20
7 happen in 2018, that resulted in death?   10:13:23
8    A   I didn't make any such assumption. I   10:13:26
9 don't know                            10:13:28
10   Q   Is that --                     10:13:29
11   A   I understand they're going to re --   10:13:30
12 significantly reduce accidents overall. But how   10:13:31
13 many will be caused by the autonomous vehicle and   10:13:34
14 its logic, I don't know               10:13:39
15   Q   And accidents caused by autonomous   10:13:41
16 vehicles will have an impact on future regulatory   10:13:42
17 constraints, fair?                    10:13:47
18   A   I think that's --               10:13:48
19       MR EISEMAN: Objection as to form   10:13:49
20   A   -- depending on the number and severity, I   10:13:49
21 think that's possible                 10:13:52
22   Q   (BY MR BERRY) But that's not something   10:13:56
23 that you looked at in this case?       10:13:57
24   A   No  I -- I -- I haven't seen any   10:13:58
25 information on that subject that's produced in this   10:14:00
                                        Page 42

1 case.                                 10:14:02
2    Q   Sir, did you look at or make any   10:14:07
3 assumptions about how long each trade secret will   10:14:09
4 remain a trade secret?                10:14:12
5    A   I didn't make such an assumption. I mean,   10:14:14
6 I am relying upon either your client or the   10:14:16
7 technical expert retained by Waymo. I'm not making   10:14:19
8 that judgment call.                   10:14:24
9    Q   Let's take Trade Secret 9, for example.   10:14:25
10 How long did you assume for your analysis that would   10:14:27
11 remain a trade secret?  That's the FAC lens.   10:14:29
12   A   I know which one it is.          10:14:35
13   Q   Okay.                         10:14:37
14   A   I don't remember time. Is it .34 years?   10:14:37
15 I -- I don't remember -- we can look at one of my   10:14:39
16 tables, and I can tell you. I don't have that fact   10:14:42
17 memorized.                            10:14:45
18   Q   The time that you're referring to is the   10:14:45
19 time to indep -- independently develop a round,   10:14:46
20 right?                                10:14:49
21   A   Correct.                      10:14:50
22   Q   I'm asking you a different question. For   10:14:50
23 how long did you assume that would remain a trade   10:14:51
24 secret?                               10:14:54
25   A   Well, I assume it would remain a train --   10:14:54
                                        Page 43

1 trade secret until someone could independently   10:14:56
2 design around it I did make that assumption   10:14:58
3    Q   And, sir, do you know whether today   10:15:01
4 somebody had already independently developed around   10:15:01
5 these trade secrets?                  10:15:01
6    A   I don't --                    10:15:04
7        MR EISEMAN: Objection as to form   10:15:05
8    A   -- know -- I don't know that        10:15:05
9    Q   (BY MR BERRY) Is that something that   10:15:06
10 would be relevant to your opinions?    10:15:07
11   A   Yes                           10:15:09
12   Q   And why is it?                 10:15:09
13   A   Well, if it was either shorter or longer   10:15:11
14 than the numbers I have used, I would want to adjust   10:15:14
15 my damages accordingly                10:15:17
16   Q   And if it were shorter, you would have to   10:15:19
17 reduce your damages, right?            10:15:21
18   A   Well, it's an incomplete hypothetical  If   10:15:23
19 they reduced it and they still used as a basis the   10:15:26
20 trade secret, I don't think it has any relevance to   10:15:28
21 what I'm doing                        10:15:30
22       But if it really was someone who knew   10:15:31
23 nothing about the trade secrets and started from   10:15:33
24 scratch and -- and did design around it, that would   10:15:35
25 be very relevant to me                10:15:38
                                        Page 44

1    Q   Sir, your damages opinions in this case   10:15:52
2 assume that the court will not enter a permanent   10:15:55
3 injunction, correct?                  10:15:58
4    A   Yes.                          10:16:00
5    Q   And you didn't do any work to figure out   10:16:01
6 what would happen or what would happen to your   10:16:04
7 damages opinions if the court were to enter a   10:16:06
8 permanent injunction?                 10:16:10
9    A   That's accurate.               10:16:11
10   Q   And, sir, your damages opinions in this   10:16:12
11 case assume that Uber is using the nine trade   10:16:19
12 secrets, right?                       10:16:24
13   A   Well, they're either using it currently or   10:16:26
14 they are going to use between now and entry to the   10:16:29
15 marketplace.                          10:16:33
16   Q   And if Uber, in fact, does not use at any   10:16:33
17 time one or more of the nine trade secrets, that's   10:16:36
18 relevant to your damages opinion, right?   10:16:38
19   A   I do think that's relevant.       10:16:41
20   Q   And for example, if Uber doesn't use one   10:16:43
21 of the nine trade secrets and never did, there would   10:16:46
22 be no unjust enrichment from that, correct?   10:16:48
23   A   I agree with you.              10:16:52
24   Q   I'm going to move on to your first   10:16:57
25 opinion.  Do you need a break before we do that?   10:16:59
                                        Page 45

12 (Pages 42 - 45)

**Page 46**

1    A   Does the court reporter need a break?   10:17:05
2         THE COURT REPORTER:  Just slow down,   10:17:05
3    please.   10:17:05
4    A   No.  If we both slow down, I don't need a   10:17:05
5    break.   10:17:08
6    Q   (BY MR. BERRY) So let's talk, sir, about   10:17:08
7    you can accelerated development opinion.  My   10:17:10
8    understanding is that they are two variables.  One   10:17:13
9    is the value of any accelerated development and the   10:17:16
10   second is the length of acceleration; is that fair?   10:17:20
11   A   That is fair.   10:17:24
12   Q   For the first variable, the value of   10:17:26
13   accelerated development, sir, you obtained that   10:17:29
14   number from a presentation that Ms. Qi prepared?   10:17:31
15   A   Ms. Qi, yes.   10:17:35
16   Q   Qi?   10:17:36
17   A   I think it's pronounced Qi.   10:17:36
18   Q   And, sir, you did not independently   10:17:45
19   calculate the value of accelerated development to   10:17:47
20   Uber, right?   10:17:50
21   A   Correct.   10:17:51
22   Q   You relied on Ms. Qi?   10:17:51
23   A   I did.   10:17:54
24   Q   And for the length of acceleration, you   10:17:56
25   also relied on other people to give you that number?   10:17:59

**Page 47**

1    A   Correct.  I have no independent opinion on   10:18:03
2    any of those numbers.   10:18:05
3    Q   For Trade Secret 25 and 111, you relied on   10:18:07
4    Waymo's technical expert, Dr. Hesselink?   10:18:12
5    A   Hesselink, yes.   10:18:15
6    Q   And for all the other trade secrets, you   10:18:16
7    relied on those, right?   10:18:19
8    A   Interrogatory answer.   10:18:22
9    Q   So to arrive at your unjust accelerated   10:18:22
10   profits opinion, you take the value of acceleration   10:18:27
11   from Ms. Qi, multiply that by the length of   10:18:31
12   acceleration, and that's how you get your number --   10:18:35
13        MR. EISEMAN:  Objection as to form.   10:18:37
14   Q   (BY MR. BERRY) -- fair?   10:18:38
15   A   Basically, yes.   10:18:39
16   Q   Sir, how many hours did you personally   10:18:42
17   spend on your accelerated development opinion?   10:18:44
18   A   I -- I have no way to estimate that.  I   10:18:48
19   mean, I would say it was a couple of hours.   10:18:50
20        I mean, what I do in any case is I look   10:18:54
21   for the best yardsticks to determine what I have to   10:18:58
22   measure.  And then once I do that and that's been   10:19:02
23   assembled and presented to me, I make a judgment.   10:19:07
24   That doesn't take a lot of time.   10:19:09
25        But going through and considering the   10:19:12

**Page 48**

1    different alternatives may take a fair amount of   10:19:14
2    time.   10:19:17
3         But once -- once I understood what Ms. Qi   10:19:17
4    did and all the options or calculations that I could   10:19:21
5    rely upon, I then made a judgment as to which of   10:19:26
6    those to rely upon.  And I would say that was no   10:19:29
7    more than a couple hours.   10:19:33
8    Q   Sir, in your Opening Expert Report you   10:19:35
9    state with respect to unjust enrichment, it's the   10:19:38
10   Defendants' burden to prove any deductible expenses   10:19:41
11   and/or apportionment that you applicable?   10:19:44
12   A   Yeah, not giving you a legal opinion.  But   10:19:47
13   as -- as a damage expert, that's my experience in   10:19:49
14   other cases.   10:19:51
15   Q   So I -- my question to you, sir, is:  On   10:19:52
16   what do you base that?   10:19:55
17   A   On, I think, statue (sic) and case law.   10:19:57
18   Q   What statute?   10:20:02
19   A   I -- I don't remember.  Like I say, I'm   10:20:04
20   not giving you a legal expert -- a legal opinion.   10:20:04
21   Q   So I asked you about statutes, but what   10:20:12
22   case law do you base that on?   10:20:14
23   A   Again, I have seen cases that have held   10:20:17
24   that, but I can't -- I'm not cite -- I didn't cite   10:20:19
25   cases in my report.   10:20:22

**Page 49**

1    Q   Sir, you have seen a trade secret case   10:20:24
2    holding that it's the Defendants' burden to   10:20:26
3    apportion any damages?   10:20:27
4    A   No.  No.  I think that -- that once you   10:20:30
5    establish, like, revenues, then the cost portion is   10:20:33
6    what I'm talking about.   10:20:37
7         Or again, if there's only a piece of a   10:20:39
8    product that is practicing the trade secret, you   10:20:42
9    can't use the entire product -- or you may or may   10:20:45
10   not be able to use the entire product.  And if you   10:20:48
11   can't, then it's the Defendants' burden to figure   10:20:52
12   out that apportionment.  That's my experience.   10:20:54
13   Q   When you wrote this in your expert report   10:20:57
14   that it's the Defendants' burden for any -- to do   10:20:59
15   any apportionment, did you have something in --   10:21:02
16   particular in mind that you based that on?   10:21:04
17   A   No.  It's just my general experience.  And   10:21:07
18   unlike some of your re -- expert reports, who I   10:21:10
19   believe lawyers wrote some significant sections, I   10:21:13
20   wrote that section.  No lawyer wrote that.  That's   10:21:16
21   just my experience.   10:21:19
22   Q   And sitting here now, you can't point to   10:21:24
23   anything in the trade secret context that says?   10:21:27
24   A   No.  And -- and if I'm correct, I would   10:21:30
25   assume my lawyers have the burden on my side to cite   10:21:32

13 (Pages 46 - 49)

**Page 50**

1  the appropriate statute or case law to the judge      10:21:36
2  I'm not going to do it                                 10:21:40
3      Q   Sir, in your Opening Report you pointed        10:21:42
4  out that you did not have a copy of Uber's Rubicon     10:21:47
5  model that matches to the version that Ms Qi used,     10:21:48
6  right?                                                 10:21:54
7      A   That is correct                                10:21:55
8      Q   And you knew that when you wrote your          10:21:55
9  report that you didn't have it, right?                 10:21:57
10     A   I knew that, yes                                10:21:59
11     Q   And you didn't need the Rubicon model to       10:22:00
12 write your Opening Report, right?                      10:22:03
13     A   No   I -- again, I -- I -- if I wanted to      10:22:04
14 change assumptions and say Mike Wagner knows more      10:22:06
15 than Uber, I would need it                             10:22:10
16       I -- I didn't think even if I had the           10:22:13
17 model, that I would be making those judgments that I   10:22:15
18 know more than they know   But if I had it, I could    10:22:19
19 better understand the logic they use to come to        10:22:22
20 their numbers                                          10:22:25
21     Q   Let's put it this way:  You were               10:22:26
22 confident in the opinions in this case in your         10:22:29
23 Opening Report despite not having the Rubicon model?   10:22:31
24     A   I was                                          10:22:34
25     Q   And, sir, did you believe that you were       10:22:35

**Page 51**

1  acting reasonably when you arrived at the opinions     10:22:47
2  in this case, even though you didn't have the          10:22:50
3  Rubicon model?                                         10:22:53
4      A   Absolutely   It doesn't get better than        10:22:54
5  this   I mean, we would -- you would have had a        10:22:57
6  different Daubert motion if Mike Wagner came up with   10:22:59
7  a model and made a whole bunch of assumptions about    10:23:05
8  market entry and prices and competition               10:23:06
9        You would be all over me   No   I always        10:23:08
10 try to seek models from the parties that aren't        10:23:11
11 prepared in anticipation of the litigation   That's    10:23:17
12 the Rosetta Stone of my work   And I had it here       10:23:19
13 So no, I am absolutely comfortable with what I did     10:23:24
14     Q   Sir, who found the Qi document for you?        10:23:29
15     A   I -- I don't know   I can tell you Greg        10:23:32
16 Pinsonneault brought it to my attention   I don't      10:23:33
17 know if he found it or some other staff member found   10:23:35
18 it                                                     10:23:38
19     Q   And, sir, you had access in this case to      10:23:46
20 Uber's underlying financial and accounting             10:23:49
21 documents, right?                                      10:23:52
22     A   I just think to some extent I did   I         10:23:53
23 don't remember seeing a lot   Like, for example, I     10:23:55
24 don't remember seeing an Uber financial statement      10:23:57
25 produced in the case                                   10:24:01

**Page 52**

1      Q   And to the extent one was -- one was          10:24:01
2  produced, you sure didn't look at it, right?           10:24:03
3      A   Well, Mike Wagner didn't.  And if it's on      10:24:06
4  the "Documents Considered List," then my staff         10:24:08
5  didn't -- didn't bring it to my attention.             10:24:11
6      Q   But an Uber profit and loss statement is       10:24:13
7  just simply not relevant to the analysis that you      10:24:16
8  did in this case?                                       10:24:16
9      A   Well, yeah.  As we talked about earlier,       10:24:17
10 this business, your client isn't yet.  So that --      10:24:19
11 I don't think there would be a P&L.                     10:24:23
12      Now, they may have a P&L for the ATG              10:24:26
13 group, but that's just going to show expenses to       10:24:30
14 date.                                                   10:24:34
15     Q   Now, you did, in fact, rely on some            10:24:40
16 Rubicon PowerPoints produced by Uber in this case,     10:24:43
17 right?                                                  10:24:46
18     A   I did.                                          10:24:47
19     Q   Let me show you one that you -- or I           10:24:47
20 believe you relied upon.                                10:24:50
21      (Exhibit 2273 was marked for                       10:24:55
22 identification and is attached to the transcript.)      10:24:55
23     A   Thank you.                                      10:25:31
24     Q   (BY MR. BERRY) Sir, I have handed you          10:25:35
25 what's been marked as Exhibit 2273.  And it's a copy   10:25:36

**Page 53**

1  of a May 20, 2016 "Project Rubicon PowerPoint "        10:25:39
2      Do you see that?                                    10:25:45
3      A   I do                                            10:25:46
4      Q   And, sir, this is one of the documents          10:25:46
5  that you relied upon in your report, right?             10:25:47
6      A   It is   I think it's behind Tab 9 of          10:25:51
7  Volume 5 of my report                                   10:25:53
8      Q   So one of the ones that you not only           10:25:58
9  considered, but actually relied upon, right?            10:26:01
10     A   Yes                                             10:26:04
11     THE COURT REPORTER:  Wait   Slow down,             10:26:04
12 please   Repeat                                         10:26:04
13     Q   (BY MR. BERRY) So, sir, it's one that you      10:26:04
14 not only considered, but you actually relied upon?      10:26:04
15     A   Yes                                             10:26:04
16     Q   Would you please turn to page 2   It's the    10:26:07
17 "Executive Summary "  And it's the page ending in       10:26:11
18 551                                                     10:26:14
19     A   Yes                                             10:26:15
20     Q   And do you see at the top -- and -- it          10:26:17
21 says "Goal for Today's Meeting"?                         10:26:19
22     A   Yes                                             10:26:21
23     Q   It says, Reach consensus on appropriate         10:26:22
24 number of AVs to order in 2019 and previewed in         10:26:25
25 2020                                                     10:26:30

14 (Pages 50 - 53)

1    Do you see that?                10:26:32
2  A  I do.                         10:26:32
3  Q  Sir, is it your understanding that the   10:26:33
4  Rubicon model was designed to forecast the number of   10:26:35
5  vehicles purchased?              10:26:40
6  A  Yes.                         10:26:41
7  Q  And that was the purpose of it, right?   10:26:41
8  A  Well, it's -- it's -- it's -- one of the   10:26:43
9  major purpose -- purposes certainly is -- as   10:26:45
10 reflected in this Executive Summary, is they're   10:26:49
11 using that modeling to make this decision, which is   10:26:51
12 an operational decision.           10:26:54
13 Q  And, sir, in the top right of this page   10:26:56
14 there's a -- text and an orange box.  Do you see   10:26:59
15 that?                           10:27:02
16 A  Well, I see it, but I can't read it.   10:27:02
17 Q  Here.  It says, Note -- you really can't   10:27:05
18 read that, sir?                  10:27:08
19 A  I -- my eyes -- eyes are not good --   10:27:09
20 Q  Okay.                       10:27:10
21 A  -- but -- I mean, I -- I know what it   10:27:10
22 said -- I know what it says.  I can't read it here   10:27:13
23 though.                         10:27:15
24 Q  Sir, it says, Results are highly   10:27:16
25 speculative and depend on significant assumptions on   10:27:17
                                  Page 54

1  cost curves and pace of technology development.   10:27:20
2  Output of this analysis require commentary and   10:27:22
3  context.                        10:27:26
4    Do you see that?                10:27:26
5  A  I do.                        10:27:27
6  Q  And is that your opinion as well, sir,   10:27:27
7  that results are highly speculative and depend on   10:27:29
8  significant assumptions?           10:27:34
9  A  Well, I don't know if I would use the   10:27:35
10 word "speculative."  But I would say that the   10:27:36
11 results were -- are uncertain, because this deal is   10:27:38
12 a market that no one has entered yet.   10:27:41
13   And you know, I have done a number of   10:27:43
14 cases like this.  And in any of those, there's   10:27:46
15 uncertainties, and that has to be taken into   10:27:48
16 consideration.                   10:27:51
17 Q  So Uber considered its own project Rubicon   10:27:52
18 model to be highly speculative, correct?   10:27:55
19    MR. EISEMAN:  Objection as to form.   10:27:57
20 A  Well, no.  They think based -- based on   10:28:00
21 all of their work, that these are the best numbers   10:28:03
22 they can come up with.             10:28:07
23    They -- they have this qualifying   10:28:08
24 statement, you know, on this first page, which I   10:28:09
25 think is appropriate and fair.  But no, they're --   10:28:12
                                  Page 55

