QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>             Plaintiff,<br><br>       vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>             Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S RESPONSE TO DEFENDANTS' SUBMISSION OF MICHAEL WAGNER'S DEPOSITION TESTIMONY**<br><br>**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:         September 27, 2017<br>Time:        8:00 a.m.<br>Ctrm:        8, 19th Floor<br>Judge:       Honorable William H. Alsup<br>Trial Date: October 10, 2017 |

Nothing about Defendants' submission of Michael Wagner's deposition transcript changes the outcome on their motion to exclude. Defendants' submission implies that they obtained some "gotcha" admission from Wagner during his deposition, but there is none. As before, Wagner's methodologies are sound, and all of Defendants' (repeated) challenges go to the weight of the evidence. For all of the same reasons Waymo explained in its opposition, Defendants' motion to exclude should be denied.

**Wagner Did Not Calculate Lost Profits to Waymo (pp. 23-24, 41, 80)**

As Waymo explained in its opposition, Waymo is not seeking lost profits. In both their motion and in Wagner's deposition, Defendants try to cast Wagner's damages analysis as a "future profits model." (Dkt. 1786-3 at 41:1-3, 80:16-17.) But as Wagner made clear in his deposition (in testimony that Defendants do not highlight in their submission), he is not calculating Waymo's future lost profits. (Dkt. 1786-3 at 22:20-23.) Instead, he is calculating Defendants' unjust enrichment based on how *Uber* expected the trade secrets to accelerate its own AV timeline at the time of misappropriation. This is an accepted way of measuring harm. *W.L. Gore & Assoc. v. GI Dynamics*, 872 F. Supp. 2d 883, 891 (2012) (allowing damages expert to measure unjust enrichment using defendants' own models for an unreleased product because defendant had come up with a "sophisticated method for calculating the value of bringing a product to market"). The Court should deny Defendants' motion because Wagner has put forth an almost identical model here. *Apple v. Motorola,* 757 F.3d 1286, 1314-15 (Fed. Cir. 2014) (cautioning the judiciary "not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another" because "[t]hese tasks are solely reserved for the fact finder").

**Ad Hoc Information is Not Relevant to How Uber Measured Its Own Projected Enrichment at the Time of Misappropriation (pp. 29-32, 57, 64, 66-68, 73**

Defendants continue to suggest that Wagner's analysis is unreliable because he failed to consider certain ad hoc information. (Dkt. 1786-3 at 29-31 (implying that Wagner's analysis is unreliable because he did not consider whether Uber plans to launch with a safety driver, or when they plan on removing safety drivers), 32 (implying that Wagner's analysis is unreliable because

he did not consider how self-driving regulations could affect Uber's launch plans), 57 (implying that Wagner's analysis is unreliable because Uber has since stopped using the Rubicon models)). But as Waymo explained in its opposition, unjust enrichment is measured as of the date of the misappropriation. *See, e.g., University Computing v. Lykes-Youngstown*, 504 F.2d 518, 536 (5th Cir. 1974); *Litton Sys. v. Ssangyong*, 1993 WL 317266, at *4 (N.D. Cal. Aug. 19, 1993). As Defendants were misappropriating Waymo's trade secrets (*i.e.*, as they were acquiring Otto), Uber calculated the potential enrichment *to itself* as of that date. As Wagner explained in his deposition, finding such a model in a party's production is like finding a "Rosetta Stone"; using models that are not prepared in anticipation of litigation is the best-case scenario for any damages expert. (Dkt. 1786-3 at 50:25-13.) Wagner assumed that Uber's own assumptions were "reasonable, conservative, and [reflected] the best judgment of [Uber] at the time they made the projection." (*Id.* at 30:12-16.) To the extent Defendants have factual criticisms regarding Wagner's interpretation of their own models, they are free to cross-examine Wagner on those issues at trial. *City of Pomona v. SQM N. Am.*, 750 F.3d 1036, 1044 (9th Cir. 2014).

Even more importantly, the document underlying Ms. Qi's analysis that Defendants withheld until the day before Wagner's deposition reveals that intervening events are *not even relevant* to determining whether Qi's analysis was correct; Uber was not assuming any incremental benefit from the Otto acquisition at all until 2018. As Waymo has explained, Qi attempted to calculate the present value of incremental profit Uber expected to achieve by accelerating AV deployment in its ride sharing fleet. Ms. Qi's analysis confirms this: she calculates the EBIT (profit) for a base case and with one year and two years of "accelerated technological capabilities." Importantly, Uber did not model any increased profit due to AV vehicle trips until 2018. In other words, according to Qi's model, Uber would not even *begin* realizing the benefits of its accelerated AV timeline until 2018. Thus, nothing that has or has not occurred in the past two years can show that history has proven Uber's analysis "false," as Defendants misleadingly argued in their motion and suggested in their deposition questioning of Wagner. (Mot. 6 ("the Qi Slide assumes that the Otto acquisition will advance Uber's AV program by 1-2 years . . . [b]ut history has proven that false").)

