# EXHIBIT G
# FILED UNDER SEAL

# EXHIBIT 2
# FILED UNDER SEAL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| **WAYMO LLC** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **CASE NO. 3:17-cv-00939-WHA** |
| **UBER TECHNOLOGIES, INC.;** | § | |
| **OTTOMOTTO LLC; OTTO** | § | |
| **TRUCKING LLC** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

---

## REBUTTAL EXPERT REPORT OF WALTER BRATIC

---

**September 7, 2017**

Respectfully submitted,

_____
Walter Bratic

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

# Table of Contents

I.    QUALIFICATIONS ..................................................................................................4

II.   ASSIGNMENT AND SCOPE OF ENGAGEMENT .........................................4

III.  INFORMATION REVIEWED ...............................................................................5

IV.   SUMMARY OF OPINIONS ...................................................................................6

    A. Rebuttal Opinions Regarding the Wagner Report .........................................6

    B. Affirmative Opinion – Alleged Misappropriation of the Waymo Purported Trade
    Secrets ..........................................................................................................7

        i.   Unjust Enrichment Damages ...........................................................7

        ii.  Reasonable Royalty Damages ..........................................................8

        iii. Alleged Infringement of the '936 Patent .........................................8

V.    Parties-in-Suit .........................................................................................................9

    A. Waymo (Google) ...........................................................................................9

    B. Uber ...............................................................................................................11

    C. Ottomotto .....................................................................................................12

VI.   RESPONSE TO THE WAGNER REPORT ........................................................13

    A. Mr. Wagner's Unjust Profits Opinion .........................................................13

        i.   Mr. Wagner's Unjust Profit Analysis Is Based on a Single Slide
            Summarizing an Analysis that Uber Never Used ...........................16

        ii.  Mr. Wagner Failed to Account for the Fact that the Qi Slide is 18 Months
            Old and Its Assumptions Have Been Disproven .............................22

        iii. Even Ignoring that the Qi Slide is Speculative and Unreliable, Mr.
            Wagner's Unjust Profits Opinion is Premised on Layers of Speculation and
            is Unreliable ..................................................................................25

        iv.  Mr. Wagner's Apportionment Methodology Is Flawed ..................36

        v.   Conclusions Regarding Mr. Wagner's Unjust Profits Opinion ........42

    B. Mr. Wagner's Avoided Cost Opinion ...........................................................42

        i.   The $20 Million per Month Run Rate is for the Uber's Entire AV Program
            and Not Tied to the Waymo Purported Trade Secrets .....................43

        ii.  Mr. Wagner Did Not Establish a Causal Link Connecting the Waymo
            Purported Trade Secrets to Purported Avoided Costs .....................46

        iii. Conclusions Regarding Mr. Wagner's Avoided Cost Opinion ........48

    C. Mr. Wagner's "Unquantified Unjust Enrichment" Opinions ......................48

    D. Mr. Wagner's Reasonable Royalty Opinion .................................................49

        i.   Mr. Wagner's "Baseline Royalty" is Speculative and Unreliable ...50

        ii.  Mr. Wagner's 110% Royalty Rate is Arbitrary, Not Tied to the Facts of the
            Case, and Does Not Accord with the Guidance of Georgia-Pacific ...52

        iii. Mr. Wagner Did Not Consider the Cost of Independently Developing the
            Waymo Purported Trade Secrets as a Cap to Reasonable Royalty ...56

        iv.  Conclusions Regarding Mr. Wagner's Reasonable Royalty Opinion ...57

    E. Mr. Wagner's Unjust Enrichment Opinion Regarding Waymo Purported Trade
    Secret No. 90 ...............................................................................................57

        i.   Mr. Wagner's Opinion is Not Based on Sound Methodology .........57

CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order             Page 2 of 107             Rebuttal Expert Report of Walter Bratic
                                                                       September 7, 2017

ii.   Mr. Wagner's Opinions are Internally Inconsistent, Demonstrating Their Unreliability ................................................................................ 59
F.  Mr. Wagner's Irreparable Harm Opinion ................................................. 60
i.   Any Purported Lost Profits Waymo Will Allegedly Suffer are Speculative .... 61
ii.   Mr. Wagner Did Not Establish a Causal Link Connecting the Waymo Purported Trade Secrets to the Purported Irreparable Harm ......................... 62
iii.   Mr. Wagner Failed to Acknowledge the Distinction Between Time to Independently Develop the Waymo Purported Trade Secrets and Accelerated Development ................................................................. 62
iv.   Mr. Wagner Has Not Established that Being First to the AV TaaS Market is Necessary for Waymo's Success .................................................. 63
VII. ANALYSIS   OF   ECONOMIC   DAMAGES   RESULTING   FROM   ALLEGED MISAPPROPRIATION OF THE WAYMO PURPORTED TRADE SECRETS ....................... 65
A.  The Waymo Purported Trade Secrets ........................................................ 67
i.   Waymo Purported Trade Secret No. 2 ......................................... 67
ii.   Waymo Purported Trade Secret No. 7 ......................................... 69
iii.   Waymo Purported Trade Secret No. 9 ......................................... 71
iv.   Waymo Purported Trade Secret No. 13 ........................................ 73
v.   Waymo Purported Trade Secret No. 14 ........................................ 74
vi.   Waymo Purported Trade Secret No. 25 ........................................ 77
vii.   Waymo Purported Trade Secret No. 90 ........................................ 78
viii.   Waymo Purported Trade Secret No. 96 ........................................ 79
ix.   Waymo Purported Trade Secret No. 111 ...................................... 81
x.   Conclusion .......................................................................... 83
B.  Unjust Enrichment from Alleged Use of the Waymo Purported Trade Secrets .......... 84
C.  Reasonable Royalty for the Alleged Use of the Waymo Purported Trade Secrets ..... 90
i.   Hypothetical Negotiation ....................................................... 91
ii.   Georgia Pacific Factor Analysis ............................................... 91
iii.   Royalty Conclusion .............................................................. 105
VIII. RESERVATION OF RIGHTS .................................................................. 107

## I.   QUALIFICATIONS

1.       I am a Managing Director of OverMont, a division of Whitley Penn LLP ("Whitley Penn"). I am a Certified Public Accountant licensed to practice in the State of Texas.  I have provided financial consulting services to businesses throughout my career.  I have testified in federal district courts, U.S. Bankruptcy Court, The U.S. Court of Claims, and in state courts as well as in private domestic and international arbitrations, on economic, financial, accounting, statistical, and business matters involving damages and valuation related matters.  My resume, including my current and past employment and professional affiliations, are attached as Exhibit 1 to this report. A list of my testimony during the last four years is attached as Exhibit 2.  Whitley Penn is being compensated at an hourly rate of $625 for my work performed in connection with this matter. Whitley Penn's fees are not contingent upon the outcome of this litigation.

## II.   ASSIGNMENT AND SCOPE OF ENGAGEMENT

2.       I have been retained by counsel for Uber Technologies, Inc. ("Uber, Inc.") and Ottomotto LLC ("Ottomotto") (collectively, "Uber") to review and respond to the analysis, opinions, and conclusions set forth in the Expert Report of Mr. Michael Wagner, dated August 24, 2017 (the "Wagner Report").[1]  I have also been asked to determine the economic damages that Waymo LLC ("Waymo") purportedly suffered, if any, as a result of the alleged wrongful conduct of Uber and Otto Trucking LLC ("Otto Trucking") (collectively, "Defendants"), as set forth in Waymo's First Amended Complaint.[2]   Specifically, Waymo brought the following causes of action against Defendants:[3]

- Violation of Defend Trade Secrets Acts ("DTSA");

- Violation of California Uniform Trade Secrets Act (CUTSA); and

---

[1] I collectively refer to Ottomotto and Otto Trucking herein as "Otto".
[2] First Amended Complaint, March 10, 2017 ("Amended Complaint").
[3] Amended Complaint.  I understand that claims related to Violation of California Bus. & Prof. Code § 17200 are no longer being asserted.

- Infringement of U.S. Patent No. 9,368,936 (the "'936 Patent"). [4]

3.     I understand Uber disputes Waymo's allegations in this case.  However, for purposes of analyzing the purported economic damages, if any, Waymo suffered as a result of Uber's alleged wrongful conduct, I have been asked to assume that Uber engaged in the wrongful conduct as alleged.  I understand that Waymo has alleged that Uber misappropriated nine trade secrets (i.e., Nos. 2, 7, 9, 13, 14, 25, 90, 96, and 111) (the "Waymo Purported Trade Secrets"), which are discussed in detail in Section VII (A) below.[5]

4.     This expert report sets forth my opinions based on the information available to me as of the date of this report.  The analyses and opinions contained herein are subject to revision or supplementation, as necessary, if additional information is made available to me subsequent to the issuance of this report.  Furthermore, I may develop demonstrative exhibits related to my analysis and opinions for use at trial as an aid to the trier-of-fact.

## III.   INFORMATION REVIEWED

5.     In connection with this report, Whitley Penn professionals, working under my supervision and direction, and I have reviewed certain documents, information, and testimony in this matter.  The information reviewed and considered is identified in Exhibit 3 to this report, as well as the body and footnotes of this report and attached exhibits.  In addition, I interviewed the following individuals:

- Dr. Paul McManamon, Uber technical expert in this matter;

- Dr. Michael Lebby, Uber technical expert in this matter;

- Mr. John Bares, Manager (Tiger Team) at Uber;

- Mr. James Haslim, Senior Manager, Engineering for ATG at Uber; and

---

[4] The Amended Complaint included allegations that Defendants infringed three additional patents, which were subsequently dismissed.  Amended Complaint; and Joint Stipulation and Order Regarding Dismissal of Patent Claims.
[5] Case 3:17-cv-00939-WHA, Document 563; and Plaintiff Waymo LLC's Notice Regarding Trade Secret Narrowing.

- Prashant Chouta, Global Product Operations - Self Driving Vehicles at Uber.

## IV.   SUMMARY OF OPINIONS

6.      My opinions are based on the assumption that the Waymo Purported Trade Secrets, as described below, are proven to be trade secrets and are shown to have been misappropriated and used to benefit Uber.  I understand that Uber vigorously dispute Waymo's allegations.  As of the date of issuance of this report, it is my understanding that Waymo has not provided a basis for its allegations that the purported trade secrets were used to the benefit of Uber.

### A.   Rebuttal Opinions Regarding the Wagner Report

7.      Based on my review and analysis of the documents, information, and testimony in this matter, the interviews which I conducted, and my education, training, and experience in intellectual property matters, it is my opinion that the analysis and opinions expressed in the Wagner Report are conceptually flawed, grossly overstate any purported damages Waymo allegedly suffered, and are unreliable.  More specifically:

- Mr. Wagner's opinions regarding the purported unjust enrichment Uber realized as a result of allegedly misappropriating the Waymo Purported Trade Secrets are unreliable and grossly overstate Uber's unjust enrichment, if any;

- Mr. Wagner's opinion regarding the reasonable royalty that is purportedly necessary to adequately compensate Waymo is unreliable and grossly overstates reasonable royalty damages, if any; and

- Mr. Wagner's opinion regarding the purported irreparable harm Waymo will suffer in the future as a result of the alleged misappropriation of the Waymo Purported Trade Secrets is speculative and unreliable.

### B. Affirmative Opinion – Alleged Misappropriation of the Waymo Purported Trade Secrets

#### i. Unjust Enrichment Damages

8.     Based on my review and analysis of the documents, information, and testimony in this matter, the interviews which I conducted, and my education, training, and experience in intellectual property matters, it is my opinion that Uber has not been unjustly enriched by their alleged misappropriation of the Waymo Purported Trade Secrets.  However, I have been asked to provide a calculation of unjust enrichment damages based upon the assumption that Uber has utilized the Waymo Purported Trade Secrets and have benefited from such use.  As a result, under this assumption, Uber's unjust enrichment, if any, would be limited to the cost savings realized by Uber from its alleged misappropriation of the Waymo Purported Trade Secrets.  I have calculated Uber's unjust enrichment to be no more than $605,000, based upon the costs to independently develop the accused features of Uber's in-house light detection and ranging ("LiDAR") system, referred to by Uber as "Fuji" that allegedly incorporate the Waymo Purported Trade Secrets.  The following table provides a breakdown of these development costs by alleged trade secret:

| Cost to Independently Develop Waymo's Purported Trade Secrets | |
|---|---|
| | **Total Cost** |
| **Purported Trade Secret** | |
| No. 2 | $208,920 |
| No. 7 | 43,600 |
| No. 9 | 112,160 |
| No. 13 and 14 | 126,080 |
| No. 25 | No Value |
| No. 90 | No Value |
| No. 96 | 114,040 |
| No. 111 | 200 |
| Total | **$605,000** |

9.     As discussed above, this represents the maximum benefit Uber allegedly received as a result of its alleged misappropriation of the Waymo Purported Trade Secrets.  This amount is also conservative for the reasons discussed below.

### ii.  Reasonable Royalty Damages

10.     My analysis of a reasonable royalty rate for a license to the Waymo Purported Trade Secrets is based on the construct of a hypothetical negotiation between Waymo and Uber that would have occurred on or about the time of first misappropriation (i.e., between December 2015 and August 2016).  Based on the procedures performed to date, my review and analysis of the documents produced in connection with this matter, as well as my education, training, and experience in intellectual property matters, it is my opinion that the parties would have agreed upon a reasonable royalty rate of no more than $605,000 based on the maximum cost Uber would incur to independently develop the Waymo Purported Trade Secrets.

### iii.  Alleged Infringement of the '936 Patent

11.     As of the date of issuance of this report, Plaintiff has not provided a damages opinion related to the teachings of the '936 Patent.  I understand that Uber implemented a design around and such design around has not been alleged to infringe the '936 Patent.  As a result, I have seen no evidence of any benefit received by Uber from its alleged infringement of the '936 Patent, which would significantly limit the amount of money Uber would be willing to pay for rights to the '936 Patent.  Therefore, I agree with Mr. Wagner's implicit conclusion that there are no damages related to the '936 Patent.  However, I disagree that there is any prospect of future harm to Waymo as any allegation of potential future infringement is based on pure speculation.

12.     The damages amounts contained in this report do not include prejudgment or post-judgment interest.  It is my understanding that prejudgment and post-judgment interest, including the appropriate interest rates, are a matter for the Court.  I am prepared to calculate prejudgment and post-judgment interest if asked to do so.

## V.    Parties-in-Suit

### A.  Waymo (Google)

13.    Google is a global technology company, incorporated in 1998 with its headquarters in Mountain View, California.[6]   Google stated that "[its] mission is to organize the world's information and make it universally accessible and useful."[7]  Research and development ("R&D") is one of Google's primary focal points.[8]  Sergey Brin, co-founder of Google, stated that "we're big fans of investing heavily in R&D."[9]  This heavy focus on R&D has assisted Google in expanding beyond its "search engine roots."[10]  Since the launch of its search engine in 1998, Google has become a "tech giant" with the introduction of several new services including online advertising technologies, cloud computing, video, maps, software, and email.[11]

14.    In August 2015, Google announced that a new public holding company, Alphabet Inc. ("Alphabet"), would be created to hold a collection of businesses, the largest of which would be Google.[12]  The creation of Alphabet separated Google's "profitable search and advertising business from fledgling efforts in an array of so-called moonshots."[13]  According to the Wall Street Journal ("WSJ"), the move involving Alphabet reflects the co-founders' view that the company has become more complex to manage as it pursues potentially big new businesses in industries far from Google's search-engine roots.[14]  The images below outline Alphabet's structure and key units as of October 2016:[15]

---

[6] Google, Inc. Form 10-K for the fiscal year ended December 31, 2013, pg. 3.

[7] https://www.thebalance.com/google-business-profile-2892814.

[8] http://www.businessinsider.com/history-sergey-brin-larry-page-and-google-strategy-2011-3#they-splurged-on-research-and-development-4.

[9] http://www.businessinsider.com/history-sergey-brin-larry-page-and-google-strategy-2011-3#they-splurged-on-research-and-development-4.

[10] http://www.businessinsider.com/history-sergey-brin-larry-page-and-google-strategy-2011-3#they-splurged-on-research-and-development-4.

[11] https://www.google.com/about/our-story/; http://www.telegraph.co.uk/technology/google/11984555/Rise-of-a-tech-giant-the-history-of-Google.html.

[12] Google, Inc. Form 10-K for the fiscal year ended December 31, 2015, pg. 2.

[13] https://www.wsj.com/articles/google-creates-new-company-alphabet-1439240645.

[14] https://www.wsj.com/articles/google-creates-new-company-alphabet-1439240645.

[15] https://www.cbinsights.com/blog/google-strategy-teardown/; https://www.wsj.com/articles/google-creates-new-company-alphabet-1439240645.



15.     Waymo is a subsidiary of Alphabet with its principal place of business in Mountain View, California.[16]  Waymo began as the "Google self-driving car project" in 2009, and has since become an independent company operating as a subsidiary of Alphabet.[17]   Waymo is a self-driving technology company with a mission to "make it safe and easy for people and things to move around."[18]  In October 2015, Waymo "completed the world's first fully self-driving trip on public roads in a car without a steering wheel, pedals or test driver."[19]   In 2017, Waymo introduced Chrysler Pacifica Hybrid minivans to its fleet, which were the "first vehicle[s] built on a mass-production platform with a fully-integrated hardware suite, newly designed by Waymo for the purpose of full autonomy."[20]  I understand that Waymo's vehicles utilize a combination of LiDAR

---

[16] First Amended Complaint, pg. 5.
[17] https://waymo.com/journey/.  Throughout this report, "Waymo" shall refer to the self-driving car project from its inception in 2009 to present.
[18] https://waymo.com/faq/.
[19] https://x.company/graduated. Accessed August 24, 2017.
[20] https://waymo.com/journey/.  Accessed August 24, 2017.

systems, cameras, and various other sensors to allow it to operate autonomously.[21]  The following diagram shows how "Waymo's self-driving car works":[22]



Waymo; Business Insider/ Skye Gould

### B.  Uber

16.     Uber is incorporated in the state of Delaware with its principal place of business is in San Francisco, California.[23]  Established in 2009, Uber has operated as a ridesharing company in which users of its smartphone app are connected with drivers.[24]  According to Uber, it is a "technology platform," which "connects driver-partners and riders."[25]  Furthermore, I understand that Uber

---

[21] http://www.businessinsider.com/uber-custom-lidar-tech-not-ready-google-waymo-lawsuit-2017-4.
[22] http://www.businessinsider.com/uber-custom-lidar-tech-not-ready-google-waymo-lawsuit-2017-4.
[23] First Amended Complaint, pg. 5.
[24] http://www.telegraph.co.uk/technology/uber/11962859/The-history-of-Uber.html;
https://help.uber.com/h/738d1ff7-5fe0-4383-b34c-4a2480efd71e.
[25] https://help.uber.com/h/eac2e43e-af42-4521-a042-2982c18664af.

"serves more than 40 million monthly active riders worldwide."[26]  In addition to its ridesharing business, Uber also offers other services, such as delivering, "food, flowers, and more…"[27] Additionally, according to Uber:[28]

> *To further its mission of delivering reliable transportation to the world, Uber has built one of the strongest autonomous vehicle engineering groups in the industry. From the introduction of the world's first self-driving Ubers in Pittsburgh to its recently announced partnership with Daimler, Uber is creating a future in which self-driving cars will make cities and roads safer, cleaner, and more accessible.*

17.     Uber began testing autonomous vehicles ("AVs") (with a human backup driver) in Pittsburgh, Pennsylvania in September 2016.[29]  The WSJ stated that this test represented Travis Kalanick's, Uber's former Chief Executive Officer ("CEO"), "audacious vision to one day roll out an entire fleet of AVs to replace the company's roughly 1.5 million drivers and to ferry commuters, packages and food around urban centers."[30] Since September 2016, Uber has continued its driverless car efforts in other cities around the U.S.[31]

### C.  Ottomotto

18.     Ottomotto is a Delaware limited liability company with its principal place of business in San Francisco, California.[32]  Ottomotto was established in early 2016 by Anthony Levandowski and Lior Ron with a focus of designing and developing hardware and software for autonomous driving.[33]  Ottomotto offered technologies for self-driving trucks to the transportation industry.[34]

---

[26] Uber Technologies, Inc. and Ottomotto LLC's Answer to First Amended Complaint and Affirmative Defenses, June 22, 2017, pg. 1.
[27] https://www.uber.com/drive/delivery/.
[28] Uber Technologies, Inc. and Ottomotto LLC's Answer to First Amended Complaint and Affirmative Defenses, June 22, 2017, pg. 1.
[29] https://www.wsj.com/articles/inside-ubers-new-self-driving-cars-in-pittsburgh-1473847202.
[30] https://www.wsj.com/articles/inside-ubers-new-self-driving-cars-in-pittsburgh-1473847202.
[31] https://www.usatoday.com/story/tech/news/2016/12/22/uber-moves-self-driving-cars-pilot-to-arizona/95763516/.
[32] First Amended Complaint, pg. 6.
[33] https://www.bloomberg.com/profiles/companies/1433882D:US-ottomotto-llc.
[34] https://www.bloomberg.com/profiles/companies/1433882D:US-ottomotto-llc.

19.     I understand that Mr. Levandowski was involved in robotics and the creation of AVs for a number of years prior to his employment at Google.  In an August 2008 email, Mr. Levandowski stated that "[r]obotic technology in general … [has] been a hobby of mine for many years…"[35] In 2004 and 2005, Mr. Levandowski was involved with the "Ghostrider" robot motorcycle.[36] According to the Smithsonian, the Ghostrider is a "robot motorcycle that drives itself, with no human intervention once it is underway."[37]  Ghostrider was an entrant in the AV races of 2004 and 2005 sponsored by Defense Advanced Research Projects Agency ("DARPA").[38]

20.     Otto Trucking is a limited liability company with its principal place of business in San Francisco, California.[39]  Similar to Ottomotto, I understand that Otto Trucking was founded by Mr. Levandowski and Mr. Ron in early 2016.[40]  However, Otto Trucking is essentially a legal holding entity, and has no operations or employees.[41]  I understand that Uber acquired Ottomotto in or around August 2016 and the right to acquire Otto Trucking during an option period in the second half of 2017.[42]

## VI.   RESPONSE TO THE WAGNER REPORT

### A.  Mr. Wagner's Unjust Profits Opinion

21.     Regarding his calculation of the purported unjust profits Defendants realized as a result of the alleged misappropriation of the Waymo Purported Trade Secrets (as defined below), Mr. Wagner relied on a summary slide showing the results of an internal analysis performed by Ms. Ningjun Qi, a corporate development manager at Uber, in January 2016 (the "Qi Slide").[43]  The Qi Slide shows the results of an exercise in which Ms. Qi attempted to quantify the present value

---

[35] WAYMO-UBER-00005849 – 850, at 849.
[36] http://americanhistory.si.edu/collections/search/object/nmah_1332301.
[37] http://americanhistory.si.edu/collections/search/object/nmah_1332301.
[38] http://americanhistory.si.edu/collections/search/object/nmah_1332301.
[39] First Amended Complaint, pg. 6.
[40] First Amended Complaint, pg. 12
[41] Deposition of Lior Ron, April 19, 2017, pg.13.
[42] https://newsroom.uber.com/rethinking-transportation/; Deposition of Cameron Poetzscher, June 19, 2017, pgs. 292 and 370.
[43] The Wagner Report, ¶¶ 271-281; UBER00069030 – 033, at 033; and Deposition of Ningjun Qi, June 22, 2017, pgs. 75-76.

of incremental profits that Uber could potentially realize if it were able to accelerate commercialization of Uber's AV technology by one to two years.[44]  Given that the Qi Slide represents the present value of incremental profits assumed to begin in 2018, the analysis underlying the Qi Slide was one of profits that were projected to occur no earlier than 2018 (i.e., future profits).[45]  Mr. Wagner multiplied the estimates from the Qi Slide by a proportional factor of an estimated amount of time Waymo contends it would have taken for Uber to independently develop the Waymo Purported Trade Secrets.[46]

22.     According to the Court's operative Case Management Order, "[a]s to damages studies, the cut-off date for *past damages* will be as of the expert report (or such earlier date as the expert may select)."[47]  The Court's order also stated that "the experts may try to project *future damages* (*i.e.*, after the cut-off date) if the substantive standards for future damages can be met."[48]  Mr. Wagner has not identified any actual past damages that Waymo suffered or any actual unjust profits that Uber realized as of August 24, 2017, the date the Wagner Report was issued.  Given that Mr. Wagner's opinion of purported unjust profits is premised on a projection of future profits discounted to present value, per the Court's order, Mr. Wagner's opinion must be analyzed under the substantive standards applicable to the calculation of future damages.

23.     In order to analyze the validity of Mr. Wagner's unjust profits opinion, I first examined the Qi Slide, which serves as the premise of Mr. Wagner's opinion of purported unjust profits.  Given that Mr. Wagner's opinion relied so heavily on a single projection, it is critical to understand the purpose for which it was created, the analytical rigor, if any, that went into developing it, the extent to which others reviewed and critiqued it, and the extent to which it was actually relied upon and used for business decision-making purposes.  Furthermore, when relying on a projection as the basis of an opinion, it is necessary to independently test the analysis to ensure that the assumptions are reasonable and that it is free of methodological errors.

---

[44] The Wagner Report, ¶¶ 271-281; and UBER00069030 – 033, at 033.
[45] UBER00069030 – 033, at 033.
[46] The Wagner Report, ¶¶ 282 – 285.
[47] Case 3:17-cv-00939-WHA, Document 563.
[48] Case 3:17-cv-00939-WHA, Document 563.

24.     Even if the Qi Slide employed a reasonable methodology and reasonable assumptions in January 2016, Mr. Wagner's opinion of purported unjust profits is as of August 24, 2017.[49]  As a result, the extent to which, if at all, Mr. Wagner undertook an analysis to substantiate that the assumptions underlying the Ms. Qi's analysis remained reasonable 18 months after she performed her analysis must be examined.   I analyzed whether, ignoring the methodological flaws of the Qi Slide and the fact that Ms. Qi performed her analysis 18 months prior to Mr. Wagner issuing his opinion, Ms. Qi's analysis is speculative and unreliable in light of uncertainties surrounding the autonomous vehicle ("AV") market and the subject technology.   Finally, I examined the relationship between the projected incremental profits and the Waymo Purported Trade Secrets to determine if Mr. Wagner properly apportioned projected incremental profits specifically attributable to the Waymo Purported Trade Secrets.

25.     My conclusions regarding the foregoing are summarized as follows:

- The Qi Slide is an inadequate, speculative and unreliable basis upon which to base an opinion of damages.  It underwent no peer review, and was never used or relied upon by Uber.  Mr. Wagner has not indicated that he independently tested or re-created Ms. Qi's methodology, nor has he indicated that he independently tested the assumptions Ms. Qi utilized in her analysis to assess validity and/or reasonableness.  Certain of Ms. Qi's key assumptions, such as a 15% discount rate, are unreasonable;

- Mr. Wagner failed to account for the fact that Ms. Qi prepared the analysis underlying the Qi Slide 18 months prior to the issuance of Mr. Wagner's opinions, and that assumptions it is premised upon have been disproven in real life;

- Even ignoring methodological flaws and the fact that it was prepared 18 months prior to the issuance of Mr. Wagner's opinions, the Qi Slide, and Mr. Wagner's opinion by extension, are speculative and unreliable in light of the nature of the AV technology market and uncertainties regarding its regulatory status and commercial viability; and

- Mr. Wagner's apportionment is flawed and he fails to establish a causal link between the Waymo Purported Trade Secrets and purported unjust profits.

---

[49] The Wagner Report.

### i.  Mr. Wagner's Unjust Profit Analysis Is Based on a Single Slide Summarizing an Analysis that Uber Never Used

26.     Mr. Wagner's opinion of purported unjust profits is premised on the results shown on the Qi Slide, which is a summary slide from January 2016 that shows projections of incremental profits resulting from a one to two year acceleration of Uber's entire AV program.  Given that Mr. Wagner's opinion is so heavily reliant on this single document, it was necessary for Mr. Wagner to fully examine the context in which the Qi Slide was created and independently test the data Ms. Qi relied upon and the assumptions she used in the underlying analysis.  Based on the discussion provided in the Wagner Report, Mr. Wagner has not undertaken these analyses.

27.     As an initial matter, and contrary to Mr. Wagner's assertion, Ms. Qi's analysis did not "indicate[] that Ottomotto could shorten Uber's AV development timeline by one to two years."[50] Ms. Qi testified, "this assessment is not to prove that he would accelerate AV development.  This assessment shows what happens or attempts to quantify the value of what would it look like *if AV development was accelerated by one to two years*." (emphasis added).[51]  To the extent that Mr. Wagner is suggesting that the Qi Slide represents Uber's valuation of Ottomotto (or the Waymo Purported Trade Secrets), this is rebutted by the evidence and testimony.[52]

28.     Ms. Qi described the genesis of her exercise as follows:[53]

> *[John Bares and Brian McClendon] made a comment that they do think this would accelerate AV development. But other than that, they were unsure of how to quantify it or value it. [...] They basically asked me to think about that, a way to like show the number, but they reiterated that they think this would help accelerate Uber's AV development efforts.*

---

[50] The Wagner Report, ¶ 273.
[51] Deposition of Ningjun Qi, June 22, 2017, pg. 222; *see also id.*at pgs. 217 and 222 – 223 ("I tried to quantify the value of an AV acceleration.  So call it in one to two years, what would that look like for Uber business model without that and with that.").
[52] For example:  Deposition of Ningjun Qi, June 22, 2017, pg. 217, and 222 – 223; Deposition of Ningjun Qi, August 10, 2017, pgs. 402 – 403, 406, and 433.
[53] Deposition of Ningjun Qi, June 22, 2017, pg. 216.

29.    Based on this, Ms. Qi attempted to assign a value to accelerated development of Uber's AV program, which necessarily required making various assumptions regarding future regulations, market penetration/rides-per-day, profit margins, competition, and discount rates.

30.    Despite his reliance on the Qi Slide, Mr. Wagner did not test any of the assumptions Ms. Qi utilized in her analysis, or offer any independent opinion as to their reasonableness.  In addition, Mr. Wagner did not create his own model to test against the Qi Slide.  Rather, Mr. Wagner merely made reference to an email from Ms. Qi and various Project Rubicon presentations, which were prepared *after* Ms. Qi prepared the Qi Slide, in support of his determination of whether to utilize the "optimistic city coverage" numbers or the "baseline city coverage" numbers shown on the Qi Slide.[54]  However, a bright red box with the following warning was placed prominently throughout two of the three Project Rubicon presentations Mr. Wagner referred to:[55]

> <u>Note:</u>    *Results are highly speculative, and depend on significant assumptions on Cost Curves and Pace of Technology Development. Output of this analysis require commentary and context.*

31.    The following screen shot is an example of one of the numerous instances in which this notice appeared in the Project Rubicon presentations Mr. Wagner relied on in his attempt to corroborate his analysis.[56]



---

[54] The Wagner Report, ¶¶ 274, and 278 – 279.
[55] UBER00063680 – 695; and UBER00232488 – 514.
[56] UBER00063680 – 695; and UBER00232488 – 514.

32.     Mr. Wagner's own summary of the Project Rubicon presentations demonstrates that the estimates were shifting wildly over short period of time.[57]  As stated in the September 13, 2016 presentation:  "Uncertainty is high; range is wide."[58]  Notably, although Ms. Qi used an iteration of the Rubicon model to develop the analysis underlying the Qi Slide, she was not listed as one of the 10 main creators of the Rubicon model.[59]  Mr. Wagner failed to independently analyze how Ms. Qi utilized the Rubicon model data and assumptions in her own analysis.  Furthermore, other Uber employees testified that the Rubicon model was speculative and hypothetical.  For example, Eric Meyhofer, Uber's head of ATC, testified as follows:[60]

> Q:  Okay.  So how many -- how many cities was Uber estimating that it would be in, in November 2015 then, for autonomous vehicles in -- at that time, looking forward to 2022?
>
> A:  This document runs scenarios on assumptions.
>
> Q:  I understand.  So my question now -- I'm saying -- if you're telling me that this document is not making any sort of an estimate, my question for you:  What was the estimate, pre-Otto acquisition, of how many cities that Uber would be deploying autonomous vehicles in, let's say, in 2022?
>
> A:  It would only have hypothetical scenarios.  It was unknown how many we would deploy in 2022 as it is still unknown….
>
> Q:  Was there some sort of breakthrough that Uber had between May 2016 and September 2016 that changed the projections from 13,000 units in 2019 to over 75,000 units?
>
> A:  So these results are highly speculative and depend on significant assumptions.  And they change those assumptions and speculations from one report to another --

---

[57] The Wagner Report, ¶¶ 278 – 279.
[58] UBER00232630 – 668, at 631.
[59] UBER00231665 – 696, at 665.
[60] Deposition of Eric Meyhofer, August 18, 2017, pgs. 11, 75 – 76 and 82.

33.     Mr. Meyhofer also testified that "[t]hese are assumptions teams run to play back scenarios and do if-then analysis.  This isn't our roadmap. This is what the data analytics team projected against particular dates in the scenarios."[61]  When describing statements in certain Project Rubicon presentations, Mr. Meyhofer stated:  "I don't think anything in this document would be described as accurate.  They are assumptions and estimates."[62]

> Q:  Why was the data analytics team assuming 13 cities?
>
> A:  They probably ran a lot of scenarios beyond 13 cities.  Maybe they assumed two in another scenario or one or 300.  It's a set of knobs you turn to try to understand parameters that you need to try to meet.
>
> Q:  So your testimony is that this number was just picked at random?
>
> A:  I don't think anything in Jeff Schneider's world is random.  But as a machine learning team, they do need to run lots of scenarios.
>
> Q:  Why did they pick 13 cities?
>
> A:  Unknown to me.
>
> Q:  Is that an accurate description of Uber's estimate of how many cities they would be deployed in as of -- in the year 2022, with the estimate happening in November 2015?
>
> A:  I don't think anything in this document would be described as accurate.  They are assumptions and estimates.

34.     Additionally, Mr. Wagner provided no indication that he examined how Ms. Qi, or the Rubicon model, accounted for the many risks associated with commercialization of Uber's AV technology.   Waymo itself has identified numerous "significant risks" that "could affect the success of [its] program and [its] anticipated TaaS business," including "Supply Side Risk" and

---

[61] Deposition of Eric Meyhofer, August 18, 2017, pgs. 85 – 86.
[62] Deposition of Eric Meyhofer, August 18, 2017, pg. 76.

CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017

"Demand Side Risk."[63]  In summary, Waymo identified the following categories of significant risk factors in a document titled "Chauffeur Valuation Risk Factors":[64]

1. _Supply Side Risk_:  We deliver commercially viable technology
   a. We get self-driving technology to work
      i. We can't get/develop a vehicle platform
      ii. We can't get/develop sensors
      iii. We can't solve all the software challenges
      iv. We can't get our overall system reliability high enough
   b. We get the cost of the technology down enough to run a sustainable TaaS business
2. _Demand Side Risk_:  We are able to generate harvestable consumer demand
   a. We achieve consumer acceptance of self-driving cars
   b. We avoid regulatory prohibition of our technology
3. _Other Risks_:
   a. Corporate funding risks
   b. Secular risks
   c. Macro Risks
   d. Commercialization risks

35. 

---

[63] WAYMO-UBER-00046625 – 632, at 625.
[64] WAYMO-UBER-00046625 – 632.
[65] WAYMO-UBER-00046625 – 632, at 632.



