1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT A</u>**

(Uber's Answer and Counterclaims to First Amended Complaint in Adversary Proceeding)

Debra I. Grassgreen (CA Bar No. 169978)
Miriam Manning (CA Bar No. 178584)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone:     (415) 263-7000
Facsimile:      (415) 263-7010
E-mail:        dgrassgreen@pszjlaw.com
               mmanning@pszjlaw.com

David J. Bradford (admitted *pro hac vice*)
Catherine Steege (admitted *pro hac vice*)
Terri L. Mascherin (admitted *pro hac vice*)
Katharine R. Ciliberti (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Telephone: (312) 222-9350
E-mail: dbradford@jenner.com
         csteege@jenner.com
         tmascherin@jenner.com
         kciliberti@jenner.com

*Counsel for Uber Technologies, Inc.*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>                    Debtor. | Case No. 20-30242 (HLB)<br><br>Chapter 11 |
| ANTHONY LEVANDOWSKI, an individual,<br><br>                    Plaintiff,<br><br>             v.<br><br>UBER TECHNOLOGIES, INC.<br><br>                    Defendant. | **Adv. Pro. No. 20-03050 HLB<br>[REDACTED]<br>ANSWER TO DEBTOR'S FIRST<br>AMENDED COMPLAINT FOR<br>DECLARATORY RELIEF, SPECIFIC<br>PERFORMANCE, DAMAGES, AND<br>OBJECTION TO CLAIM; AFFIRMATIVE<br>DEFENSES; AND COUNTERCLAIMS** |

Defendant Uber Technologies, Inc. ("Uber") asserts the following answers, affirmative defenses, and counterclaims to the complaint of Plaintiff Anthony S. Levandowski ("Levandowski"), as debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), and as plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), and states as follows:

## NATURE OF CLAIM

1.      This is an objection to the allegations made by Uber Technologies, Inc. ("Uber") in its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") and an action to enforce the promises Uber made to Mr. Levandowski to induce him to sell to Uber his self-driving companies and technology and to lead its autonomous vehicle program.

**ANSWER:**     Uber admits that Levandowski purports to object to allegations Uber made in its Proof of Claim (8-1) on July 6, 2020. Uber further admits that Levandowski purports to bring an action to enforce alleged promises he claims Uber made to Levandowski. Uber denies the remaining allegations in paragraph 1.

2.      Mr. Levandowski is one of the world's leading experts in autonomous vehicle technology.  Mr. Levandowski is a star engineer who built one of the first self-driving motorcycles (which is in the Smithsonian today), one of the first self-driving cars, and one of the first self-driving freight trucks.  He was a founding member of Google's autonomous car initiative, Project Chauffeur, and played an integral part in driving the technology development for Project Chauffeur.

**ANSWER:**     Uber admits that Levandowski is an engineer who has participated in projects related to the construction of self-driving vehicles. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 2 and therefore denies the allegations.

3.      Before his departure, Mr. Levandowski told Google about his intention to leave Google to start a new self-driving start-up.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 and therefore denies the allegation.

4.      Larry Page, the then-CEO of Google, threatened Mr. Levandowski and stated that if Mr. Levandowski worked for a competitor on self-driving technology, he would face very negative consequences.  Mr. Levandowski was also aware that Mr. Page had great animosity toward Uber and Travis Kalanick, Uber's then-CEO.  In addition, Mr. Levandowski was aware that Mr. Page and other executives at Google viewed Uber as a very significant competitor.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 and therefore denies the allegations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

5.      In early 2016, Mr. Levandowski left Google and helped start Ottomotto LLC ("Otto") a self-driving trucking company.

**ANSWER:**      Uber admits that Levandowski left Google in early 2016. Uber further admits that Levandowski helped start Ottomotto LLC ("Otto") and that Otto was a self-driving vehicle company. Uber denies the remaining allegations in paragraph 5.

6.      Uber expressed an interest in acquiring Otto to accelerate its self-driving program and to compete with Google, whom Mr. Kalanick believed to be an existential threat to Uber.

**ANSWER:**      Uber admits that it was interested in acquiring Otto. Uber denies the remaining allegations in paragraph 6.

7.      Because of Mr. Page's threats and known hostility towards Uber, Mr. Levandowski insisted that Uber indemnify him against claims that may be brought by Google as a condition to entering into any relationship with Uber.

**ANSWER:**      Uber admits that Levandowski sought to have Uber indemnify him against certain potential claims and that Levandowski expressed concern that Google would sue him even if he did nothing wrong. Uber denies that Levandowski is entitled to indemnification. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 7 and therefore denies the allegations.

8.      In fact, Mr. Levandowski explained to Uber multiple times that he believed Google would likely sue him if he joined Uber.  Mr. Levandowski was particularly concerned because he did not have the ability to defend himself if one of the largest companies in the world, with essentially unlimited resources, came after him.

**ANSWER:**      Uber admits that, prior to executing the Indemnification Agreement, Levandowski and Uber discussed the prospect that Google may bring litigation against Levandowski. Uber further admits that Levandowski expressed concern that Google could sue him even if he did nothing wrong. Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of paragraph 8 and therefore denies the allegations. Uber denies the remaining allegations in paragraph 8.

9.      In addition, because Mr. Levandowski left Google to work on autonomous trucking, Mr. Levandowski conditioned the sale of Otto on Uber supporting his self-driving trucking business.

**ANSWER:**      Uber admits that on April 11, 2016, the Ottomotto Merger Agreement ("Otto Agreement") and the Otto Trucking Merger Agreement ("Otto Trucking Agreement") were each executed. Uber respectfully refers the Court to the Otto Trucking Agreement, attached as Exhibit 8,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

and the August 17, 2016 amendment to that agreement, attached as Exhibit 9, for their complete and accurate contents. Uber denies the remaining allegations in paragraph 9.

10.     As part of the transaction for the acquisition of Otto, Uber agreed to indemnify Mr. Levandowski for claims Google might raise against him. These claims included claims Google might assert for breach of fiduciary duty, breach of the duty of loyalty, breaches of various restrictive covenants, and trade secret misappropriation. **Exhibit A** is a redacted copy of the Indemnification Agreement dated April 11, 2016 between Uber and Mr. Levandowski.

**ANSWER:**     Uber admits that it entered into an Indemnification Agreement on April 11, 2016 with Levandowski, and that Exhibit A to the Amended Adversary Complaint is a redacted copy of that Agreement. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 10. Answering further, Uber entered into the Indemnification Agreement based on, among other things, Levandowski's unequivocal representations that he had not breached any obligations to Google, that he had not taken any confidential information or documents from Google, and that no Google documents or information would be brought to Uber.

11.     Under the Indemnification Agreement, Uber agreed to pay for Expenses incurred by Mr. Levandowski—defined in the Agreement to include attorneys' fees and costs relating to defense of any claim brought by Google, as well as any award or judgment in Google's favor. *See* Ex. A at 3, § 2.3.

**ANSWER:**     Uber admits that the Indemnification Agreement includes at page 3 and § 2.3 language related to Expenses and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 11.

12.     As part of the acquisition of Otto, Uber also agreed to support Mr. Levandowski's trucking business objectives by either creating a new business unit within Uber (wherein Mr. Levandowski would have a leadership role) or allowing Mr. Levandowski to create a trucking business outside of Uber.

**ANSWER:**     Uber admits that on April 11, 2016, the Otto Agreement and the Otto Trucking Agreement were each executed. Uber respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 12. Answering further, Uber states that the Otto Trucking Agreement was terminated pursuant to its terms, that prior to its termination, Levandowski voluntarily sold his interest in Otto Trucking LLC ("Otto Trucking") to a third party, and that Levandowski has no legal right to enforce the terminated Agreement.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

13.     After Uber acquired Otto, Mr. Page followed through on his threats against Mr. Levandowski.  In October, 2016, Google initiated two arbitration proceedings against Mr. Levandowski.  Mr. Levandowski timely requested indemnity from Uber under the Indemnification Agreement, and Uber accepted its obligations.  Consequently, Uber paid for and controlled the defense of Mr. Levandowski for nearly three years.  Initially, Mr. Levandowski was represented by the same counsel that represented Uber.  During the course of a separate litigation, a trade secrets dispute with Waymo LLC, a Google affiliate, Uber's then-counsel determined it could not jointly represent Mr. Levandowski (or his company, Otto Trucking) and Uber.  Uber subsequently selected and hired separate counsel for Mr. Levandowski.  Uber continued to direct the defense strategy and continued to make payments for the cost of defense after replacement counsel was selected.  Uber also exercised its right to direct and control Mr. Levandowski's defense of the arbitration proceeding through the final award and including all settlement discussions with Google.

**ANSWER:**     Uber admits that in October 2016, Google initiated two arbitration proceedings against Levandowski (together, the "Google Arbitration"). Uber further admits that Levandowski thereafter requested indemnity from Uber pursuant to the April 11, 2016 Indemnification Agreement. Uber admits that it paid the legal expenses in connection with the two arbitration proceedings through September 25, 2019, the date the Arbitration Panel declared the arbitration hearing closed. Uber admits that Levandowski was represented in the arbitration proceedings by Morrison & Foerster LLP, and that Morrison & Foerster initially represented both Levandowski and Uber. Uber admits that after Google initiated *Waymo LLC v. Uber Technologies, Inc., et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.) ("Waymo litigation"), Uber determined that Levandowski should have separate counsel. Uber denies that it directed and controlled Levandowski's defense of the arbitration proceeding through the final award, including all settlement discussions with Google. Uber denies the remaining allegations in paragraph 13.

14.     After Mr. Levandowski relied on Uber's control and direction for years and after an unfavorable Interim Award issued, Uber purported to rescind the Indemnity Agreement and made clear that it would not pay for any additional Expenses incurred by Mr. Levandowski after September 25, 2016.

**ANSWER:**     Uber admits that it notified Levandowski through counsel that the Indemnification Agreement was rescinded and that it would not make additional payments after September 25, 2019. Uber respectfully refers the Court to the August 30, 2019 and September 27, 2019 letters from Uber's counsel to Levandowski's counsel for their complete and accurate contents. Uber denies the remaining allegations in paragraph 14.

15.     In addition, while in control of Mr. Levandowski's defense and settlement prospects with Google, Uber worked out its own settlement with Google's subsidiary, Waymo LLC ("Waymo") to resolve a trade secret dispute between them relating to the same underlying events. Upon information and belief, the terms of that settlement included an agreement that Uber would

never hire or work with Mr. Levandowski again, which resulted in Uber also reneging on its promises to support Mr. Levandowski's trucking business.

**ANSWER:**     Uber admits that in February 2018 it, along with Otto, entered into a Settlement Agreement with Waymo LLC, Google LLC, and Alphabet, Inc. ("Google Settlement Agreement") in connection with a civil action that Waymo filed against Uber, Otto, and Otto Trucking asserting claims for violations of the Trade Secrets Act, violations of the California Uniform Trade Secrets Act, patent infringement, and violations of Section 17200 of the California Business and Professions Code. Uber respectfully refers the Court to the Google Settlement Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 15.

16.     Uber's recently filed Proof of Claim has made the Indemnification Agreement, and Uber's actions related to its acquisition of Otto, central to this Chapter 11 Case.

**ANSWER:**     Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242. Uber denies the remaining allegations in paragraph 16.

17.     In particular, the Proof of Claim alleges that because Uber purportedly rescinded the Indemnification Agreement, not only does Uber not have any obligation to indemnify Mr. Levandowski but it also is a creditor of Mr. Levandowski.  Uber seeks payment for legal fees and costs it provided under the Indemnification Agreement and contribution for the settlements it has negotiated for its own benefit and the benefit of Mr. Levandowski's cofounder, the current lead of Uber's trucking business.

**ANSWER:**     Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242. Uber respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 17.

18.     However, Uber asserts claims that, upon information and belief, Uber released as part of the settlement with Waymo.

**ANSWER:**     Uber denies the allegations in paragraph 18.

19.     Uber also has no basis to rescind the Indemnity Agreement.  Uber has set forth numerous theories to back out of the deal it struck, but two issues appear to be core:  (1) a claim that Mr. Levandowski engaged in fraud and (2) a claim that Mr. Levandowski has pled to one count of trade secret misappropriation in a criminal indictment filed by the United States Attorney.

**ANSWER:**     Uber admits that it has asserted, among other things, that Levandowski engaged in fraud, and that Levandowski has pled guilty to one count of trade secret misappropriation in a criminal indictment filed by the United States Attorney. Uber denies the remaining allegations in paragraph 19.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

20.     First, there was no fraud.  Uber was aware of Mr. Levandowski's conduct through the extensive investigation it conducted prior to and after entering into the indemnity agreement with him, and long before it purported to rescind.  To the extent Uber claims it was unaware of certain facts, those facts were not material and were fully available to Uber had they cared to look more carefully at the materials it was provided by Mr. Levandowski.  In fact, Mr. Levandowski repeatedly told Uber to search those devices for the most accurate information.

**ANSWER:**     Uber admits that in March 2016, it engaged Stroz Friedberg, LLC ("Stroz") to conduct an independent investigation of Otto employees, including Levandowski. Uber denies the remaining allegations in paragraph 20.

21.     Second, Mr. Levandowski did not make any misrepresentations regarding any theft of trade secrets.  Mr. Levandowski has plead guilty to trade secret misappropriation with respect to one file he accessed after leaving Google.  As for that one file, Uber knew the file's name, that Mr. Levandowski kept that file, that he accessed it after he left Google, the date he accessed it, and through its due diligence firm, the contents of that file.

**ANSWER:**     Uber admits that Levandowski has pled guilty to Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA. Uber denies the remaining allegations in paragraph 21.

22.     Mr. Levandowski therefore commenced the Adversary Proceeding to obtain declaratory relief as to the impact of Uber's purported rescission on the parties' respective rights and obligations, to enforce Uber's obligations arising from the Otto transaction, and to disallow the Proof of Claim.

**ANSWER:**     Paragraph 22 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 22.

## JURISDICTION AND VENUE

23.     The Adversary Proceeding arises in and relates to the Chapter 11 Case.  The Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Mr. Levandowski against Uber herein pursuant to 28 U.S.C. §§ 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California. The parties also stipulated to have this dispute, and any others raised in Mr. Levandowski's arbitration demand and Uber's proof of claim be resolved in this Adversary Proceeding.  *See* ECF No. 13.

**ANSWER:**     Uber admits that the Adversary Proceeding relates to the Chapter 11 case and that the Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Levandowski pursuant to 28 U.S.C. 1334(b). Uber admits that the parties stipulated to have "all disputes between them" resolved before this Court as part of the Adversary Proceeding, including disputes raised in Levandowski's demand in arbitration and his Complaint in the Adversary

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Proceeding, and those raised in Uber's Proof of Claim in the Chapter 11 case. Uber denies the remaining allegations in paragraph 23.

24.    This is a core proceeding under 28 U.S.C. § 157(b) including, without limitation, under subsections (b)(2)(A), (B), (C), (K), and (O).  Mr. Levandowski consents to the entry of a final order by the Court in connection with this Adversary Proceeding.

**ANSWER:**    Uber admits that Levandowski's objection to Uber's Proof of Claim is denominated as a core proceeding under 28 U.S.C. § 157(b)(2)(B). Uber denies that the remaining claims set forth in this Adversary Proceeding are denominated as core proceedings pursuant to any of the subparts of 28 U.S.C. § 157(b)(2). Pursuant to Local Bankruptcy Rule 7012-1, Uber consents to the entry of final orders or judgments by the Bankruptcy Court.

25.    Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**ANSWER:**    Uber admits that venue is proper before this Court pursuant to 28 U.S.C. § 1409(a) and this Court's July 29, 2020 Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court. (*See* Case No. 20-03050, Dkt. 13.) Pursuant to that Stipulation, Uber does not contest that venue is proper before this Court with respect to Levandowski's Amended Adversary Complaint. Uber denies the remaining allegations in paragraph 25.

## FACTS

**A.    MR. LEVANDOWSKI ESTABLISHES HIS REPUTATION AS A PIONEER IN SELF-DRIVING CAR TECHNOLOGY**

26.    Mr. Levandowski has had a lifelong fascination with robots and autonomous devices.

**ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 and therefore denies the allegations.

27.    He earned his undergraduate and graduate degrees in Industrial Engineering and Operations Research at University of California, Berkeley ("U.C. Berkeley").

**ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 and therefore denies the allegations.

28.    In 2004, Mr. Levandowski participated in the Defense Advanced Research Projects Agency's ("DARPA") Grand Challenge, a prize competition for autonomous vehicles.  He was 24 years old at the time.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

7

DOCS_SF:104805.1 85647.001

1      **ANSWER:**   Uber lacks knowledge or information sufficient to form a belief as to the truth

2  of the allegations in paragraph 28 and therefore denies the allegations.

3      29.    The DARPA Grand Challenge was an effort to race robotic, computer-controlled vehicles between Los Angeles and Las Vegas. Mr. Levandowski and a team of engineers from U.C.

4  Berkeley—working in Mr. Levandowski's garage using crowd-sourced donations— submitted a self-driving, self-balancing, two-wheeled motorcycle. This motorcycle, Ghostrider, competed

5  against well-funded submissions from Stanford University, Carnegie Mellon, and established companies. After performing well in several qualifying rounds, Ghostrider was selected as a

6  contender for the DARPA Grand Challenge.

7      **ANSWER:**   Uber lacks knowledge or information sufficient to form a belief as to the truth

8  of the allegations in paragraph 29 and therefore denies the allegations.

9      30.    Ghostrider now sits in the Smithsonian Museum as one of America's great innovations.

10      **ANSWER:**   Uber lacks knowledge or information sufficient to form a belief as to the truth

11  of the allegations in paragraph 30 and therefore denies the allegations.

12      31.    Mr. Levandowski's Ghostrider entry caught the attention of many, including Dr.

13  Sebastian Thrun, a former Stanford computer science professor who was also a participant in the DARPA Grand Challenge.

14      **ANSWER:**   Uber lacks knowledge or information sufficient to form a belief as to the truth

15  of the allegations in paragraph 31 and therefore denies the allegations.

16      32.    Dr. Thrun recruited Mr. Levandowski to work for his mapping company, VuTool.

17  VuTool was subsequently acquired by Google.

18      **ANSWER:**   Uber lacks knowledge or information sufficient to form a belief as to the truth

19  of the allegations in paragraph 32 and therefore denies the allegations.

20  **B.**   **MR. LEVANDOWSKI BUILDS GOOGLE'S SELF DRIVING CAR PROGRAM**

21      33.    Mr. Levandowski joined Google in 2007 as part of a team hired to work on mapping

22  with Dr. Thrun. Mr. Levandowski helped develop the technology for the Google service now known as Street View.

23      **ANSWER:**   Uber lacks knowledge or information sufficient to form a belief as to the truth

24  of the allegations in paragraph 33 and therefore denies the allegations.

25      34.    In approximately 2009, Dr. Thrun and Mr. Levandowski decided to launch a self-

26  driving car program at Google. The program was named "Project Chauffeur."

**ANSWER:** Uber admits that Levandowski was part of a program called Project Chauffeur while employed by Google. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 34 and therefore denies the allegations.

35.     Project Chauffeur catapulted Google into the lead in autonomous driving when, in 2010, cars using Google's self-driving technology were able to drive ten uninterrupted routes of 100 miles.  By 2012, Google had logged over 300,000 miles of autonomous driving.  Mr. Levandowski was a key contributor in helping Google achieve these milestones.  For his past contributions and to incentivize him going forward, Google invited Mr. Levandowski to participate in the Chauffeur Bonus Plan—an incentive plan that would pay members a percentage of the valuation of Project Chauffeur starting at the end of 2015—and gave him the highest initial allocation or individual earnout percentage of any member of the plan.

**ANSWER:** Uber admits that Levandowski was part of a program called Project Chauffeur while employed by Google and that he participated in the Chauffeur Bonus Plan. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35 and therefore denies the allegations.

36.     Mr. Levandowski was an instrumental contributor to Project Chauffeur until he left Google in early 2016.

**ANSWER:** Uber admits that Levandowski was part of a program called Project Chauffeur while employed by Google and that he left Google in 2016. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36 and therefore denies the allegations.

37.     Mr. Levandowski would ultimately be paid over $127 million by Google for his work on Project Chauffeur.  The majority of that payment came in December 2015 and then in mid-August 2016, after Mr. Levandowski left Google.

**ANSWER:** Uber admits that the Arbitration Award in favor of Google and against Levandowski ("Arbitration Award") recounts that Levandowski was paid approximately $127 million by Google and that Levandowski had no right to receive that payment and was required to disgorge the same. Uber respectfully refers the Court to the redacted Arbitration Award for its complete and accurate contents, attached as Exhibit 1. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 37 and therefore denies the allegations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## C.   MR. LEVANDOWSKI CONSIDERS LEAVING GOOGLE

38.   For years, Google enjoyed its position as the leader in the self-driving space with no significant challengers.  In 2015, Uber announced the launch of its own self-driving car initiative after acquiring a team of engineers from Carnegie Mellon University.

**ANSWER:**   Uber admits that in 2015, Uber formed a partnership with Carnegie Mellon University ("CMU") that resulted in Uber hiring certain faculty members, researchers, and technicians from CMU. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 38 and therefore denies the allegations.

39.   After Uber's announcement, there were many discussions within Google about how to compete with Uber.  In those discussions, executives within Google expressed distaste and animosity towards Uber.  Larry Page, one of Google's founders and its then-CEO, was one of the individuals expressing such views.

**ANSWER:**   Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 and therefore denies the allegations.

40.   Uber's founder and then-CEO, Travis Kalanick, testified that after Uber announced its entry into self-driving, Mr. Page communicated directly to Mr. Kalanick his displeasure about the increased competition:

> So when we acquired the [Carnegie] team and we were eventually -- we acquired it because we couldn't get meetings [with Google] and we couldn't figure out if they were still up for partnering.  When we finally got the meeting, Larry made it very clear that he was very upset with us and not happy that we were doing autonomy.  And everything we would get in terms of a signal from other people who knew him or knew people around him was that generally Google was super not happy, unpumped, about us doing this.  And so when you go and hire a group of people, a large group of people, acquire a company where a large group of people, you know, come from there, you know, that competitive thing, those competitive juices get flowing, and that means there is a higher likelihood of a lawsuit of some kind.

**Exhibit B** is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* (Kalanick Waymo 2/7/2018 trial testimony) at 717:4-17.

**ANSWER:**   Uber admits that the language quoted in paragraph 40 is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* and respectfully refers the Court to the trial transcript for its complete and accurate contents. Uber denies the remaining allegations in paragraph 40.

41.   Over time, Mr. Levandowski became increasingly dissatisfied with the direction of Project Chauffeur and the slow progress it was making after its initial successes.  In 2015, Mr. Levandowski began to think about other self-driving opportunities.

**ANSWER:**   Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 and therefore denies the allegations.

42.     After learning about Mr. Levandowski's discontentment at Google, Dr. Thrun introduced Mr. Levandowski to Mr. Kalanick at Uber.  Upon meeting Mr. Levandowski, Uber repeatedly tried to recruit Mr. Levandowski and also encouraged him to leave Google to form a commercial partnership where he could supply self-driving technology to Uber as an outside technology vendor.

**ANSWER:**     Uber admits that Dr. Thrun introduced Levandowski to Mr. Kalanick. Uber denies the allegations in the second sentence of paragraph 42. Uber lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 42 and therefore denies the allegations.

43.     Mr. Levandowski's Google colleagues, and more than one of his superiors, were aware that Mr. Levandowski was having discussions with Uber as he considered his future.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 43 and therefore denies the allegations.

44.     Simultaneously, in 2015, Lior Ron rejoined Google in a business role.  Mr. Levandowski and Mr. Ron, who had met while working on Google Maps, began to discuss the problems with Project Chauffeur and ways in which the Project could be improved.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 44 and therefore denies the allegations.

45.     During those conversations, they also discussed new product markets, including self-driving trucks.  As they explored this concept and brainstormed further, both became passionate about self-driving trucking.  They were convinced that the trucking business could be disrupted by the addition of self-driving technology and that self-driving trucking technology could go to market much more quickly than passenger car technology.  Mr. Levandowski began to include Mr. Ron in his discussions with Uber and others.  Mr. Levandowski and Mr. Ron considered establishing a commercial vendor relationship with Uber to obtain funding for the trucking business.

**ANSWER:**     Uber admits that Mr. Ron participated in discussions with Uber and Levandowski. Uber lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 45 and therefore denies the allegations.

46.     Toward the end of his time at Google, Mr. Levandowski also had several discussions with Mr. Page about his dissatisfaction with Project Chauffeur.  During one of these discussions, Mr. Levandowski told Mr. Page that he wanted to create his own self-driving start-up outside of Google.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 46 and therefore denies the allegations.

47.     Mr. Page responded that if Mr. Levandowski did anything competitive with Google, he would face negative consequences.  Because Google had bought several of Mr. Levandowski's outside businesses previously and because others had left Google to start new companies without objection from Google, Mr. Levandowski understood Mr. Page's threat to be about a large, well-funded competitor and not a startup.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 47 and therefore denies the allegations.

**D.     MR. LEVANDOWSKI JOINS UBER AND OBTAINS INDEMNITY AGAINST CLAIMS GOOGLE MAY RAISE**

48.     Mr. Levandowski left Google on January 27, 2016.  He joined Otto, a self-driving trucking company and was credited as a co-founder.

**ANSWER:**     Uber admits that Levandowski left Google on January 27, 2016. Uber admits that Levandowski joined Otto and that he was credited as a co-founder. Uber denies the remaining allegations in paragraph 48.

49.     Soon after Mr. Levandowski joined Otto, Uber pushed for discussions to acquire Otto.

**ANSWER:**     Uber admits that it discussed acquiring Otto with Levandowski.  Uber denies the remaining allegations in paragraph 49.

50.     As part of these discussions, Mr. Levandowski repeatedly told Uber that Google would see Mr. Levandowski working with Uber on consumer self-driving technology (instead of trucking) as a competitive act that would convert him from a friendly, start-up competitor to an enemy.  Mr. Levandowski also told Uber that he feared that Google would sue him and seek recovery of the substantial amounts of money that had been paid to him or were owed to him, in particular, the proceeds from the Chauffeur incentive plan that Google owed him.

**ANSWER:**     Uber admits that Levandowski raised concerns that Google would sue him without a valid basis for doing so. Uber denies the remaining allegations in paragraph 50.

51.     In total, he had over a dozen conversations with executives at Uber about his concerns, including multiple conversations with Mr. Kalanick.  In particular, Mr. Levandowski discussed the possibility that Google might sue him, Mr. Page's aggressiveness with competitors, and Mr. Page's dislike of Mr. Kalanick.  In response, Mr. Kalanick stated that Uber was prepared to protect Mr. Levandowski from an aggressive assault by Google.

**ANSWER:**     Uber admits that in early 2016, Levandowski and Uber discussed concerns related to Levandowski's former employer, Google, and the prospect that Google may bring litigation against Levandowski. Uber denies the remaining allegations in paragraph 51.

52.     As a key and indivisible part of the transaction to sell Otto to Uber and have Mr. Levandowski join Uber, Uber agreed to indemnify Mr. Levandowski against any claims Google might assert against him.  *See* Ex. A.  The goal of the Indemnification Agreement was to indemnify Mr. Levandowski and others for "Pre-Signing Bad Acts," which were defined as any of the following acts that occurred prior to April 11, 2016:

"Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that

constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

"Pre-Signing Bad Acts" means any Bad Act committed prior to the Agreement Date.

*Id*. at 1-2, 3 (definition of "Bad Acts" and "Pre-Signing Bad Acts").

**ANSWER:**     Uber admits that the language quoted in paragraph 52 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 52. Answering further, Uber states that Levandowski is not entitled to indemnification.

53.     Section 2.1 outlined the scope of the indemnity for these Pre-Signing Bad Acts:

(a) ***Purchaser will indemnify and hold harmless each Diligenced Employee*** and the Company Group, ***to the maximum extent permitted by applicable Law*** (subject to the limitations and exclusions set forth herein), from and against any and ***all Expenses incurred by such Diligenced Employee*** or any member of the Company Group, as applicable, arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against any member of the Company Group or such Diligenced Employee, as applicable, arising out of or of alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "Indemnified Claim", and, collectively, the "Indemnified Claims")

*Id*. at § 2.1(a) (emphasis added).

**ANSWER:**     Uber admits that the language quoted in paragraph 53 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 53. Answering further, Uber states that Levandowski is not entitled to indemnification.

54.     "Expenses" is defined in the Indemnification Agreement to include, among other costs, reasonable attorneys' fees, costs of defense, any judgments, awards or damages, and interest incurred:

> "Expenses" means (a) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (b) any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement, and (c) any interest, assessments, taxes or other charges imposed on any of the items in part (a) and (b) of this definition, in each case, that is out-of-pocket and documented; provided, that Expenses shall exclude special, consequential, indirect, exemplary or punitive damages, unless such Expenses were specifically awarded in a Final Judgment.