1  they make decisions in the hundreds of millions of   10:28:14
2  dollars based on their judgments with this   10:28:19
3  information.                     10:28:22
4  Q  (BY MR. BERRY)  Sir, you think that this   10:28:23
5  warning on the top right page is appropriate and   10:28:26
6  fair, right?                     10:28:28
7  A  I do.                        10:28:29
8  Q  Let's -- please turn to page ending in   10:28:30
9  561.  And, sir, do you see at the top it says   10:28:33
10 "Recommendation, Next Steps"?       10:28:43
11 A  Yes.                        10:28:44
12 Q  And then under "Next Steps," the third   10:28:45
13 bullet point says, Continually refresh analysis on a   10:28:47
14 quarterly basis.                 10:28:51
15    Do you see that?                10:28:52
16 A  I do.                        10:28:52
17 Q  And did you look at the refresh analysis   10:28:52
18 on a quarterly basis?             10:28:57
19 A  No.  Because you didn't produce them.  I   10:28:58
20 think I have looked at least two subsequent to   10:29:01
21 this.                           10:29:05
22    And the only thing that has happened is   10:29:05
23 that your client has become more aggressive in their   10:29:06
24 assumptions.  They're going to enter more cities   10:29:10
25 earlier than they were as of this time.   10:29:12
                                  Page 56

1  Q  What was the date of the last Rubicon   10:29:15
2  PowerPoint that you saw?           10:29:16
3  A  I'm saying it was in June, so it would be   10:29:19
4  the next quarter                 10:29:21
5  Q  Of 2016?                     10:29:23
6  A  Yes                          10:29:24
7    THE COURT REPORTER:  Wait        10:29:25
8  Q  (BY MR. BERRY) When did Uber stop using   10:29:25
9  its Rubicon model?                10:29:29
10 A  I -- I -- I don't know that  But I know   10:29:31
11 it was sometime between June of 2016 and today, but   10:29:32
12 I don't know that date            10:29:37
13 Q  Why did Uber stop using the project   10:29:37
14 Rubicon model?                   10:29:40
15 A  I have no information on that subject  I   10:29:41
16 don't know                       10:29:43
17 Q  Is that relevant to your analysis?   10:29:44
18 A  It -- it may or may not be  I -- I would   10:29:47
19 need facts to know               10:29:49
20 Q  If Uber stopped using the Rubicon model   10:29:49
21 because it was too speculative, is that relevant to   10:29:52
22 your analysis?                   10:29:56
23    MR EISEMAN:  Objection as to form   10:30:00
24 A  I don't think so               10:30:02
25 Q  (BY MR. BERRY) So if Uber internally   10:30:03
                                  Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 58

1 decided the Rubicon modeling was too speculative to    10:30:05
2 rely upon, that is not relevant to your analysis?    10:30:10
3    A  No.  Because I'm relying upon it when they    10:30:11
4 were using it to make -- as -- as an example right    10:30:14
5 here, they are recommending 15,000s AVs to be    10:30:17
6 purchased from their OEMs in 2019.  That is a major    10:30:21
7 business decision.  And this is the best information    10:30:27
8 they had at the time.    10:30:29
9        If they then subsequently decide to do    10:30:30
10 something else, it's not that relevant to me as of    10:30:32
11 this time.  Now, if I was going to be looking at    10:30:35
12 projections later, that might be relevant to me.    10:30:38
13    Q  So let me reask my question, because I'm    10:30:41
14 not sure you answered it.    10:30:43
15    A  Okay.    10:30:45
16    Q  My question, sir:  Is it relevant to your    10:30:45
17 analysis in -- is it relevant to your analysis in    10:30:47
18 this case if Uber stopped using the project Rubicon    10:30:49
19 modeling because it was too speculative?    10:30:54
20        MR. EISEMAN:  Objection as to form.    10:30:56
21    A  I think I answered that and maybe put too    10:30:57
22 much in my answer that you should have moved to    10:30:59
23 strike.  But no, that's not relevant to me.    10:31:02
24    Q  (BY MR. BERRY) Sir, you -- you reference    10:31:04
25 here at the top of the page ending in 561 that    10:31:05

Page 59

1 there's 15,000 total units projected to be purchased    10:31:10
2 for 2019, right?    10:31:13
3    A  Yes.    10:31:15
4    Q  And did Uber, in fact, make an order for    10:31:16
5 15,000 total units for 2019?    10:31:21
6    A  I -- I don't think they made any order.    10:31:23
7 This is only 2017.  I think it's too early to place    10:31:25
8 that order.  So no, I don't think they have done it    10:31:28
9 yet.    10:31:32
10        THE COURT REPORTER:  Wait.    10:31:32
11    Q  (BY MR. BERRY) In fact, Uber, as far as    10:31:32
12 you know, has never placed an order for any vehicles    10:31:34
13 for its autonomous program?    10:31:37
14    A  Well, I think that's an incorrect    10:31:39
15 statement, because I understand they have autonomous    10:31:41
16 vehicles that are operational.  So obviously, they    10:31:42
17 didn't make them from scratch.  They bought them    10:31:45
18 from somebody.    10:31:48
19    Q  How many autonomous vehicles does Uber    10:31:49
20 have?    10:31:50
21    A  I don't know that.    10:31:51
22    Q  Enough to commercialize?    10:31:52
23    A  No, I don't think so.    10:31:54
24    Q  Has Uber placed any orders for vehicles    10:31:55
25 that would allow it to commercialize?    10:31:59

Page 60

1    A  I don't know the answer to that question.    10:32:01
2    Q  Sir, would you please turn to the page    10:32:12
3 ending in 566?    10:32:15
4    A  Yes.    10:32:18
5    Q  And do you see at the top of the page that    10:32:19
6 this page is called "Launch Schedule"?    10:32:21
7    A  Yes.    10:32:25
8    Q  And the table has a bear case, a base    10:32:25
9 case, and a bull case?    10:32:30
10    A  Yes.    10:32:32
11    Q  And in this case, sir, you used the base    10:32:33
12 case; is that fair?    10:32:36
13    A  Correct.    10:32:38
14    Q  According to the launch schedule in this    10:32:40
15 Project Rubicon PowerPoint that you relied upon, it    10:32:43
16 assumed that Uber would launch in two cities in    10:32:47
17 2016, correct?    10:32:49
18    A  It does say it.  And I kept saying    10:32:51
19 Phoenix.  I should have said Tucson.  Yes.    10:32:54
20    Q  So the analysis that you relied upon, sir,    10:32:57
21 assumed that Uber would launch in two cities in    10:33:00
22 2016, correct?    10:33:02
23    A  Correct.    10:33:03
24    Q  Uber hasn't launched in any city in 2017,    10:33:04
25 has it?    10:33:07

Page 61

1    A  As far as I know, they have not.    10:33:09
2    Q  The assumption --    10:33:09
3        THE COURT REPORTER:  Wait.    10:33:09
4    Q  (BY MR. BERRY) -- that Uber would launch    10:33:09
5 in two cities in 2016 has now proven false?    10:33:12
6    A  Yes.    10:33:19
7    Q  Sir, do you see the base case for 2017    10:33:20
8 assumes that Uber would launch in four cities by    10:33:25
9 2017, correct?    10:33:30
10    A  Yes.    10:33:31
11        MR. EISEMAN:  Objection as to form.    10:33:31
12    Q  (BY MR. BERRY) And, sir, we are now in    10:33:34
13 2017, and Uber has not launched in any cities,    10:33:36
14 correct?    10:33:39
15    A  As far as I know, they have not.    10:33:40
16    Q  And so, sir, time has proven the    10:33:41
17 assumption for four cities to be launched in 2017 as    10:33:44
18 false?    10:33:48
19    A  Correct.    10:33:50
20    Q  And, sir, do you see that this launch    10:33:51
21 schedule for 2018 assumes that Uber will launch in    10:33:54
22 six cities in -- by 2018, correct?    10:33:59
23    A  Yes.  And -- and I actually should take a    10:34:03
24 little bit of fault with what you have said.  Maybe    10:34:05
25 you're saying it correctly.    10:34:09

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | But they're not launching in six cities in | 10:34:11 |
| 2 | 2018. They're launching in three additional cities | 10:34:12 |
| 3 | beyond what they have already launched in. | 10:34:16 |
| 4 | Q  Let me ask re-ask the question and make | 10:34:19 |
| 5 | sure it's clear. Sir, by the end of 2018, the | 10:34:21 |
| 6 | modeling that you relied upon assumed that Uber | 10:34:25 |
| 7 | would launch in six cities, correct? | 10:34:29 |
| 8 | A  Yes. | 10:34:33 |
| 9 | Q  And as far as you know, sir, does Uber | 10:34:34 |
| 10 | have any current plans to launch in any cities next | 10:34:36 |
| 11 | year? | |
| 12 | A  I have not seen what their plans are for | 10:34:40 |
| 13 | next year, so I don't know. | 10:34:43 |
| 14 | Q  If you look below, it has "Detailed Launch | 10:34:47 |
| 15 | Schedule." | 10:34:49 |
| 16 | Do you see that? | 10:34:50 |
| 17 | A  Yes. | 10:34:51 |
| 18 | Q  And it identifies the names of the cities | 10:34:53 |
| 19 | that they assume that Uber is going to launch in by | 10:34:55 |
| 20 | year, right? | 10:34:59 |
| 21 | A  It does. | 10:35:00 |
| 22 | Q  And for 2016 base case, sir, it identifies | 10:35:01 |
| 23 | Pittsburgh and Tucson, right? | 10:35:06 |
| 24 | A  It does. | 10:35:08 |
| 25 | Q  But even though we're now in 2017, Uber | 10:35:11 |

Page 62

| | | |
|---|---|---|
| 1 | has not launched in either city? | 10:35:14 |
| 2 | A  As far as I know, they have not. | 10:35:16 |
| 3 | Q  And for 2017, sir, in addition to | 10:35:17 |
| 4 | Pittsburgh and Tucson, it also identifies "Singapore | 10:35:22 |
| 5 | and Dallas." | 10:35:24 |
| 6 | Do you see that? | 10:35:26 |
| 7 | A  Yes. | 10:35:26 |
| 8 | Q  And Uber has not launched in Singapore or | 10:35:26 |
| 9 | Dallas, has it? | 10:35:30 |
| 10 | A  As far as I know, they have not. | 10:35:31 |
| 11 | Q  When will Uber launch in Singapore? | 10:35:33 |
| 12 | A  I don't know what their current plans are. | 10:35:36 |
| 13 | It's not been produced in the case. | 10:35:38 |
| 14 | Q  Sir, the fact that the assumptions -- let | 10:35:51 |
| 15 | me back up and ask a different question. | 10:35:55 |
| 16 | This launch schedule from this Project | 10:35:57 |
| 17 | Rubicon PowerPoint is some of the information that | 10:36:00 |
| 18 | Ms. Qi relied upon in coming up with the value of | 10:36:03 |
| 19 | accelerated development, correct? | 10:36:08 |
| 20 | A  It is. I don't think she relied on this | 10:36:10 |
| 21 | document, but a similar document, yes. | 10:36:12 |
| 22 | Q  The fact that we are now sitting in 2017 | 10:36:14 |
| 23 | and some of these assumptions we know are false, how | 10:36:18 |
| 24 | did that impact your analysis? | 10:36:21 |
| 25 | A  It doesn't impact it at all. | 10:36:23 |

Page 63

| | | |
|---|---|---|
| 1 | Q  And why is that, sir? | 10:36:27 |
| 2 | A  Because I had calculated what I would | 10:36:28 |
| 3 | define as an expectancy measure of damages, what was | 10:36:29 |
| 4 | in your client's mind at the time they allegedly | 10:36:33 |
| 5 | took the trade secrets  And so what happens after | 10:36:36 |
| 6 | that is -- is not that relevant to me | 10:36:39 |
| 7 | Q  Okay  So you -- I want to make sure I get | 10:36:42 |
| 8 | this right  You were looking at what was in Uber's | 10:36:44 |
| 9 | mind in January of 2016, correct? | 10:36:47 |
| 10 | A  Correct | 10:36:49 |
| 11 | Q  And you have ignored intervening events, | 10:36:50 |
| 12 | to the extent there are any, between January of 2016 | 10:36:53 |
| 13 | and today? | 10:36:56 |
| 14 | MR. EISEMAN:  Objection as -- | 10:36:57 |
| 15 | A  I -- | 10:36:57 |
| 16 | MR. EISEMAN:  -- to form | 10:36:57 |
| 17 | A  -- I wouldn't say I have ignored them, | 10:36:58 |
| 18 | but -- but they are not -- they're not important to | 10:37:00 |
| 19 | change my opinion | 10:37:03 |
| 20 | Q  (BY MR. BERRY) And, sir, to the extent | 10:37:04 |
| 21 | that some of the assumptions underlying Ms. Qi's | 10:37:06 |
| 22 | analysis have proven false, that does not impact | 10:37:09 |
| 23 | your analysis? | 10:37:14 |
| 24 | MR. EISEMAN:  Objection as to form | 10:37:15 |
| 25 | A  No, it does not | 10:37:17 |

Page 64

| | | |
|---|---|---|
| 1 | Q  (BY MR. BERRY) Sir, if you were to conduct | 10:37:18 |
| 2 | an analysis today of expected profits through 2022 | 10:37:25 |
| 3 | for Uber, they would be significantly lower than | 10:37:34 |
| 4 | what Ms. Qi projected in 2016, correct? | 10:37:37 |
| 5 | MR. EISEMAN:  Objection as to form. | 10:37:40 |
| 6 | A  Not necessarily. It's an incomplete | 10:37:42 |
| 7 | hypothetical. Clearly they're entering later. But | 10:37:44 |
| 8 | they could accelerate their -- their launches of | 10:37:47 |
| 9 | cities in the future and either catch up or maybe | 10:37:50 |
| 10 | even exceed if, again, they launch more than the | 10:37:53 |
| 11 | cities that were in the base case during the time | 10:37:56 |
| 12 | horizon of the projection. | 10:37:59 |
| 13 | Q  (BY MR. BERRY) And -- | 10:38:01 |
| 14 | A  So you have given me not enough | 10:38:01 |
| 15 | information to answer the question. | 10:38:03 |
| 16 | Q  Is that -- let me back up and ask you:  Is | 10:38:04 |
| 17 | that something that you looked at in this case? Did | 10:38:05 |
| 18 | you look at Uber's current plans and current | 10:38:08 |
| 19 | forecasts and modeling in an attempt to try to | 10:38:11 |
| 20 | project revenues through 2022? | 10:38:13 |
| 21 | A  No. Because I -- I asked if that | 10:38:16 |
| 22 | information was available, and I was told it was not | 10:38:18 |
| 23 | produced. So if you want to produce it and have me | 10:38:21 |
| 24 | consider it, I'm happy to do so. But it's not | 10:38:23 |
| 25 | available for me to consider. | 10:38:27 |

Page 65

17 (Pages 62 - 65)

**Page 66**

| | | |
|---|---|---|
| 1 | Q   And what information was not available? | 10:38:28 |
| 2 | A   Their -- their current projections and | 10:38:30 |
| 3 | forecasts for both launching and profits going into | 10:38:32 |
| 4 | the future. | |
| 5 | THE COURT REPORTER:  I just need you to | 10:38:42 |
| 6 | both slow down, please. | 10:38:43 |
| 7 | Q   (BY MR. BERRY) But, sir, Uber's current | 10:38:46 |
| 8 | projection and forecasts was not necessary for you | 10:38:48 |
| 9 | to have for the opinions that you reached in this | 10:38:52 |
| 10 | case? | 10:38:53 |
| 11 | A   It -- based on my statement to you earlier | 10:38:54 |
| 12 | that -- what I think I have done as an expectancy | 10:38:57 |
| 13 | measure of damages, it's not relevant. | 10:39:00 |
| 14 | Q   Sir, what's the Book of Wisdom? | 10:39:07 |
| 15 | A   Well, it's a U.S. Supreme Court decision | 10:39:10 |
| 16 | in Sinclair versus Jenkins Refinery, I think, back | 10:39:14 |
| 17 | in 1933 or something by Justice Cardozo where the | 10:39:19 |
| 18 | case law in the patent area makes what I | 10:39:26 |
| 19 | professionally think is a bad decision; that the | 10:39:28 |
| 20 | hypothetical negotiation occurs at or before the | 10:39:31 |
| 21 | date of first infringement. | 10:39:34 |
| 22 | But the patent statute says that you are | 10:39:37 |
| 23 | to compensate the patent owner for use of the | 10:39:39 |
| 24 | invention.  By definition, there is no use of the | 10:39:43 |
| 25 | invention before infringement occurs, so you have to | 10:39:48 |

**Page 67**

| | | |
|---|---|---|
| 1 | look at facts that don't exist until after the date | 10:39:50 |
| 2 | of the hypothetical negotiation to inform your | 10:39:54 |
| 3 | opinion as to what should be paid. | 10:39:57 |
| 4 | Q   So you essentially look at events that | 10:39:59 |
| 5 | happened after the hypothetical negotiation to | 10:40:02 |
| 6 | inform what the parties have agreed upon for the | 10:40:05 |
| 7 | reasonable royalty? | 10:40:10 |
| 8 | A   Right.  Because that is an outcome | 10:40:11 |
| 9 | approach to calculating damages, what has actually | 10:40:13 |
| 10 | happened. | 10:40:17 |
| 11 | Q   And we're going to get it -- into it in | 10:40:17 |
| 12 | more detail later, sir, but your reasonable royalty | 10:40:19 |
| 13 | analysis relies upon your accelerated development | 10:40:23 |
| 14 | model, correct? | 10:40:25 |
| 15 | A   It does. | 10:40:26 |
| 16 | Q   And did you follow the Book of Wisdom and | 10:40:27 |
| 17 | look at current events to help shape what the | 10:40:30 |
| 18 | reasonable royalty should be in this case? | 10:40:32 |
| 19 | A   I -- I -- I didn't memorize that fact. | 10:40:36 |
| 20 | But if there were facts that were relevant and I | 10:40:37 |
| 21 | have said in my report that occurred after the | 10:40:40 |
| 22 | hypothetical negotiation, the answer is yes.  I | 10:40:44 |
| 23 | think the answer is yes. | 10:40:46 |
| 24 | Q   So the facts that we have just been | 10:40:47 |
| 25 | looking at here, the fact that you accelerated | 10:40:49 |