**Wagner Tested Uber's Assumptions (pp. 50, 98-101)**

Defendants continue to suggest that Wagner's methodology was not reliable because he did not independently test Uber's data, but Defendants have not raised any new arguments by way of Wagner's deposition. (Dkt. 1786-3 at 50, 98-101.) As a preliminary matter, and as Waymo explained in its opposition, Defendants did not produce the Rubicon model until almost a month after the close of fact discovery and on the eve of Wagner's deposition, even though Waymo specifically asked for it during fact discovery. (Opp. Ex. 8.) Despite this, Wagner analyzed every Rubicon-related document that Defendants produced, including presentations summarizing certain outputs from the models and notes of the team that met regularly to work on the models, and confirmed that later-in-time modeling was in line with the January 2016 modeling that Ms. Qi used (and indeed, supported the fact that Ms. Qi's estimates were conservative at the time). Wagner compared Uber's accelerated development assumptions with estimates and analysis of Waymo's technical expert Dr. Hesselink, who confirmed that they were reasonable. (Dkt. 1615 at 53, 63.) Wagner also reviewed corroborating testimony from Uber leaders like Bares and McClendon, (*id.* at 149-150), and compared the January 2016 modeling assumptions to the only other financial modeling that Uber produced (conducted in March 2017) to further corroborate the results of Ms. Qi's analysis. (Opp. Ex. 6 at 13-14.) Moreover, and as discussed above, the late-produced Rubicon model further supports Wagner's opinion.

Defendants also continue to suggest that Wagner did not do enough to test Uber's $20 million per month run rate. (Dkt. 1786-3 at 98-101.) But as Waymo explained in its opposition, this estimate comes directly from John Bares, one of the key people overseeing Uber's technical AV progress at the time. (Dkt. 1615 at 110.) Bares made these statements *in the context of the Otto acquisition* (and reconfirmed these estimates during his deposition.) (*Id.*) Wagner also compared Uber's saved development expense assumptions to Dr. Hesselink's opinions, who confirmed them. (Dkt. 1615 at 53, 63.) Bares' estimates are in line with the contemporaneous expectations of others on the deal team, and Uber cannot argue otherwise.

**Qi's Models Accounted for Future Events (pp. 54-55, 57)**

Defendants continue to point to the fact that the Rubicon model itself says that future

events may be "highly speculative." (Dkt. 1786-3 at 54-55, 47.) But as Waymo showed in its opposition, Qi – and by extension Wagner – already accounted for any potential uncertainty in the Rubicon model. As she was putting together her estimates, Qi discounted her valuations by 15% to account for these kinds of uncertainties, so any future risks associated with the Rubicon model have already been subsumed in Uber's own analysis. It was appropriate for Wagner to adopt Qi's discount rate. *W.L. Gore,* 872 F. Supp. 2d at 891 (allowing expert to calculate unjust enrichment based on defendants' future modeling where defendant "has shown that it is capable of pricing the chance of failure into its projections for its own device" and "properly discounted" future benefits "based on the risk that a product may never reach the market"). To the extent Defendants argue that Wagner should have adopted a different discount rate, that is a dispute about "the degree of relevance or accuracy" that goes to "the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft*, 598 F.3d 831, 852 (Fed. Cir. 2010).

**Wagner Correctly Assumed That Obtaining Waymo's LiDAR-Related Trade Secrets Would Significantly Advance Uber's Efforts (pp. 83-85, 102-106, 108-113)**

Defendants continue to imply that Wagner should have considered the import of other, non-LiDAR technology on Uber's commercialization timeline, such as radar, sonar, cameras and software. (Dkt. 1786-3 at 83-85, 102-106, 108-113.) As Waymo's opposition demonstrated, however, the assumption that Waymo's LiDAR trade secrets are a gating item for widespread commercialization is well-supported by the record evidence, and by the testimony of Dr. Hesselink. Even Uber's witnesses have admitted that LiDAR is a "critical path element" for being able to launch self-driving technology at scale. (Opp. Ex. 6 at 26.)

As Waymo explained in its opposition, the relevant inquiry for Wagner's analysis is how Uber valued the technology it was acquiring at the time of misappropriation. The evidence overwhelmingly suggests that Uber acquired Otto because it needed the technology to build custom lasers. (Dkt. 1615 at 63 (discussing the Otto transaction, Kalanick acknowledged, "by no means is this a perfect deal, but it is okay. We need lasers.").) There was little to no contemporaneous discussion of radar, sonar, cameras or software, and Uber does not argue otherwise. Indeed, as Uber was structuring the Otto acquisition, Uber premised payment on Otto's

ability to achieve a number of business and technical milestones.  (Dkt. 1615 at 52, 66-67.)  Every single one of the technical milestones is LiDAR-related; they do not focus on other hardware aspects of self-driving vehicles.  (*Id.*).  To the extent the milestones relate to software at all, they relate to software that supports LiDAR.