37.     Mr. Wagner's failure to independently test Ms. Qi's assumptions and methodology is particularly troubling given evidence that Ms. Qi's analysis was not vetted internally at Uber.  Ms. Qi testified that, to her knowledge "no one reviewed those slides" and that "after [she] completed the exercise it was never talked about again." [70]  Ms. Qi further testified that "this was [her] own assessment and ultimately was not used in any forum."[71]  As such, neither the Qi Slide, nor Ms. Qi's underlying analysis, was ever reviewed by Ms. Qi's

---

[66] http://www.ncsl.org/research/transportation/autonomous-vehicles-self-driving-vehicles-enacted-legislation.aspx.
[67] UBER00069030 – 033, at 033.
[68] WAYMO-UBER-00032541 at cell K20 on "Inputs" tab.
[69] WAYMO-UBER-00039951 – 40027, at 976.
[70] Deposition of Ningjun Qi, June 22, 2017, pgs. 217, and 222 – 223.
[71] Deposition of Ningjun Qi, June 22, 2017, pg. 223.

superiors or other corporate managers, presented to Uber's CEO or other executives, or part of any board package in connection with the Ottomotto transaction.

38.     Ms. Qi was deposed a second time on August 10, 2017.  In that deposition, she confirmed that her analysis was never finalized and was never used for any purpose.[72]

> Q:  … And so did you make a determination of the number of months that acquiring Otto would accelerate Uber's development in autonomous vehicles?
>
> A:  We didn't specifically make a determination.  At one point, John Bares and Brian McClendon estimated that it would help accelerate by 12 to 24 months.  But *it was not something that we ever really finalized or had an expectation of once we closed the deal*.
>
> Q:  Is that something you considered in determining the value of the deal?
>
> A:  I did do some analysis on that, but, ultimately, *it wasn't shared or used in really determining value*. (emphasis added)

39.     The foregoing evidence demonstrates that Mr. Wagner did not perform the vetting necessary to establish that the Qi Slide, which consisted of a single summary slide presenting the results of a highly speculative analysis of future incremental profits, is a reliable basis for a $1,690,000,000 opinion of purported unjust profits damages.[73]  As a result, Mr. Wagner's opinion is speculative and unreliable.

### ii.   *Mr. Wagner Failed to Account for the Fact that the Qi Slide is 18 Months Old and Its Assumptions Have Been Disproven*

40.     Even assuming, for the sake of argument, that the methodology and assumptions underlying the Qi Slide were reasonable when Ms. Qi prepared it in January 2016, Mr. Wagner

---

[72] Deposition of Ningjun Qi, August 10, 2017, pg. 406.
[73] Mr. Wagner's summary of conclusions demonstrates that he used the "Baseline Coverage" in attempting to calculate purported unjust profits damages.  Mr. Wagner made a contradictory statement that the "Optimistic Coverage" is the more reasonable option.  To the extent Mr. Wagner later seeks to base his opinions off the "Optimistic Coverage," I reserve the right to respond.  The Wagner Report, ¶¶ 286, and 326.

performed no analysis to establish that those assumptions remained reasonable 18 months later in August 2017 when Mr. Wagner issued his opinions that are premised on the Qi Slide. Forecasting future profits always involves assessment of future uncertainties in light of the best information known at the time. As a result, it is critical that forecasts of future profits account for the most current information. However, rather than project incremental profits using the best current information as of August 2017, Mr. Wagner relied on the Qi Slide, which was prepared in January 2016. As a result, Mr. Wagner has not examined or accounted for any changes to the technological, economic, regulatory, competitive, or market landscapes (for example) that may have occurred between January 2016 and August 2017. This renders Mr. Wagner's opinion further unreliable.

41.     As an initial matter, evidence indicates that the assumption upon which the Qi Slide was based—that Ottomotto would accelerate AV commercialization by 1 to 2 years—is not only incorrect, but that the Ottomotto acquisition actually set Uber's AV program back, making the "Baseline Coverage" model (i.e., 13 cities by 2022) unrealistic. For example, John Bares, a Manager at Uber, testified that, by August 2016, he believed the Ottomotto acquisition would be a "setback" to Uber's AV development effort, and that the acquisition ultimately did not advance Uber's development efforts, as explained in his testimony below.[74]

> Q: Did the acquisition of NewCo advance Uber's development efforts
>    for self-driving cars?
>
> …
>
> A: Are you asking my opinion as of today?
>
> Q: Yes.
>
> A: No.
>
> Q: Why not?
>
> A: Because we - - well, we never got any lasers out of it. It had huge
>    distractions due to the trucking - - trucking efforts; as I said earlier,
>    a huge managerial disruption on our staff due to Anthony's - - as a

---

[74] Deposition of John Bares, June 16, 2017, pg. 85; and Deposition of John Bares, August 11, 2017, pgs. 374 – 375.

result of Anthony's effort to manage and lead, so then, that was a setback.

Q:  … What were your expectations in August 2016?

…

A:  By that point, 2016, about the same as I just said.

Q:  So even at that point, you did not expect the acquisition to advance Uber's development efforts for self-driving cars?

A:  No, because I saw every one of those things I mentioned already taking hold.

Q:  … At some point you expected the NewCo acquisition to advance Uber's self-driving car efforts.  Correct?

A:  Yes, for a three- to four-week period, starting in early January 2016.

42.     Mr. Wagner also failed to address the status of the milestones upon which almost all of the consideration for the Ottomotto transaction are based.  Because the milestones are based on steps towards commercialization, it is logical to assume that they would be reached—and restricted stock options vested—if the city coverage assumptions underlying the Qi Slide were to bear out.[75] Yet Mr. Wagner has not applied any offset to the incremental profits represented in the Qi Slide, which estimates present value (PV) rather than net present value (NPV) of EBIT[76] contributions.[77] Under a proper analysis of purported unjust incremental profits, consideration paid to acquire Ottomotto must offset the PV shown in the Qi Slide in order to arrive at an NPV figure.

43.     Mr. Wagner's failure to offset consideration paid to acquire Ottomotto against the PV shown in the Qi Slide may be explained by the fact that no milestones have been achieved.[78] This fact suggests that, not only did the Ottomotto acquisition (and the alleged acquisition of the Waymo Purported Trade Secrets) not advance Uber's AV commercialization by one to two years, as Mr.

---

[75] UBER00016585 – 748, at 660 – 661, 669 – 671, and 706 – 720.
[76] Earnings before interest and taxes.
[77] UBER00069030 – 033, at 033.
[78] Deposition of Lior Ron, April 19, 2017, pg. 83; and Deposition of Jur Van Den Berg, August 2, 2017, pg. 172.

Wagner assumed, but that Ms. Qi's assumption of 13-city coverage by 2022 is inaccurate. Mr. Wagner failed to analyze or account for the fact that no milestones of the Ottomotto acquisition have been achieved, or any other facts relating to the current status of Uber's AV program.

44.     In summary, Mr. Wagner has relied on a single summary slide of an exercise performed 18 months prior to the issuance of his unjust enrichment opinions that was never relied upon by Uber management and subsequently proven to be incorrect. Furthermore, Mr. Wagner failed to account for the cost to acquire Ottomotto, and has relied on the results presented on the Qi Slide without vetting the underlying analysis. As a result, the Qi Slide is a speculative and unreliable basis for Mr. Wagner's opinion of purported unjust profits, rendering his opinion speculative and unreliable.

### iii. Even Ignoring that the Qi Slide is Speculative and Unreliable, Mr. Wagner's Unjust Profits Opinion is Premised on Layers of Speculation and is Unreliable

45.     Given that the commercialization of fully-automated vehicles is still at least several years away, no TaaS company has ever generated a single dollar of revenue, let alone realized profits, from the use of AVs without a safety driver to transport passengers.[79] In fact, it remains uncertain when, if ever, anybody will. According to Mr. Emil Michael, former Senior Vice President of Business Development at Uber, "the launch of a … autonomous vehicle that can generate revenue without any safety driver in there is still years away."[80] Mr. Wagner's opinion of purported unjust profits resulting from the alleged misappropriation of the Waymo Purported Trade Secrets is particularly speculative given the uncertainty inherent in efforts to commercialize AV technology for use in the TaaS space, which no company has successfully accomplished to date.[81]

46.     As discussed above, evidence indicates that Waymo is cognizant of the challenges that must be overcome in order to successfully commercialize use of AVs in TaaS. As noted, Waymo

---

[79] https://www.extremetech.com/extreme/252112-what-is-a-self-driving-car.
[80] Deposition of Emil Michael, July 28, 2017, pgs. 17, and 137-138.
[81] https://www.extremetech.com/extreme/252112-what-is-a-self-driving-car.

has identified numerous categories of "significant risks" that "could affect the success of [its] program and [its] anticipated TaaS business."[82]  Those include:[83]

1. _Supply Side Risk_:  We deliver commercially viable technology
   a. We get self-driving technology to work
      i. We can't get/develop a vehicle platform
      ii. We can't get/develop sensors
      iii. We can't solve all the software challenges
      iv. We can't get our overall system reliability high enough
   b. We get the cost of the technology down enough to run a sustainable TaaS business
2. _Demand Side Risk_:  We are able to generate harvestable consumer demand
   a. We achieve consumer acceptance of self-driving cars
   b. We avoid regulatory prohibition of our technology
3. _Other Risks_:
   a. Corporate funding risks
   b. Secular risks
   c. Macro Risks
   d. Commercialization risks

47.    As Waymo's list of significant risk factors indicates, even if Uber and/or Waymo successfully develop AV technology, they still face "Demand Side Risk," including consumer acceptance and regulatory prohibition or constraint.[84]  A January 2017 report by Deloitte stated that "[a]lthough the majority of US consumers surveyed think driving in AVs would be fun and would free up time to do other things, three out of four are skeptical that self-driving cars will be safe anytime soon."[85]  Deloitte also stated:[86]

> _... Several recent reports have attempted to estimate the failure and fatality rates associated with autonomous vehicles, and the consensus is that these vehicles would have to be driven hundreds of millions of miles to sufficiently demonstrate their safety... Raising public awareness of_

---

[82] WAYMO-UBER-00046625 – 632, at 625.
[83] WAYMO-UBER-00046625 – 632.
[84] WAYMO-UBER-00046625 – 632.
[85] Giffi, Craig, et al., _The Race to Autonomous Driving_, Deloitte Review, Issue 20, 2017, pg. 84.
[86] Giffi, Craig, et al., _The Race to Autonomous Driving_, Deloitte Review, Issue 20, 2017, pg. 86 (citations omitted).

*autonomous technology, Google has been running driverless cars on public roads for several years, while Uber recently launched an autonomous option to its ridesharing service in Pittsburgh. Both of these experiments aim to considerably increase the amount of data on real-world autonomous driving in a very visible and consumer-friendly way. On the other hand, tragic events involving autonomous vehicle features can cast a shadow over the technology, resulting in potential loss of consumer confidence.*

48.     Waymo also acknowledged the "risk that [Waymo will] have a bad accident and this will lose [Waymo] trust."[87]   Additionally, Waymo noted that there "is also a risk that [Waymo's] security systems will be breached and one of [its] vehicles hacked."[88]   A Waymo presentation, dated March 22, 2017, indicated that Waymo also recognizes that the "ideal scaling strategy has *many* feasibility challenges."[89]   The presentation indicated that Waymo has "identified ~20 major feasibility challenges" and that "likely many more challenges along the way."[90]



49.     Waymo indicated that the seven factors above were of the "[h]ighest challenge, impact, and parallel pull on resources."[92]   However, even if Uber and/or Waymo are able to successfully

---

[87] WAYMO-UBER-00046625 – 632, at 630.
[88] WAYMO-UBER-00046625 – 632, at 630.
[89] WAYMO-UBER-00032218 – 283, at 238.
[90] WAYMO-UBER-00032218 – 283, at 238.
[91] WAYMO-UBER-00032218 – 283, at 238.
[92] WAYMO-UBER-00032218 – 283, at 238.

develop AV technology, if consumers accept the technology as being safe, and if they are able to successfully scale their respective AV operations, they must still overcome a complex and still uncertain web of regulatory hurdles at various levels of government on a market-by-market basis. I understand that current regulatory policy prohibits the operation of AVs on most public roads without a human driver able to take control upon system disengagement or failure.[93]  For example, New York maintains a 1967 law "that requires drivers to have at least one hand on the steering mechanism of any moving vehicle."[94]  A recent attempt to amend this requirement failed.[95]

50.    Washington D.C. similarly permits the operation of AV on public roads if the vehicle "[h]as a manual override feature that allows a driver to assume control" and there must be "a driver seated in the control seat of the vehicle while in operation who is prepared to take control of the autonomous vehicle at any moment."[96]  California law mandates vehicles be designed so that a licensed driver could take control of the vehicle in the case of technology failure.[97]

51.    Notably, the original draft of the California law had been crafted to allow for entirely driverless cars as long as they were capable of autonomously complying with traffic laws, but the State Assembly rejected this notion and inserted an explicit requirement that AVs permit a human "operator" to override through a steering column, brake or accelerator pedal.[98]  It has been noted that these rules effectively prohibit the deployment of Waymo's driverless vehicles, which lack this capability, and that this signals an unwillingness by the California legislature to let autonomous vehicles be truly "autonomous."[99]  Waymo recognizes this specific law as a hurdle "that might limit the ability of self-driving cars to operate," and observers have noted the likelihood

---

[93] http://www.ncsl.org/research/transportation/autonomous-vehicles-self-driving-vehicles-enacted-legislation.aspx.
[94] https://www.usatoday.com/story/money/cars/2017/06/25/regulators-scramble-stay-ahead-self-driving-cars/100963150/; and http://www.govtech.com/fs/NYs-Slow-Pace-on-Autonomous-Vehicle-Legislation-Could-Put-It-at-a-Disadvantage-in-Years-Ahead.html.
[95] http://www.govtech.com/fs/NYs-Slow-Pace-on-Autonomous-Vehicle-Legislation-Could-Put-It-at-a-Disadvantage-in-Years-Ahead.html.
[96] D.C. Act 19-643, Autonomous Vehicle Act of 2012 (2013); and
http://www.ncsl.org/research/transportation/autonomous-vehicles-self-driving-vehicles-enacted-legislation.aspx.
[97] Cal. SB 1298 (2012).
[98] Cal. SB 1298, Cal. Assembly Committee on Transportation Hearing, June 25, 2012.
[99] See http://www.ibtimes.com/california-google-ready-autonomous-vehicle-showdown-2016-2233290; and
https://www.theverge.com/2015/12/16/10325672/california-dmv-regulations-autonomous-car.

that other states may model their laws after California's, resulting in entrenchment issues going forward.[100]

52.     According to Mr. Ron Medford, Director of Safety for Waymo, the California Department of Motor Vehicles has developed regulations for testing AVs, but has not completed development of regulations for the operation of AVs, and are in the process of amending the existing regulations for testing AVs.[101]   However, Mr. Medford testified that he does not know when the California regulations will be finalized, what the final regulations will say about AVs, whether the final regulations will allow Waymo to test its AVs on public roads, or what conditions will apply to the operation of AVs.[102]   Mr. Medford also provided the following testimony regarding state of California's AV regulatory structure:[103]

> Q:  Based on current California regulations, is Waymo allowed to have passengers in autonomous vehicles on public roads without drivers?
>
> A:  No.
>
> Q:  When will Waymo be allowed to have autonomous vehicles on public roads without drivers?
>
> …
>
> A:  When California allows it in its regulations.
>
> Q:  When will that be?
>
> A:  I don't know.

53.     AV developers have been required to navigate these regulations in their operations.  For example, in order for Google to test its prototype vehicles "the company was required to add

---

[100] WAYMO-UBER-00046625 – 632, at 630 – 631; Deposition of Charlie Johnson, August 17, 2017, pg. 224; and Daniel A. Crane, et al., "A Survey of Legal Issues Arising from the Deployment of Autonomous and Connected Vehicles," 23 Mich. Telecomm. Tech. L. Rev. 191, 219 (Spring 2017).
[101] Deposition of Ron Medford, August 23, 2017, pgs. 37 – 38, and 46 – 50.
[102] Deposition of Ron Medford, August 23, 2017, pgs. 73 – 75.
[103] Deposition of Ron Medford, August 23, 2017, pgs. 78 – 79.

temporary manual controls to the vehicles."[104]  Similarly, Cruise operates a pilot program testing AV technology as a ride-hailing service called "Cruise Anywhere", currently available to its employees in San Francisco.[105]  However, each vehicle has a "safety driver in place behind the wheel for testing and as required by law."[106]

54.     Uber has not yet made plans for roll-out of its AV TaaS, because planning would be hindered by uncertainties as to whether, or in what form, the regulatory environment might one day permit the technology to be implemented.[107]  This uncertainty is exacerbated by an expectation within the industry that at some point "someone is going to die in this technology.... [and that] could really set back the integration of this technology."[108]  If ill-timed, an early and highly-publicized fatality could result in a regulatory pullback that could further hinder commercialization of AV TaaS or driverless AV, generally.[109]

55.     The possibility that regulatory hurdles may constrain the progress and commercialization of AV technology is well-established.  Waymo recognizes that regulatory lags present a substantial risk to a timely launch of AV TaaS.  In its "Plan of Record Strategy," Waymo enumerated the risks it faces in the AV space, one of which is "regulatory hurdles block[ing] [its] TaaS service from operating."[110] ██████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████     Charlie Johnson, a Business Strategy and Operations Analyst at Waymo, recognized that "some regulations might impede [Waymo's] ability

---

[104] Karim R. Lakhani, et al., "Google Car," Harvard Business School Case 614-922, January 2014 (Rev. March 9, 2015), pg. 10.

[105] https://techcrunch.com/2017/08/08/cruise-is-running-an-autonomous-ride-hailing-service-for-employees-in-sf/?ncid=rss&utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+Techcrunch+%28TechCrunch%29.

[106] https://techcrunch.com/2017/08/08/cruise-is-running-an-autonomous-ride-hailing-service-for-employees-in-sf/?ncid=rss&utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+Techcrunch+%28TechCrunch%29.

[107] Deposition of Gautam Gupta, August 18, 2017, pgs. 127 – 128.

[108] S. Hrg. 114-416, "Hands Off: The Future of Self-Driving Cars," Hearing before the Committee on Commerce, Science, and Transportation, United States Senate, 114th Congress, Second Session, March 15, 2016, pg. 63.

[109] Deposition of John Krafcik, August 2, 2017, pg. 131.

[110] WAYMO-UBER-00031805 – 817, at 811.

[111] WAYMO-UBER-00031805 – 817, at 811.

to serve customers, that would be a challenge [Waymo] would have to respond to."[112]  Waymo's fears of AV regulatory issues are echoed throughout the industry, in the media, and by regulators.

56.     The Self Driving Coalition, an organization of which Waymo is a member, aggregates national news stories on the progress of AV technology.[113]  Headlines are persistently pessimistic with regard to AV policy issues.  The following are a few of those headlines:

- "New York law requiring hand on wheel stymies pace of self-driving cars"[114]

- "Regulators scramble to stay ahead of self-driving cars"[115]

- "Auto industry pushes for clear federal oversight of driverless cars"[116]

- "Car companies race to roll out self-driving cars, but the rules aren't ready"[117]

- "Automakers ask California to ease rules for self-driving car tests"[118]

- "Waymo cries foul over self-drive legislation"[119]

- "Big-name companies come out against self-driving car bill"[120]

- "Congress and DOT must take additional measures beyond self-driving vehicle guidance"[121]

- "Google, automakers object to California rules for self-driving cars"[122]

- "Self-driving car advocates:  Feds should set safety rules, not states"[123]

---

[112] Deposition of Charlie Johnson, August 17, 2017, pgs. 11 and 224.
[113] http://www.selfdrivingcoalition.org/about; and http://www.selfdrivingcoalition.org/newsroom/in-the-news.
[114] http://buffalonews.com/2017/07/31/new-york-takes-baby-steps-toward-self-driving-vehicles/.
[115] https://www.usatoday.com/story/money/cars/2017/06/25/regulators-scramble-stay-ahead-self-driving-cars/100963150/.
[116] http://www.freep.com/story/money/cars/2017/06/27/auto-industry-federal-driverless-cars/431292001/.
[117] https://www.cbsnews.com/news/is-the-u-s-ready-for-self-driving-cars-rules-legislation/.
[118] http://www.reuters.com/article/us-autos-california-regulations-idUSKBN17R30X.
[119] http://www.autonews.com/article/20170220/OEM11/302209926/waymo-cries-foul-over-self-drive-legislation.
[120] https://www.bizjournals.com/nashville/news/2017/02/10/big-name-companies-come-out-against-self-driving.html.
[121] http://thehill.com/blogs/congress-blog/technology/309242-congress-and-dot-must-take-additional-measures-beyond-self.
[122] http://news.trust.org/item/20161019210239-8mauc.
[123] https://www.usatoday.com/story/tech/news/2016/04/27/self-driving-car-advocates-say-feds-should-set-rules/83620666/.

57.     AV developers are pushing the U.S. Congress for "unified federal regulations to replace outdated rules," and have "urged California to make changes to its proposed state regulations governing autonomous vehicles."[124]  Also, individuals "involved in the nation's autonomous vehicle industry […] all raised concerns about New York's sloth-like path to driverless vehicles."[125]  According to Mr. Medford, there is currently a bill in the House of Representatives regarding autonomous vehicles.[126]  Mr. Medford understands that the bill, as written, would require the U.S. Secretary of Transportation to make certain rules regarding autonomous vehicles and that he doesn't know what those rules will be.[127]  In fact, Mr. Medford acknowledged that if the law is passed, he doesn't know if Waymo will be able to legally operate AVs in the United States under the rules that the Secretary of Transportation promulgates.[128]  I understand that a bill regarding autonomous vehicles recently passed the U.S. House of Representatives, demonstrating the unsettled regulatory nature of this area.[129]

58.     AV developers are aware of the regulatory hurdles that hinder their entry into the market. "In the race to deliver cars that can safely operate themselves, proponents are increasingly concerned about a fast-growing thicket of regulations and laws being proposed by states that could come in conflict with each other and threaten to hold up development."[130]  Mitch Bainwol, CEO of the Alliance of Automobile Manufacturers, has acknowledged that "the U.S. lacks a critical uniform national framework to advance [AV] technologies."[131]  In fact, Waymo's own CEO has testified that that regulatory hurdles are a major risk and "always need to be considered."[132]

59.     Leaders in the AV industry also recognize that regulatory hurdles may cause material delays in the commercialization of AV technology.  A representative of IHS Automotive has stated

---

[124] http://www.reuters.com/article/us-usa-selfdriving/senators-unveil-road-map-for-self-driving-car-legislation-idUSKBN1942QJ?il=0.
[125] http://buffalonews.com/2017/07/31/new-york-takes-baby-steps-to-self-driving-vehicles/.
[126] Deposition of Ron Medford, August 23, 2017, pg. 162.
[127] Deposition of Ron Medford, August 23, 2017, pg. 162.
[128] Deposition of Ron Medford, August 23, 2017, pg. 162.
[129] https://energycommerce.house.gov/selfdrive/.
[130] https://www.usatoday.com/story/money/cars/2017/06/25/regulators-scramble-stay-ahead-self-driving-cars/100963150/.
[131] http://www.freep.com/story/money/cars/2017/06/27/auto-industry-federal-driverless-cars/431292001/.
[132] Deposition of John Krafcik, August 2, 2017, pg. 131.

that "[AV regulation] could be messier, and it could take longer than we want it to," and that they anticipate "state-by-state and some federal fights happening."[133]   Volvo's vice president of government affairs, Anders Karrberg, recognizes that the U.S. "runs the risk of slowing down the development and introduction of autonomous driving technologies by making it difficult for carmakers to test, develop, certify and sell" self-driving cars.[134]

60.     Regulation can move slowly, especially regulation related to safety issues.  For example, "Congress in 2008 instructed the Department of Transportation to implement a new standard by 2011 requiring automakers to adopt rearview cameras.  After numerous delays, the rule was issued in 2014, but it won't take effect until 2018."[135]   That is, safety related regulation mandated in 2008, will not take effect until next year—a full ten years after the DOT received instructions from congress, and seven years beyond the date by which they were mandated to take action.  The slow pace with which regulators will likely act is not limited to the federal level.  Additionally, "states are balancing a desire to be viewed as beacons of innovation while also seeking to protect their residents from technology that remains unproven on a large scale."[136]

61.     Policy makers recognize the inadequacy of current AV regulations and the inability of agencies like the NHTSA to adequately oversee such regulations.[137]   Some legislators are "troubled" by NHTSA's lack of insight on matters relating to AVs.[138]  Statements from legislators also indicate a reluctance to act too quickly or to be overly permissive about AV technology.[139]

---

[133] https://www.usatoday.com/story/money/cars/2017/06/25/regulators-scramble-stay-ahead-self-driving-cars/100963150/.
[134] https://www.usatoday.com/story/money/cars/2017/06/25/regulators-scramble-stay-ahead-self-driving-cars/100963150/.
[135] https://www.usatoday.com/story/money/cars/2017/06/25/regulators-scramble-stay-ahead-self-driving-cars/100963150/.
[136] https://www.usatoday.com/story/money/cars/2017/06/25/regulators-scramble-stay-ahead-self-driving-cars/100963150/.
[137] Hrg. 114-416, Hearing before the Committee on Commerce, Science, and Transportation, United States Senate, 114th Congress, Second Session, March 15, 2016, pgs. 58 – 59.
[138] http://www.freep.com/story/money/cars/2017/06/27/auto-industry-federal-driverless-cars/431292001/.
[139] Hrg. 114-416, Hearing before the Committee on Commerce, Science, and Transportation, United States Senate, 114th Congress, Second Session, March 15, 2016, pgs. 3 – 4.

62.     Regulators and policy makers also acknowledge that regulations are a barrier to the commercial implementation of AV technology.  "Federal auto regulations pose significant legal hurdles that must be cleared before fully self-driving cars can be sold without steering wheels and gas pedals."[140]  Additionally, several well-respected legislators have reported that "existing federal vehicle regulations written over recent decades did not account for self-driving cars without a human driver behind the wheel."[141]

63.     It may be years, if ever, before regulations are in place that would allow AV TaaS operators to operate without safety drivers.  Until then, they will have to pay drivers and incur the expense of operating and maintaining AV systems, if they wish to run an AV-based TaaS platform.  Therefore, Uber allegedly gaining some modest time advantage as a result of the alleged misappropriation of the Waymo Purported Trade Secrets would likely have no real impact, as Uber, and the many other AV developers, will still have to wait for the appropriate regulatory framework to be instituted.

64.     Competition presents yet another risk to the successful commercialization of Uber's and Waymo's AV technologies.  The analysis underlying the Qi Slide is based on the assumptions that Uber can successfully penetrate 13 cities by 2022 and have thousands of rides at specific profit levels.[142]  However, among the other factors discussed, these assumptions are susceptible to the degree of competition Uber will face in the marketplace.

65.     According to a May 2017 presentation from RethinkX, an independent think tank, early movers in the AV industry include Tesla, Waymo, NVIDIA, Uber, and Baidu.[143]  RethinkX also stated that "[c]ompanies within the incumbent auto industry, such as GM and Ford, have also acquired Silicon Valley startups that are developing autonomous vehicle software."[144]

---

[140] https://www.reuters.com/article/us-usa-selfdriving/senators-unveil-road-map-for-self-driving-car-legislation-idUSKBN1942QJ.

[141] https://www.reuters.com/article/us-usa-selfdriving/senators-unveil-road-map-for-self-driving-car-legislation-idUSKBN1942QJ.

[142] UBER00069030 – 033, at 033.

[143] https://static1.squarespace.com/static/585c3439be65942f022bbf9b/t/591a2e4be6f2e1c13df930c5/1494888038959/RethinkX+Report_051517.pdf, pg. 36.

[144] https://static1.squarespace.com/static/585c3439be65942f022bbf9b/t/591a2e4be6f2e1c13df930c5/1494888038959/RethinkX+Report_051517.pdf, pg. 36.

Additionally, RethinkX noted that California had approved requests by 30 companies to test their self-driving cars on public roads.[145]

66.     Furthermore, Tesla recently announced the development of its own ridesharing platform, which RethinkX stated "is an indicator of this future industry trend."[146]   A number of platform-related developments by auto industry incumbents are in progress, including GM's $500 million investment in Lyft, BMW's ridesharing service, ReachNow, and Volkswagen's $300 million investment in Gett.[147]

67.     I also note that, while Mr. Wagner relied on the Qi Slide as the basis of his opinion, he neglected to consider his opinion of purported unjust profits in light of the following slide showing "Market Comparables" that was in the same slide deck as the Qi Slide.[148]



68.     As shown above, the slide indicated valuations for Quanergy, Velodyne, and "Google (AL's Division")" of $1.3 billion, $950 million, and $2.1 billion, respectively.[149]   Thus, Mr.

---

[145] https://static1.squarespace.com/static/585c3439be65942f022bbf9b/t/591a2e4be6f2e1c13df930c5/1494888038959/RethinkX+Report_051517.pdf, pg. 26 (citations omitted).
[146] https://static1.squarespace.com/static/585c3439be65942f022bbf9b/t/591a2e4be6f2e1c13df930c5/1494888038959/RethinkX+Report_051517.pdf, pg. 36 (citations omitted).
[147] https://static1.squarespace.com/static/585c3439be65942f022bbf9b/t/591a2e4be6f2e1c13df930c5/1494888038959/RethinkX+Report_051517.pdf, pg. 36 (citations omitted).
[148] UBER00069030 – 033, at 032.
[149] UBER00069030 – 033, at 032.

Wagner's opinion of purported unjust profits for the alleged misappropriation of the Waymo Purported Trade Secrets is greater than the entire indicated value of both Quanergy and Velodyne, and approximately 80% of the entire indicated value of "Google (AL's Division)."

69.     Given that no company, including Uber and Waymo, has yet to commercialize operations or realize a profit from its AV efforts, and the numerous "significant risks" facing successful commercialization of an AV TaaS operations, any attempt to value future incremental profits is highly speculative.  As a result, Mr. Wagner's opinion regarding the purported present value of the incremental future profits Uber will realize sometime in the future as a result of allegedly misappropriating the Waymo Purported Trade Secrets is speculative and unreliable.

### iv.   Mr. Wagner's Apportionment Methodology Is Flawed

70.     In order to establish a causal link between the Waymo Purported Trade Secrets and purported unjust profits, Waymo must be able to explain:  (i) how Uber's alleged misappropriation of the Waymo Purported Trade Secrets actually caused Uber to realize unjust profits; and (ii) what portion of those unjust profits are attributable to the alleged misappropriation of the Waymo Purported Trade Secrets, as opposed to the myriad of other contributing technologies and factors. [150]  Mr. Wagner did neither of these in his analysis.

71.     Mr. Wagner's entire unjust profits opinion is based on the false assumption that each of the Waymo Purported Trade Secrets individually accelerated Uber's entire AV technology by the amount of time it would take to independently develop each Waymo Purported Trade Secrets, thereby moving commercialization of Uber's AV technology to an earlier date.  In order to calculate the purported unjust profits attributable to the alleged misappropriation of each of the Waymo Purported Trade Secrets, Mr. Wagner multiplied the present value estimate represented on the Qi Slide by a proportional factor based on the estimated "amount of development time saved by Uber." [151]  Thus, for example, Mr. Wagner assumed that commercialization of Uber's entire AV

---

[150] Weil, et al., *Litigation Services Handbook (Fourth Edition)*, pg. 2.1-2.  I note that Mr. Wagner was an editor of this publication.
[151] The Wagner Report, ¶¶ 282 – 285.

program was accelerated by two years as a result of allegedly not having to independently develop Waymo Purported Trade Secret No. 25.[152]  However, this assumption is flawed.

72.     Mr. Wagner's assumption could only be correct if AV development were a serial process. That is, if all steps of development had to be undertaken in a specific sequence, and that the failure to finalize one component means that the development of thousands of other components—both software and hardware—are delayed by the amount of time necessary to complete predecessor components.  Mr. Wagner employs this serial development assumption to effectively opine that no other AV development (across Uber's entire AV program) would occur during a period in which independent development of the Waymo Purported Trade Secrets was occurring, and thereby, commercialization of Uber's AV technology would have taken longer but for the alleged misappropriation of the Waymo Purported Trade Secrets.  In his unjust profits analysis, Mr. Wagner flips this assumption to opine that the alleged misappropriation of the Waymo Purported Trade Secrets will allow Uber to commercialize its AV technology faster than it would have, but for the alleged misappropriation of the Waymo Purported Trade Secrets.

73.     There is no support for Mr. Wagner's serial development assumption.  Hardware is merely one component of an AV technology; LiDAR is merely a small component of AV hardware; and the Waymo Purported Trade Secrets are merely a small component of LiDAR.[153]  The headcount of Uber's hardware department is 155 people, while the software department has 405 people.[154]  The hardware engineering team does not wait for the LiDAR team to perform work, and the software team does not wait until the hardware team is finished to commence work.[155]  AVs are multidimensional systems comprised of a number of complex hardware and software elements, each being developed in parallel.[156]  As discussed in greater detail below, these elements include:

- Highly detailed 3-D computerized maps;[157]

---

[152] The Wagner Report, ¶ 285.
[153] Interview of Dr. Lebby and Dr. McManamon.
[154] UBER00231730 – 739, at 732.
[155] WAYMO-UBER-00001354 – 412, at 363.
[156] WAYMO-UBER-00001354 – 412, at 363 and 383.
[157] WAYMO-UBER-00031699 – 801, at 713 – 717.

- A suite of sensors that includes LiDAR, radar, digital camera, and sonar systems;[158]

- Communications systems;[159]

- Software-based Artificial Intelligence ("AI") algorithms and databases;[160] and

- A specially designed vehicle that can accommodate and implement these features.[161]

74.  

75.  An October 5, 2016 email from Sasha Zbrozek, Electrical Engineer at Google, regarding the investigation into Mr. Levandowski's access of Google information, confirms the secondary significance of hardware in AV technology, which undermines Mr. Wagner's assumption that a single component of LiDAR technology could unilaterally advance commercialization of Uber's AV technology.[162]  Mr. Zbrozek stated in his email that "[a]t least historically, high-value has been algorithms and software.  *The hardware (at all levels) was a second class citizen* (emphasis added).  Maybe opinions have changed."[163]  In a prior email in the same chain, Mr. Zbrozek stated the following about the materials Mr. Levandowski had accessed:[164]

> It's all electronics designs – schematics and PCB layouts, and the component library for their creation.  *It was considered low-value enough that we even considered hosting it off of Google infrastructure*.

---

[158] WAYMO-UBER-00031699 – 801, at 714.  See also http://spectrum.ieee.org/cars-that-think/transportation/self-driving/how-driveai-is-mastering-autonomous-driving-with-deep-learning.
[159] https://www.engadget.com/2017/06/24/self-driving-cars-mcity-augmented-reality/.
[160] http://spectrum.ieee.org/cars-that-think/transportation/self-driving/how-driveai-is-mastering-autonomous-driving-with-deep-learning; Hod Lipson, et al., "Driverless: Intelligent Cars and the Road Ahead," The MIT Press: Cambridge, 2016, pgs. 197 – 203.
[161] Interview of Dr. Lebby and Dr. McManamon.
[162] Deposition of Sasha Zbrozek, August 18, 2017, pg. 15; WAYMO-UBER-00084484.
[163] WAYMO-UBER-00084484 (emphasis added).
[164] WAYMO-UBER-00084484 (emphasis added).