*Id*. at 3.

**ANSWER:**     Uber admits that the language quoted in paragraph 54 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 54. Answering further, Uber states that the scope of permissible indemnification is limited by applicable law.

55.     The only limitations on Uber's indemnification obligations with respect to "Pre-Signing Bad Acts" are found in Section 2.1(b)(ii).  That section reads:

> (b) Notwithstanding anything herein to the contrary, ***an Indemnified Claim shall not, regardless of whether the Closing occurs, include***, and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation hereunder to indemnify the Company Group or any Diligenced Employee in respect of, any:
>
> > (ii) ***claims that have been determined by a Final Judgment to arise or result from any Pre-Signing Bad Acts*** committed by or on behalf of any member of the Company Group by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that ***either (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries*** in connection with the due diligence performed by the Outside Expert ***or (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees*** to the Outside Expert.

*Id*. at § 2.1(b)(ii) (emphasis added).

**ANSWER:**     Uber admits that the language quoted in paragraph 55 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies that the language quoted in paragraph 55 constitutes the "only limitations" on Uber's indemnification obligations. Uber denies the remaining allegations in paragraph 55.

PACHULSKI STANG ZIEHL & JONES LLP<br>ATTORNEYS AT LAW<br>SAN FRANCISCO, CALIFORNIA

56.     The Indemnification Agreement was structured to ensure that Mr. Levandowski would not be left unprotected against Google, which had inexhaustible resources to attack Mr. Levandowski.  Mr. Levandowski would not have entered into the transaction to sell Otto to Uber without Uber's indemnity promise.

**ANSWER:**     Uber admits that Levandowski expressed concern about Google's use of virtually inexhaustible resources to attack him without basis, but denies the remaining allegations in the first sentence of paragraph 56. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 56 and therefore denies the allegations.

57.     The Indemnification Agreement was structured so that Uber would indemnify Mr. Levandowski first and could only seek recovery from him for Expenses improperly paid (if any) after any matters initiated by Google had concluded.  Under Section 2.3 of the Indemnification Agreement, the parties specified a procedure by which Mr. Levandowski would notify Uber about Expenses and receive payment.

**2.3.  Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request.

*Id*. at § 2.3.

**ANSWER:**     Uber admits that the language quoted in paragraph 57 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 57. Answering further, Uber denies that Levandowski is entitled to indemnification.

58.     If Uber denied a request for advancement of Expenses or otherwise failed to pay an Expense, Uber agreed that Mr. Levandowski could initiate arbitration proceedings to enforce Uber's obligations or seek specific performance of Uber's obligations.  Ex. A at §§ 2.3, 3.11

**ANSWER:**     Uber admits that sections 2.3 and 3.11 appear in the Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 58.

59.     The parties also agreed that Mr. Levandowski could pursue specific performance in the event Uber refused to advance Expenses, including proceedings in San Francisco state or federal courts where both parties submitted to jurisdiction.

**3.11 Specific Performance**.  Except as set forth in this Agreement, the rights and remedies of the Parties specified shall be cumulative (and not alternative).  Each of the Parties agrees that *this Agreement is intended to be legally binding and specifically enforceable* pursuant to its terms and that Purchaser and the ***Indemnified Persons would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms*** and that monetary damages

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

would not provide adequate remedy in such event. Accordingly, in addition to any other remedy to which a nonbreaching Party may be entitled at law, *a non-breaching Party shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to specifically enforce the terms and provisions hereof.*

*Id*. at § 3.11 (emphasis added); *see also id*. at § 3.5.

**ANSWER:** Uber admits that the language quoted in paragraph 59 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 59.

### E.    UBER ACQUIRES OTTO

60.    As part of the indemnification process, Mr. Levandowski agreed to be interviewed by Uber's due diligence and risk management firm, Stroz Friedberg, LLC ("Stroz"). He also provided over 35 of his devices and gave access to over ten email and other types of accounts to Stroz for examination. To this day, Uber, through Stroz, continues to be in possession of Mr. Levandowski's devices (other than his cell phone at the time) and images of his accounts.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that Stroz collected a number of devices from Levandowski and that Levandowski gave Stroz access to a number of accounts. Upon information and belief, Uber admits that Stroz is still in possession of most of those devices and maintains static images of those accounts. Uber denies that it is in possession of Levandowski's devices and images of his accounts. Uber denies the remaining allegations in paragraph 60.

61.    The Stroz /Uber investigation of Mr. Levandowski uncovered a great number of facts related to potential claims that might be brought by Google but was, by Stroz's own admission, incomplete. In early April 2016, while Stroz' was conducting its investigation, Uber executed the Indemnification Agreement.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that the Indemnification Agreement was executed on April 11, 2016, and that the final Stroz written summary report had not been completed at that point. Uber denies the remaining allegations in paragraph 61. Answering further, Uber received preliminary findings from Stroz prior to April 11, 2016.

62.    As Stroz summarized, Uber requested preliminary information regarding the investigation "in the lead-up to Uber's signing of an agreement to purchase Otto and "long before the investigation was completed." Stroz had provided Uber with preliminary information that included Stroz's draft memo from Mr. Levandowski's interviews and access reports showing that Mr. Levandowski retained thousands of Google files, and had accessed hundreds of Google documents after he left Google, including several that were identified by Mr. Levandowski as relating to self-driving. The interview memo remained in draft form and Mr. Levandowski's counsel reserved his rights as to the accuracy of the information in the memo.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:**    Uber admits that it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that Stroz provided a draft memo to Uber dated April 2, 2016 that discussed its interviews of Levandowski. Uber admits that the final Stroz report states that counsel reserved their clients' rights with respect to accuracy in the drafts of the interview memos. Uber denies the remaining allegations in paragraph 62. Answering further, Levandowski represented to Uber that he had retained Google confidential information after he left Google because he wanted to be able to demonstrate to Google the work he had done to earn a bonus that he expected to receive.

63.    The Stroz draft interview memo contained nine pages of summaries of Mr. Levandowski's interactions and discussions with Google employees about his plans to start a company outside of Google, including summaries of one-on-one discussions and larger gatherings at his house.

**ANSWER:**    Uber admits that Stroz prepared a draft memo of its interview of Levandowski and respectfully refers the Court to the memo for its complete and accurate contents. Uber denies the remaining allegations in paragraph 63.

64.    Uber pushed for the entire transaction to proceed to closing knowing that Stroz had not completed its investigation.

**ANSWER:**    Uber admits that it signed the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement before receiving Stroz's final written summary report. Uber denies the remaining allegations in paragraph 64. Answering further, Uber received preliminary findings from Stroz prior to April 11, 2016.

65.    On April 11, 2016, Uber executed several documents to complete this transaction, including the Indemnification Agreement, the Otto Agreement and Plan of Merger (the "Otto Agreement"), and the Otto Trucking LLC Agreement and Plan of Merger (the "Otto Trucking Agreement"), which gave Uber an option to acquire a second company created by Mr. Levandowski and Mr. Ron.

**ANSWER:**    Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed. Uber refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 65.

66.    Stroz did not issue a report until August 5, 2016, almost four months after it signed the Otto acquisition documents.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:**    Uber admits that Stroz provided Uber with a final written summary report on August 5, 2016 ("Stroz Report"). Uber denies the remaining allegations in paragraph 66.

67.    The Stroz report disclosed numerous facts, including the following:

During his interview, Levandowski informed Stroz Friedberg that he:  (a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars.

**ANSWER:**    Uber admits that the language quoted in paragraph 67 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 67. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

68.    Stroz reported that Mr. Levandowski's devices demonstrated that during his time at Google, he downloaded documents and files relating to Project Chauffeur.

Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016.  An example of this activity includes system logs indicating that on December 14, 2015, approximately 24,000 files were located within the folder path "/Users/Anthony/Desktop/boards/chauffeur-svn/." These same system logs indicate that on December 14, 2015, approximately 24,000 files were located within the folder path "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files indicates that they were source code and electronic design files relating to driverless cars.

**ANSWER:**    Uber admits that the language quoted in paragraph 68 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 68. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

69.    It also reported that Mr. Levandowski downloaded Chauffeur files shortly before his departure from Google and had accessed them following his departure from Google.

Stroz Friedberg also identified access by Levandowski to several cloud storage repositories.  A review of the internet history shows access to Google Docs on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

January 26 2016, the day of Levandowski's resignation.  In particular, he accessed a file named "Chauffeur TL weekly updates - 04 2015 – Google Sheets." Further review of the laptop identified a file with the same name in Levandowski's Downloads folder, which is attached as Exhibit 27.  The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google).

**ANSWER:**     Uber admits that the language quoted in paragraph 69 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 69. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

70.     Stroz reported facts regarding hiring of Google employees.

While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining his start-up company.  The one-on-one meetings occurred at work with over 20 Google/Chauffer employees (during individual update meetings or around the Google campus), coffee shops, restaurants, homes, or telephonically.  There were also four group meetings, two of which occurred with small groups of Google and/or Chauffeur employees at a barbeque at Levandowski's house and on a ski trip to Lake Tahoe.  Two larger group meetings took place at Levandowski's house in approximately December 2015 and January 2016.  These meetings included approximately 15 to 20 Google and non-Google employees. . . .

Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google. According to Levandowski, as of the dates of his interview on March 22 and March 23, 2016, Ottomotto had approximately 30 employees, 16 of whom were former Google employees.

**ANSWER:**     Uber admits that the language quoted in paragraph 70 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 70.

71.     Stroz included as an exhibit to its report the draft memorandum of its interview with Mr. Levandowski, which included a list of some of his side projects for which he had an ownership interest, but did not include any discussion of this memo in its main report.  In addition, Mr. Levandowski's devices and accounts also contained extensive information about a company named Odin Wave/Tyto, Mr. Levandowski's estate planning, and various investments.

**ANSWER:**     Uber admits that a redacted interview memorandum of Levandowski was attached to the Stroz Report that was provided to Uber. Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the last sentence of paragraph

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

71 and therefore denies those allegations. Uber denies the remaining allegations in paragraph 71.

Answering further, Uber states that Levandowski's counsel controlled what information Stroz could

share with Uber from Stroz's interviews of the Otto employees and reviews of data provided to

Stroz. Stroz did not provide Uber copies of all of the exhibits to its summary report, and Uber did

not have access to Levandowski's devices and accounts. To the extent that any of Levandowski's

devices contained information related to Tyto, Uber did not have access to and was not told about

that material, and Levandowski did not disclose that information to Stroz. To the contrary, when

asked by Stroz what "side projects" he had done while at Google, he did not identify Tyto.

72.    Stroz noted discrepancies in what Mr. Levandowski recalled and what Stroz
discovered on Mr. Levandowski's devices.

> Our forensic examination of Levandowski's devices and accounts corroborates his
> assertion that he stored and accessed Google files on his personal laptop in folders
> labeled "Chauffeur" and "Google." However, contrary to his belief that there were no
> or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google
> work e-mail messages that were downloaded onto Levandowski's computer on
> September 20, 2014.  Ten of those e-mails were last accessed between September 1,
> 2015 and January 28, 2016.  It is difficult to believe that Levandowski was not, prior
> to his interview, fully aware of the extent of the data that he had retained.

**ANSWER:**    Uber admits that the language quoted in paragraph 72 appears in the Stroz

Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents.

Uber denies the remaining allegations in paragraph 72.

73.    Stroz also called to Uber's attention Mr. Levandowski's deletion of files and text
messages, as well as its decision not to investigate these deletions further.

> Many of these deletions may have been good faith attempts by Levandowski to purge
> retained Google material from his devices in accordance with his obligation not to
> retain confidential Google data.  However, by March 2016, Levandowski was aware
> that Stroz Friedberg was going to implement a process to preserve, identify, and
> potentially remediate retained Google material from his devices.  At that point, the
> better course would have been to let that process control.  In addition, there was an
> effort by Levandowski and his Ottomotto colleagues to delete texts in real time.
> Stroz Friedberg did not re-interview Levandowski or others regarding their reason for
> this practice.

**ANSWER:**    Uber admits that the language quoted in paragraph 73 appears in the Stroz

Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents.

Uber denies the remaining allegations in paragraph 73.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

20

74.    Despite and with full knowledge of Stroz's findings, on August 18, 2016, Uber closed the acquisition of Otto and publicly announced that it was acquiring the company and working with Mr. Levandowski.

**ANSWER:**    Uber admits that in August 2016 it closed the acquisition of Otto and that a press release was issued on August 18, 2016 by Uber and respectfully refers the Court to that press release for its full contents. Uber denies the remaining allegations in paragraph 74.

75.    In that press release, Uber touted Mr. Levandowski's skills and experience, calling him "one of the world's leading autonomous engineers" and a "prolific entrepreneur with a real sense of urgency." Uber further stated that it now had "one of the strongest autonomous engineering groups in the world [and] self-driving trucks and cars that are already on the road thanks to Otto and Uber's Advanced Technologies Center in Pittsburgh." **Exhibit C** is a true and correct copy of Uber's August 18, 2016 press release found at https://www.uber.com/en-FR/newsroom/rethinking-transportation-2/.

**ANSWER:**    Uber admits that it issued a press release on August 18, 2016 and that the language quoted in paragraph 75 appears in the press release. Uber respectfully refers the Court to the press release for its complete and accurate contents. Uber denies the remaining allegations in paragraph 75.

### F.    GOOGLE INITIATES ARBITRATION AGAINST MR. LEVANDOWSKI

76.    On October 28, 2016, nine months after Mr. Levandowski resigned from Google and only two months after Uber announced its acquisition of Otto, Google filed and served two arbitration demands on Mr. Levandowski alleging breach of fiduciary duty, breach of his employment agreements relating to misuse of confidential information, violation of his nonsolicitation obligations, and breach of other noncompetition and nonsolicitation obligations. **Exhibit D** contains true and correct copies of Google's arbitration demands without exhibits.

**ANSWER:**    Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Amended Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 76.

77.    Although alleging breach of different agreements and/or duties, both arbitration demands focused on the same set of underlying, and as the later arbitration panel determined, "interrelated" facts.

**ANSWER:**    Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Amended Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 77.  Answering further, Uber refers the Court to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Arbitration Award as setting forth the complete and accurate account of any determinations made by the Arbitration Panel.

78.   The two arbitration demands involved facts concerning Mr. Levandowski's dealings with an entity named "Odin Wave" (later renamed "Tyto LiDAR" or "Tyto") and the formation of Otto, which later acquired Tyto before Otto was acquired by Uber.

**ANSWER:**   Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Amended Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 78.

79.   Google alleged that Mr. Levandowski violated his duties to Google through his relationship with Tyto.  Google also alleged that Mr. Levandowski breached his obligations to Google by forming Otto, soliciting Google employees to join Otto and eventually Uber, and using confidential information regarding compensation to recruit Google employees.

**ANSWER:**   Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Amended Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 79.

80.   The claims asserted by Google were the precise types of claims covered by the Indemnification Agreement.

**ANSWER:**   Uber denies that the claims asserted by Google in arbitration are covered by the Indemnification Agreement. Uber denies the remaining allegations in paragraph 80.

**G.   UBER ACCEPTS THE INDEMNITY OBLIGATIONS**

81.   On November 3, 2016, Mr. Levandowski promptly provided notice to Uber of these Former Employer Claims pursuant to the requirements of the Indemnification Agreement.

**ANSWER:**   Uber admits that on November 3, 2016, Uber received notice of the Former Employer Claims under the Indemnification Agreement. Uber denies the remaining allegations in paragraph 81.

82.   On November 3, 2016, Uber's in-house counsel and as its outside counsel from Morrison & Foerster LLP ("MoFo"), Eric Tate, interviewed Mr. Levandowski about the allegations asserted in Google's arbitration demands.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:**   Uber admits that Uber's counsel interviewed Levandowski on November 3, 2016 in connection with Google's arbitration demands. Uber denies the remaining allegations in paragraph 82.

83.   After receipt of the notice and interviewing Mr. Levandowski, Uber accepted Mr. Levandowski's tender of the indemnity (even though Uber's outside counsel stated that he was concerned that not everything alleged in the arbitration demands was covered in the Stroz due diligence) and assumed control of Mr. Levandowski's defense.

**ANSWER:**   Uber admits that on November 3, 2016, it received notice of Google's arbitration demands and that Uber's counsel interviewed Levandowski. Uber denies that Levandowski is entitled to indemnification. Uber denies the remaining allegations in paragraph 83.

84.   Uber hired MoFo to initially represent Mr. Levandowski.  Through its counsel, Uber controlled the strategy for Mr. Levandowski's defense, including deciding to consolidate the two arbitrations, initiating counterclaims, filing Mr. Levandowski's answer, alleging affirmative defenses, and dealing with procedural matters relating to the arbitration.

**ANSWER:**   Uber admits that Morrison & Foerster represented Levandowski. Uber denies that it controlled the strategy for Levandowski's defense, including the issues identified in paragraph 84. Uber denies the remaining allegations in paragraph 84.

85.   In February 2017, Waymo LLC ("Waymo")—the entity Project Chauffeur became after a corporate restructuring—initiated an action in the Northern District of California for misappropriation of trade secrets and patent infringement against Uber (the "Waymo Action").  That action alleged, among other things, that Mr. Levandowski had downloaded 14,000 files from a Google server, that those files contained trade secrets, and that he had used those files at Otto, which was acquired by Uber in 2016.  These were the same files that Stroz had noted in its report, except that because Mr. Levandowski had downloaded the repository multiple times over his time at Google, Stroz had identified 24,000 files from that server.

**ANSWER:**   Uber admits that in February 2017, Waymo initiated an action in the United States District Court for the Northern District of California, alleging misappropriation of trade secrets and patent infringement against Uber. Uber respectfully refers the Court to the amended complaint for its complete and accurate contents. Uber denies the remaining allegations in paragraph 85.

86.   Based on Waymo's allegations, MoFo notified Google that Mr. Levandowski was invoking his Fifth Amendment rights and would not make disclosures in the arbitration.

**ANSWER:**   Uber admits that Morrison & Foerster notified counsel for Waymo that Levandowski was invoking his Fifth Amendment privilege. Uber denies the remaining allegations in paragraph 86.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

87.     Several weeks after, MoFo determined it had a potential conflict of interest in jointly representing Uber and Mr. Levandowski.  As a result, MoFo sought to withdraw from representation of Mr. Levandowski and continue with its representation of Uber.

**ANSWER:**     Uber admits that Morrison & Foerster terminated its representation of

Levandowski in connection with the Google Arbitration. Uber lacks knowledge or information

sufficient to admit or deny whether Morrison & Foerster determined it had a conflict of interest, and

denies the remaining allegations in paragraph 87.

88.     Uber hired Goodwin Procter to separately represent Mr. Levandowski in the arbitration, but continued to control his defense.

**ANSWER:**     Uber admits that Goodwin Procter represented Levandowski in the Google

Arbitration. Uber denies the remaining allegations in paragraph 88. Answering further, Uber states

that it was prohibited from seeing most of the discovery materials, was excluded from most of the

arbitration hearing, was prohibited from seeing most of the legal briefing and expert reports, and

exercised no control over either Levandowski's arguments or defenses.

89.     For the next year, Uber continued to pay for Mr. Levandowski's legal defense as required by the Indemnification Agreement.  Uber also continued to direct and control Mr. Levandowski's defense, requiring updates on the proceedings, approval over experts, discussion about who would be arguing motions, pre-approval of submissions to the arbitration panel, and insisting on handling all settlement discussions.  Mr. Levandowski complied with Uber's requirements and cooperated with his defense.  Mr. Levandowski and his counsel met with Uber whenever it requested.

**ANSWER:**     Uber admits that it has paid some of Levandowski's legal expenses in

connection with the Google Arbitration. Uber admits that it received periodic updates on proceedings

in the arbitration. Uber denies the remaining allegations in paragraph 89.

90.     Mr. Levandowski provided information and guidance that led to the discovery of evidence that was helpful to his defense in the arbitration as well as the Waymo action.  This included guidance that led to the discovery of statements by the administrator of the server that housed the 14,000 files at issue that the files were "low value" and that "checking out" or downloading the entire repository of 14,000 files did not "ring the alarm bells" for him.  This was because when a user accessed the server where the so-called 14,000 files were located, the system automatically downloaded the entire repository onto his or her laptop even if the user only wanted to access one or two files.  Ultimately, this discovery, driven by Mr. Levandowski's contributions, became a centerpiece of Uber's defense in the Waymo case.

**ANSWER:**     Uber admits that Levandowski provided information to his counsel in

connection with the Waymo litigation and the Google Arbitration. Uber denies that Levandowski

cooperated with Uber in the defense of the Google Arbitration as contemplated and required by the

Indemnification Agreement. Uber denies the remaining allegations in paragraph 90.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

24

91.     In addition to providing this critical information, Mr. Levandowski also provided additional information to support Uber's defense.  This included obtaining from a former Chauffeur team member the earrings she received as a parting gift that contained the alleged trade secrets at issue in the Waymo Action.  Mr. Levandowski also identified numerous events and witnesses who aided Uber in its defense of the Waymo action as well as the arbitration with Google.

**ANSWER:**     Uber admits that Levandowski provided information to his counsel in connection with the Waymo litigation and the Google Arbitration. Uber denies the remaining allegations in paragraph 91.

92.     Mr. Levandowski also complied with Uber's requirement that Uber control all settlement discussions with Google.  Mr. Levandowski made several proposals regarding possible settlement structures to Uber hoping that a global settlement could be reached with Google.  But because Uber controlled settlement prospects with Google, Mr. Levandowski did not know whether any of his settlement proposals were made to Google.

**ANSWER:**     Uber denies the allegations in paragraph 92.

**H.     UBER SETTLES THE WAYMO ACTION**

93.     In February 2018, while controlling Mr. Levandowski's defense, Uber settled the Waymo Action with Waymo/Google.  The existence of a settlement between Uber and Waymo was publicly announced, but limited information regarding the exact terms of the settlement is publicly available.

**ANSWER:**     Uber admits that a settlement was reached in the Waymo litigation, that the existence of the settlement was publicly announced in a press release on February 9, 2018, and that the terms of the settlement are confidential. *See* https://www.uber.com/newsroom/uber-waymo-settlement/. Uber denies the remaining allegations in paragraph 93.

94.     Upon information and belief, that settlement agreement contained broad releases by both parties releasing claims as to the other's past and present employees.

**ANSWER:**     Uber denies the allegations in paragraph 94.

95.     Upon information and belief, Uber agreed to a broad release as to Mr. Levandowski, a past employee of Google.

**ANSWER:**     Uber denies the allegations in paragraph 95. Answering further, Uber states that no release contained in the Google Settlement Agreement with Uber released or was intended to release any of Uber's claims or defenses against Levandowski. Uber further states that Levandowski does not have any right to enforce any term of the Google Settlement Agreement; Levandowski was neither a party nor an intended third party beneficiary of the Google Settlement Agreement. And, even if Levandowski could enforce the agreement against Uber, the agreement would not bar Uber from asserting the claims and defenses that it asserts here.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

96.    In addition, upon information and belief based on publicly available information, in the Waymo Settlement, Uber agreed to never hire or do business with Mr. Levandowski ever again.

**ANSWER:**    Uber respectfully refers the Court to the Google Settlement Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 96.

97.    Upon information and belief, because of the Waymo settlement terms, Uber refused to close on its acquisition of Otto Trucking or support Mr. Levandowski's trucking business.

**ANSWER:**    Uber denies the allegations in paragraph 97.

98.    Upon information and belief, Uber traded Mr. Levandowski's rights in Otto Trucking and his ability to practice his profession in exchange for a settlement with Waymo.

**ANSWER:**    Uber denies the allegations in paragraph 98.

**I.    UBER REQUESTS THAT MR. LEVANDOWSKI TESTIFY SHORTLY BEFORE THE ARBITRATION HEARING**

99.    On April 2, 2018, days before the final arbitration hearing and nearly a year and a half after it accepted its obligation to indemnify Mr. Levandowski, Uber for the first time informed Mr. Levandowski that it intended to seek reimbursement for the Expenses it advanced for Mr. Levandowski to defend himself in the arbitration. **Exhibit E** is a true and correct copy of Uber's April 2, 2018 letter.

**ANSWER:**    Uber admits that on April 2, 2018, counsel for Uber sent a letter to Levandowski's counsel. Uber respectfully refers the Court to the April 2, 2018 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 99.

100.    One basis for Uber's claim for reimbursement was that Mr. Levandowski "refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment"— which Mr. Levandowski had exercised over a year before with full knowledge of Uber.

**ANSWER:**    Uber admits that the language quoted in paragraph 100 appears in the April 2, 2018 letter to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that Levandowski had previously exercised his Fifth Amendment rights in a separate matter. Uber denies the remaining allegations in paragraph 100.

101.    Nevertheless, in its April 2, 2018 letter, Uber claimed that Mr. Levandowski's refusal to testify in the arbitration proceedings (after the *Waymo* court had issued an order of referral to the United States' attorney) was now a breach of the Indemnification Agreement.

**ANSWER:**    Uber admits that the April 2, 2018 letter to Levandowski's counsel discusses Levandowski's obligations under the Indemnification Agreement and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 101.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

102.    Uber then demanded that Mr. Levandowski waive his Fifth Amendment rights and testifying during the arbitration.

**ANSWER:**    Uber admits that on April 2, 2018, its counsel sent Levandowski's counsel a letter that requested that Levandowski reconsider his position in invoking the Fifth Amendment so he could testify at the arbitration hearing. Uber respectfully refers the Court to the April 2, 2018 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 102.

103.    In response to Uber's request, Mr. Levandowski immediately alerted Google and the arbitration panel that he was willing to testify and offered to make himself available for deposition before the arbitration hearing.

**ANSWER:**    Uber admits that after receiving the April 2, 2018 letter, Levandowski's counsel communicated with Google and the Arbitration Panel about potentially testifying to certain topics and Uber refers to those communications for their content. Uber denies the remaining allegations in paragraph 103.

104.    Mr. Levandowski also provided the arbitration panel and Uber with a proffer of the topics on which he was willing to testify.

**ANSWER:**    Uber admits that Levandowski submitted a proffer to the Arbitration Panel and that it was denied. Uber respectfully refers the Court to the Arbitration Panel's Order for its complete and accurate contents. Uber denies the remaining allegations in paragraph 104.

105.    Mr. Levandowski's offer to testify was denied by the arbitration panel, and Uber continued to pay Mr. Levandowski's legal fees and retain control over Mr. Levandowski's defense through the arbitration hearing and post-hearing briefing.

**ANSWER:**    Uber admits that Levandowski's offer to testify, after previously asserting the Fifth Amendment during his deposition, was denied by the Arbitration Panel. Uber admits that it paid Levandowski's legal fees until September 25, 2019, the date the Arbitration Panel declared the arbitration hearing closed. Uber denies the remaining allegations in paragraph 105.

106.    In addition, for the first time, Uber also stated that it believed that Google's claims relating to an entity called "Tyto" are Excluded Claims for which Uber may seek reimbursement after the arbitration was concluded because, according to Uber, Mr. Levandowski "provided no information to Stroz Friedberg regarding his connection to [Tyto]."

**ANSWER:**    Uber admits that the language quoted in paragraph 106 appears in the April 2, 2018 letter to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that in its April 2, 2018 letter it asserted that Google's claims

relating to Tyto Misconduct by Levandowski are Excluded Claims as defined in the Indemnification Agreement. Uber denies the remaining allegations in paragraph 106.

107.    Uber's claims were false. Uber accepted Mr. Levandowski's tender of indemnity *only after* Google's commencement of the arbitration proceeding alleging claims relating to Tyto and *only after* Mr. Levandowski had been interviewed by Uber extensively about Google's allegations relating to Tyto. In addition, Mr. Levandowski's devices given to Stroz had extensive information about Tyto on them. And Stroz had specifically identified other materials on Mr. Levandowski's devices that he had not disclosed during interviews.

**ANSWER:**    Uber admits that on November 3, 2016, Levandowski notified Uber that he was requesting indemnity in connection with the Google Arbitration. Uber admits that the Google Arbitration alleges claims related to Tyto. Uber admits that Stroz identified some materials on Levandowski's devices that he had not disclosed in his interviews. Uber denies that on November 3, 2016 it had knowledge of any Tyto information on devices given to Stroz. Uber denies the remaining allegations in paragraph 107. Answering further, Uber states that Levandowski intentionally did not disclose his involvement with Tyto in response to questions posed to him by Stroz prior to entry of the Indemnification Agreement, and that Uber learned that Levandowski had engaged in wrongful conduct in establishing and developing the Tyto business only later, through the allegations in the Google Arbitration and discovery in the Waymo litigation.

108.    In fact, Uber had considered acquiring Tyto in 2015 but declined to do so at that time. Tyto was ultimately acquired by Otto with Uber's consent and at Uber's request prior to Uber closing on its acquisition of Otto to secure a lower price for Tyto than what Tyto would have requested had it known that Uber was the acquirer.