**Page 68**

| | | |
|---|---|---|
| 1 | development work assumes that Uber is going to | 10:40:53 |
| 2 | launch in 2016, the fact that's not happened is | 10:40:56 |
| 3 | something under the Book of Wisdom that you would | 10:41:00 |
| 4 | look at, correct? | 10:41:03 |
| 5 | MR EISEMAN:  Objection as to form | 10:41:04 |
| 6 | A   Yes | 10:41 05 |
| 7 | Q   (BY MR. BERRY) How did that impact your | 10:41:05 |
| 8 | reasonable royalty analysis, the fact that the | 10:41:07 |
| 9 | numbers you used assumed that Uber would launch in | 10:41:10 |
| 10 | 2016 and 2017, and that hasn't happened? | 10:41:13 |
| 11 | MR EISEMAN:  Objection as to form | 10:41:17 |
| 12 | A   I -- I have no information to adjust for | 10:41:17 |
| 13 | that, so it has not impacted my opinion | 10:41:20 |
| 14 | Q   (BY MR. BERRY) So, sir, it's something | 10:41:23 |
| 15 | that you agree you should look at, but you have not | 10:41:25 |
| 16 | made any adjustments for that? | 10:41:28 |
| 17 | MR EISEMAN:  Objection as to form | 10:41:29 |
| 18 | A   I think that's fair | 10:41:31 |
| 19 | MR EISEMAN:  Mr Berry, when we have a | 10:41:39 |
| 20 | chance to take a break, it might be good for the | 10:41:41 |
| 21 | court reporter | 10:41:44 |
| 22 | MR BERRY:  Okay  Absolutely  Let's take | 10:41:44 |
| 23 | a break | 10:41:46 |
| 24 | MR EISEMAN:  All right  It is 10:41 a m | 10:41:46 |
| 25 | We are going off the record | 10:41:49 |

**Page 69**

| | | |
|---|---|---|
| 1 | (A break was taken from 10:41 a m  to | 10:41:50 |
| 2 | 10:57 a m ) | 10:41:53 |
| 3 | THE VIDEOGRAPHER:  We are back on the | 10:57:50 |
| 4 | record  It's 10:57 a m | 10:57:50 |
| 5 | Q   (BY MR. BERRY) Sir, I want to continue now | 10:57:52 |
| 6 | and talk about -- more about the value of | 10:57:54 |
| 7 | accelerated development and the Ms Qi slide  As -- | 10:57:57 |
| 8 | as far as you know as of today, no company in the | 10:58:03 |
| 9 | world has earned a profit from using autonomous | 10:58:06 |
| 10 | vehicles to transport passengers, right? | 10:58:10 |
| 11 | A   Correct | 10:58:14 |
| 12 | Q   In fact, no company in the world, as far | 10:58:15 |
| 13 | as you're aware today, has ever made a dollar of | 10:58:16 |
| 14 | revenue transporting passengers in an autonomous | 10:58:18 |
| 15 | vehicle? | 10:58:22 |
| 16 | A   Correct | 10:58:22 |
| 17 | Q   Did you make any adjustments to the Ms Qi | 10:58:28 |
| 18 | numbers before relying on them? | 10:58:31 |
| 19 | A   No | 10:58:33 |
| 20 | Q   Let me show you a copy of that | 10:58:34 |
| 21 | presentation  Sir, I have handed you what has been | 10:58:35 |
| 22 | marked as Exhibit 299 | 10:58:48 |
| 23 | Do you recognize this as a copy of the | 10:58:53 |
| 24 | Ms Qi presentation that you relied upon? | 10:58:55 |
| 25 | A   Yes  It's behind Tab 7 of Volume 5 of my | 10:58:57 |

18 (Pages 66 - 69)

1 report.                                    10:59:00
2    Q   And this is a -- a four-slide       10:59:04
3 presentation -- PowerPoint presentation, right?   10:59:07
4    A   It was, as produced to us.          10:59:10
5    Q   And you read Ms. Qi's depo -- deposition   10:59:16
6 testimony in this case, right?             10:59:19
7    A   You have assumed a fact in evidence, yes.   10:59:20
8    Q   And she testified that this slide -- and   10:59:22
9 looking at Slide No. 4 -- let me back up.   10:59:27
10       Slide No. 4 is the one that you rely upon   10:59:32
11 for the value of accelerated development, right?   10:59:36
12   A   I do.                               10:59:39
13   Q   And did you see Ms. Qi's testimony saying   10:59:40
14 that Uber never relied upon this slide?    10:59:42
15   A   I --                                10:59:45
16       MR. EISEMAN:  Objection as to form.   10:59:45
17   A   -- yeah, I'm not sure if that's what she   10:59:46
18 said, but I do -- I did read her testimony on this   10:59:48
19 subject.                                   10:59:51
20   Q   (BY MR. BERRY) And did you read Ms. Qi's   10:59:51
21 testimony saying that this slide was never used by   10:59:52
22 Uber?                                      10:59:56
23       MR. EISEMAN:  Objection as to form.   10:59:56
24   A   I -- I at least read something that   11:00:00
25 sounded like that.                         11:00:02
                                            Page 70

1    Q   (BY MR. BERRY) And the fact that -- if   11:00:04
2 true, the fact that Uber never used this slide, how   11:00:05
3 does that impact your analysis?            11:00:10
4        MR. EISEMAN:  Objection as to form.   11:00:12
5    A   Well, it doesn't, because I don't know how   11:00:13
6 they would use it.  The -- the -- people were just   11:00:14
7 being asked -- you know, she was just asked, you   11:00:19
8 know:  What is the effect of a one- to two-year   11:00:20
9 acceleration in our development schedule?   11:00:22
10       Financially what impact that would be on   11:00:27
11 us.  I don't know what use you would make of that   11:00:29
12 after that information was communicated to the   11:00:31
13 executives at Uber --                      11:00:34
14   Q   (BY MR. BERRY) So --                 11:00:35
15   A   -- so that doesn't surprise me that it   11:00:35
16 wasn't used.                               11:00:38
17   Q   How long had Ms. Qi been at Uber when she   11:00:39
18 prepared this slide?                       11:00:42
19   A   I -- I don't have her employment history   11:00:43
20 to know that.                              11:00:45
21   Q   Is it relevant to the analysis you did?   11:00:46
22   A   I think there's some relevance.  But   11:00:50
23 again, you -- you say she did the analysis.  This   11:00:52
24 was done with a team of people.            11:00:55
25       She presented it.  She was in charge of   11:00:57
                                            Page 71

1 the analysis.  It's just not her going on her   11:00:59
2 computer at night by herself making some guesses.   11:01:01
3 This was done by the people that do the Project   11:01:04
4 Rubicon modeling.                          11:01:07
5    Q   This slide was?                     11:01:08
6    A   I don't know if this -- no.  I -- I don't   11:01:10
7 know who made the slide.  But that the analysis that   11:01:10
8 arrived at these numbers was done by a team of   11:01:14
9 people --                                  11:01:17
10   Q   What --                            11:01:18
11   A   -- is my understanding.              11:01:18
12   Q   -- and what do you base that on?      11:01:20
13   A   I think her testimony.              11:01:21
14   Q   And you said that the length of time that   11:01:22
15 Ms. Qi had been at Uber could be relevant to your   11:01:24
16 analysis.  How?                            11:01:29
17   A   Well, again, the more knowledgeable you   11:01:29
18 are about this industry, the -- everything else   11:01:31
19 being equal, the better you are -- would be able to   11:01:35
20 predict white -- what might happen to the industry.   11:01:38
21   Q   And, sir, what level of knowledge did   11:01:42
22 Ms. Qi have about the autonomous vehicle industry?   11:01:44
23       MR. EISEMAN:  Objection as to form.   11:01:47
24   A   I -- I -- I read her deposition.  I don't   11:01:49
25 think that question was asked, so I don't have any   11:01:51
                                            Page 72

1 information on that subject.                11:01:53
2    Q   (BY MR. BERRY) You just don't know?   11:01:54
3    A   I don't know.                       11:01:56
4    Q   And in this slide that we're looking at on   11:01:57
5 Exhibit 299, Ms. Qi does not provide the formula   11:02:06
6 that she used to calculate the value of accelerated   11:02:09
7 development, right?                         11:02:13
8    A   She does not.                       11:02:14
9    Q   And for the opinions you offered in this   11:02:16
10 case, sir, you are still comfortable relying on   11:02:17
11 Slide 4, despite not knowing the formula, right?   11:02:22
12   A   Yes.                               11:02:25
13   Q   And, sir, you were still comfortable   11:02:25
14 relying on Slide 4, even though you could not test   11:02:28
15 the formula, right?                        11:02:30
16   A   Yes.                               11:02:31
17   Q   If Ms. Qi testified in her deposition that   11:02:39
18 this slide was never used by Uber, you have no   11:02:41
19 reason to dispute that, right?             11:02:45
20       MR. EISEMAN:  Objection as to form.   11:02:46
21   A   I -- I do not.  I would expect that she   11:02:47
22 was telling the truth at her deposition, at least   11:02:49
23 based on her state of mind.                11:02:52
24   Q   (BY MR. BERRY) Was this slide concerning   11:02:55
25 the value of -- of any accelerated development   11:02:58
                                            Page 73

19 (Pages 70 - 73)

**Page 74**

1  presented to the Uber board at any time?    11:03:02
2    A   I -- I -- I have no information one way or   11:03:05
3  the other.  I don't believe it was.  It may or may   11:03:07
4  not have been, but I don't assume that it was.   11:03:10
5    Q   We can look at Exhibit 299 and Slide 4 and   11:03:19
6  see what some of the assumptions, right?   11:03:22
7    A   Yes, we can.   11:03:25
8    Q   And one of the assumptions that we know is   11:03:25
9  that Ms. Qi used a 15 percent discount rate for the   11:03:27
10  present value calculations, right?   11:03:30
11    A   We do.   11:03:35
12    Q   Sir, you did not evaluate the   11:03:35
13  reasonableness of using a 15 percent discount rate   11:03:37
14  before arriving at your opinions in this case?   11:03:41
15      MR. EISEMAN:  Objection as to form.   11:03:43
16    A   I don't know what you mean by "evaluate."   11:03:43
17  I saw this.  And based on my understanding of Uber   11:03:45
18  being the leader in the transportation-as-a-service   11:03:49
19  business, that that number seemed appropriate to me   11:03:52
20  based on my understanding of their risk compared to   11:03:57
21  others that were entering the market.   11:04:01
22    Q   (BY MR. BERRY) Sir, your Opening Report   11:04:02
23  does not discuss the reasonableness of using a   11:04:05
24  15 percent discount rate, correct?   11:04:07
25    A   That is correct.   11:04:10

**Page 75**

1    Q   Sir, when selecting a discount rate to   11:04:14
2  use, you should look at the riskiness of the   11:04:17
3  proposed project, right?   11:04:20
4    A   I agree --   11:04:21
5      MR. EISEMAN:  Objection as to form.   11:04:22
6    A   -- I agree with that.   11:04:22
7    Q   (BY MR. BERRY) The riskier it is, the   11:04:24
8  higher the discount rate?   11:04:26
9    A   Everything else being equal, yes.   11:04:28
10    Q   You can see here on Ms. Qi's slide that   11:04:36
11  for the baseline city coverage -- and that's the one   11:04:38
12  you used, right, sir?  You -- you used the baseline?   11:04:41
13    A   I did.   11:04:44
14    Q   And for the baseline, it assumed 13 cities   11:04:45
15  by 2022, right?   11:04:49
16    A   It did.   11:04:51
17    Q   And, sir, you did not identify those 13   11:04:51
18  cities in your Opening Report, right?   11:04:55
19    A   I did not.   11:04:57
20    Q   And you did not test the reasonableness of   11:04:57
21  assuming that Uber is going to launch in 13 cities   11:04:59
22  by 2022, correct?   11:05:02
23    A   No.  And I have no ability to do that.   11:05:05
24    Q   And, sir, you don't -- you didn't look to   11:05:07
25  see whether it's even legal to have autonomous   11:05:09

**Page 76**

1  vehicles with no safety driver in these 13 cities?   11:05:11
2      MR EISEMAN:  Objection as to form   11:05:15
3    A   Well, the question -- right question for   11:05:16
4  me to the consider and you to ask is:  Is it legal   11:05:17
5  in 2022?   11:05:21
6      None of us knows  That is some   11:05:23
7  uncertainty   11:05:24
8    Q   (BY MR BERRY) You just don't know one way   11:05:24
9  or the other, right?   11:05:27
10    A   I -- I don't know  No one can answer that   11:05:28
11  question right now  Now, based on, again,   11:05:30
12  subsequent, it appears it's more likely that that   11:05:33
13  will occur than when this projection was done, which   11:05:36
14  would mean that risk is lower and this rate should   11:05:40
15  be lower than 15 percent  But I haven't made any   11:05:43
16  such adjustment   11:05:46
17      MR BERRY:  Move to strike as   11:05:48
18  nonresponsive   11:05:48
19    Q   (BY MR BERRY) Did you do any work at all,   11:05:51
20  sir, to look at the regulatory environment of   11:05:52
21  launching an autonomous vehicle before arriving at   11:05:58
22  your opinions in this case?   11:06:00
23    A   I have looked at some facts that are   11:06:05
24  relevant to that, yes   11:06:09
25    Q   And did you discuss any analysis in your   11:06:11

**Page 77**

1  Opening Report concerning the regulatory environment   11:06:13
2  and whether it's legal or illegal to launch an   11:06:16
3  autonomous vehicle program in certain cities?   11:06:19
4    A   No   11:06:22
5    Q   Another assumption underlying this model   11:06:33
6  and the fact that by 2022, that they're going to   11:06:40
7  have launched in 13 cities, is the timing of those   11:06:43
8  launches, right?   11:06:47
9    A   That would be relevant, yes   11:06:48
10    Q   And that's not something that you   11:06:51
11  considered the reasonableness of, right?   11:06:52
12    A   No  I, again, assumed that Ms  Qi and her   11:06:54
13  staff, who were conversant with the Rubicon modeling   11:06:58
14  and the assumptions used, were properly using that   11:07:04
15  information   11:07:07
16    Q   But you just don't know one way or the   11:07:12
17  other?   11:07:14
18    A   I -- I don't know, no  That -- none of   11:07:15
19  that information has -- has been produced to me   11:07:17
20    Q   And even though that information that you   11:07:19
21  didn't have, you were still comfortable arriving at   11:07:23
22  the opinions that you made in this case, right?   11:07:25
23    A   I did  And I'm very comfortable with   11:07:27
24  doing that   11:07:29
25    Q   Another factor that goes into this present   11:07:36

20 (Pages 74 - 77)

1 value calculation on Slide 4 is the pricing of      11:07:40
2 future trips, right?      11:07:43
3      A    I would agree with that.      11:07:44
4      Q    And did you look and test the assumptions      11:07:45
5 underlying -- underlying the pricing of these trips?      11:07:49
6      A    Well, to answer your compound question,      11:07:54
7 yes and no.      11:07:56
8      Q    And what did you do to test?      11:07:57
9      A    Then you didn't listen to my answer -- or      11:07:59
10 your question -- your second question, Did you look      11:08:01
11 at or test?      11:08:03
12           I didn't test.  I -- I was aware and I      11:08:04
13 think I have seen in some Rubicon documents,      11:08:06
14 information about pricing.  But I -- I didn't test      11:08:08
15 those assumptions.  I assumed that your client knew      11:08:12
16 what they believed was the prices they would charge.      11:08:16
17      Q    So, sir, in some of the Rubicon      11:08:19
18 presentations that you saw, it disclosed future      11:08:21
19 pricing --      11:08:25
20      A    Yes --      11:08:26
21      Q    -- correct?      11:08:26
22      A    -- that's my recollection.      11:08:27
23      Q    But you didn't test those assumptions?      11:08:29
24      A    That is correct.      11:08:32
25      Q    And, sir, for your unjust enrichment      11:08:32

Page 78

1 opinion, it's your opinion that you should not look      11:08:57
2 at events postdating the creation of this slide; is      11:08:59
3 that fair?      11:09:03
4           MR. EISEMAN:  Objection as to form      11:09:03
5      A    I think that's fair for the -- the type of      11:09:05
6 damages that I have calculated      11:09:06
7      Q    (BY MR. BERRY) And what do you mean by      11:09:07
8 "the type of damages"?      11:09:08
9      A    Again, they -- I have calculated what's      11:09:10
10 called expectancy damages, what -- what was the      11:09:12
11 alleged wrongdoer forecasting or believing at the      11:09:16
12 time that they did what they are accused of doing      11:09:20
13      Q    So, sir, for an unjust enrichment major of      11:09:25
14 damages, it's your understanding that you should not      11:09:29
15 look at later events in calculating that number?      11:09:32
16           MR. EISEMAN:  Objection as to form      11:09:36
17      A    For a theft of trade secret case, yes      11:09:37
18      Q    (BY MR. BERRY) And what is that based on,      11:09:40
19 sir?      11:09:42
20      A    Again, it's my experience  I'm not citing      11:09:42
21 you a case for that proposition  You know, I have      11:09:44
22 written on the subject, and that's just my      11:09:49
23 experience      11:09:52
24      Q    Assume, sir, that every assumption that      11:09:53
25 this January 2016 modeling was based on now      11:09:58