**Wagner Properly Assesses the Value of Trade Secret 25 (pp. 87-89)**

During Wagner's deposition, Defendants again pointed to the fact that to date Dr. Hesselink has only identified evidence that Uber has used six of the scenarios listed in Trade Secret 25.  (Dkt. 1786-3 at 87-89.)  But as Waymo explained in its opposition, the fact that Uber may only be using six of them does not undercut their value; Waymo spent years driving millions of miles to develop and refine the test scenarios claimed in Trade Secret 25.  The fact that Defendants may not be using every test scenario (or that Waymo has not uncovered evidence of use for every one of them) does not make Defendants' acquisition of them any less valuable.

**Wagner Apportioned the Tyto Acquisition Price (pp. 114-117)**

Defendants continue to imply that Wagner improperly failed to apportion the Tyto acquisition price for certain assets that may have been unrelated to Trade Secret 90.  (Dkt. 1786-3 at 114-17.)  As a preliminary matter, Wagner relies on Dr. Hesselink's testimony for the understanding that almost all of Tyto's assets are attributable to Trade Secret 90, which supports attributing Tyto's entire value to Waymo's fiber laser design.  But Wagner did not do that.  Instead, Wagner accounted for Tyto's other assets by excluding the 2.75% equity stake that Tyto employees received in Otto from the valuation of Trade Secret 90.  (*Id.* 113-14.)  This is a significant amount of money ($16.2 million, more than double the $8 million that Wagner attributes to Trade Secret 90) that Wagner did *not* attribute to Trade Secret 90 in order to account for Tyto's other assets.  (*Id.* 113-115.)  Neither Uber nor its experts have proposed any specific values that should have been attributed to other assets that were acquired.

**Wagner's Reasonable Royalty Opinion is Well-Founded and Based on a Variety of Case-Specific Qualitative Factors (pp. 118-124)**

Defendants continue to suggest that Wagner's 10% upward adjustment of reasonable royalty damages based on his analysis of the *Georgia-Pacific* factors was an arbitrary adjustment.

(Dkt. 1786-3 at 118-124.) But as Wagner clearly explained during his deposition (testimony that Defendants fail to point to in their submission), the *Georgia-Pacific* analysis is "qualitative in nature," and Wagner concluded that a 10% upward adjustment is appropriate after considering all relevant factors. As Waymo explained in its opposition, this is all that was required. *Comcast IP Holdings v. Sprint*, 2015 WL 4730899, at *6–7 (D. Del. Aug. 10, 2015); *Veritas v. Microsoft*, 2008 WL 7404617, at *5 (W. D. Wash. Feb. 26, 2008).

**It is Premature to Consider the Propriety of an Injunction in Addition to a Monetary Damages Award (pp. 45, 123-124)**

Defendants highlight the fact that Wagner did not consider the effect of a permanent injunction on his damages numbers. (Dkt. 1786-3 at 45, 123-124.) Wagner has offered multiple damages theories, two premised on accelerated development and one premised on saved development expenses. Whether Waymo is entitled to an injunction in addition to monetary damages is necessarily a fact-specific inquiry, and will depend on how the jury chooses to compensate Waymo at trial. *See ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 753–54 (10th Cir. 2011) (affirming a permanent injunction preventing defendants from using plaintiff's trade secrets "forever" on top of monetary and punitive damages awards where jury found willful misappropriation, and where court recognized a "cognizable danger" that defendants would commit future violations); *E.I. DuPont de Nemours and Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 708 (E.D. Va. 2012) (affirming permanent injunction on top of a $919 million damages award and $350,000 punitive damages award in part because the misappropriated information put Kolon "in a quite advantageous position" with respect to next generation technology, "a position that Kolon enjoys only because it misappropriated DuPont's trade secrets"). The Court and the parties can, if necessary, address the effect of Waymo's request for an injunction on the jury's damages award in post-trial motions.

**Nor Can Defendants Raise the Argument that Wagner Did Not Separately Calculate Damages for Otto Trucking (p. 127)**

Whether or not Wagner presents a separate damages number for Otto Trucking has no bearing on Defendants' motion to exclude; their original motion did not raise this issue and, therefore, they cannot do so now. (Dkt. 1614-4.)

DATED: September 26, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Charles K. Verhoeven*
  Charles K. Verhoeven
  Attorneys for WAYMO LLC