> *[Mr. Levandowski] was a high-level manager, and not doing any direct technical contribution at this level.  It's not particularly surprising that he might check things out once in the misguided dream of maybe making individual contribution or maybe taking a look at the progress of a widget. It clearly wasn't part of his routine.  **Doesn't ring the alarm bells for me.***
> (emphasis added)

76.     In light of all these different components of AV technology, Mr. Wagner's assumption that each of the Waymo Purported Trade Secrets—all of which relate to discrete aspects of LiDAR hardware—allowed Uber to simply skip over months (or years) of hardware, algorithm, and software development is unsupported and unreliable.  If required to independently develop each of the Waymo Purported Trade Secrets, Uber could simply employ additional engineering resources to work in parallel with Uber's existing AV development efforts in order to commercialize its AV technology in the same amount of calendar time as it would without independent development of the Waymo Purported Trade Secrets.  For example, Uber's response to Common Interrogatory No. 1 stated:[165]

> *The Schedule times identified for the redesigns below would not significantly or materially impact the timeline for commercialization and rollout of Uber's fully-autonomous self-driving technology to the general public.*

77.     Although Mr. Wagner adopted Uber's schedule of times for all Waymo Purported Trade Secrets except Nos. 25 and 111, he ignored this important part of Uber's response.

78.     It is also important to note the difference between accelerated development and accelerated entry to market.  The Qi Slide is focused on market entry.  But even fully mature AV technology cannot immediately be commercialized. As noted elsewhere, there are regulatory, safety, and marketing obstacles, as well as the need to put the AV technology into a vehicle.  Accordingly, the amount of development time necessary to independently develop each of the Waymo Purported Trade Secrets has no direct relationship to the accelerated commercialization of Uber's entire AV

---

[165] Defendant Uber Technologies, Inc. and Ottomotto LLC's Second Supplemental Responses to Waymo's First Set of Common Interrogatories (Nos. 1-3), Response to Common Interrogatory No. 1.

technology, particularly when Uber's commercialization timeline stretches out years beyond the time required for independent development.[166]

79.     The flaw in Mr. Wagner's serial development assumption is illustrated by the way in which he calculated unjust profits in the event that multiple Waymo Purported Trade Secrets are found to have been misappropriated.  Mr. Wagner effectively opined that the alleged misappropriation of the Waymo Purported Trade Secrets accelerated commercialization of Uber's AV technology by 3.86 years, which is the sum of Mr. Wagner's purported accelerated development for eight of the Waymo Purported Trade Secrets.[167]  This would mean that, applying Ms. Qi's assumption of commercialization in 13 cities by 2022, Uber should be ready to commercialize AV Technology in 13 cities by next year (2018), which is a contention for which Mr. Wagner has no basis.

80.     In an apparent attempt to remedy the results of his flawed assumption, Mr. Wagner stated that he also "assumed that the accelerated AV development is not additive" and that "only the corresponding unjust enrichment for the trade secret with the longest period of accelerated AV development should be awarded."[168]     However, this assumption contradicts his entire methodology.  If each individual alleged trade secret advances the entire AV program by the amount of time required for independent development, this necessarily means that all other work that would be done in parallel is irrelevant.  Mr. Wagner does not explain why the Waymo Purported Trade Secrets are subject to different rules than all of the other technology that goes into the development of fully autonomous vehicles.

81.     It should be re-stated that my rebuttal opinion is based on the assumption that there is a finding that Uber has used the Waymo Purported Trade Secrets.  Uber contends that the Waymo Purported Trade Secrets have not been utilized in Uber's AV technology.[169]  Furthermore, according to Dr. McManamon, he has not seen any indication that Uber has utilized Waymo

---

[166] Interview of Dr. Lebby and Dr. McManamon.
[167] The Wagner Report, ¶ 285 (sum of "Accelerated AV Development (Years)").
[168] The Wagner Report, ¶ 286.
[169] Uber Technologies, Inc. and Ottomotto LLC's Answer to First Amended Complaint and Affirmative Defenses, June 22, 2017, pgs. 3 – 4; and Defendant Uber Technologies, Inc. and Ottomotto LLC's Second Supplemental Responses to Waymo's First Set of Common Interrogatories (Nos. 1 – 3), Response to Common Interrogatory No. 1.

Purported Trade Secrets Nos. 25 or 111.[170]  Similarly, according to Dr. Lebby, he has not seen any indication that Uber has utilized the remaining Waymo Purported Trade Secrets in its AV technology.[171]  As a result, even if Uber had already realized profits from its AV technology, which it has not, it would be improper to attribute any profits to the Waymo Purported Trade Secrets, because there is no evidence indicating that Uber used the Waymo Purported Trade Secrets.  For this reason alone, Mr. Wagner has no basis to attribute any purported unjust profits to the Waymo Purported Trade Secrets.

82.     With respect to Waymo Purported Trade Secrets Nos. 25 and 111, Mr. Wagner relied on Waymo's technical expert, Dr. Hesselink, for the opinion that alleged misappropriation saved Defendants at least two years and one year, respectively, of development time.[172]  However, it is Dr. McManamon's opinion that Waymo Purported Trade Secrets Nos. 25 and 111 would not have accelerated commercialization of Uber's AV technology at all, even if there was an indication that Uber utilized those particular Waymo Purported Trade Secrets, which there is not.[173]  If it is determined that Waymo Purported Trade Secrets Nos. 25 and 111 have not accelerated Uber's commercialization, as Dr. McManamon opined, no purported unjust profits would be attributable to those two purported trade secrets.  As a result, Mr. Wagner has overstated purported unjust profits attributable to Waymo Purported Trade Secrets Nos. 25 and 111 by "apportioning" $1,690 million and $836 million to those purported trade secrets, respectively.[174]

83.     Furthermore, based on Mr. Wagner's description of Waymo Purported Trade Secret No. 25, he understands that it consists of a collection of self-driving car test scenarios.[175]  Mr. Wagner gave no consideration to the number of scenarios within the collection of test scenarios Uber is alleged to have used in development of its AV technology.  Mr. Hesselink's report, upon which Mr. Wagner relied, identified at most six test scenarios that Waymo alleges Uber

---

[170] Interview of Dr. McManamon.
[171] Interview of Dr. Lebby.
[172] The Wagner Report, ¶ 284.
[173] Interview of Dr. McManamon.
[174] The Wagner Report, ¶ 285.
[175] The Wagner Report, ¶¶ 47 – 50.

misappropriated.[176]  Mr. Wagner's failure to apportion value to only the test scenarios that Uber used, if any, renders his apportionment analysis further unreliable.

### v.  Conclusions Regarding Mr. Wagner's Unjust Profits Opinion

84.    Mr. Wagner's opinion is based on speculation about future profits that may never occur, which is premised on the results of an unreliable analysis that has been proven incorrect. Additionally, Mr. Wagner has conflated time required to independently develop the Waymo Purported Trade Secrets with accelerated commercialization of Uber's AV technology, failed to establish a causal link connecting the alleged misappropriation of the Waymo Purported Trade Secrets to any unjust profits, and performed an improper "apportionment."  For at least the foregoing reasons, Mr. Wagner's opinion regarding the purported unjust profits Uber realized as a result of the alleged misappropriation of the Waymo Purported Trade Secrets is unreliable and grossly overstates unjust enrichment damages, if any.

85.    I also note that Mr. Wagner's unjust profits analysis is predicated on an assumption that no injunction is granted.  If an injunction is granted, Uber will have to independently develop and/or design-around the Waymo Purported Trade Secrets and, under Mr. Wagner's theory, no unjust profits will result.

### B.  Mr. Wagner's Avoided Cost Opinion

86.    Mr. Wagner's avoided cost opinion is premised on the following statement from Mr. Bares' notes from January 2016 regarding a meeting he had with Anthony Levandowski:  "he would bring (filtered) advice about what to try and not try…that is a day with him and our team could save us months towards 2020 (month = $20M run rate)."[177]  Mr. Wagner then multiplied $20 million per month by the same "amount of development time saved by Uber" that he used to calculate

---

[176] The Hesselink Report, pgs. 38 – 43.
[177] UBER00060321 – 347, at 321; Deposition of John Bares, June 16, 2017, pgs. 209 – 215; and Interview of John Bares.

purported unjust profits in order to calculate the purported avoided costs Uber enjoyed attributable to each of the Waymo Purported Trade Secrets.[178]

### i. The $20 Million per Month Run Rate is for the Uber's Entire AV Program and Not Tied to the Waymo Purported Trade Secrets

87.     Mr. Wagner's avoided cost analysis is flawed because he used the cash burn rate for Uber's entire AV program rather than the cost of independently developing each of the Waymo Purported Trade Secrets.  As he did with his opinion of purported unjust profits, Mr. Wagner assumed that each Waymo Purported Trade Secret advanced the launch date of Uber's AV, and thereby saved Uber months or years of incurred costs for its entire AV program.[179]

88.     According to Mr. Bares, "at the time [Uber] had this goal of getting to know [*sic*] safety driver in 2020, and we were burning 20 million dollars a month in our ___**org**___ so if you save us a month getting there, you save 20 million dollars." (emphasis added)[180]  Thus, as with the analysis underlying the Qi Slide, the $20 million run rate was relevant to the speed with which Uber's entire AV program was being developed, not the time necessary to independently develop each of the Waymo Purported Trade Secrets.

89.     As noted previously, LiDAR—the area of AV to which the Waymo Purported Trade Secrets allegedly relate—is merely one element of the hardware, which is merely one element of Uber's AV program. ██████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

90.     On its face, the statement from Mr. Bares' notes refers to potential cost savings Mr. Bares thought may result from advice Mr. Levandowski may have been able to provide to Uber.  Mr.

---

[178] The Wagner Report, ¶¶ 292 – 295.
[179] The Wagner Report, ¶¶ 292 – 295.
[180] Deposition of John Bares, June 16, 2017, pgs. 214 – 215.
[181] UBER00231730 – 739, at 732.

Bares' deposition testimony confirms this interpretation of the note. Mr. Bares stated the following about the note at his June 16, 2017 deposition:[182]

> *Filtered advice to me was know-how. It's like which way to attack the mountain and he had been at this since I met him that day in the desert in 2004, multiple companies, multiple efforts. The first guy to send an autonomous car across the Bay Bridge, he knew a lot about autonomy, so he would bring filtered men, he's not going to bring direct advice from a prior company such as Google, but he would bring filtered to me, like you filtered up enough and then it's know-how.*

91.    According to Mr. Bares, he did not contemplate the Waymo Purported Trade Secrets, or any proprietary technologies, when he recorded the note about the $20 million monthly run rate. In fact, Mr. Bares testified that he specifically was not considering "direct advice from a prior company such as Google."[183]   Instead, he was considering Mr. Levandowski's "filtered" advice (which, according to Mr. Bares, along with the acquisition of Ottomotto, ultimately did not save Uber any time in its AV development).[184]  Mr. Wagner has provided no basis to support the notion that Mr. Bares' consideration of the value Mr. Levandowski and/or the Ottomotto acquisition could provide Uber was tied to the Waymo Purported Trade Secrets.

92.    In light of the foregoing, Mr. Bares' note regarding a $20 million monthly run rate is not tied to the Waymo Purported Trade Secrets at issue in this matter and is not a reliable basis for Mr. Wagner's opinion regarding Uber's purported avoided costs. Furthermore, given that Mr. Wagner conflated time required to independently develop the Waymo Purported Trade Secrets with accelerated commercialization, as he did with his analysis of purported unjust profits, I incorporate the above discussion of Mr. Wagner's failure to acknowledge the distinction between time to independently develop the Waymo Purported Trade Secrets and accelerated commercialization herein. For the various reasons discussed above Mr. Wagner's opinion of the purported costs Uber

---

[182] Deposition of John Bares, June 16, 2017, pg. 214.
[183] Deposition of John Bares, June 16, 2017, pg. 214.
[184] Deposition of John Bares, June 16, 2017, pg. 214; and Deposition of John Bares, August 11, 2017, pgs. 374 – 375; and 458 – 460.

avoided as a result of the alleged misappropriation of the Waymo Purported Trade Secrets is unreliable and grossly overstates unjust enrichment damages.

93.     As discussed in detail below, it is my opinion that the appropriate measure of the purported unjust enrichment Uber realized as a result of the alleged misappropriation of the Waymo Purported Trade Secrets, if any, is the cost Uber would incur to employ additional resources to independently develop the Waymo Purported Trade Secrets.  Unlike Mr. Wagner's opinion, this measure of unjust enrichment does not conflate time to independently develop the Waymo Purported Trade Secrets with accelerated commercialization of Uber's AV technology and saved development costs.

94.     It is also worth noting the degree to which Mr. Wagner's use of the run rate for the entire AV program inflates his calculation of purported unjust enrichment.  Even if Mr. Wagner's flawed methodology were employed, and one assumed that independent development of the Waymo Purported Trade Secrets would halt all work in Uber's entire hardware department for the amount of time needed for such independent development, ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████    █████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████

95.     ██████████████████████████████████████████████████████ █

---

[185] ████████████████████████████████████████████████
[186] ████████████████████████████████████████████████████████████
[187] UBER00231730 – 739, at 732.



### ii.   Mr. Wagner Did Not Establish a Causal Link Connecting the Waymo Purported Trade Secrets to Purported Avoided Costs

96.     Mr. Wagner failed to establish a causal link between the alleged misappropriation of the Waymo Purported Trade Secrets and his calculation of purported avoided costs.  Similar to Mr. Wagner's analysis of alleged unjust profits, Waymo must explain:   1) how Uber's alleged misappropriation of the Waymo Purported Trade Secrets caused Uber to avoid costs; and 2) what portion of those avoided costs are specifically attributable to the alleged misappropriation of the Waymo Purported Trade Secrets, as opposed to other contributing technologies and factors.  Mr. Wagner did neither.

97.     Mr. Wagner's opinion is based on purported cost savings of Uber's entire AV program. He did not isolate purported cost savings attributable to each of the Waymo Purported Trade Secrets.  As with his opinion regarding purported unjust profits, Mr. Wagner improperly assumed that Uber's AV development is a serial process and that no AV development (across the entire program) would occur during a period that Uber independently developed the Waymo Purported

Trade Secrets.  For the reasons discussed above in relation to unjust profits, which I incorporated herein, this assumption is unreliable and lacks any basis in evidence.  If Mr. Wagner's assumption regarding serial development were to hold true, it would require a conclusion that during the two year period Mr. Wagner opined is needed to independently develop Waymo Purported Trade Secret No. 25, Uber's entire AV program would simultaneously:  1) not be making any advances towards commercialization or developing any other AV technology; and 2) continue to employ over 700 employees, including over 400 software personnel, at a cost of tens of millions of dollars a month, while waiting on the purported trade secret to be developed before the next purported trade secret would be independently developed.[188]

98.     As discussed above, Uber contends that the Waymo Purported Trade Secrets have not been utilized in Uber's AV technology.[189]  Furthermore, according to Dr. McManamon, he has not seen any indication that Uber has utilized Waymo Purported Trade Secrets Nos. 25 or 111.[190]  Similarly, according to Dr. Lebby, he has not seen any indication that Uber has utilized the remaining Waymo Purported Trade Secrets in its AV technology.[191]  As a result, it is improper to presume that Uber benefited from any avoided costs attributable to the Waymo Purported Trade Secrets, because there is no evidence indicating that the Waymo Purported Trade Secrets were used.  For this reason, Mr. Wagner has no basis to attribute any purported avoided costs to the Waymo Purported Trade Secrets.

99.     Furthermore, based on Mr. Wagner's description of Waymo Purported Trade Secret No. 25, he understands that it consists of a collection of self-driving car test scenarios.[192]  Mr. Wagner gave no consideration to the number of scenarios within the collection of test scenarios Uber is alleged to have used in development of its AV technology.  As a result, to the extent Uber has used less than all of the test scenarios constituting Waymo Purported Trade Secret No. 25, Mr. Wagner's

---

[188] UBER00231730 – 739, at 732.
[189] Uber Technologies, Inc. and Ottomotto LLC's Answer to First Amended Complaint and Affirmative Defenses, ¶¶ 14 – 15; and Defendant Uber Technologies, Inc. and Ottomotto LLC's Second Supplemental Responses to Waymo's First Set of Common Interrogatories (Nos. 1 – 3), Response to Common Interrogatory No. 1.
[190] Interview of Dr. McManamon.
[191] Interview of Dr. Lebby.
[192] The Wagner Report, ¶¶ 47 – 50.

apportionment is further flawed because he failed to attribute value to only the test scenarios Uber actually used, if any.

### iii.  Conclusions Regarding Mr. Wagner's Avoided Cost Opinion

100.    Mr. Wagner's opinion is premised on a data point from Mr. Bares' notes that is tied to Uber's entire AV program, and not to the Waymo Purported Trade Secrets.  Additionally, Mr. Wagner has conflated time required to independently develop the Waymo Purported Trade Secrets with accelerated commercialization of Uber's AV technology, and failed to establish a causal link between the alleged misappropriation of the Waymo Purported Trade Secrets and any avoided costs.  For at least these reasons, Mr. Wagner's opinion regarding the purported costs Uber avoided as a result of the alleged misappropriation of the Waymo Purported Trade Secrets is unreliable and grossly overstates unjust enrichment damages.

101.    I also note that Mr. Wagner's unjust profits analysis is predicated on an assumption that no injunction is granted.  If an injunction is granted, Uber will have to do the redesign work related to the Waymo Purported Trade Secrets and, under Mr. Wagner's damages theory, no development costs will be avoided.

### C.  Mr. Wagner's "Unquantified Unjust Enrichment" Opinions

102.    With respect to Mr. Wagner's discussion of cost savings based on lower costs of lasers, Mr. Wagner's opinion is as follows:  "[t]here is evidence that Uber is likely to achieve significant cost savings over the next several years on its LiDAR sensors, and this will result in substantial cost savings given the number of vehicle that it expects to roll out."[193]  However, Mr. Wagner failed to explain how this potential future cost savings is caused by, or even related to, the alleged misappropriation of the Waymo Purported Trade Secrets.  In fact, Mr. Wagner acknowledged that "[a]t this time, [he has] not found enough evidence to reliably estimate the cost savings that Uber

---

[193] The Wagner Report, ¶¶ 313 – 319, at 319.

will achieve based on developing its own LiDAR, let alone the cost savings attributable to the misappropriation of the trade secrets."[194]

103.    Similarly, Mr. Wagner's discussion regarding "value to 'De-Risking' laser approach" provides no indication how this purported value results from the alleged misappropriation of the Waymo Purported Trade Secrets, and he acknowledged that he was unable to perform "a specific quantification for the value to Uber of having a second laser path and 'de-risking' its laser approach."[195]

104.    Finally, Mr. Wagner identified several other "benefits to Defendants that he cannot quantify," including:  1) unjust enrichment to Ottomotto Trucking from potential consideration to be paid if Uber exercised its option to acquire Ottomotto Trucking; 2) unjust enrichment to Ottomotto Trucking or Uber based on employing LiDAR systems with reduced expenses in the future; and 3) unjust enrichment to Defendants related to its potential future use of Trade Secret No. 90.[196]   Notably, each of these purported benefits are "potential" and/or "future" benefits. Furthermore, with respect to the first and second "other unquantified benefit," Mr. Wagner has failed to indicate how the alleged misappropriation of the Waymo Purported Trade Secrets caused (or will potentially cause in the future) Uber to realize any unquantified benefit.

105.    Mr. Wagner's discussion regarding "Unquantified Unjust Enrichment" is mere superfluous speculation about notions that Mr. Wagner acknowledges he cannot quantify, and is entirely unreliable.

### D.  Mr. Wagner's Reasonable Royalty Opinion

106.    For his reasonable royalty calculation, Mr. Wagner utilized his opinion of purported unjust profits Defendants realized as a result of alleged misappropriation of the Waymo Purported Trade

---

[194] The Wagner Report, ¶¶ 313 – 319, at 319.
[195] The Wagner Report, ¶¶ 320 – 324.
[196] The Wagner Report, ¶¶ 320 – 325.

Secrets as a "Baseline Royalty."[197]  Mr. Wagner then applied a ten percent increase over the "Baseline Royalty," effectively applying a 110% royalty rate.[198]

### i.  Mr. Wagner's "Baseline Royalty" is Speculative and Unreliable

107.    Mr. Wagner utilized his calculation of purported unjust profits Uber realized as a result of allegedly misappropriating the Waymo Purported Trade Secrets as the royalty base, or "Baseline Royalty," for his reasonable royalty opinion.[199]  I incorporate the above discussion of Mr. Wagner's unjust profits opinion herein.  Therefore, Mr. Wagner's "Baseline Royalty" is unreliable and grossly overstates reasonable royalty damages for the same reasons that Mr. Wagner's opinion regarding purported unjust profits is unreliable and grossly overstates unjust enrichment damages.

108.    Furthermore, as discussed in detail below, the hypothetical negotiation construct involves a negotiation between a willing licensor, in this case Waymo, and a willing licensee, in this case Uber.  Considering the following factors, it is not rational or logical to conclude that Uber, as a willing licensee at a hypothetical negotiation occurring between December 2015 and August 2016, would have agreed to pay a royalty of $1.859 billion for a license to the Waymo Purported Trade Secrets wherein:

- Uber contends that it has not utilized the Waymo Purported Trade Secrets, and Dr. McManamon and Dr. Lebby opined that they have not seen any indication that Uber utilized the Waymo Purported Trade Secrets;[200]

- Uber has not realized any profits from its AV development efforts, and the launch of an AV that can generate revenue without any safety driver is still years away;[201]

- Successful commercialization of Uber's AV technology faces the same significant risks that Waymo faces, including "Supply Side Risks," and "Demand Side Risks" like

---

[197] The Wagner Report, ¶¶ 384 – 387.
[198] The Wagner Report, ¶¶ 439 – 440.
[199] The Wagner Report, ¶¶ 384 – 385.
[200] Uber Technologies, Inc. and Ottomotto LLC's Answer to First Amended Complaint and Affirmative Defenses, ¶¶ 14-15; and Defendant Uber Technologies, Inc. and Ottomotto LLC's Fifth Supplemental Responses to Waymo's First Set of Common Interrogatories (Nos. 1 – 3), Response to Common Interrogatory No. 1; Interview of Dr. McManamon; and Interview of Dr. Lebby.
[201] Deposition of Emil Michael, July 28, 2017, pgs. 137 – 138.

consumer acceptance and regulatory prohibition and/or containment.[202]
████████████████████████████

- Internal Google emails indicate Google placed little value on the Waymo Purported Trade Secrets;[204]

- If faced with a demand for an exorbitant royalty, as discussed below, Uber could have independently developed the Waymo Purported Trade Secrets for $605,000, rather than taking a license; and

- $1.859 billion is approximately twice the entire indicated value of Velodyne, and 89% of the indicated value that Google placed on its entire AV program in late 2015.[205]

109.    For at least the foregoing reasons, the notion that Uber would have paid Waymo $1.859 billion for a license to use the Waymo Purported Trade Secrets is not rational.[206]  Furthermore, although his opinion regarding the purported costs Uber avoided is also flawed and unreliable, Mr. Wagner provided no explanation as to why he chose his calculation of purported unjust profits as the "Baseline Royalty" rather than his calculation of purported avoided costs.  Although Mr. Wagner stated that he has not reviewed evidence that provides a more reasonable starting point than his calculations of purported unjust profits and avoided costs, he merely asserted that he utilized his calculation of purported unjust profits as the "Baseline Royalty" without explaining why doing so is more appropriate than using his calculation of purported avoided costs.[207]

110.    In the following table I compared Mr. Wagner's reasonable royalty opinion to what it would have been if Mr. Wagner had utilized his opinion of purported avoided cost as his "Baseline Royalty" rather than his opinion of purported unjust profits.

---

[202] WAYMO-UBER-00046625 – 632, at 632.
[203] WAYMO-UBER-00046625 – 632, at 632.
[204] WAYMO-UBER-00084484.
[205] Velodyne was valued at $950 million and Google at $2.1 billion. UBER00069030 – 033, at 032.
[206] I note that both Waymo and Uber would have been aware of these factors at the hypothetical negotiation under the Book of Wisdom.  *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933).
[207] The Wagner Report, ¶ 385.

| Trade Secret No. | Using Purported Unjust Profits as "Baseline Royalty" | Using Purported Avoided Costs as "Baseline Royalty" | Amount Using Purported Unjust Profits Increased Reasonable Royalty |
|---|---|---|---|
| 25 | $1,859,000,000 | $528,000,000 | $1,331,000,000 |
| 111 | 919,600,000 | 264,000,000 | 655,600,000 |
| 9 | 312,198,220 | 89,626,283 | 222,571,937 |
| 96 | 115,815,469 | 33,248,460 | 82,567,009 |
| 2 | 105,744,559 | 30,357,290 | 75,387,269 |
| 13 | 103,226,831 | 29,634,497 | 73,592,334 |
| 14 | 103,226,831 | 29,634,497 | 73,592,334 |
| 7 | 47,836,824 | 13,733,060 | 34,103,765 |

111.    As shown above, Mr. Wagner increased his royalty opinion by as much as $1.331 billion as a result of using his calculation of purported unjust profits as the "Baseline Royalty" rather than his calculation of purported avoided costs, and he provided no rationale for doing so.

### ii.    Mr. Wagner's 110% Royalty Rate is Arbitrary, Not Tied to the Facts of the Case, and Does Not Accord with the Guidance of Georgia-Pacific

112.    Mr. Wagner asserted that "the reasonable royalty that would be agreed to by the parties is a ten percent (10%) increase over the Baseline Royalty."[208]    Thus, Mr. Wagner's opinion is effectively that the reasonable royalty rate is 110% of purported incremental profits.    However, Mr. Wagner did not explain the rationale for a 110% royalty rate, or provide a quantitative basis to support a 110% royalty rate.    Although Mr. Wagner noted that his *Georgia-Pacific* Factor analysis resulted in identification of factors indicating lower, higher, and neutral royalty rates, he provided no objective analysis linking those factors to a 110% royalty rate.    Notably, Mr. Wagner did not indicate that he even attempted to identify publicly available license agreements for comparable technology.    As a result, Mr. Wagner's 110% royalty rate is arbitrary because it is not based on objective facts or data, and is not tied to the facts of the case.

---

[208] The Wagner Report, ¶ 439.

113.    Not only is Mr. Wagner's 110% royalty rate entirely arbitrary, the notion that Uber would pay more than the purported present value of incremental profits realized from the alleged misappropriation of the Waymo Purported Trade Secrets is illogical and contrary to the licensing parameters set forth in *Georgia-Pacific* Factor No. 15.  As recited in the Wagner Report, *Georgia-Pacific* Factor No. 15 states the following:[209]

> *The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, that amount which a prudent licensee – who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty **and yet be able to make a reasonable profit** and which amount would have been acceptable by a prudent patentee who was willing to grant a license.*  (emphasis added)

114.    Mr. Wagner's 110% royalty rate not only strips away all the incremental profits Uber would purportedly realize from the alleged misappropriation of the Waymo Purported Trade Secrets, but Mr. Wagner has also opined that Uber should pay an additional 10% premium.  The notion that Uber would pay Waymo, a competitor, 10% more than all of the purported incremental benefit flowing from a license to the Waymo Purported Trade Secrets simply makes no sense and contradicts the premise of *Georgia-Pacific* factor 15.  Mr. Wagner has effectively opined that Uber would be willing to incur losses, and subsidize a competitor, in order to receive a license to use the Waymo Purported Trade Secrets, which internal Google emails indicate Google placed little value on.[210]  No willing, or rational, licensee would do so; and the notion is contrary to the guidance provided in *Georgia-Pacific* Factor No. 15.

115.    Assuming Mr. Wagner's "Baseline Royalty" is not unreliable, which it is, a royalty rate that accords with the guidance of *Georgia-Pacific* Factor No. 15 would effectively allocate Mr. Wagner's "Baseline Royalty" amongst Uber and Waymo.  Instead, Mr. Wagner's royalty rate

---

[209] The Wagner Report, ¶ 435; and *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).
[210] WAYMO-UBER-00084484.

allocates all of his "Baseline Royalty" (which is $1.69 billion) to Waymo, and then, without justification, gives Waymo an additional 10% premium (which is an additional $169 million).

116.   For the reasons discussed above, Mr. Wagner's 110% royalty rate is arbitrary, not tied to the facts of the case, and results in grossly overstated royalty damages.

117.   Additionally, Mr. Wagner relied on a Waymo Profit and Loss statement ("P&L") in purported support of his assertion that "[t]he potential profit opportunity to Waymo related to autonomous vehicles is dramatic."[211]  Mr. Wagner further stated that "Waymo's internal modeling of its profit opportunity within TaaS also indicates substantial potential profits," and relied on these same projections in his analysis of *Georgia-Pacific* No. 8 to conclude that "Waymo expected to earn substantial profits from its TaaS offering during the hypothetical negotiation period."[212] However, Waymo's forecasts, even if credible, are irrelevant to *Georgia-Pacific* factor 8, which requires consideration only of the "*established* profitability of the product."   Furthermore, the projections in the P&L statement, extending over 10 years into the future for an entity in an industry with no operational history, are entirely speculative.

118.   Waymo employees responsible for either preparing the Waymo P&L or providing critical inputs for it confirmed that the projections Mr. Wagner made reference to are speculative.  For example, Ming Su, former Finance Manager for Waymo, testified that forecasts are sometimes "best guesses" and "… the goal isn't necessarily to be accurate … [t]he goal is to present a potential outcome," as explained in his testimony below:[213]

> Q:  Did he ever provide you with information that you used in the P&Ls?
>
> A:  I'm sure it's happened.  I think sometimes in forecasting there's -- there's kind of like, you know, best guesses.  Or there's kind of -- in areas where maybe there's no answers.  You know I think as a leader, you have to set a target.  And so you know in those times, you know,

---

[211] The Wagner Report, ¶¶ 338 and 340 (citing WAYMO-UBER-00032541).
[212] The Wagner Report, ¶¶ 339 and 414.
[213] Deposition of Ming Su, August 23, 2017, pgs. 40, 118, and 211.

maybe he'd step forward and, "Say this is the target that we're going to use."

Q:  In any of the other P&Ls that you developed in the past, did you ever have to project out 10 years?

A:  Yes.

Q:  And how accurate were those projections?

A:  No, accuracy is a -- it's a tough question to answer when it comes to something like 10 years out.

Q:  What do you mean by that?

A:  Because the goal isn't necessarily to be accurate, right?  The goal is to present a potential outcome of the future and a potential range of outcomes for the future.  It's not necessarily to nail it on the -- on the dot, because no one can truly predict the future.

119.   Furthermore, the P&L statements were missing variables, such as the cost of "maintenance for the SDS modules," regarding which Mr. Su testified that he did not know if it would "be significant" because he needed to "see some numbers on what the maintenance cost will be," which could impact overall profitability projections.[214]   Additionally, Mr. Willis, Director of Supply Chain Operations for Waymo, testified that: █████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████  ██████████████████████ ████████████████████████████████████████████████████████  However, Waymo's witnesses confirmed that projecting so far into the future increases the speculative nature of the projections and that they "don't think there's anyone that would suggest they're confident of anything occurring 10 years from now."[217]

---

[214] Deposition of Ming Su, August 23, 2017, pgs. 271 – 276.
[215] Deposition of Tim Willis, August 18, 2017, pgs. 114 – 115, 204, 211, 220, 230, 336, and 346.
[216] Deposition of Ming Su, August 23, 2017, pgs. 250 – 251.
[217] Deposition of Ming Su, August 23, 2017, pgs. 178 – 179, 216, and 251.

### iii.   Mr. Wagner Did Not Consider the Cost of Independently Developing the Waymo Purported Trade Secrets as a Cap to Reasonable Royalty

120.     According to Mr. Wagner "design around times are already incorporated into the Baseline Royalty."[218]  However, Mr. Wagner failed to consider the _costs_ of designing around the Waymo Trade Secrets.  Given that Uber would not be willing to pay a royalty that was more than the cost to independently develop the Waymo Purported Trade Secrets, the cost to independently develop the Waymo Purported Trade Secrets is a cap on reasonable royalty damages.

121.     As discussed above, Mr. Wagner's calculation of purported the costs Uber avoided as a result of allegedly misappropriating the Waymo Purported Trade Secrets is unreliable and grossly overstates unjust enrichment, if any.  However, as discussed in detail below, I have calculated the cost Uber would incur to independently develop the Waymo Purported Trade Secrets.  In the following table I have compared Mr. Wagner's reasonable royalty opinion to the cost Uber would incur to independently develop the Waymo Purported Trade Secrets, which is the cap to the reasonable royalty the parties would have agreed to at the hypothetical negotiation.

| Trade Secret No. | Mr. Wagner's "Reasonable Royalty" | Cost to Independently Develop/Reasonable Royalty Cap | Amount Mr. Wagner Overstated Reasonable Royalties |
|---|---|---|---|
| 25 | $1,859,000,000 | No Value | $1,859,000,000 |
| 111 | 919,600,000 | 200 | 919,599,800 |
| 9 | 312,198,220 | 112,160 | 312,086,060 |
| 96 | 115,815,469 | 114,040 | 115,701,429 |
| 2 | 105,744,559 | 208,920 | 105,535,639 |
| 13 | 103,226,831 | 126,080 | 103,100,751 |
| 14 | 103,226,831 | 126,080 | 103,100,751 |
| 7 | 47,836,824 | 43,600 | 47,793,224 |

---

[218] The Wagner Report, ¶ 420.

CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017

#### iv.   Conclusions Regarding Mr. Wagner's Reasonable Royalty Opinion

122.    Mr. Wagner's "Baseline Royalty" is unreliable and grossly overstates reasonable royalty damages for the same reasons that Mr. Wagner's opinion regarding purported unjust profits is unreliable and grossly overstates unjust enrichment damages.  Additionally, Mr. Wagner's 110% royalty rate is arbitrary, not tied to the facts of the case, and results in grossly overstated royalty damages.  Furthermore, Mr. Wagner failed to acknowledge that the cost to independently develop the Waymo Purported Trade Secrets is a cap to reasonable royalty damages.  For at least these reasons, Mr. Wagner's reasonable royalty opinion is unreliable and grossly overstates reasonable royalty damages.

### E.  Mr.  Wagner's  Unjust  Enrichment  Opinion  Regarding  Waymo  Purported Trade Secret No. 90

123.    Mr. Wagner explained his opinion regarding unjust enrichment related to Waymo Purported Trade Secret No. 90 as follows:  "Given Dr. Hesselink's opinion that Tyto used Trade Secret No. 90 to develop its technology, and Tyto was acquired by Defendants in May 2016, I have used the $8 million cash consideration paid in the Tyto acquisition to value the amount of unjust enrichment to Uber based on its misappropriation of Trade Secret No. 90."[219]

#### i.   Mr. Wagner's Opinion is Not Based on Sound Methodology

124.    Mr. Wagner failed to explain why the cash consideration Ottomotto paid to acquire Tyto is a reasonable measure of the value by which Uber was purportedly unjustly enriched as a result of the alleged misappropriation of Waymo Purported Trade Secret No. 90.  Despite discussing numerous factors that contributed to the value Ottomotto acquired when it purchased Tyto, Mr. Wagner merely asserted that the entire $8 million cash consideration paid to acquire Tyto represented the amount of unjust enrichment to Uber as a result of the alleged misappropriation of Waymo Purported Trade Secret No. 90.[220]  Mr. Wagner specifically noted:

---

[219] The Wagner Report, ¶ 307.
[220] The Wagner Report, ¶ 307.

- Tyto's intellectual property – identified as "[a]ll trade secrets, copyrights, and software owned by the Seller and used in the operation of the business as currently conducted," as well as "[a]ll rights in and to all inventions owned by the Seller and used in the operation of the Business as currently conducted," including four pending patent applications;

- Tangible assets – identified as "[a]ll tool, equipment, parts and inventory used to build and assemble fiber lasers and laser scanners.  All equipment used to test and calibrate fiber lasers and laser scanners"; and

- Employees – $1,440,000 of the total $8,000,000 million cash consideration was to be paid to "Transferred Employees," along with 2.75% of Ottomotto equity.