**ANSWER:**    Uber admits that Tyto was acquired by Otto with Uber's consent prior to Uber's acquisition of Otto. Uber denies the remaining allegations in paragraph 108. Answering further, at the time that Uber acquired Otto and at the time that Uber consented to Otto's acquisition of Tyto, Uber did not know that Levandowski had been involved with Tyto and did not know that Levandowski engaged in wrongful conduct in establishing and developing the Tyto business.

109.    Moreover, prior to April 2018, Uber received extensive documents and information about Tyto in the Waymo Action and had actively participated in preparing former Tyto employees (then Uber employees) for depositions, through which Uber acquired knowledge that Mr. Levandowski had helped Tyto get started. Indeed, Tyto's founder, Brent Schwarz, its technological lead, James Haslim, and the manager of the entity that invested in Tyto, Ognen Stojanovski, all worked for Uber and were deposed about Tyto. Uber had counsel present at the meetings with these witnesses and during most, if not all, of their testimony. These individuals were also central witnesses in the two arbitrations with Google with respect to the Tyto-related allegations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:** Uber admits that Brent Schwarz, James Haslim, and Ognen Stojanovski testified in either the Waymo litigation or the Google Arbitration, and that they each worked for Uber at some point. Uber refers to the transcripts of their testimony to establish who was present and for what duration. Uber admits that discovery related to Tyto was provided in the Waymo action. Uber admits that it learned certain information through the Waymo litigation that indicated that Levandowski had engaged in misconduct related to Tyto. Uber denies the remaining allegations in paragraph 109. Answering further, Uber states that Levandowski failed to disclose to Stroz or to Uber his role and his misconduct in connection with Tyto, and that Uber learned that information only later, through the Waymo litigation and through Google's allegations against Levandowski in the Google Arbitration.

110. Specifically, Uber was aware that Mr. Levandowski had facilitated the relationship between Tyto's founder and its investor, a holding company managed by Mr. Stojanovski that invested funds provided by two irrevocable trusts formed for the benefit of Mr. Levandowski's children, and would visit Tyto and his friends at that company to talk about technical and business matters from time to time. Uber was also aware of Pierre Droz's (a Google employee) allegations that Mr. Levandowski was involved with Tyto and even deposed him extensively on that very topic during the Waymo litigation.

**ANSWER:** Uber admits that through testimony in the Waymo litigation in 2017–2018 it learned certain information about Levandowski's involvement with Tyto, and that Uber learned of Peter Droz's allegations during the Waymo litigation in 2017–2018. Uber refers to the testimony of Droz and Stojanovski as setting forth the information that they provided through their testimony. Uber denies the remaining allegations in paragraph 110.

111. Armed with this knowledge, Uber paid for and controlled Mr. Levandowski's defense of the arbitration. In fact, Uber did not raise any issues regarding coverage until April 2018.

**ANSWER:** Uber admits that it paid for Levandowski's legal expenses in connection with the defense of the Google Arbitration through September 25, 2019. Uber denies the remaining allegations in paragraph 111.

**J.     UBER REFUSES TO PAY EXPENSES RELATING TO GOOGLE'S CLAIMS**

112. On March 28, 2019, the arbitration panel issued an interim award in favor of Google. The arbitration panel found violation of the exact claims covered by the Indemnification Agreement and found that Mr. Levandowski needed to pay back every cent of the compensation paid by Google.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1

2

3

**ANSWER:**    Uber admits that on March 26, 2019, the Arbitration Panel issued an interim award and respectfully refers the Court to it for its complete and accurate contents. Uber denies the remaining allegations in paragraph 112.

4

5

113.    On May 13, 2019, Mr. Levandowski requested confirmation from Uber that it was going to abide by its indemnity obligations and pay for any adverse award in light of the interim award.  **Exhibit F** is a redacted copy of Mr. Levandowski's May 13, 2019 letter.

6

7

8

**ANSWER:**    Uber admits that on May 13, 2019, its counsel received a letter from Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 113.

9

10

11

114.    In addition, Mr. Levandowski responded to Uber's claim that Mr. Levandowski did not disclose information relating to Tyto to Stroz during the due diligence.  Mr. Levandowski identified numerous documents that the arbitration panel relied on relating to Tyto that were on the devices he provided to Stroz as well and pointed out that documents from his devices were shown to witnesses at the arbitration hearing.

12

13

14

**ANSWER:**    Uber admits that on May 13, 2019, its counsel received a letter from Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 114.

15

16

115.    Mr. Levandowski sent Uber a follow up letter on June 27, 2019.  **Exhibit G** is a true and correct copy of that follow-up letter.

17

**ANSWER:**    Uber admits the allegations in paragraph 115.

18

19

20

116.    On July 3, 2019, Uber responded to Mr. Levandowski's May and June 2019 letters stating that Mr. Levandowski had breached the Indemnification Agreement, that a majority of the interim award was "attributable to an Excluded Claim," and that "Uber has no contractual obligation to advance any funder to Mr. Levandowski or to Google on Mr. Levandowski's behalf." **Exhibit H** is a true and correct copy of Uber's July 3, 2019 letter.

21

22

23

**ANSWER:**    Uber admits that on July 3, 2019, its counsel responded to Levandowski's counsel's letter of June 27, 2019, and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 116.

24

25

26

27

117.    On August 15, 2019, Mr. Levandowski was indicted for thirty-three counts of trade secret misappropriation.  The alleged trade secrets at issue in the indictment were some of the same ones that were at issue in the Waymo Action.  Mr. Levandowski ultimately agreed to plead guilty to one count of trade secret misappropriation based on his access of one Google document containing trade secret information on one occasion after he left Google and has accepted restitutionary obligations in the amount of $756,499.22.  This one file was the same file that Stroz expressly identified in its report to Uber, and in fact, the Stroz report was the basis for the indictment and the plea.  The government agreed to dismiss the remaining thirty-two counts against Mr. Levandowski.

28

**ANSWER:**    Uber admits that on August 15, 2019, Levandowski was indicted pursuant to 18 U.S.C. § 1832(a)(1), (2), (3) & (4), Theft and Attempted Theft of Trade Secrets, and 18 U.S.C. §§ 1843 and 2323, Criminal Forfeiture. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (N.D. Cal. filed Aug. 15, 2019). Uber admits that trade secret misappropriation, among other things, was at issue in the Waymo litigation, and respectfully refers the Court to the amended complaint filed in the Waymo litigation for its complete and accurate contents. Uber admits that Levandowski has pled guilty to one count of Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). Uber further admits that as part of Levandowski's sentence he has been ordered to pay $756,499.22 in restitution to Waymo LLC. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (Dkt. 99, filed Aug. 6, 2020 "Judgment in a Criminal Case"). Uber admits that counts one through thirty-two of the indictment were dismissed on the motion of the United States. *Id.* Uber admits that a file identified in Levandowski's indictment was also identified in the Stroz report. Uber denies the remaining allegations in paragraph 117. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

118.    On August 30, 2019, counsel for Uber claimed that Mr. Levandowski had fraudulently induced Uber into entering into the Indemnification Agreement, the remedy for which was rescission of the agreement.  **Exhibit I** is a true and correct copy of Uber's August 30, 2019 letter.

**ANSWER:**    Uber admits that on August 30, 2019, its counsel corresponded with counsel for Levandowski, and respectfully refers the Court to the letter for its complete and accurate contents. Uber further admits that in its August 30, 2019 letter it informed counsel that it is Uber's view that Levandowski fraudulently induced Uber to enter into the Indemnification Agreement. Uber further admits that its counsel stated in the August 30, 2019 letter that rescission of the Indemnification Agreement was a proper remedy. Uber denies the remaining allegations in paragraph 118.

119.    At this point in time, Uber did not clearly state that the Indemnification Agreement was rescinded (and instead said it had a remedy of rescission should it choose to exercise it), make

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

any offer to restore the consideration it received under the agreement, or cede control of Mr. Levandowski's defense.

**ANSWER:**    Uber denies Levandowski's characterization of the letter, and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 119.

120.    Uber continued to advance payment for expenses incurred through September 25, 2019.

**ANSWER:**    Uber admits that it advanced payment for expenses incurred through September 25, 2019. Uber denies the remaining allegations in paragraph 120. Answering further, Uber states that on September 27, 2019, counsel for Uber sent a letter to Levandowski's counsel stating that "[i]n the spirit of compromise and good will," Uber would pay Levandowski's counsel through September 25, 2019, the date on which the Arbitration Panel declared the hearing closed. Uber respectfully refers the Court to the September 27, 2019 letter for its complete and accurate contents.

121.    On September 27, 2019, Uber exercised its control over Mr. Levandowski to terminate its engagement of Goodwin Procter as counsel for Mr. Levandowski.  Following this termination, Mr. Levandowski separately engaged Goodwin Procter to represent him.

**ANSWER:**    Uber admits that on September 27, 2019, counsel for Uber sent a letter to Levandowski's counsel stating that Uber's engagement with Goodwin Procter "in connection with the defense of the arbitration brought by Google . . . is terminated." Uber respectfully refers the Court to the September 27, 2019 letter for its complete and accurate contents. Uber admits that Levandowski subsequently engaged Goodwin Procter. Uber denies the remaining allegations in paragraph 121.

122.    In addition, on November 5, 2019, Uber filed a Form 10-Q with the Securities and Exchange Commission.  In that filing, Uber again affirmed its indemnity obligations, stating, "The panel's final award is expected by December 24, 2019.  Pursuant to a contractual obligation, Uber is indemnifying both employees with respect to certain claims.  Whether Uber is ultimately responsible for such indemnification, however, depends on the exceptions and conditions set forth in the indemnification agreement." **__Exhibit J__** contains excerpts from Uber's November 2019 10-Q filing with the Securities Exchange Commission.

**ANSWER:**    Uber admits that on November 5, 2019, it filed a Form 10-Q with the Securities and Exchange Commission. Uber further admits that the language quoted in paragraph

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

122 appears in the filed Form 10-Q and respectfully refers the Court to the filed Form 10-Q for its

complete and accurate contents. Uber denies the remaining allegations in paragraph 122.

123.   On December 6, 2019, the arbitration panel issued a final arbitration award.  In
addition to the findings from the Interim Award, the Final Award awarded Google prejudgment
interest at the 10% rate pursuant to Cal. Civ. Code § 3287, and awarded attorneys' fees and costs to
Google under Cal. Civ. Code. § 1717.

ANSWER:   Uber admits that on December 6, 2019, the Arbitration Panel issued a final

arbitration award and respectfully refers the Court to it for its complete and accurate contents.

Answering further, Uber states that on December 23, 2019, the Arbitration Panel issued a Corrected

Final Award that was *nunc pro tunc* as of December 6, 2019. Uber denies the remaining allegations

in paragraph 123.

124.   The Final Award was not based on any alleged trade secret misappropriation by Mr.
Levandowski or others.  During the arbitration proceedings, Google had repeatedly represented that
it was pursuing only claims premised on different conduct than what was at issue in the Waymo
litigation.  The arbitration panel recognized this on several occasions.

ANSWER:   Uber admits that the Arbitration Panel entered a corrected final award on

December 23, 2019, *nunc pro tunc* as of December 6, 2019, and respectfully refers the Court to it for

its complete and accurate contents. Uber denies the remaining allegations in paragraph 124.

125.   On December 10, 2019, Mr. Levandowski informed Uber of the final award.
**Exhibit K** is a true and correct copy of Mr. Levandowski's December 10, 2019 letter.  Because of
the lack of clarity in Uber's previous statements, Mr. Levandowski asked Uber, as the Indemnitor in
control of the defense of the case, how it would like to proceed.  Specifically, Mr. Levandowski
inquired whether Uber intended to resolve the matter by paying the judgment or whether it would
continue to advance Expenses, including paying for Mr. Levandowski's counsel through any appeal
and posting a bond to stay the judgment pending appeal.

ANSWER:   Uber admits that on December 10, 2019, Levandowski's counsel informed

Uber that the Arbitration Panel issued its final award in *Google v. Levandowski and Ron* on

December 6, 2019. Uber respectfully refers the Court to the December 10, 2019 letter for its

complete and accurate contents. Uber denies the remaining allegations in paragraph 125.

126.   On December 31, 2019, Uber responded to Mr. Levandowski's December 10, 2019
letter and stated that it rescinded the Indemnification Agreement.  **Exhibit L** is a true and correct
copy of Uber's December 31, 2019 letter.  The stated basis for rescission of the Indemnification
Agreement was Mr. Levandowski's alleged failure to disclose his connection to Tyto—the same
basis that Uber previously stated for seeking reimbursement under the Indemnification Agreement
for Expenses paid relating to the claims based on Tyto.

33

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:** Uber admits that on December 31, 2019, Uber's counsel responded to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that in the December 31, 2019 letter, counsel for Uber stated that Uber rescinded the Indemnification Agreement, but denies that Uber had not previously rescinded the Indemnification Agreement.  Uber denies the remaining allegations in paragraph 126.

127.    Uber stated that it would not pay any portion of the final award or advance any additional Expenses.

**ANSWER:** Uber admits that in the December 31, 2019 letter, Uber's counsel stated that Uber has no obligations to advance expenses and that Uber "will not pay any part of the Final Award."  Uber denies the remaining allegations in paragraph 127.

128.    In addition, Uber ceded its right to direct and control the defense of Mr. Levandowski's case, stating, "Nor will Uber . . . take any steps—including hiring separate counsel—to direct and control Mr. Levandowski's petition to vacate the Final Award or any subsequent appeals."

**ANSWER:** Uber admits that on December 31, 2019, Uber's counsel sent Levandowski's counsel a letter and that the language quoted in paragraph 128 appears in the letter. Uber respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 128.

129.    On February 5, 2020, Uber provided payment for Mr. Levandowski's Expenses through September 25, 2019.  Uber did not provide payment for any Expenses incurred after that date.

**ANSWER:** Uber admits that it provided payment to Levandowski through September 25, 2019. Uber denies the remaining allegations in paragraph 129.

130.    On March 4, 2020, Judge Schulman in San Francisco Superior Court entered a judgment in Google's favor against Mr. Levandowski in the amount of $179,047,998.64.  **Exhibit M** is a true and correct copy of the judgment in Google's favor.

**ANSWER:** Uber admits the allegations in paragraph 130.

131.    On March 4, 2020, following entry of the judgment in Google's favor, Mr. Levandowski filed a chapter 11 petition in the United States Bankruptcy Court for the Northern District of California commencing the Chapter 11 Case.

**ANSWER:** Uber admits the allegations in paragraph 131.

132.    On March 6, 2020, Mr. Levandowski provided notice of the judgment to Uber and requested advancement of payment for these Expenses under Section 2.3 of the Indemnification Agreement.  In addition, Mr. Levandowski requested an advance for attorneys' fees and costs in the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  amount of $475,571.32, which Mr. Levandowski had incurred between September 26, 2019 and
2  February 29, 2020.  **Exhibit N** is a copy of Mr. Levandowski's March 6, 2020 request without
   exhibits.

3         **ANSWER:**      Uber admits that on March 6, 2020, counsel for Levandowski provided notice

4  of the March 4, 2020 judgment and a "Request for Advancement of Expenses Pursuant to Section

5  2.3 of the Indemnification Agreement" to Uber's counsel. Uber respectfully refers the Court to the

6  letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 132.

7         133.   On March 27, 2020, Uber responded to Mr. Levandowski's March 6, 2020 letter and
   reaffirmed its position that it had rescinded the Indemnification Agreement and was not going to pay
8  Google's judgment or any other Expenses.  **Exhibit O** is a copy of Uber's March 27, 2020 letter.

9         **ANSWER:**      Uber admits that its counsel responded to Levandowski's counsel on March

10 27, 2020 and respectfully refers the Court to the letter for its complete and accurate contents. Uber

11 denies the remaining allegations in paragraph 133.

12        134.   As a result, Mr. Levandowski filed an arbitration demand with JAMS San Francisco.

13        **ANSWER:**      Uber admits that Levandowski filed an arbitration demand with JAMS in San

14 Francisco, California. Uber denies the remaining allegations in paragraph 134.

15        135.   Uber filed an answer on April 13, 2020 in which it alleged, among other defenses that
   it had rescinded the Indemnification Agreement based on Mr. Levandowski's purported fraud, and
16 that if the Indemnification Agreement remains enforceable, a majority of Google's judgment is
   allocable to Excluded Claims as defined in the Indemnification Agreement.
17
          **ANSWER:**      Uber filed an answer on April 13, 2020 in which it alleged, among other
18
   defenses, that it had rescinded the Indemnification Agreement based on Levandowski's purported
19
   fraud, and that if the Indemnification Agreement remains enforceable, a majority of Google's
20
   judgment is allocable to Excluded Claims as defined in the Indemnification Agreement.
21
          136.   On July 6, 2020, Uber filed the Proof of Claim, through which it brought into the
22 Chapter 11 Case issues from the arbitration to support its purported position as a creditor of Mr.
   Levandowski.  **Exhibit P** is a true and correct copy of Uber's Proof of Claim, ECF No. 8-1.
23
          **ANSWER:**      Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully
24
   refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the
25
   remaining allegations in paragraph 136.
26
          137.   On July 28, 2020, the parties agreed, and the Court approved, that Mr. Levandowski
27 could withdraw his arbitration demand and that all disputes in the arbitration demand, the original
   complaint in this proceeding, and Uber's proof of claim would be resolved as part of this Adversary
28 Proceeding.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:** Uber admits that on July 29, 2020, the Court entered a stipulation whereby the parties agreed that Levandowski could withdraw his arbitration demand and that "all disputes" between Uber and Levandowski would be resolved before this Court as part of the Adversary Proceeding, including disputes raised in Levandowski's demand in arbitration, his Complaint in the Adversary Proceeding (including claims related to the Otto Trucking Agreement), and Uber's Proof of Claim in the Chapter 11 case. Uber denies the remaining allegations in paragraph 137.

## COUNT I

### (Declaratory Judgment - Waymo Settlement Release)

138.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

139.    On February 8, 2018, Waymo and Uber executed a settlement agreement to resolve Waymo's dispute with Uber.

**ANSWER:** Uber admits that it entered into a Settlement Agreement as part of the Waymo litigation on February 8, 2018, and respectfully refers the Court to the agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 139.

140.    Upon information and belief, the Waymo Settlement contained broad releases in which Google and Uber released known and unknown claims that have or could be asserted against the other's past and former employees.

**ANSWER:** Uber denies the allegations in paragraph 140.

141.    Upon information and belief, Mr. Levandowski is a beneficiary of the releases in the Waymo Settlement as he is a former employee of Google.

**ANSWER:** Uber denies the allegations of paragraph 141.

142.    Upon information and belief, Google excluded from its release the arbitration claims against Mr. Levandowski and Uber did not exclude any claims against Mr. Levandowski in its release.

**ANSWER:** Uber denies the allegations in paragraph 142.

143.    Upon information and belief, all of the claims in the Proof of Claim and Uber's Answer and Counterclaims, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Tyto, and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, were released by Uber in the Waymo Settlement.

**ANSWER:**    Uber denies the allegations in paragraph 143.

144.    As a result of the Proof of Claim and Mr. Levandowski's objection thereto, a live controversy exists as to whether Uber released Mr. Levandowski in the Waymo Settlement and, if so, what claims Uber released.

**ANSWER:**    Uber denies the allegations in paragraph 144.

145.    This issue is ripe for determination and requires a declaration as to Mr. Levandowski's rights in the Waymo Settlement.

**ANSWER:**    Uber denies the allegations in paragraph 145.

146.    Mr. Levandowski seeks a declaration that the claims and defenses in the Proof of Claim and Uber's Amended Answer and Counterclaims, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto, and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, are barred by the Waymo Settlement.

**ANSWER:**    Uber denies the allegations in paragraph 146.

## COUNT II

### (Specific Performance to Pay Expenses)

147.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

148.    On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation.  Ex. A at 1-2.

**ANSWER:**    Uber admits that Levandowski and Uber entered into an Indemnification Agreement dated April 11, 2016, and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 148.

149.    Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer.  Ex. A at § 2.1(a).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:** Uber admits that the language quoted in paragraph 149 appears in Section 2.1(a) of the Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 149. Answering further, the Arbitration Award is not indemnifiable for multiple reasons as set forth in Uber's affirmative defenses and counterclaims, including, but not limited to, that the award was based upon felonious conduct, including conduct in violation of California Penal Code Section 502, that the award arises out of one or more Excluded Claims, that the award is not indemnifiable as a matter of policy and contract because it orders the disgorgement of monies to which Levandowski was not entitled, that the Indemnification Agreement was rescinded, and that Uber has no indemnification obligations due to Levandowski's commission of a Post-Signing Specified Bad Act.

150. As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims. *Id.* at 3.

**ANSWER:** Uber admits that page 3 of the Indemnification Agreement contains an Expenses definition and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 150.

151. Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within a set period following a request for advancement.

**ANSWER:** Uber admits that Section 2.3 of the Indemnification Agreement provides provisions related to Expenses and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 151.

152. On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

**ANSWER:** Uber admits that on March 6, 2020, counsel for Levandowski sent a "Request for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's counsel and respectfully refers the Court to that letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 152.

153. Uber has refused to advance payment for the Expenses requested in the March 6 Request and continues to refuse to pay for any Expenses.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:**     Uber admits that it has not advanced payment to Levandowski pursuant to Levandowski's March 6, 2020 request for advancement of Expenses. Uber denies that Levandowski is entitled to indemnification or any payment of Expenses pursuant to the Indemnification Agreement. Uber denies the remaining allegations in paragraph 153.

154.    Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

**ANSWER:**     Uber denies the allegations in paragraph 154.

155.    In the Indemnification Agreement, Uber agreed that Mr. Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy. *See id.* at § 3.11.  Uber also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement. *See id.*

**ANSWER:**     Uber denies the characterization that Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy and respectfully refers the Court to the Indemnification Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 155.

156.    Moreover, Mr. Levandowski has been irreparably harmed by Uber's continued breach of the Indemnification Agreement.  By way of example only, Uber's breach of the Indemnification Agreement directly caused Mr. Levandowski to have to file this bankruptcy proceeding.  The parties to the Indemnification Agreement specifically agreed that disputes regarding reimbursement of payments made under the Indemnification Agreement would not take be resolved until after Uber has satisfied its obligations to pay any final judgment and the Expenses Mr. Levandowski incurred. Uber's breach has materially impacted Mr. Levandowski's ability to continue to pursue litigation against Google and Uber.

**ANSWER:**     Uber denies the allegations in paragraph 156.

157.    Any such action for specific performance may be filed in a state or federal court located in the City and County of San Francisco.  *See id.* § 3.5.

**ANSWER:**     Uber admits that the Indemnification Agreement contains a provision called "Applicable Law" at Section 3.5 and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 157.

158.    The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

**ANSWER:**     Uber denies the allegations in paragraph 158.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

159.    A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim and have agreed to seek resolution of whether any claim is an Excluded Claim in this proceeding.

**ANSWER:**    Paragraph 159 contains legal conclusions to which no response is required. To the extent a response is required, Uber admits that on July 29, 2020, this Court entered a stipulation whereby, among other things, "Uber and Mr. Levandowski agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the Google v. Levandowski arbitration award." (Case No. 20-03050, Dkt. 13.) Uber denies the remaining allegations in paragraph 159.

160.    The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

**ANSWER:**    Uber denies the allegations in paragraph 160.

161.    Therefore, Mr. Levandowski seeks to enforce by this action the terms Uber agreed to in the Indemnification Agreement—that Uber pay for the Expenses requested on March 6, 2020 as well as payment of Google's judgment and the attorneys' fees and costs incurred by Mr. Levandowski thus far, as well as any post-judgement interest which has or will accrue, and all other Expenses that Mr. Levandowski has and will incur.

**ANSWER:**    Uber denies the allegations in paragraph 161.

## COUNT III

### (Breach of Indemnification Agreement)

162.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

163.    On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation.  Ex. A at 1-2.

**ANSWER:**    Uber admits that Levandowski and Uber entered into an Indemnification Agreement dated April 11, 2016 and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 163. Answering further,

the Arbitration Award is not indemnifiable for multiple reasons as set forth in Uber's affirmative

defenses and counterclaims, including, but not limited to, that the award was based upon felonious

conduct, including conduct in violation of California Penal Code Section 502, that the award arises

out of one or more Excluded Claims, that the award is not indemnifiable as a matter of policy and

contract because it orders the disgorgement of monies to which Levandowski was not entitled, that

the Indemnification Agreement was rescinded, and that Uber has no indemnification obligations due

to Levandowski's commission of a Post-Signing Specified Bad Act.

164.    Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to
the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred
by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise
out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to
[his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality
or similar restrictive covenant or agreement" between him and a Former Employer.  Ex. A at
§ 2.1(a).

**ANSWER:**    Uber admits that the language quoted in paragraph 164 appears in Section

2.1(a) of the Indemnification Agreement and respectfully refers the Court to the Agreement for its

complete and accurate contents. Uber denies the remaining allegations in paragraph 164.

165.    As defined in the Indemnification Agreement, "Expenses" includes reasonable
attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards,
judgments, or any amounts paid or to be paid in settlement of Google's claims.  *Id*. at 3.

**ANSWER:**    Uber admits that page 3 of the Indemnification Agreement contains an

Expenses definition and respectfully refers the Court to the Agreement for its complete and accurate

contents. Uber denies the remaining allegations in paragraph 165.

166.    Under Section 2.3 of the Indemnification Agreement, Uber is required to advance
payment for Expenses within fifteen Business Days of a request for advancement.

**ANSWER:**    Uber admits that Section 2.3 of the Indemnification Agreement provides

provisions related to Expenses and respectfully refers the Court to the Agreement for its complete

and accurate contents. Uber denies the remaining allegations in paragraph 166.

167.    On March 6, 2020, Mr. Levandowski requested that Uber advance payment for
Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between
September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

**ANSWER:**    Uber admits that on March 6, 2020, counsel for Levandowski sent a "Request

for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

counsel and respectfully refers the Court to that letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 167.

168.    Uber has refused to advance payment for the Expenses requested in the March 6 Request.  Mr. Levandowski has paid many of the Expenses since Uber refused to advance payment.

**ANSWER:**    Uber admits that it has not advanced payment to Levandowski pursuant to Levandowski's March 6, 2020 request for advancement of Expenses. Uber denies that Levandowski is entitled to indemnification or any payment of Expenses. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 168 and therefore denies the remaining allegations in paragraph 168.

169.    Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

**ANSWER:**    Uber denies the allegations in paragraph 169.

170.    As a result of Uber's refusal to honor its obligations under the Indemnification Agreement, Mr. Levandowski has suffered damages at least in the amount of the Expenses he has paid and will be required to pay to continue funding this litigation against Uber, the cost of the chapter 11 proceedings and this adversary proceeding and having to liquidate assets in the middle of a pandemic to continue to pursue his rights under the Indemnification Agreement and in challenging Google's judgment.

**ANSWER:**    Uber denies the allegations in paragraph 170.

## COUNT IV

### (Declaratory Judgment – Uber's Rescission Claim)

171.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

172.    In the Proof of Claim, Uber identifies itself as a creditor based on its purported rescission of the Indemnification Agreement.

**ANSWER:**    Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242 and that Levandowski named Uber as a creditor. Uber admits that the Indemnification Agreement has been rescinded. Uber denies the remaining allegations in paragraph 172.

173.    In addition, Uber has refused to pay Expenses due under the Indemnification Agreement because of the purported rescission.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:**     Uber admits that the Indemnification Agreement has been rescinded. Uber denies the remaining allegations in paragraph 173, and further states that it ceased paying Expenses for multiple reasons, including that it had no obligation to do so.

174.     Mr. Levandowski contends that Uber waived any right to rescind because it expressly confirmed and ratified the Otto Trucking Merger Agreement, one key component of the April 11, 2016 transactions, and thereby ratified the transaction Uber claims it was fraudulently induced into entering.

**ANSWER:**     Uber denies the allegations in paragraph 174.

175.     Mr. Levandowski also contends that Uber also impliedly waived, is estopped from asserting, and/or ratified any alleged fraudulent inducement on which Uber's purported rescission is based by entering into an amendment of the transaction Uber alleges it was fraudulently induced to enter into.

**ANSWER:**     Uber denies the allegations in paragraph 175.

176.     Mr. Levandowski further contends that Uber's rescission claim is barred by its unreasonable delay in rescinding the Indemnification Agreement, failure to return consideration provided, and actions by Uber that are inconsistent with a claim for rescission as described hereinabove.

**ANSWER:**     Uber denies the allegations in paragraph 176.

177.     Uber has not returned any consideration it received under the Indemnity Agreement, including Mr. Levandowski's devices, which it continues to retain through Stroz, as well as the consideration received under the full transaction for the Otto acquisition.  Such failure is fatal to any rescission claim, especially where, as here, Uber's refusal or inability to return the consideration it received is due to its delay in exercising any purported right to rescission.