Page 79

1 proven false.  Your analysis would still rely on the      11:10:02
2 January 2016 slide, even though we now know it's      11:10:09
3 false under this hypothetical?      11:10:12
4           MR. EISEMAN:  Objection as to form.      11:10:14
5      A    Yes.  And I have no facts to know what      11:10:15
6 you're suggesting.  But the facts could go either      11:10:17
7 way or both ways.      11:10:19
8           I need to know what the impact would be,      11:10:21
9 even if that makes it relevant, what you would want      11:10:23
10 me to do.      11:10:25
11      Q    (BY MR. BERRY) So that -- we have been      11:10:31
12 talking about the first variable, the value of      11:10:32
13 accelerated development.  Let's move on now and talk      11:10:37
14 about the second variable, the length of      11:10:39
15 acceleration.      11:10:42
16           Now, for this accelerated development      11:10:48
17 opinion, you're looking at future profits, right?      11:10:51
18      A    Future expected profits, yes.      11:10:55
19      Q    So what you're looking at is the      11:10:58
20 commercialization of this autonomous vehicle      11:11:02
21 technology, right?      11:11:05
22      A    Yes.      11:11:06
23      Q    The length of acceleration that you relied      11:11:12
24 upon is the length of development, not      11:11:16
25 commercialization, right?      11:11:19

Page 80

1      A    Well, yeah.  But there's no      11:11:20
2 commercialization until there's development.  So to      11:11:22
3 the extent you accelerate development, you      11:11:24
4 commercialize that much earlier.      11:11:27
5      Q    That's not necessarily true, though, is      11:11:29
6 it?      11:11:31
7      A    Well, I think it is --      11:11:31
8           MR. EISEMAN:  Objection as to form.      11:11:32
9      A    -- absolutely true.      11:11:33
10      Q    (BY MR. BERRY) That for each component      11:11:34
11 part that you accelerate the -- the development of,      11:11:36
12 it's your opinion that would also accelerate the      11:11:38
13 commercialization of it?      11:11:42
14      A    No.  That was not your question or my      11:11:43
15 answer.  No.  And I know this is a point of      11:11:45
16 disagreement between your technical expert and Mr.      11:11:47
17 Hesselink -- or Dr. Hesselink and also your damage      11:11:49
18 experts and me that -- and -- and I cited the      11:11:52
19 information in my report.      11:11:56
20           But -- and your client believes that      11:11:58
21 these -- this development was on the critical path      11:12:00
22 of their development.  And -- and I was, before my      11:12:05
23 40-year career in this industry, a cost and      11:12:07
24 scheduling engineer.  I fully understand the      11:12:10
25 implication of being on the critical path.      11:12:12

Page 81

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     And if -- if what I have been told is        11:12:14
2  correct, which is the belief of your client and   11:12:18
3  Dr. Hesselink, then the -- the way I have applied  11:12:21
4  the facts of this case is entirely appropriate.   11:12:23
5     Q   Sir, in your Opening Report did you      11:12:28
6  discuss at all how these nine trade secrets would  11:12:31
7  advance the commercial -- the commercialization of  11:12:35
8  Uber's technology?                    11:12:38
9     A   I -- I think -- I don't know if I discuss  11:12:39
10  it.  It's clearly implied by the way I use the   11:12:41
11  information in my report.                11:12:44
12     Q   But you don't discuss it, do you?      11:12:46
13     A   I -- I -- I didn't think it was necessary.  11:12:47
14  But no, so I did not.                  11:12:49
15     Q   And you would agree, sir, that advanced   11:12:51
16  development alone is not going to get you profits --  11:12:53
17          MR. EISEMAN:  Objection --        11:12:57
18     Q   -- in the commercial?             11:12:57
19          MR. EISEMAN:  -- objection as to form.   11:12:59
20     A   I agree with that.               11:13:00
21     Q   (BY MR. BERRY) For example, advanced    11:13:06
22  development alone will not necessarily advance   11:13:07
23  regulatory hurdles?                   11:13:11
24          MR. EISEMAN:  Objection as to form.    11:13:16
25     A   No, I don't -- I think there is some    11:13:16

Page 82

1  relationship, but there's also some independence of  11:13:18
2  those variables.                    11:13:21
3     Q   (BY MR. BERRY) And likewise, advanced   11:13:21
4  development alone is not necessarily going to affect  11:13:25
5  consumer demand and adoption issues?          11:13:29
6          MR. EISEMAN:  Objection as to form.    11:13:32
7     A   Well, I think it will.  I -- if you -- the  11:13:35
8  question is will it change consumer demand.  I --   11:13:38
9  I -- I think the consumer demand will be what it is  11:13:47
10  when this service is introduced.  And I think then  11:13:50
11  the growth in demand over time will be accelerated  11:13:53
12  permanently if you get to the market earlier.     11:13:58
13     Q   (BY MR. BERRY) Sir, each of the nine trade  11:14:04
14  secrets at issue in this case is directed at LiDAR  11:14:06
15  technology, right?                   11:14:10
16     A   It is.                      11:14:10
17     Q   And LiDAR, obviously, also includes other  11:14:11
18  technology that is not encompassed by the nine trade  11:14:14
19  secrets, right?                     11:14:17
20     A   I agree with that.               11:14:18
21     Q   A lot of other technology?           11:14:19
22     A   I agree with that.               11:14:20
23     Q   And LiDAR is only one of many systems in   11:14:22
24  an autonomous vehicle?                 11:14:26
25     A   That's true.                   11:14:28

Page 83

1     Q   And some of these other systems include   11:14:29
2  cameras?                        11:14:31
3     A   Yes.                       11:14:32
4     Q   Radar?                      11:14:32
5     A   Yes.                       11:14:33
6     Q   Sonar?                      11:14:35
7     A   I don't think in your client's product --  11:14:36
8  or my client's product, but I think some people have  11:14:38
9  suggested using sonar.                 11:14:41
10     Q   Software?                    11:14:43
11     A   Clearly.                     11:14:44
12     Q   And the vehicle itself?            11:14:45
13     A   Certainly.                    11:14:48
14     Q   Your -- your report, sir, does not discuss  11:14:52
15  how a trade secret related to LiDAR could advance   11:14:55
16  development of these other systems, does it?      11:15:00
17     A   No.  I think that many of those other     11:15:03
18  systems -- not all, but some -- are dependent upon  11:15:05
19  the finalization of your LiDAR development.  But    11:15:10
20  that's really a technical question.  I'm not giving  11:15:13
21  an independent opinion.  I think Dr. Hesselink will  11:15:16
22  do that.  And I'm relying upon his judgment.      11:15:19
23     Q   So looking only now, sir, at the work that  11:15:23
24  you did -- that you personally did, you're not     11:15:25
25  saying that advancing LiDAR is going to have an    11:15:28

Page 84

1  effect on the development of cameras --         11:15:32
2          MR EISEMAN:  Objection --         11:15:35
3     Q   (BY MR. BERRY) -- at Uber, right?      11:15:35
4          MR. EISEMAN:  -- objection as to form   11:15:37
5     A   No, I have not                  11:15:37
6     Q   (BY MR. BERRY) Let's take a -- a concrete  11:15:39
7  example here  Trade Secret 13, do you remember what  11:15:44
8  13 is?  It's the                    11:15:47
9     A   I do                       11:15:50
10     Q   You're not saying, sir, that Trade      11:15:51
11  Secret 13 related to              is going to  11:15:53
12  advance development of cameras, right?         11:15:57
13     A   I am not                     11:16:00
14     Q   And you're not saying that the Trade     11:16:00
15  Secret 13 relating to             is going to   11:16:01
16  advance software?                   11:16:05
17     A   Oh, it might  Yes, it -- that, I think --  11:16:06
18  even though -- again, you can Daubert me if you want  11:16:08
19  on this                        11:16:12
20          But based on my understanding, it would.  11:16:13
21  And I am an engineer, not in this space  But I     11:16:15
22  understand -- believe that Dr  Hesselink will      11:16:18
23  testify that there is a relation; that until you    11:16:19
24  solidify these hardware designs, that -- that a lot  11:16:23
25  of software can't be completed             11:16:27

Page 85

22 (Pages 82 - 85)

**Page 86**

```
 1    Q   Sir, are you saying that it's your opinion    11:16:29
 2  in this case that until Trade Secret 13 on the      11:16:31
 3  ████████████, that Uber can not be working on        11:16:34
 4  software?                                            11:16:38
 5    A   Oh, absolutely not.  And again, that's not    11:16:38
 6  the question you just asked.                         11:16:40
 7        And again, what I'm telling you now --         11:16:41
 8  we're kind of wasting time.  I'm not the technical   11:16:43
 9  expert.  I'm not going to be saying this at trial.   11:16:46
10  These are questions for Dr. Hesselink.              11:16:49
11        THE COURT REPORTER:  Wait.                     11:16:51
12    Q   (BY MR. BERRY) Let's put it this way:  The     11:16:52
13  team working on ████████ is different from           11:16:55
14  the team working on software, as far as you know?    11:16:57
15    A   Again, I don't know that, but that would       11:17:00
16  be my expectation.                                   11:17:03
17    Q   And certainly, sir, any advancement in         11:17:08
18  ████████████ is not necessarily going to impact      11:17:12
19  the regulatory environment?                          11:17:15
20        MR. EISEMAN:  Objection as to form.            11:17:18
21    A   Probably not.                                  11:17:19
22        MR. BERRY:  I need to take a quick break       11:17:20
23  to look at something.                                11:17:26
24        THE VIDEOGRAPHER:  Oh, okay.  This is the      11:17:2?
25  end of Disk 1 in Volume I in the deposition of       11:17:29
```

**Page 87**

```
 1  Mr Wagner   It's 11:17 a m                           11:17:33
 2        (A break was taken from 11:17 a m  to          11:17:36
 3  11:29:a m )                                          11:17:40
 4        THE VIDEOGRAPHER:  We are back on the          11:29:11
 5  record   This is the beginning of Disc 2 in Volume I 11:29:11
 6  in the deposition of Mr Wagner   It's 11:29 a m      11:29:18
 7    Q   (BY MR. BERRY) Sir, we were discussing the     11:29:22
 8  second variable in the accelerated development, the  11:29:24
 9  length of time                                       11:29:28
10    A   We were                                        11:29:29
11    Q   And I want to now focus on Trade               11:29:30
12  Secret 25  Do you recall that's the ████████         11:29:32
13    A   I do                                           11:29:35
14    Q   And you relied on Dr  Hesselink to give        11:29:35
15  you the time it would take Waymo to independently    11:29:40
16  develop Trade Secret 25?                             11:29:45
17    A   Yes                                            11:29:46
18        MR EISEMAN:  Objection as to form              11:29:46
19    Q   (BY MR. BERRY) It was the time it did take     11:29:47
20  Waymo, right?                                        11:29:48
21    A   Oh, I'm -- I'm not exactly sure what --        11:29:49
22  the basis of his two years  It was either what it    11:29:53
23  took Waymo or what he believes it will take Uber  I  11:29:56
24  don't know which one it was --                       11:29:59
25    Q   Okay                                           11:30:02
```

**Page 88**

```
 1    A   -- it is.                                       11:30:02
 2    Q   (BY MR. BERRY) Okay.  And the Trade             11:30:03
 3  Secret 25 encompasses a number of ████████,          11:30:04
 4  right?                                                11:30:07
 5    A   It does.                                        11:30:08
 6    Q   Do you know how many?                           11:30:09
 7  ████████████████████████████                          11:30:12
 9    Q   Okay.  And Waymo has alleged that Uber          11:30:14
10  ████████████████,                                     11:30:17
11  right?                                                11:30:20
12    A   I'm not aware of that.                          11:30:22
13    Q   And if it is, in fact, true that Waymo is       11:30:23
14  alleging that Uber misappropriated only some of the  11:30:28
15  ████████, it would be improper to use the            11:30:31
16  entire two years for Trade Secret 25, right?         11:30:35
17        MR. EISEMAN:  Objection as to form.            11:30:38
18    A   I -- it's an incomplete hypothetical.  I       11:30:38
19  would need more facts to know.  But even if I had    11:30:41
20  those facts, that's a question for Dr. Hesselink.    11:30:45
21  That's a technical question.                         11:30:46
22    Q   (BY MR. BERRY) For purposes of your            11:30:48
23  damages analysis, sir, you would want to know how    11:30:49
24  long it would take Uber to design the particular     11:30:52
25  ████████ that were misappropriated, correct?        11:30:56
```

**Page 89**

```
 1    A   I think that's relevant, yes.                   11:30:59
 2    Q   And it's fewer than all the ████████            11:31:01
 3  in Trade Secret 25, you would want to know that?      11:31:04
 4        MR. EISEMAN:  Objection as to form.            11:31:07
 5    A   No.  That's not -- not a fact in evidence.     11:31:08
 6  I think I would need to ask Dr. Hesselink if that    11:31:11
 7  affects his opinion.                                  11:31:13
 8        And if it does and he says, Based on the       11:31:14
 9  information I have now and a more limited subset of   11:31:18
10  ████████, I think they could do it in a year,        11:31:22
11  I would change my calculation.                        11:31:25
12    Q   (BY MR. BERRY) Let's put it this way, sir:      11:31:27
13  In your Opening Report, you did not apportion Trade  11:31:29
14  Secret 25 based on the ████████████                   11:31:35
16        MR. EISEMAN:  Objection as to form.            11:31:37
17    A   No.  And even -- even -- I -- I think I do     11:31:37
18  know what you're talking about.  That -- I believe   11:31:39
19  Waymo has only found evidence of ████████             11:31:42
20  ████████████ something like that.                     11:31:47
21        But that doesn't mean that your client        11:31:50
22  isn't using them.  That they -- my client just      11:31:52
23  hasn't found it yet.  And -- but even if that is     11:31:55
24  true, it may be that these ████████                   11:32:00
25  ████████████ and it would still take two years.      11:32:02
```

| | |
|---|---|
| 1 But that's a question for Dr. Hesselink, not for      11:32:04 | 1 what's been marked as Exhibit 2274. And do you      11:33:57 |
| 2 Mike Wagner.      11:32:06 | 2 recognize these as Uber's responses to      11:34:01 |
| 3    Q    (BY MR. BERRY) You just don't know, sir,      11:32:08 | 3 interrogatories?      11:34:05 |
| 4 do you? | 4    A    I do.      11:34:06 |
| 5    A    I -- I don't. And if I did, you -- you      11:32:10 | 5    Q    And, sir, you relied on this document?      11:34:06 |
| 6 should appropriately Daubert me, if I did.      11:32:12 | 6    A    Yes.      11:34:09 |
| 7    Q    And you spoke with Dr. Hesselink, right?      11:32:14 | 7    Q    If you could please turn to page 4. This      11:34:10 |
| 8    A    No, I have never spoken with him. Have      11:32:16 | 8 is the -- the interrogatory response that you relied      11:34:18 |
| 9 you seen any evidence that I said I had a      11:32:18 | 9 upon to get the time to independently develop all of      11:34:22 |
| 10 conversation with him? No. I have reviewed his      11:32:20 | 10 the trade secrets except for 25 and 111 --      11:34:27 |
| 11 report. Or actually, just parts of his report.      11:32:22 | 11        MR. EISEMAN: Objection as to form.      11:34:32 |
| 12    Q    Did you --      11:32:24 | 12    Q    (BY MR. BERRY) -- and 90?      11:34:34 |
| 13        THE COURT REPORTER: Wait.      11:32:24 | 13    A    Yes. You said that well.      11:34:35 |
| 14    Q    (BY MR. BERRY) Did you ever want to speak      11:32:25 | 14    Q    In the middle --      11:34:38 |
| 15 with Dr. Hesselink?      11:32:26 | 15        MR. EISEMAN: I'll withdraw my objection.      11:34:40 |
| 16    A    I never saw any need, because the      11:32:27 | 16 And I apologize for interrupting you in the middle      11:34:41 |
| 17 information that I needed to rely upon him was in a      11:32:29 | 17 of your question.      11:34:44 |
| 18 written report.      11:32:33 | 18    Q    (BY MR. BERRY) In the middle of page 4,      11:34:44 |
| 19        And that's what I tell every lawyer who I      11:32:34 | 19 Uber writes in this interrogatory response -- it      11:34:46 |
| 20 hire -- I am retained by, when I have to rely on a      11:32:37 | 20 says, The scheduled times identified for the      11:34:50 |
| 21 technical expert, I said, What I need to rely on, I      11:32:41 | 21 redesigns below would not significantly or      11:34:52 |
| 22 want it in a written report so the other side has a      11:32:41 | 22 materially impact the timeline for commercialization      11:34:56 |
| 23 chance to --      11:32:53 | 23 and rollout of Uber's fully anonymous self-driving      11:34:58 |
| 24        THE COURT REPORTER: I need --      11:32:53 | 24 technology to the general public.      11:35:03 |
| 25    A    -- test it.      11:32:53 | 25        Do you see that?      11:35:05 |
| Page 90 | Page 92 |

| | |
|---|---|
| 1        THE COURT REPORTER: -- you to slow down,      11:32:53 | 1    A    You know, I'm -- I'm not seeing where      11:35:05 |
| 2 please      11:32:53 | 2 you're reading, but I know -- I have read that      11:35:07 |
| 3    A    I'm sorry. I -- I want every opinion that      11:32:53 | 3 before, and you -- and I believe you have read it      11:35:09 |
| 4 I'm relying upon to be in a report so the other side      11:32:53 | 4 correctly.      11:35:11 |
| 5 has fair notice of it; they have a chance to depose      11:32:53 | 5    Q    And, sir, that's something in      11:35:11 |
| 6 the expert on it, rather than some private      11:32:56 | 6 Interrogatory 1, the response to, that you rejected?      11:35:13 |
| 7 conversation that I have with the technical expert      11:33:00 | 7    A    I -- I didn't reject it. Well, I did      11:35:18 |
| 8 And my client accommodated that request in this      11:33:01 | 8 reject it based on the expert report of      11:35:21 |
| 9 case      11:33:04 | 9 Dr. Hesselink and the documents where your client      11:35:24 |
| 10    Q    (BY MR BERRY) Sitting here right now,      11:33:07 | 10 says that development of LiDAR is critical to the      11:35:29 |
| 11 sir, you don't know how long it would take -- or      11:33:07 | 11 development.      11:35:33 |
| 12 that it took Waymo to develop the ▮▮▮▮▮▮▮      11:33:09 | 12    Q    Sir, this is Uber itself saying that      11:35:34 |
| 13 at issue, correct?      11:33:12 | 13 independently developing these trade secrets is not      11:35:37 |
| 14    A    I --      11:33:13 | 14 going to have a significant or material impact on      11:35:40 |
| 15        MR. EISEMAN: Objection --      11:33:14 | 15 the timeline for commercialization, correct?      11:35:42 |
| 16    A    -- don't      11:33:14 | 16    A    It does.      11:35:44 |
| 17        MR EISEMAN: -- as to form      11:33:14 | 17    Q    And yet you assumed the opposite, right?      11:35:45 |
| 18    A    Sorry      11:33:15 | 18    A    Yes.      11:35:48 |
| 19    Q    (BY MR BERRY) What was your response,      11:33:17 | 19    Q    And your basis for doing so is only based      11:35:49 |
| 20 sir?      11:33:18 | 20 on Dr. Hesselink, right?      11:35:52 |
| 21    A    I don't      11:33:19 | 21    A    And the other thing I just told you in the      11:35:54 |
| 22        (Exhibit 2274 was marked for      11:33:20 | 22 previous answer.      11:35:57 |
| 23 identification and is attached to the transcript )      11:33:20 | 23    Q    It being a -- what you call a critical      11:35:57 |
| 24    A    Thank you      11:33:49 | 24 path?      11:35:59 |
| 25    Q    (BY MR BERRY) Sir, I have handed you      11:33:50 | 25    A    Right. A number of statements by a number      11:35:59 |
| Page 91 | Page 93 |