125.   Mr. Poetzscher, Vice President of Corporate Development at Uber, testified that the Ottomotto/Tyto Acquisition was a "talent acquisition."[221]   According to Mr. Wagner, he "recognized that in addition to the technology, Defendants were also acquiring five employees from Tyto.  However, Defendants also paid additional consideration beyond the $8 million cash in the form of 2.75% equity in Ottomotto."[222]  Mr. Wagner failed to explain how this statement justifies apportionment of the entire $8 million cash consideration to Waymo Purported Trade Secret No. 90 in light of the fact that the Ottomotto/Tyto Acquisition was a talent acquisition.

126.   Mr. Wagner did not make any effort to identify the portion of the $1,440,000 that was paid to "Transferred Employees," if any, was consideration paid for Waymo Purported Trade Secret No. 90, as opposed to consideration to retain talented engineers.  Furthermore, it does not appear that Mr. Wagner apportioned any of the cash consideration to tangible assets or intellectual property other than Waymo Purported Trade Secret No. 90.  Mr. Wagner quoted the following opinion of Dr. Hesselink:[223]

> *With regards to Trade Secret No, 90, ... Defendants' accelerated their knowledge of fiber-laser technology by acquiring Tyto LiDAR in the Spring of 2016.  For several years prior to this, Tyto LiDAR – at the direction of Anthony Levandowski – exploited Waymo's trade secret information regarding fiber laser technology in order to create a lower cost design for their "Owl" device... For example at least by November 2013, Tyto LiDAR had "defined a plan to reduce the cost of the fiber laser*

---

[221] Deposition of Cameron Poetzscher, June 19, 2017, pg. 358.
[222] The Wagner Report, ¶ 307.
[223] The Wagner Report, ¶ 298.

> *and bring BOM cost down to $9,500 by January 2014." ... Tyto's continued work on lowering the cost of its own, custom-built fiber laser from late 2013 until its acquisition by Ottomotto in May 2016 further enhanced Tyto's value to Defendants...*

127.    Even if Tyto had misappropriated Waymo Purported Trade Secret No. 90 as alleged, Mr. Wagner has not accounted for the contribution "Tyto's continued work on lowering the costs of its own, custom-built fiber laser from late 2013 until its acquisition by Ottomotto in May 2013," which is not attributable to Waymo Purported Trade Secret No. 90, made to the ultimate $8 million cash consideration.  Furthermore, the notion that Tyto LiDAR exploited Waymo's trade secret information "for several years prior to the Spring of 2016," is undermined by the fact that Waymo alleged Mr. Levandowski misappropriated the Waymo Trade Secrets in December 2015.[224]

128.    For the reasons discussed above, Mr. Wagner did not perform a proper apportionment, rendering his opinion of unjust enrichment related to Waymo Purported Trade Secret No. 90 unreliable.

### ii.  Mr. Wagner's Opinions are Internally Inconsistent, Demonstrating Their Unreliability

129.    Mr. Wagner's theory of purported unjust enrichment for Waymo Purported Trade Secret No. 90 contradicts his theories of unjust enrichment related to the other Waymo Purported Trade Secrets, demonstrating that neither theory is reliable.

130.    Mr. Wagner relied on Dr. Hesselink for the understanding that "Uber's misappropriation of Trade Secret No. 90 has saved it two years and five months, based on Defendants' acquisition of Tyto."[225]  Thus, it is Mr. Wagner's understanding that Waymo Purported Trade Secret No. 90 saved Uber five months of development time more than Waymo Purported Trade Secret No. 25, which Mr. Wagner understands saved Uber two years of development time.[226]  Nevertheless, Mr. Wagner opined that unjust enrichment related to Waymo Purported Trade Secret No. 90 was $8

---

[224] First Amended Complaint, ¶¶ 43 – 47.
[225] The Wagner Report, ¶ 299.
[226] The Wagner Report, ¶ 284.

million, whereas he opined that unjust enrichment rated to Waymo Purported Trade Secret No. 25 was $1.69 billion.[227]

131.    Despite Mr. Wagner's understanding of the development time Waymo Purported Trade Secret Nos. 25 and 90 purportedly saved Uber (two years, and two years and five months, respectively), he opined that unjust enrichment related to the alleged misappropriation of Waymo Purported Trade Secret No. 25 is 211.25 times more than unjust enrichment related to the alleged misappropriation of Waymo Purported Trade Secret No. 90.[228]  The fact that Ottomotto actually paid an amount that is 211.25 less to acquire Tyto (and thereby allegedly misappropriate a trade secret that purportedly saved Uber a relatively greater amount of development time) than Mr. Wagner's opinion of unjust enrichment related to Waymo Purported Trade Secret No. 25 undermines Mr. Wagner's other unjust enrichment opinions and illuminates their unreliability.

### F.  Mr. Wagner's Irreparable Harm Opinion

132.    According to Mr. Wagner, absent an injunction, Uber's alleged misappropriation of the Waymo Purported Trade Secrets will continue and purportedly cause "significant and recurring harm to Waymo," including:[229]

- Continued misappropriation of Waymo's trade secrets;

- Potential public disclosure of Waymo's trade secrets;

- Loss of Waymo's technological lead, and by extension, market entry opportunity;

- Greater competition in the AV space; and

- Sales made by Wayo at lower prices than would have occurred but for Uber's misappropriation.

---

[227] The Wagner Report, ¶¶ 285 – 286, and 307.
[228] [$1,690,000,000 ÷ $8,000,000 = 211.25].  Mr. Wagner's reasonable royalty opinion related to Waymo Purported Trade Secret No. 25 is 232.375 time greater than his unjust enrichment opinion related to Waymo Purported Trade Secret No. 90 [$1,859,000,000 ÷ $8,000,000 = 232.375].
[229] The Wagner Report, ¶ 330.

CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017

133.    In summary, it is Mr. Wagner's opinion that Uber's alleged misappropriation of the Waymo Purported Trade Secrets will accelerate commercialization of Uber's AV technology, allowing it to enter the market earlier and thereby having "a significant impact on Waymo's future profitability."[230]   However, Mr. Wagner stated repeatedly that he is unable to quantify the lost profits Waymo will purportedly suffer as a result of the alleged misappropriation of the Waymo Purported Trade Secrets.[231]

### i. Any Purported Lost Profits Waymo Will Allegedly Suffer are Speculative

134.    As of the date of this report, neither Waymo nor Uber have commercialized their respective AV technologies or realized profits from them.  According to Mr. Emil Michael, "the launch of a … autonomous vehicle that can generate revenue without any safety driver in there is still years away."[232]

135.    Contrary to Waymo's own assessment of its likelihood of success and the many risk factors it identified, Mr. Wagner's theory of irreparable harm is premised on the assumption that Waymo will successfully commercialize its AV technology according to its "Stated Plan of Record," and that Uber's alleged misappropriation of the Waymo Purported Trade Secrets is the only thing that could impede Waymo's success.  As such, Mr. Wagner's irreparable harm theory is also premised on the assumption that Uber will successfully commercialize its AV technology in order to compete with Waymo, and that the alleged misappropriation of the Waymo Purported Trade Secrets will accelerate Uber's ability to do so.

136.    For the numerous reasons discussed above, successful commercialization of Waymo's and Uber's respective AV technologies sometime in the future is far from certain.  As a result, Mr. Wagner's opinion regarding the irreparable harm Waymo will suffer as a result of the alleged misappropriation of the Waymo Purported Trade Secrets is mere speculation.

---

[230] The Wagner Report, ¶¶ 330, 337 and 368.
[231] The Wagner Report, ¶¶ 123, 337, 366, and 368.
[232] Deposition of Emil Michael, July 28, 2017, pgs. 137 – 138.

### ii.  Mr. Wagner Did Not Establish a Causal Link Connecting the Waymo Purported Trade Secrets to the Purported Irreparable Harm

137.    Mr. Wagner failed to establish a causal link between the alleged misappropriation of the Waymo Purported Trade Secrets and the irreparable harm that Waymo will purportedly suffer sometime in the future.  As discussed above, Uber contends that the Waymo Purported Trade Secrets have not been utilized in Uber's AV technology.[233]  Furthermore, according to Dr. McManamon, he has not seen any indication that Uber has utilized Waymo Purported Trade Secrets Nos. 25 or 111.[234]  Similarly, according to Dr. Lebby, he has not seen any indication that Uber has utilized the remaining Waymo Purported Trade Secrets in its AV technology.[235]  If, as Uber contends, and Dr. McManamon and Dr. Lebby opined, Uber has not used the Waymo Purported Trade Secrets in its AV technology, it cannot be the case the alleged misappropriation of the Waymo Purported Trade Secrets will cause Waymo harm, irreparable or otherwise.

### iii.  Mr. Wagner Failed to Acknowledge the Distinction Between Time to Independently Develop the Waymo Purported Trade Secrets and Accelerated Development

138.    As discussed above, Mr. Wagner's theory of irreparable harm is premised on the notion that Uber's alleged misappropriation of the Waymo Purported Trade Secrets will accelerate Uber's successful commercialization of its AV technology, and thereby allow Uber to compete with Waymo more rapidly than it otherwise would have.  However, as discussed above, Mr. Wagner has conflated the concept of time required to independently develop the Waymo Purported Trade Secrets with accelerated commercialization of Uber's AV technology.

139.    The alleged misappropriation of the Waymo Purported Trade Secrets did not accelerate commercialization of Uber's AV technology, because Uber could have independently developed

---

[233] Uber Technologies, Inc. and Ottomotto LLC's Answer to First Amended Complaint and Affirmative Defenses, ¶¶ 14-15; and Defendant Uber Technologies, Inc. and Ottomotto LLC's Fifth Supplemental Responses to Waymo's First Set of Common Interrogatories (Nos. 1 – 3), Response to Common Interrogatory No. 1.

[234] Interview of Dr. McManamon.

[235] Interview of Dr. Lebby.

the Waymo Purported Trade Secrets in parallel with its existing development efforts by employing additional engineering resources.[236]   As with his opinions regarding unjust enrichment, Mr. Wagner assumed that independent development of the Waymo Purported Trade Secrets would have to be done serially, adding calendar days to the commercialization of Uber's AV technology.

140.   Given that the alleged misappropriation of the Waymo Purported Trade Secrets has not accelerated commercialization of Uber's AV technology, Mr. Wagner's theory, that Uber will enter the market and compete with Waymo sooner than it otherwise would have as a result of the alleged misappropriation, fails.  As a result, and as with his opinions regarding unjust enrichment, Mr. Wagner's conflation of time to independently develop the Waymo Purported Trade Secrets with accelerated commercialization of Uber's AV technology renders his opinion regarding irreparable harm unreliable.

### iv.  Mr. Wagner Has Not Established that Being First to the AV TaaS Market is Necessary for Waymo's Success

141.   Mr. Wagner provided a discussion regarding Waymo's perception that being first to the AV TaaS market is important to Waymo's long-term success.[237]   However, it is not necessarily the case that being first to market with new technology is always the best for the long-term success of a venture.  A 2015 article in Forbes stated:[238]

> Many entrepreneurs think that they need to launch as soon as possible, to get ahead of demand and anticipate what's coming.  Driven further by the incorrect notion that it's essential to beat everyone else to the punch, they're often left facing a market that isn't ready and a product that's not quite there yet.

---

[236] Interview of Dr. Lebby and Dr. McManamon.
[237] The Wagner Report, ¶¶ 343 – 351.
[238] Lipson, Jesse, *Being First To Market Isn't Always Best:  Ask Microsoft About Apple Watch*, Forbes, April 29, 2015.

142.     Although being the first-mover confers certain advantages, it does not guarantee that a firm will enjoy continued success.[239]  In fact, in some industries, it is much better to enter the market late.[240]  According to a 2013 KellogInsight article, one study showed that in just 15 of 50 product categories, pioneers were more successful than late movers.[241]  This is because pioneers tend to launch products without fully understanding customers' problems and the features that solve those problems.[242]  Learning from a pioneer's mistakes and experience is a key factor of why late entrants are often more successful than pioneers.[243]  Innovative late entrants may also enjoy the same benefits as a pioneer by redefining and reshaping a product category.[244]  Thus, there are inherent advantages to being a pioneer and a late entrant.[245]

143.     Other factors that contribute to whether a pioneer or late entrant enjoy continued success are the expected life of the product and whether value of the product is highly subjective.[246]  In a product category where the product's life cycle is short and/or the value of a product is highly subjective, a pioneer may have the greater advantage.[247]  However, in a product category where objective standards are more important than subjective factors, the late entrants have a greater advantage.[248]  For example, in the car industry, many of the elements of buying a car are objective such as safety, price, and gas mileage.[249]  Therefore, a late entrant such as Toyota's Lexus can create remarkable success 100 years after Karl Benz developed the first car.[250]

144.     History is filled with examples of successful firms that were never first.  Boeing, for example, did not pioneer modern jet travel, nor was Google the first internet search engine.[251]

---

[239] https://hbr.org/2005/04/the-half-truth-of-first-mover-advantage;
https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[240] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[241] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[242] http://www.businessinsider.com/steve-blank-first-mover-advantage-overrated-2010-10.
[243] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[244] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[245] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[246] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[247] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[248] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[249] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[250] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.
[251] https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage.

Other examples include:  Facebook, LinkedIn, Twitter, Groupon, Uber, Alibaba, and Spotify.[252] In the ride-share market, pioneer Sidecar, one of the first apps to let users request a car, shut down its operations in 2015 after it struggled to raise funding to compete with Lyft and Uber.[253]

145.    Thus, while Waymo currently perceives that having a head-start in the AV TaaS industry will be critical to its success, it is yet to be seen whether or not a first-mover advantage is actually beneficial to Waymo's long-term success.  Accordingly, Mr. Wagner's theory of the irreparable harm Waymo will purportedly suffer as a result of Uber allegedly shortening Waymo's head-start by misappropriating the Waymo Purported Trade Secrets is undermined to the extent that having a head-start does not actually provide long-term benefits in the AV TaaS market.

146.    Moreover, Waymo would not be able to enjoy a first-mover advantage in the traditional TaaS market since other firms, like Uber and Lyft, have been in this market for years without AV technology.  Thus, to the extent Waymo's strategy is to offer a differentiated TaaS product, Waymo must overcome significant barriers to compete with entrenched competitors in the traditional TaaS market.  In fact, Waymo identified Uber as the U.S. market leader in TaaS, and as an "extremely formidable" force that could combat Waymo's entry into TaaS.[254]

## VII. ANALYSIS OF ECONOMIC DAMAGES RESULTING FROM ALLEGED MISAPPROPRIATION OF THE WAYMO PURPORTED TRADE SECRETS

147.    Trade secrets damages can only be recovered if there is a finding of liability.  Accordingly, solely for purposes of evaluating damages, if any, owed to Waymo, I have been asked to assume that the Waymo Purported Trade Secrets are in fact trade secrets and were misappropriated by Uber.  It is my understanding that Waymo may be entitled to recover actual damages based upon the value of what has been lost and/or the value of what has been gained by the Uber.  I understand that remedies for misappropriation of trade secrets under the DTSA include the following:[255]

---

[252] https://techcrunch.com/2015/06/17/the-last-mover-advantage/.
[253] https://www.forbes.com/sites/briansolomon/2015/12/29/ride-share-pioneer-sidecar-shuts-down-outmuscled-by-uber-and-lyft/#3641cf8629fe.
[254] WAYMO-UBER-00004175 – 194, at 177 and 184.
[255] 18 U.S.C. § 1836.

- Damages for actual loss caused by the misappropriation;

- Damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in damages for actual loss; and

- A reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret in lieu of damages measured by any other method.

148.    The CUTSA provides the same remedies for misappropriation of trade secrets as does the DTSA.[256]   As a result, an analysis of economic damages resulting from the alleged misappropriation of the Waymo Purported Trade Secrets applies to Waymo's claims under both the DTSA and the CUTSA.

149.    It is my understanding that courts take a variety of approaches to determine the appropriate damages in trade secret misappropriation cases.  Consistent with the remedies provided under the DTSA and the CUTSA, as outlined above, the calculation of damages can be measured in several different ways:[257]

    A.   Loss Caused by the Misappropriation:

- Value of the Trade Secrets.  If the value of the trade secret(s) has been destroyed through misappropriation, the owner can be awarded the value of the secret at the time of the misappropriation.[258]

- Actual Damages/Lost Profits.  This represents the profits, if any, forgone by the plaintiff that resulted from the unauthorized use of the trade secrets.[259]

    B.   Unjust Enrichment Caused by the Misappropriation:

- Disgorgement of Gains.  This involves the disgorgement of defendants' gains, if any, attributable to its unauthorized use of the trade secrets. Such gains can be measured by defendants' profits, head start advantage and/or avoided costs.[260]

---

[256] Cal. Civ. Code § 3426.3.  A reasonable royalty is only available under the CUTSA if the claimant is unable to prove either lost profits or unjust enrichment.
[257] The measures of recovery discussed are not all additive, and, in fact, some may be mutually exclusive.
[258] Weil, et al., *Litigation Services Handbook (Fifth Edition)*, pg. 18.38.
[259] Weil, et al., *Litigation Services Handbook (Fifth Edition)*, pg. 18.37.
[260] Weil, et al., *Litigation Services Handbook (Fifth Edition)*, pg. 18.39.

C.  Reasonable Royalty:  This measures the royalty that a defendant would have been willing to pay, and a plaintiff would have been willing to accept, for the use of the trade secrets.  A reasonable royalty for the allegedly misappropriated trade secrets is typically determined with consideration of the factors set forth in *Georgia Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116 (S.D.N.Y. 1970).[261]

150.    As of the date of issuance of this report, I have not seen any evidence that the Waymo Purported Trade Secrets have been destroyed or any profits forgone by Waymo as a result of the alleged misappropriation by Uber.  In fact, according to Mr. Wagner, "Waymo is not seeking lost profits for its theft of trade secrets causes of action at this time."[262]  As a result, my analysis of damages for the alleged misappropriation of the Waymo Purported Trade Secrets is limited to Uber's unjust enrichment, if any, and an analysis of a reasonable royalty.  I discuss my analysis of these remedies in the sections below.



---

[261] *RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 926-27 (N.D. Ill. 2002); *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970); Weil, et al., *Litigation Services Handbook (Fifth Edition)*, pg. 18.34.
[262] The Wagner Report, ¶ 263.







CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017



CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017



CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order





CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017



CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017



CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017



CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017



CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017







CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order



CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017



### x. Conclusion

183.    In summary, it is my understanding that the Waymo Purported Trade Secrets are not novel, and could be independently developed for $605,000.[332]  The following table provides a breakdown of the development costs by alleged trade secret:

| Cost to Independently Develop Waymo's Purported Trade Secrets | |
|---|---|
| | **Total Cost** |
| **Purported Trade Secret** | |
| No. 2 | $208,920 |
| No. 7 | 43,600 |
| No. 9 | 112,160 |
| No. 13 and 14 | 126,080 |
| No. 25 | No Value |
| No. 90 | No Value |
| No. 96 | 114,040 |
| No. 111 | 200 |
| Total | **$605,000** |



[332] [$208,920 + $43,600 + $112,160 + $126,080 + $114,040 + $200 = $605,000].

### B.  Unjust Enrichment from Alleged Use of the Waymo Purported Trade Secrets

184.  As of the date of this report, I have seen no evidence of unjust enrichment by Uber from its alleged use of the Waymo Purported Trade Secrets.  According to Scott Boehmke, "Fuji is the only in-house LiDAR that is currently under development" by Uber.[333]  Based upon my interviews of Dr. McManamon and Dr. Lebby, I understand that the Waymo Purported Trade Secrets are well known within the industry and provide little, if any, value to Uber.[334]  In fact, I understand that the Fuji design does not incorporate many of the teachings of the Waymo Purported Trade Secrets.[335]  Additionally, I understand that Uber contends it has independently developed each of the technologies within the Fuji design, which I have seen no evidence produced in this matter that contradicts this position.  Therefore, I have seen no evidence that Uber has avoided any costs as a result of its alleged misappropriation of the Waymo Purported Trade Secrets.

185.  Furthermore, contrary to Mr. Wagner's position as discussed above, I have seen no evidence that Uber's AV development efforts have been accelerated as a result of its alleged misappropriation of the Waymo Purported Trade Secrets.  Although the Qi Slide relied upon by Mr. Wagner "*attempt[ed]*" to determine the present value to Uber "*if*" it were able to accelerate its AV development by one to two years, as discussed in detail above, results shown in the Qi Slide were speculative, never reviewed or relied on by anyone at Uber, and ultimately proven to be incorrect.  Furthermore, neither Waymo, nor its experts, have provided any evidence that Uber accelerated its AV efforts as a result of Uber's alleged misappropriation of the Waymo Purported Trade Secrets.  Therefore, I have seen no evidence that Uber received a head start advantage as a result of its alleged misappropriation of the Waymo Purported Trade Secrets.

186.  ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[333] Deposition of Scott Boehmke, April 17, 2017, pgs. 17 – 18.
[334] Interviews of Dr. McManamon and Dr. Lebby.
[335] Interviews of Dr. McManamon and Dr. Lebby.



187.

---
[336] WAYMO-UBER-00001354-R – 1371-R, at 363-R.
[337] WAYMO-UBER-00031699 – 31801 at 713 – 717.
[338] WAYMO-UBER-00031699 – 31801, at 714.



188.    Additionally, as noted by Waymo, there are many "supply side" and "demand side" risk factors that could affect the success of an AV development program and TaaS business.[341]  Waymo describes these risk factors as follows:[342]

- Supply Side Risk:

    o  "We get the self-driving technology to work"

    o  "We can't get/develop a vehicle platform;"

    o  "We can't get/develop sensors;"

    o  "We can't solve all the software challenges;" and

    o  "We can't get our overall system reliability high enough."

    o  "We get the cost of the technology down enough to run a sustainable TaaS business"

---

[339] "Self-driving cars are safer when they talk to each other," engadget, June 24, 2017, https://www.engadget.com/2017/06/24/self-driving-cars-mcity-augmented-reality/.
[340] http://spectrum.ieee.org/cars-that-think/transportation/self-driving/how-driveai-is-mastering-autonomous-driving-with-deep-learning.  Hod Lipson, et al., "Driverless: Intelligent Cars and the Road Ahead," The MIT Press: Cambridge, 2016, pgs. 197 – 203.
[341] WAYMO-UBER-00046625 – 632 at 625.
[342] WAYMO-UBER-00046625 – 632.

- Demand Side Risk:

    o "We achieve consumer acceptance of self-driving cars;" and

    o "We avoid regulatory prohibition of our self-driving technology."  Google expects "regulatory risks will increase over the next 5 years."

- Other Risk Factors:

    o "Corporate Funding Risk;"

    o "Secular Risks;"

    o "Macro Risks;" and

    o "Commercialization risks."

189.  

190.  As a result, LiDAR, which the Waymo Purported Trade Secrets are but a small component of, is one small element of the AV development effort.  There are many other complex elements and risk factors, unrelated to the development of LiDAR, which may have a significant impact on the development timeline and a company's ability to successfully implement an AV TaaS business. In fact, when considering the compensation structure for the Ottomotto acquisition, only 20% of

---

[343] WAYMO-UBER-00042527 – 531 at 529.
[344] WAYMO-UBER-00046625 – 632 at 626.
[345] WAYMO-UBER-00046625 – 632 at 626.
[346] WAYMO-UBER-00046625 – 632 at 627.
[347] WAYMO-UBER-00046625 – 632 at 627 – 628.

the "milestone" payments were based upon deliverables associated with the laser.[348]   The remaining 80% was based upon achievements in other aspects of the AV development effort.[349] This further supports the fact that Uber's AV development effort encompasses much more than the development of a sensor, or the Waymo Purported Trade Secrets.

191.   Based on the foregoing, I have seen no evidence that Uber has received a head-start benefit from its alleged misappropriation of the Waymo Purported Trade Secrets, even under an assumption of use.   In fact, it is clear that the sensor (e.g., LiDAR) is only a small component of implementing a successful AV TaaS business and a component that does not pose much risk to the AV development timeline as both Plaintiff and Uber are primarily focused on "software challenges."[350]   As a result, any alleged benefit would be limited to Uber's avoided costs which can be measured by the cost to independently develop each of the Waymo Purported Trade Secrets. The cost to independently develop each of the Waymo Purported Trade Secrets would represent the maximum benefit received by Uber under the assumption that Uber misappropriated the Waymo Purported Trade Secrets and benefited from such use.

192.   As discussed in detail above, Uber provided the following time and cost estimates to independently develop the accused features of Fuji, which allegedly incorporate the Waymo Purported Trade Secrets:[351]

---

[348] UBER00100344 – 352 at 346 and 349.
[349] UBER00100344 – 352 at 346 and 349.
[350] WAYMO-UBER-00046625 – 632 at 626; Deposition of Daniel Gruver, August 4, 2017, pgs. 112 – 113.
[351] Defendant Uber Technologies, Inc. and Ottomotto LLC's Second Supplemental Responses to Waymo's First Set of Common Interrogatories (Nos. 1 – 3).  See Exhibit 4.

| Cost to Independently Develop Waymo's Purported Trade Secrets | |
|---|---|
| | **Total Cost** |
| **Purported Trade Secret** | |
| No. 2 | $208,920 |
| No. 7 | 43,600 |
| No. 9 | 112,160 |
| No. 13 and 14 | 126,080 |
| No. 25 | No Value |
| No. 90 | No Value |
| No. 96 | 114,040 |
| No. 111 | 200 |
| Total | **$605,000** |

193.    I understand the estimates above assume that the independent contractor would not be provided with information on the current design of the accused features of Fuji.[352]  Additionally, I understand that Dr. McManamon and Dr. Lebby reviewed these estimates and believe them to be reasonable.   Therefore, under an assumption that Uber received a benefit from its alleged misappropriation and use of the Waymo Purported Trade Secrets, I have calculated Uber's unjust enrichment (i.e., based on avoided costs) to be no more than $605,000.  As discussed above, this represents the maximum benefit Uber allegedly received as a result of its alleged misappropriation of the Waymo Purported Trade Secrets.  This amount is also conservative as it overstates the damages to Waymo due to the fact that I have not seen any evidence that Uber has been unjustly enriched by its alleged misappropriation of the Waymo Purported Trade Secrets.  Additionally, this amount does not take into consideration the actual time expended and costs incurred by Uber from its development of the accused features of Fuji.  As noted above, Uber contends that it has independently developed each of the technologies within the Fuji design; and therefore, any alleged unjust enrichment realized by Uber would be net of any actual costs incurred.

---

[352] Defendant Uber Technologies, Inc. and Ottomotto LLC's Second Supplemental Responses to Waymo's First Set of Common Interrogatories (Nos. 1 – 3).

### C. Reasonable Royalty for the Alleged Use of the Waymo Purported Trade Secrets

194.    For purposes of determining a reasonable royalty for alleged use of trade secrets, it is my understanding that one can look to the guidance given by courts in patent infringement disputes.[353] 35 U.S.C. § 284 provides:

> *Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer...*

195.    In trade secret matters, Courts have adopted the guidance set forth in *Georgia-Pacific Corp. v. United States Plywood Corp* (*"Georgia-Pacific"*) to determine the reasonable royalty that would have resulted from a hypothetical negotiation between a willing licensor and willing licensee at the time the trade secrets were allegedly misappropriated.[354]  In establishing the reasonable royalty in this hypothetical willing licensor/licensee negotiation, courts have established a number of factors that are to be considered, including those established by the *Georgia-Pacific* case.  The analysis focuses on the economic and bargaining positions of the hypothetical licensor and hypothetical licensee at the time of the hypothetical negotiation, and the likely outcome of such negotiation given the parties' respective bargaining positions.  An important distinction of the hypothetical negotiation is that parties on both sides of the negotiation would have acknowledged that the alleged trade secrets were, in fact, trade secrets and misappropriated as has been alleged; whereas the licensee in a real-life negotiation may not have made such acknowledgements.

196.    While *Georgia-Pacific* enumerates various factors that should be considered in determining reasonable royalties, these factors are not absolute determinants of a reasonable royalty.  Rather, the *Georgia-Pacific* Factors are guidelines to evaluating the likely actions of the

---

[353] *University Computing Company v. Lykes-Youngstown Corporation et al*. 504 F.2d 518, 535, 537 – 539 (5th Cir. 1974); *De Lage Landen Operational Services, LLC v Third Pillar Systems, Inc.* Civil Action No. 09-2439, Memorandum dated May 9, 2011.

[354] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970); and *University Computing Company v. Lykes-Youngstown Corporation et al*. 504 F.2d 518, 535, 537 – 539 (5th Cir. 1974); *De Lage Landen Operational Services, LLC v Third Pillar Systems, Inc.* Civil Action No. 09-2439, Memorandum dated May 9, 2011.

parties in a hypothetical negotiation.  Based on the facts and circumstances of the case, the factors are not necessarily given equal weight, and are not exhaustive.  Rather, the *Georgia-Pacific* Factors are part of the overall analysis.  I have also considered recent Federal Circuit opinions as they relate to my opinion of economic damages in this matter and my opinions comply with the Federal Circuit's mandates.[355]

### i.  Hypothetical Negotiation

197.   The hypothetical negotiation for a license to the Waymo Purported Trade Secrets is assumed to have occurred on or about the date of first alleged misappropriation.  However, I am not aware of any evidence or allegation indicating when the alleged misappropriation of the Waymo Purported Trade Secrets by Uber occurred.[356]   Given that Waymo alleged that Mr. Levandowski, who is not a Defendant in this litigation, downloaded the 14,000 Waymo documents containing the Waymo Purported Trade Secrets in December 2015, the date of first misappropriation by Uber in this matter could not have occurred prior to December 2015.[357] Furthermore, although he provided no basis for the statement, Mr. Wagner asserted that the misappropriation "may have continued through the period until the date of the merger in August 2016."[358]  Despite the lack of any evidence indicating the date or dates on which any of the Waymo Purported Trade Secrets were allegedly misappropriated, similar to Mr. Wagner's assumption, I have assumed that the date of first misappropriation, and therefore the hypothetical negotiation, was sometime between December 2015 and August 2016.

### ii.  Georgia Pacific Factor Analysis

> **Georgia-Pacific Factor No. 1:**  *The royalties received by the [trade secret(s) owner] for the licensing of the [trade secret(s)], proving or tending to prove an established royalty.*

---

[355] *E.g.*, *Lucent Technologies v. Gateway*, 580 F.3d 1307 (Fed. Cir. 2009); *Cornell University v. Hewlett-Packard*, 609 F.Supp.2d 279 (N.D.N.Y. 2009); *ResQNet.com v. Lansa*, 594 F.3d 860 (Fed. Cir. 2010); *Uniloc USA v. Microsoft*, 632 F.3d 1292 (Fed. Cir. 2011); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, (Fed. Cir. Aug. 30, 2012); *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201 (Fed. Cir. 2014); *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295 (Fed. Cir. 2015).
[356] Interview of Dr. McManamon and Dr. Lebby.
[357] Amended Complaint, ¶ 44.
[358] The Wagner Report, ¶ 383.

198.    *Georgia-Pacific* Factor No. 1 involves consideration of the existence of an established royalty for the Waymo Purported Trade Secrets.  As of the issuance of this report, I am not aware of any licenses under which Waymo has granted rights to the Waymo Purported Trade Secrets.  As a result, this factor would have a neutral impact on the royalty negotiated between the parties at the hypothetical negotiation.

> *Georgia-Pacific* **Factor No. 2:**  *The rates paid by the licensee for the use of other [trade secret(s)] comparable to the [trade secret(s) at issue].*

199.    *Georgia-Pacific* Factor No. 2 involves consideration of the existence of any licenses Uber has taken for trade secrets that are comparable to the Waymo Purported Trade Secrets.  As of the issuance of this report, I am not aware of any licenses under which Uber has been granted rights to trade secrets or other technology that is comparable to the Waymo Purported Trade Secrets.  As a result, this factor would have a neutral impact on the royalty negotiated between the parties at the hypothetical negotiation.

> *Georgia-Pacific* **Factor No. 3:**  *The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.*

200.    The hypothetical negotiation in this matter would result in Uber obtaining non-exclusive and non-restrictive license to use the Waymo Purported Trade Secrets.  My analysis of a reasonable royalty in this matter is based upon the cost and time to independently develop the Waymo Purported Trade Secrets, which would represent the maximum amount Uber would be willing to pay for rights to the Waymo Purported Trade Secrets.  As a result, this factor would have a neutral impact on the royalty negotiated between the parties at the hypothetical negotiation.

> *Georgia-Pacific* **Factor No. 4:**  *The licensor's established policy and marketing program to maintain its [trade secret(s)] monopoly by not licensing others to use the invention or by gaining licenses under special conditions designed to preserve that monopoly.*

201.    ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████



202.

203.    Waymo and Uber would have been considered potential competitors at the time of the hypothetical negotiation.  Specifically, Uber identified various competitors in the AV industry, including Google, Tesla, and Apple.[362]  Furthermore, Waymo viewed the following companies as potential competitors as of 2016:[363]

---

[359] WAYMO-UBER-00031464 – 552 at 548.
[360] Deposition of Gerard Dwyer, August 9, 2017, pg. 213.
[361] Deposition of Gerard Dwyer, August 9, 2017, pgs. 213 – 214.
[362] UBER00068983.
[363] WAYMO-UBER-00001354 – 1412, at 1404 – 1405.

CONFIDENTIAL
ATTORNEYS' EYES ONLY
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017





204.    Additionally, in May 2017, Waymo announced that it would partner with Lyft, which is a competitor of Uber in the ridesharing industry.[364]  As a result, Waymo and Uber would have been considered potential competitors at the time of the hypothetical negotiation.  As a result, this factor would have an upward impact on the royalty negotiated between the parties at the hypothetical negotiation.

> ***Georgia-Pacific* Factor No. 6:**  *The effect of selling the [trade secret(s)] specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its [non-trade secret] items; and the extent of such derivative or convoyed sales.*

205.    In general, convoyed sales involve sales of related products, which flow or would be expected to flow to the licensee from the right to manufacture, use or sell products utilizing the trade secret(s).   As of the date of issuance of this report, I have seen no evidence that the Waymo Purported Trade Secrets provide the basis of demand for the Fuji LiDAR System.  Similarly, I have seen no evidence of any residual sales that Uber would be able to realize as a result of incorporating the Waymo Purported Trade Secrets into a LiDAR system.  As a result, this factor would have a neutral impact on a negotiated royalty between the parties.

> ***Georgia-Pacific* Factor No. 7:**  *The duration of the [trade secret(s)] and the term of the license.*

206.    Trade secrets have no legal limit on their duration.  As a result, the term of the license resulting from the hypothetical negotiation would have been for as long as the Waymo Purported Trade Secrets remained confidential and provided a competitive advantage to Waymo.  However, Uber could have independently developed the Waymo Purported Trade Secrets in a short period of time.  Moreover, once Waymo, and other companies, introduce an AV on the road, the LiDAR systems may be more accessible and subject to reverse engineering.  As a result, this factor would have a neutral impact on the royalty negotiated between the parties at the hypothetical negotiation.

---

[364] https://www.nytimes.com/2017/05/14/technology/lyft-waymo-self-driving-cars.html?mcubz=1.

> ***Georgia-Pacific* Factor No. 8:**   *The established profitability of the product made under the [trade secret(s)]; its commercial success; and its current popularity.*

207.     In order to evaluate this factor, it is important to review the respective expectations of the parties at the time of the hypothetical negotiation regarding potential revenues and profits realized from implementing a successful AV TaaS business.   As discussed throughout this report, I understand that any alleged use of the Waymo Purported Trade Secrets would have had little, if any, impact on future revenues and profits of Uber.   Moreover, none of the evidence cited by Wagner has to do with the "established profitability of the product," as required for consideration under *Georgia-Pacific* factor number 8.