**ANSWER:**     Uber admits that Levandowski provided a number of devices to Stroz. Upon information and belief, Uber admits that Stroz is still in possession of some or all of those devices. Uber denies that it was or is in possession of Levandowski's devices. Uber denies that it received any consideration under the Indemnification Agreement. Uber denies the remaining allegations in paragraph 177.

178.     To the extent that Uber's ability to return the consideration received is impossible, this impossibility is due to Uber's delay in exercising the purported rescission after it controlled Mr. Levandowski's defense and settlement ability for years and benefited from Mr. Levandowski's cooperation with his defense and Uber's defense in the Waymo action.

**ANSWER:**     Uber denies the allegations in paragraph 178.

179.     Uber has also ratified any purported fraud and acted in ways inconsistent with rescission, including by affirming its obligations under the Indemnification Agreement in its public filings.

**ANSWER:**     Uber denies the allegations in paragraph 179.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

43

180.    Uber's performance under the Indemnification Agreement for years and belated rescission of that agreement has substantially prejudiced Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 180.

181.    Finally, upon information and belief, Uber has released any claim for rescission as part of its release in the Waymo Settlement.

**ANSWER:**    Uber denies the allegations in paragraph 181.

182.    As a result of the acts described herein, a live controversy exists as to whether Uber has a right to rescind and whether its purported rescission is effective.

**ANSWER:**    Uber denies the allegations in paragraph 182.

183.    This issue is ripe for determination and requires a declaration as to Uber's right to rescind the Indemnification Agreement and whether Uber is a proper creditor in the Chapter 11 Case.

**ANSWER:**    Uber denies the allegations in paragraph 183.

184.    Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement.

**ANSWER:**    Uber denies the allegations in paragraph 184.

## <u>COUNT V</u>

### (Declaratory Judgment and Damages:  Rescission of Otto Transaction)

185.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

186.    As shown herein, Mr. Levandowski denies that Uber has any right to rescind the Indemnity Agreement and Mr. Levandowski seeks a declaratory judgment regarding Uber's rescission claim/defense.

**ANSWER:**    Uber denies the allegations in paragraph 186.

187.    Alternatively, if the Court determines that Uber has rescinded the Indemnification Agreement, the entirety of the Otto transaction must also be rescinded and all consideration Uber received from the Otto transaction must be returned to Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 187.

188.    In agreeing to sell Otto to Uber and lead Uber's self-driving car program, Mr. Levandowski conveyed repeatedly to Uber's representatives that he was concerned that Google would sue him.  Because of these concerns, Uber agreed to provided indemnity as key and indivisible part of the Otto transaction and as an inducement to Mr. Levandowski to sell Otto to Uber.  Mr. Levandowski would not have entered into the Otto transaction without the Indemnity Agreement because of his well-founded fear of litigation against him by Google.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

44

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:** Uber admits that, prior to executing the Indemnification Agreement and Otto Agreement, Levandowski raised concerns that Google may bring litigation against him without a valid basis for doing so. Uber denies the remaining allegations in paragraph 188.

189.   For this reason, on April 11, 2016, Uber and Mr. Levandowski executed documents for the acquisition of Otto, including the Indemnification Agreement.  All of the agreements executed on April 11, 2016 are part of one single transaction that can not be divided.

**ANSWER:** Uber admits that on April 11, 2016, Uber and Levandowski executed certain documents, including the Indemnification Agreement. Uber denies the remaining allegations of paragraph 189.

**ANSWER:**

190.   Uber's rescission of the Indemnification Agreement necessarily requires rescission of the entire Otto transaction, including returning all consideration related to the transaction, including the intellectual property Uber received from its acquisition of Otto.

**ANSWER:** Uber denies the allegations in paragraph 190.

191.   Should the Court determine that Uber effectively rescinded the Indemnification Agreement, a live controversy exists as to whether Uber's rescission also rescinds the Otto transaction and requires return of all consideration Uber received from that transaction.

**ANSWER:** Uber denies the allegations in paragraph 191.

192.   Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement without also rescinding the Otto transaction and returning all consideration received from that deal.

**ANSWER:** Uber denies the allegations in paragraph 192.

193.   In addition, Mr. Levandowski seeks damages, including any consequential damages, arising out of Uber's rescission of the Otto transaction.

**ANSWER:** Uber denies the allegations in paragraph 193.

## COUNT VI

### (Declaration As to Unenforceability of Amendment and Termination of

### Otto Trucking Agreement as to Anthony Levandowski)

194.   Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

195.    Mr. Levandowski is a party to the Otto Trucking Agreement, including as to Section 5.4 and 5.11.

**ANSWER:**    Uber denies the allegations in paragraph 195. Answering further, the April 11, 2016 Otto Trucking Agreement defines "parties" as the Company Unitholder Representative, Parent, Purchaser, Merger Sub, and the Company.

196.    Section 5.4 allowed Mr. Levandowski to form a new trucking company and to obtain the IP License from Uber if Uber failed to satisfy its funding obligations to Otto Trucking in the three years after closing on that transaction.

**ANSWER:**    Uber respectfully refers the Court to the Otto Trucking Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 196. Answering further, Uber states that the conditions precedent for Levandowski to obtain an IP License were not met, that the Otto Trucking Agreement was amended and terminated according to its terms, and that the New Otto Trucking Merger Agreement ("New Otto Trucking Agreement") did not provide Levandowski with any right to an IP License. Uber refers the Court to the New Otto Trucking Agreement, attached as Exhibit 2, for its complete and accurate contents.

197.    Section 5.11 allowed Mr. Levandowski to form a new trucking company and demand that Uber provide him with the IP License for use in the new trucking company if Uber terminated the Otto Trucking Agreement after acquiring Otto.

**ANSWER:**    Uber respectfully refers the Court to the Otto Trucking Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 197. Answering further, Uber states that the conditions precedent for Levandowski to obtain an IP license and for Uber to support a new trucking company were not met, that the Otto Trucking Agreement, including Section 5.11, was terminated, and that the New Otto Trucking Agreement did not provide for an IP License to Levandowski.

198.    Uber closed on its acquisition of Otto on August 18, 2016.

**ANSWER:**    Uber denies the allegations in paragraph 198. Answering further, Uber closed on its acquisition of Otto pursuant to the New Otto Trucking Agreement on August 23, 2016.

199.    In November 2017, Uber provided notice that it was exercising its option to acquire Otto Trucking.

**ANSWER:**    Uber admits the allegations in paragraph 199.

200.    After providing notice, Uber stalled the closing of the Otto Trucking acquisition.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    **ANSWER:**    Uber denies the allegations in paragraph 200.

2    201.    Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition
3    so that it could work out a settlement with Waymo/Google in the trade secrets action.  During that
     time, Uber was controling Mr. Levandowski's defense, including regarding settlement.

4    **ANSWER:**    Uber denies the allegations in paragraph 201.

5    202.    Upon information and belief, Uber agreed in the Waymo settlement to terms that gave
6    away Mr. Levandowski's rights.

     **ANSWER:**    Uber denies the allegations in paragraph 202.

7
8    203.    Upon information and belief, because of its agreement in the Waymo Settlement to
     never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto Trucking
9    closing and told Mr. Levandowski that it would not close the transaction if he was still part of the
     company and would not in any event give him the IP license.

10   **ANSWER:**    Uber admits that, after it terminated Levandowski for cause, it expressed

11   concerns to Levandowski about continuing a relationship with him. Uber denies the remaining

12   allegations in paragraph 203. Answering further, Uber states that Levandowski sold his interest in

13   Otto Trucking and Uber refers the Court to the Unit Purchase Agreements, attached as Exhibits 3 and

14   4, for their complete and accurate contents. Following Levandowski's sale of his interests in Otto

15   Trucking, the Otto Trucking Agreement was amended and terminated.

16   204.    Uber threatened to leave the transaction in limbo and force Mr. Levandowski to
     engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.
17
     **ANSWER:**    Uber denies the allegations in paragraph 204.
18
19   205.    Faced with the prospect of litigating immediately with a multi-billion dollar company
     in the midst of other active litigation—the defense of which was under Uber's control—and a
     criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to
20   sell his interest in the company at a significant discount.

21   **ANSWER:**    Uber admits that Levandowski resigned from Otto Trucking and sold his

22   interest in Otto Trucking. Uber denies the remaining allegations in paragraph 205.

23   206.    Uber acquired Otto Trucking on August 5, 2018.

24   **ANSWER:**    Uber admits that it entered into an Agreement and Plan of Merger with Otto

25   Trucking pursuant to the New Otto Trucking Agreement on August 5, 2018. Uber denies the

26   remaining allegations in paragraph 206.

27   207.    On August 31, 2020, in response to Mr. Levandowski's complaint, Uber answered
     and alleged that it had terminated the Otto Trucking Agreement and had acquired Otto Trucking
28   pursuant to a new Otto Trucking agreement dated August 5, 2018.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:**     Uber admits that it filed its Answer to Levandowski's complaint on August 31, 2020, and respectfully refers the Court to the Answer for its complete and accurate contents. Uber further admits that the Otto Trucking Agreement was terminated and that Otto Trucking was acquired pursuant to the New Otto Trucking Merger Agreement dated August 5, 2018. Uber denies the remaining allegations in paragraph 207.

208.     This was the first time that Mr. Levandowski learned that Uber had terminated the Otto Trucking Agreement.

**ANSWER:**     Uber denies the allegations in paragraph 208.

209.     On September 11, 2020, Uber produced a copy of an Amendment and Termination of the Otto Trucking Agreement dated August 5, 2018 (the "Termination Agreement") and an Agreement and Plan of Merger for Otto Trucking LLC dated August 5, 2018 (the "New Otto Trucking Agreement").

**ANSWER:**     Uber admits the allegations in paragraph 209.

210.     Upon receipt, of the Termination Agreement, Mr. Levandowski learned for the first time that Uber and Otto Trucking had agreed to terminate the Otto Trucking Agreement.

**ANSWER:**     Uber denies the allegations in paragraph 210.

211.     Mr. Levandowski also learned that while the agreement affirmed his status as a party as to Section 5.11, it purported to terminate his rights under that provision without his knowledge or consent.

**ANSWER:**     Uber denies the allegations in paragraph 211. Answering further, Levandowski was not a Party to the Otto Trucking Agreement as defined in the Agreement, and Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber further states that neither Levandowski's knowledge nor his consent was required to terminate the Otto Trucking Agreement or any term thereof, and in any event, Levandowski had knowledge that the Otto Trucking Agreement was terminated.

212.     Indeed, Mr. Levandowski did not sign the Termination Agreement and has never agreed to relinquish his right to the IP License.

**ANSWER:**     Uber admits that Levandowski did not sign the Termination Agreement. Uber refers the Court to the Amendment and Termination Agreement, attached as Exhibit 5, for its complete and accurate contents. Uber denies the remaining allegations in paragraph 212. Answering further, Uber states that neither Levandowski's signature, knowledge, agreement, nor his consent was required to terminate the Otto Trucking Agreement or any term thereof.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

213.    A controversy exists as to whether Uber and Otto Trucking's purported termination of Section 5.11 is enforceable and effective as to Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 213.

214.    Mr. Levandowski thus seeks a declaration that Uber and Otto Trucking could not and did not terminate his rights under Section 5.11 when it executed the Termination Agreement without his consent or signature on that document.

**ANSWER:**    Uber denies the allegations in paragraph 214.

## COUNT VII

**(Specific Performance of Uber's Obligations to Provide Mr. Levandowski an IP License**

**and Form an New Trucking Company Under Section 5.11 of Otto Trucking Agreement)**

215.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

216.    In addition to requiring the Indemnification Agreement, Mr. Levandowski also conditioned his sale of Otto to Uber on Uber's support for his autonomous trucking business.  Uber agreed to this condition in the Otto Trucking Agreement.

**ANSWER:**    Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed, and Uber respectfully refers the Court to the Agreements for their complete and accurate contents.  Uber denies the remaining allegations in paragraph 216.

217.    Under the Otto Trucking Agreement, Uber received an option to acquire Otto Trucking.

**ANSWER:**    Uber admits that the Otto Trucking Agreement contained a provision for a Call Option Period granting Uber a "right, but in no circumstances the obligation" to acquire Otto Trucking. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 217.

218.    Uber closed on its acquisition of Otto on August 18, 2016.  The effect of the acquisition of Otto obligated Uber to support Mr. Levandowski's trucking business as the only scenario where Uber could walk away from Otto Trucking was if Uber did not acquire Otto.  For example, even if Uber terminated the Otto Trucking Agreement after acquired Otto, Uber was required to give Mr. Levandowski an exclusive license to use Uber's self-driving technology in the field of trucking to form a new trucking company outside of Uber.  The terms of the exclusive license are described at Exhibits E and F of the Otto Trucking Agreement.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:**     Uber admits that it closed on the acquisition of Otto in August 2016. Uber denies the remaining allegations in paragraph 218.

219.     In late November 2017, Uber exercised its right to acquire Otto Trucking by providing notice of its decision.

**ANSWER:**     Uber admits that in November 2017, it provided notice to Otto Trucking that it would exercise its option under the Otto Trucking Agreement. Uber denies the remaining allegations in paragraph 219.

220.     On August 5, 2018, Uber terminated the Otto Trucking Agreement.

**ANSWER:**     Uber admits the allegations in paragraph 220.

221.     Uber hid its termination of the Otto Trucking Agreement from Mr. Levandowski for over two years, finally disclosing its purported termination of the Otto Trucking Agreement only recently in its answer to the Complaint.

**ANSWER:**     Uber denies the allegations in paragraph 221.  Answering further, Levandowski was aware of the forthcoming termination of the Otto Trucking Agreement and the New Otto Trucking Merger Agreement as of August 1, 2018 at the latest.

222.     Under Section 5.11, because Uber acquired Otto and obtained the benefits of that acquisition, Uber is required to provide a license to these patents and any other patents or intellectual property related to autonomous trucking to Mr. Levandowski for use in the field of trucking.

**ANSWER:**     Uber denies the allegations in paragraph 222. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

223.     Mr. Levandowski seeks specific performance of Uber's obligation under Section 5.11. Specifically, Mr. Levandowski seeks an order requiring Uber to provide a company formed by Mr. Levandowski the IP License in a form consistent with Exhibit E and F of the Otto Trucking Agreement.

**ANSWER:**     Uber denies the allegations in paragraph 223. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

50

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

224.    A search for autonomous driving related patents yielded over hundreds of results for patents owned by Uber. **Exhibit Q** is a copy of the patent search result for Uber's self-driving related patents.

**ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 224 and therefore denies the allegations.

225.    Mr. Levandowski has performed all obligations under the Otto Trucking Agreement.

**ANSWER:**    Uber denies the allegations in paragraph 225.

226.    Although Mr. Levandowski contends that the ten business day period referenced in Section 5.11 relates to how "promptly" his right to the IP License becomes available after termination of the Otto Trucking Agreement and that there is no deadline to provide such notices, on September 21, 2020, within ten business days of receipt of the Termination Agreement, Mr. Levandowski provided Uber with written notice that he is exercising his right to form the new trucking company, and has requested that Uber provide the IP License and work together to sign and prepare organization documents for the new company. **Exhibit R** is a copy of the letter notifying Uber of Mr. Levandowski's election of the right to obtain the IP License.

**ANSWER:**    Uber denies the allegations in paragraph 226. Answering further, Section 5.11 of the Otto Trucking Agreement required that the Company Founders provide written notice "no more than 10 Business Days" from the date of termination of the Agreement of any election to form a new trucking company. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

227.    Uber has refused to provide the requested license.

**ANSWER:**    Uber admits that it has not provided an IP License to Levandowski related to a new trucking company. Uber denies the remaining allegations in paragraph 227. Answering further, Uber denies that it has any obligations to provide any such IP License to Levandowski.

228.    Mr. Levandowski will be irreparably harmed by Uber's refusal to provide the IP License and to form the trucking company as agreed.

1

**ANSWER:**   Uber denies the allegations in paragraph 228.

2

229.    Uber received adequate consideration, at least in the form of its acquisition of Otto, in exchange for agreeing to Mr. Levandowski's right to lead an autonomous trucking business within Uber or with Uber's IP License.

3

4

**ANSWER:**   Uber denies the allegations in paragraph 229.

5

230.    A mutuality of remedies exists as the agreement provides for a method for adjudicating disputes, including allowing either party to sue for specific performance.

6

7

**ANSWER:**   Uber denies the allegations in paragraph 230.

8

231.    The contract is sufficiently definite in requiring that Uber must provide the IP License to Mr. Levandowski on terms consistent with Exhibits E and F of the Otto Trucking Agreement if the Otto Trucking Agreement was terminated after Uber acquired Otto.

9

10

**ANSWER:**   Uber denies the allegations in paragraph 231. Answering further,

Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto

11

Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New

12

Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking

13

Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the

14

conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

15

232.    Therefore, Mr. Levandowski seeks an order from the Court requiring Uber to provide the IP License as required by Section 5.11 of the Otto Trucking Agreement and to work with Mr. Levandowski to form the new trucking company.

16

17

**ANSWER:**   Uber denies the allegations in paragraph 232.

18

233.    In the alternative, Mr. Levandowski seeks damages for Uber's breach of Section 5.11 of the Otto Trucking Agreement, including damages for the value of the IP License and either the value of Uber Freight, which is estimated as $4 billion once Uber closes on its latest round of financing, and/or the trucking company he should have been able to form and operate using the IP License and lost profits from that company.

19

20

21

**ANSWER:**   Uber denies the allegations in paragraph 233.

22

## COUNT VIII

23

### (Declaration Regarding Uber's Fiduciary Duty To Shut Down Uber Freight)

24

234.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

25

26

**ANSWER:**   Uber restates and incorporates by reference as though fully set forth herein its

27

answers to each of the allegations above.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

235.    In addition to requiring Uber to provide the IP License upon termination, Section 5.11 of the Otto Trucking Agreement also requires Uber to become a member of a new limited liability trucking company formed by Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 235. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

236.    Uber's membership interest was to be 50% of the then available shares.

**ANSWER:**    Uber denies the allegations in paragraph 236. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

237.    The material terms of Uber's membership are provided in Exhibit F to the Otto Trucking Agreement, referenced in Section 5.11.

**ANSWER:**    Uber denies the allegations in paragraph 237. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

238.    Exhibit F addressed fiduciary duties of managers during the initial development of the company, requiring that they owe the duties to the company and the holders of equity in that company the same fiduciary duties that would be owed in a corporation until the company raises at least $17,500,000 in investments.

**ANSWER:**    Uber denies the allegations in paragraph 238. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

239.    Exhibit F, however, does not contain any limitation or waiver of the statutory fiduciary duties owed by members of the company to the company and other members.

**ANSWER:**    Uber denies the allegations in paragraph 239. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

240.    As such, once formed, Uber owes the new trucking company and Mr. Levandowski statutory fiduciary duties, including the duty not to compete with the company, including by continuing to operate Uber Freight.

**ANSWER:**    Uber denies the allegations in paragraph 240. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

241.    In its answer, Uber denies that Exhibit F contemplates that Uber would owe Mr. Levandowski and the new trucking company fiduciary duties that would prevent it from competing with the company.

**ANSWER:**    Uber denies that it owes fiduciary duties to a company that does not exist and denies the remaining allegations in paragraph 241. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

242.    As such, a controversy exists as to what fiduciary duties Uber will owe in the new trucking company to be formed consistent with the terms of Section 5.11 and Exhibit F of the Otto Trucking Agreement and whether Uber may continue to operate Uber Freight once that company is formed.

**ANSWER:**    Uber denies the allegations in paragraph 242.

243.    Mr. Levandowski requests a declaration as to Uber's obligations and fiduciary duties to Mr. Levandowski and the new trucking company as provided in Section 5.11 and Exhibit F of the Otto Trucking Agreement, including, Uber's obligation to shut down Uber Freight.

**ANSWER:**    Uber denies the allegations in paragraph 243.

## COUNT IX

### (Breach of Covenant of Good Faith and Fair Dealing )

244.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

245.    In addition to receiving indemnity, Mr. Levandowski conditioned his sale of Otto on Uber supporting his autonomous trucking business.  Uber agreed to that condition and on April 11, 2016, at the same time it executed the Otto Agreement, Uber executed the Otto Trucking Agreement.

**ANSWER:**    Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed and respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 245. Answering further, Uber states that Levandowski sold his interest in Otto Trucking on August 1, 2018, and the Otto Trucking Agreement was amended and terminated on August 5, 2018.

246.    The Otto Trucking Agreement includes an implied covenant of good faith and fair dealing.  The implied covenant ensures that neither party may engage in arbitrary or unreasonable conduct and thereby prevent the other party from receiving the fruits of the bargain.

**ANSWER:**    Paragraph 246 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 246.

247.    The intent of the parties for Mr. Levandowski to be able to continue to pursue the trucking business he left Google to start with Uber's support in exchange for Mr. Levandowski selling Otto to Uber.

**ANSWER:**    Uber denies the allegations in paragraph 247.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

248.     This intent is reflected in the Otto Trucking Agreement as the only scenario where Uber could walk away from Otto Trucking and not support Mr. Levandowski's trucking business was if Uber did not acquire Otto.

**ANSWER:**     Uber denies the allegations in paragraph 248. Answering further, Uber states that Levandowski sold his interest in Otto Trucking on August 1, 2018, and the Otto Trucking Agreement was amended and terminated on August 5, 2018.

249.     After acquiring Otto, Uber had two options for supporting the trucking business.  It could acquire Otto Trucking and appoint Mr. Levandowski as the non-executive chairman of that business.

**ANSWER:**     Uber denies the allegations in paragraph 249.

250.     In the alternative, Uber could terminate the acquisition of Otto Trucking, but support an outside trucking venture started by Mr. Levandowski as an investor.  Uber was obligated to provide an exclusive license to its self-driving technology for Mr. Levandowski to use in the field of trucking in exchange for membership in Mr. Levandowski's new company.  The IP License was an exclusive license for trucking, which barred Uber from competing with Mr. Levandowski's trucking business.  Uber's membership interest in Mr. Levandowski's new company also prevented Uber from competing with that business based on the statutory duties owed by members of an LLC.

**ANSWER:**     Uber denies the allegations in paragraph 250. Answering further, Uber states that Levandowski failed to satisfy the conditions precedent to Uber's obligation to provide Levandowski the IP License.

251.     Uber did neither.

**ANSWER:**     Uber denies the allegations in paragraph 251.

252.     Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition so that it could work out a settlement with Waymo/Google in the trade secrets action. During that time, Uber was in control of Mr. Levandowski's defense and settlement prospects, and had barred Mr. Levandowski from participating in the settlement discussion or discussing settlement directly with Google.

**ANSWER:**     Uber denies the allegations in paragraph 252.

253.     Upon information and belief, because of its agreement in the Waymo Settlement to never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP license.

**ANSWER:**     Uber denies the allegations in paragraph 253. Answering further, Uber states that it used commercially reasonable efforts to close the Otto Trucking transaction and that it expressed concerns with continuing a business relationship with Levandowski because, among other things, Levandowski was terminated from Uber for Cause.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

254.    Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

**ANSWER:**    Uber denies the allegations in paragraph 254.

255.    Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount.

**ANSWER:**    Uber admits that Levandowski resigned from Otto Trucking and sold his interest in Otto Trucking. Uber denies the remaining allegations in paragraph 255.

256.    But Mr. Levandowski, as a Company Founder and in his individual capacity, remained a party to the Otto Trucking Agreement with respect to Section 5.4 and 5.11 of that agreement and a beneficiary of the remainder of the Otto Trucking Agreement independent of his prior status as a unitholder of the company.

**ANSWER:**    Uber denies the allegations in paragraph 256.

257.    Uber and Otto Trucking agreed between them, without Mr. Levandowski's agreement or consent, to terminate the Otto Trucking Agreement.

**ANSWER:**    Uber admits that the Otto Trucking Agreement was terminated. Uber denies the remaining allegations in paragraph 257. Answering further, neither Levandowski's agreement nor his consent was required to terminate the Otto Trucking Agreement.

258.    Uber and Otto Trucking hid the termination from him for two years.

**ANSWER:**    Uber denies the allegations in paragraph 258.  Answering further, Levandowski was aware of the forthcoming termination of the Otto Trucking Agreement and the New Otto Trucking Merger Agreement as of August 1, 2018 at the latest, as evidenced by two agreements he signed that reference the New Otto Trucking Agreement, which in turn reference the termination of the Otto Trucking Agreement.

259.    Despite terminating the Otto Trucking Agreement after acquiring Otto, Uber refused to provide Mr. Levandowski with the IP License, and in fact, Uber and Otto Trucking agreed, without Mr. Levandowski's agreement or consent and without providing any consideration, to terminate Mr. Levandowski's individual rights under the Otto Trucking Agreement.[1]

**ANSWER:**    Uber admits that the Otto Trucking Agreement was terminated after Uber acquired Otto. Uber denies the remaining allegations in paragraph 259. Answering further, neither Levandowski's agreement nor his consent was required to terminate the Otto Trucking Agreement,

---

[1] Mr. Levandowski contends, as alleged in Count VII that such agreement to terminate Levandowski's rights was ineffective and unenforceable.

including any rights Levandowski had in his individual capacity. Levandowski sold his interest in

Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended

and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and

Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had

rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any

obligation by Uber to provide Levandowski with an IP License.

260.     Uber and Otto Trucking then entered into a separate agreement whereby Uber
proceeded to acquire Otto Trucking and started Uber Freight without Mr. Levandowski, the trucking
business Uber had promised that Mr. Levandowski would lead.

**ANSWER:**     Uber admits that it acquired Otto Trucking pursuant to the New Otto Trucking

Agreement dated August 5, 2018. Uber denies the remaining allegations in paragraph 260.

261.     In fact, the parties agreed in the New Trucking Agreement to terms intended to keep
Mr. Levandowski out of the company.

**ANSWER:**     Uber denies the allegations in paragraph 261.

262.     As a party to section 5.4 and 5.11 and as a beneficiary to the remainder of the Otto
Trucking Agreement, Mr. Levandowski has a right to enforce that agreement, including the covenant
of good faith and fair dealing.

**ANSWER:**     Uber denies the allegations in paragraph 262.

263.     To the extent that Mr. Levandowski has any obligations under that agreement, he has
satisfied them.

**ANSWER:**     Uber denies the allegations in paragraph 263.

264.     Uber's actions described herein were unreasonable, made in bad faith, and have
deprived Mr. Levandowski of the fruits of the bargain, including the agreed-to benefit of running a
trucking business with Uber's support.

**ANSWER:**     Uber denies the allegations in paragraph 264.

265.     By preventing Mr. Levandowski from obtaining the benefits of the Otto Trucking
Agreement, Uber has violated the implied covenant of good faith and fair dealing.

**ANSWER:**     Uber denies the allegations in paragraph 265.

266.     After Mr. Levandowski's forced divestment, Uber's refusal to provide the IP License
and for the new trucking company, and Uber's acquisition of Otto Trucking to form Uber Freight,
Uber continued to operate that business. Uber Freight has reported hundreds of millions in revenue
since its creation and Mr. Ron, who heads Uber Freight, stated that he and Uber "think there is a very
clear path to profitability."

**ANSWER:**     Uber admits that it acquired Otto Trucking and further states that it acquired Otto Trucking pursuant to the New Otto Trucking Agreement dated August 5, 2018. Uber admits that Mr. Ron is head of Uber Freight. Uber admits that Mr. Ron made a public statement that is reported at https://finance.yahoo.com/news/uber-freight-to-investors-theres-a-very-clear-path-to-profitability-232536480.html, and refers to that Court to the article for its complete and accurate contents. Uber denies the remaining allegations in paragraph 266.

267.     As a result of Uber's breaches, Mr. Levandowski has suffered damages in an amount to be proven at trial, which amount should be at least $4.128 billion.

**ANSWER:**     Uber denies the allegations in paragraph 267.

## COUNT X

### (Objection to Claim)

268.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**     Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

269.     For the reasons set forth above, the Indemnity Agreement is not subject to rescission and, if it had been, Uber waived its right to assert such remedy.

**ANSWER:**     Uber denies the allegations in paragraph 269.

270.     For the reasons set forth above, Uber is liable under the Indemnity Agreement to advance his Expenses (as defined in the Indemnification Agreement).

**ANSWER:**     Uber denies the allegations in paragraph 270.

271.     For the reasons set forth above, Mr. Levandowski generally denies the evidentiary bases upon which the Proof of Claim is based and specifically denies that (a) Uber was fraudulently induced to enter into the Indemnity Agreement, (b) Mr. Levandowski failed to comply with his obligations under the Indemnity Agreement, and (c) Uber's obligations under the Indemnity Agreement are subject to allocation as asserted in the Proof of Claim, which in any event, cannot be adjudicated until after Uber satisfies its obligations under the Indemnification Agreement.

**ANSWER:**     Uber denies the allegations in paragraph 271.

272.     For the reasons set forth above, any claim for offset or contribution is also undermined by its active participation in the conduct at issue in the Waymo Action and the Google arbitration as it (a) encouraged, if not directed, Mr. Levandowski to recruit Google employees to join Otto and Uber, and (b) knew about Mr. Levandowski's retention of Google information and access of the one file at issue in the plea agreement after he left Google.