Veritext Legal Solutions
866 299-5127

**Page 94**

1  of people in your client who said that.          11:36:02
2    Q  But what they didn't say is that it's       11:36:04
3  going to be a serial process where you can't -- you  11:36:07
4  know, you have to finish one project before you   11:36:10
5  start another one, right?                         11:36:12
6      MR. EISEMAN:  Objection.  Objection as to    11:36:13
7  form.                                             11:36:13
8    A  No one has ever used the word "serial"      11:36:14
9  except for your -- your damage experts.  So yeah,  11:36:18
10  that's the only people I have ever seen use that  11:36:20
11  term.  Oh, I -- pardon me.  I also saw lawyers write  11:36:23
12  it in the Daubert motion.                         11:36:30
13    Q  (BY MR. BERRY)  Sir, let's look at your    11:36:33
14  damages table in paragraph 285 of your report,   11:36:37
15  please.  Sir, you assume --                       11:36:42
16    A  Pardon me.  Excuse me.  Your question, I   11:36:59
17  think, said page 285.  Did --                     11:37:00
18    Q  Paragraph.                                  11:37:03
19    A  -- you mean paragraph?                       11:37:03
20    Q  Thank you.                                   11:37:04
21    A  So it's on page 107, if you're trying to   11:37:04
22  find it for anyone else in the room.              11:37:07
23    Q  And, sir, for Trade Secret 25, you assume  11:37:09
24  that it would accelerate the development by two   11:37:12
25  years, right?                                     11:37:14

**Page 95**

1    A  Yes, and on the critical path.             11:37:15
2    Q  And in this Figure 10, you identify your   11:37:17
3  assumption for each of the trade secrets for      11:37:21
4  accelerating the development, right?              11:37:24
5    A  No.                                         11:37:26
6    Q  Each of them other than Trade Secret 90?   11:37:26
7    A  No.                                         11:37:29
8    Q  Which other one do you not --              11:37:33
9    A  Well --                                     11:37:34
10    Q  -- identify?                               11:37:35
11    A  -- I'm trying to be responsive to your    11:37:35
12  question.  You said my assumption.  These aren't my  11:37:36
13  assumptions.  These are assumptions that your client  11:37:39
14  and Dr. Hesselink -- they're not Mike Wagner's   11:37:42
15  assumptions.                                     11:37:44
16    Q  So let me rephrase.  The assumptions that  11:37:45
17  you used and relied upon, sir, are contained in   11:37:46
18  Figure 10?                                        11:37:50
19    A  Yes.                                        11:37:51
20    Q  And those assumptions that you relied upon  11:37:52
21  have the length of accelerated development?       11:37:56
22    A  Yes.                                        11:37:59
23    Q  And if you were -- for these eight trade   11:37:59
24  secrets listed in Figure 10, if you were to add up  11:38:02
25  the accelerated development for each of them, you  11:38:05

**Page 96**

1  would come up with 3.85 years?                    11:38:08
2    A  I have never done the calculation, but I    11:38:11
3  know your math is good based on prior experience.  11:38:13
4    That would be correct.                          11:38:16
5    Q  But, sir, you're -- if all eight of these  11:38:17
6  trade secrets is misappropriated, you're not saying  11:38:20
7  it's going to advance the development in           11:38:22
8  commercialization of Uber by 3.85 years, right?   11:38:25
9    A  I am not.  I -- I mean, it is possible      11:38:29
10  that if all eight are being used, that it is      11:38:31
11  something above 2.  But I don't have the information  11:38:36
12  to calculate that --                              11:38:38
13    Q  It's --                                     11:38:41
14    A  -- and so I have made the assumption that  11:38:41
15  along the critical path of LiDAR, all of these eight  11:38:43
16  developments can be -- being done concurrently.  Not  11:38:47
17  serially, but concurrently.                       11:38:51
18    Q  A question on paragraph 280 of your        11:39:01
19  report.  In paragraph 280, you say, It's my opinion  11:39:04
20  that it's most reasonable to use the optimistic city  11:39:11
21  coverage range of incremental profit to measure the  11:39:15
22  value of accelerated development.                 11:39:17
23    That was a mistake, right?                      11:39:20
24    A  No, it was not a mistake.                   11:39:22
25    Q  And then you state in the following        11:39:23

**Page 97**

1  sentence, Therefore, the value of accelerated AV  11:39:25
2  development, I used Uber's incremental profit      11:39:29
3  calculations of 1.585 billion.                     11:39:32
4    You -- you -- I guess you put                    11:39:36
5  1,585 million for one year and 2,610 million for two  11:39:38
6  years.                                            11:39:44
7    Do you see that, sir?                           11:39:44
8    A  I do.  And that's in my report.             11:39:45
9    Q  But your opinions are based off the         11:39:47
10  baseline coverage?                                11:39:50
11    A  Yes, I use these numbers.  I report them a  11:39:52
12  couple times in my report.  But I -- I believe the  11:39:55
13  more reasonable number to use is the baseline, and  11:39:57
14  that's the numbers I'm going to put forward at    11:40:00
15  trial.                                            11:40:04
16    Q  Let's move on to your second opinion, sir,  11:40:06
17  the avoided cost opinion.                         11:40:09
18    And the -- the foundation for that opinion   11:40:17
19  is that by misappropriating these trade secrets,  11:40:20
20  that Uber was able to avoid some development --    11:40:23
21  developmental costs; is that fair?               11:40:26
22    A  Yes.                                        11:40:29
23    Q  And for that opinion, there are two        11:40:31
24  variables.  The first is the amount of cost savings?  11:40:34
25    A  On a monthly basis.                         11:40:40

25 (Pages 94 - 97)

1  Q  On a monthly basis?                          11:40:41
2  A  Yes.                          11:40:42
3  Q  And the second variable is the --           11:40:42
4  the length of time for any acceleration?         11:40:44
5  A  Yes.                          11:40:47
6  Q  The second variable is the same one that     11:40:48
7  you used for your first opinion, right?          11:40:50
8  A  It is.                          11:40:53
9  Q  So let's focus on your first variable, the   11:40:53
10  monthly burn rate.  And sir, you got the monthly  11:40:56
11  burn rate from some notes from Mr. Bares; is that  11:41:01
12  fair?                          11:41:04
13  A  Yes --                          11:41:04
14  MR. EISEMAN:  Objection as to form.            11:41:04
15  A  -- that's fair.  And I believe his          11:41:05
16  deposition testimony.                     11:41:16
17  (Exhibit 2275 was marked for            11:41:24
18  identification and is attached to the transcript.)  11:41:24
19  A  Thank you.                     11:41:25
20  Q  (BY MR. BERRY) Sir, I have handed you       11:41:33
21  what's been marked as Exhibit 2275.  And.  Sir, do  11:41:34
22  you recognize these as the Bares notes that you   11:41:38
23  relied upon?                     11:41:40
24  A  It does.  I recognize this document.        11:41:41
25  Q  And the -- the burn rate that you used for   11:41:43
Page 98

1  your analysis is at the top of the -- this first  11:41:49
2  page of the notes, right?                11:41:51
3  A  Yes.                          11:41:54
4  Q  And these -- what we have here in           11:41:55
5  Exhibit 227 is a long set of notes.  I think it's 27  11:41:58
6  pages, right?                     11:42:03
7  A  They're -- they are lengthy, yes.  I don't   11:42:04
8  know the number of pages.                11:42:06
9  Q  And these are notes from January 2016?      11:42:07
10  A  Yes.                          11:42:10
11  Q  And you got your burn rate from the top of   11:42:12
12  this first page, right?                 11:42:16
13  A  I did.                          11:42:18
14  Q  And it is under the section that says "The   11:42:20
15  Chess Game."                     11:42:23
16  Do you see that?                 11:42:24
17  A  Yes.                          11:42:24
18  Q  And the third line down says, He.           11:42:24
19  And I think that's referring to            11:42:27
20  Mr. Levandowski; is that right?              11:42:29
21  A  That's my assumption.                11:42:30
22  Q  "He would bring filtered advice about        11:42:31
23  when -- or what to try and not try, dot, dot, dot.  11:42:35
24  That is a day with him and our team could save us  11:42:38
25  months towards 2020.                11:42:42
Page 99

1  Then in parentheses, he says, Month equal   11:42:43
2  20 million run rate.                  11:42:46
3  Do you see that?                 11:42:47
4  A  I do.                          11:42:48
5  Q  And that's where you got your run rate?      11:42:48
6  A  Yes.                          11:42:50
7  Q  What did you do, sir, to test to see         11:42:50
8  whether that run rate was the actual Uber run rate?  11:42:53
9  A  Well, I didn't do anything.  Again --       11:42:56
10  again, this is an expectancy measure of damages   11:42:58
11  around the time of the alleged theft.  And this is  11:43:01
12  the only information I have as of that time.  I have  11:43:04
13  never seen any actual information as of this time.  11:43:07
14  Q  Did you look for actual run rate         11:43:10
15  information at this time?                11:43:13
16  A  I -- I asked if any was available, and my   11:43:14
17  staff did not bring any to my attention.  But -- so  11:43:17
18  I -- I made that attempt, but I didn't find       11:43:20
19  anything.                     11:43:22
20  Q  So did you assume that the 20 million run   11:43:23
21  rate was in place in January of 2016?          11:43:26
22  A  I -- well, it was -- it was in place or a    11:43:29
23  good approximation for the time of the -- any     11:43:32
24  acceleration that I am measuring.              11:43:36
25  Q  So my question was, sir:  Did you assume    11:43:38
Page 100

1  the 20 million run rate was in place in January of  11:43:40
2  2016?                          11:43:43
3  A  Oh, well, I guess I didn't really think      11:43:44
4  about that, to be perfectly honest.  But I think I   11:43:46
5  would have assumed that, because this is the head of  11:43:47
6  the department.  And I think that he would be     11:43:50
7  quoting what he believed his run rate was at the   11:43:52
8  time.                          11:43:54
9  Q  And, sir, did you assume that the           11:43:54
10  20 million run rate would remain at 20 million     11:43:56
11  through the Year 2022?                11:44:00
12  A  No.  I think it probably would change.      11:44:01
13  But again, because it's expectancy measure, I -- I   11:44:03
14  wouldn't change it.  I mean, I -- I have seen now,   11:44:08
15  since Mr. Bratic produced some information about   11:44:10
16  more current run rates, that it is more than double  11:44:13
17  this.                          11:44:16
18  But again, I don't think that's fair to      11:44:17
19  use those numbers for an expectancy measure.      11:44:19
20  Q  When you say Mr. Bratic produced           11:44:23
21  information, what information are you referring to?  11:44:25
22  A  I -- I think he had some schedules that      11:44:27
23  showed the -- the monthly run rate for developing  11:44:30
24  the autonomous vehicle at Uber.              11:44:35
25  Q  And so you had access to the same          11:44:37
Page 101

1 documents as Mr. Bratic, right?                    11:44:40
2    A   You know, I -- I never saw that document.   11:44:42
3 And if it's in my "Documents Considered List," the  11:44:43
4 answer is yes.  But no one showed it to me at the    11:44:46
5 time I issued my original opinion.                   11:44:49
6    Q   And now that you have seen the documents     11:44:55
7 that Mr. Bratic cites, does that change your         11:44:58
8 opinion?                                             11:45:00
9    A   No.  Just like another one.  Now, this --    11:45:00
10 this place, I could help my client by using the     11:45:02
11 current information.  But no, it does not change my  11:45:06
12 opinion.                                            11:45:10
13    Q   Because your opinion is to use the          11:45:10
14 expectancy in January of 2016 of the run rate?      11:45:12
15    A   Correct.                                    11:45:17
16    Q   And if later events change the -- that      11:45:17
17 expectancy, you disregard those because you're      11:45:20
18 looking for January 2016 expectancy?                11:45:24
19       MR. EISEMAN:  Objection as to form.          11:45:26
20    A   Yes.  And it -- what -- what -- again,       11:45:27
21 whether it helps my client or hurts my client, in   11:45:28
22 that measure of damages, I think that information is 11:45:32
23 irrelevant.                                         11:45:34
24    Q   (BY MR. BERRY) And, sir, the run rate that  11:45:34
25 you used was the run rate for the entire Uber AV    11:45:36

Page 102

1 organization, right?                                11:45:41
2    A   Correct.                                    11:45:44
3    Q   And by using the run rate for the entire    11:45:48
4 AV organization, you assumed that each trade secret 11:45:50
5 would advance the development of the entire         11:45:53
6 department -- the entire program?                   11:45:58
7    A   Not exactly, no.  I assumed, again based    11:46:00
8 on documents that I have reviewed and              11:46:04
9 Dr. Hesselink's opinion, that these trade secrets   11:46:05
10 individually and in combination are in the -- on the 11:46:10
11 critical path of development of the autonomous      11:46:13
12 vehicle.                                            11:46:16
13       And if that's true, then it's appropriate    11:46:17
14 to use all expenses of the department.              11:46:20
15    Q   Let's look at Trade Secret 9.  Again,       11:46:22
16 that's the FAC lens.  And it was your opinion, sir  11:46:24
17 -- or you relied on Uber to say that it would take  11:46:29
18 four months to independently develop Trade Secret 9, 11:46:34
19 right?                                              11:46:37
20    A   Right.  And realizing the limitations of    11:46:38
21 that number.  But I have nothing else to use, so I  11:46:40
22 have used it, yes.                                  11:46:42
23    Q   What do you mean, sir, by "the limitations  11:46:43
24 of that number"?                                    11:46:45
25    A   That -- that -- my understanding based on   11:46:46

Page 103

1 the -- the testimony of your engineer, that -- and  11:46:48
2 reading the report of Dr. Hesselink, that these     11:46:55
3 estimates of time assume straight-line development. 11:46:57
4 No problems, no issues, no software additional      11:47:02
5 development.  Those are not realistic assumptions.  11:47:08
6    Q   But this was the number you relied on,      11:47:11
7 sir?                                                11:47:13
8    A   But it is -- I have nothing better.  I       11:47:13
9 think it's a conservative number.  It -- and it is  11:47:15
10 the number I relied upon.                           11:47:17
11    Q   So to arrive at your avoided cost figure    11:47:19
12 for Trade Secret 9, you take the four months that it 11:47:22
13 would take to independently develop Trade Secret 9  11:47:25
14 and multiply that by the 20 million run rate?       11:47:28
15    A   Correct.                                    11:47:33
16    Q   So you would arrive at $80 million?         11:47:33
17    A   Approximately, yes.                          11:47:35
18    Q   And, sir, is it your opinion that Trade     11:47:36
19 Secret 9, by misappropriating that, Uber was able to 11:47:38
20 save $80 million, right?                            11:47:41
21    A   Well, if -- and you said it -- it's my      11:47:43
22 assumption.  If, again, that -- this four months is 11:47:45
23 on the critical path of development and your client 11:47:49
24 will get to market four months earlier, that that is 11:47:53
25 the -- the cost that they have saved.               11:47:56

Page 104

1    Q   And you didn't conclude it was on the       11:47:57
2 critical path, did you, personally?                 11:48:01
3    A   I -- I don't have enough facts to -- to      11:48:02
4 have an independent opinion of it  But all the      11:48:05
5 facts I have seen are consistent with that position 11:48:08
6    Q   In fact, Uber's interrogatory response      11:48:11
7 tells you it's not on the critical path, right?     11:48:14
8    A   Yes  In preparing for this litigation,      11:48:17
9 that's their statement  I understand that  And I    11:48:19
10 believe that's based on their independent expert who 11:48:22
11 has that opinion                                    11:48:25
12    Q   And if, in fact, Uber is correct that       11:48:26
13 these trade secrets are not on the critical path,   11:48:27
14 then your damages model does not work?              11:48:30
15       MR. EISEMAN:  Objection as to form           11:48:35
16    A   I would agree with that  That -- that       11:48:35
17 if -- if that's not the case, I would need to revise 11:48:36
18 the times that I have to multiply the 20 million run 11:48:40
19 rate by                                             11:48:45
20    Q   (BY MR. BERRY) And you have not done that   11:48:46
21 work?                                               11:48:47
22    A   No  I have no information to do that         11:48:48
23    Q   So for this Trade Secret 9 we have been     11:48:50
24 discussing, is it your opinion that it would save   11:48:52
25 Uber $80 million, right?                            11:48:54

Page 105

27 (Pages 102 - 105)