208.     Although the Qi Slide relied upon by Mr. Wagner "*attempt[ed]*" to determine the present value to Uber "*if*" it were able to accelerate its AV development by one to two years, as discussed in detail above, results shown in the Qi Slide do not reflect the "established profitability of the product," which doesn't exist.   Further, the results were speculative, never reviewed or relied on by anyone at Uber, and ultimately proven to be incorrect as the Ottomotto acquisition has not accelerated commercialization of Uber's AV technology.   Ms. Qi stated multiple times in her testimony that her incremental profitability projections were not readily received by her supervisors.[365]   In her testimony, Ms. Qi stated that "both John and Brian did not like this, and I remember John saying, 'This slide needs work'" and "[t]hey thought my analysis on the cheaper data collection was off."[366]   As a result, Ms. Qi testified that her incremental profitability projections (i.e., the Qi Slide) were "her own assessment and ultimately was not used in any forum."[367]

209.     Additionally, due to the high risks and uncertainties involved in the AV market, assessing future profitability is unpredictable.[368]   At the time of the hypothetical negotiation, Uber, and Waymo, faced, and still faces, numerous obstacles, including technical and regulatory hurdles, to

---

[365] Deposition of Ningjun Qi, June 22, 2017, pgs. 212 and 215 – 216; Deposition of Ningjun Qi, August 10, 2017, pgs. 412 and 417.
[366] Deposition of Ningjun Qi, June 22, 2017, pg. 215.
[367] Deposition of Ningjun Qi, June 22, 2017, pg. 223.
[368] Strategy&, "Connected car report 2016: Opportunities, risk, and turmoil on the road to autonomous vehicles," pg. 22.

its contemplated launch of an AV TaaS business that a license to the Waymo Purported Trade Secrets alone would not remove. These hurdles make Uber's internal forecasts of profit associated with that service extremely speculative. Several substantial technical hurdles stand between current AV technology and commercialization of AV TaaS. First, profitability in the AV TaaS model is tied to the ability to remove human drivers (labor costs being [70%] of total costs). Removing human drivers depends on AV technology being sufficiently reliable. Second, LiDAR cannot currently function in adverse weather conditions such as rain or snow.[369]  Therefore, LiDAR-dependent AVs cannot sustain continuous operations in areas where precipitation is common. Given the climate in the U.S., this significantly limits the potential locations in which a LiDAR-dependent AV car design can be brought to market.

210.    In addition to the technical hurdles encumbering AV commercialization, many policy and regulatory issues affect the timing and viability of an AV TaaS business.[370]  One of the major hurdles involves many current legal regimes requiring human driver fail safes for AVs to access public roadways. Uber has discussed the fact that so-called "safety drivers" may have to be in AV cars for some time.[371]  For example, Uber has not even ventured to make plans to roll-out AV TaaS because any planning process would be stymied by uncertainties as to whether, or in what form, the regulatory environment might one day permit the AV technology to be implemented.[372]

211.    Waymo also recognized the hurdles posed by regulation. In its "Plan of Record Strategy," Waymo enumerated the risks it faced in the AV space, one of which was "regulatory hurdles block[ing] [its] TaaS service from operating."[373] ██████████████████████████ ██████████████████████████ ██ ████████████████████████ ██████████████████████████ Charlie Johnson, a Business Strategy and Operations Analyst at Waymo, recognized that "some regulations might impede [Waymo's]

---

[369]  http://spectrum.ieee.org/cars-that-think/transportation/self-driving/how-driveai-is-mastering-autonomous-driving-with-deep-learning.
[370]  For example, WAYMO-UBER00032319 – 383, at 335 – 342; WAYMO-UBER-00031805 – 817, at 810.
[371]  Deposition of Gautam Gupta, August 18, 2017, pg. 126.
[372]  Deposition of Gautam Gupta, August 18, 2017, pgs. 126 – 128.
[373]  WAYMO-UBER-00031805 – 817, at 811.
[374]  WAYMO-UBER-00031805 – 817, at 811.

ability to serve customers, that would be a challenge [Waymo] would have to respond to."  Without removing drivers from cars, the cost-savings of AV versus non-AV may not even exist.

212.    As discussed above, Mr. Wagner relied on a Waymo Profit and Loss statement (P&L)[375] as allegedly supporting his argument that "[t]he potential profit opportunity to Waymo related to autonomous vehicles is dramatic."[376]  However, Waymo's forecasts, even if credible, are irrelevant to *Georgia-Pacific* factor 8, which requires consideration only of the "*established* profitability of the product."  Furthermore, the projections in the P&L statement, extending over 10 years into the future for an industry with no historical track record of commercialization, are entirely speculative.

213.    In fact, Waymo employees responsible for either preparing the Waymo P&L or for providing critical inputs to it confirmed that the projections were speculative.  For example, Mr. Su, former Finance Manager for Waymo, testified that forecasts are sometimes "best guesses" and "…the goal isn't necessarily to be accurate…[t]he goal is to present a potential outcome".[377]  Furthermore, the P&L statements were missing variables, like the cost of "maintenance for the SDS modules," which Mr. Su testified he did not know if it would "be significant" because he needed to "see some numbers on what the maintenance cost will be," that could affect overall profitability of the projections.[378]  Mr. Willis, Director of Supply Chain Operations for Waymo, testified ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████  Additionally, according to Mr. Su, projecting so far in the future increases the speculative nature of the projections and that they "don't think there's anyone that would suggest they're confident of anything occurring 10 years from now."[380]

214.    As a result, this factor would have a downward impact on the royalty negotiated between the parties at the hypothetical negotiation.

---

[375] The Wagner Report at ¶340 (citing WAYMO-UBER-00032541).
[376] The Wagner Report at ¶338.
[377] Deposition of Ming Su, August 23, 2017, pgs. 118, 211 – 212.
[378] Deposition of Ming Su, August 23, 2017, pgs. 271:8-276:24; Ex. 1877 (Waymo-Uber-40138-139).
[379] Deposition of Tim Willis, August 18, 2017, pgs. 204, 211, 220, 230, 336, and 346.
[380] Deposition of Ming Su, August 23, 2017, pgs. 178 – 179, 216, 251.

**Georgia-Pacific Factor No. 9:** *The utility and advantage of the [trade secret(s)] property over the old modes or devices, if any, that had been used for working out similar results.*

**Georgia-Pacific Factor No. 10:** *The nature of the [trade secret(s)]; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the [trade secret(s)].*

215.    *Georgia*-Pacific Factors Nos. 9 and 10 are considered together because of their similar nature. *Georgia-Pacific* Factors Nos. 9 and 10 both relate to the advantages conveyed due to use of the trade secrets and the related benefits enjoyed by the user of the trade secret(s) over alternative means of achieving similar results. As discussed above, according to Dr. McManamon and Dr. Lebby, the Waymo Purported Trade Secrets are not novel and provided very little, if any, benefit to Uber.[381] In fact, Google itself placed limited, if any, value on the Waymo Purported Trade Secrets. According to Google, "[a]t least historically, high-value has been algorithms and software. The hardware (at all levels) was a second class citizen."[382] The files allegedly downloaded by Mr. Levandowski, which included the Waymo Purported Trade Secrets, were "all electronic designs – schematics and PCB layouts, and the component library for their creation. It was considered low value enough that we had even considered hosting it off of Google infrastructure."[383]

216.    Furthermore, the development and manufacturing of LiDAR systems is dynamic and rapidly evolving.[384] As of the issuance of this report, many new and established companies are pursuing the next generation of LiDAR systems, which will lead to cheaper, smaller, and more reliable systems being announced and introduced over time.[385] I understand that these newer systems are different from conventional LiDARs with rotary joints and spinning mechanical

---

[381] Interview of Dr. McManamon and Dr. Lebby.
[382] WAYMO-UBER-00084484.
[383] WAYMO-UBER-00084484.
[384] Interview of Dr. McManamon and Dr. Lebby.
[385] For example, Velodyne announced two new LiDAR systems in the second half of 2016.
http://velodynelidar.com/docs/news/Velodyne%20LiDAR%20Announces%20Puck%20Hi-Res%20LiDAR%20Sensor,%20Offering%20Higher%20Resolution%20to%20Identify%20Objects%20at%20Greater%20Distances%20_%20Business%20Wire.pdf; http://velodynelidar.com/docs/news/Velodyne%20LiDAR%20Announces %20New%20Velarray%20LiDAR%20Sensor%20_%20Business%20Wire.pdf.

components, similar to what Waymo has developed.[386]  For example, solid-state, micro-electro-mechanical system steered ("MEMS-steered"), or coherent optical systems are recognized as viable alternatives to mechanically rotating LiDAR technology.[387]  Furthermore, I understand that various next-generation solid-state LiDAR systems have already been developed by several companies, (e.g., Velodyne, Quanergy, Valeo, Leddar).[388]  As of April 2017, the latest version of solid-state LiDAR being developed by Luminar promised to "provide 50 times more resolution and 10 times the range of current LiDAR systems."[389]

217.    I further understand that other companies such as Infineon, STMicroelectronics, and AnalogDevices have been investing in solid-state and MEMS-steered LiDAR technology and entering the AV industry.[390]  As of the date of issuance of this report, more advanced technologies were in the works, such as Oryx's "coherent optical radar" which combines the benefits of LiDAR and radar in a single device.[391]  Additionally, as noted above, there are also AV systems that do not use LiDAR at all, including Tesla's current system.

218.    As noted above, there are many other complex elements and risk factors, unrelated to the development of a LiDAR, which may have a significant impact on the development timeline and a company's ability to successfully implement an AV TaaS business.  I have seen no evidence that Uber was able to accelerate its time to market involving commercialization of AV technology as a result of its alleged misappropriation of the Waymo Purported Trade Secrets.  Therefore, the little, if any, value provided by the Waymo Purported Trade Secrets would limit the amount that

---

[386] The Hesselink Report, pgs. 51 – 52; Deposition of James Haslim, August 9, 2017, pgs. 482 – 483.
[387] http://spectrum.ieee.org/cars-that-think/transportation/sensors/can-israeli-startup-oryx-oust-lidar-from-selfdriving-cars; https://www.economist.com/news/science-and-technology/21712103-new-chips-will-cut-cost-laser-scanning-breakthrough-miniaturising.
[388] https://spectrum.ieee.org/cars-that-think/transportation/sensors/velodyne-announces-a-solidstate-lidar; http://quanergy.com/s3/; http://leddartech.com/leddar-technology-enables-new-mass-market-lidar-offering-automotive-applications/; http://leddartech.com/automotive/.
[389] WAYMO-UBER-00025181 – 183, at 181.
[390] https://www.infineon.com/cms/en/about-infineon/press/press-releases/2016/INFATV201610-002.html; and http://www.st.com/content/st_com/en/about/media-center/press-item.html/t3876.html.
[391] http://oryxvision.com/news/oryx-vision-raises-50m-build-groundbreaking-coherent-lidar-autonomous-vehicles/.

Uber would be willing to pay for rights to these trade secrets.  As a result, this factor would have a downward impact on the royalty negotiated between the parties at the hypothetical negotiation.

> ***Georgia-Pacific* Factor No. 11:**  *The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.*

219.    This factor takes into account the extent of use, and value provided from such use, of the Waymo Purported Trade Secrets by Uber.  As noted above, I understand that the Fuji design does not incorporate many of the teachings of the Waymo Purported Trade Secrets.[392]  Furthermore, based upon my interviews of Dr. McManamon and Dr. Lebby, I understand that the Waymo Purported Trade Secrets are well known within the AV industry, are not novel, and provide little, if any, value to Uber.[393]  In fact, according to Google, "[t]he hardware (at all levels) was a second class citizen"[394] and the files allegedly downloaded by Mr. Levandowski, which included the Waymo Purported Trade Secrets, were "…considered low value."[395]

220.    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

---

[392] Interviews of Dr. McManamon and Dr. Lebby.
[393] Interviews of Dr. McManamon and Dr. Lebby.
[394] WAYMO-UBER-00084484.
[395] WAYMO-UBER-00084484.
[396] ████████████████████████



221.   

---

397 WAYMO-UBER-00046625 – 632 at 625.
398 Krawiec, RJ, et al., *Governing the Future of Mobility*, Deloitte, 2017, pgs. 2 and 9 (citations omitted).
399 WAYMO-UBER-00046625 – 632 at 630.
400 WAYMO-UBER-00046625 – 632 at 632.

222.    Based on the foregoing, Uber would have been reluctant to pay a significant royalty for rights to purported trade secrets that provided little, if any, value and/or benefit to its ability to implement an AV TaaS business.  Additionally, the parties would have also taken into consideration the substantial risks and overall uncertainty surrounding the AV TaaS business, which are unrelated to the successful development of the LiDAR system.  Therefore, this factor would have a downward impact on the royalty negotiated between the parties.

> ***Georgia-Pacific* Factor No. 12:**  *The portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.*

223.    In considering *Georgia-Pacific* Factor No. 12, I conducted research regarding royalty rates for potentially comparable technology in the public domain.  As a result, I obtained information from RoyaltySource,[401] an online database and provider of publicly-available information regarding licenses of intellectual property, based on keywords and descriptions of comparable technology provided to me by Dr. McManamon and Dr. Lebby.  However, none of the agreements identified through this search were economically comparable to a hypothetical negotiation between Waymo and Uber.  As a result, this factor would have a neutral impact on the royalty negotiated between the parties at the hypothetical negotiation.

> ***Georgia-Pacific* Factor No. 13:**  *The portion of the realizable profit that should be credited to the invention as distinguished from [non-trade secret] elements, the manufacturing process, business risks, or significant features or improvements added by the [misappropriator].*

224.    This factor takes into account the relative contribution of the trade secret feature(s) to the success of the accused product(s).  As of the issuance of this report, I have seen no evidence that the Waymo Purported Trade Secrets are the basis of demand for the LiDAR system.  As discussed above, based on my interviews of Dr. McManamon and Dr. Lebby, I understand the Waymo Purported Trade Secrets are not novel and provide very little, if any, benefit to Uber.  Furthermore,

---

[401] http://www.royaltysource.com.

I understand the Waymo Purported Trade Secrets could have been independently developed with minimal time and cost.[402]

225.     As a result, my analysis of a reasonable royalty in this matter is based on the estimated time and cost to independently develop the accused features, which allegedly incorporate the Waymo Purported Trade Secrets, of the Fuji LiDAR system.[403]   As such, my analysis inherently apportions out the value of the Waymo Purported Trade Secrets from the value of the LiDAR system and the AV system as a whole.  As a result, this factor would have a neutral impact on the royalty negotiated between the parties at the hypothetical negotiation.

> **Georgia-Pacific Factor No. 14:**  *The opinion and testimony of qualified experts.*

226.   This factor includes by reference all of the opinions stated in this report, including the expertise of Dr. Lebby and Dr. McManamon on technical matters.

> **Georgia-Pacific Factor No. 15:**  *The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, that amount which a prudent licensee – who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.*

227.   This factor represents the combination of all the facts considered in my report and my assessment of the previous factors in determining the amount of a reasonable royalty.  Waymo would have entered into a hypothetical negotiation with Uber for a non-exclusive and non-restrictive license for rights to use the Waymo Purported Trade Secrets.  Based on the documents, deposition testimony, and other information I have reviewed and considered in this matter, the parties would have considered the following points at the time of the hypothetical negotiation.

---

[402] Interview of Dr. McManamon; Interview of Dr. Lebby; Interview of Mr. Haslim.
[403] Defendants Uber Technologies, Inc. and Ottomotto LLC's Fifth Supplemental Responses to Waymo's First Set of Common Interrogatories (Nos. 1 – 3), August 24, 2017.

- The Waymo Purported Trade Secrets are assumed to be trade secrets and to have been misappropriated by Uber;

- There was no established royalty for a license to the Waymo Purported Trade Secrets;

- The Waymo Purported Trade Secrets are well known within the industry and are not novel;

- The Waymo Purported Trade Secrets provide little, if any, value to Uber;

- Waymo recognized the "low value" of the Waymo Purported Trade Secrets;

- ███████████████████████████████████████████████████████

- Waymo and Uber would have been considered potential competitors at the time of the hypothetical negotiation.  However, Waymo did not have a functional TaaS business as of the date of the hypothetical negotiation;

- The Fuji LiDAR, which allegedly incorporates the Waymo Purported Trade Secrets, is only a small component of Uber's overall AV development effort;

- Waymo and Uber recognized the significant risks and uncertainties involved in implementing an AV TaaS business, which made assessing potential future success and profitability unpredictable; and

- There were alternative LiDAR designs available to Uber at the time of the hypothetical negotiation.  In fact, Uber was utilizing LiDAR systems from third-parties at the time of the hypothetical negotiation.

228.    Waymo and Uber would have also considered the other factors and considerations described above and throughout this report at the time of the hypothetical negotiation in determining a reasonable royalty.

### iii.    Royalty Conclusion

229.    Upon review of all the evidence and information in this case, it is my opinion that Waymo and Uber would have agreed to structure the royalty as a lump-sum payment.  In concluding the amount of the lump sum royalty which would result from the hypothetical negotiation, it is my opinion that Waymo and Uber would have agreed to a lump-sum royalty of no more than $605,000,

---

[404] Deposition of Gerard Dwyer, August 9, 2017, pgs. 213 – 214.

based on the cost to independently develop the Waymo Purported Trade Secrets. As noted above, the cost to independently develop the Waymo Purported Trade Secrets can be broken down by trade secret as follows:[405]

| Cost to Independently Develop Waymo's Purported Trade Secrets | |
| --- | --- |
| | **Total Cost** |
| **Purported Trade Secret** | |
| No. 2 | $208,920 |
| No. 7 | 43,600 |
| No. 9 | 112,160 |
| No. 13 and 14 | 126,080 |
| No. 25 | No Value |
| No. 90 | No Value |
| No. 96 | 114,040 |
| No. 111 | 200 |
| Total | **$605,000** |

230.    I understand that Dr. McManamon and Dr. Lebby reviewed the estimated costs and time to develop these purported trade secrets and believe them to be reasonable. Waymo would have understood that Uber would never have agreed to pay a royalty that was any more than the cost to independently develop the Waymo Purported Trade Secrets.

231.    The reasonableness of these estimates is further supported by a monthly "Headcount Spend" identified in an August 2017 Uber presentation.[406] As discussed in Exhibit 4, the time and cost to develop the Waymo Purported Trade Secrets of $605,000 is based on estimated hardware costs and "salary time" applied at the following rates: $200 per hour for Electrical Engineers, Engineers, Mechanical Engineers, and $60 per hour for Technicians.[407] Based on my review of

---

[405] See Exhibit 4.
[406] UBER00231730 – 739.
[407] Interview of Mr. Chouta.

the August 2017 Uber presentation, it appears that the hourly rates provided to me by Mr. Chouta are reasonable, if not overstated.  As of June 2017, the Hardware department, which would incorporate more than just the Fuji LiDAR design, had a headcount of 108 people and a monthly spend of approximately $1.9 million.[408]  This would result in an average spend of $100.48 per hour for its employees in the Hardware department.[409]  Therefore, in addition to the reasons identified above, the estimated cost to independently develop the Waymo Purported Trade Secrets of $605,000 appears to be conservative (i.e., overstated).

## VIII. RESERVATION OF RIGHTS

232.    This report reflects my analysis and opinions to date.  It is my understanding that discovery in this matter is ongoing, including depositions of fact witnesses.  As additional data, information, or testimony become available to me, I intend to consider this information.  I may modify or update my opinions to include additional information received after the date of this report.  Furthermore, I may prepare demonstrative graphs and/or charts to assist in the presentation of my opinions at deposition or at hearing, if I am requested to testify.

---

[408] UBER00231730 – 739, at 732.
[409] [$86,814.59 per day ÷ 108 employees = $803.84 per day]; [$803.84 per day ÷ 8 hours = $100.48 per hour].



# WALTER BRATIC

Managing Director
OverMont, a Division of Whitley Penn LLP
3737 Buffalo Speedway, Suite 1600
Houston, Texas 77098
Phone: (713) 403-3307
Cell:    (832) 541-5650
Email: walter.bratic@whitleypenn.com

| | |
|---|---|
| **Education** | M.B.A. Wharton Graduate School, University of Pennsylvania |
| | B.A. University of Pennsylvania, Phi Beta Kappa |
| | Summa Cum Laude |

| | |
|---|---|
| **Certifications** | Certified Public Accountant, State of Texas 1981 |
| | Certified Licensing Professional, 2008 |
| | Certified Fraud Examiner, 1991 |
| | Certified in Financial Forensics, AICPA 2009 |

| | |
|---|---|
| **Professional Affiliations** | American Institute of Certified Public Accountants |
| | Texas Society of Certified Public Accountants |
| | Houston Chapter, Texas Society of Certified Public Accountants |
| | Chairperson, U.S. Licensing Executive Society International Committee |
| | Intellectual Property Organization, Patent Misuse Committee |
| | United Nations/Economic Commission for Europe, Group of Experts on Enforcing Intellectual Property Rights for the Commonwealth of Independent States |
| | Editorial Board of the Journal of Commercial Biotechnology, London, England |
| | Associate Editor of the Journal of Biotechnology Applications |
| | Editorial Board of Managing Intellectual Property |
| | Lecturer on trademarks/trade secrets/Lanham Act at University of Houston Law School 2001-Present |
| | Lecturer on financial reporting, cost accounting, and management accounting topics |

| | | |
|---|---|---|
| **Professional History** | 03/01/17-Present | Managing Director, OverMont, a Division of Whitley Penn LLP |

| | | |
|---|---|---|
| **Professional History cont'd** | 9/1/08–03/01/17 | Managing Director, OverMont Consulting LLC |
| | 9/1/08–3/10 | Senior Consultant, Charles River Associates |
| | 2004–08/31/08 | Vice President, Charles River Associates |
| | 1999–2004 | Managing Director, InteCap, Inc. |
| | 1998–1999 | Partner, PricewaterhouseCoopers LLP<br>Global Director/Partner—Intellectual Property Services for the Financial Advisory Services Practice |
| | 1983–1998 | Price Waterhouse LLP<br>U.S./European Director—Intellectual Property Services for the Corporate Finance Reorganization and Disputes Practice, 1996–1998<br>Partner, 1989-1998<br>Senior Manager, 1985–1989<br>Manager, 1983–1985; Senior Consultant, 1983 |
| | 1981–1983 | CFO and Treasurer, Advanced Energy Supply Company |
| | 1980–1981 | Arthur Andersen |
| | 1978–1979 | Ernst & Whinney |

**Range of Industry Experience**

<u>**Industry Experience Includes**</u>:

- Aeronautic/Aviation/Avionics
- Agriculture
- Automotive
- Biotechnology
- Broadcasting/Media
- Chemicals
- Commercial Real Estate
- Computer Software & Hardware
- Construction
- Consumer Products
- Electronic Commerce
- Energy
- Entertainment, Gaming, & Hospitality
- Film Production/Distribution
- Financial Institutions
- Consumer & Commercial Financial Institutions
- Health and Beauty Aids
- Health Care and Life Sciences
- High Technology
- Insurance
- Investments
- Leasing
- Manufacturing
- Medical Devices/Procedures
- Mining/Extraction
- Oil & Gas
- Pharmaceuticals
- Publishing
- Restaurant/Food Distribution
- Retailing & Wholesaling
- Software
- Telecommunications
- Transportation & Distribution
- Veterinary/Livestock
- Vitamins, Mineral, Health Supplements

## Examples of Business Experience

### Intellectual Property

- Extensive experience in a variety of intellectual property issues involving patents, trademarks, trade dress, copyrights, trade secrets and know how. Have worked on assignments relating to strategic management, licensing, litigation and competition issues related to IP matters.

- Testified in federal and state court, ITC, AAA, IAA and ICC matters involving a broad range of IP topics including industry structure, licensing and practices. Also testified regarding damages related issues including lost profits, reasonable royalties, price erosion, competition and related topics. Subject matter has involved patents, trademarks and trade dress, copyrights and trade secrets. Testified regarding competition issues and the impact of the form and structure of patent license terms on technology innovation. Testified regarding product and geographical market definition related to patent and antitrust damages. Served as court appointed expert, examiner and consultant in federal and state court proceedings.

- Conducted extensive studies in strategic management of intellectual property for corporate clients including multinational, international, joint ventures, and start-up and development stage companies. Work performed included research and analysis regarding industry dynamics and IP management practices and evaluation of corporate IP strategies relating to invention/innovation cycles, license-in/license-out policies, buy/sell strategies, portfolio optimization, license enforcement and overall offensive and defensive IP strategies.

- Negotiated licenses and assisted clients in license negotiations and technology transfer projects. Determined appropriate compensation package, including royalty payments, based on the proposed structure and terms of the license agreement for the subject technology. Performed empirical studies associated with the subject technology's financial performance, industry practices and investment strategies. Reviewed and analyzed the terms and conditions of several thousand license agreements. Performed royalty compliance audits.

- Conducted auction process for sale of IP portfolios. Work included valuation of IP assets, identification of potential acquirers, preparation of IP offering circular and managing the auction process to completion. Involved in projects related to securitization of IP rights and related income streams.

- Analyzed and studied various industry standard setting bodies, practices and related license issues affecting standards adoption and innovation. Analyzed technology adoption and commercialization trends in the context of standard setting and patent pools.

- Industry focus has included, among others, energy, software and operating systems, semiconductors, life and health sciences (pharmaceutical, biotechnology, medical devices/procedures), semiconductors, high-end and consumer electronics, chemicals, computers, telecommunications and internet based services including various aspects of e-commerce, including retail, advertising, consumer tracking activities, etc.

- Analyzed and traced R&D spending and other contributions made by parties to the development of inventions in a variety of industries including biotech and pharma, semiconductors, and consumer and electronics.

- Analyzed FRAND/RAND Licensing issues in the context of standard setting organizations and patent pools.

**Antitrust Matters**

- Analyzed various aspects of anti-competitive conduct under the Sherman Act and Robinson Act as well as under various state Antitrust Statues. Investigated examples of tying arrangements, boycotts and monopolistic pricing and profits. Testified in federal, state courts and ITC proceedings regarding antitrust matters.

**Integrated Circuits**

- Performed extensive analyses and valuation of various aspects of semiconductor technology and semiconductor manufacturing, cleaning and inspection equipment. Analyzed several thousand semiconductor industry licenses regarding term and structure of such licenses and changes in licensing practices in the semiconductor industry. Served as expert and consultant on semiconductor industry licensing practices. Studied evolution and changes in technology, manufacturing and distribution of semiconductors as well as changes in industry capacity. Analyzed commodity and niche chip products, analyzed chipset, module, and motherboard interfaces, packaging including wireless and other configurations to enable data usage, transfer and storage.

**Trade Secrets**

- Valued trade secrets for transactional purposes.

- Analyzed trade secrets in the context of DOJ antitrust licensing guidelines.

- Analyzed trade secrets damages across a broad range of industries and technologies.

**Enterprise Resource Planning**

- Involved in numerous projects relating to design, implementation and performance of ERP systems involving the entire range of corporate performance and management from procurement, inventory and manufacturing controls to integrated financial reporting and planning for execution of system objectives.

**Broadcast Media/Data Storage/Data Transfer**

- Involved in broadcast rights relating to radio, TV, cable, satellite, and internet content. Rights have included sports, news, education programming relating to professional development, and career training.

- Involved in IP projects relating to valuation and licensing of technology relating to broadcast storage, distribution and retrieval such as internet, digital satellite, and terrestrial cable related to hardware and software technology for access to distributed content.

- Analyzed and valued network and data storage and transmission hardware and software solutions including internet, Ethernet, and extranet data storage and transmission.

**Consumer Electronics**

- Performed extensive experience in on a broad array of consumer electronics and components related thereto. Work has involved a broad range of products such as PC's, PDA's, cameras, video gaming systems, printers, copiers, monitors, projection systems, led, LCD and plasma screens, etc. I have analyzed trends

related to technology trends and market trends relating to manufacture, introduction, adoption and use and distribution of consumer electronics worldwide.

• Regarding video gaming systems have studied the history and evolution of video console systems over its more than 20 year development including the various console makers and different generation of products and technologies offered. Have studied market share shifts relating to competitor position. Have also studied license agreements and royalty structures for hardware and software. Have studied the development and shift in game graphics from first party to include second and third party games. Have studied the economic structure and profit model of the video gaming systems industry since its inception.

## Gaming/ Gambling

• Performed valuations of gaming industry concessions in the US, China and Venezuela. Work performed analysis of market trends, projections and demographic characteristics of potential population of relevant consumers. Analyzed the scope and extent of concessionary rights and impact on valuation.

• Analyzed electronic gaming equipment and valued features and royalties for gaming equipment. Analyzed trends related to gaming equipment technology trends and market trends relating to manufacture, introduction, adoption and use and distribution of consumer electronics worldwide.

• Studied evolution of video gaming systems including video console systems and change in distribution of video gaming content. Analyzed market share shifts relating to competitor position. Have also studied license agreements and royalty structures for hardware and software. Have studied the development and shift in game graphics from first party to include second and third party games. Have studied the economic structure and profit model of the video gaming systems industry since its inception.

## Integrated Circuits

• Performed extensive analyses and valuation of various aspects of semiconductor technology and semiconductor manufacturing, cleaning and inspection equipment. Analyzed several thousand semiconductor industry licenses regarding term and structure of such licenses and changes in licensing practices in the semiconductor industry. Served as expert and consultant on semiconductor industry licensing practices. Studied evolution and changes in technology, manufacturing and distribution of semiconductors as well as changes in industry capacity. Analyzed commodity and niche chip products, analyzed chipset, module, and motherboard interfaces, packaging including wireless and other configurations to enable data usage, transfer and storage.

## Automotive/Trucking/Farm/Heavy Equipment Industries

• Worked on numerous projects involving car and truck (light, medium, heavy) and off highway, farm and heavy equipment dealerships. Performed analysis of dealership profitability including new and used product sales, service, body shops, parts and aftermarket services. Also analyzed floor plan financing, leasing, distribution and advertising practices. Analyzed industry standards and criteria for dealership ownership, transfer and performance.

• Performed valuation of truck, automotive, farm equipment, and heavy construction dealerships.

• Studied dealer performance standards in demographic and geographic markets using manufacturer proprietary data and industry statistics. Analyzed industry criteria across manufacturers for dealer

performance standards and manufactures practices for ownership, transfer, and termination to determine whether such standards are reasonable and consistent with industry practices.

•   Analyzed trends in the retail/wholesale car dealership markets including rental fleet and auction house practices.

•   Work on financing issues regarding sale of enhanced products such as credit life and extended warranties, floor plans, lease operations, loan origination, packaging and securitization of prime and sub prime paper sales as well as loan service portfolio operations and costs.  Analyzed industry consolidation and profitability trends.  Performed dealership valuations.

•   Reviewed and analyzed licenses and valued technology relating to various automotive transportation technologies, including, ignition, safety, security, brake and engine components and systems and designs, micromotors, and designs and glass and battery technology, as well as breath alcohol detection and fleet logistics.

## Telecommunications

•   Performed numerous reviews and analyses of the telecommunications industry. Work performed included studies of wire line and wireless communications systems, including hardware, architecture, administration and related software. Regarding wireless systems, have reviewed and analyzed the adoption of various international protocol standards in the U.S., Europe and Asia (GSM, CDMA, TDMA, G3.0, G3.5, G4.0). Also analyzed data and voice transfer, routing, switching and networking systems, including hardware, architecture, administration and related software required to run such systems. Studied industry dynamics including telecommunications segment market shares by equipment manufacturer, investment rates, profitability and market transactions. Analyzed numerous licenses in the telecom industry. Valued telecom technology and negotiated telecom licenses.

•   Performed studies relating to wireless cellular networks including satellite broadcast systems. Analyzed cellular concessions in the US and overseas. Analyzed various satellite based communication networks for radio, television in cellular systems. Analyzed cellular tracking systems for vehicle equipment, and service and repair operations.

•   Analyzed cellular/wifi networks, speech codecs, CDMA 2000 and WCDMA essential patents in cell and smartphones, system and media management patents, application ("App") delivery and content management, touch screen technology and mobile display advertising technology for mobile devices.

## Copyrights

•   Served as court appointed expert appraiser to value proprietary software. Performed analyses relating to patent and copyright software issues for a variety of software and hardware related applications. Performed analyses relating to design specifications for hardware and software applications platforms and systems architecture involving industry specific applications. Analyzed and negotiated software licenses for numerous applications. Performed reverse engineering studies and COCOMO analysis for software applications. Performed studies relating to e-commerce including hardware and software platforms and supply chain management and financial reporting integration. Analyzed and valued software relating to mainframe data storage compartmentalization, compression and voice and data transmission.

•   Valued copyrights for a variety of proposals including financing, asset purchases, and securitization.

- Involved in and performed studies of IT systems including requirements definition studies, selection of hardware and software specifications and system implementation and conversion. Also performed studies of the economics associated with the impact of IT systems on operational and financial performance of the subject company.

- Performed numerous valuations and analyzed and determined royalties for software across a number of different applications.

- Analyzed value and licensing of copyrights relating to music, education and business.

- Analyzed software copyright damages.

**Energy/Mining**

- Involved in various oil and gas and alternate energy technology projects. Performed valuation and strategic studies regarding new and emerging energy technologies including advanced oil and gas recovery and production techniques and alternate energy sources. Testified in patent and trade secret cases involving valuation and licensing of new and emerging energy technologies. Assisted in and engaged in licensing activities relating to energy technologies.

- Analyzed various oil field technologies including: on- and offshore rig design; well pressure control systems relating to drilling, completion, workover and snubbing, and well stimulation techniques.

- Performed analyses relating to well stimulation/well enhancement technologies, including hydraulic and matrix fracturing. Also analyzed secondary and tertiary recovery techniques for well enhancement. Analyzed drilling techniques such as directional and horizontal drilling for conventional on shore and offshore applications as well as for shale and coalbed seam gas reservoir production. Valued the manufacturing operations of a coiled tubing company which supplied tubing to the oil industry.

- Involved in licensing and valuation of mining technologies.

**Bio/Pharma**

- Involved in numerous projects for pharmaceutical and biotechnology companies involving chemical compounds, biologics and recombinant therapies and treatment regimens for multiple indications. Performed valuations of companies as well as specific drugs and patents. Valued and analyzed various indications in different stages of FDA clinical trials. Assisted clients in strategy, valuation and licensing projects involving IP rights related to proprietary technology. Also quantified damages related to patent infringement matters and co-ownership rights and development agreements. Studied terms of co-development and co-marketing agreements and made recommendations to improve client economics.

- For various treatment indications studied effects of on-and-off label usage on adoption rates and impact on ANDA applications. Performed extensive studies of R&D funding (through NIH and under collaboration agreements) and analyzed lead times for next generation treatment regimens given FDA approval time line and impact on competitive market share. Studied the potential effects of march in rights on licensing of biopharma technology.

- Performed studies of the neutraceuticals (vitamins, minerals, supplements "VMS") industry including analysis of product manufacture, sourcing, packaging, labeling and distribution. Also analyzed profit margins and performed valuations of companies in this industry. Also performed studies regarding licensing practices in the VMS industry.

**Examples of biotech/pharma and related subject matters:**

- Advanced Macular Degeneration
- Allergic Rhinitis
- Anklyosing Spondylitis
- Asthma
- Blood Clotting
- Cholesterol Reduction
- Colitis
- Crohn's Disease
- Coronary Heart Disease
- Diabetes Management
- Genetically Modified Crops
- Genomic Mapping
- Hereditary Emphysema
- Human Growth Hormone
- Human Insulin
- Immuno-toxins/Immuno-therapy
- Oncology
- Otitis Media
- Psoriasis
- Receptors/Inhibitors
- Rheumatoid Arthritis
- Sepsis/Stroke/Brain Injury
- Tissue Plasminogen Activators
- Tissue Regeneration

**Medical Devices/Procedures**

- Involved in licensing, valuation, marketing studies and litigation(breach of contract, patent infringement, theft of trade secrets, etc.) related to medical devices, diagnostic equipment and procedures and surgical supplies and medical equipment related to patient treatment and rehabilitation.