**ANSWER:**     Uber denies the allegations in paragraph 272.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

273.    For the reasons set forth above, Mr. Levandowski denies that Uber has any right to contribution from Mr. Levandowski for the Waymo settlement.  Waymo did not prove that Mr. Levandowski misappropriated any trade secrets in that case.  As for the one file that Mr. Levandowski accessed after he left Google, Uber was well aware of that conduct and proceeded to acquire Mr. Levandowski's company and work with him anyway.  Moreover, Mr. Levandowski's guilty plea that resulted in a total restitution amount of approximately $750,000 further demonstrates the unreasonableness of Uber's decision to settle with Waymo for $245,000,000 in stock, among other consideration.  In addition, to the extent that any trade secrets were taken and used at Uber, those trade secrets did not come from Mr. Levandowski, but rather a different former Google employee.  Indeed, as admitted in Uber's public statements, Uber's self-driving software—an area that Mr. Levandowski did not work on at Google or Uber—contained problematic functions that will require it to enter into a license agreement with Waymo for use of Waymo's intellectual property. Upon information and belief, the Waymo Settlement, entered into after discovery of possible misconduct relating to Uber's source code, settled issues relating to theft of trade secrets by individuals who are not Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 273.

274.    Mr. Levandowski therefore seeks disallowance in full of the Proof of Claim.

**ANSWER:**    Uber denies the allegations in paragraph 274.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## AFFIRMATIVE AND OTHER DEFENSES

In addition to its answers to the allegations set forth above, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that would otherwise rest with Levandowski, Uber asserts the following affirmative and other defenses to certain of the claims asserted against Uber: with respect to Count I, Uber asserts Affirmative Defenses 15 and 16; with respect to Counts II and III, Uber asserts Affirmative Defenses 1-10; with respect to Count IV, Uber asserts only Affirmative Defense 7; with respect to Counts V-IX, Uber asserts Affirmative Defenses 7-14; and with respect to Count X, Uber asserts Affirmative Defense 10. Affirmative Defense 17 is asserted as to the fact of Google's intervention into Count IV, but not as to the substance of the claim set forth in Count IV.

1. **Indemnification For Disgorgement Is Barred By Public Policy**.  Levandowski's claims in Counts II and III for indemnification of the Salary and Regular Compensation ("Related Compensation"), Chauffeur Bonus, and prejudgment interest associated with the same fail because indemnification for disgorgement is impermissible in California as a matter of public policy. The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, order Levandowski to disgorge payments wrongfully obtained from Google. As a matter of law, the Related Compensation and Chauffeur Bonus never belonged to Levandowski. Under California law, Uber is not required or permitted to indemnify Levandowski for the disgorgement ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement of monies that did not belong to him, it is void and unenforceable as contrary to public policy and the law. Any amount awarded for prejudgment interest related to an award of disgorgement is likewise unenforceable.

2. **Expenses Reduced By Amounts Paid By Third Party**. Levandowski's claims in Counts II and III for indemnification for the Related Compensation, Chauffeur Bonus, and prejudgment interest related to it fail because Section 2.4(b) of the Indemnification Agreement states that "there shall be deducted from such Expenses an amount equal to the amount of any proceeds actually received by any Indemnified Person from any third-party insurer or from any other third parties in connection with such Expenses." The $127 million payment to Levandowski, related to the

DOCS_SF:104383.8 85647/001

Case: 20-03050   Doc# 63   Filed: 10/13/20   Entered: 10/13/20 18:09:09   Page 62 of 108

Related Compensation and Chauffeur Bonus, was a payment by a third party, Google, to Levandowski, an Indemnified Person, upon which Levandowski's claim for indemnification is based. Levandowski is not entitled to indemnification for that amount, or for prejudgment interest related to that amount.

3. **Indemnification For Wrongful, Unlawful and Felonious Activity Is Barred**. Levandowski's claims in Counts II and III are barred in whole or in part, by California Civil Code Sections 2773 and 2774. An agreement to indemnify Levandowski against wrongful conduct committed after April 11, 2016 that Levandowski knew to be wrongful is void and unenforceable pursuant to California Civil Code § 2773. Levandowski knowingly engaged in wrongful conduct after April 11, 2016, including by concealing his role in Tyto and concealing his theft of trade secrets from Google, all in order to deceive Google so as to receive the second installment of the Chauffeur Bonus from Google under false pretenses. The foregoing is not an exhaustive list of Levandowski's wrongful activity after April 11, 2016. Additionally, under California Civil Code § 2774 it is impermissible to indemnify Levandowski for conduct that was felonious in nature. Levandowski engaged in felonious activity in connection with the events that led to the Arbitration Award. As determined in the Arbitration Award, Levandowski concealed competitive and disloyal conduct over a four-year period in order to procure a bonus and other compensation from Google under false pretenses. This conduct constitutes felony grand theft under California Penal Code Section 487, and it caused the Arbitration Panel to order Levandowski to disgorge the compensation obtained under false pretenses. Levandowski also pled guilty to the felony of Theft and Attempted Theft of Trade Secrets for stealing Google trade secrets related to self-driving car technology for use in competing with Google. The indictment recites a course of conduct that substantially overlaps with the conduct that formed the basis of the Arbitration Award. The indictment and guilty plea are attached as Exhibits 6 and 7. Moreover, Levandowski also concealed his felony theft of trade secrets in order to procure a bonus and other compensation from Google under false pretenses. Upon information and belief, Levandowski also engaged in felonious activity in accessing Google computers and data to wrongfully acquire compensation information regarding the employees he was soliciting to join Otto, in violation of California Penal Code Section 502. This conduct also

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

formed the basis of the Arbitration Award. The foregoing may not be an exhaustive list of Levandowski's felonious activity. The Award of disgorgement was based upon Levandowski's commission of wrongful and felonious conduct. Indemnification for the Award of disgorgement is precluded as a matter of law and contract by both California Code Section 2773 and Section 2774.

4. **Indemnification Agreement Is Null And Void Due To A Post-Signing Specified Bad Act**. Levandowski's claims in Counts II and III fail, in whole or in part, because the Agreement is void based upon Levandowski's commission of one or more Post-Signing Specified Bad Acts, as provided in Section 2.1(a) of the Indemnification Agreement. Under Section 2.1(a) of the Indemnification Agreement, the Agreement is null and void as to any employee who commits a Post-Signing Specified Bad Act that was the subject of a Former Employer Claim. The definition of "Post-Signing Specified Bad Act" includes any of the following if committed after April 11, 2016, and before the closing: (a) "retaining, not returning . . . or possessing" numerous kinds of material, including "machine readable storage media . . . of any Former Employer without the express written consent of such Former Employer," (b) "retaining, storing, not returning . . . or possessing any confidential or proprietary Software of any Former Employer without the express written consent of, or any appropriate license from, such Former Employer," and (c) "retaining, storing, not returning . . . or possessing any . . . electronic copy . . . file, data, or information of any Former Employer (in any medium or form) without the express written consent of such Former Employer." The definition of Post-Signing Specified Bad Acts also includes the solicitation of employees of a Former Employer without that Former Employer's express written consent. And it includes knowingly permitting others to commit a Post-Signing Specified Bad Act, as well as failing to disclose knowledge of the commission of such acts.

Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Agreement null and void as to him, and unenforceable by him. Google, Waymo, and Tyto were all Former Employers of Levandowski. The amended complaint filed in the Waymo litigation alleged that Levandowski was a Waymo manager and provided services to Waymo. Levandowski also provided services to Tyto, so as to render Tyto a Former Employer. Both the Google Arbitration and the Waymo litigation were Former Employer

Claims within the meaning of the Indemnification Agreement. Levandowski received indemnification of certain legal fees in conjunction with the Google Arbitration. Otto Trucking was an Indemnified Person and received indemnification for certain legal fees related to the Waymo litigation.

Levandowski committed Post-Signing Specified Bad Acts by, among other things, retaining access to Google confidential information and trade secrets after April 11, 2016, including through one or more online cloud storage accounts. In addition, upon information and belief, Levandowski knowingly permitted others to retain or access confidential documents, confidential information, and trade secrets belonging to Google or Waymo after April 11, 2016.

Levandowski also committed Post-Signing Specified Bad Acts by causing Ottomotto, and thus effectively Uber, to acquire Tyto and Tyto's intellectual property without disclosing his connection to Tyto. In May 2016, Levandowski arranged for Otto, and thus (upon closing of the Otto transaction) for Uber, to acquire Tyto's assets, including its confidential information and competitive LiDAR technology, as to which Google and Waymo had a claim, without disclosing his involvement in Tyto. Levandowski's fraudulent concealment of his own involvement in Tyto as well as his misconduct between April 11, 2016 and August 2016 caused Uber to acquire patents, trade secrets, and confidential information related to Tyto's LiDAR technology that were purportedly owned by Tyto but as to which, based upon Levandowski's breach of his duty of loyalty, Google and Waymo had a claim to equitable ownership.

Levandowski also committed Post-Signing Specified Bad Acts by retaining access to confidential information and trade secrets of another Former Employer after April 11, 2016: Tyto. Upon information and belief, Mr. Levandowski obtained and retained Tyto's confidential information without the express written consent of Tyto after April 11, 2016.

Additionally, upon information and belief, Levandowski also committed Post-Signing Specified Bad Acts by permitting others at Otto, after April 11, 2016, to solicit Google or Waymo employees to join Otto without the express written consent of Google or Waymo. Waymo's amended complaint in the Waymo litigation makes allegations at paragraphs 51-54 that relate to these Post-Signing Specified Bad Acts.

This is not an exhaustive account of Levandowski's Post-Signing Specified Bad Acts; Uber's investigation continues.

All of these Post-Signing Specified Bad Acts were the subject of Former Employer Claims, including certain claims asserted in the Waymo litigation and claims asserted in the Google Arbitration.

Uber seeks a Final Judgment adjudicating that Levandowski committed such Post-Signing Specified Bad Acts that were the subject of a Former Employer Claim and upon the entry of such a Final Judgment, the Indemnification Agreement should be deemed null and void with respect to Levandowski. For purposes of nullifying the Indemnification Agreement as to Levandowski, it is not necessary that he be a party to the Former Employer Claim; it suffices that his Post-Signing Specified Bad Act was the subject of such a claim.

5.      **Excluded Claims**. Levandowski's claims in Counts II and III fail because the Arbitration Award is attributable, in whole or in part, to an Excluded Claim. Section 2.1(b)(ii) of the Indemnification Agreement provides that Uber shall have no obligation to indemnify Levandowski for claims arising from any Pre-Signing Bad Acts that "were not truthfully disclosed by [Levandowski] to the Outside Expert in response to relevant inquiries," or "were not contained or reflected in the due diligence materials provided by [Levandowski] to [Stroz]." The entire Arbitration Award is attributable to Pre-Signing Bad Acts that were not truthfully disclosed by Levandowski to the Outside Expert—including Levandowski's misconduct with respect to Tyto ("Tyto Misconduct"). Among other concealment, when asked about side projects while employed at Google, Levandowski "stressed that Google was aware, and approved of, *all of* his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Odin Wave/Tyto LiDAR project from the list and failed to disclose his involvement with and role in forming Odin Wave/Tyto. Levandowski concealed material and relevant information about Tyto to Stroz in the due diligence materials. Accordingly, the Google claim associated with the Tyto Misconduct is an Excluded Claim.

The Tyto Misconduct occurred throughout the entire period that the Chauffeur Bonus was vesting, and was the predominant reason that he was not entitled to receive the Related

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Compensation and the Chauffeur Bonus. The Tyto Misconduct was also the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Related Compensation and Chauffeur Bonus. Additionally, Levandowski did not disclose truthfully to Uber the other Pre-Signing Bad Acts that formed the basis of the Arbitration Award, including the full extent of the Otto Misconduct, and his long-running course of conduct to procure compensation and a bonus under false pretenses. Thus, the entire Arbitration Award is attributable to an Excluded Claim, and Uber has no obligation to indemnify Levandowski for that Award. In the alternative, at least 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct, and no other misconduct, was occurring.

6.   **Material Breach Of Contract By Levandowski**. Levandowski's claims in Counts II and III fail, in whole or in part, because Levandowski materially breached the Indemnification Agreement, thereby relieving Uber from its obligation to perform thereunder, and entitling Uber to a setoff and/or recoupment for the amounts paid or advanced to Levandowski for Expenses. Section 2.2(c) of the Indemnification Agreement provided that Uber had the right to direct and control the defense of any Former Employer Claims (including Google's arbitration claims), required Levandowski to cooperate in that defense, and required Levandowski to appear and give testimony at Uber's reasonable request. Levandowski refused to cooperate, did not permit Uber to control the defense, and refused to appear and testify at deposition despite Uber's reasonable request, instead broadly invoking the Fifth Amendment in response to all questions posed. This had the effect of also precluding any testimony by Levandowski at the arbitration hearing. Levandowski's failure to testify denied Uber its primary bargained-for-consideration under that agreement. If Levandowski's contention that his testimony would have made a difference is correct, then Levandowski materially breached the terms of the Indemnification Agreement by reason of his refusal to testify. In light of Levandowski's material breach of the Indemnification Agreement, Uber is not obligated to perform under the Indemnification Agreement.

7.   **Fraudulent Inducement**. Levandowski's claims in Counts II, III, and IV-IX fail because Levandowski fraudulently induced Uber to sign the Indemnification Agreement, Otto

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Agreement, and Otto Trucking Agreement by, among other misrepresentations and omissions, concealing from Uber and Stroz his involvement in Tyto and misrepresenting to Uber that he had not taken confidential information or trade secrets from Google when, in fact, he had stolen at least one Google trade secret with the intention of using it at Uber. On April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']." In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved of, *all of* his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Odin Wave/Tyto LiDAR project from the list.

Levandowski also represented during the Stroz interview that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession were there unintentionally, including tools, Drobo 5D disks and company emails on his personal laptop, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber. Levandowski thus represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

All of these representations were false. Google was not aware of and did not approve of Levandowski's involvement in the Odin Wave/Tyto side project, and Levandowski did not comply with his agreements with or obligations to Google—as determined by the award in the Google

Arbitration. In fact, Levandowski's breach of his duties and obligations to Google was so pervasive that, as determined in the Arbitration Award, it nullified any benefit he may have conferred on Google during that time period, and warranted the disgorgement of all of the compensation that accrued to him during that time. Contrary to his attestations and his statements during the Stroz interviews, Levandowski did intentionally take Google confidential information with the intention of using it at Uber—as determined by his guilty plea to the crime of Theft and Attempted Theft of Trade Secrets. This is not an exhaustive list of Levandowski's misrepresentations and omissions; Uber's investigation continues.

Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement, Otto Agreement, and Otto Trucking Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement, Otto Agreement, and Otto Trucking Agreement. Uber was harmed as a result of its justifiable reliance on Levandowski's fraud, including by incurring millions of dollars of expenses in defending the Waymo litigation and advancing Levandowski's defense costs in the Google Arbitration. Due to his fraudulent inducement, Levandowski is not entitled to enforce the Indemnification Agreement, Otto Agreement, and Otto Trucking Agreement.

8. **Unclean Hands**. Levandowski's claims in Counts II, III, and V-IX are barred by the doctrine of unclean hands. Levandowski engaged in wrongful conduct including but not limited to the following: fraudulently inducing Uber to indemnify Levandowski without disclosing that he had stolen one or more trade secrets from Google with the intent to use them at Uber; fraudulently misrepresenting to Uber that he had not intentionally taken any Google confidential information and did not intend to use any Google confidential information at Uber; fraudulently misrepresenting to Uber that he had not violated any of his agreements with or obligations to Google; fraudulently concealing from Uber his involvement in Odin Wave/Tyto; committing one or more felonies by stealing one or more trade secrets from Google and wrongfully accessing and taking compensation information from Google in order to solicit Google employees; and wrongfully obtaining a bonus of over $100 million from Google under false pretenses. Because of this and other wrongful conduct,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Levandowski is barred by the doctrine of unclean hands from seeking any indemnification or damages of any kind, or seeking to hold Uber liable in any manner, in connection with any of the events at issue in this action, the Waymo litigation, the Google Arbitration, or the criminal action.

9.  **Reimbursement For Amounts Paid Into Estate For Excluded Claims**. To the extent that Uber has paid or is otherwise required to pay into Levandowski's estate any indemnification amounts that are attributable to any Excluded Claim, Uber is entitled to reimbursement of those amounts. In addition, Uber is entitled to reimbursement for all defense costs already advanced that are allocable to any Excluded Claim.

10. **Setoff and Recoupment**. To the extent Uber is determined to have any indemnification obligation to Levandowski or to bear any other liability to Levandowski, which Uber expressly denies, Uber is entitled to an offset, reduction, or credit, and/or recoupment, for each of the following:

a.  Compensatory and consequential damages for Levandowski's fraudulent conduct including but not limited to fraudulent inducement. Levandowski fraudulently induced Uber to indemnify Levandowski. As a result of that agreement, Uber was required to defend against, and ultimately settle, litigation brought by Google's subsidiary Waymo, premised on Uber's alleged infringement of Google trade secrets and concealed involvement with Tyto and the development of its LiDAR technology. But for Levandowski's fraud, Uber would not have hired him and would not have been sued by Waymo, and relatedly would not have been required to provide hundreds of millions of dollars of value to settle the Waymo litigation. Accordingly, and as more fully set forth in Uber's counterclaims, Uber is entitled to compensatory and consequential damages in the amount of the defense costs and settlement value it provided in the Waymo litigation.

b.  Contribution from Levandowski for the value provided by Uber to settle the Waymo litigation based upon Levandowski's fault in causing Uber to incur potential liability to Waymo in connection with those claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

69

c.   Compensatory and/or rescissory damages in the amounts advanced to Levandowski to cover defense costs in the Google Arbitration. Levandowski materially breached the Indemnification Agreement by refusing to testify in the Google Arbitration. Levandowski also fraudulently induced Uber to enter into the Indemnification Agreement. Whether under a rescission or breach of contract theory, Uber is entitled to damages in the amount it paid under the Indemnification Agreement for Levandowski's defense of the Google Arbitration.

d.   Contribution for at least 50% of the approximately $9.5 million that Uber paid to indemnify Lior Ron for the portion of the Arbitration Award that was "joint and several" as between Levandowski and Ron.

e.   The amount of the Arbitration Award that is allocable to Excluded Claims.

f.   Reimbursement for all attorneys' fees and other costs allocable to Excluded Claims.

11.



12.

70

[redacted]

[redacted]

[redacted]

b. [redacted]

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA





[redacted]

13. [redacted]

14. [redacted]

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

[redacted]

15. [redacted]

16. [redacted]

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

17.

18.     **Reservation of Additional Defenses Based Upon Full Text of Arbitration Award And Full Arbitration Record**. As of the date of this Amended Answer, Uber still has not been provided a full, un-redacted copy of the Arbitration Award for which Levandowski seeks indemnification, or the record supporting that award. Uber has requested the production of the complete, un-redacted Award and the full arbitration record from both Levandowski and Intervenor Google. Uber reserves the right to assert additional defenses and affirmative defenses based upon the content of the un-redacted Arbitration Award and the arbitration record.

## PRAYER FOR RELIEF

WHEREFORE, Uber requests that this Court enter judgment in its favor and against Levandowski on each Count of the Amended Adversary Complaint, and that the Court award Uber its costs, including attorneys' fees, for defending this action.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## COUNTERCLAIMS[2]

Uber Technologies, Inc. ("Uber"), by and through its attorneys, alleges as follows in connection with its counterclaims against Anthony Levandowski:

### THE PARTIES

1.     Defendant Uber is a Delaware corporation with its principal place of business in San Francisco, California.

2.     Plaintiff Anthony Levandowski is an individual who resides in Sausalito, California.

### JURISDICTION AND VENUE

3.     The Court has jurisdiction over Uber's Counterclaims, pursuant to 28 U.S.C. § 1334(b), because the Counterclaims arise in and relate to the Chapter 11 bankruptcy case that Levandowski filed on March 4, 2020, in the United States Bankruptcy Court for the Northern District of California, Bankruptcy Petition No. 20-30242.

4.     Uber's Counterclaims seeking a declaration that its claims are non-dischargeable are denominated as core proceedings under 28 U.S.C. § 157(b)(2)(B) and (I). Pursuant to Local Bankruptcy Rule 7012-1, Uber consents to the entry of final orders or judgments by the Bankruptcy Court.

5.     Venue is proper before the Court pursuant to 28 U.S.C. § 1409(a), and this Court's July 29, 2020 Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court.

### FACTS

6.     Uber incorporates paragraphs 1–274 of its Answer and Affirmative Defenses 1-18 as though fully set forth herein.

7.     Prior to January 27, 2016, Levandowski was an employee at Google, working on Google's self-driving car project. While Levandowski was at Google, that project was operated as a

---

[2] As of the date of this Answer, Uber still has not been provided a full, un-redacted copy of the Arbitration Award for which Levandowski seeks indemnification, or the record supporting that award. Uber has requested the production of the complete, un-redacted Award and the full arbitration record from both Levandowski and Intervenor Google. Uber reserves the rights to assert additional defenses and affirmative defenses based upon the content of the un-redacted Arbitration Award and the arbitration record.

division within Google called "Project Chauffeur." In 2016, this project was referred to and established under the name of Waymo.

8.    By February 22, 2016, Uber and Levandowski had entered into a non-binding term sheet for Uber's acquisition of Ottomotto LLC ("Otto"). Prior to agreeing to the transaction, Uber and Otto, through their outside lawyers, hired a third-party forensic investigator, Stroz Friedberg ("Stroz") to gather facts and documents to confirm and ensure that Levandowski and others did not bring any proprietary or confidential Google material to Otto, and would not bring any such information to Uber.

9.    In March 2016, Uber engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. On March 22 and 23, 2016, three employees for Stroz conducted an interview of Levandowski.

10.    During his interview with Stroz on March 22 and 23, 2016, Stroz asked Levandowski if he had been involved in any "side projects" during his employment at Google. Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but did not disclose a side business called Tyto LiDAR ("Tyto"), which was a company that Levandowski created beginning in 2012, while working at Google, that was originally called Odin Wave. Levandowski had been the owner, investor, and adviser of Tyto and was the "control person" at Tyto.

11.    Levandowski actively concealed from Uber that he had any role at Tyto. Levandowski arranged for Uber to acquire the assets of Tyto through a sale of those assets in May 2016 to Otto, which Uber had agreed to acquire. Unknown to Uber, Google and Waymo had claims to Tyto's LiDAR technology including because Levandowski was concurrently employed by Google and Waymo to develop the same type of LiDAR technology and because Levandowski concealed his involvement in Tyto from Google and Waymo. By arranging for Uber to acquire the Tyto assets and employ persons employed by Tyto, Levandowski fraudulently exposed Uber to substantial claims by Google and Waymo.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

12. Levandowski also represented during the Stroz interview that the Google information that was found on his devices and accounts "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession were there unintentionally, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber. Levandowski represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

13. As part of Stroz's due diligence, on April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or other obligations to which I am subject with 'Former Employer']." In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

14. Levandowski did not disclose to Stroz that since 2012, and while working at Google, he was the control person of Tyto and did not disclose Google's potential claim to ownership of Tyto trade secrets and patents related to LiDAR technology.

15. Additionally, contrary to his attestations, his statements during the Stroz interviews and his multiple representations to Uber, Levandowski had intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets after leaving Google. Levandowski never disclosed this fact to Uber. To the contrary, Levandowski consistently assured Uber that he would not bring any confidential Google information to Uber.

16. Uber relied on Levandowski's assurances when it entered into an Indemnification Agreement with him on April 11, 2016.

17.    Levandowski fraudulently induced Uber into executing the Indemnification Agreement. Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

18.    At the time of the Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google, other than as expressly and fully disclosed to Stroz.

19.    If Uber had known Levandowski had been involved with the Tyto business, had misappropriated Google trade secrets, had breached his fiduciary duties to Google, had committed felonious misconduct, or had lied to Stroz, Uber would not have executed the Indemnification Agreement in April 2016 and it would not have completed the Otto acquisition in August 2016.

20.    Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, and owed fiduciary duties to Uber.

21.    Levandowski committed fraud on Uber while acting in his fiduciary capacity.

22.    In October 2016, Google initiated two arbitration proceedings against Levandowski, which were subsequently consolidated. *Google LLC v. Anthony Scott Levandowski and Lior Ron*, JAMS Arbitration Case Reference No. 1100086069 (Consolidated) (the "Google Arbitration"). Levandowski thereafter requested indemnity from Uber pursuant to the Indemnification Agreement.

23.    Uber was harmed as a result of its justifiable reliance on Levandowski's fraud, including by incurring millions of dollars of expenses in defending subsequent litigation brought by Google against Uber and Levandowski and advancing Levandowski's defense costs in the Google Arbitration.

24.    On August 15, 2019, a grand jury indicted Levandowski on 33 counts of theft and attempted theft of trade secrets. Levandowski was indicted pursuant to 18 U.S.C. § 1832(a)(1), (2), (3) & (4), Theft and Attempted Theft of Trade Secrets, and 18 U.S.C. §§ 1843 and 2323, Criminal

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Forfeiture. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (N.D. Cal. filed Aug. 15, 2019).

25.    The indictment and each count incorporates a course of alleged misconduct that includes Levandowski's involvement with: (a) Project Chauffeur/Waymo; (b) Odin Wave/Tyto; (c) the formation of Otto; (d) the move to Uber; and (e) the downloading of trade secrets through at least January 2016.

26.    The indictment was not publicly announced until August 27, 2019.

27.    Three days after the indictment was made public, Uber notified Levandowski in a letter dated August 30, 2019, that the Indemnification Agreement was rescinded based on Levandowski's fraudulent inducement. Uber's August 30, 2019 letter also explained that even if the Indemnification Agreement were not rescinded, Levandowski would have no right to enforce it because (a) he had committed a "Post-Signing Specified Bad Act," which was defined in the Agreement to include "retaining, not returning . . . or possessing" confidential information from a former employer, and which rendered any indemnification obligation to Levandowski "null and void" under the Agreement's plain terms, and (b) Levandowski had materially breached the Agreement by refusing to testify and failing to cooperate in the Google Arbitration. Uber also explained that Google's claims related to Levandowski's Tyto conduct were Excluded Claims.

28.    Uber reiterated its rescission of the Indemnification Agreement in letters dated September 11, 2019, September 27, 2019, December 31, 2019, and March 27, 2020.

29.    On December 6, 2019, the Google Arbitration Panel issued a final award against Levandowski. The amount of the award solely against Levandowski was over $174 million, not including amounts for which he was held jointly and severally liable with co-respondent Lior Ron. As discussed below, a primary component of that award was that Levandowski was obligated to disgorge to Google payments for a $126,544,500.00 bonus tied to Google's Project Chauffeur program ("Chauffeur Bonus") and $767,051.95 in salary and regular compensation ("Related Compensation"), to which he was not entitled, as well as to pay prejudgment interest on the same.

30.    On March 4, 2020, the California Superior Court confirmed Google's Final Award against Levandowski, and issued judgment against Levandowski in the amount of $179,047,998.64.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The primary component of the judgment was disgorgement of the Chauffeur Bonus and Related Compensation, which were payments that Levandowski was not entitled to receive, together with prejudgment interest on that amount.

31.     On March 4, 2020, Levandowski filed a voluntary Chapter 11 bankruptcy petition in the Bankruptcy Court and filed a "List of Creditors Who Have the Largest Unsecured Claims Against You and Are Not Insiders," naming Uber.

32.     On March 19, 2020, federal prosecutors announced that Levandowski had agreed to plead guilty to taking Google trade secret information with the intention of using it for his economic benefit, including at Uber. Levandowski fraudulently concealed that he had taken trade secret information when he negotiated the Indemnification Agreement.

33.     On August 6, 2020, Levandowski was sentenced to one count of Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (Dkt. 99, filed Aug. 6, 2020 "Judgment in a Criminal Case").

34.     At the time Uber agreed to indemnify Levandowski, it did not know about Levandowski's involvement and misconduct in forming the Tyto business, that he had stolen trade secrets from and breached his fiduciary duties to Google, that he had lied to Stroz, or that he had committed felonious conduct. Levandowski actively concealed those facts from Uber.

35.     On July 6, 2020, Uber filed a Proof of Claim (Claim 8-1) in Bankruptcy Petition No. 20-30242.

A.     **The Google Arbitration Award**

36.     As set forth in the Google Arbitration Award, "Google s[ought] an award that would constitute a disgorgement of compensation that was paid to Respondents during the period of time that they were disloyal."

37.     The Google Arbitration Panel ruled that "Google is entitled to an award that orders Levandowski to disgorge and restore to Google the principal sum of $127,311,551.95" in compensation.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

38.     The Google Arbitration Panel also awarded Google "the sum of $45,547,474.64 from Levandowski as pre-award interest on disgorgement damages."