Page 106

```
 1     A  Based on the inputs and the assumptions I     11:48:57
 2  have been given, yes.                               11:48:59
 3     Q  When would Uber have realized those cost       11:49:01
 4  savings?                                             11:49:03
 5     A  They would realize it at -- at the time        11:49:05
 6  they have accelerated their development.             11:49:07
 7     Q  And when is that, sir?                         11:49:10
 8     A  I don't have any information on that.  I       11:49:11
 9  don't know.                                          11:49:13
10     Q  Has -- when did you assume Uber               11:49:13
11  misappropriated Trade Secret 9?                      11:49:16
12     A  Again, I had a range.  I -- I don't have      11:49:20
13  that information.  That's liability questions.  And  11:49:21
14  no one has told me when they -- they have actually   11:49:24
15  used it to accelerate the development.  I don't      11:49:28
16  know.                                                11:49:29
17     Q  Well, I was asking:  When did you assume      11:49:31
18  they misappropriated?                                11:49:33
19     A  Oh, I -- you know, it's -- sometime in        11:49:34
20  the -- the late 2015 or early 2016 time frame is the 11:49:36
21  best I can give you.                                 11:49:41
22     Q  In that time from when they were assume --    11:49:43
23  when you assumed they misappropriated to the current 11:49:45
24  day, has Uber actually saved any costs, any money by 11:49:48
25  using Trade Secret 9?                                11:49:53
```

Page 107

```
 1         MR. EISEMAN:  Objection as to form.          11:49:55
 2     A  I -- that's a technical question.  I -- I     11:49:55
 3  have no information on that.  I don't know.          11:49:57
 4     Q  (BY MR. BERRY) You didn't look at that,       11:49:58
 5  did you, sir?                                        11:50:00
 6     A  No.  And I -- and that's not in my area of    11:50:01
 7  expertise.  I wouldn't look at that, unless I want   11:50:04
 8  to bill my client for work that's not useful.        11:50:07
 9     Q  You concluded that Trade Secret 9 would       11:50:12
10  save Uber $80 million, right?                        11:50:15
11     A  Yes.                                           11:50:17
12     Q  Where would those cost savings be?  What      11:50:18
13  line item on the P&L statement?                      11:50:20
14     A  It would be on the -- well, it's -- it's      11:50:21
15  not one line item.  It's the total expenses of      11:50:21
16  developing their autonomous vehicle.  It's all those 11:50:25
17  expenses.                                            11:50:28
18     Q  So it would save them expenses in            11:50:28
19  San Francisco, right?                                11:50:30
20     A  I would assume so.                            11:50:32
21     Q  It would save them expenses in Pittsburgh?    11:50:33
22     A  I would assume so.                            11:50:37
23     Q  Isn't it more reasonable to say that Trade   11:50:40
24  Secret 9, at most, is worth 150,000?                 11:50:41
25         MR. EISEMAN:  Objection as to form.          11:50:46
```

Page 108

```
 1     A  Is that the number your expert has put       11:50:47
 2  forward?  If his assumptions are correct, yes.  But  11:50:50
 3  if they're wrong, no.                                11:50:52
 4     Q  (BY MR. BERRY) So let's now -- we have       11:51:01
 5  been talking about Trade Secret 9.  Let's turn to    11:51:02
 6  Trade Secret 25.  And you rely on the assumptions,   11:51:05
 7  sir, that Trade Secret 25 would advance the          11:51:08
 8  commercialization of Uber's AV program by two years, 11:51:11
 9  right?                                               11:51:15
10     A  Yes.                                           11:51:16
11     Q  And by doing so, you assume that it would    11:51:17
12  save Uber two years' worth of the burn rate for the  11:51:20
13  entire AV organization, right?                       11:51:24
14     A  I do.                                          11:51:26
15     Q  How did Trade Secret 25 save Uber money      11:51:31
16  with respect to cameras?                             11:51:36
17         MR. EISEMAN:  Objection as to form.          11:51:38
18     A  I -- I have no idea if it has anything to    11:51:39
19  do with cameras.  I -- I wouldn't believe that it    11:51:42
20  would.                                               11:51:44
21     Q  (BY MR. BERRY) How did Trade Secret 25       11:51:45
22  save Uber money with respect to radar?               11:51:48
23     A  I -- I -- again, I don't know the answer     11:51:51
24  to that question.  Again, I do believe, even though  11:51:52
25  it's a semitechnical opinion, but based on my        11:51:57
```

Page 109

```
 1  engineering background that -- you know, again, as   11:52:01
 2  you said before, not everyone in the organization    11:52:04
 3  works on every part of the product.  There are       11:52:07
 4  independent teams working on these things.  That --  11:52:07
 5  those -- those items would be being developed        11:52:10
 6  independently.                                        11:52:11
 7     Q  Concurrently?                                  11:52:12
 8     A  Concurrently.  But if the entire timeline    11:52:14
 9  is accelerated, then your client has avoided their   11:52:18
10  whole development effort by that period of time.     11:52:21
11  And there's two things that could happen.            11:52:24
12         One, a radar engineer does the final         11:52:27
13  complete, absolutely-done-radar-technology, and they 11:52:31
14  would lay him off.  Then I have overstated the       11:52:34
15  numbers.                                             11:52:37
16         Or it's more likely that he would be doing   11:52:37
17  tweaks and other things or they would be playing     11:52:40
18  poker while they're waiting for someone else to      11:52:42
19  catch up, and they're -- they're now on the critical 11:52:44
20  path again.                                          11:52:47
21         THE COURT REPORTER:  Wait.                    11:52:48
22     A  Other things might happen.  I can't model    11:52:48
23  that.                                                11:52:51
24     Q  (BY MR. BERRY) You just don't know, right?   11:52:51
25     A  No, I -- I don't know.  But again, based     11:52:52
```

**Page 110**

1  on your client's statements of the existential          11:52:54
2  threat that AV does to their historical business and    11:52:58
3  they're putting tons of money, now doubling the         11:53:02
4  development costs, the chances are they -- they         11:53:06
5  would not be laying anyone off.  In fact, they may      11:53:07
6  even be hiring more people during this time period.     11:53:10
7      Q    Is it every component of later -- of LiDAR,    11:53:14
8  on the critical path?                                   11:53:15
9          MR. EISEMAN:  Objection as to form.            11:53:17
10     A    I don't know the answer to that question.     11:53:18
11  Again, that would be a question for Dr. Hesselink.     11:53:18
12     Q    (BY MR. BERRY) Now, sir, if Uber didn't        11:53:22
13  misappropriate Trade Secret 25, you assume it would    11:53:24
14  take them two years to independently develop that?     11:53:29
15     A    I have been told that by Dr. Hesselink.        11:53:34
16     Q    And according to the work that you have        11:53:35
17  done, sir, you assume that nothing else is going to    11:53:36
18  happen at Uber during those two years, but costs are   11:53:39
19  going to continue occurring?                           11:53:42
20     A    That's absolutely false.  I didn't make       11:53:44
21  that assumption.  And Mr. Bratic doesn't know what     11:53:46
22  he's talking about when he criticized me for that.     11:53:50
23          No.  I do think that all of these people      11:53:50
24  will be doing things in that time period.  They're     11:53:52
25  just not advancing the ball to getting their product  11:53:55

**Page 111**

1  to market                                              11:53:58
2      Q    Because the one critical path at Uber is       11:53:59
3  Trade Secret 25?                                        11:54:02
4          MR EISEMAN: Objection as to form               11:54:03
5      A   No, it's not the one  There's probably         11:54:03
6  plenty of them  I mean, I have developed critical      11:54:06
7  paths in my work as an engineer, and there's plenty    11:54 07
8  of tasks on the critical path  But wherever you are    11:54:07
9  on the critical path --                                11:54:14
10         THE COURT REPORTER:  Please slow down          11:54:14
11     A   -- there is going to be certain items that     11:54:15
12  everyone else is waiting on before the next steps      11:54:17
13  can be taken                                           11:54:19
14     Q    (BY MR. BERRY) And, sir, did you assume       11:54:20
15  that Trade Secret 25 is an bottleneck for Uber's       11:54:21
16  entire AV program?                                     11:54:25
17     A   Well, I -- I haven't assumed that, but I       11:54:27
18  can draw that conclusion based on Dr  Hesselink's      11:54:29
19  opinion and the fact that -- this is very data         11:54:31
20  intensive information to test ████████, and I          11:54:34
21  do believe my client spent far more than two years    11:54:38
22  developing ████████                                    11:54:42
23     Q    And if, in fact, Trade Secret 25 is not a     11:54:42
24  bottleneck for the entire AV program, your damages     11:54:45
25  model does not work?                                   11:54:49

**Page 112**

1          MR. EISEMAN:  Objection as to form.            11:54:50
2      A   I agree with that.                             11:54:51
3      Q    (BY MR. BERRY) Let's move on to Trade         11:54:52
4  Secret 90 now, sir.  It's your Tyto opinion.  And      11:54:53
5  Tyto -- Trade Secret 90 relates to fiber lasers; is    11:54:58
6  that right?                                            11:55:03
7      A   That's my understanding.                       11:55:03
8      Q    And you understand that Uber does not         11:55:04
9  currently use Trade Secret 90?                          11:55:06
10     A   That's -- that -- I have been told that,       11:55:09
11  yes.                                                   11:55:09
12     Q    And according to Waymo's expert,              11:55:11
13  Dr. Hesselink, he opines that Uber's                  11:55:13
14  misappropriation of Trade Secret 90 saved it two      11:55:17
15  years and five months based on the acquisition of     11:55:21
16  Tyto?                                                  11:55:25
17     A   Yes.                                           11:55:25
18     Q    And your accelerated development opinion      11:55:26
19  is based on time savings, right?                       11:55:28
20     A   Yes.                                           11:55:32
21     Q    So if we were to take those two years and     11:55:32
22  five months and put it into your accelerated          11:55:34
23  development model, it would say that Trade Secret 90  11:55:37
24  is worth over $2 billion, right?                       11:55:39
25     A   It would.                                      11:55:42

**Page 113**

1      Q    But that's an absurd number for something     11:55:42
2  that Uber doesn't use?                                  11:55:47
3          MR. EISEMAN:  Objection as to form            11:55:49
4      A   I don't know whether it's absurd -- absurd    11:55:50
5  or not  If -- if Dr  Hesselink is right, then --       11:55:50
6  and it's on the critical path, then you -- that        11:55:52
7  number is appropriate                                  11:55:54
8      Q    (BY MR. BERRY) And that would make Trade     11:55:55
9  Secret 90 to be -- the most valuable trade secret      11:55:57
10  in -- in your report, right?                           11:56 01
11     A   It would                                       11:56:02
12     Q    And yet the report you signed in your         11:56:02
13  opinion is that Trade Secret 90 is the least          11:56:07
14  valuable trade secret?                                 11:56:09
15     A   I believe that's correct                      11:56:11
16     Q    Why didn't you use your avoided cost         11:56:20
17  method to value Trade Secret 90?                       11:56:22
18     A   That -- there was this other method to        11:56:24
19  look at an -- an acquisition that largely related to  11:56:27
20  that -- that type of product                           11:56:31
21     Q    When you say "largely related to that type   11:56:34
22  of product," you're not referring to largely is       11:56:36
23  Trade Secret 90, are you?                              11:56:41
24         MR. EISEMAN:  Objection as to form            11:56:41
25     A   I'm sorry  I didn't understand the            11:56:42

**Page 114**

1  question.                                  11:56:43
2  Q   (BY MR. BERRY) Let me -- I'll withdraw  11:56:43
3  that question.                             11:56:44
4      So you used an entirely different model  11:56:48
5  for Trade Secret 90, right?                11:56:50
6  A   Yes.  And any other trade secrets.     11:56:52
7  Q   And you looked at the amount that Otto  11:56:54
8  paid to acquire Tyto, right?               11:56:57
9  A   Yes.  Minus the stock grants to the    11:57:00
10 employees.                                 11:57:02
11 Q   So if we look at the total cash        11:57:02
12 consideration that Otto paid to acquire Tyto, it's  11:57:05
13 $8 million, right?                         11:57:11
14 A   Correct.                               11:57:11
15 Q   For that 8 million in cash consideration,  11:57:12
16 Otto received a number of benefits, right?  11:57:13
17 A   I agree with that.                     11:57:17
18 Q   One type of benefit is it received six  11:57:19
19 Tyto employees, right?                     11:57:21
20 A   They did.                              11:57:22
21 Q   Another type of benefit is that Otto   11:57:23
22 received intellectual property from Tyto?  11:57:26
23     MR. EISEMAN:  Objection as to form?    11:57:28
24 A   I -- I -- I do believe there was some  11:57:29
25 intellectual property.  I don't recall seeing a  11:57:32

Page 114

**Page 115**

1  schedule of what it was.                   11:57:34
2  Q   (BY MR. BERRY) In fact, sir, Otto received  11:57:35
3  nine patent applications for that $8 million that it  11:57:38
4  paid to acquire Tyto?                      11:57:42
5     MR. EISEMAN:  Objection as to form.     11:57:44
6  A   You know, I have some recollection of   11:57:45
7  that, but I -- I believe you're telling me the facts  11:57:47
8  that are correct.                          11:57:50
9  Q   (BY MR. BERRY) And in fact, four of those  11:57:50
10 patent applications were still pending at the time  11:57:52
11 of the acquisition, right?                 11:57:54
12 A   Again, I don't remember that level of   11:57:55
13 detail.  I do know -- and you have refreshed my  11:57:57
14 recollection that there were some patent   11:57:59
15 applications, but I don't remember the details.  11:58:00
16 Q   And, sir, you did nothing to try to value  11:58:02
17 those patent applications, right?          11:58:04
18 A   No, I have not apportioned out that value.  11:58:06
19 Q   Did you read the patent applications?  11:58:09
20 A   No.  I think re -- I think I recall    11:58:10
21 reading the titles, but I don't recall -- I did not  11:58:12
22 read the applications.                     11:58:15
23 Q   Well, they obviously have some value,   11:58:16
24 right?                                     11:58:19
25     MR. EISEMAN:  Objection as to form.    11:58:19

Page 115

**Page 116**

1  A   They may or may not.  A lot of patents are  11:58:21
2  just more cost than value, but I would assume they  11:58:22
3  have some value.                           11:58:25
4  Q   (BY MR. BERRY) But you did no work to try  11:58:26
5  to assess that value?                      11:58:29
6  A   That is correct.                       11:58:31
7  Q   In addition to the intellectual property  11:58:33
8  of employees, Otto also received tangible property  11:58:35
9  from acquisition of Tyto?                  11:58:40
10 A   I think there probably was some tangible  11:58:43
11 property, yes.                             11:58:45
12 Q   And in fact, the tangible property      11:58:46
13 includes all tools, equipment, parts and inventory  11:58:48
14 used to build and assemble fiber lasers and laser  11:58:51
15 scanners, right?                           11:58:56
16 A   That's true.                           11:58:57
17 Q   That property had value?               11:58:58
18 A   I would assume it has some value.      11:58:59
19 Q   What work did you do, sir, to value that  11:59:01
20 property?                                  11:59:03
21 A   I didn't do any work.                  11:59:04
22 Q   Do you know what tools were included?  11:59:05
23 A   No.                                    11:59:07
24 Q   Do you know what equipment was included?  11:59:08
25 A   I do not.                              11:59:10

Page 116

**Page 117**

1  Q   Do you know what parts and inventory was  11:59:10
2  included?                                  11:59:13
3  A   No.                                    11:59:13
4  Q   And the tangible property also includes  11:59:14
5  all equipment used to test and calibrate fiber  11:59:16
6  lasers and laser scanners, right?          11:59:21
7  A   It does.                               11:59:22
8  Q   What was the value of that equipment?  11:59:23
9  A   I have no information on that.         11:59:24
10 Q   Did you look into that?                11:59:27
11 A   No.                                    11:59:28
12 Q   So for -- to value Trade Secret 90, you  11:59:29
13 applied the entire 8 million in cash consideration  11:59:31
14 that Otto paid to acquire Tyto?            11:59:33
15 A   Yes.                                   11:59:35
16 Q   And you did not attempt, sir, to apportion  11:59:35
17 out any value for the other benefits that Tyto  11:59:38
18 received -- or that Otto received?         11:59:42
19 A   Correct.                               11:59:43
20     MR. EISEMAN:  Objection as to form.    11:59:44
21 A   Again, and that's based on my          11:59:45
22 understanding that I expect that Mr. Bratic would  11:59:46
23 give me that information, and then I would consider  11:59:49
24 it and possibly change my opinion.         11:59:50
25 Q   (BY MR. BERRY) My question, sir, is:  You  11:59:53

Page 117

30 (Pages 114 - 117)

1  didn't do it?                                          11:59:53
2    A   That --                                          11:59:57
3    Q   -- you did not apportion it?                     11:59:57
4    A   -- that is correct.                              11:59:59
5    Q   Let's look at your reasonable royalty            11:59:59
6  opinion, please.                                       12:00:01
7        MR. BERRY:  Mr. Berry, you have got to           12:00:02
8  slow down.  Okay.  I mean, it's not fair to the        12:00:04
9  court reporter.                                        12:00:08
10   Q   (BY MR. BERRY)  So -- so we already talked        12:00:08
11 the Book of Wisdom, right?                             12:00:10
12   A   We did.                                          12:00:11
13   Q   And you conclude it's appropriate, when          12:00:11
14 determining a reasonable royalty, to apply the --      12:00:17
15 the logic from the Book of Wisdom?                     12:00:19
16   A   I do.                                            12:00:22
17   Q   Sir, do you also agree that the cost to          12:00:28
18 independently development a trade secret serves as     12:00:31
19 an upper limit for the reasonable royalty?             12:00:34
20       MR. EISEMAN:  Objection as to form.              12:00:36
21   A   I do.                                            12:00:37
22   Q   (BY MR. BERRY) To arrive at a reasonable         12:00:40
23 royalty, you started with a baseline royalty, right?   12:00:42
24   A   That's generally what I do.                      12:00:47
25   Q   And the baseline royalty you used was the        12:00:48
                                                          Page 118

1  that will be introduced sometime in the future has     12:01:48
2  no established profitability, right?                    12:01:51
3    A   I agree with that.                                12:01:54
4    Q   And that autonomous vehicle that's going         12:01:54
5  to be introduced at some point in the future has no    12:01:57
6  current commercial success?                            12:02:01
7    A   Correct.                                          12:02:05
8    Q   And that autonomous vehicle has no current       12:02:05
9  popularity?                                            12:02:08
10   A   Only in theory, not in -- in practice.           12:02:12
11   Q   Factor 11 looks at the extent to which the       12:02:18
12 infringer has made use of the invention and any       12:02:23
13 evidence probative -- probative of the value of that  12:02:26
14 use, right?                                            12:02:30
15   A   Yes.                                             12:02:31
16   Q   And your baseline royalty already looks at       12:02:31
17 the value of the use from the perspective of Uber,     12:02:36
18 right?                                                 12:02:40
19   A   It does.                                         12:02:42
20   Q   And so the value of that use is already          12:02:43
21 incorporated into your reasonable royalty through      12:02:45
22 the baseline?                                          12:02:49
23   A   In part.                                         12:02:49
24   Q   What part is not?                                12:02:50
25   A   The -- I used the most conservative              12:02:51
                                                          Page 120