**Consumer Retail**

- Performed research and analysis of trends in various consumer retail products including consumer electronics, eyewear, apparel, shoes and sports gear and equipment. Valued trademarks and other IP rights for footwear industry. Valued footwear retail operations.

**Security/Surveillance/Biometrics**

- Performed studies and analyses related to a variety of security and surveillance products ranging from artificial optic technology to various biometric systems including fingerprint, voice recognition, signature, heartbeat and optical technologies.  Work performed including valuation of these technologies and studies of industry trends including benchmarking.  Also participated in auction process to sell biometric technology for client.

**Trademarks/Lanham Act/Copyright**

- Performed studies of trademark licensing practices and valued trademarks (and portfolios) related to consumer marks including electronics, food, products, services and apparel and industrial products and financial services. Testified regarding various trademark and Lanham Act matters. Assisted clients in negotiating purchase/sale transactions related to trademark portfolios including conducting competitive and

complimentary trademark licensing and positioning studies as well as valuation of comparable marks. Performed strategies assessment of trademark portfolio maintenance practices and licensing out strategies.

•   Performed studies of corrective advertising and disgorgement of profits and other (FTC) measures of damages relating to trademark and tradedress infringement and false designation of origin and false advertising under the Lanham Act. Trademarks analyzed have included consumer and industrial products and services including consumer electronics as well as financial sector and information technology products and services. Analyzed trademark licenses and transactions involving sales of various marks. Also evaluated damages associated with false advertising, false designation of origin and unfair competition claims. Performed analyses relating to customer confusion, corrective advertising and unfair trade practices.

•   Performed valuation of copyright portfolios involving software, data management, manuals, process and procedures.

**Other IP Matters**

•   Analyzed production and distribution costs relating to educational and commercial film rights involving various media

•   Involved in and performed studies of IT systems including requirements definition studies, selection of data communication hardware and software specifications and system implementation and conversion. Also performed studies of the economics associated with the impact of IT systems on operational and financial performance of the subject company. Analyzed hardware and software requirements for multi-user configurations including WAN/LAN and internet connectivity.

•   Engaged in various IP projects involving consumer products ranging from consumer electronics and food to pet and recreational products. Pet industry work has involved valuation and licensing of IP related to food additives, pet accessories and hygenic products.

•   Performed extensive studies in the computer hardware and peripheral sector, including components. Analyzed trends in prices, volume and market share of PC manufacturers and related components including integrated circuits, chip sets, mother boards, etc.

•   Involved in a variety of projects relating to the chemical industry including processes, formulation, and compounds. Work included evaluation of lost profits and reasonable royalties, and industry licensing practices. Negotiated licenses and performed valuations relating to chemical processes compounds and formulations.

•   Performed numerous analyses regarding valuation and licensing of trade secrets technology, as well as impact on antitrust licensing guidelines.

•   Performed studies relating to product liability issues related to electronics components, consumer electronics products and consumer and industrial products. Analyzed economic impact of defective products on manufacturers, retailers and consumers. Performed studies related to cost of settlements and design and implementation of such settlements.

## Subject Area Expertise

### Valuations

Performed valuations of various businesses including minority and control blocks of closely held businesses and marketability discounts. These valuations have included valuation of non-public companies, including warrants, options and phantom stock. These valuations of businesses and assets include manufacturing, distribution, retail and services sectors, but not limited to, the following:

- Agriculture
- Biotechnology/Life Sciences
- Car/Truck Dealerships
- Distributorships/Franchises
- Energy (producing and non-producing properties)
- Entertainment
- Financial Institutions
- High-end and Consumer Electronics
- Holding Companies
- Hospitals/Nursing Homes/Medical Practices and Facilities
- Income Producing Properties

- Industrial Gases
- Maritime/Admiralty/Jones Act Matters
- Medical and Professional Practices
- Mining/Extraction
- Patents, Trademarks, Goodwill, Naming Rights, Tradedress and Copyrights
- Resorts/Recreational/Casinos Properties
- Restaurants and Retail Establishments
- Security/Surveillance
- Software
- Transportation
- Telecommunications
- Waste Disposal

## Additional Subject Area Expertise

Mr. Bratic has been engaged in numerous projects involving the subject areas listed below:

- Alter Ego/Corporate Veil
- Antitrust/Competition
- Audit, Accounting and Financial Reporting
- Bankruptcy Proceedings
- BOD Representation/Special Projects
- Business Interruption/Extra Expense/Betterment
- Compensation Studies
- Environmental and Natural Resources Damages

- Fiduciary Duty
- Fraud/White Collar Crime
- Leasing/Financial Institution
- Lender Liability
- Lost Profits
- Mergers and Acquisitions
- Personal Injury/Wrongful Termination/Wrongful Death
- Product Liability
- Securities Matters

### Recent Speeches

"Economic Damages in Trademark Litigation" *University of Houston Law School*, November 10, 2016.

"Lanham Act Damages" *University of Houston Law School*, April 21, 2016.

"Trade Secret Damages" *University of Houston Law School*, March 29, 2016.

"Economic Damages in Trade Secrets Litigation" *University of Houston Law School,* April 21, 2015.

"Economic Damages in Trade Secrets Litigation" *University of Houston Law School,* April 15, 2014.

"Economic Damages in Trademark Litigation" *University of Houston Law School*, February 27, 2014.

"Financial Statement Analysis – Accounting for Lawyers" Andrews Myers P.C., February 4, 2013.

"Economic Damages in Trademark Litigation" *University of Houston Law School*, November 20, 2012.

*"Economic Damages in Trade Secrets Litigation" University of Houston Law School,* April 4, 2012.

"Economic Damages in Trademark Litigation" *University of Houston Law School*, November 8, 2011.

"Determination of Post Judgment Royalties and Damages Issues from Uniloc" co-presented CLE program at Locke Lord Bissell & Liddell, May 2011.

"Economic Damages in Trade Secrets Litigation" *University of Houston Law School*, March 29, 2011.

"Economic Damages in Trademark Litigation" *University of Houston Law School*, November 18, 2010.

"Economic Damages in Trade Secrets Litigation" *University of Houston Law School*, April 7, 2010.

"Economic Damages in Trademark Litigation" *University of Houston Law School*, November 17, 2009.

"Economic Damages in Trade Secrets Litigation" *University of Houston Law School*, April 23, 2009.

"Economic Damages in Trademark Litigation" University of Houston Law School, October 27, 2008.

"Managing Intellectual Assets Hypothetical" Licensing Executive Society Australia Annual Conference, April 19, 2008.

"Patent Damages " George Mason/The University of Texas School of Law, 2008 Advanced Patent Law Institute, Alexandria, Virginia, January 11, 2008.

"Economic Damages in Trademark Litigation" University of Houston Law School, October 16, 2007.

"Taking a New Look at Patent Pools: Use and Abuse", "The Subtleties and Complexities of Valuing Emerging Technology" and "Win/Win Strategies for Successful International Technology Collaboration and Exploitation" Institute of Intellectual Property Research and Development, India, August 6-8, 2007.

"Strategic Litigation/Arbitration Considerations in Negotiating and Drafting Global License Agreements" Licensing Executive Society International Conference, June 18, 2007.

"Economic Damages in Trade Secrets Litigation" University of Houston Law School, April 26, 2007.

"Win/Win Strategies for Successful International Technology Collaboration and Exploitation" IPTEC-The International Marketplace and Conference for Technology Transfer Professionals, February 2007.

"Economic Damages in Trademark Litigation." University of Houston Law School, November 8, 2006.

"The Subtleties and Complexities of Valuing Emerging Technology." Licensing Executive Society Scandinavia Annual Conference, September 2006.

"Determining Economic Damages in Trade Secret Litigation." University of Houston Law School, April 13, 2006.

"Emerging Valuation Techniques in Technology Transfer." IPTEC-The International Marketplace and Conference for Technology Transfer Professionals, February 2006.

"Taking a New Look at Patent Pools: Use and Abuse." Licensing Executive Society Annual Conference, October 2005.

"Win/Win Strategies for successful International Technology Joint/Ventures-Partnership." Licensing Executive Society International Conference, June 2005.

"Determining Economic Damages in Trade Secrets Litigation." Continuing Legal Education Program sponsored by the State Bar of Texas, May 19–20, 2005.

"Employing and Circumventing the New Business and Future Damages Rule: How Certain Does Certain Have to Be?" University of Texas School of Law - The Damages Institute, October 2004.

"Damages in Cases Involving Cutting Edge Technologies." Law Seminars International-Calculating & Proving Patent Damages, Reston, Virginia, June 14, 2004.

"Economic Issues in Trademark Damages." University of Houston Law School, April 13, 2004.

"Treatment of IP Related to Standard." Licensing Executive Society 2004 International Conference, Paris, France, March 31, 2004.

"When Good Relationships Go Bad: Managing Default and Termination." American Conference Institute, Advanced Forum on Licensing Intellectual Property, December 9, 2003.

"Evolving Techniques in IP Portfolio Strategies: What Works?" The University of Texas School of Law, 8th Annual Advanced Patent Law Institute, Austin, Texas, October 31, 2003.

"Current Topics in IP Licensing and Litigation." Patent Lawyers Club of Washington & Northern Virginia, Reston, Virginia, September 8, 2003.

"Licensing and Competition: FTC/DOJ Views." LES Washington, DC Chapter, Washington, DC, May 2003.

"IP Valuation: Real World Transactions vs. Litigation." General Electric Crotonville IP Practice Group Meeting, Ossining, New York, April 2003.

"IP Valuation: Real World Transactions vs. Litigation." Berkeley Center for Law & Technology and The University of Texas School of Law, 3rd Annual Advanced Patent Law Institute, San Jose, California, December 6, 2002.

"Continuing Evolution of Patent Damages." The University of Texas School of Law, 7th Annual Advanced Patent Law Institute, Austin, Texas, November 1, 2002.

"IP Valuation: Real World Licenses v. The Hypothetical License in Litigation." Patent Lawyers Club of Washington & Northern Virginia, Reston, Virginia October 28, 2002.

"Monetizing IP Investments in Early Stage Companies and Start Ups in a Down Economy." Berkeley Center for Law & Technology and The University of Texas School of Law, 2nd Annual Advanced Patent Law Institute, San Jose, California, December 7, 2001.

"Complex IP Valuation and Securitization." The University of Texas School of Law, 6th Annual Advanced Patent Law Institute, Austin, Texas, November 2, 2001.

"Intellectual Property Damages in U.S. Litigation." Intellectual Property Forum 2001, London, June 18, 2001.

"Valuing the Trade Secret, Proving the Damages and Getting the Best Award." American Conference Institute, New York, New York, June 7, 2001.

"Advanced IP Valuation Methodologies." Licensing Executives Society 2001 Annual Conference, South Africa, April 30, 2001.

"Evolution of Patent Damages after Rite-Hite and Royalties Under Standard Setting Organizations: What's Fair, Reasonable and Non-Discriminatory?" Association of Corporate Patent Counsel (ACPC) Winter Meeting, Key Largo, Florida, February 6, 2001.

"Do's and Don'ts for Successful International Technology Exploitation." Licensing Executives Society 2000 Annual Meeting, Toronto, Canada, September 11, 2000.

"Convoyed Sales." Patent Section-Bar Association of the City of New York, April 2000.

"Patent Damages, Recent Developments & Emerging Trends." Intellectual Property Owners' Association 1999 Annual Meeting, San Francisco, California, November 15–16, 1999.

"Trade Secret Exploitation Opportunities." Licensing Executives Society 1999 Annual Meeting, San Antonio, Texas, October 27, 1999.

"Strategic Management of Intellectual Property." DuPont 1999 CLE Intellectual Property Law Seminar, Wilmington, Delaware, October 25, 1999.

"Establishing Your Claim For Damages—Proving and Calculating Your Loss." Multi-Jurisdictional Patent Litigation, London, England, September 23–24, 1999.

"Intellectual Property Due Diligence in Business Transactions." Association of the Bar, New York, New York, April 16, 1999.

"Advantages and Economic and Financial Impact of Intangibles: The Importance of Valuation of Intellectual Property." INDECOPI Seminario Internacional sobre Valorización de la Propiedad Intelectual, Lima, Peru, November 19–20, 1998.

"The Real Cost of Counterfeiting." International Anti-Counterfeiting Coalition Conference, Global Anti-Counterfeiting—Black and White and the Big Gray Zone in Between, Santa Monica, California, October 18–20, 1998.

"Successful Licensing/Joint Ventures Strategies: Extending the Lifeline to Development Stage Biotech Companies." Maximizing Genomic Growth Conference, New York, May 1998.

"Value and License Drivers: From the Crossroads to the Monte Carlo Grand Prix." Licensing Executives Society Winter Meeting, Newport Beach, California, February 1998.

"Strategically Managing Your Intellectual Property Portfolio." Intellectual Property Institute for Corporate Counsel Conference, San Francisco, California, January 1998.

"Royalty Rates: What's Reasonable." DuPont Intellectual Property Conference, Wilmington, Delaware, October 1997.

"Management Strategies for Handling IP Assets." InfoNex Intellectual Property Conference, Toronto, 1997.

"Preparing for Software Licensing Negotiations." Licensing Executives Society Mid-Winter Conference, 1997.

"Preparing for License Negotiations." Association of Corporate Patent Counsel Mid-Year Meeting, 1996.

**Publications**

"Valuation of Early-Stage Pharmaceutical Companies." Thomson Reuters Valuation Strategies, May/June 2014.

"Considerations for Start-Up Biotech Company Valuation." Journal of Commercial Biotechnology, April 2014.

"How Patent Pools Can Avoid Competition Concerns." Managing Intellectual Property, May 2005.

"Standards Setting Under the Microscope." Managing Intellectual Property, October 2004.

"Measuring Intellectual Property Portfolio Performance." A chapter in the book, From Ideas to Assets, published by John Wiley & Sons, Inc., Copyright © 2002.

"Emerging Issues in Research Tool Licensing." Journal of Commercial Biotechnology, Autumn 2001.

"Trade Secrets and Patents: Comparison and Contrast in Royalty Determination." Les Nouvelles, September 2000.

"Software Licensing Strategies." Austin Software Counsel, 1996.

"Biotech Valuations." Biotechnology Conference BIO '96, 1996.

"Why Trade Secrets Can Be So Valuable." Les Nouvelles, December 1999.

"The value of trade secrets." Managing Intellectual Property, October, 1999.

"Potentially Devastating Events: How Three Companies Managed and Survived a Crisis." Corporate Reputation Review, Henry Stewart Publications, Summer 1999.

"Identify and Convey IP to Reveal True Firm Value." Hidden Value Profiting from the Intellectual Property Economy, Euromoney Publications, Summer 1999.

"US University Technology Transfer Trends—A Regional Analysis." Journal of Commercial Biotechnology, Autumn 1998.

"What Makes a Biotech Company Valuable?" Managing Intellectual Property, November 1998.

"Business Discovers the Value of Patents." Managing Intellectual Property, September 1998.

"Accounting for Change: Creating New Strategic Alliances." Law Governance Review, Summer 1998.

"Monte Carlo Analyses Aid Negotiation." Les Nouvelles: Journal of the Licensing Executive Society, June 1998.

"It's All in Your Head: The Promise of Intellectual Property." Texas Business Review, Bureau of Business Research, University of Texas at Austin, June 1998.

"Biotechnology and La Frontera Nueva: Business and Intellectual Property Issues in Latin America." Journal of Biotechnology in Healthcare: Research and Regulation, Spring 1998.

"Navigating Through a Biotechnology Valuation." Journal of Biotechnology in Healthcare: Research and Regulation.

"Strategic Management of Intellectual Property." Law Governance Review, Winter 1998.

"Showing Irreparable Harm During Preliminary Injunction Hearings." IP Litigator, March/April 1997.

"Thinking About Intellectual Property: Vast Potential, Management Required." PW Review, June 1996.

"Documents and Discovery in Intellectual Property Cases: The Law Works." October 1995.

"Computers and Electronic Spreadsheets." Legal Tech Newsletter, 1986.

Exhibit 2



# V. WALTER BRATIC
**3737 Buffalo Speedway Suite 1600**
**Houston, Texas  77098**
**713-403-3307**

**Testimony during the Past Four Years**

COURT PROCEEDINGS

United States District Court for the Eastern District of Texas Marshall Division
- Alfonso Cioffi, an individual, and The Estate of Allen Rozman v. Google, Inc.
  Case No. 2:13-CV-103
  Filed 12.11.12

United States District Court of Dallas County, Texas
- Centego II, LLC v. Metrosplash Systems Group, Inc. and Philip S. Babick, Individual
  Case No. DC-14-07297
  Filed 07.10.14

United States District Court for the Eastern District of Texas Marshall Division
- Mobile Telecommunications Technologies, LLC v. HTC America
  Case No. 2:13-cv-00948
  Filed 11.07.13

In the Superior Court of the State of California For the County of San Diego
- Hooman Asbaghi and HBA Medical Group, Inc. vs. Neil K. Nydeggar; Nydeggar & Associates, and DOES 1 -20
  Case No. 37-2013-00066639-CU-PN-CTL
  Filed 09.10.13

In the United States District Court for the Northern District of Texas Dallas Division
- Mobile Telecommunications Technologies, LLC v. Research in Motion Corporation
  Case No. 3:12-cv-01652-M
  Filed 05.29.12

In the United States District Court Southern District of Florida
- Arctic Cat Inc. v. Bombardier Recreational Products Inc. and BRP U.S. Inc
  Case No. 0:14-cv-62369
  Filed 10.16.14

In the United States District Court 68th Judicial District Dallas County, Texas
- Continental Intermodal Group - South Texas LLC v. Eloy P. Garcia Balcones Muster, Inc.,
  Case No. DC-14-07993
  Filed 07.26.14

In the United States District Court for the Western District of Tennessee
- Ronald A. Katz Technology Licensing L.P. v. <u>FEDEX Corporation, Federal Express Corporation, FEDEX Corporate Services, Inc., and FEDEX Customer Information Services, Inc.,</u>
  Case No. 2:15-cv-02329
  Filed 05.18.15

In the United States District Court for the Western District of Oklahoma
- <u>Core Laboratories LP</u> v. Spectrum Tracer Services, L.L.C., Steve Faurot, and Kelly Bryson
  Case No. 5:11-CV-01157
  Filed 10.18.11

In the United States District Court for the Western District of Michigan
- <u>Stryker Corporation</u>, a Michigan corporation; Howmedica Osteonics Corp., a New Jersey corporation v. Christopher Ridgeway, an individual; Richard Steitzer, an individual; Biomet, Inc., an Indiana corporation
  Case No. 1:13-CV-1066
  Filed 09.30.13

American Arbitration Association
- Village Lindo Paseo, LP, v. <u>Campus Advantage, Inc.</u>
  Case No. 01-14-0001-3383

American Arbitration Association
- McKool Smith, P.C., v. <u>Versata Software, Inc., Versata Development Group, Inc., and Versata Computer Industry Solutions, Inc.</u>
  (EDTX, Marshall)
  Case No. 2:07-CV-153-RSP
  Filed 04.20.07

In the United States District Court for the Southern District of Texas Houston Division
- <u>Quantlab Technologies Ltd. (BVI) and Quantlab Financial, LLC</u> v. Vitaliy Godlevsky, Andriy Kuharsky, Anna Maravina, Ping An, Emmanuel Mamalakis, and SXP Analytics, LLC
  Civil Action No. 4:09-cv-4039
  Filed 12.18.09

Alternative Arbitration Association
- Hospira, Inc., and Hospira Healthcare Corporation v. <u>ICU Medical Sales, Inc.</u>

American Arbitration Association
- <u>ICU Medical, Inc.</u> v. Flextronics Medical Sales and Marketing, Ltd., Flextronics America LLC, and Flextronics International Ltd.

United States District Court Western District of Texas Austin Division
- <u>Masakazu Ushijima</u> v. Samsung Electronics Co., Ltd, and Samsung Electronics America, Inc.
  Case No. 1:16-CV-585
  Filed 05.18.16

In the Court of Chancery of the State of Delaware
- <u>OptimisCorp, Alan Morelli and Analog Ventures, LLC</u> v. John Waite, William Atkins, Gregory Smith and William Horne
  Case No. CA8773
  Filed 08.05.13

United States District Court for the Eastern District of Texas Marshall Division
- <u>Mobile Telecommunications Technologies, LLC</u> v. Samsung Telecommunications America, LLC
  Civil Action No. 2:15-cv-00183
  Filed 02.09.15

In the District Court of Nueces County, Texas 28th Judicial District
- <u>Lilly Helene Shaffer, M.D.</u> v. Nationwide Mutual Insurance Company, et al.
  Civil No. 13-11-00503-cv
  Filed 07.28.11

United States District Court for the Eastern District of Texas Marshall Division
- <u>Mobile Telecommunications Technologies, LLC</u> v. Apple, Inc.
  Civil Action No. 2:13-CV-00258
  Filed 04.02.13

In the United States District Court for the Eastern District of Texas Sherman Division
- <u>Raytheon Company</u> v. Indigo Systems Corporation and Flir Systems, Inc.
  Case No. 4:07-cv-109
  Filed 03.02.07

In the United States District Court for the Middle of District of Florida Tampa Division
- <u>PODS Enterprises, Inc.</u> v. U-Haul International, Inc.
  Case No. 8:12-cv-01479-T-27MAP
  Filed 07.03.12

United States District Court for the Western District of Texas Austin Division
- <u>DDB Technologies L.L.C.</u> v. Fox Sports Interactive Media, LLC, et al.
  Cause No. A-11-CV-1014-LY
  Filed 11.24.11

Arbitration
- Eagle Operating, Inc. v. <u>Williston Hunter N.D., LLC</u>
  Case No. 4:11-CV-00066
  Filed 08.19.11

In the United States District Court for the Southern District of Texas Houston Division
- Macro Niche Software, Inc.; R/Med, Inc. and Michael J. Ruthemeyer v. 4 Imaging Solutions, LLC, Protech Leaded Eyewear, Inc., Mark Struthers, Debbie Starr, and <u>Imaging Solutions of Australia</u>
  Case No. 4:12-cv-02293
  Filed 08.01.12

In the District Court of Harris County, Texas 269th Judicial District
- Russell M. Peck v. <u>CPaT, Inc., and Brent A. Birdwell</u>
  Case No. 2013-02986
  Filed 01.16.13

American Arbitration Association, International Centre for Dispute Resolution in the Matter of the Arbitration Between
- Chevron U.S.A. Inc. v. <u>Sabine Pass LNG, L.P..</u>
  Case No. 50198 T 00902 12

In the District Court of Clark County, Nevada
- <u>Richard Suen and Round Square Company Limited</u> v. Las Vegas Sands, Inc.
  Case No. 04A493744
  Filed 10.15.04

In the United States District Court for the Eastern District of Texas Marshall Division
- <u>Hitachi Consumer Electronics Co., Ltd., et al.</u> v. Top Victory Electronics (Taiwan) Co. Ltd., et al.
  Cause No. 2:10-CV-260-JRG
  Filed 07.22.10

In the United States District Court for the District of Delaware
- <u>XpertUniverse, Inc.</u> v. Cisco Systems, Inc.
  Civil Action No. 09-157-RGA
  Filed 03.10.09

In the District Court of Harris County, Texas 61st Judicial District
- <u>Structure Consulting Group LLC</u> v. Corey Berg, M. Daryl Cote, Brent Kassing, Jennifer Mihalic, Julia Prybys, and Stacy Rodgers
  Cause No. 2010-69070
  Filed 10.18.10

In the District Court of Harris County, Texas 129th Judicial District
- Cudd Pressure Control, Inc. v. <u>Ronnie Roles, et al.</u>
  Cause No. 2006-70697
  Filed 11.02.06

In the United States Court for the Northern District of Texas Dallas Division
- Reaux Medical Industries, LLC a Texas Limited Liability Company v. <u>Stryker Corporation, a Michigan Corporation</u>, Racing Optics, Inc., a California Corporation
  Civil Action No. 3:12-cv-03685-M
  File 09.11.12

American Arbitration Association
- Halliburton Company, and Halliburton Energy Services, Inc. v. <u>BJ Services Company</u>
  Case No. 2:08-cv-00475

In the District Court of Travis County, Texas 419th Judicial District
- Alexsam, Inc. v. <u>Netspend Corporation</u>
  Cause No. D-1-GN-07-003659
  Filed 10.24.07

In the United States District Court for the Eastern District of Texas Tyler Division
- <u>Internet Machines LLC</u> v. Alienware Corporation, et al.
  Case No. 6:10-cv-23
  Filed 02.02.10

The Circuit Court of the 11th Judicial District in and for Miami-Dade County, Florida
- <u>St. Jude Medical S.C., Inc.</u> v. Medtronic USA, Inc.
  Case No. 2010-007896-CA-01
  Filed 02.05.10

In the United States District Court for the Southern District of Texas Houston Division
- <u>Transocean Offshore Deepwater Drilling, Inc</u>. v. Maersk Contractors USA, Inc.
  Civil Action No. 4:07-cv-02392
  Filed 07.24.07

In the District Court of Nueces County, Texas, 28th Judicial District
- <u>Lilly Schaffer, M.D.</u> v. Brady Keith Lovins, Tracey Barrett, d/b/a Barrett Pools, Nationwide
  Mutual Insurance Co., and Nationwide Property and Casualty Insurance Co.
  Case No. 07-02035-00-0-A
  Filed 04.18.07

In the United States District Court for the Northern District of Georgia Atlanta Division
- Insituform Technologies, Inc., et al v. Amerik Supplies, Inc., et al v. <u>Cosmic-</u>
  <u>Sondermaschinenbau GMBH, et al.</u>
  Case No. 1:08-cv-00333
  Filed 01.30.08

In the United States Bankruptcy Court for the Eastern District of Virginia Alexandria Division
- In re: Qimonda AG, Debtor in a Foreign Proceeding <u>(Represented Objector, Micron, Inc.)</u>
  Case No. 1:09-bk-14766
  Filed 06.15.09

## DEPOSITIONS

In the United States District Court For the Eastern District of Texas Marshall Division
- <u>Effective Exploration, LLC</u> v. Bluestone Natural Resources II, LLC
  Case No. 2:16-CCV-00607-JRG-RSP
  Filed 6.08.16

In the County Court of Law of Kendall County, Texas
- <u>Massandra Capital, LLC v. Windmill IV Partners, LLC ,Windmill IV Manager, LLC, Windmill</u>
  <u>VI Investments, LLC, f/k/a Windmill IV Investments, LLC, PCSM Management, LLC, CP</u>
  <u>Boerne I, LLC, CP Boerne II, LLC and CF Commercial Brokerage, LLC d/b/a Sana Antonio</u>
  <u>Commercial Advisors</u>
  Case No. 14-587CCL
  Filed 6.25.15

In the United States Bankruptcy Court Northern District of Texas Fort Worth Division
- DSI Lending Resources, Inc., v. <u>The PLS Loan Store of Texas, Inc., PLS Financial, Inc., and</u>
  <u>PLS Financial Solutions of Illinois, Inc</u>
  Case No. 01-16-0001-5021
  Filed 9.22.16

In the United States District Court Northern District of Texas Dallas Division
- <u>Ilife Technologies,</u> Inc., v. Nintendo of America, Inc.,
  Case No. 3:13-cv-04987-M
  Filed 12.23.13

In the United States District Court for the Eastern District of Texas Tyler Division
- <u>Evicam International, Inc.,</u> v. Enforcement Video, LLC d/b/a Watchguard
  Cause No. 6:15-cv-01043
  Filed 11.24.15

In the District Court for the Southern District of New York (Foley Square)
- Infinity Headwear & Apparel, LLC, an Arkansas limited liability company v. <u>Jay Franco & Sons, Inc., a New York corporation and Jay at Play, Int'l HK Ltd., a Hong Kong limited company</u>
  Case No. 1:15-cv-01259 (JPO)(RLE)
  Filed 02.20.15

United States District Court For The Western District of Texas Austin Division
- <u>Intellectual Ventures II LLC</u> v. AT & T Inc., et al
  Case No. 13-cv-00116-LY
  Filed 02.08.13

United States District Court Middle District of Florida Orlando Division
- Sreenivasan Asokan, Chakravarthy Raghavan, Nanni Pidikiti, Rakesh Parekh, Ram Reddy, Madhubala Reddy, and Roger Lodge et. al. v. <u>American General Life Insurance Company</u>, a Texas company and subsidiary of American International Group, Inc ("AIG") ; and Does 1 - 50
  Case No. 6:15-cv-2048
  Filed 12.04.15

Private Arbitration
- DSI Lending Resources, Inc. v. <u>The PLS Loan Store of Texas, Inc., PLS Financial, Inc., and PLS Financial Solutions of Illinois, Inc. Formerly Payday Loan Store of Illinois, Inc.</u>
  Case No. 01-16-0001-5021
  Filed 4.26.16

In the United States District Court for The Western District of Texas San Antonio Division
- <u>Live Face on Web, LLC, a Pennsylvania Company</u> vs. Daniel Moreno, Individually and d/b/a Full Service Vending Co.
  Case No. 5:15-cv-00539-OLG
  Filed 07.02.15

In the District Court of Leon County, Texas 369th Judicial District
- Linda Singleton, Individually and as the Independent Administrator of The Estate of <u>Alfred A.Singleton</u>, Deceased; Leighia Ardorin; and Angelia Williams v. Laronte D. Blance and Rockin D. Driveways, Inc.
  Cause No. AP-15-405
  Filed 09.28.15

In the United States District Court for the District of Delaware
- <u>Intellectual Ventures I LLC</u> v. AT& T Mobility LLC, AT&T Mobility II LLC, and New Cingular Wireless Services, Inc. (Defendants); and Ericsson Inc. and Telefonaktiebolaget LM Ericsson (Intervenors)
  Civil Action Nos. 13-1668-LPS and 13-669-LPS
  Filed 10.07.13

In the United States District Court for the District of Delaware
- <u>Intellectual Ventures I LLC</u> v. T-Mobile USA, Inc. and T-Mobile US, Inc. (Defendants); and Ericsson Inc. and Telefonaktiebolaget LM Ericsson (Intervenors),
  Civil Action Nos. 13-1671-LPS
  Filed 10.07.13

In the United States District Court for the District of Delaware
- <u>Intellectual Ventures I LLC</u> v. Nextel Operations, Inc. and Sprint Spectrum L.P. (Defendants); and Ericsson Inc. and Telefonaktiebolaget LM Ericsson (Intervenors),
  Civil Action Nos. 13-670-LPS
  Filed 10.07.13

In the United States District Court for the District of Delaware
- <u>Intellectual Ventures I LLC</u> v. United States Cellular Corporation (Defendant); and Ericsson Inc. and Telefonaktielbolaget LM Ericsson (Intervenors),
  Civil Action No. 13-1672-LPS
  Filed 10.07.13

In the United States District Court for the District of Delaware
- <u>Intellectual Ventures I LLC and Intellectual Ventures II LLC</u> v. United States Cellular Corporation
  Civil Action No. 13-1672-LPS
  Filed 10.07.13

In the United States District Court for the District of Delaware
- <u>Intellectual Ventures I LLC</u> v. Nextel Operations, Inc. and Sprint Spectrum L.P., and Ericsson Inc. and Telefonaktiebolaget LM Ericsson
  Case No. 13-1670-LPS
  Filed 09.26.14

In the United States District Court for the District of Delaware
- <u>Intellectual Ventures I LLC</u> v. Nextel Operations, Inc. and Sprint Spectrum L.P., and Ericsson Inc. and Telefonaktiebolaget LM Ericsson
  Case No. 13-1670-LPS
  Filed 09.26.14

In the United States District Court Southern District of Texas Houston Division
- <u>Transocean Offshore Deepwater Drilling, Inc.</u> v. Seadrill Americas Inc., Seadrill Gulf Operations Auriga LLC, Seadrill Gulf Operations Vela LLC, Seadrill Gulf Operations Neptune LLC.
  Case No. 4:15-cv-00144
  Filed 08.31.15

In the United States District Court for the District of Delaware
- <u>Intellectual Ventures I LLC and Intellectual Ventures II LLC</u> v. AT&T Mobility LLC; AT&T Mobility II LLC; and New Cingular Wireless Services, Inc.
  Civil Action Nos. 12-cv-193-LPS and Civil Action Nos. 13-cv-1631-LPS
  Filed 10.07.13

In the District Court of Harris County, Texas
- <u>Apache Corporation;</u> Apache Natural Resources Petrolera Argentina S.R.L. et al v. Pioneer Natural Resources Company; Pioneer Natural Resources Canada, Inc.; and Pioneer Canada ULC
  Case No. 2014-64407 / Court 189
  Filed 10.31.14

United States District Court for the Eastern District of Texas Marshall Division
- <u>Alfonso Cioffi, an individual, Melanie Rozman, an individual, Megan Rozman, an individual an Morgan Rozman, an individual</u> v. Google, Inc.
  Case No. 2:13-cv-00103
  Filed 02.07.13

United States District Court for the Eastern District of Texas Marshall Division
- <u>Mobile Telecommunications Technologies, LLC</u> v. HTC America
  Case No. 2:13-cv-00948
  Filed 11.07.13

In the United States District Court Eastern District of Texas Tyler Division
- <u>TracBeam, LLC</u> v. T-Mobile US, Inc., et al.
  Case No. 6:13-cv-00093
  Filed 08.08.14

In the United States District Court for the District of Delaware
- <u>Intellectual Ventures I LLC and Intellectual Ventures II LLC</u> v. T-Mobile USA, Inc. and T-Mobile US, Inc.
  Case No. 1:13-cv-01633-LPS and  Case No. 1:13-cv-01632-LPS
  Filed 02.16.12

In the District Court Dallas County, Texas 298th Judicial District
- <u>Centego II, LLC</u> v. Metrosplash Systems Group, Inc. and Phillip S. Babick
  Case No. DC-14-07297
  Filed 07.10.14

United States District Court District of Minnesota
- <u>Plasti Dip International, Inc.</u> v. Rust-Oleum Brands Company and Rust-Oleum Corporation
  Case No. 0:14-cv-01831
  Filed 06.06.14

United States District Court Northern District of Georgia Atlanta Division
- <u>HCC Insurance Holdings, Inc.,</u> v. Valda Flowers, Michael Remeika and Creative Risk Underwriters, LLC
  Case No. 1:15-cv-03262
  Filed 09.16.15

United States District Court for the Central District of California
- <u>Ulti-mate Connectors, Inc.;</u> Bruce L. Billington; Thierry Pombart; and Stephen R. Brockman, on behalf of themselves and all others similarly situated, v. American General Life Insurance Company; Sea Nine Associates, Inc.; Innovative Private
  Case No. 8:14-cv-01051
  Filed 07.09.14

United States District Court for the Eastern District of Pennsylvania
- <u>Red Online Marketing Group, LP</u>, d/b/a 50onRED v. Revizer LTD
  Civil Action No. 14-cv-1353
  Filed 03.06.14

United States District Court for the Eastern District of Texas Marshall Division
- Mobile Telecommunications Technologies, LLC v. Samsung Electronics Co., LTD., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC
  Case No. 2:13-cv-00259
  Filed 04.02.13

In the United States District Court Harris County 234th Judicial District
- Vincent Anthony Matassa and Adam Henry Robinson v. Brightoil Petroleum (USA) Inc.
  Cause No. 2012-37056
  Filed 06.26.12

In the Superior Court of New Jersey Law Division Ocean County
- Joseph Fleischman v. Direct Energy, Gateway Energy Services Corporation, ABC Corp 1-10
  Case No. L00263813
  Filed 09.18.13