39.     The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, ordered Levandowski to disgorge payments wrongfully obtained from Google.

40.     By law, Uber is not required or permitted to indemnify Levandowski for the disgorgement ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement, it is void and unenforceable as contrary to public policy.

41.     Section 2.4(b) of the Indemnification Agreement states that "there shall be deducted from such Expenses an amount equal to the amount of any proceeds actually received by any Indemnified Person from any third-party insurer or from any other third parties in connection with such Expenses." The Chauffeur Bonus and Related Compensation were paid by Google, a third party, to Levandowski, an Indemnified Person. Any indemnifiable expenses must be reduced by the amount Levandowski received from third parties pursuant to Section 2.4(b) of the Indemnification Agreement.

**B.   The Indemnification Agreement's Post-Signing Specified Bad Acts Provision**

42.     The Indemnification Agreement expressly provides that if an indemnified person, such as Levandowski, commits a "Post-Signing Specified Bad Act," that will render the Agreement null and void and completely unenforceable as to that person.

43.     Section 2.1(a) of the Indemnification Agreement provides that if Levandowski committed "a Post-Signing Specified Bad Act" after April 11, 2016, the date the Indemnification Agreement was executed, but before the closing of the Otto acquisition in August 2016, then Uber's indemnification obligation to Levandowski would "become null and void and of no further force and effect and there shall be no liability on the part of" Uber or any of its affiliates to indemnify Levandowski.

44.     The definition of "Post-Signing Specified Bad Act" includes, among other things, any of the following if committed after April 11, 2016, and before the closing: (a) "retaining, not

81

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

returning . . . or possessing" numerous kinds of material, including "machine readable storage media . . . of any Former Employer without the express written consent of such Former Employer," (b) "retaining, storing, not returning . . . or possessing any confidential or proprietary Software of any Former Employer without the express written consent of, or any appropriate license from, such Former Employer," and (c) "retaining, storing, not returning . . . or possessing any . . . electronic copy . . . file, data, or information of any Former Employer (in any medium or form) without the express written consent of such Former Employer."  It also includes solicitation of employees of a Former Employer without express written consent of the Former Employer.

45.    Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Agreement null and void as to him, and unenforceable by him. Both Waymo and Tyto were each Former Employers of Levandowski.

46.    The amended complaint in *Waymo LLC v. Uber Technologies, Inc., et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.) ("Waymo litigation") alleged that Levandowski was a Waymo manager and provided services to Waymo. The Arbitration Panel found that Levandowski provided substantial services to Tyto, including technical and logistical support, and was the "control person" at Tyto. To the extent that Levandowski retained confidential documents, information, and trade secrets belonging to Google or Waymo after April 2016, and/or retained and/or accessed confidential documents, information, and trade secrets that were the subject of the Waymo litigation and that belonged to Tyto after April 2016 without Tyto's express written agreement, or to the extent that he knowingly permitted others to do so, his doing so was a Post-Signing Specified Bad Act.

47.    In May 2016, Levandowski arranged for Otto and thus Uber to acquire Tyto without disclosing his interest in it, and thereby caused Otto and Uber to acquire patents, trade secrets, and confidential information related to LiDAR technology that belonged to Tyto and as to which, based upon Levandowski's breach of his duty of loyalty, Waymo or Google had a claim. Through this acquisition and his concealment of his role in Tyto, Levandowski solicited Tyto employees to become employees of Otto and thus employees of Uber, without ever disclosing to Uber that these employees had potential conflicting interests. Neither Tyto nor Waymo provided express written consent for Levandowski to engage in any of this conduct.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

48.     With respect to Tyto, Levandowski concealed from Uber his role in Tyto and did not secure Tyto's express written consent to his Post-Signing Specified Bad Acts. Waymo also did not expressly consent in writing to any of Levandowski's misconduct that was the subject of a Former Employer Claim, including claims asserted in the Waymo litigation. Upon information and belief, Levandowski committed other Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, including the Google Arbitration.

49.     As but one example, the Google Arbitration Award recounts that Levandowski solicited a Google employee, Laila Mattos, to leave Google after she received a bonus in May 2016 and on information and belief that solicitation and/or its concealment continued after April 11, 2016 and prior to August 2016.

C.  **The Indemnification Agreement's Excluded Claims Provision**

50.     Section 2.1(b)(ii) of the Indemnification Agreement provides that an Indemnified Claim shall not include, and that Uber shall not have "any obligation" to indemnity for, an "Excluded Claim." An Excluded Claim is any claim arising out of actions that "either (A) were not truthfully disclosed by [Levandowski] to [Stroz] in response to relevant inquiries in connection with the due diligence performed by [Stroz] or (B) were not contained or reflected in the due diligence materials provided by [Levandowski] to [Stroz]."

51.     In March 2016, Uber engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. On March 22 and 23, 2016, three employees for Stroz conducted an interview of Levandowski.

52.     Levandowski did not disclose his work on Tyto to Stroz. During those interviews, Stroz expressly asked Levandowski to identify all of the side projects he had worked on while employed at Google. Levandowski concealed from Uber that since 2012 he had been secretly operating a side business that competed with Google called Tyto, and that he had been the owner, investor, and adviser of the company.

53.     Stroz's report to Uber lists all of the side projects that Levandowski disclosed to Stroz. The list does not include any reference to Tyto or to any entity involved in the development of LiDAR technology.

54.     Levandowski failed to disclose to Stroz his involvement with Tyto. Uber was not aware that Levandowski had any involvement with Tyto or had worked on Tyto as a side project while at Google at the time the Indemnification Agreement was signed.

55.     The Google Arbitration Panel found that Google's claims against Levandowski included misconduct attributed to Tyto and Otto.

56.     The Google Arbitration Panel found that, during his employment at Google, Levandowski was secretly setting up a series of trusts and LLCs that resulted in him owning and controlling the company that was ultimately known as Tyto. The Google Arbitration Panel found that Levandowski breached his duty of loyalty to Google by setting up Tyto to develop technology that was competitive with Google's self-driving car efforts. Levandowski's misconduct related to Tyto began prior to October 2012 and continued through January 2016 when Levandowski left Google (the "Tyto Misconduct"). Thereafter, on information and belief, Levandowski committed additional Post-Signing Specified Bad Acts related to Tyto by accessing and transferring Tyto trade secrets, patents, and confidential information, as well as by soliciting Tyto employees, without Tyto's express consent.

57.     The Google Arbitration Panel also found that Levandowski engaged in misconduct by setting up an entity that later became known as Otto. Levandowski's misconduct related to Otto began in August 2015 at the earliest, and continued until January 2016 when Levandowski left Google (the "Otto Misconduct").

58.     Levandowski was part of the program known as Project Chauffeur while employed by Google. Levandowski participated in the Chauffeur Bonus Plan. He also received Related Compensation.

59.     The Google Arbitration Panel entered an award against Levandowski requiring disgorgement of the compensation he earned during the period of disloyalty when he was engaged in conduct related to Tyto and Otto. The largest portion of the award was $126,544,000.00 in Chauffeur Bonus payments and $751,051.95 in Related Compensation, as well as prejudgment interest on those amounts of $45,547,474.64.

60.     As part of the Chauffeur Bonus Plan, Levandowski's interest vested in 25% annual increments each year from October 2012 to October 2015. By the time Levandowski began his Otto Misconduct in 2015, he had already accrued a right to at least 75% of his Chauffeur Bonus. Levandowski's Tyto Misconduct continued from October 2012 through the termination of his employment.

61.     The Tyto Misconduct occurred throughout the entire period during which Levandowski's Chauffeur Bonus was vesting and was the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Chauffeur Bonus and Related Compensation. Had Levandowski not been paid a bonus for the period of the Tyto Misconduct, he would not have received even a penny of the Chauffeur Bonus. Levandowski's concealment of the Tyto Misconduct is the primary cause of his receipt of the bonus and the primary reason for the disgorgement of that bonus and obligation to pay prejudgment interest on the same.

62.     The Tyto Misconduct is an Excluded Claim. During the Stroz investigation and diligence, Levandowski failed to "truthfully disclose" the information about Tyto in response to relevant inquiries. He also failed to provide all the relevant information about Tyto in the materials he gave Stroz. Either one of these failures is sufficient to render all of the Google claims relating to the Tyto Misconduct "Excluded Claims."

63.     The Otto Misconduct is also an Excluded Claim because Levandowski failed to disclose fully the extent or nature of that misconduct.

64.     Levandowski's claims are barred because the predominant cause of the misconduct is based on Excluded Claims under the plain terms of the Indemnification Agreement.

65.     In the alternative, at the least, over 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct, and no other misconduct, was occurring. Therefore, at a minimum, 75% or more of the Chauffeur Bonus and Related Compensation (and prejudgment interest thereon) is allocable to Excluded Claims for which Uber has no obligation to indemnify Levandowski under any circumstances.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

D. **Levandowski's Refusal to Testify in the Google Arbitration was a Material Breach of the Indemnification Agreement**

66.    The Indemnification Agreement provides that in the event that a claim is brought against Levandowksi by a former employer, Uber "shall direct and control the defense or settlement of the Former Employer Claim."

*67.*    Section 2.2(c) of the Indemnification Agreement further states:

> The Indemnified Person(s) party to such Former Employer Claim (i) shall furnish Purchaser and its Representatives with such information as such Indemnified Person(s) may have with respect to such Former Employer Claim . . . , (ii) shall provide to Purchaser and its Representatives any documents or other materials . . . that may be necessary or useful to the defense of such Former Employer Claim . . . , (iii) shall make himself or herself available to Purchaser upon reasonable notice for interviews and factual investigations and to appear at Purchaser's reasonable request to give testimony (including deposition and trial testimony) with respect to the defense of such Former Employer Claim . . . and (iv) shall otherwise reasonably cooperate with and assist Purchaser and its Representatives in the defense of such Former Employer Claim.

68.    Google sought Levandowski's deposition as part of the Google Arbitration.

69.    In January 2018, Uber learned that Levandowski intended to invoke the Fifth Amendment at his deposition in the Google Arbitration rather than testify at the deposition that was scheduled for later that month.

70.    On January 15, 2018, Uber's counsel emailed Levandowski's attorneys and stated: "It is Uber's view that it would be better for the defense of the claims in the Zing arbitration if Mr. Levandowski would testify to the issues raised in the arbitration, rather than invoke the 5th Amendment." Counsel for Uber also requested a meeting with Levandowski prior to his deposition.

71.    On January 15, 2018, Levandowski's counsel rejected Uber's request that Levandowski testify regarding the issues in the arbitration, stating, "[A]fter extraordinary consideration and discussion, Anthony has decided he needs to continue to broadly assert his Fifth Amendment rights."

72.    Contrary to the terms of the Indemnification Agreement providing that Uber be permitted to direct and control the litigation, Levandowski's counsel refused to meet with Uber's counsel prior to Levandowski's deposition.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

73.     On January 18, 2018, Levandowski sat for his deposition in the Google Arbitration and invoked the Fifth Amendment in response to each and every substantive question posed to him.

74.     On April 2, 2018, counsel for Uber sent Levandowski's counsel a letter that explained, among other things, that Levandowski was in material breach of the Indemnification Agreement because he refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment, and requested that Levandowski reconsider his position in invoking the Fifth Amendment so he could testify at the arbitration hearing.

75.     The April 2, 2018 letter from Uber's counsel also provided notice to Levandowski that Uber intended to exercise all of its rights to disclaim or avoid liability under the Indemnification Agreement based on (1) Levandowski's material breach by refusing to testify based on an unjustifiably broad invocation of the Fifth Amendment, (2) Levandowski's breach of the Indemnification Agreement by refusing to reasonably cooperate with the defense, and (3) the fact that certain of Google's claims were Excluded Claims.

76.     On April 20, 2018, Levandowski submitted a proffer to the Google Arbitration Panel as to issues he would testify to at the arbitration hearing.

77.     On April 24, 2018, the Google Arbitration Panel denied Levandowski's request to testify as to the subject matter that he did not testify to during fact discovery, which were the essential facts that Uber had requested that Levandowski testify to in the Google Arbitration.

78.     Contrary to Uber's request under the Indemnification Agreement that Levandowski testify in the Google Arbitration, Levandowski did not testify at the hearing due entirely to Levandowski's refusal to testify during his deposition.

79.     Levandowski failed to perform under and materially breached the Indemnification Agreement. In particular, Levandowski refused to testify in the Google Arbitration upon Uber's reasonable request, and failed to cooperate with Uber in the defense of the Google Arbitration claims, thereby denying Uber the entire consideration it bargained for under the Indemnification Agreement.

80.     Uber's inability to cause Levandowski to testify evidences that at no point was Uber in control of Levandowski's defense in the Google Arbitration.

81.     Uber never directed Levandowski's counsel to assert any arguments or defenses that they did not independently want to assert, or to refrain from asserting any arguments or defenses that they did want to assert. Uber was prohibited from participating in the dispute and denied access to and information about most of the arbitration hearing, and from presenting an argument on the allocation of Google's damages.

82.     Uber was not permitted to submit evidence of the proper allocation of damages at the Google Arbitration hearing. The Google Arbitration Panel issued its decision without any reasoned consideration or arguments presented on the issue. Both Levandowski and Google had an incentive to reach a damages award that was incorrect as a matter of law and adverse to Uber.

83.     During the Google Arbitration, Levandowski refused to cooperate, refused to testify, and refused to make it possible for rational settlement discussions to take place.

84.     Levandowski's failure to comply with his obligations under the Indemnification Agreement deprived Uber of the benefit it would have derived from the Indemnification Agreement, namely, the right to control any litigation for which it was agreeing to provide indemnification. Uber cannot be adequately compensated for the breach. Levandowski's offer to testify at the hearing came too late and therefore Levandowski did not cure his breach.

85.     Uber expects Levandowski to assert on appeal that his testimony, if allowed, would have changed the outcome of the arbitration. If it is determined that the outcome of the arbitration would have been different if Levandowski testified, then Levandowski's failure to testify was a material breach of the Indemnification Agreement, which excuses Uber's obligation to perform under the Indemnification Agreement, including payment of any Expenses in connection with the Arbitration Award.

**COUNT I**
**Declaratory Judgment – No Indemnification**
**Based On Disgorgement and Prejudgment Interest**

86.     Uber incorporates all of the above paragraphs as though fully set forth herein.

87.     The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, ordered Levandowski to disgorge the Chauffer Bonus of $126,544,500.00 and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Related Compensation of $767,051.95 for a total disgorgement of $127,311,551.95 in payments that Levandowski wrongfully obtained from Google.

88.     As a matter of law, those payments never belonged to Levandowski. Levandowski's claims against Uber under the Indemnification Agreement related to the Chauffeur Bonus and Related Compensation, along with prejudgment interest on the same, fail because indemnification for disgorgement is impermissible in California as a matter of public policy.

89.     Uber is not required or permitted to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and Related Compensation, and prejudgment interest on the same, as ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement, it is void and unenforceable as contrary to public policy.

90.     The amounts awarded for prejudgment interest related to the award of disgorgement is likewise not indemnifiable as a matter of law and policy.

91.     Independent of the prohibition on indemnification for disgorgement, any indemnifiable expenses must be reduced by the amount Levandowski received from third parties pursuant to Section 2.4(b) of the Indemnification Agreement.

92.     The Chauffeur Bonus and Related Compensation were paid by Google, a third party, to Levandowski, an Indemnified Person.

93.     Uber is not obligated to pay any amount that is attributable to the Chauffeur Bonus and Related Compensation under Section 2.4(b) of the Indemnification Agreement, including any prejudgment interest or post-judgment interest on that award.

94.     As a result of the acts described herein, a live controversy exists as to (a) whether Levandowski is entitled to indemnification for the disgorgement of the Chauffeur Bonus and Related Compensation as well as prejudgment interest related to this disgorgement; and (b) whether Levandowski is entitled to indemnification for his obligation to return or repay to Google payments that he received from Google, a third party.

95.     These issues are ripe for determination and require a declaration that Uber has no duty or obligation to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Related Compensation, for the obligation to repay any monies paid to him by Google and any

2   prejudgment interest related to the same.

3        96.     Uber therefore seeks a declaration that Uber has no duty or obligation to indemnify

4   Levandowski for the disgorgement of the Chauffeur Bonus and Related Compensation, and for the

5   obligation to repay any monies paid to him by Google and any prejudgment interest related to the

6   same.

7                              **COUNT II**
                   **Declaratory Judgment - Levandowski's Claims Are Barred**
8                       **By California Civil Code § 2774**

9        97.     Uber incorporates all of the above paragraphs as though fully set forth herein.

10       98.     California Civil Code § 2774 states: "[a]n agreement to indemnify a person against an

11  act already done, is valid, even though the act was known to be wrongful, unless it was a felony."

12  Cal. Civil Code § 2774 precludes indemnification for losses and damages caused by felonious

13  conduct, without regard to whether the party seeking indemnification is convicted for that crime or

14  not.

15       99.     Levandowski engaged in felonious acts and those acts were the basis for the

16  Arbitration Award. Any indemnification of Levandowski for the Arbitration Award or any resulting

17  judgment is precluded by Cal. Civil Code § 2774.

18       100.    Levandowski was charged with 33 felony counts of theft and attempted theft of trade

19  secrets. *See* 18 U.S.C. §§ 1832(a)(1), (2), (3), & (4). The indictment and each count incorporates a

20  course of alleged misconduct that included Levandowski's involvement with: (a) Project Chauffeur;

21  (b) Tyto; (c) the formation of Otto; (d) the move to Uber; and (e) the downloading of trade secrets

22  through at least January 2016. The indictment reflects a course of felonious conduct that

23  substantially overlaps with the conduct that formed the basis of the Arbitration Award.

24       101.    Levandowski pled guilty to the felony of Theft and Attempted Theft of Trade Secrets

25  for stealing Google trade secrets related to self-driving car technology for use in competing with

26  Google.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

102.    Levandowski also engaged in felonious activity in accessing Google computers and data to wrongfully acquire compensation and benefits information regarding the employees he was soliciting to come to Otto, in violation of California Penal Code Section 502. The Google Arbitration Panel found that Levandowski breached his duties to Google by improperly accessing Google employees' salary and performance information and then using that information to attempt to solicit those employees to Otto. This conduct was not only a breach of Levandowski's duties to Google, but it was felonious conduct within the meaning of Cal. Civil Code § 2774 and Cal. Penal Code § 502(c)(1) and (2).

103.    Uber is not required or permitted to indemnify Levandowski for any Expense resulting from or associated with his felonious activity.

104.    As a result of the acts described herein, a live controversy exists as to whether Levandowski is entitled to indemnification for the Arbitration Award and subsequent judgment, including any part of the Award or subsequent judgment that is based upon felonious conduct.

105.    These issues are ripe for determination and require a declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award and Judgment, including any part of the Award or subsequent judgment that is based upon felonious conduct.

106.    Uber therefore seeks a declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award and subsequent judgment, including any part of the Award or Judgment that is based upon felonious conduct.

**COUNT III**
**Declaratory Judgment - No Indemnification Due To Post-Signing Specified Bad Acts**

107.    Uber incorporates all of the above paragraphs as though fully set forth herein.

108.    The Indemnification Agreement expressly provides that if an indemnified person, such as Levandowski, commits a "Post-Signing Specified Bad Act," that will render the Agreement null and void and completely unenforceable as to that person.

109.    Levandowski committed one or more Post-Signing Specified Bad Acts, rendering the Agreement null and void as to him, and unenforceable by him.

110.   The definition of Post-Signing Specified Bad Acts includes retaining or using any confidential Google information after the execution of the Indemnification Agreement, as well as solicitation of employees. The expansive definition is set forth more fully in Exhibit A to the Indemnification Agreement and provides that an "Act" may include "knowingly permit[ing] someone else to take" an action.

111.   Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Indemnification Agreement null and void as to him, and unenforceable by him. Both Waymo and Tyto were each Former Employers of Levandowski. The amended complaint filed in the Waymo litigation alleged that Levandowski was a Waymo manager and provided services to Waymo. The Arbitration Panel found that Levandowski provided substantial services to Tyto, including technical and logistical support, and was the "control person" at Tyto. Both the Google Arbitration and the Waymo litigation were Former Employer Claims within the meaning of the Indemnification Agreement.   Levandowski received indemnification of certain legal fees in conjunction with the Google Arbitration. Otto Trucking LLC was an Indemnified Person and received indemnification for certain legal fees related to the Waymo litigation.

112.   Levandowski retained and/or accessed confidential documents, confidential information, patents, and trade secrets belonging to Google, Waymo, and Tyto after April 2016. In May 2016, Levandowski arranged for Otto, and thus upon closing for Uber, to acquire Tyto's assets, including its confidential information and competitive LiDAR technology, as to which Google or Waymo had a claim, without disclosing his involvement in Tyto.

113.   Levandowski's fraudulent concealment of his own involvement in Tyto, as well as his misconduct between April 11, 2016 and August 2016, caused Uber to acquire patents, trade secrets, and confidential information related to LiDAR technology that were purportedly owned by Tyto but in which, based upon Levandowski's breach of his duty of loyalty, Google or Waymo had a claim.

114.   Through this Tyto acquisition and Levandowski's concealment of his role in Tyto after April 11, 2016, Levandowski also solicited Tyto employees to become employees of Otto and thus employees of Uber, without ever disclosing to Uber that these employees had potential

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

conflicting interests. Neither Tyto nor Waymo provided express written consent for Levandowski to engage in any of this misconduct.

115.    With respect to Tyto, Levandowski concealed from Uber his role in Tyto and thus could not secure Tyto's express written consent to his Post-Signing Specified Bad Acts. Waymo also did not expressly consent in writing to any of these. Levandowski's misconduct was the subject of multiple Former Employer Claims, including the claims asserted in the Waymo litigation and claims asserted in the Google Arbitration. The acquisition of Tyto's LiDAR technology, which was arranged for in May 2016 by Levandowski, was at the heart of the Waymo litigation.

116.    Additionally, as but one example, the Google Arbitration Award recounts that Levandowski solicited a Google employee, Laila Mattos, to leave Google after she received a bonus in May 2016 and on information and belief that solicitation and/or its concealment continued after April 11, 2016 and prior to August 2016.

117.    Uber seeks a final judgment adjudicating that Levandowski committed such Post-Signing Specified Bad Acts that were the subject of a Former Employer Claim and upon the entry of such a Final Judgment, the Indemnification Agreement should be deemed null and void with respect to Levandowski. For purposes of nullifying the Indemnification Agreement as to Levandowski, it is not necessary that he be a party to the Former Employer Claim; it suffices that his Post-Signing Specified Bad Act was the subject of such a claim.

118.    As a result of the acts described herein, a live controversy exists as to whether the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

119.    This controversy is ripe for determination and requires a declaration that the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

120.    Uber therefore seeks a declaration that the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

**COUNT IV**
**Declaratory Judgment - No Indemnification And/Or Setoff Due To Excluded Claims**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

121.     Uber incorporates all of the above paragraphs as though fully set forth herein.

122.     During the Stroz investigation and diligence, Levandowski failed to "truthfully disclose" the information about Tyto in response to relevant inquiries. He also failed to provide all the relevant information about Tyto in the materials he gave Stroz. Either one of these failures is sufficient to render all of the Google claims relating to the Tyto Misconduct "Excluded Claims."

123.     Levandowski's claims are barred because the predominant cause of the Arbitration Award was misconduct that constitutes one or more Excluded Claims under the plain terms of the Indemnification Agreement.

124.     The Tyto Misconduct occurred throughout the entire period during which Levandowski's Chauffeur Bonus was vesting and was the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Chauffeur Bonus and Related Compensation.

125.     Levandowski also failed to disclose the full scope of the misconduct he committed in relation to Otto; thus, any undisclosed misconduct related to Otto also constitutes an Excluded Claim. To the extent that the Arbitration Award was based on the Otto Misconduct, Levandowski's claims are barred because that conduct also constituted an Excluded Claim.

126.     In the alternative, at the least, over 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct was occurring.

127.     As a result of the acts described herein, a live controversy exists as to whether the Arbitration Award and any judgment based on it is an Excluded Claim.

128.     This controversy is ripe for determination and requires a declaration that the Arbitration Award and any judgment based on it is an Excluded Claim.

129.     Uber therefore seeks a declaration that the Arbitration Award, and any judgment based on it, and/or any portion of that Award and judgment related to the Tyto Misconduct are Excluded Claims and not subject to indemnification.  In the alternative, Uber seeks a declaration that any indemnification to which Levandowski may otherwise be entitled must be subject to setoff and/or recoupment in the amount of any award or judgment attributable to an Excluded Claim.

**COUNT V**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**Breach of Indemnification Agreement**

130.    Uber incorporates all of the above paragraphs as though fully set forth herein.

131.    Contrary to Uber's request under the Indemnification Agreement that Levandowski testify in the Google Arbitration, Levandowski did not testify at his deposition or the arbitration hearing.

132.    Levandowski materially breached the Indemnification Agreement by failing to testify at his deposition and the Google Arbitration hearing, and by his other failures to cooperate with the defense. Levandowski failed to perform his obligations under the Indemnification Agreement by failing to comply with Uber's request that he provide relevant testimony at his deposition and at the Google Arbitration hearing and by impeding Uber's ability to have access to the information necessary for Uber to effectively oversee and direct the defense of the dispute. By broadly invoking the Fifth Amendment and declining to meet with Uber's counsel, Levandowski materially breached Sections 2.2(b) and 2.2(c) of the Indemnification Agreement and denied Uber its bargained-for consideration.

133.    Levandowski is expected to assert that the outcome of the Google Arbitration would have been different had he testified at the arbitration hearing.

134.    Levandowski admitted through his last-ditch effort to reverse course in order to try to testify in the Google Arbitration that he believes his testimony and cooperation would have changed the outcome of the arbitration against Google.

135.    If Levandowski's contention that his testimony would have made a difference is correct, then he has materially breached the terms of the Indemnification Agreement so as to excuse Uber's performance of the Indemnification Agreement. At minimum, Levandowski's breach injured Uber by depriving it of the benefits for which it bargained in the Indemnification Agreement.

136.    Uber is entitled to a declaration that Levandowski's breach of the Indemnification Agreement excuses any obligation that Uber may otherwise have to perform under the Indemnification Agreement. Uber is also entitled to restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Levandowski's breach of contract.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**COUNT VI**
**Damages Based On Fraud And Fraudulent Inducement**
**And For A Declaration That Such Damages Are Non-Dischargeable**
**Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)**

137.   Uber incorporates all of the above paragraphs as though fully set forth herein.

138.   Due to Levandowski's fraudulent inducement, Uber entered into the Indemnification Agreement with Levandowski on April 11, 2016.

139.   In March 2016, Uber engaged Stroz to conduct an independent investigation of Levandowski prior to the signing of the Indemnification Agreement.

140.   During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted Tyto from the list.

141.   Levandowski concealed from Stroz and Uber that since 2012 he had been secretly operating a business that competed with Google called Tyto. Levandowski had been the owner, investor, and adviser of Tyto and, as the Arbitration Panel found, he was secretly the control person of Tyto. Levandowski arranged for Otto to purchase Tyto, so as to transfer Tyto's trade secrets and confidential information related to the LiDAR technology to Uber, without Uber ever knowing that Levandowski was involved with Tyto and without Uber ever knowing that Levandowski had used Tyto as a means for secretly establishing a competing business with Google and that Google would have a claim to the very LiDAR technology that Uber was acquiring.

142.   Levandowski also represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

143.   Levandowski represented to Stroz during the interviews that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession was there unintentionally. Levandowski also represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber.

144.    At the time of the Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google.

145.    On April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']."

146.    In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

147.    Contrary to his attestations, his statements during the Stroz interviews, and his multiple representations to Uber, Levandowski intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets while at Uber. Levandowski never disclosed this fact to Uber. To the contrary, he expressly promised not to do anything of the kind, and to take every precaution to ensure that no Google trade secrets would come to Uber. Levandowski consistently assured Uber that it would not bring any confidential Google information to Uber.

148.    Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

149.    If Uber had known Levandowski's statements were fraudulent representations, Uber would not have executed the Indemnification Agreement in April 2016.

150.    After learning of Levandowski's fraud, Uber properly rescinded the Indemnification Agreement.

151.    Uber is entitled to restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Uber's proper rescission of that agreement as a result of Levandowski's fraud.

152.    Levandowski fraudulently concealed from Uber that Levandowski had committed Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed his retention of Google trade secrets and confidential documents, had wrongfully taken and retained trade secrets in which Waymo or Google had a claim, and had committed Post-Signing Specified Bad Acts.

153.    If Uber had known that Levandowski had committed the Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed trade secrets in which Waymo or Google had a claim, including through his secret control of Tyto, and/or known that he had committed Post-Signing Specified Bad Acts, it would not have consummated the Otto acquisition.