1  accelerated development opinion of yours, right?       12:00:50
2    A   Yes.                                             12:00:52
3    Q   And then you applied the 15                      12:00:56
4  Georgia-Pacific factors to that baseline royalty,     12:01:00
5  right?                                                 12:01:03
6    A   Well, I really apply 14 factors.  And the        12:01:03
7  15th factor is the hypothetical negotiation where      12:01:06
8  you consider the information in the 14 factors.        12:01:08
9    Q   Let's look at the -- Factor 8 looks at the       12:01:11
10 established profitability of the product embodying     12:01:15
11 the trade secrets, its commercial success, and its     12:01:20
12 current popularity, right?                             12:01:23
13   A   Yes.                                             12:01:26
14   Q   And Factor 8 talks about the product             12:01:26
15 embodying the trade secrets.  And here, sir, that      12:01:29
16 product is Uber's AV program, right?  It -- let me     12:01:31
17 --                                                     12:01:35
18       MR. EISEMAN:  Objection.                         12:01:36
19   Q   (BY MR. BERRY) -- ask a different                12:01:36
20 question.  The product here is Uber's autonomous       12:01:37
21 vehicle?                                               12:01:40
22       MR. EISEMAN:  Objection as to form.              12:01:40
23   A   Right.  The autonomous vehicle that will         12:01:41
24 be introduced commercially in the future.             12:01:43
25   Q   (BY MR. BERRY) That autonomous vehicle           12:01:47
                                                          Page 119

1  assumptions.  And there's -- I didn't even use         12:02:54
2  the -- like, the average base case.  And there's       12:02:57
3  also optimistic projections.  And if you -- if you     12:03:01
4  appropriately risk adjust all of those and come up     12:03:04
5  with a present value, the number would be higher       12:03:07
6  than my baseline.  And that's what I'm talking about   12:03:09
7  in GP Factor No. 11.                                   12:03:11
8    Q   But the profits from the accelerated             12:03:14
9  development model are already incorporated in the     12:03:20
10 baseline, right?                                       12:03:22
11   A   As -- as I just explained it, yes.  I            12:03:24
12 agree with that.                                       12:03:26
13   Q   Based upon your analysis of the                  12:03:30
14 Georgia-Pacific factors, you concluded it was         12:03:31
15 reasonable to adjust upward by 10 percent, the         12:03:34
16 reasonable royalty, right?                             12:03:38
17   A   I did.                                           12:03:40
18   Q   How did you calculate 10 percent?               12:03:41
19   A   Well, you -- first, you assumed a fact not      12:03:43
20 in evidence that I calculated it.  Listen, I have      12:03:45
21 been doing this for 40 years.  I have seen hundreds    12:03:47
22 of Georgia-Pacific analyses.  I have never seen a,     12:03:50
23 quote, calculation of an adjustment from a baseline.   12:03:53
24   Q   So let me --                                    12:03:56
25   A   The quality -- the Georgia-Pacific factors      12:03:57
                                                          Page 121

                                                          31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 122**

1　are qualitative mostly in nature.  Some -- in some　12:03:59
2　fact situations you can quantify some of it.　12:04:04
3　　　　But it's qualitative.  It's just like in　12:04:08
4　the real world where two parties negotiate over a　12:04:11
5　table about a royalty rate.  They -- they all　12:04:14
6　overstate their strengths, understate their　12:04:16
7　weaknesses.  Both sides are doing that.　12:04:19
8　　　　All the facts are then considered and　12:04:21
9　discussed, and a judgment is made as to what the　12:04:24
10　number will be.  That's the same that I did here.　12:04:29
11　　　　I had -- it's based on the facts in my　12:04:33
12　Georgia-Pacific analysis discussion, and then it's　12:04:36
13　based on applying my professional judgment to that　12:04:39
14　information to arrive at that number, which I　12:04:42
15　thought was a conservative number.　12:04:44
16　　　　MR. BERRY:  Move to strike as　12:04:48
17　nonresponsive.　12:04:48
18　　Q　(BY MR. BERRY) Sir, did you calculate the　12:04:48
19　10 percent adjustment?　12:04:50
20　　　　MR. EISEMAN:  Objection -- objection as to　12:04:52
21　form.　12:04:52
22　　A　No, I didn't calculate it.　12:04:53
23　　Q　(BY MR. BERRY) Did you base it upon a　12:04:54
24　comparable license?　12:04:56
25　　A　No.  As -- if you read my report, you　12:04:59

**Page 123**

1　would know in GP Factors 1 and 2, I said they were　12:05:01
2　neutral because there were none.　12:05:06
3　　Q　A 10 percent upward adjustment will result　12:05:08
4　in a 110 percent royalty rate, right?　12:05:12
5　　A　In --　12:05:16
6　　　　MR. EISEMAN:  Objection as to form.　12:05:16
7　　A　-- relationship to the unjust enrichment　12:05:16
8　calculation, yes.　12:05:20
9　　Q　(BY MR. BERRY) And, sir, you applied the　12:05:27
10　same -- let me ask you a different question.　12:05:31
11　　　　You looked at all nine trade secrets　12:05:35
12　together when applying the Georgia-Pacific factors　12:05:38
13　right?　12:05:42
14　　A　I did.　12:05:43
15　　Q　You did not do a separate Georgia-Pacific　12:05:43
16　factor for each trade secret?　12:05:46
17　　A　That is accurate.　12:05:49
18　　Q　And, sir, you applied the same 10 percent　12:05:49
19　upward adjustment to each of the nine trade secrets?　12:05:51
20　　A　I did.　12:05:54
21　　Q　And, sir, for a reasonable royalty, you　12:05:56
22　only opine on a lump-sum royalty, right?　12:05:59
23　　A　I do.　12:06:02
24　　Q　You did not arrive at any conclusions for　12:06:03
25　any running royalty?　12:06:05

**Page 124**

1　　A　I did not.　12:06:08
2　　Q　And your reasonable royalty opinion　12:06:13
3　assumes that the court will not grant a permanent　12:06:16
4　injunction, right?　12:06:18
5　　A　I -- I believe that's correct.　12:06:20
6　　Q　And if the court -- if the court were to　12:06:20
7　grant a permanent injunction, your reasonable　12:06:23
8　royalty opinion would no longer be applicable?　12:06:26
9　　A　I -- I think there would have to be　12:06:28
10　adjustments to it.　12:06:30
11　　Q　Sir, did you interview anybody between the　12:06:32
12　time of your Opening Report and your Reply Report?　12:06:34
13　　A　No.  If you're talking about, like, at my　12:06:38
14　client, no.  Or an expert, no.　12:06:40
15　　Q　And, sir, do you have any notes from any　12:06:42
16　interviews that you have done in this case?　12:06:44
17　　A　Yes.　12:06:48
18　　Q　What types of notes?　12:06:49
19　　A　Well, when I had telephone -- the various　12:06:51
20　telephone communications, I -- I ex -- frequently　12:06:53
21　would write some notes down of things I wanted to　12:06:57
22　remember.　12:07:01
23　　Q　And did you consider those notes at　12:07:01
24　arriving at your opinions in this case?　12:07:03
25　　A　No.　12:07:05

**Page 125**

1　　Q　Not at all?　12:07:05
2　　A　No　12:07:06
3　　Q　In arriving at your opinions in this case,　12:07:07
4　did you con -- did you look at those notes?　12:07:08
5　　A　I don't think I have looked at them since　12:07:12
6　I wrote them　12:07:13
7　　　　MR. BERRY:  Well, we request that they be　12:07:15
8　produced　12:07:18
9　　　　MR. EISEMAN:  Why don't you put it in an　12:07:18
10　e-mail and we'll get back to you about it　12:07:18
11　　　　MR. BERRY:  Well, sir, that's all the　12:07:21
12　questions I have for you today  I appreciate your　12:07:22
13　time  I believe that other people might have　12:07:23
14　questions or --　12:07:26
15　　　　MR. SCHUMAN:  I have some -- I have some　12:07:29
16　questions  I don't think it'll take very long  If　12:07:29
17　it's okay with the court reporter and the　12:07:32
18　videographer and the witness, I would prefer to　12:07:34
19　just -- instead of taking a lunch break --　12:07:36
20　　　　MR. BERRY:  Yeah, me too　12:07:39
21　　　　THE VIDEOGRAPHER:  It would be better,　12:07:41
22　though, if you could come down here photographic and　12:07:41
23　audio purposes  Shall we go off the record or --　12:07:44
24　　　　MR. BERRY:  No  I can move　12:07:47
25　　　　MR. SCHUMAN:  I'm not on the --　12:07:49

32 (Pages 122 - 125)

**Page 126**

1    A   Yeah, but I -- he thinks -- he thinks my   12 07:51
2  profile is not as good as my straight face   12 07:53
3        THE VIDEOGRAPHER: What he said  Do you   12:07:57
4  want to stay on or -- we can stay on   12 07:59
5     EXAMINATION BY COUNSEL FOR THE DEFENDANTS   12 08:03
6  BY MR. SCHUMAN:   12 08:04
7    Q   All right  Good afternoon, Mr Wagner   12:08:07
8    A   Good afternoon, Mr  Schuman   12:08:10
9    Q   Mr  Wagner, I represent a company called   12:08:14
10 Otto Trucking LLC  Do you know how Otto Trucking   12:08:16
11 is?   12:08:18
12   A   I do   12 08:19
13   Q   Who is Otto -- what's your understanding   12:08:20
14 of who Otto Trucking is?   12:08:21
15   A   Well, I -- I believe it's a company that's   12:08:23
16 owned by -- principally owned by Mr  Levandowski and   12:08:25
17 Lior   12 08:32
18       And it is in -- has signed an -- an   12 08:34
19 acquisition of purchase agreement with Uber where   12 08:37
20 it -- it's Uber's discretion to purchase that   12:08:42
21 company between now and sometime in November  And   12:08:45
22 it is a company that is focused on applying LiDAR   12:08:48
23 technology to trucks   12:08:52
24   Q   Do you know whether Otto Trucking has any   12:08:56
25 employees?   12 08:58

**Page 127**

1    A   Well, my understanding is they do not, at   12:08:59
2  least from the last facts that I have.   12:09:01
3    Q   Do you have any understanding as to   12:09:04
4  whether Otto Trucking does any research and   12:09:04
5  development activities?   12:09:07
6    A   I -- I -- I don't know whether they do or   12:09:12
7  not. I understand that Uber is advancing   12:09:15
8  development funds to them, so I -- I would think   12:09:18
9  they do. But whether that's done with -- actually   12:09:21
10 being done by Uber and not your client, I -- I don't   12:09:25
11 know.   12:09:28
12   Q   Okay. You're not offering any opinions in   12:09:29
13 this case as to any damages caused to Waymo specific   12:09:31
14 to Otto Trucking; is that right?   12:09:36
15   A   That's correct.   12:09:38
16   Q   Okay. And so then your damages -- I'm   12:09:38
17 going to walk through briefly -- not in the level of   12:09:44
18 detail that Uber's counsel did, but I just want to   12:09:46
19 walk through your -- your principal opinions in this   12:09:48
20 case.   12:09:50
21       You have offered two unjust enrichment   12:09:50
22 calculations and a -- and a reasonable royalty   12:09:55
23 measure, correct?   12:09:59
24   A   That's fair.   12:10:00
25   Q   Okay. The first unjust enrichment measure   12:10:01

**Page 128**

1  values the accelerated development to -- that Uber   12:10:05
2  was able to achieve through the alleged   12:10:10
3  misappropriation of these nine trade secrets, right?   12:10:13
4    A   Yes.   12:10:16
5    Q   And -- and your opinion -- that -- we'll   12:10:17
6  call that your first unjust enrichment opinion.   12:10:20
7        That opinion is based on internal Uber   12:10:24
8  documents showing some accelerated development,   12:10:28
9  correct?   12:10:31
10   A   That's fair.   12:10:32
11   Q   That opinion is not based on any Otto   12:10:34
12 Trucking documents; is that right?   12:10:36
13   A   It is not.   12:10:40
14   Q   So would you agree with me then that your   12:10:42
15 first unjust -- unjust enrichment theory is not   12:10:45
16 applicable to Otto Trucking?   12:10:48
17       MR. EISEMAN: Objection as to form.   12:10:50
18   A   You know, I -- what I would say is that   12:10:51
19 unless Uber exercises its option to purchase Otto   12:10:56
20 Trucking or shares this accelerated depreciation --   12:11:01
21 or accelerated development with Otto Trucking, then   12:11:04
22 my calculations have nothing to do with your client.   12:11:10
23   Q   (BY MR. SCHUMAN)  Right. And as we sit   12:11:15
24 here today, you know that Uber has not exercised the   12:11:15
25 option to the purchase Otto Trucking, right?   12:11:18

**Page 129**

1    A   I -- I don't know that. But those facts   12:11:21
2  have not been brought to my attention. And if it   12:11:23
3  had happened, I fully expect I would be aware of it.   12:11:27
4    Q   Right. And the accelerated -- sharing the   12:11:30
5  accelerated development with Otto Trucking, what did   12:11:33
6  you mean by that?   12:11:36
7    A   Well, if -- if -- if as a result of Uber   12:11:36
8  accelerating development of LiDAR on their veh -- on   12:11:43
9  their vehicles for their transportation as a   12:11:46
10 service, they -- they're also -- then by Otto   12:11:48
11 Trucking -- and Otto Trucking is going to get into   12:11:51
12 the market one or two years earlier than they   12:11:54
13 otherwise would -- then I think it might be   12:11:58
14 appropriate to your client. But unless those facts   12:12:00
15 occur, what I have calculated has nothing to do with   12:12:03
16 your client.   12:12:05
17   Q   All right. And as we sit here today, you   12:12:06
18 do know that those facts that you have just in your   12:12:07
19 last answer summarized have not occurred yet, right?   12:12:10
20   A   That's correct.   12:12:13
21   Q   Your second unjust enrichment calculation   12:12:14
22 is based on the cost that -- that you have opined   12:12:16
23 Uber saved in its development of autonomous vehicles   12:12:20
24 through alleged use of these nine trade secrets,   12:12:25
25 right?   12:12:29

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | |
|---|---|
| 1   A   Yes                                          12:12:29 | 1   be representing their interests at that point.  But   12:14:38 |
| 2   Q   And again, that's based on Uber documents   12:12:29 | 2   I -- that's only way I see my work as relevant to   12:14:41 |
| 3   showing a $20 million per-month run rate for its R&D   12:12:33 | 3   your client.                                       12:14:44 |
| 4   program on autonomous vehicles, right?           12:12:39 | 4   Q   (BY MR. SCHUMAN)  Right.  So the same         12:14:49 |
| 5   A   Yeah, documents and I believe deposition     12:12:42 | 5   caveat -- the same caveats that you're referring to   12:14:49 |
| 6   testimony of Mr Bares  And -- and so your second   12:12:44 | 6   in that answer are -- are the sort of -- we'll call   12:14:51 |
| 7   Q   Fair  Right  And -- and so your second        12:12:45 | 7   them speculative future possibility that Uber       12:14:54 |
| 8   unjust enrichment calculation is not based on any   12:12:48 | 8   acquires Otto Trucking and shares some of these    12:14:58 |
| 9   Otto Trucking-specific evidence; is that fair?    12:12:50 | 9   benefits that you have quantified with Otto Trucking   12:15:01 |
| 10   A   That is fair                                 12:12:55 | 10   in the future; is --                                12:15:04 |
| 11   Q   So your second unjust enrichment            12:12:55 | 11       MR. EISEMAN:  Objection.                       12:15:05 |
| 12   calculation, would you agree with me, is not     12:12:57 | 12   Q   (BY MR. SCHUMAN) -- that --                    12:15:05 |
| 13   applicable to Otto Trucking?                     12:13:00 | 13       MR. EISEMAN:  Objection.  Sorry.               12:15:06 |
| 14       MR EISEMAN:  Objection as to form            12:13:02 | 14   Q   (BY MR. SCHUMAN)  Am I --                      12:15:07 |
| 15   A   Yes, with the same caveats as I discussed    12:13:02 | 15       MR. EISEMAN:  Objection as to form.            12:15:09 |
| 16   on the first calculation                         12:13:05 | 16   Q   (BY MR. SCHUMAN)  I didn't ask the question   12:15:09 |
| 17   Q   (BY MR SCHUMAN)  Right  So assume --         12:13:07 | 17   yet.  Do you understand that -- do I understand your   12:15:10 |
| 18   assume for purposes of this question that Otto   12:13:09 | 18   caveats correctly?                                 12:15:14 |
| 19   Trucking pays Uber some amount of money for the work   12:13:11 | 19       MR. EISEMAN:  Objection as to form.            12:15:15 |
| 20   that Uber employees are -- are doing on          12:13:18 | 20   A   Yes.  If you took just the                     12:15:16 |
| 21   autonomous -- the development of autonomous trucks   12:13:22 | 21   word "speculative" out of your question, I would   12:15:18 |
| 22       Have you seen any evidence in the            12:13:25 | 22   agree with what you said.                          12:15:21 |
| 23   materials you reviewed as to what Otto Trucking's   12:13:28 | 23       I mean -- yeah, I don't know whether           12:15:24 |
| 24   burn rate is for that development?               12:13:32 | 24   they're going to get acquired or not.  But you know,   12:15:25 |
| 25   A   No                                           12:13:35 | 25   clearly your -- your client is -- is getting a lot   12:15:27 |
| Page 130 | Page 132 |