In the United States District Court for the Northern District of Texas
- Mobile Telecommunications Technologies, LLC v. BlackBerry Corporation
  Civil Action No. 3:12-cv-1652-M
  Filed 05.29.12

In the United States District Court for the Western District of Michigan
- Stryker Corporation, a Michigan corporation; Howmedica Osteonics Corp., a New Jersey Corporation v. Christopher Ridgeway, an individual; Richard Steitzer, an individual; Biomet, Inc., an Indiana corporation
  Case No. 1:13-CV-1066
  Filed 09.30.13

In the United States District Court for the Western District of Oklahoma
- Core Laboratories LP v. Spectrum Tracer Services, L.L.C., Steve Faurot, and Kelly Bryson
  Case No. 5:11-CV-01157
  Filed 10.18.11

American Arbitration Association, San Diego, California
- Village Lindo Paseo, LP v. Campus Advantage, Inc.
  Case No. 01-14-0001-3383

In the United States District Court for the Southern District of Texas Houston Division
- Tess AS v. Charles D. Pate, Joanna C. Pate, Mike Pate, and CJP Real Estate, LLC
  Civil Case No. 4:14-cv-01557
  Filed 06.04.14

Superior Court of California County of San Diego
- Hooman Asbaghi and HBA Medical Group, Inc. v. Neil K. Nydegger; Nydegger & Associates
  Case No. 37-2013-00066639-CU-PN-CTL
  Filed 09.10.13

United States District Court for the Western District of Tennessee
- Ronald A. Katz Technology Licensing L.P. v. FEDEX Corporation, Federal Express Corporation, FEDEX Corporate Services, Inc., and FEDEX Customer Information Services, Inc.
  Case No. 2:15-cv-02329
  Filed 05.18.15

In the United States District Court District of Utah, Central Division
- <u>N8 Medical, Inc., and Brigham Young University</u> v. Colgate-Palmolive Company
  Case No. 2:13-cv-01017
  Filed 11.12.13

In the United States District Court for the Southern District of Texas Houston Division
- <u>Lennar Homes of Texas Sales and Marketing, Ltd.</u> v. Perry Homes, LLC
  Civil Action No. 4:14-cv-01094
  Filed 04.21.14

American Arbitration Association
- McKool Smith, P.C., v. <u>Versata Software, Inc., Versata Development Group, Inc., and Versata Computer Industry Solutions, Inc.</u>
  (EDTX)
  Case No. 2:07-CV-153-RSP
  Filed 04.20.07

United States District Court Central District of California
- <u>FarStone Technology, Inc.</u> v. Apple, Inc.
  Civil Case No. 8:13-cv-01537-ODW (JEMx)
  Filed 09.30.13

United States District Court for the Eastern District of Texas Marshall Division
- <u>Mobile Telecommunications Technologies, LLC</u> v. Leap Wireless International, Inc. and Cricket Communications, Inc.
  Civil Case No. 2:13-cv-00885
  Filed 10.30.13

United States District Court for the Eastern District of Texas Marshall Division
- <u>Mobile Telecommunications Technologies, LLC</u> v. LG Electronics Mobilecomm U.S.A., Inc.
  Civil Case No. 2:13-CV-00947
  Filed 11.07.13

In the United States District Court for the Eastern District of Texas Lufkin Division
- <u>Allure Energy, Inc.</u> v. Nest Labs, Inc., Green Mountain Energy Company, and Reliant Energy Retail Holdings, LLC
  Civil Case No. 9:13-cv-00102
  Filed 05.14.13

In the District Court of Harris County, Texas 281st Judicial District
- Airport Holdings I, L.L.C. and Airport Holdings II, L.L.C. v. <u>Elford Building Corporation and John Elford, et al.</u>
  Case No. 2013-49851
  Filed 08.23.13

United States District Court for the Eastern District of Texas Marshall Division
- <u>Mobile Telecommunications Technologies, LLC</u> v. Amazon.com, Inc.
  Civil Case No. 2:13-CV-883-JRG-RSP
  Filed 10.29.13

In the United States District Court for the Northern District of Illinois Eastern Division
- Intercontinental Great Brands LLC v. Kellogg North America Company, Kellogg USA Inc., Keebler Company, Keebler Foods Company, and Kellogg Sales Company
  Case No. 1:13-cv-00321
  Filed 01.16.13

In the United States District Court for the Western District of Texas San Antonio District
- AT&T Corp. v. Park I-10 Motors, Inc.
  Case No. 5:13-cv-00644-XR
  Filed 07.16.13

United States District Court Western District of Texas Austin Division
- Masakazu Ushijima v. Samsung Electronics Co., Ltd, and Samsung Electronics America, Inc.
  Civil Case No. 1:12-CV-00318
  Filed 04.10.12

In the United States District Court for the Eastern District of Virginia Alexandria Division
- Intelligent Verification Systems, LLC v. Microsoft Corporation and Majesco Entertainment Co.
  Civil Case No. 2:12-CV-525
  Filed 09.20.12

United States District Court for the Northern District of Georgia Atlanta Division
- Mobile Telecommunications Technologies, LLC v. United Parcel Services, Inc.
  Civil Case No. 1:12-CV-03222
  Filed 09.14.12

In the District Court of Harris County, Texas 165th Judicial District
- Realty Holdings of Katy, LLC and Kemosabe Motors, L.P. D/B/A Honda Cars of Katy v. Cypress Equities LLC, et al.
  Case No. 200976361-7
  Filed 11.25.09

In the Court of Chancery of the State of Delaware
- OptimisCorp, Alan Morelli, and Analog Ventures, LLC v. John Waite, William Atkins, Gregory Smith and William Horne
  Case No. CA8773
  Filed 08.05.13

United States District Court for the Eastern District of Texas Marshall Division
- Mobile Telecommunications Technologies, LLC v. Samsung Telecommunications America, LLC
  Case No. 2:13-cv-00259
  Filed 04.02.13

United States District Court for the Eastern District of Texas Marshall Division
- Mobile Telecommunications Technologies, LLC v. Apple, Inc.
  Case No. 2:13-CV-00258
  Filed 04.02.13

In the United States District Court for the Northern District of Texas Fort Worth Division
- <u>Heil Trailer International, Co.</u> v. Gavin Kula, Jerry Davis, Robert Troxell, William Lyman and Troxell Company, Inc.
  Case No. 4:12-CV-00385
  Filed 06.11.12

In the United States District Court for the Eastern District of Texas Tyler Division
- <u>Profectus Technology LLC</u> v. Huawei Technologies Co., Ltd., et al.
  Case No. 6:11-CV-00474
  Filed 09.09.11

In the District Court Dallas County, Texas 298th Judicial District
- <u>Newton Research Partners, L.P.</u> v. Shell Exploration & Production, Company; Shell Oil Company, et al.
  Case No. DC-07-13697
  Filed 11.20.07

United States District Court for the District of Delaware
- <u>Nonend Inventions N.V.</u> v. Spotify USA Inc., et al.
  Case No. 1:13-CV-00389
  Filed 03.08.13

United States District Court for the Southern District Court of Texas Houston Division
- Jay Martin Barrash, M.D. v. <u>American Association of Nuerological Surgeons, Inc.</u>
  Case No. 4:13-CV-01054
  Filed 04.11.13

United States District Court Northern District of California Oakland Division
- <u>U.S. Ethernet Innovations, LLC</u> v. Acer, Inc., et al.
  Case No. 4:10-CV-03724
  Filed 08.23.10

In the United States District Court for the Eastern District of Texas Marshall Division
- Optimize Technology Solutions, LLC v. Staples, Inc., Dillard's Inc., Drugstore.com, Inc., <u>HSN, Inc.</u>, et al.
  Case No. 2:11-CV-00419-JRG
  Filed 09.15.11

In the District Court of Harris County, Texas 11th Judicial District
- <u>Bryant Collins</u> v. David Martinez, Jr.
  Cause No. 2013-50115
  Filed 08.26.13

United States District Court for the Northern District of Georgia Atlanta Division
- Equifax Inc., v. <u>Versata, Inc.</u>
  Case No. 1:13-cv-00213
  Filed 01.22.13

United States District Court for the Western District of Texas Austin Division
- <u>DDB Technologies L.L.C.</u> v. Fox Sports Interactive Media, LLC, et al.
  Case No. 1:11-CV-01014
  Filed 11.28.11

In the District Court of Orange County, Texas 128th Judicial District
- Henry Travis Myers and Clayton Poullard v. Midwest Carriers, L.L.C., Bashir Duale Nuh and Williams Brothers Construction, Co., Inc.
  Cause No. A 11 0487 - C

In the Circuit Court of Jefferson County, Alabama
- Tom Waugh and Seamless Pole, Inc. v. McWane, Inc. and McWane Global, et al.
  Case No. 01-CV-2013-901820.00

In the United States District Court for the District of Delaware
- Linex Technologies, Inc. v. Hewlett-Packard Company, et al.
  Case No. 1:11-cv-400-GMS
  Filed 05.06.11

In the United States District Court Northern District of California
- Brandywine Communications Technologies, LLC v. AT&T Corp. and SBC Internet Services, Inc.
  Case No. 4:12-cv-02494-CW
  Filed 05.16.12

In the District Court Harris County, Texas 269th Judicial District
- Robert P. Alford, Ruth M. Alford and Randall D. Romack v. Monster Mosquito Systems, LLC, Leo J. Niekerk, Kemper Modlin and Aubrey "Don" Knudson
  Cause No. 2012-37881
  Filed 06.29.12

In the United States District Court for the Middle District of Florida
- Arthrex, Inc. and Arthrex Manufacturing, Inc. v. Parcus Medical, LLC
  Case No. 2:10-cv-00151
  Filed 03.08.10

In the United States District Court for the Middle of District of Florida Tampa Division
- PODS Enterprises, Inc. v. U-Haul International, Inc.
  Case No. 8:12-cv-01479
  Filed 07.03.12

The International Court of Arbitration of the International Chamber of Commerce
- Dresser-Rand Holdings Spain, S.L. (Spain) and Dresser-Rand Group Inc. (U.S.A.) v. Joseba Mikel Grajales Jimenez (Spain), Centauro Capital, S.L.U. (Spain) and Others
  Case No. 20821/ASM

- Eagle Operating, Inc. v. Williston Hunter N.D., LLC
  (District of North Dakota)
  Case No. 4:11-cv-00067
  Filed 08.19.11

In the United States District Court for the Southern District of California
- Pacing Technologies, LLC v. Garmin International, Inc. and Garmin USA, Inc.
  Case No. 3:12-cv-01067-BEN-WMC
  Filed 05.01.12

In the United States District Court Middle District of Florida Fort Myers Division
- Arthrex, Inc. v. <u>Parcus Medical, LLC</u>
  Case No. 2:11-cv-00694
  Filed 12.15.11

In the District Court of Harris County, Texas 234th Judicial District
- Momentive Specialty Chemicals, Inc. v. <u>Robert R. McDaniel, Avis Lloyd McCrary, Joshua C. Brown, and Preferred Sands, LLC, et al.</u>
  Cause No. 2011-51663
  Filed 08.30.11

In the District Court of Harris County, Texas 80th Judicial District
- <u>Gulf Coast Asphalt Company, L.L.C. and Trifinery, Inc.</u> v. Russell T. Lloyd and John M. O'Quinn and Associates, L.L.P.
  Cause No. 2011-61780
  Filed 10.13.11

American Arbitration Association, International Centre for Dispute Resolution in the Matter of the Arbitration Between
- Chevron U.S.A. Inc. v. <u>Sabine Pass LNG, L.P.</u>
  Case No. 50198 T 00902 12

Under the Federal Arbitration Act
- <u>Magnum Hunter Production, Inc. and Eureka Hunter Pipeline, LLC</u> v. Seminole Energy Services, LLC and Seminole Gas Company, LLC

In the United States District Court for the Eastern District of Texas Tyler Division
- <u>Guardian Media Technologies, Ltd.</u> v. AT&T Operations, Inc., et al.
  Case No. 6:10-cv-00597
  Filed 11.10.10

In the United States International Trade Commission, Washington, DC
- In the Matter of Reduced Folate Nutraceutical Products and L-Methylfolate Raw Ingredients used therein
  Investigation No. 337-TA-857
  Filed 09.10.12

In the United States District Court for the District of Arizona
- <u>Oticon, Inc.</u> v. Sound Design Technologies, Ltd. and Sebotek Hearing Systems, LLC
  Case No. 2:11-cv-01874
  Filed 09.23.11

In the United States District Court for the Northern District of California, San Francisco Division
- <u>MedioStream, Inc.</u> v. Microsoft Corporation, et al.
  Case No. 3:11-cv-02525-RS-JCS
  Filed 06.07.11

In the District Court of Clark County, Nevada
- <u>Richard Suen and Round Square Company Limited</u> v. Las Vegas Sands, Inc.
  Case No. 04A493744
  Filed 10.15.04

In the United States District Court for the Southern District of California
- SPH America, LLC v. Acer, Inc., et al.
  Case No. 3:09-cv-02535
  Filed 11.09.09

In the United States District Court for the Eastern District of Texas Marshall Division
- Hitachi Consumer Electronics Co., Ltd., et al. v. Top Victory Electronics (Taiwan) Co. Ltd., et al.
  Cause No. 2:10-cv-00260-JRG
  Filed 07.22.10

In the United States Bankruptcy Court for the Northern District of Texas Dallas Division
- In Re: Hallwood Energy, L.P., et al., Ray Balestri, Trustee of the Hallwood Energy I Creditors' Trust v. Hunton & Williams LLP, W. Alan Kailer, Andrew E. Jillson, and Michelle A. Mendez
  Case No. 09-31253-SGJ-11
  Filed 03.01.09

In the County Court of Nueces County, Texas; In the County Court at Law No. 2
- John Jalufka v. Joshua E. Comstock, Individually, et al.
  Case No. 2011CCV-60390
  Filed 02.22.11

In the District Court of Harris County, Texas 270th Judicial District
- Araceli Alarcon Velazquez, Maria Eugenia Alarcon Velazquez, Robert Blaauw as Receiver for Zalinco Corporation, N.V. and Ocana Corporation, N.V. v. Gabriel Alarcon Velazquez
  Cause No. 2006-51822
  Filed 08.21.06

In the District Court of Harris County, Texas 61st Judicial District
- Structure Consulting Group LLC v. Corey Berg, M. Daryl Cote, Brent Kassing, Jennifer Mihalic, Julia Prybys, and Stacy Rodgers
  Cause No. 2010-69070
  Filed 10.18.10

In the United States District Court for the Easter District of Texas Tyler Division
- Secure Axcess, LLC v. ING Direct Bancorp, ING Bank, FSB d/b/a ING Direct USA, and Bank of America Corp., et al.
  Case No. 6:10-cv-00670
  Filed 12.16.10

*Waymo LLC v. Uber Technologies, Inc., et al.*

Exhibit 3

**Documents Considered**

| Bates | Beginning | End | Bates | Beginning | End | Bates | Beginning | End |
|-------|-----------|-----|-------|-----------|-----|-------|-----------|-----|
| UBER | 00005799 | 00005857 | UBER | 00018054 | 00018058 | UBER | 00023381 | 00023381 |
| UBER | 00006013 | 00006015 | UBER | 00022948 | 00022962 | UBER | 00023382 | 00023401 |
| UBER | 00006035 | 00006041 | UBER | 00022963 | 00022977 | UBER | 00023402 | 00023404 |
| UBER | 00006042 | 00006047 | UBER | 00022978 | 00023007 | UBER | 00023405 | 00023411 |
| UBER | 00006667 | 00006668 | UBER | 00023008 | 00023023 | UBER | 00023412 | 00023430 |
| UBER | 00008399 | 00008399 | UBER | 00023024 | 00023039 | UBER | 00023431 | 00023444 |
| UBER | 00008593 | 00008594 | UBER | 00023040 | 00023046 | UBER | 00023445 | 00023447 |
| UBER | 00009001 | 00009415 | UBER | 00023047 | 00023049 | UBER | 00023448 | 00023457 |
| UBER | 00011858 | 00011876 | UBER | 00023050 | 00023066 | UBER | 00023458 | 00023458 |
| UBER | 00011912 | 00011931 | UBER | 00023067 | 00023069 | UBER | 00023459 | 00023459 |
| UBER | 00012060 | 00012062 | UBER | 00023070 | 00023078 | UBER | 00023460 | 00023468 |
| UBER | 00012295 | 00012296 | UBER | 00023079 | 00023098 | UBER | 00023469 | 00023485 |
| UBER | 00012397 | 00012398 | UBER | 00023099 | 00023105 | UBER | 00023486 | 00023492 |
| UBER | 00012405 | 00012406 | UBER | 00023106 | 00023122 | UBER | 00023493 | 00023512 |
| UBER | 00012407 | 00012407 | UBER | 00023123 | 00023142 | UBER | 00023513 | 00023519 |
| UBER | 00012457 | 00012458 | UBER | 00023143 | 00023157 | UBER | 00023520 | 00023522 |
| UBER | 00012664 | 00012674 | UBER | 00023158 | 00023166 | UBER | 00023523 | 00023539 |
| UBER | 00016391 | 00016391 | UBER | 00023167 | 00023169 | UBER | 00023540 | 00023546 |
| UBER | 00016392 | 00016392 | UBER | 00023170 | 00023176 | UBER | 00023547 | 00023549 |
| UBER | 00016393 | 00016394 | UBER | 00023177 | 00023185 | UBER | 00023550 | 00023552 |
| UBER | 00016399 | 00016399 | UBER | 00023186 | 00023192 | UBER | 00023553 | 00023566 |
| UBER | 00016429 | 00016431 | UBER | 00023193 | 00023199 | UBER | 00023567 | 00023586 |
| UBER | 00016432 | 00016452 | UBER | 00023200 | 00023218 | UBER | 00023587 | 00023595 |
| UBER | 00016453 | 00016523 | UBER | 00023219 | 00023221 | UBER | 00023596 | 00023604 |
| UBER | 00016524 | 00016584 | UBER | 00023222 | 00023241 | UBER | 00023605 | 00023624 |
| UBER | 00016585 | 00016748 | UBER | 00023242 | 00023244 | UBER | 00023625 | 00023631 |
| UBER | 00016749 | 00016751 | UBER | 00023245 | 00023253 | UBER | 00023632 | 00023634 |
| UBER | 00016752 | 00016756 | UBER | 00023254 | 00023273 | UBER | 00023635 | 00023653 |
| UBER | 00016757 | 00016837 | UBER | 00023274 | 00023288 | UBER | 00023654 | 00023667 |
| UBER | 00016838 | 00016973 | UBER | 00023289 | 00023307 | UBER | 00023668 | 00023670 |
| UBER | 00016974 | 00016982 | UBER | 00023308 | 00023314 | UBER | 00023671 | 00023673 |
| UBER | 00016983 | 00017006 | UBER | 00023315 | 00023323 | UBER | 00043434 | 00043436 |
| UBER | 00017083 | 00017091 | UBER | 00023324 | 00023326 | UBER | 00047831 | 00047856 |
| UBER | 00017108 | 00017126 | UBER | 00023327 | 00023346 | UBER | 00047857 | 00047661 |
| UBER | 00017265 | 00017276 | UBER | 00023347 | 00023349 | UBER | 00060147 | 00060156 |
| UBER | 00017483 | 00017486 | UBER | 00023350 | 00023356 | UBER | 00060180 | 00060181 |
| UBER | 00017487 | 00017517 | UBER | 00023357 | 00023373 | UBER | 00060321 | 00060347 |
| UBER | 00017518 | 00017578 | UBER | 00023374 | 00023380 | UBER | 00060416 | 00060416 |

Confidential - Attorneys' Eyes Only
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017

*Waymo LLC v. Uber Technologies, Inc., et al.*

Exhibit 3

**Documents Considered**

| Bates | Beginning | End | Bates | Beginning | End | Bates | Beginning | End |
|-------|-----------|-----|-------|-----------|-----|-------|-----------|-----|
| UBER | 00060449 | 00060449 | UBER | 00068717 | 00068717 | UBER | 00101482 | 00101498 |
| UBER | 00060504 | 00060504 | UBER | 00068727 | 00068728 | UBER | 00109919 | 00109932 |
| UBER | 00060505 | 00060505 | UBER | 00068736 | 00068737 | UBER | 00114289 | 00114327 |
| UBER | 00060506 | 00060506 | UBER | 00068757 | 00068758 | UBER | 00118203 | 00118203 |
| UBER | 00060588 | 00060588 | UBER | 00068788 | 00068788 | UBER | 00119851 | 00119853 |
| UBER | 00060636 | 00060637 | UBER | 00068835 | 00068835 | UBER | 00124217 | 00124217 |
| UBER | 00060643 | 00060643 | UBER | 00068945 | 00068945 | UBER | 00124218 | 00124221 |
| UBER | 00060650 | 00060651 | UBER | 00068946 | 00068950 | UBER | 00141843 | 00141844 |
| UBER | 00060661 | 00060661 | UBER | 00068982 | 00068982 | UBER | 00145491 | 00145491 |
| UBER | 00060665 | 00060676 | UBER | 00068983 | 00068983 | UBER | 00145615 | 00145624 |
| UBER | 00062774 | 00062913 | UBER | 00069029 | 00069029 | UBER | 00145762 | 00145763 |
| UBER | 00063585 | 00063585 | UBER | 00069030 | 00069033 | UBER | 00146316 | 00146317 |
| UBER | 00063586 | 00063586 | UBER | 00069043 | 00069064 | UBER | 00146357 | 00146358 |
| UBER | 00063617 | 00063617 | UBER | 00069080 | 00069081 | UBER | 00146519 | 00146524 |
| UBER | 00063618 | 00063622 | UBER | 00069359 | 00069359 | UBER | 00146557 | 00146557 |
| UBER | 00063640 | 00063642 | UBER | 00070108 | 00070110 | UBER | 00146693 | 00146693 |
| UBER | 00063658 | 00063659 | UBER | 00070243 | 00070247 | UBER | 00146761 | 00146765 |
| UBER | 00063680 | 00063695 | UBER | 00070983 | 00071036 | UBER | 00146884 | 00146887 |
| UBER | 00063707 | 00063708 | UBER | 00071544 | 00071544 | UBER | 00146997 | 00146999 |
| UBER | 00063721 | 00063721 | UBER | 00071548 | 00071550 | UBER | 00149027 | 00149027 |
| UBER | 00063785 | 00063786 | UBER | 00071595 | 00071597 | UBER | 00149028 | 00149030 |
| UBER | 00064043 | 00064044 | UBER | 00071606 | 00071607 | UBER | 00149195 | 00149198 |
| UBER | 00064272 | 00064273 | UBER | 00071609 | 00071610 | UBER | 00150730 | 00150733 |
| UBER | 00064295 | 00064297 | UBER | 00071616 | 00071618 | UBER | 00151136 | 00151139 |
| UBER | 00064468 | 00064469 | UBER | 00071636 | 00071636 | UBER | 00177409 | 00177409 |
| UBER | 00064472 | 00064473 | UBER | 00071639 | 00071640 | UBER | 00177749 | 00177773 |
| UBER | 00064592 | 00064595 | UBER | 00072238 | 00072249 | UBER | 00211176 | 00211181 |
| UBER | 00064596 | 00064597 | UBER | 00074703 | 00074773 | UBER | 00213222 | 00213222 |
| UBER | 00064680 | 00063695 | UBER | 00076047 | 00076048 | UBER | 00213222 | 00213269 |
| UBER | 00065024 | 00065024 | UBER | 00076982 | 00076983 | UBER | 00213223 | 00213223 |
| UBER | 00065563 | 00065563 | UBER | 00086529 | 00086529 | UBER | 00213224 | 00213224 |
| UBER | 00065569 | 00065572 | UBER | 00086828 | 00086828 | UBER | 00213225 | 00213234 |
| UBER | 00065647 | 00065648 | UBER | 00098408 | 00098408 | UBER | 00213235 | 00213243 |
| UBER | 00065777 | 00065781 | UBER | 00099106 | 00099108 | UBER | 00213244 | 00213258 |
| UBER | 00065812 | 00065814 | UBER | 00099289 | 00099299 | UBER | 00213259 | 00213269 |
| UBER | 00065989 | 00065989 | UBER | 00099666 | 00099667 | UBER | 00213501 | 00213502 |
| UBER | 00065997 | 00065997 | UBER | 00099671 | 00099671 | UBER | 00218027 | 00218032 |
| UBER | 00068702 | 00068705 | UBER | 00100344 | 00100352 | UBER | 00218222 | 00218227 |

**Documents Considered**

| Bates | Beginning | End | Bates | Beginning | End | Bates | Beginning | End |
|-------|-----------|-----|-------|-----------|-----|-------|-----------|-----|
| UBER | 00218250 | 00218255 | UBER | 00232227 | 00232227 | WAYMO-UBER- | 00005995 | 00005997 |
| UBER | 00218609 | 00218610 | UBER | 00232262 | 00232274 | WAYMO-UBER- | 00006008 | 00006009 |
| UBER | 00218666 | 00218670 | UBER | 00232291 | 00232291 | WAYMO-UBER- | 00006082 | 00006082 |
| UBER | 00218672 | 00218678 | UBER | 00232375 | 00232375 | WAYMO-UBER- | 00006085 | 00006085 |
| UBER | 00221805 | 00221810 | UBER | 00232416 | 00232420 | WAYMO-UBER- | 00006087 | 00006088 |
| UBER | 00223278 | 00223278 | UBER | 00232421 | 00232421 | WAYMO-UBER- | 00006091 | 00006092 |
| UBER | 00223438 | 00223405 | UBER | 00232422 | 00232438 | WAYMO-UBER- | 00006304 | 00006305 |
| UBER | 00223442 | 00223443 | UBER | 00232447 | 00232448 | WAYMO-UBER- | 00006306 | 00006306 |
| UBER | 00223529 | 00223529 | UBER | 00232449 | 00232449 | WAYMO-UBER- | 00006316 | 00006316 |
| UBER | 00223629 | 00223630 | UBER | 00232450 | 00232450 | WAYMO-UBER- | 00006317 | 00006318 |
| UBER | 00223667 | 00223684 | UBER | 00232451 | 00232451 | WAYMO-UBER- | 00006348 | 00006348 |
| UBER | 00223840 | 00223844 | UBER | 00232452 | 00232453 | WAYMO-UBER- | 00006992 | 00006993 |
| UBER | 00224219 | 00224219 | UBER | 00232454 | 00232454 | WAYMO-UBER- | 00008897 | 00008901 |
| UBER | 00231665 | 00231696 | UBER | 00232488 | 00232514 | WAYMO-UBER- | 00008930 | 00008931 |
| UBER | 00231717 | 00232191 | UBER | 00232516 | 00232547 | WAYMO-UBER- | 00008932 | 00008934 |
| UBER | 00231729 | 00231729 | UBER | 00232549 | 00232575 | WAYMO-UBER- | 00008968 | 00009015 |
| UBER | 00231730 | 00231739 | UBER | 00232630 | 00232668 | WAYMO-UBER- | 00009042 | 00009101 |
| UBER | 00231748 | 00231751 | UBER | 00233777 | 00233779 | WAYMO-UBER- | 00009102 | 00009142 |
| UBER | 00231798 | 00231807 | | | | WAYMO-UBER- | 00009502 | 00009502 |
| UBER | 00231827 | 00231827 | WAYMO-UBER- | 00000060 | 00000063 | WAYMO-UBER- | 00009503 | 00009508 |
| UBER | 00231873 | 00231873 | WAYMO-UBER- | 00000181 | 00000181 | WAYMO-UBER- | 00009509 | 00009509 |
| UBER | 00231926 | 00231926 | WAYMO-UBER- | 00000275 | 00000275 | WAYMO-UBER- | 00009532 | 00009533 |
| UBER | 00231927 | 00231965 | WAYMO-UBER- | 00000321 | 00000331 | WAYMO-UBER- | 00009635 | 00009635 |
| UBER | 00231966 | 00231966 | WAYMO-UBER- | 00000350 | 00000355 | WAYMO-UBER- | 00009935 | 00009935 |
| UBER | 00232001 | 00232011 | WAYMO-UBER- | 00001354 | 00001412 | WAYMO-UBER- | 00009936 | 00009937 |
| UBER | 00232012 | 00232012 | WAYMO-UBER- | 00001496 | 00001499 | WAYMO-UBER- | 00009943 | 00009944 |
| UBER | 00232013 | 00232018 | WAYMO-UBER- | 00004093 | 00004329 | WAYMO-UBER- | 00010452 | 00010452 |
| UBER | 00232055 | 00232055 | WAYMO-UBER- | 00004175 | 00004194 | WAYMO-UBER- | 00010453 | 00010454 |
| UBER | 00232056 | 00232056 | WAYMO-UBER- | 00005845 | 00005845 | WAYMO-UBER- | 00010455 | 00010456 |
| UBER | 00232067 | 00232067 | WAYMO-UBER- | 00005846 | 00005846 | WAYMO-UBER- | 00010459 | 00010463 |
| UBER | 00232115 | 00232115 | WAYMO-UBER- | 00005849 | 00005850 | WAYMO-UBER- | 00010492 | 00010492 |
| UBER | 00232116 | 00232153 | WAYMO-UBER- | 00005851 | 00005852 | WAYMO-UBER- | 00010496 | 00010496 |
| UBER | 00232154 | 00232154 | WAYMO-UBER- | 00005860 | 00005863 | WAYMO-UBER- | 00010878 | 00010878 |
| UBER | 00232155 | 00232155 | WAYMO-UBER- | 00005864 | 00005864 | WAYMO-UBER- | 00011542 | 00011542 |
| UBER | 00232192 | 00232218 | WAYMO-UBER- | 00005935 | 00005940 | WAYMO-UBER- | 00011749 | 00011749 |
| UBER | 00232219 | 00232219 | WAYMO-UBER- | 00005963 | 00005963 | WAYMO-UBER- | 00011751 | 00011751 |
| UBER | 00232220 | 00232220 | WAYMO-UBER- | 00005978 | 00005983 | WAYMO-UBER- | 00011762 | 00011762 |
| UBER | 00232221 | 00232221 | WAYMO-UBER- | 00005984 | 00005985 | WAYMO-UBER- | 00011796 | 00011796 |

**Documents Considered**

| Bates | Beginning | End | Bates | Beginning | End | Bates | Beginning | End |
|-------|-----------|-----|-------|-----------|-----|-------|-----------|-----|
| WAYMO-UBER- | 00011799 | 00011799 | WAYMO-UBER- | 00031553 | 00031553 | WAYMO-UBER- | 00039951 | 00040027 |
| WAYMO-UBER- | 00011805 | 00011805 | WAYMO-UBER- | 00031554 | 00031612 | WAYMO-UBER- | 00040126 | 00040127 |
| WAYMO-UBER- | 00011811 | 00011811 | WAYMO-UBER- | 00031637 | 00031697 | WAYMO-UBER- | 00040138 | 00040139 |
| WAYMO-UBER- | 00012134 | 00012135 | WAYMO-UBER- | 00031699 | 00031801 | WAYMO-UBER- | 00040174 | 00040175 |
| WAYMO-UBER- | 00012136 | 00012137 | WAYMO-UBER- | 00031804 | 00031804 | WAYMO-UBER- | 00040727 | 00040728 |
| WAYMO-UBER- | 00012357 | 00012358 | WAYMO-UBER- | 00031805 | 00031817 | WAYMO-UBER- | 00041064 | 00041065 |
| WAYMO-UBER- | 00012359 | 00012361 | WAYMO-UBER- | 00031818 | 00031960 | WAYMO-UBER- | 00041754 | 00041757 |
| WAYMO-UBER- | 00012362 | 00012363 | WAYMO-UBER- | 00031973 | 00032046 | WAYMO-UBER- | 00041811 | 00041849 |
| WAYMO-UBER- | 00013908 | 00013908 | WAYMO-UBER- | 00032047 | 00032059 | WAYMO-UBER- | 00041893 | 00041971 |
| WAYMO-UBER- | 00014000 | 00014019 | WAYMO-UBER- | 00032060 | 00032077 | WAYMO-UBER- | 00041972 | 00041989 |
| WAYMO-UBER- | 00014020 | 00014040 | WAYMO-UBER- | 00032078 | 00032096 | WAYMO-UBER- | 00041990 | 00042068 |
| WAYMO-UBER- | 00014078 | 00014098 | WAYMO-UBER- | 00032097 | 00032139 | WAYMO-UBER- | 00042069 | 00042091 |
| WAYMO-UBER- | 00014703 | 00014704 | WAYMO-UBER- | 00032176 | 00032217 | WAYMO-UBER- | 00042255 | 00042264 |
| WAYMO-UBER- | 00014707 | 00014707 | WAYMO-UBER- | 00032218 | 00032283 | WAYMO-UBER- | 00042280 | 00042327 |
| WAYMO-UBER- | 00016837 | 00016837 | WAYMO-UBER- | 00032284 | 00032318 | WAYMO-UBER- | 00042351 | 00042359 |
| WAYMO-UBER- | 00019667 | 00019705 | WAYMO-UBER- | 00032319 | 00032383 | WAYMO-UBER- | 00042374 | 00042382 |
| WAYMO-UBER- | 00020826 | 00020899 | WAYMO-UBER- | 00032384 | 00032526 | WAYMO-UBER- | 00042398 | 00042419 |
| WAYMO-UBER- | 00021118 | 00021131 | WAYMO-UBER- | 00032530 | 00032539 | WAYMO-UBER- | 00042515 | 00042515 |
| WAYMO-UBER- | 00022235 | 00022236 | WAYMO-UBER- | 00032541 | 00032541 | WAYMO-UBER- | 00042527 | 00042531 |
| WAYMO-UBER- | 00022237 | 00022237 | WAYMO-UBER- | 00033191 | 00033204 | WAYMO-UBER- | 00042532 | 00042553 |
| WAYMO-UBER- | 00022840 | 00022840 | WAYMO-UBER- | 00033587 | 00033588 | WAYMO-UBER- | 00042554 | 00042589 |
| WAYMO-UBER- | 00025177 | 00025180 | WAYMO-UBER- | 00033665 | 00033665 | WAYMO-UBER- | 00042590 | 00042603 |
| WAYMO-UBER- | 00025181 | 00025183 | WAYMO-UBER- | 00035227 | 00035263 | WAYMO-UBER- | 00042993 | 00042993 |
| WAYMO-UBER- | 00026142 | 00026142 | WAYMO-UBER- | 00035632 | 00035637 | WAYMO-UBER- | 00043001 | 00043003 |
| WAYMO-UBER- | 00026142 | 00026143 | WAYMO-UBER- | 00035653 | 00035657 | WAYMO-UBER- | 00043047 | 00043057 |
| WAYMO-UBER- | 00026243 | 00026244 | WAYMO-UBER- | 00036066 | 00036067 | WAYMO-UBER- | 00043058 | 00043058 |
| WAYMO-UBER- | 00026248 | 00026248 | WAYMO-UBER- | 00036448 | 00036448 | WAYMO-UBER- | 00043101 | 00043101 |
| WAYMO-UBER- | 00026471 | 00026476 | WAYMO-UBER- | 00038713 | 00038717 | WAYMO-UBER- | 00043102 | 00043123 |
| WAYMO-UBER- | 00026722 | 00026723 | WAYMO-UBER- | 00038720 | 00038724 | WAYMO-UBER- | 00043124 | 00043148 |
| WAYMO-UBER- | 00026886 | 00026887 | WAYMO-UBER- | 00038726 | 00038726 | WAYMO-UBER- | 00043188 | 00043188 |
| WAYMO-UBER- | 00029355 | 00029357 | WAYMO-UBER- | 00038727 | 00038732 | WAYMO-UBER- | 00043353 | 00043358 |
| WAYMO-UBER- | 00031414 | 00031415 | WAYMO-UBER- | 00038737 | 00038742 | WAYMO-UBER- | 00043362 | 00043366 |
| WAYMO-UBER- | 00031431 | 00031432 | WAYMO-UBER- | 00038744 | 00038746 | WAYMO-UBER- | 00043437 | 00043470 |
| WAYMO-UBER- | 00031433 | 00031446 | WAYMO-UBER- | 00039433 | 00039433 | WAYMO-UBER- | 00043722 | 00043750 |
| WAYMO-UBER- | 00031447 | 00031447 | WAYMO-UBER- | 00039478 | 00039478 | WAYMO-UBER- | 00043956 | 00043983 |
| WAYMO-UBER- | 00031460 | 00031461 | WAYMO-UBER- | 00039532 | 00039533 | WAYMO-UBER- | 00044023 | 00044072 |
| WAYMO-UBER- | 00031462 | 00031463 | WAYMO-UBER- | 00039556 | 00039557 | WAYMO-UBER- | 00044108 | 00044171 |
| WAYMO-UBER- | 00031464 | 00031552 | WAYMO-UBER- | 00039661 | 00039661 | WAYMO-UBER- | 00044261 | 00044324 |