154.    But for Levandowski's fraud, Uber would not have acquired any LiDAR technology in which Google or Waymo had a claim, and would not have been subject to the claims asserted against it by Waymo.  Levandowski's fraud, including his concealment of his involvement as the control person in Tyto, was a substantial factor in the Google Arbitration Award and also a substantial factor in causing Uber to provide Waymo consideration valued at approximately $245 million to resolve claims asserted in the Waymo litigation. Uber is entitled to contribution from Levandowski for all losses it incurred in connection with the Google Arbitration and the Waymo claims.

155.    The sole basis for Uber's inclusion in the Waymo litigation was Uber's acquisition of Otto and agreement to acquire Otto Trucking LLC. Uber would not have closed that transaction or entered into the Indemnification Agreement had it known of Levandowski's fraudulent and other wrongful conduct, and Waymo would not have sued Uber but for that misconduct. The Waymo litigation was a direct consequence of Levandowski's fraudulent conduct.

156.    Uber is entitled to consequential damages caused by Levandowski's fraud committed upon Uber, including but not limited to the value of the consideration that Uber has been required to

provide Waymo in the Waymo litigation to resolve claims arising out of and caused by Levandowski's fraud, including claims for violations of the Trade Secret Act, violations of the California Uniform Trade Secret Act, patent infringements, and violation of the California Business and Professional Code.

157.   Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber against any amounts Uber is found to owe to Levandowski based upon Levandowski's fraud.

158.   Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's claims for recovery of benefits conferred upon Levandowski under the Indemnification Agreement and for all damages incurred as a result of Levandowski's fraud, including recovery of the value of the consideration that Uber provided Waymo in connection with the Waymo litigation. The Court should therefore declare that all of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

159.   Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity, making Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

160.   Levandowski's actual fraud and fraudulent misrepresentations were wrongful acts, which Levandowski committed intentionally and which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

**COUNT VII**
**Contribution Of The Value Of The Consideration Provided To Settle The Waymo Litigation And For A Declaration That Such Right Of Contribution Is Non-Dischargeable Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)**

161.   Uber incorporates all of the above paragraphs as though fully set forth herein.

162.   Levandowski fraudulently concealed from Uber that Levandowski had committed Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed his retention of Google trade secrets and confidential documents, had wrongfully taken and retained

trade secrets in which Waymo or Google had a claim, and had committed Post-Signing Specified Bad Acts.

163.   If Uber had known that Levandowski had committed the Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed trade secrets in which Waymo or Google had a claim, and/or known that he had committed Post-Signing Specified Bad Acts, it would not have consummated the Otto acquisition.

164.   But for Levandowski's fraud, Uber would not have been subject to the claims asserted against it by Waymo and it would not have been necessary for Uber to provide consideration valued at approximately $245 million to resolve those claims. Uber is entitled to contribution from Levandowski for all losses it incurred in connection with the Waymo claims.

165.   Levandowski is jointly and severally liable to Waymo for the losses that Waymo claimed in its claims against Uber.

166.   Uber is entitled to contribution from Levandowski in the amount equal to the consideration it provided Waymo to settle the Waymo litigation.

167.   Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber for contribution against any amounts Uber is found to owe to Levandowski.

168.   Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's debts for recovery of contribution damages. The Court should therefore declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

169.   Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity, making Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

170.   Levandowski's actual fraud and fraudulent misrepresentations which give rise to Uber's claims for contribution were wrongful acts, which Levandowski committed intentionally and which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**COUNT VIII**
**Declaratory Judgment For Rescission Based On Fraudulent Inducement**

171.    Uber incorporates all of the above paragraphs as though fully set forth herein.

172.    Due to Levandowski's fraudulent inducement, Uber entered into the Indemnification Agreement with Levandowski on April 11, 2016.

173.    In March 2016, Uber engaged Stroz to conduct an independent investigation of Levandowski prior to the signing of the Indemnification Agreement.

174.    During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Tyto project from the list.

175.    Levandowski fraudulently concealed from Stroz and Uber that since 2012 he had been secretly operating a side business that competed with Google called Tyto, which was a company that Levandowski created beginning in 2012. Levandowski had been the owner, investor, and adviser of Tyto.

176.    Levandowski fraudulently represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

177.    Levandowski fraudulently represented during the Stroz interviews that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession was there unintentionally, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber.

178.    At the time of the Indemnification Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google.

179. On April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']."

180. In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

181. Contrary to his attestations, his statements during the Stroz interviews, and his multiple representations to Uber, Levandowski intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets while at Uber. Levandowski never disclosed this fact to Uber. To the contrary, he expressly promised not to do anything of the kind, and to take every precaution to ensure that no Google trade secrets would come to Uber. Levandowski consistently assured Uber that it would not bring any confidential Google information to Uber.

182. Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

183. If Uber had known Levandowski's statements were fraudulent representations, Uber would not have executed the Indemnification Agreement in April 2016.

184. After learning of Levandowski's fraud, Uber properly rescinded the Indemnification Agreement.

185. As a result of the acts described herein, a live controversy exists as to whether Uber has effectively rescinded the Indemnification Agreement.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

186.    The issue of whether Uber has effectively rescinded the Indemnification Agreement is ripe for determination.

187.    Uber therefore seeks a declaration that it has effectively rescinded the Indemnification Agreement.

**COUNT IX**
**Contribution Of The Amounts Paid For Lior Ron And**
**For A Declaration That Such Amounts Are Non-Dischargeable**
**Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)**

188.    Uber incorporates all of the above paragraphs as though fully set forth herein.

189.    The Corrected Final Award and subsequent judgment awarded Google $9,573,096.60 from Lior Ron, individually and jointly and severally with Levandowski.

190.    On February 5, 2020, Uber paid Google, on Ron's behalf, $9,453,135.87 to settle this portion of the award, as well as the much smaller amount awarded solely against Ron.

191.    Ron assigned to Uber his right to seek contribution from Levandowski in the amount proportionate to Levandowski's comparative fault. Levandowski is solely or primarily at fault with respect to that award.

192.    Uber is entitled to contribution from Levandowski in the amount of the joint and several portion of the Google Award that Uber paid on behalf of Lior Ron.

193.    Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber for contribution against any amounts Uber is found to owe to Levandowski.

194.    Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's debts for recovery of contribution damages. The Court should therefore declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

195.    Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity making, Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

196.    Levandowski's actual fraud and fraudulent misrepresentations which give rise to Uber's claims for contribution were wrongful acts, which Levandowski committed intentionally and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

<div align="center">

**COUNT X**
**Incorporation Of Proof Of Claim**

</div>

197.    Uber incorporates all of the above paragraphs as though fully set forth herein.

198.    Uber incorporates by reference as though fully set forth herein its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") in Bankruptcy Petition No. 20-30242 pending in the United States Bankruptcy Court for the Northern District of California and reasserts those claims herein.

199.    On March 4, 2020, Levandowski filed a voluntary Chapter 11 individual bankruptcy petition in the Bankruptcy Court and filed a "List of Creditors Who Have the Largest Unsecured Claims Against You and Are Not Insiders," naming Uber.

200.    On July 6, 2020, Uber filed a Proof of Claim alleging various claims against Levandowski and to the extent not otherwise asserted in these counterclaims, Uber incorporates and reasserts those claims herein, including but not limited to: (1) contribution for the amount of the joint and several portion of the Corrected Final Award in the Google Arbitration that Uber paid on behalf of Lior Ron; (2) restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Uber's proper rescission of that agreement as a result of Levandowski's fraud; (3) consequential damages arising out of Levandowski's fraud committed upon Uber; and  (4) a defense against indemnification based upon the Excluded Claims provision of the Indemnification Agreement and/or a claim for reimbursement, recoupment and/or setoff as to all amounts subject to the Excluded Claims provision.

201.    To the extent not otherwise alleged in these counterclaims, Uber incorporates by reference all claims in its July 6, 2020 Proof of Claim.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Uber prays for the following relief:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

202.   That the Complaint filed by Levandowski be dismissed in its entirety with prejudice, that judgment be entered in favor of Uber and against Levandowski, and that Levandowski be denied all relief requested in his Complaint;

203.   A declaration that Uber has valid claims against Levandowski as alleged in the July 6, 2020 Proof of Claim;

204.   A declaration that Levandowski is not subject to a release from claims;

205.   A declaration that the Indemnification Agreement has been rescinded or is null and void;

206.   A final judgment that Levandowski is not entitled to indemnification under the Indemnification Agreement because Levandowski fraudulently induced Uber to enter into that agreement;

207.   A declaration that Levandowski is not entitled to indemnification for disgorgement of the Chauffeur Bonus and Related Compensation or any prejudgment interest related to the same;

208.   A declaration that Levandowski is not entitled to indemnification for any amounts paid to him by a third party, Google, including the Chauffeur Bonus and Related Compensation, as well as any prejudgment interest associated with the same;

209.   A declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award or any resulting judgment because Cal. Civil Code § 2774 precludes indemnification due to Levandowski's felonious conduct;

210.   A final judgment determining that Levandowski committed Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, and an order from the Court that the Indemnification Agreement is null and void, including because Levandowski committed Post-Signing Specified Bad Acts;

211.   An final judgment that Levandowski materially breached the Indemnification Agreement and that the agreement is not enforceable against Uber on account of that breach;

212.   An award of consequential damages arising out and caused by Levandowski's fraud committed upon Uber; including but not limited to the value provided by Uber to Waymo in conjunction with its settlement agreement with Waymo;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

213.   An award of contribution for the value provided by Uber to Waymo in conjunction with its settlement agreement with Waymo;

214.   An award of consequential damages arising out of and caused by Levandowski's breach of the Indemnification Agreement;

215.   Setoff and/or recoupment of any amounts Levandowski owes to Uber against any amounts Uber is otherwise found to owe to Levandowski;

216.   An award of contribution for the portion of the joint and several part of the Corrected Final Award in *Google, LLC v. Anthony Scott Levandowski and Lior Ron* that Uber paid on behalf of Lior Ron;

217.   An final judgment providing restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement based on Uber's rescission of the Indemnification Agreement;

218.   An Order from the Court that the amounts that Levandowski seeks to recover under the Indemnification Agreement may not be recovered because they are based upon Excluded Claims, or in the alternative that at least over 75% of the amounts Levandowski seeks to compel Uber to pay, plus attorneys' fees and costs, are Excluded Claims related to the Tyto Misconduct and not subject to indemnification;

219.   A declaration that Uber's claims and the damages sought herein are not subject to discharge pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6);

220.   Prejudgment and post judgment interest on any amounts awarded to Uber;

221.   Attorneys' fees and costs incurred by Uber in defending this action, including fees incurred in the Bankruptcy proceeding; and

222.   Such other and further relief as is just and proper.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Dated:  October 13, 2020                     Respectfully submitted,

                                             PACHULSKI STANG ZIEHL & JONES LLP

                                             By: */s/ Debra I. Grassgreen*
                                             Debra I. Grassgreen
                                             Miriam Manning

                                             -and-

                                             David J. Bradford
                                             Catherine Steege
                                             Terri L. Mascherin
                                             Katharine R. Ciliberti
                                             JENNER & BLOCK LLP

                                             *Counsel for Uber Technologies, Inc.*

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 1

**JAMS ARBITRATION**
**CASE REFERENCE NO 1100086069**

GOOGLE, LLC,

      Claimant

         and

ANTHONY SCOTT LEVANDOWSKI      **CORRECTED FINAL AWARD**

And

LIOR RON,

      Respondents

| **Counsel for Claimant** | **Counsel for Respondents** |
|---|---|
| Keker & Van Nest LLP<br>633 Battery Street<br>San Francisco, CA 94111<br><br>Robert A. Van Nest<br>Rachael E. Meny<br>Jennifer A. Huber<br>Thomas R. Gorman<br>W. Hamilton Jordan<br>Jo W. Golub<br>Ben Berkowitz<br>Reid Mullen<br>Molly Caldwell Villagra | ***Attorneys for Respondent Anthony Levandowski***<br><br>Goodwin Procter LLP<br>135 Commonwealth Drive<br>Menlo Park, CA 94025<br><br>Neel Chatterjee<br>Brett M. Schuman<br>Rachel M. Walsh<br>Andrew Ong<br><br>***Attorneys for Respondent Lior Ron***<br><br>Taylor & Patchen LLP<br>One Ferry Building, Suite 355<br>San Francisco, CA 94111<br><br>Stephen E. Taylor<br>Jonathan A. Patchen<br>Cheryl A. Cauley<br>Karan S. Dhadialla<br>Daniel P. Martin |





























































































































































REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 2

*EXECUTION VERSION*
*Confidential*

**AGREEMENT AND PLAN OF MERGER**

**by and among**

**Otto Trucking LLC, a Delaware limited liability company;**

**Uber Technologies, Inc., a Delaware corporation;**

**Uber Freight Holding Corporation, a Delaware corporation;**

**Zing Merger Sub II, LLC, a Delaware limited liability company; and**

**the Company Unitholder Representative**

**Dated as of August 5, 2018**

OMM_US:76271562.23

























































































































































































































































































































































































































REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 3

















CONFIDENTIAL





REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 4



























CONFIDENTIAL

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 5







VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 6

SEALED BY ORDER OF COURT

# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: SAN JOSE



FILED

UNITED STATES OF AMERICA,

V.

AUG 15 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

ANTHONY SCOTT LEVANDOWSKI,

## CR 19 00377

LHK

SVK

DEFENDANT(S).

# INDICTMENT

18 U.S.C. § 1832(a)(1), (2), (3) & (4) – Theft and Attempted Theft of Trade Secrets;
18 U.S.C. §§ 1843 and 2323 – Criminal Forfeiture.

A true bill.

_____
Foreman

Filed in open court this _____ 15 _____ day of _____ August 2019 _____
_____.

Nathanael Cousins
Clerk
U.S. Magistrate Judge

Bail, $ _____ no bail arrest warrant _____

SEALED BY ORDER
OF COURT

FILED

AUG 1 5 2019

1  DAVID L. ANDERSON (CABN 149604)

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

   United States Attorney
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA
10                        SAN JOSE DIVISION
11  UNITED STATES OF AMERICA,           CR 19 00377 LHK SVK
                                    )   Case No.
12         Plaintiff,               )   VIOLATIONS: Title 18, United States Code,
                                    )   Sections 1832(a)(1), (2), (3) & (4) – Theft and
13     v.                           )   Attempted Theft of Trade Secrets; Title 18, United
                                    )   States Code, Sections 1843 and 2323 – Criminal
14  ANTHONY SCOTT LEVANDOWSKI,      )   Forfeiture.
                                    )
15         Defendant.               )   San Jose Venue
                                    )
16  _____ )
17
18                         I N D I C T M E N T
19  The Grand Jury charges:
20                      Introductory Allegations
21         1.    In or about 2009, Google Inc. ("Google") began a self-driving car project known within
22  the company as Project Chauffeur. Google employees working on Project Chauffeur designed and
23  developed both the hardware and software necessary for fully autonomous vehicles. Self-driving
24  vehicles, and many of their component parts, were intended for use in interstate commerce. At all times
25  relevant to this Indictment, Google owned all of the Project Chauffeur intellectual property, including
26  but not limited to, the trade secrets at issue. Google was headquartered, and Project Chauffeur
27  maintained offices in, Mountain View, California.
28         2.    In December 2016, after the events outlined in this Indictment, Project Chauffeur became

1    Waymo, a stand-alone company with over 600 employees. Waymo operated alongside Google and

2    other technology companies under the umbrella of Alphabet Inc.

3        3.    Uber Technologies, Inc. ("Uber") began as a ridesharing app in or about 2009. By 2015,

4    Uber had expanded its business to include food delivery and other logistics. That same year, Uber

5    began investing in autonomous vehicle technologies. At all times relevant to this Indictment, Uber was

6    headquartered in San Francisco, California.

7        4.    Anthony LEVANDOWSKI joined Google as an engineer in or about April 2007. He was

8    one of the founding members of Project Chauffeur. In or about 2007, 2009, and 2012,

9    LEVANDOWSKI signed employment agreements with Google. Each employment agreement

10   contained, among other provisions, a Confidential Information paragraph, which obligated

11   LEVANDOWSKI to hold Google's Confidential Information, including trade secrets, in confidence.

12   On or about January 27, 2016, LEVANDOWSKI resigned from Google without notice. At the time of

13   his departure, LEVANDOWSKI was in charge of the Light Detection and Ranging (LiDAR)

14   engineering team within Project Chauffeur.

15       5.    Without disclosing it to Google, in or about the spring of 2012, LEVANDOWSKI

16   participated in the formation of a LiDAR company later incorporated as Odin Wave LLC ("Odin

17   Wave"). Odin Wave had a handful of employees and offices in Berkeley, California. The company

18   worked to develop a high-accuracy mapping LiDAR sensor. In or about late 2013, Odin Wave began

19   doing business as Tyto LiDAR LLC ("Tyto") and moved to offices in San Leandro, California.

20   Paperwork formalizing the name change was filed in or about February 2014. By 2015, Tyto was

21   attempting to market its LiDAR technology to self-driving companies, including Uber.

22       6.    No later than in or about September 2015, LEVANDOWSKI decided to leave Google

23   and form a new self-driving company. LEVANDOWSKI's new company was initially called 280

24   Systems, Inc. but later changed its name to Ottomotto Inc. ("Ottomotto"). In or about fall 2015,

25   LEVANDOWSKI began having discussions with executives at Uber regarding Uber potentially making

26   an investment in or acquiring Ottomotto. Those negotiations intensified in December 2015 and January

27   2016, with Uber and Ottomotto signing a term sheet in February 2016.

28       7.    On or about April 11, 2016, Uber's Board of Directors approved the Uber/Ottomotto

transaction. Shortly thereafter, Ottomotto acquired Tyto. Uber's acquisition of Ottomotto closed in August 2016. (By the time of the acquisition, Ottomotto had been re-incorporated as Ottomotto LLC and Otto Trucking LLC.)

<div align="center">The Technology</div>

8.  The technology and information at issue involved the research, development, and production of LiDAR technology for self-driving vehicles. A LiDAR sensor is typically mounted on the exterior of a self-driving vehicle. It works by sending out an array of high-power, pulsing lasers into the surrounding environment. The laser beams bounce off surrounding objects and return to the sensor, which measures the qualities of the return signals to determine the size, shape, and distance of surrounding objects. Self-driving companies have used LiDAR for critical functions, including but not limited to, mapping and perception. For mapping, LiDAR can be used to create a three-dimensional map of the static environment in which the vehicle will operate. Regarding perception, LiDAR dynamically detects what is happening around a vehicle as it travels through the previously mapped environment. In real time, it provides information to the vehicle about other vehicles, pedestrians, and obstacles on the road.

9.  Through years of research and testing, and millions of dollars in investment, Project Chauffeur developed its own customized LiDAR systems. Those custom systems were used for both mapping and perception and consisted of thousands of individual hardware and software components. The success of the LiDAR effort was critical to the overall success of Project Chauffeur. Moreover, having custom LiDAR, as opposed to commercially available LiDAR, was a key differentiator between Project Chauffeur and its competitors in the 2015 and 2016 timeframe.

10. The Google employees working on Project Chauffeur used secure, password-protected repositories to store their files, with access available to employees in the course of their job responsibilities, as authenticated by valid user credentials. Project Chauffeur's repositories included the following:

    a.  SVN: Project Chauffeur engineers used computer-assisted design (CAD) software to design hardware, including custom LiDAR. CAD files, including circuit board drawings and schematics, were housed on a subversion, or SVN, server hosted on Google's network. To

1   access SVN, Project Chauffeur employees had to email the SVN administrator to request a

2   username and password.

3       b.   <u>Google Drive</u>: The Project Chauffeur team used Google's corporate drive as a repository

4   for non-CAD files, such as presentations and spreadsheets.  Only Google employees could

5   access this Drive, after authentication of their credentials on the Google network.

6       11.   In the months before his departure from Google, LEVANDOWSKI downloaded

7   thousands of Project Chauffeur files.  On or about December 11, 2015, he downloaded approximately

8   14,000 files from SVN.  These files contained critical engineering information about the hardware used

9   on Project Chauffeur self-driving vehicles, including schematics for the printed circuit boards used in

10  various custom LiDAR products.  On or about December 14, 2015, LEVANDOWSKI transferred the

11  SVN files from his Google laptop to his personal laptop.  Additionally, between in or about October

12  2015 and January 2016, LEVANDOWSKI downloaded, directly to his personal laptop, at least 20 files

13  from the Google Drive, including instructions for calibrating and tuning Google's custom LiDAR and an

14  internal tracking document setting forth, among other things, technical goals for each team within

15  Project Chauffeur.

16

17  COUNTS ONE THROUGH THIRTY-THREE: (18 U.S.C. §§ 1832(a)(1), (2), (3) & (4) – Theft and
    Attempted Theft of Trade Secrets)

18

19      12.   The allegations contained in Paragraphs 1 through 11 are realleged and incorporated as if

20  fully set forth herein.

21      13.   On or about the dates set forth in the separate counts below, in the Northern District of

22  California and elsewhere, the defendant,

23                    ANTHONY SCOTT LEVANDOWSKI,

24  intending to convert a trade secret that was related to a product and service used in and intended for use

25  in interstate and foreign commerce to the economic benefit of anyone other than the owner of that trade

26  secret, and knowing and intending that the offense would injure the owner of that trade secret, as

27  specifically alleged in each of Counts One through Thirty-three below:

28      a.   knowingly stole, and without authorization appropriated, took, carried away, concealed,

and by fraud, artifice, and deception obtained trade secrets belonging to Google, and attempted to do so;

   b.   knowingly and without authorization copied, duplicated, sketched, drew, downloaded, uploaded, altered, photocopied, replicated, transmitted, delivered, sent, communicated, and conveyed trade secrets belonging to Google and attempted to do so; and

   c.   knowingly and without authorization received, bought, and possessed trade secrets belonging to Google, and attempted to do so, knowing the same to have been stolen and appropriated, obtained, and converted without authorization:

| Count | Date | File Name | Description | Source |
|-------|------|-----------|-------------|--------|
| One | 12-11-15 | projects/Laser/GBr/gbr-laser-module/3-1-0/gbr-laser-moduleA-3-1-0/laserA.PcbDoc | Transmit Block Configuration | SVN |
| Two | 12-11-15 | projects/Laser/GBr/gbr-laser-module/3-1-0/gbr-laser-moduleB-3-1-0/laserB.PcbDoc | Transmit Block Configuration | SVN |
| Three | 12-11-15 | projects/Laser/GBr/gbr-laser-module/3-1-0/gbr-laser-moduleC-3-1-0/laserC.PcbDoc | Transmit Block Configuration | SVN |
| Four | 12-11-15 | projects/Laser/GBr/gbr-laser-module/3-1-0/gbr-laser-moduleD-3-1-0/laserD.PcbDoc | Transmit Block Configuration | SVN |
| Five | 12-11-15 | projects/Laser/GBr/gbr-laser-module/3-1-0/gbr-laser-moduleE-3-1-0/laserE.PcbDoc | Transmit Block Configuration | SVN |
| Six | 12-11-15 | projects/Laser/GBr/gbr-laser-module/3-1-0/gbr-laser-moduleF-3-1-0/LsrBrdF.PcbDoc | Transmit Block Configuration | SVN |
| Seven | 12-11-15 | projects/Laser/GBr/gbr-motherboard/gbr-motherboard_3-0-0/receiver.SchDoc | Receiver Schematic and Structure | SVN |
| Eight | 12-11-15 | projects/Laser/GBr/gbr-motherboard/gbr-motherboard_3-0-0/DAC_rcvr.SchDoc | Receiver DAC Circuit | SVN |
| Nine | 12-11-15 | projects/Laser/GBr/gbr-motherboard/gbr-motherboard_3-0-0/flop.SchDoc | Receiver Flip-flop Circuit | SVN |
| Ten | 12-11-15 | projects/Laser/GBr/gbr-motor/gbr-motor_2-5-0/gbr-motor.PcbDoc | Motor Design | SVN |
| Eleven | 12-11-15 | projects/Laser/PBr/pbr-motor-pcb/pbr-motor-pcb_1-1-4/pbr-motor.PcbDoc | Motor Design | SVN |

| Twelve | 12-11-15 | projects/Laser/PBr/pbr-flex-clock/pbr-flex-clock_1-4-1/pbr-flex-clock. PcbDoc | Use and Structure of a Flex PCB | SVN |
| Thirteen | 12-11-15 | projects/Laser/PBr/pbr-receiver/pbr-receiver_1-4-1/apd.SchDoc | APD Circuit Design | SVN |
| Fourteen | 12-11-15 | projects/Laser/PBr/pbr-motherboard/pbr-motherboard-1-14-0/receiver.SchDoc | Receiver Schematic and Structure | SVN |
| Fifteen | 12-11-15 | projects/Laser/PBr/pbr-motherboard/pbr-motherboard-1-14-0/DAC_rcvr.SchDoc | Receiver DAC Circuit | SVN |
| Sixteen | 12-11-15 | projects/Laser/PBr/pbr-motherboard/pbr-motherboard-1-14-0/flop.SchDoc | Receiver Flip-flop Circuit | SVN |
| Seventeen | 12-11-15 | projects/Laser/PBr/pbr-motherboard/pbr-motherboard-1-14-0/APD_BIAS.SchDoc | APD Circuit Design | SVN |
| Eighteen | 12-11-15 | projects/Laser/KBr/kbr-motherboard/kbr-motherboard-1-5-0/pulse_shaper.SchDoc | Pulse Control Circuit | SVN |
| Nineteen | 12-11-15 | projects/Laser/TBr/tbr-motherboard/tbr-motherboard_4-2-0/receiver.SchDoc | Receiver Schematic and Structure | SVN |
| Twenty | 12-11-15 | projects/Laser/TBr/tbr-motherboard/tbr-motherboard_4-2-0/DAC_rcvr.SchDoc | Receiver DAC Circuit | SVN |
| Twenty-one | 12-11-15 | projects/Laser/TBr/tbr-motherboard/tbr-motherboard_4-2-0/flop.SchDoc | Flip-flop Circuit | SVN |
| Twenty-two | 12-11-15 | projects/Laser/YBr/ybr-pulser/ybr-pulser_1-1-0/driver.SchDoc | Laser Pulse Driver Design | SVN |
| Twenty-three | 12-11-15 | projects/Laser/YBr/ybr-rx-module/ybr-rx-module_1-0-0/ybr-rx_module.SchDoc | Receiver Module Design | SVN |
| Twenty-four | 12-11-15 | projects/Laser/BBr/bbr-motherboard/bbr-motherboard_1-0-0/driver.SchDoc | Laser Pulse Driver Design | SVN |
| Twenty-five | 12-11-15 | projects/Laser/CBr/laser_module_test/laser_module_test_1-0-2B/laser.SchDoc | Laser Pulser Circuit Schematic | SVN |
| Twenty-six | 12-11-15 | projects/Laser/CBr/laser_module_test/spice_sim/laser_module_1-0-1.asc | Simulation Models for Laser Pulser Circuit | SVN |
| Twenty-seven | 11-19-15 | Google Fiber Laser for Lidar | Presentation re Project Chauffeur's Unique Fiber Laser Design | Google Drive |

| Twenty-eight | 12-18-15 | Thermal Rotary Coupling | Presentation re LiDAR Engineering Issue | Google Drive |
|---|---|---|---|---|
| Twenty-nine | 01-04-16 | PBR Intensity Calibration | Instructions for how to calibrate long-range LiDAR intrinsic properties once it is installed on vehicle | Google Drive |
| Thirty | 01-04-16 | Pbr Extrinsic Calibration | Instructions for how to calibrate long-range LiDAR to function properly with mid-range LiDAR on vehicle | Google Drive |
| Thirty-one | 01-04-16 | Tx and Rx tuning Instructions | Instructions for checking that the laser in the long-range LiDAR is positioned correctly and meets certain criteria | Google Drive |
| Thirty-two | 01-04-16 | TBR TESTING STATION | Manual for various quality control tests and assembly steps to be performed on short-range LiDAR during manufacturing | Google Drive |
| Thirty-three | 01-11-16 | Chauffeur TL weekly updates - Q4 2015 | Internal Project Chauffeur Tracking and Planning Document | Google Drive |

Each in violation of Title 18, United States Code, Sections 1832(a)(1), (2), (3) & (4).

FORFEITURE ALLEGATION:  (18 U.S.C. §§ 1834 and 2323 – Proceeds and Property Involved in Theft of Trade Secrets)

14.     The allegations contained in Counts One through Thirty-three of this Indictment are hereby realleged and incorporated as if fully set forth here.  Upon conviction of any of those offenses, the defendant,

ANTHONY SCOTT LEVANDOWSKI,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 1834 and 2323, any property used, or intended to be used, in any manner or part to commit or facilitate the

INDICTMENT

1  commission of the offenses, and any property constituting or derived from any proceeds obtained

2  directly or indirectly as a result of the commission of the offenses.