| | |
|---|---|
| 1   Q   Okay.  Did -- on the list of materials you   12:13:36 | 1   of funds from Uber  Uber is forwarding -- committed   12:15:29 |
| 2   reviewed or at least considered is the Brent Schwarz   12:13:39 | 2   to forward a lot of funds to your client  There --   12:15:32 |
| 3   deposition.                                       12:13:44 | 3   there is a -- a deal done that your client -- client   12:15:34 |
| 4       Do you recall reviewing any portions of       12:13:45 | 4   will have to accept and Uber can force on your       12:15:38 |
| 5   Mr. Schwarz's deposition?                         12:13:47 | 5   client, if they want to                             12:15:41 |
| 6   A   I personally do not.                          12:13:48 | 6       I don't know what their mind-set is right       12:15:43 |
| 7   Q   You have a separate section of your           12:13:55 | 7   now, and I don't know how much developed on the     12:15:45 |
| 8   report -- and we were just covering this with Uber's   12:13:58 | 8   truck has been done as to whether Uber believes it's   12:15:47 |
| 9   counsel -- unjust enrichment related to Trade Secret   12:14:02 | 9   appropriate to purchase your client                 12:15:51 |
| 10   No. 90.  And I think you have an $8 million unjust   12:14:04 | 10       So I don't think it's wild speculation,        12:15:54 |
| 11   enrichment figure for that; is --               12:14:08 | 11   but I clearly do not know whether it will happen or   12:15:56 |
| 12   A   Yes --                                       12:14:10 | 12   not  But then all the caveats apply                12:16:00 |
| 13   Q   -- that right?                               12:14:10 | 13   Q   (BY MR SCHUMAN)  Right  So fair enough         12:16:03 |
| 14   A   -- that's correct.                           12:14:11 | 14   Taking out the word "speculative "  I know we don't   12:16 03 |
| 15   Q   And that is -- that -- is that based on      12:14:12 | 15   like using that word  The caveats you're referring   12:16:06 |
| 16   any Otto Trucking documents or evidence?         12:14:15 | 16   to regarding the applicability of your unjust       12:16:09 |
| 17   A   No.                                          12:14:17 | 17   enrichment damage theories, those caveats are Uber   12:16:12 |
| 18   Q   Does that theory have any applicability to   12:14:18 | 18   acquires Otto Trucking and that Uber shares some of   12:16:17 |
| 19   Otto Trucking?                                   12:14:20 | 19   the technology it's developing using the allegedly   12:16:21 |
| 20       MR. EISEMAN:  Objection as to form.          12:14:21 | 20   misappropriated trade secrets with Otto Trucking; is   12:16:25 |
| 21   A   You know, I -- no, again, with the same      12:14:22 | 21   that right?                                         12:16:28 |
| 22   caveats.  And -- and I personally believe that my   12:14:26 | 22   A   That's -- that's -- again, that's my           12:16:28 |
| 23   work is only relevant unless client is -- you will   12:14:28 | 23   conclusion -- or that would be my opinion as a       12:16:30 |
| 24   have no role at the trial, because your client will   12:14:32 | 24   damage expert                                       12:16:33 |
| 25   be owned by Uber.  And I assume Uber's counsel will   12:14:35 | 25   Q   If both of those assumptions are true,         12:16:33 |
| Page 131 | Page 133 |

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 then your damages opinions -- your unjust enrichment 12:16:36
2 damages opinions may have some applicability to Otto 12:16:39
3 Trucking, correct? 12:16:41
4     MR. EISEMAN:  Objection as to form. 12:16:44
5     A   That's fair. 12:16:44
6     Q   (BY MR. SCHUMAN) You also have a 12:16:49
7 reasonable royalty rate calculation, and that 12:16:52
8 measures the amount that Uber would have agreed to 12:16:55
9 pay Waymo in this hypothetical negotiation set in 12:16:57
10 the -- somewhere in the December 15 -- August -- 12:17:01
11 between December '15 and August 2016 time period, 12:17:04
12 right? 12:17:08
13     A   Correct. 12:17:09
14     Q   You didn't do any separate calculation of 12:17:09
15 the amount that Otto Trucking would have agreed to 12:17:11
16 pay Waymo at a hypothetical negotiation set during 12:17:15
17 that same time period, correct? 12:17:20
18     A   That is accurate. 12:17:22
19     Q   Okay.  And then for the reasonable royalty 12:17:23
20 calculation that you did, you start with a baseline 12:17:25
21 of Uber's unjust enrichment.  And then you adjusted 12:17:28
22 upward based on some analysis you have done of 12:17:32
23 certain of the Georgia-Pacific factors.  Namely 4, 12:17:36
24 5, 6, 8, and 11, correct? 12:17:38
25     A   Those are the only ones that had any 12:17:42

Page 134

1 projections from Otto Trucking, right? 12:18:51
2     A   Correct  I don't believe I have seen any 12:18:52
3 projections for your client -- 12:18:54
4     Q   Right 12:18:56
5     A   -- and so I poss -- I could not have 12:18:56
6 possibly considered them 12:18:58
7     Q   Okay  You answered my next question, so 12:18:59
8 that'll make us go a little faster 12:19:01
9     Factor 11 talks about the extent of the 12:19:04
10 use of the invention  This is addressed at 12:19:06
11 paragraphs 424 and 428 of your report  And again, 12:19:09
12 you find that that factor pushes the base -- the -- 12:19:12
13 the reasonable royalty baseline up a little bit 12:19:13
14 because of your assumptions based on the work of 12:19:17
15 others that -- that Uber has used these trade 12:19:21
16 secrets, right? 12:19:24
17     A   Yes 12:19:25
18     Q   And you -- you have not done a re -- at 12:19:28
19 least -- have -- have you seen any evidence of any 12:19:30
20 use of any of these trade secrets by my client, Otto 12:19:33
21 Trucking? 12:19:36
22     MR  EISEMAN:  Objection as to form 12:19:37
23     A   I have not 12:19:37
24     Q   (BY MR  SCHUMAN) And so your analysis of 12:19:41
25 Factor 11 is inapplicable to my client, Otto 12:19:42

Page 136

1 impact on changing the number from the baseline 12:17:45
2 That is correct 12:17:47
3     Q   And -- and Factor 5 -- this is addressed 12:17:48
4 in your report at paragraphs 399 to 401 -- that -- 12:17:52
5 that factor deals with the commercial relationship 12:17:55
6 between Waymo and Uber and some documents that you 12:17:58
7 referred regarding the -- the potential competitive 12:18:02
8 relationship between those two companies, right? 12:18:08
9     A   Yes 12:18:10
10     Q   That analysis in Factor 5 is -- is 12:18:11
11 inapplicable to -- to my client Otto Trucking -- 12:18:13
12     A   Yeah -- 12:18:16
13     Q   -- correct? 12:18:16
14     A   -- as discussed in my report, that is 12:18:17
15 correct 12:18:19
16     Q   Right  And -- and Factor 8 deals with 12:18:20
17 expected future profitability  And you analyzed 12:18:25
18 Waymo's and Uber's projections for profitability of 12:18:29
19 autonomous vehicles 12:18:36
20     And in your view, that factor counseled in 12:18:36
21 favor of some enhancement to the baseline for the 12:18:38
22 reasonable royalty calculation, right? 12:18:42
23     A   That's fair 12:18:44
24     Q   Okay  And -- and you were working with 12:18:45
25 Waymo and Uber projections there, not any 12:18:48

Page 135

1 Trucking, right? 12:19:46
2     MR  EISEMAN:  Objection as to form 12:19:47
3     A   Based on the information that I have at 12:19:48
4 this time, that is correct 12:19:50
5     Q   (BY MR  SCHUMAN) Okay  Mr  Wagner, if the 12:19:53
6 jury finds that -- and this is the hypothetical, so 12:19:55
7 it's -- follow me here  If the jury finds that 12:19:57
8 and Ottomotto -- strike that  I'm going to start 12:20:01
9 over 12:20:05
10     Hypothetical:  If at trial in this case 12:20:05
11 the jury finds in favor of Uber -- Uber and 12:20:06
12 Ottomotto -- so a defense verdict for them -- but 12:20:10
13 against Otto Trucking on liability, what's your 12:20:13
14 opinion as to the damages that Waymo would be 12:20:17
15 entitled to as to my client, Otto Trucking? 12:20:20
16     MR  EISEMAN:  Objection as to form 12:20:23
17     A   I would need more facts to know if there's 12:20:24
18 any relevance of what I have done would apply to 12:20:25
19 your client in that hypothetical 12:20:28
20     Q   (BY MR  SCHUMAN) So as you sit here today 12:20:30
21 based on the work you have done so far up to and 12:20:32
22 including today, you don't have an opinion of what 12:20:35
23 damages Waymo would be entitled to under that 12:20:38
24 hypothetical verdict -- 12:20:40
25     MR  EISEMAN:  Objection 12:20:41

Page 137

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 138**

1 Q (BY MR SCHUMAN) -- is that fair?          12:20:41

2    MR EISEMAN: Objection as to form          12:20:43

3 A I do not          12:20:43

4 Q (BY MR SCHUMAN) In -- in response to some          12:20:44

5 of the questions you got from Uber's counsel, you --          12:20:50

6 you mentioned that you personally spent          12:20:55

7 approximately 64 hours total working on -- working          12:20:58

8 on your opinions in this case  Obviously, your          12:21:01

9 staff spent many more hours than that          12:21:04

10    Approximately what percentage of your          12:21:06

11 64 hours, Mr Wagner, did you spend focusing on          12:21:09

12 calculating damages specific to my client, Otto          12:21:14

13 Trucking?          12:21:16

14 A Zero          12:21:17

15 Q Just bear with me a second          12:21:25

16 A But I could -- the approximate -- it's          12:21:27

17 exactly 64 0 hours through September 15  And it's          12:21:30

18 been 13 4 hours since then before today          12:21:36

19 Q I would --          12:21:39

20 A -- between September 15 and today          12:21:40

21 Q In response to some questions from Uber's          12:21:44

22 counsel, I think you made clear that your damages          12:21:45

23 are based on Uber's use of -- alleged use of the          12:21:46

24 trade secrets in its development of its autonomous          12:21:53

25 vehicles          12:21:56

**Page 139**

1    If the evidence at trial shows that my          12:22:01

2 client, Otto Trucking, has not used any of those          12:22:04

3 trade secrets, would you agree with me that your          12:22:07

4 opinions are irrelevant to Otto Trucking?          12:22:10

5    MR EISEMAN: Objection as to form          12:22:13

6 A I'm not giving you a legal opinion  But          12:22:16

7 as -- my judgment as a damage expert, you are          12:22:17

8 correct          12:22:20

9 Q (BY MR SCHUMAN) You mentioned that you          12:22:29

10 had documents in this case from Uber with its own          12:22:31

11 modeling of the benefits of -- of -- well, let me --          12:22:38

12 let me ask it -- strike that  Let me start that          12:22:44

13 question again          12:22:47

14    Do you remember some testimony you gave in          12:22:48

15 response to Uber's counsel where you characterized          12:22:49

16 some of the information you got from -- that you          12:22:52

17 were able to review from Uber as the Rosetta Stone          12:22:55

18 in your field?          12:22:57

19    Do you remember that --          12:22:59

20 A I --          12:22:59

21 Q -- testimony?          12:22:59

22 A -- do remember that          12:23:00

23 Q And -- and what is the information again          12:23:01

24 that you characterize as being the Rosetta Stone in          12:23:03

25 your field?          12:23:05

**Page 140**

1 A Well, you know, I -- well, let me -- let          12:23:06

2 me give you an example of another case that I          12:23:07

3 testified in last year in a similar fact situation          12:23:10

4 of this case where there's no product in the market          12:23:13

5 yet  There's regulatory approvals that need to be          12:23:16

6 done that weren't done yet; that there would be no          12:23:20

7 commercialization for years into the future  And I          12:23:21

8 had the business plans of the company that took the          12:23:24

9 trade secrets          12:23:30

10    Now, there they provided me the model, and          12:23:31

11 they never made a calculation of what the impact          12:23:36

12 would be on them to accelerate the development by          12:23:39

13 any amount of time  I had to get into their model,          12:23:43

14 understand the logic, and make that calculation          12:23:46

15 myself          12:23:47

16    In this case I have the same thing in that          12:23:49

17 I have projections done at the time of the alleged          12:23:51

18 theft by the party who was alleged to have taken the          12:23:55

19 trade secrets          12:23:59

20    But they have even gone to the next step          12:24:01

21 of actually quantifying the impact of acceleration,          12:24:04

22 and so that's why I say it's the Rosetta Stone          12:24:07

23 Normally I have to do more work than I did in this          12:24:09

24 case, but Uber has done it for me          12:24:12

25 Q Right  And have you seen any similar          12:24:17

**Page 141**

1 documents from my client, Otto Trucking?          12:24:20

2 A I knew that was next question  The answer          12:24:23

3 is no  And you're closing the loop          12:24:25

4    MR SCHUMAN: Why don't we take a          12:24:32

5 two-minute break  I don't think I have anything          12:24:33

6 more, but why don't we just --          12:24:36

7    MR BERRY: I actually have a couple of          12:24:36

8 questions          12:24:38

9    MR SCHUMAN: Well, I'm not sure I'm done          12:24:38

10 yet  I just want to --          12:24:40

11    MR BERRY: Okay          12:24:41

12    MR SCHUMAN: -- take a two-minute break          12:24:41

13 and make sure  And then if you have something else          12:24:41

14    MR BERRY: Okay          12:24:44

15    MR SCHUMAN: -- you guys can take that          12:24:45

16 up          12:24:46

17    THE VIDEOGRAPHER: It's 12 24 p m  We're          12:24:47

18 going off the record          12:24:49

19    (A break was taken from 12 24 p m  to          12:24:51

20 12 28 p m )          12:25:12

21    THE VIDEOGRAPHER: We are back on the          12:28:09

22 record  It's 12 28 p m          12:28:09

23 Q (BY MR SCHUMAN) Mr Wagner, did either          12:28:15

24 the Quinn firm or Waymo ask you or your firm to          12:28:17

25 prepare any damages opinions specific to my client,          12:28:22

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 142**

```
1  Otto Trucking?                    12:28:27
2    A  I don't recall that specific instruction    12:28:28
3    Q  As you sit here today, do you plan to do    12:28:31
4  any work between now and the time of trial on    12:28:33
5  developing opinions regarding damages specific to my    12:28:38
6  client, Otto Trucking?              12:28:45
7    A  No                           12:28:46
8      MR SCHUMAN:  Okay  I have no further    12:28:47
9  questions for you  Thank you for your time    12:28:49
10   A  Thank you                    12:28:52
11     MR EISEMAN:  Mr Berry, what do you    12:28:56
12  consider this -- these questions?  Do you consider    12:28:58
13  them to be redirect?               12:28 59
14     MR BERRY:  I haven't even thought about    12:29:02
15  how to characterize it              12:29 03
16     EXAMINATION BY COUNSEL FOR THE DEFENDANTS    12:29:08
17  BY MR BERRY:                      12:29:12
18   Q  Mr Wagner, I had a -- a couple of    12:29:12
19  questions  The first is:  Your opinions in this    12:29:13
20  case assume that Uber is going to go to market and    12:29:15
21  commercialize its AV technology using the Fuji    12:29:19
22  LiDAR, right?                     12:29:23
23     MR EISEMAN:  Objection as to form    12:29:24
24   A  I -- again, I -- I think that's assumed    12:29:24
25  But again, that's a better question for    12:29:27
```

**Page 143**

```
1  Dr. Hesselink  But that's the current product that    12:29:30
2  I believe he is the opinion uses the trade secrets.    12:29:33
3    Q  (BY MR. BERRY) And you rely on    12:29:38
4  Dr. Hesselink on --                 12:29:41
5    A  I do.                       12:29:41
6    Q  -- that?  And if Uber does, in fact, does    12:29:41
7  not go to market with the Fuji LiDAR, your opinion    12:29:43
8  is they are not applicable, right?     12:29:46
9      MR. EISEMAN:  Objection as to form.    12:29:48
10   A  Incomplete hypothetical.  If they then do    12:29:49
11  something else that has no use of the trade secrets,    12:29:51
12  the answer would be yes.           12:29:54
13   Q  (BY MR. BERRY) For example, if Uber were    12:29:55
14  to go back to -- and use Velodyne and go to market    12:29:57
15  with Velodyne LiDAR, there would be no damages,    12:30:01
16  right?                           12:30:04
17     MR. EISEMAN:  Objection as to form.    12:30:04
18   A  Again, as a damage expert, that would be    12:30:05
19  my opinion, if you asked me.           12:30:07
20     MR. BERRY:  No further questions.  Thank    12:30:09
21  you.                             12:30:10
22     THE VIDEOGRAPHER:  All right.  This will    12:30:12
23  conclude the deposition of Mr. Wagner, consisting of    12:30:15
24  two original video discs, which will be retained by    12:30:18
25  Veritext.  The time is 12:30 p.m., and we're going    12:30:23
```

**Page 144**

```
1  off the record.                    12:30:37
2      (Off video record.)             12:30:37
3      MR. BERRY:  Please go ahead and mark this    12:30:42
4  AEO.                             12:30:44
5      MR. EISEMAN:  Right.  And we'll handle the    12:30:46
6  actual redactions consistent with the judge's    12:30:47
7  practice in the case.              12:30:51
8                                   12:30:52
9      (TIME NOTED:  12:30 p.m.)          12:30:52
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 145**

```
1      I, MARY J. GOFF, CSR No. 13427, Certified
2  Shorthand Reporter of the State of California,
3  certify;
4      That the foregoing proceedings were taken
5  before me at the time and place herein set forth, at
6  which time the witness declared under penalty of
7  perjury; that the testimony of the witness and all
8  objections made at the time of the examination were
9  recorded stenographically by me and were thereafter
10  transcribed under my direction and supervision; that
11  the foregoing is a full, true, and correct
12  transcript of my shorthand notes so taken and of the
13  testimony so given;
14      That before completion of the deposition,
15  review of the transcript ( ) was (XX) was not
16  requested:  ( ) that the witness has failed or
17  refused to approve the transcript.
18      I further certify that I am not financially
19  interested in the action, and I am not a relative or
20  employee of any attorney of the parties, nor of any
21  of the parties.
22      I declare under penalty of perjury under the
23  laws of California that the foregoing is true and
24  correct, dated this 23rd day of September, 2017.
25      MARY J. GOFF, CSR No. 13427
```

37 (Pages 142 - 145)