**Documents Considered**

| Bates | Beginning | End | Bates | Beginning | End | Bates | Beginning | End |
|-------|-----------|-----|-------|-----------|-----|-------|-----------|-----|
| WAYMO-UBER- | 00044325 | 00044337 | WAYMO-UBER- | 00050099 | 00050099 | LAZ-BB | 00000001 | 00000008 |
| WAYMO-UBER- | 00044338 | 00044401 | WAYMO-UBER- | 00050123 | 00050123 | LAZ-BB | 00000009 | 00000016 |
| WAYMO-UBER- | 00044589 | 00044626 | WAYMO-UBER- | 00050196 | 00050198 | LAZ-BB | 00000017 | 00000017 |
| WAYMO-UBER- | 00045518 | 00045521 | WAYMO-UBER- | 00050240 | 00050241 | LAZ-BB | 00000018 | 00000052 |
| WAYMO-UBER- | 00045724 | 00045725 | WAYMO-UBER- | 00050320 | 00050320 | LAZ-BB | 00000053 | 00000060 |
| WAYMO-UBER- | 00045885 | 00045886 | WAYMO-UBER- | 00050331 | 00050345 | LAZ-BB | 00000061 | 00000065 |
| WAYMO-UBER- | 00046262 | 00046262 | WAYMO-UBER- | 00050346 | 00050359 | LAZ-BB | 00000066 | 00000095 |
| WAYMO-UBER- | 00046264 | 00046264 | WAYMO-UBER- | 00050360 | 00050420 | LAZ-BB | 00000096 | 00000105 |
| WAYMO-UBER- | 00046391 | 00046417 | WAYMO-UBER- | 00050504 | 00050504 | LAZ-BB | 00000106 | 00000114 |
| WAYMO-UBER- | 00046451 | 00046452 | WAYMO-UBER- | 00051847 | 00051848 | LAZ-BB | 00000115 | 00000129 |
| WAYMO-UBER- | 00046625 | 00046632 | WAYMO-UBER- | 00054953 | 00054953 | LAZ-BB | 00000130 | 00000143 |
| WAYMO-UBER- | 00046633 | 00046635 | WAYMO-UBER- | 00055926 | 00055927 | LAZ-BB | 00000144 | 00000145 |
| WAYMO-UBER- | 00046636 | 00046640 | WAYMO-UBER- | 00055971 | 00055975 | LAZ-BB | 00000146 | 00000189 |
| WAYMO-UBER- | 00046678 | 00046678 | WAYMO-UBER- | 00055988 | 00055992 | LAZ-BB | 00000190 | 00000207 |
| WAYMO-UBER- | 00046679 | 00046679 | WAYMO-UBER- | 00056843 | 00056845 | LAZ-BB | 00000208 | 00000268 |
| WAYMO-UBER- | 00046694 | 00046697 | WAYMO-UBER- | 00056929 | 00056933 | LAZ-BB | 00000269 | 00000279 |
| WAYMO-UBER- | 00046742 | 00046742 | WAYMO-UBER- | 00057157 | 00057158 | LAZ-BB | 00000280 | 00000301 |
| WAYMO-UBER- | 00046973 | 00046977 | WAYMO-UBER- | 00057432 | 00057505 | LAZ-BB | 00000302 | 00000304 |
| WAYMO-UBER- | 00046983 | 00046988 | WAYMO-UBER- | 00057707 | 00057708 | LAZ-BB | 00000305 | 00000343 |
| WAYMO-UBER- | 00047060 | 00047061 | WAYMO-UBER- | 00058740 | 00058747 | LAZ-BB | 00000344 | 00000377 |
| WAYMO-UBER- | 00047062 | 00047063 | WAYMO-UBER- | 00059470 | 00059508 | LAZ-BB | 00000378 | 00000405 |
| WAYMO-UBER- | 00047165 | 00047165 | WAYMO-UBER- | 00064392 | 00064406 | LAZ-BB | 00000406 | 00000450 |
| WAYMO-UBER- | 00048246 | 00048248 | WAYMO-UBER- | 00066296 | 00066298 | LAZ-BB | 00000451 | 00000467 |
| WAYMO-UBER- | 00048412 | 00048437 | WAYMO-UBER- | 00079254 | 00079261 | LAZ-BB | 00000468 | 00000497 |
| WAYMO-UBER- | 00048482 | 00048484 | WAYMO-UBER- | 00080591 | 00080630 | LAZ-BB | 00000498 | 00000509 |
| WAYMO-UBER- | 00048635 | 00048638 | WAYMO-UBER- | 00080888 | 00080925 | | | |
| WAYMO-UBER- | 00048639 | 00048643 | WAYMO-UBER- | 00081012 | 00081061 | TYTO- | 000001 | 000004 |
| WAYMO-UBER- | 00048677 | 00048677 | WAYMO-UBER- | 00082092 | 00082094 | TYTO- | 000054 | 000069 |
| WAYMO-UBER- | 00048712 | 00048716 | WAYMO-UBER- | 00083633 | 00083633 | TYTO- | 000193 | 000212 |
| WAYMO-UBER- | 00049293 | 00049295 | WAYMO-UBER- | 00084484 | 00084491 | TYTO- | 000368 | 000407 |
| WAYMO-UBER- | 00049937 | 00049939 | WAYMO-UBER- | 00085723 | 00085739 | TYTO- | 000477 | 000502 |
| WAYMO-UBER- | 00049949 | 00049951 | WAYMO-UBER- | 00085775 | 00085775 | | | |
| WAYMO-UBER- | 00049952 | 00049953 | WAYMO-UBER- | 00085776 | 00085776 | Blattmachr | 00000001 | 00000026 |
| WAYMO-UBER- | 00049959 | 00049961 | | | | | | |
| WAYMO-UBER- | 00049967 | 00049972 | OTTOTRUCKING | 00000020 | 00000034 | LEV_ | 002126 | 002126 |
| WAYMO-UBER- | 00049974 | 00049974 | OTTOTRUCKING | 00000035 | 00000050 | | | |
| WAYMO-UBER- | 00049976 | 00049976 | OTTOTRUCKING | 00000127 | 00000141 | SANDSTONE | 000001 | 000007 |
| WAYMO-UBER- | 00049980 | 00050025 | OTTOTRUCKING | 00002492 | 00002522 | | | |

*Waymo LLC v. Uber Technologies, Inc., et al.*

Exhibit 3

## Documents Considered

**Legal Filings**

Case Management Order, Reference to Magistrate Judge for Mediation/Settlement, and Further Reference to Magistrate Judge for Discovery Supervision, June 7, 2017.

Complaint for Violation of Defense of Trade Secrets Act, Violation of California Uniform Trade Secret Act, Patent Infringement, and Violation of Cal. Bus and Prof. Code Section 17200, Case No. 3:17-cv-00939, February 23, 2017, with Exhibits A-C.

Declaration of Gary Brown, March 9, 2017.

Declaration of Gregory Kintz, March 10, 2017.

Declaration of James Haslim in Support of Defendants' Opposition, April 7, 2017.

Declaration of Michael Janosko, March 9, 2017.

Declaration of Pierre-Yves Droz, March 9, 2017, with Exhibits A, B, D, and F.

Declaration of Scott Boehmke in Support of Defendants' Opposition, April 7, 2017.

Defendant Uber Technologies, Inc. and Ottomotto LLC's Fifth Supplemental Responses to Waymo's First Set of Common Interrogatories (Nos. 1-3), August 24, 2017.

Defendant, Otto Trucking LLC's Answer to First Amended Complaint and Counterclaims, June 22, 2017.

Defendants Uber Technologies, Inc. and Ottomotto LLC's Second Supplemental Responses to Waymo's First Set of Common Interrogatories (Nos. 1-3), August 11, 2017.

First Amended Complaint for Violation of Defense of Trade Secrets Act, Violation of California Uniform Trade Secret Act, Patent Infringement, and Violation of Cal. Bus and Prof. Code Section 17200, Case No. 3:17-cv-00939, March 10, 2017, with Exhibits A-D.

Infringement Contents Pursuant to Patent L.R. 3-1, U.S. Patent No. 9,368,936.

Joint Stipulation and Order Regarding Dismissal of Patent Claims, July 7, 2017.

Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief, May 11, 2017.

Order Re Access to Under-Seal Material, Case No. 3:17-cv-00939, March 16, 2017.

Order Re: Waymo' Motion to Compel, June 8, 2017.

Patent Local Rule 2-2 Interim Model Protective Order, n.d.

Plaintiff Waymo LLC's Corrected Supplemental Initial Disclosures, June 22, 2017.

Plaintiff Waymo LLC's Disclosure of Asserted Claims and Infringement Contentions, May 23, 2017.

Plaintiff Waymo LLC's Notice Regarding Trade Secret Narrowing, August 1, 2017.

Plaintiff Waymo's Responses to Questions for Hearing on Plaintiff's Motion for Provisional Relief, May 2, 2017.

Plaintiff's Amended Objections and Responses to Uber's Third Set of Interrogatories (Nos. 13-14), August 10, 2017.

Plaintiff's List of Asserted Trade Secrets Pursuant to Cal. Code Civ. Proc. Section 2019.210, March 10, 2017.

Plaintiff's Objections and Responses to Uber's First Set of Interrogatories (Nos. 1-11), June 16, 2017.

Plaintiff's Second Supplemental Objections and Responses to Uber's First Set of Interrogatories (Nos. 1-11), July 21, 2017.

Plaintiff's Third Supplemental Objections and Responses to Uber's First Set of Interrogatories (Nos. 1-11), July 28, 2017.

Supplemental Declaration of James Haslim in Support of Defendants' Sur-Reply to Plaintiff Waymo LLC's Motion for Preliminary Injunction, April 28, 2017.

Uber Technologies, Inc. and Ottomotto LLC's Answer to First Amended Complaint and Affirmative Defenses, June 22, 2017.

Waymo, LLC v. Uber Technologies, Inc., et al, Transcript of Proceedings, May 3, 2017.

*Waymo LLC v. Uber Technologies, Inc., et al.*

Exhibit 3

**Documents Considered**

---

**Depositions**

Deposition of Adam Kenvarg, August 15, 2017, with Exhibits 78, 109, 122-126, 523, 579, 694.

Deposition of Benjamin Ingram, August 16, 2017, with Exhibits 1430-1442.

Deposition of Brent Schwarz, August 15, 2017, with Exhibits 699 - 725.

Deposition of Brian McClendon, August 1, 2017, with Exhibits 170, 252, 256-264, 285, 294, and 392-470.

Deposition of Cameron Poetzscher, August 11, 2017, Volume 2, with Exhibits 203, 297, 299, and 605-612.

Deposition of Cameron Poetzscher, June 19, 2017, Volume 1, with Exhibits 250-291.

Deposition of Charlie Johnson, August 17, 2017, with Exhibits 1560-1565.

Deposition of Chelsea Bailey, August 1, 2017, with Exhibits 1227-1244.

Deposition of Daniel Chu, April 3, 2017, with Exhibits 1030-1033.

Deposition of Daniel Gruver, August 4, 2017, with Exhibits 494-525.

Deposition of David Meall, April 13, 2017, with Exhibits 5-8.

Deposition of Dmitri Dolgov 30(b)(6), August 8, 2017, with Exhibits 600-602.

Deposition of Dmitri Dolgov, August 8, 2017, with Exhibits 1350-1371.

Deposition of Emil Michael, July 28, 2017, with Exhibits 392-393 and 399-417.

Deposition of Eric Meyhofer, August 18, 2017, Volume 1.

Deposition of Gaetan Pennecot, April 20, 2017, Volume 1, with Exhibits 100-104.

Deposition of Gaetan Pennecot, June 14, 2017, Volume 2, with Exhibits 86-99 and 105-106.

Deposition of Gaetan Pennecot, June 16, 2017, Volume 3, with Exhibits 107-121 and 1062-1065.

Deposition of Gautam Gupta, August 18, 2017, with Exhibits 837-853.

Deposition of Gerard Dwyer, August 9, 2017, with Exhibits 1033-1034, 1400-1401, 1404-1423, and 1153.

Deposition of James Haslim, April 18, 2017, Volume 1, with Exhibits 57-63.

Deposition of James Haslim, August 9, 2017, Volume 3, with Exhibits 570-586.

Deposition of James Haslim, May 4, 2017, Volume 2, with Exhibits 150-161 and 1060-1061.

Deposition of Jeff Holden, August 15, 2017, with Exhibits 299 and 801-836.

Deposition of John Bares, August 11, 2017, Volume 2, with Exhibits 650-682.

Deposition of John Bares, June 16, 2017, Volume 1, with Exhibits 162-171.

Deposition of John Krafcik, August 2, 2017, with Exhibits 1245-1270.

Deposition of Jur Van Den Berg, August 2, 2017, with Exhibits 471-493.

Deposition of Larry Page, July 17, 2017, with Exhibits 1085-1111 and 1031.

Deposition of Lior Ron, April 19, 2017, with Exhibits 200-203.

Deposition of Maxime Levandowski, July 18, 2017, with Exhibits 113, 120, and 310-322.

Deposition of Ming Su, August 23, 2017.

Deposition of Ningjun Qi, August 10, 2017, Volume 2, with Exhibits 587-593, 297, and 299.

Deposition of Ningjun Qi, June 22, 2017, Volume 1, with Exhibits 81, 259, 268, 287, and 292-308.

Deposition of Pierre-Yves Droz 30(b)(6), August 3, 2017, with Exhibits 1271-1293.

Deposition of Pierre-Yves Droz, March 31, 2017, with Exhibits 1 and 1017-1029.

Deposition of Ron Medford, August 23, 2017, with Exhibits 1845-1850.

Deposition of Sasha Zbrozek, August 18, 2017.

*Waymo LLC v. Uber Technologies, Inc., et al.*

Exhibit 3

**Documents Considered**

| **Depositions (Continued)** |
| --- |

Deposition of Scott Boehmke, April 17, 2017, Volume 1, with Exhibits 50-56.
Deposition of Scott Boehmke, July 28, 2017, Volume 2, with Exhibits 450-468
Deposition of Tim Willis, August 18, 2017.
Deposition of Travis Kalanick, July 27, 2017, with Exhibits 365-391.

| **Other** |
| --- |

Email from Cameron Poetzscher to Emil Michael, "Re: Newco Update / Urgent Response Needed", January 19, 2016.
Email from Cameron Poetzscher to Travis Kalanick and Emil Michael, "Newco comp", August 15, 2016.
Email from Cameron Poetzscher to Travis Kalanick, et al, "Newco update", January 13, 2016.
Email from Emil Michael to Cameron Poetzscher and Jeff Holden, "Re: Newco", January 27, 2016.
Email from Ken Babcock to ATC Competitive Intelligence, "[ATC] Competitive Intelligence Update : Week Ending 02/19/2016 - A/C Privilege", February 19, 2016.
Email from Ken Babcock to ATC Competitive Intelligence, "[ATC] Competitive Intelligence Update : Week Ending 03/04/2016 - A/C Privilege", March 4, 2016.
Email from Mayrose Munar to Travis Kalanick, "Re: Homework-draft - Invitation to comment", May 23, 2015.
Email from Nicolas Garcia Belmonte to Visualization Team and Jai Ranganathan, "Visualization bi-weekly update 08/19", August 22, 2016.
Email from Sarah Abboud to ATC: ATC-Internal, "Sprint #7 Report", August 3, 2016.
Email from Scott Boehmke to James Haslim, October 28, 2016.
Email from Sugandha Sangal to Uber Employees, "[atg-internal] Triage Report : December 15", December 15, 2016.
Employment Agreement between Uber Technologies Inc. and Sameer Kshirsagar, August 17, 2016.
Expert Report of Erik Laykin, August 24, 2017, with Exhibits A - N.
Expert Report of Jim Timmins, Teknos Associates, August 24, 2017, with Appendix A.
Expert Report of Michael J. Wagner, August 24, 2017, Volumes 1-9.
Offer Letter from Ottomotto LLC to Sameer Kshirsagar, July 2, 2016.
Opening Expert Report of Lamertus Hesselink, Ph.D, August 24, 2017.
U.S. Patent No. 9,368,936 B1.
U.S. Patent No. 9,470,520 B2.
Uber, "Uber Safe", n.d.

**Documents Considered**

**Third Party Sources**

"Self-driving cars are safer when they talk to each other," engadget, June 24, 2017 [https://www.engadget.com/2017/06/24/self-driving-cars-mcity-augmented-reality/]

18 U.S.C. § 1836

*Applied Med. Res. Corp. v. United States Surgical Corp.* , 435 F.3d 1356 (Fed. Cir. 2006)

*Ariba, Inc. v. Emptoris, Inc.* , 567 F. Supp. 2d 914 (E.D. Tex. 2008)

*Cadillac Prods. v. TriEnda Corp.* , 2000 U.S. Dist. LEXIS 13049 ( E.D. Mich. Aug. 2, 200)

Cal. SB 1298, Cal. Assembly Committee on Transportation Hearing, June 25, 2012

California Civil Code § 3426.3

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.* , 809 F.3d 1295 (Fed. Cir. 2015)

*Cornell University v. Hewlett-Packard* , 609 F.Supp.2d 279 (N.D.N.Y. 2009)

D.C. Act 19-643, Autonomous Vehicle Act of 2012 (2013)

*De Lage Landen Operational Services, LLC v. Third Pillar Systems, Inc.*  Civil Action No. 09-2439, Memorandum dated May 9, 2011

*Ericsson, Inc. v. D-Link Systems, Inc.* , 773 F.3d 1201 (Fed. Cir. 2014)

*Fromson v. Western Litho Plate & Supply Co.* , 853 F.2d 1568 (Fed. Cir. 1988)

*Georgia-Pacific Corp. v. United States Plywood Corp.* , 318 F. Supp. 1116 (S.D.N.Y. 1970)

Giffi, Craig, et al., "The Race to Autonomous Driving", Deloitte Review, Issue 20, 2017

Google, Inc.'s Form 10-K for the fiscal year ended December 31, 2013

Google, Inc.'s Form 10-K for the fiscal year ended December 31, 2015

Guggenheim Securities, LLC, "Motown Valley - Revving Up for Electric, Self-driving Cars on Demand", April 17, 2017

*Hanson v. Alpine Valley Ski Area, Inc.* , 718 F.2d 1075 (Fed. Cir. 1983)

Hod Lipson, et al., "Driverless: Intelligent Cars and the Road Ahead," The MIT Press: Cambridge, 2016

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.* , 378 F. Supp. 2d 459 (D. Del. 2005)

Hrg. 114-416, Hearing before the Committee on Commerce, Science, and Transportation, United States Senate, 114th Congress, Second Session, March 15, 2016

http://americanhistory.si.edu/collections/search/object/nmah_1332301

http://buffalonews.com/2017/07/31/new-york-takes-baby-steps-toward-self-driving-vehicles/

http://fortune.com/2016/02/17/uber-china-didi-kuaidi/

http://leddartech.com/automotive/

http://leddartech.com/leddar-technology-enables-new-mass-market-lidar-offering-automotive-applications/

http://news.trust.org/item/20161019210239-8mauc

http://oryxvision.com/news/oryx-vision-raises-50m-build-groundbreaking-coherent-lidar-autonomous-vehicles/

http://quanergy.com/s3/

http://spectrum.ieee.org/cars-that-think/transportation/self-driving/how-driveai-is-mastering-autonomous-driving-with-deep-learning

http://spectrum.ieee.org/cars-that-think/transportation/sensors/can-israeli-startup-oryx-oust-lidar-from-selfdriving-cars

http://thehill.com/blogs/congress-blog/technology/309242-congress-and-dot-must-take-additional-measures-beyond-self

http://velodynelidar.com/docs/news/Velodyne%20LiDAR%20Announces %20New%20Velarray%20LiDAR%20Sensor%20_%20Business%20Wire.pdf

http://velodynelidar.com/docs/news/Velodyne%20LiDAR%20Announces%20Puck%20Hi-Res%20LiDAR%20Sensor,%20Offering%20Higher%20Resolution%20to%20Identify%20Objects%20at%20Greater%20Distances%20_%20Business%20Wire.pdf

http://www.autonews.com/article/20170220/OEM11/302209926/waymo-cries-foul-over-self-drive-legislation

http://www.businessinsider.com/history-sergey-brin-larry-page-and-google-strategy-2011-3#they-splurged-on-research-and-development-4

http://www.businessinsider.com/steve-blank-first-mover-advantage-overrated-2010-10

Confidential - Attorneys' Eyes Only
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017

**Documents Considered**

**Third Party Sources  (Continued)**

http://www.businessinsider.com/uber-custom-lidar-tech-not-ready-google-waymo-lawsuit-2017-4
http://www.cmu.edu/news/stories/archives/2015/february/uber-partnership.html
http://www.freep.com/story/money/cars/2017/06/27/auto-industry-federal-driverless-cars/431292001/
http://www.govtech.com/fs/NYs-Slow-Pace-on-Autonomous-Vehicle-Legislation-Could-Put-It-at-a-Disadvantage-in-Years-Ahead.html
http://www.ibtimes.com/california-google-ready-autonomous-vehicle-showdown-2016-2233290
http://www.ncsl.org/research/transportation/autonomous-vehicles-self-driving-vehicles-enacted-legislation.aspx
http://www.nytimes.com/2011/05/18/technology/18talent.html
http://www.reuters.com/article/us-autos-california-regulations-idUSKBN17R30X
http://www.reuters.com/article/us-uber-tech-research-idUSKCN0WN0WR
http://www.reuters.com/article/us-usa-selfdriving/senators-unveil-road-map-for-self-driving-car-legislation-idUSKBN1942QJ?il=0
http://www.royaltysource.com
http://www.selfdrivingcoalition.org/about
http://www.selfdrivingcoalition.org/newsroom/in-the-news
http://www.st.com/content/st_com/en/about/media-center/press-item.html/t3876.html
http://www.telegraph.co.uk/technology/google/11984555/Rise-of-a-tech-giant-the-history-of-Google.html
http://www.telegraph.co.uk/technology/uber/11962859/The-history-of-Uber.html
https://bits.blogs.nytimes.com/2013/04/07/how-deal-makers-put-a-value-on-start-ups-disruptions/?hpw
https://blog.ot.to/introducing-otto-the-startup-rethinking-commercial-trucking-cfdc502ef452
https://blog.ot.to/our-next-chapter-otto-joins-uber-307ee347a5bf
https://energycommerce.house.gov/selfdrive/
https://hbr.org/2005/04/the-half-truth-of-first-mover-advantage
https://help.uber.com/h/738d1ff7-5fe0-4383-b34c-4a2480efd71e
https://help.uber.com/h/eac2e43e-af42-4521-a042-2982c18664af
https://insight.kellogg.northwestern.edu/article/the_second_mover_advantage
https://medium.com/waymo/introducing-waymos-suite-of-custom-built-self-driving-hardware-c47d1714563
https://medium.com/waymo/say-hello-to-waymo-whats-next-for-google-s-self-driving-car-project-b854578b24ee
https://newsroom.uber.com/5billion/
https://newsroom.uber.com/rethinking-transportation/
https://spectrum.ieee.org/cars-that-think/transportation/sensors/velodyne-announces-a-solidstate-lidar
https://static1.squarespace.com/static/585c3439be65942f022bbf9b/t/591a2e4be6f2e1c13df930c5/1494888038959/RethinkX+Report_051517.pdf
https://techcrunch.com/2015/06/17/the-last-mover-advantage/
https://techcrunch.com/2017/08/08/cruise-is-running-an-autonomous-ride-hailing-service-for-employees-in-sf/
https://waymo.com/faq/
https://waymo.com/journey/
https://waymo.com/ontheroad/
https://www.bizjournals.com/nashville/news/2017/02/10/big-name-companies-come-out-against-self-driving.html
https://www.bloomberg.com/profiles/companies/1433882D:US-ottomotto-llc
https://www.cbinsights.com/blog/google-strategy-teardown/

## Documents Considered

**Third Party Sources  (Continued)**

https://www.cbsnews.com/news/is-the-u-s-ready-for-self-driving-cars-rules-legislation/
https://www.economist.com/news/science-and-technology/21712103-new-chips-will-cut-cost-laser-scanning-breakthrough-miniaturising
https://www.engadget.com/2017/06/24/self-driving-cars-mcity-augmented-reality/
https://www.extremetech.com/extreme/252112-what-is-a-self-driving-car
https://www.forbes.com/sites/briansolomon/2015/12/29/ride-share-pioneer-sidecar-shuts-down-outmuscled-by-uber-and-lyft/#3641cf8629fe
https://www.forbes.com/sites/steveandriole/2015/04/24/whats-your-technology-company-worth-strategic-versus-operational-valuation/#1469899a1b47
https://www.ft.com/content/7f6e251a-5801-11e6-9f70-badea1b336d4
https://www.google.com/about/our-story/
https://www.infineon.com/cms/en/about-infineon/press/press-releases/2016/INFATV201610-002.html
https://www.linkedin.com/in/ming-su-a99a835
https://www.nytimes.com/2016/12/13/technology/google-parent-company-spins-off-waymo-self-driving-car-business.html
https://www.nytimes.com/2017/05/14/technology/lyft-waymo-self-driving-cars.html?mcubz=1
https://www.reuters.com/article/us-usa-selfdriving/senators-unveil-road-map-for-self-driving-car-legislation-idUSKBN1942QJ
https://www.sae.org/news/3544/
https://www.thebalance.com/google-business-profile-2892814
https://www.theverge.com/2015/12/16/10325672/california-dmv-regulations-autonomous-car
https://www.uber.com/drive/delivery/
https://www.uber.com/info/atg/
https://www.uber.com/info/atg/car/
https://www.uber.com/info/atg/truck/
https://www.uber.com/our-story/
https://www.usatoday.com/story/money/cars/2017/06/25/regulators-scramble-stay-ahead-self-driving-cars/100963150/
https://www.usatoday.com/story/tech/news/2016/04/27/self-driving-car-advocates-say-feds-should-set-rules/83620666/
https://www.usatoday.com/story/tech/news/2016/12/22/uber-moves-self-driving-cars-pilot-to-arizona/95763516/
https://www.wsj.com/articles/google-creates-new-company-alphabet-1439240645
https://www.wsj.com/articles/inside-ubers-new-self-driving-cars-in-pittsburgh-1473847202
https://x.company/graduated
Karim R. Lakhani, et al., "Google Car," Harvard Business School Case 614-922, January 2014 (Rev. March 9, 2015)
*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.* , 383 F.3d 1337 (Fed. Circ. 2004)
Krawiec, RJ, et al., "Governing the Future of Mobility", Deloitte, 2017, pgs. 2 and 9 (citations omitted)
*LaserDynamics, Inc. v. Quanta Computer, Inc.* , (Fed. Cir. Aug. 30, 2012)
Lipson, Jesse, "Being First To Market Isn't Always Best:  Ask Microsoft About Apple Watch", Forbes, April 29, 2015
*Lucent Technologies v. Gateway* , 580 F.3d 1307 (Fed. Cir. 2009)
Morgan Stanley, "Autonomous Cars: Self-Driving the New Auto Industry Paradigm", November 6, 2013
National Highway Traffic Safety Administration, "Federal Automated Vehicles Policy", September, 2016
National Highway Traffic Safety Administration, "Preliminary Statement of Policy Concerning Automated Vehicles"
*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.* , 399 F. Supp. 2d 1064, 1078 (N.D. Cal. 2005)
*P & G Co. v. Paragon Trade Brands, Inc.* , 989 F. Supp. 547 (D. Del. 1997)

*Waymo LLC v. Uber Technologies, Inc., et al.*

Exhibit 3

## Documents Considered

**Third Party Sources  (Continued)**

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.* , 575 F.2d 1152 (6th Cir. Mich. 1978)

Phil Magney, "The Importance of Maps for Automated Driving", n.d.

Phil Magney," Vehicle Autonomy - A Framework for Understanding the Value Chain", n.d.

*ResQNet.com, Inc. v. Lansa, Inc.* , 594 F.3d 860 (Fed. Cir. 2010)

*RKI, Inc. v. Grimes* , 200 F. Supp. 2d 916, 926-27 (N.D. Ill. 2002)

S. Hrg. 114-416, "Hands Off: The Future of Self-Driving Cars," Hearing before the Committee on Commerce, Science, and Transportation, United States Senate, 114th Congress, Second Session, March 15, 2016

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.* , 289 U.S. 689 (U.S. 1933)

Strategy&, "Connected car report 2016: Opportunities, risk, and turmoil on the road to autonomous vehicles," n.d.

*Studiengesellschaft Kohle v. Dart Industries, Inc.* , 862 F.2d 1564 (Fed. Cir. 1988)

*Uniloc USA v. Microsoft* , 632 F.3d 1292 (Fed. Cir. 2011)

*Unisplay, S.A. v. American Elec. Sign Co.* , 69 F.3d 512 (Fed. Cir. 1995)

*University Computing Company v. Lykes-Youngstown Corporation et al.*  504 F.2d 518, 535, 537 – 539 (5th Cir. 1974)

Weil, et al., Litigation Services Handbook (Fifth Edition)

Weil, et al., Litigation Services Handbook (Fourth Edition)

*Wright v. United States* , 53 Fed. Cl. 466 (Fed. Cl. 2002)

*Waymo LLC v. Uber Technologies, Inc., et al.*

Exhibit 4



Confidential - Attorneys' Eyes Only
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017

*Waymo LLC v. Uber Technologies, Inc., et al.*

Exhibit 5



Confidential - Attorneys' Eyes Only
Subject to Protective Order

Rebuttal Expert Report of Walter Bratic
September 7, 2017

# Appendix A

# Qualifications and Education

- BA University of Pennsylvania 1975
- MBA Wharton School of Business 1978
- CPA in Texas since 1981
- Certified Licensing Professional
- 30 years real world-licensing and valuation experience
- 20 years public accounting
- 10 years partner at PriceWaterhouseCoopers
- Lecturer on intellectual property damages – University of Houston Law Center
- Editorial Board of 3 intellectual property publications
- Court appointed expert and examiner

# GP Factors Grouped Into Buckets

- Licensing Characteristics
- Nature / Use of Invention
- Commercial Success
- Market / Competition Position
- Experts ☐ Negotiation

# Georgia-Pacific ("GP") Factors

1. Royalties for Patent-in-Suit
2. Royalty Rates for Other Comparable Patents
3. Nature and Scope of License
4. Patent Owner's Willingness to License
5. Competitive Nature of Parties
6. Non-Patented Sales from Use of the Patent-in-Suit
7. Duration of the Patent and the Term of the License
8. Established Profitability / Commercial Success
9. Utility & Advantages of Invention
10. Nature of the Patented Invention & Benefits to User
11. Extent of Infringer's Use
12. Customary Royalty Rates for Use of Invention in the Business
13. Profit Credited to the Invention
14. Opinion of Experts
15. **Hypothetical Negotiation**

Source: Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970).

3

# GP #15 Hypothetical Negotiation







- Between December 2015 and August 2016
- Negotiation on the date of the first alleged misappropriation
- Assume Trade Secrets are valid and misappropriated
- Parties must agree to non-exclusive and non-restrictive license

*Georgia-Pacific Corp. v. United States Plywood Corp.*

# Georgia-Pacific Factors: A Commonly Used Framework

| Financial / Business | Technical | Licensing |
|---|---|---|
| • Evidence probative of the extent and value of use | • Utility and advantages offered by license | • Royalties received by the licensor |
| • Established profitability of products made under patents | • Benefits to users | • Rates paid by the licensee for comparable rights |
| • Portion of realizable profit credited to the patents | | • Customary industry licensing practices |
| • Commercial relationship of the parties | | • Nature and scope of the license |
| • Extent of derivative product sales | | • Duration and term of the license |
| | | • Licensor's established policy |

5

# Components

# UBER
## ATG



**360° radar coverage**

Forward facing camera array focus both close and far field, watching for braking vehicles, crossing pedestrians, traffic lights, and signage

Top mounted lidar units provide a 360° 3-dimensional scan of the environment

Side and rear facing cameras work in collaboration to construct a continuous view of the vehicle's surroundings

Roof mounted antennae provide GPS positioning and wireless data capabilities

Custom designed compute and storage allow for real-time processing of data while a fully integrated cooling solution keeps components running optimally

## Self Driving Uber sensor suite

7 Cameras
1 Laser
Inertial Measurement Units

Custom compute and data storage
360° radar coverage

Advanced
Technologies
Group

# LiDAR is a Small Piece of the AV



Other Hardware

LiDAR

Radar

Cameras

Software

AV

# Wagner Damages Comparison

## Wagner's Damages
$1.859 billion

vs.

Velodyne Valuation
$950 million

Chauffeur Valuation
$2.1 billion

Quanergy Valuation
$1.3 billion

9



# Wagner Damages Comparison

Wagner's Damages — $1.859 billion

Velodyne Valuation — $950 million

Chauffeur Valuation — $2.1 billion

Quanergy Valuation — $1.3 billion

10



Wagner's "skipping ahead" Concept for Unjust Profits








Wagner's Concept for Saved Development Costs

# Executive Summary

**Goal for Today's Meeting**
- Reach consensus on appropriate number of AVs to order in 2019, and preview 2020

**Background / Initial Results from December 2015**
- **Team:** Cross-functional task force involving ATC Data Algorithms, Marketplace Dynamics, Operations Research, Growth Optimization, Strategic Finance, and ATC Strategy
- **Initial 2019 Baseline:** 7,000 Units (recommended we order 5k-10k units, w/ optionality for 10k-20k units)
    - *Initial 2020 Baseline (for Reference Only):* 25,000 Units (recommended we order 15k-35k units, w/ optionality for 50k-75k units)

**Revised Results**
- **Revised 2019 Baseline:** 13,620 Units
    - *Revised 2020 Baseline (to be further refined):* 42,375 Units
- **Key Changes:** Panel of experts approach; sentiment favored bull capabilities; delta between Base & Bull > delta between Base & Bear

**2019 Recommendation**
- **15,000 Units (+/- 2,500)**
    - **Considerations:**
        - Capable of servicing a significant # of trips, which would have a material impact on the business (AV overall replacement rate = ~14.7%; replacement rate at peak demand = ~2.3x)
        - Large capital outlay: ~$2.1bn (15k units * $154k per unit; assuming kit cost of ~$129k & vehicle cost of $25k)
        - Volume recommended to ensure vehicles operate at high levels of utilization

**Key Strategic Questions for Discussion**
- Launch schedule? Competitive tactics? Marketplace health? How do we ensure are the lowest cost operator? Etc...

U B E R

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Use or disclosure of document data is subject to restrictions on the title page.                    © 2016 Uber                    3

UBER00232551

> **Note:** Results are highly speculative, and depend on significant assumptions on Cost Curves and Pace of Technology Development. Output of this analysis require commentary and context.



14