3      15.     If any of the property described above, as a result of any act or omission of the defendant:

4          a.     cannot be located upon the exercise of due diligence;

5          b.     has been transferred or sold to, or deposited with, a third party;

6          c.     has been placed beyond the jurisdiction of the court;

7          d.     has been substantially diminished in value; or

8          e.     has been commingled with other property which cannot be divided without

9          difficulty,

10  the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21,

11  United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 2323(b).

12      All pursuant to Title 18, United States Code, Sections 1834 and 2323.

13

14  DATED: 8-15-19                                          A TRUE BILL.

15

16                                                          FOREPERSON

17

18  DAVID L. ANDERSON
    United States Attorney
19

20  Katherine L. Wawrzyniak
21  KATHERINE L. WAWRZYNIAK
    ANDREW F. DAWSON
22  AMIE D. ROONEY
    Assistant United States Attorneys
23

24

25

26

27

28

AO 257 (Rev. 6/78)

~~SEALED BY ORDER OF COURT~~

| DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT |
|---|

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT

☐ SUPERSEDING

─── OFFENSE CHARGED ───

18 U.S.C. § 1832(a)(1), (2), (3) & (4) – Theft and Attempted
Theft of Trade Secrets; and
18 U.S.C. §§ 1843 and 2323 – Criminal Forfeiture.

☐ Petty
☐ Minor
☐ Misde-
   meanor
☒ Felony

PENALTY: Maximum Penalties (per Count):
10 years imprisonment;
$250,000 fine, or twice the gross gain/loss;
$100 special assessment; and
3 years' supervised release.

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

─── DEFENDANT - U.S ───

Anthony Scott Levandowski

DISTRICT COURT NUMBER **LHK**

**CR 19 00377 SVK**

─── DEFENDANT ───

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior
summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**FILED**

**IS IN CUSTODY**
AUG 15 2019
4) ☐ On this charge
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
5) ☐ On another conviction    NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE
6) ☐ Awaiting trial on other charges    ☐ Federal ☐ State
If answer to (6) is "Yes", show name of institution

─── PROCEEDING ───

Name of Complaintant Agency, or Person (& Title, if any)

Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court,
give name of court

☐ this person/proceeding is transferred from another district
per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on motion
of:                                SHOW
☐ U.S. ATTORNEY ☐ DEFENSE    DOCKET NO.

☐ this prosecution relates to a
pending case involving this same
defendant                          MAGISTRATE
                                   CASE NO.
☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding this
defendant were recorded under

Name and Office of Person
Furnishing Information on this form    DAVID L. ANDERSON

☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)    Katherine L. Wawrzyniak

Has detainer ☐ Yes    If "Yes"
been filed?  ☐ No      give date
                       filed

DATE OF        Month/Day/Year
ARREST ▶

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED    Month/Day/Year
TO U.S. CUSTODY ▶

☐ This report amends AO 257 previously submitted

─── ADDITIONAL INFORMATION OR COMMENTS ───

PROCESS:
☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT    Bail Amount: No bail

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance    * Where defendant previously apprehended on complaint, no new summons or
Defendant Address:                      warrant needed, since Magistrate has scheduled arraignment

Date/Time:              Before Judge:

Comments:



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

## CRIMINAL COVER SHEET

**_Instructions:_** _Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case._

| | | |
|---|---|---|
| **CASE NAME:** | **CASE NUMBER:** | |
| USA v. Anthony Scott Levandowski | CR 19 00377 LHK SVK | |

| | | | |
|---|---|---|---|
| **Is This Case Under Seal?** | Yes ✓ | No | |
| **Total Number of Defendants:** | 1 ✓ | 2-7 | 8 or more |
| Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326? | Yes | No ✓ | |
| Venue (Per Crim. L.R. 18-1): | SF | OAK | SJ ✓ |
| Is this a potential high-cost case? | Yes | No ✓ | |
| Is any defendant charged with a death-penalty-eligible crime? | Yes | No ✓ | |
| Is this a RICO Act gang case? | Yes | No ✓ | |

**Assigned AUSA (Lead Attorney):** Katherine L. Wawrzyniak    **Date Submitted:** 08/15/2019

**Comments:**

Government will be filing a notice of related case to Waymo v. Uber, et al., 17-cv-939 WHA.

Form CAND-CRIM-COVER (Rev. 11/16)

RESET FORM    SAVE PDF

VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 7

1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   AMIE D. ROONEY (CABN 215324)
    KATHERINE L. WAWRZYNIAK (CABN 252751)
5   ANDREW F. DAWSON (CABN 264421)
    Assistant United States Attorneys
6
          450 Golden Gate Avenue, Box 36055
7         San Francisco, California 94102-3495
          Telephone: (415) 436-7200
8         FAX: (415) 436-7234
          Amie.Rooney@usdoj.gov
9         Katherine.Wawrzyniak@usdoj.gov
          Andrew.Dawson@usdoj.gov
10
11  Attorneys for United States of America

12                UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO DIVISION

15

16  UNITED STATES OF AMERICA,              )   NO. CR 19-377 WHA
                                           )
17          Plaintiff,                     )   STIPULATED MOTION TO SET
                                           )   CONSOLIDATED HEARING FOR CHANGE OF
18      v.                                 )   PLEA AND SENTENCING
                                           )
19  ANTHONY SCOTT LEVANDOWSKI,             )
                                           )
20          Defendant.                     )
                                           )
21  _____)

22          The parties in this matter have reached an agreement to resolve this case.  An executed plea

23  agreement, attached hereto as Exhibit A, reflects the parties' agreement.  Pursuant to General Order 72,

24  the parties agree and hereby move that the guilty plea and sentencing should be consolidated for a date

25  after the presentence report has been prepared, and that this matter should be referred to the Probation

26  Office.  The parties further request that, in light of the enclosed plea agreement, the Court vacate any

27  //

28
    STIPULATED MOTION RE CHANGE OF PLEA        1
    CR 19-377 WHA

1 │ pending discovery or motion deadlines that would otherwise occur in the interim.

2

3 │                                         DAVID L. ANDERSON
    │                                         United States Attorney

4

5 │ Dated: March 19, 2020                   _____/s/ Amie D. Rooney_____
    │                                         AMIE D. ROONEY
6 │                                         KATHERINE L. WAWRZYNIAK
    │                                         ANDREW F. DAWSON
7 │                                         Assistant United States Attorneys

8

9 │ Dated: March 19, 2020                   _____/s/ Miles Ehrlich_____
    │                                         MILES EHRLICH
10 │                                         ISMAIL RAMSEY
    │                                         Attorneys for Defendant
11

12

13 │                          **[PROPOSED] ORDER**

14 │        The parties having stipulated and good cause appearing therefor, it is hereby ORDERED that this

15 │ matter be set for a consolidated change of plea and sentencing hearing on _____ at 2:00pm. It

16 │ is further ORDERED that this matter be referred to the Probation Office for preparation of a presentence

17 │ report. Any pending discovery or motion deadlines occurring in the interim are hereby VACATED.

18

19 │ Dated: March __ , 2020

20

21 │                                         _____
22 │                                         HON. WILLIAM ALSUP
    │                                         United States District Judge
23

24

25

26

27

28

# EXHIBIT A

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  AMIE D. ROONEY (CABN 215324)
   KATHERINE L. WAWRZYNIAK (CABN 252751)
5  ANDREW F. DAWSON (CABN 264421)
   Assistant United States Attorneys
6
        450 Golden Gate Avenue, Box 36055
7       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
8       FAX: (415) 436-7234
        Amie.Rooney@usdoj.gov
9       Katherine.Wawrzyniak@usdoj.gov
        Andrew.Dawson@usdoj.gov
10

11  Attorneys for United States of America

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15

16   UNITED STATES OF AMERICA,          )   NO. CR 19-377 WHA
                                        )
17           Plaintiff,                 )   PLEA AGREEMENT
                                        )
18                                      )
       v.                               )
19                                      )
     ANTHONY SCOTT LEVANDOWSKI,         )
20                                      )
           Defendant.                   )
21   _____)

22

23         I, Anthony Scott Levandowski, and the United States Attorney's Office for the Northern District

24   of California (hereafter "the government") enter into this written Plea Agreement (the "Agreement")

25   pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

26   The Defendant's Promises

27         1.      I agree to plead guilty to Count Thirty-Three of the captioned Indictment, charging me

28

     PLEA AGREEMENT                           1                          v. 11/21/2019
     CR 19-377 WHA

1  with Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). I
2  agree that the elements of the offense are as follows: (1) I intended to convert a trade secret to the
3  economic benefit of anyone other than the owner thereof; (2) The trade secret is related to a product
4  used in or intended for use in interstate or foreign commerce; (3) I intended or knew that the offense
5  would injure any owner of that trade secret; and (4) I stole, or without authorization, appropriated, took,
6  carried away, or concealed such information.

7  I agree that the maximum penalties are as follows:

8  a.  Maximum prison term                         10 years
9  b.  Maximum fine                                $ 250,000
10 c.  Restitution
11 d.  Maximum supervised release term             3 years
12 e.  Mandatory special assessment                $100
13 f.  Forfeiture

14  2.  I agree that I am guilty of the offense to which I am pleading guilty, and I agree that the
15 following facts are true:  In April 2007, I joined Google Inc. ("Google") as part of the VuTool team,
16 which Google acquired to build out Google Street View.  In or about 2009, I co-founded Google's
17 "Project Chauffeur," which was the name given to Google's self-driving car program.  I worked in
18 Google's self-driving car program for approximately seven years.  In the course of my employment, I
19 was aware that my employment agreement obligated me to keep Google's valuable non-public
20 information confidential, and I understood that non-public information related to Project Chauffeur was
21 sensitive and subject to this confidentiality requirement.

22  In late 2015, I considered leaving Google to start a new self-driving company.  My new company
23 was initially called 280 Systems, Inc., but it later changed its name to Ottomotto Inc. ("Ottomotto").
24 Around the same time, I began having discussions with executives at Uber Technologies, Inc. ("Uber")
25 regarding Uber's potential investment in, or acquisition of, Ottomotto.  These negotiations intensified in
26 December 2015, while I was still a Google employee.  Uber ultimately acquired Ottomotto in or about
27 August 2016.

28

PLEA AGREEMENT                    2
CR 19-377 WHA

1     My employment with Google ended on or about January 27, 2016. Prior to my departure, I
2  downloaded thousands of files related to Project Chauffeur. On or about December 11, 2015, I
3  downloaded approximately 14,000 files from an internal, password-protected Google server known as
4  "SVN," which was hosted on Google's network. On or about December 14, 2015, I transferred those
5  SVN files from my Google-issued laptop to my personal laptop.

6     In addition, prior to my departure from Google, I downloaded a variety of files from a corporate
7  Google Drive repository to my personal laptop. I downloaded these files with the intent to use them for
8  my own personal benefit, and I understand that I was not authorized to take the files for that purpose.

9     In all, I downloaded at least 20 files from Google Drive between October 2015 and January
10  2016, including an internal tracking document entitled "Chauffeur TL weekly updates – Q4 2015"
11  (hereinafter, the "Chauffeur Weekly Update"). I downloaded this file with the intent to use it for the
12  benefit of someone other than Google. The Chauffeur Weekly Update contained a variety of details
13  regarding the status of Google's self-driving car program. It included the Project Chauffeur team's
14  quarterly goals and weekly metrics, my team's OKRs (objectives and key results), as well as summaries
15  of technical challenges currently faced by the program and notes related to previous challenges that had
16  been overcome. I downloaded the Chauffeur Weekly Update to my personal laptop on or about January
17  11, 2016, and I accessed the document after my resignation from Google, which occurred on or about
18  January 27, 2016. In particular, I understand and admit that, as indicated by a third-party review of my
19  laptop, I last accessed this file on February 24, 2016, nearly a month after my departure from Google.

20     I admit that, as of January and February 2016, the Chauffeur Weekly Update was Google's
21  property and qualified as a trade secret. The document was not generally known or readily ascertainable
22  through proper means by another person in the public who could obtain economic value from the
23  disclosure or use of the information. Google took reasonable measures to keep the document secret, and
24  the document derived independent economic value, actual or potential, from being secret. I further
25  admit that I intended to convert the Chauffeur Weekly Update to the economic benefit of somebody
26  other than the owner. In particular, I intended to use the Chauffeur Tracking Document to benefit
27  myself and Uber. I also admit that the Chauffeur Weekly Update is related to Google's self-driving car
28

PLEA AGREEMENT                    3
CR 19-377 WHA

1  technology, which is a product intended for use in interstate and foreign commerce, and that I knew that

2  my misappropriation and unauthorized possession of the Chauffeur Weekly Update would injure

3  Google.

4       Finally, I agree that for purposes of the Sentencing Guidelines, the loss value for purposes of §

5  2B1.1 of the United States Sentencing Guidelines is more than $550,000 but less than or equal to

6  $1,500,000. The government and I agree that this represents a reasonable estimate of a loss attributable

7  to my offense conduct, a loss that is real, but difficult to calculate. I understand that Google and its

8  successor-in-interest, Waymo, are not bound by the parties' agreement and may assert in this or future

9  proceedings that the loss amount associated with the Chauffeur Weekly Update is lower or higher.

10      3.    I agree to give up all rights that I would have if I chose to proceed to trial, including the

11  rights to a jury trial with the assistance of an attorney; to confront and cross-examine government

12  witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth

13  Amendment claims; to any further discovery from the government; and to pursue any affirmative

14  defenses and present evidence.

15      4.    I agree to give up my right to appeal my conviction, including constitutional challenges

16  to the statute of conviction. I agree to give up my right to appeal the judgment and all orders of the

17  Court. I also agree to give up my right to appeal any aspect of my sentence, including any orders

18  relating to forfeiture and/or restitution, reserving only my right to claim that my sentence violated this

19  plea agreement, applicable law, or the Constitution. I reserve my right to claim that my counsel was

20  ineffective. I understand that this waiver includes, but is not limited to, any and all constitutional or

21  legal challenges to my conviction and guilty plea, including arguments that the statute to which I am

22  pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is

23  insufficient to support my plea of guilty.

24      5.    I agree not to file any collateral attack on my conviction or sentence, including a petition

25  under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, except that I reserve my right to claim that my counsel was

26  ineffective. I also agree not to seek relief under 18 U.S.C. § 3582.

27      6.    I agree not to ask the Court to withdraw my guilty plea at any time after it is entered. In

28

PLEA AGREEMENT         4
CR 19-377 WHA

1 the event I violate any of the terms of the Agreement, I agree that the facts set forth in Paragraph 2 of
2 this Agreement and, if applicable, the fact that I made a sworn admission to them in a previous court
3 proceeding, shall be admissible against me in any subsequent proceeding, including at trial. In any
4 subsequent proceeding conducted after I violate any of the terms of the Agreement, I expressly waive
5 any and all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 with regard to the facts set forth in
6 Paragraph 2 of the Agreement and, if applicable, the fact that I made a sworn admission to them at a
7 previous court proceeding.

8      7.    I understand that the Court must consult the United States Sentencing Guidelines and
9 take them into account when sentencing, together with the factors set forth in 18 U.S.C. § 3553(a). I
10 also understand that the Court is not bound by the Guidelines calculations below; the Court may
11 conclude that a higher Guidelines range applies to me, and, if it does, I will not be entitled, nor will I
12 ask, to withdraw my guilty plea. I further agree that regardless of the sentence that the Court imposes on
13 me, I will not be entitled, nor will I ask, to withdraw my guilty plea. I agree that the Sentencing
14 Guidelines offense level should be calculated as set forth below, and that I will not request a downward
15 departure under the Sentencing Guidelines from that offense level, although I reserve the right to seek a
16 downward variance based on the factors set forth in 18 U.S.C. § 3553(a). I understand that the
17 government is free to oppose any such request. The parties have reached no agreement regarding my
18 Criminal History Category.

19      a.    Base Offense Level, U.S.S.G. § 2B1.1:                       6

20      b.    Specific offense characteristics under U.S.S.G. Ch. 2       + 14
21            (More than $550,000, but less than or equal to $1,500,000)

22      c.    Acceptance of Responsibility:                    - 3
           If I meet the requirements of U.S.S.G. § 3E1.1, I may be entitled to a
23            three-level reduction for acceptance of responsibility, provided that I
           forthrightly admit my guilt, cooperate with the Court and the Probation
24            Office in any presentence investigation ordered by the Court, and continue
           to manifest an acceptance of responsibility through and including the time
25            of sentencing.

26      d.    Adjusted Offense Level:                         17

27      8.    I agree that regardless of any other provision of this Agreement, the government may and

28

PLEA AGREEMENT              5
CR 19-377 WHA

1  will provide the Court and the Probation Office with all information relevant to the charged offense and

2  the sentencing decision, including Victim Impact Statements. I agree that, based on the nature of the

3  offense, the Court should impose the following special condition of supervised release which is

4  reasonably related to deterrence and rehabilitation:

> Special Condition (Searches)
> The defendant shall submit his person, residence, office, vehicle, electronic devices and their data (including cell phones, computers, and electronic storage media), and any property under defendant's control to a search. Such a search shall be conducted by a United States Probation Officer or any federal, state, or local law enforcement officer at any time, with or without suspicion. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

10      9.    I agree that I will make a good-faith effort to pay any fine, forfeiture, or restitution I am

11  ordered to pay. I agree to pay the special assessment at the time of sentencing.

12      I agree to pay full restitution for all losses caused by all the schemes or offenses with which I

13  was charged in this case, and I understand that the amount of restitution will not be limited to the loss

14  attributable to the count to which I am pleading guilty, pursuant to 18 U.S.C. § 3663(a)(3). I understand

15  that the Court will not consider my economic circumstances in determining the restitution amount. I

16  agree to pay restitution in the amount of $756,499.22, which represents costs incurred by Waymo and/or

17  Google in the course of assisting the government's investigation and is not related to a calculation of the

18  value of the technology at issue. I agree that those costs were reasonably incurred by Waymo and/or

19  Google and that they are recoverable in restitution under the Mandatory Victims Restitution Act. The

20  parties agree that this amount constitutes full restitution in this case.

21      Any restitution payments shall be paid through the Office of the Clerk of the District Court by

22  bank or cashier's check or money order made payable to the "Clerk, United States District Court."

23      I understand that the restitution described above creates a lien in favor of the United States on all

24  property and rights to property I may possess upon entry of judgment and continues for the later of 20

25  years from the entry of judgment or 20 years after release from imprisonment or until the debt is paid in

26  full. I further understand the government will record a notice of the lien in any county where I reside or

27  have property. I further understand that this order of restitution cannot be discharged in bankruptcy and

28

PLEA AGREEMENT      6
CR 19-377 WHA

1    that if I default on the payment of a fine or restitution, the Court may revoke probation or a term of
2    supervised release, modify the terms or conditions of probation or supervised release, resentence me,
3    hold me in contempt of court, order the sale of property, enter or adjust a payment schedule, or take any
4    other action necessary to obtain compliance.

5       Within thirty days of the execution of this Plea Agreement, if asked by the Financial Litigation
6    Unit ("FLU") of the United States Attorney's Office, I agree to complete, under penalty of perjury, a
7    financial statement provided by the U.S. Attorney's Office and to update that statement with material
8    changes within seven days of the change. I understand that I must identify all assets and financial
9    interests valued at more than $1,000. I further understand that these assets and financial interests
10   include all assets and financial interests in which I have an interest, direct or indirect, whether held in
11   my own name or in the name of another, in any property, real or personal.

12       I agree to surrender assets I obtained as a result of my crimes, and release funds and property
13   under my control in order to pay any fine, forfeiture, or restitution. I further agree to notify the FLU
14   before transferring any interest in property owned directly or indirectly by me, including any interest
15   held or owned under any other name or entity, including trusts, partnerships, and/or corporations. I also
16   agree to notify the FLU of any interest in property I may obtain, directly or indirectly, which is valued at
17   more than $1,000, and which includes any interest obtained under any other name, or entity, including a
18   trust, partnership, or corporation, after the execution of this Plea Agreement until the fine or restitution
19   is paid in full.

20       I agree that any fine, forfeiture, or restitution imposed by the Court against me will be due
21   immediately and subject to immediate enforcement by the government as authorized by 18 U.S.C.
22   § 3613. I further understand that the government may seek immediate collection of the entire fine,
23   forfeiture, or restitution from any assets without regard to any schedule of payments imposed by the
24   Court or established by the Probation Office and that monetary penalties imposed by the Court will be
25   submitted to the Treasury Offset Program so that any federal payment or transfer of returned property I
26   receive may be offset and applied to federal debts.

27       10.    I agree not to commit or attempt to commit any crimes before sentence is imposed or

28

PLEA AGREEMENT         7
CR 19-377 WHA

1  before I surrender to serve my sentence. I also agree not to violate the terms of my pretrial release; not
2  to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the
3  government; and not to fail to comply with any of the other promises I have made in this Agreement. I
4  agree not to harass, annoy, or intimidate any witnesses in this case, either directly or indirectly, before
5  and after I am sentenced. This includes, but is not limited to, personal contact, telephone, mail, or
6  electronic mail contact, or any other written form of communication. I agree that the Court may also
7  include this provision as a condition of my supervised release term. I agree that if I fail to comply with
8  any promises I have made in this Agreement, then the government will be released from all of its
9  promises in this Agreement, including those set forth in The Government's Promises Section below, but
10 I will not be released from my guilty plea.

11     11.    I agree that this Agreement contains all of the promises and agreements between the
12 government and me, and I will not claim otherwise in the future. No modification of this Agreement
13 shall be effective unless it is in writing and signed by all parties.

14     12.    I agree that the Agreement binds the U.S. Attorney's Office for the Northern District of
15 California only, and does not bind any other federal, state, or local agency.

16 The Government's Promises

17     13.    The government agrees to move to dismiss any open charges pending against the
18 defendant in the captioned Indictment at the time of sentencing.

19     14.    The government agrees not to file any additional charges against the defendant that could
20 be filed as a result of the investigation that led to the captioned Indictment.

21     15.    The government agrees to support the Guidelines calculation set out in paragraph 7 and to
22 recommend a sentence within the range associated with that calculation, unless the defendant violates
23 the terms of the Agreement above or fails to accept responsibility.

24 The Defendant's Affirmations

25     16.    I confirm that I have had adequate time to discuss this case, the evidence, and the
26 Agreement with my attorney and that my attorney has provided me with all the legal advice that I
27 requested.

28

PLEA AGREEMENT                    8
CR 19-377 WHA

1      17.   I confirm that while I considered signing this Agreement, and at the time I signed it, I
2 was not under the influence of any alcohol, drug, or medicine that would impair my ability to understand
3 the Agreement.

4      18.   I confirm that my decision to enter a guilty plea is made knowing the charge that has
5 been brought against me, any possible defense, and the benefits and possible detriments of proceeding to
6 trial. I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or
7 threatened me to enter into this Agreement.

8 Dated: 3/19/20

ANTHONY SCOTT LEVANDOWSKI
Defendant

DAVID L. ANDERSON
United States Attorney

Dated: 03/19/2020

AMIE D. ROONEY
KATHERINE L. WAWRZYNIAK
ANDREW F. DAWSON
Assistant United States Attorneys

16      19.   I have fully explained to my client all the rights that a criminal defendant has and all the
17 terms of this Agreement. In my opinion, my client understands all the terms of this Agreement and all
18 the rights my client is giving up by pleading guilty, and, based on the information now known to me, my
19 client's decision to plead guilty is knowing and voluntary.

Dated: 3/19/2020

MILES EHRLICH
ISMAIL RAMSEY
Attorneys for Defendant

PLEA AGREEMENT
CR 19-377 WHA
9

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 8

EXECUTION

AGREEMENT AND PLAN OF MERGER

by and among

Otto Trucking LLC, a Delaware limited liability company;

Uber Technologies, Inc., a Delaware corporation;

Apparate International C.V., a limited partnership;

Zing Merger Sub II, LLC, a Delaware limited liability company; and

the Company Unitholder Representative

Dated as of April 11, 2016

129068510 v9

CONFIDENTIAL









































































































Case 3:17-cv-00939-WHA   Document 2720-3   Filed 11/05/20   Page 581 of 630



Case: 20-03050   Doc# 63-1   Filed: 10/13/20   Entered: 10/13/20 18:09:09   Page 472 of 519































REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 9

1   Debra I. Grassgreen (CA Bar No. 169978)
    Miriam Manning (CA Bar No. 178584)
2   PACHULSKI STANG ZIEHL & JONES LLP
    150 California Street, 15th Floor
3   San Francisco, CA 94111
    Telephone:   (415) 263-7000
4   Facsimile:   (415) 263-7010
    E-mail:      dgrassgreen@pszjlaw.com
5                mmanning@pszjlaw.com

6   David J. Bradford (admitted *pro hac vice*)
    Catherine Steege (admitted *pro hac vice*)
7   Terri L. Mascherin (admitted *pro hac vice*)
    Katharine R. Ciliberti (admitted *pro hac vice*)
8   JENNER & BLOCK LLP
    353 N. Clark St.
9   Chicago, IL 60654
    Telephone: (312) 222-9350
10  E-mail: dbradford@jenner.com
            csteege@jenner.com
11          tmascherin@jenner.com
            kciliberti@jenner.com
12  *Counsel for Uber Technologies, Inc.*

13              **UNITED STATES BANKRUPTCY COURT**
14              **NORTHERN DISTRICT OF CALIFORNIA**
                **SAN FRANCISCO DIVISION**
15  | | |
    |---|---|
    In re:                                    | Case No. 20-30242 (HLB)
16                                            |
    ANTHONY SCOTT LEVANDOWSKI,                | Chapter 11
17                              Debtor.       |

18  ANTHONY SCOTT LEVANDOWSKI, an             | Adv. Pro. No. 20-03050 (HLB)
    individual,                               |
19                              Plaintiff,    | **CERTIFICATE OF SERVICE OF:**
20       v.                                   | **[REDACTED] ANSWER TO DEBTOR'S**
                                              | **FIRST AMENDED COMPLAINT FOR**
    UBER TECHNOLOGIES, INC.                   | **DECLARATORY RELIEF, SPECIFIC**
21                              Defendant.    | **PERFORMANCE, DAMAGES, AND**
                                              | **OBJECTION TO CLAIM; AFFIRMATIVE**
22                                            | **DEFENSES; AND COUNTERCLAIMS**
23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1

## CERTIFICATE OF SERVICE

2

I, Hung Phan, am employed in the city and county of San Francisco, State of California. I am over the age of 18 and not a party to the within action; my business address is 150 California Street, 15th Floor, San Francisco, California 94111-4500.

3

4

On **October 13, 2020**, I caused to be served the following documents in the manner stated below:

5

6

**[REDACTED] ANSWER TO DEBTOR'S FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, SPECIFIC PERFORMANCE, DAMAGES, AND OBJECTION TO CLAIM; AFFIRMATIVE DEFENSES; AND COUNTERCLAIMS**

7

8

**1.  BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**  Pursuant to controlling General Orders and LBR, the foregoing document was served by the court via NEF and hyperlink to the document.  On **October 13, 2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

9

10

- John W. Berry    john.berry@mto.com, lori.cruz@mto.com
- Alexander S. Gorin    alex.gorin@mto.com, cindi.richardson@mto.com
- Debra I. Grassgreen    dgrassgreen@pszjlaw.com, hphan@pszjlaw.com
- Tobias S. Keller    tkeller@kbkllp.com
- Dara Levinson Silveira    dsilveira@kbkllp.com, hrobertsdonnelly@kbkllp.com
- Andrew R. Lewis    andrew.lewis@mto.com, aileen.beltran@mto.com
- Brett M. Schuman    bschuman@goodwinlaw.com, pdukemosier@goodwinlaw.com
- Hong-An Vu    HVu@goodwinlaw.com, ASkorostensky@goodwinlaw.com
- Rachel M. Walsh    rwalsh@goodwinlaw.com

11

12

13

14

15

16

17

**2.   BY EMAIL:** I caused to be served the above-described document by email to the parties indicated on the attached service list at the indicated email address.

18

*Attorneys for Google LLC*

19

**Munger, Tolles & Olson LLP**
Thomas B. Walper   thomas.walper@mto.com
John W. Berry   john.berry@mto.com

20

**Keker, Van Nest & Peters LLC**
Rachael E. Meny   rmeny@keker.com
Thomas E. Gorman   tgorman@keker.com

21

*Attorneys for Anthony S. Levandowski*

**Keller Benvenutti Kim LLP**
Tobias S. Keller   tkeller@kbkllp.com
Dara L. Silveira   dsilveira@kbkllp.com

**Goodwin Procter LLP**
Brett M. Schuman   bschuman@goodwinlaw.com
Rachel M. Walsh   rwalsh@goodwinlaw.com
Hong-An Vu   hvu@goodwinlaw.com

22

23

24

I declare under penalty of perjury, under the laws of the State of California and the United States of America that the foregoing is true and correct.

25

Executed on **October 13, 2020** at San Francisco, California.

26

*/s/ Hung Phan*

27

*Legal* Assistant

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA